ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON C. DAVIS (253370)
KENNETH J. BLACK (291871)
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com
       – and –
DANIELLE S. MYERS (259916)
MICHAEL ALBERT (301120)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dmyers@rgrdlaw.com
malbert@rgrdlaw.com

[Proposed] Lead Counsel for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FAN YUAN, Individually and on Behalf of All Others Similarly Situated,<br><br>                         Plaintiff,<br><br>     vs.<br><br>FACEBOOK, INC., et al.,<br><br>                         Defendants. | Case No. 5:18-cv-01725-EJD<br><br>CLASS ACTION<br><br>AMALGAMATED BANK'S MEMORANDUM OF LAW IN OPPOSITION TO COMPETING LEAD PLAINTIFF MOTIONS<br><br>DATE:       August 30, 2018<br>TIME:       9:00 a.m.<br>CTRM:      4, 5th Floor<br>JUDGE:     Hon. Edward J. Davila |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     ARGUMENT .......................................................................................................3

        A.      MPERS Is Not Eligible for Appointment as Lead Plaintiff.....................4

                1.      MPERS Is Presumptively Barred from Service as Lead Plaintiff
                        because its Caseload Far Exceeds the Statutory Limit .................4

                2.      MPERS Cannot Trigger the Statutory Presumption ...................12

                        a.      MPERS Withheld Its Financial Interest from the Court...............12

                        b.      Attorney General Hood – MPERS' Sole Decider – Owes
                                Divided Loyalties to Mississippi's Residents and the
                                Putative Class Here, Precluding a *Prima Facie* Showing of
                                Adequacy ...................................................................14

                        c.      MPERS' Designated Special Assistant Attorneys General
                                Are Also Conflicted ..................................................19

        B.      Neither of the Other Movants – the "Facebook Investor Group" and
                Michael P. Carfagna – Can Trigger the PSLRA Presumption Because
                Both Lack a Sufficiently Large Financial Interest ................................20

        C.      Amalgamated Bank Is the Presumptive Lead Plaintiff Candidate.........21

III.    CONCLUSION...................................................................................................21

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*Aronson v. McKesson HBOC, Inc.*,
   79 F. Supp. 2d 1146 (N.D. Cal. 1999) ............................................................ *passim*

5

6

*Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*,
   814 F.3d 132 (2d Cir. 2016)............................................................................3, 20

7

*Bodri v. GoPro, Inc.*,
   2016 WL 1718217 (N.D. Cal. Apr. 28, 2016) ................................................13, 21

8

9

*Chiaretti v. Orthodontic Ctrs. of Am., Inc.*,
   2003 U.S. Dist. LEXIS 25264 (E.D. La. Aug. 28, 2003) ...............................8, 9, 10

10

*Cohen v. United States Dist. Ct.*,
   586 F.3d 703 (9th Cir. 2009) ...........................................................................9

11

12

*Craig v. CenturyLink Inc.*,
   2017 WL 4768566 (W.D. La. Oct. 20, 2017) ..................................................7, 8

13

14

*Cunha v. Hansen Nat. Corp.*,
   2009 WL 2029797 (C.D. Cal. July 13, 2009) ................................................. *passim*

15

*Dees v. Colonial Bancgroup, Inc.*,
   2009 WL 1285424 (M.D. Ala. May 7, 2009) ...................................................12

16

17

*DuPont v. Wyly*,
   61 F.R.D. 615 (D. Del. 1973) ...........................................................................18, 19

18

19

*Epic Sys. Corp. v. Lewis*,
   __ U.S. __, 2018 WL 2292444 (May 21, 2018) ..............................................9

20

*Gemsco, Inc., v. Walling*,
   324 U.S. 244 (1945)..........................................................................................9

21

22

*Hesse v. Sprint Corp.*,
   598 F.3d 581 (9th Cir. 2010) ...........................................................................14

23

24

*IBP, Inc. v. Alvarez*,
   546 U.S. 21 (2005)............................................................................................10

25

26

*In re Alamosa Holdings, Inc. Sec. Litig.*,
   2004 WL 578439 (N.D. Tex. Mar. 4, 2004) ....................................................8

27

*In re Atl. Power Corp. Sec. Litig.*,
   2014 WL 12628589 (D. Mass. Mar. 31, 2014)................................................13, 14

28

**Page**

*In re Cavanaugh,*
  306 F.3d 726 (9th Cir. 2002) ........................................................................... *passim*

*In re Critical Path, Inc. Sec. Litig.,*
  156 F. Supp. 2d 1102 (N.D. Cal. 2001) ................................................................11

*In re Diamond Foods, Inc., Sec. Litig.,*
  281 F.R.D. 405 (N.D. Cal. 2012)..........................................................................12

*In re Elan Corp. Sec. Litig.,*
  2009 WL 1321167 (S.D.N.Y. May 11, 2009) .......................................................21

*In re Enron Corp., Sec. Litig.,*
  206 F.R.D. 427 (S.D. Tex. 2002)..................................................................7, 8, 21

*In re Extreme Networks Inc. Sec. Litig.,*
  2016 WL 3519283 (N.D. Cal. June 28, 2016) ......................................................10

*In re Gemstar-TV Guide Int'l Sec. Litig.,*
  209 F.R.D. 447 (C.D. Cal. 2002) ..........................................................................12

*In re Herley Indus. Inc.,*
  2010 WL 176869 (E.D. Pa. Jan. 15, 2010)...........................................................11

*In re Internap Network Servs. Corp. Sec. Litig.,*
  2012 WL 12878579 (N.D. Ga. Aug. 23, 2012) .....................................................15

*In re Netflix, Inc., Sec. Litig.,*
  2012 WL 1496171 (N.D. Cal. Apr. 27, 2012) ......................................................12

*In re Network Assocs. Sec. Litig.,*
  76 F. Supp. 2d 1017 (N.D. Cal. 1999) ..................................................................11

*In re SiRF Tech. Holdings, Inc. Sec. Litig.,*
  2008 WL 2220601 (N.D. Cal. May 27, 2008) ......................................................12

*In re Telxon Corp. Sec. Litig.,*
  67 F. Supp. 2d 803 (N.D. Ohio 1999).......................................................... *passim*

*In re Unumprovident Corp. Sec. Litig.,*
  2003 U.S. Dist. LEXIS 24633 (E.D. Tenn. Nov. 6, 2003) .........................7, 8, 9, 12

*Keating v. Office of Thrift Supervision,*
  45 F.3d 322 (9th Cir. 1995) ..................................................................................16

1

2                                                                                     **Page**

3

4    *Knurr v. Orbital ATK, Inc.*,
        220 F. Supp. 3d 653 (E.D. Va. 2016) ............................................................ *passim*

5    *Mazur v. eBay Inc.*,
        257 F.R.D. 563 (N.D. Cal. 2009) ........................................................................16

6

7    *Micholle v. Ophthotech Corp.*,
        2018 WL 1307285 (S.D.N.Y. Mar. 13, 2018) ...................................................21

8    *Naiditch v. Applied Micro Circuits Corp.*,
9        2001 WL 1659115 (S.D. Cal. Nov. 5, 2001) ......................................................12

10   *Nicolow v. Hewlett Packard Co.*,
11       2013 WL 792642 (N.D. Cal. Mar. 4, 2013)........................................................13

12   *Piven v. Sykes Enters., Inc.*,
        137 F. Supp. 2d 1295 (M.D. Fla. 2000) ..............................................................12

13   *Radcliffe v. Experian Info. Sols. Inc.*,
14       715 F.3d 1157 (9th Cir. 2013) ............................................................................18

15   *Smith v. Suprema Specialties*,
16       206 F. Supp. 2d 627 (D.N.J. 2002) .....................................................................12

17   *Stengle v. Am. Ital. Pasta Co.*,
        2005 U.S. Dist. LEXIS 43816 (W.D. Mo. Dec. 19, 2005) .............................7, 8, 9

18   *Thompson v. Shaw Grp., Inc.*,
19       2004 WL 2988503 (E.D. La. Dec. 14, 2004).................................................8, 9, 10

20   *Tsirekidze v. Syntax-Brillian Corp.*,
21       2008 WL 942273 (D. Ariz. Apr. 7, 2008) ..........................................................21

22   *United States v. Gupta*,
        848 F. Supp. 2d 491 (S.D.N.Y. 2012)..................................................................16

23   *United States v. Parrott*,
24       248 F. Supp. 196 (D.D.C. 1965) .........................................................................16

25   *United States v. Rand*,
26       308 F. Supp. 1231 (N.D. Ohio 1970)...................................................................16

27   *United States v. Scrushy*,
        366 F. Supp. 2d 1134 (N.D. Ala. 2005) ..............................................................16

28

Page

*Williams v. Taylor,*
    529 U.S. 362 (2000) ............................................................................................11

*Wilson v. Conair Corp.,*
    2016 WL 7742772 (E.D. Cal. June 3, 2016) ........................................................18

*Young v. United States ex rel. Vuitton et Fils S.A.,*
    481 U.S. 787 (1987) ............................................................................................17

