# EXHIBIT 6

# FORTUNE

## State Farm v. AG Jim Hood: Wild suit, wild questions, wild ending

By **ROGER PARLOFF** February 8, 2008

Yesterday morning, an extraordinary lawsuit — in which State Farm had gone to Mississippi federal court to enjoin a Mississippi state criminal investigation of the insurer — ended in an extraordinary way.

After Mississippi Attorney General Jim Hood endured three hours of tough questioning by a State Farm attorney (who said, when court adjourned at 5 p.m., that he still had another hour left to go), attorneys for both sides huddled for hours until they struck a settlement. It was finalized Wednesday morning, before Hood's testimony was to resume.

Most details of the settlement were sealed, including the all-important question of whether Hood would be permitted to continue his criminal inquiry. It appears that Judge David C. Bramlette wrestled the agreement out of the parties after making an important, though not necessarily determinative, legal finding in State Farm's favor. His order is available here.

Nevertheless, my very subjective reading of the spectacle (I'd gone down to the Natchez, Mississippi, federal court to watch the hearing) was that it had ended rather like that infamous Roberto Duran-Sugar Ray Leonard bout in which Duran failed to answer the eighth-round bell, mumbling, "*No más, no más.*"

The case, which State Farm brought last September, is an instance of one of the rarest species of lawsuit, and one of the most difficult to win: a suit by the target of a state criminal investigation asking a federal court to halt the inquiry in its tracks.

Generally, the law forbids federal courts from interfering in this situation, because the federal courts are supposed to assume that state courts will adequately protect the federal civil rights of the target.

There is a narrow exception to that rule, however, if the target can show that the state prosecution is being brought in "bad faith" or for purposes of "harassment" — an extremely difficult thing to prove. Nevertheless, under the unusual facts of this case, State Farm, in fact, won a temporary restraining order against Hood last September, which was still in effect as of Wednesday, and it is hard to believe that State Farm would have settled the case without keeping that ban in place.

State Farm's statement on the outcome reads: "Judge Bramlette has ruled that our contract with the attorney general is valid, unambiguous and enforceable and we are very pleased with the outcome."

Hood's office, on the other hand, emailed this comment: "Thanks to Judge Bramlette, who has the patience [of] Job, this case has been dismissed. I am glad I had an opportunity to rebut the allegations against our office. The Office of Attorney General will continue to fight for the policy holders [of] Mississippi. As for the criminal investigation, as with any case, I cannot comment."

In February 2006 Attorney General Hood commenced a criminal investigation into whether State Farm had engaged in fraudulent practices to avoid paying

money it owed policyholders for wind damage sustained in Hurricane Katrina. (A thirty-foot storm surge had demolished many homes on the coast, leaving nothing but slabs of concrete; that made it hard to determine the degree to which the homes had suffered damage from hurricane-force winds, which was covered under homeowners policies, before they were washed away by the later storm surge, which was not.)

Hood had agreed to drop his criminal inquiry in a letter agreement dated January 23, 2007. On that same date State Farm agreed to settle a civil case Hood had brought against State Farm in state court; a federal private class action brought for 32,000 policyholders by a group of lawyers headed by Richard F. ("Dickie") Scruggs; and 640 individual cases also brought by Scruggs' group. The Scruggs attorneys stood to make $10-20 million in fees from the class action, and another $26 million from the 640 individual cases. Scruggs and other members of his group are major campaign contributors to attorney general Hood.

While the settlement of the 640 individual cases did become final, a federal judge refused to approve the class action deal as proposed. Then, before that judge's qualms could be addressed, the Scruggs group lawyers withdrew from the deal, and the case was dismissed. There is evidence that the Scruggs group withdrew from the deal at least in part because they were infuriated that State Farm had failed to pressure a subcontractor into dropping its suit against two former employees who had, for many months, been secretly assisting both the Scruggs group and the Hood investigation by supplying them with internal, confidential State Farm documents — allegedly in violation of their employment agreements. Scruggs himself was the main party on the hook in the case against the whistleblowers, since he was paying their attorneys fees and had agreed to indemnify them for any judgment ultimately entered against them.

After the class action deal fell apart, State Farm says it nevertheless honored the deal's substantive terms — reevaluating slab claims and offering to pay a minimum of 50% of the policyholders' policy limits for structural damages — albeit in the more informal setting of mediations supervised by the Mississippi Department of Insurance. (The Scruggs group attorneys don't make any money off these mediations.) The company claims to have already paid out more than $70 million to policyholders in those mediations in a process that is ongoing.

In August 2007 Hood served State Farm with a new criminal grand jury subpoena seeking documents nearly identical to those that had been sought during his earlier criminal inquiry, prompting State Farm to sue the following month in federal court in Jackson, Mississippi, to stop Hood from reopening the criminal inquiry. State Farm claimed that Hood was violating its January 2007 letter agreement and unethically colluding with the Scruggs group, using the criminal proceeding as a way to pressure State Farm into paying lucrative settlements that would benefit the Scruggs lawyers — Hood's campaign contributors.

Hood responded that his January 2007 agreement had only been a "gentleman's agreement"; that, in any case, State Farm had failed to honor its terms in that the deal had contemplated federal court supervision; and that the criminal inquiry was, in any event, not covered by the letter agreement because it was a new inquiry focusing no longer upon a fraud upon policyholders (withholding payments for wind damage) but fraud upon the National Flood Insurance Program (improperly deflecting State Farm's wind damage liability to the federally-funded National Flood Insurance Program).

