# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE SEARS HOLDINGS CORPORATION
SECURITIES LITIGATION

No. 06 Civ. 4053-JES

**LEAD PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.   BASIS OF ALLEGATIONS ...................................................................................2

II.  PARTIES ..............................................................................................................6

     A.   Lead Plaintiffs ..........................................................................................6

     B.   Defendants. ...............................................................................................7

III. JURISDICTION ....................................................................................................9

IV.  FACTUAL BACKGROUND ................................................................................9

     A.   Confidential Witnesses ............................................................................9

     B.   Kmart's Enormously Valuable Real Estate Portfolio ...........................11

          1.   Kmart's Expansion Into Real Estate .........................................11

          2.   Kmart's Valuable Real Estate Holdings ....................................11

          3.   Prior To The Bankruptcy, The True Value Of Kmart's Real Estate
               Holdings Was Not Apparent In Its Public Filings .....................13

     C.   Kmart Bankruptcy ..................................................................................16

          1.   The Bankruptcy Petition ............................................................16

          2.   Kmart's Initial Reorganization Steps.........................................16

          3.   ESL and Lampert Invest In Kmart Bonds and Unsecured Claims ...........17

          4.   The Plan Of Reorganization.......................................................18

          5.   The Investment Agreement Between Kmart, ESL and TAP ....................18

          6.   Kmart Emerges From Bankruptcy .............................................20

     D.   Kmart's Misleading Disclosures Regarding The Market Value Of
          Its Real Estate ........................................................................................20

          1.   Kmart's Misleading Bankruptcy Disclosures  Regarding Real
               Estate Value ..............................................................................20

          2.   Kmart's Misleading Post-Bankruptcy Disclosures  Regarding Real
               Estate Value ..............................................................................22

E.      Kmart's Real Estate Sales Begin to Reveal The True Value Of Kmart's Real Estate Portfolio ..................................................................................23

F.      Kmart/Sears Merger ..........................................................................................28

V.      FALSE AND MISLEADING STATEMENTS ....................................................28

A.     First Quarter 2003 10-Q and Earnings Release ....................................................31

B.     Second Quarter 2003 10-Q and Earnings Release ................................................33

C.     Third Quarter 2003 10-Q and Earnings Release ..................................................35

D.     2004 Form 10-K .................................................................................................38

E.     First Quarter 2004 10-Q and Earnings Release ....................................................42

VI.     KMART VIOLATED CERTAIN GAAP DISCLOSURE REQUIREMENTS ...............44

A.     SOP 90-7 ..............................................................................................................44

B.     CON 1 ...................................................................................................................45

C.     SFAS 141 ..............................................................................................................46

VII.    DEFENDANTS HAVE NOW ADMITTED FACTS THAT SHOW THAT THE MARKET VALUE ASSESSMENT THEY RELIED UPON WAS GROSSLY UNDERVALUED, SATISFYING THE SCIENTER STANDARD UNDER THE PSLRA .........................................................................................................................46

VIII.   CLASS ACTION ALLEGATIONS ..................................................................................53

IX.    DEFENDANTS CANNOT AVAIL THEMSELVES OF THE SAFE HARBOR DEFENSE UNDER SECURITIES LAWS ......................................................................56

X.     DEFENDANTS MAY NOT AVAIL THEMSELVE OF THE SAFE HARBOR DEFENSE UNDER SECTION 1125 OF THE BANKRUPTCY CODE ......................58

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ...........................................................................................................................58

XII.   LOSS CAUSATION ALLEGATIONS ............................................................................59

XIII.  DURING THE CLASS PERIOD, DEFENDANTS LAMPERT AND DAY ACTED AS CONTROL PERSONS AS DEFINED BY THE EXCHANGE ACT .......................61

XIV.  CAUSES OF ACTION .......................................................................................................63

This is a securities class action brought by the Public Employees' Retirement System of Mississippi, Plumbers and Pipefitters National Pension Fund, Fred P. Campo and Leonard Cope (collectively "Lead Plaintiffs"), by and through their attorneys Grant & Eisenhofer P.A., Lerach Coughlin Stoia Geller Rudman & Robbins LLP and Gardy & Notis, LLP, on behalf of themselves and a proposed class of entities and persons who sold any shares of Kmart Holding Corporation ("Kmart") stock between May 6, 2003 through September 29, 2004 (the "Class Period").

Lead Plaintiffs allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge.  Lead Plaintiffs' information and belief is based upon, among other things, its investigation, conducted by and through its attorneys, into the facts and circumstances alleged herein including, without limitation: (a) interviews with former employees of Kmart, Kmart's successor, subsidiaries and companies affiliated with and doing business with Kmart, including third parties retained during Kmart's bankruptcy proceeding; (b) review and analysis of filings made by Kmart and its successor in interest, Sears Holdings Corporation ("Sears" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (c) review and analysis of filings made during Kmart's bankruptcy proceeding; (d) press releases, public statements, news articles, securities analysts' reports and other publications disseminated by or concerning Kmart, Sears, Kmart's subsidiaries and/or the other defendants; and (f) other publicly available information about Kmart, Sears, Kmart's subsidiaries and/or the other defendants.

Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Consolidated Class Action Complaint (the "Complaint") after a reasonable

opportunity for discovery.  Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody and/or control.

## I.      BASIS OF ALLEGATIONS

1.      Lead Plaintiffs bring this action for securities fraud against Sears, the legal successor to Kmart, Julian Day ("Day"), the former CEO of Kmart, and Edward S. Lampert ("Lampert") (collectively, "Defendants") to recover damages sustained in connection with the Defendants' fraudulent material misrepresentations and omissions regarding the value of real estate held by Kmart.  These statements were made in a number of public statements filed the SEC after Kmart emerged from bankruptcy on May 6, 2003.

2.      In their public statements, Defendants misrepresented material information that would have allowed investors to understand that Kmart's real estate was worth tens of billions of dollars and falsely reported that Kmart's entire property, plant and equipment ("PPE") was worth only $10 million, when the real estate alone was worth more than a thousand times that amount. As a result of these misrepresentations, Kmart's stock price was substantially undervalued, allowing Defendants to purchase shares at reduced prices and causing Lead Plaintiffs and the Class to sell their shares for much less than those shares would have been worth had the truth been disclosed.  When the truth was finally disclosed through a series of real estate transactions, Kmart stock jumped more than 61% in value from $54.86 to $88.06.

3.      Kmart was one of America's largest retailers and, during the 1970s and 1980s, conducted an enormous expansion of its operations.  During the mid to late 1980s, Kmart was a pioneer in a type of transaction that became known as a "sale-lease back."  In a sale-leaseback, the owner of a property sells it and leases it back from the buyer.  This frees up the capital of the original owner while allowing the owner to retain possession and use of the property.  Kmart's thousands of owned and leases store locations were on extremely favorable terms with very low,

fixed lease rates for periods that often exceeded 50 years.  By 2002-2003, because of their favorable lease terms in comparison to then prevailing market rates, these leased and owned store locations were extraordinarily valuable.  However, Kmart's public filings represented that the value of the real estate was just $10 million.  At the same time, Kmart's actual retail operations were poorly run and on January 22, 2002, Kmart was forced to file for bankruptcy protection.

4.     Defendant Lampert and the hedge fund that he operates, ESL Holdings, Inc. ("ESL"), are well-known as shrewd, even brilliant investors who are able to recognize undervalued assets.  Lampert was friendly with several persons who were intimately familiar with Kmart's sale-leasebacks and the resulting undervaluation of Kmart's real estate assets in its financial disclosures.  Consequently, ESL acquired debt of Kmart at distressed prices.   By September 2002, Lampert held roughly one-third of all Kmart debt, allowing Lampert to become involved in the bankruptcy and to become privy to confidential Kmart financial information as a member of the Financial Institutions Committee ("FIC"), the committee overseeing the bankruptcy on behalf of institutions with holdings in Kmart at the time of the bankruptcy.

5.     Kmart emerged from bankruptcy on May 6, 2003, appointing defendant Lampert its Chairman on the same day.  Even if he had no duty prior to that day, as of that day, defendant Lampert had a duty to report accurately the market value of Kmart's real estate holdings in Kmart's subsequent SEC filings.  No longer was Lampert a private investor with obligations only to ESL.  He had chosen to become a Kmart insider and thus assumed certain responsibilities to Kmart investors.  His knowledge was Kmart's knowledge and needed to be reflected in Kmart's public statements and securities filings.  Defendant Day, as Kmart's CEO, already possessed this duty.

6.      Throughout Kmart's bankruptcy, however, Defendants had represented to Kmart's creditors and the bankruptcy court that Kmart's real estate had little value.  The liquidation analysis filed by the Company on January 24, 2003 as part of its Plan of Reorganization ("POR") estimated that the total recovery value of Kmart's stores, both owned and leased, would be no more than $700 million.  On January 28, 2003, Kmart filed a Form 8-K with the SEC asserting that the net book value of its PPE was only $4.6 billion (with less than $3 billion allocated to owned and leased real estate).  Using "Fresh-Start accounting," a form of accounting used in bankruptcy proceedings, Kmart reported that it had $10 million of PPE as long-term assets on its financial statements.  Critically, even after Kmart emerged from bankruptcy on May 6, 2003, Kmart repeated in its public filings, beginning with a Form 10-Q filed on June 16, 2003, that its real estate portfolio was valued at just $10 million.

7.      Kmart's public representations regarding the value of its real estate were in sharp contrast to the information possessed by corporate insiders, such as Defendants Day and Lampert.  Lead Plaintiffs have now learned that Defendants had access to reports based on data maintained on Kmart's real estate management system, which contained specific information about Kmart's owned and leased real estate, including the specific terms of store leases, location, rent per square foot, and other information that Kmart kept confidential from its competitors and the general public.  The insider data reflected not the book value of Kmart's real estate (a depressed number calculated by carrying the original cost of the real estate, less its depreciation over time), but the leasehold value, which could be used to calculate the potential market value of Kmart's real estate.  Kmart's leasehold interest in the real estate, which resulted from the exceptionally generous terms in Kmart's leased stores, was very high.  At the time Kmart was publicly claiming total PPE of only $10 million, these internal reports showed Kmart could sell

owned and leased stores at rates as high as $11.5 to $15 million per store, making its real estate portfolio worth as much as $9 to $18 billion.

8.      Lampert was highly motivated to keep his knowledge about the value of Kmart's real estate to himself because, during the bankruptcy and thereafter, he had obtained the right to receive Kmart stock at prices ranging from $10 to $13 per share.  Lampert knew that the price of Kmart's stock would have been far higher had he disclosed the truth about the value of Kmart's real estate.

9.      It was not until mid-2004, when Kmart engaged in its first store sales post-bankruptcy, that the true value of Kmart's real estate holdings began to be revealed.  On June 4, 2004, Kmart announced that it would sell up to 24 stores to The Home Depot Inc. ("Home Depot") for up to $365 million, or roughly $15 million per store. On this news, Kmart's stock price jumped $7.67 per share to $62.53 per share, nearly a 14% increase.  On June 30, 2004, Kmart announced the sale of 54 stores at a maximum purchase price of $621 million in cash to Sears, Roebuck & Co. ("Sears, Roebuck"), with each store fetching an average price of $11.5 million.  Following this second announcement, Kmart's common stock increased $3.58 per share, or approximately 5.25%, and closed at $71.80 per share.

10.      On September 29, 2004, Kmart announced that it had finalized the transaction with Sears, Roebuck, selling 50 stores for an aggregate purchase price of approximately $575 million in cash, or an average price of $11.5 million.  As a result, Kmart's common stock increased $2.21 per share, or approximately 2.57%, and closed at $88.06 per share.  These three increases reflect that Kmart's stock was undervalued by $33.20 as a result of its misrepresentations regarding its real estate, or a total of $3.3 billion.

11.     Relying on the store sales, analysts began to project share values for Kmart's real estate alone ranging as high as $150 per share.  Given Kmart's 100,000,000 outstanding shares at that time, the value of the real estate exceeded $15 billion.  Further, projecting the value of sold stores in Kmart's entire real estate portfolio indicates that Kmart's real estate may have been worth in excess of $18 billion.

12.     Lead Plaintiffs and the Class were deceived about the true value of their Kmart shares by Defendants' affirmative misrepresentations and omissions concerning the true value of Kmart's real estate portfolio during the Class Period.  These representations began after Kmart emerged from bankruptcy and continued throughout the Class Period.  In reliance on Defendants' misrepresentations, investors who acquired Kmart shares through the bankruptcy process or thereafter and who sold those shares before September 29, 2004, for substantially less than those shares were worth, were damaged.  Unlike Lead Plaintiffs and the Class, Defendants Lampert (though ESL) and Day profited handsomely, acquiring more than 14 million Kmart shares through the bankruptcy proceeding for prices as low as $10 per share, when those shares were worth at least $35 more than they paid for them, providing them with excess value due to their fraud of at least $500 million.

## II.     PARTIES

### A.     Lead Plaintiffs

13.     The Public Employees' Retirement System of Mississippi ("Mississippi PERS") is a pension fund for the benefit of the current and retired public employees of the State of Mississippi.  Mississippi PERS has approximately $16 billion in total assets under management and is responsible for the retirement income of employees of the state, public including current and retired employees of the state, public school districts, municipalities, counties, community colleges, state universities and such other public entities as libraries and water districts.

