# EXHIBIT J

1   BERNSTEIN LITOWITZ BERGER
       & GROSSMANN LLP
2   DAVID R. STICKNEY  (Bar No. 188574)
    TIMOTHY A. DeLANGE  (Bar No. 190768)
3   BRETT M. MIDDLETON  (Bar No. 199427)
    12481 High Bluff Drive, Suite 300
4   San Diego, CA 92130
    Tel:    (858) 793-0070
5   Fax:    (858) 793-0323
    davids@blbglaw.com
6   timothyd@blbglaw.com
    brettm@blbglaw.com
7
    *Attorneys for Plaintiff Public Employees'*
8   *Retirement System of Mississippi*

9

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

DEC 02 2008

ALAN CARLSON, Clerk of the Court

BY _____ DEPUTY

10              SUPERIOR COURT FOR THE STATE OF CALIFORNIA  **30-2008**

11                        COUNTY OF ORANGE

                                                    **00226005**

12  PUBLIC EMPLOYEES' RETIREMENT        Case No.
    SYSTEM OF MISSISSIPPI, Individually and
13  On Behalf of All Others Similarly Situated,    Judge:    JUDGE GAIL A. ANDLER
                                                              DEPT. CX102
14                              Plaintiff,          **CLASS ACTION COMPLAINT**

15        v.                                        DEMAND FOR JURY TRIAL

16  MORGAN STANLEY, MORGAN
    STANLEY MORTGAGE CAPITAL INC.,
17  MORGAN STANLEY DEAN WITTER
    CAPITAL I INC., f/k/a MORGAN
18  STANLEY CAPITAL I INC., MORGAN
    STANLEY & CO., INCORPORATED,
19  MCGRAW-HILL COMPANIES, MOODY'S
    CORP., ANTHONY B. TUFARIELLO,
20  WILLIAM J. FORSELL, VALERIE H. KAY,
    STEVEN S. STERN, MORGAN STANLEY
21  MORTGAGE LOAN TRUST 2006-4SL,
    MORGAN STANLEY MORTGAGE LOAN
22  TRUST 2006-5AR, MORGAN STANLEY
    MORTGAGE LOAN TRUST 2006-5ARW,
23  MORGAN STANLEY MORTGAGE LOAN
    TRUST 2006-6AR, MORGAN STANLEY
24  MORTGAGE LOAN TRUST 2006-7,
    MORGAN STANLEY MORTGAGE LOAN
25  TRUST 2006-8AR, MORGAN STANLEY
    MORTGAGE LOAN TRUST 2006-9AR,
26  MORGAN STANLEY MORTGAGE LOAN
    TRUST 2006-10SL, MORGAN STANLEY
27  MORTGAGE LOAN TRUST 2006-11,

28  (Caption continued on next page)

---

                    CLASS ACTION COMPLAINT

THIS CASE IS SUBJECT TO
MANDATORY ELECTRONIC FILING
PURSUANT TO RULE 308 OF THE LOCAL RULES
OF THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

| | |
|---|---|
| 1 | MORGAN STANLEY MORTGAGE LOAN TRUST 2006-12XS, MORGAN STANLEY |
| 2 | MORTGAGE LOAN TRUST 2006-13AX, MORGAN STANLEY MORTGAGE LOAN |
| 3 | TRUST 2006-14SL, MORGAN STANLEY MORTGAGE LOAN TRUST 2006-15XS, |
| 4 | MORGAN STANLEY MORTGAGE LOAN TRUST 2006-16AX, |
| 5 | |
| 6 | Defendants. |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

CLASS ACTION COMPLAINT

Exhibit A
- 15 -

# **TABLE OF CONTENTS**

Page

I. SUMMARY OF THE ACTION ....................................................................... 1

II. JURISDICTION AND VENUE ...................................................................... 5

III. THE PARTIES................................................................................................. 6

    A. Plaintiff .................................................................................................. 6

    B. Defendants ............................................................................................. 6

IV. FACTUAL BACKGROUND .......................................................................... 10

    A. The Development Of The Secondary Mortgage Market
        And Subprime Mortgages .................................................................... 10

    B. The Mechanics Of Structuring Mortgage Pass-Through
        Certificates ............................................................................................ 13

    C. Assessing The Quality Of A Mortgage Pass-Through
        Certificate Investment .......................................................................... 14

    D. The Role Of The Ratings Agencies In Structuring And
        Rating Certificates ................................................................................ 16

V. CERTIFICATES OFFERED BY DEFENDANTS ......................................... 17

VI. DEFENDANTS MISREPRESENTED THE NATURE OF THE
    LOANS UNDERLYING THE CERTIFICATES .......................................... 19

    A. Representations Regarding Loan Origination Underwriting .............. 19

    B. Representations Regarding Appraisals ................................................ 21

    C. Representations Regarding Credit Enhancement................................. 22

    D. Defendants' Representations Failed To Disclose The True
        Risk Of Investing In The Certificates .................................................. 24

        1. The Deterioration Of Underwriting Standards .................................. 24

        2. Inadequate Due Diligence Of Underwriting
           Standards................................................................................. 26

        3. The Investment-Grade Ratings Misrepresented The
           True Risk Of The Certificates................................................. 27

VII. MATERIAL MISSTATEMENTS AND OMISSIONS IN THE
    OFFERING DOCUMENTS.......................................................................... 28

VIII. CLASS ACTION ALLEGATIONS .............................................................. 37

i

CLASS ACTION COMPLAINT

**FIRST CAUSE OF ACTION**
    For Violation of Section 11 of the Securities Act (Against The
    Individual Defendants, Issuing Defendants and Underwriter
    Defendants) ................................................................................................................. 39

**SECOND CAUSE OF ACTION**
    For Violation of Section 12(a)(2) of the Securities Act (Against the
    Issuing Defendants and Underwriter Defendants) ...................................................... 41

**THIRD CAUSE OF ACTION**
    For Violation of Section 15 of the Securities Act (Against Morgan
    Stanley, MSMC and MSCo) ...................................................................................... 42

**RELIEF REQUESTED** ........................................................................................................ 42

ii

CLASS ACTION COMPLAINT

## I.   SUMMARY OF THE ACTION

1.   Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi PERS" or "Plaintiff") brings this securities class action on behalf of itself and all persons or entities ("plaintiffs" or the "Class") who purchased or otherwise acquired beneficial interests in the assets of the Morgan Stanley Issuing Trusts (defined, *infra*) pursuant to or traceable to Morgan Stanley Dean Witter Capital I Inc., f/k/a Morgan Stanley Capital I Inc.'s ("MSC I") March 14, 2006 Registration Statement and accompanying prospectuses and prospectus supplements.  By this action, Mississippi PERS seeks redress pursuant to the Securities Act of 1933 (the "Securities Act") against defendants Morgan Stanley, MSC I, Morgan Stanley Mortgage Capital Inc. ("MSMC"), Morgan Stanley & Co., Incorporated ("MSCo"), McGraw-Hill Companies, Moody's Corp., Anthony B. Tufariello, William J. Forsell, Valerie H. Kay, Steven S. Stern, and the Issuing Trusts.[1]

2.   This action arises from defendants' sale of mortgage pass-through certificates using false and misleading offering documents.  Mortgage pass-through certificates are securities entitling the holder to income payments from pools of mortgage loans and/or mortgage-backed securities ("MBS").  Here, the loan pools consisted of loans for residential property predominately in California.  Fundamentally, the value for pass-through certificates depends on the ability of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event of default.  In this regard, rating agencies played an important role in the sale of such securities to investors.  Credit rating agencies were supposed to evaluate and report on the risk associated with investment alternatives.  Based on the rating agencies' purported analysis of the loan pools, the certificates received high ratings, including "triple-A," categorizing them as investment-grade securities.  As

---

[1]  The Issuing Trusts, as set forth in ¶23, *infra*, include defendants:  Morgan Stanley Mortgage Loan Trust 2006-4SL, Morgan Stanley Mortgage Loan Trust 2006-5AR, Morgan Stanley Mortgage Loan Trust 2006-5ARW, Morgan Stanley Mortgage Loan Trust 2006-6AR, Morgan Stanley Mortgage Loan Trust 2006-7, Morgan Stanley Mortgage Loan Trust 2006-8AR, Morgan Stanley Mortgage Loan Trust 2006-9AR, Morgan Stanley Mortgage Loan Trust 2006-10SL, Morgan Stanley Mortgage Loan Trust 2006-11, Morgan Stanley Mortgage Loan Trust 2006-12XS, Morgan Stanley Mortgage Loan Trust 2006-13AX, Morgan Stanley Mortgage Loan Trust 2006-14SL, Morgan Stanley Mortgage Loan Trust 2006-15XS, Morgan Stanley Mortgage Loan Trust 2006-16AX.

---

1

CLASS ACTION COMPLAINT

Exhibit A
- 18 -

1  alleged below, however, defendants misrepresented the quality of the loans in the loan pools and gave

2  unjustifiably high ratings to the certificates.

3       3.     On March 14, 2006, MSC I filed with the Securities and Exchange Commission

4  ("SEC") the Pre-effective Amendment No. 2 to Form S-3 Registration Statement under the Securities

5  Act of 1933 (the "Registration Statement"), whereby it indicated its intention to sell more than 29

6  billion of the originally registered 50 billion mortgage pass-through certificates ("Certificates") through

7  a yet-to-be-determined number of individual entities created solely to issue the Certificates (the

8  "Issuing Trusts"). The Certificates were to be issued pursuant to the Registration Statement and an

9  accompanying prospectus, also filed with the SEC on March 14, 2006 (the "Prospectus"), generally

10  explaining the structure of the Issuing Trusts and an overview of the Certificates. The Certificates were

11  then sold to investors by the Underwriter Defendants, as defined herein, pursuant to a series of

12  prospectus supplements, which were also filed with the SEC and incorporated by reference into the

13  Registration Statement ("Prospectus Supplements"). Each "Prospectus Supplement" included a

14  detailed description of that Issuing Trust and its respective Certificates. The Registration Statement,

15  Prospectus and each of the respective Prospectus Supplements are collectively referred to herein as the

16  "Offering Documents."

17       4.     As set forth below, the Offering Documents contained materially false and misleading

18  statements and omitted material information in violation of Sections 11, 12(a)(2) and 15 of the

19  Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. Defendants are strictly liable for these

20  misstatements under the Securities Act.

