# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MORGAN STANLEY MORTGAGE PASS-THROUGH CERTIFICATES LITIGATION, | MASTER FILE NO. 09-CV-2137-KBF |
| | ECF Case |
| This Document Relates To: | <u>CLASS ACTION</u> |
|     ALL ACTIONS. | |

**JOINT DECLARATION OF DAVID R. STICKNEY AND ARTHUR C. LEAHY
IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT
AND PLAN OF ALLOCATION, AND APPLICATION FOR AN AWARD OF
<u>ATTORNEYS' FEES AND EXPENSES</u>**

# TABLE OF CONTENTS

Page

TABLE OF EXHIBITS TO DECLARATION.............................................................................iii

I.  PRELIMINARY STATEMENT ............................................................... 1

II.  HISTORY OF THE ACTION ...................................................................5

  A.  The Commencement Of The Action
      And The Lead Plaintiff Appointment Process .........................................5

  B.  The Consolidated Complaints And Three Rounds Of Motions To Dismiss ..........6

  C.  Additional Motions For Reconsideration
      And The Fourth Amended Complaint ................................................10

  D.  The Pre-Trial Schedule .................................................................13

  E.  Preparing The Case For Trial ..........................................................13

    1.  Obtaining Evidence From Defendants And Third Parties ...................... 13

    2.  Responding To Discovery............................................................ 17

    3.  Resolution Of Discovery Disputes................................................. 17

    4.  Working With Experts And Consultants ........................................ 20

  F.  Plaintiffs' Motion For Class Certification ...........................................20

  G.  Defendants' Motion For Reconsideration Of The September 15, 2011 Order......22

III.  THE SETTLEMENT ................................................................... 22

  A.  Settlement Negotiations................................................................23

  B.  Reasons For The Settlement ...........................................................24

  C.  Notice To The Settlement Class Meets The Requirements Of Due Process And
      Rule 23 Of The Federal Rules Of Civil Procedure .................................27

  D.  The Plan Of Allocation Is Fair And Reasonable ...................................29

IV.  THE APPLICATION FOR ATTORNEYS' FEES AND EXPENSES.......................... 31

  A.  Application For Attorneys' Fees.......................................................32

    1.  The Requested Fee Of 17% Of The Settlement Fund Is Fair
        And Reasonable ...................................................................... 32

    2.  The Standing And Expertise Of Lead Counsel....................................... 35

3.      The Risks Of Litigation And The Need To Ensure The
        Availability Of Competent Counsel In High-Risk,
        Contingent Securities Cases ................................................................ 35

4.      The Reaction Of The Settlement Class To Date ...................................... 37

B.      Application For Litigation Expenses ................................................................37

## TABLE OF EXHIBITS TO DECLARATION

| EX. | DESCRIPTION |
|-----|-------------|
| 1 | Declaration of George W. Neville, Special Assistant Attorney General, Legal Counsel to Lead Plaintiff the Public Employees' Retirement System of Mississippi, in Support of (a) Plaintiffs' Motion for Approval of Settlement and Plan of Allocation; (b) Lead Counsel's Application for Attorneys' Fees and Expenses; and (c) Lead Plaintiffs' Request for Reimbursement of Costs and Expenses |
| 2 | Declaration of Nashira D. Washington Re Notice Dissemination and Publication |
| 3 | Declaration of Brett Brandenberg in Support of Plan of Allocation |
| 4 | Schedule of Plaintiffs' Counsel's Lodestar and Expenses |
| 4A | Declaration of David R. Stickney in Support of Lead Counsel's Application for Attorneys' Fees and Expenses, Filed on Behalf of Bernstein Litowitz Berger & Grossmann LLP |
| 4B | Declaration of Daniel S. Drosman Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses |
| 4C | Declaration of John L. Gadow in Support of Lead Counsel's Application for Award of Attorneys' Fees and Expenses, Filed on Behalf of Pond Gadow & Tyler |
| 4D | Schedule of Plaintiffs' Counsel's Expenses by Category |

We, David R. Stickney of the law firm of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz" or "BLB&G") and Arthur C. Leahy of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), submit this joint declaration in support of Plaintiffs' motion for final approval of the proposed Settlement and approval of the Plan of Allocation, as well as Lead Counsel's application for an award of attorneys' fees and expenses. We are partners in our respective law firms and have actively supervised and participated in the prosecution of this Action since its inception. As a result, we have personal knowledge of all material matters related to this Action. The statements in this declaration are made based on our personal knowledge as to each of our respective firm's participation as Co-Lead Counsel, unless otherwise indicated.

## I.     PRELIMINARY STATEMENT

1.     Our law firms are the Court-appointed Co-Lead Counsel in this Action. This Declaration does not seek to detail each and every event that occurred since the Action was commenced nearly six years ago. Rather, the Declaration provides the Court with highlights of the litigation, the events leading to the Settlement, and the basis upon which Lead Counsel and the Public Employees' Retirement System of Mississippi ("MissPERS") and West Virginia Investment Management Board ("West Virginia") (collectively, "Lead Plaintiffs"), and NECA-IBEW Health and Welfare Fund ("NECA-IBEW"), Pompano Beach Police and Firefighters' Retirement System ("Pompano Beach"), and Carpenters Pension Fund of West Virginia ("Carpenters") (collectively, with Lead Plaintiffs, "Plaintiffs") recommend its approval.

2.     The Settlement requires Defendants to pay $95,000,000 in cash (the "Settlement Amount"). On September 22, 2014, Defendants deposited the Settlement Amount into an escrow account for the benefit of the Settlement Class. The Settlement benefits the Settlement

Class by conferrring a guaranteed and substantial benefit of $95,000,000, and avoids the risks and expenses of continued litigation, including the risk of no recovery at all or recovering less than the Settlement Amount after substantial delay.

3.      In entering into the Stipulation and Agreement of Settlement dated September 5, 2014 (the "Stipulation," ECF No. 307), Plaintiffs and Lead Counsel were fully informed about the strengths and weaknesses of the case.[1]  As detailed below, Lead Counsel conducted an extensive investigation; filed six class action complaints; opposed three rounds of motions to dismiss; conducted substantial discovery; moved for class certification; obtained more than 15 million pages of documents; obtained testimony through 13 depositions; engaged and consulted experts on issues such as damages, negative causation, materiality, mortgage loan underwriting and statistics; analyzed hundreds of loan files related to the offerings; and researched the applicable law with respect to the claims and potential defenses.

4.      The parties reached an agreement to settle for $95,000,000 after over five years of hard-fought litigation and extensive settlement negotiations.  Based upon our experience, evaluation of the facts and applicable law and our recognition of the risk and expense of continued litigation, Plaintiffs and Lead Counsel submit that the proposed Settlement is fair, reasonable and adequate.  We believe that the Settlement represents a very good result, and is in the best interest of the Settlement Class.

5.      In addition to understanding the record for their claims and damages, Plaintiffs and Lead Counsel were familiar with Defendants' affirmative defenses – including, for example, defenses based on the statute of limitations; due diligence defenses; defenses based on investors'

---

[1] All terms with initial capitalization not otherwise defined herein shall have the meanings ascribed to them in the Stipulation.

"actual knowledge" of the false and misleading statements at the time they purchased the securities; and the "negative causation" defense to damages pursuant to Section 11(e) of the Securities Act of 1933 ("Securities Act") (*i.e.*, the causes of any claimed damages were factors other than the alleged untrue statements and omissions, such as the national economic downturn).

6.      Representatives of Lead Plaintiffs supervised Lead Counsel, remained informed throughout the settlement negotiations, and ultimately approved the Settlement. *See* Declaration of George W. Neville, Special Assistant Attorney General, Legal Counsel to Lead Plaintiff the Public Employees' Retirement System of Mississippi, in Support of (a) Plaintiffs' Motion for Approval of Settlement and Plan of Allocation; (b) Lead Counsel's Application for Attorneys' Fees and Expenses; and (c) Lead Plaintiffs' Request for Reimbursement of Costs and Expenses ("Neville Decl."), attached hereto as Exhibit 1.

