# EXHIBIT P

EFiled: Feb 13 2018 11:35AM EST
Transaction ID 61683401
Case No. 12286-VCL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| IN RE FACEBOOK, INC. CLASS C RECLASSIFICATION LITIGATION | ) ) ) Consolidated ) C.A. No. 12286-VCL ) ) PUBLIC VERSION Dated: FEBRUARY 13, 2018 |

## CO-LEAD COUNSEL'S BRIEF
## IN SUPPORT OF THEIR MOTION FOR AN AWARD
## OF ATTORNEYS' FEES AND EXPENSES

OF COUNSEL:

**KESSLER TOPAZ**
 **MELTZER & CHECK, LLP**
Lee D. Rudy
Eric L. Zagar
J. Daniel Albert
Grant Goodhart
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

**GRANT & EISENHOFER P.A.**
Stuart M. Grant (#2526)
Cynthia A. Calder (#2978)
Joseph Christensen (#5146)
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000

**PRICKETT, JONES**
 **& ELLIOTT, P.A.**
Michael Hanrahan (#941)
Paul A. Fioravanti, Jr. (#3808)
Corinne Elise Amato (#4982)
Eric J. Juray (#5765)
1310 N. King Street
Wilmington, Delaware 19801
(302) 888-6500

Dated: February 9, 2018

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ..................................................................... 1

BACKGROUND ........................................................................................ 5

    A.    Zuckerberg Pressed Facebook's Board To Adopt The
           Reclassification To Preserve His Control Of Facebook ...................... 5

    B.    The Committee's Financial Advisor Calculates That The
           Reclassification Benefits Zuckerberg By At Least $6.5
           Billion .............................................................................................. 8

    C.    The Committee Never Demanded Money Or Any Other
           Meaningful "Gives" From Zuckerberg ............................................. 10

    D.    Zuckerberg Goes Public With His Plan During
           Negotiations With The Committee ..................................................... 11

    E.    The Only "Negotiations" Concerned Loopholes In
           Zuckerberg's Commitment To Continue As Facebook's
           Executive Leader, and Andreessen's Disloyal Conduct
           Undercut Those Negotiations ............................................................ 12

    F.    The Reclassification Would Have Caused Substantial
           Harm To The Class A Stockholders .................................................. 14

    G.    Plaintiffs' Significant Litigation Efforts Result In
           Zuckerberg's Abandonment Of The Reclassification Four
           Days Before Trial ............................................................................ 15

    H.    Efforts To Resolve The Fee And Expense Request ........................... 20

ARGUMENT ........................................................................................... 22

I.    PLAINTIFFS ARE ENTITLED TO A MOOTNESS FEE .......................... 22

II.    APPLICATION OF THE *SUGARLAND* FACTORS DEMONSTRATES THAT PLAINTIFFS' FEE AND EXPENSE REQUEST SHOULD BE GRANTED IN FULL ...................................................................24

    A.    The Substantial Benefit Plaintiffs Achieved ........................................25

    B.    The Value of the Benefit Achieved For The Class A Stockholders Does Not Have to Be Susceptible to Precise Mathematical Calculation In Order to Support the Fee Award ...................................................................................................27

        1.    The Value of Control of Facebook, Which Will Pass to the Class A Stockholders Due to Plaintiffs' Efforts, Supports The Requested Fee ........................................30

        2.    Defendants' Expert's Analysis, When Corrected, Supports The Requested Fee........................................................34

        3.    The Wedge Analysis Supports The Requested Fee .................36

    C.    The Fee Requested Is Reasonable When Measured Against The Value Of The Benefit Conferred ...................................40

    D.    The Remaining *Sugarland* Factors Also Support The Fee And Expense Request...........................................................................44

        1.    The Complexities Of The Case ...................................................44

        2.    Standing And Ability Of Plaintiffs' Counsel.............................47

        3.    The Lodestar Crosscheck Supports The Fee Request....................................................................................47

III.   WHILE THE COURT IS NOT REQUIRED TO DO SO, IF THERE IS ANY QUESTION ABOUT THE FACTUAL RECORD, THE COURT SHOULD HOLD AN EVIDENTIARY HEARING .....................................53

CONCLUSION ...........................................................................................................55

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Abercrombie & Fitch Co. S'holders Derivative Litig.*,
  886 A.2d 1271 (Del. 2005) ...................................................................24

*In re Activision Blizzard, Inc. S'holder Litig.*,
  124 A.3d 1025 (Del. Ch. 2015) .........................................................48

*Allied Artist Pictures Corp. v. Baron*,
  413 A.2d 876 (Del. 1980) ...................................................................22

*In re Am. Int'l Grp, Inc. Consol. Derivative Litig.*,
  C.A. No. 769-VCS (Del. Ch. Jan. 25, 2011) ......................................42

*Americas Mining Corp. v. Theriault*,
  51 A.2d 1213 (Del. 2012) ...................................................................50

*In re Books-A-Million, Inc. S'holders Litig.*,
  2016 WL 5874974 (Del. Ch. Oct. 10, 2016) ......................................31

*Bray v. Oklahoma Pub. Co.*,
  1991 WL 189136 (Del. Ch. Sept. 24, 1991) .......................................22

*Chrysler Corp. v. Dann*,
  223 A.2d 384 (Del. 1966) ..............................................................22, 49

*In re Clear Channel Outdoor Holdings Inc. Deriv. Litig.*,
  C.A. No. 7315-CS (Del. Ch. Sept. 9, 2013) .........................42, 51, 52

*In re Compellent Techs., Inc. S'holder Litig.*,
  2011 WL 6382523 (Del. Ch. Dec. 9, 2011) .......................27, 28, 29

*In re Del Monte Foods Co. S'holder Litig.*,
  2011 WL 2535256 (Del. Ch. June 27, 2011)................................24, 25

*In re Digex Inc. S'holders Litig.*,
  C.A. No. 18336-CC (Del. Ch. Apr. 6, 2001)......................................51

*In re Emerson Radio S'holder Derivative Litig.*,
  2011 WL 1135006 (Del. Ch. Mar. 28, 2011) ...............................25, 30

*Feldman v. Donegal Grp., Inc.*,
　　C.A. No. 18786-VCJ (Del. Ch. Aug. 8, 2001) ....................................................41

*First Interstate Bancorp Consol. S'holder Litig.*,
　　756 A.2d 353 (Del. Ch. 1999) ...........................................................................49

*Franklin Balance Sheet Inv. Fund v. Crowley*,
　　2007 WL 2495018 (Del. Ch. Aug. 30, 2007) .....................................................49

*Garner v. Wolfinbarger*,
　　430 F.2d 1093 (5th Cir. 1970) .........................................................................17

*In re Genentech, Inc. S'holders Litig.*,
　　C.A. No. 3911-VCS (Del. Ch. July 9, 2009)...................................42, 50, 51, 52

*Goodrich v. E.F. Hutton Grp., Inc.*,
　　681 A.2d 1039 (Del. 1996) ................................................................................28

*Gotham Partners LP v. Hallwood Realty Partners LP*,
　　817 A.2d 160 (Del. 2002) ..................................................................................31

*IRA Trust FBO Bobbie Ahmed v. Crane*,
　　2017 WL 6335912 (Del. Ch. Dec. 11, 2017) ...............................................31, 45

*In re James River Group, Inc. S'holder Litig.*,
　　2008 WL 160926 (Del. Ch. Jan. 8, 2008)...........................................................24

*Jedwab v. MGM Grand Hotels, Inc.*,
　　1986 WL 3426 (Del. Ch. 1986) .........................................................................17

*Kuo v. Genius Prods.*,
　　C.A. No. 3329-CC (Del. Ch. July 30, 2009) (Letter Op.), *aff'd on*
　　*reargument by*, 2009 WL 2913618 (Del. Ch. Aug. 26, 2009) ...........................23

*Lewis v. Engle*,
　　C.A. No. 497-VCS (Del. Ch. Dec. 29, 2004) ................................................42, 43

*Loral Space & Commc'ns, Inc. v. Highland Crusade Offshore*
　　*Partners, L.P.*,
　　977 A.2d 867 (Del. 2009) .............................................................................25, 42

*In re Loral Space and Commc'ns Inc. Consol. Litig.*,
　　C.A. No. 2808-VCS (Del. Ch. Dec. 2, 2008) .....................................................42

iv

*In re the Mosaic Company S'holder Litig.*,
   C.A. No. 6228-VCL (Del. Ch. Sept. 15, 2011) ....................................................28

*In re NCS Healthcare Inc., S'holders Litig.*,
   2003 WL 21384633 (Del. Ch. May 28, 2003)....................................................44

*In re Plains Res. Inc. S'holder Litig.*,
   2005 WL 332811 (Del. Ch. Feb. 4, 2005) ....................................................24, 49

*Ryan v. Gifford*,
   2009 WL 18143 (Del. Ch. Jan. 2, 2009)............................................................48

*In re Safeway Inc. S'holder Litig.*,
   C.A. No. 9445-VCL (Del. Ch. Sept. 17, 2014) ...................................................29

*San Antonio Fire & Police Pension Fund v. Bradbury*,
   2010 WL 4273171 (Del. Ch. Oct. 28, 2010) ......................................................47

*Seinfeld v. Coker*,
   847 A.2d 330 (Del. Ch. 2000) ..........................................................................47

*In re Southern Peru Copper Corp. S'holder Derivative Litig.*,
   C.A. No. 961-CS (Del. Ch. Dec. 19, 2011) ...........................................42, 49, 50

*Sugarland Indus., Inc. v. Thomas*,
   420 A.2d 142 (Del. 1980) .....................................................................24. 25. 44

*In re Talecris Biotherapeutics Holdings S'holder Litig.*,
   2011 WL 6078494 (Del. Ch. Dec. 5, 2011) (ORDER) .......................................30

*Tandycrafts, Inc. v. Initio Partners*,
   562 A.2d 1162 (Del. 1989) ...............................................................................23

*In re Telecorp. PCS, Inc. S'holder Litig.*,
   C.A. No. 19260-VCS (Del. Ch. Aug 20, 2003)....................................................42

*United Vanguard Fund, Inc. v. TakeCare Inc.*,
   693 A.2d 1076 (Del. 1997) ...............................................................................22

*United Vanguard Fund, Inc. v. TakeCare Inc.*,
   727 A.2d 844 (Del. Ch. 1998) ..........................................................................23

## PRELIMINARY STATEMENT

In this case, Plaintiffs and Plaintiffs' Counsel[1] took on a controversial reclassification (the "Reclassification"), which would have extended the voting control of Facebook Inc. ("Facebook" or the "Company") currently held by Facebook's founder, Chairman and Chief Executive Officer, Mark Zuckerberg ("Zuckerberg"), for decades, when such voting control – and the right to command a control premium – would have passed to the Company's Class A stockholders. The primary purpose of the Reclassification was to allow Zuckerberg to sell a significant portion of his Facebook equity interest without divesting control. The Reclassification would not only have conferred a significant, non-ratable benefit on Zuckerberg, but also would have increased the wedge between Zuckerberg's voting power and economic stake in Facebook, thereby visiting billions of dollars' worth of harm on the public Class A stockholders. Put simply, the Reclassification was meant to preserve Zuckerberg's control when the only true threat to that control was his own public promise to sell stock to fund his personal interests.

