ROBBINS GELLER RUDMAN
  & DOWD LLP
DENNIS J. HERMAN (220163)
JASON C. DAVIS (253370)
KENNETH J. BLACK (291871)
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
dherman@rgrdlaw.com
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

BERNSTEIN LITOWITZ BERGER &
  GROSSMANN LLP
JOHN C. BROWNE
JEREMY P. ROBINSON
KATE W. AUFSES
1251 Avenue of the Americas
New York, NY  10020
Telephone:  212/554-1400
212/554-1444 (fax)
johnb@blbglaw.com
jeremy@blbglaw.com
kate.aufses@blbglaw.com

Co-Lead Counsel for the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re FACEBOOK, INC. SECURITIES LITIGATION | Master File No. 5:18-cv-01725-EJD |
| | CLASS ACTION |
| This Document Relates To: | CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | |
| | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .................................................................................................1

II.  PARTIES .........................................................................................................10

    A.  Plaintiffs..................................................................................................10

    B.  Defendants ...............................................................................................11

III.  JURISDICTION AND VENUE ......................................................................13

IV.  BACKGROUND AND OVERVIEW OF DEFENDANTS' FRAUD SCHEME............14

    A.  Facebook's Business ...............................................................................14

        1.  Facebook's Business Depends on Monetizing User Data Through the Sale of Targeted Advertising ...................................................15

        2.  Facebook's Success in Selling Ads Depends upon the Active Use of Its Platforms by Users Willing to Share What They and Their Friends Are Doing..........................................................................17

        3.  Facebook's Success in Retaining and Attracting Active Users Depends upon the Company's Reputation as a Trusted Platform that Will Protect User Privacy ...................................................19

        4.  Prior to and During the Class Period, Facebook Repeatedly Touted Its Privacy Protection Practices and the Company's Purported Commitment to Vigorous Enforcement of the Same................................20

    B.  Facebook Has Repeatedly Disregarded and Concealed Violations of User Privacy ....................................................................................................22

        1.  In 2012, Facebook Agreed to an Extraordinary 20-Year FTC Consent Decree Arising from Its Repeated Failures to Protect User Data and Privacy..........................................................................24

        2.  Facebook Secretly Continued to Ignore Threats to User Privacy Even After the Consent Decree Was Entered ...........................................26

    C.  In 2015, Defendants Learned that Data from Tens of Millions of Users Had Been Sold to Cambridge Analytica in Violation of Facebook's Terms of Use ......................................................................................................29

        1.  Contrary to Defendants' Public Representations, Facebook Did Not Take Any Meaningful Steps to Assure that Cambridge Analytica Destroyed the User Data..........................................................34

        2.  Facebook Waited Six Months, Until Defendants Knew the Risks to the Company Had Increased Following the Brexit Vote, to Take Any Action to Address the Data Breach..........................................35

**Page**

3. Defendants Deliberately Decided Not to Notify Affected Users that Their Data Had Been Compromised.................................................37

4. Defendants Knew that the Certifications Obtained from Cambridge Analytica Were Unreliable to Assure Data Had Been Deleted ................39

D. As Scrutiny into Brexit and Russian Election Interference Intensified, Defendants Knew that the Risks to the Company and its Users from Undisclosed Privacy Breaches Had Increased ..........................................43

1. Defendants Continued to Tout Facebook's Privacy Protections While Concealing Its Past Privacy Violations....................................44

2. Facebook's Chief Privacy Enforcement Officer Was Forced Out Amid Internal Disputes over the Company's Privacy Disclosures...........47

3. The Cambridge Analytica Scandal Was Just the Tip of the Iceberg, as Numerous Other Undisclosed Business Practices Exposed User Data to Risk of Harm ...............................................................48

E. Facebook's Failure to Respond to the Cambridge Analytica Breach in a Manner Consistent with Its Prior Public Statements Is Revealed, Causing Massive Economic Losses to the Class ..................................................54

1. Facebook's Privacy Misconduct Sparked Numerous Government Investigations ..................................................................61

2. Defendants Admit Fault for the Cambridge Analytica Privacy Failure .........................................................................65

F. Defendants Recklessly and Falsely Assured Investors that the Cambridge Analytica Scandal Had Not Affected Facebook's User Engagement or Financial Results, Reinflating Facebook's Stock Price ...........................70

1. Defendants Tout Facebook's 1Q18 Results as Demonstrating Users Were Unconcerned with the Cambridge Analytica Scandal ...........70

2. Zuckerberg Falsely Assures Investors that European Privacy Regulations Are Not Impacting the Business ...............................74

3. Defendants Continued to Falsely Downplay Reports of Privacy Risks Ahead of Facebook's 2Q18 Earnings Release............................76

G. Facebook's 2Q18 Financial Results Reveal the Huge Impact the Data Privacy Scandal Had on Facebook's User Engagement, Advertising Revenues and Earnings, Leading to a Stunning $100 Billion Loss in Facebook's Value..................................................................80

V. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE WITH SCIENTER DURING THE CLASS PERIOD ..................83

Page

A. Defendants Recklessly Made Materially False and Misleading Statements Concerning Facebook's Response to the Cambridge Analytica Data Leak ..........84

B. Defendants Recklessly Made Materially False and Misleading Statements Concerning Facebook's Privacy Practices ................................87

   1. April 2017 Privacy White Paper ................................87

   2. Sandberg Misrepresents the Strength of Facebook's Privacy Policies and Its Compliance with GDPR Requirements ............................89

   3. Misrepresentations Concerning the Use of Facebook's Platform to Influence the Outcome of U.S. Elections................................92

   4. Facebook's DAU and MAU Metrics Were Misleading in Context..........95

C. Defendants Recklessly Made Materially False and Misleading Statements Following Disclosure of Facebook's Failure to Respond to the Cambridge Analytica Data Breach in a Manner Consistent with Its Public Statements ..........99

   1. Misrepresentations Concerning Reports of Past Privacy Violations .........99

   2. Misrepresentations Concerning Facebook's 1Q18 Financial Results and the Impact of the Privacy Disclosures on Facebook's Business ................................108

D. Defendants Recklessly Made Materially False and Misleading Statements Concerning Risks to the Company's Business ....................................117

   1. Data Breaches ................................117

   2. Unfavorable Media and Regulatory Investigations ................................119

   3. Privacy Policies................................122

   4. Privacy Regulation and FTC Consent Decree ................................127

VI. ADDITIONAL SCIENTER ALLEGATIONS................................128

A. Zuckerberg's $5.3 Billion Aggregate Sales ................................132

B. Sandberg's $389 Million Insider Sales ................................136

C. Wehner's $21 Million Insider Sales ................................137

VII. ADDITIONAL ALLEGATIONS OF RELIANCE, MATERIALITY, LOSS CAUSATION AND DAMAGES................................138

A. Market Efficiency ................................138

**Page**

      B.      Loss Causation and Damages ............................................................................139

VIII.   CLASS ACTION ALLEGATIONS ...................................................................147

IX.     CLAIMS FOR RELIEF ....................................................................................149

X.      PRAYER FOR RELIEF ....................................................................................154

XI.    JURY DEMAND ...............................................................................................155

1    Lead Plaintiff Amalgamated Bank, as Trustee for the Long View LargeCap 1000 Growth

2  Index Fund, LongView Quantitative LargeCap Fund, and LongView Quant LargeCap Equity VEBA

3  Fund ("Amalgamated"), and Public Employees' Retirement System of Mississippi ("Mississippi,"

4  and, together with Amalgamated, "Lead Plaintiffs"), by and through their respective undersigned

5  attorneys, on behalf of themselves and the Class (as defined below) of investors in the publicly

6  traded common stock of Facebook, Inc. ("Facebook" or the "Company"), allege the following in

7  support of their claims for violation of the Securities Exchange Act of 1934 ("1934 Act") and Rule

8  10b-5 promulgated thereunder against Facebook and certain of its officers and directors.[1]

9  **I.    INTRODUCTION**

10    1.    This securities class action arises from defendants' materially false and misleading

11  statements and omissions concerning Facebook's privacy and data protection practices and their

12  impact of defendants' privacy misconduct on Facebook's business and financial condition.  It is

13  brought on behalf of all persons who purchased Facebook common stock between February 3, 2017

14  and July 25, 2018, inclusive (the "Class Period"), against Facebook and three of its officers and/or

15  directors: Chief Executive Officer ("CEO") Mark Zuckerberg, Chief Operating Officer ("COO")

16  Sheryl K. Sandberg and Chief Financial Officer ("CFO") David M. Wehner (collectively,

17  "defendants").   As set forth below, when the full truth concerning defendants' Class Period

18  misrepresentations was revealed, including misconduct that Zuckerberg himself admitted was a

19  "major breach of trust,"[2] Facebook precipitously shed more than $100 billion in shareholder value.

20    2.    Facebook derives virtually all of its revenue from monetizing the personal

21  information – data – that it collects from the people who use its social media platforms.  It does so

22  

23  [1]   Except as to allegations concerning themselves and their respective transactions in Facebook stock, the allegations by Amalgamated and Mississippi are made on information and belief based
24  upon an investigation conducted by and at the direction of the undersigned Lead Counsel, including: (i) review of the Company's filings with the U.S. Securities & Exchange Commission ("SEC") and
25  other government agencies here and abroad; (ii) information on the Company's website and in media and analyst reports and other public statements by or about the Company or its representatives; and
26  (iii) information obtained from other sources believed to be reliable, as described herein.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth
27  herein after a reasonable opportunity for discovery.

28  [2]   F8 2018 Developer Conf. Tr. at 9 (May 1, 2018).

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                         - 1 -

1   through the sale of "targeted advertising" that is based on Facebook users' personal information,

2   including their online activities, the pages they visit, the posts they "liked," and the people they

3   "friended."  While Facebook users generally understood that the Company was using their personal

4   data in order to tailor the ads that they would see on its platforms, they trusted Facebook to keep that

5   personal data private, to not share it directly with advertisers or other third parties without their

6   express consent, and to act in accordance with its public statements regarding the steps it would take

7   to protect their privacy.

8          3.     Unbeknownst to users – and investors – this trust was misplaced.  Facebook was not

9   doing what it said to protect users' privacy, placing the personal data of millions of users at risk.

10  These failures presented huge – and undisclosed – risks to the Company, because the success of its

11  targeted advertising depended on users' willingness to actively use its social media platforms, where

12  they would generate – and share – the data on which those ads were based.  If user engagement

13  declined, or if users became less willing to share the data they generated on Facebook's platforms,

14  Facebook's ability to generate the billions of dollars in revenues it earned from the sale of targeted

15  ads would diminish.  And the number one thing that could cause users to disengage or refuse to share

16  their data was their lack of trust that the Company was protecting the privacy of their information.

17         4.     As defendants have frequently acknowledged, the Company's reputation as a

18  trustworthy social media platform where users control their data and can share personal information

19  without worry that their privacy will be compromised is the fundamental cornerstone of Facebook's

20  business.  Defendants have therefore sought to foster this trust by repeatedly assuring users of their

21  commitment to protecting their privacy.  The Company's Data Use Policy explicitly assured users

22  that Facebook "do[es] not share information that personally identifies you with advertising,

23  measurement or analytics partners unless you give us permission."[3]  Defendants made similar

24  assertions on numerous occasions, particularly when questions or concerns were raised about what

25  Facebook was doing to protect user privacy.  For example, in an interview in October 2017, when

26  the use of Facebook user data to influence elections in the United States and abroad had come under

27  _____

28  [3]    Facebook Data Policy (Sept. 29, 2016).

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                                    - 2 -

1    scrutiny, Sandberg told users: "when you share on Facebook you need to know that no one's going

2    to steal our data.  No one is going to get your data that shouldn't have it . . . and that you are

3    controlling who you share with."[4]

4          5.     To the extent that unauthorized disclosure of private data occurred, Facebook assured

5    users that the Company would provide "[n]otifications to specific people" victimized by the

6    disclosure, as well as "[p]roactive notifications" to users at risk.[5]  The Company also assured users

7    that violators of its policies would be punished, and any compromised data would be retrieved or

8    deleted as soon as Facebook learned of an unauthorized disclosure.  Through these and the other

9    misstatements set forth herein, defendants portrayed the Company as a trustworthy social media

10   platform with strong privacy protections that allowed users to control their personal data.  In addition

11   to assuring users that their data would be protected, these statements assured investors that the

12   Company was actively and aggressively confronting the risks to its business model from privacy

13   breaches that could reduce use of its platforms and diminish the success of its targeted ads.

14         6.     In 2014 and 2015, Facebook learned that a political consulting firm called Cambridge

15   Analytica had obtained the personal data of tens of millions of Facebook users without their

16   knowledge or consent.  The data was used to build complex psychological profiles of Facebook

17   users that became the basis for targeted political advertising designed to trigger some of the worst

18   characteristics in people, such as paranoia and racial bias.  Facebook was well aware of Cambridge

19   Analytica's activities, including because in November 2014 it had hired one of the two co-founders

20   of the affiliated company that had been formed to funnel the user data to Cambridge Analytica, and

21   had put him to work at its Menlo Park headquarters.

22         7.     Cambridge Analytica's unauthorized access to and use of Facebook user data was

23   reported by *The Guardian* in December 2015.[6]  Defendants responded to the article with feigned

24   _____

25   [4]   Interview by Mike Allen with Sheryl Sandberg, Chief Operating Officer of Facebook, Axios
     (Oct. 12, 2017), https://tinyurl.com/y9k7mlok.

26   [5]   Jen Weedon, William Nuland & Alex Stamos, Information Operations and Facebook (Version
     1.0) (Apr. 27, 2017).

27   [6]   Harry Davies, *Ted Cruz using firm that harvested data on millions of unwitting Facebook users*,
28   The Guardian (Dec. 11, 2015), https://tinyurl.com/kctlw6n.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                    - 3 -

surprise, vigorously assuring users, investors, regulators and the public at large that any compromised data would be deleted, that violators would be punished, and that it would halt any misuse of its users' data. As a Company spokesman told *The Guardian*: "[W]e will take swift action against companies that [violate Facebook's privacy policies], including banning those companies from Facebook and requiring them to destroy all improperly collected data."[7] Facebook would use variations of this statement over and over thereafter, whenever questions about its ability to protect its users' privacy were raised, including during the Class Period.

8. Behind the scenes, however, Facebook's primary concern was minimizing the public relations fallout from the scandal. Rather than acting immediately to retrieve the data or punish the violators of its privacy policies, Facebook reached out to Cambridge Analytica for assistance in casting doubt on the newspaper's report. Facebook did ***nothing*** to try to retrieve the compromised data until six months later, after news reports raised concerns about Cambridge Analytica's interference in the British Brexit vote – and Facebook's response to the prior data breach was certain to come under increasing scrutiny.

9. Even then, Facebook did nothing but send a short letter asking Cambridge Analytica to confirm it had deleted the personal data of tens of millions of Facebook users. Despite knowing how widely such data could have been distributed and how difficult it was to retrieve it once it was sent to third parties, Facebook made no effort to verify Cambridge Analytica's assurances, investigate the extent of its use or distribution of the data, or verify that the data had in fact been deleted. Nor did the Company notify affected users whose data had been compromised or take any action against Cambridge Analytica or its affiliates for violating the Company's privacy policies. Zuckerberg later admitted "we didn't do enough," which was a "huge mistake [and] [i]t was my mistake."[8]

10. Facebook did not even notify the Federal Trade Commission ("FTC") – as required under numerous state laws and a 2012 FTC consent decree that was in place throughout the Class

---

[7]   *Id.*

[8]   Toby Shapshak, *It Was My Mistake Zuckerberg Admits, While Facebook Didn't Do Enough To Prevent Abuse*, Forbes (Apr. 4, 2018), https://tinyurl.com/y83cjlp3.

Period.[9]  Acknowledging both a failure to protect privacy and a violation of the consent decree, Sandberg stated on April 6, 2018, "the FTC consent decree was important.  And we've taken every step we know how to make sure we're in accordance with it.  But the bigger answer is, should we have taken these steps years ago anyway?  And the answer to that is yes, like a very clear, a very firm yes."[10]

11.     As a result of Facebook's failure to respond to the Cambridge Analytica data breach in a manner consistent with its public statements, a massive amount of compromised Facebook data – later estimates would reveal that more than 87 million users were affected – remained in the hands of malicious actors.  Moreover, as defendants knew at the time but has only recently been revealed to the public, Facebook's privacy failures had permitted thousands of other app developers and other third parties to access user data without their knowledge or consent, presenting similar risks violating user privacy rights.

12.     By concealing the truth from users and investors, defendants misled the market and concealed material risks regarding the most critical aspect of Facebook's business – its reputation as a trustworthy platform where users could share and control their private information.  Defendants also concealed the true extent of the risks facing Facebook in connection with privacy issues, including the risk of slowing growth resulting from user's lessening their activity or restricting the data that could be shared as its platform.  These risks also included that the Company would have to materially increase spending on privacy measures was required to provide the level of protection described in Facebook's policies and their public statements in response to the Cambridge Analytica scandal.  Defendants further knew or recklessly disregarded that the Company was at significant risk and could become subject of increased government oversight and potentially costly fines and regulation.

---

[9]    Sarah Frier, *Former FTC Technologist Says Facebook Violated Consent Decree*, Bloomberg (June 19, 2018), https://tinyurl.com/y8wz8vvr; *In the Matter of Facebook, Inc.*, No. C-4365, Decision and Order at 3-4, 6 (F.T.C. July 27, 2012).

[10]    Steve Inskeep, *We Did Not Do Enough To Protect User Data, Facebook's Sandberg Says*, NPR (Apr. 6, 2018), https://tinyurl.com/y8u7keyb.

13.    At the same time defendants were concealing these material risks from the market, they were selling billions of dollars' worth of their own Facebook shares.  During the Class Period, Zuckerberg sold approximately 30,000 Facebook shares for proceeds of more than ***$5.3 billion***, while Sandberg sold $389 million worth and Wehner $21 million worth during the same period. These sales greatly exceeded defendants' sales prior to the Class Period.  They included particularly large sales during the first quarter of 2018 – more than triple the amount they had sold in the last quarter of 2017 – before news of Facebook's failure to address the Cambridge Analytica breach in the manner it had previously stated became public, as did reports of numerous other failures by the Company to act in a manner consistent with its public statements and posted privacy policies.

14.    On March 17, 2018, *The Guardian* reported that Facebook had delayed taking action to address the Cambridge Analytica data breach, and that not all of the affected user data had been deleted.[11]  In an article published the same day, *The New York Times* reported that Facebook's failure to comply with its privacy policies was "one of the largest data leaks in the social network's history."[12]  The revelation that – contrary to its numerous prior public statements – Facebook had waited six months to even attempt to delete the compromised data, could not verify whether that had been done, and had made no effort to investigate the extent of the breach or notify affected users or the FTC sent shockwaves through users, investors, regulators and the public at large.  These disclosures directly contradicted defendants' prior representations and caused the price of Facebook's common stock to drop nearly 7% on Monday, March 19, 2018, the first trading day after the news broke.  In the days that followed, the U.S. Congress and British Parliament called for inquiries, former Facebook insiders came forward with accounts of repeated warnings that had been given and ignored by Zuckerberg and other members of management, and calls for users to disengage from the platform – #DeleteFacebook – took off.

---

[11]   Carole Cadwalladr & Emma Graham-Harrison, *Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach*, The Guardian (Mar. 17, 2018), https://tinyurl.com/y9yhysal; Carole Cadwalladr (@carolecadwalla), Twitter (Mar. 22, 2018), https://tinyurl.com/y9l77t5d.

[12]   Matthew Rosenberg, Nicholas Confessore & Carole Cadwalladr, *How Trump Consultants Exploited the Facebook Data of Millions*, N.Y. Times (Mar. 17, 2018), https://tinyurl.com/ybj4ulek.

15.     By March 27, 2018, Facebook's stock was trading as low as $152 per share, a stunning drop of nearly 18% in value from its price just before news of the Cambridge Analytica scandal broke, reflecting an extraordinary loss of more than $100 billion in market capitalization . As recognized in a March 2018 report by one of the world's leading corporate governance and proxy advisors, Institutional Shareholder Services ("ISS"), Facebook's "failure to protect its users' privacy has eroded the level of trust among users, calling into question the company's business model and its governance."[13]

16.     The revelation of defendants' privacy misconduct also sparked numerous government investigations.  On March 26, 2018, the FTC formally announced an investigation into Facebook's breach of the consent decree in response to "substantial concerns about the privacy practices of Facebook."[14]  On July 12, 2018, *The Wall Street Journal* reported that the SEC was investigating "whether Facebook Inc. adequately warned investors that developers and other third parties may have obtained users' data without their permission or in violation of Facebook policies."[15]  The former Director of the FTC has publicly stated that Facebook's actions represent "'***a serious breach of the FTC's consent***.'"[16]

17.     Meanwhile, defendants embarked on an orchestrated apology tour, repeatedly admitting their failure to protect user privacy or live up to their prior assurances.  Zuckerberg signed full page advertisements in several U.S. and U.K. newspapers conceding that Facebook's response to the Cambridge Analytica data breach was a "***breach of trust***," and apologizing that "we didn't do

---

[13]    Oshni Arachchi, *Trouble in Tech: a Crisis of Trust in Social Media*, ISS-Ethix at 3 (Mar. 28 2018), https://tinyurl.com/y84p6hjc.

[14]    Press Release, Federal Trade Commission, Statement by the Acting Director of FTC's Bureau of Consumer Protection Regarding Reported Concerns about Facebook Privacy Practices (Mar. 26, 2018), https://tinyurl.com/y794spyd.

[15]    Dave Michaels, *SEC Probes Why Facebook Didn't Warn Sooner on Privacy Lapse*, Wall St. J., (July 12, 2018), https://tinyurl.com/ycttv9hs.

[16]    *Facebook may have breached a 2011 Consent Agreement, FTC says*, Fortune (Mar. 30, 2018), https://tinyurl.com/ybh4lnb4.  All citations are omitted and emphasis is added unless otherwise noted.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                                                                          - 7 -

1   more at the time."[17]   In other interviews and on his personal Facebook page, Zuckerberg took

2   "responsibility" for this breach of trust told reports that Facebook's actions in response to the

3   Cambridge Analytica scandal were "clearly a mistake . . . I'm not trying to say it was the right thing

4   to do."

5         18.     On April 4, 2018, Facebook announced it would overhaul its privacy practices to

6   better protect user information, admitting "*we believe most people on Facebook could have had*

7   *their public profile scraped*" by "malicious actors" mining their data.  Facebook also, for the first

8   time, started to notify data misuse victims and "tell people if their information may have been

9   improperly shared with Cambridge Analytica."[18]

10        19.     In the wake of the Cambridge Analytica scandal, additional information concerning

11  Facebook's Class Period privacy misconduct came to light, including that Facebook was still

12  permitting third parties with access to user data without their knowledge or consent.  In addition,

13  both before and after the Cambridge Analytica scandal, investors and analysts were concerned about

14  Facebook's preparedness for impending European privacy legislation referred to as the General Data

15  Protection Regulation (the "GDPR").  Defendants claimed because that compliance would not be an

16  issue, Facebook purportedly "had almost all of what's in [the GDPR] implemented for years, around

17  the world."  These assurances were materially misleading, including because numerous users were

18  opting out of data sharing, resulting in a material decline in European users that jeopardized the

19  Company's growth.

20        20.     Despite the public admissions that Facebook's privacy and enforcement practices

21  were not what they had been portrayed to be during the Class Period, defendants rushed to assure

22  investors that the disclosures had only minor impacts on user engagement and would not have a

23  material impact  on the Company's financial performance.  For example:

24

25

---

26  [17]   Sheena McKenzie, *Facebook's Mark Zuckerberg says sorry in full-page newspaper ads*, CNN
    (Mar. 25, 2018), https://tinyurl.com/yawxvkga.

27  [18]   Mike Schroepfer, *An Update on Our Plans to Restrict Data Access on Facebook*, Facebook
28  Newsroom (Apr. 4, 2018), https://tinyurl.com/yb35fawn.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                          - 8 -

- When Zuckerberg testified before Congress on April 10-11, 2018, he represented that Facebook had seen no dramatic declines in the number of Facebook users and ***no decrease*** in user interaction on Facebook whatsoever.

- When Facebook shareholders formally proposed that the Company explore implementing a "risk oversight committee" and issue related reports[19] due to concerns that "[t]he Cambridge Analytica scandal and the misuse of data to influence elections around the world,"[20] defendants opposed the requests, assuring investors that Facebook's existing risk oversight was adequate. The shareholder proposals were not adopted.

- When Facebook reported its 1Q18 results on April 25, 2018, defendants said that user activity had increased, advertising effects were *de minimis*, and increased spending on security in the wake if the Cambridge Analytica scandal was already reflected in the quarterly results.[21]

- On May 31, 2018, Zuckerberg told investors relatively few users were taking advantage of new privacy regulations in Europe requiring users to opt in to data sharing (rather than the historic opt-out procedures), assuring investors that the Company's business model was not at risk because the "vast majority"[22] of users had opted in to Facebook's use of their data for advertising and other purposes.

21. Buoyed by a favorable first quarter 2018 ("1Q18") earnings report and the purported lack of financial impact resulting from the Cambridge Analytica scandal, Facebook's stock price immediately climbed by more than 9% following the 1Q18 earnings report. Facebook's stock price continued to climb thereafter, as defendants continued to make positive statements about their response to the recent controversy and the health of Facebook's business in its wake. By July, Facebook's stock price was trading well above $200 per share.

---

[19] Facebook's Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 at 51 ("Proposal Four: Stockholder Proposal Regarding A Risk Oversight Committee") and 55 ("Proposal Six: Stockholder Proposal Regarding A Content Governance Report") (Apr. 13, 2018).

[20] Letter from Jonas Kron, Snr. Vice President, Trillium Asset Management to Facebook Shareholders (Apr. 17, 2018 ), https://tinyurl.com/ycskmtdv. *See also* Letter from Natasha Lamb, Managing Partner, Arjuna Capital & Michael W. Frerichs, Illinois State Treasurer (and others) to Facebook Shareholders (May 17, 2018), https://tinyurl.com/y9mugt89 ("Facebook's controversies have a direct impact on the Company's market value" including because "[f]ollowing the Cambridge Analytica disclosures, Facebook shares lost approximately $100 billion in market value.").

[21] 1Q18 Facebook, Inc. Earnings Call Tr. at 15 (Apr. 25, 2018).

[22] Facebook, Inc. Annual Shareholders Meeting Tr. at 16-17 (May 31, 2018).

22.     On July 25, 2018, the Company reported its second quarter 2018 ("2Q18") earnings, stunning investors when Facebook finally revealed that its privacy misconduct had in fact hit the Company's bottom line and seriously impacted its business.  Among other things, defendants reported a significant decline in users in Europe, zero user growth in the United States, decelerating worldwide growth of active users (*i.e.*, those most responsible for generating data used in targeted advertising), lower than expected revenues and earnings, ballooning expenses affecting profitability, and reduced guidance going forward.  All of this was a direct result of the disclosures concerning Facebook's true privacy practices, including its misrepresentations about its efforts to prevent and address events like the Cambridge Analytica data breach and the impact of GDPR.  Indeed, Zuckerberg opened the July 25, 2018 investor conference call by discussing "all the investments we've made over the last 6 months to improve safety, security and privacy across our services," which had "significantly impact[ed] our profitability."[23]

23.     Market reaction to the Company's 2Q18 earnings report and conference call was swift and severe, causing the price of Facebook's common stock to ***drop by nearly 19%*** on July 26, 2018, for a staggering single-day ***loss of approximately $100 billion in market capitalization*** that was the ***largest such one-day drop in U.S. history***.  By July 30, 2018, the price of Facebook stock had fallen by 21%, shedding approximately $112 billion in market capitalization.  This action seeks to recover for the enormous damages suffered by Facebook investors.

## II.     PARTIES

### A.     Plaintiffs

24.     Plaintiff Amalgamated is an investment bank with over $4 billion in assets that serves thousands of labor unions, nonprofits, social impact enterprises, political organizations, foundations and individuals.  Amalgamated has been offering investment management services since 1973, and has over $40 billion in assets under management and custody.  Amalgamated is the trustee for the LongView LargeCap 1000 Growth Index Fund, the LongView Quantitative LargeCap Fund, and the LongView Quant LargeCap Equity VEBA Fund, each of which purchased Facebook common stock

---

[23]    2Q18 Facebook, Inc. Earnings Call Tr. at 3 (July 25, 2018).

1   during the Class Period and was damaged thereby, as set forth in the certification attached hereto as

2   Exhibit A and incorporated herein by reference.

3        25.    Plaintiff Mississippi (or "PERS") is a public retirement system that serves the state of

4   Mississippi.  Founded in 1952, PERS provides retirement benefits for individuals working in

5   Mississippi's state government, public schools, universities, community colleges, municipalities,

6   counties, legislature, highway patrol, and other public entities.  It currently has over 300,000

7   members, including over 100,000 retiree and beneficiary members, and approximately $26.5 billion

8   in assets under management.  Mississippi purchased Facebook common stock during the Class

9   Period and was damaged thereby, as set forth in the certification schedule attached hereto as Exhibit

10   B and incorporated herein by reference.

11        26.    Ernestine Bennett, Fan Yuan, Fern Helms and James Kacouris are the plaintiffs in

12   putative class actions filed against Facebook and its officers and directors that have been

13   consolidated into this proceeding.  Like the other members of the proposed Class, each of these

14   plaintiffs alleges in their respective complaints that they purchased Facebook common stock at the

15   artificially inflated prices prevailing in the market during the Class Period and were damaged

16   thereby.

17       **B.**    **Defendants**

18        27.    Defendant Facebook is a Delaware corporation with its principal place of business

19   located in Menlo Park, California, where it owns and leases 3 million square feet of office buildings

20   and 130 acres of land for future expansion.  Facebook's common stock is traded under the ticker

21   "FB" on the NASDAQ Global Select Market ("NASDAQ"), an efficient market.  As of December

22   31, 2017, the Company had 25,105 employees.  In its FY17 Report on Form 10-K, the Company

23   stated: "We use our investor.fb.com and newsroom.fb.com websites as well as Mark Zuckerberg's

24   Facebook Page (https:/www.facebook.com/zuck) as means of disclosing material non-public

25   information and for complying with our disclosure requirements under Regulation FD."[24]

26

27

28   _____

[24]   Facebook, Inc. Annual Report (Form 10-K) at 7 (Feb. 1, 2018).

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                         - 11 -

28.     Defendant Zuckerberg founded Facebook in 2003 and is its CEO and Chairman of the Board.  Zuckerberg controls Facebook.  The Company has two classes of common stock, giving Zuckerberg the ability to control more than half of the voting power of the Company.  Because Zuckerberg controls a majority of the Company's voting power, Facebook is considered a "controlled company" pursuant to corporate governance rules for NASDAQ-listed companies.  As a result, Facebook does not need to have a majority of independent directors, a compensation committee, or an independent nominating function (directors are responsible for nominating members to the Company's board).  Zuckerberg personally appointed more than half of Facebook's Board of Directors, including himself, and has the authority to make major decisions by himself.

29.     As set forth herein, Zuckerberg controlled the Company, had knowledge of or access to inside information concerning Facebook, including the conduct described below, and had a duty to disseminate accurate information concerning Facebook and to correct any misleading statements, which he violated in making the misrepresentations and omissions alleged herein.   Indeed, Zuckerberg was personally involved in developing Facebook's data security platform and, according to his own admissions, personally responsible for the data security breach and other facts, transactions and circumstances alleged herein.  For example, Zuckerberg has publicly stated that he is "responsible for what happens on our platform"[25] and testified that "I started Facebook, I run it, and I'm responsible for what happens here."[26]  Zuckerberg also specifically admitted responsibility and apologized for the Cambridge Analytica data breach, testifying that the situation "was a big mistake.  And it was my mistake.  And I'm sorry."  *Id*.  During the Class Period, Zuckerberg sold 29,680,150 shares, netting gross proceeds of $5,330,078,471.

30.     Defendant Sandberg is, and at all relevant times was, COO of Facebook.  Since she was appointed COO in March 2008, Sandberg has run the Company's business operations and is Zuckerberg's "right hand" in running the Company.  Sandberg has served on Facebook's Board of

[25]   Kif Leswing, *Mark Zuckerberg and Sheryl Sandberg respond to Cambridge Analytica scandal,* Business Insider (Mar. 21, 2018), https://tinyurl.com/ybn2hhsp.

[26]   Transcript of Senate Commerce, Science and Transportation Committee and Senate Judiciary Committee Joint Hearing on Facebook, ASC Servised II Media, LLC. (Apr. 10, 2018).

1   Directors since June 2012.  As set forth herein, Sandberg controlled the Company, had knowledge of
2   or access to inside information concerning Facebook, including the conduct described below, and
3   had a duty to disseminate accurate information concerning Facebook and to correct any misleading
4   statements, which she violated in making the misrepresentations and omissions alleged herein.
5   Indeed, Sandberg has asserted that she is responsible for "controls on the Company" relating to data
6   security and she holds herself "responsible for the [controls] we didn't have."[27]  "[W]e run the
7   company," Sandberg has said. *Id*.  During the Class Period, Sandberg sold 2,589,000 shares, netting
8   gross proceeds of $389,943,538.

9       31.     Defendant Wehner is, and at all relevant times was, CFO of Facebook.  Since he was
10  appointed CFO in June 2014, Wehner has run the finance, facilities and information technology
11  functions at Facebook.  From November 2012 to June 2014, Wehner served as Facebook's Vice
12  President, Corporate Finance and Business Planning.  As set forth herein, Wehner controlled the
13  Company, had knowledge of or access to inside information concerning Facebook, including the
14  conduct described below, and had a duty to disseminate accurate information concerning Facebook
15  and to correct any misleading statements, which he violated in making the misrepresentations and
16  omissions alleged herein.  During the Class Period, Wehner sold 130,201 shares, netting gross
17  proceeds of $21,417,346.

18      32.     Defendants Zuckerberg, Sandberg and Wehner are collectively referred to herein as
19  the "Executive Defendants."  The Executive Defendants made, or caused to be made, false
20  statements that caused the price of Facebook common stock to be artificially inflated during the
21  Class Period.

22  **III.     JURISDICTION AND VENUE**

23      33.     The claims asserted herein arise under and pursuant to §§10(b), 20(a) and 20A of the
24  1934 Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated
25  thereunder by the SEC.

26

27  [27]  *Full video and transcript: Facebook COO Sheryl Sandberg and CTO Mike Schroepfer at Code
28  2018*, Recode (May 30, 2018), https://tinyurl.com/y8rbhr2v.

34.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

35.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Facebook maintains its headquarters in Menlo Park, California, and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

36.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## IV.     BACKGROUND AND OVERVIEW OF DEFENDANTS' FRAUD SCHEME

### A.     Facebook's Business

37.     Facebook is the world's largest social networking company.  The Company offers a number of products and platforms that can be accessed by personal computers, smartphones and other devices, including facebook.com, Instagram, Messenger, WhatsApp and Oculus.   The Company's FY17 Form 10-K claims that these platforms enable users to "connect and share with friends and family," "discover and learn about what is going on in the world around them," and "share their opinions, ideas, photos and videos, and other activities with audiences ranging from their closest friends to the public at large."

38.     According to Facebook's FY16 Form 10-K:

The geography of our users affects our revenue and financial results because we currently monetize users in different geographies at different average rates.  Our revenue and ARPU[28] in regions such as United States & Canada and Europe are relatively higher primarily due to the size and maturity of those online and mobile advertising markets.  For example, ARPU in 2016 in the United States & Canada region was more than eight times higher than in the Asia-Pacific region.[29]

---

[28]   Facebook defines ARPU as "Average Revenue Per User."   "We define ARPU as our total revenue in a given geography during a given quarter, divided by the average of the number of MAUs in the geography at the beginning and end of the quarter."

[29]   Facebook, Inc. Annual Report (Form 10-K) at 36 (Feb. 1, 2018).

39.     Facebook does not provide investors with segmented information about how the various platforms it operates are performing.  Instead, Facebook's reports to the SEC outlined in its FY17 Form 10-K assert that:

> Our chief operating decision-maker is our Chief Executive Officer who makes resource allocation decisions and assesses performance based on financial information presented on a consolidated basis.  There are no segment managers who are held accountable by the chief operating decision-maker, or anyone else, for operations, operating results, and planning for levels or components below the consolidated unit level.  Accordingly, we have determined that we have a single reportable segment and operating unit structure.[30]

40.     Because the Company does not provide investors with financial reports segmented by platform, there is no way for investors or analysts to know how much of Facebook's advertising revenue growth came from acquired platforms, such as Instagram, and how much resulted from the Company's original and largest platform, facebook.com.  This prevents Company outsiders from assessing how the main Facebook website is performing in the Company's most lucrative markets, the United States and Europe.

**1.     Facebook's Business Depends on Monetizing User Data Through the Sale of Targeted Advertising**

41.     Facebook generates revenue almost entirely through the sale of advertisements that are "targeted" towards particular users based on the users' personal data. Targeted advertisements are ads designed for specific and customizable audiences, and Facebook allows advertisers to target ads to particular Facebook users based on not only geography and demographics, but also on custom searches of user data.

42.     These targeted advertisements are extremely lucrative for Facebook.  In FY17, Facebook reported $40.6 billion in revenue, and $39.9 billion of that, or over 98%, came from targeting advertising and marketing placement.  Prior to that, Facebook had reported five straight years of rapidly increasing revenue growth, derived overwhelmingly from the sale of targeted advertising:

| Revenue ($mns) | 2016 | 2015 | 2014 | 2013 | 2012 |
|---|---|---|---|---|---|
| **United States** | $   12,579 | $   8,513 | $   5,649 | $   3,613 | $   2,578 |

---

[30]   Facebook, Inc. Annual Report (Form 10-K) at 69 (Feb. 1, 2018).

| Rest of World | 15,059 | 9,415 | 6,817 | 4,259 | 2,511 |
| Total | 27,638 | 17,928 | 12,466 | 7,872 | 5,089 |

43.     Facebook claimed in its FY18 Form 10-K that it was able to generate this revenue because its "ads enable marketers to reach people based on a variety of factors including age, gender, location, interests, and behaviors."[31]  As one *Seeking Alpha* author explained in a March 19, 2018 report: "Facebook's business model relies on its high traffic, but its real 'moat' is its exclusive control over a vast array of very detailed user data that allows micro-targeting advertising."[32]

44.     Facebook's success is driven by the Company's possession of the data uploaded to its platform by billions of Facebook users, including not just their demographic and personal information, but also the people they have "friended," the pages and posts they have visited and those that they have "followed" or "liked."[33]  Together, this data gives marketers insight into the products or services that would interest a particular user.  This treasure trove of data allows marketers to direct advertising to targeted individuals most likely to purchase their products and services, increasing the success of promotional campaigns and generating billions of dollars in revenue for Facebook.

45.     Facebook sells targeted advertising not only on its primary platform, but also on applications, or "apps," developed by third parties and integrated into Facebook's platform.  For example, a game app, like Candy Crush, can represent a significant source of revenue to Facebook based on the ads that are placed in front of users as they play the game.  The creation and existence of entertaining or informative "apps" also helps attract new users and engage existing users.  Thus, as part of its strategy to increase its user base and its users' level of engagement, and in turn make its platform more attractive to potential advertisers and other fee-based partnerships, Facebook enables developers to build social applications on Facebook and to integrate their websites with Facebook.

---

[31]   Facebook, Inc. Annual Report (Form 10-K) at 5 (Feb. 1, 2018).

[32]   Erich Reimer, *The Cambridge Analytica Mishap Is Serious For Facebook*, Seeking Alpha, (Mar. 19, 2018) https://tinyurl.com/y8htltro.

[33]   Facebook users can "follow" a page or "like" a post by clicking on a button embedded on its website or in its app.

46.     A key aspect of Facebook's growth strategy with respect to apps was to provide app developers access to Facebook's vast stockpile of user data.  Indeed, as Sandy Parakilas, a former Facebook operations manager responsible for privacy issues, has explained, the Company was keen to encourage more developers to build apps for its platform, and "'one of the main ways to get developers interested in building apps was through offering them access to this [user] data.'"[34]  A critical problem with this strategy from a privacy perspective, however, was that a user could consent to app developers gaining access to the personal data of his or her **friends** without the knowledge or consent of those friends.  As discussed below, it was because of this feature that Cambridge Analytica was able to harvest data from over 87 million users, when only approximately 270,000 users actually consented to sharing their data.

> **2.     Facebook's Success in Selling Ads Depends upon the Active Use of Its Platforms by Users Willing to Share What They and Their Friends Are Doing**

47.     Given the importance of user data to the success of the Company's targeted advertisements, Facebook's financial performance depends on its success in attracting active users to its platform.  As the Company acknowledged in its FY17 Form 10-K:

> The size of our user base and our users' level of engagement are critical to our success.  Our financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging active users of our products, particularly for Facebook and Instagram.[35]

48.     Simply put, engaged users generate more advertising revenue for Facebook.  As the Company stated in its FY17 Form 10-K:

> Trends in the number of users affect our revenue and financial results by influencing the number of ads we are able to show, the value of our ads to marketers, the volume of Payments transactions, as well as our expenses and capital expenditures.[36]

49.     As noted in the March 28, 2018 ISS report, the fact that "Facebook derives almost all of its revenue from advertising" – for example, earning as much as 98% of its revenue from

---

[34]   Paul Lewis, '*Utterly Horrifying*': *ex-Facebook insider says covert data harvesting was routine*, The Guardian (Mar. 20, 2018), https://tinyurl.com/ybdonk3p.

[35]   Facebook, Inc. Annual Report (Form 10-K) at 8 (Feb. 1, 2018).

[36]   *Id*. at 35.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                                                                      - 17 -

1  advertising in 2017 – signaled, among other things, "a quantification of [the] trust and confidence

2  that the company ha[d] managed to construct amongst its users."[37]

3      50.    To provide investors with insight into user engagement, Facebook regularly reports

4  the average number of daily active users ("DAUs") and monthly active users ("MAUs") on its

5  platform.[38] As of December 31, 2017, Facebook reported 1.4 billion DAUs and 2.13 billion MAUs,

6  both of which it said represented 14% growth over the prior year.[39] According to its FY17 Form 10-

7  K, the Company "view[s] DAUs and DAUs as a percentage of MAUs, as measures of user

8  engagement."[40] DAUs and MAUs, along with average revenue per user ("ARPU") are identified in

9  Facebook's annual reports as the key metrics by which the Company measures the success of its

10  business plan.[41]

11      51.    For example, during the Company's November 1, 2017, third quarter 2017 ("3Q17")

12  earnings call, Wehner opened his prepared remarks by providing the same "community metrics" he

13  provides every quarter, and describing defendants' attention to those metrics and to efforts to

14  improve them:

15          Let's begin with our community metrics.  Daily active users in Q3 reached
            1.37 billion, up 16% compared to last year. . . .  MAUs were up 284 million year-
16          over-year or 16%. . . .

17          Before going to the financials, let me touch briefly on our ongoing effort to
            improve our user estimate.  This quarter, we implemented a new methodology to
18          help identify duplicate accounts.[42]

19

---

20  [37]  Oshni Arachchi, *Trouble in Tech: a Crisis of Trust in Social Media*, ISS-Ethix at 3 (Mar. 28
21  2018), https://tinyurl.com/y84p6hjc.

22  [38]  Facebook, Inc. Annual Report (Form 10-K) at 7 (Feb. 1, 2018).  A DAU is defined in
    Facebook's SEC reports as "a registered Facebook user who logged in and visited Facebook through
23  our website or a mobile device, or used our Messenger application (and is also a registered Facebook
    user) on a given day."  *Id.* at 38.  An MAU is defined similarly, as a registered user who logged in
24  and visited the site or used Messenger "in the last 30 days."

25  [39]  *Id.* at 37.

26  [40]  *Id.* at 38.

27  [41]  *Id.* at 7, 23, 38.

28  [42]  3Q17 Facebook, Inc. Earnings Call Tr. at  6-7 (Nov. 1, 2017).

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                    - 18 -

52.     During the same November 1, 2017 3Q17 earnings call, defendants reported that using the new methodology had resulted in significant increases to the number of duplicate and fake accounts identified on the platform.  As reported on the call, duplicate accounts represented in its MAU metric increased from 6% to 10%, while estimated false accounts may have represented 3% to 4% (up from 2% to 3% two quarters earlier) of its monthly active users worldwide.

53.     In addition to measuring user engagement in the aggregate, Facebook has created a sophisticated system for monitoring granular data about users' engagement with Facebook's platform, such as any action a user takes reacting to, commenting on or sharing an ad, claiming an offer, viewing a photo or video, or clicking on a link.  Defendants encourage their customers to review these metrics when making business decisions, and, because customers do, the Executive Defendants paid close attention to and continuously improved these metrics.

### 3.     Facebook's Success in Retaining and Attracting Active Users Depends upon the Company's Reputation as a Trusted Platform that Will Protect User Privacy

54.     The personal data provided by users is essential to the success of Facebook's business, because without it Facebook would not be able to sell billions of dollars in targeted advertising.  In order to attract users to Facebook and convince them to share their personal data with the Company, Facebook assures users that the Company will protect the information they provide and keep it private.

55.     Facebook has acknowledged that its reputation as a trustworthy platform for sharing personal information is critical to its success.  As early as 2011, Zuckerberg stated in a Facebook post that Facebook's users "feel comfortable sharing things about their real lives" because they believed that they had "complete control over who they share with at all times."[43]

56.     More recently, after the disclosures regarding Cambridge Analytica in March 2018, Facebook and its executives reiterated the importance of privacy protections to Facebook's business model.  As Zuckerberg stated in a March 21, 2018 interview with *Recode*:

---

[43]    Mark Zuckerberg, "*Our Commitment to the Facebook Community*," Facebook (Nov. 29, 2011), https://tinyurl.com/ybovhlqp.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

The No. 1 thing that people care about is privacy and the handling of their data.  You know, if you think about it, the most fundamental thing that our services are, whether it's Facebook or Whatsapp or Instagram, is this question of, "Can I put content into it?"  Right?  Whether it's a photo, or a video or a text message.  And will that go to the people I want to send it to and only those people?  And, whenever there is a breach of that, that undermines the fundamental point of these services.  So I think *it's a pretty big deal*, and that's why we're trying to make sure we fully understand what's going on, and make sure that this doesn't happen again.[44]

57.     In another interview with Freakonomics, recorded in the summer of 2017 but posted online April 1, 2018, Zuckerberg stated that "*people engage and share their conte[n]t and feel free to connect because they know that their privacy is going to be protected*."[45]

58.     Sandberg also reiterated this point in a March 22, 2018 CNBC interview, where she stated that users' belief that their personal data is protected "goes to the core of our service."[46]  In her words, maintaining users' belief that their data was safe is "the most important thing we can do for running this company."[47]

59.     ISS made the same point in its March 28, 2018 report, stating that the fact that "Facebook derives almost all of its revenue from advertising" signals, among other things, "a quantification of [the] trust and confidence that the company has managed to construct amongst its users."[48]

### 4.     Prior to and During the Class Period, Facebook Repeatedly Touted Its Privacy Protection Practices and the Company's Purported Commitment to Vigorous Enforcement of the Same

60.     Recognizing the critical importance of privacy to the success of the Company's business model, defendants made repeated representations to users, investors and the public at large about the effectiveness of the Company's privacy controls.  For example, Facebook's January 2015

---

[44]   Interview by Kara Swisher and Kurt Wagner, with Mark Zuckerberg, Chief Operating Officer of Facebook, Recode (Mar. 22, 2018), https://tinyurl.com/ycy5zuru.

[45]   Interview by Stephen J. Dubner with Mark Zuckerberg, Chief Operating Officer of Facebook, Freakonomics Radio, https://tinyurl.com/yc7e3p8u.

[46]   Interview by Julia Boorstin, with Sheryl Sandberg, Chief Operating Officer of Facebook, CNBC (Mar. 22, 2018), https://tinyurl.com/yd9b2ezo.

[47]   *Id.*

[48]   Oshni Arachchi, *Trouble in Tech: a Crisis of Trust in Social Media*, ISS-Ethix at 3 (Mar. 28 2018), available for download at https://tinyurl.com/y84p6hjc.

1   Data Use Policy assured that the Company would not share users' personal data absent their consent,

2   stating that: "[w]e do not share information that personally identifies you (personally identifiable

3   information is information like name or email address that can by itself be used to contact you or

4   identifies who you are) with advertising, measurement or analytics partners unless you give us

5   permission."[49]

6   　　　　61.   Each of the Executive Defendants has likewise spoken publicly about the Company's

7   strong commitment to protecting user privacy.  For example, in a Facebook earnings call prior to the

8   Class Period, Zuckerberg told investors that the Company had created "a space that had the kind of

9   privacy that no one had ever seen before."[50]  Zuckerberg also has publicly touted how "[p]rotecting

10  the privacy of the people on Facebook is of utmost importance to us."[51]  Zuckerberg has also

11  specifically represented that Facebook users "have control over how [their] information is shared" on

12  Facebook; "we do not share [users] personal information with people or services [they] don't want";

13  "we do not give advertisers access to [users'] personal information"; and "we do not and never will

14  sell any of [Facebook's users] information to anyone."[52]  And, when recently questioned about

15  Facebook's privacy protections, Zuckerberg has made assurances that, unlike "those other services

16  [i.e. Google, Yahoo! or Microsoft]," users of Facebook "have control over every single thing that

17  [they]'ve shared on Facebook."[53]

18  　　　　62.   Sandberg made similar statements on repeated occasions both before and during the

19  Class Period.  Indeed, as far back as April 2014, in an article specifically discussing targeted

20  advertising, Sandberg assured the public that "[p]rivacy is of the utmost concern and importance to

21  [49]   Facebook Data Policy (Jan. 30, 2015), https://tinyurl.com/y7hofbd4.

22  [50]   Anita Balakrishnan, Sara Salinas and Matt Hunter, *Mark Zuckerberg has been talking about*
23  *privacy for 15 years – here's almost everything he's said*, CNBC (Mar. 21, 2018),
    https://tinyurl.com/y9pd8nct.

24  [51]   Graham Ruddick, *Facebook forces Admiral to pull plan to price car insurance based on posts*,
25  The Guardian (Nov. 2, 2016), https://tinyurl.com/hg9t6pl.

26  [52]   Mark Zuckerberg, *From Facebook, answering privacy concerns with new settings,* Wash. Post
    (May 24, 2010), https://tinyurl.com/y976ksab.

27  [53]   Mark Zuckerberg & Sheryl Sandberg on "Charlie Rose" Tr. at 37 (Nov. 7, 2011),
28  https://tinyurl.com/ybxaddgs.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                    - 21 -

Facebook and it's important to us that the people who use our service know that we are very protective of them.  It is their data, they have control of it, they share it."[54]  During the Class Period, Sandberg reiterated these statements, representing in October 2017 that, "[w]hen [users] share on Facebook, you need to know that no one is going to steal your data, no one is going to get your data that shouldn't have it . . . and that you are controlling who you share with."[55]

### B.   Facebook Has Repeatedly Disregarded and Concealed Violations of User Privacy

63.    In contrast to defendants' public assurances, the Company has repeatedly ignored threats to user privacy where addressing or correcting the problem would threaten Facebook's growth.  Insiders warned senior management that ignoring privacy breaches was risky and exposed the Company to serious consequences, including regulatory and enforcement actions and negative publicity that could erode user trust in the platform, leading to declining user engagement, less effective advertising and declining revenues.

64.    According to a June 18, 2016 memorandum posted on the Company's internal website by Facebook Vice President Andrew Bosworth, who has been described as one of "Zuckerberg's most trusted lieutenants":

> ***The ugly truth is that we believe in connecting people so deeply that anything that allows us to connect more people more often is \*de facto\* good.***  It is perhaps the only area where the metrics do tell the true story as far as we are concerned.
>
> That isn't something we are doing for ourselves.  Or for our stock price (ha!).  It is literally just what we do.  ***We connect people.  Period.***
>
> ***That's why all the work we do in growth is justified.  All the questionable contact importing practices.***  All the subtle language that helps people stay searchable by friends.  All of the work we do to bring more communication in.  The work we will likely have to do in China some day.  All of it.
>
> *            *            *
>
> I know a lot of people don't want to hear this.  Most of us have the luxury of working in the warm glow of building products consumers love.  But make no

---

[54]   Press Association, *Facebook's Sheryl Sandberg defends targeted ads*, The Guardian (Apr. 22, 2014), https://tinyurl.com/yccmwl8g.

[55]   Gideon Lichfield, *Watch Sheryl Sandberg's technique for shielding Facebook from hard questions*, Quartz at Work (Oct. 13, 2017), https://tinyurl.com/ybjmxykz.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

mistake, **growth tactics are how we got here**. If you joined the company because it is doing great work, that's why we get to do that great work. We do have great products but we still wouldn't be half our size without pushing the envelope on growth. Nothing makes Facebook as valuable as having your friends on it, and no product decisions have gotten as many friends on as the ones made in growth.[56]

65.    The memo, originally posted to "rally the troops" in response to controversy sparked by the live streaming of a shooting death on Facebook, stated that collateral damage to users was irrelevant: "So we connect more people. That can be bad if they make it negative. Maybe it costs a life by exposing someone to bullies. Maybe someone dies in a terrorist attack coordinated on our tools. And still we connect people."[57]

66.    Senior Facebook executives made a deliberate decision to minimize privacy concerns in order to emphasize user growth. According to Sandy Parakilas, a former Facebook operations manager, who "led Facebook's efforts to fix privacy problems on its developer platform" in advance of its IPO, Facebook "prioritized data collection from its users over protecting them from abuse," because "[t]he more data [Facebook] has [to] offer, the more value it creates for advertisers," meaning "it has no incentive to police the collection or use of that data – except when negative press or regulators [we]re involved."[58]

67.    Parakilas further explained that Facebook "allocated resources in a way that implied that they were almost entirely focused on growth and monetization at the expense of user protection" and that he "could not get engineers to build or maintain some of the compliance functions that [he] felt were necessary."[59]

---

[56]    The description was in an article by *Buzzfeed News* accompanying the memo, both of which were published on March 29, 2018. *Buzzfeed* reported that, as of the time its article was published, the memo was still available and regularly accessed on Facebook's internal website. Ryan Mac, Charlie Warzel and Alex Kantrowitz, *Top Facebook Executive Defended Data Collection in 2016 Memo – And Warned That Facebook Could Get People Killed,* Buzzfeed News (Mar. 29, 2018), https://tinyurl.com/yd96zp7t.

[57]    *Id.*

[58]    Sandy Parakilas, *We Can't Trust Facebook to Regulate Itself*, N.Y. Times (Nov. 19, 2017), https://tinyurl.com/y7k86jcv.

[59]    Noah Kulwin, *'Facebook Is a Fundamentally Addictive Product,'* Intelligencer: N.Y. Mag., https://tinyurl.com/y9fu64rw.

1              **1.      In 2012, Facebook Agreed to an Extraordinary 20-Year FTC**
                   **Consent Decree Arising from Its Repeated Failures to Protect**
2                  **User Data and Privacy**

3          68.     Facebook's cavalier attitude towards user privacy has led to repeated regulatory

4    violations and other problems.  Each time, defendants have responded by downplaying the problems

5    and portraying them as isolated violations of its internal policies.  And time and time again,

6    Facebook has told users, regulators and the public that internal privacy policies would be

7    strengthened and vigorously enforced in the future.

8          69.     On November 29, 2011, the FTC announced that Facebook had agreed to settle

9    "charges that it deceived consumers by telling them they could keep their information on Facebook

10   private, and then repeatedly allowing it to be shared and made public."[60]  Among the charges that

11   were settled were allegations that Facebook had represented that third-party apps on its platform

12   would only have access to user data "that they needed to operate," when, in fact, "***the apps could***

13   ***access nearly all of users' personal data – data the apps didn't need***."[61]

14         70.     The FTC alleged that Facebook told its users that:

15                 (a)     they could restrict access to information by selecting a "Friends Only" setting

16   when, in fact, that setting "did not prevent their information from being shared with third-party

17   applications their friends used";

18                 (b)     their photos and videos would be inaccessible to others once their accounts

19   were deactivated or deleted when, in fact, Facebook had "allowed access to the content, even after

20   users had deactivated or deleted their accounts"; and

21                 (c)     the Company "complied with the U.S.- EU Safe Harbor Framework that

22   governs data transfer between the U.S. and the European Union" when, in fact, "[i]t didn't."[62]

---

23   [60]   Laura Berger, *Facebook Settles FTC Charges That It Deceived Consumers By Failing To Keep*
24   *Privacy Promises,* FTC (Nov. 29, 2011), https://tinyurl.com/z2ban4p.  *See also* Jacqui Cheng, *FTC*
     *complaint says Facebook's privacy changes are deceptive*, ars Technica (Dec. 21, 2009),
25   https://tinyurl.com/y9dllg8j; Ryan Singel, *Facebook Privacy Changes Break the Law, Privacy*
     *Groups Tell FTC*, Wired (Dec. 17, 2009), https://tinyurl.com/y9txcbeg.
26
     [61]   Laura Berger, *Facebook Settles FTC Charges That It Deceived Consumers By Failing To Keep*
27   *Privacy Promises,* FTC (Nov. 29, 2011), https://tinyurl.com/z2ban4p.

28   [62]   *Id.*

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                       - 24 -

1       71.    The FTC's press release about the settlement stated that Facebook had agreed "to take

2  several steps to make sure it lives up to its promises in the future, including giving consumers clear

3  and prominent notice **and obtaining consumers' express consent before their information is shared**

4  **beyond the privacy settings they have established**."[63]  According to the FTC release, the settlement

5  "bars Facebook from making any further deceptive privacy claims, requires that the company get

6  consumers' approval before it changes the way it shares their data, and requires that it obtain

7  periodic assessments of its privacy practices by independent, third-party auditors for the next 20

8  years."[64]

9       72.    The FTC and Facebook formally agreed to the settlement on July 27, 2012.  As part

10 of the consent decree, Facebook promised that it would: (i) "not misrepresent in any manner,

11 expressly or by implication, the extent to which it maintains privacy or security of [user]

12 information"; (ii) accurately describe Facebook's "collection [and] disclosure of any [user]

13 information" and "the extent to which [Facebook] makes or has made [user] information accessible

14 to third parties"; and (iii) "obtain the user's affirmative express consent" before "any sharing of a

15 user's nonpublic user information . . . with any third party."[65]  The settlement also requires Facebook

16 to: (i) prevent anyone from accessing a user's material more than 30 days after the user has deleted

17 his or her account; (ii) establish and maintain a comprehensive privacy program designed to address

18 privacy risks associated with the development and management of new and existing products and

19 services and protect the privacy and confidentiality of consumers' information; and (iii) obtain

20 independent third-party audits every two years (until 2032) certifying that it has a privacy program in

21 place that meets or exceeds the requirements of the FTC order, and to ensure that the privacy of

22 consumers' information is protected.

23      73.    As David Vladeck, the former FTC Director who worked on the agency's

24 enforcement action against Facebook, has explained, "[t]**he FTC consent decree put Facebook on**

---

25 [63]  *Id.*

26 [64]  *Id.*

27 [65]  In the Matter of Facebook, Inc., No. C-4365, Decision and Order at 3-4 (F.T.C. July 27, 2012)
28 https://tinyurl.com/ybxg2g86.

*notice*" that its representations concerning its privacy practices needed to be completely accurate and that any representations would receive significant regulatory scrutiny.[66]

### 2. Facebook Secretly Continued to Ignore Threats to User Privacy Even After the Consent Decree Was Entered

74.     Disregarding the FTC consent decree, Facebook continued to permit user to data to be shared with third parties without the users' knowledge or consent – including by allowing app developers to access the personal data of users' friends unbeknownst to the friends.  This was a deliberate business decision by defendants, who knew about but disregarded this privacy violation in order to further Facebook's financial success.  By doing so, defendants knowingly cultivated – but concealed – a serious threat to the user trust that formed the cornerstone of Facebook's business model.

75.     Indeed, according to Sandy Parakilas, who in 2011 and 2012 led the team responsible for policing data breaches on Facebook's app program, even at that time it was "well known at the company" that user data was being shared with third-party app developers.[67]  For example, Parakilas said that in 2012 he had expressed concerns about these privacy practices to some of "[the top five] executives at the Company," including in a presentation that contained a "map of [data] vulnerabilities."[68]  Further, Parakilas said in an interview that his presentation documented the "many gaps that left users exposed" in Facebook's platform[69] and, in particular, highlighted how "the Facebook platform allowed developers to access a huge amount of Facebook's data" – which Parakilas described as "one of the biggest vulnerabilities the company had."[70]

---

[66]     David C. Vladeck, *Facebook, Cambridge Analytica, and the Regulator's Dilemma: Clueless or Venal?*, Har. L. Rev. (Apr. 4, 2018), https://tinyurl.com/yc2kmlwe.

[67]     David Morgan, *Former manager says he warned Facebook about potential privacy risks in 2012*, CBS News (Apr. 9, 2018), https://tinyurl.com/ycrfvqhr.

[68]     Noah Kulwin, *'Facebook Is a Fundamentally Addictive Product,'* Intelligencer: N.Y. Mag., (Apr. 2018), https://tinyurl.com/y9fu64rw.

[69]     Sandy Parakilas, *I worked at Facebook. I know how Cambridge Analytica could have happened.*, Wash. Post (Mar. 20, 2018), https://tinyurl.com/yct8wep3.

[70]     Noah Kulwin, *'Facebook Is a Fundamentally Addictive Product,'* Intelligencer: N.Y. Mag., (Apr. 2018), https://tinyurl.com/y9fu64rw.

76.     As Parakilas later testified to the House of Commons' Digital, Culture, Media and Sport Committee in the U.K. ("DCMS Committee"), "the concern I had was that they [*i.e.*, Facebook and its senior executives] had built this platform that would allow people to get all of this data on people who had not really explicitly authorized" it.[71]   Parakilas elaborated that "it was really personal data," including names, emails and even private messages, and "they basically allowed that to leave Facebook's servers intentionally."[72]  Parakilas later explained that, although "executives at Facebook were well aware that developers could, without detection, pass data to unauthorized fourth parties" – such as what happened with Cambridge Analytica – he "did not get much if any follow-up from the executives," who were "***not . . . concerned about the vulnerabilities that the Company was creating; they were concerned about revenue growth and user growth***."[73]  He stated that "[d]espite my attempts to raise awareness about this issue, nothing was done to close the vulnerability."[74]

77.     Moreover, Facebook executives knew that once the app developers had this unauthorized data, there was essentially nothing that Facebook could do to control how it was used. Confirming this, Parakilas testified that "there were not any controls once the data had left [Facebook] to ensure that it was being used in an appropriate way."[75]  Likewise, Parakilas stated to *The Guardian* that Facebook had "'***Zero.  Absolutely no[]***'" control over the data once it left "Facebook servers."  So, Facebook "'***had no idea what developers were doing with the data***,'" according to Parakilas.[76]

---

[71]  Parakilas testimony to the DCMS Committee on March 21, 2018 ("Parakilas U.K. Test.") at Q1206.

[72]  *Id.*

[73]  James Jacoby and Anya Bourg, *Facebook Insider Says Warning About Data Safety Went Unheeded By Executives*, PBS Frontline (Mar. 20, 2018), https://tinyurl.com/ydzeglw9.

[74]  *Id.*

[75]  Parakilas U.K. Test. at Q1206.

[76]  *Id.*

78.     Further, Parakilas could not recall "the company conducting a single audit of a developer where the company inspected the developer's data storage."[77]  Parakilas also said he had told other Facebook executives to audit its app developers to find out "what's going on with the data" they were collecting from users, to which one executive responded, "Do you really want to see what you'll find?"[78]  *They felt that it was better not to know*," Parakilas told *The Guardian*.[79]  "The company just wanted negative stories to stop," he said.  "It didn't really care how the data was used."[80]

79.     Facebook later claimed that it remedied this specific problem in 2014 – by simply turning off users' ability to provide access to their friends' personal data without their knowledge or consent.  However, the Company "gave pre-existing apps a one-year grace period to comply with the new rules."[81]  Even worse, Facebook did nothing to retrieve or protect the data of millions of users that had been harvested without their permission prior to implementation of the changes (or during the grace period).  Nor did defendants provide notice to users whose data had been disclosed without authorization.  Thus, defendants knew or recklessly disregarded that these failures had exposed not only millions of users to significant undisclosed risks of harm, but also exposed the Company itself and, in turn, its investors.  Indeed, as set forth below, by the time the full consequences of the Cambridge Analytica scandal were revealed to investors, Facebook had lost hundreds of billions of dollars in shareholder value.

---

[77]  *Id.*

[78]  *Id.*

[79]  Paul Lewis, '*Utterly horrifying': ex-Facebook insider says covert data harvesting was routine*, The Guardian (Mar. 20, 2018), https://tinyurl.com/ybdonk3p.

[80]  Sandy Parakilas, *We Can't Trust Facebook to Regulate Itself*, N.Y. Times (Nov. 19, 2017), https://tinyurl.com/y7k86jcv.

[81]  Deepa Seetharaman, *Facebook's Latest Problem: It Can't Track Where Much of the Data Went Company's internal probe finds that some developers who scooped up data are now out of business, and others won't cooperate*, Wall St. J. (June 27, 2018), https://tinyurl.com/y8lpyewe.

C. **In 2015, Defendants Learned that Data from Tens of Millions of Users Had Been Sold to Cambridge Analytica in Violation of Facebook's Terms of Use**

80.     On December 11, 2015, *The Guardian* reported that Cambridge Analytica, a "'behavioral microtargeting'" company founded by Dr. Aleksandr Kogan, a Russian-born lecturer at Cambridge University, had been using "commodified Facebook data" to target voters and develop election strategies in political campaigns in the United States.[82] The newspaper reported that Kogan had duped users of Amazon's crowdsourcing marketplace Mechanical Turk into taking a survey that required them to give access to their Facebook profiles, which the company then used to "hoover[] up tens of thousands of individuals' demographic data." In addition, the company harvested the same data for each of the survey takers' friends, "meaning the dataset ballooned significantly in size."[83]

81.     As has since been revealed, Cambridge Analytica obtained from a Facebook app developer the personal data and information of over 87 million Facebook users, without their knowledge or consent. Specifically, in 2014 Kogan and Joseph Chancellor (who, until recently, was an employee at Facebook) formed Global Science Research ("GSR") for the purpose of funneling user data to Cambridge Analytica.[84] GSR developed and launched on Facebook an app called "This Is Your Digital Life." This Is Your Digital Life marketed itself to Facebook users as a tool that would help them understand their own personalities and supply data to be used by academic psychologists. The information gathered by the This Is Your Digital Life app included names, locations, birthdays, genders and Facebook "likes," which offer a range of personal insights into users.

---

[82]   Harry Davies, *Ted Cruz using firm that harvested data on millions of unwitting Facebook users*, The Guardian (Dec. 11, 2015), https://tinyurl.com/kctlw6n.

[83]   *Id.* ("Research shows that in 2014, Facebook users had an average of around 340 friends.").

[84]   In his testimony to the DCMS Committee on March 27, 2018 ("Wylie U.K. Test."), Christopher Wylie, Cambridge Analytica's former Director of Research ("Wylie"), Cambridge Analytica's former Director of Research, stated that "GSR became a company simply to service Cambridge Analytica. GSR did not pre-exist." Wylie U.K. Test. at Q1322.

82.     This Is Your Digital Life was used by relatively few Facebook users – only around 270,000 users downloaded the app.  Although those users consented to the app's use of their personal data and information, the app used their consent to access the personal data of their *friends, without* those friends' consent.  Because each Facebook user has multiple (often hundreds) of friends, this caused the dataset to balloon significantly in size and provided GSR with access to the personal data and information of a ***staggering 87 million Facebook*** users.  Moreover, the express consent provided by the users of the app was limited to the use of the app itself, and did not allow their data, or the data of their friends, to be used for other purposes or shared with third parties.

83.     Nevertheless, in 2014 and 2015, Kogan and GSR provided this highly sensitive personal information to Cambridge Analytica.  In his testimony to the DCMS Committee on March 27, 2018, Wylie stated that this data was used in a multi-million dollar operation called "Project Ripon," whose purpose "was to develop and scale psychological profiling algorithms for use in American political campaigns."  He said that Cambridge Analytica had "sought to identify mental and emotional vulnerabilities in certain subsets of the American population and worked to exploit those vulnerabilities by targeting information designed to activate some of the worst characteristics in people, such as neuroticism, paranoia and racial biases."[85]

84.     According to Kogan, Facebook gave him this data, at least initially, without any preconditions.  Asked on April 24, 2018 by the Chair of the DCMS Committee, "So there was no requirement from Facebook, when they gave you that data in the first place, that you should destroy it or give it back," Kogan testified, "In fact, there was not even a signed agreement initially.  They gave me the dataset without any agreement signed.  It was just, 'Here's an email.  Here's the dataset.'"[86]  As Wylie has testified: Facebook "didn't really do anything to safeguard the data."[87]

---

[85]  As used herein, "Wylie Stmt." refers to the written statement Wylie provided to the Senate Judiciary Committee on May 16, 2018, and "Wylie Test." refers to the transcript of his oral testimony to the Committee on May 21, 2018.  Wylie Stmt., ¶¶19, 22, 25.

[86]  Kogan Testimony before the DCMS Committee (Apr. 24, 2018) ("Kogan U.K. Test.") at Q1784; *see also* at Q2039 (Kogan: "You would just say what [user data] you wanted and [Facebook] would give it to you.").

[87]  Hannah Kuchler and Aliya Ram, *Facebook was informed privacy breach app might sell user data*, Fin. Times (Mar. 29, 2018), https://tinyurl.com/yckwyjpe; *see also* Kogan U.K. Test. at Q1984

1   "There were a lot of apps at the time that were pulling lots of data – including from friend networks

2   – and Facebook wasn't exactly proactive in asking questions or finding out where that data went,"

3   Wylie has said.[88]

4        85.    "By summer 2014," *The Guardian* reported, Kogan's business partner was boasting

5   that GSR – one of a number of companies affiliated with Cambridge Analytica[89] – "'own[ed] a

6   massive data pool of 40+ million individuals across the United States – for each of whom we have

7   generated detailed characteristics and trait profiles.'"[90]

8        86.    Defendants knew prior to the publication of *The Guardian* article that Cambridge

9   Analytica had accessed user data and what it had done with it:

10        (a)    When the This Is Your Digital Life survey app that was used to harvest

11   Facebook user data was launched in 2014, GSR sent documents to Facebook that purported to give it

12   the right to "***disseminate***, ***publish***, ***transfer***, append or merge with other databases, [and] ***sell***,

13   ***license*** . . . and ***archive***" any user data it collected.[91]  The Company, according to Wylie, did nothing

14   to prevent the launch of the app or prevent GSR from selling the data.

15        (b)    Wylie also testified that, based on information Kogan had provided, Facebook

16   engineers should have known ***as early as July 2014*** – more than a year before *The Guardian* article

17   was published – that user data had been passed on to Cambridge Analytica.[92]

18

---

19   (Kogan: "We had a terms of service up on the Facebook platform–linked to the Facebook platform–

20   that said we could transfer and sell data for at least a year and a half, and nothing was ever mentioned.").

21   [88]  Hannah Kuchler and Aliya Ram, *Facebook was informed privacy breach app might sell user data,* Fin. Times (Mar. 29, 2018), https://tinyurl.com/yckwyjpe.

22   [89]  According to Wylie, "GSR became a company simply to service Cambridge Analytica.  GSR did

23   not pre-exist."  Wylie U.K. Test. at Q1322.

24   [90]  Harry Davies, *Ted Cruz using firm that harvested data on millions of unwitting Facebook users*, The Guardian (Dec. 11, 2015), https://tinyurl.com/kctlw6n.

25   [91]  Julia Carrie Wong, *Congress tried to crack Zuckerberg - but Facebook still has all the power*,

26   The Guardian (Apr. 10, 2018), https://tinyurl.com/ybh7l3zm.

27   [92]  Wylie U.K. Test. at Q1336.  Wylie testified that, based on what Kogan had told him about a

28   conversation he had with Facebook engineers in July 2014 after Facebook had throttled the data harvesting app, "Facebook would have known from that moment about the project . . . ." *Id.*  Wylie, who testified that he had "heard different things from different people and all of them are plausible"

1       (c)     Paul-Olivier Dehaye, a user privacy expert and advocate who testified before

2 the DCMS Committee on March 27, 2018 ("Dehaye U.K. Test.") alongside Wylie, said that the

3 journalist who wrote *The Guardian* article had "started talking to Facebook and asking Facebook

4 questions about this data" "between October 2014 and a few months later maybe."[93]

5       (d)     Zuckerberg has corroborated this account, admitting that "in 2015, we learned

6 from journalists at *The Guardian* that Kogan had shared data from his app with Cambridge

7 Analytica," which he knew was against Facebook's "policies for developers to share data without

8 people's consent."[94]

9       (e)     Sandberg likewise has publicly acknowledged that in 2015 "we received word

10 that this researcher gave the data to Cambridge Analytica,"[95] admitting that they were aware "two

11 and a half years ago" that Kogan gave the data to Cambridge Analytica.[96]

12       (f)     Wylie has similarly testified that "Facebook was first notified of [Cambridge

13 Analytica's] harvesting scheme in 2015."[97]

14       87.     Additionally, in November 2015 – a month **before** *The Guardian's* story was

15 published – Facebook had hired Joseph Chancellor, one of the two founders (with Kogan) of GSR,

16 as a quantitative social psychologist to work at the Company's Menlo Park headquarters.[98]  As a

---

18 about when Facebook first learned of Cambridge Analytica's access to user data, allowed that he did "not know if [Kogan's account] is entirely true or not, but that is what he told me."  *Id.*

19 [93]   Dehaye U.K. Test. at Q1342.

20 [94]   Mark Zuckerberg, Facebook (Mar. 21, 2018), http://tinyurl.com/yadalrr7.

21 [95]   Steve Inskeep, *Full Transcript: Facebook COO Sheryl Sandberg on Protecting User Data*,
22 National Public Radio (Apr. 5, 2018), https://tinyurl.com/y8aamyhn; *see also* Interview by
Savannah Guthrie with Sheryl Sandberg, Chief Operating Officer of Facebook, Today Show (Apr. 6,
23 2018), https://tinyurl.com/ydb26wx3.

24 [96]   Interview by Savannah Guthrie with Sheryl K. Sandberg, Chief Operating Officer of Facebook,
Today Show (Apr. 6, 2018), https://tinyurl.com/ydb26wx3.

25 [97]   Wylie Stmt., ¶43.

26 [98]   Chancellor's employment by Facebook was not publicly reported until two-and-a-half years after
he was hired, at which time he was still working at the Company.  Harry Davies, *Ted Cruz using*
27 *firm that harvested data on millions of unwitting Facebook users*, The Guardian (Dec. 11, 2015),
https://tinyurl.com/kctlw6n.  Since Chancellor's employment became public,  Facebook has
28 steadfastly refused to make any comment about what he did for the Company.  On or around

1   result, throughout the Class Period, defendants had direct access to and control over one of the two

2   individuals who had formed GSR and was involved in its scheme to harvest Facebook user data and

3   provide it to Cambridge Analytica.  In fact, Chancellor signed the June 4, 2014 "GS Data and

4   Technology Subscription Agreement" by which Cambridge Analytica purchased a license purporting

5   to give it the right to use the Facebook user data harvested by GSR.

6          88.    Despite Facebook's internal knowledge or deliberate disregard of this privacy breach,

7   in 2015 the Company outwardly professed surprise and concern over the disclosures by *The

8   Guardian*.   In *The Guardian* article, a "Facebook spokesman" was quoted as saying that

9   "'***misleading people or misusing their information is a direct violation of our policies and we will***

10  ***take swift action against companies that do, including banning those companies from Facebook***

11  ***and requiring them to destroy all improperly collected data***.'"[99]   The author of the article later

12  recounted that the statement had been emailed by "a senior, California-based employee."[100]

13  Company spokespersons repeated the claim in media reports days and even years after *The Guardian*

14  first reported how Facebook user data was being misused.[101]

15         89.    Inwardly, however, Facebook was attempting to discount the newspaper's report,

16  including by coordinating its response with Cambridge Analytica's public relations department, as

17  revealed by an email that was later leaked to the media:

18              Here are the articles I saw yesterday in addition to The Guardian.  Please let
        me know (1) where there are inaccuracies and (2) whether I can share ***your PR***

19

20  September 7, 2018, CNN reported that Facebook had announced that Chancellor was "no longer
    employed by Facebook," but that the Company refused to give any more details.  Donnie
21  O'Sullivan, *Facebook employee with ties to Cambridge Analytica leaves company*, CNN (Sept. 7,
22  2018), https://tinyurl.com/yd37e4d5.

23  [99]   *See* Harry Davies, *Ted Cruz using firm that harvested data on millions of unwitting Facebook
    users*, The Guardian (Dec. 11, 2015), https://tinyurl.com/kctlw6n.

24  [100]   Harry Davies, *Facebook told me it would act swiftly on data misuse – in 2015*, The Guardian,
25  (Mar. 26, 2018), https://tinyurl.com/yad86mj9.

26  [101]   *See, e.g.*, Jane McCallion, *Ted Cruz entangled in Facebook data-grabbing scandal*, ITPro (Dec.
    14, 2015), https://tinyurl.com/yc9a6qcg; Kendall Taggart, *The Truth About The Trump Data Team
27  That People Are Freaking Out About*, BuzzFeed News (Feb. 16, 2017),
    https://tinyurl.com/y7yewq47; Nina Burleigh, *How Big Data Mines Personal Info to Craft Fake
28  News and Manipulate Voters*, Newsweek (June 8, 2017), https://tinyurl.com/ycf2715d.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                    - 33 -

*contact*'s info with our **PR team** (for the purpose of sharing that contact info with any media outlet who contacts us)?"[102]

> **1.   Contrary to Defendants' Public Representations, Facebook Did Not Take Any Meaningful Steps to Assure that Cambridge Analytica Destroyed the User Data**

90.     Despite Facebook's public promises to take "swift action" against parties that compromise user data in violation of its terms of use, including by "'requiring them to destroy all improperly collected data,'" the Company did nothing to recover or seek destruction of the data in Cambridge Analytica's possession until July 2016 – long after Facebook had been made aware of it.[103] Even then, Facebook simply sent Cambridge Analytica and some of its affiliates a form to sign stating that the data – consisting of more than **87 million users' personal** information – had been deleted.

91.     Facebook did nothing to verify that the data had been deleted.  Nor did Facebook make any attempt to investigate **what** data had been compromised or from **which** users, or how widely it had been distributed beyond Cambridge Analytica.  Further, Facebook did not inform the FTC or its own users that the data had been compromised.  Instead, after months of delay, Facebook simply trusted Kogan and Cambridge Analytica – who Facebook **knew** had violated the privacy of its users and breached Facebook's privacy policies – to have destroyed this critical data.

92.     Facebook's lack of effort and diligence in enforcing its own policies is stunning. Wylie, who as noted above was employed at Cambridge Analytica from mid-2013 to late 2014, while it was actively harvesting Facebook user data, has testified that the only effort Facebook made to delete the user data in his possession was to request that he do so in a letter sent in July 2016, more than six months after the breach was publicly reported.  As Wylie explained to the U.S. Senate:

> WYLIE: In 2016, they sent me a letter that said we're aware [that] you may still have data from this harvesting program. . . .  And then, it requested that I - if I still had the data to delete it and then sign a certification of that - that I no longer had the data.

---

[102]  Allan Smith, *Leaked email shows how Cambridge Analytica and Facebook first responded to what became a huge data scandal*, Business Insider (Mar. 22, 2018), https://tinyurl.com/ybt3ywvw.

[103]  *See* Harry Davies, *Ted Cruz using firm that harvested data on millions of unwitting Facebook users*, The Guardian (Dec. 11, 2015), https://tinyurl.com/kctlw6n.

SEN. HARRIS: Did it require you to sign that under the supervision of a notary or just sign it or send it back?

WYLIE: It did not require a notary or any sort of legal procedure.  So, I signed the certification and sent it back and they accepted it.[104]

93.     Zuckerberg admitted in his Senate testimony that Facebook, based solely on Cambridge Analytica's unverified representations that compromised data had been deleted, had made a conscious decision ***not*** to inform its users or the FTC about the data breach.[105]  "I think we clearly viewed it as a mistake that we didn't inform people" of the data security breach at the time, Zuckerberg testified.[106]  Zuckerberg's own testimony is consistent with Wylie's account.[107]

**2.     Facebook Waited Six Months, Until Defendants Knew the Risks to the Company Had Increased Following the Brexit Vote, to Take Any Action to Address the Data Breach**

94.     The timing of Facebook's decision to send letters asking Cambridge Analytica to delete the leaked data is as revealing as the form of Facebook's "enforcement," which relied solely upon self-reporting from known privacy violators.  In February 2016, reports surfaced that Cambridge Analytica had also been deploying its micro-targeting to influence the United Kingdom's vote to break away from the European Union in the process known as "Brexit."  For example, on February 23, 2016, *The Wall Street Journal* reported that a group supporting Brexit "also signed up U.S. data-driven campaign firm Cambridge Analytica LLC, which will use data gathering and

---

[104]  Wylie Test. at 30; *see also* Wylie U.K. Test., at Q1339 (MP: "Do you know if Facebook ever made any efforts to retrieve data, to delete data?" Wylie: "No, they did not.    That is my knowledge."); Kogan U.K. Test. at Q1986 (Member of Parliament ("MP"): "what measures did Facebook take to check that any material that they considered you had but should not have had was deleted?"  Kogan: "None." MP: "None at all."?  Kogan: "None at all.").

[105]  As used herein, "Zuck. Sen. Test." refers to the transcript of Zuckerberg's testimony at the Senate Commerce, Science and Transportation Committee and Senate Judiciary Committee Joint Hearing on Facebook on April 10, 2018.  *E.g.*, Zuck. Sen. Test. at 63 (Harris: "So there was a decision made on that basis not to inform the users.  Is that correct?" Zuckerberg: "That's my understanding.  Yes.").

[106]  Zuck. Sen. Test. at 63.

[107]  *See* Zuck. Sen. Test. at 35-36.

1   audience-targeting methods in the U.K. similar to those it has used to support Sen. Ted Cruz's

2   presidential bid. Cambridge Analytica is the U.S. affiliate of U.K.'s SCL Group."[108]

3       95.     Four months later, on June 23, 2016, voters in the United Kingdom surprisingly voted

4   to approve the Brexit referendum and break away from the European Union.  *The New York Times*

5   reported that the "stunning turn of events was accompanied by a plunge in the financial markets,

6   with the value of the British pound and stock prices plummeting."[109]  *The New York Times* also

7   reported that the narrow "margin of victory startled even proponents of a British exit."

8       96.     It was only ***after*** the June 23, 2016 Brexit vote that Facebook – obviously aware of

9   the increasing risk that its past failures to respond to the data breach in the manner it had described at

10  the time of *The Guardian*'s report would be exposed – sent letters to Cambridge Analytica and some

11  of its affiliated entities quietly asking them to self-report deletion.

12      97.     The day after the results of the June 23, 2016 Brexit referendum became public,

13  Facebook sought to prevent Kogan from publicly discussing the data breach by getting him to sign a

14  confidentiality agreement and releasing him from liability to the Company.  The "Confidential

15  Settlement Agreement and Mutual Release" contained a confidentiality clause[110] and stated that

16  "Facebook believes that GSR and Dr. Kogan obtained Facebook user information in a manner and

17  for a purpose that may not have been consistent with or permissible under Facebook terms,

18  conditions and/or policies."  If GSR or Kogan violated the confidentiality agreement, they would be

19  liable for "actual or statutory damages, or liquidated damages in the amount of U.S. $25,000," but

20  were otherwise "release[d] and forever discharge[d]" from "any and all claims."[111]  During his

21

22

---

23  [108]  Nicholas Winning, *Both Sides Hire U.S. Help for U.K. 'Brexit' Vote*, Wall St. J. (Feb. 23, 2016),
    https://tinyurl.com/y7s7v2rl.

24  [109]  Steven Erlanger, *Britain Votes to Leave E.U.; Cameron Plans to Step Down*, N.Y. Times (June

25  24, 2016), https://tinyurl.com/y9exswg4.

26  [110]  Letter from Rebecca Stimson, Head of Public Policy, Facebook UK, to Damian Collins, Chair,
    Digital, Culture, Media and Sport Committee, United Kingdom House of Commons at 3 (May 14,

27  2018), https://tinyurl.com/ybkndthq (question #5).

28  [111]  *Id*. at 19 (unmarked/unnumbered exhibit).

testimony before the U.K. Parliament, Kogan claimed that that non-disclosure or confidentiality agreement prevented his answering a number of questions.[112]

### 3. Defendants Deliberately Decided Not to Notify Affected Users that Their Data Had Been Compromised

98.     After Cambridge Analytica responded to Facebook's letter by stating that it had deleted the data, Zuckerberg said that Facebook deemed the whole situation to be a "closed case" and, for that reason, did not tell anyone about it – not users, not the FTC, and not investors.  As Zuckerberg testified to the Senate:

> [Senator] Nelson: Yes, you did that, and you apologized for it.  But you didn't notify them. And do you think that you have an ethical obligation to notify 87 million Facebook users?
>
> Zuckerberg: Senator, **when we heard back** from Cambridge Analytica that they had told us that they weren't using the data and had deleted it, we considered it a closed case.  In retrospect, that was clearly a mistake.
>
> We shouldn't have taken their word for it, and we've updated our policies and how we're going to operate the company to make sure that we don't make that mistake again.
>
> [Senator] Nelson: Did anybody notify the FTC?
>
> Zuckerberg: No, Senator, for the same reason – that we'd considered it a closed – a closed case.[113]

99.     These "case closed" discussions occurred in the context of the Brexit vote that had just occurred and at the same time that the presidential election was entering its final phase in the United States, thrusting Cambridge Analytica's political data back into the spotlight.  *The Washington Times* reported in August 2016 that the Trump campaign had "hired the data targeting firm, Cambridge Analytica, who got the Brexit message to the millions."[114]  When asked why he thought Facebook never "made any efforts to retrieve or delete data," Wylie testified that he thought Facebook did not push the issue because "if you want to investigate a large data breach, *that is going*

---

[112] *See, e.g.*, Kogan U.K. Test. at Q1986-Q1990.

[113] Zuck. Sen. Test. at 10.

[114] Kelly Riddell, *Why Donald Trump's nickname of Mr. Brexit may be right on*, Wash. Times (Aug. 18, 2018), https://tinyurl.com/y9nufvhu.

1   *to get out and that might cause problems*," and that his "*impression [was] they have sort of wanted*

2   *to push it under the rug.*"[115]

3       100.   Even before he testified to Congress, Zuckerberg acknowledged that Facebook should

4   have informed users of the data breach, claiming that he "regret[s] that we didn't [issue a

5   notification] at the time.  And I think that we got that wrong."[116]  Defendant Sandberg has also

6   recognized that "we have the responsibility to disclose to people when problems occur[]," admitting

7   that the Company failed to meet its disclosure responsibility.[117]  When asked directly whether

8   Facebook should have timely disclosed that Facebook users' data had been stolen, Sandberg

9   admitted, "[y]es, you are right and we should have done that . . . .  Of course you are right, and we

10  should have done it."[118]

11      101.   Defendants' responsibility to users was legal as well as practical.   When *The*

12  *Guardian* publicly disclosed the breach in December 2015, all but three states and all major U.S.

13  territories had enacted statutes requiring companies to follow specific procedures after a data breach,

14  and nearly all of them required prompt disclosure regardless of the damage inflicted.  The other three

15  states – Alabama, New Mexico and South Dakota – have since enacted similar statutes.

16      102.   Defendants' failure to notify users is all the more shocking given the repeated

17  warnings they had received about the risks to users, and the Company, from privacy violations.  In

18  an article published on March 20, 2018, Roger McNamee – an early Facebook investor and long-

19  time mentor to Zuckerberg – revealed that he had privately warned Zuckerberg and Sandberg *in*

20  *October 2016* that he had noticed how "bad actors" were "taking the tools created for advertisers and

21

22

---

23  [115]   Wylie U.K. Test. at Q1339.

24  [116]   Interview by Laurie Segall, with Mark Zuckerberg, Chief Operating Officer of Facebook, CNN,
25  (Mar. 22, 2018), https://tinyurl.com/y7aerupa.

26  [117]   Interview by Julia Boorstin, with Sheryl Sandberg, Chief Operating Officer of Facebook, CNBC
(Mar. 22, 2018), https://tinyurl.com/yd9b2ezo.

27  [118]   Interview by Savannah Guthrie with Sheryl Sandberg, Chief Operating Officer of Facebook,
28  Today Show (Apr. 6, 2018), https://tinyurl.com/ydb26wx3.

using them to harm innocent people."[119]  McNamee said he had specifically told Zuckerberg and Sandberg that "there's a systemic problem here," but defendants "treated it like it was a public relations problem, rather than a business problem."[120]  McNamee said he had tried for three months – between October 2016 and January 2017 – to persuade Zuckerberg and Sandberg that Facebook was responsible for the misuse of Facebook users' data.

103.    As with Parakilas' earlier attempts to convince executives to audit app developers' use of user data, McNamee's warnings fell on deaf ears.  In light of these warnings, McNamee believed that Facebook's March 2018 disclosures about the Cambridge Analytica data breach were three years too late: "[I]f he had made the statements in 2015, it would have been completely appropriate.  2015 is when they fully understood what had happened with Cambridge Analytica. And instead, they remained absolutely silent for more than two years knowing that this abuse had occurred."[121]  McNamee further concluded that, in concealing this information, Facebook was "behaving in a manner that is just totally inappropriate."[122]

### 4.    Defendants Knew that the Certifications Obtained from Cambridge Analytica Were Unreliable to Assure Data Had Been Deleted

104.    Zuckerberg has conceded that Facebook's failure to follow up on and investigate the extent of the Cambridge Analytica data breach and assure that compromised data was deleted was the "biggest mistake[]"Facebook ever made.[123]  As he ultimately admitted, Facebook "should have been doing more all along" to protect its users' privacy.  Sandberg has also admitted that it was a

---

[119]    Interview by Noel King with Roger McNamee, Co-Founder of Elevation Partners, NPR (Mar. 20, 2018), https://tinyurl.com/y8xusvvr.

[120]    *Id.*

[121]    Interview by Noel King with Roger McNamee, Co-Founder of Elevation Partners, NPR (Mar. 20, 2018), https://tinyurl.com/y8xusvvr.

[122]    *Id.*

[123]    Interview by Nicholas Thompson, with Mark Zuckerberg, Chief Operating Officer of Facebook, Wired (Mar. 21, 2018), https://tinyurl.com/y77krl23.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

"mistake that [Facebook] did not verify" whether Cambridge Analytica had deleted the user data[124] and acknowledged that the Company should have "checked"[125] and "follow[ed]-up"[126] to ensure Facebook users' personal data was, in fact, protected.  She stated that Facebook was "not focused enough on the possible misuses of data" and "protecting people's data" at the time. [127]  Sandberg has also admitted that Facebook "could have done . . . two and a half years ago" what it is doing today.[128]  Facebook's Chief Privacy Officer, Erin Egan, has similarly admitted that "we should have done more to investigate claims about Cambridge Analytica and take action in 2015."[129]

105.     During his Senate testimony, Zuckerberg admitted that, nearly three years after the breach had been detected, Facebook *still* had not verified that the affected data had been deleted. Zuckerberg's testimony leaves no doubt that Facebook had failed to conduct an investigation or audit or make any other effort to verify deletion of the data compromised by Cambridge Analytica in a manner consistent with the Company's public assurances of what would be done in response to the abuses of user data reported by *The Guardian*.[130]

106.     Given the size and nature of the breach, and the public representations about the seriousness with which such violations were taken and the swift repercussions that would follow, it

[124]   Interview by Julia Boorstin, with Sheryl Sandberg, Chief Operating Officer of Facebook, CNBC (Mar. 22, 2018), https://tinyurl.com/yd9b2ezo.

[125]   Interview by  Savannah Guthrie with Sheryl Sandberg, Chief Operating Officer of Facebook, Today Show (Apr. 6, 2018), https://tinyurl.com/ydb26wx3.

[126]   Interview with Sheryl Sandberg, Chief Operating Officer, Facebook, NPR (Apr. 5, 2018), https://tinyurl.com/y9w9mvxk.

[127]   Interview by Judy Woodruff with Sheryl Sandberg, Chief Operating Officer of Facebook, PBS NewsHour (Apr. 5, 2018), https://tinyurl.com/y94a24s2.

[128]   Interview by Mike Allen with Sheryl Sandberg, Chief Operating Officer of Facebook, Axios (Oct 12, 2017), https://tinyurl.com/y9k7mlok.

[129]   Sheera Frenkel and Adam Satariano, *Facebook Fined in U.K. Over Cambridge Analytica Leak*, N.Y. Times (July 10, 2018), https://tinyurl.com/y6wk7v8b.

[130]   Zuck. Sen. Test. at 25 ("[W]e need to … go do a full audit of all of Cambridge Analytica's systems to understand what they're doing, whether they still have any data, to make sure that they remove all the data.  If they don't, we're going to take legal action against them to do so."); and 77 ("For Cambridge Analytica, first of all, we need to finish resolving this by doing a full audit of their systems to make sure that they delete all the data that they have and so we can fully understand what happened.").

1   would have been reckless for any company to fail to undertake such audits and other measures at the

2   time of a data breach, and to instead rely on unverified and self-serving certifications of the type

3   described by Wylie to assume that the risks had been eliminated.  For Facebook, which has long-

4   prided itself on its "hacker culture" and its position at the forefront of technological innovation and

5   monetization of personal information, the conclusion is inescapable that the lack of any meaningful

6   response was deliberate.

7        107.    Defendants were well aware of the risks of relying on Cambridge Analytica's bald

8   assertions that data had been deleted.  Zuckerberg, Sandberg and numerous other high-ranking

9   executives at Facebook knew all too well how easy it was to obtain private data, and how difficult it

10  was to retrieve it once it had been leaked into the public domain.

11       108.    Wylie's 2018 testimony to the U.K. Parliament lays bare how easy it was for the user

12  data to be accessed well after it had purportedly been "destroyed."   In his testimony, Wylie

13  explained that the user data possessed by Cambridge Analytica was "completely fungible in the

14  sense that you can copy it a million times, it can go anywhere and . . . [i]t is often impossible to

15  ascertain where did the data go or where is it or how much of it [there] is."[131]

16       109.    In his written testimony to the U.S. Senate, Wylie explained that Cambridge

17  Analytica "often stored or transmitted data in insecure formats, including files of hundreds of

18  thousands of Americans' data being passed around via unencrypted e-mails.  [Cambridge Analytica]

19  also allowed access to its American datasets to external contractors, including senior staff from the

20  company Palantir."[132]  Wylie's testimony also noted how Cambridge Analytica's parent, SCL, "has a

21  documented history of poor handling of sensitive data" and had been criticized in the United

22  Kingdom "for its inability to properly handle sensitive Ministry of Defense information."[133]

23       110.    Wylie also noted in his written Senate testimony that Kogan had been working on

24  state-funded research in Russia, "building similar algorithms using Facebook data for psychological

25  [131]  Wylie U.K. Test. at Q1337-Q1338.

26  [132]  Wylie Stmt., ¶28.  See Wylie U.K. Test., at Q1324; see also at Q1341 (Wylie: "Staff at Palantir
27  had access to the data; all kinds of people had access to the data.").

28  [133]  Wylie Stmt., ¶29.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1    profiling."[134]  At the same time, he said, Cambridge Analytica was working closely with Lukoil, one

2    of Russia's largest oil companies, which "is known to conduct intelligence gathering on behalf of,"

3    and has "formal information sharing agreements with the Russian Federal Security Service."[135]

4    Wylie testified that, based on conversations with Kogan and Nix, "I also know . . . that [Kogan] was

5    making [the Facebook data harvesting project] known to his colleagues in Russia" and "I know that

6    the scale . . . of the data and the location of the data was made known" to Lukoil by Nix.[136]  Given

7    these and numerous other contacts between Cambridge Analytica and Russia, Wylie told Senators

8    that, based on what was made known, the Facebook "data could have been easily acquired by

9    something as simple as the key logger on Dr. Kogan's computer when he was visiting Russia," with

10   or without Kogan or other's consent.[137]  Wylie's written testimony was to the same effect.[138]

11         111.    After initially acknowledging that private data of more than 50 million users was

12   compromised by Cambridge Analytica, Facebook later admitted that up to 87 million users had their

13   data compromised.  In addition, Zuckerberg and other defendants have acknowledged that the

14   circumstances were not unique to Kogan and Cambridge Analytica, and that data from millions of

15   other users could have been compromised in a similar manner by other app developers and third

16   parties.

17         112.    For example, when asked during his Senate testimony about the activities of the

18   Internet Research Agency, a Russian distributor of fake news that has been indicted for violation of

19   U.S. election laws, Zuckerberg acknowledged that "it is entirely possible that there will be a

20   connection" between the 126 million users who may have been shown content from a Facebook page

21

22

23   [134]  *Id.*, ¶30.

24   [135]  *Id.*, ¶33.

25   [136]  Wylie Test. at 11.

26   [137]  *Id.*

27   [138]  Wylie Stmt., ¶35 ("there are reasonable grounds to suspect that . . . Russian security services
     may have been notified of the existence of CA's Facebook data and/or methods . . . [and] that it was
28   made known that certain data assets could have been accessed inside Russia").

1   associated with the agency and the 87 million users whose data was compromised by Cambridge

2   Analytica.[139]

3       113.   On July 17, 2018, CNN interviewed MP Damian Collins, who confirmed that

4   Facebook user data had in fact been improperly shared beyond Cambridge Analytica:

5           Damian Collins, the Conservative MP leading a British parliamentary
          investigation into online disinformation, told CNN that a British investigation found
6          evidence that the data, collected by Professor Aleksandr Kogan on behalf of
          Cambridge Analytica, had been accessed from Russia and other countries. The
7          discovery was made by the Information Commissioner's Office (ICO), Britain's data
          protection authority, Collins said.[140]

8

       **D.**    **As Scrutiny into Brexit and Russian Election Interference Intensified,**
9             **Defendants Knew that the Risks to the Company and its Users from**
             **Undisclosed Privacy Breaches Had Increased**
10

11       114.   Facebook's assertion that it took the Cambridge Analytica data leak seriously and was

12   acting swiftly to delete compromised data and punish violators of its terms of service assured users,

13   investors, government regulators and others that the data breach did not present are ongoing risk to

14   the Company or its users.  In truth, however, Facebook's delay in addressing the problem and its

15   failure to take any steps to investigate the breach or verify that affected data had been deleted gave

16   rise to continuing, and concealed, risks to Facebook's reputation and its ability to continue obtaining

17   and monetizing user data, which was the very foundation of its business.

18       115.   Loss of user trust in the Company threatened user engagement, reducing the

19   effectiveness of targeted advertising, leading to declining revenues that would threaten the

20   Company's growth and earnings.  In addition, the concealment of the Cambridge Analytica issues

21   concealed the true likelihood of the enormous risks to Facebook posed by increased government

22   oversight and potentially costly fines and regulation, as well as increased spending on data security

23   and privacy.

24       116.   The magnitude of these risks increased when Facebook's ability to protect its user

25   data from being compromised or abused came under scrutiny yet again following Brexit.  In 2016,

26   there were multiple revelations that Russia had interfered in the U.S. presidential election in an

27   [139]  Zuck. Sen. Test. at 25.

28   [140]  Interview with Damian Collins, Member of Parliament of the United Kingdom, CNN (July 17, 2018), https://tinyurl.com/y7zgbfgw.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

attempt to influence the outcome.  As discussed below, after initially dismissing these reports out of hand as entirely baseless, defendants eventually conceded that Facebook could have done more to prevent the use of its platform by foreign agents to influence voter behavior and public opinion.  But, as they did in connection with Cambridge Analytica, defendants assured the public that they had been and would continue to be strongly committed to preventing misuse and abuse of their platform.

### 1.   Defendants Continued to Tout Facebook's Privacy Protections While Concealing Its Past Privacy Violations

117.   On February 16, 2017, BuzzFeed published an article about Cambridge Analytica's assistance to the Trump campaign.  The article recounted the 2015 data breach, noting that, in the wake of the presidential election, questions "about what the firm is doing with that personal Facebook data have multiplied."  When Facebook was contacted for comment, spokesman Andy Stone responded by repeating the same false assurances the Company had given *The Guardian* when its initial report was published:

> Misleading people or misusing their information is a direct violation of our policies and we will take swift action against companies that do, including banning those companies from Facebook and requiring them to destroy all improperly collected data.[141]

118.   Defendants repeated this statement over and over, whenever Facebook's failure to enforce its terms of use or protect its users from harm came under attack, including in media articles in February and June 2017 questioning the use of Facebook data to influence elections (*infra* §V.A).

119.   Facebook also sought to affirmatively assure users, investors, regulators and others about the strength of its security measures and its purported commitment to transparency when issues of data being compromised came to light.

120.   On April 27, 2017, amid the increasing public concern over "fake news" and the use and manipulation of personal data, Facebook published a white paper, "Information Operations and Facebook."  "Given the increasing role that Facebook is playing in facilitating civic discourse," read

---

[141]   Kendall Taggart, *The Truth About the Trump Data Team that People Are Freaking Out About*, Buzzfeed (Feb. 16, 2017), https://tinyurl.com/y7yewq47.

1   the introduction to the document, "we wanted to publicly share what we are doing to help ensure

2   Facebook remains a safe and secure forum for authentic dialogue."[142]

3        121.   The introduction went on to state that "we wanted to be transparent about our

4   approach" and "explain our understanding of these threats and challenges and what we are doing

5   about them."[143]   The white paper received significant media attention and was frequently cited by

6   defendants thereafter to demonstrate the Company's purported commitment to transparency in their

7   efforts to protect users from harm.[144]

8        122.   Among the threats discussed in the white paper was "targeted data collection," *i.e.,*

9   stealing personal information from an individual's email or social media accounts, which could be

10  used by "malicious actors" to "more effectively target spear phishing campaigns or otherwise

11  advance harmful information operations."[145]   Facebook claimed that it had "***long focused***" on

12  protecting users from such threats, including by "closely monitor[ing]" activity on its platform with

13  "dedicated teams [who] focus daily on account integrity, user safety and security."[146]   Facebook said

14  that it gave users the tools they needed to assure that their data was not circulated without their

15  authorization, provided "[n]otifications to specific people if they have been targeted" and

16  "***[p]roactive notifications to people . . . [who] may be at risk based on the behavior of particular***

17

18

19

---

20  [142]   Jen Weedon, William Nuland & Alex Stamos, *Information Operations and Facebook* (Version

21  1.0, Apr. 27, 2017).

22  [143]   *Id.*

23  [144]   *See, e.g.,* Colin Stretch, Facebook General Counsel, Testimony to U.S. Senate Subcommittee on
    the Judiciary Subcommittee on Crime and Terrorism (Oct. 31, 2017); Emma Hinchlifte, *Facebook is

24  going after propaganda – here's how*, Mashable (Apr. 27, 2017), https://tinyurl.com/y89cyba8.

25  [145]   Jen Weedon, William Nuland & Alex Stamos, *Information Operations and Facebook* (Version
    1.0, Apr. 27, 2017), at 4, 6-7.

26  [146]   *Id.* at 7.   Facebook's Chief Technology Officer, Mike Schroepfer, would later testify that
    Facebook's "Community [I]ntegrity" head and/or team (he changes to plural in the middle of his

27  response) is in charge of such efforts and "[t]hey report through Mark [Zuckerberg]," DCMS
    Committee Mike Schroepfr Testimony ("Schroepfr U.K.Test.") at Q2300-Q2302 (Apr. 26, 2018).

28

1  *malicious actors*" and "work[] directly with government bodies responsible for election protections

2  to notify and educate people who may be at greater risk."[147]

3    123.    Notably, Facebook did not say in the white paper, or in any other contemporaneous

4  statement, that the Company had done ***none*** of those things when it learned of the Cambridge

5  Analytica data breach or at any time thereafter.  As a result, at the time the white paper was

6  circulated, tens of millions, and potentially hundreds of millions, of Facebook users were unaware

7  that their personal data had been compromised, or that their data was still at risk of being used by

8  malicious actors to manipulate public opinion.

9    124.    In an interview with *Axios* on October 12, 2017, Sandberg similarly failed to disclose

10  the continuing risks arising from past data breaches by Cambridge Analytica and others, even while

11  touting the strength of the Company's commitments to protecting users' privacy and the adequacy of

12  its efforts to do so.  Near the beginning of the interview, Sandberg was questioned as to when the

13  Company had first learned of Russian attempts to interfere with U.S. election results.  Sandberg

14  responded that it was in 2015 and 2016:

15        So here's what happened, is that, we were very focused on those threats.  And
        then, we started to hear the rumors and this in, you know, around the election itself of
16        a different kind of attack.  Which wasn't – I'm going to get your email and get into
        your account and take all your stuff and you know, steal your data.  It was more, it
17        was a more subtle, even though just as important, which was hosting in an
        inauthentic way to try to be deceptive and divisive.[148]
18

19    125.    During the interview, Sandberg acknowledged that Facebook's targeted advertising

20  based on user data could be abused, and repeatedly stated that the Company "want[s] to make sure

21  that we do all we can to shut that down" and was "***following up aggressively on every single lead we***

22  ***have***" in investigating Russia's abuse of the platform in connection with the 2016 general election.[149]

23  Sandberg, however, never disclosed the risks remaining to users as a result of the sale of user data to

24  ─────────────────────

25  [147]  Jen Weedon, William Nuland & Alex Stamos, *Information Operations and Facebook* (Version
1.0, Apr. 27, 2017), at 7.

26  [148]  Interview by Mike Allen with Sheryl Sandberg, Chief Operating Officer of Facebook, Axios
27  (Oct 12, 2017).

28  [149]  *Id.*

1  Cambridge Analytica and other past data breaches that had left user data exposed to misuse and

2  abuse by malicious actors.

3          **2.      Facebook's Chief Privacy Enforcement Officer Was Forced
                     Out Amid Internal Disputes over the Company's Privacy**

4          **Disclosures**

5          126.    In December 2017, Alex Stamos, Facebook's Chief Information Security Officer (and

6  a co-author of the white paper described above), was forced out of his job as a result of "internal

7  disagreements over how the social network should deal with its role in spreading disinformation."[150]

8          127.    Tellingly, Stamos' departure was not reported until March 19, 2018 – *after* it was

9  publicly revealed that the Company had failed to verify that user data had been deleted by

10  Cambridge Analytica and other third parties or notify the affected users that their privacy had been

11  compromised. *The New York Times* reported that Stamos had clashed with top executives, including

12  Sheryl Sandberg, because he had "advocated more disclosure around Russian interference."  The

13  article said that the Company wanted to handle his departure quietly because "executives thought his

14  departure would look bad" in light of the circumstances surrounding the investigations into Russian

15  hacking.[151]

16          128.    In a follow-up article, *The New York Times* reported:

17               After a breach of the Democratic National Committee in June 2016, Mr.
                Stamos pulled together a team to investigate Russian interference on Facebook.  The
18               findings pit him against executives in the company's legal and communications
                groups.  While Mr. Stamos argued to disclose more, others said that by proactively
19               disclosing what they had found, Facebook had become a target for further public ire,
                according to seven current and former Facebook employees.[152]
20
21          129.    In an internal memo circulated at Facebook on March 23, 2018 in response to *The*

22  *New York Times* report, Stamos acknowledged that he had disagreements with other executives over

23  information security.  Although Stamos denied that he had been forced out, he went on to criticize a

24  corporate culture at Facebook regarding the protection of user data:

25  [150]  *See The New York Times* (@nytimes) Twitter (Mar. 19, 2018), https://tinyurl.com/y72hcs7z.

26  [151]  Sheera Frenkel, Nicole Perlroth and Scott Shane, *Facebook Exit Hints at Dissent on Handling of
        Russian Trolls*, N.Y. Times (Mar. 19, 2018), https://tinyurl.com/y85ktx41.

27  [152]  Sheera Frenkel and Nicole Perlroth, *The End for Facebook's Security Evangelist*, N.Y. Times
28  (Mar. 20, 2018), https://tinyurl.com/yaf6u2ss.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                              - 47 -

"We need to build a user experience that **conveys honesty and respect**, not one optimized to get people to click yes to giving us more access," Stamos wrote. We need to intentionally **not collect data** where possible, and to keep it **only as long as we are using it** to serve people."

\*       \*       \*

We need to **find and stop adversaries** who will be copying the playbook they saw in 2016.  We need to **listen to people** (including internally) when they tell us a feature is creepy or point out a negative impact we are having in the world.  We need to **deprioritize short-term growth** and revenue and to explain to Wall Street why that is ok.  We need to be **willing to pick sides** when there are clear moral or humanitarian issues.  And we need to be **open, honest and transparent** about challenges and what we are doing to fix them.[153]

130.    As *Business Insider* reported on April 9, 2018, Facebook employees are "quitting or asking to switch departments over ethical concerns."  These "dissatisfied Facebook engineers are reportedly attempting to switch divisions to work on Instagram or WhatsApp, rather than continue work on the platform responsible for the Cambridge Analytica scandal."  Indeed, "[a]s it became evident that Facebook's core product might be to blame" for the data security breach, "engineers working on it reportedly found it increasingly difficult to stand by what it built."[154]

### 3.    The Cambridge Analytica Scandal Was Just the Tip of the Iceberg, as Numerous Other Undisclosed Business Practices Exposed User Data to Risk of Harm

131.    Facebook's intrusions on user privacy were not limited to third-party apps on its platform, nor were they limited to the period of time preceding May 2015, when Facebook claimed to have changed its policies to prevent scraping of certain user data.  However, as with the Cambridge Analytica data breach, these activities remained concealed until 2018.

132.    Acknowledging that its prior practices had failed to live up to its privacy promises, on April 4, 2018, Facebook publicly disclosed that it had over-hauled its privacy practices to "better protect [user] Facebook information."[155]  Among other things, Facebook announced that it would

---

[153]  Stamos' memo was published by Ryan Mac and Charlie Warzel, *Departing Facebook Security Officer's Memo: "We Need To Be Willing To Pick Sides*," Buzzfeed (July 29, 2018), https://tinyurl.com/y9wvplp4 (emphasis in original).

[154]  Prachi Bhardwaj, *Some Facebook employees are reportedly quitting or asking to switch departments over ethical concerns*, Business Insider (Apr. 9, 2018), https://tinyurl.com/y7lecwv6.

[155]  Mike Schroepfer, *An Update on Our Plans to Restrict Data Access on Facebook*, Facebook Newsroom (Apr. 4, 2018), https://tinyurl.com/yb35fawn.

1   *start* blocking apps from gaining unauthorized access to personal information concerning attendance

2   at events, including private events and would "no longer allow apps to ask for access to *personal*

3   *information such as religious or political views, relationship status and details, custom friends*

4   *lists, education and work history, fitness activity, book reading activity, music listening activity,*

5   *news reading, video watch activity, and games activity*." Facebook also blocked the ability to use

6   phone numbers and email to search for a person, admitting that "*[g]iven the scale and sophistication*

7   *of the activity we've seen, we believe most people on Facebook could have had their public profile*

8   *scraped*" by "*malicious actors*" mining data through "*search and account recovery*" inquiries.[156]

9         133.    On April 17, 2018, *The Telegraph* published an article titled "Facebook quietly

10  stopped apps from harvesting users' private data just two weeks ago." According to *The Telegraph*:

11        Facebook exposed private friend lists to app developers without their
12  knowledge until two weeks ago, despite claiming to have blocked the service three
     years ago.

13        The loophole allowed apps to collect the friend lists of anybody who had
     installed the app, exposing their names and profile photos. Facebook quietly
14  switched the "taggable friends" interface off on April 4, burying the announcement
     among a series of other privacy measures.

15        The revelations are the latest privacy blow to the social network . . . .[157]

16

17        134.    Thereafter, additional reports came to light describing repeated instances in which

18  Facebook's conduct contradicted defendants' public statements regarding Facebook's purported

    privacy practices.

19        135.    On May 14, 2018, under the headline "Huge new Facebook data leak exposed
20
    intimate details of 3m users," *New Scientist* reported that highly sensitive personal data from at least
21
    3 million Facebook users had been harvested, transmitted to hundreds of third parties and then left
22
    exposed:
23
          Data from millions of Facebook users who used a popular personality app
24  [*i.e.*, the "myPersonality" app], including their answers to intimate questionnaires,
    was left exposed online for anyone to access, a New Scientist investigation has
25  found.

26  ────────────────
    [156] *Id.*

27  [157] Margi Murphy, *Facebook quietly stopped apps from harvesting users' private data just two*
    *weeks ago*, The Telegraph (Apr. 17, 2018), https://tinyurl.com/yccglavl.
28

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                             - 49

Academics at the University of Cambridge distributed the data from the personality quiz app myPersonality to hundreds of researchers via a website with insufficient security provisions, which led to it being left vulnerable to access for four years. Gaining access illicitly was relatively easy.

The data was highly sensitive, revealing personal details of Facebook users, such as the results of psychological tests. It was meant to be stored and shared anonymously, however such poor precautions were taken that deanonymising would not be hard.

\* \* \*

[App creator David Stillwell] . . . says that Facebook has long been aware of the myPersonality project, holding meetings with himself and [his partner] going back as far as 2011.[158]

136.    TechCrunch reported that the breach is "likely only one of many places were such huge sets of personal data collected during a period of permissive Facebook access terms have been obtainable."[159]

137.    On May 14, 2018, CNN reported that "Facebook has suspended 200 apps for possible misuse of user data in the wake of the Cambridge Analytica scandal."[160]

138.    On June 3, 2018, *The New York Times* reported that the Company had "struck agreements allowing phone and other device makers access to vast amounts of its users' personal information." According to the article, the Company had made such agreements with **_at least 60_** device makers, including Apple, Amazon, Blackberry, Microsoft and Samsung. The newspaper reported that most of the agreements remained in effect until April 2018, when Facebook began winding them down "after assessing its privacy and data practices in the wake of the Cambridge Analytica scandal." According to the article:

[T]he partnerships, whose scope has not previously been reported, raise concerns about the company's privacy protections and compliance with a 2011 consent decree with the Federal Trade Commission. Facebook allowed the device companies access to the data of users' friends without their explicit consent, even after declaring that it would no longer share such information with outsiders. Some device makers could

---

[158] Timothy Revel and Phee Waterfield, *Huge new Facebook data leak exposed intimate details of 3m users*, New Scientist (May 14, 2018), https://tinyurl.com/y8yacrkl.

[159] Devin Coldewey, *Anyone could download Cambridge researchers' 4-million-user Facebook data set for years*, TechCrunch (May 14, 2018), https://tinyurl.com/y7ukrmst.

[160] Ivana Kottasova, *Facebook suspends 200 apps over possible data misuse*, CNN Business (May 14, 2018), https://tinyurl.com/y8whckgq.8.

retrieve personal information even from users' friends who believed they had barred any sharing, The New York Times found.[161]

139.    In fact, Facebook was overriding users' privacy settings in order to provide these device makers with more data.  This violated the FTC consent decree, which required the Company to obtain express consent before enacting changes that over-rode a user's privacy preferences.

140.    One of the sources for *The New York Times*' reporting, Ashkan Soltani, former CTO of the FTC, further reported via Twitter that the term used to describe this practice, though not used in the article, is "whitelisting," *i.e.*, Facebook whitelisted third party developers such as Blackberry. According to Soltani, "Whitelisted 'partners' could access friend's non-public profile information including religion, birthday, political affiliation, location even with 'platform settings' (Apps, Websites, and Games) was turned off . . . @Facebook 'whitelisted' platform partner's apps by automatically registering them as 'installed' for a given user's friends (is_app_user = true) in the platform API, ***overriding users' privacy settings***."[162] Soltani further explained that "a tell-tale sign of an @FTC-like problem is when the legal department updates the data use policy to 'clarify' that these arrangements existed after a press inquiry."  He pointed to Facebook's clarification between May 20, 2018, and June 3, 2018.[163]

141.    Then on June 5, 2018, *NBC News* reported that Facebook had also improperly shared user data with "Chinese companies believed to be national security risks."[164]  Under pressure from

---

[161]  Nicholas Confessore, Gabriel J.X. Dance and Michael LaForgia, *Facebook Gave Device Makes Deep Access to Data on Users and Friends*, N.Y. Times (June 3, 2018), https://tinyurl.com/y93uj4nb.

[162]  Ashkan Soltani (@ashk4n) Twitter (June 4, 2018), https://tinyurl.com/y77pgvfm.

[163]  Ashkan Soltani (@ashk4n) Twitter (June 4, 2018), https://tinyurl.com/y7oanpdl.

[164]  Alyssa Newbomb, *Sen. Bill Nelson asked: "What in the world is next? And what in the world is going to protect American' personally identifiable private information?* NBC News (June 6, 2018), https://tinyurl.com/ya2x6yq6; *see also* Ben Brody and Steven Dennis, *Senators Aim to Call Facebook, Google, Twitter to Hearings*, Bloomberg (June 7, 2018), https://tinyurl.com/yb47wv6w (quoting Sen. Cornyn: "Huawei is a 'Chinese national-security threat to the United States and any collaboration there is a problem'").

1   members of Congress, Facebook later revealed that it also had "integrations" under which it shared

2   users' data with Chinese companies Lenovo, OPPO, and TCL.[165]

3        142.   On June 29, 2018, in an article headlined "Data Disaster:  Facebook suffers another

4   massive data breach that exposed the details of 120 million users," *The Sun* (United Kingdom)

5   reported that another Facebook personality quiz app dubbed "'NameTests'" was exposing the details

6   [of data amassed from 120 million users] to third-parties online since 2016," including "names,

7   date[s] of birth[], posts, statuses, photos and friend lists."   The person, Inti De Ceukelaire, who

8   discovered the leak was paid $8,000 by Facebook – and the Company quickly sought to fix the

9   privacy violation.[166]

10        143.   On August 24, 2018, the Company banned the myPersonality app.  According to the

11   *San Francisco Chronicle*:

12        The twin developments come as Facebook is under intense scrutiny over
        privacy following the Cambridge Analytica scandal this year.  Allegations that the

13        political consultancy used personal information harvested from 87 million Facebook
        accounts have dented Facebook's reputation.

14
        ***Since the scandal broke, Facebook has investigated thousands of apps and***
15   ***suspended more than 400 of them over data-sharing concerns.***[167]

16        144.   Further, according to one of the myPersonality app developers, Facebook knew about

17   the app's use of users' data.  As reported by *The Wall Street Journal* on August 23, 2018:

18        One of the researchers behind the app, David Stillwell, . . . said the findings
        from the myPersonality app were used to publish several social-science research

19        papers in recent years and that he and his research partner were invited to Facebook's
        offices in 2011 and 2015 to discuss their work.

20
        "'***It is therefore odd that Facebook should suddenly now profess itself to***
21   ***have been unaware of the myPersonality research and to believe that the data may***
   ***have been misused***,'" Mr. Stillwell said in a statement.[168]

22

23   [165] *See* Ben Brody and Sarah Frier, *Facebook Discloses It Shared Data With Chinese Device*
   *Makers*, Bloomberg (June 6, 2018), https://tinyurl.com/y9hxql46.
24

25   [166] Saqib Shah, *Data Disaster:  Facebook suffers another massive data breach that exposed the*
   *details of 120 million users*, The Sun (June 29, 2018), https://tinyurl.com/yd3vxx39.

26   [167] Kelvin Chan & Michael Liedtke, *Facebook pulls security app from store*, S.F. Chronicle (Aug.
   24, 2018), https://tinyurl.com/ycm2jmnn.
27

28   [168] Deepa Seetharaman, *Facebook Bans Quiz App That Captured Data of Four Million Users*, Wall
   St. J. (Aug. 23, 2018), https://tinyurl.com/yb5ur8ce.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD           

145.    In September 2018, a group of academic researchers from Northeastern and Princeton published online a study titled "Investigating sources of PII used in Facebook's targeted advertising," which demonstrated that Facebook was harvesting and using users' personal data, including phone numbers, that had been "***obtained without a user's knowledge***" for targeted advertising.[169]

146.    Briefly, by running tests with previously unused phone numbers, the academic researchers found that Facebook was "scanning friends' contact databases, linking contacts to existing Facebook accounts, and then augmenting the Facebook accounts with any additional PII [personally identifying information] found in the contacts database."[170]   In other words, Facebook was secretly scraping users' contacts for personal data from their friends – and then using that data for advertising purposes.   As the study noted, this "***use [is] particularly pernicious because it involves [personally identifying information] that a user is not even aware Facebook has***" and, thus, the user is "***provided no information about or control over how [it is] used to target them with ads***."   The academics further found that Facebook provided "***either no disclosure about the potential uses of the data, or insufficient disclosure in the form of generic statements***."[171]   In other words, Facebook was engaged in conduct that was the antithesis of giving users control over their personal data because it deprived them of knowledge and consent.

147.    On September 28, 2018, Facebook disclosed yet another data breach, this one exposing the personal information of nearly 50 million users whose private information, including names, gender and hometown, was targeted by hackers who were able to move from the compromised account of one user to attack the accounts of that user's friends.[172]   As reported by *The New York Times*:

---

[169]   Giridhari Venkatadri, Elena Lucherini, Piotr Sapiezynski, & Alan Mislove, *Investigating sources of PII used in Facebook's Targeted advertising*, Sciendo (Apr. 19, 2018), https://tinyurl.com/yco3mxyt.

[170]   *Id.*

[171]   *Id.*

[172]   Guy Ross, *Security Update*, Facebook Newsroom (Sept. 28, 2018), https://tinyurl.com/y9xe5fbl.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

> Users who posted breaking stories about the breach from The Guardian, The Associated Press and other outlets were prompted with a notice that their posts had been taken down. So many people were posting the stories, they looked like suspicious activity to the systems that Facebook uses to block abuse of its network.[173]

148.    Facebook's stock price dropped by 2.5% on the news, reflecting the heightened awareness of investors and users to continued disclosures of Facebook's inability to protect their private information. As reported by *Fortune*:

> The company's swift response did little to settle investor unease about the string of snafus at the social media giant. Facebook's stock fell as much as 5% to $162.57 a share during intraday trading Friday as news of the hack broke. The stock recovered slightly before the market's official close, but once it did Facebook's market cap had lost about $13 billion of its value.[174]

**E.    Facebook's Failure to Respond to the Cambridge Analytica Breach in a Manner Consistent with Its Prior Public Statements Is Revealed, Causing Massive Economic Losses to the Class**

149.    On March 12, 2018, *The New York Times* and *The Guardian* contacted Facebook for comment on articles they were planning to jointly publish regarding Cambridge Analytica's use of Facebook user data. These articles were going to address the fact that, contrary to Facebook's assurances, not all of the user data had been deleted. After initially threatening to sue the publications to delay or prevent publication,[175] Facebook sought to pre-empt their articles by issuing a press release of its own.

150.    Thus, on Friday, March 16, 2018, Facebook announced in an article published on the Company's investor relations website that it was suspending Cambridge Analytica, its parent company, and whistleblower Wylie for sharing Facebook's users' data without the users', or Facebook's, consent. In the article (quoted in full below), Facebook acknowledged that user data from "[a]pproximately 270,000 people" who had downloaded Kogan's app and their friends had been passed on to Cambridge Analytica and other entities in violation of Facebook's platform

---

[173]   Mike Isaac and Sheera Frenkel, *Facebook Security Breach Exposes Accounts of 50 Million Users*, N.Y. Times (Sept. 28, 2018), https://tinyurl.com/yctmkrys.

[174]   Kevin Kelleher, "*Facebook Loses Around $13 Billion in Value After Data Breach Affects 50 Million of Its Users*," Fortune (Sept. 28, 2018), https://tinyurl.com/y93smzvc.

[175]   *See, e.g.*, Carole Cadwalladr (@carolecadwalla) Twitter (Mar. 17, 2018, 6:07 AM), https://tinyurl.com/y9rbglkk ("Yesterday @facebook threatened to sue us.").

1  policies.  The article asserted that "[w]hen [Facebook] learned of the violation in 2015" it had

2  "demanded certification from Kogan and all parties he had given data to that the information had

3  been destroyed."  Alluding to the prior media contacts, the article asserted that "Several days ago, we

4  received reports that, contrary to the certifications we were given, not all data was deleted."  The

5  Company said it was "moving aggressively to determine the accuracy of the claims" and asserted it

6  was "committed to vigorously enforcing our policies to protect people's information" and "will take

7  whatever steps are required to see that this happens," including taking legal action "to hold

8  [violators] responsible and accountable for" their actions.[176]

9       151.   The March 16, 2018 article did not disclose that – despite knowing that Cambridge

10  Analytica had "lied" to Facebook – Facebook had waited six months after the original data breach to

11  request certifications from Cambridge Analytica, Kogan and Wylie.  Nor did the article disclose that

12  other than collecting the certifications, Facebook had made no effort to determine how much user

13  data had been compromised, what that data contained, what users were affected, who else had access

14  to their data, or how that data was being used.  Nor did Facebook disclose that it had failed to notify

15  the victims of the data breach that the user data accessed by Kogan had been transmitted to other

16  entities and persons who had not certified that the data had been destroyed.

17       152.   To the contrary, the following day, Facebook updated the article, asserting that "[t]he

18  claim that this is a data breach is completely false."  Facebook stated that the affected users had

19  "knowingly provided their information" to Kogan, suggesting that any breach of the Company's

20  terms of use was the fault of the users, not Facebook.[177]  In reality, only around 270,000 users had

21  provided consent – but over **87 million** users had their data harvested and misused.  The update,

22  published at 9:50 a.m. PDT, was plainly intended as a response to the articles by *The New York*

23  *Times* and *The Guardian* about the data breach, which had been published earlier the same day.

24       153.   On March 17, 2018, *The Guardian* reported that it had been shown "a dossier of

25  evidence about the data misuse" by Wylie, including "emails, invoices, contracts and bank transfers

---

[176]  Paul Grewal, *Suspending Cambridge Analytica and SCL Group From Facebook,* Facebook Newsroom (Mar. 16, 2018), https://tinyurl.com/ycd7en7b.

[177]  *Id.*

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                                     - 55 -

1    that reveal more than 50 million profiles – mostly belonging to registered US voters – were

2    harvested from the site in one of the largest-ever breaches of Facebook data."  The newspaper said

3    the data had been shared with U.S. and U.K. regulators, and went on to report:

> The evidence Wylie supplied to UK and US authorities includes a letter from Facebook's own lawyers sent *to him in August 2016*, asking him to destroy any data he held that had been collected by GSR, the company set up by Kogan to harvest the profiles.
>
> That legal letter was sent several months after the *Guardian* first reported the breach and days before it was officially announced that [Steve] Bannon was taking over as campaign manager for Trump and bringing Cambridge Analytica with him.
>
> "Because this data was obtained and used without permission, and because GSR was not authorized to share or sell it to you, it cannot be used legitimately in the future and must be deleted immediately," the letter said.
>
> Facebook did not pursue a response when the letter initially went unanswered for weeks because Wylie was travelling, nor did it follow up with forensic checks on his computers or storage, he said.
>
> "That to me was the most astonishing thing.  They waited two years and did *absolutely nothing to check that the data was deleted.  All they asked me to do was tick a box on a form and post it back.*"
>
> Paul-Olivier Dehaye, a data protection specialist, who spearheaded the investigative efforts into the tech giant, said: "*Facebook has denied and denied and denied this.  It has misled MPs and congressional investigators and it's failed in its duties to respect the law*.
>
> "It has a legal obligation to inform regulators and individuals about this data breach, and it hasn't.  *It's failed time and time again to be open and transparent*."[178]

19    154.    Also on March 17, 2018, *The New York Times* reported that the data breach was "one

20   of the largest data leaks in the social network's history.  The breach allowed the company to exploit

21   the private social media activity of a huge swath of the American electorate, developing techniques

22   that underpinned its work on President Trump's campaign in 2016."  As described by *The New York

23   Times*:

> Interviews with a half-dozen former employees and contractors, and a review of the firm's emails and documents, have revealed that Cambridge not only relied on the private Facebook data but still possesses most or all of the trove.

\*        \*        \*

---

[178]   Carole Cadwalladr and Graham-Harrison, *Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach*, The Guardian (Mar. 17, 2018), https://tinyurl.com/y9yhysal.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                                                                    - 56 -

The data Cambridge collected from profiles, a portion of which was viewed by The Times, included details on users' identities, friend networks and "likes." Only a tiny fraction of the users had agreed to release their information to a third party.

\*        \*        \*

Mr. Grewal, the Facebook deputy general counsel, said in a statement that both Dr. Kogan and "SCL Group and Cambridge Analytica certified to us that they destroyed the data in question."

But copies of the data still remain beyond Facebook's control. The Times viewed a set of raw data from the profiles Cambridge Analytica obtained.

While Mr. Nix has told lawmakers that the company does not have Facebook data, a former employee said that he had recently seen hundreds of gigabytes on Cambridge servers, and that the files were not encrypted.[179]

155.    As noted by *The New York Times*, "the full scale of the data leak involving Americans has not been previously disclosed – and Facebook, until now, has not acknowledged it." The newspaper went on to report:

During a week of inquiries from The Times, Facebook downplayed the scope of the leak and questioned whether any of the data still remained out of its control. But on Friday, the company posted a statement expressing alarm and promising to take action.[180]

156.    Reaction to the disclosures was swift and severe. On March 18, 2018, numerous elected officials in the United States and Europe called for investigations into Facebook, demanding that Zuckerberg testify to Congress and Parliament to explain how the breach had occurred and why affected users were not informed.[181]

157.    As CNN reported on March 19, 2018:

The Cambridge Analytica scandal has done immense damage to the brand, sources across the company believe. It will now take a Herculean effort to restore public trust in Facebook's commitment to privacy and data protection, they said.

---

[179]  Matthew Rosenberg, Nicholas Confessore and Carole Cadwalladr, *How Trump's Consultants Exploited the Facebook Data of Millions*, N.Y. Times (Mar. 17, 2018); https://tinyurl.com/yb4ulek.

[180]  *Id.*

[181]  David Z. Morris, *U.S. and U.K. Lawmakers Demand Investigations of Facebook's Data Handling*, Fortune (Mar. 18, 2018), https://tinyurl.com/y864gatz.

1   No one has provided an adequate explanation for why Facebook did not disclose

2   Kogan's violation to the more than 50 million users who were affected when the company first learned about it in 2015.[182]

3   158.   Many others agreed with the criticism:

4   (a)   Venture capitalist Roger McNamee, a Facebook investor and former mentor to

5   Zuckerberg, told CNN on March 21, 2018 that "the social network is facing a crisis of public trust

6   'that is going to destroy the company.'"[183]

7   (b)   "[I]f news reports that the data of 50 million people were shared proves true,

8   the company's possible exposure runs into the trillions of dollars. . . . 'Facebook can look forward to

9   multiple investigations and potentially a whole lot of liability here.'"[184]

10   (c)   "The scandal also highlights a problem that is built into the company's DNA:

11   Its business is data exploitation. Facebook makes money by, among other things, harvesting your

12   data and selling it to app developers and advertisers. Preventing those buyers from passing that data

13   to third parties with ulterior motives may ultimately be impossible.  Indeed, the most alarming aspect

14   of Cambridge Analytica's 'breach' is that it wasn't a breach at all. It happened almost entirely above

15   board and in line with Facebook policy."[185]

16   (d)   "[T]he story here isn't how this data was used. . . . ***The problem here is how***

17   ***Facebook, the biggest social network, chose to stay silent and not inform the affected***

18   ***users***. . . .  [T]the problem is Facebook's silence on the matter until it was pushed by the

19   whistleblower who made the details public. . . .   In its press release, Facebook blamed everything on

20

21

---

22   [182] Dylan Byers, *Facebook is facing an existential crisis*, CNN Business (Mar. 19, 2018),

23   https://tinyurl.com/y9zon63o.

24   [183] Selena Larson, *WhatsApp cofounder: 'It is time' to delete Facebook*, CNN Business (Mar. 21, 2018), https://tinyurl.com/y9qvknvf.

25   [184] Craig Timberg & Tony Romm, *Facebook may have violated FTC privacy deal, say former*

26   *federal officials, triggering risk of massive fines*, Wash. Post (Mar. 18, 2018), https://tinyurl.com/y6umxjmo.

27   [185] Dylan Byers, *Facebook is facing an existential crisis*, CNN Business (Mar. 19, 2018),

28   https://tinyurl.com/y9zon63o.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

1   how it was lied to by a researcher and takes no charge of its policies that allowed such behavior or

2   says anything about why the affected users weren't informed."[186]

3       (e)    "This time around, Facebook might not clamber out of the hot water so easily.

4   While the company had ample cover last time thanks to Google and Twitter's twin implications in

5   the controversy over Russian-bought political ads targeting U.S. voters, this time Facebook stands

6   alone.  The revelation that Facebook data on as many as 50 million users appears to have made its

7   way into a political data operation with no consent from users is Facebook's burden to bear

8   alone."[187]

9       159.    As *The New York Times* would later note: "The Cambridge Analytica scandal

10   revealed how loosely Facebook had policed the bustling ecosystem of developers building apps on

11   its platform."[188]

12       160.    Investors and stock analysts recognized that the disclosures and the firestorm of

13   criticism they engendered had fundamentally altered the value proposition for the Company:

14       (a)    In explaining the removal of its Buy recommendation on the Company on

15   March 20, 2018, William O'Neill & Co. wrote:

16       The Company has come under increasing scrutiny from U.S. and U.K.
17   lawmakers after it was revealed over the weekend that 50M users' data were
    harvested by a third party without user notification.

18       Facebook was aware of the privacy breach two years ago.  This lack of
19   disclosure could be viewed as a violation of privacy laws in the U.K. and many U.S.
    states, raising further questions . . . .

20       Furthermore, the increased scrutiny adds to the criticism of Russian social
21   media influence in the 2016 election and will likely bring further backing for social
    media regulation, which could add uncertainty to share performance.[189]

22

23   [186]  Rafia Shaikh, *50 Million Facebook Profiles Harvested Without User Consent – Data Monster Chose NOT to Alert Victims & Is Trying to Threaten Reporters*, Wccftech (Mar. 17, 2018), https://tinyurl.com/ycvf9ju7.

24

25   [187]  Tony Hatmaker, *Zuck and Sandberg go M.I.A. as Congress summons Facebook leadership by name*, TechCrunch (Mar. 20, 2018), https://tinyurl.com/yayg3fnn.

26   [188]  Gabriel J.X. Dance, Nicholas Confessore & Michael Laforgia, *Facebook Gave Device Makers Deep Access to Data on Users and Friends*, N.Y. Times (June 3, 2018), https://tinyurl.com/y93uj4nb.

27

28   [189]  Derek Higa, *Facebook, Inc CI A (FB)*, William O'Neill & Co. (Mar. 20, 2018).

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

(b)     As *Seeking Alpha* similarly wrote on March 19, 2018:

The importance of this incident cannot be overstated for Facebook on both the user privacy front but also more importantly on Facebook's business model front. . . . If Cambridge Analytica was able to acquire information on tens of millions of Facebook users so quickly and easily, and then keep the information for years without Facebook suspecting otherwise, then that shows a serious flaw in Facebook's ability to keep exclusive control over its information.[190]

(c)     Even analysts who remained bullish on the Company and believed Facebook would weather the storm recognized the negative impact of the disclosures.  As Piper Jaffray noted on March 21, 2018: "[t]here's a lot of negative sentiment baked into FB after the revelation of the data extraction by Cambridge Analytica and Facebook's botched PR responses."  The report went on to warn: "This situation could get worse if further data extractions are disclosed or if the FTC pursues a fine with Facebook."[191]

161.    Over the next several days, additional details emerged regarding the scope of the data breach and defendants' knowledge of the severity of the breach at the time it occurred, their failure to act to constrain the harm to users privacy interests or to respond to the breach in the manner described in their contemporaneous public statements about the breach, and their continuing efforts thereafter to downplay or conceal the extent of the problems and the magnitude of the risks the data breach continued to present to the Company's business and reputation.

162.    Amid these disclosures, several social media campaigns began to urge users to disconnect from Facebook and delete the information they had posted there.  On March 20, 2018, Brian Acton, co-founder of WhatsApp, a $19 billion Facebook acquisition, tweeted: "It is time. #deletefacebook."[192]  A *Business Insider* article similarly reported:

The hashtag #DeleteFacebook is trending on Twitter.

***People are furious, and they have good reason to be***: Data from over 50 million Facebook users was used to target voters and influence the 2016 US

---

[190]   Erich Reimner, *The Cambridge Analytica Mishap Is Serious For Facebook*, Seeking Alpha (Mar. 19, 2018), https://tineurl.com/y7tk075.

[191]   Sam Kemp, *Saber Rattling Will Pass; Forward Catalyst Chain Positions FB Well Into 1H*, Piper Jaffray (Mar. 21, 2018).

[192]   Brian Acton @brianacton, Twitter (Mar. 20, 2018), https://tinyurl.com/yacgbyl.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

presidential election, as well as the 2016 "Brexit" referendum, reports revealed over the weekend.

As a result, ***people are deleting their Facebook accounts en masse***.[193]

163.    The foregoing disclosures caused the price of Facebook stock to decline precipitously.  Facebook shares fell nearly 7% on Monday, March 19, 2018 – the first trading day after the news broke – and fell an additional 2.5% the next trading day amid additional disclosures of the nature and extent of the risks that had been concealed from investors.  As additional details of Facebook's concealment were disclosed and the negative news continued to mount, Facebook's shares continued to decline.  Within a week, Facebook's stock was trading around $150 per share, a stunning drop of nearly 18% in value from its price just before news of the Cambridge Analytica scandal broke, reflecting an extraordinary loss of more than $100 billion in market capitalization in just one week.

### 1.    Facebook's Privacy Misconduct Sparked Numerous Government Investigations

164.    Given the volume of leaked data and its detailed, personal nature; the number of people affected; and the politically contentious nature of the leaks, government agencies launched investigations into Facebook's actions.

### a.    The U.S. Federal Trade Commission

165.    Facebook's deliberate decision ***not*** to notify the affected users that their data had been compromised and their privacy and personal information was at risk was a direct and knowing violation of the 20-year consent decree the Company had executed with the FTC just three years prior.  Several former FTC officials have confirmed that Facebook violated the consent decree by enabling Cambridge Analytica to misuse Facebook users' personal data, and then failing to promptly disclose the known data security breach.  Vladeck, the former FTC Director who worked on the agency's 2011 enforcement action against Facebook, has explained that Facebook committed "***a serious breach of the FTC's consent***" decree, which will lead to "serious consequences" Jessica Rich, a former head of the FTC's consumer protection bureau, stated "[i]f I had to bet, they will find

---

[193]  Ben Gilbert, *#DeleteFacebook is trending: Here's how to delete your Facebook account*, Business Insider, (Mar. 20, 2018), https://tinyurl.com/y8vku9n2.

1    violations."[194]   Ashkan Soltani, a former FTC official who investigated Facebook for privacy

2    violations that led to the FTC consent decree, testified that Facebook has violated the decree.[195]   As

3    these former regulators have explained, violations of the consent decree, such as those described

4    here, expose Facebook to significant regulatory fines.

5         166.   On March 20, 2018, news publications widely reported that the FTC had opened an

6    investigation into Facebook's compliance with the consent decree, including whether the Company

7    violated the provision requiring it to "notify users and obtain their permission before data about them

8    is shared beyond the privacy settings they have established."[196]

9         167.   On March 26, 2018, the FTC issued a press release confirming that it had launched an

10   investigation into Facebook's compliance with the consent decree, stating that: "the FTC takes very

11   seriously recent press reports raising substantial concerns about the privacy practices of

12   Facebook."[197]   The information disclosed in *The Guardian* and *The New York Times* articles and

13   related later media reports and government inquiries demonstrate that Facebook violated the terms of

14   the consent decree, including by permitting user data to be shared with and used by third-party

15   developers without informed consent by or permission from its users.

16                    **b.      The U.K. Information Commissioner's Office**

17        168.   On July 11, 2018, the U.K. Information Commissioner's Office ("ICO") issued a

18   report following its investigation into the way that Facebook, Cambridge Analytica and others used

19   individuals' personal information in political processes.[198]   The ICO Report states that in 2017,[199] the

---

[194]  *Facebook may have breached a 2011 Consent Agreement, FTC says*, Fortune (Mar. 30, 2018), https://tinyurl.com/ybh4lnb4.

[195]  Sarah Frier, *Former FTC Technologist Says Facebook Violated Consent Decree*, Bloomberg (June 19, 2018), https://tinyurl.com/y8wz8vvr.

[196]  Tony Romm & Craig Timberg, *FTC opens investigation into Facebook after Cambridge Analytica scrapes millions of users' personal information*, Wash. Post (Mar. 20 2018), https://tinyurl.com/y7crku4n.

[197]  Press Release, Statement by the Acting Director of FTC's Bureau of Consumer Protection Regarding Reported Concerns about Facebook Privacy Practices (Mar. 26, 2018) (on file with author).

[198]  ICO, *Investigation into the use of data analytics in political campaigns*, *ICO Report* (July 11, 2018), https://tinyurl.com/y9req4jo. ("ICO Report").

1   ICO launched a formal investigation into the misuse of personal information leading up to the Brexit

2   vote in the summer of 2016.  Over 40 investigators worked on the investigation along with experts.

3   One key focus of the investigation was the misuse of the same data that Cambridge Analytica

4   applied in the U.S. presidential election.

5          169.    According to the ICO Report, its investigation in "the second half of 2017 was both

6   complex and wide ranging."[200]   The report states that the investigation "involved meetings,

7   interviews and correspondence with over 30 organisations" that included "Facebook, Cambridge

8   Analytica and AggregateIQ (AIQ)."[201]   The ICO Report attached a Notice of Intent to take

9   regulatory action against Facebook for data breaches, and the notice states that the ICO *sent an*

10  *investigation letter "to the Facebook companies on 23 August 2017*."[202]   The ICO made iterative

11  requests after that time.  The ICO confirms that a "key strand" of its investigation focused on the

12  Cambridge Analytica data leak because the leaked data also included "1 million" users in the United

13  Kingdom.[203]

14         170.    The ICO explained that it intended to impose a penalty on Facebook.  The penalty

15  arose out of the "very serious" data incident involving Facebook's failure to take appropriate

16  technical and organizational measures against "unauthorized or unlawful processing of personal

17  data" in violation of its statutory obligations.[204]  These violations stemmed from Facebook's failure

18  to protect the privacy of its users' data that Cambridge Analytica and related companies exploited in

19  both the U.K. Brexit referendum and the U.S. presidential election. The ICO Notice states that

20  Facebook's violations were serious because they affected a "very large number of individuals" and a

21

---

22  [199]  *Id.* at 6.

23  [200]  *Id.* at 9.

24  [201]  *Id.*

25  [202]  ICO, *Data Protection Act 1998, Supervisory Powers of the Information Commissioner, Notice of*
26  *Intent*, at 7 (June 19, 2018), https://tinyurl.com/y7weawvvu ("ICO Notice").

27  [203]  ICO Report at 8.

28  [204]  ICO Notice at 2-3.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1  "very substantial volume of personal data" and involved uses that were beyond reasonable

2  expectations thereby causing the victims distress.[205]

3      171.    The ICO's investigation also demonstrated that Facebook knew or should have

4  known about the Cambridge Analytica data leak and misuse.  The ICO wrote that "the Facebook

5  Companies **knew or ought reasonably to have known** that there was a risk that the contravention

6  would (a) occur, **and** (b) be of a kind likely to cause substantial distress."[206] The ICO further wrote

7  that Facebook "failed to take reasonable steps to prevent such contravention" in that Facebook is a

8  large and experienced data collector and "**should have been aware of the risks**."[207]  And the ICO

9  stated that Facebook "had ample opportunity over a long period of time to implement appropriate

10 technical . . . measures" to prevent the data violations "but failed to do so."[208]  The ICO did act on its

11 intent to penalize Facebook and, as CNBC reported on July 11, 2018, the ICO was "hitting Facebook

12 with the maximum possible fine it can impose."[209]

13              **c.**    **The U.S. Securities and Exchange Commission, Justice Department and FBI**

14

15     172.    On July 12, 2018, *The Wall Street Journal* reported that the SEC was investigating

16 "whether Facebook Inc. adequately warned investors that developers and other third parties may

17 have obtained users' data without their permission or in violation of Facebook policies."  Further, the

18 article specifically noted that Facebook's 2017 annual report "didn't address the risk of app

19 developers or other commercial entities such as Cambridge Analytica improperly obtaining user

20 data."[210]

21

22 [205] *Id*. at 17.

23 [206] *Id*. at 18.

24 [207] *Id*.

25 [208] *Id*.

26 [209] Ryan Brown, *Facebook faces UK fine of around $660,000 after data scandal found to be illegal*, CNBC (July 11, 2018), https://tinyurl.com/yc369jyy.

27 [210] Dave Michaels & Georgia Wells, *SEC Probes Why Facebook Didn't Warn Sooner on Privacy Lapse*, Wall St. J. (July 12, 2018), https://tinyurl.com/y7vap23d.

28

173.    The Justice Department and the FBI also reportedly joined the government investigations into Facebook's privacy lapses in the wake of the Cambridge Analytica data breach.

**2.    Defendants Admit Fault for the Cambridge Analytica Privacy Failure**

174.    On March 21, 2018, defendants broke their silence as Zuckerberg and Sandberg conceded that they had known that the data of millions of Facebook users had been harvested and used without their consent.   In a post to his personal Facebook page, Zuckerberg took "responsibil[ity] for what happens on our platform" and admitted that the Company had "made mistakes," and that the Cambridge Analytica issue reflected "a breach of trust between Facebook and the people who share their data with us and expect us to protect it. We need to fix that."[211]   Sandberg re-posted Zuckerberg's post on her own Facebook page, adding: "We know that this was a major violation of people's trust, and I deeply regret that we didn't do enough to deal with it. We have a responsibility to protect your data."[212]

175.    In an interview with *Wired* the same day, Zuckerberg similarly admitted that the *Guardian* and *New York Times* reports were credible and admitted that Cambridge Analytica was not the only third party Kogan had shared "a lot" of users' data with, that Facebook had not audited Cambridge Analytica to verify that user data had been deleted, and that the Company might have to do a "full forensic audit" of every one of its developers operating before it could determine the extent of the data breach.[213]

176.    However, Zuckerberg attempted to deflect criticism of the Company by falsely suggesting that third parties had never actually received Facebook user data.   The transcript of the interview published by *Wired* stated in relevant part:

> [Wired:]   You learned about the Cambridge Analytica breach in late 2015, and you got them to sign a legal document saying the Facebook data they had misappropriated had been deleted.   ***But in the two years since, there were all kinds***

---

[211]   Mark Zuckerberg, Facebook (Mar. 21, 2018), https://tinyurl.com/yadalrv7.

[212]   Sheryl Sandberg, Facebook (Mar. 21, 2018), https://tinyurl.com/y9jw7y3k.

[213]   Interview by Nicholas Thompson, with Mark Zuckerberg, Chief Operating Officer of Facebook, Wired (Mar. 21, 2018), https://tinyurl.com/y77krl23.

*of stories in the press that could have made one doubt and mistrust them. Why didn't you dig deeper to see if they had misused Facebook data*?

[Zuckerberg]: So in 2015, when we heard from journalists at *The Guardian* that Aleksandr Kogan seemed to have shared data with Cambridge Analytica *and a few other parties*, the immediate actions that we took were to ban Kogan's app and to demand a legal certification from Kogan and all the other folks who he shared it with. We got those certifications, and Cambridge Analytica had actually told us that they actually hadn't received raw Facebook data at all. It was some kind of derivative data, but they had deleted it and weren't [making] any use of it.

In retrospect, though, I think that what you're pointing out here is *one of the biggest mistakes that we made*. And that's why the first action that we now need to go take is to not just rely on certifications that we've gotten from developers, *but [we] actually need to go and do a full investigation of every single app that was operating before we had the more restrictive platform policies* – that had access to *a lot of data* – and for any app that has any suspicious activity, we're going to go in and do a *full forensic audit*. And any developer who won't sign up for that we're going to kick off the platform. So, yes, I think the short answer to this is that's the step that I think we should have done for Cambridge Analytica, and we're now going to go *do it for every developer who is on the platform who had access to a large amount of data* before we locked things down in 2014.

<p style="text-align:center">*       *       *</p>

[Wired:] How confident are you that Facebook data didn't get into the hands of Russian operatives – into the Internet Research Agency, or even into other groups that we may not have found yet?

[Zuckerberg:] I can't really say that. I hope that we will know that more certainly *after we do an audit.* You know, for what it's worth on this, the report in 2015 was that Kogan had shared data with Cambridge Analytica *and others*. When we demanded the certification from Cambridge Analytica, what they came back with was saying: Actually, we never actually received raw Facebook data. We got maybe some personality scores or some derivative data from Kogan, but actually that wasn't useful in any of the models, so we'd already deleted it and weren't using it in anything. So yes, we'll basically confirm that we'll fully expunge it all and be done with this.

So I'm not actually sure where this is going to go. I certainly think *The New York Times* and *Guardian* and Channel 4 reports that we received last week suggested that Cambridge Analytica still had access to the data. *I mean, those sounded credible enough that we needed to take major action based on it*.[214]

177.   In an interview with *Recode*, Zuckerberg revealed that Facebook needed to investigate tens of thousands of apps that may have improperly shared data, while conceding that the Company might never be able to determine what or how much user data had been sold to or shared

---

[214]   Nicholas Thompson, *Mark Zuckerberg Talks to Wired About Facebook's Privacy Problem*, Wired (Mar. 21, 2018), https://tinyurl.com/y77krl23.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                 - 66 -

1   with third parties.[215]  Ime Archibong, Facebook's Vice President of Product Partnerships, warned

2   that this number may increase as the investigation continues to "find all the apps that may have

3   misused people's Facebook data."[216]

4      178.   In the *Recode* interview, Zuckerberg repeated the claim that Cambridge Analytica had

5   said it "never had the data and deleted what derivative data they had"[217] while admitting that

6   Facebook had done nothing to verify those assertions.  While attempting to justify the Company's

7   actions as reasonable at the time, Zuckerberg admitted that "in retrospect it was clearly a mistake.

8   I'm explaining to you the situation at the time, and the actions that we took, but ***I'm not trying to say***

9   ***it was the right thing to do***.  I think given what we know now, we clearly should have followed

10   up."[218]  *Recode* itself was unimpressed by Zuckerberg's attempts to explain away Facebook's

11   response to the data breach, noting in a companion article about the interview:

12      But Zuckerberg did not give any details about why the company did not do
   those checks, or about why broader monitoring of third-party developers – who in
13      some cases were given vast troves of user information – was so shoddy.

14      He said Facebook is now trying to go back and check who has user data,
   although it's essentially an effort to put the genie back into the bottle. When asked if
15      he could recover some of the data now, Zuckerberg admitted, "not always."[219]

16      179.   On March 25, 2018, Facebook also took out full-page advertisements in several U.S.

17   and U.K. newspapers, including *The New York Times*, *The Washington Post*, *The Wall Street*

18   *Journal*, *The Observer*, *The Sunday Times*, *Sunday Mirror*, *Sunday Express* and *Sunday Telegraph*.

19   These ads were signed by Zuckerberg, who stated with direct reference to the Cambridge Analytica

20

21   [215]  Kara Swisher & Kurt Wagner, *Mark Zuckerberg says he's 'open' to testifying to Congress, fixes*
   *will cost 'many millions' and he 'feels really bad,'* Recode (Mar. 21, 2018),
22   https://tinyurl.com/yblq3jng.

23   [216]  Ime Archibong, *An Update on Our App Investigation and Audit*, Facebook Newsroom (May 14,
   2018), https://tinyurl.com/yaovr5v3.

24   [217]  Interview by Kara Swisher and Kurt Wagner, with Mark Zuckerberg, Chief Operating Officer of
25   Facebook, Recode (Mar. 22, 2018), https://tinyurl.com/ycy5zuru.

26   [218]  *Id.*

27   [219]  Kara Swisher & Kurt Wagner, *Mark Zuckerberg says he's 'open' to testifying to Congress, fixes*
   *will cost 'many millions' and he 'feels really bad,'* Recode (Mar. 21, 2018),
28   https://tinyurl.com/yblq3jng.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                          - 67 -

scandal: "This was a breach of trust, and I'm sorry we didn't do more at the time.  We're now taking steps to ensure this doesn't happen again."  Defendant Zuckerberg further stated: "I promise to do better for you."[220]

180.    On April 4, 2018, in a Q&A session with members of the press, Zuckerberg admitted with respect to the Cambridge Analytica scandal that "it's clear now that we didn't do enough.  We didn't take a broad enough view of what our responsibility is, and that was a huge mistake.  It was my mistake."  Zuckerberg elaborated by acknowledging that "[i]t's not enough to have rules requiring they [*i.e.*, app developers] protect information, it's not enough to believe them when they tell us they're protecting information – we actually have to ensure that everyone in our ecosystem protects people's information."[221]

181.    In an April 5, 2018 interview with NPR, Sandberg acknowledged that Facebook did not previously have sufficient privacy controls in place and indicated her awareness that Facebook was not in compliance with the FTC consent decree.  Specifically, Sandberg stated that:

> "We're in constant conversation with the FTC.  And that consent decree was important.  And we've taken every step we know how to make sure we're in accordance with it.  But the bigger answer is, ***should we have taken these steps years ago anyway?  And the answer to that is yes, like a very clear, a very firm yes***."[222]

182.    Defendants' orchestrated apology tour had its intended effect, as many analysts responded by writing positive research reports telling investors to expect only a relatively modest and short-term impact from the new revelations about Facebook's failure to enforce or abide by policies intended to protect user privacy and data from unauthorized use by app developers or third parties.[223]

---

[220] Sheena McKenzie, *Facebook's Mark Zuckerberg says sorry in full-page newspaper ads*, CNN (Mar. 25, 2018), https://tinyurl.com/yawxvkga.

[221] *Hard Questions: Q&A with Mark Zuckerberg on Protecting People's Information*, Facebook Newsroom (Apr. 4, 2018), https://tinyurl.com/ycwuda3n.

[222] Steve Inskeep, *We Did Not Do Enough To Protect User Data, Facebook's Sandberg Says*, NPR (Apr. 6, 2018), https://tinyurl.com/y8u7keyb.

[223] *See, e.g.*, Mark S.F. Mahaney, *Defending Facebook*, RBC Capital Markets (Mar. 21, 2018) (maintaining outperform rating and $250 price target: "we view [Zuckerberg's] statement . . . as delayed – but appropriate – responses and steps by Facebook"); Brian Nowak, C.F.A., *Our Thoughts on FB's Public Statement*, MorganStanley (Mar. 21, 2018) (maintaining overweight and $230 price

183.    On June 8, 2018, *The Wall Street Journal* reported that even more companies than previously reported had been "whitelisted" well after the point in 2014-2015 when Facebook claimed to have stopped sharing user data in this manner.  As detailed in the article, which described the previously undisclosed agreements:

> Facebook Inc. [FB 0.49%] struck customized data-sharing deals that gave select companies special access to user records well after the point in 2015 that the social network has said it walled off that information, according to court documents, company officials and people familiar with the matter.
>
> Some of those and other agreements, collectively known internally as "whitelists," also allowed certain companies to access additional information about a user's Facebook friends, the people familiar with the matter said. That included information like phone numbers and a metric called "friend link" that measured the degree of closeness between users and others in their network, the people said.
>
> The whitelist deals were struck with companies including Royal Bank of Canada and Nissan Motor Co., who advertised on Facebook or were valuable for other reasons, according to some of the people familiar with the matter. They show that Facebook gave special data access to a broader universe of companies than was previously disclosed. They also raise further questions about who has access to the data of billions of Facebook users and why they had access, at a time when Congress is demanding the company be held accountable for the flow of that data.
>
> Many of these customized deals were separate from Facebook's data-sharing partnerships with at least 60 device makers, which it disclosed this week. Several lawmakers and regulators have said those device-maker arrangements merit further investigation.
>
> *            *            *
>
> Privacy experts said Facebook users likely didn't know how their data was being shared.
>
> *            *            *
>
> Eventually, Facebook set up internal teams dedicated to brokering and developing customized data deals.[224]

---

target: "We look to these and further forthcoming data safeguards (expected in coming days) to reassure users that FB is acting more proactively and decisively to protect their data"); Ronald V. Josey, *Our Thoughts on Facebook's Privacy and Data Issues*, JMP (Mar. 21, 2018) ("we expect this issue to be an overhang over the short-to-medium term, although we also do not believe these issues have impacted usage or advertiser demand"); Ken Sena, *FB: It's Not You, It's Us*, Wells Fargo Securities (Mar. 21, 2018) ("Constructive First Steps, Continue to View Business Impact as Likely Minimal").

[224] Deepa Seetharaman & Kristen Grind, *Facebook Gave Some Companies Special Access to Additional Data About Users' Friends*, Wall St. J. (June 8, 2018), https://tinyurl.com/y9wxnafq.

**F.      Defendants Recklessly and Falsely Assured Investors that the
Cambridge Analytica Scandal Had Not Affected Facebook's User
Engagement or Financial Results, Reinflating Facebook's Stock Price**

184.      As the first quarter drew to a close, investors and market analysts were justifiably concerned over the impact that Facebook's past misrepresentations concerning the Cambridge Analytica data breach and the use of its platform to further election interference and other political activities by Russia would have on the Company's users and advertisers.  The impending launch of the General Data Protection Regulation ("GDPR") in the European Union added to these concerns.

185.      Nevertheless, analysts were cautiously optimistic that Facebook's promises of quick and decisive action to combat the threats would help it rebound quickly from the negative disclosures.  As a Morningstar analyst wrote on March 26, 2018:

> Facebook's latest data breach issue, which surfaced 11 days ago and involved Cambridge Analytica, was followed on March 25 by the Federal Trade Commission's announcement of an investigation into the company's abilities and willingness to protect user information.  While this recent development may have brought forth further doubts regarding Facebook and its user growth and engagement, along with more demand for a GDPR type of regulation in the U.S., we remain confident that the firm is more likely to endure the short-term impact of the data breach issue and at this point do not expect a significant long-term negative effect on Facebook's platform and operations.[225]

Other analysts made similar comments.[226]

**1.      Defendants Tout Facebook's 1Q18 Results as Demonstrating
Users Were Unconcerned with the Cambridge Analytica
Scandal**

186.      When Facebook reported its 1Q18 results on April 25, 2018, investors were buoyed by revenues, earnings and DAU/MAU metrics that were all in line with estimates.  Sandberg told

---

[225]  Ali Magharabi, *Many Downside Scenarios Are Priced In, Facebook Shares are now attractive*, Morningstar (Mar. 26, 2018).

[226]  *See, e.g.*, Lloyd Walmsley, *Attractive long-term but 1Q brings risks*, Deutsche Bank (Apr. 18, 2018) ("1Q likely to be heavily focused on fallout from CA and upcoming GDPR");Youseff Squali, *1Q18 Likely Strong Despite CA Mishap; Investments to Pressure Margins S/M Term*, SunTrust Robinson Humphrey (Apr. 20, 2018) ("we believe the very recent negative publicity may have removed 'upside' ad revenue opportunities and likely added uncertainty around user engagement and growth"); Mark S.F. Mahaney, *Facebook, Inc. Q1 Preview & Cheat Sheet*, RBC Capital Markets (Apr. 23, 2018) ("The almost unanimous opinion from the executives we talked with at ad technology/consulting companies . . . was that the recent controversies would have no material impact on the relevance and attractiveness and importance of Facebook as a marketing platform. Facebook has been, is, and will remain for the foreseeable future a 'must buy' for most consumer-oriented marketers.").

1   investors "[i]t was a great quarter for our business.  Q1 ad revenue grew 50% year-over-year.

2   Mobile ad revenue was $10.7 billion, up 60% from last year and contributed approximately 91% of

3   total ad revenue.  Revenue growth was broad-based across regions, marketer segments and

4   verticals."[227]

5          187.    Sandberg further assured the market that there would not be a significant business

6   impact from the March revelations regarding Cambridge Analytica, stating "we think the

7   investigatory work we're doing into APIs . . . is very important, and we don't expect it to have an

8   impact on revenue."  Zuckerberg commented that "[d]espite facing important challenges, our

9   community and business are off to a strong start in 2018," while Sandberg further assured investors

10  "we know that people want control over how their information is used . . . [t]hat's why we're

11  building industry-leading transparency tools" that would both "strengthen[] privacy and choice while

12  giving businesses of all sizes new and better tools to help them grow."[228]

13         188.    As *The New York Times* reported on April 25, 2018:

14             Despite it all, the Facebook juggernaut marches on.

15             The social network is undergoing its worst crisis in its 14-year history as it
16             faces a torrent of criticism about its privacy practices and the way it handles user
               data.

17             But on Wednesday, Facebook showed that – as with past scandals – the
               controversy is so far doing little to hurt its bottom line.
18
19             The Silicon Valley company reported a 63 increase in profit and a 49 percent
               jump in revenue for the first quarter, driven by continued growth in its mobile
               advertising business.  Mobile advertising now represents more than 90 percent of
20             Facebook's advertising revenue.

21             The company also said that it added 70 million monthly active users last
               quarter, bringing it to 2.2 billion monthly active users as of March.
22
23             The results sent Facebook's shares up more than 7 percent in aftermarket
               trading on Wednesday, reflecting Wall Street's willingness to shrug off the
               company's privacy issues as long as the money keeps flowing in.
24

25

26   _____

27   [227]  1Q18 Facebook, Inc. Earnings Call Tr. at 5 (Apr. 25, 2018).

28   [228]  *Id*. at 3, 5, 14.

1   "All the data privacy issues, the congressional hearings, none of that will get as much scrutiny from investors as the bottom line," said Brian Wieser, an analyst at

2   Pivotal Research.  "All investors are looking for is a change in user metrics."[229]

3   189.   The Company's 1Q18 results, together with management's assurances on the 1Q18

4   conference call, led many analysts to conclude that the disclosures concerning Cambridge Analytica

5   had not impacted user's engagement with the platform.[230]

6   190.   Bolstered by the 1Q18 results and defendants' assurances of the strength of

7   Facebook's business in the face of criticism over its user data and privacy practices, the Company's

8   stock price began to recover.  The price of Facebook's share rose more than 9% immediately after

9   the 1Q18 results were released, and by late May the shares had recovered to the levels at which they

10  were trading before *The Guardian* and *New York Times* published articles about the Cambridge

11  Analytica data breach.

12  191.   Thereafter, defendants continued to tout the 1Q18 results as a sign that the Company

13  had weathered the storm, while assuring investors that there was no reason to be concerned that the

14  past user privacy scandals or new privacy regulations would have a negative impact on Facebook's

15  business.

16  192.   In April 2018, Facebook shareholders made various proposals in response to the

17  Cambridge Analytica scandal, seeking to restore user trust in the wake of those events.  For example,

18  shareholders proposed that "Facebook's Board issue a report discussing the merits of establishing a

19  Risk Oversight Board Committee."[231]

20

21  [229]  Sheera Frenkel & Kevin Roose, *Facebook's Privacy Scandal Appears to Have Little Effect on Its*

22  *Bottom Line*, N.Y. Times (Apr. 25, 2018), https://tinyurl.com/ycolhzhmw.

23  [230]  *See, e.g.*, Jason Helfstein, *Strong 1Q Suggests Cambridge Analytica Soon to Be a Distant Memory; Maintain Outperform, $225 PT*, Oppenheimer (Apr. 25, 2018) ("[m]ost positive takeaway

24  was constructive tone from mgmt"); Sam Kemp, *Strong Q1 + Cambridge Analytica & GDPR Set to Fade From Focus, Remain OW*, Piper Jaffray (Apr. 25, 2018) ("Incremental news around impacts

25  from the recent Cambridge Analytica (CA) debacle were nil and, ***alongside mgmt commentary downplaying GDPR impact***, will likely accelerate the fading relevance of these topics from investor

26  focus.").

27  [231]  Facebook's Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 at 51 (Apr. 13, 2018) ("Proposal Four:  Stockholder Proposal Regarding A Risk Oversight

28  Committee").

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

1    193.    In support of this proposal, on April 17, 2018, Facebook investors noted the fact that

2    the Company faced "significant financial, reputational and regulatory risk" from events like "[t]he

3    Cambridge Analytica scandal and the misuse of data to influence elections around the world," which

4    "cost Facebook investors $90 billion in market value between March 16th and March 17th."[232]

5    Facebook shareholders also proposed that "Facebook issue a report to shareholders . . . [*inter alia*]

6    assessing the risks posed by content management controversies (including election interference . . .)

7    to the company's finances operations and reputation."[233]   In support of this proposal, on May 17,

8    2018, Facebook investors, including the Illinois State Treasurer, explained that "Facebook's

9    controversies have a direct impact on the Company's market value," including because "[f]ollowing

10   the Cambridge Analytica disclosures, Facebook shares lost approximately $100 billion in market

11   value."[234]   Defendants opposed both stockholder proposals, assuring investors that Facebook's risk

12   oversight was adequate and there was no need for the requested report.

13   194.    At the same time, on May 15, 2018, as part of Facebook's attempt to increase

14   transparency into its operations in the aftermath of the data privacy scandals of the previous months,

15   including the Cambridge Analytica scandal, Facebook published its "enforcement numbers" for the

16   first time.   In a post on its corporate website, Facebook announced that in the fourth quarter of 2017,

17   Facebook had removed 694 million fake accounts, and in the first quarter of 2018, it had disabled

18   another 583 million fake accounts – close to 1.3 billion accounts in total.

19   195.    During Facebook's annual meeting on May 31, 2018, Natasha Lamb, managing

20   partner of activist investor Arjuna Capital, said:

21       From political subterfuge, fake news, hate speech and sexual harassment, it is clear
         that content that violates Facebook's own terms of service poses a risk to the
22       Company's market value and brand.  Last year, at this very meeting, we highlighted

23   [232] Letter from Jonas Kron, Snr. Vice President, Trillium Asset Management to Facebook
     Shareholders (Apr. 17, 2018 ), https://tinyurl.com/ycskmtdv.
24

25   [233] Facebook's Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 at
     55 (Apr. 13, 2018) ("Proposal Six:  Stockholder Proposal Regarding A Content Governance
26   Report").

27   [234] Letter from Natasha Lamb, Managing Partner Arjuna Capital, and Michael W. Frerichs, Illinois
     State Treasurer, (and others) to Facebook Shareholders (May 17, 2018), https://tinyurl
28   .com/y9mugt89.

the risk posed by fake news propagated over the platform. And while our board opposed reporting, we learned [six] months later and only through congressional testimony that 126 million Americans may have viewed Russian propaganda prior to the 2016 U.S. presidential election. Four months later, we learned that 87 million Americans data was compromised by Cambridge Analytica with the intent to manipulate users for political gain. In the wake of that scandal, Facebook's market value dropped nearly $100 billion. And while today's proposal is broader, I'm surprised to see a similar reaction from our board, a recommendation to vote against greater transparency and accountability to investors. Fines and regulation by governments, lost advertising revenue and a soured brand may further impact investment returns. In fact, users may leave the social media platform if they feel its content lacked integrity.[235]

196.  Following comments like these, Zuckerberg took to the stage to tout the Company's 1Q18 results ("that shows a lot of good continued momentum" in the business) and assure investors that users were not changing their behavior in the wake of the scandals, and were still opting in to share their data with Facebook (the "vast majority of people say yes, they want that data used").[236] The shareholder proposals were defeated.

## 2.  Zuckerberg Falsely Assures Investors that European Privacy Regulations Are Not Impacting the Business

197.  Zuckerberg's assurance that the "vast majority" of users were opting into data sharing was particularly important to investors, as it came just after the launch of the GDPR in the European Union on May 25, 2018. The GDPR is a broad set of regulations governing the collection and use of personal data that is designed to protect the privacy of E.U. citizens. Significantly, and in addition to a host of disclosure and control requirements, the GDPR requires corporations to make their data collection and sharing policies opt-in, rather than opt-out, and limits the breadth and type of data collection and sharing by companies like Facebook.

198.  The GDPR imposes several requirements on all entities (including Facebook) that process and target personal data from individuals located in the European Union. The GDPR requires, among other things, that the processor (*e.g.*, Facebook) disclose any data collection, disclose whether the data is being shared with any third parties, and delete that data under certain circumstances. The GDPR also requires that any entities notify individuals in the European Union

---

[235]  Facebook, Inc. Annual Shareholders Meeting Tr. at 6 (May 31, 2018).

[236]  Facebook, Inc. Annual Shareholders Meeting Tr. at 8, 16 (May 31, 2018).

1    whose data may have been breached, compromised, or deleted.  The GDPR also imposes significant

2    reporting and internal control requirements, mandating companies like Facebook to appoint a data

3    collection officer and to report its compliance to the GDPR's provisions to independent public

4    authorities appointed by E.U. member states.  The GDPR further requires the processor to obtain a

5    user's affirmative consent before using and distributing that user's personal data, as well as limiting

6    the breadth of consent given.

7         199.    The GDPR was adopted by the European Council and Parliament on April 14, 2016.

8    All companies operating within the European Union had to comply with the GDPR by May 25, 2018

9    or face stiff penalties.

10        200.    Defendants used the years between the GDPR's passage and implementation to

11   reassure investors that it would have little to no impact on Facebook's business.  During quarterly

12   conference calls and in investor presentations starting in mid-2017 and continuing into 2018,

13   defendants used updates to their Terms of Service and Data Policy to claim that Facebook had

14   already largely given its users the privacy controls necessary to comply with the GDPR.  In or

15   around August 2017, Facebook began implementing changes to its products, including the platform,

16   because of the GDPR.[237]  According to a Facebook representative, Facebook had "assembled the

17   largest cross-functional team in the history of the Facebook family of companies," to implement

18   these changes, including teams to conduct legal, product and engineering assessments on the

19   GDPR's impact.[238]  Facebook also created a "What is the [GDPR]?" page on its website touting the

20   steps Facebook had already taken to give users' control of their data in compliance with the GDPR,

21   and which claimed that even under the GDPR, "[b]usinesses that advertise with the Facebook

22   Companies can continue to use Facebook platforms and solutions in the same way they do today."[239]

23

24

---

25   [237] Aliya Ram, *Tech sector struggles to prepare for new EU data protection laws*, Fin. Times (Aug. 29, 2017), https://tinyurl.com/y8stccmx.

26   [238] *Id.*

27   [239] *What is the General Data Protection Regulation*, Facebook Business, https://tinyurl.com/y8arzv6j.

28

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

201.     During this time, defendants continually reassured investors that the GDPR would not have a material impact on Facebook's business.  For example, in an interview with *Axios* on October 12, 2017, Sandberg claimed that Facebook was already adhering to the GDPR requirements, stating: "Europe . . . has passed a single privacy law ***and we are adhering to that***.  But, privacy is something we take really seriously."[240]  During the Company's 3Q17 earnings call on November 1, 2017, Sandberg emphasized the point, claiming: "On GDPR, the Facebook family of apps ***already applies*** the core principles in the framework because we built our services around transparency and control."[241]  As noted below, Sandberg repeated similar statements during the Company's January 31, 2018 earnings call, stating that "the Facebook family of apps already applies the core principles in the GDPR framework, which are transparency and control."[242]

202.     On April 4, 2018, Zuckerberg gave an interview to C-Span in which he stated that "leading up to the GDPR event, a lot of people are asking us, 'Okay, are you going to implement all those things?'"  He responded by saying:

> And my answer is that ***we've had almost all of what's in there implemented for years, around the world, not just in Europe***.  So, to me, the fact that a lot of people might not be aware of that is an issue, and I think we could do a better job of putting these tools in front of people and not just offering them, and I would encourage people to use them and make sure they're comfortable with how their information is used on our services and others.[243]

### 3.     Defendants Continued to Falsely Downplay Reports of Privacy Risks Ahead of Facebook's 2Q18 Earnings Release

203.     While the market was reassured by defendants' comments, questions surrounding Facebook's privacy practices continued to swirl.  On June 8, 2018, Facebook responded to inquiries from numerous journalists seeking a response to *The New York Times*' and *The Wall Street Journal*'s

---

[240]  Interview by Mike Allen with Sheryl Sandberg, Chief Operating Officer of Facebook, Axios (Oct 12, 2017), https://tinyurl.com/y9k7mlok.

[241]  3Q17 Facebook, Inc. Earnings Call Tr. at 111 (Nov. 1, 2017).

[242]  4Q17 Facebook, Inc. Earnings Call Tr. at 6, 9 (Jan. 31, 2018).

[243]  *Hard Questions: Q&A with Mark Zuckerberg on Protecting People's Information*, Facebook Newsroom (Apr. 4, 2018), https://tinyurl.com/ycwuda3n.

1  reporting about whitelisting and other unauthorized sharing of users' data.  Facebook issued the

2  same statement to multiple outlets in response, which read:

> For the most part this is a rehash of last week-end's New York Times story –
> namely that we built a set of device integrated APIs used by around 60 companies to
> create Facebook-like experiences.  In April 2018, we announced that we were
> winding these down. In terms of our Platform APIs, the Journal has confused two
> points.  In 2014, all developers were given a year to switch to the new, more
> restricted version of the API.  A few developers including Nissan and RBC asked for
> a short extension – and those extensions ended several years ago.  Any new 'deals',
> as the Journal describes them, involved people's ability to share their broader
> friends' lists – not their friends' private information like photos or interests – with
> apps under the more restricted version of the API.  Per our testimony to Congress
> 'We required developers to get approval from Facebook before they could request
> any data beyond a user's public profile, friend list, and email address.'[244]

204.    Journalists were skeptical of this response.  One *Bloomberg* technology journalist

tweeted: "I don't understand how extending friend data access for Nissan, RBC and more is 'a

rehash of last week-end's New York Times story.'  Relationship with brands who make apps for

their brands clearly different than the relationship with device-makers who make Facebook

experiences."[245]  Axios, after reviewing a timeline of Facebook's half disclosures, concluded: "Each

new admission – even of the kinds of small bugs and problems that are common across the industry

– reinforces a view in Washington that Facebook has been unwilling to come fully clean."[246]

205.    On June 27, 2018, *The Wall Street Journal* reported  that Facebook could not track

where the data it had improperly disseminated – not just to Cambridge Analytica, but to developers

and others – had ended up:

> Some developers say they have little incentive to respond to Facebook's
> requests to cooperate with the probe, either because they are out of business, have
> moved on to other projects or are uneasy about allowing another company to look at
> their servers and the way their apps are constructed. Such intellectual property is "the
> lifeblood" of a developer's business, said Morgan Reed, president of ACT | The App
> Association, a trade group that represents more than 5,000 app makers and
> connected-device companies.

---

[244] Jack Morse, *Another day, another Facebook privacy scandal*, Mashable (June 8, 2018), https://tinyurl.com/ybuzngh8.

[245] Sarah Frier @sarahfrier, Twitter (Jun. 8, 2016), https://tinyurl.com/ycbqgsuw.

[246] David McCabe, *The big picture: Facebook's year of missteps*, Axios (June 9, 2018), https://tinyurl.com/ybtgbcby.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1

2

In addition, Facebook doesn't have legal authority to force developers to cooperate.

*       *       *

3

4

5

It is difficult for Facebook to track down all the user data gobbled up by developers, owing largely to the way the platform was designed, according to developers, former Facebook employees and academics.[247]

6

7

8

9

10

11

12

13

14

15

16

206.    On June 29, 2018, Facebook responded in writing to outstanding questions put on the record to Zuckerberg by the members of the U.S. House of Representatives on April 11, 2018.  The responses, which spanned more than 700 pages, included a number of new revelations, including that Apple, Amazon and the other device makers were not the only developers that received special or extended access to users' friends data.  In fact, Facebook had granted more than 60 other developers an extension of up to eight months past the May 2015 deadline to come into compliance with Facebook's new rules for developers.  Facebook also disclosed that it separately allowed another five developers to access to users' friends' data "in the context of a beta test."  Facebook did not identify the nature of the beta test referenced.  Facebook also conceded that "early records may have been deleted from our system," and that "it is possible" that Facebook had failed to identify other developers who had also received extended access to users' friends' data.[248]

17

18

19

20

207.    On July 1, 2018, after reviewing Facebook's responses to members' of Congress's written questions, *The Wall Street Journal*, based in part on its earlier investigations in combination with a review of Facebook's answers, concluded that Facebook's responses contradicted Zuckerberg's previous statements to Congress:

21

22

Facebook . . . disclosed it gave dozens of companies special access to user data, detailing for the first time a spate of deals that ***contrasted*** with the social network's previous public statements that it restricted personal information to outsiders in 2015.

23

*       *       *

24

25

26

[247]  Deepa Seetharaman, *Facebook's Latest Problem: It Can't Track Where Much of the Data Went*, Wall St. J. (June 27, 2018), https://tinyurl.com/y8lpyewe.

27

28

[248]  Letter from Facebook, Inc. to Chairman Greg Walden, Ranking Member Frank Pallone, U.S. House of Representatives, Energy and Commerce Committee at 96 (June 29, 2018), https://tinyurl.com/y7uj7vlo.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

The company disclosed it was still sharing information of users' friends, such as name, gender, birth date, current city or hometown, photos and page likes, with 61 app developers nearly six months after it said it stopped access to this data in 2015.

*      *      *

The disclosure follows a Journal article in June that reported Facebook struck customized data-sharing deals that gave select companies such as Nissan Motor Co. access to user records for their apps well after the point in 2015 when it said it walled off that information. Nissan is listed in Friday's document.[249]

208.    On July 2, 2018, *The Washington Post* reported that multiple federal agencies, including the FBI, the SEC, the FTC and the DOJ, were investigating Facebook in relation to the data-sharing scandal involving Cambridge Analytica: "The questioning from federal investigators centers on what Facebook knew three years ago and why the company [did not] reveal it at the time to its users or investors, as well as any discrepancies in more recent accounts, among other issues."[250]   Facebook confirmed the investigation and said it was cooperating with authorities.

209.    On July 11, 2018, CNN revealed that Facebook had given a "Russian internet company with links to the Kremlin" the right

to collect data on unknowing users of the social network after a policy change supposedly stopped such collection.  Facebook told CNN on Tuesday that apps developed by the Russian technology conglomerate Mail.Ru Group, were being looked at as part of the company's wider investigation into the misuse of Facebook user data in light of the Cambridge Analytica scandal.[251]

210.    Mail.Ru Group was one of the developers granted extended access to users' friends' data as identified in the June 29, 2018 submission Facebook made to Congress, highlighting the risk in granting such extensions.

---

[249]  Georgia Wells, *Facebook Reveals Apps, Others That Got Special Access to User Data*, Wall St. J. (July 1, 2018), https://tinyurl.com/yargzpor.

[250]  Craig Timberg , Elizabeth Dwoskin , Matt Zapotosky & Devlin Barrett, *Facebook's disclosures under scrutiny as federal agencies join probe of tech giant's role in sharing data with Cambridge Analytica*, Wash. Post (July 2, 2018).

[251]  Donie O'Sullivan, Drew Griffin & Curt Devine, *Russian company had access to Facebook user data through apps*, CNN Business (July 11, 2018), https://tinyurl.com/y8zna8rl.

### G.   Facebook's 2Q18 Financial Results Reveal the Huge Impact the Data Privacy Scandal Had on Facebook's User Engagement, Advertising Revenues and Earnings, Leading to a Stunning $100 Billion Loss in Facebook's Value

211.   Heading into Facebook's 2Q18 earnings call, the Company's share price was hovering around $210 per share and many investors and analysts, buoyed by the Company's 1Q18 earnings report and defendants' assurances regarding the continued strength of the business in the wake of the scandal, remained strongly bullish on the Company.[252]

212.   Investors and analysts were therefore stunned when Facebook issued its 2Q18 earnings on July 25, 2018, reporting flat to declining user growth, lower than expected revenues and earnings, contracting gross margins, and reduced guidance going forward, all as a substantial result of the fallout of the disclosures concerning Facebook's privacy practices, including its misrepresentations about its efforts to prevent and address events like the Cambridge Analytica data breach or the Russian attempts to influence election results in the United States.

213.   The Company reported having 1.47 billion average DAUs in June and quarterly revenues of $13.2 billion, both of which were below average analyst estimates as compiled by *Bloomberg*.  The revenue miss was Facebook's first since 2015.  In addition, the Company reported that, after years of growth, its active user base (MAU and DAU) had declined in Europe, was flat in the United States and Canada, and was decelerating worldwide.

214.   Facebook's failure to make any attempt to determine what data had been compromised, to verify that the data had been destroyed, and to notify affected users that their data had been compromised, was directly contrary to the repeated representations defendants had made about Facebook's response to the Cambridge Analytica data breach and its commitment to and the

---

[252]   *See, e.g.*, Michael J. Olsen, *Core Strength & LT "Call Options" Override Short-Term Concerns; OW & PT to $250*, Piper Jaffray (July 20, 2018) ("Regulatory Concerns Unlikely to Change the Big Picture"); Youseff Squali, *Strong 2Q18 Expected Despite Head Winds; Maintain Buy*, SunTrust Robinson Humphrey (July 20, 2018) ("[D]espite all the negative headlines, we believe ad revenue should continue to drive very healthy growth . . . ."); Michael Pachter, *Expect Another Strong Quarter Despite Negative Press and Privacy Overhang*, Wedbush (July 20, 2018) ("Notwithstanding heightened scrutiny and elevated legislative and regulatory risk, we expect Facebook to weather the controversy surrounding its Cambridge Analytica data breach and the implementation of GDPR in Europe."); Rob Sanderson, *Q2 Preview: Expecting Revenue Growth Upside, Remains a Top Pick*, MKM Partners (July 20, 2018) (Buy rating with $255 price target); Mark S.F. Mahaney, *Q2 Preview & Cheat Sheet*, RBC Capital Markets (July 22, 2018) (outperform rating with $250 price target).

1   resources it had committed to protecting user privacy.  The outrage sparked by the disclosure of

2   Facebook's privacy practices and prior misrepresentations directly and proximately led users to

3   disconnect from or reduce their use of Facebook's platform, and to take advantage of new tools and

4   regulations giving them more control over the use of their data, including the right to opt out of

5   tracking or sharing settings that were critical to the effectiveness of Facebook's targeted advertising

6   programs.

7          215.    Concern over Facebook's privacy practices also caused advertisers to reduce or

8   eliminate their spending on the platform,  sparked numerous government investigations, and led to

9   dramatic increases in spending on regulatory compliance and safety programs needed to correct the

10  conditions that had led to the Cambridge Analytica data breach and permitted Russian agents to take

11  advantage of Facebook's lax security measures to attempt to influence U.S. election results.  All of

12  these factors, individually and in combination, were the cause of the disappointing 2Q18 earnings

13  report and reduced 2H18 guidance and of the resultant decline in the price of Facebook common

14  stock.

15         216.    During the 2Q18 conference call on July 25, 2018, Wehner told investors to expect

16  revenue growth rates to decelerate in the second half of the year "by high single digit percentages

17  from prior quarters sequentially."  Wehner said that one of the driving factors in the Company's

18  declining revenue growth was that users were sharing less data with the Company and advertisers

19  were reducing their spending on the platform in the wake of the privacy disclosures:

> In terms of what is driving the deceleration, . . . it's a combination of
> factors. . . . And then finally, we're giving people who use the  . . . services more
> choice around privacy.  And that's coming both in terms of impacts that could be
> ongoing from things like GDPR as well as other product options that we're providing
> that could have an impact on revenue growth.[253]

23         217.    As Wehner explained, users exercising their right to opt out of data sharing under the

24  new European regulations, reduced ad spending based on less reliance on Facebook's data to support

25  targeted advertising, and new product features that would give users  even more control over data

---

[253]  2Q18 Facebook Inc., Earnings Call Tr. at 9-10 (July 25, 2018).

sharing and content viewing in the wake of the Cambridge Analytica and Russian interference investigations all contributed to driving the lowered growth estimates:

> We do think that there will be some modest impact [from GDPR]. And I don't want to overplay these factors, but you've got a couple things going on. You've got the impact of the opt-outs. And while we're very pleased with the vast majority of people opting into the third-party data use, some did not. So that'll [sic] have a small impact on revenue growth. And then we're also seeing some impact from how advertisers are using their own data for targeting, so again, that'll [sic] have a modest impact on growth. And then in addition, we're continuing to focus our product development around putting privacy first, and that's going to, we believe, have some impact on revenue growth. So it's really a combination of kind of how we're approaching privacy as well as GDPR and the like. So I think all of those factors together are one of the factors that we're talking about . . . .[254]

218.    Market reaction to the Company's 2Q18 earnings report and conference call was swift and severe, causing the price of Facebook's common stock to drop by nearly 19% on July 26, 2018, another staggering loss of over $100 billion in market capitalization that was the largest such one-day drop in U.S. history.

219.    In addition, the quarterly results reflected – for the first time – the economic impact of the damage caused to the Company's reputation by the disclosure of its past misrepresentations of the risks arising from the Cambridge Analytica data breach and what Facebook had done to address it.  As *The New York Times* reported on July 25, 2018:

> Facebook reported on Wednesday that growth in digital advertising sales and in the number of its users had decelerated in the second quarter. The company's leaders, including its chief executive, Mark Zuckerberg, added that the trajectory was not likely to improve anytime soon, especially as Facebook spends to improve the privacy and security of users.

> Facebook has grappled with months of scrutiny over Russian misuse of the platform in the 2016 American presidential campaign and the harvesting of its users' data through the political consulting firm Cambridge Analytica.  The results were among the first signs that the issues had pierced the company's image and would have a lasting effect on its moneymaking machine.

> In response, Facebook's stock tumbled more than 23 percent in after-hours trading, erasing more than $120 billion in market value in less than two hours.[255]

220.    The *Los Angeles Times* similarly reported on July 26, 2018:

---

[254] 2Q18 Facebook Inc., Earnings Call Tr. at 13 (July 25, 2018).

[255] Sheera Frenkel, *Facebook Starts Paying a Price for Scandals*, N.Y. Times (July 25, 2018), https://tinyurl.com/y9rug8ru.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

1

2

Facebook Inc. saw the first signs of user disenchantment in the midst of public scandals over privacy and content, with second-quarter revenue and average daily visitors missing analysts' projections.

3

Its stock sank as much as 25% in extended trading.

4

\*       \*       \*

5

6

7

The company's user growth fell short of expectations in the same quarter Chief Executive Mark Zuckerberg testified for 10 hours in Congress on data privacy issues.  It also came as Europe implemented strict new data laws, which Facebook had warned could lead to fewer daily visitors in that region.  The company also was bombarded by public criticism over its content policies, especially in countries such as Myanmar and Sri Lanka where misinformation has led to violence.

8

9

"The core Facebook platform is declining," said Brian Wieser, an analyst at Pivotal Research Group.[256]

10      221.    On September 5, 2018, the Pew Research Center issued a report on research it had

11  conducted from May 29, 2018 to June 11, 2018, in the aftermath of the Cambridge Analytica

12  scandal.  The report, "Americans are changing their relationship with Facebook," documented

13  changes in Facebook user engagement over the previous 12 months, and revealed substantial

14  disengagement by Facebook users in that period, including that more than half (54%) of Facebook

15  users had changed their privacy settings to share less with Facebook, 42% had taken extended breaks

16  from engaging with Facebook, while more than a quarter (26%) had deleted the Facebook app from

17  their cell phones.  "All told, some 74% of Facebook users say they have taken at least one of these

18  three actions in the past year," with disengagement particularly pronounced among the younger users

19  coveted by advertisers.[257]

20  **V.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND
         OMISSIONS MADE WITH SCIENTER DURING THE CLASS PERIOD**

21

22      222.    Defendants violated the federal securities laws by knowingly or recklessly making

23  materially false and misleading statements about Facebook's business and operations, including by

24  omitting or concealing material facts about the Company that were necessary to make the

25  misrepresentations alleged herein not misleading under the circumstances in which they were made,

26  [256] *BUSINESS BEAT; Facebook shares sink after miss; Firm sees revenue and daily visitors fall in second quarter amid public scandals over privacy and content*, L.A. Times (July 26, 2018).

27  [257] Andrew Perrin, *Americans are changing their relationship with Facebook*, Pew Research Center (Sept. 5, 2018), https://tinyurl.com/y7bousjk.

28

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                                                    - 83 -

1   and by exercising their power to control the Company's activities in a manner that permitted or

2   failed to prevent the occurrence of the fraud alleged herein.  Defendants' scheme and course of

3   business operated as a fraud or deceit on purchasers of Facebook common stock, as it: (i) concealed

4   known risks to Facebook's business or the true nature and magnitude of those risks;

5   (ii) misrepresented Facebook's privacy practices, financial position, business, operations and

6   prospects; (iii) artificially inflated the price of Facebook common stock; and (iv) caused plaintiff and

7   other members of the Class to purchase Facebook common stock at artificially inflated prices.

8       **A.    Defendants Recklessly Made Materially False and Misleading**
**Statements Concerning Facebook's Response to the Cambridge**
9   **Analytica Data Leak**

10         223.    By the outset of the Class Period, Facebook investors reasonably understood that the

11   user data breaches that had resulted in the FTC consent decree and the Cambridge Analytica scandal

12   were well in the past.  Facebook had repeatedly assured users, government regulators, investors and

13   the public at large that data breaches like those involving Cambridge Analytica had been thoroughly

14   investigated and addressed, including through notification to the victims (*i.e.*, affected and at-risk

15   users) and deletion or retrieval of the purloined data, and that there was no ongoing risk to Facebook

16   as a result.  Investors were further assured by Facebook's repeated claims that its updated terms of

17   use and privacy policies, systems and processes strengthened the protections afforded to user data,

18   thereby reducing the risk of breaches like those that had been exploited by Cambridge Analytica and

19   its associated entities.

20         224.    Unbeknownst to investors, Cambridge Analytica had obtained and exploited far more

21   user data than Facebook or its officers had revealed, which had not been deleted and was still being

22   used.  In addition, Facebook had exposed data from millions of users to other third parties, creating

23   additional massive undisclosed risks to users and its business.  As a result of these practices, and

24   Facebook's lax enforcement of its privacy policies, improperly transmitted user data remained in the

25   hands of numerous third parties at the outset of the Class Period, and tens of millions of users whose

26   data had been stolen had not been informed that their data was at risk.  These unreported conditions

27   gave rise to significant risks of further regulatory investigations and proceedings and negative media

28   attention once the true scope of the data scandal was revealed, as was inevitable.  Thus, at the outset

1   of the Class Period, there were significant and undisclosed risks to the Company's reputation that

2   threatened the trust users placed in Facebook, eroding its active user base and jeopardizing its

3   financial condition.

4   225.   Facebook's false assurances that it had "'take[n] swift action'"[258] in response to the

5   Cambridge Analytica data breach, "'including banning those companies from Facebook and

6   requiring them to destroy all improperly collected data'"[259] remained alive and uncorrected in the

7   market at the outset of the Class Period.  Investors were still unaware that the Company had waited

8   more than six months to take any action to secure or delete the affected data, had relied entirely on

9   unverified certifications from current or former Cambridge Analytica employees to assure that

10  compromised data had been deleted, and had failed to undertake any investigation or audit to

11  determine how much data had been compromised, where it was located, who had been able to access

12  it, what users were affected, and, incredibly, whether it had been secured and deleted.  Thus, at the

13  outset of the Class Period, investors were unaware of the substantial risks facing the Company if its

14  failure to investigate the data breach or assure the deletion of that data came to light.  These risks

15  were heightened at the outset of the Class Period, as the Company was becoming entangled in the

16  growing controversy over Cambridge Analytica's activities in connection with Brexit vote and the

17  2016 presidential election, including its use of Facebook user data to formulate political strategies

18  and influence voter behavior and opinion.

19  226.   Thereafter, defendants continued to mislead investors, users and the public at large

20  about what had been done to address the Cambridge Analytica data breach, using much the same

21  language as they had used in their initial response to the December 2015 article in *The Guardian*.

22  227.   On or about February 16, 2017, Facebook made the following statement and provided

23  the following information to *BuzzFeed News*, with the knowledge and expectation that it would be

24

25

---

26  [258]   Marc Home, *Dealers use Facebook to peddle drugs linked to Scottish deaths; Drugs are offered with recorded delivery*, The Times (Apr. 11, 2018), https://tinyurl.com/ydgfns71.

27  [259]   Harry Davies, *Ted Cruz using firm that harvested data on millions of unwitting Facebook users*, The Guardian (Dec. 11, 2015), https://tinyurl.com/kctlw6n.

28

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                                                                    - 85 -

1  communicated to the public, as it was on that date in an article titled "The Truth About The Trump

2  Data Team That People Are Freaking Out About":

3          Facebook, which told *The Guardian* in 2015 that it was investigating
     allegations that the company had improperly obtained data from its users, would not
4    comment on the current status of that investigation. But as a general rule, Andy
     Stone, a Facebook spokesperson, said, "Misleading people or misusing their
5    information is a direct violation of our policies and we will take swift action against
     companies that do, including banning those companies from Facebook and requiring
6    them to destroy all improperly collected data."[260]

7          228.    On or about June 8, 2017, Facebook made the following statement and provided the

8  following information to *Newsweek*, with the knowledge and expectation that it would be

9  communicated to the public, as it was on that date in an article titled "How Big Data Mines Personal

10 Info to Craft Fake News and Manipulate Voters":

11         A spokesman for Facebook refused to speak on the record about the various
     allegations [regarding Cambridge Analytica's activities in the 2016 presidential
12   election] and said founder and CEO Mark Zuckerberg would not comment for this
     article. "Misleading people or misusing their information is a direct violation of our
13   policies and we will take swift action against companies that do, including banning
     those companies from Facebook and requiring them to destroy all improperly
14   collected data," the spokesman wrote in an emailed message.[261]

15         229.    The foregoing statements were materially misleading because Facebook's actions in

16 response to the Cambridge Analytica data breach, and other similar privacy violations that had not

17 yet been publicly reported, were directly contrary to defendants' assertions. Facebook had not taken

18 "swift action" when it learned of the Cambridge Analytica data breach, nor had it banned the

19 companies that shared user data with Cambridge Analytica or taken any steps reasonably calculated

20 to require Cambridge Analytica or any of its affiliated entities or employees to destroy all the data it

21 had improperly collected. To the contrary, defendants had taken no action at all against Cambridge

22 Analytica or its affiliates until after the Brexit vote, when they knew the risk had increased that the

23 Company's failures to protect user data from being compromised would be exposed. Neither had

24 Facebook taken any action to verify that the data was deleted, or to investigate the full scope of the

25

26 [260] Kendall Taggart, *The Truth About the Trump Data Team That People Are Freaking Out About*,
     BuzzFeed News (Feb. 16, 2017), https://tinyurl.com/y7yewq47.

27 [261] Nina Burleigh, *How Big Data Mines Personal Info to Craft Fake News and Manipulate Voters*,
     Newsweek (June 8, 2017), https://tinyurl.com/ycfz7l5d.

28

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                        - 86 -

1   data breach, and defendants had deliberately decided not to notify affected users that their data had

2   been shared in ways they had not authorized, in violation of regulatory requirements and the FTC

3   consent decree.  Defendants were well aware of the risk to the Company (and its users) as a result of

4   its inaction, as they had learned of the data breach no later than October 2015, and had hired one of

5   the architects of the data sharing scheme, Joseph Chancellor, who was working in Facebook's Menlo

6   Park headquarters at the time these statements were made.  Defendants knew that their actions were

7   not reasonably calculated to recover or assure destruction of the compromised data, and were also

8   aware that Facebook had exposed the data of millions of other users to similar harm both prior to and

9   after the Cambridge Analytica breach was reported.  Defendants' knowledge and reckless disregard

10  of the risks is further demonstrated by their efforts to coordinate the response to *The Guardian*'s

11  December 2015 articles in a manner intended to discredit the articles, and their use of the same

12  language in numerous subsequent public statements, which evidences a deliberate pattern of

13  downplaying and minimizing risks to users and the Company from privacy violations.  Defendants

14  were motivated to conceal privacy violations in order to protect Facebook's business model and

15  induce active use of the Company's social media platforms so Facebook could continue to monetize

16  users' personal data through targeted advertising and other means, and so they could sell their

17  personal holdings of Facebook shares at inflated prices before the Company's concealed privacy

18  risks and practices came to light.  That defendants took no action against Cambridge Analytica until

19  after the Brexit vote further confirms their knowledge of and deliberate efforts to conceal the

20  heightened risks to the Company prevailing during the Class Period.

21       **B.    Defendants Recklessly Made Materially False and Misleading
               Statements Concerning Facebook's Privacy Practices**
22

23            **1.    April 2017 Privacy White Paper**

24       230.   On April 27, 2017, Facebook published the white paper titled "Information

25  Operations and Facebook" in order to "***be transparent***" about what it was doing to protect users

26  from being exploited by misuse of their personal data, including attempts to use [t]argeted data

27

28

1  collection" to "control[] public discourse."[262]  *Supra*, §IV, D.1.  The white paper included the

2  following description of Facebook's efforts to combat the problem:

3          What we're doing about targeted data collection

4          Facebook has long focused on helping people ***protect their accounts from
       compromise***.  Our security team closely monitors a range of threats to our platform,

5      including bad actors with differing skillsets and missions, in order to defend people
       on Facebook (and our company) against targeted data collection and account

6      takeover.  Our dedicated teams focus daily on account integrity, user safety, and
       security, and we have implemented additional measures to protect vulnerable people

7      in times of heightened cyber activity such as elections periods, times of conflict or
       political turmoil, and other high profile events.

8
           Here are some of the steps we are taking:

9

10        •      Providing a set of customizable security and privacy features,
                including multiple options for two-factor authentication and in-
                product marketing to encourage adoption;

11

12        •      ***Notifications to specific people*** if they have been targeted by
                sophisticated attackers, with custom recommendations depending on
                the threat model;

13

14        •      ***Proactive notifications to people*** who have yet to be targeted, but
                whom we believe may be at risk based on the behavior of particular
                malicious actors;

15

16        •      In some cases, ***direct communication with likely targets***;

17        •      Where appropriate, ***working directly with government bodies
                responsible for election protections to notify*** and educate people who
                may be at greater risk.[263]

18

19      231.  The foregoing statements were materially false and misleading because, as defendants

20  knew or recklessly disregarded, Facebook did not provide "notifications to specific people" whose

21  data had been targeted or compromised or "proactive notifications to people" who may be at risk.

22  On the contrary, the Company did not take any of these steps in response to the biggest data breach

23  in its history – or with respect to any of the other app developers who gained unauthorized access to

24  user information.  It was also materially false and misleading for Facebook to state that it had "long

25  focused on helping people protect their accounts from compromise" and that the Company was

26  [262] Jen Weedon, William Nuland & Alex Stamos, *Information Operations and Facebook* at 3-4, 7
    (Version 1.0, Apr. 27, 2017).

27  [263] Jen Weedon, William Nuland & Alex Stamos, *Information Operations and Facebook* at 3-4, 7

28  (Version 1.0, Apr. 27, 2017).

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                     - 88

1   being "transparent" about its privacy practices.  The opposite was true, because Facebook had long

2   sacrificed user privacy for financial success and its true privacy practices were not publicly

3   disclosed.

4          232.    Further, the foregoing statements were materially false and misleading because they

5   omitted the following material facts necessary in order to make those statements, in light of the

6   circumstances under which they were made, not misleading: (i) the Company had knowingly or

7   recklessly allowed third parties to harvest and misuse user data without their knowledge or consent,

8   including, for example, Cambridge Analytica and its affiliated companies; (ii) the Company had

9   taken no action against Cambridge Analytica, Kogan or other malicious actors upon learning that

10  user data had been compromised in violation of Facebook's terms of service; (iii) the Company had

11  waited six months before asking Cambridge Analytica and other entities to certify that all user data

12  had been destroyed and then failed to take any steps to confirm destruction; (iv) the Company had

13  made no effort to identify what data had been compromised from what users, or to notify users who

14  had been, or were at risk of being, targeted; (v) the Company had violated the FTC consent decree;

15  and (vi) a major risk to Facebook's business model, finances and reputation existed.  Defendants'

16  knowledge or reckless disregard that these statements would be, and were, misleading to investors

17  may be inferred from the same facts that support a strong inference of scienter with respect to the

18  assurances about Facebook's purported commitment to enforcement of its privacy policies.

19         **2.**      **Sandberg Misrepresents the Strength of Facebook's Privacy**
                   **Policies and Its Compliance with GDPR Requirements**

20

21         233.    Following publication of the white paper, Sandberg repeatedly reassured investors

22  that Facebook was adhering to and enforcing its privacy policies in order to help conceal the

    Company's past and current violations of those policies.  In addition, Sandberg assured investors that

23  the Company's privacy practices were ***already compliant with*** new privacy regulations being

24  adopted in Europe and other jurisdictions.  These statements were all deliberately or recklessly

25  materially false and misleading because they concealed that Facebook's past actions in response to

26  reports of data breaches like the one involving Cambridge Analytica were inconsistent with

27  defendants' public assurances of how the Company had and would continue to act in response to

28

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                        - 89 -

1   such events.  The statements were also materially false and misleading because they misrepresented

2   the current state of Facebook's privacy policies and practices, including Facebook's compliance with

3   the GDPR and other regulations.

4       234.  For example, during a public interview by *Axios* on October 12, 2017, Sandberg

5   falsely claimed that Facebook was ***not*** overriding user privacy settings to increase revenues to it or

6   its advertisers, and said that the Company's existing practices were already compliant with the

7   stringent new requirements that would be added when the GDPR became effective:

8       (a)  "[W]hen you share on Facebook you need to know that no one's going to steal

9   our data.  No one is going to get your data that shouldn't have it.  That we're not going to make

10   money in ways that you would feel uncomfortable with off your data.  And that you're controlling

11   who you share with. . . .  Privacy for us is making sure that you feel secure, sharing on

12   Facebook.."[264]

13       (b)  "Europe[] has passed a single privacy law and ***we are adhering to that***.  But

14   privacy is something we take really seriously."[265]

15       235.  During Facebook's 3Q17 earnings call on November 1, 2017, Sandberg again

16   misleadingly assured investors that Facebook was compliant with the GDPR:

17         ***On GDPR, the Facebook family of apps already applies the core principles***
        ***in the framework because we built our services around transparency and control***,

18         and we're building on this to ensure that we comply in May of next year.[266]

19       236.  On January 23, 2018, Sandberg appeared at a Facebook event in Brussels, Belgium –

20   the Facebook "Gather Conference" – where she again touted Facebook's current and historic privacy

21   policies without disclosing the massive risks to users and the Company from past violations of those

22   policies:  "'***Our apps have long been focused on giving people transparency and control*** . . . .'"

23   Sandberg then specifically linked Facebook's historic practices to its compliance with GDPR

24   requirements, stating that:  "'***this gives us a very good foundation to meet all the requirements of***

---

25  [264]  Interview by Mike Allen with Sheryl Sandberg, Chief Operating Officer of Facebook, Axios
26  (Oct 12, 2017), https://tinyurl.com/y9k7mlok.

27  [265]  *Id*.

28  [266]  3Q17 Facebook, Inc. Earnings Call Tr. at 11 (Nov. 1, 2017).

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                       

1    *the GDPR and to spur us on to continue investing in products and in educational tools to protect*

2    *privacy*.'"[267]

3         237.    During Facebook's FY17 earnings call on January 31, 2018, Sandberg misleadingly

4    represented that because Facebook's historic practices met most of the GDPR requirements, there

5    was little reason to expect a negative impact once the new regulations went into effect:

6        As part of our effort to be more transparent, last quarter, we published our
     advertising principles, which have long guided our approach across all of our

7        platforms. These principles are our commitment to the people who use our
     services. They are: ***We build for people first. We don't sell your data. You can***

8    ***control the ads you see.*** Advertising should be transparent. Advertising should be
     safe and civil.

9                          \*      \*      \*

10

11       When you think about GDPR, ***the Facebook family of apps already applies the core***
     ***principles in the GDPR framework, which are transparency and control.*** And

12   we're building on this to make sure we're ready to fully comply by May. ***We're***
     ***going to continue to give people a personalized experience and be clear about how***

13   ***we're using the data and give choices***. And we realize that this means that some
     users might opt out of our ad targeting tools. We also know that there may be a

14   DAU impact for implications on European usage. But from the targeting, we're not
     forecasting a big impact here. ***There is some risk and we're watching closely. Over***

15   ***the long run, we feel confident that we're very well-placed to navigate the***
     ***transition.***[268]

16        238.    The foregoing statements were materially false and misleading because, contrary to

17   Sandberg's representations that "no one is going to get your data that shouldn't have it" and that

18   users had "control" over their data, app developers had collected vast amounts of Facebook users'

19   friends' personal data without their knowledge or consent prior to 2014 – and still possessed that

20   data. Further, as set forth above, during the Class Period, Facebook was still engaged in harvesting

21   and using Facebook users' data without their knowledge or consent and, as such, depriving users of

22   control over their personal data. For the same reasons, Sandberg's representations concerning, for

23

24

25

26   ---
     [267]  Julia Fioretti, *Facebook to hand privacy controls to users ahead of EU law*, Reuters (Jan. 23,
27   2018), https://tinyurl.com/yd32bb4f.

     [268]  4Q17 Facebook, Inc. Earnings Call Tr. at 6, 9 (Jan. 31, 2018).
28

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1   example, Facebook "already appl[ing] the core principles in the GDPR framework," including

2   "transparency and control," were materially false and misleading.[269]

3       239.   The foregoing statements were also materially false and misleading because they

4   omitted the following material facts necessary in order to make those statements, in light of the

5   circumstances under which they were made, not misleading: (i) the Company had knowingly or

6   recklessly allowed third-party app developers to harvest and misuse user data without their

7   knowledge or consent, including, for example, Cambridge Analytica and its affiliated companies;

8   (ii) the Company had taken no action against Cambridge Analytica, Kogan or other malicious actors

9   upon learning that user data had been compromised in violation of Facebook's terms of service;

10   (iii) the Company had waited six months before asking Cambridge Analytica and other entities to

11   certify that all user data had been destroyed and then failed to take any steps to confirm destruction;

12   (iv) the Company had made no effort to identify what data had been compromised from what users,

13   or to notify users who had been, or were at risk of being, targeted; (v) the Company had violated the

14   FTC consent decree; and (vi) major risk to Facebook's business model, finances and reputation

15   existed.

16           **3.**      **Misrepresentations Concerning the Use of Facebook's**
                **Platform to Influence the Outcome of U.S. Elections**

17

18       240.   Following the 2016 presidential election, Facebook's role in facilitating Russian

19   interference in U.S. elections came under increasing scrutiny.  During this period, defendants

20   repeatedly misrepresented the extent to which Russian and other actors had used Facebook's social

21   media platforms to advance their efforts and the Company's response to such threats.  In particular,

22   despite knowingly or recklessly disregarding that Russian actors were using Facebook user data to

23   develop effective targeted political advertising, defendants repeatedly failed to disclose that massive

24   amounts of this data, including the data that had been obtained by Cambridge Analytica, could have

25   been and likely was targeted by Russian operatives due to Facebook's failures to comply with its

26

27   ---

[269] Interview by Mike Allen with Sheryl Sandberg, Chief Operating Officer of Facebook, Axios (Oct

28   12, 2017), https://tinyurl.com/y9k7mlok.

1   privacy policies or react to reported violations of those policies in the manner reflected in their

2   public statements.

3       241.    In prepared remarks to the U.S. Senate Committee on the Judiciary Subcommittee on

4   Crime and Terrorism, and the U.S. House of Representatives Permanent Select Committee on

5   Intelligence delivered on October 31, 2017 and November 1, 2017, respectively, Facebook General

6   Counsel Colin Stretch claimed – similar to how defendants had responded to prior public disclosures

7   of privacy violations – that incidents of Russian use of Facebook's platform had been isolated and

8   quickly dealt with.  Commenting about the activities of the Internet Research Agency ("IRA"),

9   Stretch testified, for example:

10          Though the volume of these posts was a tiny fraction of the overall content on
            Facebook, any amount is too much. Those accounts and Pages violated Facebook's
11          policies – which is why we removed them, as we do with all fake or malicious
            activity we find.
12
13      242.    During his oral testimony before the House subcommittee on November 1, 2017,

14   Stretch said that everything Facebook knew had been disclosed:

15          Rep. Eric Swalwell: Can each of you assure the American people that you have fully
            searched your platforms and disclosed to this committee every Russian effort to
16          influence the 2016 election?  Mr. Edgett?

17          Twitter Deputy Gen. Counsel Sean Edgett: **We've provided everything we have to
            date**, and we're continuing to look at this.  So there will be more information that we
18          share.

19          Swalwell: Mr. Stretch?

20          Stretch:  **The same is true**, particularly in connection with, as I mentioned earlier,
            some of the threat sharing that the companies are now engaged in.

21      243.    In response to a follow-up Question for the Record from U.S. Sen. Dianne Feinstein

22   delivered on January 8, 2018, Stretch specifically denied that there was a link between Russian

23   election interference and Cambridge Analytica, while continuing to conceal the fact that massive

24   amounts of user data of the type critical to the success of Russia's efforts had been exposed in the

25   Cambridge Analytica data breach:

26          Feinstein QFR #4: Facebook confirmed in the House Intelligence committee
            hearing that they found no overlap in the groups targeted by the Trump campaign's
27          advertisements, and the advertisements tied to the Russia-linked accounts identified
            thus far. . . .  **Does this assessment extend to both the content used and groups**
28

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD                                                                      - 93 -

*targeted by the companies associated with the campaign – like Cambridge Analytica – and Russian accounts*?

Stretch: ***We have seen only what appears to be insignificant overlap*** between the targeting and content used by the IRA and that used by the Trump campaign (including its third-party vendors). We are happy to schedule a meeting with your staff to discuss our findings in more detail.

244.     Each of these statements was materially false and misleading as a result of defendants' continuing omission to investigate or disclose the extent of the Cambridge Analytica data breach, to notify affected users that their data had been compromised, or to reveal that the Company had no reliable or reasonable basis on which to conclude that the data exposed by Cambridge Analytica had been deleted or recovered, or was otherwise unavailable for use in activities by foreign agents seeking to influence U.S. elections.

245.     At the time the statements were made, defendants knew user data had repeatedly been used to design effective political advertising, including by Cambridge Analytica, which was known to have been actively working on behalf of the Trump campaign in the 2016 election.  Defendants also knew that Facebook had failed to recover or delete the data – or even fully investigate the extent of the Cambridge Analytica data breach.  As a result, defendants knew or recklessly disregarded that their testimony about the use of Facebook would be misleading in the absence of a disclosure of the risk that the data of more than 50 million users that had previously been compromised was still available and had been used in targeted political advertising to influence the outcome of the 2016 election.

246.     By reason of their claimed investigation into and response to the 2015 report of the data breach, as well as Facebook's hiring of Chancellor to work in its headquarters,  defendants knew or recklessly disregarded that Kogan had worked closely with Russian operatives in the past, giving rise to a heightened risk that data provided to Cambridge Analytica had been obtained by Russian agents either before or after the data breach was originally reported. *See* §IV, C.4. Russia's likely targeting of and use of the data exposed by Cambridge Analytica was obvious to anyone who had looked into the matter, as defendants claimed to have done before they testified to Congress. For example:

1         (a)    When the Cambridge Analytica scandal was exposed in March 2018,

2   Zuckerberg – in contrast to the testimony above – readily acknowledged that Russia could have

3   targeted the data that Facebook had failed to recover or delete, testifying on April 10, 2018 that: "it

4   is entirely possible that there will be a connection."[270]

5         (b)    Just months later, the connection was confirmed by a Member of Parliament,

6   following that body's investigation in the Cambridge Analytica scandal, further demonstrating the

7   connection was apparent and readily discoverable by those professing to have investigated the

8   matter.

9         **4.**    **Facebook's DAU and MAU Metrics Were Misleading in Context**

10

11       247.    Facebook repeatedly touted its quarterly DAU and MAU metrics to assure investors

12   that users would remain engaged with its social media platforms, despite any concerns raised over

13   the privacy of their data.  For example:

14         (a)    On May 3, 2017, Facebook published a press release entitled "Facebook

15   Reports First Quarter 2017 Results."  In this release, defendants stated, "***Daily active users (DAUs)*** –

16   DAUs were 1.28 billion on average for March 2017, an increase of 18% year-over-year. ***Monthly***

17   ***active users (MAUs)*** – MAUs were 1.94 billion as of March 31, 2017, an increase of 17% year-over-

18   year."[271]  The same day, Zuckerberg posted an update to his personal Facebook page in which he

19   stated: "We just announced our quarterly results and gave an update on our progress connecting the

20   world. Our community now has more than 1.9 billion people, including almost 1.3 billion people

21   active every day."[272]

22         (b)    On July 26, 2017, Facebook published a press release entitled "Facebook

23   Reports Second Quarter 2017 Results."  In this release, defendants stated, "***Daily active users***

24   ***(DAUs)*** – DAUs were 1.32 billion on average for June 2017, an increase of 17% year-over-year.

---

25   [270]  Zuck. Sen. Test. at 25.

26   [271]  Press Release, Facebook, Inc., *Facebook Reports First Quarter 2017 Results* (May 3, 2017),
27   https://tinyurl.com/y75jvydf.

28   [272]  Mark Zuckerberg, Facebook (May 3, 2017), https://tinyurl.com/y747rvhu.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1    *Monthly active users (MAUs)* – MAUs were 2.01 billion as of June 30, 2017, an increase of 17%

2    year-over-year."[273]   The same day, Zuckerberg posted an update to his personal Facebook page in

3    which he stated: "We just announced our quarterly results and gave an update on our progress to

4    bring the world closer together.  Our community is now more than 2 billion people, including more

5    than 1.3 billion people who use Facebook every day."[274]

6                (c)        On November 1, 2017, Facebook published a press release entitled,

7    "Facebook Reports Third Quarter 2017 Results."  In this release, defendants stated, "***Daily active***

8    ***users (DAUs)*** – DAUs were 1.37 billion on average for September 2017, an increase of 16% year-

9    over-year.  *Monthly active users (MAUs)* – MAUs were 2.07 billion as of September 30, 2017, an

10   increase of 16% year-over-year."[275]   The same day, Zuckerberg posted an update to his personal

11   Facebook page in which he stated: "Our community continues to grow, now with nearly 2.1 billion

12   people using Facebook every month, and nearly 1.4 billion people using it daily.  Instagram also hit

13   a big milestone this quarter, now with 500 million daily actives."[276]

14               (d)        On January 31, 2018, Facebook published a press release entitled "Facebook

15   Reports Fourth Quarter and Full Year 2017 Results."  In this release, defendants stated, "**Daily**

16   **active users (DAUs)** – DAUs were 1.40 billion on average for December 2017, an increase of 14%

17   year-over-year.  **Monthly active users (MAUs)** – MAUs were 2.13 billion as of December 31, 2017,

18   an increase of 14% year-over-year."[277]  The same day, Zuckerberg posted an update to his personal

19   Facebook page in which he stated: "2017 was a strong year for Facebook in many ways.  Our

20

21

22

---

23   [273]  Press Release, Facebook, Inc., *Facebook Reports Second Quarter 2017 Results* (July 26, 2017), https://tinyurl.com/y9n4m62t.

24   [274]  Mark Zuckerberg, Facebook (July 26, 2017), https://tinyurl.com/ycb246wo.

25   [275]  Press Release, Facebook, Inc., *Facebook Reports Third Quarter 2017 Results* (Nov. 1, 2017), https://tinyurl.com/y8m8q62v.

26

27   [276]  Mark Zuckerberg, Facebook (Nov. 1, 2017), https://tinyurl.com/y85fh4vb.

28   [277]  Press Release, Facebook, Inc., Facebook Reports Fourth Quarter and Full Year 2017 Results (Jan. 31, 2018), https://tinyurl.com/yalrxezy.

1  community continues to grow with more than 2.1 billion people now using Facebook every month
2  and 1.4 billion people using it daily.  Our business grew 47% year-over-year to $40 billion."[278]

3         248.    Defendants also touted their active monitoring of engagement of these metrics.  For
4  example:

5         (a)     Wehner: "***We monitor the sentiment and engagement of people engaging in***
6  ***News Feed***.  We're really pleased with the strength of sentiment and engagement as we've ramped
7  up News Feed ads."[279]

8         (b)     Sandberg: "Because your experience on Facebook or Instagram is about the
9  quality of what you see . . . what we do is ***we monitor it carefully***.  We ramp slowly.  We monitor
10 engagement sentiment, quality of ads.  ***We get a lot of feedback directly from people*** who use
11 Facebook. . . .  ***And we just continue to monitor the metrics***."[280]

12        (c)     Wehner: "[i]mproving the quality and the relevance of the ads has enabled us
13 to show more of them, without harming the experience.  And, our focus really remains on the
14 experience.  So, ***we'll continue to monitor engagement and sentiment very carefully***."[281]

15        (d)     Sandberg: "When we introduce ads into feed and continue to increase the ad
16 load, ***we monitor really carefully***.  ***We're looking at user engagement on the platform***.  We also
17 look at the quality of ads."[282]

18        (e)     Analyst: "Can you just talk about some of the biggest trends you're
19 monitoring?"

20        (f)     Wehner: "Yes, I can start with the stats.  So on -- yes, Mark, on the
21 engagement front, we're seeing time spent growth per DAU across the Facebook family of apps and
22 that includes Facebook itself."[283]

---

[278]  Mark Zuckerberg, Facebook (Jan. 31, 2018), https://tinyurl.com/ydxwh302.

[279]  2Q14 Facebook, Inc. Earnings Call Tr. at 16 (July 23, 2014).

[280]  3Q15 Facebook, Inc. Earnings Call Tr. at 15 (Nov. 4, 2015).

[281]  4Q15 Facebook, Inc. Earnings Call Tr. at 9 (Jan. 27, 2016).

[282]  4Q15 Facebook, Inc. Earnings Call Tr. at 10 (Jan. 27, 2016).

1    (g)    Wehner: "We have also increased our estimate for inauthentic accounts to

2    approximately 2% to 3% of worldwide MAUs. . . .  ***We continuously monitor*** and aggressively take

3    down those accounts.  These accounts tend to be less active and thus, we believe, impact DAU less

4    than MAU."[284]

5    249.    The foregoing statements and the statistics provided therein, were misleading in the

6    context of the surrounding information, because privacy violations had been deliberately concealed

7    from users, such that their active engagement with the Company's social media platforms was not an

8    accurate or reliable indicator of user response to privacy concerns.

9    250.    The quarterly DAU and MAU metrics set forth above were materially false and

10   misleading for additional reasons, including:

11   (a)    The DAU and MAU figures reported for 1Q17 and 2Q17 were materially

12   false and misleading because, at the time, Facebook was using an incorrect methodology to calculate

13   duplicate accounts, which caused the Company to overstate DAUs and MAUs and understate

14   duplicate accounts.  Facebook admitted to this reality on November 1, 2017, when it implemented a

15   "new methodology for duplicate accounts that included improvements to the data signals we rely on

16   to help identify such accounts";

17   (b)    All of the above DAU and MAU figures were materially false and misleading

18   because they failed to account for the number of fake accounts on Facebook.  In May 15, 2018,

19   Facebook announced for the first time that it had deleted a total of ***1.277 billion fake accounts***

20   during the period from 4Q17 to 2Q18.[285]

21

22

23

24

---

25   [283]  1Q17 Facebook, Inc. Earnings Call Tr. at 9 (May 3, 2017).

26   [284]  3Q17 Facebook, Inc. Earnings Call Tr. at 7 (Nov. 1, 2017).

27   [285]  Interview by Mike Allen with Sheryl Sandberg, Chief Operating Officer of Facebook, Axios
28   (Oct 12, 2017), https://tinyurl.com/y9k7mlok.

C.   **Defendants Recklessly Made Materially False and Misleading Statements Following Disclosure of Facebook's Failure to Respond to the Cambridge Analytica Data Breach in a Manner Consistent with Its Public Statements**

1.   **Misrepresentations Concerning Reports of Past Privacy Violations**

251.   On March 16, 2018, defendants posted a statement on Facebook entitled "Suspending Cambridge Analytica and SCL Group From Facebook," which stated:

> *We are committed to vigorously enforcing our policies to protect people's information.  We will take whatever steps are required to see that this happens*. We will take legal action if necessary to hold them responsible and accountable for any unlawful behavior.
>
> *        *        *
>
> In 2014, after hearing feedback from the Facebook community, we made an update *to ensure that each person decides what information they want to share about themselves, including their friend list*.  This is just one of the many ways we give people the tools to *control their experience*.  Before you decide to use an app, you can review the permissions the developer is requesting and choose which information to share.  You can manage or revoke those permissions at any time.
>
> On an ongoing basis, *we also do a variety of manual and automated checks to ensure compliance with our policies and a positive experience for users*.  These include steps such as random audits of existing apps along with the regular and proactive monitoring of the fastest growing apps.
>
> *We enforce our policies in a variety of ways - from working with developers to fix the problem, to suspending developers from our platform, to pursuing litigation*.[286]

252.   The above statements were materially misleading because they were designed to cast doubt on *The New York Times* and *Guardian* articles reporting on Facebook's failure to address the Cambridge Analytica data breach in a manner consistent with defendants' past public statements.  In reality, Facebook was not remotely "committed to vigorously enforcing" or "ensur[ing] compliance with" its privacy protection policies and was not taking "whatever steps are required" to do so.  On the contrary, Facebook: (i) had authorized Kogan and his affiliated companies to sell user data to third parties in direct violation of the terms of service posted on Facebook's website; (ii) had taken no action against Kogan or other malicious actors upon learning that user data had been

---

[286] Paul Grewal, *Suspending Cambridge Analytica and SCL Group from Facebook*, Facebook Newsroom (Mar. 16, 2018), http://tinyurl.com/ycd7en7b.

1   compromised in violation of the terms of service; (iii) had waited six months before asking

2   Cambridge Analytica and other entities to certify that all user data had been destroyed; and (iv) had

3   made no effort – either themselves, or in concert with government bodies – to identify what data had

4   been compromised from what users, or to notify users who had been, or were at risk of being,

5   targeted.

6      253.   The foregoing statements were also materially false and misleading because, contrary

7   to the representations for example, that Facebook "ensure[s] that each person decides what

8   information they want to share about themselves, including their friend list," and that users "control

9   their experience" and "choose which information to share," as set forth above, during the Class

10  Period, Facebook was still engaged in harvesting and using Facebook users' data without their

11  knowledge or consent and, as such, was depriving users of control, choice and decision-making

12  power over their personal data.

13     254.   The foregoing statements were also materially false and misleading because they

14  omitted the following material facts necessary in order to make those statements, in light of the

15  circumstances under which they were made, not misleading:  (i) the Company had knowingly or

16  recklessly allowed third parties other than Cambridge Analytica and its affiliates to harvest and

17  misuse user data without their knowledge or consent; (ii) Facebook had taken no action against those

18  other malicious actors upon learning that user data had been compromised in violation of Facebook's

19  terms of service; (iii) Facebook had waited six months before asking Cambridge Analytica and other

20  entities to certify that all user data had been destroyed and then failed to take any steps to confirm

21  destruction; (iv) Facebook had made no effort to identify what data had been compromised from

22  what users; (v) Facebook had violated the FTC consent decree; (vi) Facebook had made no effort to

23  notify users that Cambridge Analytica or the other app developers had, without users' knowledge or

24  consent, collected and still possessed vast amounts of Facebook users' friends' personal data; and

25  (vii) Facebook's user numbers, business, finances and reputation would decline as a result of the

26  Cambridge Analytica scandal.

27     255.   On March 17, 2018, the day following the above statements, defendants provided an

28  addendum to Facebook's March 16, 2018 statement, which stated:

1        **The claim that this is a data breach is completely false.**  Aleksandr Kogan

2 requested and gained access to information from users who chose to sign up to his app, and ***everyone involved gave their consent.  People knowingly provided their***

3 ***information***, no systems were infiltrated, and no passwords or sensitive pieces of information were stolen or hacked.[287]

4      256.   The above statements were materially misleading because they were similarly

5 designed to undermine media reports concerning Facebook's lax privacy practices so as to conceal

6 the true risks of sharing data from users and investors.  In reality, the Cambridge Analytica scandal

7 was a massive data breach and tens of millions of Facebook users had their personal data harvested

8 and used by an external party without their knowledge, consent or notice.  It was patently false to

9 claim that the Cambridge Analytica scandal was not a "data breach."   Moreover, contrary to

10 Facebook's representations that "everyone involved gave their consent" and "[p]eople knowingly

11 provided their information," only approximately 270,000 users had consented to participate in the

12 survey at issue in the Cambridge Analytica data breach, but approximately 87 million Facebook

13 users had their personal data improperly exploited.  None of those additional tens of millions of users

14 was provided timely or proper notice of the data breach.

15      257.   The foregoing statements were also materially false and misleading because they

16 omitted the following material facts necessary in order to make those statements, in light of the

17 circumstances under which they were made, not misleading:  (i) the Company had knowingly or

18 recklessly allowed third parties other than Cambridge Analytica and its affiliates to harvest and

19 misuse user data without their knowledge or consent; (ii) Facebook had taken no action against those

20 other malicious actors upon learning that user data had been compromised in violation of Facebook's

21 terms of service; (iii) Facebook had waited six months before asking Cambridge Analytica and other

22 entities to certify that all user data had been destroyed and then failed to take any steps to confirm

23 the destruction; (iv) Facebook had made no effort to identify what data had been compromised from

24 what users; (v) Facebook had violated the FTC consent decree; (vi) Facebook had made no effort to

25 notify users that Cambridge Analytica or the other app developers had, without users' knowledge or

26 consent, collected and still possessed vast amounts of Facebook users' friends' personal data; and

27 ───────────────
[287] Paul Grewal, *Suspending Cambridge Analytica and SCL Group from Facebook*, Facebook

28 Newsroom (Mar. 16, 2018), https://tinyurl.com/ycd7en7b.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1  (vii) Facebook's user numbers, business, finances and reputation would decline as a result of the

2  Cambridge Analytica scandal.

3       258.    Thereafter, defendants continued to attempt to undermine media reports about

4  Facebook's privacy practices and deflect criticisms from users and inquiries from government

5  officials and regulators.  Each of these misrepresentations was similarly misleading to investors,

6  because each concealed the true nature of Facebook's privacy practices and the risks they created for

7  its business.  For example:

8       (a)    On March 21, 2018, Zuckerberg posted an update to his personal Facebook

9  page, which Facebook uses to disseminate public information regarding the Company,[288] in which he

10  stated in part:

11       ***The good news is that the most important actions to prevent this from happening
         again today we have already taken years ago***.

12

13                      *        *        *

14       In 2014, to prevent abusive apps, we announced that we were ***changing the
         entire platform to dramatically limit the data apps could access***.

15                      *        *        *

16       In this case, ***we already took the most important steps a few years ago in
         2014 to prevent bad actors from accessing people's information in this way***."[289]

17

18       (b)    During the summer of 2017, Zuckerberg was interviewed on the podcast

19  "Freakonomics Radio."  In the interview, which was posted on April 1, 2018, he stated: "***Of course,***

20  ***privacy is extremely important, and people engage and share their context and feel free to connect***

21  ***because they know that their privacy is going to be protected***."[290]

22       259.    The above statements were materially misleading because they assured investors that

23  data breaches like the Cambridge Analytica scandal were behind the Company and the consequences

24  ───────────────────

[288]  Facebook stated in all its Class Period press releases announcing earnings results and guidance
"Facebook uses the investor.fb.com and newsroom.fb.com websites as well as Mark Zuckerberg's

25  Facebook Page (facebook.com/zuck) as means of disclosing material non-public information and for
complying with its disclosure obligations under Regulation FD."

26  [289]  Mark Zuckerberg, Facebook (Mar. 21, 2018), https://tinyurl.com/yadalrv7.

27  [290]  Interview by Stephen J. Dubner with Mark Zuckerberg, Chief Operating Officer of Facebook,
Freakonomics Radio, https://tinyurl.com/yc7e3p8u.

28

1    of that the breaches would be minimal because Facebook had been protecting privacy for years.  In

2    reality, Facebook had not been protecting privacy and the consequences of Facebook's data

3    protection misconduct would not be fully revealed until July 25, 2018, when Facebook disclosed,

4    *inter alia*, heightened privacy-related expenses and declining active user figures.  Defendants'

5    knowledge or reckless disregard that these statements would be, and were, misleading to investors

6    may be inferred from the same facts that support a strong inference of scienter with respect to the

7    assurances about Facebook's purported commitment to enforcement of its privacy policies.

8           260.    In addition, the foregoing statements were materially false and misleading because

9    they omitted the following material facts necessary in order to make those statements, in light of the

10   circumstances under which they were made, not misleading:  (i) Facebook had violated the FTC

11   consent decree; (ii) Facebook's misconduct with respect to user privacy would impact the

12   Company's bottom line by destroying its reputation as a company that protected privacy and by

13   requiring the Company to incur billions in expenses to become privacy compliant, including with

14   respect to the GDPR; and (iii) as a result, Facebook's user numbers, revenue growth, operating

15   margins and business prospects would materially decline.

16          261.    On April 4, 2018, Zuckerberg conducted a telephonic press conference, which was

17   transcribed and posted on Facebook's website under the title "Hard Questions:  Q&A With Mark

18   Zuckerberg on Protecting People's Information."[291]  In this conference:

19          (a)     Zuckerberg sought to assure investors that, with respect to the Cambridge

20   Analytica scandal, "people chose to share that data" with Kogan.

21          (b)     Zuckerberg also attempted to deflect charges that Facebook had deliberately

22   violated the FTC consent decree and to assure investors that the impact of the GDPR would be

23   minimal because Facebook had been effectively complying with it for years.  During that interview,

24   Zuckerberg stated:

25                  *You asked about the FTC consent order.  We've worked hard to make sure*
                    *that we comply with it.  I think the reality here is that we need to take a broader*
26                  *view of our responsibility, rather than just the legal responsibility.  We're focused*

---

[291]  *Hard Questions:  Q&A with Mark Zuckerberg on Protecting People's Information*, Facebook
Newsroom (Apr. 4, 2018), https://tinyurl.com/ycwuda3n.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

*on doing the right thing and making sure people's information is protected, and we're doing investigations*.  We're locking down the platform, et cetera. I think that our responsibilities to the people that use Facebook are greater than just what's written in that order, and that's the standard I want to hold us to.

\*     \*     \*

For Facebook specifically, one of the things we need to do and that I hope that more people look at are just the privacy controls that you have. I think, especially leading up to the GDPR event, a lot of people are asking us, "Okay, are you going to implement all those things?" *And my answer is that we've had almost all of what's in there implemented for years, around the world, not just in Europe. So, to me, the fact that a lot of people might not be aware of that is an issue, and I think we could do a better job of putting these tools in front of people and not just offering them*, and I would encourage people to use them and make sure that they're comfortable with how their information is used on our services and others.

\*     \*     \*

So, first, the vast majority of data that Facebook knows about you is because you chose to share it.  Right? *It's not tracking.  There are other internet companies or data brokers or folks that might try to track and sell data, but we don't buy and sell.  In terms of the ad activity, I mean that's a relatively smaller part of what we're doing*.  The majority of the activity is people actually sharing information on Facebook, which is why people understand how much content is there, because people put all the photos and information there themselves. *The second point, which I touched on briefly there: for some reason we haven't been able to kick this notion for years that people think we will sell data to advertisers.  We don't.  That's not been a thing that we do*.  Actually it just goes counter to our own incentives.  Even if we wanted to do that, it just wouldn't make sense to do that.  So, I think we can certainly do a better job of explaining this and making it understandable, but the reality is the way we run the service is: people share information, we use that to help people connect and to make the services better, and we run ads to make it a free service that everyone in world can afford.

\*     \*     \*

*[T]he main principals [sic] are, you have control over everything you put on the service*, and most of the content Facebook knows about you it [sic] because you chose to share that content with your friends and put it on your profile.  And we're going to use data to make those services better, whether that's ranking News Feed, or ads, or search, or helping you connect with people through people you may know, but we're never going to sell your information.[292]

262.    In addition, during the Q&A session, a reporter (Kurt Wagner from *Recode*) asked Zuckerberg whether he had "seen any actual change in usage from users or change in ad buys from advertisers over the past couple of weeks as result of all this?"  By stating, "I don't think there has been any meaningful impact we've observed," Zuckerberg misleadingly suggested that the

---

[292] *Hard Questions: Q&A with Mark Zuckerberg on Protecting People's Information*, Facebook Newsroom (Apr. 4, 2018), https://tinyurl.com/ycwuda3n.

1  Cambridge Analytica scandal would have no meaningful impact on Facebook's user numbers,

2  revenues and business.[293]

3      263.   The above statements were materially misleading in several respects. First,

4  Zuckerberg indicated that Facebook had been complying with the FTC Consent Decree, when in

5  reality it had not been doing so, as alleged above. Second, Zuckerberg sought to assure investors

6  that data breaches like the Cambridge Analytica scandal were behind the Company and the

7  consequences of that breach would be minimal because Facebook had been protecting privacy for

8  years. In reality, Facebook had not been protecting privacy and the consequences of Facebook's

9  data protection misconduct would not be fully revealed until July 25, 2018, when Facebook

10  disclosed, *inter alia*, heightened privacy-related expenses and declining active user figures. Further,

11  Zuckerberg's statement that "we've had almost all of what's in [the GDPR] implemented for years,

12  around the world," misleadingly sought to assure investors that Facebook was already adhering to or

13  prepared to meet the requirements of the GDPR, when in reality the Company was not meeting those

14  requirements, which was not fully revealed until July 25, 2018. Defendants' knowledge or reckless

15  disregard that these statements would be, and were, misleading to investors may be inferred from the

16  same facts that support a strong inference of scienter with respect to the assurances about Facebook's

17  purported commitment to enforcement of its privacy policies.

18      264.   The foregoing statements were materially false and misleading because, contrary to

19  Zuckerberg's representations that, for example, users had "control" and "choice" over their data, app

20  developers had collected vast amounts of Facebook users' friends' personal data without their

21  knowledge or consent prior to 2014 – and still possessed that data. Further, as set forth above,

22  during the Class Period, Facebook was still engaged in harvesting and using Facebook users' data

23  without their knowledge or consent and, as such, was depriving users of control over their personal

24  data. In addition, Zuckerberg's assurance that the users whose data had been improperly harvested

25  and used in the Cambridge Analytica scandal "chose to share" their data with Kogan was materially

26

27  ───────────────

28  [293] *Id.*

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1  false and misleading because only approximately 270,000 users had signed up for the app, but more

2  than 87 million users had had their data harvested and used without their knowledge or consent.

3       265.    The foregoing statements were also materially false and misleading because they

4  omitted the following material facts necessary in order to make those statements, in light of the

5  circumstances under which they were made, not misleading:  (i) Facebook had violated the FTC

6  consent decree; (ii) Facebook's misconduct with respect to user privacy would impact the

7  Company's bottom line by destroying its reputation as a company that protected privacy and by

8  requiring the Company to incur billions in expenses to become privacy compliant, including with

9  respect to the GDPR; and (iii) as a result, Facebook's user numbers, revenue growth, operating

10  margins and business prospects would materially decline.

11       266.    Thereafter, defendants continued to falsely assure investors and users about the

12  strength of Facebook's privacy policies, as they attempted to falsely portray the events concerning

13  the Cambridge Analytica data breach as reflecting past practices that had been fully addressed and

14  were not affecting the Company's current operations.  Each of these statements was materially false

15  and misleading because the historic practices were much broader than described by defendants.  For

16  example:

17       (a)    On April 5, 2018, Sandberg was interviewed by Judy Woodruff for PBS

18  NewsHour, and stated:

19          ***We have always built privacy into our ads models***.

20          ***We do not sell data or give your personal data to advertisers, period***.  What
      happens on Facebook is, someone wants to advertise.  ***We are able to show targeted***

21        ***ads that you will hopefully be interested in without passing any personal data***.

22          ***Our commitment to that remains very strong***.[294]

23       (b)    On April 10 and 11, 2018, Zuckerberg testified before the U.S. Senate

24  Committees on the Judiciary and on Commerce, Science, and Transportation, and the U.S. House of

25  Representatives Committee on Energy and Commerce.  In his prepared remarks before both the

26  Senate and House Committees, Zuckerberg stated in part:

---

[294]  Interview by Judy Woodruff with Sheryl Sandberg, Chief Operating Officer of Facebook, PBS
NewsHour (Apr. 5, 2018), https://tinyurl.com/y94a24s2.

It's not enough to give people control of their information, we have to make sure developers they've given it to are protecting it too.

\*          \*          \*

In 2014, to prevent abusive apps, we announced that we were changing the entire platform to dramatically limit the Facebook information apps could access. Most importantly, apps like Kogan's could no longer ask for information about a person's friends unless their friends had also authorized the app. We also required developers to get approval from Facebook before they could request any data beyond a user's public profile, friend list, and email address. These actions would prevent any app like Kogan's from being able to access as much Facebook data today.[295]

(c)     On April 24, 2018, Facebook published a press release entitled "How to Take Control of Your Facebook." That release included the misleading statement:

You likely have seen advertisements in your News Feed. Advertising is what keeps Facebook free to everyone who uses it. Facebook's goal is to ensure that the ads you see are as relevant to you as the content you see from friends and family. Your information is utilized to show you more relevant ads, but ***Facebook never sells your data or tells advertisers who you are***.[296]

267.    The above statements were materially misleading because they assured investors that data breaches like the Cambridge Analytica scandal were behind the Company and the consequences of those breaches would be minimal because Facebook had been protecting privacy for years. In reality, Facebook had not been protecting privacy and the consequences of Facebook's data protection misconduct would not be fully revealed until July 25, 2018, when Facebook disclosed, *inter alia*, heightened privacy-related expenses and declining active user figures. Defendants' knowledge or reckless disregard that these statements would be, and were, misleading to investors may be inferred from the same facts that support a strong inference of scienter with respect to the assurances about Facebook's purported commitment to enforcement of its privacy policies.

268.    The foregoing statements were also materially false and misleading because, contrary to Zuckerberg's representations that, for example, users had "control" over their information, app developers had collected vast amounts of Facebook users' friends' personal data without their

---

[295] Facebook, Social Media Privacy, and the Use and Abuse of Data: Hearing Before the S. Comm. on the Judiciary and the S. Comm. on Commerce, Sci., and Transp., 115th Cong. (2018) (Statement of Mark Zuckerberg, Chairman and Chief Executive Officer of Facebook, Inc.).

[296] Press Release, *How to Take Control of Your Facebook*, PR Newswire (Apr. 24, 2018), https://tinyurl.com/y84wzmof.

1   knowledge or consent prior to 2014 – and still possessed that data.  Further, as set forth above,

2   during the Class Period, Facebook was still engaged in harvesting and using Facebook users' data

3   without their knowledge or consent and, as such, was depriving users of control over their personal

4   data.

5          269.   In addition, the statements were materially false and misleading because they omitted

6   the following material facts necessary in order to make those statements, in light of the

7   circumstances under which they were made, not misleading:  (i) Facebook had violated the FTC

8   consent decree; (ii) Facebook's privacy misconduct would impact the Company's bottom line by

9   destroying its reputation as a company that protected privacy and by requiring the Company to incur

10   billions in expenses to become privacy compliant, including with respect to the GDPR; and (iii) as a

11   result, Facebook's user numbers, revenue growth, operating margins and business prospects would

12   materially decline.

13           **2.**     **Misrepresentations Concerning Facebook's 1Q18 Financial**
                   **Results and the Impact of the Privacy Disclosures on**

14                      **Facebook's Business**

15          270.   On April 25, 2018, Facebook published a press release entitled "Facebook Reports

16   First Quarter 2018 Results."  In this release, defendants stated, "**Daily active users (DAUs)** – DAUs

17   were 1.45 billion on average for March 2018, an increase of 13% year-over-year.  **Monthly active**

18   **users (MAUs)** – MAUs were 2.20 billion as of March 31, 2018, an increase of 13% year-over-

19   year."[297]

20          271.   The same day, Zuckerberg posted an update to his personal Facebook page, in which

21   he stated: "Despite facing important challenges, our community continues to grow.  More than 2.2

22   billion people now use Facebook every month and more than 1.4 billion people use it daily."[298]

23          272.   Also on April 25, 2018, Facebook conducted its quarterly conference call with

24   investors.  The press release and the conference call received widespread media attention, as

25   investors, analysts and others paid particular attention to the financial impact on the Company from

26      [297]   Press Release, Facebook, Inc., *Facebook Reports First Quarter 2018 Results* (Apr. 25, 2018),

27   https://tinyurl.com/yblj7aqd.

28   [298]   Mark Zuckerberg, Facebook (Apr. 25, 2018), https://tinyurl.com/y9mgzu8k.

1   the recent disclosures concerning its privacy practices, including its failure to act in response to the

2   Cambridge Analytica data breach in a manner consistent with its prior public representations

3   concerning the matter.  The following day, Facebook filed its Report on Form 10-Q for the 1Q18

4   with the SEC.

5          273.    The Company's earnings release and Form 10-Q highlighted the growth in MAUs

6   and DAUs as a sign of the success of its business, while its officers touted the strength of the

7   Company's business as an indicator of the purported lack of meaningful impact resulting from the

8   controversy.  "Despite facing important challenges, our community and business are off to a strong

9   start in 2018," Zuckerberg told investors in Facebook's 1Q18 earnings release.  During the April 25,

10  2018 earnings call for 1Q18, Zuckerberg added that "sharing and interaction" and other indicators of

11  user engagement were increasing as a result of changes in the platforms' ranking and sharing

12  algorithms.  "[W]e're optimistic about what we're seeing here," he added.  During the same

13  conference call, Wehner told investors that the 1Q18 results "demonstrated [that] growth in our

14  business and global community remains strong," while telling them "we do not anticipate [that new

15  European privacy regulations] will significantly impact advertising revenues."[299]

16         274.    Even when defendants acknowledged the impact of the Cambridge Analytica data

17  scandal, they assured investors that any negative effect would be short-lived and manageable without

18  negative impact to the business.  Wehner told investors on the earnings call that the increased

19  spending needed to beef up data security programs in the wake of the scandal were already included

20  in the 1Q18 results, and the increase in the lower limit of the Company's spending guidance simply

21  reflected that it was "putting more" investment into that category "more quickly than we

22  anticipated."  Sandberg allowed that a "handful" of advertisers had "paused spend" immediately

23  after the Cambridge Analytica scandal broke, but encouraged investors to take an optimistic outlook

24  by telling them that one of the advertisers that reduced spend "ha[d] already come back" and

25  assuring investors that "we haven't seen a meaningful trend or anything much since then."[300]

26  _____

27  [299]  1Q18 Facebook, Inc. Earnings Call Tr. at 6, 7, 9 (Apr. 25, 2018).

28  [300]  *Id.* at 8, 12.

1    275.    When Facebook released its quarterly results, it raised the lower end of its expense

2    guidance, telling investors to expect full-year 2018 expenses to grow 50%-60% as compared with

3    the prior range of 45% to 60%.  During the call, Wehner said that the "narrowed range reflects the

4    significant investments we're making in areas like safety and security, content acquisition, and our

5    long-term innovation efforts."[301]  Later in the call, an analyst asked Wehner to explain the impact

6    more specifically, particularly in light of "what you've seen over the last couple of months" – *i.e.*,

7    the Cambridge Analytica scandal.[302]  Wehner responded:

> If you recall, it's very consistent with what we've been talking about it last
> couple of quarters, which is the acceleration of expense growth is really driven by 3
> factors.  It's the investments that we're making in safety and security; it's the content
> investments that we're making to support Watch and finally, it's innovation
> initiatives around our longer-term bets like AI, AR/VR and connectivity.  It's those 3
> factors.
>
> If I had to point to what's really leading us to tighten the range, ***it's really the
> first factor, which is the safety and security investments.  Specifically, we're
> putting more behind that more quickly than we anticipated.  And so that's where
> you're going to see it come up.  If you look at the current results from this quarter,
> you'll see that*** our sales and marketing expense grew 51 percent in the quarter.  One
> of the – year-over-year – one of the factors driving that is that's where we're
> categorizing our community operations investment and other operations teams that
> support the quality initiatives and the safety initiatives.  You're already seeing some
> of that getting picked up in the quarter, and you'll see that carry through in the year.

276.    On Facebook's April 25, 2018 first quarter earnings call, Sandberg stated:

> Before going through our results, I want to take a minute to talk about ads and
> privacy.  ***At Facebook, we have always built privacy protection into our ads system***.
> We use the information you provide and that we receive from websites to target ads
> for advertisers, but we don't tell them who you are.  ***We don't sell your information
> to advertisers or anyone else.***
>
> ***We also believe that people should control their advertising experience.***  For
> every ad we show, there's an option to find out why you're seeing that ad and to turn
> off ads from that advertiser entirely.  And you can opt out of being targeted based on
> certain information like the websites you visit or your relationship status.
>
> ***Advertising and protecting people's information are not at odds.  We do
> both.  Targeted ads that respect people's privacy are better ads.***  They show people
> things that they're more likely to be interested in.  We regularly hear from people
> who use Facebook that they prefer to see ads that are relevant to them and their lives.
>
> Effective advertising is also critical to helping businesses grow.

---

[301]  1Q18 Facebook, Inc. Earnings Call Tr. at 8 (Apr. 25, 2018).

[302]  *Id.* at 9.

\*     \*     \*

*In the coming months, GDPR will give us another opportunity to make sure people fully understand how their information is used by our services. It's an EU regulation, but as Mark said a few weeks ago, we're going to extend these controls to everyone who uses Facebook, regardless of where in the world they live  Our commitment to you is that we will continue to improve our ads model by strengthening privacy and choice while giving businesses of all sizes new and better tools to help them grow.*

\*     \*     \*

*Going forward, we will continue to focus on these 3 priorities and ensure that people's privacy is protected on Facebook.*[303]

277.    On the same April 25, 2018 call, Wehner stated,

*The changes that Mark and Sheryl described will, we believe, benefit our community and our business and will serve to strengthen Facebook overall. At the highest level, we believe that we can continue to build a great ads business while protecting people's privacy.*

\*     \*     \*

So on GDPR, *I think fundamentally, we believe we can continue to build a great ads business while protecting the privacy of the people that use Facebook.* As part of the rollout of GDPR, *we're providing a lot of control to people around their ad settings. And we're committed, as Sheryl and Mark mentioned, to providing the same controls worldwide.* And while *we don't expect these changes will significantly impact advertising revenue, there's certainly potential for some impact.* Any change of our – of the ability for us and our advertisers to use data can impact our optimizational potential at the margin, which could impact our ability to drive price improvements in the long run. So we'll just have to watch how that plays out over time. I think it's important to note that GDPR is affecting the entire online advertising industry. And so what's really most important in winning budgets is our relative performance versus other opportunities presented to marketers, and that's why it will be important to watch kind of how this plays out at the industry level.

\*     \*     \*

I don't know that we really see a doomsday scenario here. *I think what we think is that depending on how people react to the controls and the ad settings, there could be some limitations to data usage. We believe that those will be relatively minor.* But depending on how broadly the controls are adopted and set, there is a potential to impact targeting for our advertisers. *Obviously, if they are less able to target effectively, they'll get a lower ROI on their advertising campaigns. They'll then bid differently into the auction.* That ultimately will flow through into how we can realize price on the impressions that we're selling. So I think that's the mitigating issue that we could see, depending on how GDPR and our broader commitment to providing these same controls worldwide could play out. *We think that there is a great case for not just our business but also for the user experience on Facebook to have targeting because we think it's a better experience for the people who use*

---

[303]  *Id*. at 4-6.

1       ***Facebook to have targeted ads.  We think we can do that in a privacy-protected***
    ***way, and it's just a better experience.  You get more relevant ads, and it's – and I***
2       ***think overall benefits that only the advertisers but also the people who use***
    ***Facebook.***  So I don't think see a real doomsday scenario here.  We see an
3   opportunity to really make the case.[304]

4          278.   Defendants' effort to tout the 1Q18 results in a manner meant to assure investors that

5   the Cambridge Analytica data scandal had not, and would not, have a meaningful financial impact on

6   the business was misleading, because they knew or recklessly disregarded that those results were not

7   reflective of the true impact that the disclosure of the Cambridge Analytica data breach was having

8   on the Company's business:

9          (a)   To begin with, the quarterly results only included two weeks of user data post-

10  disclosure of the wider scope of the Cambridge Analytica data breach.  Nevertheless, defendants,

11  who knew or recklessly disregarded that assessment of the true impact would become apparent in the

12  current quarter (based in part on their active monitoring of user engagement), assured investors that

13  the 1Q18 results were sufficient to conclude that the disclosures would not have a meaningful

14  financial impact.

15         (b)   In addition, defendants concealed that the loss of advertisers was far more

16  significant than Sandberg's "handful . . . one of whom has already come back" statement suggested.

17  For example, Italy's biggest bank, UniCredit, had terminated all of its advertising and partnerships

18  with Facebook at the end of March as a result of the scandal.  The action did not come to light until

19  August 2018, when *The Guardian* published an article about it.[305]  "'Facebook is not acting in an

20  ethical way,'" the bank's CEO, Jean Pierre Mustier, told the newspaper.  "'We will not use it until it

21  has proper ethical behaviour.'"  As revealed on the 2Q18 earnings call, this was not an isolated

22  incident, as many other advertisers had similarly cut ties with Facebook or reduced spending on its

23  platform.

24         (c)   Finally, defendants knew that massive increases in spending would be

25  required to improve the security of user data and Facebook's platform, which further made the 1Q18

26  [304] *Id*. at 6, 8, 15.

27  [305]  Rupert Neate, *UniCredit cuts ties with Facebook over data breach scandal*, The Guardian (Aug.
28  7, 2018) https://tinyurl.com/y7thc4jj.

1   results not reflective of the true impact the data breach scandal would have on Facebook's financial

2   condition and results.

3       279.    Thereafter, defendants continued to mislead investors, analysts, users and others

4   about the risks of user disengagement and the financial impact of the disclosures about the

5   Company's privacy practices.  In numerous public comments, defendants falsely assured investors

6   that the privacy disclosures had not impacted, and could not reasonably be expected to impact, the

7   Company's business.

8       280.    On May 1, 2018, Zuckerberg gave his keynote address at Facebook's annual F8

9   Developer Conference.  In that appearance, Zuckerberg stated:

10      ***I also want to talk about data privacy***.  And what happened with Cambridge
        Analytica was a major breach of trust.  An app developer took data that people had
11      shared with them and sold it.  So we need to make sure that this never happens again,
        so we're taking a number of steps here.

12      First, as you all know we're restricting the data that developers will be able to
13      request from people.  ***Now the good news here is that back in 2014, we already
        made a major change to how the platform works to prevent people from sharing a
14      lot of their friends' information.  So this specific situation could not happen again
        today***.[306]

15      281.    The above statements were materially misleading because they assured investors that

16  data breaches like the Cambridge Analytica scandal were behind the Company and the consequences

17  of that breach would be minimal because Facebook had been protecting privacy for years.  In reality,

18  Facebook had not been protecting privacy and the consequences of Facebook's data protection

19  misconduct would not be fully revealed until July 25, 2018, when Facebook disclosed, *inter alia*,

20  heightened privacy-related expenses and declining active user figures.

21      282.    In addition, the foregoing statements were materially false and misleading because

22  they omitted the following material facts necessary in order to make those statements, in light of the

23  circumstances under which they were made, not misleading:  (i) Facebook had violated the FTC

24  consent decree; (ii) Facebook's privacy misconduct would impact the Company's bottom line by

25  destroying its reputation as a company that protected privacy and by requiring the Company to incur

26  billions in expenses to become privacy compliant, including with respect to the GDPR; and (iii) as a

27  _____

28  [306]  F8 2018 Developer Conf. Tr. at 9 (May 1, 2018).

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1    result, Facebook's user numbers, revenue growth, operating margins and business prospects would

2    materially decline.

3        283.   On May 31, 2018, Facebook held its Annual Stockholders Meeting.  At this event,

4    Zuckerberg stated:

> So we recently went through this process of rolling out our flows and settings for
> GDPR compliance, first, in Europe, and we're going to do it around the world.  And
> one of the settings that we ask people proactively to make a decision on is, do you
> want your ads, for how we do ad targeting, to be informed by the other apps and
> websites that you use? *People have to proactively make a decision.  Yes or no.  Do
> they want that data used?  And the majority, I think we can even say vast majority
> of people say, yes, they want that data used.*  Because if they're going to see ads,
> you want to see good ads, right?  So I think that this is one of the core questions that
> society faces and individuals face across the different services that we use, are how
> do we want our data to be used and where? . . .  This is going to be a core thing that
> we need to think about going forward, but we think about it very deeply as this is a –
> just a core part of the value that we're trying to provide.[307]

11       284.   The above statement was materially misleading because: (i) it falsely and without a

12   reasonable basis assured investors that the GDPR had not caused, and would not cause, a decline in

13   active use of Facebook's social media platforms; and (ii) it portrayed Facebook as adhering to and

14   prepared to meet the requirements of the GDPR, when in reality Facebook was not adhering or

15   prepared to meet GDPR requirements.

16       285.   In addition, the foregoing statements were materially false and misleading because

17   they omitted the following material facts necessary in order to make those statements, in light of the

18   circumstances under which they were made, not misleading:  (i) Facebook had violated the FTC

19   consent decree; (ii) Facebook's privacy misconduct would impact the Company's bottom line by

20   destroying its reputation as a company that protected privacy and by requiring the Company to incur

21   billions in expenses to become privacy compliant, including with respect to the GDPR; and (iii) as a

22   result, Facebook's user numbers, revenue growth, operating margins and business prospects would

23   materially decline.

24       286.   On June 8, 2018, Facebook provided additional responses to questions posed to the

25   Company by the members of the Senate Committee on Commerce, Science, and Transportation.  In

26   their responses to these questions, defendants stated:

27   _____

28   [307]  Facebook, Inc., Annual Shareholders Meeting Tr. at 16-17 (May 31, 2018).

1

*Privacy is at the core of everything we do, and our approach to privacy*
2   *starts with our commitment to transparency and control. Our threefold approach*
*to transparency includes, first, whenever possible, providing information on the*
3   *data we collect and use and how people can control it in context and in our*
*products.* Second, we provide information about how we collect and use data in our
4   user agreements and related educational materials. And third, we enable people to
learn more about the specific data we have about them through interactive tools such
5   as Download Your Information, which lets people download a file containing data
that they may want to take to another service, and Access Your Information, a tool
6   we are launching that will let people more easily access and manage their data on
Facebook.

7
*Our approach to control is based on the belief that people should be able to*
8   *choose who can see what they share and how their data shapes their experience on*
*Facebook. People can control the audience for their posts and the apps that can*
*receive their data. They can see and delete the history of their activities on*
9   *Facebook, and, if they no longer want to use Facebook, they can delete their*
*account and the data associated with it.* Of course, we recognize that controls are
10  only useful if people know how to find and use them. That is why we continuously
deliver in-product educational videos in people's News Feeds on important privacy
11  topics. We are also inviting people to take our Privacy Checkup – which prompts
people to review key data controls – and we are sharing privacy tips in education
12  campaigns off of Facebook, including through ads on other websites. To make our
privacy controls easier to find, we are launching a new settings menu that features
13  core privacy settings in a single place. We are always working to help people
understand and control how their data shapes their experience on Facebook.

14
\*       \*       \*
15
Like many other free online services, we sell advertising space to third
16  parties. Doing so enables us to offer our services to consumers for free. This is part
of our mission to give people the power to build community and bring the world
17  closer together.

18
\*       \*       \*
19
*We maintain our commitment to privacy by not telling advertisers who*
*users are or selling people's information to anyone. That has always been true.*
20  *We think relevant advertising and privacy are not in conflict, and we're committed*
*to doing both well*.
21
We believe targeted advertising creates value for people and advertisers who
22  use Facebook. Being able to target ads to the people most likely to be interested in
the products, service or causes being advertised enables businesses and other
23  organizations to run effective campaigns at reasonable prices.

24  \*       \*       \*

25  We do not have a "business reason" to compromise the personal data of
users; we have a business reason to protect that information.
26
\*       \*       \*
27

28

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

***We believe that everyone has the right to expect strong protections for their information,*** and that we also need to do our part to help keep our community safe, in a way that's consistent with people's privacy expectations.[308]

287.    The above statements were materially misleading because they assured investors that data breaches like the Cambridge Analytica scandal were behind the Company and the consequences of such breach as would be minimal because Facebook had been protecting privacy for years.  In reality, Facebook had not been protecting user privacy and the consequences of Facebook's data protection misconduct would not be fully revealed until July 25, 2018, when Facebook disclosed, *inter alia*, heightened privacy-related expenses and declining active user figures.

288.    The foregoing statements were also materially false and misleading because, contrary to Facebook's representations that, for example, users had "control" and "choice" over their data, app developers had collected vast amounts of Facebook users' friends' personal data without their knowledge or consent prior to 2014 – and still possessed that data.  Further, as set forth above, during the Class Period, Facebook was still engaged in harvesting and using Facebook users' data without their knowledge or consent and, as such, was depriving users of control over their personal data.

289.    In addition, the statements were materially false and misleading because they omitted the following material facts necessary in order to make those statements, in light of the circumstances under which they were made, not misleading:  (i) Facebook had violated the FTC consent decree; (ii) Facebook's privacy misconduct with respect to user privacy would impact the Company's bottom line by destroying its reputation as a company that protected privacy and by requiring the Company to incur billions in expenses to become privacy compliant, including with respect to the GDPR; and (iii) as a result, Facebook's user numbers, revenue growth, operating margins and business prospects would materially decline.

---

[308] Facebook, Social Media Privacy, and the Use and Abuse of Data: Hearing before the S. Committee on Commerce, Sci., and Transp., 115 Cong. (2018) (Statement of Facebook, Inc. in response to letter from Chairman John Thune).

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

D.      **Defendants Recklessly Made Materially False and Misleading Statements Concerning Risks to the Company's Business**

290.    Investors were further misled about Facebook's privacy practices and the risks those activities presented to its business model by a series of purported risk warnings published in the Company's annual and quarterly reports to the SEC.  Each of these warnings, as described below, was materially misleading and incomplete, because each described the risks to the Company as arising from contingent and uncertain future events, while failing to disclose the existence of current or past events that presented a much greater risk of the negative events described than a reasonable investor would understand from reading the risk warnings in context with the other publicly available information about the Company, including the false assurances and other misrepresentations previously alleged.  By warning investors of negative conditions that ***could*** arise ***if*** certain events were to occur, defendants understated and misled investors about the true nature, extent and magnitude of the risks facing the Company, because investors were unaware that events that would cause those conditions to manifest had ***already*** occurred, presenting massive and undisclosed risk to the success of the business.

1.      **Data Breaches**

291.    On February 3, 2017, Facebook filed its FY16 report on Form 10-K with the SEC (the "2016 Form 10-K").  The report was signed by Zuckerberg, Sandberg and Wehner, among others, and made available on Facebook's investor relations website.  The report included the following statements concerning the Company's data collection and privacy practices:

> ***Security breaches and improper access to or disclosure of our data or user data, or other hacking and phishing attacks on our systems, could harm our reputation and adversely affect our business*** (emphasis in original).
>
> Our industry is prone to cyber-attacks by third parties seeking unauthorized access to our data or users' data.  ***Any failure to prevent or mitigate security breaches and improper access to or disclosure of our data or user data could result in the loss or misuse of such data, which could harm our business and reputation and diminish our competitive position***.  In addition, computer malware, viruses, social engineering (predominantly spear phishing attacks), and general hacking have become more prevalent in our industry, have occurred on our systems in the past, and will occur on our systems in the future.  As a result of our prominence, we believe that we are a particularly attractive target for such breaches and attacks.  Such attacks may cause interruptions to the services we provide, degrade the user experience, cause users to lose confidence and trust in our products, or result in financial harm to us.  Our efforts to protect our company data or the information we receive may also

be unsuccessful due to software bugs or other technical malfunctions; employee, contractor, or vendor error or malfeasance; government surveillance; or other threats that evolve. In addition, third parties may attempt to fraudulently induce employees or users to disclose information in order to gain access to our data or our users' data. Although *we have developed systems and processes that are designed to protect our data and user data*, to prevent data loss, and to prevent or detect security breaches, we cannot assure you that such measures will provide absolute security.

In addition, some of our developers or other partners, such as those that help us measure the effectiveness of ads, may receive or store information provided by us or by our users through mobile or web applications integrated with Facebook. *We provide limited information to such third parties based on the scope of services provided to us. However, if these third parties or developers fail to adopt or adhere to adequate data security practices, or in the event of a breach of their networks, our data or our users' data may be improperly accessed, used, or disclosed*.

Affected users or government authorities could initiate legal or regulatory actions against us in connection with any security breaches or improper disclosure of data, which could cause us to incur significant expense and liability or result in orders or consent decrees forcing us to modify our business practices. Any of these events could have a material and adverse effect on our business, reputation, or financial results.[309]

292. The statements quoted above were repeated or incorporated by reference into the other reports on Forms 10-K and 10-Q that Facebook filed with the SEC during the Class Period, including its reports filed on May 4, 2017 (1Q17 10-Q), July 27, 2017 (2Q17 10-Q), November 2, 2017 (3Q17 10-Q), and February 1, 2018 (FY17 10-K), each of which were materially false and misleading for the same reasons as set forth above.

293. The foregoing statements were materially false and misleading because they: (i) described the risks to Facebook's business and reputation arising from its privacy practices as contingent and based on events that had not yet occurred, when in fact defendants knew that an improper data disclosure had occurred that, at the time, posed a serious risk of harm to Facebook's business, reputation and competitive position; (ii) falsely asserted that the Company had developed effective systems and processes for protecting user data from unauthorized disclosure; (iii) falsely asserted that the Company only provided "limited information" to app developers and only to the extent needed to provide services on Facebook's platforms; (iv) omitted to disclose that the Company's previously reported data breaches were much broader than the Company had disclosed; and (v) omitted to disclose that the Company's systems and processes permitted app developers to

---

[309] Facebook, Inc., Annual Report (Form 10-K) at 12-13 (Feb. 3, 2017).

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

1  share users' data with third parties without the users' authorization, including for uses by those third

2  parties that were beyond the scope of and inconsistent with the requirements of Facebook's terms of

3  use, such that the risks to the Company's business and reputation due to improper access to user data

4  were materially greater than investors would reasonably understand based on the foregoing

5  statements.

6      294.    Further, the statements were materially false and misleading because they omitted the

7  following material facts necessary in order to make those statements, in light of the circumstances

8  under which they were made, not misleading:  (i) the Company had knowingly or recklessly allowed

9  third parties such as Cambridge Analytica (and affiliates) and others to harvest and misuse user data

10  without their knowledge or consent; (ii) Facebook had taken no action against those other malicious

11  actors upon learning that user data had been compromised in violation of Facebook's terms of

12  service; (iii) Facebook had waited six months before asking Cambridge Analytica and other entities

13  to certify that all user data had been destroyed and then failed to take any steps to confirm

14  destruction; (iv) Facebook had made no effort to identify what data had been compromised from

15  what users; (v) Facebook had violated the FTC consent decree; (vi) Facebook had made no effort to

16  notify users that Cambridge Analytica or the other app developers had, without users' knowledge or

17  consent, collected and still possessed vast amounts of Facebook users' friends' personal data; and

18  (vii) a major risk to Facebook's business model, finances and reputation existed.

19          **2.    Unfavorable Media and Regulatory Investigations**

20      295.    The 2016 Form 10-K also included the following statements concerning the

21  Company's risk of negative media reports and regulatory investigations arising from its data

22  collection and privacy practices:

23          ***Unfavorable media coverage could negatively affect our business*** (emphasis
            in original).

24
            We receive a high degree of media coverage around the world.  Unfavorable
25          publicity regarding, for example, our privacy practices, terms of service, product
            changes, product quality, litigation or regulatory activity, government surveillance,
26          the actions of our advertisers, the actions of our developers whose products are
            integrated with our products, the use of our products or services for illicit,
27          objectionable, or illegal ends, the actions of our users, the quality and integrity of
            content shared on our platform, or the actions of other companies that provide similar
28          services to us, could adversely affect our reputation.  Such negative publicity also

1    could have an adverse effect on the size, engagement, and loyalty of our user base
2    and result in decreased revenue, which could adversely affect our business and
     financial results.

3                              *        *        *

4            ***We have been subject to regulatory investigations and settlements, and we
     expect to continue to be subject to such proceedings and other inquires in the
5    future, which could cause us to incur substantial costs or require us to change our
     business practices in a manner materially adverse to our business*** (emphasis in
6    original).

7            From time to time, we receive formal and informal inquiries from
     government authorities and regulators regarding our compliance with laws and
8    regulations, many of which are evolving and subject to interpretation.  We are and
     expect to continue to be the subject of investigations, inquiries, actions, and audits in
9    the United States, Europe, and around the world, particularly in the areas of privacy,
     data protection, consumer protection, and competition, as we continue to grow and
10   expand our operations.  For example, several data protection authorities in the
     European Union have initiated actions, investigations, or administrative orders
11   seeking to assert jurisdiction over Facebook, Inc. and our subsidiaries and to restrict
     the ways in which we collect and use information, and other data protection
12   authorities may do the same.  Further, the European Commission's Directorate
     General for Competition has issued a Statement of Objections in connection with our
13   2014 acquisition of WhatsApp and is investigating whether Facebook provided
     incorrect or misleading information during the merger review process (though the
14   investigation will not have an impact on the merger approval).  Orders issued by, or
     inquiries or enforcement actions initiated by, government or regulatory authorities
15   could cause us to incur substantial costs, expose us to unanticipated civil and
     criminal liability or penalties (including substantial monetary fines), or require us to
16   change our business practices in a manner materially adverse to our business.

17           296.    In addition, the 2016 Form 10-K also included the following statements concerning

18   the risks to the Company from a loss of users' trust in Facebook's ability to protect their privacy, as

19   could occur following public reports or investigations into breaches of those privacy policies, or the

20   Company's past failures to address known breaches of those policies:

21           If we fail to retain existing users or add new users, or if our users decrease
     their level of engagement with our products, our revenue, financial results, and
22   business may be significantly harmed.

23           The size of our user base and our users' level of engagement are critical to
     our success.  Our financial performance has been and will continue to be
24   significantly determined by our success in adding, retaining, and engaging active
     users of our products, particularly for Facebook and Instagram.  We anticipate that
25   our active user growth rate will continue to decline over time as the size of our active
     user base increases, and as we achieve higher market penetration rates.  ***If people do
26   not perceive our products to be useful, reliable, and trustworthy, we may not be
     able to attract or retain users or otherwise maintain or increase the frequency and
27   duration of their engagement***. . . .  Any number of factors could potentially
     negatively affect user retention, growth, and engagement, including if:

28

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD
                                                                          - 120 -

1      [T]here are decreases in user sentiment about the quality or usefulness of our
2 products or *concerns related to privacy and sharing, safety, security*, or other factors;

3                                    *       *       *

4      Technical or other problems prevent us from delivering our products in a
5 rapid and reliable manner or otherwise affect the user experience, such as security breaches or failure to prevent or limit spam or similar content;

6                                    *       *       *

7      *We, developers whose products are integrated with our products, or other*
8 *partners and companies in our industry are the subject of adverse media reports or other negative publicity.*

9      297.   The statements quoted above were repeated or incorporated by reference into the

10 other reports on Forms 10-K and 10-Q that Facebook filed with the SEC during the Class Period,

11 including its reports filed on May 4, 2017 (1Q17 10-Q), July 27, 2017 (2Q17 10-Q), November 2,

12 2017 (3Q17 10-Q), and February 1, 2018 (FY17 10-K), each of which were materially false and

13 misleading for the same reasons as set forth above.

14      298.   Each of these statements was materially false or misleading because they described

15 the risks to Facebook's business and reputation arising from its privacy practices and from

16 developers' and other third parties' use of Facebook user data as contingent and based on events that

17 had not yet occurred, while omitting to disclose that the Company's previously reported data

18 breaches were much broader than the Company had disclosed, such that the risks of negative media

19 reports and regulatory investigations that could harm Facebook's reputation and negatively impact

20 its user engagement, growth, and financial condition were materially greater than investors would

21 reasonably understand based on the foregoing statements.  Defendants' knowledge or reckless

22 disregard that these statements would be, and were, misleading to investors may be inferred from the

23 same facts that support a strong inference of scienter with respect to the assurances about Facebook's

24 purported commitment to enforcement of its privacy policies.

25      299.   The foregoing statements were also materially false and misleading because they

26 omitted the following material facts necessary in order to make those statements, in light of the

27 circumstances under which they were made, not misleading:  (i) the Company had knowingly or

28 recklessly allowed third parties such as Cambridge Analytica (and affiliates) and others to harvest

1  and misuse users' data without their knowledge or consent; (ii) Facebook had taken no action against

2  those other malicious actors upon learning that user data had been compromised in violation of

3  Facebook's terms of service; (iii) Facebook had waited six months before asking Cambridge

4  Analytica and other entities to certify that all user data had been destroyed and then failed to take

5  any steps to confirm the destruction; (iv) Facebook had made no effort to identify what data had

6  been compromised from what users; (v) Facebook had violated the FTC consent decree; (vi)

7  Facebook had made no effort to notify users that Cambridge Analytica or the other app developers

8  had, without users' knowledge or consent, collected and still possessed vast amounts of Facebook

9  users' friends' personal data; and (vii) a major risk to Facebook's business model, finances and

10  reputation existed.

11      300.    The misleading impact of the risk warnings was heightened by the other statements

12  Facebook and its officers made about protecting user data, including in the Company's terms of use

13  and privacy policies and the other systems, controls and procedures that defendants regularly touted

14  regarding the purported strength of their efforts to protect users from harm resulting from the

15  unauthorized disclosure of their data, and their purported commitment to vigorously enforcing

16  policies designed to prevent that from occurring, including by notifying affected users and banning

17  or taking legal action against those who had disseminated their data without consent.

18          **3.    Privacy Policies**

19      301.    Among the policies publicized by Facebook that, read in conjunction with the risk

20  warnings, caused investors to be misled were the following:

21          (a)    "PROMOTE SAFETY AND SECURITY.  We use the information we have

22  to help verify accounts and activity, and to promote safety and security on and off of our Services,

23  such as by investigating suspicious activity or violations of our terms or policies.  We work hard to

24  protect your account using teams of engineers, automated systems, and advanced technology such as

25  encryption and machine learning.  We also offer easy-to-use security tools that add an extra layer of

26

27

28

1    security to your account.  For more information about promoting safety on Facebook, visit the

2    Facebook Security Help Center."[310]

3              (b)     "VENDORS, SERVICE PROVIDERS AND OTHER PARTNERS.  We

4    transfer information to vendors, service providers, and other partners who globally support our

5    business, such as providing technical infrastructure services, analyzing how our Services are used,

6    measuring the effectiveness of ads and services, providing customer service, facilitating payments,

7    or conducting academic research and surveys.  These partners must adhere to strict confidentiality

8    obligations in a way that is consistent with this Data Policy and the agreements we enter into with

9    them."[311]

10             (c)     "PROTECT DATA.  Only use friend data (including friends list) in the

11   person's experience in your app. . . .  Don't sell, license or purchase any data obtained from us or our

12   services. . . .  Don't transfer any data that you receive from us (including anonymous, aggregate or

13   derived data) to any ad network, data broker or other advertising or monetization-related service. . . .

14   Enforcement is both automated an manual, and can include disabling your app, restricting you and

15   your app's access to platform functionality, requiring that you delete data, terminating our

16   agreements with you or any other action that we deem appropriate."[312]

17             (d)     "We notify our users with context around the status of their account and

18   actionable recommendations if we assess they are at increased risk of future account compromise by

19   sophisticated actors or when we have confirmed their accounts have been compromised."[313]

20             (e)     "SHARING YOUR CONTENT AND INFORMATION.  You own all of the

21   content and information you post on Facebook, and you can control how it is shared through your

22   privacy and application settings.  In addition . . . [w]hen you use an application, the application may

23   ask for your permission to access your content and information as well as content and information

---

24   [310]  Facebook Data Policy (Sept. 29, 2016).

25   [311]  *Id.*

26   [312]  Facebook Platform Policies (Jan. 10, 2017).

27   [313]  Jen Weedon, William Nuland & Alex Stamos, *Information Operations and Facebook* at 7 n.6
28   (Version 1.0, Apr. 27, 2017).

1   that others have shared with you.  We require applications to respect your privacy, and your

2   agreement with that application will control how the application can use, store, and transfer that

3   content and information.  (To learn more about Platform, including how you can control what

4   information other people may share with applications, read our Data Policy and Platform Page.)."[314]

5         (f)     "Protecting people's rights. . . .  We respect other people's rights, and expect

6   you to do the same. . . .  If you collect information from users, you will: obtain their consent, make it

7   clear you (and not Facebook) are the one collecting their information, and post a privacy policy

8   explaining what information you collect and how you will use it."[315]

9       302.   The foregoing privacy policies were misleading in and of themselves because

10   defendants failed to disclose that Facebook had repeatedly failed to adhere to them.  As a result, the

11   magnitude of the risks facing the Company from negative press reports, government and regulatory

12   investigations, and user disengagement arising from disclosure of the massive amount of user data

13   that had already been compromised was materially and substantially greater than investors

14   understood based on the information available at the time the risk warnings were provided.  For

15   example:

16         (a)     Contrary to the assurance that Facebook "investigat[ed] suspicious activity or

17   violations of our terms or policies,"[316] the Company had deliberately ignored information brought

18   to its attention about such risks and violations.  In particular, during the Class Period, defendants

19   were still concealing that they had failed to fully or promptly investigate or address the Cambridge

20   Analytica data breach, and continued to cover up the fact that the Company had repeatedly failed to

21   respond to, and had deliberately ignored, thousands of reports of violations of its terms of use and

22   policies regarding user data.

23

24

25

---

26   [314]  Facebook Terms of Service (Jan. 30, 2015).

27   [315]  *Id.*

28   [316]  Facebook Data Policy (Sept, 29 2016).

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

(b)     Contrary to the assertion that defendants "work hard to protect your account using teams of engineers, automated systems, and advanced technology,"[317] the Company had no ability to track the user data provided to developers or others, much less any ability to determine whether that information had been used or shared beyond the extent authorized by the user, or what user data had been compromised, who had it, or how it was being used.  In particular, during the Class Period, the Company was still concealing that it was unaware of how much data had been compromised or how many users had been affected by the Cambridge Analytica data breach, or what other developers or third parties had improperly accessed, used or distributed user data, or where or how any of that data was being used.

(c)     Contrary to the warning to app developers that the Company would enforce its Platform Policies to prevent app developers from selling or transferring user data, or from using their customers' friend data outside of their customer's use of the app, Facebook had failed to make any effort to verify that user data compromised in the Cambridge Analytica data breach had been deleted, and its enforcement of the Platform Policies regarding user data was limited, haphazard and inconsistent.

(d)     Contrary to the assertion that Facebook notified users whose data had been compromised and provided "actionable recommendations"[318] accompanied by important "contextual" information, in fact the Company had failed to notify tens of millions of users whose data had been compromised by the Cambridge Analytica data breach, and potentially hundreds of millions more users whose data had been compromised in other data breaches that had not yet been disclosed.

(e)     Contrary to the assertions that the Company's vendors, service providers and other partners "must adhere to strict confidentiality obligations in a way that is consistent with"[319] Facebook's terms of use and privacy policies, and that the Company "require[s] applications to

---

[317]  Facebook Data Policy (Sept, 29 2016).

[318]  Jen Weedon, William Nuland & Alex Stamos, *Information Operations and Facebook* at 7 n.6 (Version 1.0, Apr. 27, 2017).

[319]  Facebook Data Policy (Sept, 29 2016).

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1  respect [user] privacy, and [the user's] agreement with that application will control how the

2  application can use, store, and transfer that content and information,"320 or that the Company

3  expected app developers and others to protect user's rights by making it clear what information is

4  being collected and how it is being used, Facebook had repeatedly ignored information brought to its

5  attention about violations of those policies, and repeatedly authorized developers and others to use

6  information in ways that were directly contrary to those policies.

7          (f)     Contrary to the assertions that Facebook users "can control" how their

8  information is shared through the privacy settings on the Company's website and other means

9  (including their agreements with applications), defendants knew that Facebook's privacy policies

10  and settings were deliberately confusing to users, especially with respect to how a user's Facebook

11  "friends" could override the user's privacy settings and share the user's data with third parties

12  without their consent.  Facebook's privacy settings and other controls therefore did not offer the

13  level of protection described in the policies set forth above, because the Company's business model

14  was dependent on users freely sharing their information with applications, developers and

15  advertisers, and defendants therefore had a strong incentive to encourage users to do so and to make

16  it difficult for them to effectively opt out of sharing their data.

17       303.     Defendants' knowledge or reckless disregard that these statements would be, and

18  were, misleading to investors may be inferred from the same facts that support a strong inference of

19  scienter with respect to the assurances about Facebook's purported commitment to enforcement of

20  its privacy policies.

21       304.     Further, the statements set forth above were materially false and misleading because

22  they omitted the following material facts necessary in order to make those statements, in light of the

23  circumstances under which they were made, not misleading:  (i) the Company had knowingly or

24  recklessly allowed third parties other than Cambridge Analytica and its affiliates to harvest and

25  misuse users' data without their knowledge or consent; (ii) Facebook had taken no action against

26  those other malicious actors upon learning that user data had been compromised in violation of

27

28  _____
320  Facebook Terms of Service (Jan. 30, 2015).

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1   Facebook's terms of service; (iii) Facebook had waited six months before asking Cambridge

2   Analytica and other entities to certify that all user data had been destroyed and then failed to take

3   any steps to confirm destruction; (iv) Facebook had made no effort to identify what data had been

4   compromised from what users; (v) Facebook had violated the FTC consent decree; (vi) Facebook

5   had made no effort to notify users that Cambridge Analytica or the other app developers had, without

6   users' knowledge or consent, collected and still possessed vast amounts of Facebook users' friends'

7   personal data; and (vii) a major risk to Facebook's business model, finances and reputation existed.

8              **4.      Privacy Regulation and FTC Consent Decree**

9        305.    The Management's Discussion & Analysis section of the FY17 Form 10-K included

10   the following statement:

11            **Government Regulation**

12            We are subject to a number of U.S. federal and state and foreign laws and
        regulations that affect companies conducting business on the Internet. Many of these
13        laws and regulations are still evolving and being tested in courts, and could be
        interpreted in ways that could harm our business. These may involve user privacy,
14        data protection, and personal information, rights of publicity, content, intellectual
        property, advertising, marketing, distribution, data security, data retention and
15        deletion, electronic contracts and other communications, competition, protection of
        minors, consumer protection, telecommunications, product liability, taxation,
16        economic or other trade prohibitions or sanctions, securities law compliance, and
        online payment services. ***In particular, we are subject to federal, state, and foreign***
17        ***laws regarding privacy and protection of people's data***. Foreign data protection,
        privacy, content, competition, and other laws and regulations can be more restrictive
18        than those in the United States. U.S. federal and state and foreign laws and
        regulations, which in some cases can be enforced by private parties in addition to
19        government entities, are constantly evolving and can be subject to significant change.
        As a result, the application, interpretation, and enforcement of these laws and
20        regulations are often uncertain, particularly in the new and rapidly evolving industry
        in which we operate, and may be interpreted and applied inconsistently from country
21        to country and inconsistently with our current policies and practices.

22            Proposed or new legislation and regulations could also significantly affect our
        business. There currently are a number of proposals pending before federal, state,
23        and foreign legislative and regulatory bodies. In addition, the New European
        General Data Protection Regulation (GDPR) will take effect in May 2018 and will
24        apply to all of our products and services in Europe. The GDPR will include
        operational requirements for companies that receive or process personal data of
25        residents of the European Union that are different than those currently in place in the
        European Union, and will include significant penalties for non-compliance.
26        Similarly, there are a number of legislative proposals in the United States, at both the
        federal and state level, that could impose new obligations in areas affecting our
27        business, such as liability for copyright infringement by third parties. In addition,
        some countries are considering or have passed legislation implementing data

28

protection requirements or requiring local storage and processing of data or similar requirements that could increase the cost and complexity of delivering our services.

We are currently, and may in the future be, subject to regulatory orders or consent decrees. ***Violation of existing or future regulatory orders or consent decrees could subject us to substantial monetary fines and other penalties that could negatively affect our financial condition and results of operations.***[321]

306.    Substantially similar statements were included in the MD&A sections of Facebook's May 4, 2017 (1Q17), July 27, 2017 (2Q17) and November 2, 2017 (3Q17) reports on Form 10-Q.

307.    The foregoing statements were materially false and misleading because they failed to disclose that Facebook had already violated the FTC consent decree, including by deliberately deciding not to fully investigate or report the Cambridge Analytica data breach or notify affected users.  The statements were also materially false and misleading because they failed to disclose that the Company had similarly failed to report, investigate or notify users of other data breaches, including the unauthorized provision of user information to other app developers, smartphone manufacturers and others.  Defendants' knowledge or reckless disregard that these statements would be, and were, misleading to investors may be inferred from the same facts that support a strong inference of scienter with respect to the assurances about Facebook's purported commitment to enforcement of its privacy policies.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

308.    The facts detailed in §IV above, when viewed collectively and holistically and together with the other allegations in this Complaint, establish a strong inference that each of the defendants knew or recklessly disregarded that each of the misrepresentations and omissions set forth in §V above would be, and were, misleading to investors at the time they were made.

309.    Each of the defendants knew or recklessly disregarded that their statements concerning privacy risks and the Cambridge Analytica breach were or would be misleading to investors at the time they were made because, as previously alleged, at the time the foregoing statements were made, each of the defendants knew or recklessly disregarded, *inter alia,* that: (i) Facebook user data had been provided to Cambridge Analytica in violation of Facebook's terms of

---

[321]    Facebook, Inc., Annual Report (Form 10-K) at 6-7 (Feb. 1, 2018).

1   use; (ii) Facebook had done nothing to investigate the scope of the breach or recover the user data at

2   the time it learned of the breach; (iii) Facebook acted only after the risks of exposure had increased

3   as a result of Cambridge Analytica's participation in events leading to the Brexit vote; (iv)

4   defendants had deliberately decided ***not*** to notify affected users that their data had been

5   compromised; (v) the certifications obtained from Cambridge Analytica and its employees and

6   affiliates were unreliable to reasonably assure that user data had in fact been deleted; (vi) Facebook's

7   lax historical privacy practices had given rise to numerous other risks of user data being

8   compromised, such that the Cambridge Analytica data breach was not an isolated event; and (vii)

9   Facebook was continuing to share user data without authorization and in violation of its stated

10  policies.

11          310.    Defendants' scienter may be further inferred from other facts alleged herein,

12  including that: (i) GSR founder Joseph Chancellor, who had detailed knowledge about Cambridge

13  Analytica's access to and use of the user data, had been hired by Facebook around the time it learned

14  of the data breach and was still working in its headquarters at the time the foregoing statements were

15  made; (ii) defendants had been repeatedly warned of the concealed risks to the Company arising

16  from its lax privacy practices, including by McNamee, Parakilas and others; (iii) defendants knew

17  that providing truthful, accurate and complete disclosures would threaten their business model, as it

18  would expose users to information that was likely to dissuade them from actively engaging on

19  Facebook's social media platforms; (iv) defendants paid close attention to user engagement metrics,

20  and the critical importance of those metrics to Facebook's business model and financial success; (v)

21  the Company had a long history of internally disregarding the privacy rights of users and acting in

22  ways that contradicted its public assurances to users; and (vi) Facebook was subject to an FTC

23  consent decree at the time the statements were made, providing defendants with heightened

24  awareness of the risks of and their responsibilities with respect to violating user privacy rights.

25          311.    In addition, defendants' scienter can be inferred from the stark contrast between their

26  disinterest in protecting users' privacy and the aggressive tack they took and take in protecting their

27  own, in particular when it came to negotiating and enforcing the Company's confidentiality and non-

28  disclosure agreements.  Kogan, who refused to respond to a number of questions asked of him by

members of the U.K. parliament for fear that doing so would violate the agreement he signed with Facebook, was typical.  As reported by *Bloomberg*, Facebook has a well-earned reputation for "searching for leakers" and negatively influencing their ability to find employment elsewhere in Silicon Valley.[322]  Indeed, Zuckerberg has reportedly announced at all-hands meetings the firing of employees for leaking, often to applause from other employees.[323]  Consistent with these Facebook practices, counsel for plaintiffs, in investigating the allegations contained in this Complaint, have contacted dozens of witnesses who otherwise would be inclined to be interviewed who declined to provide information based on their fear that either they would be prosecuted by Facebook for violating the terms of non-disclosure agreements with the Company or they would be subject to retaliation from Facebook in seeking employment, or both.

312.   Defendants' massive stock sales during the Class Period provide additional strong evidence in support of an inference of scienter, in that they further demonstrate how each of the defendants had a direct, substantial pecuniary motive to conceal the true facts from investors and users, so as to enable defendants to sell their personal shares of Facebook stock at prices that were inflated by fraud.

313.   In 2015, Zuckerberg learned that Cambridge Analytica was misusing Facebook users' personal data.  Zuckerberg has admitted to possessing knowledge of this nonpublic information.  In a recent March 21, 2018 Facebook post, he admitted that "[i]n 2015, we learned from journalists at *The Guardian* that Kogan had shared data from his app with Cambridge Analytica."[324]  Likewise, in a March 21, 2018 interview with *Wired*, he admitted that "in 2015, . . . we heard from journalists at *The Guardian* that Aleksandr Kogan seemed to have shared data with Cambridge Analytica and a few other parties."[325]  Sandberg similarly admitted in a recent April 5, 2018 interview with the

---

[322] *Facebook's Former Employees Open Up About the Data Scandal*, Bloomberg Radio (Mar. 29, 2018), https://tinyurl.com/ya5o6ymn.

[323] *Id.*

[324] Mark Zuckerberg, Facebook (Mar. 21, 2018), https://tinyurl.com/yadalrv7.

[325] Nicholas Thompson, *Mark Zuckerberg Talks to Wired about Facebook's Privacy Problem*, Wired (Mar. 21, 2018), https://tinyurl.com/y77krl23.

1    Today show that Facebook was aware as early as November 2015 that Kogan shared users' data with

2    Cambridge Analytica, stating: "You are right that we could have done these two and a half years

3    ago. . . . [W]e thought that the data had been deleted and we should have checked."[326]

4        314.    At the same time, in December 2015, that *The Guardian* told Facebook that

5    Cambridge Analytica had illegally provided Facebook user data to third parties, Zuckerberg began

6    the process of disposing of billions of dollars worth of his Facebook shares through a limited liability

7    company that created in December 2015 and controls called Chan Zuckerberg Initiative, LLC

8    ("CZI").  On December 22, 2015, eleven days after *The Guardian* published its article, Zuckerberg

9    transferred over 414 million of his Facebook shares – valued at about $45 billion at the time of the

10   transfer – to CZI.  Zuckerberg retained complete control over CZI's ability to dispose of the

11   transferred shares.

12       315.    Over the ensuing months, Zuckerberg proceeded to unload over 29.4 million

13   Facebook shares for nearly $5.3 billion.  During the year that preceded the eventual revelation that

14   Facebook had failed to safeguard its users' data, Zuckerberg sold over 10.1 million of his personal

15   Facebook shares, collecting $1.74 billion in profits in the months preceding the revelations of

16   Facebook's misconduct.  Indeed, within the one month preceding the March 17, 2018 revelations,

17   Zuckerberg sold over $780 million worth of Facebook stock.

18       316.    Sandberg also sold large amounts of her personally held Facebook shares during the

19   Class Period prior to the revelation of Facebook's data security breach.  In total, Sandberg sold over

20   ***2.2 million*** shares of Facebook stock between February 3, 2017 and March 23, 2018, collecting ***over***

21   ***$318 million*** for these sales.

22       317.    As the financial press has observed, during the months preceding Facebook's

23   disclosure of its data security breach, "[Facebook] executives [were] selling shares like crazy."[327]

24   During the three-month window prior to the disclosure of the data security breach alone, Zuckerberg

25

---

26   [326] Interview by Savannah Guthrie with Sheryl Sandberg, Chief Operating Officer of Facebook, Today Show (Apr. 6, 2018), https://tinyurl.com/ydb26wx3.

27   [327] Matt Rosoff, *Facebook is facing its biggest test ever – and its lack of leadership could sink the company*, CNBC (Mar. 18, 2018), https://tinyurl.com/yafbfrtc.

28

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1  sold more stock "than any insider at any other company."[328]  In fact, Zuckerberg *sold twice as much*

2  *stock* during the Class Period as compared to the same amount of time preceding the Class Period.

3  Meanwhile, Zuckerberg did not buy *any* shares during the Class Period.  As noted in news reports,

4  Sandberg's sale of her personal stock, while less than Zuckerberg's, "is still unusually large among

5  officers of top tech companies."[329]

6        318.  CNBC reported that in the first quarter of 2018, "as Facebook struggled with data

7  leaks and fake news scandals, insiders at the company were selling more stock than they typically

8  do," and that in the "second quarter, top executives sold 13.6 million shares, up from 8.3 million in

9  the first quarter, and roughly *triple the amount* they sold in the last quarter of 2017."[330]  Facebook's

10  SEC filings corroborate these reports and reveal suspicious trading by each of the Executive

11  Defendants.

12       **A.**  **Zuckerberg's $5.3 Billion Aggregate Sales**

13        319.  During the February 27, 2017 to July 25, 2018 period, Zuckerberg sold over *$5.3*

14  *billion* worth of Facebook stock.  Zuckerberg sold this stock out of an investment vehicle that he

15  controls and created in December 2015, when he transferred 99% of his Facebook stock to the

16  vehicle.  He publicly proclaimed that the purpose of the vehicle was charitable but the limited

17  liability company structure does not require the vehicle to spend "a minimum of 5 percent of the

18  value of their endowment every year for charitable purposes"[331] as typical nonprofits require.  When

19  Facebook reported to investors information about this new private investment vehicle in December

20  2015, the Company confirmed that Zuckerberg would "control the voting and disposition of any

21

22

---

23  [328]  Evelyn Cheng, *Zuckerberg has sold more Facebook stock in the last 3 months than any insider at any other Company*, CNBC (Mar. 20, 2018), https://tinyurl.com/y9pnn7n9.

24
25  [329]  Matt Rosoff, *Facebook is facing its biggest test ever – and its lack of leadership could sink the company*, CNBC (Mar. 18, 2018), https://tinyurl.com/yafbfrtc.

26  [330]  Kate Rooney, *Facebook insiders sold more stock than usual in the second quarter*, CNBC (July 26, 2018), https://tinyurl.com/ya3earqp.

27  [331]  Natasha Singer and Mike Isaac, *Mark Zuckerberg's Philanthropy Uses L.L.C. for More Control*, N.Y. Times (Dec. 2, 2015), https://tinyurl.com/yac2hntu.

28

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1  shares held by such entity."[332]  Thus, Zuckerberg "remains completely free to do as he wishes"[333]

2  with the proceeds from his Class Period stock sales as a result.

3      320.    When Zuckerberg created his investment vehicle in December 2015, Facebook

4  reported that he told the Company the amount of stock he planned to sell into the open market.  In

5  particular, Facebook reported that Zuckerberg told the Company that "he *plan[ned]* to sell or gift *no*

6  *more* than $1 billion of Facebook stock each year for the next three years and that he intends to

7  retain his majority voting position in our stock for the foreseeable future."[334]  Zuckerberg had

8  already created the investment vehicle on or about December 1, 2015, when Facebook reported the

9  news to investors.  The first reports of the Cambridge Analytica scandal surfaced in late December

10  2015 and, after that time but before the scandal surfaced,  Zuckerberg changed his original plan to

11  sell $3 billion.[335]

12      321.    In fact, Zuckerberg's Class Period sales of *$5.3 billion* are *55% higher* than the $3

13  billion that the Company reported on December 1, 2015 when Zuckerberg created his first plan.  He

14  sold *$2 billion* in stock (or 11.9 million shares) during the February 27, 2017 to March 23, 2018

15  period that preceded *The Guardian* and *The New York Times* reports regarding the Cambridge

16  Analytica scandal and Facebook's attendant inability to safeguard its users' personal information.

17  Once that news surfaced, Zuckerberg and his team minimized the problem, "pumping" Facebook's

18  stock price higher during the March to July 2018 period.  During that time, Zuckerberg "dumped"

19  over  7.7 million shares for proceeds of more than *$3.3 billion* before the July 25, 2018 investor call

20  when he and others at Facebook shocked the markets with the news that Facebook had essentially

21

22

23  [332]  Facebook Form 8-K (Dec. 1, 2015), https://tinyurl.com/zh5wsje.

24  [333]  Jesse Eisinger, *How Mark Zuckerberg's Altruism Helps Himself*, N.Y. Times (Dec. 3, 2015), https://tinyurl.com/yadroxe3.

25  [334]  Facebook Form 8-K (Dec. 1, 2015), https://tinyurl.com/zh5wsje.

26  [335]  Zuckerberg publicly reported a change in his plan on or about September 22, 2017.  *See*
27  Facebook Form 8-K (Sept. 27, 2017), https://tinyurl.com/yahx5mjz ("On September 22, 2017, Mr.
Zuckerberg announced that he anticipates selling 35 million to 75 million shares of Facebook stock
28  over approximately 18 months from the date of this report . . . .").

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1   ended its ability to grow in light of the business changes that the Cambridge Analytica scandal

2   precipitated.

3       322.   Zuckerberg's suspicious sales immediately preceding the March 2018 revelations,

4   along with the financial benefits that he garnered in minimizing that news before the Company's

5   July 25, 2018 investor call are clear.  After the March 18, 2018 disclosure, Zuckerberg assured

6   investors that Facebook was taking appropriate steps to ensure that users' privacy was being

7   protected and that the breach would have only a negligible impact on users' engagement on the

8   Facebook platform.  During that same time, Zuckerberg continued to unload his Facebook shares.

9   Specifically, between March 18, 2018 and the July 25, 2018 investor call, Zuckerberg sold $3.45

10  billion worth of Facebook stock (18.5 million shares).  As the financial press has since reported,

11  Zuckerberg continued to "sell[] more stock than [he] typically d[id]" during this period, selling in

12  2Q18 "double what he sold in the first quarter" of 2018 and "10 times what he sold in the fourth

13  quarter" of 2017.[336]

14      323.   Zuckerberg's trading during the Class Period was a dramatic activity departure from

15  his prior trading activity, as he sold three times more stock during the Class Period than he did for

16  the same period preceding the Class Period.  Strikingly, during the Class Period, while he was in

17  possession of material nonpublic information, Zuckerberg did not buy a single Facebook share.

18      324.   As the following charts show, Zuckerberg's quarterly insider sales during the Class

19  Period dwarf his prior sales, both in the dollar amount of the sales and in the number of shares sold:

20

21

22

23

24

25

26

27  [336] Kate Rooney, *Facebook insiders sold more stock than usual in the second quarter*, CNBC (July

28  26, 2018), https://tinyurl.com/ya3earqp.

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

Shares Sold by Defendant Zuckerberg
No. of Shares Sold
14,000,000
12,000,000
10,000,000
8,000,000
6,000,000
4,000,000
2,000,000
0
1,282,578
1,776,823
1,390,841
1,078,911
6,778,285
13,023,797
4,120,600
Q1 2017
Q2 2017
Q3 2017
Q4 2017
Q1 2018
Q2 2018
Q3 2018

Zuckerberg Insider Selling By Month
Proceeds
$1,200,000,000
$1,000,000,000
$800,000,000
$600,000,000
$400,000,000
$200,000,000
$0
Feb 17
Mar
Apr
May
Jun
Jul
Aug
Sep
Oct
Nov
Dec
Jan 18
Feb
Mar
Apr
May
Jun
Jul





**B.      Sandberg's $389 Million Insider Sales**

325.     Sandberg also dumped massive amounts of her Facebook stock during the Class Period.   She sold *$389 million* worth of Facebook stock throughout this period, and, like Zuckerberg, was in a position to control the timing of the true extent of Facebook's underlying business problems with regard to the way that it treated users' information.  During the nearly one-year period from February 16, 2017 to March 15, 2018, Sandberg sold over 1.5 million shares for more than $270 million in proceeds.  Similar to Zuckerberg's rosy statements to the market after *The Guardian* and *The New York Times* stories surfaced in late March 2018, Sandberg also issued favorable statements that increased the stock's price before the July 25, 2018 earnings call.  During the three and a half-month period from March 30, 2018 to July 19, 2018, Sandberg sold over 411,000 shares for $75 million in proceeds.  In all, she unloaded over 2.5 million shares for more than $389 million:

| Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 2/16/2017 | $133.39 | 327,000 | $43,618,530 |
| 2/28/2017 | $135.58 | 158,534 | $21,494,040 |
| 2/28/2017 | $136.15 | 88,190 | $12,007,069 |
| 2/28/2017 | $136.16 | 80,276 | $10,930,380 |
| 3/15/2017 | $139.02 | 115,258 | $16,023,167 |
| 3/15/2017 | $139.03 | 108,469 | $15,080,445 |
| 3/15/2017 | $139.77 | 54,530 | $7,621,658 |
| 3/15/2017 | $139.78 | 48,743 | $6,813,297 |
| 3/30/2017 | $140.37 | 141,490 | $19,860,951 |
| 3/30/2017 | $142.41 | 130,910 | $18,642,893 |
| 3/30/2017 | $142.90 | 100 | $14,290 |
| 4/18/2017 | $141.20 | 66,306 | $9,362,407 |
| 4/18/2017 | $141.22 | 77,194 | $10,901,337 |
| 4/18/2017 | $141.73 | 12,300 | $1,743,279 |
| 4/18/2017 | $141.77 | 7,700 | $1,091,629 |
| 5/11/2017 | $149.92 | 159,470 | $23,907,742 |
| 5/11/2017 | $150.51 | 2,200 | $331,122 |
| 5/11/2017 | $150.53 | 1,830 | $275,470 |
| 5/24/2017 | $149.22 | 39,232 | $5,854,199 |
| 5/24/2017 | $149.23 | 37,675 | $5,622,240 |
| 5/24/2017 | $149.83 | 45,662 | $6,841,537 |
| 5/24/2017 | $149.84 | 40,931 | $6,133,101 |
| 6/6/2017 | $152.99 | 19,006 | $2,907,728 |
| 6/6/2017 | $153.00 | 20,894 | $3,196,782 |
| 6/6/2017 | $153.98 | 123,600 | $19,031,928 |
| 6/19/2017 | $152.47 | 41,899 | $6,388,341 |
| 6/19/2017 | $152.50 | 48,564 | $7,406,010 |
| 6/19/2017 | $153.01 | 21,315 | $3,261,408 |

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

| Sale Date | Price | Shares Sold | Proceeds |
|-----------|-------|-------------|----------|
| 6/19/2017 | $153.04 | 19,722 | $3,018,255 |
| 2/14/2018 | $173.46 | 1,900 | $329,574 |
| 2/14/2018 | $174.97 | 10,900 | $1,907,173 |
| 2/14/2018 | $176.54 | 6,300 | $1,112,202 |
| 2/14/2018 | $177.14 | 12,525 | $2,218,679 |
| 2/14/2018 | $178.32 | 10,500 | $1,872,360 |
| 2/14/2018 | $179.32 | 12,875 | $2,308,745 |
| 3/2/2018 | $173.62 | 18,200 | $3,159,884 |
| 3/2/2018 | $174.51 | 11,080 | $1,933,571 |
| 3/2/2018 | $175.49 | 22,236 | $3,902,196 |
| 3/2/2018 | $176.48 | 3,484 | $614,856 |
| 3/15/2018 | $182.79 | 28,866 | $5,276,416 |
| 3/15/2018 | $183.51 | 26,134 | $4,795,850 |
| 4/2/2018 | $154.95 | 16,870 | $2,614,007 |
| 4/2/2018 | $155.60 | 20,620 | $3,208,472 |
| 4/2/2018 | $156.67 | 11,610 | $1,818,939 |
| 4/2/2018 | $157.65 | 3,500 | $551,775 |
| 4/2/2018 | $158.54 | 2,400 | $380,496 |
| 4/18/2018 | $166.66 | 40,261 | $6,709,898 |
| 4/18/2018 | $167.32 | 14,739 | $2,466,129 |
| 5/14/2018 | $186.84 | 43,789 | $8,181,537 |
| 5/14/2018 | $187.51 | 11,211 | $2,102,175 |
| 5/30/2018 | $185.88 | 12,492 | $2,322,013 |
| 5/30/2018 | $186.80 | 5,200 | $971,360 |
| 5/30/2018 | $187.72 | 37,308 | $7,003,458 |
| 6/12/2018 | $192.20 | 46,206 | $8,880,793 |
| 6/12/2018 | $192.92 | 8,794 | $1,696,538 |
| 6/28/2018 | $193.94 | 4,424 | $857,991 |
| 6/28/2018 | $194.94 | 17,172 | $3,347,510 |
| 6/28/2018 | $195.79 | 24,444 | $4,785,891 |
| 6/28/2018 | $196.71 | 8,960 | $1,762,522 |
| 7/19/2018 | $208.32 | 41,078 | $8,557,369 |
| 7/19/2018 | $209.16 | 13,922 | $2,911,926 |
| **Totals** | | **2,589,000** | **$389,943,538** |

C.     **Wehner's $21 Million Insider Sales**

326.     Wehner also unloaded large amounts of Facebook stock during the Class Period, as the following chart demonstrates:

| Sale Date | Price | Shares Sold | Proceeds |
|-----------|-------|-------------|----------|
| 2/21/2017 | $133.50 | 6,584 | $878,964 |
| 3/1/2017 | $136.50 | 1,209 | $165,029 |
| 3/1/2017 | $136.90 | 806 | $110,341 |
| 4/24/2017 | $144.96 | 16,008 | $2,320,520 |
| 4/28/2017 | $149.90 | 20,000 | $2,998,000 |
| 5/19/2017 | $148.47 | 15,470 | $2,296,831 |
| 8/21/2017 | $167.16 | 15,470 | $2,585,965 |
| 11/21/2017 | $179.05 | 15,470 | $2,769,904 |
| 2/22/2018 | $178.79 | 14,901 | $2,664,150 |

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

| | | | |
|---|---|---|---|
| 5/16/2018 | $183.61 | 9,522 | $1,748,334 |
| 5/21/2018 | $184.90 | 4,761 | $880,309 |
| 6/20/2018 | $199.90 | 10,000 | $1,999,000 |
| | **Totals** | **130,201** | **$21,417,346** |

## VII.   ADDITIONAL ALLEGATIONS OF RELIANCE, MATERIALITY, LOSS CAUSATION AND DAMAGES

327.   Lead Plaintiffs and other members of the Class suffered damages as a result of the misrepresentations and omissions alleged herein when the circumstances, events and conditions concealed from investors became known to the market, or the risks arising from those circumstances, conditions and events manifested, causing declines in the market price of Facebook common stock, which trades in an efficient market.

### A.   Market Efficiency

328.   Through the efficient operation of the markets in which Facebook common stock was publicly traded, Lead Plaintiffs and the other members of the proposed Class may be presumed to have relied upon each of the false and misleading statements alleged herein.

329.   At all relevant times, the market for Facebook's common stock was an efficient market for the following reasons, among others:

(a)   Facebook's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Facebook filed periodic public reports with the SEC and the NASDAQ and was, at all times alleged herein, eligible to file a Form S-3 with the SEC;

(c)   Facebook regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on national circuits of major newswire services, publications on its website and other Internet sites, and through other wide-ranging public disclosures, such as through conference calls, communications with the financial press and other similar reporting services;

(d)   During the Class Period, Facebook was followed by securities analysts employed by major brokerage firms, who regularly wrote reports based upon the publicly available

1  information disseminated by defendants about Facebook that were distributed to the sales forces and

2  certain customers of their respective brokerage firms;

3       (e)  Institutions collectively owned more than two-thirds of Facebook's

4  outstanding shares during the Class Period, each of these institutions regularly analyzed and reported

5  on the publicly available information about Facebook and its operations; and

6       (f)  During the Class Period, the average daily trading volume of Facebook

7  common stock was greater than 20 million shares.

8       330.  Through the foregoing mechanisms, the information publicly disseminated by

9  defendants about the Company and its operations, and the import thereof, became widely available

10 to and was acted upon by investors in the marketplace such that, as a result of their transactions in

11 Facebook stock, the information disseminated by defendants, including the false and misleading

12 statements described above, became incorporated into and were reflected by the market price of

13 Facebook's common stock.

14      331.  Under these circumstances, all purchasers of Facebook's common stock during the

15 Class Period are presumed to have relied upon the false and misleading statements and material

16 omissions alleged herein.

17 **B.  Loss Causation and Damages**

18      332.  Each member of the proposed Class suffered economic losses as a direct and

19 proximate result of the fraud alleged herein.  Each Class member suffered similar injury as a result

20 of: (i) their purchase of Facebook's common stock at prices that were higher than they would have

21 been had defendants made truthful and complete disclosures of information about the Company as

22 necessary to prevent the statements, omissions and course of business alleged herein from being

23 materially false or misleading to investors; and (ii) their retention of those shares through the date of

24 one or more declines in the market price of those shares that was caused by the revelation of

25 business conditions and risks concealed from investors by defendants' scheme to defraud, or the

26 financial consequences of their concealed actions.

27      333.  The misrepresentations and omissions alleged herein impacted the public trading

28 price for Facebook's common stock by causing it to trade at prices higher than it would have had the

1  facts, risks and conditions concealed by defendants' fraud become known sooner than they did.  The

2  impact on Facebook's stock price occurred by increasing the trading price of Facebook stock at the

3  time of the misrepresentations or by preventing a price decline that would have occurred at that time

4  with the full disclosure of the truth, or both.

5       334.   The facts, risks and conditions concealed from investors by defendants' scheme to

6  defraud reached the market through a series of partial disclosures.  Though each of the disclosures

7  was incomplete, each revealed some of the business conditions concealed by defendants' fraudulent

8  scheme and the concealed materialization of risks to its operations, leading to price declines that

9  partially corrected Facebook's stock price by reducing the extent to which it had been inflated by

10  defendants' fraudulent scheme, thereby injuring Lead Plaintiffs and other members of the Class who

11  had purchased Facebook stock during the Class Period at prices that had been artificially inflated by

12  the fraudulent course of business and misleading statements and omissions alleged herein.

13       335.   The fraud-related events that impacted the price of Facebook's common stock include

14  those identified in the chart below, which identifies each event, the change in Facebook's stock price

15  on the day of the event, and, for purposes of comparison, the percentage change during the same

16  time period in the Standard & Poor's 500 Stock Index ("S&P 500"), one of the market indices to

17  which Facebook compares its stock performance in its annual reports to the SEC:

18

19

20

21

22

23

24

25

26

27

28

| Date | Event[337] | Facebook | | S&P 500[338] |
|---|---|---|---|---|
| | | $ Δ | % Δ | % Δ |
| 3/19/18 | *NYT & Guardian* reports | ($12.53) | (6.8%) | (1.4%) |
| 3/20/18 | Continuing revelations of extent of data breach and lax enforcement and of regulatory and user backlash | ($4.41) | (2.6%) | 0.15% |
| 3/22/18 | | ($4.50) | (2.7%) | (2.5%) |
| 3/23/18 | | ($5.50) | (3.3%) | (2.1%) |
| 3/27/18 | | ($7.84) | (4.9%) | (1.7%) |
| 4/26/18 | 1Q18 Earnings Release | $14.47 | 9.1% | 1.0% |
| 7/26/18 | 2Q18 Earnings Release | ($41.24) | (19.0%) | (0.3%) |

336. On Monday, March 19, 2018, following the numerous disclosures over the preceding weekend regarding the misuse of Facebook user data – including the press release issued by Facebook after the market closed on Friday, March 16, 2018, and the articles published by *The New York Times* and *The Guardian* on Saturday, March 17, 2018 – the price of Facebook declined. The shares opened at $177.01 per share – a 4.4% decline from the previous Friday's closing price. Over the course of the day, as additional news regarding the extent of the data breach emerged, Facebook's stock continued to decline. Facebook shares closed at $172.56 per share, a 6.8% decline from the prior Friday's closing price on volume of 88 million shares traded, more than four times the average trading volume during the Class Period.

337. The price of Facebook common stock continued to decline thereafter as a result of additional disclosures of material information regarding the extent of the data breach, Facebook's misrepresentations about its response to that breach, and the magnitude of the risks facing the Company. By the close of the market on March 27, 2018, the price of Facebook common stock had declined to $152.22 per share as a result of such disclosures, completing a stunning 17.8% ($32.87)

[337] In some cases, the identified event occurred after the market closed on the preceding trading day but prior to the date indicated in the chart, which is the date of the relevant price decline. The list of events identified herein is necessarily preliminary, and based upon Lead Plaintiffs' analysis and investigation to date. Upon further investigation and discovery and additional analysis, Lead Plaintiffs may change, alter or amend their theory of damages, including by identifying different or additional inflationary and corrective events that caused or contributed to the damages claimed in this action, or by using other industry indices or competitor stock price data to more precisely establish the magnitude of the Company-specific changes arising from those events.

[338] The chart indicates the percentage change in the S&P 500 Index as a whole. Part of the change in the index price therefore reflects the change in the price of Facebook stock, which represents a significant portion of the index. As a result, the company-specific portion of the price changes reflected in the chart is actually greater than indicated by a simple comparison of Facebook's price change to the change in the market index.

1  decline in the price of its shares immediately before Facebook's failure to retrieve user data from

2  Cambridge Analytica and other third parties was disclosed.  The following are just some of the

3  disclosures that caused Facebook's stock price to decline:

4        (a)     On March 18, 2018, Wylie tweeted that he had been "[s]uspended by

5  @facebook.  For blowing the whistle.  ***On something they have known privately for 2 years***"[339];

6        (b)     On March 19, 2018, *The New York Times* reported that Facebook's Chief

7  Information Security Officer had been forced to resign from the Company in December 2017 as a

8  result of the growing investigations into Facebook's role in allowing Russian hacking to occur on its

9  platform during the 2016 U.S. presidential election;[340]

10        (c)     On March 20, 2018, *The Guardian* reported that app developers routinely

11  practiced data harvesting using the Facebook platform, and, as a result, data from hundreds of

12  millions of users was at risk of being exploited through tactics similar to Cambridge Analytica's.

13  This news, and additional disclosures regarding the widening scope of the data privacy risks,

14  including calls for users to "#deleteFacebook" and unconfirmed reports of government investigations

15  into the matter, caused the Company's stock price to fall further, closing at $168.15 per share, a

16  further 2.6% decline in the value of Facebook shares; and

17        (d)     Also on March 20, 2018, *The Guardian* reported that Parakilas – the platform

18  operations manager responsible for policing access to Facebook data in 2011 and 2012 – had stated

19  that Facebook's lax data use policies had likely been exploited by numerous other app developers,

20  putting the data of hundreds of millions more Facebook users at risk.[341]

21      338.    On March 21, 2018, Zuckerberg and Sandberg began conducting media interviews

22  designed to assure investors, users and the public that defendants were taking responsibility for their

23  actions, were doing everything they could to correct the problem, and that Cambridge Analytica had

24

25  [339] @chrisinsilico, Twitter (Mar. 18, 2018), https://tinyurl.com/yd9do32r.

26  [340] Nicole Perlroth, Sheera Frenkel, and Scott Shane, *Facebook Exit Hint at Dissent on Handling of Russian Trolls*, N.Y. Times (Mar. 19, 2018), https://tinyurl.com/y85ktx41.

27  [341] Paul Lewis, '*Utterly Horrifying': ex-Facebook insider says covert data harvesting was routine*, The Guardian (Mar. 20, 2018), https://tinyurl.com/ybdonk3p.

28

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1  deceived them into believing that it had destroyed the purloined user data in 2015.  As a result of

2  defendants' public relations campaign, the decline in Facebook's share price was temporarily halted,

3  and Facebook's stock closed at $169.39 per share, less than a percentage point higher than its closing

4  price on March 20, 2018.

5         339.    However, as additional details emerged concerning the scope of the data breach, the

6  risks facing the Company, and the increased calls for government investigations, Facebook's stock

7  price resumed its decline, closing at $159.39 per share on Friday, March 23, 2018, completing an

8  overall decline of $25.70 per share (14%) from the closing price the prior Friday before the scandal

9  broke.

10        340.    On March 27, 2018, the price of Facebook common stock fell by $7.84 per share, a

11  4.9% decline from the prior day's close.  This decline was the result of continuing revelations of the

12  extent of the data breach and the risks to the Company, including the FTC's confirmation that it had

13  opened an investigation into Facebook's compliance with the FTC consent decree.

14        341.    On April 26, 2018, Facebook's stock price rocketed upwards by 9% as the Company

15  reported 1Q18 earnings, which, together with the statements made by defendants on the earnings call

16  that day, led many analysts and investors to believe that the data breach had only had a negligible

17  impact on user engagement with Facebook's platform.

18        342.    On July 26, 2018, however, Facebook announced its earnings for 2Q18.  This

19  announcement revealed the true extent of the damage from the Cambridge Analytica scandal and

20  caused Facebook's stock to plummet by 19%.  Defendants revealed that the data privacy scandal had

21  had a far greater impact on the Company than they had previously represented, resulting in

22  dramatically lowered user engagement, substantially decreased advertising revenue and earnings,

23  and reduced growth expectations going forward.

24        343.    The decline in user engagement, advertising revenues, and guidance for the remainder

25  of the year – alongside the increased spending that Facebook was required to undertake to protect

26  user data from being exploited – was the result of defendants' concealment of the risks arising from

27  the Cambridge Analytica data breach; defendants' false assurances about the adequacy of the

28

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS -
5:18-cv-01725-EJD

1    Company's prior response to that incident; and the adequacy of the measures that defendants

2    imposed to prevent similar events from occurring in the future or to curtail the harm if they did.

3         344.    Facebook's quarterly results were a direct and proximate result of the concealed

4    problems with the Company's decision to grow at the expense of protecting user privacy.  The

5    Company's costs ballooned to $7.4 billion, a 50% increase from the prior year.  Much of the increase

6    resulted from measures imposed to protect user data from exploitation, including to provide the level

7    of protection that the Company had previously, and falsely, asserted it was already providing.

8    Capital expenditures similarly rose 133% from the prior year, reflecting spending on infrastructure

9    necessary to render Facebook's services safe for users.

10        345.    Investors and analysts explicitly connected the historic decline in Facebook's market

11   capitalization to the Cambridge Analytica scandal and related privacy concerns, including the recent

12   implementation of the GDPR in Europe, that had shaken the Company over the previous months.

13        346.    For instance, on July 26, 2018, CFRA issued a report noting that, "[w]e lower our

14   EPS estimates for 2018 to $7.29 from $7.42 and 2019 to $8.24 from $8.63, given what we see as

15   FB's *efforts to invest significantly to respond to the Cambridge Analytica revelations*."[342]  Cowen

16   similarly noted that the decline in advertising revenue that Facebook was bringing in was driven in

17   part by "*privacy via features that could reduce ad targeting capabilities* (like clearing user history)

18   and GDPR impact on users in Europe (as some users don't opt in for tracking usage)."[343]  Wells

19   Fargo has noted its concern over the negative impact "*of the continued efforts around security and*

20   *privacy*, both from the standpoint of GDPR implementation as well as new services and controls that

21   offer more ways for users to opt out of ads," and its report also mentioned the magnitude of the

22   "*Security & Privacy efforts*" that Facebook was now being forced to impose.[344]

23

24   [342]  Scott Kessler, *CFRA Reiterates Hold Opinion on Shares of Facebook, Inc.*, CFRA (July 26,
25   2018)

26   [343]  John Blackledge, Nick Yako, William Kerr, and James Kopelman, *2Q18 Results: 2H18 Ad Rev Decel and L-T Margin Forecast Worse Than Expected*, Cowen (July 26, 2018).

27   [344]  Ken Sena, Peter Stabler, Conor McDade, Robert J. Coolbrith, *FB: Coming Up Against Scale*,
28   Wells Fargo Securities (July 25, 2018).

347.     Additionally, J.P. Morgan's report on July 26, 2018 stated: "FB is seeing some *headwinds from data & privacy related issues* . . . . For 2H18, FB also called out privacy as likely to drag on revenue growth.  FB is giving users more choices around privacy & how their data is used, & we believe advertisers are also being more cautious around targeting consumers."[345] Macquarie's analysts similarly described their "concerns [that] LT trends/headlines are forcing *significant changes to user privacy/data concerns*.  In 3Q, we expect that users globally may be offered options that go well beyond GDPR changes.  Such changes are likely a key driver of the 4Q revenue guidance."[346]

348.     Barclays issued a research report, titled "FB Throws Some Napalm on the Fire," that described:

**Key Take-Away: Either Core Is Imploding or FB Wants Self-Inflicted Pain**

> We haven't seen this disastrous a print since the 1Q16 LNKD-massacre that brought the entire NASDAQ down.  The two theories we could come up with as to why FB is guiding revenue down severely with 3Q and 4Q now expected to both decelerate high single digits sequentially are: 1) they don't want to create the perception of getting rich while their product presents issues for society (but why didn't this happen on the Jan/April calls?), or 2) *there are more serious engagement problems with core Facebook that have materialized recently that they are trying to fix*.  The truth is likely somewhere in the middle.[347]

349.     Journalists and commentators also connected Facebook's earnings report for 2Q18 to the privacy scandals that had ensnared the Company earlier in the year.  For example, CNBC headlined its July 25, 2018 video report on Facebook's earnings miss, "Facebook shares collapse *as*

---

[345]   Thereal Heisenberg, 'Facebook Throws Napalm On The Fire': Wall Street Reacts To Zuckerberg's Terrible, No Good, Very Bad Quarter, Heisenberg Report (July 26, 2018), https://tinyurl.com/y878v99j.

[346]   Benjamin Schachter, Ed Alter and Angela Newell, *2Q'18 Bombshell Guidance; Structural Shifts*, Macquarie Research (July 26, 2018); *see also* Shelby Seyrafi, CFA, *FB: Major Guidance Reset, but we Suspect the Company is Conservatively Creating a Lower Bar*, FBN Securities (July 26, 2018) ("Drivers of the deceleration . . . . On privacy/GDPR, the data we came across was a bit mixed, but it appears that the negative impact was worse than we had modeled. . . .  Moreover, this was with basically a half-quarter's impact from GDPR, as this was instituted in May.").

[347]   Sheera Frenkel, *Facebook Says It Deleted 865 Million Posts, Mostly Spam*, N.Y. Times (May 15, 2018), https://tinyurl.com/ycwds4zo.

1   *a result of Cambridge Analytica election scandal*."[348]   *Bloomberg* noted on July 25, 2018,

2   "Facebook Takes Historic Plunge as ***Scandals Finally Take a Toll***."[349] *The New York Times*

3   similarly headlined its story, "Facebook starts paying a price for scandals"[350] *CNET.com*'s reporting

4   suggested that the July 2018 stock collapse was the inevitable end-point of the Company's

5   continuing response to the Cambridge Analytica privacy scandal, noting, "Until now . . . there was a

6   sense that the vast majority of users didn't fully understand Facebook's business.  But the ***ongoing***

7   ***scandals have caused many people to take another look***."[351]

8        350.   In a July 29, 2018 *Forbes* article, titled "Profit Versus Privacy: Facebook's Stock

9   Collapse and its Empty 'Privacy First' Policy," Kalev Leetaru reported, "At the center of

10   [Facebook's] pessimistic outlook? The ***increasing impact of the profit versus privacy battle at the***

11   ***center of the Cambridge Analytica story*** and the ***growing inability of Facebook to control its***

12   ***platform and protect it from harmful misuse***."[352] In *Tech Republic*, James Sanders published a

13   report that described the "fallout from a confluence of factors in the ***Facebook data privacy scandal***

14   has come to bear in the last week of July 2018."[353] *USA Today* noted that the "***Cambridge Analytica***

15   ***scandal [was] one of many reasons*** for [Facebook's] stock plunge."[354] And *The Washington Post*

16   explained, "The ***cost of years of privacy missteps*** finally caught up with Facebook this week. . . .

17

18   [348]     Julia Boorstin, Facebook shares collapse as a result of Cambridge Analytica election
19   scandal, CNBC (July 25, 2018), https://tinyurl.com/y92gq3nc.

20   [349] Sarah Frier, *Facebook Takes Historic Plunge as Scandals Finally Take a Toll*, Bloomberg (July 25, 2018), https://tinyurl.com/ycubn6mb.

21   [350] Sheera Frankel, *Facebook Starts Paying a Price for Scandals*, N.Y. Times (July 25, 2018),
22   https://tinyurl.com/y9rug8ru.

23   [351] Richard Hieva, *Facebooks bad year just got worse*, CNet.com (July 26, 2018), https://tinyurl.com/y7hpmxlv.

24   [352] Kalev Leetaru, *Profit Versus Privacy: Facebook's Stock Collapse and its Empty 'Privacy First'*
25   *Policy*,  Forbes (July 29, 2018), https://tinyurl.com/yc9vopf7.

26   [353] James Sanders, *Facebook data privacy: A cheat sheet*, Tech Republic (September 12, 2018), https://tinyurl.com/yclp5a2w.

27   [354] Jessica Guynn, *Why Facebook had its worst day is complicated*, USA Today, (July 28, 2018),
28   https://tinyurl.com/y9oyhrve.

1   *Worries about the rising costs of privacy regulations and controversies*, along with declining

2   growth in users and revenue played a key role in a major Wall Street sell-off . . . ."[355]

3       351.   Overseas, the news reports were comparable.  As *The Guardian* reported on July 26,

4   2018: "More than $119bn (£90.8bn) has been wiped off Facebook's market value, which includes a

5   $17bn hit to the fortune of its founder, Mark Zuckerberg, *after the company told investors that user*

6   *growth had slowed in the wake of the Cambridge Analytica scandal*."[356]  *The Independent* (UK)

7   also headlined an article "Facebook shares *plummet over privacy scandal* and slow growth in new

8   users."[357]

9   **VIII.   CLASS ACTION ALLEGATIONS**

10       352.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

11   of Civil Procedure on behalf of all persons who purchased Facebook common stock during the Class

12   Period (the "Class").  Excluded from the Class are defendants and their immediate families, directors

13   and officers of Facebook and their immediate families, and each of the foregoing persons' legal

14   representatives, heirs, successors or assigns, and any entity in which defendants have or had a

15   controlling interest.

16       353.   The members of the Class are so numerous that joinder of all members is

17   impracticable.  The disposition of their claims in a class action will provide substantial benefits to

18   the parties and the Court.  During the Class Period, Facebook had more than 2.395 billion shares of

19   common stock outstanding, owned by hundreds or thousands of persons.

20       354.   There is a well-defined community of interest in the questions of law and fact

21   involved in this case.  Questions of law and fact common to the members of the Class that

22   predominate over questions that may affect individual Class members include:

23           (a)   Whether the 1934 Act was violated by defendants;

---

24   [355]  Craig Timberg and Elizabeth Dwoskin, *How years of privacy controversies finally caught up*

25   *with Facebook*, Wash.  Post (July 26, 2018), https://tinyurl.com/y7kn8o9x.

26   [356]  Rupert Neate, *Over $119bn wiped off Facebook's market cap after growth shock,* The Guardian
(July 26, 2018), https://tinyurl.com/yat6o6og.

27   [357]  Tom Embury-Dennis, *Facebook shares plummet over privacy scandal and slow growth in new*

28   *users,* The Independent (July 25, 2018), https://tinyurl.com/ybm8uuk2.

1         (b)     Whether defendants omitted and/or misrepresented material facts;

2         (c)     Whether defendants' statements omitted material facts necessary in order to

3   make the statements made, in light of the circumstances under which they were made, not

4   misleading;

5         (d)     Whether defendants knew or recklessly disregarded that their statements were

6   false and misleading;

7         (e)     Whether the price of Facebook common stock was artificially inflated; and

8         (f)     The extent of damages sustained by Class members and the appropriate

9   measure of damages.

10       355.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class

11   sustained damages from defendants' wrongful conduct.

12       356.    There is a presumption that the members of the Class relied on the misrepresentations

13   and omissions alleged herein, pursuant to the fraud-on-the-market theory as well as under *Affiliated*

14   *Ute Citizens v. United States*, 406 U.S. 128 (1972), where the acts complained of are predicated upon

15   omissions of material fact.

16       357.    The misconduct alleged herein operated as a fraud on the market as it impacted the

17   market price of Facebook common stock, including because:

18         (a)     Defendants made public misrepresentations or failed to disclose material facts

19   during the Class Period;

20         (b)     The omissions and misrepresentations were material;

21         (c)     The Company's stock traded in an efficient market;

22         (d)     The misrepresentations alleged would tend to induce a reasonable investor to

23   misjudge the value of the Company's stock; and

24         (e)     Plaintiffs and other members of the Class purchased Facebook common stock

25   between the time defendants misrepresented or failed to disclose material facts and the time the true

26   facts were disclosed, without knowledge of the misrepresented or omitted facts.

27

28

358.     Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests that conflicts with those of the Class.

359.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.     CLAIMS FOR RELIEF

<div align="center">

**COUNT I**
**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

</div>

360.     Plaintiffs incorporate all prior allegations by reference.

361.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

362.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Facebook common stock during the Class Period.

363.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Facebook common stock.  Plaintiffs and the Class would not have purchased Facebook common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

1   364.   As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and

2   the other members of the Class suffered damages in connection with their purchases of Facebook

3   common stock during the Class Period.

**COUNT II**
**For Violation of §20(a) of the 1934**
**Act Against All Defendants**

6   365.   Plaintiffs incorporate all prior allegations by reference.

7   366.   During the Class Period, defendants acted as controlling persons of Facebook within

8   the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public

9   statements about Facebook, the Executive Defendants had the power and ability to control the

10  actions of Facebook and its employees.  Facebook controlled the Executive Defendants and its other

11  officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the

12  1934 Act.

**COUNT III**
**For Violations of §20A of the 1934 Act**
**Against Defendant Zuckerberg**

15  367.   Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as

16  if fully set forth herein.  As set forth in the paragraphs above and below, Defendant Zuckerberg

17  committed underlying violations of §10(b) and Rule 10b-5 thereunder by selling Facebook common

18  stock while in possession of material nonpublic information about the Company's deficient privacy

19  protections and material risks to the Company and, consequently, is liable to contemporaneous

20  purchasers of that stock under §20A of the 1934 Act.

21  368.   Under §20A of the 1934 Act, "[a]ny person who violates any provision of this title or

22  the rules or regulations thereunder by purchasing or selling a security while in possession of

23  material, nonpublic information shall be liable in an action . . . to any person who,

24  contemporaneously with the purchase or sale of securities that is the subject of such violation, has

25  purchased (where such violation is based on a sale of securities) or sold (where such violation is

26  based on a purchase of securities) securities of the same class." 15 U.S.C. §78t-1(a).

27  369.   Throughout the Class Period, Zuckerberg was in possession of material nonpublic

28  information regarding Facebook's deficient privacy protections and material risks to the Company.

370.    Defendant Zuckerberg's aggregated daily insider sales of his Facebook Class A common stock during the Class Period are shown in the table below:

| Trade Date | Shares | Insider Sale Proceeds | Trade Date | Shares | Insider Sale Proceeds |
|---|---|---|---|---|---|
| 2/27/2017 | 192,874 | $26,249,516 | 4/6/2018 | 145,000 | $23,049,687 |
| 2/28/2017 | 193,242 | $26,249,687 | 4/9/2018 | 162,000 | $25,765,797 |
| 3/8/2017 | 190,638 | $26,249,493 | 4/10/2018 | 162,000 | $26,077,639 |
| 3/9/2017 | 189,998 | $26,249,525 | 4/11/2018 | 145,000 | $24,059,149 |
| 3/17/2017 | 187,604 | $26,249,636 | 4/12/2018 | 145,000 | $23,853,082 |
| 3/20/2017 | 187,728 | $26,249,745 | 4/13/2018 | 145,000 | $23,885,937 |
| 3/30/2017 | 70,219 | $9,999,858 | 4/16/2018 | 145,000 | $23,893,540 |
| 3/31/2017 | 70,275 | $9,999,797 | 4/17/2018 | 145,000 | $24,348,750 |
| 4/11/2017 | 187,767 | $26,249,778 | 4/18/2018 | 145,000 | $24,190,673 |
| 4/12/2017 | 187,687 | $26,249,593 | 4/19/2018 | 162,000 | $27,014,864 |
| 5/16/2017 | 141,950 | $21,249,850 | 4/20/2018 | 162,000 | $27,052,706 |
| 5/17/2017 | 144,437 | $21,249,779 | 4/23/2018 | 145,000 | $24,161,233 |
| 5/26/2017 | 140,064 | $21,249,886 | 4/24/2018 | 145,000 | $23,426,871 |
| 5/30/2017 | 139,469 | $21,249,655 | 4/25/2018 | 145,000 | $23,087,982 |
| 6/8/2017 | 138,149 | $21,249,717 | 4/26/2018 | 212,557 | $37,088,554 |
| 6/9/2017 | 138,846 | $21,249,129 | 4/27/2018 | 177,028 | $30,883,270 |
| 6/21/2017 | 138,813 | $21,249,578 | 4/30/2018 | 156,967 | $27,260,171 |
| 6/22/2017 | 138,205 | $21,249,941 | 5/1/2018 | 145,000 | $24,908,295 |
| 6/29/2017 | 140,841 | $21,249,271 | 5/2/2018 | 220,000 | $38,862,071 |
| 6/30/2017 | 140,595 | $21,249,035 | 5/3/2018 | 199,530 | $34,808,784 |
| 7/12/2017 | 134,599 | $21,249,617 | 5/4/2018 | 237,000 | $41,697,212 |
| 7/13/2017 | 133,501 | $21,249,680 | 5/7/2018 | 237,000 | $42,287,824 |
| 8/14/2017 | 124,625 | $21,249,796 | 5/8/2018 | 220,000 | $39,186,693 |
| 8/15/2017 | 124,359 | $21,249,595 | 5/9/2018 | 220,000 | $39,885,285 |
| 8/25/2017 | 127,342 | $21,249,709 | 5/10/2018 | 220,000 | $40,669,369 |
| 8/28/2017 | 127,183 | $21,249,553 | 5/11/2018 | 220,000 | $40,987,320 |
| 9/7/2017 | 123,644 | $21,249,717 | 5/14/2018 | 220,000 | $41,137,360 |
| 9/8/2017 | 123,503 | $21,249,854 | 5/15/2018 | 220,000 | $40,479,883 |
| 9/19/2017 | 123,815 | $21,249,679 | 5/16/2018 | 220,000 | $40,354,785 |
| 9/20/2017 | 123,637 | $21,249,477 | 5/17/2018 | 220,000 | $40,343,839 |
| 9/29/2017 | 124,633 | $21,249,547 | 5/18/2018 | 237,000 | $43,391,467 |
| 10/2/2017 | 124,894 | $21,249,517 | 5/21/2018 | 237,000 | $43,683,830 |
| 10/11/2017 | 123,485 | $21,249,788 | 5/22/2018 | 220,000 | $40,553,419 |
| 10/12/2017 | 122,752 | $21,249,620 | 5/23/2018 | 220,000 | $40,618,621 |
| 11/14/2017 | 119,230 | $21,249,761 | 5/24/2018 | 220,000 | $40,934,971 |
| 11/15/2017 | 119,485 | $21,249,412 | 5/25/2018 | 220,000 | $40,745,841 |
| 11/27/2017 | 116,141 | $21,249,533 | 5/29/2018 | 220,000 | $40,790,973 |
| 11/28/2017 | 115,997 | $21,249,612 | 5/30/2018 | 220,000 | $41,182,290 |

CONSOLIDATED COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

| | | | | | |
|---|---|---|---|---|---|
| 12/7/2017 | 119,098 | $21,249,707 | 5/31/2018 | 220,000 | $41,937,965 |
| 12/8/2017 | 117,829 | $21,249,838 | 6/1/2018 | 237,000 | $45,853,073 |
| 2/12/2018 | 220,000 | $38,635,723 | 6/4/2018 | 237,000 | $45,737,922 |
| 2/13/2018 | 177,200 | $30,929,013 | 6/5/2018 | 220,600 | $42,718,882 |
| 2/14/2018 | 220,000 | $39,026,000 | 6/6/2018 | 220,000 | $41,897,754 |
| 2/15/2018 | 245,400 | $43,901,109 | 6/7/2018 | 220,000 | $41,413,594 |
| 2/16/2018 | 245,400 | $43,719,265 | 6/8/2018 | 220,000 | $41,513,378 |
| 2/20/2018 | 220,000 | $38,835,127 | 6/11/2018 | 220,000 | $42,033,413 |
| 2/21/2018 | 228,400 | $40,904,384 | 6/12/2018 | 220,000 | $42,309,938 |
| 2/22/2018 | 228,400 | $40,881,223 | 6/13/2018 | 237,000 | $45,760,485 |
| 2/23/2018 | 220,000 | $40,014,898 | 6/14/2018 | 267,000 | $52,214,130 |
| 2/26/2018 | 220,000 | $40,618,821 | 6/15/2018 | 250,000 | $48,974,895 |
| 2/27/2018 | 220,000 | $40,253,285 | 6/18/2018 | 247,500 | $49,027,822 |
| 2/28/2018 | 245,400 | $44,529,455 | 6/19/2018 | 240,000 | $47,044,460 |
| 3/1/2018 | 245,400 | $43,423,597 | 6/20/2018 | 240,000 | $48,417,988 |
| 3/2/2018 | 220,000 | $38,500,131 | 6/21/2018 | 240,000 | $48,461,671 |
| 3/5/2018 | 220,000 | $39,410,874 | 6/22/2018 | 240,000 | $48,211,475 |
| 3/6/2018 | 220,000 | $39,720,907 | 6/25/2018 | 240,000 | $47,074,618 |
| 3/7/2018 | 220,000 | $39,907,908 | 6/26/2018 | 240,000 | $47,451,913 |
| 3/8/2018 | 228,400 | $41,692,621 | 6/27/2018 | 257,000 | $51,140,945 |
| 3/9/2018 | 228,400 | $42,162,003 | 6/28/2018 | 257,000 | $50,254,415 |
| 3/12/2018 | 220,000 | $40,732,522 | 6/29/2018 | 236,615 | $46,329,394 |
| 3/13/2018 | 220,000 | $40,225,112 | 7/2/2018 | 240,000 | $46,799,219 |
| 3/14/2018 | 245,400 | $44,942,497 | 7/3/2018 | 212,600 | $41,166,309 |
| 3/15/2018 | 245,400 | $44,939,108 | 7/5/2018 | 240,000 | $47,066,812 |
| 3/16/2018 | 220,000 | $40,594,574 | 7/6/2018 | 240,000 | $48,316,665 |
| 3/19/2018 | 175,246 | $30,504,876 | 7/9/2018 | 240,000 | $48,996,111 |
| 3/20/2018 | 145,000 | $24,158,892 | 7/10/2018 | 257,000 | $52,357,773 |
| 3/21/2018 | 153,400 | $25,808,227 | 7/11/2018 | 257,000 | $52,255,054 |
| 3/22/2018 | 152,700 | $25,441,367 | 7/12/2018 | 240,000 | $49,371,961 |
| 3/23/2018 | 145,000 | $23,674,979 | 7/13/2018 | 240,000 | $49,752,309 |
| 3/26/2018 | 145,000 | $22,555,546 | 7/16/2018 | 240,000 | $49,841,323 |
| 3/27/2018 | 153,539 | $24,175,526 | 7/17/2018 | 240,000 | $49,981,589 |
| 3/28/2018 | 140,200 | $21,527,971 | 7/18/2018 | 240,000 | $50,343,432 |
| 3/29/2018 | 145,000 | $22,978,944 | 7/19/2018 | 240,000 | $50,047,178 |
| 4/2/2018 | 145,000 | $22,610,877 | 7/20/2018 | 240,000 | $50,404,452 |
| 4/3/2018 | 145,000 | $22,462,916 | 7/23/2018 | 257,000 | $54,134,125 |
| 4/4/2018 | 145,000 | $22,237,405 | 7/24/2018 | 257,000 | $55,141,446 |
| 4/5/2018 | 145,000 | $23,081,281 | 7/25/2018 | 240,000 | $52,010,641 |
| | | | **Total** | **29,451,835** | **$5,297,581,009** |

371.   Contemporaneously with Defendant Zuckerberg's insider sales, plaintiffs purchased a total of 260,091 shares of Facebook Class A common stock for a total of more than $44.6 million between February 3, 2017 and July 25, 2018.  Plaintiffs' contemporaneous purchases included:

| Lead Plaintiff | Date | Shares | Purchase Amount | No. of Days After Zuckerberg Sale |
|---|---|---|---|---|
| Mississippi | 3/17/2017 | 4,050 | $566,329 | Same day |
| Mississippi | 3/21/2017 | 16,219 | $2,272,893 | 1 day |
| Amalgamated | 3/31/2017 | 3,611 | $512,961 | Same day |
| Amalgamated | 4/3/2017 | 1,387 | $197,349 | 3 days |
| Mississippi | 6/16/2017 | 4,035 | $607,796 | 7 days |
| Amalgamated | 6/23/2017 | 3,937 | $610,530 | 1 day |
| Amalgamated | 8/16/2017 | 100 | $17,013 | 1 day |
| Mississippi | 8/16/2017 | 5,200 | $883,812 | 1 day |
| Amalgamated | 8/29/2017 | 300 | $50,428 | 1 day |
| Amalgamated | 8/29/2017 | 10 | $1,681 | 1 day |
| Mississippi | 9/15/2017 | 1,311 | $225,008 | 7 days |
| Amalgamated | 9/18/2017 | 1 | $170 | 10 days |
| Amalgamated | 10/3/2017 | 20 | $3,401 | 1 day |
| Amalgamated | 10/19/2017 | 10 | $1,741 | 7 days |
| Mississippi | 12/15/2017 | 3,218 | $579,787 | 7 days |
| Amalgamated | 12/18/2017 | 226 | $40,866 | 10 days |
| Amalgamated | 3/2/2018 | 1,200 | $210,823 | Same day |
| Amalgamated | 3/2/2018 | 50 | $8,784 | Same day |
| Mississippi | 3/16/2018 | 2,898 | $536,368 | Same day |
| Amalgamated | 3/19/2018 | 1,414 | $244,007 | Same day |
| Mississippi | 3/19/2018 | 62,000 | $10,634,662 | Same day |
| Amalgamated | 3/20/2018 | 1,800 | $293,672 | Same day |
| Amalgamated | 3/20/2018 | 50 | $8,158 | Same day |
| Mississippi | 3/26/2018 | 55,000 | $8,590,126 | Same day |
| Amalgamated | 4/11/2018 | 300 | $49,995 | Same day |
| Amalgamated | 4/11/2018 | 10 | $1,666 | Same day |
| Mississippi | 4/27/2018 | 18,978 | $3,305,763 | Same day |
| Amalgamated | 5/2/2018 | 60 | $10,599 | Same day |
| Mississippi | 5/14/2018 | 9,444 | $1,766,417 | Same day |
| Amalgamated | 5/29/2018 | 100 | $18,632 | Same day |
| Amalgamated | 6/8/2018 | 2,021 | $382,191 | Same day |
| Mississippi | 6/13/2018 | 34,609 | $6,690,716 | Same day |
| Mississippi | 6/15/2018 | 3,132 | $613,372 | Same day |
| Amalgamated | 6/19/2018 | 100 | $19,562 | Same day |
| Amalgamated | 6/19/2018 | 10 | $1,956 | Same day |
| Amalgamated | 6/22/2018 | 6,155 | $1,241,771 | Same day |
| Mississippi | 6/27/2018 | 16,214 | $3,211,359 | Same day |
| Mississippi | 7/17/2018 | 911 | $189,251 | Same day |
| **Total** | | **260,091** | **$44,601,615** | |

1    372.    Tens of thousands of other Class members, if not more, also purchased shares
2  contemporaneously with Zuckerberg's insider sales during the Class Period.  Facebook had a total of
3  nearly 7.6 billion shares traded in the United States during the Class Period, or an average daily
4  trading volume of more than 20.4 million shares.  On each of the days that Zuckerberg sold his
5  Facebook shares, between 8.5 million and 129.8 million shares were traded to investors, including
6  members of the Class.

7    373.    Plaintiffs and other Class members who purchased shares of Facebook common stock
8  contemporaneously with Zuckerberg's insider sales suffered damages because:  (i) in reliance on the
9  integrity of the market, they paid artificially inflated prices as a result of defendants' violations of
10  §§10(b) and 20(a) of the 1934 Act; and (ii) they would not have purchased Facebook common stock
11  at the prices they paid, or at all, if they had been aware that the market prices had been artificially
12  inflated by defendants' false and misleading statements and omissions.

**X.    PRAYER FOR RELIEF**

14    WHEREFORE, plaintiff prays for judgment as follows:

15    A.    Determining that this action is a proper class action, certifying Lead Plaintiffs as class
16  representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead
17  Counsel;

18    B.    Awarding plaintiffs and the members of the Class damages and interest;

19    C.    Awarding plaintiffs' reasonable costs, including attorneys' fees; and

20    D.    Awarding such equitable/injunctive or other relief as the Court may deem just and
21  proper.

1    XI.    **JURY DEMAND**

2           Plaintiffs demand a trial by jury.

3    DATED:  October 15, 2018                  ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
4                                              DENNIS J. HERMAN
                                               JASON C. DAVIS
5                                              KENNETH J. BLACK

6

7                                                   s/ Dennis J. Herman
                                                   DENNIS J. HERMAN
8
                                               One Montgomery Street, Suite 1800
9                                              San Francisco, CA  94104
                                               Telephone:  415/288-4545
10                                             415/288-4534 (fax)

11                                             Counsel for Amalgamated and Co-Lead Counsel
                                               for the Class
12
                                               BERNSTEIN LITOWITZ BERGER &
13                                               GROSSMANN LLP
                                               JONATHAN D. USLANER
14                                             12481 High Bluff Drive, Suite 300
                                               San Diego, CA  92130
15                                             Telephone:  858/793-0070
                                               858/793-0323 (fax)
16
                                               BERNSTEIN LITOWITZ BERGER &
17                                               GROSSMANN LLP
                                               JOHN C. BROWNE
18                                             JEREMY P. ROBINSON
                                               KATE W. AUFSES
19

20                                                   s/ John C. Browne
                                                   JOHN C. BROWNE
21
                                               1251 Avenue of the Americas
22                                             New York, NY  10020
                                               Telephone:  212/554-1400
23                                             212/554-1444 (fax)

24
                                               Counsel for Mississippi and Co-Lead Counsel for
25                                             the Class

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PIERCE BAINBRIDGE BECK PRICE
  & HECHT LLP
DAVID L. HECHT
CLAIBORNE R. HANE
20 West 23rd Street, Fifth Floor
New York, NY 10010
Telephone:  213/262-9333

Counsel for Helms and Additional Counsel for
the Class

POMERANTZ LLP
JEREMEY A. LIEBERMAN
J. ALEXANDER HOOD II
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone:  212/661-1100
212/661-8665 (fax)

Counsel for Kacouris and Additional Counsel for
the Class

## ATTESTATION

I, Dennis J. Herman, am the ECF User whose ID and password are being used to file this CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS.  In compliance with Local Rule 5-1(i)(3), I hereby attest that counsel for co-lead plaintiff Public Employees' Retirement System of Mississippi, John C. Browne, concurs in this filing.

s/ Dennis J. Herman
DENNIS J. HERMAN

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on October 15, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Dennis J. Herman
DENNIS J. HERMAN
ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:  DennisH@rgrdlaw.com

# Mailing Information for a Case 5:18-cv-01725-EJD "In re Facebook, Inc. Securities Litigation"

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,7223240420@filings.docketbird.com

- **Kate Whitman Aufses**
  Kate.Aufses@blbglaw.com,denab@blbglaw.com,jose.echegaray@blbglaw.com,Errol.Hall@blbglaw.com,adamw@blbglaw.com,Jeremy@blbglaw.com,JohnB@blbgla

- **Kenneth Joseph Black**
  KennyB@rgrdlaw.com

- **Michael D. Blatchley**
  MichaelB@blbglaw.com,errol.hall@blbglaw.com

- **Francis A. Bottini , Jr**
  fbottini@bottinilaw.com,sammirati@bottinilaw.com

- **John Christopher Browne**
  JohnB@blbglaw.com,jose.echegaray@blbglaw.com,errol.hall@blbglaw.com,Robert.Trisotto@blbglaw.com,JonathanU@blbglaw.com,jeremy@blbglaw.com,kate.aufse

- **Paul J. Collins**
  pcollins@gibsondunn.com,atumanova@gibsondunn.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,ptiffith@rgrdlaw.com,KennyB@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Claiborne R Hane**
  chane@piercebainbridge.com,rtorres@piercebainbridge.com

- **Dennis J. Herman**
  dennish@rgrdlaw.com,khuang@rgrdlaw.com,mburch@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com

- **Avi Josefson**
  Avi@blbglaw.com,jose.echegaray@blbglaw.com,errol.hall@blbglaw.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com

- **Kristin A. Linsley , Esq**
  KLinsley@gibsondunn.com,lchiou@gibsondunn.com,RWong@gibsondunn.com

- **Joshua Seth Lipshutz**
  jlipshutz@gibsondunn.com,rwong@gibsondunn.com,pkaul@gibsondunn.com,kwarren@gibsondunn.com,gbok@gibsondunn.com,cleach@gibsondunn.com

- **Brian Michael Lutz**
  BLutz@gibsondunn.com,rwong@gibsondunn.com,pkaul@gibsondunn.com,kwarren@gibsondunn.com,gholman@gibsondunn.com

- **Mark Cotton Molumphy**
  mmolumphy@cpmlegal.com,zagudelo@cpmlegal.com,shernandez@cpmlegal.com,kma@cpmlegal.com,kchen@cpmlegal.com,sbiehl@cpmlegal.com,jacosta@cpmleg

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,3045517420@filings.docketbird.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Jeremy P. Robinson**
  jeremy@blbglaw.com,errol.hall@blbglaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com

- **Gerald H. Silk**
  jerry@blbglaw.com,errol.hall@blbglaw.com

- **Orin Snyder**
  osnyder@gibsondunn.com,pkaul@gibsondunn.com,kwarren@gibsondunn.com,gholman@gibsondunn.com,gbok@gibsondunn.com,cschmidt@gibsondunn.com,cleacl

- **David Ronald Stickney**
  davids@blbglaw.com,denab@blbglaw.com,avi@blbglaw.com,lisa.napoleon@blbglaw.com,ashley.lee@blbglaw.com,kayem@blbglaw.com

- **Jonathan Daniel Uslaner**
  jonathanu@blbglaw.com,kayem@blbglaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
David          Lawrence Hecht
Pierce Bainbridge Beck Price & Hecht LLP
20 West 23rd Street
5th Floor
New York, NY 10010
```