Orin Snyder (*pro hac vice*)
    osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
    klinsley@gibsondunn.com
Brian M. Lutz (SBN 255976)
    blutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

Joshua S. Lipshutz (SBN 242557)
    jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: 202.955.8217
Fax: 202.530.9614

Paul J. Collins (SBN 187709)
    pcollins@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Telephone: 650.849.5300
Facsimile: 650.849.5333

*Attorneys for Defendants Facebook, Inc.,*
*Mark E. Zuckerberg, Sheryl K. Sandberg, and*
*David M. Wehner*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FACEBOOK, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | CASE NO. 5:18-CV-01725-EJD<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  April 25, 2019<br>Time:  9:00 A.M.<br>Location:  Courtroom 4, 5th Floor<br>Judge:  Hon. Edward J. Davila<br><br>Date First Action Filed: March 20, 2018 |

1

**TABLE OF CONTENTS**

2

**Page**

3   I. PRELIMINARY STATEMENT ................................................................................................ 2

4   II. FACTUAL BACKGROUND ................................................................................................. 5

5         A.      The Relevant Agreements ................................................................................. 5

6         B.      The Alleged Events Relevant To Plaintiffs' Claims ......................................... 7

7   III. ARGUMENT ....................................................................................................................... 9

8         A.      The PSLRA Imposes Strict Pleading Requirements .......................................... 9

9         B.      Plaintiffs Fail To Plead An Actionable Misstatement Or Omission .................. 9

10                1.      Statements About Policy Violations Not False Or
                           Misleading ............................................................................................. 11

11

12                2.      Statements In Response To Election Meddling Not False
                           Or Misleading ........................................................................................ 12

13                3.      Statements About The Cambridge Analytica Incident And
                           Its Impact On Facebook Not False Or Misleading ................................ 13

14

15                4.      Statements In A 2017 *Axios* Interview Not False Or
                           Misleading ............................................................................................. 14

16                5.      Statements About Facebook's Q1-2018 Results Not False
                           Or Misleading ........................................................................................ 16

17

18                6.      Statements About DAU And MAU Metrics Not False Or
                           Misleading ............................................................................................. 17

19                7.      Statements About GDPR Compliance And Its Impact On
                           Facebook Not False Or Misleading ....................................................... 18

20

21                8.      Risk Factor Statements Not False Or Misleading .................................. 19

                  9.      Statements In Facebook's Privacy Policies Inactionable ...................... 20

22

23        C.      Plaintiffs Fail To Plead A Strong Inference Of Scienter ................................. 20

24                1.      Conclusory Allegations Of Knowledge Insufficient To
                           Plead Scienter ........................................................................................ 21

25                2.      Alleged Conduct Unrelated To The Misstatements Does
                           Not Create Scienter ............................................................................... 23

26

27                3.      Stock Sales Do Not Support A Strong Inference Of
                           Scienter .................................................................................................. 24

28                4.      Plaintiffs Fail To Plead Corporate Scienter .......................................... 26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

D.     Plaintiffs Fail To Plead Loss Causation ................................................................ 26

    1.     Plaintiffs Fail To Plead Loss Causation For The March 19, 2018 Decline ................................................................ 27

    2.     Plaintiffs Fail To Plead Loss Causation With Respect To Other March Declines ................................................................ 28

    3.     Plaintiffs Fail To Allege Loss Causation Adequately For The July 26, 2018 Decline ................................................................ 30

E.     Plaintiffs Fail To Plead Reliance ................................................................ 33

F.     Plaintiffs Fail To Plead Claims Under Sections 20(a) Or 20A ................................................................ 34

IV. CONCLUSION ................................................................ 35

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999)..................................................................................23

*In re Allied Nev. Gold Corp. Sec. Litig.*,
   2016 WL 4191017 (D. Nev. Aug. 8, 2016) ...........................................................29

*Altayyar v. Etsy, Inc.*,
   242 F. Supp. 3d 161 (E.D.N.Y. 2017) ...................................................................17

*In re Apple Comput. Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989).................................................................................34

*Baker v. Seaworld Entm't, Inc.*,
   2016 WL 2993481 (S.D. Cal. Mar. 31, 2016) ........................................................19

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)..................................................................................................9

*In re BofI Holding, Inc. Sec. Litig.*,
   302 F. Supp. 3d 1128 (S.D. Cal. 2018)..............................................................28, 30

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
   2016 WL 2937483 (N.D. Cal. May 20, 2016) ...........................................27, 29, 30, 33

*Brodsky v. Yahoo! Inc.*,
   592 F. Supp. 2d 1192 (N.D. Cal. 2008) ..................................................................32

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002)...............................................................3, 9, 12, 14

*Brown v. Ambow Educ. Holding Ltd.*,
   2014 WL 523166 (C.D. Cal. Feb. 6, 2014).............................................................26

*Cheung v. Keyuan Petrochemicals, Inc.*,
   2012 WL 5834894 (C.D. Cal. Nov. 1, 2012)......................................................21, 26

*In re ChinaCast Educ. Corp. Sec. Litig.*,
   809 F.3d 471 (9th Cir. 2015)...................................................................................26

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017)...................................................................................24

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)....................................................................................14

Gibson, Dunn &
Crutcher LLP

*Colyer v. Acelrx Pharms., Inc.*,
  2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) ................................................................19

*In re Countrywide Fin. Corp. Sec. Litig.*,
  2009 WL 943271 (C.D. Cal. Apr. 6, 2009) ....................................................................24

*Curry v. Yelp Inc.*,
  875 F.3d 1219 (9th Cir. 2017)........................................................................................30

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005)....................................................................................3, 23

*In re Dot Hill Sys. Corp. Sec. Litig.*,
  594 F. Supp. 2d 1150 (S.D. Cal. 2008) ..........................................................................24

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ...................................................................................................26, 27

*In re Extreme Networks, Inc. Sec. Litig.*,
  2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ................................................................14

*In re: Facebook, Inc. Consumer Privacy User Profile Litig.*,
  Case No. 3:18-md-02843-VC (N.D. Cal. Sept. 21, 2018) ...............................................20

*Fadia v. FireEye, Inc.*,
  2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ...........................................................11, 12

*Fosbre v. Las Vegas Sands Corp.*,
  2013 WL 5970250 (D. Nev. Nov. 7 2013) .....................................................................15

*In re: Fusion-io, Inc. Sec. Litig.*,
  2015 WL 661869 (N.D. Cal. Feb. 12, 2015)...............................................................11, 22

*Gammel v. Hewlett-Packard Co.*,
  2013 WL 1947525 (C.D. Cal. May 8, 2013) ...................................................................15

*Glazer Capital Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008)..........................................................................................26

*Haberland v. Bulkeley*,
  896 F. Supp. 2d 410 (E.D.N.C. 2012) ............................................................................14

*In re Heartland Payment Sys., Inc. Sec. Litig.*,
  2009 WL 4798148 (D.N.J. Dec. 7, 2009) .......................................................................20

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
  189 F.3d 971 (9th Cir. 1999)..........................................................................................34

*Hong v. Extreme Networks, Inc.*,
  2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ................................................................12

Gibson, Dunn &
Crutcher LLP

*In re Immersion Corp. Sec. Litig.*,
    2011 WL 871650 (N.D. Cal. Mar. 11, 2011) ................................................................31

*Ironworkers Local 580—Joint Funds v. Linn Energy, LLC*,
    29 F. Supp. 3d 400 (S.D.N.Y. 2014) ........................................................................17

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
    2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) ...................................................10, 16

*In re Kalobios Pharm., Inc. Sec. Litig.*,
    258 F. Supp. 3d 999 (N.D. Cal. 2017) ...................................................................5, 34

*Katyle v. Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ....................................................................................28

*In re Leapfrog Enters., Inc. Sec. Litig.*,
    200 F. Supp. 3d 987 (N.D. Cal. 2016) ....................................................................23

*In re LeapFrog Enters., Inc. Sec. Litig.*,
    527 F. Supp. 2d 1033 (N.D. Cal. 2007) ............................................................21, 23

*In re LifeLock, Inc. Sec. Litig.*,
    690 F. App'x 947 (9th Cir. 2017) .............................................................................20

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ..................................................................................35

*Lloyd v. CVB Fin. Corp.*,
    2012 WL 12883522 (C.D. Cal. Jan 12, 2012) ...........................................2, 19, 20

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ....................................................................................4

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ...........................................................................9, 26, 30

*McGann v. Ernst & Young*,
    102 F.3d 390 (9th Cir. 1996) ....................................................................................20

*In re Mellanox Techs. Ltd. Sec. Litig.*,
    2014 WL 12650991 (N.D. Cal. Mar. 31, 2014) ......................................................14

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ............................................9, 21, 24, 26, 32

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ................................................................................29

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
    881 F.3d 750 (9th Cir. 2018) ....................................................................................27

Gibson, Dunn &
Crutcher LLP

v

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) .................................................................12

*In re Netflix, Inc. Sec. Litig.*,
   2005 WL 1562858 (N.D. Cal. June 28, 2005) ......................................................24

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
   54 F.3d 1424 (9th Cir. 1995).................................................................................26

*In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*,
   184 F. Supp. 2d 991 (N.D. Cal. 2001) .................................................................22

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
   730 F.3d 1111 (9th Cir. 2013).................................................................27, 29, 31

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014).......................................................................21, 35

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014)...................................................................10, 29, 31

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010).........................................................................12, 15

*Palmer v. Apple Inc.*,
   2016 WL 1535087 (N.D. Cal. Apr. 15, 2016) .....................................................12

*In re Paypal Holdings, Inc. S'holder Deriv. Litig.*,
   2018 WL 466527 (N.D. Cal. Jan. 18, 2018) ........................................................14

*In re Pixar Sec. Litig.*,
   450 F. Supp. 2d 1096 (N.D. Cal. 2006) ...............................................................25

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014)...............................................................................16

*In re Rackable Sys., Inc. Sec. Litig.*,
   2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ........................................................32

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017)........................................................................10, 12

*In re Rigel Pharm., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012).................................................................................10

*Rodriguez v. Gigamon Inc.*,
   325 F. Supp. 3d 1041 (N.D. Cal. 2018) ...............................................................24

*Rok v. Identiv, Inc.*,
   2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ...........................................27, 29, 30, 32

Gibson, Dunn &
Crutcher LLP

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001)...................................................................................25

*S.E.C. v. Rana Research, Inc.*,
    8 F.3d 1358 (9th Cir. 1993)...................................................................................20

*Scandlon v. Blue Coat Sys., Inc.*,
    2013 WL 5313168 (N.D. Cal. Sept. 23, 2013) ......................................................32

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
    119 F. Supp. 3d 1213 (C.D. Cal. 2015)..................................................................33

*Seaman v. Cal. Bus. Bank*,
    2014 WL 1339649 (N.D. Cal. Apr. 2, 2014) .........................................................23

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999)...................................................................................24

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996)...................................................................................34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................................21

*Turocy v. El Pollo Loco Holdings, Inc.*,
    2016 WL 4056209 (C.D. Cal. July 25, 2016) ........................................................17

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
    382 F. Supp. 2d 1173 (N.D. Cal. 2004) .................................................................33

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002)...........................................................................25, 26

*In re Verifone Sec. Litig.*,
    2016 WL 1213666 (N.D. Cal. Mar. 29, 2016) ..................................................17, 32

*In re Verisign, Inc., Deriv. Litig.*,
    531 F. Supp. 2d 1173 (N.D. Cal. 2007) .................................................................22

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ...............................................................35

*Wenger v. Lumisys, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) .....................................................................10

*Westley v. Oclaro, Inc.*,
    897 F. Supp. 2d 902 (N.D. Cal. 2012) ...................................................................21

*Wietschner v. Monterey Pasta Co.*,
    294 F. Supp. 2d 1102 (N.D. Cal. 2003) .................................................................24

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)..............................................................................4, 9, 21, 25

**Statutes**

15 U.S.C. § 78u-4...........................................................................................................9, 21

15 U.S.C. § 78u-5................................................................................................................14

**Regulations**

17 C.F.R. § 240.10b5-1.......................................................................................................24

1   **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2       **PLEASE TAKE NOTICE** that on April 25, 2019, at 9:00 a.m., or as soon thereafter as the

3   matter may be heard, in the U.S. District Court for the Northern District of California, San Jose

4   Courthouse, Courtroom 4, located at 280 South 1st Street, San Jose, CA 95113, Defendants Facebook,

5   Inc. ("Facebook" or the "Company"), Mark E. Zuckerberg, Sheryl K. Sandberg, and David M. Wehner

6   (the "Individual Defendants") (Facebook and the Individual Defendants, together, "Defendants"),

7   through their undersigned counsel, will, and hereby do, move to dismiss the Consolidated Class Action

8   Complaint for Violation of the Federal Securities Laws (the "Complaint") (ECF No. 86) pursuant to

9   Federal Rule of Civil Procedure 12(b)(6).   This Motion is based on this Notice, the supporting

10  Memorandum of Points and Authorities, the Declaration of Brian M. Lutz filed concurrently herewith,

11  the accompanying Request for Judicial Notice, the complete files and records in this action, and any

12  additional material and arguments as may be considered in connection with the hearing.

