1
2
3
4
5
6

ROBBINS GELLER RUDMAN
   & DOWD LLP
DENNIS J. HERMAN (220163)
JASON C. DAVIS (253370)
KENNETH J. BLACK (291871)
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
dherman@rgrdlaw.com
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

7
8
9
10
11
12
13

BERNSTEIN LITOWITZ BERGER &
   GROSSMANN LLP
JOHN C. BROWNE
JEREMY P. ROBINSON
KATE W. AUFSES
1251 Avenue of the Americas
New York, NY  10020
Telephone:  212/554-1400
212/554-1444 (fax)
johnb@blbglaw.com
jeremy@blbglaw.com
kate.aufses@blbglaw.com

14

Co-Lead Counsel for the Class

15

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

16

## NORTHERN DISTRICT OF CALIFORNIA

17

## SAN JOSE DIVISION

18
19
20

In re FACEBOOK, INC. SECURITIES
LITIGATION

21
22

This Document Relates To:

   ALL ACTIONS.

23
24
25
26
27
28

)
)
)
)
)
)
)
)
)
)
)
)

Master File No. 5:18-cv-01725-EJD

<u>CLASS ACTION</u>

**LEAD PLAINTIFFS' MEMORANDUM
OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

Date: April 25, 2019
Time: 9:00 A.M.
Location: Courtroom 4, 5th Floor
Judge: Hon. Edward J. Davila

Date First Action Filed: March 28, 2018

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ...................................................................... 1

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 4

I.   THE COMPLAINT ALLEGES ACTIONABLE MISSTATEMENTS AND
     OMISSIONS .................................................................................................................. 4

     A.   Defendants Made Material Misstatements Concerning Facebook's
          Response To Data Misuse And Privacy Violations ............................................. 5

          1.   Defendants Falsely Stated That Data Misuse Victims Received
               Notice ........................................................................................................ 5

          2.   Defendants Did Not Take Swift Action Or Require Destruction Of
               Misused Data ............................................................................................ 7

          3.   Defendants Misrepresented How Users Controlled Their
               Information ................................................................................................ 9

     B.   Defendants' Risk Disclosures Were Materially False And Misleading ............... 11

     C.   When The Cambridge Analytica Scandal Broke, Defendants Concealed Its
          Full Impact On Facebook's Business ................................................................... 13

          1.   Defendants Misleadingly Assured Investors That The Cambridge
               Analytica Scandal Was A Non-Issue ....................................................... 13

          2.   Defendants Misleadingly Downplayed The Impact Of The
               Cambridge Analytica Scandal On Facebook's Business .......................... 15

     D.   Defendants Falsely Assured Investors That Facebook Was Already
          "Adhering" To The European GDPR Privacy Law To Further Mask Risks ........ 17

     E.   Facebook's Privacy Policies Are Actionable ....................................................... 19

II.  THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER ....................... 20

     A.   Defendants' Admissions Establish Scienter ......................................................... 21

     B.   First-Hand Witness Accounts Further Confirm Defendants' Scienter ................. 23

     C.   The Fact That Data Protection Is Core To Facebook's Business Model
          Contributes To A Strong Inference Of Scienter ................................................... 24

     D.   Widespread Privacy Misconduct At Facebook Confirms Scienter ...................... 25

E.     The FTC Consent Decree Supports Scienter ........................................ 26

F.     Defendants' Billions-Worth Of Insider Sales Supports Scienter ......................... 26

G.     Defendants' Stock Sales Are Not Sanitized By Rule 10b-5-1 Plans .................. 27

III.   THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION .............................. 28

IV.    RELIANCE IS PRESUMED ................................................................................. 33

V.     THE COMPLAINT PLEADS INSIDER TRADING CLAIMS .......................................... 34

VI.    THE COMPLAINT PLEADS CONTROL PERSON LIABILITY ...................................... 34

VII.   CONCLUSION ................................................................................................ 35

ii

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 5:18-cv-01725-EJD

1

## TABLE OF AUTHORITIES

2

CASES                                                                                          Page(s)

3

*Affiliated Ute Citizens v. United States,*
4     406 U.S. 128 (1972)............................................................................................................33

5 *In re Akorn Sec. Litig.,*
    240 F. Supp. 3d 802 (N.D. Ill. 2017) ...............................................................................30
6

7 *Alaska Elec. Pension Fund v. Flowserve Corp.,*
    572 F.3d 221 (5th Cir. 2009) ...........................................................................................28

8

*Baker v. SeaWorld Entm't, Inc.,*
9     No.: 14cv2129-MMA (AGS), 2017 WL 5885542 (S.D. Cal. Nov. 29, 2017) .......................33

10 *In re Banc of Cal. Sec. Litig.,*
    SACV 17-00118 AG (DFMx), 2017 WL 3972456 (C.D. Cal. 2017) ....................................26
11

12 *Basic v. Levinson,*
    458 U.S. 224 (1988).....................................................................................................20, 33

13

*Batwin v. Occam Networks, Inc.,*
14     No. CV 07–2750 CAS (SHx), 2008 WL 2676364 (C.D. Cal. July 1, 2008)....................19, 33

15 *Berson v. Applied Signal Tech., Inc.,*
    527 F.3d 982 (9th Cir. 2008) ...................................................................................3, 12, 13
16

17 *Blackie v. Barrack,*
    524 F.2d 891 (9th Cir. 1975) ...........................................................................................33

18

*In re BofI Holding, Inc. Sec. Litig.,*
19     No. 3:15-CV-02324-GPC-KSC, 2017 WL 2257980 (S.D. Cal. May 23, 2017) ...................34

20 *In re BP plc Sec. Litig.,*
    843 F. Supp. 2d 712 (S.D. Tex. 2012) ............................................................................7, 8
21

22 *In re Carter-Wallace Inc., Sec. Litig.,*
    150 F.3d 153 (2d Cir. 1998)...........................................................................................19, 20

23

*In re Countrywide Fin. Corp. Sec. Litig.,*
24     588 F. Supp. 2d 1132 (C.D. Cal. 2008) .........................................................................24, 25

25 *Cutler v. Kirchner,*
    696 F. App'x 809 (9th Cir. 2017) ..................................................................................12, 13
26

27 *Dura Pharm. v. Broudo,*
    544 U.S. 336 (2005)........................................................................................................28

28

iii

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) ...............................................................26

*Fadia v. FireEye, Inc.*,
    No. 5:14-cv-05204-EJD, 2016 WL 6679806 (N.D. Cal. Nov. 14, 2016)..............8, 9

*In re Finisar Corp. Sec. Litig.*,
    646 F. App'x 506 (9th Cir. 2016) ...............................................................16, 17

*In re Finisar Corp. Sec. Litig.*,
    No. 5:11-cv-01252-EJD, 2017 WL 1549485 (N.D. Cal. May 1, 2017) ..............6, 20

*Hong v. Extreme Networks*,
    No. 15-cv-04883-BLF, 2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ....................6

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ...............................................................34

*Howard v. Hui*,
    No. C 92–3742–CRB, 2001 WL 1159780 (N.D. Cal. Sept. 24, 2001)....................34

*Huddleston v. Herman & MacLean*,
    640 F.2d 534 (5th Cir. 1981) ...............................................................12

*In re Infosonics Corp. Deriv. Litig.*,
    No. 06cv1336 BTM(WMc), 2007 WL 2572276 (S.D. Cal. Sept. 4, 2007)..............27

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...............................................................4, 6, 14

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) .....................................................11

*In re LifeLock Inc., Securities Litigation*,
    690 F. App'x 947 (9th Cir. 2017) ...........................................................20

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .........................................................15, 17, 28, 29

*Lloyd v. CVB Fin. Corp.*,
    NO. CV 10-06256 MMM (PJWx),
    2012 WL 12883522 (C.D. Cal. Jan. 12, 2012) .........................................13

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ...............................................................29

*McGann v. Ernst & Young*,
    102 F.3d 390 (9th Cir. 1996) ...............................................................20

iv

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 5:18-cv-01725-EJD

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ................................................................17

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) .................................................28, 29, 33

*Mirmehdi v. United States*,
    689 F.3d 975 (9th Cir. 2012) ................................................................35

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
    No. 14-cv-00722-SI, 2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ......................33

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009) ...................................................11

*Mulligan v. Impax Labs.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ....................................................11

*Muzinich & Co. v. Raytheon Co.*,
    No. CV-01-284-S-BLW,
    2002 U.S. Dist. LEXIS 26962 (D. Idaho Apr. 30, 2002) .............................20

*Nguyen v. Radient Pharms. Corp.*,
    SA CV 11-0406 DOC (MLGx),
    2011 U.S. Dist. LEXIS 122533 (C.D. Cal., Oct. 20, 2011) ...........................30

*In re Novatel Wireless Sec. Litig.*,
    830 F. Supp. 2d 996 (S.D. Cal. 2011) ..............................................18, 27

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ............................................................26

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) .....................................................................18

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007) ...................................................34

*Palmer v. Apple, Inc.*,
    No. 5:15-cv-05808-RMW, 2016 WL 1535087 (N.D. Cal. Apr. 15, 2016) ...............9

*In re Peoplesoft, Inc.*,
    2000 WL 1737936 (N.D. Cal. May 25, 2000) ...........................................23

*Petrie v. Elec. Game Card, Inc.*,
    761 F.3d 959 (9th Cir. 2014) ................................................................4

*In re Quality Sys. Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ..........................................................9, 19

v

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 5:18-cv-01725-EJD

*In re Questcor Sec. Litig.*,
   No. SA CV 12–01623 DMG (FMOx), 2013 WL 5486762 (C.D. Cal. Oct. 1,
   2013) ................................................................................................................27

*Reese v. BP Exploration*,
   643 F.3d 681 (9th Cir. 2011) ....................................................................7, 9

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ..................................................................12, 17

*Ret. Fund v. Apollo Group*,
   774 F.3d 598 (9th Cir. 2014) .......................................................................33

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard
   Co.*,
   845 F.3d 1268 (9th Cir. 2017) .......................................................................9

*Rodriguez v. Gigamon, Inc.*,
   325 F. Supp. 3d 1041 (N.D. Cal. 2018) .......................................................27

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir 2016) .........................................................................20

*Schulein v. Petroleum Dev. Corp.*,
   SACV 11-1891 AG (ANx), 2012 WL 12884851 (C.D. Cal. June 25, 2012) ........................12

*Sgarlata v. PayPal*,
   No. 17-cv-06956-EMC, 2018 WL 6592771 (N.D. Cal. Dec. 13, 2018)................................12

*Shaev v. Baker*,
   No.16-cv-05541-JST, 2017 WL 1735573 (N.D. Cal. May 4, 2017) ...............................23, 24

*Speakes v. Taro Pharm. Indus.*,
   16-cv-08318 (ALC), 2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018)....................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)........................................................................................20

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ........................................................22

*Toy Invs., Inc. v. Poof-Slinky, Inc.*,
   No. 13–0634–RSM, 2013 WL 6095838 (W.D. Wash. Nov. 20, 2013)....................................35

*In re Toyota Motor Corp. Sec. Litig.*,
   No. CV 10–922 DSF (AJWx), 2011 WL 2675395 (C.D. Cal. July 7, 2011) ..........................24

*United States v. McGraw-Hill Cos.*,
   No. CV 13-0779 DOC (JCGx), 2013 WL 3762259 (C.D. Cal. July 16, 2013)..................9, 11

vi

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ...................................................................................27

*In re VeriFone Holdings, Inc., Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ................................................................................................20

*In re Verifone Sec. Litig.*,
    No. 5:13-cv-01038, 2016 WL 1213666 (N.D. Cal. Mar. 29, 2016) .......................................33

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*,
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017) .........................................................................19, 22

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) ............................................................................................15, 17

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
    282 F. Supp. 3d 1074 (N.D. Cal. 2017) ...........................................................................23, 24

## MEMORANDUM OF POINTS AND AUTHORITIES

Lead Plaintiffs hereby respond to Defendants' motion to dismiss (ECF No. 93, "Motion" or "Mot.").[1]

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Defendants' Motion should be denied where it disregards and/or disputes the factual allegations of the Complaint and otherwise attempts to convert the Motion into a motion for summary judgement.

