Orin Snyder (*pro hac vice*)
    osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Kristin A. Linsley (SBN 154148)
    klinsley@gibsondunn.com
Brian M. Lutz (SBN 255976)
    blutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

Joshua S. Lipshutz (SBN 242557)
    jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: 202.955.8217
Fax: 202.530.9614

Paul J. Collins (SBN 187709)
    pcollins@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Telephone: 650.849.5300
Facsimile: 650.849.5333

*Attorneys for Defendants Facebook, Inc.,*
*Mark E. Zuckerberg, Sheryl K. Sandberg, and*
*David M. Wehner*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FACEBOOK, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | CASE NO. 5:18-CV-01725-EJD<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>Date:       April 25, 2019<br>Time:       9:00 A.M.<br>Location:  Courtroom 4, 5th Floor<br>Judge:      Hon. Edward J. Davila<br><br>Date First Action Filed: March 20, 2018 |

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ................................................................................................ 1

II. ARGUMENT ......................................................................................................................... 3

    A. Plaintiffs Fail To Allege Any False Or Misleading Statement. ..................................... 3

        1. Statements About Notifying Users Not False Or Misleading. ................................................................................................ 3

        2. Statements About Facebook's Response To Policy Violations Not False. ............................................................................... 4

        3. Statements About User Control Over Information Not False Or Misleading. ........................................................................... 5

        4. Risk Disclosures Not False Or Misleading. ..................................... 6

        5. Statements About User Consent To Data Sharing Not False Or Misleading. ................................................................................. 8

        6. Statements About Cambridge Analytica's Impact On Facebook's Business Not False Or Misleading. ................................. 9

        7. Statements About GDPR Compliance Not False Or Misleading. ................................................................................................ 10

        8. Privacy Policies Not False Or Misleading, And Inactionable. .............................................................................................. 11

    B. Plaintiffs Fail To Plead Facts Supporting A Strong Inference Of Scienter. ............... 12

        1. Defendants Have Never Admitted Scienter. .................................... 12

        2. So-Called Witness Accounts Do Not Establish Scienter. .............................. 14

        3. Scienter Cannot Be Inferred Based On Alleged Facts That Defendants Did Not Know About. ....................................................... 15

        4. The Alleged Stock Sales Do Not Support An Inference Of Scienter. .............................................................................................. 16

    C. Plaintiffs Fail To Plead Loss Causation. .................................................................... 18

        1. Plaintiffs Fail To Plead Loss Causation With Respect To The March Declines. ..................................................................... 19

        2. Plaintiffs Fail To Plead Loss Causation With Respect To The July Decline. ...................................................................... 20

    D. Plaintiffs Fail To Plead Reliance. ............................................................................... 23

    E. Plaintiffs Fail To State A Claim For Control Person Liability. .................................. 24

III. CONCLUSION ................................................................................................................... 24

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999)...................................................................................4, 13

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972) ........................................................................................................23

*Batwin v. Occam Networks, Inc.*,
    2008 WL 2676364 (C.D. Cal. July 1, 2008) ...................................................................12

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008).............................................................................................6

*Binder v. Gillespie*,
    184 F.3d 1059 (9th Cir. 1999)........................................................................................23

*In re BofI Holding, Inc. Sec. Litig.*,
    302 F. Supp. 3d 1128 (S.D. Cal. 2018) ..........................................................................19

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
    2016 WL 2937483 (N.D. Cal. May 20, 2016).................................................................22

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
    2016 WL 4585753 (N.D. Cal. Sept. 2, 2016) .................................................................21

*In re BP p.l.c. Sec. Litig.*,
    843 F. Supp. 2d 712 (S.D. Tex. 2012) .............................................................................5

*Brown v. Ambow Educ. Holding Ltd.*,
    2014 WL 523166 (C.D. Cal. Feb. 6, 2014).....................................................................22

*In re Carter-Wallace, Inc. Sec. Litig.*,
    150 F.3d 153 (2d Cir. 1998)............................................................................................12

*Cheung v. Keyuan Petrochemicals, Inc.*,
    2012 WL 5834894 (C.D. Cal. Nov. 1, 2012)..................................................................13

*City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013) ..................................................................4, 11

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..........................................................................16

*Eng v. Edison Int'l*,
    2018 WL 1367419 (S.D. Cal. Mar. 16, 2018) ................................................................18

Gibson, Dunn &
Crutcher LLP

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
  235 F. Supp. 2d 549 (S.D. Tex. 2002) .......................................................................16

*In re Facebook, Inc. S'holder Deriv. Privacy Litig.*,
  No. 18-cv-01792-HSG (N.D. Cal. March 22, 2019).............................................1, 16

*In re Finisar Corp. Sec. Litig.*,
  646 F. App'x 506 (9th Cir. 2016) ............................................................................10

*In re Fusion-io, Inc. Sec. Litig.*,
  2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ...........................................3, 5, 10, 14

*Hong v. Extreme Networks, Inc.*,
  2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) .........................................................13

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
  2018 WL 4181954 (N.D. Cal. Aug. 31, 2018)...........................................................1

*In re Kalobios Pharm., Inc. Sec. Litig.*,
  258 F. Supp. 3d 999 (N.D. Cal. 2017) .....................................................................23

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005).......................................................................19, 21, 22

*In re LifeLock, Inc. Sec. Litig.*,
  690 F. App'x 947 (9th Cir. 2017) ......................................................................11, 12

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016)............................................................................10, 20

*Lomingkit v. Apollo Educ. Grp. Inc.*,
  2017 WL 633148 (D. Ariz. Feb. 16, 2017)...............................................................8

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014)......................................................................19, 20, 22

*Magro v. Freeport-McMoran Inc.*,
  2018 WL 3725781 (D. Ariz. Aug. 3, 2018)........................................................20, 22

*McGann v. Ernst & Young*,
  102 F.3d 390 (9th Cir. 1996)....................................................................................11

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008).................................................................1, 3, 12, 17, 22, 23

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
  991 F.3d 750 (9th Cir. 2018)...............................................................18, 19, 21, 22

*Nursing Home Pension Fund, Local 144 v. Oracle Corporation*,
  380 F.3d 1226 (9th Cir. 2004).................................................................................17

Gibson, Dunn &
Crutcher LLP

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
   730 F.3d 1111 (9th Cir. 2013) ........................................................................2, 19, 20, 23

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ........................................................................15

*Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ........................................................................18, 19, 21

*In re Paypal Holdings, Inc. Shareholder Derivative Litigation*,
   2018 WL 466527 (N.D. Cal. Jan. 18, 2018) ...............................................9

*In re Peoplesoft, Inc.*,
   2000 WL 1737936 (N.D. Cal. May 25, 2000) ............................................15

*Plichta v. SunPower Corp.*,
   790 F. Supp. 2d 1012 (N.D. Cal. 2011) .....................................................12

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ........................................................................15

*Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*,
   732 F. App'x 543 (9th Cir. 2018) ................................................................19

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ........................................................................4

*Rok v. Identiv, Inc.*,
   2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ..................................................20

*Rok v. Identiv, Inc.*,
   2018 WL 807147 (N.D. Cal. Feb. 9, 2018) ................................................18

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ........................................................................3, 17

*S. Ferry LP #2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009) .................................................16

*SEC v. Rana Research, Inc.*,
   8 F.3d 1358 (9th Cir. 1993) ..........................................................................12

*Sgarlata v. PayPal Holdings, Inc.*,
   2018 WL 6592771 (N.D. Cal. Dec. 13, 2018) ..........................................7

*Shaev v. Baker*,
   2017 WL 1735573 (N.D. Cal. May 4, 2017) .............................................14, 15, 16

*Speakes v. Taro Pharm. Indus., Ltd.*,
   2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018) ..........................................9

Gibson, Dunn &
Crutcher LLP

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) ..................................................................13

*In re Toyota Motor Corp. Sec. Litig.*,
    2011 WL 2675395 (C.D. Cal. July 7, 2011) ...........................................................16

*United States v. McGraw-Hill Cos.*,
    2013 WL 3762259 (C.D. Cal. July 16, 2013) ...........................................................5

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002)..........................................................................16, 17

*In re Verisign, Inc., Deriv. Litig.*,
    531 F. Supp. 2d 1173 (N.D. Cal. 2007) ..................................................................13

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2018 WL 1142884 (N.D. Cal. Mar. 2, 2018)...........................................................23

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*,
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ..........................................................12, 13

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011).....................................................................15

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018)..................................................................................15

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
    282 F. Supp.3d 1074 (N.D. Cal. 2017) ..............................................................15, 16

*Wenger v. Lumisys, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) .......................................................................9

*Williams v. Globus Medical, Inc.*,
    869 F.3d 235 (3d Cir. 2017)......................................................................................6

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)......................................................................1, 12, 16

**Statutes**

15 U.S.C. § 78u-4(b)(1) .............................................................................................3

**Regulations**

17 C.F.R. § 229.503(c)...............................................................................................6

## I.      PRELIMINARY STATEMENT

Seeking to capitalize on historic turbulence in the price of technology stocks like Facebook, Plaintiffs filed this action in the hopes of converting the revelation that Cambridge Analytica and its affiliates had lied to Facebook and misappropriated Facebook user data into securities fraud.  But Plaintiffs' approach—lobbing at the wall disparate and generic statements about privacy, Cambridge Analytica, Russian interference in U.S. elections, Facebook's efforts to comply with the GDPR, and Facebook's daily and monthly users, without making any attempt to explain, based on particularized factual allegations in the Complaint, why each statement supposedly was not true—falls far short of the strict requirements for pleading securities fraud under the PSLRA.  This kind of kitchen-sink pleading is "unacceptable" under the PSLRA because it requires "a laborious deconstruction and reconstruction of a great web of scattered, vague, redundant, and often irrelevant allegations." *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954, at *6 (N.D. Cal. Aug. 31, 2018). Plaintiffs' failure (and inability) to point to specific allegations demonstrating that the sundry statements were false in light of contemporaneous facts demands dismissal of the Complaint.

