ROBBINS GELLER RUDMAN
   & DOWD LLP
DENNIS J. HERMAN (220163)
JASON C. DAVIS (253370)
KENNETH J. BLACK (291871)
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
dherman@rgrdlaw.com
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

BERNSTEIN LITOWITZ BERGER &
   GROSSMANN LLP
JOHN C. BROWNE
JEREMY P. ROBINSON
KATE W. AUFSES
1251 Avenue of the Americas
New York, NY  10020
Telephone:  212/554-1400
212/554-1444 (fax)
johnb@blbglaw.com
jeremy@blbglaw.com
kate.aufses@blbglaw.com

Co-Lead Counsel for the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re FACEBOOK, INC. SECURITIES LITIGATION<br><br>_____<br><br>This Document Relates To:<br><br>    ALL ACTIONS.<br><br>_____ | Master File No. 5:18-cv-01725-EJD<br><br>CLASS ACTION<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

1

**TABLE OF CONTENTS**

2

**Page**

3  I.     INTRODUCTION .................................................................................1

4  II.    PARTIES ..........................................................................................11

5       A.    Plaintiffs..................................................................................11

6       B.    Defendants ..............................................................................12

7  III.   JURISDICTION AND VENUE .........................................................14

8  IV.   BACKGROUND AND OVERVIEW OF DEFENDANTS' FRAUD SCHEME............14

9       A.    Facebook's Business ...............................................................14

10           1.    Facebook's Business Depends on Monetizing User Data ........................15

11           2.    Facebook's Success Depends On User Trust, Which Defendants
12                    Cultivated By Stating Users Controlled Their Data ..................................17

13      B.    In 2012, Facebook Agreed to an Extraordinary 20-Year FTC Consent
              Decree Due To Repeated Failures to Protect User Privacy ...................18
14

15      C.    Defendants Immediately Violated The FTC Consent Decree By
              Continuing To Secretly Share User Friends' Data ...............................21

16           1.    Reciprocity: Facebook Gave Third Parties Access To User
17                    Friends' Data In Exchange For Data, Money Or Other Business
18                    Benefits .....................................................................................21

19           2.    Facebook's Internal Documents Confirm Defendants' Decision To
                      Exchange Data For Reciprocal Value.......................................23

20      D.    In April 2014, Defendants Stated That Third Party Access To User
21            Friends' Data Would Not Be Allowed But Secretly Continued To Give
              That Information To Millions Of Third Parties ....................................26
22

23      E.    In 2015, Defendants Learned that Data from Tens of Millions of Users
              Had Been Sold to Cambridge Analytica in Violation of Facebook's Terms
24            of Use .......................................................................................28

25      F.    The Information Sold To Cambridge Analytica Was Taken From
              Facebook *After* Defendants Claimed That Third-Party Access To Users'
26            Friends' Data Had Been Shut Down...........................................32

27      G.    During the Class Period, Defendants Made False Statements Regarding
              User Data Control, Risks To Facebook And  Compliance With The 2012
28            FTC Consent Decree.......................................................33

Page

1.    Defendants Falsely Stated That Users Controlled Their Data ...................34

2.    As the SEC Found, Facebook Made Materially False Statements About The Risks Facing The Company Due To The Cambridge Analytica Scandal ......................................................................................42

3.    Defendants Falsely Stated That Cambridge Analytica Did Not Have User Data And That Facebook Believed That Cambridge Analytica "Did Nothing Wrong" ...............................................................49

4.    Defendants Made False Statements Regarding Their Response To The Cambridge Analytica Misconduct ......................................................51

5.    Defendants Made Materially False And Misleading Statements Regarding their Compliance With the FTC Consent Decree ....................56

H.    Facebook's Failure to Respond to the Cambridge Analytica Breach in a Manner Consistent with Its Prior Public Statements Is Revealed, Causing Massive Economic Losses to the Class ................................................................58

1.    Facebook's Privacy Misconduct Sparked Numerous Government Investigations ........................................................................................63

2.    The U.K. Information Commissioner's Office ..........................................64

3.    Defendants Admit Fault for the Cambridge Analytica Privacy Failure .....................................................................................................65

I.    Defendants Recklessly and Falsely Assured Investors that the Cambridge Analytica Scandal Had Not Affected Facebook's User Engagement or Financial Results, Reinflating Facebook's Stock Price .....................................69

1.    Defendants Tout Facebook's 1Q18 Results as Demonstrating Users Were Unconcerned with the Cambridge Analytica Scandal ...........70

2.    Zuckerberg Falsely Assures Investors that European Privacy Regulations Are Not Impacting the Business .............................................73

3.    Defendants Continued to Falsely Downplay Reports of Privacy Risks Ahead of Facebook's 2Q18 Earnings Release ................................76

J.    Facebook's 2Q18 Financial Results Reveal the Huge Impact the Data Privacy Scandal Had on Facebook's User Engagement, Advertising Revenues and Earnings, Leading to a Stunning $100 Billion Loss in Facebook's Value ...............................................................................................78

K.    Facebook's Class Period False Statements Reflect The Anti-Privacy Corporate Culture That Has Always Existed At Facebook ..................................82

Page

V.  FACTS REVEALED THROUGH RECENT REGULATORY ACTIONS, INVESTIGATIONS AND OTHER PROCEEDINGS HAVE FURTHER CONFIRMED DEFENDANTS' DELIBERATE MISCONDUCT DURING THE CLASS PERIOD .................................................................................................88

    A.  Defendants' Liability For Securities Fraud Is Confirmed In Actions Filed By The SEC And the FTC .......................................................................................89

        1.  Facebook Paid $100 Million Dollars To Settle SEC Charges That Facebook Committed Securities Fraud ......................................................89

        2.  Facebook Paid A Record-Setting $5 Billion Dollar Penalty To Settle FTC Charges That Facebook Violated User Privacy and the FTC Consent Decree ...............................................................................92

    B.  Defendants' Privacy Violations And Misuse Of User Data Are Confirmed By Multiple Courts Nationwide ...................................................................97

        1.  Another Court In This District Has Sustained Claims Against Facebook For Improperly Sharing Users' Personal Information With Third Parties ....................................................................................97

        2.  The Court Of Chancery Of The State Of Delaware .................................99

        3.  The Superior Court of the District of Columbia .....................................101

    C.  Defendants' Privacy Violations And Misuse Of User Data Are Confirmed In Multiple Investigations By Other Nations ...........................................101

        1.  United Kingdom's House of Commons Digital, Culture, Media and Sport Committee .................................................................................101

        2.  Joint Investigation of Facebook, Inc. by the Privacy Commissioner of Canada and the Information and Privacy Commissioner for British Columbia ..................................................................................102

    D.  Post-Class Period Events Confirm Defendants' Privacy Violations And Misuse Of User Data During The Class Period ....................................102

        1.  Defendants' Internal Investigation Reveals That "Tens of Thousands" Of Apps Abused User Data ..................................................102

        2.  Defendants Revise Facebook's Business Model To Respect Privacy And Reverse Their Prior Privacy Abuses ...................................104

VI.  MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE WITH SCIENTER DURING THE CLASS PERIOD .................106

A.   Defendants Made Materially False and Misleading Statements Concerning Facebook Users' "Control" Over Their Data..........................................106

B.   Defendants Made Materially False and Misleading Statements About Respecting Users' Privacy Settings ......................................................112

C.   Defendants Made Materially False and Misleading Statements Concerning Risks to Facebook's Business ...............................................................113

D.   Defendants Made Materially False and Misleading Statements Concerning The Results Of Facebook's Investigation Into Cambridge Analytica's Data Misuse ...............................................................................................119

E.   Defendants Made Materially False and Misleading Statements Concerning Facebook's Response To Instances Of Data Misuse ...........................121

F.   Defendants Made Materially False And Misleading Statements Concerning Facebook Users Consenting To, Or Knowingly, Providing Their Information To Kogan..................................................................125

G.   Defendants Made Materially False and Misleading Statements Concerning Facebook's Compliance With The 2012 FTC Consent Decree..........127

H.   Defendants Made Materially False and Misleading Statements Concerning Notifying Facebook Users Whose Accounts Were Compromised Or At Risk Of Being Compromised ..............................................................132

I.   Defendants Made Materially False and Misleading Statements Concerning Facebook's GDPR Compliance ........................................................134

J.   Defendants Made Materially False and Misleading Statements Concerning Use of Facebook's Platform to Influence Elections ...........................134

K.   Defendants Made Materially False and Misleading Statements Concerning DAU and MAU Metrics....................................................................137

L.   Defendants Made Materially False and Misleading Statements Concerning Facebook's 1Q18 Financial Results and the Impact of the Privacy Disclosures on Facebook's Business .................................................140

M.   Defendants Made Materially False and Misleading Statements That Facebook Does Not "Sell" Users' Data ...........................................149

N.   Additional False and Misleading Statements...................................153

    1.   Statements in Facebook's September 29, 2016 Privacy Policy..............154

    2.   Statements in Facebook's February 3, 2017 10-K Report......................157

1

Page

2          3.     Additional Statements in Facebook's March 16, 2018 Post ...................159

3          4.     Statements on Facebook's April 4, 2018 Telephonic Press
                  Conference .................................................................................160
4

5  VII.   ADDITIONAL SCIENTER ALLEGATIONS ..................................................162

6     A.    Zuckerberg's $5.3 Billion Aggregate Sales ...........................................166

7     B.    Sandberg's $389 Million Insider Sales ..................................................170

8     C.    Wehner's $21 Million Insider Sales .......................................................172

9  VIII.  ADDITIONAL ALLEGATIONS OF RELIANCE, MATERIALITY, LOSS
         CAUSATION AND DAMAGES ......................................................................172
10
      A.    Market Efficiency ...................................................................................172
11
      B.    Loss Causation and Damages .................................................................174
12

13  IX.    CLASS ACTION ALLEGATIONS ..................................................................181

14  X.     CLAIMS FOR RELIEF ....................................................................................183

15  XI.    PRAYER FOR RELIEF ....................................................................................188

16  XII.   JURY DEMAND ...............................................................................................189

17

18

19

20

21

22

23

24

25

26

27

28

Lead Plaintiff Amalgamated Bank, as Trustee for the Long View LargeCap 1000 Growth Index Fund, LongView Quantitative LargeCap Fund, and LongView Quant LargeCap Equity VEBA Fund ("Amalgamated"), and Public Employees' Retirement System of Mississippi ("Mississippi," and, together with Amalgamated, "Lead Plaintiffs"), by and through their respective undersigned attorneys, on behalf of themselves and the Class (as defined below) of investors in the publicly-traded common stock of Facebook, Inc. ("Facebook" or the "Company"), allege the following in support of their claims for violation of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder against Facebook and certain of its officers and directors.[1]

I.    INTRODUCTION

1.      This securities class action arises from defendants' materially false and misleading statements and omissions concerning Facebook's privacy and data protection practices and the impact of defendants' misconduct on Facebook's business and financial condition.  It is brought on behalf of all persons who purchased Facebook common stock between February 3, 2017 and July 25, 2018, inclusive (the "Class Period"), against Facebook and three of its officers and/or directors: Chief Executive Officer ("CEO") Mark Zuckerberg, Chief Operating Officer ("COO") Sheryl K. Sandberg and Chief Financial Officer ("CFO") David M. Wehner (collectively, "defendants").  When the full truth concerning defendants' misrepresentations was revealed, including misconduct that Zuckerberg has admitted was a "major breach of trust,"[2] Facebook's stock price declined precipitously, causing the loss of billions of dollars in shareholder value.

---

[1] This Second Amended Complaint is filed pursuant to the Court's September 25, 2019 Order (ECF No. 118).  In amending their complaint, Plaintiffs reserve all rights and allegations under their prior complaint.  Nothing herein is intended to waive, in whole or in part, any previously asserted claims, arguments or allegations.  Except as to allegations concerning themselves and their transactions in Facebook stock, Plaintiffs allegations are based on an investigation conducted by Lead Counsel, including: (i) review of the Company's filings with the SEC and other government agencies; (ii) information on the Company's website and in media and analyst reports and other public statements; and (iii) information from other sources believed to be reliable, as described herein. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

[2] F8 2018 Developer Conference Tr. at 9 (May 1, 2018).

2.       Facebook derives virtually all of its revenue from monetizing the personal information – data – that it collects from the users of its social media platforms.  It does so through the sale of "targeted advertising" that is based on Facebook users' personal information, including their online activities, the pages they visit, the posts they "liked," and the people they "friended." While Facebook users generally understood that the Company was using their personal data in order to tailor the ads that they would see, they trusted Facebook to keep that personal data private, not to share it directly with third parties, and to act in accordance with defendants' public statements regarding Facebook's protection of user privacy and user control over data. Defendants frequently acknowledged that maintaining from Facebook's users' trust was critical to the Company's continued growth and financial success.

3.       Unbeknownst to users – and investors – their trust in Facebook was misplaced.  In contrast to defendants' public statements, Facebook was deliberately sharing user data with hundreds of third parties, including third party app developers and multi-national corporations such as Apple, Amazon, Blackberry, Microsoft and Samsung, who had been "whitelisted" for access to users' data.  As another court has already found, Facebook did not "come close to disclosing [this] massive information-sharing program," and users did not consent to this use of their data.  *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 2019 WL 4261048, at *14 (N.D. Cal. Sept. 9, 2019) (the "Consumer Case").

4.       During the Class Period, defendants knew or willfully blinded themselves to the fact that sensitive user information for approximately 87 million Facebook users had been provided to a third-party political consulting firm called Cambridge Analytica, and remained at risk of being used and abused.  Indeed, the data was misused by Cambridge Analytica to build psychological profiles of Facebook users that became the basis for political advertising designed to trigger some of the worst characteristics in people, such as paranoia and racial bias.

5.      On December 11, 2015, *The Guardian* reported that Cambridge Analytica may have obtained Facebook user data for use in political campaigns.[3]  Defendants responded to the article with feigned surprise and assured users, investors, regulators and the public that they would "require" any compromised data to be deleted, that violators would be punished, and that it would swiftly halt any misuse of its users' data.  For example, a Company spokesman told *The Guardian*: "[W]e will take swift action against companies that [violate Facebook's privacy policies], including banning those companies from Facebook and requiring them to destroy all improperly collected data."  Facebook would use variations of this statement over and over thereafter, including during the Class Period, whenever questions were raised about users' control over their data or Facebook's ability to protect its users' data.

6.      Behind the scenes, however, Facebook's primary concern was minimizing the public relations fallout from the scandal.  Facebook did not publicly confirm that Cambridge Analytica had obtained user data (to the contrary, as discussed below, during the Class Period Facebook was still pointing to statements on Cambridge Analytica's website stating that Cambridge Analytica did *not* use Facebook data).  Nor did defendants reveal that just before *The Guardian* story broke, Facebook had hired the co-founder of Global Science Research ("GSR"), the company that had funneled the user data to Cambridge Analytica, and put him to work at Facebook's Menlo Park headquarters, where he remained employed throughout the Class Period.

7.      In the wake of *The Guardian* article, Facebook did not try to retrieve the compromised data in order to understand what had been taken, and did not even try to confirm whether the data was deleted until six months later, after news reports raised concerns about Cambridge Analytica's interference in the British Brexit vote.  Even then, Facebook did nothing but rely on a few unverified (and demonstrably false) oral and written statements from GSR and Cambridge Analytica that they had deleted the user data, with the final such statement not being received until April 2017.

---

[3] Harry Davies, *Ted Cruz using firm that harvested data on millions of unwitting Facebook users*, Guardian (Dec. 11, 2015), https://tinyurl.com/kctlw6n.

8.       Facebook did not notify the public or government regulators of the lost data, or alert the users whose data had been compromised.  In addition, because the data provided to Cambridge Analytica was in a format that was easily shared with others, defendants knew that the representations of GSR and Cambridge Analytica, even if reliable (and they were not), were insufficient to assure that the user data was not still at risk of being misused.  Zuckerberg later acknowledged his responsibility for these failures, admitting "we didn't do enough," which was a "huge mistake [and] [i]t was my mistake."[4]

9.       Since this action was commenced, additional facts have been revealed demonstrating that defendants could not reasonably rely upon the bare assertions of GSR and Cambridge Analytica.  Newly uncovered documents show that as early as September 2015, Facebook personnel were referring to Cambridge Analytica as "sketchy (to say the least)," and that in 2015 Facebook determined that both GSR and Cambridge Analytica had violated Facebook's terms of use.  It has also been revealed that Facebook learned that both GSR and Cambridge Analytica had repeatedly lied to Facebook regarding the scope and type of user data they possessed.  And internally, Facebook ignored multiple red flags revealing that the Cambridge Analytica data was still being used by Cambridge Analytica itself to develop political advertisements that it placed on Facebook, leaving no doubt that the data had not been deleted and the certifications to the contrary were incorrect.  *See* Section IV.G.4.

10.      There is no dispute that by December 2015 defendants knew that significant amounts of sensitive user data had been transferred to third parties in violation of its stated policies.  Defendants also knew that this created huge – and undisclosed – risks for the Company.  Facebook's ability to generate revenue depended on users' willingness to post – and share – data on which ads were based.  If user engagement declined, or if users became less willing to share their data, Facebook's ability to generate revenue would diminish.  And the number one thing that could cause users to disengage or refuse to share their data was a lack of trust that the

---

[4] Toby Shapshak, '*It Was My Mistake' Zuckerberg Admits, While Facebook 'Didn't Do Enough To Prevent Abuse'*, Forbes (Apr. 4, 2018), https://tinyurl.com/y83cjlp3.

1  Company was protecting their information.  Zuckerberg himself has admitted that "the No. 1

2  thing that people care about is privacy and the handling of their data.[5]

3      11.   Despite their knowledge of these risks, defendants decided to conceal and deny

4  them in public statements, including in documents filed with the Securities Exchange

5  Commission ("SEC") during the Class Period.  In their periodic SEC filings, defendants set forth

6  a number of "risk factors," including the risk of harm to Facebook's business if third parties

7  obtained user data.  Facebook, however, described these risks as merely hypothetical, stating that

8  "*if* developers fail to adopt or adhere to adequate data security practices . . . our users' data *may*

9  *be* improperly accessed" and *"if"* that happened there *"could"* be harm to Facebook's business.

10  In reality, defendants knew that these risks were not hypothetical because they knew that multiple

11  third parties – not just Cambridge Analytica – had *in fact* improperly gained access to user data

12  and used it in ways not authorized by those users.  *See* Section IV.G.2.

13      12.   Defendants' reinforced their false and misleading risk disclosures through other

14  misrepresentations during the Class Period.  In February and March 2017, defendants responded

15  to press inquiries regarding the status of their "investigation" into Cambridge Analytica by (i)

16  referring reporters to Cambridge Analytica's website statement that it supposedly "does not use

17  data from Facebook," and (ii) telling reporters that Facebook's "investigation to date [into

18  Cambridge] had not uncovered anything that suggests wrongdoing."  These statements were false.

19  As Zuckerberg later admitted, Facebook had known since 2015 that Cambridge Analytica used

20  data from Facebook and had done so in violation of Facebook's policies.  *See* Section IV.G.3.

21      13.   On July 24, 2019, following an investigation that lasted more than a year, the SEC

22  announced a $100 million settlement with Facebook over charges that the Company had made

23  materially false and misleading risk disclosures in its filings with the SEC, including from the

24

25

26

---

27  [5] Kara Swisher and Kurt Wagner, *Here's the transcript of Recode's interview with Facebook CEO

28  Mark Zuckerberg about the Cambridge Analytica controversy and more*, Recode (Mar. 22, 2018), https://tinyurl.com/ycy5zuru.

1    start of the Class Period until at least March 2018.[6]  *See* Complaint, *SEC v. Facebook, Inc.*, 3:19-

2    cv-04241-JD (N.D. Cal. July 24, 2019), ECF No. 1 (the "SEC Complaint").  The SEC concluded

3    that "Facebook knew, or should have known, that its Risk Factor disclosures in its annual reports

4    . . . and in its quarterly reports . . . were materially misleading. "[7]  These materially false statements

5    acted as a "fraud or deceit upon purchasers" of Facebook stock during the Class Period.[8]

6         14.    Defendants also made representations regarding the privacy and security of user

7    data on Facebook during the Class Period.  For example, defendants assured the public that

8    Facebook users had control of their data and Facebook was not sharing sensitive user data with

9    third parties.  *See, e.g.*, Section IV.G.1 (Sandberg:  ***"you are controlling who you share with***";

10   Zuckerberg: when you share on Facebook "***you have complete control*** over who sees it and how

11   you share it"); *see also* Section VI.A.  These statements were materially false and misleading.  In

12   reality, users had no control over their data because behind the scenes Facebook was engaged in

13   a "massive information-sharing program" that was deliberately concealed from users and

14   investors, who did not begin to learn the truth until March 2018.  Consumer Case, 2019 WL

15   4261048, at *14.

16        15.    Remarkably, Facebook engaged in these activities for years (including throughout

17   the Class Period) even though Zuckerberg had assured users on April 30, 2014 that Facebook

18   would stop allowing third parties to collect data about users' friends, which Facebook stated in a

19   press release was "a really important step for giving people power and control over how they

20   share their data with apps" and gave people "more control over their data."[9]  In contrast to

21   Zuckerberg's promises, the data of more than 87 million people that was ultimately transferred to

22

23   ───────────────
     [6] Press Release, *Facebook to Pay $100 Million for Misleading Investors About the Risks It Faced
24   From Misuse of User Data*, Securities & Exchange Commission (July 24, 2019),
     https://tinyurl.com/wyz5j65.

25   [7] *See* SEC Complaint at ¶44; *see also id.* at ¶¶47-49 (Facebook made misleading statements to
26   the press in February and March 2017).

     [8] *Id.* at ¶53.
27
     [9] Complaint for Civil Penalties, Injunction, and Other Relief, *United States of America v.
28   Facebook*, No. 19-cv-2184 (D.D.C. Jul. 25, 2019), ECF No. 3 (the "FTC Complaint") at ¶98.

1   Cambridge Analytica was collected *after* Zuckerberg and Facebook assured users that third

2   parties such as GSR would no longer be able to obtain users' friends' data.  *See* Section IV.F.

3   16.   Indeed, it has now become clear that defendants' "important" public

4   announcement in April 2014 was an utter sham.  Defendants exempted a wide array of

5   "whitelisted" app developers and corporate giants such as Google, Amazon, Samsung,

6   Blackberry, Huawei (a Chinese technogy company with deep ties to China's government), and

7   Mail.Ru Group (a Kremlin-connected technology conglomerate) from this prohibition on third

8   party access to user friend data.  Defendants allowed these entities and hundreds more to override

9   user privacy settings in order to get this data in secret.  Recently obtained Facebook documents

10  confirm the obvious:  this widespread practice was conceived of, and approved by, Zuckerberg

11  and Sandberg as part of Facebook's "reciprocity" initiative – where Facebook secretly gave third

12  parties access to its trove of user data in exchange for advertising revenues and other valuable

13  business benefits.  *See* Section IV.C.1.

14  17.   On July 24, 2019, the Federal Trade Commission announced a "record-breaking

15  *$5 billion* penalty" against Facebook.[10]  The FTC determined that from prior to the Class Period

16  until at least June 2018, Facebook had violated the 2012 FTC Consent Decree by "*deceiving users*

17  *about their ability to control the privacy of their information*."[11]  The $5 billion FTC penalty

18  against Facebook is unprecedented and historic: it is 18 times greater than the largest ever

19  previously imposed on any company for violating consumers' privacy, and as the FTC noted it is

20  "one of the largest penalties ever assessed by the U.S. government for any violation."[12]  *See*

21  Section V.A.2.

22  18.   In addition to false statements regarding Cambridge Analytica, the risks facing the

23  Company, and the ability of users to control their data, defendants made numerous other false and

24  misleading statements and omissions during the Class Period, including misrepresentations and

25

26  [10] Press Release, *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook*, Federal Trade Commission (July 24, 2019), https://tinyurl.com/y2h458h4.

27  [11] *Id.*

28  [12] *Id.*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                    - 7 -

omissions concerning: (i) the Company's efforts to investigate and contain the data exposed to Cambridge Analytica (*e.g.*, Sections V.D, F); (ii) Facebook's response to other incidents where data had been exposed to third parties or used in violation of user's privacy settings (Sections V.E, H, J, M); (iii) Facebook's compliance with regulatory requirements governing user privacy, including the 2012 FTC Consent Decree (Sections V.G, I); and (iv) the impact of Facebook's privacy violations on its business (Sections V.K, L).

19.     At the same time as defendants were making false statements and concealing material risks from the market they were selling billions of dollars' worth of Facebook shares. During the Class Period, Zuckerberg sold approximately 30,000 Facebook shares for proceeds of more ***$5.2 billion***, while Sandberg sold $389 million worth of Facebook stock and Wehner $21 million.  These sales exceeded defendants' pre-Class Period sales, and included particularly large sales during the first quarter of 2018 – before Facebook's failure to address the Cambridge Analytica breach became public, as did reports of numerous other false statements by the Company regarding privacy, security and user control over data.

20.     On March 17, 2018 *The Guardian* reported that Facebook had delayed taking action to address the Cambridge Analytica data breach, and that Facebook user data was potentially still in the hands of Cambridge Analytica and other third parties.[13]   In an article published the same day, *The New York Times* reported that Facebook's failure to comply with its privacy policies was "one of the largest data leaks in the social network's history."[14]

21.     These disclosures sent shockwaves through the market and caused the price of Facebook's common stock to drop nearly 7% on Monday, March 19, 2018, the first trading day after the news broke.  In the days that followed, the U.S. Congress and British Parliament called

---

[13] Carole Cadwalladr & Emma Graham-Harrison, *Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach*, Guardian (Mar. 17, 2018), https://tinyurl.com/y9yhysal; Carole Cadwalladr (@carolecadwalla), TWITTER (Mar. 22, 2018), https://tinyurl.com/y9l77t5d.

[14] Matthew Rosenberg, Nicholas Confessore & Carole Cadwalladr, *How Trump Consultants Exploited the Facebook Data of Millions*, N.Y. Times (Mar. 17, 2018), https://tinyurl.com/ybj4ulek.

1    for inquiries, multiple former Facebook insiders came forward with accounts of repeated

2    warnings that had been given and ignored by Zuckerberg and other members of management, and

3    calls for users to disengage from the platform – #DeleteFacebook – took off.

4          22.     By March 27, 2018 Facebook's stock was trading as low as $152/share, a drop of

5    nearly 18% in value from its price just before news of the Cambridge Analytica scandal broke,

6    reflecting a loss of more than $100 billion in market capitalization.  A March 2018 report by one

7    of the world's leading corporate governance and proxy advisors, Institutional Shareholder

8    Services ("ISS"), stated that Facebook's "failure to protect its users' privacy has eroded the level

9    of trust among users, calling into question the company's business model and its governance."[15]

10         23.     Meanwhile, defendants embarked on an orchestrated apology tour, repeatedly

11   admitting their failure to protect user privacy or live up to their prior assurances.  These were not

12   mere expressions of regret.  On the contrary, Zuckerberg himself signed full page advertisements

13   in several U.S. and U.K. newspapers conceding that Facebook's response to the Cambridge

14   Analytica data breach was a "***breach of trust***," and apologizing that "we didn't do more at the

15   time."[16]  In other public statements, Zuckerberg took "responsibility" for this breach of trust and

16   told reporters that Facebook's actions in response to the Cambridge Analytica scandal were

17   "clearly a mistake . . . I'm not trying to say it was the right thing to do."

18         24.     Despite their public admissions of fault, defendants rushed to assure investors that

19   the disclosures had only minor impacts on user engagement and would not have a material effect

20   on the Company's financial performance.  For example, Zuckerberg testified to Congress in April

21   2018 that Facebook had seen no dramatic declines in the number of Facebook users and no

22   decrease in user interaction on Facebook whatsoever, and when Facebook reported its results for

23   the first quarter on 2018 on April 25, 2018, defendants said that user activity had increased,

24   advertising effects were *de minimis*, and any incremental spending occasioned by changes the

25

---

26   [15] Oshni Arachchi, *Trouble in Tech: A Crisis of Trust in Social Media*, ISS-Ethix at 3 (Mar. 28
     2018), available for download at https://tinyurl.com/y84p6hjc.

27   [16] Sheena McKenzie, *Facebook's Mark Zuckerberg says sorry in full-page newspaper ads*, CNN
28   (Mar. 25, 2018), https://tinyurl.com/yawxvkga.

1  Company made to address Cambridge Analytica matters were already reflected in the quarterly

2  results.[17]  *See also* Section IV.L (discussing additional false statements).

3       25.      Buoyed by the favorable earnings report for the first quarter of 2018 and the

4  purported lack of financial impact resulting from the Cambridge Analytica scandal, Facebook's

5  stock price immediately climbed by more than 9% following the earnings report.  Facebook's

6  stock price continued to climb thereafter.  By July, Facebook's stock price was trading well above

7  $200 per share.

8       26.      On July 25, 2018, the Company reported its earnings results for the second quarter

9  of 2018, stunning investors when Facebook finally revealed that its privacy misconduct had in

10  fact hit the Company's bottom line and seriously impacted its business.  Defendants reported a

11  significant decline in users in Europe, zero user growth in the United States, decelerating

12  worldwide growth of active users (*i.e.*, those most responsible for generating data used in targeted

13  advertising), lower than expected revenues and earnings, ballooning expenses affecting

14  profitability, and reduced guidance going forward.  All of this was a direct result of the disclosures

15  concerning Facebook's true privacy practices.  Indeed, Zuckerberg opened the July 25, 2018

16  investor conference call by discussing "the investments we've made over the last six months to

17  improve safety, security and privacy across our services," which had "significantly impact[ed]

18  our profitability."[18]

19       27.      Market reaction to the Company's earnings report for the second quarter of 2018

20  and conference call was swift and severe, causing the price of Facebook's common stock to drop

21  by nearly 19% on July 26, 2018, for a staggering single-day loss of approximately $100 billion

22  in market capitalization. This was the ***largest such one-day drop in U.S. history***.  By July 27,

23  2018, Facebook stock had fallen by 21%, shedding approximately $112 billion in market

24  capitalization.  This action seeks to recover for the enormous damages suffered by Facebook

25  investors.

26

27  [17] Q1 2018 Facebook, Inc Earnings Call Tr. at 15 (Apr. 25, 2018).

28  [18] Q2 2018 Facebook, Inc. Earnings Call Tr. at 3 (July 25, 2018).

1   **II.      PARTIES**

2        **A.      Plaintiffs**

3        28.      Amalgamated is an investment bank with over $4 billion in assets that serves

4   thousands of labor unions, nonprofits, social impact enterprises, political organizations,

5   foundations and individuals.  Amalgamated has been offering investment management services

6   since 1973, and has over $40 billion in assets under management and custody.  Amalgamated is

7   the trustee for the LongView LargeCap 1000 Growth Index Fund, the LongView Quantitative

8   LargeCap Fund, and the LongView Quant LargeCap Equity VEBA Fund, each of which

9   purchased Facebook common stock during the Class Period and were damaged thereby, as set

10  forth in the certification attached hereto as Exhibit A and incorporated herein by reference.

11       29.      The Public Employees' Retirement System of Mississippi ("Mississippi" or

12  "PERS") is a public retirement system that serves the state of Mississippi.  Founded in 1952,

13  PERS provides retirement benefits for individuals working in Mississippi's state government,

14  public schools, universities, community colleges, municipalities, counties, legislature, highway

15  patrol, and other public entities.  It currently has over 300,000 members, including over 100,000

16  retiree and beneficiary members, and approximately $26.5 billion in assets under management.

17  Mississippi purchased Facebook common stock during the Class Period and was damaged

18  thereby, as set forth in the previously-filed certification and the schedule attached hereto as

19  Exhibit B, which are each incorporated herein by reference.

20       30.      Ernestine Bennett, Fan Yuan, Fern Helms and James Kacouris are the plaintiffs in

21  putative class actions filed against Facebook and its officers and directors that have been

22  consolidated into this proceeding.  Like the other members of the proposed Class, each of these

23  plaintiffs alleges in their respective complaints that they purchased Facebook common stock at

24  the artificially-inflated prices prevailing in the market during the Class Period and were damaged

25  thereby.

26

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                              - 11 -

1

### B.     Defendants

2        31.     Defendant Facebook is a Delaware corporation with its principal place of business

3  located in Menlo Park, California, where it owns and leases 3 million square feet of office

4  buildings and 130 acres of land for future expansion.  Facebook's common stock is traded under

5  the ticker "FB" on the NASDAQ Global Select Market ("NASDAQ"), an efficient market.  As

6  of December 31, 2017, the Company had 25,105 employees.  In its FY17 Report on Form 10-K,

7  the Company stated: "We use our investor.fb.com and newsroom.fb.com websites as well as Mark

8  Zuckerberg's Facebook Page (https://www.facebook.com/zuck) as means of disclosing material

9  non-public information and for complying with our disclosure requirements under Regulation

10  FD."

11        32.     Defendant Zuckerberg founded Facebook in 2003 and is its CEO and Chairman of

12  the Board.  Zuckerberg controls Facebook.  The Company has two classes of common stock,

13  giving Zuckerberg the ability to control more than half of the voting power of the company.

14  Because Zuckerberg controls a majority of the company's voting power, Facebook is considered

15  a "controlled company" pursuant to corporate governance rules for NASDAQ-listed companies.

16  As a result, FB does not need to have a majority of independent directors, a compensation

17  committee, or an independent nominating function (directors are responsible for nominating

18  members to the company's board).   Zuckerberg personally appointed more than half of

19  Facebook's Board of Directors, including himself, and has the authority to make major decisions

20  by himself.

21        33.     As set forth herein, defendant Zuckerberg controlled the Company, had knowledge

22  of or access to inside information concerning Facebook, including the conduct described below

23  and had a duty to disseminate accurate information concerning Facebook and to correct any

24  misleading statements, which he violated in making the misrepresentations and omissions alleged

25  herein.  Indeed, defendant Zuckerberg was personally involved in developing Facebook's data

26  security platform and, according to his own admissions, personally responsible for the data

27  security breach and other facts, transactions and circumstances alleged herein.  For example,

28

1    Zuckerberg has publicly stated that he is "responsible for what happens on our platform"[19] and

2    testified that "I started Facebook, I run it, and I'm responsible for what happens here."[20]

3    Zuckerberg also specifically admitted responsibility and apologized for the Cambridge Analytica

4    data breach, testifying that the situation "was a big mistake.  And it was my mistake.  And I'm

5    sorry."  *Id*.  During the Class Period, Zuckerberg sold 29,680,150 shares, netting gross proceeds

6    of $5,330,078,471.

7         34.    Defendant Sandberg is, and at all relevant times was, COO of Facebook.  Since

8    she was appointed COO in March 2008, Sandberg has run the Company's business operations

9    and is Zuckerberg's "right hand" in running the Company.  Sandberg has served on Facebook's

10   Board of Directors since June 2012.  As set forth herein, Sandberg controlled the Company, had

11   knowledge of or access to inside information concerning Facebook, including the conduct

12   described below and had a duty to disseminate accurate information concerning Facebook and to

13   correct any misleading statements, which she violated in making the misrepresentations and

14   omissions alleged herein.  Indeed, Sandberg has asserted that she is responsible for "controls on

15   the Company" relating to data security and she holds herself "responsible for the [controls] we

16   didn't have."[21]   "[W]e run the company," Sandberg has said.  *Id*.  During the Class Period,

17   Sandberg sold 2,589,000 shares, netting gross proceeds of $389,943,538.

18        35.    Defendant Wehner is, and at all relevant times was, CFO of Facebook.  Since he

19   was appointed CFO in June 2014, Wehner has run the finance, facilities and information

20   technology functions at Facebook.  From November 2012 to June 2014, Wehner served as

21   Facebook's Vice President, Corporate Finance and Business Planning.  As set forth herein,

22   Wehner controlled the Company, had knowledge of or access to inside information concerning

23

24   [19] Kif Leswing, *Mark Zuckerberg and Sheryl Sandberg respond to Cambridge Analytica scandal*, Business Insider (Mar. 21, 2018), https://tinyurl.com/ybn2hhsp.

25   [20] Facebook, Social Media Privacy, and the Use and Abuse of Data: Hearing before the S.

26   Committee on Commerce, Sci., and Transp., 115 Cong. (April 10, 2018) (Statement of Mark Zuckerberg, Chairman and Chief Executive Officer, Facebook, Inc.).

27   [21] *Full video and transcript: Facebook COO Sheryl Sandberg and CTO Mike Schroepfer at Code*

28   *2018*, Recode (May 30, 2018), https://tinyurl.com/y8rbhr2v.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                          - 13 -

Facebook, including the conduct described below and had a duty to disseminate accurate information concerning Facebook and to correct any misleading statements, which he violated in making the misrepresentations and omissions alleged herein.  During the Class Period, Wehner sold 130,201 shares, netting gross proceeds of $21,417,346.

36.     Defendants Zuckerberg, Sandberg and Wehner are collectively referred to herein as the "Executive Defendants."  The Executive Defendants made, or caused to be made, false statements that caused the price of Facebook common stock to be artificially inflated during the Class Period.

III.     JURISDICTION AND VENUE

37.     The claims asserted herein arise under and pursuant to §§10(b), 20(a) and 20A of the 1934 Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

38.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

39.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Facebook maintains its headquarters in Menlo Park, California, and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

40.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

IV.     BACKGROUND AND OVERVIEW OF DEFENDANTS'
        FRAUD SCHEME

        A.     Facebook's Business

41.     Facebook is the world's largest social networking company.  The Company offers products and platforms such as facebook.com, Instagram, Messenger, WhatsApp and Oculus, which are designed to facilitate connection and information sharing between users through mobile

1    devices and personal computers.  Facebook was founded in 2004 by its current CEO Zuckerberg,

2    who according to Facebook's SEC filings is the Company's "chief operating decision-maker."

3        42.    The Company operates by monitoring both users and non-users, tracking their

4    internet activity and retaining personal data.

5                    **1.    Facebook's Business Depends on Monetizing User Data**

6        43.    Facebook's main asset is the vast treasure-trove of user personal data that it has

7    amassed since its founding.  The Company generates substantially all of its tens of billions of

8    dollars in revenue by selling access to its users' data, including through the sale of advertisements

9    that are "targeted" towards particular users based on the users' personal data.  In fiscal year 2017,

10   Facebook reported $40.6 billion in revenue, with $39.9 billion or over 98%, coming from

11   targeting advertising and marketing placement.  In FY 2018, Facebook's revenue ballooned to

12   $55.8 billion, with $55.01 billion or 98.6% generated by ads.

13       44.    Facebook stated its FY18 Form 10-K that it was able to generate this revenue

14   because its "ads enable marketers to reach people based on a variety of factors including age,

15   gender, location, interests, and behaviors."  As one *Seeking Alpha* author explained in a March

16   19, 2018 report: "Facebook's business model relies on its high traffic, but its real "moat" is its

17   exclusive control over a vast array of very detailed user data that allows micro-targeting

18   advertising."[22]

19       45.    Facebook sells targeted advertising not only on its primary platform, but also on

20   applications, or "apps," developed by third parties and integrated into Facebook's platform.

21   These apps represent a significant source of revenue to Facebook.  For example, game apps, like

22   Candy Crush or Farmville, generate large revenues for Facebook based on the ads that are placed

23   in front of users as they play the game.  These apps also help attract new users to, and engage

24   existing users on, the Facebook platform.

25

26

27   [22] Erich Reimer, *The Cambridge Analytica Mishap Is Serious For Facebook*, Seeking Alpha,

28   (Mar. 19, 2018) https://tinyurl.com/y8htltro.

46.     During and prior to the Class Period, Facebook relied heavily on the addition of apps to increase user engagement.  "User engagement" or "engagement" is a key metric for Facebook.  It is measured by counting user's active reactions to content posted on Facebook – i.e., whether users "Like" a Post, or click on an image or leave a comment.  Facebook engages in extensive analysis of user activity and reports this information to advertisers.

47.     Facebook has acknowledged that is financial performance depends on its success in attracting active users to its platform.  As the Company stated in its FY17 Report on Form 10-K:

> The size of our user base and our users' level of engagement are critical to our success.  Our financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging active users of our products, particularly for Facebook and Instagram.

Simply put, engaged users generate more advertising revenue for Facebook.  Indeed, as Facebook explained in its fiscal year 2017 annual report: "Trends in the number of users affect our revenue and financial results by influencing the number of ads we are able to show, the value of our ads to marketers, the volume of Payments transactions, as well as our expenses and capital expenditures."

48.     As discussed in more detail below, to encourage third-party app developers to develop new apps for the platform, Facebook provided them with access to user's content and data, including information that users believed was private.  According to Sandy Parakilas, a former Facebook operations manager responsible for privacy issues, "'one of the main ways to get developers interested in building apps was through offering them access to this [user] data.'"[23]

---

[23] Paul Lewis, *'Utterly Horrifying': ex-Facebook insider says covert data harvesting was routine*, Guardian (Mar. 20, 2018), https://tinyurl.com/ybdonk3p.

1

2

        **2.**     **Facebook's Success Depends On User Trust, Which Defendants Cultivated By Stating Users Controlled Their Data**

3

4

      49.     As defendants have repeatedly acknowledged, Facebook's reputation as a trustworthy platform for sharing personal information is essential to the Company's success.[24]

5

6

Indeed, if unable to attract new users or keep existing ones, Facebook would fail or be significantly less profitable.  To cultivate this critical user trust, defendants repeatedly assured the

7

8

public that the Company respected privacy and that users sharing on Facebook had control over their personal data.

9

10

      50.     For example, as Sandberg stated on March 22, 2018 in a CNBC Interview, users' belief that their personal data is protected, "goes to the core of our service" and maintaining users'

11

belief that their data was safe is "the most important thing we can do for running this company."[25]

12

Zuckerberg has likewise stressed that "The No. 1 thing that people care about is privacy and the

13

handling of their data . . . . So I think *it's a pretty big deal*."[26]  Further, Sandberg represented in

14

October 2017 that "[w]hen [users] share on Facebook, you need to know that no one is going to

15

16

steal your data, no one is going to get your data that shouldn't have it . . . and that you are controlling who you share with."[27]

17

18

19

20

21

22

23

[24] For example, Facebook's Form 10-K for the fiscal year ended December 31, 2017 stated: "If people do not perceive our products to be . . . trustworthy, we may not be able to attract or retain users . . ."; *see also* Mark Zuckerberg,  "*Our Commitment to the Facebook Community*" Facebook (Nov. 29, 2011), https://tinyurl.com/ybovhlqp (Zuckerberg describing how people share on Facebook because they have "complete control over who they share with at all times"); *see also* Kara Swisher and Kurt Wagner, *Here's the transcript of Recode's interview with Facebook CEO Mark Zuckerberg about the Cambridge Analytica controversy and more*, Recode (Mar. 22, 2018), https://tinyurl.com/ycy5zuru; *CNBC Exclusive: CNBC Transcript: Sheryl Sandberg Sits Down with CNBC's Julia Boorstin Today*, CNBC (Mar. 22, 2018), https://tinyurl.com/ya4z2elm.

24

25

[25] *CNBC Exclusive: CNBC Transcript: Sheryl Sandberg Sits Down with CNBC's Julia Boorstin Today*, CNBC (Mar. 22, 2018), https://tinyurl.com/ya4z2elm.

[26] Kara Swisher and Kurt Wagner, *Here's the transcript of Recode's interview with Facebook CEO Mark Zuckerberg about the Cambridge Analytica controversy and more*, Recode (Mar. 22, 2018), https://tinyurl.com/ycy5zuru.

26

27

28

[27] Gideon Lichfield, *Watch Sheryl Sandberg's technique for shielding Facebook from hard questions*, Quartz at Work (Oct. 13, 2017), https://tinyurl.com/ybjmxykz.

51.     Likewise, Zuckerberg has publicly touted how "[p]rotecting the privacy of the people on Facebook is of utmost importance to us."[28]   Zuckerberg has also specifically represented that Facebook users "have control over how [their] information is shared" on Facebook; "we do not share [users] personal information with people or services [they] don't want;" and "we do not and never will sell any of [Facebook's users] information to anyone."[29] Sandberg has likewise spoken publicly about Facebook's privacy controls, stating for example that "[p]rivacy is of the utmost concern and importance to Facebook and it's important to us that the people who use our service know that we are very protective of them.  It is their data, they have control of it, they share it."[30] As detailed below, Defendants' statements were false.

### B.   In 2012, Facebook Agreed to an Extraordinary 20-Year FTC Consent Decree Due To Repeated Failures to Protect User Privacy

52.     In contrast to their public assurances, defendants repeatedly disregarded user privacy and data control in order to promote growth and increase profits.  This approach has led to repeated regulatory violations and other problems.

53.     On November 29, 2011, the Federal Trade Commission ("FTC") announced that Facebook had agreed to settle "charges that it deceived consumers by telling them they could keep their information on Facebook private, and then repeatedly allowing it to be shared and made public."[31]  These charges included the fact that Facebook had represented that third-party apps on

---

[28] Graham Ruddick, *Facebook forces Admiral to pull plan to price car insurance based on posts*, Guardian (Nov. 2, 2016), https://tinyurl.com/hg9t6pl.

[29] Mark Zuckerberg, *From Facebook, answering privacy concerns with new settings*, Wash. Post (May 24, 2010), https://tinyurl.com/y976ksab; *see also* Facebook Data Policy (Jan. 30, 2015), https://tinyurl.com/y7hofbd4; Anita Balakrishnan, Sara Salinas & Matt Hunter, *Mark Zuckerberg has been talking about privacy for 15 years – here's almost everything he's said*, CNBC (Mar. 21, 2018), https://tinyurl.com/y9pd8nct;

[30] Press Association, *Facebook's Sheryl Sandberg defends targeted ads*, Guardian (Apr. 22, 2014), https://tinyurl.com/yccmwl8g; Gideon Lichfield, *Watch Sheryl Sandberg's technique for shielding Facebook from hard questions*, Quartz at Work (Oct. 13, 2017), https://tinyurl.com/ybjmxykz.

[31] *Facebook Settles FTC Charges That It Deceived Consumers By Failing To Keep Privacy Promises*, Federal Trade Commission (Nov. 29, 2011), https://tinyurl.com/z2ban4p (the "FTC Press Release").  *See also*, Jacqui Cheng, *FTC complaint says Facebook's privacy changes are deceptive*, Ars Technica (Dec. 21, 2009), https://tinyurl.com/y9dllg8j; Ryan Singel, *Facebook*

1   its platforms would only have access to user data "that they needed to operate" when, in fact, "the

2   apps could access nearly all of users' personal data – data the apps didn't need."[32]

3       54.    The FTC had alleged that Facebook told its users that:

4           a)    they could restrict access to information by selecting a "Friends Only"

5   setting when, in fact, that setting "did not prevent their information from being shared with third-

6   party applications their friends used";

7           b)    their photos and videos would be inaccessible to others once their accounts

8   were deactivated or deleted when, in fact, Facebook had "allowed access to the content, even after

    users had deactivated or deleted their accounts"; and

9           c)    the Company "complied with the U.S.- EU Safe Harbor Framework that

10  governs data transfer between the U.S. and the European Union" when, in fact, "It didn't."[33]

11      55.    The FTC press release about the settlement stated that Facebook had agreed "to

12  take several steps to make sure it lives up to its promises in the future, including giving consumers

13  clear and prominent notice **and obtaining consumers' express consent before their information**

14  **is shared beyond the privacy settings they have established**."  According to the FTC, the

15  settlement "bar[ed] Facebook from making any further deceptive privacy claims, require[d] that

16  the company get consumers' approval before it changes the way it shares their data, and it

17  require[d] that Facebook obtain periodic assessments of its privacy practices by independent,

18  third-party auditors for the next 20 years."[34]

19      56.    On August 10, 2012, Facebook and the FTC formally agreed to settle the FTC's

20  charges and entered into the Consent Decree (the "FTC Consent Decree" or "Consent Decree")

21  that would govern Facebook's conduct for the subsequent twenty years.[35]

22

23  ────────────

    *Privacy Changes Break the Law, Privacy Groups Tell FTC*, Wired (Dec. 17, 2009),

24  https://tinyurl.com/y9txcbeg.

25  [32] FTC Press Release.

26  [33] *Id*.

    [34] *Id*.

27
    [35] John Leibowitz, J. Thomas Rosch, et al., *Decision and Order*, Federal Trade Commission (Aug.

28  10, 2012), https://tinyurl.com/ybxg2g86.

57.     Part I of the Consent Decree provided that Facebook, "in connection with any product or service . . . shall not misrepresent in any manner, expressly or by implication, the extent to which it maintains the privacy or security of covered information, including, but not limited to: . . . (B) the extent to which a consumer can control the privacy of any covered information maintained by [Facebook] and the steps a consumer must take to implement such controls; [and ] (C) the extent to which [Facebook] makes or has made covered information accessible to third parties . . . ."

58.     Part IV of the Consent Decree additionally ordered Facebook to "establish and implement, and thereafter maintain, a comprehensive privacy program that is reasonably designed to (1) address privacy risks related to the development and management of new and existing products and services for consumers, and (2) protect the privacy and confidentiality of covered information."[36]

59.     As David Vladeck, the former FTC Director who worked on the agency's enforcement action against Facebook, explained, "[*t*]*he FTC consent decree put Facebook on notice*" that its representations concerning its privacy practices needed to be completely accurate and that any representations would receive significant regulatory scrutiny.[37]

*          *          *

60.     As described in more detail in Sections IV.C, IV.G.1, and V.A.2 *infra*, in 2019 following an extensive investigation, the FTC charged Facebook with violating Parts I.B, I.C, and IV of the Consent Decree by *inter alia* "*misrepresenting the extent to which users could control the privacy of any covered information maintained by [Facebook]*" based on conduct extending through the Class Period, including Facebook's practice of whitelisting third parties for continued access to user friends' data without the knowledge or consent of the users.  Indeed, Facebook

---

[36] *Id*.

[37] David C. Vladeck, *Facebook, Cambridge Analytica, and the Regulator's Dilemma: Clueless or Venal?*, Har. L. Rev. (Apr. 4, 2018), https://tinyurl.com/yc2kmlwe.

even overrode users' privacy settings in order to provide whitelisted third parties with access to use friend data.[38]

61.    In July 2019, Facebook settled the FTC's charges by paying a record-breaking $5 billion penalty, which constituted the "largest ever imposed on any company for violating consumers' privacy" and was "almost 20 times greater than the largest privacy or data security penalty ever imposed worldwide."[39]

**C.    Defendants Immediately Violated The FTC Consent Decree By Continuing To Secretly Share User Friends' Data**

62.    Despite the 2012 FTC Consent Decree, Facebook secretly continued giving third party app developers access to user friends' data regardless of how users set their Privacy Settings.[40]

**1.    Reciprocity: Facebook Gave Third Parties Access To User Friends' Data In Exchange For Data, Money Or Other Business Benefits**

63.    In 2013, defendants acknowledged internally that it was improper for Facebook to give third-party app developers to access user friends' data.  As an internal Facebook document dating from August 2013 explains:

> Users should not be able to act as a proxy to access personal information about friends that have not expressed any intent in using the app.[41]

64.    Defendants' belated acknowledgement was long overdue.  As the 2019 FTC Complaint charges: "Facebook knew or should have known that its conduct violated the 2012

---

[38]  FTC Complaint at ¶¶43-48.

[39]  *Id*.

[40]  FTC Complaint at ¶¶37-50.  As explained below, the FTC determined this conduct to have violated the FTC Consent Decree because "Facebook represented to consumers that they could control the privacy of their data by using desktop and mobile privacy settings to limit the information Facebook could share" – but "[i]n fact, Facebook did not limit its sharing of consumer information."

[41]  *Id*. at ¶81.

1  [Consent Decree] because it was *engaging in the very same conduct that the [FTC] alleged was*

2  *deceptive in Count One of the original Complaint that led to the 2012 [Consent Decree].*"[42]

3       65.    The problem for Facebook was that completely cutting off this practice – and

4  providing users with actual control over their data – would significantly limit Facebook's ability

5  to profit from its vast store of user data.  Defendants did not want to completely give up on

6  monetizing this data.

7       66.    Accordingly, defendants – including Zuckerberg and Sandberg – decided to

8  continue providing access to user friend data to a wide array of third parties who would, in

9  exchange, provide reciprocal value to Facebook.  As discussed below, and confirmed in internal

10  Facebook documents, this "reciprocity" became the "fundamental principle that govern[ed]" the

11  Facebook Platform from 2014 and continued through mid-2018.

12       67.    The way it worked was that defendants would exchange user friend data as

13  consideration for a reciprocal exchange of value with third party app developers and other

14  companies who were "whitelisted" for secret access to user friend data.

15       68.    In this way, defendants engaged in selling user friend data in exchange for

16  reciprocal benefits.  For defendants, "reciprocity" came in various forms, including an exchange

17  of data between a whitelisted app developer and Facebook, by Facebook requiring the third party

18  to spend substantial sums on advertising at Facebook or by a third party enhancing Facebook's

19  brand and platform to make it more attractive to users, as in the case of the dozens of major phone

20  device makers that Facebook whitelisted during the Class Period.

21       69.    Indeed, as noted by *Slate*, Facebook's whitelisting "private agreements were

22  conditional on the third party sending over its own valuable user data to Facebook, or on the

23  company making big advertising purchases with Facebook," which constitutes a "business in

24  selling or bartering data."[43]

25

26  _____

   [42] *Id.* at ¶9.

27  [43] Elena Botella, *Facebook Earns $132.80 From Your Data Per Year*, Slate (Nov. 15, 2018),

28  https://tinyurl.com/ssgktsy.

1

2

### 2. Facebook's Internal Documents Confirm Defendants' Decision To Exchange Data For Reciprocal Value

3

70.     Internal Facebook documents made public in connection with litigation between

4

Facebook and an app developer, Six4Three[44] (the "Six4Three Documents") confirm that

5

defendants supplied user friend data in exchange for reciprocal value.  For example, an internal

6

Facebook memo explaining the policies for Facebook's Platform 3.0 rollout (which indicates that

7

the memo was created in the period from mid-2013 to early 2014), states:

8

9

10

11

> *The fundamental principle that governs Platform usage is a simple concept: reciprocity.  Reciprocity involves an equitable value exchange between a 3rd party developer and Facebook.*  This value exchange involves one of the following from developers:  high-quality experiences that FB users can use to tell great stories to their friends and family on FB and/or monetary value in the form of revenue sharing or direct payment.  In return, Facebook offers a developers [sic] access to our Platform.[45]

12

The memo also states:  "During app review, we examine the APIs that the app uses in order to

13

determine what [is] the appropriate level of reciprocity.  The guideline for this review is 'take

14

data, give data.'"[46]

15

71.     Facebook emails dating from September 2013 also note that "the capability will

16

remain to give access features which are publicly deprecated [*i.e.*, discontinued] but available to

17

whitelisted apps."[47]  This included "apps that have been whitelisted for . . . friends_*"[48] and listed

18

Netflix as an example.[49]

19

72.     Facebook directly linked third parties' access to data to the amount a third party

20

was spending on advertising at Facebook.  For example, an email string dating from September

21

2013 shows Ime Archibong, Facebook's Director of Global Product Partnerships, and

22

23

---

[44] *Six4Three, LLC v. Facebook, Inc., Mark Zuckerberg et al.*, Case No. CIV 533328, Superior Court of California, County of San Mateo (Hon. V. Richard Swope) (the "Six4Three Litigation").

24

[45] Six4Three Documents, Ex. 43 at FB-01220345.

25

[46] *Id.* at FB-01220349.

26

[47] Six4Three Documents, Ex. 80 at FB-000061439.

27

[48] *Id.*

28

[49] *Id.* at FB-000061437.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                          - 23 -

1    Konstantinos Papamiltiadis, Facebook's Director of Developer Platforms and Programs,

2    discussing the fact that Facebook was requiring third-party app developers to "spend on

3    [advertising at Facebook] *at least $250K a year to maintain access to the data*."  Otherwise, they

4    would "[c]ommunicate in one-go to all apps that don't spend that those permission[s] will be

5    revoked."[50]

6         73.    Zuckerberg and Sandberg were involved in the decision to exchange user friends'

7    data for reciprocal value from third parties.  For example, internal Facebook documents dating

8    from October 30, 2012 shows Facebook employees stating that "we've been having *a series of*

9    *conversations w/ Mark [i.e., Zuckerberg]* for months about the Platform Business Model."[51]

10   These discussions included the fact that Facebook would "remove/*whitelist access* to the Stream

11   APIs and Search APIs and potentially other APIs that might leak the friend graph" and that "[w]e

12   are going to require that all platform partners agree to data reciprocity."[52]

13        74.    Zuckerberg and Sandberg were on an email exchange dated November 9, 2012

14   where they each approved the use of "reciprocity" in order to increase the value of Facebook.

15   Zuckerberg stated, "*I think we should go with full reciprocity*" in order to "*increase the value*

16   *of our network . . .[by] . . . increase[ing] sharing back into Facebook*."[53]  Sandberg responded:

17   "I like full reciprocity and this is the heart of why."[54]

18        75.    The Six4Three Documents also include an internal Facebook email exchange on

19   November 2012 in which a Facebook employee suggested that his team "identify our top 20

20   developers and put together a straw man for how we will enforce reciprocity with each of them.

21   We need this for the meeting with Mark [Zuckerberg] on Monday to help ground the discussion

22   about what 'full reciprocity' actually means . . . ."[55]  The same day, those employees discussed

23

---

24   [50] Six4Three Documents, Ex. 79 at FB-000061251.

25   [51] Six4Three Documents, Ex. 45 at FB-00423235-36.

     [52] *Id.* at FB-00423236.

26   [53] Six4Three Documents, Ex. 48 at FB-01155756.

27   [54] *Id.*

28   [55] Six4Three Documents, Ex. 175 (FB-00947599).

1  whether the team would classify the developers who would be required to engage in reciprocity

2  with Facebook by "a specific criterion (e.g., MAU)" or "based on the . . . partners which Mark

3  [Zuckerberg] focuses on."  Mike Vernal responded that the team should focus on "***the apps that***

4  ***Mark [Zuckerberg] knows, loves, and is concerned about***."[56]

5        76.    Additional internal Facebook emails show that Zuckerberg was actively involved

6  in granular decisions to grant or ban third parties from having access to users' friends' data.  An

7  internal Facebook email exchange dating from January 2013 shows that Zuckerberg specifically

8  approved shutting down Twitter's "friends API access" because Twitter, a competitor, had

9  launched the "Vine" video app that allowed users to "find friends via FB."  As such, Facebook

10  staff wrote, "Unless anyone raises objections, we will shut down their friends API access today."

11  Zuckerberg replied: "Yup, go for it."[57]

12        77.    As for Tinder, which was whitelisted, Zuckerberg wrote about the reasons why a

13  Tinder co-founder wanted to meet with him, stating: "He probably just wants to make sure we

14  won't turn off their API."[58]  Of course, Facebook "whitelisted" this dating app so they continued

15  to get secret access to users' friends' data.

16        78.    Similarly, the Six4Three Documents show that Facebook made decisions about

17  how to deal with developers who were angry about changes to the platform (*i.e.*, restriction of

18  their access to user friends' data) based on the apps' spending and personal relationships with

19  Zuckerberg and Sandberg.  In December 2013, a Facebook employee wrote, "There are also

20  comms plans in the works for working with developers who are high ad spenders and ***friends of***

21  ***Mark/Sheryl*** [*i.e.*, Zuckerberg and Sandberg]."[59]

22

23

24  [56] *Id*. at FB-00947598.

25  [57] Six4Three Documents, Ex. 44 (FB-00934373).

26  [58] Angel Au-Yeung, *Facebook CEO Mark Zuckerberg Dismissed Tinder Cofounder As Irrelevant*
27  *But Still Let Dating App Get Special Access To Users' Data*, Forbes (Nov. 7, 2019),
   https://tinyurl.com/rwjbxo5.

28  [59] Six4Three Documents, Ex. 198 (FB-00194154).

79.     Indeed, reports show that Facebook used "whitelisting" as a bargaining chip with third parties while presenting the more restrictive policies to the public as privacy enhancements. Before Facebook supposedly cut off third parties' access to users' friends' data, an internal Facebook email shows the Company divided apps into "'three buckets: existing competitors, possible future competitors, [or] developers that we have alignment with on business models.'"[60] Facebook employees internally complained that this plan to "group apps into buckets based on how scared we are of them" made them feel "unethical" and "like a bad person."[61]   After Facebook supposedly cut off access to friends' data, and announced that change publicly (*see* Section IV.D *infra*), the developers who fell into the "alignment" bucket were able to regain access privately by agreeing to make mobile advertising purchases or provide reciprocal user data from their sites.  Facebook executives who worked on the plan reportedly referred to it as the "'Switcharoo Plan.'"

80.     Facebook employees pointed to Zuckerberg as being intimately involved in the discussions and decision-making around these changes to the platform.  For instance, in an October 2013 instant message conversation among Facebook employees, Douglas Purdy wrote, "[W]e have spent hours and hours with *[Z]uck*, etc. about this."[62] Similarly, another Facebook employee wrote in 2013 that he shared his concerns about changes to the platform "in every single meeting I have with . . . *Zuck*."[63]

**D.     In April 2014, Defendants Stated That Third Party Access To User Friends' Data Would Not Be Allowed But Secretly Continued To Give That Information To Millions Of Third Parties**

81.     In April 2014, Facebook publicly announced that it was shutting down third parties'  ability to access and collect user friends' data.  On April 30, 2014, Zuckerberg himself made this announcement at Facebook's April 30, 2014 F8 Developers' Conference, where he

---

[60] Katie Paul & Mark Hosenball, *Facebook executives planned 'switcharoo' on data policy change: court filings*, Reuters (Nov. 6, 2019), https://tinyurl.com/urs5p3x.

[61] Six4Three Documents, Ex. 109 (FB-01363612-13).

[62] Six4Three Documents, Ex. 113 (FB-01353433).

[63] Six4Three Documents, Ex.114 (FB-01364691).

1    acknowledged how "surpris[ing]" it can be when "one of your friends shares some of your data

2    with an app," which he promised to "change."[64]

3         82.    Zuckerberg stated that Facebook would shut-off third-party access to user friend

4    data to ensure that "everyone has to choose to share their own data with an app themselves."[65]

5    He stressed that this was "a really important step for giving people power and control over how

6    they share their data with apps."  On April 30, 2014, Facebook issued a press release promising

7    to give "people more control," including "more control over their data."[66]

8         83.    As stated in the FTC Complaint, "in April 2014 . . . Facebook announced that it

9    would stop allowing third-party developers to collect data [about friends]"[67]

10        84.    Despite what the FTC Complaint calls "these clear statements," "Facebook

11   continued to allow *millions* of third-party developers access to [user friends' data] for at least one

12   year."[68]  The FTC Complaint notes that "Facebook did not disclose this fact to its users" – thereby

13   depriving users of knowledge and the ability to consent to the disclosure of their data.[69]

14        85.    This conduct violated Parts I.B and I.C of the FTC Consent Decree, which

15   prohibited Facebook from misrepresenting "the extent to which a consumer can control the

16   privacy of [their personal information]" and "the extent to which [Facebook] makes or has made

17   covered information accessible to third parties."[70]

18

19   _____

20   [64] Larry Magid, *Zuckerberg Pledges More User Control Of Facebook App Privacy – Unveils Anonymous Log-In*, Forbes (Apr. 30, 2014), https://tinyurl.com/rqrfxad; *see also* FTC Complaint at ¶97.

21   [65] FTC Complaint at ¶97.

22   [66] *Id.* at ¶98.

23   [67] *Id.* at ¶8

24   [68] FTC Complaint at ¶164.

25   [69] *Id.* at ¶100.  To the contrary, in September 2015, Facebook launched a "Privacy Checkup" tool
26   as a means to help users "be in control" of their data and included a list of apps that users had
     installed.  But this tool failed to list the apps that had access to user data based on their friends'
27   consent and did not disclose that Facebook was continuing to share that data with "millions of
     third-party developers."  *Id.* at ¶¶101-05.

28   [70] *Id.* at Count I, ¶¶160-65.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                          - 27 -

1

**E.    In 2015, Defendants Learned that Data from Tens of Millions of
Users Had Been Sold to Cambridge Analytica in Violation of
Facebook's Terms of Use**

2

3      86.    On December 11, 2015, *The Guardian* reported that Cambridge Analytica, a

4  "'behavioral microtargeting'" company founded by Dr. Aleksandr Kogan ("Kogan"), a Russian-

5  born lecturer at Cambridge University, had been using "commodified Facebook data" to target

6  voters and develop election strategies in political campaigns in the United States.[71]

7      87.    As has since been revealed, in the summer and fall of 2014 – *after* Zuckerberg

8  stated that app developers would not have access to user friend data – Cambridge Analytica

9  obtained from Kogan the personal data and information of over 87 million Facebook users,

10  without their knowledge or consent.  Specifically, in 2014 Kogan and Joseph Chancellor (who,

11  until recently, was an employee at Facebook) formed Global Science Research ("GSR") for the

12  purpose of funneling user data to Cambridge Analytica.[72]

13      88.    GSR developed and launched on Facebook an app called "This Is Your Digital

14  Life."  This Is Your Digital Life marketed itself to Facebook users as a tool that would help them

15  understand their own personalities and supply data to be used by academic psychologists.  The

16  information gathered by the This Is Your Digital Life app included names, locations, birthdays,

17  genders and Facebook "likes," which offer a range of personal insights into users.

18      89.    This Is Your Digital Life was used by relatively few Facebook users – only around

19  270,000 users downloaded the app.  Although those specific users consented to Kogan's app's

20  use of their personal data, the app also accessed the personal data of their friends, without those

21  friends' knowing consent.  Because each Facebook user has multiple (often hundreds) of friends,

22  this caused the dataset to balloon significantly in size, and provided GSR with access to the

23

24

25  _____

[71] Harry Davies, *Ted Cruz using firm that harvested data on millions of unwitting Facebook users*,
26  Guardian (Dec. 11, 2015), https://tinyurl.com/kctlw6n.

27  [72] Wylie testified to the House of Commons' Digital, Culture, Media and Support Committee in
the U.K. on March 27, 2018 ("Wylie U.K. Test.").  According to Wylie, "GSR became a company
28  simply to service Cambridge Analytica.  GSR did not pre-exist."  Wylie U.K. Test. at Q1322.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                         - 28 -

1  personal data and information of a staggering 87 million Facebook users.  This access was what

2  defendants said was shut off in April 2014.

3      90.      In 2014 and 2015, Kogan and GSR sold this highly sensitive personal data to

4  Cambridge Analytica.  In testimony to the House of Commons' Digital, Culture, Media and Sport

5  Committee in the U.K. on March 27, 2018 ("Wylie U.K. Test."), Cambridge Analytica's former

6  Director of Research, Christopher Wylie, stated that this data was used in a multi-million dollar

7  operation "to develop and scale psychological profiling algorithms for use in American political

8  campaigns."  He said that Cambridge Analytica had "sought to identify mental and emotional

9  vulnerabilities in certain subsets of the American population and worked to exploit those

10 vulnerabilities by targeting information designed to activate some of the worst characteristics in

11 people, such as neuroticism, paranoia and racial biases."[73]

12      91.      Wylie also explained that Kogan was known to be involved in state-funded

13 research in Russia to build "algorithms using Facebook data for psychological profiling."[74]  For

14 its part, Cambridge Analytica was working closely with one of Russia's largest oil companies,

15 Lukoil, which "is known to conduct intelligence gathering on behalf of," and has "formal

16 information sharing agreements with the Russian Federal Security Service."[75]

17      92.      According to Kogan, Facebook gave GSR Facebook user data, at least initially,

18 without any preconditions.  Asked on April 24, 2018 by the Chair of the Digital, Culture, Media

19 and Sport Committee, United Kingdom House of Commons, "So there was no requirement from

20 Facebook, when they gave you that data in the first place, that you should destroy it or give it

21 back," Kogan testified "In fact, there was not even a signed agreement initially.  They gave me

22

23

24

---

25  [73] Wylie Stmt. at ¶¶19, 22, 25.  As used herein, "Wylie Stmt." refers to the written statement
Wylie provided to the Senate Judiciary Committee on May 16, 2018, and "Wylie Test." refers to

26  the transcript of his oral testimony to the Committee on May 21, 2018.

27  [74] Wylie Stmt. at ¶28.  *See* Wylie Test. at Q1324; *see also* at Q1341 (Wylie: "Staff at Palantir had
access to the data; all kinds of people had access to the data.").

28  [75] *Id.* at 33.

1   the dataset without any agreement signed.  It was just, 'Here's an email.  Here's the dataset.'"[76]

2   As Wylie has testified: Facebook "didn't really do anything to safeguard the data."[77]  "There were

3   a lot of apps at the time that were pulling lots of data – including from friend networks."[78]

4          93.     In December 2015, Facebook outwardly professed surprise and concern over the

5   disclosures by *The Guardian*.  *The Guardian* article quoted a "Facebook spokesman" as saying:

6   "Misleading people or misusing their information is a direct violation of our policies and we will

7   take swift action against companies that do" including banning those companies from Facebook

8   and requiring them to destroy all improperly collected data."[79]

9          94.     In reality, however, Facebook had known for months prior to *The Guardian* article

10  that Cambridge Analytica had accessed user data and was misusing that data.  In 2014, GSR sent

11  documents to Facebook purporting to give GSR the right to "***disseminate***, ***publish***, ***transfer***,

12  append or merge with other databases, ***sell***, ***license*** . . . and ***archive***" any user data that it

13  collected.[80]

14         95.     The Company, according to Wylie, did nothing to prevent the launch of the app or

15  prevent GSR from selling the data. Wylie also testified that, based on information Kogan had

16  provided, Facebook engineers should have known ***in 2014*** – more than a year before *The*

17  *Guardian* article was published – that user data had been passed on to Cambridge Analytica.[81]

18

19  [76] Kogan U.K. Test., at Q1784 *House of Commons, Digital, Culture, Media and Sport Committee*
    (Apr. 24, 2018); *see also* at Q2039 (Kogan: "You would just say what [user data] you wanted and
20  [Facebook] would give it to you.").

21  [77] Hannah Kuchler and Aliya Ram, *Facebook was informed privacy breach app might sell user*
    *data*, Fin. Times (Mar. 29, 2018), https://tinyurl.com/yckwyjpe; *see also* Kogan Test., at Q1984
22  (Kogan: "We had a terms of service up on the Facebook platform–linked to the Facebook
    platform–that said we could transfer and sell data for at least a year and a half, and nothing was
23  ever mentioned.").

24  [78] *Id.*

25  [79] *See* Harry Davies, *Ted Cruz using firm that harvested data on millions of unwitting Facebook*
    *users*, Guardian (Dec. 11, 2015), https://tinyurl.com/kctlw6n.

26  [80] Julia Carrie Wong, *Congress tried to crack Zuckerberg - but Facebook still has all the power*,
27  Guardian (Apr. 10, 2018), https://tinyurl.com/ybh7l3zm.

28  [81] Wylie U.K. Test. at Q1336.  Wylie testified that, based on what Kogan had told him about a
    conversation he had with Facebook engineers in July 2014 after Facebook had throttled the data

96.     This account has been confirmed by an internal Facebook email that was only recently made public in ongoing litigation in Washington DC by the D.C. attorney general.  The email, which was released with the names of the recipients redacted, shows that Facebook was on alert of illicit practices by Cambridge Analytica months before December 2015.

97.     The email is dated September 22, 2015, and states that "our team has been spending a lot of time lately attempting to clarify to clients in the political space how our policies apply to pitches . . . regarding matching social data to voter files."  The email further states:

> We suspect many of these companies are doing similar types of scraping, **the largest and most aggressive on the conservative side being Cambridge Analytica** (http://ca-political.org/what-we-do/), **a sketchy (to say the least)** data modeling company that has penetrated our market deeply . . .

> […] Can you help us **investigate what Cambridge specifically is actually doing?**

98.     Zuckerberg admitted that, "in 2015, we learned from journalists at *The Guardian* that Kogan had shared data from his app with Cambridge Analytica," which he knew was against Facebook's "policies for developers to share data without people's consent."[82]

99.     Sandberg also has admitted that in 2015 "we received word that this researcher gave the data to Cambridge Analytica,"[83] acknowledging that they were aware "two and a half years ago . . . ." that Kogan gave the data to Cambridge Analytica.[84]

100.     Despite these internal concerns about Cambridge Analytica, in November 2015 – the month before *The Guardian's* story was published – Facebook hired Joseph Chancellor, one of the two founders (with Kogan) of GSR, as a quantitative social psychologist to work at the

---

harvesting app, "Facebook would have known from that moment about the project. . . ."  *Id.* Wylie, who testified that he had "heard different things from different people and all of them are plausible" (*id.*) about when Facebook first learned of Cambridge Analytica's access to user data, allowed that he did "not know if [Kogan's account] is entirely true or not, but that is what he told me."  *Id.*

[82] Mark Zuckerberg, Facebook (Mar. 21, 2018), http://tinyurl.com/yadalrr7.

[83] Steve Inskeep, *Full Transcript: Facebook COO Sheryl Sandberg on Protecting User Data*, National Public Radio (Apr. 5, 2018), https://tinyurl.com/y8aamyhn.

[84] Eun Kyung Kim, *Sheryl Sandberg on TODAY: Other Facebook data breaches 'possible'*, Today (Apr. 6, 2018), https://tinyurl.com/ydb26wx3.

Company's Menlo Park headquarters.[85]  Chancellor was employed by Facebook throughout the Class Period and, as a result, at all relevant times defendants had direct access to and control over one of the two individuals who had formed GSR and was involved in its scheme to harvest Facebook user data and provide it to Cambridge Analytica.  In fact, Chancellor signed the June 4, 2014 "GS Data and Technology Subscription Agreement" by which Cambridge Analytica purchased a license purporting to give it the right to use the Facebook user data harvested by GSR.

**F.**      **The Information Sold To Cambridge Analytica Was Taken From Facebook *After* Defendants Claimed That Third-Party Access To Users' Friends' Data Had Been Shut Down**

101.    It has only recently been revealed that the underlying Facebook user data obtained by Cambridge Analytica was taken from Facebook after Zuckerberg and Sandberg's April 2014 announcement that third-party access to such data was no longer allowed.  Specifically, the app designed by Kogan did not begin harvesting the Facebook user data sold to Cambridge Analytica until June 2014 at the earliest.

102.    In other words, Kogan was one of the app developers who was secretly grandfathered into the third-party information sharing program that defendants had told the public was discontinued months earlier.

103.    This fact is acknowledged in the June 2014 contract that Kogan and Chancellor (through GSR) signed with Cambridge Analytica's parent company, which stated:  "GS's method relies on a pre-existing application functioning under Facebook's old terms of service.  New

---

[85] Chancellor's employment by Facebook was not publicly reported until two-and-a-half years after he was hired, at which time he was still working at the Company.  Harry Davies, *Ted Cruz using firm that harvested data on millions of unwitting Facebook users*, Guardian (Dec. 11, 2015), https://tinyurl.com/kctlw6n.   Since Chancellor's employment became public, Facebook has steadfastly refused to make any comment about what he did for the Company.  On or around September 7, 2018, CNN reported that Facebook had announced that Chancellor was "no longer employed by Facebook," but that the Company refused to give any more details.  Donnie O'Sullivan, *Facebook employee with ties to Cambridge Analytica leaves company* CNN (Sept. 7, 2018), https://tinyurl.com/yd37e4d5.

1    applications are not able to access friend networks and no other psychometric profiling

2    applications exist under the old Facebook terms."[86]

3              104.    Further, in its complaint filed in connection with its $100 million settlement with

4    Facebook, the SEC confirmed that Kogan collected the data sold to Cambridge Analytica *after*

5    Zuckerberg had publicly announced that access to user friends' data had been shut-off.  The SEC

6    Complaint states:

> ***In the summer and early fall of 2014***, a business entity [*i.e.*, GSR] created and
> controlled by the researcher [*i.e.*, Kogan] retained a surveying firm to recruit and
> pay approximately 270,000 Facebook users to download the researcher's app and
> take the personality survey.  This enabled . . . [Kogan] to collect Facebook data
> from both the 270,000 app users and many app users' friends, which collectively
> amounted to tens of millions of Facebook users.[87]

11            105.    In sum, because Facebook was secretly giving Kogan continued access to user

12   friends' data in contravention of its public promises in April 2014 to shut-off that access, more

13   than 87 million users had their data improperly harvested by Kogan without their knowledge or

14   consent, which Kogan then sold to Cambridge Analytica.

15            106.    As Roger McNamee, an early investor in Facebook and mentor to Zuckerberg,

16   stated, only "270,000 people signed up to take [Kogan's] test" – but Kogan "was able to harvest

17   data from 50 million people.  And those people – all but the 270,000 who signed up for the test –

18   *did not give any permission*."[88]

19   **G.      During the Class Period, Defendants Made False Statements
             Regarding User Data Control, Risks To Facebook And  Compliance
20           With The 2012 FTC Consent Decree**

21            107.    Defendants knew throughout the Class Period that third parties possessed and were

22   misusing sensitive user information.  Indeed, defendants knew that Kogan had sold user data to

23

---

24   [86] *See* Chris Wylie "*Background Papers*," page 84 of 122; *available at*
     https://www.parliament.uk/documents/commons-committees/culture-media-and-
25   sport/Chris%20Wylie%20Background%20papers.pdf; *see also* U.K. Parliamentary Committee,
     Interim Report at ¶105.
26
     [87] SEC Complaint at ¶24.
27
     [88] Interview of Roger McNamee by Noel King, *Facebook Is Losing Users' Trust, Tech Investor
28   Says*, NPR (March 20, 2018), https://tinyurl.com/y8xusvvr.

1   Cambridge Analytica in violation of Facebook's policies.   Defendants were also aware of

2   Facebook's own practice of secretly "whitelisting" third parties, including multiple major

3   corporations, for continued access to users' friends' data after that access was supposedly shut

4   down.  They further knew that Facebook was overriding users' privacy settings.   Nonetheless,

5   defendants assured the public that Facebook users could "control" their data, that the Company

6   faced only hypothetical risks of data misuse, that defendants had found no wrongdoing in their

7   investigation of Cambridge Analytica and that defendants had not violated the FTC Consent

8   Decree.  These statements were false.

9               **1.       Defendants Falsely Stated That Users Controlled Their Data**

10          108.    Facebook and the Executive Defendants repeatedly stated during the Class Period

11   that Facebook users controlled their data on Facebook.  These statements were designed to inspire

12   trust in Facebook by assuring the public (including investors) that Facebook respected user

13   privacy and only shared its users' data with uers's knowledge and consent.  On multiple occasions

14   during the Class Period, Zuckerberg, Sandberg and Facebook expressly assured the public that

15   Facebook users had control of their own data, that Facebook was not sharing sensitive user data

16   with third parties, and that Facebook was not overriding user privacy settings.

17          109.    On October 12, 2017, for example, Sandberg gave an interview to *Axios* in which

18   she stated, "[W]hen you share on Facebook, you need to know" that "no one is going to get your

19   data that shouldn't have it" because "***you are controlling who you share with***."[89]   On April 4,

20   2018, Zuckerberg likewise stated, "[Y]ou have control over everything you put on the service."[90]

21   This statement was reiterated on Facebook's website in an April 24, 2018 post stating, "[It's]

22

23

24

25

---

26   [89] Mike Allen, *Exclusive interview with Facebook's Sheryl Sandberg*, Axios (Oct. 12, 2017)
    https://tinyurl.com/y9k7mlok.

27   [90] *Hard Questions:* Q&A With Mark Zuckerberg on Protecting People's Information, Facebook

28   Newsroom (Apr. 4, 2018), https://tinyurl.com/rv69jh9.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                        - 34 -

1   important to know that **you are in control** of your Facebook, what you see, what you share, and

2   what people see about you."[91]

3       110.   On April 10, 2018, Zuckerberg testified to the Joint Senate Commerce and

4   Judiciary Committees.  And he gave very precise and detailed answers assuring Congress that

5   users controlled what information they shared, stating that "every piece of content that you share

6   on Facebook, you own and **you have complete control** over who sees it and how you share it,"

7   "that control is something that's important," and when "you sign up for the Facebook, you get the

8   ability to share the information that you want" because "every person gets to control who gets to

9   see their content."[92]

10       111.   These and similar statements detailed below (*see* Section VI.A) were materially

11   false and misleading.  In reality, throughout the Class Period, defendants knew that users did not

12   have control over their personal data because Facebook was engaged in a massive – and secret –

13   information sharing campaign with whitelisted app developers and business partners who were

14   given users' friends' data in exchange for providing benefits to Facebook.  Facebook deliberately

15   provided this information to third parties despite the fact that (i) Facebook users did not know

16   about and had **not** consented to the information sharing; (ii) doing so was an obvious breach of

17   the FTC Consent Decree; and (iii) defendants themselves had stated publicly in April 2014 that

18   such information was **not** being shared.

19       112.   As extensively detailed in the FTC Complaint filed in connection with Facebook's

20   record-breaking $5 billion settlement with the FTC, Facebook's own admissions to the United

21   States Senate, news reports, and other disclosures the Company was illicitly sharing reams of

22   sensitive user data with third parties without user knowledge or consent while making contrary

23   representations to the public.

24

25

---

26   [91] *How to Take Control of Your Facebook*, Facebook Newsroom (Apr. 24, 2018), https://tinyurl.com/y84wzmof.

27   [92] *Transcript of Mark Zuckerberg's Senate hearing*, Wash. Post (Apr. 10, 2018),

28   https://tinyurl.com/y7cu7jh7.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

- 35 -

113.    The FTC Complaint explains that that from "April 30, 2015, to **at least June 2018**," Facebook falsely stated that users could "control" the privacy of their data "by using Facebook's desktop and mobile privacy settings to limit to their Facebook Friends the information that Facebook could share."   In reality, "regardless of the privacy settings a user checked, Facebook continued to provide access to [user friend data] to Whitelisted Developers."[93]

114.    These Whitelisted Developers included dozens of "gaming, retail, and technology companies, as well as third-party developers of dating apps and other social media services."[94] As the FTC charged: "Facebook did not tell its users that it was still granting these Whitelisted Developers access to their data," and users "had no way of knowing that Facebook would still share it with these Whitelisted Developers."[95]

115.    This special access allowed specifically approved third parties, including app developers and mobile device makers, to "access user data without permission" including by allowing them to "circumvent users' privacy [or] platform settings and access Friends' information, even when the user disabled the Platform."[96]

116.    Relatedly, an investigation by *The New York Times* revealed that, during the Class Period, Facebook had "struck agreements allowing phone and other device makers access to vast amounts of its users' personal information."   As set forth in the article, Facebook allowed **at least 60** phone and other device makers continued access "to the data of users' friends without their explicit consent" throughout 2017 and 2018 – "even after [Facebook] declar[ed] that it would no longer share such information with outsiders."[97]   *The New York Times* reported that Facebook entered into these whitelisting agreements with dozens of third parties such as **Apple, Amazon,**

---

[93] *See* FTC Complaint at ¶¶173-74; *see also generally id.* ¶¶106-13, 166-75.

[94] *Id.* at ¶108.

[95] FTC Complaint at ¶¶112-13.

[96] U.K. Parliamentary Committee, *Final Report* at ¶83

[97] Nicholas Confessore, Gabriel J.X. Dance and Michael LaForgia, *Facebook Gave Device Makes Deep Access to Data on Users and Friends*, N.Y. Times (June 3, 2018), https://tinyurl.com/y93uj4nb.

*Blackberry, Microsoft and Samsung* – which "allowed Facebook to expand its reach."  Further, "most" of these relationships "remain[ed] in effect" in June 2018 (with Facebook starting to wind down some in April 2018).  According to the article:

> [T]he partnerships, whose scope has not previously been reported, raise concerns about the company's privacy protections and compliance with a 2011 consent decree with the Federal Trade Commission.  Facebook allowed the device companies access to the data of users' friends without their explicit consent, even after declaring that it would no longer share such information with outsiders. Some device makers could retrieve personal information even from users' friends who believed they had barred any sharing, The New York Times found.[98]

117.    Even Facebook itself has admitted, in response to written questions from Congress, that certain of these "whitelisting" relationships, including with Tobii, Apple, and Amazon, continued through at least October 2018.

118.    The fact that Facebook was overriding users' privacy settings in order to provide these third parties with data contradicted defendants' Class Period statements and violated the 2012 FTC Consent Decree, which required the Company to obtain express consent before enacting changes that overrode users' privacy preferences.  This practice also violated Parts I.B and I.C of the FTC Consent Decree, which, as discussed above, prohibited Facebook from misrepresenting the extent to which users could control their data and the extent to which Facebook makes user data available to third parties.

119.    One of the sources for *The New York Times*'s reporting, Ashkan Soltani, a former Chief Technology Officer of the FTC (who also worked on the FTC's 2011 investigation into Facebook), reported that: "Whitelisted 'partners' could access friend's non-public profile information including religion, birthday, political affiliation, location even with 'platform settings' (Apps, Websites, and Games) was turned off . . . @Facebook 'whitelisted' platform partner's apps by automatically registering them as 'installed' for a given user's friends (is_app_user = true) in the platform API, *overriding users' privacy settings*."[99]  Soltani further explained that "a tell-tale sign of an @FTC-like problem is when the legal department updates

---

[98] *Id.*

[99] Ashkan Soltani (@ashk4n) TWITTER (June 4, 2018), https://tinyurl.com/y77pgvfm.

1    the data use policy to 'clarify' that these arrangements existed after a press inquiry."  He pointed

2    to Facebook's "clarification between" May 20, 2018, and June 3, 2018.

3           120.    In testimony to the U.K. Parliamentary Committee (the "Soltani Tr."), Mr. Soltani

4    also confirmed that: "As recently as June 2018, using the Blackberry token that *The New York*

5    *Times* was testing with, which was provided to me, I was able to access user data *in lieu of a*

6    *user's platform settings*."[100]

7           121.    He further testified: ". . . based on *The New York Times* reporting and my testing,

8    [user friend data] was still accessible to certain apps—at least the whitelisted apps that we tested"

9    after Facebook and Zuckerberg had announced in 2014 that it would no longer be available.[101]

10   Indeed, Mr. Soltani confirmed that Facebook "*allowed whitelisted apps to completely override*

11   *[platform] setting[s] altogether*"[102] and did so for nearly a decade through 2018:

12          **Jo Stevens:**  So we are effectively talking about, in the case of whitelisted apps,
13          potentially nine years—nearly a decade—when they have been able to access—

14          **Ashkan Soltani:**  Friends' information.

15          **Jo Stevens:**  —friends' information, overriding privacy settings?

16          **Ashkan Soltani:**  That's right; I believe so, yes.[103]

17          122.    In connection with his testimony to the U.K. Parliamentary Committee about

18   Facebook's improper whitelisting practices, Ashkan Soltani identified Sandberg as the Facebook

19   executive responsible for making the decision to engage in this practice. Mr. Soltani testified:

20          My understanding is that a lot of these decisions [including whitelisting and
21          overriding privacy settings) are [Ms. Sandberg's].  She is the one who makes the
             monetization calls and makes the priorities, and that is who I would want to see up
22          here testifying on these business decisions, and specifically on the monetization
23          and decisions of what to prioritize.[104]

24   _____

25   [100] Soltani Tr., Q4333.

     [101] *Id.* at Q4335.

26   [102] *Id*. at Q4342.

27   [103] *Id.* at Q4343.

28   [104] *Id.* at Q4348.

123.    The Six4Three Documents discussed above also show that whitelisting was widespread.  For example, an internal Facebook email exchange dating from November 2013 reveals that Facebook had at least "5,200 existing whitelisted apps."[105]

124.    This unauthorized information sharing program included foreign companies with close ties to foreign governments.  On June 5, 2018, *NBC News* reported that Facebook had improperly shared user data with "Chinese companies believed to be national security risks."[106] Under pressure from members of Congress, Facebook later revealed that it had "integrations" under which it shared users' data with Chinese companies Lenovo, OPPO, and TCL.[107]

125.    On June 5, 2018, *The Washington Post* reported that:

> **Facebook admitted Tuesday that it allowed Huawei, a Chinese telecom company with alleged ties to the country's government, to have special access to data about the social site's users**, an arrangement that could stoke fears that consumers' personal information is at risk.
>
> The relationship between Facebook and Huawei was one of the special agreements brokered between the social giant and device makers over the past decade that sought to make it easier for Facebook users to access site services on a wide array of technologies.
>
> **For years, lawmakers in Congress and top U.S. national security officials have raised red flags about the security of Huawei products**, fearing that the Chinese government could demand access to communications stored on their devices or servers. The company has denied the charges, but the Pentagon took the rare step this year of banning sales of Huawei smartphones on U.S. military bases.[108]

---

[105] Six4Three Documents, Ex. 100 (FB-00521473).

[106] Alyssa Newbomb, *Sen. Bill Nelson asked: "What in the world is next? And what in the world is going to protect American' personally identifiable private information?* NBC News (June 6, 2018), https://tinyurl.com/ya2x6yq6; *see also* Ben Brody & Steven Dennis, *Senators Aim to Call Facebook, Google, Twitter to Hearings*, Bloomberg (June 7, 2018), https://tinyurl.com/yb47wv6w (quoting Sen. Cornyn: "Huawei is a 'Chinese national-security threat to the United States and any collaboration there is a problem'").

[107] *See* Ben Brody & Sarah Frier, *Facebook Discloses It Shared Data With Chinese Device Makers*, Bloomberg (June 6, 2018), https://tinyurl.com/y9hxql46.

[108] Tony Romm, *Facebook granted devices from Huawei, a Chinese telecom firm, special access to social data*, Wash. Post (June 5, 2018), https://tinyurl.com/y8pe5rco.

1    *The Washington Post* further reported that "the social media giant quietly **began unwinding** the

2    program in April" – that is, **April 2018**.

3    126.    On June 8, 2018, *The Wall Street Journal* reported that even more companies than

4    previously reported had been whitelisted well after the point when Facebook claimed to have

5    stopped sharing user data in this manner.  As detailed in the article, which described the previously

6    undisclosed agreements:

7        Facebook Inc. [FB 0.49%] struck customized data-sharing deals that gave select
8        companies special access to user records well after the point in 2015 that the social
         network has said it walled off that information, according to court documents,
9        company officials and people familiar with the matter.

10       Some of those and other agreements, collectively known internally as "whitelists,"
         also allowed certain companies to access additional information about a user's
11       Facebook friends, the people familiar with the matter said. That included
         information like phone numbers and a metric called "friend link" that measured
12       the degree of closeness between users and others in their network, the people said.

13       The whitelist deals were struck with companies including Royal Bank of Canada
14       and Nissan Motor Co., who advertised on Facebook or were valuable for other
         reasons, according to some of the people familiar with the matter. They show that
15       Facebook gave special data access to a broader universe of companies than was
         previously disclosed. They also raise further questions about who has access to the
16       data of billions of Facebook users and why they had access, at a time when
17       Congress is demanding the company be held accountable for the flow of that data.

18       Many of these customized deals were separate from Facebook's data-sharing
19       partnerships with at least 60 device makers, which it disclosed this week. Several
         lawmakers and regulators have said those device-maker arrangements merit
20       further investigation.

21       [. . .]

22       Privacy experts said Facebook users likely didn't know how their data was being
23       shared.

24       [. . .]

25       Eventually, Facebook set up internal teams dedicated to brokering and developing
         customized data deals.[109]

26

27   _____
28   [109] Deepa Seetharaman & Kirsten Grind, *Facebook Gave Some Companies Special Access to
     Additional Data About Users' Friends*, Wall St. J. (June 8, 2018), https://tinyurl.com/y9wxnafq.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                              - 40 -

127.    On July 11, 2018, CNN revealed that Facebook had given a "Russian internet company with links to the Kremlin" the right:

> to collect data on unknowing users of the social network after a policy change supposedly stopped such collection.  Facebook told CNN on Tuesday that apps developed by the Russian technology conglomerate Mail.Ru Group, were being looked at as part of the company's wider investigation into the misuse of Facebook user data in light of the Cambridge Analytica scandal.[110]

128.    A July 12, 2018 article in *The New York Times* confirmed that the same type of "rich behavioral data" provided to Cambridge Analytica was also provided to Mail.Ru Group. *The New York Times* article stated that Facebook "gave a Kremlin-linked company access to years of user data.  You are right to be scared."[111]

129.    Until at least early April 2018, Facebook was exposing private friends lists to third-party app developers through "taggable friends'" interface on the Facebook Platform.  As reported by *The Telegraph* on April 17, 2018:

> Facebook exposed private friend lists to app developers without their knowledge until two weeks ago, despite claiming to have blocked the service three years ago.

130.    This practice allowed apps to collect the friend lists of anybody who had installed the app, exposing their names and profile photos.  Facebook quietly switched the "taggable friends" interface off on April 4, 2018, burying the announcement among a series of other privacy measures . . . .[112]

131.    In sum, contrary to defendants' Class Period representations, Facebook users did not have control over their most senstive data.  To the contrary, Facebook was deliberately shared

---

[110] Donie O'Sullivan, Drew Griffin & Curt Devine, *Russian company had access to Facebook user data through apps*, CNN Business (July 11, 2018), https://tinyurl.com/y8zna8rl.

[111] Siva Vaidhyanathan, *This Russian Company Knows What You Like on Facebook*, N.Y. Times (July 12, 2018), https://tinyurl.com/y9jc8su9.

[112] Margi Murphy, *Facebook quietly stopped apps from harvesting users' private data just two weeks ago*, Telegraph (Apr. 17, 2018), https://tinyurl.com/yccglavl.

by Facebook with dozens – and perhaps thousands – of non-parties pursuant to contractual arrangements that they had with Facebook.

### 2. As the SEC Found, Facebook Made Materially False Statements About The Risks Facing The Company Due To The Cambridge Analytica Scandal

132. During the Class Period, Facebook filed two Form 10-K annual reports and four Form 10-Q quarterly reports with the SEC.  In each of those periodic reports Facebook included generic language stating that a risk it faced was that third parties might obtain or misuse sensitive user information.  These boilerplate warnings were written as hypothetical investment risks, *i.e.*, that there **could** be injury to investors "**if**" a third party were to fail to adhere to Facebook's guidelines because it might result in sensitive user data being "improperly accessed."

133. For example, in its Form 10-K filed on February 3, 2017, the first day of the Class Period, Facebook stated that "**if** developers fail to adopt or adhere to adequate data security practices . . . our data or our users' data **may be** improperly accessed, used or disclosed."[113]  The Form 10-K also stated that "any failure to prevent or mitigate security breaches and improper access to or disclosure of our data or user data **could** result in the loss or misues of such data, which could harm our business and reputation[.]"[114]

134. Nearly identical risk warnings were made in each subsequent Form 10-K and Form 10-Q filed by Facebook during the Class Period.  These include Facebook's quarterly reports on Forms 10-Q for the (1) period ended March 31, 2017 ("**if** these third parties or developers fail to adopt or adhere to adequate data security practices . . . our data or our users' data **may be** improperly accessed, used or disclosed"); (2) period ended June 30, 2017 (same); (3) period ended September 30, 2017 (same); period ended March 31, 2018 (same); (4) period ended September 30, 2018 (same).  In addition, Facebook's annual report on Form 10k for the fiscal year ended December 31, 2017, filed on February 1, 2018, made the same statement as well as stating "any failure to prevent or mitigate security breaches and improper access to or disclosure of our data

---

[113] FY 2017 Facebook, Inc. Form 10-K (Jan. 31, 2018) at 13.

[114] *Id.*

1   or user data **could** result in the loss or misues of such data, which could harm our business and

2   reputation."[115]

3       135.   As confirmed by facts set forth in the recent SEC Complaint, which Facebook

4   settled for $100 million, Facebook knew or deliberately disregarded throughout the Class Period

5   that each of these statements was materially false and misleading.  As the SEC concluded, they

6   acted "as a **fraud or deceit upon purchasers**" of Facebook's securities.

7       136.   The SEC relied upon detailed and specific evidence showing that, from at least

8   December 2015 through March 16, 2018 Facebook knew that Cambridge Analytica had sensitive

9   user information and was using it for improper purposes that created risks for the Company.  But

10  despite this knowledge, Facebook misled investors by repeatedly telling the market that the risks

11  were only hypothetical.

12      137.   Even before the publication of the December 11, 2015 *The Guardian* article

13  discussed above, multiple Facebook employees acknowledged internally that Cambridge

14  Analytica was a "sketchy (to say the least) data modeling company that has penetrated our market

15  deeply."[116]  Within days of the publication of *The Guardian* article, Facebook learned that a

16  researcher (Aleksandr Kogan) had used a company called GSR, which Kogan formed with an

17  individual who later became a Facebook employee (Joseph Chancellor) to collect user data from

18  Facebook and create personality scores for the Facebook users.  Facebook was also told at this

19  time that GSR had transferred just the personality scores – not underlying data – to Cambridge

20  Analytica.

21      138.   Facebook immediately decided that the transfer of personality scores derived from

22  user data violated Facebook's Platform Policy, and this conclusion was shared inside Facebook

23  amongst multiple employees in Facebook's communications, legal, operations, policy and

24

25

26

---

27  [115] FY 2018 Facebook, Inc. Form 10-K (Jan. 31, 2019) at 13.

28  [116] SEC Complaint at ¶34.

1   privacy, and research groups.[117]  Facebook privately asked GSR and Cambridge Analytica to

2   delete the data and was told by both GSR and Cambridge Analytica that it had been deleted.[118]

3         139.    Facebook did nothing else to confirm that the data had been deleted – it did not

4   even initially ask for written certifications that the data had been deleted.  Instead, it relied on

5   nothing more than bare and private statements from GSR (which had breached Facebook's data

6   use policy) and Cambridge Analytica, a company that Facebook regarded as "sketchy (to say the

7   least)"[119] and which had also breached Facebook's data use policy.

8         140.    Facebook did not believe the oral statements from GSR and Cambridge Analytica

9   that the data had been deleted.  To the contrary, Facebook suspected that the data was still

10  available to GSR and Cambridge Analytica, but the Company was not concerned about the actual

11  misuse of user data as long as that misuse did not become public.  In 2016, however, it became

12  clear that Cambridge Analytica was heavily involved in attempting to influence the United

13  Kingdom's vote to break away from the European Union in the process known as "Brexit."

14        141.    On February 23, 2016, *The Wall Street Journal* reported that a group supporting

15  Brexit "also signed up U.S. data-driven campaign firm Cambridge Analytica LLC, which will use

16  data gathering and audince-tarketing methods in the U.K. similar to those it has used to support

17  Sen. Ted Cruz's presidential bid."[120]

18        142.    Following the June 23, 2016 Brexit vote, Facebook, aware of the increasing risk

19  that its past failures to respond to the data breach in the manner it had described would be exposed,

20  contacted Cambridge Analytica asking them to confirm they had deleted the data.

21        143.    The day after the results of the June 23, 2016 Brexit referendum became public,

22  Facebook sought to prevent Kogan from publicly discussing the data breach by getting him to

23  sign a confidentiality agreement and releasing him from liability to the Company.   The

24  _____

25  [117] *Id.* at ¶30.

26  [118] *Id.*

    [119] *Id.* at ¶34.

27  [120] Nicholas Winning, *Both Sides Hire U.S. Help for U.K. 'Brexit' Vote*, Wall St. J. (Feb. 23,
28  2016), https://tinyurl.com/y7s7v2rl.

1  "Confidential Settlement Agreement and Mutual Release" contained a confidentiality clause and

2  stated that "Facebook believes that GSR and Dr. Kogan obtained Facebook user information in a

3  manner and for a purpose that may not have been consistent with or permissible under Facebook

4  terms, conditions and/or policies."[121]  If GSR or Kogan violated the confidentiality agreement,

5  they would be liable for "actual or statutory damages, or liquidated damages in the amount of

6  U.S. $25,000," but were otherwise "release[d] and forever discharge[d]" from "any and all

7  claims."[122]  During his testimony before the U.K. Parliament, Kogan claimed that the non-

8  disclosure or confidentiality agreement prevented his answering a number of questions.[123]

9       144.    This settlement agreement revealed beyond doubt to Facebook that GSR and

10  Cambridge had lied when initially describing the types of user data they had missappropriated.

11  Specifically, the agreement stated – contrary to Kogan's and Cambridge Analytica's statements

12  in December 2015 – that the data Kogan transferred to Cambridge was *not* just personality scores,

13  but also included highly sensitive user information such as names, birthdays, page likes and

14  locations.[124]  Kogan certified that he and GSR had deleted the data.

15       145.    Facebook was now aware that both GSR and Cambridge Analytica had previously

16  misrepresented the kind of user data they possessed and, contrary to their prior assurances,

17  Cambridge Analytica possessed sensitive raw data that went far beyond personality scores.  But

18  Facebook did nothing in response to this information.  It did not make any sort of public

19  announcement, notify its affected users, or even require Cambridge Analytica to immediately sign

20  a certification like the type belatedly signed with GSR certifying that Cambridge Analytica had

21  deleted this sensitive data.

22

23

24  [121] Letter from Rebecca Stimson, Head of Public Policy, Facebook UK, to Damian Collins, Chair,
25  Digital, Culture, Media and Sport Committee, United Kingdom House of Commons (May 14,
    2018), https://tinyurl.com/ybkndthq, at p. 3 (question #5).
26  [122] *Id*. at p. 19 (unmarked/unnumbered exhibit).
27  [123] *See, e.g.*, Kogan U.K. Test. at Q1986-Q1990.
28  [124] SEC Complaint at ¶31.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                        - 45 -

146.     Throughout 2016, Facebook was flooded with additional red flags that alerted, or should have alerted, the Company to the fact that Cambridge Analytica had not deleted the data, and was continuing to misuse sensitive user information it had obtained from Facebook.  These include the following:

- In the summer and fall of 2016, several Facebook employees learned of media reports claiming that Cambridge Analytica was using personality profiles to target advertising;

- On October 27, 2016, *The Washington Post* published an article that was discussed amongst *Facebook's* attorneys and employees in the Company's political advertising group, which claimed that Cambridge Analytica combined psycholgical tests with "likes" on "social media sites";

- Other Facebook employees who had been responsible for coordinating Facebook's response to the initial *Guardian* article **circulated a link to a video of a marketing pesentation by Cambridge Analytica's CEO** about Cambridge Analytica's ability to target voters based on personality;

- From August 2016 through November 2016, **Facebook's political advertising team knew that Cambridge Analytica named Facebook and Instagram** advertising audiences by personality trait for certain political groups.[125]

147.     In addition to these facts set forth in the SEC Complaint, defendants received multiple direct warnings about the risks that the misuse of user information posed to the Company. Roger McNamee – an early Facebook investor and long-time mentor to Zuckerberg – revealed that he had privately warned Zuckerberg and Sandberg **in October 2016** that he had noticed how "bad actors" were "taking the tools created for advertisers and using them to harm innocent people."[126]

148.     In an interview, McNamee elaborated on the nature of his warning to Zuckerberg and Sandberg.  He described the "core of the [Cambridge Analytica] issue" to be Facebook's "callous disregard for the privacy rights of users and a lack of care with respect to data that had been entrusted to Facebook."[127]     Then, in response to a question from a reporter that directly

---

[125] *Id.* at ¶35.

[126] Interview with Roger McNamee by Noel King, *Facebook Is Losing Users' Trust, Tech Investor Says*, NPR (Mar. 20, 2018), https://tinyurl.com/y8xusvvr.

[127] *Id.*

1    concerned Facebook's "callous lack of care," McNamee confirmed that he "reached out" to

2    Zuckerberg and Sandberg "directly in 2016, and [he] warned [them] about the possibilty of these

3    kinds of problems."[128]

4        149.    McNamee said he had specifically told Zuckerberg and Sandberg that "there's a

5    systemic problem here," but defendants "treated it like it was a public relations problem, rather

6    than a business problem."[129]  McNamee said he "continued to push for three months" – between

7    October 2016 and January 2017 – to persuade Zuckerberg and Sandberg that Facebook was

8    responsible for the misuse of Facebook users' data.

9        150.    Despite all of these bright red flags, it was not until April 2017, months into the

10   Class Period, that Cambridge Analytica finally provided Facebook with a similar unverified

11   written certification to the one Facebook received from Kogan and GSR a year earlier.  Facebook

12   admitted this fact in its answer to a complaint filed by the District of Columbia regarding the

13   Cambridge Analytica matter.  The answer states that Facebook "admits Facebook sought and

14   received a certification from Kogan in June 2016 and from Cambridge Analytica in April

15   2017."[130]

16       151.    This belated and bare certification from Cambridge Analytica was unreliable and

17   contradicted by information known to Facebook, including the red flags identified by the SEC

18   above demonstrating that Cambridge Analytica had not deleted the missapropriated data in 2015

19   as it had previously represented.

20       152.    In light of these warnings, Roger McNamee believed that Facebook's and

21   Zuckerberg's March 2018 disclosures about the Cambridge Analytica data breach were far too

22   late: "[I]f [Zuckerberg] had made the statement in 2015, it would have been completely

23   appropriate.  2015 is when they fully understood what had happened with Cambridge Analytica.

24   And instead, they remained absolutely silent for more than two years knowing that this abuse had

25   _____

26   [128] *Id.*

     [129] *Id.*

27   [130] *See* Defendant Facebook, Inc.'s Answer to Plaintiff's Complaint, *Dist. of Columbia v.*
28   *Facebook, Inc.*, No. 2018 CA 008715, (D.C. Super. July 8, 2019), at ¶40.

1   occurred."[131]  McNamee further concluded that, in concealing this information, Facebook was

2   "behaving in a manner that is just totally inappropriate."[132]

3       153.   Even Zuckerberg ultimately conceded in March 2018 that Facebook's failure to

4   follow up on and investigate the extent of the Cambridge Analytica data breach and ensure that

5   compromised data was deleted was the "biggest mistake[]"[133] that Facebook ever made.  As

6   Zuckerberg admitted in his March 2018 testimony before the United States Senate, Facebook

7   "should have been doing more all along" to protect their users' privacy.

8       154.   Sandberg has also admitted that it was a "mistake that [Facebook] did not verify"

9   whether Cambridge Analytica had deleted the user data[134] and acknowledged that the Company

10  should have "checked"[135] and "follow[ed]-up"[136] to ensure Facebook user's personal data was, in

11  fact, protected.  She stated that Facebook "could have done . . . two and a half years ago" what it

12  is doing today.[137]

13      155.   Defendants' statements cited above were not simple expressions of regret, they

14  were admissions of wrongdoing.

15      156.   Zuckerberg's Senate testimony leaves no doubt that Facebook had failed to

16  conduct an investigation or audit or make any other effort to verify deletion of the data

17  compromised by Cambridge Analytica in a manner consistent with the Company's public

18

19

20  [131] Interview with Roger McNamee by Alisa Chang, *Zuckerberg's Former Mentor Weighs In on Cambridge Analytica Statement*, NPR (Mar. 21, 2018), https://tinyurl.com/v46d5ha.

21  [132] *Id.*

22  [133] Nicholas Thompson, *Mark Zuckerberg Talks to Wired About Facebook's Privacy Problem*, *Wired* (Mar. 21, 2018), https://tinyurl.com/y77krl23.

23
24  [134] *CNBC Exclusive: CNBC Transcript: Sheryl Sandberg Sits Down with CNBC's Julia Boorstin Today*, CNBC (Mar. 22, 2018), https://tinyurl.com/ya4z2elm.

25  [135] Eun Kyung Kim, *Sheryl Sandberg on TODAY: Other Facebook data breaches 'possible'*, Today (Apr. 6, 2018), https://tinyurl.com/ydb26wx3.

26  [136] Steve Inskeep, *Full Transcript: Facebook COO Sheryl Sandberg On Protecting User Data*, NPR (Apr. 5, 2018), https://tinyurl.com/y8aamyhn.

27
28  [137] Mike Allen, *Exclusive interview with Facebook's Sheryl Sandberg*, Axios (Oct. 12, 2017) https://tinyurl.com/y9k7mlok.

1    assurances of what would be done in response to the abuses of user data reported by *The*

2    *Guardian*.[138]

3        157.    Given the size and nature of the breach, defendants knowledge about the misuse

4    of user data, and the public representations about the seriousness with which such violations were

5    taken and the swift repercussions that would follow, it is inexcusable that Facebook did not do a

6    complete investigation of Cambridge Analytica.

7        158.    The SEC concluded that, due to these facts, "Facebook filed materially misleading

8    periodic reports with the Commission [and] ***Facebook knew, or should have known, that its risk***

9    ***disclosures***" in its Form 10-K annual reports and Form 10-Q quarterly reports filed during the

10    Class Period were materially false and misleading.

11

12           **3.**      **Defendants Falsely Stated That Cambridge Analytica Did Not**
                   **Have User Data And That Facebook Believed That**

13                    **Cambridge Analytica "Did Nothing Wrong"**

14        159.    In February 2017, at the start of the Class Period, Facebook began getting media

15    inquiries regarding the status of the investigation that the Company claimed it was doing in

16    relation to the two year old article in *The Guardian*. Facebook's communications group pointed

17    reporters to Cambridge Analytica's public statement that it "does not use data from Facebook"

18    and "does not obtain data from Facebook profiles or Facebook likes."[139]  These statements were

19    false and misleading because they "suggested that Facebook was unaware that Cambridge had

20    improperly obtained Facebook user data."[140]

21

22

---

23    [138] *Transcript of Mark Zuckerberg's Senate hearing*, Wash. Post (Apr. 10, 2018),
https://tinyurl.com/y7cu7jh7. ("we need to . . . go do a full audit of all of Cambridge Analytica's

24    systems to understand what they're doing, whether they still have any data, to make sure that they
remove all the data.  If they don't, we're going to take legal action against them to do so."); 77

25    ("For Cambridge Analytica, first of all, we need to finish resolving this by doing a full audit of
their systems to make sure that they delete all the data that they have and so we can fully

26    understand what happened.").

27    [139] SEC Complaint at ¶48.

28    [140] *Id.*

160.    In February and March 2017, just after the start of the Class Period, Facebook made additional false and misleading statements in an attempt to downplay the risks facing the Company as a result of the Cambridge Analytica issues.  On at least two occastions in March 2017, Facebook's communications group responded to reporters by stating, ***"Our investigation to date [into Cambridge Analytica] has not uncovered anything that suggests wrongdoing*.**"[141]

161.    On March 30, 2017, Facebook's statement was published in a story by *The Intercept*, which quoted Facebook as stating, "'[O]ur investigation to date has not uncovered anything that suggests wrongdoing."[142]

162.    These statements were materially false and misleading because, as noted above, in reality Facebook had determined that the transfer of user data had been done in violation of Facebook's policies.  Moreover, as the SEC concluded, "th[is] quote served to reinforce the misleading impression in Facebook's periodic filings that the company was not aware of any material developer misues of user data."[143] In stark contrast to Facebook's public statements, more than 30 Facebook employees in different corporate groups, including "***senior managers in Facebook's communications, legal, operations, policy and privacy groups***, learned that [Kogan and GSR] had transferred information to Cambridge in violation of Facebook's policies."[144]

163.    On March 16, 2018, Facebook publicly admitted for the first time that it was aware that Kogan had violated Facebook's policies by transferring personal data to Cambridge Analytica.[145]  Despite this extensive knowledge at the highest levels of the Company that sensitive user data had been wrongly transferred to third parties, Facebook continued to make materially false and misleading disclosures in its public filings describing that the risk of this occuring was merely hypothetical.

---

[141] *Id.* at ¶49.

[142] Mattathias Schwartz, *Facebook Failed To Protect 30 Million Users From Having Their Date Harvested By Trump Campaign Affiliate*, Intercept (Mar. 30, 2017), https://tinyurl.com/matkerl.

[143] SEC Complaint at ¶49.

[144] *Id.* at ¶33.

[145] *Id.* at ¶51.

164.    After the facts set forth in the SEC's complaint became public, a *Vice* report explained that "Facebook [had] repeatedly **lied to journalists** about the severity of the Cambridge Analytica scandal as part of an alleged coverup of a privacy breach that gave up to 87 million users' personal data to the Trump-linked political firm."[146]   This report quoted investigative journalist Carole Cadwalladr who stated that the SEC complaint "'**proves Facebook's press team lied to me in February 2017**.'"   Cadwalladr was one of the reporters for *The Guardian* and *Observer* who had worked on the Cambridge Analytica investigation for years.

165.    As *Vice* reported, "Facebook officials told *The Guardian* in Dec. 2015 that they were investigating whether Cambridge Analytica was improperly harvesting users' personal information for political campaigns" and that the "company's inquiry confirmed that the firm had violated Facebook's privacy rules, according to the SEC."   "When journalists began circling back the following November, though, Facebook's PR team allegedly referred them to information that was false," pointing investigative journalists to statements by Cambridge Analytica about its use of Facebook users' data.

166.    Even into "February 2017, the communications group [at Facebook] pointed reporters to Cambridge's public statement that it 'does not use data from Facebook' and 'does not obtain data from Facebook profiles or Facebook likes.'"  Those statements were false, as Facebook's own investigation had already uncovered by the time Facebook directed investigative journalists to Cambridge Analytica's false comments.

**4.    Defendants Made False Statements Regarding Their Response To The Cambridge Analytica Misconduct**

167.    When *The Guardian* first reported on the Cambridge Analytica scandal in December 2015, a Facebook spokesman was quoted in the story stating, "[W]e will take swift

---

[146] David Uberti, *Facebook Misled Journalists About How Bad the Cambridge Analytica Scandal Was*, Vice News (July 25, 2019), https://tinyurl.com/y35bry9t.

1  action against companies that [violate Facebook's privacy policies], including banning those

2  companies from Facebook and requiring them to destroy all improperly collected data."[147]

3  Moreover, Facebook's data use policy in effect for most of the Class Period stated that Facebook

4  would "notify our users" if Facebook "confirmed their accounts have been compromised."[148]

5      168.   As set forth above, recently-revealed facts demonstrate that these (and other

6  statements set forth below in Section VI.E) were materially false and misleading.  Contrary to

7  their public statements during and prior to the Class Period, defendants' response to learing

8  December 2015 about Cambridge Analytica's violations of Facebook policy was inadequite and

9  primarily focused on minimizing bad publicity for Facebook rather than protecting Facebook's

10  users from further misuse of their data.  Facebook did not take any sort of "swift action" against

11  Cambridge Analytica, it did not "require" Cambridge Analytica to "destroy" user data that

12  Facebook knew it had, and it did not notify either the FTC or the 87 million users whose data was

13  compromised.

14      169.   **Facebook Did Not Notify Users**. The fact that Facebook should have notified

15  these users that their data had been compromised has been acknowledged by defendants

16  themselves.  In March 2018, Zuckerberg acknowledged that Facebook should have informed

17  users of the data breach, claiming that he "regret[s] that we didn't [issue a notification] at the

18  time.  And I think that we got that wrong."[149]  Sandberg has also recognized that "*we have the*

19  *responsibility to disclose to people when problems occur[],*" admitting that the Company failed

20  to meet its disclosure responsibility.[150]  When asked directly whether Facebook should have

21

22

23

24  [147] Harry Davies, *Ted Cruz using firm that harvested data on millions of unwitting Facebook users*, Guardian (Dec. 11, 2015), https://tinyurl.com/kctlw6n.

25  [148] Facebook Terms of Service (Jan. 30, 2016).

26  [149] Interview by Laurie Segall, with Mark Zuckerberg, Chief Operating Officer of Facebook, CNN (Mar. 22, 2018), https://tinyurl.com/y7aerupa.

27  [150] *CNBC Exclusive: CNBC Transcript: Sheryl Sandberg Sits Down with CNBC's Julia Boorstin Today*, CNBC (Mar. 22, 2018), https://tinyurl.com/ya4z2elm.

28

1  timely disclosed that Facebook users' data had been stolen, Sandberg admitted, "Yes, you are

2  right and we should have done that.  Of course you are right, and we should have done it."[151]

3       170.    Indeed, the plain language of Facebook's data use policy in effect for most of the

4  Class Period stated that Facebook would notify users when they learned that the user account had

5  been compromised.[152]  There was no exception to this policy if Facebook believed – however

6  implausibly – that the data had later been deleted years after it was compromised.  Facebook itself

7  admits that it determined in December 2015 that a massive amount of user data had been shared

8  improperly with Cambridge Analytica (affecting nearly 87 million users) and this sharing violated

9  Facebook's terms of use.   At this point Facebook knew that the user's accounts were

10  "compromised" and they should have been notified immediately under the terms of Facebook's

11  own data use policy.

12       171.    **Facebook Did Not "Require" Deletion Of Data**. Facebook did not actually

13  "require" that GSR and Cambridge Analytica delete the user data.  Instead, Facebook pretended

14  to rely on oral promises and unverified and utterly implausible certifications (from known bad

15  actors) that data had been deleted.  Facebook did so even though defendants knew that GSR and

16  Cambridge Analytica had repeatedly lied to Facebook regarding the scope and type of user data

17  Cambridge Analytica had obtained.

18       172.    Zuckerberg has conceded that Facebook's failure to follow up on and investigate

19  the extent of the Cambridge Analytica data breach and assure that compromised data was deleted

20  was the "biggest mistake[]"[153] Facebook ever made.   As he ultimately admitted, Facebook

21  "should have been doing more all along" to protect their users' privacy.

22

23

24

---

25  [151] Eun Kyung Kim, *Sheryl Sandberg on TODAY: Other Facebook data breaches 'possible'*,

26  Today (Apr. 6, 2018), https://tinyurl.com/ydb26wx3.

    [152] Facebook Terms of Service (Jan. 30, 2016).

27  [153] Nicholas Thompson, *Mark Zuckerberg Talks to Wired About Facebook's Privacy Problem*,

28  Wired (Mar. 21, 2018), https://tinyurl.com/y77krl23.

173.    Sandberg has also admitted that it was a "mistake that [Facebook] did not verify" whether Cambridge Analytica had deleted the user data[154] and acknowledged that the Company should have "checked"[155] and "follow[ed]-up"[156] to ensure Facebook user's personal data was, in fact, protected.  She stated that Facebook was "not focused enough on the possible misuses of data" and "protecting people's data" at the time.[157]  Sandberg has also admitted that Facebook "could have done . . . two and a half years ago" what it is doing today.[158]  Facebook's Chief Privacy Officer, Erin Egan has similarly admitted that "we should have done more to investigate claims about Cambridge Analytica and take action in 2015."[159]

174.    During his Senate testimony, Zuckerberg admitted that, nearly three years after the breach had been detected, Facebook *still* had not verified that the affected data had been deleted. Zuckerberg's testimony leaves no doubt that Facebook had failed to conduct an investigation or audit or make any other effort to require deletion of the data compromised by Cambridge Analytica in a manner consistent with the Company's public assurances of what would be done in response to the abuses of user data.[160]

---

[154] *CNBC Exclusive: CNBC Transcript: Sheryl Sandberg Sits Down with CNBC's Julia Boorstin Today*, CNBC (Mar. 22, 2018), https://tinyurl.com/ya4z2elm.

[155] Eun Kyung Kim, *Sheryl Sandberg on TODAY: Other Facebook data breaches 'possible'*, Today (Apr. 6, 2018), https://tinyurl.com/ydb26wx3.

[156] Steve Inskeep, *Full Transcript: Facebook COO Sheryl Sandberg On Protecting User Data*, NPR (Apr. 5, 2018), https://tinyurl.com/y8aamyhn.

[157] Judy Woodruff, *Sheryl Sandberg: Facebook 'made big mistakes' on protecting user data*, PBS (Apr. 5, 2018), https://tinyurl.com/vbkaqkx.

[158] Mike Allen, *Exclusive interview with Facebook's Sheryl Sandberg*, Axios (Oct. 12, 2017) https://tinyurl.com/y9k7mlok.

[159] Sheera Frenkel & Adam Satariano, *Facebook Fined in U.K. Over Cambridge Analytica Leak*, N.Y. Times (July 10, 2018), https://tinyurl.com/y6wk7v8b.

[160] *Transcript of Mark Zuckerberg's Senate hearing*, Wash. Post (Apr. 10, 2018), https://tinyurl.com/y7cu7jh7. ("we need to . . . go do a full audit of all of Cambridge Analytica's systems to understand what they're doing, whether they still have any data, to make sure that they remove all the data.  If they don't, we're going to take legal action against them to do so."); 77 ("For Cambridge Analytica, first of all, we need to finish resolving this by doing a full audit of their systems to make sure that they delete all the data that they have and so we can fully understand what happened.").

175.     Given the size and nature of the breach, and the public representations about the seriousness with which such violations were taken and the swift repercussions that would follow, it was reckless for defendants to fail to undertake audits and other measures at the time of a data breach. The same is true for their reliance on unverified and self-serving certifications of the type described by Wylie to assume that the risks had been eliminated.  It was especially reckless for Facebook to do so given its position at the forefront of technological innovation and monetization of personal information.

176.     Defendants were well aware of the risks of relying on Cambridge Analytica's bald assertions that data had been deleted.  Zuckerberg, Sandberg and numerous other high-ranking executives of Facebook knew all too well how easy it was to obtain private data, and how difficult it was to retrieve it once it had been leaked into the public domain.

177.     Wylie's 2018 testimony to the U.K. Parliament lays bare how easy it was for the user data to be accessed indefinitely.  In his testimony, Wylie explained that the user data possessed by Cambridge Analytica was "completely fungible in the sense that you can copy it a million times, it can go anywhere and . . . [i]t is often impossible to ascertain where did the data go or where is it or how much of it [there] is."[161]

178.     In his written testimony to the United States Senate, Wylie explained that Cambridge Analytica "often stored or transmitted data in insecure formats, including files of hundreds of thousands of Americans' data being passed around via unencrypted e-mails. [Cambridge Analytica] also allowed access to its American datasets to external contractors, including senior staff from the company Palantir."[162]   Wylie's testimony also noted how Cambridge Analytica's parent, SCL, "has a documented history of poor handling of sensitive data" and had been criticized in the U.K. "for its inability to properly handle sensitive Ministry of Defense information."[163]

---

[161] Wylie U.K. Test. at Q1337-Q1338 (intervening comment omitted).

[162] Wylie Stmt. at ¶28. *See* Wylie Test. at Q1324; *see also* at Q1341 (Wylie: "Staff at Palantir had access to the data; all kinds of people had access to the data.").

[163] *Id*. at 29.

179.    Facebook's purported reliance on oral assurances and unverified (and long delayed) "certifications" from GSR and Cambridge Analytica is all the more implausible given the facts detailed above showing how Facebook knew that Cambridge Analytica was "sketchy (to say the least)" and that Cambridge Analytica and GSR had repeatedly lied to Facebook about the scope and type of data that had been taken, as well as repeatedly lying that it had been deleted. See Section IV.G.2.

180.    When asked why he thought Facebook never "made any efforts to retrieve or delete data," Wylie testified that he thought Facebook did not push the issue because "if you want to investigate a large data breach, that is going to get out and that might cause problems," and that his "*impression [was] they have sort of wanted to push it under the rug.*"[164]

### 5.    Defendants Made Materially False And Misleading Statements Regarding their Compliance With the FTC Consent Decree

181.    The 2012 FTC Consent Decree was in effect throughout the Class Period.  As Zuckerberg explained in testimony to the Senate Commerce Committee on June 8, 2012, the FTC Consent Decree obligated Facebook "not to misrepresent the extent to which it maintains the privacy or security" of user data.

182.    At various times during the Class Period, defendants made public assurances that they were complying with the FTC Consent Decree.  In particular, after the March 2018 disclosures regarding Cambridge Analytica, defendants engaged in an aggressive public relations campaign to reassure the market that Facebook had not violated the FTC Consent Decree.  These public statements included:

- On March 18, 2018, in a *Washington Post* article, Facebook stated, "We reject any suggestion of violation of the consent decree.  *We respected the privacy settings* that people had in place."[165]

---

[164] Wylie U.K. Test at Q1339.

[165] Craig Timberg & Tony Romm, *Facebook May Have Violated FTC Privacy Deal, Say Former Federal Officials, Triggering Risk Of Massive Fines*, Wash. Post (Mar. 18, 2018), https://tinyurl.com/yb8myroq.

1

2

- On April 4, 2018, Zuckerberg stated, "You asked about the FTC consent order.  We've worked hard to make sure that we comply with it."[166]

3

4

- On April 5, 2018, in an interview with NPR, Sandberg stated, "The FTC consent decree was important.  *And we've taken every step we know how to make sure we're in accordance with it.*"[167]

5

6

7

- On April 10, 2018, in response to questions about the FTC Consent Decree from the Joint Senate Commerce and Judiciary Committees, Zuckerberg stated that they had changed Facebook in 2014 "so that that way it just massively restricts the amount of – of data access that a developer could get."[168]

8

9

10

183.    On June 8, 2018, in response to written questions submitted by the Senate Commerce Committee whether the FTC Consent Decree was implicated by Facebook's recent disclosures around Cambridge Analytica, Zuckerberg stated that it was not because:

11

12

13

Facebook accurately represented the operation of its developer Platform and the circumstances under which people could share data (including friends data) with developers [and] *honored the restrictions of all privacy settings that covered developer access to data*.

14

15

16

17

18

19

20

184.    As described above, these statements were materially false and misleading.  Far from respecting the restrictions on privacy settings, Facebook was secretly sharing massive amounts of user data with third parties and actively overriding users' privacy settings as described above.  Facebook was secretly overriding users' privacy settings in order to share information about users' friends with a wide array of "whitelisted" third-party app developers and major corporations.  Thus, defendants' statements regarding user control, including in the context of the FTC Consent Decree were materially false and misleading.

21

22

23

24

25

26

27

28

---

[166] Q&*A With Mark Zuckerberg on Protecting People's Information*, Facebook Newsroom (Apr. 4, 2018), https://tinyurl.com/rv69jh9.

[167] Steve Inskeep, *Full Transcript: Facebook COO Sheryl Sandberg on Protecting User Data*, National Public Radio (Apr. 5, 2018), https://tinyurl.com/y8aamyhn.

[168] *Transcript of Mark Zuckerberg's Senate hearing*, Wash. Post (Apr. 10, 2018), https://tinyurl.com/y7cu7jh7.

### H.    Facebook's Failure to Respond to the Cambridge Analytica Breach in a Manner Consistent with Its Prior Public Statements Is Revealed, Causing Massive Economic Losses to the Class

185.    On March 12, 2018 *The New York Times* and *The Guardian* contacted Facebook for comment on articles they were planning to jointly publish regarding Cambridge Analytica's use of Facebook user data.  These articles were going to address the fact that the user data had been deleted.  After initially threatening to sue the publications to delay or prevent publication,[169] Facebook sought to pre-empt their articles by issuing a press release of its own.

186.    Thus, on Friday, March 16, 2018, Facebook announced in an article published on the Company's investor relations website that it was suspending Cambridge Analytica, its parent company, and whistleblower Wylie for sharing Facebook's users' data without the users' consent.  In the article, Facebook stated "[i]n 2015, we learned that [Kogan] lied to us and violated our Platform Policies by passing data … to SCL/Cambridge Analytica [and] Christopher Wylie of Eunoia Technologies Inc."   Facebook explained that "[a]pproximately 270,000 people downloaded the app" and "[i]n so doing, they gave their consent for Kogan to access [their data]."[170]  The article asserted that "[w]hen [Facebook] learned of the violation in 2015" it had "demanded certification from Kogan and all parties he had given data to that the information had been destroyed."  *Id*.  Alluding to the prior media contacts, the article asserted that "Several days ago, we received reports that, contrary to the certifications we were given, not all data was deleted."  *Id*.  The Company said it was "moving aggressively to determine the accuracy of the claims" and asserted it was "committed to vigorously enforcing our policies to protect people's information" and "will take whatever steps are required to see that this happens," including taking legal action "to hold [violators] responsible and accountable for" their actions.  *Id*.  Referring to Zuckerberg's April 2014 announcement that access to user friend data would be shut-off,

---

[169] *See, e.g.*, Carole Cadwalladr (@carolecadwalla) TWITTER (Mar. 17, 2018, 6:07 AM), https://tinurl.com/y9rbglkk ("Yesterday @facebook threatened to sue us.") (March 17, 2018).

[170] Paul Grewal, *Suspending Cambridge Analytica and SCL Group From Facebook* (Mar. 16, 2018), https://tinyurl.com/ycd7en7b.

1    Facebook further stated:  "In 2014 . . . we made an update to ensure that each person decides what

2    information they want to share about themselves, including their friend list."

3          187.    The March 16, 2018 article did not disclose that – despite knowing that Cambridge

4    Analytica had "lied" – Facebook had waited many months after first learning about the improper

5    data access to request certifications from Cambridge Analytica, Kogan and Wylie.  Nor did the

6    article disclose that other than collecting the worthless certifications, Facebook had made no effort

7    to determine how much user data had been compromised, what that data contained, what users

8    were affected, who else had access to their data, or how that data was being used.  Nor did

9    Facebook disclose that it had failed to notify the victims of the data breach and the user data

10   accessed by Kogan had been transmitted to other entities and persons who had not certified that

11   the data had been destroyed.

12         188.    To the contrary, the following day, Facebook published an addendum to the article

13   asserting that "The claim that this is a data breach is completely false."  *Id*.  Facebook stated that

14   the affected users had "chose to sign up to [Kogan's] app," "everyone involved gave their

15   consent," and "[p]eople knowingly provided their information" to Kogan.  *Id*.  In reality, only

16   around 270,000 users had provided consent – but over 87 million users had their data harvested

17   and misused.  The addendum, published at 9:50 a.m. PDT, was plainly intended as a response to

18   articles by the *The New York Times* and *The Guardian* about the data breach, which had been

19   published earlier the same day.

20         189.    On March 17, 2018, *The New York Times* reported that the data breach was "one

21   of the largest data leaks in the social network's history.  The breach allowed the company to

22   exploit the private social media activity of a huge swath of the American electorate, developing

23   techniques that underpinned its work on President Trump's campaign in 2016."  As described by

24   *The Times*:

25            Interviews with a half-dozen former employees and contractors, and a review of
              the firm's emails and documents, have revealed that Cambridge not only relied on
26            the private Facebook data but still possesses most or all of the trove.

27                                    *        *        *

28

The data Cambridge collected from profiles, a portion of which was viewed by The Times, included details on users' identities, friend networks and "likes." Only a tiny fraction of the users had agreed to release their information to a third party.

*          *          *

Mr. Grewal, the Facebook deputy general counsel, said in a statement that both Dr. Kogan and "SCL Group and Cambridge Analytica certified to us that they destroyed the data in question."

But copies of the data still remain beyond Facebook's control.  The Times viewed a set of raw data from the profiles Cambridge Analytica obtained.

While Mr. Nix has told lawmakers that the company does not have Facebook data, a former employee said that he had recently seen hundreds of gigabytes on Cambridge servers, and that the files were not encrypted.

190.    As noted by *The Times*, "[T]he full scale of the data leak involving Americans has not been previously disclosed – and Facebook, until now, has not acknowledged it."  The newspaper went on to report that Facebook at first "downplayed" the issue, it subsequently "posted a statement expressing alarm and promising to take action."

191.    Reaction to the disclosures was swift and severe.  On March 18, 2018, numerous elected officials in the United States and Europe called for investigations into Facebook, demanding that Zuckerberg testify to Congress and Parliament to explain how the breach had occurred and why affected users were not informed.[171]

192.    On March 19, 2018, CNN reported that:

The Cambridge Analytica scandal has done immense damage to the brand, sources across the company believe.  It will now take a Herculean effort to restore public trust in Facebook's commitment to privacy and data protection, they said.

No one has provided an adequate explanation for why Facebook did not disclose Kogan's violation to the more than 50 million users who were affected when the company first learned about it in 2015.[172]

---

[171] David Z. Morris, *U.S. and U.K. Lawmakers Demand Investigations of Facebook's Data Handling*, Fortune (Mar. 18, 2018), https://tinyurl.com/y864gatz.

[172] Dylan Byers, *Facebook is facing an existential crisis*, CNN Business (Mar. 19, 2018), https://tinyurl.com/y9zon63o.

193.   Others agreed.  On March 17, 2018 a prominent tech reporter, wrote "[T]he story here isn't how this data was used. . . .  ***The problem here is how Facebook, the biggest social network, chose to stay silent and not inform the affected users***. . . . [T]the problem is Facebook's silence on the matter until it was pushed by the whistleblower who made the details public. . .  In its press release, Facebook blamed everything on how it was lied to by a researcher and takes no charge of its policies that allowed such behavior or says anything about why the affected users weren't informed."[173]

194.   Similarly, on March 20, 2018, another tech reporter wrote: "This time around, Facebook might not clamber out of the hot water so easily . . . The revelation that Facebook data on as many as 50 million users appears to have made its way into a political data operation with no consent from users is Facebook's burden to bear alone."[174]

195.   Investors and stock analysts recognized that the disclosures and the firestorm of criticism they engendered had fundamentally altered the value proposition for the Company.  For example, in explaining the removal of its Buy recommendation on the Company on March 20, 2018, William O'Neill & Co. wrote:

> Facebook was aware of the privacy breach two years ago.  This lack of disclosure could be viewed as a violation of privacy laws in the U.K. and many U.S. states, raising further questions . . . .
>
> Furthermore, the increased scrutiny adds to the criticism of Russian social media influence in the 2016 election and will likely bring further backing for social media regulation, which could add uncertainty to share performance.[175]

A *Seeking Alpha* article similarly wrote on March 19, 2018:

> The importance of this incident cannot be overstated for Facebook on both the user privacy front but also more importantly on Facebook's business model front. . . . If Cambridge Analytica was able to acquire information on tens of millions of Facebook users so quickly and easily, and then keep the information for years

---

[173] Rafia Shaikh, *50 Million Facebook Profiles Harvested Without User Consent – Data Monster Chose NOT to Alert Victims & Is Trying to Threaten Reporters*, Wccftech (Mar. 17, 2018), https://tinyurl.com/ycvf9ju7.

[174] Tony Hatmaker, *Zuck and Sandberg go M.I.A. as Congress summons Facebook leadership by name*, TechCrunch (Mar. 20, 2018), https://tinyurl.com/yayg3fnn.

[175] Derek Higa, *Facebook, Inc CI A (FB)*, William O'Neill & Co. (Mar. 20, 2018).

without Facebook suspecting otherwise, then that shows a serious flaw in Facebook's ability to keep exclusive control over its information.[176]

Even analysts who remained bullish on the Company and believed Facebook would weather the storm recognized the negative impact of the disclosures.  As PiperJaffray noted on March 21, 2018: "there's a lot of negative sentiment baked into FB after the revelation of the data extraction by Cambridge Analytica and Facebook's botched PR responses."  The report went on to warn: "This situation could get worse if further data extractions are disclosed or if the FTC pursues a fine with Facebook."

196.    Over the next several days, additional details emerged regarding the scope of the data breach and defendants' knowledge of the severity of the breach at the time it occurred, their failure to act to constrain the harm to users privacy interests or to respond to the breach in the manner described in their contemporaneous public statements, and their continuing efforts thereafter to downplay or conceal the extent of the problems and the magnitude of the risks the Cambridge Analytica data misuse continued to present to the Company's business and reputation.

197.    Amid these disclosures, several social media campaigns began to urge users to disconnect from Facebook and delete the information they had posted there.  On March 20, 2018, Brian Acton, co-founder of WhatsApp, a $19 billion Facebook acquisition, tweeted: "It is time. #deletefacebook."[177]   A *Business Insider* article similarly reported:   "The hashtag #DeleteFacebook is trending on Twitter. ***People are furious, and they have good reason to be***: . . . . [a]s a result, ***people are deleting their Facebook accounts en masse***."[178]

198.    The foregoing disclosures caused the price of Facebook stock to decline precipitously.  Facebook shares fell nearly 7% on Monday, March 19, 2018 – the first trading day after the news broke – and fell an additional 2.5% the next trading day amid additional disclosures

---

[176] Erich Reimner, *The Cambridge Analytica Mishap Is Serious For Facebook*, Seeking Alpha (Mar. 19, 2018), https://tineurl.com/y7tk075.

[177] Brian Acton @brianacton, TWITTER (Mar. 20, 2018), https://tinyurl.com/yacgbyl.

[178] Ben Gilbert, *#DeleteFacebook is trending: Here's how to delete your Facebook account*, Business Insider, (Mar. 20, 2018), https://tinyurl.com/y8vku9n2.

of the nature and extent of the risks that had been concealed from investors.  As additional details of Facebook's concealment were disclosed, and the negative news continued to mount, Facebook's shares continued to decline.  Within a week, Facebook's stock was trading around $150/share, a stunning drop of nearly 18% in value from its price (~$185) just before news of the Cambridge Analytica scandal broke, reflecting an extraordinary loss of more than $100 billion in market capitalization in just one week.

### 1.    Facebook's Privacy Misconduct Sparked Numerous Government Investigations

199.    Given the volume of leaked data and its detailed, personal nature, the number of people affected, and the politically contentious nature of the leaks, multiple government agencies launched investigations into Facebook's actions.

200.    On March 26, 2018, the FTC confirmed that it had launched an investigation into Facebook's compliance with the 2012 Consent Decree, stating: "the FTC takes very seriously recent press reports raising substantial concerns about the privacy practices of Facebook."[179]

201.    On July 12, 2018, *The Wall Street Journal* reported that the U.S. Securities and Exchange Commission ("SEC") was investigating "whether Facebook Inc. adequately warned investors that developers and other third parties may have obtained users' data without their permission or in violation of Facebook policies."[180]  The Justice Department and the FBI also reportedly joined the government investigations into Facebook's privacy lapses in the wake of the Cambridge Analytica data breach.

202.    In addition, and as discussed in greater detail below, numerous governments of other countries began investigating defendants' misuse of Facebook user information.

---

[179] Press Release, Statement by the Acting Director of FTC's Bureau of Consumer Protection Regarding Reported Concerns about Facebook Privacy Practices (Mar. 26, 2018) (on file with author).

[180] David Michaels and Georgia Wells, *SEC Probes Why Facebook Didn't Warn Sooner on Privacy Lapse*, The Wall Street Journal (July 12, 2018). https://www.wsj.com/articles/sec-probes-why-facebook-didnt-warn-sooner-on-privacy-lapse-1531422043.

1

## 2.    The U.K. Information Commissioner's Office

2       203.    On July 11, 2018, a United Kingdom government agency called the Information

3   Commissioner's Office or "ICO" issued a report following its investigation into the way that

4   Facebook, Cambridge Analytica and others used individuals' personal information in political

5   processes.[181]   The report states that in 2017,[182] the ICO launched a formal investigation into the

6   misuse of personal information leading up to the "Brexit" vote in the summer of 2016.  Over 40

7   investigators worked on the investigation along with experts.  One key focus of the investigation

8   is the misuse of the same data that Cambridge Analytica applied in the U.S. presidential election.

9       204.    According to the ICO's report, its investigation in "the second half of 2017 was

10  both complex and wide ranging."[183]   The report states that the investigation "involved meetings,

11  interviews and correspondence with over 30 organisations" that included "Facebook, Cambridge

12  Analytica and AggregateIQ (AIQ)."[184]   The ICO report attaches a Notice of Intent to take

13  regulatory action Facebook for data breaches, and the notice states that the ICO **sent an**

14  **investigation letter "to the Facebook companies on 23 August 2017**."[185]   The ICO made iterative

15  requests after that time.  The ICO confirms that a "key strand" of its investigation focused on the

16  Cambridge Analytica data leak because the leaked data also included "1 million" users in the

17  UK.[186]

18      205.    The ICO explained that it intended to impose a penalty on Facebook.  The penalty

19  arose out of the "very serious" data incident involving Facebook's failure to take appropriate

20  technical and organizational measures against "unauthorized or unlawful processing of personal

21

---

22  [181]  *Investigation into the use of data analytics in political campaigns*, Information
     Commissioner's Office (July 11, 2018), https://tinyurl.com/y9req4jo. ("ICO Report").

23
     [182] *Id*. at 6.

24  [183] ICO Report at 9.

25  [184] *Id*.

26  [185] *Data Protection Act 1998, Supervisory Powers of the Information Commissioner, Notice of
     Intent*, Information Commissioner's Office (June 19, 2018), https://tinyurl.com/uscosm6, at 7

27  ("ICO Notice").

28  [186] ICO Report at 8.

data" in violation of its statutory obligations, as the ICO wrote.[187]  These violations stemmed from Facebook's failure to protect the privacy of its users' data that Cambridge Analytica and related companies exploited in both the U.K. "Brexit" election and the U.S. presidential election. The ICO Notice of Intent states that the Facebook's violations were serious because they affected a "very large number of individuals" and a "very substantial volume of personal data" and involved uses that were beyond reasonable expectations thereby causing the victims distress.[188]

206.    The ICO's investigation also demonstrated that Facebook knew or should have known about the Cambridge Analytica data leak and misuse.  The ICO wrote that "the Facebook Companies *knew or ought reasonably to have known* that there was a risk that the contravention would (a) occur, *and* (b) be of a kind likely to cause substantial distress."[189]  The ICO further wrote that Facebook "failed to take reasonable steps to prevent such contravention" in that Facebook is a large and experienced data collector and "*should have been aware of the risks*."[190] And the ICO that Facebook "had ample opportunity over a long period of time to implement appropriate technical . . . measures" to prevent the data violations "but failed to do so."[191]  The ICO did act on its intent to penalize Facebook and, as *CNBC* reported on July 11, 2018, the ICO was "hitting Facebook with the maximum possible fine it can impose."[192]  On October 24, 2018, the ICO imposed its maximum penalty of £500,000.

### 3.    Defendants Admit Fault for the Cambridge Analytica Privacy Failure

207.    On March 21, 2018, defendants broke their silence as Zuckerberg and Sandberg made a number of statements in which they conceded that they had known that the data of millions of its users had been harvested and used without consent but had done nothing.  In a post to his

---

[187] ICO Notice at 2-3.

[188] *Id*. at 17.

[189] *Id*. at 18.

[190] *Id*.

[191] *Id*.

[192] Ryan Brown, *Facebook faces UK fine of around $660,000 after data scandal found to be illegal*, CNBC (July 11, 2018), https://tinyurl.com/yc369jyy.

1   personal Facebook page, Zuckerberg took "responsibil[ity] for what happens on our platform"

2   and admitted that the Company had "made mistakes," and that the Cambridge Analytica issue

3   reflected "a breach of trust between Facebook and the people who share their data with us and

4   expect us to protect it. We need to fix that."[193]  Sandberg re-posted Zuckerberg's post on her own

5   Facebook page, adding: "We know that this was a major violation of people's trust, and I deeply

6   regret that we didn't do enough to deal with it. We have a responsibility to protect your data."[194]

7         208.   Defendants' statements were not mere expressions of regret, they were outright

8   admissions of "responsibility" for "breach[es]" and "violations" of user "trust" and

9   acknowledgments that defendants "didn't do enough" to respect user privacy or provide users

10  with the promised control over their data.

11        209.   In an interview with *Wired* the same day, Zuckerberg similarly admitted that the

12  *Guardian* and *Times* reports were credible and admitted that Cambridge Analytica was not the

13  only third party Kogan had shared "a lot" of users' data with, that Facebook had not audited

14  Cambridge Analytica to verify that user data had been deleted, that the Company might have to

15  do a "full forensic audit" of every one of its developers operating before it could determine the

16  extent of the data breach.[195]

17        210.   The transcript of the interview published by *Wired* stated in relevant part:

18  Thompson: You learned about the Cambridge Analytica breach in late 2015, and
    you got them to sign a legal document saying the Facebook data they had
19  misappropriated had been deleted. ***But in the two years since, there were all kinds
    of stories in the press that could have made one doubt and mistrust them. Why***
20  ***didn't you dig deeper to see if they had misused Facebook data***?

21  Zuckerberg: So in 2015, when we heard from journalists at *The Guardian* that
22  Aleksandr Kogan seemed to have shared data with Cambridge Analytica ***and a***
    ***few other parties***, the immediate actions that we took were to ban Kogan's app
23  and to demand a legal certification from Kogan and all the other folks who he
    shared it with.  We got those certifications, and Cambridge Analytica had actually
24

25
    _____

26  [193] Mark Zuckerberg, Facebook (Mar. 21, 2018), https://tinyurl.com/yadalrv7.

    [194] Sheryl Sandberg, Facebook (Mar. 21, 2018), https://tinyurl.com/y9jw7y3k.
27
    [195] Nicholas Thompson, *Mark Zuckerberg Talks to Wired About Facebook's Privacy Problem*,
28  *Wired* (Mar. 21, 2018), https://tinyurl.com/y77krl23.

told us that they actually hadn't received raw Facebook data at all.  It was some kind of derivative data, but they had deleted it and weren't [making] any use of it.

In retrospect, though, I think that what you're pointing out here is **one of the biggest mistakes that we made**.  And that's why the first action that we now need to go take is to not just rely on certifications that we've gotten from developers, **but [we] actually need to go and do a full investigation of every single app that was operating before we had the more restrictive platform policies** – that had access to **a lot of data** – and for any app that has any suspicious activity, we're going to go in and do a **full forensic audit**.

*          *          *

Thompson: How confident are you that Facebook data didn't get into the hands of Russian operatives – into the Internet Research Agency, or even into other groups that we may not have found yet?

Zuckerberg: I can't really say that.  I hope that we will know that more certainly **after we do an audit.**  You know, for what it's worth on this, the report in 2015 was that Kogan had shared data with Cambridge Analytica **and others**.[196]

211.    In an interview with *Recode* on March 21, 2018, Zuckerberg revealed that Facebook needed to investigate tens of thousands, of apps that may have improperly shared data, while conceding that the Company might never be able to determine what or how much user data had been sold to or shared with third parties.[197]  Ime Archibong, Facebook's Vice President of Product Partnerships, warned that this number may increase as the investigation continues to "find all the apps that may have misused people's Facebook data."[198]

212.    In the *Recode* interview, Zuckerberg repeated the claim that Cambridge Analytica had said it "never had the data and deleted what derivative data" it had,[199] while admitting that

---

[196] Nicholas Thompson, *Mark Zuckerberg Talks to Wired About Facebook's Privacy Problem*, Wired (Mar. 21, 2018), https://tinyurl.com/y77krl23.

[197] Kara Swisher & Kurt Wagner, *Mark Zuckerberg says he's 'open' to testifying to Congress, fixes will cost 'many millions' and he 'feels really bad'*, Recode (Mar. 21, 2018), https://tinyurl.com/yblq3jng.

[198] Ime Archibong, *An Update on Our App Investigation and Audit*, Facebook Newsroom (May 14, 2018), https://tinyurl.com/yaovr5v3.

[199] Kara Swisher & Kurt Wagner, *Here's the transcript of Recode's interview with Facebook CEO Mark Zuckerberg about the Cambridge Analytica controversy and more*, Recode (Mar. 22, 2018), https://tinyurl.com/ycy5zuru.

Facebook had done nothing to verify those assertions.  While attempting to justify the Company's actions as reasonable at the time Zuckerberg admitted "in retrospect it was clearly a mistake.  I'm explaining to you the situation at the time, and the actions that we took, but ***I'm not trying to say it was the right thing to do***.  I think given what we know now, we clearly should have followed up."[200]  *Recode* itself was unimpressed by Zuckerberg's attempts to explain away Facebook's response to the data breach, noting in a companion article about the interview:

> But Zuckerberg did not give any details about why the company did not do those checks, or about why broader monitoring of third-party developers – who in some cases were given vast troves of user information – was so shoddy.

> He said Facebook is now trying to go back and check who has user data, although it's essentially an effort to put the genie back into the bottle. When asked if he could recover some of the data now, Zuckerberg admitted, "not always."[201]

213.    On March 25, 2018, Facebook also took out full-page advertisements in several U.S. and U.K. newspapers, including *The New York Times*, *The Washington Post*, *The Wall Street Journal*, *The Observer*, *The Sunday Times*, *Sunday Mirror*, *Sunday Express* and *Sunday Telegraph*.  These ads were signed by Zuckerberg, who stated with direct reference to the Cambridge Analytica scandal: "This was a breach of trust, and I'm sorry we didn't do more at the time.  We're now taking steps to ensure this doesn't happen again."  Zuckerberg further stated: "I promise to do better for you."[202]

214.    On April 4, 2018, in a Q&A session with members of the press, Zuckerberg admitted with respect to the Cambridge Analytica scandal, "it's clear now that we didn't do enough . . . [w]e didn't take a broad enough view of what our responsibility is, and that was a huge mistake.  It was my mistake."[203]  Zuckerberg elaborated by acknowledging that "it's not

---

[200] *Id.*

[201] Kara Swisher & Kurt Wagner, *Mark Zuckerberg says he's 'open' to testifying to Congress, fixes will cost 'many millions' and he 'feels really bad'*, Recode (Mar. 21, 2018), https://tinyurl.com/yblq3jng.

[202] Sheena McKenzie, *Facebook's Mark Zuckerberg says sorry in full-page newspaper ads*, CNN (Mar. 25, 2018), https://tinyurl.com/yawxvkga.

[203] *Hard Questions:* Q&A With Mark Zuckerberg on Protecting People's Information, Facebook Newsroom (Apr. 4, 2018), https://tinyurl.com/rv69jh9.

enough to have rules requiring they [*i.e.*, app developers] protect information, it's not enough to believe them when they tell us they're protecting information – we actually have to ensure that everyone in our ecosystem protects people's information."

215.    In an April 5, 2018 interview with NPR, Sandberg acknowledged that Facebook did not previously have sufficient privacy controls in place, and indicated awareness that Facebook was not in compliance with the FTC Consent Decree.  Specifically, Sandberg stated: "we're in constant conversation with the FTC, and that consent decree was important, and we've taken every step we know how to make sure we're in accordance with it.  But the bigger answer is, ***should we have taken these steps years ago anyway?  And the answer to that is yes.  Like a very clear, a very firm, yes***."

216.    Defendants' orchestrated apology tour had its intended effect.  Indeed, analysts responded by telling investors to expect only a relatively modest and short term impact from the revelations about Facebook's failure to protect privacy or provide users control over their data.[204]

**I.      Defendants Recklessly and Falsely Assured Investors that the Cambridge Analytica Scandal Had Not Affected Facebook's User Engagement or Financial Results, Reinflating Facebook's Stock Price**

217.    As the first quarter drew to a close, investors and market analysts were justifiably concerned over the impact that Facebook's past misrepresentations concerning the Cambridge Analytica data breach and the use of its platform to further election interference and other political activities by Russia would have on the Company's users and advertisers.  The impending launch of the General Data Protection Regulation ("GDPR") in the E.U. added to these concerns.

---

[204] *See, e.g.*, Mark S.F. Mahaney, *Defending Facebook*, RBC Capital Markets (Mar. 21, 2018) (maintaining outperform rating and $250 price target: "we view [Zuckerberg's] statement . . . as delayed – but appropriate – responses and steps by Facebook"); Brian Nowak, C.F.A., *Our Thoughts on FB's Public Statement*, Morgan Stanley (Mar. 21, 2018) (maintaining overweight and $230 price target: "We look to these and further forthcoming data safeguards (expected in coming days) to reassure users that FB is acting more proactively and decisively to protect their data"); Ronald V. Josey, *Our Thoughts on Facebook's Privacy and Data Issues*, JMP (Mar. 21, 2018) ("we expect this issue to be an overhang over the short-to-medium term, although we also do not believe these issues have impacted usage or advertiser demand"); Ken Sena, *FB: It's Not You, It's Us*, Wells Fargo Securities (Mar. 21, 2018) ("Constructive First Steps, Continue to View Business Impact as Likely Minimal").

218.    Nevertheless, analysts were cautiously optimistic that Facebook's promises of quick and decisive action to combat the threats would help it rebound quickly from the negative disclosures.  As a Morningstar analyst wrote on March 26, 2018:

> Facebook's latest data breach issue, which surfaced 11 days ago and involved Cambridge Analytica, was followed on March 25 by the Federal Trade Commission's announcement of an investigation into the company's abilities and willingness to protect user information.  While this recent development may have brought forth further doubts regarding Facebook and its user growth and engagement, along with more demand for a GDPR type of regulation in the U.S., we remain confident that the firm is more likely to endure the short-term impact of the data breach issue and at this point do not expect a significant long-term negative effect on Facebook's platform and operations.[205]

Other analysts made similar comments.[206]

### 1.    Defendants Tout Facebook's 1Q18 Results as Demonstrating Users Were Unconcerned with the Cambridge Analytica Scandal

219.    When Facebook reported its first quarter results on April 25, 2018, investors were buoyed by revenues, earnings and DAU/MAU metrics that were all in line with estimates. Sandberg told investors "It was a great quarter for our business.  Q1 ad revenue grew 50% year-over-year.   Mobile ad revenue was $10.7 billion, up 60% from last year and contributed approximately 91% of total ad revenue.   Revenue growth was broad-based across regions, marketer segments and verticals."

---

[205] Ali Magharabi, *Many Downside Scenarios Are Priced In, Facebook Shares are now attractive*, Morningstar (Mar. 26, 2018).

[206] *See, e.g.*, Lloyd Walmsley, *Attractive long-term but 1Q brings risks*, Deutsche Bank (Apr. 18, 2018) ("1Q likely to be heavily focused on fallout from CA and upcoming GDPR"); Youseff Squali, *1Q18 Likely Strong Despite CA Mishap; Investments to Pressure Margins S/M Term*, SunTrust Robinson Humphrey (Apr. 20, 2018) ("we believe the very recent negative publicity may have removed 'upside' ad revenue opportunities and likely added uncertainty around user engagement and growth"); Mark S.F. Mahaney, *Facebook, Inc. Q1 Preview & Cheat Sheet*, RBC Capital Markets (Apr. 23, 2018) ("The almost unanimous opinion from the executives we talked with at ad technology/consulting companies . . . was that the recent controversies would have no material impact on the relevance and attractiveness and importance of Facebook as a marketing platform. Facebook has been, is, and will remain for the foreseeable future a "must buy" for most consumer-oriented marketers.").

220.    Sandberg further assured the market that there would not be a significant business impact from the March revelations regarding Cambridge Analytica, stating "we think the investigatory work we're doing into APIs is very important and we don't expect it have an impact on revenue."  Zuckerberg commented that "Despite the important issues that we faced . . . our community and our business continued to grow really well," while Wehner assured investors that Facebook was "committed to transparency."

221.    As *The New York Times* reported on April 25, 2018:

Despite it all, the Facebook juggernaut marches on.

The social network is undergoing its worst crisis in its 14-year history as it faces a torrent of criticism about its privacy practices and the way it handles user data.

But on Wednesday, Facebook showed that – as with past scandals – the controversy is so far doing little to hurt its bottom line.

The results sent Facebook's shares up more than 7 percent in aftermarket trading on Wednesday.[207]

222.    The Company's 1Q18 results together with management's assurances on the 1Q18 conference call led many analysts to conclude that the disclosures concerning Cambridge Analytica had not impacted user's engagement with the platform.[208]

223.    Bolstered by the 1Q18 results and defendants assurances of the strength of Facebook's business in the face of the firestorm of criticism it was facing over its user data and privacy practices, the Company's stock price began to recover.  The price of Facebook's share rose more than 9% immediately after 1Q18 results were released, and by late May the shares had

---

[207] Sheera Frenkel & Kevin Roose, *Facebook's Privacy Scandal Appears to Have Little Effect on Its Bottom Line*, N.Y. Times (Apr. 25, 2018), https://tinyurl.com/ycolhzhmw.

[208] *See, e.g.*, Jason Helfstein, *Strong 1Q Suggests Cambridge Analytica Soon to Be a Distant Memory; Maintain Outperform, $225 PT*, Oppenheimer (Apr. 25, 2018) ("Most positive takeaway was constructive tone from mgmt"); Sam Kemp, *Strong Q1 + Cambridge Analytica & GDPR Set to Fade From Focus, Remain OW*, PiperJaffray (Apr. 25, 2018) ("Incremental news around impacts from the recent Cambridge Analytica (CA) debacle were nil and, ***alongside mgmt commentary downplaying GDPR impact***, will likely accelerate the fading relevance of these topics from investor focus.").

1    recovered to the levels they were trading at before *The Guardian* and *The New York Times* articles

2    about the Cambridge Analytica data breach broke.

3            224.    Thereafter, defendants continued to tout the 1Q18 results as a sign that the

4    Company had weathered the storm, while assuring investors that there was no reason to be

5    concerned that the past user privacy scandals or new privacy regulations would have a negative

6    impact on Facebook's business.

7            225.    In April 2018, Facebook shareholders made various proposals in response to the

8    Cambridge Analytica scandal.  For example, shareholders proposed that "Facebook's Board issue

9    a report discussing the merits of establishing a Risk Oversight Board Committee."[209]

10           226.    In support of this proposal, on April 17, 2018, Facebook investors noted the fact

11   that the Company faced "significant financial, reputational and regulatory risk" from events like

12   "The Cambridge Analytica scandal and the misuse of data to influence elections around the

13   world," which "cost Facebook investors $90 billion in market value between March 16th and

14   March 17th."[210]   Facebook shareholders also proposed that "Facebook issue a report to

15   shareholders . . . [inter alia] assessing the risks posed by content management controversies

16   (including election interference . . .) to the company's finances operations and reputation."[211]  In

17   support of this proposal, on May 17, 2018, Facebook investors, including the Illinois State

18   Treasurer explained that "Facebook's controversies have a direct impact on the Company's

19   market value" including because "[f]ollowing the Cambridge Analytica disclosures, Facebook

20

21

22

23   _____

[209] Facebook's Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934
24   at 51 ("Proposal Four:  Stockholder Proposal Regarding A Risk Oversight Committee") (Apr. 13,
     2018).

25   [210] Letter from Jonas Kron, Snr. Vice President, Trillium Asset Management to Facebook
26   Shareholders (Apr. 17, 2018), https://tinyurl.com/ycskmtdv.

27   [211] Facebook's Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934
     at 55 ("Proposal Six:  Stockholder Proposal Regarding A Content Governance Report") (Apr. 13,
28   2018).

1    shares lost approximately $100 billion in market value."[212]  Defendants opposed both stockholder

2    proposals, assuring investors that Facebook's risk oversight was fine and that there was no need

3    for the requested report.

4        227.   During Facebook's annual meeting on May 31, 2018, Natasha Lamb, managing

5    partner of activist investor Arjuna Capital, said:

6            From political subterfuge, fake news, hate speech and sexual harassment, it is clear
             that content that violates Facebook's own terms of service poses a risk to the
7            Company's market value and brand.  Last year, at this very meeting, we
             highlighted the risk posed by fake news propagated over the platform.  And while
8            our board opposed reporting, we learned [six] months later and only through
             congressional testimony that 126 million Americans may have viewed Russian
9            propaganda prior to the 2016 U.S. presidential election.  Four months later, we
10           learned that 87 million Americans data was compromised by Cambridge Analytica
             with the intent to manipulate users for political gain.  In the wake of that scandal,
11           Facebook's market value dropped nearly $100 billion.  And while today's proposal
             is broader, I'm surprised to see a similar reaction from our board, a
12           recommendation to vote against greater transparency and accountability to
             investors.  Fines and regulation by governments, lost advertising revenue and a
13           soured brand may further impact investment returns.  In fact, users may leave the
             social media platform if they feel its content lacked integrity.[213]
14

15       228.   Following comments like these, Zuckerberg took to the stage to tout the

16   Company's 1Q18 results ("that shows a lot of good continued momentum" in the business) and

17   assure investors that users were not changing their behavior in the wake of the scandals, and were

18   still opting in to share their data with Facebook (the "vast majority of people say yes, they want

19   that data used").[214]  The shareholders proposals were defeated.

20           **2.    Zuckerberg Falsely Assures Investors that European Privacy
                     Regulations Are Not Impacting the Business**
21

22       229.   Zuckerberg's assurance that the "vast majority" of users were opting into data

23   sharing was particularly important to investors, as it came just after the launch of the General

24

25   [212] Letter from Natasha Lamb, Managing Partner, Arjuna Capital and Michael W. Frerichs,
     Illinois State Treasurer (and others) to Facebook Shareholders. (May 17, 2018), https://tinyurl
26   .com/y9mugt89.

27   [213] Facebook, Inc. Annual Shareholders Meeting Tr. at 6 (May 31, 2018).

28   [214] *Id.* at 8, 16.

1    Data Protection Regulation ("GDPR") in the E.U. on May 25, 2018.  The GDPR is a broad set of

2    regulations governing the collection and use of personal data that is designed to protect the

3    privacy of EU citizens.   Significantly, and in addition to a host of disclosure and control

4    requirements, the GDPR requires corporations to make their data collection and sharing policies

5    opt-in, rather than opt-out, and limits the breadth and type of data collection and sharing by

6    companies like Facebook.

7             230.    The GDPR imposes several requirements on all entities (including Facebook) that

8    process and target personal data from individuals located in the European Union.  The GDPR

9    requires, among other things, that the processor (*e.g.*, Facebook) disclose any data collection,

10   disclose whether the data is being shared with any third parties, and to delete that data under

11   certain circumstances.   The GDPR also requires that any entities notify individuals in the

12   European Union whose data may have been breached, compromised, or deleted.  The GDPR also

13   imposes significant reporting and internal control requirements, mandating companies like

14   Facebook to appoint a data collection officer and to report its compliance to the GDPR's

15   provisions to independent public authorities appointed by European Union member states.  The

16   GDPR further requires the processor to obtain a user's affirmative consent before using and

17   distributing that user's personal data, as well as limiting the breadth of consent given.

18           231.    The GDPR was adopted by the European Council and Parliament on April 14,

19   2016.  All companies operating within the European Union had to comply with the GDPR by

20   May 25, 2018 or face stiff penalties.

21           232.    Defendants used the years between its passage and implementation to reassure

22   investors that the GDPR would have little to no impact on Facebook's business.  During quarterly

23   conference calls and in investor presentations starting in mid-2017 and continuing into 2018,

24   defendants used updates to their Terms of Service and Data Policy to claim that Facebook had

25   already largely given its users the privacy controls necessary to comply with GDPR.  In or around

26   August 2017, Facebook began implementing changes to its products, including the Platform,

27

28

1   because of the GDPR.[215]  According to a Facebook representative, Facebook had "assembled the

2   largest cross-functional team in the history of the Facebook family of companies," to implement

3   these changes, including teams to conduct legal, product and engineering assessments on the

4   GDPR's impact.[216]  Facebook also created a "What is the [GDPR]?"[217] page on its website touting

5   the steps Facebook had already taken to give users' control of their data in compliance with the

6   GDPR, and which claimed that even under GDPR "Businesses that advertise with the Facebook

7   Companies can continue to use Facebook platforms and solutions in the same way they do

8   today."[218]

9          233.    During this time, defendants continually reassured investors that the GDPR would

10   not have a material impact on Facebook's business.  For example, in an interview published by

11   Axios on October 12, 2017, Sandberg claimed that Facebook was already adhering to GDPR

12   requirements, stating "Europe has passed a single privacy law *and we are adhering to that* . . .

13   privacy is something we take really seriously."[219]  During the Company's 3Q17 earnings call on

14   November 1, 2017, Sandberg emphasized the point, claiming "On GDPR, the Facebook family

15   of apps *already applies* the core principles in the framework because we built our services around

16   transparency and control."  As noted below, Sandberg repeated similar statements during the

17   Company's January 31, 2018 earnings call, stating that "the Facebook family of apps already

18   applies the core principles in the GDPR framework, which are transparency and control."

19

20

21

22

23   [215] Aliya Ram, *Tech sector struggles to prepare for new EU data protection laws*, Fin. Times
24   (Aug. 29, 2017), https://tinyurl.com/y8stccmx.

     [216] *Id.*

25   [217] *What is the General Data Protection Regulation (GDPR)?*, Facebook Business,
26   https://tinyurl.com/y8arzv6j.

27   [218] *Id.*

28   [219] Mike Allen, *Exclusive interview with Facebook's Sheryl Sandberg*, Axios (Oct. 12, 2017)
     https://tinyurl.com/y9k7mlok.

### 3. Defendants Continued to Falsely Downplay Reports of Privacy Risks Ahead of Facebook's 2Q18 Earnings Release

234.   While the market was reassured by defendants' comments, questions surrounding Facebook's privacy practices continued to swirl.  On June 8, 2018, Facebook responded to inquiries from numerous journalists seeking a response to *The New York Times*' and *The Wall Street Journal*'s reporting about whitelisting and other unauthorized sharing of users' data. Facebook issued the same statement to multiple outlets in response, which read:

> For the most part this is a rehash of last week-end's New York Times story – namely that we built a set of device integrated APIs used by around 60 companies to create Facebook-like experiences.  In April 2018, we announced that we were winding these down. In terms of our Platform APIs, the Journal has confused two points.  In 2014, all developers were given a year to switch to the new, more restricted version of the API. . . . Per our testimony to Congress 'We required developers to get approval from Facebook before they could request any data beyond a user's public profile, friend list, and email address.'[220]

235.   Journalists were skeptical of this response.  *Axios*, after reviewing a timeline of Facebook's half disclosures, concluded that "Each new admission – even of the kinds of small bugs and problems that are common across the industry – reinforces a view in Washington that Facebook has been unwilling to come fully clean."[221]

236.   On June 27, 2018, *The Wall Street Journal* reported that Facebook could not track where the data it had improperly disseminated – not just to Cambridge Analytica, but to developers and others writ large – had ended up.[222]

237.   On June 29, 2018, Facebook responded in writing to outstanding questions put on the record to Zuckerberg by the members of the U.S. House of Representatives on April 11, 2018. The responses, which spanned more than 700 pages, stated that Apple, Amazon and the other device makers described herein were not the only developers that received special or extended

---

[220] Jack Morse, *Another day, another Facebook privacy scandal*, Mashable (June 8, 2018), https://tinyurl.com/ybuzngh8.

[221] David McCabe, *The big picture: Facebook's year of missteps*, Axios (June 9, 2018), https://tinyurl.com/ybtgbcby.

[222] Deepa Seetharaman, *Facebook's Latest Problem: It Can't Track Where Much of the Data Went*, Wall St. J. (June 27, 2018), https://tinyurl.com/y8lpyewe.

1    access to users' friends data.  Facebook also conceded that "early records may have been deleted

2    from our system," and that "it is possible" that Facebook had failed to identify other developers

3    who had also received extended access to users' friends' data.[223]

4        238.    On July 1, 2018, after reviewing Facebook's responses to written questions from

5    members of Congress, *The Wall Street Journal*, based in part on its earlier investigations in

6    combination with a review of Facebook's answers and earlier discussions, concluded that

7    Facebook's responses contradicted Zuckerberg's previous statements to Congress:

8        Facebook . . . disclosed it gave dozens of companies special access to user data,
         detailing for the first time a spate of deals that ***contrasted*** with the social network's
9        previous public statements that it restricted personal information to outsiders in
         2015.
10

11                                    *         *         *

12       The disclosure follows a Journal article in June that reported Facebook struck
         customized data-sharing deals that gave select companies such as Nissan Motor
13       Co. access to user records for their apps well after the point in 2015 when it said
         it walled off that information. Nissan is listed in Friday's document.[224]
14

15       239.    On July 2, 2018, *The Washington Post* reported that multiple federal agencies,

16   including the FBI, the SEC, the FTC and the DOJ, were investigating Facebook related to the

17   data-sharing scandal involving Cambridge Analytica:    "The questioning from federal

18   investigators centers on what Facebook knew three years ago and why the company [did not]

19   reveal it at the time to its users or investors, as well as any discrepancies in more recent accounts,

20   among other issues."[225]  Facebook confirmed the investigation and said it was cooperating with

21   authorities.

22

23   _____

24   [223] Letter from Facebook, Inc. to Chairman Greg Walden, Ranking Member Frank Pallone, U.S.
     House of Representatives, Energy and Commerce Committee at 96 (June 29, 2018), https://
     tinyurl.com/y7uj7vlo.

25   [224] Georgia Wells, *Facebook Reveals Apps, Others That Got Special Access to User Data*, Wall
26   St. J. (July 1, 2018), https://tinyurl.com/yargzpor.

27   [225] Craig Timberg, Elizabeth Dwoskin , et al., *Facebook's disclosures under scrutiny as federal
     agencies join probe of tech giant's role in sharing data with Cambridge Analytica*, Wash. Post
28   (July 2, 2018).

240.    On July 11, 2018, CNN revealed that Facebook had given a "Russian internet company with links to the Kremlin":

> [The right] to collect data on unknowing users of the social network after a policy change supposedly stopped such collection.  Facebook told CNN on Tuesday that apps developed by the Russian technology conglomerate Mail.Ru Group, were being looked at as part of the company's wider investigation into the misuse of Facebook user data in light of the Cambridge Analytica scandal.[226]

241.    Mail.Ru Group was one of the developers granted extended access to users' friends' data as identified in the June 29, 2018 submission Facebook made to Congress, highlighting the risk in granting such extensions.

**J.    Facebook's 2Q18 Financial Results Reveal the Huge Impact the Data Privacy Scandal Had on Facebook's User Engagement, Advertising Revenues and Earnings, Leading to a Stunning $100 Billion Loss in Facebook's Value**

242.    Heading into Facebook's 2Q18 earnings call, the Company's share price was hovering around $210 and many investors and analysts, buoyed by the Company's 1Q18 earnings report and defendants' assurances regarding the continued strength of the business in the wake of the scandal, remained strongly bullish on the Company.[227]

243.    Investors and analysts were therefore stunned when Facebook issued its second quarter earnings on July 25, 2018, reporting flat to declining user growth, lower than expected revenues and earnings, contracting gross margins, and reduced guidance going forward, all as a

---

[226] Donie O'Sullivan, Drew Griffin & Curt Devine, *Russian company had access to Facebook user data through apps*, CNN Business (July 11, 2018), https://tinyurl.com/y8zna8rl.

[227] *See, e.g.*, Michael J. Olsen, *Core Strength & LT "Call Options" Override Short-Term Concerns; OW & PT to $250*, PiperJaffray (July 20, 2018) ("Regulatory Concerns Unlikely to Change the Big Picture"); Youseff Squali, *Strong 2Q18 Expected Despite Head Winds; Maintain Buy*, SunTrust Robinson Humphrey (July 20, 2018) ("Despite all the negative headlines, we believe ad revenue should continue to drive very healthy growth"); Michael Pachter, *Expect Another Strong Quarter Despite Negative Press and Privacy Overhang*, Wedbush (July 20, 2018) ("Notwithstanding heightened scrutiny and elevated legislative and regulatory risk, we expect Facebook to weather the controversy surrounding its Cambridge Analytica data breach and the implementation of GDPR in Europe."); Rob Sanderson, *Q2 Preview: Expecting Revenue Growth Upside, Remains a Top Pick*, MKM Partners (July 20, 2018) (Buy rating with $255 price target); Mark S.F. Mahaney, *Q2 Preview & Cheat Sheet*, RBC Capital Markets (July 22, 2018) (outperform rating with $250 price target).

1   substantial result of the fallout of the disclosures concerning Facebook's privacy practices,

2   including its misrepresentations about its efforts to prevent and address events like the Cambridge

3   Analytica data breach or the Russian attempts to influence election results in the U.S.

4       244.    The Company reported having 1.47 billion average daily active users in June and

5   quarterly revenues of $13.2 billion, both of which were below average analyst estimates as

6   compiled by *Bloomberg*.  The revenue miss was Facebook's first since 2015.  In addition the

7   company reported that, after years of growth, its active user base (MAU and DAU) had declined

8   in Europe, was flat in the U.S. and Canada, and was decelerating worldwide.

9       245.    Facebook's failure to make any attempt to determine what data had been

10  compromised, to verify that the data had been destroyed, or to notify affected users that their data

11  had been compromised, was directly contrary to the repeated representations defendants had made

12  about Facebook's response to the Cambridge Analytica data breach and its commitment to and

13  the resources it had committed to protecting user privacy.  The outrage sparked by the disclosure

14  of Facebook's privacy practices and prior misrepresentations directly and proximately led users

15  to disconnect from or reduce their use of Facebook's platform, and to take advantage of new tools

16  and regulations giving them more control over the use of their data, including the right to opt out

17  of tracking or sharing settings that were critical to the effectiveness of Facebook's targeted

18  advertising programs.

19      246.    It also caused advertisers to reduce or eliminate their spending on the platform,

20  sparked numerous government investigations, and led to dramatic increases in spending on

21  regulatory compliance and safety programs needed to correct the conditions that had led to the

22  Cambridge Analytica data breach and permitted Russian agents to take advantage of Facebook's

23  lax security measures to attempt to influence U.S. election results.   All of these factors,

24  individually and in combination, were the cause of the disappointing 2Q18 earnings report and

25  reduced 2H18 guidance and of the resultant decline in the price of Facebook common stock.

26      247.    During the 2Q18 conference call on July 25, 2018, Wehner told investors to expect

27  revenue growth rates to decelerate in the second half of the year "by high single digit percentages

28  from prior quarters sequentially."  Wehner said that one of the driving factors in the Company's

declining revenue growth was that users were sharing less data with the Company and advertisers were reducing their spending on the platform in the wake of the privacy disclosures:

> In terms of what is driving the deceleration, . . . it's a combination of factors. . . . And then finally, we're giving people who use the . . . services more choice around privacy.  And that's coming both in terms of impacts that could be ongoing from things like GDPR as well as other product options that we're providing that could have an impact on revenue growth.[228]

248.    As Wehner explained, users exercising their right to opt out of data sharing under the new European regulations, reduced ad spending based on less reliance on Facebook's data to support targeted advertising, and new product features that would give users  even more control over data sharing and content viewing in the wake of the Cambridge Analytica and Russian interference investigations all contributed to driving the lowered growth estimates:

> We do think that there will be some modest impact [from GDPR].  And I don't want to overplay these factors, but you've got a couple things going on.  You've got the impact of the opt-outs.  And while we're very pleased with the vast majority of people opting into the third-party data use, some did not. So that'll [sic] have a small impact on revenue growth.  And then we're also seeing some impact from how advertisers are using their own data for targeting, so again, that'll [sic] have a modest impact on growth.  And then in addition, we're continuing to focus our product development around putting privacy first, and that's going to, we believe, have some impact on revenue growth.  So it's really a combination of kind of how we're approaching privacy as well as GDPR and the like.  So I think all of those factors together are one of the factors that we're talking about . . . .[229]

249.    Market reaction to the Company's 2Q18 earnings report and conference call was swift and severe, causing the price of Facebook's common stock to drop by nearly 19% on July 26, 2018, another staggering loss of $120 billion in market capitalization that was the largest such one-day drop in U.S. history.

250.    In addition, the quarterly results reflected – for the first time – the economic impact of the damage caused to the Company's reputation by the disclosure of its past misrepresentations of the risks arising from the Cambridge Analytica data breach and what Facebook had done to address it.  As *The New York Times* reported on July 25, 2018:

---

[228] Q2 2018 Facebook, Inc., Earnings Call Tr. at 9-10 (July 25, 2018).

[229] *Id.* at 13.

Facebook reported on Wednesday that growth in digital advertising sales and in the number of its users had decelerated in the second quarter.  The company's leaders, including its chief executive, Mark Zuckerberg, added that the trajectory was not likely to improve anytime soon, especially as Facebook spends to improve the privacy and security of users.

Facebook has grappled with months of scrutiny over Russian misuse of the platform in the 2016 American presidential campaign and the harvesting of its users' data through the political consulting firm Cambridge Analytica.  The results were among the first signs that the issues had pierced the company's image and would have a lasting effect on its moneymaking machine.

In response, Facebook's stock tumbled more than 23 percent in after-hours trading, erasing more than $120 billion in market value in less than two hours.[230]

251.    *The Los Angeles Times* similarly reported on July 26, 2018:

Facebook Inc. saw the first signs of user disenchantment in the midst of public scandals over privacy and content, with second-quarter revenue and average daily visitors missing analysts' projections.

Its stock sank as much as 25% in extended trading.

\*          \*          \*

The company's user growth fell short of expectations in the same quarter Chief Executive Mark Zuckerberg testified for 10 hours in Congress on data privacy issues.  It also came as Europe implemented strict new data laws, which Facebook had warned could lead to fewer daily visitors in that region.  The company also was bombarded by public criticism over its content policies, especially in countries such as Myanmar and Sri Lanka where misinformation has led to violence.

"The core Facebook platform is declining," said Brian Wieser, an analyst at Pivotal Research Group.[231]

252.    On September 5, 2018, the Pew Research Center issued a report it conducted from May 29 to June 11, 2018, in the aftermath of the Cambridge Analytica scandal.  The report, "Americans are changing their relationship with Facebook," documented changes in Facebook user engagement in previous 12 months, and revealed substantial disengagement by Facebook users in that period, including that more than half (54%) of Facebook users had changed their

---

[230] Sheera Frenkel, *Facebook Starts Paying a Price for Scandals*, N.Y. Times (July 25, 2018), https://tinyurl.com/y9rug8ru.

[231] *BUSINESS BEAT; Facebook shares sink after miss; Firm sees revenue and daily visitors fall in second quarter amid public scandals over privacy and content*, L.A. Times (July 26, 2018).

1   privacy settings to share less with Facebook, 42% had taken extended breaks from engaging with

2   Facebook, while more than a quarter (26%) had deleted the Facebook app from their cell phones.

3   "All told, some 74% of Facebook users say they have taken at least one of these three actions in

4   the past year," with disengagement particularly pronounced among the younger users coveted by

5   advertisers.[232]

6        **K.    Facebook's Class Period False Statements Reflect The Anti-Privacy**
         **Corporate Culture That Has Always Existed At Facebook**
7

8        253.    The many Class Period false statements made by defendants regarding privacy,

9   supposed user control over data and related issues were simply reflecting a culture that existed at

10   Facebook since its founding and through at least the end of the Class Period.  That culture was to

11   pay lip service to concerns about privacy and misuse of user data while at every turn prioritizing

12   growth and user revenue.  Whenever they were forced to choose between providing meaningful

13   privacy protections for user data or opportunities for growth, the most senior executives at

14   Facebook (including Zuckerberg and Sandberg) consistently minimized privacy concerns in favor

15   of expanding Facebook.

16        254.    These anti-privacy decisions created an internal tension with Facebook's public

17   stance that it respected user privacy.  To retain the illusion that Facebook was accurately

18   representing the way in which it protected sensitive user data, defendants developed a playbook

19   for how to respond to public stories relating to misuse of such data.  Time and time again they

20   would respond to reporter inquiries on upcoming stories by attacking the stories, accusing them

21   of being wrong, and trying to keep them from being published.  Then, after the stories were

22   published (and almost uniformly proved to be accurate) defendants would embark on a public

23   apology tour replete with admissions of "mistakes," promises to do better in the future, dressed

24   up with lavish statements regarding Facebook's high respect for user privacy and assurances that

25   it was the Company's top priority.

26

27   ─────────────────────
[232] Andrew Perrin, *Americans are changing their relationship with Facebook*, Pew Research
28   Center (Sept. 5, 2018), https://tinyurl.com/y7bousjk.

255.     Inside Facebook, senior employees were fully aware that Facebook's public act was a sham.  Both prior to and throughout the Class Period, serious privacy concerns were raised to the highest levels of Facebook by very senior employees.  Facebook's lack of response to these concerns was not innocent: it was deliberate strategy aimed at utilizing sensitive user data in order to grow Facebook no matter what the cost for user privacy.

256.     According to Sandy Parakilas, Facebook's former operations manager Sandy Parakilas who "led Facebook's efforts to fix privacy problems on its developer platform" in advance of its IPO, Facebook "prioritized data collection from its users over protecting them from abuse" because "[t]he more data [Facebook] has [to] offer, the more value it creates for advertisers," meaning "it has no incentive to police the collection or use of that data – except when negative press or regulators [we]re involved."[233]

257.     Parakilas further explained that Facebook "allocated resources in a way that implied that they were almost entirely focused on growth and monetization at the expense of user protection" and that he "could not get engineers to build or maintain some of the compliance functions that [he] felt were necessary."[234]

258.     Indeed, according to Parakilas it was "well known at the company" that user data was being shared with third-party app developers.[235]  For example, Parakilas said that in 2012 he had expressed concerns about these privacy practices to some of "[the top five] executives at the Company," including in a presentation that contained a "map of [data] vulnerabilities."[236] Further, Parakilas said in an interview that his presentation documented the "many gaps that left

---

[233] Sandy Parakilas, *We Can't Trust Facebook to Regulate Itself*, N.Y. Times (Nov. 19, 2017), https://tinyurl.com/y7k86jcv.

[234] Noah Kulwin, *'Facebook Is a Fundamentally Addictive Product,'* Intelligencer, (Apr. 2018) https://tinyurl.com/y9fu64rw.

[235] David Morgan, *Former manager says he warned Facebook about potential privacy risks in 2012*, CBS News (Apr. 9, 2018), https://tinyurl.com/ycrfvqhr.

[236] Noah Kulwin, *'Facebook Is a Fundamentally Addictive Product,'* Intelligencer (Apr. 2018), https://tinyurl.com/y9fu64rw.

1   users exposed" in Facebook's platform[237] and, in particular, highlighted how "the Facebook

2   platform allowed developers to access a huge amount of Facebook's data" – which Parakilas

3   described as "one of the biggest vulnerabilities the company had."[238]

4          259.    As Parakilas later testified to the U.K. House of Commons Digital, Culture, Media

5   and Sport Committee, "the concern I had was that they [*i.e.*, Facebook and its senior executives]

6   had built this platform that would allow people to get all of this data on people who had not really

7   explicitly authorized" it.[239]   Parakilas elaborated that "it was really personal data," including

8   names, emails and even private messages, and "they basically allowed that to leave Facebook's

9   servers intentionally."[240]  Parakilas stated that, although "executives at Facebook were well aware

10  that developers could, without detection, pass data to unauthorized fourth parties" – such as what

11  happened with Cambridge Analytica – he "did not get much if any follow-up from the

12  executives," who were "***not . . . concerned about the vulnerabilities that the Company was***

13  ***creating; they were concerned about revenue growth and user growth***."[241]   He stated that

14  "[d]espite my attempts to raise awareness about this issue, nothing was done to close the

15  vulnerability."[242]  Parakilas confirmed that his warnings went to Facebook executives who were

16  "***among the top five executives in the company***."[243]

17

18

[237] Sandy Parakilas, *I worked at Facebook. I know how Cambridge Analytica could have happened.*, Wash. Post (Mar. 20, 2018), https://tinyurl.com/yct8wep3.

[238] Noah Kulwin, *Facebook Is a Fundamentally Addictive Product*, Intelligencer (Apr. 2018), https://tinyurl.com/y9fu64rw.

[239] Parakilas testified to the House of Commons' Digital, Culture, Media and Support Committee in the U.K. on March 21, 2018 ("Parakilas U.K. Test."). Parakilas U.K. Test., at Q1206.

[240] *Id.*

[241] James Jacoby and Anya Bourg, *Facebook Insider Says Warning About Data Safety Went Unheeded By Executives*, PBS Frontline (Mar. 20, 2018), https://tinyurl.com/ydzeglw9.

[242] *Id.*

[243] *See, e.g.*, https://www.pbs.org/wgbh/frontline/article/facebook-insider-says-warnings-about-data-safety-went-unheeded-by-executives/; *see also id.* at 4:01 of the embedded video (Mr. Parakilas is asked, "And how senior were the senior executives?" He responds, "Very senior. Like, among the top five executives in the Company.")

1    260.    Moreover, Facebook executives knew that once the app developers had this

2    unauthorized data, there was essentially nothing that Facebook could do to control how it was

3    used.  Confirming this, Parakilas testified that "there were not any controls once the data had left

4    [Facebook] to ensure that it was being used in an appropriate way."[244]  Likewise, Parakilas stated

5    to *The Guardian*,[245] that Facebook had "'***Zero.  Absolutely no[]***'" control over the data once it

6    left "Facebook servers."  So, Facebook "'***had no idea what developers were doing with the***

7    ***data***,'" according to Parakilas.

8    261.    Parakilas could not recall "the company conducting a single audit of a developer

9    where the company inspected the developer's data storage."[246]  Parakilas also said he had told

10   other Facebook executives to audit its app developers to find out "what's going on with the data"

11   they were collecting from users, to which one executive responded, "Do you really want to see

12   what you'll find?"[247]  "***They felt that it was better not to know***," Parakilas told *The Guardian*.[248]

13   "The company just wanted negative stories to stop," he said.  "It didn't really care how the data

14   was used."[249]

15   262.    Despite Facebook's many assurances to the contrary – including its April 2014

16   false promise to eliminate third-party sharing of data – Facebook's deliberately lax privacy

17   practices continued even *after* discovery of the Cambridge Analytica issues.  According to a June

18   18, 2016 memorandum posted on the Company's internal website by Facebook VP Andrew

19   Bosworth, who has been described as one of "Zuckerberg's most trusted lieutenants":

20

21

22   [244] Parakilas U.K. Test. at Q1206.

23   [245] Paul Lewis, '*Utterly Horrifying': ex-Facebook insider says covert data harvesting was routine*, Guardian (Mar. 20, 2018), https://tinyurl.com/ybdonk3p.

24   [246] *Id.*

25   [247] *Id.*

26   [248] Paul Lewis, *Utterly horrifying': ex-Facebook insider says covert data harvesting was routine*, Guardian (Mar. 20, 2018), https://tinyurl.com/ybdonk3p.

27   [249] Sandy Parakilas, *We Can't Trust Facebook to Regulate Itself*, N.Y. Times (Nov. 19, 2017),

28   https://tinyurl.com/y7k86jcv.

***The ugly truth is that we believe in connecting people so deeply that anything that allows us to connect more people more often is \*de facto\* good.***  It is perhaps the only area where the metrics do tell the true story as far as we are concerned.

That isn't something we are doing for ourselves.  Or for our stock price (ha!).  It is literally just what we do.  We connect people.  Period.

That's why all the work we do in growth is justified.  ***All the questionable contact importing practices***.  All the subtle language that helps people stay searchable by friends.  All of the work we do to bring more communication in.  The work we will likely have to do in China some day.  All of it.

\*          \*          \*

I know a lot of people don't want to hear this.  Most of us have the luxury of working in the warm glow of building products consumers love.  But make no mistake, ***growth tactics are how we got here***.  If you joined the company because it is doing great work, that's why we get to do that great work.  We do have great products but we still wouldn't be half our size without pushing the envelope on growth.  Nothing makes Facebook as valuable as having your friends on it, and no product decisions have gotten as many friends on as the ones made in growth.[250]

263.   The memo, originally posted to "rally the troops" in response to controversy sparked by the live streaming of a shooting death on Facebook, stated that collateral damage to users was irrelevant: "So we connect more people.  That can be bad if they make it negative.  Maybe it costs a life by exposing someone to bullies.  Maybe someone dies in a terrorist attack coordinated on our tools.  And still we connect people."[251]

264.   In December 2017, Alex Stamos, Facebook's Chief Information Security Officer (and a co-author of the white paper described above), was forced out of his job as a result of

---

[250] The description was in an article by *Buzzfeed News* accompanying the memo, both of which were published on March 29, 2018.  *Buzzfeed* reported that, as of the time its article was published, the memo was still available and regularly accessed on Facebook's internal website.  Ryan Mac, Charlie Warzel and Alex Kantrowitz, *Top Facebook Executive Defended Data Collection in 2016 Memo – And Warned That Facebook Could Get People Killed,* Buzzfeed News (Mar. 29, 2018), https://tinyurl.com/yd96zp7t; Gideon Lichfield, *Watch Sheryl Sandberg's technique for shielding Facebook from hard questions*, Quartz at Work (Oct. 13, 2017), https://tinyurl.com/ybjmxykz; Sandy Parakilas, *We Can't Trust Facebook to Regulate Itself*, N.Y. Times (Nov. 19, 2017), https://tinyurl.com/y7k86jcv; Noah Kulwin, *'Facebook Is a Fundamentally Addictive Product'*, Intelligencer, https://tinyurl.com/y9fu64rw.

[251] *Id.*

1  "internal disagreements over how the social network should deal with its role in spreading

2  disinformation."

3      265.   Tellingly, Stamos' departure was not reported until March 19, 2018 – *after* it was

4  publicly revealed that the Company had failed to verify that user data had been deleted by

5  Cambridge Analytica and other third parties or notify the affected users that their privacy had

6  been compromised.  *The New York Times* reported that Stamos had clashed with top executives,

7  including Sheryl Sandberg, because he had "advocated more disclosure around Russian

8  interference."[252]  The article said that the Company wanted to handle his departure quietly because

9  "executives thought his departure would look bad" in light of the circumstances surrounding the

10  investigations into Russian hacking.  *Id.*

11      266.   In a follow-up article, *The New York Times* reported:

12      After a breach of the Democratic National Committee in June 2016, Mr. Stamos
        pulled together a team to investigate Russian interference on Facebook.   The
13      findings pit him against executives in the company's legal and communications
        groups.  While Mr. Stamos argued to disclose more, others said that by proactively
14      disclosing what they had found, Facebook had become a target for further public
        ire, according to seven current and former Facebook employees.[253]
15

16      267.   In an internal memo circulated at Facebook on March 23, 2018 in response to *The*

17  *New York Times* report, Stamos acknowledged that he had disagreements with other executives

18  over information security.  Although Stamos denied that he had been forced out, he went on to

19  criticize a corporate culture at Facebook regarding the protection of user data:

20      "We need to build a user experience that ***conveys honesty and respect***, not one
        optimized to get people to click yes to giving us more access," Stamos wrote.  We
21      need to intentionally ***not collect data*** where possible, and to keep it ***only as long***
        ***as we are using it*** to serve people."
22

23                              *        *        *

24      We need to ***find and stop adversaries*** who will be copying the playbook they saw
        in 2016.  We need to ***listen to people*** (including internally) when they tell us a
25

---

26  [252] Sheera Frenkel, Nicole Perlroth and Scott Shane, *Facebook Exit Hints and Dissent on*
     *Handling of Russian Trolls*, N.Y. Times (Mar. 19, 2018), https://tinyurl.com/y85ktx41.

27  [253] Sheera Frenkel and Nicole Perlroth, *The End for Facebook's Security Evangelist*, N.Y. Times
     (Mar. 20, 2018), https://tinyurl.com/yaf6u2ss.

28

feature is creepy or point out a negative impact we are having in the world.  We need to **deprioritize short-term growth** and revenue and to explain to Wall Street why that is ok.  We need to be **willing to pick sides** when there are clear moral or humanitarian issues.  And we need to be **open, honest and transparent** about challenges and what we are doing to fix them. (Emphasis in original).[254]  *Id.*

268.    As *Business Insider* reported on April 9, 2018, Facebook employees are "quitting or asking to switch departments over ethical concerns."[255]  These "dissatisfied Facebook engineers are reportedly attempting to switch divisions to work on Instagram or WhatsApp, rather than continue work on the platform responsible for the Cambridge Analytica scandal."  *Id.* Indeed, "[a]s it became evident that Facebook's core product might be to blame" for the data security breach, "engineers working on it reportedly found it increasingly difficult to stand by what it built."  *Id.*

**V.    FACTS REVEALED THROUGH RECENT REGULATORY ACTIONS, INVESTIGATIONS AND OTHER PROCEEDINGS HAVE FURTHER CONFIRMED DEFENDANTS' DELIBERATE MISCONDUCT DURING THE CLASS PERIOD**

269.    Facebook's misconduct as alleged herein has been confirmed and corroborated by specific facts uncovered in multiple governmental and regulatory investigations both in the United States and abroad, as well as by court proceedings throughout the country.  These proceedings and investigations have been detailed and extensive and include review or access to previously-unavailable internal Facebook documents, direct interviews or sworn testimony from Facebook executives and Facebook's past interactions with regulators.

270.    They have resulted in specific findings that (i) Facebook knowingly made materially false and misleading statements during the Class Period relating to its risk disclosures and about its purported response to the Cambridge Analytica data scandal, *SEC v. Facebook, Inc.*, 3:19-cv-04241-JD (N.D. Cal.) (defined above as the "SEC Complaint"); (ii) that Facebook made

[254] Ryan Mac and Charlie Warzel, *Departing Facebook Security Officer's Memo: "We Need To Be Willing To Pick Sides*." Buzzfeed (July 29, 2018), https://tinyurl.com/y9wvplp4.

[255] Prachi Bhardwaj, *Some Facebook employees are reportedly quitting or asking to switch departments over ethical concerns*, Business Insider (Apr. 9, 2018), https://tinyurl.com/y7lecwv6.

1   repeated misrepresentations regarding its handling of user data and deliberately violated the 2012

2   FTC Consent Decree, *United States of America v. Facebook*, Case No. 19-cv-2184 (D.D.C.)

3   (defined above as the "FTC Complaint"); (iii) that Facebook's users could proceed with the vast

4   majority of their privacy lawsuit against Facebook, including on claims that specifically sound in

5   fraud, *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 2019 WL 4261048 (N.D. Cal.

6   Sept. 9, 2019) (defined above as the "Consumer Case") ("plaintiffs have also adequately alleged

7   that Facebook intended to defraud its users regarding this conduct"); and (iv) concluded that

8   "Facebook *intentionally and knowingly violated both data privacy* and anti-competition laws,"

9   Final Report of the Digital, Cultural, Media and Sport Committee of the British House of

10  Commons (defined below as the "Final Report").

11          A.      **Defendants' Liability For Securities Fraud Is Confirmed In Actions
                    Filed By The SEC And the FTC**
12

13          271.    As noted above, after extensive investigations the SEC and the FTC both

14  concluded that Facebook engaged in significant misconduct with respect to its representations

15  regarding user data and privacy.

16                  1.      **Facebook Paid $100 Million Dollars To Settle SEC Charges
                            That Facebook Committed Securities Fraud**

17          272.    In late July 2019, following an extensive, year-long investigation,[256] the SEC

18  announced that defendant Facebook had agreed to pay $100 million to resolve SEC charges that

19  Facebook had made *inter alia* "untrue statements of material fact" or material omissions that

20  operated "as a *fraud or deceit upon purchasers*" of its securities.[257]  The SEC's case was based

21  on a review of internal documents and supported by specific facts uncovered in its investigation.

22

23

24  [256] On July 12, 2018, *The Wall Street Journal* reported that the U.S. Securities and Exchange

25  Commission ("SEC") was investigating "whether Facebook Inc. adequately warned investors that
    developers and other third parties may have obtained users' data without their permission or in

26  violation of Facebook policies." *See* Dave Michaels & Georgia Wells, *SEC Probes Why Facebook
    Didn't Warn Sooner on Privacy Lapse*, Wall St. J. (July 12, 2018), https://tinyurl.com/y7vap23d.

27  [257] *Securities and Exchange Commission v. Facebook, Inc.*, 3:19-cv-04241-JD, (N.D. Cal.) (the

28  "SEC Action"), ECF No. 1 (the "SEC Complaint"), ¶53.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                          - 89 -

273.   **False Risk Disclosures**. The SEC charged Facebook with making materially false and misleading statements in the "risk factors" section of its SEC filings, including its filings during the Class Period. Specifically, the SEC charged that "[i]n its quarterly and annual reports filed between January 28, 2016 and March 16, 2018, Facebook did not disclose that a researcher had, in violation of the company's policies, transferred data relating to [tens of millions of Facebook users] to Cambridge Analytica.  Instead, Facebook misleadingly presented the potential for misuse of user data as merely a hypothetical risk."[258]

274.   The SEC concluded "Facebook knew, or should have known, that its Risk Factor disclosures in its annual reports on Form 10-K for the fiscal years ended . . . December 31, 2016, and December 31, 2017, and its quarterly reports on Form 10-Q filed in . . . 2017 . . . were materially misleading."[259]

275.   **False Statements Regarding Cambridge Analytica.** The SEC also charged Facebook with making materially misleading statements about "its investigation into the Cambridge Analytica matter."  Specifically, the SEC charged Facebook with "falsely claim[ing] the company found no evidence of wrongdoing," which "reinforce[ed] the misleading statements in its periodic filings."[260]  The SEC pointed to the fact that, when asked by reporters about its investigation into the Cambridge matter, authorized Facebook representatives stated "Our investigation to date has not uncovered anything that suggests wrongdoing."[261] As the SEC charged, this "was misleading because Facebook had, in fact, determined that [Kogan's] transfer of user data to Cambridge violated the Company's Platform Policy."[262]

276.   **The SEC Relied On Numerous Facts**.  In support of its charges, the SEC pointed to multiple facts, including the following.  First, as early as September 2015, Facebook "was

---

[258] *Id.* at ¶6.

[259] *Id.* at ¶44.

[260] *Id.*

[261] *Id.* at ¶49.

[262] *Id.*

1   already familiar with Cambridge and had suspicions that Cambridge had misused user data."[263]

2   Second, in December 2015, Facebook learned that Cambridge Analytica had improperly bought

3   Facebook user data from Kogan in violation of Facebook's policies.  At that time, Kogan and

4   Cambridge Analytica "confirmed to Facebook that [Kogan] had used a Facebook app to collect

5   user data and then used that data to create personality scores, which were then shared with

6   Cambridge."[264]  Facebook determined that this transfer to Cambridge Analytica "violated the

7   Company's Platform Policy"[265] and disseminated this conclusion widely within Facebook,

8   including to "Facebook's communications, legal, operations, policy, privacy and research

9   groups."[266]

10         277.    Third, in June 2016, Facebook learned that Kogan and Cambridge Analytica lied

11  about the improper transfer and purported deletion of Facebook user data.  In particular, in June

12  2016, Kogan revealed to Facebook that "contrary to [Kogan's] and Cambridge [Analytica's]

13  representations in December 2015," it was not only user "personality scores" had been improperly

14  sold to Cambridge Analytica.  Instead, Kogan had also improperly shared "actual Facebook user

15  data, including names, birthdays, location, and certain page likes."[267]  This also revealed that

16  Cambridge Analytica had lied to Facebook when it represented in December 2015 that it had

17  deleted the Facebook user data that it had received from Kogan.[268]  Following exposure of these

18  lies in June 2016, it was not until nearly one year later in April 2017 that Facebook received from

19  Cambridge Analytica another representation that the improperly-shared Facebook user data was

20  purportedly deleted.[269]

21

22  [263] *Id.* at ¶34.

    [264] *Id.* at ¶29.

23  [265] *Id.* at ¶30.  The SEC defined Facebook's "Platform Policy" as "a set of rules governing what

24  developers are allowed to do with the apps they create and the data that they gather."  *Id.*

25  [266] *Id.*

    [267] *Id*.

26  [268] *Id.* (noting that, in December 2015, "Cambridge . . . told Facebook that it had deleted the data

27  received from [Kogan]").

28  [269] *Id.* at ¶32.

278.    Fourth, the SEC noted that "[t]hroughout 2016, red flags were raised to Facebook suggesting that Cambridge was potentially misusing Facebook user data."[270]   These red flags included Facebook's awareness of "a video of a marketing presentation by Cambridge's chief executive officer about the firm's ability to target voters based on personality," and the Company's knowledge of the fact that "Cambridge named Facebook and Instagram advertising audiences by personality trait for certain clients" – coupled with Facebook's awareness of media reports of Cambridge's use of personality profiles to target advertising in the summer and fall of 2016.[271]

279.    Fifth, the SEC explained that it was not until March 16, 2018 that Facebook "publicly acknowledged, ***for the first time***, that it had confirmed that [Kogan] had transferred user data to Cambridge, in violation of its Platform Policy, and that the company had told [Kogan] and Cambridge to delete the data in December 2015."[272]

280.    On August 22, 2019, Judge James Donato entered a final judgment as to defendant Facebook in the SEC Action, which *inter alia* permanently enjoined Facebook from further (i) selling securities "by means of any untrue statement of a material fact" or "any omission of material fact" and (ii) operating a "fraud or deceit upon the purchaser" of its securities.[273]

### 2.    Facebook Paid A Record-Setting $5 Billion Dollar Penalty To Settle FTC Charges That Facebook Violated User Privacy and the FTC Consent Decree

281.    On July 24, 2019, following a detailed investigation spanning more than one year, the FTC announced that Facebook had agreed to "pay a record-breaking $5 billion penalty and submit to new restrictions and a modified corporate structure that will hold the company accountable for the decisions it makes about its users' privacy," in order to "settle [FTC] charges

---

[270] *Id.* at ¶35.

[271] *Id.*

[272] *Id.* at ¶51

[273] SEC Action, ECF No. 11 at 1-2.

1  that [Facebook] violated a 2012 FTC order by deceiving users about their ability to control the

2  privacy of their information."[274]

3     282.   The $5 billion penalty against Facebook was the "*largest ever imposed on any*

4  *company for violating consumers' privacy*," was "almost *20 times greater* than the largest

5  privacy or data security penalty ever imposed worldwide" and was "one of the *largest penalties*

6  *ever assessed by the U.S. government for any violation*."[275]

7           **a.**      **The FTC Imposed Privacy Reforms Designed To**
                    **Remove Zuckerberg's "Unfettered Control" Over**

8                     **"Decisions Affecting User Privacy"**

9     283.   In addition to a record-setting penalty, the FTC also forced Facebook to implement

10  significant privacy reforms in order to "prevent Facebook from deceiving its users about privacy

11  in the future" and, in particular, to remove Zuckerberg's "unfettered control" over privacy-related

12  decisions at Facebook.  Indeed, as described by the FTC:

13     "The [new FTC] order creates greater accountability at the board of directors level.
It establishes an independent privacy committee of Facebook's board of directors,

14     *removing unfettered control by Facebook's CEO Mark Zuckerberg over*

15     *decisions affecting user privacy.*"

16     284.   These far-reaching privacy reforms were set forth in a stipulated order (the

17  "Stipulated Order") signed by Zuckerberg.  Among other things, the reforms included:

18  •   Prohibitions on Facebook engaging in further misrepresentations concerning its privacy
practices, including misrepresentations about Facebook's "collection, use or disclosure of

19  [user personal information," the "extent to which a consumer can control the privacy of

20  [user personal information]," "the extent to which [Facebook] makes or has made [user
personal information] accessible to third parties," and the "steps [Facebook] takes or has

21  taken to verify the privacy or security protections that any third party provides";[276]

22  •   Requiring Facebook to obtain a "User's affirmative express consent" prior to sharing user
personal information with third parties;[277]

23

24

---

25  [274] Press Release, *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on
Facebook*, Federal Trade Commission (July 24, 2019), https://tinyurl.com/y2h458h4.

26  [275] *Id.*

27  [276] Stipulated Order, Section I ("Prohibition Against Misrepresentations").

28  [277] *Id.* Section II ("Changes To Sharing Of Nonpublic User Information").

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD               - 93 -

- Requiring Facebook to establish and implement a "comprehensive privacy program" to protect user personal information, including the appointment of a "Chief Privacy Officer," rigorous documentation requirements and regular privacy audits at least every 12 months;[278] and

- Requiring Facebook to establish an "Independent Privacy Committee" consisting of Independent Directors to assess the state of Facebook's privacy program, its compliance with the Stipulated Order and the existence and mitigation of any "material risks to the privacy, confidentiality, and Integrity" of user personal information.[279]

285.    Facebook is required to comply with the Stipulated Order and its privacy reforms for the next 20 years.

### b.    The FTC Charged Facebook With Violating the 2012 FTC Consent Decree Through "Deceptive Privacy Settings And Statements"

286.    The FTC charged Facebook with violating the 2012 FTC Consent Decree by "subvert[ing] users' privacy choices to serve its own business interests" through "at least June 2018"[280] – which covers nearly the entire Class Period here.  As explained by the FTC, Facebook made "deceptive privacy . . . statements" regarding its users' ability to restrict "the sharing of their information to their Facebook Friends, when, in fact, third-party developers could access and collect their data through their Friends' use of third-party developers' apps."[281]  Among other statements, the FTC devoted considerable focus to the fact that defendants had "misrepresent[ed] 'the extent to which a consumer can control the privacy of their personal information,"[282] which violated Parts I.B and I.C of the 2012 Consent Decree.

287.    Moreover, the FTC charged Facebook with knowingly or recklessly violating the FTC Consent Decree by depriving users of control over their personal information.  For example, the FTC stated that "Facebook knew or should have known that its conduct violated the 2012

---

[278] *Id.* Section VII ("Mandated Privacy Program").

[279] *Id.* Section X ("Mandated Independent Privacy Committee And Other Governance Matters").

[280] FTC Complaint at ¶4.

[281] *Id.* at ¶9.

[282] *See, e.g., id.* at ¶¶6, 155, 160, 166.

1  [Consent Decree] because it was engaging in the very same conduct that the [FTC] alleged was

2  deceptive in Count One of the original Complaint that led to the 2012 Order."[283]

3        288.    In support of these charges, the FTC relied on the fact that, from "April 30, 2015,

4  to at least June 2018" Facebook misrepresented that users could "control" the privacy of their

5  data, when, in fact, "regardless of the privacy settings a user checked, Facebook continued to

6  provide access to [user personal information] to Whitelisted Developers."[284]  These Whitelisted

7  Developers with undisclosed access to user friend information included more than two dozen

8  "gaming, retail, and technology companies, as well as third-party developers of dating apps and

9  other social media services;[285]

10        289.    According to the FTC, Facebook also knowingly or recklessly violated the FTC

11  Consent Decree by:

12    a)  Publicly misrepresenting that it would "no longer allow third-party developers to access
         [user friend data]" when, in fact, "Facebook continued to allow millions of third-party
13       developers access to [user friend data] for at least another year";[286] and

14    b)  "[R]epresenting to consumers that they could control the privacy of their data by using
15       desktop and mobile privacy settings to limit the information Facebook could share with
         their Facebook Friends" when, in fact, "Facebook did not limit its sharing of consumer
16       information with third-party developers based on the privacy settings."[287]

17              **c.    The FTC Charged Facebook With Violating The 2012
                        Consent Decree By Failing To Maintain A Reasonable**
18                      **Privacy Program**

19        290.    The FTC also charged that Facebook violated the 2012 Consent Decree because it

20  "failed to maintain a reasonable privacy program that safeguarded the privacy, confidentiality,

21

22

23

24  _____

25  [283] *Id.*

   [284] *See, e.g.*, *id.* ¶¶106-13, 166-75.

26  [285] *Id.* at ¶108.

27  [286] *Id.* at ¶¶160-65.

28  [287] *Id.* at ¶¶155-59.

1   and integrity of user information, as required by Part IV of the 2012 Order."[288]  This violated Part

2   IV of the 2012 Consent Decree.

3        291.    Specifically, Facebook failed to "vet third-party developers before granting them

4   access to consumer data"[289] and, then, Facebook's "enforcement of its policies, terms and

5   conditions . . . was inadequate and was influenced by the financial benefit that violator third-party

6   app developers provided to Facebook."  As the FTC stated:  "This conduct was unreasonable."[290]

7        **d.    The FTC Charged Facebook With Violating The 2012
               Consent Decree By Misusing User Information**
8        **Provided For Account Security**

9        292.    The FTC also charged Facebook with violating users' privacy by engaging in

10  "deceptive practices" in violation of Section 5(a) of the *Federal Trade Commission Act* (the "FTC

11  Act").  Among other things, Facebook violated section 5(a) of the FTC Act because it represented

12  that users' "phone numbers provided for two-factor authentication would be used for security

13  purposes"[291]  In reality, and contrary to its representations, "Facebook would also use [those]

14  phone numbers . . . for targeting advertisements to those users."[292]

15       **e.    Defendants Facebook and Zuckerberg Agreed That
               The Facts In The FTC Complaint Would Be "Taken
16             As True" In Any Subsequent FTC Enforcement Action**

17       293.    In the Stipulated Order, which was signed by Zuckerberg himself, Facebook

18  agreed that "the facts alleged in the [FTC's] Complaint *will be taken as true*, without further

19  proof" in any "subsequent" litigation by the FTC to enforce its rights under the Stipulated

20  Order.[293]

21

22

23  _____

24  [288] *Id.* at ¶10.

25  [289] *Id.* at ¶¶11, 12.

26  [290] *Id.* at ¶12; *see also id.* at ¶¶176-82.

    [291] *Id.* at ¶187.

27  [292] *Id.* at ¶188.

28  [293] Stipulated Order at 3, ¶E.

**B.      Defendants' Privacy Violations And Misuse Of User Data Are Confirmed By Multiple Courts Nationwide**

**1.      Another Court In This District Has Sustained Claims Against Facebook For Improperly Sharing Users' Personal Information With Third Parties**

294.    On September 9, 2019, in a related MDL privacy case against Facebook, Judge Chhabria issued an opinion and order largely denying Facebook's motion to dismiss.  In that opinion he addressed several factual issues that are also relevant to this securities litigation.  *See In re Facebook Inc., Consumer Privacy User Profile Litig.*, 2019 WL 4261048 (N.D. Cal. September 9, 2019) (Chhabria, J.) (defined above as the "Consumer Case").

295.    Judge Chhabria stated that "[b]roadly speaking, this [consumer] case is about whether Facebook acted unlawfully in making user information widely available to third parties. It's also about whether Facebook acted unlawfully in failing to do anything meaningful to prevent third parties from misusing the information they obtained."  *Id.* at *2.

296.    The plaintiffs in the Consumer Case pursued four main categories of wrongdoing against Facebook: (1) giving app developers unauthorized access to sensitive user information; (2) continued disclosure by Facebook through at least June 2018 of sensitive user information to "whitelisted" apps; (3) sharing sensitive user information with business partners through at least June 2018; and (4) failing to prevent third parties from misusing the information Facebook allowed them to access.  *Id.* at *4-5.

297.    Facebook argued in its motion to dismiss that all of the claims asserted in the Consumer Case failed because Facebook users purportedly had agreed that "Facebook could disseminate their 'friends only' information in the way it has done."  *Id.* at *4 The court rejected this argument on several grounds.

298.    First, the court was forced to apply a "fiction" created by California law, which "requires the Court to ***pretend*** that users actually read Facebook's contractual language before clicking their acceptance, ***even though we all know virtually none of them did.***"  *Id.* at *12.

299.    The court expressly doubted that any Facebook user had consented to this practice in ***reality***, as opposed to the legal fiction created by operation of California law.  The court stated

1    that "in reality, virtually no one 'consented' in a layperson's sense to Facebook's dissemination

2    of this information to app developers." *Id.* ("for the rare person who actually read the contractual

3    language, it would have been difficult to isolate and understand the pertinent language among all

4    of Facebook's complicated disclosures.")

5          300.   Moreover, the court distinguished its ruling under California law from the FTC

6    lawsuit.  The court noted that "the FTC's claims against Facebook are not based on California

7    law; they are based on alleged violations of the Federal Trade Commission Act and the earlier

8    FTC consent order from 2012." *Id.* at n.13.  According to the court:

9          While California law, for better or worse, allows Facebook to ***bury a disclosure***
          of its information-sharing practices in the fine print of its contractual language, the
10         ***FTC consent order required Facebook to disclose such practices prominently,***
          ***in a way that would likely come to the attention of Facebook users***.  More
11         broadly, the consent order precluded Facebook from explicitly or implicitly
          misrepresenting the extent to which the company protects user privacy.
12

13   *Id.* n.13.

14         301.   Second, the court found it "easy to conclude" that users could pursue claims

15   against Facebook based on Facebook's post-2014 disclosure of information to whitelisted apps,

16   which the consumer plaintiffs alleged was done because these apps generated revenue for

17   Facebook. *Id.* at 25. The court noted that "thousands of companies were allegedly on this list,

18   including Airbnb, Netflix, UPS, Hot or Not, Salesforce, Lyft, Telescope, and Spotify."  *Id.* at 8.

19         302.   Third, the court rejected Facebook's argument that users had consented to

20   Facebook's disclosure of sensitive information to a wide range of other enormous companies.

21   While Facebook contended that its Data Use Policy disclosed this practice, the court held that it

22   "does not come close to disclosing the ***massive information-sharing program*** with business

23   partners that plaintiffs allege."  *Id.* at 25.  As the court noted, Facebook itself had since identified

24   a "non-exclusive list of companies" that includes such giants as Blackberry, Samsung, Yahoo,

25   the Russian search engine Yandex, Amazon, Microsoft, and Sony.  *Id.* at 8.

26         303.   Finally, the court allowed the consumer plaintiffs to pursue claims based on

27   allegations that although Facebook had a policy preventing app developers from using

28   information for improper purposes, "Facebook did nothing to enforce this policy, thus giving

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                              - 98 -

1    users the impression that their information was protected, while in reality countless app

2    developers were using it for other purposes." *Id.* at 9 (using Cambridge Analytica as an example).

3    The court noted that Facebook interpreted its policy to mean, in essence, "we tell app developers

4    that they can only use your information to facilitate their interactions with your friends, but you

5    can't really be sure they'll honor that." *Id.* at 28.  The court characterizes this as a view that the

6    Facebook user "assumed the risk that app developers would misuse [their] information." *Id.*

7        304.    The court rejected Facebook's argument, noting that its Data Use Policy could

8    reasonably be interpreted to mean that "Facebook is actively policing the activities of app

9    developers . . . and thereby successfully preventing sensitive information from being

10   misappropriated." *Id.*  The Court also noted that the Data Use Policy could be interpreted by a

11   reasonable user to mean that the "Facebook platform has the ability to ***physically prevent*** app

12   developers from being able to "see" friend information outside the context of their interactions

13   with users." *Id.* at 28-29 (emphasis added).

14       305.    Based on these findings, the court concluded that the consumer plaintiffs had

15   successfully pled a number of privacy-related claims, including claims based on concealment and

16   deceit that "sound in fraud," and had to satisfy the strict pleading requirements of Rule 9(b).  *Id.*

17   at 37.  For these claims, the court held:

18           The plaintiffs have also adequately alleged that Facebook ***intended to defraud its***
             ***users*** regarding this conduct:  the plaintiffs contrast Facebook's ***public-facing***
19           ***statements about protecting privacy*** and restricting information-sharing with the
             ***reality of Facebook's alleged practices***, and that contrast is a sufficient basis from
20           which to infer fraudulent intent at the pleading stage.

21   *Id.*  (emphasis added).

22                   **2.    The Court Of Chancery Of The State Of Delaware**

23       306.    On May 30, 2019, Vice Chancellor Joseph R. Slights of the Delaware Court of

24   Chancery (the "Delaware Court") issued an opinion in the action captioned *In re Facebook, Inc.*

25   *Section 220 Litigation* (the "Delaware Opinion").  In the Delaware Opinion, "[a]fter carefully

26   reviewing the evidence and the arguments of counsel" submitted in a one-day trial, the Delaware

27   Court concluded that the plaintiffs there had "demonstrated, by a preponderance of the evidence,

28

1   a credible basis [to] infer that **wrongdoing occurred at the Board level in connection with data**

2   **privacy breaches**" by Facebook and its executives.  Thus, the Delaware Court ordered Facebook

3   to produce certain books and records documents sought by the plaintiffs.

4          307.   In reaching this conclusion, the Delaware Court relied on evidence that Facebook

5   and its directors knowingly violated the FTC Consent Decree.  For example, the Delaware Court

6   found evidence that Facebook's Board of Directors "knew the Company had not implemented or

7   maintained" measures required by the FTC Consent Decree but "nevertheless condoned the

8   Company's monetization of its users' private data in violation of the Consent Decree."  Notably,

9   both defendants Zuckerberg and Sandberg sat on Facebook's Board during the Class Period.

10         308.   The Delaware Court further noted that the "Cambridge Analytica Scandal was

11  facilitated by Facebook's policies" and it "would not have happened" if Facebook had complied

12  with the FTC Consent Decree.  The Delaware Court also explained that Facebook's practice of

13  entering into so-called "whitelist" agreements with device manufacturers, providing the latter

14  with "the personal data of hundreds of millions of [Facebook's] users" without user consent or

15  knowledge.   Specifically, the Delaware Court found evidence that Facebook gave these

16  "whitelisted" device makers "unauthorized access to the Facebook platform and Facebook's user

17  data for a substantial fee" but "[a]ll the while, its users were left in the dark."

18         309.   The Delaware Court also relied on evidentiary-based conclusions by the United

19  Kingdom's Parliamentary Committee that "emails from Zuckerberg and Sandberg" showed that

20  "**Facebook 'intentionally and knowingly' violated both data privacy and competition laws**."

21  Indeed, the Delaware Court cited the U.K. Parliamentary Committee's conclusion that

22  Facebook's Board – which as noted above included both defendants Zuckerberg and Sandberg –

23  "was aware of data privacy breaches but attempted to 'deflect attention' from those breaches to

24  avoid scrutiny."  The Delaware Court also found a "credible basis to infer [Facebook's] Board

25  knew the Company was allowing unauthorized third-party access to user data."

26         310.   Finally, the Delaware Opinion discusses the fact that, in July 2018, Facebook

27  suffered "one of the sharpest single-day market value declines in history when its stock price

28  dropped 19%, wiping out $120 billion of shareholder wealth."  The Court concluded that this

1  "unprecedented misfortune followed new reports that, in 2015, the private data of 50 million
2  Facebook users had been poached by Cambridge Analytica."

3              **3.      The Superior Court of the District of Columbia**

4              311.    On May 31, 2019, the Honorable Fern Flanagan Saddler of the Superior Court of
5  the District of Columbia (the "D.C. Court") released an opinion (the D.C. Opinion") in the action
6  captioned *District of Columbia v. Facebook, Inc.*, No. 2018 CA 8715B (D.C. Sup. Ct.).  The D.C.
7  Opinion also authorized discovery into Facebook's privacy practices and potential misconduct,
8  based on the D.C. Court's conclusion that the District of Columbia's Office of the Attorney
9  General "allege[d] sufficient facts to demonstrate that Facebook's alleged statements, actions, or
10 omissions could be interpreted . . . as material and misleading."

11     **C.     Defendants' Privacy Violations And Misuse Of User Data Are
           Confirmed In Multiple Investigations By Other Nations**
12
13              **1.      United Kingdom's House of Commons Digital, Culture,
                   Media and Sport Committee**
14
15              312.    On February 19, 2019, the Digital, Cultural, Media and Sport Committee
16 ("DCMSC" or the "Committee") of the British House of Commons issued its "Disinformation
17 and 'fake news': Final Report" (the "Final Report"), a scathing condemnation of Facebook's
   privacy practices and its misuse of user data. The DCMSC concluded, "[I]t is evident that
18 ***Facebook intentionally and knowingly violated both data privacy*** and anti-competition laws."[294]
19 The Committee also concluded, "The Cambridge Analytica scandal was facilitated by Facebook's
20 policies."[295]

21

22

23

24

25

_____

26 [294] House of Commons, Digital, Culture, Media and Sport Committee, "Disinformation and 'fake
27 news': Final Report," at 41, 91, February 14, 2019, *available at*
   https://publications.parliament.uk/pa/cm201719/cmselect/cmcumeds/1791/1791.pdf.
28 [295] *Id*. at 26.

1

2

        **2.**     **Joint Investigation of Facebook, Inc. by the Privacy Commissioner of Canada and the Information and Privacy Commissioner for British Columbia**

3

4

5

6

7

8

9

10

11

12

      313.    On April 25, 2019, the Privacy Commissioner of Canada and the Information and Privacy Commissioner for British Columbia (the "Commissions") issued their Report of Findings ("Report"), outlining the conclusions of their joint investigation into Facebook's compliance with Canada's Personal Information Protection and Electronic Documents Act ("PIPEDA") and British Columbia's Personal Information Protection Act ("PIPA"). The Commissions determined that Facebook failed to protect the personal information of users from unauthorized disclosure. Specifically, the Report concluded that: "(i) Facebook failed to obtain valid and meaningful consent of installing users," "(ii) Facebook also failed to obtain meaningful consent from friends of installing users," "(iii) Facebook had inadequate safeguards to protect user information," "(iv) Facebook failed to be accountable for the user information under its control."[296]

13

14

    **D.**    **Post-Class Period Events Confirm Defendants' Privacy Violations And Misuse Of User Data During The Class Period**

15

        **1.**     **Defendants' Internal Investigation Reveals That "Tens of Thousands" Of Apps Abused User Data**

16

17

18

19

20

21

22

      314.    On September 20, 2019, defendants announced an "update on our ongoing App Developer Investigation, which we began in March of 2018 as part of our response to the episode involving Cambridge Analytica."[297] The investigation concerned "apps that had access to large amounts of information before we changed our platform policies in 2014," and Facebook revealed, "To date, this investigation has addressed *millions of apps*. Of those, *tens of thousands have been suspended for a variety of reasons* while we continue to investigate."[298] Specifically, Facebook investigated and suspended apps "for any number of reasons including *inappropriately*

23

---

24

25

26

[296] Joint Investigation of the Privacy Commissioner of Canada and the Information and Privacy Commissioner for British Columbia, "Report of findings," Overview, April 25, 2019, *available at* https://www.priv.gc.ca/en/opc-actions-and-decisions/investigations/investigations-into-businesses/2019/pipeda-2019-002/.

27

[297] Ime Archibong, *An Update on Our App Investigation and Audit*, Facebook Newsroom (Sept. 20, 2019), https://tinyurl.com/yx3fym84.

28

[298] *Id.*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

*sharing data obtained from us*, *making data publicly available* without protecting people's identity or *something else that was in clear violation* of our policies."

315.    Defendants noted that the banned apps came from about 400 developers, though they only identified a handful by name in the announcement.  For instance, defendants announced that they banned an app called myPersonality, "which *shared information with researchers and companies* with only limited protection in place" – the exact same abuse of user data that triggered the Cambridge Analytica scandal.[299]   Facebook similarly suspended apps like Rankwave for failing to cooperate with its investigation, LionMobi and JediMobi for "infect[ing] users' phots with malware in a profit-generating scheme," and others for "using quiz apps to scrape users' data off our platform."[300]

316.    As part of the App Developer Investigation, defendants announced:

> [W]e are far from finished. . . . We've also improved the ways we investigate and enforce against potential privacy violations that we find. . . . [W]e've made widespread improvements to how we evaluate and set policies for all developers that build on our platforms.  We've removed a number of APIs, the channels that developers use to access various types of data.  We've grown our teams dedicated to investigating and enforcing against bad actors.  This will allow us to, on an annual basis, review every active app with access to more than basic user information.  And when we find violators, we'll take a range of enforcement actions.  .  .  .  And we will not allow apps on Facebook that request a disproportionate amount of information from users relative to the value they provide.[301]

317.    While defendants' announcement was light on specifics, the same day, a state court in Massachusetts unsealed documents in the Massachusetts Attorney General's investigation into Facebook's potential violation of state consumer protection laws.  The unsealed documents showed that Facebook had suspended 69,000 apps – the majority of which Facebook flagged for failing to cooperate with the investigation, and about 10,000 of which had potentially misappropriated users' data.[302]

---

[299] *Id.*

[300] *Id.*

[301] *Id.*

[302] Kate Conger, Gabriel J.X. Dance & Mike Issac, *Facebook's Suspension of 'Tens of Thousands' of Apps Reveals Wider Privacy Issues*, N.Y. Times (Sept. 20, 2019), https://tinyurl.com/y5laq2jz.

318.   *The New York Times* described Facebook's announcement as "a tacit admission that the scale of its data privacy issues was far larger than it had previously acknowledged. . . . The disclosures about app suspensions renew questions about whether people's personal information on Facebook is secure, even after the company has been under fire for more than a year for its privacy practices."[303]

### 2.   Defendants Revise Facebook's Business Model To Respect Privacy And Reverse Their Prior Privacy Abuses

319.   In response to the privacy misconduct at issue in this case, throughout 2019, defendants announced sweeping revisions to the Facebook platform that they intended would make Facebook more "privacy-focused."

320.   On March 6, 2019, defendant Zuckerberg announced specifically that Facebook's "vision and principles" would support a newly "privacy-focused messaging and social networking platform."[304]   In his statement on Facebook.com, Zuckerberg admitted that Facebook's privacy practices had been too lax, stating, "I understand that many people don't think Facebook can or would even want to build this kind of privacy-focused platform – because frankly we don't currently have a strong reputation for building privacy protective services, and we've historically focused on tools for more open sharing."[305]   Zuckerberg committed to several principles around which Facebook "plann[ed] to rebuild more of our services," including:

- "People should have . . . clear control over who can communicate with them and confidence that no one else can access what they share"

- "People's private communications should be secure. End-to-end encryption prevents anyone – including us – from seeing what people share on our services."

- "People . . . should not have to worry about what they share coming back to hurt them later. So we won't keep messages or stories around for longer than necessary to deliver the service or longer than people want them."

- "People should expect that we will do everything we can to keep them safe on our services within the limits of what's possible in an encrypted service."

---

[303] *Id.*

[304] Mark Zuckerberg, *A Privacy-Focused Vision for Social Networking*, Facebook (Mar. 6, 2019), https://tinyurl.com/y64headh.

[305] *Id.*

- "People should be able to use any of our apps to reach their friends, and they should be able to communicate across networks easily and securely."

- "People should expect that we won't store sensitive data in countries with weak records on human rights like privacy and freedom of expression in order to protect data from being improperly accessed."[306]

321.    Defendant Zuckerberg broached these issues again on Facebook's earnings call for the first quarter of 2019 on April 24, 2019. He opened the call by reiterating his "privacy-focused vision for the future of social networking," and he described the changes that Facebook would be implementing to "build[] this privacy-focused platform."[307] In addition, defendant Sandberg explained, "We're making significant investments in safety and security while continuing to grow our community and our business. This quarter once again shows that we can do both. ***As we prepare to build more services around our privacy roadmap, we're changing the way we run the company. We are committed to earning back trust through the actions we take.*** A key part of earning back trust is increasing transparency."[308]

322.    One week later, on April 30, 2019, Facebook held its annual F8 conference. In his keynote address on the first day of the conference, defendant Zuckerberg stated:

> Privacy gives us the freedom to be ourselves. . . . The future is private. This is the next chapter for our services. . . . Over time, I believe that a private social platform will be even more important in our lives than our digital town squares. So today, we're going to start talking about what this could look like as a product. . . . how we need to change how we run this company in order to build this. . . . I know that we don't exactly have the strongest reputation on privacy right now to put it lightly, but I'm committed to doing this well. . . .[309]

323.    At the F8 conference, defendants unveiled the privacy-focused redesign of Facebook's desktop website and mobile app. *The New York Times* described, "[T]he revisions add new features to promote group-based communications instead of News Feed, where people publicly post a cascade of messages and status updates. . . . And it unveiled a spare, stark white look for Facebook, a departure from the site's largely blue-tinted design. . . . The redesign is the

---

[306] *Id.*

[307] Q1 2019 Facebook, Inc., Earnings Call Tr. at 2 (Apr. 24, 2019).

[308] *Id.* at 5.

[309] *Day 1 of F8 2019: Building New Products and Features for a Privacy-Focused Social Platform*, Facebook Newsroom (Apr. 30, 2019), https://tinyurl.com/wt6klnj.

1  most tangible sign of how the privacy scandals and user-data issues that have roiled Facebook are

2  forcing change at the company."[310] In an interview with *The New York Times*, Zuckerberg

3  explained that the platform's new features "will end up creating a more trustworthy platform."[311]

4  **VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND**
   **OMISSIONS MADE WITH SCIENTER DURING THE CLASS PERIOD**

5

6     324.    During the Class Period, Facebook, Zuckerberg, Sandberg, and Wehner violated

7  the federal securities laws by knowingly or recklessly making untrue statements of material fact

8  or omitting to state material facts necessary to make the statements made, in the light of the

9  circumstances under which they were made, not misleading.

10     **A.    Defendants Made Materially False and Misleading Statements**
       **Concerning Facebook Users' "Control" Over Their Data**

11     325.    During the Class Period, defendants knowingly or recklessly made materially false

12  and misleading statements concerning Facebook users' control over their data and information,

13  including the statements set forth below.

14     326.    From the start of the Class Period through May 25, 2018, inclusive, under the

15  heading "SHARING YOUR CONTENT AND INFORMATION, in its *Statement of Rights and*

16  *Responsibilities* published on the Company's corporate website, Facebook stated, "You own all

17  of the content and information you post on Facebook, and ***you can control how it is shared***

18  ***through your privacy and application settings***."[312]

19     327.    On October 12, 2017, during a public interview with Axios, Sandberg stated:

20     [W]hen you share on Facebook you need to know . . . ***No one is going to get your***
       ***data that shouldn't have it***.  That we're not going to make money in ways that
21     you would feel uncomfortable with off your data.  And that ***you're controlling***

22

23

24  ───────────────
   [310] Mike Issac, *Facebook Unveils Redesign as It Tries to Move Past Privacy Scandals*, N.Y. Times
25  (Apr. 30, 2019), https://tinyurl.com/y5rqjmmo.

26  [311] *Id*.

27  [312] Facebook's *Statement of Rights and Responsibilities* was published on Facebook's corporate
   website starting on January 30, 2015 and ending May 25, 2018 inclusive, *available at*
28  https://tinyurl.com/sl22kyc.

*who you share with*. . . .  Privacy for us is making sure that you feel secure, sharing on Facebook.[313]

328.    On November 1, 2017, during Facebook's earnings call for the third quarter of 2017, Sandberg stated, ". . . the Facebook family of apps already applies the core principles in the [GDPR] framework because we built our services around transparency and control."[314]

329.    On January 23, 2018, during an appearance at the Facebook Gather Conference in Brussels, Belgium, Sandberg stated, "Our apps have long been focused on giving people *transparency and control* . . . ."[315]

330.    On January 31, 2018, during Facebook's earnings call for the fourth quarter of 2017, Sandberg stated, ". . .  the Facebook family of apps *already applies* the core principles in the GDPR framework, which are *transparency and control*."[316]

331.    On February 28, 2018, during an appearance at the Morgan Stanley Technology, Media & Telecom Conference, Wehner stated, "So we think with transparency and *control*, we're set up well to be in a position where we're compliant with GDPR when the regulation goes into effect in May."[317]

332.    On March 16, 2018, in a post on its corporate website titled *Suspending Cambridge Analytica and SCL Group From Facebook*, Facebook stated, "In 2014, after hearing feedback from the Facebook community, we made an update to ensure that each person decides what information they want to share about themselves, including their friend list.  This is just one of the many ways *we give people the tools to control their experience*.  Before you decide to use an

---

[313] Mike Allen, *Exclusive interview with Facebook's Sheryl Sandberg*, Axios (Oct. 12, 2017) https://tinyurl.com/y9k7mlok.

[314] Q3 2017 Facebook, Inc. Earnings Call Tr. at 11 (Nov. 1, 2017).

[315] Facebook Gather Conference, Brussels, Belgium (Jan. 23, 2018).

[316] Q4 2017 Facebook, Inc. Earnings Call Tr. at 9 (Jan. 30, 2018).

[317] Morgan Stanley Technology, Media & Telecom Conference Tr. at 9 (Feb. 28, 2018).

1   app, you can review the permissions the developer is requesting and choose which information to

2   share. You can manage or revoke those permissions at any time."[318]

3       333.   On April 4, 2018, during a telephonic press conference with journalists and

4   members of the press, Zuckerberg stated, "[T]he main principles are, **you have control over**

5   **everything you put on the service**, and most of the content Facebook knows about you it [*sic*]

6   because you chose to share that content with your friends and put it on your profile."[319]

7       334.   On April 24, 2018, in a public post on Facebook.com, Facebook stated, "You've

8   been hearing a lot about Facebook lately and how your data is being used. While this information

9   can sometimes be confusing and technical, it's important to know that **you are in control of your**

10  **Facebook**, what you see, what you share, **and what people see about you**."[320]

11      335.   On June 29, 2018, in its *Responses to the U.S. House of Representatives Energy*

12  *and Commerce Committee's Questions for the Record*, Facebook stated, "We already show

13  people what apps their accounts are connected to and **allow them to control what data they've**

14  **permitted those apps to use**."[321]

15      336.   In the same document discussed immediately above, Facebook further stated,

16      Privacy is at the core of everything we do, and our approach to privacy starts with
    **our commitment to transparency and control**.  [. . .]  Our approach to control is

17      based on the belief that people should be able to choose who can see what they
    share and how their data shapes their experience on Facebook.  **People can control**

18      **the audience for their posts and the apps that can receive their data.**[322]

19      337.   On April 10, 2018, during his live oral testimony before the Joint Commerce and

20  Judiciary Committees of the U.S. Senate, Zuckerberg made the following statements:

21

22  _____

23  [318] Paul Grewal, *Suspending Cambridge Analytica and SCL Group From Facebook* (Mar. 16,
    2018), https://tinyurl.com/sd69qnd.

24  [319] *Hard Questions:* Q&A *With Mark Zuckerberg on Protecting People's Information*, Facebook
    Newsroom (Apr. 4, 2018), https://tinyurl.com/rv69jh9.

25  [320] *How to Take Control of Your Facebook*, Facebook Newsroom (Apr. 24, 2018),
26  https://tinyurl.com/y84wzmof.

27  [321] Facebook, Inc., *Responses to House Energy and Commerce Questions for the Record*, at 9
    (June 29, 2018), https://tinyurl.com/ro4buvn.

28  [322] *Id*. at 25.

1        (a)    "This is the most important principle for Facebook:  Every piece of content

2 that you share on Facebook, you own and you have **complete control** over who sees it and -- and

3 how you share it, and you can remove it at any time. That's why every day, about 100 billion

4 times a day, people come to one of our services and either post a photo or send a message to

5 someone, because **they know that they have that control and that who they say it's going to go**

6 **to is going to be who sees the content**.  And I think that that control is something that's important

7 that I think should apply to -- to every service."[323]

8        (b)    "That's what the [Facebook] service is, right? It's that you can connect

9 with the people that you want, and you can share whatever content matters to you, whether that's

10 photos or links or posts, and **you get control over it**."[324]

11        (c)    "The two broad categories that I think about are content that a person is[sic]

12 chosen to share and that they have complete control over, they get to control when they put into

13 the service, when they take it down, who sees it. And then the other category are data that are

14 connected to making the ads relevant.  **You have complete control over both**."[325]

15        (d)    "Every person gets to **control who gets to see their content**."[326]

16        (e)    "But, Senator, the -- your point about surveillance, I think that there's a

17 very important distinction to draw here, which is that when -- when organizations do

18 surveillance[,] people don't have control over that. **But on Facebook, everything that you share**

19 **there[,] you have control over**."[327]

20     338.    On April 11, 2018, during his live testimony before the U.S. House of

21 Representatives' Energy and Commerce Committee, Zuckerberg stated,

22

23

---

24 [323] *Transcript of Mark Zuckerberg's Senate hearing*, Wash. Post (Apr. 10, 2018),
https://tinyurl.com/y7cu7jh7.

25 [324] *Id.*

26 [325] *Id.*

27 [326] *Id.*

28 [327] *Id.*

1         (a)     "[. . .] on Facebook, you have control over your information."[328]

2         (b)     "[. . .] every single time that you share something on Facebook or one of

3 our services, right there is a control in line, where you control who -- who you want to share

4 with."[329]

5         (c)     "Congresswoman, giving people control of their information and how they

6 want to set their privacy is foundational to the whole service [on Facebook]. It's not just a – kind

7 of an add-on feature, something we have to . . . comply with. . . . ***all the data that you put in, all***

8 ***the content that you share on Facebook is yours. You control how it's used.***"[330]

9     339.    On June 8, 2019, in its *Responses to Additional Question from the Senate*

10 *Commerce Committee*, Facebook stated, "Privacy is at the core of everything we do, and our

11 approach to privacy starts with our commitment to transparency and control. [. . .] Our approach

12 to control is based on the belief that people should be able to choose who can see what they share

13 and how their data shapes their experience on Facebook. ***People can control the audience for***

14 ***their posts and the apps that can receive their data***."[331]

15     340.    The statements concerning user control set forth in ¶¶326-39 *supra* were

16 materially false and misleading because, when they were made, Facebook users could not control

17 their data, including because:

18         (a)     Defendants publicly stated in April 2014 that Facebook would stop

19 providing third parties with access to user friends' data, but continued to secretly provide that

20 data to numerous third parties, including app developers, "whitelisted" third parties, mobile

21 device makers and others;

22

23

---

[328] *Transcript of Zuckerberg's appearance before House committee*, Wash. Post (Apr. 11, 2018), https://tinyurl.com/y9ssaqpl.

[329] *Id.*

[330] *Id.*

[331] Facebook, *Responses to Senate Commerce Committee's Questions for the Record* (June 8, 2018) at 4

1          (b)      Defendants were overriding user privacy settings to provide user friends'

2    data to third parties;

3          (c)      Defendants knew that bad actors were able to access data; and

4          (d)      Defendants knew that users could not control their data that Facebook had

5    given to third parties without user knowledge or consent.

6          341.     In addition, the FTC has confirmed that Facebook made materially false and

7    misleading statements concerning Facebook users' control over their data by charging that

8    Facebook's conduct, including during the Class Period, violated Parts I.B and I.C of the FTC

9    Consent Decree because Facebook misrepresented the extent to which users could "control the

10   privacy" of their data and the extent to which Facebook "makes or has made [user data] accessible

11   to third parties," respectively.  In charging Facebook, the FTC relied on the fact that *inter alia*

12   "regardless of the privacy settings a user checked, Facebook continued to provide access to [user

13   data] to Whitelisted Developers" from at least the start of the Class Period through to at least June

14   2018.[332]

15         342.     Facebook paid $5 billion to settle the FTC's charges and stipulated that it "agrees

16   that the ***facts alleged in the [FTC] Complaint will be taken as true*** . . . in any subsequent civil

17   litigation by [the FTC] to enforce its rights . . ." to the $5 billion penalty that Facebook was

18   required to pay.[333]  Zuckerberg personally signed this stipulation on July 23, 2019.

19         343.     The statements concerning user control set forth in ¶¶326-39 *supra* were also

20   materially false and misleading because they omitted to state material facts necessary to make

21   them, in the light of the circumstances under which they were made, not misleading, including

22   that:

23         (a)      Users did not have control over their data on Facebook;

24         (b)      Contrary to their public statements in April 2014 that Facebook would stop

25   providing third parties with access to user friends' data, defendants continued to secretly provide

26

27   [332] FTC Complaint at ¶174.

28   [333] Stipulated Order, at 3, ¶I.E.

that data to numerous third parties, including app developers, "whitelisted" third parties, mobile device makers and others;

> (c)      Defendants were overriding user privacy settings to provide user friends' data to third parties;

> (d)      Bad actors were able to access data on Facebook; and

> (e)      Users could not control their data that Facebook had given to third parties without user knowledge or consent.

**B.     Defendants Made Materially False and Misleading Statements About Respecting Users' Privacy Settings**

344.    On March 17, 2018, Facebook made the following statement and provided the following information to a reporter for the *The Washington Post*, with the knowledge and expectation that it would be communicated to the public, as it was on that date, "***We respected the privacy settings that people had in place***.  Privacy and data protections are fundamental to every decision we make."[334]

345.    The statement set forth in ¶344 *supra* was materially false and misleading because, when it was made, Facebook did not respect the privacy settings that people had in place, including because:

> (a)      Defendants publicly stated in April 2014 that Facebook would stop providing third parties with access to user friends' data, but continued to secretly provide that data to numerous third parties, including app developers, "whitelisted" third parties, mobile device makers and others;

> (b)      Defendants were overriding user privacy settings to provide user friends' data to third parties; and

> (c)      Defendants knew that bad actors were able to access data.

---

[334] Craig Timberg & Tony Romm, *Facebook May Have Violated FTC Privacy Deal, Say Former Federal Officials, Triggering Risk Of Massive Fines*, Wash. Post (Mar. 18, 2018), https://tinyurl.com/yb8myroq.

1      346.    In addition, the FTC has confirmed that this statement was materially false and

2  misleading because, in charging Facebook with violations of the FTC Consent Decree, the FTC

3  relied on the fact that *inter alia* "regardless of the privacy settings a user checked, Facebook

4  continued to provide access to [user data] to Whitelisted Developers" from at least the start of the

5  Class Period through to at least June 2018.[335]

6      347.    Defendant Facebook paid $5 billion to settle the FTC's charges and stipulated that

7  it "agrees that the ***facts alleged in the [FTC] Complaint will be taken as true*** . . . in any

8  subsequent civil litigation by [the FTC] to enforce its rights . . ." to the $5 billion penalty that

9  Facebook was required to pay.[336]  Zuckerberg personally signed this stipulation on July 23, 2019.

10     348.    The statement set forth in ¶344 *supra* was also materially false and misleading

11  because its omitted to state material facts necessary to make it, in the light of the circumstances

12  under which it was made, not misleading, including that:

13             (a)    Defendants did not respect the privacy settings that people had in place;

14             (b)    Defendants were overriding user privacy settings to provide user friends'

15  data to third parties;

16             (c)    Contrary to their public statements in April 2014 that Facebook would stop

17  providing third parties with access to user friends' data, defendants continued to secretly provide

18  that data to numerous third parties, including app developers, "whitelisted" third parties, mobile

19  device makers and others; and

20             (d)    Bad actors were able to access data on Facebook.

21  **C.    Defendants Made Materially False and Misleading Statements
          Concerning Risks to Facebook's Business**

22

23     349.    During the Class Period, defendants knowingly or recklessly made materially false

24  and misleading statements concerning the business risks facing Facebook, including the

25  statements set forth below.

26

27  [335] FTC Complaint at ¶174.

28  [336] Stipulated Order, at 3, ¶I.E.

350.     On February 3, 2017, Facebook filed its annual report on Form 10-K for the fiscal year ended December 31, 2016 with the SEC (the "2016 Form 10-K"), which was signed by Zuckerberg, Sandberg and Wehner, among others, and made available on Facebook's investor relations website.  Facebook's 2016 Form 10-K included the following statements concerning risks facing the Company:

(a)     "Security breaches and improper access to or disclosure of our data or user data, or other hacking and phishing attacks on our systems, ***could*** harm our reputation and adversely affect our business";

(b)     "Any failure to prevent or mitigate security breaches and improper access to or disclosure of our data or user data ***could*** result in the loss or misuse of such data, which could harm our business and reputation and diminish our competitive position";

(c)     "We provide limited information to . . . third parties based on the scope of services provided to us.  However, ***if*** these third parties or developers fail to adopt or adhere to adequate data security practices . . . our data or our users' data ***may be*** improperly accessed, used, or disclosed.[337]

351.     The statements quoted in ¶350 *supra* were repeated or incorporated by reference into Facebook's other reports on Forms 10-K and 10-Q that the Company filed with the SEC during the Class Period, including its quarterly reports filed on May 4, 2017 (the "1Q17 10-Q"), July 27, 2017 (the "2Q17 10-Q"), November 2, 2017 (the "3Q17 10-Q"), and its annual report filed on February 1, 2018 (the "2017 Form 10-K"), each of which was signed by Zuckerberg, Sandberg and Wehner, among others, and made available on Facebook's investor relations website.

352.     The risk factor statements set forth in ¶¶350-51 *supra* were materially false and misleading because, when they were made because:

[337] FY 2016 Facebook, Inc. Form 10-K at 12-13 (Feb. 3, 2017).

1          (a)      Defendants did not disclose, but knew or recklessly disregarded, the fact

2 that Kogan had violated the Company's policies by improperly transferring data relating to tens

3 of millions of Facebook users to Cambridge Analytica;

4          (b)      Defendants misleadingly presented the potential for improper access to or

5 disclosure of user data as merely a hypothetical investment risk;

6          (c)      Defendants misleadingly presented the potential for misuse of user data as

7 merely a hypothetical investment risk;

8          (d)      Defendants created the false impression that Facebook had not suffered a

9 significant episode of improper access to or disclosure of user data by a developer;

10         (e)      Defendants created the false impression that Facebook had not suffered a

11 significant episode of misuse of user data by a developer;

12         (f)      Defendants publicly stated in April 2014 that Facebook would stop

13 providing third parties with access to user friends' data, but continued to improperly provide

14 access to that data to numerous third parties, including app developers, "whitelisted" third parties,

15 mobile device makers and others, throughout the Class Period;

16         (g)      Defendants were overriding user privacy settings to provide third parties

17 with improper access to user friends' data throughout the Class Period; and

18         (h)      Defendants knew that bad actors were able to access data.

19    353.    In addition, the SEC has confirmed that the statements set forth in ¶¶350-51 *supra*

20 were materially misleading because it charged *inter alia* that:

21         (a)      "In its quarterly and annual reports filed between January 28, 2016 and

22 March 16, 2018 [i.e., including those set forth above], Facebook did not disclose that a researcher

23 [*i.e.*, Kogan] had, in violation of the company's policies, transferred data relating to

24 approximately 30 million Facebook users to Cambridge Analytica.   Instead, Facebook

25 misleadingly presented the potential for misuse of user data as merely a hypothetical risk";[338]

26

27

---

28 [338] SEC Complaint at ¶6.

1           (b)     "Facebook's Risk Factor disclosures [including those set forth above]

2  misleadingly suggested that the company faced merely the risk of [user data] misuse and any

3  harm to its business that might flow from such an incident;"[339] and

4           (c)     "Facebook knew, or should have known, that its Risk Factor disclosures in

5  its annual reports on Form 10-K for the fiscal years ended . . . December 31, 2016 and December

6  31, 2017, and in its quarterly reports on Form 10-Q filed in . . . 2017 . . . were materially

7  misleading."[340]

8      354.   The risk factor statements set forth in ¶¶350-51 *supra* were also materially false

9  and misleading because they omitted to state material facts necessary to make them, in the light

10  of the circumstances under which they were made, not misleading, including that:

11           (a)     Kogan had violated the Company's policies by improperly transferring

12  data relating to tens of millions of Facebook users to Cambridge Analytica;

13           (b)     Facebook had in fact suffered a significant episode of improper access to

14  or disclosure of user data caused by a developer;

15           (c)     Facebook had in fact suffered a significant episode of misuse of user data

16  caused by a developer;

17           (d)     Defendants publicly stated in April 2014 that Facebook would stop

18  providing third parties with access to user friends' data, but continued to secretly provide that

19  data to numerous third parties, including app developers, "whitelisted" third parties, mobile

20  device makers and others, throughout the Class Period;

21           (e)     Defendants were overriding user privacy settings to provide user friends'

22  data to third parties throughout the Class Period; and

23             (f)     Defendants knew that bad actors were able to access data.

24      355.   Facebook's 2016 Form 10-K also stated "Although *we have developed systems*

25  *and processes that are designed to protect our data and user data, to prevent data loss and to*

26

27  [339] *Id.* at ¶39

28  [340] *Id.* at ¶44.

1    ***prevent or detect security breaches***, we cannot assure you that such measures will provide

2    absolute security."[341]   This statement was repeated or incorporated by reference into the other

3    reports on Forms 10-K and 10-Q that Facebook filed with the SEC during the Class Period,

4    including the 1Q17 10-Q, 2Q17 10-Q, 3Q17 10-Q, and the 2017 Form 10-K.

5        356.   These statements were false and misleading for the reasons cited above, including

6    that they:

7        (a)   Misleadingly presented the potential for improper access to or disclosure

8    of user data as merely a hypothetical investment risk;

9        (b)   Defendants did not employ the "systems and processes" purportedly

10   developed to protect user data;

11       (c)   Created the false impression that Facebook had not suffered a significant

12   episode of improper disclosure and misuse of user data.

13       357.   The statement set forth in ¶355 *supra* was also materially false and misleading

14   because it omitted to state material facts necessary to make it, in the light of the circumstances

15   under which it was made, not misleading, including that:

16       (a)   Kogan had violated the Company's policies by improperly transferring

17   data relating to tens of millions of Facebook users to Cambridge Analytica;

18       (b)   Facebook had in fact suffered a significant episode of improper access to

19   or disclosure of user data caused by a developer; and

20       (c)   Facebook had in fact suffered a significant episode of misuse of user data

21   caused by a developer.

22       358.   In addition, the 2016 Form 10-K also included the following statements

23   concerning the risks to the Company from a loss of user trust in Facebook's ability to protect their

24   privacy, as could occur following public reports or investigations into breaches of those privacy

25   policies, or the Company's past failures to address known breaches of those policies:

26

27

28   [341] FY 2016 Facebook, Inc. Form 10-K at 13 (Feb. 3, 2017)

If we fail to retain existing users or add new users, or if our users decrease their level of engagement with our products, our revenue, financial results, and business may be significantly harmed.

The size of our user base and our users' level of engagement are critical to our success.  Our financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging active users of our products, particularly for Facebook and Instagram.  We anticipate that our active user growth rate will continue to decline over time as the size of our active user base increases, and as we achieve higher market penetration rates.  ***If people do not perceive our products to be useful, reliable, and trustworthy, we may not be able to attract or retain users or otherwise maintain or increase the frequency and duration of their engagement***. . . .

Any number of factors could potentially negatively affect user retention, growth, and engagement, including if:

there are decreases in user sentiment about the quality or usefulness of our products or ***concerns related to privacy and sharing, safety, security***, or other factors[342]

These statements were repeated or incorporated by reference into the other reports on Forms 10-K and 10-Q that Facebook filed with the SEC during the Class Period, including the 1Q17 10-Q, 2Q17 10-Q, 3Q17 10-Q, and the 2017 Form 10-K.

359.    These statements were false and misleading for the reasons cited above, including that they:

(a)    Misleadingly presented the risks to Facebook's business and reputation arising from "concerns related to privacy and sharing, safety [and] security" as merely hypothetical investment risks; and

(b)    Created the false impression that Facebook had not suffered a significant episode of improper disclosure and misuse of user data.

360.    The statements set forth in ¶358 *supra* were also materially false and misleading because they omitted to state material facts necessary to make them, in the light of the circumstances under which they were made, not misleading, including that:

---

[342] FY 2016 Facebook, Inc. Form 10-K at 8 (Feb. 3, 2017)

1          (a)     Kogan had violated the Company's policies by improperly transferring

2 data relating to tens of millions of Facebook users to Cambridge Analytica;

3          (b)     Facebook had in fact suffered a significant episode of improper access to

4 or disclosure of user data caused by a developer; and

5          (c)     Facebook had in fact suffered a significant episode of misuse of user data

6 caused by a developer.

7       **D.     Defendants Made Materially False and Misleading Statements Concerning The Results Of Facebook's Investigation Into**

8              **Cambridge Analytica's Data Misuse**

9       361.    During the Class Period, defendants knowingly or recklessly made materially false

10 and misleading statements concerning the results of Facebook's investigation into Cambridge

11 Analytica's data misuse.

12       362.    On March 4, 2017, Facebook made the following statement through an authorized

13 spokesperson to reporters from *The Guardian* with the knowledge and expectation that it would

14 be communicated to the public, as it was on that date in an article titled, *Watchdog to launch*

15 *inquiry into misuse of data in politics*, "Our investigation to date has not uncovered anything that

16 suggests wrongdoing with respect to Cambridge Analytica's work on the [Brexit] and Trump

17 campaigns."[343]

18       363.    On March 30, 2017, Facebook made the following statement through an

19 authorized spokesperson to a reporter from *The Intercept* with the knowledge and expectation that

20 it would be communicated to the public, as it was on that date in an article titled *Facebook Failed*

21 *To Protect 30 Million Users From Having Their Data Harvested By A Trump Campaign Affiliate*,

22 "Our investigation to date has not uncovered anything that suggests wrongdoing" with respect to

23 Cambridge Analytica.[344]

24

25

---

26 [343] Jamie Doward, Carolle Cadwalladr and Alice Gibbs, *Watchdog to launch inquiry into misuse of data in politics*, Guardian (Mar. 4, 2017), https://tinyurl.com/jkp5hhg.

27 [344] Mattathias Schwartz, *Facebook Failed To Protect 30 Million Users From Having Their Data*

28 *Harvested By A Trump Campaign Affiliate*, Intercept (March 30, 2017).

364.    The statements set forth in ¶¶362-63 *supra* were materially false and misleading because, when they were made because:

(a)    Facebook did not disclose, but knew or recklessly disregarded, the fact that Facebook had determined by no later than December 2015 that Kogan had violated the Company's policies by improperly transferring data relating to tens of millions of Facebook users to Cambridge Analytica; and

(b)    Facebook's investigation into the Cambridge Analytica matter had found evidence of wrongdoing because Facebook had determined that Kogan violated Facebook's policies such as the prohibition on transferring or selling Facebook user data to other parties when he sold the data of tens of millions of Facebook users to Cambridge Analytica.

365.    In addition, the SEC has confirmed that the statements set forth in ¶¶362-63 *supra* were materially misleading because it charged *inter alia* that:

(a)    "[W]hen asked by reporters in 2017 about its investigation into the Cambridge Analytica matter, Facebook falsely claimed the company found no evidence of wrongdoing;"[345] and

(b)    "[I]n March 2017, Facebook's communications group provided the following quote to reporters:  'Our investigation to date has not uncovered anything that suggests wrongdoing.'  This was misleading because Facebook had, in fact, determined that [Kogan's] transfer of user data to Cambridge violated the company's Platform Policy."[346]

366.    The statements set forth in ¶¶362-63 *supra* were also materially false and misleading because they omitted to state material facts necessary to make them, in the light of the circumstances under which they were made, not misleading, including that:

(a)    Facebook had determined by no later than December 2015 that Kogan had violated the Company's policies by improperly transferring data relating to tens of millions of Facebook users to Cambridge Analytica; and

---

[345] SEC Complaint at ¶6.

[346] *Id.* at ¶49.

1    (b)    Facebook's investigation into the Cambridge Analytica matter had found

2   evidence of wrongdoing.

3    **E.    Defendants Made Materially False and Misleading Statements**
     **Concerning Facebook's Response To Instances Of Data Misuse**
4

5    367.    During the Class Period, defendants recklessly made materially false and

6   misleading statements concerning Facebook's response to instances of data misuse.

7    368.    On or about February 16, 2017, Facebook made the following statement and

8   provided the following information to *BuzzFeed News*, with the knowledge and expectation that

9   it would be communicated to the public, as it was on that date in an article titled *The Truth About*

10  *The Trump Data Team That People Are Freaking Out About*:

11       [A]s a general rule, Andy Stone, a Facebook spokesperson, said, "***Misleading***
         ***people or misusing their information is a direct violation of our policies and we***
12       ***will take swift action against companies that do,*** including banning those
         companies from Facebook ***and requiring them to destroy all improperly collected***
13       ***data***."[347]

14   369.    On or about June 8, 2017, Facebook made the following statement and provided

15  the following information to Newsweek, with the knowledge and expectation that it would be

16  communicated to the public, as it was on that date in an article titled *How Big Data Mines*

17  *Personal Info to Craft Fake News and Manipulate Voters*:

18       ***Misleading people or misusing their information is a direct violation of our***
         ***policies and we will take swift action against companies that do***, including
19       banning those companies from Facebook ***and requiring them to destroy all***
         ***improperly collected data.***[348]
20

21   370.    Throughout the Class Period, under the heading "PROTECT DATA," Facebook's

22  Data Policy published on the Company's corporate website stated the following concerning

23  Facebook's response to instances of policy violations:

24       Enforcement is both automated and manual, and can include disabling your app,
         restricting you and your app's access to platform functionality, ***requiring that you***
25

---

26  [347] Kendall Taggart, *The Truth About the Trump Data Team That People are Freaking Out About*,
    BuzzFeed News (Feb. 16, 2017), https://tinyurl.com/y7yewq47.

27  [348] Nina Burleigh, *How Big Data Mines Personal Info to Craft Fake News and Manipulate Voters*,
28  Newsweek (June 8, 2017), https://tinyurl.com/ycfz7l5d.

*delete data*, terminating our agreements with you or any other action that we deem appropriate.[349]

371.    The statements about taking "swift action against companies that [misuse people's information]" in ¶¶368-70 *supra* were materially misleading because, among other things, Facebook did not take "swift action" when it learned that Kogan had improperly sold user data to Cambridge Analytica.  Instead, after learning that both Kogan and Cambridge Analytica had lied about the nature of the data transferred to Cambridge Analytica and about all the data being deleted, Facebook waited nearly one year (from June 2016 to April 2017) for a certification from Cambridge Analytica reporting deletion of the purloined data.

372.    The statements about Facebook "requiring [data misusers] to destroy all improperly collected data" or "requiring that [policy violators] delete data" in ¶¶368-70 *supra* were materially misleading because Facebook could not "require" data misusers to "destroy" or "delete" improperly collected data.  Facebook simply did not have the technical ability to "automat[ically]" "require" deletion of misused user data.  Defendants knew that once user data was in the hands of a third party – Facebook had no ability to control that data or "require" that third party to do anything.

373.    For example, even though Facebook *knew* that both Kogan and Cambridge Analytica had lied about the nature of the data transferred to Cambridge Analytica and about whether all of the data had been deleted, Facebook could do nothing to "require" deletion of the data.  As such, Facebook knowingly or recklessly relied on unsupported certifications from known liars stating that the data had been deleted.  Further, even when confronted with red flags that Cambridge Analytica was still using the purloined data, Facebook had no ability to "require" destruction or deletion of the data.

374.    To be sure, as discussed above, Zuckerberg has admitted that Facebook's failure to follow-up on the Cambridge Analytica data misuse and require the data to be deleted was the

---

[349] Facebook Platform Policies (Jan. 11, 2017).

1    "biggest mistake[]" Facebook ever made.[350]   Zuckerberg also admitted that Facebook "should

2    have been doing more all along" to protect users' privacy.  Sandberg also admitted that it was a

3    "mistake that [Facebook] did not verify" whether Cambridge Analytica had deleted the user

4    data[351] and acknowledged that the Company should have "checked"[352] and "follow[ed]-up"[353] to

5    ensure Facebook user's personal data was, in fact, protected.  She stated that Facebook was "not

6    focused enough on the possible misuses of data" and "protecting people's data" at the time. [354]

7    Sandberg has also admitted that Facebook "could have done . . . two and a half years ago" what

8    it is doing today.[355]

9          375.   The statements set forth in ¶¶368-70 *supra* were also materially false and

10    misleading because they omitted to state material facts necessary to make them, in the light of the

11    circumstances under which they were made, not misleading, including that:

12          (a)     Facebook did not take swift action against third parties who had misused

13    user information; and

14          (b)     Facebook could not and did not "require" data misusers to "destroy" or

15    "delete" improperly collected data.

16          376.   On March 16, 2018, defendants posted a statement on Facebook.com entitled

17    "Suspending Cambridge Analytica and SCL Group From Facebook," which stated:

18          ***We are committed to vigorously enforcing our policies to protect people's
       information.  We will take whatever steps are required to see that this happens.***

19

20    [350] Nicholas Thompson, *Mark Zuckerberg Talks to Wired About Facebook's Privacy Problem*,

21    *Wired* (Mar. 21, 2018), https://tinyurl.com/y77krl23.

22    [351] *CNBC Exclusive: CNBC Transcript: Sheryl Sandberg Sits Down with CNBC's Julia Boorstin
       Today*, CNBC (Mar. 22, 2018), https://tinyurl.com/ya4z2elm.

23    [352] Eun Kyung Kim, *Sheryl Sandberg on TODAY: Other Facebook data breaches 'possible'*,

24    Today (Apr. 6, 2018), https://tinyurl.com/ydb26wx3.

25    [353] Steve Inskeep, *Full Transcript: Facebook COO Sheryl Sandberg On Protecting User Data*,
       NPR (Apr. 5, 2018), https://tinyurl.com/y8aamyhn.

26    [354] Judy Woodruff, *Sheryl Sandberg: Facebook 'made big mistakes' on protecting user data*, PBS
       (Apr. 5, 2018), https://tinyurl.com/vbkaqkx.

27    [355] Eun Kyung Kim, *Sheryl Sandberg on TODAY: Other Facebook data breaches 'possible'*,

28    Today (Apr. 6, 2018), https://tinyurl.com/ydb26wx3.

We will take legal action if necessary to hold them responsible and accountable for any unlawful behavior.

*        *        *

On an ongoing basis, ***we also do a variety of manual and automated checks to ensure compliance with our policies and a positive experience for users***.  These include steps such as random audits of existing apps along with the regular and proactive monitoring of the fastest growing apps.

***We enforce our policies in a variety of ways - from working with developers to fix the problem, to suspending developers from our platform, to pursuing litigation.***[356]

377.    The statement about Facebook being "committed to vigorously enforcing our policies to protect people's information" and take "whatever steps are required to see that this happens" in ¶376 *supra* was materially misleading because, among other things, Facebook did not "vigorously enforce [its] policies" and nor did it "take whatever steps are required" to do so when it learned that Kogan had improperly sold user data to Cambridge Analytica.  Instead, after learning that both Kogan and Cambridge Analytica had lied about the nature of the data transferred to Cambridge Analytica and about all the data being deleted, Facebook waited nearly one year (from June 2016 to April 2017) for a certification from Cambridge Analytica reporting deletion of the purloined data.

378.    Further, defendants did not require or confirm that the data had in fact been destroyed by Cambridge Analytica.  Defendants knew that once user data was in the hands of a third party – Facebook had no ability to control that data or "require" that third party to do anything.  As such, Facebook knowingly or recklessly relied on unsupported certifications from known liars stating that the data had been deleted.  Further, even when confronted with red flags that Cambridge Analytica was still using the purloined data, Facebook had no ability to "require" destruction or deletion of the data.

---

[356] Paul Grewal, *Suspending Cambridge Analytica and SCL Group From Facebook*, Facebook Newsroom (Mar. 16, 2018), https://tinyurl.com/sd69qnd.

379.     The statement set forth in ¶376 *supra* was also materially false and misleading because it omitted to state material facts necessary to make them, in the light of the circumstances under which it was made, not misleading, including that:

(a)     Defendants did not "vigorously enforce [Facebook's] policies" and nor did they "take whatever steps are required" against third parties who had misused user information; and

(b)     Defendants did not require or confirm that the data sold to Cambridge Analytica had in fact been destroyed – even after Cambridge Analytica had been exposed as a liar and Facebook was confronted with multiple red flags that the data was not deleted.

### F.     Defendants Made Materially False And Misleading Statements Concerning Facebook Users Consenting To, Or Knowingly, Providing Their Information To Kogan

380.     On March 17, 2018, Facebook provided an addendum to Facebook's March 16, 2018 statement posted on its corporate website (*see supra* ¶332), which stated:

> ***The claim that this is a data breach is completely false.***  Aleksandr Kogan requested and gained access to information from ***users who chose to sign up to his app,*** and ***everyone involved gave their consent.  People knowingly provided their information***, no systems were infiltrated, and no passwords or sensitive pieces of information were stolen or hacked.[357]

381.     The above statement concerning user choice, consent and knowledge was materially false and misleading because, when it was made, defendants knew that Kogan was one of the app developers who was secretly grandfathered into the "user friends' data" sharing program that defendants had told the public was discontinued in April 2014.  Thus, over 87 million Facebook users who had their personal data harvested by Kogan due to defendants decision to continue to secretly give Kogan access to user friend data did ***not*** "cho[o]se to sign up to his app" – indeed, they did not even sign up at all.  Nor did these users "g[i]ve their consent" or "knowingly provide[] their information" to Kogan.

---

[357] Paul Grewal, *Suspending Cambridge Analytica and SCL Group from Facebook*, Facebook.com Newsroom (Mar. 16, 2018), https://tinyurl.com/ycd7en7b.

382.    The statement set forth in ¶380 *supra* was also materially false and misleading because it omitted to state material facts necessary to make it, in the light of the circumstances under which it was made, not misleading, including that:

(a)    Kogan was one of the app developers who was secretly grandfathered into the "user friends' data" sharing program that defendants had told the public was discontinued in April 2014;  and

(b)    Over 86 million Facebook users who had their personal data harvested by Kogan did *not* "cho[o]se to sign up to his app," did *not* "g[i]ve their consent" and did *not* "knowingly provide[] their information" to Kogan.

383.    On March 21, 2018, Zuckerberg posted an update to his personal Facebook.com page, which Facebook uses to disseminate public information regarding the Company,[358] in which he stated in part:

> *The good news is that the most important actions to prevent this from happening again today we have already taken years ago*. . . . In 2014, to prevent abusive apps, we announced that we were *changing the entire platform to dramatically limit the data apps could access*. . . . In this case, we already took the most important steps a few years ago in 2014 to prevent bad actors from accessing people's information in this way.[359]

384.    The above statement was materially false and misleading when it was made because Zuckerberg knew that, after the purported 2014 changes, Facebook continued to secretly provide that user friend data to numerous third parties, including app developers, "whitelisted" third parties, mobile device makers and others.  Zuckerberg also knew that Facebook was overriding user privacy settings to provide user friends' data to third parties.

385.    In addition, the FTC has confirmed that "Facebook continued to allow millions of third-party developers access to [user friends' data] for at least one year."[360]  The FTC Complaint

---

[358] Facebook stated in all its Class Period press releases announcing earnings results and guidance, "Facebook uses the investor.fb.com and newsroom.fb.com websites as well as Mark Zuckerberg's Facebook Page (facebook.com/zuck) as means of disclosing material non-public information and for complying with its disclosure obligations under Regulation FD."

[359] Mark Zuckerberg, Facebook (Mar. 21, 2018), https://tinyurl.com/yadalrv7.

[360] FTC Complaint at ¶164.

1 | notes that "Facebook did not disclose this fact to its users" – thereby depriving users of knowledge

2 | and the ability to consent to the disclosure of their data.[361]  This conduct violated Parts I.B and

3 | I.C of the FTC Consent Decree, which prohibited Facebook from misrepresenting "the extent to

4 | which a consumer can control the privacy of [their personal information]" and "the extent to

5 | which [Facebook] makes or has made covered information accessible to third parties."[362]

6 |      386.    Facebook paid $5 billion to settle the FTC's charges and stipulated that it "agrees

7 | that the ***facts alleged in the [FTC] Complaint will be taken as true*** . . . in any subsequent civil

8 | litigation by [the FTC] to enforce its rights . . ." to the $5 billion penalty that Facebook was

9 | required to pay.[363]  Zuckerberg personally signed this stipulation on July 23, 2019.

10 |      387.    The statement set forth in ¶383 *supra* was also materially false and misleading

11 | because it omitted to state material facts necessary to make it, in the light of the circumstances

12 | under which it was made, not misleading, including that, after Facebook announced in April 2014

13 | that access to "user friends' data" was  discontinued, Facebook continued to secretly provide that

14 | user friend data to numerous third parties, including app developers, "whitelisted" third parties,

15 | mobile device makers and others.  Indeed, Facebook was even overriding users' privacy settings

16 | in order to provide user friend data to these whitelisted third parties.

17 |      **G.    Defendants Made Materially False and Misleading Statements**
18 |               **Concerning Facebook's Compliance With The 2012 FTC Consent**
     |               **Decree**

19 |      388.    Throughout the Class Period, defendants recklessly made materially false and

20 | misleading statements concerning Facebook's compliance with the FTC Consent Decree.

21 |

22 |

23 |

---

24 | [361] *Id.* at ¶100. To the contrary, in September 2015, Facebook launched a "Privacy Checkup" tool
25 | as a means to help users "be in control" of their data and included a list of apps that users had
     | installed.  But this tool failed to list the apps that had access to user data based on their friends'
26 | consent and did not disclose that Facebook was continuing to share that data with "millions of
     | third-party developers."  *Id.* at ¶¶101-05.

27 | [362] *Id.* Count I, ¶¶160-65.

28 | [363] Stipulated Order, at 3, ¶I.E.

389.    On February 2, 2017, Facebook filed its FY16 Form 10-K, which was signed by Zuckerberg, Sandberg and Wehner, among others, and made available on Facebook's investor relations website.  Facebook's FY16 Form 10-K stated:

> Violation of existing or future regulatory orders or **consent decrees** could subject us to substantial monetary fines and other penalties that could negatively affect our financial condition and results of operations.[364]

390.    Substantially similar statements were included in the MD&A sections of Facebook's May 4, 2017 (1Q17), July 27, 2017 (2Q17) and November 2, 2017 (3Q17), Reports on Form 10-Q and its February 1, 2018 (FY17 10-K) Report on Form 10-K.

391.    On July 26, 2017, in Facebook's earnings call for the second quarter of 2017, Sandberg stated, "*[W]e respect local laws and regulations* . . .  Certainly, regulation is always an area of focus that we work hard to make sure that we are explaining our business clearly and making sure regulators know the steps we take to protect privacy as well *as making sure that we're in compliance*."[365]

392.    On March 17, 2018, Facebook made the following statement and provided the following information to a reporter for *The Washington Post*, with the knowledge and expectation that it would be communicated to the public, as it was on that date, "***We reject any suggestion of violation of the consent decree.***"[366]

393.    On April 4, 2018, in a telephonic press conference with journalists and members of the press, Zuckerberg stated, "You asked about the ***FTC consent order***. ***We've worked hard to make sure that we comply with it***."[367]

---

[364] FY 2016 Facebook, Inc. Form 10-K at 7 (Feb. 3, 2017).

[365] Q2 2017 Facebook, Inc. Earnings Call Tr. at 17 (July 26, 2017).

[366] Craig Timberg & Tony Romm, *Facebook May Have Violated FTC Privacy Deal, Say Former Federal Officials, Triggering Risk Of Massive Fines*, Wash. Post (Mar. 18, 2018), https://tinyurl.com/yb8myroq.

[367] *Hard Questions:* Q&A *With Mark Zuckerberg on Protecting People's Information*, Facebook Newsroom (Apr. 4, 2018), https://tinyurl.com/rv69jh9.

1    394.    On April 5, 2018, in an interview on National Public Radio, Sandberg stated,

2 "We're in constant conversation with the FTC, and *that consent decree was important*, and *we've*

3 *taken every step we know how to make sure we're in accordance with it*."[368]

4    395.    On April 10, 2018, in his live testimony before the Joint Commerce and Judiciary

5 Committees of the U.S. Senate, Zuckerberg stated, "Our view is that -- is that we believe that *we*

6 *are in compliance with the consent order*, but I think we have a broader responsibility to protect

7 people's privacy even beyond that."[369]

8    396.    Defendants' statements in ¶¶389-95 above were materially false and misleading

9 when made because they denied violations of the FTC Consent Decree – or presented such

10 violations as hypothetical risks – when defendants knew or recklessly disregarded the fact that

11 Facebook was violating Parts I.B and I.C of the FTC Consent Decree, including by:

12        (a)    Publicly stating in April 2014 that Facebook would stop providing third

13 parties with access to user friends' data, when they continued to secretly provide that data to

14 numerous third parties, including app developers, "whitelisted" third parties, mobile device

15 makers and others;

16        (b)    Overriding user privacy settings to provide user friends' data to third

17 parties; and

18        (c)    Knowingly allowing bad actors to access data.

19    397.    Indeed, the FTC has confirmed that Facebook knowingly violated Parts I.B and

20 I.C of the FTC Consent Decree, including because:

21   At least tens of millions of American users relied on Facebook's deceptive privacy
     settings and statements to restrict the sharing of their information to their Facebook
22   Friends, when, in fact, third-party developers could access and collect their data
     through their Friends' use of third-party developers' apps.
23

24   Facebook knew or should have know that its conduct violated the 2012 [Consent]
     Order because it was *engaging in the very same conduct that the [FTC] alleged*
25

26 ------
   [368] Steve Inskeep, *Full Transcript: Facebook COO Sheryl Sandberg On Protecting User Data*,
   NPR (Apr. 5, 2018), https://tinyurl.com/y8aamyhn.
27 [369] *Transcript of Mark Zuckerberg's Senate hearing*, Wash. Post (Apr. 10, 2018),
   https://tinyurl.com/y7cu7jh7.
28

*was deceptive* in Count one of the original Complaint that led to the 2012 [Consent] Order.[370]

398.    In addition, the FTC has confirmed that Facebook made materially false and misleading statements concerning Facebook users' control over their data by charging that Facebook's conduct, including during the Class Period, violated Parts I.B and I.C of the FTC Consent Decree because Facebook misrepresented the extent to which users could "control the privacy" of their data and the extent to which Facebook "makes or has made [user data] accessible to third parties," respectively.  In charging Facebook, the FTC relied on the fact that *inter alia* "regardless of the privacy settings a user checked, Facebook continued to provide access to [user data] to Whitelisted Developers" from at least the start of the Class Period through to at least June 2018.[371]

399.    Facebook paid $5 billion to settle the FTC's charges and stipulated that it "agrees that the ***facts alleged in the [FTC] Complaint will be taken as true*** . . . in any subsequent civil litigation by [the FTC] to enforce its rights . . ." to the $5 billion penalty that Facebook was required to pay.[372]  Zuckerberg personally signed this stipulation on July 23, 2019.

400.    The statements set forth in ¶¶389-95 *supra* were also materially false and misleading because they omitted to state material facts necessary to make them, in the light of the circumstances under which they were made, not misleading, including that defendants knew or recklessly disregarded the fact that Facebook was violating Parts I.B and I.C of the FTC Consent Decree, including by:

(a)    Stating publicly in April 2014 that Facebook would stop providing third parties with access to user friends' data – but secretly continuing to provide that data to numerous third parties, including app developers, "whitelisted" third parties, mobile device makers and others;

---

[370] FTC Complaint at ¶9.

[371] *Id.* at ¶174.

[372] Stipulated Order, at 3, ¶I.E.

1          (b)     Secretly overriding user privacy settings to provide user friends' data to

2    third parties; and

3          (c)     Knowingly allowing bad actors to access data.

4    401.    Facebook's 2016 Form 10-K also stated:

5          Affected users or government authorities could initiate legal or regulatory actions
           against us in connection with any security breaches or ***improper disclosure of***
6          ***data***, which could cause us to incur significant expense and liability or result in
           orders or ***consent decrees forcing us to modify our business practices.***  Any of
7          these events could have a material and adverse effect on our business, reputation,
           or financial results.
8

9    This statement was repeated or incorporated by reference into the other reports on Forms 10-K

10   and 10-Q that Facebook filed with the SEC during the Class Period, including the 1Q17 10-Q,

11   2Q17 10-Q, 3Q17 10-Q, and the 2017 Form 10-K.

12   402.    Defendants' statement above was materially false and misleading when made

13   because:

14         (a)     It presented improper disclosures of data and violations of the FTC

15   Consent Decree as hypothetical risks when defendants knew or recklessly disregarded the fact

16   that Facebook was violating Parts I.B and I.C of the FTC Consent Decree; and

17         (b)     The Company had suffered a significant episode involving an improper

18   disclosure of data.

19   403.    The statement set forth in ¶401 *supra* was also materially false and misleading

20   because it omitted to state material facts necessary to make it, in light of the circumstances under

21   which it was made, not misleading, including that:

22         (a)     Defendants knew or recklessly disregarded the fact that Facebook was

23   violating Parts I.B and I.C of the FTC Consent Decree; and

24         (b)     The Company had suffered a significant episode involving an improper

25   disclosure of data.

26

27

28

**H.    Defendants Made Materially False and Misleading Statements Concerning Notifying Facebook Users Whose Accounts Were Compromised Or At Risk Of Being Compromised**

404.    Throughout the Class Period, defendants made materially false and misleading statements concerning providing notice to Facebook users whose accounts were compromised or at risk of being compromised.

405.    On April 27, 2017, Facebook published on its corporate website a document titled *Information Operations and Facebook* to describe what it was doing to "help[] people protect their accounts from compromise."[373]  In this document, Facebook stated:

> ***We notify our users*** with context around the status of their account and actionable recommendations if we assess they are at increased risk of future account compromise by sophisticated actors ***or when we have confirmed their accounts have been compromised***.[374]

406.    Facebook also stated that it would provide:

(a)    "***Notifications to specific people*** if they have been targeted by sophisticated attackers, with custom recommendations depending on the threat models"[375]; and

(b)    "***Proactive notifications to people*** who have yet to be targeted, but whom we believe may be ***at risk*** based on the behavior of particular malicious actors."[376]

407.    The foregoing statements were materially false and misleading because, as defendants knew or recklessly disregarded, defendants did not "notify" Facebook users whose accounts were compromised or at risk of being compromised; did not provide "notifications to specific people" whose accounts or data had been targeted or compromised; and did not provide "proactive notifications to people" whose data may be at risk.  On the contrary, the Company did not take any of these steps in response to the biggest data breach in its history – or with respect to any of the other app developers who gained unauthorized access to user information.

---

[373] Jen Weedon, William Nuland and Alex Stamos, *Information Operations and Facebook*, Facebook Newsroom, at 7 (Apr. 27, 2017), https://tinyurl.com/lzjbju9.

[374] *Id.* at 7, n.6.

[375] *Id.* at 7.

[376] *Id.*

408.   In fact, Zuckerberg admitted in his Senate testimony that defendants made a conscious decision ***not*** to notify the tens of millions of users whose data was compromised when Kogan improperly sold that data to Cambridge Analytica:

> <u>HARRIS</u>:        So there was a decision made on that basis not to inform the users.
>                    Is that correct?
>
> <u>ZUCKERBERG</u>:  That's my understanding.  Yes.[377]

Further, Zuckerberg admitted that he "got it wrong" and "didn't do enough" in deliberately deciding not to notify those users, which was a "huge mistake [and] [i]t was my mistake [i.e., Zuckerberg's mistake]."[378]

409.   Sandberg also acknowledged that defendants "have the responsibility ***to disclose to people when problems occur[]***," admitting that the Company failed to meet its disclosure responsibility with respect to the Cambridge Analytica data misuse.[379]   Further, when asked directly whether Facebook should have timely disclosed that Facebook users' data had been stolen, Sandberg admitted, "[y]es, you are right and we should have done that . . . Of course you are right, and we should have done it."[380]

410.   The statements set forth in ¶¶405-09 *supra* were also materially false and misleading because they omitted to state material facts necessary to make them, in the light of the circumstances under which they were made, not misleading, including that defendants did not notify users whose accounts had been compromised or who were at risk of having their accounts compromised, did not provide "notifications to specific people" whose accounts or data had been

---

[377] *Transcript of Mark Zuckerberg's Senate hearing*, Wash. Post (Apr. 10, 2018), https://tinyurl.com/y7cu7jh7.

[378] Interview by Laurie Segall with Mark Zuckerberg, CNN Business (Mar. 22, 2018), https://tinyurl.com/vws42d8; Toby Shapshak, *It Was My Mistake Zuckerberg Admits, While Facebook Didn't Do Enough To Prevent Abuse*, Forbes (Apr. 4, 2018), https://tinyurl.com/y83cjlp3.

[379] *CNBC Exclusive: CNBC Transcript: Sheryl Sandberg Sits Down with CNBC's Julia Boorstin Today*, CNBC (Mar. 22, 2018), https://tinyurl.com/ya4z2elm.

[380] Eun Kyung Kim, *Sheryl Sandberg on TODAY: Other Facebook data breaches 'possible'*, Today (Apr. 6, 2018), https://tinyurl.com/ydb26wx3.

targeted or compromised; and did not provide "proactive notifications to people" whose data may be at risk.  On the contrary, the Company did not take any of these steps in response to the biggest data breach in its history – or with respect to any of the other app developers who gained unauthorized access to user information.  On the contrary, Zuckerberg admitted that defendants made a conscious decision ***not*** to notify the tens of millions of users whose data was compromised when Kogan improperly sold that data to Cambridge Analytica.  Defendants also later admitted that they "should have" notified users whose accounts were compromised in the Cambridge Analytica scandal, but they "didn't do enough" to do so.

**I.      Defendants Made Materially False and Misleading Statements Concerning Facebook's GDPR Compliance**

411.    On October 12, 2017, during an interview with Axios, Sandberg stated, "Europe[] has passed a single privacy law [*i.e.*, the GDPR] and ***we are adhering to that***.  But privacy is something we take really seriously."[381]

412.    The statement set forth in ¶411 *supra* was materially false and misleading because Facebook was not at the time "adhering to" the GDPR.  On the contrary, defendants were depriving users of control over their data, were sharing it without knowledge or consent and, even worse, were overriding users' privacy settings when doing so.

413.    The statement set forth in ¶411 *supra* was also materially false and misleading because it omitted to state material facts necessary to make it, in light of the circumstances under which it was made, not misleading, including that Facebook was not adhering to the European privacy law.

**J.      Defendants Made Materially False and Misleading Statements Concerning Use of Facebook's Platform to Influence Elections**

414.    In prepared remarks to the U.S. Senate Committee on the Judiciary Subcommittee on Crime and Terrorism, and the U.S. House of Representatives Permanent Select Committee on Intelligence delivered on October 31 and November 1, 2017 respectively, Facebook General

---

[381] Mike Allen, *Exclusive interview with Facebook's Sheryl Sandberg*, Axios (Oct. 12, 2017) https://tinyurl.com/y9k7mlok.

1  Counsel Stretch stated, "Though the volume of these posts was a tiny fraction of the overall

2  content on Facebook, any amount is too much. Those accounts and Pages violated Facebook's

3  policies – which is why we removed them, as we do with all fake or malicious activity we find."[382]

4     415.    During his oral testimony before the House subcommittee on November 1, 2017,

5  Stretch participated in the following exchange with Representative Eric Swalwell and Twitter's

6  Deputy General Counsel Sean Edgett:

7     SWALWELL: Can each of you assure the American people that you have fully
       searched your platforms and disclosed to this committee every Russian effort to
8      influence the 2016 election?  Mr. Edgett?

9     EDGETT: *We've provided everything we have to date*, and we're continuing to
       look at this.  So there will be more information that we share.
10

11    SWALWELL: Mr. Stretch?

12    STRETCH:  *The same is true*, particularly in connection with, as I mentioned
       earlier, some of the threat sharing that the companies are now engaged in.[383]
13

14     416.    In response to a follow-up Question for the Record from U.S. Sen. Dianne

15  Feinstein delivered on January 8, 2018, Stretch further stated:

16    Feinstein QFR #4: Facebook confirmed in the House Intelligence committee
       hearing that they found no overlap in the groups targeted by the Trump campaign's
17     advertisements, and the advertisements tied to the Russia-linked accounts
       identified thus far. . . . *Does this assessment extend to both the content used and
18     groups targeted by the companies associated with the campaign – like
       Cambridge Analytica – and Russian accounts*?
19

20    Stretch: *We have seen only what appears to be insignificant overlap* between the
       targeting and content used by the IRA and that used by the Trump campaign
21     (including its third-party vendors). We are happy to schedule a meeting with your
       staff to discuss our findings in more detail.[384]
22

23

24  [382] Hearing on "Social Media Influence in the 2016 US Elections" Before the S. Select Comm.
    On Intelligence, 115th Cong. (Nov. 1, 2017) (Testimony of Colin Stretch, General Counsel,
    Facebook, Inc.), https://tinyurl.com/s35ezf3.
25

26  [383] Hearing on "Russia Investigative Task Force Hearing With Social Media Companies" Before
    the H. Permanent Select Comm. On Intelligence, 115th Cong. (Nov. 1, 2017),
    https://tinyurl.com/snl5w9x (Testimony of Colin Stretch, General Counsel, Facebook, Inc.).
27

28  [384] Letter from Colin Stretch, General Counsel, Facebook, Inc. to Chairman Richard Burr, U.S.
    Senate Select Committee on Intelligence, at 8 (Jan. 8, 2018), https://tinyurl.com/tuxynzh.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

417.    Each of these statements was materially false and misleading as a result of defendants' continuing omission to investigate or disclose the extent of the Cambridge Analytica data breach, to notify affected users that their data had been compromised, or to reveal that the Company had no reliable or reasonable basis on which to conclude that the data exposed by Cambridge Analytica had been deleted or recovered, or was otherwise unavailable for use in activities by foreign agents seeking to influence U.S. elections.

418.    At the time the statement was made, defendants knew user data had repeatedly been used to design effective political advertising, including by Cambridge Analytica, which was known to have been actively working on behalf of the Trump campaign in the 2016 election. Defendants also knew that Facebook had failed to recover or delete – or even fully investigate the extent of – the Cambridge Analytica data breach.  As a result, defendants knew or recklessly disregarded that their testimony about the use of Facebook would be misleading in the absence of a disclosure of the risk that the data of more than 50 million users that had previously been compromised was still available and had been used in targeted political advertising to influence the outcome of the 2016 election.

419.    By reason of their claimed investigation into and response to the 2015 report of the data breach, as well as Facebook's hiring of Chancellor to work in its headquarters, defendants knew or recklessly disregarded that Kogan had worked closely with Russian operatives in the past, giving rise to a heightened risk that data provided to Cambridge Analytica had been obtained by Russian agents either before or after the data breach was originally reported.  Russia's likely targeting of and use of the data exposed by Cambridge Analytica was obvious to anyone who had looked into the matter, as defendants claimed to have done before they testified to Congress.  For example, when the Cambridge Analytica scandal was exposed in March 2018, Zuckerberg – in contrast to the testimony above – readily acknowledged that Russia could have targeted the data that Facebook had failed to recover or delete.[385]  Just months later the connection was confirmed by a Member of Parliament, following that body's investigation in the Cambridge Analytica

---

[385] *Transcript of Mark Zuckerberg's Senate hearing*, Wash. Post (Apr. 10, 2018), https://tinyurl.com/y7cu7jh7.

1    scandal, further demonstrating the connection was apparent and readily discoverable by those

2    professing to have investigated the matter.

3    **K.    Defendants Made Materially False and Misleading Statements**
     **Concerning DAU and MAU Metrics**

4

5    420.    Facebook repeatedly touted its quarterly DAU and MAU metrics to assure

6    investors that users would remain engaged with its social media platforms, despite any concerns

7    raised over the privacy of their data.  For example:

8    (a)    On May 3, 2017, defendants published a press release entitled, "Facebook

9    Reports First Quarter 2017 Results," in which they stated, "**Daily active users (DAUs)** – DAUs

10   were 1.28 billion on average for March 2017, an increase of 18% year-over-year. **Monthly active**

11   **users (MAUs)** – MAUs were 1.94 billion as of March 31, 2017, an increase of 17% year-over-

12   year."[386]  The same day, Zuckerberg posted an update to his personal Facebook.com page, in

13   which he stated, "Our community now has more than 1.9 billion people, including almost 1.3

14   billion people active every day."[387]

15   (b)    On July 26, 2017, defendants published a press release entitled, "Facebook

16   Reports Second Quarter 2017 Results," in which they stated, "**Daily active users (DAUs)** – DAUs

17   were 1.32 billion on average for June 2017, an increase of 17% year-over-year.  **Monthly active**

18   **users (MAUs)** – MAUs were 2.01 billion as of June 30, 2017, an increase of 17% year-over-

19   year."[388]  The same day, Zuckerberg posted an update to his personal Facebook.com page, in

20   which he stated, "Our community is now more than 2 billion people, including more than 1.3

21   billion people who use Facebook every day."[389]

22   (c)    On November 1, 2017, defendants published a press release entitled,

23   "Facebook Reports Third Quarter 2017 Results," in which they stated, "**Daily active users**

24   _____

25   [386] Press Release, Facebook, Inc., Facebook Reports First Quarter 2017 Results (May 3, 2017), https://tinyurl.com/y75jvydf.

26   [387] Mark Zuckerberg, Facebook (May 3, 2017), https://tinyurl.com/y747rvhu.

27   [388] Press Release, Facebook, Inc., Facebook Reports Second Quarter 2017 Results (July 26, 2017), https://tinyurl.com/y9n4m62t.

28   [389] Mark Zuckerberg, Facebook (July 26, 2017), https://tinyurl.com/ycb246wo.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

1   (**DAUs**) – DAUs were 1.37 billion on average for September 2017, an increase of 16% year-over-

2   year. **Monthly active users (MAUs)** – MAUs were 2.07 billion as of September 30, 2017, an

3   increase of 16% year-over-year."[390]  The same day, Zuckerberg posted an update to his personal

4   Facebook.com page, in which he stated, "Our community continues to grow, now with nearly 2.1

5   billion people using Facebook every month, and nearly 1.4 billion people using it daily.  Instagram

6   also hit a big milestone this quarter, now with 500 million daily actives."[391]

7          (d)      On January 31, 2018, defendants published a press release entitled,

8   "Facebook Reports Fourth Quarter and Full Year 2017 Results," in which they stated, "**Daily**

9   **active users (DAUs)** – DAUs were 1.40 billion on average for December 2017, an increase of

10  14% year-over-year.  **Monthly active users (MAUs)** – MAUs were 2.13 billion as of December

11  31, 2017, an increase of 14% year-over-year."[392]  The same day, Zuckerberg posted an update to

12  his personal Facebook.com page, in which he stated, "Our community continues to grow with

13  more than 2.1 billion people now using Facebook every month and 1.4 billion people using it

14  daily.  Our business grew 47% year-over-year to $40 billion."[393]

15         421.    Defendants also touted their active monitoring of engagement and these metrics.

16  For example:

17         (a)     Wehner: "***We monitor the sentiment and engagement of people engaging***
18                 ***in News Feed***. We're really pleased with the strength of sentiment and
                   engagement as we've ramped up News Feed ads."[394]

19         (b)     Sandberg: "Because your experience on Facebook or Instagram is about
20                 the quality of what you see . . . what we do is ***we monitor it carefully***.  We
                   ramp slowly.  We monitor engagement sentiment, quality of ads.  ***We get***

21

22

23
   ────────────────
24  [390] Press Release, Facebook, Inc., Facebook Reports Third Quarter 2017 Results (Nov. 1, 2017),
     https://tinyurl.com/y8m8q62v.

25  [391] Mark Zuckerberg, Facebook (Nov. 1, 2017), https://tinyurl.com/y85fh4vb.

26  [392] Press Release, Facebook, Inc., Facebook Reports Fourth Quarter and Full Year 2017 Results
     (Jan. 31, 2018), https://tinyurl.com/yalrxezy.

27  [393] Mark Zuckerberg, Facebook (Jan. 31, 2018), https://tinyurl.com/ydxwh302.

28  [394] Q2 2014 Facebook, Inc. Earnings Call Tr. at 16 (July 23, 2014).

*a lot of feedback directly from people* who use Facebook. . . . ***And we just continue to monitor the metrics***."[395]

(c)    <u>Wehner</u>: "Improving the quality and the relevance of the ads has enabled us to show more of them, without harming the experience.  And, our focus really remains on the experience.  So, ***we'll continue to monitor engagement and sentiment very carefully***."[396]

(d)    <u>Sandberg</u>: "When we introduce ads into feed and continue to increase the ad load, ***we monitor really carefully.  We're looking at user engagement on the platform***.  We also look at the quality of ads."[397]

(e)    <u>Analyst</u>: "Can you just talk about some of the biggest trends you're monitoring?"

Wehner: "Yes, I can start with the stats.  So on -- yes, Mark, on the engagement front, we're seeing time spent growth per DAU across the Facebook family of apps and that includes Facebook itself."[398]

(f)    <u>Wehner</u>: "We have also increased our estimate for inauthentic accounts to approximately 2% to 3% of worldwide MAUs. . . .  ***We continuously monitor*** and aggressively take down those accounts.  These accounts tend to be less active and thus, we believe, impact DAU less than MAU."[399]

422.    The foregoing statements (¶¶420-21), and the statistics provided therein, were misleading in the context of the surrounding information, because privacy violations had been deliberately concealed from users, such that their active engagement with the Company's social media platforms was not an accurate or reliable indicator of user response to privacy concerns.

423.    The quarterly DAU and MAU metrics set forth above were materially false and misleading for additional reasons. For instance, the DAU and MAU figures reported for Q1 2017 and Q2 2017 were materially false and misleading because, at the time, Facebook was using an incorrect methodology to calculate duplicate accounts, which caused the Company to overstate DAUs and MAUs and understate duplicate accounts.  Facebook admitted to this reality on

---

[395] Q3 2015 Facebook, Inc. Earnings Call Tr. at 15 (Nov. 4, 2015).

[396] Q4 2015 Facebook, Inc. Earnings Call Tr. at 9 (Jan. 27, 2016).

[397] *Id.* at 10.

[398] Q1 2017 Facebook, Inc. Earnings Call Tr. at 9 (May 3, 2017).

[399] Q3 2017 Facebook, Inc. Earnings Call Tr. at 7 (Nov. 1, 2017).

1   November 1, 2017, when it implemented a "new methodology for duplicate accounts that

2   included improvements to the data signals we rely on to help identify such accounts."[400]

3       424.   All of the above DAU and MAU figures were materially false and misleading

4   because they failed to account for the number of fake accounts on Facebook.  In May 15, 2018,

5   Facebook announced for the first time that it had deleted a total of *1.277 billion fake accounts*

6   during the period from Q4 2017 to Q2 2018.

7       425.   The statements set forth in ¶¶420-21 *supra* were also materially false and

8   misleading because they omitted to state material facts necessary to make them, in the light of the

9   circumstances under which they were made, not misleading, including that defendants had

10  knowingly or recklessly misrepresented Facebook's privacy practices, including by violating

11  Parts I.B and I.C of the FTC Consent Decree, which, when revealed, would (and did) erode user

12  trust in Facebook and cause a decline in daily and monthly active users.  Further, given their

13  privacy misconduct, defendants omitted the fact that they knew or recklessly ignored that active

14  user engagement metrics were not accurate or reliable indicators of the health or strength of

15  Facebook's business.

16      426.   The statements set forth in ¶¶420-21 *supra* were also materially false and

17  misleading because they omitted to state material facts necessary to make them, in the light of the

18  circumstances under which they were made, not misleading, including the fact that Facebook was

19  using an incorrect methodology to calculate duplicate accounts and the fact that hundreds of

20  millions of the accounts were fake.  Indeed, Facebook eventually revealed that it had deleted a

21  total of *1.277 billion fake accounts* during the period from Q4 2017 to Q2 2018.

22
23      **L.   Defendants Made Materially False and Misleading Statements
            Concerning Facebook's 1Q18 Financial Results and the Impact of
24          the Privacy Disclosures on Facebook's Business**

25      427.   On April 25, 2018, defendants published a press release entitled, "Facebook

26  Reports First Quarter 2018 Results," in which they stated, "**Daily active users (DAUs)** – DAUs

27

28  ─────────────────────
    [400] *Id.*

    SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
    FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

1   were 1.45 billion on average for March 2018, an increase of 13% year-over-year. **Monthly active**

2   **users (MAUs)** – MAUs were 2.20 billion as of March 31, 2018, an increase of 13% year-over-

3   year."[401] The same day, Zuckerberg posted an update to his personal Facebook.com page, in

4   which he stated, "Despite facing important challenges, our community continues to grow.  More

5   than 2.2 billion people now use Facebook every month and more than 1.4 billion people use it

6   daily."[402]

7        428.    The Company's earnings release and 10-Q report highlighted the growth in MAUs

8   and DAUs as a sign of the success of its business, while its officers touted the strength of the

9   Company's business as an indicator of the purported lack of meaningful impact resulting from

10  the controversy.  "Despite facing important challenges, our community and business are off to a

11  strong start in 2018," Zuckerberg told investors in Facebook's first quarter of 2018 earnings

12  release.  On April 25, 2018, during Facebook's earnings call for the first quarter of 2018,

13  Zuckerberg added that "sharing and interaction" and other indicators of user engagement were

14  increasing as a result of changes in the platforms' ranking and sharing algorithms.  "[W]e're

15  optimistic about what we're seeing here," he said.  During the first quarter conference call,

16  Wehner told investors that the first quarter of 2018 results "demonstrated [that] growth in our

17  business and global community remains strong," while telling them "we do not anticipate [that

18  new European privacy regulations] will significantly impact advertising revenues."[403]

19       429.    Even when defendants acknowledged impacts of the Cambridge Analytica data

20  scandal, they assured investors that any negative effect would be short-lived and manageable

21  without negative impact to the business.  Wehner told investors on the earnings call that the

22  increased spending needed to beef up data security programs in the wake of the scandal were

23  already included in the first quarter of 2018 results, and the increase in the lower limit of the

24  Company's spending guidance simply reflected that it was "putting more" investment into that

25

26  [401] Press Release, Facebook, Inc., Facebook Reports First Quarter 2018 Results (Apr. 25, 2018),
    https://tinyurl.com/yblj7aqd.

27  [402] Mark Zuckerberg, Facebook (Apr. 25, 2018), https://tinyurl.com/y9mgzu8k.

28  [403] Q1 2018 Facebook, Inc. Earnings Call Tr. at 6, 7, 9 (Apr. 25, 2018).

1  category "more quickly than we anticipated."  Sandberg allowed that a "handful" of advertisers

2  had "paused spend" immediately after the Cambridge Analytica scandal broke, but encouraged

3  investors to take an optimistic outlook by telling them that one of the advertisers that reduced

4  spend "has already come back" and assuring investors that "we haven't seen a meaningful trend

5  or anything much since then."[404]

6      430.   On Facebook's April 25, 2018 first quarter earnings call, Sandberg stated:

7      Before going through our results, I want to take a minute to talk about ads and
    privacy.  [. . .]

8

9      ***We also believe that people should control their advertising experience.***  For
    every ad we show, there's an option to find out why you're seeing that ad and to

10      turn off ads from that advertiser entirely.  And you can opt out of being targeted
    based on certain information like the websites you visit or your relationship status.

11

12      Advertising and protecting people's information are not at odds.  We do both.
    Targeted ads that respect people's privacy are better ads.  They show people things

13      that they're more likely to be interested in.  We regularly hear from people who
    use Facebook that they prefer to see ads that are relevant to them and their lives.

14      Effective advertising is also critical to helping businesses grow.

15                    *      *      *

16

17      ***In the coming months, GDPR will give us another opportunity to make sure***
    ***people fully understand how their information is used by our services.  It's an***

18      ***EU regulation, but as Mark said a few weeks ago, we're going to extend these***
    ***controls to everyone who uses Facebook, regardless of where in the world they***

19      ***live.  Our commitment to you is that we will continue to improve our ads model***
    ***by strengthening privacy and choice while giving businesses of all sizes new and***

20      ***better tools to help them grow.***

21                    *      *      *

22      ***Going forward, we will continue to focus on these 3 priorities and ensure that***
    ***people's privacy is protected on Facebook***.[405]

23

24      431.   On the same April 25, 2018 call, Wehner stated,

25      ***The changes that Mark and Sheryl described will, we believe, benefit our***
    ***community and our business and will serve to strengthen Facebook overall.  At***

26

27  _____
[404] *Id*. at 8, 12.

28  [405] *Id*. at 4-6.

1    *the highest level, we believe that we can continue to build a great ads business
2    while protecting people's privacy.*

3                          *          *          *

4    So on GDPR, *I think fundamentally, we believe we can continue to build a great
     ads business while protecting the privacy of the people that use Facebook.*  As
5    part of the rollout of GDPR, *we're providing a lot of control to people around
     their ad settings.  And we're committed, as Sheryl and Mark mentioned, to
6    providing the same controls worldwide.*  And while *we don't expect these
     changes will significantly impact advertising revenue, there's certainly potential
7    for some impact.*  Any change of our – of the ability for us and our advertisers to
     use data can impact our optimizational potential at the margin, which could impact
8    our ability to drive price improvements in the long run.  So we'll just have to watch
     how that plays out over time. I think it's important to note that GDPR is affecting
9    the entire online advertising industry.  And so what's really most important in
10   winning budgets is our relative performance versus other opportunities presented
     to marketers, and that's why it will be important to watch kind of how this plays
11   out at the industry level.

12                         *          *          *

13   I don't know that we really see a doomsday scenario here.  *I think what we think
14   is that depending on how people react to the controls and the ad settings, there
     could be some limitations to data usage.  We believe that those will be relatively
15   minor.*  But depending on how broadly the controls are adopted and set, there is a
     potential to impact targeting for our advertisers.  *Obviously, if they are less able
16   to target effectively, they'll get a lower ROI on their advertising campaigns.
     They'll then bid differently into the auction.*  That ultimately will flow through
17   into how we can realize price on the impressions that we're selling.  So I think
18   that's the mitigating issue that we could see, depending on how GDPR and our
     broader commitment to providing these same controls worldwide could play out.
19   *We think that there is a great case for not just our business but also for the user
20   experience on Facebook to have targeting because we think it's a better
     experience for the people who use Facebook to have targeted ads.  We think we
21   can do that in a privacy-protected way, and it's just a better experience.  You get
     more relevant ads, and it's – and I think overall benefits that only the advertisers
22   but also the people who use Facebook.*  So I don't think see a real doomsday
23   scenario here.  We see an opportunity to really make the case.[406]

24         432.    Defendants effort to tout the first quarter of 2018 results in a manner meant to

25   assure investors that the Cambridge Analytica data scandal had not, and would not, have a

26   meaningful financial impact on the business was misleading, because they knew or recklessly

27   _____

28   [406] *Id.* at 6, 8, 15.

1    disregarded that those results were not reflective of the true impact that disclosure of the

2    Cambridge Analytica data breach was having on the Company's business:

3         (a)    To begin with, the quarterly results only included two weeks of user data

4    post-disclosure of the wider scope of the Cambridge Analytica data breach.   Nevertheless,

5    defendants, who knew or recklessly disregarded that assessment of the true impact would become

6    apparent in the current quarter (based in part on their active monitoring of user engagement, *see*

7    ¶421, assured investors that the first quarter results were sufficient to conclude that the disclosures

8    would not have a meaningful financial impact.

9         (b)    In addition, defendants concealed that the loss of advertisers was far more

10   significant than Sandberg's "handful . . . one of whom has already come back" statement

11   suggested.  For example, Italy's biggest bank, UniCredit, had terminated all of its advertising and

12   partnerships with Facebook at the end of March as a result of the scandal.  The action did not

13   come to light until August 2018, when *The Guardian* published an article about it.[407]  "'Facebook

14   is not acting in an ethical way,'" the bank's CEO, Jean Pierre Mustier, told the newspaper.  "'We

15   will not use it until it has proper ethical behaviour.'"  As revealed on the second quarter of 2018

16   earnings call, this was not an isolated incident, as many other advertisers had similarly cut ties

17   with Facebook, or reduced spending on its platform.

18        (c)    Finally, defendants knew that massive increases in spending would be

19   required to improve the security of user data and Facebook's platform, which further made the

20   first quarter of 2018 results not reflective of the true impact that the data breach scandal would

21   have on Facebook's financial condition and results.

22        433.   Thereafter, defendants continued to mislead investors, analysts, users and others

23   about the risks of user dis-engagement and the financial impact of the disclosures about the

24   Company's privacy practices.   In numerous public comments, defendants falsely assured

---

[407] Rupert Neate, *UniCredit cuts ties with Facebook over data breach scandal*, Guardian (Aug. 7, 2018), https://tinyurl.com/y7thc4jj.

1    investors that the privacy disclosures had not impacted, and could not reasonably be expected to

2    impact the Company's business.

3          434.    On May 1, 2018, Zuckerberg gave his keynote address at Facebook's annual F8

4    Developer Conference.  In that appearance, Zuckerberg stated:

5          *I also want to talk about data privacy*.  And what happened with Cambridge
           Analytica was a major breach of trust.  An app developer took data that people had
6          shared with them and sold it.  So we need to make sure that this never happens
           again, so we're taking a number of steps here.
7

8          First, as you all know we're restricting the data that developers will be able to
           request from people.  *Now the good news here is that back in 2014, we already*
9          *made a major change to how the platform works to prevent people from sharing*
           *a lot of their friends' information.  So this specific situation could not happen*
10         *again today.*[408]

11         435.    The above statements were materially misleading because they assured investors

12   that data breaches like the Cambridge Analytica scandal were behind the Company and the

13   consequences of that breach would be minimal because Facebook had been protecting privacy

14   for years.   In reality, Facebook had not been protecting privacy and the consequences of

15   Facebook's data protection misconduct would not be fully revealed until July 25, 2018, when

16   Facebook disclosed *inter alia* heightened privacy-related expenses and declining active user

17   figures.

18         436.    In addition, the statements set forth in ¶434 *supra* were materially false and

19   misleading because they omitted the following material facts necessary in order to make those

20   statements, in light of the circumstances under which they were made, not misleading:  (i)

21   Facebook had violated the 2012 FTC Consent Decree; (ii) Facebook's privacy misconduct would

22   impact the Company's bottom line by destroying its reputation as a company that protected

23   privacy and by requiring the Company to incur billions in expenses to become privacy compliant,

24   including with respect to the GDPR; and (iii) as a result, Facebook's user numbers, revenue

25   growth, operating margins and business prospects would materially decline.   Defendants'

26   knowledge or reckless disregard that these statements would be, and were, misleading to investors

27

28   [408] F8 2018 Developer Conference Tr. at 9 (May 1, 2018).

1  may be inferred from the same facts that support a strong inference of scienter with respect to the

2  assurances about Facebook's purported commitment to enforcement of its privacy policies.

3       437.    On May 31, 2018, Facebook held its Annual Stockholders Meeting.  At this event,

4  Zuckerberg stated,

> So we recently went through this process of rolling out our flows and settings for
> GDPR compliance, first, in Europe, and we're going to do it around the world.
> And one of the settings that we ask people proactively to make a decision on is,
> do you want your ads, for how we do ad targeting, to be informed by the other
> apps and websites that you use? ***People have to proactively make a decision.  Yes
> or no.  Do they want that data used?  And the majority, I think we can even say
> vast majority of people say, yes, they want that data used.***  Because if they're
> going to see ads, you want to see good ads, right?  So I think that this is one of the
> core questions that society faces and individuals face across the different services
> that we use, are how do we want our data to be used and where? . . .  This is going
> to be a core thing that we need to think about going forward, but we think about it
> very deeply as this is a – just a core part of the value that we're trying to provide.[409]

     438.    The above statement was materially misleading because: (i) it falsely and without

a reasonable basis assured investors that GDPR had not caused, and would not cause, a decline

in active use of Facebook's solid media platforms; and (ii) it portrayed Facebook as adhering to

and prepared to meet the requirements of the GDPR, when in reality Facebook was not.

     439.    In addition, the statements set forth in ¶437 *supra* were materially false and

misleading because they omitted the following material facts necessary in order to make those

statements, in light of the circumstances under which they were made, not misleading:  (i)

Facebook had violated the 2012 FTC Consent Decree; (ii) Facebook's privacy misconduct would

impact the Company' bottom line by destroying its reputation as a company that protected privacy

and by requiring the Company to incur billions in expenses to become privacy compliant,

including with respect to the GDPR; and (iii) as a result, Facebook's user numbers, revenue

growth, operating margins and business prospects would materially decline.  Defendants'

knowledge or reckless disregard that these statements would be, and were, misleading to investors

---

[409] Facebook, Inc., Annual Shareholders Meeting Tr. at 16-17 (May 31, 2018).

1    may be inferred from the same facts that support a strong inference of scienter with respect to the

2    assurances about Facebook's purported commitment to enforcement of its privacy policies.

3         440.   On June 8, 2018, Facebook provided additional responses to questions posed to

4    the Company by the members of the Senate Committee on Commerce, Science, and

5    Transportation.  In their responses to these questions, defendants stated:

> *Privacy is at the core of everything we do, and our approach to privacy starts with our commitment to transparency and control.  Our threefold approach to transparency includes, first, whenever possible, providing information on the data we collect and use and how people can control it in context and in our products.*  Second, we provide information about how we collect and use data in our user agreements and related educational materials.  And third, we enable people to learn more about the specific data we have about them through interactive tools such as Download Your Information, which lets people download a file containing data that they may want to take to another service, and Access Your Information, a tool we are launching that will let people more easily access and manage their data on Facebook.

> *Our approach to control is based on the belief that people should be able to choose who can see what they share and how their data shapes their experience on Facebook.  People can control the audience for their posts and the apps that can receive their data.  They can see and delete the history of their activities on Facebook, and, if they no longer want to use Facebook, they can delete their account and the data associated with it.*  Of course, we recognize that controls are only useful if people know how to find and use them.  That is why we continuously deliver in-product educational videos in people's News Feeds on important privacy topics.  We are also inviting people to take our Privacy Checkup – which prompts people to review key data controls – and we are sharing privacy tips in education campaigns off of Facebook, including through ads on other websites.  To make our privacy controls easier to find, we are launching a new settings menu that features core privacy settings in a single place.  We are always working to help people understand and control how their data shapes their experience on Facebook.

> *                    *          *          *

> Like many other free online services, we sell advertising space to third parties.  Doing so enables us to offer our services to consumers for free.  This is part of our mission to give people the power to build community and bring the world closer together.

> *                    *          *          *

> *We maintain our commitment to privacy by not telling advertisers who users are or selling people's information to anyone.  That has always been true.  We think*

*relevant advertising and privacy are not in conflict, and we're committed to doing both well.*

We believe targeted advertising creates value for people and advertisers who use Facebook.  Being able to target ads to the people most likely to be interested in the products, service or causes being advertised enables businesses and other organizations to run effective campaigns at reasonable prices.

\*       \*       \*

We do not have a "business reason" to compromise the personal data of users; we have a business reason to protect that information.

\*       \*       \*

**We believe that everyone has the right to expect strong protections for their information**, and that we also need to do our part to help keep our community safe, in a way that's consistent with people's privacy expectations.[410]

441.     The above statements were materially misleading because they assured investors that data breaches like the Cambridge Analytica scandal were behind the Company and the consequences of that breach would be minimal because Facebook had been protecting privacy for years.   In reality, Facebook had not been protecting privacy and the consequences of Facebook's data protection misconduct would not be fully revealed until July 25, 2018, when Facebook disclosed *inter alia* heightened privacy-related expenses and declining active user figures.

442.     The statements set forth in ¶440 *supra* were also materially false and misleading because, contrary to Facebook's representations that, for example, users had "control" over their data and "choice" over to whom it was disclosed, app developers had collected vast amounts of Facebook users' friends' personal data without their knowledge or consent prior to 2014 – and still possessed that data.  Further, as set forth above, during the Class Period, Facebook was still engaged in harvesting and using Facebook users' data without their knowledge or consent and, as such, depriving users of control over their personal data.

---

[410] Facebook, Social Media Privacy, and the Use and Abuse of Data: Hearing before the S. Committee on Commerce, Sci., and Transp., 115 Cong. (Apr. 10, 2018) (Statement of Facebook, Inc. in response to letter from Chairman John Thune).

443.    In addition, the statements set forth in ¶440 *supra* were materially false and misleading because they omitted the following material facts necessary in order to make those statements, in light of the circumstances under which they were made, not misleading:  (i) Facebook had violated the 2012 FTC Consent Decree; (ii) Facebook's privacy misconduct would impact the Company' bottom line by destroying its reputation as a company that protected privacy and by requiring the Company to incur billions in expenses to become privacy compliant, including with respect to the GDPR; and (iii) as a result, Facebook's user numbers, revenue growth, operating margins and business prospects would materially decline.   Defendants' knowledge or reckless disregard that these statements would be, and were, misleading to investors may be inferred from the same facts that support a strong inference of scienter with respect to the assurances about Facebook's purported commitment to enforcement of its privacy policies.

**M.    Defendants Made Materially False and Misleading Statements That Facebook Does Not "Sell" Users' Data**

444.    Throughout the Class Period, defendants made materially false and misleading statements that Facebook does not "sell" users' data.  In reality, defendants were using user friend data as consideration for a reciprocal exchange of value with third-party app developers and other companies who were "whitelisted" for secret access to user friend data.  Thus, defendants engaged in selling user friend data in exchange for reciprocal benefits.  For defendants, "reciprocity" came in various forms, including an exchange of data between an app developer and Facebook, by Facebook requiring the third party to spend substantial sums on advertising at Facebook or by a third party enhancing Facebook's brand and platform to make it more attractive to users, as in the case of the dozens of major phone device makers that Facebook whitelisted during the Class Period.

445.    On or about November 27, 2017, defendants posted a notification on Facebook.com titled "Our Advertising Principles," in which they stated in relevant part: "***We don't sell your data***. We don't sell personal information like your name, Facebook posts, email

1  address, or phone number to anyone.  Protecting people's privacy is central to how we've

2  designed our ad system."[411]

3    446.    On January 31, 2018, during Facebook's earnings call for the second quarter of

4  2017, Sandberg stated in relevant part, "These principles are our commitment to the people who

5  use our services. They are: We build for people first. *We don't sell your data*."[412]

6    447.    On March 22, 2018, during an interview on the CNBC television program

7  "Closing Bell," Sandberg again stated, "We provide a free service that's an ad-based business

8  model, and in order to do that, *we do not sell your data*."[413]

9    448.    On April 4, 2018, during a teleconference with members of the press, Zuckerberg

10  stated:

11      There are other internet companies or data brokers or folks that might try to track
         and sell data, *but we don't buy and sell*. [. . .]  The second point, which I touched
12      on briefly there: for some reason *we haven't been able to kick this notion for
         years that people think we will sell data to advertisers.  We don't.  That's not
13      been a thing that we do. Actually it just goes counter to our own incentives*. . .
         And we're going to use data to make those services better . . . but *we're never
14      going to sell your information*.[414]

15    449.    The same day, defendants posted a notification on Facebook.com titled, "We're

16  Making Our Terms and Data Policy Clearer, Without New Rights to Use Your Data on

17  Facebook," in which they stated in relevant part: "**What we share**: *We will never sell your

18  information to anyone.* We have a responsibility to keep people's information safe and

19  secure, and *we impose strict restrictions on how our partners can use and disclose data*."[415]

20

21

22  [411] Rob Goldman, *Our Advertising Principles*, Facebook Newsroom (Nov. 27, 2017), https://tinyurl.com/sae6e86.

23  [412] Q4 2017 Facebook, Inc. Earnings Call Tr. at 6 (Jan. 31, 2018).

24  [413] *CNBC Exclusive: CNBC Transcript: Sheryl Sandberg Sits Down with CNBC's Julia Boorstin Today*, CNBC (Mar. 22, 2018), https://tinyurl.com/ya4z2elm.

25
26  [414] *Hard Questions: Q&A With Mark Zuckerberg on Protecting People's Information*, Facebook Newsroom (Apr. 4, 2018), https://tinyurl.com/rv69jh9.

27  [415] Erin Egan and Ashlie Beringer, *We're Making Our Terms and Data Policy Clearer, Without New Rights to Use Your Data on Facebook*, Facebook Newsroom (Apr. 4, 2018), https://tinyurl.com/vsdwugx.
28

450.     On April 5, 2018, Sandberg stated during an interview on National Public Radio:

It's a good opportunity to remind everyone what we say all the time, but we need to keep saying so people understand it – which is that *we don't sell data, period*, . . . And again, we do not sell data, ever.[416]

451.     The same day, during an interview with PBS NewsHour, Sandberg stated, "*We do not sell data* or give your personal data to advertisers, *period*."[417]

452.     On April 10, 2018, Zuckerberg appeared to testify before the Joint Commerce, Science, and Transportation and Judiciary Committees of the United States Senate, during which he stated, "I want to be clear. *We don't sell information. So regardless of whether we could get permission to do that, that's just not a thing we're going to go do*."[418]  Zuckerberg further stated, "Well, Senator, once again, *we don't sell any data to anyone. We don't sell it to advertisers, and we don't sell it to developers*."[419]  During the same hearing, Zuckerberg stated, "*We don't sell data to anyone*."[420]

453.     On April 11, 2018, Zuckerberg appeared before the Energy and Commerce Committee of the United States House of Representatives, during which hearing he stated, "Mr. Chairman, *you're right that we don't sell any data*. . . . There is a common misperception, as you say, that is just reported – often keeps on being reported, that, for some reason, we sell data. *I can't be clearer on this topic. We don't sell data*." And he reiterated, "*Congressman, we don't sell people's data*. So I think that's an important thing to clarify up front."[421]

454.     On April 25, 2018, during Facebook's earnings call for the first quarter of 2018,

---

[416] Steve Inskeep, *Full Transcript: Facebook COO Sheryl Sandberg On Protecting User Data*, NPR (Apr. 5, 2018), https://tinyurl.com/y8aamyhn.

[417] Judy Woodruff, *Sheryl Sandberg: Facebook 'made big mistakes' on protecting user data*, PBS (Apr. 5, 2018), https://tinyurl.com/vbkaqkx.

[418] *Transcript of Mark Zuckerberg's Senate hearing*, Wash. Post (Apr. 10, 2018), https://tinyurl.com/y7cu7jh7.

[419] *Id.*

[420] *Id.*

[421] *Transcript of Zuckerberg's appearance before House committee*, Wash. Post (Apr. 11, 2018), https://tinyurl.com/y9ssaqpl.

1    (a)    Zuckerberg stated, "We use the information you provide and that we
2    receive from websites to target ads for advertisers, but we don't tell them who you are. ***We don't***
3    ***sell your information to advertisers or anyone else***."[422]

4    (b)    Sandberg stated: "***At Facebook, we have always built privacy protection***
5    ***into our ads system***. [. . .] ***We don't sell your information to advertisers or anyone else.***"

6    455.    On May 24, 2018, defendants posted to Facebook.com their follow up to
7    Zuckerberg's testimony before the European Parliament, in which they stated in relevant part,
8    "We don't tell advertisers who you are; and ***we don't sell your data***."[423]

9    456.    On June 29, 2018, defendants filed written responses to additional questions posed
10   to them by the Energy and Commerce Committee of the U.S. House of Representatives, in which
11   they stated, "***Facebook does not sell people's information to anyone, and we never will***."
12   defendants further stated, "When the individual is a Facebook user, we are also able to use this
13   information to personalize their experiences on Facebook, whether or not they are logged out, but
14   we will not target ads to users relying on this information unless the user allows this in their
15   privacy settings. ***We don't sell or share this information with third parties***."[424]

16   457.    On July 18, 2018, in an interview with Recode, Zuckerberg stated, "***We don't sell***
17   ***data***. . . So while it may seem like a small difference to you, this distinction on "selling data," I
18   actually think to people it's like the whole game, right? ***So we don't sell data, we don't give the***
19   ***data to anyone else***, but overwhelmingly people do tell us that if they're going to see ads on
20   Facebook, they want the ads to be relevant; they don't want bad ads."[425]

21   458.    Defendants' statements in ¶¶445-57 *supra* were materially false and misleading
22   when made.  In reality, defendants were using user friend data as consideration for a reciprocal
23

---

24   [422] Q1 2018 Facebook, Inc. Earnings Call, Tr. at 4 (Apr. 25, 2018).

25   [423]Facebook Brussels, *Follow-up questions from EP* (May 24, 2018), https://tinyurl.com/vjt83sx.

26   [424] Facebook, *Responses to House Energy and Commerce Questions for the Record* (June 29,
     2018) at 62.

27   [425] Kara Swisher, *Full Transcript: Facebook CEO Mark Zuckerberg on Recode Decode*, Recode
28   (July 18, 2018). https://tinyurl.com/rc299l6.

exchange of value with third party app developers and other companies who were "whitelisted" for secret access to user friend data.  Thus, defendants engaged in selling user friend data in exchange for reciprocal benefits.  For defendants, "reciprocity" came in various forms, including an exchange of data between an app developer and Facebook, by Facebook requiring the third party to spend substantial sums on advertising at Facebook or by a third party enhancing Facebook's brand and platform to make it more attractive to users, as in the case of the dozens of major phone device makers that Facebook whitelisted during the Class Period.

459.    Indeed, as noted by Slate¸ Facebook's whitelisting "private agreements were conditional on the third party sending over its own valuable user data to Facebook, or on the company making big advertising purchases with Facebook," which constitutes a "business in selling or bartering data."[426]

460.    Defendants' statements in ¶¶445-57 above were also materially false and misleading because they omitted to state material facts necessary to make them, in the light of the circumstances under which they were made, not misleading, including the fact that defendants were using user friend data as consideration for a reciprocal exchange of value with third party app developers and other companies who were "whitelisted" for secret access to user friend data.  Thus, defendants engaged in selling user friend data in exchange for reciprocal benefits.  For defendants, "reciprocity" came in various forms, including an exchange of data between an app developer and Facebook, by Facebook requiring the third party to spend substantial sums on advertising at Facebook or by a third party enhancing Facebook's brand and platform to make it more attractive to users, as in the case of the dozens of major phone device makers that Facebook whitelisted during the Class Period.

N.    **Additional False and Misleading Statements**

461.    Plaintiffs acknowledge that the Court's September 25, 2019 Order Granting Defendants' Motion to Dismiss the Consolidated Class Action Complaint (the "MTD Order")

[426] Elena Botella, *Facebook Earns $132.80 From Your Data Per Year*, Slate (Nov. 15, 2018), https://tinyurl.com/ssgktsy.

1  found the following statements not to have been false and misleading.  For the avoidance of doubt,

2  Plaintiffs stand on the prior allegations in their Amended Consolidated Class Action Complaint

3  and preserve their right to appeal these dismissed statements.

4  **1.    Statements in Facebook's September 29, 2016 Privacy Policy**

5  462.    Among the Privacy Policies publicized by Facebook that, read in conjunction with

6  the risk warnings, caused investors to be misled were the following: "PROMOTE SAFETY AND

7  SECURITY. We use the information we have to help verify accounts and activity, and to promote

8  safety and security on and off of our Services, such as by investigating suspicious activity or

9  violations of our terms or policies."[427]

10  463.    The Privacy Policy additionally stated, "We work hard to protect your account

11  using teams of engineers, automated systems, and advanced technology such as encryption and

12  machine learning."[428]

13  464.    The Privacy Policy additionally stated, "These partners must adhere to strict

14  confidentiality obligations in a way that is consistent with this Data Policy and the agreements

15  we enter into with them."[429]

16  465.    The foregoing privacy policies were misleading in and of themselves because

17  defendants failed to disclose that Facebook had repeatedly failed to adhere to them.  As a result,

18  the magnitude of the risks facing the Company from negative press reports, government and

19  regulatory investigations, and user disengagement arising from disclosure of the massive amount

20  of user data that had already been compromised was materially and substantially greater than

21  investors understood based on the information available at the time the risk warnings were

22  provided.

23  466.    For example, contrary to the assurance that Facebook "investigat[ed] suspicious

24  activity or violations of our terms or policies," the Company had deliberately ignored information

25

26  [427] Facebook Data Policy (Sept. 29, 2016) (The Court's MTD Order identified this statement as Statement 3.).

27  [428] *Id*. (The MTD Order identified this statement as Statement 4.).

28  [429] *Id*. (The MTD Order identified this statement as Statement 5.).

1   brought to its attention about such risks and violations.  In particular, during the Class Period,

2   defendants were still concealing that they had failed to fully or promptly investigate or address

3   the Cambridge Analytica data breach, and continued to cover up the fact that the Company had

4   repeatedly failed to respond to, and had deliberately ignored, thousands of reports of violations

5   of its terms of use and policies regarding user data.  Defendants were also knowingly or recklessly

6   providing unauthorized access to user friend data to numerous third parties, including app

7   developers, whitelisted third parties and others.

8       467.   Contrary to the assertion that defendants "work hard to protect your account using

9   teams of engineers, automated systems, and advanced technology," the Company had no ability

10  to track the user data provided to developers or others, much less any ability to determine whether

11  that information had been used or shared beyond the extent authorized by the user, or what user

12  data had been compromised, who had it, or how it was being used. In particular, during the Class

13  Period, the Company was still concealing that it was unaware of how much data had been

14  compromised or how many users had been affected by the Cambridge Analytica data breach, or

15  what other developers or third parties had improperly accessed, used or distributed user data, or

16  where or how any of that data was being used.  Defendants were also knowingly or recklessly

17  providing unauthorized access to user friend data to numerous third parties, including app

18  developers, whitelisted third parties and others.

19      468.   Contrary to the warning to app developers that the Company would enforce its

20  Platform Policies to prevent app developers from selling or transferring user data, or from using

21  their customers' friend data outside of their customer's use of the app, Facebook had failed to

22  make any effort to verify that user data compromised in the Cambridge Analytica data breach had

23  been deleted, and its enforcement of the Platform Policies regarding user data was limited,

24  haphazard and inconsistent.   Defendants were also knowingly or recklessly providing

25  unauthorized access to user friend data to numerous third parties, including app developers,

26  whitelisted third parties and others.

27      469.   Contrary to the assertions that the Company's vendors, service providers and other

28  partners "must adhere to strict confidentiality obligations in a way that is consistent with"

1  Facebook's terms of use and privacy policies, and that the Company "require[s] applications to

2  respect [user] privacy, and [the user's] agreement with that application will control how the

3  application can use, store, and transfer that content and information," or that the Company

4  expected app developers and others to protect user's rights by making it clear what information

5  is being collected and how it is being used, Facebook had repeatedly ignored information brought

6  to its attention about violations of those policies, and repeatedly authorized developers and others

7  to use information in ways that were directly contrary to those policies.  Defendants were also

8  knowingly or recklessly providing unauthorized access to user friend data to numerous third

9  parties, including app developers, whitelisted third parties and others.

10       470.    Defendants' knowledge or reckless disregard that these statements would be, and

11  were, misleading to investors may be inferred from the same facts that support a strong inference

12  of scienter with respect to the assurances about Facebook's purported commitment to

13  enforcement of its privacy policies.

14       471.    Further, the statements set forth above were materially false and misleading

15  because they omitted the following material facts necessary in order to make those statements, in

16  light of the circumstances under which they were made, not misleading: (i) the Company had

17  knowingly or recklessly allowed third parties other than Cambridge Analytica and its affiliates to

18  harvest and misuse users' data without their knowledge or consent; (ii) Facebook had taken no

19  action against those other malicious actors upon learning that user data had been compromised in

20  violation of Facebook's terms of service; (iii) Facebook had waited six months before asking

21  Cambridge Analytica and other entities to certify that all user data had been destroyed and then

22  failed to take any steps to confirm destruction; (iv) Facebook had made no effort to identify what

23  data had been compromised from what users; (v) Facebook had violated the FTC Consent Decree;

24  (vi) Facebook had made no effort to notify users that Cambridge Analytica or the other app

25  developers had, without users' knowledge or consent, collected and still possessed vast amounts

26  of Facebook users' friends' personal data; and (vii) a major risk to Facebook's business model,

27  finances and reputation existed.

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD
- 156 -

**2.      Statements in Facebook's February 3, 2017 10-K Report**

472.     Facebook's 2016 Form 10-K, dated February 3, 2017, contained the following statements concerning the risks to Facebook's business due to a loss of user trust in Facebook's ability to protect users' privacy, as could occur following public reports or investigations into breaches of Facebook's privacy policies, or the Company's past failures to address known breaches of those policies:

(a)      "[T]echnical or other problems prevent us from delivering our products in a rapid and reliable manner or otherwise affect the user experience, such as security breaches or failure to prevent or limit spam or similar content";[430]

(b)      "[W]e, developers whose products are integrated with our products, or other partners and companies in our industry are the subject of adverse media reports or other negative publicity";[431]

(c)      "Unfavorable media coverage could negatively affect our business";[432] and

(d)      "We have been subject to regulatory investigations and settlements, and we expect to continue to be subject to such proceedings and other inquiries in the future, which could cause us to incur substantial costs or require us to change our business practices in a manner materially adverse to our business."[433]

473.     The statements quoted above were repeated or incorporated by reference into the other reports on Forms 10-K and 10-Q that Facebook filed with the SEC during the Class Period, including its reports filed on May 4, 2017 (1Q17 10-Q), July 27, 2017 (2Q17 10-Q), November 2, 2017 (3Q17 10-Q), and February 1, 2018 (FY17 10-K), each of which were materially false and misleading for the same reasons as set forth below.

---

[430] FY 2016 Facebook, Inc. Form 10-K at 8 (Feb. 3, 2017) (The MTD Order identified this statement as Statement 16.).

[431] *Id.* at 9 (The MTD Order identified this statement as Statement 17.).

[432] *Id.* at 13 (The MTD Order identified this statement as Statement 18.).

[433] *Id.* at 16 (The MTD Order identified this statement as Statement 19.).

474.    Each of these statements was materially false or misleading because they described the risks to Facebook's business and reputation arising from its privacy practices and from developers' and other third parties' use of Facebook user data as hypothetical, contingent and based on events that had not yet occurred, while omitting to disclose that the Company's previously reported data breaches were much broader than the Company had disclosed, such that the risks of negative media reports and regulatory investigations that could harm Facebook's reputation and negatively impact its user engagement, growth, and financial condition were materially greater than investors would reasonably understand based on the foregoing statements. Defendants were also knowingly or recklessly providing unauthorized access to user friend data to numerous third parties, including app developers, whitelisted third parties and others. Defendants' knowledge or reckless disregard that these statements would be, and were, misleading to investors may be inferred from the same facts that support a strong inference of scienter with respect to the assurances about Facebook's purported commitment to enforcement of its privacy policies.

475.    The misleading impact of these statements was heightened by the other statements Facebook and its officers made about protecting user data, including in the Company's terms of use and privacy policies and the other systems, controls and procedures that defendants regularly touted regarding the purported strength of their efforts to protect users from harm resulting from the unauthorized disclosure of their data, and their purported commitment to vigorously enforcing policies designed to prevent that from occurring, including by notifying affected users and banning or taking legal action against those who had disseminated their data without consent.

476.    Further, the statements set forth above were materially false and misleading because they omitted the following material facts necessary in order to make those statements, in light of the circumstances under which they were made, not misleading: (i) the Company had knowingly or recklessly allowed third parties other than Cambridge Analytica and its affiliates to harvest and misuse users' data without their knowledge or consent; (ii) Facebook had taken no action against those other malicious actors upon learning that user data had been compromised in violation of Facebook's terms of service; (iii) Facebook had waited six months before asking

1    Cambridge Analytica and other entities to certify that all user data had been destroyed and then

2    failed to take any steps to confirm destruction; (iv) Facebook had made no effort to identify what

3    data had been compromised from what users; (v) Facebook had violated the FTC Consent Decree;

4    (vi) Facebook had made no effort to notify users that Cambridge Analytica or the other app

5    developers had, without users' knowledge or consent, collected and still possessed vast amounts

6    of Facebook users' friends' personal data; and (vii) a major risk to Facebook's business model,

7    finances and reputation existed.

### 3.    Additional Statements in Facebook's March 16, 2018 Post

8

9        477.    Facebook's March 16, 2018 public post on Facebook.com entitled "Suspending

10   Cambridge Analytica & SCL Group From Facebook" contained the following statement, "These

11   include steps such as random audits of existing apps along with the regular and proactive

12   monitoring of the fastest growing apps. We enforce our policies in a variety of ways – from

13   working with developers to fix the problem, to suspending developers from our platform, to

14   pursuing litigation."[434]

15       478.    The above statement was materially misleading because it was designed to cast

16   doubt on *The New York Times* and *Guardian* articles reporting on Facebook's failure to address

17   the Cambridge Analytica data breach in a manner consistent with defendants' past public

18   statements. In reality, Facebook was not remotely "enforcing [its] policies in a variety of ways."

19   On the contrary, Facebook: (i) had authorized Kogan and his affiliated companies to sell user data

20   to third parties in direct violation of the terms of service posted on Facebook's website; (ii) had

21   taken no action against Kogan or other malicious actors upon learning that user data had been

22   compromised in violation of the terms of service; (iii) had waited six months before asking

23   Cambridge Analytica and other entities to certify that all user data had been destroyed; and (iv)

24   had made no effort – either themselves, or in concert with government bodies – to identify what

25

26

27   [434] Paul Grewal, *Suspending Cambridge Analytica and SCL Group From Facebook*, Facebook
     Newsroom (Mar. 16, 2018), https://tinyurl.com/sd69qnd (The MTD Order identified this
28   statement as Statement 28.).

1    data had been compromised from what users, or to notify users who had been, or were at risk of

2    being, targeted.

3           479.    Further, the statements set forth above were materially false and misleading

4    because they omitted the following material facts necessary in order to make those statements, in

5    light of the circumstances under which they were made, not misleading: (i) the Company had

6    knowingly or recklessly allowed third parties other than Cambridge Analytica and its affiliates to

7    harvest and misuse users' data without their knowledge or consent; (ii) Facebook had taken no

8    action against those other malicious actors upon learning that user data had been compromised in

9    violation of Facebook's terms of service; (iii) Facebook had waited six months before asking

10   Cambridge Analytica and other entities to certify that all user data had been destroyed and then

11   failed to take any steps to confirm destruction; (iv) Facebook had made no effort to identify what

12   data had been compromised from what users; (v) Facebook had violated the FTC Consent Decree;

13   (vi) Facebook had made no effort to notify users that Cambridge Analytica or the other app

14   developers had, without users' knowledge or consent, collected and still possessed vast amounts

15   of Facebook users' friends' personal data; and (vii) a major risk to Facebook's business model,

16   finances and reputation existed.

17                 **4.      Statements on Facebook's April 4, 2018 Telephonic Press
18                           Conference**

19           480.    On April 4, 2018, Zuckerberg conducted a telephonic press conference, which was

20   transcribed and posted on Facebook's website under the title "Hard Questions: Q&A With Mark

21   Zuckerberg on Protecting People's Information." During this press conference, he stated in part:

22           For Facebook specifically, one of the things we need to do and that I hope that
             more people look at are just the privacy controls that you have. I think, especially
23           leading up to the GDPR event, a lot of people are asking us, "Okay, are you going
             to implement all those things?" ***And my answer is that we've had almost all of***
24           ***what's in there implemented for years, around the world, not just in Europe. So,***
             ***to me, the fact that a lot of people might not be aware of that is an issue, and I***
25           ***think we could do a better job of putting these tools in front of people and not***
26           ***just offering them,*** and I would encourage people to use them and make sure that

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD
                                                                                      - 160 -

1   they're comfortable with how their information is used on our services and
2   others.[435]

3   481.   The above statement was materially false and misleading because it sought to

4   assure investors that data breaches like the Cambridge Analytica scandal were behind the

5   Company and the consequences of that breach would be minimal because Facebook had been

6   protecting privacy for years – when, in reality, Facebook had not been protecting privacy and the

7   consequences of Facebook's data protection misconduct would not be fully revealed until July

8   25, 2018, when Facebook disclosed, *inter alia,* heightened privacy-related expenses and declining

9   active user figures.  Further, Zuckerberg's statement that "we've had almost all of what's in [the

10  GDPR] implemented for years, around the world," misleadingly sought to assure investors that

11  Facebook was already adhering to or prepared to meet the requirements of the GDPR, when in

12  reality the Company was not meeting those requirements, which was not fully revealed until July

13  25, 2018.  Defendants' knowledge or reckless disregard that these statements would be, and were,

14  misleading to investors may be inferred from the same facts that support a strong inference of

15  scienter with respect to the assurances about Facebook's purported commitment to enforcement

16  of its privacy policies.

17

18

19  482.   The foregoing statements were also materially false and misleading because they

20  omitted the following material facts necessary in order to make those statements, in light of the

21  circumstances under which they were made, not misleading: (i) Facebook had violated the FTC

22  Consent Decree; (ii) Facebook's misconduct with respect to user privacy would impact the

23  Company's bottom line by destroying its reputation as a company that protected privacy and by

24  requiring the Company to incur billions in expenses to become privacy compliant, including with

25

26

---

27  [435] *Hard Questions: Q&A With Mark Zuckerberg on Protecting People's Information*, Facebook
    Newsroom (Apr. 4, 2018), https://tinyurl.com/rv69jh9 (The MTD Order identified this statement
28  as Statement 32.).

1  respect to the GDPR; and (iii) as a result, Facebook's user numbers, revenue growth, operating

2  margins and business prospects would materially decline.

3  **VII.    ADDITIONAL SCIENTER ALLEGATIONS**

4        483.    The facts detailed above, when viewed collectively and holistically and together

5  with the other allegations in this Complaint, establish a strong inference that each of the

6  defendants knew or were deliberately reckless that each of the misrepresentations and omissions

7  set forth above would be, and were, misleading to investors at the time they were made.

8        484.    Each of the defendants knew or recklessly disregarded that their statements

9  concerning privacy risks and the Cambridge Analytica breach were or would be misleading to

10  investors at the time they were made because, as previously alleged, at the time the foregoing

11  statements were made, each of the defendants knew or recklessly disregarded, *inter alia,* that: (a)

12  Facebook user data had been provided to Cambridge Analytica in violation of Facebook's terms

13  of use; (b) Facebook had done nothing to investigate the scope of the breach or require destruction

14  of the user data at the time it learned of the breach; (c) Facebook acted only after the risks of

15  exposure had increased as a result of Cambridge Analytica's participation in events leading to the

16  Brexit vote; (d) defendants had deliberately decided ***not*** to notify affected users that their data

17  had been compromised; (e) the certifications obtained from Cambridge Analytica and its

18  employees and affiliates were unreliable to reasonably assure that user data had in fact been

19  deleted; (f) Facebook's lax historic privacy practices had given rise to numerous other risks of

20  user data being compromised, such that the Cambridge Analytica data breach was not an isolated

21  event; and (g) Facebook was continuing to share user data without authorization and in violation

22  of its stated policies.

23        485.    Defendants' scienter may be further inferred from other facts alleged herein,

24  including that: (a) GSR Founder Chancellor, who had detailed knowledge about Cambridge

25  Analytica's access to and use of the user data had been hired by Facebook around the time it

26  learned of the data breach, and was still working in its headquarters at the time the foregoing

27  statements were made; (b) defendants had been repeatedly warned of the concealed risks to the

28  Company arising from its lax privacy practices, including by McNamee, Parakilas and others; (c)

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

1    defendants knew that providing truthful, accurate and complete disclosures would threaten their

2    business model, as it would expose users to information that was likely to dissuade them from

3    actively engaging on Facebook's social media platforms; (d) defendants' close attention to user

4    engagement metrics, and the critical importance of those metrics to Facebook's business model

5    and financial success; (e) the Company had a long history of internally disregarding privacy rights

6    of users, and acting in ways that contradicted its public assurances to users; and (f) Facebook was

7    subject to an FTC Consent Decree at the time the statements were made, providing defendants

8    with heightened awareness of the risks of and their responsibilities with respect to violating user

9    privacy rights.

10          486.    In addition, defendants' scienter can be inferred from the stark contrast between

11    their disinterest in protecting users' privacy and the aggressive tack they took and take in

12    protecting their own, in particular when it came to negotiating and enforcing the Company's

13    confidentiality and non-disclosure agreements.  Kogan, who refused to respond to a number of

14    questions asked of him by members of the U.K. parliament for fear that doing so would violate

15    the agreement he signed with Facebook, was typical.  *Supra* ¶143.  As reported by *Bloomberg*,

16    Facebook has a well-earned reputation for "searching for leakers" and negatively influencing their

17    ability to find employment elsewhere in Silicon Valley.[436]  Indeed, Zuckerberg has reportedly

18    announced at all-hands meetings the firing of employees for leaking, often to applause from other

19    employees.[437]  Consistent with these Facebook practices, counsel for plaintiffs, in investigating

20    the allegations contained in this complaint, have contacted dozens of witnesses otherwise inclined

21    to be interviewed who declined to provide information based on their fear either that they would

22    be prosecuted by Facebook for violating the terms of a non-disclosure agreement with the

23    Company, or subject to retaliation from Facebook in seeking employment, or both.

24

25

26    _____

[436] *Bloomberg*, Decrypted podcast, *Facebook's Former Employees Open Up About the Data
27    Scandal* (Mar. 29, 2018), https://tinyurl.com/ya5o6ymn (starting at minute 2).

28    [437] *Id.*

1    487.    Defendants' massive stock sales during the Class Period provide additional strong

2   evidence in support of an inference of scienter, in that they further demonstrate how each of the

3   defendants had a direct, substantial pecuniary motive to conceal the true facts from investors and

4   users, so as to enable defendants to sell their personal shares of Facebook stock at prices that were

5   inflated by fraud.

6    488.    In 2015, defendant Zuckerberg learned that Cambridge Analytica was misusing

7   Facebook users' personal data.  Defendant Zuckerberg has admitted to possessing knowledge of

8   this nonpublic information.  In a recent March 21, 2018 Facebook post, he admitted that "[i]n

9   2015, we learned from journalists at *The Guardian* that Kogan had shared data from his app with

10  Cambridge Analytica."[438]  Likewise, in a March 21, 2018 interview with Wired, he admitted that

11  "in 2015, . . . we heard from journalists at *The Guardian* that Aleksandr Kogan seemed to have

12  shared data with Cambridge Analytica and a few other parties."[439]  Sandberg similarly admitted

13  in a recent April 6, 2018 interview with the Today show that Facebook was aware as early as

14  November 2015 that Kogan shared users' data with Cambridge Analytica, stating: "You are right

15  that we could have done these two and a half years ago. . . . [W]e thought that the data had been

16  deleted and we should have checked."[440]

17   489.    At the same time in December 2015 that *The Guardian* told Facebook that

18  Cambridge Analytica had illegally provided Facebook user data to third parties, defendant

19  Zuckerberg began the process of disposing of billions of dollars of his Facebook shares through

20  a limited liability company that he controls and created in December 2015 called Chan

21  Zuckerberg Initiative, LLC ("CZI").  On December 22, 2015, eleven days after *The Guardian*

22  published its article, defendant Zuckerberg transferred over 414 million of his Facebook shares-

23

24

25  [438] Mark Zuckerberg, Facebook (Mar. 21, 2018), https://tinyurl.com/yadalrv7.

26  [439] Nicholas Thompson, *Mark Zuckerberg Talks to Wired about Facebook's Privacy Problem*, Wired (Mar. 21, 2018), https://tinyurl.com/y77krl23.

27
28  [440] Eun Kyung Kim, *Sheryl Sandberg on TODAY: Other Facebook data breaches 'possible'*, Today (Apr. 6, 2018), https://tinyurl.com/ydb26wx3.

1    valued at about $45 billion at the time of the transfer to CZI.  Defendant Zuckerberg retained

2    complete control over CZI's ability to dispose of the transferred shares.

3        490.    Over the ensuing months, defendant Zuckerberg proceeded to unload over 29.4

4    million Facebook shares for nearly $5.3 billion dollars.  During the year that preceded the eventual

5    revelation that Facebook failed to safeguard its users' data, defendant Zuckerberg sold over 10.1

6    million of his personal Facebook shares, collecting $1.74 billion in profits.  As the financial press

7    has since noted, defendant Zuckerberg unloaded more shares "than any insider at any other

8    company"[441] in the months preceding the revelations of Facebook's misconduct.  Indeed, within

9    the one month preceding the March 17, 2018 revelations, defendant Zuckerberg sold over $780

10   million in Facebook stock.

11       491.    Defendant Sandberg also sold large amounts of her personally-held Facebook

12   shares during the Class Period prior to the revelation of Facebook's data security breach.  In total,

13   defendant Sandberg sold over *2.2 million* shares of Facebook stock between February 3, 2017

14   and March 23, 2018, collecting *over $318 million* for these sales.

15       492.    As the financial press has observed, during the months preceding Facebook's

16   disclosure of its data security breach, "[Facebook] executives [were] selling shares like crazy."[442]

17   During the three-month window prior to the disclosure of the data security breach alone,

18   Zuckerberg sold more stock "than any insider at any other company."[443]  In fact, Zuckerberg *sold*

19   *twice as much stock* during the Class Period as compared to the same amount of time preceding

20   the Class Period.  Meanwhile, Zuckerberg did not buy *any* shares during the Class Period.  As

21

22

23

24
_____
25   [441] Evelyn Cheng, *Zuckerberg has sold more Facebook stock in the last 3 months than any insider*
     *at any other Company*, CNBC (Mar. 20, 2018), https://tinyurl.com/y9pnn7n9.

26   [442] Matt Rosoff, *Facebook is facing its biggest test ever – and its lack of leadership could sink the*
     *company*, CNBC (Mar. 18, 2018), https://tinyurl.com/yafbfrtc.

27   [443] Evelyn Cheng, *Zuckerberg has sold more Facebook stock in the last 3 months than any insider*
28   *at any other Company*, CNBC (Mar. 20, 2018), https://tinyurl.com/y9pnn7n9.

1   noted in news reports, Sandberg's sales of her personal stock, while less than defendant

2   Zuckerberg, "is still unusually large among officers of top tech companies."[444]

3          493.    *CNBC* reported that in the first quarter of 2018, "as Facebook struggled with data

4   leaks and fake news scandals, insiders at the company were selling more stock than they typically

5   do," and that in the "second quarter, top executives sold 13.6 million shares, up from 8.3 million

6   in the first quarter, and roughly **triple the amount** they sold in the last quarter of 2017."[445]

7   Facebook's SEC filings corroborate these reports and reveal suspicious trading by each of the

8   Executive Defendants.

9          **A.     Zuckerberg's $5.3 Billion Aggregate Sales**

10         494.    During the February 27, 2017 to July 25, 2018 period, Zuckerberg sold over **$5.3**

11  **billion** worth of Facebook stock.  Zuckerberg sold this stock out of an investment vehicle that he

12  controls and created in December 2015, when he transferred 99% of his Facebook stock to the

13  vehicle.  He publicly proclaimed that the purpose of the vehicle was charitable but the limited

14  liability company structure does not require the vehicle to spend "a minimum of 5 percent of the

15  value of their endowment every year for charitable purposes"[446] as typical nonprofits require.

16  When Facebook reported to investors information about this new private investment vehicle in

17  December 2015, the Company confirmed that Zuckerberg would "control the voting and

18  disposition of any shares held by such entity."[447]  Thus, Zuckerberg "remains completely free to

19  do as he wishes" [448] with the proceeds from his Class Period stock sales as a result.

20

21

22  ───────────────
23  [444] Matt Rosoff, *Facebook is facing its biggest test ever – and its lack of leadership could sink the company*, CNBC (Mar. 18, 2018), https://tinyurl.com/yafbfrtc.

24  [445] Kate Rooney, *Facebook insiders sold more stock than usual in the second quarter*, CNBC (July 26, 2018), https://tinyurl.com/ya3earqp.

25  [446] Natasha Singer and Mike Isaac, *Mark Zuckerberg's Philanthropy Uses L.L.C. for More Control*, N.Y. Times (Dec. 2, 2015), https://tinyurl.com/yac2hntu.

26  [447] Facebook, Inc. Form 8-K (Dec. 1, 2015).

27  [448] Jesse Eisinger, Pro Publica, *How Mark Zuckerberg's Altruism Helps Himself*, N.Y. Times (Dec. 3, 2015), https://tinyurl.com/yadroxe3.
28

1          495.    When Zuckerberg created his investment vehicle in December 2015, Facebook

2 reported that he told the Company the amount to stock he planned to sell into the open market.

3 In particular, Facebook reported that Zuckerberg told the Company that "he **plan[ned]** to sell or

4 gift **no more** than $1 billion of Facebook stock each year for the next three years and that he

5 intends to retain his majority voting position in our stock for the foreseeable future."[449]

6 Zuckerberg had already created the investment vehicle on or about December 1, 2015, when

7 Facebook reported the news to investors.  The first reports of the Cambridge Analytica scandal

8 surfaced in late December 2015 and, after that time but before the scandal surfaced, Zuckerberg

9 changed his original plan to sell $3 billion.[450]

10          496.    In fact, Zuckerberg's Class Period sales of **$5.3 billion** are **55% higher** than the

11 $3 billion plan that the Company reported on December 1, 2015 when Zuckerberg created his

12 first plan.  He sold **$2 billion** in stock (or 11.9 million shares) during the February 27, 2017 to

13 March 23, 2018 period that preceded *The Guardian* and *The New York Times* reports regarding

14 the Cambridge Analytica scandal and Facebook's attendant inability to safeguard its users'

15 personal information.  Once that news surfaced, Zuckerberg and his team minimized the problem,

16 "pumping" Facebook's stock price higher during the March – July 2018 period.  During that time

17 Zuckerberg "dumped" over 7.7 million shares for proceeds of more than **$3.3 billion** before the

18 July 25, 2018 investor call when he and others at Facebook shocked the markets with the news

19 that Facebook had essentially ended its ability to grow in light of the business changes that the

20 Cambridge Analytica scandal precipitated.

21          497.    Zuckerberg's suspicious sales immediately preceding the March 2018 revelations,

22 along with the financial benefits that he garnered in minimizing that news before the Company's

23 July 2018 investor are clear.  After the March 18, 2018 disclosure, defendant Zuckerberg assured

24

25 _____

[449] Facebook, Inc. Form 8-K (Dec. 1, 2015).

26 [450] Zuckerberg publicly reported a change in his plan on or about September 22, 2017.  *See*
Facebook, Inc. Form 8-K (Sept. 27, 2017), https://tinyurl.com/yahx5mjz.  ("On September 22,
27 2017, Mr. Zuckerberg announced that he anticipates selling 35 million to 75 million shares of
Facebook stock over approximately 18 months from the date of this report . . . .").
28

investors that Facebook was taking appropriate steps to ensure that users' privacy was being protected and that the breach would have only a negligible impact on users' engagement on the Facebook platform.   During that same time, defendant Zuckerberg continued to unload his Facebook shares.   Specifically, between March 18, 2018 and July 25, 2018 investor call, defendant Zuckerberg sold $3.45 billion of Facebook stock (18.5 million shares).  As the financial press has since reported, defendant Zuckerberg again continued to "sell[] more stock than [he] typically d[id]" during this period, selling in the second quarter of 2018 "double what he sold in the first quarter" of 2018 and "10 times what he sold in the fourth quarter" of 2017.[451]

498.   Defendant Zuckerberg's trading during the Class Period dramatically departed from his prior trading activity, as he sold three times more stock during the Class Period than he did for the same period preceding the Class Period.  Strikingly, during the Class Period while he was in possession of material nonpublic information, defendant Zuckerberg did not buy a single Facebook share.

499.   As the following charts show, Zuckerberg's quarterly insider sales during the Class Period dwarf his prior sales, both in the dollar amount of the sales and in the number of shares sold:

---

[451] Kate Rooney, *Facebook insiders sold more stock than usual in the second quarter*, CNBC (July 26, 2018), https://tinyurl.com/ya3earqp.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

500.    Further, Zuckerberg engaged in random patterns of selling during the first part of the Class Period in 2017 – selling only twice in February, six times in March, twice in April, four times in May, six times in June, twice in July, four times in August, five times in September, three times in October, four times in November and twice in December.  Then, in March 2018, he rapidly accelerated his trading to sell shares *every single trading day possible* until July 25, 2018 – when the bottom dropped out on the stock price.

501.    Finally, in the fourth quarter of 2018, Zuckerberg did not sell a single share.  As noted by Bloomberg reporters, this was "the first quarter in more than two years [that Zuckerberg has] refrained from doing so."[452]  The reasons are obvious, he capitalized on the artificially inflated price of Facebook's stock prior to the July 25, 2018 corrective disclosure – and then stopped selling when the price was low.

### B.    Sandberg's $389 Million Insider Sales

502.    Defendant Sandberg also dumped massive amounts Facebook stock during the Class Period.  She sold ***$389 million*** worth of Facebook stock throughout this time, and, like Zuckerberg, was in a position to control the timing of the true extent of Facebook's underlying business problems with regard to the way that it treated users' information.  During the nearly one-year period from February 16, 2017 to March 15, 2018, Sandberg sold over 1.5 million shares more than $270 million in proceeds.  Similar to Zuckerberg's rosy statements to the market after *The Guardian* and *The New York Times* stories surfaced in late March 2018, Sandberg also issued favorable statements that increased the stock's price before the July 2018 earnings call.  During the three and a half-month period from March 30, 2017 to July 19, 2018, Sandberg sold over 411 thousand shares for $75 million in proceeds.  In all, she unloaded over 2.5 million shares for more than $389 million:

| Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 2/16/2017 | $133.39 | 327,000 | $43,618,530 |
| 2/28/2017 | $135.58 | 158,534 | $21,494,040 |
| 2/28/2017 | $136.15 | 88,190 | $12,007,069 |
| 2/28/2017 | $136.16 | 80,276 | $10,930,380 |

---

[452] Anders Melin and Brandon Kochkodin, *Mark Zuckerberg Halts Stock Sales as Facebook Shares Tumble*, Bloomberg (Jan. 3, 2019), https://tinyurl.com/t7dpcxx.

| Sale Date | Price | Shares Sold | Proceeds |
|-----------|-------|-------------|----------|
| 3/15/2017 | $139.02 | 115,258 | $16,023,167 |
| 3/15/2017 | $139.03 | 108,469 | $15,080,445 |
| 3/15/2017 | $139.77 | 54,530 | $7,621,658 |
| 3/15/2017 | $139.78 | 48,743 | $6,813,297 |
| 3/30/2017 | $140.37 | 141,490 | $19,860,951 |
| 3/30/2017 | $142.41 | 130,910 | $18,642,893 |
| 3/30/2017 | $142.90 | 100 | $14,290 |
| 4/18/2017 | $141.20 | 66,306 | $9,362,407 |
| 4/18/2017 | $141.22 | 77,194 | $10,901,337 |
| 4/18/2017 | $141.73 | 12,300 | $1,743,279 |
| 4/18/2017 | $141.77 | 7,700 | $1,091,629 |
| 5/11/2017 | $149.92 | 159,470 | $23,907,742 |
| 5/11/2017 | $150.51 | 2,200 | $331,122 |
| 5/11/2017 | $150.53 | 1,830 | $275,470 |
| 5/24/2017 | $149.22 | 39,232 | $5,854,199 |
| 5/24/2017 | $149.23 | 37,675 | $5,622,240 |
| 5/24/2017 | $149.83 | 45,662 | $6,841,537 |
| 5/24/2017 | $149.84 | 40,931 | $6,133,101 |
| 6/6/2017 | $152.99 | 19,006 | $2,907,728 |
| 6/6/2017 | $153.00 | 20,894 | $3,196,782 |
| 6/6/2017 | $153.98 | 123,600 | $19,031,928 |
| 6/19/2017 | $152.47 | 41,899 | $6,388,341 |
| 6/19/2017 | $152.50 | 48,564 | $7,406,010 |
| 6/19/2017 | $153.01 | 21,315 | $3,261,408 |
| 6/19/2017 | $153.04 | 19,722 | $3,018,255 |
| 2/14/2018 | $173.46 | 1,900 | $329,574 |
| 2/14/2018 | $174.97 | 10,900 | $1,907,173 |
| 2/14/2018 | $176.54 | 6,300 | $1,112,202 |
| 2/14/2018 | $177.14 | 12,525 | $2,218,679 |
| 2/14/2018 | $178.32 | 10,500 | $1,872,360 |
| 2/14/2018 | $179.32 | 12,875 | $2,308,745 |
| 3/2/2018 | $173.62 | 18,200 | $3,159,884 |
| 3/2/2018 | $174.51 | 11,080 | $1,933,571 |
| 3/2/2018 | $175.49 | 22,236 | $3,902,196 |
| 3/2/2018 | $176.48 | 3,484 | $614,856 |
| 3/15/2018 | $182.79 | 28,866 | $5,276,416 |
| 3/15/2018 | $183.51 | 26,134 | $4,795,850 |
| 4/2/2018 | $154.95 | 16,870 | $2,614,007 |
| 4/2/2018 | $155.60 | 20,620 | $3,208,472 |
| 4/2/2018 | $156.67 | 11,610 | $1,818,939 |
| 4/2/2018 | $157.65 | 3,500 | $551,775 |
| 4/2/2018 | $158.54 | 2,400 | $380,496 |
| 4/18/2018 | $166.66 | 40,261 | $6,709,898 |
| 4/18/2018 | $167.32 | 14,739 | $2,466,129 |
| 5/14/2018 | $186.84 | 43,789 | $8,181,537 |
| 5/14/2018 | $187.51 | 11,211 | $2,102,175 |
| 5/30/2018 | $185.88 | 12,492 | $2,322,013 |
| 5/30/2018 | $186.80 | 5,200 | $971,360 |
| 5/30/2018 | $187.72 | 37,308 | $7,003,458 |
| 6/12/2018 | $192.20 | 46,206 | $8,880,793 |
| 6/12/2018 | $192.92 | 8,794 | $1,696,538 |

| Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 6/28/2018 | $193.94 | 4,424 | $857,991 |
| 6/28/2018 | $194.94 | 17,172 | $3,347,510 |
| 6/28/2018 | $195.79 | 24,444 | $4,785,891 |
| 6/28/2018 | $196.71 | 8,960 | $1,762,522 |
| 7/19/2018 | $208.32 | 41,078 | $8,557,369 |
| 7/19/2018 | $209.16 | 13,922 | $2,911,926 |
| | **Totals** | **2,589,000** | **$389,943,538** |

## C.     Wehner's $21 Million Insider Sales

503.     Defendant Wehner also unloaded large amounts of Facebook stock during the Class Period, as the following chart demonstrates:

| Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 2/21/2017 | $133.50 | 6,584 | $878,964 |
| 3/1/2017 | $136.50 | 1,209 | $165,029 |
| 3/1/2017 | $136.90 | 806 | $110,341 |
| 4/24/2017 | $144.96 | 16,008 | $2,320,520 |
| 4/28/2017 | $149.90 | 20,000 | $2,998,000 |
| 5/19/2017 | $148.47 | 15,470 | $2,296,831 |
| 8/21/2017 | $167.16 | 15,470 | $2,585,965 |
| 11/21/2017 | $179.05 | 15,470 | $2,769,904 |
| 2/22/2018 | $178.79 | 14,901 | $2,664,150 |
| 5/16/2018 | $183.61 | 9,522 | $1,748,334 |
| 5/21/2018 | $184.90 | 4,761 | $880,309 |
| 6/20/2018 | $199.90 | 10,000 | $1,999,000 |
| | **Totals** | **130,201** | **$21,417,346** |

## VIII.   ADDITIONAL ALLEGATIONS OF RELIANCE, MATERIALITY, LOSS CAUSATION AND DAMAGES

504.     Lead Plaintiff and other members of the Class suffered damages as a result of the misrepresentations and omissions alleged herein when the circumstances, events and conditions concealed from investors became known to the market, or the risks arising from those circumstances, conditions and events manifested, causing declines in the market price of Facebook common stock, which trades in an efficient market.

### A.     Market Efficiency

505.     Through the efficient operation of the markets in which Facebook common stock was publicly traded, Lead Plaintiff and the other members of the proposed Class may be presumed to have relied upon each of the false and misleading statements alleged herein.

1     506.   At all relevant times, the market for Facebook's common stock was an efficient

2  market for the following reasons, among others:

3          (a)    Facebook's stock met the requirements for listing, and was listed and

4  actively traded on the NASDAQ Global Select Market, a highly efficient and automated market;

5          (b)    As a regulated issuer, Facebook filed periodic public reports with the SEC

6  and the NASDAQ and was, at all times alleged herein, eligible to file a Form S-3 with the SEC;

7          (c)    Facebook regularly communicated with public investors via established

8  market communication mechanisms, including through regular disseminations of press releases

9  on the national circuits of major newswire services, publications on its website and other Internet

10  sites, and through other wide-ranging public disclosures, such as through conference calls,

11  communications with the financial press and other similar reporting services;

12          (d)    During the Class Period, Facebook was followed by securities analysts

13  employed by major brokerage firms.  Analysts employed by each of these firms regularly wrote

14  reports based upon the publicly available information disseminated by defendants about

15  Facebook.  These reports were distributed to the sales force and certain customers of their

16  respective brokerage firms;

17          (e)    Institutions collectively owned more than two-thirds of Facebook's

18  outstanding shares during the Class Period.  Each of these institutions regularly analyzed and

19  reported on the publicly available information about Facebook and its operations; and

20          (f)    During the Class Period, the average daily trading volume of Facebook

21  common stock was greater than 20 million shares.

22     507.   Through the foregoing mechanisms, the information publicly disseminated by

23  defendants about the Company and its operations, and the import thereof, became widely

24  available to and was acted upon by investors in the marketplace such that, as a result of their

25  transactions in Facebook stock, the information disseminated by defendants, including the false

26  and misleading statements described above, became incorporated into and were reflected by the

27  market price of Facebook's common stock.

28

508.     Under these circumstances, all purchasers of Facebook's common stock during the Class Period are presumed to have relied upon the false and misleading statements and material omissions alleged herein.

B.     **Loss Causation and Damages**

509.     Each member of the proposed Class suffered economic losses as a direct and proximate result of the fraud alleged herein.  Each Class member suffered similar injury as a result of: (i) their purchase of Facebook's common stock at prices that were higher than they would have been had defendants made truthful and complete disclosures of information about the Company as necessary to prevent the statements, omissions and course of business alleged herein from being materially false or misleading to investors; and (ii) their retention of those shares through the date of one or more declines in the market price of those shares that was caused by the revelation of defendants' misrepresentations and omissions and the risks concealed from investors by defendants' scheme to defraud, or the financial consequences of their concealed actions.

510.     The misrepresentations and omissions alleged herein impacted the public trading price for Facebook's common stock by causing it to trade at a price higher than it would have had the facts, risks and conditions concealed by defendants' fraud become known sooner than it did. The impact on Facebook's stock price occurred by increasing the trading price of Facebook stock at the time of the misrepresentation or by preventing a price decline that would have occurred at that time with the full disclosure of the truth, or both.

511.     The facts, risks and conditions concealed from investors by defendants' scheme to defraud reached the market through a series of partial disclosures.  Though each of the disclosures was incomplete, each revealed some of the falsity of defendants' statements regarding user control over data, the Cambridge Analytica matter, and other elements of defendants' fraud alleged herein, including the concealed materialization of risks to its operations, leading to price declines that partially corrected Facebook's stock price by reducing the extent to which it had been inflated by defendants' fraud scheme, thereby injuring Lead Plaintiffs and other members of the Class who had purchased Facebook securities during the Class Period at prices that had been artificially

inflated by the fraudulent course of business and misleading statements and omissions alleged herein.

512.     The disclosures that impacted the price of Facebook's common stock include those identified in the chart below, which identifies each event, the change in Facebook's stock price on the day of the event, and, for purposes of comparison, the percentage change during the same time period in the Standard & Poor's 500 Stock Index ("S&P 500"), one of the market indices to which Facebook compares its stock performance in its annual reports to the SEC:

| Date | Event[453] | Facebook | | S&P 500[454] |
|---|---|---|---|---|
| | | $ Δ | % Δ | % Δ |
| 3/19/18 | *NYT & Guardian* reports | ($12.53) | (6.8%) | (1.4%) |
| 3/20/18 | Continuing revelations of extent of data breach and lax enforcement, and of regulatory and user backlash | ($4.41) | (2.6%) | 0.15% |
| 3/22/18 | | ($4.50) | (2.7%) | (2.5%) |
| 3/23/18 | | ($5.50) | (3.3%) | (2.1%) |
| 3/27/18 | | ($7.84) | (4.9%) | (1.7%) |
| 4/26/18 | 1Q18 Earnings Release | $14.47 | 9.1% | 1.0% |
| 7/26/18 | 2Q18 Earnings Release | ($41.24) | (19.0%) | (0.3%) |

513.     On Monday, March 19, 2018, following the numerous disclosures over the preceding weekend regarding the misuse of Facebook user data – including the press release issued by Facebook after the market closed on Friday, March 16, 2018 and the articles published by *The New York Times* and *The Guardian* on Saturday, March 17, 2018 caused the price of Facebook common stock to decline.  The shares opened at $177.01 – a 4.4% decline from the previous Friday's closing price.  Over the course of the day, as additional news regarding the

---

[453] In some cases, the identified event occurred after the market closed on the preceding trading day but prior to the date indicated in the chart, which is the date of the relevant price decline.  The list of events identified herein is necessarily preliminary, and based upon Lead Plaintiff's analysis and investigation to date.  Upon further investigation and discovery and additional analysis, Lead Plaintiff may change, alter or amend their theory of damages, including by identifying different or additional inflationary and corrective events that caused or contributed to the damages claimed in this action, or by using other industry indices or competitor stock price data to more precisely establish the magnitude of the Company-specific change arising from those events.

[454] The chart indicates the percentage change in the S&P 500 Index as a whole.  Part of the change in the index price therefore reflects the change in the price of Facebook stock, which represents a significant portion of the index.  As a result, the company-specific portion of the price changes reflected in the chart is actually greater than indicated by a simple comparison of Facebook's price change to the change in the market index.

1    extent of the data breach emerged, Facebook's stock continued to decline.  Facebook closed at

2    $172.56, a 6.8% decline from the prior Friday's closing price on volume of 88 million shares,

3    more than four times the average trading volume during the Class Period.

4          514.    The price of Facebook common stock continued to decline thereafter as a result of

5    additional disclosures of material information regarding the extent of the data breach, Facebook's

6    misrepresentations about its response to that breach, and the magnitude of the risks facing the

7    Company.  By the close of the market on March 27, 2018, the price of Facebook common stock

8    had declined to $152.22 as a result of such disclosures, completing a stunning 17.8% ($32.87)

9    decline in the price of its shares immediately before Facebook's failure to retrieve user data from

10   Cambridge Analytica and other third parties was disclosed.   Following are just some of the

11   disclosure that caused Facebook's stock price to decline:

12
13   > On March 18, 2018, Wylie tweeted that he had been "Suspended by @facebook.
>     For blowing the whistle.  ***On something they have known privately for 2
>     years***"[455];

14
15   > On March 19, 2018, *The New York Times* reported that Facebook's Chief
16   >   Information Security Officer, had been forced to resign from the Company in
>     December 2017 as a result of the growing investigations into Facebook's role in
17   >   allowing Russian hacking to occur on its platform during the 2016 U.S.
>     presidential election[456];

18   > On March 20, 2018, *The Guardian* reported that app developers routinely
19   >   practiced data harvesting using the Facebook platform, and, as a result, data from
>     hundreds of millions of users was at risk of being exploited through tactics similar
20   >   to Cambridge Analytica's.  This news, and additional disclosures regarding the
>     widening scope of the data privacy risks, including calls for users to
21   >   "#deleteFacebook" and unconfirmed reports of government investigations into the
>     matter, caused the Company's stock price to fall further, closing at $168.15, a
22   >   further 2.6% decline in the value of Facebook shares; and

23   > Also on March 20, 2018, *The Guardian* reported that Parakilas – the platform
24   >   operations manager responsible for policing access to Facebook data in 2011 and
>     2012 – had stated that Facebook's lax data use policies had likely been exploited

25

26   ___

[455] @chrisinsilico, TWITTER (Mar. 18, 2018), https://tinyurl.com/yd9do32r.

27   [456] Nicole Perlroth, Sheera Frenkel & Scott Shane, *Facebook Exit Hint at Dissent on Handling of*
28   *Russian Trolls*, N.Y. Times (Mar. 19, 2018), https://tinyurl.com/y85ktx41.

by numerous other app developers, putting the data of hundreds of millions more Facebook users at risk.[457]

515.    On March 21, 2018, Zuckerberg and Sandberg began conducting media interviews designed to assure investors, users and the public that defendants were taking responsibility for their actions, were doing everything they could to correct the problem, and that Cambridge Analytica had deceived them into believing that it had destroyed the purloined user data in 2015. As a result of defendants' public relations campaign, the decline in Facebook's share price was temporarily halted, and Facebook's stock closed at $169.39, less than a percentage point higher than its closing price on March 20.

516.    However, as additional details emerged concerning the scope of the data breach, the risks facing the Company, and increased calls for government investigations, Facebook's stock price resumed its decline, closing at $159.39 on Friday, March 23, 2018, completing an overall decline of $25.70/share (14%) from the closing price the prior Friday before the scandal broke.

517.    On March 27, 2018, the price of Facebook common stock fell by $7.84/share, a 4.9% decline from the prior day's close.  This decline was the result of continuing revelations of the extent of the data breach and the risks to the Company, including the FTC's confirmation that it had opened an investigation into Facebook's compliance with the 2012 FTC Consent Decree.

518.    On April 26, 2018, Facebook's stock price rocketed upwards by 9% as the Company reported 1Q18 earnings which, together with the statements made by defendants on the earnings call that day, led many analysts and investors to believe that the data breach had only had a negligible impact on user engagement with Facebook's platform.

519.    On July 26, 2018, however, Facebook announced its earnings for the second quarter of 2018.  This announcement revealed the true extent of the damage of the Cambridge Analytica scandal and caused Facebook's stock to plummet by 19%.  Defendants revealed that the data privacy scandal had caused a far greater impact on the Company than they had previously

[457] Paul Lewis, *'Utterly Horrifying': ex-Facebook insider says covert data harvesting was routine*, Guardian (Mar. 20, 2018), https://tinyurl.com/ybdonk3p.

1  represented, resulting in dramatically lowered user engagement, substantially decreased

2  advertising revenue and earnings, and reduced growth expectations going forward.

3    520.    The decline in user engagement, advertising revenues, and guidance for the

4  remainder of the year – alongside the increased spending that Facebook was required to undertake

5  to protect user data from being exploited – were the result of defendants' concealment of the risks

6  arising from the Cambridge Analytica data breach; defendants' false assurances about the

7  adequacy of the Company's prior response to that incident; and the adequacy of the measures that

8  defendants imposed to prevent similar events from occurring in the future or to curtail the harm

9  if they did.

10    521.    Facebook's quarterly results were a direct and proximate result of the concealed

11  problems with the Company's decision to grow at the expense of protecting user privacy.  The

12  Company's costs ballooned to $7.4 billion, a 50% increase from the prior year.  Much of the

13  increase resulted from measures imposed to protect user data from exploitation, including to

14  provide the level of protection that the Company had previously, and falsely, asserted it was

15  already providing.  Capital expenditures similarly rose 133% from the prior year, reflecting

16  spending on infrastructure necessary to render Facebook's services safe for users.

17    522.    Investors and analysts explicitly connected the historic decline in Facebook's

18  market capitalization to the Cambridge Analytica scandal – and related privacy concerns,

19  including the recent implementation of GDPR in Europe, that had shaken the Company over the

20  previous months.

21    523.    For instance, on July 26, 2018, CFRA issued a report noting, "[w]e lower our EPS

22  estimates for 2018 to $7.29 from $7.42 and 2019 to $8.24 from $8.63, given what we see as FB's

23  *efforts to invest significantly to respond to the Cambridge Analytica revelations*."[458]  Cowen

24  similarly noted that the decline in advertising revenue that Facebook was bringing in was driven

25  in part by "*privacy via features that could reduce ad targeting capabilities* (like clearing user

26

27  ――――――――――――――――――
     [458] Scott Kessler, *CFRA Reiterates Hold Opinion on Shares of Facebook, Inc.*, CFRA (July 26,

28  2018).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD
                                                                         - 178 -

1    history) and GDPR impact on users in Europe (as some users don't opt in for tracking usage)."[459]

2    Wells Fargo was noted its concern over the negative impact "*of the continued efforts around*

3    *security and privacy*, both from the standpoint of GDPR implementation as well as new services

4    and controls that offer more ways for users to opt out of ads," and its report also mentioned the

5    magnitude of the "*Security & Privacy efforts*" that Facebook was now being forced to impose.[460]

6           524.   Additionally, J.P. Morgan's report on July 26, 2018, stated, "FB is seeing some

7    headwinds from data & privacy related issues . . . .  For 2H18, FB also called out privacy as likely

8    to drag on revenue growth.  FB is giving users more choices around privacy & how their data is

9    used, & we believe advertisers are also being more cautious around targeting consumers."[461]

10   Macquarie's analysts similarly described their "concerns re LT trends/headlines are forcing

11   significant changes to user privacy/data concerns.  In 3Q, we expect that users globally may be

12   offered options that go well beyond GDPR changes.  Such changes are likely a key driver of the

13   4Q revenue guidance."[462]

14          525.   Barclays issued a research report titled "FB Throws Some Napalm on the Fire"

15   that described:

16          **Key Take-Away: Either Core Is Imploding or FB Wants Self-Inflicted Pain**

17          We haven't seen this disastrous a print since the 1Q16 LNKD-massacre that
18          brought the entire NASDAQ down.  The two theories we could come up with as
             to why FB is guiding revenue down severely with 3Q and 4Q now expected to
19          both decelerate high single digits sequentially are: 1) they don't want to create the

20   [459] John Blackledge, Nick Yako, et al., *2Q18 Results: 2H18 Ad Rev Decel and L-T Margin*
21   *Forecast Worse Than Expected*, Cowen (July 26, 2018).

22   [460] Ken Sena, Peter Stabler, et al., *FB: Coming Up Against Scale*, Wells Fargo Securities (July 25, 2018).

23   [461] Doug Anmuth, Ashwin Kesireddy, et al., *Major Reset Stories & Data/Privacy Drag on N-T*
24   *Revs Heavy Investments Continue; Remain OW, PT to $205 Dropping from AFL*, J.P. Morgan (July 26, 2018).

25   [462] Benjamin Schachter, Ed Alter & Angela Newell, *2Q'18 Bombshell Guidance; Structural*
26   *Shifts*, Macquarie Research (July 26, 2018); *see also* Shelby Seyrafi, CFA, *FB: Major Guidance*
     *Reset, but we Suspect the Company is Conservatively Creating a Lower Bar*, FBN Securities (July
27   26, 2018) ("Drivers of the deceleration . . . . On privacy/GDPR, the data we came across was a
     bit mixed, but it appears that the negative impact was worse than we had modeled. . . .  Moreover,
28   this was with basically a half-quarter's impact from GDPR, as this was instituted in May.")

perception of getting rich while their product presents issues for society (but why didn't this happen on the Jan/April calls?), or 2) *there are more serious engagement problems with core Facebook that have materialized recently that they are trying to fix*.[463]

526.     Journalists and commentators also connected Facebook's earnings report for the second quarter of 2018 to the privacy scandals that had ensnared the Company earlier in the year. For example, CNBC headlined its July 25, 2018 video report on Facebook's earnings miss, "Facebook shares collapse *as a result of Cambridge Analytica*."[464]  Bloomberg noted on July 25, 2018, "Facebook Takes Historic Plunge as *Scandals Finally Take a Toll*."[465] The New York Times similarly headlined its story, "Facebook starts paying a price for scandals"[466] CNET.com's reporting suggested that the July 2018 stock collapse was the inevitable end-point of the Company's continuing response to the Cambridge Analytica privacy scandal, noting, "Until now . . . there was a sense that the vast majority of users didn't fully understand Facebook's business. But the ongoing scandals have caused many people to take another look."[467]

527.     Reporting for *Forbes* in a July 29, 2018 article titled "Profit Versus Privacy: Facebook's Stock Collapse and its Empty 'Privacy First' Policy," Kalev Leetaru described, "At the center of [Facebook's] pessimistic outlook? The *increasing impact of the profit versus privacy battle at the center of the Cambridge Analytica story* and the growing inability of Facebook to control its platform and protect it from harmful misuse."[468] In *Tech Republic*, James

---

[463] Ross Sandler, Deepak Mathivanan, et al., *FB Throws Some Napalm On The Fire*, Barclays Equity Research (July 26, 2018).

[464] Julia Boorstin, *Facebook shares collapse as a result of Cambridge Analytica election scandal*, CNBC (July 25, 2018), https://tinyurl.com/yaaqqbw8.

[465] Sarah Frier*, Facebook Takes Historic Plunge as Scandals Finally Take a Toll*, Bloomberg (July 25, 2018), https://tinyurl.com/ycubn6mb.

[466] Sheera Frankel, *Facebook Starts Paying a Price for Scandals*, N.Y. Times (July 25, 2018), https://tinyurl.com/y9rug8ru.

[467] Richard Hieva, *Facebooks bad year just got worse*, CNet.com (July 26, 2018), https://tinyurl.com/y7hpmxlv.

[468] Kalev Leetaru, *Profit Versus Privacy: Facebook's Stock Collapse and its Empty 'Privacy First' Policy*, Forbes (July 29, 2018), https://tinyurl.com/yc9vopf7.

1    Sanders published a report on that described the "fallout from a confluence of factors in the

2    **Facebook data privacy scandal** has come to bear in the last week of July 2018."[469] *USA Today*

3    noted that the "Cambridge Analytica scandal [was] one of many reasons for [Facebook's] stock

4    plunge."[470] And The Washington Post explained, "The cost of years of privacy missteps finally

5    caught up with Facebook this week. . . .  Worries about the rising costs of privacy regulations and

6    controversies, along with declining growth in users and revenue played a key role in a major Wall

7    Street sell-off . . . ."[471]

8            528.    Overseas, the news reports were comparable. *The Guardian* reported on July 26,

9    2018, "More than $119bn (£90.8bn) has been wiped off Facebook's market value, which includes

10   a $17bn hit to the fortune of its founder, Mark Zuckerberg, **after the company told investors that**

11   **user growth had slowed in the wake of the Cambridge Analytica scandal**."[472]  The Independent

12   (UK) also headlined an article, "Facebook shares **plummet over privacy scandal** and slow growth

13   in new users."[473]

14   **IX.    CLASS ACTION ALLEGATIONS**

15           529.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal

16   Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Facebook

17   common stock during the Class Period (the "Class").  Excluded from the Class are defendants

18   and their immediate families, directors and officers of Facebook and their immediate families,

19   and each of the foregoing persons' legal representatives, heirs, successors or assigns, and any

20   entity in which defendants have or had a controlling interest.

21

22   [469] James Sanders, *Facebook data privacy: A cheat sheet*, Tech Republic (Sept. 12, 2018),
23   https://tinyurl.com/yclp5a2w.

24   [470] Jessica Guynn, *Why Facebook had its worst day is complicated*, USA Today, (July 28, 2018).

25   [471] Craig Timberg and Elizabeth Dwoskin, *How years of privacy controversies finally caught up
     with Facebook*, Wash. Post (July 26, 2018), https://tinyurl.com/y7kn8o9x.

26   [472] Rupert Neate, *Over $119bn wiped off Facebook's market cap after growth shock*, Guardian
     (July 26, 2018), https://tinyurl.com/yat6o6og.

27   [473] Tom Embury-Dennis, *Facebook shares plummet over privacy scandal and slow growth in new
28   users*, Independent (July 25, 2018), https://tinyurl.com/ybm8uuk2.

530.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, Facebook had more than 2.395 billion shares of common stock outstanding, owned by hundreds or thousands of persons.

531.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    Whether the 1934 Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the price of Facebook common stock was artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

532.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from defendants' wrongful conduct.

533.    There is a presumption that each of the members of the Class relied on the misrepresentations and omissions alleged herein, pursuant to the fraud on the market theory as well as under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) where the acts complained of are predicated upon omissions of material facts.

534.    The misconduct alleged herein operated as a fraud on the market as it impacted the market price of Facebook common stock, including because:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

1

(c)      the Company's stock traded in an efficient market;

2

(d)      the misrepresentations alleged would tend to induce a reasonable investor

3
to misjudge the value of the Company's stock; and

4

(e)      Plaintiffs and other members of the Class purchased Facebook common

5
stock between the time defendants misrepresented or failed to disclose material facts and the time

6
the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

7

535.    Plaintiffs will adequately protect the interests of the Class and has retained counsel

8
who are experienced in class action securities litigation.  Plaintiffs have no interest which conflicts

9
with those of the Class.

10

536.    A class action is superior to other available methods for the fair and efficient

11
adjudication of this controversy.

12
**X.      CLAIMS FOR RELIEF**

13
**COUNT I**
**For Violation of §10(b) of the 1934 Act and Rule 10b-5**

14
**Against All Defendants**

15

537.    Plaintiffs incorporate all prior allegations by reference.

16

538.    During the Class Period, defendants disseminated or approved the false statements

17
specified above, which they knew or recklessly disregarded were misleading in that they

18
contained misrepresentations and failed to disclose material facts necessary in order to make the

19
statements made, in light of the circumstances under which they were made, not misleading.

20

539.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

21

(a)      Employed devices, schemes and artifices to defraud;

22

(b)      Made untrue statements of material fact or omitted to state material facts

23
necessary in order to make the statements made, in light of the circumstances under which they

24
were made, not misleading; or

25

(c)      Engaged in acts, practices and a course of business that operated as a fraud

26
or deceit upon plaintiff and others similarly situated in connection with their purchases of

27
Facebook common stock during the Class Period.

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

- 183 -

540.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Facebook common stock.  Plaintiffs and the Class would not have purchased Facebook common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

541.   As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Facebook common stock during the Class Period.

**COUNT II**
**For Violation of §20(a) of the 1934**
**Act Against All Defendants**

542.   Plaintiffs incorporate all prior allegations by reference.

543.   During the Class Period, defendants acted as controlling persons of Facebook within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about Facebook, the Executive Defendants had the power and ability to control the actions of Facebook and its employees.   Facebook controlled the Executive Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

**COUNT III**
**For Violations of §20A of the Exchange Act**
**Against Defendant Mark Zuckerberg**

544.   Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.  As set forth in the paragraphs above and below, defendant Zuckerberg committed underlying violations of §10(b) and Rule 10b-5 thereunder by selling Facebook common stock while in possession of material nonpublic information about the Company's deficient privacy protections and material risks to the Company and, consequently, is liable to contemporaneous purchasers of that stock under §20A of the Exchange Act.

545.   Under §20A of the Exchange Act, "[a]ny person who violates any provision of this title or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action . . . to any person who,

1  contemporaneously with the purchase or sale of securities that is the subject of such violation, has

2  purchased (where such violation is based on a sale of securities) or sold (where such violation is

3  based on a purchase of securities) securities of the same class."  15 U.S.C. §78t-1(a).

4     546.  Throughout the Class Period, defendant Zuckerberg was in possession of material

5  nonpublic information regarding Facebook's deficient privacy protections and material risks to

6  the Company.

7     547.  Defendant Zuckerberg's aggregated daily insider sales of his Facebook Class A

8  common stock during the Class Period are shown in the table below:

| Trade Date | Shares | Insider Sale Proceeds | Trade Date | Shares | Insider Sale Proceeds |
|---|---|---|---|---|---|
| 2/27/2017 | 192,874 | $26,249,516 | 4/6/2018 | 145,000 | $23,049,687 |
| 2/28/2017 | 193,242 | $26,249,687 | 4/9/2018 | 162,000 | $25,765,797 |
| 3/8/2017 | 190,638 | $26,249,493 | 4/10/2018 | 162,000 | $26,077,639 |
| 3/9/2017 | 189,998 | $26,249,525 | 4/11/2018 | 145,000 | $24,059,149 |
| 3/17/2017 | 187,604 | $26,249,636 | 4/12/2018 | 145,000 | $23,853,082 |
| 3/20/2017 | 187,728 | $26,249,745 | 4/13/2018 | 145,000 | $23,885,937 |
| 3/30/2017 | 70,219 | $9,999,858 | 4/16/2018 | 145,000 | $23,893,540 |
| 3/31/2017 | 70,275 | $9,999,797 | 4/17/2018 | 145,000 | $24,348,750 |
| 4/11/2017 | 187,767 | $26,249,778 | 4/18/2018 | 145,000 | $24,190,673 |
| 4/12/2017 | 187,687 | $26,249,593 | 4/19/2018 | 162,000 | $27,014,864 |
| 5/16/2017 | 141,950 | $21,249,850 | 4/20/2018 | 162,000 | $27,052,706 |
| 5/17/2017 | 144,437 | $21,249,779 | 4/23/2018 | 145,000 | $24,161,233 |
| 5/26/2017 | 140,064 | $21,249,886 | 4/24/2018 | 145,000 | $23,426,871 |
| 5/30/2017 | 139,469 | $21,249,655 | 4/25/2018 | 145,000 | $23,087,982 |
| 6/8/2017 | 138,149 | $21,249,717 | 4/26/2018 | 212,557 | $37,088,554 |
| 6/9/2017 | 138,846 | $21,249,129 | 4/27/2018 | 177,028 | $30,883,270 |
| 6/21/2017 | 138,813 | $21,249,578 | 4/30/2018 | 156,967 | $27,260,171 |
| 6/22/2017 | 138,205 | $21,249,941 | 5/1/2018 | 145,000 | $24,908,295 |
| 6/29/2017 | 140,841 | $21,249,271 | 5/2/2018 | 220,000 | $38,862,071 |
| 6/30/2017 | 140,595 | $21,249,035 | 5/3/2018 | 199,530 | $34,808,784 |
| 7/12/2017 | 134,599 | $21,249,617 | 5/4/2018 | 237,000 | $41,697,212 |
| 7/13/2017 | 133,501 | $21,249,680 | 5/7/2018 | 237,000 | $42,287,824 |
| 8/14/2017 | 124,625 | $21,249,796 | 5/8/2018 | 220,000 | $39,186,693 |
| 8/15/2017 | 124,359 | $21,249,595 | 5/9/2018 | 220,000 | $39,885,285 |
| 8/25/2017 | 127,342 | $21,249,709 | 5/10/2018 | 220,000 | $40,669,369 |
| 8/28/2017 | 127,183 | $21,249,553 | 5/11/2018 | 220,000 | $40,987,320 |
| 9/7/2017 | 123,644 | $21,249,717 | 5/14/2018 | 220,000 | $41,137,360 |
| 9/8/2017 | 123,503 | $21,249,854 | 5/15/2018 | 220,000 | $40,479,883 |

| | | | | | |
|---|---|---|---|---|---|
| 9/19/2017 | 123,815 | $21,249,679 | 5/16/2018 | 220,000 | $40,354,785 |
| 9/20/2017 | 123,637 | $21,249,477 | 5/17/2018 | 220,000 | $40,343,839 |
| 9/29/2017 | 124,633 | $21,249,547 | 5/18/2018 | 237,000 | $43,391,467 |
| 10/2/2017 | 124,894 | $21,249,517 | 5/21/2018 | 237,000 | $43,683,830 |
| 10/11/2017 | 123,485 | $21,249,788 | 5/22/2018 | 220,000 | $40,553,419 |
| 10/12/2017 | 122,752 | $21,249,620 | 5/23/2018 | 220,000 | $40,618,621 |
| 11/14/2017 | 119,230 | $21,249,761 | 5/24/2018 | 220,000 | $40,934,971 |
| 11/15/2017 | 119,485 | $21,249,412 | 5/25/2018 | 220,000 | $40,745,841 |
| 11/27/2017 | 116,141 | $21,249,533 | 5/29/2018 | 220,000 | $40,790,973 |
| 11/28/2017 | 115,997 | $21,249,612 | 5/30/2018 | 220,000 | $41,182,290 |
| 12/7/2017 | 119,098 | $21,249,707 | 5/31/2018 | 220,000 | $41,937,965 |
| 12/8/2017 | 117,829 | $21,249,838 | 6/1/2018 | 237,000 | $45,853,073 |
| 2/12/2018 | 220,000 | $38,635,723 | 6/4/2018 | 237,000 | $45,737,922 |
| 2/13/2018 | 177,200 | $30,929,013 | 6/5/2018 | 220,600 | $42,718,882 |
| 2/14/2018 | 220,000 | $39,026,000 | 6/6/2018 | 220,000 | $41,897,754 |
| 2/15/2018 | 245,400 | $43,901,109 | 6/7/2018 | 220,000 | $41,413,594 |
| 2/16/2018 | 245,400 | $43,719,265 | 6/8/2018 | 220,000 | $41,513,378 |
| 2/20/2018 | 220,000 | $38,835,127 | 6/11/2018 | 220,000 | $42,033,413 |
| 2/21/2018 | 228,400 | $40,904,384 | 6/12/2018 | 220,000 | $42,309,938 |
| 2/22/2018 | 228,400 | $40,881,223 | 6/13/2018 | 237,000 | $45,760,485 |
| 2/23/2018 | 220,000 | $40,014,898 | 6/14/2018 | 267,000 | $52,214,130 |
| 2/26/2018 | 220,000 | $40,618,821 | 6/15/2018 | 250,000 | $48,974,895 |
| 2/27/2018 | 220,000 | $40,253,285 | 6/18/2018 | 247,500 | $49,027,822 |
| 2/28/2018 | 245,400 | $44,529,455 | 6/19/2018 | 240,000 | $47,044,460 |
| 3/1/2018 | 245,400 | $43,423,597 | 6/20/2018 | 240,000 | $48,417,988 |
| 3/2/2018 | 220,000 | $38,500,131 | 6/21/2018 | 240,000 | $48,461,671 |
| 3/5/2018 | 220,000 | $39,410,874 | 6/22/2018 | 240,000 | $48,211,475 |
| 3/6/2018 | 220,000 | $39,720,907 | 6/25/2018 | 240,000 | $47,074,618 |
| 3/7/2018 | 220,000 | $39,907,908 | 6/26/2018 | 240,000 | $47,451,913 |
| 3/8/2018 | 228,400 | $41,692,621 | 6/27/2018 | 257,000 | $51,140,945 |
| 3/9/2018 | 228,400 | $42,162,003 | 6/28/2018 | 257,000 | $50,254,415 |
| 3/12/2018 | 220,000 | $40,732,522 | 6/29/2018 | 236,615 | $46,329,394 |
| 3/13/2018 | 220,000 | $40,225,112 | 7/2/2018 | 240,000 | $46,799,219 |
| 3/14/2018 | 245,400 | $44,942,497 | 7/3/2018 | 212,600 | $41,166,309 |
| 3/15/2018 | 245,400 | $44,939,108 | 7/5/2018 | 240,000 | $47,066,812 |
| 3/16/2018 | 220,000 | $40,594,574 | 7/6/2018 | 240,000 | $48,316,665 |
| 3/19/2018 | 175,246 | $30,504,876 | 7/9/2018 | 240,000 | $48,996,111 |
| 3/20/2018 | 145,000 | $24,158,892 | 7/10/2018 | 257,000 | $52,357,773 |
| 3/21/2018 | 153,400 | $25,808,227 | 7/11/2018 | 257,000 | $52,255,054 |
| 3/22/2018 | 152,700 | $25,441,367 | 7/12/2018 | 240,000 | $49,371,961 |
| 3/23/2018 | 145,000 | $23,674,979 | 7/13/2018 | 240,000 | $49,752,309 |
| 3/26/2018 | 145,000 | $22,555,546 | 7/16/2018 | 240,000 | $49,841,323 |

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD

| 3/27/2018 | 153,539 | $24,175,526 | | 7/17/2018 | 240,000 | $49,981,589 |
|---|---|---|---|---|---|---|
| 3/28/2018 | 140,200 | $21,527,971 | | 7/18/2018 | 240,000 | $50,343,432 |
| 3/29/2018 | 145,000 | $22,978,944 | | 7/19/2018 | 240,000 | $50,047,178 |
| 4/2/2018 | 145,000 | $22,610,877 | | 7/20/2018 | 240,000 | $50,404,452 |
| 4/3/2018 | 145,000 | $22,462,916 | | 7/23/2018 | 257,000 | $54,134,125 |
| 4/4/2018 | 145,000 | $22,237,405 | | 7/24/2018 | 257,000 | $55,141,446 |
| 4/5/2018 | 145,000 | $23,081,281 | | 7/25/2018 | 240,000 | $52,010,641 |
| | | | | **Total** | **29,451,835** | **$5,297,581,009** |

548. Contemporaneously with defendant Zuckerberg's insider sales, Plaintiffs purchased a total of 260,091 shares of Facebook Class A common stock for a total of more than $44.6 million between February 3, 2017 and July 25, 2018. Plaintiffs' contemporaneous purchases included:

| Lead Plaintiff | Date | Shares | Purchase Amount | No. of Days After Zuckerberg Sale |
|---|---|---|---|---|
| Mississippi | 3/17/2017 | 4,050 | $566,329 | Same day |
| Mississippi | 3/21/2017 | 16,219 | $2,272,893 | 1 day |
| Amalgamated | 3/31/2017 | 3,611 | $512,961 | Same day |
| Amalgamated | 4/3/2017 | 1,387 | $197,349 | 3 days |
| Mississippi | 6/16/2017 | 4,035 | $607,796 | 7 days |
| Amalgamated | 6/23/2017 | 3,937 | $610,530 | 1 day |
| Amalgamated | 8/16/2017 | 100 | $17,013 | 1 day |
| Mississippi | 8/16/2017 | 5,200 | $883,812 | 1 day |
| Amalgamated | 8/29/2017 | 300 | $50,428 | 1 day |
| Amalgamated | 8/29/2017 | 10 | $1,681 | 1 day |
| Mississippi | 9/15/2017 | 1,311 | $225,008 | 7 days |
| Amalgamated | 9/18/2017 | 1 | $170 | 10 days |
| Amalgamated | 10/3/2017 | 20 | $3,401 | 1 day |
| Amalgamated | 10/19/2017 | 10 | $1,741 | 7 days |
| Mississippi | 12/15/2017 | 3,218 | $579,787 | 7 days |
| Amalgamated | 12/18/2017 | 226 | $40,866 | 10 days |
| Amalgamated | 3/2/2018 | 1,200 | $210,823 | Same day |
| Amalgamated | 3/2/2018 | 50 | $8,784 | Same day |
| Mississippi | 3/16/2018 | 2,898 | $536,368 | Same day |
| Amalgamated | 3/19/2018 | 1,414 | $244,007 | Same day |
| Mississippi | 3/19/2018 | 62,000 | $10,634,662 | Same day |
| Amalgamated | 3/20/2018 | 1,800 | $293,672 | Same day |
| Amalgamated | 3/20/2018 | 50 | $8,158 | Same day |
| Mississippi | 3/26/2018 | 55,000 | $8,590,126 | Same day |
| Amalgamated | 4/11/2018 | 300 | $49,995 | Same day |
| Amalgamated | 4/11/2018 | 10 | $1,666 | Same day |
| Mississippi | 4/27/2018 | 18,978 | $3,305,763 | Same day |
| Amalgamated | 5/2/2018 | 60 | $10,599 | Same day |

| Mississippi | 5/14/2018 | 9,444 | $1,766,417 | Same day |
| Amalgamated | 5/29/2018 | 100 | $18,632 | Same day |
| Amalgamated | 6/8/2018 | 2,021 | $382,191 | Same day |
| Mississippi | 6/13/2018 | 34,609 | $6,690,716 | Same day |
| Mississippi | 6/15/2018 | 3,132 | $613,372 | Same day |
| Amalgamated | 6/19/2018 | 100 | $19,562 | Same day |
| Amalgamated | 6/19/2018 | 10 | $1,956 | Same day |
| Amalgamated | 6/22/2018 | 6,155 | $1,241,771 | Same day |
| Mississippi | 6/27/2018 | 16,214 | $3,211,359 | Same day |
| Mississippi | 7/17/2018 | 911 | $189,251 | Same day |
| **Total** | | **260,091** | **$44,601,615** | |

549.    Tens of thousands of other Class members, if not more, also purchased shares contemporaneously with defendant Zuckerberg's insider sales during the Class Period.  Facebook had a total of nearly 7.6 billion shares traded in the United States during the Class Period, or an average daily trading volume of more than 20.4 million shares.  On each of the days that defendant Zuckerberg sold his Facebook shares, between $8.5 million and $129.8 million shares were traded to investors, including members of the Class.

550.    Plaintiffs and other Class members who purchased shares of Facebook common stock contemporaneously with defendant Zuckerberg's insider sales suffered damages because: (i) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the defendants' violations of §§10(b) and 20(a) of the Exchange Act; and (ii) they would not have purchased Facebook common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by defendants' false and misleading statements and omissions.

# XI.    PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.    Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiff and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' Counsel as a Class Counsel;

B.    Awarding Plaintiffs and the members of the Class damages and interest;

C.    Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

1       D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

2   proper.

3   **XII.    JURY DEMAND**

4       Plaintiffs demand a trial by jury.

5   DATED:  November 15, 2019                ROBBINS GELLER RUDMAN
                                                & DOWD LLP
6                                            DENNIS J. HERMAN
                                             JASON C. DAVIS
7                                            KENNETH J. BLACK

8

9                                            _/s/ Dennis J. Herman_
                                             DENNIS J. HERMAN
10

11                                           One Montgomery Street, Suite 1800
                                             San Francisco, CA  94104
                                             Telephone:  415/288-4545
12                                           415/288-4534 (fax)

13                                           *Counsel for Amalgamated and Co-Lead Counsel
                                             for the Class*
14

15                                           BERNSTEIN LITOWITZ BERGER &
                                                GROSSMANN LLP
16                                           JONATHAN D. USLANER
                                             12481 High Bluff Drive, Suite 300
                                             San Diego, CA  92130
17                                           Telephone:  858/793-0070
                                             858/793-0323 (fax)
18

19                                           BERNSTEIN LITOWITZ BERGER &
                                                GROSSMANN LLP
20                                           JOHN C. BROWNE
                                             JEREMY P. ROBINSON
                                             KATE AUFSES
21

22

23                                           _/s/ John C. Browne_
                                             JOHN C. BROWNE

24                                           1251 Avenue of the Americas
                                             New York, NY  10020
25                                           Telephone:  212/554-1400
                                             212/554-1444 (fax)
26

27                                           *Counsel for Mississippi and Co-Lead Counsel
                                             for the Class*

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:18-cv-01725-EJD                                      - 189 -

PIERCE BAINBRIDGE BECK PRICE
 & HECHT LLP
DAVID L. HECHT
CLAIBORNE R. HANE
20 West 23rd Street, Fifth Floor
New York, NY 10010
Telephone:  213/262-9333

*Counsel for Helms and Additional Counsel for
the Class*

POMERANTZ LLP
JEREMEY A. LIEBERMAN
J. ALEXANDER HOOD II
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone:  212/661-1100
212/661-8665 (fax)

*Counsel for Kacouris and Additional Counsel
for the Class*

ATTESTATION

I, John C. Browne, am the ECF User whose ID and password are being used to file this SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS.  In compliance with Local Rule 5-1(i)(3), I hereby attest that counsel for co-lead plaintiff Amalgamated, Dennis J. Herman, concurs in this filing.

CERTIFICATE OF SERVICE

I, John C. Browne, declare as follows:

I am employed in the County of New York, State of New York, I am over the age of eighteen years and am not a party to this action; my business address is 1251 Avenue of the Americas, 44th Floor, New York, NY 10020, in said County and State.

I hereby certify that on November 15, 2019, the foregoing Lead Plaintiffs' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS was filed with the Clerk of the Court via CM/ECF. Notice of this filing will be sent electronically to all registered parties by operation of the Court's electronic filing systems.

*/s/ John C. Browne*
JOHN C. BROWNE
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212/554-1400
212/554-1444 (fax)
Email: johnb@blbglaw.com