Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Kristin A. Linsley (SBN 154148)
  klinsley@gibsondunn.com
Brian M. Lutz (SBN 255976)
  blutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: 202.955.8217
Fax: 202.530.9614

Paul J. Collins (SBN 187709)
  pcollins@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Telephone:  650.849.5300
Facsimile:  650.849.5333

*Attorneys for Defendants Facebook, Inc.,
Mark E. Zuckerberg, Sheryl K. Sandberg, and
David M. Wehner*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FACEBOOK, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | CASE NO. 5:18-CV-01725-EJD<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:      July 16, 2020<br>Time:      9:00 A.M.<br>Location:  Courtroom 4, 5th Floor<br>Judge:     Hon. Edward J. Davila<br><br>Date First Action Filed:  March 20, 2018 |

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ................................................................................................ 2

II. BACKGROUND ..................................................................................................................... 4

    A.    The Relevant Agreements ............................................................................................ 5

    B.    The Alleged Events Relevant to Plaintiffs' Claims ..................................................... 6

    C.    Procedural History ....................................................................................................... 8

III. ARGUMENT ......................................................................................................................... 9

    A.    The PSLRA Imposes Strict Pleading Requirements .................................................... 9

    B.    Plaintiffs Fail to Plead an Actionable Misstatement or Omission ............................... 9

        1.    Statements About "Control" Not False or Misleading.................................... 10

        2.    Statement About Respecting Users' Privacy Settings Not False or Misleading ....................................................................................... 12

        3.    Risk Factor Statements Not False or Misleading............................................ 12

        4.    Statements About Cambridge Analytica Investigation Not False or Misleading ....................................................................................... 14

        5.    Statements About Response to Data Misuse Not False or Misleading.......................................................................................... 14

        6.    Statements About User Consent Not False or Misleading............................. 15

        7.    Statements About Consent Decree Compliance Not False or Misleading ....................................................................................... 16

        8.    Statements About User Notification Not False or Misleading.......................................................................................... 17

        9.    Statement About GDPR Compliance Not False or Misleading.......................................................................................... 18

        10.    Statements About Russian Interference in U.S. Elections Not False or Misleading ..................................................................... 18

        11.    Statements About User Metrics Not False or Misleading.............................. 19

        12.    Statements About Q1-2018 Results Not False or Misleading.......................................................................................... 19

        13.    Statements About Sale of User Data Not False or Misleading.......................................................................................... 20

Gibson, Dunn &
Crutcher LLP

i

C.    Plaintiffs Fail To Plead a Strong Inference of Scienter..............................................20

    1.    Regulatory "Findings" Do Not Support a Strong Inference
        of Scienter ......................................................................................................21

    2.    So-called "Witness Statements" Do Not Establish Scienter..........................22

    3.    Stock Sales Do Not Support a Strong Inference of Scienter..........................23

    4.    Statements of Regret Do Not Establish Scienter ...........................................25

    5.    Plaintiffs Fail to Plead Corporate Scienter...................................................26

D.    Plaintiffs Fail to Plead Loss Causation .......................................................................26

    1.    Plaintiffs Fail to Plead Loss Causation for the March 19,
        2018 Decline ..................................................................................................28

    2.    Plaintiffs Fail to Plead Loss Causation with Respect to
        Other March Declines ....................................................................................29

    3.    Plaintiffs Fail to Adequately Allege Loss Causation for the
        July 26, 2018 Decline....................................................................................31

E.    Plaintiffs Fail to Plead Reliance..................................................................................34

F.    Plaintiffs Fail to Plead Claims Under Sections 20(a) Or 20A ...................................35

G.    The SAC Should Be Dismissed With Prejudice ..........................................................35

IV. CONCLUSION............................................................................................................................35

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999)..................................................................................26

*In re Allied Nev. Gold Corp. Sec. Litig.*,
2016 WL 4191017 (D. Nev. Aug. 8, 2016) ...........................................................30

*In re Apple Comput. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989)...............................................................................35

*Baker v. Seaworld Entm't, Inc.*,
2016 WL 2993481 (S.D. Cal. Mar. 31, 2016) .......................................................13

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .................................................................................................9

*Bien v. LifeLock Inc.*,
2015 WL 12819154 (D. Ariz. July 21, 2015 .........................................................17

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
2016 WL 2937483 (N.D. Cal. May 20, 2016) .......................................................27

*Brodsky v. Yahoo! Inc.*,
592 F. Supp. 2d 1192 (N.D. Cal. 2008) .................................................................33

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002)...................................................................................9

*Brown v. Ambow Educ. Holding Ltd.*,
2014 WL 523166 (C.D. Cal. Feb. 6, 2014).............................................................27

*Cheung v. Keyuan Petrochemicals, Inc.*,
2012 WL 5834894 (C.D. Cal. Nov. 1, 2012).....................................................21, 26

*In re ChinaCast Educ. Corp. Sec. Litig.*,
809 F.3d 471 (9th Cir. 2015)..................................................................................26

*City of Fort Lauderdale Gen. Emps.' Ret. Sys. v. Edison Int'l*,
2019 WL 6445432 (9th Cir. Nov. 29, 2019)...........................................................30

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017)..................................................................................24

*Costabile v. Natus Med. Inc.*,
2018 WL 7134363 (N.D. Cal. Dec. 18, 2018) .......................................................10

Gibson, Dunn &
Crutcher LLP

*Curry v. Yelp Inc.*,
    875 F.3d 1219 (9th Cir. 2017)...................................................................................30

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005)...........................................................................3, 21, 26

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)....................................................................................................27, 34

*Eng v. Edison Int'l*,
    2018 WL 1367419 (S.D. Cal. Mar. 16, 2018) .........................................................27

*In re Fusion-io, Inc. Sec. Litig.*,
    2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ...........................................................22

*Glazer Capital Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008)....................................................................................22

*In re Hansen Nat. Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ...................................................................35

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
    189 F.3d 971 (9th Cir. 1999).............................................................................34, 35

*Hong v. Extreme Networks, Inc.*,
    2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) .....................................12, 17, 19, 26

*In re Immersion Corp. Sec. Litig.*,
    2011 WL 871650 (N.D. Cal. Mar. 11, 2011).........................................................32

*Inchen Huang v. Higgins*,
    2019 WL 1245136 (N.D. Cal. Mar. 18, 2019) .......................................................26

*Ironworkers Local 580—Joint Funds v. Linn Energy, LLC*,
    29 F. Supp. 3d 400 (S.D.N.Y. 2014).......................................................................19

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
    398 F. Supp. 3d 549 (N.D. Cal. 2019) ....................................................................10

*In re Kalobios Pharm., Inc. Sec. Litig.*,
    258 F. Supp. 3d 999 (N.D. Cal. 2017) ..........................................................4, 34, 35

*In re Leapfrog Enters., Inc. Sec. Litig.*,
    200 F. Supp. 3d 987 (N.D. Cal. 2016) ....................................................................25

*In re LeapFrog Enters., Inc. Sec. Litig.*,
    527 F. Supp. 2d 1033 (N.D. Cal. 2007) ..................................................................22

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)......................................................................................27

Gibson, Dunn &
Crutcher LLP

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ............................................................................................35

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ......................................................................................26, 28

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ..........................................................................................9, 30

*In re Maxim Integrated Prods., Inc. Secs. Litig.*,
    639 F. Supp. 2d 1038 (N.D. Cal. 2009) .............................................................................31

*In re Mellanox Techs. Ltd. Sec. Litig.*,
    2014 WL 12650991 (N.D. Cal. Mar. 31, 2014) .................................................................19

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ...................................................................9, 21, 24, 31, 32, 33

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) .....................................................................................27, 30

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
    881 F.3d 750 (9th Cir. 2018) ....................................................................................26, 27, 28

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
    2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) ...................................................................14

*In re Netflix, Inc. Sec. Litig.*,
    2005 WL 1562858 (N.D. Cal. June 28, 2005) ...................................................................23

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
    730 F.3d 1111 (9th Cir. 2013) ..............................................................................27, 28, 30, 32

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ......................................................................................21, 35

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ...................................................................................10, 28, 30

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ............................................................................................33

*In re Pixar Sec. Litig.*,
    450 F. Supp. 2d 1096 (N.D. Cal. 2006) .............................................................................25

*Ponce v. SEC*,
    345 F.3d 722 (9th Cir. 2003) ............................................................................................21

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) ........................................................................................9, 11

Gibson, Dunn &
Crutcher LLP

v

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012).................................................................9

*Rodriguez v. Gigamon Inc.*,
  325 F. Supp. 3d 1041 (N.D. Cal. 2018) ..............................................24

*Rok v. Identiv, Inc.*,
  2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ...............................27, 30, 33

*Rok v. Identiv, Inc.*,
  2018 WL 807147 (N.D. Cal. Feb. 9, 2018) ..........................................26

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001)..........................................................24, 25

*SEC v. Dain Rauscher, Inc.*,
  254 F.3d 852 (9th Cir. 2001)...............................................................21

*SEC v. Leslie*,
  2008 WL 4183939 (N.D. Cal. Sept. 9, 2008) ......................................21

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
  119 F. Supp. 3d 1213 (C.D. Cal. 2015) ...............................................34

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999)................................................................24

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
  160 F. Supp. 2d 1059 (N.D. Cal. 2001) ...............................................10

*In re Stac Elecs. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996)................................................................35

*In re Stratosphere Corp. Sec. Litig.*,
  1997 WL 581032 (D. Nev. May 20, 1997)..............................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..............................................................................21

*In re UBS Auction Rate Sec. Litig.*,
  2010 WL 2541166 (S.D.N.Y. June 10, 2010)........................................14

*In re Verifone Sec. Litig.*,
  2016 WL 1213666 (N.D. Cal. Mar. 29, 2016) ......................................33

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002)........................................................24, 25

*Veltex Corp. v. Matin*,
  2010 WL 11549762 (C.D. Cal. June 25, 2010) ...............................13, 14

Gibson, Dunn &
Crutcher LLP

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017) .................................................................35

*Wietschner v. Monterey Pasta Co.*,
    294 F. Supp. 2d 1102 (N.D. Cal. 2003) ...................................................................23

*Williams v. GlobusMedical, Inc.*,
    869 F.3d 235 (3d Cir. 2017)....................................................................................13

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ...................................................................10

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)...............................................................3, 9, 21, 23, 25

**Statutes**

15 U.S.C. § 78u-4(b) ..........................................................................................9, 21

15 U.S.C. § 78u-5(c) ........................................................................................10, 19

15 U.S.C. § 78u-5(i) ...............................................................................................10

**Regulations**

17 C.F.R. § 240.10b5-1(c) .......................................................................................24

Gibson, Dunn &
Crutcher LLP

MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July 16, 2020, at 9:00 a.m., or as soon thereafter as the matter may be heard, in the U.S. District Court for the Northern District of California, San Jose Courthouse, Courtroom 4, located at 280 South 1st Street, San Jose, CA 95113, Defendants Facebook, Inc. ("Facebook" or the "Company"), Mark E. Zuckerberg, Sheryl K. Sandberg, and David M. Wehner (the "Individual Defendants") (Facebook and the Individual Defendants, together, "Defendants"), through their undersigned counsel, will, and hereby do, move to dismiss the Second Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws (the "SAC") (ECF No. 123) pursuant to Fed. R. Civ. P. 12(b)(6). This Motion is based on this Notice, the supporting Memorandum of Points and Authorities, the Declaration of Brian M. Lutz filed concurrently herewith, the accompanying Request for Judicial Notice, the complete files and records in this action, and any additional material and arguments as may be considered in connection with the hearing.

Defendants seek dismissal of the Complaint with prejudice for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), because Plaintiffs fail to plead violations of Sections 10(b), 20(a), or 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Fed. R. Civ. P. 9(b).

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Defendants respectfully submit this Memorandum of Points and Authorities in support of their Motion to Dismiss the SAC pursuant to Fed. R. Civ. P. 12(b)(6).

