ROBBINS GELLER RUDMAN
  & DOWD LLP
DENNIS J. HERMAN (220163)
JASON C. DAVIS (253370)
KENNETH J. BLACK (291871)
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: 415/288-4545
415/288-4534 (fax)
dherman@rgrdlaw.com
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

BERNSTEIN LITOWITZ BERGER &
  GROSSMANN LLP
JOHN C. BROWNE
JEREMY P. ROBINSON
KATE AUFSES
1251 Avenue of the Americas
New York, NY  10020
Telephone: 212/554-1400
212/554-1444 (fax)
johnb@blbglaw.com
jeremy@blbglaw.com
kate.aufses@blbglaw.com

Co-Lead Counsel for the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re FACEBOOK, INC. SECURITIES LITIGATION | ) ) ) |
| | ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) ) |

Master File No. 5:18-cv-01725-EJD

CLASS ACTION

LEAD PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS

DATE:          July 16, 2020
TIME:          9:00 a.m.
LOCATION:  Courtroom 4, 5th Floor
JUDGE:        Hon. Edward J. Davila

1

**TABLE OF CONTENTS**

2

**Page**

3

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................1

4

STATEMENT OF ISSUES TO BE DECIDED .........................................................................1

5

INTRODUCTION .......................................................................................................................1

6

ARGUMENT ..............................................................................................................................4

7

I.      The Facts Show Falsity and Scienter as to Defendants' "User Control" Statements ..........4

8

II.     The Facts Show Falsity and Scienter as to Defendants' Risk Disclosures and
        Cambridge Analytica Statements, as the SEC Found .........................................................7

9

10

        A.      Cambridge Analytica's Data Breach Was a Major Event of Improper
                Access Disclosure and Misuse ..................................................................................8

11

                1.      Evidence of Falsity and Scienter as to the Risk Factor Statements ............8

12

                2.      Evidence of Falsity and Scienter as to the Investigation Statements.........11

13

        B.      Cambridge Analytica's Continued Possession and Misuse of the Data for
                Unauthorized Political Purposes from 2016 through 2018....................................12

14

15

                1.      Evidence of Falsity and Scienter as to the Risk Factor Statements ..........13

                2.      Evidence of Falsity and Scienter as to the Investigation Statements.........18

16

        C.      Cambridge Analytica's Refusal to Comply with Facebook's "Demand" for
                a "Legal Certification" and Free Pass on Any "Ban" Corroborate Falsity

17

                and Scienter.............................................................................................................22

18

III.    The Statements Regarding the FTC Consent Decree Were False and Made with

19

        Scienter .................................................................................................................................25

20

IV.     The Remaining Statements Are Also Actionably False, With Scienter ............................27

21

V.      The SAC Pleads Loss Causation..........................................................................................29

22

VI.     Reliance Is Presumed ..........................................................................................................34

23

VII.    The Complaint Pleads Insider Trading Claims and Control Person Liability ...................34

24

CONCLUSION ...........................................................................................................................35

25

26

27

28

1

# TABLE OF AUTHORITIES

2
**Page**

3
**CASES**

4
*Affiliated Ute Citizens of Utah v. United States,*

5
    406 U.S. 128 (1972).............................................................................................34

6
*Alaska Elec. Pension Fund v. Flowserve Corp.,*
    572 F.3d 221 (5th Cir. 2009) ...........................................................................30

7

8
*Baker v. SeaWorld Entm't, Inc.,*
    2017 WL 5885542 (S.D. Cal. Nov. 29, 2017) .................................................34

9
*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)..........................................................................................34

10

11
*Batwin v. Occam Networks, Inc.,*
    2008 WL 2676364 (C.D. Cal. July 1, 2008) ...................................................35

12
*Berson v. Applied Signal Tech., Inc.,*

13
    527 F.3d 982 (9th Cir. 2008) .............................................................................9

14
*Beyond Techs. Corp. Sec. Litig.,*
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ..........................................................22

15

16
*Blackie v. Barrack,*
    524 F.2d 891 (9th Cir. 1975) ...........................................................................34

17
*Dura Pharm. v. Broudo,*

18
    544 U.S. 336 (2005)....................................................................................29, 30

19
*Evanston Police Pension Fund v. McKesson Corp.,*
    411 F. Supp. 3d 580 (N.D. Cal. 2019) ............................................................10

20

21
*Haberland v. Bulkeley,*
    896 F. Supp. 2d 410 (E.D.N.C. 2012)..............................................................27

22
*Hefler v. Wells Fargo & Co.,*

23
    2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) .................................................26

24
*Howard v. Everex Sys., Inc.,*
    228 F.3d 1057 (9th Cir. 2000) .........................................................................35

25

26
*Howard v. Hui,*
    2001 WL 1159780 (N.D. Cal. Sept. 24, 2001) ...............................................35

27
*In re Akorn Sec. Litig.,*

28
    240 F. Supp. 3d 802 (N.D. Ill. 2017) ..............................................................32

1

2                                                                           **Page**

3

4   *In re Atossa Genetics Inc. Sec. Litig.*,
        868 F.3d 784 (9th Cir. 2017) ................................................................14

5   *In re ChinaCast Educ. Corp. Sec. Litig.*,
6       809 F.3d 471 (9th Cir. 2015) .........................................................12, 18

7   *In re Facebook, Inc. Consumer Privacy User Profile Litig.*,
        402 F. Supp. 3d 767 (N.D. Cal. 2019) ....................................18, 19, 21
8
9   *In re Gentiva Sec. Litig.*,
        932 F. Supp. 2d 352 (E.D.N.Y. 2013) .................................................26

10  *In re Intuitive Surgical Sec. Litig.*,
11      2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) .............................20, 27

12  *In re Lifelock, Inc. Sec. Litig.*,
        690 F. App'x 947 (9th Cir. 2017) .........................................................27

13  *In re Montage Tech. Grp. Ltd. Sec. Litig.*,
14      2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) .....................................34

15  *In re Musical Instruments and Equip. Antitrust Litig.*,
16      798 F.3d 1186 (9th Cir. 2015) .............................................................10

17  *In re Openwave Sys. Sec. Litig.*,
        528 F. Supp. 2d 236 (S.D.N.Y. 2007)...................................................35
18
19  *In re Paypal Holdings, Inc.*,
        2018 WL 466527 (N.D. Cal. Jan. 18, 2018) ........................................27

20  *In re Quality Sys. Inc. Sec. Litig.*,
21      865 F.3d 1130 (9th Cir. 2017) .......................................................13, 19

22  *In re Questcor Sec. Litig.*,
        2013 WL 5486762 (C.D. Cal. Oct. 1, 2013)........................................29
23
24  *In re Scholastic Corp. Sec. Litig.*,
        252 F.3d 63 (2d Cir. 2001).....................................................................7

25  *In re VeriFone Holdings, Inc. Sec. Litig.*,
26      704 F.3d 694 (9th Cir. 2012) ...................................................6, 10, 15

27  *In re Verifone Sec. Litig.*,
        2016 WL 1213666 (N.D. Cal. Mar. 29, 2016).............................10, 34

28

1

2                                                                          **Page**

3

*In re Volkswagen "Clean Diesel" Mktg.,*
    *Sales Practices, and Prods. Liab. Litig.,*
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ..............................................................6

*In re Wells Fargo & Co. S'holder Derivative Litig.,*
    282 F. Supp. 3d 1074 (N.D. Cal. 2017) ...........................................................6, 17

*In re Wireless Facilities, Inc. Sec. Litig.,*
    2007 WL 9667131 (S.D. Cal. May 7, 2007).....................................................7, 14

*Karam v. Corinthian C., Inc.,*
    2012 WL 8499135 (C.D. Cal. Aug. 20, 2012)......................................................26

*Lloyd v. CVB Fin. Corp.,*
    811 F.3d 1200 (9th Cir. 2016) .................................................................29, 30, 31

*Loos v. Immersion Corp.,*
    762 F.3d 880 (9th Cir. 2014) ..............................................................................31

*Mineworkers' Pension Scheme v. First Solar Inc.,*
    881 F.3d 750 (9th Cir. 2018) ...................................................................... *passim*

*Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.,*
    2010 WL 11469576 (D. Minn. Feb. 3, 2010) .......................................................16

*Mirmehdi v. United States,*
    689 F.3d 975 (9th Cir. 2012) ..............................................................................35

*Nguyen v. Radient Pharm. Corp.,*
    WL 5041959 (C.D. Cal. Oct. 20, 2011)................................................................32

*Nursing Home v. Oracle Corp.,*
    380 F.3d 1226 (9th Cir. 2004) .......................................................................19, 29

*Ret. Fund v. Apollo Gr. Inc.,*
    774 F.3d 598 (9th Cir. 2014) ..............................................................................34

*S. Ferry LP, No. 2 v. Killinger,*
    542 F.3d 776 (9th Cir. 2008) ..............................................................................21

*Sgarlata v. PayPal Holdings, Inc,*
    2018 WL 6592771 (N.D. Cal. Dec. 13, 2018)......................................................17

*Toy Invs., Inc. v. Poof-Slinky, Inc.,*
    2013 WL 60095838 (W.D. Wash. Nov. 20, 2013) ...............................................35

1

2                                                                                        **Page**

3

4  *Zelman v. JDS Uniphase Corp.,*
       376 F. Supp. 2d 956 (N.D. Cal. 2005) ...................................................................................7

5  *Zucco Partners, LLC v. Digimarc Corp.,*
       552 F.3d 981 (9th Cir. 2009) ..............................................................................................22
6

7  **STATUTES, RULES AND REGULATIONS**

8  15 U.S.C.
       §78j(b).............................................................................................................1, 34, 35
9      §78t(a).................................................................................................................1, 35
       §78t-1........................................................................................................................1
10
11 17 C.F.R.
       §240.10b-5................................................................................................1, 12, 15, 34
12     §240.10b-5-1..........................................................................................................29
       §20(a)........................................................................................................................1
13     §20A............................................................................................................1, 34, 35

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### MEMORANDUM OF POINTS AND AUTHORITIES

Lead Plaintiffs ("Plaintiffs") hereby oppose Defendants' motion to dismiss.[1]

### STATEMENT OF ISSUES TO BE DECIDED

Whether Plaintiffs' Complaint sets forth facts that, considered holistically, adequately plead claims under §10b(b), of the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5 and §§20(a) and 20A of the Exchange Act, 15 U.S.C. §78t(a) and §78t-1, including based on Defendants' own admissions of knowing or reckless misconduct harming investors.

### INTRODUCTION

This case arises from Defendants' materially false and misleading statements regarding Facebook's privacy and data protection practices and the impact of that misconduct on Facebook's business.  The Court previously addressed these claims in granting Facebook's motion to dismiss Plaintiffs' original consolidated complaint.  However, compelling new evidence that has come to light since the original complaint was filed, and, together with the facts previously before the Court, this new evidence adequately alleges that Defendants knowingly made multiple false statements during the Class Period.

First, the Court has already held that Defendant Sandberg's Class Period statement that Facebook users "controlled" how their data was used was materially false and misleading.  ECF No. 118 (the "MTD Order") at 40-41 ("Facebook was overriding user privacy settings" to provide data to third parties).  The SAC alleges new, substantially similar statements by Zuckerberg.  *See* Section I below.  These statements are false in light of the Court's prior rulings.  *Id.*

---

[1]   All references to "Mot." or "Motion" are to Defendants' Notice of Motion and Motion to Dismiss Second Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws; Memorandum of Points and Authorities in Support Thereof (ECF No. 126).  All references to the "Lutz Decl." are to the Declaration of Brian M. Lutz in Support of Defendants' Motion to Dismiss Second Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 126-1).  All terms or abbreviations not otherwise defined herein have the same meaning as defined in the Second Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws ("Complaint" or "SAC") (ECF No. 123).  All "¶__" and "¶¶__" references are to the Complaint.  Unless otherwise noted, all emphasis is added and internal citations and quotations are omitted.

1    The SAC also alleges new facts demonstrating that Defendants had scienter when they made

2    these false statements.  Internal Facebook documents that were revealed only after the original

3    complaint was filed show that the decision to give users' data to selected third parties without the

4    users' authorization was made (not surprisingly) at the direction of Zuckerberg and Sandberg, who

5    expressly approved of those practices.  Moreover, a historic $5 billion civil penalty assessed against

6    Facebook by the Federal Trade Commission ("FTC") – following a lengthy investigation involving

7    interviews and the review of internal Facebook documents – shows that Facebook knowingly

8    violated its 2012 consent decree by "deceiving users about their ability to control the privacy of their

9    information," and did so at least through June 2018.  This penalty is, as the FTC noted, "one of the

10   largest penalties ever assessed by the U.S. government for any violation."   The widespread

11   misconduct cited by the FTC raises a strong inference of scienter against Defendants.  *See* Section I

12   below.

13   Second, the SAC sets forth multiple new factual allegations demonstrating that Defendants

14   knowingly made false and misleading risk disclosures in their SEC filings during the Class Period,

15   and made intentionally false statements regarding their investigation into whether Cambridge

16   Analytica had improperly obtained and misused Facebook user data.  As set forth in detail in the

17   SAC and below, Defendants falsely represented no third party had improperly obtained and misused

18   Facebook data, by representing that any such events were merely ***hypothetical*** risks to Facebook's

19   business.  Defendants' spokesperson also falsely claimed, during the Class Period, that Facebook's

20   ***own*** investigation into Cambridge Analytica had "not uncovered anything that suggests

21   wrongdoing."  That was a lie.  Defendants made all of these statements knowing that Cambridge

22   Analytica had improperly obtained and was improperly misusing Facebook user data in foreign and

23   domestic political campaigns.  *See* Section II below.  No user ever consented to that conduct.

