# EXHIBIT G

June 8, 2018

Chairman John Thune
Ranking Member Bill Nelson
U.S. Senate Committee on Commerce, Science, and Transportation
512 Dirksen Senate Building
Washington, D.C. 20510

Dear Chairman Thune, Ranking Member Nelson, and Members of the Committee:

      Thank you for your questions for the record from the April 10, 2018 Hearing titled Facebook, Social Media Privacy, and the Use and Abuse of Data. Per your request, attached are the answers for the record for your questions.

      Please note that we received over 2,000 questions from the Senate and House Committees before which we testified on April 10 and 11, 2018. We appreciate the extra time you gave us to respond to these questions. We did our best to review and answer them in the available timeframe. We respectfully request an opportunity to supplement or amend our responses if needed.

Sincerely,

Facebook, Inc.



Address: 1601 Willow Road
Menlo Park, CA 94025

**IMPORTANT -- PLEASE READ**

DO NOT DETACH

United States Senate

Committee on Commerce, Science, and Transportation

Washington, D.C. 20510-6125

---

MEMORANDUM

Date of Hearing: April 10, 2018

Hearing: Facebook, Social Media Privacy, and the Use and Abuse of Data

Thank you for your recent testimony before the Senate Committee on Commerce, Science, and Transportation. The testimony you provided was greatly appreciated.

Attached are **post-hearing questions** pertaining to the above-mentioned hearing. As a courtesy, please submit a single document consolidating the posed questions followed by your answers for insertion in the printed hearing record. Your responses can be e-mailed to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

Should the committee not receive your response within the time frame mentioned below or if the committee staffer assigned to the hearing is not notified of any delay, the committee reserves the right to print the posed questions in the formal hearing record noting your response was not received at the time the record was published.

Committee staffer assigned to the hearing: ▇▇▇▇▇▇▇▇
Phone: ▇▇▇▇▇▇▇▇
Date material should be returned: May 9, 2018.

Thank you for your assistance and, again, thank you for your testimony.

We are investigating all apps that, like Aleksandr Kogan's, had access to large amounts of information before we changed our platform in 2014 to reduce data access. The investigation process is in full swing, and it has two phases. First, a comprehensive review to identify every app that had access to this amount of Facebook data. And second, where we have concerns, we will conduct interviews, make requests for information (RFI)—which ask a series of detailed questions about the app and the data it has access to—and perform audits that may include on-site inspections. We have large teams of internal and external experts working hard to investigate these apps as quickly as possible. To date thousands of apps have been investigated and around 200 (from a handful of developers: Kogan, AIQ, Cube You, the Cambridge Psychometrics Center, and myPersonality) have been suspended—pending a thorough investigation into whether they did in fact misuse any data. Where we find evidence that these or other apps did misuse data, we will ban them and notify people whose data was shared with these apps. Additionally, we have suspended an additional 14 apps, which were installed by around one thousand people. They were all created after 2014, after we made changes to more tightly restrict our platform APIs to prevent abuse. However, these apps appear to be linked to AIQ, which was affiliated with Cambridge Analytica. So, we have suspended them while we investigate further. Any app that refuses to take part in or fails our audit will be banned.

*Question 13.* **Does Facebook believe it would have a responsibility to report such incidents to the FTC under the consent decree? If such incidents have occurred, has Facebook reported them to the FTC?**

The July 27, 2012 Consent Order memorializes the agreement between Facebook and the FTC and does not require ongoing reporting.

Instead, and among other things, the consent order obligates Facebook not to misrepresent the extent to which it maintains the privacy or security of covered information (Section I), not to materially exceed the restrictions of a privacy setting that applies to nonpublic user information without affirmative express consent (Section II), and to implement a comprehensive privacy program that is subjected to ongoing review by an independent assessor (Sections IV and V). Facebook accurately represented the operation of its developer Platform and the circumstances under which people could share data (including friends data) with developers, honored the restrictions of all privacy settings that covered developer access to data, and implemented a comprehensive privacy program build on industry-leading controls and principles, which has undergone ongoing review by an independent assessor approved by the FTC.

**Cambridge Analytica Timeline Questions**

**There have been conflicting reports regarding the timeline of Facebook's response to the "thisisyourdigitallife" application developed for Cambridge Analytica. Please provide specific information about Facebook's response to the matter.**

*Question 14.* **With respect to the harvesting of user data from the "thisisyourdigitallife" application, for each the following (a) Cambridge Analytica, (b) Christopher Wylie, and (c) Dr. Kogan, on what date did Facebook:**

   1. **First contact that party about the data collected from the application?**

2. Seek certification that the partys copy of the data was destroyed?

3. Receive the certification from party?

On December 11, 2015, *The Guardian* published an article reporting that Kogan and his company, GSR, may have passed information the app had obtained from Facebook users to SCL Elections Ltd. (SCL)/Cambridge Analytica. If this occurred, Kogan and his company violated Facebook's Platform Policies, which explicitly prohibited selling user data accessed from Facebook and from sharing any user data accessed from Facebook with any ad network, data broker or other advertising or monetization related service.

