Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Brian M. Lutz (SBN 255976)
  blutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: 202.955.8217
Facsimile: 202.530.9614

Paul J. Collins (SBN 187709)
  pcollins@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Telephone: 650.849.5300
Facsimile: 650.849.5333

*Attorneys for Defendants Facebook, Inc.,
Mark E. Zuckerberg, Sheryl K. Sandberg, and
David M. Wehner*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE FACEBOOK, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | CASE NO. 5:18-CV-01725-EJD<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:      June 10, 2021<br>Time:     9:00 a.m.<br>Location:  Courtroom 4, 5th Floor<br>Judge:    Hon. Edward J. Davila<br><br>Date First Action Filed:  March 20, 2018 |

Gibson, Dunn & Crutcher LLP

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ............................................................................................ 2

II. BACKGROUND ............................................................................................................... 4

    A.    Cambridge Analytica's Certification Of Destruction ................................... 5

    B.    Cambridge Analytica's Wrongdoing With The Trump Campaign .............. 6

    C.    Plaintiffs' Improper Expert Declaration On Loss Causation ...................... 7

    D.    Procedural History ..................................................................................... 8

III. ARGUMENT ................................................................................................................... 8

    A.    The PSLRA Imposes Strict Pleading Requirements ................................. 8

    B.    Plaintiffs Fail to Plead an Actionable Misstatement or Omission .............. 9

        1.    Plaintiffs add deficient allegations for only three categories
            of statements................................................................................. 9

        2.    Plaintiffs added *zero* new allegations for the remaining ten
            categories of alleged misstatements. ............................................ 12

    C.    Plaintiffs Fail To Plead a Strong Inference of Scienter............................. 14

        1.    Plaintiffs fail to plead facts showing that the Individual
            Defendants knew Cambridge Analytica lied in its
            certifications. ............................................................................... 14

        2.    Plaintiffs fail to plead knowledge of wrongdoing with the
            Trump campaign. .......................................................................... 17

        3.    Plaintiffs fail to plead that the Individual Defendants knew
            about whitelisting. ........................................................................ 18

        4.    Plaintiffs' recycled scienter allegations remain deficient. ............. 19

    D.    Plaintiffs Fail to Plead Loss Causation .................................................... 21

        1.    Plaintiffs fail to plead loss causation for the March 19,
            2018 decline. ............................................................................... 23

        2.    Plaintiffs fail to plead loss causation with respect to other
            March declines. ............................................................................ 26

        3.    Plaintiffs fail to plead loss causation for the June 2018
            whitelisting disclosures. ............................................................... 28

        4.    Plaintiffs fail to adequately allege loss causation for the
            July 26, 2018 decline..................................................................... 29

Gibson, Dunn &
Crutcher LLP

E.     Plaintiffs Fail to Plead Reliance .................................................................. 34

F.     Plaintiffs Fail to Plead Claims Under Sections 20(a) Or 20A .................................. 35

IV. CONCLUSION .................................................................................................. 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999)........................................................................21

*In re Apple Comput. Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989)...................................................................35

*Axonic Capital LLC v. Gateway One Lending & Fin.*,
    2019 WL 4138024 (C.D. Cal. May 22, 2019) ............................................15

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020).........................................................22, 27, 30

*Brodsky v. Yahoo! Inc.*,
    592 F. Supp. 2d 1192 (N.D. Cal. 2008) .....................................................33

*Cheung v. Keyuan Petrochems., Inc.*,
    2012 WL 5834894 (C.D. Cal. Nov. 1, 2012) .............................................15

*In re ChinaCast Educ. Corp. Sec. Litig.*,
    809 F.3d 471 (9th Cir. 2015).................................................................15, 18

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017).....................................................................21

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ...............................................................................22, 34

*Glazer Cap. Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008).................................................................15, 16

*Grigsby v. BofI Holding, Inc.*,
    979 F.3d 1198 (9th Cir. 2020)......................................22, 26, 27, 29

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
    189 F.3d 971 (9th Cir. 1999).....................................................................35

*In re Immersion Corp. Sec. Litig.*,
    2011 WL 871650 (N.D. Cal. Mar. 11, 2011)............................................33

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
    398 F. Supp. 3d 549 (N.D. Cal. 2019) ........................................................9

*In re Kalobios Pharms., Inc. Sec. Litig.*,
    258 F. Supp. 3d 999 (N.D. Cal. 2017) .......................................................35

Gibson, Dunn &
Crutcher LLP

*In re Leapfrog Enter., Inc. Sec. Litig.*,
    200 F. Supp. 3d 987 (N.D. Cal. 2016) ...................................................................21

*In re LeapFrog Enters., Inc. Sec. Litig.*,
    527 F. Supp. 2d 1033 (N.D. Cal. 2007) ................................................................20

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002)...............................................................................35

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016)..........................................................................22, 25

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014)..................................................................................27

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
    639 F. Supp. 2d 1038 (N.D. Cal. 2009) ................................................................30

*Melot v. JAKKS Pac., Inc.*,
    2014 WL 12589334 (C.D. Cal. June 6, 2014) .......................................................33

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008)..........................................................14, 31, 32, 33, 34

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
    881 F.3d 750 (9th Cir. 2018)............................................................................22, 23

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020)..................................................................................14

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
    54 F.3d 1424 (9th Cir. 1995)..................................................................................15

*In re Northpoint Commc'ns Grp., Inc., Sec. Litig.*,
    184 F. Supp. 2d 991 (N.D. Cal. 2001) ..................................................................16

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
    730 F.3d 1111 (9th Cir. 2013).............................................................22, 24, 25, 26, 32

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014)...................................................................8, 12, 24, 26, 27

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010)..................................................................................34

*Ponce v. SEC*,
    345 F.3d 722 (9th Cir. 2003)..................................................................................20

*Prodanova v. H.C. Wainwright & Co., LLC*,
    2018 WL 8017791 (C.D. Cal. Dec. 11, 2018) .......................................................15

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012)................................................................................................9

*Rok v. Identiv, Inc.*,
    2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ........................................................................22

*SEC v. Dain Rauscher, Inc.*,
    254 F.3d 852 (9th Cir. 2001)............................................................................................20

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996)............................................................................................35

*Strasburger v. Blackburne & Sons Realty Cap. Corp.*,
    2020 WL 6128069 (C.D. Cal. Apr. 22, 2020) .................................................................16

*Towers v. Iger*,
    912 F.3d 523 (9th Cir. 2018)............................................................................................16

*In re Verifone Sec. Litig.*,
    2016 WL 1213666 (N.D. Cal. Mar. 29, 2016)..................................................................33

*Weiss v. Amkor Tech., Inc.*,
    527 F. Supp. 2d 938 (D. Ariz. 2007)................................................................................31

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017)............................................................................................10

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)............................................................................................21

**Statutes**

15 U.S.C. § 78u-4(b)(1)-(2) ......................................................................................................8

15 U.S.C. § 78u-4(b)(2)(A).....................................................................................................14

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on June 10, 2021, at 9:00 a.m., or as soon thereafter as the matter may be heard, in the U.S. District Court for the Northern District of California, San Jose Courthouse, Courtroom 4, located at 280 South 1st Street, San Jose, CA 95113, Defendants Facebook, Inc. ("Facebook" or the "Company"), Mark E. Zuckerberg, Sheryl K. Sandberg, and David M. Wehner (the "Individual Defendants") (Facebook and the Individual Defendants, together, "Defendants"), through their undersigned counsel, will, and hereby do, move to dismiss the Third Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "TAC") (ECF No. 142) pursuant to Fed. R. Civ. P. 12(b)(6).  This Motion is based on this Notice, the supporting Memorandum of Points and Authorities, the Declaration of Brian M. Lutz filed concurrently herewith, the accompanying Request for Judicial Notice, the complete files and records in this action, and any additional material and arguments as may be considered in connection with the hearing.

Defendants seek dismissal of the Complaint with prejudice for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), because Plaintiffs fail to plead violations of Sections 10(b), 20(a), or 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Fed. R. Civ. P. 9(b).

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Defendants respectfully submit this Memorandum of Points and Authorities in support of their Motion to Dismiss the TAC pursuant to Fed. R. Civ. P. 12(b)(6).

## STATEMENT OF ISSUES TO BE DECIDED

1.     Whether Plaintiffs' claim under Section 10(b) of the Exchange Act and Rule 10b-5 should be dismissed with prejudice for failure to plead that (1) any challenged statement was false or misleading, (2) any Defendant acted with scienter, (3) Plaintiffs suffered any loss caused by any allegedly false or misleading statement, and (4) Plaintiffs relied on any allegedly false or misleading statement.

2.     Whether Plaintiffs' claims under Sections 20(a) and 20A of the Exchange Act should be dismissed for failure to plead a primary violation of the Exchange Act.

# I.    PRELIMINARY STATEMENT

This action should be dismissed once again, this time with prejudice.  After three tries, it is now crystal clear that Plaintiffs cannot plead a viable claim that Facebook and its senior-most officers committed securities fraud.  In the TAC, Plaintiffs ask this Court to credit bewildering and unsupported conspiracy theories cobbled together with the benefit of hindsight about what some Facebook employees should have been able to figure out concerning Cambridge Analytica had they dug deeper.  They then leap to the conclusion that the Individual Defendants somehow should have known what these other employees supposedly knew.  Plaintiffs also invite the Court to adopt an unprecedented and nonsensical theory of loss causation—that the impact on Facebook's stock price of information that supposedly corrected prior misstatements did not kick in until more than seven weeks after the disclosure was made.  These new and far-fetched allegations only make the pleading more "difficult to understand" and "hard to grasp" than the previous dismissed complaints.  ECF No. 118 ("2019 Order") at 3 n.1.  But more importantly, the TAC comes nowhere close to curing the fatal pleading deficiencies identified in the Court's prior orders dismissing Plaintiffs' earlier complaints.  The TAC confirms that Plaintiffs cannot plead falsity, scienter, loss causation, or reliance with respect to any of the challenged statements concerning Cambridge Analytica.  And Plaintiffs still cannot plead loss causation as to the "whitelisting" theory of fraud, because, as Plaintiffs acknowledge, Facebook's stock price did not decline when the "truth" about whitelisting came out in June 2018.

From the start of this case, Plaintiffs' theory of liability has focused on two issues: (i) Cambridge Analytica and (ii) whitelisting.  Under Plaintiffs' "main theory of securities fraud," ECF No. 137 ("2020 Order") at 33, Plaintiffs claim that "Defendants knew that Cambridge Analytica had sensitive user information and was using that information for improper purposes."  *Id.*  The Court has twice rejected this theory, finding that Plaintiffs failed to plead that (i) any challenged statement was rendered false by a failure to disclose information about Cambridge Analytica, (ii) any Defendant made a challenged statement with scienter, and (iii) Plaintiffs relied on any alleged misstatement, given that Cambridge Analytica's misuse of user data had been publicly reported years before the issue resurfaced in March 2018.

