# Exhibit 5

**facebook**

Damian Collins
Chair, Digital, Culture, Media and Sport Committee
House of Commons
London
SW1A 0AA

14th May 2018

Dear Mr Collins,

Thank you for your letter of 1st May following the testimony of Facebooks Chief Technology Officer Mike Schroepfer.

In your letter you listed 39 points where the Committee felt our answers were unsatisfactory or where during the hearing we offered to provide further information. This letter contains our response to those 39 points. Where appropriate we have included references to the transcript of Mr Schroepfer's testimony showing where he answered a number of these points at the time.

**<u>Questions</u>**

***1. What is the percentage of sites on the internet on which Facebook tracks users?***

Facebook provides a number of different tools that third parties, such as website owners and publishers, can choose to integrate into their services.  These technologies have a range of purposes: Facebook social plugins, such as the Like button and Share button, enrich users' experience of Facebook by allowing them to see what their Facebook friends have liked, shared, or commented on across the Web.  Facebook also offers the Facebook Pixel, which allows third parties to understand how people are engaging with their content  and better reach people who use or might be interested in their products and services.

We receive information when a site or app that use these Facebook technologies is visited. Specifically, our servers log (i) standard browser or app records of the fact that a particular device or user visited the website or app (this connection to Facebook's servers occurs automatically when a person visits a website or app that contains our technologies, such as a Like button, and is an inherent function of Internet design); and (ii) any additional information the publisher of the app or website chooses to share with Facebook about the person's activities on that site (such as the fact that a purchase was made on the site).
(See https://www.facebook.com/policies/cookies). Facebook requires third parties using these technologies to do so in accordance with all applicable laws including, where applicable, obtaining appropriate valid consent from the end user.

# facebook

As explained by Mr Schroepfer (Q2103), many companies offer these types of services and, like Facebook, they also get information from the apps and sites that use them.  He explained, for example, that Parliament's website www.parliament.uk  collects and shares browser and cookie information with six different companies- Google, LinkedIn, Twitter, Hotjar, Pingdom and Facebook- so when a person visits Parliament's website, it sends information about their visit to each one of those third parties. Twitter, Pinterest and LinkedIn all have similar Like and Share buttons to help people share things on their services. Google has a popular analytics service. And Amazon, Google and Twitter all offer login features. These companies — and many others — also offer advertising services. In fact, most websites and apps send the same information to multiple companies each time you visit them.

Between 9 April and 16 April 2018, the Facebook Like button appeared on 8.4M websites, the Share button appeared on 931K websites, and there were 2.2M Facebook Pixels installed on websites. We do not know the total number of websites in the world in order to express this as a percentage.

*2. Did the Internet Research Agency use custom audiences? What targeting tools did the IRA use for their advertising? Did they have a custom audience for state-by-state campaigns/races in the USA? Did they use look-alike audiences from Facebook as part of their advertising spend?*

The vast majority of Internet Research Agency adverts did not use custom audiences to target the ads we identified that were run in the United States between June 2015 and August 2017. In the limited cases when it did run ads using custom audiences in its targeting, the IRA used either a Website Custom Audience or Lookalikes. The former enables advertisers to target people on Facebook that have visited their website, through use of the Facebook pixel. The Lookalike audience tool enables advertisers to reach new people on Facebook who are similar to members of an existing audience. In addition, we found that the IRA did not use Data File Custom Audiences (DFCAs), which is the only type of custom audience that is created based on data provided by the advertiser. Advertisers create DCFAs by uploading a data file with a list of people for whom they have contact information, such as email addresses and phone numbers. Once the file is uploaded, the data is hashed (to safeguard the privacy of the people involved). Facebook then uses the hashed data to find matches with Facebook users to create the audience.

*3. What is Facebook's definition of a political advertisement? What budget does Facebook put behind examining the parameters and use of political adverts?*

The precise definition of what constitutes a political advert will vary by location reflecting local laws and regulations. In the UK, the Electoral Commission provides relevant guidance (for example, regarding what constitutes campaigning in a referendum, and what constitutes political campaigning). As part of preparing to roll out our political advert transparency measures in the UK we will be working with the Commission (together with other relevant UK stakeholders and experts) to develop appropriate definitions for the UK.

**facebook**

Our advert transparency measures are aimed at identifying both adverts placed by or on behalf of a politician or candidate, as well as adverts aimed at influencing opinion on political issues. As confirmed to the Committee by Mr Schroepfer, our intention is for Facebook's new transparency measures to be in place in the UK in time for the UK local elections in 2019, if not before.

A key stage of our transparency efforts — the view ads tool — will become available in the UK in June of this year. This will enable people in the UK to see all of the ads every advertiser is running on Facebook at the same time.

In time for the local elections in May 2019, we will require those seeking to run political adverts to complete an authorization process to help ensure ads are coming from authentic accounts and when they run they will be required to display who paid for them. They will be placed in a searchable archive that would include the ads themselves and certain information about them (such as how many times an ad may have been seen, how much money was spent on them, and what kinds of people saw them).

Our teams are dedicating considerable time, effort and resources to addressing advertising transparency, particularly with respect to political adverts. While there is no single budget figure, this is a critical engineering and business priority and teams from across our companies have and will continue to tackle these issues with urgency.

### 4. How many developers did your enforcement team at Facebook take action against between 2011-2014?

Due to system changes, we do not have records for the time-period before 2014 that establish the number of apps we terminated for developer violations. However, we regularly take action against apps. For example, in 2017, we took action against about 370,000 apps, ranging from imposing restrictions on certain features to removal of the app from the platform. And beginning in 2014, Facebook proactively reviewed all new apps seeking to access anything beyond basic data fields and has rejected more than half of apps (about 299,000 apps in total) seeking those permissions.

### 5. Does the NDA signed with Dr Kogan prevent legal action being taken? What was the date of the agreement? Was there a payment made to Dr Kogan?

As stated by Mr Schroepfer (Q 2322), a formal agreement was signed by Dr Kogan on 24 June 2016 in respect of his obligations to delete Facebook user data and obtain certifications from other third-parties to whom he provided some data (SCL, Eunoia Technologies (a company founded by Christopher Wylie), and a researcher at the Toronto Laboratory for Social Neuroscience at the University of Toronto). A copy of the agreement is enclosed.

**facebook**

This agreement with Dr Kogan contained a standard confidentiality clause. No payment was made by any party in connection with the agreement. As Mr Schroepfer also explained, we want Dr Kogan to be able to be open about these events and have waived this confidentiality obligation.

### 6. Who was the person at Facebook responsible for the decision not to tell users affected in 2015?

The information that surfaced in December 2015 reported that Dr. Kogan may have shared data that he obtained lawfully from users on Facebook's platform with a third party (Cambridge Analytica) in violation of our developer policies.  Dr. Kogan's violation of our policies did not trigger a legal notification obligation by Facebook, both because the data shared with Dr. Kogan's app was authorized by users and because of the nature of the information itself — consisting of information people shared publicly or with their friends on Facebook (generally not passwords, financial data, or other data requiring notification under laws in place at the time).

Accordingly, our focus in December 2015 was to ensure that Dr Kogan and anyone with whom he had shared data promptly deleted all data.  We retained an outside law firm to investigate and take action against Dr Kogan.  We obtained certifications from Dr Kogan and others he shared data with assuring us that all variants of the data had been deleted.  We also promptly removed Dr Kogan's app from the Facebook platform. An audit of Cambridge Analytica and the other parties involved would likely be the most effective way of seeking to determine what data was in fact shared and whether it was deleted at the time.

Because we are taking a broader view of our responsibilities that go beyond our legal obligations, we have since notified all people potentially impacted with a detailed notice at the top of their News Feed. In doing so, we have likely notified many people who did not have their data passed to Cambridge Analytica. Not only did we take an expansive methodology to identify users whose information may have been shared with Dr Kogan's app, but we also notified all potentially affected users outside the United States, despite Dr Kogan's statements — including to the Committee — that he only passed information relating to US users to Cambridge Analytica.

### 7. Who at Facebook heads up the investigation into Cambridge Analytica, including all the strands of the investigation?

Our legal team, led by General Counsel Colin Stretch, is leading the investigation into Cambridge Analytica.

**facebook**

### 8. Has Joseph Chancellor signed an NDA?

As stated by Mr Schroepfer (Qs 2192-2194), Joseph Chancellor has not signed a non-disclosure agreement with Facebook relating to this issue.  All employees of Facebook (as with many businesses) are required to sign a standard confidentiality agreement as part of their employment, and Mr Chancellor is no exception.

