BERNSTEIN LITOWITZ BERGER &
  GROSSMANN LLP
JOHN C. BROWNE
JEREMY P. ROBINSON
ALEXANDER T. PAYNE
1251 Avenue of the Americas
New York, NY  10020
Telephone: 212/554-1400
212/554-1444 (fax)
johnb@blbglaw.com
jeremy@blbglaw.com
alex.payne@blbglaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DENNIS J. HERMAN (220163)
JASON C. DAVIS (253370)
KENNETH J. BLACK (291871)
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: 415/288-4545
415/288-4534 (fax)
dherman@rgrdlaw.com
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

Co-Lead Counsel for the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re FACEBOOK, INC. SECURITIES LITIGATION | ) ) ) ) Master File No. 5:18-cv-01725-EJD |
| | ) CLASS ACTION |
| This Document Relates To: | ) ) LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| ALL ACTIONS. | ) ) ) ) |

DATE:       June 10, 2021
TIME:       9:00 a.m.
LOCATION:   Courtroom 4, 5th Floor
JUDGE:      Hon. Edward J. Davila

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................................1

STATEMENT OF ISSUES TO BE DECIDED ......................................................................1

INTRODUCTION ...........................................................................................................1

ARGUMENT .................................................................................................................3

I.  Defendants Provide No Valid Basis For The Court To Reverse Its Prior Rulings Finding Falsity, Scienter And Reliance For The User Control And Related Statements .........................................................................................................3

II. The TAC Adequately Alleges Falsity and Scienter Concerning Defendants' Cambridge Analytica Investigation Statements ..............................................5

    A.  Facebook Sells $75,000,000 in Ads to The Trump Campaign via Cambridge Analytica's Illicit Project Alamo Dataset ...............................6

        1.  Zuckerberg and Sandberg Linked to Project Alamo...................7

        2.  Zuckerberg and Sandberg Linked to The Investigation.............8

        3.  Zuckerberg and Sandberg Are the Original Architects of Cambridge Analytica's "Whitelisted" Data...........................9

        4.  "[C]lear [C]hannels" Link Project Alamo to Facebook's Cambridge Analytica Investigation, and *Vice Versa* ...............9

    B.  Red Flags Fly While Facebook Pursues The "Super Bowl" Ads Bonanza ..........11

        1.  Facebook's June-November 2016 Project Alamo Reveals Continuing Misuse of the Misappropriated Facebook Data ....................11

        2.  Facebook's Review of Cambridge Analytica's September 27, 2016 "Big Data" Presentation Corroborates Continuing Data Misuse for Trump..............14

        3.  Facebook's Review of Cambridge Analytica's "Likes" Interview Further Corroborates Data Misuse for Trump ...........................15

        4.  Facebook's Discovery of Cambridge Analytica's Fraudulent "Deletion Certification" Shows Continuing Access ..................16

III. The TAC Alleges Additional Facts Showing That Defendants' Risk Disclosures Were Materially Misleading And Made With Scienter ..................17

IV. The Complaint Adequately Pleads Loss Causation ........................................20

    A.  The March 2018 Price Declines................................................21

    B.  The July 26, 2018 Price Decline ..............................................26

V.      Expert Analysis Confirms The Complaint's Loss Causation Allegations..........................28

VI.     Reliance Is Presumed ...........................................................................................................30

VII.    The Complaint Pleads Insider Trading Claims and Control Person Liability ..................30

VIII.   The Other Misstatements In The TAC Should Be Sustained And Defendants'
        Motion To Dismiss Should Be Denied In Its Entirety ........................................................31

CONCLUSION.........................................................................................................................................31

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**CASES**

4

*Affiliated Ute Citizens of Utah v. United States,*
   406 U.S. 128 (1972) ............................................................................................30

5

*Baker v. SeaWorld Entm't, Inc.,*
   2017 WL 5885542 (S.D. Cal. Nov. 29, 2017) ......................................................30

6

7

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) ............................................................................................30

8

9

*Batwin v. Occam Networks, Inc.,*
   2008 WL 2676364 (C.D. Cal. July 1, 2008) ......................................................30

10

*In re Bear Stearns Companies, Inc. Sec., Deriv., & ERISA Litig.,*
   763 F. Supp. 2d 423 (S.D.N.Y. 2011) .................................................................27

11

12

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................21

13

14

*Berson v. Applied Signal Tech., Inc.,*
   527 F.3d 982 (9th Cir. 2008) ..........................................................................9, 17

15

*Blackie v. Barrack,*
   524 F.2d 891 (9th Cir. 1975) .............................................................................30

16

17

*In re Bradley Pharm., Inc. Sec. Litig.,*
   421 F. Supp. 2d 822 (D.N.J. 2006) ....................................................................25

18

19

*ChinaCast Educ. Corp. Sec. Litig.,*
   809 F.3d 471 (9th Cir. 2015) ...............................................................................6

20

*Desta v. Wins Fin. Holdings Inc.,*
   2018 WL 1136525 (C.D. Cal. Feb. 28, 2018) ...................................................25

21

22

*Dura Pharm., Inc. v. Broudo,*
   544 U.S. 336 (2005) ......................................................................................19, 20

23

24

*In re Facebook, Inc. Consumer Priv. User Profile Litig.,*
   402 F. Supp. 3d 767 (N.D. Cal. 2019) .................................................................5

25

*Fecht v. Price Co.,*
   70 F.3d 1078 (9th Cir. 1995) ...............................................................................8

26

27

*In re Gilead Scis. Sec. Litig.,*
   536 F.3d 1049 (9th Cir. 2008) ......................................................................21, 27

28

*Grigsby v. BofI Holding, Inc.*,
  979 F.3d 1198 (9th Cir. 2020) ................................................................20, 22, 24

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ...........................................................................31

*Howard v. Hui*,
  2001 WL 1159780 (N.D. Cal. Sept. 24, 2001) ..................................................31

*Kornberg v. United States*,
  693 F. App'x 542 (9th Cir. 2017) .......................................................................10

*Kui Zhu v. Taronis Techs. Inc.*,
  2020 WL 1703680 (D. Ariz. Apr. 8, 2020) .......................................................25

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ................................................................20, 22, 25

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ..............................................................................28

*In re Mattel, Inc. Sec. Litig.*,
  Case No. 2:19-cv-10860, ECF No. 74 (C.D. Cal. Jan. 26, 2021) ......................27

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ........................................................................19, 20

*Mirmehdi v. United States*,
  689 F.3d 975 (9th Cir. 2012) ..............................................................................31

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ....................................................30

*Nursing Home v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) .......................................................................5, 17

*Nuveen Mun. High Income Bond Opportunity Fund v. City of Alameda, Cal.*,
  730 F.3d 1111 (9th Cir. 2013) ............................................................................20

*In re Openwave Sys. Sec. Litig.*,
  528 F. Supp. 2d 236 (S.D.N.Y. 2007).................................................................31

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
  411 F. Supp. 2d 1172 (N.D. Cal. 2005) ..............................................................28

*In re Quality Sys. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ..............................................................................5

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ......................................................................8, 14, 19

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)...............................................................................4

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)....................................................25, 28

*Toy Invs., Inc. v. Poof-Slinky, Inc.*,
    2013 WL 60095838 (W.D. Wash. Nov. 20, 2013) .................................31

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ...................................................28

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
    2013 WL 2247394 (C.D. Cal. May 9, 2013) .........................................4

*In re Wireless Facilities, Inc. Sec. Litig.*,
    2007 WL 9667131 (S.D. Cal. May 7, 2007)................................4, 15, 16

*Yourish v. Cal. Amplifier*,
    191 F.3d 983 (9th Cir. 1999) ...................................................................8

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) ...................................................4

## MEMORANDUM OF POINTS AND AUTHORITIES

Lead Plaintiffs ("Plaintiffs") hereby oppose Defendants' motion to dismiss.[1]

## STATEMENT OF ISSUES TO BE DECIDED

Whether Plaintiffs' Complaint sets forth facts that, considered holistically, adequately plead claims under §10b(b), of the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5 and §§20(a) and 20A of the Exchange Act, 15 U.S.C. §78t(a) and §78t-1, including based on Defendants' own admissions of knowing or reckless misconduct harming investors.

## INTRODUCTION

This action arises from Defendants' materially false and misleading statements regarding Facebook's privacy and data protection practices and the impact of that misconduct on Facebook's business.  In its August 7, 2020 opinion dismissing the prior complaint without prejudice (the "Opinion") (ECF No. 137), the Court granted leave to amend and flagged two areas in particular where additional allegations could satisfy the Court's concerns.  **First**, the Court suggested that "Plaintiffs can cure their allegations by alleging, among other things, that Facebook embedded employees in the 2016 Trump campaign and thus knew that the deletion certifications were false." Opinion at 66.  **Second**, after determining that Plaintiffs had adequately established falsity, scienter and reliance with respect to Defendants' alleged misrepresentations concerning user control over their data, the Court stated that additional facts potentially could be alleged to adequately plead loss causation for these statements.  *Id.* at 39, 40, 47-48, 57-58, 59-61, 65 and 66.  Indeed, the sole ground on which the Court dismissed the user control statements was loss causation.

---

[1] References to "Mot." or "Motion" are to Defendants' Notice of Motion and Motion to Dismiss Third Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws; Memorandum of Points and Authorities in Support Thereof (ECF No. 145).  The "Lutz Decl." refers to the Declaration of Brian M. Lutz in Support of Defendants' Motion to Dismiss Third Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 146).  All terms not otherwise defined have the same meaning as in the Third Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Complaint" or "TAC") (ECF No. 142).  "¶_" and "¶¶__" refers to the Complaint.  Unless otherwise noted, all emphasis is added and internal citations and quotations are omitted.

The TAC addresses each of these issues, combining compelling new evidence and allegations with the facts previously before the Court to adequately plead Defendants' violations of the federal securities laws.

