BERNSTEIN LITOWITZ BERGER &
  GROSSMANN LLP
JOHN C. BROWNE
JEREMY P. ROBINSON
ALEXANDER T. PAYNE
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
(212) 554-1444 (fax)
johnb@blbglaw.com
jeremy@blbglaw.com
alex.payne@blbglaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DENNIS J. HERMAN (220163)
JASON C. DAVIS (253370)
KENNETH J. BLACK (291871)
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
(415) 288-4534 (fax)
dherman@rgrdlaw.com
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

Co-Lead Counsel for the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re FACEBOOK, INC. SECURITIES LITIGATION | Master File No. 5:18-cv-01725-EJD |
| | CLASS ACTION |
| This Document Relates To: | **LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE** |
| ALL ACTIONS. | |

## I. STATEMENT OF ISSUES TO BE DECIDED

1. Whether the Court should grant Defendants' request to strike the expert declaration of Dr. Matthew D. Cain that is attached to and incorporated in the Complaint concerning loss causation.

2. Whether the Court should strike or disregard portions of the Complaint that cite Dr. Cain's conclusions where those conclusions serve to buttress the Complaint's factual allegations establishing loss causation.

## II. INTRODUCTION

In conjunction with their motion to dismiss, Defendants move to strike the expert declaration of Dr. Matthew D. Cain ("Cain Report"), attached as Exhibit C to the Complaint. Dr. Cain is a well-credentialed and seasoned economist with significant experience serving as a Financial Economist at the Securities Exchange Commission ("SEC") and currently a Senior Fellow at the Berkeley Center for Law and Business and a Senior Visiting Scholar at Berkeley Law School. Cain Report, ¶¶1-6. Defendants' motion to strike should be denied for multiple reasons.

A principle focus of Defendants' motion to dismiss is their factual dispute that no new information concerning users' lack of control over their data was revealed to the market through the alleged corrective disclosures in March and July 2018. For example, Defendants argue that the articles published in *The New York Times* and *The Guardian* on March 17, 2018 revealing that users did not control their data due to, among other things, the fact that Cambridge Analytica continued to possess and misuse the data of tens of millions of users without consent or knowledge, cannot be corrective disclosures and therefore the Complaint fails to plead loss causation as a matter of law. According to Defendants, that information somehow had been revealed three years earlier by the 2015 article published in *The Guardian,* even though Defendants had publicly responded to *The Guardian* article by assuring users that their data was safe and totally within the users' control. Mot. at 24. Further, the Court stated in its August 7, 2020 motion to dismiss

opinion: "[of] course, the market was not aware of Cambridge Analytica's *continued* misuse until the March 2018 *The Guardian* article." ECF No. 137 at 64.

It appears that Defendants' real objection to the Cain Report is that it is devastating to their effort to halt this Action at the pleading stage—which provides no basis to strike documents and information validly incorporated into a pleading. Defendants' arguments are inconsistent with the alleged facts, facially implausible, and should be rejected.

As discussed in Plaintiff's accompanying Memorandum of Law in Opposition To Defendants' Motion to Dismiss Third Amended Consolidated Class Action Complaint, the 2015 article in *The Guardian* could not possibly have revealed that data misappropriated or shared with app developers would remain outside of Facebook's and users' control years after the article was published and contrary to Defendants' subsequent representations that users had control over their data. Thus, Defendants' chronology is impossible, as the Court itself recognized. ECF No. 137 at 64. The Cain Report corroborates the well-pled allegations of the Complaint by bringing expert analysis to bear on the loss causation arguments raised by Defendants. Dr. Cain's conclusions provide further support for the reality that new information regarding users' lack of control over their data was revealed by the March 2018 disclosures (¶¶364-70, 690-95, 723), causing enormous – and statistically significant – stock price declines. ¶¶373, 689, 724. The Cain Report also corroborates the Complaint's loss causation allegations relating to the July 2018 disclosures.

