Orin Snyder (*pro hac vice*)
  osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:  202.955.8217
Facsimile:  202.530.9614

Brian M. Lutz (SBN 255976)
  blutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

Paul J. Collins (SBN 187709)
  pcollins@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Telephone:  650.849.5300
Facsimile:  650.849.5333

*Attorneys for Defendants Facebook, Inc.,
Mark E. Zuckerberg, Sheryl K. Sandberg, and
David M. Wehner*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE FACEBOOK, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | CASE NO. 5:18-CV-01725-EJD<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Date:  June 10, 2021<br>Time:  9:00 a.m.<br>Location:  Courtroom 4, 5th Floor<br>Judge:  Hon. Edward J. Davila<br><br>Date First Action Filed:  March 20, 2018 |

1

**TABLE OF CONTENTS**

2

Page

3

I. PRELIMINARY STATEMENT ................................................................................................ 1

4

II. ARGUMENT ........................................................................................................................... 3

5

    A.      Plaintiffs Fail to Plead an Actionable Misstatement or Omission ............................... 3

6

            1.      Plaintiffs Fail to Show That Any of the Challenged
                    Statements Were False or Misleading ................................................................ 3

7

8

    B.      Plaintiffs Fail to Plead a Strong Inference of Scienter ................................................ 5

9

            1.      Plaintiffs' Trump "Embed" Theory of Scienter Is Not
                    Supported by Facts ............................................................................................ 5

10

            2.      Plaintiffs Fail to Plead That the Three Employees Working
                    with the Trump Campaign Shared What They Supposedly

11

                    Knew with Anyone at Facebook, Including the Individual
                    Defendants .......................................................................................................... 7

12

            3.      Plaintiffs' "Red Flags" Allegations Do Not Plead Scienter ............................ 10

13

            4.      Plaintiffs Fail to Plead the Individual Defendants Knew
                    About Alleged Whitelisting ............................................................................. 13

14

15

    C.      Plaintiffs Fail to Plead Loss Causation ................................................................... 14

16

            1.      Plaintiffs Fail to Plead Loss Causation for the March
                    Declines ............................................................................................................. 16

17

18

            2.      Plaintiffs Fail to Plead Loss Causation for the July Decline ......................... 20

19

            3.      The Cain Declaration Does Not Help Plaintiffs Plead Loss
                    Causation ........................................................................................................... 24

20

    D.      Plaintiffs Fail to Plead Reliance ................................................................................ 24

21

    E.      Plaintiffs Fail to Plead Claims Under Sections 20(a) or 20A .................................. 25

22

III. CONCLUSION ..................................................................................................................... 25

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020)........................................................................................16

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
    2016 WL 4585753 (N.D. Cal. Sept. 2, 2016) ...............................................................18

*Cheung v. Keyuan Petrochems., Inc.*,
    2012 WL 5834894 (C.D. Cal. Nov. 1, 2012)................................................................10

*In re ChinaCast Educ. Corp. Sec. Litig.*,
    809 F.3d 471 (9th Cir. 2015)..........................................................................................9

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ...............................................................................................3, 15

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
    402 F. Supp. 3d 767 (N.D. Cal. 2019) .........................................................................10

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995)..........................................................................................8

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) .........................................................................19

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008).......................................................................................22

*Glazer Cap. Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008).........................................................................................10

*Grigsby v. BofI Holding, Inc.*,
    979 F.3d 1198 (9th Cir. 2020)...........................................................................15, 18, 19

*Inchen Huang v. Higgins*,
    2019 WL 1245136 (N.D. Cal. Mar. 18, 2019) .............................................................15

*Iron Workers Loc. 580 Joint Funds v. NVIDIA Corp.*,
    2021 WL 796336 (N.D. Cal. Mar. 2, 2021) ..................................................................9

*In re Kalobios Pharms., Inc. Sec. Litig.*,
    258 F. Supp. 3d 999 (N.D. Cal. 2017) .........................................................................20

*Khoja v. Orexigen Therapeutics, Inc.*,
    2020 WL 6395629 (S.D. Cal. Nov. 2, 2020) ...........................................................18, 19

*In re Liberty Tax, Inc. Sec. Litig.*,
    435 F. Supp. 3d 457 (E.D.N.Y. 2020), *aff'd*, 828 F. App'x 747 (2d Cir. 2020)..........................19

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016)............................................................................................18, 19

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008).................................................................................15, 20, 23, 24

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018)..............................................................................................15, 19

*In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*,
    184 F. Supp. 2d 991 (N.D. Cal. 2001) ...................................................................................7, 14

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ...................................................................................................9

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
    730 F.3d 1111 (9th Cir. 2013) .................................................................................................19

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014)..............................................................................................15, 17

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010)....................................................................................................24

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014)....................................................................................................9

*In re Quality Systems, Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017)....................................................................................................9

*Rok v. Identiv, Inc.*,
    2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ................................................................................16

*Rok v. Identiv., Inc.*,
    2018 WL 807147 (N.D. Cal. Feb. 9, 2018)..............................................................................15

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008)..................................................................................................8, 9

*Strasburger v. Blackburne & Sons Realty Cap. Corp.*,
    2020 WL 6128069 (C.D. Cal. Apr. 22, 2020) ..........................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................................................13

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017).......................................................................................................3

Gibson, Dunn &
Crutcher LLP

*Yourish v. Cal. Amplifier,*
    191 F.3d 983 (9th Cir. 1999)................................................................................................8

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009)................................................................................................9

**Statutes**

15 U.S.C. §78u-4(b)(2)(A)................................................................................................14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

1

## I.     PRELIMINARY STATEMENT

Plaintiffs' Opposition confirms that this action should be dismissed with prejudice once and for all.  The Court already dismissed two prior complaints for failure to plead each element of a securities fraud claim with the specificity required under the PSLRA.  The Court's most recent order gave Plaintiffs one "final opportunity" to cure their pleading deficiencies, and highlighted the specific facts required for an amended pleading to survive dismissal with prejudice.  ECF No. 137 ("2020 Order") at 66.  Plaintiffs' Opposition makes clear what was obvious from the start.  Despite a 747-paragraph amended complaint, covering 283 pages, and even attaching an improper expert opinion, Plaintiffs *still* cannot allege any specific facts demonstrating that anyone at Facebook—and most importantly, the Individual Defendants—knew that Cambridge Analytica had lied to Facebook and continued to retain misappropriated user data.  Plaintiffs *still* cannot allege any specific facts demonstrating that anyone at Facebook—including, again, the Individual Defendants—knew that Cambridge Analytica supposedly used the purloined data to assist the 2016 Trump campaign.  And Plaintiffs *still* cannot allege any specific facts demonstrating that Facebook's stock price declines in March and July 2018 were caused by the correction of a prior false statement, as opposed to negative news about the Cambridge Analytica events or a quarterly earnings miss.  Once again, Plaintiffs fail to plead an actionable securities fraud claim.  Plaintiffs have been given every opportunity, and should not be given another.  This case should be dismissed with prejudice.

Plaintiffs' Opposition cobbles together theories of falsity and scienter, combining unsupported conjecture in one paragraph of the TAC with unfounded inferences hundreds of paragraphs later.  Plaintiffs twist themselves into conspiratorial pretzels hoping that the Court will simply endorse what Plaintiffs say line-level Facebook employees "should have known," "would have been seeing," or "would have known" about Cambridge Analytica's compliance with Facebook's data use policies, rather than focus on the absence of specific facts demonstrating what anyone at Facebook—let alone its senior executives—*actually knew*.

