# EXHIBIT 1

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
SALVATORE J. GRAZIANO
JEREMY P. ROBINSON
1251 Avenue of the Americas
New York, NY  10020
Telephone: 212/554-1400
212/554-1444 (fax)
salvatore@blbglaw.com
jeremy@blbglaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON C. DAVIS (253370)
KENNETH J. BLACK (291871)
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: 415/288-4545
415/288-4534 (fax)
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

Co-Lead Counsel for the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re FACEBOOK, INC. SECURITIES LITIGATION | ) ) ) | Master File No. 5:18-cv-01725-EJD |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | **LEAD PLAINTIFFS' MOTION FOR LEAVE TO AMEND UNDER FEDERAL RULE 15, MEMORANDUM OF POINTS AND AUTHORITIES** |
| ALL ACTIONS. | ) ) ) | |

DATE:           TBD
TIME:           TBD
LOCATION:    Courtroom 4, 5th Floor
JUDGE:         Hon. Edward J. Davila

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on a date and time to be set by the Court to be heard in Courtroom 4, before the Honorable Edward J. Davila, in the United States District Court for the Northern District of California, San Jose Division, Lead Plaintiffs Amalgamated Bank, as Trustee for the Long View LargeCap 1000 Growth Index Fund, LongView Quantitative LargeCap Fund, and LongView Quant LargeCap Equity VEBA Fund ("Amalgamated"), and Public Employees' Retirement System of Mississippi ("Mississippi," and, together with Amalgamated, "Lead Plaintiffs") will, and hereby do, move for leave to amend their current complaint under Federal Rule of Civil Procedure 15.

Through this Motion, Plaintiffs seek leave to amend under Federal Rule 15 to include: i) at minimum, the additional facts set forth in Exhibits A (clean) and B (redline reflecting changes) to the Declaration of Jeremy P. Robinson (the "Declaration"), which reflects proposed changes to the Third Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws; and ii) such additional facts, in further support of Plaintiffs' existing legal theories and claims, as may be revealed between the date of this motion and the date set by the Court for the filing of the Fourth Amended Complaint (if leave is granted), including based on ongoing discovery. This motion is based upon this notice, the accompanying memorandum of points and authorities, the accompanying Declaration and exhibits thereto, and such other matters as the Court may consider.

1

## STATEMENT OF THE ISSUES TO BE DECIDED

2       Whether Plaintiffs should be granted leave to file a Fourth Amended Complaint when it

3  was filed pursuant to the Court-ordered deadline to file for leave to amend under Federal Rule of

4  Civil Procedure 15 in the Case Management Order (ECF Nos. 207, 216); where the liberal and

5  permissive standards of Federal Rule 15 govern; where Defendants will face no undue prejudice

6  or delay; where Plaintiffs have only recently had the opportunity to start taking initial discovery;

7  and where the proposed amendment is not offered in bad faith and is not futile.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................1

II.    RELEVANT FACTUAL BACKGROUND.................................................4

    A.    DEFENDANTS' MISLEADING STATEMENTS ABOUT RISKS
        FACING FACEBOOK AND USER CONTROL ...................................4

    B.    FACEBOOK PAYS HISTORIC REGULATORY PENALTIES...........7

    C.    THE NINTH CIRCUIT SUSTAINED PLAINTIFFS' CLAIMS FINDING
        THAT DEFENDANTS MADE FALSE RISK DISCLOSURES AND
        THAT PLAINTIFFS ADEQUATELY PLED LOSS CAUSATION....................8

    D.    NEW FACTS HAVE EMERGED SINCE THE THIRD AMENDED
        COMPLAINT WAS FILED IN 2020.......................................................9

III.   ARGUMENT ............................................................................................12

    A.    LEGAL STANDARD.............................................................................12

    B.    DEFENDANTS WILL NOT FACE UNDUE PREJUDICE FROM
        GRANTING LEAVE TO AMEND........................................................13

    C.    THE PROPOSED AMENDMENT WILL NOT BE FUTILE. ............14

    D.    THE AMENDMENTS ARE NOT PROPOSED IN BAD FAITH .......19

    E.    PLAINTIFFS DID NOT UNDULY DELAY SEEKING TO AMEND ..............19

IV.   CONCLUSION........................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                                          **PAGE(S)**

*Allen v. Bayshore Mall*,
   2013 WL 6441504 (N.D. Cal. Dec. 9, 2013) ...................................................................................15

*Bowen v. Target Corp.*,
   2019 WL 9240985 (C.D. Cal. Nov. 12, 2019) ..............................................................................13

*Brown v. Stored Value Cards, Inc.*,
   953 F.3d 567 (9th Cir. 2020) .................................................................................................3, 12

*Buffin v. Community.com, Inc.*,
   2021 WL 4439224 (C.D. Cal. Aug. 6, 2021) ...............................................................................18

*Chudacoff v. Univ. Med. Ctr. of S. Nevada*,
   649 F.3d 1143 (9th Cir. 2011) ...............................................................................................3, 12

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
   433 F. Supp. 3d 515 (S.D.N.Y. 2020) .........................................................................................18

*dpiX LLC v. Yieldboost Tech, Inc.*,
   2015 WL 5158534 (N.D. Cal. Sept. 2, 2015) .........................................................................15, 19

*Droesch v. Wells Fargo Bank, N.A.*,
   2021 WL 5771132 (N.D. Cal. Dec. 6, 2021) ...............................................................................15

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
   81 F.4th 918 (9th Cir. 2023) ......................................................................................................16

*In re Facebook Inc. Derivative Litig.*,
   No. 2018-0307-JTL, 2025 WL 262194 (Del. Ch. Jan. 21, 2025) ...............................................18

*In re Facebook Inc. Derivative Litigation*,
   C.A. No. 2018-0307-KSJM (Del. Ch. Ct.) ................................................................................12

*In re Facebook, Inc. Sec. Litig.*,
   87 F.4th 934 (9th Cir. 2023), *cert. granted in part sub nom. Facebook, Inc. v.*
   *Amalgamated Bank*, 144 S.Ct. 2629 (2024), *and cert. dismissed as improvidently*
   *granted*, 604 U.S. 4 (Nov. 22, 2024) ................................................................................. passim

