BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
SALVATORE J. GRAZIANO
JEREMY P. ROBINSON
PREETHI KRISHNAMURTHY
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212/554-1400
212/554-1444 (fax)
salvatore@blbglaw.com
jeremy@blbglaw.com
preethi@blbglaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
JASON C. DAVIS (253370)
KENNETH J. BLACK (291871)
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

Co-Lead Counsel for the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re FACEBOOK, INC. SECURITIES LITIGATION | Master File No. 5:18-cv-01725-EJD |
| | <u>CLASS ACTION</u> |
| This Document Relates To:<br><br>ALL ACTIONS. | **LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

| | |
|---|---|
| DATE: | January 21, 2027 |
| TIME: | 9:00 A.M. |
| LOCATION: | Courtroom 4, 5th Floor |
| JUDGE: | Hon. Edward J. Davila |

**TABLE OF CONTENTS**


NOTICE OF MOTION AND MOTION ....1

MEMORANDUM OF POINTS AND AUTHORITIES ....1

STATEMENT OF ISSUES TO BE DECIDED ....1

I. PRELIMINARY STATEMENT ....2

II. STATEMENT OF RELEVANT FACTS COMMON TO THE CLASS ....4

A. Defendants' Classwide Misrepresentations ....4

B. Defendants Knew Cambridge Analytica Had Misappropriated and Misused the Private Data of Millions of Facebook Users ....5

C. Defendants Allowed Third Parties to Access User Data Without Consent ....7

D. Defendants Profited from Massive Insider Trades While Facebook's Stock Price Was Inflated ....8

E. A Series of Corrective Disclosures Revealed the Relevant Truth ....8

F. Facebook Resolves Government Charges Arising from the Same Misconduct ....9

III. PROCEDURAL HISTORY ....9

IV. ARGUMENT ....9

A. The Proposed Class Satisfies Rule 23(a) ....10

1. The Class Is Sufficiently Numerous ....10

2. Multiple Common Questions of Law and Fact Exist ....11

3. Lead Plaintiffs' Claims Are Typical of The Class ....11

4. Lead Plaintiffs Will Adequately Represent the Proposed Class ....12

B. The Proposed Class Satisfies Rule 23(b)(3) ....14

1. Common Questions of Law and Fact Predominate ....14

a. Classwide Reliance Favors Certification. ....15

b. Damages Can Be Measured on a Classwide Basis ....20

c. Predominance Is Satisfied for Lead Plaintiffs' Other Claims ....23

2. A Class Action Is Superior to Other Means of Adjudication ....24

C. BLB&G and Robbins Geller Should Be Appointed Class Counsel ....25

V. CONCLUSION ........................................................................ 25

# TABLE OF AUTHORITIES

**CASES** **Page(s)**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....................................14

*Amgen Inc.v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)....................................10, 14, 15

*AMI - Gov't Emps. Provident Fund Mgmt. Co. v. Alphabet Inc.*,
2026 WL 1382950 (N.D. Cal. May 18, 2026)....................................10, 20, 23

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................................15

*Basile v. Valeant Pharma. Int'l, Inc.*,
2017 WL 3641591 (C.D. Cal. Mar 15, 2017)....................................24

*Brown v. China Integrated Energy Inc.*,
2015 WL 12720322 (C.D. Cal. Feb. 17, 2015)....................................17

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989)....................................16, 17, 18

*City of Sunrise Firefighters' Pension Fund v. Oracle*,
2022 WL 1459567 (N.D. Cal. May 9, 2022)....................................13

*In re Cooper Cos. Inc. Sec. Litig.*,
254 F.R.D. 628 (C.D. Cal. 2009)....................................2

*Crews v. Rivian Auto., Inc.*,
2024 WL 3447988 (C.D. Cal. July 17, 2024)....................................11

*In re Diamond Foods, Inc., Sec. Litig.*,
295 F.R.D. 240 (N.D. Cal. 2013)....................................13, 18, 20

*Epstein v. MCA, Inc.*,
50 F.3d 644 (9th Cir. 1995)....................................2

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)....................................15

*In re FibroGen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)....................................17, 18

*Grae v. Corr. Corp. of Am.*,
330 F.R.D. 481 (M.D. Tenn. 2019)....................................13

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)....15

*Hatamian v. Advanced Micro Devices, Inc.*,
2016 WL 1042502 (N.D. Cal. Mar. 16, 2016)....11

*Homyk v. ChemoCentryx, Inc.*,
2024 WL 1141699 (N.D. Cal. Mar. 6, 2024)....10, 24

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000)....23

*Junge v. Geron Corp.*,
2022 WL 1002446 (N.D. Cal. Apr. 2, 2022)....14, 15, 19

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001)....18, 19

*Lamartina v. VMware, Inc.*,
2024 WL 3286059 (N.D. Cal. July 2, 2024) (Davila, J.)....10, 13, 25

*In re LDK Solar Sec. Litig.*,
255 F.R.D. 519 (N.D. Cal. 2009)....11

*Lytle v. Nutramax Lab'ys, Inc.*,
114 F.4th 1011 (9th Cir. 2024)....20

*Malriat v. QuantumScape Corp.*,
2022 WL 17974629 (N.D. Cal. Dec. 19, 2022)....10, 16, 18

*Matsushita Elec. Indus. Co., Ltd. v. Epstein*,
516 U.S. 367 (1996)....2

*In re Mattel, Inc. Sec. Litig.*,
2021 WL 4704578 (C.D. Cal. Oct. 6, 2021)....2

*Monroe Cty. Emps. Ret. Sys. v. S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019)....18

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
2016 WL 1598666 (N.D. Cal. Apr. 21, 2016)....16

*Mulderrig v. Amyris, Inc.*,
340 F.R.D. 575 (N.D. Cal. 2021)....25

*In re NetSol Techs., Inc. Sec. Litig.*,
2016 WL 7496724 (C.D. Cal. July 1, 2016)....10

*In re NVIDIA Corp. Sec. Litig.*,
825 F. Supp. 3d 1047 (N.D. Cal. 2026)....20, 21, 22, 23

*Petrie v. Elec. Game Card, Inc.*,
308 F.R.D. 336 (C.D. Cal. 2015) ........ 17, 19

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
2025 WL 3546227 (N.D. Cal. Dec. 4, 2025) ........ 14

*Police Ret Sys. of St. Louis v. Granite Constr.*,
2021 WL 229310 (N.D. Cal. Jan. 21, 2021) ........ 17, 19

*Pub. Employees' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*,
2022 WL 17920570 (N.D. Ga. Nov. 28, 2022) ........ 13

*Purple Mountain Tr. v. Wells Fargo & Co.*,
2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) ........ *passim*

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ........ 23

*In re SanDisk LLC Sec. Litig.*,
2018 WL 4293336 (N.D. Cal. Sep. 4, 2018) ........ 12, 23

*Sayce v. Forescout Techs., Inc.*,
754 F. Supp. 3d 878 (N.D. Cal. 2024) ........ 10, 16

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
335 F.R.D. 276 (N.D. Cal. 2020) ........ 12, 22, 24

