# EXHIBIT 1

**EXPERT REPORT OF JONAH B. GELBACH**
In re FACEBOOK, INC. SECURITIES LITIGATION Master File No. 5:18-cv-01725-EJD

**REDACTED**

**TABLE OF CONTENTS**

**Page**


I. Introduction .....1

II. Qualifications and Compensation .....2

III. Summary of Opinions .....5

IV. Relevant Allegations and Factual Background .....5

A. The Class .....5

B. Defendants .....6

C. Summary of Plaintiffs' Claims .....7

V. Market Efficiency .....14

VI. Market Efficiency Evidence .....17

A. First *Cammer* Factor: Average Weekly Trading Volume .....17

B. Second *Cammer* Factor: The Number of Analysts Who Followed Facebook .....18

C. Third *Cammer* Factor: Market Makers .....20

D. Fourth *Cammer* Factor: S-3 Registration Eligibility .....21

E. Fifth *Cammer* Factor: Cause-and-Effect Relationship Between Events and Stock Price .....23

F. *Krogman* Market Efficiency Indicators .....33

G. Conclusion as to Market Efficiency .....35

VII. Damages Can Be Calculated on a Classwide Basis Consistent with Plaintiffs' Theory of Liability .....35

A. Plaintiffs' Theory of Liability .....37

B. Event Studies May Be Used to Measure Share-Price Inflation in This Litigation .....41

C. Provisional Calculations of Artificial Share-Price Inflation .....43

a. The March 2018 Stock Price Declines .....44

b. The July 2018 Stock Price Decline .....50

**Page**

D. It is Possible to Use Traditional Tools of Financial Economics That Apply Classwide to Remove Any Confounding Effects ....57

E. Provisional Damages Calculation Based on Artificial Share-Price Inflation Calculations....61

F. Conclusion as to the Calculation of Available Damages....66

VIII. Further Work....67

## I. Introduction

1. I have been retained by Robbins Geller Rudman & Dowd LLP and Bernstein Litowitz Berger & Grossmann LLP ("Counsel") in the case of *In re Facebook, Inc. Securities Litigation*, No. 5:18-cv-01725-EJD (N.D. Cal.).

2. Counsel asked me to analyze whether the Class A common stock (the "Stock") of Facebook, Inc., now known as Meta Platforms, Inc. ("Facebook," or "Meta," or the "Company"), traded in an efficient market during the period between February 3, 2017 and July 25, 2018, inclusive (the "Class Period"). The scope of my engagement also includes determining whether, under the theories of liability advanced by plaintiffs Amalgamated Bank and Public Employees' Retirement System of Mississippi ("Lead Plaintiffs" or "Plaintiffs"), damages in this matter can be calculated using a common methodology for all Class members. My opinions appear in this expert report ("Report"), together with its **Appendix A**, **Appendix B**, and **Appendix C** discussed below.

3. To make these determinations, I analyzed the market for Facebook Stock, the price behavior of Facebook Stock, and the factors that are generally accepted indicators of market efficiency for a publicly traded security. I examined Company press releases, U.S. Securities Exchange Commission ("SEC") filings, the daily prices of Facebook Stock, its trading volume, the performance of the overall stock market, the performance of Facebook's industry sector, the performance of peer firms, equity analyst reports covering Facebook published during the Class Period, and other pertinent data and documents, including the Ninth Circuit's opinion affirming in part and reversing in part the District Court's judgment dismissing the Third Amended Complaint ("the Ninth Circuit Opinion");[1] the Fourth Amended Consolidated Class Action Complaint for

[1] *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934 (9th Cir. 2023).

Violations of the Federal Securities Laws filed on July 1, 2025 ("Complaint");[2] and the District Court's February 27, 2026 Order granting in part and denying in part Defendants' motion to dismiss the Complaint (the "MTD Opinion").[3] For purposes of this report I have assumed the Complaint's allegations of fact to be true and generally will not qualify factual statements as "alleged" unless there is special need for clarity. **Appendix B** to this Report lists the documents and data I considered or relied on in preparing this Report.

4. This report presents my methodology, findings, and conclusions.

5. My work in this matter is ongoing. I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

## II. Qualifications and Compensation

6. I am an economist and the Herman F. Selvin Professor of Law at the University of California, Berkeley School of Law.

7. The opinions I offer in this report are founded on my extensive expertise in economics and in econometrics, which is a term used by economists to refer to statistical methods used for the study of issues in economics.

8. A copy of my *curriculum vitae* (CV) is attached to this report as **Appendix A**. This CV is dated July 31, 2026 and is current to the best of my knowledge, including a list of what I believe to be all scholarly publications I have authored throughout my career, including in the previous 10 years. I offer the following facts in this report for convenience and emphasis:

(a) I have both a J.D. (received from Yale in 2013) and a Ph.D. in economics

---

2 ECF No. 228.

3 ECF No. 258.

(received from MIT in 1998).

(b) For the first 12 years of my career, I was appointed as a professor of economics at two universities.

(i) In 1998, I was hired as an Assistant Professor in the Department of Economics at the University of Maryland at College Park ("Maryland").

(ii) In 2005, Maryland awarded me tenure, and I was a tenured Associate Professor on the Maryland faculty for the academic years 2005-2006 and 2006-2007.

(iii) In 2007, I accepted an offer to move to the Department of Economics in the Eller College of Management at the University of Arizona ("Arizona"). I was a tenured Associate Professor at Arizona from then until 2010, when I resigned to pursue my J.D. at Yale.

(c) At both Maryland and Arizona, I taught doctoral-level courses that either focused principally on econometric methods or made substantial use of them.

(d) At all times since I completed my J.D. in 2013, I have been a tenure-track or tenured professor, first at the law school of the University of Pennsylvania (untenured 2013-2016, tenured 2016-2019) and then at the University of California Berkeley School of Law (tenured 2019-present).

(e) At all times since I received my Ph.D. in economics from MIT in 1998, I have been fully or partially engaged in the professional use of statistical methods and economic reasoning. This was true including the academic years between 2010 and 2013, when I was a law student and also engaged in scholarly and professional activities using statistical methods and economic reasoning.

(f) From 2016-2021, I was a Co-Editor of the Journal of Law, Economics, & Organization, with a principal focus on submitted articles using quantitative empirical (*i.e.*, statistical) methods.

(g) I was a member of the Board of Directors of the American Law and Economics Association between 2017 and 2020. Candidates for Director are nominated by the existing Board and elected by the membership at large. The ALEA is the primary association of scholars who work in the area of law and economics, which includes the area of law and finance.

(h) I regularly receive and fulfill requests to provide peer review reports for journals regarding submitted articles that use econometric or statistical methods, including on topics that relate to securities litigation.

(i) I have published many articles using statistical methods, as well as several articles that contribute new methods and are highly cited by applied statisticians in many fields of study (*i.e.*, not simply economics).[4]

(j) Several of my published papers focus directly on statistical inference in the single-firm event study context that is the subject of many securities litigation cases, including this one.[5]

(k) I have served or am serving as an expert witness or consultant on more than a dozen cases, including cases involving securities and other complex litigation.

(l) The opinions I offer in this report are founded on my expertise in economics, statistics, and/or econometrics.

---

4 *See* Appendix A.

5 *See id*.

9. I am being paid $1,300 per hour for my work in this case. My compensation is not contingent in any way on my findings or on the outcome of this matter.

## III. Summary of Opinions

10. It is my opinion that during the Class Period, Facebook Stock traded on a semi-strong form efficient market.

(a) The Stock traded on the Nasdaq exchange, and it met criteria for liquidity commonly considered in securities litigation.

(b) The event study evidence I develop below indicates that on earnings release dates, Facebook Stock returns are much more likely to have a substantial magnitude, as would be expected on days when the market learns new information that causes investors to update their beliefs about a company's value.

(c) I therefore conclude that Facebook Stock traded on a semi-strong form efficient market during the period I analyzed.

11. It is also my opinion that damages in this matter can be calculated on a classwide basis in a manner consistent with Plaintiffs' theory of liability. The only individualized information necessary to do so can be obtained from class members' objective stock trading records.

## IV. Relevant Allegations and Factual Background

### A. The Class

12. I understand that the proposed Class in this matter includes all persons who purchased or otherwise acquired Facebook Stock between February 3, 2017 and July 25, 2018, inclusive.[6]

---

[6] Complaint, ¶ 1.

### B. Defendants

13. Facebook is a publicly listed Delaware corporation with headquarters in Menlo Park, California.[7] During the Class Period and other relevant times, Facebook operated a social media platform where users who registered for accounts could make other users "friends," could share information and opinions with other users, could engage with third-party apps hosted on the platform, and could "like" posts made by others. Facebook's stock is and was listed on the Nasdaq; throughout the period at issue in this litigation, its ticker symbol was "FB".[8]

14. It is my understanding that Plaintiffs have also named three individuals as defendants. Those individual defendants are:

(a) Mark E. Zuckerberg, who served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board throughout the Class Period.[9] Zuckerberg controls the Company.[10]

(b) Sheryl K. Sandberg, who was the Company's Chief Operating Officer ("COO") throughout the Class Period.[11] Sandberg controlled the Company during her tenure as COO.[12]

---

7 *Id.*, ¶¶ 41, 49.

8 Facebook changed its name to Meta Platforms, Inc. in 2021. Ninth Circuit Opinion at 941, n.1. It announced a change in its ticker symbol from "FB" to "META" in 2022. *Meta Platforms, Inc. to Change Ticker Symbol to 'META' on June 9*, May 31, 2022 https://investor.atmeta.com/investor-news/press-release-details/2022/Meta-Platforms-Inc.-to-Change-Ticker-Symbol-to-META-on-June-9/default.aspx.

9 Complaint, ¶ 42.

10 *Id.*

11 *Id.*, ¶ 44.

12 *Id.*

(c) David M. Wehner, who was the Company's Chief Financial Officer ("CFO") throughout the Class Period.[13] Wehner controlled the Company during his tenure as CFO.[14]

**C. Summary of Plaintiffs' Claims**

15. I understand Plaintiffs allege that they suffered damages for which Defendants are liable due to violations of the Securities Exchange Act of 1934 ("Exchange Act").

(a) Plaintiffs allege that all Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.[15]

(b) Plaintiffs allege that all Defendants violated §20(a) of the Exchange Act by virtue of their status as controlling persons.[16]

(c) Plaintiffs allege that Zuckerberg violated §20A of the Exchange Act for his sale of Facebook Stock while in possession of material nonpublic information about the Company.[17]

16. Plaintiffs' §10(b) claim alleges that Defendants knowingly or recklessly made a series of false or misleading statements or material omissions to investors during the Class Period concerning: (i) the risk of misappropriation and misuse of Facebook user data by third parties (including third parties involved in the Cambridge Analytica scandal); and (ii) the ability of users

---

13 *Id.*, ¶ 45.

14 *Id.*

15 *Id.*, ¶¶ 709-13 (setting forth Count I).

16 *Id.*, ¶¶ 714-15 (setting forth Count II).

17 *Id.*, ¶¶ 716-22 (setting forth Count III).

to control their data on Facebook's platform.[18] Plaintiffs further allege that they suffered economic losses in March 2018 and July 2018, when disclosures of the relevant truth about a major incident of misappropriation and misuse of users' private data and users' inability to control their data, and the extent and impact of Facebook's user data misconduct on Facebook's business, were revealed to the market.[19]

17. First, on March 16, 2018, Facebook published a blog post admitting that, "[i]n 2015, we learned that [a University of Cambridge professor] lied to us and violated our Platform Policies by passing data . . . to SCL/Cambridge Analytica [and] Christopher Wylie of Eunoia Technologies Inc."[20] Facebook explained that the professor used a quiz app to access detailed data for 270,000 Facebook users and "more limited information about friends who had their privacy settings set to allow it."[21] The next day, *The Guardian* and *The New York Times* reported[22] the more extensive details of what had happened: by purchasing Facebook data from a company started by the professor in question, political consulting firm Cambridge Analytica had, in the words of the Ninth Circuit, "improperly harvested personal data from millions of unwitting

---

[18] Ninth Circuit Opinion at 941, 948-53.

[19] *Id.* at 945-46.

[20] Paul Grewal, *Suspending Cambridge Analytica and SCL Group From Facebook*, Facebook Newsroom (Mar. 16, 2018); Complaint, ¶ 468;.

[21] Paul Grewal, *Suspending Cambridge Analytica and SCL Group From Facebook*, Facebook Newsroom (Mar. 16, 2018).

[22] Carole Cadwalladr & Emma Graham-Harrison, *Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach*, Guardian (Mar. 17, 2018); Matthew Rosenberg, Nicholas Confessore & Carole Cadwalladr, *How Trump Consultants Exploited the Facebook Data of Millions*, N.Y. Times (Mar. 17, 2018).

Facebook users and retained copies of the data beyond Facebook's control."[23] On March 20, 2018, *The Guardian* published an article revealing that app developers routinely harvested users' data and quoting a former Facebook employee who stated that the "'majority of Facebook users' could have had their data harvested by app developers without their knowledge."[24]

18. Over the following 10 days, the price of Facebook Stock declined 18%, from a closing price of $185.09 on March 16 to a closing price of $152.22 on March 27, as investors worked to digest the implications of the revelations for Facebook Stock's value. Market observers voiced concerns that the revelations would lead to added regulation,[25] reduced future profitability,[26] and consequences for violating Facebook's 2012 consent decree with the Federal Trade Commission ("FTC").[27]

19. In addition, on June 3, 2018, *The New York Times* reported that Facebook had accorded "whitelisted" status to dozens of third parties, allowing them unauthorized "'access to

---

[23] Ninth Circuit Opinion at 941.

[24] Paul Lewis, *'Utterly horrifying': ex-Facebook insider says covert data harvesting was routine*, Guardian (Mar. 20, 2018)

[25] Deutsche Bank, *Opening Pandora's Box?*, March 19, 2018 at 1 (listing "potential indirect impact from data regulations/legislation that ultimately curbs Facebook's ability to serve hyper targeted ads" as the "perhaps most concerning" risk "surrounding the Cambridge Analytica issue"); UBS, *Facebook: Wading Through the Data of a FB Story*, March 19, 2018 at 1 ("L[ong] T[erm] changes in the regulation of social media platforms and the collection/use of 1st party data remain the main risk factor for FB.").

[26] Bank of America, *Data Mgmt Changes Underway As Trust Rebuilding Process Begins; PO to $230*, March 21, 2018 at 2 ("privacy issues or pushback on Facebook's policy changes impact revenue generation").

[27] Bank of America, *Facebook: FTC investigation increases regulatory risk; Lowering PO to $210*, March 27, 2018 at 1 ("The FTC investigation is significant as it raises risk of civil penalties on data privacy violations, and if history serves, could take multiple years to resolve.").

vast amounts of its users' personal information.'"[28] This included access to information about users' friends' data without obtaining the friends' consent throughout 2017 and 2018, despite the fact that the Company had "'declar[ed] that it would no longer share such information with outsiders.'"[29]

20. Then, with the Company's second quarter 2018 earnings announcement on July 25, 2018—*i.e.*, the first full fiscal quarter since the revelation of the Cambridge Analytica scandal—Facebook disclosed "'dramatically lowered user engagement, substantially decreased advertising revenue and earnings, and reduced growth expectations going forward.'"[30] The next day, Facebook's stock price dropped nearly 19% in what was, at the time, the largest single-day drop in a firm's market capitalization in U.S. history.[31] Numerous analysts, media outlets, and market observers directly attributed the stock drop to, *inter alia*, the impact of the Cambridge Analytica and whitelisting scandals.[32]

21. Following extensive appellate practice, Plaintiffs amended their complaint, and Defendants moved to dismiss the operative Complaint on September 2, 2025.[33] In resolving the Defendants' motion to dismiss, the District Court determined the following:

(a) Count I regarding violations of §10(b) of the Exchange Act and Rule 10b-5

---

[28] Complaint, ¶ 426 (quoting from Nicholas Confessore, Gabriel J.X. Dance and Michael LaForgia, *Facebook Gave Device Makes Deep Access to Data on Users and Friends*, N.Y. Times (June 3, 2018)).

[29] *Id*.

[30] Ninth Circuit Opinion at 946, 956.

[31] *Id*. at 955.

[32] Complaint, ¶¶ 692-700.

[33] ECF No. 238.

could proceed as to: (1) the initial misuse portion of the Cambridge Analytica theory of fraud as to the user control statements and the risk factor statements;[34] and (2) the whitelisting theory of fraud as to user control statements.[35] The Court dismissed Count I as to the "investigation statement,"[36] and "the continued misuse sub-theory of the Cambridge Analytica theory of fraud."[37]

(b) Counts II and III could proceed.[38]

22. I confine my attention in this report to the two aspects of Count I that the District Court found could proceed: (1) the initial misuse sub-theory of the Cambridge Analytica theory of fraud as to the risk disclosure and user control statements; and (2) the whitelisting theory of fraud related to user control statements.[39]

(a) I understand that the "Cambridge Analytica theory of fraud" concerns Plaintiffs' allegations that the "risk factor" and "user control" statements omitted material information and were false or misleading and due to Cambridge Analytica's misappropriation and misuse of Facebook user data. Cambridge Analytica improperly obtained this Facebook user data from Global Science Research ("GSR"), a company

---

[34] MTD Opinion at 25-26.

[35] *Id.* at 30-32.

[36] *Id.* at 19.

[37] *Id.* at 29.

[38] *Id.* at 33 (numbered paragraph 6).

[39] *Id.* at 33 (numbered paragraph 3). The "continued misuse" sub-theory of fraud, which the District Court dismissed as to Count I, relates to the fact that "Cambridge Analytica did not delete users' data and indeed continued to use it to support Donald Trump's 2016 presidential campaign." *Id*. at 19.

started by Professor Aleksandr Kogan of Cambridge University.[40] Professor Kogan had developed a personality quiz app and uploaded it to Facebook; when users took the quiz, the quiz app would harvest not only those users' data, but also the data of their Facebook "friends";[41] the harvested information included Facebook "likes" and other information about the friends.[42] I understand that the "initial misuse sub-theory of the Cambridge Analytica theory of fraud" involves Cambridge Analytica's improper misappropriation and misuse of the purloined Facebook data, including for political purposes, and related allegations.[43]

(b) I understand that the "whitelisting theory of fraud" refers to Plaintiffs' allegations that Facebook's "user control" statements made during the Class Period "were false because Defendants exempted a wide array of 'whitelisted' app developers and corporations from Facebook's general prohibition on third-party access to user friend data in exchange for advertising revenues and other business benefits."[44]

23. In sum, Plaintiffs allege essentially that Defendants misled market participants into believing that improper data access was only a hypothetical risk when it had already occurred, and that users controlled their data when they did not. Had market participants known the truth, they would have understood that:

(a) Facebook had so far received substantial revenues resulting from data-

---

40 *Id.* at 2.

41 *Id.*

42 Ninth Circuit Opinion at 943.

43 MTD Opinion at 3.

44 *Id.* at 30 (citing Complaint, ¶ 24).

sharing activity that it misled market participants into believing had not occurred or could not occur.

(b) Facebook could not continue to realize such revenues once users and the wider public learned the truth about the vulnerability of users' data, because public and official pressure predictably would force it to end its data-sharing practices.

(c) Facebook would face the loss of users due to reputational harm, thereby reducing its attractiveness to advertisers.

(d) Facebook would incur substantial costs, *e.g.*, related to data privacy programming, monitoring, and enforcement, once public pressure forced it to fulfill its earlier promises about users' control over data.

(e) Facebook would face an increased threat of government regulation and could incur a substantial penalty for violating the 2012 FTC consent decree.

24. It is financial economics 101 that a reduction in expected future cash flow reduces a company's value today. Once the revelations relating to improper data access and lack of user control—and the effect these revelations would have on the business, including the cost of correcting them—became known, these factors naturally led investors to reduce the value they contemporaneously placed on Facebook Stock.

25. Thus, according to the Plaintiffs' theory of liability, Facebook's omissions and false and misleading statements caused market participants to over-value the Company's Stock compared to what its value would have been had Defendants not misled the market about the lack of user control over data and the extent to which user data had already been compromised. Investors who purchased Facebook Stock during the Class Period thus paid inflated prices.

26. Following the March 2018 and July 2018 stock price declines, investors who

purchased in reliance on the Company's false and misleading statements suffered substantial out-of-pocket losses, as their Stock was now worth less than the artificially inflated price they had paid for it.

