# Exhibit B

but, again, we had matters we had to deal with. 13:32:20
Mr. Rhodes or is it Ms. McGinn? 13:32:35
MS. MCGINN: Well, it's neither of us 13:32:36
because neither of us know how to deal with the -- if 13:32:38
we could just put the video on? 13:32:38
Is this Soares or Chen? This is 13:32:38
Ms. Chen. 13:32:44
JUDGE FRANCIS J. MATHEW: If you would 13:32:44
announce who we're -- 13:32:45
MS. MCGINN: It is Stacy Chen, who is an 13:32:46
attorney for Facebook and was designated as a 13:32:48
corporate representative for her deposition. 13:32:50
JUDGE FRANCIS J. MATHEW: All right. 13:32:52
Thank you. 13:32:54
(Video deposition of Stacy Chen was 13:33:08
played.) 13:33:10
Q. And what did you do to prepare to testify 13:33:10
about these topics? 13:33:12
A. With respect to the App Developer 13:33:12
Investigation, I led the investigation from the 13:33:15
internal legal team at Facebook, now Meta, for 13:33:19
roughly two-and-a-half to three years, and there was 13:33:22
just a maternity leave in the middle. 13:33:26
And, in addition, in advance of my 13:33:30
testimony today, I spent about 20 to 25 hours 13:33:33

reviewing and refreshing my recollection and speaking to people who I had worked with through the App Developer Investigation. 13:33:37 13:33:43 13:33:47

Q. Okay. What kind of documents did you review to refresh your recollection? 13:33:47 13:33:49

A. I reviewed some of the public-facing Newsroom posts that the company had posted in the 2018-to-2019 time frame, some of the investigative reports, lab notebooks, and documentation that we had from the App Developer Investigation. 13:33:54 13:34:01 13:34:04 13:34:10 13:34:14

And then in particular for Topic 5, I reviewed the documents that have the Bates numbers that are reflected there. 13:34:18 13:34:21 13:34:24

Q. What did you refer to as a lab notebook? What is that? 13:34:25 13:34:28

A. These were documents that we put together during the App Developer Investigation to memorialize the analysis that we were doing and the steps we were taking to execute on the commitment that launched what we call the App Developer Investigation. 13:34:29 13:34:31 13:34:35 13:34:39 13:34:42

Q. Does that have any other name or is there a database or repository associated with the lab notebooks? 13:34:48 13:34:51 13:34:57

A. There must have been. I think if there are any of the documents I could tell you if that's 13:35:03 13:35:06

the thing that I'm thinking about. They were memos that we drafted at the time so they would look like memos. 13:35:09 13:35:12 13:35:15

Q. Okay. We very well may have them and get to them so we can discuss that later. 13:35:16 13:35:19

I should ask you, it looks like you have another document in addition to Exhibit 284 in front of you. What is that? 13:35:22 13:35:26 13:35:29

A. This is background, sort of reference sheet, if you will, and what it has is what we talked about in terms of the scope of the testimony, and some of the underlying facts, if you will, that I was refreshing on in preparation for the deposition that sort of talks about the scope of the investigation and what we covered. 13:35:30 13:35:35 13:35:38 13:35:40 13:35:43 13:35:45 13:35:49

Q. Okay. What's your current role at Meta? 13:35:50

A. My job title is director of strategic counsel. 13:35:52 13:35:58

Q. Okay. And what does that entail? 13:35:58

A. It entails working across our global litigation and regulatory portfolio for the legal department. 13:36:00 13:36:06 13:36:11

Q. Does global litigation mean non-US litigation or is it something broader than that? 13:36:12 13:36:19

A. It includes US and outside the US 13:36:22

litigation regulatory matters. 13:36:25
Q. And how long have you been in that role? 13:36:28
A. Since July 2022, so three years. 13:36:30
Q. And what was your role prior to 2022? 13:36:32
A. Prior to 2022, I was on the enforcement litigation team. 13:36:37 13:36:41
Q. And what is the enforcement litigation team? 13:36:47 13:36:48
A. It is a team that both conducted the App Developer Investigation and brought offensive cases against individuals or entities who were violating our terms of service. 13:36:49 13:36:54 13:36:55 13:36:58
Q. And how long were you in that role? When did that start? 13:36:59 13:37:02
A. In the spring of 2018 until I started the job that I have now, so roughly four years. 13:37:03 13:37:08
Q. Ms. Chen, you've been shown what's been previously marked as Exhibit 104. This is a native copy of a document so it doesn't have Bates stamps on it, but the metadata appears on the last page, just for the record. 13:37:12 13:37:16 13:37:19 13:37:22 13:37:27
So the Bates number for this document is 3087, but the individual pages don't have Bates numbers, and I think that will be the case for a number of documents we looked at. So I just wanted 13:37:37 13:37:40 13:37:44 13:37:45

to explain that for the record. 13:37:47
So the first page of this slide deck is 13:37:48
called "ADI Phase II Process and Enforcement Rubric." 13:37:51
Okay. So do you have the right document 13:37:56
in front of you, the one I just described? 13:37:59
A. I do. I do. 13:38:01
Q. Okay. 13:38:02
A. It's labeled Exhibit 104, Stepnowsky, 13:38:03
November 8th, 2024. 13:38:12
Q. Great. And I recognize the lettering is 13:38:12
very small, but there is a date on the first page of 13:38:14
the slide deck. It says: "As of 6/21/2018." 13:38:16
Do you see that? 13:38:22
A. I do. 13:38:22
Q. Okay. And this document relates to the 13:38:23
same -- the ADI, the App Developer Investigation that 13:38:31
you mentioned before; is that right? 13:38:33
A. Yes. 13:38:34
Q. And what was the purpose of this slide 13:38:39
deck? 13:38:42
A. Give me a second. 13:38:42
Q. Sure. Yeah. 13:38:44
A. I'll page through it quickly and answer 13:38:45
your question. 13:38:47
Q. I should mention whenever you get a new 13:38:48

document or exhibit I may launch into questions, but you should take whatever time you need to review the document and you can just let me know when you're ready to answer questions. 13:38:50 13:38:52 13:38:54 13:38:56

A. Great. 13:38:57

It looks like this was a document that we put together in the summer of 2018. The date is June 2018, and I -- I don't have a reason to question that date. 13:39:00 13:39:06 13:39:09 13:39:11

And it looks like it was a memorialization, if you will, about things that we were working through and thinking about at that time in the App Developer Investigation. 13:39:12 13:39:13 13:39:21 13:39:24

Q. When you say "we," who are you referring to? 13:39:29 13:39:31

A. Generally, the App Developer Investigation team, which was both internal and external team members. There are multiple and many stakeholders who helped us execute on this commitment, and I think this reflects the collective input of the partnerships team, which I worked with very closely, likely me, if I had to review the metadata -- and I see my name on there, and also our external partners at Gibson Dunn, who are leading the investigation with me along with FTI and Stroz. 13:39:32 13:39:33 13:39:35 13:39:38 13:39:44 13:39:49 13:39:54 13:39:59 13:40:07 13:40:11

