GIBSON, DUNN & CRUTCHER LLP
Brian M. Lutz (SBN 255976)
blutz@gibsondunn.com
Martie Kutscher (SBN 302650)
mkutscherclark@gibsondunn.com
Michael J. Kahn (SBN 303289)
mjkahn@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: 202.955.8217
Facsimile: 202.530.9614

*Attorneys for Defendants Facebook, Inc., Mark E. Zuckerberg, Sheryl K. Sandberg, and David M. Wehner*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE FACEBOOK, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | CASE NO. 5:18-CV-01725-EJD<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFFS' MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL**<br><br>Date: January 21, 2027<br>Time: 9:00 a.m.<br>Location: Courtroom 4, 5th Floor<br>Judge: Hon. Edward J. Davila<br><br>Date First Action Filed: March 20, 2018 |

## TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

II. STATEMENT OF RELEVANT FACTS ..... 5

A. Factual Background ..... 5

B. Procedural History ..... 7

III. LEGAL STANDARD ..... 8

IV. ARGUMENT ..... 8

A. Plaintiffs' Unpleaded Claim Cannot Support Class Certification. ..... 8

B. Plaintiffs Have Not Established A Viable Classwide Damages Model. ..... 10

1. The Damages Model Is Not Tied To Plaintiffs' Theory Of Liability. ..... 10

2. Plaintiffs' "Materialization Of Risk" Theory For The July 2018 Stock Drop Fails. ..... 11

C. Plaintiffs Have Not Established Classwide Reliance. ..... 12

1. Plaintiffs Have Failed To Prove They Are Entitled To The Presumption Of Reliance. ..... 12

2. Defendants Have Rebutted Any Presumption Of Reliance. ..... 14

D. At A Minimum, Any Class Period Should End In March 2018, When Plaintiffs Allege The Full Truth Was Revealed. ..... 19

E. The Court Should Not Certify A Class For Plaintiffs' Remaining Claims. ..... 21

F. Lead Plaintiffs Cannot Be Class Representatives. ..... 22

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) .... 18

*Anderson v. U.S. Dep't of Hous. & Urb. Dev.*,
554 F.3d 525 (5th Cir. 2008) .... 1, 8, 10

*In re Apache Corp. Sec. Litig.*,
2024 WL 532315 (S.D. Tex. Feb. 9, 2024) .... 4, 19

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) .... 14, 15, 16, 17

*Azoiani v. Love's Travel Stops & Country Stores, Inc.*,
2007 WL 4811627 (C.D. Cal. Dec. 18, 2007) .... 24

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .... 1, 2, 4, 19

*Bibo v. Fed. Express, Inc.*,
2009 WL 1068880 (N.D. Cal. Apr. 21, 2009) .... 9

*Brown v. Am. Airlines, Inc.*,
285 F.R.D. 546 (C.D. Cal. 2011) .... 1, 10

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .... 1, 2, 8, 10

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .... 21

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .... 4

*In re Enovix Corp. Sec. Litig.*,
2026 WL 1078569 (N.D. Cal. Apr. 21, 2026) .... 14, 17

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) .... 3, 7, 11, 15, 18, 20, 21

*Fendler v. Westgate-Cal. Corp.*,
527 F.2d 1168 (9th Cir. 1975) .... 24

*In re FibroGen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) .... 16, 17

*FindWhat Inv. Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) .... 15, 17, 18, 23

*In re Fortune Sys. Sec. Litig.*,
680 F. Supp. 1360 (N.D. Cal. 1987) .... 20

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) .......... 15

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
594 U.S. 113 (2021) .......... 3, 12, 14, 16, 18

*Greenberg v. Crossroads Sys., Inc.*,
364 F.3d 657 (5th Cir. 2004) .......... 18

*Grigsby v. BofI Holding, Inc.*,
979 F.3d 1198 (9th Cir. 2020) .......... 18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .......... 1, 3, 8, 12, 13, 14, 19

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) .......... 4, 23

*Hayes v. MagnaChip Semiconductor Corp.*,
2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) .......... 19, 20

*James v. City of Dallas*,
254 F.3d 551 (5th Cir. 2001) .......... 21

*Junod v. NWP Servs. Co.*,
2016 WL 6306030 (C.D. Cal. July 18, 2016) .......... 9

*Ludlow v. BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015) .......... 2, 10, 11, 12

*Nova Scotia Health Emps.' Pension Plan v. Comerica Inc.*,
2026 WL 323711 (9th Cir. Feb. 6, 2026) .......... 21

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) (en banc) .......... 8

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) .......... 21

*Ortiz v. CVS Caremark Corp.*,
2013 WL 6236743 (N.D. Cal. Dec. 2, 2013) .......... 9

*In re Qualcomm Inc. Sec. Litig.*,
2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) .......... 16

*R.I. Off. of the Gen. Treasurer ex rel. Emps. Ret. Sys. of R.I. v. Boeing Co.*,
182 F.4th 422 (4th Cir. 2026) .......... 2, 10, 11, 12

*Santiago v. City of Chicago*,
19 F.4th 1010 (7th Cir. 2021) .......... 23

*Santos v. TWC Admin. LLC*,
2014 WL 12558009 (C.D. Cal. Aug. 4, 2014) .......... 9

*Simington v. Lease Fin. Grp., LLC*,
2012 WL 6681735 (S.D.N.Y. Dec. 14, 2012) .......... 9

*Turner v. Apple, Inc.*,
2025 WL 1953697 (N.D. Cal. July 16, 2025)....................9

*United States v. Ga.-Pac. Co.*,
421 F.2d 92 (9th Cir. 1970)....................22

*In re Vaxart, Inc. Sec. Litig.*,
813 F. Supp. 3d 970 (N.D. Cal. 2025)....................22

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
325 F.R.D. 280 (D. Minn. 2018)....................19, 20

*Waine-Golston v. Time Warner Ent.-Advance/New House P'ship*,
2012 WL 6591610 (S.D. Cal. Dec. 18, 2012)....................9

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................8

*Welling v. Alexy*,
155 F.R.D. 654 (N.D. Cal. 1994)....................24

*York v. Starbucks Corp.*,
2011 WL 8199987 (C.D. Cal. Nov. 23, 2011)....................9

**Statutes**

15 U.S.C. §78t-1(a)....................22

28 U.S.C. §1658(b)(2)....................10

**Rules**

Fed. R. Civ. P. 23(a)(3)....................4

Fed. R. Civ. P. 23(b)(3)....................19

## I. INTRODUCTION

Plaintiffs have failed to carry their burden to "actually *prove*—not simply plead—that [the] proposed class satisfies each requirement" for class certification. *Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 275 (2014). To justify class certification, Plaintiffs must establish that (1) the class is predicated on a claim they pleaded, *Anderson v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 525, 529 (5th Cir. 2008), (2) "damages are capable of measurement on a classwide basis," *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), and (3) the class's "reliance" on the alleged misstatements is capable of classwide adjudication, *Basic Inc. v. Levinson*, 485 U.S. 224, 249-50 (1988). Plaintiffs fail all of these requirements, and each failure independently requires denial of their Motion.