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b) ...................................................................................................................1
    §78u-4(a)(2)(A)(v) .................................................................................................5
    §78u-4(a)(3)(B) ......................................................................................................4
    §78u-4(a)(3)(B)(i) ..................................................................................................1
    §78u-4(a)(3)(B)(iii) ............................................................................................3, 4
    §78u-4(a)(3)(B)(iii)(I) ..........................................................................................10
    §78u-4(a)(3)(B)(vi) ...................................................................................... *passim*
    §78u-4(b)(3)(B) ....................................................................................................16

Federal Rules of Civil Procedure
    Rule 23 ....................................................................................................... *passim*
    Rule 23(a) .................................................................................................4, 12, 20
    Rule 26(b)(3) ........................................................................................................16

Northern District of California Local Civil Rules
    Civil L.R. 3-7(c) .............................................................................................13, 17
    Civil L.R. 3-7(d)(2) .........................................................................................18, 19

Mississippi Code Annotated
    §7-5-1 ...................................................................................................................14
    §25-11-101 ...........................................................................................................14

**LEGISLATIVE HISTORY**

H.R. Conf. Rep. No. 104-369, at 35 (1995),
    *reprinted in* 1995 U.S.C.C.A.N. 730 ...................................................................11

**SECONDARY AUTHORITIES**

1 McLaughlin on Class Actions §4:31 (14th ed.) ..................................................2

1

2                                                                                      **Page**

3

5 MOORE'S FEDERAL PRACTICE - CIVIL
    §23.25[2][b][vi] (2018)................................................................2
    §23.25[2][b][vii] (2018)...............................................................2
    §23.191[3][d] (2018)...................................................................9

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      INTRODUCTION

Presented with four competing lead plaintiff motions pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Court is tasked with appointing the movant "most capable of adequately representing the interests of class members."[1]   In that regard, Mississippi Public Employees' Retirement System ("MPERS") will likely contend that its purported financial interest and prior "experience" warrant its appointment as lead plaintiff.  They do not.

In fact, MPERS "is presumptively barred from serving as lead plaintiff" as it has already served as lead plaintiff in *sixteen* cases since 2015 – and is seeking appointment in four more cases – in contravention of the PSLRA's provision limiting service as lead plaintiff to no "*more than 5* securities class actions . . . during any 3-year period."[2]  MPERS' motion omits any reference to this provision, even though it is MPERS' burden to "demonstrate[] why it should be excepted from the ban against frequent litigants."[3]  No exception consistent with the statute exists.

While the presumptive bar alone precludes MPERS' appointment, MPERS suffers from other fundamental defects preventing it from triggering the rebuttable presumption, including that:

- MPERS curiously chose not to quantify its financial interest in the relief sought by the class using traditional accounting methods, even though it routinely does so with other lead plaintiff motions it has filed in §10(b) cases;

- MPERS and its counsel failed to comply with not just one but several local rules;

- MPERS' sole decision-maker, Mississippi Attorney General Jim Hood, is effectively acting as both client and lawyer; and

- MPERS omitted Attorney General Hood's own civil and criminal investigation into the precise conduct underlying the claims at issue in this case while expressly highlighting two other state Attorneys General's identical investigations (ECF No. 39 at 5).[4]

---

[1]      15 U.S.C. §78u-4(a)(3)(B)(i).

[2]      *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146, 1156 (N.D. Cal. 1999) (barring institution that served as lead plaintiff in six cases); 15 U.S.C. §78u-4(a)(3)(B)(vi) (the "Five-in-Three Provision").  All citations are omitted and emphasis is added unless otherwise noted.

[3]      *Id.* at 1156-57.

[4]      *Compare* ECF No. 39 at 2 ("Facebook investors, including [MPERS], incurred significant losses when it was revealed that the Company had allowed a political consulting firm named

1    By omitting the latter two facts from its motion, MPERS avoided having to explain how such

2    divided loyalties – that is, Attorney General Hood's representation of Mississippi citizens for

3    violations of state law on one hand and his representation of the putative class here on the other –

4    involving the very same misconduct are not disqualifying (they are).  Attorney General Hood's

5    duality is particularly problematic given anomalous features of Mississippi law providing that

6    Attorney General Hood – *not MPERS* – makes all decisions regarding the prosecution and

7    resolution of this case.[5] Thus, if appointed lead plaintiff, Attorney General Hood effectively would

8    be the sole decider in both this case *and* in his ongoing civil and criminal investigation – an obvious

9    disabling conflict.[6]  Individually or collectively, these defects yield but one inevitable conclusion:

10   MPERS is not the presumptive lead plaintiff.

11   Nor are Attorney General Hood's divided loyalties somehow inoculated or minimized by

12   MPERS' designation of two outside attorneys as Special Assistant Attorneys General (one of whom

13   has not appeared or filed the required attorney certification in this case) as the Retention Agreement

14   in this case provides that the "Attorney General does not relinquish his constitutional or statutory

15   authority or responsibility through this Retention Agreement," and "the Attorney general shall have

16   

17   Cambridge Analytica to improperly exploit the personal data of over 50 million Facebook users . . .
     .") *with* Declaration of Danielle S. Myers in Support of Amalgamated Bank's Opposition to

18   Competing Lead Plaintiff Motions ("Myers Opp. Decl."), Ex. 1 (announcing investigation of
     "Facebook's conduct related to the recently published reports that personal user information from

19   Facebook profiles was provided to third parties without the users' knowledge or consent,"
     specifically, "to a company called SCL/Cambridge Analytica").

20   [5]  *See* Myers Opp. Decl., Ex. 2 (explaining that the "Attorney General does not require the

21   Mississippi Public Employees' Retirement System . . . to make decisions regarding the prosecution
     of such cases," and the Attorney General "exercises ultimate authority, and sometimes does act

22   contrary to the opinion of the agency in question").

23   [6]  *See* 5 MOORE'S FEDERAL PRACTICE - CIVIL §23.25[2][b][vi] (2018) ("The named plaintiff
     may not serve as counsel."); 5 MOORE'S FEDERAL PRACTICE - CIVIL §23.25[2][b][vii] ("Even the

24   existence of non-class claims may distract a class representative from vigorously pursuing class
     claims. Thus, if a class representative has non-class claims as well as class claims against a

25   defendant, particularly if the non-class claims are asserted in a second lawsuit, one that is separate
     from the class action, a court may well conclude that the class representative has a disqualifying

26   conflict of interest with the class."); 1 MCLAUGHLIN ON CLASS ACTIONS §4:31 (14th ed.) (explaining
     general principle that "'other litigation pending between the plaintiff and defendants' may present a

27   disabling conflict" and that "[n]ot only might other suits indicate personal motives external to class
     interests, they create the possibility that the plaintiff will use the class suit as leverage to secure

28   personal advantage in other actions").

1   the sole authority to settle this litigation on behalf of the class."[7]  In fact, Attorney General Hood's

2   conflict is compounded by outside counsel's failure to comply with Civil L.R. 3-7(d)(2), which

3   requires counsel owning the security that is the subject of the action – as counsel certified they do

4   here (ECF Nos. 41-42) – to "set forth with specificity the extent of any such ownership or interest

5   and explains why that ownership or interest does not constitute a conflict of interest sufficient to

6   disqualify the attorney from representing the class."  *Id.*  MPERS' counsel did not do so.[8]  In sum,

7   when viewed under either the distinct Five-in-Three Provision (§vi) or the Rebuttable Presumption

8   Provision (§iii) of the PSLRA, MPERS' motion should be denied.

9       Like MPERS, the other two movants cannot be appointed lead plaintiff as neither suffered a

10  sufficient loss to trigger the presumption; their motions should also be denied.

11      By contrast, Amalgamated Bank, as Trustee for the LV LargeCap 1000 Growth Index Fund,

12  LongView Quantitative LargeCap Fund, and LongView Quant LargeCap Equity VEBA Fund

13  ("Amalgamated Bank") is an institutional investor that suffered a substantial loss, easily meets the

14  Rule 23 requirements, has an impressive track record of service as lead plaintiff, and selected

15  qualified counsel.  Amalgamated Bank's motion should be granted.

16  **II.   ARGUMENT**

17      "The 'most capable plaintiff' –  and hence the lead plaintiff – is the one who has the greatest

18  financial stake in the outcome of the case, ***so long as*** he meets the requirements of Rule 23." *In re*

19  *Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002).  To identify the presumptively most adequate

20  plaintiff, "the district court must compare the financial stakes of the various plaintiffs and determine

21

22  [7]     *See* Myers Opp. Decl., Ex. 3 at ¶2.

23  [8]     MPERS' omissions take on an altogether different hue when the Court further considers
    MPERS' failure to acknowledge – even in a footnote – the Second Circuit's reported decision in

24  *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132 (2d Cir. 2016), affirming
    Judge Caproni's order unsealing a complaint alleging "that defendants, as counsel for a state

25  employees' pension fund that was a lead plaintiff in a major securities class action, 'regularly engage
    in a kickback scheme with the Mississippi Attorney General's Office, a public entity whose

26  constituents might otherwise be in the dark about the arrangement,'" because "[w]hether true or not,
    this allegation would naturally be of legitimate interest to the public (especially those who contribute

27  to and receive payments from MPERS) and to federal courts in the future (e.g., those considering
    whether to name BLB & G as lead class counsel or find MPERS to be an adequate class

28  representative in future class actions)."  *Id.* at 143.

which one has the most to gain from the lawsuit." *Id.* at 730. "It must then focus its attention on ***that*** plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.'" *Id.* (emphasis in original).  "If the plaintiff with the largest financial stake in the controversy provides information that satisfies these requirements, he becomes the presumptively most adequate plaintiff." *Id.* If, however, "the plaintiff with the greatest financial stake does not satisfy the Rule 23(a) criteria, the court must repeat the inquiry, this time considering the plaintiff with the next-largest financial stake, until it finds a plaintiff who is both willing to serve and satisfies the requirements of Rule 23." *Id.*

Separately, the PSLRA's Five-in-Three Provision presumptively bars a putative lead plaintiff from serving as lead plaintiff in more than five securities class action cases during any three-year period.  *See* 15 U.S.C. §78u-4(a)(3)(B)(vi); *Aronson*, 79 F. Supp. 2d at 1156-57.