Even before State Farm filed its suit on September 13, 2007, the plot had begun to thicken. On August 21, 2007, Scruggs was indicted in federal court in Birmingham for criminal contempt for failing to obey a court order in the case brought by State Farm's subcontractor against his whistleblowers. Scruggs has pleaded not guilty. The order he is charged with defying had required him to return to the subcontractor documents that had been "purloined" by Scruggs's whistleblowers; instead, Scruggs had turned the documents over to Hood's office (even though Hood's office already had a set).

In June 2007, Judge William Acker Jr. had recommended that criminal contempt charges be brought against Scruggs. He had found that the night after Acker issued his order, Scruggs had called Hood and had prompted him to have a subordinate email instructions to Scruggs to send the documents to him. He noted that he could not understand why Scruggs and Hood would have behaved as they had unless they had "teamed up to bully State Farm into civil and criminal settlements."

Then in late November 2007, Scruggs and four associates were indicted by federal prosecutors in Oxford, Mississippi for allegedly trying to bribe a state judge to influence litigation stemming from an intra-Scruggs-group squabble over the $26 million in fees received from State Farm's settlement of the 640 Katrina cases. Scruggs has pleaded not guilty to those charges, too.

At Wednesday's hearing, attorney general Hood professed very vague memories of what, if anything, Scruggs had asked him to do in the days immediately following Judge Acker's order, stating only that his understanding had been that there was a "law enforcement exception" to the order and referring all more specific inquiries to the line prosecutor handling the inquiry, Courtney Schloemer. He said he'd never seen the letter Schloemer emailed to Scruggs instructing him to send the documents to her, though he'd had "some communication" about it with her before she sent it.

Schloemer had been subpoenaed to testify at this week's hearing, so had the proceeding not been settled, she presumably would have done so. It would have been a ticklish task. She either would have had to accept sole responsibility for aiding conduct that Judge Acker has said he considers contemptuous, or she would have had to testify that her boss played a more active role than he now recalls. (In his testimony Wednesday, Hood also maintained that he had still never read any of Judge Acker's orders, including the one that had all but labeled Hood a co-conspirator in Scruggs' alleged contempt.)

But the emotional high point of Wednesday's hearing came when State Farm attorney James R. Robie posed a certain highly specific question to Hood, the very asking of which suggested that State Farm might have somehow gained access to sources who were once quite close to Scruggs.

An attorney's questions do not constitute evidence. On the other hand, an attorney is not supposed to ask an inflammatory question without a good-faith basis. Accordingly, it was a bombshell when State Farm's Robie began the following line of inquiry:

Q. Mr. Hood, before Scruggs settled with State Farm ... the case with 640 plaintiffs, which generated a fee in excess of $20 million for Mr. Scruggs and his partners, did they dispatch Mr. [Timothy] Balducci and Mr. [Steven] Patterson to have dinner with you in a restaurant in Jackson to talk about that?" [Balducci and Patterson are associates of Scruggs who have each pleaded guilty to bribing a state court judge in connection with one of the two federal criminal cases that Scruggs now stands accused of.]

A. I don't know.

Hood's counsel, J. Lawson Hester, objected on relevance grounds, but Judge Bramlette overruled and allowed Robie to press further.

Q. I'm asking you whether or not Mr. Scruggs sent Mr. Balducci and Mr. Patterson to have dinner with you here at a restaurant in Jackson to talk about settlement of that case.

A. I don't know what Mr. Scruggs did with Balducci and Patterson.

Q. Did you have dinner with Mr. Balducci or Mr. Patterson at Crechale's restaurant where they discussed Scruggs' desire to settle that case?

A. No, sir. I haven't been to Crechale's in a long time.

Q. You did not have dinner with them where they discussed —

A. When are you talking about? And you said "Crechale's." I haven't been to Crechale's so I know I didn't have dinner with anybody at Crechale's.

Q. My real question is: Did Mr. Patterson or Mr. Balducci have dinner with you and tell you that if you did not participate or assist Mr. Scruggs in settling that mass tort action which was going to generate a 20-million-dollar-plus fee, that he would fund an alternative candidate to run against you for attorney general?

A. If you're asking me did somebody come to me and threaten me, the answer is no. Now, out of all candor in this, I don't want to mislead you. I remember having dinner on one occasion with Mr. Balducci and Mr. Patterson, but that conversation was about they were leaving the firm that they were presently — that Mr. Balducci was presently with. They didn't convey any threats to me about settling the case or anything like that. [Balducci left the firm of Joey Langston in about January 2007 to start his own firm, bringing nonlawyer Patterson, who had also worked with Langston, with him as a business associate. (Last month Langston pled guilty to participating in yet another bribery attempt, in 2006, allegedly intended to aid Scruggs in a different state-court fee-dispute litigation. Scruggs has denied involvement in any wrongdoing there, too.)]

Q. They never suggested that if you didn't participate in dropping your criminal investigation that Dickie Scruggs would fund an alternate candidate and [former Mississippi attorney general] Mike Moore would support that?

A. No, sir. Absolutely not.

Well, Hood denied it, so that's where things stand. But had the proceeding continued, we might have learned what Mr. Robie's basis was for asking the question, and we might have heard some other interesting questions he thought he had a good-faith basis for asking.

Between the pending federal prosecutions of Scruggs and the multiple ongoing litigations between State Farm and the remnants of Scruggs's group, now known as the Katrina Litigation Group, it seems likely that we will eventually be hearing more about the evidence that prompted Mr. Robie's question.