Mississippi PERS provides benefits to over 60,000 retirees, and future benefits to more than 250,000 current and former public employees.  As set forth in its previously filed certifications, incorporated herein my reference, Mississippi PERS sold shares of Kmart during the Class Period and suffered losses as result of the federal securities law violations alleged herein.

14.     Plumbers and Pipefitters National Pension Fund ("Plumbers and Pipefitters") manages the pension assets for Plumbers and Pipefitters participants and their families. Plumbers and Pipefitters is one of the nation's largest Taft-Hartley funds with more than 144,000 participants and beneficiaries and assets of approximately $4 billion.  As set forth in its previously filed certifications, incorporated herein my reference, Plumbers sold shares of Kmart during the Class Period and suffered losses as a result of the federal securities law violations alleged herein.

15.     As set forth in their previously filed certifications, incorporated herein my reference, Fred S. Campo and Leonard Cope are individual investors who collectively purchased $40,000 in Kmart bonds, which were subsequently exchanged for Kmart shares in the bankruptcy and then sold during the Class Period at artificially depressed prices.  Campo's stock sales represented a loss of 82% on his investment and Cope's stock sales represented a loss of 70%.

**B.     Defendants.**

16.     Defendant Sears is an Illinois corporation with its principal place of business at Hoffman Estates, Illinois. Sears was formed in 2005 when Kmart Holdings Corporation (the post-bankruptcy successor to Kmart Corporation) purchased Sears, Roebuck.  Sears is the successor in law and in fact to Kmart's debts, obligation and liabilities. Sears engages in the nationwide retail marketing, distribution and sale of a broad variety of consumer goods, under brand names such as Craftsman, Kenmore, Lands End, DieHard, Martha Stewart Everyday, Joe

7

Boxer, Jaclyn Smith, Sesame Street, and under the proprietary Kmart label as well. Sears reported net income of $858 million for its 2005 fiscal year, on some $55 billion in revenues.

17.     Defendant Lampert is an individual with a residence in Greenwich, Connecticut. Chairman of Sears's Board of Directors through March 2005, Lampert is also the Chairman, Chief Executive Officer, and principal owner of ESL, a hedge fund based in Greenwich, Connecticut. Lampert founded ESL in April 1988. Lampert was previously Kmart's chairman as well as a director of Kmart, and during the bankruptcy proceeding, Lampert sat on the FIC, charged with obtaining the largest possible recovery for creditors of Kmart. Through ESL, Lampert owned approximately 51.4% of Kmart's stock during times material to this Complaint. During the bankruptcy, due to Lampert's position on the FIC and as a plan investor, Lampert was in a position to influence the appointment of six of nine Kmart board members.  Upon Kmart's emergence from bankruptcy on May 6, 2003, Lampert became Chairman of the Company.

18.     Defendant Day became the President and Chief Operating Officer of Kmart in March 2002 and served as Chief Executive Officer of Kmart from January 2003 to October 2004.  Following the merger of Kmart and Sears, Roebuck, Day served as a Director of Sears Holding Corporation (the parent company of Sears, Roebuck and Kmart Corporation) until April 2006.  Prior to joining Kmart as CEO, Day served as Chief Operating Officer and a member of the Office of the Chief Executive of Sears.  During the Class Period, Day was instrumental in orchestrating Kmart's post-bankruptcy strategy and knew that Kmart's real estate portfolio, undervalued in the bankruptcy, would be the linchpin of that strategy.  On September 10, 2003, he acquired 1,038,507 options to purchase Kmart stock at $10.00 per share and a further 519,253 options to purchase Kmart stock at $20.00 per share.  Day held onto these options during the Class Period and, after the merger of Sears and Kmart, exercised 983, 317 options (which were

converted to options to acquire Sears shares) at $10 to $20 each and sold his shares at prices ranging between $120 and $155.50 per share. It cost Day $13 million to exercise these options and he sold the shares for $145 million after the Class Period.

## III. JURISDICTION

19. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated under Section 10(b) of the Exchange Act, 17 C.F.R. § 240.10b-5, and 15 U.S.C. § 78r.

20. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

21. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the acts and transactions forming the basis for the claims in this action, including the preparation and dissemination of materially false and misleading information, and the failure to disclose material information, occurred in substantial part in this District.

22. In connection with the acts and omissions alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the mails, interstate telephone communications and the facilities of the national securities markets.

## IV. FACTUAL BACKGROUND

### A. Confidential Witnesses

23. The factual allegations set forth herein are based on the investigation of Lead Plaintiffs and their counsel and agents, as well as on the direct personal knowledge of witnesses in position to ascertain the facts attributed to them in this Complaint.

24.     Witness 1 ("W1") is a former executive at Kmart employed in its real estate department.  W1 was directly involved with research supporting the Company's decisions to purchase, sell or develop real estate.  W1's employment at Kmart ended just prior to Kmart's bankruptcy.  In this role, W1 was in a position to review information maintained on Kmart's real estate management system ("REMS") and collect data from REMS reports.  W1 stated that senior management, including Defendant Day, had access to REMS, as did members of Kmart's Board of Directors.

25.     Witness 2 ("W2") was formerly employed at Rockwood Gemini Advisors ("Rockwood"), a third party hired during Kmart's bankruptcy to assist with the valuation of Kmart's real estate and store locations.  W2 worked with Rockwood through Kmart's emergence from bankruptcy and was in a position to know the true leasehold and market value of Kmart's properties during and after bankruptcy.

26.     Witness 3 ("W3") was an executive in Kmart's real estate department who left the Company while Kmart was in bankruptcy.  W3 was involved with expanding, remodeling and disposing of Kmart stores, and was directly involved in the decision to sell Kmart stores in the first tranche of store sales in the bankruptcy.  W3 was thus in a position to know how to assess whether to expand or retain Kmart stores, as compared to the cost of subleasing them and building new stores from the ground up.

27.     Witness 4 ("W4") is employed by Abacus Realty ("Abacus"), a third party hired by Kmart during the bankruptcy to assess Kmart's leases and assist in the sale of Kmart stores during the first tranche of sales in the bankruptcy.  W4 confirmed that Abacus analyzed Kmart's leases as part of this assignment and reported these findings to Kmart.

**B.**   **Kmart's Enormously Valuable Real Estate Portfolio**

    **1.**   **Kmart's Expansion Into Real Estate**

28.   Although Kmart's origins dated to the Kresge chain founded in the 1890s, it began a massive expansion into "big box" (tens to hundreds of thousands of square feet per store) stores in the 1970s, adding several thousand locations through both purchases and leases. By the 1980s, an era in which the yield on property was low because capitalization was inexpensive, it became increasingly attractive to commercial entities to rent rather than buy property. Accordingly, Kmart began selling and then leasing back its property, structuring the terms to its own advantage. Sale leasebacks were an effective way for Kmart to generate cash, improve debt-to-equity ratio and reduce depreciation and interest costs. Because Kmart was the seller in a novel kind of transaction, Kmart was able to negotiate extremely generous terms for itself in the leases.

29.   Large Real Estate Investment Trusts ("REITs") acted as landlords to Kmart, acquiring big box spaces and leasing them back. However, the terms of Kmart's leases were confidential information for obvious reasons: disclosure in the marketplace would have undermined Kmart's ability to negotiate new lease terms effectively.

    **2.**   **Kmart's Valuable Real Estate Holdings**

30.   As a result of its enormous expansion beginning in the 1970s, Kmart held a vast real estate portfolio consisting of owned and leased stores. Many of its owned stores were in prime locations, rendering them very valuable. In addition, the value of Kmart's real estate portfolio was also substantial due to the high resale value of Kmart's leases, which comprised the majority of Kmart stores. According to W1, roughly half of those leases were negotiated in the 1970s, and, in many cases, had lease and options terms exceeding 75 years.

31.     By 2002, the REMS database was in place, tracking the terms of Kmart's leases and store operations and, implicitly, the value of its real estate holdings.  According to W1, REMS tracked operational data for each store location.  W1 reported that information from REMS was easily accessible to senior management and to members of Kmart's Board of Directors.  According to W1, based on information obtained from REMS, reports as to the leasehold value of each store location were prepared for senior executives of Kmart.

32.     In addition to its internal sources of information, during its bankruptcy proceeding (discussed *infra* at Section IV. C.), Kmart hired Abacus to survey the terms of its leased properties.  Lead Plaintiffs now possess a document prepared in August, 2002 by Abacus, which identifies by Kmart store each lease term, the rent per square foot, the number of square feet per store, as well as the number of options to renew the lease and the terms of each renewal.  The document also identifies whether the leases were "gross lease" – meaning that the landlord assumed responsibility for taxes and maintenance on specific fixtures – or "net lease" – meaning that the tenant assumes responsibility for them.  W4, who did not produce the document, independently corroborated that Abacus possessed and analyzed information regarding Kmart's leases.

33.     According to the Abacus document, the vast majority of Kmart's leases contained provisions that fixed the rent for the length of the contract.  Many of the leases with fixed rent provisions also had eight or more five-year options to extend the contract, meaning that rent remained static for the life of those extensions, which could be longer than seventy-five years.  In contrast, leases negotiated beginning in the mid 1990s had inflationary clauses that caused rent to increase over time.

34.　　In addition, under the old leases, the terms were "gross lease," meaning that the landlord, not Kmart, was liable for upkeep and maintenance of the property, according to W1. Contracts negotiated today have terms far less forgiving (called "net lease"), as landlords are not likely to assume the same responsibilities for upkeep.　These responsibilities – which can include new roofing, new parking lots, and taxes, (called a "triple net" lease) – are substantial and expensive.　Taken together, the flexible terms of Kmart's older leases made them extremely valuable, particularly when compared to costs associated with developing a new property.

35.　　W3 confirmed that it was well known internally at Kmart that the leases were valuable, particularly those negotiated from the 1960s to the 1980s, which had rents fixed as low as $2 to $4 per square foot.　W3 and W1 both stated that as of 2002, nationwide average rents for store spaces similar to the Kmart stores rents were $9-10 per square foot.

36.　　The value of Kmart's leaseholds was also apparent given the substantial costs of building a new store.　According to W1, whereas the book value of at least half of the Kmart stores was as little as $4-5 million, the cost of building each new store could range as high as $8-9 million.　Similarly, W3 stated that the cost of building stores from the ground up could be double or sometimes even eight times as much as Kmart's basis.

### 3.　　Prior To The Bankruptcy, The True Value Of Kmart's Real Estate Holdings Was Not Apparent In Its Public Filings

37.　　Kmart had three primary types of real estate:　owned locations and leased locations, with leased locations being subdivided into "capitalized leases" and "operating leases."　*See* Statement of Financial Accounting Standards "SFAS" No. 13, *Accounting for Leases*.　Owned locations is a self-explanatory term and refers to the real estate owned by a company.　In an operating lease, the lessor transfers only the right to use the property to the lessee. At the end of the lease period, the lessee returns the property to the lessor. Since the

lessee does not assume the risk of ownership, the lease expense is treated as an operating

expense in the current income statement and the lease is not recorded on the balance sheet.

38.     In a capital lease, the lease terms provide that the lessee assumes the risks of

ownership.  Consequently, the lease, when signed, is recognized both as an asset and as a

liability (for the lease payments) on the balance sheet at the present value of the future lease

payments. As payments are made, the lease liability is reduced on the balance sheet and the

interest component of the payment is expensed on the income statement. The company records

depreciation expense each year on the asset as if it had purchased the asset outright.

39.     SFAS No. 13 requires a lease to be accounted for as a capital lease if it meets any

one of the following four conditions:

(a)     if the lease life exceeds 75% of the estimated life of the asset;

(b)     if there is a transfer of ownership to the lessee at the end of the lease term;

(c)     if there is a "bargain purchase" option to purchase the asset at the end of the lease
        term; or

(d)     if the present value of the lease payments, discounted at an appropriate discount
        rate, exceeds 90% of the fair market value of the asset.

40.     Under Generally Accepted Accounting Principles ("GAAP"), Kmart was not

required to, and did not, disclose the true value of its real estate holdings in its public filings.

Under  Statement of Financial Accounting Concepts ("CON") 5:  *Recognition and Measurement*

*in Financial Statements of Business Enterprises,* property, plant, and equipment are reported at

their historical cost, which is the amount of cash, or its equivalent, paid to acquire an asset.  Net

book value is reference to that historical cost less subsequent depreciation or amortization

charges.  Net book value does not account for the potential purchase price a property could

obtain in a competitive market (i.e., market value), or even where there is a severely limited

marketing period (i.e., liquidation value).  Although book value is the amount at which property

& equipment is carried on a company's books in accordance with GAAP, it clearly does not reflect the true value of the assets.

41.     Pursuant to CON 5, Kmart recorded its owned stores as assets at the book value of those stores (i.e., original cost), less accumulated depreciation.  According to the Form 10-K filed on May 15, 2002 Kmart recorded its 133 owned stores as of January 30, 20002 at an aggregate, original cost value of $1.507 billion.  Because those stores had significantly increased in value from their initial purchase and construction, the fair market value of these stores was much higher than the value shown as assets on Kmart's books.  Similarly, a certain (undisclosed) number of Kmart's leases were "capitalized" such that these leases appeared as assets on Kmart's financial statements.  The value of the property under these capitalized leases was reported in a manner similar to Kmart's owned stores, and thus were recorded on the May 15, 2002 From 10-K at an aggregate value of $1.727 billion.  Like the owned real estate, these capitalized leases had a fair market value that was much greater than the amounts shown on Kmart's financial statements.