21       5.     Morgan Stanley is a Wall Street investment bank that, through its various subsidiaries,

22  provides financial products and services worldwide. MSMC originates mortgage loans and purchases

23  residential mortgage loans through bulk purchases for securitization or resale. Many of the bulk

24  mortgage loans purchased by MSMC were pooled together by MSC I and deposited into qualifying

25  special purpose entities – the Issuing Trusts. These pools of loans were then securitized into mortgage-

26  backed securities ("MBS") and sold by the Issuing Trusts and Underwriter Defendants to investors in

27  the form of the Certificates. The Certificates were packaged in "tranches" by different levels of risk

28

2

CLASS ACTION COMPLAINT

1  and reward. The Certificates entitle investors to receive monthly distributions of interest and principal

2  on cash flows from the mortgages held by the Issuing Trusts. As the original borrowers on each of the

3  loans paid their mortgages, distributions were made to investors in accordance with the terms of the

4  Certificates. If borrowers failed to pay back their mortgages, defaulted, or foreclosed, these losses

5  flowed to investors based on the seniority of their Certificates.

6        6.      Thus, the investment quality of the Certificates was necessarily linked to the quality of

7  the mortgage loan pools held by each Issuing Trust. The Offering Documents included several

8  representations regarding: (i) the underwriting standards used by the loan originators; (ii) the standards

9  and guidelines used by MSMC when evaluating and acquiring the loans; (iii) the appraisal standards

10 used to value the properties collateralizing the loans, and the corresponding loan-to-value ratios of the

11 loans; (iv) the credit enhancement supporting the loan securitization process; and (v) the pre-established

12 ratings assigned to each tranche of Certificates issued pursuant to the Offering Documents.

13       7.      This action relates to Certificates issued by fourteen (14) Issuing Trusts (as set forth in

14 ¶23, herein) purchased by Plaintiff and other Class members. While all of the Certificates were offered

15 pursuant to the March 16, 2006 Registration Statement and Prospectus, each Issuing Trust issued its

16 own Prospectus Supplement offering Certificates related only to its unique loan pool. Plaintiff

17 Mississippi PERS purchased Series 2006-14SL Mortgage Pass-Through Certificates pursuant to the

18 Prospectus Supplement filed by defendant Morgan Stanley Mortgage Loan Trust 2006-14SL ("MSML

19 Trust 2006-14SL"). Each of the Prospectus Supplements is identical, or nearly identical, in substance,

20 with exceptions related to the tabular data regarding the pool of loans underlying each series of

21 Certificates.

22       8.      The Certificates issued by each Issuing Trust were divided into several classes, or

23 "tranches," which had different priorities of seniority, payment, exposure to risk and default, and

24 interest payments. Defendants Moody's Corp., through its division Moody's Investor Service, Inc.

25 ("Moody's"), and McGraw-Hill Companies, through its division, Standard & Poor's ("S&P"), directly

26 and indirectly participated in and took steps necessary for the distribution of the Certificates. In

27 addition, Moody's and S&P directly participated in the selection of the underlying mortgages to be

28

3
CLASS ACTION COMPLAINT

Exhibit A
- 20 -

1    securitized and issued by each Issuing Trust.  Moreover, as a condition to the issuance of the

2    Certificates, Moody's and S&P rated the investment quality of the Certificates with pre-determined

3    ratings.  These ratings, which were expressly included in each of the Prospectus Supplements, in part,

4    determined the price at which these Certificates were offered to Plaintiff and the Class.  Moody's and

5    S&P assigned investment-grade ratings on all tranches of the offered Certificates.

6         9.    The highest investment rating used by Moody's is "Aaa."  The highest rating used by

7    S&P is "AAA."  These ratings signify the highest investment-grade, and are considered to be of the

8    "best quality," and carry the smallest degree of investment risk.  Ratings of "AA," "A," and "BBB"

9    represent high credit quality, upper-medium credit quality and medium credit quality, respectively.

10   These ratings are considered "investment-grade ratings."  Any instrument rated lower than BBB is

11   considered below investment-grade, or "junk bond."

12        10.   As alleged more fully below, the Offering Documents misstated and omitted material

13   information regarding the quality of the loans underlying the Certificates and the process by which

14   MSMC acquired those loans.  Specifically, the Offering Documents failed to disclose, *inter alia*, that

15   the loan originators had systematically ignored their stated and pre-established underwriting and

16   appraisal standards and that MSMC ignored its purchasing guidelines and overpaid for underlying

17   mortgages without regard to the quality of the loans for the sole purpose of increasing its position in the

18   mortgage lending and securitization industry.  Likewise, the underlying mortgages were based on

19   collateral appraisals that overstated the value of the underlying properties.

20        11.   As a result of the materially false and misleading statements in the Offering Documents,

21   Plaintiff and the Class purchased Certificates that were far riskier than represented and that were not of

22   the "best quality," or even "medium credit quality."  Consequently, certain Certificate tranches

23   represented to be investment-grade instruments were later revealed to be below investment-grade

24   instruments, or "junk bonds."  The downgrades in the ratings to below investment-grade caused the

25   value of the Certificates to collapse.  The Certificates continue to lose value as delinquencies, defaults

26   and foreclosures related to the mortgages underlying the Certificates continue to increase.  As a result,

27   Plaintiff and other Class members have suffered significant losses and damages.

28

4

CLASS ACTION COMPLAINT

1  II.  JURISDICTION AND VENUE

2      12.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of

3  the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  This Court has jurisdiction over the subject

4  matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, which explicitly

5  states, "[e]xcept as provided in section 16(c) [15 U.S.C. § 77p(c)] no case arising under this title and

6  brought in any State court of competent jurisdiction shall be removed to any court of the United

7  States."  Section 16(c) of the Securities Act refers to "covered class actions."  This action asserts claims

8  under the Securities Act and is not a "covered class action" within the meaning of Section 16(c), and

9  therefore, pursuant to Section 22 of the Securities Act, this action is not removable.  *See Luther v.*

10  *Countrywide Home Loans Servicing LP,* 533 F.3d 1031 (9th Cir. 2008).

11      13.    Venue is proper in this Court because a substantial portion of the wrongs complained of

12  herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in

13  Orange County. Further, defendants have availed themselves of the benefits of conducting business in

14  Orange County and have engaged in numerous activities which had an effect in this County.  As the

15  chart below demonstrates, by an overwhelming amount, a great percentage of the underlying mortgages

16  pooled in the Certificates of each of the fourteen Issuing Trusts were securitized by properties located

17  in California, and the related underwriting and appraisals were conducted in California:

| Trust | Concentration of CA Loans | Next highest Concentration (State) |
|---|---|---|
| MSM 2006-4SL | 25% | 11% (NY) |
| MSM 2006-5AR | 45% | 9% (FL) |
| MSM 2006-5ARW | 45% | 9% (FL) |
| MSM 2006-6AR | 42% | 9% (FL) |
| MSM 2006-7 | 25% | 10% (TX) |
| MSM 2006-8AR | 34% | 14% (FL) |
| MSM 2006-9AR | 38% | 11% (FL) |
| MSM 2006-10SL | 25% | 12% (NY) |
| MSM 2006-11 | 23% | 10% (FL) |
| MSM 2006-12XS | 21% | 12% (FL) |
| MSM 2006-13AX | 42% | 9% (NV) |
| MSM 2006-14SL | 24% | 9% (NY) |
| MSM 2006-15XS | 22% | 10% (NY) |
| MSM 2006-16AX | 26% | 11% (FL) |

5

CLASS ACTION COMPLAINT

A substantial amount of those properties are believed to be located in Orange County. At times relevant to this action, MSMC, the entity that originated or otherwise acquired the loans related to this action, had "primary facilities" and core operations in Foothill Ranch, Orange County. Consequently, many of the witnesses that may be called to testify regarding the allegations herein reside and work in Orange County. Moreover, defendants promoted and sold the Certificates to investors located in California.

III.   THE PARTIES

   A.   Plaintiff

   14.   Plaintiff Public Employees' Retirement System of Mississippi is a governmental defined benefit pension plan qualified under Section 401(a) of the Internal Revenue Code, and is the retirement system for nearly all non-federal public employees in the State of Mississippi. Established by the Mississippi Legislature in 1952, Mississippi PERS provides benefits to over 75,000 retirees, and future benefits to more than 250,000 current and former public employees. Mississippi PERS acquired Certificates pursuant and/or traceable to the Offering Documents. On August 18, 2007, Mississippi PERS purchased 1,325,000 Series 2006-14SL Mortgage Pass-Through Certificates issued by the MSML Trust 2006-14SL, each priced at $95.38.

   B.   Defendants

   15.   Defendant Morgan Stanley is a Delaware Corporation with its principal executive office located at 1585 Broadway, New York, New York 10036. Morgan Stanley has more than 45,000 employees in offices around the world, including California. Morgan Stanley, through its subsidiaries and affiliates, provides various financial products and services to corporations, governments, financial institutions, and individuals worldwide. Morgan Stanley, through its subsidiary MSMC, created and controls MSC I, a limited purpose, wholly-owned finance subsidiary designed to facilitate the issuance and sale of the Certificates.

   16.   Defendant Morgan Stanley Mortgage Capital Inc. ("MSMC," as defined previously) is a New York corporation with its principal place of business located at 1585 Broadway, New York, New York 10036, and offices and core operations in Foothills Ranch, California. MSMC is an indirect

6

CLASS ACTION COMPLAINT

wholly-owned subsidiary of Morgan Stanley, and the parent of MSC I.  MSMC is also an affiliate

through common parent ownership of MSCo.  MSMC provides warehouse and repurchase financing to

mortgage lenders and purchases closed, first and subordinate-lien residential mortgage loans for

securitization or resale.  MSMC originates mortgage loans, or otherwise acquires residential mortgage

loans through bulk purchases and also through purchases of single loans through MSMC's conduit loan

purchase program.  MSMC served as the "Sponsor" and "Seller" in the securitization of the Issuing

Trusts; and, in coordination with MSCo, worked with ratings agencies, loan sellers and servicers in

structuring the securitization transactions related to the Certificates.

17.     Defendant Morgan Stanley Dean Witter Capital I Inc., f/k/a Morgan Stanley Capital I

Inc. ("MSC I," as previously defined) is a Delaware corporation and a limited purpose, wholly-owned

subsidiary of MSMC (and indirect subsidiary of Morgan Stanley), with its principal place of business

located at 1585 Broadway, New York, New York 10036.  MSC I is an affiliate, through common

parent ownership, of MSCo.  MSC I served in the role as "Depositor" in the securitization of the

Issuing Trusts, and was an "Issuer" of the Certificates within the meaning of Section 15 of the

Securities Act, 15 U.S.C. § 77b(a)(4).

18.     Defendant Morgan Stanley & Co., Incorporated ("MSCo," as defined previously) is a

Delaware corporation with its principal place of business located at 1585 Broadway, New York, New

York 10036.  MSCo is an affiliate, through common ownership, of MSMC and MSC I.  MSCo acted as

an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).