7.      Plaintiffs also seek approval of the proposed Plan of Allocation as fair and reasonable.  To prepare the Plan of Allocation, Lead Counsel engaged AlixPartners, a well-recognized firm of senior business and consulting professionals.  Under the proposed Plan of Allocation, the Settlement Amount (plus interest accrued and after deduction of Court-approved expenses and attorneys' fees) will be distributed on a *pro rata* basis to members of the Settlement Class who timely submit valid proofs of claim based on their "Recognized Claim" amount as calculated based on the Plan of Allocation.  The Plan of Allocation is based on the methodology for calculating damages set forth in Section 11(e) of the Securities Act and takes into account the increased risk for claims the Court did not sustain but that remained subject to appeal.  *See* Declaration of Brett Brandenberg in Support of Plan of Allocation ("Brandenberg Decl."), attached hereto as Exhibit 3.

8.     In addition, Lead Counsel request an Order awarding attorneys' fees and expenses.  Specifically, Lead Counsel are applying for an attorneys' fee of 17% of the Settlement Fund, and for Plaintiffs' Counsel's expenses in the amount of $1,110,072.81, plus interest at the same rate as earned by the Settlement Fund.[2]  Lead Counsel also request that the Court award Lead Plaintiff MissPERS its costs and expenses directly related to its representation of the Settlement Class pursuant to 15 U.S.C. § 77z-1(a)(4), in the amount of $19,925.00.

9.     As explained in our accompanying brief in support of Lead Counsel's request for attorneys' fees and expenses, the requested fee of 17% of the Settlement Fund is consistent with or less than the amount awarded in other residential mortgage-backed securities class actions.  In addition, the reasonableness is confirmed with a lodestar cross-check resulting in a multiplier of less than 1.23, which is below the multiplier awarded in comparable class action settlements, both in the Second Circuit and other Circuits.  Moreover, as detailed further below, the Action involved substantial risks and complex factual and legal issues, many of which had not been addressed by any court in the country at the time of the filing of the initial complaints.

10.    Lead Counsel undertook this representation on a contingency basis, with no guarantee of payment.  They vigorously pursued this litigation for nearly six years, while committing the extensive resources necessary to prosecute this complex action to a successful result.  Given the substantial recovery obtained for the benefit of the Settlement Class, the complexity and amount of work involved, the skill and expertise required, and the significant risks that counsel undertook, Lead Counsel submit that the requested award of 17% of the Settlement Fund is fair and reasonable.

---

[2] "Plaintiffs' Counsel" include the Court-appointed Co-Lead Counsel Bernstein Litowitz and Robbins Geller, and additional counsel Pond Gadow & Tyler ("Pond Gadow").

## II.   HISTORY OF THE ACTION

11.     The Action commenced on December 2, 2008, and continued until the parties reached agreement to settle on July 23, 2014.  During the course of the litigation, the parties engaged in extensive motion practice, including three rounds of motions to dismiss as well as multiple motions for reconsideration relating to claims in six class action complaints.  When the Court sustained the Complaint, lifting the automatic discovery stay of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), the parties obtained substantial evidence during discovery, including more than 15 million pages of documents and testimony from 13 depositions.  As detailed below, Plaintiffs obtained the $95 million settlement only following five and one-half years of active litigation, as well as extensive settlement negotiations with a mediator and directly between experienced counsel for the parties.

### A.     The Commencement Of The Action
### And The Lead Plaintiff Appointment Process

12.     On December 2, 2008, MissPERS filed the initial class action complaint against Defendants and others in the Superior Court of California, County of Orange, Case No. 30-2008-00226005 ("Initial Complaint").  The Initial Complaint asserted claims under the Securities Act on behalf of all persons and entities who purchased or otherwise acquired mortgage pass-through certificates in 13 Morgan Stanley offerings.[3]  Defendants removed the case to the United States District Court for the Central District of California and further moved to transfer the action to the United States District Court for the Southern District of New York.  MissPERS moved to remand and opposed Defendants' motion to transfer. Following motion practice, the United States

---

[3] The Initial Complaint lists 14 offerings, but one of the offerings, MSM 2006-5ARW, was later determined to be a private placement which was derived from one of the 13 offerings (MSM 2006-5AR). Accordingly, MSM 2006-5ARW was eventually omitted from subsequent complaints, and it is not one of the offerings subject to the Settlement.

District Court for the Central District of California granted Defendants' motion to transfer the action to this Court, where the case was assigned to the Honorable Laura Taylor Swain, Case No. 09-cv-02137-LTS.

13. On May 7, 2009, West Virginia filed a separate class action complaint against Defendants and others asserting Securities Act violations, Case No. 09-cv-4414-LTS ("West Virginia Complaint"). The West Virginia Complaint asserted claims related to the 13 Offerings in the Initial Complaint, and 16 additional Morgan Stanley offerings.

14. On June 5, 2009, West Virginia filed a motion to consolidate the two pending class actions, and for appointment as lead plaintiff in accordance with the lead plaintiff provisions of the PSLRA. 15 U.S.C. § 77z-1(a)(3)(B)(ii). On July 17, 2009, the Court consolidated the cases and appointed West Virginia as lead plaintiff and Robbins Geller as lead counsel.

**B. The Consolidated Complaints And Three Rounds Of Motions To Dismiss**

15. On September 15, 2009, West Virginia filed the Consolidated Amended Complaint ("Consolidated Complaint"). The Consolidated Complaint asserted claims related to the 13 Offerings in the Initial Complaint, and 16 additional offerings.

16. Lead Counsel engaged in thorough investigations in preparation for drafting the Initial Complaint, the West Virginia Complaint and the Consolidated Complaint. The investigations included, among other things, locating and interviewing witnesses, closely analyzing the offering documents, and reviewing additional sources such as court filings, investigations, media reports, performance and downgrade data related to the securities, Congressional testimony, SEC filings, press releases, and public statements made by Morgan Stanley, the rating agencies and the originators.

17.     On November 16, 2009, Defendants filed a motion to dismiss the Consolidated Complaint and supporting memoranda of law and declaration with exhibits.  ECF Nos. 44, 45, 46.  Defendants argued that the claims should be dismissed because, *inter alia*:  (i) West Virginia lacked standing to assert claims with respect to offerings in which it did not purchase certificates (West Virginia purchased certificates in 1 of the 29 trusts); (ii) the offering documents were not false and misleading; (iii) the complaint failed to allege any injury cognizable under the Securities Act; and (iv) the complaint failed to plead compliance with the statute of limitations.

18.     Robbins Geller researched and prepared an opposition to Defendants' motion.  On December 28, 2009, Robbins Geller filed a memorandum of law and declaration with exhibits.  ECF Nos. 61, 62.  Defendants filed their reply brief on January 27, 2010.  ECF No. 63.

19.     After formal briefing on Defendants' motion had closed, the law surrounding RMBS class actions continued to evolve.  Accordingly, over the next six months, the parties submitted supplemental authority for the Court's consideration related to disputed issues in Defendants' motion to dismiss.  In total, the parties filed six letters or notices, bringing to the Court's attention at least nine decisions issued after the motion to dismiss was fully briefed.  *See* ECF Nos. 64, 65, 66, 72, 73, 79.

20.     On August 17, 2010, the Court granted in part Defendants' motion to dismiss on standing and statute-of-limitations grounds (the "August 17, 2010 Order," ECF No. 81).  Specifically, the Court held that West Virginia lacked standing to pursue any claims other than those related to the offering in which it purchased (MSM 2007-11AR).   The Court also determined, however, that West Virginia's claims related to the MSM 2007-11AR should be dismissed with prejudice because they were not filed until after the expiration of the applicable statute of limitations.

21.     The August 17, 2010 Order also granted Plaintiffs leave to amend in order to demonstrate MissPERS' standing with respect to any of the claims that the Court dismissed on standing grounds and to "augment and clarify the pleading of the claims asserted by [Miss]PERS."

22.     As a result of the August 17, 2010 Order, Plaintiffs filed an application to modify the Lead Plaintiff order to:  (1) appoint MissPERS as Co-Lead Plaintiff; and (2) approve its selection of BLB&G as Co-Lead Counsel.  The Court granted the motion.  ECF Nos. 87 and 94.