Plaintiffs were prepared to prove at trial that Zuckerberg was taking billions of dollars of value from the Class A stockholders without compensating them for that taking. Even though Zuckerberg and the other Defendants fought the claims

---

[1] "Plaintiffs' Counsel" refers to co-lead counsel Grant & Eisenhofer P.A. and Kessler Topaz Meltzer & Check LLP, along with additional counsel Prickett Jones & Elliott, P.A.  Saxena White LLP also participated in the litigation by reviewing documents.

throughout the litigation, just four days before Zuckerberg was scheduled to take the stand, he asked Facebook's board of directors (the "Board") to terminate the Reclassification.  The Board acquiesced,[2] eliminating the need for Zuckerberg to answer, under oath, the questions regarding his interference with the work of the Board's Special Committee and the ways in which the Reclassification was designed to serve Zuckerberg's personal interests at the expense of the public stockholders.

By forcing Zuckerberg to give up on the Reclassification, Plaintiffs not only thwarted a multi-billion dollar loss in value to the Class A stockholders, but also sent a message to the rest of the tech world that its growing practice of vesting founders with extended control even as their equity interest shrinks to a minimal percentage must stop.   When the news of Zuckerberg's capitulation broke, *Bloomberg News* quoted the Council of Institutional Investors' executive director, who said, "This really is the death knell for existing companies trying to adopt a non-voting share class."[3]

---

[2] Transmittal Affidavit of Joseph L. Christensen, Esq. in Support of Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses ("Christensen Trans. Aff.") Ex. 1 (Facebook Form 8-K, filed Sept. 22, 2017).

[3] Christensen Trans. Aff. Ex. 2 (Oliver Renick & Sarah Frier, *Facebook Fail Hits at Silicon Valley Cult of Founder Control*, BLOOMBERG (Sept. 25, 2017) https://www.bloomberg.com/news/articles/2017-09-25/facebook-fail-is-blow-for-silicon-valley-cult-of-founder-control).

Under any reasonable method of quantification, the benefit created by this litigation measures in the billions of dollars.   The Special Committee's own financial advisor, Evercore Group L.L.C. ("Evercore"), calculated that the value of control of Facebook is equal to 3% to 4% of Facebook's market capitalization – *$6.5 to $8.7 billion* when Evercore submitted its work to the Special Committee's counsel, and *$14.3 to $19 billion* in September 2017 when Defendants abandoned the Reclassification.[4]  Evercore also cited a study that is part of a substantial body of economic literature that has empirically observed the value destruction and agency problems that result when economic ownership is reduced relative to voting control, such as the Reclassification would have created here.[5]  Plaintiffs' expert, Benjamin Sacks ("Sacks"), previously opined that this harm would be measured in the billions of dollars.   Sacks updates his opinion in the supplemental report submitted herewith,[6] and provides additional analysis to show that even the analysis presented by Defendants' expert, Daniel Fischel ("Fischel"), when corrected to exclude distorting, outlier data points, proved the Reclassification would have inflicted substantial economic harm on the Class A stockholders.

---

[4]  *See* Christensen Trans. Aff. Ex. 3 (Draft Evercore presentation, EVERCORE00076542 at p. 2).

[5]  *See* Christensen Trans. Aff. Ex. 3 (*Id.* at p. 6 n. 1 (citing Masulis, Ronald and Wang, Cong and Xie, Fei. "Agency Problems at Dual-Class Companies." Journal of Finance, vol. 64 (2009), pp. 1697-272)).

[6]  *See* Christensen Trans. Aff. Ex. 4 (Supplemental Report of Benjamin Sacks).

Sacks provides three independent methodologies for measuring the benefit created here, which range from a low of $1.29 billion to as much as $27.59 billion.

Plaintiffs' Counsel seek an award of $129 million for their fees and expenses (the "Fee and Expense Request").  Under any method of quantifying the benefit created for Facebook's Class A stockholders, the Fee and Expense Request is a small fraction of that benefit.  The calculation of the Fee and Expense Request under the percentage-of-the-benefit approach is approximately 10% of the lowest calculated value of control, $1.29 billion, which conservatively assumes that control passes from Zuckerberg to the Class A stockholders in *30 years* and is discounted back to present value.  The amount of the Fee and Expense Request as a percentage of any other than the lowest calculations of the benefit is substantially below 10%, and approaches as little as 0.67% of the top end of Evercore's analysis as of the date when Defendants abandoned the Reclassification.

This litigation was a total victory for Facebook's public Class A stockholders.  The Courts of Delaware have often stated that exceptional results obtained by hard fought, go-the-distance litigation should be rewarded with a commensurately sizable fee award.  Plaintiffs' Counsel submit that this is just such a case and, therefore, respectfully request that the Court approve the Fee and Expense Request.

# BACKGROUND

**A.    ZUCKERBERG PRESSED FACEBOOK'S BOARD TO ADOPT THE RECLASSIFICATION TO PRESERVE HIS CONTROL OF FACEBOOK**

Since going public in 2012, Facebook has had two classes of stock – Class A stock with one vote per share and Class B stock with ten votes per share.[7]   The Class B stock is held by Zuckerberg and a few select others.[8]   The Class A stockholders bought into this structure that gave Zuckerberg majority voting control so long as he did not sell a substantial amount of his economic value of Facebook.

By March 2015, Zuckerberg's stock sales and other factors reduced his control of Facebook's voting power to 61.1%.[9]   Zuckerberg had also signed on to Bill Gates' and Warren Buffett's "Giving Pledge," which publicly obligated him to give away at least half of his wealth during his lifetime or upon his death.[10] He had also been widely quoted as intending to begin his philanthropy early in his

---

[7] *See* Christensen Trans. Aff. Ex. 5 (Mar. 22, 2012 Facebook Certificate of Incorporation at §3.2).

[8] *See* Christensen Trans. Aff. Ex. 6 (June 1, 2015 Email from Dave Kling to Mark Zuckerberg regarding Class B Voting Analysis, MZ0006947).

[9] *See* Christensen Trans. Aff. Ex. 7 (Simpson Thacher Recapitalization Proposal presentation, dated July 23, 2015, GS-00020366 at 370); Christensen Trans. Aff. Ex. 8 (Facebook, Inc., Schedule 14A, dated April 24, 2015 at p. 35).

[10] *See* Christensen Trans. Aff. Ex. 9 (*More U.S. billionaires pledge to give away wealth*, REUTERS (Dec. 9, 2010), available at http://www.reuters.com/article/us-wealth-philanthropy-billionaires-idUSTRE6B818R20101209).

lifetime,[11] and in the summer of 2015 was developing his own accelerated version of the Giving Pledge pursuant to which he would donate 99% of his wealth to philanthropic causes.[12]

While committed to his personal goals, Zuckerberg was unwilling to relinquish control of Facebook to the Class A stockholders.[13]  Zuckerberg first turned to Facebook's in-house counsel, who warned him that at the annual donation rate he was considering ($2 billion to $3 billion), he would lose voting control in just two to three years.[14]  In order to allow Zuckerberg to do this without losing control, Facebook's legal department recommended a reclassification with the creation of a non-voting class of stock (Class C) that Zuckerberg could sell without losing any voting power.[15]

Facebook's in-house counsel, who are obligated to serve the interests of Facebook and all of its stockholders, started this process down a conflicted path

---

[11] *Id.*

[12] Christensen Trans. Aff. Ex. 10 (Mar. 2015 Email chain among Mark Zuckerberg, Dave Kling, and Colin Stretch, FB_0025271 at 273); Christensen Trans. Aff. Ex. 11 (June 9, 2015 Email Chain from Mark Zuckerberg to Dave Kling regarding note to Board, MZ0006955 at 957).

[13] *Id.*; Christensen Trans. Aff. Ex. 12  (Zuckerberg Dep. Tr. at 46-47; 53).

[14] *See* Christensen Trans. Aff. Ex. 13  (May 30, 2015 Email from Dave Kling to Mark Zuckerberg regarding Class B Voting Analysis, FB_0025298).

[15] *See* Christensen Trans. Aff. Ex. 10  (FB_0025271-4) (March 2015 email chain between Zuckerberg and Facebook General Counsel Colin Stretch in which Stretch recommends a "Google-style" reclassification with stock "that has zero voting rights" and will "help reduce further erosion of your voting power").

with a recommendation of the reclassification in order to serve Zuckerberg's personal interests at the expense of Facebook's public stockholders.  Zuckerberg took that advice, and began laying the groundwork for the Reclassification with the Board at the Board's dinner preceding its June 2015 meeting.[16]

In August 2015, Zuckerberg had his personal legal counsel, William Hinman ("Hinman"), present the Reclassification to the Board.[17]  Hinman, who did not inform the Board that he was Zuckerberg's personal lawyer, told the Board that the Reclassification would help insulate the Company from the wolf pack of Wall Street takeover artists.[18]  The Board was not told that the real reason for the Reclassification was to facilitate Zuckerberg's personal plans while preserving his voting control.  The Board was told, without any supporting analysis, that Zuckerberg's philanthropy could be expected to inure to the benefit of the Company.[19]  The Board formed a special committee ("Special Committee" or "Committee") charged with the authority to negotiate a reclassification, consider

---

[16] Christensen Trans. Aff. Ex. 14  (June 9, 2015 Email from Colin Stretch to Zuckerberg and the Facebook Board, MZ0000029 at 30).

[17] Christensen Trans. Aff. Ex. 15  (Aug. 20, 2015 Board of Directors Meeting Minutes, FB_0000001).

[18] Facebook did not need that insulation, however, as its sizable market capitalization served as a deterrent to such activism.  Christensen Trans. Aff. Ex. 16  (Wehner Dep. Tr. at 177:13-179:3) (Facebook's Chief Financial Officer agreeing that no activist stockholders are making short term demands on Facebook. and that analysts are bullish on Facebook's long-term plan).

[19] Christensen Trans. Aff. Ex. 15  (FB_0000001 at 3).

alternatives to the Reclassification, or just say no to Zuckerberg's request, although it is far from clear that the Special Committee understood the breadth of its mandate.[20]   The members of the Committee were Susan Desmond-Hellmann ("Desmond-Hellmann"), Marc Andreessen ("Andreessen"), and Erskine Bowles ("Bowles").[21]

### B. THE COMMITTEE'S FINANCIAL ADVISOR CALCULATES THAT THE RECLASSIFICATION BENEFITS ZUCKERBERG BY AT LEAST $6.5 BILLION

The Special Committee hired Evercore as its financial advisor in October 2015.[22]   Evercore's initial presentation to the Committee was set for November 9, 2015.[23]   Evercore prepared dozens of drafts before reaching a final draft that it sent to the Committee's legal advisor (Wachtell Lipton Rosen & Katz, "WLRK").[24] This final draft explained that Evercore had reviewed precedent transactions to

---

[20] *See id.* at 3-4; Christensen Trans. Aff. Ex. 17 (Desmond-Hellman Dep. at 57-58) ("The Special Committee was responding, was reacting, to a specific request that Mark Zuckerberg made to the Board…."); *id.* at 66-70 (if the Special Committee had said "no" to the Reclassification, Zuckerberg would have "figured out [another] way to be philanthropic while retaining control of the company").

[21] *Id.*

[22] Christensen Trans. Aff. Ex. 18  (Oct. 14, 2015 Email David Shapiro to the Special Committee, FBOD00002874 at 875).

[23] *Id.*; Christensen Trans. Aff. Ex. 19 (Oct. 21, 2015 Email from David Shapiro regarding FB Update, EVERCORE00163332).