13      Defendants seek dismissal of the Complaint with prejudice for failure to state a claim upon

14  which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), because Plaintiffs

15  fail to plead violations of Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the

16  "Exchange Act"), and Rule 10b-5 promulgated thereunder, under the heightened pleading standards of

17  the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Federal Rule of Civil

18  Procedure 9(b).

19  <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

20      Defendants respectfully submit this Memorandum of Points and Authorities in support of their

21  Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

22  **STATEMENT OF ISSUES TO BE DECIDED**

23      1.    Whether Plaintiffs' claim under Section 10(b) of the Exchange Act and Rule 10b-5

24  should be dismissed for failure to plead that (1) any challenged statement was false or misleading,

25  (2) any Defendant acted with scienter, (3) Plaintiffs suffered any loss caused by any allegedly false or

26  misleading statement, and (4) Plaintiffs relied on any allegedly false or misleading statement.

27      2.    Whether Plaintiffs' claims under Sections 20(a) and 20A of the Exchange Act should

28  be dismissed for failure to plead a primary violation of the Exchange Act.

Gibson, Dunn &
Crutcher LLP

1

## I.    PRELIMINARY STATEMENT

The securities claims asserted in this action arise during a period of incredible volatility in U.S. stock markets, and in the technology sector in particular.  Since July 25, 2018, five of the most widely followed technology stocks—Facebook, Apple, Amazon, Netflix, and Google—have lost nearly $600 billion in market capitalization, erasing much of the $700 billion increase these same stocks experienced in the first half of the year.[1]  The CBOE Volatility Index, which measures expected volatility, also showed substantial growth in 2018, Lutz Ex. 34—and even recorded its largest daily increase in its history in February of this year, Lutz Ex. 23.  Plaintiffs seek to capitalize on the fact that in this period of significant market volatility, the price of Facebook stock—like the price of other technology stocks and U.S. stocks generally—experienced large swings up and down, claiming that somehow, some way, there must be some viable claim against Facebook under the securities laws.  And Plaintiffs make this claim even though the information at the core of their Complaint—that Cambridge Analytica had improperly obtained and may have misused Facebook user data—had been in the market for years.  Plaintiffs resort to rank speculation and inference to mount a theory of securities fraud, but their efforts fail: The Complaint should be dismissed.

The Complaint alleges an overarching hindsight theory: News media reports in March 2018 about the Cambridge Analytica events revealed, according to Plaintiffs, inadequacies in Facebook's privacy practices, which they claim Facebook withheld from investors.  But Plaintiffs' allegations are self-defeating because they do not claim that the Cambridge Analytica events were a secret or that Facebook misled investors into believing that an event like Cambridge Analytica could not or would not happen.  Nor could they—it was widely reported more than one year before the start of the putative class period and more than two years before the March 2018 articles in *The Guardian* and *The New York Times* that an app developer, in flagrant violation of Facebook's policies, shared Facebook user data with Cambridge Analytica, and that data may have been used in an election campaign.  Under

---

[1] Lutz Exs. 29-33.  As set forth in Defendants' accompanying Request for Judicial Notice, the Court may take judicial notice of Facebook's and other companies' stock prices and stock price indices. *See, e.g.*, *Lloyd v. CVB Fin. Corp.*, 2012 WL 12883522, at *13 (C.D. Cal. Jan 12, 2012).  References to "Lutz Ex." are to the exhibits to the Declaration of Brian M. Lutz, filed concurrently herewith.

Gibson, Dunn & Crutcher LLP

1  hornbook law, a failure to disclose information that already had been disclosed to the market cannot
2  give rise to an actionable securities fraud claim.

3  In the end, the Complaint rests on an implausible theory of fraud based on a chain of
4  unsupported inferences:  Defendants *must have known* that Cambridge Analytica lied when it told to
5  Facebook in 2016 that it had deleted Facebook users' data; Defendants *must have known* that
6  Facebook's privacy practices were inadequate because an app developer violated Facebook's policies
7  in 2013; changes Facebook made to its Platform years before (in 2014) that significantly restricted
8  third-party access to user data *must have been* inadequate; and any movements in Facebook's stock
9  price during this unprecedented period of market upheaval in March and July 2018—both increases
10  and decreases—*must have been* the result of Defendants' alleged fraud relating to Cambridge Analytica
11  and data privacy issues.  But "Congress enacted the PSLRA to put an end to" exactly this kind of "fraud
12  by hindsight" pleading.  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005).  To meet their
13  difficult pleading burden under the PSLRA and Rule 9(b), Plaintiffs must plead specific facts—not
14  unsupported inferences and conclusions—demonstrating that Defendants made false or misleading
15  statements, that Defendants knew or deliberately ignored that their statements were untrue, and that
16  any investor losses were proximately caused by disclosures revealing the "truth" of Defendants' alleged
17  misstatements (not general market volatility).  The Complaint fails to plead any such facts.

18  **No Actionable Misstatement.**  Plaintiffs' core theory is that Defendants made various
19  statements that are alleged to have been false and misleading because Facebook's response to
20  Cambridge Analytica's misappropriation of Facebook user data was inadequate.  Critically, Plaintiffs
21  do not and cannot allege that Defendants made any false statements about the Cambridge Analytica
22  events themselves.  Instead, Plaintiffs lard their Complaint with dozens of allegedly false statements
23  having nothing to do with Cambridge Analytica and concerning such disparate subjects as purported
24  meddling in U.S. elections, Facebook's efforts to comply with new European privacy legislation, the
25  Company's user engagement metrics, and Facebook's data privacy policies.  But Plaintiffs cannot show
26  that, because of the Cambridge Analytica events, the challenged statements "affirmatively create[d] an
27  impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."
28  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  Nor are the statements

rendered false by a litany of supposed "omissions" having nothing to do with the statements themselves.  Accordingly, Plaintiffs fail to meet even the most basic requirement of their securities fraud claim: the existence of a false or misleading statement.

**No Scienter.**  A securities fraud complaint must be dismissed if it cannot plead particularized facts showing that "the defendants made false or misleading statements either intentionally or with deliberate recklessness."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).  Here, Plaintiffs plead no facts—as opposed to conclusions—showing that any Defendant knew that any of the sundry statements Plaintiffs challenge in the Complaint were false.  Rather, Plaintiffs ask this Court to infer that Defendants knew or deliberately disregarded facts demonstrating the falsity of their statements based on, for example, the alleged knowledge of lower-level employees or that the Individual Defendants sold stock during the putative class period.  But what lower-level employees who are not alleged to have had any contact with the Individual Defendants supposedly believed has no bearing on what the Individual Defendants knew.  And the mere sale of stock pursuant to Rule 10b5-1 plans adopted before the start of the alleged class period is insufficient, as a matter of law, to give rise to a strong inference of scienter.

**No Loss Causation.**  No alleged facts demonstrate that any of the alleged "corrective disclosures" in March and July 2018—which Plaintiffs claim caused Facebook's stock price to decline—revealed both "new" information and the "truth" of any alleged misstatement.  *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209-10 (9th Cir. 2016) (loss causation requires showing that "defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss").  The March 2018 articles in *The Guardian* and *The New York Times* cannot constitute "corrective disclosures" because the core allegations about Cambridge Analytica's misappropriation and misuse of user data already had been revealed by *The Guardian* in 2015.  Plaintiffs' attempt to shoehorn the Cambridge Analytica reports into a securities claim arising out of a stock price decline in July 2018 is even more deficient.  Facebook warned investors in April of the very information that Plaintiffs say "caused" the decline in July—an increase in expenses and slower user growth following implementation of European privacy legislation.  And, again, Plaintiffs do not allege—nor can they— that any of this information "corrected" any prior misstatement.  Because Plaintiffs fail to plead any

Gibson, Dunn &
Crutcher LLP

causal link between the challenged statements and Plaintiffs' alleged losses, the Complaint must be dismissed on loss causation grounds, as well.

**No Reliance.**  For the same reason that Plaintiffs fail to allege loss causation, the Complaint fails because Plaintiffs cannot rely on the fraud-on-the-market presumption of reliance.  That Cambridge Analytica had improperly obtained and misused Facebook user data already was known in the market more than a year before the start of the putative class period.  Thus, "[a]ny undisclosed information that might have otherwise misled the market about [Cambridge Analytica] would not have done so here because such information had already been substantively disseminated by the press."  *In re Kalobios Pharm., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1009 (N.D. Cal. 2017) (Davila, J.).

Plaintiffs cannot satisfy their pleading burden, and the Complaint should be dismissed.

## II.     FACTUAL BACKGROUND[2]

Facebook was founded in 2004 by Mark Zuckerberg, who is also the Company's CEO and Chairman of its Board of Directors.  ¶ 28.  Sheryl Sandberg has served as Facebook's COO since March 2008, ¶ 30, and David Wehner has served as CFO since June 2014, ¶ 31.  Facebook gives its more than two billion active users the power to stay connected with friends and family, build communities, discover what is going on in the world, and share and express what matters to them.  ¶ 37.  Facebook also enables independent third-party developers' applications or websites (collectively, "apps") to interact with Facebook's Platform so that users can share experiences with their Facebook friends—for example, by playing a game together, sharing book recommendations, and having other social experiences.  *See* ¶¶ 45-46.

## A.     The Relevant Agreements

***Facebook's agreements with users.***  The use and sharing of data on Facebook are governed by agreements between Facebook and its users, including Facebook's Data Policy (previously referred to as the "Data Use Policy" and the "Privacy Policy") and Terms of Service (previously referred to as the "Statement of Rights and Responsibilities").  *E.g.*, ¶¶ 4, 60, 200, 232.  These policies explain how users

---

[2]  By summarizing Plaintiffs' allegations here, Defendants do not concede the allegations are true.  The Court may refer to documents incorporated in the Complaint by reference.  Citations in the form of "¶ ___" or "¶¶ ___" refer to the paragraphs of the Complaint.  Unless otherwise noted, all emphasis is added, and all internal quotation marks and citations are omitted.

Gibson, Dunn & Crutcher LLP

can control whether and how their data is shared with their Facebook friends, other Facebook users, and third parties. ¶ 301(b). For example, the Data Policy informs users of the categories of information third-party apps may access if users choose to allow (or "authorize") apps to do so. Lutz Ex. 25 at 2. The policies also inform users how to control access to their data by adjusting their privacy and application settings, and caution users about sharing data with third parties, including the "information that others have shared" with them. *See id.*; ¶ 301(e).

Before 2015, Facebook's policies allowed users to share information about their friends with third-party app developers. ¶¶ 46, 82. The Data Policy in place in 2013 stated that app developers could ask for a user's friends' data, alerted users to the fact that their friends might choose to share some of *their* information with apps, and explained the social benefits of connecting with their friends using apps. *E.g.*, Lutz Ex. 24. For example, when using a music app, the policy advised users that "[y]our friend might … want to share the music you 'like' on Facebook." *Id*. at 4. "[I]f you've shared your likes with just your friends, the application could ask your friend for permission to share them." *Id*. Thus, a user's friend could re-share the user's likes with an app that the friend had downloaded, so long as the original user (whose likes were at issue) had consented to such sharing. If a user chose to turn off all Platform apps, that user's friends could not share the user's information. *Id*. In 2014, as part of Facebook's ongoing commitment to user privacy, Facebook announced that it would implement changes to its Platform that "dramatically limit[ed] the Facebook information apps could access," and "turn[ed] off users' ability to provide access to their friends' personal data." ¶¶ 79, 251, 266(b), 280.