2.      Whether Plaintiffs' Complaint sets forth facts that, considered holistically, adequately plead claims under Section 10b(b) of the Securities Exchange Act (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, and Sections 20(a) and 20A of the Exchange Act, including based on Defendants' own admissions of knowing or deliberately reckless misconduct harming investors.

## INTRODUCTION

This case arises from Defendants' false and misleading statements and omissions concerning Facebook's privacy practices.  In March and July 2018, investors were blindsided by revelations that a privacy scandal thought to be long resolved – the Cambridge Analytica scandal of 2015 – was not resolved, was still exposing Facebook to serious risks and, once those risks materialized, seriously impacted the Company's business.  As set forth below, during the Class Period, Defendants misrepresented to investors the steps they took in response to the Cambridge Analytica scandal, misstated the Company's privacy practices and knowingly or at least recklessly concealed the enormous privacy-related risks confronting Facebook.  When these misrepresentations and risks came to light, Facebook's stock price suffered extraordinary declines, twice shedding over $100 billion in market capitalization.  ¶¶14-19, 22-23, 335.

---

[1]  Amalgamated Bank, as Trustee for the Long View LargeCap 1000 Growth Index Fund, LongView Quantitative LargeCap Fund, and LongView Quant LargeCap Equity VEBA Fund ("Amalgamated"), and Public Employees' Retirement System of Mississippi ("Mississippi,") are the Court-appointed Lead Plaintiff for this action.  Defendants are Facebook and its CEO, Mark Zuckerberg, COO, Sheryl Sandberg, and CFO, David Wehner.  Abbreviations used herein have the same meaning as used in the Complaint (ECF No. 86, "Complaint").  Citations in the form "¶¶" are to the Complaint.  Unless otherwise noted, all emphasis is added and all internal citations and quotations are omitted.

Investors, journalists, analysts and others were shocked to learn that Defendants had been misrepresenting and concealing these grave threats to user privacy and the Company's business. *See* ¶¶337(a)-(d), 345-51. Multiple government investigations ensued, including by the U.S. Senate, U.K. Parliament, and the Federal Trade Commission, which had previously entered into a consent decree with Facebook that prohibited the kind of misconduct that Defendants engaged in during the Class Period. ¶¶164-73.

As Defendants have frequently acknowledged, the cornerstone of Facebook's business is its reputation as a trustworthy social media platform where users can control their personal data without worry their privacy will be compromised.  Zuckerberg stated that "***the No. 1 thing*** that people care about is privacy and the handling of their data" (¶56) and Sandberg has stressed that protection of user data "goes to the core of [Facebook's] service" and is "the most important thing we can do for running this company."  ¶58.

During the Class Period, Defendants claimed that users controlled their data and no third parties could gain unauthorized access to it.  ¶¶4, 234(a), 237, 251, 261(b).  To the extent that Defendants disclosed any risks to users or the Company from data misuse, they presented them as purely theoretical and contingent on future events.  ¶¶291-94, 296-300.  Defendants further stated that data misuse victims received notification (¶230), and Facebook acted swiftly to require destruction of any improperly obtained data.  ¶227; *see also* ¶¶225, 227-28, 230, 301(d).  Through these and other misstatements, Defendants falsely portrayed Facebook as a company that carefully protected the privacy of its users and their data. ¶¶222-307.

Contrary to their representations, Defendants have now admitted that they made a deliberate choice not to notify the victims of the 2015 Cambridge Analytica data breach (¶¶9, 90-93, 94-97, 100) and failed to take meaningful steps to verify that the purloined data had been destroyed.  ¶¶8, 9, 104-10.  As a result, and unbeknownst to investors, a massive amount of user data remained exposed to malicious actors – and beyond users' control – during the Class Period. When this came to light in March 2018, prompted by articles in *The New York Times* and *The Guardian*, Zuckerberg and Sandberg admitted that they had committed a "***major breach of trust***"

1   (¶¶1, 17, 174, 179, 280) in their handling of the matter.

2   Defendants' motion ignores or disputes the facts alleged and misstates the law.  They make

3   the absurd argument that "market volatility" is (somehow) to blame for the Company's enormous

4   stock price declines in March and July 2018 (Mot. at 2), but ignore the indisputable evidence that

5   the alleged stock price declines were historically large and dramatically out of line with any general

6   market declines.  *E.g.* ¶335.

7   Defendants' attacks on falsity, scienter, and loss causation fare no better.  First, on falsity,

8   they assert that they were under no obligation to notify the victims of the Cambridge Analytica

9   scandal.  But this is belied by their own later admissions of responsibility (¶100) ("we have the

10   responsibility to disclose to people when problems occur") and the outraged reactions of investors

11   and others when their misconduct was revealed.   ¶¶158(d), 162.  Defendants try to evade

12   responsibility for their misleading risk disclosures by manufacturing new law, claiming that a risk

13   factor must already be "having an ongoing adverse impact" to be actionable.  That is not the law.

14   It is misleading to warn of supposed "as-yet-unrealized risks and contingencies" where "some of

15   these risks may already have come to fruition."  *See, e.g.*, *Berson v. Applied Signal Tech., Inc.*,

16   527 F.3d 982, 986 (9th Cir. 2008).  This is precisely what Plaintiffs alleged here.  Defendants'

17   additional falsity arguments should be rejected, as discussed below.

18   Second, the Complaint's detailed allegations raise an overwhelming inference of scienter.

19   Among other well-pled facts detailed below, Zuckerberg has admitted that he knew about the

20   Cambridge Analytic data misuse in 2015 (¶¶86(d)-(e), 176, 313) but nonetheless made an

21   intentional decision to withhold notice from the victims.  ¶¶86(d)-(e), 100, 176, 313.  And both

22   Zuckerberg and Sandberg have admitted that they were "wrong" in their handling of the

23   Cambridge Analytica scandal.  ¶¶1, 17, 174, 179, 280.  These and other admissions are buttressed

24   by accounts from first-hand witnesses, the core importance of data protection to Facebook's

25   business, and the widespread data misuse pervading the Company.  When viewed holistically,

26   these particularized factual allegations adequately plead scienter.  *See* §II, *infra*.

27   Zuckerberg also engaged in highly suspicious stock sales during the Class Period,

28

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 5:18-cv-01725-EJD

pocketing **$5.3 billion** in proceeds – a truly astronomical sum.   ¶¶319-24, 370.   Contrary to Defendants' arguments, Zuckerberg's 10b5-1 plans cannot insulate him from liability given his obviously discretionary and highly suspicious pattern of trading.

Third, Defendants attack loss causation primarily by insisting that the "truth was already on the market" as of December 2015.  Not so.  This case arises from events that were unknown to the market until much later, and which caused historically large prices declines when they were revealed.  This is why Defendants do not – and cannot – offer an alternative explanation for the precipitous drops in Facebook's stock price on each of the corrective disclosure dates.  Defendants' argument that the truth had been known to the market for years, fails in the face of reams of market commentary expressly saying otherwise.  *E.g.*, ¶58(d) ("The problem here is how Facebook … chose to stay silent and not inform the affected users"); ¶160(b) (scandal "shows a serious flaw in Facebook's ability to keep exclusive control over its information"); ¶349 ("Facebook shares collapse as a result of Cambridge Analytica election scandal.").

Ultimately, Defendants' challenges to the Complaint rest on their disagreement with the allegations.  But this provides no basis to grant dismissal.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("If defendants are permitted to present their own version of the facts at the pleading stage . . . it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently plausible claim for relief.").   For the reasons set forth herein, Defendants' Motion should be denied.

## ARGUMENT[2]

### I.    THE COMPLAINT ALLEGES ACTIONABLE MISSTATEMENTS AND OMISSIONS

The Complaint adequately pleads falsity because it identifies "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Petrie v. Elec.*

---

[2] The facts giving rise to this Action are detailed in the Complaint.  While space does not permit a detailed recitation or summary of the allegations herein, the paragraphs relevant to the issues raised in the Motion are cited and/or described below.

*Game Card, Inc.*, 761 F.3d 959, 970 (9th Cir. 2014).   None of Defendants' arguments to the contrary have merit.

> ### A.      Defendants Made Material Misstatements Concerning Facebook's Response To Data Misuse And Privacy Violations

During the Class Period, Defendants misled investors about how Facebook handled privacy violations, including by falsely stating that victims received notice when their data was compromised, Defendants would ensure the deletion of any purloined data, and users could control their data, including where it went and with whom it was shared.

> #### 1.      Defendants Falsely Stated That Data Misuse Victims Received Notice

On April 27, 2017, as public concern over the misuse of user data grew in the wake of the 2016 U.S. presidential election, Facebook published a white paper titled "Information Operations and Facebook," which purported to describe how Facebook protected user data.  ¶¶120-22, 230. The document stated that Facebook notified victims of data violations – and even provided "proactive notifications" to those at risk.  ¶230.

These representations were untrue.  On April 10, 2018, Zuckerberg admitted in sworn testimony to the U.S. Senate that Facebook had consciously decided ***not*** to notify the tens of millions of victims of the Cambridge Analytica data violation – the biggest data violation in the Company's history.  ¶¶93, 98-103.[3]  Nor did the Company even investigate how many other Facebook users had their data improperly shared with app developers – let alone give notice to those victims.  ¶¶79, 131-48.  Likewise, during the Class Period, Facebook continued to share user data in ways that violated its privacy policies, including by providing access to users' friends' data to scores of "whitelisted" mobile device makers, including Apple, Microsoft, and Samsung. ¶¶138, 140, 183, 209-10.   None of the victims of these unauthorized disclosures received notifications.

---

[3] *See also* ¶¶93 n.105, 100, 158(d).  It was not until April 4, 2018, that Defendants first started to notify the Cambridge Analytica victims.  ¶18.  Defendants have now admitted that victims should have been notified, and they "didn't do enough" to address the Cambridge Analytica scandal, which was a "major breach of trust."  ¶¶9, 100, 174, 180-81, 280.

1    Defendants ignore most of these allegations.   Instead, they argue that the white paper

2  applied only to one narrow type of data misuse ("phishing with malware"), apparently contending

3  that they never promised to notify victims of data misuse like that involved in the Cambridge

4  Analytica scandal.  Mot. at 12.  This argument, however, is belied by Defendants' own admissions

5  that notice was required and should have been provided.  ¶100 (Sandberg: "we should have done

6  that"; Zuckerberg: Facebook "got [it] wrong" by deciding to withhold notice from the Cambridge

7  Analytica victims).  *See also* ¶¶174-83.  It is also contradicted by Defendants' conduct in belatedly

8  starting to notify the victims in 2018, after their failure to do so earlier was revealed (¶18), as well

9  as by market commentary confirming that investors and users thought that Facebook *had* informed

10  the victims.  *E.g.*, ¶158(d) ("the problem here is how Facebook . . . chose to stay silent and not

11  inform the affected users."); ¶162 ("people are furious, and they have good reason to be").

12    Defendants' argument also mischaracterizes the white paper itself and ignores the context

13  in which it was published – amid growing concern over the ability of malicious actors to access

14  Facebook's user data to influence the outcome of elections.  Further, the "notification" statements

15  are contained in a section of the document titled "Targeted Data Collection," that discussed how

16  users could "***protect their accounts from compromise***" through "a set of customizable security

17  and ***privacy features***."  *See, e.g.*, Lutz Decl. Ex. 26 at 7.  Thus, in the context of discussing privacy,

18  security, and data collection issues broadly, the white paper explained how Facebook was

19  purportedly addressing those problems and promised that data misuse victims were notified.