Even more stark is the absence of the required *particularized facts* supporting a *strong inference* of scienter—meaning specific facts demonstrating that the Defendants made false or misleading statements "either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).  Plaintiffs attempt to twist certain historical events into supposed "admissions" of scienter, Opp. 21, but they fail to link any of the allegations (*e.g.*, "Defendants knew they could not trust Cambridge Analytica," *id.*) to the Defendants, as required to plead a strong inference of scienter. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) (scienter requires "allegation[s] of specific information conveyed to management and related to the fraud"); *see In re Facebook, Inc. S'holder Deriv. Privacy Litig.*, No. 18-cv-01792-HSG, Dkt. 113 at 16-18 (N.D. Cal. March 22, 2019) (dismissing complaint for failure to plead with particularity that Facebook's Board knew of alleged "privacy issues").  Nor does Facebook's wish that it had acted differently three years ago when the Cambridge Analytica issue first surfaced come anywhere near to an "admission" that the Defendants knew that every statement about privacy over the next three years was a lie.  As to stock sales, Plaintiffs essentially abandon their claim that stock sales

Gibson, Dunn &
Crutcher LLP

1

by Ms. Sandberg and Mr. Wehner made pursuant to 10b5-1 plans somehow create an inference of fraud.  Opp. 26 n.31.  Plaintiffs instead ask this Court to infer illicit intent by Mr. Zuckerberg simply because he sold a large number of shares during the Class Period (pursuant to an authorized 10b5-1 plan)—just as he did *before* the Class Period.  But that is not the law.  *See infra* at 16-17.  The PSLRA erects a high barrier to plead knowledge of falsity or deliberate recklessness, and Plaintiffs have not met this burden.

Plaintiffs also fail to plead loss causation.  Plaintiffs seek to evade their pleading burden by seemingly disclaiming any obligation to trace the claimed losses back to "the very facts about which the defendant lied."  *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119-21 (9th Cir. 2013).  But for each alleged loss, Plaintiffs must show at the pleadings phase that the disclosure in question revealed the "truth," which had been misrepresented in an earlier misstatement by Defendants.  With respect to the March 2018 declines, Plaintiffs make no effort to disentangle them and relate each back to a prior alleged misstatement, choosing instead to broadly allege that there were "revelations" in March that show the "disclosure of risks and information previously concealed by fraud."  Opp. 29.  Plaintiffs' failure—and inability—to explain how these "revelations" show any particular Facebook statement to be fraudulent is a fatal pleading deficiency.  Plaintiffs' inability to plead loss causation as to the July 2018 decline (after Facebook announced quarterly results of $13.2 billion in revenues, reflecting 42% year-over-year growth) is even clearer.  Plaintiffs admit that they ground their loss causation theory on Facebook's report of "reduced user engagement and increased expenses," Opp. 31, but Plaintiffs cannot dispute that Facebook had specifically warned investors that implementation of the GDPR could have a negative impact on Facebook's revenues and user engagement, *see* OB 31.  And Plaintiffs' argument that use of the word "privacy" on the July earnings call is an "admission" that Cambridge Analytica negatively impacted Facebook's financial results is nonsensical.  If that were the law in the Circuit, the burden of pleading loss causation as an element of securities fraud would be nonexistent.

For all of these reasons, and the reasons set forth in Defendants' Motion and below, Plaintiffs' Complaint should be dismissed with prejudice.

Gibson, Dunn &
Crutcher LLP

2

REPLY IN SUPPORT OF MOTION TO DISMISS
CASE NO. 5:18-CV-01725-EJD

## II.     ARGUMENT

**A.     Plaintiffs Fail To Allege Any False Or Misleading Statement.**

To plead an actionable misstatement, Plaintiffs must "specify each statement alleged to have been misleading [and] the reasons why the statement is misleading." *Metzler*, 540 F.3d at 1061; *accord* 15 U.S.C. § 78u-4(b)(1).   Plaintiffs must plead "***contemporaneous*** statements or conditions" demonstrating the false or "misleading nature of the statements ***when made***."   *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001); *accord In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *8, 18 (N.D. Cal. Feb. 12, 2015).[1]   Plaintiffs fail to identify specific facts demonstrating that any of the hodgepodge statements raised in their Opposition were false or misleading.

### 1.     Statements About Notifying Users Not False Or Misleading.

Plaintiffs' argument that Defendants "falsely stat[ed] that victims received notice when their data was compromised," Opp. 5, patently mischaracterizes the white paper on which they rely for this assertion.   In a 2017 white paper authored by Facebook's former Chief Security Officer and others, the Company stated that it would provide "[n]otifications to specific people if they have been targeted by ***sophisticated attackers***," Ex. 26 at 7, which, as the white paper references, meant an attacker ***suspected of working on behalf of a nation-state***."   Ex. 37 (cited in Ex. 26 at 7 n.5); *accord id.* ("[W]e decided to show this additional warning if we have a strong suspicion that an attack could be ***government-sponsored***.").   Facebook did not say in the white paper that it would notify users whose data was obtained in accordance with Facebook's policies, and then improperly shared with a third party, as was the case with Cambridge Analytica—which Plaintiffs do not claim was "suspected of working on behalf of a nation-state" or "government-sponsored."   *See* ¶¶ 80-83 (alleging that Cambridge Analytica misappropriated Facebook user data for use in U.S. political campaigns).   Moreover, Plaintiffs never explain how a commitment to notify users in a ***2017*** white paper bears any relationship to the ***pre-2015*** Cambridge Analytica events.[2]

---

[1]  Unless otherwise noted, all emphasis is added, and all internal quotation marks and citations are omitted.

[2]  For the same reason, the statement that Facebook would provide "[p]roactive notifications to people who have yet to be targeted" (cited in ¶¶ 230-231)—which immediately followed the statement about providing notification to users targeted by state-sponsored actors—was not false or misleading.

Gibson, Dunn &
Crutcher LLP

Plaintiffs' reliance on statements and actions by Facebook in 2018 regarding notice to users potentially affected by Cambridge Analytica's data misappropriation is an improper attempt to plead fraud by hindsight. *See* Opp. 6. The purported "admissions" on which Plaintiffs rely do not demonstrate that Facebook previously had committed to provide notice to users whose data was accessed improperly by Cambridge Analytica; rather, they at most demonstrate that—in retrospect—Facebook wished that it had notified affected individuals. *Cf. In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 536 (3d Cir. 1999) (allegation that defendant "expressed regret" nine months after allegedly false statement does not demonstrate "actual knowledge of [] statements' falsity"); *see also City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1109 (E.D. Wash. 2013) ("Without evidence of contemporaneous falsity, an allegation of a misleading representation, which entirely rests on later contradictory statements, constitutes an impermissible attempt to plead fraud by hindsight."), *aff'd*, 691 F. App'x 393 (9th Cir. 2017).