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Plaintiffs' claim under Section 10(b) of the Exchange Act and Rule 10b-5 should be dismissed with prejudice for failure to plead that (1) any challenged statement was false or misleading, (2) any Defendant acted with scienter, (3) Plaintiffs suffered any loss caused by any allegedly false or misleading statement, and (4) Plaintiffs relied on any allegedly false or misleading statement.

2.      Whether Plaintiffs' claims under Sections 20(a) and 20A of the Exchange Act should be dismissed for failure to plead a primary violation of the Exchange Act.

Gibson, Dunn &
Crutcher LLP

## I.     PRELIMINARY STATEMENT

The SAC should be dismissed because it is based on virtually identical and recycled alleged misstatements and deficient scienter allegations that this Court already ruled, in a detailed 48-page opinion, failed to satisfy the strict standard for pleading securities fraud under the PSLRA.  Plaintiffs make little effort to bolster the allegations from their prior complaint, which this Court found "difficult to understand" and "hard to grasp."  ECF No. 118 at 3 n.1.  Instead, they retread the same ground as before, repeating statements that this Court found to be inactionable, and cutting-and-pasting allegations about stock sales, so-called witness accounts, and expressions of regret that this Court concluded failed to support a strong inference that any Defendant acted with scienter.  And the few "new" allegations Plaintiffs offer do not change the analysis.  Plaintiffs allege, for example, that every statement during the putative class period that mentions the word "control" must be actionable, but nowhere do Plaintiffs explain *why* these statements were false at the time they were made (they were not).  And despite an amended pleading spanning 189 pages and 550 paragraphs, Plaintiffs still cannot point to a *single* factual allegation drawn from a confidential witness or other source showing, as they must, that the Individual Defendants knew or consciously disregarded that the challenged statements were untrue at the time they were made.  These and other fatal pleading deficiencies once again demand dismissal, this time with prejudice.

To meet their high pleading burden under the PSLRA and Rule 9(b), Plaintiffs must plead specific facts—not unsupported and meandering inferences and conclusions—demonstrating that Defendants made false or misleading statements, that Defendants knew or deliberately ignored that their statements were untrue, and that any investor losses were proximately caused by disclosures revealing the "truth" of the alleged misstatements.  The SAC fails to plead any such actionable facts.

**No Actionable Misstatement.**  In its order granting Defendants' motion to dismiss the prior complaint, the Court held that—for 35 of the 36 challenged statements—Plaintiffs failed to plead that Defendants made a misrepresentation to Facebook investors.  *See* ECF No. 118 at 22-44.  Plaintiffs nonetheless recycle these same alleged misstatements nearly verbatim in the SAC and offer nothing new that would cure the defects that necessitated dismissal of Plaintiffs' claims the first time.  The Court should dismiss these statements for the same reasons set forth in the Court's prior order.

Gibson, Dunn & Crutcher LLP

Plaintiffs seize on the single statement the Court found was adequately alleged to be false (but nonetheless inactionable for failure to plead scienter)—that users "control[] who [they] share with" and "no one is going to get your data that shouldn't have it"—and now massively overreach by saying that any statement made during the class period that used the word "control" must have been false or misleading.  The new "control" statements fail for the same reasons the Court explained in its careful decision dismissing the prior complaint—many are not capable of objective verification (and therefore are too vague to be actionable), and there are no facts alleged demonstrating that indisputably true statements about users' control over the content they post on Facebook were false.

**No Scienter.**  Plaintiffs also cannot cure their prior failure to plead scienter.  A securities fraud complaint must be dismissed if it does not plead particularized facts showing that "the defendants made false or misleading statements either intentionally or with deliberate recklessness."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014-15 (9th Cir. 2005)).  Plaintiffs make almost no effort to update the scienter allegations that the Court previously found to be deficient.  In fact, Plaintiffs simply repeat their allegations about stock sales, expressions of regret, and "witnesses" who have no information about Defendants' state of mind, which this Court already rejected as a basis for pleading a strong inference of scienter.  The regulatory settlements Plaintiffs now cite do not save their new complaint.  These settlements say nothing about the Individual Defendants' knowledge of Cambridge Analytica's data misuse or Facebook's allegedly improper "whitelisting" practices at the time the challenged statements were made.  The SAC still falls well short of pleading specific facts supporting a strong inference that any of the Individual Defendants—or anyone else at Facebook—knew or consciously disregarded that they were being untruthful when making any challenged statement.  This pleading failure again requires dismissal.

**No Loss Causation.**  The SAC also does nothing to remedy Plaintiffs' failure to plead loss causation.  No alleged facts demonstrate that any of the supposed "corrective disclosures" in March and July 2018—which Plaintiffs claim caused Facebook's stock price to decline—revealed both "new" information and the "truth" of any alleged misstatement.  The March 2018 articles in *The Guardian* and *The New York Times* cannot constitute "corrective disclosures" because the core allegations about Cambridge Analytica's misappropriation and misuse of user data already had been revealed to the

world by *The Guardian* in 2015.  Plaintiffs' attempt to shoehorn the Cambridge Analytica reports into a securities claim arising out of a stock price decline in July 2018 suffers the same fate.  Facebook warned investors in April 2018 of the very information that Plaintiffs say "caused" the decline in July 2018—an increase in expenses and slower user growth following implementation of European privacy legislation.  And, again, Plaintiffs do not allege that any of this information "corrected" any prior misstatement.  Plaintiffs' failure to plead any causal link between the challenged statements and Plaintiffs' alleged losses requires dismissal on loss causation grounds.

**No Reliance.**  For the same reason that Plaintiffs fail to allege loss causation, the SAC should be dismissed because Plaintiffs cannot rely on the fraud-on-the-market presumption of reliance.  This case is fundamentally about misconduct by Cambridge Analytica, but the market knew more than one year before the start of the putative class period that Cambridge Analytica had improperly obtained and misused Facebook user data.  Thus, "[a]ny undisclosed information that might have otherwise misled the market about [Cambridge Analytica] would not have done so here because such information had already been substantively disseminated by the press." *In re Kalobios Pharm., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1009 (N.D. Cal. 2017) (Davila, J.).

Plaintiffs again fail to satisfy their pleading burden under the PSLRA.  No amount of re-pleading can cure the fatal defects.  The SAC should be dismissed again, this time with prejudice.

## II.    BACKGROUND[1]

Facebook was founded in 2003 by Mark Zuckerberg, who is also the Company's CEO and Chairman of its Board of Directors.  ¶ 32.  Sheryl Sandberg has served as Facebook's COO since March 2008, ¶ 34, and David Wehner has served as CFO since June 2014, ¶ 35.  Facebook, the world's largest social networking company, gives its more than two billion active users the power to stay connected and share information through its various products and platforms.  ¶¶ 41, 420(b).  Facebook also enables independent third-party developers' applications or websites (collectively, "apps") to interact

---

[1]  By summarizing Plaintiffs' allegations here, Defendants do not concede the allegations are true.  The Court may refer to documents incorporated in the SAC by reference.  Citations in the form of "¶ __" or "¶¶ __" refer to the paragraphs of the SAC.  Citations to "Ex. __" refer to the exhibits to the Declaration of Brian M. Lutz in support of Defendants' Motion to Dismiss the SAC, filed concurrently herewith.  Unless otherwise noted, all emphasis is added, and all internal quotation marks and citations are omitted.

with Facebook's Platform so that users can share third-party app experiences with their Facebook friends—for example, by playing a game together or having other social experiences.  *See* ¶¶ 45, 48.

A.     **The Relevant Agreements**

*Facebook's agreements with users.*  The use and sharing of data on Facebook are governed by agreements between Facebook and its users, including Facebook's Data Policy (previously referred to as the "Data Use Policy" and the "Privacy Policy") and Terms of Service (previously referred to as the "Statement of Rights and Responsibilities").  *E.g.*, ¶¶ 167, 170, 232, 276, 370, 462-64.  These policies explain how users can control whether and how their data is shared with their Facebook friends, other Facebook users, and third parties.  ¶¶ 326, 469.  For example, the Data Policy informs users of the categories of information third-party apps may access if users choose to allow (or "authorize") apps to do so.  Ex. 26 at 2.  The policies also inform users how to control access to their data by adjusting their privacy and application settings, and caution users about sharing data with third parties, including the "information that others have shared" with them.  *See id.*; ¶ 469.

Before 2015, Facebook's policies allowed users to share information about their friends with third-party app developers.  ¶¶ 48, 89.  The Data Policy in place in 2013 stated that app developers could ask for certain information about users' friends, alerted users that their friends might choose to share some of *their* information with apps, and explained the social benefits of connecting with their friends using apps.  *E.g.*, Ex. 25.  For example, the policy advised users that when using a music app, "[y]our friend might … want to share the music you 'like' on Facebook."  *Id*. at 4.  "[I]f you've shared your likes with just your friends, the application could ask your friend for permission to share them."  *Id*.  Thus, a user's friend could re-share the user's likes with an app that the friend had downloaded, so long as the original user (whose likes were at issue) had consented to such sharing by their friends.  If a user chose to turn off all Platform apps, that user's friends could not share the user's information with apps.  *Id.*  In 2014, as part of Facebook's ongoing commitment to user privacy, Facebook announced that it would implement changes to its Platform that "dramatically limit[ed] the Facebook information apps could access," and "shut[] off third-parties' access to collect user friends' data" to ensure that "everyone has to choose to share their own data with an app themselves."  ¶¶ 81-83, 186, 383, 434; *see also* Ex. 30 (disclosing that platform changes would be finalized one year later).  Facebook informed

1    users that it would continue to share information with "service providers" like device manufacturers,

2    telling users that it would "give [their] information to the people and companies that help us provide,

3    understand and improve the services we offer."  Ex. 25 at 8; *accord* Ex. 27 at 2 ("We transfer

4    information to vendors, service providers, and other partners who globally support our business ….").

5         ***Facebook's agreements with application developers.***  Third-party app developers must agree

6    to Facebook's Platform Policy before offering apps on the Facebook Platform.  ¶¶ 275-276 & n.265,

7    368-370.  This policy, in place at all times relevant to the allegations in the SAC, limits the extent to

8    which developers can collect and use Facebook user data, and requires developers to explain to users

9    the categories of information they will collect and how it will be used.  ¶¶ 210, 275-276, 368-370.  The

10   Platform Policy prohibits developers from selling or transferring user data, and from using their

11   customers' friend data outside of customer use of the app.  ¶ 468.

12   **B.      The Alleged Events Relevant to Plaintiffs' Claims**

13        ***Aleksandr Kogan and Cambridge Analytica.***  In 2013, Aleksandr Kogan, a professor and data

14   researcher at Cambridge University, developed a personality quiz app called "This is Your Digital

15   Life."  ¶¶ 87-88.  The app appeared on the Facebook Platform in 2014 and told users that the results of

16   the quiz would be used for academic purposes.  ¶¶ 87-88.  Approximately 270,000 people installed the

17   app and consented to sharing their data, including some information about their Facebook friends, ¶ 89,

18   which at that time was permitted under Facebook's policies, subject to the friends' privacy and

19   application settings, Ex. 25.

20        ***The December 2015 Guardian Article and Facebook's Response.***  In December 2015—over

21   one year before the beginning of the alleged class period—*The Guardian* reported that Kogan, through

22   his company Global Science Research ("GSR"), sold some of the information collected through the

23   "This Is Your Digital Life" app to Cambridge Analytica, in violation of Facebook's policies.  Ex. 17;

24   ¶¶ 5, 86-89, 98.  According to the article, Cambridge Analytica used Kogan's data on tens of millions

25   of Facebook users to create psychological profiles of U.S. voters, which were then used to support Ted

26   Cruz's presidential campaign.  Ex. 17; ¶¶ 5, 86-89.  After the article was published, Facebook

27   investigated the issue, removed Kogan's app from Facebook, and obtained certifications and

28   confirmations from Kogan, GSR, Cambridge Analytica, and its parent company that all user data had

been destroyed.   ¶¶ 5, 93, 137-138, 150, 186, 210, 377.   By that time Facebook already had implemented changes to its Platform to restrict third-party apps from requesting information about users' friends.   ¶¶ 98, 332, 376, 383, 434, 450.