24   These facts led to the Securities Exchange Commission ("SEC") – after an investigation that

25   lasted more than a year  – to find that "Facebook knew, or should have known, that its Risk Factor

26   disclosures . . . were materially misleading" and these false statements acted as a "Fraud or deceit

27   upon purchasers" of Facebook stock during the Class Period."  *Id.* Based on its review of internal

28   documents and other evidence submitted by Facebook, the SEC found "senior managers in

1  Facebook's communications, legal, operations, policy and privacy groups" (some 30 people) knew

2  about Cambridge Analytica's improper data harvesting and how that conduct presented new,

3  undisclosed risks to users and the business.  The SEC's findings are consistent with eyewitness

4  accounts from Roger McNamee, who was Zuckerberg and Sandberg's business mentor, a prominent

5  tech venture capitalist and an early Facebook investor.  He discussed how bad actors were abusing

6  users' privacy choices with Zuckerberg and Sandberg for several months – from  October 2016 and

7  February 2017 – or just prior to the start of the Class Period.  Based on his communications with

8  Zuckerberg, Sandberg and their representative, McNamee concluded that "top management knew"

9  about Cambridge Analytica's continuing, improper possession and misuse of Facebook users'

10  personal data.  Since the FAC was filed, Facebook has settled the SEC's case for $100 million.

11      Third, the SAC has laid bare that a key Facebook defense – that it justifiably relied on "legal

12  certifications" of deletion from Cambridge Analytica that it both "***demanded***" and "got" "in 2015."

13  While Facebook's policy required the demanded "legal certification" in 2015, in reality, Cambridge

14  Analytica refused to comply with Facebook's demands until April 2017, at the earliest.  Even then,

15  Cambridge Analytica only provided a certification from one of its foreign affiliates that wasn't even

16  the parent company that controlled Cambridge Analytica.  And by then, Defendants had witnessed,

17  in 2016, Cambridge Analytica lying about the data it stole and then misusing that data for political

18  purposes to which no users ever consented.  Yet Defendants continued to allow Cambridge

19  Analytica to operate freely on the platform, notwithstanding Facebook's supposed policy requiring

20  an all-out "ban."  Defendants' business interests favored the continuing data abuses – conduct that

21  the FTC cited among the pervasive abuses that Defendants promoted internally but concealed from

22  investors.

23      Facebook's failure to take action against Cambridge Analytica was just another in a long line

24  of deliberate failures by the Company to police its platform or enforce the policies it claimed

25  protected its users and its business from harm.  Because the Court is already familiar with the

26  general contours of this case and the alleged misrepresentations on which it is based, Plaintiffs will

27  not recount all the underlying facts in detail.  Instead, the primary focus in this brief is on the

28  evidence pled in the current Complaint that was not before the Court during the prior round of

briefing.   Plaintiffs do so by focusing on four broad categories of alleged misstatements: (1) Defendants' representations that Facebook's users had control over the data they shared on its platform, which the Court has already held were materially false at the time they were made (*infra* §I); (2) Defendants' false assurances to investors that the risks arising from the Cambridge Analytica breach had been fully investigated, addressed and contained, which the Securities and Exchange Commission (the "SEC") also has determined were materially false and misleading at the times they were made (*infra* §II.A, B); (3) Defendants' false statements that they had uncovered no wrongdoing by Cambridge Analytica, also deemed misleading by the SEC (*id.*); (4) new facts showing Defendants' prinicpal defense to the Cambridge Analytica claims – that they "got" a "legal certification" of deletion from Cambridge Analytica "in 2015" – is false (*infra* §II.C); and (5) Defendants' false statements that they had taken every action they could to comply with their FTC privacy obligations (*infra* §III).

By focusing the Court's attention on these broad categories of misrepresentations, Plaintiffs aim to highlight that this case raises numerous issues of disputed fact on *all* of the issues raised in the pleadings that can only be resolved through discovery.   The new evidence that has come to light contradicts the spin Defendants attempted to put on their misconduct during the last round of briefing, demonstrating that the Court should not credit *any* of defendants' self-serving factual arguments for dismissal – including those that led to dismissal of other misrepresentations that were previously dismissed but for which additional evidence needed to complete the factual record has not yet come to light.   Defendants' motion should be denied in its entirety.

**ARGUMENT**

**I.      The Facts Show Falsity and Scienter as to Defendants' "User Control" Statements**

Throughout the Class Period, Defendants falsely stated that users controlled their data. ¶¶14, 50, 108-312, 325-343.   These statements were explicit and unequivocal.   *See* ¶327 (October 2017 Sandberg: "no one is going to get your data that shouldn't have it" because "you're **controlling** who you share with"); ¶333 (April 2018 Zuckerberg: "you have **control over everything** you put on the

1    service"); ¶337(a) (April 2018 Zuckerberg: "you own and you have **complete control** over who sees

2    [your content]"; ¶337(c) (April 2018 Zuckerberg: "[y]ou have **complete control**").

3         This Court has already ruled that Sandberg's October 2017 "control" statement was false

4    because the FAC "adequately pleaded that users could not control their data." MTD Order at 40-41

5    ("Facebook was overriding users privacy settings to provide data" to whitelisted "mobile device

6    makers, depriving users of control," and "Defendants knew that bad actors were able to access

7    data."). For the same reasons, Defendants' other "control" statements alleged in the SAC (¶¶325-

8    343) – including Zuckerberg's promise of "complete control" – are false and misleading.

9         Defendants do not meaningfully dispute the falsity of Sandberg's and Zuckerberg's

10   statements. They focus instead on statements like Facebook's promise that it "built [its] services

11   around transparency and control," which they argue are too vague. Mot. at 11. But it is

12   fundamentally misleading for Defendants to state that Facebook's platform was "built" or "focused"

13   on user control of data when they were overriding users' privacy settings to secretly share user data

14   with third parties. ¶¶63-85, 108-131, 286-293. Likewise, Defendants' argument that users made "a

15   deliberate choice to post" their information misses the point. Defendants promised that users had

16   control over their data **after** it was posted on Facebook. Finally, Defendants argue that the

17   whitelisting allegations are "undercut" because Facebook disclosed that certain app developers were

18   given access to data through April 2015. *Id.* This fails because whitelisting continued from that

19   time through at least June 2018. ¶¶113-121, 341.

20        The Court found that the prior Complaint did not adequately allege scienter as to the control

21   statements. MTD Order at 45-47. But the SAC alleges a multitude of new facts raising a strong

22   inference of scienter. **First**, Facebook's own internal documents, which were revealed only after the

23   FAC was filed, show that Zuckerberg and Sandberg "knew about whitelisting or [were] provided

24   detailed information about it." *Id.* at 47 (specifying this as a means of showing scienter).

25        Indeed, multiple documents quoted in the SAC demonstrate that these Defendants were the

26   original architects of Facebook's "full reciprocity" business model – in which the Facebook gave

27   access to user friend data to certain whitelisted parties who, in a reciprocal exchange, would give

28   Facebook data, ad revenues or access to new users. ¶¶70-80; *see in particular* ¶74 (Zuckerberg: "I

1  think we should go with full reciprocity;" Sandberg: "I like full reciprocity").  Internal emails show

2  that Zuckerberg attended meetings with Facebook employees to discuss what app developers should

3  be whitelisted with the focus being on "the apps that Mark [Zuckerberg] knows, loves and is

4  concerned about." ¶75.  Other emails show whitelisting being authorized for "developers who are

5  high ad spenders and friends of Mark/Sheryl [*i.e.*, Zuckerberg and Sandberg]." ¶78.[2]  Instant

6  messages note that Facebook employees "spent hours and hours with [Z]uck[erberg]" about these

7  issues. ¶80.  Thus, the facts pled in the SAC place both Zuckerberg and Sandberg as being directly

8  involved in and aware of Facebook's whitelisting practices.

9       ***Second***, after Plaintiffs filed the original complaint in this case, the FTC levied "one of the

10  largest penalties ever assessed by the U.S. government" for Facebook's privacy misconduct – a $5

11  billion fine, which concerned whitelisting misconduct during the Class Period.  ¶¶17, 61, 113, 281-

12  293.  The FTC Complaint explains that from "April 30, 2015, to ***at least June 2018***," Facebook

13  falsely stated that users could "control" the privacy of their data "by using Facebook's . . . settings,"

14  but, in reality, "regardless of the privacy settings a user checked, Facebook continued to provide

15  access to [user friend data] to Whitelisted Developers." ¶113.  The widespread abuses cited by the

16  FTC raise a strong inference of scienter as to all Defendants.[3]

17       Defendants dismiss the FTC's detailed findings and the numerous documents showing

18  Zuckerberg and Sandberg's direct involvement in whitelisting because they pre-date the Class

19  Period. Mot. at 22; *see also Id.* at 16 n.4.  But, it is well-established that pre-class period information

20

21

22  ――――――――――――
[2]     Zuckerberg was even personally involved in the granular decisions on which specific apps to
23  whitelist – for example, he personally authorized Twitter being cut off from user friend data, but
   agreed to let Tinder continue as a whitelisted app.  ¶¶76-77.

24  [3]     *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074 (N.D. Cal. 2017)
25  (where "'claims arise from a pervasive and undisputed fraud going to the core of the Company's
   business, it is reasonable to infer senior executives knew'"); *In re Volkswagen "Clean Diesel"*
26  *Mktg., Sales Practices, and Prods. Liab. Litig.*, 2017 WL 66281, at *14 (N.D. Cal. Jan. 4, 2017)
   ("[t]he importance and falsity of the emissions-compliance statements gives rise to a plausible
   inference of VW AG's corporate scienter"); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694,
27  708 (9th Cir. 2012) (inferring senior executives knew, or at least "'[r]ecklessly turn[ed] a "blind eye"
   to,'" the stream of red flags").

28

is relevant to Defendants' knowledge during the Class Period.[4]  Moreover, as noted above, the FTC confirmed that Defendants' whitelisting practices spanned nearly the entire Class Period through to June 2018.  ¶¶113, 281-293.  Askhan Soltani, a former member of the FTC, confirmed the same, testifying to the Parliamentary Committee that "whitelisted apps" could access user friend data "overriding privacy settings" through to nearly the end of the Class Period.[5]  ¶¶120-121.  Moreover, the FTC concluded Facebook "knew or should have known" it was engaging in the "very same conduct" that was prohibited by the 2012 consent decree.  ¶287; *see also* Davis Decl.,[6] Ex. B, ¶¶106-113, 166-175.  The FTC made its findings only after reviewing internal Facebook documents.  ¶¶281, 288; *e.g.*, Davis Decl., Ex. B, ¶90.  The FTC also found Facebook's misconduct was purposeful and continued until at least June 2018.  Thus, Defendants' contention that the FTC's findings relate only to events that occurred "years before the class period" (Mot. at 16 n.4) is belied by the specific, fact-based findings made by the FTC and other facts described in the Complaint.  Thus, the control statements should be sustained.

## II.   The Facts Show Falsity and Scienter as to Defendants' Risk Disclosures and Cambridge Analytica Statements, as the SEC Found

Facebook's misconduct in the Cambridge Analytica matter is just one important example of the rampant misconduct leading to the FTC's historic $5 billion penalty.  Indeed, by the start of the Class Period on February 3, 2017, Facebook knew that Cambridge Analytica possessed sensitive user information ***that it had already misused and was still misusing*** in violation of Facebook

---

[4]   *See*, *e.g.*, *In re Wireless Facilities, Inc. Sec. Litig.*, 2007 WL 9667131, at *8 (S.D. Cal. May 7, 2007) (pre-class period knowledge is "not lost when the class period began") (collecting cases); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (pre-class period information is relevant to establishing defendants' knowledge); *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970 (N.D. Cal. 2005) (class period dates function only to define the class "not to restrict the universe of relevant or actionable facts . . . .").

[5]   Mr. Soltani also confirmed Sandberg's scienter, identifying the whitelisting decisions as hers.  ¶122.  Defendants' only response is that Mr. Soltani said "no such thing."  Mot. at 23.  Defendants mischaracterize Mr. Soltani's testimony.  It is clear from both the SAC and the transcript that Mr. Soltani was discussing whitelisting, then, the Committee expressed frustration about not having the right person from Facebook to testify, so Mr. Soltani testified that they should invite Ms. Sandberg, as he understood that "these decisions are hers."  ¶¶121-122; Lutz Decl., Ex. 12 at 32-33.

[6]   All references to "Davis Decl." are to the Declaration of Jason C. Davis in Support of Lead Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant' Motion to Dismiss.