For this reason, Facebook immediately banned the app from our platform and investigated what happened and what further action we should take to enforce our Platform Policies. Facebook also contacted Kogan/GSR and demanded that they explain what data they collected, how they used it, and to whom they disclosed it. Facebook further insisted that Kogan and GSR, as well as other persons or entities to whom they had disclosed any such data, account for and irretrievably delete all such data and information.

Facebook also contacted Cambridge Analytica to investigate the allegations reflected in the reporting. On January 18, 2016, Cambridge Analytica provided written confirmation to Facebook that it had deleted the data received from Kogan and that its server did not have any backups of that data. On June 11, 2016, Kogan executed and provided to Facebook signed certifications of deletion on behalf of himself and GSR. The certifications also purported to identify all of the individuals and entities that had received data from GSR (in addition to Kogan and his lab), listing the following: SCL, Eunoia Technologies (a company founded by Christopher Wylie), and a researcher at the Toronto Laboratory for Social Neuroscience at the University of Toronto. On July 7, 2016, a representative of the University of Toronto certified that it deleted any user data or user-derived data. On August 16, 2016, Eunoia (executed by Eunoia Founder Christopher Wylie) certified that it deleted any user and user-derived data. On September 6, 2016, counsel for SCL informed counsel for Facebook that SCL had permanently deleted all Facebook data and derivative data received from GSR and that this data had not been transferred or sold to any other entity. On April 3, 2017. Alexander Nix, on behalf of SCL, certified to Facebook, that it deleted the information that it received from GSR or Kogan.

Because all of these concerns relate to activity that took place off of Facebook and its systems, we have no way to confirm whether Cambridge Analytica may have Facebook data without conducting a forensic audit of its systems. Cambridge Analytica has agreed to submit to a forensic audit, but we have not commenced that yet due to a request from the UK Information Commissioner's Office, which is simultaneously investigating Cambridge Analytica (which is based in the UK). And even with an audit, it may not be possible to determine conclusively what data was shared with Cambridge Analytica or whether it retained data after the date it certified that data had been deleted.

The existing evidence that we are able to access supports the conclusion that Kogan only provided SCL with data on Facebook users from the United States. While the accounts of Kogan and SCL conflict in some minor respects not relevant to this question, both have consistently maintained that Kogan never provided SCL with any data for Facebook users outside the United

States. These consistent statements are supported by a publicly released contract between Kogan's company and SCL.

*Question 15.* **Was Facebook aware at that time that Cambridge Analytica had developed other platform applications to collect user data? What applications did it delete due to associations with Cambridge Analytica and when were they removed from the platform?**

Our investigation of Cambridge Analytica's advertising activities is ongoing, and we have banned Cambridge Analytica from purchasing ads on our platform. Cambridge Analytica generally utilized custom audiences, some of which were created from contact lists and other identifiers that it generated and uploaded to our system to identify the people it wanted to deliver ads to on Facebook, and in some instances, refined those audiences with additional targeting attributes.

**Facebook's "People You May Know" Feature**

**Facebook's "People You May Know" feature has drawn attention for disclosures that reveal sensitive relationships, such as psychiatrists who have reported that their clients were recommended to each other.**

*Question 16.* **What pieces of data does Facebook use for the PYMK feature? Has it ever used data collected from data brokers for this purpose?**

People You May Know can help Facebook users find friends on Facebook. People You May Know suggestions come from things such as having friends in common, or mutual friends; being in the same Facebook group or being tagged in the same photo; users' networks (for example, school or work); and contacts users have uploaded. We give people context when we suggest someone with mutual friends. Users may delete contacts that they have uploaded to Facebook, in which case that information is no longer used for People You May Know. Facebook does not allow advertisers to target ads based on People You May Know. Facebook does not use data collected from data brokers for PYMK.

*Question 17.* **Has PYMK ever used location to make recommendations and does it currently? If so, is this based on device reported geolocation or IP address?**

PYMK uses country-level location to help users find friends.

*Question 18.* **Does Facebook provide users with the ability to opt out of data collected from them or data about them being used by PYMK?**

See Response to Question 16.

*Question 19.* **Has the PYMK feature ever bypassed the privacy controls in order to perform its analytics for recommendations? For example, if a user's friends list is set to private, will Facebook still use this data to make recommendations to others?**

See Response to Question 16.