Plaintiffs now allege that the employees at Facebook who investigated Cambridge Analytica's

1    misuse of user data, and three other Facebook employees who interacted with the Trump campaign

2    during the 2016 presidential election, should have been able to determine that Cambridge Analytica

3    lied when it certified to Facebook that it deleted the data it had improperly obtained, and that Cambridge

4    Analytica still possessed and was using that misappropriated user data.  For example, Plaintiffs claim

5    that because employees must have seen that Cambridge Analytica was using personality scores to target

6    potential voters, the employees must have known that this data had been misappropriated from

7    Facebook rather than obtained from publicly available profiles.  But Plaintiffs still plead no facts

8    demonstrating that anyone at Facebook actually knew that, let alone that any misappropriated data was

9    being used to target ads by Cambridge Analytica in the 2016 presidential campaign, as Plaintiffs allege.

10    At bottom, Plaintiffs' theory continues to be based entirely on assumption, not fact: that "Facebook

11    *should have known* that Cambridge Analytica was still involved in data mining."  *Id.* at 34 (emphasis

12    in original).  But this Court has already concluded that this is not enough to plead falsity.

13        Plaintiffs' new allegations also do nothing to help them plead scienter regarding the Cambridge

14    Analytica statements.  Even crediting Plaintiffs' baseless theory about what some employees should

15    have known, there is not a single fact pleaded indicating that any Individual Defendant knew about the

16    Cambridge Analytica certifications, let alone that they knew or deliberately ignored that the

17    certifications were false or that Cambridge Analytica continued to misuse misappropriated user data.

18    And finally, nothing in the TAC cures Plaintiffs' intractable failure and inability to plead that they

19    relied to their detriment on any of the alleged Cambridge Analytica misstatements.  As this Court

20    already has found, *The Guardian* and other publications reported Cambridge Analytica's

21    misappropriation of data in 2015 and 2016, so "the market was already aware of the core information

22    that Plaintiffs claim was omitted."  *Id.* at 64.

23        Plaintiffs fare no better with their alternative "whitelisting" theory, which this Court called the

24    "only viable theory of falsity."  *Id.* at 65.  The Court previously concluded that Plaintiffs adequately

25    pleaded that statements about users controlling their data were misleading because Facebook provided

26    a handful of whitelisted apps access to restricted user data.  The whitelisting theory failed, however,

27    because when the "truth" about whitelisting was revealed to the market in June 2018, the price of

28    Facebook's stock **did not decline**, and Plaintiffs therefore could not plead loss causation.  *Id.*  Plaintiffs

Gibson, Dunn &
Crutcher LLP

MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

have an impossible problem.  Knowing they cannot plead a loss tied to whitelisting, they concoct an illogical and unprecedented theory: that the revelation of whitelisting caused no price decline in June 2018, when the disclosure occurred that corrected the alleged prior misstatements, but this disclosure somehow caused a price impact **seven weeks later**, during an earnings call that did not even address or discuss whitelisting—but on which an earnings miss, a far more obvious reason for a stock price decline, was disclosed.  This fanciful theory fails as a matter of basic common sense, and it has no support under established law.

The Court gave Plaintiffs one last chance to plead a securities fraud claim with the particularity required under the PSLRA and Rule 9(b).  Plaintiffs have now confirmed that they cannot meet their pleading burden.  This case should be dismissed with prejudice.

## II.     BACKGROUND[1]

The TAC relies on the same core events alleged in the previous complaints.  Defendants respectfully direct the Court to its August 7, 2020 Order and Defendants' prior motion to dismiss for a summary of those allegations.  *See* 2020 Order at 2-8; ECF No. 126 at 4-8.

The Court's decisions granting the two prior motions to dismiss in this action focused on Facebook's so-called "whitelisting" practices, which this Court concluded in its 2020 Order constituted Plaintiffs' "only viable theory of falsity."  2020 Order at 65.  Plaintiffs' TAC includes no new factual allegations concerning whitelisting, and certainly no allegations demonstrating that the public disclosure of whitelisting practices in June 2018 caused any decline in Facebook's stock price.  Instead, the TAC includes additional allegations that appear to be directed at two separate issues addressed in the Court's August 2020 Order:  (1) Plaintiffs' failure to allege any "specific facts" showing that "Defendants knew that GSR and Cambridge Analytica did not delete the relevant data" after they

---

[1]  By summarizing Plaintiffs' allegations here, Defendants do not concede the allegations are true.  Citations in the form of "¶ __" or "¶¶ __" refer to the paragraphs of the TAC.  Citations to "Ex. __" refer to the exhibits to the Declaration of Brian M. Lutz, filed concurrently herewith.  Unless otherwise noted, all emphasis is added, and all internal quotation marks and citations are omitted.

MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

provided certifications of destruction to Facebook, *id.* at 35, and (2) Plaintiffs' failure to plead specific facts showing that Facebook's "top management knew about Cambridge Analytica's involvement with the Trump campaign," *id.* at 43-44.  The new allegations are difficult to summarize because they are a confusing and jumbled collection of undeveloped and unsupported conspiracy theories.  But the bottom line is that the new allegations do nothing to plead loss causation as to Plaintiffs' whitelisting theory of fraud, and they do not cure the separate pleading deficiencies identified by the Court with respect to Plaintiffs' Cambridge Analytica theory of fraud.

### A.    Cambridge Analytica's Certification Of Destruction

Despite a recent public report from the UK Information Commissioner's Office finding that the misappropriated user data had been deleted, Ex. 35 at 15 & 17, Plaintiffs continue to claim that Cambridge Analytica and its affiliated companies lied in certifying that the misappropriated data had been destroyed, and that Defendants must have known that the certifications were false.  Plaintiffs still do not allege any facts demonstrating that any Facebook employee actually knew that any Cambridge Analytica certification was false.  Rather, Plaintiffs allege that it can be inferred that Facebook employees would have known that Cambridge Analytica's January 2016 certification of destruction was false if they had compared it to destruction certifications provided by GSR and Kogan in June 2016.  ¶¶ 193, 200.  In the January 2016 certification, Cambridge Analytica allegedly represented that it had only "received *personality score data* from Dr. Kogan that was derived from Facebook data," which Cambridge Analytica certified had been deleted.  ¶¶ 177-178, 236; *see* Ex. 24.  The June 2016 certifications, by contrast, allegedly disclosed that Kogan had sent raw Facebook data to Cambridge Analytica, not just derivative personality score data.  ¶¶ 197, 200; *see* Ex. 5 at 25-33.  Additionally, Plaintiffs allege that the Facebook team investigating Cambridge Analytica, ¶ 179, should have known Cambridge Analytica lied in its certification because:

- A Cambridge Analytica entity provided an oral certification instead of a written one, which should have "alerted Facebook's investigation team to the fact that Cambridge Analytica was still abusing the stolen data," ¶ 249;

- In September 2016, Cambridge Analytica's Alexander Nix was promoting that his firm could target voters based on personality—including stating that *in the past* "we were able to perform a model" through survey results, ¶ 263; and

- Facebook's investigation team was aware that Cambridge Analytica was using personality scores in September 2016, which, according to Plaintiffs, must have meant that Cambridge Analytica was using misappropriated Facebook user data as opposed to other publicly available data, ¶¶ 254-260.

Plaintiffs still do not allege that any Facebook employee who supposedly could have figured out that Cambridge Analytica had lied shared this information (assuming they even knew this information) with any of the three Individual Defendants (or anyone else at Facebook).

Plaintiffs also allege that three political advertising employees who allegedly were "embedded inside the Trump campaign's digital operations in San Antonio, Texas," alongside Cambridge Analytica employees, ¶ 224, also knew that Cambridge Analytica continued to rely on misappropriated data. Plaintiffs do not allege facts demonstrating that any of these three employees were aware that Cambridge Analytica (or Kogan or GSR) had misappropriated data in the first place, let alone provided a destruction certification. Plaintiffs nonetheless claim that it can be inferred that these three "embedded" employees knew that Cambridge Analytica had provided false certifications because they were "[s]eated beside" Cambridge Analytica employees, ¶ 229, and "would have been seeing" the "psychographic stuff," ¶ 235, so they "*would have known* Cambridge Analytica was still using the misappropriated data that violated Facebook's policies," ¶ 237; *see also* ¶¶ 232-233. Again, Plaintiffs do not allege facts demonstrating that any of these three Facebook employees who Plaintiffs claim that, if they had known about the Cambridge Analytica certifications, could have figured out that they were untrue, communicated this knowledge to any of the Individual Defendants.

## B.   Cambridge Analytica's Wrongdoing With The Trump Campaign

Plaintiffs now allege in the TAC that Cambridge Analytica used misappropriated user data to help the Trump campaign target ads in the 2016 presidential election. ¶ 275. Plaintiffs allege that the Trump campaign, with the help of Cambridge Analytica, used the Facebook platform to send negative ads about Hillary Clinton to "idealistic white liberals, young women, and African Americans" to discourage them from voting for Hillary Clinton. ¶¶ 241-244, 271-272; Exs. 11, 13. Plaintiffs do not allege any facts showing that anybody at Facebook knew the audience for these ads or knew that the ads relied on misappropriated data. Plaintiffs claim that "top management of Facebook knew they had employees embedded in the [Trump] campaign," based on a statement by Roger McNamee, an early

investor in Facebook who has not been affiliated with the Company or its management for many years. ¶ 281. Plaintiffs also make the perplexing claim that Facebook's senior officers would have been aware of reports about Trump's ads because, according to a *Reuters* article about Facebook's removal of the iconic Vietnam war photo showing a naked girl burned by napalm, Facebook's senior-most officers make the "toughest calls" about removing content from Facebook. ¶ 273; Ex. 12.

## C.   Plaintiffs' Improper Expert Declaration On Loss Causation

Plaintiffs acknowledge that they cannot factually connect the revelation of Facebook's alleged whitelisting practices in June 2018 to any stock price decline. They admit that the disclosure of whitelisting practices "was not sufficiently distinct from the March 2018 disclosures [about Cambridge Analytica] to trigger a significant sell-off in Facebook stock." ¶ 703. They try to overcome their inability to plead loss causation as to their whitelisting theory through an improper expert declaration from Dr. Matthew Cain, who was not asked to opine about the lack of any stock price drop correlating to the whitelisting disclosures, but who nevertheless suggests that the significance of data privacy disclosures generally were not fully known to the market until late July 2018. TAC Ex. C ("Cain Decl."). As discussed in Defendants' motion to strike filed concurrently herewith, Dr. Cain's declaration should be stricken because it (1) constitutes evidence outside the pleadings that may not be considered in connection with a motion to dismiss, and (2) only introduces *conclusions, not factual allegations*.

Regardless, Dr. Cain's declaration cannot cure Plaintiffs' inability to plead facts demonstrating that the correction of any alleged misstatement by Defendants caused the decline in Facebook's stock price. He opines that "new information was revealed to the market" on the dates that Facebook's stock price declined but, like Plaintiffs, he fails to identify what this "*new* information" actually was. Cain Decl. ¶¶ 11, 36. And as for his opinion that certain declines in Facebook's stock price were "*proximately caused* by the revelation of the truth concerning Defendants' alleged misrepresentations and/or omissions," ¶ 724, Dr. Cain reaches that conclusion without *any* analysis that traces newly disclosed information back to a prior misstatement, or explains *how* or *why* the price declines were *caused* by any of the alleged corrective disclosures as opposed to other information or market conditions. Cain Decl. ¶¶ 11, 37. Indeed, Dr. Cain was not asked to and did not directly opine on the

MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn & Crutcher LLP

1   price impact of the allegedly corrective whitelisting disclosure, *id.* ¶ 17, and the term "whitelisting"

2   does not appear anywhere in Dr. Cain's report.  The Cain Declaration, in other words, is beside the

3   point because it contains no allegations of fact; rather, it is impermissible and baseless expert testimony

4   that does not cure Plaintiffs' inability to plead specific facts sufficient to plead loss causation.