### 9. Agreement to provide documentation that Cambridge Analytica had certified the deletion of the data.

A copy of the certifications from those to whom Dr Kogan said he gave the data are enclosed.

### 10. What was the number of paid adverts from the IRA during the US election?

After the 2016 US election, we found that fake accounts associated with the IRA spent approximately $100,000 on around 3,500 Facebook and Instagram adverts between June 2015 and August 2017. All adverts have been published by the US House of Representatives  and are available here: https://democrats-intelligence.house.gov/facebook-ads/social-media-advertisements.htm.

### 11. From which country did the $2 million that AIQ spent on ads come?

According to its advertiser registration, AIQ was based in Canada.  However, in order to run adverts on behalf of Vote Leave and other UK referendum campaigners, AIQ would have required access to be granted to their Facebook pages by the respective campaigns.  In other words, the VoteLeave and other campaigns explicitly granted access to AIQ to be an administrator of their pages.

From our internal investigation so far, to run adverts on Facebook, AIQ incurred approximately $1.6 million USD to run adverts from the Vote Leave Facebook Page; approximately $329,000 USD to run adverts from the BeLeave Facebook Page; approximately $51,500 USD to run adverts from the Veterans for Britain Facebook Page; and approximately $32,700 USD to run adverts from the DUP Vote to Leave Facebook Page.

### 12. How many UK Facebook users and Instagram users were contacted by non-UK entities during the EU referendum?

Many Facebook and Instagram users are frequently in contact with friends and family in other countries, and may read foreign media, or may follow celebrities or public figures abroad.

Many referendum campaigners have at some point used foreign consulting or advertising agencies. Our understanding is that all registered campaigners need to report details of their suppliers during the referendum period to the Electoral Commission. The Electoral Commission then publishes these suppliers' details on the public register available on its website.

# facebook

Regarding alleged coordinated foreign activity during the EU Referendum, we have previously addressed the Committee's questions on Russian interference (in our letters of 17 January and 28 February 2018). We found a few adverts connected to the IRA which ran during the regulated period of the EU Referendum campaign – 15 April to 23 June 2016 - that were shown to a small number of people in the UK. As requested by the Electoral Commission we shared information about how much was spent by the IRA to reach UK voters during this period. This amounted to around 1 USD. We also provided copies of the Adverts to the Electoral Commission.

The release of the set of IRA adverts by the US House of Representatives, which shows a significant amount of activity by the IRA with only a handful of their adverts listing the UK as a possible audience, confirms the position we shared with the Electoral Commission and the Committee.

***13. How many clicks or swipes does it take to alter your Facebook privacy settings on a smartphone? What steps are you taking to reduce the lengthy process of changing one's privacy settings?***

We have recently rolled out changes to our settings. To access Privacy Settings in our updated menu, it only takes three clicks. First, users click on the three bars at the bottom of the app. Then, they click on "Settings & Privacy." Finally, they can click on either "Settings" to access the full suite of core Facebook settings, including privacy, or they can go straight to the "Privacy Shortcuts" menu to access core privacy settings.








# facebook

During our preparations for GDPR, we heard feedback from regulators, policymakers, and users that-- while it's important we offer many granular privacy settings—they are too distributed across the platform and should be centralised in one place. We took this feedback on board and, following a significant engineering and design effort, we also created an updated Settings menu where users have easy access to all the core Facebook settings in one place. Now, instead of having settings spread across 20 different places on Facebook, users can go to one place.

The updated menu is now clearer, more visual and easier to find. From this one place, users can now make their account more secure, control their information, control the ads they see, and manage who sees their posts and profile information.

***14. What proportion of political campaigning ads globally are run on your platform? Do you have a rough estimate, based on average political campaign spend data?***

We are not aware of any data on total political advertising spend globally - whether online or otherwise - which would be required in order to estimate what proportion of that advertising is placed on Facebook, nor do we have a reliable way today to know what adverts previously run on our platform are "political".  As Mr Schroepfer stated (Qs 2262-2263), Facebook does not monitor market share of political advertising or have the means to do so.

***15. What data on dark ads do you have?***

We understand dark ads to refer to adverts that an advertiser targets to a specific audience but that are not otherwise viewable on Facebook (outside the audience for the adverts).

In general, Facebook maintains for paid advertisers data such as name, address, and banking details. We also maintain information about advertiser's accounts on the Facebook platform and information about their ad campaigns (most advertising content, run dates, spend, etc.). Advertisers do not however obtain information from Facebook which personally identifies recipients of their ads.

We believe that the Committee's concerns will be addressed by the new feature which we've been testing in Canada called "view ads".  This is a key step in our commitment to advert transparency, and lets anyone see all the adverts a Page is running on Facebook — even if they are not in the audience for the advert and even if the user does not follow the Page running the adverts. This will apply to all advertiser Pages on Facebook — not just Pages running political adverts. We plan to launch "view ads" globally in late June of this year.

Users are also always able to see who is showing them adverts and how they are being targeted, including by clicking the drop-down menu available in any advert and selecting "Why am I seeing this?".  This tells the user who the advertiser is and provides them with an explanation of how he or she has matched the advertiser's targeting criteria. If users do not wish to see

# facebook

further adverts from the advertiser concerned, they can then choose "Hide ad". Users can also "Report Ad" from this drop-down menu, including because the user considers the advert to be misleading or a false news story. Through this drop-down they are also directed to their Ad Preferences and Ad Settings where they can see and amend the interests on which advertisers can target them; see and amend the advertisers that are able to target them as a result of previous interactions; and opt out of receiving adverts based on data from third-party partners.

***16. Is it possible for Facebook to view pages set up during elections (e.g. the EU Referendum campaign) that host dark ads, and then are taken down a day later? Is it possible that no-one would ever be able to audit these dark ads, as no one (not even Facebook) would see them during the time they are online?***

We refer you to our answer to question 15 above regarding the information we retain in relation to adverts and advertisers on our platform, including when the underlying Page is deleted.

We are also working to further increase ads transparency specifically around political advertising.  Advertisers running advertisements for political adverts on Facebook and Instagram will be required to be authenticated before they can run political adverts. In addition, political adverts will be accompanied by "paid for by" information.  We will also release a public, searchable archive of adverts with political content, which will include adverts that are deleted or run for a short time. We are working to roll this out in the UK before the local elections in May 2019.

It is important to note that the systems that will identify electoral and issue adverts subject to our new ads transparency policies are in the process of being developed and will not be perfect. We are invested in continuing to develop and refine these systems as fast as we can to improve accuracy in identifying ads subject to these requirements.

***17.  Was there any link between the US elections and the 2017 purge of fake accounts?***

The 2017 purge of fake accounts that was referenced by the Committee (Qs 2288 - 2297) relates to steps we took to disrupt a specific spam operation (see https://www.facebook.com/notes/facebook-security/disrupting-a-major-spam-operation/10154327278540766).  The operation was made up of inauthentic likes and comments that appeared to come from accounts located in Bangladesh, Indonesia, Saudi Arabia, and a number of other countries. We are not aware of a connection to the 2016 US elections.

**facebook**

**18. What proportion of the fake accounts you purged had any involvement from Russia?**

We are not aware of links between the spam operation referenced in Q 17 and the Russian government.

Outside of the 2017 "purge", in our review of the 2016 US election we found that the Russian Internet Research Agency had set up a network of hundreds of fake accounts to spread divisive content and interfere in the US presidential election. We began investigating their activity globally and taking down their Pages and accounts. In Autumn 2017, we removed 470 fake IRA accounts and Pages. In April 2018, we removed more than 270 further accounts and Pages operated by the Internet Research Agency.

**19.  Do you know how many developers were using and selling data on to third parties such as GSR? Is GSR the only company that has received letters from Facebook, demanding that they delete their Facebook data?**

To clarify, GSR is a company established by Dr Kogan — the developer of the thisisyourdigitallife app.  We understand that Dr Kogan/GSR transferred data at some point to third-parties that include Christopher Wylie (and his company) and Cambridge Analytica/SCL Elections.  We obtained certifications of deletion from each of those third parties.

We are in the process of investigating every app that had access to a large amount of information before we changed our platform in 2014. If we find suspicious activity, we will take steps to investigate or take enforcement actions against the app. If we determine that there has been an improper use of data shared with third parties, we will ban those developers and notify everyone affected.