**The Cambridge Analytica Investigation-related Statements**.  The TAC supplements and further strengthens the allegations concerning Facebook's Cambridge Analytica investigation.  As set forth below in Section II, the TAC alleges new facts demonstrating that Defendants knowingly or recklessly disregarded the highly misleading nature of Facebook's repeated claim that its Cambridge Analytica investigation had "not uncovered anything that suggests wrongdoing." Indeed, the TAC alleges in detail that Defendants were aware during and after 2016 of Cambridge Analytica's continued possession and misuse of the purloined user data in connection with the Trump campaign.  *See* ¶¶193-99, 203-14, 230-40, 245-50, 268, 280-82.  For example, Zuckerberg and Sandberg personally attended an important May 18, 2016 meeting that kicked off Project Alamo—where Facebook embedded its own officials in the Trump campaign to work directly with Cambridge Analytica and its treasure trove of Facebook user data.  Out of that meeting, with blessing from the highest reaches of Facebook, including Zuckerberg and Sandberg, the Company's embedded employees (sometimes referred to as the "embeds") trained Trump and Cambridge Analytica staff on how to manipulate and exploit Facebook user data.

At the same time that they were spearheading Project Alamo, Zuckerberg and Sandberg knew about and were directly involved in the Cambridge Analytica investigation.  Defendants cannot credibly deny that these facts give rise to a strong inference, one at least as cogent and compelling as any opposing inference, that Zuckerberg and Sandberg knew about or at least recklessly disregarded Cambridge Analytica's continued misuse of the purloined user data.  When added to previously alleged facts, including boilerplate certifications of deletion that were supplied by the wrong Cambridge Analytica affiliates and/or were obviously untrue, the inference of scienter becomes insurmountable.

**Additional Loss Causation Allegations For Defendants' Control Statements**.  In light of the Court's ruling that the Complaint adequately pleaded falsity, scienter and reliance concerning Defendants' user control statements, the TAC sets forth additional facts establishing loss causation

1    for those misstatements.  As explained below in Section IV, the TAC includes new facts showing

2    that the alleged corrective disclosures in March 2018 revealed the falsity of Defendants' user

3    control (and other) statements and the subsequent July 25, 2018 disclosures revealed the full extent

4    of the impact that these revelations about Cambridge Analytica and data privacy issues had on

5    Facebook's business.  ¶¶685-25.

6          Defendants cannot dispute the reality that analysts, the press and even Facebook itself

7    expressly linked the precipitous March 2018 stock price declines directly to the Cambridge

8    Analytica scandal's revelation that users lacked control over their data on Facebook.  These market

9    commentators, and again Facebook too, similarly linked the historic stock price decline on July

10   25, 2018 to the fallout that Facebook faced from the Cambridge Analytica scandal and the loss of

11   user engagement and other business consequences resulting from the revelation of Facebook's

12   privacy misconduct.  As even further support for its well-pled factual allegations, the TAC

13   provides the opinion of a well-regarded financial economist who confirms that there is a

14   compelling scientific basis to conclude the facts alleged in the TAC demonstrate loss causation for

15   the control statements.  ¶¶721-25.

16         In sum, given the Court's prior rulings and a holistic analysis of the new and previously

17   pled facts, the TAC adequately states claims under Sections 10(b), 20(a) and 20A of the Securities

18   and Exchange Act of 1934.  Defendants' explanations and narratives contradicting the allegations

19   of the TAC serve only to raise factual disputes that cannot be credited at the pleading stage.

20   Defendants' motion should be denied and this action should proceed into discovery.

21                                         **ARGUMENT**

22   **I.    Defendants Provide No Valid Basis For The Court To Reverse Its Prior
            Rulings Finding Falsity, Scienter And Reliance For The User Control And**
23   **      Related Statements**

24         Defendants ask this Court to reconsider its findings that Plaintiffs have adequately alleged

25   falsity with respect to their misleading user control statements (¶¶501-14), the respecting user

26   privacy settings statements (¶519) and their claim that a Cambridge Analytica scandal could not

27   happen again (¶609).  Defendants, however, offer no basis for the Court to reverse itself beyond

28   their counter-factual assertions that these statements were true.  Mot. at 12-13.  They simply ignore

1   that the Court already rejected these exact same arguments.  Order at 37-39, 40, 57-58.  This

2   provides no valid basis for reconsideration.  *See Vanleeuwen v. Keyuan Petrochemicals, Inc.*, 2013

3   WL 2247394, at *7-8, *10 (C.D. Cal. May 9, 2013) (applying the law of the case doctrine and

4   declining to reconsider holding from prior order concluding that falsity, scienter, and loss causation

5   elements were adequately pleaded).

6       Defendants also ask the Court to "reconsider its prior ruling" on scienter for the above-

7   discussed misstatements.  Mot. at 18-19.  In that regard, Defendants claim that the "undefined

8   concept of 'reciprocity'" is not the same thing as whitelisting.  Mot. at 18.  Defendants are

9   incorrect.   As explained in the TAC, Zuckerberg and Sandberg expressly implemented

10  "reciprocity" as the "fundamental principle that govern[ed] the Facebook platform and involved

11  the "exchange of user data as consideration for a reciprocal exchange of value" with "third party

12  app developers and other companies who were 'whitelisted' for secret access to user friend data."

13  ¶¶67-68, 75 (Zuckerberg: "I think we should go with full reciprocity"; Sandberg: "I like full

14  reciprocity").   Further, internal Facebook emails show that Zuckerberg attended meetings with

15  Facebook employees to discuss which app developers should be whitelisted, with the focus on "the

16  apps that Mark [Zuckerberg] knows, loves, and is concerned about."  ¶76.

17      Defendants also claim that, even if Zuckerberg and Sandberg knew about whitelisting in

18  2012 and 2013, they did not know about it in 2017 and 2018.  This is plainly incorrect.  Defendants

19  do not even attempt to explain how Zuckerberg and Sandberg somehow magically *unlearned* their

20  specific knowledge of whitelisting practices.  It is well-established that pre-class period knowledge

21  is "not lost when the class period began."  *See, e.g.*, *In re Wireless Facilities, Inc. Sec. Litig.*, 2007

22  WL 9667131, at 8* (S.D. Cal. May 7, 2007) (collecting cases); *In re Scholastic Corp. Sec. Litig.*,

23  252 F.3d 63, 72 (2d Cir. 2001) (pre-class period information to establishing defendants'

24  knowledge); *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970 (N.D. Cal. 2005) (the class

25  period dates function only to define the class " not to restrict the universe of relevant or actionable

26  facts.").

27      Defendants do not make any attempt to claim that Zuckerberg or Sandberg formally

28  "cancelled" or eliminated the whitelisting practices between 2013 and 2017.  Nor can Defendants

1   credibly argue that this widespread practice of "whitelisting" access to Facebook data for hundreds

2   of the largest corporations and app developers in the world (¶¶74, 80, 316-17, 319-20, 329) was

3   done secretly and without authorization within Facebook by "rogue" employees who were

4   concealing their practices from top management.   Defendants' claim defies logic and common

5   sense.   At best, this argument raises a factual dispute that cannot properly be resolved at the

6   pleading stage.

7           Moreover, Defendants ignore that the FTC Complaint, which resulted in a historic $5

8   billion fine, alleges as a fact that Facebook's whitelisting practices spanned the entire Class Period

9   (¶¶316-17), that Facebook acted purposefully and "knew or should have known" that it was

10   engaging in the "very same conduct" that was prohibited by the 2012 consent decree.   ¶¶462-63.

11   Defendants offer no valid basis for the Court to reconsider its prior ruling on scienter.   To the

12   contrary, their arguments are belied by the facts set forth in the TAC.

13   **II.      The TAC Adequately Alleges Falsity and Scienter Concerning Defendants'
            Cambridge Analytica Investigation Statements**

14

15           On March 4, March 5 and March 30, 2017, Facebook's official spokesperson for its highly-

16   touted Cambridge Analytica investigation (the "Investigation Spokesperson") stated publicly that

17   "*[o]ur investigation* to date has not uncovered *anything that suggests* wrongdoing with respect to

18   Cambridge Analytica's work on the Leave and Trump campaigns."   ¶¶10, 300-09.   These

19   statements were false because "[a]fter January 2016, Facebook learned more facts showing

20   serious, continuing policy violations and wrongdoing, while Cambridge Analytica was working

21   on the Trump campaign and in connection with that work."   ¶301.   As such, the TAC alleges falsity

22   and scienter as to the Investigation Spokesperson's statements in the "most direct way."[2]

23

24   ---

     [2] *Nursing Home v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The *most direct way* to

25   show *both* that a statement was false when made *and* that the party making the statement knew
     that it was false is via contemporaneous reports or data, available to the party, which contradict

26   the statement."); *see also In re Quality Sys. Sec. Litig.*, 865 F.3d 1130, 1145-46 (9th Cir. 2017)
     (speaker referenced "database" in making statements, but the "database" showed the statements

27   were untrue, showing falsity and scienter) (citing *Nursing Home*, 380 F.3d at 1230-31)); *see also
     In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 800 (N.D. Cal.

28   2019) ("contrast" between statement and "reality" sufficient "to infer fraudulent intent").

1      Defendants try to avoid responsibility for their official spokesperson's lies by defining

2  "Individual Defendants" in their brief to exclude the Investigation Spokesperson (Mot. at 1) and

3  tying their scienter arguments to that phrase.  Mot. at 1, 3, 6, 8, 10, 14, 15, 16, 17, 18, 19, 20, 21

4  (limiting scienter to the "Individual Defendants").  That tactic fails for multiple reasons.  As an

5  initial matter, there is no dispute that the Investigation Spokesperson spoke in his capacity as the

6  "Facebook spokesperson" (¶299), and Facebook is primarily liable for his fraud.  *ChinaCast Educ.*

7  *Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("In the context of Rule 10b-5, we have

8  adopted the general rule of imputation and held that a corporation is responsible for a corporate

9  officer's fraud committed 'within the scope of his [or her] employment' or 'for a misleading

10  statement made by an employee or other agent who has actual or apparent authority.' . . .  The rule

11  exists for good reason: 'Imputation creates incentives for a principal to choose agents carefully

12  and to use care in delegating functions to them.'").

13      Even more to the point, Zuckerberg and Sandberg themselves made direct statements about

14  the Cambridge Analytica investigation that they knew or should have known were false.  §III;

15  ¶¶524-35, 583-84.  Plaintiffs summarize below facts concerning the scienter of Zuckerberg and

16  Sandberg and the falsity of their statements in tandem with the Investigation Spokesperson's

17  statements.