As described below, it is widely recognized that opinions of subject matter experts further corroborating and confirming the allegations of a complaint may be considered at the pleading stage when weighing Plaintiffs' well-pleaded allegations.

**III.   ARGUMENT**

**A.   The Complaint Adequately Pleads Loss Causation**

The Complaint alleges loss causation based on the extraordinarily (and historically) negative reaction of Facebook's stock price to a series of disclosures that revealed Cambridge Analytica's (and other entities) continued possession and misuse of user data and the related truth that users did not have control over their personal data as well as subsequent disclosures regarding

the impact that lack of control had on the Company's business and financial performance. ¶¶364-65, 440, 689-91, 696, 698-99. On March 17, 2018, articles published by *The New York Times* and *The Guardian* revealed for the first time that, despite Defendants' prior touting of their privacy controls, users did not have control over their data, in part because Cambridge Analytica still possessed most, if not all, of the user data Facebook had told the public was deleted and Cambridge Analytica had used that data without users' consent in the Trump political campaign throughout 2016 and continuing into 2017. ¶¶360-65. The March 17, 2018 articles also revealed that Defendants' prior statements regarding risk disclosure warnings (¶¶525-26, 530, 533), respect for users' privacy settings (¶519), and the results of Facebook's investigation into Cambridge Analytica's data misuse were false and misleading. ¶¶537-38.

The March 17, 2018 *New York Times* article explicitly linked the news of Cambridge Analytica's continued possession and misuse of the data to the issue of users' lack of control. ¶691 (stating "copies of the data still remain beyond Facebook's control" and noting that *The Times* even "viewed a set of raw data from the profiles Cambridge Analytica obtained"). The Complaint also provides examples of how the press contemporaneously linked this news to the new revelation that users did not control their data. ¶693 (March 19, 2018 article printed in the *Los Angeles Times* noting Facebook "bushwhacked" the public by promising users "own all of the content and information [that they] post on Facebook, and [users] can control how it is shared'" – when "[t]he reality is: [user] data belong[s] to Facebook, and the company will enrich itself by doing with it whatever it pleases"). Indeed, Facebook's own March 16, 2018 website statement, which was designed to preempt the articles printed on March 17, drew a direct link between its announcement suspending Cambridge Analytica and the overriding issue of user control. ¶692 (contrasting the Cambridge Analytica situation with the "updates" from 2014 that purportedly enabled users to "decide what information they want to share . . . [as] just one of the many ways we give people the tools to ***control their experience"*** (emphasis in Facebook's original)).

The extent of users' lack of control continued to be revealed by a series of partial disclosures from March 18, 2018 through March 27, 2018 (¶¶696, 698-99). These disclosures

1  occurred in March 2018 and caused statistically significant stock price declines.  The Complaint
2  alleges numerous examples of the press contemporaneously linking these disclosures to the issue
3  of users' control over their data.  ¶700.
4      On June 3, 2018, *The New York Times* published an article regarding Facebook's improper
5  whitelisting practices.  ¶703.  Pointing to several public reports, the Complaint details how the
6  market viewed this revelation as a follow-on to the series of disclosures that had alerted investors
7  that users' data remained at risk from app developers across the board.  ¶¶704-05.  Indeed, further
8  demonstrating the follow-on nature of this disclosure, Cambridge Analytica itself was one of the
9  "whitelisted" parties.  ¶¶124-36.
10      When reporting the Company's 1Q2018 financial results, Defendants falsely told investors
11  that Facebook's purported privacy deficiencies and the revelations from the Cambridge Analytica
12  data misuse had not and would not significantly impact Facebook's business.  ¶¶394-97. The press
13  and analysts believed Defendants' false statements.  ¶396, 397 n.415.  As a result of these false
14  statements, Facebook's stock price increased more than 9%, thus remaining artificially inflated as
15  a result of the fraud.  ¶398.  Defendants' assurances were false.
16      On July 25, 2018, Facebook finally revealed the significant financial impact of the March
17  2018 disclosures on Facebook's business when the Company reported declining user engagement
18  in Europe, lower than expected revenues, increased expenses, and reduced guidance, due
19  principally to the revelations about Facebook's privacy practices.  ¶¶417-26; 707.  Facebook's
20  stock declined 19% on this news, eliminating $100 billion of shareholder value and representing
21  at the time the largest single-day market capitalization decline in U.S. history.  ¶707.  Defendants
22  themselves explicitly linked the decreased user engagement and revenue growth to the need to
23  strengthen data privacy measures and provide users with data controls.  ¶708-09.  The press and
24  analysts again contemporaneously connected the surprise downward revision of guidance to the
25  issue of user control.  ¶¶713-20.
26
27
28