What is strikingly absent from the TAC is any specific fact drawn from a document, a confidential witness (this being the rare securities case where the plaintiffs have no such witnesses), or from any other source demonstrating that anyone at Facebook knew that Cambridge Analytica had lied

Gibson, Dunn &
Crutcher LLP

1   in its destruction certification; that anyone at Facebook knew that Cambridge Analytica had retained

2   the misappropriated user data; or that anyone at Facebook knew that Cambridge Analytica had used

3   the misappropriated data in the Trump campaign.  It is no surprise, then, that the TAC alleges no facts

4   creating a strong inference that the Individual Defendants knew all of this, and yet nonetheless caused

5   Facebook to lie to the market by saying that, as far as Facebook knew, the stolen data had been deleted.

6   Plaintiffs' wild conspiracy theories, built on unsupported allegations and illogical inferences sprinkled

7   throughout the TAC, are just a cover for their inability to plead specific facts amounting to fraud.

8   Because they cannot cure the deficiencies the Court identified in its last dismissal order, Plaintiffs

9   cannot plead falsity or scienter with respect to their core Cambridge Analytica theory of fraud.

10          Plaintiffs also fail to address, much less cure, their fatal inability to plead loss causation for

11   either the March or July price declines.  The fundamental problem with Plaintiffs' "user control" theory

12   is that Plaintiffs *still* cannot, in their third amended complaint, plead with particularity how any alleged

13   corrective disclosure revealed the "truth" of a prior misstatement, or how any alleged misstatement by

14   Facebook *caused* the losses they now seek to recover.  For the Cambridge Analytica statements—their

15   "main theory of securities fraud," 2020 Order at 33—Plaintiffs lack a plausible loss causation theory

16   because, as this Court found, "the market was already aware of the core information that Plaintiffs

17   claim was omitted" *in 2015*. *Id.* at 64.  For the user control statements allegedly rendered false by

18   whitelisting practices—Plaintiffs' "only viable theory" of securities fraud, *id.* at 65—Plaintiffs offer

19   no theory at all from which "the Court can infer the stock price fell in June 2018" after the whitelisting

20   was disclosed.  *Id.*

21          Plaintiffs' new theory as to the July declines is even more illogical and defective.  Facebook

22   said nothing on the July earnings call about whitelisting, third-party data sharing, or any other privacy

23   practice at issue in the TAC.  Yet Plaintiffs claim that the July earnings call "corrected" statements

24   about user control that this Court already found were alleged to have been corrected more than seven

25   weeks earlier by an article discussing whitelisting.  And while the "essential facts" relating to the

26   Cambridge Analytica events indisputably were disclosed no later than March 2018, Plaintiffs claim

27   that the July earnings miss somehow traces back to the alleged fraud revealed four months earlier.

28   These arguments defy common sense, and they cannot be squared with the foundational requirement

Gibson, Dunn &
Crutcher LLP

under the PSLRA of pleading specific facts demonstrating that new information revealed a fraud by correcting a prior misstatement.

Plaintiffs' Opposition confirms that they cannot cure the fatal deficiencies this Court previously identified.  The TAC should be dismissed, this time with prejudice.

## II.     ARGUMENT

### A.     Plaintiffs Fail to Plead an Actionable Misstatement or Omission

#### 1.     Plaintiffs Fail to Show That Any of the Challenged Statements Were False or Misleading

Plaintiffs' Opposition confusingly mixes its discussions of falsity and scienter—two different concepts, each of which Plaintiffs must plead with particularity.  But as this Court has repeatedly recognized in its detailed rulings dismissing the prior complaints, Plaintiffs are required—with respect to every challenged statement—not only to plead specific facts demonstrating that the statement was false or materially misleading at the time it was made, but also particularized facts supporting a strong inference that the speaker intentionally, or with deliberate recklessness, lied when making the statement.  *See* 2020 Order at 30 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)). Plaintiffs' Opposition confirms that Plaintiffs satisfy neither requirement.

***Risk Factors.***  Plaintiffs tacitly acknowledge in their Opposition that to plead that the risk factor statements were false, they have to plead facts showing that Facebook *actually knew* that the risks had, in fact, already come to pass—that is, that Cambridge Analytica continued to use the misappropriated data after certifying that it had been deleted.  ECF No. 153 ("Opp.") at 17-19.  But as discussed below, there are no facts alleged that show this—only conjecture and unsupported conclusions about what Plaintiffs assert Facebook *should have* known.  The risk factor statements are not actionable for this reason alone.

Even if Plaintiffs had adequately alleged that Facebook knew that Cambridge Analytica continued to use the misappropriated data (they have not), there can be no dispute that the TAC does not (and cannot) allege that the risks warned of—harm to Facebook's "reputation," "business," or "competitive position" as a result of third party misuse of purloined data—had already materialized at the time of the challenged risk factor statements.  *See* 2020 Order at 40-41; *Williams v. Globus Med., Inc.*, 869 F.3d 235, 242 (3d Cir. 2017) (statement regarding hypothetical risk is false only when effects

3

of risk have "already come to fruition").  The risk factor statements are not actionable for this separate reason, as the Court already twice concluded.  2020 Order at 40-41; ECF No. 118 ("2019 Order") at 35-36.

*Cambridge Analytica Investigation.*  Plaintiffs argue that Facebook's statement that its "investigation to date has not uncovered anything that suggests wrongdoing with respect to Cambridge Analytica's work on the Leave and Trump campaigns" was false when made in March 2017 because "[a]fter January 2016, Facebook learned more facts showing serious, continuing policy violations and wrongdoing." Opp. at 5.  As with the risk factor statements, however, whether this statement was false turns on what Facebook *actually knew* about wrongdoing by Cambridge Analytica—not what Plaintiffs think Facebook *should have* known, *see id.* at 6—when this statement was made in March 2017.  As discussed below, Plaintiffs fail to point to anything in the TAC that, if true, would demonstrate that anyone at Facebook, let alone the Facebook spokesperson who made the statements, actually knew in March 2017 that Cambridge Analytica had continued to use the purloined data in connection with either the Leave or Trump campaigns.[1]  Thus, there are no facts pled demonstrating that the investigation statement was false at the time it was made.

*User Control.*  In their Opening Brief, Defendants requested that the Court revisit its prior ruling that Plaintiffs' "whitelisting" allegations were sufficient to show the falsity of Facebook's statements regarding users' control of their data and Facebook respecting users' privacy settings.  ECF No. 145 ("OB") at 12.  In response, Plaintiffs argue that emails *from 2012 and 2013* relating to "reciprocity"— which they confuse with "whitelisting"—somehow relate to Facebook's data privacy practices years later.  Opp. at 4-5.  But even if, as Plaintiffs argue, Facebook provided a handful of apps access to certain data in a manner that was inconsistent with users' privacy settings (an allegation Facebook

---

[1]  Neither the TAC nor Plaintiffs' Opposition attempts to address the pleading deficiencies identified by the Court with respect to Cambridge Analytica's alleged misuse of Facebook user data in connection with the 2016 Leave campaign in the United Kingdom.  *See* 2020 Order at 43-44. Plaintiffs, therefore, have tacitly abandoned that claim.

vigorously disputes), that does not mean that statements made five years later about users having the power to control the sharing of their data were false or misleading.

**B.      Plaintiffs Fail to Plead a Strong Inference of Scienter**

In its 2020 Order, the Court directed Plaintiffs to plead "specific facts" showing that (a) "Defendants knew that GSR and Cambridge Analytica did not delete the relevant data" after they provided certifications of destruction to Facebook and (b) Facebook's "top management knew about Cambridge Analytica's involvement with the Trump campaign." 2020 Order at 35, 43-44. Plaintiffs fail to plead facts meeting either requirement for pleading scienter. Without specific facts, Plaintiffs offer an implausible and unsupported theory: Because Facebook sold ads to the 2016 Trump campaign, and because three Facebook employees working with the Trump campaign understood that the campaign was working with Cambridge Analytica, Facebook's senior executives must also have known that Cambridge Analytica continued to use the misappropriated data it explicitly certified to Facebook it had deleted. *See* Opp. at 6-16. This theory, which is unsupported by any facts, let alone the factual specificity required under the PSLRA, comes nowhere close to pleading scienter with respect to the Cambridge Analytica-related statements.