*Finjan, Inc. v. Qualys Inc.*,
   2020 WL 1865264 (N.D. Cal. Apr. 13, 2020) ............................................................................19

*Hyun Ju Shin v. Yoon*,
   2019 WL 1255242 (E.D. Cal. Mar. 19, 2019) ...........................................................................14

*Jones v. PGA Tour, Inc.*,
   2023 WL 2173417 (N.D. Cal. Feb. 21, 2023) ........................................................................3, 13

*Juarez v. Jani-King of California, Inc.*,
    2019 WL 2548691 (N.D. Cal. June 20, 2019) ........................................................................20

*Mattson v. VMV Grp., LLC*,
    2023 WL 7404555 (D. Or. Nov. 9, 2023) ...............................................................................14

*Naranjo v. Bank of Am. Nat'l Ass'n*,
    2015 WL 913031 (N.D. Cal. Feb. 27, 2015) ...........................................................................15

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ................................................................................................16

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
    2017 WL 3149297 (N.D. Cal. July 25, 2017)..............................................................13, 14, 19

*Perfect 10, Inc. v. Google, Inc.*,
    2008 WL 4217837 (C.D. Cal. July 16, 2008) .........................................................................13

*Radisson Hotels Int'l, Inc. v. Red Lion Hotels Corp.*,
    2021 WL 6275064 (E.D. Wash. Jan. 27, 2021) ......................................................................13

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ..................................................................................................18

*Strickland v. Ujiri*,
    2020 WL 5530076 (N.D. Cal. Sept. 15, 2020) ............................................................3, 14, 19

*Todd v. Tempur-Sealy Int'l, Inc.*,
    2015 WL 5064076 (N.D. Cal. Aug. 26, 2015) ..................................................................13, 19

*Underwriters at Lloyd's v. Abaxis, Inc.*,
    2020 WL 3188420 (N.D. Cal. June 15, 2020) ............................................................12, 13, 14

**OTHER AUTHORITIES**

Fed. R. Civ. P. 15(a)(2)......................................................................................................................12

## I.    INTRODUCTION

Plaintiffs respectfully move for leave to file an amended complaint pursuant to the Federal Rule 15 deadline set by the Court. ECF Nos. 207, 216. As the Ninth Circuit confirmed in 2023, Plaintiffs' operative complaint adequately states claims for violations of the federal securities laws. ECF No. 175; *see also* ECF No. 194 (The Court: "The Ninth Circuit has spoken; Plaintiffs have stated a claim"). But Defendants have signaled their intent to file another pleadings motion, this time under Federal Rule 12(c) and limited to one of their defense theories. *See* February 27, 2025 Tr. at 6:23-7:3 (Defendants' counsel: "Our 12(c) motion will … focus on the Cambridge Analytica theory" and the "risk factors"). Given Defendants' plan to continue to attack one aspect of the pleadings, Plaintiffs respectfully submit that they should be granted leave to amend their current complaint, which was filed several years ago in 2020 and without the benefit of any discovery. This will help ensure that Plaintiffs' complaint reflects a more complete set of facts regarding Defendants' alleged misconduct that is reasonably available by the Court's Rule 15 deadline to amend, including the new facts revealed by the initial discovery that this Court ordered, and Defendants agreed to produce. Discovery is ongoing.

Even though initial discovery only started recently, Plaintiffs have already uncovered new facts that they respectfully submit should be fairly considered by this Court on any pleading motion. Indeed, Defendants have produced documents further supporting Plaintiffs' long-existing legal theories, including that, prior to and during the Class Period, Defendants Facebook, Zuckerberg, Sandberg, and Wehner knew, or recklessly disregarded, that Facebook users did not control their data because third parties—such as, for example, Huawei and Cambridge Analytica—were able to harvest Facebook users' data in violation of Facebook's stated policies and misuse that data on a massive scale.

Apparently conceding that they lack strong arguments regarding key issues—such as how Cambridge Analytica and Huawei were initially able to misappropriate or "harvest" Facebook user data in violation of Facebook's policies—Defendants appear to rely on a narrow defense theory. Specifically, Defendants seem to contend that Plaintiffs must *also* allege and prove that one of these third parties (specifically, Cambridge Analytica) *also* misused the harvested data throughout

1  the entirety of the 2016 U.S. presidential election. This defense theory failed before the Ninth

2  Circuit and continues to lack merit.

3      In any event, Plaintiffs have added newly revealed facts to address this specific line of

4  attack by Defendants. The additional facts include, for example, that in late 2016 and early 2017,

5  Zuckerberg and Sandberg were briefed internally that Cambridge Analytica was using a massive

6  dataset of existing Facebook user data (including in the "Project Alamo" dataset) in connection

7  with the 2016 presidential campaign. ██████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████    Thus, coupled with the existing facts in the

10  complaint that Defendants knew that Cambridge Analytica had improperly harvested millions of

11  Facebook users' private data without their consent, as well as other facts that have emerged since

12  the operative complaint was filed in 2020, the inference of Defendants' scienter is cogent and

13  compelling. Even though discovery is continuing, Plaintiffs should be granted leave to amend

14  under Rule 15 to fairly have a chance to incorporate these newly revealed facts in their complaint.

15      Plaintiffs include as exhibits proposed amendments to the complaint in clean and redline

16  based on the initial discovery produced to date as well as other facts that have emerged since 2020.

17  *See* **Exhibits A (clean)** and **B (redline)**.[1] Plaintiffs anticipate that additional new facts further

18  supporting their existing legal theories may be revealed, including based on ongoing discovery,

19  which is not scheduled to conclude until March 2026 (ECF No. 207). Thus, Plaintiffs may make

20  further changes to the proposed amendments or may later move to file an amended complaint that

21  includes the new allegations currently in Exhibit A, as well as any subsequently revealed facts that

22  further bolster Plaintiffs' existing legal theories and claims. The proposed amendments, as well as

23  any future amendments, are subject to final Lead Plaintiffs' review and approval.