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
2025 WL 1243818 (N.D. Cal. Apr. 25, 2025) ........ 10, 14, 16, 19

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
2023 WL 3569981 (N.D. Cal. May 19, 2023) ........ 12

*Sundaram v. Freshworks Inc.*,
2025 WL 1083168 (N.D. Cal. Apr. 10, 2025) ........ 17

*In re VeriSign, Inc. Sec. Litig.*,
2005 WL 7877645 (N.D. Cal. Jan. 13, 2005) ........ 10, 12

*Weston v. DocuSign, Inc.*,
348 F.R.D. 354 (N.D. Cal. 2024) ........ 10, 11, 20, 23

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
594 F.3d 1087 (9th Cir. 2010) ........ 20, 23

**STATUTES, RULES & REGULATIONS**

15 U.S.C. § 78t(a) ........ 23

15 U.S.C. § 78u-4(e)(1) ........ 21

17 C.F.R. § 239.13 ........................................................................................................17

Fed. R. Civ. P. 23(g)(1)(A) ........................................................................................................25

H.R. Conf. Rep. No. 104-369 (1995),
*reprinted in* 1995 U.S.C.C.A.N. 730 (1995)........................................................................13

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on January 21, 2027, to be heard in Courtroom 4, before the Honorable Edward J. Davila, in the United States District Court for the Northern District of California, San Jose Division, Lead Plaintiffs Amalgamated Bank, as Trustee for the Long View LargeCap 1000 Growth Index Fund, LongView Quantitative LargeCap Fund, and LongView Quant LargeCap Equity VEBA Fund ("Amalgamated"), and Public Employees' Retirement System of Mississippi ("MissPERS," and, together with Amalgamated, "Lead Plaintiffs") will, and hereby do, move the Court for an order: (i) certifying this action against Defendants Facebook, Inc. ("Facebook" or the "Company"), Mark E. Zuckerberg, Sheryl K. Sandberg, and David M. Wehner (collectively, "Defendants") as a class action pursuant to Federal Rules of Civil Procedure ("Rule") 23; (ii) appointing Lead Plaintiffs as Class Representatives; and (iii) approving Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") as Class Counsel. This Motion is based on this Notice of Motion and Motion, Memorandum of Points and Authorities, the Declaration of Jeremy P. Robinson with accompanying exhibits, the papers and pleadings filed in this action, and such further argument and matters as may be offered at the time of hearing on this Motion.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF ISSUES TO BE DECIDED

1. Whether to certify the proposed Class (defined below) pursuant to Rule 23(a) and (b)(3);

2. Whether to appoint Lead Plaintiffs as Class Representatives; and

3. Whether to appoint Robbins Geller and BLB&G as Class Counsel.

---

[1] References to "¶__" are to the Fourth Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (Dkt. No. 228). References to "Ex. __" are to the exhibits attached to the accompanying Declaration of Jeremy P. Robinson. Unless otherwise noted: (i) all emphasis is added; (ii) all internal citations and quotations and original emphasis have been omitted; and (iii) all original alterations are incorporated.

## I. PRELIMINARY STATEMENT

Lead Plaintiffs respectfully request that the Court certify the following Class pursuant to Rules 23(a) and 23(b):

> **All persons who purchased Facebook common stock between February 3, 2017 and July 25, 2018, inclusive (the "Class Period"), and who were damaged thereby (the "Class").**[2]

Lead Plaintiffs further request that they be appointed as Class Representatives, and that Robbins Geller and BLB&G be appointed as Class Counsel pursuant to Rule 23(g).

This securities action is ideally suited for class certification. "As the Ninth Circuit has so aptly stated, securities fraud cases fit Rule 23 'like a glove.'" *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 632 (C.D. Cal. 2009) (quoting *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367 (1996)). "The law in the Ninth Circuit is very well established that the requirements of Rule 23 should be liberally construed in favor of class action cases brought under the federal securities laws." *In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *3 (C.D. Cal. Oct. 6, 2021).

This case arises from Defendants' alleged misstatements common to all proposed Class members that Facebook users controlled their private data on the prominent social media platform, and that any misappropriation or misuse of such data was merely a hypothetical possibility. In reality, Facebook users did not control their data, and the Company had already experienced a major instance of misuse and misappropriation of user data. Cambridge Analytica had illicitly

[2] The Class also includes all persons or entities who purchased Facebook common stock contemporaneously with sales of Facebook common stock made or caused by Defendant Zuckerberg during the Class Period. Excluded from the Class are Defendants, the officers and directors of Facebook at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

misappropriated and misused data from tens of millions of Facebook users, and Defendants allowed favored, “whitelisted” customers, including Cambridge Analytica and other bad actors with links to the Chinese and Russian governments, unauthorized access to user data. The relevant truth was revealed over a series of disclosures. Starting on March 16, 2018, Facebook publicly confirmed Cambridge Analytica’s misappropriation and misuse of Facebook user data, and then more news articles followed with additional reporting. On July 25, 2018—following a June 3 news report regarding Defendants’ improper whitelisting practices—Facebook’s second quarter earnings revealed additional facts that allowed investors to appreciate the significance of Defendants’ misconduct on Facebook’s business, as well as the cost of remedying Defendants’ misstated privacy practices. These disclosures each caused Facebook stock to plummet, inflicting billions of dollars of losses on investors. To recover those losses, Lead Plaintiffs assert securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the “Exchange Act”) and Rule 10b-5 promulgated thereunder against all Defendants and an insider trading claim under Section 20A against Defendant Zuckerberg.

The Rule 23 requirements are all met here. Numerosity and commonality are satisfied because the proposed Class is comprised of many thousands of investors whose claims involve multiple common questions capable of classwide proof, including whether Defendants’ public statements common to all investors were false or misleading, whether Defendants acted with scienter, and whether they caused putative Class members to suffer damages. Typicality and adequacy are met because Lead Plaintiffs: (i) assert the same claims based on the same misconduct by Defendants as other proposed Class members; (ii) have no conflicts with other Class members; (iii) are institutional investors of the type that Congress deemed ideally suited to lead securities class actions; and (iv) have actively prosecuted this action for eight years. Common issues predominate because the action concerns ***classwide*** claims that are capable of ***classwide*** proof, based on Defendants’ ***classwide*** misconduct. The class mechanism is the superior method of resolving these common questions, and the proposed Class is ascertainable because membership is based on objective criteria, *i.e.*, the dates that investors acquired Facebook common stock.

Lead Plaintiffs’ Motion should be granted.

## II. STATEMENT OF RELEVANT FACTS COMMON TO THE CLASS

During the Class Period, Facebook traded on the Nasdaq, one of the world's most liquid and efficient markets, and was one of the world's largest companies by market capitalization. ¶¶1, 41, 51. Throughout that time, Facebook derived virtually all its revenue from monetizing its users' data through targeted advertising. ¶53. Facebook's financial success depended on maintaining user trust, and it cultivated the necessary trust by repeatedly stating that users "controlled" their data and that any misappropriation or misuse of that data was merely a hypothetical possibility. ¶¶53, 57. As summarized below, Defendants' representations were false.