27. Plaintiffs seek damages to compensate them for these losses.

## V. Market Efficiency

28. I understand that Plaintiffs in this case invoke the "fraud-on-the-market" presumption of reliance, and I understand that courts apply this presumption when plaintiffs demonstrate that a stock trades on an efficient market on the trading dates in the Class Period.[45]

29. The Supreme Court wrote in 1988's *Basic v. Levinson* decision that:

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[46]

30. For large companies whose stock is liquidly traded on major stock exchanges such as the Nasdaq, it is widely accepted among economists that share price responds when value-relevant information about the company is made public.[47] This response will tend to be in the direction of the news: when the public receives new and material positive news about a company, its share price rises, and when the public receives new and material negative news about a

---

45 *Basic Inc. v. Levinson*, 485 U.S. 224, 244 (1988) ("*Basic*") ("'In an open and developed market, the dissemination of material misrepresentations or withholding of material information typically affects the price of the stock, and purchasers generally rely on the price of the stock as a reflection of its value.'") (citation omitted).

46 *Id.* at 241-42 (citation omitted).

47 Tarun Chordia, Richard Roll, and Avanidhar Subrahmanyam, *Liquidity and market efficiency*, 87 J. Fin. Econ. 249, 251 (2008) find that greater liquidity in a stock's trading leads to "better incorporation of private information into prices"; *see also* Dennis Chung and Karel Hrazdil, *Liquidity and market efficiency: A large sample study*, 34 J. Banking & Fin. 2346 (2010) (finding that "the more liquid the market is, the more efficient it is in incorporating information into prices").

company, its share price falls. In addition, this stock price response will tend to begin relatively quickly for securities traded in markets that are liquid and characterized by a substantial volume of trading.

31. Financial economists have considered three different notions of market efficiency:[48]

(a) Weak form efficiency, which means that a stock's price cannot be reliably predicted using historical information on stock prices.

(b) Semi-strong form efficiency, which means that stock prices adjust relatively quickly to fully reflect newly public information.

(c) Strong form efficiency, which means that stock prices adjust to fully reflect all information, including that which is not made public.

32. Thus, a security that trades on a semi-strong form efficient market meets the notion of efficiency described in *Basic* and reiterated in *Halliburton II.*[49]

33. Given the liquidity and volume of trading on major national stock exchanges such as the Nasdaq, prices for stocks traded on these exchanges generally will begin responding relatively quickly to value-relevant information.

34. In my opinion, the fact that Facebook Stock traded on the Nasdaq on all trading dates relevant to this litigation indicates a strong likelihood that the market for Facebook Stock

---

[48] *See* Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work,* 25 J. Fin. 383, 383, 416 (1970); John Y. Campbell, Andrew W. Lo, and A. Craig MacKinlay, THE ECONOMETRICS OF FINANCIAL MARKETS 22 (1997).

[49] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014); Eugene F. Fama, *Efficient Capital Markets: II*, 46 J. Finance 1575, 1607 (1991) ("The cleanest evidence on" semi-strong form "market-efficiency comes from event studies, especially event studies on daily returns"); *id.* at 1601 ("The typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements.").

was semi-strong efficient during this period. In this report, I supplement that initial opinion with an array of information about additional factors that courts have used in considering the question of whether a security trades on an efficient market.

35. In *Cammer v. Bloom*, the court offered five additional "facts which . . . might give rise to an inference that" such a company "traded in an efficient market."[50] These five "*Cammer* factors" are:

(a) Average weekly trading volume.

(b) The number of analysts who follow and report on the company's stock.

(c) How many market makers the company's stock has.

(d) Whether the company is eligible to file a Form S-3 registration statement.

(e) Whether "empirical facts show[] a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[51]

36. In *Krogman v. Sterritt*, the court considered three additional factors:[52]

(a) The size of the company's market capitalization.

(b) The size of the stock's bid-ask spread.

(c) The firm's float, which is the percentage of its shares held by the public rather than by insiders.

37. For each of the factors just described, the evidence indicates that during the Class Period, Facebook Stock satisfied the test in question. I conclude that the Stock traded on an

---

50 *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-86 (D.N.J. 1989) ("*Cammer*").

51 *Id*. at 1287.

52 *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001) ("*Krogman*");

efficient market during the Class Period.

## VI. Market Efficiency Evidence

38. This Part of my report presents and evaluates evidence regarding the five *Cammer* factors and the three *Krogman* factors described above.

### A. First *Cammer* Factor: Average Weekly Trading Volume

39. The first *Cammer* factor is average weekly trading volume. *Cammer* at 1285. In *Cammer*, the court explained that "[t]he reason" high weekly trading volume "suggests there is an efficient market is because it implies significant investor interest in the company," and this "interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Id.* at 1286.

40. To address this issue, I calculated the total trading volume for Facebook Stock for each week that started the week the Class Period began and ended the week the Class Period ended.[53] There are 78 such weeks.

41. Throughout the Class Period, Facebook Stock had an average weekly trading volume that exceeded 100 million shares exchanged per full week. For these 78 weeks, Facebook Stock's average weekly trading volume was 4.4% of its shares outstanding, more than twice the figure *Cammer* describes as triggering a strong presumption of market efficiency.

42. Figure 1 plots Facebook Stock's weekly trading volume between the weeks ending January 29, 2017 and July 27, 2018 (this period strictly contains the Class Period). The Stock's weekly trading volume always exceeded the 2% strong-presumption threshold.

43. I conclude that weekly trading volume in the Stock during the Class Period satisfies

---

[53] For weeks with fewer than 5 trading days, I multiplied the actual total trading volume by an adjustment factor. This factor is the ratio of 5 to the number of trading days in the week (*e.g.*, for a 4-day week, the adjustment factor is 5/4=1.25).

the first *Cammer* factor.

**Figure 1: Weekly Trading Volume Facebook Stock, as Percentage of Shares Outstanding**




**B. Second *Cammer* Factor: The Number of Analysts Who Followed Facebook**

44. The second *Cammer* factor is the "number of securities analysts [who] followed and reported on a company's stock during the class period." *Cammer* at 1286.[54] The logic of considering this factor is that analysts are likely to review publicly available information and advise investors who follow these analysts as to the analysts' recommendations of whether to buy or sell the stock, which in turn, causes "the market price of the stock [to] be bid up or down to

54 Attention to analyst coverage reflects a mechanism the Supreme Court pointed to in *Basic*: "For purposes of accepting the presumption of reliance in [*Basic*], we need only believe that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic* at 246, n.24.

reflect" information that is newly publicly available.[55]

45. To address this issue, I requested Counsel provide me with analyst reports about the Company that were dated during the Class Period and data on its analyst coverage. Counsel provided several hundred analyst reports and data from Bloomberg and LSEG on analyst coverage during the Class Period.

46. Examining the reports and data revealed that more than 60 financial firms issued analyst reports on Facebook during the Class Period, including firms such as Barclays, BofA Global Research, Cantor Fitzgerald, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, Jefferies, J.P. Morgan, Morgan Stanley, Raymond James, RBC Capital Markets, Roth Capital Partners, Truist Securities, and UBS Equities, among others.

47. I examined numerous of these reports and found that they regularly discussed developments in the Company's financial position and business operations. Such reports discussed events related to this litigation, *e.g.*, the revelation of the Cambridge Analytica scandal.[56] Reports regularly appeared on the dates when the Company released information about its financial results, and they provide analysis contextualizing these results.[57] The reports provide analysts' "price

55 *Cammer* at 1286.

56 *See, e.g.*, UBS Securities LLC, *First Read: Facebook Wading Through the Data of a FB Story*, UBS (Mar. 19, 2018); Evercore ISI Research, *Darkest Hour: Thoughts on Yesterday's Selloff*, (Mar. 20, 2018).

57 *See, e.g.*, Barclays, *Facebook, Inc.: Video Killed the Newsfeed Star? Probably Not*, (May 4, 2017); Cantor Fitzgerald U.S. Equity Research, *Daily Research Highlights*, Cantor Fitzgerald (Jul. 27, 2017) at 5; Credit Suisse, *Driving Revenue Outperformance to Fund the Content and Security Investments*, (Nov. 2, 2017); Bank of America, *Changes coming, but not for ads; Raising 2018E EPS by 13% and reiterate Buy*, (Feb. 1, 2018); J.P. Morgan, *Strong 1Q Results Should Get People Re-Engaged in FB; Reiterating Overweight & $242 PT* (Apr. 26, 2018); and BMO Capital Markets, *Margin Erosion Expected, but Revenue Deceleration Greater Than Expected* (Jul. 26, 2018).

targets" for Facebook and adjust them in response to new, value-relevant information about the Company's financial results and projections.[58]

48. This extensive analyst coverage satisfies the second *Cammer* factor.

### C. Third *Cammer* Factor: Market Makers

49. The third *Cammer* factor considers how many market makers the stock has. *Cammer* at 1286. Having "market makers and arbitrageurs would ensure completion of the market mechanism," because "these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[59]

50. The SEC defines a market maker as "a firm that stands ready to buy or sell a stock listed on an exchange at publicly quoted prices."[60] The Nasdaq exchange defines a market maker for purposes of the Nasdaq exchange as "a N[asdaq] member firm that buys and sells securities at prices it displays in N[asdaq] for its own account (principal trades) and for customer accounts (agency trades)."[61]

51. Facebook Stock was listed on the Nasdaq Global Select Market throughout the Class Period. Nasdaq Rule 5315 requires that any firm listed on the Global Select Market must have at least three "registered and active Market Makers."[62] In general, there are many market

---

[58] *See, e.g.*, reports cited above.

[59] *Cammer* at 1286-87.

[60] *See* https://www.investor.gov/introduction-investing/investing-basics/how-stock-markets-work/executing-order (heading "Your Broker Has Options for Executing Your Trade") (accessed on August 18, 2026).

[61] *See* https://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess ("Definition of a Market Maker") (accessed on August 18, 2026).

[62] *See* Rule 5315(e)(3), https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/Nasdaq%205300%20Series (accessed on August 18, 2026).

makers for stocks listed on the Nasdaq exchange; as of June 20, 2026, for example, Facebook Stock had 47 such market makers.[63] Among the financial institutions that disclosed being market makers during the Class Period are: Needham;[64] JP Morgan;[65] Deutsche Bank;[66] UBS;[67] SunTrust Robinson Humphrey, Inc.;[68] Jefferies;[69] Morgan Stanley;[70] Oppenheimer;[71] JMP Securities;[72] BMO Capital Markets;[73] and Wedbush Securities.[74]

52. I conclude that the number of market makers for Facebook Stock during the Class Period satisfies the third *Cammer* factor.

### D. Fourth *Cammer* Factor: S-3 Registration Eligibility

---

63 *See* https://nasdaqtrader.com/Trader.aspx?id=DailyMPPositionReport (accessed on June 20, 2026).

64 Needham, *SNAP vs FB - Who Wins?*, (Feb. 13, 2017) at 9.

65 J.P. Morgan, *Deep Dive Into Facebook's Product & Ad Changes; We Are Increasingly Confident in '17/'18 Estimates; Reit OW & $170 PT* (Mar. 9, 2017) at 20.

66 Deutsche Bank, *Off to the races: Messenger and video should spark next leg up in shares* (Jul. 27, 2017) at 9.

67 UBS, *Facebook: Positive Post in a Continuing Multi-Year Story*, (Jul. 26, 2017) at 13.

68 SunTrust Robinson Humphrey, *Kind of the Social Web – Initiating with Buy/$210 PT*, (Aug. 15, 2017) at 30.

69 Jefferies, *Channel Checks at Ad Week: Positive on FB/GOOGL/TTD/CRTO* (Oct. 2, 2017) at 2.

70 Morgan Stanley, *FB Watch: What is it and How Big Could it Be*? (Dec. 1, 2017) at 10.

71 Oppenheimer, *Fundamentals Provide the Muse* (Dec. 11, 2017) at 14.

72 JMP Securities, *Our Thoughts on Facebook's Privacy and Data Issues* (Mar. 21, 2018) at 6.

73 BMO Capital Markets, *Strong Results, but We Expect Regulatory Overhand to Persist* (Apr. 25, 2018) at 11.

74 Wedbush Securities, *Expect Another Strong Quarter Despite Negative Press and Privacy Overhang* (Jul. 20, 2018) at 6.

53. The fourth *Cammer* factor is whether the company is "entitled to file an S-3 Registration Statement in connection with public offerings." *Cammer* at 1287. The logic behind this factor is that the eligibility requirements for filing Form S-3 indicate that information about such firms is widely available due to the number of outstanding shares and their analyst coverage. Indeed, nearly a decade before *Cammer*, the SEC stated that eligibility to file Form S-3 "'*is predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place*.'"[75]

54. Key requirements for an issuer's eligibility to file Form S-3 are that the issuer has been a reporting company for at least a year, that it be current in its SEC filings, and that it have a public float over $75 million.[76] Facebook met the Form S-3 eligibility requirements:

(a) Facebook filed Form S-3 in October 2014, at which time CFO Wehner certified that the Company "has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3."[77]

(b) Facebook's 2018 and 2019 Form 10-K filings stated that the Company had filed all reports required by Sections 13 and 15(d) of the Securities Exchange Act of 1934

---

[75] *Cammer* at 1284 (quoting SEC Securities Act Release No. 6331) (emphasis added in *Cammer* and preserved here).

[76] *See, e.g.*, Stephen J. Choi and A.C. Pritchard, SECURITIES REGULATION: CASES AND ANALYSIS, 6th Edition at 507 (2024). Form S-3, together with instructions, may be found at https://www.sec.gov/files/forms-3.pdf.

[77] Facebook, Inc., Registration Statement (Form S-3ASR), at II-6 (Oct. 29, 2014), https://www.sec.gov/Archives/edgar/data/1326801/000132680114000055/facebook-universalsx3.htm.

during the preceding 12 months.[78]

(c) Facebook's public float during the Class Period was in the hundreds of billions of dollars, far exceeding the $75 million requirement to file Form S-3.

55. I conclude that the fourth *Cammer* factor was met during the Class Period.

### E. Fifth *Cammer* Factor: Cause-and-Effect Relationship Between Events and Stock Price

56. The fifth *Cammer* factor is whether "empirical facts show[] a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer* at 1287.

57. To assess whether this factor is met, I employ an event study, which is a statistical technique for evaluating the direction and magnitude of a stock's response to events that may include price-relevant news about the stock.

58. Event studies "have a long history"[79] and are widely used by financial economists to assess market efficiency. As one prominent economist has written, "event studies can give a clear picture of the speed of adjustment of prices to information,"[80] and they are "the cleanest evidence we have on efficiency."[81] Others have written that the "general applicability of the event-

---

[78] For the avoidance of doubt, I searched the SEC's Delinquent Filings page, https://www.sec.gov/enforcement-litigation/delinquent-filings, for the years 2017 and 2018 and found no mention of any SEC order or opinion relating to any delinquency by Facebook during these years.

[79] John Y. Campbell, Andrew W. Lo, and A. Craig MacKinlay, THE ECONOMETRICS OF FINANCIAL MARKETS 149 (1997).

[80] Eugene F. Fama, *Efficient Capital Markets: II*, 46 J. Finance 1575, 1602 (1991).

[81] *Id.* at 1607.

study methodology has led to its wide use," including to measure "the effect of an event on the price of . . . common equity."[82] Event studies are frequently used by testifying expert witnesses on both the plaintiff and defendant sides in securities fraud litigation.[83]

59. A first step in constructing an event study is to devise a statistical model, also known as a regression model, that relates the stock's daily return to daily returns for explanatory variables associated with the stock even in the absence of unusual events.[84] For example, daily returns for the S&P 500 index will capture variation in economy-wide conditions, such as those due to new information about the likelihood of recession, about interest rate changes, and so on. Other variables can be included in the regression model to capture changes in conditions that operate more specifically within a firm's industry.[85]

60. The second step is to use data on daily returns to estimate the model's parameters (*e.g.*, the regression coefficient for the S&P 500 index). These parameters are then used to calculate the stock's expected return on each date under consideration (*i.e.*, both dates included in the estimation of the model and event dates the model will be used to assess).

61. The third step is to calculate the abnormal return for each date. The abnormal return equals the stock's actual return minus its expected return. In other words, the abnormal return on a given date is the component of the stock's actual return that can't be attributed simply to broad-

---

[82] John Y. Campbell, Andrew W. Lo, and A. Craig MacKinlay, THE ECONOMETRICS OF FINANCIAL MARKETS 149 (1997).

[83] Brief of Testifying Economists as Amici Curiae in Support of Respondent, *Halliburton Co. v. Erica P. John Fund, Inc.*, No. 13-317 (U.S. Jan. 28, 2014), at 3.

[84] I use the log return, which is a common approach to measuring daily stock returns. For trading date $t$, the log return is defined as $\log P_t - \log P_{t-1}$, where $t - 1$ refers to the previous trading day.

[85] *See, e.g.*, Jill E. Fisch, Jonah B. Gelbach, and Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tex. L. Rev. 553, 572 (2018).

market or industry-specific developments on that date. The abnormal return on a date thus includes the effects on the stock return of whatever non-predictable forces operated on that date. For this reason, abnormal returns can be used to assess whether movements in a stock's return are systematically different on dates with value-relevant news about the firm than on other dates.

62. One way to use an event study to assess the cause-and-effect relationship *Cammer* describes is to compare the abnormal returns from ordinary dates to abnormal returns from dates identified as potential "news dates"—dates when it is particularly likely that new, value-relevant information about a company was released to the market. If there is a "difference in price movement between the two sample sets," then "that is statistical evidence that the market incorporates new public information into the price of the stock."[86]

63. This is true even if "[n]ot every (or even most) of the predefined news dates in" the event study actually had an impact on share price, because "[t]here is no inherent reason why every news item included actually would contain 'new' material information that would alter expectations as to the stock's performance or value…*e.g.*, released earnings that simply meet pre-existing guidance."[87] Thus, it is important to recognize that in the context of an event study, the term "value-relevant news," or just "news," refers to what might be called "new news"—information *that comes as a surprise to the market*. For example, when a company issues a surprise announcement that its financial position worsened over the preceding quarter, when the market expected the opposite, that will cause the company's share price to fall. But a press release containing only facts that were already well known to the investing public will not affect share

---

[86] Brief of Testifying Economists as Amici Curiae in Support of Respondent, *Halliburton Co. v. Erica P. John Fund, Inc.*, No. 13-317 (U.S. Jan. 28, 2014), at 10.

[87] *Id.*

price, because such facts already would have been incorporated in the stock's price, given that the stock trades on a semi-strong form efficient market. To put it more succinctly: in an efficient market, "non-news" will not affect the company's daily return.[88]

64. Because regression model results include a degree of random variation, the abnormal return for a particular date will include both the effects of any news event that occurred on that date and the typical but unpredictable variation in a stock's return that occurs even in the absence of such a news event. It is thus necessary to use statistical tests to determine whether abnormal returns are sufficiently unusual on news dates to support the inference that the market did respond to the news itself.

65. Such statistical tests boil down to testing whether the distribution of abnormal returns on identifiable news dates is systematically different from the distribution of abnormal returns on non-news dates.

66. To identify potential news dates, I first identified the dates during (and in one case, immediately following) the Class Period when the Company conducted earnings calls to discuss its quarterly earnings reports. Such dates are always reasonable candidates for news-dates because company earnings reports may contain surprises relative to market expectations. I refer to these as "News Dates."

67. Table 1 lists the 6 dates I identified as potentially involving news, together with the

[88] This fact explains how false or misleading statements can both (1) function like non-news statements, in that they do not cause an observable movement in share price when made, and (2) cause the maintenance of price inflation, as is often at issue in securities litigation. For example, if a company announces that its financial position is just as investors had believed it to be, and if investors treat this statement as non-news, then the statement itself will not cause an observable change in the stock's market return for that day. But if the company's financial position is actually worse than investors had believed, then the firm's underlying value will have fallen. Accordingly, a non-news statement that misleads by concealing a truth that would be news can create or maintain artificial inflation in the stock price by maintaining the stock's price at an artificially high level.

reasons for identifying them as such; I refer to these six dates as News Dates in the analysis that follows. Additionally, the table lists the day of the week and (where relevant) the time of day when the news event occurred. For events that occurred on non-trading days, or after Nasdaq trading had ended for the day (4pm Eastern time), the effective date of the potential news in question is the next trading day.

**Table 1: Dates Identified as Potential News Dates**

| | Actual Event Date | | | Trading-Relevant Date | |
|---|---|---|---|---|---|
| **Event Description** | Day of Week | Event Date | Time of Release | Day of Week | Effective Date |
| **2017Q1 Earnings Call** | Wednesday | 5/3/2017 | After trading hours | Thursday | 5/4/2017 |
| **2017Q2 Earnings Call** | Wednesday | 7/26/2017 | After trading hours | Thursday | 7/27/2017 |
| **2017Q3 Earnings Call** | Wednesday | 11/1/2017 | After trading hours | Thursday | 11/2/2017 |
| **2017Q4 Earnings Call** | Wednesday | 1/31/2018 | After trading hours | Thursday | 2/1/2018 |
| **2018Q1 Earnings Call** | Wednesday | 4/25/2018 | After trading hours | Thursday | 4/26/2018 |
| **2018Q2 Earnings Call** | Wednesday | 7/25/2018 | After trading hours | Thursday | 7/26/2018 |

68. I present two models for the regression of Facebook daily returns. For each earnings release date, each Model is estimated based on the 250 trading dates before the earnings release date of interest, with other earnings dates and damages-related dates excluded from the estimation.