Q. Okay. You mentioned the partnership team, likely yourself, Gibson Dunn, FTI. 13:40:16 13:40:18
Are there any other stakeholders that were part of the -- what you referred to as the ADI team at that point? 13:40:25 13:40:27 13:40:30
A. Yeah. Also our close partners were the developer operations team and the platform policy team. I don't have a clear recollection looking at this document if they input specifically into this document, but they were definitely a part of the team that helped execute on the App Developer Investigation. 13:40:31 13:40:36 13:40:42 13:40:44 13:40:46 13:40:49 13:40:52
Q. And is developer operations often referred to DevOps? 13:40:52 13:40:56
A. Yes. 13:40:59
Q. And who was leading the DevOps team at that time? 13:40:59 13:41:03
A. At the time his name was Bill Fusz. 13:41:03
Q. Okay. And who was leading the platform policy team at that time? 13:41:07 13:41:09
A. It was a woman named Alison Hendrix, reporting in to Steve Satterfield. 13:41:09 13:41:13
Q. Got it. 13:41:17
Anyone else that you haven't mentioned that you would consider a stakeholder in the ADI team 13:41:18 13:41:22

at this time? 13:41:26
A. Do you mean functionally or in terms of individuals? 13:41:26 13:41:33
Q. I meant functionally. 13:41:38
A. Functionally, let me just make sure I've gotten them all. 13:41:40 13:41:43
From the internal team it would have been the legal team, which I was leading; the partnerships team, which we talked about; the platform policy team; the developer operations team. 13:41:44 13:41:46 13:41:50 13:41:53
And then externally, it was the -- the Gibson Dunn team, in partnership with FTI Consulting and Stroz Friedberg. 13:41:55 13:41:58 13:42:06
Q. Okay. And you said that this document reflected the input from each of those stakeholders about how to conduct the ADI; is that fair? 13:42:09 13:42:13 13:42:18
A. Yeah. As I mentioned before, I don't have a clear recollection of whether this reflected the DevOps and policy team input, but it reflects the -- it's at the very least legal partnerships and Gibson Dunn. Gibson Dunn working with FTI and Stroz as well. 13:42:22 13:42:28 13:42:30 13:42:35 13:42:40 13:42:46
Q. Okay. Can you turn to page 4 of the slide? 13:42:46 13:42:49
A. Yes. 13:42:51

Q. At the top it says, "Guiding Principles: The Commitment." 13:42:52 13:42:55
A. I see that. 13:42:58
Q. And then underneath it says, "App Developer Investigation and enforcement"; right? 13:42:59 13:43:02
A. Yes, the subheading to the slide, I see that. 13:43:03 13:43:06
Q. Okay. And this is quoting from a post that Mark Zuckerberg made publicly on March 21st, 2018; is that right? 13:43:07 13:43:09 13:43:14
A. Yes. 13:43:14
Q. And what is -- what is the "commitment" that is referred to in this slide? 13:43:22 13:43:24
A. It is the recitation that is reflected in Mark's post on March 21st, 2018. I think that it is -- let me just read this, one second. 13:43:26 13:43:33 13:43:39
I think it's not reflected in the sort of screenshot from his post itself, but the language, it looks like is excerpted in the blowout in the right-hand side. 13:43:42 13:43:46 13:43:50 13:43:55
Q. Okay. You understand the excerpt on the right-hand side to be quoting from Mark's post; is that right? 13:43:57 13:44:01 13:44:03
A. I do. I haven't done a full comparison if there is language contextually that is not 13:44:03 13:44:05

reflected, but the language looks like it is from the post. 13:44:10 13:44:12
Q. Okay. Understood. Fair. 13:44:12
So let's -- let's go through this and see if we can break it down. 13:44:14 13:44:18
Well, first, let me ask a different question. 13:44:20 13:44:22
Am I reading this correctly and understanding that the commitments made in that post by Mark were considered to be guiding principles of the App Developer Investigation? 13:44:22 13:44:24 13:44:28 13:44:32
A. The App Developer Investigation was launched from a specific recitation in that post, but there are other -- there are other things that he includes in his post that wouldn't have been considered a part of the App Developer Investigation. 13:44:35 13:44:37 13:44:40 13:44:43 13:44:47
Q. Okay. But the -- the part that's quoted here is considered a guiding principle for the ADI; is that right? 13:44:52 13:44:54 13:44:57
A. Yes. Assuming that it's excerpted, which I think it is, but, again, just would want to line it up side by side. 13:44:57 13:45:00 13:45:03
Q. Understood. 13:45:04
A. It's easier. 13:45:04
Q. So let's go through that. 13:45:05

There are two -- two sections to what is pulled out here. 13:45:07 13:45:09

One is described as internal app audit, and the first part of that reads: "We will investigate all apps that had access to large amounts of information before we changed our platform to dramatically reduce data access in 2014, and we will conduct a full audit of any app with suspicious activity." 13:45:09 13:45:13 13:45:17 13:45:20 13:45:24 13:45:29 13:45:34

Did I read that right? 13:45:35

A. You did. 13:45:35

And the thing that I would want to check is that it wasn't a distillation of what he said, if you will, but you did read the language on the slide right. 13:45:37 13:45:39 13:45:46 13:45:49

Q. Okay. Well, I think we'll -- we'll see different iterations, you know, of this, so we may be able to confirm that later. But -- but you don't have any specific recollection that the language was different from this; right? You're just saying you can't confirm it by looking at it? 13:45:49 13:45:53 13:45:55 13:45:58 13:46:00 13:46:02

A. I think -- I don't remember if I -- let me just check my -- I have an excerpt of it here, which I believe you have a copy of it. It's on the third page. 13:46:04 13:46:06 13:46:10 13:46:15

Q. And following the background and technical investigations, it says here "Other apps may receive a request for information, also known as an RFI and/or a remote or on-site audit"; is that right? 13:46:16 13:46:19 13:46:22 13:46:26 13:46:33
A. I see that language, and yes. 13:46:34
Q. Yes, that is how the process worked? 13:46:36
A. I think if you're asking -- the reason I'm hesitating is in June 2018, I don't have handy if we had done any of those yet, but that was the process, and eventually we executed on that. 13:46:39 13:46:41 13:46:53 13:46:56
But I just -- for June 2018 purposes, I'm a little bit foggy on that. 13:46:59 13:47:03
Q. Okay. And the language -- it says, "Others may receive." I -- I take it then the process was not intended that everyone who got a background investigation and technical investigation would also get an RFI and/or audit; is that right? 13:47:05 13:47:08 13:47:15 13:47:18 13:47:20
A. I think you're saying just because somebody got a background and technical investigation would they -- not everybody who got the background and technical investigation would have also gotten RFI and an audit, that's correct. 13:47:26 13:47:32 13:47:36 13:47:38 13:47:42
Q. So I think now we can go back to page 4, slide 4 of the document. And kind of pick up where 13:47:43 13:47:47

we left off in the commitments. 13:47:52
The second part of the commitment that is extracted here is under the title "Enforcement." And it says: "We will ban any developer from our platform that does not agree to a thorough audit." 13:47:56 13:48:03 13:48:08 13:48:10
Do you see that? 13:48:14
A. I do. 13:48:14
Q. And what did Facebook understand "thorough audit" to mean as part of this commitment? 13:48:14 13:48:17
A. Through the App Developer Investigation, we were focused on executing on the commitment and looking for instances of data misuse. 13:48:21 13:48:25 13:48:33
And if it was the case that a developer would not meet our satisfaction and standards for investigating the app or the developer, we would ban them. 13:48:36 13:48:40 13:48:44 13:48:46
Q. I'm not sure you answered the question. 13:48:48
I'm asking what does "thorough audit" mean in the context of this commitment? 13:48:52 13:48:57
A. It's a little bit self-explanatory. 13:48:59
Q. Indulge me. Can you please explain it? 13:49:02
A. A synonym for thorough is rigorous, but I don't know. 13:49:05 13:49:11
Q. Okay. 13:49:12
A. It feels self-explanatory. 13:49:12