First, Plaintiffs seek certification on a claim they failed to plead. This Court held Plaintiffs may pursue only two theories of fraud: that Defendants failed to disclose (i) they "knew that … in 2015, Aleksandr Kogan, through his company GSR, sold user data to Cambridge Analytica, which in turn sold it to Ted Cruz's presidential campaign" (the "initial misuse" theory), ECF No. 258 ("2026 Order") at 19, and (ii) that Facebook allegedly provided certain third parties "access [to] users' data and users' friends' data, in contravention of user privacy settings" (the whitelisting theory), *id.* at 4. Those two theories are what remain after eight years of pleadings litigation, including multiple motions to dismiss, an appeal to the Ninth Circuit, litigation in the Supreme Court, and four amended complaints. Plaintiffs now ask this Court to certify a class on yet another theory of fraud, one that appears in none of their complaints and has never survived the pleadings. The new theory is that Defendants allegedly "concealed from investors" "that Facebook's profitability was boosted by third parties' improper access to and use of users' data" and that "an amount of its revenue was based on unsustainable practices allowing third-party access to user data without users' consent." ECF No. 278 (the "Motion" or "Mot.") 21 (citation modified). But "[c]lass certification is not a time for asserting new legal theories that were not pleaded in the complaint," *Brown v. Am. Airlines, Inc.*, 285 F.R.D. 546, 560 (C.D. Cal. 2011), and Plaintiffs cannot "structure a class around claims not pled," *Anderson*, 554 F.3d at 529.

Second, Plaintiffs' Motion should be denied because they have not proven that "damages are capable of measurement on a classwide basis" in a manner "consistent with [Plaintiffs'] liability case."

*Comcast*, 569 U.S. at 34-35. Plaintiffs' proposed damages model is based on Plaintiffs' unpleaded "profitability inflation" theory and Cambridge Analytica's "continued misuse" of Facebook data—a theory this Court dismissed with prejudice. Thus, neither basis for damages is "consistent with [Plaintiffs'] liability case." *Id.* at 35; *see also R.I. Off. of the Gen. Treasurer ex rel. Emps. Ret. Sys. of R.I. v. Boeing Co.*, 182 F.4th 422, 441 (4th Cir. 2026). Plaintiffs take this approach because any damages for their *actual* claims cannot be calculated on a classwide basis. This is because Plaintiffs' alleged damages are based on a "materialization of the risk" theory—that the "fraud" was revealed (at the latest) in March 2018; the market learned of risks to Facebook's business at that time; and those risks ultimately materialized (and led to a stock drop) in July 2018. Indeed, Plaintiffs' own expert agrees, having invoked Facebook's July 2018 drop in other litigation as the materialization of a risk the market already knew. But damages under a "materialization of the risk" theory cannot be calculated on a classwide basis. Once the alleged "fraud" is known, investors trade in individualized ways based on their own risk tolerance before the risk materializes (here, July 2018). *See Ludlow v. BP, P.L.C.*, 800 F.3d 674, 691 (5th Cir. 2015). Accordingly, Plaintiffs have failed to establish that damages can be resolved on a classwide basis for any of their claims.

Third, Plaintiffs have failed to show that the element of reliance may be established on a classwide basis. Plaintiffs invoke the "fraud-on-the-market" presumption of reliance—the idea that in an efficient market, every investor is presumed to have relied on an alleged materially false or misleading statement when making investment decisions because all material public information is incorporated into the company's stock price. *Basic*, 485 U.S. at 241-42. Plaintiffs can invoke that presumption only if they prove they bought stock before the "truth" was revealed. They cannot do so. Every class member, by definition, bought during the class period, which begins on February 3, 2017. However, the "truth" was initially publicly reported as early as December 2015, over a year earlier. This means every purchase at issue came *after* that truth was on the market. Plaintiffs' only response is that they *alleged* the truth emerged in March 2018. But, at this stage, Plaintiffs must *prove* when the truth came out, not re-plead it. Because they provide no such proof, the presumption of reliance cannot apply.

Even if Plaintiffs could invoke the presumption of reliance, Defendants' evidence rebuts it.

Under the Supreme Court's opinions in *Halliburton II*, 573 U.S. 258, and *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021), a defendant can rebut the presumption of reliance, thus defeating class certification, by showing that an alleged misstatement had no impact on the stock price when made (on the "front end") or when supposedly corrected (on the "back end"). Defendants can demonstrate the lack of price impact through *any evidence* that severs the link between the alleged misrepresentation and the price plaintiffs paid for the stock. *See Goldman*, 594 U.S. at 125.

There was no price impact here. On the front end, Facebook's stock price did not rise when the alleged misstatements were made, which is no surprise given that investors do not trade on generic statements like those remaining in the case. On the back end, the whitelisting theory fails because Facebook's stock did not drop when news of whitelisting became public. *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 954 (9th Cir. 2023) ("[T]he June 2018 whitelisting revelation, which was unaccompanied by a stock price drop, is not actionable."), *cert. dismissed as improvidently granted*, 604 U.S. 4 (2024) (per curiam). Nor can the March 2018 drop carry the initial misuse theory. The market had known the initial misuse facts since 2015—what was new in March 2018 was Cambridge Analytica's alleged *continued misuse* of Facebook user data, a theory this Court dismissed with prejudice. Regardless, there is no basis to infer the market relied on the alleged misstatements due to the stock drop in March 2018, because there is a "mismatch" between the specific facts disclosed in March 2018 and the generic risk factor and user control statements they supposedly corrected. *See Goldman*, 594 U.S. at 123. Reliance therefore cannot be decided on a classwide basis.

Fourth, even if some class could be certified (it cannot), the class period must end on March 20, 2018. Investors who buy after "the truth was revealed" "[can]not be said to have acted in reliance on a fraud-tainted price." *Halliburton II*, 573 U.S. at 278. Plaintiffs have admitted, three times over, that the truth here was revealed by March 20, 2018. Their Fourth Amended Complaint (the "4AC") (ECF Nos. 227-3, 228) alleges that the March 2018 disclosures "revealed the essential facts" underlying *all* of the alleged frauds. 4AC ¶ 683. Plaintiffs told the Ninth Circuit that "[t]he truth concealed by the misstatements became known to the market in March 2018." Reply Br. of Pls.-Appellants at 30, *In re Facebook*, No. 22-15077 (9th Cir. Oct. 12, 2022), ECF No. 38 ("Ninth Circuit Reply Br."). And Plaintiffs' own expert—Dr. Jonah Gelbach—testified that the March 2018 disclosures "clearly

revealed" the misappropriation by Cambridge Analytica and the lack of user control. Decl. of Brian M. Lutz ("Lutz Decl.") Ex. 1 ("Gelbach Tr.") 90:5-14. By Plaintiffs' own account, the later disclosures added nothing—the June whitelisting reporting merely confirmed what the market already knew (because the "truth" about user control of data was revealed by March), and the July earnings report revealed only the "extent of the damage," not any new fraud. 4AC ¶¶ 683-85, 687. Because "a class period ends when the truth has been disseminated to the market," *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *8 (S.D. Tex. Feb. 9, 2024) (citation omitted), no one who bought after March 20, 2018 belongs in any class.

Fifth, neither lead plaintiff, the Public Employees' Retirement System of Mississippi ("MSPERS") nor Amalgamated Bank, as Trustee for the LongView LargeCap 1000 Growth Index Fund, LongView Quantitative LargeCap Fund, and LongView Quant LargeCap Equity VEBA Fund ("Amalgamated"), can represent the purported class because their claims are not typical of the putative class. Fed. R. Civ. P. 23(a)(3); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). [redacted] And those managers confirmed that they *did not* rely on the alleged misrepresentations when they bought Facebook stock. That is precisely the "showing that severs the link between the alleged misrepresentation and … [the] decision to trade" that rebuts the presumption of reliance as to MSPERS. *Basic*, 485 U.S. at 248. [redacted] That admission bars its claims and, at the very least, prohibits it from representing the class. Without a viable class representative, no class can be certified.

* * *

Each of these defects independently defeats certification—the class rests on an unpleaded claim, damages cannot be measured classwide, reliance cannot be established classwide, and neither proposed representative can serve. The Court should deny the Motion. If any class is nonetheless certified, it must end on March 20, 2018.