### A.    MPERS Is Not Eligible for Appointment as Lead Plaintiff

MPERS cannot be appointed lead plaintiff because it has triggered the PSLRA's presumptive bar on frequent litigants, obscured its financial interest, and cannot make the *prima facie* Rule 23 showing due to irremediable divided loyalties and conflicts of interest.

### 1.    MPERS Is Presumptively Barred from Service as Lead Plaintiff because its Caseload Far Exceeds the Statutory Limit

The first impediment to MPERS' motion is the Five-in-Three Provision, a distinct subpart (§vi) from the rebuttable presumption subpart (§iii) of the PSLRA's lead plaintiff provision (§78u-4(a)(3)(B)).  This independent statutory requirement for appointment clearly states, "a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, ***in no more than 5*** securities class actions brought as plaintiff class actions . . . during any 3-year period." 15 U.S.C. §78u-4(a)(3)(B)(vi).  By its own admission, MPERS has been appointed to serve as lead plaintiff in ***seven*** cases ***filed*** within the last three years ***and is seeking appointment in four more cases***, including this one. *See* ECF No. 40-1 at ¶6.[9]  In fact, MPERS has served as lead plaintiff in ***sixteen*** cases ***during***

---

[9]      While the PSLRA's Certification provision only requires an entity to "identif[y] any other action . . . ***filed*** during the 3-year period preceding the date on which the certification is signed by the plaintiff, in which the plaintiff has sought to serve as a representative party on behalf of a class,"

the last three years (2015-current).  "Thus, under the terms of the Reform Act, [MPERS] is presumptively barred from serving as lead plaintiff."  *Aronson*, 79 F. Supp. 2d at 1156.

To be clear, MPERS is one of the most frequent lead plaintiffs in securities cases:

| | *Case* | *Certification Signatory* |
|---|---|---|
| 1. | *Yuan v. Facebook, Inc.*, No. 5:18-cv-01725 (N.D. Cal.) [pending] | Jacqueline H. Ray Special Assistant Attorney General |
| 2. | *Gov't Emps. Ret. Sys. of the Virgin Islands v. WageWorks, Inc.* No. 4:18-cv-01523-JSW (N.D. Cal.) [pending] | Jacqueline H. Ray Special Assistant Attorney General |
| 3. | *Wigginton v. Advance Auto Parts, Inc.*, No. 1:18-cv-00212-GMS (D. Del.) [pending] | Jacqueline H. Ray Special Assistant Attorney General |
| 4. | *Asanhussainsyedmohid v. Acuity Brands Inc.*, No. 1:18-cv-00012 (D. Del.) [pending] | Jacqueline H. Ray Special Assistant Attorney General |
| 5. | *In re Dr. Reddy's Labs. Ltd. Sec. Litig.*, No. 3:17-cv-06436 (D.N.J.) | Jacqueline H. Ray Special Assistant Attorney General |
| 6. | *In re Signet Jewelers Ltd. Sec. Litig.*, No. 1:16-cv-06728 (S.D.N.Y.) | Jacqueline H. Ray Special Assistant Attorney General |
| 7. | *In re Roadrunner Transp. Sys., Inc. Sec. Litig.*, No. 2:17-cv-00144 (E.D. Wis.) | Jacqueline H. Ray Special Assistant Attorney General |
| 8. | *Pub. Emps. Ret. Sys. of Miss. v. Treehouse Foods, Inc.*, No. 16-cv-10632 (N.D. Ill.) | S. Martin Millette, III Special Assistant Attorney General |
| 9. | *In re Stericycle, Inc. Sec. Litig.*, 16-cv-7145 (N.D. Ill.) | Jacqueline H. Ray Special Assistant Attorney General |

the Five-in-Three Provision is broader and presumptively bars service in "more than 5 securities class actions . . . during *any* 3-year period."  *Compare* 15 U.S.C. §78u-4(a)(2)(A)(v) *with* 15 U.S.C. §78u-4(a)(3)(B)(vi).  Thus, while MPERS' Certification is accurate as to the cases it has served in that were ***filed*** during the last three years, it does not reveal the additional cases MPERS has ***served*** as lead plaintiff during the three-year period between 2015 and now.

| | *Case* | *Certification Signatory* |
|---|---|---|
| 10. | *In re Banco Bradesco, S.A.*, No. 1:16-cv-4155 (S.D.N.Y.) | Jacqueline H. Ray Special Assistant Attorney General |
| 11. | *3226701 Canada, Inc. v. Qualcomm, Inc.*, No. 3:15-cv-02678 (S.D. Cal.) | Jacqueline H. Ray Special Assistant Attorney General |
| 12. | *Pub. Emps. Ret. Sys. of Miss. v. Millennial Media, Inc.*, No. 1:14-cv-07923 (S.D.N.Y.) | George W. Neville Special Assistant Attorney General |
| 13. | *Salhuana v. Diamond Foods, Inc.*, No. 11-cv-05386 (N.D. Cal.)[10] | George W. Neville Special Assistant Attorney General |
| 14. | *La. Mun. Police Emps. Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, No. 2:11-CV-00289 (D. Vt.) | S. Martin Millette, III Special Assistant Attorney General |
| 15. | *Bach v. Amedisys, Inc.*, No. 3:10-cv-00395 (M.D. La.) | George W. Neville Special Assistant Attorney General |
| 16. | *In re Morgan Stanley Mortgage Pass-Through Certificates Litig.*, No. 09-cv-2137 (S.D.N.Y.) | George W. Neville Special Assistant Attorney General |
| 17. | *Hill v. State Street Corp.*, No. 1:09-cv-12146 (D. Mass.) | George W. Neville Special Assistant Attorney General |
| 18. | *In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, No. 08-cv-8093 (S.D.N.Y.) | George W. Neville Special Assistant Attorney General |

---

[10]     While MPERS will undoubtedly retort that some of these cases have been resolved, "the 5-in-3 rule is ***not*** confined to simply the number of **presently** active cases a party is serving as a lead plaintiff in, but applies to **all** cases (active or otherwise) the party in question has served as a lead plaintiff in the past three years." *Cunha v. Hansen Nat. Corp.*, 2009 WL 2029797, at *4 (C.D. Cal. July 13, 2009) (emphasis added and in original). "Nowhere in the statute suggest, much less does its language provide, that it is limited [to active cases], and with good reason." *Id.* "Even once a case has been settled or finally adjudicated the lead plaintiff still remains tasked with a host of administrative duties." *Id.* "In short, the ending of the formal case does not end the lead plaintiff's responsibilities to or for the class he, she or it was appointed to represent." *Id.*

|    | *Case* | *Certification Signatory* |
|----|--------|---------------------------|
| 19. | *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust and Plumbers' & Pipefitters' Local #562 Pension Fund v. J.P. Morgan Acceptance Corp. I,* No. 08-cv-01713 (E.D.N.Y.) | George W. Neville Special Assistant Attorney General |
| 20. | *In Re Merck & Co., Inc. Securities, Derivative & ERISA Litig.,* No. 05-CV-02367 (D.N.J.) | Geoffrey Morgan Special Assistant Attorney General (declaration signatory) |

It is axiomatic that the "larger the number of cases being directed by a single institutional investor, the less likely it is these purposes are being served." *In re Unumprovident Corp. Sec. Litig.*, 2003 U.S. Dist. LEXIS 24633, at *21-*22 (E.D. Tenn. Nov. 6, 2003); *Aronson*, 79 F. Supp. 2d at 1156 (recognizing that Congress "desired to increase client control over plaintiff's counsel, and allowing simultaneous prosecution of six securities actions is inconsistent with that goal").[11]  As such, district courts do not hesitate to exercise their discretion in declining to ignore the presumptive bar when, like here, there are other qualified institutional investors with significant losses that can serve as lead plaintiff. *See Aronson*, 79 F. Supp. 2d at 1156-57; *Cunha*, 2009 WL 2029797, at *7.[12]

---

[11]     *See also In re Enron Corp., Sec. Litig.*, 206 F.R.D. 427, 457 (S.D. Tex. 2002) (recognizing that "involvement in numerous other securities fraud [cases], both as Lead Plaintiff and class participant, may demonstrate valuable experience and quality leadership, it also means fractured attention and resources with respect to this suit"); *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 822 (N.D. Ohio 1999) (recognizing that "an institutional investor that is *simultaneously* involved in one or more other securities class actions would have fewer resources available and be less able to police its attorney's conduct") (emphasis in original).