42.     The remainder of Kmart's leases (those that were not capitalized – representing the vast majority of its leases) were classified as operating leases.  Under Statement of Financial Accounting Standards "SFAS" No. 13, *Accounting for Leases*, operating leases are not classified as assets and were reported in Kmart's Statements of Operations as current operating expenses. Thus, the enormous value of these operating leases (because of their below market rents) was hidden from the investing public.

43.     As explained below, while Kmart was not required to disclose the actual value of its owned and leased real estate prior to bankruptcy, after it emerged from bankruptcy and applied Fresh-Start accounting principles and adjusted assets to fair market value, it was

required, but wholly failed, to disclose the actual value of its enormously valuable real estate holdings.

**C.      Kmart Bankruptcy**

**1.      The Bankruptcy Petition**

44.      Kmart and 37 of its United States subsidiaries filed voluntary petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code on January 22, 2002. The Company emerged from bankruptcy protection on May 6, 2003 pursuant to an amended plan of reorganization and related amended Disclosure Statement which was confirmed by the United States Bankruptcy Court of the Northern District of Illinois (the "Court") on April 23, 2003.

45.      Proofs of claim totaling roughly $75.2 billion were filed, although Kmart estimated that allowed claims would not exceed $9.2 billion.  Kmart stated that it had developed a five-year business plan and intended to aggressively pursue "fast track" reorganization, projecting its emergence from bankruptcy by July, 2003.  In fact, Kmart emerged even sooner, on May 6, 2003.

**2.      Kmart's Initial Reorganization Steps**

46.      At the time Kmart filed for bankruptcy protection, Kmart operated approximately 2,114 stores and held roughly $10.34 billion in debt.  Many of the store locations occupied prime commercial locations, ripe for development, with generous lease terms.  In its initial bankruptcy filing, Kmart stated that it intended to reduce its total number of stores by 605 to 1509 stores.

47.      Immediately after filing for bankruptcy, Kmart embarked on its planned store reductions.  According to W3, in this first tranche of store sales, Kmart sold off its most undesirable stores because they were operationally in the red and their market value could not overcome the operational deficit.  On March 20, 2002, Kmart sought bankruptcy court approval to close 283 stores, which the court granted on March 30, 2002.

48.     Kmart then engaged in a second round of store closings, selecting an additional 316 stores for closing, which the bankruptcy court approved on January 28, 2003.

49.     Following the second wave of closings, Kmart's stores numbered 1,513.  As the Company worked its way through bankruptcy, losses mounted to nearly $2 billion by October 14, 2002.  The price of the Company's bonds fell 75% in value during this period.

### 3.     ESL and Lampert Invest In Kmart Bonds and Unsecured Claims

50.     In early 2002, shortly after Kmart filed for bankruptcy, Lampert became aware of the vast, untapped value of Kmart's real estate.  ESL had extensive real estate investments, and utilized its real estate analyst, Jeffrey Stollenwerk, to analyze the value of Kmart real estate.  According to W3, Stollenwerk was a sophisticated investor with contacts to all the major big box stores and was very knowledgeable regarding the value of real estate held by retail chains such as Kmart.  Through Stollenwerk, Lampert collected a wealth of nonpublic knowledge about the market value of Kmart's real estate that then formed the basis of his massive Kmart investment.

51.     Throughout 2002, armed with insider knowledge of the market value of Kmart's holdings, ESL began acquiring Kmart debt at distressed prices.  ESL and Third Avenue Partners ("TAP") acquired approximately $1.8 billion worth of trade vendor and lease rejections claims from Kmart's unsecured creditors – for an undisclosed discounted amount.  Specifically, ESL held $382 million of lender claims, $1.177 billion of note claims and $61 million of trade vendor/lease rejection claims, while TAP held $99 million in note claims and $79 million in trade vendor/lease rejection claims.

52.      By the end of August 2002, ESL had acquired sufficient debt to seek a place on one or more of the bankruptcy committees involved with the Kmart proceeding.  On September 12, 2002, defendant Lampert's hedge fund, ESL, was appointed to the FIC.

### 4.   The Plan Of Reorganization

53.   In January 2003, Kmart made public its proposed Plan of Reorganization ("POR").  Under the POR, Kmart's pre-petition lenders (primarily bondholders) received cash for their claims, in the amount of 40% of their allowed claims.  Most other obligations owed to Kmart's unsecured creditors, including holders of notes, vendors and lessors with rejected leases, were converted into common stock of the new holding company.  Noteholders had $2.27 billion in claims and received, as a group, 25 million shares of stock in Kmart ("new Kmart stock"), while holders of trade vendor and lease rejection claims had $4.3 billion in aggregate claims and, as a group, received 31.9 million shares of new Kmart stock.  Kmart's pre-petition existing common stock was reduced to zero and former common stock holders were entitled only to recoveries obtained by Kmart's litigation trust.

54.   Under the POR, Kmart common stock was valued at $1 billion in the aggregate and, as a result, former note holders received 14.4% of their claims in new Kmart stock and other creditors received 9.7% of the value of their claims.

55.   Under the POR, Kmart was to emerge from bankruptcy in May 2003.

### 5.   The Investment Agreement Between Kmart, ESL and TAP

56.   Despite his fiduciary duty to maximize assets for the benefit of all institutional creditors, during late 2002 and early 2003, Lampert negotiated a deal that granted ESL and TAP the right to acquire Kmart shares at a great discount, provided that they lend funds to the struggling entity.  Pursuant to the Investment Agreement dated January 24, 2003 ("Investment Agreement"), the Company issued 14 million shares of new Kmart common stock to affiliates of ESL and TAP, in exchange for $127 million, net of $13 million of commitment fees and other expenses incurred by ESL and TAP.  These shares were acquired at a cost of $10 per share.

57.     In addition to the shares purchased by ESL and TAP, ESL's $382 million in lender claims were converted into a cash entitlement of $152.8 million (40% of principal amount), for which ESL agreed to accept stock in the new Kmart in lieu of cash.  ESL and TAP also had an additional $1.4 billion in other claims as to which they were entitled to receive stock under the terms of the POR.  As compensation for all of these claims, ESL and TAP received an additional 32 million shares of new Kmart stock.

58.     ESL also received a 9%, $60 million principal amount convertible note, convertible at any time at ESL's option, into new common shares at a conversion price equal to $10 per share.  ESL was also granted the option, exercisable at its own discretion prior to May 6, 2005, to purchase from Kmart approximately 6.6 million new common shares at a price of $13 per share.  ESL assigned a portion of the option to TAP.

59.     As a result of the POR and Investment Agreement, when Kmart emerged from bankruptcy, there were 89.7 million new Kmart shares outstanding and options (largely to ESL and TAP) for 8.3 million shares.  ESL and TAP received 14 million shares in return for their investment of $140 million, with each share valued at $10,  and received an additional 32 million shares in return for ESL's willingness to forego a payment of $152.8 million for its and TAP's remaining bankruptcy claims of $1.4 billion.  Thus, ESL and TAP received approximately 46 million shares of new Kmart stock in satisfaction of the pre-petition claims they held and their new investment, representing more than 50% of shares of the new Kmart stock.

60.     The POR and Investment Agreement further provided that Kmart's new board was to consist of just nine members:  one member of senior management; two members selected by the unsecured creditors' committee; two members selected by the FIC (on which Lampert sat); and the remaining four members were to be chosen by ESL and TAP.  ESL and TAP

exercised these rights on March 31, 2003, adding Lampert and three others to Kmart's board, plus the two chosen by the FIC.

### 6.    Kmart Emerges From Bankruptcy

61.    Having received the formal endorsement of the statutory creditors committees, Kmart's POR, as amended, was confirmed by the Bankruptcy Court on April 23, 2003, just fourteen months after Kmart entered bankruptcy.  On May 6, 2003, Kmart officially emerged from bankruptcy, becoming a wholly-owned subsidiary of Kmart Management Corporation. That same day, Lampert emerged as Kmart's Chairman, and the owner, through ESL, of approximately 51.4% of Kmart's new stock.

62.    Before filing for bankruptcy, Kmart common stock traded on the New York Stock Exchange under the symbol "KM".  On or about June 10, 2003, after Kmart had emerged from bankruptcy, Kmart began trading on the NASDAQ under the symbol "KMRT."

**D.    Kmart's Misleading Disclosures Regarding The Market Value Of Its Real Estate**

**1.    Kmart's Misleading Bankruptcy Disclosures Regarding Real Estate Value**

63.    The First Amended Joint Plan of Reorganization was filed by Kmart on January 24, 2003.  Key portions of the POR were repeated in SEC filings throughout the Class Period. The POR  (and subsequent filings) unequivocally stated that Kmart's assets (including owned and leased properties) would be recorded using "Fresh-Start" accounting adjustments and would be valued at "fair market value":

> In accordance with Fresh-Start accounting, all assets and liabilities were recorded at their respective fair market values upon emergence from Chapter 11.  Such fair values represented our best estimates based on independent appraisals and valuations.

Thus, according to the "Fresh-Start Accounting and Enterprise Value" section of the same filing, Kmart reduced the net book value of its PPE to just $10 million through the pro rata application of "negative goodwill" and by writing the value of the property down to fair market value. Kmart defined negative good will as "the excess of fair value of net assets over reorganization value."

64.     Agencies that regulate federally insured financial institutions in the United States define market value as:

> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specific date where buyer and seller are typically motivated, both parties are well informed and advised, and a reasonable time is allowed for exposure in the open market.

65.     Thus, in real estate parlance, "market value" is the most probable cash price as of a specific date for which property should sell after reasonable exposure in a competitive market, with the buyer and seller acting prudently and knowledgeably, and assuming that neither party is under duress.  The most common way to ascertain market value is by looking at comparable real estate sold under similar conditions in a geographic region.  For Kmart stores in particular, location and the age of the store – and the terms of the lease – played significant roles.

66.     Significantly, as shown below, while Kmart claimed it adjusted the prices of all its assets to "fair market value," in fact, it never did so.  It provided misleading low values for its PPE (owned and capitalized lease stores plus fixtures and furniture) and provided no information regarding the value of stores subject to operating leases.

### 2.    Kmart's Misleading Post-Bankruptcy Disclosures
####        Regarding Real Estate Value

67.    Once Kmart emerged from bankruptcy, defendants had an independent duty to disclose accurately in its SEC filings the fair value of Kmart's real estate.  Instead of doing so – which would have revealed defendants' false statements in the bankruptcy proceeding – defendants relied upon and repeated their previously false statements and omissions.  In its initial form 10-Q, filed on June 16, 2003, Kmart stated, consistent with its earlier bankruptcy filings, that "all assets and liabilities were recorded at their respective fair market values upon emergence from Chapter 11."  The Kmart 10-Q further stated that, as of April 30, 2003, Kmart had PPE on its books of $4.623 billion and that it was reducing that value by $4.613 billion, which Kmart claimed was necessary "[t]o adjust assets and liabilities to fair market value ('FMV'), and reflect the write-off of predecessor Company's equity and the application of negative goodwill to long-lived assets."  Thus, the value of Kmart's PPE was just $10 million according to the June 2003 Form 10-Q.

68.    This understated the value of Kmart's real estate by $9 to $18 billion.  As shown by the Abacus document setting forth the terms of all of Kmart's leases, which was uncovered through plaintiffs' investigation, Kmart insiders knew that the real estate was actually worth $9 to $18 billion.  Even using the $4.623 billion pre-write-off number disclosed by Kmart, the real estate was substantially undervalued.  Plaintiffs estimate that the real estate, after purported fair market value adjustments, represented just $2 billion of the $4.6 billion amount.  Thus, even before the purported write-down for negative good will, Kmart misrepresented the value by $7 to $16 billion.

69.    As noted previously, while Kmart had thousands of highly valuable operating leases that were very valuable because they were for extended periods and had very favorable

lease terms, Kmart never, in any of its bankruptcy, or post-bankruptcy filings, provided any
disclosures regarding the asset value of these operating leases, even though it purported to record
all assets at 'fair market value" in its post-bankruptcy filings.

70.     Kmart sought to justify its failure to record any value for its operating leases in a
lease footnote (Note 14) to its Form 8-K filed on August 8, 2003.  In that footnote, Kmart first
notes that:

> We conduct our operations primarily in leased facilities. Kmart
> store leases are generally for terms of 25 years with multiple five-
> year renewal options that allow us the option to extend the life of
> the lease up to 50 years beyond the initial noncancelable term.

It then states "No asset has been recorded for favorable lease terms as the application of Fresh-
Start accounting resulted in the substantial write-off of all long-term assets."  Kmart thus claims
that it did not record any value of the "favorable lease terms" because it had written them off
through the application of negative goodwill, thus implying that they had no value when, in fact,
Kmart knew that they were enormously valuable.