As an underwriter, MSCo participated in the drafting and dissemination of the Prospectus Supplements

pursuant to which the Certificates were sold to Plaintiff and other Class members.

19.     Defendant McGraw-Hill Companies is a New York corporation with its principal place

of business located at 1221 Avenue of the Americas, New York, New York 10020, and several offices

located in California.  Standard & Poor's ("S&P," as defined previously), a division of McGraw-Hill

Companies, provides credit ratings, risk evaluation, investment research and data to investors.  S&P

acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C.

§ 77b(a)(11).  S&P participated in the drafting and dissemination the Prospectus Supplements pursuant

to which the Certificates were sold to Plaintiff and other Class members. In addition, S&P worked with MSMC, loan sellers and servicers in structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

20. Defendant Moody's Corp. is a Delaware corporation with its principal place of business located at 250 Greenwich Street, New York, New York 10007, and a regional office in California. Moody's Investor Service, Inc. ("Moody's," as defined previously), a division of Moody's Corp., provides credit ratings, research and risk analysis to investors. Moody's acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11). Moody's participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. In addition, Moody's worked with MSMC, loan sellers and servicers in structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

21. Defendant McGraw-Hill Companies, inclusive of S&P, and defendant Moody's Corp., inclusive of Moody's, are collectively referred to herein as the "Rating Agency Underwriters."

22. Defendants MSCo, Morgan Stanley and the Rating Agency Underwriters are collectively referred to herein as the "Underwriter Defendants."

23. Defendants, the Issuing Trusts, were created and structured by MSC I to issue billions of dollars worth of Certificates pursuant to the Registration Statement and Prospectuses. For each offering by the Issuing Trusts, MSC I served as the "Depositor," MSCo served as a designated "Underwriter," and MSMC served as the "Sponsor"/"Seller." The following chart identifies (1) each Issuing Trust; (2) the stated value of the Certificates issued; and (3) the Registration Statement and Prospectus Supplement dates pursuant to which the Certificates were issued and sold.

| Amended Registration Statement | Issuing Trust | Prospectus Supplement Date | Principal Amount |
|---|---|---|---|
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-4SL | 3/27/2006 | $ 303,460,867 |

8

CLASS ACTION COMPLAINT

| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-5AR | 3/27/2006 | $ 556,422,690 |
|---|---|---|---|
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-5ARW | 3/27/2006 | $ 150,000,000 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-6AR | 4/26/2006 | $ 1,037,398,613 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-7 | 5/25/2006 | $ 548,035,116 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-8AR | 5/25/2006 | $ 791,945,629 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-9AR | 7/20/2006 | $ 652,221,992 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-10SL | 7/25/2006 | $ 298,543,237 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-11 | 7/26/2006 | $ 682,377,191 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-12XS | 9/26/2006 | $ 521,285,533 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-13AX | 8/26/2006 | $ 608,919,208 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-14SL | 10/24/2006 | $ 353,987,132 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-15XS | 10/25/2006 | $ 671,388,000 |
| 3/14/2006 | Morgan Stanley Mortgage Loan Trust 2006-16AX | 10/26/2006 | $ 956,299,494 |

24. . Defendants MSC I, Morgan Stanley and the Issuing Trusts are collectively referred to herein as the "Issuing Defendants."

25. Defendant Anthony B. Tufariello ("Tufariello") was, at all relevant times, the President (Principal Executive Officer) and Director of MSC I. Defendant Tufariello signed the Registration Statement. While serving as President of MSC I, defendant Tufariello was concurrently the Managing Director, Global Head of Securitized Products, of defendant Morgan Stanley.

26. Defendant William J. Forsell ("Forsell") was, at all relevant times, the Treasurer (Principal Financial Officer) and Controller of MSC I. Defendant Forsell signed the Registration

9

CLASS ACTION COMPLAINT

1    Statement.  While serving as Treasurer of MSC I, defendant Forsell was concurrently the Assistant

2    Treasurer of defendant Morgan Stanley.

3         27.    Defendant Valerie H. Kay ("Kay") was, at all relevant times, a Director of MSC I.

4    Defendant Kay signed the Registration Statement.  While serving as a Director of MSC I, defendant

5    Kay was concurrently a Managing Director of defendant Morgan Stanley.

6         28.    Defendant Steven S. Stern ("Stern") was, at all relevant times, a Director of MSC I.

7    Defendant Stern signed the Registration Statement.  While serving as a Director of MSC I, defendant

8    Stern was concurrently the Co-Head of the U.S. Principal Transaction Group, Real Estate Lending, of

9    defendant Morgan Stanley.

10        29.    Defendants Tufariello, Forsell, Kay, and Stern are collectively referred to herein as the

11   "Individual Defendants."

12   IV.   FACTUAL BACKGROUND

13        A.    The Development Of The Secondary Mortgage Market And Subprime Mortgages

14        30.    Traditionally, consumers wishing to finance the purchase of a house (or other property)

15   were able to obtain a 30-year or 15-year fixed rate mortgage or a conventional adjustable rate mortgage

16   ("ARM") through a mortgage lender that would profit by servicing the loans and collecting interest

17   payments over the life of the mortgages.  As such, the lender (or loan originator) had an interest in

18   making sure that borrowers were able to repay their loans; or that loans were at least adequately

19   collateralized in the case of default.

20        31.    To increase available funds for borrowers, the U.S. government chartered Government

21   Sponsored Enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae")

22   and the Federal Home Loan Mortgage Corporation ("Freddie Mac").  The GSEs were empowered to

23   buy mortgages (*i.e.,* the rights to repayment of the loans) from loan originators, thus developing a

24   secondary market for mortgages.  Once bought, the loans were pooled together, securitized and sold to

25   investors as "mortgage backed securities," or "MBS."  The money that a loan originator earned from

26   the loan sales was then used to finance new mortgages, thereby increasing the lender's revenues.

27

28

10

CLASS ACTION COMPLAINT

Exhibit A

- 27 -

32.     Investors who purchased MBS would (typically) receive monthly payments over the lifetime of the underlying loans, in accordance with the borrowers' payments of principal and interest. To protect MBS investors, the GSEs only purchased loans that met approved underwriting standards. In addition, the prices of the MBS were discounted to account for an assumed rate of default or non-payment of a certain percentage of loans.

33.     From 1995 to 2005, the housing market experienced a dramatic rise in home ownership. According to the Research Department of the Federal Reserve Bank of San Francisco ("FRBSF"), after decades of relative stability, the rate of U.S. homeownership began to surge as 12 million more Americans became homeowners between 1994 and 2004.  The increased demand also resulted in a growth in new home construction.  In 2005, according to the U.S. Census Bureau, 1,283,000 newly-constructed single-family houses sold, compared with an average of 609,000 per year from 1990 to 1995.

34.     Investment banks such as Morgan Stanley and other entities became active in and profited from the lucrative secondary market for mortgage loans.  Unlike GSEs, investment banks were not constrained by the same strict conditions and restrictions when purchasing loans from loan originators.  As the secondary market for loans originated with less stringent underwriting standards expanded, loan originators were increasingly able to lend to borrowers with higher credit-risk profiles without absorbing all of the increased risk.  In exchange for the increased risk of default and/or delinquencies, the loan originators provided the loans at higher interest rates – *i.e.*, subprime loans – with higher potential rates of return, due to the higher interest percentage charged to the borrowers and thus the higher rate of return to investors in the secondary market.

35.     In recent years, several factors led to greater demand for subprime and alternative loan mortgages in the secondary market.  Perhaps the most significant factor was the introduction of new pricing models, the Gaussian copula models developed by David X. Li, which allowed for rapid pricing of exotic finance structures that relied upon pooled mortgages and MBS.  The increased demand in the secondary market, along with persistent low interest rates and low inflation (perhaps caused by the increased demand in the secondary market), facilitated consumer borrowing.

CLASS ACTION COMPLAINT

Exhibit A
- 28 -

36.   Concurrently, as loan originators increased the amount of loans sold rather than held and serviced, they became less vigilant in guarding against the risk of defaults and delinquencies because they were able to quickly transfer the risk to purchasers in the secondary market.  Loan fees and sales revenue became the lender's primary profit mechanism, making the sheer quantity of loans issued more important than the quality of any particular loan.  To facilitate more loans, lenders began to offer more aggressive loan products such as subprime mortgages, hybrid loans and negative amortization "option ARM" loans, with little or no documentation.  In addition, it is now known that loan originators abandoned their stated underwriting and appraisal standards, and other methods of risk assessment, in order to increase loan origination quantities.

37.   According to Harvard University's Joint Center for Housing Studies, between 2001 and 2005, the subprime market grew from just $210 billion (in real terms) to $625 billion, amounting to approximately 20% of the total residential loans originated in 2005.  The FRBSF observed that "it seems probable that the growth in the subprime market [gave] many households access to credit that would previously have been denied."  This time period also saw a dramatic growth in Alt-A loans, a characteristic of which was reduced or eliminated documentation required to secure a mortgage (commonly referred to as a "liar loan").  According to a report by rating agency S&P, Alt-A originations increased from less than $20 billion in 2000 to more than $300 billion in 2005.

38.   The end result was a mortgage paradigm shift where loan originators allowed consumers to borrow more money than they could afford to repay.  As consumers were able to borrow more, they were able to spend more.  Accordingly, housing prices kept rising.  In that environment, consumers who were unable to repay their loans could simply borrow more money (against increased equity) or sell their house at a perpetually increasing price to other consumers – who likely borrowed more than they could afford to repay, as well.  Thus, in the sky-rocketing housing market, the effects of the loan originators' over-aggressive lending practices were not immediately realized.

39.   Eventually, however, the aggressive lending practices overburdened the housing market.  Housing prices peaked, loan volume leveled-off and loan defaults and delinquencies started to rise.  Without underlying repayment revenues and adequate collateral value to support MBS, the credit

12

CLASS ACTION COMPLAINT

Exhibit A
- 29 -

1    market began deteriorating and investors in mortgaged-backed instruments, directly or through

2    derivative instruments such as mortgage pass-through certificates, experienced tremendous losses.

3           B.    The Mechanics Of Structuring Mortgage Pass-Through Certificates

4         40.    Mortgage pass-through certificates are securities in which the holder's interest

5    represents an equity interest in the "issuing trust." The pass-through certificates entitle the holder to

6    income payments from pools of mortgage loans and/or MBS. Although the structure and underlying

7    collateral of the mortgages and MBS vary, the basic principle is the same.