23.     Separately, West Virginia moved for immediate appellate review of the August 17, 2010 Order pursuant to Fed. R. Civ. P. 54(b).  ECF No. 93.  The Court denied the motion, but the claims are preserved for appeal in the ordinary course.  ECF No. 102.

24.     On September 10, 2010, MissPERS filed the Second Amended Complaint ("Second Complaint," ECF No. 84).  In accordance with the Court's decision on standing, the Second Complaint included additional named plaintiffs that purchased in various offerings, including Plaintiffs NECA-IBEW, Pompano Beach, and Carpenters ("New Plaintiffs"), and two additional plaintiffs that subsequently voluntarily dismissed their claims.  ECF No. 84.  The Second Complaint alleged Securities Act violations in connection with the issuance of seven Morgan Stanley offerings.

25.     On October 11, 2010, Defendants filed a motion to dismiss the Second Complaint, along with a supporting memorandum of law, declaration, 22 exhibits and an appendix.  ECF Nos. 88-91.  Defendants argued, *inter alia*, that:  (i) Plaintiffs' claims were time-barred; (ii) Plaintiffs had not alleged any cognizable injury; (iii) Plaintiffs failed to allege any actionable misrepresentation or omission; and (iv) the Court had not granted leave to assert

claims by additional plaintiffs. ECF No. 89. Plaintiffs opposed the motion, and briefing was complete on November 23, 2010. ECF Nos. 97, 98, 103.

26.     On January 25, 2011, the Court heard oral argument on Defendants' motion. During the argument, the Court requested that the parties provide additional information regarding Moody's Investors Service ("Moody's") and Standard & Poor's ("S&P") ratings definitions and ratings actions. Following the argument, Plaintiffs and Defendants provided the Court with the requested information. ECF Nos. 107, 108.

27.     Over the course of the next 10 months (both before and after the January 25, 2011 hearing), the parties submitted supplemental material and new legal authority. In total, the parties made 15 supplemental submissions, bringing to the Court's attention 14 new decisions, as well as newly released testimony before the Financial Crisis Inquiry Commission ("FCIC"). ECF Nos. 105, 106, 110, 111, 113, 115-117, 119, 121-128.

28.     On September 15, 2011, the Court granted in part and denied in part Defendants' motion, and directed the filing of an amended complaint as to certain allegations. ECF No. 129 (the "September 15, 2011 Order"). The Court held, *inter alia*, that the New Plaintiffs' claims were timely; MissPERS' claims could be amended to sufficiently allege timeliness; and claims premised on the existence of actionable misstatements or omissions regarding ratings did not sufficiently plead falsity.

29.     Defendants subsequently moved for reconsideration of the portion of the Court's September 15, 2011 Order which held that the tolling doctrine articulated in *American Pipe & Construction Co. v. Utah,* 414 U.S. 538 (1974), applied to the three-year statute of repose in Section 13 of the Securities Act. ECF No. 132. The Court denied the motion. ECF No. 148.

30.     On September 30, 2011, MissPERS and the New Plaintiffs filed the Third Amended Complaint ("Third Complaint," ECF No. 134).   The Third Complaint alleged Securities Act violations in connection with the issuance of five Morgan Stanley offerings, and included detailed allegations with respect to Plaintiffs' compliance with the Securities Act's one-year statute of limitations.

31.     On October 17, 2011, Defendants filed a motion to dismiss the Third Complaint, along with a supporting declaration and 42 exhibits.  ECF Nos. 138-140.  Defendants argued that Plaintiffs' claims did not comply with the one-year statute of limitations.   ECF No. 139. Plaintiffs opposed the motion, and briefing was complete on November 14, 2011.  ECF Nos. 143, 144.  On July 16, 2012, the Court denied Defendants' motion to dismiss (the "July 16, 2012 Order," ECF No. 149).

### C.    Additional Motions For Reconsideration And The Fourth Amended Complaint

32.     Following the Court's order sustaining Plaintiffs' Third Complaint, Defendants filed a motion to stay proceedings on July 27, 2012, pending the outcome of appeals before the Second Circuit that related to the statute of repose:  *In re IndyMac Mortgage-Backed Securities Litigation* and *Citigroup Inc. v. International Fund Management S.A.*  ECF Nos. 150, 151. Plaintiffs opposed the motion on several grounds, including that (1) the pendency of a case before the court of appeals does not justify a blanket stay; and (2) MissPERS' claim related to its purchase in MSM 2006-14SL was timely (and would proceed to discovery) regardless of the outcome of the *IndyMac/Citigroup* appeals.  ECF Nos. 155, 156.

33.     Prior to the August 14, 2012 pre-trial conference, the Court directed that the parties' pre-conference submission "principally address the scope and feasibility of discovery concerning the plaintiffs, certificates and funds as to which there are no statute of

limitations/repose issues." ECF No. 152. In response, Defendants again proposed a complete stay of the case pending the resolution of *IndyMac*/*Citigroup*. Plaintiffs explained that discovery should proceed as to all claims, but requested that, if the Court was inclined to stay any part of the case: (i) the parties commence disclosures and discovery limited to claims arising from MissPERS' purchase in MSM 2006-14SL; and (ii) the Court schedule a further pre-trial conference to address the case schedule, including for class certification, following resolution of *IndyMac*/*Citigroup*. The pre-conference statement also contained the parties' respective positions regarding, among other things, discovery limitations, required expert evidence, and a statement of material disputed facts. ECF No. 154.

34.     On August 14, 2012, Judge Swain held an initial pre-trial conference and commented that Plaintiffs' proposal regarding limited and focused discovery "sound[ed] feasible" not only to enable MissPERS to commence discovery as to its claims, but also "as an experimental ground for exploring templates discovery methodologies and identifying efficient pathways to pertinent information that could be a useful foundation for larger discovery in the event that the *American Pipe* rationale does not stand on appeal." *See* Tr. at 3:3-14. Given that Defendants had not yet filed their reply in support of their motion to stay, however, the Court adjourned the conference until November 30, 2012, but noted that, in the interim, it intended to decide Defendants' stay motion and to "make a decision as to whether it is appropriate to make an exception for the PERS and 2006-14SL fund related discovery." *See id.* 3:15-22.

35.     The parties submitted competing pre-conference statements in advance of the November 30, 2012 pre-trial conference. Plaintiffs again proposed that the parties commence disclosures and discovery related to claims for which there were no issues of timeliness, and requested that the Court schedule a further pre-trial conference to address the case schedule,

including for class certification.  ECF No. 171. Defendants' statement reiterated their request for a complete stay pending the outcome of *IndyMac* and *Citigroup*.  ECF No. 173.  Plaintiffs filed an additional pre-conference statement on January 10, 2013, explaining their proposed next steps for efficient case management.  ECF No. 175.

36.    On September 20, 2012, Plaintiffs moved for reconsideration of the August 17, 2010 Order as it concerned standing in light of the recent Second Circuit decision in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.* ("*NECA*" or *"Goldman Sachs"*), 693 F.3d 145 (2d Cir. 2012).  *Goldman Sachs* held that purchasers of RMBS offerings have standing to bring claims on behalf of purchasers in different RMBS offerings, so long as those offerings are "backed by mortgages originated by the same lenders that originated the mortgages backing plaintiff's certificates, because such claims implicate 'the same set of concerns' as plaintiff's claims."  *Id.* at 148-49.  Accordingly, Plaintiffs moved for reconsideration to the extent that the August 17 Order dismissed claims arising from Defendants' issuance of securities in 9 of the 14 offerings covered by the Initial Complaint, and for leave to amend to conform the complaint to *Goldman Sachs*.  ECF Nos. 163-164.

37.    On January 11, 2013, the Court granted Plaintiffs' motion to amend, and denied Defendants' motion to stay, finding, in part, that the outcome of the two Second Circuit appeals would not affect the scope of the claims because "MissPERS had standing under [*Goldman Sachs*] as of the time of the Initial Complaint to sue on behalf of purchasers of each of the [13] offerings."  ECF No. 176.  Accordingly, on January 31, 2013, MissPERS and the New Plaintiffs filed the Fourth Amended Complaint ("Fourth Complaint" or "Complaint") asserting claims arising from the 13 Offerings included in the Initial Complaint.  ECF No. 177.  On March 8, 2013, Defendants filed their Answer.  ECF No. 194.