[24] *See* Christensen Trans. Aff. Exs. 20 (Nov. 3, 2015 Email Chain among Wachtell and Evercore regarding draft presentation, EVERCORE00151609); 21 and 22 (Nov. 3, 2015 Email from Marc Kushner forwarding Evercore draft presentation to Wachtell, EVERCORE00148882 & 883).

determine the value of control of Facebook, and that in the precedent transactions the premium paid to controllers of dual-class companies was between 3% and 4% of market capitalization.[25]   A previous Evercore draft from ten days earlier made the point even more explicitly, in a section titled "Value of Control":[26]

- Selected precedent dual class acquisitions and change-of-control dual class recapitalizations indicate that the "value" of control is 3-4% of existing low vote equity value

- This analysis suggests that Z[uckerberg] would realize a value transfer of $6.5-$8.7 billion if the Z[uckerberg] proposal were implemented[27]

The Reclassification would cause a value transfer of billions of dollars from Class A stockholders to Zuckerberg because it would prevent control from shifting from Zuckerberg to the Class A stockholders – an event that would have given the Class A stockholders the right to claim a multi-billion dollar premium for themselves. Evercore's draft presentation recommended that the Committee ask for "Direct Compensation" to the Class A stockholders, to "compensate [them] for extending Z[uckerberg]'s control…."[28]

---

[25] Christensen Trans. Aff. Ex. 22  (EVERCORE00148883 at 89).

[26] Before being presented to the Committee, the Committee's counsel substantially edited Evercore's analysis describing the "Value of Control." The final materials sent to the Committee eliminated any reference to the "Value of Control." *Compare* Christensen Trans. Aff. Ex. 22   (EVERCORE0014883 at 89 *with* Christensen Trans. Aff. Ex. 23   (Nov. 4, 2015 Draft Evercore Presentation incorporating Wachtell's comments, EVERCORE00166454 at p.3).

[27] Christensen Trans. Aff. Ex. 3  (EVERCORE00076542 at p. 2).

[28] Christensen Trans. Aff. Ex. 22  (EVERCORE00148883 at 98).

## C.  THE COMMITTEE NEVER DEMANDED MONEY OR ANY OTHER MEANINGFUL "GIVES" FROM ZUCKERBERG

Even though the Special Committee was charged with considering a reclassification proposal from Zuckerberg, the Committee instead agreed to make the first move by "initiating the structuring conversations."[29]  But the Committee never proposed key terms that one would expect from a properly functioning committee, namely, a payment from Zuckerberg to the Class A stockholders, a Class A vote on the Reclassification, and/or some form of restriction on Zuckerberg's ability to divest his shares.  The Committee never demanded these terms because, the Special Committee claims, Zuckerberg had already "rejected" them, through his counsel.[30]  Had this matter gone to trial, Defendants would have had to explain how Zuckerberg rejected terms *before* the Committee received any analysis from Evercore, authorized negotiations to begin, and agreed upon an initial proposal.[31]

---

[29] Christensen Trans. Aff. Ex. 24  (Sept. 23, 2015 Special Committee Meeting Minutes, FBOD00000002 at 3).

[30] Christensen Trans. Aff. Ex. 25   (Bowles Dep. Tr. at 145-146); *see also* Christensen Trans. Aff. Ex. 26  (Nov. 4, 2015 Email chain among Wachtell re Evercore draft presentation, WLRK0000753).

[31] *See* Christensen Trans. Aff. Exhs. 27, 28  (Nov. 5, 2015 Email from David Shapiro to Special Committee attaching Special Committee Presentation, FBOD00003297; FBOD00003298 at 311) ("Options for Special Committee Consideration" include three items that "Z[uckerberg] has already rejected":  a "True-up  Payment,"  a  "Majority-of-the-Minority  Vote,"  and  "Transfer Restrictions.").  Committee Chairperson Desmond-Hellmann agreed it appeared

### D.   ZUCKERBERG GOES PUBLIC WITH HIS PLAN DURING NEGOTIATIONS WITH THE COMMITTEE

In the midst of his "negotiations" with the Special Committee, on December 1, 2015, Zuckerberg announced that he intended to give away 99% of his wealth during his lifetime, while remaining at the helm of Facebook for many years to come.[32]  The announcement gave the Special Committee extraordinary leverage in its negotiations with Zuckerberg, but the Committee squandered that opportunity.[33]  It neither sought new terms from Zuckerberg nor revisited any of the prematurely "rejected" terms like a monetary payment, a Class A vote, or any form of transfer restrictions.[34]  Instead, by its January 11, 2016 meeting, the Special Committee made further concessions to Zuckerberg, agreeing to increase the proposed dividend of one Class C share for each Class A and Class B share to a ratio of two Class C shares for each Class A and Class B share.[35]  Doubling the dividend ratio

---

that these items had been "rejected" during an October 23, 2015 conversation between the Committee's counsel and Zuckerberg's counsel.  Christensen Trans. Aff. Ex. 17 (Desmond-Hellmann Dep. Tr. at 111-112).

[32] Christensen Trans. Aff. Ex. 29 (https://www.facebook.com/notes/mark-zuckerberg/a-letter-to-our-daughter/10153375081581634/).

[33] *See* Christensen Trans. Aff. Ex. 17 (Desmond-Hellmann Dep. Tr. at 225-226) ("[W]e had more leverage because he had gone public with what he intended to do. . . . [W]e knew about his intentions before, but they had become public, so the stakes were higher for him.").

[34] Christensen Trans. Aff. Ex. 25 (Bowles Dep. Tr. at 145-146, 158).

[35] Christensen Trans. Aff. Ex. 30 (Jan, 11, 2016 Special Committee Meeting Minutes, FBOD00000043).

would allow Zuckerberg to further increase his stock sales – and reduce his equity stake by twice as much – without losing voting control.[36]   The Committee extracted no value from Zuckerberg for this benefit.

### E.   THE ONLY "NEGOTIATIONS" CONCERNED LOOPHOLES IN ZUCKERBERG'S COMMITMENT TO CONTINUE AS FACEBOOK'S EXECUTIVE LEADER, AND ANDREESSEN'S DISLOYAL CONDUCT UNDERCUT THOSE NEGOTIATIONS

The only actual "negotiations" between Zuckerberg and the Committee concerned the loopholes in Zuckerberg's obligation to serve as Facebook's executive leader as a condition of his continued corporate control.[37]   For example, Zuckerberg wanted the ability to significantly scale back his responsibilities to Facebook or take a leave of absence to serve in a government position without surrendering control, and to let his control pass to his heirs for at least some number of years.[38]

The Committee did not immediately accept these demands.  Bowles did not believe that a lengthy government leave would be appropriate.[39]   Desmond-Hellmann did not believe that Zuckerberg's control should be able to pass to his

---

[36] Christensen Trans. Aff. Ex. 31  (Dec. 3, 2015 Email among Morgan Stanley regarding Sunset Modeling, MS00005452-54).

[37] Christensen Trans. Aff. Ex. 25 (Bowles Dep. Tr. at 158).

[38] Christensen Trans. Aff. Ex. 12  (Zuckerberg Dep. Tr. at 103-104, 109, 148-149).

[39] *See* Christensen Trans. Aff. Ex. 25  (Bowles Dep. Tr. at 273, 289).

heirs for several years after Zuckerberg died.[40]   But Andreessen undercut the

Committee's negotiations with Zuckerberg over these topics by back-channeling

the Committee's confidential positions and strategies directly to Zuckerberg.

These covert communications were done without the other Committee members'

knowledge or consent.[41]   Not only did Zuckerberg and Andreessen speak on the

phone before and after every Special Committee meeting, Andreessen even texted

Zuckerberg what Zuckerberg should say to Bowles during a teleconference in

which Zuckerberg was pushing for an eight-year leave.[42]   Desmond-Hellman

agreed that it appeared Andreessen was "coaching" Zuckerberg through these

negotiations.[43]   In the end, Zuckerberg got exactly what he wanted on every item:

---

[40] Christensen Trans. Aff. Ex. 17  (Desmond-Hellmann Dep. Tr. at 252) ("I was puzzled because I was struggling to understand how Mark saw control after his death. You know, he was dead and so I just was -- I didn't know what was in his head about what 'control' meant and needed to understand how he was thinking about this.").

[41] *See* Christensen Trans. Aff. Ex. 25   (Bowles Dep. Tr. at 263-264, 287); Christensen Trans. Aff. Ex. 17  (Desmond-Hellmann Dep. Tr. at 276).

[42] Christensen Trans. Aff. Ex. 32   (Mar. 5, 2016 Text messages between Zuckerberg and Andreessen, MZ0006925) ("The committee wants to do this.  You don't need to question that…. This line of argument is not helping ☺…. They are both genuinely trying to get the right answer…. THIS is the key topic…. NOW WE'RE COOKING WITH GAS…."); *see also* Christensen Trans. Aff. Exhs. 33, 34, 35, 36 and 37 (Additional text messages between Zuckerberg and Andreessen, MZ0006915; MZ0006919; MZ0006917; MZ0006911; MZ0006910).

[43] Christensen Trans. Aff. Ex. 17  (Desmond-Hellmann Dep. Tr. at 282) ("Q. Would you agree that these texts from Mr. Andreessen to Mr. Zuckerberg are coaching Mr. Zuckerberg during the call? A. Coaching. I guess -- that seems reasonable to me that they are coaching.")

(i) the ability to maintain control with a minimal commitment of time to Facebook;

(ii) the ability to take virtually unlimited leave to serve in a government position;

and (iii) the ability to let control pass to someone of his choosing for up to three

years.

### F.   THE RECLASSIFICATION WOULD HAVE CAUSED SUBSTANTIAL HARM TO THE CLASS A STOCKHOLDERS

Zuckerberg's continued control of the Company under the terms of the

Reclassification would have imposed on the Class A stockholders substantial costs

that would far outweigh any purported benefits of the Reclassification.   As

Professor Lucian Bebchuk ("Bebchuk") explained, the "Reclassification would

essentially deprive Public Class A Stockholders of the control rights that they

would otherwise obtain," yet "Zuckerberg would not pay … any monetary

compensation for [this] loss."[44]   Moreover, Professor Bebchuk opined that "the

Reclassification would create a significant risk, which would likely grow over

time, that Zuckerberg would be able to continue leading the Company even if he

[became] a value-decreasing leader."[45]   Despite this obvious risk, the Special

Committee negotiated no safety valve by which Zuckerberg's control could be

---

[44] Christensen Trans. Aff. Ex. 38 (Rebuttal Expert Report of Prof. Lucian A. Bebchuk ("Bebchuk Rebuttal") at 73).

[45] *Id.* at 76.

broken, leaving the Class A stockholders powerless to remove Zuckerberg even if he was destroying value.

Excluding Zuckerberg's votes, there were 1.5 <u>billion</u> votes "against" and 453 million votes "for" the Reclassification.[46]  Despite the overwhelming majority of Class A stockholders who cast ballots at the June 20, 2016 meeting voting against the Reclassification, Zuckerberg's voting control allowed him to ignore their wishes and approve the Reclassification by himself.  Only through the efforts of Plaintiffs and their counsel did the stockholders achieve the outcome they preferred.