***Facebook's agreements with application developers.*** Third-party app developers must agree to Facebook's Platform Policy before offering apps on the Facebook Platform. ¶¶ 176, 301. This policy limits the extent to which developers can collect and use Facebook user data, and requires developers to explain to users the categories of information they will collect and how it will be used. *Id.* The Platform Policy prohibits developers from selling, licensing, or purchasing "any data obtained from [Facebook] or [its] services," and from transferring data "to any ad network, data broker or other advertising or monetization-related service." ¶ 301(c).

1

**B.    The Alleged Events Relevant To Plaintiffs' Claims**

2

    ***Aleksandr Kogan and Cambridge Analytica.***  In 2013, Aleksandr Kogan, a professor and data

3

researcher at Cambridge University, developed a personality quiz app called "thisisyourdigitallife."

4

¶¶ 80-81.  The app appeared on the Facebook Platform in 2014 and told users that the results of the

5

quiz would be used for academic purposes.  ¶ 81.  Approximately 270,000 people installed the app and

6

consented to sharing their data, including some information about their Facebook friends, ¶¶ 81-82,

7

which at that time was permitted under Facebook's policies, subject to the friends' privacy and

8

application settings, Lutz Ex. 24.

9

    ***The December 2015 Guardian Article and Facebook's Response.***  In December 2015, over a

10

year before the beginning of the alleged class period, *The Guardian* reported that Kogan, through his

11

company Global Science Research ("GSR"), sold some of the information collected through the

12

"thisisyourdigitallife" app to Cambridge Analytica, in violation of Facebook's policies.  Lutz Ex. 13;

13

¶¶ 150, 232, 280.  According to the article, Cambridge Analytica used Kogan's data on tens of millions

14

of Facebook users to create psychological profiles of U.S. voters, which were then used to support Ted

15

Cruz's presidential campaign.  Lutz Ex. 13; ¶¶ 80-81.  After the article was published, Facebook

16

investigated the issue, removed Kogan's app from Facebook, and obtained certifications and

17

confirmations from Kogan, GSR, Cambridge Analytica, and its parent company that all user data had

18

been destroyed.  ¶¶ 9, 90, 92, 96, 98, 150-151, 176.  Based on its investigation and those certifications,

19

and because by that time Facebook had implemented changes to its Platform to restrict third-party apps

20

from requesting information about users' friends, Facebook considered this matter to be closed.[3]

21

¶¶ 98, 251, 258, 266, 280.

22

23

————————————

24

    [3]  In 2016 and 2017, media outlets continued to report on Cambridge Analytica's misuse of Facebook user data, including a story on *The Intercept* reporting that, although Facebook requested that

25

Cambridge Analytica and its affiliates delete the Facebook user data they obtained from Kogan, "[i]t remains unclear what was ultimately done with the Facebook data, or whether any models or

26

algorithms derived from it wound up being used by the Trump campaign."  Lutz Ex. 20 at 6; *see also* Lutz Ex. 14 at 1 ("For several years, a data firm eventually hired by the Trump campaign,

27

Cambridge Analytica, has been using Facebook as a tool to build psychological profiles that represent some 230 million adult Americans."); Lutz Ex. 21 at 1 ("Cambridge Analytica used its

28

own database and voter information collected from Facebook and news publishers in its effort to help elect Donald Trump.").

Gibson, Dunn &
Crutcher LLP

MOTION TO DISMISS
CASE NO. 5:18-CV-01725-EJD

***The Cambridge Analytica story resurfaces in 2018.***  On March 17, 2018, articles published by *The New York Times* and *The Guardian* again reported that, in 2015, Cambridge Analytica had misappropriated Facebook user data via Kogan's application.  This time, however, the articles reported that Cambridge Analytica had lied when it represented to Facebook in 2016 that it had deleted all user data, and in fact had retained the data and used it in connection with Donald Trump's presidential campaign.  ¶¶ 150, 153-154.  Facebook immediately suspended Cambridge Analytica, its parent company, and Cambridge Analytica employees from the Facebook Platform.  ¶ 150.

***Facebook's first quarter 2018 earnings report.***  On April 25, 2018, Facebook reported earnings for the first quarter of 2018 ("Q1-2018"), with quarterly revenue, earnings, and daily and monthly active user growth meeting or exceeding analyst expectations.  ¶¶ 21, 186, 188, 190, 270-271.  Although a "handful" of advertisers had "paused spend" with Facebook after the Cambridge Analytica news, Facebook reported that this did not appear to reflect a "meaningful trend."  ¶ 274.  Facebook also reported that its expenses were expected to increase year-over-year by "50% [to] 60%," driven by the "significant investments [Facebook was] making in areas like safety and security," as well as the 48% increase in Facebook's employees from the prior year.  ¶ 275; Lutz Ex. 11 at 7, 8.

Facebook also addressed the possible impact of the General Data Protection Regulation ("GDPR")—the European Union's ("EU") new privacy legislation governing the collection and use of personal data of EU citizens—which would take effect the following month.  ¶ 276; Lutz Ex. 11 at 8, 11, 15-16, 18, 23.  Facebook noted that while it was "early and difficult to know … in advance" the business implications of Facebook's implementation of the GDPR, the Company anticipated that Facebook's European daily and monthly user base could "be flat to slightly down."  Lutz Ex. 11 at 8, 23.  And while the Company did not anticipate the GDPR would "significantly impact advertising revenue," it noted that "there is certainly the potential for some impact, and we will be monitoring this closely."  *Id.* at 8; *see also id.* at 18 ("[T]he amount of uncertainty [] for us and all the other companies in the digital advertising industry is reasonably higher than it's been [] because we're in the process of rolling out GDPR.  We're going to all know a lot more after we rollout.").

***Facebook's second quarter 2018 earnings report.***  On July 25, 2018, Facebook announced its Q2-2018 earnings, reporting lower than expected revenue growth, profitability, and user growth.

Gibson, Dunn & Crutcher LLP

8

¶¶ 212, 216.  Facebook attributed the user growth slowdown to the effects of "the GDPR rollout, consistent with the outlook we gave on the Q1 call," but noted that "the vast majority of people [had continued] opting in to … third-party data use."  Lutz Ex. 12 at 7, 18.  One analyst remarked during the earnings call that Facebook had given an "accurate read into the June quarter" on the likely impact of the GDPR.  *Id.* at 15; *see also id.* ("We had indicated in the … first quarter that we would expect to see a decline [in daily active users and monthly active users in Europe following implementation of the GDPR].").  Facebook also reported that expenses were "up 50%" year-over-year, in line with estimates made in the prior quarter.  *Id.* at 8.  And Facebook reported a decline in revenue growth as a result of "currency … headwind[s]," and "impacts that could be ongoing from things like GDPR as well as other product options that we're providing that could have an impact on revenue growth."  *Id.* at 8, 12.  The Q2-2018 earnings announcement did not *even mention* Cambridge Analytica or any other privacy incident alleged in the Complaint.  *See id.*

# III.   ARGUMENT

## A.   The PSLRA Imposes Strict Pleading Requirements

To state a Section 10(b) claim, a complaint must allege facts sufficient to establish (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) on which Plaintiff relied; (5) economic loss; and (6) loss causation.  *Loos v. Immersion Corp.*, 762 F.3d 880, 886-87 (9th Cir. 2014), *as amended* (Sept. 11, 2014).  A securities fraud complaint also must meet the stringent pleading standards of Federal Rule of Civil Procedure 9(b) and the PSLRA, which require a plaintiff to plead falsity and scienter with particularity.  15 U.S.C. § 78u-4(b)(1)-(2); *Zucco*, 552 F.3d at 990-91.  The Complaint fails to meet these standards.

## B.   Plaintiffs Fail To Plead An Actionable Misstatement Or Omission

To survive a motion to dismiss, a complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008); *accord* 15 U.S.C. § 78u-4(b)(1).  Statements are misleading only if they "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody*, 280 F.3d at 1006.  "Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17

Gibson, Dunn & Crutcher LLP

9

(1988).  "Thus, as long as [any] omissions do not make the actual statements misleading, a company is not required to disclose" other facts "even if investors would consider the omitted information significant."  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012).

In addition, "[t]o be misleading, a statement must be capable of objective verification." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017).  Vague, optimistic statements (*i.e.*, "puffery") are not actionable because they do not induce reliance by reasonable investors and thus are immaterial as a matter of law.  *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

Plaintiffs fail to allege with particularized facts how any of the dozens of statements sprinkled throughout their 155-page Complaint were false or misleading.  Plaintiffs make no attempt to plead that Defendants lied to investors by suggesting that an event like Cambridge Analytica would not or could not happen.  Nor could they, because the Cambridge Analytica events were well known more than a year before the start of the putative class period.  Lacking a coherent theory of falsity, Plaintiffs point to an array of disconnected statements over an 18-month period covering widely disparate topics—alleged Russian interference in U.S. elections, ¶¶ 240-246, Facebook's efforts to comply with the GDPR, ¶¶ 233-239, 258-265, 283-285, the Company's daily and monthly active user figures, ¶¶ 247-250, and Facebook's data policies, ¶¶ 301-304, for example—all in the hope that something sticks.  This kitchen-sink approach to pleading falsity is "unacceptable" under the PSLRA because it requires "a laborious deconstruction and reconstruction of a great web of scattered, vague, redundant, and often irrelevant allegations."  *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954, at *6 (N.D. Cal. Aug. 31, 2018); *accord Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998).  But even more, Plaintiffs' scattershot pleading reflects a fundamental inability to identify any well-pleaded theory of how any of the dozens of statements Plaintiffs identify was false or misleading.  None of the alleged misstatements gives rise to a securities fraud claim.[4]

---

[4] Given Plaintiffs' scattershot approach, it is impossible for Defendants to address every single statement in this Motion.  Accordingly, Defendants address below what they view as the core alleged misstatements in Plaintiffs' Complaint.  Defendants reserve the right to address additional alleged misstatements in their reply brief, if necessitated by Plaintiffs' opposition brief.

Gibson, Dunn & Crutcher LLP

1

**1.     Statements About Policy Violations Not False Or Misleading**

Plaintiffs challenge two identical statements from 2017 that "[m]isleading people or misusing their information is a direct violation of our policies and we will take swift action against companies that do, including banning those companies from Facebook and requiring them to destroy all collected data." ¶¶ 227-228.  These statements are not actionable.

First, the statements are not alleged to have been false.  Plaintiffs do not allege that misleading people or misusing their information was ***allowed*** under Facebook's policies, nor do they allege specific facts demonstrating that, when the statements were made, Facebook did not intend promptly to ban from Facebook companies that violated Facebook's policies and to require such companies to destroy misappropriated data.  *See In re: Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *16 (N.D. Cal. Feb. 12, 2015) ("[T]o plead falsity, plaintiff must provide evidentiary facts contemporary to the alleged false or misleading statements from which this court can make inferences permissible under Rule 9(b).").  Nor does Plaintiffs' claim that Facebook—more than a year earlier—failed to act fast enough in response to the Kogan and Cambridge Analytica events render these statements misleading. ¶ 229.  The statements did not purport to address Facebook's response to Cambridge Analytica— indeed, in each case Facebook specifically declined to comment on Cambridge Analytica.  *See* ¶ 227 ("Facebook … would not comment on the current status [of its investigation of Cambridge Analytica].");  ¶ 228 ("A spokesman for Facebook refused to speak on the record about the various allegations [regarding Cambridge Analytica] ….").  Rather, on their face, the statements address how Facebook "will" respond to violation of the Company's policies ***in the future***, and there are no facts alleged that what Facebook said was untrue.  Moreover, even if the statements concerned Cambridge Analytica, which they did not, Plaintiffs' own allegations show that, after the March 2015 article in *The Guardian* was published, Facebook ***did*** investigate the alleged data misuse, ***did*** remove Kogan's app from Facebook, and ***did*** obtain certifications and confirmations that all user data had been destroyed.  ¶¶ 9, 90, 92, 96, 98, 150-151, 176.