20  "[P]hishing with malware" was not the sole focus of the paper; it was merely given as an example

21  of misconduct that could compromise user data.  *Id.*

22    Defendants' reliance on *Hong v. Extreme Networks*, 2017 WL 1508991, at *15 (N.D. Cal.

23  Apr. 27, 2017) is misplaced because, unlike there, the content and context of the white paper is

24  facially connected to and has direct bearing on the privacy issues at the heart of this case.  In any

25  event, even if the parties' competing interpretations of the white paper were a close call (they are

26  not), Plaintiffs' interpretation prevails at the pleading stage.  *See In re Finisar Corp. Sec. Litig.*,

27  2017 WL 1549485, at *5 (N.D. Cal. May 1, 2017) (Davila J.); *Khoja*, 899 F.3d at 1003 (noting the

28

"prohibition against resolving factual disputes at the pleading stage"); *see also id.* at 1000 ("It is improper to judicially notice a [document] when the substance of the [document] is subject to varying interpretations.").

## 2. Defendants Did Not Take Swift Action Or Require Destruction Of Misused Data

In 2015, when news of Cambridge Analytica's unauthorized access to Facebook users' data first surfaced, Defendants outwardly professed shock and concern, assuring the public that they would respond quickly to address the issue. For example, Facebook stated:

> [M]isleading people or misusing their information is a direct violation of our policies and ***we will take swift action against companies that do***, including banning those companies from Facebook and ***requiring them to destroy all improperly collected data***.

¶¶7, 88, 90, 225. During the Class Period, the Company repeated nearly verbatim the above refrain whenever questions surfaced about data misconduct at Facebook. ¶¶117, 227-28. This was misleading. *See e.g.*, *In re BP plc Sec. Litig.*, 843 F. Supp. 2d 712, 759 (S.D. Tex. 2012).[4]

In reality, Facebook: (i) had not taken any action to enforce its user privacy policies until six months after the Cambridge Analytica data breach was publicly reported and more than a year after the Company learned of it (¶¶86, 94-97); and (ii) took no meaningful steps to "require" Cambridge Analytica to "destroy" the affected data, to investigate the extent of the breach, or even to identify the amount of data affected. ¶¶90-93, 98-99, 104-08. Moreover, the Cambridge Analytica event was only the tip of the iceberg, as the data of millions of other Facebook users had been and continued to be exposed in ways that violated Facebook's user policies – without Defendants doing anything to address the violations. ¶¶9, 79, 90-112, 131-48. These misrepresentations helped Defendants conceal significant risks to Facebook's business, including the harm to the Company's reputation and business model that would – and did – occur when their breach of trust came to light. *E.g.*, ¶¶149-83, 225, 229.

---

[4] "A repeated utterance, even on a promise of progress, can become misleading where repetition becomes a statement of current and ongoing compliance." (citing *Reese v. BP Exploration*, 643 F.3d 681, 691 (9th Cir. 2011)).

1    Defendants argue that these statements are not actionable because they are not false, are

2 forward-looking, or are immaterial puffery. Mot. at 11-12. Defendants are wrong.

3    First, the Complaint alleges with particularity how these statements are false. ¶¶5, 80-99,

4 104-08, 131-48, 225, 229. Far from taking "swift action" or "requiring" "destruction" of the

5 purloined data, Defendants waited more than a year to take any action, failed to require deletion

6 of the data and then left the breach unresolved and the data exposed throughout most of the Class

7 Period until Defendants' failures exploded into the news. *Id.*; *see also* ¶¶156-63.

8    Indeed, when they did act, Defendants willfully disregarded their obligation to "require"

9 the "destr[uction]" of the data by taking no meaningful steps to confirm that it was actually done.

10 ¶¶92, 99 (a whistleblower stated that Facebook "wanted to push it under the rug."). Zuckerberg

11 and Sandberg have since admitted that, contrary to their assertions of quick and decisive action,

12 the Company's inadequate response to the scandal was a "major breach of trust." ¶¶1, 17, 174,

13 179, 280; *see also* ¶¶229, 239, 244-45.

14    Defendants miss the point in claiming that Plaintiffs must allege that "misusing [user]

15 information was ***allowed*** under Facebook's policies." Mot. at 11. The issue is not whether

16 Facebook's policies facially purported to prevent the type of misconduct alleged in the Complaint,

17 but whether Defendants' actions matched those policies. They did not. Further, the Complaint

18 alleges, in great detail, how Facebook repeatedly and deliberately violated its own policies by

19 turning a blind eye to reports of violations (¶¶86-93) or ***allowing*** third parties to access user data

20 in ways that violated those policies. ¶¶131-48. These practices, in turn, concealed significant risks

21 to Facebook's business, which relied on user trust to generate Facebook's tens of billions of dollars

22 in revenue through the sale of targeted ads. ¶¶41-49, 54-59.

23    Second, Defendants argue that these statements are forward-looking and protected by the

24 safe harbor. Mot. at 11. They are wrong. Defendants' repeated assertions that they "will take

25 swift action" were misleading because they did not accurately reflect how Facebook had and would

26 respond to privacy violations, as described above. Defendants' reliance on *Fadia v. FireEye, Inc.*,

27 2016 WL 6679806, at *11-12 (N.D. Cal. Nov. 14, 2016) is misplaced. The statements there, unlike

28

1    here, were accompanied by meaningful cautionary language.  *Id.* at *11.  Also, in that case, the

2    defendants' use of the phrase "we will" was made in the context of discussing future plans and,

3    thus, was plainly meant to indicate something that would be achieved, as the Court noted, "at some

4    point in the future."  *Id.*  Here, by contrast, Facebook obviously used the phrase "we will" to refer

5    to its present practices – and not, for instance, a vague promise that "at some point, years in the

6    future, we will start deleting stolen user data."  To suggest otherwise is not only illogical, but also

7    ignores the way the market interpreted this statement at the time.  *See e.g.*, ¶¶153-63.[5]

8         Finally, Defendants' contention that the "swift action" statement is puffery (Mot. at 12) is

9    incorrect and ignores the rest of the statement, which asserted that Facebook banned companies

10   that violated its user policies and required them to "destroy all improperly collected data."  The

11   fact that Facebook did neither is both objectively verifiable and admitted.  *See* ¶¶90-113.  Thus,

12   the misleading nature of this statement does not depend on debating what "swift" means in the

13   abstract.  *See United States v. McGraw-Hill Cos.*, 2013 WL 3762259, at *6 (C.D. Cal. July 16,

14   2013) ("specific assertions of current and ongoing policies that stand in stark contrast to the

15   behavior alleged" are not puffery).[6]

16        **3.    Defendants Misrepresented How Users Controlled Their Information**

17        Defendants misrepresented their data privacy and protection policies in other ways as well,

18

---

19   [5] To the extent the statement could be construed as a promise of future action, the safe harbor
20   offers no protection for the current and backward-looking aspects of the statement.  *In re Quality
     Sys. Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017) ("defendant may not transform non-
21   forward-looking statements into forward-looking statements that are protected by the safe harbor
     provisions of the PSLRA by combining non-forward-looking statements about past or current facts
22   with forward-looking statements about projected revenues and earnings."); *see also Reese*, 643
     F.3d at 691 (even a forward-looking statement can become an inaccurate assertion as to a matter
23   of past or existing fact if repeated filing creates an "impression of a state of affairs that differs in a
     material way from one that actually exists").

24   [6] The other cases cited by Defendants are easily distinguishable.  In *Retail Wholesale &
     Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*, the Court found the
25   code of conduct to be mere "opinions as to what actions are preferable."  845 F.3d 1268, 1276 (9th
     Cir. 2017).  Here, the challenged statements are not aspirational statements about what the
26   Company ***should*** do but concrete statements about what it ***did*** do.  ¶¶227-28.  The statements at
     issue in *Fadia*, 2016 WL 6679806, at *7 ("smooth, rapid, and successful"), and *Palmer v. Apple,
27   Inc.*, 2016 WL 1535087, at *5 (N.D. Cal. Apr. 15, 2016) ("lightening [sic] fast" products), are
     similarly unlike anything present in this case.

28
LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 5:18-cv-01725-EJD

including by falsely stating that users had "control" over their data and therefore third parties could not get unauthorized access.  For example, on October 12, 2017, in response to concerns over Russian election interference, Sandberg stated "when you share on Facebook you need to know . . . [n]o one is going to get your data that shouldn't have it" because "you are controlling who you share with."  ¶¶4, 62, 234; *see also* ¶¶230, 235-37, 251.

Sandberg's statements were materially misleading because users could ***not*** control their data in the way she described.  This is demonstrated by numerous contemporaneous facts, including that: (1) neither the victims nor Facebook had control over the purloined Cambridge Analytica data, which remained at risk during the Class Period (*e.g.*, ¶¶77, 108, 178, 205, 223, 229); (2) the users' "friend" data that Facebook had for years given to *all* of its numerous app developers also remained exposed to misuse and beyond those users' control (¶¶131-48); (3) Facebook was then overriding user privacy settings to provide scores of mobile device makers with access to users' friend data without consent – and thereby depriving users of control (¶¶138-40, 207, 209); and (4) Sandberg and other executives had been expressly warned by a Facebook insider in October 2016 about "a systemic problem" at Facebook that permitted "bad actors" to take "the tools created for advertisers and us[e] them to harm innocent people."  ¶¶102-03.  For these reasons, Defendants' conclusory assertion that Sandberg's statement is not "alleged to be false or misleading" fails. Mot. at 15.

Defendants' other arguments fare no better.  ***First***, Defendants' contention that Sandberg's statements were forward-looking is incorrect, because she was purporting to describe the current state of affairs, not some future plan or upcoming business strategy.[7]  ***Second***, Sandberg's words were not mere puffery.  Her statements concerned a core aspect of Facebook's business model – the protection of user data, which provides Facebook with its sole source of revenue.  ¶¶41-49, 56 ("The No. 1 thing that people care about is privacy and the handling of their data").  Courts across

---

[7] Sandberg's imperative – "you need to know" – obviously refers to Facebook's current practices.  Likewise, her statement "you ***are*** controlling who you share with" is by its plain language a statement of present practices.  It defies common sense to suggest, as Defendants do, that Sandberg was trying to communicate that users would only be able to control their information in the future.

the country have held that statements concerning the core of a company's business or strategy are not mere puffery.[8]   **Third**, Defendants unsupported assertion that Sandberg's statement was unrelated to the issues in this case is wrong.  Mot. at 16.  Her statements directly concerned key issues in this case – Facebook's purported privacy protections[9] – and she made them specifically to preserve user trust, which was the cornerstone of the Company's business model, finances, and reputation.

### B.   Defendants' Risk Disclosures Were Materially False And Misleading

Facebook's risk disclosures during the Class Period were materially false and misleading. *See, e.g.,* ¶¶6-13, 290-300.  They failed to disclose the existence and magnitude of the risks created by the Company's existing and uncorrected failures to protect user privacy, including the risk presented by the exposed data possessed by Cambridge Analytica and other privacy violations.  *Id*.

Indeed, Defendants' purported risk disclosures were couched in contingent terms that warned only of theoretical risks that "could" manifest "if" certain actions occurred in the future. *See* ¶291.  For example, Facebook warned that "[a]ny failure to prevent or mitigate security breaches and improper access to or disclosure of . . . user data ***could*** result in the loss or misuse of such data, which ***could*** harm our business and reputation."  *Id.*  But Defendants knew when making these statements that they had not properly "mitigate[d]" the Cambridge Analytica data violation – including because they had not investigated the full extent of the breach, had decided to not to notify the victims and had no reliable assurances that the affected data had been deleted.  *See, e.g.,* ¶¶8, 9, 90-93, 94-97, 100, 104-10.

Given that these actions (and failures) had *already occurred* by the start of the Class Period,

---

[8] *E.g., Mulligan v. Impax Labs.*, 36 F. Supp. 3d 942, 968 (N.D. Cal. 2014); *McGraw-Hill*, 2013 WL 3762259, at *7; *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508-09 (S.D.N.Y. 2009); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006); *see also* ¶58 (Sandberg stating that maintaining user belief in Facebook's protection of privacy "***goes to the core of our service***").