## 2. Statements About Facebook's Response To Policy Violations Not False.

Plaintiffs' argument that Facebook lied during the Class Period when it described how it generally would respond to policy violations—with "swift action" and by requiring third parties to "destroy all improperly collected data," Opp. 7-9—also fails because none of the challenged statements are adequately alleged to have been false.[3] Plaintiffs do not seriously dispute that the phrase "swift action" is, by its nature, incapable of "objective verification" and therefore inactionable. *See Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017). Further, Plaintiffs' own allegations demonstrate that Facebook (i) required Kogan, Cambridge Analytica, and affiliated parties to certify in writing that all improperly collected Facebook user data had been destroyed, and (ii) banned Aleksandr Kogan's "This Is Your Digital Life" app from Facebook. ¶¶ 9, 90, 92, 96, 98, 150-151, 176. Although Plaintiffs protest that Facebook should have

---

[3] Moreover, Plaintiffs' argument is premised on the notion that these statements were about Cambridge Analytica. In fact, when each challenged statement was made, the Facebook spokesperson ***specifically declined*** to comment on Cambridge Analytica. *See* ¶ 227 ("Facebook … would not comment on the current status [of its investigation of Cambridge Analytica]."); ¶ 228 ("A spokesman for Facebook refused to speak on the record about the various allegations [regarding Cambridge Analytica] …."). As such, these statements cannot have been rendered false or misleading by Facebook's response to the Cambridge Analytica events, as Plaintiffs claim.

done more to confirm that Cambridge Analytica and Kogan were telling the truth when they certified that they had destroyed the misappropriated user data, *see* Opp. 7-8, this kind of Monday-morning-quarterbacking does not mean the statements were false at the time they were made.[4]

### 3.    Statements About User Control Over Information Not False Or Misleading.

Generic statements that users "controlled" their data also were not false or misleading.  *See* Opp. 9-11.  Plaintiffs' position ignores that Facebook user data was shared with Kogan's app only in accordance with users' privacy and application settings, *see* Ex. 24; OB 7, 13, which Plaintiffs implicitly concede, *see* Opp. 14.  Indeed, as Facebook explained in Congressional testimony that Plaintiffs agree is incorporated by reference in the Complaint, *see* ¶ 206, "access to information about an app user's friends required not only the consent of the app user, but also required that the friends whose data would be accessed have their own privacy settings set to permit such access by third-party apps.  In other words, Kogan's app could have accessed a user's friends' information ***only for friends whose privacy settings permitted such sharing***."  Ex. 28 at 4 (emphasis added).

Plaintiffs' argument to the contrary is a red herring.  They claim that statements about user control over their data were false because "the purloined Cambridge Analytica data … remained at risk during the Class Period."  Opp. 10.  But this ignores that users consented to share their data with Kogan's app or consented to their friends' sharing their data with app developers, as was permitted under Facebook's then-operative 2013 Data Policy.  *See* Ex. 24; OB 7, 13.  Thus, because Facebook users did control whether and how their data was shared with app developers, the generic statements about user control Plaintiffs point to were not false.[5]

---

[4] *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 754-59 (S.D. Tex. 2012), is inapposite because the defendants there made specific promises of progress towards process safety reforms recommended following an initial safety incident, which a subsequent safety incident demonstrated were false.  By contrast here, Plaintiffs fail to allege any instance after the challenged statements in which Facebook did not act promptly in response to policy violations.  Similarly, unlike in *United States v. McGraw-Hill Cos.*, 2013 WL 3762259, at *5-7 (C.D. Cal. July 16, 2013), Plaintiffs do not allege ***contemporaneous*** conditions that rendered statements of Facebook's policies false.  *See Fusion-io*, 2015 WL 661869, at *8, 18.

[5] Finally, the challenged "control" statements are inactionable because Plaintiffs fail to allege any contemporaneous facts demonstrating that any speaker knew the data misappropriated by Cambridge Analytica remained at risk during the Class Period.  To the contrary, Facebook required Cambridge Analytica to certify in writing to the data's destruction, and Cambridge Analytica

Gibson, Dunn &
Crutcher LLP

### 4.   Risk Disclosures Not False Or Misleading.

Plaintiffs also fail to plead facts demonstrating that Facebook's risk factor statements were false or misleading.  *See* Opp. 11-13.  Although Plaintiffs baselessly accuse Defendants of "inventing a new legal standard," Opp. 13, it is ***Plaintiffs*** who have done so by asserting that Defendants "failed to disclose the existence and magnitude of the risks" facing Facebook, *id.* at 11.  This novel and legally unsupported argument fails on multiple levels.  First, as Plaintiffs acknowledge, the risk disclosures unquestionably disclosed the ***existence*** of risks facing Facebook.  *See generally* ¶¶ 290-300.  And second, there is no securities law requirement—and Plaintiffs certainly identify none—that Facebook ***quantify*** the "magnitude" of risks to Facebook's business.  *See* 17 C.F.R. § 229.503(c).

Plaintiffs espouse this new theory in their Opposition because they fail to plead facts demonstrating that the risks Facebook warned of already had come to fruition at the time the challenged risk factor statements were made.  *See, e.g.*, *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985-86 (9th Cir. 2008).  Because the warned-of risks had not materialized, Facebook's risk disclosures are inactionable.  *See Williams v. Globus Medical, Inc.*, 869 F.3d 235, 241-43 (3d Cir. 2017) (dismissing claim alleging falsity of risk factor statements because plaintiffs "failed to adequately plead that the risk about which Globus warned—the risk of adverse effects on sales as a result of the loss of a single independent distributor—had actually materialized at the time" the risk factor statements were made) (distinguishing *Berson*).

Here, Facebook warned that its business and reputation could be harmed, and its competitive position diminished, if the Company failed to prevent or mitigate security breaches and improper access to or disclosure of user data, ¶ 291; that its business could be negatively affected by "unfavorable media coverage," ¶ 295; that it could be required to incur costs or change its business practices in response to regulatory investigations and settlements, ¶ 295; and that it could be unable to "attract or retain users or otherwise maintain the frequency and duration of their engagement" if users did not "perceive [the Company's] products to be useful, reliable, and trustworthy," ¶ 296.  None of these statements are false

---

confirmed the data had been destroyed.  ¶¶ 9, 90, 92, 96, 98, 150-151, 176.  At the time the statements were made, Plaintiffs identify no facts demonstrating that Defendants believed Cambridge Analytica had lied about deleting the data.  Even more, at the time of Ms. Sandberg's statement, Facebook had updated its platform in a way that significantly restricted the amount of data that app developers could access.  *See* ¶¶ 98, 251, 258, 266, 280.

Gibson, Dunn &
Crutcher LLP

or misleading because Plaintiffs fail to plead facts showing that, at the time the statements were made, the warned-of risks already had materialized.  Plaintiffs nowhere allege that, when the statements were made, (i) Facebook's business and reputation were being harmed, and its competitive position diminished, because the Company allegedly had failed to prevent improper access to user data; (ii) the Company's business was being affected by negative media; (iii) Facebook was incurring undisclosed costs or making undisclosed changes to its business practices because of regulatory investigations or settlements; or (iv) Facebook was failing to attract or retain users because of a perception that the Company's products were not useful, reliable, or trustworthy.  Rather, these risks allegedly only came to fruition—if at all—after March 2018 articles in *The New York Times* and *The Guardian* showed that Cambridge Analytica had lied when it certified to the destruction of misappropriated Facebook user data.  *See* ¶¶ 14-15.

Plaintiffs seek to overcome their inability to plead that these risks had already materialized by claiming—without supporting facts—that "Defendants knew … that they had not properly 'mitigate[d]' the Cambridge Analytica data violation" at the time the challenged risk factor statements were made.  Opp. 11.  To the contrary, Facebook obtained written certifications from Kogan, Cambridge Analytica, and its affiliates that all Facebook user data had been destroyed and banned Kogan and his app from Facebook, ¶¶ 9, 90, 92, 96, 98, 150-151, 176, and there are no facts alleged demonstrating that Facebook believed these certifications were false before the March 2018 articles.  Even more, at the time of the risk disclosures in question, Facebook had changed its platform in a way that significantly restricted access by third-party developers to user data—meaning that a Cambridge Analytica-like event was very unlikely to happen again.  ¶¶ 98, 251, 258, 266, 280.[6]  *See Sgarlata v.*

---

[6]  Plaintiffs' other attacks on the risk factors amount to unsupported speculation that third parties *might* have misused Facebook user data, but this speculation cannot render the risk factors false or misleading.  *See* Opp. 12-13.  For example, Plaintiffs' allegation that Facebook gave unspecified "app developers and other third parties' access to users' friends' data, *see* Opp. 12, does not render false Facebook's statement that it had "developed systems and processes that are designed to protect our data and user data," ¶ 291—especially in the context of Facebook's statement that "some of our developers or other partners … may receive or store information provided by us or by our users," *id.*  Nor is a statement that Facebook "provide[d] limited information to such third parties," *id.*, rendered false by Plaintiffs' assertion that Facebook "exposed the user data on its servers to copying" by unspecified third parties, Opp. 13.  And Plaintiffs do not allege a single fact demonstrating that Facebook's alleged contractual relationships with device makers or app

Gibson, Dunn &
Crutcher LLP

*PayPal Holdings, Inc.*, 2018 WL 6592771, at *7 (N.D. Cal. Dec. 13, 2018) (dismissing claim based on risk factor statements because Plaintiffs failed to plead facts demonstrating that the speakers knew magnitude of purported data breach when challenged statements were made).