**The Cambridge Analytica story resurfaces in 2018.**   On March 17, 2018, articles published by *The New York Times* and *The Guardian* again reported that, in 2015, Cambridge Analytica had misappropriated Facebook user data via Kogan's application.   This time, however, the articles reported that Cambridge Analytica had lied when it represented to Facebook in 2016 that it had deleted all user data, and in fact had retained the data and used it in connection with Donald Trump's presidential campaign.   ¶¶ 20, 189-190.   Facebook immediately suspended Cambridge Analytica, its parent company, and certain related employees from the Facebook Platform.   ¶ 186.

**Facebook's first quarter 2018 earnings report.**   On April 25, 2018, Facebook reported earnings for the first quarter of 2018 ("Q1-2018"), with quarterly revenue, earnings, and daily and monthly active user growth meeting or exceeding analyst expectations.   ¶¶ 25, 219, 221, 223, 427.   Although a "handful" of advertisers had "paused spend" with Facebook after the Cambridge Analytica news, Facebook reported that this did not appear to reflect a "meaningful trend."   ¶ 429.   Facebook also reported that its expenses were expected to increase, driven by the investments Facebook was making in data security programs and the 48% increase in the number of Facebook's employees from the prior year.   ¶ 429; Ex. 9 at 7-8.

Facebook also addressed the possible impact of the General Data Protection Regulation ("GDPR")—the European Union's ("EU") new privacy legislation governing the collection and use of personal data of EU citizens—which would take effect the following month.   ¶ 430-31; Ex. 9 at 8, 11, 15-16, 18, 23.   Facebook noted that while it was "early and difficult to know … in advance" the business implications of Facebook's implementation of the GDPR, the Company anticipated that Facebook's European daily and monthly user base could "be flat to slightly down."   Ex. 9 at 8, 23. And while the Company did not anticipate the GDPR would "significantly impact advertising revenue," it noted that "there is certainly the potential for some impact, and we will be monitoring this closely." *Id.* at 8; *see also id.* at 18 ("[T]he amount of uncertainty [] for us and all the other companies in the digital advertising industry is reasonably higher than it's been [] because we're in the process of rolling

out GDPR.  We're going to all know a lot more after we rollout.").

*Facebook's second quarter 2018 earnings report.*  On July 25, 2018, Facebook announced its second quarter of 2018 ("Q2-2018") earnings, reporting lower than expected revenue growth, profitability, and user growth.  ¶¶ 243-244, 247.  Facebook attributed the user growth slowdown to the effects of "the GDPR rollout, consistent with the outlook we gave on the Q1 call," but noted that "the vast majority of people [had continued] opting in to … third-party data use."  Ex. 10 at 7, 18.  One analyst remarked during the earnings call that Facebook had given an "accurate read into the June quarter" on the likely impact of the GDPR.  *Id.* at 15; *see also id.* ("We had indicated in the … first quarter that we would expect to see a decline [in daily active users and monthly active users in Europe following implementation of the GDPR].").  Facebook also reported that expenses were "up 50%" year-over-year, in line with estimates made in the prior quarter.  *Id.* at 8.  And Facebook reported a decline in revenue growth as a result of "currency … headwind[s]," and "impacts that could be ongoing from things like GDPR as well as other product options that we're providing that could have an impact on revenue growth."  *Id.* at 8, 12.  The Q2-2018 earnings announcement *did not mention* Cambridge Analytica or any other privacy incident alleged in the Complaint.  *See id.*

## C.    Procedural History

On October 15, 2018, Plaintiffs filed their Consolidated Class Action Complaint for Violation of the Federal Securities Laws (the "Consolidated Complaint").  ECF No. 86.  This Court granted Defendants' Motion to Dismiss the Consolidated Complaint on September 25, 2019.  ECF No. 118 [hereinafter "MTD Order"].  The Court held that Plaintiffs failed to carry their burden to plead with particularity the elements of their securities fraud claims under Section 10(b) and Rule 10b-5.  First, the Court found that Plaintiffs failed to show specific, evidentiary facts from which the Court could infer that Defendants had made false statements.  *Id.* at 25-44.  Of the 36 allegedly misleading statements or omissions in the Consolidated Complaint, the Court found that *only one* was adequately alleged to be false or misleading.  *Id.* at 40-41.  The Court dismissed Plaintiffs' claim as to that statement because Plaintiffs failed to plead particularized facts from which the Court could infer that the speaker intentionally or recklessly lied when making the statement.  *Id.* at 46-47.  Plaintiffs' remaining claims for Sections 20(a) and 20A of the 1934 Securities Exchange Act also were dismissed

1    because they depended on a primary violation of Section 10(b) or Rule 10b-5.  *Id*. at 47-48.

2         Plaintiffs filed their SAC on November 15, 2019.  ECF No. 123.

3                              **III.    ARGUMENT**

4    **A.    The PSLRA Imposes Strict Pleading Requirements**

5         To state a Section 10(b) claim, a complaint must allege facts sufficient to establish (1) a material

6    misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a

7    security; (4) on which plaintiff relied; (5) economic loss; and (6) loss causation.  *Loos v. Immersion*

8    *Corp.*, 762 F.3d 880, 886-87 (9th Cir. 2014), *as amended* (Sept. 11, 2014).  A securities fraud complaint

9    also must meet the stringent pleading standards of Federal Rule of Civil Procedure 9(b) and the PSLRA,

10   which require a plaintiff to plead falsity and scienter with particularity.  15 U.S.C. § 78u-4(b)(1)-(2);

11   *Zucco*, 552 F.3d at 990-91.  The SAC once again fails to meet these standards.

12   **B.    Plaintiffs Fail to Plead an Actionable Misstatement or Omission**

13        To survive a motion to dismiss, a complaint must "specify each statement alleged to have been

14   misleading [and] the reason or reasons why the statement is misleading."  *Metzler Inv. GmbH v.*

15   *Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008); *accord* 15 U.S.C. § 78u-4(b)(1).

16   Statements are misleading only if they "affirmatively create an impression of a state of affairs that

17   differs in a material way from the one that actually exists."  *Brody v. Transitional Hosps. Corp.*, 280

18   F.3d 997, 1006 (9th Cir. 2002).  "A plaintiff may rely on contemporaneous statements or conditions to

19   demonstrate why statements were false when made, but such circumstantial evidence must be plead

20   with particularity."  MTD Order at 29 (citing *In re Stratosphere Corp. Sec. Litig.*, 1997 WL 581032, at

21   *13 (D. Nev. May 20, 1997)).

22        "Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Basic Inc. v. Levinson*,

23   485 U.S. 224, 239 n.17 (1988).  "Thus, as long as [any] omissions do not make the actual statements

24   misleading, a company is not required to disclose" other facts "even if investors would consider the

25   omitted information significant."  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir.

26   2012).

27        "To be misleading, a statement must be capable of objective verification."  *Retail Wholesale &*

28   *Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017).

Vague, optimistic statements (*i.e.*, "puffery") are not actionable because they do not induce reliance by reasonable investors and thus are immaterial as a matter of law.  *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

Finally, under the PSLRA "safe harbor" provision, forward-looking statements are not actionable if they are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).  "A forward-looking statement is defined as a statement containing a projection of revenues, income, or earnings per share, management's plans or objectives for future operations, and a prediction of future economic performance."  *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1067 (N.D. Cal. 2001) (citing 15 U.S.C. § 78u-5(i)(1)(A)-(C)).

Plaintiffs' SAC rehashes the same allegedly false and misleading statements that the Court previously found were inactionable.  *See generally* ¶¶ 324-482.  Plaintiffs' cosmetic changes to the SAC fail to remedy the defects the Court identified in its order dismissing Plaintiffs' prior complaint, including that Plaintiffs failed to plead contemporaneous falsity for the vast majority of the challenged statements.  *See* MTD Order at 29-44.  Courts routinely dismiss similar amended complaints that simply recast previously dismissed statements.  *See, e.g.*, *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 398 F. Supp. 3d 549, 556 (N.D. Cal. 2019) (dismissing amended complaint that "largely repeat[ed] statements that the Court previously found were 'not actionable false statements'"); *Costabile v. Natus Med. Inc.*, 2018 WL 7134363, at *3 (N.D. Cal. Dec. 18, 2018) (dismissing amended complaint containing allegations that were "substantially the same as the allegations in the FAC the Court previously deemed deficient"); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1034 (N.D. Cal. 2012) (dismissing amended complaint consisting of allegations that "remain[ed] essentially the same as the allegations previously found deficient by the Court").  The Court should reach the same conclusion here.

### 1.      Statements About "Control" Not False or Misleading

Seizing on the single statement the Court previously found was adequately alleged to be false (but inactionable for failure to plead scienter), *see* MTD Order at 40-41, Plaintiffs have scoured the public record for any statement by Defendants containing the word "control" and now allege that all of

these statements must also have been false or misleading.  *See* ¶¶ 325-343.  But a statement is not false or misleading simply because it contains the word "control."  Rather, many of the "new" statements Plaintiffs identify are too vague to be actionable, and in any event, Plaintiffs fail to plead specific facts demonstrating these statements were false or misleading at the time they were made.

For example, Plaintiffs challenge various statements to the effect that Facebook "built [its] services around transparency and control."  ¶ 328; *accord* ¶¶ 329-331.  These statements are too vague to be actionable because whether or not Facebook's services are "built … around transparency and control" or "focused on giving people transparency and control," ¶¶ 328-329, is not "capable of objective verification," *Hewlett-Packard Co.*, 845 F.3d at 1275.  Moreover, even if these statements could be objectively verified, Plaintiffs do not—and cannot—allege that Facebook did not design its services to give users control over their data.  Even Plaintiffs concede the numerous ways that Facebook enabled users to control access to their data.  *See, e.g.*, ¶ 81 (Facebook shut down third parties' ability to access and collect user friends' data); ¶ 84 & n.69 (discussing Facebook's "Privacy Checkup" tool).  For the same reason, the statement that Facebook "[gave] people the tools to control their experience," ¶ 332, as well as similar statements, *see* ¶¶ 326, 335-336, 338(a)-(b), 339, were not false or misleading.

Plaintiffs also challenge statements that users "have control over everything [they] put on the [Facebook] service."  ¶ 333; *accord* ¶ 334 ("[Y]ou are in control of your Facebook, what you see, what you share, and what people see about you."); ¶¶ 337(b), (e).  Once again, these statements were indisputably true.  Users control what content they share with Facebook by making a deliberate choice to post that content.  In other words, "what people see about" a given Facebook user is dictated by what the user has chosen to post.  *See* MTD Order at 33 ("Plaintiffs do not allege that users could not control information-sharing.").

Finally, Plaintiffs cannot plausibly allege that statements that users could "control[] who [they] share with" and that "no one is going to get your data that shouldn't have it," ¶ 327; *see also* ¶¶ 337(a), 337(c)-(d), 338(b), were false or misleading because some developers could continue to access users' friends' data after April 2014.  *See* ¶¶ 340(a)-(b), 341, 343(a)-(c).  Facebook publicly announced that, during a limited transition period, existing developers could continue to access friends' data, subject to users' privacy and application settings, and Facebook's policies also disclosed the same.  *See* Ex. 25 at

Gibson, Dunn &
Crutcher LLP

4; Ex. 30 (disclosing that platform changes would not be applied to existing apps until April 30, 2015). These disclosures directly undercut Plaintiffs' claims about "whitelisting" and alleged "overriding" of privacy settings.