1    policies, and that Cambridge Analytica had repeatedly lied to Facebook about the nature of the data

2    it possessed.  *See* ¶¶132-158.  By February 2017, Facebook had been "investigating" the "sketchy (to

3    say the least)" activities of Cambridge Analytica – and had been doing so since at least September

4    22, 2015.  ¶¶97-98, 276.  By mid-December 2015, Facebook determined internally that the transfer

5    of user data to Cambridge Analytica "violated the company's Platform Policy."  ¶¶98-99, 276; *see*

6    *also* Lutz Decl., Ex. 15.  Thus, as discussed below and alleged in detail in the SAC, Zuckerberg and

7    Sandberg already knew of Cambridge Analytica's wrongdoing when, in October 2016, they

8    launched a four-month-long series of discussions with Roger McNamee about Cambridge

9    Analytica's abusive data practices in the Brexit/Trump campaigns, among other things, as discussed

10   below.

11        Notwithstanding this knowledge, and as the SEC confirmed, Facebook misleadingly

12   presented the risks of improper access, disclosure and misuse of user data as merely hypothetical in

13   multiple SEC filings.[7]

14        **A.    Cambridge Analytica's Data Breach Was a Major Event of Improper**
             **Access Disclosure and Misuse**
15

16        **1.    Evidence of Falsity and Scienter as to the Risk Factor**
                 **Statements**

17        In Facebook's 2016 annual report filed on February 3, 2017, the first day of the Class Period,

18   its 2017 annual report filed on February 1, 2018, and in multiple quarterly reports throughout the

19   Class Period, Defendants falsely told investors that the risk of improper access, disclosure or use of

20   user data was hypothetical.  ¶¶349-360.  For example, Facebook stated: "[a]ny . . . improper access

21   to or disclosure of . . . user data ***could*** result in the loss or misuse of such data" (¶350(b)) and "***if*** . . .

22   third parties or developers fail to adopt or adhere to adequate data security practices . . . our data or

23   our users' data ***may be*** improperly accessed, used, or disclosed."  ¶350(c).

24

25   _____
     [7]    Defendants argue that the SEC did not have to allege scienter, but the SEC did have to allege
26   falsity, and as a factual matter the SEC ***did*** allege scienter, charging that "***Facebook knew, or should***
     ***have known***, that its Risk Factor disclosures in its annual reports on Form 10-K for the fiscal years
27   ended . . . December 31, 2016, and December 31, 2017, and its quarterly reports on Form 10-Q filed
     in . . . 2017 . . . were materially misleading."  ¶274.
28

1    The above statements were materially misleading because they presented the risk of improper

2    access, disclosure and use of user data as merely hypothetical, when, in reality, Defendants knew

3    that Kogan, a third party app developer, had *already* improperly *disclosed* the data of tens of

4    millions of Facebook users to Cambridge Analytica, another third party, who had *already*

5    "improperly *access[ed]*" and "*used*" the data.  ¶¶86-106, 132-158; *see also* ¶¶349-360 (detailing

6    other false risk statements).  Indeed, as the SEC put it, "Facebook did not disclose that [Kogan] had,

7    in violation of the company's policies, transferred data relating to [approximately 30 million

8    Facebook users] to Cambridge Analytica.  Instead, Facebook misleadingly presented the potential

9    for misuse of user data as merely a hypothetical risk."  ¶273.  As noted above, by mid-December

10   2015, Facebook had internally determined that the transfer of user data to Cambridge Analytica

11   "violated the company's Platform Policy."  ¶¶98, 99, 276; *see also* Lutz Decl., Ex. 15, ¶30.

12   Defendants themselves even admit that by December 2015, "Facebook investigated the

13   issue," "removed Kogan's app from Facebook" and demanded deletion of the data.  Mot. at 6.  This

14   concession explains why Defendants do not even attempt to defend their risk disclosure statements

15   on the grounds identified above and pursued by the SEC.  Mot. at 13.  Instead, their main rebuttal

16   argument is that Plaintiffs have purportedly failed to show that "the Cambridge Analytica data

17   breach was already affecting Facebook."  *Id.*  But that argument misses the point.  As the SEC

18   confirmed, Facebook's risk disclosures were misleading because they presented the risk of improper

19   "access," "disclosure," and "use" as *hypothetical* – when a major event of exactly such improper

20   "access," "disclosure," and "use" *had already occurred*.  Nothing turns on whether any harm was

21   "already affecting Facebook."[8]  Here, as in *Berson v. Applied Signal Tech., Inc.*, Defendants publicly

22   "indicate[d] a risk," when they knew that such an event was "a certainty" because it had already

23   occurred.  527 F.3d 982, 987 (9th Cir. 2008); *see also* MTD Order at 36 (falsity allegations adequate

24   when plaintiffs pled that "defendants knew [of a] data breach" but disclosed only a "potential

25   vulnerability").

26

27   ────────────────────
     [8]    Defendants are also wrong because, as explained below, they knew or ought to have known that

28   Cambridge Analytica was still misusing the user data in question.  *See infra* §§II.A.2, II.B.2.

1       Although they do not claim that the SEC got anything wrong, Defendants do argue that

2 "Facebook did not admit the SEC's charge" so it cannot "aid Plaintiffs in pleading contemporaneous

3 falsity." Mot. at 13. Defendants are wrong. To start, Plaintiffs pled multiple facts demonstrating

4 falsity – and those facts are corroborated by the SEC's similar and related factual allegations.

5 Indeed, as discussed above, Defendants even admit many of those same facts. So Plaintiffs are not

6 just relying on the *fact* of an SEC Complaint; they are relying on the corroborated (and largely

7 undisputed) *facts* set forth in the SEC Complaint. Defendants are also incorrect to suggest that the

8 facts set forth in the SEC complaint are irrelevant. It is well-established in this Circuit that

9 complaints filed by the SEC and other regulators may be relied upon when deciding motions to

10 dismiss. *Verifone*, 704 F.3d at 706-07 (relying on allegations in an SEC complaint incorporated into

11 the plaintiff's pleading; reversing district court's dismissal of securities action); *In re Musical*

12 *Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1199 (9th Cir. 2015) (relying on allegations

13 in an FTC complaint and settlement); *see also Evanston Police Pension Fund v. McKesson Corp.*,

14 411 F. Supp. 3d 580, 593 (N.D. Cal. 2019) (denying motion to dismiss in securities action; crediting

15 allegations in complaint filed by attorneys-general, "[b]ecause the Ninth Circuit has relied on

16 comparable documents when deciding motions to dismiss Section 10(b) and antitrust claims, the

17 [c]ourt holds it is appropriate to do so here.").

18       Defendants' scienter for these false risk disclosures is straightforward. Both Zuckerberg and

19 Sandberg have publicly admitted to knowing about the Cambridge Analytica data breach in 2015.

20 Zuckerberg openly admitted that "in 2015, we learned from journalists at *The Guardian* that Kogan

21 had shared data from his app with Cambridge Analytica," which he knew was against Facebook's

22 "policies for developers to share data without people's consent." ¶98. Sandberg admitted to

23 knowing the same in 2015. ¶99. These admissions establish that Defendants knew or ought to have

24 known that Facebook's risk disclosures were misleading for the reasons set forth above. At

25 minimum, Zuckerberg and Sandberg's admissions raise an issue of fact that cannot be decided on

26 this motion. Indeed, given the high-level response inside Facebook to *The Guardian*'s December 11,

27 2015 article, it is essentially indisputable that Zuckerberg and Sandberg were aware of these facts.

28 ¶¶86, 93, 97.

1    Roger McNamee, an early investor in Facebook and mentor to Zuckerberg, also confirmed

2    Defendants' knowledge.  He stated with specific reference to Zuckerberg:  "2015 is when they fully

3    understood what had happened with Cambridge Analytica" but "they remained absolutely silent for

4    more than two years knowing that this abuse had occurred."  ¶152.

5    The SEC likewise confirmed Defendants' scienter.  The SEC charged that "Facebook ***knew,***

6    ***or should have known***, that its [risk disclosures discussed above] were materially misleading,"

7    which operated "as a ***fraud or deceit*** upon purchasers" of its securities.  ¶¶272-274.  In addition to

8    paying $100 million to settle these charges, Facebook consented to an order enjoining it from further

9    selling securities "by means of any untrue statement of a material fact [or omission]" and from

10   further operating "a '***fraud or deceit*** upon the purchaser[s]' of its securities."  ¶¶272, 280.

11   **2.    Evidence of Falsity and Scienter as to the Investigation
           Statements**

12   In addition to the false risk disclosures, Defendants knowingly made other false statements

13   during the Class Period about the Cambridge Analytica matter.  On March 4, 2017 and March 30,

14   2017, Defendants had Facebook's corporate spokesperson reassure the market by stating:  "***[o]ur***

15   ***investigation*** to date has ***not uncovered anything that suggests wrongdoing*** with respect to

16   Cambridge Analytica's work on the [Brexit] and Trump campaigns."  ¶¶160, 362-363.  But, as found

17   by the SEC and alleged in the SAC, Facebook's investigation ***had*** "uncovered . . . wrongdoing" –

18   namely, that Cambridge Analytica ***had*** improperly accessed the data of Facebook users and ***had***

19   misused it during the campaigns.  *See*, *e.g.*, ¶¶97-100, 136-138, 141-49, 152.  Indeed, as the SEC

20   concluded, "senior managers in Facebook's communications, legal, operations, policy and privacy

21   groups" all knew that Cambridge Analytica had violated Facebook's policies (¶¶162-164) and

22   McNamee spoke with Zuckerberg, Sandberg and their self-appointed representative about

23   Cambridge Analytica's misuse of user data during the 2016 campaigns.  *Infra*, §§II.A.1, II.B.2.  The

24   SEC charged that these statements "served to reinforce the misleading impression in Facebook's

25   periodic filings that the company was not aware of any material developer misuses of user data."

26   ¶162.  Journalists reacted after reading the SEC Complaint by writing that "Facebook repeatedly ***lied***

27   ***to journalists*** about the severity of the Cambridge Analytica scandal," and one journalist wrote that

28

LEAD PLTFS' MEMORANDUM OF P'S & A'S IN OPPOSITION TO DEFS' MOTION TO DISMISS -
5:18-cv-01725-EJD
                                                                                    - 11 -

1  this "**proves Facebook's press team lied to me in February 2017**." ¶164.  Thus, these Class Period

2  statements were false and misleading.

3       Defendants assert that the SAC fails to adequately allege Facebook's corporate scienter.

4  Mot. at 26.  But Defendants misunderstand how standard agency principles work in the securities

5  fraud context.   The Facebook "spokesperson" who made the March 2017 statements is the

6  quintessential example of an agent who is authorized to speak for Facebook, the corporate defendant.

7  *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("In the context of Rule

8  10b-5, we have adopted the general rule of imputation and held that a corporation is responsible for a

9  corporate officer's fraud committed 'within the scope of his [or her] employment' or 'for a

10  misleading statement made by an employee or other agent who has actual or apparent authority.' . . .

11  The rule exists for good reason: 'Imputation creates incentives for a principal to choose agents

12  carefully and to use care in delegating functions to them.'").   Thus, these intentional

13  misrepresentations by Facebook's "spokesperson" *are* equally Facebook's fraud.

14      **B.**    **Cambridge Analytica's Continued Possession and Misuse of the Data**
15                **for Unauthorized Political Purposes from 2016 through 2018**

16       Defendants' risk factor and investigation statements identified above also were false and

17  misleading when made because they covered the entire 2016 calendar year when Defendants knew,

18  or should have known, that Cambridge Analytica still possessed *and was misusing the data*.[9]

19       As the Court will recall, one of Defendants' key defenses to claims arising from Cambridge

20  Analytica's continuing misuse of the data was that they relied on "certifications of destruction"

21  supposedly obtained from Cambridge Analytica in 2015[10] to conclude that all the user data exposed

---

22  [9]   In 2015, Defendants claimed they thought that Cambridge Analytica had deleted the data.  The
23  fact that Defendants knew that Cambridge Analytica kept misusing the data throughout 2016 shows,
obviously, that the latter still possessed the data and continued to misuse it throughout the Class
24  Period.  Thus, Defendants' 2017 annual report filed on February 1, 2018, and multiple quarterly
reports throughout the Class Period, were misleading because they told investors that the risk of
25  improper access, disclosure or use of user data was hypothetical.  ¶¶349-360.  This section focuses
on the February 3, 2017 statements for simplicity's sake.

26  [10]   ECF No. 93 at 23 (Defendants: "That Facebook wished it had done more *in 2015* – beyond
27  investigating the issue and ***demanding*** and ***receiving certifications of destruction*** of the improperly
obtained data – does not establish that the Individual Defendants knew that any challenged statement
28  was false when made.").   The argument rested on Zuckerberg's self-serving statement in March
2018 that "in 2015" Defendants took "immediate actions," and "'demand[ed] a legal certification

1   in that breach had been destroyed, and, thus, it could no longer harm Facebook after 2015.  MTD

2   Order at 30, Mot. at 15.[11]  They ask the Court to make the same finding again here (Mot. at 13) but

3   the SAC's newly-alleged facts and underlying evidence demonstrate that Defendants received **no**

4   certification from **any** "Cambridge Analytica" entity until ***April 2017 at the earliest*** – and, even

5   then, merely received a certification from a related but nevertheless foreign affiliate that was not its

6   parent company.  ¶150; *see also infra* §II.C.  Facebook's "certification" defenses to falsity and

7   scienter are therefore meritless.