5   **D.      Procedural History**

6          The Court twice dismissed Plaintiffs' complaint for failure to satisfy the heightened pleading

7   standards applicable to securities fraud claims.  2019 Order; 2020 Order.  In its most recent order, the

8   Court held that the vast majority of the challenged statements were not adequately alleged to have

9   been false, but that Plaintiffs adequately pleaded that statements related to user control of data were

10  actionable in light of whitelisting practices.  2020 Order at 36-59.  With respect to scienter, the Court

11  held that Plaintiffs had adequately pleaded that certain of the Individual Defendants were aware of

12  whitelisting practices, *id.* at 61, but that Plaintiffs failed to plead "sufficient allegations from which

13  the Court can infer that Defendants knew that GSR and Cambridge Analytica did not delete the

14  relevant data" because Plaintiffs only offered "speculation" and "vague evidence." *Id.* at 33-35.  The

15  Court held that Plaintiffs failed to plead reliance as to their Cambridge Analytica theory of securities

16  fraud "because the market was already aware of the core information that Plaintiffs claim was

17  omitted." *Id.* at 64-65.  Finally, the Court held that Plaintiffs failed to plead loss causation as to their

18  "only viable theory of falsity" about whitelisting because "Plaintiffs allege[d] *no* facts from which the

19  Court can infer the stock price fell" after the revelation of whitelisting in June 2018. *Id.* at 65.  The

20  Court dismissed the Second Amended Complaint (the "SAC") (ECF No. 123), and gave Plaintiffs

21  one "final opportunity to amend."  2020 Order at 66-67.

22                              **III.    ARGUMENT**

23  **A.      The PSLRA Imposes Strict Pleading Requirements**

24         To state a Section 10(b) claim, a complaint must allege facts sufficient to establish (1) a material

25  misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a

26  security; (4) on which plaintiff relied; (5) economic loss; and (6) loss causation.  2020 Order at 30.

27  Every element must be pleaded with particularity under the PSLRA and Federal Rule of Civil

28  Procedure 9(b).  15 U.S.C. § 78u-4(b)(1)-(2); *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d

598, 605 (9th Cir. 2014). The TAC fails to meet the heightened standard required to plead each of these elements of a securities fraud claim.

**B.      Plaintiffs Fail to Plead an Actionable Misstatement or Omission**

This Court is familiar with the stringent standards for pleading falsity in a securities fraud case. 2020 Order at 31-32. Statements are misleading only if they "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* at 31. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Id.* at 32. "Thus, as long as [any] omissions do not make the actual statements misleading, a company is not required to disclose" other facts "even if investors would consider the omitted information significant." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012).

The TAC rehashes the same allegedly misleading statements the Court already has found to be inactionable. *See generally* ¶¶ 500-636. Plaintiffs' cosmetic changes fail to remedy the defects the Court identified in its order dismissing Plaintiffs' prior complaint. Courts routinely dismiss similar amended complaints that simply recast previously dismissed statements. *See, e.g.*, *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 398 F. Supp. 3d 549, 556 (N.D. Cal. 2019). The Court should reach the same conclusion here.

**1.      Plaintiffs add deficient allegations for only three categories of statements.**

Plaintiffs allege the exact same thirteen categories of allegedly misleading statements this Court already has twice dismissed. *Compare* 2020 Order at 32, *with* ¶¶ 500-636. For only three of thirteen categories—response to data misuse, risk factors, and the Cambridge Analytica investigation—do Plaintiffs allege anything new. This Court previously held the alleged misstatements in these three categories were not actionable, 2020 Order at 40-46, and Plaintiffs' few new allegations do not cure the fatal pleading defects the Court identified.

*Data Misuse*. Plaintiffs' new allegations regarding Facebook's response to data misuse are cosmetic and easily disregarded. Plaintiffs previously alleged that Facebook did not require data misusers to destroy "improperly collected data." SAC ¶ 375(b). Now they add that this was "especially" true given Facebook's alleged "selective enforcement for non-competing advertisers policy." ¶ 550(b). Plaintiffs do not explain what this means or provide any specific facts to support

the conclusion, so these new words fail to satisfy the PSLRA requirement to specify the reasons why a statement is misleading.  2020 Order at 31.  To the extent Plaintiffs are referring to the allegations *hundreds of paragraphs* earlier about "Zuckerberg and Sandberg's selective policy enforcement business model," ¶¶ 283-284, Plaintiffs do not allege any facts demonstrating that this meant that Facebook did *not* require app developers who "[m]islead[] people or misus[e] their information" to destroy data.  ¶ 543.  Additionally, Plaintiffs allege the "selective enforcement" occurred *years before*—not during—the Class Period, so they fail to plead that the challenged statements were false *when made*.  ¶¶ 283–284 nn.296-99; Ex. 8 ¶ 89.

Plaintiffs also previously alleged that "Facebook waited nearly one year" for *Cambridge Analytica* to certify "deletion of the purloined data," SAC ¶¶ 371, 377.  Now Plaintiffs allege instead that Facebook waited that long for *SCL* (Cambridge Analytica's parent) to certify deletion, and assert that this certification "did not mention" Cambridge Analytica.  ¶¶ 546, 552.  But whether SCL's certification mentioned Cambridge Analytica does nothing to strengthen Plaintiffs' previously dismissed allegation that Facebook falsely stated that it was "committed to vigorously enforcing [its] policies" and would take "whatever steps [we]re required" to do so.  ¶ 552.  This "data misuse" category of statements should be dismissed for the third time for failure to plead falsity.  2020 Order at 45-46.

*Risk Factors*.  This Court already twice held that the risk factor statements in Facebook's SEC filings, ¶¶ 524-535, are not actionable.  2020 Order at 40-43.  Plaintiffs previously alleged that the risk factor statements were false or misleading because "Defendants created the false impression that Facebook had not suffered a significant episode of misuse of user data" and "Defendants knew that bad actors were able to access data."  SAC ¶¶ 352, 354.  In the TAC, they merely expand that same point by adding conclusory—and superfluous—allegations that Defendants knew that Cambridge Analytica accessed Facebook data and continued to use it, "including in high profile elections," and that Cambridge Analytica had provided "mutually contradictory" deletion certifications.  ¶¶ 527, 529.

These allegations are unsupported by specific facts demonstrating that anyone at Facebook (let alone the Individual Defendants) knew Cambridge Analytica continued to use the purportedly deleted data.  *See infra* at 14-17.  At any rate, these allegations fail to address *Williams v. Globus Medical, Inc.*, and similar cases holding that for risk factor statements to be misleading, the warned-of risks must

1   already have come to pass at the time the statement was made.  *See* 869 F.3d 235, 242 (3d Cir. 2017).

2   As this Court recognized in the 2020 Order, "for a risk disclosure to be false or misleading, a plaintiff

3   must allege facts indicating that, when the risk factor was made, the risk warned of was 'already

4   affecting' the defendant."  2020 Order at 40-41.  Plaintiffs again do not and cannot allege that adverse

5   effects on Facebook's "reputation," "business," or "competitive position," ¶ 525, were "already

6   affecting" Facebook at the time of the allegedly false risk factor statements.

7       *Cambridge Analytica Investigation*.  Plaintiffs allege again that Facebook falsely stated in

8   articles about data misuse in elections that its "investigation to date has not uncovered anything that

9   suggests wrongdoing with respect to Cambridge Analytica's work on the [Brexit] and Trump

10   campaigns" and that its "investigation to date has not uncovered anything that suggests wrongdoing."

11   ¶¶ 537-538.  This Court previously "agree[d]" with Defendants that Plaintiffs failed to plead that

12   "Facebook had determined that the misappropriated data was still being used in connection with the

13   Brexit and Trump campaigns."  2020 Order at 43.  The Court concluded that this category of statements

14   was not actionable, but noted that "it [wa]s possible" Plaintiffs could succeed by alleging "that

15   Facebook embedded employees in the 2016 Trump campaign and thus knew that the deletion

16   certifications were false."  *Id.* at 66.  Plaintiffs fail to remedy this pleading deficiency.

17       In their prior complaint, Plaintiffs made the conclusory allegation that Facebook "determined

18   that Kogan violated Facebook's policies . . . when he sold the data of tens of millions of Facebook

19   users to Cambridge Analytica."  SAC ¶ 364(b).  Plaintiffs now add that Facebook must have known

20   that its investigation into Cambridge Analytica was deficient because Facebook determined that

21   Cambridge Analytica—rather than Kogan—had "violated Facebook's policies . . . when Cambridge

22   Analytica, through SCL, bought the data of tens of millions of Facebook users from GSR."  ¶ 539(c).

23   This allegation uses different words, but is as conclusory and insufficient as the prior allegations that

24   were unsupported by specific factual allegations demonstrating that statements about Facebook's

25   investigation of Cambridge Analytica were false.

26       Plaintiffs also claim that Facebook's investigation revealed that Cambridge Analytica

27   continued to use the purportedly deleted data "to target Facebook users for disinformation and voter

28   suppression advertisements on Facebook" in connection with the Trump campaign.  ¶ 539(d).  But as

discussed below, Plaintiffs fail to allege specific facts showing that any Facebook employee knew that Cambridge Analytica lied when it certified that the improperly obtained user data had been deleted, and instead continued to use the data. *See infra* at 14-17. Nor is there any specific fact alleged demonstrating that anybody at Facebook knew that Cambridge Analytica allegedly was using that data to conduct "disinformation" and "voter suppression" campaigns. *See infra* at 17-18.

Thus, the "investigation" statements once again are unsupported by any specific facts demonstrating that they were false at the time they were made, and should be dismissed.

### 2. Plaintiffs added *zero* new allegations for the remaining ten categories of alleged misstatements.

The remaining ten categories of allegedly false or misleading statements are repeated verbatim from the previous complaint, with no new factual allegations. These statements are grouped and discussed below.

#### a. Two categories previously held actionable.

This Court previously held that statements regarding users' control of their data and Facebook respecting users' privacy settings were actionable because of allegations that certain app developers were "whitelisted" for continued access to certain user data. 2020 Order at 36-39. Defendants respectfully disagree with this aspect of the Court's decision. Even if Facebook briefly provided a handful of apps access to certain data in a manner that was inconsistent with users' privacy settings (an allegation Facebook vigorously disputes), that does not render false or misleading statements that Facebook gave users broad power to control how and with whom their data was shared. In other words, Plaintiffs' whitelisting allegations do not render Defendants' "control" statements false or misleading.[2] *See* ¶¶ 500-523.