**20. What kind of developer activity leading up to 2014 led to Facebook's major policy changes related to sharing friends' data? (Please give specific examples.) Were these changes responding to genuine concerns among Facebook users?**

In early 2014, Facebook introduced changes to provide users more choice and control over what information apps received, to reduce the amount of data that could be shared with third-party apps, and to establish a new review and approval process for any new apps that sought to request anything more than basic information about the installing user. We announced these changes because, among other things, we learned that consumers wanted more control over their information. These changes accompanied a new version of the platform API, called Graph API V2, which incorporated several key new elements. The changes included:

- Institution of a review and approval process, called App Review (also called Login Review), for any app seeking to operate on the new platform that would request access to data beyond the user's own public profile, email address, and a list of friends of the user who had installed and authorised the same app;

# facebook

- Limiting the data that apps on the new platform could access about friends of the installing user; and
- Providing users with even more granular controls over the categories of their data an app operating on the new platform could access.

We are in the process of restricting the data available to apps even more severely, so that the only data that an app will be able to request without App Review will be name, profile photo, and email address.

### 21. How many Facebook staff have been added to the app review team since 2014?

We work continuously to make our platform safer and more secure, and our effort to do so is a holistic one that often involves hiring additional employees as well as continually evaluating our processes and policies. Facebook has several groups dedicated to detecting, investigating and combating violations of its policies. Those efforts have expanded and evolved over time. For example:

- Our Developer Operations team reviews Facebook apps requesting detailed personal information for policy violations. The Developer Operations Policy Enforcement team looks for policy violations and either brings developers into compliance or removes them from the platform. The Developer Operations Review team conducts an upfront review of apps to confirm proper use of advanced permissions.
- Our Security teams make sure the worst actors and abusers are dissuaded from targeting our products, communities, and company. The teams also stay abreast of trends in attacks and are composed of investigators, analysts, and security engineers.
- Our Platform Integrity team builds systems and automation to detect and enforce misbehaving platform applications, with a focus on commercial spam. The team detects and fixes Developer Platform security gaps, and redesigns platform products to make them harder for bad actors to abuse.

We have and will continue to add more people and resources to our Developer Operations team, as well as other teams that work on privacy, safety, and security at Facebook. This year we are doubling the number of people who work on safety issues overall from 10,000 to 20,000, and that includes content reviewers, systems engineers and security experts. We are on track to hit this goal.

### 22. What is the legal situation regarding Facebook storing non-Facebook users' data?

When a person who is not a registered user of Facebook visits a site or app that uses our services and accepts the use of Facebook cookies (or similar technologies), we receive logs of this visit in the same manner described in response to question 1 above. This is an inherent feature of how the Internet works and occurs automatically by virtue of the fact that the person's device contacts

**facebook**

Facebook's servers in order for the Facebook buttons and other features on those sites to work. The information received in this manner allows Facebook to identify a specific browser; however, when the person visiting the website or app is not a Facebook user, we do not receive any information that would allow us to identify the individual using that browser.

Facebook's processing of such data for non-users complies with all applicable laws. Our privacy policy (https://www.facebook.com/policy.php) explains in detail what we do with the information we receive, and makes clear that we may collect data from people away from Facebook who are logged out or don't have a Facebook account. Our Cookies Policy (https://www.facebook.com/policies/cookies/) provides more detailed information about how and why we use cookies and the controls that people have. And we comply with applicable EU laws by obtaining consent from European users before dropping cookies that are not strictly necessary by displaying a cookie banner to every browser visiting Facebook for the first time to notify users about our cookie use as follows: *"To help personalise content, tailor and measure ads and provide a safer experience, we use cookies. By clicking on or navigating the site, you agree to allow us to collect information on and off Facebook through cookies. Learn more, including about available controls: Cookie Policy."*

In order for third parties to use our Facebook technologies in their websites or apps, it is also a contractual requirement that they do so in accordance with applicable laws and that where necessary they obtain valid consent or have another legal basis to share browser or app logs with Facebook from their service.

### 23. Did Facebook pass user information to Cambridge Analytica or to Aleksandr Kogan?

No, Facebook did not pass user information gathered by Dr Kogan's app to Cambridge Analytica. As Mr Schroepfer explained to the Committee (Q 2389), Facebook provided tools that let users share their data and their friends' data with Dr Kogan's app, and Dr Kogan in turn appears to have shared some of that data with Cambridge Analytica and other third parties.

### 24. At the 8 February evidence session, Chris Matheson asked Simon Milner, "Have you ever passed any user information over to Cambridge Analytica or any of its associated companies?" Simon Milner replied "No". Chris Matheson asked, "But they do hold a large chunk of Facebook's user data, don't they?" Simon Milner said, "No. They may have lots of data, but it will not be Facebook user data. It may be data about people who are on Facebook that they have gathered themselves, but it is not data that we have provided." [Qq 447-448] Do you agree with this answer?

This question was answered in Mr Schroepfer's evidence to the Committee (Q2407-2419, Q2429-2430). Additionally, we should point out that the quotation contained in this question is an incomplete representation of the evidence that Mr Milner gave on 8 February 2018 (see http://data.parliament.uk/writtenevidence/committeeevidence.svc/evidencedocument/digital-

# facebook

culture-media-and-sport-committee/fake-news/oral/78195.pdf). That evidence also included the following relevant clarification regarding the statements you have quoted:

*Q473 Chair: [...] I just have a couple of clarification questions I want to ask before we finish. Going back to the discussion on Facebook developers, Mr Milner, you said that it was not true that developers had Facebook user data— but they had data about people on Facebook. I just wondered what the difference was between those two things.*

*Simon Milner: I suppose I was initially assuming that Mr Matheson was saying "Have you provided data? Has Facebook provided data to Cambridge Analytica or some other outside entity?" We do not provide your data to anyone without your permission; but the developer, the system that Ms Bickert was talking about, does allow people to decide, "I am prepared to let them have some of my Facebook data in order to get a service from them." I am sorry if I implied—*

As explained above, we found out in December 2015 that Dr Kogan may have transferred data obtained from Facebook users by his app to Cambridge Analytica.  Any data Dr Kogan shared with Cambridge Analytica took place independently, outside of Facebook's platform (and we still have not been able to verify what sharing, if any, occurred because we have been holding off on our forensic audit of third parties at the request of the Information Commissioner's Office). Facebook did not permit or agree to that transfer and it happened in breach of Facebook's Platform Policy. On learning this, we acted promptly to terminate Kogan's app from our platform and demanded that Dr Kogan and GSR, as well as the other entities to whom they confirmed they had disclosed data obtained via the app, account for and irretrievably delete all such data. Facebook obtained written certifications from Dr Kogan, GSR, and other third parties (including SCL and Christopher Wylie) declaring that all such data they had obtained (including derivative data) was accounted for and destroyed. These deletion certifications were all obtained many months prior to Mr Milner's testimony; and Mr Milner's testimony is consistent with their contents and our understanding of the facts at that time.

In March 2018, after Mr Milner's testimony, Facebook received information from the media suggesting that the certifications we received may not have been accurate. We immediately banned SCL and Cambridge Analytica from our advertising platform and have since been investigating. As part of our investigation, we have hired a forensic auditor to understand what information Cambridge Analytica had and whether it has been destroyed. That is the most effective way to know whether Cambridge Analytica still has the data it obtained from Kogan. We paused the audit in response to the UK Information Commissioner's Office request, so that they can pursue their investigations first.

# facebook

**25. At the time of Simon Milner's testimony in February 2018, who at Facebook knew about Cambridge Analytica? Who was in charge?**

It was not until March 2018, after Mr Milner's testimony, that Facebook learned of allegations from the media that, contrary to their assurances, Dr Kogan and Cambridge Analytica did not delete data about Facebook users that Dr Kogan obtained through his app. At that point, a number of people at Facebook became aware of these allegations, and we commenced a company investigation involving hundreds of different people, ultimately managed by our General Counsel, Colin Stretch.

**26. When did Mark Zuckerberg know about Cambridge Analytica?**

Mr. Zuckerberg did not become aware of allegations that Cambridge Analytica may not have deleted data about Facebook users obtained through Dr. Kogan's app until March of 2018, when these issues were raised in the media.

**27. Can you tell us about the financial links between SCL and Cambridge Analytica?**

We will provide separately our confidential letter to the Electoral Commission which addresses this issue.

**28. How much money has been made from fraudulent ads (for example - but not limited to - the recent case of financial expert Martin Lewis?) When you find out they have been fraudulent, do you return the money to the purchaser of the ads?**

Fraudulent ads are not allowed on Facebook. They are in breach of our advertising policies and we will remove them. We have been working with Mr Lewis's team for some time and have removed a large number of ads that feature him and violate our Ads policies. To make all of this happen automatically, as has been suggested, is technically challenging. We are constantly working on improving our machine learning tools to better detect fraudulent or misleading ads and prevent them from appearing on Facebook, and we are making good progress in this area.