18      **A.    Facebook Sells $75,000,000 in Ads to The Trump Campaign via**
         **Cambridge Analytica's Illicit Project Alamo Dataset**
19
        The TAC pleads newly-alleged facts that ***"connect*** [Cambridge Analytica's] wrongdoing

20  to either the Brexit or Trump campaign," thus showing falsity and scienter.  Order at 44.  These

21  newly-alleged facts particularize "red flags" that Facebook's investigation witnessed and explain

22  their "significance" to falsity and scienter.  Order at 35.  They also establish a direct link to

23  Zuckerberg and Sandberg, belying Defendants' counter-factual narrative that only "line-level

24  employees" knew or should have known about the continued misuse of the Cambridge Analytica

25  data.  Mot. at 15.

26

27

28

1.  **Zuckerberg and Sandberg Linked to Project Alamo**

As set forth in the TAC, "Project Alamo" referred to a joint operation between Facebook and Cambridge Analytica to support the Trump campaign.  ¶¶224-44.  Facebook embedded at least three of its employees inside of Cambridge Analytica to that end.  *Id.*  Defendants started laying the groundwork for this project on May 18, 2016 when Zuckerberg and Sandberg and their top two political operatives hosted a dozen conservative leaders – including the Trump campaign's representative (Bennett) – at the company's Menlo Park headquarters (¶¶188-92) for a day-long meeting to address alleged bias against Trump and other conservatives, and how to help them "get their voice out" with "special training."  ¶190.  This "really matter[ed]" to Sandberg.  *Id.*  Zuckerberg and Sandberg's VP Kaplan (VP of Public Policy) and Director Harbath set up the meeting.  ¶¶180-82.  VP Kaplan had close ties to Sandberg and dealt with political issues.  Director Harbath appears on Facebook documents discussing the Cambridge Analytica investigation (¶¶141-42) and was a member of Facebook's four-person, internally-labelled "Republican team" that sold ads to political campaigns and provided training to them.  ¶¶191 n.190-192; 223; 228; 246; 268 n.282.

"Shortly after" the May 18th day-long meeting, Director Harbath and others on Facebook's political ads team met with the Trump campaign's data experts, Cambridge Analytica, to discuss special training for the Trump campaign.  *See* ¶192; *id.* at n.193 (Cambridge witness: "I met them," referring to Facebook's "[R]epublican team in D.C.").  Director Harbath was the manager and a member of the four-person Facebook Republican ads sales team at the time (¶¶268 n.282; ¶191; 141) and is on investigation correspondence. ¶141.

By June 2016, "at least three" out of the four Republican ads sales team started executing top management's May 18th promise to provide the Trump campaign special training.  ¶224; 243 (quoting fact witness) ("Facebook embeds showed [Trump] campaign personnel and Cambridge [Analytica] staff how to aggregate look-alikes" and "create custom audiences, and implement so-called dark ads").  Defendants do not dispute these facts.

Additional undisputed facts include that Zuckerberg, Sandberg, VP Kaplan and Director Harbath offered the Trump campaign's manager (Bennett) "special training" in May 2016 (¶190)

and that Facebook embedded at least three Facebook representatives (out of four total) to start the "special training" in June 2016 (e.g., ¶243).  These allegations raise a strong an inference that those four top executives authorized the embedding operation.  Order at 61 (executives who were "original architects" of plan were aware of plan).  Temporal proximity establishes a causal inference. *Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999) ("temporal proximity"); *Fecht v. Price Co.*, 70 F.3d 1078, 1083-84 (9th Cir. 1995) ("shortness of time").  Facts that the 2016 election was like the "Super Bowl" or a "big deal" to Facebook (per Sandberg) in ad sales (¶¶180-82) – with the Trump team spending $75,000,000 on Facebook ads versus $6,000,000 by the Clinton team (¶223 n.227) – also bolsters scienter.  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("core-operations").  The facts that the 2016 election was the top attraction on Facebook (per Director Harbath) and that Trump was the most popular candidate (per Zuckerberg) strengthens the inference that the Project Alamo embedding operation was core to the business.  *Id.*; ¶48 ("size of our user base and our users' level of engagement are critical to our success").

## 2.    Zuckerberg and Sandberg Linked to The Investigation

Zuckerberg and Sandberg were involved in discussions relating to the Cambridge Analytica investigation (¶¶35; 161-63; 203-04; 249 n.262; 268), which lasted from "September 22, 2015" (¶137) through "April 3, 2017."  ¶205 (Facebook didn't consider the matter closed until after April 3, 2017); ¶249 n.264 (detailed bases for the April 3, 2017 end date).  The challenged investigations statements corroborate the ongoing nature of the investigation.  *See, e.g.*, ¶10 (quoting March 4th, 5th and 30th of 2017 statements, which admit "[o]ur investigation *to date*"); ¶300 (March 4th) ¶303 (March 5th), ¶307 (March 30th).  VP Kaplan reported to VP Schrage, who was running the company's Cambridge Analytica strategy.   ¶188; *see also* ¶¶161-62.[3]  VP Kaplan's direct report, Director Harbath, is on investigation documents showing her active role.  ¶141.  Plaintiffs "allege the existence" and duration of the investigation in detail, and facts far

---

[3] *Accord* Lutz Ex. 12 at 2 ("In addition to **Sandberg** … executives involved in sensitive content **issues** include Joel **Kaplan**, Facebook's Washington-Based government relations chief; and Elliot **Schrage**, the vice president of public policy and communications").

1    stronger than just Zuckerberg and Sandberg's "position" in the company to show they knew about

2    the investigation.  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).

### 3.    Zuckerberg and Sandberg Are the Original Architects of Cambridge Analytica's "Whitelisted" Data

5            Undisputed facts show that Facebook overrode millions of users' privacy settings to

     provide Cambridge Analytica and other companies "whitelisted" data.  ¶¶128-36.   Zuckerberg

     and Sandberg were the original architects of the whitelisting program.  Order at 60-61 ("documents

     demonstrate Defendants Zuckerberg and Sandberg were the original architects of Facebook's 'full

     reciprocity' business model," which included "whitelisting").  Facebook's investigation team was

10   aware of Cambridge Analytica's misuse of data (*e.g.*, ¶¶140-41, 170-73 (seeking and finding App

     ID to query internal databases)) and investigation personnel (*e.g.*, ¶¶133-36; ¶176 (business

     manager of whitelisting program (Hendrix) also worked on Cambridge Analytica investigation)).

     The facts show that it took Cambridge Analytica more than one year to harvest the 30 million

     users' data and that Facebook insiders helped the Cambridge Analytica miners violate Facebook's

15   stated policies.   *See, e.g.*, ¶¶97-102 (illicit app waiver); ¶¶117-19 (exceeding data mining

     safeguards); ¶120 (commercial purpose); ¶¶128-36 (whitelisting).  Facebook paid Kogan and lured

     Chancellor away from Kogan to teach Facebook all these facts (¶¶143-51) as the investigation

     discovered.  ¶¶146, 160.

### 4.    "[C]lear [C]hannels" Link Project Alamo to Facebook's Cambridge Analytica Investigation, and *Vice Versa*

20           Defendants advance "bewildering and unsupported conspiracy theories" (Mot. at 2) to

21   suggest that Director Harbath and the Project Alamo Facebook embeds (¶268 n.282) kept to

22   themselves whatever they learned from Project Alamo.  ¶¶224-44.  Defendants' assumptions are

23   implausible and contradicted by the TAC.  Facebook's internal documents show Director Harbath,

24   who covered Cambridge Analytica (¶¶189-92), spearheaded the 17-month Cambridge Analytica

25   investigation.  ¶141.  Facebook's political team warned a group of Facebook employees, that: "***Our***

26   ***team*** has been spending a lot of time lately attempting to clarify to clients in the political space

27   how our policies apply … the largest and most aggressive on the conservative [political] side being

28   Cambridge Analytica [.]  a sketchy (to say the least) data modeling company that has penetrated

1  our market deeply…[c]an you **help us investigate**?"  ¶137; *see also* ECF No. 135-5 at 1 (copy of

2  internal communication) ("we'd like to work with your team to make sure **we have clear channels**

3  **between our teams**").

4       Defendants tried to anonymize Director Harbath's name from their internal document, but

5  that effort failed (¶141 (showing "M" and "N" refers to Harbath)).  Harbath wrote the rest of the

6  investigation team: "**[f]ollowing up** …**we** are getting several pointed questions from the political

7  partner space about what is in bounds … many companies seem to be on the edge- possibly over"

8  and wanted to "get ahead of future issues."  ¶¶139, 141; ECF No. 130-5 (copy of communications).

9  Harbath also monitored and circulated internal company-wide communication groups and other

10 emails that supported the investigation.  ¶160 (quoting "M" and "N" (Harbath): "according to

11 Wait, What thread and also an email…").  She reported "two new hires Cambridge Analytica has

12 made."  ECF No. 130-5 at 7.  She flagged relevant media for the team and interacted with her PR

13 counterparts.  *Id.*  (Harbath: "Unfortunately, this firm is now a PR issue … fielding comms policy

14 requests and concerns").  "I do suspect there is plenty of bad actor behavior going on."  *Id* at 8.[4]

15       Although the communication string that the SEC and the TAC quote ends on "5/9/2016"

16 (ECF No. 130-5 at 1) – shortly before the May 18th meetings and before the June launch date of

17 Project Alamo – the communication is evidence that the Republican ads team **did** communicate

18 with the investigation team during Project Alamo (*cf.* Mot. at 3 (assuming the embeds "must

19 have")) because it shows that they did so in the ordinary course of business.  *Kornberg v. United*

20 *States*, 693 F. App'x 542, 544 (9th Cir. 2017) (evidence concerning an organization's typical

21 practices can be admitted to show practices were followed on any particular occasion).  In short,

22 the TAC does not **assume** the embeds reported any "sketchy" or "on the edge- possibly over" data

23 misuse at Project Alamo, the TAC alleges specific facts showing it.

24       Further, there is evidence that, on September 27, 2016, Facebook's investigation team

25 watched and "circulated" a video of a September 2016 presentation by Cambridge Analytica CEO

26

---

27 [4] *Accord* Lutz Ex. 7 at ¶34 (SEC complaint) ("employees in Facebook's political advertising group

28 requested an investigation…**[a]fter** the Guardian article… these employees reiterated their
concern); *see also* RJN at 3-4 §C ("not subject to reasonable dispute").