### B. Expert Analysis Corroborates The Complaints' Loss Causation Allegations

Dr. Cain reviewed the information revealed in the alleged March and July 2018 corrective disclosures, as well as related events, and opined that "new information was revealed to the market concerning the continued misuse of user data by Cambridge Analytica, the extent and scope of Facebook's data privacy issues, and the lack of user control over data provided to Facebook." Cain Report, ¶11.

The Cain Report itself does not contain new facts or evidence.  Rather, it relies on the facts pleaded in the Complaint, meticulously reviews these facts, applies scientifically sound methodology, and concludes each disclosure event revealed new information that would carry importance to a reasonable investor making an investing decision, and catalogues the factual basis for his conclusions.  Cain Report, ¶¶14-26.  Lastly, Dr. Cain's Declaration supplements the Complaint with a scientifically recognized event study concluding that the corrective disclosures resulted in statistically significant stock price declines.  Cain Report, ¶¶27-35; Cain Report, Ex. 2.

### C. Courts Should Consider Expert Declarations Attached to the Pleadings

On a motion to dismiss, as Defendants' *own* cases confirm, courts are permitted to consider declarations from experts supporting the contentions and allegations that form the basis of the pleadings.  *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 821 (C.D. Cal. 2011) (denying motion to strike expert report from pleading because "expert report serves merely to buttress Plaintiffs' contentions concerning the lack of an agreement or understanding with the FDA and the inadequacy of Defendants' bioequivalency studies, upon which Plaintiffs' complaint rests") (reconsideration denied); *see also Sanchez v. Bay Area Rapid Transit Dist.*, 2013 WL 4764485, at *9 (N.D. Cal. Sept. 5, 2013) (expert report attached to the complaint did not fall under Rule 10(c), denying motion to strike, and noting "[e]xpert reports and photographs are commonly attached to complaints"); *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *19 (D.N.J. Dec. 15, 2015) ("The allegedly suspiciously timed stock sales are bolstered by the declaration of [an expert food scientist] . . . [and] the declaration of [the expert] only serves to supplement the allegations contained in the Amended Complaint . . . ."); *Cole v. Hunter*, 2014 WL 266501, at *4 (N.D. Tex.

Jan. 24, 2014) (denying motion to strike and holding that expert reports attached to complaint constitute "written instruments" under Rule 10(c) where reports "serve merely to buttress Plaintiffs' contentions concerning their allegations of excessive force").

Rule 10(c) of the Federal Rules of Civil Procedure states that a plaintiff may attach a "written instrument" to its complaint, and that the written instrument "is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c).  In *In re Mannkind Securities Actions*, the court reviewed case law analyzing the applicability of Rule 10(c) to expert declarations, including *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212 (S.D. Cal. 2001) on which Defendants rely, and concluded "there exists 'no inflexible rule' governing the sort of 'written instruments' that may be attached to a pleading."  835 F. Supp. 2d at 821 (noting the "expert report is not essential to its finding that Plaintiffs' complaint survives Defendants' motion to dismiss" and that the report's "assertions help to establish that Defendants were misrepresenting the facts when they told investors that their studies were 'pre-approved,' 'blessed,' and so on").