**1.      Plaintiffs' Trump "Embed" Theory of Scienter Is Not Supported by Facts**

Plaintiffs plead that three Facebook employees were "embedded" with the Trump campaign, ¶¶ 224-244, but the Opposition fails to point the Court to any specific non-conclusory allegation that, if true, would demonstrate that these Facebook employees knew that Cambridge Analytica used misappropriated Facebook data in its work for the Trump campaign, or that those employees passed that knowledge on to anyone, let alone anyone at Facebook with authority over Facebook's risk disclosure statements in its SEC filings. Accepting Plaintiffs' theory would require the Court to infer—without any factual support—each of the following:

- the three line-level employees, of Facebook's over 25,000 employees, ¶ 32, who were allegedly "embedded" with the Trump campaign knew the contents of Cambridge Analytica's deletion certifications that were provided to someone else in a different Facebook department more than six months earlier;

- these three employees actually saw the "psychographic stuff" allegedly derived from misappropriated Facebook data because they were "seated next to" Cambridge Analytica employees, ¶ 235;

Gibson, Dunn &
Crutcher LLP

- having seen the "psychographic stuff," these three Facebook employees *would have known* that Cambridge Analytica used the misappropriated data from Kogan (as opposed to data obtained from publicly available or other sources) and that the January 2016 Cambridge Analytica certifications provided to others at Facebook were, therefore, false; and

- after deducing that Cambridge Analytica was still using misappropriated Facebook data, these three line-level employees reported Cambridge Analytica's ongoing wrongdoing up the chain-of-command, ultimately reaching the Individual Defendants.

Each link in this implausible and unsupported chain of inferences is premised on what Plaintiffs believe Facebook "should have known," *e.g.*, ¶ 307, "would have been seeing," *e.g.*, ¶ 235, or "would have known," *e.g.*, ¶ 237, from unidentified documents allegedly maintained as part of "Project Alamo"—not specific facts demonstrating what anyone at Facebook actually knew. Did the three Facebook employees know the content of the Cambridge Analytica certifications that they had no role in obtaining and are not alleged to have known existed? Plaintiffs don't say. Did they actually see any Facebook data in the "psychographic stuff" in the Cambridge Analytica materials? Again, Plaintiffs don't plead that they did. If the Facebook employees saw particular meeting materials or videos, did they understand that the "psychographic stuff" was, as Plaintiffs allege, based on Facebook data misappropriated by Kogan? More silence. And, finally, did these three employees ever share what they "should have known" about Cambridge Analytica with anyone else at Facebook? Did they share what they "would have been seeing" with the Individual Defendants, who were the senior-most officers of the Company? Once again, there is not a single fact pled in Plaintiffs' 283-page TAC demonstrating that this happened.

In the absence of those necessary facts, Plaintiffs create a fictional entity—the Cambridge Analytica "investigation team." *See* Opp. at 9. But, once again, Plaintiffs' Opposition, like the TAC, fails to articulate any details regarding this supposed "investigation team." Who was on it? To whom did the "team" report? What documents or other information did the "team" review? Did the "team" prepare or deliver any reports to others at Facebook, including—critically—the Individual Defendants?[2] Once again, the TAC offers no such facts. Yet Plaintiffs ask this Court to conclude that

---

[2]   Plaintiffs assert that a line-level Facebook employee on the political advertising team "spearheaded the 17-month Cambridge Analytica investigation," Opp. at 9, when she sent an instant message to

this "team" connected all of the disparate dots in precisely the way Plaintiffs suggest.  For instance, Plaintiffs claim that "Facebook's investigation team" was purportedly "aware of Cambridge Analytica's misuse of data," Opp. at 9; the "investigation team" watched and circulated a video that "connects" (Plaintiffs do not say how) Cambridge Analytica's misuse of Facebook's data to its work on the Trump campaign, *id.* at 10-11; and the "investigation team" "collected additional facts" (Plaintiffs do not say what facts) that Cambridge Analytica was continuing to use purloined Facebook user data, *id.* at 12.

Plaintiffs' conspiracy theories that unnamed line-level employees "must have," "should have," or "would have" known that Cambridge Analytica had lied in its certifications and was using stolen Facebook user data in support of the Trump campaign are based on speculation, not specific facts. These pleading deficiencies are fatal to Plaintiffs' attempt to plead scienter.  *See In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 1005 (N.D. Cal. 2001) ("The PSLRA clearly establishes a preference for facts over such inferential leaps.").

> ### 2. Plaintiffs Fail to Plead That the Three Employees Working with the Trump Campaign Shared What They Supposedly Knew with Anyone at Facebook, Including the Individual Defendants

Plaintiffs argue that information the "investigation team" supposedly knew about must have been shared with Facebook executives responsible for the Company's public disclosures.  Plaintiffs have no facts to support this theory, let alone specific facts required to plead scienter under the PSLRA. None of Plaintiffs' unsupported theories satisfies their requirement to plead facts demonstrating that Facebook's "top management knew about Cambridge Analytica's involvement with the Trump campaign."  2020 Order at 43.

First, Plaintiffs boldly proclaim that the Individual Defendants "were involved in discussions" regarding the "Cambridge Analytica investigation," Opp. at 8, but the paragraphs of the TAC they cite purportedly in support of this assertion say nothing of the sort.  *See* ¶¶ 35 (Sandberg is the COO), 161-

---

another line-level employee regarding an app ID for Cambridge Analytica in late 2015, ¶ 141.  For reasons that only Plaintiffs can explain, they refer to the employee as "Director" throughout their Opposition.  *See* Opp. at 7-10, 18.  To be clear, the employee is not a member of the Facebook Board of Directors; she is a line-level employee in Facebook's public policy department.

Gibson, Dunn & Crutcher LLP

163 (Schrage ran the PR response to Cambridge Analytica), 203-204 (testimony from Zuckerberg from April 2018 that he did not know if there were conversations about contacting users about the data breach), 249 n.262 (testimony from Zuckerberg that Facebook obtained written certifications of deletion from SCL), 268 (the "investigation team" reviewed and circulated an article in *The Washington Post* that Nix shared on social media).

Second, Plaintiffs contend that the Individual Defendants are "linked to" the Facebook employees working with the Trump campaign due to the "temporal proximity" between (a) a meeting involving the Individual Defendants and certain conservative political operatives on May 18, 2016 and (b) the alleged "embedding" of three Facebook employees in the Trump campaign a month later.  Opp. at 7-8.  This theory not only fails to draw any factual connection between these two events, it also lacks any support under the law.  Plaintiffs' "temporal proximity" argument rests entirely on two cases— *Yourish v. California Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999), and *Fecht v. Price Co.*, 70 F.3d 1078, 1083-84 (9th Cir. 1995)—that address *falsity*, not *scienter.  See* Opp. at 8.  In *Yourish*, the court noted that it was *not* considering the heightened pleading standard under the PSLRA, but nonetheless dismissed the complaint because the temporal proximity of the two statements at issue was not sufficient to plead a false statement under Rule 9(b).  *Yourish*, 191 F.3d at 997-98 & 998 n.17.  And in *Fecht*, the court held that the "shortness in time" between a company's optimistic statement about a program and the termination of that same program constituted circumstantial evidence that the statement was false when made—not that the senior executives of the company *knew* that the statement was false.  *Fecht*, 70 F.3d at 1083.  Plaintiffs cite no case in which a court applied temporal proximity to infer scienter.  Plaintiffs' unprecedented temporal proximity theory is no basis to infer that the Individual Defendants knew that Cambridge Analytica was using purloined data in connection with its work with the Trump campaign.