24      Pursuant to the Court's Case Management Order, Plaintiffs' proposed amendment is

25  governed by Rule 15(a)(2), which mandates that courts should "freely" grant leave to amend

---

[1] References to "Exhibit or Ex. _" refer to the exhibits to the accompanying Declaration of Jeremy Robinson ("Robinson Decl.") filed herewith.

LEAD PLTFS' MOTION FOR LEAVE TO FILE A FOURTH AMENDED COMPLAINT
No. 5:18-cv-01725-EJD                                                    2

"where justice so requires." *See* ECF Nos. 207, 216. The Ninth Circuit has explained that motions under Rule 15 should be treated with "extreme liberality" and "generally shall be denied only upon showing of bad faith, undue delay, futility, or undue prejudice to the opposing party." *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020); *Chudacoff v. Univ. Med. Ctr. of S. Nevada*, 649 F.3d 1143, 1152 (9th Cir. 2011). Defendants cannot make such a showing here.

*First*, Defendants will face no undue prejudice, the factor that carries the "greatest weight." *Jones v. PGA Tour, Inc.*, 2023 WL 2173417, at *3 (N.D. Cal. Feb. 21, 2023). Plaintiffs seek to add new facts that further support one aspect of their existing legal theories that Plaintiffs have pled all along—which was endorsed by the Ninth Circuit and left undisturbed by the Supreme Court—including regarding Defendants' knowledge of Cambridge Analytica's misuse of the purloined Facebook user data. Plaintiffs also seek to add new facts about one statement that Facebook made regarding its investigation into Cambridge Analytica based on initial discovery that Defendants recently produced as relevant to Plaintiffs' existing legal theories. Thus, there is no "change of tactics or theories" on Plaintiffs' part that courts have found may otherwise support a claim of undue prejudice. *Id.* at *3.

Moreover, there is no undue delay, as the new facts that Plaintiffs seek to add were only recently revealed based on Plaintiffs' review of initial discovery, as well as a newly published book by a former Facebook insider. Plaintiffs also anticipate that ongoing discovery may reveal additional new facts that warrant inclusion in the proposed amendment. Furthermore, although the Action was first filed nearly seven years ago, this Court recently acknowledged that "very little has happened" in the litigation beyond the pleading stage. ECF No. 194 at 1. Thus, "[d]iscovery is in its early stages," and amendment will impose no undue burden on Defendants. *Strickland v. Ujiri*, 2020 WL 5530076, at *2 (N.D. Cal. Sept. 15, 2020). Indeed, Defendants have not yet even filed an answer to the current complaint. Plus, because Plaintiffs filed this motion, Defendants' deadline to answer is automatically stayed pursuant to the Court's April 19, 2025 order. ECF No. 216 (Court: "If Plaintiffs file a motion to amend their complaint on or before May 30, 2025, Defendants' deadline to answer the complaint … shall automatically be stayed"). Thus, Defendants will not face any undue burden or prejudice if Plaintiffs are granted leave to amend.

**Second**, amendment is not futile. Plaintiffs' proposed amendment adds facts that further confirm and support the legal theories that have been in this case since its inception, including legal theories credited by the Ninth Circuit in sustaining Plaintiffs' claims that Defendants violated the federal securities laws. As such, Plaintiffs' long-existing or already-sustained securities claims will only be strengthened by the proposed amendment.

**Third**, the remaining relevant considerations also weigh in favor of granting leave to amend, as this action was brought in good faith to advance meritorious claims credited by the Ninth Circuit in its December 2023 ruling and left undisturbed by the Supreme Court. Plaintiffs sought leave to file the proposed amendment as soon as practicable after learning new facts and pursuant to the Court-ordered deadline to move under Rule 15. To be sure, the proposed amendment will be the first time that Plaintiffs have amended their pleading based on discovery from Defendants. As this Court recently noted, prior to February 2025, "not a single document ha[d] been produced in discovery due to the automatic discovery stay." ECF No. 194 at 1.

For all of the reasons stated herein, Plaintiffs respectfully submit that they should be granted leave to file an amended complaint that incorporates new facts supporting Plaintiffs' existing legal theories and already-sustained claims.

## II. RELEVANT FACTUAL BACKGROUND

### A. DEFENDANTS' MISLEADING STATEMENTS ABOUT RISKS FACING FACEBOOK AND USER CONTROL

During the Class Period, Facebook was the world's largest social media company, with billions of users interacting with the platform and providing, through posts containing personal information as well as interactions with their Facebook "friends," a vast stream of valuable data. *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 941-42 (9th Cir. 2023) ("*Facebook*"), *cert. granted in part sub nom. Facebook, Inc. v. Amalgamated Bank*, 144 S.Ct. 2629 (2024), *and cert. dismissed as improvidently granted*, 604 U.S. 4 (Nov. 22, 2024). Facebook's revenue hinged on monetizing that data, including through selling access to Facebook users for advertising purposes. ¶54. However, Facebook faced problems with unauthorized misuse of user data.  For example, in 2011, Defendants settled charges by the Federal Trade Commission that Facebook "deceived consumers

1  by telling them they could keep their information on Facebook private, and then repeatedly

2  allowing it to be shared and made public." ¶¶64-65.[2]

3       To build user and investor trust, Defendants represented that users controlled their personal

4  data on the Facebook platform and that their data was safeguarded from improper access and

5  misuse by third parties. *E.g.*, ¶¶60-62,425-44. For example, Defendants claimed that users "[had]

6  complete control over who sees your content," "are controlling who you share with," "have control

7  over everything," and "control the sharing of their content and information via privacy and

8  application settings." ¶¶426-27. Relatedly, in risk disclosures filed with the SEC, Defendants

9  presented the prospect of unauthorized misappropriation and misuse of Facebook user data as

10  merely a hypothetical possibility instead of something that had already happened. ¶¶449-51.

11       Defendants knew or recklessly disregarded that their statements were misleading. For

12  example, Defendants conspired to "whitelist"—*i.e.*, grant unfettered access to Facebook user

13  data—to third parties (including Amazon, Huawei, and Spotify) who, in exchange, gave Facebook

14  access to data, ad revenues, or access to new users. *Facebook*, 87 F.4th at 942; ¶¶24, 442, 590.