### A. Defendants' Classwide Misrepresentations

Throughout the Class Period, Defendants made materially false and misleading public statements and omissions, including in SEC filings, on the Facebook website, and in press interviews and Congressional testimony. For example, Facebook's *Statement of Rights and Responsibilities*, which appeared on the Company's website from the start of the Class Period through May 2018, assured users: "You own all of the content and information you post on Facebook, and ***you can control how it is shared***…." ¶608. In October 2017, Defendant Sandberg (then-COO) stated, "when you share on Facebook you need to know … ***[n]o one is going to get your data that shouldn't have it*** … ***you're controlling who you share with***." ¶609. Defendants doubled down when news broke about the misuse of user data. In April 2018, Defendant Zuckerberg testified before the U.S. Senate that "***Every piece of content that you share on Facebook, you own and you have complete control over who sees it***…. [Users] have that control." ¶615(a).

Defendants also misled investors into believing that no third-party misappropriation or misuse of Facebook user data had occurred by presenting these issues as merely hypothetical risks. Facebook's 2016 Form 10-K published at the start of the Class Period, for example, stated that "improper access to or disclosure of … user data ***could*** result in the loss or misuse of such data" and "***if*** … third parties or developers fail to adopt or adhere to adequate data security practices … our users' data ***may*** be improperly accessed, used, or disclosed." ¶628. The Individual Defendants

signed multiple Class Period SEC filings containing these misleading risk factor statements. ¶¶629-32.

**B. Defendants Knew Cambridge Analytica Had Misappropriated and Misused the Private Data of Millions of Facebook Users**

When making these statements, Defendants knew that Cambridge Analytica had improperly accessed and misused the personal data of tens of millions of Facebook users. ¶¶171-222. App developer Aleksandr Kogan collected personal data from Facebook users and then, in violation of Facebook's policies, sold the data to Cambridge Analytica, which used it for political purposes, including manipulating voters through targeted political advertising. ¶¶4, 11, 119-32.

Defendants knew about Cambridge Analytica's misappropriation and misuse of Facebook user data early on. [redacted]

[redacted]

[redacted]

Throughout the Class Period, Facebook executives continued to keep Defendants Sandberg and Zuckerberg in the loop on Cambridge Analytica's misuse of user data. [redacted] Later, Sandberg "selectively deleted" emails that the Delaware Chancery Court found were likely "the most sensitive and probative exchanges" in a case stemming from Facebook executives' misconduct relating to Cambridge Analytica. ¶16.

Similarly, Defendant Zuckerberg continued to receive information about Cambridge Analytica's data misuse during the Class Period. For example, [redacted]

[redacted]

**C. Defendants Allowed Third Parties to Access User Data Without Consent**

Throughout the Class Period, Defendants operated a systematic "whitelisting" program that gave privileged third parties unauthorized access to users' data and their friends' data, including by *directly overriding Facebook users' privacy settings*. ¶¶3, 24. These third parties included not only Cambridge Analytica but also Huawei (a technology company with ties to the Chinese government), Mail.Ru Group (a conglomerate that maintains ties to the Kremlin), Amazon, Google, Samsung, and Blackberry. *Id.* Zuckerberg and Sandberg implemented Facebook's "whitelisting" program prior to the Class Period, approving improper access to user data for companies that provided Facebook "reciprocal" value, such as "at least $250K a year" in advertising spend. *E.g.*, ¶¶80-90. [redacted]

Defendants' whitelisting practices continued throughout the Class Period. [redacted] Remarkably, even *after* the Cambridge Analytica scandal was revealed in March 2018 and Zuckerberg testified to Congress about user data control, Facebook continued to provide "special access through whitelisting." A *New York Times* investigation revealed that Facebook had agreements with dozens of third parties and "most" of them were still in effect as of June 2018. Facebook ultimately admitted to Congress that certain whitelisting relationships continued until October 2018. ¶¶426-27.

**D. Defendants Profited from Massive Insider Trades While Facebook's Stock Price Was Inflated**

Defendants' misrepresentations caused the price of Facebook common stock to trade at artificially inflated prices during the Class Period. During that time, the Individual Defendants made substantial insider sales of their personally held Facebook shares for enormous profits. ¶¶646, 650, 658-59. Defendant Zuckerberg alone sold tens of millions of shares of Facebook stock during the Class Period for ***$5.3 billion*** in proceeds, including 10.1 million shares for $1.74 billion in proceeds in the months before the March 2018 partial disclosure. ¶¶646, 650. This was a dramatic departure from his prior trading pattern. ¶654. Defendant Sandberg similarly sold over 2.5 million Facebook shares during the Class Period for over ***$389 million*** in proceeds, and Defendant Wehner made unusual Class Period sales for total proceeds of $21 million. ¶¶658-59.

**E. A Series of Corrective Disclosures Revealed the Relevant Truth**

The relevant truth emerged through a series of corrective disclosures that collectively wiped out hundreds of billions of dollars in shareholder value. After the market closed on March 16, 2018—reversing their prior efforts to downplay or deny any impropriety—Defendants admitted for the first time that "we" had known "[i]n 2015" that Cambridge Analytica had misappropriated user data, via Kogan, in "violation" of Facebook's "Platform Policies." ¶¶467-68. The following day, March 17, 2018, *The New York Times* and *The Guardian* published articles regarding Cambridge Analytica's misappropriation and misuse of Facebook user data. ¶¶27, 471-72. On March 19, 2018—the first trading day following these revelations—Facebook's stock dropped nearly 7%. ¶480. On March 20, 2018, *The Guardian* published an article revealing that app developers routinely harvested users' data without their knowledge, resulting in an additional 2.6% decline. *Id*. Both of these stock price drops were statistically significant. Ex. 1 ("Gelbach Rpt.") ¶¶117, 121. Defendants, however, continued to conceal the full scope of the fraud, reassuring the market that "we don't expect [the investigation to] have an impact on revenue." ¶502.

On June 3, 2018, *The New York Times* reported that Facebook had given "whitelisted" third parties unauthorized access to users' data, exposing the broader pattern of data abuse beyond

Cambridge Analytica. ¶426. On July 25, 2018, in its earnings announcement, Defendants disclosed the substantial impact their misconduct had on the Company's results, allowing investors to appreciate the significance of the Cambridge Analytica and whitelisting scandals. This included lower-than-expected revenue growth, declining profitability, and flat or declining active user metrics. ¶¶525-29. As a result of the July 25 disclosures, investors began to appreciate that closing down access to third-party use of user data and remedying Defendants' improper data practices would result in reduced revenues and increased operating costs. Gelbach Rpt. ¶97. The market's response was swift and steep. By market close on July 26, 2018, Facebook's stock had plunged nearly ***19%***, losing approximately $100 billion in market capitalization in a single day—the largest such drop in U.S. stock market history. ¶34. This stock price decline was statistically significant. Gelbach Rpt. ¶123.

### F. Facebook Resolves Government Charges Arising from the Same Misconduct

After extensive investigations, both the SEC and FTC concluded that Defendants knew their misrepresentations about user control and actual misuse of user data were false. *See, e.g.*, ¶¶556-57, 560, 569. Facebook settled the FTC's charges of violating the 2012 FTC consent decree for a record $5 billion and the SEC's securities-fraud charges for $100 million. ¶¶554, 563-64.