69. Model 1 includes an intercept, the daily return of the S&P 500 index, and an equal-weighted index of the returns of companies identified by Facebook in its proxy statements as peer firms.[89]

[89] Some observers thought that news involving Facebook in this case made regulation of large internet companies more likely (*e.g.*, *see* citations *supra* note 25). That means such news might have been expected to affect the returns of some Peer Group companies. To the extent that such effects would operate to reduce not only Facebook's value, but also the value of its peer companies, peer companies' daily returns could be expected to move lower on dates when Facebook had negative news. This effect would tend to make Facebook's *abnormal* returns smaller in magnitude

70. Model 2 includes an intercept and a custom, data-driven index based on returns of the S&P 500 and the same peers included in Model 1. The key difference between Model 2 and Model 1 is that Model 2 is based on a machine learning approach that allows the data to determine the weights that different peers (and the S&P 500) receive in accounting for developments in the broader market and industry when calculating Facebook's abnormal returns.[90]

71. **Appendix C** supplements the discussion here with details about the two models, including their comparative performance on the dimension of root mean square error ("RMSE"). RMSE is important because a model with a lower RMSE has lower variability of abnormal returns, which reduces the chances of mistaking random variation in abnormal returns for a real effect of news on event dates of interest. Thus, RMSE is a useful diagnostic measure of model performance. As **Appendix C** discusses, the RMSE for Model 2 was between 19% and 36% lower than the RMSE for Model 1 across the 6 earnings release dates, suggesting that Model 2 is generally the better model.[91]

---

on such dates, making it less likely that these abnormal returns would deviate from their distribution on typical, non-news dates. Accordingly, using the peers' returns to construct an industry measure is methodologically conservative, in that it places an additional hurdle in the path of finding evidence that the distribution of Facebook's abnormal returns on potential news dates differs substantively from Facebook abnormal returns' distribution.

[90] Model 2 was the subject of my scholarly research; *see* Andrew Baker and Jonah B. Gelbach, *Machine Learning and Predicted Returns for Event Studies in Securities Litigation*, 5 J. L. Fin. & Accounting 231 (2021), which shows that it is sometimes possible to improve stock-returns regression model performance further by using basic machine learning techniques. As discussed below and in **Appendix C**, these improvements lead to lower variability of the model's prediction of abnormal returns, and therefore greater statistical power in testing for the significance of event effects.

[91] That said, even the upper end of the Model 1 range indicates that the standard deviation of daily abnormal returns from Model 1 is below 1.1%, which is relatively low as a general matter, reflecting the highly liquid nature of the market for Facebook Stock.

72. I report results for both models, because equal-weighting is a common approach to constructing an industry index. All my substantive conclusions regarding market efficiency are the same regardless of the Model I consider.

73. Table 2 reports the abnormal returns, RMSE, and associated T-statistic for each of the six earnings release dates.

**Table 2: Abnormal Returns For Earnings Release Dates**

| | Model 1 | | | Model 2 | | |
|---|---|---|---|---|---|---|
| | **AR** | **RMSE** | **T-statistic** | **AR** | **RMSE** | **T-statistic** |
| **May 4, 2017** | -.0053 | .0085 | -0.62 | -.0077 | .0054 | -1.41 |
| **July 27, 2017** | .0232 | .0080 | 2.89 | .0462 | .0055 | 8.39 |
| **November 2, 2017** | -.0193 | .0077 | -2.50 | -.0232 | .0064 | -3.65 |
| **February 1, 2018** | .0460 | .0083 | 5.54 | .0549 | .0061 | 8.99 |
| **April 26, 2018** | .0819 | .0102 | 8.04 | .0656 | .0079 | 8.36 |
| **July 26, 2018** | -.2162 | .0109 | -19.90 | -.2089 | .0088 | -23.64 |

74. If abnormal returns on the earnings release dates were drawn from the same distribution as abnormal return for other dates, then the t-statistics should be distributed very similarly to a standard normal random variable (*i.e.*, one whose probability density function is a bell curve with mean 0 and standard deviation 1). This means they would mostly be between -1 and 1, and none of the 6 would be expected to have a magnitude as high as, say, 2. Further, on a date when no share price-relevant news occurred, there will be only low probability that an abnormal return's absolute value will exceed certain threshold values, known as "critical values."

75. Row 1 of Table 3 reports the expectation of the number of abnormal returns' absolute values, among 6 dates on which no value-relevant news occurred, that would be expected to exceed the critical values for probability levels 10%, 5%, and 1% of the standard normal (bell curve) distribution. The corresponding expectations are 0.6, 0.3, and 0.06, so that the expectations

are for no more than 1 of the 6 dates to have an abnormal return that exceeds each critical values.

**Table 3: Number of News Dates on Which Abnormal Returns Exceed Critical Values**

| | 10% | 5% | 1% |
|---|---|---|---|
| ***Expectation*** | **0.6** | **0.3** | **0.06** |
| **Model 1** | 5 | 5 | 4 |
| **Model 2** | 5 | 5 | 5 |

76. I report the number of earnings release dates for which each model's abnormal returns exceeded the applicable critical value and reported these counts in the second and third rows of Table 3.

(a) The second row of Table 3 reports the actual number of the 6 News Dates for which the Model 1 abnormal return's absolute value exceeds the three critical values.[92] For the 10% and 5% critical values, the simple market model's abnormal returns indicate that 5 of the 6 News Dates exceeded the critical value; abnormal returns exceeded the 1% critical value for 4 of the 6 News Dates.

(b) The third row of Table 3 reports the actual number of the 6 News Dates for which the Model 2 abnormal return's absolute value exceeds the three critical values. For all three critical values, 5 of the 6 News Date abnormal returns have magnitudes that exceed the critical value.

77. These results are highly inconsistent with the expectations in the top row of the table. For example, the probability of drawing 6 times from a normal distribution and obtaining at least 5 values that exceed the 10% critical value is 0.000055—less than 1 in 10,000.[93] The

[92] The values are 1.64, 1.96, and 2.58.

[93] This probability is the same as the probability of drawing 6 times from a binomial distribution with success probability 0.1 and obtaining 5 or 6 successes.

probability of conducting the same procedure and obtaining at least 5 values that exceed the 5% critical value is roughly 2 in a million;[94] the probability of obtaining at least 4 (or 5) values that exceed the 1% critical value is much smaller than that.[95]

78. One limitation of the approach in Table 3 is that it relies on the assumption that abnormal returns do indeed have a bell-curve, *i.e.*, normal, probability distribution. But I found strong evidence that the Model 1 and Model 2 abnormal returns do not have such a distribution.[96] To address this issue, I used the sample quantiles ("SQ") approach, which I developed for event studies in my scholarly work,[97] and which is robust to non-normality of abnormal returns. The SQ approach allows me to provide evidence analogous to that in Table 3, but without relying on the assumption that all three models' abnormal returns come from a normal distribution.

---

[94] This probability is the same as the probability of drawing 6 times from a binomial distribution with success probability 0.05 and obtaining 5 or 6 successes, which is 0.000001797.

[95] The probability of drawing 6 times from a binomial distribution with success probability 0.01 and obtaining 4, 5, or 6 successes is less than 1 in a million; the probability of obtaining 5 or 6 successes is less than 1 in a billion.

[96] I used the Shapiro-Wilk test to test for normality of the distribution of abnormal returns. For all earnings release dates and both models, the p-value for testing the null hypothesis of normality was well below 0.01. That indicates powerful evidence against the normality of abnormal returns.

[97] Jonah B. Gelbach, Eric Helland, Jonathan Klick, *Valid Inference in Single-Firm, Single-Event Studies*, 15 Am. L. & Econ. Rev. 495 (2013). The SQ approach replaces the critical values from the normal distribution with ones that are based on the abnormal returns generated by the model(s). For example, to find the critical value for Model 2 corresponding to the 90th percentile of the standard normal distribution, I first compute the absolute value of each Model 2-generated abnormal return and then sort these values. Then I find the value such that 90 percent of the sorted values are below that value; this is the 90th percentile of the empirical distribution of (absolute-valued) abnormal returns. It serves as the SQ approach's 10% critical value: if the abnormal return for a News Date came from the same distribution as the abnormal returns for Non-News Dates, its absolute value would have only a 10% chance of exceeding this 10% critical value. The same logic is used for the 5% and 1% critical values, *mutatis mutandis*.

79. I report the SQ approach results in Table 4. The results are the same as in Table 3 except that for Model 1, there are 3 News Dates whose abnormal returns are larger in magnitude than the 1% critical value (this number was 4 in Table 3). As with the Table 3 results, these results are highly inconsistent with the expectations in the top row of the table. For example, the probability of drawing 6 times from a normal distribution and obtaining at least 5 values that exceed the 10% critical value is 0.000055—less than 1 in 10,000.[98] The probability of conducting the same procedure and obtaining at least 5 values that exceed the 5% critical value is roughly 2 in a million;[99] the probability of obtaining at least 5 values that exceed the 1% critical value is much smaller than that.[100] The probability of obtaining at least 3 values out of 6—as in the Model 1/99%-critical-value combination for Table 4—is less than 1 in 10,000.[101]

**Table 4: Number of News Dates on Which Abnormal Returns Exceed Critical Values, Based on Sample Quantiles Approach**

| | 10% | 5% | 1% |
|---|---|---|---|
| ***Expectation*** | **0.6** | **0.3** | **0.06** |
| **Model 1** | 5 | 5 | 3 |
| **Model 2** | 5 | 5 | 5 |

80. These results provide overwhelming evidence against the null hypothesis that News Dates' abnormal returns come from the same distribution as Non-News Dates' abnormal returns.

98 This probability is the same as the probability of drawing 6 times from a binomial distribution with success probability 0.1 and obtaining 5 or 6 successes.

99 This probability is the same as the probability of drawing 6 times from a binomial distribution with success probability 0.05 and obtaining 5 or 6 successes, which is 0.000001797.

100 This probability is the same as the probability of drawing 6 times from a binomial distribution with success probability 0.01 and obtaining 5 or 6 successes, which is less than 1 in a billion.

101 This probability is the same as the probability of drawing 6 times from a binomial distribution with success probability 0.01 and obtaining 3 or more successes, which is 0.00001955.

Accordingly, I conclude that abnormal returns come from a different distribution for News Dates and Non-News Dates.

81. In sum, all of the evidence I have considered in this section points to one firm conclusion: During the Class Period, Facebook Stock responded to earnings news on the first possible trading date after the news was made public.

82. In other words, during the Class Period, there was a cause-and-effect relationship between news about Facebook Stock and the Company's Stock price. I conclude that the fifth *Cammer* factor was met during the Class Period.

### F. *Krogman* Market Efficiency Indicators

83. In *Krogman*, the court offered three additional factors to consider.

84. First, *Krogman* determined that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[102] Facebook had a very large market cap throughout the Class Period; with an average value of over $400 billion and a minimum value of over $300 billion.[103] Facebook's massive market capitalization values placed it among the highest-capitalized companies in the

[102] *Krogman* at 478.

[103] The precise market capitalization numbers depend on whether I include Facebook's Class B stock, whose several hundred million shares outstanding during the Class Period were mostly owned by Facebook officers and directors, especially Zuckerberg. Facebook, Inc., Proxy Statement (Form DEF 14A), at 37 (Apr. 14, 2017); Facebook, Inc., Proxy Statement (Form DEF 14A), at 38 (Apr. 13, 2018). Although this stock is not traded publicly, its existence affects calculations related to Facebook's economic value because Class B shares can be exchanged for Class A shares on a one-for-one basis. Facebook Inc., Annual Report (Form 10-K), at 77 (Feb. 1, 2018). Incorporating Facebook's Class B stock leads to average and minimum market capitalization values of $469 billion and $364 billion; counting only Class A stock yields average and minimum market capitalization values of $401 billion and $308 billion.

world.[104] I conclude that the first *Krogman* factor is satisfied.

85. Second, *Krogman* pointed to the bid-ask spread, which "is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares."[105] A low bid-ask spread is indicative of an efficient market, because it suggests that the stock is not too expensive to trade.[106] For Facebook's Stock, I calculated the quoted spread, which equals the ask value minus the bid value. I then calculated the effective spread as the quoted spread divided by the midpoint of the ask and bid values, with this ratio then multiplied by 100%. To assess Facebook Stock's spread, I calculated the spread for the last 1 second of every trading day in the Class Period.[107] The average effective spread was 0.0151% (1.51 basis points), which is very low; even the maximum observed spread for sampled Facebook quotes on any day during this period was only 0.108% (10.8 basis points).[108] This low-

---

[104] For example, one source describes Facebook as the fifth-largest company among the S&P 500 as of December 29, 2017, and the sixth-largest as of December 31, 2018. Finhacker.cz, *Largest 20 S&P 500 Companies by Market Cap (1989–2026)*, https://www.finhacker.cz/en/top-20-sp-500-companies-by-market-cap/.

[105] *Krogman* at 478.

[106] *Id. See also* Hendrik Bessembinder and Kumar Venkataraman, *Bid-Ask Spreads*, in ENCYCLOPEDIA OF QUANTITATIVE FINANCE, ed. Rama Cont (2010) (https://onlinelibrary.wiley.com/doi/10.1002/9780470061602.eqf18003).

[107] Across the 371 trading dates in the Class Period, there were a total of 19,706 quotes for Facebook Stock during the last second of the trading day, or a bit more than 53 per day.

[108] As a basis for comparison, I repeated my calculation of the effective spread during the last 1 second of every Class Period trading day, using a size-50 random sample of stocks that traded on the Nasdaq as of the first day of the Class Period. The average effective spread over the Class Period for these firms ranged between 0.0283% (2.83 basis points, or nearly 90% more than the value for Facebook) and 12.56% (1,256 basis points, roughly 800 times Facebook's value); the maximum firm-level effective spread ranged between 0.12% (12 basis points, or 15% higher than Facebook's value) and 24.79% (2,479 basis points, which is more than 200 times Facebook's maximum daily effective spread). In sum, effective spreads for Facebook's Stock were much lower than for the 50 randomly chosen Nasdaq-listed stocks. For an additional comparison,

bid-ask spread satisfies the second *Krogman* factor.

86. Third, *Krogman* stated that a firm's float, which is "the percentage of shares held by the public, rather than insiders," indicates market efficiency because "'the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security'" due to the fact that "'insiders may have private information that is not yet reflected in stock prices.'"[109] In other words, insiders might trade on their private information, causing a stock's value to diverge from what publicly available news suggests. At my request, Counsel provided me with Bloomberg data on Facebook Stock's free-float percentage during the Class Period. I found that the minimum value of the free-float percentage over the Class Period was 98%, indicating that the overwhelming majority of Facebook Stock's equity was available to the public. I conclude that the third *Krogman* factor is satisfied.

### G. Conclusion as to Market Efficiency

87. Based on the evidence presented in Sections A-F above, all of the *Cammer* and *Krogman* factors were satisfied during the Class Period. It is my opinion that during the Class Period, Facebook Stock traded in a semi-strong form efficient market, such that value-relevant information about the Company was promptly incorporated into its share price.

## VII. Damages Can Be Calculated on a Classwide Basis Consistent with Plaintiffs' Theory of Liability

88. Counsel asked me to opine whether it will be possible to calculate damages on a classwide basis for the Defendants' violations of the Exchange Act and Rule 10b-5, using a

---

consider that a widely cited study of stock market liquidity found that the effective spread for Dow Jones stocks was roughly 0.60% (60 basis points) in the 1980s, and fell "dramatically" to about 0.20% (20 basis points) over the ensuing two decades. Charles M. Jones, *A Century of Stock Market Liquidity and Trading Costs* (May 23, 2002) (https://ssrn.com/abstract=313681).

[109] *Krogman* at 478.

common methodology that is consistent with Plaintiffs' theory of liability. It is my opinion that it will be possible to do so. To demonstrate this fact, I offer provisional damages calculations in Section E, below. I emphasize that these calculations are preliminary and for demonstrative purposes and could change, including if I become aware of new or additional information, including as a result of ongoing discovery produced in this litigation.[110]

89. The Complaint advances the liability theory that the Defendants' misrepresentations and/or omissions caused Facebook Stock to trade at artificially inflated prices during the Class Period. I understand that Plaintiffs allege they suffered losses as a result of (1) purchasing Facebook Stock when its price was artificially inflated, and either (2) selling Facebook Stock after some or all of the artificial inflation had been removed from Facebook Stock's price, or (3) retaining Facebook Stock through July 26, 2018, at which point remaining artificial inflation in Facebook Stock's price was eliminated following the corrective disclosure that occurred after trading hours on July 25, 2018.

90. In Section A, below, I review the Plaintiffs' theory of liability, on which loss causation assessments and damages calculations must be based.

91. In Section B, below, I explain that event studies may be used to measure the share-price inflation removed on corrective disclosure dates.

92. In Section C, below, I provide my assessment, based on the current record, of loss causation and of estimates of artificial share-price inflation that was removed on the dates of March 19 and 20 and July 26, 2018. My analysis leverages widely used, traditional tools of financial economics to construct provisional calculations of artificial share-price inflation at issue in this

---

[110] I understand that the current case schedule calls for the close of fact discovery on February 19, 2027. It is my understanding that, as of the drafting of this report, Defendants have yet to finish producing documents in response to Plaintiffs' loss-causation-related document requests.

litigation, all on a classwide basis.

93. In Section D, below, I explain how traditional tools of financial economics can be used to remove confounding sources of price change, allowing me to isolate the price impact of fraud-related conduct.

94. In Section E, below, I offer provisional formulas relating damages calculations to the artificial share-price inflation calculated in Section C. Final damages calculations will be based on a complete record and will be subject to applicable statutory limitations. My analysis demonstrates that once the record is complete, it will be possible to finalize the damages methodology discussed here and estimate per-share artificial inflation on a classwide basis. This formula will then be available to determine individual class members' damages, with necessary individualized information limited to objective trading records whose key features can be fed into the classwide damages formula. No individualized adjudication will be necessary.

## A. Plaintiffs' Theory of Liability

95. The calculation of artificial share-price inflation in this case can be done in a way that is common to all proposed Class members and consistent with Plaintiffs' theory of liability—*i.e.,* that Defendants made misleading statements and omissions regarding Facebook users' control over their data and the risk of third-party misappropriation and misuse of user data, including specifically the theories of falsity sustained by the Court concerning Cambridge Analytica's initial misappropriation and misuse of Facebook user data and Facebook's whitelisting practices, which is summarized as follows.

96. Defendants represented to the public that users controlled their data on the Facebook platform and that any risk of third-party misuse was purely hypothetical. But they knew or recklessly disregarded that this was false or misleading. In fact, no later than December 2015, Defendants knew of Kogan's acquisition of user-friends' data for tens of millions of users, and

that Kogan had sold Facebook data to Cambridge Analytica in violation of platform policies. Even after Defendants learned these facts, and even after they decided to shut off the Facebook users' friend data spigot that Kogan had used, Defendants continued to allow favored app developers and other partners to access user-friends' data.

97. Defendants allowed this type of unauthorized access to user data via their whitelisting practices. These practices were unknown to the investing public until *The New York Times* reported on them on June 3, 2018. Facebook posted on its blog that it disagreed with the *Times* reporting, once again obscuring from public view the importance that unauthorized access to user data had played in boosting the Company's revenues. The public could see the true importance to Facebook of whitelisting—and of third-party access to user data more broadly—only after Facebook's July 25, 2018 earnings call. As a result of the disclosures on the earnings call that day, investors began to appreciate that closing down access to third-party use of user data and remedying Defendants' improper data practices would result in reduced revenues and increased operating costs.

98. At all times at issue in this litigation, Facebook's revenues overwhelmingly came from advertising sales. Advertisers naturally would be willing to pay more to place ads on Facebook if they could target those ads to the most amount of users with traits most likely to respond positively to them. Some such ads would involve no need for third parties to access user data—*e.g.*, an ad might target young adults, or San Jose Sharks fans, and so on. Facebook offered advertisers that sort of targeting facility via its own advertising platform.