Q. Okay. I mean, to the fullest extent possible; is that fair? 13:49:14 13:49:18

A. I mean, the -- the language of the commitment is as it reads. I would not equate "thorough" with full -- fullest extent possible, but I think it -- to the extent we're mincing words, you know, we're looking to be expansive and fulsome with our execution of the commitment. 13:49:19 13:49:23 13:49:30 13:49:34 13:49:38 13:49:41

So I -- I'm -- I'm not sure -- I'm not sure how to answer the question. 13:49:43 13:49:50

Q. Well, I'm trying to understand, Mark used words -- used the terms "full audit" and "thorough audit." And so I'm trying to understand if that was meant to convey that any app that exhibited suspicious activity would be audited to the fullest extent possible or something short of that. 13:49:51 13:49:56 13:50:01 13:50:04 13:50:10 13:50:14

A. It would be thorough. 13:50:17

Q. But not necessarily as thorough as possible? 13:50:19 13:50:22

A. I -- I mean, it feels a little bit academic. I'm not sure if there's like a difference that's grounded in what we executed on that you're particularly worried about. 13:50:23 13:50:30 13:50:33 13:50:37

Q. Well, I'm trying to understand how, you know, a layperson, a -- a Facebook user would 13:50:41 13:50:45

understand these commitments when -- when Mark made them publicly. 13:50:50 13:50:53

Do you think that a Facebook user would hear the terms "full audit" and "thorough audit" and believe that Facebook was going to do everything in their power to conduct these audits and make sure that all the information came to light? 13:50:57 13:51:00 13:51:06 13:51:09 13:51:12

A. I mean, I would say not in my capacity as a company witness, but in my lay understanding, I would not equate "thorough" with "full extent possible." It may be robust, but, again, this is in my -- it's outside the scope of the testimony, I think, as a 30(b)(6) witness. 13:51:13 13:51:27 13:51:31 13:51:35 13:51:39 13:51:43

Q. So I'd like to turn back to the exhibit that we were looking at that was the slide deck called "ADI Phase II Process and Enforcement Rubric." 13:51:45 13:51:48 13:51:52

Do you have that? 13:51:58

A. I do. 13:51:59

Q. Okay. Great. 13:52:00

Earlier we were talking about the definition of "misuse," and there's another slide in this document that we haven't looked at that deals specifically with that topic. So could we turn to page 8, slide 8. 13:52:02 13:52:04 13:52:10 13:52:16 13:52:19

And that slide is titled, gotting -- 13:52:21

"Guiding Principles: How Do We Define Data Misuse and Suspicious Activity?" 13:52:28 13:52:31

Is it fair to say that this slide represents the collective view of the ADI stakeholders at this time as to how to define "data misuse" and "suspicious activity" within the ADI for purposes of fulfilling Mark's commitment? 13:52:33 13:52:37 13:52:46 13:52:50 13:52:55

A. I think -- going back to this slide, it's -- the deck is from June 2018, and I think the title of the slide sort of poses the question: "How do we define data misuse and suspicious activity?" 13:52:57 13:53:03 13:53:08 13:53:12

Q. Okay. And the slide was put together by the key stakeholders that you mentioned before who are participating in the ADI; right? 13:53:15 13:53:17 13:53:25

A. Yes, which was the partnerships team, the legal team, the Gibson Dunn team in consultation with the investigative teams. 13:53:27 13:53:30 13:53:34

Q. Okay. So I guess going back to my -- my earlier question, is it fair to say that this slide represents the collective thinking of that -- that group? 13:53:35 13:53:39 13:53:42 13:53:44

A. I think it does, and I think the reason that it's interesting is that it's posed as a question at the top. 13:53:44 13:53:48 13:53:51

So as you're directing my attention to 13:53:52

this slide in this time frame, I think that it was -- sort of the question was posed: "How do we define data misuse and suspicious activity?" 13:53:54 13:53:59 13:54:04

Q. And so at this time, the ADI team's thinking on how to answer that question with respect to data misuse, first, let's look at -- consisted of first sharing or selling Facebook user data; is that right? 13:54:09 13:54:15 13:54:19 13:54:27 13:54:30

A. That's the first bullet. 13:54:30

Q. Okay. "Whether raw, aggregated or derived, with or to third parties"; is that right? 13:54:32 13:54:36

A. That is what the first bullet says. 13:54:42

Q. And was that activity that was considered to be data misuse by the ADI team at this time? 13:54:44 13:54:46

A. I think this would have been signals that we were looking for in conducting our investigation that we would have wanted to investigate and look for -- look into further. 13:54:48 13:54:58 13:55:00 13:55:03

Q. Okay. But, specifically, this slide is about defining data misuse. So I'm trying to understand if beyond just signals that you would be looking for, if those would be considered within the scope of the definition of data misuse? 13:55:05 13:55:10 13:55:13 13:55:16 13:55:20

A. Well, I think that that's the interesting thing about the title of this slide is it's a 13:55:23 13:55:26

question. It's: "How do we define data misuse and suspicious activity?" 13:55:28 13:55:32

Q. Okay. So fair to say the group was at least considering that that would be in scope for the definition of "data misuse"; is that right? 13:55:32 13:55:35 13:55:37

A. I think the team would have been looking for these things when considering and evaluating whether there was data misuse. 13:55:42 13:55:44 13:55:47

Q. Okay. Similarly, with an authorized data collection, was that something that they were considering with respect to the definition of data misuse at this time? 13:55:52 13:55:58 13:56:00 13:56:03

A. Again, sort of going back to the title of the slide, I think it's a question that is posed at the time, and that's sort of based on reviewing the slide as it is presented here. 13:56:03 13:56:07 13:56:10 13:56:14

Q. A question posed; meaning, they were considering whether that should be part of the definition of "data misuse"; correct? 13:56:20 13:56:23 13:56:25

A. That would be my read of the slide is, "How do we define data misuse" in quotes, "and suspicious activity," also in quotes, and it looks like the bullets that follow sort of offer possibilities. 13:56:30 13:56:32 13:56:36 13:56:38 13:56:41

Q. Okay. Just tick through them. So 13:56:41

another possibility for the definition of data misuse at this time was "inappropriate data requests"; is that right? 13:56:43 13:56:50 13:56:53

A. I don't know that that would have been considered misuse of itself, but that would have been something that we were looking for within the scope of the investigation. 13:56:53 13:56:58 13:57:01 13:57:04

Q. And why do you say you don't know if it would have been considered misuse itself? 13:57:05 13:57:08

A. Well, these -- these were all things that we were looking out for when we were conducting our investigation. 13:57:10 13:57:13 13:57:17

Q. Okay. But it's under a bullet point in a slide called, "How do we define data misuse"; right? 13:57:17 13:57:20

A. Right, which poses the question: How do we define data misuse? 13:57:24 13:57:29

Q. Uh-huh. 13:57:33

And it looks here like they're considering whether or not inappropriate data requests would be considered data misuse. Is that not a fair reading of this slide? 13:57:34 13:57:37 13:57:39 13:57:41

A. I don't know. That's what I'm having a little -- I'm trying to recall, but I think, you know, inappropriate data requests is certainly something we looked for within the scope of the App 13:57:43 13:57:48 13:57:50 13:57:53