## II. STATEMENT OF RELEVANT FACTS

### A. Factual Background

Plaintiffs allege that, throughout the putative class period, Defendants made materially false and misleading statements concerning whether and how third parties access user data on Facebook's platform. 2026 Order at 2-5. When this litigation began, Plaintiffs challenged 83 statements falling into 13 categories, ECF No. 137 ("2020 Order") at 8-25 (summarizing challenged statements). Those challenged statements have been whittled down, and only two categories of allegedly false or misleading statements remain in the case: (1) "risk factor" disclosures in Facebook's SEC filings, and (2) statements about "user control" of data that users shared on Facebook. 2026 Order at 5, 26, 30.

*The Challenged Statements.* Plaintiffs challenge "risk factor" disclosures in Facebook's 2016 Form 10-K, filed on February 3, 2017, warning that "[s]ecurity breaches and improper access to or disclosure of [Facebook] data or user data, or other hacking and phishing attacks on our systems, could harm our reputation and adversely affect our business." *Id.* at 10 (emphasis omitted) (quoting 4AC ¶ 628(a)); *see also id.* (listing similar challenged statements). Plaintiffs allege that these statements present the risk of third-party data misuse as "a purely hypothetical risk." *Id.* at 3, 6. Plaintiffs also challenge several "user control" statements. They point to several statements from 2017 and 2018 that users could control who can see the data they share on Facebook and allege that these statements were false and misleading in light of Cambridge Analytica's "misuse" of Facebook data and Facebook's "whitelisting" practices. 2026 Order at 4-5; ECF No. 168 ("2021 Order") at 4, 13.

*Cambridge Analytica.* Plaintiffs' first theory of fraud focuses on Cambridge Analytica, a political consulting firm. In 2014, a personality quiz app developed by Cambridge University researcher Aleksandr Kogan appeared on Facebook. 2026 Order at 2. Approximately 270,000 people installed the app and consented to share their data, as well as data about their Facebook friends (if their friends' settings permitted such sharing with apps). *Id.* The public learned about this in December 2015, when *The Guardian* reported that, in violation of Facebook's policies, Kogan and his company had sold data on tens of millions of Facebook users collected through his app to Cambridge Analytica and that Ted Cruz's presidential campaign used psychological profiles based on that data. *Id.* at 2-3; Lutz Decl. Ex. 2. Facebook said it was "carefully investigating th[e] situation" and that it would "take

swift action against companies" that misled Facebook users or misused user data, including by banning those companies and requiring them to delete the misappropriated data. Lutz Decl. Ex. 2, at 3. In March 2017, *The Intercept* reported that Facebook had done exactly that. It noted that, "[s]hortly after *The Guardian* published its 2015 article, Facebook contacted [Kogan's company] and requested that it delete the data it had taken from Facebook users," a request that Facebook "believe[d]" Kogan and Cambridge Analytica's parent company complied with. *Id.*, Ex. 3, at 4-5; *see also* 4AC ¶¶ 468, 492 (Kogan and Cambridge Analytica reported to Facebook that they had deleted the Facebook user data). Dozens of other articles reported on these and related facts in 2016 and 2017. In March 2018, Defendants and several news outlets reported that Cambridge Analytica had misled Facebook, retained Facebook user data, and continued to misuse that data. 2026 Order at 3-4. Plaintiffs allege that, by this point, the full scope of the allegedly misleading nature of Defendants' statements became clear to the market. 4AC ¶ 683.

*Whitelisting.* Plaintiffs' second theory of fraud involves Facebook's alleged "whitelisting" practices. Plaintiffs allege that, throughout the putative class period, Facebook allowed certain "whitelisted" apps and third parties to access data from users and their friends based on previously signed data-sharing agreements with several device manufacturers, like BlackBerry and Microsoft, even when users selected settings allegedly restricting such data sharing. 2026 Order at 4; 4AC ¶¶ 426, 434-36. While certain details regarding this alleged whitelisting were revealed in a *New York Times* article from June 3, 2018, Plaintiffs contend this disclosure revealed no new "essential facts" regarding Defendants' allegedly fraudulent statements that had not already been disclosed in March 2018, 4AC ¶ 683, and Plaintiffs' expert agrees, *see* Gelbach Tr. 90:5-14, 97:11-19 (testifying the market learned the "truth" that users supposedly did not control their data by March 2018).

*Market Changes.* From March 2018 to July 2018, the value of Facebook's stock fluctuated. Plaintiffs allege that, on March 19, following reporting by Defendants and others that Cambridge Analytica had not deleted the Facebook user data it obtained from Kogan's app, Facebook's common stock dropped nearly 7%. 2026 Order at 4. They allege it fell an additional 2.5% the next day. *Id.* That dip did not last long. In April, the value of Facebook's stock rose more than 9% after the release of a favorable first-quarter earnings report. *Id.* Facebook's stock price did not experience a statistically

significant decline following the *New York Times* whitelisting reporting in June. 2021 Order at 13; 4AC ¶ 683. Facebook's stock price declined on July 26, 2018, after Facebook reported lower-than-expected revenue growth, profitability, and user growth for its second quarter. 2026 Order at 4. Plaintiffs do not contend that this announcement corrected any alleged misstatement by revealing new facts about Cambridge Analytica or whitelisting. Rather, Plaintiffs allege this decline was caused by "'dramatically lowered user engagement, substantially decreased advertising revenue and earnings, and reduced growth expectations going forward' on account of the Cambridge Analytica and whitelisting scandals" disclosed earlier in 2018. *In re Facebook*, 87 F.4th at 956 (quoting Plaintiffs' allegations). The July 2018 decline, in other words, reflected the materialization of risks Plaintiffs allege the market had learned of in March 2018.

**B. Procedural History**

This Court initially dismissed Plaintiffs' claims in their entirety. *See* 2021 Order at 14. On appeal, the Ninth Circuit affirmed this Court's dismissal order in part, but it reversed as to the two categories of statements discussed above. 2026 Order at 5. According to the Ninth Circuit, Plaintiffs "adequately pleaded falsity as to the statements in Facebook's 2016 10-K that represented the risk of third parties improperly accessing and using Facebook users' data as purely hypothetical" because improper third-party data access "had already occurred." *In re Facebook*, 87 F.4th at 949-50. It also held that Plaintiffs adequately pleaded that "the Cambridge Analytica and whitelisting revelations" caused the March 2018 and July 2018 stock drops. *Id.* at 954-57. For the July 2018 stock drop, the Ninth Circuit held that Plaintiffs adequately pleaded that the financial results reported in July were caused by users and advertisers negatively reacting to "the Cambridge Analytica and whitelisting scandals" from March and June. *Id.* at 955-57. The Ninth Circuit's ruling tracked Plaintiffs' arguments that the July 2018 stock drop was a "market react[ion] to additional information about the extent of the financial damage *inflicted by a previously disclosed fraud*," Br. of Pls.-Appellants at 57 n.6, *In re Facebook*, No. 22-15077 (9th Cir. May 23, 2022), ECF No. 14 ("Ninth Circuit Opening Br.") (emphasis added), not that it revealed new information about the alleged fraud itself.

On remand, Plaintiffs amended their complaint, and Defendants moved to dismiss. ECF No. 238. This Court granted in part and denied in part Defendants' motion. 2026 Order at 33. It permitted

Plaintiffs' claims "based on the user control statements and the whitelisting theory of fraud." *Id.* It also permitted claims based on "the Cambridge Analytica theory of fraud," but *only* insofar as they were premised on Cambridge Analytica's 2015 "initial misuse" of Facebook's data. *Id.* The Court otherwise dismissed with prejudice Plaintiffs' claims related to Cambridge Analytica, including claims based on Facebook's "investigation" into Cambridge Analytica's misuse of data and Cambridge Analytica's "continued misuse" of user data after it certified to Facebook that it had deleted that data. *Id.*

Thus, after eight years of litigation on the pleadings, only two theories of fraud remain in the case: the Cambridge Analytica "initial misuse" theory and the "whitelisting" theory.