[12]     *See also Craig v. CenturyLink Inc.*, 2017 WL 4768566, at *4-*5 (W.D. La. Oct. 20, 2017) (finding institution "should be disqualified" pursuant to the Five-in-Three Provision); *Knurr v. Orbital ATK, Inc.*, 220 F. Supp. 3d 653, 663 (E.D. Va. 2016) ("there is simply no reason to exempt [institution] from the Five-in-Three Provision when [another institution] is fully qualified to serve as lead plaintiff"); *Stengle v. Am. Ital. Pasta Co.*, 2005 U.S. Dist. LEXIS 43816, at *20 (W.D. Mo. Dec. 19, 2005) ("the Court should not lightly appoint a professional plaintiff, and in this case there is no need to do so" as there "are several other investors who can adequately represent the class"); *Unumprovident*, 2003 U.S. Dist. LEXIS 24633, at *23 (finding "no justification for granting an exception to a party which has so significantly exceeded the limitations of the professional plaintiff rule, at least where a viable alternative is available which would be just as, if not more, consistent with the purposes underlying the PSLRA"); *Enron*, 206 F.R.D. at 457 (declining to waive application of presumptive bar to candidate in part because "there are other competent and qualified institutional applicants").

1    Indeed, the PSLRA's Five-in-Three Provision exists for situations like this, in which a

2   movant like MPERS inexplicably continues to seek appointment as lead plaintiff to such a degree

3   that it has now served as lead plaintiff in *sixteen* federal securities cases and is seeking to serve as

4   lead plaintiff in *four additional cases* (including this one) – *all within a three-year period*.  *See*

5   *Craig*, 2017 WL 4768566, at *4 (disqualifying institution that "sought to serve as lead [plaintiff] in

6   *13* SEC class actions . . . and was appointed Lead Plaintiff in *8* of those cases"); *Cunha*, 2009 WL

7   2029797, at *4 (disqualifying institution that served "as lead plaintiff in *8* cases in the past 3 years,

8   which is well beyond the maximum limit placed by the PSLRA"); *Aronson*, 79 F. Supp. 2d at 1156

9   (disqualifying institution "'serving as a lead plaintiff or co-lead plaintiff in *six* such actions'").[13]

10    Importantly, the PSLRA "places the burden on the [presumptively barred institution] to

11   demonstrate why the bar should not be applied."  *Telxon*, 67 F. Supp. 2d at 820; *Unumprovident*,

12   2003 U.S. Dist. LEXIS 24633, at *20 (same); *Aronson*, 79 F. Supp. 2d at 1156-57 (recognizing that

13   institutional investor "has not demonstrated why it should be excepted from the ban against frequent

14   litigants").  And, while the PSLRA grants district courts discretion to lift the presumptive bar, that

15   discretion is circumscribed to instances that are "consistent with the purposes" of the PSLRA.  15

16   U.S.C. §78u-4(a)(3)(B)(vi).  Congress enacted the PSLRA to "increase client control over plaintiff's

17   counsel, and allowing simultaneous prosecution of six securities actions is inconsistent with that

18   goal."  *Aronson*, 79 F. Supp. 2d at 1156; *Chiaretti*, 2003 U.S. Dist. LEXIS 25264, at *5 (same); *see*

19   *also Thompson*, 2004 WL 2988503, at *7 ("Although the legislative history appears to favor

20

---

21   [13]    *See also Knurr*, 220 F. Supp. 3d at 658 (disqualifying institution that "by its own admission,
served as lead plaintiff in *at least 16* securities class actions in the last three years"); *Stengle*, 2005

22   U.S. Dist. LEXIS 43816, at *19-*20 (disqualifying institution that was "currently serving as a lead
plaintiff in *at least six* actions"); *In re Alamosa Holdings, Inc. Sec. Litig.*, 2004 WL 578439, at *1

23   (N.D. Tex. Mar. 4, 2004) (disqualifying institution that "served as class representative in *five* class
actions within the last three years and is also seeking to serve in a *sixth*"); *Thompson v. Shaw Grp.,*

24   *Inc.*, 2004 WL 2988503, at *7 (E.D. La. Dec. 14, 2004) (disqualifying institution because "there is a
risk of overstretch where [the fund] would be directing a total of *eight* concurrent lawsuits");

25   *Unumprovident*, 2003 U.S. Dist. LEXIS 24633, at *22 (disqualifying institution that had served in
*thirteen* cases); *Chiaretti v. Orthodontic Ctrs. of Am., Inc.*, 2003 U.S. Dist. LEXIS 25264, at *6

26   (E.D. La. Aug. 28, 2003) (disqualifying institution because its "general counsel currently oversees *at
least six* large securities class actions"); *Enron*, 206 F.R.D. at 457 n.33 (disqualifying institution that

27   "moved for appointment as Lead Plaintiff in *thirteen* [cases and] served as lead plaintiff in *nine*");
*Telxon*, 67 F. Supp. 2d at 819-22 (holding that pension fund "cannot serve as lead plaintiff" because

28   it "has served as lead plaintiff in *five* securities class actions").

1   institutional investors, a policy of equal force is the general prevention of over-representation

2   regardless of the plaintiff's status.").

3          It is no answer that the presumptive bar does not apply to MPERS because the PSLRA's

4   legislative history indicates that a statutory purpose was to encourage institutions to serve as lead

5   plaintiff.  First, Amalgamated Bank is an institutional investor, so this purpose will still be satisfied

6   when the Court applies the provision to MPERS.  Second, if "Congress had intended to grant a

7   blanket exemption from operation of the [PSLRA] to institutional investors . . . it could easily have

8   [done so]." *Telxon*, 67 F. Supp. 2d at 821.  Congress chose ***not*** to do so.  *See* 15 U.S.C. §78u-

9   4(a)(3)(B)(vi); *Aronson*, 79 F. Supp. 2d at 1156 ("The text of the statute contains no flat exemption

10  for institutional investors.).[14]  Third, as *Cavanaugh* emphasized, "Congress enacts statutes, not

11  purposes, and courts may not depart from the statutory text because they believe some other

12  arrangement would better serve the legislative goals."  306 F.3d at 731-32; *Cohen v. United States*

13  *Dist. Ct.*, 586 F.3d 703, 709 (9th Cir. 2009) (emphasizing that "[w]hen a statute speaks with clarity

14  to an issue, courts must apply the clear meaning of the statute").  Attempts "to use the Conference

15  Report to manufacture an ambiguity in the text of the PSLRA" are unavailing because "Congress

16  enacts, and the President signs, statutes – not conference reports," and the "'mental processes' of

17  legislators, even if formalized in a committee report, are unpersuasive in light of the fact that the

18  Five-in-Three Provision plainly contains no exemption for institutional investors."  *Knurr*, 220 F.

19  Supp. 3d at 661 (quoting *Gemsco, Inc., v. Walling*, 324 U.S. 244, 260 (1945) ("The plain words and

20  meaning of a statute cannot be overcome by a legislative history which, through strained processes

21  of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference

22  in every direction.")); *see generally Epic Sys. Corp. v. Lewis*, __ U.S. __, 2018 WL 2292444, at *16

23  (May 21, 2018) ("[L]egislative history is not the law. 'It is the business of Congress to sum up its

24  own debates in its legislation,' and once it enacts a statute '"[w]e do not inquire what the legislature

25  meant; we ask only what the statute means.'").

26  _____

27  [14]       *See also Knurr*, 220 F. Supp. 3d at 661 (same); *Cunha*, 2009 WL 2029797, at *4 (same);
    *Stengle*, 2005 U.S. Dist. LEXIS 43816, at *20 (same); *Unumprovident*, 2003 U.S. Dist. LEXIS

28  24633, at *15 (same); *Telxon*, 67 F. Supp. 2d at 822 (same); 5 MOORE'S FEDERAL PRACTICE
    §23.191[3][d] ("the statute does not create a blanket exception for institutional investors").

1    In fact, not only does the statute ***not*** contain an exemption for institutional investors, it

2    contains language that ***only*** applies to institutional investors: "a person may be a lead plaintiff, or an

3    ***officer, director, or fiduciary*** of a lead plaintiff, in no more than 5 securities class actions."  15

4    U.S.C. §78u-4(a)(3)(B)(vi).[15] Jacqueline H. Ray, Mississippi's Special Assistant Attorney General

5    here, is plainly an "officer, director, or fiduciary" of MPERS, and is individually barred by the

6    statute as she has signed six of MPERS' certifications in the cases MPERS has served as lead

7    plaintiff in since 2015 (and signed an additional four certifications in cases in which MPERS is

8    seeking to serve as lead plaintiff).[16]  *See Chiaretti*, 2003 U.S. Dist. LEXIS 25264, at *6 ("LSERS'

9    general counsel currently oversees at least six large securities class actions and serves as general

10   counsel for two large pension funds. He falls within the clear cautioning instruction of the Act.");

11   *Thompson*, 2004 WL 2988503, at *6 (disqualifying institution where its "in-house counsel, is

12   currently directing seven securities fraud class actions").  Indeed, "[i]f the [executive director] were

13   not a 'fiduciary' [or 'officer'] as [those] term[s] [are] commonly understood, it would strain reason

14   to say who is." *Chiaretti*, 2003 U.S. Dist. LEXIS 25264, at *6 n.3.  Thus, the inclusion of this

15   specific language that only applies to entities like institutional investors indicates that "[i]f Congress

16   had intended to grant a blanket exemption from operation of the [PSLRA] to institutional investors .