**E.      Kmart's Real Estate Sales Begin to Reveal The True
          Value Of Kmart's Real Estate Portfolio**

71.     The truth about the actual values of Kmart's real estate, which Kmart claimed was
worth $10 million (albeit as the result of the application of negative goodwill), and which had an
implicit fair market value based upon Kmart's disclosures of $2.046 billion, began to be unveiled
when Kmart embarked on its store selling spree approximately one year after Lampert became
Chairman.  On June 4, 2004, Kmart announced the sale of up to 24 Kmart stores to Home Depot
for up to $365 Million.  On June 30, 2004, Kmart announced it would sell up to 54 Kmart stores
to Sears, Roebuck for up to $621 Million.

72.     On August 23, 2004, Kmart announced the final agreement for the sale of 18
stores to Home Depot for $271 million in cash.  That agreement was comprised of a sale of 4

owned stores for $59 million, or $14.75 million per store. It also included the sale of 14 leased stores for $212 million, or $15.143 million per store.

73.     On September 30, 2004, Kmart announced it had completed the sale of 50 stores to Sears, Roebuck (4 owned stores, 45 leases transferred and 1 owned store leased to Sears, Roebuck) for $575.9 million. This equates to a per store value of $11.520 million. While Lampert's sales of those 68 Kmart stores represented the sale of only 4.49% of Kmart's real estate assets, those sales fetched the astonishing sum of $846.9 million.

74.     As the result of sales to Home Depot and Sears, Roebuck, it became clear that Kmart had enormously valuable real estate assets that simply had not been previously disclosed in its public filings. In keeping with its practice since it emerged from bankruptcy, Kmart never provided investors with any information as to the value of its real estate holdings. It is possible, however, to extrapolate the true value of Kmart's real estate based upon the market values paid by Home Depot and Sears, Roebuck, through an alternative methodology based upon information obtained by Lead Plaintiffs in their investigation, and through the analyses presented by certain analysts who followed Kmart.

75.     **Value based Upon Third Party Sales** – The most direct method of determining the value of Kmart's real estate is to determine what Home Depot and Sears, Roebuck were willing to pay and extrapolating that to the entire base of Kmart stores. As noted above, between the Home Depot and Sears, Roebuck transactions, Kmart received $846.9 million for 68 stores, or a per store average of $12.45 million. Multiplying this amount by all of Kmart's 1,513 stores indicates that Kmart's real estate many have been worth as much as $18.8 billion.

76.     **Estimating Value Based On Lease Terms** – According to the Abacus report obtained by Lead Plaintiffs in the course of their investigation, which reflects the terms of

Kmart's leases, the average rent per square foot was $4.18 per square foot. Further, the average number of square feet in a Kmart store was 95,178 square feet. At the same time, several analysts' reports reviewed by Lead Plaintiffs, as well the statements of W1 and W3 – both of whom worked in Kmart's real estate department – indicates that average nationwide rents for "big box" stores was $8 to $10 per square foot, with many at $9 per square foot. Thus, on average each Kmart store had a lease that was $4.82 per sq. ft. below the national average. Given that the average size of the stores was 95,178 square feet, each store had a lease that provided an annual discount of $458,758. Thus, assuming a fifty year average life on each lease ( most leases had extensions that exceeded 50 years), the average net present value of each lease was $5.95 million. Multiplied by 1513 stores, this differential would yield around $9.01 billion for Kmart's real estate.

77.     W3 independently corroborated the use of this methodology to value Kmart's real estate. W3 further stated that Kmart analyzed the value of its leases by looking at the spread between the rent Kmart was paying and the cost of building Kmart stores from the ground up. For example, if a store was 100,000 square feet, the rent under the current lease was $2 per square foot, and the going market rate was $10 per square foot, then there was a spread of $8 per square foot. This was multiplied by the term of the lease. W3 would then determine the present value of the lease by using a capitalization rate.

78.     By November 2004, at least one real estate analyst with Deutsche Bank, Louis Taylor, had calculated that Kmart's real estate could be worth as much as $153 a share or $15.23 billion in value for Kmart's real estate.

79.     A November 18, 2004 article in the *New York Times* acknowledged Lampert's capitalization on his knowledge of the hidden value of Kmart's real estate which was unknown to investors:

> After a tottering Kmart filed for bankruptcy protection in January 2002, Mr. Lampert began buying its bonds, making a contrarian bet that if he could take control, he could turn the company around.
>
> He also noticed something that most other investors did not: the value of Kmart's real estate might be worth more than the business itself.
>
> So, for slightly less than $1 billion, his investment company bought control of Kmart, a stake now worth about $2.5 billion.

80.     Observers of Kmart have expressed great admiration at how Lampert was able to capitalize on concealing the value of Kmart's real estate.  As *Investment Dealer's Digest* commented on June 19, 2006: " Where others saw an outmoded discount department store badly beaten up by Wal-Mart, Lampert saw, among other things, a real estate gold mine . . . His success has spawned many would-be imitators, and created a frenzy by hedge funds and buyout firms scouring the retail sector in search of real estate gold beneath retail rust."

81.     That Lampert's profits on Kmart's real estate have been built on deception of Kmart's investors has not been lost on observers.   According to Ben Stein, writing in The New York Times on December 18, 2005:

> Why did its stock soar? Certainly not owing to Mr. Lampert's genius at retailing. Kmart is struggling against the Wal-Mart and Target juggernauts. No, Mr. Lampert's Kmart is considered a real estate play. Its stores, while not selling a lot of merchandise, are in good locations and are expected to deliver huge returns on liquidation. Mr. Lampert, meanwhile, acquired Sears and merged it with Kmart, and is contemplating laying off employees in large numbers. Again, this is expected to be a real estate play.
>
> But if the poor pre-bankruptcy Kmart was so loaded with valuable real estate that it has made investors in the post-bankruptcy Kmart rich, didn't that real estate belong to the stockholders of Kmart? Why was it not liquidated for the benefit of

26

existing stockholders? Why was it turned over to the new stockholders while the old stockholders walked off with nearly nothing? Where was the management of the old Kmart? Asleep?

82.　　In the first conference call that Lampert had with analysts and investors after Kmart emerged from bankruptcy, in November 2004, he admitted that Kmart's real estate was worth more than their operating business."  According to Lampert:

> There's been a lot of speculation about real estate strategy and real estate values, and there is some truth to the notion that there are certain retailers whose real estate is worth more than their operating business," Lampert told Wall Street analysts on a conference call in November 2004. "While that may have been true of Kmart at one time, we've worked very, very hard to improve the profitability of each of our stores and to make those stores worth a lot more as an operating business than as real estate.

83.　　Lampert's strategy of buying retailers for their underlying hidden real estate value has become the subject of widespread study and attempted imitation.  According to the *New York Times*, April 14, 2005,  "Mr. Lampert popularized an increasingly important way for potential buyers to look at chains: for their valuable real estate. And now, most private equity firms hire a real estate consultant to advise them or may even ask it to become part of a joint venture."

84.　　*Institutional Investor Americas* advised their readers in February 2007 how the strategy of using hidden real estate value in retailers originated with Lampert's acquisition of Kmart:

> Using sale leasebacks to finance buyouts originated with activist hedge fund manager Edward Lampert, chairman of ESL Investments in Greenwich, Connecticut. In 2002, Lampert took control of Kmart Corp. by snapping up the once-bankrupt retailer's bonds. The following year he sold 78 Kmart stores to Sears, Roebuck & Co. and Home Depot for nearly $1 billion; he later used Kmart's soaring stock as currency to buy Sears.

85.　　In a September 4, 2006 article, *Forbes Magazine* explained how ordinary shareholders could also employ the strategy Lampert's had used when acquiring Kmart:

Asset strippers and takeover tycoons make fortunes unlocking value hidden in real-estate-rich corporations. A quarter-century ago Carl Lindner did that by acquiring control of the previously bankrupt Penn Central, which owned plenty of urban real estate. In 1995 Steven Roth snapped up Alexander's, an inept department store chain, thereby getting his hands on a block of Manhattan that housed the firm's flagship store; Roth's Vornado recently put a 55-story skyscraper on the site. Hedge fund operator Edward Lampert is a billionaire in large part because he saw value in Kmart. After getting control of the firm during bankruptcy proceedings, he sold the deeds (or leaseholds) for 600 of its stores, reaping large gains, and moved in on Sears, Roebuck, another retailer that had seen better days.

**F.    Kmart/Sears Merger**

86.    On or about November 16, 2004, Kmart and Sears, Roebuck announced a $12.3 billion cash-and-stock deal, creating the new company Sears Holdings Corporation. By accepting the Sears, Roebuck offer, Kmart stymied a potential offer for Sears, Roebuck from Vornado Realty Trust ("Vornado"), just 12 days after Vornado disclosed that it held a 4% stake in Sears, Roebuck. At the time, analysts speculated that Vornado's interest was in liquidating Sears, Roebuck for its real estate holdings.

87.    Lampert was on both sides of the Kmart/Sears, Roebuck deal – and would obviously not have fared as well had Sears, Roebuck merged with Vornado, not Kmart. Through ESL, which also held 15% of Sears, Roebuck, Lampert was Sears, Roebuck's largest shareholder. The Kmart/Sears, Roebuck deal closed on or about March 24, 2005. Lampert became the Chairman of the combined companies, now known as Sears Holdings Corporation.

**V.    FALSE AND MISLEADING STATEMENTS**

88.    During the Class Period, the Defendants issued numerous statements or failed to disclose material facts concerning the true value of Kmart's real estate holdings which rendered Kmart's public statements materially false and misleading. These false and misleading statements and omissions induced Kmart's investors into believing that the stock that they

acquired as part of the settlement of Kmart's bankruptcy claims or that they purchased on the open market thereafter was less valuable than it actually was.  In fact, at the time that Kmart made these statements, Kmart and the Individual Defendants possessed information about the market and leasehold value of Kmart's property that should have been disclosed to the investing public.

89.     The Defendants had a duty to disclose to investors the actual value of Kmart's real estate.  The SEC regulates statements by companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience."  SEC Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH)  23,120, at 17,095-3, 17 C.F.R. § 241.20560 (Jan. 13, 1984).  Under SEC regulations, the management of a public company has a duty promptly "to make full and prompt announcements of material facts regarding the company's financial condition."  SEC Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH)  23,120A, at 17,095, 17 C.F.R. § 241.8995 (Oct. 15, 1970).  The SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments."  SEC Release No. 18271, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH)  83,049, at 84,618 (Nov. 19, 1981).

90.     In Securities Act Release No. 6349 (Sept. 8, 1981), the SEC stated that:

> [I]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

91.     In Accounting Series Release 173, the SEC reiterated the duty of management to present a true representation of a company's operations:

> [I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

29

92.     Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and

Analysis of Financial Condition and Results of Operations, require the issuer to furnish

information required by Item 303 of Regulation S-K [17 C.F.R. § 229.303].

93.     On May 18, 1989, the SEC issued an interpretive release (Securities Act Release

No. 6835 -May 18, 1989) which stated, in relevant part:

> The MD&A requirements are intended to provide, in one section
> of a filing, material historical and prospective textual disclosure
> enabling investors and other users to assess the financial condition
> and results of operations of the registrant, with particular emphasis
> on the registrant's prospects for the future. As the Concept Release
> states:
>
> The Commission has long recognized the need for a narrative
> explanation of the financial statements, because a numerical
> presentation and brief accompanying footnotes alone may be
> insufficient for an investor to judge the quality of earnings and the
> likelihood that past performance is indicative of future
> performance. MD&A is intended to give the investor an
> opportunity to look at the company through the eyes of
> management by providing both a short and long term analysis of
> the business of the company. The Item asks management to discuss
> the dynamics of the business and to analyze the financials.

94.     The SEC has thus stated, "[i]t is the responsibility of management to identify and

address those key variables and other qualitative and quantitative factors which are peculiar to

and necessary for an understanding and evaluation of the individual company."

95.     SEC Staff Accounting Bulletin No. 101 ("SAB 101"), Revenue Recognition in

Financial Statements, drawing from Regulation S-K, Article 303, and Financial Reporting

Release No. 36, also reiterated the importance of the MD&A in financial statements:

> Management's Discussion & Analysis (MD&A) requires a
> discussion of liquidity, capital resources, results of operations and
> other information necessary of a registrant's financial condition,
> changes in financial condition and results of operations.  This
> includes unusual or infrequent transactions, known trends, or

uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in Financial Reporting Release (FRR) 36 that **MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."** [Emphasis added; footnotes omitted.]

A.     <u>First Quarter 2003 10-Q and Earnings Release</u>

96.     On June 16, 2003, Kmart published its Form 10-Q for the First Quarter of 2003, ended April 30, 2003. Simultaneously with the filing of its First Quarter 2003 10-Q, Kmart published an earnings release, filed with the SEC on a Form 8-K. The Form 10-Q was signed by Defendant Day, Chief Executive Officer, and James F. Gooch, Vice-President and Treasurer. In both the Form 10-Q and the earnings release, Kmart announced its financial performance for the first quarter of 2003.

97.     Kmart reported that its total current assets and shareholder equity were valued at $6.66 billion as of April 30, 2003, as compared to $13.872 billion as of May 1, 2002, for the predecessor company. It stated that its PPE, including real estate, was valued at $10 million as of April 30, 2003, as compared to $5.972 billion as of May 1, 2002 for the predecessor company.