8         41.    First, a "depositor" acquires an inventory of loans from a "sponsor"/"seller," who either

9    originated the loans or acquired the loans from other loan originators, in exchange for cash. The type

10   of loans in the inventory may vary, including conventional, fixed or adjustable rate mortgage loans (or

11   mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens,

12   with various lifetimes to maturity. The depositor then transfers, or deposits, the acquired pool of loans

13   to the issuing trust entity.

14        42.    The issuing trust then securitizes the pool of loans so that the rights to the cash-flows

15   from the inventory can be sold to investors. The securitization transactions are structured such that the

16   risk of loss is divided among different levels of investment, or "tranches." Although technically

17   different instruments, tranches are related MBS offered as part of the same pass-through certificate

18   offering, each with a different level of risk and reward. Any losses to the underlying loans, due to

19   default, delinquency or otherwise, are applied in reverse order of seniority. As such, the most senior

20   tranches of pass-through certificates are often rated as the best quality, or "AAA." Junior tranches,

21   which usually obtain lower ratings, ranging from "AA" to "BBB-," are less insulated from risk, but

22   offer greater potential returns.

23        43.    By working with the underwriters, the depositor, and the rating agencies, the issuing

24   trust is able to ensure that each particular mortgage pass-through certificate tranche will receive a pre-

25   determined rating by pre-determined rating agencies at the time of offering.

26        44.    Once the tranches are established, the issuing trust passes the certificates back to the

27   depositor, who then passes the certificates to one or more underwriter. The underwriter offers the

28

13

CLASS ACTION COMPLAINT

various certificates to investors, in exchange for cash that will be passed back to the depositor, minus
any fees owed to the underwriters.



45.     Each purchased or acquired certificate represents an equity interest in the issuing trust
and the right to future payments of principal and interest on the underlying loans.  Those payments are
collected by the loan servicer and distributed, through the issuing trust, to investors at regular
distribution intervals throughout the life of the loans.

46.     Mortgage pass-through certificates must be offered to the public pursuant to a
registration statement and prospectus in accordance with the provisions of the Securities Act.

C.     Assessing The Quality Of A Mortgage Pass-Through Certificate Investment

47.     The fundamental basis upon which certificates are valued is the ability of the borrowers
to repay the principal and interest on the underlying loans and the adequacy of the collateral.  Thus,
proper loan underwriting is critical to assessing the borrowers' ability to repay the loans, and a
necessary consideration when purchasing and pooling loans.  If the loans pooled in the MBS were to
suffer defaults and delinquencies in excess of the assumptions built into the certificate payment
structure, as set forth in the offering prospectus, certificate owners would suffer more than expected
losses as income necessary to service the certificates would necessarily diminish.

48.     Likewise, independent and accurate appraisals of the collateralized real estate are
essential to ensure that the mortgage or home equity loan can be satisfied in the event of a default and
foreclosure on a particular property.  In the event of a foreclosure, an accurate appraisal is necessary to
determine the likely price at which the foreclosed property can be sold and thus the amount of money
that issuing trust would receive and be able to pass through to certificate holders.

14
CLASS ACTION COMPLAINT

49. An accurate appraisal is also critical to calculating loan-to-value ("LTV") ratio, which is a financial metric commonly used to evaluate the price and risk of MBS and mortgage pass-through certificates. The LTV ratio expresses the amount of mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a borrower seeks to borrow $90,000 to purchase a home worth $100,000, the LTV ratio is equal to $90,000 divided by $100,000, or 90%. If, however, the appraised value of the house has been artificially inflated to $100,000 from $90,000, the real LTV ratio would be 100% ($90,000 divided by $90,000).

50. From an investor's perspective, a high LTV ratio represents a greater risk of default on the loan. First, borrowers with a small equity position in the underlying property have "less to lose" in the event of a default. Second, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which might cause the borrower to default and would prevent the issuing trust from recouping its expected return in the case of foreclosure and subsequent sale of the property.

51. Consequently, the LTV ratios of the loans underlying mortgage pass-through certificates are important to investors' assessment of the value of such certificates. Indeed, prospectuses typically provide information regarding the LTV ratios, and even guarantee certain LTV ratio limits for the loans that will support the offered certificates.

52. The underwriting standards and appraisals of the pooled loans are critically important considerations when setting assumptions and parameters for each certificate tranche. The assumed amount of expected payments of principal and interest will necessarily affect the total available funds and potential yield to investors. In addition, the assumed amount of expected payments will affect the offered credit enhancement, such as overcollateralization, excess interest, shifting of interests, and subordination.

53. Overcollateralization is the amount by which the aggregate stated principal balance of the mortgage loans exceeds the aggregate class principal balance for the certificate tranches. In other words, overcollateralization serves as a cushion, so that in the case of default on certain loans, the

1    remaining payments would be adequate to cover the yield on all certificates without any tranche taking
2    a loss.

3         54.    A similar cushion is provided by the interest generated by the loans in excess of what is
4    needed to pay the interest on the certificates and related expenses of the trust. Often, the tranches are
5    structured so that the weighted average interest rate of the mortgage loans is higher than the aggregate
6    of the weighted average pass-through rate on the certificates, plus servicing fee rates on the mortgage
7    loans.

8         55.    If the assumed underwriting standards and appraisals are inaccurate, or the loan
9    purchasing guidelines used to acquire those loans are disregarded, the stated credit enhancement
10   parameters will be inaccurate, and investors will not receive the level of protection as set forth in the
11   respective registration statement and prospectus(es).

12        D.    The Role Of The Ratings Agencies In Structuring And Rating Certificates

13        56.    Traditionally, rating agencies published ratings to reflect an unbiased assessment of risk
14   associated with a particular investment instrument. Historically, an overwhelming majority of the
15   rating agencies' revenues were generated by fees from subscribers who received their research and
16   ratings. In the structured finance arena (*i.e.*, mortgage pass-through certificates and other MBS),
17   however, rating agencies often played an active role in structuring the very instruments that they rated –
18   and they received lucrative fees for their services.

19        57.    The rating of any particular MBS was critical to its issuance because of regulations
20   requiring many institutional investors, such as banks, mutual funds and public pension funds, to hold
21   only "investment-grade" bonds and securitized interests. Indeed, many MBS – including mortgage
22   pass-through certificates – were geared towards, and promoted to, institutional investors. Here, in fact,
23   each of the Prospectus Supplements stated, "Certificates May Not Be Appropriate for Individual
24   Investors."

25        58.    As reported in the *International Herald Tribune*, the rating agencies did "much more
26   than evaluate [MBS instruments] and give them letter grades," they played an "integral role" in
27   structuring the transactions and instructing the assemblers "how to squeeze the most profit out" of the
28

16
CLASS ACTION COMPLAINT

1  MBS by maximizing the tranches with the highest ratings. Now, it is evident that these credit rating

2  agencies indirectly and directly participated in and took steps necessary to the distribution of mortgage

3  pass-through certificates and other MBS.

4  V.     CERTIFICATES OFFERED BY DEFENDANTS

5       59.    In theory, the loan securitization process entails a series of "arm's-length" transactions

6  where the certificates are valued, appropriately priced and sold to investors. The depositor pays a fair

7  price to the sponsor/seller based on the represented quality of the pool of loans. The depositor then

8  verifies the quality of the loans and transfers them to the issuing trust. The depositor then works with

9  the underwriters to assess the likely cash-flows from the loan repayments and, based on those

10  calculations, sets the parameters and expected yield of each certificate tranche that the underwriter will

11  offer to investors.

12       60.    In this case, however, the transactions were not arm's-length transactions. To the

13  contrary, Morgan Stanley controlled all of the entities involved at all stages of the process.

14       61.    Morgan Stanley, through MSMC, established MSC I for the sole purpose of issuing the

15  Certificates. On March 14, 2006, MSC I filed with the SEC the Registration Statement and Prospectus,

16  identifying itself as the "Depositor" of a to-be-determined series of Certificate offerings, pursuant to

17  forthcoming Prospectus Supplements.

18       62.    The Prospectus and Prospectus Supplements provided information to investors about the

19  Certificates in more detail in progression. First, the Prospectus provided general information regarding

20  the Certificate offerings. Then, the respective Prospectus Supplements provided the specific terms of

21  the particular Certificate series offering. To the extent that the Prospectus presented multiple options,

22  investors were told to rely on the information in the Prospectus Supplement as to the applicable option.

23       63.    The Prospectus filed on March 14, 2006 provided that MSC I would offer a series of

24  Certificates representing beneficial ownership interests in the related Issuing Trusts and that the assets

25  of each trust would consist of (i) conventional, fixed or adjustable interest rate mortgage loans secured

26  by first liens or junior liens, or first and junior liens on one- to four-family residential properties,

27  including mortgage participations; (ii) mortgage pass-through certificates and mortgage-backed

28

17

CLASS ACTION COMPLAINT

Exhibit A

- 34 -

securities; (iii) direct obligations of the United States or other governmental agencies; or (iv) any combination of the preceding.

64.     Subsequent to filing the Prospectus, MSC I caused to be filed Prospectus Supplements for each of the Issuing Trusts.  For example, on October 24, 2006, MSC I filed with the SEC a Prospectus Supplement offering Series 2006-14SL Mortgage Pass-Through Certificates on behalf of the MSML Trust 2006-14SL Issuing Trust.

65.     In the Prospectus and each of the respective Prospectus Supplements, MSC I was identified as the Depositor for the Issuing Trusts' Certificate offerings.  While MSC I served as the Depositor for each of the Issuing Trusts, it was directed and controlled by its parent MSMC and Morgan Stanley.

66.     The Registration Statement, and each of the respective Prospectus Supplements, identified MSMC as the "Sponsor" and "Seller" of the loans acquired by the Depositor, MSC I.  While MSMC served as the Sponsor and Seller for each of the Issuing Trusts, it was directed and controlled by Morgan Stanley.

67.     According to the Registration Statement and Prospectus Supplements, MSMC originated the loans or otherwise acquired them through bulk or single purchases pursuant to its conduit loan purchase program.  A pool of loans was then sold to the Depositor and passed-through to the Issuing Trusts.

68.     MSC I, the Depositor, then worked with the Underwriter Defendants and MSMC to structure the securitization transactions and price the Certificates.  Per the Registration Statement, Prospectus and Prospectus Supplements, MSCo was a designated "Underwriter."  In addition, by way of their actual participation and conduct in structuring the transactions, the Rating Agency Underwriters directly and indirectly participated in the distribution process.  Specifically, the Rating Agency Underwriters participated in structuring the transactions and, as a condition to the issuance of the Certificates, provided investment-grade ratings as detailed in each of the Prospectus Supplements.