### D. The Pre-Trial Schedule

38.     On February 21, 2013, the parties filed a joint pre-trial statement which contained competing proposals for a pre-trial schedule.  Although the parties agreed on certain dates, they fundamentally disagreed about most elements of the proposed schedule.  Defendants' schedule provided for two phases of discovery, the first directed at class certification and the second, to commence only after class certification, directed at the merits of Plaintiffs' claims.  Plaintiffs opposed bifurcation and proposed a schedule based on discovery that proceeded concurrently for both class and merits issues.  ECF No. 180.

39.     Judge Swain held a pre-trial conference on February 25, 2013, and ruled that discovery would not be bifurcated.  The next day, on February 26, 2013, the Court issued Pre-Trial Scheduling Order No. 1.  ECF No. 183.  The order set forth significant deadlines for the litigation, including, for example, dates for (1) Rule 26(a)(1) initial disclosures (March 15, 2013); (2) class certification motion practice to be initiated (July 31, 2013); (3) completion of non-expert witness discovery (January 31, 2014); (4) the filing of dispositive motions (June 2, 2014); and (5) the final pre-trial conference (October 17, 2014).  Judge Swain referred discovery and certain pre-trial proceedings to Magistrate Judge Sarah Netburn.

### E. Preparing The Case For Trial

#### 1. Obtaining Evidence From Defendants And Third Parties

40.     Documents related to various steps of Morgan Stanley's securitization operation were critical evidence in this Action, including those related to the origination and acquisition of loans, the review and due diligence of loans, the structuring of the Offerings and the sale of the RMBS to the Settlement Class.

41.     In mid-March 2013, Lead Counsel served the first set of requests for production of documents on the Defendants, which sought relevant documents from 61 categories. Thereafter, on May 8, 2013, Lead Counsel served Plaintiffs' first set of interrogatories.

42.     Lead Counsel served approximately 100 subpoenas on various third parties seeking the production of relevant documents.   These third parties included 58 financial institutions which potentially held information regarding the number and identity of investors in the Certificates; two companies that provided due-diligence services for Defendants; 28 companies that originated the loans underlying the Offerings; four companies that serviced the loans securitized in the Offerings; three rating agencies that rated the Offerings; and a consultant that Defendants hired to evaluate their securitization operation.[4]

43.     Discovery required the production of confidential information, including certain non-public, personal financial information protected from disclosure under the Fair Credit Reporting Act, 15 U.S.C. § 1681,  *et seq*., and the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801, *et seq*.  Accordingly, one of the first issues that the parties faced prior to exchanging documents was the appropriate scope of a stipulation governing the treatment of confidential information. The parties were able to reach agreement on most of the terms of the confidentiality stipulation, including the treatment of personal financial information, but disagreed regarding (1) Defendants' request for a "two-tiered" protective order; (2) Defendants' request to impose on the non-designating party the burden of bringing a motion to challenge a confidentiality

---

[4] The third parties served include, but are not limited to, Bank of America Securities, LLC; Bank of New York Mellon Corporation; Barclays Capital, Inc.; BlackRock Investments, LLC; Cantor Fitzgerald L.P.; Charles Schwab & Co., Inc.; CIBC World Markets Corp.; Citigroup Global Markets, Inc.; Comerica Bank; Credit Suisse Securities (USA), Inc.; Deutsche Bank Securities, Inc.; Goldman Sachs & Co.; HSBC Bank USA, N.A.; JP Morgan Securities, LLC; Merrill Lynch Pierce Fenner & Smith, Inc.; Mesirow Financial, Inc.; Raymond James & Associates, Inc.; RBC Capital Markets Corporation; RBS Securities, Inc.; State Street Corporation; Stifel Nicolaus & Co., Inc.; The Northern Trust Co.; U.S. Bank National Association; UBS Securities LLC; and Wells Fargo Bank.

designation; and (3) Defendants' request to prohibit, without exception, a party from using in other RMBS actions documents marked confidential. In early April, the parties submitted competing letter briefs to Judge Netburn on these issues.

44. On April 12, 2013, Judge Netburn held a telephonic conference, at which the Court heard argument regarding the disputed issues. On the call, the Court granted Defendants' requests for a "two-tiered" protective order. Following the April 12 conference, Judge Netburn entered a revised proposed confidentiality stipulation which incorporated the Court's rulings. ECF No. 207. Additionally, the Court entered an Order setting forth the discovery procedures generally applicable in the case. ECF No. 206.

45. Due to the volume and complexity of the information at issue, it was also important to establish an effective and efficient method for handling relevant electronically stored information ("ESI") in the parties' possession. On March 15, 2013, the parties submitted to the Court a [Proposed] Joint Protocol for Production of Electronic Discovery Material, which outlined the sources of relevant ESI, dictated the form in which ESI should be produced, and contained provisions regarding the production of hard-copy documents. ECF No. 197-1. Separately, the parties engaged in extensive negotiations regarding the protocols that would be used to search for and gather relevant ESI, including appropriate sources of ESI, the proper search terms to be applied, and time frames to be searched.

46. In response to their document discovery efforts, Lead Counsel received a substantial volume of documents from Defendants and third parties. In addition to the documents identified through the ESI Protocol, Lead Counsel reviewed documents that had been previously produced by Defendants in related matters concerning the Offerings, including both private litigations and government investigations. The production also included transcripts from

approximately 34 depositions conducted in related matters. In total, Lead Counsel obtained more than 15 million pages of documents.

47. Given the number of individuals, entities, and time periods involved in issuing the Offerings, the documents came in a wide variety of formats and styles. The effective review of documents required the analysis of not only emails and other routine correspondence, but also detailed analyses of spreadsheets and other complex compilations of financial data. To organize and search the documents, Lead Counsel used a sophisticated electronic system to categorize the documents by issue, prepare witness files, and identify documents supporting Plaintiffs' claims.

48. The documents that were produced addressed many issues that were critical to the litigation, including, for example: the process through which the mortgages were originated or acquired through Morgan Stanley's loan "conduit"; the process through which mortgages were acquired in "whole loan transactions"; the selection and approval of the counterparties in these whole loan transactions, including many of the originators described in the Complaint; the evaluation and due diligence performed on the mortgages prior to purchase; communications between the Defendants and other relevant parties, including the rating agencies, due-diligence firms, and originators; the approval of variances from underwriting guidelines that were identified through this diligence process; the selection of mortgages for inclusion in the Trusts; the structuring of the Trusts and the Certificates; the marketing and sale of Certificates to investors; the monitoring of the performance of the mortgages through the securitization process and beyond; the evaluation of the quality of originators that sold Morgan Stanley loans; and Defendants' evaluations of potential breaches of representations and warranties.

49. The parties also deposed 13 witnesses. Lead Counsel noticed and took five depositions of Morgan Stanley employees, including the following:

- Valerie Holt Kay, former Managing Director, SPG Mortgage Finance at Morgan Stanley (pursuant to a Fed. R. Civ. P. 30(b)(6) deposition);

- Bradley Davis, former Vice President, Valuation Due Diligence at Morgan Stanley;

- Michael Dubeck, former Managing Director, U.S. Residential Mortgage Loan Trading at Morgan Stanley;

- Stephen Rudner, former Managing Director, Co-Head of Morgan Stanley's U.S. residential mortgage business; and

- Christine Egan, former Vice President and Head of Seller Approval and Oversight Group for Morgan Stanley.

## 2. **Responding To Discovery**

50. On March 22, 2013, Defendants propounded 47 document requests and 16 interrogatories on each Plaintiff. Plaintiffs responded on April 25, 2013, and Lead Counsel coordinated the collection and production of documents in Plaintiffs' control. Plaintiffs also served supplemental responses to Defendants' first set of interrogatories on July 25, 2013.

51. Defendants thereafter served a second set of interrogatories on September 9, 2013. Plaintiffs responded on October 15, 2013, and on March 3, 2014.

52. Defendants obtained testimony from eight individuals from Plaintiffs or their asset managers, all of whom appeared for deposition as designees under Rule 30(b)(6).