### G. PLAINTIFFS' SIGNIFICANT LITIGATION EFFORTS RESULT IN ZUCKERBERG'S ABANDONMENT OF THE RECLASSIFICATION FOUR DAYS BEFORE TRIAL

Plaintiffs Amalgamated Bank and Sjunde AP-Fonden ("AP-7") filed complaints challenging the Reclassification on May 10, 2016 and contemporaneously moved to enjoin the Reclassification prior to Facebook's June 20, 2016 annual meeting.  The Court ordered expedition and set a preliminary injunction hearing for June 16, 2016.  Defendants suspended the Reclassification pending an expedited trial in April 2017.

After the Court consolidated the litigation and approved a leadership structure, Plaintiffs filed their Consolidated Verified Class Action Complaint

---

[46] *Id*. at 118-120.

challenging the Reclassification.  Plaintiffs also served document requests directed to all Defendants and subpoenas directed to Evercore, Goldman Sachs and Morgan Stanley.  Plaintiffs later subpoenaed certain individual bankers and the Special Committee's legal advisor.

On June 17, 2016, Plaintiffs moved for class certification and filed their supporting brief.  Defendants served document requests on Plaintiffs and noticed their depositions in connection with class certification.  Plaintiffs served objections and responses to Defendants' document requests and collected and produced more than 3,600 pages of documents.  On September 14, 2016, a representative of AP-7 sat for deposition.  On April 17, 2017, this Court certified the Class.

Beginning in June 2016, Defendants and the subpoenaed third parties produced over 25,000 documents, comprising approximately a quarter of a million pages.  Many of these documents were not produced voluntarily, as Defendants and the subpoenaed third parties collectively served 105 pages of responses and objections to Plaintiffs' document requests (and another 29 pages of responses and objections to Plaintiffs' subpoenas *ad testificandum*).  In addition, Defendants and the subpoenaed third parties served at least 35 different iterations of initial, revised, supplemental, reformatted and corrected privilege and redaction logs spanning over 1,300 pages and thousands of entries.

Plaintiffs engaged in extensive meet and confers with Defendants and third parties, but could not resolve a variety of privilege issues.   Plaintiffs filed two motions to compel.   The first was premised on *Garner v. Wolfinbarger*[47] and argued that good cause, in the form of damning evidence of improprieties by certain Defendants and their advisors, existed to require production of attorney-client privileged information.   Plaintiffs directed their second motion to compel at Evercore and Goldman Sachs, challenging the improper privilege designations of business strategy communications.   Plaintiffs argued that the financial advisors could not hide behind *Jedwab v. MGM Grand Hotels, Inc.*,[48] which only permits attorney-client legal advice exchanged in the presence of a financial advisor to remain privileged.

The parties fully briefed the motions to compel and argued before the Court on November 9, 2016.   While the motions were pending, Defendants and their advisors produced more than 800 additional documents in an effort to thwart the relief sought in the motions.   While the Court denied Plaintiffs' *Garner* motion without prejudice to its being renewed at a later stage of discovery, the Court granted extensive relief, after reviewing numerous documents *in camera*, on Plaintiffs' *Jedwab* motion.   According to the Court, "[v]irtually all of the

---

[47] 430 F.2d 1093 (5th Cir. 1970).

[48] 1986 WL 3426 (Del. Ch. 1986)

documents submitted for *in camera* review [did] not contain legal advice."[49] Following the Court's decisions on Plaintiffs' motions to compel, which provided important clarifications on the contours of Delaware law regarding attorney-client privilege, Defendants and certain of the subpoenaed third parties produced more than 3,700 additional documents that never would have been produced absent Plaintiffs' persistence.

While the parties negotiated and litigated the appropriate scope of document production, Plaintiffs contemporaneously prepared for and took depositions.  In August 2016, Plaintiffs deposed Facebook's Chief Financial Officer, David Wehner, and Facebook's Vice President of Global Communications, Marketing and Public Policy, Elliot Schrage, as well as Committee member Bowles. Plaintiffs determined that further depositions would likely be unproductive without a judicial determination over the challenged privilege designations, and the parties agreed to postpone further fact depositions until the Court decided Plaintiffs' motions to compel.

Thereafter, the parties negotiated a revised trial schedule (with the trial now scheduled for September and October of 2017).  Between May and June 2017, Plaintiffs' Counsel deposed Zuckerberg, the other two Special Committee members, Desmond-Hellmann and Andreessen, Board member Reed Hastings, and

---

[49] Order Regarding Documents Submitted by Goldman Sachs for In Camera Review, Dec. 12, 2016 (Trans ID 59941104)

representatives from Evercore, Goldman Sachs and Morgan Stanley.  Plaintiffs'
Counsel also prepared for (but ultimately decided not to take) the depositions of
Board member Peter Thiel, Chief Operating Officer, Sheryl Sandberg, and
Evercore bankers Marc Kushner and Roger Altman.

Plaintiffs retained Sacks to provide analysis of the economic harm that
Facebook's Class A stockholders would suffer as a result of the Reclassification
and Bebchuk to rebut the corporate governance analysis of Professor Guhan
Subramanian ("Subramanian"), submitted on behalf of Defendants.  Plaintiffs'
Counsel also prepared for expert depositions, with each of Sacks, Bebchuk and
Subramanian's depositions lasting two full days and the deposition of Fischel
lasting a full day.  Plaintiffs' Counsel also briefed their opposition to Defendants'
motion *in limine*, seeking to exclude Bebchuk's rebuttal report and related
testimony.

Plaintiffs' Counsel drafted and negotiated the terms of the proposed pre-trial
order and compiled the joint exhibit list.  The pre-trial order is 431 paragraphs long
and includes many contested facts and issues, some of which were not resolved
until September 14, 2017 (the day after it was due to be filed with the Court).  In
preparing the joint exhibit list for the Court, Plaintiffs' Counsel culled a list of over
1,700 exhibits to just over 1,000 exhibits.  After Defendants' additions, the parties
submitted slightly over 1,400 exhibits.

Plaintiffs' Counsel also drafted a comprehensive 70-page pre-trial brief and prepared for the pre-trial conference, including the argument on Defendants' motion *in limine* and worked extensively to prepare for the witness and expert examinations at trial.

Trial was scheduled to begin with Zuckerberg's examination on Tuesday, September 26, 2017.  Late in the evening, on Thursday, September 21, the Special Committee's counsel informed Plaintiffs' Counsel that the Facebook Board had met and terminated the Reclassification.  Facebook's Form 8-K stated that the Reclassification was abandoned on the unanimous recommendation of the Special Committee.[50]  Zuckerberg's Facebook post reveals that Zuckerberg "asked [the] board to withdraw the proposal to reclassify our stock – and the board has agreed."[51]

On September 25, the Court ordered the parties' stipulation of dismissal of this action as moot, retaining jurisdiction to adjudicate Plaintiffs' fee application.

### H.    EFFORTS TO RESOLVE THE FEE AND EXPENSE REQUEST

Over the last several months, Plaintiffs' Counsel negotiated with defense counsel and participated in a mediation in an effort to reach an agreed-upon

---

[50] Christensen Trans. Aff. Ex. 1  (Facebook Form 8-K, filed Sept. 22, 2017).

[51] Christensen Trans. Aff. Ex. 39   (Sept. 22, 2017 Zuckerberg Facebook post *available at* https://www.facebook.com/zuck/posts/10104055333186581).

resolution of the Fee and Expense Request.   Neither the negotiations nor the mediation  produced a resolution and have now ceased.

# ARGUMENT

## I.    PLAINTIFFS ARE ENTITLED TO A MOOTNESS FEE

Plaintiffs are entitled to a mootness fee for creating a corporate benefit because "(1) the suit was meritorious when filed; (2) the action producing [the corporate] benefit . . . was taken by the [D]efendants before a judicial resolution was achieved; and (3) the resulting corporate benefit was causally related to the lawsuit."[52]

Plaintiffs' breach of fiduciary duty and injunctive relief claims far exceed the meritorious standard,[53] which only requires that the claims would survive a motion to dismiss[54] and have "some reasonable likelihood of ultimate success."[55] Defendants acknowledged that the claims are meritorious by their (i) agreement to the equivalent of a preliminary injunction by stipulating that they would not implement the Reclassification until after trial,[56] and (ii) decision to forgo dispositive motion practice.

---

[52] *United Vanguard Fund, Inc. v. TakeCare Inc.*, 693 A.2d 1076, 1079 (Del. 1997).

[53] The strength of Plaintiffs' claims is apparent on the face of the Complaint. *Bray v. Oklahoma Pub. Co.*, 1991 WL 189136, at *3 (Del. Ch. Sept. 24, 1991) (allegations that controlling stockholder sought to further entrench his control by issuing super-voting shares to all stockholders knowing that the minority stockholders' shares would convert to low-voting shares upon termination of certain family trusts were sufficient to establish meritorious claim).

[54] *Allied Artist Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980).

[55] *Chrysler Corp. v. Dann*, 223 A.2d 384, 387 (Del. 1966).

[56] May 13, 2016 Letter from Kevin R. Shannon, Transaction ID No. 59004747.

Defendants' abandonment of the Reclassification days before trial was an action taken before judicial resolution and was exactly what Plaintiffs sought to achieve through trial.[57]   Defendants would have implemented the Reclassification in 2016 but for the litigation.   The litigation caused Defendants to agree the Reclassification would not be implemented pending the outcome of the litigation. Causation is presumed so long as the "action benefiting the corporation chronologically followed the filing of a meritorious suit."[58]   The presumption stands here because Defendants threw in the towel on the eve of trial after Plaintiffs developed a complete factual and expert record, filed a pre-trial brief and order and prepared to cross-examine Zuckerberg at trial.   Plaintiffs' action caused this result, but the Court need only conclude that the litigation was a contributing factor to support a fee award.[59]

---

[57] Compl. at ¶¶ 108-110.

[58] *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1165 (Del. 1989) (quoting *Baron,* 413 A.2d at 880).

[59] *Kuo v. Genius Prods*., C.A. No. 3329-CC at 3 (Del. Ch. July 30, 2009) (Letter Op.), *aff'd on reargument by*, 2009 WL 2913618 (Del. Ch. Aug. 26, 2009); *see also United Vanguard Fund, Inc. v. Take Care, Inc.*, 727 A.2d 844, 854 (Del. Ch. 1998).

## II.   APPLICATION OF THE *SUGARLAND* FACTORS DEMONSTRATES THAT PLAINTIFFS' FEE AND EXPENSE REQUEST SHOULD BE GRANTED IN FULL

The decision to award attorneys' fees and the amount to award are committed to the sound discretion of the Court.[60] "[E]ach case stands on its own, and the court is called upon, in the exercise of its discretion, to make an award that furthers the policy objectives of encouraging monitoring behavior by stockholders and protecting the assets of Delaware corporations from unreasonable opportunistic demands."[61] "Delaware decisions have sought to align the interests of entrepreneurial plaintiffs' counsel with the classes they represent by granting minimal fees for minimal benefits and major fees for major results."[62] Thus, the Court's fee award should reflect the unique circumstances of this case and the major victory achieved.

In determining an appropriate fee award, the Court considers the *Sugarland* factors:

(i) the amount of time and effort applied to the case by counsel for the plaintiffs; (ii) the relative complexities of the litigation; (iii) the standing and ability of petitioning counsel; (iv) the contingent nature

[60] *In re Abercrombie & Fitch Co. S'holders Derivative Litig.*, 886 A.2d 1271, 1273 (Del. 2005); *In re Plains Res. Inc. S'holder Litig.*, 2005 WL 332811, at *3 (Del. Ch. Feb. 4, 2005).