Second, the statement that "we will take swift action" against companies that violate Facebook's policies is an inactionable forward-looking statement.  *See Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *11 (N.D. Cal. Nov. 14, 2016) (Davila, J.) (statement prefaced by "we will" is forward-

looking).  Plaintiffs plead no facts—nor could they—that "(1) the statement [was] not actually believed [by the speaker], (2) there [was] no reasonable basis for the belief, or (3) the speaker [was] aware of undisclosed facts tending seriously to undermine the statement's accuracy."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388 (9th Cir. 2010); *see Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 978 (N.D. Cal. 2015) (statement that CEO planned to stay with corporation for the foreseeable future was not false or misleading where plaintiff failed to allege that CEO was planning to leave).  Finally, the statement is inactionable puffery because it is not "capable of objective verification."  *Retail Wholesale*, 845 F.3d at 1275; *see also FireEye*, 2016 WL 6679806, at *7 (descriptions of corporate events as "smooth" and "rapid" are "regularly deem[ed] corporate puffery"); *Palmer v. Apple Inc.*, 2016 WL 1535087, at *5 (N.D. Cal. Apr. 15, 2016) ("Statements regarding 'lightening [sic] fast internet and video' are … subjective puffery [and] are not actionable.").

### 2.    Statements In Response To Election Meddling Not False Or Misleading

In 2017, Facebook published a white paper addressing the Company's response to misuse of Facebook's Platform by "organized actors (governments or non-state actors) to distort domestic or foreign political sentiment."  Lutz Ex. 26 at 4.  In the white paper, Facebook described the steps it was taking to address this insidious misuse of Facebook's Platform.  The white paper stated that Facebook would provide notifications to users victimized by "phishing with malware to infect a person's computer and credential theft to gain access to their online accounts."  *Id.* at 7.  Plaintiffs claim these statements were false because, a year earlier, Facebook had not provided notifications to users whose data had been improperly accessed by Cambridge Analytica.  ¶ 231.

This theory fails because the white paper, on its face, had nothing to do with the kind of data misuse at issue with Cambridge Analytica—a completely different context in which user data was obtained in accordance with Facebook's policies and later shared in violation of those policies, *see* ¶¶ 46, 79, 150, 280.  *See, e.g.*, *Brody*, 280 F.3d at 1006; *Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017) (falsity inadequately alleged where "the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves").  Facebook stated in the white paper that it would notify users targeted through "phishing with malware … to steal information from the individual and/or the organization with which

1    they're affiliated."  Lutz Ex. 26 at 7.  The Complaint does not and cannot allege that this statement was

2    false—*i.e.*, that Facebook would *not* take action in response to "phishing" or "malware" attacks—or

3    that the statement gave investors a false impression based on the unrelated and widely publicized

4    Cambridge Analytica events from more than a year prior.

5          **3.      Statements About The Cambridge Analytica Incident And Its Impact On
                      Facebook Not False Or Misleading**

6          None of the statements Plaintiffs challenge concerning the March 2018 news that Cambridge

7    Analytica may have lied to Facebook and retained user data is adequately alleged to be false or

8    misleading.  *See* ¶¶ 251-269.

9          First, Plaintiffs allege that Facebook lied when it explained that "everyone involved gave their

10   consent" to share data with Kogan, who then violated Facebook's policies by sharing the data with

11   Cambridge Analytica.  ¶¶ 255, 261(a).  In so alleging, Plaintiffs misrepresent the record.  *All* Facebook

12   users *consented* to the Data Policy in place at the time Kogan launched his app, which advised users

13   that app developers could ask for a user's friends' data and that their friends might choose to share

14   some of *their* information with apps.  *E.g.*, Lutz Ex. 24.  Further, the Data Policy informed users that

15   they could decline to allow their friends to share their information with apps by turning off the Platform,

16   but if users chose not to opt out, the Data Policy advised them that their friends could share their data

17   with apps.  *Id.* at 4.  Although friends' ability to share data with third-party apps was restricted for new

18   apps when Facebook updated its Platform in 2014, there is no factual basis to allege that when Kogan

19   obtained user data, he did so without consent—including from users whose data was shared by their

20   friends.

21         Second, Plaintiffs challenge various statements from March 2018 relating to the 2014 changes

22   to Facebook's Platform that limited users' ability to provide access to their friends' data and

23   Facebook's policy of not selling user data to advertisers.  ¶¶ 258, 261-262, 266, 280.  According to

24   Plaintiffs, these statements were misleading because they "assured investors that data breaches like the

25   Cambridge Analytica scandal were behind the Company and the consequences of the breaches would

26   be minimal."  ¶¶ 259, 263, 267, 281.  But again, Plaintiffs allege no facts showing that these statements

27   were false or misleading.  Plaintiffs do not allege that, after the Platform changes, app developers *were*

28   able to access and misuse Facebook users' friends data.  Nor do they allege that Facebook sold data to

advertisers—which it did not.  And there are no factual allegations supporting Plaintiffs' conclusion that Facebook "assured" anyone that the consequences from Cambridge Analytica would be "minimal."  *Id.*  Plaintiffs allude to a statement on Facebook's Q1-2018 earnings call that Facebook did not expect that "investigatory work" the Company was doing would "have an impact on revenue," ¶ 187, but they nowhere allege that this forward-looking statement was false.[5]  Thus, the challenged statements did not "affirmatively create an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."  *Brody*, 280 F.3d at 1006.

Third, Plaintiffs claim that statements about Facebook's compliance with the FTC consent decree and other laws and regulations were false because, in Plaintiffs' view, Facebook was not in compliance with the consent decree.  ¶¶ 261(b), 263, 305-307.  But "[f]ederal securities laws do not impose upon companies a 'duty to disclose uncharged, unadjudicated wrongdoing.'"  *In re Paypal Holdings, Inc. S'holder Deriv. Litig.*, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018) (quoting *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)).  Nor are companies required to engage in "self-flagellation" by disclosing unproven allegations.  *See Haberland v. Bulkeley*, 896 F. Supp. 2d 410, 426 (E.D.N.C. 2012).  Facebook has not been found to have violated the FTC consent decree.  Plaintiffs' self-interested view about Facebook's compliance does not give rise to a securities claim.[6]  *See Paypal*, 2018 WL 466527, at *5.

### 4.   Statements In A 2017 *Axios* Interview Not False Or Misleading

Statements by Ms. Sandberg in a 2017 interview regarding Facebook's commitment to protecting user data also are not adequately alleged to be false or misleading.  ¶ 234(a).  Plaintiffs

---

[5]   Indeed, statements on Facebook's earnings calls about the anticipated impact on the Company of the Cambridge Analytica events are protected under the PSLRA safe harbor for forward-looking statements.  *See* 15 U.S.C. § 78u-5(c)(1); *In re Mellanox Techs. Ltd. Sec. Litig.*, 2014 WL 12650991, at *14 (N.D. Cal. Mar. 31, 2014) (holding that forward-looking statements made during earnings calls were protected by PSLRA safe harbor); *see also* Lutz Ex. 11 at 1 ("[O]ur remarks today will include forward-looking statements.  Actual results may differ materially from those contemplated by these forward-looking statements.").

[6]   A host of other statements—that Facebook was "committed to vigorously enforcing" or "ensur[ing] compliance with" its policies, ¶¶ 251-252, that "privacy is extremely important," ¶ 258(b), and that "[o]ur commitment to [privacy] remains very strong," ¶ 266(a)—are not actionable under the securities laws.  *See, e.g.*, *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *23 (N.D. Cal. Mar. 21, 2018) ("'commitment' statements are inactionable puffery").

challenge statements that "[n]o one is going to get your data that shouldn't have it" and that Facebook users are "controlling who [they] share with," ¶ 234(a), on the theory that, before 2014, Cambridge Analytica had collected Facebook user data and it still possessed that data, ¶ 238. But a statement that "no one is *going to* get your data" is an inactionable forward-looking statement.[7] *Fosbre v. Las Vegas Sands Corp.*, 2013 WL 5970250, at *15 (D. Nev. Nov. 7 2013) ("[i]t's *going to* be above our original budget" is a forward-looking statement). And Plaintiffs allege no facts demonstrating that Ms. Sandberg did not actually believe her statement was true or made it without a reasonable basis. *See Oracle*, 627 F.3d at 388. By the time of the interview, Facebook had updated its Platform with further protections for user data, including restricting the sharing of users' friends data. ¶¶ 98, 251, 258, 280. Moreover, Cambridge Analytica (and others who received data improperly from Kogan) had confirmed that all user data had been deleted, and there is no allegation that Facebook knew that this was false. ¶¶ 9, 90, 92, 96, 98, 150-51, 176.

Nor is the statement about "user control" adequately alleged to have been false or misleading. As Plaintiffs acknowledge, Facebook's policies advised users that they controlled access to their data and gave users tools to adjust their privacy and application settings—including an option to turn off all Platform access and disallow any sharing of their data with apps. ¶ 301(b); Lutz Ex. 24. That Cambridge Analytica obtained user data in violation of these policies does not mean that a statement two years later about users controlling their data was false or misleading.[8]

Plaintiffs also allege that this statement was misleading because it did not disclose facts regarding Facebook's response to Cambridge Analytica's misuse of user data, that "the Company had

---

[7] The statement also is inactionable under the securities laws. *See, e.g.*, *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *9 (C.D. Cal. May 8, 2013) (statements that "we will not release a [TouchPad] that isn't perfect" and "webOS is ready for primetime" constituted inactionable puffery).

[8] Plaintiffs also claim that the statements were false because "during the Class Period, Facebook was still engaged in harvesting and using Facebook users' data without their knowledge or consent." ¶ 238. But the April 2018 article on which this allegation appears to be based, *see* ¶ 145, acknowledges that Facebook told users that it "use[s] the information we have about you … to select and personalize ads, offers and other sponsored content that we show you." Lutz Ex. 17 at 2. In other words, users consented to Facebook using their data to serve them targeted ads. There are no facts alleged showing that the statement that Facebook users "control[] who [they] share with," ¶ 234(a), was false or misleading. Plaintiffs' similar allegations regarding other "control" statements fail for the same reason. *See* ¶¶ 251, 253, 261, 264, 266, 268, 286, 288, 301(e).

MOTION TO DISMISS
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn & Crutcher LLP

violated the FTC consent decree," and that a "major risk to Facebook's business model, finances and reputation existed." ¶ 239.  But the statement had nothing to do with Cambridge Analytica, Facebook's compliance with the FTC consent decree, or the Company's "business model, finances and reputation," *id.*, and Facebook "was not under a duty to disclose [Plaintiffs'] 'laundry list' of allegedly fraudulent activities that are unconnected to the actual challenged statements." *Uber Techs.*, 2018 WL 4181954, at *5; *see also Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (omission of declining growth trends not misleading where statement did not speak to those trends).

### 5.   Statements About Facebook's Q1-2018 Results Not False Or Misleading

None of the statements Plaintiffs challenge regarding Facebook's Q1-2018 financial results are adequately alleged to have been false or misleading.[9]  *See* ¶¶ 270-289.  Plaintiffs allege that statements on the quarterly earnings call—that "a handful of advertisers [had] paused spend [in response to the Cambridge Analytica-related disclosures], one of whom [had] already come back," and that "we haven't seen a meaningful trend or anything much since then," ¶¶ 274, 278(b); Lutz Ex. 11 at 17— were misleading because "the loss of advertisers was far more significant" than suggested, ¶ 278(b). But the only contemporaneous allegation that Plaintiffs offer to support their claim of falsity is that ***a single advertiser***, UniCredit, had terminated its advertising and partnerships with Facebook. *Id.*  That one advertiser left Facebook—during a quarter in which Facebook reported $12.0 billion of revenue, including $10.7 billion of mobile advertising revenue, Lutz Ex. 11 at 7—does not render the statements false, nor does it show that at this time Facebook had seen a "meaningful trend" in advertisers leaving the Platform.  ¶ 274.