[9] Indeed, just before the quoted statement, Sandberg had been discussing Facebook's purported "adher[ence]" to the European privacy law (which was a false statement in its own right, *see* §I.D, *infra*).  She also prefaced her statement with the comment "Privacy is something we take really seriously" and concluded it with the statement "Privacy for us is making sure you feel secure, sharing on Facebook."  ¶234(a); *see also id.*, n.264 (link to video of interview, starting at 23:37).

it was materially misleading to "warn" investors of the potential risks to the Company from unaddressed privacy violations without revealing that those exact risks already existed at the time. *Cutler v. Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017) (statements misleading where defendants "disclosed a risk 'in the abstract' but omitted the fact that it had 'already . . . come to fruition'"); *Berson*, 527 F.3d at 986 (finding it is misleading to warn of "as-yet-unrealized risks and contingencies" where "some of these risks may already have come to fruition."); *Schulein v. Petroleum Dev. Corp.*, 2012 WL 12884851, at *7 (C.D. Cal. June 25, 2012) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.") (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981)).  Indeed, in *Sgarlata v. PayPal Holdings, Inc*., based on similar facts, Judge Chen found that the defendants' statements "could plausibly have created an impression that only a potential vulnerability and not an actual breach had been discovered."  2018 WL 6592771, at *7 (N.D. Cal. Dec. 13, 2018) (finding that plaintiff-investors "satisfie[d] the pleading requirements for falsity").

Further, contrary to Facebook's representation that it "ha[d] developed systems and processes" that were purportedly "designed to protect . . . user data," Defendants had for years been giving untrammeled access to user friend data to numerous app developers and other third parties.  ¶¶131-38.  Defendants undertook these reckless data practices to lure app developers and generate risky growth at the expense of users' privacy.  *E.g.*, ¶¶46, 64-67, 74-78, 158(c), 291.  Indeed, it was revealed in June 2018 that even after the supposed platform changes in 2014, Facebook continued providing vast amounts of user data to device makers such as Apple, Amazon, Blackberry, Microsoft, and Samsung, including "access to the data of users' friends without their explicit consent."  ¶138 ("Some device makers could retrieve persona information ***even from users' friends who believed they had barred any sharing*.").[10]

---

[10] In *Reese v. Malone*, the Ninth Circuit held that the defendants' statement that corrosion in an oil pipeline was "low" and "manageable" was misleading where available inspection data showed objectively high corrosion rates.  747 F.3d 557, 570 (9th Cir. 2014).  Here, akin to *Reese*, Defendants assured investors that Facebook's "systems and processes" were purportedly

1    In addition, Defendants' risk disclosures included the affirmative, false reassurance that

2    Facebook gave developers and other third parties only "limited" data (¶291) when, in reality, it

3    "didn't really care how the data was used" (¶78; *see also* ¶99) and exposed the user data on its

4    servers to copying "'a million times'" (¶108) by hundreds or thousands of third parties (¶¶131-

5    148). The representation that Facebook gave out "limited" data when, in fact, they had given away

6    detailed personal information on 87 million users was false and misleading.

7    Unable to defend these statements on the merits, Defendants attempt to sidestep liability

8    by inventing a new legal standard. They declare that "in order for a risk disclosure to be false," it

9    must already be "having an ongoing adverse impact." Mot. at 19. But that is not the law. The

10   Ninth Circuit has repeatedly held that it is misleading to warn of "as-yet-unrealized risks and

11   contingencies" where "some of these risks may already have come to fruition." *E.g.*, *Berson*, 527

12   F.3d at 986; *Cutler*, 696 F. App'x at 813. Here, the Complaint pleads numerous facts showing that

13   the risks Defendants presented as theoretical had already occurred. Thus, these are actionable

14   misstatements.[11]

15   **C.    When The Cambridge Analytica Scandal Broke, Defendants Concealed Its
16          Full Impact On Facebook's Business**

17        **1.    Defendants Misleadingly Assured Investors That The Cambridge
                 Analytica Scandal Was A Non-Issue**

18   When Facebook's failure to notify or protect the victims of the Cambridge Analytica

19   scandal started to come to light in 2018, Defendants rushed to assure the public that this incident

20   was a non-issue and that their privacy misdeeds were in the past. ¶¶149-52, 176.

21

22

---

23   "designed to protect . . . user data" and "prevent data loss" when the facts known to Defendants
     belied those same statements. ¶291.

24   [11] Defendants' cases do not support the novel proposition that they advance. Their main case is

25   *Lloyd v. CVB Financial Corp.*, but there, unlike here, the court found that the plaintiff did not plead
     "already materialized" facts contradicting those alleged misstatements. 2012 WL 12883522, at

26   *19 (C.D. Cal. Jan. 12, 2012). The same is true for Defendants' other two cases. *See* Mot. at 19-
     20. In other words, far from articulating some novel "ongoing adverse impact" doctrine,

27   Defendants' cases simply hold that the specific risk statements at issue must be adequately alleged
     to be misleading when made. This is exactly what Plaintiffs have done here.

28

For example, Defendants sought to minimize the Cambridge Analytica scandal by stating that "everyone involved gave their consent," "[p]eople knowingly provided their information" (¶255) and "people chose to share that data." ¶261(a). These statements were false and misleading because at most 270,000 users had consented to sharing their data with Aleksandr Kogan, while at least 87 million users had their data compromised. Further, no one consented to the sale of their data for use in political campaigns. ¶¶112, 195, 256-57.

Defendants assert that, because Facebook's Data Policy from 2013 vaguely mentioned that users' friends' data "could" be shared with app developers, all 87 million victims somehow consented to sharing their data with Kogan. Mot. at 13. At best, this unconvincing argument rests on an indirect, non-specific, and passive theory of consent. This fails. Defendants ignore that, at the time, the FTC Consent Decree required Facebook to obtain a "user's affirmative express consent." ¶72. Defendants' "indirect, passive consent" argument is further undermined by the confidentiality agreement that Facebook required Kogan to sign, which stated, "Facebook believes that GSR and Dr. Kogan obtained Facebook user information in a manner and for a purpose that may not have been consistent with or permissible under Facebook terms, conditions and/or policies." ¶97. Thus, Defendants' argument should be rejected.[12]

The argument fails for an independent reason as well. As noted, Defendants stated that users "knowingly provided their information" to Kogan. ¶255. This is indisputably false. Even if, as Defendants contend, users somehow could have figured out that their data *might* be shared, over 87 million people did not "knowingly provide" their information to Kogan because their data was shared by others without their knowledge.

Relatedly, it was misleading for Zuckerberg to state "we've worked hard to make sure that we comply" with the FTC Consent Decree. ¶261(b); *see also* ¶¶305-07. Defendants argue in

---

[12] Further, Facebook's own executives appear to acknowledge that the Company's data disclosures are misleading. For example, in 2016, Facebook Vice President Andrew Bosworth referred to both "questionable contact importing practices" and "the subtle language that helps people stay searchable by friends" in boasting about how Facebook's success is attributable to their "pushing the envelope on growth." ¶64. At most, Defendants' argument creates a factual dispute that cannot be resolved on the pleadings. *Khoja*, 899 F.3d at 1003 (noting the "prohibition against resolving factual disputes at the pleading stage.")

response that they were not required to "engage in self-flagellation by disclosing unproven allegations." Mot. at 14. The point, however, is that the FTC Consent Decree prohibited Defendants from engaging in the conduct set forth in the Complaint, including misrepresenting their privacy practices and sharing data without proper consent, which renders their statements misleading. After all, a securities fraud complaint based on "nondisclosure of uncharged illegal conduct" need only "plausibly articulate 'that the underlying conduct occurred.'" *Speakes v. Taro Pharm. Indus.*, 2018 WL 4572987, at *4 (S.D.N.Y. Sept. 24, 2018) (citation omitted).

### 2. Defendants Misleadingly Downplayed The Impact Of The Cambridge Analytica Scandal On Facebook's Business

After the release of Facebook's 1Q18 results in April and before releasing its 2Q18 results in July, Defendants also downplayed the impact that the Cambridge Analytica scandal would have on Facebook's business. As set forth in the Complaint, numerous facts establish that, in the wake of the revelations of Defendants' privacy misconduct, user engagement on Facebook declined materially. But, during this same time, Defendants misleadingly maintained, for example, that "our community continues to grow" (¶271), "we're optimistic about what we're seeing here," (¶273), and "we do not anticipate [that new European privacy regulations] will significantly impact advertising revenues." *Id.*

These and similar statements misleadingly concealed the truth regarding user disengagement. *See* ¶¶184-96, 274-89. Defendants' fundamental "reassurance[s] that everything was fine" about Facebook's user engagement was materially misleading because "there was a basis for serious doubts about the ability" of Facebook to keep growing as it always had. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016), (such statements actionable); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (same).

The Complaint alleges facts demonstrating that Facebook's user numbers were declining as a result of the Cambridge Analytica scandal. For example, an independent expert survey conducted by the Pew Research Center and made public in September 2018 revealed significant disengagement by Facebook users in the prior twelve months. According to the study, 54% of Facebook users had changed their privacy settings to share less with Facebook; 42% took extended

15

breaks from Facebook; and 26% had deleted the Facebook app from their cell phones.  ¶221.[13]
Initiatives such as the "#deleteFacebook" movement – a call that users were reportedly taking up
"en masse" (¶162) – confirm this trend of user disengagement.  Indeed, Facebook's own engineers
started abandoning the platform.   ¶130.  Taken together, these facts plausibly show user
engagement stagnating during the April-May 2018 period in which Defendants made reassuring
statements about the condition of the platform.  *See In re Finisar Corp. Sec. Litig.*, 646 F. App'x
506, 507 (9th Cir. 2016).

This was confirmed by Facebook itself on July 25, 2018, when Defendants announced that
the Company's provision of "more choice around privacy" to users was one of the driving forces
behind the Company's revenue growth deceleration.  ¶¶216-18.  On the same day, Facebook
admitted that, after years of growth, its active user base (MAU and DAU) had declined in Europe,
was flat in the United States and Canada, and was decelerating worldwide.  ¶213.  The fact that
the user base was declining or stagnating during the same period of time (*i.e.*, 2Q18) when
Defendants made reassuring statements on that subject supports finding falsity.

At the time they made the above statements, Defendants were aware that user numbers
were declining.  Indeed, there can be no question that Zuckerberg was intensely focused on user
numbers at the time because he himself was speaking to investors about the exact same data.
Zuckerberg spoke emphatically and with detailed knowledge, specifically confirming that he was
paying attention to the number of users who were "opting-in" to the European privacy law (the
"GDPR").  ¶283 ("I think we can even say vast majority of people say, yes, they want that data
used.")  Notably, Zuckerberg made these statements after stock analysts reported that in valuing
the Company "'[a]ll investors are looking for is a change in user metrics'" (¶188), and he made

---

[13] While the study surveyed U.S. Facebook users regarding their actions over the past twelve
months, the survey was conducted during the period from May 31, 2018 to June 11, 2018 – shortly
after the Cambridge Analytica news broke in 2018.  Facebook's own reported statistics establish
that the user disengagement occurred specifically in the wake of the Cambridge Analytica scandal
because Facebook reported that active users grew broadly until March 31, 2018, and then faced
"zero user growth in the United States."  ¶¶22, 213.  This means the survey results reflected
declining user engagement from the period *after* March 31, 2018, but *before* the May 31, 2018/June
11, 2018 end dates covered by the survey.

them to investors at the company's annual stockholders meeting (¶283) immediately after the Cambridge Analytica scandal raised investors' concerns about user engagement.[14]  *See Reese*, 747 F.3d at 572 (courts infer access to data that defendants reference).