**5.    Statements About User Consent To Data Sharing Not False Or Misleading.**

Plaintiffs also point to no facts demonstrating that Facebook's statements following the disclosure of Cambridge Analytica's data misappropriation were false or misleading. *See* Opp. 13-15. This claim is premised on Plaintiffs' argument that users did not consent to sharing data that ultimately was improperly accessed by Cambridge Analytica. But as noted above, Plaintiffs do not dispute that Facebook's 2013 Data Policy allowed users to share certain information about their friends if their friends consented to such sharing, *see* Ex. 24; OB 7, 13, so they quibble with the terms of the consent, which they claim is "indirect, non-specific, and passive," Opp. 14. Plaintiffs fail to cite a single case to support their "consent is not consent" theory,[7] let alone a case demonstrating that the challenged statements about user consent somehow are false or misleading under the federal securities laws. *Id*. The statements Plaintiffs challenge explained that users consented to share their information with Kogan's app or have their information shared by their friends, in accordance with Facebook's then-operative policies. *See* ¶¶ 255, 261(a). There are no facts alleged demonstrating that these statements were untruthful.

Moreover, the statement that "'we've worked hard to make sure that we comply' with the FTC Consent Decree" is not actionable. *See, e.g.*, *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *23 (D. Ariz. Feb. 16, 2017) ("Courts often hold that statements regarding general legal compliance are too vague to be actionable misrepresentations or omissions.") (collecting cases). Plaintiffs point to no facts, as they must, demonstrating that Facebook had *not* "worked hard" to comply with the Consent

---

developers, *see* Opp. 12, resulted in a "loss or misuse of [user] data"—the subject of the challenged risk factor statements, ¶ 291.

[7] In a separate case brought on behalf of Facebook users, *In re Facebook, Inc., Consumer Privacy User Profile Litigation*, Judge Chhabria recognized that the language of Facebook's data policy explained that users were consenting to the sharing of their data—and their friends' data: "[I]f you read the words, you come away knowing that even if you limit your settings so that you're sharing only with friends, these third-party apps can communicate with your friends and get all of the information that your friends have access to unless you further change your settings." No. 18-md-2843 (N.D. Cal.), Feb. 1, 2019 Hr'g Tr. at 135 (Ex. 36).

Gibson, Dunn &
Crutcher LLP

Decree.  These statements therefore come nowhere close to passing muster under the strict pleading requirements of the PSLRA.[8]

### 6. Statements About Cambridge Analytica's Impact On Facebook's Business Not False Or Misleading.

Statements purportedly about the impact of the Cambridge Analytica events on Facebook's business also are unsupported by specific facts demonstrating that they were false or misleading.[9]  For example, Plaintiffs challenge an April 15, 2018 statement that "our community continues to grow," Opp. 15 (quoting ¶ 271), but there are no facts alleged demonstrating that this statement was untrue at the time it was made.  To the contrary, Plaintiffs' own Complaint alleges that Facebook reported *increases* in daily active users and monthly active users from the prior year.  *Compare* ¶ 270 (1.45 billion DAUs and 2.20 billion MAUs as of March 31, 2018), *with* ¶ 247(a) (1.28 billion DAUs and 1.94 billion MAUs as of March 31, 2017).[10]

Plaintiffs similarly challenge the forward-looking statement that "we do not anticipate [that new European privacy regulations] will significantly impact advertising revenues," Opp. 15 (quoting ¶ 273), but this statement was not false or misleading, particularly when viewed in context.  In fact, the statement in full (which Plaintiffs misleadingly omit from their Complaint and Opposition) specifically cautioned investors about potential impacts from Facebook's implementation of the GDPR:

> First, as you might expect, ***we believe that European MAU and DAU may be flat to slightly down sequentially in Q2 as a result of the GDPR roll out***.  Second, while we do not anticipate these changes will significantly impact advertising revenue, ***there is certainly the potential for some impact***, and we will be monitoring this closely.

---

[8]  *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *4-5 (S.D.N.Y. Sept. 24, 2018), is inapposite because it addresses a plaintiff's burden for pleading an uncharged illegal price-fixing conspiracy.  In contrast, in *In re Paypal Holdings, Inc. Shareholder Derivative Litigation*, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018), Judge Seeborg held—in the context of an FTC Civil Investigative Demand—that companies need not disclose "uncharged, unadjudicated wrongdoing," which is precisely what Plaintiffs allege here.

[9]  Plaintiffs refer repeatedly to "reassuring statements" about "the condition of Facebook's platform" in the wake of the Cambridge Analytica events, but Plaintiffs only specify a few statements, some of which do not concern Cambridge Analytica at all.  *See* Opp. 16 (citing ¶¶ 271, 273).  Obviously, Plaintiffs cannot meet their pleading burden by recasting the statements that actually were made.  *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1246-47 (N.D. Cal. 1998) (dismissing complaint that "repackage[d] defendants' actual oral statements in vague and impressionistic terms").

[10]  Plaintiffs have abandoned in their Opposition their baseless claim that DAU and MAU metrics were false.  *See* ¶¶ 247-250; OB 17-18.

Gibson, Dunn &
Crutcher LLP

Importantly, ***GDPR affects the entire online advertising industry so the Facebook-specific impact is difficult to model in advance***. Ex. 11 at 8 (emphasis added).  This statement did not, as Plaintiffs claim, "downplay[] the impact that the Cambridge Analytica scandal would have on Facebook's business," Opp. 15, nor could it because it had nothing to do with the Cambridge Analytica events.  Rather, the statement addressed the potential impact of Facebook's implementation of the GDPR—including that European MAU and DAU could be "flat to slightly down," and that the GDPR could have "some impact" on advertising revenue.

Plaintiffs fail to allege any specific, contemporaneous facts demonstrating that statements about the impact of Cambridge Analytica on Facebook's business were false or misleading.  *Fusion-io*, 2015 WL 661869, at *8, 18.  Rather, all Plaintiffs can offer is (i) a survey that they admit covered a substantial period of time ***before*** Cambridge Analytica's data misappropriation became widely known, Opp. 15-16 & n.13; (ii) allegations about Defendants' purported access to "negative user engagement data" that say nothing of the sort, Opp. 17 (citing ¶ 284 (no discussion of access to user metrics)); and (iii) impacts from Facebook's implementation of GDPR that the Company specifically warned investors about, Opp. 16; *see also* Ex. 11 at 8.  None of these allegations demonstrate that purported (but unspecified) "reassuring statements" about Cambridge Analytica's impacts on Facebook's business were false at the time they were made.[11]

### 7.    Statements About GDPR Compliance Not False Or Misleading.

Plaintiffs' attacks on Facebook's GDPR-related statements are an impermissible attempt to plead fraud by hindsight.  *See* Opp. 17-19.  Plaintiffs identify no ***contemporaneous*** facts demonstrating that the GDPR-related statements were false ***at the time they were made***.  *See Fusion-io*, 2015 WL 661869, at *8, 18.  For example, Plaintiffs do not plead any facts showing that, as of April 4, 2018, Facebook did not have "almost all of what's in [the GDPR] implemented for years, around the world,

---

[11] Plaintiffs' own cases demonstrate the necessity of identifying contemporaneous facts supporting the challenged statements' falsity.  For example, in *In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016), the court found that statements denying that the company's customers were building inventory beyond demand were false or misleading because "during annual contract negotiations … customers would have discussed inventory levels and defendants would have learned that customers were stockpiling inventory."  Similarly, in *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016), the defendants reassured investors that the company had "no serious doubts" about a borrower's ability to repay, even though the company "had known for two months that there was a basis for serious doubts about the ability of [the borrower] to repay."

Gibson, Dunn &
Crutcher LLP

not just in Europe." Opp. 17 (citing ¶ 261(b)). Nor do Plaintiffs plead any facts showing that, as of January 31, 2018, Facebook was not "already appl[ying] the core principles in the GDPR framework, which are transparency and control." ¶ 237. In fact, Plaintiffs do not identify *a single provision* of the GDPR that Facebook had not implemented at the time the challenged statements were made.

Instead, Plaintiffs allege that the GDPR-related statements were false because, on July 25, 2018, Facebook "disclosed declining user growth in Europe and lower than expected revenues, which caused the Company to miss analyst estimates for the first time since 2015." Opp. 18. But this is a paradigmatic example of improper fraud by hindsight pleading—in essence, Plaintiffs allege that the GDPR compliance statements must have been false because user growth slightly declined once Facebook had fully implemented the GDPR. That is not permitted under the PSLRA's strict pleading requirements. *See City of Roseville*, 963 F. Supp. 2d at 1109. Moreover, Plaintiffs ignore that Facebook *specifically warned* investors in April 2018 that implementation of the GDPR could have an impact on Facebook's advertising revenues and user growth, ¶ 277; Ex. 11 at 8, and that Facebook's 2018 expenses would increase significantly, ¶ 275. *See* Opp. 18 (asserting that GDPR-related statements were false because Facebook disclosed lower than expected revenues and increased costs). Accordingly, Plaintiffs fail to plead—and cannot plead—that Defendants' GDPR-related statements were false or misleading.