### 2.   Statement About Respecting Users' Privacy Settings Not False or Misleading

Plaintiffs claim that the statement, "We respected the privacy settings that people had in place," ¶ 344, was false and misleading because Facebook continued to give "'whitelisted' third parties" and others access to users' friends data after April 2014, ¶ 345; *see also* ¶¶ 346, 348.  But Plaintiffs ignore the context in which this March 2018 statement was made: in response to an allegation that Facebook had violated the 2012 FTC consent decree *in connection with the Cambridge Analytica events.  See* Ex. 23 ("Facebook has denied violating the consent decree when it allowed an app developer working for Cambridge Analytica to gain access to information about an estimated tens of millions of people. … [¶] In a statement Saturday, Facebook said, 'We reject any suggestion of violation of the consent decree. We respected the privacy settings that people had in place.'").  Plaintiffs do not allege—nor can they— that the Cambridge Analytica events resulted from *Facebook's* failure to respect the privacy settings in place when Kogan and Cambridge Analytica obtained the Facebook user data they later misused. Rather, to the extent anyone failed to respect users' privacy settings, it was Kogan and Cambridge Analytica—*not Facebook*—when they elected to violate the contractual obligations imposed by Facebook for the express purpose of protecting user data.  Nor can this statement be rendered false by unrelated alleged practices of "whitelisting" or "overriding user privacy settings."  *See* ¶¶ 345-346, 348.  As the Court previously recognized in dismissing Plaintiffs' prior complaint, a statement about specific events (here, Cambridge Analytica's misuse of Facebook user data) cannot be rendered false by allegations about separate, unrelated practices (here, alleged "whitelisting").  MTD Order at 39 (citing *Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017)).

### 3.   Risk Factor Statements Not False or Misleading

Risk factor statements in Facebook's SEC filings, *see* ¶¶ 349-360, 401-403, also were not false or misleading, as the Court previously determined when it dismissed Plaintiffs' prior complaint, MTD Order at 35-38.  With respect to Facebook's warning that "Security breaches and improper access to … user data … could harm our reputation and adversely affect our business," ¶ 350; *see also* ¶ 401,

Plaintiffs allege no new facts that undercut the Court's earlier conclusion that "Plaintiffs do not allege that the Cambridge Analytica data breach was 'already affecting Facebook' at the time these risk disclosures were made."  MTD Order at 35.  It remains the case that "the risks of negative media or regulatory action had not yet materialized" when the challenged risk factor statements were made.  *Id.* at 36.  Nor is there any well-pleaded allegation that Defendants believed "a materially different 'state of affairs' existed" at the time the challenged risk factor statements were made.  *Id.*  To the contrary, like Plaintiffs' prior complaint, the SAC confirms that, following the 2015 article in *The Guardian*, "Facebook privately asked GSR and Cambridge Analytica to delete the [misappropriated user] data *and was told by both GSR and Cambridge Analytica that it had been deleted.*"[2]  ¶ 138; *see also* ¶ 144 ("Kogan certified that he and GSR had deleted the data.").

Plaintiffs' reliance on the SEC's charge that Facebook's risk factor statements were misleading is misplaced.  *See* ¶ 353.  The SEC's allegations regarding Kogan's misappropriation of Facebook user data do not alter the Court's prior conclusion.  *See* MTD Order at 35-36.  Again, Plaintiffs cannot allege that the warned-of risks—harm to Facebook's reputation, adverse effects on the Company's business, and diminishment of its competitive position, *see* ¶ 350—were "'already affecting Facebook'" at the time the challenged risk factor statements were made in 2017 and early 2018.  MTD Order at 35.  Those disclosures were made well before the March 2018 news reports that Cambridge Analytica had not deleted the Facebook user data obtained in violation of Facebook's policies.  *See Williams v. GlobusMedical, Inc.*, 869 F.3d 235, 242 (3d Cir. 2017) ("The risk actually warned of is the risk of adverse effects on sales ….  Accordingly, the risk at issue only materialized … if sales were adversely affected at the time the risk disclosures were made.").  Moreover, Facebook did not admit the SEC's charge that the challenged risk factor statements were misleading (*see* Ex. 16 ¶¶ 2, 11), so the SEC's allegations do not aid Plaintiffs in pleading contemporaneous falsity.  *See, e.g.*, *Veltex Corp. v. Matin*,

---

[2] For the same reasons, Facebook's risk factor statements regarding "the risks to the Company from a loss of user trust in Facebook's ability to protect their privacy" were not false. ¶ 358.  Plaintiffs do not allege that, when these statements were made, Facebook already was suffering from an inability "to attract or retain users or otherwise maintain or increase the frequency and duration of their engagement." *Id.*; *see, e.g.*, *Baker v. Seaworld Entm't, Inc.*, 2016 WL 2993481, at *12 (S.D. Cal. Mar. 31, 2016) (risk factor statement not false where plaintiffs failed to allege that warned-of risks "were having any impact on attendance" when statement was made).

Gibson, Dunn & Crutcher LLP

2010 WL 11549762, at *3 (C.D. Cal. June 25, 2010) (rejecting plaintiffs' reliance on allegations that defendants settled a securities fraud complaint brought by the SEC because the defendants "settled that case 'without admitting or denying the allegations in the complaint'"); *In re UBS Auction Rate Sec. Litig.*, 2010 WL 2541166, at *19 n.11 (S.D.N.Y. June 10, 2010) ("'[S]tatements made by the SEC … in … settlement documents are not law; they are rather untested assertions made by litigants …. Further, the position articulated in the SEC settlement agreement is not binding on this Court.'" (quoting *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138, at *5 (S.D.N.Y. Apr. 18, 2006)) (third alteration in original)).

### 4.      Statements About Cambridge Analytica Investigation Not False or Misleading

Statements about "the results of Facebook's investigation into Cambridge Analytica's data misuse" also were not false or misleading. *See* ¶¶ 361-366. Plaintiffs claim that it was misleading for Facebook to state in March 2017 that its "investigation to date ha[d] not uncovered anything that suggests wrongdoing with respect to Cambridge Analytica's work on the [Brexit] and Trump campaigns," ¶ 362 (second alteration in original); *accord* ¶ 363, because Facebook previously had determined that Kogan violated Facebook policies by transferring user data to Cambridge Analytica in or before 2015, ¶¶ 364-366. But Kogan and Cambridge Analytica had assured Facebook well before March 2017 that they had already deleted the data Kogan misappropriated. *See, e.g.*, ¶¶ 138, 144; Ex. 24 ("The company believes that Kogan and SCL complied with the request, which was made during the Republican primary, before Cambridge Analytica switched over from Ted Cruz's campaign to Donald Trump's."). Plaintiffs allege no contemporaneous facts—because there are none—suggesting that, as of March 2017, the Company had determined that Kogan and Cambridge Analytica had misused data in connection with the Brexit and Trump campaigns. *See* ¶¶ 362-363.

### 5.      Statements About Response to Data Misuse Not False or Misleading

Previously dismissed statements about "Facebook's response to instances of data misuse" also were not false or misleading. ¶ 367; *see* ¶¶ 368-379. As the Court previously held, statements about taking "swift action" against companies that violate Facebook's policies, ¶¶ 368-369, are not false and misleading unless Plaintiffs allege "specific facts demonstrating that *when the statements were made*, Facebook did not intend to (1) take swift action and/or (2) promptly ban from Facebook companies

that violated Facebook's policies and require those companies to destroy misappropriated data." MTD Order at 30. Plaintiffs again allege no such facts; instead, they continue to claim that the challenged statements are misleading because of how Facebook allegedly responded to Kogan's and Cambridge Analytica's misappropriation of user data years earlier. *See* ¶¶ 371-375. This theory fails for multiple reasons. First, what Facebook did *years before the start of the class period* in response to the Cambridge Analytica events has no bearing on the truth or falsity of the Company's 2017 statements of its *present intent* to take swift action to ban policy violators. *See* MTD Order at 30 ("[W]hat happened in 2015 is irrelevant, the Class Period starts in February 2017."). Second, the challenged statements *did not concern* Cambridge Analytica, and therefore, they cannot have been rendered false by Facebook's alleged response to the Cambridge Analytica events. *See id.* at 30 ("[T]hese statements, by their terms, are outside the scope of the Cambridge Analytica matter and are thus outside the purview of Plaintiffs' claim.").[3]

Statements about requiring policy violators to destroy improperly collected data also were not false or misleading because Facebook purportedly "did not have the technical ability to 'automat[ically]' 'require' deletion of misused user data." ¶ 372; *see also* ¶ 373. Facebook never promised that it "automatically" would require the deletion of improperly collected user data, only that it would require the data to be destroyed. *See* ¶¶ 368-370. As Plaintiffs acknowledge, Facebook could enforce this requirement in a variety of ways, including by obtaining certifications of destruction (as in the case of Cambridge Analytica, *see* ¶¶ 138, 144) or by banning policy violators from Facebook.

### 6. Statements About User Consent Not False or Misleading

As the Court previously held, statements that users consented to sharing their data with Kogan's app, *see* ¶¶ 380-387, also were not false or misleading because the privacy policy in place during the creation and implementation of Kogan's app told users that their Facebook "friends" could re-share their data unless they affirmatively opted out by adjusting their application settings. MTD Order at 42;

---

[3] March 2018 statements about Facebook's commitment to enforcing its policies were not false or misleading for the same reasons. *See* ¶¶ 376-379. Other than "irrelevant" allegations about Facebook's response to the Cambridge Analytica events (MTD Order at 30; *see* ¶¶ 377-379), Plaintiffs allege no contemporaneous facts demonstrating that, as of March 2018, Facebook was not "committed to vigorously enforcing [its] policies" and did not intend to "take whatever steps are required to see that this happens." ¶ 376.

Gibson, Dunn &
Crutcher LLP

*see also* Ex. 25 ("Just like when you share information by email or elsewhere on the web, information you share on Facebook can be re-shared.  This means that if you share something on Facebook, anyone who can see it can share it with others, including the games, applications, and websites they use.").

Plaintiffs now allege that these statements were false because Kogan's app purportedly was "secretly grandfathered into the 'user friends' data' sharing program" that Facebook announced that it was discontinuing for *new apps* in April 2014.  ¶ 381.  But there was nothing "secret[]" about the fact that there would be a transition period for existing apps: Facebook expressly disclosed in April 2014 that the platform changes would be finalized one year later.  *See* Ex. 30 ("The new Facebook Login and the announcements below [including restrictions on friends' data sharing] are available to all new apps starting today *while existing apps have a full year to upgrade (April 30, 2015).*") (emphasis added).  And as the Court previously recognized, *see* MTD Order at 42, Facebook disclosed to users that a user's friends could re-share the user's data with apps, *see* Ex. 25 at 4.

A March 2018 statement about the April 2014 platform changes also was not false or misleading by failing to disclose the already-public fact that user friends data sharing allegedly continued for preexisting apps for a short time after the announcement.  *See* ¶¶ 383-385.  Plaintiffs do not (and cannot) dispute that, in 2014, Facebook "chang[ed] [its] entire platform to dramatically limit the data apps could access."  ¶ 383; *see also*  ¶¶ 81-85 (discussing 2014 platform changes).  That Facebook allegedly allowed a brief sunset period for certain "whitelisted" third parties, *see* ¶ 384, does not render false or misleading the indisputably true statement that Facebook changed its platform to restrict access to users' friends' data in 2014.[4]

### 7.    Statements About Consent Decree Compliance Not False or Misleading

As the Court previously held, MTD Order at 27-28, statements about Facebook's compliance with the FTC consent decree also were not false or misleading.  *See* ¶¶ 388-403.  Statements that "the consent decree was important," that Facebook "worked hard to make sure that [it] compl[ied]" with the consent decree, and that the Company "respect[ed] local laws and regulations," ¶¶ 391, 393, 394,

---

[4]  Plaintiffs' reliance on the FTC's allegation that Facebook made misleading statements about the platform change in 2014 is misplaced.  *See* ¶¶ 385-386; *see also id.* ¶¶ 81-85.  The FTC's allegations, which Facebook did not admit, concerned statements made in 2014—years before the class period in this case and the March 2018 statement at issue here.

MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

are not capable of objective verification and therefore are "too vague to be actionable."  MTD Order at 27 (holding that "statement[s] of general compliance" are "inactionable corporate puffery").  And statements about Facebook's belief that it had complied with the consent decree, *see* ¶¶ 391-392, 395, were not false or misleading because, at the time the statements were made, "the FTC only stated an intent to investigate Facebook, but had not made any formal finding that Facebook violated the decree order," and the Company was not "required to engage in 'self-flagellation' by disclosing unproven allegations."  MTD Order at 27-28; *see also Bien v. LifeLock Inc.*, 2015 WL 12819154, at \*3-5 (D. Ariz. July 21, 2015) (holding that statements of belief in compliance with FTC consent order were inactionable opinion statements), *aff'd sub nom. In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 950-52 (9th Cir. 2017).  Even if Plaintiffs could sufficiently allege that Defendants were aware of Facebook's so-called "whitelisting" practices, *see* ¶¶ 396, 398-399, Plaintiffs have not alleged facts—as they must—demonstrating that Defendants "were aware of undisclosed material facts tending to *significantly undermine* the accuracy of their belief" that Facebook still was in compliance with the FTC consent decree.  *Bien*, 2015 WL 12819154, at \*4.

### 8.   Statements About User Notification Not False or Misleading

Statements in an April 2017 white paper about notifying Facebook users whose accounts were compromised by "sophisticated attackers" also were not false or misleading.  *See* ¶¶ 404-410.  The Court previously considered these *exact statements* and held they were not rendered false by Facebook's alleged failure to notify users whose data was improperly collected and misused by Kogan and Cambridge Analytica.  MTD Order at 38-40.  The Court held that the statements were not false or misleading because (1) they referred to "targeted data collection and theft" and "phishing with malware," which are not methodologies Cambridge Analytica allegedly employed; and (2) "notification was limited to people targeted by 'sophisticated attackers,'" defined as attackers "'suspected of working on behalf of a nation-state,'" and Plaintiffs did not allege that Cambridge Analytica "was 'suspected of working on behalf of a nation state' or 'government sponsored.'"  *Id.* at 38-39; *see also* Ex. 28; *Hong*, 2017 WL 1508991, at \*15 (falsity inadequately alleged where "the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves").  Plaintiffs allege nothing new that would change either of

this Court's prior conclusions.

Purported "admissions" that Facebook should have notified users affected by Kogan's and Cambridge Analytica's data misuse, *see* ¶¶ 408-409, also do not render the 2017 white paper statements false or misleading.  As the Court previously held, "while these statements may demonstrate Defendants' regret, they do not contradict any alleged earlier statement by Defendants that affected users would be notified about the Cambridge Analytica breach."  MTD Order at 39-40.

### 9.      Statement About GDPR Compliance Not False or Misleading

The October 12, 2017 statement that "we are adhering to" the GDPR also was not false or misleading.  *See* ¶¶ 411-413.  As the Court previously held, this statement cannot plausibly be read to assert—as Plaintiffs claim—that Facebook at that time was "adhering to the European privacy law," which had not yet gone into effect.  ¶ 413; *accord* ¶ 412; *see* ¶ 229 (GDPR did not become effective until May 25, 2018); MTD Order at 43 ("Defendants … never asserted that Facebook was fully compliant with the GDPR.").  Rather, this statement "expresses an intention to adhere to this privacy law, … not a profession of being fully compliant" in advance.  MTD Order at 43.  Thus, the statement cannot be rendered false by Facebook's alleged failure to comply fully with the GDPR, *which was not even in effect at the time the statement was made*.

### 10.     Statements About Russian Interference in U.S. Elections Not False or Misleading

Statements about Russian interference in U.S. elections also are not adequately alleged to be false or misleading.  *See* ¶¶ 414-419.  Plaintiffs allege that it was false for Facebook's then-general counsel to state that the Company had provided "everything we have to date" regarding Russian efforts to influence the 2016 election, and that Facebook had seen "only what appears to be insignificant overlap between the targeting and content used by the [Russian Internet Research Agency] and that used by the Trump campaign."  ¶¶ 415-416.  Plaintiffs allege *no facts* demonstrating that either of these statements were false—*i.e.*, that Facebook *had not provided* complete information about Russian efforts to influence the 2016 election, or that the Company *had seen* significant overlap between the targeting and content used by the Russian IRA and the Trump campaign.  Instead, Plaintiffs allege that these statements were false and misleading because they did not disclose the *unrelated* Cambridge Analytica events.  *See* ¶¶ 417-419.  But Plaintiffs' speculation about "Russia's *likely* targeting of and

Gibson, Dunn &
Crutcher LLP

use of the data exposed by Cambridge Analytica" does not come close to meeting their pleading burden under the heightened standards of the PSLRA. ¶ 419. As the Court previously held, statements that "plainly do[] not bear on the Cambridge Analytica-type privacy issues" cannot be rendered false or misleading by a purported failure to disclose Kogan and Cambridge Analytica's misappropriation and misuse of user data. MTD Order at 39 (citing *Hong*, 2017 WL 1508991, at *15).

### 11. Statements About User Metrics Not False or Misleading

Statements about Facebook's Daily Active User ("DAU") and Monthly Active User ("MAU") metrics—which Plaintiffs failed to even defend in opposing Defendants' prior motion to dismiss, *see* MTD Order at 43 n.12—also were not false and misleading because Facebook later implemented a new methodology for identifying duplicate accounts. *See* ¶¶ 420-426. As the Court previously recognized, "the DAU and MAU figures used were not misleading" because "simply using a new methodology to count accounts is not misleading." MTD Order at 43 n.12 (citing *Ironworkers Local 580—Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 426 (S.D.N.Y. 2014)).

### 12. Statements About Q1-2018 Results Not False or Misleading

Statements about Facebook's Q1-2018 financial results and the alleged "anticipated impact" of "privacy disclosures" on Facebook's business also were not false or misleading. ¶¶ 427-443. As the Court previously held, statements on Facebook's earnings calls about the anticipated impact on the Company of GDPR implementation, *see* ¶¶ 428, 430, 431; *see also* ¶ 437, are protected under the PSLRA safe harbor for forward-looking statements. MTD Order at 25-26; *see* 15 U.S.C. § 78u-5(c)(1); *In re Mellanox Techs. Ltd. Sec. Litig.*, 2014 WL 12650991, at *14 (N.D. Cal. Mar. 31, 2014) (holding that forward-looking statements made during earnings calls were protected by PSLRA safe harbor); *see also* Ex. 9 at 1; Ex. 11 at 8. Plaintiffs claim that these statements were false or misleading because they were meant to "assure investors that the Cambridge Analytica data scandal had not, and would not, have a meaningful financial impact on the business," and that "data breaches like the Cambridge Analytica scandal were behind the Company." ¶¶ 432, 435, 441. But most of the challenged statements do not even *mention* Cambridge Analytica, let alone discuss the supposed going-forward impact of the

Cambridge Analytica events on Facebook's business.[5]  ¶¶ 430, 431, 437, 440.  Thus, these statements about unrelated subjects cannot be rendered false or misleading by Defendants' alleged failure to disclose "heightened privacy-related expenses and declining active user figures" that purportedly followed the 2018 Cambridge Analytica disclosures.  ¶¶ 435, 441; *accord* ¶ 432(c); *see* MTD Order at 39.  And as the Court previously held, Defendants were not required to engage in "self-flagellation" by disclosing that Facebook had "violated the 2012 FTC Consent Decree" and engaged in "privacy misconduct [that] would impact the Company's bottom line."  MTD Order at 27-28.

### 13.  Statements About Sale of User Data Not False or Misleading

Finally, statements that Facebook does not "sell" user data also were not false or misleading. *See* ¶¶ 444-460.  Plaintiffs make the contorted claim that these statements were false or misleading because Facebook used user friend data "as consideration for a reciprocal exchange of value with third-party app developers and other companies who were 'whitelisted' for secret access to user friend data." ¶ 444; *see also* ¶¶ 458-460.  But Plaintiffs do not allege any well-pleaded facts demonstrating that Facebook actually *sold* user data.  At most, Plaintiffs' allegations suggest that Facebook shared data with app developers and service providers to facilitate and/or improve the Company's services, as Facebook disclosed in its Data Policy.  *See* Ex. 25 at 8; Ex. 27 at 2.  Facebook's truthful statements are not actionable.

### C.  Plaintiffs Fail To Plead a Strong Inference of Scienter

The SAC should be dismissed on the separate ground that Plaintiffs once again fail to plead with particularity that Defendants knew or should have known that any of the challenged statements were false or misleading.  This is unsurprising because Plaintiffs continue to rely on the same deficient allegations that this Court already held were insufficient to plead scienter with respect to Plaintiffs' prior complaint.  MTD Order at 45-47.  Plaintiffs' only new allegations—supposed "findings" from regulatory actions; one so-called "witness" account; and cherry-picked statements from documents created many years before the class period—come nowhere close to satisfying Plaintiffs' significant burden of pleading "with particularity facts giving rise to a strong inference that the defendant acted

---

[5]  Mr. Zuckerberg's May 1, 2018 statement at Facebook's annual F8 Developer Conference, ¶ 434, is virtually identical to his March 21, 2018 Facebook post, ¶ 383, and is not false or misleading for the same reasons, *see supra* at 16.

with the required state of mind" regarding "each act or omission alleged." 15 U.S.C. § 78u-4(b)(2)(A).

Plaintiffs must plead that "the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991 (quoting *Daou*, 411 F.3d at 1014-15). "Recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014). A strong inference of scienter exists "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "In reviewing a complaint under this standard, the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Metzler*, 540 F.3d at 1061. Plaintiffs fail to plead that any Individual Defendant acted with scienter under these strict standards, which is fatal to their claim against both the Individual Defendants and Facebook. *See Cheung v. Keyuan Petrochemicals, Inc.*, 2012 WL 5834894, at *3 (C.D. Cal. Nov. 1, 2012) ("Plaintiffs must allege the requisite level of scienter with respect to at least one of the Individual Defendants" in order to plead corporate scienter).

### 1. Regulatory "Findings" Do Not Support a Strong Inference of Scienter

Plaintiffs fail to plead scienter based on allegations made in an SEC settlement. After the SEC finished its "extensive, year-long investigation," ¶ 272, the SEC charged Facebook with securities law violations that *do not require proof of scienter*. Ex. 15 at 13-15.[6] While the SEC alleged that certain statements by Facebook were rendered misleading by Cambridge Analytica's misappropriation of user data, ¶¶ 273-275—which Defendants deny for the reasons set forth above, *see supra* at 13-14—the SEC did *not* allege that any of the Individual Defendants knew that the challenged statements were false. To the contrary, the SEC alleged that Facebook's "processes and procedures around the drafting of its" SEC filings "failed to bring [Kogan's] sale of data from tens of millions of Facebook users to Cambridge to the attention of the individuals with primary responsibility for drafting and approving

---

[6] *See SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001) (Sections 17(a)(2) and (3) do not require scienter); *Ponce v. SEC*, 345 F.3d 722, 737 n.10 (9th Cir. 2003) ("Section 13(a) violations do not require scienter"); *SEC v. Leslie*, 2008 WL 4183939, at *1 (N.D. Cal. Sept. 9, 2008) ("there is no scienter requirement under section 13 or the corresponding regulations").

Gibson, Dunn &
Crutcher LLP

those reports." Ex. 15 ¶ 40; *see id.* ¶ 41.  "As a result, Facebook *senior management* and relevant legal staff did not assess the scope, business impact, or legal implications of [Kogan's] improper transfer of data to Cambridge."  *See id.* ¶ 43.  These allegations provide no basis for pleading intentional or deliberately reckless misconduct (*i.e.*, scienter).