8          Cambridge Analytica's refusal to comply with Facebook's "demanded" legal certification in

9   2015 – and again in 2016, continuing into 2017 and beyond – creates a strong and compelling

10  inference that Cambridge Analytica was ***still using*** it, as ample, additional facts show.

11                **1.**    **Evidence of Falsity and Scienter as to the Risk Factor**
                          **Statements**
12

13         As explained in the SAC, Roger McNamee warned Defendants about *inter alia* a "callous

14  disregard for the privacy rights of users and a lack of care with respect to data . . . entrusted to

15  Facebook."  ¶148.  The direct, specific and personal warnings that Zuckerberg and Sandberg

16  received from their longtime business mentor and early Facebook investor, Mr. McNamee, further

17  demonstrate falsity and scienter as to the risk warnings and other Cambridge Analytica-related

18  statements.  ¶¶147-152.  McNamee's long-term business relationships with Zuckerberg and

19  Sandberg (¶¶147-148) show the facts he provides are based on his personal knowledge and are

20  reliable.  *In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (courts credit such

21  facts at the pleading stage).  The discussions that Zuckerberg and Sandberg had with McNamee

22  during the months leading up to the Class Period are relevant to the falsity and scienter of their

23  February 3, 2017 risk statements (¶350(b)(c)) because those statements, by design, covered the entire

24

25  _____

    from Kogan and all the other folks who he shared it with'" and "'***[w]e got those certifications***.'"
26  FAC at 86, ¶176; *see also* ¶210 (same).  That was false.  ¶150.

27  [11]  *See* MTD Order at 36-37 (concerning risk warnings: "Court can[not] infer that Facebook knew
    of the risk still posed by the Cambridge Analytica [because] Defendants ***had*** asked and ***had received***
28  certifications from Kogan, ***Cambridge Analytica, and its affiliates***").

1   2016 period.[12]  To avoid McNamee, Defendants go outside the SAC, and mischaracterize the timing

2   and the substance of their dealings with him.  Mot. at 23.

3          Contradicting Defendants' false claim that they talked to McNamee "***one year before the***

4   ***class period***" (Mot. at 23) (emphasis in original) or in February 2016, the SAC alleges that

5   McNamee reached out to them in "***October 2016***," and that their dealings lasted about "***three***

6   ***months***."  ¶149.  The document that Defendants attempt to rely upon confirms the discussions

7   started around October 2016, because it states that McNamee warned them about 2016 "election-

8   related things."  Lutz Decl., Ex. 19 at 3.  Corroborating evidence from McNamee himself proves that

9   he reached out to Zuckerberg and Sandberg about "Brexit" and other election subjects on "the ***30th***

10  ***of October," 2016***, and "they g[o]t right back" to him "within hours."  Davis Decl., Ex. C at 20:2-18.

11  They told him they took him "seriously" and self-selected "one of [their] senior people [to] work

12  really closely" with him – Facebook's Dan Rose, who was "the second-longest serving executive at

13  Facebook."  *Id.* at 21:1-11.  These dealings lasted through "***February of 2017***" – *i.e.*, the start of the

14  Class Period.  *Id.* at 23:18.

15         Also, contrary to Defendants' false claim that they only talked to McNamee about

16  "'algorithms'" (Mot. at 23), the very document that Defendants attempt to rely upon to rebut the

17  SAC confirms that their dealings addressed the fact that "***bad actors***" were systematically misusing

18  the platform in the context of "***election-related things***."[13]  Corroborating evidence further proves that

19  McNamee gave "***15 or 16 different examples***" of situations where they [Zuckerberg, Sandberg and

20  Rose] had contributed to bad actors, you know, harming innocent people," including the key bad

21  _____

[12]  *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 801 (9th Cir. 2017) (finding an omission
22  actionable in light of a statement with "emphasis on the past tense indicat[ing] that [defendant] was
    referring to prior events"); *See, e.g.*, *Wireless Facilities*, 2007 WL 9667131, at *8 (Pre-class period
23  knowledge is "not lost when the class period began") (collecting cases).  Thus, Defendants'
    argument that McNamee's dealings with them are "too stale" lacks merit because they made their
24  February 3, 2017 risk statements in the 2016 annual report, which, by their own design, covers the
    entire 2016 calendar year.

25  [13]  Lutz Decl., Ex. 19 at 3 ("And what I was saying ***to them***" – plural – "is, guys, I'm not sure
    exactly what's going on here, but I'm afraid ***there is a systemic problem*** with the algorithms ***and the***
26  ***business*** model of Facebook ***that allow bad actors to cause harm to innocent users of Facebook***.
    And I gave them four different examples – you know, ***not only election-related things but also***
27  things like in Housing and Urban Development, they had cited Facebook for advertising tools that
    allowed discrimination in violation of the Fair Housing Act.")
28

1    actor, **Cambridge Analytica**. ¶147; Davis Decl., Ex. C at 19:4-6, 23:12-17, 29:18-30:15. Reflecting

2    on his discussions with top management, McNamee explained that "roughly" around June 2016

3    "they embed[ed] three [Facebook] employees in the Trump campaign working in a war room in the

4    San Antonio data office of Trump working side by side **with Cambridge Analytica** people on this

5    gigantic dataset that was **obviously the same one that had been misappropriated** by Cambridge

6    Analytica two years earlier." *Id*. at 29:18-30:15. "And here's the thing" – McNamee explained –

7    "**The top management of Facebook knew** they **had employees embedded in the campaign**,

8    everybody knew that Cambridge Analytica was working for Trump, **and there wasn't enough time**

9    **between December and June to recreate that dataset**." *Id*. at 29:18-30:15.

10          McNamee's personal interactions both with Zuckerberg and Sandberg and with their self-

11   selected representative demonstrate that Zuckerberg and Sandberg "knew about [the Cambridge

12   Analytica data misuse] *or* w[ere] provided detailed information about it." MTD Order at 47 (one

13   way to show scienter). A final government report that Facebook *itself* emphasizes in its brief

14   corroborates McNamee's account and further belies Zuckerberg and Sandberg's false claim that they

15   had no idea that Cambridge Analytic continued to misuse the 30 million users' data during the 2016

16   Brexit and Trump campaigns.[14] These findings corroborate McNamee's accounts. They show

17   Facebook *did* embed its employees into the Cambridge Analytica campaign machinery *while* it was

18   abusing the 30 million users' data. *Id.* Even if Zuckerberg and Sandberg merely turned a blind eye

19   to Cambridge Analytica's data misuse after collaborating with McNamee on the issue, "[r]ecklessly

20   turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5." *VeriFone*, 704

21   F.3d at 708.[15]

22

23   [14]    *See* Lutz Decl., Ex. 13 (UK Government Agency "Final Report") at 40, ¶126 (finding "a member
        of the Trump digital election campaign described 'Project Alamo,' which involved staff working for
24   the then presidential candidate Donald Trump, **Cambridge Analytica staff and Facebook staff all**
        **working together with the Cambridge Analytica data sets**, targeting specific states and specific
25   voters. The project **spent $85 million** on Facebook adverts and [the campaign member] said that
        'without Facebook we wouldn't have won.'"); *id.* at 50-51; ¶¶166-167, 172-174 (finding a
26   Cambridge Analytica sub-contractor (AIQ) also spent more than 3.5 million pounds on Brexit
        advertisements that included "target[ing] people via Facebook").

27   [15]    Similarly, though "the FTC Consent Decree alone is insufficient to infer scienter as Plaintiffs
        have provided no particularized facts from which this Court can infer Sandberg consciously lied,"
28   (Order at 47), the existence of the pre-existing decree, combined with the concluded FTC and SEC

1    These same facts explain why Zuckerberg and Sandberg allowed Cambridge Analytica to

2  continue operating freely on the platform *while* it remained delinquent on the "legal certification"

3  that Facebook "demanded" in "2015."  ¶¶150, 186, 210; *infra* §II.C.  Far from carving out an

4  exception to company policies, it *was* company policy to allow Cambridge Analytica's abuses to

5  continue for the right price.  *E.g.*, MTD Order at 47 (facts showing conduct flowing in a "'top

6  down'" manner another way to show scienter as to top management).  Indeed, the SAC alleges in

7  detail, with reference to internal emails bearing Zuckerberg and Sandberg's *own* names, that they

8  *invented* Facebook's policy of permitting third parties to violate privacy policies for a price

9  generally above $250,000, in cash or similar value.  ¶¶63-80 ("reciprocity" overrides privacy

10  policies).

11    The FTC's findings confirm the above.  The FTC found that both the "severity" *and* the

12  "speed" of Facebook's enforcing policy violations depended upon business factors – including

13  whether the violators paid "$250,000" or more to escape enforcement.[16]  The $85 million in revenue

14  that Cambridge Analytica funneled into Facebook over the summer and fall of 2016 far exceeds the

15  $250,000 threshold that Zuckerberg and Sandberg used to allow policy violators to go unpunished.

16  That Facebook immediately "banned" Kogan's personality quiz in *2015* but allowed Cambridge

17  Analytica to keep operating until *2018 – despite* the fact that it was a known co-conspirator in the

18  largest data misuse scandal in Facebook's history – is additional evidence that Cambridge Analytica

19  was a direct beneficiary of Zuckerberg and Sandberg's corrupt, selective enforcement business

20  model.  *Infra* §II.C; *see also* §§II.A.2, II.B.2.  Where, as here, Defendants engage in systematic

21

22  investigations, as well as the other investigations, support scienter.  ¶¶271-313.  *See Minneapolis
    Firefighters' Relief Ass'n v. Medtronic, Inc.*, 2010 WL 11469576, at *8 (D. Minn. Feb. 3, 2010)
23  (scienter alleged where defendant company had entered into an agreement that required senior
    management to monitor the type of activities covered by their statements.).

24  [16]  The FTC found: "Facebook relied on administering consequences for policy violations that came
    to its attention after third-party developers had already received the data," but that "*the severity* of
25  consequences that Facebook administered to third-party developers for violating the company's
    Platform Policies, *and the speed* with which such measures were effectuated, took into account the
26  financial benefit that Facebook considered the developer to offer to Facebook."  Davis Decl., Ex. B,
    ¶123.  "As internal Facebook documents explained, Facebook would contact apps spending *more
27  than $250,000* on advertising and ask them to confirm the need for the data they were accessing,
    while Facebook would terminate access for apps spending *less than $250,000*." *Id.*, ¶90.
28

1   misconduct that was known to the individual Defendants, they cannot avoid scienter by complaining

2   that they were unaware of one particular instance of misconduct that their own, warped "reciprocity"

3   policies put into motion. *See Wells Fargo*, 282 F. Supp. 3d 1074 (where "'claims arise from a

4   pervasive and undisputed fraud going to the core of the Company's business, it is reasonable to infer

5   senior executives knew'").  The FTC's $5 billion punishment of Facebook's misconduct – ***during***

6   the period when it was already under existing consent orders for past misconduct – and specifically

7   covering the selective enforcement misconduct, draws this case even closer to the *Wells Fargo* fake

8   account scandal because both cases involve rampant misconduct flowing from policy decisions that

9   senior executives made.

10          All of these facts are sufficient to show scienter, and they satisfy this Court's standards for

11   alleging falsity as to the risk factor statements because the statements would be misleading to

12   investors because they "'could plausibly have created an impression that only a ***potential***

13   ***vulnerability*** [of improper access, disclosure, loss or misuse] ***and not an actual*** [major incident of

14   improper access, disclosure, loss or misuse] had been discovered.'"  MTD Order at 36 (citing and

15   quoting *Sgarlata v. PayPal Holdings, Inc*, 2018 WL 6592771, at *7 (N.D. Cal. Dec. 13, 2018)).

16          For example, when Zuckerberg and Sandberg reflected upon the calendar year of 2016, and

17   reported the "risks" facing investors on February 3, 2017, they had their discussions with McNamee,

18   which ended in February 2017, fresh in mind.  At that time, they both knew or should have known

19   that "third parties" (Cambridge Analytica) ***and*** "developers" (Kogan) ***had*** subverted "data security

20   practices" for the purpose of "improperly access[ing], ***us[ing]***, or disclos[ing]" "users' data" to

21   Cambridge Analytica ***so that*** Cambridge Analytica could ***continue misusing*** the misappropriated

22   data, contrary to their reassuring statements that those kinds of events were merely hypothetical risks

23   that had not, in fact, occurred.  ¶350(c); ¶352.  That statement's entire "if/then" construct was false,

24   and they did ***not have*** any "legal certifications" of deletion from ***any*** Cambridge Analytica entity by

25   this point in time and ***had not*** banned any Cambridge Analytica entity.  Quite the contrary,

26   Cambridge Analytica continued driving revenue well over the $250,000 floor that Zuckerberg and

27   Sandberg's selective enforcement model had established.

28

1    These same facts demonstrate that Facebook *had* "fail[ed] to prevent" Cambridge

2  Analytica's "improper access," which *had* "result[ed] in the loss or misuse" of user data and *had*

3  harmed at least 30 million Facebook users meaning the "business" *had* been "harm[ed]."¶350(c);

4  ¶352. That harm is clear and does not disappear just because Facebook tried to hide it for as long as

5  possible. *See, e.g.*, *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767,

6  776 (N.D. Cal. 2019). (When "you share sensitive information with a limited audience (especially

7  when you've made clear that you intend your audience to be *limited*), you retain privacy rights and

8  can sue someone for violating them."). Here, users "*limited*" sharing their personal information to a

9  personality quiz for academic "research" – *not* for sale to an untrustworthy third party who bought

10  the data for the purpose of misusing in political campaigns, as Zuckerberg and Sandberg knew or

11  recklessly disregarded.