_____

[2] The Court also held the statement that Facebook "built [its] services around transparency and control" was actionable. 2020 Order at 39. Defendants respectfully disagree that this statement can be objectively verified. *See id.* at 32 (to be misleading, a statement must "be capable of objective verification"); *see also Apollo*, 774 F.3d at 606.

b.     **Two categories with some previously held actionable and unactionable statements.**

*Q1-2018.*  The Court already concluded that statements about Q1-2018 financial results and the anticipated impact of GDPR were not false or misleading.  2020 Order at 55-57.  And it held the same for statements by Mr. Zuckerberg regarding whether consumers wanted their data to be used.  *Id.* at 57.  Because Plaintiffs have not added any new allegations, the Court should dismiss the allegations about these statements for the same reasons as before.  *See* ¶¶ 602-619.

This Court also found that statements regarding situations like Cambridge Analytica not happening again and Facebook having strong data protections were adequately alleged to be actionable because of Plaintiffs' whitelisting allegations.  2020 Order at 57-58; *see* ¶¶ 609, 615.  Defendants, again, respectfully disagree.  Plaintiffs do not allege that the Cambridge Analytica events resulted from—or bear any connection to—whitelisting, so the whitelisting allegations do not render statements about Cambridge Analytica type events not happening again false or misleading.  Nor are Plaintiffs' allegations concerning whitelisting inconsistent with Facebook's robust data protection practices.

*User Consent.*  The Court already concluded that statements regarding providing data to Kogan were not adequately alleged to have been false or misleading.  2020 Order at 46-48.  The TAC contains no new factual allegations that would change this conclusion, and these statements should again be dismissed.  ¶¶ 555-562.  But the Court did conclude that, in light of the whitelisting allegations, Plaintiffs had adequately alleged that the statement that Facebook "was changing to 'dramatically limit the data apps could access'" was actionable.  2020 Order at 47-48; *see* ¶ 558.  Facebook again respectfully disagrees with this portion of the Court's 2020 Order.  Limiting the data apps could access and alleged whitelisting are not mutually exclusive—even if, as Plaintiffs allege, Facebook whitelisted a small number of apps for a limited period of time, Facebook still dramatically limited the data that was accessible to the millions of apps on Facebook's platform.  *See* Ex. 8 ¶¶ 81, 114.

c.     **Six categories of misstatements previously dismissed.**

This Court already concluded that six categories of statements were not adequately pleaded to be false or misleading in their entirety: (1) 2012 FTC Consent Decree compliance, (2) user notification, (3) GDPR compliance, (4) election interference, (5) user metrics, and (6) selling user data.  2020 Order

Gibson, Dunn &
Crutcher LLP

1    at 48-55, 58-59.  The allegations in the TAC relating to these allegations are unchanged from the prior

2    complaint, ¶¶ 563-601, 620-636, and should be dismissed again.

3                    **d.    Miscellaneous statements previously dismissed.**

4           Plaintiffs also cut and paste from their prior complaint "Additional False and Misleading

5    Statements" (¶¶ 637-658) that they recognize were already dismissed by the Court, but are included

6    again unchanged from the prior complaint "[f]or the avoidance of doubt."  ¶ 637.  These statements

7    should be dismissed again for the reasons this Court explained when it dismissed Plaintiffs' first

8    complaint.  *See* 2019 Order at 27, 31-38, 41, 43-44.

9    **C.    Plaintiffs Fail To Plead a Strong Inference of Scienter**

10          The TAC should be dismissed on the separate ground that Plaintiffs fail to plead with

11   particularity that any of the Individual Defendants knew or were reckless in not knowing that any of

12   the challenged statements were false or misleading.  Plaintiffs bear a heavy burden of pleading with

13   particularity facts giving rise to a "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A).  This is

14   an "'exacting' pleading obligation" that has real "teeth," *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414

15   (9th Cir. 2020), requiring Plaintiffs to plead with particularity that Defendants made false statements

16   intentionally or with deliberate recklessness, 2020 Order at 59-60.  The Court must weigh "*all*

17   reasonable inferences to be drawn from the allegations, including inferences unfavorable to the

18   plaintiffs."  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

19   Plaintiffs fail to plead scienter under this strict standard.

20          **1.    Plaintiffs fail to plead facts showing that the Individual Defendants knew**
               **Cambridge Analytica lied in its certifications.**

21          There is not a single non-conclusory allegation that the Individual Defendants—or any other

22   unnamed senior officer whose knowledge may be imputed to Facebook—knew that Cambridge

23   Analytica lied to Facebook when it certified that it had deleted the data it received from Kogan.  *See*

24   ¶¶ 183, 193 (conclusory scienter allegations).  Nor are there any factual allegations that any Individual

25   Defendant was even kept apprised of the investigation into Cambridge Analytica (*see* ¶¶ 203, 268

26   (conclusory allegations)), which is not surprising given the allegations in the SEC Complaint,

27   incorporated by reference in the TAC, that Facebook's "processes and procedures around the drafting

28   of its" SEC filings "failed to bring [Kogan's] sale of data from tens of millions of Facebook users to

Cambridge to the attention of the individuals with primary responsibility for drafting and approving those reports."  Ex. 7 ¶ 40.  "As a result, Facebook **senior management** and relevant legal staff did not assess the scope, business impact, or legal implications of [Kogan's] improper transfer of data to Cambridge."  *Id.* ¶ 43.  Plaintiffs' failure to plead the Individual Defendants' knowledge means that there is no viable securities claim with respect to all of the statements allegedly rendered false by failing to disclose Cambridge Analytica's deceit.  *See* 2020 Order at 33-35.

At most, Plaintiffs point to the work of line-level employees on the team investigating Cambridge Analytica, and three employees allegedly embedded in the Trump campaign alongside Cambridge Analytica.  What line-level employees knew about Cambridge Analytica is beside the point; to plead scienter for <u>both</u> the Individual Defendants *and* Facebook, Plaintiffs must plead facts showing what the *Individual Defendants* knew or were deliberately reckless in not knowing.  *See Cheung v. Keyuan Petrochems., Inc.*, 2012 WL 5834894, at *3 (C.D. Cal. Nov. 1, 2012) (to plead a corporation's scienter, "Plaintiffs must allege the requisite level of scienter with respect to at least one of the Individual Defendants"); *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation."); *Axonic Capital LLC v. Gateway One Lending & Fin.*, 2019 WL 4138024, at *8 (C.D. Cal. May 22, 2019) (holding that because "corporations act through their directors and officers" they "can only be held liable for fraud if one or more of these individuals are liable for fraud," and rejecting argument "that the scienter of '[a]ny individual agent' … can be imputed to the corporation").  The Ninth Circuit "has not … adopted a theory of collective scienter."  *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008); *see also Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995) ("[T]here is no case law supporting an independent 'collective scienter' theory.").  Accordingly, "corporate scienter may not be established by imputing the false statements of one agent [] with the alleged scienter of another agent []."  *Prodanova v. H.C. Wainwright & Co., LLC*, 2018 WL 8017791, at *14 (C.D. Cal. Dec. 11, 2018).

In any event, Plaintiffs fail to plead that even the line-level employees who investigated Cambridge Analytica knew that its certification to Facebook was false.  Plaintiffs continue to rely on "speculation to argue that Facebook *should have known* that Cambridge Analytica was still involved

Gibson, Dunn &
Crutcher LLP

in data mining" after it provided its certification of destruction, 2020 Order at 34, asking the Court to accept untenable and illogical inferences with the benefit of hindsight.  For example, Plaintiffs allege:

- A Cambridge Analytica entity provided an oral certification instead of a written one, which must have "alerted Facebook's investigation team to the fact that Cambridge Analytica was still abusing the stolen data," ¶ 249; and

- A third party research paper from 2015 used a personality score model based on Facebook user "likes", so when the investigation team saw Cambridge Analytica using a similar model *a year later*, the team *must have known* that (i) Cambridge Analytica's model was based on "likes" data, and (ii) that data must have been the *misappropriated* data as opposed to data from publicly available profiles, ¶¶ 254-260; *see also supra* at 5-6.

This kind of highly speculative "extended chain of inferences" does not satisfy the PSLRA, which "clearly establishes a preference for facts over such inferential leaps."  *In re Northpoint Commc'ns Grp., Inc., Sec. Litig.*, 184 F. Supp. 2d 991, 1005 (N.D. Cal. 2001); *see also Towers v. Iger*, 912 F.3d 523, 531 (9th Cir. 2018) ("inferential hopscotch" fails to plead knowledge with particularity under similar FRCP 23.1 standard).  And, in any event, allegations that these employees "*should* have known of the violations . . . [are] not sufficient to meet the stringent scienter pleading requirements of the PSLRA."  *Magistri*, 549 F.3d at 748 (emphasis in original); *see Strasburger v. Blackburne & Sons Realty Cap. Corp.*, 2020 WL 6128069, at *5 (C.D. Cal. Apr. 22, 2020) ("should have known" allegations only plead that a defendant was "merely negligent," not scienter).

At base, Plaintiffs still ask the Court to infer that because a handful of line-level employees allegedly knew that Cambridge Analytica continued to engage in psychographics and use personality scores, they must have known Cambridge Analytica was still relying on the misappropriated Facebook data from Kogan.  *See, e.g.*, ¶¶ 254-266.  But, as this Court previously held, "Plaintiffs do not explain why the equally likely inference—that Cambridge Analytica was using data *other than* the misappropriated Facebook data—is overcome."  2020 Order at 34 (emphasis in original); *see also* Ex. 13 at 1 (data can be obtained from many sources, "even without social media or personality quizzes").  The Court should once again reject Plaintiffs' "vague evidence about Cambridge Analytica use of personality profiles—which they could have compiled with non-Facebook data—to target political advertising" as insufficient to establish that *anybody* at Facebook, let alone the Individual Defendants, knew that Cambridge Analytica lied in its certification.  2020 Order at 35.

MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

Nor can Plaintiffs plead scienter as to the Cambridge Analytica certifications by pointing to three Facebook employees who they claim advised the Trump campaign.  ¶ 224.  Plaintiffs allege that because these employees purportedly saw that Cambridge Analytica was "still using psychographics" and used Facebook user IDs, they must have known that Cambridge Analytica was using the *misappropriated* data.  ¶¶ 232-233.  This runs headlong into the same problem just discussed: there are no facts supporting an inference that this was the misappropriated data as opposed to other data.  2020 Order at 34-35.  Although Plaintiffs allege in conclusory fashion that user IDs could have come only from Kogan, Plaintiffs fail to explain why this is the case given that user IDs are publicly available. Ex. 28 at 1.  Nor do Plaintiffs allege that these three employees knew anything about Cambridge Analytica's certifications, let alone that they were supposedly false.  In any event, Plaintiffs allege no facts demonstrating that the Individual Defendants knew what these employees supposedly knew, which is fatal to Plaintiffs' attempt to plead scienter as to the certification statements.  *Supra* at 14-15.

Finally, Plaintiffs' theory that Facebook should have known that Cambridge Analytica lied by comparing its certification with Kogan's certification fails.  Plaintiffs allege that (1) Cambridge Analytica certified in January 2016 that it had only received "personality score data," ¶¶ 177-178, but (2) Kogan's June 2016 certification showed this was false because Kogan stated he transferred raw Facebook user data, not just derivative personality score data, to Cambridge Analytica, ¶ 200; *see also* ¶¶ 193-199.  However, the January 2016 certification itself discloses that Cambridge Analytica certified to destruction of *all* data, not just personality score data as Plaintiffs allege.  Ex. 24 at 3 ("**all Facebook data** … including but not limited to **Facebook user data and Facebook user friend data** and data derived from such Facebook user data and Facebook user friend data [] has been accounted for and **permanently deleted**…").  Regardless, these allegations are no help to Plaintiffs because there is not even a suggestion in the TAC—let alone specific facts—indicating that the Individual Defendants knew anything about the certifications or compared them against each other.