Where we discover adverts that violate our policies or applicable laws, we do not generally return money and it would seem perverse to return it to someone attempting to deceive our users. Instead, we make investments in areas to improve security on Facebook and beyond. In addition, the investments that we are making to address security issues are so significant that we have informed investors that we expect that the amount that we will spend will impact our profitability.

# facebook

**29. Can we see copies of adverts from AIQ? Who saw these adverts shown to? Who paid for them?**

As explained in Q11 above, AIQ incurred approximately $2 million USD advertising on Facebook for a number of EU referendum campaigners. We are in the process of identifying and compiling the content and additional information for these adverts. We have also notified the campaigns who commissioned these adverts that the Committee has asked to see their content. We understand that you intend also to speak to the campaigns as part of your inquiry and will be able to put questions about their advertising, strategy and funding directly to them.

**30. Why wasn't GSR identified during audits of third party developers?**

Dr Kogan signed a certification on behalf of his company, GSR, confirming that it had deleted all Facebook data obtained through his app.  So GSR was one of the parties that signed a certification following our December 2015 investigation.

**31. How can the feature allowing users to edit previews of articles (in response to concerns over Fake News) be removed?**

We agree that allowing users to edit link previews can be abused to contribute to fake news and so we removed this ability in 2017, as part of our continuing efforts to stop the spread of misinformation on our platform. This remains disallowed for most people who share content on Facebook. However, conscious of the needs of publishers on our platform, we have provided a means for publishers to indicate their ownership of links and continue to be able to edit how their own links appear on Facebook. We allowed this because we know that media pages use this feature daily to customise and post links which they own.

**32. What work is Joseph Chancellor doing right now for Facebook? What is his job title? Was Facebook aware of Joseph Chancellor's involvement in GSR at the time of his application to the company, or during his employment?**

Mr Chancellor is a quantitative researcher on the User Experience Research team at Facebook, whose work focusses on aspects of virtual reality. We are investigating Mr Chancellor's work with Dr Kogan/GSR through counsel. The remainder of this question was answered by Mr Schroepfer (Qs 2186 - 2199, 2489).

**33.  Mr Schroepfer said that recruitment is taking place to boost work being done in Myanmar. When is this happening and can you provide more details?**

We've been too slow in Myanmar to deal with the hate and violence. We are investing in people, technology and programs to help address these very serious challenges.

**facebook**

Specifically, our work has been focused on:

**Policies - removal of hate speech and repeat offenders:** We have clear rules against hate speech, harassment and fake accounts. This content has no place on Facebook, and we work hard to keep it off our platform. Our Community Standards (https://www.facebook.com/communitystandards) prohibit hate speech that targets people based on their race, ethnic identity or religion. We remove violating content when it's reported. We have also designated several hate figures and hate organisations in Myanmar. These include Wirathu, Thuseitta, Ma Ba Tha, and Parmaukkha. This means they are not allowed a presence on Facebook, and we will remove accounts and content which support, praise or represent these individuals or organisations.

**People - more Myanmar dedicated resources:** In the past two years, we have added dozens more Burmese language reviewers to handle reports from users across our services. We have also increased the number of people across the company working on Myanmar-related issues and we now have a special product team working to better understand the local challenges and build the right tools to help keep people in the country safe. We are hiring more staff dedicated to Myanmar, including Burmese speakers and experts.

**Products - tools and technology to help detect and remove content and accounts that violate our policies:** We have improved the way we detect fake accounts on our service — including ones that are hard to spot. Specifically, our technology is able to more effectively recognise fake accounts by identifying patterns of activity — without assessing the content itself. For example, our systems may detect repeated posting of the same content or an increase in messages sent.

**Partnerships - digital literacy education with local partners:** We launched a local language version of our Community Standards (https://www.facebook.com/safety/resources/myanmar) to educate new users on how to use Facebook responsibly in 2015 and we have been promoting these actively in Myanmar, reaching over 8 million people through promotional posts on our platform alone. We've also rolled out several education programs and workshops with local partners to update them on our policies and tools so that they can use this information in outreach to communities around the country.

One example of our education initiatives is our work with the team that developed the Panzagar initiative (https://www.facebook.com/supportflowerspeech) to develop the Panzagar counter-speech Facebook stickers to empower people in Myanmar to share positive messages online. We also recently released locally illustrated false news tips, which were promoted on Facebook and in consumer print publications. We have a dedicated Safety Page for Myanmar (https://www.facebook.com/safety/resources/myanmarand) and have delivered hard copies of our local language Community Standards and safety and security tips to civil society groups in Myanmar who have distributed them around the country for trainings.

# facebook

*34. What is the average time taken to respond to content that has been reported to Facebook in the region?*

User content reports are reviewed by our Community Operations team who work around the globe 24 hours a day, seven days a week. The vast majority of the content reported to us is reviewed within 24 hours. It can be even faster for specific types of content such as credible threats or suicide prevention, as we optimise our processes to make sure that our team of experts handles these sensitive reports as quickly as possible.

*35. How many fake accounts have been identified and removed in Myanmar?*

We don't break down the removal of fake accounts by country. We will however be publishing our transparency report this week which will include information about the prevalence and removals of fake accounts globally.

*36. How much of your revenue is derived from Myanmar?*

Myanmar is a small market for Facebook. We do not publish country advertising revenue figures.

*37. Are custom audiences used as a tool by AIQ using the GSR data from the US? What was the total value of AIQ/Vote Leave spend on Facebook? Can we see examples and copies of adverts that they used? To whom were they sent, and who decided what kind of targeting to use?*

This question has been answered in our response to Qs 11 & 29 above.

*38. Is there evidence that CA/SCL shared data with AIQ?*

From the investigations we have conducted to-date we have found no evidence that AIQ used data obtained from Dr. Kogan's app to advertise on our platform for the purposes of the EU referendum. Specifically, as Mr. Schroepfer explained in his written submission to the Committee:

- Many of the Referendum-related ad campaigns AIQ ran on Facebook employed Data File Custom Audiences (DFCA) to target Facebook users. Advertisers create DCFAs by uploading a data file with a list of people for whom they have contact information, such as email addresses and phone numbers. Once the file is uploaded, the data is hashed. Facebook then uses the hashed data to find matches with Facebook users to create the audience. DFCAs are the only method through which an advertiser can input its own data to  attempt to identify specific Facebook users for ad targeting.  However, all of the DFCAs AIQ created used  email addresses to match to the individuals from the data file AIQ uploaded with Facebook users. The data gathered through Dr. Kogan's app did not

**facebook**

include the email addresses of app installers or their friends. This means that AIQ could not have obtained these email addresses from the data Dr. Kogan's app gathered from Facebook. AIQ must have obtained these email addresses targeted in these campaigns from a different source.

- We also conducted an analysis of the DFCAs employed by AIQ in its Referendum-related ads, on the one hand, and UK user data potentially collected by Dr. Kogan's app, on the other hand, and found very little overlap (fewer than 4% of people were common to both data sets, which overlap we believe to be consistent with random chance). As a result, we have no evidence This suggests that data from Dr. Kogan's app was not used to build AIQ's targeting data sets in connection with these Referendum campaigns.  Only AIQ has access to complete information about how it generated these data sets.

### 39. Why was data responsibility moved from Facebook Irl to Facebook Inc in California just one month before GDPR kicks in?

Mr Schroepfer answered this question at the hearing (Q2372-2374). All users in the EU will continue to be provided with the Facebook service by Facebook Ireland, who remains the data controller for EU user data. Facebook Inc. will provide the Facebook service to people outside of Europe, which is not a change for many parts of the world.  This ensures that we can continue to be responsive to local regulatory concerns, without an obligation to work through an EU-based Lead Supervisory Authority for people outside of Europe (under provisions in the GDPR, the Irish Data Protection Commissioner would be the lead supervisory authority responsible for all people receiving services from Facebook Ireland, a controller based in the Union).  We've received strong feedback from regulators and judicial systems outside of Europe that they want us to be directly responsive to them and not be required to go through Europe on data protection matters.

This also allows us to customize our terms and data policy to reflect regional norms and legal frameworks.  For example, the Facebook Ireland terms and data policy describe the legal basis that applies to each form of data processing, but this is not a concept that has any relevance outside of Europe.  Likewise, we are providing different versions of our Facebook Inc. terms in different countries.  For example, consumers outside of the United States will be able to bring legal action against Facebook in their home country, whereas people inside the United States are required to bring legal action against Facebook in courts in California.  These changes are now reflected in separate localized terms.