1    Alexander Nix that further "connect[s]" (Order at 44) Cambridge Analytica's data misuse to its

2    work on the Trump campaign.  ¶¶262-63.  Evidence also shows Facebook's investigation team

3    "saw and discussed" (¶268) an interview of Cambridge Analytica's CEO by the *Washington Post*

4    on October 27, 2016, which raised more red flags about Cambridge Analytica's continuing data

5    misuse.  ¶¶267-70.  These specific facts are not assumptions, as Defendants argue, but additional

6    evidence that clear communication channels among the embeds and the rest of the investigation

7    team were operating in summer 2016.

8        **B.    Red Flags Fly While Facebook Pursues The "Super Bowl" Ads
            Bonanza**

9

10           **1.    Facebook's June-November 2016 Project Alamo Reveals
                Continuing Misuse of the Misappropriated Facebook Data**

11           Contrary to Defendants argument that the TAC's allegations are "vague," specific facts

12   show the Facebook embeds were "[s]eated beside" Cambridge Analytica in the "center of the data

13   center," helping to deploy illicit Facebook data as their "hands-[on] partners."  ¶¶224-27, 229

14   (quoting fact witnesses).  These Facebook employees witnessed facts showing that "Cambridge

15   Analytica had not deleted the misappropriated data and had used the data in connection with

16   President Donald Trump's campaign."   Order at 64.   These Facebook embeds had also

17   "commenced the investigation into Cambridge Analytica and stayed involved in it."   ¶237.

18   Moreover, they detected and relayed their suspicions to the rest of the investigation team.  §II.A.4.

19   These facts support both falsity and scienter as to the Investigation Spokesperson's updates about

20   the investigation in "the most direct way."  Facts linking Zuckerberg and Sandberg to the embeds

21   and the investigation do the same thing.  §II.A.1-2.

22           **Facebook's digital fingerprints.**  A "Facebook User ID is a persistent, unique identifier

23   that connects individuals to their Facebook profiles." ¶232 n.238.  They conclusively connect the

24   Project Alamo dataset to Facebook.  ¶¶230-37, 43. "Facebook embeds showed [Trump] campaign

25   personnel and Cambridge [Analytica] staff how to aggregate look-alikes" and "create custom

26   audiences, and implement so-called dark ads."  ¶243 (fact witness).  The User IDs ("UIDs") were

27   a necessary part of that process (¶¶230-37) so "the embeds saw these facts."  ¶233.  That inference

28   is not an assumption, as Defendants argue, but rests on "specific facts" concerning the mechanics

1   of the tasks the embeds executed.  Order at 35 (inferences based on specific facts are appropriate).

2   These details address the Court's concerns that the prior complaint was vague.  *Id.* at 35.  The

3   UIDs prove the Project Alamo team used a dataset that Cambridge Analytica **could not** "have

4   compiled with non-Facebook data."  *Id.* at 35.

5        **Facebook's Rosetta Stone email.**  Cambridge Analytica and the Facebook embeds named

6   the files they uploaded to Facebook hundreds of times by "personality" type (¶236) and a copy of

7   the Project Alamo dataset shows each targeted UID (each targeted Facebook user) had a

8   corresponding "personality type" score (¶242).  The TAC shows a copy of the email that

9   Cambridge Analytica previously sent to Facebook proving that the disputed data were the sole

10  input to the personality scores.  ¶236.  Nix's "[F]acebook" "big data" presentation (*infra.* §II.B.2)

11  and "likes" interview (*infra.* §II.B.3) reinforces that email.  ¶236; *accord* ¶¶184-83.  Embeds

12  deployed personality scores that Cambridge Analytica did not "compile[] with non-Facebook

13  data."  Order at 35.

14       **The whitelisted collection and "3.5 million" person suppression data.**  Facebook's

15  investigation team collected additional facts that Cambridge Analytica was using the **same** 30

16  million Facebook User IDs and whitelisted data underlying its personality scores **after** the date

17  that Cambridge Analytica said it deleted "personality scores" (but not any raw UIDs or "likes"

18  data) in January 2016 (¶¶177-78) and in the period leading up to the Alamo's start date in June

19  2016 (¶224).).  § II.A.3.  Further, evidence shows the Alamo team deployed the illicit "legacy"

20  dataset with Cambridge Analytica because they "didn't have the time" to make a new dataset while

21  they ran Project Alamo.  ¶¶238-44.  These facts show continuing misuse of the data Facebook

22  whitelisted to Cambridge Analytica.

23       The "voter suppression" (¶242) facts corroborate continuing data misuse and its duration.

24  "Channel 4 News [] obtained copies of **the** database that Cambridge Analytica deployed **while**

25  Facebook was embedded," and Channel 4 News reported on September 28, 2020 that the database

26  "reveal[ed] that 3.5 million Black Americans were categorized by Trump's campaign as

27  'Deterrence' – voters they wanted to stay home on [the 2016] election day."  ¶242.  These facts

28  show Project Alamo kept using the disputed data right up to election day (i.e., throughout Project

1   Alamo's 19-week duration) and how easy it was to see the data.  ¶242 (Professor Carroll: "Just a

2   click is all it took").  Neither investors nor users would expect Facebook to insert full-time

3   employees into Cambridge Analytica to give Cambridge Analytica special training on how to use

4   the "Facebook User IDs" and other Facebook data in this way.  ¶242; ¶233 n.240.

5          **Defendants' mystery trafficker theory is less plausible, and still shows wrongdoing.**

6   Defendants argue in response that the UID's in the gigantic Project Alamo UID/personality dataset

7   were "publicly available" (Mot. at 17) and for that reason did not show "continuing policy

8   violations and wrongdoing, while Cambridge Analytica was working on the Trump campaign and

9   in connection with that work."  ¶301.  But Facebook's investigation records show Cambridge

10  Analytica did not have its own app to get millions of UIDs in any authorized way (*e.g.,* ¶¶140, 141

11  (searching for App ID); ¶168 (finding "Business ID" only with "0 fans")) and the UID/personality

12  dataset did not come from the Trump campaign.  ¶¶225; 228 n.229; 238-39; ¶238 n.244; ¶242;

13  ¶261.  The only plausible conclusion was that this was the dataset that Cambridge Analytica had

14  illicitly obtained in the past—indeed, subsequent facts have proven that this was the case.

15         And even if the Court were to accept Defendants' unsupported suggestion that Cambridge

16  Analytica may have obtained this data from some other source (and it should not on a motion to

17  dismiss), it would not advance Defendants' arguments for dismissal.  Obtaining that dataset from

18  ***any*** third party "other than" the Chancellor/Kogan data traffickers would just change the names of

19  the traffickers and result in ***more*** "data transfer" policy violations, as the investigation records

20  prove and the Court's rulings show.[5]  That still "suggests [the] wrongdoing" (¶299) of "continuing

21  policy violations" (¶301) by Cambridge Analytica on the Trump campaign, contrary to the

22  Investigation Spokesperson's updates.  ¶¶10; 299.  Thus, even Defendants' argument "link[s]

23  Cambridge Analytica's privacy violations" to the Trump campaign.  Order at 44.  But the facts

24  show that Plaintiffs' theory makes more sense – Cambridge Analytica just kept using the data it

25  stole in the first place instead of committing yet another heist.

26

27  [5] *See, e.g.*, ¶177 ("transfer[]" policy violation); ¶¶140 (stated "transfer" policy examples)); *see also*
    Order at 33 ("[b]oth Parties also agree that Kogan's **transfer** of personality scores [based on
28  Facebook data] to a third-party violated Facebook's Platform Policy) (emphasis in original)).

**Defendants' data scraper theory is less plausible, and still shows wrongdoing.**  Nor could Cambridge Analytica have recompiled the millions of "publicly available" UIDs (Mot. at 17) by itself without committing more "policy violations."  ¶301.  The only way to collect millions of datapoints (aside from getting them in a policy-violating "transfer" as with the Chancellor/Kogan transfer) is via automated mass collection called "scraping."  Facebook's investigation records show it would be "*very* difficult" for Cambridge Analytica to engage in any "data-scraping activity" while complying with Facebook's stated policies.  ¶140.

Defendants' documents show "Facebook's political advertising group requested an investigation into possible 'scraping'—the automated and unauthorized aggregation of Facebook user data[6]— by Cambridge." Lutz Ex. 7 at ¶34 (SEC Complaint); *see also* RJN at 3 (TAC incorporates it).  This scenario runs headlong into the same problem that Defendants' data trafficking argument faces: "continuing policy violations" by Cambridge Analytica (¶301) that are "link[ed] [to] Cambridge Analytica's privacy violations" on the Trump campaign.  Order at 44.  And while this theory would still prove Plaintiffs' case, again, Plaintiffs' theory that Cambridge Analytica just kept using the data that Facebook whitelisted to Chancellor (a full-time Facebook employee during the Trump campaign) and Kogan is far more plausible on the "totality" of the facts.  *Killinger*, 542 F.3d at 784.

### 2. Facebook's Review of Cambridge Analytica's September 27, 2016 "Big Data" Presentation Corroborates Continuing Data Misuse for Trump

Facebook's investigation discovered (§II.A.4), on or about September 27, 2016, the video presentation by Cambridge Analytica CEO (Nix) stating Cambridge Analytica was using "[F]acebook" data as their "Big Data" source.  ¶265.  Nix was talking about Facebook big data that Cambridge Analytica had harvested "*in the past*" (Mot. at 5 (last bullet) (emphasis in original))

---

[6] Defendants' "publicly available" UID argument relies on a Facebook internet post ((Mot. at 17) (citing Lutz Ex. 28)); RJN at 7 (§H (neither mentioned nor relied upon in the TAC)) yet Defendants fail to notice another Facebook post touting "automated programs [used] to scrape [a user's] name, *user ID*" violate stated policies.  *See* October 1, 2020 Facebook Press Release, "Taking Legal Action Against Data Scraping" (https://about.fb.com/news/2020/10/taking-legal-action-against-data-scraping/) (last visited February 18, 2020)).

1  in accordance with an email Facebook received from Cambridge Analytica "in the past" admitting

2  that Facebook data was the key ingredient to Cambridge Analytica's personality scores.  ¶264.