Numerous courts in this Circuit have accepted factual analysis of an expert in similar circumstances, including *DeMarco*, a case on which Defendants rely.  *See DeMarco*, 149 F. Supp. 2d at 1222 (declining to strike complaint allegations with expert's analysis); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) (considering analysis of plaintiff's "statistical expert"); *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1210 (W.D. Wash. 2009) (noting "Plaintiffs have also provided expert data analysis reinforcing their claim that WaMu's appraisal process was corrupt").

Defendants' attempt to minimize the import of Dr. Cain's conclusions by questioning the preface that his statements were derived "from an economic perspective."  Mot. to Strike at 6. However, this was not an empty turn of phrase nor a legal conclusion made up out of whole cloth. Dr. Cain's conclusions that the stock price declines were statistically significant and proximately caused by the disclosure of new information were undergirded by a thorough event study.  ¶¶724-25; Cain Report, ¶¶27-35.

Because Dr. Cain's conclusions are non-conclusory, are based on a rigorous analysis of the factual allegations of the Complaint, and buttress the contentions that form the basis of the Complaints' loss causation allegations, the Cain Report is properly attached to the pleadings and should be considered by the Court.

## IV.   CONCLUSION

For the reasons stated above, the Court should deny Defendants' motion to strike Dr. Cain's declaration. In the event the Court should strike Dr. Cain's declaration, the sufficiency of the factual allegations in the Complaint remains unaffected.

DATED: February 19, 2021

Respectfully submitted,
BERNSTEIN LITOWITZ BERGER &
  GROSSMANN LLP
JOHN C. BROWNE
JEREMY P. ROBINSON
ALEXANDER T. PAYNE

      /s/ John C. Browne
         JOHN C. BROWNE

1251 Avenue of the Americas
New York, NY  10020
Telephone: 212/554-1400
212/554-1444 (fax)
johnb@blbglaw.com
jeremy@blbglaw.com
alex.payne@blbglaw.com

Counsel for Mississippi and Co-Lead Counsel for the Class

ROBBINS GELLER RUDMAN
  & DOWD LLP
DENNIS J. HERMAN
JASON C. DAVIS
KENNETH J. BLACK

**/s/    Jason C. Davis
         JASON C. DAVIS

One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: 415/288-4545
415/288-4534 (fax)
dherman@rgrdlaw.com

LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE
5:18-cv-01725-EJD                                                                                                  7

jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

Counsel for Amalgamated and Co-Lead Counsel for the Class

** Pursuant to Civ. L.R. 5-1(i)(3), the electronic filer has obtained approval from this signatory

PIERCE BAINBRIDGE BECK PRICE
  & HECHT LLP
CLAIBORNE R. HANE
20 West 23rd Street, Fifth Floor
New York, NY 10010
Telephone:  213/262-9333

Counsel for Helms and Additional Counsel for the Class

POMERANTZ LLP
JEREMEY A. LIEBERMAN
J. ALEXANDER HOOD II
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone:  212/661-1100
212/661-8665 (fax)

Counsel for Kacouris and Additional Counsel for the Class

CERTIFICATE OF SERVICE

I, John C. Browne, declare as follows:

I am employed in the County of New York, State of New York, I am over the age of eighteen years and am not a party to this action; my business address is 1251 Avenue of the Americas, 44th Floor, New York, New York 10020, in said County and State.

I hereby certify that on February 19, 2021, the foregoing LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE was filed with the Clerk of the Court via CM/ECF. Notice of this filing will be sent electronically to all registered parties by operation of the Court's electronic filing systems.

    /s/ John C. Browne
JOHN C. BROWNE

1251 Avenue of the Americas
New York, NY 10020
Telephone: 212/554-1400
212/554-1444 (fax)
johnb@blbglaw.com