Third, Plaintiffs suggest that the Individual Defendants must have known about Cambridge Analytica's misuse of Facebook user data because the Trump campaign's advertising revenue was a "big deal" to Facebook's business.  Opp. at 8.  This is just another way of arguing that senior executives "must have been aware" of certain facts because those facts go to the "core operations" of the corporation.  *See, e.g.*, *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782-86 (9th Cir. 2008).  The "core

operations" theory applies only when "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," *id.* at 786, or when the facts are "especially prominent" or "patently obvious," *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009).  Here, the Trump campaign's alleged ad spend constituted a mere 0.27% of Facebook's revenue in 2016, *see* Reply Declaration of Brian Lutz, Ex. 36 at 31—hardly an amount "core" to Facebook's operations.  And even if this was a "big deal" to Facebook (whatever that means), there are no facts pled demonstrating that Facebook's senior officers knew the details of the Trump campaign's operations and strategy, *i.e.*, that Cambridge Analytica was involved in the Trump campaign, let alone that Cambridge Analytica had retained and used misappropriated Facebook data in that role.  *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (pleading scienter under core operations doctrine is "not easy," and requires "specific admissions" by officers of "detailed involvement in the minutia of a company's operations" or "witness accounts demonstrating that executives had actual involvement in creating false reports"); *Iron Workers Loc. 580 Joint Funds v. NVIDIA Corp.*, 2021 WL 796336, at *12 (N.D. Cal. Mar. 2, 2021) (failure to plead scienter under core operations theory where there were no particularized allegations that senior officers were involved in minutia of company's operations).

    The cases cited by Plaintiffs do not compel a different conclusion.  *In re ChinaCast Education Corp. Securities Litigation*, 809 F.3d 471, 476-77 (9th Cir. 2015), for example, involved statements made by the co-founder and CEO; the Ninth Circuit held only that it could infer *his* scienter from the statements *he* made and impute *his* scienter to the company.  In *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004), the plaintiff pled the existence of an internal database that Oracle's senior executives admitted to monitoring *and* specific allegations regarding data from that database that was inconsistent with Oracle's public statements.  And in *In re Quality Systems, Inc. Securities Litigation*, 865 F.3d 1130, 1145-46 (9th Cir. 2017), the Ninth Circuit held that the plaintiff had pled a strong inference of scienter where the individual defendants "told investors they had real-time access to, and knowledge of, sales information" that the court found contradicted their public statements, and where witnesses—including a board member—acknowledged that the senior officer defendants knew their statements were false.  Here, by contrast, Plaintiffs point to no internal

Facebook report relating to Cambridge Analytica's misappropriation of Facebook user data or its use of that data for the Trump campaign, and they plead no facts (from a confidential witness or otherwise) that Facebook's senior executives monitored any such information had it existed.[3]

Finally, Plaintiffs attempt to pin Facebook's scienter on an unidentified Facebook "spokesperson" who, according to Plaintiffs, knew or should have known that Cambridge Analytica had used misappropriated user data in connection with the Trump campaign.  Opp. at 5-6.  This argument fails.  The spokesperson is not identified, and is not an Individual Defendant.  *See, e.g.*, *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008) (noting that the Ninth Circuit has not adopted the "collective scienter" theory); *Cheung v. Keyuan Petrochems., Inc.*, 2012 WL 5834894, at *3 (C.D. Cal. Nov. 1, 2012) (to plead a corporation's scienter, "Plaintiffs must allege the requisite level of scienter with respect to at least one of the Individual Defendants").  And Plaintiffs do not plead any facts about what the nameless spokesperson knew or what information was provided to him or her.  Thus, there is no basis for the Court to infer that the spokesperson knew that it was false to say that Facebook had not uncovered any evidence that Cambridge Analytica had used the stolen data to help the Trump campaign.

### 3.   Plaintiffs' "Red Flags" Allegations Do Not Plead Scienter

Plaintiffs' "red flags" theory of scienter (Opp. at 11-16) is easily dismissed.  Even if line-level employees somehow connected the dots and knew that Cambridge Analytica supposedly was using purloined data in the Trump campaign—and there are no facts pled showing that they did—Plaintiffs still fail to allege that this information was brought to the attention of Facebook's senior management or that that the Individual Defendants were "deliberately reckless" in not connecting the dots themselves.  The Opposition simply ignores the allegations in the SEC complaint (incorporated by reference in the TAC), which state that Kogan's sale of data to Cambridge Analytica was not brought

---

[3]  Plaintiffs cite *In re Facebook, Inc., Consumer Privacy User Profile Litigation*, 402 F. Supp. 3d 767, 800 (N.D. Cal. 2019).  The court in the consumer privacy litigation, however, merely contrasted statements Facebook made regarding consumer data with Facebook's data privacy practices.  The court did not find—or even consider—whether any Facebook senior officer acted with scienter, let alone apply the PSLRA's heightened pleading standard.

to the attention of Facebook's "senior management and relevant legal staff." Ex. 7 ¶ 43 ("As a result, Facebook senior management and relevant legal staff did *not assess the scope, business impact, or legal implications of [Kogan's] improper transfer of data to Cambridge.*" (emphasis added)).

**Cambridge Analytica's use of user IDs.** Plaintiffs claim that the use of Facebook User IDs, though publicly available, somehow "prove the Project Alamo team used a dataset that Cambridge Analytica *could not* 'have compiled with non-Facebook data.'" Opp. at 12 (quoting 2020 Order at 35). But Plaintiffs fail to explain how the Facebook employees working with the Trump campaign *knew* that the publicly available user IDs could not have come from a source "other than the misappropriated Facebook data." 2020 Order at 34.  Plaintiffs refer to "investigation records" from late 2015 (*i.e.*, instant messages between line-level employees—not the Trump "embeds"—across different departments within Facebook) that purportedly show that Cambridge Analytica did not have its own app to collect this publicly available data, and therefore could only have gotten the data through violations of Facebook's policies. Opp. at 13.  Even if this were all true, Plaintiffs fail to allege that the three Facebook employees knew that Cambridge Analytica lacked a method of obtaining the publicly available user IDs on its own, or that Cambridge Analytica could not have obtained the user IDs through other lawful means.  And, yet again, Plaintiffs plead no facts showing that this knowledge (assuming it existed in the first place) made its way all the way up the Facebook chain to the Company's senior officers—the only people whose knowledge can be imputed to Facebook for scienter purposes.

**Filenames.** Plaintiffs argue that the three Facebook employees deduced from the names of the files Cambridge Analytica uploaded to Facebook—which were supposedly named by "personality" type—that Cambridge Analytica was still using misappropriated Facebook data. *Id.* at 12.  Plaintiffs point to an email from Cambridge Analytica to a different person in Facebook six months before the three Facebook employees even began work with the Trump campaign, and a presentation that the Cambridge Analytica CEO gave in September 2016, *id.*, neither of which Plaintiffs allege the three Facebook employees at the Trump campaign actually saw.  Likewise, Plaintiffs do not explain how the Facebook employees working with the Trump campaign could have concluded that the Cambridge Analytica personality scores then in use could have only been derived from the misappropriated Facebook data, as opposed to data obtained from a number of other sources.  *See* 2020 Order at 35

Gibson, Dunn &
Crutcher LLP

(noting that personality profiles used by Cambridge Analytica "could have [been] compiled with non-Facebook data").  Indeed, according to Trump campaign official Theresa Hong in the video Plaintiffs cite in ¶¶ 224-230, Facebook was not the only technology company to send representatives to Project Alamo—Google and YouTube also assigned employees to work with the Trump campaign.[4]

*September 2016 presentation by Cambridge Analytica CEO and October 2016* **The Washington Post** *article, neither of which mentions Facebook.*  Plaintiffs next point to a September 2016 presentation by Cambridge Analytica's CEO and an October 2016 article in *The Washington Post*.  Opp. at 14-15.  But Plaintiffs offer no facts that anyone at Facebook *actually saw* these materials, let alone the Individual Defendants.  Instead, Plaintiffs once again point to "Facebook's investigation team" and "investigation records and other sources."  *Id.*  Neither the presentation nor *The Washington Post* article mention "Facebook," *see* Ex. 37; Ex. 38, and Facebook's logo appears on just one slide in the September 2016 presentation along with 11 other technology companies.  ¶ 265.  Thus, even if senior executives *had* viewed these materials (there are no allegations that they did), there is no basis to conclude that they would have deduced that Cambridge Analytica was continuing to use the misappropriated data to build its profiles rather than data from any one of a number of other sources, such as Google, YouTube, or even Facebook data from a source other than Kogan.