15  Indeed, Defendants even overrode user privacy settings to give sweeping access to whitelisted

16  counterparties. ¶¶430-35. Defendants also knew that when data was given to third parties, such as

17  app developers using the Facebook platform, Facebook could not control how that data was used.

18  ¶668.

19       Further, Defendants knew or recklessly disregarded that Cambridge Analytica, which

20  Facebook knew internally was a bad actor as early as 2015, had surreptitiously acquired a large

21  amount of Facebook user data from a third party—and had misused that data—all in violation of

22  Facebook's platform policies. For example, in September 2015, "Facebook employees noticed that

23  [Cambridge Analytica] was 'receiving vast amounts of Facebook user data,'" and in November

24  2015, Defendants hired "Aleksandr Kogan, a Cambridge University academic who helped

25  Cambridge Analytica obtain user data from Facebook, to give an internal presentation on the

26

27  _____

   [2] Citations to "¶_" refer to paragraphs in the redlined draft amended complaint attached as **Exhibit**

28  **A** to the Robinson Decl.

lessons he learned from collecting and working with the Facebook data. *Facebook*, 87 F.4th at 942; ¶¶157-58. On December 11, 2015, *The Guardian* reported that Cambridge Analytica supported Ted Cruz's presidential campaign by deploying Facebook user data. *Facebook*, 87 F.4th at 943. The Cruz campaign denied anything untoward, claiming that "all the information is acquired legally and ethically with the permission of the users." ¶167. Facebook said only that it was "carefully investigating this situation" and that misleading people or "misusing their information is a direct violation of [Facebook's] policies," and that the Company would "take swift action" against third parties found to have misused Facebook users' data. *Id.* ¶¶167-68. However, internally, Facebook confirmed that Cambridge Analytica had indeed violated Facebook's policies and terms. ¶221.

In January 2016, Cambridge Analytica admitted to Facebook that it had acquired personality score data based on Facebook user data from a company called GSR (Global Science Research, which was run by Kogan and Chancellor) in violation of Facebook's policies. *See Facebook*, 87 F.4th at 943. At the time, in early 2016, Cambridge Analytica told Facebook that it would delete this misappropriated data—psychographic personality scores about Facebook users' Openness, Conscientiousness, Extroversion, Agreeableness, or Neuroticism (OCEAN score data). *Id.* But in June 2016, Cambridge Analytica's data supplier, Kogan, "revealed that he had shared derivative and raw data from Facebook users—not just the personality score data—with Cambridge Analytica's chief executive, Alexander Nix, and that the data was still being used in violation of Facebook's policies." *Id.* Facebook also "embedded" several of its employees undercover in the Trump campaign. ¶283. Those "embeds" witnessed the campaign's continued misuse of the data obtained from Cambridge Analytica throughout 2016, thus alerting Facebook's investigative team that user data was still being misused. ¶¶293-300. ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

1  ████████████████████████████████████████████. Throughout this period,

2  Facebook's embeds and senior executives heavily relied on "a/c priv" labels to shield their

3  communications." ¶¶180, 217, 403. Facebook is currently withholding from production in this

4  Action tens of thousands of communications under that same shield.

5      The truth ultimately started to surface in March 2018 by Facebook itself and in news

6  reports. In these disclosures, investors learned that Cambridge Analytica had, in fact,

7  misappropriated tens of millions' of Facebook users' data in violation of its policies—and that

8  Facebook had never told the affected users despite repeated public assurances that the users had

9  "control" over their data. Hiding the large scale data harvesting by Cambridge Analytica violated

10  users' trust, as did reports that Cambridge Analytica misused Facebook users' data. ¶¶476-79.

11  Investors were shocked, and the fallout for Facebook was stark and dramatic. Facebook's stock

12  price dropped nearly 18% in just one week in March 2018. ¶487. On June 3, 2018, *the New York*

13  *Times* reported that Facebook had continued to deprive users of control over their data by

14  whitelisting dozens of third parties like Apple, Microsoft, and Samsung to let them access user

15  data without the users' knowledge or consent. *Facebook*, 87 F.4th at 946. Multiple news outlets

16  subsequently reported that Facebook shared its users' data with foreign entities "believed to be

17  national security risks" without the users' knowledge. *Id.* This news gave additional examples that

18  Facebook users did not "control" their own data, further undermining users' trust that their data

19  were safe. The market digested the impact of this second revelation on July 25, 2018, when

20  "Facebook announced unexpectedly low revenue growth, profitability, and user growth in its Q2

21  earnings call." *Id.* Facebook's share price plunged nearly 19%, wiping out approximately $100

22  billion in shareholder value—which was then the largest one-day stock decline in U.S. history. *Id.*;

23  ¶538.

24      **B.    FACEBOOK PAYS HISTORIC REGULATORY PENALTIES**

25      In July 2019, Defendants agreed to pay a $5 billion penalty to the FTC to settle charges

26  that Facebook made misleading claims that users controlled their data. ¶570. This was the largest

27  penalty ever imposed on any company for violating consumers' privacy. ¶571. Also in July 2019,

28

Facebook agreed to pay $100 million to resolve SEC charges that Facebook deceived investors, including through the same misleading risk disclosures at issue in this case. ¶561.

### C. THE NINTH CIRCUIT SUSTAINED PLAINTIFFS' CLAIMS FINDING THAT DEFENDANTS MADE FALSE RISK DISCLOSURES AND THAT PLAINTIFFS ADEQUATELY PLED LOSS CAUSATION

On October 18, 2023, the United States Court of Appeals for the Ninth Circuit reversed-in-part the Court's dismissal of Plaintiffs' claims. *Facebook*, 87 F.4th at 941. In particular, the Ninth Circuit determined that loss causation had been adequately alleged for statements regarding users' "control" over their data, including as to Cambridge Analytica's data harvesting misconduct, and the Ninth Circuit sustained the falsity of Defendants' "Risk Factor" statements. In that regard, the Ninth Circuit credited Plaintiffs' allegations that Cambridge Analytica and its data harvesting partners had improperly accessed and disclosed Facebook's users' data in violation of Facebook's stated policies, as was flagged by Facebook employees in September 2015, and raised to Cambridge Analytica in an email from a Facebook executive starting in December 2015. *Id.* at 949-52. Relying on these allegations, the Ninth Circuit held that "Facebook represented the risk of improper access to or disclosure of Facebook user data as purely hypothetical when that exact risk had already transpired." *Id*. at 949.