## III. PROCEDURAL HISTORY

After multiple dismissals, Lead Plaintiffs successfully appealed. *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 946 (9th Cir. 2023). The Ninth Circuit reversed in part the dismissal of Lead Plaintiffs' claims, finding that Lead Plaintiffs had adequately alleged that certain risk and user control statements were false or misleading and the March and July 2018 stock price declines were causally connected to those misstatements. *Id.* at 951-52, 956-57. The Supreme Court, after full briefing and argument, declined to disturb the Ninth Circuit's ruling. On remand, Lead Plaintiffs filed the Fourth Amended Complaint and, on February 27, 2026, this Court sustained in part Lead Plaintiffs' claims. *See* Dkt. 258 at 18-19.

## IV. ARGUMENT

"Class actions are particularly well-suited in the context of securities litigation, wherein geographically dispersed shareholders with relatively small holdings would otherwise have

difficulty in challenging wealthy corporate defendants." *In re VeriSign, Inc. Sec. Litig.*, 2005 WL 7877645, at *9 (N.D. Cal. Jan. 13, 2005). In the Ninth Circuit, it "is very well established that the requirements of Rule 23 should be liberally construed in favor of class action cases brought under the federal securities laws." *In re NetSol Techs., Inc. Sec. Litig.*, 2016 WL 7496724, at *3 (C.D. Cal. July 1, 2016); *VeriSign*, 2005 WL 7877645, at *9. As this Court has held, "'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Lamartina v. VMware, Inc.*, 2024 WL 3286059, at *2 (N.D. Cal. July 2, 2024) (Davila, J.) (quoting *Amgen Inc.v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 465-66 (2013)).

Here, as in multiple recent securities cases in this District, the proposed Class should be certified in full. *E.g., AMI - Gov't Emps. Provident Fund Mgmt. Co. v. Alphabet Inc.*, 2026 WL 1382950, at *7 (N.D. Cal. May 18, 2026); *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2025 WL 1243818, at *9 (N.D. Cal. Apr. 25, 2025); *Weston v. DocuSign, Inc.*, 348 F.R.D. 354, 372 (N.D. Cal. 2024); *Homyk v. ChemoCentryx, Inc.*, 2024 WL 1141699, at *7 (N.D. Cal. Mar. 6, 2024).

## A. The Proposed Class Satisfies Rule 23(a)

### 1. The Class Is Sufficiently Numerous

Rule 23(a)(1) requires only that "the class [be] so numerous that joinder of all members is impracticable." Courts find this standard met "if the class includes forty or more members." *Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *3 (N.D. Cal. Dec. 19, 2022). In securities cases, courts may infer that requirement is met "when a corporation has millions of shares trading on a national exchange." *VMware*, 2024 WL 3286059, at *2; *see also Sayce v. Forescout Techs., Inc.*, 754 F. Supp. 3d 878, 900 (N.D. Cal. 2024) ("In cases involving securities traded on national stock exchanges, numerosity is practically a given.").

Numerosity is met here. Facebook had more than ***2.35 billion*** shares outstanding throughout the Class Period, and weekly trading volume exceeded 100 million shares (4.4% of total volume). ¶702; Gelbach Rpt. ¶41. These figures readily support the conclusion that thousands of geographically dispersed investors comprise the proposed Class, rendering joinder

impracticable. *See Pardi*, 2024 WL 4336627, at *4 (numerosity satisfied with average weekly trading volume of 4.6 million shares); *DocuSign*, 348 F.R.D. at 362 (183.5 million outstanding shares sufficient).

**2. Multiple Common Questions of Law and Fact Exist**

Rule 23(a)(2) requires that "questions of law or fact" be common to the class—and even "a single common question" satisfies "the commonality requirement of Rule 23(a)(2)." *Pardi*, 2024 WL 4336627, at *4. Securities cases consistently meet this requirement because class members face the common question of whether they were "allegedly defrauded over a period of time by similar misrepresentations." *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *4 (N.D. Cal. Mar. 16, 2016); *see also Crews v. Rivian Auto., Inc.*, 2024 WL 3447988, at *4 (C.D. Cal. July 17, 2024) ("Securities class actions typically satisfy Rule 23(a)(2) because ... the same basic legal claims ... are based on the same nucleus of operative facts: the alleged misrepresentations and omissions.").

Here, multiple questions are common to the proposed Class, including whether Defendants made material misrepresentations or omissions to investors during the Class Period; whether Defendants acted with scienter; and whether Defendants' alleged misstatements caused investors to suffer damages. Courts routinely find such questions sufficient for commonality. *E.g.*, *Pardi*, 2024 WL 4336627, at *4 (finding common questions for securities class); *Purple Mountain Tr. v. Wells Fargo & Co.*, 2022 WL 3357835, at *3 (N.D. Cal. Aug. 15, 2022) (same).

**3. Lead Plaintiffs' Claims Are Typical of The Class**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The typicality inquiry asks "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Pardi*, 2024 WL 4336627, at *3. Typicality demands reasonable similarity, not perfect identity. *Id*. Accordingly, differences in the amount of damages, the size or manner of purchase or holding, and the nature of the purchase or holding are insufficient to defeat class certification. *See In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 529-30 (N.D. Cal. 2009).

Here, Lead Plaintiffs purchased Facebook stock during the Class Period at artificially inflated prices resulting from Defendants' misrepresentations (*see* Dkt. Nos. 86-1, 86-2)—the same injury every proposed Class member suffered. When the relevant truth emerged, each of these purchasers faced the same harm. Because all Class members' claims turn on whether Defendants made "material misstatements and omissions" that "artificially inflated" Facebook's share price, typicality is satisfied. *In re SanDisk LLC Sec. Litig.*, 2018 WL 4293336, at *1 (N.D. Cal. Sep. 4, 2018) (typicality met where class members' claims involved the same "core factual and legal questions"); *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2023 WL 3569981, at *7 (N.D. Cal. May 19, 2023) ("Like other securities class actions, [lead] [p]laintiffs have shown the class members writ large have been the victims of the same material misstatements and the same fraudulent course of conduct, rendering Plaintiffs typical.").

**4. Lead Plaintiffs Will Adequately Represent the Proposed Class**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Proposed representatives are adequate if they and their counsel (1) do not have any conflicts of interest with other class members, and (2) will prosecute the action vigorously on behalf of the class. *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 284-85 (N.D. Cal. 2020). Both prongs are satisfied here.

***First***, Lead Plaintiffs have no conflicts with absent Class members. Like all proposed Class members, Lead Plaintiffs purchased Facebook common stock during the Class Period and were harmed by Defendants' alleged misrepresentations. *See* Doc. Nos. 86-1, 86-2 (certification showing Lead Plaintiffs' Class Period transactions); *VeriSign*, 2005 WL 7877645, at *8 ("The Lead Plaintiffs' claims and the unnamed class members' claims do not conflict. They all arise out of the same set of facts—Defendants' alleged misrepresentations during the Class Period."). Lead Plaintiffs also purchased stock contemporaneously with Defendant Zuckerberg's insider sales. ¶¶719-20. Lead Plaintiffs thus have the same interest in maximizing the Class's recovery as all other Class members.