99. If Facebook had announced the relevant truth—that Facebook had already suffered a major instance of misappropriation and misuse of users' data, that its profitability was boosted by third parties' improper access to and use of users' data, and that users did not have control over

their data—then investors reasonably would have realized that revenues would decrease and costs would increase when the relevant truth was revealed. They would have naturally inferred that Facebook's revenue would fall when it shut off third-party access and that the Company would incur greater costs to properly secure user data. That would reduce the ability of app developers to acquire and sell data useful for advertising. In turn, ad targeting deterioration would dampen demand for Facebook's ads, predictably reducing the number of ads sold, the price advertisers would be willing to pay for them, or both. Further, reputational harm could have led to reduced use, exacerbating the reduction in advertising revenues.

100. Additionally, Facebook's course of conduct, which it undertook despite being bound by the FTC consent decree, exposed the Company to extraordinary legal and financial jeopardy. For example, the $5 billion fine it ultimately agreed to pay to the FTC demonstrates the magnitude of the Company's exposure. This jeopardy is further demonstrated by the $100 million settlement Facebook agreed to with the SEC.[111]

101. Further, many observers believed that Facebook faced the very real prospect of expensive/problematic regulation as a result of the Cambridge Analytica scandal.[112]

102. Although there was public reporting about the possibility of Kogan's access to and GSR's sale of Facebook user data to Cambridge Analytica as early as December 2015 and at various times between then and March 2018,[113] Defendants obscured the truth. For example, the

---

[111] Press Release, *Facebook to Pay $100 Million for Misleading Investors About the Risks It Faced From Misuse of User Data*, Securities & Exchange Commission (July 24, 2019).

[112] *See, e.g.*, sources cited in footnote 123 below.

[113] *See, e.g.*, Harry Davies, "Ted Cruz Using Firm that Harvested Data on Millions of Unwitting Facebook Users," *The Guardian* (Dec. 11, 2015); Kif Leswing, "Ted Cruz's Secret Weapon: Your Facebook Likes, Fortune (Dec. 11, 2015); Kate Knibbs, Ted Cruz Might Have Your Facebook Data, Depending on How Broke Your Friends Are," *Gizmodo* (Dec. 11, 2015); "Cambridge

Company announced that it was investigating the facts—even though it already knew them. Facebook also promised swift action to address any improprieties—and signaled to investors through inaction that there was no such impropriety. Meanwhile, the Company represented in

---

Analytica Data Analysis Drives Ted Cruz Presidential Campaign," *Privacy International* (Dec. 11, 2015); "Cruz Campaign Creeps on Facebook User Data in Search of Advantages," *RT* (Dec. 12, 2015); Emma Roller, "Is It Ted Cruz's Party — Or Marco Rubio's?," *The New York Times* (Dec. 15, 2015); Brendan Sasso & National Journal, "Political Campaigns Are Spying on You, and There Are No Rules to Stop Them," *The Atlantic* (Dec. 15, 2015); Harry Davies, "Ted Cruz Erased Trump's Iowa Lead by Spending Millions on Voter Targeting," *The Guardian* (Feb. 1, 2016); Joshua Green & Sasha Issenberg, "Inside the Trump Bunker, With Days to Go," *Bloomberg* (Oct. 27, 2016); McKenzie Funk, "Cambridge Analytica and the Secret Agenda of a Facebook Quiz," *The New York Times* (Nov. 19, 2016); Benton Institute for Broadband & Society, "The Secret Agenda of a Facebook Quiz" (Nov. 23, 2016); Yvonne Abraham, "Surveillance Is Everywhere Now," *Boston Globe* (Nov. 30, 2016); Hannes Grassegger & Mikael Krogerus, "Trump Knows You Better Than You Know Yourself," *Antidote Zine* (Jan. 22, 2017); Hannes Grassegger & Mikael Krogerus, "The Data That Turned the World Upside Down" (Jan. 28, 2017); Samson Simon Sharaf, "Democracy and the Power of Software," *The Nation* (Feb. 4, 2017); Ed Richards, "A Frightening Example of How Data-Driven Psy-Ops Has Just Changed the Course of History," *LinkedIn* (Feb. 7, 2017); Berit Anderson, The Rise of the Weaponized AI Propaganda Machine, Medium (Feb. 12, 2017); John Young, "The Big Faker and His Big Date with Big Data," *John Young Column* (Feb. 27, 2017); Jamie Doward, Carole Cadwalladr & Alice Gibbs, "Watchdog to Launch Inquiry into Misuse of Data in Politics," *The Guardian* (March 4, 2017); *Diplomat Magazine*, "Big Data and the Future of Democracy: The Matrix World Behind the Brexit and the US Elections" (March 5, 2017); Zach Marzouk, "ICO Investigates Data's Role in Political Campaigns," *ITPro.* (March 6, 2017); Michael Van Sickler, "Another Link Between Trump and that Russian Oligarch," *Tampa Bay Times* (March 16, 2017); Violet Blue, "The Facebook President and Zuck's Racist Rulebook," *Engadget* (March 26, 2017); Mattathias Schwartz, "Facebook Failed to Protect 30 Million Users from Having Their Data Harvested by Trump Campaign Affiliate," *The Intercept* (March 30, 2017); Nina Burleigh, "How Big Data Mines Personal Info to Craft Fake News and Manipulate Voters," *Newsweek* (June 8, 2017); Stephanie Wood, "What That Facebook Quiz Is Doing to Your Privacy," *The Sydney Morning Herald* (July 21, 2017); Sue Halpern, "How He Used Facebook to Win," *The New York Review* (June 8, 2017); Carole Cadwalladr, "British Courts May Unlock Secrets of How Trump Campaign Profiled US Votes," *The Guardian* (Sept. 30, 2017); Stephanie Kirchgaessner, "Cambridge Analytica Used Data from Facebook and Politico to Help Trump," *The Guardian* (Oct. 26, 2017); Oversight Democrats, "Conyers & Cummings Demand Top Trump Campaign Consultants Disclose Details of Campaign Data Operations" (Oct. 26, 2017); and Sandy Parakilas, "We Can't Trust Facebook to Regulate Itself," *The New York Times* (Nov. 19, 2017). As the District Court noted, "most of these articles focus on other topics, mentioning Cambridge Analytica's data collection only in passing," and "in some of those Facebook and Cambridge Analytica denied any relationship with each other." MTD Opinion at 23.

SEC filings that unauthorized data access was merely a hypothetical risk, rather than an already-materialized fact and an ongoing one to boot, and Defendants represented that Facebook users controlled their data on the Facebook platform.

103. In sum, Facebook's fraudulent course of conduct artificially inflated its shares by concealing from investors that (i) an amount of the Company's revenue was based on unsustainable practices allowing third-party access to user data, (ii) the Company would have to shoulder substantial auditing and programming costs once it was compelled to shut off unconsented third-party access to user data, (iii) the Company faced substantial legal and financial liability for violating the FTC consent decree that bound it, (iv) the Company faced the risk of diminished use due to reputational harm, and (iv) the risk of expensive regulation in the U.S. was substantial.

### B. Event Studies May Be Used to Measure Share-Price Inflation in This Litigation

104. In general, an event study may be used to measure the market's reaction to value-relevant information.[114] A corrective disclosure is one type of value-relevant information, in that it reveals value-relevant truth previously concealed or distorted by misrepresentations and/or omissions. Event studies focused on dates on which the market learned additional information about the previously concealed or distorted relevant truth are well suited to measuring the price impact of misrepresentations and/or omissions. Thus, for dates on which the market learned additional information about the relevant truth that was previously concealed, obscured, or muted by the Company's false and/or misleading statements, an event study can be used to measure the

[114] Indeed, prominent financial economist Eugene Fama has argued that event studies are so direct a measure "of the adjustment of prices to public announcements" that he proposed using the term "event studies" in place of the term "semi-strong-form tests of the adjustment of prices to public announcements." Eugene F. Fama, *Efficient Capital Markets: II*, 46 J. Finance 1575, 1577 (1991).

share-price impact of that news.

105. Accordingly, both loss causation and the calculation of share-price inflation in this case are amenable to measurement in whole or in part using event studies that apply classwide and rely on common proof.[115]

106. The share-price inflation amounts removed on corrective disclosure dates are available for use in backcasting the share-price inflation that was operative on Class Period dates before the corrective disclosures occurred.

(a) Given that that Plaintiffs' theory of liability alleges that Defendants' misleading statements and omissions concealed and distorted the same relevant truth from the outset of the Class Period through and until each corrective disclosure removed share-price inflation, I can use a constant-dollar approach to calculate the share-price inflation for each date in the Class Period that precedes a corrective disclosure date. Under the constant-dollar approach, the share-price inflation associated with each $1 drop in share price due to corrective disclosures is treated as being $1.[116]

(b) Alternatively, I can use a constant-percentage approach, in which case it is assumed that each 1% drop in share price due to a corrective disclosure would have been associated with a 1%-lower share price on dates when the stock price was inflated.[117] As discussed below, Facebook's Stock price drop on July 26, 2018 was, in percentage terms,

---

[115] Jill E. Fisch, Jonah B. Gelbach, and Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tex. L. Rev. 553, 555 (2018).

[116] In other words, it is assumed (or shown) that a corrective "disclosure at any time in the past would also have resulted in a stock price decline of $1." David Tabak and Chudozie Okongwu, *Inflation Methodologies in Securities Fraud Cases: Theory and Practice*, NERA Working Paper 2 (Jul. 2002).

[117] *Id*.

very much in line with the guidance the Company provided on July 25 regarding the depression in its future operating margin. Both the Company's actual share price drop and the share price drop one would have expected based on the Company's guidance were approximately 20%. Accordingly, share-price inflation associated with the July 25 share price drop may be appropriately measured on a constant-percentage basis. I return to this issue below.

(c) Further, I can use a combination of the above, for example, I can use the constant-dollar method to measure the share-price inflation associated with the March 19 and 20, 2018 declines, and the constant-percentage method to measure the share-price inflation associated with the July 26, 2018 decline.

(d) For present purposes, the key point is that each of the approaches outlined above is consistent with Plaintiffs' theory of liability, applies classwide, and is based on analyses and proof that are common to all proposed Class members.

107. With share-price inflation calculated for each date in the Class Period, damages can then be estimated for each combination of purchase and sale date (or retention through the lookback period) using out-of-pocket damages, as limited by applicable statutes. All these calculations are done on a classwide basis without reference to the actions or facts about individual class members. The actual damages owed to each class member will then be computable using objectively determinable trading history data, such that a third-party claims administrator can determine individual damage amounts without need for any individualized adjudication.

## C. Provisional Calculations of Artificial Share-Price Inflation

108. The Complaint alleges that class members suffered losses associated with Stock

price declines on March 19 and 20, 2018, as well as on July 26, 2018.[118] In my opinion, these losses were caused or at least partially caused by market reaction to news that exposed Defendants' control and risk statements as false and misleading, including about Facebook's Cambridge Analytica and/or whitelisting scandals and their impact on Facebook's business.

### a. The March 2018 Stock Price Declines

109. March 19, 2018 was the first trading day following Facebook's March 16, 2018 blog post and the news stories about Facebook and Cambridge Analytica that *The Guardian* and *The New York Times* published on Saturday March 17. Thus, Monday, March 19 was the first date on which the market could respond to the adverse news. Facebook's Stock price dropped 6.8% that day.[119]

110. News reports indicated that other concerns weighed on investors on March 19, 2018. For example, CNBC reported that "analysts say there are plenty of reasons for selling to continue":[120]

(a) "Fear of a global trade war tops the list of worries sparked by the Trump administration."

(b) "[A]nalysts also say the personnel shakeups and concern over the ongoing

---

[118] Complaint, ¶ 668. The Complaint also identifies March 22, 23, and 27, 2018 as additional dates when Cambridge Analytica-related "disclosures . . . impacted the price of Facebook's common stock." *Id.* I understand that Plaintiffs do not currently intend to pursue the stock price declines on these dates as part of their damages claims.

[119] Complaint, ¶ 669.

[120] Patti Domm, "Stock market meltdown has to do with a lot more than just Facebook," March 19, 2018, https://www.cnbc.com/2018/03/19/tech-stock-market-meltdown.html. *See also* Matt Phillips, "Facebook and Other Tech Companies Drag Down Stock Markets," *The New York Times*, March 19, 2018, https://www.nytimes.com/2018/03/19/business/facebook-stock-market.html.

Russia investigation, including whether President Donald Trump will fire the special prosecutor, are also hanging over the market." More generally, there was "an atmosphere of uncertainty being created by the White House."

(c) "[T]he economy seems to have lost some oomph. Economists no longer see 3 percent growth forecasts for the current quarter. Recent real estate and retail sales data raise questions about what is going on with the consumer."

(d) "[T]here is concern Fed interest rate hikes could slow things down even more."

111. These developments help explain why March 19, 2019 saw log returns of -0.031 for Google, -0.023 for PayPal, -0.017 for Amazon, and -0.015 for Apple, to pick a few prominent tech stocks whose log returns enter the indexes used in both Model 1 and Model 2. All else equal, a day that saw declines like these can be expected to see a drop in Facebook's Stock price as well.

112. To investigate whether Facebook's Stock price decline on March 19 is explained by these other market developments, I used the Model 1 and Model 2 regression approaches, discussed in Part VI.E above, to calculate Facebook's abnormal return for March 19. The Model 1 abnormal return was -0.0509, and the Model 2 abnormal return was -0.0470. That is, according to Model 1, Facebook's log return was 5.09 log points lower than my regression model predicted it would be based on market and industry news and conditions on the same day; according to Model 2, Facebook's log return was 4.70 points lower than predicted.

113. These abnormal returns are noticeably smaller in magnitude than Facebook's actual log return of -0.070.[121] The difference indicates that roughly 2 log points of the drop in Facebook's

---

[121] The log return of -0.07 differs slightly from the raw return of -6.8% described in the Complaint. The relationship between the log return ("LogReturn") and the raw return ("RawReturn") is $LogReturn = \ln(1 + RawReturn)$, where "ln" refers to the natural log.

Stock price (*i.e.*, 7.0 points less either 5.09 or 4.70) were explained by the March 19 negative news that was not unique to Facebook.

114. This discussion illustrates the role that the regression models play in removing confounding information that operates through the influence of negative market and industry-specific developments.

115. It is my opinion that both the -0.0509 (Model 1) and -0.0470 (Model 2) abnormal returns likely underestimate the impact of the Cambridge Analytica news on Facebook's value. This is because Facebook's peer group is heavily concentrated in the tech sector, and the news about Cambridge Analytica created spillover effects on that sector, over and above its effects on Facebook in particular. As media reports made abundantly clear, market participants thought that Facebook's Cambridge Analytica scandal increased the chances of legislation increasing regulation not just of Facebook, but also of other technology firms whose business models place them in possession of user data.[122] The threat of regulation was one factor repeatedly cited for the drop in stock prices across the tech sector.[123]

116. Thus, using the Model 2 abnormal return of -0.0470, as I will do for illustrative

[122] Examples among Facebook's peer group are Google, PayPal, Amazon, Apple, and Netflix.

[123] For example, the director of floor operations at UBS commented that "the biggest worry" was "that all these high-tech stocks which were potentially subject to some form of regulation are now wide open to some form of regulation." Matt Phillips, "Facebook and Other Tech Companies Drag Down Stock Markets," *The New York Times*, March 19, 2018, https://www.nytimes.com/2018/03/19/business/facebook-stock-market.html. A Macquarie analyst voiced "concern … that you're opening a can of worms," referring to the possibility that substantial, restrictive regulation would issue following the Cambridge Analytica scandal. Matt Turner, "Google parent Alphabet drops as tech stocks get whacked," *Business Insider*, March 19, 2018, https://markets.businessinsider.com/news/stocks/google-stock-price-drops-in-tech-selloff-2018-3-1018922118.

purposes in this provisional assessment of loss causation and damages for March 19, 2018,[124] is methodologically conservative. I may determine in the future that it is possible to use information about other tech firms' stock price response to the Cambridge Analytica scandal to calculate a reasonable estimate of the impact on Facebook's Stock price of the regulatory threat. If I do make that determination, I will adjust my provisional calculations appropriately.

117. Loss causation can be assessed by testing the following null hypothesis: *March 19, 2018 was a typical trading day, in the sense that its abnormal return could be expected to be a realization from Facebook's Non-News Date abnormal returns distribution*.[125] If this were true, the abnormal return would have had a mean of 0 and a standard deviation equal to the RMSE from Model 2, which is 0.0069. The associated t-statistic is thus -0.0470 divided by 0.0069, or -6.82.[126]

(a) Under the assumption that abnormal returns are normally distributed, this t-statistic would yield a p-value of 0 to several digits.

(b) Applying the SQ test instead, which avoids the assumption of normality,[127]

---

[124] For the reasons discussed in Appendix C, my opinion is that Model 2 offers greater flexibility, which I have argued elsewhere is an enhanced feature of this approach. I have also included the standard equal-weighting approach in my analyses, as Model 1.

[125] Unless otherwise noted, all discussions and conclusions below with respect to alleged corrective disclosure dates involve testing this null hypothesis against the alternative hypothesis that *the abnormal return reflected a price drop*; on dates when statements are alleged to have caused an increase in Stock price due to artificial share-price inflation, the alternative hypothesis would be that *the abnormal return reflected a price increase*.

[126] Because the Model 1 RMSE of 0.0091 is considerably greater than Model 2's, the Model 1 t-statistic is -5.60; this value is still large enough that all my conclusions would follow just the same were I to adopt the Model 1 estimates rather than Model 2's.

[127] Both the Model 1 and the Model 2 results indicate that this assumption is inconsistent with the empirical distribution of abnormal returns. As discussed in detail in footnote 97 above, my scholarly research has shown how to appropriately test the null hypothesis at issue here without relying on the assumption of normality; the solution involves using the SQ test described in Jonah

yields a p-value of 0.004.

(c) Both these p-values indicate that the March 19, 2018 abnormal return is statistically significantly different from 0 at the 1% significance levels (and therefore the 5% and 10% levels as well),[128] meeting the conventions of academic statistical significance testing that are often applied in securities litigation.

(d) My provisional conclusion is therefore that March 19 saw a significant Stock price drop, even after accounting for industry and market impacts, indicating that class members who bought before March 19 and retained thereafter sustained losses due to Defendants' misleading statements.[129]

118. The Complaint also alleges that class members suffered losses due to the Stock price drop on March 20. The Complaint alleges that following the initial disclosure of Cambridge Analytica news over the weekend of March 16-18, "reporters continued to link the news about Cambridge Analytica's continued control and misuse of millions of Facebook users' data directly to the notion that users and even Facebook lacked control over user data," citing several articles, including the March 20 piece in *The Guardian*, discussed above at ¶ 17.[130]

---

B. Gelbach, Eric Helland, Jonathan Klick, *Valid Inference in Single-Firm, Single-Event Studies*, 15 Am. L. & Econ. Rev. 495 (2013).

[128] Further, Chebyshev's inequality, *see, e.g.*, E.L. Lehmann & Joseph P. Romano, *Testing Statistical Hypotheses* 472 (3d ed. 2005), implies that the probability of observing an abnormal return with an absolute value at least 6.82 times its standard deviation is no greater than 0.021. Because the relevant alternative hypothesis concerns the abnormal return rather than its absolute value, the relevant p-value must be even less than that. Accordingly, appeal to Chebyshev's inequality is sufficient to demonstrate that the March 19 abnormal return is statistically significant at the 5% level regardless of the structure of the abnormal returns distribution.

[129] I discuss provisional damages calculation below.

[130] Complaint, ¶¶ 676, 680.

119. Thus, the evidence shows that the mix of information available to the public continued to develop between market closing on the days of March 19 and March 20.

120. To be sure, even if new value-relevant information had *not* reached the public on these days, it would be possible for the March 16-17 news about Facebook's user data scandal to have caused the additional price drop observed on March 20. One widely cited article on event study methodology found clear evidence that the market response to earnings announcements can extend past the first post-news trading date.[131] Earnings announcements occur on dates that are known in advance, whereas events like the disclosure of the Cambridge Analytica scandal take investors by surprise. That it can take multiple days for the market to digest information even when it is prepared to receive such information makes it all the more plausible that it would take more than a day for the market to digest and process surprise news like the Cambridge Analytica scandal.[132]

121. My event study results for March 20, 2018 yield abnormal return values for this day of -0.0255 (Model 1) and -0.0293 (Model 2). The RMSE for the Model 2 estimate was 0.0066 for this date, with the t-statistic being -4.46.[133]

(a) Under the assumption that abnormal returns are normally distributed, this t-statistic would yield a p-value of 0 to several digits.

---

[131] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Lit. 13, 25-26 (1997).

[132] In addition, a recent and widely cited review of the literature documents additional evidence that full adjustment of stock prices to new information sometimes takes more than one trading day. Elizabeth Blankespoor, Ed deHaan and Ivan Marinovic, *Disclosure Processing Costs, Investors' Information Choice, and Equity Market Outcomes: A Review*, 70 J. Accounting & Econ., Issues 1 (2020).