Developer Investigation. 13:57:56

But from a definitional perspective, I don't know that -- I -- I don't know. 13:57:56 13:58:00

Q. Okay. 13:58:01

A. It's something we considered for purposes of the investigation, one way or another. 13:58:05 13:58:06

Q. Okay. Failing to delete data, is that also something that the team considered as part of the definition of data misuse at this time? 13:58:08 13:58:17 13:58:19

A. You know, I don't have a clear recollection from a definitional standpoint that that is something we would have been looking for in the -- in the course of the investigation. 13:58:21 13:58:34 13:58:37 13:58:39

Q. Okay. And then suspicious activity and that's -- there's a separate set of bullet points here. 13:58:41 13:58:42 13:58:44

Is it your testimony that those bullet points are also under consideration for potentially including in the definition of suspicious activity for purposes of the ADI? 13:58:46 13:58:50 13:58:56 13:58:58

A. Let me take a look at the bullets. 13:59:01

Can you reask your question? 13:59:04

Q. Yeah. 13:59:06

Do these bullets represent things that the ADI team considered as possibly within the scope 13:59:06 13:59:13

of suspicious activity? 13:59:20
A. These were things that we took into 13:59:24 account within the scope of the investigation. So 13:59:27 there were signals that we would have looked for, 13:59:32 and, again, from a definitional standpoint, I -- I'm 13:59:34 not sure. I don't have a clear recollection of that, 13:59:37 but either way we would have been looking at all of 13:59:39 these things. 13:59:41
Q. Okay. And, just to be clear, looking at 13:59:42 them as signals of suspicious activity; right? 13:59:44
A. Is that -- are you meaning for that to be 13:59:47 definitional? I mean, I think -- maybe I'll pose my 13:59:51 question. 13:59:56
Q. Well, it -- it looks like this whole 13:59:56 slide is meant to be definitional; right? How do we 13:59:59 define data misuse and suspicious activity? Isn't 14:00:03 that the purpose of this slide? 14:00:05
A. It's not -- I -- I don't read this as a 14:00:06 definition, if you will, but it's posing the 14:00:12 question, How do we define data misuse and suspicious 14:00:14 activity? 14:00:17
Q. Okay. And was another signal that the 14:00:18 ADI team considered as possible suspicious activity 14:00:24 reasonable evidence that the company -- app or 14:00:29 company had suffered a hack that could include 14:00:34

Facebook user data? 14:00:39

A. Yes, that's one of the things that we were looking for in -- in the course of the investigation. 14:00:40 14:00:42 14:00:45

Q. Okay. And why was that considered a signal of potential suspicious activity? 14:00:45 14:00:47

A. I mean, it's a good question. 14:00:49

We were trying to go broad in this data investigation, this data forensics investigation, and, you know, a hack may not be something -- it's -- most of the time I don't think it's volitional for the person who is being hacked. The person who's hacked is -- is a victim of the hack. So it's not suspicious activity on behalf of the developer, but it is something that we would have wanted to look into further. 14:00:54 14:00:57 14:01:00 14:01:07 14:01:10 14:01:12 14:01:15 14:01:20 14:01:24

So I think it just sort of goes to we weren't trying to be limiting with these turns of phrase, if you will. These were just more ways that we were thinking about going about the investigation to be as comprehensive as we could. 14:01:24 14:01:27 14:01:29 14:01:32 14:01:33

Q. Okay. And you mentioned that at this stage the ADI team was trying to go broad in its investigation. 14:01:36 14:01:39 14:01:44

Did it subsequently narrow the scope of 14:01:46

the definitions of data misuse or suspicious activity? 14:01:51 14:01:54

A. What do you mean by "narrow"? 14:01:55

Q. Make less broad. 14:01:57

A. Our -- our touchstone through the multiple years that we were conducting the investigation was to execute on the commitment, and so we took a broad view to the things that we wanted to look for. Like I mentioned with the ALT review, we were encouraging people to be conservative in their reviews, not in the sense of limiting but in the sense of risk conservative; in other words, elevate things that might be concerning to them even if they couldn't necessarily articulate it. 14:02:01 14:02:09 14:02:10 14:02:13 14:02:16 14:02:21 14:02:25 14:02:28 14:02:31 14:02:33

And I think the same sort of spirit is reflected here where we're looking at a variety of signals to try and understand if there was something untoward with respect to data, data use and potential violations of our policies. 14:02:36 14:02:38 14:02:40 14:02:43 14:02:48

And I think the different factors under consideration that are listed here reflect that. 14:02:50 14:02:53

Q. So let me ask this it a slightly different way. Take them separately. 14:02:58 14:03:04

So just in terms of suspicious activity, were each of the things under these four bullets 14:03:06 14:03:08

always considered potential signals of suspicious -- suspicious activity throughout the course of the ADI? 14:03:11 14:03:15
A. These are all things that we looked for within the scope of the background and tech investigations that were done through the App Developer Investigation, and otherwise as well when sort of scoping how we were going about the different ways of the investigation. 14:03:21 14:03:26 14:03:32 14:03:34 14:03:36 14:03:39
Q. And what about the bullet points under data misuse, were each of these items considered potential evidence of data misuse throughout the course of the ADI investigation? 14:03:41 14:03:43 14:03:48 14:03:50
A. Again, I think like we looked at these in the investigations that we were doing, and those were investigative signals that we took into account to execute on the commitment. 14:03:52 14:04:02 14:04:07 14:04:10
Q. So is it fair to say at this time the ADI did not have a comprehensive definition of data misuse as it was referred to in Mark's commitment? 14:04:19 14:04:21 14:04:25
A. I think if there are other documents to look at, I'd appreciate that. I think my read of this slide, which is dated June 2018th (sic), is that we were working through that, and the different considerations that we were taking into account in any event within the scope of the investigation, 14:04:30 14:04:32 14:04:36 14:04:43 14:04:46 14:04:49

along with others, as we continued along, are reflected here. 14:04:51 14:04:54

Q. And is your answer the same with respect to a definition of suspicious activity, did the ADI have a definition -- a comprehensive definition of suspicious activity as it was -- that term was used in Mark's commitment at this time? 14:04:58 14:05:00 14:05:04 14:05:07 14:05:10

A. Again, if -- if there's a document that you have that could help me refresh on it, I'd benefit from that. 14:05:13 14:05:16 14:05:20

I think at this time looking at this document back in June 2018th (sic) it looks like we're working through the considerations to take into account. And so, you know, from a definitional standpoint, this is posing the question: "How do we define data misuse and suspicious activity?" 14:05:22 14:05:23 14:05:28 14:05:30 14:05:33 14:05:37

Q. Was it one of the ADI's goals to keep users informed about their data? 14:05:40 14:05:44

A. ADI's goal was to execute on the commitment that Mark announced in his Facebook post, March 21st, 2018, and it was done at the direction of counsel in anticipation of litigation, in view of the significant litigation and regulatory matters that we had, both anticipated and existing at the time. 14:05:45 14:05:52 14:05:56 14:05:59 14:06:01 14:06:06

Q. So are you unable to give a "yes" or "no" 14:06:08

as to whether or not one of the ADI's goals was to keep users informed about their data? 14:06:12 14:06:16