## III. LEGAL STANDARD

Plaintiffs must "affirmatively demonstrate" that they satisfy the requirements for class certification. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc). At this stage, Plaintiffs must "actually *prove*—not simply plead—that [the] proposed class satisfies each requirement of Rule 23." *Halliburton II*, 573 U.S. at 275. Plaintiffs must establish (1) the class is predicated on a claim pleaded in the complaint, *Anderson*, 554 F.3d at 529, (2) "damages are capable of measurement on a classwide basis," *Comcast*, 569 U.S. at 34, and (3) "reliance" is capable of classwide adjudication, *Halliburton II*, 573 U.S. at 267-69. In reviewing these requirements, this Court must subject Plaintiffs' evidence to "rigorous analysis" because "actual, not presumed, conformance" with Rule 23 is "indispensable" to any class certification. *Wal-Mart*, 564 U.S. at 351 (citation modified). If Plaintiffs fail to carry their burden on any of these necessary steps, this Court cannot certify the class.

## IV. ARGUMENT

### A. Plaintiffs' Unpleaded Claim Cannot Support Class Certification.

This Court should deny Plaintiffs' Motion in full to the extent it seeks class certification based upon a claim not pleaded in Plaintiffs' complaint. Rule 23 "does not permit [a court] to structure a class around claims not pled." *Anderson*, 554 F.3d at 529. Yet that is precisely what Plaintiffs ask the Court to do in seeking class certification based on their new theory that Defendants "conceal[ed] from investors" "that [Facebook's] profitability was boosted by third parties' improper access to and use of

users' data." Mot. 21.

"Where the claim or theory underlying a proposed class is absent from the operative complaint, class certification is generally improper." *Junod v. NWP Servs. Co.*, 2016 WL 6306030, at *5 (C.D. Cal. July 18, 2016). That is because the complaint "must provide 'adequate notice of the claims that underl[ie] … the motion to certify [the proposed class],'" a requirement that is not met when plaintiffs seek certification "on the basis of a theory not found in the operative complaint." *Id.* (second alteration in original) (quoting *York v. Starbucks Corp.*, 2011 WL 8199987, at *10 (C.D. Cal. Nov. 23, 2011)); *Bibo v. Fed. Express, Inc.*, 2009 WL 1068880, at *7 (N.D. Cal. Apr. 21, 2009) (refusing to certify a class based on a claim not pleaded because defendants "lacked notice"). A court may not certify a class based on a theory "that was not pled in the operative … complaint." *Ortiz v. CVS Caremark Corp.*, 2013 WL 6236743, at *11 (N.D. Cal. Dec. 2, 2013); *Turner v. Apple, Inc.*, 2025 WL 1953697, at *5 (N.D. Cal. July 16, 2025) (Davila, J.) (holding a plaintiff could not proceed on a fraud theory in a class certification motion "because he did not plead it in the operative complaint"); *Santos v. TWC Admin. LLC*, 2014 WL 12558009, at *8 (C.D. Cal. Aug. 4, 2014) ("[A] district court cannot certify a class based on claims not alleged in the complaint."); *Waine-Golston v. Time Warner Ent.-Advance/New House P'ship*, 2012 WL 6591610, at *3 (S.D. Cal. Dec. 18, 2012) (similar); *Simington v. Lease Fin. Grp., LLC*, 2012 WL 6681735, at *8 (S.D.N.Y. Dec. 14, 2012) (similar).

Plaintiffs seek certification based on a claim that is nowhere to be found in the 4AC. In their Motion, Plaintiffs claim Defendants "conceal[ed] from investors" "that [Facebook's] profitability was boosted by third parties' improper access to and use of users' data" and that "'an amount of [its] revenue was based on unsustainable practices allowing third-party access to user data' without users' consent." Mot. 21 (third alteration in original) (citation omitted).

That claim was not pleaded. As this Court has recognized, the 4AC asserts only "two theories of fraud"—"the alleged whitelisting fraud and the alleged Cambridge Analytica fraud." 2026 Order at 16. The 4AC identifies only those alleged frauds as the reasons why Defendants' statements allegedly are misleading. 4AC ¶¶ 618, 621, 623, 626 (user control statements); *id.* ¶¶ 630, 633 (risk factor statements). Plaintiffs do not allege these statements were misleading by omitting that Facebook's revenues and profitability were boosted by allegedly improper data-sharing practices. That theory

appears for the first time in their class certification motion—eight years into this litigation. "Class certification is not a time for asserting new legal theories that were not pleaded in the complaint." *Brown*, 285 F.R.D. at 560. That is particularly true here because Plaintiffs' new claim would be time-barred. 28 U.S.C. § 1658(b)(2) (claims must be brought within five years of fraud). No class can be certified based on Plaintiffs' unpleaded theory. *Anderson*, 554 F.3d at 528-29.

**B. Plaintiffs Have Not Established A Viable Classwide Damages Model.**

Plaintiffs' unpleaded theory also dooms their damages case. Under *Comcast*, damages must be "capable of measurement on a classwide basis" in a manner "consistent with [Plaintiffs'] liability case." 569 U.S. at 34-35. Plaintiffs' damages model is not. It rests on two theories that are not in the case: the unpleaded "profitability inflation" theory and the "continued misuse" theory this Court already dismissed with prejudice. Additionally, Plaintiffs pursue a "materialization of the risk" theory of damages for the July 2018 stock drop, but that theory does not work in class actions. *See Ludlow*, 800 F.3d at 691 (affirming denial of certification under *Comcast*).

**1. The Damages Model Is Not Tied To Plaintiffs' Theory Of Liability.**

*Comcast* requires a damages model that matches the theory of liability. 569 U.S. at 35; *Boeing*, 182 F.4th at 441. Plaintiffs' model fails that requirement because it is based on a supposed "truth" that Plaintiffs never alleged was concealed and the dismissed continued misuse theory.

The 4AC alleges that Defendants concealed Cambridge Analytica's initial misuse of user data and the whitelisting practices. But Dr. Gelbach's model is based on an unpleaded "fraud": the concealment of an alleged "truth" that Facebook's "profitability was boosted by third parties' improper access to and use of users' data," creating unsustainable revenue and the risk of remediation costs, FTC liability, and regulation. ECF No. 278-2 ("Gelbach Report") ¶¶ 97, 99, 103; *see* Lutz Decl. Ex. 7 ("Dirks Report") ¶ 147. None of that is alleged in the 4AC and therefore is not "consistent with [Plaintiffs'] liability case." *Comcast*, 569 U.S. at 35.

Dr. Gelbach's model puts dollar figures on this unpleaded theory. He opines that Facebook's stock price was inflated by $54.51 per share and that the inflation left the stock on three different days as the alleged corrective disclosures came out: $8.50 on March 19, 2018, $4.99 on March 20, 2018, and $41.02 on July 26, 2018. Gelbach Report ¶¶ 104-07, 147-49 & tbl. 5. Thus, according to Plaintiffs'

expert, three quarters of the total alleged loss—$41.02—occurred when Facebook's Q2 2018 earnings allowed the market to understand that Facebook's "profitability was boosted" by the data practices—a theory of liability Plaintiffs never pleaded. *Id.* ¶¶ 97, 99; Gelbach Tr. 41:20-42:3, 44:2-15, 48:4-49:3, 52:11-69:11.

Dr. Gelbach's model also rests on the continued misuse theory this Court dismissed with prejudice. His report ties the March 20 decline to articles reporting Cambridge Analytica's "continued control and misuse." Gelbach Report ¶ 118. When pressed on this issue at his deposition, Dr. Gelbach admitted that he did "take into account" the continued misuse disclosures in measuring damages. Gelbach Tr. 190:16-192:16, 194:1-196:13; *see also id.* at 213:25-215:3.