17   . . it could easily have [done so]." *Telxon*, 67 F. Supp. 2d at 821.  It did not.[17]

18

19   [15]    MPERS will likely emphasize that one opinion issued in this District found ambiguity in the
      statute based on the fact that "[n]owhere does the statute define 'person,'" and "the term, 'person,' as
20   used in [the PSLRA] does not lend itself to a clear understanding that institutional investors . . . are
      necessarily subject to the 5-and-3 cap." *In re Extreme Networks Inc. Sec. Litig.*, 2016 WL 3519283,
21   at *5 (N.D. Cal. June 28, 2016).  That distinction is plainly flawed as "under the Dictionary Act, the
      word 'person' in the statute is defined to include 'corporations, companies, associations, firms,
22   partnerships, societies, and joint stock companies, as well as individuals,' unless 'the context
      indicates otherwise.'" *Knurr*, 220 F. Supp. 3d at 660.  And, the PSLRA does not indicate otherwise,
23   as it uses the word "person" throughout the statute, including to define who is eligible to serve as
      lead plaintiff, *i.e.*, a "person or group of persons."  15 U.S.C. §78u-4(a)(3)(B)(iii)(I).  Thus, "if
24   'person' in §78u-4(a)(B)(iii)(I) includes institutional investors, then it follows that the word 'person'
      in the Five-in-Three Provision should also include institutional investors." *Knurr*, 220 F. Supp. 3d at
25   660-61 (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("[I]dentical words used in different parts
      of the same statute are generally presumed to have the same meaning.")).

26   [16]    In fact, MPERS has sought appointment as lead plaintiff so often that ***three*** individuals –
27   Attorney General Hood, Ms. Ray, and Mr. Neville – are each barred by the Five-in-Three Provision.

28   [17]    "It is . . . a cardinal principle of statutory construction that "'we must give effect, if possible,
      to every clause and word of a statute.'"" *Williams v. Taylor*, 529 U.S. 362, 404 (2000).  Given the

1       While the statutory text is clear, a snippet of legislative history admittedly recognizes that

2   institutional investors "***may*** need to exceed this limitation."  H.R. Conf. Rep. No. 104-369, at 35

3   (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 734.  Yet, one need not resort to the legislative history

4   to find permission to lift the presumptive bar: the PSLRA's text expressly provides such discretion.

5   *See* 15 U.S.C. §78u-4(a)(3)(B)(vi) ("[e]xcept as the court may otherwise permit, consistent with the

6   purposes of this section").[18]  And, district courts recognize several obvious examples of when an

7   institution may ***need*** to exceed the limit consistent with PSLRA's purposes, including:

8       • If the institution is "the only movant" (*Aronson*, 79 F. Supp. 2d at 1156; *Cunha*, 2009
        WL 2029797, at *4);[19]
9

10      • If the "other movants had accrued an even longer record of participation in securities
        litigation" (*Aronson*, 79 F. Supp. 2d at 1156);
11

12      • If the institution is "the only institutional investor seeking appointment as lead
        plaintiff" (*Knurr*, 220 F. Supp. 3d at 662; *Cunha*, 2009 WL 2029797, at *4; *Aronson*,
        79 F. Supp. 2d at 1156);[20]
13

14      • If the other movants are "a ***group of unrelated investors***" (*Telxon*, 67 F. Supp. 2d at
        822 (emphasis in original));[21] or

15

16  regularity with which institutional investors seek to serve, and are appointed, as lead plaintiff in
    securities class actions, an entire section of the PSLRA would be rendered superfluous if district
17  courts granted institutions a blanket exemption from the presumptive bar.  In fact, since the
    PSLRA's passage over twenty years ago, the Five-in-Three Provision has ***only*** been applied to
18  institutional investors, not individual investors.

19  [18]     The "fact that the PSLRA affords courts discretion to waive the Five-in-Three Provision is
    further evidence that the Provision does not contain a flat exemption for institutional investors."
20  *Knurr*, 220 F. Supp. 3d at 662 n.9.  "After all, if courts can exempt any proposed lead plaintiff from
    the Provision, then there would be little need to add an additional exemption for institutional
21  investors." *Id.*; *Telxon*, 67 F. Supp. 2d at 821 ("[T]he purported blanket exemption reflected in the
    Conference Report cannot be squared with the more limited grant of discretion contained in the
22  statute itself.  It would turn the grant of discretion into a mandatory instruction ***requiring*** courts to
    excuse an institutional investor from the rule.") (emphasis in original).
23

24  [19]     *See In re Herley Indus. Inc.*, 2010 WL 176869, at *4 (E.D. Pa. Jan. 15, 2010) (lifting bar
    because movant was only available candidate and "uniquely positioned to serve as lead plaintiff").
25
    [20]     *See In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1112 (N.D. Cal. 2001) (lifting
26  bar because institution "is the only acceptable institutional investor"); *In re Network Assocs. Sec.
    Litig.*, 76 F. Supp. 2d 1017, 1030, 1044 n.6 (N.D. Cal. 1999) (lifting bar because "there is no
27  alternative acceptable institutional candidate").

28  [21]     *See In re Netflix, Inc., Sec. Litig.*, 2012 WL 1496171, at *6 (N.D. Cal. Apr. 27, 2012) ("The
    Court is not moved to disqualify Arkansas Teacher or Boston as a professional plaintiff only to turn

- If the "other movants are not adequate candidates" (*Smith v. Suprema Specialties*, 206 F. Supp. 2d 627, 641 (D.N.J. 2002)). [22]

No such need exists here.[23]   As such, MPERS cannot meet its burden to demonstrate why the PSLRA's presumptive bar should be lifted.

"Neither the PSLRA nor its legislative history express any congressional desire [that] institutional investors be permitted to dominate or monopolize the lead plaintiff role." *Unumprovident*, 2003 U.S. Dist. LEXIS 24633, at *23.   MPERS has far exceeded the PSLRA's limit, and continues to file lead plaintiff motions at a rapid enough pace that itself exceeds the statutory limit.   Because there is another institutional investor that suffered a substantial loss that is not subject to the presumptive bar, MPERS' motion should be denied.

### 2.   MPERS Cannot Trigger the Statutory Presumption

Beyond being barred by the Five-in-Three Provision, MPERS failed to trigger the PSLRA rebuttable presumption as it did not "provide[] information that satisfies the[] requirements," *i.e.*, "information . . . in [its] pleadings and declarations" sufficient to demonstrate it possesses "the largest financial stake" and satisfies "the Rule 23(a) criteria." *Cavanaugh*, 306 F.3d at 730.

### a.   MPERS Withheld Its Financial Interest from the Court

To conduct the "straightforward" statutory inquiry the Ninth Circuit outlined in *Cavanaugh*, the "district court must consider the losses allegedly suffered by the various plaintiffs" before selecting the presumptive lead plaintiff.   *Id*. at 729-30.   Importantly, "when the district court makes

---

and appoint the unrelated strangers of the Fish Group."); *Dees v. Colonial Bancgroup, Inc.*, 2009 WL 1285424, at *2 (M.D. Ala. May 7, 2009) (lifting bar because competing movant was group of unaffiliated individuals); *In re SiRF Tech. Holdings, Inc. Sec. Litig.*, 2008 WL 2220601, at *3 (N.D. Cal. May 27, 2008) (lifting bar because competing movant was group of unaffiliated investors).

[22]   *See In re Gemstar-TV Guide Int'l Sec. Litig.*, 209 F.R.D. 447, 454 (C.D. Cal. 2002) ("courts have waived the PSLRA's professional plaintiff restriction when there were no other suitable applicants for lead plaintiff"); *Naiditch v. Applied Micro Circuits Corp.*, 2001 WL 1659115, at *3 (S.D. Cal. Nov. 5, 2001) (lifting bar because alternative movants were small individual investors with no experience in managing a securities class action); *Piven v. Sykes Enters., Inc.*, 137 F. Supp. 2d 1295, 1305 (M.D. Fla. 2000) (lifting bar because of "Westwind's inability to establish that it is a more adequate lead plaintiff").

[23]   And, unlike *In re Diamond Foods, Inc., Sec. Litig.*, 281 F.R.D. 405 (N.D. Cal. 2012), here there is ample proof that MPERS "cannot fairly and adequately protect the interests of the class." *Id.* at 412; *see infra* §II.A.2.b (identifying divided loyalties and conflicts of interest).

1    its initial determination," the court "must rely on the presumptive lead plaintiff's complaint and

2    sworn certification; there is no adversary process to test the substance of those claims."  *Id.*

3            Unlike dozens of prior lead plaintiff motions, MPERS curiously declined to quantify its

4    financial interest for this Court.  *See* ECF No. 39 at 7 (merely stating MPERS "sustained significant

5    losses").  MPERS also neglected to comply with Civil L.R. 3-7(c) requiring lead plaintiff movants

6    that do not file complaints to certify that they either "(1) [a]dopt[] [a complaint's] allegations or, if

7    not, (2) [s]pecif[y] the allegations the party intends to assert."  *Compare id. with* ECF No. 40-1.