98.     In explaining the loss of value of its assets, Kmart disclosed:

In connection with the Company's emergence from bankruptcy, the consolidated financial statements apply the provisions of Fresh-Start accounting in accordance with Generally Accepted Accounting Principles (GAAP). Under Fresh-Start accounting, a new reporting entity, the "Successor Company", is deemed to be created, and the recorded amounts of assets and liabilities are adjusted to reflect their fair value. As a result, the reported historical financial statements of the "Predecessor Company" for

periods prior to April 30, 2003, as presented below, generally are not comparable to those of the Successor Company.

In applying Fresh-Start accounting, adjustments to reflect the fair value of assets and liabilities, on a net basis, and the write-off of the Predecessor Company's equity accounts resulted in a charge of $5.6 billion. The restructuring of Kmart's capital structure and resulting discharge of pre-petition debt resulted in gain of $5.6 billion. The charge for the revaluation of the assets and liabilities and the gain on the discharge of pre-petition debt are recorded in Reorganization items, net in the unaudited Condensed Consolidated Statement of Operations. In addition, the excess of fair value of net assets over reorganization value ("negative goodwill") was allocated on a pro-rata basis and reduced non-current assets (property and equipment, net) to $10 million in accordance with GAAP.

99.    Kmart affirmatively stated in the notes to the financial statements that it was making certain adjustments:

to adjust assets and liabilities to fair market value ("FMV"), and reflect the write-off of Predecessor Company's equity and the application of negative goodwill to long-lived assets.

100.    In the same filing, Kmart also stated:

In accordance with Fresh-Start accounting, all assets and liabilities were recorded at their respective fair market values. Such fair values represented our best estimates based on independent appraisals and valuations.

101.    These statements were false and misleading because:

(a)    Defendants knew, as set forth in Section D and E above, based on information the Company possessed in its real estate management system, that the leasehold and market values of Kmart's owned and capitalized lease real estate were substantially higher than the $10 million represented by Kmart, or even the $2.046 million in real estate value that was implicit in its filings;

(b)     Defendants wholly failed to disclose any value for its operating leases, even though they knew that those leases, with terms that were very favorable by prevailing standards, were worth billions of dollars as described in Sections D and E above; and

(c)     As described in Sections D and E above, Defendants knew, but never disclosed to the public that Kmart's total owned and leased (both operating and capitalized) real estate was actually worth between $9 billion and $18 billion.

102.     In a press release accompanying the First Quarter 2003 10-Q, issued on June 16, 2003, Kmart stated:

> This management team is very focused on building the financial foundation of the new Company. We are strengthening our business by driving profitable sales, identifying opportunities to further improve efficiency and reduce costs, and enhancing the productivity of our assets. We have increased gross margin, decreased SG&A and carefully managed our inventory. With the strong support of our new Board of Directors, we will continue to concentrate on increasing the long-term value of this enterprise.

103.     This statement was false and misleading because Defendants knew that Kmart had real estate assets worth between $9 and $18 billion and never disclosed that sales of these real estate assets would be used to fund acquisitions or otherwise significantly increase the value of Kmart to it shareholders and that was a key element of the plan to increase the "long-term value of the enterprise."

104.     On August 8, 2003, Kmart filed a Form 10Q-A, amending its First Quarter Form 10-Q previously filed on June 16, 2003.  The amended Form 10Q-A repeated the false statements set forth above in paragraphs 96-100.

## B.     Second Quarter 2003 10-Q and Earnings Release

105.      On August 29, 2003, Kmart filed with the SEC its Form 10-Q for the Second Quarter of 2003, ended June 30, 2003.    The Second Quarter 2003 10-Q was signed by Defendant Day and Richard J. Noechel, Vice President and Controller of Kmart.  The Form 10-Q

reported that Kmart's total assets were valued at $5.955 billion and the net value of its PPE was $43 million.

106.     The Second Quarter 2003 Form 10-Q also stated, with respect to the valuation of Kmart's assets:

> In accordance with Fresh-Start accounting, all assets and liabilities were recorded at their respective fair market values. Such fair values represented our best estimates based on independent appraisals and valuations.
>
> To facilitate the calculation of the enterprise value of the Successor Company, we developed a set of financial projections. Based on these financial projections, the enterprise value was determined by the Company, with the assistance of a financial advisor, using various valuation methods, including (i) a comparison of the Company and its projected performance to the market values of comparable companies, (ii) a review and analysis of several recent transactions of companies in similar industries to the Company, and (iii) a calculation of the present value of the future cash flows under the projections.
>
> The estimated enterprise value is highly dependent upon achieving the future financial results set forth in the projections as well as the realization of certain other assumptions which are not guaranteed. The estimated enterprise value of Kmart was calculated to be approximately $2.3 billion to $3.0 billion.
>
> We selected the midpoint of the range, $2.6 billion, as the estimated enterprise value. In applying Fresh-Start accounting, adjustments to reflect the fair value of assets and liabilities, on a net basis, and the write-off of the Predecessor Company's equity accounts resulted in a charge of $5.6 billion. The restructuring of Kmart's capital structure and resulting discharge of pre-petition debt resulted in a gain of $5.6 billion. The charge for the revaluation of the assets and liabilities and the gain on the discharge of pre-petition debt are recorded in Reorganization items, net in the unaudited Condensed Consolidated Statement of Operations. In addition, the excess of fair value of net assets over reorganization value ("negative goodwill") was allocated on a pro-rata basis and reduced our non-current assets, with the exception of financial instruments, to $10 as of April 30, 2003 in accordance with SFAS No. 141, "Business Combinations."

107. Kmart affirmatively stated in the notes to its financial statements that it was making certain adjustments:

> to adjust assets and liabilities to fair market value ("FMV"), and reflect the write-off of Predecessor Company's equity and the application of negative goodwill to long-lived assets.

108. In the same filing, Kmart also stated:

> In accordance with Fresh-Start accounting, all assets and liabilities were recorded at their respective fair market values. Such fair values represented our best estimates based on independent appraisals and valuations.

109. These statements were false and misleading because:

(a)      Defendants knew, as set forth in Section D and E above, based on information the Company possessed in its real estate management system, that the leasehold and market values of Kmart's owned and capitalized lease real estate were substantially higher than the $10 million represented by Kmart, or even the $2.046 million in real estate value that was implicit in its filings;

(b)      Defendants wholly failed to disclose any value for its operating leases, even though they knew that those leases, with terms that were very favorable by prevailing standards, were worth billions of dollars as described in Sections D and E above; and

(c)      As described in Sections D and E above, Defendants knew, but never disclosed to the public that Kmart's total owned and leased (both operating and capitalized) real estate was actually worth between $9 billion and $18 billion.

## C.      Third Quarter 2003 10-Q and Earnings Release

110. On December 5, 2003, Kmart filed its Form 10-Q for the third quarter ended October 29, 2003. The third quarter 2003 10-Q was signed by Defendant Day and reported

Kmart's total current assets as $6.117 billion and net PPE as $115 million.  On the same day,

Kmart filed a press release containing its financial results for the Third Quarter for  2003.

111.   With respect to the valuation of Kmart's assets, the 2003 Third Quarter 10-Q

stated:

> In accordance with Fresh-Start accounting, all assets and liabilities
> were recorded at their respective fair market values. Such fair
> values represented our best estimates based on independent
> appraisals and valuations. Immaterial differences between
> estimated pre-petition liabilities assumed by Kmart and the final
> settlement amounts are recognized as they occur.
>
> To facilitate the calculation of the enterprise value of the Successor
> Company, we developed a set of financial projections. Based on
> these financial projections and with the assistance of a financial
> advisor, the enterprise value was determined by the Company,
> using various valuation methods, including (i) a comparison of the
> Company and its projected performance to the market values of
> comparable companies, (ii) a review and analysis of several recent
> transactions of companies in similar industries to the Company,
> and (iii) a calculation of the present value of the future cash flows
> under the projections. The estimated enterprise value is highly
> dependent upon achieving the future financial results set forth in
> the projections as well as the realization of certain other
> assumptions which are not guaranteed. ***The estimated enterprise
> value of Kmart was calculated to be approximately $2.3 billion to
> $3.0 billion.*** We selected the midpoint of the range, $2.6 billion, as
> the estimated enterprise value. In applying Fresh-Start accounting,
> adjustments to reflect the fair value of assets and liabilities, on a
> net basis, and the write-off of the Predecessor Company's equity
> accounts resulted in a charge of $5.6 billion. The restructuring of
> Kmart's capital structure and resulting discharge of pre-petition
> debt resulted in a gain of $5.6 billion. The charge for the
> revaluation of the assets and liabilities and the gain on the
> discharge of pre-petition debt are recorded in Reorganization
> items, net in the unaudited Condensed Consolidated Statement of
> Operations. In addition, the excess of fair value of net assets over
> reorganization value ("negative goodwill") of approximately $5.6
> billion was allocated on a pro-rata basis reducing our non-current,
> non-financial instrument assets to $10 million as of April 30, 2003.
>
> As part of the provisions of SOP 90-7, we were required to adopt
> on April 30, 2003 all accounting guidance that was going to be
> effective within a twelve-month period. See Note 21 - Recently

> Adopted Accounting Pronouncements for a discussion of the
> impact on our financial statements of the accounting guidance we
> were required to adopt.

(Emphasis added.)

112.    Kmart affirmatively stated in the notes to the financial statements that it was

making certain adjustments:

> to adjust assets and liabilities to fair market value ("FMV"), and
> reflect the write-off of Predecessor Company's equity and the
> application of negative goodwill to long-lived assets.

113.    In the same filing, Kmart also stated:

> In accordance with Fresh-Start accounting, all assets and liabilities
> were recorded at their respective fair market values.  Such fair
> values represented our best estimates based on independent
> appraisals and valuations.

114.    These statements were false and misleading because:

(a)     Defendants knew, as set forth in Section D and E above, based on

information the Company possessed in its real estate management system, that the leasehold and

market values of Kmart's owned and capitalized lease real estate were substantially higher than

the $10 million represented by Kmart, or even the $2.046 million in real estate value that was

implicit in its filings;

(b)     Defendants wholly failed to disclose any value for its operating leases,

even though they knew that those leases, with terms that were very favorable by prevailing

standards, were worth billions of dollars as described in Sections D and E above; and

(c)     As described in Sections D and E above, Defendants knew, but never

disclosed to the public that Kmart's total owned and leased (both operating and capitalized) real

estate was actually worth between $9 billion and $18 billion.

115.     In a press release accompanying the Third Quarter 2003 10-Q, issued on

December 5, 2004, Kmart stated:

> We continue to actively manage our business in a disciplined fashion steadily
> increasing our margin realization, reducing operating costs, enhancing the
> productivity of our assets and improving the overall store experience for our
> customers.

116.     This statement was false and misleading because Defendants knew that Kmart

had real estate assets worth between $9 and $18 billion and never disclosed that sales of these

real estate assets would be used to fund acquisitions or otherwise significantly increase the value

of Kmart to it shareholders and that was a key element of the plan to manage the productivity of

"capital assets."

**D.     2004 Form 10-K**

117.     On March 18, 2004, Kmart filed its Form 10-K for the fiscal year ended January

28, 2004.   The 2003 Form 10-K was signed by Defendant Day, Chief Executive Officer, James

D. Donlan, Chief Financial Officer, Richard C. Noechel, Vice President and Controller, and

Defendant Lampert.   The Form 10-K reported total current assets of $6.084 billion and net PPE

as $153 million.

118.     With respect to Kmart's valuation of its assets, the Form 10-K stated:

> In connection with emergence from Chapter 11, we reflected the
> terms of the Plan of Reorganization in our consolidated financial
> statements applying the terms of the American Institute of
> Certified Public Accountants Statement of Position 90-7,
> "Financial Reporting by Entities in Reorganization.  Under the
> Bankruptcy Code" ("SOP 90-7") with respect to financial reporting
> upon emergence from Chapter 11 ("Fresh-Start accounting").
> Upon applying Fresh-Start accounting, a new reporting entity is
> deemed to be created and the recorded amounts of assets and
> liabilities are adjusted to reflect their estimated fair values.
>
> Property and Equipment:  Property and equipment are recorded at
> cost. Additions and betterments are capitalized and include
> expenditures that materially extend the useful lives of existing

facilities and equipment. Maintenance and repairs that do not materially improve or extend the lives of the respective assets are expensed as incurred. In conjunction with Fresh-Start accounting, our property and equipment at April 30, 2003 was adjusted to fair value. See Note 3 -- Fresh-Start Accounting.

Long-lived Assets: Long-lived assets consist primarily of land, buildings, furniture, fixtures and equipment and leasehold improvements. It is our policy to review our long-lived assets for possible impairment whenever events or circumstances indicate that the carrying amount of an asset may not be recoverable and annually when no such event has occurred. We review assets held and used on a store-level basis, which is the lowest level of assets for which there are identifiable cash flows. An impairment of long-lived assets exists when future undiscounted cash flows are less than an asset groups' carrying value over the estimated remaining useful life of the store. Impairment is measured as the difference between carrying value and fair market value. Fair market value is based on appraised value or estimated sales values of similar assets in recent transactions. Assets to be disposed of are reported at the lower of carrying amount or fair value less the cost to sell.