69.     As stated in the Prospectus and the Supplemental Prospectuses, MSCo, as a designated Underwriter, purchased the Certificates and offered them to investors, including Plaintiff and other

1  Class members.  The proceeds from those sales were then transferred to MSC I (the Depositor), minus

2  applicable underwriting fees.

3  VI.   DEFENDANTS MISREPRESENTED THE NATURE
       OF THE LOANS UNDERLYING THE CERTIFICATES

4

5      70.   The Offering Documents contained material statements regarding, *inter alia*, (i) the

6  underwriting process and standards by which the loans held by the respective Issuing Trusts were

7  originated, including the type of loan and documentation level; (ii) the standards and guidelines used by

8  MSMC when evaluating and acquiring the loans; (iii) a representation of the value of the underlying

   real-estate securing the loans pooled in the respective Issuing Trusts, in terms of LTV averages and the
9
   appraisal standards by which such real estate values were measured; and (iv) the level of credit
10
   enhancement, such as overcollateralization and excess interest, calculated to afford a certain pre-
11
   determined level of protection to investors.
12
       71.   Each Prospectus Supplement included tabular statistics concerning the loans underlying
13
   the Certificates, including (but not limited to) the type of loans, the number of loans, the weighted
14
   average mortgage rate, the aggregate scheduled principal balance of the loans, the weighted average
15
   original combined LTV ratio, and the geographic concentration of the mortgaged properties (in excess
16
   of 10% of the aggregate scheduled principal balance).
17
       A.   Representations Regarding Loan Origination Underwriting
18
       72.   Although the percentages vary among the Issuing Trusts, the Prospectus Supplements
19
   state that MSMC originated or purchased from various correspondent lenders most of the mortgage
20
   loans underlying the Certificates, and that the remaining loans in the pool were originated by one or
21
   more originators.  For example, the MSML Trust 2006-14SL Prospectus Supplement states that MSMC
22
   originated or purchased approximately 90.43% of the loans underlying the Series 2006-14SL
23
   Certificates.  Where more than 10% of the loans were originator by any particular loan originator, that
24
   originator was identified in the Prospectus Supplement.
25
       73.   The Prospectus Supplements represented that the mortgage loans underlying the
26
   Certificates "have been acquired by the Seller in the normal course of its business" and that "[a]ll of the
27

28
                              19
                      CLASS ACTION COMPLAINT
                          Exhibit A
                           - 36 -

1  Mortgage Loans were underwritten by the Originators substantially in accordance with the related

2  underwriting criteria specified" in the Prospectus Supplement.[2]

3      74.    As represented in the Prospectus Supplements, prior to acquiring any of the residential

4  mortgage loans, MSMC stated that it conducted a review of the related mortgage loan seller based upon

5  the credit quality of the selling institution.  The review process included reviewing select financial

6  information for credit risk and assessment, an underwriting guideline review, senior level management

7  discussions, and/or background checks.  The scope of MSMC's purported due diligence varied based

8  upon the credit quality of the mortgage loans.

9      75.    In addition, the Prospectus Supplements represented that each of the loan originators,

10  and in certain circumstances the Seller, MSMC, represented and warranted that **each** of the loans

11  originated and/or sold by it was underwritten in accordance with standards consistent with those

12  utilized by mortgage lenders generally during the period of origination.  The Seller, MSMC,

13  represented and warranted that each of the loans sold by it conformed to the requirements of its seller

14  guide.

15      76.    Furthermore, the Prospectus Supplements represented that each loan mortgagor will

16  have been required to complete an application ***designed to provide the original lender pertinent credit***

17  ***information concerning the mortgagor*** and, as part of the description of the mortgagor's financial

18  condition, the mortgagor will have furnished information with respect to his, her, or its assets,

19  liabilities, income (with some noted exceptions), credit history, employment history and personal

20  information.

21      77.    As noted, the Prospectus Supplements indicated that certain of the loans underlying the

22  Certificates were issued under "alternative, reduced documentation, no-stated-income, no-

23  documentation, no-ratio or stated income/stated assets programs, which require less documentation or

24  verification than do traditional full documentation programs."  A statistical breakdown of the loans

25

26

27  [2] As is generally the case, the Prospectus Supplements for each Issuing Trust uniformly used the same
    or substantially similar language.

28

1   categorized by documentation level category is included in the Prospectus Supplement for each Issuing

2   Trust.

3       78.     Accordingly, pursuant to the "Trust Agreement" and "Mortgage Loan Purchase

4   Agreement" (as defined in the Prospectus and/or Prospectus Supplements), the Seller, MSMC, made

5   certain representations, warranties and covenants related to certain Mortgage Loans.

6       B.     <u>Representations Regarding Appraisals</u>

7       79.     As stated in the Prospectus Supplements, MSCM's decision to purchase loans in some

8   cases may have been based primarily or entirely on the appraisal of the mortgaged property and the

9   LTV ratio at origination. Indeed, the Prospectus Supplements represent an assumption that *the related*

10  *mortgaged properties provide adequate security for the mortgage loans*.

11      80.     As set forth in the Prospectus Supplements, the adequacy of the mortgaged property as

12  security for repayment of the loans will have generally been determined by an appraisal in accordance

13  with pre-established guidelines conforming to the Uniform Standards of Professional Appraisal

14  Practice ("USPAP"), as adopted by the Appraisal Standards Board of the Appraisal Foundation, and on

15  forms acceptable to Fannie Mae and/or Freddie Mac.

16      81.     With respect to real estate appraisals, USPAP requires, *inter alia*:

17          An appraiser must perform assignments with impartiality, objectivity, and independence, and
            without accommodation of personal interests.

18

19          In appraisal practice, an appraiser must not perform as an advocate for any party or
            issue.

20          An appraiser must not accept an assignment that includes the reporting of predetermined
            opinions and conclusions.

21

22                              *   *   *

23          It is unethical for an appraiser to accept an assignment, or to have a compensation
            arrangement for an assignment, that is contingent on any of the following:

24          1.    the reporting of a predetermined result (*e.g.*, opinion of value);

25          2.    a direction in assignment results that favor the cause of the client;

26          3.    the amount of a value opinion;

27          4.    the attainment of a stipulated result; or

28

21

CLASS ACTION COMPLAINT

5.   the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

82.   In addition, the Prospectus Supplements represented that the appraisal procedure guidelines used by the loan originators generally will have required the appraiser or agent on its behalf to personally inspect the property and to verify whether the property was in good condition. Furthermore, the appraisal will have been based on market data analysis of recent sales of comparable properties and, when applicable, analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

83.   The Prospectus Supplements provide information regarding the weighted average combined original LTV ratio of the loans underlying the Certificates. The "Combined LTV Ratio" of a mortgage loan is defined in the Prospectus Supplements as

> ... a fraction expressed as a percentage, the numerator of which is the principal balance of the related Mortgage Loan at the date of determination, plus the principal balance of each mortgage loan senior thereto based upon the most recent information available to the Seller and the denominator of which is (a) in the case of a purchase, the lesser of the selling price of the Mortgaged Property and its appraised value determined in an appraisal obtained by the originator of such Mortgage Loan, or (b) in the case of a refinance, the appraised value of the Mortgaged Property at the time of such refinance.

84.   The Combined LTV Ratio is provided in the Prospectus Supplement, in association with various loan groupings, including by loan type and documentation level, property type and geographical location. As stated in the Prospectus Supplements, "*No Mortgage Loan had a Combined Loan-to-Value Ratio at origination of more than 100%.*"

C.   Representations Regarding Credit Enhancement

85.   Defendants, in structuring the Certificate tranche parameters, provided for certain "Credit Enhancement," as set forth in the Prospectus Supplements. Credit Enhancement is intended to provide protection to the holders of the Certificates against shortfalls in payments received on the mortgage loans and helps increase the likelihood of the receipt of all payments under the agreements pursuant to which the Certificates are issued. The Certificate securitization and offering transactions provide various forms of credit enhancement, including subordination, shifting interests,

overcollateralization and excess interest. Each form of credit enhancement is necessarily dependant on the application and effectiveness of the originator's underwriting standards, as well as an accurate appraisal of the mortgaged real estate and the corresponding LTV ratio.

86.     Each of the Prospectus Supplements represented a pre-determined amount of overcollateralization, as well as an overcollateralization floor amount with respect to a yield distribution date. For example, the MSML Trust 2006-14SL Prospectus Supplement states that the overcollateralization amount with respect to the Series 2006-14SL Certificates will be 6.4% of the aggregated "Stated Principal Balance on the Mortgage Loans" ($353,987,000), or approximately $22,655,168. Similarly calculated, the overcollateralization floor amount for any particular distribution day is equal to approximately $1,769,935.

87.     In addition, the Certificate securitization and offering transactions were structured such that the loans were expected to generate more interest than was needed to pay interest on the Certificates (and related expenses of the Issuing Trust). Specifically, the weighted average interest rate of the mortgage loan was expected to be higher than the aggregate of the weighted average pass-through rate on the Certificates, plus the servicing fee rate on the mortgage loans.

88.     The credit enhancements represented in the Prospectus Supplements directly impact and correlate with the representations regarding the ratings assigned to each Certificate tranche in a series offering. As stated in the Prospectus Supplements, "[t]he ratings assigned to mortgage pass-through certificates address the likelihood of the receipt of all payments on the Mortgage Loans by the Certificate holders under the agreements pursuant to which such [C]ertificates are issued. Such ratings take into consideration the credit quality of the Mortgage Loans, including any credit support providers, structural and legal aspects associated with such [C]ertificates, and the extent to which the payment stream on the Mortgage Pool is adequate to make the payments required by such [C]ertificates." MSML Trust 2006-14SL.[3]

---

[3] As is generally the case, the Prospectus Supplements for each Issuing Trust uniformly used the same or substantially similar language.

CLASS ACTION COMPLAINT

Exhibit A
- 40 -

89.     Here, the Rating Agency Underwriters worked directly with the Underwriter MSCo, Depositor MSC I and Sponsor/Seller MSMC to structure the Certificate transactions to achieve certain ratings.  In fact, it was a condition of the issuance of the Certificates that each tranche in the series receive the respective ratings as set forth in the Prospectus Supplements.

**D.     Defendants' Representations Failed To Disclose**
**The True Risk Of Investing In The Certificates**

**1.     The Deterioration Of Underwriting Standards**

90.     From 1995 to 2005, the housing market experienced a dramatic rise in home ownership, as 12 million more Americans became homeowners between 1994 and 2004.  Likewise, in recent years, the subprime market has grown dramatically, enabling more and more borrowers to obtain credit who traditionally would have been unable to access it.  According to Inside Mortgage Finance, from 1994 to 2006, subprime lending increased from an estimated $35 billion, or 4.5 percent of all one-to-four family mortgage originations, to $600 billion, or 20% of originations.