## 3. **Resolution Of Discovery Disputes**

53. Although the parties were able to negotiate and agree on many discovery issues, when they were unable to resolve discovery disputes, they submitted disputes to Judge Netburn for resolution. For example, the parties brought several discovery issues to the Court in late-July

and early-August 2013, including disputes related to: (i) the production of transcripts and documents from prior litigations and government investigations; (ii) the number of custodians to which Defendants would apply electronic search terms and the relevant search period; (iii) the production of documents concerning Defendants' "shorting" of Morgan Stanley RMBS; (iv) the production of monitoring agreements; and (v) the production of class member identities pursuant to a subpoena served by Plaintiffs on third-party Bank of New York Mellon.

54.     After briefing, Judge Netburn held a conference on August 12, 2013. ECF No. 226. Pursuant to the conference, Judge Netburn ordered that: (a) Defendants must produce certain transcripts and financial incentive information; (b) the parties must further confer on appropriate ESI search terms as well as the Bank of New York Mellon subpoena; (c) the parties must submit further briefing regarding production of monitoring agreements and regarding production of information related to Morgan Stanley's actions that were allegedly inconsistent with their selling efforts; and (d) Plaintiffs' proposal regarding discovery related to originators is granted.

55.     Pursuant to Judge Netburn's orders, the parties submitted six additional discovery-related letter briefs. ECF Nos. 240-245. Judge Netburn issued discovery orders shortly thereafter, including: (1) denying Defendants' request that Plaintiffs produce their "monitoring agreements," but allowing the disclosure of the date on which MissPERS entered into its monitoring agreement with outside counsel, ECF No. 246; (2) ordering that Defendants apply the agreed-upon search terms to 34 custodians in various departments (including Mortgage Finance, Collateral Analysis, Residential Mortgage Loan Trading, Credit and Compliance Due Diligence, Structuring, Capital Markets and Principal Finance), ECF No. 248; (3) ordering that Defendants apply the "Search A" terms from January 1, 2005 through December 31, 2010, and

the "Search B" terms from January 1, 2005 through June 30, 2008, *id.*; (4) denying Plaintiffs'
request for documents related to Defendants' "shorting" of its own RMBS, *id.*; and (5) ordering
Bank of New York Mellon to provide to plaintiffs, in a sworn statement, the number of unique
Bank of New York Mellon customers that purchased in each relevant offering.  ECF No. 249.

56.     Part of the Court's decision on the disputed custodians was that Defendants did
not have to search the email boxes of seven custodians that Defendants contended worked solely
on "subprime" offerings.  Plaintiffs moved for reconsideration of that finding, which the Court
denied.  ECF No. 258.

57.     As discovery continued, additional disputes required the Court's attention.  After
meeting and conferring with defense counsel, on May 13, 2014, Lead Counsel submitted a letter
brief to Judge Netburn requesting an order compelling Defendants to:  (i) complete all tranche
1-5 productions; (ii) provide a date for a specific deposition that had been noticed more than a
month prior, and timely provide deposition dates going forward; and (iii) produce privilege logs.
ECF No. 280.  Defendants responded by letter brief dated May 19, 2014.  ECF No. 282.  On
May 20, 2014, the Court conducted a call and, after hearing argument from the parties on the
issues, ordered Defendants to (1) complete their document production before May 30, 2014;
(2) produce a substantially complete privilege log before June 16, 2014; and (3) provide an
update to Plaintiffs on the status of contacting deponents seven days after the issuance of any
deposition notice.

58.     Lead Counsel's discovery efforts provided Plaintiffs with a thorough
understanding of the strengths and weaknesses of the claims and aided them in their
consideration and evaluation of the fairness of the Settlement.

### 4.    Working With Experts And Consultants

59.    In prosecuting the claims, Lead Counsel worked extensively with experts and consultants at different stages of the litigation.  Consultants were utilized to assist in formulating the allegations and information concerning the loans and borrowers, prepare the mediation brief, analyze estimated damages, review Defendants' affirmative defenses, and prepare for trial. Experts were consulted in the complex and specialized areas of the RMBS industry, class certification issues, and damages.

60.    On issues particular to class certification, Plaintiffs retained Joseph R. Mason, Ph.D., who is the Hermann Moyse Jr./Louisiana Bankers Association Chair of Banking at the Ourso School of Business, Louisiana State University, a Senior Fellow at the Wharton School, and a Senior Consultant at Precision Economics, LLC.  In his expert report in support of Plaintiffs' motion for class certification, Dr. Mason described the RMBS industry, the common issues and interconnectedness within the Offerings such that untrue statements affect all securities similarly, the number of investors, and the methods for valuing securities at different points in time in order to apply the class-wide damage methodology.  ECF No. 236.

### F.    Plaintiffs' Motion For Class Certification

61.    Pursuant to the Stipulation and Scheduling Order filed June 27, 2013 (ECF No. 219), Plaintiffs served Defendants with a draft of their class certification motion on August 7, 2013, and filed their motion with the Court on August 30, 2013.  ECF Nos. 234-237. The motion sought certification of the Action as a class action on behalf of purchasers in the 13 Offerings included in the Fourth Complaint and for which the Court sustained the claims, and appointment of MissPERS, NECA-IBEW, Pompano Beach and Carpenters as class representatives.  Plaintiffs' motion explained that the proposed class satisfied the numerosity, commonality, typicality and adequacy prongs of Rule 23(a), as well as the predominance and

superiority prongs of Rule 23(b)(3).  ECF No. 235.  In support of their motion, Plaintiffs served

the expert declaration of Dr. Mason, which included a thorough analysis of the structure and

interrelatedness of the Certificates.  ECF No. 236.  Plaintiffs also submitted extensive exhibits,

including internal Morgan Stanley emails, trading data obtained from third-party custodial banks,

and Defendants' Rule 30(b)(6) witness testimony.  ECF No. 237.

62.     After Plaintiffs filed their opening class certification motion, the parties continued

discovery and participated in discovery conferences before Judge Netburn regarding, among

other disputes, the identification of potential class members, production of monitoring

agreements, and protocols for searching Morgan Stanley's ESI.

63.     Due to the scheduling of third-party depositions in connection with class

certification, Defendants requested that Judge Netburn extend the deadlines for their opposition

to Plaintiffs' class certification motion.  Judge Netburn granted the request.  ECF Nos. 254, 257,

259, 260.

64.     On November 14, 2013, Defendants filed an opposition to Plaintiffs' class

certification motion.  ECF Nos. 265, 266.

65.     On December 16, 2013, Plaintiffs filed their reply brief, and affidavit and

exhibits, in support of their class certification motion.   ECF Nos. 274, 275.   The parties

subsequently submitted supplemental authority regarding class certification. ECF Nos. 278, 279.

66.     While the parties were briefing Plaintiffs' class certification motion, the parties

requested extensions of the dates in Pre-Trial Scheduling Order No. 1 (ECF No. 183), including

the fact discovery cut-off, to afford sufficient time to review and produce responsive documents,

and to take necessary fact witness depositions.  ECF Nos. 268, 283.  Judge Netburn granted the

requests, and ordered that the parties inform the Court by July 31, 2014, regarding settlement negotiations. ECF Nos. 270, 285.

> **G.** **Defendants' Motion For Reconsideration**
> **Of The September 15, 2011 Order**

67.     On June 27, 2013, the Second Circuit issued *Police & Fire Retirement System v. IndyMac MBS, Inc.,* 721 F. 3d 95 (2d Cir. 2013) ("*IndyMac*"), which held that *American Pipe* tolling does not apply to the Securities Act's statute of repose. On July 11, 2013, Defendants filed a motion for reconsideration of the Court's September 15, 2011 Order on this point. ECF Nos. 222-225. By order dated May 27, 2014, the Court granted Defendants' motion and vacated its prior order on Defendants' motion to dismiss. ECF No. 284. The Court held that, in light of *IndyMac*, the New Plaintiffs' claims were dismissed as time-barred insofar as they were asserted directly by New Plaintiffs as named parties. The dismissal was expressly without prejudice to the litigation of those claims by one or more class representatives if MissPERS' motion for class certification was granted.