[61] *In re James River Group, Inc. S'holder Litig.*, 2008 WL 160926, at *2 (Del. Ch. Jan. 8, 2008).

[62] *In re Del Monte Foods Co. S'holder Litig.*, 2011 WL 2535256, at *14 (Del. Ch. June 27, 2011).

24

of the litigation; (v) the stage at which the litigation ended; (vi) whether the plaintiff can rightly receive all the credit for the benefit conferred or only a portion thereof; and (vii) the size of the benefit conferred.[63]

Of these factors, the greatest weight is given to the benefit achieved by the litigation.[64]    In this case, each of these factors, and specifically the benefit achieved, counsel in favor of awarding Plaintiffs' full Fee and Expense Request.

## A.    THE SUBSTANTIAL BENEFIT PLAINTIFFS ACHIEVED

Defendants' abandonment of the Reclassification is a complete victory for Plaintiffs.    Plaintiffs' success in forcing Defendants to withdraw the Reclassification conferred a substantial benefit upon the Class A stockholders. The Reclassification would have prolonged Zuckerberg's voting control of Facebook and prevented the Class A stockholders from getting the voting control Zuckerberg's sale of shares would otherwise cause.

The preservation of Zuckerberg's voting control of Facebook while he sold off the majority of his equity stake was a fundamental shift from the Company's capital structure under its 2012 IPO.    The public bought into Facebook with the understanding that the structure would require Zuckerberg to retain a substantial

---

[63] *Id.* at *8 (quoting *In re Plains Res. Inc. S'holder Litig.*, 2005 WL 332811, at *3); *see also Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142 (Del. 1980); *Loral Space & Commc'ns, Inc. v. Highland Crusade Offshore Partners, L.P.*, 977 A.2d 867, 870 (Del. 2009).

[64] *In re Emerson Radio S'holder Derivative Litig.*, 2011 WL 1135006, at *3 (Del. Ch. Mar. 28, 2011) (citing *In re Anderson Clayton S'holder Litig.*, 1988 WL 97480, at *3 (Del. Ch. Sept. 19, 1988).

portion of his shares in order to maintain his voting control, and that Zuckerberg

had already signed the Giving Pledge under which he committed to donate at least

50% of his wealth to charitable causes during his lifetime or through his estate.[65]

Thus, the public stockholders had an expectation that at some point in the future,

control of Facebook would pass to them.  Zuckerberg accelerated that timeline

with his December 2015 announcement of his commitment to donate 99% of his

wealth to philanthropic causes through the Chan Zuckerberg Initiative ("CZI")

during his lifetime, sooner rather than later.[66]

In order to fulfill his public promise to give away 99% of his wealth during

his lifetime,[67] Zuckerberg will have to significantly reduce his economic stake in

Facebook.  The Reclassification would have allowed Zuckerberg to sell non-voting

stock instead, thereby maintaining his control.  Plaintiffs stepped in and forced

Zuckerberg to give up the Reclassification.  Now, as a result of this litigation,

---

[65] *See generally* Christensen Trans. Aff. Ex. 5   (Facebook Certificate of Incorporation); Christensen Trans. Aff. Ex. 9 ( "More U.S. billionaires pledge to give away wealth", Reuters (Dec. 9, 2010, available at http://www.reuters.com/article/us-wealth-philanthropy-billionaires-idUSTRE6B818R20101209).

[66] *See* Christensen Trans. Aff. Ex. 29  (https://www.facebook.com/notes/mark-zuckerberg/a-letter-to-our-daughter/10153375081581634/).

[67] Zuckerberg testified that he publicly announced his December 2015 pledge and moved 99% of his Facebook stock to CZI to demonstrate the strength of his commitment to his philanthropic goals and to be held publicly accountable for following through on them.  Christensen Trans. Aff. Ex. 12  (Zuckerberg Dep. Tr. at 290-92).

Zuckerberg's stock sales will result in Zuckerberg's surrendering voting control of Facebook to the Class A stockholders.  The Class A stockholders have a rightful expectation that the shift of control from Zuckerberg to them will happen, and will happen on an even shorter timeline than they originally expected at the time of Facebook's IPO, without the interference of the Reclassification.

As explained below, the Reclassification also would have allowed Zuckerberg to reduce his economic interest in Facebook from 14.79% to 4.39% while maintaining absolute voting control.  Economic evidence from numerous academic studies establishes that an increase like this would have caused substantial harm to the value of Facebook and thus, the value of the Class A stock. The termination of the Reclassification avoided this harm and thus conferred a substantial benefit on the Class A stockholders.

### B.   THE VALUE OF THE BENEFIT ACHIEVED FOR THE CLASS A STOCKHOLDERS DOES NOT HAVE TO BE SUSCEPTIBLE TO PRECISE MATHEMATICAL CALCULATION IN ORDER TO SUPPORT THE FEE AWARD

The value of the benefit conferred by this litigation, which should be assessed at the time it was conferred,[68] can be quantified with far more than the requisite level of precision required to assist this Court in determining an appropriate fee award.  "[T]he Delaware Supreme Court has described this Court's

---

[68] *In re Compellent Techs., Inc. S'holder Litig.*, 2011 WL 6382523, at *1 (Del. Ch. Dec. 9, 2011).

27

task," when setting a fee award, "as one of exercising its own 'sound business judgment.'"[69] The Court has "substantial discretion in the methods it uses and the evidence it relies upon" to quantify benefits.[70] "[S]cientific precision" is not required.[71] Fee awards may be based on "rough" calculations that fall short of "mathematical exactitude"[72] so long as they are "supported by the record" and the "product of a logical deductive process."[73] This Court has historically relied upon expert valuations, academic studies, and its own broad base of knowledge to value settlements. For example:

- In *Mosaic*, plaintiff's expert valued the benefit of a settlement that placed restrictions on high vote stock in a reclassification at 3.5% of the equity value of the company ($138 million) based on several academic studies and comparable transactions. The Court found this percentage conservative and fully supported the fee award.[74]

- In *Compellent*, the Court valued the settlement benefit of loosening deal protections in a merger using an 8% increase in the likelihood of a topping bid

---

[69] *Id.* at *21.

[70] *Id.*

[71] *Id.*

[72] *Id.* at **20-21 (citing *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1166 (Del. 1989)).

[73] *Goodrich v. E.F. Hutton Grp., Inc*., 681 A.2d 1039, 1042 (Del. 1996).

[74] *In re the Mosaic Company S'holder Litig.*, C.A. No. 6228-VCL at 48-51 (Del. Ch. Sept. 15, 2011) (TRANSCRIPT).

and an 11.37% average incremental value for a topping bid.[75]  The Court relied on

academic articles with empirical data and considered plaintiffs' expert report

"relevant and probative evidence" despite not being a "statistically valid study"

and based its fee award on its valuation of those benefits.[76]

- In *Safeway*, plaintiff's expert valued improvements to contingent

value rights at over $160 million, which the Court found fully supported the

requested fee.[77]  The Court further ruled that the termination of a rights plan caused

by the litigation in the $8 billion transaction provided a benefit worth "in the

vicinity of 70 million if you run the Compellent analysis," which also supported

the fee award.[78]

- In *Emerson,* the Court valued non-monetary benefits that reduced the

threat of future conflicted transactions based on the value of the challenged

conflicted transaction and the percentage likelihood of a transaction occurring with

and without the settlement, and awarded 25% of the value based on the stage of the

litigation.[79]

---

[75] 2011 WL 6382523, at **21-26.

[76] *Id.* at *22.

[77] *In re Safeway Inc. S'holder Litig.*, C.A. No. 9445-VCL at pp. 21-22 (Del. Ch. Sept. 17, 2014) (TRANSCRIPT).

[78] *Id.* at 22.

[79] *Emerson Radio*, 2011 WL 1135006, at *6; *see also In re Talecris Biotherapeutics Holdings S'holder Litig.*, 2011 WL 6078494 (Del. Ch. Dec. 5,

The value of the benefit conferred by this litigation can be quantified with sufficient certainty to support the Fee and Expense Request, as is shown by the three methodologies set forth below.

### 1. The Value of Control of Facebook, Which Will Pass to the Class A Stockholders Due to Plaintiffs' Efforts, Supports The Requested Fee

One of the key benefits conferred by this litigation is the elimination of the Reclassification's extension of Zuckerberg's control of Facebook.   Plaintiffs caused Defendants to revert to a capital structure that would see control of Facebook pass to the Class A stockholders once Zuckerberg relinquishes that control through the disposition of some of his shares.   Given Zuckerberg's commitment to donate 99% of his wealth during his lifetime, his relinquishment of control to the Class A stockholders is not only far more likely to happen, but also to happen sooner.

Delaware law recognizes that the ability to control a corporation carries value.[80]   In a recent opinion, this Court noted that there could be a "material"

---

2011) (ORDER) (plaintiff's expert valued appraisal rights, which were conferred by the settlement at $7.6 million, which the court found merited a fee in the range of $600,000 to $800,000).

[80] *See Gotham Partners LP v. Hallwood Realty Partners LP*, 817 A.2d 160 (Del. 2002) (affirming finding that general partner obtained voting control of limited partnership without fairly compensating the limited partners for their loss of voting control, and reversing and remanding for a determination of the full value of control taken); *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at n.14 (Del. Ch. Oct. 10, 2016) (quoting Gilson & Gordon, *Controlling Controlling*

potential value transfer to a controlling stockholder in a reclassification like the one at Facebook.[81]  Avoiding that "material" potential value transfer to Zuckerberg confers an equally material benefit on the Class A stockholders.

To measure the benefit to the Class A stockholders of the eventual gain of control from Zuckerberg, Sacks determined the value of control of Facebook by averaging the value of control found in academic studies of the private benefits of control ("Private Benefits of Control").[82]  When the average value of control found in these studies is applied to Facebook, the value of control is 3.02% of the market value of Facebook's Class A stock.[83]

---

*Shareholders*, 152 U. PA. L. REV. 785, 787 (2003) ("[T]he controlling shareholder secures value from its control position that is not received by the noncontrolling shareholders.  In turn, the controlling shareholder can extract the same value from control by selling it at a premium to the value of the non-controlling shares.").

[81] *IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 6335912, at *7 n.54 (Del. Ch. Dec. 11, 2017) ("That control of a corporation has value is well-accepted.  A controlling stockholder reaps a number of benefits from its position, including the ability to determine the outcome of director elections, to control the business operations of the corporation, and to seek a premium for its control block of shares.").

[82] The authors of these studies, experts in the field of economics, equate the value of control with the controller's ability to obtain personal benefits from the corporation.  These personal benefits, referred to in the academic literature as the Private Benefits of Control, are discussed in detail below.  When a controller receives a control premium in a change of control transaction, the economic reality is that the controller is capturing the value of the Private Benefits of Control that he or she is giving up.

[83] Christensen Trans. Aff. Ex. 4  (Sacks Supplemental Report at 3-4).

Sacks modified his analysis to account for the timing of when control would pass to the Class A stockholders. Zuckerberg has not revealed a timetable for all of his sales of Facebook stock.[84] The only real indication of that timing is his pledge to donate 99% of his wealth during his lifetime, and to do so sooner rather than later. Sacks, therefore, assumed that Zuckerberg could have maintained control of Facebook for another 40 years had the Reclassification been consummated.[85] Because the withdrawal of the Reclassification means that control will pass sooner than 40 years, Sacks used two points of time for his calculation – 10 years and 30 years – to give a broad range of timing. He calculated the present value of control passing to the Class A stockholders in 30 years instead of 40 years as $1.29 billion, and in 10 years instead of 40 years at $5.21 billion.