Plaintiffs also allege that statements about Facebook's Q1-2018 financial results were misleading because "defendants knew that massive increases in spending would be required to improve the security of user data and Facebook's Platform." ¶ 278(c).  But as Plaintiffs acknowledge, Facebook reported on the earnings call that "full-year 2018 total expenses will grow 50-60%," reflecting, among

---

[9]  Plaintiffs allege that Defendants' statements about Facebook's Q1-2018 financial results were misleading because the "results only included two weeks of user data post-disclosure of the wider scope of the Cambridge Analytica data breach," ¶ 278(a), but this would have been apparent to any investor with a calendar.

MOTION TO DISMISS
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

other things, "significant investments we're making in areas like safety & security." ¶ 275; Lutz Ex. 11 at 8. Defendants' statements cannot have been rendered misleading by a failure to disclose anticipated increased expenses that were, in fact, disclosed. *See, e.g.*, *Turocy v. El Pollo Loco Holdings, Inc.*, 2016 WL 4056209, at *8-10 (C.D. Cal. July 25, 2016) (statements not misleading where the "allegedly omitted facts rendering the statements false were actually disclosed"); *In re Verifone Sec. Litig.*, 2016 WL 1213666, at *5 (N.D. Cal. Mar. 29, 2016) (Davila, J.) (statement that acknowledged "headwind on revenue growth" not rendered misleading by alleged failure to disclose decreasing sales).

### 6.    Statements About DAU And MAU Metrics Not False Or Misleading

Plaintiffs fail to plead facts demonstrating that reports of Facebook's Daily Active User ("DAU") and Monthly Active User ("MAU") metrics were false or misleading. ¶¶ 247-250. Plaintiffs claim that Facebook's Q1-2017 and Q2-2017 DAU and MAU figures were false or misleading because "at the time, Facebook was using an incorrect methodology to calculate duplicate accounts" and later announced, on November 1, 2017, a "new methodology." ¶ 250(a). But Facebook's prior DAU and MAU estimates are not rendered false or misleading simply because Facebook later used a different methodology to calculate those metrics. *See Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 179 (E.D.N.Y. 2017) (rejecting as "far-fetched" plaintiffs' claim that "defendants should have used a particular method for calculating their financial metrics and that they knowingly declined to use that method"); *Ironworkers Local 580—Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 426 (S.D.N.Y. 2014) (rejecting as "entirely misguided" claim that changing formula for calculating financial metrics amounted to "some sort of admission that statements made in prior reporting periods were false and materially misleading"). Indeed, Facebook advised investors when it reported its Q1-2017 and Q2-2017 DAU and MAU figures that the Company's "estimates may change as our methodologies evolve, including through the application of new technologies, which may allow us to identify previously undetected false or duplicate accounts." Lutz Ex. 2 at 4; Lutz Ex. 3 at 4. Plaintiffs' inability to allege facts showing that Facebook's prior methodology for identifying duplicate accounts was "incorrect," ¶ 250(a), demonstrates the fallacy of this claim.

Plaintiffs further claim that all of Facebook's DAU and MAU figures reported during the putative class period were false or misleading because they "failed to account for the number of fake

accounts on Facebook." ¶ 250(b).  But this claim fails because each time Facebook announced new DAU and MAU metrics, the Company expressly informed investors that "false accounts" represented a portion of its DAUs and MAUs.  *See* Lutz Ex. 2 at 4 ("We also seek to identify 'false' accounts …. In 2016, for example, we estimate [false] accounts may have represented approximately 1% of our worldwide MAUs."); Lutz Ex. 3 at 4 (same); Lutz Ex. 4 at 4 ("In the third quarter of 2017, we estimate that [false] accounts may have represented approximately 2-3% of our worldwide MAUs."); Lutz Ex. 5 at 4 ("In the fourth quarter of 2017, we estimate that false accounts may have represented approximately 3-4% of our worldwide MAUs.").  Plaintiffs cannot plead a false statement by misrepresenting what Facebook actually said.[10]

### 7. Statements About GDPR Compliance And Its Impact On Facebook Not False Or Misleading

Plaintiffs also allege that Defendants made false statements about the status of Facebook's efforts to comply with the GDPR and the anticipated impact of the GDPR on Facebook's business.  *See* ¶¶ 233-237, 261, 276-277, 283.  According to Plaintiffs, these statements were false or misleading because they "assure[d] investors that Facebook was already adhering to or prepared to meet the requirements of the GDPR, when in reality the Company was not meeting those requirements," ¶ 263, and because they falsely "assured investors that the GDPR had not caused, and would not cause, a decline in active use of Facebook's social media platforms," ¶ 284.  Both theories of falsity are unsupported and, indeed, are contradicted by the challenged statements themselves.

First, none of the statements asserted that Facebook was fully compliant with the GDPR before its implementation.  Rather, the statements made clear that, while Facebook's GDPR compliance efforts were in process, there was additional work to be done in advance of GDPR implementation to reach full compliance.  *See, e.g.*, ¶ 235 ("[T]he Facebook family of apps already applies the core principles in the [GDPR] framework … ***and we're building on this to ensure that we comply in May***

---

[10]  Plaintiffs posit that Facebook's DAU and MAU metrics must have been false in view of the large number of false accounts—1.277 billion—allegedly deleted during the period from Q4-2017 to Q2-2018.  ¶ 250(b).  But this figure is misleading because Plaintiffs ignore the fact that Facebook simultaneously disclosed that "most [of the deleted false accounts] were disabled within minutes of registration," meaning that they never were counted in Facebook's DAU and MAU metrics. Lutz Ex. 27 at 2; *see also* Lutz Ex. 28 at 61.

*of next year*."); ¶ 237 (same); ¶ 261 ("[W]e've had ***almost all*** of what's in [the GDPR] implemented for years ….").

Second, the challenged statements did not, as Plaintiffs claim, "assure[] investors that the GDPR had not caused, and would not cause, a decline in active use of Facebook's social media platforms." ¶ 284.  To the contrary, to the extent the statements addressed the impact of the GDPR at all, they specifically warned that the GDPR might have an impact on Facebook's advertising revenues.  *See, e.g.*, ¶ 277 ("[W]hile we don't expect these changes will significantly impact advertising revenue, ***there's certainly potential for some impact***.").  Again, Plaintiffs cannot plead a misstatement about the GDPR by misstating what Facebook actually said.[11]

### 8.    Risk Factor Statements Not False Or Misleading

Statements in Facebook's SEC filings related to the risks associated with, for example, security breaches and improper access to Facebook user data, also are not actionable.  *See* ¶¶ 291-300.  Plaintiffs claim these statements were false because the risks they warned of already had materialized through Cambridge Analytica's misuse of Facebook user data.  *See* ¶¶ 293, 298.  But in order for a risk disclosure to be false, Plaintiffs must "allege facts indicating that [the] risk factor was already affecting [Facebook] to the extent that [D]efendants' statements were false" at the time they were made.  *Lloyd*, 2012 WL 12883522, at *19; *accord Colyer v. Acelrx Pharms., Inc.*, 2015 WL 7566809, at *9 (N.D. Cal. Nov. 25, 2015).  Here, Plaintiffs do not allege that Cambridge Analytica's misuse of Facebook user data was "already affecting Facebook" at the time the challenged risk factor statements were made.  Plaintiffs do not allege that, at the time the statements were made in 2017 and 2018, Cambridge Analytica's data misuse—which Facebook investigated and responded to following the report by *The Guardian* in 2015—was having an ongoing adverse impact on the Company, or that anyone at Facebook knew that Cambridge Analytica had lied when it certified it destroyed the data it received from Kogan.  *See Baker v. Seaworld Entm't, Inc.*, 2016 WL 2993481, at *12 (S.D. Cal. Mar. 31, 2016) (risk factor inadequately alleged to be false where plaintiffs failed "to plausibly allege Defendants knew that [warned-of risks] were having any impact on attendance at SeaWorld Entertainment parks");

---

[11]  Further, statements on Facebook's earnings calls regarding the anticipated impact on the Company of the GDPR, *see, e.g.*, ¶ 277, are protected by the PSLRA safe harbor.  *See supra* note 5.

Gibson, Dunn &
Crutcher LLP

*Lloyd*, 2012 WL 12883522, at *19 ("[P]laintiffs fail to allege facts indicating that [deterioration of the real estate market] was *already affecting* the Bank's portfolio to the extent that defendants' [risk factor] statements were false."). Thus, the risks associated with improper access to user data ***had not*** materialize, and would not materialize until Cambridge Analytica's misuse of Facebook user data resurfaced in March 2018. For this reason alone, the risk factors cannot give rise to a securities claim.[12]

### 9. Statements In Facebook's Privacy Policies Inactionable

Finally, statements in Facebook's user-facing policies are not actionable because none of the statements are adequately alleged to have been false or misleading (for the same reasons set forth above), and for the additional reason that these "statements" were not made in connection with the purchase or sale of Facebook securities. ¶¶ 301-304. To give rise to a Section 10(b) claim, a statement must be made "in a manner reasonably calculated to influence the investing public." *McGann v. Ernst & Young*, 102 F.3d 390, 397 (9th Cir. 1996); *see also S.E.C. v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993). Statements in Facebook's policies were not made in this manner. Although statements like these "might have some probative value in an action based on consumer protection laws"—and these policies are at the center of the Facebook MDL action before Judge Chhabria, *see* Consol. Compl. ¶¶ 211-293, *In re: Facebook, Inc. Consumer Privacy User Profile Litig.*, Case No. 3:18-md-02843-VC (N.D. Cal. Sept. 21, 2018), ECF No. 148—"they have none in a case alleging investor fraud." *In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 954 (9th Cir. 2017) (emphasis in original).

## C. Plaintiffs Fail To Plead A Strong Inference Of Scienter

Plaintiffs' allegations come nowhere close to pleading with particularity that Defendants knew or should have known they were (allegedly) committing securities fraud. Despite the high pleading burden imposed by the PSLRA, Plaintiffs offer almost nothing but conclusions. And even in the rare case where Plaintiffs try to allege facts, their allegations do not support a reasonable (let alone a strong)

---

[12] Plaintiffs also allege that Facebook's risk disclosures were misleading because they omitted the same alleged facts regarding Facebook's response to Cambridge Analytica's data misuse that Plaintiffs claim was missing from virtually every other challenged statement. ¶¶ 294, 299. But the allegation that Facebook had experienced data misuse and, according to Plaintiffs, had not responded adequately does not render false warnings issued years later that data misuse could put the Company at risk. *See, e.g.*, *In re Heartland Payment Sys., Inc. Sec. Litig.*, 2009 WL 4798148, at *5 (D.N.J. Dec. 7, 2009) (warning that "computer systems could be penetrated by hackers" resulting in "assessments, fines or litigation costs" not rendered false by existence of data security breach or "unresolved security issues" following the breach).

Gibson, Dunn & Crutcher LLP

1   inference of scienter.  Plaintiffs simply do not carry their burden under the PSLRA to allege "with

2   particularity facts giving rise to a strong inference that the defendant acted with the required state of

3   mind" regarding "each act or omission alleged." 15 U.S.C. § 78u-4(b)(2)(A).  The Complaint must be

4   dismissed on this independent ground.

5          In this Circuit, plaintiffs must plead that "the defendants made false or misleading statements

6   either intentionally or with deliberate recklessness."  *Zucco*, 552 F.3d at 991.  "Recklessness only

7   satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious

8   misconduct."  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014).  A strong inference

9   of scienter exists "only if a reasonable person would deem the inference of scienter cogent and at least

10  as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor*

11  *Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  "In reviewing a complaint under this standard, the

12  court must consider *all* reasonable inferences to be drawn from the allegations, including inferences

13  unfavorable to the plaintiffs."  *Metzler*, 540 F.3d at 1061.  Plaintiffs fail to plead that any Individual

14  Defendant acted with scienter under these strict standards, which is fatal to their claim against both the

15  Individual Defendants and Facebook.  *See Cheung v. Keyuan Petrochemicals, Inc.*, 2012 WL 5834894,

16  at *3 (C.D. Cal. Nov. 1, 2012) ("Plaintiffs must allege the requisite level of scienter with respect to at

17  least one of the Individual Defendants" in order to plead corporate scienter).