Moreover, the Complaint alleges that Zuckerberg had access to negative user engagement data.  ¶284.  He made his statements on May 31, 2018, two months into the second financial quarter and after the GDPR roll-out.  As Wehner later admitted, the user engagement numbers were poor in that second financial quarter.  ¶¶213, 217.  It is far more plausible to infer that these numbers suffered throughout the quarter rather than suddenly took a nosedive after Zuckerberg spoke.  On July 25, 2018, Wehner admitted that "the impact of the opt-outs" on the second quarter was one of the few key factors driving the decline in user engagement and, therefore, revenue for the same quarter.  ¶¶213, 217.

In short, these statements are actionable.  *Lloyd*, 811 F.3d at 1209 ("[T]he omission of [material] fact[s], combined with the reassurance that everything was fine as of December 31, 2009, meets the pleading standard for a material omission"); *Finisar*, 646 F. App'x at 507 (statements downplaying looming inventory bubble actionable); *Warshaw*, 74 F.3d at 959 (statement that "everything [was] going fine" actionable).

### D. Defendants Falsely Assured Investors That Facebook Was Already "Adhering" To The European GDPR Privacy Law To Further Mask Risks

During the Class Period, Defendants repeatedly assured investors that, for example, "Europe[] has passed a single privacy law and *we are adhering to that*" and that Facebook "*already applies the core principles in the GDPR framework, which are transparency and control*."  ¶¶234-37.  These statements continued in the immediate aftermath of the March 2018 disclosures, when Defendants assured investors that the upcoming implementation of the GDPR would not materially impact the Company.  On April 4, 2018, Zuckerberg stated:

> [L]eading up to the GDPR event, a lot of people are asking us, "Okay, are you going to implement all those things?"  And my answer is that *we've had almost all of what's in there implemented for years, around the world, not just in Europe.*

---

[14] *See* ¶¶278, 281-82, 284-85, 287, 289; *see also Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (falsity "considered in context").

1    ¶261(b); *see also* ¶277 (Wehner's April 25 statement assuring that "we believe [impacts] will be

2    relatively minor").   Defendants' reassurances worked, as analysts reported in April 2018 that

3    Facebook's "commentary downplaying GDPR impact" satisfied investors' concerns.  ¶189 n.230.

4    *See In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1021 (S.D. Cal. 2011) ("the fact that

5    . . . analysts took the time to write reports on this issue demonstrates that the information disclosed

6    that day was material").

7            Unfortunately for investors, Defendants' statements were false and misleading.   On

8    July 25, 2018, Facebook disclosed declining user growth in Europe and lower than expected

9    revenues, which caused the Company to miss analyst estimates for the first time since 2015.

10   ¶¶212-13.  Wehner admitted that a primary reason for the Company's declining revenue growth

11   was "giving people who use the . . . services more choice around privacy."  ¶216.  Facebook's

12   costs also ballooned to $7.4 billion, a 50% increase from the prior year (¶344), with much of it due

13   to Facebook's "efforts to invest significantly to respond to the Cambridge Analytica revelations."

14   ¶¶346-51.  As noted, in response, the market reacted with alarm, causing Facebook's stock price

15   to decline by 19% and resulting in a market cap loss of more than $100 billion.  ¶¶218, 342.

16           Defendants argue that their GDPR compliance statements are not actionable because they

17   told investors that they had not reached "full compliance" with the GDPR at the time of the

18   challenged statements.  Mot. at 18.  But the Complaint never alleges that Defendants assured "full

19   compliance."  The Complaint alleges that, given Defendants' assurance that Facebook had in place

20   "almost all" of the GDPR requirements "***for years, around the world***" (¶261(b)), the impact on

21   expenses and user numbers of coming into "full" compliance would be relatively minor – which

22   is exactly what Wehner assured investors on April 25, 2018.  ¶277.   In reality, Defendants knew

23   or should have known that the impact of becoming fully compliant with GDPR were significant,

24   as they ultimately disclosed and admitted in July 2018.[15]

25   _____

26   [15] To the extent Defendants are arguing that they did not know the full impact of these requirements
     until after implementation was complete in May, their argument fails.  If Defendants lacked

27   sufficient data to draw any reliable conclusions about the impact of the scandal on financial or user
     metrics, then they should have not characterized them in the first place.  *See Omnicare, Inc. v.*

28   *Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1330 (2015) (explaining

Defendants' footnote argument that the April 4th and 25th statements enjoy immunity under the PSLRA as forward-looking statements (Mot. at 19 n.11) fails. Zuckerberg's April 4th statement is not in any way forward-looking, and Wehner's April 25th statement is, at best, a "mixed" statement of law and fact based on underlying facts (near full compliance and already implemented GDPR procedures) that were not true at the time. Even otherwise "forward-looking" statements are actionable under these circumstances. *Quality Sys.*, 865 F.3d at 1141.

## E.      Facebook's Privacy Policies Are Actionable

Defendants argue that the statements in Facebook's user-facing privacy policies are not actionable because the Complaint does not adequately allege them to have been false and misleading and, further, because "these 'statements' were not made in connection with the purchase or sale of Facebook securities." Mot. at 20. Both arguments fail. First, Defendants' claim that the privacy policies are not adequately alleged to be misleading fails for the same reasons set forth above. *See also* ¶¶230-46.

Second, Defendants are wrong to argue that statements in Facebook's public privacy policies were not made "in a manner reasonably calculated to influence the investing public." Mot. at 20. To start, this materiality argument is premature at the motion to dismiss stage. *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *22 (C.D. Cal. July 1, 2008). Indeed, courts repeatedly reject the notion that "*only* market-related documents, such as regulatory filings, public presentations, or press releases, can contain actionable misstatements under Section 10(b)." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, 2017 WL 66281, at *18 (N.D. Cal. Jan. 4, 2017) (declining to dismiss "emissions compliance stickers" at pleading stage where defendants argued that stickers were not publicly disseminated to investors); *see also In re Carter-Wallace Inc., Sec. Litig.*, 150 F.3d 153, 156 (2d Cir. 1998) (holding that statements

that such kinds of statements would be actionable because "[i]nvestors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments, of the kind that an individual might communicate in daily life").

1   in false advertisements in medical journals may have been made "in connection with" the purchase

2   or sale of securities).[16]

3        Furthermore, Facebook's privacy policies were publicly available and easy to access on

4   Facebook's website.  "As the Supreme Court has noted, 'market professionals generally consider

5   most publicly announced material statements about companies, thereby affecting stock market

6   prices.'"  *Carter-Wallace*, 150 F.3d at 156 (quoting *Basic v. Levinson*, 458 U.S. 224, 247 n.24

7   (1988).  It is irrelevant whether the false statements were "made for the purpose or object of

8   influencing the decisions of market participants."  *Muzinich & Co. v. Raytheon Co.*, 2002 U.S.

9   Dist. LEXIS 26962, at *9 (D. Idaho Apr. 30, 2002).  Indeed, Defendants' "fraud could be 'in

10  connection with' the sale of securities even if [Defendants] had no intent to influence investors."

11  *Id*. at *10.

12  **II.    THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER**

13       "Scienter can be established by intent, knowledge or certain levels of recklessness."  *In re*

14  *VeriFone Holdings, Inc., Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012); *see also Schueneman v.*

15  *Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir 2016) (scienter is "a mental state that not only

16  covers intent to deceive, manipulate, or defraud . . . but also deliberate recklessness.").  Facts

17  showing that Defendants "recklessly turn[ed] a blind eye to impropriety" will suffice.  *Finisar*,

18  2017 WL 1549485, *6 (Davila J.) (citing *VeriFone*, 704 F.3d at 708).  The inference of scienter

19  "need not be" or "of the 'smoking-gun' genre" – it need not even be "the most plausible of

20  competing inferences."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310, 324

21  (2007).

22

---

23  [16] Defendants cite *McGann v. Ernst & Young*, which actually supports Plaintiffs' position.  102
    F.3d 390, 397 (9th Cir. 1996).  In that case, the Court of Appeals reversed the District Court's
24  grant of judgment on the pleadings for the defendant, holding that even statements made by a third-
    party auditor in a fraudulent audit report included in a Form 10-K filed with the SEC could have
25  been made "in a manner reasonable calculated to influence the investing public."  *Id.*  Similarly,
    Defendants' reliance on *In re LifeLock Inc., Securities Litigation* is misplaced.  690 F. App'x 947
26  (9th Cir. 2017).  In that case, the Court of Appeals affirmed dismissal of statements included in
    "simple, descriptive . . . passive" advertisements for defendant's product, not, as here, lengthy,
27  detailed, comprehensive statements governing the defendant company's policies, responsibilities,
    and obligations to its users – statements that were important to Facebook's users. *Id.* at 953-54.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.    Defendants' Admissions Establish Scienter

The Complaint adequately alleges that Defendants knew before the Class Period that Cambridge Analytica had improperly obtained the personal data of tens of millions of Facebook users and that Defendants' failure to respond adequately to this massive privacy violation presented serious regulatory and business risks for Facebook.  In that regard, both Zuckerberg and Sandberg have admitted that Facebook knew Cambridge Analytica improperly obtained users' data in 2015.  ¶¶86(d)-(e), 176, 313.   Separate admissions by Facebook demonstrate that Defendants knew they were dealing with dishonest third parties in the Cambridge Analytica scandal, and that those third parties purposely violated Facebook policies and used the data for improper purposes.[17]

Given Defendants' knowledge in 2015 of the Cambridge Analytica privacy violation, they also knew – both at the time and during the Class Period – at least five facts establishing scienter. *First*, Defendants knew they could not trust Cambridge Analytica to honestly self-report their deletion of the data, yet Facebook failed to ensure that the data was destroyed.  Thus, it remained at risk during the Class Period.  ¶¶94-97, 104-13.  *Second,* Defendants knew that they had not notified the tens of millions of affected Facebook users that their privacy had been violated.  ¶¶9, 93, 98, 100, 176.  Indeed, Defendants *deliberately* chose not to notify these victims of data misuse. ¶93.[18]  *Third*, Defendants knew that they had taken no steps to investigate whether *other* app developers had improperly shared the user data they obtained.[19]  ¶¶9, 176-77.  *Fourth*, Defendants knew that neither they nor the users could control third parties' use of the purloined data and had no insight into to whom it was disclosed, how it was used, and whether it had been deleted.  ¶¶77,

---

[17] On March 17, 2018, Facebook admitted: "In 2015, we learned that a psychology professor at the University of Cambridge named Dr. Aleksandr Kogan **lied** to us and **violated** our Platform Policies by passing data from an app that was using Facebook Login to SCL/Cambridge Analytica . . . ."  *See* ¶¶150-51 & n.176; *see also* ¶¶86(d), 158(d) & n.186.

[18] *See also* ¶94 n.105 ("Harris: So there was a decision made on that basis not to inform the users. Is that correct?  Zuckerberg:  That's my understanding.  Yes.").   In fact, Defendants waited until April 4, 2018 to start to notify these victims.  ¶18.

[19] After the Cambridge Analytica scandal broke in March 2018, Zuckerberg admitted that Facebook needed to do a "full forensic audit" of "every single app" and "every developer," demonstrating defendants' complete failure to police their platform prior to 2018.  ¶176.

108, 178, 205.  ***Fifth***, Defendants also knew – especially given Facebook's history of privacy violations and the FTC Consent Decree (discussed further below) – that these failures gave rise to significant regulatory, reputational, and business risk for Facebook.  *See generally* ¶¶63-79.  Each of these facts on its own gives rise to a compelling inference of scienter.  Considered holistically, as they must be here, the inference is overwhelming that Defendants knew about, or at least were deliberately reckless as to, the false and misleading nature of their public statements.