### 8. Privacy Policies Not False Or Misleading, And Inactionable.

Plaintiffs' attacks on the purported "falsity" of Facebook's privacy policies track their attacks on other challenged statements, *see* ¶ 302, and fail for the same reasons, *see* Opp. 19 (asserting that privacy policies are misleading "for the same reasons set forth above."). Further, Plaintiffs fail to rebut Defendants' showing that Facebook's privacy policies are not statements made "'in connection with' securities trading," as they must be to support a Section 10(b) claim. *McGann v. Ernst & Young*, 102 F.3d 390, 396-97 (9th Cir. 1996). Like the advertisements at issue in *In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 953-54 (9th Cir. 2017), Facebook's privacy policies "might have some probative value in an action based on consumer protection laws, but they have none in a case alleging investor fraud." Further, like the Plaintiffs in *LifeLock*, Plaintiffs here fail to allege that Facebook's privacy policies were the sort of material "'reasonably used by market professionals to evaluate [Facebook]

stock.'" *Id.* at 954 (quoting *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993)).  In fact, Plaintiffs themselves argue that Facebook's privacy policies are "statements that were important to Facebook's **users**," Opp. 20 n.16—not statements that were important to Facebook's **investors**.  As such, Facebook's privacy policies are not only truthful and not misleading, they are inactionable.[12]

**B.**    **Plaintiffs Fail To Plead Facts Supporting A Strong Inference Of Scienter.**

Even if Plaintiffs adequately pleaded a false statement (which they have not), their Complaint still must be dismissed because the Complaint fails to meet the rigorous standard of pleading particularized facts demonstrating a "strong inference of scienter"—meaning that "the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991.  As set forth below, the vast majority of the supposed "admissions" and other baseless assertions that Plaintiffs raise in their Opposition have little or no connection to the Individual Defendants, and thus cannot demonstrate that any of the challenged statements were intentionally false when made or made with deliberate recklessness.  This is an important and fatal pleading failure that separately compels dismissal.

**1.**    **Defendants Have Never Admitted Scienter.**

To plead a strong inference of scienter, Plaintiffs must plead particularized facts demonstrating that the Individual Defendants knew the supposedly false statements challenged by Plaintiffs were false or misleading when made, or had access to information demonstrating that the Individual Defendants were deliberately reckless in allowing the false statements to be made.  *See, e.g.*, *Metzler*, 540 F.3d at 1068 (scienter requires "allegation[s] of specific information conveyed to management and related to the fraud")*; Plichta v. SunPower Corp.*, 790 F. Supp. 2d 1012, 1017-20 (N.D. Cal. 2011); *see also*

---

[12]  Plaintiffs' cases are inapposite.  *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *22 (C.D. Cal. July 1, 2008), did not address the "in connection with" requirement of Section 10(b), and to the extent Plaintiffs contend this issue cannot be resolved on the pleadings, their argument is contrary to the Ninth Circuit's holding in *LifeLock*, 690 F. App'x at 949 (affirming grant of motion to dismiss).  Similarly, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, 2017 WL 66281, at *18 (N.D. Cal. Jan. 4, 2017), concerned whether "emissions compliance stickers" could support the plaintiffs' "fraud-on-the-market" theory, **not** whether the stickers constituted statements "in connection with" securities trading.  And Facebook's privacy policies, which explain to Facebook's **users** how their data can be used and shared, are different than "[t]echnical advertisements in sophisticated medical journals detailing the attributes of a new drug[, which] could be highly relevant to analysts evaluating the stock of the company marketing the drug." *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156 (2d Cir. 1998).

Gibson, Dunn &
Crutcher LLP

*Cheung v. Keyuan Petrochemicals, Inc.*, 2012 WL 5834894, at *3 (C.D. Cal. Nov. 1, 2012) (corporate scienter can only be established through scienter of senior officers).  In their Opposition, however, Plaintiffs seek to ground their scienter argument on supposed "admissions" that bear no connection to the Individual Defendants, nor demonstrate that any Individual Defendant had the requisite fraudulent intent.  None of Plaintiffs' claimed "admissions" (Opp. 21-22)—which are anything but—support a strong inference of scienter.

For example, there is no basis to infer that any Individual Defendant knew that Facebook "could not trust Cambridge Analytica to honestly self-report their deletion of the data." Opp. 21.[13]  At most, Plaintiffs allege that in 2015 *Kogan* lied to Facebook, *id.* at n.17, but there are no facts demonstrating that any Individual Defendant knew that *Cambridge Analytica* would not act "honestly."  Plaintiffs fare no better with their arguments that "Defendants knew that they had not notified" users whose data was sold by Kogan to Cambridge Analytica, and had not "investigate[d] whether other app developers had improperly shared [] user data."  Opp. 21.  Facebook made no such statements, and there are no facts alleged demonstrating that the Individual Defendants knew or were deliberately reckless in not knowing about these assertions.

Nor do statements by Mr. Zuckerberg and Ms. Sandberg in 2018, expressing regret that Facebook had not done more in 2015 to ensure the deletion of improperly shared user data, support a strong inference of scienter.  Opp. 22.  None of these "express[ions of] regret" remotely reflect "actual knowledge of [the challenged] statements' falsity."  *Advanta*, 180 F.3d at 536; *see also Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *21 (N.D. Cal. Apr. 27, 2017) (rejecting supposed "admission" because statement was not "along the lines of 'I knew it all along'").  The cases Plaintiffs rely on—all of which involved actual admissions of false statements or knowledge[14]—cannot convert later

---

[13] Plaintiffs repeat in their Opposition brief their improper group pleading of scienter from their Complaint—generally asserting what "Defendants" supposedly knew or admitted, instead of identifying particularized "fact[s] showing what ***each*** defendant knew, when he/she knew it, or how he/she acquired that knowledge." *In re Verisign, Inc., Deriv. Litig.*, 531 F. Supp. 2d 1173, 1207 (N.D. Cal. 2007).

[14] *See Volkswagen*, 2017 WL 66281 at *14 (dealing with actual admissions of falsity to support a strong inference of scienter); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1042-43 (N.D. Cal. 2016) (company admitted that "practices and procedures by management" led

statements of regret into knowledge that the challenged statements were false at the time they were made.

### 2.    So-Called Witness Accounts Do Not Establish Scienter.

Plaintiffs have not identified any "confidential witnesses" to support the claims alleged in the Complaint.  Instead, Plaintiffs argue in their Opposition that three supposed "first-hand witness accounts"—which Plaintiffs simply identify from articles and other public sources—somehow support a strong inference of scienter.  *See* Opp. 23.  This argument is baseless:  none of the "witnesses" is alleged to have provided information to any of the Individual Defendants that would support a strong inference that any Individual Defendant knew that any challenged statement was false or was deliberately reckless in making statements that turned out to be false.

For example, Plaintiffs argue that Roger McNamee "raised red flags" about Facebook's "'systemic problem' of data misuse," but this argument mischaracterizes the document on which Plaintiffs purport to rely.  Opp. 23.  In that document, Mr. McNamee claims that he discussed with Mr. Zuckerberg and Ms. Sandberg a "systemic problem with algorithms and the business model of Facebook that allow bad actors to cause harm to innocent users of Facebook."  Lutz Ex. 15 at 3.  The document makes clear that this was in the context of Russian influence in the 2016 elections, *not* Cambridge Analytica, which Mr. McNamee characterized as "a different play."  *Id*. at 2.  Another of Plaintiffs' supposed "witnesses"—Christopher Wylie—did not testify about any information conveyed to the Individual Defendants.  *See* Opp. 23.  And Plaintiffs' allegation that Sandy Parakilas warned certain of the "top five executives" about "privacy vulnerabilities" *five years* before the Class Period has no bearing on what Defendants knew *during* the Class Period.  *See Fusion-io*, 2015 WL 661869 at *19 (alleged fact that was *three months old* too stale to establish falsity of later statement).  Further, Plaintiffs fail to plead (1) any specific facts about the nature of the vague "privacy vulnerabilities" Mr. Parakilas allegedly warned about, or (2) whether any of the Individual Defendants were among the "top five executives" who were allegedly warned.  In fact, Mr. Parakilas' testimony before Parliament, which Plaintiffs cite in the Complaint, indicates that Mr. Zuckerberg was *not* among the "top five" executives that Mr. Parakilas referred to.  *See* Ex. 35 ("I do not know that Mark Zuckerberg would

to financial restatements); *Shaev v. Baker*, 2017 WL 1735573, at *5, *10 (N.D. Cal. May 4, 2017) (admissions that defendants were aware of the sales integrity problems at issue).