Plaintiffs' reliance on allegations from a 2019 FTC settlement and a British Parliamentary Committee report also gets Plaintiffs nowhere on scienter.  ¶ 270.  Plaintiffs allege that scienter can be inferred because the FTC alleged that "Facebook knew or should have known that its conduct violated the 2012 [Consent Decree]." ¶ 287 (alteration in original).  This allegation is "entirely conclusory."  *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1044 (N.D. Cal. 2007).  In any event, an "inference that [Facebook] *should* have known of the violations [of the Consent Decree]"—suggesting only negligence—"is not sufficient to meet the stringent scienter pleading requirements of the PSLRA." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) (emphasis in original).  The Parliamentary Committee's conclusion that "it is evident that Facebook intentionally and knowingly violated both data privacy and anti-competition laws" similarly fails.  ¶ 312.  Plaintiffs fail to connect whatever knowledge supposedly is referred to by this vague assertion (which does not even identify *which* laws supposedly were violated) to any challenged statement.  And the Committee's assertion was based on "the documents we received from Six4Three," which "spanned between 2012 and 2014"—*three to five years before the class period*.  Ex. 13 at 26, 42.  As this Court already held, Plaintiffs cannot plead that Defendants knew statements during the class period were false by pointing to supposed evidence from many years prior.  MTD Order at 46; *see also In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869 at *18 (N.D. Cal. Feb. 12, 2015) (alleged fact that was *three months* old was too stale to establish falsity of later statement).[7]

### 2.  So-called "Witness Statements" Do Not Establish Scienter

Acknowledging that they still cannot find a single "confidential witness" to support their baseless securities fraud case, *see* ¶ 486, Plaintiffs continue to point to the same public statements by supposed "witnesses" that this Court previously held do not support scienter.  MTD Order at 46.

---

[7]  The scienter allegations based on the Delaware Court of Chancery's opinion in *In re Facebook, Inc. Section 220 Litigation* rely on the Parliamentary Committee report conclusions, and are deficient for the same reasons.  ¶¶ 307, 309; *see* Ex. 14 at 27 & 41 n.149.

MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

Plaintiffs again rely on allegations that early Facebook investor Roger McNamee and former Facebook employee Sandy Parakilas warned Defendants about Facebook's "lax data privacy practices." ¶ 485(b).  But again, Mr. McNamee's alleged warnings to Mr. Zuckerberg and Ms. Sandberg, made *one year before the class period* (MTD Order at 45-46), were about "algorithms" that might "allow manipulation of users by bad actors who use the same tools designed for advertisers"—a reference to Russian influence in the 2016 elections—*not* that Facebook was failing to adequately protect user data. Ex. 19.  Plaintiffs' allegations regarding Mr. Parakilas' vague warnings are even more deficient because they were (1) made "*five years* before the Class Period began" (MTD Order at 46 (emphasis in original)) and (2) not alleged to have been made to the Individual Defendants.  ¶ 258.  Repeating these deficient allegations gets Plaintiffs nowhere.

Plaintiffs' only new "witness statement"—from former FTC technologist Ashkan Soltani, who allegedly was involved in Facebook's settlement with the FTC in 2011, six years before the class period—also cannot establish scienter.  Plaintiffs refer to Mr. Soltani's "understanding [] that a lot of these decisions are [Ms. Sandberg's]."  Ex. 12 at 32; ¶ 122.  Plaintiffs then make the completely unsubstantiated leap that "these decisions" included Facebook's so-called "whitelisting" practices.  *See* ¶ 122 (adding "whitelisting and overriding privacy settings" to Mr. Soltani's testimony in brackets). But Mr. Soltani said no such thing, Ex. 12 at 32, and there is no basis to infer from his testimony that he knew about Ms. Sandberg's knowledge of or involvement in so-called "whitelisting."  Mr. Soltani is not even a current or former Facebook employee, and his testimony was admittedly "[b]ased only on publicly available information," Ex. 12 at 23, so he was not "in a position to be personally knowledgeable of the information alleged."  *Zucco*, 552 F.3d at 996.

### 3.   Stock Sales Do Not Support a Strong Inference of Scienter

Plaintiffs rely on the same deficient stock sale allegations they made in their previous complaint.  Stock sales by senior officers "are not inherently suspicious."  *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, at *8 (N.D. Cal. June 28, 2005).  "[S]tock sale allegations cannot raise an inference of scienter unless Plaintiffs allege specific facts showing that the sales were 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'"  *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1116 (N.D. Cal. 2003)

1    (quoting *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir. 1999)).  "To make this

2    determination, [the Ninth Circuit] look[s] to three factors: (1) the amount and percentage of shares sold

3    by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior

4    trading history."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856

5    F.3d 605, 621 (9th Cir. 2017).  None of these factors supports an inference of scienter here.

6           First, none of the trades referenced in the Complaint is "suspicious" because all of the trades

7    were executed pursuant to Rule 10b5-1 plans established *before* the class period—a fact Plaintiffs still

8    conspicuously fail to acknowledge.  *See* Exs. 1-4, 7-8.  Rule 10b5-1 permits company insiders to adopt

9    written, pre-arranged trading plans under which specific amounts of stock are sold according to pre-

10   established criteria, thereby eliminating an individual's discretion over trading.  *See* 17 C.F.R.

11   § 240.10b5-1(c).  "[A]utomatic sales made pursuant to Rule 10b5-1 plans do not support a strong

12   inference of scienter."  *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1056 (N.D. Cal. 2018)

13   (Davila, J.); *see also Metzler*, 540 F.3d at 1067 n.11 (noting sales "took place according to pre-

14   determined 10b5-1 trading plans" and "[s]ales according to pre-determined plans may rebut … an

15   inference of scienter").

16          Plaintiffs also fail to allege that the sales were timed to maximize the benefit to the Individual

17   Defendants.  "[I]nsider trading is suspicious only when it is dramatically out of line with prior trading

18   practices *at times calculated to maximize the personal benefit from undisclosed inside information*."

19   *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (emphasis in original).  Here, the vast majority

20   of Ms. Sandberg's and Mr. Wehner's sales before the first alleged corrective disclosure in March 2018

21   were at prices *below* the $172.56 share price at which Facebook's stock was trading *after the alleged*

22   *fraud was first revealed*.  *Compare* ¶¶ 502-503, *with* ¶ 513.  "When insiders miss the boat this

23   dramatically, their sales do not support an inference that they are preying on ribbon clerks who do not

24   know what the insiders know."  *Ronconi*, 253 F.3d at 435.  And Plaintiffs' allegation that Mr.

25   Zuckerberg's failure to sell stock in the fourth quarter of 2018 establishes scienter (¶ 501) is fatally

26   undermined by the fact that he continued to sell *after* the July 2018 stock price decline.  Exs. 5-6.

27          Second, when it comes to stock sales, the Ninth Circuit has held that, "by themselves, large

28   numbers do not necessarily create a strong inference of fraud."  *In re Vantive Corp. Sec. Litig.*, 283

F.3d 1079, 1093 (9th Cir. 2002), *abrogated on other grounds by Gebhart v. SEC*, 595 F.3d 1034 (9th Cir. 2010).  This is because Plaintiffs must provide "sufficient context of insider trading" to support an inference of scienter.  *Ronconi*, 253 F.3d at 436.  Notably absent from the Complaint is a single allegation regarding the Individual Defendants' holdings of Facebook stock or the percentage of those holdings sold during the class period.  *Compare* ¶¶ 490-491, 496, 502-503.  Without this information, Plaintiffs cannot allege that the sales are suspicious because there is no way to compare them to the Individual Defendants' overall holdings.

Third, Plaintiffs' allegations regarding the Individual Defendants' trading practices prior to the class period do not support any inference of scienter.  "For individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period."  *Zucco*, 552 F.3d at 1005.  Plaintiffs do not allege *any* facts about Ms. Sandberg's and Mr. Wehner's trading history.  "Without a meaningful trading history from which to compare, the Court cannot conclude that [their] trades were suspicious and thus supportive of scienter."  *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1105 (N.D. Cal. 2006).  With respect to Mr. Zuckerberg, Plaintiffs make inconsistent allegations.  *Compare* ¶ 392 ("Zuckerberg sold twice as much stock during the Class Period as compared to the same amount of time preceding the Class Period."), *with* ¶ 498 ("[Mr. Zuckerberg] sold three times more stock during the Class Period than he did for the same period preceding the Class Period.").  Regardless, neither of these allegations (which do not even include the sale price) supports a finding that Mr. Zuckerberg's trading was "dramatically out of line with prior trading practices" as a matter of law.  *Vantive*, 283 F.3d at 1095 (court "[u]nable to find anything unusual about" an insider selling nearly *six* times as much stock during the class period).

### 4.    Statements of Regret Do Not Establish Scienter

This Court already held that Plaintiffs cannot plead scienter by pointing to Defendants' "statements of regret."  *See* MTD Order at 45.  Nonetheless, Plaintiffs repeat their rejected allegation that Facebook's expressions of regret that it did not do more in 2015 when the Company first learned that about Cambridge Analytica somehow constitute "admissions of wrongdoing."  ¶ 155.  Again, "Plaintiffs' theory is basically an assertion of fraud by hindsight," *In re Leapfrog Enters., Inc. Sec.*

1    *Litig.*, 200 F. Supp. 3d 987, 1005 (N.D. Cal. 2016), which cannot support a strong inference of scienter.

2    *Daou*, 411 F.3d at 1021; *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 536 (3d Cir. 1999),

3    *abrogated on other grounds by Tellabs*, 551 U.S. 308, 324 (2007) (allegation that defendant "expressed

4    regret" nine months after allegedly false statement does not demonstrate "actual knowledge of []

5    statements' falsity"); *Hong*, 2017 WL 1508991, at *21 (rejecting supposed "admission" because

6    statement was not "along the lines of 'I knew it all along'").  There is no reason for this Court to revisit

7    its ruling rejecting this theory.

8    ### 5.    Plaintiffs Fail to Plead Corporate Scienter

9    "[A] corporation 'can only act through its employees and agents' and can likewise only have

10   scienter through them."  *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015).

11   Thus, to plead Facebook's scienter, "Plaintiffs must allege the requisite level of scienter with respect

12   to at least one of the Individual Defendants."  *See Keyuan Petrochemicals*, 2012 WL 5834894, at *3.

13   Because Plaintiffs fail to plead scienter as to any of Facebook's senior executives, (which must be

14   pleaded individually, not collectively), they fail to plead scienter as to Facebook.

15   ### D.    Plaintiffs Fail to Plead Loss Causation

16   The SAC also must be dismissed on the independent ground that Plaintiffs fail to adequately

17   plead loss causation.  The scant new allegations in the SAC do nothing to remedy the defects with

18   Plaintiffs' loss causation theory that Facebook identified in its prior motion to dismiss.  To adequately

19   plead loss causation—the causal connection between a misrepresentation and a loss—the plaintiff

20   "must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than

21   some other intervening event" or "other fact."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir.

22   2016); *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).  Plaintiffs

23   must plead loss causation with particularity under Rule 9(b).  *Inchen Huang v. Higgins*, 2019 WL

24   1245136, at *4 (N.D. Cal. Mar. 18, 2019).