12              **2.    Evidence of Falsity and Scienter as to the Investigation
                        Statements**

13

14    Nor does the Complaint rely solely on McNamee's eyewitness account to plead falsity and

15  scienter for the Cambridge Analytica-related statements. As noted, on March 4 and March 30, 2017,

16  Facebook's "spokesperson" falsely stated that "[o]ur investigation to date has not uncovered

17  anything that suggests wrongdoing." The statements of the "spokesperson" are the statements of

18  "Facebook" the corporate defendant. *ChinaCast*, 809 F.3d at 476.

19    The spokesperson specifically referenced Facebook's "investigation" of Cambridge

20  Analytica in the March 2017 statements, but *that* "investigation" had uncovered a litany of facts

21  revealing "suggest[ions] of wrongdoing" and more.[17] These facts show falsity, and scienter as to the

22  spokesperson, in the "most direct way" under the securities laws.[18]

23  _____
[17]  *See* ¶¶159-162 (data sale, misuse show falsity as to March 4 and March 30, 2017 "not uncovered
24  anything that suggests wrongdoing" statements); ¶366(b) ("Facebook's investigation into the
    Cambridge Analytica matter had found evidence of wrongdoing," showing falsity); ¶¶9, 97 (finding
25  Cambridge Analytica "sketchy"); ¶¶98, 138 (violated policies); ¶¶141-145 (lied about the scope of
    the stolen data); ¶146 (Facebook investigation personnel "flooded with additional red flags" that
26  Cambridge Analytica still abusing the data in October 2016); ¶¶147-148 (Cambridge Analytica one
    of the "bad actors" harming users); ¶162 ("30 Facebook" personnel including "senior managers" in
27  *five* different groups knew about the investigation in Cambridge Analytica, and policy violations).
    These and other facts, discussed below, reject Defendants' argument that a piece of paper or
28  supposed "oral" statements from Cambridge Analytica or anyone else that they deleted any data had
    any import – as Defendants knew or should have known, Cambridge Analytica was *still using the*

1    Taking one of many "suggest[ions] of wrongdoing" by Cambridge Analytica as an example,

2    in June 2016, Facebook's investigation uncovered the fact that Cambridge Analytica had lied about

3    the data that it purchased from Kogan.  At that time, Facebook entered into a settlement agreement

4    with Kogan admitting that the data he had sold "to Cambridge [Analytica] was ***not just*** personality

5    scores, ***but also*** included highly sensitive user information such as names, birthdays, page likes and

6    locations."  ¶144.  Initially, the fact of the settlement alone illustrates that defendants' prior

7    assertions that they considered the Cambridge Analytica matter "closed" in 2015 shortly after it was

8    reported by *The Guardian* is not credible.  Plainly, they were still concerned with Cambridge

9    Analytica's activities in 2016, knew the certifications had not yet been received, and were highly

10    concerned (as illustrated by the release they gave Kogan in exchange for his agreement to keep quiet

11    about the scandal) over the negative impact that public disclosure of those facts could have, given

12    the significant controversies then brewing over the use of Facebook data in the Brexit and U.S.

13    presidential elections.  ¶¶140-145; *see also* ¶143 n.121, 122 (citing Davis Decl., Ex. I).  The

14    discussions with Kogan heightened these concerns, because they alerted Defendants that the scope of

15    the data that Cambridge Analytica had misappropriated had expanded beyond what had been

16    previously reported, and that Kogan ***and*** Cambridge Analytica had ***both*** "previously misrepresented"

17    to Facebook that they had only given personality scores to Cambridge Analytica.[19]  They also

18    revealed to Facebook that Cambridge Analytica paid "750,000 GBP" for the data.  Davis Decl., Ex. I

19    

20    ***data,*** repeatedly lied about the data, and still was not "banned" per Facebook's own policies.  Mot. at
13.

21    [18]    *Nursing Home v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to

22    show ***both*** that a statement was false when made ***and*** that the party making the statement knew that
it was false is via contemporaneous reports or data, available to the party, which contradict the

23    statement."); *Quality Sys.*, 865 F.3d at 1145 (9th Cir. 2017) (speaker referenced "database" in
making statements, but the "database" showed the statements were untrue, showing falsity and

24    scienter) (citing *Nursing Home*, 380 F.3d at 1230-31)); *see also Facebook, Inc.*, 402 F. Supp. 3d at
787 (N.D. Cal. 2019) ("contrast" between statement and "reality" a sufficient "to infer fraudulent

25    intent").

26    [19]    ¶¶145-146; *accord* Lutz Decl., Ex. 15, ¶31("in June 2016, Facebook and the researcher signed a
settlement agreement.  In a certification attached to that agreement, the researcher reported –

27    ***contrary to his and Cambridge's representations in December 2015*** – that, in addition to the
personality scores, he had also transferred actual U.S. Facebook user data, including names,

28    birthdays, location, and certain page likes, to Cambridge").

1    at 26.  Cambridge Analytica was obviously still using the data that had cost it so much money –

2    otherwise, why would it lie?

3            That Facebook's "investigation" team quickly moved to cover up the facts that Kogan

4    disclosed to them in June 2016 further establishes scienter.  Where, as here, Defendants attempt to

5    prevent third parties from disclosing the truth, that conduct supports an inference of "active

6    concealment" for scienter purposes.  *In re Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at *16

7    (N.D. Cal. Sept. 29, 2017).  The settlement agreement that Facebook made Kogan sign in June 2016

8    supports this inference.  ¶¶141-145.  Kogan had admitted facts showing Cambridge Analytica lied

9    about the data and paid about a million dollars for it – he did so to allow Cambridge Analytica to

10   continue misusing the data in political campaigns.  To make sure Kogan never told anyone about

11   those facts, Facebook bound Kogan to a non-disclosure provision that Facebook tied to $25,000 in

12   liquidated damages if he ever talked.  *Id.*  These facts compare favorably to the agreements that this

13   Court considered in its scienter analysis in the *Intuitive* securities case.[20]  But in this case,

14   Facebook's non-disclosure agreement concerned not just "hundreds" of injured people.  *Id.*  The

15   agreement concerned 270,000 people who thought they were giving personal data to a "researcher"

16   in taking a "personality survey" – and not, as the facts show, for the purpose of selling some

17   30,000,000 users' personal information down the river to a political operator whom Facebook's own

18   documents put at the center of a high-priority or "hi pri" investigation on account of being a "PR

19   issue."  ¶¶9, 104; Davis Decl., Ex. D at 7.

20           After discovering that Cambridge Analytica had lied about the data that it stole in June 2016,

21   in the fall of 2016 Facebook's investigation team also saw Cambridge Analytica puffing its access to

22   the stolen data.  ¶146.  For example, they saw and discussed an October 27, 2016, article in *The*

23   *Washington Post* reporting that Cambridge combined psychological tests with "likes" on social-

24   media sites, and a video of a marketing presentation by Cambridge's chief executive officer (Nix)

25   about the firm's ability to "target" voters based on personality.  *Id.*  *The Washington Post* report

26

27   [20]   *Intuitive*, 2017 WL 4355072, at *15 ("The SAC also includes allegations that the [people who
      made the statements] authorized [defendant] to enter into hundreds of tolling agreements with
28   individuals who had been injured allegedly by [defendant].")

1   embeds the video, and shows the Ted Cruz campaign paid Cambridge Analytica $5.8 million while

2   the Trump campaign had paid Cambridge Analytica $5 million in September of 2016.[21]   The video

3   shows Nix stating: "[Senator] Ted Cruz *employed our data*, behavior insight . . . clearly, the Cruz

4   campaign is over now, but *what I can tell you* is that of the two candidates left in this election, *one*

5   *of them is using these technologies*, and it's going to be very interesting to see how they impact the

6   next seven weeks."   ¶146; Davis Decl., Ex. E at 9.   In the presentation that Facebook's *own*

7   *investigation* team witnessed, Nix stood before a large screen: the left side of the screen shows his

8   sources of "*Big Data*" and it includes the "*Facebook*" logo.  Davis Decl., Ex. F.

9          Standing alone, these "red flags" (¶146) might show a political promoter puffing his wares.

10  Considered in light of the fact that Facebook's *investigation* had discovered that Cambridge

11  Analytica had, in fact, bought the 30 million users' data for about a million dollars then lied about it,

12  however, the red flags raise a compelling and cogent inference Facebook's investigation team knew,

13  or should have known, that Cambridge Analytica continued to misuse the stolen data for

14  unauthorized political purposes.  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)

15  (courts "consider the totality of circumstances, rather than to develop separately rules of thumb for

16  each type of scienter allegation").  The totality of the facts show scienter and falsity.

17         These and other facts also show falsity and scienter in the most direct way because they

18  contradict Facebook's "spokesperson" statements about Facebook's *own* Cambridge Analytica

19  investigation on March 4, 2017 that "[o]ur *investigation* to date has *not uncovered anything that*

20  *suggests wrongdoing* with respect to Cambridge Analytica's work on the [Brexit] and Trump

21  campaigns" and the spokesperson's even more strident statement on March 30, 2017 that was not

22  limited to the Trump/Brexit campaigns. ¶362.  Facebook's own investigation found out Cambridge

23  Analytica was lying about the scope of the data that it bought from Kogan while Cambridge

24  Analytica was still working on the Brexit/Trump campaigns, *while* Facebook had embedded three of

25

26  [21]   Davis Decl., Ex. J at 2 ("Cruz rose from 5 percent to 35 percent in the polls, *Nix said in his*
    *speech* [link: https://www.youtube.com/watch?v=n8Dd5aVXLCc], which he delivered at the
27  Concordia summit"); *id.* at 6 ("Cambridge Analytica relies on a system it developed called OCEAN
    . . . psychological tests are combined with the collection of data, *such as the 'likes'*" from social-
28  media sites that are "*added to a spreadsheet* that contains the name of every voter.")

1   its own employees to work with Cambridge Analytica on the latter campaign.  *See infra* §II.B.1; *see*

2   *generally* §§II.A-B.[22]  There, Facebook did witness, or readily inferred that Cambridge Analytica

3   was still misusing the misappropriated data, in violation of Facebook's publicly stated policies.

4   These facts unfolded while Cambridge Analytica refused to sign the "legal certification[]" of

5   deletion that Facebook "demanded" six to nine months earlier – even though ***other*** entities like

6   Kogan did sign the certifications.  *See infra* §II.C.

7          The spokesperson's "access" to the investigation specifically identified in the statements also

8   shows scienter.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009)

9   ("details about the [speaker's] access to information within the company" another way to show

10  scienter).  Relevant Journalists who took the spokesperson's March 4, 2017 statement are in accord.

11  ¶164 (quoting Carol Cadwalladr, who stated that the SEC's complaint "proves Facebook's press

12  team lied to me"); *see also* Davis Decl., Ex. A ("Carol Cadwalladr" on the byline for the March 4,

13  2017 report containing the no "suggest[ion] of wrongdoing" statement).  That kind of fact-witness

14  account corroborates scienter.  *See*, *e.g.*, *In re See Beyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d

15  1150, 1169 (C.D. Cal. 2003) (finding that allegations that speaker lied "raises a strong inference that

16  these individuals deliberately misled analysts and investors").  Ample facts show falsity and scienter

17  as Facebook's investigation statements.

18          **C.      Cambridge Analytica's Refusal to Comply with Facebook's
                      "Demand" for a "Legal Certification" and Free Pass on Any "Ban"**
19          **Corroborate Falsity and Scienter**

20          No piece of paper can cover up Defendants' knowledge about Cambridge Analytica's data

21  misappropriation and misuse.   Yet Defendants make a sweeping argument about various

22  "certifications" from various third parties, conflating third parties and "certifications" alike.  *E.g.*,

23  Mot. at 6-7 ("Facebook investigated the issue, removed Kogan's app from Facebook, and obtained

24  ***certifications and confirmations*** from Kogan, GSR, ***Cambridge Analytica, and its parent company***

25

---

26  [22]   *See also* Lutz Decl., Ex. 13, ¶126 (in "Project Alamo . . . ***Cambridge Analytica staff and***
27  ***Facebook staff all working together with the Cambridge Analytica data sets***, targeting specific
    states and specific voters" on the Trump campaign and the "project ***spent $85 million*** on Facebook
28  advert").

1  that all user data had been destroyed.").  Then Defendants falsely suggest they "got" all these things

2  in 2015, lumping this argument under a hearing about their conduct in "2015."  *Id.*

3        But Facebook is improperly lumping distinct entities together.  A March 16, 2018 press

4  release from Facebook shows the entities are separate (¶186) (citing Davis Decl., Ex. K):

> We are suspending *[1]* Strategic Communication Laboratories (SCL), including their
> political data analytics firm, *[2]* Cambridge Analytica, from Facebook.  Given the
> public prominence of this organization, we want to take a moment to explain how we
> came to this decision and why. . . .  In 2015, we learned that a psychology professor
> at the University of Cambridge named *[3]* Dr. Aleksandr Kogan lied to us and
> violated our Platform Policies by passing data from an app that was using Facebook
> Login to SCL/Cambridge Analytica, a firm that does political, government and
> military work around the globe.  He also passed that data to *[4]* Christopher Wylie of
> Eunoia Technologies, Inc.