## 2.    Plaintiffs fail to plead knowledge of wrongdoing with the Trump campaign.

Plaintiffs also fail to plead that the Individual Defendants knew that Cambridge Analytica was using the misappropriated data to help the Trump campaign target ads in a way that allegedly amounted to voter suppression.  ¶ 539(d).  Plaintiffs allege that the Trump campaign, with the help of Cambridge

Analytica, ran ads on Facebook to discourage "idealistic white liberals, young women, and African Americans" from voting for Hillary Clinton. ¶¶ 241-244. There are no well-pleaded facts indicating that the three Facebook employees assisting the Trump campaign knew about these ads, let alone that they amounted to illicit voter suppression. ¶ 242 (alleging only that they must have known). But, more importantly for purposes of establishing scienter, there are *no allegations* that the Individual Defendants or any other senior executive knew anything about these ads, who they were targeted to, or that they were supposedly based on misappropriated data.

Plaintiffs point to a statement by Roger McNamee, the former Facebook investor who had not been involved with Facebook since 2009, Ex. 26 at 13:21-14:13, that "top management of Facebook knew they had employees embedded in the [Trump] campaign," ¶ 281. Even if there were specific facts alleged demonstrating that McNamee was in a position to actually know if this was true (and there are not), there are no facts pleaded—from McNamee or otherwise—that any Individual Defendant knew that Cambridge Analytica had used stolen data to assist the Trump Campaign to suppress votes. The bottom line is that the TAC contains no facts demonstrating that any "senior controlling officer" at Facebook, including any Individual Defendant, knew or was deliberately reckless in not knowing that the challenged statements concerning the Cambridge Analytica events were false or misleading. *Supra* at 14-15 (quoting *ChinaCast*, 809 F.3d at 476).

### 3. Plaintiffs fail to plead that the Individual Defendants knew about whitelisting.

Defendants respectfully request that the Court reconsider its prior ruling that Plaintiffs sufficiently pleaded that Mr. Zuckerberg and Ms. Sandberg knew about whitelisting access to friends' data during the Class Period. 2020 Order at 61. Plaintiffs fail to plead a "strong inference" of knowledge with respect to whitelisting for two principal reasons. *First*, the 2012-13 emails on which Plaintiffs rely do not even mention whitelisting access to friends' data, and instead are about the undefined concept of "reciprocity"—which is not the same thing and Plaintiffs do not allege otherwise. ¶¶ 74-76. And the indisputable context of these emails makes clear that it would be unreasonable to infer that these emails were about whitelisting, as that term and concept is used in the TAC and this Court's prior orders. As this Court has noted, "[b]efore April 2014, a user automatically consented to an app developer gaining access to their personal data *and* the personal data of his or her friends," 2020

Order at 3 (emphasis in original), because "Facebook's default settings" allowed access to friends' data.  Ex. 8 ¶ 5; *see id.* ¶ 20 ("Graph API V1 [] allowed third-party developers to access and collect data about Affected Friends.").  Because app developers had access to friends' data *by default* in 2012-13—the time frame of the referenced emails about "reciprocity"—there would have been no need for Facebook to "whitelist" apps to access that data.

   *Second*, even if the 2012-13 emails were sufficient to allege knowledge of whitelisting at that time, the emails are insufficient to plead that Defendants knew that statements *in 2017-18* were false because of whitelisting.  ¶¶ 316-318.  Plaintiffs' theory suffers from a fundamental chronology problem.  In 2014, Facebook publicly announced that it was shutting down app developers' access to friends' data, which it completed in April 2015.  2020 Order at 3-4; *see* Ex. 8 ¶ 8.  Plaintiffs' securities fraud theory is premised on the allegation that after this shutdown—in which *millions* of app developers had their access to friends' data taken away (Ex. 8 ¶¶ 81, 114)—roughly two dozen developers were still given access to this data.  ¶¶ 316-318; *see* Ex. 8 ¶¶ 106-109.  But Plaintiffs' scienter allegations only focus on what Mr. Zuckerberg and Ms. Sandberg knew in 2012-13 *before* access to friends' data was shut down, ¶¶ 74-76, as illustrated here:



There is not a single allegation that suggests any Individual Defendant knew that, after learning that millions of app developers had their access shutdown in 2014-15, a very small percentage of developers allegedly still had access when the challenged statements were made in 2017-18.  Thus, Defendants respectfully request that the Court reconsider its prior ruling that the whitelisting statements were adequately alleged to have been made with scienter.

   **4. Plaintiffs' recycled scienter allegations remain deficient.**

   Plaintiffs repeat their deficient scienter allegations from their prior complaints.  These allegations fail to plead scienter for all of the reasons discussed in Defendants' last motion to dismiss and reply in support thereof, ECF Nos. 126 and 132, and the Court's 2020 Order (at 33-35), as summarized below.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

***Governmental investigations and settlements.***  Plaintiffs' reliance on allegations of knowledge made by the SEC (¶ 449), FTC (¶¶ 462, 572), the UK Information Commissioner's Office (¶ 381), and the UK Parliament (¶ 487) fail to plead scienter because they are "entirely conclusory."  *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1044 (N.D. Cal. 2007).[3]  As this Court correctly noted, untested allegations by the government—as here—are not entitled to any special weight.  2020 Order at 35 & 40 n.4.  And Plaintiffs' heavy reliance on the SEC complaint is misplaced.  After the SEC finished its "extensive, year-long investigation," ¶ 447, the SEC charged Facebook with securities law violations that *do not require proof of scienter*.  Ex. 7 ¶¶ 52-62; *see SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001) (Sections 17(a)(2) and (3) do not require scienter); *Ponce v. SEC*, 345 F.3d 722, 737 n.10 (9th Cir. 2003) ("Section 13(a) violations do not require scienter.").  Additionally, the allegations in the SEC complaint cut *against* an inference of scienter because they assert that Kogan's and Cambridge Analytica's misappropriation of data was *not* brought to the attention of those with authority over Facebook's SEC filings—*i.e.*, the Individual Defendants.  *Supra* at 14.

***So-Called Witnesses***.  Plaintiffs still have not found a single confidential witness to support their conclusory claim that the Individual Defendants knew the challenged statements were false, ¶ 662, and continue to rely on the same public statements by supposed "witnesses" that this Court previously held do not support scienter.  2019 Order at 46; 2020 Order at 35.  Plaintiffs double down on their deficient allegations about McNamee, claiming that he "personally spoke with Zuckerberg, Sandberg and Rose about" "Cambridge Analytica's misuse of stolen data."  ¶ 282.  But the interview transcript on which Plaintiffs rely does not say that.  *See* Ex. 26 at 26:12-25, 29:4-7.  As this Court has already held, Plaintiffs' allegations "fail to establish that McNamee <u>told</u> Defendants that Cambridge Analytica did *not* delete the data or that he would even have such personal knowledge about Cambridge Analytica's data use."  2020 Order at 35 (emphases in original).  Plaintiffs also continue to make the same allegations about Sandy Parakilas' vague warnings about data privacy

---

[3]  The scienter allegations based on the Delaware Court of Chancery's opinion in *In re Facebook, Inc. Section 220 Litigation* rely on the Parliamentary Committee report conclusions, and are deficient for the same reasons.  ¶¶ 482, 484; *see* Ex. 6 at 27 & 41 n.149 (citing Ex. 4).

MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

issues, ¶ 433, but they were (1) made "*five years* before the Class Period began," and (2) not alleged to have been made to the Individual Defendants. 2019 Order at 46. Finally, Plaintiffs continue to allege that former FTC technologist Ashkan Soltani testified that Ms. Sandberg knew about whitelisting. ¶ 325 (Plaintiffs adding "whitelisting and overriding privacy settings" to Mr. Soltani's testimony in brackets). But he never said that. Ex. 3 at Q4348. Mr. Soltani also is not a current or former Facebook employee, and his testimony was "[b]ased only on publicly-available information," Ex. 3 at Q4327, so he was not "in a position to be personally knowledgeable of the information alleged." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009).

**Supposed "Admissions."** This Court already held that Plaintiffs cannot plead scienter by pointing to Defendants' "statements of regret." 2019 Order at 45. Nonetheless, Plaintiffs repeat their rejected allegation that statements in which the Defendants expressed regret that they did not do more in 2015 when the Company first learned about Cambridge Analytica somehow constitute "admissions" of wrongdoing. ¶¶ 382-383. Again, "Plaintiffs' theory is basically an assertion of fraud by hindsight," which cannot support a strong inference of scienter. *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1005 (N.D. Cal. 2016); *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 536 (3d Cir. 1999) (allegation that defendant "expressed regret" nine months after allegedly false statement does not demonstrate "actual knowledge of [] statement's falsity").

**Stock Sales.** Plaintiffs rely on the same deficient stock sale allegations they made in their previous complaints. This Court already held these allegations fail to plead an inference of scienter, and Plaintiffs allege nothing new that should change the Court's conclusion. 2020 Order at 61-62. Again, Plaintiffs fail to (1) provide the Court with any context about Defendants' stock holdings or the percentage of those holdings sold, (2) plead that the timing of sales was suspicious, (3) plead that Defendants' sales were out of line with their trading practices, or (4) explain why the sales were at all suspicious given that they were made pursuant to Rule 10b5-1 plans (Exs. 29-34). *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 621-22 (9th Cir. 2017); ECF No. 126 at 23-25. These allegations fail to plead scienter. 2020 Order at 61-62.

**D.     Plaintiffs Fail to Plead Loss Causation**

The TAC also must be dismissed on the independent ground that Plaintiffs again fail to plead

Gibson, Dunn &
Crutcher LLP

1    loss causation.  The few new allegations in the TAC do nothing to remedy the defects with Plaintiffs'

2    loss causation theory that Facebook identified in its prior motion to dismiss or, with respect to their

3    "whitelisting" allegations, that the Court identified in its 2020 Order.

4         To adequately plead loss causation—the causal connection between a misrepresentation and a

5    loss—with the particularity required by Rule 9(b), a plaintiff "must demonstrate that an economic loss

6    was caused by the defendant's misrepresentations, rather than some other intervening event" or "other

7    fact."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209-10 (9th Cir. 2016).  Although "loss causation is

8    a 'context-dependent' inquiry," *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753

9    (9th Cir. 2018), when a securities fraud plaintiff relies on a "revelation of the fraud" theory of loss

10   causation, the plaintiff must plead that (1) she purchased a security at a price that was artificially

11   inflated by a specific alleged misstatement; (2) a "corrective disclosure" subsequently revealed the

12   "truth" about that specific misstatement; and (3) the disclosure of the truth caused the company's stock

13   price to decline.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43, 346-47 (2005); *In re BofI*

14   *Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020).  In short, a securities fraud plaintiff must

15   trace her claimed loss back to "the very facts about which the defendant lied."  *Nuveen Mun. High*

16   *Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013); *In re BofI*,

17   977 F.3d at 790 ("Even if the true facts concealed by the fraud are revealed to the market, the plaintiff

18   must still show that the disclosure of the truth caused the company's stock price to decline.").