Facebook has now held lengthy meetings or evidence sessions around the world. In the UK we provided written submissions to this inquiry, we have provided senior officials to give evidence to the Committee's session in Washington, one of the most senior people in the company has given 5 hours of testimony in the UK Parliament and today we have answered the 39 further questions provided by the Committee.  We were disappointed after providing a very significant amount of information to the Committee at the last hearing the Committee declared our response insufficient.

# facebook

While Mr Zuckerberg has no plans to meet with the committee or travel to the UK at the present time we continue to fully recognize the seriousness of these issues and remain committed to working with you to provide any additional relevant information you require for your inquiry into fake news. We will also continue to cooperate fully with the relevant regulators.

Yours sincerely

Rebecca Stimson, Head of Public Policy, Facebook UK

**CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE**

---

THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE (the "Agreement" or "Settlement Agreement") is entered into this ___ day of June, 2016 ("Effective Date") by and between Facebook, Inc. ("Facebook") on one side, and Global Science Research Ltd. ("GSR") and Dr. Aleksandr Kogan ("Dr. Kogan") on the other side shall be individually referred to as a "Party" and collectively as the "Parties.

**I.      RECITALS**

WHEREAS, Facebook believes that GSR and Dr. Kogan obtained Facebook user information in a manner and for a purpose that may not have been consistent with or permissible under Facebook terms, conditions and/or policies ("Facebook Terms");

WHEREAS, GSR and Dr. Kogan deny that they violated any Facebook Terms;

WHEREAS, the Parties desire to fully and finally resolve any and all known and unknown claims that may exist, arising out of or related to GSR's and Dr. Kogan's use of the "thisisyourdigitallife" Facebook Application (App ID: 599050663475147) (the "GSR App") to obtain Facebook user information and GSR's and Dr. Kogan's use and sharing of such Facebook user information ("the Matter") on the terms and conditions set forth below and to exchange certain consideration in settlement.

NOW THEREFORE, for and in consideration of the representations, mutual covenants, agreements, and acts set forth below, and for other good and valuable consideration acknowledged by the Parties to be satisfactory and adequate, and with the intent to be fully bound, the Parties hereby agree as follows:

**II.      TERMS**

      **A.      Cooperation, Deletion, Certification**

          **1.**      In Exhibits A1 and A2 attached hereto, GSR and Dr. Kogan have provided Facebook with a complete list of applications, scripts, scrapers, or other methodologies used by GSR or Dr. Kogan or any entity in which GSR or Dr. Kogan has an ownership interest to collect Facebook user information ("Facebook Applications"), including a complete description of the collection, use, sharing, and disclosure of Facebook user information obtained from the Facebook Applications and data derived from such Facebook user information, specifically: a) personality scores and average personality scores; b) derived dimensional scores summarizing information captured in the "likes"; and c) a co-occurrence matrix of likes  (collectively, all such Facebook user information and data derived from such Facebook user information related to the GSR App is referred to herein as "App Data").  Certain information has been redacted in Exhibits A1 and A2.  Neither GSR nor Dr. Kogan derived any other data from such App

Data, except as listed in (a), (b) and (c) in the preceding sentence.  App Data includes data from the Facebook account of the GSR App user as well as Facebook data (i.e. friend's endpoints) from the accounts of the GSR App user's friends that was collected by the GSR App.  Within fourteen (14) business days of full execution of this Agreement, GSR shall provide the unredacted version of Exhibit A1 and Dr. Kogan shall provide the unredacted version of Exhibit A2, with the identity and contact details for persons to which GSR or Dr. Kogan is subject to a written confidentiality obligation being provided on an "attorneys eyes only – outside counsel" basis.  GSR and Dr. Kogan will use best efforts to respond truthfully and completely to Facebook questions that Facebook may have after reviewing the description in Exhibits A1 and A2, provided that neither GSR nor Dr. Kogan shall be required by Facebook to violate any written confidentiality obligations of GSR or Dr. Kogan to any third parties.

2.    GSR and Dr. Kogan will delete all App Data in their possession within fourteen (14) business days of full execution of this Agreement.

3.    Neither GSR nor Dr. Kogan will make use of the App Data or any data provided by Facebook to Dr. Kogan directly for research purposes, including any reference or use in academic papers or manuscripts, without first obtaining Facebook's written permission.  The decision to permit a requested use of App Data or Facebook data shall be in Facebook's sole discretion.

4.    GSR will notify all persons that accessed or received App Data from GSR or Dr. Kogan or with whom either GSR or Dr. Kogan shared or disclosed App Data that all App Data is to be permanently deleted.  GSR will also provide all persons receiving notice with a Certification in the form attached as Exhibit B.  GSR will inform all such persons that this notification shall be completed within fourteen (14) business days following receipt by such persons.

5.    GSR and Dr. Kogan will disclose to Facebook the identity and contact details for all persons notified to delete App Data.  Disclosure of the identity and contact details for persons to which GSR or Dr. Kogan are subject to a written confidentiality obligation shall be provided on an "attorneys eyes only - outside counsel" basis.    This disclosure shall be completed within fourteen (14) business days following full execution of this Agreement.

### B.    Representations and Warranties

a.    GSR and Dr. Kogan represent and warrant that:

1.    the description to be provided by GSR and Dr. Kogan under Section II.A.1 above and the unredacted versions of Exhibits A1 and A2 shall be accurate and complete, to the best of their knowledge.

2.    they will delete all App Data in their possession as provided in Section II.A.2.

3.      they will provide accurate and complete information, to the best of their knowledge, when completing Exhibits A1 and A2.

4.      neither GSR nor Dr. Kogan have provided access to, shared, or disclosed App Data to Philometrics Inc.

5.      Dr. Kogan received no payment related to App Data other than reimbursement for out-of-pocket expenses.

6.      GSR received payment related to App Data from one, and only one, entity.

b.      Facebook represents and warrants that it will not contact or bring any enforcement action against any individual or entity that returns a Certification and agrees to disgorge to Facebook all revenue related to its use, disclosure, or sharing of App Data, unless Facebook obtains information indicating that the certifying party did not delete all App Data or that the entity's Certification is materially inaccurate or materially incomplete.

C.      **No Use of Facebook data**

GSR and Dr. Kogan agree that they will not collect, access, disclose, or share data collected by GSR or Dr. Kogan from Facebook users (other than via the personal Facebook profiles of Dr. Kogan or any GSR members or the GSR business Facebook page) for any purpose, including but not limited to academic research, without first obtaining written permission from Facebook.  All research papers that have been submitted to Facebook for review and approval and which list Dr. Kogan as a contributing author shall be returned to the authors without a determination by Facebook of permissible use, if any.  Any paper that contains co-authors may be resubmitted for review by the co-authors after consultation with Facebook's research management team.

D.      **Confidentiality**

1.      This Settlement Agreement, including all discussions leading to this Settlement Agreement and all of its terms and conditions, shall be held in strict confidence by the Parties.  Neither Party shall disclose, directly or indirectly, the negotiations or terms and conditions of this Settlement Agreement without the other party's express written consent except a) as required for GSR and Dr. Kogan to meet their obligations hereunder respecting communications with third parties, b) to disclose that GSR, Dr. Kogan and the parties returning Certifications have deleted App Data, and c) to attorneys, agents, and advisors under confidentiality obligations.

2.      Facebook shall not disclose, directly or indirectly, the negotiations or terms and conditions of this Settlement Agreement, but may use and disclose information contained in any Certification provided to Facebook or information regarding persons that had access to App Data, if Facebook does not receive a Certification from the person or it becomes aware that the information provided is incomplete or inaccurate.

Information provided to Facebook on an "attorneys eyes only - outside counsel" basis may be disclosed to Facebook, if the entity does not provide Facebook's counsel a completed Certification. Facebook, GSR and Dr. Kogan may also disclose this Settlement Agreement and all information disclosed as part of this Settlement Agreement in the event of a breach of the Settlement Agreement and to the extent legally required in response to a subpoena or other legal process.

### E.     Costs and Attorney Fees

Each Party to this agreement shall be responsible for its own attorney's fees and costs incurred in the Matter.

## III.     DAMAGES, INDEMNIFICATION AND REMEDIES

A.     The Parties acknowledge that it would be difficult to measure accurately the damages from any breach of the terms, conditions, covenants, restrictions, representations, and warranties set forth herein, and that the injury from any such breach would be difficult to calculate.

B.     The Parties therefore agree that if GSR or Dr. Kogan materially breaches any of provisions in Section II, TERMS, and such breach is not cured within thirty (30) days following notice from Facebook, then Facebook may, in its sole discretion, elect to recover actual or statutory damages, or liquidated damages in the amount of U.S. $25,000 from the breaching Party.  The Parties agree that the liquidated damages identified in this paragraph constitute compensation and shall not be considered a penalty.