3      All the facts previously discovered by the investigation team were "not lost" as they

4  reviewed these and other additional red flags.  *Wireless Facilities*, 2007 WL 9667131, at *8.  They

5  show Cambridge Analytica was discussing the same personality scores (¶¶252-53) model (¶¶254-

6  60) and survey data (¶¶261-63) that Chancellor/Kogan had harvested in the past via whitelisting

7  and similar technologies.  At the conclusion of a September 27, 2016 presentation regarding the

8  use of Facebook big data, personality scores, model and surveys (¶¶252-63; *see also* ECF No. 130-

9  6 (transcript of presentation)), Cambridge Analytica's CEO told Facebook's investigation team

10  "that of the two candidates left in this election, **one** of them **is using** these technologies, and it's

11  going to be very interesting to see how they impact the next seven weeks."  ¶251.

12      The investigation uncovered these facts contemporaneous with the Project Alamo

13  discoveries.  §II.A.4.  These newly-alleged "voluminous allegations [] tend to show that

14  Facebook's investigation revealed wrongdoing" by Cambridge Analytica in connection with the

15  "Trump campaign."  Order at 44.

16         **3.**    **Facebook's Review of Cambridge Analytica's "Likes"
       Interview Further Corroborates Data Misuse for Trump**

17

18      The October 27, 2016 *Washington Post* interview addressed "Trump's plan for a

19  comeback" (¶267) and Facebook's investigation that Cambridge Analytica's psychographic work

20  on the Trump campaign relied upon Facebook "likes."  ¶269.  Indeed, Facebook's investigation

21  records and other sources show the importance of the "likes" to the psychographic model and data

22  that GSR transferred to Cambridge Analytica.[7]  Those facts were "not lost" on the investigation

23     [7] *See, e.g.*, ¶¶97-102 (illicit harvesting app requesting "likes[]" it did not need, but which Facebook
24  permitted anyway, in violation of its stated policies);  ¶¶110-16 (contract showing GSR had the
   only psychographics "likes" harvesting app on Facebook);  ¶¶117-19 (testimony showing
25  Facebook engineers rate-limited GSR's "likes" harvesting for volume reasons); ¶¶124-136
   (Facebook affirmatively "whitelisted" the illicit app to get more data from people who "liked"
26  (¶129) certain Facebook pages); ¶¶143-51 (Facebook learns that "likes" drive the work GSR did
   "for Cambridge Analytica" (¶148)); ¶¶164-65 (original inventor of "likes" model contacts
27  Facebook, Facebook's employees call the model "solid science," linking team to an academic
   paper explaining that the "likes" model "may have considerable negative implications"); ¶¶170-
28  75 (pulling data on harvesting app from Facebook records); ¶¶193-99 (costing £750,000 to run the

team as they reviewed Nix's remarks.  *See Wireless Facilities*, 2007 WL 9667131, at *8.  These "voluminous allegations…tend to show that Facebook's investigation revealed wrongdoing" by Cambridge Analytica in connection with the "Trump campaign."  Order at 44.

### 4.    Facebook's Discovery of Cambridge Analytica's Fraudulent "Deletion Certification" Shows Continuing Access

The final category of red flags concerns evidence that Facebook's investigation uncovered, in June 2016 and September 6, 2016, that Cambridge Analytica and affiliates had submitted fraudulent deletion assurances.  ¶¶193-99.  For example, the TAC explains that on June 11, 2016 GSR and Kogan provided new certifications exposing their prior certifications as "necessarily false" (¶193), revealing that Cambridge Analytica had obtained access to significantly more data than they had previously admitted (¶194) and in some cases had paid for the data (¶196).  The Court previously reviewed similar facts and determined that Facebook's discovery of deletion certification "lie[s]" may have been sufficient for Facebook to infer that Cambridge Analytica had *access* to the subject data, but was not sufficient to infer that Cambridge Analytica was *using* the subject data on the Trump campaign.  Order at 34-35.

The TAC details voluminous new facts and evidence "show[ing] Facebook that Cambridge Analytica had not deleted the data and that the company was still misusing the data" on the Trump campaign.  Order at 35.  As set forth in the TAC, in September 2016, Facebook's investigation team was confronted with SCL's refusal to provide a written certification of deletion, which alerted the investigators to the fact that Cambridge Analytica was still abusing the stolen user data.  ¶¶245-50.  These facts contradict the Investigation Spokesperson's statements that "[o]ur investigation to date has not uncovered anything that suggests wrongdoing with respect to Cambridge Analytica's work on the Leave and Trump campaigns."   ¶10, 301.  They establish scienter as to the Investigation Spokesperson in the most direct way under the securities laws.  *Supra* n.2.  The same and additional facts establish falsity and scienter as to Zuckerberg and Sandberg's statements relating to the Cambridge Analytica investigation.

---

"likes" harvesting operation); ¶198 (admissions that GSR sold Cambridge Analytica the "likes" of "30 million people").

**III.    The TAC Alleges Additional Facts Showing That Defendants' Risk Disclosures Were Materially Misleading And Made With Scienter**

The additional facts set forth in the TAC regarding Facebook's investigation into Cambridge Analytica's misuse of user data also provide new grounds on which to find falsity and scienter regarding Defendants' risk disclosures.   In Facebook's 2016 annual report filed on February 3, 2017, the first day of the Class Period, its 2017 annual report filed on February 1, 2018, and in multiple quarterly reports throughout the Class Period, Defendants falsely told investors that the risk of improper access, disclosure or use of user data was merely hypothetical. ¶¶524-35.  For example, Facebook stated: "*[a]ny* . . . improper access to or disclosure of . . . user data *could* result in the loss or misuse of such data" (¶525b) and "*if* . . . third parties or developers fail to adopt or adhere to adequate data security practices . . . our data or our users' data *may be* improperly accessed, used, or disclosed." ¶525(c).  Contrary to these statements, Defendants knew that Facebook had in fact suffered a massive instance of improper access, use and disclosure of users' data.

Zuckerberg and Sandberg knew about Facebook's Cambridge Analytica investigation and embeds; all of the facts they uncovered about Cambridge Analytica's continuing data misuse were freely available to Zuckerberg and Sandberg.  §IV.D-I, K; *see also* Order at 36 (falsity allegations adequate where "defendants knew [of a] data breach" but disclosed only a "potential vulnerability"); *accord Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). Those facts establish falsity and scienter.  *Nursing Home*, 380 F.3d at 1230 ("The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, *available* to the party, which contradict the statement.").  None of the continuing misuse facts (*e.g.*, ¶301) were public until March 2018: "Of course, the market was not aware of Cambridge Analytica's *continued* misuse until the March 2018 *The Guardian* article." Order at 64.  Thus, the TAC sufficiently alleges falsity and scienter as to Facebook's risk disclosures.

Now Zuckerberg and Sandberg try to blame inaction by GC Colin Stretch and his staff for their false SEC statements.  Mot. at 15 ("relevant legal staff did not assess").  Now they say

"Facebook had no specific mechanism to summarize or report violations of its Platform Policy to employees responsible for ensuring the accuracy of Facebook's filings with the Commission." Lutz. Ex. 7 at ¶42.   This tactic fails.   It is like purposely removing brakes from a bus and then blaming the brake manufacturer for an ensuing "accident."   Emails from Facebook's files show that Facebook moved global policy enforcement *away* from GC Stretch ((Zuckerberg and Sandberg's "relevant legal staff") (Mot. at 15)) and into a business unit "to lead global policy enforcement."   ¶283 n.297.

Emails also show that enforcement decisions required "extensive consultation" with the business team and that enforcement was done "sparingly" and on a "case-by-case basis."   *Id.* Evidence connects personnel from the selective policy enforcement group to Cambridge Analytica.[8]   Evidence connects Zuckerberg and Sandberg direct reports (VP Rose and VP Bosworth) to the selective enforcement business and to Cambridge Analytica.   ¶¶215-223 (VP Bosworth); ¶¶278, 283 (VP Rose).   Evidence connected Sandberg direct report VP Schrage to the selective enforcement model and Cambridge Analytica.[9]   Evidence shows Cambridge Analytica's Project Alamo was worth $75,000,000 to Facebook – *far* above Zuckerberg and Sandberg's $250,000 selective policy enforcement threshold.   ¶284.

The "ugly truth" – in the words of Sandberg's direct report (VP Bosworth) in writing to the Facebook embeds and everyone else at the company in June 2016 – was that money and "growth" justified "questionable" conduct.   ¶¶219-20.   That VP Bosworth figured out the "snake oil" nature of the data shows he conducted a detailed analysis of the Facebook User IDs and related personality score data.   But Facebook tolerated (indeed, participated) in the wrongdoing because Facebook was selling $75,000,000 in ads to the Trump campaign via Cambridge Analytica at the time (§II.A.1).   Facts that the 2016 election was like the "Super Bowl" or a "big deal" to Facebook (per Sandberg) in ad sales (¶¶180-82); was the top attraction on Facebook (per Director Harbath

---

[8] *See, e.g.*, *id.* (Hendrix discussing business team controls policy enforcement); ¶¶132-63 (Hendrix whitelisting testimony and documents); ¶177 (Hendrix on Cambridge Analytica emails).

[9] ¶283 n.300 (email with "Schrage" on it, discussing "political" business and "efforts to examine 'good' revenue opportunities resulting from policy relaxation/changes"); ¶161 (*New York Times* report that "Schrage" was an "architect" of the Cambridge Analytica debacle).

1  (¶223); and that Trump was the most popular candidate (per Zuckerberg) strengthen the inference

2  that the Project Alamo embedding operation was being monitored at the highest levels of the

3  Company.  *Id.*; ¶48 ("size of our user base and our users' level of engagement are critical to our

4  success").  *Killinger*, 542 F.3d at 784 ("core-operations" permits scienter inference).  These and

5  the "totality" (*id.*) of all the other facts set forth above – focusing on Zuckerberg and Sandberg's

6  connection to Facebook's investigation into Cambridge Analytica – are sufficient to allege falsity

7  and scienter as to Zuckerberg and Sandberg.

8      As discussed in greater detail, below, the TAC adequately pleads that the "truth" concealed

9  by Defendants' Cambridge Analytica statements was not revealed to the market until March 2018.

10  Indeed, Defendants previously admitted that "new facts of substance" came to light on March 17,

11  2018 via *The Guardian* and *The New York Times* articles reporting that Cambridge Analytica

12  continued misusing Facebook data in connection with the Trump campaign.[10]   The Court agreed:

13  "In March 2018, the market learned that Cambridge Analytica had not deleted the misappropriated

14  data and had used the data in connection with President Donald Trump's campaign."  Order at 64.