*Cambridge Analytica's deletion certifications.*  The last of the supposed "red flags" is one the Court has already rejected:  That GSR's and Kogan's June 2016 certifications proved that the Cambridge Analytica certification from six months earlier was false.  Opp. at 16.  Plaintiffs rely on Cambridge Analytica's use of personality profiles, which, as the Court has already ruled, Cambridge Analytica "could have compiled with non-Facebook data."  2020 Order at 35.  Plaintiffs' Opposition also continues to ignore the content of Cambridge Analytica's January 2016 certification, which certified destruction of *all* data, not just personality score data, as Plaintiffs allege.  Ex. 24 at 3.  Thus, even if the June 11, 2016 certifications from GSR and Kogan revealed that they had transferred to Cambridge Analytica "more data than they had previously admitted," Opp. at 16, Cambridge Analytica

---

[4]  *See The digital guru who helped Donald Trump to the Presidency*, BBC News (Aug. 17, 2017), https://www.bbc.com/news/av/magazine-40852227, at 2:36.

REPLY IN SUPPORT OF MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn &
Crutcher LLP

had already certified that "*all Facebook data . . . including but not limited to Facebook user data and Facebook user friend data and data derived from such Facebook user data and Facebook user friend data [] has been accounted for and permanently deleted.*"  Ex. 24 at 3 (emphasis added).

### 4. Plaintiffs Fail to Plead the Individual Defendants Knew About Alleged Whitelisting

In their Opening Brief, Defendants asked the Court to revisit its ruling that Plaintiffs adequately alleged scienter concerning whitelisting for two reasons:  (1) the emails upon which Plaintiffs rely to allege scienter refer to "reciprocity," which is different than "whitelisting," and (2) the TAC alleges no facts supporting Plaintiffs' conclusion that the Individual Defendants knew that a limited number of app developers retained access to Facebook user data after April 2015 when Facebook cut-off access to that data.  OB at 18-19.  Plaintiffs respond with three meritless arguments.

First, Plaintiffs dismiss as "incorrect" Defendants' argument that Plaintiffs improperly confuse "reciprocity" with the concept of "whitelisting" as used in the TAC and this Court's prior orders.  *See* Opp. at 4.  But Plaintiffs ignore that in 2012 and 2013—the timeframe in which the emails cited in Plaintiffs' Opposition were sent, Opp. at 4—app developers had access to friends' data by default, so there would have been no need for Facebook to "whitelist" apps so that they could access that same data.  *See* OB at 18-19; Ex. 8 ¶ 5.  Instead, Plaintiffs rely on a string of quotations from the Six4Three emails in 2012-2013 relating to "reciprocity" that are taken out of context and manipulated.  In their Opposition, for example, Plaintiffs improperly graft the word "whitelisting" into an email string quoted in the TAC as addressing "reciprocity"—and then suggest that the alleged "whitelisting" that appears nowhere in the email "focus[es] on the apps that Mark [Zuckerberg] knows, loves, and is concerned about."  *Compare* ¶ 76, *with* Opp. at 4.  Plaintiffs' suggestion that "reciprocity" must refer to "whitelisting" is precisely the type of conclusory allegation that need not be accepted as true even at the pleading stage.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (holding that courts must consider "competing inferences rationally drawn from the facts alleged").

Second, Plaintiffs mischaracterize Defendants' argument regarding the timing of the allegedly false "user control" statements.  Opp. at 4.  As explained in the Opening Brief, even if Facebook had a "whitelisting" program in 2012-2013 (Facebook disputes this), by April 2015 Facebook had withdrawn millions of app developers' access to friends' data.  OB at 19.  Plaintiffs allege that roughly two dozen

Gibson, Dunn & Crutcher LLP

developers maintained access to this data, but rely in their Opposition on the Six4Three documents *from three to five years before the Class Period*.  Defendants do not argue that the Individual Defendants "unlearned" anything, Opp. at 4—only that there are no allegations in the TAC demonstrating that the Individual Defendants knew during the Class Period that a few app developers maintained access to the data *after general access was revoked in April 2015*.

Finally, Plaintiffs again attempt to outsource to the FTC Complaint the pleading of specific facts showing a strong inference of scienter for Facebook's alleged whitelisting, Opp. at 5—a pleading tactic that this Court has repeatedly rejected.  *Cf.* 2020 Order at 40 n.4 (rejecting Plaintiffs' attempted reliance on the SEC complaint), 45 n.9 (same).  The FTC's untested allegation that Facebook "knew or should have known" that it was violating the FTC consent decree, Opp. at 5 (citing ¶¶ 462-463), does not relieve Plaintiffs of their obligation to plead particularized facts demonstrating that the Individual Defendants acted with *scienter*.  *See, e.g.*, *Strasburger v. Blackburne & Sons Realty Cap. Corp.*, 2020 WL 6128069, at *5 (C.D. Cal. Apr. 22, 2020) ("should have known" allegations only plead that a defendant was "merely negligent," not scienter).

\*       \*       \*

The Court gave Plaintiffs one last chance to "state with particularity facts giving rise to a strong inference" that Defendants acted with scienter. 15 U.S.C. § 78u-4(b)(2)(A); 2020 Order at 66.  In place of particularized facts, Plaintiffs offer only conspiracy theories, innuendo, and an ever more fantastical "extended chain of inferences" that falls apart under scrutiny.  *See In re Northpoint Commc'ns Grp.*, 184 F. Supp. 2d at 1005 ("The PSLRA clearly establishes a preference for facts over such inferential leaps.").  Plaintiffs have failed to plead specific facts giving rise to a strong inference that Defendants acted with scienter when making or approving any challenged statement.

## C.      Plaintiffs Fail to Plead Loss Causation

Plaintiffs' Opposition confirms they cannot plead loss causation for their "main theory of securities fraud" relating to Cambridge Analytica, 2020 Order at 33, or for their "only viable theory" of securities fraud based on Facebook's alleged whitelisting practices, *id.* at 65.  Plaintiffs again suggest several ways they might plead loss causation, "including by identifying price declines that accompany the materialization of concealed risks or the disclosure of information previously concealed by fraud."

Opp. at 20.  The problem for Plaintiffs is that, in their *third* amended complaint, they still cannot plead with specificity how *any* alleged false or misleading statement caused the losses they now seek to recover.  2020 Order at 65 ("[T]he plaintiff in a securities fraud action must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event." (citing *Dura Pharms.*, 544 U.S. at 343-44)).

Plaintiffs' loss causation theory boils down to a single idea, routinely rejected by courts in this Circuit:  Because Facebook's stock price dropped following news articles and earnings reports, those drops *must* have been caused by fraud, which *must* have been perpetrated by Facebook, and *must* have been new to the market.  *See* Opp. at 20.  That is not the law.  *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014) (price declines upon publication of press releases and reports do not establish loss causation; plaintiffs must "specify which of the Defendants' statements were made untrue" by such documents).  Although the Ninth Circuit noted in *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018), that "loss causation is a 'context-dependent' inquiry," that court, like many others, held that plaintiffs must plead with particularity facts that, if true, would demonstrate it was a "misstatement, as opposed to some other fact, [that] foreseeably caused the plaintiff's loss."