Importantly, the Ninth Circuit also specifically credited Plaintiffs' factual allegations that:

a) "Facebook employees flagged Cambridge Analytica in September 2015 for potentially violating Facebook's terms";

b) "Kogan taught Facebook in November 2015 about the dataset Cambridge Analytica had compiled";

c) "a Facebook executive told Cambridge Analytica in December 2015 that the firm had violated Facebook's user data policies"; and

d) "after Facebook learned in June 2016 that Cambridge Analytica lied in December 2015 about deleting the data derived from Facebook "likes," Cambridge Analytica's chief executive refused to certify that the data had actually been deleted."

The Ninth Circuit held that, if true (as they are assumed to be at the current pleading stage), the above facts "more than support the claim that ***Facebook was aware of Cambridge Analytica's***

1   ***misconduct before February 2017***, so Facebook's statements about risk management '***directly***

2   ***contradict[ed]' what the company knew*** when it filed its 2016 10-K with the SEC." *See Facebook*,

3   87 F.4th at 949. Likewise, the Ninth Circuit found that Plaintiffs "adequately pleaded that the risk

4   statements in Facebook's 2016 10-K directly contradicted what Facebook knew at the time such

5   that, in the dissent's words, ***Facebook 'knew a risk had come to fruition' and 'chose to bury it.'***"

6   *Facebook*, 87 F.4th at 950. Moreover, the Ninth Circuit held that Plaintiffs "pleaded with

7   particularity that ***Facebook knew*** that Cambridge Analytica did not delete all the data it had

8   improperly accessed." *Facebook*, 87 F.4th at 957; *see also id.* ("***Facebook knew Cambridge***

9   ***Analytica retained access to improperly collected user data*** after Cambridge Analytica certified

10  that it had deleted the personality score data, and Facebook nonetheless falsely represented to users

11  that they had control over their data on the platform.").

12       In addition, the Ninth Circuit sustained Plaintiffs' loss causation allegations regarding the

13  March 16, 2018 and June 3, 2018 corrective disclosures, as discussed above.

14       On March 4, 2024, Defendants petitioned for a writ of certiorari of the United States

15  Supreme Court, which was granted on June 10, 2024 as to the risk disclosures. However, on

16  November 22, 2024, after full briefing and oral argument, the Supreme Court dismissed

17  Defendants' writ of certiorari as improvidently granted.

18       The Ninth Circuit issued its mandate on January 24, 2025, remanding the case back to the

19  Court. ECF 180. On February 19, 2025, the Court entered an Order re: Case Scheduling directing

20  the parties to submit a joint status report as to the commencement of discovery. ECF No. 194.

21  Discovery has since commenced, and Defendants have started producing documents "from related

22  matters." ECF No. 200.

23       **D.    NEW FACTS HAVE EMERGED SINCE THE THIRD AMENDED**
              **COMPLAINT WAS FILED IN 2020**
24

25       Plaintiffs filed their operative complaint in October 2020 without the benefit of any

26  discovery. ECF No. 142. In the nearly five years since then, additional facts regarding Plaintiffs'

27  long-existing theory that Defendants knew or recklessly disregarded Cambridge Analytica's

28  misconduct have come to light, including through discovery produced by Defendants.

LEAD PLTFS' MOTION FOR LEAVE TO FILE A FOURTH AMENDED COMPLAINT
No. 5:18-cv-01725-EJD                                                        9



The results of the November 2016 election only increased Defendants' focus on Cambridge Analytica and its use of Facebook user data. For example, on November 19, 2016, Mark Zuckerberg traveled to a conference in Lima, Peru with Elliot Schrage. ¶¶360-61. As Sarah Wynn-Williams, formerly Facebook's Director of Public Policy, recounted in a book published on March

LEAD PLTFS' MOTION FOR LEAVE TO FILE A FOURTH AMENDED COMPLAINT
No. 5:18-cv-01725-EJD                                                                                     10

11, 2025, on the flight to Peru, Schrage discussed with Defendant Zuckerberg "Project Alamo," the Trump campaign's dataset that included Cambridge Analytica's purloined Facebook data. ¶¶351, 360-61. As Wynn-Williams recounted:

> Elliot walk[ed] Mark through all the ways that Facebook and [Brad] Parscale's [digital director for the Trump campaign] combined team microtargeted users and tweaked ads for maximum engagement, using data tools we designed for commercial advertisers. ***The way I understand it***, Trump's campaign had ***amassed a database, named Project Alamo, with profiles of over 220 million people in America***. It charted all sorts of online and offline behavior, including gun registration, voter registration, credit card and shopping histories, what websites they visit, what car they drive, where they live, and the last time they voted. ***The campaign used Facebook's "Custom Audiences from Custom Lists" to match people in that database with their Facebook profiles***. Then Facebook's "Lookalike Audiences" algorithm found people on Facebook with "common qualities" that "look like" those of known Trump supporters. So if Trump supporters ***liked***, for example, a certain kind of pickup truck, the tool would find other people who ***liked*** pickup trucks but were not yet committed to voters to show the ads to.

¶¶360-61. Wynn-Williams further explained that Defendant Sandberg was given the same information earlier at a business operations meeting held "a few days after" the 2016 election. ¶361.

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████    █████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████. On March 15, 2017, Stone nonetheless wrote to a journalist working on a story about Cambridge Analytica for *The Intercept*, referring him to Facebook's statement to *The Guardian* in December 2015, and, at the same time, providing the following additional statement for publication: "Our investigation to date has not

1  uncovered anything that suggests wrongdoing." ¶¶397-401. On March 30, 2017, *The Intercept*

2  referenced Facebook's December 2015 statement to *The Guardian* and printed Facebook's

3  statement (via Stone) about its investigation, quoted above.

4  ██████████████████████████████████████████████████

5  ██████████████████████████████████████████████████

6  ██████████████████████████████████████████████████

7  ██████████████████████████████████████████████████

8  ████████████

9      Meanwhile, Sandberg used a pseudonymous email account that was not on the Facebook

10  platform to communicate about Cambridge Analytica and related matters, but then selectively

11  deleted those communications, leading to spoliation sanctions. ¶16.