***Second***, Lead Plaintiffs will vigorously prosecute this action and have already demonstrated their commitment to doing so. For the past eight years, Lead Plaintiffs have actively

prosecuted this litigation by regularly communicating with counsel, reviewing multiple rounds of pleadings and court filings—including before the Ninth Circuit and Supreme Court—and actively engaging in discovery. Ex. 2 (Declaration of Laken Ryals); Ex. 4 (Declaration of Mandy Tenner); *see also VMware*, 2024 WL 3286059, at *4 (adequacy satisfied where "Lead Plaintiff has supervised and monitored the progress of Court proceedings, reviewed pleadings and other documents in this case, and participated in discussions with Lead Counsel concerning significant developments in the litigation"). Lead Plaintiffs will continue to supervise and participate in the prosecution of this case through trial and any appeal and will faithfully fulfill their duties as class representatives. Ex. 2 (Declaration of Laken Ryals); Ex. 4 (Declaration of Mandy Tenner).

***Third***, as sophisticated institutional investors with the resources to prosecute this litigation, Lead Plaintiffs are precisely the type of institutional investors that Congress sought to empower when passing the PSLRA. *City of Sunrise Firefighters' Pension Fund v. Oracle*, 2022 WL 1459567, at *5 (N.D. Cal. May 9, 2022) (fact that Lead Plaintiff was a "large institutional investor" supported adequacy); H.R. Conf. Rep. No. 104-369, at 34 (1995) (acknowledging goal of PSLRA provision was to "increase the likelihood that institutional investors will serve as lead plaintiffs"). Indeed, courts have separately recognized MissPERS and Amalgamated as adequate class representatives in other securities class actions. *E.g.*, *In re Diamond Foods, Inc.*, *Sec. Litig.*, 295 F.R.D. 240, 257-58 (N.D. Cal. 2013) (finding MissPERS would adequately represent the proposed class's interest); *Pub. Employees' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 2022 WL 17920570, at *7 (N.D. Ga. Nov. 28, 2022) (same); *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 502 (M.D. Tenn. 2019) (finding Amalgamated an adequate class representative); *see also VMware*, 2024 WL 3286059, at *4 n.1 (in finding a lead plaintiff to be adequate, taking into account that it "was recently found to be an adequate class representative in a similar securities class action case").

Lead Plaintiffs have also demonstrated their ability to adequately represent the interests of the proposed Class by retaining experienced and qualified counsel. Both BLB&G and Robbins Geller have substantial experience in litigating securities class actions to resolution—including in this District—and the resources to zealously pursue this action on behalf of the entire Class. *E.g.*, *Oracle*, 2022 WL 1459567, at *5 ("BLB&G is experienced with securities class actions.");

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2025 WL 3546227, at *7 (N.D. Cal. Dec. 4, 2025) (in certifying Section 10(b) settlement class, finding Robbins Geller was "experienced in class action litigation, certification, and trial"). Based on the firms' track records of success, which are detailed in their respective firm resumes, BLB&G and Robbins Geller are fully capable of prosecuting the claims of the Class. *See* Ex. 5 (BLB&G firm resume); Ex. 6 (Robbins Geller firm resume). Thus far, BLB&G and Robbins Geller have vigorously prosecuted the Class's claims by: (1) conducting a worldwide investigation of potential claims on behalf of the Class; (2) filing four detailed complaints; (3) successfully pursuing an appeal before the Ninth Circuit and defending the resulting decision in the Supreme Court; (4) defeating in part Defendants' Motion to Dismiss the Fourth Amended Complaint; and (5) conducting extensive discovery, which is ongoing.

In sum, Lead Plaintiffs satisfy the adequacy requirements of Rule 23(a)(4) and should be appointed Class Representatives, and BLB&G and Robbins Geller should be appointed Class Counsel pursuant to Rule 23(g).

**B. The Proposed Class Satisfies Rule 23(b)(3)**

Rule 23(b)(3) requires that common questions of law and fact predominate and that a class action be superior to other means of adjudication. Both requirements are established here.

**1. Common Questions of Law and Fact Predominate**

Predominance "is a test readily met" in securities fraud cases. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Rule 23(b)(3) tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2025 WL 1243818, at *5 (N.D. Cal. Apr. 25, 2025). "Class certification under Rule 23(b)(3) is proper when common questions represent a significant portion of the case and can be resolved for all members of the class in a single adjudication." *Junge v. Geron Corp.*, 2022 WL 1002446, at *3 (N.D. Cal. Apr. 2, 2022). Predominance "does *not* require a plaintiff ... to prove that each element of her claim is susceptible to classwide proof"—only that "common questions *predominate* over any questions affecting only individual class members." *Amgen*, 568 U.S. at 469 (emphasis in original).

The predominance inquiry begins "with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). For violations of Section 10(b) and Rule 10b-5, plaintiffs must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen*, 568 U.S. at 460-61. In securities cases like this one, these elements "plainly affect all members of this putative class because the elements all relate to [defendants'] actions or inactions and their causal effect on stock prices, not circumstances unique to individual class members." *Geron*, 2022 WL 1002446, at *3. Here, the elements of reliance and damages can be resolved on a classwide basis, as discussed below.

**a. Classwide Reliance Favors Certification.**

The fraud-on-the-market presumption, established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ("*Halliburton II*"), presumes classwide reliance when securities trade in efficient markets. *See Basic*, 485 U.S. at 247. The theory assumes "that the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen*, 568 U.S. at 458; *see also Halliburton II*, 573 U.S. at 268, 270 ("[T]he market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.").

To trigger the *Basic* presumption of reliance, Lead Plaintiffs must demonstrate: (1) the alleged misrepresentations were public; (2) class members purchased shares between the date of the misstatements and the full disclosure of the truth; and (3) the company's stock traded in an efficient market. *See Halliburton II*, 573 U.S. at 277-78. All three requirements are met here.

***First***, it is undisputed that Defendants made their alleged misrepresentations publicly. *E.g.*, ¶¶608-16, 628-29.

***Second***, Lead Plaintiffs and other Class members purchased Facebook common stock at artificially inflated prices during the Class Period, and either sold such stock after the corrective

disclosures, or retained Facebook stock through July 26, 2018. *See* Gelbach Rpt. ¶89; Dkt. Nos. 86-1, 86-2.

***Third***, Facebook common stock traded in an efficient market during the Class Period. *See* Gelbach Rpt. ¶¶37, 87. As an initial matter, throughout the Class Period, Facebook common stock traded on the Nasdaq, Gelbach Rpt. ¶13, which federal courts "unanimous[ly]" recognize as "a good indicator of efficiency." *Sayce*, 754 F. Supp. 3d at 891.