[133] The Model 1 t-statistic is -2.80; this value is large enough that all my conclusions about March 20 would follow just the same were I to adopt the Model 1 estimates rather than Model 2's.

(b) Applying the SQ test instead, which avoids the assumption of normality,[134] yields a p-value of 0.004.

(c) Both these p-values indicate that the March 20, 2018 abnormal return is statistically significantly different from 0 at the 1% significance level (and therefore the 5% and 10% levels as well),[135] meeting the conventions of academic statistical significance testing that are often applied in securities litigation.

My provisional conclusion is therefore that March 20 saw a significant Stock price drop, even after accounting for industry and market impacts, indicating that class members who bought before March 19 and retained thereafter sustained losses due to Facebook's fraudulent statements.[136]

### b. The July 2018 Stock Price Decline

122. The last corrective disclosure identified in the Complaint occurred on July 25, 2018, when Facebook issued, after the market closed, earnings for the second quarter of 2018.[137]

[134] Both the Model 1 and the Model 2 results indicate that this assumption is inconsistent with the empirical distribution of abnormal returns. As discussed in detail in footnote 97 above, my scholarly research has shown how to appropriately test the null hypothesis at issue here without relying on the assumption of normality; the solution involves using the SQ test described in Jonah B. Gelbach, Eric Helland, Jonathan Klick, *Valid Inference in Single-Firm, Single-Event Studies*, 15 Am. L. & Econ. Rev. 495 (2013).

[135] Further, Chebyshev's inequality, *see, e.g.*, E.L. Lehmann & Joseph P. Romano, *Testing Statistical Hypotheses* 472 (3d ed. 2005), implies that the probability of observing an abnormal return with an absolute value at least 4.46 times its standard deviation is no greater than 0.0503. Because the relevant alternative hypothesis concerns the abnormal return rather than its absolute value, the relevant p-value must be even less than that. Accordingly, appeal to Chebyshev's inequality is sufficient to demonstrate that the March 19 abnormal return is almost certainly statistically significant at the 5% level regardless of the structure of the abnormal returns distribution.

[136] I discuss provisional damages calculation below.

[137] Complaint, ¶ 668.

123. The abnormal return for the next trading day, July 26, 2018, was -0.2162 according to Model 1 and -0.2089 according to Model 2. Both have extremely large t-statistics that correspond to p-values of 0 to many digits regardless of whether one assumes that abnormal returns follow a normal distribution on typical dates or not.[138] I conclude that the July 26, 2018 abnormal return is statistically significant at the 1% level. My provisional opinion is that Facebook's July 25 disclosure caused class members to sustain losses on July 26.

124. Two other dates bear on the understanding of the July 26 abnormal return: April 26, 2018, which was the day after Facebook's 1Q2018 earnings release, and June 4, which was the first trading day after *The New York Times* broke the story about whitelisting.

125. In its earnings call on April 25, 2018, Facebook reported unexpectedly strong results. The Company's Stock price shot up 9%.[139] This market response reflected the sentiment that, however bad the Cambridge Analytica scandal was in terms of public relations and the threat of future regulation, widely voiced concerns that it would harm Facebook's revenue and earnings paths had been off-base.

126. The July 25, 2018 earnings release demonstrated that that optimism was misplaced. This context is important for understanding why the market responded so negatively: it had already responded *positively* to Facebook's Q1 2018 results, suggesting that it was, financially

---

[138] The Model 1 t-statistic is -19.90, and the Model 2 t-statistic is -23.64. The p-values based on assuming normality of abnormal returns are 0 to many digits, and the SQ p-values (which don't require maintaining the rejected normality assumption) are 0 for both models. And as noted in footnote 128 above, Chebyshev's inequality also can be used here. Applying the inequality indicates that the p-value is no greater than the square of 1/23.64, which is 0.002. Accordingly, even with no assumptions at all about the shape of the abnormal returns distribution, Chebyshev's inequality implies that the abnormal return on July 26, 2018 is statistically significant at the 1% level.

[139] Complaint, ¶ 682.

speaking, relatively unphased by the scandal.[140]

127. June 4, 2018 was the first trading day after *The New York Times* story on Sunday, June 3, 2018 about Defendants' whitelisting practices. The Company published a blog post asserting that it disagreed with *The New York Times* story,[141] and the Company also tweeted at a Member of Congress that the *Times* "is wrong about user controls."[142] There was little reaction from analysts.[143] The Stock price fell just 0.37%, while the S&P 500 index increased 0.45%.

128. I computed abnormal returns for this date given its potential importance as a corrective disclosure date.[144] The June 4 abnormal returns were -0.0109 for Model 1 and -0.0169

[140] One can think of this combination of facts as being similar to a patient whose initial test suggests he might not have contracted a feared disease, but who then gets results from a subsequent test that definitively show he has the disease. In both the medical test example and the Facebook reality, the initial news created a baseline for optimism that naturally magnified the impact of subsequent negative news.

[141] Facebook, "Why We Disagree with The New York Times," https://about.fb.com/news/2018/06/why-we-disagree-with-the-nyt/, June 3, 2018.

[142] @Meta, Twitter (June 4, 2018, 3:53 PM), https://twitter.com/Meta/status/1003665970089603072.

[143] One analyst report mentioned *The New York Times* whitelisting story. SunTrust, "Internet - FB and GOOGL Back in Media Spotlight; Valuation Hits 5-Yr. High" at 1, 4 (Jun. 8, 2018). This report, which is dated several days after June 4, briefly discussed the *Times* story in the context of the Cambridge Analytica scandal and linked it to the FTC consent decree and the possibility of additional regulation. It did not discuss the revenue or cost implications of Facebook's whitelisting practices or their termination. The *Times* story received no mention in any of the other four analyst reports that were published between June 4 and June 11, 2018 and of which I am aware; these reports were Deutsche Bank, "Snap User Growth on Uptrend; FB Stable post GDPR" (Jun. 5, 2018); Needham, "Facebook, Inc. (FB): FB vs SNAP vs TWTR - Spending Shifts" (Jun. 6, 2018); Morgan Stanley, "India Summit 2018: How Facebook and Google Driving Digital Payments" (Jun. 8, 2018); Jefferies, "Match Group (MTCH): Data Shows Long-Term FB Impact Will Be Limited: Upgrade to Buy" (Jun. 11, 2018).

[144] It is my understanding that the Complaint identifies June 3, 2018 as a date on which fraud-related news was released, but does not claim damages for the market's reaction on June 4, 2018.

for Model 2.[145] The associated t-statistics were -1.04 for Model 1 and -1.65 for Model 2. These correspond to a p-value above 0.10 for Model 1 (whether I maintain the assumption of normality or use the SQ approach); for Model 2, the p-value is 0.05 under the maintained assumption of normally distributed abnormal returns, and 0.025 using the more flexible SQ-based approach. Thus, whether the June 4 abnormal return meets conventional levels of statistical significance depends on whether one adopts the conventional equal-weighting-based approach of Model 1 or Model 2's data-driven index weighting.

129. What can be said with confidence based on these results is that, although Facebook's near-zero actual return on June 4 may have masked price drop associated with *The New York Times* whitelisting story, the magnitude of any such price drop was comparatively small—less than 2 points.

130. In light of the facts and analysis provided in earlier parts of this report, it is my opinion that the market had not yet internalized the full significance of the June 3, 2018 whitelisting revelation. When the July 25, 2018 earnings release occurred, the market appreciated the significance of the full magnitude and impact on Facebook of the whitelisting scandal and the Cambridge Analytica scandal.

131. Zuckerberg led off the Company's Q2 2018 earnings call on July 25, 2018, stating: "Looking ahead, we will continue to invest heavily in security and privacy," and that "we're

---

[145] What drives the Model 2 result for June 4 is that the S&P 500 increased that day, while several of Facebook's peers in the regression model's Peer Group—which were Google, Amazon, Apple, PayPal, and Netflix—all had positive returns, with Google, PayPal and Amazon each having log returns of between 0.014 and 0.016. Meanwhile, Cisco and AT&T, which both enter the June 4 data-driven index negatively (meaning that their returns are negatively associated with Facebook's), both had small negative returns. Thus, June 4 was a day on which, all else equal, Facebook's peers' performance suggested that the Company could be expected to have a positive return—contrary to its actual performance.

investing so much in security that it will significantly impact our profitability. We're starting to see that this quarter."

132. Later, Wehner described a worsening revenue path: "Our total revenue growth rate decelerated approximately 7 percentage points in Q2 compared to Q1. Our total revenue growth rates will continue to decelerate in the second half of 2018, and we expect our revenue growth rates to decline by high single-digit percentages from prior quarters sequentially in both Q3 and Q4."

133. This worsening revenue path would be accompanied by faster growth in expenses, with Wehner further starting that "[o]ver the next several years, we would anticipate that our operating margins will trend towards the mid-30s on a percentage basis."

134. It is common sense that when a company announces bad news of this magnitude, its stock price will sink—as Facebook Stock did, by 19% on July 26, 2018.

135. The event study evidence for the July 26, 2018 Stock price drop can be contextualized by considering information in the record in this case.

136. First, in Facebook's July 25, 2018 earnings call, CFO Wehner announced that the Company expected its operating margin to trend down to "the mid-30s," and that this would occur over a period of several years, which he characterized as "more than two, but less than many" years. Facebook's operating margin had been 50% in 2017[146] and 45% in 2016.[147] Facebook's own internal communications [redacted]

[146] Facebook, "Facebook Reports Fourth Quarter and Full Year 2017 Results," January 31, 2018, https://investor.atmeta.com/investor-news/press-release-details/2018/Facebook-Reports-Fourth-Quarter-and-Full-Year-2017-Results/default.aspx.

[147] *Id.* In contrast to his Q2 2018 earnings commentary, Wehner's Q1 2018 statement was unaccompanied by any guidance regarding future operating margin.

[redacted][148]

(a) I will suppose that Wehner's Q2 2018 comments mean that Facebook's operating margin would fall to 35%, and I will interpret Wehner's comments as suggesting the Company's operating margin would stay in that region thereafter in the absence of other developments.

(b) Given that investors had believed Facebook would maintain operating margins of ~43% for the next several years, a drop to 35% would leave the Company on a profitability path that was 19% lower.

(c) A common method used by investment bankers,[149] as well as analysts following Facebook,[150] to value firms is to multiply a measure of earnings by a figure known as an "earnings multiple." Thus, if earnings fall by a given percentage P relative to previous expectations, then if the earnings multiple is unchanged, the company's overall value falls by the same percentage P.[151]

(d) Thus, Facebook's Q2 2018 guidance that it expected its operating margin to drop to ~80% of its previous level would naturally cause people who use the earnings

---

148 [redacted]

149 With respect to investment bankers, *see, e.g.*, Joshua Rosenbaum & Joshua Pearl, INVESTMENT BANKING: VALUATION, LBOS, M&A, AND IPOS 51-53 (3rd Ed. 2020).

150 *See, e.g.*, Bank of America, *Facebook 4Q Quick Take*, February 1, 2017, at 1; Credit Suisse, *Facebook Inc.: Opportunity Arises, as News Flow Rubs Salt Into the Wound*, March 19, 2018 at 2; UBS, *Facebook: And Now Turning Back to the Business*, April 25, 2018 at 4; RBC Capital Markets, *Facebook, Inc.: Don't Unfriend FB Now…*, July 25, 2018 at 2.

151 This analysis also assumes that the Company's revenue path (as distinct from the operating margin Facebook would realize from revenue at a given time) remained unchanged. To the extent that Facebook's omissions and false and misleading statements misled the market into overestimating its revenue path, the analysis below is actually conservative.

multiple valuation method to reduce their estimate of Facebook's value by ~20%.

(e) This drop would be tempered slightly by the fact that it would take "several" years for operating margins to bottom out.

(f) These facts suggest that Facebook's actual Stock price drop on July 26, 2018 was quite consistent with the Company's own guidance in the earnings call the day before.

137. The same earnings call featured commentary downplaying the role of other potential explanations for the Company's dimmed outlook, such as GDPR. For example, Wehner observed on the call that GDPR's rollout "didn't have a significant impact in Q2" and would only have "some modest impact" going forward. On the same call, Sandberg similarly stated that "GDPR has not had a significant revenue impact."

138. And the call included clear references to the follow-on effects of the changes Facebook undertook after the public learned the revelations about Cambridge Analytica.

(a) Among the factors Wehner mentioned as causes of the revenue slowdown was "giving people who use our services more choices around data privacy," which he said "may have an impact on our revenue growth." As noted above, Facebook's revenue is virtually all from advertising sales, so Wehner's comment demonstrates the link between users' data privacy and advertising revenue.[152]

152 [redacted]

(b) The Company's operating costs ballooned as it undertook the audits and other steps that Zuckerberg publicly promised in March, with Zuckerberg acknowledging that these investments in security and privacy would "significantly impact our profitability."[153]

139. Viewed in this full context, then, the earnings call, especially including Wehner's comments about operating margin, provide strong reason to believe that the July 26, 2018 Stock price response to the news in Facebook's earnings announcement was a reasonable magnitude and was driven by factors that are traceable to the alleged fraud, rather than some other explanation.

140. In sum, it is my opinion that the July 26, 2018 Stock price drop was the result of the market newly appreciating the significance of the Cambridge Analytica and whitelisting scandals.

### D. It is Possible to Use Traditional Tools of Financial Economics That Apply Classwide to Remove Any Confounding Effects

141. I understand that damages in this litigation cannot be awarded for losses caused by

[redacted]

153 [redacted] In mid-May, a Facebook VP had stated that "large teams of internal and external experts" were "working hard to investigate" the apps in question, that "thousands of apps have been investigated"—and even so, he admitted that "[t]here is a lot more work to be done to find all the apps that may have misused people's Facebook data—and it will take time." Ime Archibong, An Update on Our App Investigation and Audit, https://about.fb.com/news/2018/05/update-on-app-audit/, May 14, 2018.

events that are not themselves traceable to securities fraud.

142. I recognize that Facebook may have internal documents that quantify causes of reduced revenue or increased costs that would not be connected to the fraudulent conduct at issue in this litigation. If so, it will be possible to calculate the impact on Facebook's value that is associated with these factors using traditional tools of financial economics that apply classwide and are common to all proposed Class members. One avenue would be to use a multiples-based approach, whether involving earnings or some other metric.[154] Another approach would be to use discounted cash flow (DCF) analysis[155] to measure the present value to the Company of changes in its revenues or costs due to factors unrelated to the fraud at issue here.[156]

143. If it is determined that any confounding information affected the Stock price reactions on March 19-20, 2018 or July 26, 2018, the traditional tools of financial economics discussed above will be available to assess the impact of such confounding information in a manner common to all proposed Class members. I note, though, that my preliminary review of the information environment does not indicate that any confounding information materially contributed to the March 19-20, 2018 Stock price declines. Specifically, based on my preliminary

---

[154] Various measures may be used with multiples-based valuation. One possibility is revenue-based multiples. Aswath Damodaran, "Relative Valuation: First Principles." DAMODARAN ON VALUATION: SECURITY ANALYSIS FOR INVESTMENT AND CORPORATE FINANCE, 233–54, §7.4.3 (2012), https://doi.org/10.1002/9781119201786.ch7. This approach might be especially well suited to valuing revenue effects based on Facebook's internal documents in the current case. Another common approach to multiple-based valuation is to use earnings before interest, taxes, depreciation, and amortization, or EBITDA. Various measures of firm value may be used, including the share price and the enterprise value (which combines the value of the firm's equity, debt, and other financial categories). *See, e.g.*, Joshua Rosenbaum & Joshua Pearl, INVESTMENT BANKING: VALUATION, LBOS, M&A, AND IPOS 51-53 (3rd Ed. 2020).

[155] *See, e.g.*, Joshua Rosenbaum & Joshua Pearl, INVESTMENT BANKING: VALUATION, LBOS, M&A, AND IPOS 115-46 (3rd Ed. 2020).

[156] These tools are frequently used by analysts to construct measures of company value.

analysis, it does not appear that any other value-relevant, non-fraud related information was released during this time period that might explain the March 19-20, 2018 Stock price declines. Thus, it is my preliminary opinion that the March 16, 2018 Facebook blog post and the March 17 and 20, 2018 news articles—which confirmed for the first time, *inter alia*, that Facebook had known since 2015 of the sale of users' data to Cambridge Analytica and the extent of that and similar data misuse—are what impacted the Stock price on March 19-20, 2018. Moreover, these disclosures are fraud-related. First, these disclosures revealed that users did not control their data and that Facebook had experienced a major data misappropriation and misuse incident, despite the fact that Defendants had claimed such incidents were merely hypothetical possibilities. And second, these disclosures permitted the market to appreciate, at least in part, the foreseeable consequences of the data misappropriation and lack of user control. In sum, it is my preliminary determination that there is no confounding information affecting the Stock price on March 19-20, 2018.

144. I note in addition that, based on my preliminary analysis of the information environment, it does not appear that any confounding information materially impacted the July 26, 2018 price decline. Rather, the Stock price reaction on that date was in response to Facebook's July 25, 2018 (after hours) announcement of Q2 2018 earnings. As discussed above at ¶¶ 131-133 and 136-137, the July 25, 2018 earnings release and conference call announced negative results related to revenue, margins, costs, and outlook. As also discussed above, at ¶ 138, the July 25, 2018 announcements revealed the foreseeable consequences of the Cambridge Analytica and whitelisting scandals—including the need for remediation and increased security expenditures, greater regulatory and legal exposure, reputational harm, and adverse effects on revenue, growth, profitability, and operating costs.

145. However, if discovery reveals that some portion of Facebook's disappointing revenue, margin, or cost announcements on July 25, 2018 were caused by non-fraud-related factors, I will employ appropriate financial tools that apply classwide and are based on proof common to all proposed Class members to estimate the impact of those non-fraud-related factors and exclude that impact from my estimate of per-share artificial inflation. For example, the July 25, 2018 conference call included some discussion of the impact of GDPR. Although Defendants downplayed its impact, if further discovery reveals that GDPR did have an appreciable impact on the announced financial metrics, I will use appropriate tools of economic analysis to estimate that impact and exclude it from my estimate of per-share artificial inflation.

(a) Suppose that discovery reveals that GDPR reduced Facebook's future annual earnings path by X dollars each year. Then DCF or multiples-based analysis could be used to calculate the impact on the Company's value of having X fewer dollars in earnings each year. Appropriate adjustment to share-price inflation would then be feasible using a constant-dollar approach to the adjustment.

(b) If discovery revealed that the impact were measured in percent of earnings rather than dollars of earnings, a multiples-based approach would be appropriate. Appropriate adjustment to share-price inflation would then be feasible using a constant-percentage approach to the adjustment.

(c) The key point is that these analyses would be based on proof that is common to all proposed Class members and applies classwide.

146. In sum, based on my current analysis, there does not appear to be any confounding information that impacted the March 19-20, 2018 Stock price declines. The same is true of the July 26, 2018 Stock price decline. But if discovery reveals that some portion of these stock price

declines was caused by non-fraud-related factors, I will assess its impact and appropriately exclude it from my estimate of per-share artificial inflation. I will re-evaluate these opinions as appropriate in response to any evidence Facebook provides in discovery, as well as any other additional information of which I become aware.

### E. Provisional Damages Calculation Based on Artificial Share-Price Inflation Calculations

147. It is possible to use the share-price inflation calculations from above to calculate per-share damages on a classwide basis for all Class members under §10(b) of the Exchange Act and SEC Rule 10b-5 using the standard and well-accepted method known as "out-of-pocket" damages.[157]

(a) Damages are calculated formulaically under this approach, as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale, subject to applicable statutory limitations.

(b) For shares that were not sold before the final corrective disclosure, damages are limited by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), based on a 90-day "lookback period":[158] "the award of damages to the plaintiff shall not exceed the difference between the purchase . . . price paid . . . by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the

[157] For the reasons given above, I do not make any confounder adjustments to share-price inflation amounts in the provisional analysis I provide here. If any confounder adjustments to share-price inflation ultimately are necessary, my damages calculations will take these into account appropriately.

[158] The PSLRA Look-Back Period is "the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S.C. §78u-4(e)(1)

action is disseminated to the market."[159]

148. Table 5 shows how to calculate the amount of share-price inflation that was removed from Facebook's Stock on each corrective disclosure date, measured in dollar terms. These calculations use the fact that the abnormal return for day $t$ equals the part of that day's log return that is unexplained by the log returns of the S&P 500 and the log returns of the included peer companies. It can then be shown that the percentage change impact on day $t$ is $100\% \times [\exp(AR_t) - 1]$, which is what Table 5 reports under the heading "Percentage Price Impact." The share-price inflation removed on a given day, which is reported in the table's last column, is the product of this percentage change impact and the previous day's closing price. The key results are as follows:

(a) On March 19, the share-price inflation removed was 4.59%, corresponding to $8.50 per share.