A. The goal of ADI was to execute on Mark's commitment. 14:06:17 14:06:21

Q. So does that mean it was not one of the ADI's goals to keep users informed about their data? 14:06:26 14:06:29

A. The principal and singular goal was to execute on Mark's commitment, and through the process, we did keep people informed in circumstances where an update seemed warranted. 14:06:32 14:06:38 14:06:40 14:06:44

So it's not that it was a goal or a nongoal. We did notify people as needed in the -- as articulated under the commitment. 14:06:51 14:06:53 14:06:58

Q. And how did you determine whether an update seemed warranted? 14:07:07 14:07:10

A. There were some Newsroom posts in the 2018/2019 time frame with updates, and we can reference those for the specific circumstances that were being shared. 14:07:11 14:07:17 14:07:22 14:07:25

One of them was, you know, the notification about myPersonality. 14:07:28 14:07:30

Q. Earlier I think we looked at a slide deck where the ADI team was considering potential definitions of data misuse and suspicious activity within the context of Mark's commitments. 14:07:33 14:07:37 14:07:43 14:07:48

Do you remember that? 14:07:51
A. I remember that we were discussing the -- a slide deck that was posing the question about how we define data misuse and suspicious activity. 14:07:51 14:07:56 14:07:58
Q. And that was in June of 2018; right? 14:08:00
A. Yes, I think so. 14:08:04
Q. And so I think you testified that -- so at that time, the ADI team had not coalesced on a comprehensive definition of data misuse; right? 14:08:06 14:08:13 14:08:18
A. Well, I think I testified that there were lots of different things that we were taking into account for investigative purposes, and they were enumerated in the document we were looking at. 14:08:20 14:08:24 14:08:27 14:08:32
Q. Okay. And I guess what I'm understanding from your testimony and from this document is that as of about a year and a half later, in late September of 2019, the ADI team still did not have a comprehensive definition of "data misuse"; is that accurate? 14:08:34 14:08:36 14:08:44 14:08:48 14:08:55 14:08:59
A. Yeah, I -- I think that -- I don't agree with the statement as -- as recited. We were looking at risk signals of potential data misuse, and we were looking -- you know, it wasn't from a limiting standpoint. We were expansive in our investigation, but we were looking for sale of data in violation of 14:08:59 14:09:04 14:09:10 14:09:13 14:09:15 14:09:27

our policies, so... 14:09:29

Q. I mean, can you tell me at this time in September of 2019, what the ADI's definition of "data misuse" was? 14:09:35 14:09:37 14:09:46

A. I think we landed on sale of data in violation of our policies, and I -- I don't remember if it was September 2019 or otherwise. 14:09:47 14:09:52 14:09:55

Q. So there had to be a sale of data in violation of the policies in order to trigger a notification under the ADI rubric; is that right? 14:09:57 14:10:04 14:10:07

A. Well, myPersonality fell short of that and -- and we notified users anyway in that situation. 14:10:11 14:10:19 14:10:22

Q. So was it just essentially that the ADI team had discretion on whether or not to notify users in any particular situation? 14:10:23 14:10:36 14:10:40

A. I wouldn't call it "discretion." I think that investigation would elevate the risk signals that we needed to take into account and investigate and engage with developers on, and we were always looking to execute on the letter of the commitment as stated, and so I wouldn't call it discretionary. 14:10:42 14:10:49 14:10:55 14:10:58 14:11:03 14:11:11

Q. So did the ADI ever reduce to writing anywhere a comprehensive definition of "data misuse" that could be referred to in determining whether or 14:11:16 14:11:20 14:11:26

not a particular incident constituted data misuse or not? 14:11:29 14:11:32
A. I think they would have been in the investigative record. 14:11:32 14:11:38
Q. The investigative record for each individual app, is that what you're saying? 14:11:41 14:11:43
A. Potentially or in -- in presentation documents like these. 14:11:45 14:11:48
Q. Did they all refer to a -- a -- one specific definition or did -- was it more case-by-case? 14:11:49 14:11:57 14:12:01
A. Sitting here today, I can't -- I don't have a clear recollection of that, but if you have a document I could look at, I could -- I can refresh myself on it. 14:12:01 14:12:11 14:12:14 14:12:17
Q. Well, I think at this point like these are -- we have different variations of, you know -- this -- the voluntary user notification framework, but I'm trying to understand, you know, as the 30(b)(6) corporate designee on the ADI if there's some document that we are missing or if there's something you're aware of, anywhere in your preparation, that Facebook memorialized a concrete definition of "data misuse"? 14:12:18 14:12:21 14:12:24 14:12:29 14:12:34 14:12:39 14:12:42 14:12:48 14:12:55
A. I think that it's such a -- I think 14:12:57

that -- maybe you can ask your question again. 14:13:00
Q. Yeah. 14:13:02
I mean, I'm not asking you to recite anything verbatim from memory. I'm asking if you have -- if you're aware of such a definition existing? Because we haven't seen one. 14:13:03 14:13:06 14:13:08 14:13:11
A. I -- so we in terms of the notification obligation that we executed on, it's, as recited in the commitment, which is, if we find developers that misuse personally identifiable information, we will ban them and tell everyone affected by those apps. 14:13:14 14:13:17 14:13:20 14:13:29 14:13:32
And so that is the notification part of the commitment. 14:13:36 14:13:38
Q. And it's the company's position that that is self-explanatory, within the context of the ADI? 14:13:44 14:13:47
A. That is -- that is the commitment that we executed on. 14:13:53 14:13:56
Q. We're going to introduce another exhibit. This should be 287. 14:13:57 14:13:59
COURT REPORTER: 288. 14:14:11
MR. RHODES: I'm sorry, 288. 14:14:13
Q. So on the next page Nana describes some specific examples of this category of apps. 14:14:15 14:14:20
And she -- the first section is labeled "Quiz apps." She says, "Tended to go viral. Request 14:14:26 14:14:30

access to sensitive permissions and have no use case for collecting large amounts of user data." 14:14:38 14:14:41

Do you see that? 14:14:45

A. I do see that language. 14:14:46

Q. Were those signals of potential data misuse? 14:14:48 14:14:51

A. I think those were things that we would look and we did look for in the scope of the App Developer Investigation. 14:14:51 14:15:01 14:15:05

Q. She also says, "We're often generated via quiz app creation platforms that apparently pass down similar permission requests to each app." 14:15:05 14:15:08 14:15:11

Do you see that? 14:15:14

A. I do. 14:15:14

Q. Do you know what that means? 14:15:15

A. Through the course of the investigation something that we started to identify in Wave 1 and then formally scoped out as a category of developers to investigate more deeply in Wave 2 of the App Developer Investigation, there -- we came to understand that there were these quiz creation platforms -- quiz app creation platforms where developers would create an infrastructure for others to be able to easily develop quiz apps. And so that is what the quiz app creation platform refers to. 14:15:16 14:15:22 14:15:26 14:15:29 14:15:34 14:15:40 14:15:45 14:15:47 14:15:50 14:15:53

Q. And am I reading this correctly that the quiz app creation platform was granted permissions at some point by Facebook, and then could pass down those permissions to -- to other apps that were created by the platform without Facebook's approval? 14:16:00 14:16:03 14:16:09 14:16:11 14:16:14

A. I'd have to refresh myself on the specific findings, but at a general level, I think one of the ways that the plat- -- the quiz creation -- quiz app creation platforms operated was to have users grant permission to certain permissions -- or authorize certain permissions, and then the apps that would be built on top of it would have the benefit of those permissions. 14:16:29 14:16:31 14:16:35 14:16:40 14:16:43 14:16:54 14:16:57 14:16:59