A damages model built on an unpleaded theory and a dismissed one fails *Comcast*. The Court should deny the Motion for this reason alone. *See Boeing*, 182 F.4th at 441.

**2. Plaintiffs' "Materialization Of Risk" Theory For The July 2018 Stock Drop Fails.**

Plaintiffs resort to these unpleaded or dismissed theories because the theory they actually pleaded is a materialization of risk theory, and damages under this theory cannot be measured on a classwide basis. *See Ludlow*, 800 F.3d at 691.

Plaintiffs are pursuing a classic "materialization of the risk" theory. Plaintiffs' position, advanced here and in the Ninth Circuit, is that the July 2018 stock drop reflected the impact on Facebook's business of the "frauds" disclosed in March 2018—in particular, it "revealed the true extent of the damage that the revelations about Cambridge Analytica had on Facebook's business." 4AC ¶ 687; Ninth Circuit Opening Br. at 57 n.6 (the July 2018 stock drop was a "market react[ion] to additional information about the extent of the financial damage inflicted by a previously disclosed fraud"). The Ninth Circuit recognized as much, noting that Plaintiffs pleaded that the July 2018 stock drop was caused by "dramatically lowered user engagement, substantially decreased advertising revenue and earnings, and reduced growth expectations going forward on account of the [previously revealed] Cambridge Analytica and whitelisting scandals." *In re Facebook*, 87 F.4th at 956 (internal quotation marks omitted). Plaintiffs' expert, Dr. Gelbach, conceded that the market knew Facebook's business faced these very risks when the "frauds" were revealed in March, Gelbach Tr. 162:20-165:25, and that the July drop "reveal[ed] the impact of the concealed facts on Facebook's … value," Gelbach

Tr. 167:10-19. And in the *Alphabet* securities litigation, Dr. Gelbach described this very drop as "the July 25, 2018 news of Facebook's materialized risk from the Cambridge Analytica scandal." Lutz Decl. Ex. 4 (Rebuttal Expert Report of Professor Jonah B. Gelbach, *In re Alphabet, Inc. Sec. Litig.*, No. 3:18-cv-06245-TLT (N.D. Cal. Aug. 14, 2023), ECF No. 199-1, Ex. 1) ¶ 99.

Damages under Plaintiffs' materialization of the risk theory "cannot be applied uniformly across the class, as *Comcast* requires." *Ludlow*, 800 F.3d at 691. Once a risk is disclosed (here, no later than March 2018) but before it materializes (here, July 2018), investors respond in their own unique and individual ways. Some will decide the risk is overblown and hold or buy more shares. Other investors may decide the disclosed risk is serious enough that they should sell their shares. Whether and how investors respond to the disclosed risk is a "determination not derivable as a common question, but rather one requiring individualized inquiry." *Id.* at 690. Here, Plaintiffs' damages methodology "does not provide any mechanism for separating" the various classes of investors—based on risk tolerance and timing of market revelations—and therefore "cannot provide an adequate measure of class-wide damages under *Comcast*." *Id.* Plaintiffs' expert made no attempt to account for such individualized issues in his damages model. Accordingly, Plaintiffs cannot reliably measure damages "on a class-wide basis," even for the surviving theory they pleaded. *Boeing*, 182 F.4th at 439.

Whatever theory the Court considers, Plaintiffs have no viable damages model. The theories their model measures were never pleaded or were dismissed with prejudice, and the theories they pleaded cannot support classwide damages for the July 2018 drop.

### C. Plaintiffs Have Not Established Classwide Reliance.

Plaintiffs also cannot establish classwide reliance. *First*, Plaintiffs are not entitled to the presumption of reliance because the "truth" was public before the class period began. *Halliburton II*, 573 U.S. at 277-78. *Second*, even if the presumption could apply, Defendants have rebutted it because the challenged statements had no impact on Facebook's stock price when made or when supposedly corrected. *See Halliburton II*, 573 U.S. at 269; *Goldman*, 594 U.S. at 123, 125.

#### 1. Plaintiffs Have Failed To Prove They Are Entitled To The Presumption Of Reliance.

To invoke the presumption of reliance, Plaintiffs must prove, among other things, that they "traded the stock between when the misrepresentations were made and when the truth was revealed."

*Halliburton II*, 573 U.S. at 277-78. They cannot.

The proposed class period begins February 3, 2017. Mot. 2. But the market knew the "truth"—that Facebook user data could be used and disseminated by third parties—by December 2015, when *The Guardian* reported that Kogan had sold Facebook user data to Cambridge Analytica; additional reporting followed, including by *The Intercept* in 2017. *See* Lutz Decl. Ex. 5 ("Fischel Report") ¶¶ 10-11, 39-40, 44; Lutz Decl. Ex. 7 ("Dirks Report") ¶¶ 80-82. This is consistent with Plaintiffs' concessions in this case. [redacted] Lutz Decl. Ex. 6 ("Lynam Tr.") 124:6-128:11, 133:23-138:21. The upshot is the market knew no later than December 2015 the "truth" Plaintiffs allege was concealed during the Class Period: "that Facebook users did not have control over their information and content on Facebook and that third-party misuse of Facebook users' personal data was not a purely hypothetical risk." Fischel Report ¶ 39. That means every class member bought *after* the truth was on the market—and *after* the market knew that Facebook user data could be used by third parties. Plaintiffs' response is to point to the 4AC's allegations about when the truth was revealed, Gelbach Report ¶¶ 108-40; Mot. 8-9, but Plaintiffs must "actually prove—not simply plead" facts establishing the presumption of reliance, *Halliburton II*, 573 U.S. at 275.

To address this issue, Plaintiffs introduce yet another new theory that appears nowhere in their 4AC. They say the relevant "truth" was not the third-party access to and use of Facebook user data, but Facebook's supposed *confirmation* that third parties had used and disseminated data, which Plaintiffs say happened in March 2018. *See* Mot. 3; *see also* Gelbach Tr. 121:7-122:14, 130:21-132:11, 183:20-184:10. Again, this theory appears nowhere in the 4AC, so it cannot support certification, for the reasons explained above. *See supra* Section IV.A. The theory is wrong anyway. Facebook confirmed the problems about third-party use and dissemination of Facebook data a year earlier, in March 2017, when *The Intercept* reported that, "[s]hortly after *The Guardian* published its 2015 article, Facebook contacted Global Science Research and requested that it delete the data it had taken from Facebook users," and that "[t]he company believes that Kogan and SCL [Cambridge Analytica's parent] complied with the request." Lutz Decl. Ex. 3, at 4-5; Fischel Report ¶¶ 11, 39; Dirks Report

¶¶ 42-47, 82, 129-30.

Plaintiffs have not proven they bought before the alleged truth was revealed, so the presumption of reliance does not apply.

**2. Defendants Have Rebutted Any Presumption Of Reliance.**

Even if Plaintiffs could invoke the presumption of reliance, Defendants have rebutted it for both the initial misuse and whitelisting theories. A defendant defeats class certification by showing that the alleged misstatements had no impact on the stock price when made (the front end) or when supposedly corrected (the back end), and it may do so with any evidence that severs the link between the misstatement and the price paid. *Halliburton II*, 573 U.S. at 269; *Goldman*, 594 U.S. at 123, 125; *see also Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.* (*Goldman II*), 77 F.4th 74, 105 (2d Cir. 2023).

Plaintiffs do not contend the challenged statements drove Facebook's stock price up when made. Their theory is inflation maintenance—that the statements allegedly kept an already-inflated price from falling, so the back-end drop when the truth came out stands in as the measure of the front-end inflation. *See* Gelbach Report ¶¶ 63 n.88, 97, 99, 105, 106(a); Gelbach Tr. 184:11-185:19; Fischel Report ¶ 60. "Simply put, the theory goes: back-end price drop equals front-end inflation." *Goldman II*, 77 F.4th at 80. That theory holds only if the back-end disclosure actually corrects the front-end statement. If there is a "mismatch" between the two, there is little reason to think the market ever relied on the front-end statement. *Goldman*, 594 U.S. at 123. The back-end disclosure must be "corrective," "new," and "value relevant," meaning it actually caused some of the decline. *In re Enovix Corp. Sec. Litig.*, 2026 WL 1078569, at *8 (N.D. Cal. Apr. 21, 2026). Here, there was no front-end impact and no back-end impact.