8    MPERS' decision to withhold its loss – its financial interest – from its motion, perhaps in an effort to

9    obtain the upper hand by presenting a more favorable loss calculation after competing movants'

10   proverbial cards were face-up on the table, should not be rewarded, particularly considering that

11   MPERS not only failed to comply with Civil L.R. 3-7(c), MPERS deviated from its own historical

12   practice of quantifying its loss in its motions.[24]

13           Nor should the Court be persuaded that MPERS' approach does not run afoul of the PSLRA,

14   as the court in *In re Atl. Power Corp. Sec. Litig.*, 2014 WL 12628589, at *1 n.1. (D. Mass. Mar. 31,

15   2014), rejected such a "justification" that the statute does not require disclosure:

16           This purported reliance on a reading of the statute as the sole source of its
             responsibilities for disclosure to the court and adverse parties not only delayed full
17           comparative analysis; it bespeaks a less than full commitment to transparency in
             providing the court with information that it ultimately would require to make its
18           decision. It also presented the prospect that this plaintiff group, or perhaps more
             accurately, its designated counsel, hoped to keep its options open while reconfiguring
19           tactics for its approach to consideration of the selection of lead plaintiff and their
             counsel.

20
     *Id.*[25]  Consequently, the Court should deny MPERS' motion.

21

22   ────────────────────
     [24]    *See generally Bodri v. GoPro, Inc.*, 2016 WL 1718217, at *3 (N.D. Cal. Apr. 28, 2016)
23   ("Only after the parties filed their opening briefs, and the parties were made aware of how their
     respective motions would fare under this methodology, did the Majesty Palms Group argue that the
24   more appropriate measure of greatest financial stake was the 'retained shares' methodology. . . .
     This fact alone counsels in favor of adopting the LIFO methodology, as opposed to the retained
25   shares methodology."); *Nicolow v. Hewlett Packard Co.*, 2013 WL 792642, at *4 (N.D. Cal. Mar. 4,
     2013) ("Tellingly, VRS itself made no reference to net shares purchased or a retained shares
26   calculation in its opening motion seeking appointment as lead plaintiff, shifting its argument only
     after PGGM came forward with larger LIFO losses.").

27   [25]    Amalgamated Bank's counsel asked MPERS' counsel to clarify several opaque statements in
28   its motion to ensure no gamesmanship occurs with respect to financial interest in further briefing.

1

2

              **b.**     **Attorney General Hood – MPERS' Sole Decider – Owes Divided Loyalties to Mississippi's Residents and the Putative Class Here, Precluding a *Prima Facie* Showing of Adequacy**

3

4

       The Court must also assess whether MPERS has made a *prima facie* showing that it "meets

5

the requirements of Rule 23." *Cavanaugh*, 306 F.3d at 729, 732 (noting the "district court has

6

latitude as to what information it will consider in determining typicality and adequacy"). Class

7

representation is inadequate if the representative "has an insurmountable conflict of interest with

8

other class members." *Hesse v. Sprint Corp.*, 598 F.3d 581, 589 (9th Cir. 2010). MPERS' motion

9

acknowledges it must satisfy this standard, claiming that MPERS' "interests are perfectly aligned

10

with those of the other Class members and are not antagonistic in any way" because "[t]here are no

11

facts to suggest any actual or potential conflict of interest or other antagonism between Mississippi

12

and other Class members." *See* ECF No. 39 at 8. Yet, MPERS neglected to advise the Court of

13

anomalous features of Mississippi law that make Attorney General Hood the sole decider in this

14

case. That unique role is hindered by the similarly omitted fact of Attorney General Hood's

15

concurrent (civil and criminal) investigation into Facebook regarding the same underlying

16

misconduct at issue in this case – a veritable cornucopia of conflicts.

17

       Unlike other states' laws, the statute governing MPERS grants the Attorney General

18

exclusive authority to "institute, conduct, and maintain an action in order to enforce the U.S.

19

securities laws, including pursuing claims on behalf of Mississippi PERS." Myers Opp. Decl., Ex.

20

3; *see also* Miss. Code Ann. §7-5-1 (providing that Attorney General is "given the ***sole power*** to

21

bring or defend a lawsuit on behalf of a state agency"); Miss. Code Ann. §25-11-101 (providing that

22

MPERS is an "agency of the State of Mississippi"). Not only does the Attorney General "not require

23

the Mississippi Public Employees' Retirement System . . . to make decisions regarding the

24

prosecution of such cases," by his own admission, the Attorney General "***exercises ultimate***

25

***authority, and sometimes does act contrary to the opinion of the agency in question***." *See* Myers

26

Opp. Decl., Ex. 2. Stated differently, if its motion is granted, MPERS would be a nominal lead

27

plaintiff by operation of Mississippi law; Attorney General Hood effectively would serve as both

28

1  lead plaintiff **and** counsel, while simultaneously conducting a parallel civil and criminal

2  investigation into the same underlying misconduct.  *Id.*

3       Nor does the Attorney General's appointment of Special Assistant Attorneys General –

4  Bernstein Litowitz – minimize these disabling defects, as the Retention Agreement governing this

5  case confirms that Attorney General Hood is the sole decider – not MPERS or anyone else: "If

6  appointed as lead plaintiff by the Court, ***the Attorney General shall have the sole authority*** to settle

7  this litigation on behalf of the class . . . ."  Myers Opp. Decl., Ex. 3 at ¶2; *see In re Internap Network*

8  *Servs. Corp. Sec. Litig.*, 2012 WL 12878579, at *6 (N.D. Ga. Aug. 23, 2012) ("because attorneys

9  have the power to settle claims on behalf of their clients, the court has concerns about the possibility

10 of a settlement between proposed class representatives Matise and/or Whitaker and Defendants, and

11 the potential impact such a settlement could have on the class").

12      In addition to Attorney General Hood's expressly defined role as the sole decider for MPERS

13 (and potentially the putative class) in this securities fraud class action, MPERS' motion failed to

14 mention the fact that Attorney General Hood is simultaneously conducting an investigation as the

15 chief law enforcement officer of Mississippi into Facebook's user privacy practices and how the

16 Company allowed Cambridge Analytica to improperly exploit the personal data of over 50 million

17 Facebook users, *i.e.*, the same underlying conduct at issue in this litigation.  *See* Myers Opp. Decl.,

18 Ex. 1.[26] In fact, the litigation hold letter Attorney General Hood sent to defendant Zuckerberg noted

19 that "[o]ne of the many potential outcomes of the ongoing investigation could be civil or criminal

20 litigation arising under state law."  *Id.*

21      As these facts make clear, Attorney General Hood ***already*** has access to Facebook

22 information as Mississippi's chief law enforcer – a reality defendants will vigorously object to given

23 that "all discovery and other proceedings shall be stayed during the pendency of any motion to

24 dismiss."  15 U.S.C. §78u-4(b)(3)(B).  Worse, Facebook will no doubt credibly contend this

---

25 [26]    In addition to Attorney General Hood's own investigation, General Hood joined 36 other
26 Attorneys General – including the two expressly mentioned in MPERS' brief – in sending a March
   26, 2018 letter to defendant Zuckerberg requesting, among other things, "a full accounting" of the
27 events giving rise to the misuse and misappropriation of the 50 million Facebook profiles, stressing
   that the states' senior-most law enforcement officers "are committed to protecting our residents'
28 personal information." Myers Opp. Decl., Ex. 4.

AMALGAMATED BANK'S MEMORANDUM OF LAW IN OPPOSITION TO COMPETING LEAD
PLAINTIFF MOTIONS - 5:18-cv-01725-EJD                                                      - 15 -

1   litigation should be indefinitely stayed while Attorney General Hood's investigation proceeds apace,

2   severely prejudicing the putative class. *See Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324

3   (9th Cir. 1995) ("'[A] court may decide in its discretion to stay civil proceedings . . . "when the

4   interests of justice seem[] to require such action."'").[27]

5         Courts have long recognized the potential for conflicts in simultaneous criminal and civil

6   investigations, even when the investigations are conducted by ***different*** government agencies.[28]

7   Here, Attorney General Hood's investigative actions on behalf of Mississippi residents and

8   attempted prosecution of this class action on behalf of Facebook shareholders will be overseen by

9   not only the same governmental entity, but ***the same person***.[29]   At every juncture, Attorney General

10

---

11   [27]   The Attorney General's parallel investigation would likely prejudice the class in other ways.
     For example, all discovery obtained by MPERS in this litigation could be considered in the Attorney

12   General's "possession, custody or control," for the purposes of any *Brady* (or similar Mississippi)
     disclosure obligations in the event that Attorney General Hood brings criminal charges against

13   Facebook.   And, if Bernstein Litowitz (the Attorney General's Special Assistant Attorneys)
     interviews non-party witnesses that provide material exculpatory evidence against Facebook, any

14   mental impression contained in the attorney's notes would – in a usual case – ordinarily be attorney
     work-product and exempt from production under Rule 26(b)(3). However, because the

15   government's *Brady* obligations in the criminal case would extend to all exculpatory materials in its
     possession, custody or control – and because a prosecutor like Attorney General Hood has an

16   affirmative duty to learn of any exculpatory evidence known to others acting on the government's
     behalf – the Attorney General's Office would have to produce Bernstein Litowitz's otherwise

17   protected interview notes to Facebook in the criminal action, which the Company, can in turn, use
     (regardless of its admissibility) in this case. *See, e.g.*, *United States v. Gupta*, 848 F. Supp. 2d 491,

18   497 (S.D.N.Y. 2012) ("the Court finds the SEC's assertion of work product protection is overcome
     by Gupta's substantial need for *Brady* material"); *id.* at 494 (rejecting USAO's argument that "the

19   USAO and the SEC did not work as part of the 'same prosecutorial team,' that the USAO and the
     SEC made 'independent investigatory and charging decisions,' that neither the USAO nor the SEC

20   had control over the other's actions in how to proceed, and that the USAO conducted much of its
     investigation without the SEC's involvement through the use of wiretaps and grand jury

21   subpoenas").   Regardless of the myriad ways Attorney General Hood's dual roles could ultimately
     negatively impact the class, the mere fact that he is subject to such unique defenses precludes his

22   appointment. *See Mazur v. eBay Inc.*, 257 F.R.D. 563, 569 (N.D. Cal. 2009) ("The fact that the court
     may have to spend time at some future date assessing Mazur's roles and actions makes her an

23   inadequate representative.").