119. With respect to explaining its fresh-start accounting, Kmart said the following:

In accordance with Fresh-Start accounting, all assets and liabilities were recorded at their respective fair market values upon emergence from Chapter 11. Such fair values represented our best estimates based on independent appraisals and valuations. Immaterial differences between estimated pre-petition liabilities assumed by the Successor Company and the final settlement amounts are recognized as they occur.

To facilitate the calculation of the enterprise value of the Successor Company, we developed a set of financial projections. Based on these financial projections and with the assistance of a financial advisor, the enterprise value was determined by the Company, using various valuation methods, including (i) a comparison of the Company and its projected performance to the market values of comparable companies, (ii) a review and analysis of several recent transactions of companies in similar industries to the Company, and (iii) a calculation of the present value of the future cash flows under the projections. The estimated enterprise value is highly dependent upon achieving the future financial results set forth in the projections as well as the realization of certain other assumptions which are not guaranteed. The estimated enterprise value of Kmart was calculated to be approximately $2.3 billion to $3.0 billion. We selected the midpoint of the range, $2.6 billion, as

the estimated enterprise value. In applying Fresh-Start accounting, adjustments to reflect the fair value of assets and liabilities, on a net basis, and the write-off of the Predecessor Company's equity accounts resulted in a charge of $5.6 billion. The restructuring of Kmart's capital structure and resulting discharge of pre-petition debt resulted in a gain of $5.6 billion. The charge for the revaluation of the assets and liabilities and the gain on the discharge of pre-petition debt are recorded in Reorganization items, net in the Consolidated Statements of Operations. In addition, the excess of fair value of net assets over reorganization value ("negative goodwill") of approximately $5.6 billion was allocated on a pro-rata basis reducing our non-current, non-financial instrument assets to $10 million as of April 30, 2003.

As part of the provisions of SOP 90-7, we were required to adopt on April 30, 2003 all accounting guidance that was going to be effective within a twelve-month period. See Note 2 -- Summary of Significant Accounting Policies for a discussion of the impact on our financial statements of the accounting guidance we adopted.

120.    Kmart affirmatively stated in the notes to the financial statements that it was making certain adjustments:

to adjust assets and liabilities to fair market value ("FMV"), and reflect the write-off of Predecessor Company's equity and the application of negative goodwill to long-lived assets.

121.    In the same filing, Kmart also stated:

In accordance with Fresh-Start accounting, all assets and liabilities were recorded at their respective fair market values. Such fair values represented our best estimates based on independent appraisals and valuations.

122.    In a press release issued on March 19, 2004, Kmart announced that, for the fourth quarter of 2003, it had generated a profit for the first time in three years. Kmart reported a profit of $276 million for the fourth quarter ended January 28, 2004, compared with a $1.1 billion loss in the same period the previous year. $86 million of Kmart's profit for the fourth quarter were based on sales of real estate – pure profit transactions since Kmart had written down the book value of its real estate to practically zero during the reorganization.

123.    These statements were false and misleading because:

(a)    Defendants knew, as set forth in Section D and E above, based on information the Company possessed in its real estate management system, that the leasehold and market values of Kmart's owned and capitalized lease real estate were substantially higher than the $10 million represented by Kmart, or even the $2.046 million in real estate value that was implicit in its filings;

(b)    Defendants wholly failed to disclose any value for its operating leases, even though they knew that those leases, with terms that were very favorable by prevailing standards, were worth billions of dollars as described in Sections D and E above; and

(c)    As described in Sections D and E above, Defendants knew, but never disclosed to the public that Kmart's total owned and leased (both operating and capitalized) real estate was actually worth between $9 billion and $18 billion.

124.    In the 10-K, Kmart also explained its strategy for the future as follows:

Following the Company's recent emergence from Chapter 11, we have primarily focused on building a professional senior management team and establishing the fundamentals we need to run an efficient and effective retail organization. In 2004, our new senior management team will continue the active management of such process improvement initiatives, focusing on the generation of profitable sales, controlling costs and streamlining overhead, increasing asset productivity and improving customer service.

Kmart will continue to improve the customer store experience, providing quality products at attractive pricing, and enhancing our service culture. By improving our logistics and allocation process, we will be able to allow stores to provide their particular customers with a more customized merchandise offering. ***

We believe that the execution of the strategies noted above will provide our current customers with an improved shopping experience, allow us to win back customers we have disappointed in the past and help sustain profitability.

125.    These statements were false and misleading because Defendants knew that Kmart had real estate assets worth between $9 and $18 billion and never disclosed that sales of these real estate assets would be used to fund acquisitions or otherwise significantly increase the value of Kmart to it shareholders.

**E.    First Quarter 2004 10-Q and Earnings Release**

126.    On May 17, 2004, Kmart filed its quarterly report for the first quarter ended April 28, 2004.  The 2004 First Quarter 10-Q was signed by Defendant Day, James Donlon, and Richard J. Noechel.   The 2004 First Quarter 10-Q reported that the value of Kmart's total current assets was $6.028 billion and net PPE was valued at $190 million.   Shareholders equity was reported as $2.285 billion.

127.    The 2004 First Quarter 10-Q also stated:

> To facilitate the calculation of the enterprise value of the Successor Company, we developed a set of financial projections. Based on these financial projections and with the assistance of a financial advisor, we determined the enterprise value using various valuation methods, including (i) a comparison of the Company and its projected performance to the market values of comparable companies, (ii) a review and analysis of several recent transactions of companies in similar industries to the Company, and (iii) a calculation of the present value of the future cash flows under the projections. The estimated enterprise value is highly dependent upon achieving the future financial results set forth in the projections as well as the realization of certain other assumptions which are not guaranteed. The estimated enterprise value of the Company was calculated to be approximately $2.3 billion to $3.0 billion. We selected the midpoint of the range, $2.6 billion, as the estimated enterprise value. In applying Fresh-Start accounting, adjustments to reflect the fair value of assets and liabilities, on a net basis, and the write-off of the Predecessor Company's equity accounts resulted in a charge of $5.6 billion. The fair value adjustments included the recognition of approximately $2.2 billion of intangible assets that were previously not recorded in the Predecessor Company's financial statements, such as favorable leasehold interests, Kmart brand rights, pharmacy customer relationships and other lease and license agreements. The

restructuring of the Predecessor Company's capital structure and resulting discharge of pre-petition debt resulted in a gain of $5.6 billion. The charge for the revaluation of the assets and liabilities and the gain on the discharge of pre-petition debt are recorded in Reorganization items, net in the Unaudited Condensed Consolidated Statements of Operations. In addition, the excess of fair value of net assets over reorganization value (i.e., "negative goodwill") of approximately $5.6 billion was allocated on a pro-rata basis reducing our non-current, non-financial instrument assets, including the previously unrecorded intangible assets, to $10 million as of April 30, 2003.

128.    Kmart affirmatively stated in the notes to the financial statements that it was making certain adjustments:

to adjust assets and liabilities to fair market value ("FMV"), and reflect the write-off of Predecessor Company's equity and the application of negative goodwill to long-lived assets.

129.    In the same filing, Kmart also stated:

In accordance with Fresh-Start accounting, all assets and liabilities were recorded at their respective fair market values. Such fair values represented our best estimates based on independent appraisals and valuations.

130.    These statements were false and misleading because:

(a)    Defendants knew, as set forth in Section D and E above, based on information the Company possessed in its real estate management system, that the leasehold and market values of Kmart's owned and capitalized lease real estate were substantially higher than the $10 million represented by Kmart, or even the $2.046 million in real estate value that was implicit in its filings;

(b)    Defendants wholly failed to disclose any value for its operating leases, even though they knew that those leases, with terms that were very favorable by prevailing standards, were worth billions of dollars as described in Sections D and E above; and

(c)     As described in Sections D and E above, Defendants knew, but never disclosed to the public that Kmart's total owned and leased (both operating and capitalized) real estate was actually worth between $9 billion and $18 billion.

131.    In a press release accompanying the First Quarter 2004 10-Q, issued on May 17, 2004, Kmart stated:

> Our focus on the productivity of our asset base, exemplified by the diligent management of our inventories which ended the quarter at $3.4 billion, a reduction of over 23% from the prior year, has been a primary element of our improved liquidity position. We apply similar rigor to managing the productivity of our capital assets focusing on the need to allocate those assets to their best use. Given our success, Kmart today is a financially strong company.

132.    This statement was false and misleading because Defendants knew that Kmart had real estate assets worth between $9 and $18 billion and never disclosed that sales of these real estate assets would be used to fund acquisitions or otherwise significantly increase the value of Kmart to it shareholders and that was a key element of the plan to manage the productivity of "capital assets" and was a critical element of its focus on the "productivity" of its asset base.

## VI.    KMART VIOLATED CERTAIN GAAP DISCLOSURE REQUIREMENTS

### A.     SOP 90-7

133.    According to SOP 90-7, *Financial Reporting by Entities in Reorganization under the Bankruptcy Code,* "Reorganization value generally approximates fair value of the entity before considering liabilities, and approximates the amount a willing buyer would pay for the assets of the entity immediately after the restructuring." The AICPA Task Force supports this position based on the fact that reorganization value and the terms of the plan are determined only after extensive arms-length negotiations between adversarial interested parties.

134.    As such, the accounting and disclosure requirements of SOP 90-7 are based on a presumption that reorganization value approximates fair value and the recorded balances for the

individual assets in the post-emergence balance sheet are also fair value. A situation where the calculation of reorganization value of $2.6 billion results in negative goodwill of $5.6 billion, or in excess of two times the amount of the total reorganization value was not contemplated by the AICPA.

135.    SOP 90-7 requires the disclosure of the adjustments to the historical amounts of individual assets and liabilities. This is meant to provide straightforward disclosure of the adjustment between historical cost and the fair values of the assets.  Kmart did not comply with SOP 90-7.  Instead, in the Form 8-K filed on August 8, 2003, Kmart combined the fair value adjustments to the assets and liabilities with the significant allocation of negative goodwill to prevent users of its financial statements from being able to separate the components of the fresh-start adjustments.  This violated SOP 90-7.  Kmart never provided the information that allowed investors to deduce the adjustment it had made between historical cost and the fair values of the assets or what the fair values of those assets were.

136.    Additionally, Kmart failed to properly disclose all significant matters relating to the determination of reorganization value, as required by SOP 90-7, specifically, that all Kmart stores might or would not continue to operate on a going concern basis and sales of these stores would lead to significant cash proceeds, beyond what was anticipated on a going concern basis in the discounted cash flow analysis calculation of the reorganization value. Disclosure of the true fair value of those assets and leases would have been the only way to communicate to investors the inherent sale value in the real estate assets of the Company.

**B.     CON 1**

137.    Kmart also violated the disclosure requirements of CON 1, *Objectives of Financial Reporting by Business Enterprises*. According to ¶ 34:

> Financial reporting should provide information that is useful to
> present and potential investors and creditors and other users in
> making rational investment, credit, and similar decisions.  The
> information should be comprehensible to those who have a
> reasonable understanding of business and economic activities and
> are willing to study the information with reasonable diligence.

138.    CON 1 also states in ¶ 40, that:

> Financial reporting should provide information about the economic
> resources of an enterprise, the claims to those resources
> (obligations of the enterprise to transfer resources to other entities
> and owners' equity), and the effects of transactions, events, and
> circumstances that change resources and claims to those resources.

139.    Kmart not only failed to disclose the true value of the real estate assets it owned

or leased but also purposefully made the fresh-start accounting disclosures incomprehensible for

the readers of their financial statements.

### C.    <u>SFAS 141</u>

140.    Kmart violated the disclosure provisions of SFAS 141, *Business Combinations,*

which requires disclosure of the amount of goodwill recognized. It was not until the Form 10-Q

filed on December 5, 2003 that Kmart affirmatively disclosed that negative goodwill of

approximately $5.6 billion was allocated on a pro-rata basis. All post-emergence disclosure

previous to that date merely stated that "negative goodwill was allocated on a pro-rata basis and

reduced our non-current assets, with the exception of financial instruments, to $10 million as of

April 30, 2003 in accordance with SFAS No. 41, "Business Combinations."

## VII.    DEFENDANTS HAVE NOW ADMITTED FACTS THAT SHOW THAT THE MARKET VALUE ASSESSMENT THEY RELIED UPON WAS GROSSLY UNDERVALUED, SATISFYING THE SCIENTER STANDARD UNDER THE PSLRA

141.    When Lampert began acquiring his controlling interest in Kmart during Kmart's

bankruptcy, he had determined that Kmart's real estate was worth much more than the value

attributed to those assets.  Accumulating a 51% interest in Kmart by acquiring debt for less than

46

one billion dollars, Lampert had determined that Kmart's real estate was worth more than his acquisition price alone. The key for Lampert in unlocking the profit from this acquisition was concealing from Kmart's creditors and investors the true value of Kmart's real estate.