91.     As detailed above, Wall Street aggressively pushed into the complex, high-margin business of packaging mortgages and selling them to investors as MBS, including mortgage pass-through certificates.  This aggressive push created a boom for the mortgage lending industry.  By buying and packaging mortgages, Wall Street enabled the lenders to extend credit even as the dangers grew in the housing market.  At the center of the escalation was Wall Street's partnership with subprime lenders.  This relationship was a driving force behind the once-soaring home prices and the spread of exotic loans that are now defaulting and foreclosing in record numbers.

92.     Morgan Stanley, seeking to compete with its Wall Street peers and to expand its share of the mortgage securities market, reached out to subprime lenders for the purchase of subprime loans.  According to a December 6, 2007 article in *The New York Times*, "Wary of Risk, Bankers Sold Shaky Mortgage Debt," Morgan Stanley cultivated a relationship with New Century Financial, one of the largest subprime lenders.  As a result of this relationship, Morgan Stanley expanded its subprime underwriting business by 25% from 2004 to 2006.  According to a former New Century executive, Morgan Stanley agreed to pay above-market prices for loans in return for a steady supply of mortgages.

1    According to the article, the former New Century executive said: "Morgan would be aggressive and

2    say, 'We want to lock you in for $2 billion a month.'"

3        93.      As is now evident, far too much of the lending in recent years was neither responsible

4    nor prudent. According to Ben S. Bernanke, Chairman of the Federal Reserve Board, in a March 14,

5    2008 speech at the National Community Reinvestment Coalition Annual Meeting, "[t]he deterioration

6    in underwriting standards that appears to have begun in late 2005 is another important factor underlying

7    the current crisis. A large share of subprime loans that were originated during this time feature high

8    combined loan-to-value ratios and, in some cases, layers of additional risk factors, such as a lack of full

9    documentation or the acceptance of very high debt-to-income ratios."

10        94.      In its March 2008 Policy Statement on Financial Market Developments, the President's

11    Working Group on Financial Markets concluded that "[t]he turmoil in financial markets clearly was

12    triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages, beginning*

13    *in late 2004 and extending into early 2007*." (Emphasis in original). As U.S. housing prices

14    subsequently declined, the delinquency rate for such mortgages soared.

15        95.      The rapid increase in mortgage defaults and home foreclosures between 2006 and 2008,

16    during the time when Morgan Stanley had expanded its mortgage-related business in an attempt to

17    compete with its Wall Street competitors and was purchasing subprime loans at above-market prices

18    from New Century, compromised the quality of the mortgages pools underlying the Certificates and

19    thus diminished the value of the Certificates. In fact, according to data from Moody's, loans made by

20    New Century now have some of the highest default rates in the industry – almost twice those of

21    competitors like Wells Fargo and Ameriquest.

22        96.      As a result, the government has launched numerous investigations into the subprime

23    mortgage lending industry, including Morgan Stanley. In January 2008, the FBI announced criminal

24    investigations into 14 mortgage lenders. By April of 2008, the FBI's investigations had expanded to 19

25    mortgage lenders. The government's investigations focused on subprime mortgage lending practices

26    by major banks and companies.

27

28

25

CLASS ACTION COMPLAINT

97.     In May 2008, the FBI and the criminal division of the Internal Revenue Service formed a task force to examine mortgages that were made with little or no proof of the earnings or assets of borrowers. The task force includes federal prosecutors in New York, Los Angeles, Philadelphia, Dallas and Atlanta. The task force is focusing on the role of mortgage lenders and brokers in low- or no-documentation loans, and is also examining how the loans were bundled into securities.

2.     Inadequate Due Diligence Of Underwriting Standards

98.     Morgan Stanley and other investment banks contracted with external firms to review whether the loans included in MBS that they underwrote were in compliance with the loan originators' represented standards. Morgan Stanley was a noted client of Clayton Holdings, Inc. ("Clayton"). In June of 2007, the New York Attorney General subpoenaed documents from Clayton and another due diligence firm, Bohan Group ("Bohan"), seeking information regarding whether the investment banks withheld information that should have been disclosed to investors. Similar subpoenas were issued by the SEC and Massachusetts and Connecticut regulators.

99.     On January 27, 2008, the New York Attorney General entered into an agreement with Clayton for immunity from prosecution in exchange for additional documents and testimony regarding its due diligence reports. Both *The New York Times* and *Wall Street Journal* published articles detailing the agreement and Clayton's expected testimony. According to *The New York Times* (Anderson, J. and Bajaj, V., "Reviewer of Subprime Loans Agrees to Aid Inquiry of Banks," Jan. 27, 2008), Clayton communicated daily with bankers putting together securities," and that "starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending exceptions." In response, rather than change the "broad language written in prospectuses" to reflect the environment, "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

100.    A more recent article in the *Los Angeles Times* (Reckard, E., "Sub-prime Mortgage Watchdogs Kept On Leash; Loan Checkers Say Their Warnings of Risk Met With Indifference," March 18, 2008) revealed that Clayton and Bohan employees "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as

1  borrowers' incomes that seemed inflated or documents that looked fake – but the problems were

2  glossed over, ignored, and stricken from the reports."

3     101.     In its most recent annual report, filed on Form 10-K with the SEC on January 28, 2008,

4  Morgan Stanley confirmed that it is under direct investigation and is "responding to subpoenas and

5  requests for information from certain regulatory and Governmental entities concerning the origination,

6  purchase, securitization and servicing of subprime and non-subprime residential mortgages and related

7  issues."

8         3.     The Investment-Grade Ratings
               Misrepresented The True Risk Of The Certificates

9

10    102.     As detailed above, the Rating Agency Underwriters directly participated in structuring

11 the securitization transactions underlying the Certificates and, as a condition to the issuing of the

12 Certificates to the public, provided pre-determined ratings for the Certificates.  These pre-determined

13 credit ratings were, for virtually all tranches of the offered Certificates, investment-grade.  Moody's and

14 S&P maintained investment-grade ratings on the Certificates until, at the earliest, December 20, 2007,

15 and for certain senior tranches, until late August 2008.

16    103.     The ratings provided by the Rating Agency Underwriters did not represent the true risk

17 of the Certificates, as they were based on insufficient information and faulty assumptions concerning

18 how many underlying mortgages were likely to default.  The President's Working Group on Financial

19 Markets, Policy Statement Financial Market Developments (March, 2008), confirms that there were

20 flaws in credit rating agencies' assessments of subprime MBS and other complex structured financial

21 products, such as mortgage pass-through certificates.

22    104.     Internal rating agency emails discovered and released by U.S. Congressional

23 investigators reveal that some Rating Agency Underwriter employees suspected before the credit

24 markets deteriorated that the Rating Agency Underwriters used lax standards for rating MBS.  For

25 example, one email between colleagues at S&P stated, "Rating agencies continue to create and [sic]

26 even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this

27

28

house of cards falters."[4]  As J.P. Morgan CEO Jamie Dimon observed, "There was a large failure of common sense.  Very complex securities should not have been rated as if they were easy to value bonds."

105.     Consequently, on June 11, 2008, the SEC proposed new rules that would, *inter alia*, prohibit rating agencies from issuing ratings on a structured product, including mortgage pass-through certificates, unless information on the assets underlying the product was made available; prohibit credit rating agencies from structuring the same products they rate; and require the public disclosure of the information used by credit rating agencies in determining a rating on a structured product, including information on the underlying assets.

## VII.     MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

106.     The Registration Statement for the Issuing Trusts contained an illustrative form of a prospectus for use in the offering of the Certificates.  The Registration Statement was prepared by the Issuing Defendants and Underwriter Defendants, and signed by the Individual Defendants.  Along with the Registration Statement, the Prospectus was filed providing details of the Certificate offerings.  The Prospectus was prepared by the Issuing Defendants and the Underwriting Defendants.  Subsequently, Prospectus Supplements were filed with the SEC containing a detailed description of the mortgage pools underlying the Certificates and making certain representations about the loan origination process and the quality of the loans.  The Prospectus Supplements were prepared by the Issuer Defendants and the Underwriter Defendants.  The Rating Agency Underwriters directly participated in the structuring of the mortgage pools, and as a condition of the issuance of the Certificates, provided the investment-grade ratings predetermined in the Prospectus Supplements.  The Underwriter Defendants sold the Certificates pursuant to the Prospectus Supplements.  The Prospectuses were referenced and incorporated into the Registration Statement.

---

[4]  Collateralized debt obligations, or "CDOs," are a type of asset-backed security and structured credit product, structured similarly to mortgage pass-through certificates.

107.    The Registration Statement and the Prospectuses stated the "Loan Purchasing Guidelines and Underwriting Standards" concerning the loans underlying each of the Certificates offered pursuant to the Registration Statement.  Specifically, the Registration Statement stated:

> Each of the Originators, and in certain circumstances the Seller, will represent and warrant that each of the Mortgage Loans originated and/or sold by it was underwritten in accordance with standards consistent with those utilized by mortgage lenders generally during the period of origination.  The Seller will represent that and warrant that each of the Mortgage Loans sold by it conformed to the requirements of the seller guide.

108.    Each of the Prospectus Supplements identified loan originators that accounted for greater than ten percent of the loans in the mortgage pools underlying the Certificates, if applicable. For each such circumstance, that Prospectus Supplement provided representations regarding the underwriting standards utilized by that loan originator.

109.    The Morgan Stanley Mortgage Loan Trust 2006-8AR, Morgan Stanley Loan Trust 2006-7, and Morgan Stanley Loan Trust 2006-8AR Prospectus Supplements listed Morgan Stanley Credit Corporation ("MSCC") as a loan originator accounting for more than ten percent of the respective loans in the mortgage pools underlying those Issuing Trusts, and represented that:

> MSCC's origination guidelines for Mortgage Loans use a combination of automated and judgmental underwriting criteria to evaluate credit risk, and this risk assessment may affect documentation requirements.  MSCC's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral.  A prospective borrower applying for a mortgage loan is required to submit an application in writing or via telephone, which elicits pertinent information about the prospective borrower, including the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired. MSCC employs underwriters to scrutinize the prospective borrower's credit profile.
>
> *   *   *
>
> A potential borrower's ability to make the proposed loan payments is measured by the applicant's income, credit, residence stability and assets. One test to determine this ability is the debt-to-income ratio, which is the borrower's total monthly debt service divided by total monthly gross income. MSCC typically allows for a debt-to-income ratio of 45%. Debt-

to-income exceptions must be approved by the appropriate level underwriter, and supported by compensating factors.