68.     On May 29, 2014, the case was reassigned to the Honorable Katherine B. Forrest. After reassignment, this Court vacated the referral to Judge Netburn and entered a superseding pre-trial schedule, including a fact discovery cut-off (September 29, 2014), expert discovery cut-off (December 30, 2014), deadline for summary judgment and *Daubert* motions (January 15, 2015), and a trial date of May 18, 2015. ECF Nos. 288, 292.

## III.     THE SETTLEMENT

69.     The Settlement of $95,000,000 (plus interest) was the result of extensive arm's-length negotiations between the parties. The Settlement provides the Settlement Class a substantial benefit and eliminates the significant risks of continued litigation under circumstances where a favorable outcome could not be assured. Lead Counsel believe that the

Settlement is fair, reasonable, and an excellent result for Settlement Class Members considering the risk of recovering much less or even nothing after substantial delay.

### A.     Settlement Negotiations

70.     Settlement negotiations occurred through Court-ordered mediation and, later, direct negotiations, led by senior counsel for both sides.  On February 26, 2013, the Court instructed the parties to confer and decide whether the parties would work with an outside mediator or an assigned Magistrate Judge.  ECF No. 183.  The Court further ordered the parties to begin meeting with the assigned Magistrate Judge or outside mediator for settlement purposes by June 30, 2013.  ECF No. 183.  The parties filed a joint statement on March 15, 2013, informing the Court that the parties had agreed to work with an outside mediator.  ECF No. 197.

71.     While continuing their discovery efforts, the parties agreed to mediation before Professor Eric Green.  Beginning in June 2013, the parties exchanged detailed mediation statements.  The parties participated in a mediation session later that month.  Representatives from MissPERS and NECA-IBEW appeared and participated at the mediation.  The mediation process ended in an impasse, and discovery and active litigation continued.

72.     Direct negotiations resumed in the summer of 2014, led by senior attorneys for both sides.  On July 23, 2014, the parties signed a Term Sheet to Settle Class Action, reflecting the agreement to settle the action for $95 million.  That same day, the parties informed the Court that they had reached an agreement in principle to settle the case.  The Court adjourned the dates and deadlines in the matter, and ordered the parties to file the settlement materials no later than September 8, 2014.  ECF No. 303.

73.     The parties negotiated and filed the Stipulation and its detailed exhibits, and Plaintiffs filed their unopposed motion for preliminary approval of the Settlement on September 8, 2014.  ECF Nos. 305-308.

74. The Court granted preliminary approval of the Settlement on September 10, 2014, and scheduled the final approval hearing date for December 18, 2014. ECF Nos. 309, 311.

## B. Reasons For The Settlement

75. Plaintiffs and Lead Counsel endorse the Settlement. Plaintiffs are sophisticated institutional investors who have actively overseen the prosecution of the Action. Lead Counsel are two law firms that specialize in complex securities litigation, including litigation involving RMBS, and are highly experienced in such litigation. Based on their experience and knowledge of the facts and applicable law, Lead Counsel and Plaintiffs determined that the Settlement was in the best interest of the Settlement Class.

76. Even assuming that Plaintiffs prevailed at trial in establishing untrue statements and omissions in the offering documents for the 13 Offerings for which the Court sustained Plaintiffs' claims, recoverable damages under Section 11 of the Securities Act are based on the "difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought . . . ." 15 U.S.C. § 77k(e)(3). Lead Counsel engaged a consultant to assist in estimating potentially recoverable damages using the statutory measure under Section 11. Such estimate, before taking into account causation or other defenses to damages, amounts to billions of dollars in the aggregate based on certain assumptions. However, damages under Section 11 may be reduced or eliminated if the defendant proves that a portion or all of the statutory damages are attributable to causes other

than the misstatements or omissions.  Throughout the course of the litigation, Defendants contended that any losses were caused by factors other than untrue statements in the offering documents (such as the overall economic downturn and general decline in housing prices), and they would have had additional opportunities to persuade the Court or a jury that their position was meritorious.

77.   The Settlement enables the Settlement Class to recover a substantial sum of money, while avoiding continued protracted litigation and significant challenges.  Lead Counsel and Plaintiffs appreciated the unique and significant risks inherent in this litigation.  At the time of the initial filing, there was little established precedent for RMBS litigation, and no court had sustained claims under the federal securities laws for purchasers of RMBS securities.  Likewise, no court at that time had certified an RMBS class or accepted plaintiffs' damages theories arising from such claims.  Indeed, the first court to decide a class certification motion in an RMBS case denied the motion.  *See N.J. Carpenters Health Fund v. Residential Capital, LLC,* 272 F.R.D. 160 (S.D.N.Y. 2011).

78.   Lead Counsel and Plaintiffs were also aware that they faced numerous affirmative defenses to the claims at issue in this case, including statute of limitations and that Lead Plaintiff and the Settlement Class had "actual knowledge" of the false and misleading statements at the time they purchased the securities.  The Court dismissed claims arising from the 2007 Offerings based on the statute-of-limitations defense.  While such claims remained subject to appellate review, there is no guarantee that the Second Circuit Court of Appeals would reverse such dismissal.  Assuming West Virginia succeeded at the appellate level, Plaintiffs would have faced additional challenges to proving their claims based on the passage of time.

79. Defendants also contended that the claims arising from the 2006 Offerings were untimely because Plaintiffs should have been on notice well before December 2007 (one year prior to the filing of MissPERS' Initial Complaint in this Action), based on a variety of media reports alerting it to the claims. Although the Court denied Defendants' motion to dismiss on this ground as to the claims arising from the 2006 Offerings, Lead Counsel and Plaintiffs understood that Defendants would continue to press this defense.

80. To avoid summary judgment and prevail at trial, Plaintiffs would need to present evidence that the offering documents contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein. Plaintiffs expected Defendants to argue that there was insufficient evidence to support a potential jury finding of false statements in the offering documents, and, for example, that the offering documents fully disclosed the standards Defendants employed when purchasing loans. Defendants also would have argued that the alleged misstatements concerning appraisals or loan-to-value ratios were inactionable because, according to Defendants (under unsettled law on review this Supreme Court Term), such statements are subjective opinions that are actionable only if the plaintiff alleges that the speaker did not truly believe the opinion at the time it was made.

81. Defendants also asserted a "due diligence" defense and contended that they conducted appropriate reviews and analyses of the character and quality of loans prior to the loans being securitized in the Offerings.

82. In addition to the foregoing defenses, Defendants opposed Plaintiffs' motion to certify for litigation purposes a class of RMBS investors in the 13 Offerings for which the Court sustained claims. Although courts have granted motions to certify litigation classes of investors in RMBS, at least one district court has denied such a motion. *Compare Pub. Emps.' Ret. Sys. of*

*Miss. v. Merrill Lynch & Co.,* No. 08-cv-10841-JSR (S.D.N.Y. June 15, 2011), ECF No. 149 (certifying litigation class of RMBS investors), *with N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08-cv-5653-PAC, 2011 WL 3874821 (S.D.N.Y Aug. 16, 2011) (certifying litigation class of RMBS investors), with *Residential Capital,* 272 F.R.D. 160 (S.D.N.Y. 2011) (denying motion to certify litigation class of RMBS investors).

83.    The Settlement eliminates the above litigation risks and guarantees the Settlement Class a cash recovery. Lead Counsel firmly believe that settling the Action at this juncture is in the best interest of the Settlement Class.

### C.    Notice To The Settlement Class Meets The Requirements Of Due Process And Rule 23 Of The Federal Rules Of Civil Procedure

84.    As required by the Court's Preliminary Approval Order, beginning on September 17, 2014, Plaintiffs, through the Claims Administrator, Gilardi & Co., LLC ("Gilardi"), mailed copies of the Notice to potential Settlement Class Members. Lead Counsel had obtained the identity of certain known holders of the Certificates, and had researched the contact information for the investors. Specifically, to identify potential Settlement Class Members, Lead Counsel: (i) reviewed Defendants' internal files for information about the initial purchasers of the RMBS; and (ii) served subpoenas to dozens of major custodial banks whose internal records reflect holdings and transactions in the RMBS at issue.