Sacks' conclusions are consistent with Evercore's determination of the value of control. Evercore evaluated select precedent transactions where a control premium was paid to a controller of a dual class company,[86] as well as change-in-control dual class recapitalizations where the high vote stockholders relinquished

---

[84] Zuckerberg disclosed some anticipated stock sales in the Form 8-K that announced the withdrawal of the Reclassification. *See* Christensen Trans. Aff. Ex. 1 (Facebook Form 8-K, filed Sept. 22, 2017).

[85] Zuckerberg is 33 years old. Forty years of control would keep him in control until he is 73 years old.

[86] Christensen Trans. Aff. Ex. 22 (EVERCORE00148883 at 92).

voting control, and found that the average amount of the premium paid to a controller is between 3% and 4% of the Company's low vote equity value.[87]

Evercore employed the following methodology.  Evercore initially identified 86 acquisitions of dual class companies since 1990, but data was only available for 71 acquisitions.[88]  Evercore narrowed the 71 acquisitions by applying three criteria: (i) high vote holders had greater than 30% voting power; (ii) high vote holders had less than 50% economic ownership; and (iii) greater than 1:1 voting ratio between the share classes.[89]  This resulted in 44 acquisitions.[90]  Of those 44 acquisitions, a premium was paid to the high vote stockholders in 11 transactions.[91]  Finally, using

---

[87] *Id.* at 93.

[88] *Id.* at 92.

[89] *Id.*

[90] *Id.*

[91]  *Id.*   In the other 33 transactions, no premium was paid, either because (i) although permitted by the charter, the transaction was not structured to provide such a premium (12 transactions) or (ii) the charter provisions called for either equal economic treatment or equal voting treatment (21 transactions).  Facebook's Restated Certificate of Incorporation permits differential consideration if each class separately approves the transaction.   The Amended and Restated Certificate of Incorporation that would have been effective if the Reclassification was implemented also permits differential consideration so long as the holders of a majority of the outstanding shares of Class A, Class B, and Class C stock, each voting as a separate class, pursuant to Section 3.10, approve an amendment to the charter eliminating the equal treatment provision in Section 3.6.

those 11 transactions, Evercore calculated the mean economic premium in the range of 3.1% (of total equity value) to 3.8% (of low vote equity value).[92]

Evercore also analyzed change-in-control dual class recapitalizations where the high vote stockholders relinquished voting control. Evercore identified 19 such recapitalizations since 1993. In all but one transaction, the high vote stockholders previously held greater than 50% of the voting power, and were subsequently reduced to below 50%. In those 19 recapitalizations, a premium was paid in nearly every transaction. The median premium paid was 3.5% and the average premium was 3.9%.[93] Evercore calculated the premia as a percentage of the value of the low vote equity.[94]

Evercore's finding that the average premium paid to a controller is between 3% and 4% of the Company's low vote equity value is consistent with Sacks' analysis and suggests that Sacks' estimate of the value of control is likely conservative.

### 2. Defendants' Expert's Analysis, When Corrected, Supports The Requested Fee

In defense of the claims asserted in the litigation, Defendants proffered Fischel's Expert Report ("Fischel Opening") in which he concluded that "public

---

[92] Christensen Trans. Aff. Ex. 22 (EVERCORE00148883 at 92).

[93] *Id.* at 93.

[94] *Id.*

shareholders typically have benefitted from recapitalizations even when the newly issued shares of low-vote stock trade at a discount."[95]   In support of this conclusion, Fischel cited 26 other companies that authorized and subsequently issued a new class of common stock with inferior voting rights during the period from January 1995 to April 2017 ("Precedent Transactions").[96]   Fischel analyzed the market reaction on the date each Precedent Transaction was announced (or if the announcement was issued after trading, the first trading date after the announcement).   He found that, across all 26 companies, the average excess return on the announcement date was a positive 0.72%.[97]

In his supplemental expert report, Sacks used Fischel's methodology, *arguendo*, but corrected Fischel's analysis by excluding certain Precedent Transactions based on circumstances that indicate they are either unreliable or not valid precedents for the Reclassification.   Fischel's positive average excess return is driven largely by two outliers:   Radio One, Inc. and Spinnaker Industries, Inc., both of which had excess positive returns close to 20%.[98]

---

[95] Christensen Trans. Aff. Ex. 40 (Fischel Opening at ¶ 56).

[96] *Id*. at ¶¶ 53-56, Exs. 8-10.

[97] *Id*. at ¶ 55, Ex. 9.

[98] Christensen Trans. Aff. Ex. 4  (Sacks Supplemental) at 10.   There are also other significant reasons to exclude Radio One and Spinnaker.   Radio One's reclassification was designed to raise equity for anticipated and ***pending*** mergers and acquisitions and therefore the excess return is likely driven by the market reaction to the prospect of other transactions.   *Id*. at 11 n. 16.   Market data for

After excluding the two outliers, Sacks also excluded Precedent Transactions where the companies were missing closing prices in the year leading to the reclassification announcement because this suggests the stock was thinly traded, or the market reaction to the announcement of the reclassification at those companies was confounded by another market-moving announcement, such as earnings.[99] With these corrections, the average excess return on the announcement date is *negative* 1.30%.[100] Thus, Sacks demonstrates that Fischel's analysis, when corrected, proves that the Class A stockholders benefitted by Defendants' decision to abandon the Reclassification in the range of at least $5.26 billion to $6.34 billion.

### 3. The Wedge Analysis Supports The Requested Fee

Sacks' expert report opined that the Reclassification would have reduced the value of the Class A stock by at least 1.16% of its market value.[101] The market value of 1.16% of the Class A stock was approximately $3 billion immediately

---

Spinnaker is unavailable, indicating that Spinnaker is a very thinly traded company and any excess return calculation would be speculative at best. *Id.*

[99] Christensen Trans. Aff. Ex. 4 (Sacks Supplemental) at 10-11.

[100] Sacks also reviewed Fischel's work to take into account Precedent Transactions that were announced with other confounding announcements (*e.g.,* positive earnings announcements, a change of control or significant dividend). With these corrections, the average excess return on the announcement date is *negative* 1.57%.

[101] Christensen Trans. Aff. Ex. 41(Opening Report of Benjamin Sacks ("Sacks Opening") at ¶ 6). Sacks found the negative effect on the Class A stock could be as high as 7.21%. *Id.* at ¶¶ 32, 37.

prior to the termination of the Reclassification.[102]  Sacks' analysis focused on the Reclassification's effect on the Class A stock as Zuckerberg reduced his equity stake while maintaining control.   The Reclassification would have allowed Zuckerberg to sell non-voting Class C stock so that his equity stake would go from 14.79% to 4.39% while he maintained his 53.78% of the voting power.[103]   This would have increased the difference between his voting power and equity stake by approximately 10%, from 38.99% to 48.85%.[104]

Sacks analyzed the harm caused to Class A stockholders by this increase based on numerous academic studies, five of which quantified the effect of changes in insider equity ownership and voting control on firm value:

- Paul A. Gompers *et al.*, *Extreme Governance: An Analysis of Dual-Class Firms in the United States*, 23 REV. FIN. STUD. 3 (2010) (analyzed U.S. dual-class firms between 1995-2002);

- Lindsay Baran & Arno Forst, *Disproportionate Insider Control and Board of Director Characteristics*, 35 J. CORP. FIN. 62 (Dec. 2015) (analyzed dual-class firms between 2000-2012);

- Belén Villalonga & Raphael Amit, *How Do Family Ownership, Control and Management Affect Firm Value?,* 80 J. FIN. ECON. 2, 385 (2006) (analyzed Fortune 500 firms between 1994-2000);

---

[102] Christensen Trans. Aff. Ex. 41 (Sacks Opening at ¶¶ 6, 14, 37).

[103] Christensen Trans. Aff. Ex. 41(Sacks Opening at ¶ 19-20 (this calculation excludes the percentage of votes  Zuckerberg controls by proxy)).

[104] Christensen Trans. Aff. Ex. 41(Sacks Opening at ¶¶ 19-20).

- Belén Villalonga & Raphael Amit, *How Are U.S. Family Firms Controlled?*, 22 REV. FIN. STUD. 3047 (2009) (analyzed Fortune 500 firms between 1994-2000); and

- Nilanjan Basu, *et al.*, *Multiple Blockholders*, *Power, and Firm Value*, 66 J. BANKING & FIN. 66 (May 2016) (analyzed U.S. firms between 2004-2009).[105]

These studies all find that agency problems occur when there is a difference between an insider's voting rights and cash flow rights, which is referred to as the "wedge."[106]   When insiders have greater voting rights than cash flow rights, they can make corporate decisions that produce Private Benefits of Control without suffering the same economic consequences of those decisions as the minority (or here, the low-vote) stockholders suffer.[107]   These agency problems become more pervasive as the wedge increases.[108]   The wedge studies *all find a reduction in firm value as the wedge increases*, based upon thousands of data points between 1994 and 2012[109] and multiple regression models to examine different variables.[110]

---

[105] These studies quantify the effect of changes in the wedge.  *See, e.g.*, Luigi Zingales, *What Determines the Value of Corporate Votes?*, 110 Q.J. Econ. 1047 (1995); Robert W. Masulis *et al.*, *Agency Problems at Dual-Class Companies*, 64 J. Fin. 1697 (2009); Alexander Dyck and Luigi Zingales, *Private Benefits of Control: An International Comparison*, 59 J. Fin. 537 (2004).

[106] Christensen Trans. Aff. Ex. 41(Sacks Opening at ¶¶ 7, 14-18, 19-27, Appendix at C1-8).

[107] *Id*.

[108] Christensen Trans. Aff. Ex. 41 (Sacks Opening at ¶ 14); *see also* Christensen Trans. Aff. Ex. 38 (Bebchuk Rebuttal at 58-61).

[109] Christensen Trans. Aff. Ex. 41(Sacks Opening at ¶ 32; Appendix at C1-8).

The Reclassification is a textbook example of one of these Private Benefits of Control.[111]   It was done solely for Zuckerberg's benefit, would have harmed the Class A stockholders and was pushed through by Zuckerberg's voting control despite overwhelming opposition by Class A stockholders.   It would have enabled Zuckerberg to control Facebook with far less equity even while he, for example, served in government for extended periods of time.   Zuckerberg also had other opportunities to enjoy less overt Private Benefits of Control.   For example, he could (i) direct new investments, talents and opportunities to CZI or some other charity or interest instead of Facebook,[112] (ii) make risky acquisitions motivated by a desire to increase Facebook's size and his influence, power and stature,[113] (iii) direct Facebook's business strategy to enhance his legacy and reputation or further his political and charitable agendas,[114] or (iv) block value-maximizing transactions for Facebook that could affect his ability to influence and control the business.[115]

Sacks did not assume Zuckerberg would do all or any of these things.   The Reclassification, however, would have let Zuckerberg increase his wedge, which

---

[110] Christensen Trans. Aff. Ex. 41(Sacks Opening at ¶ 24).

[111] *Id*. at ¶28.