18         **1.     Conclusory Allegations Of Knowledge Insufficient To Plead Scienter**

19         Plaintiffs' scienter allegations fail because they "are entirely conclusory."  *In re LeapFrog*

20  *Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1044 (N.D. Cal. 2007).  Plaintiffs repeatedly assert that

21  the Individual Defendants "knew" information that rendered their statements false, but they offer no

22  facts to support these conclusions, let alone facts pleaded with particularity, as required under the

23  PSLRA.  *See Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 928 (N.D. Cal. 2012) (pleading scienter

24  under PSLRA requires "specific facts explaining the basis for the claim that Defendants had such

25  knowledge").  For example, Plaintiffs assert that the Individual Defendants "knew that their actions

26  were not reasonably calculated to recover or assure destruction of the compromised data," ¶ 229, and

27  that "the certifications obtained from Cambridge Analytica and its employees and affiliates were

28  unreliable," ¶ 309, but they allege no particularized facts establishing *how* and *why* the Individual

MOTION TO DISMISS
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

Defendants supposedly knew in 2015 that Facebook had been lied to and knew that the steps Plaintiffs admit the Company took after learning about the improper conduct by Kogan and Cambridge Analytica were insufficient.  This kind of impermissible conclusory pleading permeates the Complaint.  *See* ¶ 229 (Defendants were "aware that Facebook had exposed the data of millions of other users to similar harm"); ¶ 278 (Defendants knew of "the true impact that … the Cambridge Analytica data breach was having"); ¶ 309.  Plaintiffs' inability to allege "a single fact showing what each defendant knew, when he/she knew it, or how he/she acquired that knowledge," *In re Verisign, Inc., Deriv. Litig.*, 531 F. Supp. 2d 1173, 1207 (N.D. Cal. 2007), is fatal to their Complaint.

Similarly, Plaintiffs allege that Facebook hired "GSR founder Joseph Chancellor, who had detailed knowledge about Cambridge Analytica[]." ¶ 310.  But they do not allege that Mr. Chancellor knew information that rendered the challenged statements false or that he conveyed any such information to the Individual Defendants.  ¶ 310(i); *see In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 1005 (N.D. Cal. 2001) ("an extended chain of inferences" does not satisfy the PSLRA, which "clearly establishes a preference for facts over such inferential leaps").  And although Plaintiffs assert that the Individual Defendants supposedly knew of Facebook's "lax privacy practices" because they were told that by Sandy Parakilas and Roger McNamee, ¶ 310(ii), Plaintiffs do not allege that Mr. Parakilas raised any concerns *to the Individual Defendants*,[13] and Mr. McNamee's warnings were about "algorithms" that "allow[ed] manipulation of users by bad actors who use the same tools designed for advertisers," *not* that Facebook was failing to adequately protect user data, Lutz Ex. 15.  This attempt to plead scienter by speculation and conclusion—rather than particularized facts—fails under the PSLRA.

---

[13] Plaintiffs misrepresent the article they cite for their allegation that "'[the top five] executives at the Company'" were warned by Mr. Parakilas. ¶ 75.  That article states only that Mr. Parakilas warned *unnamed* executives; it says nothing about the "top five" executives at Facebook. Lutz Ex. 18.  That Plaintiffs have taken such liberties with their pleading confirms their inability to plead scienter.  In any event, Mr. Parakilas made this alleged warning in *2012*, ¶ 75, which has no bearing on the alleged falsity of statements made during the 2017-18 putative class period or whether Defendants acted with scienter.  *See Fusion-io*, 2015 WL 661869, at *19 (allegation that confidential witness was told company would not meet projected revenues "is not a contemporaneous fact which suggests the falsity of" statements made three months later).  Indeed, Plaintiffs' own allegations make clear that there were many more restrictions on the types of information app developers could access in 2017-18 as compared to 2012 due to the changes Facebook made to its Platform since 2012.  *See supra* at 6.

Gibson, Dunn &
Crutcher LLP

1    Nor are Plaintiffs' conclusory allegations saved by allegations that, after it was reported that

2    Cambridge Analytica had lied to Facebook and may have retained misappropriated user data, Facebook

3    expressed regret that it did not do more in 2015 when the Company first learned that data had been

4    shared with Cambridge Analytica in violation of Facebook's policies.  That Facebook wished it had

5    done more in 2015—beyond investigating the issue and demanding and receiving certifications of

6    destruction of the improperly obtained data—*does not* establish that the Individual Defendants knew

7    that any challenged statement was false when made.  "Plaintiffs' theory is basically an assertion

8    of fraud by hindsight," *In re Leapfrog Enters., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1005 (N.D. Cal.

9    2016), which fails to support a strong inference of scienter in the Ninth Circuit.  *Daou*, 411 F.3d at

10   1021; *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 536 (3d Cir. 1999) (allegation that

11   defendant "expressed regret" nine months after allegedly false statement does not demonstrate "actual

12   knowledge of [] statements' falsity").[14]

13         **2.        Alleged Conduct Unrelated To The Misstatements Does Not Create Scienter**

14   Several of Plaintiffs' scienter allegations must be rejected for the simple reason that they have

15   no bearing on whether the Individual Defendants knew that any statement was allegedly false.

16   Plaintiffs' allegation that "defendants paid close attention to user engagement metrics," even if true,

17   does not establish knowledge of falsity.  ¶ 310(iv).  Similarly, that "Facebook was subject to an FTC

18   consent decree," ¶ 310(vi), does not support an inference of scienter.  Indeed, "[t]he fact that

19   [Facebook] was subject to a consent order … does not give Defendants a *greater* motive to lie ….  If

20   anything, it would tend to suggest the opposite."  *Seaman v. Cal. Bus. Bank*, 2014 WL 1339649, at *6

21   (N.D. Cal. Apr. 2, 2014).  Finally, Plaintiffs' allegation that a Facebook representative used "the same

22   language in numerous subsequent public statements" regarding the actions Facebook takes in response

23   to those who mislead users, ¶ 229, also is irrelevant to the Individual Defendants' scienter and in no

24   way shows that they knew or consciously disregarded the truth of any challenged statement.  Because

25   these "allegations  simply  have  no  relevance  to  the  misrepresentation  for  which  they  purportedly

26   _____

27   [14]  Plaintiffs' allegation that the Individual Defendants knew that "the Company had a long history of
          internally disregarding the privacy rights of users," ¶ 310(v), merely restates Plaintiffs' deficient

28        theory of falsity.  *LeapFrog*, 527 F. Supp. 2d at 1044 (scienter not adequately pled when plaintiff
          "conflate[d] a purported showing of falsity with a showing of requisite scienter").

MOTION TO DISMISS
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

1  establish scienter," they cannot establish a strong inference of scienter.  *In re Dot Hill Sys. Corp. Sec.*

2  *Litig.*, 594 F. Supp. 2d 1150, 1163 (S.D. Cal. 2008).

3        **3.**     **Stock Sales Do Not Support A Strong Inference Of Scienter**

4       Stock sales by senior officers "are not inherently suspicious."  *In re Netflix, Inc. Sec. Litig.*,

5  2005 WL 1562858, at *8 (N.D. Cal. June 28, 2005).  "[S]tock sale allegations cannot raise an inference

6  of scienter unless Plaintiffs allege specific facts showing that the sales were 'dramatically out of line

7  with prior trading practices at times calculated to maximize the personal benefit from undisclosed

8  inside information.'"  *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1116 (N.D. Cal. 2003)

9  (quoting *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir. 1999)).  "To make this

10  determination, [the Ninth Circuit] look[s] to three factors: (1) the amount and percentage of shares sold

11  by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior

12  trading history."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856

13  F.3d 605, 621 (9th Cir. 2017).  None of these factors supports an inference of scienter here.

14       First, none of the trades referenced in the Complaint is "suspicious" because all of the trades

15  were executed pursuant to Rule 10b5-1 plans—a fact Plaintiffs conspicuously fail to mention.  *See* Lutz

16  Exs. 1, 6-10.  Rule 10b5-1 permits company insiders to adopt written, pre-arranged trading plans under

17  which specific amounts of stock are sold according to pre-established criteria, thereby eliminating an

18  individual's discretion over trading.  *See* 17 C.F.R. § 240.10b5-1(c).  "[A]utomatic sales made pursuant

19  to Rule 10b5-1 plans do not support a strong inference of scienter."  *Rodriguez v. Gigamon Inc.*, 325

20  F. Supp. 3d 1041, 1056 (N.D. Cal. 2018) (Davila, J.); *see also Metzler*, 540 F.3d at 1067 n.11 (noting

21  sales "took place according to pre-determined 10b5-1 trading plans" and "[s]ales according to pre-

22  determined plans may rebut … an inference of scienter"); *In re Countrywide Fin. Corp. Sec. Litig.*,

23  2009 WL 943271, at *4 (C.D. Cal. Apr. 6, 2009).  Because all of the stock sales referenced in the

24  Complaint were made pursuant to Rule 10b5-1 plans established *before* the Class Period, Lutz Exs. 1,

25  6-10, they cannot support any assertion that the sales were suspicious.

26       Moreover, Plaintiffs fail to allege that the sales were timed to maximize the benefit to the

27  Individual Defendants.  "[I]nsider trading is suspicious only when it is dramatically out of line with

28  prior trading practices *at times calculated to maximize the personal benefit from undisclosed inside*

1   *information.*"  *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (emphasis in original).  Here, the

2   vast majority of Ms. Sandberg's and Mr. Wehner's sales before the first alleged corrective disclosure

3   in March 2018 were at prices *below* the $172.56 share price at which Facebook's stock was trading

4   *after the alleged fraud was first revealed.*  *Compare* ¶¶ 325-326, *with* ¶ 336.[15]  "When insiders miss

5   the boat this dramatically, their sales do not support an inference that they are preying on ribbon clerks

6   who do not know what the insiders know."  *Ronconi*, 253 F.3d at 435.

7           Second, when it comes to stock sales, the Ninth Circuit has held that, "by themselves, large

8   numbers do not necessarily create a strong inference of fraud."  *In re Vantive Corp. Sec. Litig.*, 283

9   F.3d 1079, 1093 (9th Cir. 2002), *abrogated on other grounds by Gebhart v. S.E.C.*, 595 F.3d 1034 (9th

10  Cir. 2010).  This is because Plaintiffs must provide "sufficient context of insider trading" to support an

11  inference of scienter.  *Ronconi*, 253 F.3d at 436.  Notably absent from the Complaint is a single

12  allegation regarding the Individual Defendants' holdings of Facebook stock or the percentage of those

13  holdings sold during the Class Period.  ¶¶ 315-316, 321, 325-326.  Without this information, Plaintiffs

14  cannot allege that the sales are suspicious because there is no way to compare them to the Individual

15  Defendants' overall holdings.

16          Third, Plaintiffs' allegations regarding the Individual Defendants' trading practices prior to the

17  Class Period do not support any inference of scienter.  "For individual defendants' stock sales to raise

18  an inference of scienter, plaintiffs must provide a 'meaningful trading history' for purposes of

19  comparison to the stock sales within the class period."  *Zucco*, 552 F.3d at 1005.  Plaintiffs do not

20  allege *any* facts about Ms. Sandberg's and Mr. Wehner's trading history.  This is fatal to Plaintiffs'

21  claim because "[w]ithout a meaningful trading history from which to compare, the Court cannot

22  conclude that [their] trades were suspicious and thus supportive of scienter."  *In re Pixar Sec. Litig.*,

23  450 F. Supp. 2d 1096, 1105 (N.D. Cal. 2006).  With respect to Mr. Zuckerberg, Plaintiffs make

24  inconsistent allegations.  *Compare* ¶ 317 ("Zuckerberg sold twice as much stock during the Class

25  Period as compared to the same amount of time preceding the Class Period.") *with* ¶ 323

26  ("[Mr. Zuckerberg] sold three times more stock during the Class Period than he did for the same period

27

28  ────────────────────
    [15]  Plaintiffs do not allege the prices at which Mr. Zuckerberg sold stock, precluding the Court from
          inferring scienter based on his trades.