Additional admissions by Defendants further confirm their scienter.  Zuckerberg himself admitted in March 2018 that his failure to properly address the Cambridge Analytica data violation was a "***major breach of trust***" for which he was "***responsible***."  ¶¶1, 17, 174, 179, 280.  Zuckerberg repeated these and similar admissions in multiple times, including in a post on his Facebook page (¶174[20]), in a signed letter he published in several U.S. and U.K. newspapers (¶179), and in his May 1, 2018 keynote address at an annual developer conference. [21]  ¶280.  Sandberg likewise acknowledged that the Cambridge Analytica breach was a "***major violation of people's trust***." ¶174.  Further, both Zuckerberg and Sandberg admitted that they "***didn't do enough***" to deal with the Cambridge Analytica violation in 2015.  *See, e.g.*, ¶¶104, 174 180, 181.[22]

Defendants' admissions and the other facts discussed herein establish a cogent inference, one at least as compelling as any competing inference, of Defendants' scienter concerning their misstatements about Facebook's privacy practices, compliance, and misleading risk disclosures.[23]

---

[20] In this post, Zuckerberg took "***responsibil[ity] for what happens on our platform***" and admitted *inter alia* that the Cambridge Analytica privacy violation was a "***breach of trust***" between Facebook and the people who share their data with us and expect us to protect it."

[21] Zuckerberg stated: "I also want to talk about data privacy.  And ***what happened with Cambridge Analytica was a major breach of trust***."

[22] Zuckerberg admitted on CNBC he "***regret[s] that we didn't [issue a notification] at the time***. And I think we got that wrong."  ¶100 (similar admissions by Sandberg).  Market commentators agreed that Defendants' failure to notify affected users was a particularly stunning example of Defendants' misconduct.  CNN stated: "No one has provided an adequate explanation for why Facebook did not disclose Kogan's violation to the more than 50 million users who were affected[.]"  ¶157; *see also* ¶158(d) ("The problem here is how Facebook, the biggest social network, chose to stay silent and not inform the affected users.")

[23] *Volkswagen*, 2017 WL 66281, at *14 (scienter established where, among other things, various Volkswagen former executives admitted wrongdoing and apologized publicly for betraying customers' trust); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016) ("Moreover, if there are enough other suggestions of knowledge or recklessness on the

22

## B.     First-Hand Witness Accounts Further Confirm Defendants' Scienter

Prior to the Class Period, several witnesses specifically warned Defendants about Facebook's privacy failures.  First**,** Roger McNamee, an early Facebook investor, raised red flags in October 2016 about Facebook's "systemic problem" of data misuse and warned both Zuckerberg and Sandberg about that problem.[24]   ¶¶102-03.   Second**,** Christopher Wylie, Cambridge Analytica's former Director of Research, testified that "Facebook was first notified of [Cambridge Analytica's] harvesting scheme in 2015" (¶86(f)) and that Facebook did almost nothing to ensure that he or anyone else actually deleted any users' data.  ¶¶84, 90-92.  Third, Sandy Parakilas, the former Facebook executive who policed app program data breaches, warned some of the "the top five executives at the Company" about serious privacy vulnerabilities.  ¶75. In response, he was told to ignore the problems because, as he explained, Facebook ""didn't really care how the data was used'" and felt it was better "'not to know.'"  ¶78.[25]  Multiple warnings from multiple sources are "red flags" that contribute to the strong inference of scienter.[26]

---

part of defendants, an admission of fault by 'management' as a whole may be enough for a court to  infer scienter even if the company was unwilling—or unable at the time—to disclose specifically who was responsible."); *see also Shaev v. Baker*, 2017 WL 1735573, at *10 (N.D. Cal. May 4, 2017) (director's testimony to Congress admitting that the board was monitoring fraud contributed to a plausible inference of scienter).

[24] Defendants attempt to marginalize Mr. McNamee's direct warnings to Zuckerberg and Sandberg by claiming that they related exclusively to "algorithms."  Mot. at 22.  That is wrong.  In reality, Mr. McNamee was referencing Facebook's "callous disregard for the privacy rights of users and a lack of care with respect to data that had been entrusted to Facebook."  *E.g.*, Lutz Ex. 15 at 2.

[25] Defendants assert that Mr. Parakilas did not make his warnings to "the top five executives at Facebook" and accuse Plaintiffs of taking "liberties with" the facts.  Mot at 22, n.13.  Defendants are simply wrong.  It is well-known that Parakilas expressly confirmed that his warnings went to executives who were "***among the top five executives in the company***."      *See, e.g.*, https://www.pbs.org/wgbh/frontline/article/facebook-insider-says-warnings-about-data-safety-went-unheeded-by-executives/; *see also id.* at 4:01 of the embedded video (Mr. Parakilas is asked, "And how senior were the senior executives?" He responds, "*Very* senior.  Like, among the top five executives in the Company.")

[26] *In re Wells Fargo & Co. S'holder Deriv. Litig*., 282 F. Supp. 3d 1074, 1099 (N.D. Cal. 2017) (red flags raised to management contributed to inference of scienter); *Shaev*, 2017 WL 1735573, at *4 (same); *In re Peoplesoft, Inc.*, 2000 WL 1737936, at *3 (N.D. Cal. May 25, 2000) (finding inference of scienter where, among other things, "field representatives were telling management in loud and 'highly confrontational' terms that quotas and budgets could not be met, so contentiously that management fired the naysayers").

23

### C.    The Fact That Data Protection Is Core To Facebook's Business Model Contributes To A Strong Inference Of Scienter

The Complaint explains how user data and Facebook's protection of that data lies at the very core of Facebook's business model (¶¶41-46) – and this reality also contributes to a strong inference of Defendants' knowledge or deliberate recklessness.  ¶¶2, 41, 54-55.  As Zuckerberg admitted in a March 21, 2018 interview: "The No. 1 thing that people care about is privacy and the handling of their data" and "whenever there is a breach of [privacy] that undermines the fundamental point of [Facebook's] services.  So I think it's a pretty big deal."  ¶56; *see also* ¶¶57-58.  Likewise, in a CNBC interview, Sandberg reiterated that maintaining users' belief that their data is safe is the "core of our service [and] the most important thing we can do for running this company."  ¶58.  To maintain this belief, Defendants touted their policies and procedures for protecting user data from unauthorized disclosure.  ¶¶60-62.

In contrast to Defendants' public assurances, internally they acknowledged their disregard for privacy in favor of growth.  ¶¶63-67, 133-41.  For example, in an internal memo circulated inside Facebook during the Class Period, executives openly discussed the fact that Facebook "prioritized data collection from its users over protecting them from abuse" because "[t]he more data [Facebook] has to offer, the more value it creates for advertisers," meaning "it has no incentive to police the collection or use of that data – except when negative press or regulators [we]re involved."  ¶66; *see also* ¶¶64-65 (memo to employees noting ***all the questionable contact importing practices*** as serving the purpose of prioritizing growth).[27]

In order to protect the core business of the Company, when privacy concerns came to light the most senior – almost exclusively Zuckerberg and Sandberg -- responded by aggressively misleading users, investors, regulators, journalists, and the public at large about the true nature of

---

[27] *Wells Fargo*, 282 F. Supp. 3d at 1099 (agreeing that where "claims arise from a pervasive and undisputed fraud going to the core of the Company's business, it is reasonable to infer senior executives knew"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1191 (C.D. Cal. 2008) (finding that complaint persuasively alleged that systematic data falsification at company "came from the top down and pervaded virtually every office" and contributed to compelling inference of scienter); *see also Shaev*, 2017 WL 1735573, at *12; *In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at *4 (C.D. Cal. July 7, 2011).

Facebook's privacy practices.[28]  When the Cambridge Analytica data breach was first reported in 2015, Defendants publicly professed shock and promised quick action to recover user data; privately, however, they attempted to blunt the public relations fallout from the scandal, including by casting doubt on the newspaper accounts.  ¶¶86-89.  For example, as noted above, Facebook publicly stated that misusing user data was a violation of its policies and promised to take "swift action against companies that do."

Indeed, contrary to their promises, Defendants did nothing to address the breach for six months, and only asked Cambridge Analytica to destroy the data when concerns over the use of stolen data in connection with Brexit.  ¶¶94-96.  It even hired one of the founders of the shell company that had been used to funnel Facebook user data to Cambridge Analytica.  ¶¶87-88.  Tellingly, it was precisely then that Facebook released Kogan from liability in exchange for his promise to keep secret what he had done.  ¶97.  These actions further demonstrate Defendants' deliberate or reckless indifference to the misleading statements made during the Class Period.

### D.   Widespread Privacy Misconduct At Facebook Confirms Scienter

After the March 17, 2018 disclosure concerning the Cambridge Analytica violation, a series of stunning disclosures revealed widespread privacy misconduct at Facebook.  ¶¶131-48.  On April 17, 2018, the *Telegraph* reported that Facebook misled investigators by stating that it had blocked app developer access to all "friend" data.  ¶133.  On June 3, 2018, the *New York Times* revealed that Facebook secretly gave numerous third parties special access rights to users' data under a "whitelisting" program.  ¶138.  Dozens of phone makers had similar *carte blanche* to use or misuse the data.  *Id.*  Later in 2018, experts uncovered the fact that Facebook was ***still*** harvesting and using its users' personal data that had been "obtained without a user's knowledge" for targeted

---

[28] *S. Ferry LP, No. 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (inferring scienter where defendant CEO "discussed WaMu's technology and integrations with a high degree of specificity on more than one occasion . . . represented repeatedly that he was confident about WaMu's risk management—and, most importantly, that he had adequate information to make those predictions . . . admitted the crucial nature of the risk-management endeavor . . . represented his own knowledge of and confidence about WaMu's structures . . . [and] maintained that he knew what he was talking about" and noting that if defendant "did not in fact have such knowledge, it would at least be actionably reckless to reassure the public about these matters at all")

1    advertising.  ¶¶145-46.  The fact that Facebook was engaged in such pervasive misconduct

2    regarding a core aspect of the Company's business – privacy – supports scienter.[29]

3    ### E.    The FTC Consent Decree Supports Scienter

4    The "FTC Consent decree put Facebook on notice" that its representations concerning its

5    privacy practices needed to be completely accurate" but Facebook did no such thing.  ¶73.  This

6    fact supports scienter.  *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 706

7    (S.D. Tex. 2002) (consent decree covering subject of fraud one of the "specific facts giving rise to

8    a strong inference of scienter").[30]

9    ### F.    Defendants' Billions-Worth Of Insider Sales Supports Scienter

10   Allegations of suspicious stock sales may be particularly cogent evidence of scienter.

11   *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004).  Courts

12   consider three main factors to evaluate whether stock sales are suspicious: "(1) the amount and

13   percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history."

14   *Id.*  Here, these factors demonstrate that Defendants' stock sales during the Class Period were

15   suspicious, thus contributing to a strong inference of scienter.

16   Zuckerberg's proceeds of ***$5.3 billion*** from his Class Period stock sales is "a truly

17   astronomical figure" that, standing alone, raises an inference of scienter.  *Id.*; *see also* ¶¶319-24,

18   370.[31]  Moreover, these sales were highly suspicious given their timing:  he pocketed the majority

19   of these proceeds – $3.45 billion – between the first corrective disclosure on March 18, 2018, and

20   the final corrective disclosure on July 25, 2018.  ¶322.  During this period, while Defendants led

21   ――――――――――――――

22   [29] *Countrywide*, 588 F. Supp. 2d at 1191 (finding that complaint persuasively alleged that systematic data falsification at company "came from the top down and pervaded virtually every office" and contributed to compelling inference of scienter).

23   [30] Also relevant to the scienter inquiry, the Complaint alleges that Facebook's Chief Information

24   Security Officer, was forced out of Facebook in December 2017 due to disagreements with top executives, including Sandberg.  ¶¶126-29.  His departure was not announced until March 19,

25   2018.  *See In re Banc of Cal. Sec. Litig.*, 2017 WL 3972456, at *8 (C.D. Cal. 2017) (holding that high-level resignations on the same day of announcement of SEC investigation, along with other

26   allegations, "adds one more piece to the scienter puzzle").

27   [31] Likewise, Sandberg pocketed ***$389 million*** in proceeds from her stock sales during the Class Period.  ¶325.  Wehner also unloaded material amounts of stock during the Class Period, reaping

28   over $21.4 million in proceeds.  ¶326.