Gibson, Dunn &
Crutcher LLP

have been aware specifically of what I said…").   None of these so-called witness statements demonstrate that the Individual Defendants acted with scienter.[15]

### 3.   Scienter Cannot Be Inferred Based On Alleged Facts That Defendants Did Not Know About.

Plaintiffs cannot overcome their inability to plead particularized factual allegations of scienter by simply inferring scienter on the basis that "user data" is "at the core of Facebook's business model." Opp. 24-26.[16]   This is not allowed under the PSLRA.   *See Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018) (core operations theory does not allow inference of knowledge of every detail of core operation); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 361 (S.D.N.Y. 2011) (fact that lending was core operation does not allow inference that defendants knew about subprime nature of particular portfolio).

"[A]bsent some additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter, the core operations inference will generally fall short of a strong inference of scienter."   *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014); *see Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (core operations theory unavailable where no "specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring

---

[15]   The cases cited by Plaintiffs are inapposite because in those cases, unlike here, plaintiffs pleaded specific facts about *how* and *when* individual defendants were put on notice of the *specific* issue that was the subject of the alleged misrepresentations. *See In re Wells Fargo & Co. S'holder Deriv. Litig.*, 282 F. Supp.3d 1074, 1082, 1099-1100 (N.D. Cal. 2017) ("each of [the] Defendants" was "involved in the day-to-day operations of the bank and [had] [] access" to complaints about "fraudulent exploitation of [] clients"); *Shaev*, 2017 WL 1735573, at *4 (emails to defendant "warning him that employees were creating fake accounts," as well as *admissions* that red flags reached and were discussed by defendants); *In re Peoplesoft, Inc.*, 2000 WL 1737936, at *2-3 (N.D. Cal. May 25, 2000) (bugs were "reported to management" and "field representatives were plainly telling management that their expectations were unattainable" such that "[t]op management was on notice").

[16]   Plaintiffs mischaracterize their Complaint by arguing that "executives openly discussed the fact that Facebook 'prioritized data collection from its users over protecting them from abuse'" in "an internal memo circulated … during the Class Period." Opp. 24.  The language they quote is from Sandy Parakilas, who was at the company from 2011-2012—not during the Class Period. ¶¶ 66, 75.  The memo alleged in the Complaint says nothing about misuse of user data or "polic[ing] the collection of use of that data" as Plaintiffs argue in their brief. ¶¶ 64-65.

Gibson, Dunn &
Crutcher LLP

[]; or witness accounts demonstrating that executives had actual involvement in" misconduct).[17] Thus, Plaintiffs' assertion that user data was important to Facebook's business model fails to support an inference that the Individual Defendants knew that Cambridge Analytica had falsely certified that it destroyed Facebook users' data, or that other alleged privacy violations had occurred, at the time of the allegedly false statements. *See In re Facebook, Inc. S'holder Deriv. Privacy Litig.*, No. 18-cv-01792-HSG, Dkt. 113 at 16-18 (N.D. Cal. March 22, 2019) (cannot infer knowledge of Cambridge Analytica-like incidents based on alleged knowledge of unrelated "privacy issues"); *Zucco*, 552 F.3d at 1000-01 (allegations that management were "closely reviewed" and "analyzed" data did not support inference "that management was in a position to know that such data was being manipulated").[18]

### 4. The Alleged Stock Sales Do Not Support An Inference Of Scienter.

Plaintiffs effectively concede that their stock sale allegations against Ms. Sandberg and Mr. Wehner are insufficient, relegating their arguments to a footnote that merely mentions the proceeds from sales. Opp. 26 n.31. That is not enough, OB 24-25, and these stock sales provide no basis to infer scienter as to these two Individual Defendants.

Similarly, Plaintiffs fail to allege facts that would permit the Court to evaluate the context of Mr. Zuckerberg's stock sales. Plaintiffs make much of the magnitude of Mr. Zuckerberg's sales, Opp. 26, but "by themselves, large numbers do not necessarily create a strong inference of fraud." *In*

---

[17] Plaintiffs' cases applying the core operations doctrine are distinguishable because the defendants were allegedly aware of the issues that gave rise to the litigation. *Wells Fargo*, 282 F. Supp. 3d at 1101 (relevant issues were "closely tracked" and "red flags" sufficiently pleaded); *Shaev*, 2017 WL 1735573, at *12 (core operations allegations "not [] sufficient on their own," but together with other allegations, including *admissions of knowledge*, led to inference of scienter); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1190 (C.D. Cal. 2008) (defendants "not just generally aware" of issues, but "were … regularly provided detailed [] statistics" that "track[ed] exactly the business practices in issue"); *In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at *4 (C.D. Cal. July 7, 2011) (finding it implausible that management was not aware of vehicle defect given eight government investigations, the high cost of potential recall, and media scrutiny); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (plaintiffs pleaded "actual knowledge" because defendant *admitted* that he "had all of the information necessary").

[18] Plaintiffs do not even try to explain why the existence of the FTC Consent Decree supports an inference of scienter. Opp. 26; *see* OB 23. It does not. *Enron* did not analyze whether and why a consent decree mattered to its scienter analysis. *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 706 (S.D. Tex. 2002). Plaintiffs also to fail explain why the departure of Facebook's Chief Information Security Officer supports an inference of scienter (Opp. 26 n.30), and mere innuendo does not satisfy the PSLRA. *Zucco*, 552 F.3d at 1002 (plaintiffs must plead specific facts overcoming normal "inference that the employees resigned or were terminated for unrelated personal or business reasons").

Gibson, Dunn &
Crutcher LLP

*re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002). Instead, Plaintiffs must allege "the amount and percentage of shares sold" to provide the Court with "sufficient context" to determine whether stock sales are suspicious. *See Ronconi*, 253 F.3d at 435-36. Critically, Plaintiffs *do not allege* the percentage of Mr. Zuckerberg's holdings that were sold during the relevant period. Even in *Nursing Home Pension Fund, Local 144 v. Oracle Corporation*, 380 F.3d 1226, 1232 (9th Cir. 2004), which Plaintiffs cite, the plaintiffs alleged the percentage of shares sold. More importantly, *Oracle* is easily distinguishable because there, the sales in question were the first stock sales by the officer in *five years*. *See id.* In contrast, Plaintiffs acknowledge that Mr. Zuckerberg sold large amounts of stock before the Class Period began (¶ 317)—and well before any of the alleged corrective disclosures—which strongly undercuts any nefarious inference from these sales.

Plaintiffs' remaining arguments also should be rejected. Because their claim that Mr. Zuckerberg sold two or three times as much stock during the Class Period as the prior similar period is plainly insufficient to plead scienter, *see Vantive*, 283 F.3d at 1093 (no scienter inferred when sales *six* times as much), Plaintiffs pivot in their Opposition and argue that Mr. Zuckerberg sold 7.3 times as many shares in the second quarter of 2018 as compared to the second quarter of 2017. Opp. 27. But Plaintiffs cannot cherry-pick time periods in the Class Period to dramatize specific sales; it is Mr. Zuckerberg's entire trading history that matters, not what happens in a snapshot in time. Plaintiffs' argument that Mr. Zuckerberg sold stock while prices were high also must be rejected because Plaintiffs do not allege the prices at which Mr. Zuckerberg sold. Opp. 27. Moreover, Plaintiffs' argument that the Individual Defendants' Rule 10b5-1 plans do not "insulate[]" them "for purposes of a motion to dismiss" misses the point (Opp. 27): the 10b5-1 plans (all implemented *before* the Class Period (OB 24)) strongly undercut any inference of scienter that the sales might otherwise provide. *See Metzler*, 540 F.3d at 1067 n.11. To be clear, it is *Plaintiffs'* burden to allege with particularity why the alleged stock sales are suspicious in light of the 10b5-1 plans, not *Defendants'* burden to prove that their sales complied with their 10b5-1 plans, as Plaintiffs suggest. Opp. 28. Plaintiffs have failed to meet this burden.

Gibson, Dunn & Crutcher LLP

Finally, because Plaintiffs can only plead scienter as to Facebook by pleading an Individual Defendant's scienter (OB 21)—a standard Plaintiffs do not challenge—Plaintiffs fail to plead a strong inference of scienter as to Facebook.

## C.    Plaintiffs Fail To Plead Loss Causation.

Plaintiffs' Opposition identifies several ways that they might seek to plead loss causation, *see* Opp. 28, but they fail to actually satisfy their burden to plead with specificity how any alleged false or misleading statements caused the losses they now seek to recover.