25   While "loss causation is a 'context-dependent' inquiry," Plaintiffs here rely on a "restrictive …

26   fact specific" causation theory based on "[r]evelation of the fraud in the marketplace."  *First Solar*, 881

27   F.3d at 753, at *3; *Rok v. Identiv, Inc.*, 2018 WL 807147, at *7 (N.D. Cal. Feb. 9, 2018).  Under this

28   rubric, Plaintiffs must prove that (1) they purchased a security at a price that was artificially inflated

by a specific alleged misstatement, and (2) that a "corrective disclosure" revealed the "truth" about that specific misstatement, which caused a "substantial" amount of plaintiff's alleged losses. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341, 344-48 (2005); *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119-20 (9th Cir. 2013); *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *5 (C.D. Cal. Feb. 6, 2014) (the market must "actually learn[] of and react[] to the specific fraud alleged by the plaintiff, as opposed to reacting to reports of the defendant's poor financial health generally").  The release of negative information followed by a stock drop is therefore insufficient to establish loss causation, and Plaintiffs must instead trace their claimed loss back to "the very facts about which the defendant lied." *Nuveen*, 730 F.3d at 1120.  Further, the alleged "corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time." *Rok v. Identiv, Inc.*, 2017 WL 35496, at *18 (N.D. Cal. Jan. 4, 2017) (quoting *Meyer v. Greene*, 710 F.3d 1189, 1197-98 (11th Cir. 2013)); *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 2937483, at *5 (N.D. Cal. May 20, 2016) ("New information is critical to demonstrating loss causation.").[8]

Plaintiffs fail to satisfy their burden.  Plaintiffs' loss causation allegations consist of "a series of partial disclosures" preceding stock drops on March 19, 20, 22, 23, and 27, 2018, and Facebook's second quarter earnings announcement on July 25, 2018.  ¶¶ 511-528.  But none of these "partial disclosures" revealed any supposed "truth" regarding any particular statement that Plaintiffs allege was false or misleading.  In short, Plaintiffs fail to plead that it was Defendants' "misstatement, as opposed to some other fact, [that] foreseeably caused the plaintiff's loss." *First Solar, Inc.*, 881 F.3d at 753.[9]

---

[8] Plaintiffs claim that they are proceeding under a "corrective disclosure" theory, ¶¶ 510-520.  In their opposition to Defendants' last motion to dismiss, Plaintiffs claimed that they were also asserting a "materialization of risk" theory.  ECF No. 99 at 28 n.34.  But the only paragraph of the SAC relating to this theory merely appends conclusory language, with no factual support, that unspecified alleged "disclosures … revealed some of the falsity of defendants' statements … including the concealed materialization of risks to its operations."  ¶ 511.  Although the "'materialization of the risk' approach has not been [explicitly] adopted by the Ninth Circuit," *Eng v. Edison Int'l*, 2018 WL 1367419, at *2-3 (S.D. Cal. Mar. 16, 2018), courts that have recognized the theory have held that a plaintiff may not employ conclusory allegations to plead adequately a "materialization of risk." *See, e.g., Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 176-77 (2d Cir. 2005) (similar materialization of risk allegation was "a legal conclusion; missing are the necessary allegations of fact to support the conclusion").

[9] In *First Solar*, the Court of Appeals reaffirmed that the "ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." 881 F.3d at 753.  The court recognized that, although securities fraud plaintiffs need not plead "a causation

### 1. Plaintiffs Fail to Plead Loss Causation for the March 19, 2018 Decline

According to Plaintiffs, the March 19, 2018 decline was "caused" by disclosures in articles published on March 17, 2018 in *The Guardian* and *The New York Times*. ¶¶ 512-513. But Plaintiffs fail to show how those articles revealed the "truth," or even related back, to any particular misstatement made by Defendants. Instead, Plaintiffs' loss causation argument consists entirely of conclusory allegations that "the articles published by *The New York Times* and *The Guardian* on Saturday, March 17, 2018 caused the price of Facebook common stock to decline," ¶ 513, and that certain unspecified facts in those articles contradicted other unspecified "prior public statements," SAC at 58. Plaintiffs' failure to "specify which of the Defendants' statements were made untrue" by these documents is fatal under Rule 9(b)'s particularity requirement. *See, e.g., Apollo*, 774 F.3d at 608 (rejecting loss causation theory because it was "unclear what claims" made by defendants were invalidated by alleged disclosures in press releases and reports); *Nuveen*, 730 F.3d at 1119-20 (plaintiff must trace loss back to "the very facts about which the defendant lied").

Plaintiffs do not make this connection because they cannot. None of the news articles on which Plaintiffs rely describe or reveal a particular Facebook statement to be false or misleading—they at most express frustration that Facebook's controls did not stop Cambridge Analytica from misusing user data. The March 17, 2019 articles say *nothing* about "whitelisting," nor do they indicate that Kogan's app obtained user data in a manner contrary to Facebook's policies. In fact, they say the opposite: that Facebook's then-active Platform Policy "allowed [the] collection of friends' data to improve user experience in the app" but "barred it [from] being sold [] or used for advertising." Ex. 21. Because this "critical link is missing," Plaintiffs "invit[e] the court to assume that the misrepresentations account" for the losses, rather than some other information, such as the revelation that Cambridge Analytica breached Facebook's policies, stole user data, and lied about deleting it. *See Lloyd*, 811 F.3d at 1209 (Plaintiff "must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some other intervening event").

In any event, the articles in *The Guardian* and *The New York Times* cannot constitute "corrective

---

theory based on market revelation of the [alleged] fraud," the plaintiff still must plead and prove that it was the "defendant's misstatement, as opposed to some other fact," that "foreseeably caused the plaintiff's loss." *Id.*

MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

disclosures" because the essential allegations in both articles already had been revealed by *The Guardian* in 2015 (and continued to be the subject of media reports thereafter, *see, e.g.*, Ex. 24)—more than one year before the putative class period—*i.e.*, that Cambridge Analytica had harvested and misused this same user data to serve targeted advertisements for political campaigns. *See* Ex. 17. The only new facts of substance revealed by the March 17, 2018 articles were that Cambridge Analytica might not have deleted all of the Facebook data in its possession, despite its contrary representations to Facebook, and might have used that data during the 2016 presidential campaign. Exs. 21-22. Even Plaintiffs recognize that the only new information of import in the March 17, 2018 articles—that Cambridge Analytica, in contravention of representations made to Facebook, improperly retained and possibly used Facebook user data—was accomplished without Facebook's consent, and in violation of its policies. *E.g.*, ¶¶ 186, 373. Thus, insofar as the March 17, 2018 articles revealed any new information, that information hardly revealed the "truth" of alleged misstatements *by Facebook*.

### 2.    Plaintiffs Fail to Plead Loss Causation with Respect to Other March Declines

Plaintiffs also claim that a hodgepodge of "[c]ontinuing revelations of [the] extent of data breach and lax enforcement and of regulatory and user backlash" in the ten days following the initial articles in *The Guardian* and *The New York Times* qualify as corrective disclosures. ¶ 512. The supposedly "corrective" disclosures that Plaintiffs cite are:

- a March 18, 2018 tweet by Cambridge Analytica employee Christopher Wylie stating that he had been "[s]uspended by @Facebook," ¶ 514;

- a March 19, 2018 press report stating that Facebook's Chief Information Security Officer was leaving Facebook as a result of investigations into "Russian hacking," *id.*;

- disclosures on March 20, 2018 "regarding the widening scope of the data privacy risks, including call for users to 'deleteFacebook' and unconfirmed reports of government investigations into the matter," *id.*;

- a March 20, 2018 press report stating that app developers harvested user data from Facebook in violation of Facebook's policies, and a claim by a Facebook Platform operations manager that Facebook user data had been exploited, *id.*;

- additional unspecified "[c]ontinuing revelations" that are alleged to have occurred between March 22, March 23, and March 27, 2018, ¶ 512;

- more "additional details" concerning the scope of the data breach, the risks facing the

Company, and the "increased calls for government investigations," ¶ 516; and

- yet more "continuing revelations" on March 27, 2018 concerning "the extent of the data breach and risks to the Company, including the FTC's confirmation that it had opened an investigation into Facebook's compliance with the FTC consent decree," ¶ 517.

For all these purported corrective disclosures, Plaintiffs do not even try to meet their burden of tracing the alleged loss back to "the very facts about which the defendant lied," *Nuveen*, 730 F.3d at 1120, or explain how the statements corrected some particular falsehood perpetuated by Defendants. Nor do they try to explain *why* or *how* these "revelations" proximately caused any of the stock price drops to which they purportedly correspond. *See Apollo*, 774 F.3d at 608 ("Plaintiffs must demonstrate a causal connection between the deceptive acts … and the injury suffered by the Plaintiffs."); *In re Allied Nev. Gold Corp. Sec. Litig.*, 2016 WL 4191017, at *14 (D. Nev. Aug. 8, 2016). These failures are fatal to their claims.

In addition, the purported "corrective disclosures" on March 20, 22, 23, and 27 that merely assert unspecified "additional details" and "continuing revelations," are patently insufficient under Rule 9(b), as they neither tie to any allegedly false statement, *Apollo*, 774 F.3d at 605, 608, nor suggest any new material information relating to the alleged fraud that was not already in the market. *See, e.g., Meyer*, 710 F.3d at 1197-98 ("[C]orrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time …."); *Rok*, 2017 WL 35496, at *18 (same). And as for the purported disclosures on March 20, 23, and 27, concerning "increased calls for government investigations," "unconfirmed reports of government investigations," and the FTC "open[ing] an investigation," these allegations also do not establish loss causation. "The announcement of an investigation does not 'reveal' fraudulent practices to the market," *Loos*, 762 F.3d at 890, and is insufficient to establish loss causation unless the plaintiff also sufficiently "alleges a subsequent corrective disclosure," *City of Fort Lauderdale Gen. Emps.' Ret. Sys. v. Edison Int'l*, 2019 WL 6445432, at *1 (9th Cir. Nov. 29, 2019) (request for government investigation is "too opaque to constitute partial disclosures of the true facts"); *accord Curry v. Yelp Inc.*, 875 F.3d 1219, 1225 (9th Cir. 2017).[10]  In short, Plaintiffs' transparent attempt to capture as many price declines as possible,

---

[10]  As for the other purported disclosures, none of the information they contained differed materially from information already available to the public.  The March 18 tweet itself says nothing novel or

MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

regardless of their relation to the alleged "fraud," is not a viable theory of loss causation.[11]

**3.      Plaintiffs Fail to Adequately Allege Loss Causation for the July 26, 2018 Decline**

Plaintiffs' loss causation theory as to the July 26, 2018 stock price drop is even more deficient. Plaintiffs allege that Facebook's second quarter earnings announcement on July 25, 2018, which reported lower than expected revenues, profits, and user engagement, "revealed the true extent of the damage from the Cambridge Analytica scandal." ¶ 519.  Plaintiffs' attempt to shoehorn the purported collateral effects of the "Cambridge Analytica scandal" into a viable securities fraud theory against Facebook fails for at least three reasons.

*First*, Facebook's second quarter earnings announcement described nothing "new" relating to Facebook's privacy practices, third-party data harvesting, or Cambridge Analytica.  The announcement did not *even mention* Cambridge Analytica, "whitelisting," or any privacy incident alleged in the Complaint.  *See* Ex. 10.  Accordingly, nothing in the earnings call "corrected" any alleged prior misstatement or omission of material fact.  *See In re Maxim Integrated Prods., Inc. Secs. Litig.,* 639 F. Supp. 2d 1038, 1048 (N.D. Cal. 2009) (a "disclosure that does not reveal anything new to the market is, by definition, not corrective").

Plaintiffs nonetheless speculate that Facebook's reported 50% year-over-year increase in expenses revealed that Facebook was not in fact "protect[ing] user data from exploitation." ¶ 521.  But this expense information was not "new"; on the contrary, in Plaintiffs' prior complaint, they *admitted*

---

material: simply that Mr. Wylie was "[s]uspended by @facebook." ¶ 514.  The March 19 article, which noted that Facebook's Chief Information Officer was leaving the company, revealed nothing new about Facebook's privacy practices, or Russian interference in the 2016 election—the article's actual subject matter.  *See also* ¶ 514 (alleging that Facebook's CIO denied that he had been "forced out," contradicting Plaintiffs' characterization of the article).  Likewise, the substance of the March 20 article, had already been disclosed in November 2017, in a separate op-ed written by Mr. Parakilas for the *New York Times*.  *See* Ex. 18; *see also* ¶¶ 260-61 & ns. 245-249 (Plaintiffs citing the two Parakilas articles interchangeably).  The March 20, 2018 article even states that "Parakilas first went public with his concerns about privacy at Facebook *four months ago*." Ex. 20 at 2.