10  Davis Decl., Ex. K.  The press release shows that Facebook understood, in 2015, that "SCL" and

11  "Cambridge Analytica" were distinct entities that received users' data in violation of Facebook's

12  policies.  It also shows that Kogan, the academic, was a co-conspirator in the policy violations by

13  disclosing the data to SCL and Cambridge Analytica.  Though not mentioned in the press release, he

14  did so through a company called Global Science Research ("GSR").  ¶6.  Kogan co-founded GSR

15  with Joseph Chancellor, who went to work for Facebook full-time in 2015.  *Id.*  And it shows Wylie

16  and Eunoia are related (Wylie owned Eunoia).

17        Upon discovering any violation in 2015, Facebook's enforcement policies involved, quoting

18  Facebook, two necessary actions: "banning those companies from Facebook *and* requiring them to

19  destroy all improperly collected data."  ¶5.  On March 21, 2018, Zuckerberg gave this explanation to

20  the media about how Facebook purported to act on those two steps:

> So *in 2015*, when we heard from journalists at *The Guardian* that Aleksandr Kogan
> seemed to have shared data with *Cambridge Analytica* and a few other parties, the
> *immediate actions* that we took were to ban Kogan's app and *to demand a legal
> certification* from Kogan *and all the other folks* who he shared it with.  *We got
> those certifications* . . . .

24  ¶210.  Demanding and receiving a "*legal certification*" was the means Facebook followed to enforce

25  the "require deletion" piece its two-part enforcement policy.[23]  Zuckerberg was precise about

26

---

27  [23]  Zuckerberg has repeatedly told the public that legal certifications were the means of enforcing
     the deletion prong of Facebook's two-part enforcement policy, as in response to this question from
28  CNN: "So why didn't Facebook follow up [with Cambridge Analytica after 2015]?"  Zuckerberg:

1    requiring the "legal certification[s]" and not some random "confirmations" that Defendants argue

2    about now, while failing to acknowledge Facebook's CEO admitted that "legal certifications" were

3    the documents that supposedly mattered.

4          Understanding the facts just summarized makes it possible to assess precisely when

5    Facebook got "legal certifications" and from whom – without conflating the timing or any "legal

6    certification" with non-compliant statements of deletion.  The timeline starts in 2015.  It is clear

7    from Zuckerberg and the Facebook press release (quoted above) that Facebook **demanded** legal

8    certifications from both SCL and Cambridge Analytica in **December 2015**.  Facebook's written

9    answers to questions from the U.S. Senate admit that,[24] on **January 18, 2016**, "Cambridge

10   Analytica" responded to the demand not with a legal certification but with some kind of "written

11   confirmation."  Davis Decl., Ex. G at 126.  Then, on **September 6, 2016**, Facebook reached out again

12   for the demanded legal certification, but "SCL" (not "Cambridge Analytica") responded with some

13   sort of oral communication from "counsel" and nothing in writing.  *Id*.  Next, "*[o]n April 3, 2017*,

14   Alexander Nix, on behalf of SCL, **certified** to Facebook, that it deleted the information." *Id*.  "SCL"

15   referred to "SCL Elections Limited."  *Id*.  "SCL Elections Limited" is a UK entity as the name

16   shows and, while related to "Cambridge Analytica" in ownership, it is not the same, it is not

17   Cambridge Analytica's "parent" company.[25]

18         To make the Complaint easier to read, Plaintiffs generally refer to the "Cambridge

19   Analytica" entities – *i.e.*, the UK entity SCL Elections Limited, its US corporate cousin Cambridge

20   Analytica, and UK parent corporation "SCL Group" (¶376) – as "Cambridge Analytica."  But

21   unpacking those entities shows that Cambridge Analytica never actually gave Facebook a legal

22   certification.  For example, the April 2017 "unverified" certification was actually given by SCL.

---

23
24   "Well, I mean, I don't know about you, but I – I'm used to when people **legally certify** that they're going to do something that they do it."  Davis Decl., Ex. H at 4:2-5:12.

25   [24]   ¶339 n.331 (June 8, 2018, U.S. Senate Questions and Facebook Answers); *see also* Davis Decl., Ex. G (Excerpt from Questions/Answers).

26   [25]   ¶146 (citing October 27, 2016 *Washington Post* report); *see also* Davis Decl., Ex. J at 2 (October
27   27, 2016 *Washington Post* report) ("Cambridge Analytica – a U.S.-incorporated affiliate of SCL Group, a British firm that has worked on campaigns in 22 countries – says it is working on 50
28   campaigns in the United States.").

1    ¶150.   To assess some of Defendant's arguments, however, it is necessary to peer into the

2    Cambridge Analytica group with greater precision.  For example, the Complaint alleges that it "was

3    not until *April 2017*, months into the Class Period, that Cambridge Analytica finally provided

4    Facebook with [an] unverified written *certification*."  ¶150.  *That* certification came from "SCL

5    Elections Limited," as demonstrated.  *That* certification is unreliable on its face – it states, literally,

6    that it "*cannot be relied upon*."  Davis Decl., Ex. I at 38.  *That* was the *only* legal certification that

7    Facebook ever received from *any* Cambridge Analytica entity as Facebook's answers to the US

8    Senate show.  Thus, the US "Cambridge Analytica" entity *still* had not signed any legal certification

9    as of the date of those answers – June 18, 2018 – and likely *to this day*.  Facebook made Kogan sign

10   a certification in his personal capacity, and for his business, GSR.  *Id.* at 29, 33.  Yet, Cambridge

11   Analytica's CEO did not provide a certification in his personal capacity, or in the name of

12   Cambridge of Cambridge Analytica, or in the name of the parent company, SCL Group.

13        As to banning, despite the fact the Cambridge Analytica drove the platform policy violations

14   at issue as the funding source behind the entire operation, Facebook allowed them to operate freely

15   until *March 2018*.  ¶186.  It banned Kogan in *December 2015*.  ¶210.  This disparate treatment of

16   Cambridge Analytica, relative to Kogan, strengthens falsity and scienter in this case for the reasons

17   already given.  *Infra.* §II.B.1.  Finally, Cambridge Analytica's *continuing misuse* of the stolen data

18   *throughout* 2016 shows all "certifications" from all sources were not worth the paper they were

19   printed on.  Thus, Defendants' factual argument about "certifications" and "confirmations" does

20   nothing to rebut scienter or falsity in this case.

21   **III.    The Statements Regarding the FTC Consent Decree Were False and Made
          with Scienter**

22

23        The SAC adds several new and highly specific statements by Defendants regarding

24   Facebook's purported compliance with the 2012 consent decree.  *See* ¶¶182, 215 Sandberg (April 5,

25   2018: "The FTC consent decree was important.  *And we've taken every step we know how to make*

26   *sure we're in accordance with it*.");  ¶183 (June 8, 2018:  Zuckerberg told Senate that 2012 consent

27

28

1   decree was not violated because Facebook had "***honored the restrictions of all privacy settings*** that

2   covered developer access to data"); *see also* ¶¶389-395 (other statements).[26]

3          Defendants knew that these statements were false.   As alleged in detail in the SAC,

4   Defendants made a deliberate decision to violate the 2012 consent decree almost immediately after it

5   was implemented.  *See* ¶¶62-80.  Moreover, internal Facebook emails demonstrate that Zuckerberg

6   and Sandberg were personally involved in the decision to override user privacy settings (¶118) to

7   allow "whitelisted" app developers access to third party data (¶¶66, 73-76), including Apple,

8   Amazon, Blackberry, Microsoft and Samsung.  ¶¶116-117, 286.  The FTC concluded that Facebook

9   knowingly violated the 2012 consent decree (¶64) in order to "subvert user's privacy choices to

10  serve its own business interests" through "at least June 2018."   ¶286.

11         In response, Defendants rely on the Court's prior determination that Zuckerberg's statement

12  that Facebook "'worked hard to make sure'" it complied with the 2012 consent decree was "'too

13  vague'" to be actionable, and Facebook had no duty to disclose "'unproven allegations.'"  *See* Mot.

14  at 16-17; MTD Order at 27.  But, as noted above, the new statements alleged in the complaint are far

15  more specific as they involve both of Facebook's most senior executives speaking with specificity

16  that Facebook was complying with the 2012 consent decree.  These are not vague statements of

17  "general compliance" as the Court was addressing in the prior complaint.[27]

18         When viewed in the context of Facebook's historic privacy misconduct and unprecedented

19  $5 billion civil penalty, Defendants' claim that they need not "'self-flagellat[e]'" about violating the

20  2012 consent decree (Mot. at 17) is misplaced.  While Defendants may not have a duty to disclose

21  unproven allegations (MTD Order at 27) – here, they chose to speak on an important subject and

22  made material misrepresentations about it.   This states a claim for securities fraud.[28]   And

23  _____

24  [26]  Defendants' statements about complying with more advanced standards in Europe (Mot. at 16) are false or misleading for similar reasons.

25  [27]  The two cases cited by the Court, *Karam v. Corinthian C., Inc.*, 2012 WL 8499135, at *10 (C.D. Cal. Aug. 20, 2012) (compliance was "job one") and *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352,

26  370 (E.D.N.Y. 2013) ("'compliance program was "robust"'") (MTD Order at 27) both deal with general statements of corporate culture or compliance – not specific representations regarding a

27  specific consent decree.

28  [28]  *See Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *28 (N.D. Cal. Feb. 27, 2018) (statement about "terrific" relationship with regulators misleading in context).

1    Defendants' statements were not couched as "opinions" (Mot. at 17), but even if they had been they

2    would still be misleading because they were not based on a reasonable investigation.  *Intuitive*

3    *Surgical*, 2017 WL 4355072, at *2 (an opinion statement such as "'we believe our conduct is

4    lawful,'" could be misleading if not based on a reasonable investigation).[29]

5    **IV.    The Remaining Statements Are Also Actionably False, With Scienter**

6            Defendants' statements about never "'sell[ing]'" or "shar[ing]" data (*e.g.*, ¶¶456-457) were

7    materially misleading on account of Defendants' deliberate whitelisting and related misconduct to

8    make more money under Facebook's "reciprocity" scheme.  *E.g.*, ¶¶16, 63-80, 444-460.  Even if not

9    technically "'sell[ing]'" users' data in cash-for-data transactions (Mot. at 20) bartering data-for-data

10   or data-for-ad revenue are transactions sufficiently similar in substance to render these statements

11   misleading.  *See Berson*, 527 F.3d at 985 ("a statement is misleading if it would give a reasonable

12   investor the 'impression of a state of affairs that differs in a material way from the one that actually

13   exists'").  Facebook opened its data bartering market ***and*** its related privacy-overriding privileges to

14   all comers – including Chinese and Russian companies with ties to their respective governments,

15   presenting national security risks.  *Supra* §I; ¶¶125-127.  At minimum, Defendants knew, or should

16   have known that state actors could access user data for improper purposes and broke their own

17   promises to tell users about it.  *Cf.* Mot. at 17-18 (§III.B 8, 10).  Where, as here, Defendants like

18   Facebook engage in rampant misconduct, they cannot be heard to complain that they were unaware

19   of a ***particular*** instance of the misconduct – just as in the cases where Defendants mass produced

20   fake bank accounts or emissions-cheating cars, Facebook's non-consensual, mass-bartering of

21

22   ---

      [29]   Defendants' decision to speak with specificity on this subject, particularly in the context of the

23   enormous FTC civil penalty and privacy misconduct alleged for the first time in the SAC,
      distinguishes it from the cases the Court previously relied on for the holding that Defendants' do not

24   have to "'self-flagellat[e].'"  MTD Order at 27.  *See Haberland v. Bulkeley*, 896 F. Supp. 2d 410,
      426 (E.D.N.C. 2012) (applying Delaware state law to claim that defendant had to voluntarily

25   disclose the existence of an "not material" private litigation); *In re Paypal Holdings, Inc.*, 2018 WL
      466527, at *3 (N.D. Cal. Jan. 18, 2018) (not required to disclose existence of a non-public FTC

26   investigation).  Defendants' citation to *In re Lifelock, Inc. Sec. Litig.*, 690 F. App'x 947 (9th Cir.
      2017) (Mot. at 17) actually demonstrates why their statements are actionable in the context of this

27   case.  In *Lifelock*, the one alleged false statement was non-specific and expressly couched as an
      opinion.  *Id*. at 951 ("'[w]e endeavor to comply with all applicable laws and believe we are in

28   compliance with the requirements of the FTC Order.'")