19        A corrective disclosure "must by definition reveal new information to the market."  *In re BofI*,

20   977 F.3d at 794; *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020) ("[A] disclosure

21   is not 'corrective' if it contains information derived entirely from public filings and other publicly

22   available sources of which the stock market was presumed to be aware."); *Rok v. Identiv, Inc.*, 2017

23   WL 35496, at *18 (N.D. Cal. Jan. 4, 2017) ("[C]orrective disclosures must present facts to the market

24   that are new, that is, publicly revealed for the first time.").

25        Plaintiffs attempt to plead loss causation under the "corrective disclosure" theory.  ¶¶ 687-712.

26   More specifically, Plaintiffs contend that they suffered losses resulting from "a series of partial

27   disclosures" concerning Facebook's data privacy practices preceding stock drops on March 19, 20, 22,

28   23, and 27, 2018, and its second quarter earnings announcement on July 25, 2018.  ¶¶ 687-720.  But

Gibson, Dunn &
Crutcher LLP

none of these supposed "partial disclosures" revealed any supposed "truth" regarding any particular statement that Plaintiffs allege was false or misleading.  In fact, Plaintiffs affirmatively *disavow* the *only* "corrective" disclosure about whitelisting that this Court found revealed the truth about any alleged misstatement, surely because it resulted in no stock price decline.  ¶ 703; 2020 Order at 64-65.  As a result, Plaintiffs once again fail to plead that it was Defendants' "misstatement, as opposed to some other fact, [that] foreseeably caused the plaintiff's loss."  *First Solar, Inc.*, 881 F.3d at 753.

      **1.**      **Plaintiffs fail to plead loss causation for the March 19, 2018 decline.**

Plaintiffs claim that the March 19, 2018 stock price decline was "caused" by disclosures in Facebook's March 16, 2018 press release and articles published on March 17, 2018 in *The Guardian* and *The New York Times*.  ¶ 689.  But Plaintiffs fail to show how the press release or those articles revealed the "truth," or even related back, to any particular misstatement made by Defendants.  Instead, Plaintiffs' loss causation argument consists entirely of conclusory allegations that "the articles published by *The New York Times* and *The Guardian* on Saturday, March 17, 2018 [] caused the price of Facebook common stock to decline," *id.*, and that certain unspecified facts in those articles contradicted other unspecified "prior public statements," TAC at 143.  For example, Plaintiffs claim that "contrary to Defendants' Class Period representations concerning control over user data and Facebook respecting user privacy, this news revealed that Facebook could not ensure that users controlled their data or had privacy with respect to data accessed by third parties on the Facebook platform."  ¶ 691.  Plaintiffs also claim that the March 16-17, 2018 news "revealed that, *inter alia*, Defendants' risk statements were misleading because, in reality and contrary to these statements, improper access, disclosure and misuse of user data were not merely hypothetical investment risks." ¶ 694.  Finally, Plaintiffs claim that the March 16-17, 2018 news revealed *all* of the following *categories* of statements to be materially misleading:

- statements that Facebook had not "uncover[ed] anything that suggest[ed] wrongdoing with respect to Cambridge Analytica's work on the … Trump campaign[]," ¶ 694(a);

- statements that Facebook "require[d]" data misusers to "destroy all improperly collected data," ¶ 694(b);

- statements regarding Facebook's compliance with the 2012 FTC Consent Decree, ¶ 694(c); and

- statements that Facebook notified users whose accounts were compromised or at risk of being compromised, ¶ 694(d).

This Court previously found that the articles in *The Guardian* and *The New York Times* cannot constitute "corrective disclosures" because the essential allegations in both articles, *i.e.*, that Cambridge Analytica had harvested and misused Facebook user data to serve targeted advertisements for political campaigns, had already been revealed by *The Guardian* in 2015—more than one year before the putative class period. 2020 Order at 64. The only new information revealed by the March 16-17, 2018 news was that Cambridge Analytica did not delete all of the Facebook data in its possession, despite its contrary representations to Facebook, and supposedly used that data during the 2016 presidential campaign. *Id.*; Exs. 21-22. Even Plaintiffs recognize that this was the only new information of import in the articles. *E.g.*, ¶¶ 361, 548. Thus, insofar as the March 17, 2018 articles revealed any new information, it was that Cambridge Analytica lied to Facebook, which Plaintiff does not allege "corrected" any prior statement by Defendants.

Plaintiffs' failure to "specify which of the Defendants' statements were made untrue" by the news disclosed *in March* is fatal under Rule 9(b)'s particularity requirement. *Apollo*, 774 F.3d at 608 (rejecting loss causation theory because it was "unclear what claims" made by defendants were invalidated by alleged disclosures in press releases and reports); *Nuveen*, 730 F.3d at 1119-20 (plaintiff must trace loss back to "the very facts about which the defendant lied"). As before, none of the news articles on which Plaintiffs rely describe or reveal a particular Facebook statement to be false or misleading. For example, Plaintiffs rely on a March 17, 2018 article in *The New York Times*, which stated that "copies of the data still remain beyond Facebook's control" and noted that *The Times* even "viewed a set of raw data from the profiles Cambridge Analytica obtained." ¶ 691. But Plaintiffs fail to draw any connection between this article—or any other article—and any of Defendants' statements, because they cannot. The March 17, 2018 articles say *nothing* about whitelisting, nor do they indicate that Kogan's app obtained user data in a manner contrary to Facebook's policies. In fact, they say the opposite: that Facebook's then-active Platform Policy "allowed [the] collection of friends' data to improve user experience in the app" but "barred it [from] being sold [] or used for advertising." Ex. 21 at 1-2. Nor do *any* of the articles blame the March 19, 2018 stock price decline on *any* previous

statement by Facebook.  Acknowledging that this "critical link is missing," Plaintiffs again "invite[] the court to assume that the misrepresentations account" for the losses, rather than some other information, such as the revelation that Cambridge Analytica breached Facebook's policies, stole user data, and lied about deleting it.  *Nuveen*, 730 F.3d at 1121; *see Lloyd*, 811 F.3d at 1209 (Plaintiff "must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event").  As in *Nuveen*, this Court should reject Plaintiffs' baseless invitation.

Plaintiffs similarly attempt to circumvent the "chronology problem" this Court discussed at length in its prior Order by recharacterizing the March 17, 2018 articles as having revealed the alleged "lack of user control" and then conflating those statements with the "whitelisting" practices that were disclosed more than six weeks later.  *Compare* ¶ 689, *with* SAC ¶ 513.  But the March disclosures, which were followed by a market price drop, corrected no prior false or misleading statement by Facebook, and the separate June disclosures regarding whitelisting practices did not result in any material stock price movement.  Plaintiffs cannot remedy this fundamental chronology problem by conflating these two distinct issues into a single issue under the rubric of "user control."  *See* ¶¶ 311-334 (alleging that the "user control" statements were shown to be false by the revelation of whitelisting practices, *not* by what Kogan and Cambridge Analytica did).  Plaintiffs themselves acknowledge that the news about whitelisting that allegedly revealed those user control statements to be false was revealed in *June* 2018—more than *six weeks* after the March stock price declines.  ¶¶ 316, 319.

Plaintiffs also attempt to plead around this fundamental failure by introducing an alleged expert declaration from Dr. Cain.  ¶ 723 ("Based on his analysis, Dr. Cain opined that, on each of the alleged corrective disclosures discussed in his declaration, 'new information was revealed to the market concerning the continued misuse of user data by Cambridge Analytica, the extent and scope of Facebook's data privacy issues, and the lack of user control over data provided to Facebook.'"); ¶ 724 ("Dr. Cain further opined that: 'from an economic perspective, these declines were *proximately caused* by the revelation of the truth concerning Defendants' alleged misrepresentations and/or omissions.'").  Dr. Cain's declaration is improper and should be stricken, *see* Mot. to Strike, but it is in any event of no help to Plaintiffs with respect to the March stock price decline, as it is entirely conclusory: he reaches his conclusion about proximate causation without even attempting to explain *how* or *why* the price

MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

declines in March 2018 were *caused* by any of the alleged corrective disclosures in Plaintiffs'
Complaint.  *See* Cain Decl. ¶¶ 11, 37.  Thus, even if the Court were to consider Dr. Cain's declaration,
it would find that Dr. Cain, like Plaintiffs, fails to identify what "new information was revealed to the
market" on March 19, 2018 (or at any point in time).  *See id.* ¶¶ 11, 36.

Dr. Cain's declaration is likewise of no assistance to Plaintiffs with respect to the chronology
problem associated with the June 2018 whitelisting disclosure.  To the contrary, Dr. Cain does not
dispute that there was no material stock price reaction to the whitelisting disclosure on June 3, 2018—
indeed, Plaintiffs did not even bother to ask him to address it—but, using the "user control" canard,
Plaintiffs nevertheless suggest that the whitelisting disclosure somehow relates back to the March 2018
stock price drops.  Like Plaintiffs' conclusory complaint, Dr. Cain's conclusory (and improper)
declaration fails to support Plaintiffs' heavy burden under the PSLRA and Rule 9(b) to plead each
element of securities fraud, including loss causation, with particularity.  *Grigsby*, 979 F.3d at 1206;
*Apollo*, 774 F.3d at 605.

**2.      Plaintiffs fail to plead loss causation with respect to other March declines.**

As in the SAC, Plaintiffs once again claim that the same hodgepodge of "additional disclosures
of material information regarding the lack of user control over their data on the Facebook platform, the
extent of the Cambridge Analytica data misuse, and the magnitude of the risks facing the Company"
in the ten days following the initial articles in *The Guardian* and *The New York Times* qualify as
corrective disclosures.  *Compare* ¶¶ 688, 696, 698-699, *with* SAC ¶¶ 512, 514, 516-517.  They do not.