C.     If Facebook establishes a breach by the other Party of this Settlement Agreement or any of the covenants and restrictions set forth herein, then Facebook shall be entitled as a matter of right to obtain from any court of competent jurisdiction an injunction, without the necessity of posting any bond or other security, prohibiting GSR and Dr. Kogan from any further breaches of this Settlement Agreement.

D.     Facebook shall be entitled to recover reasonable attorneys' fees and costs incurred in enforcing its rights under Section C.

## IV.     Mutual Releases

A.     Facebook, and its agents, partners, representatives, heirs, successors, predecessors, and assigns, and each of them, release and forever discharge  GSR and Dr. Kogan, and its and their agents, partners, representatives, heirs, successors, predecessors, and assigns and attorneys, and any entity in which GSR or Dr. Kogan has an ownership interest that was disclosed in accordance with Section II.A.1, from any and all claims, demands, damages, liabilities, suits, actions, and causes of action whatsoever, whether known or unknown, arising from or related in any way to the Matter, the App Data, or the GSR App, except for the rights and obligations created in and by this Agreement.

B.      GSR and Dr. Kogan, and its and their agents, partners, representatives, heirs, successors, predecessors, and assigns, and each of them, release and forever discharge Facebook, and its agents, partners, representatives, heirs, successors, predecessors, assigns and attorneys from any and all claims, demands, damages, liabilities, suits, actions, and causes of action whatsoever, whether known or unknown, arising from or related in any way to the Matter, the App Data, or the GSR App, except for the rights and obligations created in and by this Agreement.

C.      Except as provided in Section II.B (Facebook warranties), nothing in this Agreement or any statement or action by any Party in connection with this Agreement shall be deemed to constitute a release or waiver of the claims of either Party, to the extent they may exist, against any third party.

D.      Each Party knowingly and intentionally waives any protection afforded to them by California Civil Code §1542, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Each Party further knowingly and intentionally waives any protection under any state counterpart to California Civil Code §1542. Each Party agrees that this Agreement is intended to cover all claims or possible claims arising out of or related to those matters referenced or impliedly covered in the general release referenced above, whether the same are known, unknown or hereafter discovered or ascertained, and the provisions of §1542 of the California Civil Code and any similar laws in other jurisdictions are hereby expressly waived. The Parties hereto expressly acknowledge that they have been advised by their counsel of the contents and effect of such provisions, and with such knowledge they hereby expressly waive whatever benefits they may have pursuant to such provisions.

## V.      MISCELLANEOUS

A.      **Applicable Law -** This Agreement shall be governed by and construed, applied, and interpreted under the laws of the state of California.  Any dispute arising hereunder shall be brought in state or federal court encompassing San Mateo County, California, to which GSR and Dr. Kogan hereby consent to personal jurisdiction for purposes of any dispute brought under this Agreement.

B.      **Complete Agreement –** The Parties understand and acknowledge that this Settlement Agreement encompasses their entire understanding with respect to the settlement of claims and potential claims between them that relate to or arise from the Matter. No other oral or written understandings impact, modify, or supersede the Settlement Agreement.  The terms of this Agreement may be modified in the future only by a written agreement signed by both Parties.

**C.     No Inducement / Consultation with Counsel -** Each of the Parties to this Agreement represent and agree that no promise, inducement, or agreement not herein expressed has been made regarding the Agreement; that in executing this Agreement, they have consulted with and/or had the opportunity to consult with their attorneys, that they have executed this Agreement freely and voluntarily, with full knowledge of all material facts after independent investigation, and without fraud, duress, or undue influence of any kind or nature whatsoever; and that they have read the Agreement and fully understand each and every provision contained therein. Each of the Parties has obtained or has had the opportunity to obtain the advice of independent legal counsel of their choice to assure themselves that the terms and conditions of the Agreement are fair, just and equitable, and consistent with applicable law.

**D.     Counterparts and Signature -** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Facsimile or electronic copies of this Agreement, including execution signatures, may serve as originals. This Agreement may be executed and delivered by each party to the other party via e-mail or facsimile transmission, with such execution and delivery having the same legal force and effect as if the original hereto had been executed and delivered.

**E.     Severability; Unenforceability -** In the event that any term, clause, or provisions of this Agreement shall be construed to be or adjudged invalid, void, or unenforceable, such term, clause, or provision shall be construed as severed from this Agreement and the remaining terms, clauses, and provisions shall remain in effect.

**F.     Waiver -** The waiver by any Party of a breach or default of any provision of this Agreement or any right hereunder shall not constitute a waiver by such party of any succeeding breach of the same or other provision; nor shall any delay or omission on the part of either party to exercise or avail itself of any right, power, or privilege operate as a waiver of any such right, power, or privilege by such Party.

**G.     Binding on Successors and Assigns -** This Agreement shall inure to the benefit of, and be binding upon, the Parties' respective heirs, successors, and assigns.

EXECUTED as of the date first written above by each Party with the intent to be legally bound hereby.

FACEBOOK, INC.                              GLOBAL SCIENCE RESEARCH LTD.

By: _____        By: _____
                                                          *Aleksandr Kogan*

Its: _____        Its: _____
                                                          CEO, Director

                                                 DR. ALEKSANDR KOGAN
                                                          *Aleksandr Kogan*
                                                 _____

EXHIBIT A1

CERTIFICATION

**Global Science Research Ltd.**

I, _____ Aleksandr Kogan _____, on behalf of Global Science Research Ltd. ("GSR" or "Recipient") certifies that all Facebook data gathered by GSR from the "thisisyourdigitallife" Facebook Application (App ID: 599050663475147), including but not limited to Facebook user data and Facebook user friend data and data derived from such Facebook user data and Facebook user friend data ("App Data") has been accounted for and permanently deleted and destroyed from both active and redundant storage that is under GSR's direct or influential control.

1.  The following is a complete list of applications, scripts, scrapers, or other methodologies used by GSR or any entity in which GSR has an ownership interest to collect Facebook user information ("Facebook Applications"):

> "thisisyourdigitallife" Facebook Application (App ID: 599050663475147) operated by Dr. Kogan and then Global Science Research Ltd. ("GSR"). The app consisted of server side scripts (written mostly in C# and VB.net, running on an ASP.net platform) and a front-end webpage + script (html, javascript). The app under GSR collected and stored the following data on users who authorized the app on GSR servers: Name, gender, location, birthdate, page likes, friends list, each friend's name, each friend's gender, each friend's location, each friend's birthdate, each friend's page likes (from friends whose privacy settings permitted users to share this data through the app).

> Philometrics corporate Facebook page - https://www.facebook.com/philometrics/?fref=ts. Neither GSR nor Philometrics actively stores nor uses the data that exists on the corporate page. However, Philometrics receives notifications in both email form and on the Facebook page of certain events on the page, such as people viewing the page or people liking the page. Thus, data may be defined as "collected" in emails or Facebook accounts.  This Philometrics Facebook corporate page does not (and did not) collect any data from the "thisisyourdigitallife" app.

> All GSR members have their own private Facebook profiles. Through these profiles, they (and anyone else with a Facebook profile) can access a wide variety of content on other users. The profile may automatically generate email communications to the GSR member, and as a result GSR members have in their email accounts many emails from Facebook respecting actions by their Facebook friends.

> GSR has access to various public aggregated Facebook information freely available from online sources. For example, aggregate estimated data on number of users on Facebook can be found here: http://www.statista.com/statistics/268136/top-15-countries-based-on-number-of-facebook-users/

GSR also advertised using the Facebook advertising platform. As part of each advertising campaign, Facebook provided all of the information that normally appears in the advertising console when running a campaign. GSR did not use this data for any purpose other than to monitor how the ad campaign was doing.

2.  The following is a complete description of the collection of Facebook user information obtained by GSR from the Facebook Applications:

GSR collected and stored the following App Data: name, gender, birthdate, location, and page likes of (a) users who authorized the "thisisyourdigitallife" app and (b) their friends (whose privacy settings permitted users to share this data with GSR through the app).

3.  The following is a complete description of data derived by GSR from such Facebook user information:

a) predicted survey responses to a wide variety of demographic and psychological surveys;
b) average survey scores, grouped by page like, demographic groups, and geographic groups;
b) derived dimensional scores summarizing information captured in the "likes"; and
c) a co-occurrence matrix of likes.

4.      GSR used the App Data for the following purposes:

Providing modeled data to certain third parties listed in Section 6 below.

Providing SCL Elections Limited ("SCL") with data for predicted survey results. Shared the raw Facebook data with Eunoia Technology ("Eunoia").