15  The new facts disclosed on March 17th caused Facebook's stock to decline 6.8% when market

16  opened on Monday, March 19, 2018, and continued to decline thereafter as the market digested

17  the extent of the Cambridge Analytica scandal.  ¶¶688-89.

18      These "immediate" stock price reactions to the new facts of substance show the new

19  revelations "proximate[ly] caus[ed]" the declines.  *Mineworkers' Pension Scheme v. First Solar*

20  *Inc.*, 881 F.3d 750, 754 (9th Cir. 2018), *cert. denied*, _U.S._, 139 S. Ct. 2741 (2019).  Thus,

21  Plaintiffs have pleaded loss causation as to the investigation updates and data misuse statements –

22  not a heavy burden at this stage (*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (at the

23  pleading stage, "it should not prove burdensome for a plaintiff who has suffered an economic loss

24

25

---

26  [10] ECF No. 126 at 29 (Defendants: "The only **new facts of substance** revealed by the March 17, 2018 articles were that Cambridge Analytica might not have deleted all of the Facebook data in its

27  possession … **and** might have used that data during the 2016 presidential campaign." (Citing the March 17, 2018 *Guardian* article (ECF No. 126-22) and the related March 17, 2018 *New York*

28  *Times* article, "How Trump Consultants Exploited the Data of Millions" (ECF No. 126-23)).

1  to provide a defendant with some indication of the loss and the causal connection that the plaintiff

2  has in mind")) as Plaintiffs further demonstrate, below.

3  **IV.     The Complaint Adequately Pleads Loss Causation**

4         As noted above, in response to the Court's ruling on loss causation, the TAC alleges in

5  great detail how the alleged corrective disclosures in March and July 2018 revealed that

6  Defendants' user control and related statements were false and then disclosed the significant

7  impact and business consequences of the same revelations.  As explained herein, the TAC easily

8  satisfies the threshold for pleading loss causation.

9         The inquiry into loss causation requires "no more than the familiar test for proximate

10  cause."  *First Solar Inc.*, 881 F.3d at 753; *accord Dura Pharm. v. Broudo*, 544 U.S. 336, 347

11  (2005) (plaintiff need only "provide a defendant with some indication of the loss and the causal

12  connection that plaintiff has in mind").    In the Ninth Circuit "loss causation is a 'context-

13  dependent' inquiry, as there are an 'infinite variety' of ways for a tort to cause a loss," *Lloyd v.*

14  *CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016), including by identifying price declines that

15  accompany the materialization of concealed risks or the disclosure of information previously

16  concealed by fraud.  *First Solar*, 881 F.3d at 753-54.

17         The law is clear that "[t]he disclosure need not precisely mirror the earlier

18  misrepresentation"—rather, it need only "relate back to the misrepresentation."  *Lloyd*, 811 F.3d

19  at 1210; *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1207-08 (9th Cir. 2020) (same; quoting

20  *Lloyd*).    As discussed further below, this well-established principle eviscerates most of

21  Defendants' loss causation arguments, all of which depend a legally-unsupported strict mirror-

22  image reflection between the alleged corrective disclosure and the misrepresentations.[11]

23

24

25  ─────────────────
   [11] Defendants rely heavily on *Nuveen Municipal High Income Bond Opportunity Fund v. City of*

26  *Alameda, California* to support their erroneous arguments seeking to impose a mirror-image
   standard of loss causation.  730 F.3d 1111 (9th Cir. 2013).  Defendants' reliance is misplaced.

27  Indeed, in *Nuveen*, the Ninth Circuit expressly held that "[d]isclosure of the fraud is <u>not</u> a sine qua
   non [i.e., an essential condition] of loss causation, which may be shown even where the alleged

28  fraud is not necessarily revealed prior to the economic loss."  *Id.* at 1120.

"So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate.  This is not 'a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' loss causation."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)) (noting "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds").

The Complaint meets this standard.  It alleges with particularity that extraordinary declines in Facebook stock were caused by revelations that, despite Defendants' prior assurances, users did not control their data.  Indeed, in March 2018, Facebook itself revealed that Cambridge Analytica still possessed the user data that purportedly had been deleted and that Cambridge Analytica had used that data without users' consent for purposes of political manipulation.  The revelations continued through a series of partial disclosures throughout March 2018 further exposing the extent of users' lack of control over their data, including that many other app developers had access to user's data notwithstanding the platform's privacy controls touted by Defendants.  ¶¶364-65, 689-93, 696, 698-700.

The full extent of the impact on Facebook's business caused by the Cambridge Analytica scandal was not fully revealed until July 2018 when the Company announced its second quarter earnings.  The resulting declines in the price of Facebook's common stock were literally historic, with Facebook's stock price plummeting by a total of 18% during the last two weeks of March 2018 (¶¶688-96) and 19% on a single day in July 2018 (July 26, 2018 (¶707))—each time erasing approximately $100 billion in market capitalization. *E.g.*, ¶¶23, 28, 373, 707.  Indeed, at the time, Facebook's July 25, 2018 stock price decline was the largest single-day loss of shareholder value in U.S. history.  ¶¶28, 424, 485, 707.

A.      **The March 2018 Price Declines**

The TAC alleges loss causation with specificity based on the negative reaction of Facebook's stock price to articles published by the *New York Times* and *The Guardian* on March 17, 2018 and subsequent disclosures in March revealing that users did not control their data.

1   ¶¶364-65, 689-93.  The news that Cambridge Analytica still possessed and was misusing the

2   personal data of tens of millions of Facebook users showed that, "contrary to Defendants'

3   statements regarding control over user data and Facebook respecting user privacy," Facebook

4   "could not ensure that users controlled their data or had privacy … on the Facebook platform."

5   ¶691.

6        The *New York Times* expressly linked the Cambridge Analytica news to issues of data

7   control, stating that "copies of the data still remain beyond Facebook's control."  *Id.*  Indeed,

8   Facebook itself directly linked the news about Cambridge Analytica to user control issues,

9   claiming that this could not happen again because Facebook had taken steps to enhance the tools

10  for users to "control their experience" on Facebook.  ¶692.  Unsurprisingly, the press, securities

11  analysts and other market commentators all linked the March news about Cambridge Analytica to

12  revelations about a lack of user control.  ¶693.  Also telling, when Defendant Zuckerberg testified

13  on April 10, 2018 to the Joint Senate Commerce and Judiciary Committees that "every piece of

14  content that you share on Facebook, you own and ***you have complete control*** over who sees it and

15  how you share it" (¶¶313, 512), his invocation of user control measures was in response to a

16  legislator's question asking "what sorts of legislative changes would help to solve the problems

17  the Cambridge Analytica story has revealed?"  Robinson Decl. Ex. 1.  Thus, Zuckerberg himself

18  connected the March 2018 Cambridge Analytica revelations to the issue of user control when

19  testifying under oath to Congress.

20        Defendants argue that Plaintiffs fail to draw any connection between the March 17, 2018

21  disclosures because they "say *nothing* about whitelisting."  Mot. at 24.  Defendants have it exactly

22  wrong.  To start, the Court sustained as misleading Defendants' statements about user control –

23  which is exactly what the TAC connects to the March 2018 corrective disclosures.  Defendants'

24  argument that the March 2018 disclosures had to use the magic word "whitelisting" is just an

25  attempt at misdirection.  The reality is that Defendants are improperly trying to impose a mirror-

26  image requirement between the alleged misconduct and the corrective disclosure.  That is not the

27  law in this Circuit.  *Lloyd*, 811 F.3d at 1210 (loss causation does not require precise mirror-image

28  disclosure between the statements and the corrective disclosure); *Grigsby*, 979 F.3d at 1207-08

1    (same).  Under controlling precedent, the TAC easily pleads loss causation for a number of false

2    and misleading statements, including those that the Court already has found to be false and made

3    with scienter.

4          The TAC's allegations also readily plead loss causation in accordance with the Courts'

5    prior reasoning on this issue.  When the Court previously held that Defendants' statements about

6    users' control were false and misleading, the Court reasoned that "[b]y default, if a third-party can

7    access a users' data, without permission and in contravention of Facebook's stated policy, a user

8    does not have control over their content."  Order at 39.  The Court also noted "[o]f course, the

9    market was not aware of Cambridge Analytica's *continued* misuse until the March 2018 *The*

10   *Guardian* article."  Order at 64.

11         Further, Defendants' own March 16 statement preempting these disclosures underscored

12   that the revelation that Cambridge Analytica still possessed users' data was new information

13   relating to user's control and was inconsistent with the Company's prior representations.  ¶692

14   ('[i]n 2014 . . . we made an update to ensure that each person decides what information they want

15   to share about themselves, including their friend list,' which is 'just one of the many ways we give

16   people the tools to **control their experience'** (emphasis in Facebook's original)").  Thus, the March

17   2018 disclosures revealed that, contrary to Defendants' assurances, neither users nor Facebook

18   exercised control over the data that numerous app developers, like Cambridge Analytica, had

19   accessed and misused.

20         Defendants try to distract from these facts by arguing that the March 17, 2018 and

21   subsequent articles cannot be corrective in light of the earlier December 2015 article in *The*

22   *Guardian*.  Defendants are wrong.  The Court noted itself that "[o]f course, the market was not

23   aware of Cambridge Analytica's *continued* misuse until the March 2018 *The Guardian* article."

24   Order at 64.  In any event, this counter-factual argument cannot be resolved on a pleading motion

25   like this one.

26         Defendants resort to several other arguments in an effort to assail these well-pled

27   allegations, none of which are availing.  First, Defendants' claim that the articles from the *New*

28   *York Times* and *The Guardian* did not "blame" the stock price declines "on any prior statement"

1    by the Company (Mot. at 24-25) is of no moment.  As discussed above, a corrective disclosure

2    need not precisely "mirror" a false statement, let alone explicitly identify particular prior

3    statements rendered false.  *See Grigsby*, 979 F.3d 1198, 1207-08 (9th Cir. 2020) (holding news

4    article that "did not precisely mirror [defendant's] denial" was corrective as it "sufficiently related

5    back" to "statement [defendant] had no knowledge" of SEC investigation).