Contrary to Plaintiffs' argument, Opp. at 20, the court in *First Solar* left intact the "restrictive" pleading requirements for "causation theor[ies] based on market revelation of the fraud"—*i.e.*, corrective disclosures—of the type Plaintiffs rely on here.  *First Solar*, 881 F.3d at 753-54; *Rok v. Identiv., Inc.*, 2018 WL 807147, at *8 (N.D. Cal. Feb. 9, 2018); *see Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1206 (9th Cir. 2020) (holding that plaintiffs must plead all elements, including loss causation, with particularity).  This means that Plaintiffs cannot "plead loss causation through 'euphemism' and thereby avoid alleging the necessary connection between the defendant's fraud and the actual loss."  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008).[5]

---

[5] Neither Plaintiffs' single passing reference to their purported "materialization of risk" theory in the TAC, ¶ 687, nor the sole reference in their Opposition, Opp. at 20, demonstrates the type of

Gibson, Dunn &
Crutcher LLP

As set forth below, nothing in Plaintiffs' Opposition cures the fundamental "chronology problem" with Plaintiffs' loss causation theory.  Opp. at 24.  Plaintiff's "main theory of securities fraud" is that in March 2018, Facebook's stock price declined when the market learned that Cambridge Analytica continued to retain and misuse Facebook user data, despite earlier certifying that the data had been deleted.  2020 Order at 33.  But Plaintiffs fail to show that the information revealed in March 2018 corrected any prior misstatement.  Plaintiffs' "alternative" and "only viable theory of falsity" is that Defendants' user control statements allegedly were corrected by news articles discussing Facebook's whitelisting practices published in June 2018, but Plaintiffs still fail to allege any "facts from which the Court can infer the stock price fell in June 2018." *Id.* at 65.  Plaintiffs offer no coherent theory or factual basis for linking the March 2018 price decline to user control statements that—as this Court previously concluded and as Plaintiffs themselves allege in the TAC—were rendered false by so-called whitelisting practices revealed in June 2018.  Plaintiffs' new theory is that the July price decline was caused by the March 2018 news about Cambridge Analytica, which allegedly revealed Defendants' user control statements to be false, but it simply defies common sense that the same supposedly corrective statements in March, which Plaintiffs allege caused an immediate stock price decline, caused another stock price decline more than four months later.

### 1.  Plaintiffs Fail to Plead Loss Causation for the March Declines

As explained in Defendants' Opening Brief, Plaintiffs fail to plead loss causation for any of the March 2018 price declines because Plaintiffs fail to show how the alleged corrective disclosures—Facebook's March 16, 2018 press release, the articles published in *The Guardian* and *The New York Times* on March 17, 2018, and additional news articles published from March 20 to March 27, 2018—revealed the "truth" about, or even related back to, any challenged statement made by Defendants.  OB at 23-28.  A corrective disclosure "must by definition reveal new information to the market."  *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020); *Rok v. Identiv, Inc.*, 2017 WL 35496, at *18 (N.D. Cal. Jan. 4, 2017) ("[C]orrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time.").  Plaintiffs admit that the only new information revealed

---

particularized factual pleading required under the PSLRA, or even Rule 9(b).  *See Inchen Huang v. Higgins*, 2019 WL 1245136, at *4, 16 (N.D. Cal. Mar. 18, 2019).

REPLY IN SUPPORT OF MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD

Gibson, Dunn & Crutcher LLP

by the March 2018 news was that Cambridge Analytica had not deleted the misappropriated Facebook data, contrary to its prior representations to Facebook, and had allegedly used that data during the 2016 presidential campaign.  Opp. at 19; ¶¶ 361, 548; *see* 2020 Order at 64.  Thus, to plead loss causation under the "corrective disclosure" theory, *see* ¶¶ 687-712, Plaintiffs must show that the March 2018 news revealed the truth about a particular statement that Plaintiffs allege was false or misleading.  Plaintiffs once again fail to do so.

### a.    User Control Statements

Plaintiffs argue that the TAC satisfies their burden to plead loss causation because "the alleged corrective disclosures in March . . . revealed that Defendants' user control and related statements were false."  Opp. at 20; *see id.* at 21-22.  Plaintiffs make little effort to "specify which of the Defendants' [user control] statements were made untrue," *Apollo*, 774 F.3d at 608, by the March 2018 news, which is not surprising given that 14 of the 20 user control statements were not made until *after* the March 2018 declines.  ¶¶ 502-514.  Plaintiffs nevertheless claim they have pled loss causation for the March 2018 price declines because "Facebook itself directly linked the news about Cambridge Analytica to user control issues."  Opp. at 22.  Not true.  Plaintiffs identify no statements from Facebook in March 2018 linking the Cambridge Analytica events to an inability of users to control their data.  At most, Facebook explained on March 16, 2018 that the Company updated its platform in 2014 "to give people the tools to control their experience."  *Id.* (quoting ¶ 692).  That was indisputably true:  In 2014, Facebook changed its platform to "limit the Facebook information apps could access" and "shut off third parties' access to collect user friend data."  2020 Order at 4.

Nor can Plaintiffs plead loss causation by manipulating this Court's prior order.  Plaintiffs claim that because "the Court sustained as misleading Defendants' statements about user control," Opp. at 22, they have pled loss causation with respect to the March 2018 declines.  As Plaintiffs are aware, however, the Court found that the user control statements were adequately alleged to have been misleading because of so-called "whitelisting practices," *not* because Facebook misrepresented any fact related to Cambridge Analytica.  *See* 2020 Order at 38 ("It was thus false for Defendants to say users 'controlled' their data since whitelisted app-developers could access user-data in contravention of user privacy settings.").  Plaintiffs argue they have "readily ple[d] loss causation in accordance with

the Court's prior reasoning on this issue," citing the Court's statement that "[b]y default, if a third-party can access a users' data, without permission and in contravention of Facebook's stated policy, a user does not have control over their content."  Opp. at 23 (quoting 2020 Order at 39).  This is a badly misleading portrayal of the Court's Order.  Plaintiffs fail to mention that in the very next sentence, the Court found that the user control statements were misleading only "because they indicate that users could control who accessed their data, when whitelisted developers and certain phone companies could still access user information." 2020 Order at 39.  This theory also fails for a more fundamental reason: The March 2018 disclosures did not reveal that Cambridge Analytica accessed user data "without permission and in contravention of Facebook's stated policy."  As this Court has already concluded, that had been known by the market for years, and thus could not have caused Plaintiffs' alleged losses in March 2018.

Plaintiffs' *post hoc* theory of falsity with respect to the user control statements also is at odds with their own pleading.  Plaintiffs themselves allege that the user control statements were false and misleading *due to Defendants' whitelisting practices*.  ¶¶ 311-334, 500-518.  Plaintiffs cannot mix and match elements of a securities fraud claim by pleading falsity and scienter for the user control statements based on Defendants' whitelisting practices, and then attempt to plead loss causation for those same statements based on an unrelated event—the March 2018 news about Cambridge Analytica's improper conduct.  *See Khoja v. Orexigen Therapeutics, Inc.*, 2020 WL 6395629, at *12 (S.D. Cal. Nov. 2, 2020) (plaintiffs failed to adequately plead loss causation where the alleged corrective disclosure neither corrected nor "related back" to any false or misleading statements); *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 4585753, at *3 (N.D. Cal. Sept. 2, 2016) (alleged corrective disclosure "must relate back to the misrepresentation and not to some other negative information about the company").

Plaintiffs contend that Defendants are "improperly trying to impose a mirror-image requirement between the alleged misconduct and the corrective disclosure."  Opp. at 22; *see id.* at 23-24.  Not so.  Defendants' argument is based on the well-established principle that an alleged corrective disclosure "must at least relate back to the misrepresentation."  *Grigsby*, 979 F.3d at 1208; *see* OB at 22-23 (collecting authority); Opp. at 20 (acknowledging that a corrective disclosure must "'relate back to the

Gibson, Dunn &
Crutcher LLP

misrepresentation'" (quoting *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016))).  Here, where Plaintiffs allege that the user control statements were false or misleading and made with scienter due to Defendants' alleged whitelisting practices, *see* 2020 Order at 37-39, 60-61, Plaintiffs must show that the March 2018 news revealed the truth about or "relate[d] back to the misrepresentation [regarding the alleged whitelisting practices] and not to some other negative information about the company." *Grigsby*, 979 F.3d at 1208.  Because Plaintiffs failed to do so, they failed to plead loss causation for any of the March 2018 declines.  *Khoja*, 2020 WL 6395629, at *15 (granting motion to dismiss "in light of Lead Plaintiff's failure to allege adequately that the May 12, 2015 *Bloomberg* article relates back to a material misrepresentation or omission of fact"); *see Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119-20 (9th Cir. 2013) (plaintiff must trace loss back to "the very facts about which the defendant lied"); *Lloyd*, 811 F.3d at 1209 (plaintiff "must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event"); *First Solar*, 881 F.3d at 753 (plaintiff must show that it was "the defendant's misstatement, as opposed to some other fact, [that] foreseeably caused the plaintiff's loss").