12      Plaintiffs anticipate that ongoing discovery, including Defendants' initial productions due

13  May 30, as well as related proceedings,[3] may reveal additional facts relevant to Plaintiffs' existing

14  legal theories.

15  **III.    ARGUMENT**

16      **A.    LEGAL STANDARD**

17      Rule 15(a) of the Federal Rules of Civil Procedure provides that courts should "freely give

18  "leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). A motion under Rule 15

19  "generally shall be denied only upon showing of bad faith, undue delay, futility, or undue prejudice

20  to the opposing party." *Chudacoff*, 649 F.3d at 1152; *see also Underwriters at Lloyd's v. Abaxis,*

21  *Inc.*, 2020 WL 3188420, at *2 (N.D. Cal. June 15, 2020) ("Leave to amend is thus ordinarily

22  granted unless the amendment is futile, would cause undue prejudice to the defendants, or is sought

23  by plaintiffs in bad faith or with a dilatory motive").  The Ninth Circuit has clarified that "requests

24  for leave to amend should be granted with extreme liberality." *Brown*, 953 F.3d at 574.

25

26  ───────────────

    [3] For example, a trial in the derivative action *In re Facebook Inc. Derivative Litigation*, C.A. No.
27  2018-0307-KSJM (Del. Ch. Ct.), also stemming from Defendants' alleged Cambridge Analytica-
    related misconduct, is scheduled to begin July 16, 2025. ¶16. Evidence introduced before or during
28  the trial could potentially be relevant to Plaintiffs' claims.

"Absent prejudice, or a strong showing of any of the remaining . . . factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Abaxis*, 2020 WL 3188420, at *3. Thus, in evaluating motions under Rule 15(a)(2), "[t]he burden of persuasion is on the party opposing amendment." *Perfect 10, Inc. v. Google, Inc.*, 2008 WL 4217837, at *2 (C.D. Cal. July 16, 2008); *see also Abraxis*, 2020 WL 3188420, at *3 (the party opposing amendment has the "burden of showing prejudice").

As set forth below, Defendants cannot satisfy their burden here.

## B.  DEFENDANTS WILL NOT FACE UNDUE PREJUDICE FROM GRANTING LEAVE TO AMEND

Defendants will not suffer undue prejudice, especially because the new facts that Plaintiffs seek to add only confirm and augment existing theories of liability and claims, which were endorsed by the Ninth Circuit, and the Action is still at an early stage.

"Prejudice is the touchstone of the inquiry under Rule 15(a)." *Abaxis*, 2020 WL 3188420, at *3. "Neither delay resulting from the proposed amendment nor the prospect of additional discovery needed by the non-moving party in itself constitutes a sufficient showing of prejudice." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 2017 WL 3149297, at *3 (N.D. Cal. July 25, 2017). Instead, "[t]he undue prejudice which a court must guard against is that prejudice which would cause a party undue difficulty in prosecuting a lawsuit as a result of a change of tactics or theories on the part of the other party." *Jones*, 2023 WL 2173417, at *3; *see also Radisson Hotels Int'l, Inc. v. Red Lion Hotels Corp.*, 2021 WL 6275064, at *2 (E.D. Wash. Jan. 27, 2021) (no undue prejudice when there was "no evidence of a significant change of tactics or theory").

Courts have rejected the proposition that defendants would suffer undue prejudice where they would "incur additional expense responding to the new complaint," but "not have to radically change their litigation strategy." *Todd v. Tempur-Sealy Int'l, Inc.*, 2015 WL 5064076, at *3 (N.D. Cal. Aug. 26, 2015). Moreover, courts in the Ninth Circuit have found a lack of undue prejudice where the proposed "amendments simply add new factual bases for legal claims that were previously alleged." *Bowen v. Target Corp.*, 2019 WL 9240985, at *4 (C.D. Cal. Nov. 12, 2019); *see also Oracle*, 2017 WL 3149297, at *3 ("[f]urther factual support for [plaintiff's] existing

1   claims does not harm [defendant]"); *Mattson v. VMV Grp., LLC*, 2023 WL 7404555, at *6 (D. Or.

2   Nov. 9, 2023) (no undue prejudice where "[t]he additional facts . . . relate to the same core facts

3   and theories that have been alleged from this case's inception").

4       Here, Defendants will not suffer undue prejudice because of Plaintiffs' proposed

5   amendment.  Plaintiffs are not asserting new claims or legal theories, as the new facts only confirm

6   the same legal theories that Plaintiffs have advanced—and Defendants have known about—for

7   several years.  But for the first time in that period, Plaintiffs have access to discovery from

8   Defendants.  Thus, in their proposed amendment, Plaintiffs seek only to "clarify[] the pleadings

9   based on what [they have] learned in discovery." *Oracle*, 2017 WL 3149297, at *3.

10      Further, as this Court recently acknowledged, "very little" has happened in the case as it is

11  just out of the pleading stage (ECF No. 194), and "[d]iscovery is in its early stages." *Strickland*,

12  2020 WL 5530076, at *2.  Indeed, Defendants have not even filed an answer (and their obligation

13  to do so is now automatically stayed); they have only just started reproducing materials from other

14  matters (which have already been collected); no depositions have taken place or even been noticed;

15  the fact discovery cutoff is not until March 2026; the deadline to file dispositive motions is over a

16  year away; and no trial date has been set. ECF No. 207; *see Strickland*, 2020 WL 5530076, at *2

17  ("the discovery deadlines are several months away, and no depositions . . . have been taken by any

18  party"); *Hyun Ju Shin v. Yoon*, 2019 WL 1255242, at *6 (E.D. Cal. Mar. 19, 2019) (no prejudice

19  because the case was in its "early stages," since the fact discovery deadline was ten months away

20  and trial fourteen months away).

21      In sum, Defendants will not face any undue prejudice if leave to amend is granted.

22      **C.      THE PROPOSED AMENDMENT IS NOT FUTILE.**

23      Given the lack of undue prejudice, Defendants face the burden to make a "strong showing"

24  on one of the other potential grounds for denying the motion. *Abraxis, Inc.*, 2020 WL 3188420, at

25  *3. As set forth below, Defendants cannot satisfy this burden here.