Additionally, "[t]o assess whether a market was efficient, the Ninth Circuit refers to the factors outlined in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989)." *QuantumScape*, 2022 WL 17974629, at *7. The *Cammer* factors include: (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) eligibility to file an S-3 registration statement; and (5) a cause-and-effect relationship between unexpected corporate disclosures and resulting stock price movements. *QuantumScape*, 2022 WL 17974629, at *7-10 (applying *Cammer* factors). No single factor is "determinative of market efficiency." *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *8 (N.D. Cal. Apr. 21, 2016). All five factors support efficiency here.

***Cammer* Factor 1 (Trading Volume)**. "[A]verage weekly volume of approximately 2% of total shares outstanding ... supports a strong presumption of market efficiency." *Wells Fargo*, 2022 WL 3357835, at *4. Facebook's 4.4% average weekly volume exceeds this threshold. Gelbach Rpt. ¶41; *see also Wells Fargo*, 2025 WL 1243818, at *6-7 ("stock traded in an efficient market" where defendant company's "average weekly trading volume was 3.4 percent of all outstanding shares").

***Cammer* Factor 2 (Analyst Coverage)**. Broad analyst coverage suggests "the market would rapidly and fully incorporate information into the stock price because analyst reports would likely be closely reviewed by investors." *Wells Fargo*, 2022 WL 3357835, at *4. While "[t]here appears to be no case that identifies a threshold number of analysts necessary for this factor to favor market efficiency[,] ... [c]ourts have found this factor supports market efficiency with as few as four to seven analysts covering a particular stock." *QuantumScape*, 2022 WL 17974629, at *8. The fact that more than ***60*** financial firms issued Class Period analyst reports covering Facebook,

collectively issuing over several hundred such reports, strongly supports efficiency here. Gelbach Rpt. ¶¶46-48; *see also In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *9 (N.D. Cal. Mar. 11, 2024) ("Coverage of [Defendant] by at least eight securities analysts during the class period supports a finding that analyst coverage supports a finding of market efficiency.").

***Cammer* Factor 3 (Market Makers)**. "The more market-makers for a particular security (and, relatedly, the greater the volume of the security the market-makers are prepared to handle), the more reasonable it is to infer that the security is liquid, and, therefore, more likely the market for that security is efficient." *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 351 (C.D. Cal. 2015). As few as "[t]en market makers for a security would justify a substantial presumption" of market efficiency. *Cammer*, 711 F. Supp. at 1293. Facebook's ***47*** disclosed market makers easily satisfy this factor. Gelbach Rpt. ¶¶51-52; *see also Sundaram v. Freshworks Inc.*, 2025 WL 1083168, at *4 (N.D. Cal. Apr. 10, 2025) (existence of 39 market makers "creates a substantial presumption of market efficiency").

***Cammer* Factor 4 (Form S-3 Eligibility)**. Form S-3 eligibility requires 12 months of SEC reporting, timely SEC filings, and a market capitalization of at least $75 million. 17 C.F.R. § 239.13. This factor reflects "the [SEC's] belief that the market operates efficiently for these companies," *Brown v. China Integrated Energy Inc.*, 2015 WL 12720322, at *17 (C.D. Cal. Feb. 17, 2015), and contemplates a company's *eligibility* to file a Form S-3. Here, Facebook filed a Form S-3 in October 2014, prior to the Class Period, and Defendant Wehner certified at the time that Facebook "has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3." Gelbach Rpt. ¶54. Throughout the Class Period, Facebook continued to meet all the requirements for a Form S-3 filing, including a market capitalization in the hundreds of billions of dollars—dwarfing the $75 million threshold—and timely filing of its SEC reports. *See id.*; *Wells Fargo*, 2022 WL 3357835, at *4 (S-3 eligibility supported finding of market efficiency); *Police Ret Sys. of St. Louis v. Granite Constr.*, 2021 WL 229310, at *6 (N.D. Cal. Jan. 21, 2021) (same).

***Cammer* Factor 5 (Price Reaction to News)**. This factor examines "whether there is a cause-and-effect relationship between company news days and movement in the stock price." *Wells Fargo*, 2022 WL 3357835, at *4. The presence of a causal relationship is "strong evidence

of an efficient market." *Fibrogen*, 2024 WL 1064665, at *10; *Cammer*, 711 F. Supp. at 1287. The cause-and-effect relationship between events and stock price movements for Facebook common stock supports market efficiency.

Plaintiffs' expert economist, Dr. Gelbach, used an event study to analyze whether Facebook's common-stock price reacted to new Company-specific information during the Class Period. Gelbach Rpt. ¶¶56-82. "Courts regularly accept experts' event studies to support market efficiency analyses at the class certification stage." *QuantumScape*, 2022 WL 17974629, at *12; *see also Diamond Foods*, 295 F.R.D. at 249 ("In analyzing event studies at the class certification stage, courts have acknowledged that many decision points in designing an event study require some subjectivity.").

Dr. Gelbach concluded that Facebook's shares responded promptly to new information about the Company, which supports a showing that Facebook's common stock traded in an efficient market throughout the Class Period. Gelbach Rpt. ¶81. Dr. Gelbach reached this conclusion by analyzing and comparing Facebook's stock price movements on six days when new, value-relevant information about the Company was likely released to the market ("News Dates"), against dates when no such news was released to the market. *Id.* ¶¶62-67. The six News Dates include the dates Facebook held earnings calls to discuss its quarterly earnings reports. ¶67. Dr. Gelbach's report shows that Facebook's common stock experienced statistically significant abnormal returns on five of these six News Dates, compared to non-news dates. Gelbach Rpt. ¶¶74-82. Thus, in consideration of the *Cammer* factors, Dr. Gelbach's event study supports a finding of market efficiency. *Id.* ¶¶38-82; *see Wells Fargo*, 2022 WL 3357835, at *5 (market efficiency established for Wells Fargo stock where three earnings announcements were analyzed finding "statistically significant price movement on just one date"); *Monroe Cty. Emps. Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 385-86 (N.D. Ga. 2019) (market efficiency supported where five of seven tested dates elicited statistically significant stock price reactions).

In addition to the *Cammer* factors, courts in this Circuit examining market efficiency also consider the following three factors from *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001) (the "*Krogman* Factors"): (1) the market capitalization of the company; (2) the bid-ask

spread of the stock; and (3) public float. *See, e.g.*, *Petrie*, 308 F.R.D. at 349, 356-57; *Wells Fargo*, 2025 WL 1243818, at *6. These factors also support a finding of market efficiency here.

***Krogman* Factor 1 (Market Capitalization)**. Market capitalization "may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. During the Class Period, Facebook's market capitalization had an average value of over $400 billion and a minimum value of over $300 billion, making it one of the highest-capitalized companies in the world. Gelbach Rpt. ¶84. The size of Facebook's market capitalization easily supports a finding of efficiency. *See Junge v. Geron Corp.*, 2022 WL 1002446, at *4-5 (N.D. Cal. Apr. 2, 2022) (market capitalization that averaged $731.69 million sufficient to meet *Krogman* Factor 1).