(b) On March 20, the share-price inflation removed was 2.89%, corresponding to $4.99 per share.

(c) On July 26, 2018, the share-price inflation removed was 18.86%, corresponding to $41.02 per share.

**Table 5: Share-Price Effects Corresponding to Artificial Share-Price Inflation**

| Event Trading Date | Percentage Price Impact | Previous Closing Price | Share Price Inflation Removed |
|---|---|---|---|
| **3/19/2018** | -4.59% | $185.09 | -$8.50 |
| **3/20/2018** | -2.89% | $172.56 | -$4.99 |
| **7/26/2018** | -18.86% | $217.50 | -$41.02 |

159 *Id.*

149. Using a constant-*dollar* approach for all corrective disclosure dates, the loss associated with the revelation of information on any date listed in Table 5 that were associated with the revelation of information in the March 16-20 and July 25 disclosures, for a class member who purchased a share during the Class Period before a corrective disclosure date listed in Table 5, and sold after that date, would equal the dollar amount of share-price inflation removed on that date. With the constant-dollar approach, the total losses for a share would equal the sum of price inflation that was removed over all dates that occurred between the dates when the share was purchased and when it was sold; for covered shares retained through July 26, 2018, the loss would include the $41.02 share-price inflation removed that day. For example:

(a) A share purchased on February 28, 2018 and held through July 27, 2018 would be associated with a loss on all dates listed in Table 5, for a total loss of $54.51.

(b) A share purchased in the Class Period and sold before March 19, 2018 would have 0 loss, as would a share that was both purchased after March 20, 2018 and sold before July 25, 2018.

(c) A share purchased on March 1, 2018 and sold on March 28, 2018 would have a loss of $13.49 ($8.50 for March 19 and $4.99 for March 20).

(d) A share purchased on May 15, 2018 and sold on July 27, 2018 would have a loss of $41.02.

150. To illustrate how a constant-*percentage* approach could be used, I will assume for the purposes of demonstration that the share-price inflation associated with the July 26, 2018 disclosure is treated on a constant-percentage basis. Consider a share purchased on May 1, 2018, at the closing price of $173.86. Treating the July 26, 2018 disclosure on constant-percentage basis implies that this purchase price was inflated by $32.79 (18.86% of $173.86). For a share purchased

at the May 2, 2018 closing price of $176.07, the inflation amount would instead be $33.21 (18.86% of $176.07).

151. It is possible to combine the use of constant-dollar and constant-percentage approaches. This would occur, if, for example, I determined that March 19 and 20 would more appropriately be handled on a constant-dollar basis whereas July 26 would more appropriately be handled on a constant-percentage basis. In that case, the calculations discussed above in ¶ 149 would apply for calculating inflation related to the March disclosure dates, whereas the calculations discussed above in ¶ 150 would apply for calculating inflation related to July 26.

152. Damages for violations of §20A of the Exchange Act also can be assessed on a classwide basis, using a common methodology consistent with Plaintiffs' theory of liability. I understand that §20A applies to investors' losses when they purchased securities contemporaneously with the sale of securities by Defendants who possessed material, nonpublic information:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.[160]

153. I understand that the §20A loss associated with a share purchased by a class member during the Class Period equals the difference between the purchase price the class member paid, and either the sale price the class member received (if the class member sold the share before the final corrective disclosure) or the value of the share following the July 25, 2018 corrective disclosure that eliminated remaining artificial price inflation (if the class member retained the share

[160] 15 U.S.C. §78t-1(a).

that long).

154. A class member's total loss for purposes of §20A then equals the sum of that class member's §20A-covered losses for all affected shares. The total loss experienced by each class member who suffered losses under §20A therefore will be calculable using only information from trading records and—for those who retain the share after the July 25, 2018 corrective disclosure eliminated all artificial price inflation—market prices.

155. Damages under §20A are limited by the following statutory language:

> The total amount of damages imposed under subsection (a) shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the violation.[161]

156. To calculate this statutory damage limitation for any proven §20A claims requires only the calculation of the profit gained or loss avoided by any Defendants found liable. For an affected share, the loss avoided equals the decline in the price between the sale and the July 25, 2018 corrective disclosure that, according to Plaintiffs, eliminated all remaining artificial price inflation. The total loss avoided for a Defendant equals the sum of that Defendant's loss avoided over all affected shares.

157. If a Defendant's losses avoided is less than the total §20A losses sustained by class members, then the total §20A damages for that Defendant will be limited to that Defendant's losses. These losses can then be divided among the affected class members on a *pro rata* basis.

158. Implementing the limitation on §20A damages thus requires no individualized information other than what can be obtained via objective trading records, and it can be determined using a classwide formula that requires no individualized adjudication.

159. In sum: (a) damages available under §10(b) of the Exchange Act and Rule 10-5

[161] 15 U.S.C. §78t-1(b)(1).

promulgated thereunder can be calculated on a classwide basis given artificial share-price inflation calculations, and (b) damages available under §20A of the Exchange Act can be calculated on a classwide basis for covered shares because such calculation requires knowing only the purchase date and price, together with the dates of any sale.

160. Once the share-price inflation removed on each corrective disclosure date has been calculated, then, the only individualized information necessary to measure damages available for each share purchased during the Class Period is basic trading data: the share's purchase price and date; whether the share was sold within 90 days of the market's incorporation into the Facebook Stock price of the information in the corrective disclosure issued on July 25, 2018; and the sale price and date if the share was so sold. All of this individualized information is available via objective trading records.

161. All steps of the process of creating the damages formula involve only classwide determinations about share price changes on various dates, and any confounding sources of price change for which adjustments are necessary. The only role for individual data will be when actual damage amounts are calculated for each class member, and the only data needed to do that will be objective information from stock trading histories.

### F. Conclusion as to the Calculation of Available Damages

162. In sum, it is my opinion that traditional tools of financial economics can be used to measure artificial price inflation on the dates relevant to this litigation consistent with Plaintiffs' theory of liability, based on common proof, and applicable classwide. All other information necessary to determine the damages available under federal securities law may be assembled via trading records of class members during the Class Period. To calculate damages, these inputs will be used in a single, classwide formula that can be implemented by a claims administrator in a manner common to all class members.

163. Therefore, it is my opinion that it is possible to calculate damages for the Exchange Act claims in this matter on a classwide basis consistent with the Plaintiffs' theory of liability.

164. Finally, I emphasize again that the various tools described above—DCF, multiples-based valuation, and event studies—are commonly used to measure aspects of firm value. Market investors have no choice but to determine the value they place on a firm given the publicly available information. To do so, they use the same categories of information I have described above, together with tools such as DCF, multiples-based valuation, and the kind of reasoning that supports event study-based valuation. Thus, the financial economics tools that I have employed for my preliminary damages analysis and plan to use at the merits stage on a full record reflect the same approaches that investors use, and that market prices therefore reflect, every day in U.S. public securities markets. Should new or additional damages-relevant information come to my attention, I will use such tools, and/or any other appropriate tool, to value it appropriately in arriving at a final damages formula for use on a classwide basis.

## VIII. Further Work

165. My work in this matter is ongoing. I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

166. I declare under penalty of perjury under the laws of the United States that the foregoing expert report is true and correct to the best of my knowledge and belief.

DATED: August 20, 2026

Jonah B. Gelbach, Ph.D., J.D.
Herman F. Selvin Professor of Law
University of California at Berkeley School of Law

# APPENDIX A

# JONAH B. GELBACH
# CURRICULUM VITAE
# JULY 31, 2026

gelbach@berkeley.edu

## CURRENT APPOINTMENT

UNIVERSITY OF CALIFORNIA AT BERKELEY LAW SCHOOL

| | |
|---|---|
| Herman F. Selvin Professor of Law | 2022-present |
| Professor of Law | 2019-2022 |

## PAST TENURE-LINE APPOINTMENTS

UNIVERSITY OF PENNSYLVANIA LAW SCHOOL

| | |
|---|---|
| Professor of Law | 2016-2019 |
| Associate Professor of Law (untenured) | 2013-2016 |

UNIVERSITY OF ARIZONA, ELLER COLLEGE OF MANAGEMENT

| | |
|---|---|
| Associate Professor of Economics (tenured) | 2007-2010 |

UNIVERSITY OF MARYLAND AT COLLEGE PARK

| | |
|---|---|
| Associate Professor of Economics (tenured) | 2005-2007 |
| Assistant Professor of Economics (untenured) | 1998-2005 |

## VISITING APPOINTMENTS

GEORGETOWN UNIVERSITY LAW CENTER

| | |
|---|---|
| Visiting Professor of Law | Spring 2025 |

NYU SCHOOL OF LAW

| | |
|---|---|
| Visiting Professor of Law | 2021-2022 |

FLORIDA STATE UNIVERSITY COLLEGE OF LAW

| | |
|---|---|
| Visiting Professor of Law and Economics | 2006-2007 |

## EDUCATION

| | |
|---|---|
| YALE LAW SCHOOL, J.D. | 2013 |
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Ph.D. (Economics) | 1998 |
| UNIVERSITY OF MASSACHUSETTS AT AMHERST, B.A. (Major: Economics) | 1993 |

## EDITORSHIPS & BOARD MEMBERSHIPS

| | |
|---|---|
| CO-EDITOR, JOURNAL OF LAW, ECONOMICS, AND ORGANIZATION | 2016-2021 |
| MEMBER, BOARD OF DIRECTORS, AMERICAN LAW AND ECONOMICS ASSOCIATION | 2017-2020 |
| SECTION CHAIR, AALS SECTION ON LAW AND ECONOMICS | 2017-2018 |

## PUBLISHED OR FORTHCOMING ACADEMIC ARTICLES AND BOOK CHAPTERS

1. *Can LLMs Replicate Surveys in Empirical Legal Interpretation?*, in LAW, BEHAVIOR, AND DECISION – RECHT, VERHALTEN UND ENTSCHEIDUNG: FESTSCHRIFT ZUM 70. GEBURTSTAG VON CHRISTOPH ENGEL 601 (Stefan Bechtold & Indra Spiecker gen. Döhmann eds., Nomos 2026).
2. Bruen*'s Tenth Amendment Problem*, 94 **University of Chicago Law Review** ___ (forthcoming 2026 or 2027) (with Jacob Charles)
3. *[Sealed Document]: An Empirical Study of Sealing Orders in the Federal Courts*, 76 **Duke Law Journal** ___ (forthcoming 2027) (with Matthew Brundage, Amy Cass, Nora Freeman Engstrom, David Freeman Engstrom, Othman Bensouda Koraichi, and Austin Peters)
4. *Validating Valuation: How Statistical Learning Can Cabin Expert Discretion in Valuation Disputes,* 52 **JOURNAL OF CORPORATION LAW** ___ (forthcoming 2026) (with Andrew Baker and Eric Talley)
5. *Codifying Plausibility Discovery: A Proposal to Amend Rule 12*, 114 **CALIFORNIA LAW REVIEW** 1029 (2026)
6. *How a Rule 23(b)(2) Class Action Could Save Law Firms From Trump*, 78 **STANFORD LAW REVIEW ONLINE** (forthcoming 2025) (with Nora Freeman Engstrom and David Marcus)
7. *The Dynamic Dilemma: Dynamics and Disuniformity in Statutory Interpretation*, in **RESEARCH HANDBOOK ON LAW AND TIME**, edited by Frank Fagan & Saul Levmore, Edward Elgar Ltd., 73-108 (2025)
8. *Shedding Light on Secret Settlements: An Empirical Study of California's STAND Act*, 92 **UNIVERSITY OF CHICAGO LAW REVIEW** 103 (2025) (with Nora Freeman Engstrom, David Freeman Engstrom, Austin Peters, & Garrett Wen)
9. *Pulling Back the Curtain on the Federal Class Action*, 17 **JOURNAL OF TORT LAW** 117 (2024) (with Deborah Hensler)
10. *Secrecy by Stipulation*, 74 **DUKE LAW JOURNAL** 99 (2024) (with Nora Freeman Engstrom, David Freeman Engstrom, Austin Peters, & Aaron Schaffer-Neitz)
11. *Tailwiz: Empowering Domain Experts with Easy-to-Use, Task-Specific Natural Language Processing Models*, in **Proceedings of the Eighth Workshop on Data Management for End-to-End Machine Learning (DEEM '24) 12, 22 (Ass'n for Computing Mach. 2024)** (with Timothy Dai, Austin Peters, David Freeman Engstrom, and Daniel Kang)
12. *Beyond Transsubstantivity*, 26 **N.Y.U. JOURNAL OF LEGISLATION AND PUBLIC POLICY** 909 (2024)
13. *Free PACER*, in **LEGAL TECH AND THE FUTURE OF CIVIL JUSTICE**, edited by David Engstrom, Cambridge University Press (2023)
14. *Power and Statistical Significance in Securities Fraud Litigation*, 11 **HARVARD BUSINESS LAW REVIEW** 55 (2021) (with Jill E. Fisch)
15. *Legal Tech, Civil Procedure, and the Future of American Adversarialism*, 169 **UNIVERSITY OF PENNSYLVANIA LAW REVIEW** 1001 (2021) (with David F. Engstrom)
16. *Machine Learning and Predicted Returns for Event Studies in Securities Litigation*, 5 **JOURNAL OF LAW, FINANCE, AND ACCOUNTING** 231 (2020) (with Andrew Baker)
17. *Estimation Evidence*, 168 **UNIVERSITY OF PENNSYLVANIA LAW REVIEW** 549 (2020)
18. *A Bayesian Approach to Event Studies for Securities Litigation*, 176 **JOURNAL OF INSTITUTIONAL & THEORETICAL ECONOMICS** 86 (2020) (with Jenny Rae Hawkins)

19. *It's all relative: Explanationism and Probabilistic Evidence Theory*. 23 **International Journal of Evidence & Proof** 168-175 (2019).
20. *The Reduced Form of Litigation Selection Models and the Plaintiff's Win Rate*, 61 **Journal of Law and Economics** 125 (2018)
21. *Rethinking Judicial Review of High Volume Agency Adjudication*, 96 **Texas Law Review** 1097 (2018) (with David Marcus)
22. *What We Don't Know About Class Actions but Hope to Know Soon*, 87 **Fordham Law Review** 65 (2018) (with Deborah R. Hensler).
23. *Error Costs, Legal Standards of Proof and Statistical Significance*, 25 **Supreme Court Economic Review** 1 (2017) (with Michelle M. Burtis and Bruce H. Kobayashi)
24. *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 **Texas Law Review** 553 (2018) (with Jill E. Fisch and Jon Klick)
25. *American Pipe Tolling, Statutes of Repose, and Protective Filings: An Empirical Study*, 69 **Stanford Law Review Online** 92 (2017) (with David Freeman Engstrom)
26. *Crushed: Social Security Litigation in the Federal Courts*, 101 **Judicature** 65 (2017) (with David Marcus)
27. *The Triangle of Law and The Role of Evidence in Class Action Litigation*, 165 **University of Pennsylvania Law Review** 1807 (2017)
28. *Can Variation in Subgroups' Average Treatment Effects Explain Treatment Effect Heterogeneity? Evidence from a Social Experiment*, 99 **Review of Economics & Statistics** 683 (2017) (with Marianne Bitler and Hilary Hoynes)
29. *Empirical Law and Economics*, **Oxford Handbook** series, edited by Francesco Parisi (2017) (with Jonathan Klick)
30. *The Law and Economics of Proportionality in Discovery*, 50 **Georgia Law Review** 1093 (2016) (with Bruce Kobayashi)
31. *Can Simple Mechanism Design Results be Used to Implement the Proportionality Standard in Discovery?* 172 **Journal of Institutional & Theoretical Economics** 200 (2016)
32. *Material Facts in the Debate over* Twombly *and* Iqbal*,* 68 **Stanford Law Review** 369 (2016)
33. *When Do Covariates Matter? And Which Ones, and How Much?* 34 **Journal of Labor Economics** 509 (2016)
34. *Uncontrolled Experiments From the Laboratories of Democracy: Traditional Cash Welfare, Federalism, and Welfare Reform*, **The Law and Economics of Federalism**, edited by Jonathan Klick, Edward Elgar Publishing Ltd. (2017)
35. *Can We Learn Anything About Pleading Changes from Existing Data?,* 44 **International Review of Law & Economics** 72 (2015)
36. *Can the Dark Arts of the Dismal Science Shed Light on the Empirical Reality of Civil Procedure?* 2 **Stanford Journal of Complex Litigation** 223 (2014)
37. *Rethinking Summary Judgment Empirics: The Life of the Parties*, 162 **University of Pennsylvania Law Review** 1663 (2014)
38. *Expert Mining and Required Disclosure*, 81 **University of Chicago Law Review** 131 (2014)
39. *Valid Inference in Single-Firm, Single-Event Studies*, 15 **American Law & Economics Review** 495 (2013) (with Eric Helland and Jonathan Klick)

40. Note, *Locking the Doors to Discovery? Assessing the Effects of* Twombly *and* Iqbal *on Access to Discovery*, 121 **YALE LAW JOURNAL** 2270 (2012)
41. *Robust Inference with Multiway Clustering*, 29 **JOURNAL OF BUSINESS & ECONOMIC STATISTICS** 238 (2011) (with A. Colin Cameron and Douglas L. Miller)
42. *Passive Discrimination: When Does It Make Sense to Pay Too Little?* 76 **UNIVERSITY OF CHICAGO LAW REVIEW** 797 (2009) (with Jonathan Klick and Lesley Wexler)
43. *Bootstrap-Based Improvements for Inference with Clustered Errors,* 90 **REVIEW OF ECONOMICS & STATISTICS** 414 (2008) (with A. Colin Cameron and Douglas L. Miller)
44. *Distributional Impacts of the Self-Sufficiency Project*, 92 **JOURNAL OF PUBLIC ECONOMICS** 748 (2008) (with Marianne Bitler and Hilary Hoynes)
45. *Welfare Reform and Children's Living Arrangements*, 41 **JOURNAL OF HUMAN RESOURCES** 1 (2006) (with Marianne Bitler and Hilary Hoynes)
46. *What mean impacts miss: Distributional effects of welfare reform experiments*, 96 **AMERICAN ECONOMIC REVIEW** 988 (2006) (with Marianne Bitler and Hilary Hoynes)
47. *Are Less-Educated Women Crowding Less-Educated Men Out of the Labor Market?* in **BLACK MALES LEFT BEHIND**, 87 (Ronald B. Mincy, ed., 2006) (with Rebecca Blank)
48. *Welfare Reform and Health*, 40 **JOURNAL OF HUMAN RESOURCES** 309 (2005) (with Marianne Bitler and Hilary Hoynes)
49. *Migration, the Life Cycle, and State Benefits: How Low Is the Bottom?, 112* ***JOURNAL OF POLITICAL ECONOMY*** *1091 (2004)*
50. The Impact of Welfare Reform on Marriage and Divorce, 41 **DEMOGRAPHY** 213 (2004) (with Marianne Bitler, Hilary Hoynes, and Madeline Zavodny)
51. *Some Evidence on Race, Welfare Reform, and Household Income, 93* ***AMERICAN ECONOMIC REVIEW, PAPERS AND PROCEEDINGS OF THE ONE HUNDRED FIFTEENTH ANNUAL MEETING OF THE AMERICAN ECONOMIC ASSOCIATION, WASHINGTON, DC*** *293 (2003) (with Marianne Bitler and Hilary Hoynes)*
52. *Public Schooling for Young Children and Maternal Labor Supply*, 92 **AMERICAN ECONOMIC REVIEW** 307 (2002)
53. *Is More for the Poor Less for the Poor? The Politics of Means-Tested Targeting,* 2 **TOPICS IN ECONOMIC ANALYSIS & POLICY** (2002) (with Lant Pritchett)
54. *Indicator Targeting in a Political Economy: Leakier Can Be Better, 4* ***JOURNAL OF POLICY REFORM*** *113 (with Lant Pritchett)*

**BOOK REVIEWS AND OTHER COMMENTS**

1. *The Importance of Base Rates in Differential Impact: A Bail Reform Case Study: Comment*, 181 **JOURNAL OF INSTITUTIONAL & THEORETICAL ECONOMICS** 156 (2025)
2. *Comment* to Chapter 3, "Improving the Use of Demonstrations," by Robert R. Weathers II and Austin Nichols, in LESSONS FROM SSA DEMONSTRATIONS FOR DISABILITY POLICY AND FUTURE RESEARCH, Austin Nichols, Jeffrey Hemmeter, and Debra Goetz Engler, eds. (2021)
3. *Maybe there Is No Bias in the Selection of Disputes for Litigation: Comment*, 174 **JOURNAL OF INSTITUTIONAL & THEORETICAL ECONOMICS** 171 (2018)