Q. Without a separate approval from Facebook; right? 14:17:01 14:17:05

A. I would have to refresh myself on the particular investigative findings, but I think that is the risk that this language was meant to flag. 14:17:05 14:17:10 14:17:12

Q. Okay. And one of those -- one of those quiz app creation platforms that's mentioned here at the bottom of this section it's called Quiz Monster; is that right? 14:17:14 14:17:22 14:17:26 14:17:30

A. I think you're referring to the last open bullet in the e-mail, and, yes, I think so. 14:17:30 14:17:32

Q. And it says, "Quiz Monster is associated 14:17:36

with" 600,000 -- excuse me -- "605,524 apps"; is that right? 14:17:40 14:17:46

A. That is what the e-mail says. 14:17:46

Q. Okay. So if I'm understanding this correctly, Quiz Monster got permissions to sensitive data from Facebook and then was able to generate over 600,000 other quiz apps that were granted the same permissions without separate approval? 14:17:49 14:17:52 14:17:59 14:18:05 14:18:13

A. I would have to reference the investigative report for Quiz Monster, the specifics, but I think at a general level, Quiz Monster was a quiz app creation platform, and I think that the number of apps is roughly what I remember as well. 14:18:15 14:18:17 14:18:23 14:18:27 14:18:31

Q. Okay. And the -- some of the specific apps -- or excuse me -- quiz apps that are mentioned here, for example, Are You Intelligent has more than 400,000 authenticated users and obtained permissions to sensitive user and friend data; is that right? 14:18:38 14:18:47 14:18:51 14:18:55 14:19:00

A. I see that bullet that recites that language, yes. 14:19:03 14:19:05

Q. Uh-huh. 14:19:05

Another bullet point under "Horoscope fortune telling apps" was "Anita Predictions had more than 9 million authenticated users and obtained permissions to sensitive user and friend data"; is 14:19:07 14:19:12 14:19:19 14:19:23

that right? 14:19:26
A. That is the example that is given in the e-mail. 14:19:26 14:19:28
Q. And each of these -- it's described as having no clear monetization model which suggested they might potentially have generated revenues by selling data; right? 14:19:28 14:19:30 14:19:42 14:19:45
A. I think that language is reflected under the quiz app bullet in the last sentence, and I would have to reference the investigative reports for more details on that, which I think Nana was meaning to flag that this was a category of apps to look at more closely and consider sort of platform and policy level changes. 14:19:46 14:19:47 14:19:53 14:19:56 14:19:59 14:20:02 14:20:05
Q. Okay. So fair -- so that -- that language applied to the quiz apps is what you're saying? 14:20:06 14:20:09 14:20:11
A. Well, for -- for each of the investigations we did, we'd have to look at the investigative file for the app by app, sort of developer by developer, but I think generally Nana was flagging a concern -- 14:20:11 14:20:13 14:20:15 14:20:20 14:20:22
Q. Mm-hmm. 14:20:24
A. -- that was worth looking at from an enforcement and forward-looking changes perspective. 14:20:27 14:20:31

Q. And each of the following three categories, that being horoscope/fortune telling apps, social gifting apps, and game apps are described as requesting access to sensitive permissions and having no use case for collecting large amounts of user data; correct? 14:20:33 14:20:35 14:20:40 14:20:43 14:20:46 14:20:49

A. I would -- I would read this as being tied to the examples that she's given there, and I think just for fidelity to the investigative record for any of the specifics, I think we would want to look at the investigative reports. 14:20:51 14:20:56 14:21:01 14:21:04 14:21:06

Q. Okay. But she's giving these as examples of broader concerns that they have about categories of apps; right? 14:21:07 14:21:10 14:21:12

A. Yes, for the ones that she's enumerated here. 14:21:13 14:21:21

Q. And the numbers are pretty large here; right? For example, the @smiles and @hearts have over 31 million and 29 million authenticated users and obtained permissions to sensitive user and friend data? 14:21:21 14:21:28 14:21:35 14:21:38 14:21:41

A. Yes. I'm not recalling those specific investigations, but that's what she has here, and I don't have reason sitting here to doubt that. 14:21:42 14:21:45 14:21:48

Q. Same thing with It Girl has more than 14:21:51

29 million authenticated users and obtained permissions to some sensitive user and friends' data? 14:21:56 14:21:59
A. My response would be the same, that I don't have a specific recall right here of that particular investigation, but we could look at the investigative file. And I do not otherwise have a reason to believe that Nana didn't accurately reflect the sort of description of the app. 14:22:02 14:22:04 14:22:08 14:22:11 14:22:16 14:22:19
Q. And we can confidently say that none of the users of any of these apps were notified of any misuse, right, in the context of the ADI? 14:22:22 14:22:25 14:22:30
A. We did not do user notifications for these apps by name, whether any of the authorizing users for these apps were separately notified because of the -- myPersonality or This is Your Digital Life notifications, I don't know. 14:22:32 14:22:38 14:22:42 14:22:46 14:22:50
Q. Right. But they weren't -- they weren't notified in connection with any of these apps; correct? 14:22:50 14:22:53 14:22:56
A. No, these apps, based on going through the investigative process, assuming that they did, wouldn't have met the threshold for notification if they were not notification triggers, which they were not. 14:22:56 14:22:59 14:23:02 14:23:04 14:23:06
Q. Okay. I guess while we're on that 14:23:06

subject, I see in the document you brought with you that was -- that's marked as Exhibit 285, it says that -- am I reading these figures on -- I guess it's page 3 of the document under "investigative process" -- those figures are for the entirety of the -- the ADI from 2018 to 2021? 14:23:08 14:23:11 14:23:26 14:23:30 14:23:34 14:23:36

A. I think it's a floor. The reason that we had a plus there is that there was some additional work by -- done by internal teams that we stood up starting sort of late fall of 2018, and so those numbers are the floor. 14:23:50 14:23:55 14:23:59 14:24:04 14:24:12

Q. Got it. 14:24:15

But am I reading this correctly that order of magnitude, Facebook only had spoke to about 30 developers throughout the course of the whole ADI? 14:24:21 14:24:29 14:24:32

A. I think order of magnitude it was 30 plus, but -- 14:24:35 14:24:38

Q. Okay. 14:24:39

A. -- you know -- yeah. 14:24:39

Q. And that's out of over 7,000 that would have been flagged for suspicious activity sufficient to warrant a background or technical report; is that right? 14:24:42 14:24:44 14:24:53 14:24:56

A. We did 7300-plus background technical reports that were based on different investigative 14:24:56 14:25:08

signals. 14:25:13

And we would have -- the RFIs that would have followed would have been going to questions that we had or concerns that we had surfaced through the course of the investigation. And then of those we spoke with about 30-plus developers. 14:25:14 14:25:19 14:25:22 14:25:26 14:25:29

Q. And, ultimately, only conducted about 14 data audits; is that right also? 14:25:35 14:25:38

A. Order of magnitude, yes, roughly 14 data audits. 14:25:40 14:25:47

Q. Okay. Does that strike you as a pretty small number out of the whole universe of apps and app developers that were investigated? 14:25:47 14:25:50 14:25:54

A. It doesn't if you take into account the way that we went about the investigation, which was extremely robust and working with professionals who had careers in rooting out bad activity and looking to identify nefarious activity. 14:25:56 14:26:01 14:26:04 14:26:08 14:26:12