***Whitelisting – No Front-End Impact***. Plaintiffs do not argue the statements challenged under the whitelisting theory had any front-end impact, and they did not. Facebook's stock price did not rise when any of them was made, with one exception addressed below. Fischel Report ¶¶ 62, 67-70 & tbl. 1. That is unsurprising. Statements to Facebook users about how their data may be shared are not what investors trade on. Dirks Report ¶¶ 56-58, 70-73, 77; Lutz Decl. Ex. 8 ("Acadian Decl.") ¶¶ 5, 13-16. As MSPERS's investment manager Wedgewood Partners stated in a sworn declaration, it "did not believe this information [about whitelisting] was material from an investment standpoint because it did

not relate to Facebook's earnings or other financial metrics that are relevant to investment decisions." Lutz Decl. Ex. 14 ("Wedgewood Decl.") ¶ 6; *see also* Acadian Decl. ¶¶ 5, 13-16 (trading decisions not based on news about data privacy). Nor would investors take the generic user control statements as a guarantee by Facebook that user data would not be shared with any third parties in light of Facebook's repeated disclosures to the contrary. Dirks Report ¶¶ 37-39, 73-76, 112.

One statement requires separate discussion. Facebook's stock price rose on April 5, 2018, the trading day after Mr. Zuckerberg made a user control statement following the market close on April 4, 2018. Fischel Report ¶ 71. That increase is not evidence of price impact, for three reasons. *First*, the April 4 statement echoed user control statements Defendants had made many times before without any price movement, and the market does not react to repeated information. Fischel Report ¶ 72; *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1310 (11th Cir. 2011) ("[D]isclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price."). *Second*, the increase is attributable to Mr. Zuckerberg's separate statement that Facebook had not observed "any meaningful impact" from the #deleteFacebook campaign, as confirmed by analyst commentary. Fischel Report ¶ 73. *Third*, if the April 4 statement had added inflation to the stock price, that inflation should have caused Facebook's stock to drop when the alleged whitelisting practices were revealed in June 2018. But the stock did not drop. *In re Facebook*, 87 F.4th at 954; Fischel Report ¶ 74; *see Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015) ("impact of a false statement" is measured by "what happens when the truth is finally disclosed").[1]

There was no front-end impact from any statements challenged under the whitelisting theory.

***Whitelisting – No Back-End Impact.*** That leaves Plaintiffs' "price maintenance" theory, which focuses on back-end corrective disclosures. *See, e.g.*, *Goldman II*, 77 F.4th at 80. Here, the back-end disclosures did not cause the stock price to decline, correct any false statements, or provide new information to the market.

*First*, Facebook's stock price did not experience a statistically significant price decline when the whitelisting "truth" was revealed in June 2018. *In re Facebook*, 87 F.4th at 954 (no "stock price

[1] There also was a stock price increase on April 10, 2018, when user control statements were made, but the increase occurred before the statements were made. Fischel Report ¶¶ 75-76 & fig. 1.

drop" after "June 2018 whitelisting revelation"); Fischel Report ¶ 41. And if there is no price drop, the inflation-maintenance theory falls away. *Goldman II*, 77 F.4th at 80.

*Second*, even if the stock had dropped in June, there still would be no price impact because of a mismatch between the generic front-end user control statements and the specific back-end whitelisting disclosure. When the front-end statement is generic and the back-end disclosure is specific, any inference of reliance on the front-end statement "break[s] down": the market's reaction to specific new facts reflects the value of those facts, not the removal of inflation attributable to a generic assurance. *Goldman*, 594 U.S. at 123. *Goldman* itself involved exactly this pattern—generic statements about managing conflicts of interest were "corrected" by specific news about government enforcement that, at a high level of generality, involved the same topic as the supposed misstatements. *Id.* at 116, 120, 123. On remand, the Second Circuit held this mismatch rebutted the presumption of reliance. *Goldman II*, 77 F.4th at 100, 105. The gap here is the same. The front-end statements are generic assurances that users control their data. *E.g.*, 4AC ¶ 610 ("each person decides what information they want to share about themselves," and "we give people the tools to control their experience"); *see* Dirks Report ¶ 112 (front-end alleged misstatements were generic and lacked specificity of Facebook's publicly available policies). The June 2018 reporting disclosed specific data-sharing partnerships with at least 60 device makers that "allowed the device companies access to the data of users' friends without their explicit consent." Lutz Decl. Ex. 9, at 1; 4AC ¶ 426; *see* Fischel Report ¶ 15. Nothing about the market's reaction to those specifics can measure any inflation from the generic front-end statements. *See Goldman II*, 77 F.4th at 100; *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *12 (S.D. Cal. Mar. 20, 2023).

*Finally*, Plaintiffs cannot substitute the July 2018 stock drop as the back-end disclosure for whitelisting. That drop came more than a month after the June 2018 news and followed Facebook's July 25, 2018 second-quarter earnings release, which reported lower-than-expected revenue growth, profitability, and user growth. 2026 Order at 4. The earnings release said nothing about whitelisting. By Plaintiffs' own account, the drop reflected the business consequences of the "scandals" disclosed in March and June. This was the materialization of a risk, not a corrective disclosure revealing the true facts that made the alleged misstatements false. *See In re FibroGen Sec. Litig.*, 2024 WL 1064665, at

*12-15 (N.D. Cal. Mar. 11, 2024) (price maintenance theory requires "correction of a previous misstatement;" disclosure of an "action . . . based on a prior corrective disclosure" is not corrective). A drop that reflects the consequences of an alleged fraud does not show that any front-end statement propped up the price, and Plaintiffs' efforts to use it that way confuse loss causation with the narrower reliance inquiry. *See Goldman II*, 77 F.4th at 99 n.11 (reliance requires a "closer fit" between the "front- and back-end statements").

***Cambridge Analytica – No Front-End Impact***. The statements challenged under the initial misuse theory also did not cause a price impact. The risk factor statements were not followed by any statistically significant price increase when they were first made, and no analyst suggested they conveyed value-relevant information. Fischel Report ¶¶ 63-66; Dirks Report ¶¶ 60-62 & n.64, 72.[2] That is not surprising because investors would not understand these risk disclosures as making specific representations about past instances of data misuse—and no analyst interpreted them that way. Dirks Report ¶¶ 62-69. It also is not surprising because identical risk factor statements were published in Facebook's SEC filings prior to the beginning of the class period, and the repetition of previously disclosed statements adds nothing to the information available to the market. Fischel Report ¶ 64; *see* Dirks Report ¶¶ 58, 60 ("repetitive boilerplate disclosures and general statements" are not "value-relevant"). And the one user control statement followed by a price increase came after the March 2018 disclosures, when the market already knew about the alleged "fraud," so no one could have relied on it. Fischel Report ¶¶ 62, 68-74; *FindWhat*, 658 F.3d at 1310. There was no front-end impact for any statement challenged under the initial misuse theory.

***Cambridge Analytica – No Back-End Impact.*** As with the whitelisting theory, the March 2018 stock drop that followed news about Cambridge Analytica cannot be used to infer front-end inflation.