24   [28]   *United States v. Scrushy*, 366 F. Supp. 2d 1134, 1140 (N.D. Ala. 2005) (granting a stay
     where "the Government manipulated the simultaneous investigations for its own purposes"); *United*

25   *States v. Rand*, 308 F. Supp. 1231, 1234 (N.D. Ohio 1970) (dismissing indictment on the finding that
     the government had "engaged in an obnoxious form of using parallel proceedings"); *United States v.*

26   *Parrott*, 248 F. Supp. 196, 202 (D.D.C. 1965) (The government "may not bring a parallel civil
     proceeding and avail itself of the civil discovery devices to obtain evidence for subsequent criminal

27   prosecution").

28   [29]   The American Bar Association's Standards on Prosecutorial Investigations actually warn
     against conflicts of interest in parallel civil and criminal investigations like Attorney General Hood

1   Hood will be hobbled by divided loyalties owed to the putative class **and** his constitutional duties

2   owed to Mississippi's residents in connection with his ongoing civil and criminal investigation.[30]

3           MPERS' silence with respect to Attorney General Hood's ongoing investigation into

4   Facebook – while simultaneously noting two other states' Attorneys General's investigations – is

5   exacerbated by MPERS' failure to comply with Civil L.R. 3-7(c) and outside counsel's failure to

6   articulate how their beneficial ownership of Facebook stock does not constitute a further disabling

7   conflict of interest as Civil L.R. 3-7(d) requires.  Ultimately, Attorney General Hood's anomalous

8   role and parallel investigations underscore his bifurcated loyalties and confirm that his interests

9   diverge from those of the rest of the putative class in this case, all of which preclude a finding that he

10  is able to "fairly and adequately protect the interests of the class."  *Radcliffe v. Experian Info. Sols.*

11  is currently conducting, specifically cautioning that a prosecutor "should retain sole control of the
    criminal investigation and maintain independent judgment at all times," "should be aware of rules
12  that prohibit or restrict the sharing or disclosure of information or material gathered through certain
    criminal investigative techniques," and "should not be a party to nor allow the continuation of efforts
13  by civil investigative agencies or attorneys to use the criminal process for the purpose of obtaining a
    civil settlement."  ABA Standard 2.13.  Given Attorney General Hood's dual hats that only he can
14  wear pursuant to Mississippi law, General Hood cannot possibly comply with these standards.  *See*
    *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 805 (1987) (describing scenario
15  where attorney's conduct would violate ABA ethical provisions because attorney could not
    discharge the obligation of undivided loyalty to both clients where both have a direct interest,
16  including if a "prosecutor may be tempted to bring a tenuously supported prosecution if such a
    course promises financial or legal rewards for the private client" or "[c]onversely, a prosecutor may
17  be tempted to abandon a meritorious prosecution if a settlement providing benefits to the private
    client is conditioned on a recommendation against criminal charges").
18

19  [30]     This is not a remote risk, but a clear and present danger based on existing (and prior) civil
    and criminal investigations Attorney General Hood is (and has been) conducting.  *See* Myers Opp.
20  Decl., Ex. 5 ("AG Jim Hood threatening criminal prosecution to aid contingency lawyers in opioid
    cases," and noting that "[t]here's a massive conflict of interest in being able to criminally prosecute
21  the same person that you are suing in civil court."); Myers Opp. Decl., Ex. 6 ("Hood had agreed to
    drop his criminal inquiry in a letter agreement dated January 23, 2007.  On that same date State Farm
22  agreed to settle a civil case Hood had brought against State Farm in state court; a federal private
    class action brought for 32,000 policyholders by a group of lawyers headed by Richard F. ('Dickie')
23  Scruggs; and 640 individual cases also brought by Scruggs' group. The Scruggs attorneys stood to
    make $10-20 million in fees from the class action, and another $26 million from the 640 individual
24  cases.  Scruggs and other members of his group are major campaign contributors to attorney general
    Hood."); *see also* Myers Opp. Decl., Ex. 7 at ¶31 (alleging that Attorney General Hood "has utilized
25  and is continuing to utilize his criminal investigation of State Farm to coerce State Farm to
    compromise or give up its meritorious defenses to the civil actions filed by Attorney General Hood
26  and [Scruggs' law firm]").  In fact, in that prior case, which presented an arguably less conflicted
    scenario than here because it involved a separate civil case General Hood was not counsel in, the
27  erection of an ethical wall – which would be impossible to erect here – still did not prevent General
    Hood from accepting documents in the separate civil case for the criminal office's investigation.  *See*
28  *id.* at ¶¶33-37, 60; Myers Opp. Decl., Ex. 6.

AMALGAMATED BANK'S MEMORANDUM OF LAW IN OPPOSITION TO COMPETING LEAD
PLAINTIFF MOTIONS - 5:18-cv-01725-EJD                                              - 17 -

1    *Inc.*, 715 F.3d 1157, 1165-66 (9th Cir. 2013) ("We are concerned about the destruction of the

2    'shar[ed] . . . interests between the representatives and absentee[]' class members . . . ."); *Wilson v.*

3    *Conair Corp.*, 2016 WL 7742772, at *4 (E.D. Cal. June 3, 2016) (finding proposed representative

4    inadequate based on potential conflict of interest because she was "not only seeking injunctive relief

5    on behalf of the class but also individual personal injury damages" and recognizing the "substantial

6    risk that plaintiff will therefore have different priorities and litigation incentives than the class

7    members" and "could, for example, be tempted to accept an inadequate settlement offer on the class

8    claims in exchange for a larger settlement on her personal injury claims or, alternatively, be

9    motivated to proceed to trial when it may be in the best interest of the class to settle").

10          *DuPont v. Wyly*, 61 F.R.D. 615 (D. Del. 1973) is instructive.  A proposed class representative

11   (Mr. duPont) sought certification of a securities class action while several additional cases between

12   Mr. duPont and defendants, involving various facts, circumstances, and claims, were pending.  In

13   assessing the defendants' conflicting interest challenge to Mr. duPont's adequacy, the court first

14   recognized that adequacy in the class action context "demands assurance that representative parties

15   can be counted upon to faithfully defend the interests of all members of the class."  *Id.* at 621.  The

16   court further recognized that "'diverse and potentially conflicting interests within the class are

17   incompatible with the maintenance of a . . . class action.'"  *Id.* at 622.  In this regard, the court found

18   duPont's multiplicity of pending claims inconsistent with an assurance that duPont would not be

19   conflicted, and gave several examples of "situations [that] may arise in the course of this lawsuit in

20   which the judgment brought to bear by Mr. duPont could be influenced by considerations foreign to

21   the interests of the class," including:

- "Since plaintiff will receive the benefit of a large percentage of any judgment in the anti-trust suit, but will recover only a small portion of any recovery here, control over the prosecution of both cases presents him with both the opportunity and the incentive to protect his potential of recovery in the anti-trust suit by proceeding slowly here or indeed by 'throwing' this suit and barring class members from raising the same questions in later suits."  *Id.* at 622.

- "For example, if Mr. duPont has a desire to wage war with those who control UCC, he would be less favorably disposed than other members of the class to any overtures of settlement."  *Id.*

- "[W]here a person is a member of two groups with distinct and conflicting relevant interests and, on balance, his economic interest in one substantially outweighs his economic interest in the other he is unfit to represent the second group in a class suit." *Id.* at 623 (citing cases).

To alleviate these practical concerns, duPont responded that, "if he is permitted to represent the class, he will not press the damage claim asserted in the complaint against UCC, but will instead pursue recovery from the other defendants." *Id.* at 624.  Not surprisingly, the court determined "[t]his offer, contained in plaintiff's brief, dramatizes rather than alleviates Mr. duPont's conflicting interests." *Id.*  Ultimately, while the court recognized that its analysis of the conflict question "necessarily involved speculation about what might happen at various stages of this suit," the court "need not find that the events hypothesized represent plaintiff's present intent" and even recognized that "[h]is motives may be beyond reproach." *Id.*  "But the assurance demanded by due process and Rule 23 is that the representative party in a class action be free of any interest which holds the potential of influencing his conduct of the litigation in a manner inconsistent with the interests of the class.  That assurance is lacking here." *Id.*  So too here.