142. By virtue of his connection within the real estate industry, Lampert possessed the knowledge and tools to perform his own valuation assessment of Kmart's real estate. According to W3, Lampert's real estate analyst, Jeffrey Stollenwerk, was a sophisticated investor with contacts to all the major big box stores. Through Stollenwerk, Lampert collected a wealth of nonpublic knowledge about the market value of Kmart's real estate. By the time Lampert sat on the new entity's Board of Directors, Lampert had access to REMS, the Company's real estate management system. W1 confirmed that senior management and directors had access to REMS. Moreover, assessments prepared by Abacus, a third party consultant to Kmart in the bankruptcy proceeding, confirmed what insiders already knew: the rents of the older leases were at $2-$4 per square foot, for below current lease rates. These low rents allowed Kmart or any buyer of those leases to profit handsomely from the difference at current market rates. In short, there was substantial non-public opportunity for arbitrage in the old leases, and Lampert knew it.

143. According to a February 20, 2006 article in *Fortune* magazine, which interviewed Lampert, Lampert admitted that he knew after acquiring his controlling interest in Kmart and studying its financials that Kmart's real estate was undervalued:

> Just about everybody thought Lampert was crazy in 2002 when he began buying up Kmart debt at around 40 cents on the dollar after the retailer filed for Chapter 11. Crazier still, Lampert loaded up more as the price sank to 20 cents, eventually boosting his total investment to $700 million. "To most people, Kmart looked like a pile of trash," says Al Koch of restructuring advisor AlixPartners, then Kmart's interim CFO. "We were told that this hedge fund guy had bought a huge portion of Kmart and wanted to get it out of bankruptcy fast. None of us had ever heard of him."

But Lampert knew exactly what he was doing. . . . [I]f need be, Lampert could sell off Kmart's real estate, which had been valued at $800 million in a liquidation analysis filed in bankruptcy court. He was sure it was worth much more.

144.     A BusinessWeek article from April 16, 2007, confirmed that Lampert knew that Kmart's real estate was deeply undervalued when he acquired his controlling interest in the company:

Such daring shouldn't come as a surprise at a Lampert-run shop. When he looks at a company, he sees value hidden from plain view—value that traditional accounting methods often miss. That keen eye is what prompted him to buy up a majority of Kmart's bonds at a deep discount after it filed for bankruptcy protection in 2002. He saw that Kmart's real estate was deeply undervalued by creditors, and figured that would protect his investment. He was right.

145.     Thus, Lampert has admitted to at least two reporters that he knew that Kmart's real estate was undervalued when he became Kmart's chairman.  At that time, he assumed obligations beyond those of an ordinary investor.  No longer was he permitted to shrewdly deceive the marketplace about the state of his knowledge.

146.     The motivation for Lampert's actions was clear – to obtain control of Kmart as cheaply as possible.  During the bankruptcy, ESL and Lampert were able to obtain control of Kmart by purchasing vast numbers of shares pursuant to the Investment Agreement.  Under that agreement, Lampert and ESL obtained control of Kmart by purchasing shares at the very low prices of $10 to $13 per share.  These low prices were based upon the value of Kmart as presented to the bankruptcy court.  Had the true value of the real estate -- $9 to $18 billion -- been disclosed, Kmart's enterprise value would have doubled or tripled, requiring Lampert and ESL to pay much more to acquire control.  After Kmart emerged from bankruptcy, Lampert was strongly motivated not to disclose the true valuations to prevent his earlier machinations from coming to light until a reasonable period of time had passed.

147.     As the controlling shareholder of Kmart, Chairman of Kmart's Board of Directors, and having orchestrated Kmart's rapid emergence from bankruptcy, Lampert was involved in every key decision involving Kmart's business strategy and projected that Kmart's real estate would provide the necessary cash flow to improve Kmart's operations.

148.     Both Defendants Lampert and Day were deeply involved in formulating a turnaround plan for Kmart.   By chairing the influential FIC, and by owning the majority of Kmart's debt, Lampert dictated the course of Kmart's bankruptcy.   Lampert ordered the dismissal of most of Kmart's key executives, installed Defendant Day as Kmart's Chief Executive Officer, and sought the appointment of a new executive board.   He demanded that Kmart exit bankruptcy before May 31, 2003 in order to secure ESL's funding.

149.     After installing key executives, Defendant Lampert held at least two to three lengthy conference calls a week with Defendant Day, and participated in daily meetings with Kmart's executive team.   As part of Kmart's reorganization plan, Lampert controlled six of the nine seats on Kmart's Board of Directors.

150.     Exploiting his knowledge about the true value of Kmart's real estate and the potential cash flows that Kmart could realize from the sale of these real estate assets, Lampert embarked on a strategy to purchase creditor claims at bargain prices so that they could be converted to Kmart stock.  He then reaped the rewards of these strategic purchases when Kmart's stock price skyrocketed, after Kmart's revenues were boosted by sales of its real estate assets. There would have been nothing wrong with this strategy if Defendants had disclosed the true value of Kmart's real estate once Lampert became Chairman.

151.     Lampert and the entities he controlled acquired millions of dollars worth of claims from Kmart's creditors and Kmart's bonds.   In particular, Lampert purchased "trade

vendor/lease rejection" claims from Kmart's unsecured creditors which he then converted into millions of additional Kmart stock during the Class Period.  Lampert and the entities he controlled acquired Kmart's shares due to acquisitions from trade vendors and lessors.  These interests were converted into Kmart shares as follows:

|  | Date of Conversion of Claims into Shares | Shares Obtained |
|---|---|---|
| CRK Partners II, LP | 6/30/2003 | 1,760,981 |
|  | 10/23/2003 | 427,800 |
|  | 11/3/2003 | 113,346 |
|  | 1/2/2004 | 1,188,615 |
|  | 2/12/2004 | 8,178 |
|  | 4/27/2004 | 222,629 |
|  | 6/7/2004 | 114 |
|  | 7/16/2004 | 517,646 |
|  | 8/5/2004 | 15,824 |
|  | 8/18/2004 | 13,331 |
|  | 8/24/2004 | 5,991 |
|  | 1/31/2005 | 4,643,292 |
| CRK Partners, LLC | 6/30/2003 | 1,760,981 |
|  | 10/23/2003 | 427,800 |
|  | 11/3/2003 | 113,346 |
|  | 1/2/2004 | 1,188,615 |
|  | 2/12/2004 | 8,178 |
|  | 4/27/2004 | 222,629 |
|  | 6/7/2004 | 114 |
|  | 7/1/2004 | 24 |
|  | 7/16/2004 | 517,646 |
|  | 8/5/2004 | 15,824 |
|  | 8/18/2004 | 13,331 |
|  | 8/24/2004 | 5,991 |
|  | 1/31/2005 | 4,643,292 |

|  | Date of Conversion of Claims into Shares | Shares Obtained |
|---|---|---|
| ESL Investments, Inc. | 6/30/2003 | 1,760,981 |
|  | 10/23/2003 | 427,800 |
|  | 11/3/2003 | 113,346 |
|  | 1/2/2004 | 1,188,615 |
|  | 2/12/2004 | 8,178 |
|  | 4/27/2004 | 222,629 |
|  | 6/7/2004 | 114 |
|  | 7/16/2004 | 517,646 |
|  | 8/5/2004 | 15,824 |
|  | 8/18/2004 | 13,331 |
|  | 8/24/2004 | 5,991 |
|  | 1/31/2005 | 6,269,998 |
|  |  |  |
| ESL Limited (Bermuda) | 7/1/2004 | 7,217,324 |
|  |  |  |
| Edward S. Lampert | 6/30/2003 | 1,760,981 |
|  | 10/23/2003 | 427,800 |
|  | 11/3/2003 | 113,346 |
|  | 1/2/2004 | 1,188,615 |
|  | 2/12/2004 | 8,178 |
|  | 4/27/2004 | 222,629 |
|  | 6/7/2004 | 114 |
|  | 7/16/2004 | 517,646 |
|  | 8/5/2004 | 15,824 |
|  | 8/18/2004 | 13,331 |
|  | 8/24/2004 | 5,991 |
|  | 1/31/2005 | 6,269,998 |

152.    In acquiring these vendor claims for pennies on the dollar – and then later converting them to Kmart stock – undervalued as a result of Lampert's omission of material information – Lampert obtained a windfall.   Of course, his ability to acquire these shares for the

pennies on the dollar for which he acquired them was dependent on creditors not realizing Kmart's true value.

153.    As a holder of significant debt in the Company, Lampert could exercise considerable power.  This power was expressed through Lampert's appointment to the FIC on September 12, 2002.   As a member of the FIC, Lampert owed a fiduciary duty to institutional creditors whose interests Lampert was to represent.  To maximize recovery for the institutional debt holders, members of the FIC were required to actively challenge the conclusions of Kmart regarding the value of its assets.  However, by virtue of the equity holdings in Kmart that he obtained through the Investment Agreement, Lampert had an interest in depressing Kmart's shares.  His acquisition of a considerable stake in Kmart was a bargain as long as Kmart's shares were traded at depressed value.

154.    Thus, during the bankruptcy period—from January 22, 2002 through May 6, 2003—Lampert faced a profound conflict of interest:  as a creditor committee member, Lampert was obligated to obtain the highest recovery possible for creditors.  This included challenging low estimates of Kmart's assets so as to maximize the pool of resources available to satisfy creditors' claims.  At the same time, because Lampert stood to acquire significant equity holdings in the new company, Lampert had powerful motive to suppress the value of Kmart shares while negotiating the terms of his financial support for the Company.

155.    Defendant Day's interest in Kmart amounted to approximately 1.6 million in stock options which grew ever more valuable as Kmart's stock price went up.  In fiscal 2003, Day was the only executive at Kmart to receive stock options.  The 1,557,760 options awarded to Day were pursuant to Day's employment agreement entered into during Kmart's bankruptcy and according to Kmart's definitive proxy statement to shareholders filed on April 8, 2004,  "such

award will help to retain Mr. Day and to align his interests with those of the Company's

shareholders."   At the time of the grant, Kmart's stock price was at $15 per share.  Day did not

exercise a single option until after Kmart's merger with Sears.   Exercising approximately

980,000 options for $13 million, he then sold these shares for $145 million, or at approximately

$147 per share.

## VIII.   CLASS ACTION ALLEGATIONS

156.   Lead Plaintiffs bring this action on their own behalf and as a class action pursuant

to Rule 23(a) and Rule 23(b) (3) of the Federal Rules of Civil Procedure on behalf of a class (the

"Class") consisting of all persons and entities who sold or otherwise disposed of publicly traded

securities of Kmart, between May 6, 2003 and September 29, 2004 and who were injured

thereby. Excluded from the Class are: (i) Defendants; (ii) members of the family of each

individual defendant; (iii) any entity in which any defendant has a controlling interest; (iv) the

officers and directors of Sears and its subsidiaries and affiliates; and (v) the legal representatives,

heirs, successors or assigns of any such excluded party.

157.   Throughout the Class Period, shares of Kmart common stock were traded actively

on the NASDAQ, an efficient market. Throughout the Class Period, Kmart debt securities were

traded on the open market. The members of the Class, as sellers of debt and common stock, are

so numerous that joinder of all members is impracticable. Although the exact number of Class

members may only be determined through appropriate discovery, Lead Plaintiffs believe that

Class members number in the thousands. Approximately 89 million shares of Kmart stock were

issued and outstanding during the Class Period. There was also approximately $2.1 billion of

Kmart debt outstanding at the end of the Class Period.

158.   Lead Plaintiffs' claims are typical of the claims of the members of the Class.

Lead Plaintiffs and other members of the Class sold their Kmart common stock and/or debt

securities and sustained damages as a result of Defendants' wrongful conduct complained of herein.

159.    Upon information and belief, thousands of entities and individuals comprising the Class were fraudulently induced to sell shares of Kmart stock and/or bonds at artificially low prices, because of Defendants' false and deceptive scheme to conceal the Company's true value, including, in particular and without limitation, the value of Kmart's leasehold and other real estate interests.

160.    The members of the Class are so numerous and dispersed throughout the United States such that joinder of all members is impracticable.

161.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.

162.    Among the questions of law and fact common to the Class are:

a.      Whether Kmart, Lampert and Day engaged in a scheme to conceal the true value of Kmart's leasehold and other real estate interests;

b.      Whether Kmart, Lampert and Day engaged in a scheme to conceal the true value of Kmart's debt and equity securities;

c.      Whether Kmart, Lampert and Day's scheme to conceal the true value of Kmart shares was carried out intentionally with direct knowledge, or at least recklessly;

d.      Whether Lampert related his fiduciary duty to other institutional shareholders; and

e.      Whether the members of the Class have sustained damages and, if so, what the appropriate measure of damages should be.

163.     Lead Plaintiffs' claims against Defendants are typical of the claims of the members of the Class.  Lead Plaintiffs and the Class each sustained damages arising out of the Defendants' wrongful conduct as detailed herein. Specifically, Lead Plaintiffs' claims and the Class's claims arise from the Defendants' scheme to illegally conceal Kmart's true value of the Company by making false and misleading, and incomplete statements, and omitting to make statements, necessary to provide a full and fair picture of Kmart, its business, the value of its leaseholds and other real estate interests, and the value of its stock and debt.

164.     Lead Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Lead Plaintiffs have retained counsel competent and experienced in class action lawsuits. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class and should be named as representatives for the Class.