The adequacy of the mortgaged property as security for the proposed mortgage loan will generally be determined by an appraisal or automated property valuations acceptable to MSCC. Appraisals are conducted by independent appraisers acceptable to MSCC. The appraisals generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, on income generated from the property.

110.     The Morgan Stanley Mortgage Loan Trust 2006-11 and Morgan Stanley Loan Trust 2006-15XS Prospectus Supplements listed American Home Mortgage Corp. ("AHM") as a loan originator accounting for more than ten percent of the respective loans in the mortgage pools underlying those Issuing Trusts, and represented that:

The ["conforming or "prime"] mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines of the Originator.

The Originator's non-conforming underwriting guidelines are similar to those of the government sponsored enterprises Fannie Mae and Freddie Mac, but these loans are "non-conforming" in that they may not conform to the maximum loan amounts and in some cases underwriting guidelines of Fannie Mae and Freddie Mac. These non-conforming loans do not conform to and are not insurable by the Federal Housing Administration nor can they be guaranteed by the U.S. Department of Veterans Affairs.

The Originator's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.

111.     The Morgan Stanley Mortgage Loan Trust 2006-12XS Prospectus Supplement listed First National Bank of Nevada ("FNBN") as a loan originator accounting for more than ten percent of the loans in the mortgage pool underlying that Issuing Trust, and represented that:

All of the mortgage loans have been originated under FNBN's "full" or "alternative" underwriting guidelines (i.e., the underwriting guidelines

30

CLASS ACTION COMPLAINT

applicable to the mortgage loans typically are less stringent than the underwriting guidelines established by Fannie Mae or Freddie Mac primarily with respect to the income and/or asset documentation which borrower is required to provide).   To the extent the programs reflect underwriting guidelines different from those of Fannie Mae or Freddie Mac, the performance of the mortgage loans thereunder may reflect relatively higher delinquency rates and/or credit losses.   In addition, FNBN may make certain exceptions to the underwriting guidelines described herein if, in FNBN's discretion, compensating factors are demonstrated. . . .

FNBN's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral. . . .

112.   The Morgan Stanley Mortgage Loan Trust 2006-8AR Prospectus Supplement listed First Wachovia Mortgage Corp. ("Wachovia") as a loan originator accounting for more than ten percent of the loans in the mortgage pool underlying that Issuing Trust, and represented that:

*Prime Products*: Wachovia manually underwrites every Jumbo A Fixed Rate, Jumbo LIBOR ARM and Jumbo Alt-A Fixed Rate/ARM loan and generally follows Fannie Mae guidelines. Wachovia uses Custom Desktop Underwriter to supplement the underwriting of the Jumbo A Fixed Rate and the Jumbo LIBOR ARM loans to ensure the consistent and objective application of risk evaluation; however, income/asset documentation, credit requirements, collateral documentation must be met for each product. . . . The collateral Review Team, consisting of trained appraisers, is available to assist underwriters with reviews of appraisals on more difficult properties. The Investor Relations team supports underwriters by requesting single loan variances from investors and assisting all production channels with underwriting clarification and oversight.   The online Products and Underwriting manual is available to every employee and updated twice monthly.

Wachovia's non-conforming (jumbo) guidelines are provided to its whole loan investors on an ongoing basis for review and acceptability.   Loans are documented generally in accordance with Fannie Mae guidelines.   Jumbo LIBOR ARM loans require one full appraisal report (Fannie Mae Forms 1004, 1025, or 1073) for loan amounts up to $1,000,000 and two full appraisal reports for loan amounts greater than $1,000,000.   Jumbo Fixed A Rate loans require one full and one desk review for loan amounts greater than $1,000,000 when the property is a primary residence or second home.   Investment properties and co-ops require two full appraisal reports for loan amounts greater than $650,000.   The borrower's capacity to repay, creditworthiness, source of funds for down payment and the

31

CLASS ACTION COMPLAINT

adequacy of the collateral securing the mortgage are evaluated per guidelines stated within the Wachovia Mortgage Corporation online Products and Underwriting Manual.

\* \* \*

Exception loans which are originated outside of stated guidelines are available to customers with demonstrated Wachovia relationships and/or strong compensating factors. Exception loans must be approved by exception officers within Wachovia, GBG or the Wealth Management Group.

*Collateral Evaluation/Appraisers*: All jumbo loan products originated through Wachovia require the full Uniform Residential Appraisal Report (Fannie Mae Form 1004 for single-family properties or Fannie Mae Form 1025 for 2-4 family properties or Fannie Mae Form 1073 for all condominiums).

113. The Morgan Stanley Mortgage Loan Trust 2006-7 Prospectus Supplement listed GreenPoint Mortgage Funding, Inc. ("GreenPoint") as a loan originator accounting for more than ten percent of the loans in the mortgage pool underlying that Issuing Trust, and represented that:

Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Exceptions to the guidelines are permitted where compensating factors are present. The GreenPoint underwriting guidelines are generally not as strict as Fannie Mae or Freddie Mac.

\* \* \*

In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers the ratio of those amounts to the proposed borrower's monthly gross income. . . .

As part of its evaluation of potential borrowers, GreenPoint generally requires a description of the borrower's income. . . .

\* \* \*

In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. All Appraisal are required to conform to the Uniform Standards of Professional Appraisal Practices adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.

32

CLASS ACTION COMPLAINT

114.    The above statements, as set forth in ¶¶107-113, were materially false and misleading when made because they failed to disclose that MSMC and loan originators systematically ignored their stated and traditional underwriting standards during the period of origination; that the underwriting standards actually utilized did not properly evaluate the borrower's credit standing and ability to repay the loan, as represented; exceptions were made to the underwriting standards despite the absence of true compensating factors; and that the appraisals were not conducted in accordance with the loan originators' stated underwriting standards.  In addition, the statements failed to disclose that the loans sold to the Issuing Trusts (via the Depositor) did not conform to the requirements of the seller guide.

115.    Regarding MSMC's acquisition of loans that are sold to the Depositor and transferred to the Issuing Trusts, the Prospectuses stated:

> MSMC acquires residential mortgage loans through bulk purchases and also through purchases of single loans through MSMC's conduit loan purchase program.  The mortgage loans purchased through its conduit program generally conform to the conduit origination standards.
>
> Prior to acquiring any residential mortgage loans, MSMC conducts a review of the related mortgage loan seller that is based upon the credit quality of the selling institution.  MSMC's review process may include reviewing select financial information for credit and risk assessment and conducting an underwriting guideline review, senior level management discussion and/or background checks.  The scope of the loan due diligence varies based on the credit quality of the mortgage loans.
>
> The underwriting guideline review entails a review of the mortgage loan origination process and systems.  In addition, such review may involve a consideration of corporate policy and procedures relating to state and federal predatory lending, origination practices by jurisdiction, historical loan level loss experience, quality control practices, significant litigation and/or material investors.

116.    The above statements were materially false and misleading when made because they failed to disclose that loan originators: (i) systematically ignored their stated and traditional underwriting standards and that the underwriting standards actually utilized failed to conform to MSMC's conduit originations standards; and (ii) abandoned their respective corporate policy and procedures relating to origination and quality control practices so that they could increase their loan

CLASS ACTION COMPLAINT

origination quantity and the resulting fees obtained. In addition, the statements failed to disclose that MSMC entered into an agreement with subprime lenders, such as New Century, to pay a premium for a steady supply of mortgages, even though most, if not all, of those systematically ignored their stated and pre-established underwriting standards.

117. The Registration Statement and Prospectuses contained the following statement concerning the appraisals performed on the loans underlying the Certificates:

> The adequacy of the mortgaged property as security for the repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to [Fannie Mae] and/or [Freddie Mac]. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon market data analysis of the recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

118. The above statements were materially false and misleading when made because they failed to disclose that the appraisals used to determine the adequacy of the mortgaged property for security for the repayment of the related mortgage loans were not made in accordance with pre-established appraisal procedures and in conformity with USPAP.

119. The Registration Statement and Prospectuses stated that "[n]o Mortgage Loan had a Loan-to-Value Ratio at origination of more than approximately 100.00%."

120. The above statement was materially false and misleading when made because the actual LTV ratio for a number of mortgage loans would have exceeded 100% if the underlying properties were appraised according to pre-established appraisal procedures and in accordance with USPAP, per the definition of "Loan-to-Value Ratio" set forth in the Registration Statement.

121.    The Prospectuses represent that the securitization transactions are based on the assumption "that the related mortgage properties provide adequate security for the mortgage loans...." In accordance with that assumption, the Prospectuses presented tabular statistics regarding loan LTV ratios, including "Weighted Average Combined Original LTV" by geographic distribution, property type, document level, occupancy, seasoning (months), and range of credit scores.

122.    The above statements, including the tabular statistics, were materially false and misleading when made because they failed to disclose that the LTV ratios would have been higher if the underlying properties were appraised according to pre-established appraisal procedures and in accordance with USPAP, as stated in the Registration Statement and Prospectuses.

123.    The Prospectuses represented that the securitization structure of each of the Certificate offerings was structured to include credit enhancement in the form of overcollateralization. Each Prospectus Supplement states a particular amount by which the aggregate stated principal balance of the mortgage loans is greater than the aggregate class principal of the Certificates. For example, the MSML Trust 2006-14SL Prospectus Supplement states:

> On the closing date the aggregate stated principal balance of the mortgage loans is expected to exceed the aggregate class principal of the [offered Series 2006-14SL Mortgage Pass-Through] Certificates by approximately $22,655,168.   In other words, it is expected that there will be approximately 6.40% overcollateralization as of the closing date.

124.    The above statements were materially false and misleading when made because they failed to disclose that because MSMC paid a premium for a steady supply of mortgages from loan originators such as New Century, that systematically ignored their underwriting standards and abandoned their property appraisal standards, borrowers would not be able to repay their loans, foreclosure sales would not recoup the full value of the loans, and the aggregate expected principal payments would not, nor could they be expected to, exceed the aggregate class principal of the Certificates. As such, the Certificates were not protected with the level of credit enhancement and overcollateralization represented to investors in the Prospectus Supplements.

125.    The Prospectuses stated that the mortgage loans held by the Issuing Trusts and underlying the Certificates "are expected to generate more interest than is needed to pay interest on the

[] Certificates and the related expenses of the trust fund because the weighted average interest rate on the mortgage loans is expected to be higher than the weighted average pass-through rate on the [C]ertificates plus the servicing fee."

126.    The above statements were materially false and misleading when made because they failed to disclose that because the loan originators systematically ignored their underwriting standards and abandoned their property appraisal standards, borrowers would not be able to repay their loans, foreclosure sales would not recoup the full value of the loans, and the aggregate expected principal payments would not, nor could they be expected to, exceed the aggregate class principal of the Certificates. As such, the Certificates were not protected with the level of credit enhancement and overcollateralization represented to investors in the Prospectus Supplements.