85.    Lead Counsel forwarded to the Claims Administrator a total of 1,747 unique names and addresses of known holders of the Certificates. These lists were supplemented by a proprietary database maintained by the Claims Administrator, containing the names and addresses of over 4,900 of the largest and most common U.S. nominees (*i.e.,* brokerage firms, banks, and institutions who hold securities in the name of the nominee, on behalf of the beneficial purchasers). The Court-approved Notice requires nominees, within 7 days, to either

(i) send a copy of the Notice and the Claim Form to the beneficial owner of such certificates, or (ii) provide to Gilardi the names and addresses of such persons. In the aggregate, as of November 10, 2014, Gilardi has disseminated over 6,700 copies of the Notice to potential Settlement Class Members and their nominees. *See* Declaration of Nashira D. Washington Re Notice Dissemination and Publication ("Washington Decl."), Ex. 2 hereto, ¶¶2-9.

86.    In addition, a Summary Notice was published in the national edition of *Investor's Business Daily* on September 24, 2014, and over the *Business Wire* on September 23, 2014. *See id.* ¶10. Information regarding the Settlement, including downloadable copies of the Notice and Claim Form, was posted on the website established by the Claims Administrator specifically for this Settlement, www.MorganStanleyRMBSSettlement.com, *id.* ¶12, as well as on Lead Counsel's websites, www.blbglaw.com and www.rgrdlaw.com. This method of giving notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]." Fed. R. Civ. P. 23(e)(1).

87.    The Notice advises Settlement Class Members of the essential terms of the Settlement, sets forth the procedure for objecting to or opting out of the Settlement, and provides specifics on the date, time and place of the final approval hearing. The Notice also contains information regarding Lead Counsel's fee application and the proposed plan of allocating the Settlement proceeds among Settlement Class Members.

88.    As explained in the accompanying Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation of Settlement Proceeds, the Notice fairly apprises Settlement Class Members of their rights with respect to the Settlement and therefore is the best notice practicable under the circumstances and

complies with the Court's September 10, 2014 Preliminary Approval Order (ECF No. 309), Federal Rule of Civil Procedure 23, the PSLRA, and due process.

89.     In addition, we are informed that on September 18, 2014, Defendants' counsel caused the materials required under the Class Action Fairness Act, 28 U.S.C. § 1715, to be timely mailed via overnight mail to the United States Attorney General, the Federal Reserve Bank of New York, the Attorneys General of each of the 50 states and the District of Columbia, the primary securities regulator for each of the 50 states and the District of Columbia, and the Attorneys General and primary securities regulators for various United States territories.

### D.     The Plan Of Allocation Is Fair And Reasonable

90.     Plaintiffs have proposed a plan to allocate the proceeds of the Settlement among Settlement Class Members who submit valid Proofs of Claim.  The objective of the proposed Plan of Allocation is to equitably distribute the Settlement proceeds to those Settlement Class Members who suffered economic losses as a result of the alleged misrepresentations and omissions.

91.     Plaintiffs engaged Brett Brandenberg of AlixPartners to examine the plan to allocate the Settlement proceeds among claimants.  The Brandenberg Declaration, attached hereto as Exhibit 3, explains the methods used to determine the Recognized Claims and the basis for the analysis.  As explained more fully in the Notice and in the Brandenberg Declaration, a Claimant's Net Recognized Losses will be calculated for each Claimant's purchases of the Certificates.  The calculation will depend on several considerations, including:  (a) when the Certificates were purchased or acquired and the price on the date of purchase; (b) any principal payments received; (c) whether the Certificates were sold, and if so, when they were sold and for how much; and/or (d) if held on the applicable dates of suit identified for each of the Certificates, the price of the Certificates on that date.  Brandenberg Decl. ¶6.  In addition, to account for the

reduced likelihood of success on claims related to the 2007 Offerings (arising from the Court's dismissal), the Plan of Allocation applies a 70% discount to the value of the claims related to the 2007 Offerings. *See, e.g., In re Am. Bank Note Holographics, Inc.,* 127 F. Supp. 2d 418, 429 (S.D.N.Y. 2001) ("Allocation formulas, including certain discounts for certain securities, are recognized as an appropriate means to reflect the comparative strengths and values of different categories of the claim.").

92.     The Plan of Allocation, as set forth in the Notice, is based on the statutory calculation methodology embodied in Section 11(e) of the Securities Act.  As explained in the Brandenberg Declaration, in lay terms, that methodology first establishes a cost basis for each purchase, which can be no greater than the offering price of a security.   Then there is a calculation of what is received, which is measured by the value of the Certificates if they were sold (and when), or if they were held.   This methodology then accounts for the fact that mortgage-backed securities pay back principal.   In other words, the securities essentially entitle the security holder to a cash flow payment as the mortgages are paying back principal, which is what happens because the mortgages amortize over time.   That payment of principal reduces the amount outstanding on the security, which, under the Plan, is credited against the calculated loss.

93.     Although the precise language of the Plan is necessarily technical, the language utilized in the Plan is consistent with industry terminology.   In addition, specific illustrative examples of how to calculate under various hypothetical scenarios are included in the Plan for clarification.

94.     In sum, the proposed Plan of Allocation takes into account the statutory damages permitted under Section 11, as well as the increased risk to those claims that were not sustained by the Court, and was explained in the Notice sent to Settlement Class Members.   It was

prepared in consultation with Plaintiffs' damages consultant, tracks the theory of damages asserted by Plaintiffs and is necessarily fair, reasonable and adequate to the Settlement Class as a whole.

95.     In response to over 6,700 Notices, there have been no objections to date of the proposed Plan of Allocation.

## IV.     THE APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

96.     Lead Counsel are also applying to the Court for attorneys' fees and expenses in connection with the services rendered in this Action.  Specifically, Lead Counsel are applying for a fee of 17% of the Settlement Fund (*i.e.,* $16.15 million), and for $1,110,072.81 in Plaintiffs' Counsel's Litigation Expenses, plus interest at the same rate and for the same time as that earned on the Settlement Fund.  Lead Counsel also seek approval of certain costs and expenses incurred by Lead Plaintiff MissPERS directly relating to its representation of the Settlement Class as authorized by the PSLRA.

97.     In determining whether a requested award of attorneys' fees is fair and reasonable, district courts are guided by the factors first articulated by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).  As summarized in *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Cir. 2000), these factors include:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation…; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Id.* at 50.

98.     Based on consideration of each of the foregoing factors as further discussed below, and on the additional legal authorities set forth in the accompanying Memorandum of Law in Support of Lead Counsel's Application for an Award of Attorneys' Fees and Expenses

(the "Fee Memorandum") filed contemporaneously herewith, we respectfully submit that Lead Counsel's requested fee should be granted.

### A.     Application For Attorneys' Fees

#### 1.     The Requested Fee Of 17% Of The Settlement Fund Is Fair And Reasonable

99.    For their extensive efforts on behalf of the Settlement Class, Lead Counsel are applying for compensation from the Settlement Fund on a percentage basis. As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances, is supported by public policy, has been recognized as appropriate by the United States Supreme Court for cases of this nature and represents the overwhelming current trend in the Second Circuit and most other circuits.

100.    Based on the result achieved for the Settlement Class, the extent and quality of work performed, the risks of the litigation and the contingent nature of the representation, Lead Counsel submit that a 17% fee award is justified and should be approved. The sophisticated institutional investor Lead Plaintiffs approve of Lead Counsel's fee request. *See* Neville Decl. ¶15.

101.    As discussed in the Fee Memorandum, a 17% fee is fair and reasonable for attorneys' fees in common fund cases such as this, and is well within, or below, the range of the percentages typically awarded in securities class actions in this Circuit.

102.    We maintained daily control and monitoring of the work performed by our respective firms in this case. While we personally devoted substantial time to this case, other experienced attorneys at our respective firms undertook particular tasks appropriate to their

levels of expertise, skill and experience, and more junior attorneys and paralegals worked on matters appropriate to their experience levels. A task breakdown, describing the principal tasks in which each attorney was involved, is included in our respective firm's declarations attached hereto as Exhibits 4A and 4B.