[112] *Id*. at ¶¶ 23-28; Christensen Trans. Aff. Ex. 38  (Bebchuk Rebuttal at 55).

[113] Christensen Trans. Aff. Ex. 38  (Bebchuk Rebuttal at 56).

[114] Christensen Trans. Aff. Ex. 41 (Sacks Opening at ¶¶ 23-28); Christensen Trans. Aff. Ex. 38  (Bebchuk Rebuttal at 56-58).

[115] Christensen Trans. Aff. Ex. 41  (Sacks Opening at ¶¶ 23-24); Christensen Trans. Aff. Ex. 38  (Bebchuk Rebuttal at 55-57).

increases the likelihood that he might do any one of those or other value destroying acts, which reduces firm value.   This reduction in value is based on empirical evidence.   Sacks applied multiple regression models from each of the studies and, while the precise results differ, all predict a decline in Class A value.   These regression models all show a decline in Facebook's value of at least -1.16%.[116]

In his supplemental expert report, Sacks updated his analysis to calculate the harm averted by the cancellation of the Reclassification.[117]   Using updated market data, stockholdings and accounting information as of the date of the withdrawal of the Reclassification, Sacks found that the benefit realized by the Class A stockholders from the withdrawal of the Reclassification to be at least 0.96% of the Class A stock's market value, or $3.9 billion.   In addition, as Zuckerberg fulfills his promise to donate his wealth during his lifetime, the wedge may now shrink, rather than expand.   Thus, while the litigation saved the Class A stockholders from considerable harm in the short run (at least $3.9 billion), it should also result in a long run benefit as firm value increases should there be a reduction in the wedge.

### C.   THE FEE REQUESTED IS REASONABLE WHEN MEASURED AGAINST THE VALUE OF THE BENEFIT CONFERRED

---

[116] Christensen Trans. Aff. Ex. 41  (Sacks Opening at ¶¶ 30-37).

[117] Christensen Trans. Aff. Ex. 4 (Sacks Supplemental) at 15.

A fee can be awarded "on a percentage basis" when the benefit "is capable of some realistic financial valuation."[118]   The expert methodologies discussed above all estimate the benefit from the cancelation of the Reclassification as a percentage of market capitalization of Facebook and range, when expressed in dollar figures, from $1.29 billion to $27.59 billion.

A fee of $129 million is 10% of $1.29 billion[119], the lowest value found in Sacks' analysis of the value of control.  This modest percentage accounts for the nature of the benefit and difficulty in precisely quantifying it.  At the high end of the range of expert valuations ($27.59 billion), the requested fee would be less than one percent (0.46%) of the benefit conferred.

Defendants will no doubt contend that (i) the fee request is too rich and/or (ii) the fee request is unreasonable because the quantification of the benefit is uncertain.  These arguments lack merit.  *First*, the Court does not reduce attorneys' fees just because the benefit is financially large.[120]   That principle applies here,

---

[118] *Feldman v. Donegal Grp., Inc.*, C.A. No. 18786-VCJ at 29 (Del. Ch. Aug. 8, 2001) (TRANSCRIPT).

[119] Plaintiffs are requesting an "all in" Fee and Expense Award, which includes nearly $5 million in unreimbursed expenses.

[120] *Lewis v. Engle*, C.A. No. 497-VCS, at 22 (Del. Ch. Dec. 29, 2004) (TRANSCRIPT) ("If some plaintiff's lawyer goes to trial and wins a $10 billion recovery, I will say right now, that's when I am most likely to award 33 percent.  I just am.  Why?  Because that's when the real risk has been taken"); *In re Telecorp. PCS, Inc. S'holder Litig.*, C.A. No. 19260-VCS, at 102 (Del. Ch. Aug 20, 2003) (TRANSCRIPT) ("I would tend not to decline a percentage in a mega case"); *In re*

where Plaintiffs conferred a quantifiable financial benefit on stockholders who hold a huge portion of the equity of a corporation with an enormous market capitalization. A fee award should properly incentivize plaintiffs' counsel to fight hard for the best possible result against defendants with the greatest of resources, including in cases where the relief will likely not be money damages.[121] *Second*, Defendants should not be able to escape paying a proper fee simply because their own actions – in particular, deliberately pairing the announcement of both the Reclassification and its cancellation with confounding information – created uncertainty in the quantification of the benefits. Then-Chancellor Strine explained

---

*Am. Int'l Grp, Inc. Consol. Derivative Litig.*, C.A. No. 769-VCS, at 10 (Del. Ch. Jan. 25, 2011) (TRANSCRIPT) ("I've said this before and I will continue to say it – that, you know, you don't reduce people's fees because they gain much"); *In re Genentech, Inc. S'holders Litig.*, C.A. No. 3911-VCS, at 41 (Del. Ch. July 9, 2009) (TRANSCRIPT) ("And in a situation like this, where the benefit is so large, I – I'm not going to quibble about it, because the risk premium is important here. There is uncompensated work that gets done. There are cases where people take on risk and they don't get anything for it."); *In re Clear Channel Outdoor Holdings Inc. Deriv. Litig.*, C.A. No. 7315-CS, at 53 (Del. Ch. Sept. 9, 2013) ("We've always adhered to the idea that if you get a very solid recovery, you should have a very solid fee. That's the way the best incentive system works. You don't want to say, '[i]f you get really good results, we're going to shave your fee.' That doesn't make any sense.").

[121] *In re Loral Space and Commc'ns Inc. Consol. Litig.*, C.A. No. 2808-VCS at 75 (Del. Ch. Dec. 2, 2008) (TRANSCRIPT); *see also In re Southern Peru Copper Corp. S'holder Derivative Litig.*, C.A. No. 961-CS, at 85 (Del. Ch. Dec. 19, 2011) (TRANSCRIPT) (awarding plaintiffs' counsel 15% ($304 million) of the $2.031 billion benefit they created and noting that the award "creates a healthy incentive for plaintiffs' lawyers to actually seek real achievement for the…classes that they represent in class actions").

that "you don't reward people for doing hinkey things" by accepting their argument of "goodie for us, you can't precisely value it because we did such wacky stuff that no one can put a precise price on it."[122]   Likewise, Defendants cannot claim a fee discount here simply because a down-to-the-penny calculation is not practicable.   *Third*, the value of preventing the harm in the first place is greater than a damage award that may be imprecise.   The determination of damages is often not exact and is dependent on the selection of discount rates and other factors that involve subjective judgments.

Measuring the benefit achieved at its lowest value, Facebook's Class A stockholders have received a $0.54 per share benefit.   A $129 million fee award would mean that each Class A stockholder[123] would pay roughly $0.05 per share for that benefit.[124]   It "is certainly fair and reasonable" for the class to pay that much to Plaintiffs' Counsel for their fees and expenses in exchange for the valuable benefit the class received.[125]   Moreover, the indirect cost to the Class will be even less because (i) the Class does not own 100% of Facebook's equity and (ii)

---

[122] *Loral Space*, C.A. No. 2808-VCS at 39.

[123] The Co-Lead Plaintiffs in this matter each expressed their support for an award of the requested fee in their affidavits.  Christensen Trans. Aff. Exs. 44 and 45.

[124] *In re NCS Healthcare Inc., S'holders Litig.*, 2003 WL 21384633, at *3 (Del. Ch. May 28, 2003) (finding it "fair and reasonable" for the class to pay $0.25 per share to plaintiffs' counsel for a $3.90 per share benefit they enjoyed).

[125] *Id.*

the fee will likely be funded in part by sources outside Facebook like D&O insurance.

### D.   THE REMAINING *SUGARLAND* FACTORS ALSO SUPPORT THE FEE AND EXPENSE REQUEST

By itself the extraordinary benefit achieved supports the Fee and Expense Request.  Each of the secondary *Sugarland* factors also weighs in favor of the request.

### 1.   The Complexities Of The Case

This case had industry-wide implications, as it was set against the backdrop of tech company founders' demands for ever increasing voting control, and the public stockholders' growing dissatisfaction with the multi-class structures used to effectuate those demands.  The litigation was viewed as a test for whether the Silicon Valley mindset of outsized and perpetual founder control could be extended even further, and many thought Zuckerberg would prevail.

The case was legally complex because, at the time it was litigated, there was no case that definitively determined the standard of review or validity of transactions like the Reclassification.[126]  It was factually complex, involving three sets of principals and their respective advisors:  the Special Committee,

---

[126] Subsequently, on December 11, 2017, Chancellor Bouchard issued an opinion in *IRA Trust FBO Bobbie Ahmed*, finding that a reclassification proposed by NRG Yield, Inc.'s controlling stockholder was a conflicted transaction subject to entire fairness review even though it nominally involved a *pro rata* distribution of shares. 2017 WL 6335912 at *3.

Zuckerberg and Facebook, each of whom took aggressive and obstructionist positions on attorney-client privilege and were represented by sophisticated counsel.   Plaintiffs' Counsel successfully navigated this complexity and broke through veils of privilege to stop the Reclassification.

When this litigation forced Zuckerberg to back down and abandon the Reclassification, the financial community responded positively.   Indeed, *Bloomberg* reported:

> Silicon Valley spent more than a decade finding ways to give company founders more control.  When Facebook Inc. tried to follow suit, shareholders pushed back.
>
> Google started it with a 2004 initial public offering that gave co-founders Larry Page and Sergey Brin voting rights well beyond their economic stakes in the search giant.  Groupon Inc., Zynga Inc. and Facebook did it too, and this year Snap Inc. sold stock with no voting rights at all.
>
> In each case, investors went along, buying into the argument that founders need control so they can carry out their long-term visions.  Sometimes shareholders sued, and invariably lost.
>
> In 2015 Facebook doubled down with a proposed new share class to solidify co-founder Mark Zuckerberg's grip on the social media giant forever, even if he sold almost all of his stock.   Shareholders sued again, and this time they won. Facebook scrapped its plans on Friday, just days before a class action lawsuit challenging the move was set to go to trial.
>
> ***"This really is the death-knell for existing companies trying to adopt a non-voting share class,"*** said Ken Bertsch, executive

director at the Council of Institutional Investors, a nonprofit group that advocates for strong corporate governance.[127]

Plaintiffs have re-shaped the landscape with this watershed victory, and stockholders of all controlled corporations will benefit.

As the business world observed, Plaintiffs forcing Zuckerberg to back down was a "rare victory for shareholder activists"[128] that bucked the trend of technology company CEOs to "gain outsize control over their company, often at the cost of common shareholder input."[129]   Dual- and multi- class stock structures which confer enhanced control rights upon controllers rank among the foremost governance issues for investors today.  As this media commentary makes clear, corporate use of public equity without synonymous voting rights is a source of tremendous concern, making Plaintiffs' victory an important one with great significance to Facebook's public stockholders.

---

[127] Christensen Trans. Aff. Ex. 2  (Renick & Frier), *supra* n.3 (emphasis added).

[128] Christensen Trans. Aff. Ex. 42  (Kate Vinton, *Zuckerberg Drops Facebook New Share Class Proposal Aimed At Securing His Control*, FORBES (Sept. 22, 2017) https://www.forbes.com/sites/kathleenchaykowski/2017/09/22/zuckerberg-drops-facebook-new-share-class-proposal-aimed-at-securing-his-control/#8b51784140ce).

[129] Christensen Trans. Aff. Ex. 43  (Mike Isaac, *Facebook Drops Stock Move That Would Have Solidified Zuckerberg's Control*, NY TIMES (Sept. 22, 2017) https://www.nytimes.com/2017/09/22/technology/facebook-stock-reclassification-zuckerberg-control.html).