MOTION TO DISMISS
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

preceding the Class Period.").  More importantly, neither of these allegations supports a finding that Mr. Zuckerberg's trading practices were "dramatically out of line with prior trading practices." *Vantive*, 283 F.3d at 1095 (court "[u]nable to find anything unusual about" an insider selling nearly *six* times as much stock during the class period).  Because Plaintiffs fail to plead facts demonstrating that the stock sales here were unusual, their allegations do not support a strong inference of scienter.

### 4. Plaintiffs Fail To Plead Corporate Scienter

"[A] corporation can only act through its employees and agents and can likewise only have scienter through them."  *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015).  Thus, to plead Facebook's scienter, "Plaintiffs must allege the requisite level of scienter with respect to at least one of the Individual Defendants."  *See Keyuan Petrochemicals*, 2012 WL 5834894, at *3.  Because Plaintiffs fail to plead scienter as to any of the Individual Defendants, they fail to plead scienter as to Facebook.[16]

### D. Plaintiffs Fail To Plead Loss Causation

The Complaint must also be dismissed on the independent ground that Plaintiffs fail to plead loss causation with particularity.  *See Loos*, 762 F.3d at 888 (loss causation subject to PSLRA heightened pleading standard).  Loss causation "is the 'causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss.'"  *Metzler*, 540 F.3d at 1062 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).  To plead loss causation, a plaintiff must allege facts specifically demonstrating that (1) he or she purchased a security at a market price that was artificially "inflated by a fraudulent misrepresentation; and (2) the artificial inflation was removed from the market price as a result of a corrective disclosure revealing the truth to the market.  *Dura*, 544 U.S. at 342; *Loos*, 762 F.3d at 888.

The release of negative information followed by a stock drop is not enough to establish loss causation.  *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *5 (C.D. Cal. Feb. 6, 2014) (the

---

[16]  To the extent Plaintiffs seek to plead Facebook's scienter under a "collective scienter" theory based on employees other than the Individual Defendants, that inference fails because the Ninth Circuit has "not … adopted a theory of collective scienter."  *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744-45 (9th Cir. 2008); *see also Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995) ("[T]here is no case law supporting an independent 'collective scienter' theory ….").

Gibson, Dunn & Crutcher LLP

market must "actually learn[] of and react[] to the specific fraud alleged by the plaintiff, as opposed to reacting to reports of the defendant's poor financial health generally").  To the contrary, where, as here, a plaintiff's loss causation theory is based on "corrective disclosures," ¶¶ 334-344, the plaintiff must allege that the disclosures revealed the "truth" about a specific alleged misstatement, which caused at least a "substantial" amount of plaintiff's alleged losses.  *Dura*, 544 U.S. at 341, 344-48; *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119-20 (9th Cir. 2013) (securities fraud plaintiff must trace its claimed loss back to "the very facts about which the defendant lied").  And the alleged "corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time."  *Rok v. Identiv, Inc.*, 2017 WL 35496, at *18 (N.D. Cal. Jan. 4, 2017); *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 2937483, at *5 (N.D. Cal. May 20, 2016) ("New information is critical to demonstrating loss causation.").

Plaintiffs fail to satisfy their burden.  Plaintiffs' loss causation allegations consist of "a series of partial disclosures" preceding stock drops on March 19, 20, 22, 23, and 27, 2018, and Facebook's second quarter earnings announcement on July 25, 2018.  ¶¶ 333-342.  But none of the "partial disclosures" revealed the supposed "truth" regarding any particular statement that Plaintiffs allege was false or misleading.  In short, Plaintiffs fail to plead that it was Defendants' "misstatement, as opposed to some other fact, [that] foreseeably caused the plaintiff's loss."  *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).[17]

### 1.   Plaintiffs Fail To Plead Loss Causation For The March 19, 2018 Decline

According to Plaintiffs, the March 19, 2018 decline was caused by disclosures in articles published on March 17, 2018 in *The Guardian* and *The New York Times*.  ¶¶ 335-336.  But Plaintiffs fail to show how those articles revealed the "truth" about any *particular* misstatement made by Defendants.  *See, e.g.*, ¶ 14 (the "revelation" was "contrary to its numerous public statements").  Indeed, Plaintiffs' loss causation argument consists entirely of conclusory allegations that "news regarding the

---

[17]  In *First Solar*, the Court of Appeals reaffirmed that the "ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  881 F.3d at 753.  The court recognized that, although securities fraud plaintiffs need not plead "a causation theory based on market revelation of the [alleged] fraud," the plaintiff must plead and prove that it was the "defendant's misstatement, as opposed to some other fact," that "foreseeably caused the plaintiff's loss."  *Id.*

Gibson, Dunn &
Crutcher LLP

extent of the data breach" in *The Guardian* and *The New York Times* caused shares to fall, ¶ 336, and that certain unspecified facts in those articles contradicted other unspecified "prior representations," ¶ 14.  Such bald conclusions fail Rule 9(b)'s particularity requirement.  *See In re BofI Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d 1128, 1135 (S.D. Cal. 2018) (alleged corrective disclosures must "relate back to the misrepresentation"); *Katyle v. Penn Nat'l Gaming, Inc*., 637 F.3d 462, 471 (4th Cir. 2011) (loss causation allegations are reviewed for "sufficient specificity").

As a matter of law, the articles in *The Guardian* and *The New York Times* cannot constitute "corrective disclosures" because the essential allegations in both articles had already been revealed by *The Guardian* in 2015 (and continued to be the subject of media reports thereafter, *see supra* note 3)— more than a year before the putative class period—*i.e.*, that Cambridge Analytica had harvested and misused this same user data to serve targeted advertisements for political campaigns.  *See* Lutz Ex. 13.  The only new fact revealed by the March 17, 2018 articles was that Cambridge Analytica might not have deleted all of the Facebook user data in its possession, despite its contrary representations to Facebook, and might have used that data during the 2016 presidential election.  ¶¶ 14, 153.  Indeed, even Plaintiffs recognize that the only new information in the March 17, 2018 articles—that Cambridge Analytica, in contravention of representations made to Facebook, improperly retained and possibly used Facebook user data—was accomplished without Facebook's knowledge or consent, and in violation of Facebook's Platform and Data Policies.  ¶¶ 92-93, 150, 176, 232.  Thus, to the extent there was any new information in the March 17, 2018 articles, that information hardly revealed the "truth" of the alleged misstatements.

### 2.    Plaintiffs Fail To Plead Loss Causation With Respect To Other March Declines

Plaintiffs also claim that a hodgepodge of "[c]ontinuing revelations of [the] extent of data breach and lax enforcement and of regulatory and user backlash" in the tens days following *The Guardian* and *The New York Times* articles qualify as corrective disclosures.  ¶ 335.  The supposedly "corrective" disclosures plaintiffs cite are:

- a March 18, 2018 tweet by Cambridge Analytica employee Christopher Wylie stating that he had been "[s]uspended by @Facebook," ¶ 337(a);

Gibson, Dunn & Crutcher LLP

- a March 19, 2018 press report stating that Facebook's Chief Information Security Officer was leaving Facebook as a result of the investigations into "Russian hacking," ¶ 337(b);

- disclosures on March 20, 2018 "regarding the widening scope of the data privacy risks, including call for users to 'deleteFacebook' and unconfirmed reports of government investigations into the matter," ¶ 337(c);

- a March 20, 2018 press report stating that app developers harvested user data from Facebook in violation of Facebook's policies, ¶ 337(c), and a claim by a Facebook Platform operations manager that Facebook user data had been exploited, ¶ 337(d);

- additional unspecified "continuing revelations" that are alleged to have occurred between March 22 and March 27, 2018, ¶ 335;

- more "additional details" concerning the scope of the data breach, the risks facing the Company, and the "increased calls for government investigations," ¶ 339; and

- yet more "continuing revelations" on March 27, 2018 concerning "the extent of the data breach and risks to the Company, including the FTC's confirmation that it had opened an investigation into Facebook's compliance with the FTC consent decree," ¶ 340.

For all these purported corrective disclosures, Plaintiffs do not even try to meet their burden of tracing the alleged loss back to "the very facts about which the defendant lied," *Nuveen*, 730 F.3d at 1120, or explain how the statements corrected some particular falsehood perpetuated by Facebook or the Individual Defendants.  Nor do they try to explain *why* or *how* these "revelations" proximately caused any of the stock price drops to which they purportedly correspond.  *See Apollo*, 774 F.3d at 608 ("Plaintiffs must demonstrate a causal connection between the deceptive acts … and the injury suffered by the Plaintiffs.");  *In re Allied Nev. Gold Corp. Sec. Litig.*, 2016 WL 4191017, at *14 (D. Nev. Aug. 8, 2016).  This failure is fatal to their claims.

In addition, the purported "corrective disclosures" on March 20, 22, 23, and 27 that merely assert unspecified "additional details" and "continuing revelations," are patently insufficient under Rule 9(b), as they neither tie to any allegedly false statement, *Apollo*, 774 F.3d at 605, 608, nor suggest any new material information relating to the alleged fraud that was not already in the market.  *See, e.g., Meyer v. Greene*, 710 F.3d 1189, 1197-98 (11th Cir. 2013) ("[C]orrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time …."); *Identiv*, 2017 WL 354496, at *18 (same); *Bonanno*, 2016 WL 2937483, at *5 (same).  And as to the purported disclosures

Gibson, Dunn &
Crutcher LLP

on March 20, 23, and 27, concerning "increased calls for government investigations," "unconfirmed reports of government investigations," and the FTC "open[ing] an investigation," these allegations also cannot establish loss causation. "The announcement of an investigation does not 'reveal' fraudulent practices to the market," *Loos*, 762 F.3d at 887, and is "insufficient to establish loss causation" *id.* at 883; *accord Curry v. Yelp Inc.*, 875 F.3d 1219, 1225 (9th Cir. 2017); *Identiv*, 2017 WL 35496, at *18-19.[18] In short, Plaintiffs' transparent attempt to capture as many price declines as possible, regardless of their relation to the alleged "fraud," is not a viable theory of loss causation.

### 3. Plaintiffs Fail To Allege Loss Causation Adequately For The July 26, 2018 Decline

Plaintiffs' loss causation theory as to the July 26, 2018 stock price drop is even more deficient. They allege that Facebook's second quarter earnings announcement on July 25, 2018, which reported lower than expected revenues, profits, and user engagement, "revealed the true extent of the damage from the Cambridge Analytica scandal." ¶¶ 342-343. Plaintiffs' attempt to shoehorn the collateral effects of the "Cambridge Analytica scandal" into a viable securities fraud theory against Facebook fails for at least three reasons.

*First*, Facebook's second quarter earnings announcement described nothing "new" relating to Facebook's privacy practices, third-party data harvesting, or Cambridge Analytica. *Bonanno*, 2016 WL 2937483, at *5. Indeed, the announcement did not *even mention* Cambridge Analytica or any other privacy incident alleged in the Complaint. *See* Lutz Ex. 12. Accordingly, nothing in the earnings call "corrected" any alleged prior misstatement or omission of material fact. *See BofI*, 302 F. Supp. 3d at

---

[18] As for the other purported disclosures, none of the information they contained differed materially from information already available to the public. The March 18 tweet itself says nothing novel: simply that Mr. Wylie was "[s]uspended from Facebook" for "some[]" unspecified reason. ¶ 337(a). The March 19 article, which noted that Facebook's Chief Information Officer was leaving the company, revealed nothing new about Facebook's privacy practices, or Russian interference in the 2016 election—the article's actual subject matter. *See also* ¶ 129 (admitting that Facebook's CIO denied that he had been "forced out," contradicting Plaintiffs' characterization of the article). Likewise, the substance of the March 20 article, written by Mr. Parakilas, had already been disclosed in November 2017, in a separate op-ed he authored for the *New York Times* that similarly summarized his purported experience with app developer data misuse. Lutz Ex. 22; *see also* ¶¶ 65-66, 78 & ns.58, 79-80 (Plaintiffs citing the two Parakilas articles interchangeably). Indeed, the March 20, 2018 article states that "Parakilas first went public with his concerns about privacy at Facebook *four months ago*." Lutz Ex. 16 at 2.