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 5:18-cv-01725-EJD

investors to believe that the consequences of the Cambridge Analytica privacy violation were safely in the past, Zuckerberg took advantage of Facebook's rising stock price to sell aggressively before the stock price plunged on July 25, 2018.  Finally, in the second quarter of 2018, Zuckerberg sold 7.3 times the amount of shares he sold in the same quarter the prior year.  ¶324.  But he did not buy one single share during this time.  ¶323.  This suspicious trading pattern contributes to a strong inference of scienter.

### G. Defendants' Stock Sales Are Not Sanitized By Rule 10b-5-1 Plans

Faced with overwhelmingly large and suspicious stock sales, Defendants seek to escape by pointing to their "Rule 10b5-1 plans." Mot at 24.  This fails.  Defendants are incorrect that the mere presence of a 10b5-1 trading plan insulates their highly suspicious stock trades for purposes of a motion to dismiss.  *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013) ("the fact of the 10b5-1 trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales").[32]  Further, Zuckerberg's trading pattern – or lack thereof – during the Class Period belies the notion that his sales were "automatic" or "pre-established."

Indeed, Zuckerberg engaged in random patterns of selling during the first part of the Class Period in 2017 – selling only twice in February, six times in March, twice in April, four times in May, six times in June, twice in July, four times in August, five times in September, three times in October, four times in November and twice in December.  ¶370.  Then, in March 2018, he rapidly accelerated his trading to sell shares *every single trading day possible* until July 25, 2018 – when the bottom dropped out on the stock price.  *Id.*  At a minimum, Zuckerberg's trading plan provides him with incredibly broad discretion – rendering his sales neither "automatic" nor

---

[32] *See also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) ("although evidence of the nondiscretionary nature of Defendants' sales may ultimately provide the basis of an affirmative defense at a later stage of the litigation, it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales."); *Novatel*, 830 F. Supp. 2d at 1025 ("[i]mproper use of 10b5-1 trading is evidence of scienter" and denying summary judgment based on this issue of material fact); *In re Infosonics Corp. Deriv. Litig.*, 2007 WL 2572276, at *9 (S.D. Cal. Sept. 4, 2007) (trading plans create issues of fact that "cannot be resolved at the pleading stage.").

1  "nondiscretionary."[33]  Tellingly, Defendants did not submit the actual terms of the Rule 10b5-1

2  plans that Defendants purportedly had in place.

3  ## III.   THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

4  The inquiry into loss causation requires "no more than the familiar test for proximate

5  cause."  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018);

6  *accord Dura Pharm. v. Broudo*, 544 U.S. 336, 346 (2005) (plaintiff need only "provide a defendant

7  with some indication of the loss and the causal connection that plaintiff has in mind").  In the Ninth

8  Circuit "loss causation is a 'context-dependent' inquiry, as there are an 'infinite variety' of ways

9  for a tort to cause a loss," *Lloyd*, 811 F.3d at 1210, including by identifying price declines that

10  accompany the materialization of concealed risks or the disclosure of information previously

11  concealed by fraud.  *First Solar*, 881 F.3d at 754.[34]

12  Here, the Complaint alleges with particularity that extraordinary declines in the price of

13  Facebook stock were caused by the disclosure of risks and information previously concealed by

14  fraud, including Facebook's failure to respond to the Cambridge Analytica data breach as it had

15  promised, inadequate privacy practices and breaches, and the resulting impact those facts were

16  having on Facebook's user engagement, financial condition and operating results.  These declines

17  were literally historic, with Facebook's stock price plummeting by a total of 18% during the last

18  two weeks of March 2018 (¶¶336-40) and 19% on a single day in July 2018 (July 26, 2018 (¶342))

19  – each time erasing $100 billion in market capitalization.  *E.g.*, ¶¶14-23, 160-63, 184-85, 188-90,

20  211-12, 218-20, 332-51.  The Complaint further alleges that the movement of the overall market

21  (¶335) demonstrates that the alleged price declines did not reflect market volatility or other macro-

22  economic factors.  Because the Complaint provides defendants with an "indication of the loss and

23

24

---

25  [33] For this reason, the Court's statement in *Rodriguez v. Gigamon, Inc.* regarding "**automatic** sales made pursuant to Rule 10b5-1" has no application here.  325 F. Supp. 3d 1041, 1056 (N.D. Cal. 2018).

26

27  [34] Although defendants suggest that Plaintiffs are proceeding only under a "corrective disclosure" theory (Mot. at 27), in fact the Complaint pleads both materialization of risk and corrective disclosure theories of damages.  *E.g.*, ¶¶332-34.

28

1   the causal connection plaintiff has in mind," Plaintiffs have adequately pled loss causation[35]. *Dura*

2   544 U.S. at 347; *First Solar*, 881 F.3d at 753 ("loss causation is a 'context-dependent' inquiry.").

3   **<u>March Price Declines.</u>**   The Complaint plausibly alleges loss causation based on the

4   reaction of Facebook's stock price to the March 2018 disclosures relating to Cambridge Analytica

5   and other instances of privacy-related misconduct.  *E.g.*, ¶¶14-17, 163, 335-40; *see also* ¶¶149-83.

6   In addition to the price reaction to the articles published on March 17, 2018 (¶336), the Complaint

7   details subsequent disclosures and price declines in March (¶¶335-40), including revelations that:

8   (i) privacy breaches were more common than previously known (¶¶149-62); (ii) the number of

9   users affected had not been fully investigated (¶¶174-78); (iii) Facebook's privacy protections

10  were not as robust as represented (¶¶337-39); Facebook's failure to enforce its policies or notify

11  affected users had harmed the Company's reputation and decreased user trust, threatening user

12  engagement (¶¶157, 160-62; *see also* ¶¶44-59); that Facebook had not notified the FTC of the

13  Cambridge Analytica breach, and the Company was exposed to numerous investigations by

14  government entities that further threatened Facebook's business.[36]  ¶¶156, 160, 164-73.

15       Defendants do not deny that the Complaint alleges statistically significant declines in

16  Facebook stock price.  And they do not identify any other information that purportedly caused the

17  decline in Facebook's stock price.  Instead, they attack the March disclosures in conclusory

18  fashion, asserting that the "essential allegations" in the March 17, 2018 *Guardian* and *New York*

19  *Times* articles had been revealed in 2015.  Mot. at 27-28.  Defendants are wrong.[37]  As the *New*

20

21  [35] Contrary to most of defendants' arguments (*e.g.*, Mot. at 27), loss causation does not require a
    revelation of the fraud or a "fact for fact" correlation between the alleged misrepresentations and
22  the corrective disclosure.  *First Solar*, 881 F.3d at 754; *Lloyd*, 811 F.3d at 1210; *Alaska Elec.*
    *Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009).  Defendants' contentions
23  that loss causation is based on "conclusory allegations" about "unspecified facts" is just wrong, as
    described above.  *See* Mot. at 27-28 (citing ¶¶14, 336); *cf.* ¶¶14-17, 150-63, 218-20, 332-40.

24  [36] Defendants misstate the law when they contend that "the announcement of an investigation is
    insufficient to plead loss causation" (Mot. at 30) and cite to cherry-picked language from the Ninth
25  Circuit's 2014 decision in *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).  But in the
    much more recent case, *First Solar*, the Ninth Circuit made clear that they "*affirmed the opposite*,"
26  holding that the announcement of a government investigation can establish loss causation.  881
    F.3d at 754; *see also Lloyd*, 811 F.3d at 1210 (same).

27  [37] The "essential allegations" that give rise to this case are not – as Defendants describe it – "that
28  Cambridge Analytica had harvested and misused this same user data."  Mot. at 28.  Rather, this

29

1   *York Times* March 17 report stated: "[T]he full scale of the data leak involving Americans has not

2   been previously disclosed – and Facebook, until now, has not acknowledged it."[38]  ¶155.

3          Critically, the fact that Defendants had waited more than a year after they learned of the

4   breach to take any action, and then ***never*** notified the many millions of Cambridge Analytica

5   victims or the FTC of the data misuse was not revealed until March of 2018.  It was not until then

6   that investors learned that Facebook had not ensured destruction of the purloined data, and

7   Defendants do not claim otherwise.  Indeed, it is for this reason that commentators stated, for

8   example, on March 19, 2018: "No one has provided an adequate explanation for why Facebook

9   did not disclose Kogan's violation to the more than 50 million users who were affected when the

10  company first learned about it in 2015."  ¶157; *see also* ¶158(d) (CNN reported: "The problem

11  here is how Facebook, the biggest social network, chose to stay silent and not inform the affected

12  users"); ¶160(a) (Securities analyst: "Facebook was aware of the privacy breach two years ago.

13  This lack of disclosure could be viewed as a violation of privacy laws…").  This alone is fatal to

14  Defendants' "there was no new news" loss causation argument.

15         Ultimately, Defendants' argument is a "truth on the market" defense raising factual issues

16  that may not be resolved on the pleadings.  *E.g.*, *Nguyen v. Radient Pharms. Corp.*, 2011 U.S. Dist.

17  LEXIS 122533, *19-21 (C.D. Cal., Oct. 20, 2011).  It is well-established that stock price declines

18  in reaction to the marketplace disclosures are sufficient to plead loss causation, and the Complaint

19  pleads as much here.  *See, e.g.*, *In re Akorn Sec. Litig.*, 240 F. Supp. 3d 802, 816 (N.D. Ill. 2017).

20         Defendants' arguments are also inconsistent with the reaction of numerous analysts,

21  journalists, Facebook insiders, and others at the time.  For example, as recognized in a March 2018

22  report issued by the world's leading corporate governance advisor, Institutional Shareholder

23  Services ("ISS"), Facebook's "failure to protect its users' privacy has eroded the level of trust

24

25  case arises from Facebook's misrepresentations about how it had responded to that and similar
    incidents that exposed user data to harm.  *E.g.*, ¶¶8-12.

26  [38] Moreover, the 2015 articles relied upon by Defendants disclosed only *past* misuse of user data.

27  ¶¶6-7, 80-89.  They did not reveal that because Facebook failed to retrieve the data or notify users
    that their data was exposed, the data was *later* used for nefarious purposes including by entities
    seeking to interfere in the United States election.  *E.g.*, ¶¶14, 90-125.

28

1    among users, calling into question the Company's business model and governance." ¶15.[39]  These

2    knowledgeable market participants viewed the March disclosures as new, material, and troubling.

3    For all of the foregoing reasons, loss causation for the March declines is adequately pled.

4         **July Price Declines.**  Following the March 2018 disclosures, Facebook embarked on a

5    public relations campaign to assure investors that, while they had made mistakes in the past, those

6    mistakes were now resolved, and the privacy scandals were not threatening the Company's

7    business model or financial results.  ¶¶177-82 & n.233.  On April 25, 2018, the Company issued

8    its 1Q18 earnings report, which appeared to validate Defendants' assertions that the scandal had

9    not impacted user trust or engagement.  ¶¶20, 184-89.  In response, the Company's stock price

10   jumped by 9%.  ¶¶21, 188-90, 211, 341.  Thereafter, Defendants continued to reassure investors

11   about the purported limited impact of the scandal on the Company's business, or on the roll out of

12   the user opt-in requirements of GDPR, which caused Facebook's stock price to continue to rise.

13   ¶¶200-02, 211.

14        The market was therefore stunned when Facebook issued its 2Q18 earnings on July 25,

15   2018, reporting declining user numbers in Europe, lower than expected revenues, and reduced

16   guidance going forward, all as a substantial result of the fallout from the disclosures concerning

17   Facebook's privacy practices.  ¶212.  This news caused an immediate 19% decline in Facebook's

18   stock price, a stunning and severe drop that eliminated $100 billion of shareholder value in a single

19   day.  ¶¶23, 218, 335, 342-44.  By comparison, the overall market declined by just 0.3%.  ¶335.