Plaintiffs' loss causation theory ultimately boils down to the idea—routinely rejected by courts in this Circuit—that because Facebook's stock price dropped following news articles and earnings reports, those drops *must* have been caused by fraud, which *must* have been effected *by Facebook*, and *must* have been new to the market.  *See* Opp. 28-29; OB 26-33.  That is not the law.  *See, e.g.*, *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014) (price declines upon publication of press releases and reports do not establish loss causation; plaintiffs must "specify which of the Defendants' statements were made untrue" by such documents).  Although the Ninth Circuit noted in *Mineworkers' Pension Scheme v. First Solar, Inc.*, 991 F.3d 750, 753 (9th Cir. 2018), that "loss causation is a 'context-dependent' inquiry," courts repeatedly have held that plaintiffs must still plead with particularity facts that, if true, would demonstrate that it was a "misstatement, as opposed to some other fact, [that] foreseeably caused the plaintiff's loss."  *Id*.  Indeed, contrary to Plaintiffs' argument (Opp. 33), the court in *First Solar* left intact the "restrictive" pleading requirements for "causation theor[ies] based on market revelation of the fraud"—*i.e.*, corrective disclosures—of the type Plaintiffs rely here.  *First Solar*, 881 F.3d at 753, at *3; *Rok v. Identiv, Inc.*, 2018 WL 807147, at *8 (N.D. Cal. Feb. 9, 2018).[19]

---

[19]  Plaintiffs recognize that they are proceeding under a "corrective disclosure" theory, Opp. 29; ¶¶ 333-342, but now claim that they are also asserting a "materialization of risk" theory.  Opp. 28 n.34 (citing ¶¶ 332-334).  The paragraphs from the Complaint that Plaintiffs cite in support of this proposition, however, merely append conclusory language, with no factual support, that unspecified alleged "*disclosures* … revealed some of the business conditions concealed by defendants' fraudulent scheme and the concealed materialization of risks to its operations." ¶ 334.  Although the "'materialization of the risk' approach has not been [explicitly] adopted by the Ninth Circuit," *Eng v. Edison Int'l*, 2018 WL 1367419, at *2-3 (S.D. Cal. Mar. 16, 2018), courts that have recognized the theory have held that a plaintiff may not employ conclusory allegations to plead

Gibson, Dunn &
Crutcher LLP

### 1.   Plaintiffs Fail To Plead Loss Causation With Respect To The March Declines.

In its Motion, Facebook demonstrated that Plaintiffs fail to plead a credible loss causation theory based on the allegedly "corrective" disclosures in March 2018 because Plaintiffs do not establish that any of those disclosures revealed the "truth," or even related back to any particular alleged misstatement made by Facebook.   OB 27-30.   Plaintiffs rely on the same flawed approach in their Opposition.   Opp. 29 (citing, for example, ¶¶ 337-339 for the proposition that "Facebook's privacy protections were not as robust as represented").

Plaintiffs fail to trace their claimed loss back to "the very facts about which the defendant lied." *Nuveen*, 730 F.3d at 1119-21.   Plaintiffs argue that the March 2018 articles on which they rely provide "some evidence that [Facebook's privacy practices] may not have been as 'ample' as [Facebook] had made [them] seem."   *Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543, 546 (9th Cir. 2018) (citing *First Solar*, 881 F.3d at 753)).   But nothing in the articles cited "blame" the March 2018 stock movements on any "previous statement" by Facebook.   *Id.*   The news articles following the stock drop do not articulate that theory—they at most express frustration that Facebook's controls did not stop Cambridge Analytica from misusing user data.   *See Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).

Plaintiffs do not explain how any of these "revelations," taken alone or collectively, show any particular Facebook statement to be fraudulent.   *See Apollo*, 774 F.3d at 608 (rejecting loss causation theory because it was "unclear what claims" made by defendants were invalidated by alleged disclosures).   Plaintiffs do not make this connection because they cannot.   None of the news articles Plaintiffs rely upon suggest that Facebook committed a fraud.   And none describe a particular Facebook statement or omission as false or misleading.   *See, e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d 1128, 1135 (S.D. Cal. 2018) (holding that corrective disclosures must "relate back to the misrepresentation and not to some other negative information about the company).   Because this "critical link is missing," Plaintiffs "invit[e] the court to assume that the misrepresentations account"

---

adequately a "materialization of risk."   OB 26; *see, e.g.*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 176 (2d Cir. 2005) (similar materialization of risks allegation was "a legal conclusion; missing are the necessary allegations of fact to support the conclusion").

Gibson, Dunn &
Crutcher LLP

for the losses, and not other plausible explanations such as, for example, Cambridge Analytica's false representation that the user data it obtained had been destroyed. *See Nuveen*, 730 F.3d at 1121.[20]

Plaintiffs nevertheless contend that the disclosures revealed *new* information, but none withstand even cursory scrutiny. Plaintiffs, for example, assert that the articles revealed that Facebook did not disclose "Kogan's violations" or "inform the affected users" in 2015. Opp. 30. But Plaintiffs do not dispute that Kogan's and Cambridge Analytica's actions were public knowledge in 2015 (and were discussed again by the media in 2016 and 2017). *See* OB 28; *e.g.*, Ex. 13.[21] Plaintiffs similarly point to an assertion in one news article that Facebook had not before "acknowledged" the "data leak." Opp. 30. Plaintiffs are wrong again. Facebook told *The Guardian* in December 2015 that it was investigating the allegations, and that if it found violations of Facebook policies, it would require destruction of "all improperly collected data." Ex. 13. That is exactly what Facebook did; Cambridge Analytica just allegedly lied about deleting the data. Finally, Plaintiffs cite a number of "analysts, journalists, Facebook insiders, and others" for the proposition that "[t]hese knowledgeable market participants viewed the March disclosures as new, material and troubling." *See* Opp. 30-31. But even if true, these allegations say nothing about any allegedly false or misleading statement *by Facebook*, as Plaintiffs are required to plead under the PSLRA.

## 2. Plaintiffs Fail To Plead Loss Causation With Respect To The July Decline.

In their opening brief, Defendants demonstrated that Plaintiffs' loss causation allegations with the respect to the July 26, 2018 stock price drop are, if anything, even more deficient because (1) Facebook's earnings announcement, which did not even mention Cambridge Analytica or any other

---

[20] Facebook does not "contend that 'the announcement of an investigation is insufficient to plead loss causation'" in all circumstances. *Contra* Opp. 29 n.36. The Ninth Circuit has made clear that "the announcement of an investigation, 'standing alone and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure.'" *Lloyd*, 811 F.3d at 1209-10 (quoting *Loos*, 762 F.3d at 890 n.3)). Thus, the FTC investigation, standing alone, does not show loss causation. *See* ¶ 340. And in any event, there has been no "subsequent corrective disclosure" because that investigation is ongoing. *Id.*; *see Magro v. Freeport-McMoran Inc.*, 2018 WL 3725781, at *9 (D. Ariz. Aug. 3, 2018).

[21] Plaintiffs mischaracterize Facebook's loss causation argument as merely "a 'truth on the market' defense." Opp. 30. To plead loss causation under a corrective disclosure theory, it is Plaintiffs' burden to establish that the alleged "corrective disclosures ... present facts to the market that are new, that is, publicly revealed for the first time." *Rok v. Identiv, Inc.*, 2017 WL 35496, at *18 (N.D. Cal. Jan. 4, 2017).

Gibson, Dunn &
Crutcher LLP

privacy issue, did not correct any alleged prior misstatement or omission of material fact (OB 30-31); (2) Plaintiffs did not demonstrate a proximate causal connection between the price drop following the earnings announcement and any alleged fraud, as opposed to disappointing news about Facebook's finances (*id.* at 31-32), and (3) Facebook's stock price movements in the months immediately preceding the July 26, 2018 stock price drop affirmatively *undermine* Plaintiffs' loss causation theory (*id.* at 32-33). In short, Defendants demonstrated that the absence of some "plausible explanation why it was … [the alleged fraud] that substantially caused stock prices to fall" requires dismissal. *See Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 4585753, at *6 (N.D. Cal. Sept. 2, 2016); OB 27, 29-31, 33.

In response, Plaintiffs make two meritless arguments. *First,* Plaintiffs contend that because Facebook reported "reduced user engagement and increased expenses," the earnings announcement *must* have disclosed new information relating to Cambridge Analytica and Facebook's purported "fraud." *See* Opp. 31-32.[22]  Plaintiffs, however, do not dispute the fact that several months before, Facebook had accurately warned investors that implementation of the GDPR could have a negative impact on Facebook's revenue growth and user engagement and that "investors [should] expect full-year 2018 expenses to grow 50%-60%." *See* OB. 31. Nor do Plaintiffs contend that anything was disclosed on the earnings call relating to Cambridge Analytica or any other privacy incident alleged in the Complaint. *Id.* at 30-31. Instead, Plaintiffs make an absurd argument that, because Mr. Zuckerberg and Ms. Sandberg mentioned the word "privacy" during Facebook's earnings call, it necessarily follows that Facebook "admi[tted]" that Cambridge Analytica was the "condition[] that contributed to the unexpectedly poor quarterly results," and therefore the stock drop revealed relevant new information. *See* Opp. 32 (headlining Mr. Zuckerberg's statement, "'I also want to talk about **privacy**.'" (emphasis in original)). This is obviously wrong; talking about a new privacy law that impacted the entire industry (GDPR) and saying that the company continues to invest in privacy, Ex. 12 at 2, is not

---

[22] Facebook *does not* contend that "loss causation cannot be established by a price decline following an earnings announcement." Opp. 33. A plaintiff may show "that the stock price fell upon the revelation of an earnings miss," *First Solar*, 881 F.3d at 754, but the plaintiff must still allege facts that show that *fraud* by the defendant caused that loss. *See Apollo*, 774 F.3d at 607; *Lentell*, 396 F.3d at 177-78.