[11]  Plaintiffs' only allegation that even alludes to the broad category of potential statements it claims were revealed to be false is the general assertion that the "each" of the dozen or so "incomplete" and partial disclosures "revealed some of the falsity of defendants' statements regarding user control over data, the Cambridge Analytica matter, and other elements of defendants' fraud alleged herein." ¶ 511.  Thus, Plaintiffs at once assert—without explanation or citation—that every one of the dozens of alleged false statements was newly revealed to be fraudulent by every one of the alleged corrective disclosures.  This ham-fisted approach fails Rule 9(b)'s particularity requirement.  *See, e.g.*, *Metzler*, 540 F.3d at 1064.

Gibson, Dunn &
Crutcher LLP

that the 50% increase in expenses was precisely in line with Facebook's guidance in April 2018 that "investors [should] expect full-year 2018 expenses to grow 50%-60%." *See* Ex. 10 at 8; ECF No. 86 at ¶ 275.  Plaintiffs similarly allege that Facebook admitted for the first time during the second quarter earnings call that implementation of the GDPR could have a negative impact on Facebook's revenues and user engagement.  ¶ 247-248.  Here again, Facebook expressly warned investors in its first quarter earnings announcement that the GDPR would likely have an impact on Facebook's user base in Europe, and possibly more broadly.  *See, e.g.*, ¶ 431; *see also* Ex. 9 at 8, 11, 15, 18, 23 (Mr. Wehner projecting that GDPR would cause Facebook's UK user base to "be flat to slightly down," and Ms. Sandberg warning that GDPR "would affect the [advertising] product."); *compare* Ex. 10 at 7 (Mr. Wehner describing the Q2-2018 impact from GDPR as "consistent with the outlook" from the Q1-2018 estimates).  During the second quarter earnings call, one analyst even praised Facebook for providing an "accurate read into the June quarter" on the likely effect of the GDPR.  Ex. 10 at 15.

*Second*, Plaintiffs have not, and cannot, show a proximate causal connection between the price drop following the earnings announcement and any alleged fraud.  *See Nuveen*, 730 F.3d at 1120 (a plaintiff must connect the loss back to the "very facts about which the defendant lied").  Plaintiffs fail to offer any plausible explanation why it was the alleged fraud that substantially caused stock prices to fall, as opposed to disappointing news about Facebook's finances.  *See In re Immersion Corp. Sec. Litig.*, 2011 WL 871650, at *8 (N.D. Cal. Mar. 11, 2011) (rejecting loss causation allegations where plaintiff "fail[ed] to plead facts sufficient to … show any decline in stock price was caused by the alleged fraud rather than a typical market reaction to disappointing financial reports").

Plaintiffs' loss causation theory with respect to the July earnings call is particularly attenuated because the earnings announcement made no reference to any of the privacy incidents alleged in the SAC that form the basis of the alleged fraud.  Rather, as Plaintiffs recognize, Facebook's shares fell on the news that Facebook reported "lower than expected revenues and earnings," with "reduced guidance going forward," and that its user growth was "decelerating worldwide."  ¶ 26.  Numerous courts in this Circuit and elsewhere have rejected remarkably similar loss causation allegations where the "far more plausible reason" for a stock drop is a company's failure to "hit prior earnings estimates"—and *not* the revelation of fraud.  *Metzler*, 540 F.3d at 1063, 1065 (announcements had not "disclosed—or even

suggested—[fraud] to the market"); *In re Verifone Sec. Litig.*, 2016 WL 1213666, at *9 (N.D. Cal. Mar. 29, 2016) ("While the less-than-expected revenue and subsequent reports refer to VeriFone's unsuccessful business model transition, the alleged statements sound more as a critique of poor performance rather than an indication of securities fraud" and "do[] not show that Defendants engaged in fraudulent misconduct which led to lower revenues."); *Brodsky v. Yahoo! Inc*., 592 F. Supp. 2d 1192, 1207 (N.D. Cal. 2008) (rejecting theory that deceleration in growth and revenue decrease in earnings report were linked to "any announcement of fraud" where the reports had not "comment[ed] on any [of the] fraud issues"); *Rok*, 2017 WL 35496, at *19-20 (holding that SEC filings "did not address" or "mention" underlying fraudulent conduct and, hence, plaintiff could not show that the stock price decline "was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors").

*Third*, the movement of Facebook's stock price in the months preceding the July 2018 drop further undermine Plaintiffs' loss causation theory.  Following publication of the 2015 *The Guardian* article, the 2018 *The Guardian* and *The New York Times* articles, and all the other purported "[c]ontinuing revelations of [the] extent of data breach and lax enforcement and of regulatory and user backlash" that Plaintiffs allege, Facebook's stock price made a *full recovery by May 10, 2018*—and *continued to climb* thereafter.  ¶ 512; Ex. 29.  On April 25, 2018, Facebook's first quarter revenues, earnings, and user engagement metrics all met or exceeded expectations.  ¶ 219.  Accordingly, if any *fraud* pertaining to Cambridge Analytica was revealed in March 2018, that information was fully incorporated into the market price of Facebook's stock no later than March 27.  *See* ¶¶ 514-517.  The notion that these same facts again gave rise to "fraud" four months later is nonsensical.

At the end of the day, the SAC attempts to plead "revelation of fraud" based solely on Facebook's announcement of "an earnings miss."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 393 (9th Cir. 2010).  Plaintiffs' hope seems to be that, by not specifying any particular statement rendered false, one of the dozens in the SAC might sneak through.  But Plaintiffs cannot "plead loss causation through 'euphemism' and thereby avoid alleging the necessary connection between the defendant's fraud and the actual loss."  *Metzler*, 540 F.3d at 1064.  After all, "a plaintiff will always be able to contend that the market 'understood'" a statement "as a coded message revealing the fraud."  *Id*.  If

this were sufficient, Rule 10b-5 would be converted into loss insurance for negative news subsequently depicted by lawyers as a result of fraud. *See Dura*, 544 U.S. at 345.

**E.  Plaintiffs Fail to Plead Reliance**

Plaintiffs must plead that they relied on the allegedly false or misleading statements in purchasing Facebook stock. *See ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1252-53 (C.D. Cal. 2015). Plaintiffs rely on the fraud-on-the market presumption to establish reliance. ¶¶ 533-534. But they are not entitled to this presumption where, as here, the market already was aware of the core information that Plaintiffs claim was omitted—namely, that Facebook "knowingly and recklessly allowed third-party app developers to harvest and misuse user data without their knowledge and consent, including, for example, Cambridge Analytica and its affiliated companies." ¶ 471. "In a fraud-on-the-market case, an omission is actionable under section 10(b) and Rule 10b-5 only if the allegedly undisclosed information *has not already entered the market*." *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 975-76 (9th Cir. 1999). "If the market has become aware of the allegedly concealed information, the facts allegedly omitted by the defendant would already be reflected in the stock's prices and the market will not be misled." *Id*. at 976. Under these circumstances, "the element of reliance will not be satisfied, and plaintiff's claims based on a fraud on the market theory will fail." *Id*.; s*ee Kalobios*, 258 F. Supp. 3d at 1008 (rejecting fraud-on-the-market presumption when allegedly omitted information about defendant's reputation was well documented in the press).

Plaintiffs admit that "in December 2015, Facebook learned that Cambridge Analytica had improperly bought Facebook user data from Kogan in violation of Facebook's policies," more than one year before the start of the class period. ¶ 276. The article in *The Guardian* article published in December 2015 reported that Kogan collected user data through his app and then sold certain of that data to Cambridge Analytica in violation of Facebook's policies, and that Cambridge Analytica in turn used Kogan's data to create psychological profiles of voters for the purpose of assisting political campaigns. ¶¶ 5, 86-92, 232, 280; *see also* Ex. 17. Mainstream news sources reported additional details about Cambridge Analytica's misuse of Facebook user data. *See, e.g.*, ¶¶ 141, 146 (describing articles published in *The Wall Street Journal* and *The Washington Post*). Because "the content of [the] articles, as well as the credibility and wide circulation of their respective sources," ensured that the

market was aware of the allegedly omitted information about third party misuse of Facebook user data, Plaintiffs are not entitled to a presumption of reliance under the fraud-on-the-market doctrine.  *See Kalobios*, 258 F. Supp. 3d at 1009; *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1115-16 (9th Cir. 1989); *Heliotrope*, 189 F.3d at 976-77; *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1410 (9th Cir. 1996).

**F.      Plaintiffs Fail to Plead Claims Under Sections 20(a) Or 20A**

Because both the Section 20(a) and Section 20A claims require Plaintiffs to plead a primary violation of the Exchange Act, Plaintiffs' failure to plead a violation of Section 10(b) or Rule 10b-5 requires dismissal of these claims.[12] *NVIDIA*, 768 F.3d at 1052 (Section 20(a)); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

**G.      The SAC Should Be Dismissed With Prejudice**

Because the SAC lacks particularized facts sufficient to meet the heightened pleading standard under the PSLRA, and because there is no basis to conclude that Plaintiffs can remedy those deficiencies, the SAC must be dismissed with prejudice.  *See, e.g.*, *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1163 (C.D. Cal. 2007).

**IV.      CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss the SAC with prejudice.

DATED:  January 15, 2020                    GIBSON, DUNN & CRUTCHER LLP


By:      /s/ *Orin Snyder*
Orin Snyder
200 Park Avenue
New York, N.Y. 10166-0193
Tel: 212.351.4000
Fax: 212.351.4035
osnyder@gibsondunn.com

---

[12]  Plaintiffs' Section 20(a) claim must be dismissed for the additional reason that Plaintiffs fail to plead facts demonstrating Facebook "exercised actual power over [a] primary violator." *NVIDIA*, 768 F.3d at 1052; *see In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 66281, at *19 (N.D. Cal. Jan. 4, 2017) (Plaintiffs must plead Section 20(a) claims with particularity.).  Plaintiffs fail to explain, because they cannot, how Facebook simultaneously could control, ¶ 366, and be controlled by the Individual Defendants.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joshua S. Lipshutz
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Tel:  202.955.8500
Fax:  202.467.0539
jlipshutz@gibsondunn.com

Kristin A. Linsley
Brian M. Lutz
555 Mission Street
Suite 3000
San Francisco, CA 94105-0921
Tel: 415.393.8200
Fax: 415.374.8306
klinsley@gibsondunn.com
blutz@gibsondunn.com

Paul J. Collins
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel:  650.849.5300
Fax:  650.849.5333
pcollins@gibsondunn.com

*Attorneys for Defendants Facebook, Inc.,
Mark E. Zuckerberg, Sheryl K. Sandberg,
and David M. Wehner*

36

MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

1

## CERTIFICATE OF SERVICE

2

I, Orin Snyder, declare as follows:

3

I am employed in the County of New York, State of New York, I am over the age of eighteen

4

years and am not a party to this action; my business address is 200 Park Avenue, New York, NY 10166-

5

0193, in said County and State.

6

I hereby certify that on January 15, 2020, the foregoing **DEFENDANTS' NOTICE OF**

7

**MOTION AND MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS**

8

**ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS;**

9

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** was filed with

10

the Clerk of the Court via CM/ECF.  Notice of this filing will be sent electronically to all registered

11

parties by operation of the Court's electronic filing systems.

12

13

14

DATED: January 15, 2020                            By:   _/s/ *Orin Snyder*_____
                                                                                Orin Snyder

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn & Crutcher LLP

1
CERTIFICATE OF SERVICE
CASE NO. 5:18-CV-01725-EJD