1   personal user data is a rampant violation of privacy that supports falsity (and a compelling inference

2   of scienter).  *See infra* at 7, n.4.  Cases of this type readily satisfy scienter.  *Id.*

3        Likewise, as to scienter, the widespread nature of the misconduct that the FTC punished, the

4   fact that it was long-lasting, and the fact that Zuckerberg and Sandberg's ***own names*** appear on

5   documents concerning the fraud (*e.g.*, the whitelisting) allows the Court to infer that they "knew

6   about [the misconduct that violated the FTC consent decree] or w[ere] provided detailed information

7   about it."   MTD Order at 47 (a means of showing scienter).   The rest of the scienter factors

8   summarized above point to the same conclusion.  *See infra* §I.  The rest of Defendants' arguments

9   fail for similar reasons.[30]   Also, Facebook users did ***not*** "consent" (Mot. at 15-16) to Kogan's

10  trafficking their data under false "research" pretenses of taking a "personality survey" for some

11  academic "researcher."   ¶104; *see infra* §II.B.2; *see generally* §II.  "Fraudulent consent" about the

12  ***purpose*** of the sharing is "not consent," as Defendants knew or should have known.  *See infra* §II.[31]

13  And, Defendants do not defend their misstatements that users "chose to sign up" for Kogan's app

14  and "knowingly provided their information."   Only 270,000 users did so, but tens of millions of

15  victims had their data misused.  ¶¶86-106, 381-382.

16        Further, Plaintiffs respectfully submit that the other statements set forth in the SAC,

17  including the misleading user metrics and related results (¶¶420-443), statements that users would be

18  notified when their accounts had been compromised (¶¶404-410), and assurances of existing GDPR

19  compliance (¶¶411-413), are actionable for the reasons detailed in the SAC.  Defendants do little to

20  defend these statements other than declaring them to be true and relying on the Court's prior Order.

21  *E.g.*, Mot. at 17-19.  Defendants raise fact disputes that cannot be resolved at the present stage.

22

---

23  [30]   For example, the rampant privacy misconduct uncovered by both the FTC ***and*** the SEC show
24  Facebook did ***not*** "respect[ed] [user] privacy settings" (Mot. at 12) in overriding those settings and
    allowing Cambridge Analytica to keep operating ***without*** any "legal certification" (from 2015 to
25  April 2017) and without any "ban" (from 2015 to 2018).  ¶¶70-80, 344-348.

26  [31]   Defendants' reliance on the 2013 Data Policy is misplaced because it was abrogated by their
    April 2014 statements that they had shut down access to user friend data.  ¶¶81-85.  In reality,
27  Defendants secretly let millions of third-parties continue to access that data, including Kogan who
    used that undisclosed access to collect the data sold to Cambridge Analytica.  *E.g.*, ¶¶101-106, 380-
28  387.

1    Finally, Zuckerberg's $5.3 billion in class period stock sales, and Sandberg's $389 million in

2    Class Period stock sales corroborate scienter as to all of their Class Period statements and omissions.

3    *Nursing Home*, 380 F.3d at 1232.  The numbers alone are "truly astronomical figure[s]" that

4    independently support scienter.  *Id.*  Zuckerberg and Sandberg make a number of arguments in

5    opposition that rest on their Rule 10b5-1 trading plans (Mot. at 23-25), but "the fact of the 10b5-1

6    trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales." *In re*

7    *Questcor Sec. Litig.*, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013).  **If**, as Zuckerberg and

8    Sandberg suggest, all of their sales were on an automatic selling program set up prior to the Class

9    Period, **then**, knowing that they **had** to sell **during** the class period (Mot. at 24) gave them a $5.6

10   billion (combined) incentive to conceal negative facts from the market for as long as possible as they

11   sold "truly astronomical" volumes of stock.  *Nursing Home*, 380 F.3d at 1232.

12   **V.    The SAC Pleads Loss Causation**

13   Loss causation requires "no more than the familiar test for proximate cause."[32]  In this Circuit

14   "loss causation is a 'context-dependent' inquiry, as there are an 'infinite variety' of ways for a tort to

15   cause a loss," *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016), including by

16   identifying price declines that accompany the materialization of concealed risks or the disclosure of

17   information previously concealed.  *First Solar*, 881 F.3d at 754.[33]

18   Here, the Complaint alleges with particularity that extraordinary declines in the price of

19   Facebook stock were caused by the revelation of previously concealed and misrepresented material

20   risks and other information concerning Facebook's user data practices, including Facebook's

21   misrepresentations and omissions concerning Cambridge Analytica – its improper access to user

22   data, the data loss, the data misuse, failed loss mitigation (even by Facebooks' **own** "legal

23   certification" and "banning" standards) and serious misconduct discovered by Facebooks **own**

24   investigation into Cambridge Analytica (but concealed from the public by Facebook).  When the

25   ────────────────

[32]   *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018); *accord*
26   *Dura Pharm. v. Broudo*, 544 U.S. 336, 347 (2005) (plaintiff need only "provide a defendant with
     some indication of the loss and the causal connection that the plaintiff has in mind").

27   [33]   Defendants suggest that Plaintiffs allege only under a "corrective disclosure" theory (Mot. at 27,
28   n.8), the Complaint also pleads a materialization of risk theory.  *E.g.*, ¶511.

1    truth started to emerge in March 2018, Facebook's stock value fell immediately.  The declines were

2    literally historic, with Facebook's stock price plummeting by a total of 18% during the last two

3    weeks of March 2018 (¶¶512-517) and 19% on a single day in July 2018 (July 26, 2018 (¶519)) –

4    each time erasing approximately $100 billion in market capitalization.  *E.g.*, ¶¶22, 27, 198.  The

5    Complaint further alleges that the movement of the overall market (¶512) demonstrates that the

6    alleged price declines did not reflect market volatility or other macro-economic factors.  Because the

7    Complaint provides Defendants with an "indication of the loss and the causal connection plaintiff

8    has in mind," Plaintiffs have adequately pled loss causation.[34]  *Dura*, 544 U.S. at 347; *First Solar*,

9    881 F.3d at 753 ("'loss causation is a 'context-dependent' inquiry.'").

10    **March Price Declines**.  The Complaint alleges loss causation with specificity based on the

11    reaction of Facebook's stock price to the March 2018 disclosures relating to Cambridge Analytica

12    and other instances of privacy-related misconduct.  *E.g.*, ¶¶21, 198, 512-513; *see also* ¶¶185-197,

13    207-216.  In addition to the price reaction to the articles published on March 17, 2018 (*id.*), the

14    Complaint details subsequent disclosures and price declines in March (*see* ¶¶512-514), including

15    revelations that: (i) privacy breaches were more common than previously known (*e.g.*, ¶¶189-190,

16    195); (ii) the number of users affected had not been fully investigated (*compare* ¶363 (30 million

17    users' data stolen *with* ¶¶106, 192, 194) (50 million users; *with* ¶164 (87 million)); (iii) Facebook's

18    privacy protections were not as robust as represented (*e.g.*, ¶116); (iv) Facebook's failure to enforce

19    its policies or notify affected users had harmed the Company's reputation and decreased user trust,

20    threatening user engagement (¶¶192-197; *see also* ¶¶248, 252); and (v) that Facebook had not

21    notified the FTC of the Cambridge Analytica breach, and the Company was exposed to numerous

22

23

---

24    [34]    Contrary to most of Defendants' arguments (*e.g.*, Mot. at 28 ("[t]he March 17, 2019 articles say
      nothing about 'whitelisting,'") Mot. at 31 (no loss causation where Defendants themselves "did not

25    even mention Cambridge Analytica, 'whitelisting,' or any privacy incident")), it is black-letter law
      that loss causation does not require a revelation of the fraud or a "fact for fact" correlation between

26    the alleged misrepresentations and the corrective disclosure.  *First Solar*, 881 F.3d at 754; *Lloyd*, 811
      F.3d at 1210; *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009).

27    Defendants' contentions that loss causation is based on "conclusory allegations" about "unspecified
      facts" is just wrong, as described above.  *See* Mot. at 27-29 (citing ¶¶512-513 and Lutz Decl., Exs.

28    17, 21-22, 24); *cf.* ¶¶512-528.

1   investigations by government entities that further threatened Facebook's business.  These facts are

2   sufficient to allege loss causation at this stage.[35]

3         Defendants do not deny that the Complaint alleges statistically significant declines in

4   Facebook stock price.  And they do not identify any other information that purportedly caused the

5   decline in Facebook's stock price.  Instead, they attack the March disclosures in conclusory fashion,

6   asserting that the "essential allegations" in the March 17, 2018 *Guardian* and *New York Times*

7   articles had been revealed in 2015.  Mot. at 27-29.  Even if Defendants were correct (and they are

8   not), these "essential allegations" were falsely concealed and denied by Defendants during the Class

9   Period by, among other things, their: (i) materially false and misleading risk disclosures stating that

10  any such risks were "hypothetical" (¶¶132-158, 349-359); (ii) denials that their investigation had

11  uncovered any wrongdoing in relation to Cambridge Analytica (¶¶159-164, 361-366); (iii) false

12  statements that users had complete control over their data ((¶¶108-131, 325-343); and (iv) denials

13  that these issues were having any impact on Facebook's business.  ¶¶217-218.  At the end of the day,

14  Defendants' contentions at best raise factual issues for expert analysis and discovery.

15        Critically, the facts described above – that the Cambridge Analytica data breach and related

16  lack of user control over data posted to Facebook presented continuing risks to Facebook's business,

17  and that the Company's professed commitment to enforcing user data protection policies was false –

18  was not even partially revealed until March of 2018.  Indeed, it is for this reason that commentators

19  stated, for example, on March 19, 2018: "No one has provided an adequate explanation for why

20  Facebook did not disclose Kogan's violation to the more than 50 million users who were affected

21  when the company first learned about it in 2015."[36]  This alone is fatal to Defendants' "there was no

22

23

---

24  [35]   Defendants misstate the law when they contend that "'the announcement of an investigation' . . . is insufficient to [plead] loss causation" (Mot. at 30) and cite to cherry-picked language from the

25  Ninth Circuit's 2014 decision in *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).  But in the much more recent case, *First Solar*, the Ninth Circuit made clear that they "affirmed the

26  opposite," holding that the announcement of a government investigation can establish loss causation. 881 F.3d at 753; *see also Lloyd*, 811 F.3d at 1210 (same).

27  [36]   ¶192; *see also* ¶193 (CNN: "The problem here is how Facebook, the biggest social network,

28  chose to stay silent and not inform the affected users"); ¶195 (Securities analyst, same).

1    new news" loss causation argument.  Ultimately, Defendants' argument is a "truth-on-the-market"

2    defense raising factual issues that may not be resolved on the pleadings.[37]

3         Defendants' arguments are also inconsistent with the reaction of numerous analysts,

4    journalists, Facebook insiders, and others at the time.  For example, as recognized in a March 2018

5    report issued by the world's leading corporate governance advisor, Institutional Shareholder Services

6    ("ISS"), Facebook's "failure to protect its users' privacy has eroded the level of trust among users,

7    calling into question the company's business model and governance." ¶22.[38]  These knowledgeable

8    market participants viewed the March disclosures as new, material, and troubling.

9         **July Price Declines**.  Following the March 2018 disclosures, Facebook embarked on a public

10   relations campaign to assure investors that, while they had made mistakes in the past, those mistakes

11   were now resolved, and the privacy scandals were not threatening the Company's business model or

12   financial results.  ¶¶217-218; *see also* ¶¶212-216.  On April 25, 2018, the Company issued its 1Q18

13   earnings report, which appeared to validate Defendants' assertions that the scandal had not impacted

14   user trust or engagement.  ¶¶219-222.  In response, the Company's stock price jumped by 9%.  ¶223.

15   Thereafter, Defendants continued to reassure investors about the purported limited impact of the

16   scandal on the Company's business, or on the roll out of the user opt-in requirements of GDPR,

17   which caused Facebook's stock price to continue to rise.  ¶¶223-233.

18        The market was therefore stunned when Facebook issued its 2Q18 earnings on July 25, 2018,

19   reporting declining user numbers in Europe, lower than expected revenues, and reduced guidance

20   going forward, all as a substantial result of the fallout from the disclosures concerning Facebook's

21   privacy practices.  ¶¶242-251.  This news caused an immediate 19% decline in Facebook's stock

22   price, a stunning and severe drop that eliminated $100 billion of shareholder value in a single day.

23   ¶¶249-250.  By comparison, the overall market declined by just 0.3%.  ¶512.

24

25   [37]  *E.g.*, *Nguyen v. Radient Pharm. Corp.*, WL 5041959, at *6 (C.D. Cal. Oct. 20, 2011).  It is well
     established that stock price declines in reaction to the marketplace disclosures are sufficient to plead
26   loss causation, and the Complaint pleads as much here.  *See*, *e.g.*, *In re Akorn Sec. Litig.*, 240 F.
     Supp. 3d 802, 816 (N.D. Ill. 2017).

27   [38]  *See also*, *e.g.*, ¶192 (scandal has damaged "public trust in Facebook's commitment to privacy
     and data protection.");  ¶195 (similar).
28

1    Defendants make two arguments that the Complaint fails to plead loss causation for the July

2  25, 2018 disclosure.  First, they argue that there was nothing "new" in the 2Q18 results, asserting

3  that the reduced user engagement and increased expenses had previously been disclosed.  This is

4  incorrect and belied by the reaction of numerous market observers and participants.  For example,

5  *The New York Times* reported: "The results were among the first signs that the issues had pierced the

6  company's image and would have a lasting effect on its moneymaking machine."  ¶250.  Other

7  journalists drew the same conclusion.  *E.g.*, ¶526 n.464; ¶¶522-528.  Numerous analysts lowered

8  their earnings estimates, explicitly recognizing the negative impact that Facebook's past privacy

9  violations were having on user engagement and advertising revenues.  *Id*.