For all these purported corrective disclosures, Plaintiffs do not even try to meet their burden of
tracing the alleged loss back to "the very facts about which the defendant lied," *Nuveen*, 730 F.3d at
1120, or explain how the statements corrected some particular falsehood allegedly perpetuated by
Defendants.  Nor do they try to explain *how* or *why* these "revelations" proximately caused any of the
stock price drops to which they purportedly correspond.  *See Apollo*, 774 F.3d at 608 ("Plaintiffs must
demonstrate a causal connection between the deceptive acts … and the injury suffered by the
Plaintiffs.").  In fact, the only new allegations added by the TAC related to the other March 2018 price
declines are the additional articles cited in ¶ 700, which Plaintiffs only claim "continued to link the
news about Cambridge Analytica's continued control and misuse of millions of Facebook users' data

Gibson, Dunn &
Crutcher LLP

1   directly to the notion that users and even Facebook lacked control over user data."  In other words,

2   despite filing three complaints, Plaintiffs still cannot find a single corrective disclosure that both

3   revealed the truth about a specific misstatement and caused a decline in Facebook's stock price in

4   March 2018.

5          In addition, the purported "corrective disclosures" on March 20, 22, 23, and 27 that merely

6   assert unspecified "additional details" and "continuing revelations" are patently insufficient under

7   Rule 9(b), as they neither tie to any allegedly false statement, *Apollo*, 774 F.3d at 608, nor suggest any

8   new material information relating to the alleged fraud that was not already in the market.  *See In re*

9   *BofI*, 977 F.3d at 794 ("A corrective disclosure, though, must by definition reveal new information to

10  the market."); *Grigsby*, 979 F.3d at 1205 ("[A] disclosure is not 'corrective' if it contains information

11  derived entirely from public filings and other publicly available sources of which the stock market was

12  presumed to be aware.").  And as for the purported disclosures on March 20, 23, and 27 concerning

13  "increased calls for government investigations," ¶ 698, "unconfirmed reports of government

14  investigations," ¶ 696, and the FTC "open[ing] an investigation," ¶ 699, these allegations once again

15  do not establish loss causation.  *See Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) ("The

16  announcement of an investigation does not 'reveal' fraudulent practices to the market.").[4]  In short,

17

18  _____

19  [4]  As for the other purported disclosures, none of the information they contained differed materially

20      from information already available to the public or corrected any prior misstatement.  The March

21      18 tweet itself says nothing novel or material: simply that Mr. Wylie was "[s]uspended by

22      @facebook." ¶ 696.  The March 19 article, which noted that Facebook's Chief Information Officer

23      was leaving the company, revealed nothing new about Facebook's privacy practices.  *See also* ¶ 442

24      (alleging that Facebook's CIO denied that he had been "forced out," contradicting Plaintiffs'

25      characterization of the article).  Likewise, the substance of the March 20 article had already been

26      disclosed in November 2017, in a separate op-ed written by Mr. Parakilas for the *New York Times*.

27      *See* Ex. 20; *see also* ¶¶ 435-436 & nn.522-26 (Plaintiffs citing the two Parakilas articles

28

Plaintiffs' transparent attempt to capture as many price declines as possible, regardless of their relation to the alleged "fraud," is not a viable theory of loss causation.

**3.      Plaintiffs fail to plead loss causation for the June 2018 whitelisting disclosures.**

In dismissing the SAC, this Court held that Plaintiffs failed to plead loss causation as to "whitelisting"—their "only viable theory" of securities fraud.  2020 Order at 65.  In granting leave to amend, the Court suggested that Plaintiffs might in theory cure their failure to plead loss causation "by alleging more facts about the stock price following the June 3, 2018 whitelisting revelation."  *Id.* at 66.  Plaintiffs do not even try to address in the TAC the Court's holding that Plaintiffs "allege[d] *no* facts from which the Court [could] infer the stock price fell" following the June 2018 whitelisting disclosures.  *Id.* at 65 (emphasis in original).

Instead, Plaintiffs now attempt to plead an entirely different, and unprecedented, loss causation theory:   Plaintiffs now allege that investors did not react to the whitelisting disclosure on June 3, 2018, when *The New York Times* published the article "concerning Facebook's improper whitelisting practices," ¶ 703, because (1) the disclosure "was not sufficiently distinct from the March 2018 disclosures [about Cambridge Analytica] to trigger a significant sell-off in Facebook stock," *id.*, *and* (2) the disclosure fueled the July 25, 2018 stock price drop *seven weeks later* because it was only then, when Facebook announced its second quarter financial results, that "the true extent of the damage that the revelations about Cambridge Analytica had on Facebook's business" became known, ¶ 707.  Plaintiffs' nonsensical theory that Facebook's allegedly "improper whitelisting practices" was material—but somehow not distinct enough to move the market when the practice was actually disclosed in June—is patently inconsistent with the law of loss causation.

This Court has already recognized that the Cambridge Analytica scandal and whitelisting cannot be lumped together under the heading "user control" because they are two fundamentally distinct theories of securities fraud.  The Cambridge Analytica events involved an ***app developer violating Facebook's policies***, whereas whitelisting allegedly involved ***Facebook granting*** a limited

interchangeably).  The March 20, 2018 article even states that "Parakilas first went public with his concerns about privacy at Facebook *four months ago*."  Ex. 23 at 2.

number of apps continued access to data for a brief period of time after Facebook broadly restricted data access across its Platform.  *Compare, e.g.*, 2020 Order at 5 ("In December 2015, *The Guardian* reported that Kogan, through his company Global Science Research ("GSR"), sold some of the information collected through the "This Is Your Digital Life" app to Cambridge Analytica, *in violation of Facebook's policies*."); *id.* at 33 ("Both Parties also agree that Kogan's *transfer* of personality scores to a third-party *violated **Facebook's Platform Policy**.*"), *with, e.g.*, *id.* at 36-37 ("Facebook continued to give whitelisted parties users' friend's data (and *overrode **user privacy settings** to do so).*"); *id.* at 38 ("[W]hitelisted app-developers could access user-data *in contravention of **user privacy settings**.*"); *id.* at 38-39 ("[C]ertain whitelisted developers and phone companies were able to access user data and *circumvent **user privacy settings**.*").

Plaintiffs' kitchen-sink theory of loss causation—predicated on the conflation of whitelisting and Cambridge Analytica, and without a single allegation showing how these "revelations" corrected any alleged false or misleading statement by Facebook—runs roughshod over the PSLRA and Rule 9(b), which require a securities fraud plaintiff to plead loss causation with particularity.  *Grigsby*, 979 F.3d at 1206.  The new "user control" allegations in the TAC amount to nothing more than puzzle pleading at its worst and fail to remedy the defects with Plaintiffs' loss causation theory that this Court previously recognized.  2020 Order at 65-66.

**4.      Plaintiffs fail to adequately allege loss causation for the July 26, 2018 decline.**

Plaintiffs' loss causation theory as to the July 26, 2018 stock price drop is even more deficient. Plaintiffs allege that Facebook's second quarter earnings announcement on July 25, 2018, which reported lower than expected revenues, profits, and user engagement, "revealed the true extent of the damage that the revelations about Cambridge Analytica had on Facebook's business."   ¶ 707. Plaintiffs' attempt to shoehorn the purported collateral effects of the "Cambridge Analytica scandal" into a viable securities fraud theory fails for at least three reasons.

*First*, Facebook's second quarter earnings announcement described nothing "new" relating to Facebook's privacy practices, third-party data harvesting, or Cambridge Analytica.  Plaintiffs admit that the "essential facts" of the Cambridge Analytica scandal—*i.e.*, the alleged fraud—had already been revealed to the market in March 2018.  ¶ 703.  Plaintiffs fail to explain how revelation of the same

MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

"essential facts" can again give rise to a loss *four months later*. In any event, Facebook's second quarter earnings announcement *did not even mention* Cambridge Analytica, "whitelisting," or any privacy incident alleged in the Complaint. *See* Ex. 2. Accordingly, nothing in the earnings call "corrected" any alleged prior misstatement or omission of material fact. *See In re BofI*, 977 F.3d at 794 ("A corrective disclosure, though, must by definition reveal new information to the market."); *In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1048 (N.D. Cal. 2009) ("[A] disclosure that does not reveal anything new to the market is, by definition, not corrective.").

Conceding that there was no actual corrective disclosure, Plaintiffs instead allege that the July 26, 2018 stock price decline was caused by the *effects* of the alleged corrective disclosures from months earlier (in March 2018), claiming that the July 25, 2018 earnings announcement "revealed that the data privacy scandal had caused a far greater impact on the Company than they had previously represented, resulting in dramatically lowered user engagement, substantially decreased advertising revenue and earnings, and reduced growth expectations going forward." ¶ 707. But Plaintiffs allege no *facts* in support of this attenuated theory, merely speculation. For example, there are no facts alleged that users stopped sharing data in the summer of 2018 *because of* the news about Cambridge Analytica (nor would that even make sense given that the media had been reporting about Cambridge Analytica since *December 2015*, *see* 2020 Order at 64; ¶ 5). The only statement Plaintiffs cite in support of this argument is a statement from Mr. Wehner on the earnings call that: "'we expect our revenue growth rates to decline by high single digit percentages from prior quarters' due to, *inter alia*, Facebook '… giving people who use our services more choices around data privacy, which may have an impact on our revenue growth.'" ¶ 708. Even assuming Plaintiffs had alleged a plausible theory of securities fraud relating to Cambridge Analytica—which they have not—Plaintiffs allege no facts from which the Court can infer that "giving people … more choices around data privacy" had anything to do with the alleged Cambridge Analytica fraud. Indeed, the TAC itself demonstrates that the Cambridge Analytica scandal was *not* the result of users failing to have "choices around data privacy." Plaintiffs admit, as they must, that Facebook users *consented* to sharing their data with Kogan *consistent with their privacy settings*. SAC ¶ 89; Ex. 25; Ex. 9. Thus, any potential future revenue declines related to providing users with "more choices around data privacy" had nothing to do with any alleged fraud

MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

1    related to Cambridge Analytica.

2          Moreover, Plaintiffs omit the other factors Mr. Wehner gave for Facebook's expectation that

3    revenue growth rates would decline in the second half of 2018:

4          There are several factors contributing to that deceleration.  For example, we expect
     currency to be a slight headwind in the second half vs. the tailwinds we have
5          experienced over the last several quarters.  We plan to grow and promote certain
     engaging experiences like Stories that currently have lower levels of monetization.  We
6          are also giving people who use our services more choices around data privacy, which
     may have an impact on our revenue growth.
7

8    Ex 2 at 8.  Once again, Plaintiffs allege no facts whatsoever to support their preferred inference that

9    (1) Mr. Wehner's general statement about "giving people who use our services more choices around

10   data privacy" related to, or was a response to, Cambridge Analytica in particular, as opposed to, *e.g.*,

11   GDPR, *id.* at 12 ("And then finally, we're giving people who use service—the services more choice

12   around privacy.  And that's coming both in terms of impacts that could be ongoing from things like

13   GDPR as well as other product options that we're providing that could have an impact on revenue

14   growth."), and (2) that the July 26, 2018 stock price decline *was caused by* this "revelation."  *See*

15   *Metzler*, 540 F.3d at 1065 ("The TAC's allegation that the market understood the June 24 and August

16   2 disclosures as a revelation of [the alleged fraud] is not a 'fact.'  It is an inference that [plaintiff]

17   believes is warranted from the facts that are alleged.  But [defendant] persuasively explains why this is

18   not the case."); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 947 (D. Ariz. 2007) (stock price drop

19   following earnings announcement that "sa[id] nothing about prior alleged false statements" "cannot be

20   the proximate result of the [fraud] alleged in the SAC").

21         Plaintiffs further speculate that Facebook's reported 50% year-over-year increase in expenses

22   revealed that Facebook was not in fact "protect[ing] user data from exploitation."  ¶ 711.  But this

23   expense information was not "new"; on the contrary, in Plaintiffs' first amended complaint, Plaintiffs

24   admitted that the 50% increase in expenses was precisely in line with Facebook's guidance in April

25   2018 that "investors [should] expect full-year 2018 expenses to grow 50%-60%."  ECF No. 86 ¶ 275;

26   *see* Ex. 1 at 8.  Plaintiffs similarly allege that Facebook admitted for the first time during the second

27   quarter earnings call that implementation of the GDPR could have a negative impact on Facebook's

28   revenues and user engagement.  ¶¶ 422-423.  Wrong again: Facebook expressly warned investors in its

first quarter earnings announcement that the GDPR would likely have an impact on Facebook's user base in Europe, and possibly more broadly. *See* ¶ 606; Ex. 1 at 8, 11, 15, 18, 23 (Mr. Wehner projecting that GDPR would cause Facebook's European user base to "be flat to slightly down," and Ms. Sandberg warning that GDPR "would affect the [advertising] product."). During the second quarter earnings call, one analyst even praised Facebook for providing an "accurate read into the June quarter" on the likely effect of the GDPR. Ex. 2 at 15; *see also id.* at 7 (Mr. Wehner describing the Q2-2018 impact from GDPR as "consistent with the outlook" from the Q1-2018 estimates).