Provided Dr Kogan's lab with all of the raw data. As set forth in Dr. Kogan's Certificate Exhibit A2, this data was stored on Dr Kogan's servers and was not further shared with anyone else except in extreme summary form (e.g. presentation of results at conferences).

5.      GSR received payments totaling approximately 750,000 GBP from a single entity as a result of use and/or disclosure of App Data.  GSR did not receive any payments from any other entities in relation to the App Data.  All of the payments received by GSR were used to operate GSR.  None of the payments received by GSR remain as reflected by the financial statement that GSR will provide to Facebook upon filing in June 2016.

6.      During the period in which GSR had access to App Data, GSR provided the following third parties (in addition to Dr. Kogan and his lab) with access to or some or all App Data:

| Name | Contact Information | Number of unique Facebook Profiles Involved, and Specific Data Points Shared |
|---|---|---|
| SCL | Alexander Ashburner Nix <br> ▮▮▮▮▮▮▮▮▮ | Approximately 30 million people. Shared forecasted survey responses (derived from page likes) and some limited profile data (such as name, location, birthday, and whether an individual had liked any of a limited list of specific Facebook pages) |
| Eunoia | Christopher Wylie <br> ▮▮▮▮▮▮▮▮▮ | Approximately 30 million people. Where available, for each person shared name, location, birthday, and page likes |
| Dan Randles | Daniel Randles <br> ▮▮▮▮▮▮▮▮▮ | Received forecasted survey responses for approximately 130,000 people. These forecast were derived from the page likes of 130,000 people who authorized the thisisyourdigitallife app. Location and birth year were included, but no name was included to ensure anonymity of persons. |

GSR did not provide access to, share, or disclose App Data with any other entity, and in particular did not provide access to, share or disclose App Data to Philometrics Inc., which has a shared ownership with GSR.

**GSR certifies that GSR has provided a copy of this Certification to the last address known to GSR for each and every third party listed in the table in paragraph 6 above and asked them to provide a completed Certification in the form set forth in Exhibit B to GSR.**

**GLOBAL SCIENCE RESEARCH LTD.**
_____

Name of Person or Entity (Please Print)

*Aleksandr Kogan*
_____                         06/11/2016
                                                     _____
By                                                                              Date

CEO, Director
_____

Title (if on behalf of an organization)

EXHIBIT A2

CERTIFICATION

**Dr. Aleksandr Kogan**

I, Dr. Aleksandr Kogan, personally ("Dr. Kogan" or "Recipient") certify that all
Facebook data Dr. Kogan gathered from the "thisisyourdigitallife" Facebook Application
(App ID: 599050663475147), including but not limited to Facebook user data and
Facebook user friend data and data derived from such Facebook user data and Facebook
user friend data ("App Data") has been accounted for and permanently deleted and
destroyed from both active and redundant storage that is under Recipient's direct or
influential control.

1.  In addition to the response by GSR described in the Certification by GSR (Exhibit
A1),  to which Dr Kogan has access to as part of GSR, the following is a complete list of
applications, scripts, scrapers, or other methodologies used by Dr. Kogan or any entity in
which Dr. Kogan has an ownership interest to collect Facebook user information
("Facebook Applications"):

"thisisyourdigitallife" Facebook Application (App ID: 599050663475147) operated by
Dr. Kogan and then Global Science Research Ltd. ("GSR"). The app consisted of server
side scripts (written mostly in C# and VB.net, running on an ASP.net platform) and a
front-end webpage + script (html, javascript). While operated by Dr. Kogan (prior to
GSR's existence), the app collected the following data on users who authorized the app
and was stored on Dr. Kogan's lab server: Name, gender, location, birthdate, page likes,
friends list, each friend's name, each friend's gender, each friend's location, each friend's
birthdate, each friend's page likes (from friends whose privacy settings permitted users to
share this data through the app), some wall posts and some private messages. While
under Dr. Kogan's private operation (and data stored on his lab's server), the data was
used exclusively for academic purposes by his lab.

Dr Kogan has his own private Facebook profile. Through this profile, Dr. Kogan (and
anyone else with a Facebook profile) can access a wide variety of content on other users.
The profile automatically generates email communications to Dr. Kogan, and as a result
Dr Kogan has in his email account many emails from Facebook respecting actions by his
Facebook friends.

Dr Kogan has access to various public aggregated Facebook information freely
available from online sources. For example, aggregate estimated data on number
of users on Facebook can be found here:
http://www.statista.com/statistics/268136/top-15-countries-based-on-number-of-
facebook-users/

Facebook user information provided to Dr. Kogan by Facebook. In particular, Facebook
has provided Dr. Kogan with country level data on number of friendships and emoticons
used as a part of an ongoing research relationship.

2.  In addition to collection by GSR described in the Certification by GSR (Exhibit A1), the following is a complete description of the collection of Facebook user information obtained from the Facebook Applications:

Aggregated, country level data provided directly by Facebook for academic research papers prepared in collaboration with the Protect and Care team at Facebook, including the following papers:

1) Tracing Cultural Similarities and Differences in Emotional Expression through Digital Records of Emotions.

2) Birds of a Feather Flock Together and Opposites Attract? The Relationship between Cross-National Value Similarities and Online Social Networks.

3) Amount and Diversity of Digital Emotional Expression on Predicts Life Satisfaction Around the World.

4) Happiness Predicts Larger Online Social Networks for Nations and Individuals Low, but not High, in Consumeristic Attitudes and Behaviors.

5) Silk Road to Friendships: Economic Cooperation is Associated with International Friendships around the World.

6) International friendships predict government aid after natural disasters

7) Emotional Expression Follow Different Life Course Trajectories for Rich versus Poor Nations

8) Big Data Public Health: Online Friendships can Identify Populations At-Risk of Physical Health Problems and All-Causes Morbidity.

Dr Kogan also has one paper entitled "Donations Predict Social Capital Gains for Low SES, But Not High SES Individuals and Countries" which was prepared with a graduate student in his lab, other academic collaborators, and members (current and former) of the Protect and Care team at Facebook that contains data collected from the "thisisyourdigitallife" app. In particular, this paper calculates number of friends per consenting user.  This data was used exclusively for academic purposes. The paper has previously been reviewed and approved by Facebook's internal review team.

In addition to all of the App Data collected from "thisisyourdigitallife" by GSR, Dr Kogan also has a dataset collected by his lab using the app before GSR existed. The data includes up to several million people—which was the result of several thousand participants partaking in the study and data from their friends being collected as well. The data on these users that Dr. Kogan's lab holds are as follows: names, gender, birthdate, location, and page likes. In addition, for people who participated in the study and provided consent, Dr Kogan has limited wall post and private message data.

3.  In addition to the description by GSR described in the Certification by GSR (Exhibit A1), the following is a complete description of data derived by Dr. Kogan from Facebook user information:

From the "thisisyourdigitallife" app:

(a) predicted survey responses to a wide variety of demographic and psychological surveys

(b) average survey scores, grouped by page like, demographic groups, and geographic groups;

(c) derived dimensional scores summarizing information captured in the "likes"; and

(d) a co-occurrence matrix of likes.

From Facebook user information provided to Dr. Kogan by Facebook:

(a) Number of friendships created between each country pair, monthly

(b) Ratio of domestic to international friendships within a country

(c) Number of emoticons used per capita and per person in each country

(d) Number of emoticons used per capita and per person by various age groups in each country

(e) Other summaries of the aggregated friendship and emoticon usage data

4.      In addition to use by GSR described in the Certification by GSR (Exhibit A1), Dr. Kogan used the App Data for the following purposes:

At the University of Cambridge Prosociality and Well-being Laboratory: Number of unique Facebook Profiles Involved, and Specific Data Points Shared:  Profiles for approximately 50 million people. Where available, each person shared name, location, birthday, and page likes.

The App Data was used by Dr. Kogan and his research team to prepare a variety of manuscripts on social psychological and methodological questions. None of the manuscripts were ever submitted for publication.

A single paper using the App Data was submitted for review, which was reviewed by several reviewers. The paper has been retracted before any publication. The paper presented summary statistical data, but never any individual records.

Dr Kogan has also presented at various academic conferences and university talks results from the App Data. In these talks, Dr Kogan presented summary findings from the data, but never any individual records.  None of the manuscripts were ever submitted for publication.

5.      The sole payments Dr. Kogan received that were related to App Data were expense reimbursements.  Dr. Kogan received no salary, distributions or dividends related to App Data.

6.      In addition to the sharing by GSR described in the Certification by GSR (Exhibit A1), during the period in which Dr. Kogan had access to App Data, members of Dr. Kogan's research group had access to some of the data on the lab servers for analyses. However, data copying or moving off the servers was prohibited, and to the best of Dr. Kogan's knowledge, never occurred.

Dr. Kogan did not provide access to, share, or disclose App Data with any entity other than those identified in Exhibit A1, including without limitation Philometrics Inc., in which Dr. Kogan had or has an ownership interest.


DR. ALEKSANDR KOGAN
_____
Name of Person or Entity (Please Print)

*Aleksandr Kogan*
_____                    06/11/2016
                                                          _____
_____                              Date

## EXHIBIT B

## CERTIFICATION

I, _____, personally if acting in an individual capacity, or on behalf of _____, if acting on behalf of an organization or entity, ("Recipient") certify that all Facebook data gathered by the "thisisyourdigitallife" Facebook Application (App ID: 599050663475147), received from or on behalf of Global Science Research Ltd. ("GSR") or Dr. Aleksandr Kogan ("Dr. Kogan"), including but not limited to Facebook user data and Facebook user friend data and data derived from such Facebook user data and Facebook user friend data ("App Data") has been accounted for and permanently deleted and destroyed from both active and redundant storage that is under my direct or influential control.

1.      The Recipient used this information for the following purposes:

_____

_____

2.      The Recipient received _____ in revenue as a result of its use and/or disclosure of App Data. The Company will disgorge the amount listed above to Facebook, Inc. upon request.

3.      During the period in which the Recipient had access to App Data, the following third parties had access to or where provided with some or all App Data:

| Name | Contact Information | Number of unique Facebook Profiles Involved, and Specific Data Points Shared |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

4.      In consideration for the Recipient's complete and accurate execution of this Certification, upon receipt of a such this Certification, Facebook and its agents, partners,

representatives, heirs, successors, predecessors, and assigns and each of them release and forever discharge the Recipient from any and all claims, demands, damages, liabilities, suits, actions, and causes of action, related in any way to the Recipient's use and disclosure of App Data disclosed in paragraphs 1 and 3. This release shall be void if the information provided in this Certification is not complete or accurate.

**I certify that I have provided a copy of this Certification to each and every third party listed in the table in paragraph 3 above and asked them to provide a completed Certification to me.  Upon receipt, I will promptly forward the certification to GSR at _____ _____.**

_____

Name of Person or Entity (Please Print)

_____          _____

By                                                            Date

_____

Title (if on behalf of an organization)

FACEBOOK, INC.

By:

Its:      _____

EXHIBIT B

CERTIFICATION

I,_____Dr. Michael Inzlicht_____, personally if acting in an individual capacity, or on behalf of____Toronto Laboratory for Social Neuroscience_____, if acting on behalf of an organization or entity, ("Recipient") certify that all Facebook data gathered by the "thisisyourdigitallife" Facebook Application (App ID: 599050663475147), received from or on behalf of Global Science Research Ltd. ("GSR") or Dr. Aleksandr Kogan ("Dr. Kogan"), including but not limited to Facebook user data and Facebook user friend data and data derived from such Facebook user data and Facebook user friend data ("App Data") has been accounted for and permanently deleted and destroyed from both active and redundant storage that is under my direct or influential control.

1.      The Recipient used this information for the following purposes:

_____Academic research_____

_____


2.      The Recipient received $0_____ in revenue as a result of its use and/or disclosure of App Data. The Company will disgorge the amount listed above to Facebook, Inc. upon request.

3.      During the period in which the Recipient had access to App Data, the following third parties had access to or where provided with some or all App Data:

| Name | Contact Information | Number of unique Facebook Profiles Involved, and Specific Data Points Shared |
|------|---------------------|----------------------------------------------------------------------------|
| None |                     |                                                                            |
|      |                     |                                                                            |
|      |                     |                                                                            |
|      |                     |                                                                            |
|      |                     |                                                                            |

4.      In consideration for the Recipient's complete and accurate execution of this Certification, upon receipt of a such this Certification, Facebook  and its agents, partners,

representatives, heirs, successors, predecessors, and assigns and each of them release and forever discharge the Recipient from any and all claims, demands, damages, liabilities, suits, actions, and causes of action, related in any way to the Recipient's use and disclosure of App Data disclosed in paragraphs 1 and 3. This release shall be void if the information provided in this Certification is not complete or accurate.

**I certify that I have provided a copy of this Certification to each and every third party listed in the table in paragraph 3 above and asked them to provide a completed Certification to me. Upon receipt, I will promptly forward the certification to GSR at The Lexicon 10-12, Mount Street, Manchester, Lancashire M2 5NT  or via email attachment to info@globalscienceresearch.com.**

Dr. Michael Inzlicht
_____

Name of Person or Entity (Please Print)

_____                    July 7 2016
                                                    _____

                By                                          Date


_____

Title (if on behalf of an organization)


FACEBOOK, INC.


By:

Its:      _____

## CERTIFICATION

I, Alexander Nix, on behalf of SCL Elections Limited ("SCL"), certify that all Facebook data gathered by the "thisisyourdigitallife" Facebook Application (App ID: 599050663475147), received from or on behalf of Global Science Research Ltd. ("GSR") or Dr. Aleksandr Kogan ("Dr. Kogan"), including but not limited to Facebook user data and Facebook user friend data and data derived from such Facebook user data and Facebook user friend data ("App Data") has been accounted for and permanently deleted and destroyed from both active and redundant storage that is under my direct or influential control.

1. The Recipient used this information for the following purposes:

To train a model to predict personality using commercially available demographic, consumer and lifestyle data. In out-of-sample testing, it was found that this model was statistically only slightly more accurate than random, and the approach was abandoned. After Facebook contacted SCL in December 2015 we deleted all data we received from Dr Kogan. This includes dropping all database tables, and deleting the raw data (stored as csv) from our encrypted fileserver.

2. During the period in which the Recipient had access to App Data, the following third parties had access to or where provided with some or all App Data:

No third parties had access to the App Data at any time.

**This certificate is provided in order to assist Facebook with its investigations into the use of the App Data and the information contained herein is true to the best of my knowledge, information and belief but this certificate is provided without liability or prejudice to me personally or to SCL and cannot be relied upon to found any action against SCL or any related person or entity.**

......................................................
**Alexander Nix**
**For and on behalf of SCL Elections Limited**

EXHIBIT B

CERTIFICATION

I, _CHRISTOPHER WYLIE_ , ~~personally if acting in an individual capacity,~~ ~~or~~ on behalf of _EUNOIA TECHNOLOGIES INC._ , if acting on behalf of an organization or entity, ("Recipient") certify that all Facebook data gathered by the "thisisyourdigitallife" Facebook Application (App ID: 599050663475147), received from or on behalf of Global Science Research Ltd. ("GSR") or Dr. Aleksandr Kogan ("Dr. Kogan"), including but not limited to Facebook user data and Facebook user friend data and data derived from such Facebook user data and Facebook user friend data ("App Data") has been accounted for and permanently deleted and destroyed from both active and redundant storage that is under my direct or influential control.

1.     The Recipient used this information for the following purposes:

_NONE — DELETED IN 2015_

2.     The Recipient received _0.00_ in revenue as a result of its use and/or disclosure of App Data.  The Company will disgorge the amount listed above to Facebook, Inc. upon request.

3.     During the period in which the Recipient had access to App Data, the following third parties had access to or where provided with some or all App Data:

| Name | Contact Information | Number of unique Facebook Profiles Involved, and Specific Data Points Shared |
|------|---------------------|------------------------------------------------------------------------------|
|      |                     |                                                                              |
|      |                     |                                                                              |
|      |                     |                                                                              |
|      |                     |                                                                              |
|      |                     |                                                                              |

4.     In consideration for the Recipient's complete and accurate execution of this Certification, upon receipt of a such this Certification, Facebook  and its agents, partners,

130248750.4

representatives, heirs, successors, predecessors, and assigns and each of them release and forever discharge the Recipient from any and all claims, demands, damages, liabilities, suits, actions, and causes of action, related in any way to the Recipient's use and disclosure of App Data disclosed in paragraphs 1 and 3. This release shall be void if the information provided in this Certification is not complete or accurate.

**I certify that I have provided a copy of this Certification to each and every third party listed in the table in paragraph 3 above and asked them to provide a completed Certification to me.  Upon receipt, I will promptly forward the certification to GSR at _____ _____.**

ELNOIA TECHNOLOGIES, INC.
_____
Name of Person or Entity (Please Print)

_____
By
CHRISTOPHER WYLIE
DIRECTOR
_____
Title (if on behalf of an organization)

16 Aug 2016
_____
Date

FACEBOOK, INC.

By:

Its:          _____