6         Second, there is no "chronology problem."  Mot. at 25.  Defendants cherry pick this

7    language from the Court's prior observation that the risk warning stating that "data may be

8    improperly accessed" if "developers fail to . . . adhere to adequate data security practices" was not

9    truthful given that Kogan's data misuse had been partially reported in December 2015.  Order at

10   12, 42.  This has nothing to do with the loss causation analysis, which focuses solely on whether

11   the disclosures in March 2018 (and later July 2018) revealed new information suggesting that

12   Defendants' prior statements were false.  It is nonsensical to claim this "chronology problem"

13   applies to Defendants' user control statements.  Absent clairvoyance, the 2015 article in *The*

14   *Guardian* could not have revealed that the data shared with or otherwise misappropriated by app

15   developers or Cambridge Analytica would still remain outside of Facebook's control years after

16   the article was published and contrary to Facebook's subsequent representations to the contrary.

17        At bottom, Defendants argue that there is no loss causation based on the March 2018

18   disclosures because only the June 3 article published in *The New York Times* referencing

19   Facebook's whitelisting policy possibly could have corrected Defendants' user control statements.

20   Mot. at 28.  They are wrong.

21        Market observers and the press contemporaneously linked the March 2018 news

22   concerning Cambridge Analytica to Defendants' false promises that users controlled their data and

23   must consent to its dissemination.  ¶¶369, 693.  The subsequent disclosures from March 20, 2018

24   through March 27, 2018 that numerous other app developers took advantage of Facebook's lax

25   policies, putting hundreds of millions of more users at risk, and that the Company was being

26   investigated for not complying with the 2012 FTC Consent Decree, revealed users could expect a

27   broad range of third parties across the board to possess their data without consent, whether or not

28   those parties had been technically "whitelisted."  ¶¶698-700.  Because these disclosures conveyed

1    that users' lack of control over their data was not confined to only Cambridge Analytica or even

2    to a single app developer, but was a pervasive occurrence, Defendants are wrong that these

3    disclosures do not correct any prior falsehood.  Mot. at 26.

4         Accordingly, when the whitelisting practices were reported in the June 3, 2018 article, the

5    public already had been apprised that users lacked control over their data, that a broad array of

6    third parties had access to that data, and numerous press reports viewed the whitelisting practices,

7    not as a blockbuster revelation, but as a coda to the series of prior revelations that users' data

8    remained at risk.  ¶¶704-05.

9         Defendants cite no authority for their assertion that this theory "is patently inconsistent

10   with the law of loss causation."  Mot. at 28.  Defendants' failure is not surprising since the Ninth

11   Circuit and numerous other courts have sustained loss causation allegations in situations like this

12   where a series of disclosures revealed the falsity of a company's prior statements, culminating in

13   an announcement that caused no significant stock price drop because the market had already taken

14   the relevant information into account.  *See Lloyd*, 811 F.3d at 1210 (loss causation adequately

15   pleaded on announcement of SEC subpoena into defendants' underwriting and noting that the fact

16   that "the market reacted hardly at all to [the company's] bombshell disclosure about its largest

17   borrower, confirm[ed] that investors understood the SEC announcement as at least a partial

18   disclosure of the inaccuracy of the previous . . . statements").[12]

19

20   [12] *See also Kui Zhu v. Taronis Techs. Inc.*, 2020 WL 1703680, at *6 (D. Ariz. Apr. 8, 2020) (loss

21   causation found where removal of press release from company's website raised suspicion
     defendant did not have a binding contract with the City of San Diego, causing stock price declines,

22   and subsequent admission no binding contract existed "had a minimal effect on . . . stock price");
     *Desta v. Wins Fin. Holdings Inc.*, 2018 WL 1136525, at *9 (C.D. Cal. Feb. 28, 2018) (rejecting

23   defendants' loss causation theory since "[i]t is reasonable to infer . . . price . . . did not drop . . .
     because [a prior] article had already revealed the relevant information to the market"); *see also In*

24   *re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 289 (S.D.N.Y. 2008) (causation
     sufficiently pleaded even though subsequent disclosures did not result in price declines since "it is

25   plausible to infer . . . share price did not react negatively to the subsequent announcements . . .
     because the market already had taken account of such information"); *In re Bradley Pharm., Inc.*

26   *Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J. 2006) (share price movement suggested that "the

27   market corrected the price . . . when the truth began to leak out on [news of SEC investigation]
     and that by the time [the company] announced its restatement of earnings . . . , the market had

28   already incorporated that the previously released financial statements could not be relied upon").

1   In a final throw of the die, Defendants attempt to distinguish the Cambridge Analytica

2   events from whitelisting by arguing that the former involves a violation of Facebook's policies

3   and the latter involves Facebook itself (secretly) granting access to the data.  Mot. at 28-29.  This

4   is distinction without a difference as the only relevant question is whether users have control over

5   their personal data. Both Cambridge Analytica's continued misuse of the data and the whitelisting

6   practice point to the same hidden phenomena: Facebook had no ability nor willingness to honor

7   the privacy controls they touted.  Indeed, contemporaneous news articles viewed the whitelisting

8   disclosure as adding to the existing data control issue raised by the March 2018 revelations

9   regarding Cambridge Analytica.  ¶¶704-05.   Moreover, Facebook **did** "whitelist" Cambridge

10  Analytica's data.  ¶¶128-36.

11              **B.**         **The July 26, 2018 Price Decline**

12  Following the March 2018 disclosures, Defendants' focus turned to assuring investors that,

13  while they admittedly should have put privacy controls in place years ago (¶390), those mistakes

14  were now resolved, and the privacy deficiencies were not threatening the Company's business

15  model or financial results. ¶¶392-93; *see also* ¶¶387-91.  On April 25, 2018, the Company issued

16  its 1Q18 earnings report, which Defendants touted as demonstrating that the privacy deficiencies

17  had not impacted user trust or engagement.  ¶¶394-97.  In response, the Company's stock price

18  jumped by 9%.  ¶398.  Thereafter, the stock price continued to rise as Defendants reassured

19  investors that the Company's business was safe from the impact of the privacy revelations and that

20  the roll out of the user opt-in requirements of GDPR were no cause for concern.  ¶¶398-08.

21  These statements were false and investors learned the truth when Facebook issued its 2Q18

22  earnings on July 25, 2018, reporting declining European user numbers, lower than expected

23  revenues, and reduced guidance, all as a substantial result from the disclosures concerning

24  Facebook's privacy practices.  ¶¶417-26; 707.  This caused an immediate 19% decline in

25  Facebook's stock price, a stunning drop that eliminated $100 billion of shareholder value in a

26  single day.  ¶¶424-25.  By comparison, the overall market declined by just 0.3%.  ¶688.

27  Defendants dispute these loss causation allegations merely because the loss occurred four

28  months after the March 2018 disclosures.  Mot. at 29-30.  Their argument is unavailing.  The Ninth

1  Circuit has sustained loss causation allegations where, as here, the financial impact from a prior

2  disclosure of improper practices was revealed several months later by an earnings announcement

3  of "less-than-expected revenues." *Gilead*, 536 F.3d at 1058 (holding loss causation sufficiently

4  pleaded where disclosure of FDA Warning letter revealed use of improper off-label marketing and

5  caused a price drop three months later when the company reported a surprise earnings miss due to

6  decreased demand).

7      Defendants' attempt to label these allegations "mere speculation" is also without merit.

8  Mot. at 30.  In *Gilead*, the Ninth Circuit held allegations that "physicians were less eager to

9  prescribe" the company's drug and that competitors had used the disclosure of improper marketing

10  practices to lure away customers were not "too speculative" to plead loss causation based on a

11  revenue miss.  536 F.3d at 1058.  Much more is alleged here as Defendants *themselves* linked the

12  measures taken to give users control over their data to the negative impact on revenue growth and

13  forward-looking guidance.  ¶¶708-09.  Defendant Wehner explicitly attributed the downward

14  guidance on "giving people who use our services more choices around data privacy." *Id*.  A

15  Citigroup analyst asked whether giving users more control over their privacy "is one of the reasons

16  you're expecting meaningful decel[eration]" of growth, prompting Wehner again to enumerate the

17  GDPR, data sharing opt-outs, and new privacy protections as reasons for declining revenue

18  growth. *Id*.  Investors and analysts also made the same connection.  ¶¶712-15.

19      In a flailing effort, Defendants argue loss causation is not sufficiently pleaded because the

20  Complaint alleges "other reasons unrelated to the alleged fraud why revenues might have declined"

21  and fails to rule out "disappointing news about Facebook's finances" as the cause of the price drop.

22  Mot. at 32-33.  However, at the pleading stage it is well established that other possible reasons for

23  the price decline do not need to be ruled out.  *See Gilead*, 536 F.3d at 1058 (allegations were

24  "'enough fact to raise a reasonable expectation that discovery will reveal evidence'—or the lack

25  thereof—of the [the disclosure's] effect on demand"); *In re Mattel, Inc. Sec. Litig.*, Case No. 2:19-

26  cv-10860, ECF No. 74, at 27 (C.D. Cal. Jan. 26, 2021) ("[C]onclusively deciding reasons for the

27  market's reaction is premature, and reasonable theories concerning that reaction do not warrant

28  Rule 12 dismissal."); *In re Bear Stearns Companies, Inc. Sec., Deriv., & ERISA Litig.*, 763 F.

1    Supp. 2d 423, 507 (S.D.N.Y. 2011) ("[A]t the motion to dismiss stage, the . . . [c]omplaint need

2    not rule out all competing theories for the drop in Bear Stearns' stock price; that is an issue to be

3    determined by the trier of fact on a fully developed record.").

4         Further, Defendants' contention that the upward movement of Facebook's stock price prior

5    to the July 2018 drop "undermines" loss causation is baseless.  Mot. at 33-34.  Upward price

6    movement during a series of disclosures does not negate loss causation.  *In re UTStarcom, Inc.*

7    *Sec. Litig.*, 617 F. Supp. 2d 964, 978 (N.D. Cal. 2009) ("To the extent that stock price actually

8    increased after corrective disclosures, Defendants will have the opportunity after discovery to

9    demonstrate that, in fact, the subject of the alleged misrepresentations did not cause Plaintiffs'

10   claimed loss."); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 n.33 (5th Cir. 2009)

11   (rejecting argument loss causation was not pleaded because price increased after a partial

12   disclosure within a series); *Take-Two*, 551 F. Supp. 2d at 289-90 ("[B]ecause the rapid recovery

13   of Take–Two's share price from declines that it suffered may have resulted from factors unrelated

14   to the company's options backdating, it is premature to preclude a showing of loss causation on

15   that ground.").  Because Defendants falsely touted the Company's 1Q18 results as evidence there

16   was no significant business impact from the March 2018 disclosures, analysts were led to believe

17   the fallout from the fraud was behind the Company.  ¶397 n.415.  The July 2018 disclosure exposed

18   the falsity of that assurance. *See Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys.*,

19   Inc., 411 F. Supp. 2d 1172, 1178 (N.D. Cal. 2005) (loss causation was pleaded where, between

20   partial disclosures, false "assurance allegedly allowed Cisco's stock to continue to trade at

21   artificially inflated prices").

22   **V.    Expert Analysis Confirms The Complaint's Loss Causation Allegations**

23        The detailed loss causation allegations in the TAC are further supported by the Expert

24   Report of Dr. Matthew D. Cain, a seasoned practitioner with significant experience serving as a

25   Financial Economist at the Securities Exchange Commission ("SEC") and currently a Senior

26   Fellow at the Berkeley Center for Law and Business and a Senior Visiting Scholar at Berkeley

27   Law School.  Compl., Ex. C.

28

The declaration of Dr. Matthew D. Cain ("Dr. Cain Report") brings expert analysis to further refute the loss causation arguments raised by Defendants.  Dr. Cain's conclusions provide scientific support for the reality that the TAC adequately pleads loss causation for the alleged corrective disclosures in March 2018 and July 2018 and, in particular, new information regarding users' lack of control over their data was revealed by the March 2018 disclosures  (¶¶364-70, 690-95, 723), causing enormous – and statistically significant – stock price declines.  ¶¶373, 689, 724.

Dr. Cain conducted a detailed analysis where he reviewed the allegations of the TAC, carefully surveyed dozens of news articles, analyst reports and other relevant disclosures relating to each alleged corrective disclosure (Ex. C., ¶¶15-26), and performed a scientifically accepted event study, or regression model, to test "whether the deviation from expected price movements" of Facebook common stock following the alleged corrective disclosures were "sufficiently large compared to the usual volatility in the Company stock price return such that simple random movement can be rejected as the cause."  *Id.* ¶28.  Dr. Cain's regression model used a 120 day "rolling estimation window" and other methodology that is widely accepted by financial economists.  *Id.* ¶¶31-32.  His analyst confirmed that the abnormal rate of return for the alleged corrective disclosures was statistically significant at either the 99% level (for the March 19, 2018 and July 26, 2018 disclosures) or the 95% level (for the March 20, 2018 and March 27, 2018 disclosures), both of which are well above the 90% threshold that permits Dr. Cain to "reject randomness as the cause of the abnormal movements in stock price" on those days.  *Id.* ¶34.

Based on his work, Dr. Cain opined that the alleged corrective disclosures "significantly altered the information environment available to investors in Facebook securities," and "the price declines in Facebook's common stock on March 19, 2018, March 20, 2018, March 27, 2018 and July 25, 2018 were statistically significant [and] were proximately caused by the revelation of the truth concerning Defendants' alleged misrepresentations and/or omissions."  ¶¶723-24.

As discussed in the accompanying Opposition to Defendants' Motion to Strike, the Dr. Cain Report itself does not contain new facts or evidence.  Rather, it relies on the facts pleaded in the TAC, meticulously reviews these facts, applies scientifically sound methodology, and concludes each disclosure event revealed new information that would carry importance to a

1  reasonable investor making an investing decision, and catalogues the factual basis for his

2  conclusions.  It is widely-recognized that opinions of subject matter experts further corroborating

3  and confirming the allegations of a complaint may be considered at the pleading stage when

4  weighing Plaintiffs' well-pleaded allegations.

5  **VI.   Reliance Is Presumed**

6      Plaintiffs have alleged that Facebook's stock traded in an efficient market.  ¶¶32, 680-84.

7  There is therefore a presumption that the material misrepresentations and omissions alleged in the

8  Complaint (*see* ¶¶685-725) impacted Facebook's stock price.  *Basic Inc. v. Levinson*, 485 U.S.

9  224 (1988).  Defendants attempt to rebut the presumption of reliance by again asserting that the

10  truth was on the market as of December 2015.  This argument is both incorrect and premature.  *See*

11  *Baker v. SeaWorld Entm't, Inc.*, 2017 WL 5885542, at *11 (S.D. Cal. Nov. 29, 2017).  It should

12  be rejected.[13]

13  **VII.   The Complaint Pleads Insider Trading Claims and Control Person Liability**

14      Defendants argue that Plaintiffs' §20A claims must be dismissed because Plaintiffs have

15  failed to state an underlying claim under §10(b).  Mot. at 35.  As discussed above, however,

16  Plaintiffs have adequately pled primary violations of §10(b) and Rule 10b-5.  Moreover, since

17  Plaintiffs have pled scienter against Zuckerberg, the Complaint adequately pleads that he

18  possessed material, nonpublic, adverse information.[14]  The Complaint also adequately alleges that

19  during the Class Period and contemporaneously with Zuckerberg's insider sales, Plaintiffs

20  purchased a total of 260,091 shares of Facebook's common stock for more than $44.6 million.

21

22

23

---

24  [13] In addition to failing to rebut the *Basic* presumption, Defendants also ignore that reliance also

25  may be presumed as a result their numerous omissions.  *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972); *Blackie v. Barrack*, 524 F.2d 891, 902, 905 (9th Cir. 1975);

26  *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *6-7 (N.D. Cal. Apr. 21, 2016).

   [14] *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *27 (C.D. Cal. July 1, 2008) ("Because

27  . . . plaintiff has alleged scienter with respect to its §10(b) claim . . . defendants' argument [that

   plaintiff's §20A claim must be dismissed because he failed to allege the insider trader defendant

28  knew of material, non-public information when he sold stock] lacks merit.").

1    ¶745.  Tens of thousands of other Class members also purchased shares contemporaneously with

2    Zuckerberg's insider sales.  ¶746.  These allegations are sufficient to allege a §20A claim.[15]

3         The complaint also pleads control person liability under Section 20(a) of the Exchange Act,

4    which imposes liability on persons who "exercised actual power or control over the primary

5    violator."  *Howard v. Hui*, 2001 WL 1159780, at *3 (N.D. Cal. Sept. 24, 2001).  Scienter is not

6    required.  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Zuckerberg, Sandberg

7    and Wehner are all senior officers and are "control persons."  ¶¶33-35; ¶¶247-48.

8    **VIII.   The Other Misstatements In The TAC Should Be Sustained And Defendants'
           Motion To Dismiss Should Be Denied In Its Entirety**

9
10        In light of the Court's prior rulings, this brief focuses on the new facts alleged in the TAC

11   showing that Facebook's Cambridge Analytica investigation-related statements were misleadingly

12   made with scienter and establishing loss causation for the control statements that were otherwise

13   sustained by the Court.  With respect to all other false and misleading statements set forth in the

14   TAC, Plaintiffs preserve all appellate rights and maintain they are actionable for the reasons

15   detailed therein.

16                                    **CONCLUSION**

17        Plaintiffs respectfully submit that the Motion should be denied in its entirety.  In the

18   alternative, in the event the Court is inclined to grant any part of Defendants' motion, Plaintiffs

19   respectfully request leave to amend.  *See Toy Invs., Inc. v. Poof-Slinky, Inc.*, 2013 WL 60095838,

20   at *1 (W.D. Wash. Nov. 20, 2013) ("'requests for leave to amend should be granted with extreme

21   liberality'") (quoting *Mirmehdi v. United States*, 689 F.3d 975, 985 (9th Cir. 2012)).

22

23

24

25

26   _____

27   [15] *See In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255-56 (S.D.N.Y. 2007) ("the
     Complaint alleges that members of the putative class traded Openwave stock contemporaneously

28   with the defendants named in the Section 20A cause of action, and has specified the dates of the
     defendants' trades.  Such averments are sufficient to state a cause of action under Section 20A.").

1    DATED: February 19, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

BERNSTEIN LITOWITZ BERGER &
  GROSSMANN LLP
JOHN C. BROWNE
JEREMY P. ROBINSON
ALEXANDER T. PAYNE


          /s/ John C. Browne
          JOHN C. BROWNE

1251 Avenue of the Americas
New York, NY  10020
Telephone: 212/554-1400
212/554-1444 (fax)
johnb@blbglaw.com
jeremy@blbglaw.com
alex.payne@blbglaw.com
Counsel for Mississippi and Co-Lead Counsel for
the Class

ROBBINS GELLER RUDMAN
  & DOWD LLP
DENNIS J. HERMAN
JASON C. DAVIS
KENNETH J. BLACK


**/s/    Jason C. Davis
          JASON C. DAVIS

One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: 415/288-4545
415/288-4534 (fax)
dherman@rgrdlaw.com
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

Counsel for Amalgamated and Co-Lead Counsel for
the Class

** Pursuant to Civ. L.R. 5-1(i)(3), the electronic
filer has obtained approval from this signatory

PIERCE BAINBRIDGE BECK PRICE
  & HECHT LLP
CLAIBORNE R. HANE
20 West 23rd Street, Fifth Floor
New York, NY 10010
Telephone:  213/262-9333

1

Counsel for Helms and Additional Counsel for the
Class

2

3

POMERANTZ LLP
JEREMEY A. LIEBERMAN
J. ALEXANDER HOOD II
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone:  212/661-1100
212/661-8665 (fax)

4

5

6

7

Counsel for Kacouris and Additional Counsel for
the Class

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

I, John C. Browne, declare as follows:

3

I am employed in the County of New York, State of New York, I am over the age of

4

eighteen years and am not a party to this action; my business address is 1251 Avenue of the

5

Americas, 44th Floor, New York, New York 10020, in said County and State.

6

I hereby certify that on February 19, 2021, the foregoing LEAD PLAINTIFFS'

7

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'

8

MOTION TO DISMISS was filed with the Clerk of the Court via CM/ECF.  Notice of this filing

9

will be sent electronically to all registered parties by operation of the Court's electronic filing

10

systems.

11

<u>      /s/ John C. Browne      </u>
JOHN C. BROWNE

12

13

1251 Avenue of the Americas
New York, NY  10020
Telephone: 212/554-1400

14

212/554-1444 (fax)
johnb@blbglaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28