### b.   Cambridge Analytica Investigation and Data Misuse Statements

Plaintiffs claim in one sentence that because Facebook's stock price declined in March 2018, when "the 'truth' concealed by Defendants' Cambridge Analytica statements was . . . revealed to the market," they "have pleaded loss causation as to the investigation updates and data misuse statements." Opp. at 19.  But Plaintiffs do not even try to argue that the information revealed in March 2018 corrected any of the Cambridge Analytica investigation or data misuse statements.  *See id.* at 19-26.

Plaintiffs' position appears to be that merely because there were "'immediate' stock price reactions" to the March 2018 news, the news "'proximate[ly] caus[ed]' the declines." *Id.* at 19 (quoting *First Solar*, 881 F.3d at 754).  "[L]oss causation is not adequately pled simply by allegations of a drop in stock price following an announcement of bad news if the news did not disclose the fraud." *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 471 (E.D.N.Y. 2020), *aff'd*, 828 F. App'x 747 (2d Cir. 2020) (quoting *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 384 (E.D.N.Y. 2013)).  "So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud.  Enabling a plaintiff

to proceed on such a theory would effectively resurrect what *Dura* discredited—that loss causation is established through an allegation that a stock was purchased at an inflated price." *Metzler*, 540 F.3d at 1064.

Plaintiffs also mischaracterize Defendants' position.  It is not that "the March 17, 2018 and subsequent articles cannot be corrective in light of the earlier December 2015 article in *The Guardian*." Opp. at 23.  Rather, the *only* alleged misstatements that could have possibly been "corrected" by this news are the statements about Facebook's investigation of Cambridge Analytica because, as Plaintiffs concede and this Court has found, the only new information revealed by the March 2018 news was "Cambridge Analytica's *continued* misuse" of the misappropriated user data.  Opp. at 23 (quoting 2020 Order at 64); *see* OB at 24.[6]  As a result, pleading loss causation as to the March declines requires "plead[ing] facts showing that Defendants knew or should have known that [Cambridge Analytica's certifications of deletion] were false."  2020 Order at 64.  Plaintiffs have not done so, nor have they pled facts demonstrating that the March disclosures revealed the truth of any challenged statement.  Plaintiffs have therefore once again failed to plead loss causation as to the March declines.

### 2.   Plaintiffs Fail to Plead Loss Causation for the July Decline

As demonstrated in Defendants' Opening Brief, Plaintiffs' loss causation theory as to the July 2018 price decline is, if anything, even more deficient because (1) Facebook's second quarter earnings announcement revealed *no* new information relating to the Cambridge Analytica events or any other privacy practice at issue in the TAC, OB at 29-32; (2) Plaintiffs failed to show a proximate causal connection between the price drop following the earnings announcement and any alleged fraud, *id.* at 32-33; and (3) Facebook's stock price movement in the months leading up to July 26, 2018 further undermines Plaintiffs' loss causation theory, *id.* at 33-34.  Advancing yet another confusing loss causation theory, Plaintiffs claim they pled loss causation for the July 2018 price decline based on

---

[6]  Plaintiffs are wrong that the Court "cannot . . . resolve[] on a pleading motion" what information the market was aware of at the time of the alleged corrective disclosure.  Opp. at 23.  Courts routinely consider this issue on a motion to dismiss.  *See, e.g.*, 2020 Order at 42, 64; *In re Kalobios Pharms., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1007-11 (N.D. Cal. 2017) (Davila, J.) (rejecting fraud-on-the-market presumption at motion to dismiss stage).

Gibson, Dunn &
Crutcher LLP

Facebook's 2Q18 earnings announcement, which allegedly revealed to be false (1) statements about Facebook's 1Q18 results, Opp. at 26, and (2) statements about user control, *id.* at 27.  According to Plaintiffs, Facebook's 2Q18 earnings announcement revealed both categories of statements to be false because Facebook "report[ed] declining European user numbers, lower than expected revenues, and reduced guidance, all as a substantial result from the disclosures concerning Facebook's privacy practices." Opp. at 26.  This new theory fails to plead loss causation as to the July decline.

### a.    Statements About Facebook's 1Q18 Results

Plaintiffs cannot plead loss causation for the July 2018 price decline based on Defendants' statements about Facebook's 1Q18 financial results.  This Court has already held that three of the five challenged statements in this category were not adequately alleged to be false or misleading.  2020 Order at 55-57.  Because Plaintiffs have not added any new allegations with respect to these statements in the TAC, *see* ¶¶ 602-619, the Court should dismiss these statements for the same reasons as before.  As for the other two statements, the Court previously found that these statements were adequately alleged to be false based on Facebook's whitelisting practices, which were revealed more than a month *before* the 2Q18 earnings call.  2020 Order at 57-58; *see* ¶¶ 609, 615.  Facebook's 2Q18 earnings announcement said *nothing* about whitelisting.  ECF No. 146-2; *see* OB at 29-30.  Nor did the earnings call "correct" any prior misstatement.  OB at 29-30.  Accordingly, Plaintiffs cannot rely on Defendants' statements about Facebook's 1Q18 results to plead loss causation for the July 2018 price decline.

### b.    User Control Statements

Plaintiffs also fail to plead loss causation for the July 2018 price decline based on Defendants' user control statements.  Plaintiffs' theory with respect to the user control statements can be easily rejected for at least three reasons.

First, the July 2018 earnings announcement cannot serve as a corrective disclosure when it *did not even mention*—much less reveal new information about—third-party data harvesting, whitelisting, Cambridge Analytica, or any other privacy practice at issue in the TAC.  *See* OB at 22, 30 (collecting authority).  Indeed, Plaintiffs admit that the "essential facts" of the alleged fraud—the March 2018 news about Cambridge Analytica—already had been revealed to the market *four months earlier*.  ¶ 703; *see* Opp. at 26 (admitting that "the loss occurred four months after the March 2018 disclosures").

Gibson, Dunn &
Crutcher LLP

1    Plaintiffs fail to explain, because they cannot, how the revelation of the same "essential facts" that were

2    already revealed to the market in March caused a loss four months later.

3         Recognizing the absurdity of this theory, Plaintiffs point to a single case, *In re Gilead Sciences*

4    *Securities Litigation*, 536 F.3d 1049, 1058 (9th Cir. 2008), involving a delayed stock price impact from

5    an earlier disclosure.  *See* Opp. at 26-27.  Plaintiffs' reliance on *Gilead* is misplaced.  In that case, the

6    company represented that demand for its most popular drug, Viread, was strong, and that Gilead

7    complied with federal and state regulations, when in fact the company and its officers allegedly knew

8    that 75-95% of Viread sales resulted from off-label marketing efforts.  *Gilead*, 536 F.3d at 1051.  When

9    the FDA issued a public Warning Letter about the company's off-label marketing, Gilead's stock price

10   did not drop because the market "failed to appreciate the extent of Gilead's off-label marketing, and

11   thus could not foresee the letter's impact on sales."  *Id.* at 1053; *see id.* at 1058 (the letter "did not

12   contain enough information to significantly undermine Gilead's [statements] concerning demand for

13   Viread").  It was only when the company reported a major earnings miss three months later that the

14   public learned for the first time that Viread sales fell significantly below expectations.  *Id.* at 1054.  The

15   Ninth Circuit found that plaintiffs adequately pled loss causation because "the October drop in stock

16   price was plausibly caused by the Warning Letter" in August.  *Id.* at 1058.

17        This case is different from *Gilead* in every respect.  Whereas Gilead's stock price did not decline

18   after the Warning Letter was made public, Facebook's stock price declined immediately after the

19   Cambridge Analytica news in March 2018.  Gilead's earnings miss was directly caused by the alleged

20   fraud (below-expectation sales of Viread due to the Warning Letter), whereas Facebook's earnings

21   miss in July was not the result of the alleged fraud (the March 2018 news about Cambridge Analytica).

22   Whereas the corrective disclosure in *Gilead* (the Warning Letter) "would not necessarily trigger a

23   market reaction because it did not contain enough information," the March 2018 news about Cambridge

24   Analytica "trigger[ed] a market reaction" because it discussed all the "essential facts" of the alleged

25   fraud concerning Cambridge Analytica.  And while it was not surprising that "the public failed to

26   appreciate [the] significance" of Gilead's off-label marketing, here it is indisputable that the public was

27   very aware of the significance of the March 2018 news about Cambridge Analytica, as Plaintiffs

28   themselves allege, and as the March stock price decline illustrates.  ¶ 689.

Second, Plaintiffs fail to plead loss causation for the July 2018 decline because they cannot show a proximate causal connection between the price drop and the alleged fraud. Although the law does not require a plaintiff to rule out every single possible competing theory for a stock price drop, it does require securities fraud plaintiffs to plead a plausible explanation of why it was the alleged *fraud* that caused the decline. Here, the obvious catalyst for Facebook's July 2018 stock price decline was disappointing news about Facebook's financial performance. *See Metzler*, 540 F.3d at 1065 (no loss causation where alleged corrective disclosure "contained a far more plausible reason for the resulting drop in [the company]'s stock price—the company failed to hit prior earnings estimates"). Plaintiffs themselves allege several other (more plausible) reasons unrelated to the alleged fraud why revenues might have declined. *See, e.g.*, ¶¶ 708, 713 (impact of GDPR); ¶ 708 (changes in how advertisers used their own data for targeting); ¶ 714 (changes in foreign exchange rates); *see also* 2020 Order at 65-66 (noting Plaintiffs attributed the stock drop to a variety of reasons other than the alleged fraud).[7]

Third, that Facebook's stock price made a full recovery from its March 2018 decline by May 10, 2018—and continued to climb thereafter—further undermines Plaintiffs' loss causation theory because if any fraud pertaining to Cambridge Analytica was revealed in March 2018, that information was fully

---

[7] Plaintiffs argue that "Defendants themselves linked the measures taken to give users control over their data to the negative impact on revenue growth and forward-looking guidance" because "Defendant Wehner explicitly attributed the downward guidance on 'giving people who use our services more choices around data privacy.'" Opp. at 27. But Plaintiffs fail to allege any facts showing that (1) Wehner's statement about "giving people . . . more choices around data privacy" corrected statements about Cambridge Analytica (or even had anything to do with the Cambridge Analytica events, as opposed to, for example, GDPR, *see* Ex. 2 at 12 (linking privacy choices to GDPR)), or (2) that the July 2018 stock price decline was caused by this revelation. Nor do Plaintiffs allege that giving users additional control over their data had anything to do with whitelisting, which is unsurprising because Facebook was already discussing providing users with more control on the 1Q18 earnings call *before* the alleged whitelisting practices were disclosed in June. Ex. 1 at 5, 8, 11, 16.

incorporated into the market price of Facebook's stock no later than March 27 (the last alleged stock price decline in March).  *See* OB at 33-34; ¶ 688.  The only "baseless" loss causation theory, Opp. at 28, is Plaintiffs' nonsensical theory that revelation of the same "essential facts" that had been revealed to the market *four months earlier* can once again give rise to "fraud."  At bottom, Plaintiffs attempt to plead "revelation of fraud" based on Facebook's announcement of an earnings miss, but this theory has been thoroughly and routinely rejected by the Ninth Circuit.  *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 394 (9th Cir. 2010); *Metzler*, 540 F.3d at 1065; *see also* OB at 33 (collecting authority). Plaintiffs' failure to explain how the July 2018 earnings miss was caused by—or even related to—the Cambridge Analytica revelations is fatal to their loss causation theory regarding the July 2018 decline. *See* OB at 30-31.

### 3.     The Cain Declaration Does Not Help Plaintiffs Plead Loss Causation

"In a final throw of the die," Opp. at 26, Plaintiffs attempt to remedy their deficient loss causation allegations by claiming that Cain's "expert analysis" "provide[s] scientific support" for their argument that the March 2018 news revealed "new information regarding users' lack of control over their data" and that the March and July 2018 stock price declines were statistically significant.  *Id.* at 28-29.  As explained in Defendants' Opening Brief, OB at 7-8, 25-26, and Defendants' motion to strike, ECF No. 148, Cain's declaration is an improper expert opinion that does not provide any *facts* to support Plaintiffs' loss causation allegations, and should therefore be stricken.  In their Opposition, Plaintiffs *confirm* that Cain's declaration "does not contain new facts or evidence," Opp. at 29, further supporting Defendants' argument that his declaration is improper and should be stricken.  *See* ECF No. 148.  In any event, even if the Court were to consider Cain's "non-conclusory" conclusions, ECF No. 157 at 7, Cain's declaration is of no help to Plaintiffs' attempt to plead loss causation because Cain merely parrots Plaintiffs' own unsupported and conclusory allegations.  *See* OB at 7-8, 25-26.  Cain's declaration confirms that Plaintiffs cannot cure their deficient loss causation allegations with respect to any of the price declines identified in the TAC.

### D.     Plaintiffs Fail to Plead Reliance

Plaintiffs' reliance argument in the Opposition is a word-for-word copy and paste from their opposition to Defendants' motion to dismiss the prior complaint.  Plaintiffs simply ignore that the Court

already heard that exact argument and rejected it.  In the 2020 Order, this Court held Plaintiffs failed to plead reliance as to their "main theory of securities fraud . . . that Defendants knew that Cambridge Analytica had sensitive user information and was using that information for improper purposes," 2020 Order at 33, "because the market was already aware of the core information that Plaintiffs claim was omitted," *id.* at 64.  The Court should reaffirm its holding that Plaintiffs fail to plead reliance for all statements allegedly rendered false by omission of this information.  *Id.* at 64.

**E.     Plaintiffs Fail to Plead Claims Under Sections 20(a) or 20A**

Plaintiffs' argument on Sections 20(a) and 20A likewise copies and pastes from the argument they asserted in their opposition to Defendants' motion to dismiss the prior complaint.  As stated in the Opening Brief, Plaintiffs' inability to state a claim under Section 10(b) or Rule 10b-5 requires dismissal of their Section 20(a) and 20A claims.  *See* OB at 35.  And Plaintiffs' failure to plead scienter undercuts their argument that the Court may presume that Mr. Zuckerberg possessed material, nonpublic, adverse information.  Opp. at 30-31.

## III.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the TAC with prejudice.

DATED:  April 5, 2021                      GIBSON, DUNN & CRUTCHER LLP

By:      ___*/s/ Orin Snyder*___
Orin Snyder
200 Park Avenue
New York, N.Y. 10166-0193
Tel: 212.351.4000
Fax: 212.351.4035
osnyder@gibsondunn.com

Joshua S. Lipshutz
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Tel:  202.955.8500
Fax:  202.467.0539
jlipshutz@gibsondunn.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Brian M. Lutz
555 Mission Street
Suite 3000
San Francisco, CA 94105-0921
Tel: 415.393.8200
Fax: 415.374.8306
blutz@gibsondunn.com

Paul J. Collins
1881 Page Mill Road
Palo Alto, CA 94304-1211
Tel:  650.849.5300
Fax:  650.849.5333
pcollins@gibsondunn.com

*Attorneys for Defendants Facebook, Inc.,*
*Mark E. Zuckerberg, Sheryl K. Sandberg,*
*and David M. Wehner*

Gibson, Dunn &
Crutcher LLP

REPLY IN SUPPORT OF MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:18-CV-01725-EJD