26      Through a careful review of Defendants' productions, as well as materials that have

27  become public since the operative complaint was filed in 2020, Plaintiffs have uncovered

28  additional support for what are already meritorious and upheld claims, and Plaintiffs expect that

1   Defendants' subsequent productions will include additional new facts that will further confirm

2   their existing legal theories. As such, Defendants cannot show that the proposed amendment is

3   futile.

4          "A proposed amendment is futile only if ***no set of facts*** can be proved under the amendment

5   to the pleadings that would constitute a valid and sufficient claim or defense." *Allen v. Bayshore*

6   *Mall*, 2013 WL 6441504, at *4 (N.D. Cal. Dec. 9, 2013); *Droesch v. Wells Fargo Bank, N.A.*, 2021

7   WL 5771132, at *3 (N.D. Cal. Dec. 6, 2021) (same). It is accepted that "denial of a motion for

8   leave [to amend] on this ground is rare and courts generally defer consideration of challenges to

9   the merits of a proposed amended pleading until after leave to amend is granted and the amended

10  pleading is filed." *dpiX LLC v. Yieldboost Tech, Inc.*, 2015 WL 5158534, at *3 (N.D. Cal. Sept. 2,

11  2015). To the extent that Defendants challenge the amendment, "[t]he proper test to be applied

12  when determining the legal sufficiency of a proposed amendment is identical to the one used when

13  considering the sufficiency of a pleading challenged under Rule 12(b)(6)." *Wells Fargo*, 2021 WL

14  5771132, at *3; *Naranjo v. Bank of Am. Nat'l Ass'n*, 2015 WL 913031, at *8 (N.D. Cal. Feb. 27,

15  2015).

16         As an initial matter, it will not be futile to add the new facts in the proposed amendment

17  because they confirm and provide additional details concerning Plaintiffs' long-standing theories,

18  including claims that have already been credited by the Ninth Circuit. For example, the Ninth

19  Circuit held that the current complaint adequately pled that the risk statements were false when

20  made because Defendants represented "the risk of improper access to or disclosure of Facebook

21  user data as purely hypothetical when that exact risk had already transpired." *Facebook*, 87 F.4th

22  at 949. The Ninth Circuit also credited Plaintiffs' allegations that "Facebook was aware of

23  Cambridge Analytica's misconduct before February 2017, so Facebook's statements about risk

24  management directly contradict[ed] what the company knew when it filed its 2016 10-K with the

25  SEC." *Id.* at 949. Further, the Ninth Circuit found that Plaintiffs "adequately pleaded that the risk

26  statements in Facebook's 2016 10-K directly contradicted what Facebook knew at the time such

27  that, in the dissent's words, ***Facebook 'knew a risk had come to fruition' and 'chose to bury it.'***"

28  *Id.* at 950.  And the Ninth Circuit credited Plaintiffs' allegation that "Facebook had reason to know

1   in June 2016 … that Cambridge Analytica was still using a model based on the data in violation

2   of Facebook's policies … [and] [t]hus, [Plaintiffs] pleaded with particularity that Facebook knew

3   Cambridge Analytica did not delete all the data it improperly accessed." *Id.* at 957; *see also id.*

4   ("***Facebook knew Cambridge Analytica retained access to improperly collected user data*** . . .").

5       Thus, the proposed amendments will only strengthen the inference of Defendants' scienter.

6   "The most direct way to show . . . that the party making the statement knew that it was false is via

7   contemporaneous reports or data, available to the party, which contradict the statement." *Nursing*

8   *Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004); *E. Ohman*

9   *J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 940 (9th Cir. 2023) (defendants' "access and

10  review of contemporaneous reports are the most direct way to prove scienter").

11      In their proposed amendment, Plaintiffs have already incorporated allegations of multiple

12  instances in which Zuckerberg and Sandberg had access to, and reviewed, contemporaneous

13  reports learning about Cambridge Analytica's actions. *See* Ex. A.

14      For example, the proposed amendments show that Facebook began an internal

15  investigation of Cambridge Analytica by December 15, 2015, and Zuckerberg expressed interest

16  in how the campaigns were utilizing user data by February of 2016. Furthermore, on October 27,

17  2016, Zuckerberg forwarded a Bloomberg email that discussed the facts that Cambridge Analytica

18  was a primary "supplier of Trump's data," which was "a ***database they named Project Alamo***, and

19  "[p]owered by ***Project Alamo*** and data supplied by the RNC and ***Cambridge Analytica***, [Trump's]

20  team is spending $70 million a month" including in connection with this "massive Facebook and

21  data engine." ¶¶337-39. Then, on November 19, 2016, Zuckerberg traveled to a conference in

22  Lima, Peru with Schrage. ¶¶360-61. As Wynn-Williams, formerly Facebook's Director of Public

23  Policy, reported in her recent book, Schrage told Zuckerberg about the Trump campaign's "Project

24  Alamo" database "with profiles of over 220 million people in America," how it used "Facebook's

25  Custom Audiences from Custom Lists to match people in that databased with their Facebook

26  profiles," and used "Lookalike" tools that extrapolated large audiences based on a smaller set of

27  data showing what Facebook users had "liked." ¶361. Wynn-Williams further explained that

28

1  Sandberg was given the same information earlier at a business operations meeting held "a few

2  days after" the 2016 election. *Id.*

3  

4

5

6

7

8

9

10

11

12  . On March 15, 2017, Stone nonetheless wrote

13  to a journalist working on a story about Cambridge Analytica for *The Intercept*, referring him to

14  Facebook's statement to *The Guardian* in December 2015, and, at the same time, providing the

15  following additional statement for publication: "Our investigation to date has not uncovered

16  anything that suggests wrongdoing." ¶¶397-401. On March 30, 2017, *The Intercept* referenced

17  Facebook's December 2015 statement to *The Guardian* and printed Facebook's statement (via

18  Stone) about its investigation, as quoted above.

19

20

21

22

23

24

25

26

27

28

1  ████████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ████████████████████████████████████████████████

5  ████████████

6          ██████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ███████████████████████████████████. Zuckerberg's

9  interest in Cambridge Analytica is further indicative of scienter. *Reese v. Malone*, 747 F.3d 557,

10 579 (9th Cir. 2014) (fact that "the former CEO requested updates on the company's response to

11 the spill in the form of briefing memoranda" supported scienter, because it was "direct evidence

12 of its prominence in the eyes of BP's top management").

13         Additional conduct by Defendants supports a scienter finding. On January 21, 2025, in a

14 shareholder derivative case also stemming from Facebook executives' misconduct in relation to

15 Cambridge Analytica, the Delaware Chancery Court imposed sanctions against Sandberg, finding

16 that she had deleted sensitive and relevant emails from her personal Gmail account. ¶16. The Court

17 found that "[b]eause Sandberg *selectively deleted* items from her Gmail account, it is likely that

18 the most sensitive and probative exchanges *are gone*." *In re Facebook Inc. Derivative Litig.*, No.

19 2018-0307-JTL, 2025 WL 262194, at *11 (Del. Ch. Jan. 21, 2025). Sandberg's efforts to erase

20 relevant information are indicative of scienter. *Constr. Laborers Pension Tr. for S. California v.*

21 *CBS Corp.*, 433 F. Supp. 3d 515, 548 (S.D.N.Y. 2020) (conduct such as "deleting text messages"

22 indicative of scienter); *Buffin v. Community.com, Inc.*, 2021 WL 4439224, at *2 (C.D. Cal. Aug.

23 6, 2021) (allegations that Defendant "made a conscious effort to conceal facts" supported scienter).

24         These additional allegations, combined with further corroborative allegations based on

25 discovery that Defendants assert is forthcoming (as well as ongoing follow-up discovery, including

26 depositions), combined with what Plaintiffs have already pled, more than suffice to state a claim

27 for relief, and Defendants cannot show futility.

28

**D.    THE AMENDMENTS ARE NOT PROPOSED IN BAD FAITH**

Defendants cannot show that Plaintiffs' proposed amendments are proposed in bad faith. "In order for the Court to find that a moving party filed for leave to amend in bad faith, the opposing party must offer evidence that shows wrongful motive on the part of the moving party," such as "seeking to prolong the litigation by adding new but baseless legal theories." *Yieldboost Tech, Inc.*, 2015 WL 5158534, at *4. Here, Plaintiffs filed for leave to amend pursuant to the Court-ordered date in the Case Management Order. Further, they do so based on documents that have recently been, and soon will be, produced in discovery or else become publicly available support Plaintiffs' existing claims and theories with new facts. Moreover, given that discovery is already proceeding and the proposed amendment will not alter the class definition in any way, there is no need for the proposed amendment to prolong the other deadlines that have been set by this Court. Indeed, to the extent that the new allegations strengthen Plaintiffs' case, they may moot Defendants' anticipated motion for judgment on the pleadings and thereby expedite, rather than prolong, the litigation.

**E.    PLAINTIFFS DID NOT UNDULY DELAY SEEKING TO AMEND**

There is no reasonable concern about undue delay here. Plaintiffs moved to amend by the deadline ordered by the Court and as soon as reasonably practicable following remand of the case from the Supreme Court and the commencement of document production. "Undue delay requires examination not only of the scheduling order, but also whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading." *Finjan, Inc. v. Qualys Inc.*, 2020 WL 1865264, at *4 (N.D. Cal. Apr. 13, 2020). Courts have rejected undue delay arguments where, as here, the documents that formed the basis of the amendments were "recently produced in discovery." *Strickland*, 2020 WL 5530076, at *2; *see also Oracle*, 2017 WL 3149297, at *4 (no undue delay where a "majority" of the proposed amendments were "a result of recent developments in discovery"); *Tempur-Sealy*, 2015 WL 5064076, at *2 (no undue delay where the "virtually all" of the evidence underlying the amendments "was procured through discovery" after the prior complaint was filed). Discovery in this action essentially ***began*** just over two months ago and Defendants' initial document production is not even scheduled to be

LEAD PLTFS' MOTION FOR LEAVE TO FILE A FOURTH AMENDED COMPLAINT
No. 5:18-cv-01725-EJD                                                                                    19

completed until May 30, 2025. ECF No. 207 at 2. Plaintiffs therefore moved expeditiously to amend their complaint. To the extent any of the allegations are attributable to material that became available prior to the commencement of discovery; nearly all the delay between the filing of the Third Amended Complaint and today was due to motion practice and the appeals process. *See Juarez v. Jani-King of California, Inc.*, 2019 WL 2548691, at *4 (N.D. Cal. June 20, 2019) ("[t]he passage of time during the pendency of appeal, without more, does not contribute to a finding of undue delay").

## IV.    CONCLUSION

For all of the reasons outlined above, Plaintiffs' motion for Leave to File a Fourth Amended Complaint should be granted.

DATED: May 30, 2025                    Respectfully submitted,

*/s/ Jeremy P. Robinson*
Jeremy P. Robinson
BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
SALVATORE J. GRAZIANO
JEREMY P. ROBINSON
TIMOTHY G. FLEMING
THOMAS SPERBER
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212/554-1400
212/554-1444 (fax)
salvatore@blbglaw.com
jeremy@blbglaw.com
timothy.fleming@blbglaw.com
thomas.sperber@blbglaw.com

*Counsel for Mississippi and Co-Lead Counsel for the Class*

and

*/s/ Jason C. Davis*
Jason C. Davis

ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON C. DAVIS
KENNETH J. BLACK
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545

415/288-4534 (fax)
jdavis@rgrdlaw.com
kblack@rgrdlaw.com


LUKE O. BROOKS (212802)
DARRYL J. ALVARADO (253213)
HILLARY B. STAKEM (286152)
J. MARCO JANOSKI GRAY (306547)
JESSICA E. ROBERTSON (352207)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
lukeb@rgrdlaw.com
dalvarado@rgrdlaw.com
hstakem@rgrdlaw.com
mjanoski@rgrdlaw.com
jrobertson@rgrdlaw.com

*Counsel for Amalgamated and Co-Lead Counsel
for the Class*