***Krogman* Factor 2 (Bid-Ask Spread)**. The bid-ask spread is "the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Krogman*, 202 F.R.D. at 478. If there is a narrow bid-ask spread—a low number—it "indicates greater efficiency," *Granite Constr.*, 2021 WL 229310, at *6, because it means there are as many ready buyers as there are ready sellers. Gelbach Rpt. ¶85. The average bid-ask spread for Facebook common stock for each trading day during the Class Period was 0.0151% (*e.g.*, a bid-ask spread of $0.151 on a trading price of $100), which supports a finding of efficiency. *Id.*; *see also Wells Fargo*, 2025 WL 1243818, at *7 (factor met when "average bid-ask spread ... during the Class Period was 0.02 percent").

***Krogman* Factor 3 (Public Float)**. Courts consider the percentage of shares held by the public (the public float) versus insiders as further evidence of market efficiency. *See Krogman*, 202 F.R.D. at 478. Higher percentages of shares held by the public equate to more efficient markets. *See Borteanu*, 348 F.R.D. at 258. During the Class Period, Facebook's public float as a percent of total shares outstanding never dipped below 98%, supporting a finding of market efficiency. Gelbach Rpt. ¶86; *see also Wells Fargo*, 2022 WL 3357835, at *5 (float of approximately 90% supported efficiency).

Because Facebook common stock traded in an efficient market during the Class Period, Lead Plaintiffs are entitled to the fraud-on-the-market presumption of reliance.

**b. Damages Can Be Measured on a Classwide Basis**

"Damage calculations alone cannot defeat certification." *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010); *see also In re NVIDIA Corp. Sec. Litig.*, 825 F. Supp. 3d 1047, 1089 (N.D. Cal. 2026) ("[T]he presence of individualized damages on its own is insufficient to defeat class certification."). At the class certification stage, "[w]hether plaintiff will ultimately prevail in proving damages is not necessary to determine... . Instead, the question ... is whether plaintiff has met its burden of establishing that damages can be proven on a classwide basis." *Diamond Foods*, 295 F.R.D. at 252; *DocuSign*, 348 F.R.D. at 369 ("[A]ll the plaintiffs must do at the class certification stage is propose a damages methodology that will be able to reliably calculate damages in a manner common to the class at trial"). To meet that burden, the Ninth Circuit has held that "class action plaintiffs may rely on an unexecuted damages model to demonstrate that damages are susceptible to common proof so long as the district court finds, by a preponderance of the evidence, that the model will be able to reliably calculate damages in a manner common to the class at trial." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1024 (9th Cir. 2024); *see also NVIDIA*, 825 F. Supp. 3d at 1063. While "[n]ovel techniques" for calculating damages "demand a greater degree of specificity and completeness … that [is] unnecessary for a well-accepted technique." *Alphabet*, 2026 WL 1382950, at *7.

Here, Dr. Gelbach has confirmed that damages can be calculated on a classwide basis. Going far beyond what the Ninth Circuit requires at the class certification stage, he has even provisionally calculated damages by measuring the dollar amount of artificial inflation in Facebook's share price that was removed as a result of the corrective disclosures.[3] Gelbach Rpt. ¶¶88-164. These per-share inflation figures are applicable classwide.

As an initial matter, Dr. Gelbach has used the "out-of-pocket" methodology and employed an event study to calculate damages. *Id.* ¶¶104-07, 147. "Damages are calculated formulaically under this approach, as the artificial inflation in the share price at the time of purchase minus the

[3] Dr. Gelbach may update his calculations based on additional evidence developed in discovery. Gelbach Rpt. ¶165.

artificial inflation in the share price at the time of sale, subject to applicable statutory limitations." *Id.* ¶147. For shares not sold before the final corrective disclosure, damages are limited by the PSLRA 90-day lookback period, pursuant to which the damages to the plaintiff shall not exceed the difference between the purchase price and the mean trading price during the 90-day period following the disclosure. *Id.*[4] "An out-of-pocket model addressing the difference in inflation at purchase and inflation at sale [tracks] Plaintiffs' theory of liability, even if other complicating factors in calculating inflation and addressing loss causation may arise in the model." *NVIDIA*, 825 F. Supp. 3d at 1090.

Dr. Gelbach's analysis describes the relationship between Plaintiffs' theory of liability and the artificial inflation in Facebook's share price. He explains that "[i]f Facebook had announced the relevant truth—that Facebook had already suffered a major instance of misappropriation and misuse of users' data, that its profitability was boosted by third parties' improper access to and use of users' data, and that users did not have control over their data—then investors reasonably would have realized that revenues would decrease and costs would increase when the relevant truth was revealed." Gelbach Rpt. ¶99. Specifically, Facebook's fraud "artificially inflated its shares by concealing from investors" that "an amount of [its] revenue was based on unsustainable practices allowing third-party access to user data" without users' consent, that Facebook "would have to shoulder substantial auditing and programming costs once it was compelled to shut off unconsented third-party access to user data," that it "faced substantial legal and financial liability for violating the FTC consent decree that bound it," and that "the risk of expensive regulation in the U.S. was substantial." *Id.* ¶103.

In addition to explaining the source of the artificial inflation in Facebook's share price, Dr. Gelbach details his methodology for quantifying that inflation. He explains that "for dates on which the market learned additional information about the relevant truth that was previously concealed, obscured, or muted by the Company's false and/or misleading statements, an event study can be used to measure the share-price impact of that news." *Id.* ¶104. Then, the "share-price

4 *See also* 15 U.S.C. § 78u-4(e)(1).

inflation amounts removed" as a result of that news are used to "backcast[] the share-price inflation … on Class Period dates" before the dates on which the market incorporated that additional information. *Id.* ¶106. Using this event study methodology, Dr. Gelbach has provisionally calculated the dollar amount of abnormal return that occurred based on each of the corrective disclosures. *Id.* ¶¶108-40.

Dr. Gelbach also explains that, in calculating Facebook's stock-price abnormal returns on the disclosure dates, he has removed the effects of any market and industry-specific confounding information by using a market and peer indices. *Id.* ¶148. And Dr. Gelbach explains that, based on his preliminary analysis, there does not appear to be any confounding information that impacted the stock price declines on the disclosure dates. *Id.* ¶¶142-44. He further describes how, if it is determined that confounding information did affect those stock price reactions, he can exclude the impact of any confounding information by using traditional tools of financial economics. *Id.* ¶¶141-46. Whether damages can be disaggregated from the effects of confounding information "is an inquiry into loss causation and loss causation need not be analyzed at the class certification stage." *Symantec*, 335 F.R.D. at 288; *NVIDIA*, 825 F. Supp. 3d at 1090 (incorporating *Symantec*'s holding).

Using the abnormal returns (which he has already provisionally calculated) and controlling for any additional confounding information, Dr. Gelbach's final damages assessment will measure the amount of share price inflation removed based on each date when the market incorporated additional information about the relevant truth. *Id.* ¶148. Damages per share would equal the amount of inflation removed on all such dates between when the share was purchased and when it was sold and, if the share was held through the end of the Class Period, the total amount of inflation removed between when the share was purchased and the end of the Class Period, less the impact of any confounding information. *Id.* ¶¶149-50. This calculation of damages per share applies classwide.

Dr. Gelbach further explains that, once damages per share are calculated using the methodology above, "the only individualized information necessary to measure damages available for each share purchased during the Class Period is basic trading data," which is "available via

objective trading records." *Id.* ¶160. "[C]ourts routinely accept" such expert explanation for "mechanically calculat[ing"]" individual class member damages. *Alphabet*, 2026 WL 1382950, at *6; *see also DocuSign*, 348 F.R.D. at 368 (accepting representation that computing damages was "formulaic, based upon information collected in the claims process"). The potential for "individualized damage assessments…does not detract from the action's suitability for class certification." *Yokoyama*, 594 F.3d at 1089.

The out-of-pocket methodology that Dr. Gelbach outlines is "well-accepted" and "the standard measurement of damages in Section 10(b) securities cases." *Alphabet*, 2026 WL 1382950, at *6; *DocuSign*, 348 F.R.D. at 368 ("The out-of-pocket method of damages calculation is common for § 10(b) actions."). Courts have found that such a "damages methodology, coupled with its general acceptance, suffices to show for class certification purposes that classwide damages can be determined without excessive difficulty and attributed to the plaintiffs' theory of liability." *SanDisk*, 2018 WL 4293336, at *2; *NVIDIA*, 825 F. Supp. 3d at 1090; *Alphabet*, 2026 WL 1382950, at *6 ("Courts routinely accept such an outline of the out-of-pocket method as sufficient to show damages are susceptible of classwide calculation.").

**c. Predominance Is Satisfied for Lead Plaintiffs' Other Claims**

Plaintiffs' Section 20(a) control-person claim against all Defendants satisfies the predominance test. Section 20(a) "assigns joint and several liability for any person who 'controls any person liable' under Section 10(b)." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1149 (9th Cir. 2017) (quoting 15 U.S.C. § 78t(a)). Under Section 20(a), plaintiffs must show "(1) a primary violation of federal securities laws ... ; and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Plaintiffs' Section 20(a) claim involves common legal and factual questions that can be resolved on a classwide basis, just as Plaintiffs' predicate Section 10(b) claim does. Section 20(a)'s additional element of control—whether exercised by the Individual Defendants over Facebook, by Facebook over the Individual Defendants, or both—requires common facts and law.

Predominance is also readily met by the Section 20A insider trading claim against Defendant Zuckerberg, as it, too, involves common legal and factual questions that can be resolved

on a classwide basis. *E.g.*, *Symantec*, 335 F.R.D. at 286 (common questions include whether defendants "committed underlying violations of Section 10(b) and Rule 10b-5...while in the possession of material, adverse, nonpublic information"). Indeed, the core questions of (i) whether Zuckerberg traded on the basis of material non-public information and (ii) what constitutes "contemporaneous" trading, are common questions that are susceptible to classwide proof. *See, e.g.*, *Basile v. Valeant Pharma. Int'l, Inc.*, 2017 WL 3641591, at *12 (C.D. Cal. Mar 15, 2017). Moreover, given that Plaintiffs can demonstrate classwide reliance for the Section 10(b) violation, they can do so for the Section 20A claim as well. *ChemoCentryx*, 2024 WL 1141699, at *7. And Plaintiffs' Section 20A claim is subject to common damages methodologies—either by calculating Zuckerberg's "loss avoided" or "profit gained"—each of which applies classwide. Gelbach Rpt. ¶¶152-58. These common questions predominate and any "individual questions involved in determining whether a putative class member traded contemporaneously with [Zuckerberg] are no more difficult to resolve than other issues routinely found insufficient to derail certification in securities class actions." *Symantec*, 335 F.R.D. at 286.

**2. A Class Action Is Superior to Other Means of Adjudication**

Rule 23(b)(3) also requires the Court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." To determine superiority, courts examine: "(1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action." *Pardi*, 2024 WL 4336627, at *5.

A class action is the superior method of litigating these claims. *First*, the prospective Class consists of many investors "dispersed around the country" for whom "the cost of litigating on an individual basis is much higher than any likely individual recovery." *Id*. *Second*, there are no "other Section 10(b) actions against [Facebook] related to the fraud alleged here." *Id*. *Third*, this forum is appropriate because "concentrating the litigation of prospective Class Members [here] removes the risk of inconsistent adjudication and promotes the fair and efficient use of the judicial system."

*Lamartina*, 2024 WL 3286059, at *4. Moreover, the proposed Class is ascertainable because membership is based on objective criteria, *i.e.*, the dates that investors acquired Facebook common stock, and putative Class members can be easily identified through stock-holder records. *Finally*, managing this case as a class action presents no unusual difficulties. *See Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 591 (N.D. Cal. 2021) ("Plaintiffs know of no difficulty in the management of this litigation that would preclude its maintenance as a class action.").

**C. BLB&G and Robbins Geller Should Be Appointed Class Counsel**

Lead Plaintiffs also request that the Court appoint BLB&G and Robbins Geller as Class Counsel. In appointing class counsel, the Court must take into account: (i) the work counsel has done; (ii) counsel's experience in handling class actions, other complex litigation, and claims alleging securities law violations; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). Here, these considerations weigh heavily in favor of appointing BLB&G and Robbins Geller as Class Counsel. As discussed above, these experienced firms have prosecuted many successful securities class actions in this District and elsewhere and have vigorously prosecuted this case for eight years. They will continue to commit the necessary resources to ensure a successful recovery for the Class.

**V. CONCLUSION**

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court: (1) certify the Class as described above; (2) appoint Lead Plaintiffs as Class Representatives; and (3) appoint BLB&G and Robbins Geller as Class Counsel under Rule 23(g).

DATED: August 21, 2026

Respectfully submitted,

*<u>/s/ Jeremy P. Robinson</u>*
Jeremy P. Robinson

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
SALVATORE J. GRAZIANO
JEREMY P. ROBINSON
PREETHI KRISHNAMURTHY
TIMOTHY G. FLEMING
THOMAS SPERBER
MATTHEW GOLDSTEIN
1251 Avenue of the Americas
New York, NY 10020

Telephone: 212/554-1400
212/554-1444 (fax)
salvatore@blbglaw.com
jeremy@blbglaw.com
preethi@blbglaw.com
timothy.fleming@blbglaw.com
thomas.sperber@blbglaw.com
matthew.goldstein@blbglaw.com

*Counsel for MissPERS and Co-Lead Counsel for the Class*

and

*/s/ Jason C. Davis***
Jason C. Davis

ROBBINS GELLER RUDMAN
& DOWD LLP
JASON C. DAVIS
KENNETH J. BLACK
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
jdavis@rgrdlaw.com
kblack@rgrdlaw.com

LUKE O. BROOKS (212802)
DARRYL J. ALVARADO (253213)
HILLARY B. STAKEM (286152)
J. MARCO JANOSKI GRAY (306547)
JESSICA E. ROBERTSON (352207)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
lukeb@rgrdlaw.com
dalvarado@rgrdlaw.com
hstakem@rgrdlaw.com
mjanoski@rgrdlaw.com
jrobertson@rgrdlaw.com

*Counsel for Amalgamated and Co-Lead Counsel for the Class*

** Pursuant to Civ. L.R. 5-1(i)(3), the electronic filer has obtained approval from this signatory.