4. *Debunking the Myth of the Copyright Troll Apocalypse,* 101 **Iowa Law Review Bulletin** 43 (2016) (with Shyamkrishna Balganesh)
5. *The Sheriff of Nottingham Hypothesis: A Tribute to Theodore Eisenberg: Comment,* 171 **Journal of Institutional & Theoretical Economics** 141 (2015)
6. *Welfare Reform: Effects of a Decade of Change,* 44 **Journal of Economic Literature** 1056 *(2006)*

## COURSES TAUGHT

University of California at Berkeley School of Law (2019-present)

Doctrinal classes: Civil Procedure; Legislation & Statutory Interpretation; Evidence

Seminar/workshop: Civil Procedure Scholarship Workshop; Public Access to Court Electronic Records; Law, Economics & Business Workshop; Statutory Interpretation Theory; Civil Procedure Stories; Interpretation in Constitutional and Statutory Law

Georgetown Law (Spring 2025)

Seminar: Evidence Stories

NYU Law (2021-2022)

Doctrinal class: Procedure (Fall 2021)

Seminar: Statutory Interpretation (Spring 2022)

University of Pennsylvania Law School (2013-2019)

Doctrinal classes: Civil Procedure; Legislation; Evidence

Seminars: Theories of Statutory Interpretation; Advanced Topics in Procedure and Litigation; Law, Economics & Psychology; Statutory Interpretation and Legislation; Public Law

University of Pennsylvania Fels Institute of Government (2018)

*Executive MPA*: Economic Principles of Public Policy

University of Arizona (2007-2010)

*Doctoral:* Linear Econometrics, Nonlinear Econometrics

*Undergraduate:* Law & Economics; Individuals & Society (basic microeconomics)

*Executive MBA:* Selected lectures in Strategy courses

Florida State University College of Law (2006-2007)

Law and Statistics; Law and Economics; Social Insurance;
Writing Workshop in Empirical Law and Economics

University of Maryland (1998-2006)

*Doctoral:* Empirical Microeconomics; Public Economics (both tax and social insurance programs)

*Undergraduate:* Introductory Microeconomics; Economics of the Gambling Industry

## LITIGATION WRITINGS

### Lead Amicus Curiae/Principal Author

Brief of Evidence and Civil Procedure Scholars as *Amici Curiae* in Support of Plaintiffs-Appellants, *In re NFL Sunday Ticket Antitrust Litigation*, Nos. 24-5493 and 24-5691 (CA9, January 16, 2025)

Brief for *Amicus Curiae* Jonah B. Gelbach in Support of Plaintiffs-Appellants, *In Re: Lipitor (Atorvastatin calcium) Marketing, Sales Practices and Products Liability Litigation*, Nos. 17-1140(L), 17-1136, 17-1137, 17-1189 (CA4, April 28, 2017)

Brief of *Amici Curiae* Civil Procedure Professors in Support of Respondents, *Tyson Foods, Inc. v. Bouaphakeo*, No. 14-1446 (U.S. Sept. 29, 2015), 2015 WL 5719742

### Signatory to Amicus Briefs

Brief of Nora Freeman Engstrom, David Freeman Engstrom, Jonah B. Gelbach, Rose Carmen Goldberg, and Brianne Holland- Stergar as *Amici Curiae* Supporting the Appellant and Reversal, *Entropic Communications, LLC v. Charter Communications, Inc.*, No. 24-1896 (9th Cir., August 12, 2024)

Motion for Leave to File and Brief of Amici Curiae Professors of Civil Procedure in Support of Petitioners, *Morrissey v. Mayorkas*, No. 22-235 (U.S., October 13, 2022)

Brief Amicus Curiae of Professors of Civil Procedure in Support of Appellant Paul S. Morrissey and Reversal, *Morrissey v. Mayorkas*, No. 20-5024 (D.C. Cir., May 22, 2020)

Brief of 44 Election Law, Scientific Evidence, and Empirical Legal Scholars as *Amici Curiae* in Support of Appellees, No. 16-1161 (U.S., September 1, 2017), 2017 WL 3948430

Brief for Civil Procedure and Securities Law Professors as *Amici Curiae* in Support of Petitioner, *California Public Employees' Retirement System v. ANZ Securities, Inc., et al.*, No. 16-373 (U.S., March 6, 2017), 2017 WL 929693

Brief for Civil Procedure and Securities Law Professors as *Amici Curiae* in Support of Petition for a Writ of Certiorari, *DeKalb County Pension Fund v. Transocean Ltd., Robert L. Long, Jon A. Marshall, and Transocean Inc.*, No. 16-206 (U.S., September 14, 2016)

Brief of Amici Curiae Civil Procedure Scholars in Support of Petitioner on Petition for a Writ of Certiorari, *Kosilek v. O'Brien*, No. 14-1120 (U.S., April 15, 2015), 2015 WL 1776459

Brief of Civil Procedure and Securities Law Professors as *Amici Curiae* in Support of Petitioner, *Public Employees' Ret. Sys. of Mississippi v. IndyMac MBS, Inc., et al.*, No. 13-640 (U.S., May 28, 2014), 2014 WL 2361893

## PUBLIC SECTOR CONSULTING

### Social Security Administration

Member, Technical Expert Panel for the Claimant Representative Demonstration (April 2019)

### Administrative Conference of the United States

*A Study of Social Security Litigation in the Federal Courts*, Final Report (July 28, 2016) (with David Marcus) (led to formal ACUS recommendation to the Judicial Conference of the United States to develop special procedural rules for review of final administrative decisions taken pursuant to 42 U.S.C. § 405(g)), available at https://www.acus.gov/report/report-study-social-security-litigation-federal-courts

### United States District Court for the Eastern District of Pennsylvania

Provided pro bono consulting services to the District Court's Jury Committee for purposes of improving the racial representativeness of the qualified jury wheel (2016-2019)

## PRIVATE CONSULTING & EXPERT WORK (NON-CONFIDENTIAL ONLY)

*In re Shoals Technologies Group, Inc. Securities Litigation,* No. 3:24-cv-00334 (M.D. Tenn.): Expert witness for Plaintiffs Erste Asset Management GmbH and Kissimmee Utility Authority Employees' Retirement Plan.

Publicly filed report:

- Expert Report of Jonah B. Gelbach, January 21, 2026, Exhibit C to Declaration of Christopher M. Wood in Support of Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Approval of Class Counsel, ECF 127, No. 3:24-CV-00334 (M.D. Tenn.).

*In re La Twon Weaver*, No. HC 23947 (Cal. Super. Ct. S.D. Cnty.): Expert witness for habeas petitioner La Twon Weaver with respect to claims brought under the California Racial Justice Act.

Publicly filed report:

- Expert Report of Jonah B. Gelbach, *In re La Twon Weaver*, No. HC 23947 (Cal. Super. Ct. S.D. Cnty. Dec. 11, 2025).

*Skye Biologics Holdings LLC et al v. 1159424 Ontario Limited*, Court File No. CV-25-00746403-00CL (Ont. Sup. Ct. J. (Com. List): Provided expert opinion regarding U.S. procedural law and was cross-examined (similar to deposition) in November 2025.

Consultant to Arnold Ventures related to criminal justice research, September-December, 2023.

*In re Alphabet, Inc. Securities Litigation*, No. 4:18-cv-06245-JSW (N.D.C.A.): Expert witness for Lead Plaintiff State of Rhode Island, Office of the Rhode Island Treasurer on behalf of the Employees' Retirement System of Rhode Island.

Publicly filed reports:

- Rebuttal Expert Report of Professor Jonah B. Gelbach, August 14, 2023, Exhibit 1 to Declaration of Jason A. Forge in Support of Reply in Support of Lead Plaintiff's Motion to Certify Class, Appoint Class Counsel, and Appoint Class Counsel, ECF 199, No. 3:18-cv-06245-TLT (N.D. Cal. August 14, 2023)
- Rebuttal Expert Report of Professor Jonah B. Gelbach, October 6, 2022, Exhibit C to Reply in Support of Lead Plaintiff's Motion to Certify Class, Appoint Class Representative, and Appoint Class Counsel, ECF 145-2, No. 4:18-cv-06245-JSW (N.D. Cal. October 6, 2022)

*Tavres v. Barnes & Noble, Inc.,* No. 3:19-cv-07655 (N.D.CA.): Served as expert witness for statistical analysis on behalf of plaintiff. Deposed in April 2021.

[Global Trade Secrets Misappropriation Litigation]: Provided advice on legal arguments and analysis.

*ATA Airlines, Inc., v. Federal Express Corporation*

Provided economic and statistical advice to Haynes and Boone LLP (petitioner's counsel) for preparation of petition for rehearing *en banc* by the United States Court of Appeals for the Seventh Circuit. The petition appealed a three-judge panel's reversal of the $66 million damage award petitioner won at a jury trial (2012).

Baker McKenzie: Provided event study analysis related to a U.S. pharmaceutical firm (2012).

International Center for Law & Economics:

Provided survey of statistical research on sugar-sweetened beverages (2010).

## REFEREEING AND PEER REVIEW SERVICE (SELECTED JOURNALS)

- American Economic Journal: Applied Economics
- American Economic Journal: Economic Policy
- American Economic Review
- American Journal of Political Science
- American Law and Economics Review
- Demography
- Harvard Law Review
- Journal of the American Statistical Association
- Journal of Econometrics
- Journal of Law and Economics
- Journal of Law, Economics and Organization
- Journal of Legal Economics
- Journal of Legal Studies
- Journal of Political Economy
- Nature: Computational Science
- Northwestern University Law Review empirical issue
- Quarterly Journal of Economics
- Review of Economic Studies
- Review of Economics and Statistics
- Science
- Stanford Law Review
- Yale Law Journal

# Appendix B

**Court Documents**

- Fourth Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF 228)
- Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Fourth Amended Complaint (ECF 258)
- Brief of Testifying Economists as Amici Curiae in Support of Respondent, *Halliburton Co. v. Erica P. John Fund, Inc.*, No. 13-317 (U.S. Jan. 28, 2014)
- Expert Report of Jonah B. Gelbach, *In re Shoals Techs. Grp., Inc. Sec. Litig.*, No. 3:24-cv-00334 (M.D. Tenn. Jan. 21, 2026), ECF 127-3

**Analyst Reports**

- Bank of America, *Facebook 4Q Quick Take* (Feb. 1, 2017)
- Bank of America, *Changes coming, but not for ads; Raising 2018E EPS by 13% and reiterate Buy* (Feb. 1, 2018)
- Bank of America, *Data Mgmt Changes Underway As Trust Rebuilding Process Begins; PO to $230* (Mar. 21, 2018)
- Bank of America, *Facebook: FTC investigation increases regulatory risk; Lowering PO to $210* (Mar. 27, 2018)
- Barclays, *Facebook, Inc.: Video Killed the Newsfeed Star? Probably Not* (May 4, 2017)
- BMO Capital Markets, *Strong Results, but We Expect Regulatory Overhand to Persist* (Apr. 25, 2018)
- BMO Capital Markets, *Margin Erosion Expected, but Revenue Deceleration Greater Than Expected* (July 26, 2018)
- Cantor Fitzgerald, *Daily Research Highlights* (July 27, 2017)
- Credit Suisse, *Driving Revenue Outperformance to Fund the Content and Security Investments* (Nov. 2, 2017)
- Credit Suisse, *Facebook Inc.: Opportunity Arises, as News Flow Rubs Salt Into the Wound* (Mar. 19, 2018)
- Deutsche Bank, *Off to the races: Messenger and video should spark next leg up in shares* (July 27, 2017)
- Deutsche Bank, *Opening Pandora's Box?* (Mar. 19, 2018)
- Deutsche Bank, *Snap User Growth on Uptrend; FB Stable post GDPR* (Jun. 5, 2018)
- Evercore ISI Research, *Darkest Hour: Thoughts on Yesterday's Selloff* (Mar. 20, 2018)
- Jefferies, *Channel Checks at Ad Week: Positive on FB/GOOGL/TTD/CRTO* (Oct. 2, 2017)
- JMP Securities, *Our Thoughts on Facebook's Privacy and Data Issues* (Mar. 21, 2018)
- J.P. Morgan, *Deep Dive Into Facebook's Product & Ad Changes; We Are Increasingly Confident in '17/'18 Estimates; Reit OW & $170 PT* (Mar. 9, 2017)
- J.P. Morgan, *Strong 1Q Results Should Get People Re-Engaged in FB; Reiterating Overweight & $242 PT* (Apr. 26, 2018)
- Jefferies, *Match Group (MTCH): Data Shows Long-Term FB Impact Will Be Limited: Upgrade to Buy* (Jun. 11, 2018)
- Morgan Stanley, *FB Watch: What is it and How Big Could it Be*? (Dec. 1, 2017)

- Morgan Stanley, *India Summit 2018: How Facebook and Google Driving Digital Payments* (Jun. 8, 2018)
- Needham, *SNAP vs FB - Who Wins?* (Feb. 13, 2017)
- Needham, *Facebook, Inc. (FB): FB vs SNAP vs TWTR - Spending Shifts* (Jun. 6, 2018)
- Oppenheimer, *Fundamentals Provide the Muse* (Dec. 11, 2017)
- RBC Capital Markets, *Facebook, Inc.: Don't Unfriend FB Now…* (July 25, 2018)
- SunTrust Robinson Humphrey, *Kind of the Social Web – Initiating with Buy/$210 PT* (Aug. 15, 2017)
- SunTrust, *Internet - FB and GOOGL Back in Media Spotlight; Valuation Hits 5-Yr. High* (Jun. 8, 2018)
- UBS, *Facebook: Positive Post in a Continuing Multi-Year Story* (July 26, 2017)
- UBS, *Facebook: Wading Through the Data of a FB Story* (Mar. 19, 2018)
- UBS, *First Read: Facebook Wading Through the Data of a FB Story* (Mar. 19, 2018)
- UBS, *Facebook: And Now Turning Back to the Business* (Apr. 25, 2018)
- Wedbush Securities, *Expect Another Strong Quarter Despite Negative Press and Privacy Overhang* (Jul. 20, 2018)

**News Articles**

- "Big Data and the Future of Democracy: The Matrix World Behind the Brexit and the US Elections," *Diplomat Magazine* (Mar. 5, 2017)
- "Cambridge Analytica Data Analysis Drives Ted Cruz Presidential Campaign," *Privacy International* (Dec. 11, 2015)
- "Conyers & Cummings Demand Top Trump Campaign Consultants Disclose Details of Campaign Data Operations," House Oversight Democrats (Oct. 26, 2017)
- "Cruz Campaign Creeps on Facebook User Data in Search of Advantages," *RT* (Dec. 12, 2015)
- "The Secret Agenda of a Facebook Quiz," *Benton Institute for Broadband & Society* (Nov. 23, 2016);
- Yvonne Abraham, "Surveillance Is Everywhere Now," *Boston Globe* (Nov. 30, 2016)
- Berit Anderson, "The Rise of the Weaponized AI Propaganda Machine," *Medium* (Feb. 12, 2017)
- Ime Archibong, "An Update on Our App Investigation and Audit, Meta (May 14, 2018)
- Ime Archibong, "Why We Disagree with The New York Times," Meta (June 3, 2018)
- Violet Blue, "The Facebook President and Zuck's Racist Rulebook," *Engadget* (Mar. 26, 2017)
- Nina Burleigh, "How Big Data Mines Personal Info to Craft Fake News and Manipulate Voters," *Newsweek* (June 8, 2017)
- Carole Cadwalladr, "British Courts May Unlock Secrets of How Trump Campaign Profiled US Votes," *The Guardian* (Sept. 30, 2017)
- Carole Cadwalladr & Emma Graham-Harrison, "Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach," *The Guardian* (Mar. 17, 2018)
- Nicholas Confessore, Gabriel J.X. Dance & Michael LaForgia, "Facebook Gave Device Makes Deep Access to Data on Users and Friends," *The New York Times* (June 3, 2018)
- Harry Davies, "Ted Cruz Using Firm that Harvested Data on Millions of Unwitting Facebook Users," *The Guardian* (Dec. 11, 2015)

- Harry Davies, "Ted Cruz Erased Trump's Iowa Lead by Spending Millions on Voter Targeting," *The Guardian* (Feb. 1, 2016)
- Patti Domm, "Stock market meltdown has to do with a lot more than just Facebook," *CNBC* (Mar. 19, 2018)
- Jamie Doward, Carole Cadwalladr & Alice Gibbs, "Watchdog to Launch Inquiry into Misuse of Data in Politics," *The Guardian* (Mar. 4, 2017)
- McKenzie Funk, "Cambridge Analytica and the Secret Agenda of a Facebook Quiz," *The New York Times* (Nov. 19, 2016)
- Hannes Grassegger & Mikael Krogerus, "Trump Knows You Better Than You Know Yourself," *Antidote Zine* (Jan. 22, 2017)
- Hannes Grassegger & Mikael Krogerus, "The Data That Turned the World Upside Down" (Jan. 28, 2017)
- Joshua Green & Sasha Issenberg, "Inside the Trump Bunker, With Days to Go," *Bloomberg* (Oct. 27, 2016)
- Paul Grewal, "Suspending Cambridge Analytica and SCL Group From Facebook," Facebook Newsroom (Mar. 16, 2018)
- Sue Halpern, "How He Used Facebook to Win," *The New York Review* (June 8, 2017)
- Stephanie Kirchgaessner, "Cambridge Analytica Used Data from Facebook and Politico to Help Trump," *The Guardian* (Oct. 26, 2017)
- Kate Knibbs, "Ted Cruz Might Have Your Facebook Data, Depending on How Broke Your Friends Are," *Gizmodo* (Dec. 11, 2015)
- Kif Leswing, "Ted Cruz's Secret Weapon: Your Facebook Likes," *Fortune* (Dec. 11, 2015)
- Zach Marzouk, "ICO Investigates Data's Role in Political Campaigns," *ITPro.* (Mar. 6, 2017)
- Matt Phillips, "Facebook and Other Tech Companies Drag Down Stock Markets," *The New York Times* (Mar. 19, 2018)
- Ed Richards, "A Frightening Example of How Data-Driven Psy-Ops Has Just Changed the Course of History," *LinkedIn* (Feb. 7, 2017)
- Emma Roller, "Is It Ted Cruz's Party — Or Marco Rubio's?," *The New York Times* (Dec. 15, 2015)
- Matthew Rosenberg, Nicholas Confessore & Carole Cadwalladr, "How Trump Consultants Exploited the Facebook Data of Millions," *The New York Times* (Mar. 17, 2018)
- Sandy Parakilas, "We Can't Trust Facebook to Regulate Itself," *The New York Times* (Nov. 19, 2017)
- Brendan Sasso & National Journal, "Political Campaigns Are Spying on You, and There Are No Rules to Stop Them," *The Atlantic* (Dec. 15, 2015)
- Mattathias Schwartz, "Facebook Failed to Protect 30 Million Users from Having Their Data Harvested by Trump Campaign Affiliate," *The Intercept* (Mar. 30, 2017)
- Samson Simon Sharaf, "Democracy and the Power of Software," *The Nation* (Feb. 4, 2017)
- Michael Van Sickler, "Another Link Between Trump and that Russian Oligarch," *Tampa Bay Times* (Mar. 16, 2017)

- Matt Turner, "Google parent Alphabet drops as tech stocks get whacked," *Business Insider* (Mar. 19, 2018)
- Stephanie Wood, "What That Facebook Quiz Is Doing to Your Privacy," *The Sydney Morning Herald* (July 21, 2017)
- John Young, "The Big Faker and His Big Date with Big Data," *John Young Column* (Feb. 27, 2017)

**Academic Publications**

- Andrew Baker & Jonah B. Gelbach, *Machine Learning and Predicted Returns for Event Studies in Securities Litigation*, 5 J. L. Fin. & Accounting 231 (2021)
- Elizabeth Blankespoor, Ed deHaan & Ivan Marinovic, *Disclosure Processing Costs, Investors' Information Choice, and Equity Market Outcomes: A Review*, 70 J. Accounting & Econ., Issues 1 (2020)
- Tarun Chordia, Richard Roll & Avanidhar Subrahmanyam, *Liquidity and market efficiency*, 87 J. Fin. Econ. 249 (2008)
- Dennis Chung & Karel Hrazdil, *Liquidity and market efficiency: A large sample study*, 34 J. Banking & Fin. 2346 (2010)
- Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. 383 (1970)
- Eugene F. Fama, *Efficient Capital Markets: II*, 46 J. Finance 1575 (1991)
- Jill E. Fisch, Jonah B. Gelbach & Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tex. L. Rev. 553 (2018)
- Jonah B. Gelbach, Eric Helland & Jonathan Klick, *Valid Inference in Single-Firm, Single-Event Studies*, 15 Am. L. & Econ. Rev. 495 (2013)
- Charles M. Jones, *A Century of Stock Market Liquidity and Trading Costs* (May 23, 2002), https://ssrn.com/abstract=313681
- Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Lit. 13 (1997)
- David Tabak & Chudozie Okongwu, *Inflation Methodologies in Securities Fraud Cases: Theory and Practice*, NERA Working Paper 2 (July 2002)

**Books**

- Hendrik Bessembinder & Kumar Venkataraman, *Bid-Ask Spreads*, *in Encyclopedia of Quantitative Finance* (Rama Cont ed. 2010)
- John Y. Campbell, Andrew W. Lo & A. Craig MacKinlay, *The Econometrics of Financial Markets* (1997)
- Stephen J. Choi & A.C. Pritchard, *Securities Regulation: Cases and Analysis* (6th ed. 2024)
- Aswath Damadaran, *Relative Valuation: First Principles, in Damodaran on Valuation* (2d ed. 2012)
- E.L. Lehmann & Joseph P. Romano, *Testing Statistical Hypotheses* (3d ed. 2005)
- Joshua Rosenbaum & Joshua Pearl, *Investment Banking: Valuation, LBOs, M&A, and IPOs* (3d ed. 2020)

**Bates Documents**

- FB-CA-SECURITIES-2061145
- FB-CA-SECURITIES-4358708
- FB-CA-SECURITIES-4741240
- FB-CA-SECURITIES-5244292

**Company Documents**

- Facebook, Inc., Registration Statement (Form S-3ASR) (Oct. 29, 2014)
- Facebook, Inc., Proxy Statement (Form DEF 14A) (Apr. 14, 2017)
- Facebook, Inc., Proxy Statement (Form DEF 14A) (Apr. 13, 2018)
- Facebook Inc., Annual Report (Form 10-K) (Feb. 1, 2018)
- Facebook. Inc., Second Quarter 2018 Results Conference Call (July 25, 2018)
- Facebook Reports Second Quarter 2018 Results (July 25, 2018)

**Cases**

- *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)
- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989)
- *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934 (9th Cir. 2023)
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001)

**Other Documents**

- Press Release, *Facebook Reports Fourth Quarter and Full Year 2017 Results* (Jan. 31, 2018)
- Press Release, *Facebook to Pay $100 Million for Misleading Investors About the Risks It Faced From Misuse of User Data*, U.S. Securities and Exchange Commission (July 24, 2019)
- Press Release, *Meta Platforms, Inc. to Change Ticker Symbol to 'META' on June 9*, META (May 31, 2022)
- The Nasdaq Stock Market Rulebook, Rule 5315(e)(3), https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/Nasdaq%205300%20Series (accessed on Jan. 2, 2026)
- *Daily MP Position Report*, Nasdaq Trader, https://nasdaqtrader.com/Trader.aspx?id=DailyMPPositionReport (accessed on June 20, 2026)
- *Delinquent Filings*, U.S. Securities and Exchange Commission, https://www.sec.gov/enforcement-litigation/delinquent-filings
- *Executing an Order*, Investor.gov, https://www.investor.gov/introduction-investing/investing-basics/how-stock-markets-work/executing-order (heading “Your Broker Has Options for Executing Your Trade”) (accessed on Jan. 2, 2026)
- *Form S-3: Registration Statement Under the Securities Act of 1933*, U.S. Securities and Exchange Commission, https://www.sec.gov/files/forms-3.pdf
- *How to Become a Market Maker*, Nasdaq Trader, https://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess (accessed on Jan. 2, 2026)

- Meta @Meta, Twitter (June 4, 2018, 3:53 PM), https://twitter.com/Meta/status/1003665970089603072
- *What is the adjusted close?*, Yahoo!, https://help.yahoo.com/kb/SLN28256.html (accessed on Aug. 17, 2026)

**APPENDIX C**
**REGRESSION MODEL DETAILS**

1. I downloaded relevant data on the dividend-adjusted stock prices for Facebook and other relevant issuers described below, as well as the S&P 500 index, from Yahoo! for the period January 1, 2016 through July 27, 2018. I used the adjusted prices that account for splits and dividends.[1]

2. In all my analysis of stock returns, the measure of the return I used is the log daily return, *i.e.*, for Facebook Stock on date *t*, this is the natural log of the date-*t* closing price minus the natural log of the closing price for date *t-1*. I used the same approach for all other returns included in my analysis. This is a common approach in event studies. I use the terms "log return" and "return" interchangeably below and in the main body of my report, except where the distinction is expressly noted.

3. In estimating the models considered here, for each event date of interest, I used the 250 trading days before that event date as the estimation window. Among these 250 trading days, I excluded from all estimation any date that was either an earnings release date (For 2017: May 4, July 27, and November 2; for 2018: February 1, April 26, and July 26) or a damages date (March 19, March 20, or July 26 of 2018). Additionally, in estimating Model 2, I randomly selected 50 trading days from the non-excluded dates as test-set dates (also sometimes referred to as "hold-out" dates).[2] I use these test-set dates for evaluating the root mean square error ("RMSE") for Model 2, as discussed further below.

---

[1] *See* Yahoo!, "What is the adjusted close?", https://help.yahoo.com/kb/SLN28256.html, accessed on August 17, 2026.

[2] The selection of test-set dates is done using a "seed" parameter that ensures replicability of results: re-applying the same code to the same data using the same seed will yield the same results.

4. For each model, I constructed an index using firms described in Facebook's proxy statements for 2018 and 2019 as peer firms for compensation purposes.[3] The tickers and names of the included firms are listed in Table 1.[4]

**TABLE 1: FIRMS WHOSE RETURNS ARE INCLUDED IN MODEL 2**

| Ticker | Name |
|---|---|
| AAPL | Apple |
| AMZN | Amazon |
| CMCSA | Comcast |
| CRM | salesforce.com |
| CSCO | Cisco |
| DIS | Disney |
| GOOGL | Google |
| MSFT | Microsoft |
| NFLX | Netflix |
| PYPL | PayPal |
| QCOM | Qualcomm |
| T | AT&T |
| VZ | Verizon |

## A. Model 1

5. To construct the industry index for Model 1, I calculated the log return for each peer firm on each day and then took the simple average of these daily log returns; the result is an Equal-Weight Industry Index ("EWII"). To estimate Model 1, I used ordinary least squares

[3] Facebook's 2018 proxy statement, which reported the Peer Group that was selected for 2017 as well as the Peer Group selected prospectively for 2018, explains that in choosing its Peer Group, the Company "aim[s] to compensate our executive officers at levels that are commensurate with the most competitive levels of compensation for executives in similar positions at a group of publicly-traded peer companies set forth below, with whom we compete for hiring and retaining executive talent." Facebook, Inc., Proxy Statement (Form DEF 14A), at 36-38 (Apr. 13, 2018).

[4] Facebook's chosen peers also included CBS, Time Warner, Twenty-First Century Fox, and Twitter, which are excluded from my analysis because they have been delisted.

("OLS") to calculate the coefficients on the log returns for the S&P 500 index,[5] the EWII, and an intercept (also known as a "constant"), with Facebook's log return as the dependent variable, using data for the set of dates described above. I then used the resulting coefficients to calculate Facebook's predicted return on each event date of interest. I calculated abnormal returns by subtracting the model-based predicted return from the actual return. This is the standard procedure used to calculate abnormal returns based on a market index and industry index.

**B. Model 2**

6. Equal-weight indexes are commonly used in financial economics and are also used in securities litigation. Among other things, they have the advantage of being easy to explain and understand. However, they also put the same weight on firms whose stock returns may have very different correlations with the defendant's return, which may affect predicting the defendant's returns on event dates. For example, as discussed below, my results indicate that Google's returns are much more closely related to Facebook's than Microsoft's returns are.

7. A natural way to address this issue is to let the empirically observed relationship between the defendant's returns and peer firms' returns guide the choice of weights. For example, it is possible to build an index by putting more weight on Google's returns, and less weight on Microsoft's, than the EWII does.

8. In my peer-reviewed scholarship, I have demonstrated how to use simple machine-learning algorithms to achieve improved index performance in the sense of reducing RMSE.[6] That

---

[5] Facebook was a constituent of this index during the period at issue here. To avoid the mechanical relationship between the index and Facebook's returns that otherwise would occur, I computed an adjusted version of this index that excludes Facebook's market capitalization.

[6] Andrew Baker and Jonah B. Gelbach, *Machine Learning and Predicted Returns for Event Studies in Securities Litigation*, 5 J. L. Fin. & Accounting 231 (2021).

is practically important in securities litigation because the RMSE is the denominator of an event-date's t-statistic. Reducing the RMSE will increase the statistical power when testing the statistical significance of event-date abnormal returns, making it less likely that real price impacts will erroneously be ignored because they are found to be statistically insignificant.

9. Constructing the industry index for Model 2 involves the following two steps, which are carried out using the data described above, excluding the test-set dates.

(a) Apply the algorithm known as elastic net regression (ENR), which relates Facebook's daily log return to the log returns of the S&P 500 index and for each of the peer firms; the relationship is captured by a set of coefficients, as with standard ordinary least squares ("OLS") estimation.[7]

(b) Multiply each coefficient by its corresponding return (e.g., multiply together Google's return on a given date and the coefficient on that return) and add the

[7] As applied here, ENR chooses coefficient values to minimize the sum of squared abnormal returns, with adjustments for the number and magnitude of the coefficients on included peer firms' returns and S&P returns; these adjustments are often referred to as "penalization" because they penalize the tendency of OLS to pay too much attention to sample-specific variation in regressors (the variables used to explain the dependent variable). ENR can be viewed as a mixture of two simpler machine learning regression approaches, lasso and ridge regression. Lasso is especially good at selecting peer firms for exclusion from the index, and ridge regression is good at ensuring that included coefficients aren't set too high due to sample-specific variation. By combining them, ENR secures the benefit of both types of adjustment to standard OLS estimation. The approach I take in calculating Model 2 allows the degree of mixture between lasso and ridge regression to be chosen optimally given the data, so that if the data are more consistent with lasso than ridge regression, or vice versa, the ENR results will be based only on the more consistent approach. Additionally, the degree of penalization is chosen in a data-driven say, so that if there is no need for penalization, ENR will yield the same results as OLS. Finally, nothing stops the ENR algorithm from yielding coefficients that lead to the exact same abnormal returns as Model 1 produces (this would entail placing equal coefficients on each peer firm's return, together with a coefficient on the S&P index return that has the same ratio to peer firms' coefficients as the ratio of the Model 1 S&P 500 coefficient to the Model 1 EWII coefficient).

resulting products for all peer firms and the S&P 500. The resulting sum is the value of my data-driven index ("DDI").

10. The ENR algorithm is capable of determining that some variables should be excluded from the index entirely when that is appropriate, even as it assigns nonzero coefficients to other variables. Thus, this algorithm allows data-driven selection of peer firms and their weights in the DDI. The algorithm is well-suited to the task of improving index performance, because—as applied here—its basis for choosing coefficient values is exactly what a good model should do: minimize error in predicting Facebook's abnormal returns.

11. To calculate Model 2 abnormal returns, I used OLS to estimate the coefficient on an intercept and the just-described DDI.[8] As with Model 1, the coefficients are then used to predict Facebook's log return for each event date of interest. Abnormal returns are calculated by subtracting this predicted log return from the actual Facebook log return for each date of interest.

12. Model 2 is thus just like Model 1, except that Facebook's predicted log returns are based on peer-firm weights determined using a data-driven weight selection approach designed to reduce RMSE by accounting for the actual pattern of correlation in Facebook's returns with its peer firms' returns. This is the key difference between the two models: whereas Model 1 imposes equal weights as a matter of assumption, Model 2 chooses weights by leveraging the actual patterns of co-variation of Facebook's returns with the S&P 500 and the Company's peers. Further, if equal weighting is the best approach in this case, nothing stops Model 2 from determining that.

---

8 The S&P 500 is one of the variables used to construct the data-driven index, so it is unnecessary to include it in this step of the model.

13. In sum, both Model 1 and Model 2 are designed to account for variation in the log returns of the S&P 500 index and Facebook's peer firms. This means that both models are suitable for removing confounding effects that might otherwise lead an analyst to attribute Stock-price changes to litigation-relevant events. Model 1 is more conventional, and perhaps easier to understand, but Model 2 has the potential to improve statistical performance by further reducing the variability of abnormal returns. Thus, both are of interest, and so I report results for both.

**C. Coefficient Values**

14. TABLE 2 reports the coefficient values used to construct abnormal returns for each of the 6 earnings release dates, as well as the R-squared and RMSE values.[9] The results in Table 2 show that Model 2's RMSE is generally smaller than Model 1's, with the reduction ranging from 19% for July 26, 2018 to 36% for May 4, 2017. As noted above, this implies gains in statistical power, i.e., actual price impacts on event dates will be more likely to be detected.

[9] Only the coefficient estimates are used to construct abnormal returns for event dates and dates used in the estimation. Accordingly, I do not report the estimated standard errors for the coefficients.

**TABLE 2: Model 1 and Model 2 Coefficients For Earnings Release Dates**

| | May 4, 2017 | July 27, 2017 | November 2, 2017 | February 1, 2018 | April 26, 2018 | July 26, 2018 |
|---|---|---|---|---|---|---|
| ***Model 1*** | | | | | | |
| **S&P500** | .1020 | -.0932 | -.2515 | -.4807 | -.3440 | -.0935 |
| **EWII** | .9025 | 1.1722 | 1.3389 | 1.3931 | 1.3177 | 1.0946 |
| **Intercept** | .0002 | .0003 | .0006 | .0000 | -.0005 | -.0002 |
| | | | | | | |
| **R-squared** | .3841 | .4496 | .5089 | .4303 | .5205 | .4694 |
| **RMSE[a]** | .0085 | .0080 | .0077 | .0083 | .0102 | .0109 |
| | | | | | | |
| ***Model 2*** | | | | | | |
| **Data-driven index** | 1.1371 | 1.1097 | 1.0893 | 1.0813 | 1.0606 | 1.0547 |
| **Intercept** | -.0001 | -.0001 | -.0002 | -.0001 | -.0001 | -.0001 |
| | | | | | | |
| **R-squared** | .5321 | .6563 | .7137 | .6155 | .6233 | .5778 |
| **RMSE** | .0054 | .0055 | .0064 | .0061 | .0079 | .0088 |

[a] Based on all observations used in estimation of Model 1. RMSE estimates based on re-estimating Model 1 with a 50-date test-set held out were generally a bit higher, but not for all event dates.

15. Table 3 reports the data-driven index weights for each earnings release date. Google's coefficient is always the largest of any peer firm, with Amazon often being substantial as well. The S&P 500 enters the index, albeit with relatively low weight, on the 2017 earnings release dates, but not for the 2018 earnings release dates. Depending on the earnings release date in question, many of the peer firms receive no weight at all, and among those that do, they typically receive much lower weight than Google.[10] By contrast, as the first column of the table demonstrates, the EWII assigns the same coefficient, 0.0769 (i.e., one-thirteenth) to each peer firm.

10 There are also some negative coefficients, indicating that some peer firms' returns are negatively correlated with Facebook's, after accounting for the variation in all the other peer firms' returns and the S&P 500's return.

**TABLE 3: Index Weights for Earnings Release Dates**

| | Model 1 | May 4, 2017 | July 27, 2017 | November 2, 2017 | February 1, 2018 | April 26, 2018 | July 26, 2018 |
|---|---|---|---|---|---|---|---|
| **SP500** | | .0704 | .2127 | .1216 | | | |
| **AAPL** | .0769 | .1327 | .1749 | .2080 | .1213 | | |
| **AMZN** | .0769 | .1804 | .1569 | .1705 | .1394 | .1325 | .1218 |
| **CMCSA** | .0769 | | .1048 | .0540 | | | .0092 |
| **CRM** | .0769 | .0273 | .0972 | .0854 | .1364 | | |
| **CSCO** | .0769 | | -.0888 | -.1021 | -.0339 | -.0169 | -.1083 |
| **DIS** | .0769 | | -.1414 | -.0353 | | | |
| **GOOGL** | .0769 | .3945 | .2845 | .2721 | .3504 | .4810 | .4689 |
| **MSFT** | .0769 | | .0377 | .0492 | | | |
| **NFLX** | .0769 | | .0577 | .0887 | .0689 | .0554 | .0789 |
| **PYPL** | .0769 | .0639 | .0796 | .0853 | .1166 | .1486 | .1567 |
| **QCOM** | .0769 | | -.0148 | .0038 | | .0329 | .0589 |
| **T** | .0769 | | -.0651 | -.0338 | -.0241 | | |
| **VZ** | .0769 | | -.0040 | -.0177 | | | |

16. Table 4 reports the coefficient estimates, R-squared, and RMSE used to construct abnormal returns for each of the 5 damages-related dates.[11] The results show that Model 2's RMSE is generally smaller than Model 1's, with the reduction ranging from as little as 2% (for June 4, 2018) to as great as 28% (for March 20, 2018). As noted above, this implies gains in statistical power, i.e., event effects will be more likely to be detected where they actually exist.

---

[11] Only the coefficient estimates are used to construct abnormal returns for event dates and dates used in the estimation. Accordingly, I do not report the estimated standard errors for the coefficients.

**TABLE 4: Model 1 and Model 2 Coefficients For Damages-Related Dates**

| | March 19, 2018 | March 20, 2018 | April 26, 2018 | June 4, 2018 | July 26, 2018 |
|---|---|---|---|---|---|
| ***Model 1*** | | | | | |
| **S&P500** | -.2531 | -.2479 | -.3440 | -.2670 | -.0935 |
| **EWII** | 1.2695 | 1.2689 | 1.3177 | 1.2282 | 1.0946 |
| **Intercept** | -.0003 | -.0003 | -.0005 | -.0002 | -.0002 |
| | | | | | |
| **R-squared** | .5049 | .5037 | .5205 | .4946 | .4694 |
| **RMSE[a]** | .0091 | .0091 | .0102 | .0105 | .0109 |
| | | | | | |
| ***Model 2*** | | | | | |
| **Data-driven index** | 1.0410 | 1.0700 | 1.0606 | 1.0496 | 1.0547 |
| **Intercept** | .0000 | -.0001 | -.0001 | .0000 | -.0001 |
| | | | | | |
| **R-squared** | .6786 | .6755 | .6233 | .6544 | .5778 |
| **RMSE** | .0069 | .0066 | .0079 | .0103 | .0088 |

[a] Based on all observations used in estimation of Model 1. RMSE estimates based on re-estimating Model 1 with a 50-date test-set held out were generally a bit higher, but not for all event dates.

17. Table 5 reports the data-driven index weights for each damages-related date. As with earnings release dates, Google's coefficient is always the largest of any peer firm, with Amazon's often being sizable as well. The S&P 500 enters the index on half the dates, with its contribution on two of the dates being second only to Google's. Fewer of the peer firms receive no weight at all than was the case for the earnings release dates (in fact, the only two damages-related dates that have more than one zero-weight peer firm are April 26 and July 26, 2018 which happen to also be earnings release dates). Once again, the EWII's constant coefficient of 0.0769 for each peer firm differs substantially from the data-driven index coefficient results for ENR.

**TABLE 5: Index Weights for Damages-Related Dates**

| | Model 1 | March 19, 2018 | March 20, 2018 | April 26, 2018 | June 4, 2018 | July 26, 2018 |
|---|---|---|---|---|---|---|
| **SP500** | | .1021 | .1948 | | .2209 | |
| **AAPL** | .0769 | .0466 | .0763 | | .0550 | |
| **AMZN** | .0769 | .1512 | .1583 | .1325 | .1082 | .1218 |
| **CMCSA** | .0769 | .0006 | .0617 | | .0006 | .0092 |
| **CRM** | .0769 | .0798 | .1046 | | .0753 | |
| **CSCO** | .0769 | -.1436 | -.1444 | -.0169 | -.2216 | -.1083 |
| **DIS** | .0769 | | -.0257 | | -.0307 | |
| **GOOGL** | .0769 | .3990 | .2722 | .4810 | .3483 | .4689 |
| **MSFT** | .0769 | .0138 | .0726 | | .0542 | |
| **NFLX** | .0769 | .1027 | .0752 | .0554 | .0968 | .0789 |
| **PYPL** | .0769 | .1351 | .1497 | .1486 | .1440 | .1567 |
| **QCOM** | .0769 | .0534 | .0371 | .0329 | .0769 | .0589 |
| **T** | .0769 | -.0376 | -.0349 | | -.1003 | |
| **VZ** | .0769 | .0012 | .0205 | | .1003 | |