And so that was part of, you know, the $130 million plus in external OpEx that we spent on professionals, looking at these apps and developers and developing, you know, increasingly sophisticated ways of understanding the Version 1 data that we had and going through the investigative process. 14:26:17 14:26:24 14:26:32 14:26:39 14:26:42 14:26:45

And where we had concerns, we would 14:26:51

follow up with the developers as is reflected with the fairly significant numbers of RFIs that we sent in the -- in the engagement that we had. 14:26:55 14:26:58 14:27:02

Q. Do you know how many RFIs you received in total? 14:27:05 14:27:12

A. I don't have that on my reference sheets, but I think order of magnitude, it's -- I believe it's north of -- north of a thousand. And with developers, sometimes we'd go through multiple rounds of RFIs if we had questions that were outstanding from their responses in an earlier round. 14:27:13 14:27:19 14:27:23 14:27:25 14:27:28 14:27:32

Q. The next app is LOVOO/VOO; and it describes creating fake profiles. Some of its executives were taken into custody. 14:27:36 14:27:46 14:27:52

And, as a result, at the top it says, "We have drafted and sent a certification of deletion to this developer to sign, confirming that all Facebook data has been destroyed." 14:27:57 14:28:04 14:28:06 14:28:09

Do you see that? 14:28:15

A. I see that language under numbered paragraph -- subnumbered paragraph 1. 14:28:16 14:28:18

Q. Isn't relying on app developer self-certification for deletion of data one of the things that was specifically a problem and that Facebook said it should have done better with respect 14:28:21 14:28:26 14:28:27 14:28:30

to Cambridge Analytica and Aleksandr Kogan? 14:28:34

A. I think we went through the certification 14:28:39
pr- -- process with Kogan. I think, you know, 14:28:43
Facebook, as a private entity, does not have the 14:28:46
subpoena and investigatory powers of a government 14:28:58
regulatory. So with the tools that we have and, you 14:29:02
know, the investigative diligence that we put into 14:29:04
this, one of the -- one of the tools that we had was 14:29:07
to get certifications. 14:29:10

Q. And do you know if Facebook sought to 14:29:15
conduct an on-site audit or something more than just 14:29:19
a self-certification of the developer in this 14:29:26
instance? 14:29:29

A. I would want to check our files to be 14:29:29
sure that I'm accurate on that. 14:29:35

Q. Facebook also could have instituted legal 14:29:39
action to ensure deletion; isn't that right? 14:29:42

A. I would have to refresh myself on the 14:29:46
analysis that went into it. 14:29:53

We did take legal action against one of 14:29:56
the developers in ADI. It was not this particular 14:29:59
group, but -- but that was one of the -- one of the 14:30:06
actions that we took. 14:30:10

Q. Is that the RankWave situation you're 14:30:18
thinking of? 14:30:22

A. Yes. 14:30:22
Q. Okay. Were there any other instances in which, as far as you're aware of, Facebook took legal action to force data deletion? 14:30:22 14:30:24 14:30:28
A. In terms of sort of nonprivileged facts, that is the one investigation that resulted in a lawsuit. Though -- and then -- RankWave is the one case that we filed lawsuit against RankWave for their failure to cooperate with our audit. 14:30:30 14:30:33 14:30:36 14:30:47 14:30:52
Q. The next example is MyType. It says, "We have suspended this app for failure to cooperate in the investigation," but it also says, "We're continuing to investigate whether or not data sold by MyType may have included Facebook user data." 14:30:54 14:31:00 14:31:02 14:31:08 14:31:12
The -- the next paragraph under context, it says, "The site does not specify whether certain data included Facebook user data, but third-party academic articles suggests it may have." 14:31:20 14:31:24 14:31:34 14:31:37
Do you see that? 14:31:39
A. Let me -- let me catch up to where you're reading. 14:31:40 14:31:45
Q. Uh-huh. 14:31:46
A. I see the language that you're reading. 14:31:46
Q. So, again, I assume Facebook did not notify users of the MyType app; is that correct? 14:31:50 14:31:54

A. No. MyType did not trigger a notification. 14:31:58 14:32:01

Q. And why not? 14:32:04

A. I'd have to refresh myself on the specifics of this investigation and look at the investigative record on it, but I think we couldn't confirm that there was sale of data in violation of our policies. 14:32:11 14:32:14 14:32:15 14:32:19 14:32:21

Q. You're being handed what's been previously marked as Exhibit 125. 14:32:27 14:32:30

A. This document is titled, "Summary of Platform Learnings" and it's dated February 14th, 2019. It's on Gibson Dunn letterhead. Gibson Dunn is the firm I was mentioning that was my partner in execution on the App Developer Investigation. 14:32:32 14:32:35 14:32:37 14:32:43 14:32:47

Q. And what was the purpose of this document? 14:32:51 14:32:53

A. We were, as 2018 was coming to a close and thinking about the transition and investigative approach from Wave 1 to Wave 2 and beyond, focused on making sure that we captured what the lessons learned were from the investigation so that our partner teams across the business would have the benefit of what we were finding and seeing and could figure out what the right thing was to do with that information in the 14:32:53 14:32:55 14:33:15 14:33:25 14:33:28 14:33:31 14:33:34 14:33:36

spirit of whether there might be policy improvements or changes to sort of data logging information. And the idea was to just make sure that with all the work that had gone into it that that information was captured and sort of socialized more broadly than the -- the core team. 14:33:38 14:33:42 14:33:52 14:33:55 14:33:56 14:33:59

Q. And beyond the letterhead, who specifically drafted this? 14:34:05 14:34:08

A. It would have been our core team at Gibson Dunn and we had a team. I think I was reminded that we had over -- over a hundred timekeepers at Gibson Dunn, but I think Alex Southwell, who was the lead partner, who led ADI with me, would have signed off on the version, if not having drafted substantial parts of it. 14:34:09 14:34:12 14:34:15 14:34:18 14:34:21 14:34:24 14:34:27

Q. And what was the source material for each of these -- the findings that are listed in here? 14:34:29 14:34:37

A. Gibson Dunn worked closely with the FTI and Stroz teams to document what they had observed and learned and wanted to make sure the company had back end sort of written form, like memorialized form to, again, be able to socialize with the partner teams who would have been able to make improvements and change, you know, sort of the configuration of different things to account for this feedback. 14:34:42 14:34:47 14:34:50 14:34:59 14:35:03 14:35:07 14:35:09 14:35:13

Q. So are you saying they conducted interviews with the FTI and Stroz team? 14:35:17 14:35:19
A. We were all working as one team, so I don't think I would describe it as firmly as "interviews," but these were teams that were working, you know, day in and day out, arm in arm to execute on this, and there were, you know, many timekeepers. 14:35:22 14:35:25 14:35:30 14:35:32 14:35:35
I was reminded that there were over 400 timekeepers from the FTI team and 290 from the Stroz team, so I think they sourced sort of the best of the thinking and documented it in here. 14:35:38 14:35:41 14:35:47 14:35:51
Q. I think the topic discusses the methodology, for example underlying the document. So that's what I'm trying to get at, is the methodology by which these conclusions were reached? 14:35:53 14:35:55 14:35:58 14:36:00
A. Yeah. And I -- I think by February of 2019, it was nearly a year into the investigation, and it would have reflected the collective man-hours across hundreds of people who were working on this to synthesize the things that they would have recommended that we think about. 14:36:03 14:36:06 14:36:09 14:36:18 14:36:24 14:36:27
Q. Okay. So if I'm understanding you correctly, the conclusions in this document reflect the collective thinking of a lot of different folks from Facebook and externally that they had found in 14:36:28 14:36:32 14:36:36 14:36:41

the course of the ADI; is that right? 14:36:45

A. This particular document would have been 14:36:47 from -- at the direction and lead of the Gibson Dunn 14:36:54 team, working very closely with the FTI and Stroz 14:36:59 teams, the sort of collective feedback from them. 14:37:05

And leading the Stroz team was 14:37:10 Eric Friedberg who had a career as a federal 14:37:18 prosecutor in cybersecurity investigations and 14:37:21 Anthony Ferrante at FBI, who I believe had 14:37:24 cybersecurity practice and has a -- had a 14:37:28 distinguished career in FBI and the White House. 14:37:31

Q. So am I understanding correctly that the 14:37:35 conclusions in the document are based on solely 14:37:37 information from external parties like FTI, Stroz, 14:37:45 and Gibson Dunn and not those of Facebook? 14:37:50

A. This particular document was one that we 14:37:53 asked the external teams to put together for the 14:37:55 benefit of the internal teams. And that's certainly 14:37:58 not to the exclusion to the many internal discussions 14:38:07 that had been in progress based on our own learnings 14:38:09 within ADI. 14:38:13

So I think if you're asking about this 14:38:20 document itself, this is the reflected advice of our 14:38:22 external partners and teams, but that was not to the 14:38:27 exclusion of other discussions that we had 14:38:32

internally. 14:38:34

Q. Did Facebook dispute any of the findings in the document? 14:38:34 14:38:37

A. The purpose of this document was exactly the opposite of disputing the observations of our experts who we'd hired, that we wanted to take their feedback and see what we could do about it. 14:38:38 14:38:41 14:38:45 14:38:49

Q. So in the course of the ADI, Facebook only notified users of two apps that their data had been misused, right: Cambridge Analytica and myPersonality. Correct? 14:38:52 14:38:56 14:39:03 14:39:07

A. We notified in two instances. 14:39:07

Cambridge Analytica was the only confirmed data misuse. 14:39:09 14:39:11

myPersonality was not confirmed there was no sale of data, but we notified users in that event anyway. 14:39:12 14:39:14 14:39:18

Q. And there were 125,000 apps that were suspended as part of the ADI enforcement; correct? 14:39:27 14:39:36

A. Yes, roughly. 14:39:40

Q. Okay. So was Facebook able to conclusively determine that all but two of those 125,000 apps involved data misuse? 14:39:42 14:39:51 14:39:56

A. We would suspend the apps when the developer -- but when we didn't get responses to our 14:39:58 14:40:01

RFIs or where we had concerns about the developer and -- we would engage with them further, if we could. If they did not respond to our request for information, as the commitment recited, we would proceed to ban them. 14:40:06 14:40:10 14:40:14 14:40:17 14:40:20

Q. But Facebook wouldn't be able to independently confirm whether or not there had been data misuse where developers didn't respond to the RFI due to a lack of available data in Facebook's own records; isn't that true? 14:40:24 14:40:28 14:40:31 14:40:36 14:40:41

A. No, I think if we didn't have engagement from the developer, they would have the information about whether they misused data or not. 14:40:42 14:40:45 14:40:49

Q. Who is "they"? 14:40:52

A. The developer. 14:40:53

Q. But if they didn't respond to the RFI and you banned them, then you wouldn't have actually been able to confirm whether or not they did, in fact, misuse data; isn't that right? 14:40:54 14:40:59 14:41:02 14:41:07

A. We wouldn't be able to -- we weren't able to confirm it in those instances. So as the commitment required, we didn't -- we weren't able to confirm it so we wouldn't have notified users. 14:41:08 14:41:11 14:41:14 14:41:18

Q. On the first page, No. 5, one of the conclusions is that "No identity verification process 14:41:20 14:41:24

was in place to validate developers' identity." 14:41:32
Do you see where that is? 14:41:35
A. I do. 14:41:35
Q. And then it says under 5A, "Without a verified identity, it's hard to know if a developer who has previously been enforced against has a new identity." 14:41:36 14:41:39 14:41:42 14:41:45
Do you see that? 14:41:47
A. I do see that under A. 14:41:48
Q. And then the next subpoint says that "There were no safeguards to prevent banned users from remaining on the platform." 14:41:49 14:41:52 14:41:55
Do you see that? 14:41:57
A. I do see that language. 14:41:58
Q. So I mean, would you consider that a serious deficiency, that Facebook had no safeguards to prevent banned users from remaining on the platform and just changing their name? 14:41:59 14:42:03 14:42:07 14:42:10
A. I think that the observation was true that in terms of bad actors potentially being able to circumvent what was in place, but there were enforcement actions that the developer operations team could take that would apply to a developer. 14:42:13 14:42:15 14:42:34 14:42:36 14:42:38
So I think sitting here -- and, again, today the purpose of this document was to get the 14:42:41 14:42:46

best of the teams thinking and not to litigate the specific words that they put on the page, but to take them and see what improvements we could make, but I -- I think this sort of no safeguards might sort of over- -- overstate the fact that there were some safe- -- safeguards on the platform. 14:42:48 14:42:50 14:42:53 14:42:56 14:42:59 14:43:03

Q. So the instances in which Facebook notified users is a very small subsection of all the stuff that Facebook reviewed as part of the ADI. Isn't that what you're saying? 14:43:06 14:43:10 14:43:21 14:43:25

A. I think that's a characterization. We notified users where we confirmed data misuse, which was in This is Your Digital Life. And in addition to that, we also notified them with respect to myPersonality app. 14:43:26 14:43:29 14:43:31 14:43:35 14:43:38

Q. And, again, I think there were 125,000 apps that were suspended as part of the ADI's review for misconduct -- or excuse me -- data misuse, and yet there was only notification to users in two out of those 125,000 instances; correct? 14:43:41 14:43:48 14:43:54 14:43:58 14:44:02

A. We notified in two instances and, you know, even when we notified -- with myPersonality, we were confronted with allegations of defamation and that we were severely damaging, unjustifiably, a professional's reputation. 14:44:05 14:44:10 14:44:15 14:44:24 14:44:32

And so we needed to get the notification decisions right, certainly notifying users in instances where we had found misuse and also not making statements where it might not be true. 14:44:35 14:44:38 14:44:45 14:44:50

Q. Was there ever any announcement that the ADI had concluded publicly? 14:44:53 14:44:59

A. I believe we'd shared with regulators, the FTC, in particular, that we had concluded our investigation. 14:45:03 14:45:12 14:45:15

Q. That was -- that information was not made public; correct? 14:45:15 14:45:17

A. Not -- not to my knowledge. 14:45:18

Q. So as far as the public is aware, the ADI is still going on to this day; right? 14:45:23 14:45:27

A. From our experience with notifications and the posts, as far as the public is concerned, nobody else remembers ADI. 14:45:29 14:45:32 14:45:36

Q. So I have just handed you what's been previously marked as Exhibit 119. It is the September 20th, 2019, post that is -- well, I'll ask you. 14:45:40 14:45:45 14:45:50 14:45:58

Is it the same post that's referenced in the second-to-last bullet point of your back- -- background document, Exhibit 285? 14:46:00 14:46:01 14:46:05

A. Yes, it looks like it. 14:46:08