*First*, the March 2018 drop can only be used to infer front-end inflation if the market learned new facts about the alleged fraud. *FibroGen*, 2024 WL 1064665, at *12; *Enovix*, 2026 WL 1078569, at *8. It did not. Plaintiffs contend Facebook's stock traded in an efficient market, Mot. 16-19, which

[2] The stock price increased after a risk factor disclosure made on July 27, 2017, but that disclosure merely repeated prior risk factor disclosures and thus could not have caused the stock price increase. Fischel Report ¶¶ 63, 65.

means the market is "presumed to be aware" of all public information, *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). The initial misuse facts had been public since 2015. Fischel Report ¶¶ 10-11, 39-40, 44 (quoting a March 21, 2018 *New Yorker* article observing that the March 2018 reports "were not really revelations at all" because "[w]e knew as early as December, 2015 … that Facebook data obtained without users' knowledge was being exploited by Cambridge Analytica on behalf of Senator Ted Cruz"); Dirks Report ¶¶ 43-44, 80-82, 127. Repetition of the initial misuse facts could not have caused the drop—and was not value-relevant to investors. *See* Dirks Report ¶¶ 58, 60, 86; *see also FindWhat*, 658 F.3d at 1310; *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665-66 (5th Cir. 2004). What the market learned in March 2018 was Cambridge Analytica's alleged *continued misuse* of data, Fischel Report ¶¶ 12-13, 44-45, 48; Dirks Report ¶¶ 50-51, 85-93, 101, as the Ninth Circuit recognized, *In re Facebook*, 87 F.4th at 957 (loss causation pleaded based on revelation "that Facebook knew Cambridge Analytica retained access to improperly collected user data after Cambridge Analytica certified that it had deleted the personality score data"). But the continued misuse theory was dismissed from this case, 2026 Order at 33, so facts about continued misuse did not "correct" any alleged misstatement remaining in the case.

*Second*, even if something new about the initial misuse emerged in March 2018, there again is a mismatch. The challenged statements are generic: risk disclosures that never mention Cambridge Analytica, *e.g.*, 4AC ¶¶ 628-29 ("[s]ecurity breaches and improper access to or disclosure of our data or user data … could harm our reputation and adversely affect our business"), and the user control statements discussed above, *see supra* Section IV.C.2. The March 2018 disclosures were specific and informed the market that the deletion certifications were false, Cambridge Analytica "still possesses most or all of the trove [of data]," and it allegedly had used the data for the Trump campaign. Lutz Decl. Ex. 10, at 1-2, 7. That mismatch "break[s] down" any inference that "back-end price drop equals front-end inflation." *Goldman*, 594 U.S. at 123. The market's reaction to those specific revelations reflects the value of the new facts, not inflation from generic risk language. Dirks Report ¶¶ 58, 60, 79, 86, 99-101, 109. In any event, these facts were not value-relevant to investors. MSPERS's investment manager "viewed the information reported in the March 2018 news about Cambridge

Analytica as immaterial from an investment perspective" and it would not have changed its decision to buy Facebook stock even if it had known this information at the time. Wedgewood Decl. ¶ 4; *see also* Acadian Decl. ¶¶ 5, 13-16 (trading decisions not based on news about data privacy).

Because there was no front-end or back-end price impact from any of the alleged misstatements that remain in the case, Plaintiffs are not entitled to a presumption of reliance. Reliance therefore becomes an individual question for every class member, and "individual issues then would … overwhelm[] the common ones." *Basic*, 485 U.S. at 242. The record previews exactly that litigation. The only actual reliance evidence before the Court shows investors disregarding the alleged fraud for different, individual reasons: one investment manager traded through an algorithm that never considered the news, another deemed the news immaterial and kept buying, [redacted] *Supra* Section IV.C.1; *infra* Section IV.F. Reliance would have to be tried investor by investor, so common questions cannot predominate, and no class can be certified. Fed. R. Civ. P. 23(b)(3).

### D. At A Minimum, Any Class Period Should End In March 2018, When Plaintiffs Allege The Full Truth Was Revealed.

For the reasons above, Plaintiffs' Motion should be denied in full. But, at a minimum, any class period should end on March 20, 2018, after the March 2018 corrective disclosures. By that point, "the truth was revealed" to the market, so Plaintiffs cannot "prove" that stock bought after that date was traded "between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 277-78.

Investors "[can]not be said to have acted in reliance on a fraud-tainted price" when they "did not buy or sell the stock … before the truth was revealed." *Halliburton II*, 573 U.S. at 278. For that reason, "a class period ends when the truth has been disseminated to the market." *In re Apache Corp.*, 2024 WL 532315, at *8 (citation omitted); *see, e.g.*, *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *8 (N.D. Cal. Dec. 22, 2016); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 295 (D. Minn. 2018) (excluding from the class investors who bought after the corrective disclosure).

Here, Plaintiffs contend the relevant truth was revealed to the market no later than March 20, 2018. The 4AC, for example, alleges that the March 2018 disclosures "revealed the essential facts …

that users did not have control over their Facebook data or their privacy on the Facebook platform because users did not know that their data was being shared with numerous third parties." 4AC ¶ 683; *see also* 4AC ¶¶ 671, 674. And Plaintiffs argued before the Ninth Circuit that the March 2018 disclosures "made clear enough" to the market that the challenged statements were false—that they revealed the truth about Facebook's alleged misrepresentations. Ninth Circuit Opening Br. at 21; *see also* Ninth Circuit Reply Br. at 30 ("[T]he truth concealed by the misstatements became known to the market in March 2018."). Plaintiffs' expert testified that the March 16-17 disclosures "clearly revealed" "that Facebook had suffered a major instance of misappropriation and misuse and that users did not have control of their data," i.e., the two "frauds" alleged by Plaintiffs. Gelbach Tr. 90:5-14; *see also id.* at 89:14-93:9, 97:11-19 (testifying that the market knew about the alleged falsity of the risk factor and user control statements in March 2018).[3]

Investors who bought after the "unequivocal" alleged corrective disclosure in March 2018 thus cannot invoke the fraud-on-the-market presumption. *Hayes*, 2016 WL 7406418, at *8; *see also W. Va. Pipe*, 325 F.R.D. at 294-95. Any class period should therefore end on March 20, 2018. Ending the class period there also eliminates any claim for the July 2018 stock drop.[4]

---

[3] While the alleged whitelisting practices were revealed in June 2018, Plaintiffs claim these disclosures merely confirmed the information revealed in March. 4AC ¶¶ 683-85.

[4] Under the Ninth Circuit's decision, putative class members who bought before the "truth" was revealed in March 2018 hypothetically could recover for losses in July that Plaintiffs prove are attributable to "the Cambridge Analytica and whitelisting scandals." *In re Facebook*, 87 F.4th at 956. This pleading stage inference is not supported by the evidence. As Plaintiffs' expert testified, market participants knew based on the revelation of the "truth" in March 2018 of the risk of "user attrition on the Facebook platform," "advertisers spending less on advertising on the Facebook platform," and weaker financial performance. Gelbach Tr. 163:20-165:6. These are the very risks that Plaintiffs allege materialized in July and caused a stock drop. *In re Facebook*, 87 F.4th at 956. Investors who bought or held knowing about these risks have no claim because they were on "reasonable notice of the type of danger presented to their holdings by defendants' alleged past actions and the nature of those actions." *In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1370-71 (N.D. Cal. 1987). Permitting

There is no justification for a class period running to July 2018. The July earnings release did not reveal the "truth" behind either alleged fraud. By Plaintiffs' own account, it revealed "the true extent of the damage" from the earlier revelations of the "truth." 4AC ¶ 687; *see also* Lutz Decl. Ex. 11 (Lead Pls.' Am. Resps. & Objs. to Defs.' First Set of Interrogs.) at 12 (the July "announcement revealed the foreseeable consequences" of the "scandals"). Plaintiffs allege the drop was caused by lower user engagement, lower advertising revenue, and reduced growth expectations "on account of the Cambridge Analytica and whitelisting scandals" disclosed in March and June. *In re Facebook*, 87 F.4th at 956. Revealing the consequences of an alleged fraud is not revealing the fraud. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) (distinguishing between how "the market reacted to the purported 'impact' of the alleged fraud—the earnings miss—rather than to the fraudulent acts themselves"). And according to Plaintiffs, the fraud was revealed in March 2018. If any class is certified, it must end in March 2018.

**E. The Court Should Not Certify A Class For Plaintiffs' Remaining Claims.**

Plaintiffs briefly mention a few remaining claims against Defendants and assert that "predominance" is satisfied for their "other claims." Mot. 3, 23 (Section 20(a) control-person claim and Section 20A insider-trading claim). But "class certification must be addressed on a claim-by-claim basis." *James v. City of Dallas*, 254 F.3d 551, 563 (5th Cir. 2001), *abrogated on other grounds by M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012). Because the "Section 20(a) claim depends on [the] Section 10(b) claim," the Section 20(a) class falls with the Section 10(b) class—and cannot be certified. *See Nova Scotia Health Emps.' Pension Plan v. Comerica Inc.*, 2026 WL 323711, at *1 n.1 (9th Cir. Feb. 6, 2026).

Plaintiffs' sole remaining claim, Section 20A, is similarly unfit for certification. Plaintiffs argue that Section 20A certification is appropriate because "Plaintiffs can demonstrate classwide reliance for the Section 10(b) violation." Mot. 24. But they cannot, as explained above. The Section 20A class

---

recovery for the July 2018 stock drop for investors that bought or held Facebook stock after the alleged "truth" was revealed in March "would effectively convert Rule 10b-5 into a scheme of investor's insurance," a result for which "[t]here is no support." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (citation modified).

also fails because it is defined to include members who cannot possibly hold a Section 20A claim. Section 20A reaches only purchasers who traded "contemporaneously" with a defendant, 15 U.S.C. § 78t-1(a), and any Section 20A class must be defined "with precision" because "[a] court cannot certify a class that consists of some people who traded contemporaneously with the insiders and others who likely didn't." *See In re Vaxart, Inc. Sec. Litig.*, 813 F. Supp. 3d 970, 973 (N.D. Cal. 2025). Here, Lead Plaintiffs propose an uncertifiable class of every purchaser of Facebook stock over roughly 371 trading days, from February 3, 2017 through July 25, 2018, even those who were not contemporaneous purchasers. Mr. Zuckerberg sold on only 154 of those days. Mot. 2 n.2, 24; 4AC ¶ 719. Plaintiffs' footnote that the class "also includes" contemporaneous purchasers cures nothing because "the plaintiffs have not submitted any evidence that would allow a determination … [of] the contemporaneous trading period." *See In re Vaxart*, 813 F. Supp. 3d at 973. For example, 14 of Lead Plaintiffs' own 38 purchases occurred one to ten days *after* any Zuckerberg sale. 4AC ¶ 720. No Section 20A class can or should be certified.

**F. Lead Plaintiffs Cannot Be Class Representatives.**

Lead Plaintiffs are not adequate representatives of the putative class. MSPERS did not rely on Facebook's alleged misstatements. And Amalgamated is subject to unique defenses and has not controlled its counsel.

***MSPERS is inadequate because its agents did not rely on the alleged fraud.*** [redacted] Lutz Decl. Ex. 12 ("Ryals Tr.") 74:12-75:14; Acadian Decl. ¶ 10; Wedgewood Decl. ¶ 2. Accordingly, what these investment managers did (and did not) rely on when deciding to purchase Facebook stock is imputed to MSPERS. *See United States v. Ga.-Pac. Co.*, 421 F.2d 92, 97 & n.9 (9th Cir. 1970).

MSPERS has no claim because its investment managers did not rely on the alleged misstatements. Wedgewood Partners—[redacted] (*see* Lutz Decl. Ex. 13 (Exhibit 26 of deposition of Laken Ryals); Ryals Tr. 110:13-112:5, 131:8-23; Wedgewood Decl. ¶¶ 3, 5)—deemed the whitelisting news and "the information reported in the March 2018 news about Cambridge Analytica as immaterial

from an investment perspective," and swore that had it known the so-called "truth" sooner, it "still would have made those purchases at the same prices." Wedgewood Decl. ¶¶ 4, 6. Acadian Asset Management, another MSPERS manager, traded Facebook stock through an "automated investment process" that did not consider such news at all, and in fact bought nearly $15 million of Facebook stock on four occasions *after* the March 2018 disclosures. Acadian Decl. ¶¶ 5, 12-16. And a third manager, Harding Loevner, [redacted] Lutz Decl. Ex. 15; Lutz Decl. Ex. 16.

MSPERS's own agents' disregard for the alleged fraud means MSPERS cannot prove the reliance element of its own claim. Without reliance, MSPERS has no claim and cannot lead the class. *Hanon*, 976 F.2d at 508. And given that multiple sophisticated investment managers have confirmed that the alleged fraud in this case was immaterial, there is good reason to suspect that many other members of the putative class think the same. This is yet another predominance problem that dooms Plaintiffs' Motion.

***Amalgamated is inadequate because it*** [redacted] ***and Amalgamated has not participated in the litigation.*** [redacted] Lynam Tr. 124:6-128:11, 133:23-138:21 ([redacted]). That concession exposes Amalgamated to unique defenses on both reliance and damages. Amalgamated cannot assert a fraud-on-the-market theory of reliance [redacted] And Amalgamated cannot argue loss causation [redacted] *FindWhat*, 658 F.3d at 1310. These "substantial" problems with its case prohibit Amalgamated from leading the class and confirm that the larger putative class is flawed and subject to individualized inquiries likely to predominate over common questions. *See Santiago v. City of Chicago*, 19 F.4th 1010, 1018 (7th Cir. 2021).

Amalgamated also is inadequate because it has ceded this case entirely to its lawyers.

[redacted] Lynam Tr. 9:20-22, 13:8-17, 52:16-53:24. [redacted] Lynam Tr. 209:22-210:13 & *passim*. [redacted] Lynam Tr. 21:11-17 ([redacted]). And when shown the March 16, 2018 Facebook blog post that Amalgamated itself identified as a corrective disclosure in its interrogatory responses, *see* Lutz Decl. Ex. 11, at 10, [redacted]

[redacted]

Lynam Tr. 170:2-171:17 (objections omitted). While a class representative can obviously use a lawyer, that class representative must still "check[] the otherwise unfettered discretion of counsel," not "cede[] control to [the] lawyers." *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994) (citation modified). Amalgamated has "done nothing to monitor this lawyer-driven litigation." *Azoiani v. Love's Travel Stops & Country Stores, Inc.*, 2007 WL 4811627, at *2 (C.D. Cal. Dec. 18, 2007) (citation modified).

Plaintiffs' failure to identify any viable class representative dooms their Motion. *Fendler v. Westgate-Cal. Corp.*, 527 F.2d 1168, 1170 (9th Cir. 1975) (per curiam). At a minimum, the Court should decline to appoint MSPERS or Amalgamated as class representatives.

## CONCLUSION

This Court should deny Plaintiffs' Motion and decline to certify any class.

DATED: October 9, 2026

By: /s/ Brian M. Lutz

GIBSON, DUNN & CRUTCHER LLP

Brian M. Lutz (SBN 255976)
Martie Kutscher (SBN 302650)
Michael J. Kahn (SBN 303289)
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306
blutz@gibsondunn.com
mkutscherclark@gibsondunn.com
mjkahn@gibsondunn.com

Joshua S. Lipshutz (SBN 242557)
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: 202.955.8217
Facsimile: 202.530.9614
jlipshutz@gibsondunn.com

*Attorneys for Defendants Facebook, Inc., Mark E. Zuckerberg, Sheryl K. Sandberg, and David M. Wehner*