In sum, Attorney General Hood cannot ***simultaneously*** investigate and/or prosecute Facebook on behalf of Mississippi's residents ***and*** serve as the sole fiduciary on behalf of class members in this securities class action involving the same underlying misconduct without subjecting himself to an incurable conflict of interest that precludes a *prima facie* showing of adequacy.

### c.  MPERS' Designated Special Assistant Attorneys General Are Also Conflicted

In addition to Attorney General Hood's own divided loyalties which were omitted from MPERS' motion, the Special Assistant Attorneys General similarly neglected to comply with Civil L.R. 3-7(d) which requires "[e]ach lawyer seeking to serve as class counsel" in PSLRA case to "file a certificate" that either "[a]ffirms that the lawyer does not directly own or otherwise have a beneficial interest in securities that are the subject of the action," or "[s]et[] forth with specificity the extent of any such ownership or interest and explains why that ownership or interest does not constitute a conflict of interest sufficient to disqualify the attorney from representing the class." N.D. Cal. Civ. L.R. 3-7(d).  Here, not only has one of MPERS' retained Special Assistant Attorneys

General declined to file the required certification, neither of the two filed certifications even attempts to comply with the rule which requires the attorney to specify why the attorneys' beneficial ownership of Facebook securities in discretionary accounts managed by professional money managers does not constitute a disqualifying conflict of interest.  *See* ECF Nos. 41-42.[31]

When combined with other omissions concerning MPERS' financial interest and Attorney General Hood's simultaneous civil and criminal investigation into the same subject matter as this lawsuit – let alone MPERS' triggering of the presumptive bar – it is readily apparent that MPERS has not made a *prima facie* showing of typicality or adequacy.

**B.      Neither of the Other Movants – the "Facebook Investor Group" and Michael P. Carfagna – Can Trigger the PSLRA Presumption Because Both Lack a Sufficiently Large Financial Interest**

"If the plaintiff with the greatest financial stake does not satisfy the Rule 23(a) criteria, the court must repeat the inquiry, this time considering the plaintiff with the next-largest financial stake."  *Cavanaugh*, 306 F.3d at 730.  Amalgamated Bank has the largest financial interest of the remaining movants:

| Movant | Shares Purchased | Estimated Loss |
|---|---|---|
| Amalgamated Bank | 76,996 | $621,751 |
| Facebook Investor Group[32] | 55,195 | $150,303 |
| Michael P. Carfagna | options only[33] | $126,046 |

---

[31]      In MPERS' discussion of its adequacy and selection of counsel, it also neglected to even cite to the Second Circuit's reported *Bernstein* opinion.  *See supra* n. 8.

[32]      It is doubtful that the Facebook Investor Group could be appointed lead plaintiff in any event as it is an "amalgamation of previously unrelated individuals together in this case [that] was made 'for the sole purpose of aggregating their claims in an effort to become the presumptive lead plaintiff.'"  *Bodri*, 2016 WL 1718217, at *4 (concluding that such a group "fails to meet the adequacy prong of Rule 23").  Indeed, the group members' Certifications are in different formats, and one includes a statement that the individual retained a law firm that is not mentioned anywhere in the group's motion.  *See* ECF No. 36-2 at page 6 of 10.

[33]      *See generally Micholle v. Ophthotech Corp.*, 2018 WL 1307285, at *9 (S.D.N.Y. Mar. 13, 2018) ("the Wang Group traded almost exclusively in put and call options, making Wang and Zhao atypical plaintiffs"); *In re Elan Corp. Sec. Litig.*, 2009 WL 1321167, at *2 (S.D.N.Y. May 11, 2009) (recognizing that options traders may "introduce factual issues irrelevant to stockholder class members, like strike price, duration, maturity, volatility, and interest rates, and . . . could subject the class to unique defenses, causing unnecessary conflict").

1   ECF Nos. 29-3, 26-3, 36-3.  And, as its motion demonstrates, Amalgamated Bank satisfies the Rule

2   23 requirements and selected qualified counsel.  *See* ECF No. 28 at 6-7.  Therefore, the Court need

3   not look further than Amalgamated Bank.  *Cavanaugh*, 306 F.3d at 732.  The Facebook Investor

4   Group and Mr. Carfagna's motions should be denied.

5        **C.**    **Amalgamated Bank Is the Presumptive Lead Plaintiff Candidate**

6        Amalgamated Bank not only suffered a substantial, six-figure loss, it satisfies the Rule 23

7   requirements and is not subject to the PSLRA's presumptive bar on repeat litigants.  "[O]ther than

8   pointing out its relatively low[er] financial stake in the litigation," it is unlikely that the other

9   movants will make any argument against Amalgamated Bank's appointment.  *Tsirekidze v. Syntax-*

10  *Brillian Corp.*, 2008 WL 942273, at *5 (D. Ariz. Apr. 7, 2008) (appointing pension fund as lead

11  plaintiff despite the fact that it did not suffer the greatest financial interest because it "is the first

12  [movant] to meet [the PSLRA's] standards").

13       For over two decades, Amalgamated Bank has pursued a thoughtful approach to shareholder

14  engagement, promoting the highest standards of environmental, social, and corporate governance

15  practices at the companies in which it invests.  *See, e.g.*, *Enron*, 206 F.R.D. at 454 (noting that

16  Amalgamated Bank moved "for an injunction freezing and imposing a constructive trust over insider

17  trading proceeds" and "sought limited expedited discovery from Arthur Andersen LLP" based on

18  evidence brought "into court of document destruction at Enron's headquarters in Houston").

19  Amalgamated Bank is exactly the type of judicious and effective litigant envisioned by the PSLRA

20  to serve as a lead plaintiff.

21  **III.**    **CONCLUSION**

22       MPERS cannot serve as lead plaintiff because it: (1) cannot meet its burden under the

23  PSLRA's Five-in-Three Provision to lift the presumptive bar; (2) withheld its financial interest; and

24  (3) cannot make the Rule 23 showing required of it due to divided loyalties and conflicts of interest.

25  The Facebook Investor Group and Mr. Carfagna suffered a smaller loss than Amalgamated Bank and

26  cannot trigger the statutory presumption.  Consequently, all three competing motions should be

27  denied.  Amalgamated Bank's motion should be granted.

28

DATED: June 4, 2018

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIELLE S. MYERS
MICHAEL ALBERT


s/ Danielle S. Myers
DANIELLE S. MYERS

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON C. DAVIS
KENNETH J. BLACK
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

[Proposed] Lead Counsel for Plaintiff

1

<u>CERTIFICATE OF SERVICE</u>

2       I hereby certify that on June 4, 2018, I authorized the electronic filing of the foregoing with

3 the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4 e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5 caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6 CM/ECF participants indicated on the attached Manual Notice List.

7       I certify under penalty of perjury that the foregoing is true and correct.  Executed on June 4,

8 2018.

9                                   <u>   s/ Danielle S. Myers            </u>
DANIELLE S. MYERS

10

11 ROBBINS GELLER RUDMAN
      & DOWD LLP

12 655 West Broadway, Suite 1900
San Diego, CA  92101-8498

13 Telephone:  619/231-1058
619/231-7423 (fax)

14 E-mail:  dmyers@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 5:18-cv-01725-EJD Yuan v. Facebook, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,7223240420@filings.docketbird.com

- **Kenneth Joseph Black**
  KennyB@rgrdlaw.com

- **Francis A. Bottini , Jr**
  fbottini@bottinilaw.com,sammirati@bottinilaw.com

- **Paul J. Collins**
  pcollins@gibsondunn.com,atumanova@gibsondunn.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,ptiffith@rgrdlaw.com,KennyB@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com

- **Kristin A. Linsley , Esq**
  KLinsley@gibsondunn.com,lchiou@gibsondunn.com,RWong@gibsondunn.com

- **Joshua Seth Lipshutz**
  jlipshutz@gibsondunn.com,pkaul@gibsondunn.com,kwarren@gibsondunn.com,gholman@gibsondunn.com,shinrick@gibsondunn.com,gbok@gibsondunn.com,cschm

- **Brian Michael Lutz**
  BLutz@gibsondunn.com,pkaul@gibsondunn.com,kwarren@gibsondunn.com

- **Mark Cotton Molumphy**
  mmolumphy@cpmlegal.com,zagudelo@cpmlegal.com,shernandez@cpmlegal.com,kma@cpmlegal.com,kchen@cpmlegal.com,jacosta@cpmlegal.com,emartinez@cpi

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,3045517420@filings.docketbird.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com,bmurray@glancylaw.com

- **Orin Snyder**
  osnyder@gibsondunn.com,pkaul@gibsondunn.com,kwarren@gibsondunn.com,gholman@gibsondunn.com,shenrick@gibsondunn.com,gbok@gibsondunn.com,cschm

- **David Ronald Stickney**
  davids@blbglaw.com,avi@blbglaw.com,lisa.napoleon@blbglaw.com,ashley.lee@blbglaw.com,kayem@blbglaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)