165.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual members of the Class may in some instances be relatively small, the expense and burden of individual litigation make it impossible for such class members individually to redress the wrongs done to them. Also, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and possibly conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

166.     The names and addresses of the record sellers of Kmart's publicly traded securities, sold during the Class Period, are available from the Company's transfer agent(s) and/or from other sources. Notice may be provided to such record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## IX.    DEFENDANTS CANNOT AVAIL THEMSELVES OF THE SAFE
## HARBOR DEFENSE UNDER SECURITIES LAWS

167.    It was critical to Defendants' scheme that the true value of Kmart's real estate portfolio remain hidden until a reasonable time after the Company emerged from bankruptcy and until Lampert had acquired additional shares at prices as low as $13 per share post-bankruptcy.

168.    As alleged herein, Defendants Lampert and Day acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Kmart were materially false and misleading or omitted material facts; knew that such statements or documents would be issued or disseminated to the investing public; knew that members of the investing public were likely to reasonably rely on those misrepresentations and omissions; and knowingly and substantially participated or were involved in the issuance or dissemination of such statements or documents as primary violations of the federal securities law.

169.    Defendants Lampert and Day participated in and knew of the fraudulent scheme alleged herein, by virtue of their receipt of information reflecting the true facts regarding Kmart; their control over, and/or receipt of Kmart's allegedly materially misleading misstatements; and/or their association with Kmart, all of which made Lampert and Day privy to confidential proprietary information concerning Kmart.

170.    With respect to non-forward-looking statements and/or omissions, the Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

171.    Defendants' false and misleading statements and omissions do not constitute forward-looking statements protected by any statutory safe harbor. The statements alleged to be false and misleading herein all relate to facts and conditions existing at the time the statements

were made. No statutory safe harbor applies to any of Kmart's, Lampert's or Day's materially false or misleading statements.

172.    Alternatively, to the extent that any statutory safe harbor is intended to apply to any forward-looking statement pleaded herein, the Defendants are liable for the false forward-looking statement pleaded because, at the time each forward-looking statement was made, the defendant making the statement knew or had actual knowledge that the forward-looking statement was materially false or misleading, and the forward-looking statement was authorized and/or approved by a director and/or executive officer of Kmart who knew that the forward-looking statement was false or misleading. None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made. Nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## X.  DEFENDANTS MAY NOT AVAIL THEMSELVE OF THE SAFE HARBOR DEFENSE UNDER SECTION 1125 OF THE BANKRUPTCY CODE

173.    The Defendants are not entitled to any protection from the statutory safe harbor provided for under Section 1125(e) of the Bankruptcy Code, 11 U.S.C. § 1125(e).  Lead Plaintiffs claims against the Defendants for violations of the securities laws are not in connection with the Defendants' solicitation of acceptance of Kmart's reorganization plan.  Lead Plaintiffs' claims are based on misrepresentations and omissions by the Defendants in Kmart's public filings issued after Kmart's reorganization plan was confirmed, and after Kmart emerged from bankruptcy.

## XI.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

174.    Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

   a.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   b.    The omissions and misrepresentations were material;

   c.    The Company's shares traded in efficient markets;

   d.    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

   e.    Lead Plaintiffs and other members of the Class purchased Kmart's publicly-traded securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

175.    At all relevant times, the markets for Kmart's publicly-traded securities were efficient for the following reasons, among others:

a.     As a regulated issuer, Kmart filed periodic public reports with the SEC;

b.     Kmart regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

c.     Kmart's publicly-traded securities were actively traded in an efficient market.

## XII.   <u>LOSS CAUSATION ALLEGATIONS</u>

176.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that undervalued the prices of Kmart's securities and operated as a fraud or deceit on Class Period sellers of Kmart's securities by issuing materially false and misleading statements that misrepresented the true value of Kmart's real estate and other assets.  As Kmart disclosed that its real estate was, in fact, more valuable than previously represented, the prices of Kmart's securities increased precipitously.  As a result of their sales of Kmart's securities during the Class Period at prices that did not reflect the true value of the Company's securities, Lead Plaintiffs and the other Class members have suffered economic loss, i.e., damages under the federal securities laws.

177.    By misrepresenting the value of Kmart's real estate, and by failing to reveal the leasehold value of Kmart's stores, Defendants presented a misleading picture of Kmart's true worth.  As alleged in this Complaint, the prices of Kmart's securities were artificially deflated by the false and misleading statements Defendants made during the Class Period.  But for the false and misleading information about the value of Kmart's real estate, the Company's securities

would not have traded at the depressed levels that it did during the Class Period. Had Defendants disclosed complete and truthful information about the value of the Company's stores and other assets during the Class Period, Lead Plaintiffs and other members of the Class would not have sold their securities at the prices and at the times they did, but instead would have held their shares, or would have sold at prices which were not artificially deflated by Defendants' misrepresentations.

178. As a direct result of Defendants' disclosures on June 4, 2004, June 30, 2004 and September 29, 2004 – in which Defendants disclosed details about the true value of Kmart's assets, – Kmart's common stock price increased dramatically. On June 4, 2004, when Kmart announced its first agreement to sell some of its stores, which valued each store at approximately $15.2 million per store, or $365 million in the aggregate, Kmart's common stock increased $7.67 per share, or approximately 14%, and closed at $62.53 per share.

179. On June 30, 2004, when Kmart announced that it will sell up to 54 of its stores for a maximum purchase price of $621 million in cash to Sears, Roebuck, Kmart's common stock increased $3.58 per share, or approximately 5.25%, and closed at $71.80 per share.

180. On September 29, 2004, when Kmart announced that it finalized the transaction with Sears Roebuck, selling 50 stores for an aggregate purchase price of approximately $575 million in cash, Kmart's common stock increased $2.21 per share, or approximately 2.57%, and closed at $88.06 per share.

181. Finally, on November 17, 2004, when Kmart announced its merger with Sears, Roebuck, Kmart's common stock closed at $109.00 per share. From the news of the first agreement to sell some of its stores through the announcement of its merger agreement with Sears, Roebuck, the price of Kmart common stock more than doubled.

## XIII. DURING THE CLASS PERIOD, DEFENDANTS LAMPERT AND DAY ACTED AS CONTROL PERSONS AS DEFINED BY THE EXCHANGE ACT

182.     During the Class Period, Defendant Lampert, as Chairman of Kmart and as the largest shareholder in Kmart, and Defendant Day, as Chief Executive Officer of the Company, were privy to confidential and proprietary information concerning Kmart, its operations, finances, financial condition and present and future business prospects.  Defendants Lampert and Day also had access to material adverse non-public information concerning Kmart and Sears, as discussed in detail above.  Because of their positions, Defendants Lampert and Day had access to non-public information about Kmart's business, finances, the value of its real estate, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, Defendants Lampert and Day knew or recklessly disregarded that the true facts specified herein had not been disclosed to, and were being concealed from, the investing public.

183.     Defendants Lampert and Day are liable as direct participants in the wrongs complained of herein. Defendant Day, by reason of his status as CEO, and through his actions in directing and controlling the Company's actions, was a "controlling person" which the meaning of § 20(a) of the Exchange Act and possessed and exercised his power and influence to cause Kmart to engage in the unlawful conduct complained of herein.  Defendant Lampert, by reason of his status as Chairman of Kmart and as the largest shareholder in Kmart, was a "controlling person" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause Kmart to engage in the unlawful conduct complained of herein.  Lampert possessed the power to appoint six of nine members of Kmart's board.  Because of their positions of control,

Defendants Lampert and Day were able to and did, directly or indirectly, control the conduct of Kmart's businesses.

184.     Defendants Lampert and Day, because of their positions with Kmart and Sears, controlled and/or possessed the authority to control the contents of the Company's reports, press releases and presentations to securities analysts and through them, to the investing public. Defendants Lampert and Day were provided with copies of Kmart's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, Defendants Lampert and Day had the opportunity to commit the fraudulent acts alleged herein.

185.     As Chairman of Kmart, as the largest shareholder in Kmart and as a controlling person of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the federal securities laws, Defendant Lampert had a duty to disseminate promptly accurate and truthful information with respect to Kmart's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Kmart's securities would be based upon truthful and accurate information. As CEO and former COO of Kmart, Defendant Day was charged with the duty to disseminate promptly accurate and truthful information with respect to Kmart's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Kmart's securities would be based upon truthful and accurate information.  Defendants

Lampert's and Day's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

186.     Defendants Lampert and Day are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on sellers of Kmart's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding the true value of Kmart's assets and the intrinsic value of Kmart's securities; and (ii) caused Plaintiffs and members of the Class to sell Kmart's publicly traded securities at undervalued prices.

## XIV.   CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

187.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

188.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding the true value of Kmart's assets, including its real estate and the intrinsic value of Kmart's securities; and (ii) cause Lead Plaintiffs and members of the Class to sell Kmart's publicly traded securities at undervalued prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

189.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the sellers of Kmart's securities in an effort to conceal the

true value for Kmart's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

190.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material information about the true value of Kmart's assets, as specified herein.

191.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to misrepresent Kmart's true value to investors, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Kmart and the value of its assets in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the sellers of Kmart's securities during the Class Period.

192.    Defendant Lampert's primary liability, and controlling person liability, arises from the following facts: (i) Defendant Lampert was Chairman and the largest shareholder of Kmart during the Class Period; (ii) Defendant Lampert, by virtue of his responsibilities and activities, was privy to and participated in the creation, development and reporting of Kmart's internal budgets, plans, projections and/or reports; (iii) Defendant Lampert enjoyed significant personal contact and familiarity with other senior officers and directors of the Company and was advised of and had access to other members of the Company's management team, internal

reports and other data and information about Kmart's finances, operations, and sales at all relevant times; and (iv) Defendant Lampert was aware of Kmart's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

193. Defendant Day's primary liability, and controlling person liability, arises from the following facts: (i) Defendant Day was CEO of Kmart during the Class Period; (ii) Defendant Day, by virtue of his responsibilities and activities, was privy to and participated in the creation, development and reporting of Kmart's internal budgets, plans, projections and/or reports; (iii) Defendant Day enjoyed significant personal contact and familiarity with other senior officers and directors of the Company and was advised of and had access to other members of the Company's management team, internal reports and other data and information about Kmart's finances, operations, and sales at all relevant times; and (iv) Defendant Day was aware of Kmart's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

194. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true value of Kmart's assets from the investing public. As demonstrated by Defendants' statements throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

195.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Kmart's securities were undervalued during the Class Period. In ignorance of the fact that market prices of Kmart's publicly-traded securities did not reflect their true value, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class sold Kmart's securities during the Class Period at undervalued prices and have been damaged thereby.

196.     At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the value of Kmart's assets, including its real estate, which was not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have sold their Kmart's securities at the undervalued prices which they did.

197.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

198.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective sales of Kmart's securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of
### the Exchange Act (Against Defendants Lampert and Day)

199.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

200.     Defendants Lampert and Day acted as controlling persons of Kmart within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and ownership and contractual rights, participation in and/or awareness of Kmart's operations and/or intimate knowledge of the false financial statements filed by Kmart with the SEC and disseminated to the investing public, Defendants Lampert and Day had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Kmart, including the content and dissemination of the various statements which Lead Plaintiffs contends are false and misleading. Defendants Lampert and Day were provided with or had unlimited access to copies of Kmart's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

201.     In particular, Defendants Lampert and Day had direct and supervisory involvement in the day-to-day operations of Kmart and, therefore, are presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

202.     As set forth above, Kmart and defendants Lampert and Day each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, defendants Lampert and Day are liable pursuant to Section 20(a)

of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead

Plaintiffs and other members of the Class suffered damages in connection with their sales of

Kmart's securities during the Class Period.

### PRAYER FOR RELIEF

203.    WHEREFORE, Lead Plaintiffs demand judgment as follows:

a.      Awarding money damages against all Defendants, jointly and severally,
for all losses and damages suffered as a result of the acts and transactions
complained of herein;

b.      Implementing corporate reforms deemed just and proper under the
circumstances;

c.      Awarding pre- and post-judgment interest on the damages awards;

d.      Awarding to Lead Plaintiffs the costs and disbursements of the action,
including reasonable attorneys' fees, accountants' and experts' fees, costs,
and expenses; and

e.      Granting such other relief as the Court may deem just and proper.

# JURY DEMAND

204.    Lead Plaintiffs demand a trial by jury on all claims so triable.

Dated:  May 11, 2007

_____
Jay W. Eisenhofer (JE-5593)
Geoffrey C. Jarvis (GJ-7040)
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, New York  10017
Tel:    (646) 722-8500
Fax:    (646) 722-8501

Samuel H. Rudman (SR-7957)
David A. Rosenfeld (DR-7564)
LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631-367-7100
Fax: 631-367-1173

Mark C. Gardy (MG-0338)
James S. Notis (JN-4189)
GARDY & NOTIS, LLP
440 Sylvan Avenue, Suite 110
Englewood Cliffs, NJ  07632
Telephone:  201-567-7377
Fax: 201-567-7337

*Co-lead Counsel for Lead Plaintiffs and the Class*

Nadeem Faruqi
FARUQI & FARUQI, LLP
369 Lexington Avenue, 10th Floor
New York, NY  10017
Telephone:  212-983-9330
Fax: 212-983-9331

Signature block continued/

Louis P. Malone
O'DONOGHUE & O'DONOGHUE LLP
4748 Wisconsin Ave., N.W.
Washington, D.C.  20016
Telephone:  202-362-0041
Fax:  202-362-2640

***Additional Counsel for Plaintiff***