127.    The Registration Statement and Prospectuses stated that it was "a condition of the issuance of the Certificates" that they receive respective ratings from the Rating Agency Underwriters, as set forth in the Prospectus Supplements. As stated:

> [T]he ratings assigned to mortgage pass-through certificates address the likelihood of the receipt of all payments on the Mortgage Loans by the Certificateholders under the agreements pursuant to which such certificates are issued. Such ratings take into consideration the credit quality of the Mortgage Loans, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the Mortgage Pool is adequate to make the payments required by such certificates.

128.    Each Prospectus Supplement listed the "Initial Ratings of the Certificates" being offered by the Issuing Trust. In each, certain Certificates were rated as investment-grade, in accordance with the pre-established rating systems utilized by the Rating Agency Underwriters. For example, the MSML Trust 2006-14SL Prospectus Supplement included the following chart identifying each Series 2006-14SL Certificate rating:

| Class Offered Certificates | Initial Principal Balance (1) | Pass-Through Rate | Principal Types | Interest Accrual Period/ Delay (2) | Initial Ratings of the Certificates (3) | |
|---|---|---|---|---|---|---|
| | | | | | S&P | Moody's |
| Class A-1 | $234,162,000 | Floating Rate (4), (5) | Senior | 0 day | AAA | Aaa |
| Class M-1 | $ 35,929,000 | Floating Rate (4), (6) | Subordinate | 0 day | AA | Aa2 |
| Class M-2 | $ 6,902,000 | Floating Rate (4), (7) | Subordinate | 0 day | AA- | Aa3 |
| Class M-3 | $ 19,469,000 | Floating Rate (4), (8) | Subordinate | 0 day | A | A2 |
| Class M-4 | $ 6,017,000 | Floating Rate (4), (9) | Subordinate | 0 day | A- | A3 |
| Class B-1 | $ 8,495,000 | Floating Rate (4), (10) | Subordinate | 0 day | BBB+ | Baa1 |
| Class B-2 | $ 5,663,000 | Floating Rate (4), (11) | Subordinate | 0 day | BBB | Baa2 |
| Class B-3 | $ 4,601,000 | Floating Rate (4), (12) | Subordinate | 0 day | BBB- | Baa3 |

129.    The above statements, as set forth in ¶¶127 and 128, were false and misleading when made because they (i) failed to disclose that the ratings assigned to the Certificates did not reflect the true likelihood of the receipt of all payments on the loans; (ii) misrepresented that the ratings considered the actual credit quality of the loans; (iii) misrepresented that the ratings considered the extent to which the payment stream on the loans was adequate to make the payments required by the Certificates; and (iv) misrepresented that certain Certificates were "investment-grade" when they should have been classified as below investment-grade, in accordance with the Rating Agency Underwriters' pre-established rating guidelines.

VIII.    CLASS ACTION ALLEGATIONS

130.    Plaintiff brings this action pursuant to California Code of Civil Procedure § 382, individually and on behalf of itself and all persons or entities ("plaintiffs" or the "Class") who purchased or otherwise acquired beneficial interests in the assets of the Morgan Stanley Issuing Trusts (as set forth in ¶23) pursuant to or traceable to Morgan Stanley Dean Witter Capital I Inc., f/k/a Morgan Stanley Capital I Inc.'s ("MSC I") March 14, 2006 Registration Statement and accompanying Prospectuses and Prospectus Supplements.

131.    This action is properly maintainable as a class action for the following reasons:

a)    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through discovery, plaintiffs believe that there are thousands of members of the proposed Class, who may be identified from records maintained by the Issuing

Defendants and/or may be notified of this action using the form of notice customarily used in securities class actions.

b) Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is adequately representative of the Class and will fairly and adequately protect the interests of the Class.

c) The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

d) A class action is superior to all other methods for a fair and efficient adjudication of this controversy. There will be no difficulty in the management of this action as a class action. Furthermore, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

132. There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member. The common questions include, *inter alia*, the following:

a) Whether defendants violated the Securities Act;

b) Whether statements made by defendants to the investing public in the Registration Statement, Prospectus and Prospectus Supplements both omitted and misrepresented material facts about the mortgages underlying the Issuing Trusts; and

c) The extent and proper measure of the damages sustained by the members of the Class.

## FIRST CAUSE OF ACTION

### For Violation of Section 11 of the Securities Act
(Against The Individual Defendants, Issuing Defendants and Underwriter Defendants)

133. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

134. This Cause of Action is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiff and the Class, against the Individual Defendants, the Issuing Defendants and the Underwriter Defendants. This Cause of Action is predicated upon defendants' strict liability for making false and misleading statements in the Offering Documents.

135. The Registration Statement for the Certificate offerings was materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

136. The Individual Defendants, the Issuing Defendants and the Underwriter Defendants are strictly liable to Plaintiff and the Class for making the misstatements and omissions in issuing the Certificates.

137. The Individual Defendants each signed the Registration Statement.

138. The Underwriter Defendants each acted as an underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates. The Underwriter Defendants were underwriters for the respective Issuing Trusts.

139. The Individual Defendants, Issuing Defendants and Underwriter Defendants owed to the Plaintiff and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

140. The Individual Defendants, Issuing Defendants and Underwriter Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

39

CLASS ACTION COMPLAINT

141.    Each of the Individual Defendants, Issuing Defendants and Underwriter Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

142.    The Individual Defendants, Issuing Defendants and Underwriter Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Prospectuses, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

143.    By reason of the conduct alleged herein, each of the Individual Defendants, Issuing Defendants and Underwriter Defendants violated Section 11 of the Securities Act, and is liable to Plaintiff and the Class.

144.    Plaintiff and other Class members acquired Certificates pursuant and/or traceable to the Registration Statements.  At the time Plaintiff and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

145.    Plaintiff and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Individual Defendants, Issuing Defendants and Underwriter Defendants.

146.    By virtue of the foregoing, Plaintiff and other Class members are entitled to damages, jointly and severally from each of the Individual Defendants, Issuing Defendants and Underwriter Defendants, as set forth in Section 11 of the Securities Act.

147.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents, within one year after the Certificates' ratings were downgraded to "junk bonds," and within three years of the Certificates being offered to the public. Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## SECOND CAUSE OF ACTION

### For Violation of Section 12(a)(2) of the Securities Act
#### (Against the Issuing Defendants and Underwriter Defendants)

148.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

149.    This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiff and the Class, against the Issuing Defendants and Underwriter Defendants.

150.    The Issuing Defendants and Underwriter Defendants promoted and sold Certificates pursuant to the defective Prospectuses for their own financial gain.  The Prospectuses contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

151.    The Issuing Defendants and Underwriter Defendants owed to Plaintiff and the other Class members who purchased Certificates pursuant to the Prospectuses a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.  The Issuing Defendants and Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectuses, as set forth herein.

152.    Plaintiff and other Class members purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Prospectuses.  Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Prospectuses.

153.    By reason of the conduct alleged herein, the Issuing Defendants and Underwriter Defendants violated Section 12(a)(2) of the Securities Act, and are liable to Plaintiff and other Class members who purchased Certificates pursuant to and/or traceable to the Prospectuses.

154.    Plaintiff and other Class members were damaged by the Issuing Defendants' and Underwriter Defendants' wrongful conduct.  Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section

41

12(a)(2) of the Securities Act. Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in Section 12(a)(2) of the Securities Act.

155. This action is brought within one year after the discovery of the untrue statements and omissions contained in the Prospectuses, within one year after the Certificates' ratings were downgraded to "junk bonds," and within three years of when the Certificates were sold to the public. Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

<u>THIRD CAUSE OF ACTION</u>

<u>For Violation of Section 15 of the Securities Act</u>
(Against Morgan Stanley, MSMC and MSCo)

156. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

157. This Cause of Action is brought against defendants Morgan Stanley, MSMC and MSCo as controlling persons, pursuant to Section 15 of the Securities Act. Each of Morgan Stanley, MSMC and MSCo, by virtue of its control, ownership, offices, directorship, and specific acts, was at the time of the wrongs alleged herein a controlling person of the Issuing Defendants within the meaning of Section 15 of the Securities Act. Each of Morgan Stanley, MSMC and MSCo had the power and influence, and exercised that power and influence, to cause the Issuing Defendants to engage in violations of the Securities Act, as described herein.

158. Morgan Stanley's, MSMC's and MSCo's control ownership and position made them privy to, and provided them with actual knowledge of, the material facts concealed from Plaintiff and other Class members.

159. By virtue of the wrongful conduct alleged herein, Morgan Stanley, MSMC and MSCo are liable to Plaintiff and other Class members for their sustained damages.

<u>RELIEF REQUESTED</u>

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

(a) Declaring this action properly maintainable as a class action pursuant to California Code of Civil Procedure § 382;

42

<u>CLASS ACTION COMPLAINT</u>

Exhibit A
- 59 -

1    (b)    Awarding compensatory and/or rescissionary damages in favor of Plaintiff and other

2    Class members against all defendants, jointly and severally, for all damages sustained as a result of

3    defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

4    (c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

5    action, including counsel fees and expert fees; and

6    (d)    Such other relief as the Court may deem just and proper.

7    **JURY DEMAND**

8    Plaintiff demands a trial by jury on all claims so triable.

9    Dated: December 2, 2008                    BERNSTEIN LITOWITZ BERGER
                                                & GROSSMANN LLP
10

11                                             _David R. Stickney_ (by TAD)
                                               David R. Stickney
12
                                               DAVID R. STICKNEY (Bar No. 188574)
13                                             TIMOTHY A. DeLANGE (Bar. No. 190768)
                                               BRETT M. MIDDLETON (Bar. No. 199427)
14                                             12481 High Bluff Drive, Suite 300
                                               San Diego, CA 92130
15                                             Tel:    (858) 793-0070
                                               Fax:    (858) 793-0323
16                                             davids@blbglaw.com
                                               timothyd@blbglaw.com
17                                             brettm@blbglaw.com

18
                                               POND, GADOW & TYLER
19                                             JOHN GADOW
                                               BLAKE TYLER
20                                             502 South President Street
                                               Jackson, MS 39201
21                                             johngadow@pgtlaw.com
                                               btyler@pgtlaw.com
22
                                               *Counsel for Plaintiff Public Employees'*
23                                             *Retirement System of Mississippi and Proposed*
                                               *Lead Counsel for the Class*
24

25

26

27

28

43

CLASS ACTION COMPLAINT

Exhibit A

- 60 -