103. We respectfully submit that the work undertaken by Lead Counsel in prosecuting this case and arriving at this Settlement has been time-consuming and challenging. From the outset, Lead Counsel and Plaintiffs appreciated the unique and significant risks inherent in this litigation arising from complex structured securities. As explained above, as of the filing of this Action, to our knowledge, no court had ever sustained similar securities law claims relating to RMBS; accepted the theory of damages; certified a class of similar RMBS investors; or addressed many of the legal and factual issues presented in the Action. As a result, it was unclear at the time of the filing of MissPERS' Initial Complaint whether Plaintiffs would overcome Defendants' anticipated motions to dismiss – much less obtain class certification, survive summary judgment, and prevail at trial and on any post-trial appeals.

104. This Action settled only after Lead Counsel overcame multiple legal and factual challenges. To do so, Lead Counsel conducted an extensive investigation; filed six class action complaints; opposed three rounds of motions to dismiss; conducted substantial discovery; moved for class certification; obtained more than 15 million pages of documents; obtained testimony through 13 depositions; engaged and consulted experts on issues such as RMBS damages, negative causation, materiality, mortgage loan underwriting and statistics; analyzed hundreds of loan files related to the offerings; researched the applicable law with respect to the claims and potential defenses; and engaged in hard-fought settlement negotiations with experienced defense

counsel.   The requested fee is particularly justified here given the uncertainties and risks surrounding complex securities, such as the Certificates.

105.   As described in Lead Counsel's Fee Memorandum, the requested fee is not only fair and reasonable under the percentage approach but a lodestar cross-check confirms the reasonableness of the fee.  Attached hereto as Exhibits 4A-4C are declarations from Plaintiffs' Counsel in support of an award of attorneys' fees and expenses.   Included with each Lead Counsel's declaration is a schedule summarizing the timekeepers and lodestar of each firm, a description of the role that each timekeeping attorney performed in this particular case, as well as a brief biography of the firm and its attorneys who were principally involved in this Action.[5]

106.   As set forth in Exhibit 4, based on the declarations attached hereto, the two Co-Lead Counsel, along with additional Plaintiffs' Counsel Pond Gadow, expended a total of 29,123.30 hours in the prosecution and investigation of this Action.  The resulting lodestar is $13,150,005.75 for all Plaintiffs' Counsel.  The requested fee, therefore, yields a 1.23 multiplier and is fair and reasonable based upon the significant risk of the litigation and the quality of representation by Plaintiffs' Counsel in achieving the exceptional Settlement before the Court. Indeed, as discussed in the Fee Memorandum, when using a lodestar cross-check, courts have routinely awarded fee requests with similar and larger lodestar multipliers in securities class actions.

107.   As represented in the attached declarations of Plaintiffs' Counsel (Exhibits 4A-4C), the lodestar summaries were prepared from daily time records regularly prepared and maintained by Plaintiffs' Counsel.

---

[5] Exhibit 4 is a summary chart of the lodestar and expenses of the three Plaintiffs' Counsel firms, Lead Counsel Bernstein Litowitz and Robbins Geller, and additional counsel to Lead Plaintiff MissPERS, Pond Gadow.

108.    Lead Counsel took this case on a contingency basis, committed their resources and litigated it for more than five years without any compensation or guarantee of success. Based on the very good result achieved for the Settlement Class, the quality of work performed, the risks of the Action and the contingent nature of the representation, Lead Counsel submit that the request for a 17% fee award is fair and reasonable and consistent with other similar cases in the Second Circuit.

### 2.    Standing And Expertise Of Lead Counsel

109.    The expertise and experience of counsel are other important factors in setting a fair fee.  As demonstrated by Lead Counsel's firm biographies, attached hereto as Exhibits 4A-H and 4B-H, the attorneys at Bernstein Litowitz and Robbins Geller are experienced and skilled class action securities litigators and have a successful track record in securities cases throughout the country – including within this Circuit – and in RMBS litigation, in particular.

110.    The quality of the work performed by counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel.  Lead Counsel were opposed in this case by very skilled and highly-respected counsel.  The Defendants were represented by Davis Polk & Wardwell LLP, who spared no effort in the defense of its clients.  In the face of this knowledgeable and formidable defense, Lead Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle on terms that are favorable to the Settlement Class.

### 3.    The Risks Of Litigation And The Need To Ensure The Availability Of Competent Counsel In High-Risk, Contingent Securities Cases

111.    As noted above, the Action was undertaken on a wholly contingent basis.  From the outset, Lead Counsel understood that they were embarking on a complex and expensive litigation with no guarantee of compensation for the investment of time, money and effort that

the case would require.  At the outset of the case, Lead Counsel understood that very limited precedent existed for similar claims arising from the purchase of RMBS.  In addition, Lead Counsel understood that Defendants would raise myriad challenges based on the structured nature of the securities and that liability, damages and class certification would be heavily contested with no assurance of success.

112.  In undertaking the responsibility for prosecuting the Action, Lead Counsel assured that sufficient attorney resources were dedicated to the investigation of the Settlement Class claims against the Defendants and that sufficient funds were available to advance the expenses required to pursue and complete such complex litigation.  Plaintiffs' Counsel received no compensation and, in total, seek $1,110,072.81 in Litigation Expenses in prosecuting this Action for the benefit of the Settlement Class, as set forth below and in their respective attached declarations.

113.  Lead Counsel also bore the risk that no recovery would be achieved.  As discussed herein, this case presented a number of risks and uncertainties which could have prevented any recovery whatsoever.  Despite the vigorous and competent efforts of Lead Counsel, success in contingent-fee litigation, such as this, is never assured.

114.  Lead Counsel know from experience that the commencement of a securities class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations.

115.  Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws.  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only

occur if private plaintiffs − particularly institutional investors − take an active role in protecting the interests of securities purchasers.  If this important public policy is to be carried out, plaintiffs' counsel should be adequately compensated, taking into account the risks undertaken in prosecuting securities class actions.

### 4.      The Reaction Of The Settlement Class To Date

116.     As set forth above, Notices have been disseminated to at least 6,700 potential Settlement Class Members and their nominees.  Washington Decl. ¶9.  In addition, the Summary Notice was published in *Investor's Business Daily* and over the *Business Wire. See id.* ¶10.  The Notice explains the Settlement and Lead Counsel's anticipated fee request.  The deadline to object to Lead Counsel's fee request is November 26, 2014.  To date, no Settlement Class Member has objected.

117.     In sum, given the complexity and magnitude of the Action; the responsibility undertaken by Lead Counsel; the difficulty of proof on liability and damages; the experience of Lead Counsel and defense counsel; and the contingent nature of Lead Counsel's agreement to prosecute this Action, Lead Counsel respectfully submit that the requested attorneys' fees are reasonable and should be approved.

### B.      Application For Litigation Expenses

118.     Lead Counsel also request $1,110,072.81 in Lead Counsel's Litigation Expenses in prosecuting this Action for the benefit of the Settlement Class, as set forth in their respective declarations attached hereto as Exhibits 4A and 4B.  Lead Counsel respectfully submit that their respective expense amounts are appropriate, fair, and reasonable and should be approved.

119.     From the beginning of the case, Lead Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Lead Counsel also understood that, even assuming that the case was

ultimately successful, an award of expenses would not compensate them for the lost use of the funds advanced to prosecute this Action. Thus, our respective firms were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

120. As set forth in Lead Counsel's respective declarations, the expenses were necessary and appropriate for the prosecution of this Action. A chart reflecting all expenses by category sought is attached hereto as Exhibit 4D.

121. Lead Counsel also seek approval of certain costs and expenses incurred by Lead Plaintiff MissPERS directly relating to its representation of the Settlement Class pursuant to 15 U.S.C. § 77z-1(a)(4), as set forth in Exhibit 1, attached hereto, in the total amount of $19,925.00.

122. The application for expenses is well within the upper limit of $2 million contained in the Notice mailed to the Settlement Class. As noted above, in response to over 6,700 Notices, as of the date of this Declaration, there are no objections to such expenses.

123. Approval of the Settlement is independent from approval of Lead Counsel's application for an award of attorneys' fees and expenses; any determination with respect to Lead Counsel's application for an award of attorneys' fees and expenses will not affect the Settlement, if approved.

We declare under penalty of perjury that the foregoing facts are true and correct and that this declaration was executed this 13th day of November, 2014.

_____
David R. Stickney

_____
Arthur C. Leahy