## 2.    Standing And Ability Of Plaintiffs' Counsel

The Court considers the standing and ability of Plaintiffs' Counsel in deciding the amount of a fee award.[130]   Plaintiffs' Counsel are well-known to this Court for their skill and expertise in representing stockholders in complex litigation.   In addition to their well-documented successes in previous litigation before this Court, their skill and experience is further evidenced by the result achieved here.   Plaintiffs prevailed against formidable opponents represented by experienced, skillful and well-respected firms.[131]   This Court adjudicates cases involving luminaries of the business world on a regular basis.   Rarely, however, does the Court see such luminaries wave the white flag of unconditional surrender on the eve of trial.   That Plaintiffs, through their counsel, were able to achieve such a victory against Zuckerberg, the Facebook Board and their litigation team further supports the award of the requested fee.

## 3.    The Lodestar Crosscheck Supports The Fee Request

Plaintiffs have presented the Court with three methodologies for valuing the benefit conferred by this litigation that are well-grounded in accepted economic principles and, therefore, properly support the Fee and Expense Request.   The

---

[130] *San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL 4273171, at *13 (Del. Ch. Oct. 28, 2010).

[131] The standing of opposing counsel may also be considered in determining an allowance of counsel fees.   *Seinfeld v. Coker,* 847 A.2d 330, 336 (Del. Ch. 2000).

lodestar crosscheck that this Court frequently employs likewise supports the requested fee.

Counsel litigated this matter on a fully contingent basis, investing nearly $8 million in time and approximately $4.3 million in expenses with no guarantee of any recovery. Moreover, the contingent risk was greater because this case did not involve a merger case or other transaction where relief would likely take the form of a monetary fund. Counsel was willing to risk their $12.3 million investment (and the additional time and money to see the case through to the end) and try, not settle, the case.

Delaware courts recognize that counsel is typically "entitled to a much larger fee when the compensation is contingent than when it is fixed on an hourly or contractual basis."[132] Delaware has a public policy to "reward this sort of risk taking in determining the amount of a fee award."[133]

---

[132] *Ryan v. Gifford*, 2009 WL 18143, at *13 (Del. Ch. Jan. 2, 2009); *see also In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1073-74 (Del. Ch. 2015) (quoting *In re Plains Res. Inc.*); *Franklin Balance Sheet Inv. Fund v. Crowley,* 2007 WL 2495018, at *12 (Del. Ch. Aug. 30, 2007) ("Fee awards should encourage future meritorious lawsuits by compensating the plaintiffs' attorneys for their lost opportunity cost (typically their hourly rate), the risks associated with the litigation, and a premium."); *In re Plains Res. Inc.*, 2005 WL 332811, at *6 ("[T]he plaintiffs' counsel were all retained on a contingent fee basis, and stood to gain nothing unless the litigation was successful. It is consistent with the public policy of Delaware to reward this risk-taking in the interests of shareholders."); *Chrysler Corp. v. Dann*, 223 A.2d at 389 (awarding greater fees considering the contingent nature of the action).

[133] *First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d 353, 365 (Del. Ch. 1999).

Plaintiffs' Counsel, collectively, devoted 13,636.7 hours to this matter, with a lodestar of $7,907,565.25 through September 22, 2017.[134] They also expended $4,276,353.38 in out-of-pocket expenses.[135] The requested award represents a 15.77x multiple of Plaintiffs' Counsel's lodestar,[136] with an implied hourly rate of $9,146.[137] These metrics are justified by comparison to awards in other cases.

Because of the extraordinary result achieved here, the *Southern Peru* litigation provides one of the best comparable cases for this analysis. There, the plaintiffs achieved the result that they sought – rescissory damages for an unfair interested transaction. After trial, the Court concluded that damages were $2 billion, and awarded the plaintiffs' attorneys' fees and expense reimbursement of 15% of that recovery, *i.e.*, $304 million.[138] The fee award represented a multiplier of 87 times lodestar (multiplier of 66 on lodestar plus expenses) and an implied hourly rate of $35,000. The Delaware Supreme Court held that this Court did not abuse its discretion in making that fee award, concluding that the "extraordinary

---

[134] Affidavit of Cynthia A. Calder A. Calder in Support of Co-Lead Counsel's Application for Award of Attorneys' Fees and Expenses.

[135] *Id.*

[136] $129 million award minus $4,276,353.38 expense reimbursement = $124,723,646.62 fee award. $124,723,646.62 fee award/$7.907 million lodestar = 15.77x multiplier.

[137] ($129 million fee award minus $4,276,353.38 expense reimbursement) /13,636.7 hours = $9,146.18 per hour.

[138] *Americas Mining Corp. v. Theriault*, 51 A.2d 1213 (Del. 2012).

benefit that was achieved in this case merits a very substantial award of attorneys' fees."[139]

While Plaintiffs here did not try their case as the *Southern Peru* plaintiffs did, they were literally just days from opening the trial when Defendants mooted the case.  Like in Southern *Peru*, Plaintiffs here achieved the full relief sought. And like the *Southern Peru* plaintiffs, Plaintiffs here were the sole cause of the extraordinary relief obtained.  In recognition of the nature of the benefit created here, however, Plaintiffs seek 10 percent of that benefit, which is just two thirds of the 15 percent fee award granted in *Southern Peru*.

This Court has awarded double digit multipliers even in shared credit cases where the litigation was not the sole cause of the benefit.  For example, in *In re Genentech, Inc. S'holders Litig.*, C.A. No. 3911-VCS (Del. Ch. July 9, 2009) (TRANSCRIPT), the plaintiffs sought to enjoin a controlling stockholder's tender offer.  At the same time, a special committee negotiated with the controller, which raised its offer from $86.50 to $93 per share, and subsequently to $95 per share. The Court determined that the stockholder litigation gave the special committee "leverage"[140] and the stockholder plaintiffs deserved "substantial credit" for the $2 price bump from $93 to $95, and "some credit" for the first increase from $86.50

---

[139] *Id*. at 1255.

[140] *Genentech*, C.A. No. 3911-VCS at 44, 49.

to $93.[141]   The Court awarded a fee of $24.5 million, which translated into an  11.3

multiplier and an hourly rate of $5,445.00.[142]

As then-Vice Chancellor Strine observed, plaintiffs should not be penalized

just because the numbers are large.[143]  Plaintiffs' being granted an 11.3 multiplier

in a shared credit case that settled long before trial provides strong support for the

award of a 15.7 multiplier in this sole credit case Defendants mooted on the eve of

trial.[144]

Mootness fees are not meant to be a consolation prize, particularly when the

mooting action is a complete withdrawal of the transaction on the eve of trial in

hard-fought litigation.  They are, like fees awarded after trial or in a settlement,

meant to incentivize plaintiffs' counsel to take on the difficult but meritorious

---

[141] *Id.* at 49.

[142] *Id.* at 56.   The Court also noted that the plaintiffs sought just 2.26% of the benefit created by the $2 bump ($934 million total), and that the percentage would be "far smaller" if the $6.50 bump were included ($1.8 billion).   *Id.* at 49. Likewise here, Plaintiffs base their request on the smallest valuation of the benefit.

[143] *Id.*

[144] Similarly, this Court granted plaintiffs' counsel a multiplier of 9x in *In re Digex Inc. S'holders Litig.*, C.A. No. 18336-CC at 141-47 (Del. Ch. Apr. 6, 2001) (TRANSCRIPT) where plaintiffs' counsel shared credit for the benefit achieved with a special committee.  *See also In re Clear Channel Outdoor Holdings Inc. Derivative Litigation*, C.A. No. 7315-CS (Del. Ch. Sept. 9, 2013) (TRANSCRIPT) (approving a $6 million fee award, representing a 10.5x multiplier and an hourly rate of $5,702.55, where plaintiff's action drove the formation of a special litigation committee and plaintiff successfully negotiated a $200 million (23.5%) reduction, and improved terms, of an intercompany cash management agreement between the subject company and its controlling stockholder).

cases and litigate them zealously.  As noted in both *Genentech* and *Clear Channel* – two of the highest implied multiple and hourly rates awarded by this Court – Plaintiffs' Counsel should be appropriately rewarded when the benefits attained are large and the risk is great, even when the implied hourly and lodestar figures are high.  "[I]n a situation like this where the benefit is so large ... the risk premium is important .... There is uncompensated work that gets done.  There are cases where people take on risk and they don't get anything for it."[145]  Here, the risk taken, the substantial benefits obtained and the litigation being the sole and direct cause of Defendants' decision to abandon the Reclassification justify the Fee and Expense Request.  The fee requested provides the proper incentives and is an appropriate reward for the hard work that Plaintiffs and their Counsel devoted to this matter and the result they achieved.

---

[145] *Genentech*, C.A. No. 3911-VCS at 53.

## III.   WHILE THE COURT IS NOT REQUIRED TO DO SO, IF THERE IS ANY QUESTION ABOUT THE FACTUAL RECORD, THE COURT SHOULD HOLD AN EVIDENTIARY HEARING

Plaintiffs' Counsel submit that the valuation methodologies presented herein are well-supported by both a detailed factual record and expert opinion relying upon robust academic studies.  Every fact supporting the Fee and Expense Request is supported by record evidence.  However, if the Court concludes that it needs additional testimony to be able to adjudicate the fee request, Plaintiffs' Counsel would be prepared to call four witnesses at an evidentiary hearing.[146]   The witnesses, and the topics Plaintiffs currently expect to cover with those witnesses, are as follows:

- Mark Zuckerberg:  By his own admission, Zuckerberg requested that the Board abandon the Reclassification.   Plaintiffs are entitled to question Zuckerberg as to why he asked that the Reclassification be withdrawn.  Moreover, only Zuckerberg knows the rate at which he will sell his Facebook stock,[147] which will determine when control of Facebook will pass from him to the Class A stockholders.

---

[146] Plaintiffs reserve the right to call additional witnesses should they deem additional witnesses to be necessary in light of the briefing that follows this application and/or the testimony as it unfolds at the hearing.

[147] This issue in particular might require credibility determinations counseling for in-person testimony.

- William Hiltz of Evercore:  Hiltz can testify to Evercore's analysis that valued control of Facebook at 3.8% to 4% of Facebook's market capitalization.

- Benjamin Sacks:  Sacks will testify as to the opinions and valuation methodologies set forth in his Supplemental Report, submitted with this application.

- Any expert Defendants relied upon in opposing Plaintiffs' Fee and Expense Request.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant the Fee and Expense Request.

DATED:  February 2, 2018

**GRANT & EISENHOFER P.A.**

OF COUNSEL:

**KESSLER TOPAZ MELTZER
    & CHECK, LLP**
Lee D. Rudy
Eric L. Zagar
J. Daniel Albert
Grant Goodhart
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

*/s/ Cynthia A. Calder*
Stuart M. Grant (#2526)
Cynthia A. Calder (#2978)
Joseph Christensen (#5146)
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000

**PRICKETT, JONES & ELLIOTT, P.A.**
Michael Hanrahan (#941)
Paul A. Fioravanti, Jr. (#3808)
Corinne Elise Amato (#4982)
Eric J. Juray (#5765)
1310 N. King Street
Wilmington, Delaware 19801
(302) 888-6500

**Words:  12,611**

55