Gibson, Dunn & Crutcher LLP

1135-36 (a "disclosure that does not reveal anything new to the market is, by definition, not corrective").

Plaintiffs nonetheless suggest that Facebook's reported 50% year-over-year increase in expenses revealed that Facebook was not in fact "protect[ing] user data from exploitation." ¶ 344.  But this expense information was not "new"; on the contrary, Plaintiffs admit that the 50% increase in expenses was precisely in line with Facebook's guidance in April 2018 that "investors [should] expect full-year 2018 expenses to grow 50%-60%." ¶ 275.  Plaintiffs similarly allege that Facebook admitted for the first time during the second quarter earnings call that implementation of the GDPR could have a negative impact on Facebook's revenues and user engagement. ¶ 22.  Here again, Facebook expressly warned investors in its first quarter earnings announcement that the GDPR would likely have an impact on Facebook's user base in Europe, and possibly more broadly.  *See, e.g.*, ¶ 277; *see also* Lutz Ex. 11 at 8, 11, 15, 18, 23 (Mr. Wehner projecting that GDPR would cause Facebook's UK user base to "be flat to slightly down," and Ms. Sandberg warning that GDPR "would affect the [advertising] product."); *compare* Lutz Ex. 12 at 7 (Mr. Wehner describing the Q2-2018 impact from GDPR as "consistent with the outlook" from the Q1-2018 estimates).  Indeed, during the second quarter earnings call, one analyst praised Facebook for providing an "accurate read into the June quarter" on the likely effect of the GDPR.  Lutz Ex. 12 at 15.

*Second*, Plaintiffs have not, and cannot, show a proximate causal connection between the price drop following the earnings announcement and any alleged fraud.  *See Nuveen*, 730 F.3d at 1120 (to satisfy "proximate cause" a plaintiff must trace the loss back to the "very facts about which the defendant lied"); *Apollo*, 774 F.3d at 608.  Indeed, Plaintiffs fail to offer any "plausible explanation why it was … the alleged fraud that substantially caused stock prices to fall," as opposed to disappointing news about Facebook's finances that Plaintiffs cannot plausibly attribute to any alleged fraud.  *See In re Immersion Corp. Sec. Litig.*, 2011 WL 871650, at *8 (N.D. Cal. Mar. 11, 2011) (rejecting loss causation allegations because the plaintiff "fail[ed] to plead facts sufficient to … show any decline in stock price was caused by the alleged fraud rather than a typical market reaction to disappointing financial reports").

Plaintiffs' loss causation theory with respect to the July earnings call is particularly attenuated because the earnings announcement made no reference to any of the privacy incidents alleged in the Complaint that form the basis of the alleged fraud. Rather, as Plaintiffs recognize, Facebook's shares fell on the news that Facebook reported "lower than expected revenues and earnings," with "reduced guidance going forward," and that its user growth was "decelerating worldwide." ¶¶ 212-213, 216. Numerous courts in this Circuit and elsewhere have rejected remarkably similar loss causation allegations where the "far more plausible reason" for a stock drop is a company's failure to "hit prior earnings estimates"—and *not* the revelation of fraud. *Metzler*, 540 F.3d at 1065; *Verifone*, 2016 WL 1213666, at *9 ("While the less-than-expected revenue and subsequent reports refer to VeriFone's unsuccessful business model transition, the alleged statements sound more as a critique of poor performance rather than an indication of securities fraud" and "do[] not show that Defendants engaged in fraudulent misconduct which led to lower revenues."); *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192 (N.D. Cal. 2008) (rejecting theory that deceleration in growth and revenue decrease in earnings report were sufficiently linked to "any announcement of fraud" where the reports had not "comment[ed] on any [of the] fraud issues"); *Rok*, 2017 WL 35496, at *19-20 (holding that SEC filings "did not address" or "mention" underlying fraudulent conduct and, hence, plaintiff could not show that the stock price decline "was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors"); *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 199703, at *11 (N.D. Cal. Jan. 13, 2010) (holding that earnings statements that disclosed negative news about company revenues and profitability "do not reveal the necessary causal link between the alleged fraud and the drop in … stock price"); *Scandlon v. Blue Coat Sys., Inc.*, 2013 WL 5313168, at *4 (N.D. Cal. Sept. 23, 2013) (rejecting "conclusor[y]" allegations that "investors belatedly learned the truth" about weakened international sales where earnings report did not indicate that any "previously-concealed truths [had come] to light").

*Third*, the movement of Facebook's stock price in the months preceding the July 26, 2018 drop further undermine Plaintiffs' loss causation theory. Following publication of the 2015 *The Guardian* article, the 2018 *The Guardian* and *The New York Times* articles, and all the other purported "[c]ontinuing revelations of [the] extent of data breach and lax enforcement and of regulatory and user

backlash" that Plaintiffs allege, Facebook's stock price made a *full recovery by May 10, 2018*—and *continued to climb* thereafter.  ¶ 190; Ex. 29.  On April 25, 2018, Facebook's first quarter revenues, earnings, and user engagement metrics all met or exceeded expectations.  ¶ 186.  Accordingly, if any *fraud* pertaining to Cambridge Analytica was revealed in March 2018, that information was fully incorporated into the market price of Facebook's stock no later than March 27.  *See* ¶¶ 337-340.  The notion that these same facts again gave rise to "fraud" four months later is nonsensical.[19]

For all these reasons, the Complaint must be dismissed on loss causation grounds.

**E.   Plaintiffs Fail To Plead Reliance**

Plaintiffs must plead that they relied on the allegedly false or misleading statements in purchasing Facebook stock.  *See ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1252-53 (C.D. Cal. 2015).  Plaintiffs must either allege facts establishing their entitlement to the presumption of reliance based on the fraud-on-the-market theory or, if the presumption is unavailable, that they heard an alleged misstatement and relied on it.  *See In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1187-88 (N.D. Cal. 2004).

Plaintiffs rely on the fraud-on-the market presumption to establish reliance.  ¶¶ 356-357.  But they are not entitled to a presumption of reliance under the fraud-on-the-market doctrine where, as here, the market already was aware of the core information that Plaintiffs claim was omitted—namely, that Facebook "knowingly and recklessly allowed third-party app developers to harvest and misuse user data without their knowledge and consent, including, for example, Cambridge Analytica and its affiliated companies."  ¶ 232.  "In a fraud-on-the-market case, an omission is actionable under section 10(b) and Rule 10b-5 only if the allegedly undisclosed information *has not already entered the*

---

[19] Plaintiffs cite to several news stories discussing the second quarter earnings report that speculate that the unfavorable earnings were caused by any number of factors, including Facebook's heightened investments in privacy, "engagement problems with core Facebook," a desire not to "create the perception of getting rich while their product presents issues for society," Cambridge Analytica, the GDPR, "years of privacy missteps," other unnamed "scandals," and "a confluence" of other "factors."  ¶¶ 346-351; *see also* Lutz Ex. 19 (*Bloomberg* describing how the "primary factor constraining Facebook's revenue opportunity" is the inherent limit to growth in "digital advertising").  But none of those news stories indicate that any conduct by Defendants was revealed to be *fraudulent* by the earnings report.  Nor do they indicate that any *fraudulent* conduct was the "substantial" cause of the downturn.  And regardless, analyst opinions "cannot reveal to the market the falsity of … misrepresentations."  *Bonanno*, 2016 WL 2937483, at *5.

MOTION TO DISMISS
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

*market*." *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 975-76 (9th Cir. 1999).  "If the market has become aware of the allegedly concealed information, the facts allegedly omitted by the defendant would already be reflected in the stock's prices and the market will not be misled." *Id*. at 976.  Under such circumstances, "the element of reliance will not be satisfied, and plaintiff's claims based on a fraud on the market theory will fail." *Id*.; *see Kalobios*, 258 F. Supp. 3d at 1008 (rejecting fraud-on-the-market presumption when allegedly omitted information about defendant's reputation was well documented in the press).

Plaintiffs admit that "Cambridge Analytica's unauthorized access to and use of Facebook user data was reported by *The Guardian* in December 2015," more than one year before the start of the Class Period.  ¶ 7.  The article reported that Kogan collected user data through his app and then sold certain of that data to Cambridge Analytica in violation of Facebook's policies, and that Cambridge Analytica in turn used Kogan's data to create psychological profiles of voters for the purpose of assisting political campaigns.  ¶¶ 80-81, 150, 232, 280; *see also* Lutz Ex. 13.  Mainstream news sources reported additional details about Cambridge Analytica's misuse of Facebook user data.  *See, e.g.*, ¶¶ 94, 95, 99 (describing articles published in *The Wall Street Journal*, *The New York Times*, and *The Washington Times*).  Because "the content of [the] articles, as well as the credibility and wide circulation of their respective sources," ensured that the market was aware of the allegedly omitted information about third party misuse of Facebook user data, Plaintiffs are not entitled to a presumption of reliance under the fraud-on-the-market doctrine.  *See Kalobios*, 258 F. Supp. 3d at 1009; *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1115-16 (9th Cir. 1989); *Heliotrope*, 189 F.3d at 976-77; *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1410 (9th Cir. 1996).

## F.    Plaintiffs Fail To Plead Claims Under Sections 20(a) Or 20A

Because both the Section 20(a) and Section 20A claims require Plaintiffs to plead a primary violation of the Exchange Act, Plaintiffs' failure to plead a violation of Section 10(b) or Rule 10b-5

1  requires dismissal of these claims.[20] *NVIDIA*, 768 F.3d at 1052 (Section 20(a)); *Lipton v. Pathogenesis*

2  *Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) (Section 20A).

3                              **IV.    CONCLUSION**

4         For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint

5  with prejudice.

6  DATED:  December 14, 2018              GIBSON, DUNN & CRUTCHER LLP

7
                                         By:  _____/s/ *Orin Snyder*_____
8                                              Orin Snyder
                                               200 Park Avenue
9                                              New York, N.Y. 10166-0193
                                               Tel: 212.351.4000
10                                             Fax: 212.351.4035
                                               osnyder@gibsondunn.com
11
                                               Joshua S. Lipshutz
12                                             1050 Connecticut Avenue, N.W.
                                               Washington, D.C. 20036-5306
13                                             Tel:  202.955.8500
                                               Fax:  202.467.0539
14                                             jlipshutz@gibsondunn.com
15
                                               Kristin A. Linsley
16                                             Brian M. Lutz
                                               555 Mission Street
17                                             Suite 3000
                                               San Francisco, CA 94105-0921
18                                             Tel: 415.393.8200
                                               Fax: 415.374.8306
19                                             klinsley@gibsondunn.com
                                               blutz@gibsondunn.com
20

21

22

23

24

25  _____

26  [20]  Plaintiffs' Section 20(a) claim must be dismissed for the additional reason that Plaintiffs fail to
         plead facts demonstrating Facebook "exercised actual power over [a] primary violator."  *NVIDIA*,
27       768 F.3d at 1052; *see In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab.
         Litig.*, 2017 WL 66281, at *19 (N.D. Cal. Jan. 4, 2017) (Plaintiffs must plead Section 20(a) claims
28       with particularity.).  Plaintiffs fail to explain, because they cannot, how Facebook simultaneously
         could control, ¶ 366, and be controlled by the Individual Defendants.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Paul J. Collins
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel:  650.849.5300
Fax:  650.849.5333
pcollins@gibsondunn.com

*Attorneys for Defendants Facebook, Inc.,
Mark E. Zuckerberg, Sheryl K. Sandberg,
and David M. Wehner*

# CERTIFICATE OF SERVICE

I, Orin Snyder, declare as follows:

I am employed in the County of New York, State of New York, I am over the age of eighteen years and am not a party to this action; my business address is 200 Park Avenue, New York, NY 10166-0193, in said County and State.

I hereby certify that on December 14, 2018, the foregoing **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** was filed with the Clerk of the Court via CM/ECF. Notice of this filing will be sent electronically to all registered parties by operation of the Court's electronic filing systems.


DATED: December 14, 2018                    By:   /s/ *Orin Snyder*
                                                  Orin Snyder