20        Defendants make two arguments that the Complaint fails to plead loss causation for the

21   July 25, 2018 disclosure.  First, they argue that there was nothing "new" in the 2Q18 results,

22   asserting that the reduced user engagement and increased expenses had previously been disclosed.

23   This is incorrect and belied by the reaction of numerous market observers and participants.  For

24   example, the *New York Times* reported: "The results were among the ***first signs*** that the issues had

25   pierced the company's image and would have a lasting effect on its moneymaking machine."  ¶219.

26

27   [39] *See also, e.g.*, ¶157 (scandal has damaged "public trust in Facebook's commitment to privacy and data protection."); ¶159(b) (scandal "shows a serious flaw in Facebook's ability to keep exclusive control over its information.").

28

Other journalists drew the same conclusion.  *E.g.*, ¶349 ("Facebook shares collapse as a result of Cambridge Analytica election scandal"; "Facebook Takes Historic Plunge as Scandals Finally Take a Toll"); *see also* ¶¶220, 349-51 (similar).  Numerous analysts lowered their earnings estimates, explicitly recognizing the negative impact that Facebook's past privacy violations were having on user engagement and advertising revenues.  ¶¶346-48.[40]

Defendants' assertion that loss causation cannot be established because the earnings release did not use the words "Cambridge Analytica" or (purportedly) "reference . . . the privacy incidents" is similarly misguided and ignores their own admissions about the conditions that contributed to the unexpectedly poor quarterly results.  Indeed, within the first few seconds of his remarks on the July 25, 2018 conference call, Zuckerberg said, "I want to start by talking about all the investments we've made over the last six months to improve safety, security *and privacy* across our services." Lutz Ex. 12 at 2.  He then spoke at length about privacy and transparency tools relating to advertising and elections, even expressly stating "I also want to talk about *privacy*."  *Id.* at 4. Sandberg likewise said, "We've taken strong steps to address a number of issues included election integrity, fake news, and protecting people's information."  *Id.*

Defendants' assertion also ignores multiple market observers who expressly drew a causal link between Facebook's disappointing results and Cambridge Analytica scandal.  *See* ¶219 ("Facebook Inc. saw the first signs of user disenchantment in the midst of public scandals over privacy and content, with second-quarter revenue and average daily visitors missing analysts' projections"); ¶220 ("results among the first signs that the [Cambridge Analytica privacy] issues had pierced the company's image and would have a lasting effect on its moneymaking machine"); ¶349 ("Facebook shares collapse as a result of Cambridge Analytica election scandal"); ¶350 ("Cambridge Analytica scandal [was] one of many reasons for [Facebook's stock plunge" and "the cost of years of privacy missteps finally caught up with Facebook"); ¶351 ("Facebook shares

---

[40] Defendants themselves concede that analyst reaction is relevant to this inquiry, citing "one analyst" who said on the Company's earnings call that Facebook had provided "an accurate read on the quarter."  Mot. at 31.  But even this analyst later authored a report stating that Facebook's reported MAU was below expectations.

1    plummet over privacy scandal and slow growth in new users.").

2         Second, Defendants' contention that loss causation cannot be established by a price decline

3    following an earnings announcement (Mot. at 31) is contradicted by the most recent Ninth Circuit

4    loss causation decision, which does not require that a disclosure explicitly reveal a fraud:

5              A plaintiff may also prove loss causation by showing that the stock price fell upon
               the revelation of an earnings miss, even if the market was unaware at the time that
6              fraud had concealed the miss.

7    *First Solar*, 881 F.3d at 754.  The cases Defendants rely on all arise in circumstances unlike here,

8    where the negative earnings or guidance were not plausibly alleged to have resulted from

9    conditions concealed by fraud.[41]  Here, the Complaint clearly connects the July 25, 2018

10   disclosures to the prior concealment and misrepresentations (¶344), and as noted above, quotes

11   many market participants who made the same connection.  ¶¶219-20, 346-51.

## IV.    RELIANCE IS PRESUMED

13        Plaintiffs have alleged that Facebook's stock traded in an efficient market.  ¶¶327-31.

14   There is therefore a presumption that the material misrepresentations and omissions alleged in the

15   Complaint (¶¶222-307) impacted Facebook's stock price.  *Basic*, 485 U.S. at 224. Defendants'

16   attempt to rebut the presumption of reliance by again asserting that the truth was on the market as

17   of December 2015.  This argument is both incorrect and premature.  *See Baker v. SeaWorld Entm't,*

18   *Inc.*, 2017 WL 5885542, at *11 (S.D. Cal. Nov. 29, 2017).  It should be rejected.[42]

19

20

---

21   [41] Several of the cases Defendants cite were decided at a time of uncertainty in the Ninth Circuit
     over whether fraud itself had to be disclosed, or disclosure of information concealed by the fraud
22   was sufficient.  *See First Solar*, 881 F.3d at 752 (describing two lines of authority).  This
     uncertainty was eliminated last year when *First Solar* clarified that revelation of fraud was not
23   required.  *Id.* at 754.  Among the cases Defendants rely upon from this period is this Court's
     opinion in *Verifone*, which relied on one of the more restrictive cases, *Or. Pub. Emps.' Ret. Fund*
24   *v. Apollo Group*, 774 F.3d 598, 604 (9th Cir. 2014), to find that loss causation was not established.
     *In re Verifone Sec. Litig.*, 2016 WL 1213666, at *9 (N.D. Cal. Mar. 29, 2016); *cf. First Solar*, 881
25   F.3d at 752.

26   [42] In addition to failing to rebut the *Basic* presumption, Defendants also fail to recognize that
     reliance also may be presumed as a result their numerous omissions.  *See Affiliated Ute Citizens v.*
27   *United States*, 406 U.S. 128 (1972); *Blackie v. Barrack*, 524 F.2d 891, 902, 905 (9th Cir. 1975);
     *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *6-7 (N.D. Cal. Apr. 21, 2016).

28

V.   **THE COMPLAINT PLEADS INSIDER TRADING CLAIMS**

Defendants argue that Plaintiffs' Section 20A claims must be dismissed because Plaintiffs have failed to state an underlying claim under Section 10(b).  Mot. at 34.  As discussed above, however, Plaintiffs have adequately pled primary violations of Section 10(b) and Rule 10b-5. Moreover, since Plaintiffs have pled scienter against Zuckerberg, the Complaint adequately pleads that he possessed material, nonpublic, adverse information.  *Batwin*, 2008 WL 2676364, at *27 ("Because . . . plaintiff has alleged scienter with respect to its § 10(b) claim . . . defendants' argument [that plaintiff's §20A claim must be dismissed because he failed to allege the insider trader defendant knew of material, non-public information when he sold stock] lacks merit.").

The Complaint also adequately alleges that during the Class Period and contemporaneously with Zuckerberg's insider sales, Plaintiffs purchased a total of 260,091 shares of Facebook's common stock for more than $44.6 million.  ¶371.  Thousands of other Class members also purchased shares contemporaneously with Zuckerberg's insider sales.  ¶372.  These allegations are sufficient to allege a Section 20A claim. *See In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255-56 (S.D.N.Y. 2007) ("the Complaint alleges that members of the putative class traded Openwave stock contemporaneously with the defendants named in the Section 20A cause of action, and has specified the dates of the defendants' trades. Such averments are sufficient to state a cause of action under Section 20A.").

VI.   **THE COMPLAINT PLEADS CONTROL PERSON LIABILITY**

Section 20(a) of the Exchange Act imposes liability on persons who "exercised actual power or control over the primary violator."  *Howard v. Hui*, 2001 WL 1159780, at *3 (N.D. Cal. Sept. 24, 2001).  "Actual power or control" means "that the defendants were active in the day-to-day affairs of [the primary violator] or that they exercised specific control over the preparation and release of the [alleged false] statements."  *Id.*   Neither scienter nor culpable participation is required.  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).[43]

---

[43] Defendants' contention that control person claims are subject to a heightened pleading standard is misplaced. *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *24 (S.D. Cal. May 23, 2017) (declining to apply heightened standard).  But even if a higher standard applies, the allegations of the Complaint would amply meet it.

34

1    Defendants' contention that they were not control persons under the Act is borderline

2 frivolous.  Zuckerberg founded the Company, personally appointed more than half of its Directors,

3 controls a majority of Facebook stock's voting power, and testified to the United States Senate, "*I*

4 *started Facebook. I run it. And I'm responsible for what happens here*."  ¶¶20, 28-29, 192-95.

5 Sandberg manages and oversees the Company's business operations, serves on its Board of

6 Directors, and has publicly asserted that she "run[s] the Company" with Zuckerberg and was

7 personally "responsible for the controls we didn't have" over data privacy.  ¶30.  Wehner is

8 Facebook's CFO, signed all of its SEC filings, and is one of its principal spokespersons on

9 quarterly conference calls with investors.  ¶¶31, 50, 216-17, 248, 273, 275, 277, 291.

## VII.    CONCLUSION

11    Plaintiffs respectfully submit that the Motion should be denied in its entirety.  In the

12 alternative, in the event the Court is inclined to grant any part of Defendants' motion, Plaintiffs

13 respectfully request leave to amend.  *See Toy Invs., Inc. v. Poof-Slinky, Inc.*, 2013 WL 6095838,

14 at *1 (W.D. Wash. Nov. 20, 2013) ("'requests for leave to amend should be granted with extreme

15 liberality'") (quoting *Mirmehdi v. United States*, 689 F.3d 975, 985 (9th Cir. 2012)).

DATED:  February 12, 2019                    ROBBINS GELLER RUDMAN
                                               & DOWD LLP
                                             DENNIS J. HERMAN
                                             JASON C. DAVIS
                                             KENNETH J. BLACK


                                             */s/ Dennis J. Herman*
                                             DENNIS J. HERMAN

                                             One Montgomery Street, Suite 1800
                                             San Francisco, CA  94104
                                             Telephone:  415/288-4545
                                             415/288-4534 (fax)

                                             Counsel for Amalgamated and Co-Lead Counsel
                                             for the Class

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BERNSTEIN LITOWITZ BERGER &
   GROSSMANN LLP
JONATHAN D. USLANER
12481 High Bluff Drive, Suite 300
San Diego, CA  92130
Telephone:  858/793-0070
858/793-0323 (fax)

BERNSTEIN LITOWITZ BERGER &
   GROSSMANN LLP
JOHN C. BROWNE
JEREMY ROBINSON
KATE W. AUFSES


*/s/ John C. Browne*
JOHN C. BROWNE

1251 Avenue of the Americas
New York, NY  10020
Telephone:  212/554-1400
212/554-1444 (fax)

Counsel for Mississippi and Co-Lead Counsel
for the Class

PIERCE BAINBRIDGE BECK PRICE
   & HECHT LLP
CLAIBORNE R. HANE
20 West 23rd Street, Fifth Floor
New York, NY 10010
Telephone:  213/262-9333

Counsel for Helms and Additional Counsel for
the Class

POMERANTZ LLP
JEREMEY A. LIEBERMAN
J. ALEXANDER HOOD II
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone:  212/661-1100
212/661-8665 (fax)

Counsel for Kacouris and Additional Counsel for
the Class

36

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 5:18-cv-01725-EJD

1

**CERTIFICATE OF SERVICE**

2

I, John C. Browne, declare as follows:

3

I am employed in the County of New York, State of New York, I am over the age of

4

eighteen years and am not a party to this action; my business address is 1251 Avenue of the

5

Americas, 44th Floor, New York, NY 10020, in said County and State.

6

I hereby certify that on February 12, 2019, the foregoing **LEAD PLAINTIFFS'**

7

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**

8

**DEFENDANTS' MOTION TO DISMISS** was filed with the Clerk of the Court via CM/ECF.

9

Notice of this filing will be sent electronically to all registered parties by operation of the Court's

10

electronic filing systems.

11

Dated:  February 12, 2019                                       /s/   _John C. Browne_
                                                                            John C. Browne

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 5:18-cv-01725-EJD