REPLY IN SUPPORT OF MOTION TO DISMISS
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn & Crutcher LLP

1    an implied admission that Cambridge Analytica—or some specific matter related to it—was the

2    proximate cause of an alleged earnings miss.[23]

3        *Second*, Plaintiffs claim that the Ninth Circuit's decision in *First Solar* renders inapposite the

4    bevy of cases, such as *Metzler*, 540 F.3d 1049, 1065 (9th Cir. 2008), in which courts have rejected

5    remarkably similar loss causation theories—where the "far more plausible reason" for a stock drop was

6    a company's failure to "hit prior earnings estimates," and not fraud.  Opp. 33 & n.41.  Plaintiffs are

7    wrong.  Even where a plaintiff advances a "materialization of the risk" loss causation theory, and even

8    where some risk ultimately materializes, a plaintiff still must show that a "statement Defendants made

9    was indeed a misstatement or an omission concealing" that risk.  *Magro*, 2018 WL 3725781, at *9; *see*

10   *Lentell*, 396 F.3d at 176-77.  In other words, Plaintiffs still must show fraud, and a causal connection

11   between the loss and that fraud.  *See Brown v. Ambow Educ. Holding Ltd*., 2014 WL 523166, at *5

12   (C.D. Cal. Feb. 6, 2014) (the market must not simply react to "reports of the defendant's poor financial

13   health generally").  Plaintiffs here neglect to do so.[24]

14       Plaintiffs contend that the cases Facebook cited in its opening brief (OB 31-32) are inapposite

15   because here the July stock drop is "plausibly alleged to have resulted from conditions concealed by

16   fraud."  Opp. 33.  As proof, Plaintiffs fall back on their refrain that some journalists connected the

17   Cambridge Analytica controversy to the July 2018 stock drop.  *Id.* at 31-32.  But, again, none of these

18   articles suggest that any Facebook statement or omission was fraudulent, nor that any such fraud caused

---

[23]  Plaintiffs also reference news articles claiming that the stock drop was novel because it was "among the first signs" that "issues had pierced the company's image."  Opp. 31.  But these reporters were merely reacting to the fact that Facebook's *stock price* had significantly dropped—not the underlying metrics themselves.  *See, e.g., id.* at 32 ("Facebook Takes Historic Plunge as Scandals Finally Take a Toll").  In any event, the articles do not suggest that Facebook committed any fraud.  Analyst opinions "cannot reveal to the market the falsity of … misrepresentations," *Bonanno v. Cellular Biomedicine Grp., Inc*., 2016 WL 2937483, at *5 (N.D. Cal. May 20, 2016), and "market speculation about whether fraud has occurred … cannot form the basis of a viable loss causation theory," *see Loos*, 762 F.3d at 890.

[24]  Plaintiffs further misstate the holding in *First Solar* by asserting that it stands for the proposition that the Plaintiffs need not show any "revelation of fraud."  Opp. 33 n.41.  The court in *First Solar* made clear that loss causation may be proven upon an earnings miss, "even if the market was unaware *at the time* that fraud had concealed the miss … [and] [f]raud simply causes a delay in the revelation of those facts."  881 F.3d at 754.  The court therefore did not jettison the requirement that fraud, at some juncture, must be disclosed.  Here, Plaintiffs allege no later disclosure showing that any materialized risk was concealed by fraud.

Gibson, Dunn &
Crutcher LLP

the stock drop.  *See Nuveen*, 730 F.3d at 1123; *Metzler*, 540 F.3d at 1059, 1063 (loss causation theory rejected where announcements had not "disclosed—or even suggested—[fraudulent activities] to the market").  Indeed, Plaintiffs do not deny that these same articles connected the earnings drop to a confluence of factors *other than* Cambridge Analytica.  *See* OB 33 n.19.

Plaintiffs, moreover, ignore entirely the material and judicially noticeable fact that the market price of Facebook's stock rebounded between March 2018, when Plaintiffs contend the market first learned of the alleged fraud, and July 2018.  The fact that Facebook's stock price not only rebounded, but reached record highs, before the July 2018 earnings announcement undermines Plaintiffs' loss causation theory.  OB 32-33.  Plaintiffs instead restate their nonsensical argument that Facebook's positive first quarter metrics—in which revenues, earnings, and user engagement metrics met or exceeded expectations—were somehow fraudulent without actually being false.  *See* Opp. 31 (the "1Q18 earnings report … appeared to validate Defendants' assertions that the scandal had not impacted user trust or engagement").  Plaintiffs have failed to plead loss causation with respect to the July decline.

## D.     Plaintiffs Fail To Plead Reliance.

Plaintiffs' argument that they are entitled to a presumption of reliance, Opp. 33, ignores that the market became aware of Cambridge Analytica's misappropriation of Facebook user data in 2015, *see* Section C.  Plaintiffs are wrong that it is "premature" to consider whether they are entitled to the presumption of reliance.  Opp. 33.  Courts routinely consider this issue on a motion to dismiss.  *See, e.g.*, *In re Kalobios Pharm., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1007-11 (N.D. Cal. 2017) (rejecting fraud-on-the-market presumption at motion to dismiss stage).  Plaintiffs also are not entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), which applies only in cases where, unlike here, Plaintiffs "primarily allege[] omissions."  *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999).  To the extent Plaintiffs allege omissions at all, *Affiliated Ute* is inapplicable because "the only alleged omission[s] [are] of the truth that [the] affirmative misstatement[s] [allegedly] misrepresent[]."  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2018 WL 1142884, at *5 (N.D. Cal. Mar. 2, 2018).

1   **E.      Plaintiffs Fail To State A Claim For Control Person Liability.**

2           Plaintiffs' inability to state a Section 10(b) or Rule 10b-5 claim requires dismissal of their

3   Section 20(a) and 20A claims.  *See* OB 35.  Plaintiffs also challenge arguments that Defendants never

4   made, Opp. 35, but tellingly fail to contest (and thus concede) the argument that Defendants did make:

5   that Facebook cannot be a control person of the Individual Defendants.  *See* OB 35 n.20.

6                                    **III.      CONCLUSION**

7           For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint

8   with prejudice.

9   DATED:  March 25, 2019                    GIBSON, DUNN & CRUTCHER LLP

10                                    By:      /s/ *Orin Snyder*
11                                             Orin Snyder
                                               200 Park Avenue
12                                             New York, N.Y. 10166-0193
                                               Tel: 212.351.4000
13                                             Fax: 212.351.4035
                                               osnyder@gibsondunn.com
14
                                               Joshua S. Lipshutz
15                                             1050 Connecticut Avenue, N.W.
                                               Washington, D.C. 20036-5306
16                                             Tel:  202.955.8500
                                               Fax:  202.467.0539
17                                             jlipshutz@gibsondunn.com
18
                                               Kristin A. Linsley
19                                             Brian M. Lutz
                                               555 Mission Street
20                                             Suite 3000
                                               San Francisco, CA 94105-0921
21                                             Tel: 415.393.8200
                                               Fax: 415.374.8306
22                                             klinsley@gibsondunn.com
                                               blutz@gibsondunn.com
23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Paul J. Collins
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel:  650.849.5300
Fax:  650.849.5333
pcollins@gibsondunn.com

*Attorneys for Defendants Facebook, Inc.,
Mark E. Zuckerberg, Sheryl K. Sandberg,
and David M. Wehner*

REPLY IN SUPPORT OF MOTION TO DISMISS
CASE NO. 5:18-CV-01725-EJD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn & Crutcher LLP

## **CERTIFICATE OF SERVICE**

I, Orin Snyder, declare as follows:

I am employed in the County of New York, State of New York, I am over the age of eighteen years and am not a party to this action; my business address is 200 Park Avenue, New York, NY 10166-0193, in said County and State.

I hereby certify that on March 25, 2019, the foregoing **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** was filed with the Clerk of the Court via CM/ECF.  Notice of this filing will be sent electronically to all registered parties by operation of the Court's electronic filing systems.

DATED: March 25, 2019                    By:    /s/ *Orin Snyder*
                                                          Orin Snyder