10    Defendants' assertion that loss causation cannot be established because the earnings release

11  did not use the words "Cambridge Analytica" or (purportedly) "reference . . . the privacy incidents"

12  is similarly misguided and ignores their own admissions about the conditions that contributed to the

13  unexpectedly poor quarterly results.  Indeed, within the first few seconds of his remarks on the July

14  25, 2018 conference call, Zuckerberg said, "I want to start by talking about all the investments we've

15  made over the last six months to improve safety, security and privacy across our services."  Lutz

16  Decl., Ex. 10 at 2.  He then spoke at length about privacy and transparency tools relating to

17  advertising and elections, even expressly stating "I also want to talk about privacy."  *Id*.  Sandberg

18  likewise said, "We've taken strong steps to address a number of issues including election integrity,

19  fake news, and protecting people's information."  *Id*. at 4.

20    Defendants' assertion also ignores multiple market observers who expressly drew a causal

21  link between Facebook's disappointing results and the Cambridge Analytica scandal.[39]  Moreover,

22  Defendants' contention that loss causation cannot be established by a price decline following an

23  earnings announcement (Mot. at 31) is contradicted by the most recent Ninth Circuit loss causation

---

[39]   *See, e.g.*,  ¶251 ("Facebook Inc. saw the first signs of user disenchantment in the midst of public scandals over privacy and content, with second-quarter revenue and average daily visitors missing analysts' projections"); ¶250 ("results were among the first signs that the [Cambridge Analytica privacy] issues had pierced the company's image and would have a lasting effect on its moneymaking machine"); ¶526 n.464 ("Facebook shares collapse as a result of Cambridge Analytica election scandal"); ¶527 ("Cambridge Analytica scandal [was] one of many reasons for [Facebook's] stock plunge" and "[t]he cost of years of privacy missteps finally caught up with Facebook"); ¶528 ("Facebook shares plummet over privacy scandal and slow growth in new users").

1    decision, which does not require that a disclosure explicitly reveal a fraud.[40]  The cases Defendants

2    rely on all arise in circumstances unlike here, where the negative earnings or guidance were not

3    plausibly alleged to have resulted from conditions concealed by fraud.[41]  Here, the Complaint clearly

4    connects the July 25, 2018 disclosures to the prior concealment and misrepresentations (¶522), and

5    as noted above, quotes many market participants who made the same connection.  ¶¶523-528.

6    **VI.    Reliance Is Presumed**

7            Plaintiffs have alleged that Facebook's stock traded in an efficient market.  ¶¶31, 504-508.

8    There is therefore a presumption that the material misrepresentations and omissions alleged in the

9    Complaint (*see* ¶¶509-528) impacted Facebook's stock price.  *Basic Inc. v. Levinson*, 485 U.S. 224

10   (1988).  Defendants attempt to rebut the presumption of reliance by again asserting that the truth was

11   on the market as of December 2015.  This argument is both incorrect and premature.  *See Baker v.*

12   *SeaWorld Entm't, Inc.*, 2017 WL 5885542, at *11 (S.D. Cal. Nov. 29, 2017).  It should be rejected.[42]

13   **VII.   The Complaint Pleads Insider Trading Claims and Control Person Liability**

14           Defendants argue that Plaintiffs' §20A claims must be dismissed because Plaintiffs have

15   failed to state an underlying claim under §10(b).  Mot. at 35.  As discussed above, however,

16   Plaintiffs have adequately pled primary violations of §10(b) and Rule 10b-5.  Moreover, since

17   Plaintiffs have pled scienter against Zuckerberg, the Complaint adequately pleads that he possessed

18

19

---

20   [40]  *First Solar*, 881 F.3d at 754 ("A plaintiff may also prove loss causation by showing that the
     stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time

21   that fraud had concealed the miss.").

22   [41]  Several of the cases Defendants cite were decided at a time of uncertainty in the Ninth Circuit
     over whether fraud itself had to be disclosed, or disclosure of information concealed by the fraud

23   was sufficient.  *See First Solar*, 881 F.3d at 752 (describing two lines of authority).  This uncertainty
     was eliminated last year when *First Solar* clarified that revelation of fraud was not required.  *Id.* at

24   754.  Among the cases Defendants rely upon from this period is this Court's opinion in *Verifone*,
     which relied on one of the more restrictive cases, *Or. Pub. Emps.' Ret. Fund v. Apollo Gr. Inc.*, 774

25   F.3d 598, 604 (9th Cir. 2014), to find that loss causation was not established.  *In re Verifone Sec.*
     *Litig.*, 2016 WL 1213666, at *9 (N.D. Cal. Mar. 29, 2016); *cf. First Solar*, 881 F.3d at 752.

26   [42]  In addition to failing to rebut the *Basic* presumption, Defendants also ignore that reliance also
     may be presumed as a result their numerous omissions.  *See Affiliated Ute Citizens of Utah v. United*

27   *States*, 406 U.S. 128 (1972); *Blackie v. Barrack*, 524 F.2d 891, 902, 905 (9th Cir. 1975); *In re*
     *Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *6-*7 (N.D. Cal. Apr. 21, 2016).

28

1   material, nonpublic, adverse information.[43]  The Complaint also adequately alleges that during the

2   Class Period and contemporaneously with Zuckerberg's insider sales, Plaintiffs purchased a total of

3   260,091 shares of Facebook's common stock for more than $44.6 million. ¶548.  Tens of thousands

4   of other Class members also purchased shares contemporaneously with Zuckerberg's insider sales.

5   ¶549.  These allegations are sufficient to allege a §20A claim.[44]

6          The complaint also pleads control person liability under Section 20(a) of the Exchange Act,

7   which imposes liability on persons who "exercised actual power or control over the primary

8   violator." *Howard v. Hui*, 2001 WL 1159780, at *3 (N.D. Cal. Sept. 24, 2001).  Scienter is not

9   required. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Zuckerberg, Sandberg

10  and Wehner are all senior officers and are "control persons."  ¶¶33-35; ¶¶247-248.

11                                          **CONCLUSION**

12         Plaintiffs respectfully submit that the Motion should be denied in its entirety.  In the

13  alternative, in the event the Court is inclined to grant any part of Defendants' motion, Plaintiffs

14  respectfully request leave to amend. *See Toy Invs., Inc. v. Poof-Slinky, Inc.*, 2013 WL 60095838, at

15  *1 (W.D. Wash. Nov. 20, 2013) ("'requests for leave to amend should be granted with extreme

16  liberality'") (quoting *Mirmehdi v. United States*, 689 F.3d 975, 985 (9th Cir. 2012)).

17  DATED: March 24, 2020                    Respectfully submitted,

18                                           ROBBINS GELLER RUDMAN
                                               & DOWD LLP
19                                           DENNIS J. HERMAN
                                             JASON C. DAVIS
20                                           KENNETH J. BLACK

21

22                                           ___s/ Jason C. Davis_____
                                                JASON C. DAVIS
23

24  [43]  *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *27 (C.D. Cal. July 1, 2008) ("Because
    . . . plaintiff has alleged scienter with respect to its §10(b) claim . . . defendants' argument [that
25  plaintiff's §20A claim must be dismissed because he failed to allege the insider trader defendant
    knew of material, non-public information when he sold stock] lacks merit.").

26  [44]  *See In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255-56 (S.D.N.Y. 2007) ("the
27  Complaint alleges that members of the putative class traded Openwave stock contemporaneously
    with the defendants named in the Section 20A cause of action, and has specified the dates of the
28  defendants' trades.  Such averments are sufficient to state a cause of action under Section 20A.").

<table>
<tr><td>1</td><td></td><td></td></tr>
<tr><td>2</td><td></td><td>One Montgomery Street, Suite 1800<br>San Francisco, CA  94104</td></tr>
<tr><td>3</td><td></td><td>Telephone: 415/288-4545<br>415/288-4534 (fax)</td></tr>
<tr><td>4</td><td></td><td>dherman@rgrdlaw.com<br>jdavis@rgrdlaw.com</td></tr>
<tr><td>5</td><td></td><td>kennvb@rgrdlaw.com</td></tr>
</table>

1  
2 One Montgomery Street, Suite 1800  
San Francisco, CA  94104  
3 Telephone: 415/288-4545  
415/288-4534 (fax)  
4 dherman@rgrdlaw.com  
jdavis@rgrdlaw.com  
5 kennvb@rgrdlaw.com  

6 Counsel for Amalgamated and Co-Lead Counsel for the Class

7 DATED: March 24, 2020 BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP  
8 JOHN C. BROWNE  
JEREMY P. ROBINSON  
9 KATE AUFSES  

10  

11                   s/ John C. Browne  
                   JOHN C. BROWNE  

12  

13 1251 Avenue of the Americas  
New York, NY  10020  
14 Telephone: 212/554-1400  
212/554-1444 (fax)  
15 johnb@blbglaw.com  
jeremy@blbglaw.com  
16 kate.aufses@blbglaw.com  

Counsel for Mississippi and Co-Lead Counsel for the Class  

17  
18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
28  

LEAD PLTFS' MEMORANDUM OF P'S & A'S IN OPPOSITION TO DEFS' MOTION TO DISMISS -
5:18-cv-01725-EJD

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify under penalty of perjury that on March 24, 2020, I authorized the electronic

3

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

4

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List.

5

 s/ Jason C. Davis
JASON C. DAVIS

6

7

ROBBINS GELLER RUDMAN
     & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:  jdavis@rgrdlaw.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 5:18-cv-01725-EJD "In re Facebook, Inc. Securities Litigation"

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com

- **Kate Whitman Aufses**
  Kate.Aufses@blbglaw.com,jose.echegaray@blbglaw.com,adamw@blbglaw.com,ManagingClerk@blbglaw.com,Jeremy@blbglaw.com,JohnB@blbglaw.com

- **Kenneth Joseph Black**
  KennyB@rgrdlaw.com

- **Michael D. Blatchley**
  MichaelB@blbglaw.com,ManagingClerk@blbglaw.com

- **Francis A. Bottini , Jr**
  fbottini@bottinilaw.com,sammirati@bottinilaw.com

- **John Christopher Browne**
  JohnB@blbglaw.com,jose.echegaray@blbglaw.com,JonathanU@blbglaw.com,jeremy@blbglaw.com,kate.aufses@blbglaw.com,virgilio@blbglaw.com,ManagingClerk@

- **Paul J. Collins**
  pcollins@gibsondunn.com,atumanova@gibsondunn.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,ptiffith@rgrdlaw.com,KennyB@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Claiborne R Hane**
  chane@piercebainbridge.com

- **David Lawrence Hecht**
  dhecht@piercebainbridge.com,DocketLA@piercebainbridge.com,DocketNY@piercebainbridge.com,mmcgowin@piercebainbridge.com

- **Dennis J. Herman**
  dennish@rgrdlaw.com,mburch@rgrdlaw.com,e_file_sd@rgrdlaw.com,lmix@rgrdlaw.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,tcrockett@pomlaw.com,abarbosa@pomlaw.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com

- **Avi Josefson**
  Avi@blbglaw.com,jose.echegaray@blbglaw.com,managingclerk@blbglaw.com

- **Jason Matthew Kirschberg**
  jason@gadowtyler.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com

- **Kristin A. Linsley , Esq**
  KLinsley@gibsondunn.com,lchiou@gibsondunn.com

- **Joshua Seth Lipshutz**
  jlipshutz@gibsondunn.com,rwong@gibsondunn.com,pkaul@gibsondunn.com,kwarren@gibsondunn.com,MKutscherClark@gibsondunn.com,cleach@gibsondunn.com

- **Brian Michael Lutz**
  BLutz@gibsondunn.com,pkaul@gibsondunn.com,kwarren@gibsondunn.com,gholman@gibsondunn.com,kwright@gibsondunn.com,jbarry@gibsondunn.com,RCaluba@

- **Mark Cotton Molumphy**
  mmolumphy@cpmlegal.com,zagudelo@cpmlegal.com,kchen@cpmlegal.com,bnorton@cpmlegal.com,jacosta@cpmlegal.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Darren Jay Robbins**
  darrenr@rgrdlaw.com

- **Jeremy P. Robinson**
  jeremy@blbglaw.com,ManagingClerk@blbglaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com

- **Gerald H. Silk**
  jerry@blbglaw.com,managingclerk@blbglaw.com

- **Orin Snyder**
  osnyder@gibsondunn.com,pkaul@gibsondunn.com,kwarren@gibsondunn.com,gholman@gibsondunn.com,gbok@gibsondunn.com,cschmidt@gibsondunn.com,cleach

- **Robert Lootfi Tashjian**
  tashjianr@sec.gov,stearnsj@sec.gov,habermeyerj@sec.gov,johnstonj@sec.gov,austinh@sec.gov,bukowskij@sec.gov,lamarcas@sec.gov,RoeselerK@sec.gov,Schneider

- **Jonathan Daniel Uslaner**
  jonathanu@blbglaw.com,MichaelB@blbglaw.com,Scott.Foglietta@blbglaw.com,Matthew.Mahady@blbglaw.com,Jose.Echegaray@blbglaw.com,Avi@blbglaw.com

- **Thomas David Warren**
  twarren@piercebainbridge.com,DocketLA@piercebainbridge.com,DocketNY@piercebainbridge.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)