Another problem with Plaintiffs' theory that the earnings miss reported in July was caused by the Cambridge Analytica scandal is that Plaintiffs themselves allege several other reasons unrelated to the alleged fraud why revenues might have declined. *See, e.g.*, ¶¶ 708, 713 (GDPR); ¶ 708 (changes in how advertisers used their own data for targeting); ¶ 714 (foreign exchange rate changes). Recognizing this, Plaintiffs make the absurd argument that Mr. "Zuckerberg's admission that GDPR resulted in a decline in active users in Europe is an acknowledgment that providing users with the ability to control their data caused this decline in user engagement." ¶ 709. Not only is this allegation unsupported by any particularized facts, but it again improperly lumps together disparate issues as being somehow about "user control." And as Plaintiffs are well aware, GDPR was not put in place in response to any alleged fraud by Defendants; its implementation was announced years earlier, and the law applies to the entire industry, not just Facebook. Put simply, Mr. Zuckerberg's admission that "GDPR resulted in a decline in active users in Europe" is an acknowledgement that *GDPR* may have caused this decline in user engagement—not an implied admission that *Cambridge Analytica* or *whitelisting* was the proximate cause of an alleged earnings miss. ¶ 709. Plaintiffs offer no facts in the TAC that would alter this Court's prior finding that "Plaintiffs allege no reason why users' decision to opt-in to data sharing would be effected by any alleged privacy misconduct." 2020 Order at 57.

*Second*, Plaintiffs have not, and cannot, show a proximate causal connection between the price drop following the earnings announcement and any alleged fraud. *See Nuveen*, 730 F.3d at 1120 (a plaintiff must connect the loss back to the "very facts about which the defendant lied"). Plaintiffs fail to offer any plausible explanation why it was the alleged fraud that substantially caused stock prices to fall, as opposed to disappointing news about Facebook's finances. *See Metzler*, 540 F.3d at 1065

Gibson, Dunn & Crutcher LLP

(plaintiff failed to allege loss causation where alleged corrective disclosure "contained a far more plausible reason for the resulting drop in [the company]'s stock price—the company failed to hit prior earnings estimates"); *In re Immersion Corp. Sec. Litig.*, 2011 WL 871650, at *8 (N.D. Cal. Mar. 11, 2011) (rejecting loss causation allegations where plaintiff "fail[ed] to plead facts sufficient to … show any decline in stock price was caused by the alleged fraud rather than a typical market reaction to disappointing financial reports").

Plaintiffs' loss causation theory with respect to the July earnings call is particularly attenuated because the earnings announcement made no reference to any of the privacy incidents alleged in the TAC that form the basis of the alleged fraud.  Rather, as Plaintiffs recognize, the far more plausible explanation for why Facebook's shares fell is the news that Facebook reported "lower than expected revenues and earnings," with "reduced guidance going forward," and that its user growth was "decelerating worldwide."  ¶¶ 27, 707; *see* 2020 Order at 66 (noting that Plaintiffs attributed the stock drop to the "Cambridge Analytica scandal, decline in user engagement, advertising revenues, and 'related privacy concerns,' including GDPR").  Numerous courts in this Circuit have rejected remarkably similar loss causation allegations where the "far more plausible reason" for a stock drop is a company's failure to "hit prior earnings estimates"—and *not* the revelation of fraud.  *Metzler*, 540 F.3d at 1063, 1065 (announcements had not "disclosed—or even suggested—[fraud] to the market"); *In re Verifone Sec. Litig.*, 2016 WL 1213666, at *9 (N.D. Cal. Mar. 29, 2016) (finding that "the alleged statements sound more as a critique of poor performance rather than an indication of securities fraud" and "do[] not show that Defendants engaged in fraudulent misconduct which led to lower revenues."); *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1207 (N.D. Cal. 2008) (rejecting theory that deceleration in growth and revenue decrease in earnings report were linked to "any announcement of fraud" where it had not "comment[ed] on any [] fraud issues"); *Melot v. JAKKS Pac., Inc.*, 2014 WL 12589334, at *17 (C.D. Cal. June 6, 2014) (no loss causation where earnings announcement "did not reveal any of 'the practices that the plaintiff contends are fraudulent'" and "another plausible reason for the fall in the share price is evident from the FAC—[the company]'s failure to meet its prior earnings estimates").

*Third*, the movement of Facebook's stock price in the months preceding the July 2018 drop further undermines Plaintiffs' loss causation theory.  Following publication of the 2015 *The Guardian*

article, the 2018 *The Guardian* and *The New York Times* articles, and all the other purported "[c]ontinuing revelations of [the] extent of data breach and lax enforcement, and of regulatory and user backlash" that Plaintiffs allege, ¶ 688, Facebook's stock price made a *full recovery by May 10, 2018—and continued to climb* thereafter, Ex. 27.  On April 25, 2018, Facebook's first quarter revenues, earnings, and user engagement metrics all met or exceeded expectations.  ¶ 394.  Accordingly, if any *fraud* pertaining to Cambridge Analytica was revealed in March 2018, that information was fully incorporated into the market price of Facebook's stock no later than March 27.  *See* ¶¶ 696-699.  The notion that these same facts again gave rise to "fraud" four months later is nonsensical.

At the end of the day, the TAC attempts to plead "revelation of fraud" based solely on Facebook's announcement of "an earnings miss."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 394 (9th Cir. 2010).  Plaintiffs fail to plead any facts showing the connection between the July stock price decline and any alleged fraud—whether through Cambridge Analytica or whitelisting.  Rather, Plaintiffs seem to hope that, by not specifying any particular statement rendered false, one of the dozens in the TAC might sneak through.  But Plaintiffs cannot "plead loss causation through 'euphemism' and thereby avoid alleging the necessary connection between defendant's fraud and the actual loss." *Metzler*, 540 F.3d at 1064.  After all, "a plaintiff will always be able to contend that the market 'understood'" a statement "as a coded message revealing the fraud."  *Id*.  If this were sufficient, Rule 10b-5 would be converted into loss insurance for negative news later depicted by lawyers to be the result of fraud.  *See Dura*, 544 U.S. at 345.  Plaintiffs have failed to plead loss causation with respect to the July decline.

## E.    Plaintiffs Fail to Plead Reliance

In the 2020 Order, this Court held Plaintiffs failed to plead reliance as to their "main theory of securities fraud [] that Defendants knew that Cambridge Analytica had sensitive user information and was using that information for improper purposes," 2020 Order at 33, "because the market was already aware of the core information that Plaintiffs claim was omitted," *id.* at 64.  Nothing has changed in the TAC that alters this Court's conclusion that Plaintiffs failed to plead reliance.

Plaintiffs again rely on the fraud-on-the market presumption to establish reliance.  ¶¶ 730-731. "In a fraud-on-the-market case, an omission is actionable under section 10(b) and Rule 10b-5 only if

MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

1   the allegedly undisclosed information *has not already entered the market*."  *Heliotrope Gen., Inc. v.*

2   *Ford Motor Co.*, 189 F.3d 971, 975 (9th Cir. 1999).  "If the market has become aware of the allegedly

3   concealed information, the facts allegedly omitted by the defendant would already be reflected in the

4   stock's prices and the market will not be misled."  *Id*. at 975-76.  Under these circumstances, "the

5   element of reliance will not be satisfied, and plaintiff's claims based on a fraud on the market theory

6   will fail."  *Id*. at 976.

7          Here, *The Guardian* article published in December 2015 reported that Kogan collected user

8   data through his app and then sold certain of that data to Cambridge Analytica in violation of

9   Facebook's policies, and that Cambridge Analytica in turn used Kogan's data to create psychological

10  profiles of voters for the purpose of assisting political campaigns.  ¶¶ 5, 152-153; *see also* Ex. 9.  Other

11  mainstream news sources amplified *The Guardian* article and reported additional details about

12  Cambridge Analytica's misuse of Facebook user data.  2020 Order at 64 (describing articles published

13  in *The Wall Street Journal* and *The Washington Post*); *see* Exs. 10, 14-16, 18-19.  Because "the content

14  of [the] articles, as well as the credibility and wide circulation of their respective sources," ensured that

15  the market was aware of the allegedly omitted information about third party misuse of Facebook user

16  data, Plaintiffs are not entitled to a presumption of reliance under the fraud-on-the-market doctrine.

17  *See In re Kalobios Pharms., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1009 (N.D. Cal. 2017) (Davila, J.)

18  (rejecting fraud-on-the-market presumption when allegedly omitted information about defendant's

19  reputation was well documented in the press); *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1114-

20  16 (9th Cir. 1989); *Heliotrope*, 189 F.3d at 976-78; *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409-

21  10 (9th Cir. 1996).  The Court should re-affirm its holding that Plaintiffs fail to plead reliance for all

22  of the statements allegedly rendered false by omission of this information.  2020 Order at 64.

23  **F.      Plaintiffs Fail to Plead Claims Under Sections 20(a) Or 20A**

24         Because Plaintiffs fail to plead a primary violation of the Exchange Act, both the Sections 20(a)

25  and 20A claims must be dismissed.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir.

26  2002).

27                              **IV.      CONCLUSION**

28         For the foregoing reasons, the TAC should be dismissed with prejudice.

Gibson, Dunn &
Crutcher LLP

1    DATED:  December 18, 2020                  GIBSON, DUNN & CRUTCHER LLP

2                                               By: _____/s/ *Orin Snyder*_____
3                                                   Orin Snyder
                                                    200 Park Avenue
4                                                   New York, N.Y. 10166-0193
                                                    Tel: 212.351.4000
5                                                   Fax: 212.351.4035
                                                    osnyder@gibsondunn.com
6
                                                    Joshua S. Lipshutz
7                                                   1050 Connecticut Avenue, N.W.
                                                    Washington, D.C. 20036-5306
8                                                   Tel:  202.955.8500
                                                    Fax:  202.467.0539
9                                                   jlipshutz@gibsondunn.com
10
                                                    Brian M. Lutz
11                                                  555 Mission Street
                                                    Suite 3000
12                                                  San Francisco, CA 94105-0921
                                                    Tel: 415.393.8200
13                                                  Fax: 415.374.8306
                                                    blutz@gibsondunn.com
14
                                                    Paul J. Collins
15                                                  1881 Page Mill Road
                                                    Palo Alto, CA 94304-1211
16                                                  Tel:  650.849.5300
                                                    Fax:  650.849.5333
17                                                  pcollins@gibsondunn.com
18
                                                    *Attorneys for Defendants Facebook, Inc.,*
19                                                  *Mark E. Zuckerberg, Sheryl K. Sandberg,*
                                                    *and David M. Wehner*
20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD