# Exhibit 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

In re FACEBOOK, INC. SECURITIES LITIGATION

Master File No.: 5:18-cv-01725-EJD

---

This Document Relates To:

ALL ACTIONS

---

** CONFIDENTIAL **

VIDEO-RECORDED DEPOSITION OF
JONAH B. GELBACH, Ph.D.
San Diego, California
Friday, September 18, 2026
Volume 1

Reported by:
LESLIE JOHNSON
RPR, CCRR, CSR No. 11451
Job No.: 8430381
PAGES 1 - 219

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

In re FACEBOOK, INC. Master File No.:

SECURITIES LITIGATION 5:18-cv-01725-EJD

__________________________________________________________

This Document Relates To:

ALL ACTIONS

__________________________________________________________

** CONFIDENTIAL **

VIDEO-RECORDED DEPOSITION OF JONAH B. GELBACH, Ph.D., Volume 1, taken on behalf of Defendants, at 655 West Broadway, Suite 1900, California, beginning at 9:03 a.m. and ending at 5:23 p.m., on Friday, September 18, 2026, before LESLIE JOHNSON, Certified Shorthand Reporter No. 11451.

APPEARANCES:

Counsel for Lead Plaintiff Amalgamated Bank and Co-Lead Counsel for the Class:

ROBBINS GELLER RUDMAN & DOWD LLP

BY: LUKE O. BROOKS, ESQ.

J. MARCO JANOSKY GRAY, ESQ.

DARRYL J. ALVARADO, ESQ.

655 West Broadway, Suite 1900

San Diego, California 92101

(619)231-1058

lukeb@rgrdlaw.com

mjanoski@rgrdlaw.com

dalvarado@rgrdlaw.com

Counsel for Lead Plaintiff the Public Employees' Retirement System of Mississippi and Co-Lead Counsel for the Class:

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

BY: JEREMY P. ROBINSON, ESQ. (Via Zoom)

TIMOTHY G. FLEMING, ESQ. (Via Zoom)

1251 Avenue of the Americas

New York, New York 10020

(212)554-1400

jeremy@blbglaw.com

timothy.fleming@blbglaw.com

APPEARANCES (Cont.):

For Defendants Facebook, Inc., Mark E. Zuckerberg, Sheryl K. Sandberg, and David M. Wehner:

GIBSON DUNN & CRUTCHER LLP

BY: MICHAEL J. KAHN, ESQ.

BRIAN M. LUTZ, ESQ.

One Embarcadero Center, Suite 2600

San Francisco, California 94111-3715

(415)393-8200

mjkahn@gibsondunn.com

blutz@gibsondunn.com

- and -

BY: BRIAN YANG, ESQ.

3161 Michelson Drive, Suite 1200

Irvine, California 92612-4412

(949)451-4025

byang2@gibsondunn.com

Also Present:

OLIVER CALDERON, Videographer

MICHAEL A. KEABLE, Compass Lexecon

I N D E X

| WITNESS | EXAMINATION |
|---|---|
| JONAH B. GELBACH, Ph.D. Volume 1 | |
| BY MR. KAHN | 8 |

EXHIBITS

JONAH B. GELBACH, Ph.D.

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report of Jonah B. Gelbach | 10 |
| Exhibit 2 | Fourth Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws | 49 |
| Exhibit 3 | The Guardian article entitled "Ted Cruz using firm that harvested data on millions of unwitting Facebook users" | 105 |
| Exhibit 4 | The Intercept article entitled "Facebook Failed to Protect 30 Million Users From Having Their Data Harvested by Trump Campaign Affiliate" | 147 |
| Exhibit 5 | The New York Times Op-Ed entitled "We Can't Trust Facebook to Regulate Itself" | 207 |

San Diego, California; Friday, September 18, 2026
9:03 a.m.

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:03 a.m. on September 18, 2026. 09:03:17

Please note that the microphones are sensitive and may pick up whispering and private conversation. Please mute your phones at this time. Audio and video recording will continue to take 09:03:35 place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Jonah B. Gelbach, Ph.D., taken by counsel for Defendant in the matter of "In re Facebook Securities Litigation" filed in the 09:03:55 United States District Court, Northern District of California, San Jose Division, Case No. 518-cv-01725-EJD.

The location of the deposition is 655 West Broadway, Suite 1900, San Diego, California 92101. 09:04:17

My name is Oliver Calderon, representing Veritext Legal Solutions, and I am the videographer. I am not authorized to administer an oath. I am not related to any party in this action nor am I financially interested in the outcome. 09:04:41

If there are any objections to proceeding, please state them at the time of your appearance. Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney. 09:04:43 09:04:52

MR. KAHN: Hello. Michael Kahn from Gibson Dunn on behalf of Defendants. With me is Brian Yang and Brian Lutz from Gibson Dunn, also on behalf of Defendants, as well a Michael Keable from Compass Lexecon. 09:05:12

MR. BROOKS: Good morning. Luke Brooks from Robbins Geller Rudman & Dowd for Plaintiffs and the witness, here with Marco Janoski, also of Robbins Geller. And Timothy Fleming I'm informed is on the Zoom from Bernstein Litowitz. 09:05:29

MR. FLEMING: Good morning or -- yes, good morning.

THE VIDEOGRAPHER: Thank you, Counsel.

Could the court reporter please introduce yourself, administer the oath to the witness, and counsel may proceed afterwards. 09:05:43

THE REPORTER: Good morning. Leslie Johnson, License No. 11451.

/ / / /

/ / / /

JONAH B. GELBACH, Ph.D., 09:06:02
having been first duly sworn, was examined
and testified as follows:

EXAMINATION 09:06:04

BY MR. KAHN:

Q Have you ever been deposed before?

A Yes.

Q Nonetheless, I'll walk through a few ground rules just to make sure we're on the same 09:06:09 page.

It's important that we not speak over each other because we have the court reporter here, and we need to make sure that I finish my question and you start your answer after I finish out my question 09:06:19 so there's no inaccuracies on the record.

If you don't understand a question, just tell me and I'll rephrase.

You may hear Plaintiffs' counsel make objections today. Unless they specifically tell you 09:06:34 to not answer the question, you should just proceed and answer the question, notwithstanding the objection.

Is there anything that would affect your ability to give accurate testimony today? 09:06:44

A No. 09:06:46
Q What did you do to prepare for the deposition today?
A I read a number of documents and I met with counsel. 09:06:55
Q How many times did you meet with counsel?
A We met yesterday in one meeting. And I guess you could say for a short period before this.
Q When was the before this time?
A I arrived a little after 8:30 a.m., I 09:07:09 think.
Q Oh, today?
A Yeah.
Q Got it.
And how long was your meeting yesterday? 09:07:15
A I think we started at 10:00 a.m., and I don't remember exactly when we finished, but it was probably somewhere between 2:00 and 3:00 p.m.
Q Was anybody else besides counsel present?
A No. 09:07:31
Q What about at this morning's meeting? Anybody besides counsel present?
A No.
Q Okay. Did you review any documents, other than those listed in Appendix B to your report, in 09:07:43

preparation for today's deposition? 09:07:47
A I did review a small part of appellate briefs in the Ninth Circuit appeal, I think, from 2022. I don't recall whether those are listed in Appendix B. To the best of my recollection, that 09:08:06 would be it.
Q Did you discuss your deposition today and the testimony you're providing with anybody else besides counsel?
A No. 09:08:21
(Exhibit 1 marked for identification.)
BY MR. KAHN:
Q I'm going to go ahead and mark the expert report that you provided in this matter as Exhibit 1. 09:08:50
Do you recognize Exhibit 1 as the expert report that you submitted in this matter?
A I recognize the cover page.
Q Can you please turn to page 67.
Is that your signature on the -- that page 09:09:16 there?
A Yes.
Q So do you recognize that this is the expert report that you signed in this matter?
A Well, again, I recognize that it's the 09:09:25

signature page. I haven't reviewed the pages in 09:09:27
between, but I assume that you've given me the
expert report that I wrote for this matter.

Q You have no reason to dispute that that is
your expert report? 09:09:38

A Correct.

Q Is the rate that you are charging in this
matter, your hourly rate, the same as you charge in
other engagements that you've done as an expert
witness? 09:09:55

A Yes, I have at least one other in which
I'm charging the same rate. There are some where
I'm now charging a higher rate that I took on after
this one.

Q Is the rate that you're charging in this 09:10:09
case higher than the rates that you have accepted in
other engagements?

A Yes. There are others I started before
this one.

Q Are you receiving any compensation in 09:10:23
connection with this expert report or your expert
engagement in this matter that is beyond the hourly
rate?

A The one that you --

Q Correct. 09:10:36

A -- referenced? 09:10:36
No.
Q Before you sign a report, do you satisfy yourself that you agree with the contents of the expert report? 09:10:51
A Yes.
Q And what is your process for doing that before you sign it?
A Can you be clearer about what you mean by "process"? 09:11:00
Q Before you sign a report, what do you do to make sure you're comfortable with the contents before you actually sign it?
A Well, I read it and make sure that I agree with those contents. It's not typically a problem 09:11:14 for me because I wrote the report.
Q And you only sign reports if you agree with the opinions in that report?
A Correct.
Q And you only sign them -- strike that. 09:11:28
And you only sign reports if you agree with the statements in your report, correct?
A If they're presented as my statements, correct.
Q Ands that is true of the expert reports 09:11:42

that you've listed in Appendix A of Exhibit 1? 09:11:44
A I'm sure it is because it's true of any report I have signed.
Q So you agree with the statements that you made in the expert report submitted in "In re Shoals 09:11:55 Technologies Group, Inc. Securities Litigation"?
A Yes.
Q And you agree with the statements you made in the expert report submitted in "In re La Twon Weaver"? 09:12:06
A If we're going to go through them, I will just take a moment to go to the page you're talking about. Are you talking about page 7 of Appendix A, my CV?
Q That is correct? 09:12:27
A Yes.
Q And you agree with the statements you made in the expert reports submitted in "In Re Alphabet Inc. Securities Litigation"?
A Yes. The only thing I want to say by way 09:12:42 of qualification is that I wrote that report several years ago, or there were two reports, and it's been several years, so to the extent that any new information would have developed, you know, that might affect what I would think today. But it's 09:12:59

certainly the case that, at the time I signed those reports, I agreed with the things that were in them. 09:13:03

Q And is that true with respect to the other experts reports we talked about with respect to the "In re Shoals Securities Litigation" matter? 09:13:20

A Yeah. I guess what I would say is, if there's any new development that would reasonably change my view of any opinion or statement made in any one of these reports, then, of course, I would want to be able to update my view in light of such new information. But it is the case that, at the time I signed those reports, they reflected my beliefs. 09:13:32

Q And sitting here today, you're not aware of any information that would make you disagree with the statements you made in the expert reports we just talked about? 09:13:48

A Correct.

Q Did your process for preparing your expert report in this case differ at all from your process for preparing the expert reports in the other cases we just discussed? 09:14:04

A In this case, I didn't rely on an assistant, which I did do in the Alphabet reports. I don't believe I did in the Shoals reports nor in 09:14:24

the Weaver report. I guess it depends on what you 09:14:28
mean by "process," but . . .

Q Well, that actually takes me to a question I was about to ask.

Did anybody besides you help you draft the 09:14:38 report?

A Help me draft it?

Q Uh-huh.

A I drafted the report myself.

I did receive feedback from counsel on 09:14:55 drafts, but I consider this entirely my work product.

Q Did counsel provide you with any facts, data, or assumptions that you relied on in forming your opinions in this case? 09:15:15

MR. BROOKS: Objection. Vague and ambiguous and compound.

THE WITNESS: Yeah. Could you be more specific about what you're asking?

BY MR. KAHN: 09:15:23

Q Did counsel provide you with any assumptions that you relied on in forming your opinions in this case?

A Well, counsel provided me with the complaint and the motion to dismiss. And I've 09:15:32

understood that I should -- that I should -- that the assignment involves giving opinions under the assumption that the plaintiffs' theory of liability is -- you know, is found -- found true, subject to the motion to dismiss. 09:15:43 09:16:09

I don't know if I would call that asking me to make assumptions so much as -- or giving me assumptions to make so much as asking me to do those things I just described.

Q Any other assumptions that counsel told you to assume for purposes of your report? 09:16:30

A Nothing occurs to me at the moment.

Q And you reviewed this report, of course, before you signed it, correct?

A I did. 09:16:47

Q And you agree with the statements in your report, correct?

A I think I said I did, yes.

Q And you, of course, agree with the opinions that you are expressing in this report, correct? 09:16:56

A I think I said I did, yeah.

Q Are you already on Appendix A still, your CV?

A I am. Page 7. 09:17:07

Q Let's turn to where you list your degrees. 09:17:09
A First page of the CV.
Q No other degrees besides those listed here?
A Well, I did graduate from high school, but 09:17:28 I don't know if you count a diploma as a degree.
Q Besides that --
A Besides that, no.
Q Besides your high school degree, which is not listed here, all of your other degrees are 09:17:42 listed here?
A That's correct.
Q I want to direct your attention to paragraph 7 of your report.
You describe your fields of expertise as 09:18:06 economics, statistics, and econometrics, correct?
MR. BROOKS: Objection. Lacks foundation.
THE WITNESS: Sorry. Can you repeat the question? Sorry.
BY MR. KAHN: 09:18:23
Q Sure.
You describe your fields of expertise as economics, statistics, and econometrics, correct?
MR. BROOKS: Same objection.
THE WITNESS: I think what I say is that 09:18:32

the opinions I offer in the report are founded on 09:18:33
expertise in those areas.

BY MR. KAHN:

Q Okay. Any other expertise besides economics, statistics, and econometrics that you 09:18:46 believe qualifies you to offer the opinions in your report?

A I think that's enough.

Q How many securities class actions have you served in as a testifying expert? 09:19:02

MR. BROOKS: Objection. Vague and ambiguous.

THE WITNESS: Can you describe or can you define what you mean by "testifying expert"?

BY MR. KAHN: 09:19:13

Q Well, strike that.

How many securities cases have you served in as an expert who has submitted a report?

A Got it.

I think it's Alphabet -- the ones listed 09:19:25 in my CV in Appendix A. So it's Alphabet, Shoals, this one.

Q And in all of those cases, you represented the -- strike that.

In all of those cases, you were retained 09:19:44

on behalf of the plaintiffs, correct? 09:19:47
A Correct.
Q Without limiting yourself to just cases in which you have put in a report, how many securities cases have you served in as an expert? 09:20:04
MR. BROOKS: Objection. Vague and ambiguous. And I think that consulting work is going to be privileged. And I'm not sure if you're asking about that or if you're asking about something different. 09:20:20
BY MR. KAHN:
Q I'm just asking for the number. So I'm not asking for the contents. Even for consulting work. I'm just asking in terms of how many matters have you served on as a consultant or an expert, 09:20:29 whether a testifying expert or a consulting expert. Let me start over.
How many securities cases have you served on as an expert or a consultant?
A You asked the question have I served on. 09:20:53 I want to be sure.
Do you mean that are concluded, or would that include ongoing engagements?
Q Let's include ongoing engagements.
A I'm not going to be able to figure out 09:21:14

accurately the exact number, but if you want to ask a range, I could -- 09:21:17
Q A range would be great, thank you.
A It would certainly be more than five. I think it would be fewer than 15. But I would want to check my records. 09:21:32
Q How many event studies have you conducted in securities litigation?
MR. BROOKS: Objection. Vague and ambiguous. 09:21:45
THE WITNESS: Can you define what you mean by an event study for that purpose -- for purposes of the question I mean.
BY MR. KAHN:
Q You performed an event study in connection with your expert work in this case, correct? 09:21:52
A I did. I looked at both the question of market efficiency and some provisional issues related to corrective disclosures.
I guess I'm not sure whether you would regard that as one or two event studies. 09:22:09
Q Do you regard them as one or two?
A I don't have a particular opinion on the matter.
Q Okay. Besides -- let's for purposes of 09:22:21

this question refer to it as one event study. 09:22:24
In how many other matters have you performed an event study for a securities case?
MR. BROOKS: You can give a number.
THE WITNESS: Again, I'm not going to be 09:22:38 able to give you a precise number.
There's Alphabet, Shoals, and this case.
In addition to those, probably something like five, give or take.
BY MR. KAHN: 09:23:04
Q Have you ever performed a discounted cash flow or DCF valuation?
A In a report?
Q Let's just start -- let's start with a report. 09:23:16
A I don't believe so.
Q Outside of a report, have you performed a DCF analysis?
A I mean, I think the answer has to be yes, in that you're asking about one of the most 09:23:32 fundamental tools of financial economics. And it's a very normal thing for an economist to use such a tool in thinking about financial economics matters. So it's a little hard for me to know how to answer the question at the level of generality you're 09:23:52

asking it. But I certainly have used the tool of DCF in thinking about valuation matters, for example. 09:23:55

Q Have you ever valued -- strike that.

Have you ever valued a company using the DCF methodology? 09:24:11

A Well, I don't know if you would consider this valuing a company, but there is a matter where I -- which is ongoing and confidential -- where the typical approach to valuing the company in question is to use a DCF. And my work in that matter has been involved in engaging with that topic. 09:24:38

Whether you would say that I used a DCF or not, I'm not quite sure. But I certainly would say that using DCF valuation techniques has been part of my work in that matter. 09:24:59

Q Besides that one matter, have you ever run a DCF analysis on a company to value it?

MR. BROOKS: Outside of litigation work? I just want to make sure we're clear on the question. 09:25:22

MR. KAHN: Yes, outside of litigation work.

THE WITNESS: Well, I do have a recently -- I think it was just published paper on 09:25:30

CONFIDENTIAL

valuation. And I can't remember whether in that paper -- it's a co-authored paper, and I cannot remember whether in that paper we actually go about valuing a company with DCF or not. We certainly do talk about DCF techniques in that paper. 09:25:34 09:25:50

BY MR. KAHN:

Q Anything else you can recall besides the paper discussing DCF techniques in the one matter that you discussed?

A Where I actually performed a DCF? 09:26:06

Q Correct.

A Not off the top of my head.

Q Have you ever performed an earnings multiple valuation?

A In what context? 09:26:20

Q In any context.

A I'm trying to think about the details of that paper because we also engage with that topic there. And I'm not sure whether -- did we do that?

Yeah. I mean, it's a paper about the use of various tools to do valuation, and one of them that we engage with in extensively I believe is earnings multiples. So I suppose you would say yes with respect to that paper. 09:26:43

Pretty sure I talk about that topic in the 09:27:03

Shoals report. Didn't come up that I needed to use 09:27:06
it there. Those are the things that come to mind.
Q I'm directing your attention to paragraph 3 of your report where you say that Appendix B lists the materials you considered or 09:27:29 relied on.
Is there anything that you considered that is not in Appendix B in forming your opinions in this report?
MR. BROOKS: Objection. Vague and 09:27:43 ambiguous.
THE WITNESS: For purposes of that question, what do you mean by "considered"?
BY MR. KAHN:
Q When you formed your opinions in this 09:27:53 report, is there any other material that formed the basis of your opinions or statements in the report that is not listed in Appendix B?
A That form the basis, no.
Q We talked earlier about the assumptions 09:28:26 that you were provided to form your opinions in this report.
Was there anything you were told that you should not assume for purposes of preparing your report? 09:28:41

MR. BROOKS: Objection. Lacks foundation. 09:28:42
Don't answer that question.
Is that discoverable, in your view?
MR. KAHN: I mean --
MR. LUTZ: Just ask the questions. 09:29:00
MR. KAHN: Yeah. You should go ahead and -- it's an assumption, right? If you're told not to assume something, that is an assumption that we're entitled to take discovery about.
MR. BROOKS: I just want to make clear 09:29:10 that that's fair game for your experts.
MR. LUTZ: You can object on the record and instruct him not to answer, but you're not going to have colloquy with counsel about some --
MR. BROOKS: Who is taking this 09:29:19 deposition?
MR. LUTZ: He is.
MR. BROOKS: Why are you piping up here?
MR. LUTZ: I'm here defending the deposition too -- or taking the deposition with my 09:29:26 colleague.
MR. BROOKS: So that's three of you.
BY MR. KAHN:
Q Okay. Do you understand the question, or do you need it repeated to you? And if you do, the 09:29:32

court reporter can read the question back to you. 09:29:35

A I would like the question read back, please.

(Record read as follows:

"Q We talked earlier about the 09:28:26 assumptions that you were provided to form your opinions in this report.

Was there anything you were told that you should not assume for purposes of preparing your report?") 09:28:41

THE WITNESS: My understanding was that counsel directed me not to answer, so --

MR. BROOKS: You can answer the question.

THE WITNESS: Not that I recall.

BY MR. KAHN: 09:30:02

Q Does your report contain every opinion that you intend to offer in support of Plaintiffs' motion for class certification?

MR. BROOKS: Objection. Lacks foundation. Calls for speculation. 09:30:15

THE WITNESS: I would just point out that at least in two places I -- so that's paragraph 5 and then -- let's see what number it is -- 165. In both of those places, I say that my work in the matter is ongoing and I reserve the right to amend, 09:30:47

refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter. I think that's what the other paragraph says. And I think there may be some other places internal to the -- interior to those two paragraphs where I note that the opinions I'm offering are provisional and would, you know, be appropriately updated in response to new information or additional information. 09:30:49 09:31:02 09:31:21

And so I guess I'm -- I'm -- I don't have any -- presently, I don't have any plan to offer any additional opinions, but I stand by those qualifications. And I assume that your expert will file a report. And I certainly would expect to respond to that with appropriate opinions. 09:31:43

BY MR. KAHN:

Q Does your report contain every basis for the opinions expressed in the report?

MR. BROOKS: Objection. Vague and ambiguous. 09:32:01

THE WITNESS: Can you give me an example of the kind of thing you're asking about?

BY MR. KAHN:

Q Are all of the reasons underlying your 09:32:08

opinions in this report expressed in the report? 09:32:11
A As far as I can recall and understand, yes.
Q Is there any opinion you hold relating to this case that is not in your report? 09:32:27
MR. BROOKS: Objection. Vague and ambiguous.
THE WITNESS: I don't -- what I would say is that this report contains the opinions I have to offer on class certification. And I don't know how 09:32:41 to go through every thought I've ever had in response to a question like that.
BY MR. KAHN:
Q Since signing the report, have you identified any errors in the report? 09:32:54
A There are two typographical errors that I did notice. One is -- it's going to be in the Krogman area. Yeah. I think it's Footnote 103, which is attached to paragraph 84. The number 308, the penultimate word of the paragraph -- of the 09:33:32 footnote, I believe it should be 307.
And there is another one where I referred to a date incorrectly. Off by one.
I'm sorry. I had it before I came in and . . . 09:34:14

CONFIDENTIAL

Q You can do that maybe on a break. You can -- 09:34:16

A It's July 25th instead of 26th or vice versa. I'll figure out the paragraph and get back to you. 09:34:25

Q Yeah. That sounds good.

You were asked to opine on whether damages can be calculated on a classwide basis using a methodology that's common to the class, correct?

A Correct. 09:34:44

Q And is the methodology that you propose set forth in paragraphs 104 to 107?

A 104 to 107 is in section . . .

Q Strike that.

For your methodology -- strike that. 09:35:53

Your damages methodology assumes that a company's stock price was artificially inflated during the class period, correct?

A I think I've offered a provisional damages methodology, not a damages methodology. 09:36:07

Q Sure. But your provisional damages methodology that you're proposing here assumes that a company's stock price was artificially inflated during the class period, correct?

A I don't think it assumes that. I think it 09:36:28

uses market evidence to determine whether it was the case. 09:36:30

Q Your damages methodology finds that there is artificial inflation that exists in the stock price during the class period, correct? 09:36:48

A Yes.

Q And your methodology finds that artificial inflation was removed on dates with a corrective disclosure, correct?

MR. BROOKS: Objection. Vague and ambiguous. 09:37:05

THE WITNESS: Could you define what you mean by "corrective disclosure" for purposes of that question?

BY MR. KAHN: 09:37:11

Q You use the term "corrective disclosure" throughout your report, correct?

A I think I do.

Q What is a corrective disclosure as you use that term in the report? 09:37:20

A I'm meaning to use it consistent with Ninth Circuit case law. And I have to concede that the sentence that I have in mind that describes that is escaping me at the moment.

But broadly speaking, I would describe a 09:37:40

corrective disclosure as new information provided to the market that causes the market to reevaluate the value of a company as expressed through its share price. 09:37:46

Q And in the damages model that you're proposing for this case, the idea is that the artificial inflation that you found existed in the stock price was removed on dates with corrective disclosures, as you have just defined it? 09:38:15

MR. BROOKS: Objection. Vague and ambiguous. Lacks foundation. 09:38:32

THE WITNESS: Could you repeat that?

BY MR. KAHN:

Q In the damages model that you're proposing for this case, the idea is that the artificial inflation that you found existed in the stock price was removed on dates with corrective disclosures? 09:38:40

MR. BROOKS: Same objection.

THE WITNESS: Well, first, I just want to reiterate the point about provisional, that this is a provisional methodology. And I'll mean that throughout my answers with respect to the parts of my report that involve the provisional methodology. 09:38:53

Having said that, I think if we take a look at my report, you're talking about -- well, can 09:39:17

you tell me where in my report you're discussing? 09:39:23
BY MR. KAHN:
Q Can you please answer the question.
A Well, I'm -- I think you said throughout my report. And I'm not sure exactly what you're 09:39:33 referring to.
Q I said you used the term "corrective disclosure" throughout your report. I'm no longer asking you about your definition of a "corrective disclosure." I asked you a different question. 09:39:44
A Okay. I thought the question had to do with what my provisional methodology shows.
Q Right. Can you answer the question?
A I'd like to refer to the report to do that, and it would be helpful if you would tell me 09:39:58 which part of it you're thinking about. But I can do it on my own if you want.
So, for example --
Q Well, how about this? I'll refer you to paragraph 106 of your report -- 09:40:21
A Uh-huh.
Q -- where you say: "The share price inflation amounts were moved on corrective disclosure dates."
A Okay. 09:40:31

CONFIDENTIAL

Q Does that refresh you on what your opinion is on whether there was artificial inflation in the stock price that was removed on corrective disclosure dates? 09:40:31

A Well, I don't think I needed any refreshing, but I agree with you that that phrase is present. 09:40:39

Q Okay. And so that is what your methodology is doing, correct?

MR. BROOKS: Objection. Vague and ambiguous, compound, and overbroad. 09:40:52

THE WITNESS: I think that what's correct is that my provisional methodology is directed at -- in part, at measuring the impact of corrective disclosures on Facebook's share price and using that impact to measure the reduction in artificial share price inflation. 09:41:12

BY MR. KAHN:

Q And in your opinion, a class member would be damaged if they bought at an artificially inflated stock price and continued holding over a corrective disclosure date when some or all of that artificial inflation was removed, correct? 09:41:31

A I think that's what the law says. But, yes, that is my opinion. 09:41:48

Q And you calculate artificial inflation by reference to the share price decline after a corrective disclosure; is that correct? 09:41:49

MR. BROOKS: Objection. Vague and ambiguous. Compound. 09:41:58

THE WITNESS: What do you mean by "reference to"?

BY MR. KAHN:

Q The amount of artificial inflation that you calculate is calculated based on the share price decline after a corrective disclosure? 09:42:17

MR. BROOKS: Same objection.

THE WITNESS: I understand artificial share price inflation to be -- well, the price change that an event study used in conjunction with loss causation and damages measurement. What I've done in that part of the report, or I do, is directed at measuring the reduction in share price inflation that occurs as a result of corrective disclosures. 09:42:49 09:43:15

BY MR. KAHN:

Q And the amount of the reduction in share price inflation is equal to the amount of artificial inflation that existed in the stock price prior to the corrective disclosure? 09:43:36

MR. BROOKS: Objection. Compound. 09:43:38
THE WITNESS: I'm not sure what you mean by that, by the reference to the amount that existed prior to the disclosure.
Are you speaking of the full amount? 09:44:00
BY MR. KAHN:
Q So, for the amount of the reduction in share price inflation that occurred as a result of a corrective disclosure, is that the amount -- does that constitute part of the artificial inflation 09:44:19 that you are opining existed in the stock price prior to the corrective disclosure?
A Part of it, yes.
Q And the model -- strike that.
And the methodology that you're proposing 09:44:38 assumes that the stock price was inflated by that amount that we just discussed as of the beginning of the class period, correct?
A Again, I'm hung up on the word "assumes" here. 09:45:09
Q I'm trying to understand the backcasting methodology that you discuss in your report.
Can you describe for me how this backcasting methodology works?
A The idea of backcasting? 09:45:21

Q Yeah. Go ahead. 09:45:23
A Yeah. The idea of backcasting is that inflation that is removed as a result of a corrective disclosure would have been present in the share price before its removal. That is, of course, 09:45:39 implied by removal. It can't be removed if it's not there to begin with.
Whether any particular corrective disclosure -- sorry. The amount of share price inflation that is present on any given date might or 09:46:03 might not be equal to the amount. I'm speaking generally here. You asked about methodology generally. The amount that's present on any given date might or might not equal the amount that is removed on a particular corrective disclosure date. 09:46:19 So it's difficult for me to answer your question in an acontextual way. But hopefully that's helpful.
Q You use the term "value-relevant information" in your report.
What does that mean? 09:46:40
A Can you direct me to where in the report you're referring?
Q Sure. Let's look at paragraph 104.
A Okay.
Q The first sentence uses the term 09:46:51

CONFIDENTIAL

"value-relevant information." 09:46:52
What does that mean?
A Value-relevant information is information that is relevant to the value of a company in its share price. 09:47:07
Q In the next sentence, you use the term "value-relevant truth."
What does that mean?
A I think that "value-relevant truth" means true facts that are relevant to the value of a 09:47:24 company and thus its share price.
Q And you also use the term "relevant truth," for instance, in the next sentence.
What does that mean?
A Well, do you mean in this case what does 09:47:54 it mean?
Q What does it mean in paragraph 104?
A Okay. Well, in paragraph 104, Counsel, I start by saying "in general." So this isn't -- I take your question then to involve what the term 09:48:10 would mean as a general matter. And the sentence is "Event studies focused on dates on which the market learned additional information about the previously concealed or distorted relevant truth," et cetera, useful "to measuring the price impact of 09:48:29

CONFIDENTIAL

misrepresentations and/or omissions." 09:48:32

So the relevant truth here is the set of facts that are relevant to the valuation of a company and thus its share price, including those facts that may have been misrepresented, omitted, 09:48:51 or -- well, misrepresented covers falsely described.

Q And turning to -- you asked earlier about context. Let's turn to your provisional damages calculations for this case.

You calculate that Facebook's stock price 09:49:15 was artificially -- strike that.

You find that Facebook's stock price was artificially inflated by the false or misleading statements that are alleged by Plaintiffs in their complaint, correct? 09:49:31

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: Can you say it again?

BY MR. KAHN:

Q You found that Facebook's stock price was artificially inflated by the false or misleading 09:49:39 statements alleged by the Plaintiffs in their complaint, correct?

MR. BROOKS: Lacks foundation.

THE WITNESS: Is there a particular paragraph you have in mind? 09:49:59

BY MR. KAHN: 09:50:00
Q Do you not know the answer to the question?
A I just want to make sure I understand.
You said we were going to talk about 09:50:06 context, and I wanted to make sure that I understood which context you had in mind.
Q I direct your attention to paragraph 95.
A Okay.
Q I'd like you to read the first sentence 09:50:33 there and see whether that refreshes your recollection about your findings in this case.
A Do you want me to read it out loud or just to myself?
Q To yourself is fine. And if that helps 09:50:45 refresh your recollection about what your findings were, you can testify about what those findings were.
MR. BROOKS: Do you have the question in mind? 09:51:12
THE WITNESS: I have to be honest, it's a very long sentence. And then it refers to a summary that follows in succeeding paragraphs. So that's why I'm pausing. I'm not quite sure what you -- how you are connecting the sentence -- the question to 09:51:25

that particular paragraph. 09:51:28

BY MR. KAHN:

Q Does your model find that Facebook's stock price was artificially inflated by the false or misleading statements alleged in the complaint in 09:51:36 this case?

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: Well, I didn't -- I didn't -- you know, I'm only offering a provisional methodology here, as I've said before. 09:51:51

What my provisional methodology shows is that the revelation of information on corrective disclosure dates is clearly associated with substantial drops in Facebook's share price, which is certainly consistent with and provisionally I 09:52:19 would say shows that Facebook's share price was artificially inflated by the concealment of those facts that were subsequently revealed.

BY MR. KAHN:

Q And you're assuming that the alleged 09:52:43 misstatements in this case concealed the relevant truth that is alleged by Plaintiffs in their complaint, correct?

MR. BROOKS: Objection. Lacks foundation.

Can we make just a clarification. And I'm 09:53:01

not sure if you're trying to do this. But you're asking about the complaint. Obviously, there was a motion to dismiss opinion that modified those allegations that's here in this paragraph. I just want to make sure that that's what you're asking. 09:53:03 09:53:13

Are you asking him about the allegations in the complaint themselves or the allegations in the complaint minus the dismissed claims?

BY MR. KAHN:

Q I am asking you -- 09:53:25

MR. BROOKS: This is creating a lot of confusion.

BY MR. KAHN:

Q -- about the complaint in this case.

I don't know what's confusing about that. 09:53:30

MR. BROOKS: So, notwithstanding the motion to dismiss opinion and the claims that are out of the case -- the statements.

BY MR. KAHN:

Q For the alleged misstatements that are still in this case, you're assuming that they are false or misleading because they concealed the relevant truth that is alleged by Plaintiffs in the complaint, correct? 09:53:42

A Well, I'm taking as true, as my report 09:54:00

says I do, Plaintiffs' theory of liability as expressed in the complaint subject to the motion to dismiss and all the things that it does. 09:54:07

Q Okay. And that relevant truth for those alleged misstatements that are still in the case is the information that Plaintiffs allege rendered those statements false or misleading in the complaint, correct? 09:54:22

A That relevant truth -- sorry, that was a long sentence. Can you ask again, please? 09:54:41

Q And the relevant truth for those alleged misstatements that are still in the case is the information that Plaintiffs allege rendered those statements false or misleading in the complaint, correct? 09:54:58

MR. BROOKS: Objection. Vague and ambiguous.

THE WITNESS: So I understand the relevant truth here to be -- basically, I'm speaking generally here, but I understand the relevant truth here to include three categories of things. 09:55:20

One is the user control statements discussed in the complaint, as well as the motion to dismiss order. A second is the risk statements.

And so, with respect to those two things, 09:55:50

the relevant truth is that Facebook's statements about those matters were false or misleading. 09:55:53

The third category that I have in mind as I sit here today thinking about the phrase "relevant truth" is factors that affect the determination -- the determinants of Facebook's share price value, Facebook's value as a company and thus it's share price. So those factors include its costs, its operating costs and others. They include its revenues, the regulatory environment and consequences of Facebook's conduct, and reputational effects of Facebook's conduct. 09:56:12 09:56:43

And so when I talk about the effect of the revelation of the relevant truth, I'm talking about the effect on those -- the effect of information about those three categories on Facebook's share price value. 09:57:18

BY MR. KAHN:

Q And the relevant truth that you just testified about is based on Plaintiffs' allegations of what rendered the alleged misstatements still in this case to be false or misleading? 09:57:36

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: The relevant truth.

Can you just repeat that question? 09:58:11

BY MR. KAHN: 09:58:14

Q The relevant truth that you just testified about is based on Plaintiffs' allegations of what rendered the alleged misstatements that are still in this case to be false or misleading? 09:58:24

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: I guess I'm -- you know, I'm -- I have in mind the complaint subject to the motion to dismiss order. I feel like I've already answered that question. 09:58:40

BY MR. KAHN:

Q Okay.

A And I guess I would just broadly characterize that as Plaintiffs' theory of liability with respect to what's remaining. 09:58:52

Q And you calculate provisionally that the artificial inflation in Facebook's stock price was removed when that relevant truth that you just testified about was disclosed to the market through corrective disclosures alleged by Plaintiffs? 09:59:11

MR. BROOKS: Objection. Vague and ambiguous.

THE WITNESS: You're asking generally? Do you have a particular --

/ / / /

BY MR. KAHN: 09:59:21

Q Just generally for your theory.

MR. BROOKS: Same objection.

THE WITNESS: When there are corrective disclosures that reveal the relevant truth, the 09:59:28 market now knows things that were concealed, and that will lead to removal of share price inflation.

MR. KAHN: We've been going about an hour. How about we take a quick break. Go off the record.

THE VIDEOGRAPHER: We're going off the 09:59:56 record. The time is 9:59 a.m.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:16 a.m.

BY MR. KAHN: 10:16:15

Q Before we took a break, we were discussing the relevant truth as you describe it in your report.

I'd like to direct your attention to paragraph 99 of your report where you say: 10:16:27

"If Facebook had announced the relevant truth -- that Facebook had already suffered a major instance of misappropriation and misuse of user's data, that its profitability was boosted 10:16:45

by third parties' improper access to and use of users' data, and that users did not have control over their data." 10:16:48

Do you see that?

A Yes. 10:17:00

Q Is that the relevant truth that you were discussing prior to our break?

A I just want to read the context here.

The sentence you -- well, you didn't even read the whole sentence. But the text you read is 10:18:06 part of a longer paragraph which describes a collection of things that market participants, investors, would have naturally inferred. And I would just say that those things are all, I think, fairly things that would be inferred would be part 10:18:38 of the relevant truth as well. I'm not even sure I'd say "as well." It's more of an elaboration on the text you focused on.

Q Sorry. I didn't mean to cut you off.

A All good. 10:18:58

Q So, when you were talking about Facebook's operating costs and revenues prior to our break, is that subsumed within the three relevant truths that are identified in paragraph 99, or are they separate relevant truths? 10:19:16

CONFIDENTIAL

A You were asking specifically about operating costs? 10:19:41

Q You testified to a fairly lengthy list of relevant truths that included, as by way of example, operating costs and revenues. You also said 10:19:55 regulatory requirements, the consequences of Facebook's conduct, reputational effects.

What I'm trying to ascertain is whether those are all distinct relevant truths or are they subsumed within the three relevant truths that you 10:20:14 identify at paragraph 99. And to be clear for the record, that Facebook had already suffered a major instance of misappropriation and misuse of users' data. That's one. Number two, that its profitability was boosted by third parties' improper 10:20:30 access to and use of users' data. And three, that users did not have control over their data.

A Well, I think when you talk about some of the things you were just talking about, not the specific text you read, but I think that you're 10:20:44 talking about aspects of the relevant truth that include the consequences of the -- you know, Facebook's false and misleading statements and then the markets learning of the actual situation. And I go on in that paragraph to talk about those things. 10:21:10

So I'm not quite sure how to answer. Like I just wouldn't think about dividing the text the way you're asking me to do. 10:21:13

Q I'm just trying to understand what you mean by the relevant truth that you discuss in your report and make sure I understand exactly what it is. 10:21:24

A Yeah. I think I answered that before the break. And I'll be glad to say it again.

I think that the relevant truth includes the fact that the user control statements were false, the fact that the risk statements were false. 10:21:35

And when I refer to these, I'm -- again, I'm -- you know, I have in mind Plaintiffs' theory of liability as expressed in the complaint subject to the motion to dismiss order. And then also the -- the -- as I said before the break, the impact of the market's knowledge that after the -- after the truth comes out that -- that there are going to be effects on the operating and other costs, revenue, regulatory implications, and reputational implications. 10:22:01 10:22:27

So those are the things I was talking about when I -- when I talk about the relevant truth, that's what I have in mind. 10:22:45

CONFIDENTIAL

Q Anything else besides those? 10:22:47
A Sitting here at this moment, those are the things that occur to me.
(Exhibit 2 marked for identification.)
BY MR. KAHN: 10:23:22
Q I'm going to go ahead and mark as Exhibit No. 2 the complaint.
Can you point me to where in the complaint Plaintiff allege the relevant truth is what you just testified is the relevant truth? 10:23:46
A Well, the complaint is nearly 300 pages long, and I haven't committed it to memory. So, if there's a -- I can certainly sit here and review it for you if you'd like --
Q No. Do you recall -- 10:24:16
A -- go through it.
Q Do you recall --
A Sorry.
Q Do you recall what section of the complaint was where you learned about what the 10:24:21 relevant truth was, as alleged by Plaintiffs, that you just testified about?
A Let me -- I'm just going to go back to my report, because I know I cite . . .
Q In case it's helpful, there is a section 10:25:06

of the complaint that identifies the allegedly false or misleading statements and the reasons why they are false or misleading, if that would help expedite. 10:25:09

A So, as an example, I think it's -- I don't have the paragraph in front of me, but it's a long section of the complaint. Looks like 4Q, I think, somewhere around page 201, 202. And then also part VIII describes allegations of reliance, materiality, loss causation, and damages. So, in particular, the loss causation and damages section is where I would expect to find some of that. I'm having trouble finding the specific paragraphs at the moment, but . . . 10:26:17 10:27:04

Q So you don't recall the precise sections of the complaint that allege the relevant truth that you testified about? 10:27:21

A Well, I think I just listed some things for you.

Q Those are what you relied upon for your knowledge about what the relevant truth is as alleged by Plaintiffs? 10:27:33

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: If you're going to ask a question like that and expect me to answer, I'm 10:27:42

happy to read through my report and look for the specific paragraph citations. 10:27:44

BY MR. KAHN:

Q I'd like to direct your attention to page 229 of the complaint. 10:27:55

A Sorry. Just give me a moment to move this clip over a bit here. I can read it better.

Page 229 you said?

Q Yes. Do you see that the title of the section is called "Materially False and Misleading Statements and Omissions Made with Scienter During the Class Period"? 10:28:28

A I see that those words are there, yeah.

Q Do you see Section A, "Defendants Made Materially False and Misleading Statements Concerning Facebook Users' 'Control' over Their Data"? 10:28:47

A Yes, I see that.

Q And after that, it lists statements that the Plaintiffs alleged were false or misleading in this case, correct? 10:28:55

I specifically direct your attention to paragraph 618.

MR. BROOKS: You don't want him to read the whole part, the whole section? 10:29:28

MR. KAHN: No. 10:29:31
THE WITNESS: Do you want me to read 618?
BY MR. KAHN:
Q Please.
And my question while you read is -- 10:29:44
A I'm not going to be able to process a question while I read.
Q Sure. Go ahead.
A Do you want to ask the question first, and then I'll read knowing what it is? 10:29:53
Q Sure. So this paragraph contains Plaintiffs allegations about why the statements concerning user control set forth in paragraph 608 through 617 were materially false and misleading.
And my question is whether in the reasons 10:30:13 that are identified here you recognize all of the relevant truths that you testified about just a moment ago.
MR. BROOKS: Objection. Lacks foundation.
THE WITNESS: I just want to make sure I 10:30:34 understand the task here. You want me to read this particular paragraph, 618, and tell you whether all of the things that I testified to are present?
BY MR. KAHN:
Q Correct. 10:30:47

A Each one of them? 10:30:47
Q Correct.
A Okay.
So this paragraph provides reasons to believe that specifically the user control 10:31:53 statements described before it were materially false and misleading by describing aspects of the relevant truth that I described earlier in my testimony. Those related to user control statements. My testimony was not limited to the truth as regards 10:32:19 the false and misleading user control statements.
Q Understood.
This section does not identify as a concealed truth that Facebook's profitability was boosted by third parties' improper access to and use 10:32:38 of users' data, correct?
MR. BROOKS: Objection. Vague and misleading. Sorry. Vague and ambiguous.
THE WITNESS: Can you just say what came after "profitability" in your question again? 10:32:57
BY MR. KAHN:
Q Boosted by third parties' improper access to and use of users' data.
A I think it explains why the user control statements themselves were false and misleading. 10:33:25

But it doesn't address one way or another what the consequences. Like, this particular paragraph does not address those consequences one way or another. 10:33:27

Q And it doesn't identify operating costs of Facebook as a reason why these statements were false or misleading, correct? 10:33:44

A As a reason why the statements were false or misleading?

Q Correct.

A No, it doesn't say that. I mean, it's a different issue, but no, it doesn't say the different issue. 10:34:02

Q And it doesn't say that the statements were false or misleading by misrepresenting revenues, correct? 10:34:15

A Still on just 618?

Q Correct.

A It doesn't say that, no.

Q And it doesn't say that what was misrepresented was the consequences of Facebook's conduct, correct? 10:34:35

A In the user control statements referred to in 608 through 617?

Q Correct.

A It does not say that. 10:34:50

Q I'm going to direct your attention to paragraph 621, which is a paragraph that alleges that the statements concerning user control set forth in paragraph 608 through 617 of the complaint were also materially false and misleading because they omit and misstate material facts. 10:34:55 10:35:17

And it goes on to identify the reasons why the alleged misstatements in paragraph 608 through 617 were false and misleading by omission.

Do you see that? 10:35:38

A You're talking about reasons (a), (b), (c), (d), and (e)?

Q Yes.

A Under 621, I see where it says those things, yeah. I mean, I see (a), (b), (c), (d), and (e). I haven't read it yet today. 10:35:45

Q And the alleged misstatements discussed in this paragraph are not alleged to be false or misleading because Facebook's profitability was boosted by third parties' improper access to and use of users' data, correct? 10:36:01

A Could you ask the question again?

Q The alleged misstatements in paragraph 608 through 617 of the complaint are not alleged to be false or misleading because Facebook's profitability 10:36:43

was boosted by third parties' improper access to and 10:36:47
use of users' data, correct?

MR. BROOKS: Objection. Vague and ambiguous. Lacks foundation.

You're referring to just what appears in 10:36:58
paragraph 621?

MR. KAHN: Just in 621.

THE WITNESS: I think that's correct.

BY MR. KAHN:

Q And misrepresenting revenues is also not 10:37:09
listed in paragraph 621 as a reason why the alleged misstatements in paragraph 608 through 617 are false or misleading, correct?

A Not listed specifically in those terms,
right. 10:37:40

Q Not listed at all, correct?

A Well, as a reason that the statements are false, no.

Q And misrepresenting costs is not -- strike
that. 10:38:09

Misrepresenting Facebook's costs, including operating costs, is not one of the reasons identified as why the statements in paragraph 608 through 617 of the complaint were false or
misleading, correct? 10:38:24

CONFIDENTIAL

And again, just referring to paragraph 621. 10:38:24

A I think that's correct.

Q And misrepresenting the consequences of Facebook's conduct are not identified as one of the reasons why the statements in paragraph 608 through 617 of the complaint were rendered false or misleading? 10:38:52

Again, focusing here on paragraph 621 of the complaint. 10:39:08

A You're asking whether the paragraph that explains why things were false says they were false because of the consequences of their falsity?

Q Correct.

A It does not say that false statements were false because of the consequences of their being false. 10:39:42

Q And you're not aware of any allegation in the complaint that any statement was rendered false or misleading because Facebook's profitability was boosted by third parties' improper access to and use of users' data, correct? 10:40:01

MR. BROOKS: Objection. Vague and ambiguous and compound.

THE WITNESS: What was the reason at the 10:40:22

end of that complicated question? 10:40:23

BY MR. KAHN:

Q So I'm quoting again your report about the relevant truth that you said Facebook's profitability was boosted by third parties' improper 10:40:32 access to and use of users' data.

And you cannot identify any allegation in the complaint that any of the alleged misstatements that are still in this case were false or misleading by omitting to disclose that relevant truth, 10:40:53 correct?

MR. BROOKS: Objection. Vague and ambiguous and lacks foundation.

THE WITNESS: When you say "that relevant truth," again, you're specifically referring to the 10:41:02 consequences of the falsity that I describe?

BY MR. KAHN:

Q We'll get there. But what I'm talking about first is the relevant truth that you identify in paragraph 99 that Facebook's profitability was 10:41:14 boosted by third parties' improper access to and use of users' data.

A You don't think that's a consequence.

Q I'm asking you, can you identify -- you cannot identify any allegation in the complaint that 10:41:27

any of the alleged misstatements that are still in this case were rendered false or misleading by failing to disclose that information I just quoted? 10:41:30

MR. BROOKS: Same objection. I'll just object that you haven't given him an opportunity to review the complaint. 10:41:43

If you're talking about those paragraphs, fine. But otherwise, object that it's overbroad and compound. That's it. I'm done.

THE WITNESS: I don't know how to -- I mean, like -- you could also give me the bible, and I wouldn't be able to tell you exactly what's in it where, so . . . 10:41:55

BY MR. KAHN:

Q Fine. Then let's direct your attention -- let's go off the record for a moment. 10:42:05

THE VIDEOGRAPHER: We are going off the record. The time is 10:42 a.m.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:55 a.m. 10:55:55

BY MR. KAHN:

Q I'd like to direct your attention -- and we're still on Exhibit 2 of the complaint. I'd like to direct your attention to paragraph 623. 10:56:10

A What's the page on that, please? 10:56:14
Q 234.
A Thank you. 234.
And you said 623?
Q Correct. 10:56:33
A Okay.
Q And this is an allegation that the alleged misstatement in paragraph 622 was false or misleading, and it provides a list of reasons.
And you'd agree that one of the reasons -- 10:56:49 strike that.
And you'd agree that Facebook's profitability being boosted by third parties' improper access to and use of users' data is not one of the reasons why this statement was alleged to be 10:57:04 false or misleading as identified in paragraph 623, correct?
A Could you just repeat the question, please?
Q You would agree that Facebook's 10:57:34 profitability being boosted by third parties' improper access and use of users' data is not one of the reasons why this statement was alleged to be false or misleading. And by "this statement," I'm referring to the statement set forth in 10:57:50

paragraph 622. 10:57:52

A Again, you're just asking me whether the consequences that flow from a false and misleading statement were among the reasons listed for why it is the case that the statement was in fact false and 10:58:07 misleading?

Q What I was asking was, is it listed in the complaint that the statement is false or misleading -- and by the statement I'm referring to the statement in 622 -- because Facebook's 10:58:23 profitability was boosted by third parties' improper access and use of users' data?

MR. BROOKS: Objection. Overbroad. Compound.

Are you referring to 623 or more broadly? 10:58:37

BY MR. KAHN:

Q I'm referring to paragraph 623.

That's not a reason listed for why the statement in 622 of the complaint is false or misleading, correct? 10:58:48

A I apologize. I didn't mean to talk over you.

The consequences of the falsity of the statement in 622 are not listed -- are not described in the list of reasons in 623 specifically, which is 10:59:09

directed to explaining why and providing reasons why 10:59:17
the statement itself in 622 was false, correct.

Q And the statement -- the alleged misstatement in 622 is not identified in paragraph 623 to be false or misleading because 10:59:40 Facebook's revenue was based on unsustainable practices allowing third party access to user data, correct?

A The last part of what you said is not one of the reasons given to establish the falsity or 11:00:00 demonstrate the falsity of the statement in 622.

Q Okay.

A And speaking specifically about paragraph 623.

Q And the alleged misstatement in 622 is not 11:00:19 identified in paragraph 623 to be false or misleading because the company would have to shoulder substantial auditing and programming costs once it was compelled to shut off unconsented third party access to user data, correct? 11:00:37

A It's true that paragraph 623 does not list as a reason why the statement in 622 is false and misleading the fact that the consequences would be what you described.

Q And the alleged misstatement in 622 is not 11:01:01

identified in paragraph 623 to be false or misleading because the company faced substantial legal and financial liability for violating the FTC consent decree that bound it, correct? 11:01:05

A What you just listed is another one of the consequences of the false and misleading statement in 622 -- alleged in 622 that is not listed as a reason in 623 for why the statement in 622 is in fact false and misleading. 11:01:23

Q And the alleged misstatement in 622 is not identified in paragraph 623 to be false or misleading because the company faced the risk of diminished use due to reputational harm, correct? 11:01:41

A You've just listed another one of the consequences of the statement in 622 that is not given in 623 as a reason why the statement in 622 is false and misleading. 11:01:57

Q And the alleged misstatement in 622 is not identified in paragraph 623 to be false or misleading because the risk of expensive regulation in the U.S. was substantial, correct? 11:02:17

A The risk of expensive regulation in the U.S. being substantial as a consequence of the false and misleading statement in 622 is not one of the reasons given in 623 for why the statement in 622 is 11:02:33

in fact false and misleading. 11:02:38
Q So we just went through a bunch -- you testified that the information that we just discussed was -- were consequences of the allegedly false statement; is that right? 11:03:00
MR. BROOKS: Objection. Vague and ambiguous.
BY MR. KAHN:
Q Let me rephrase.
You testified that the information we just 11:03:13 discussed about what was not alleged to render the alleged misstatement in paragraph 622 to be misleading were consequences of the alleged false statement, correct?
A I'm sorry. Could you read that back? It 11:03:49 seemed like too broad of a --
Q You testified that the information we just discussed about what was not alleged to render the alleged misstatement in paragraph 622 to be misleading were consequences of the alleged false 11:04:03 statement; is that right?
A The questions you've asked me since we came back from the break, as I understood them all, involved consequences of false statements and -- or potential consequences of false statements. And 11:04:29

specifically with respect to the false statement 11:04:34
alleged in 622, I did testify that I did not see in
paragraph 623 that the consequences we just
described -- we just discussed were provided as
reasons why the statement was in fact false and 11:04:56
misleading, correct.
Q I direct your attention to --
Did you want to finish?
A No. Just, if that's what you meant, then
I would say correct. 11:05:08
Q Direct your attention to paragraph 626.
The reasons that are listed here for why
the statement in paragraph 622 is alleged to be
false or misleading does not include any of the
potential consequences of the false statements that 11:05:33
you just testified about since we came back from the
break, correct?
A Let me read it. This is 626 we're
specifically talking about?
Q Correct. 11:06:10
A 626 does not list -- among the reasons for
the falsity and misleading nature of the statement
of 622, it does not list the consequences of that
false and misleading statement as a reason why that
statement was false and misleading. 11:06:30

Q Direct your attention to paragraph 630. 11:06:31
A Yeah.
Q The reasons that are listed -- strike that.
The reasons that are listed here for why 11:06:47 the statements quoted in paragraph 628 are alleged to be false or misleading does not include any of the potential consequences of the false statements that you just testified about since we came back from the break, correct? 11:07:09
A Well, I'll need to read 628.
Q I also want to strike that question and rephrase.
A Okay.
Q The reasons that are listed in 11:07:36 paragraph 630 for why the statements quoted in paragraph 628 through 629 of the complaint -- for why those statements are alleged to be false or misleading does not include any of the potential consequences of the false statements that you just 11:07:56 testified about since we came back from the break, correct?
A Well, looking at 630, it starts with (a) and ends with (k) on the succeeding page, and it refers to statements in both 628 and 629. 11:08:14

628 involves (a), (b), and (c), and 629 is its own paragraph. 11:08:18

So I -- which part of that question do you want me to answer first?

Q It was just one question. 11:08:39

What don't you understand?

A Okay. I'll read 628. I'll answer as to 628. And then I'll come back and read 629 and answer as to that.

All right. So 628 involves statements made in Facebook's 10-K that was filed on February 3, 2017. And they involve -- I'll just say that much, related to risks. 11:09:25

And then 630, I need to read that now.

Okay. So 630 provides a number of reasons -- I think that number is 11, if I've got my letters mapped -- the numbers right. 11:10:54

So 630 provides a number of reasons, as to paragraph 628 anyway, why the 10-K risk statements made in the Form 10-K filed on February 3, 2017 were false and misleading. 11:11:19

And I think your question, if I remember it correctly, had to do with whether consequences of the falsity and misleading nature of the statements in 628, paragraph 628, were among the, I think, 11 11:11:38

reasons provided in 630 for why the 628 statements are indeed false and misleading. And I do not see the consequences of the falsity and misleading nature of those statements listed in that set of 11. 11:11:46

Q And that same testimony -- 11:12:06

A Sorry. Did you want me to finish my answer? Because you asked about 628 and 629.

Q I was just about to ask about 629. So please go ahead about 629 as well.

A You said it was one question. So, as I said, I was going to start with 628 and then move to 629. 11:12:22

Q And the question is, just so you have it --

A Sorry. Can you hang on one second, please. 11:12:38

Okay. So six -- feel free to repeat the question.

Q And the potential consequences that we've been discussing since we came back from break are not listed in paragraph 630 as a reason why the alleged misstatements described in paragraph 629 are false or misleading, correct? 11:12:51

A I don't see anywhere in that list of 11 reasons why they're false that gives us a reason for 11:13:10

CONFIDENTIAL

falsity -- the consequences of the falsity. 11:13:14
Q Direct your attention to paragraph 633.
The same is true with respect to this paragraph as well, correct?
A I'm just going to read the paragraph. 11:13:32
I don't see anywhere in the list in 633 where the consequences of the falsity of the statements or misleading nature of the statements in 628 and 629 -- where those consequences are listed as a reason why the statements are false or 11:14:34 misleading.
Q Turn back to Exhibit 1 and direct your attention to paragraph 199.
A Got it.
Q You do not cite any paragraph of the 11:14:58 complaint in support of what the relevant truth is identified in this paragraph, correct?
A This paragraph does not include any citations to the complaint.
Q Direct your attention to paragraph 103. 11:15:24
You do not cite any paragraph of the complaint that alleges that the information discussed in paragraph 103 was concealed from investors, correct?
A Without reading -- I'm sorry. 11:15:45

Q Correct? 11:15:47
A Without reading 103, I can just tell from you looking at it that I don't cite any paragraph of the complaint.
Q And you cannot identify sitting here any paragraph in the complaint that alleges that Defendants concealed from investors that an amount of the company's revenue was based on unsustainable practices allowing third party access to user data, correct? 11:15:56 11:16:11
MR. BROOKS: Objection. Overbroad. Compound. Vague and just misleading. And it's an unfair question given that you haven't let him read the full complaint.
THE WITNESS: I'd be happy to read the complaint if you want me to. 11:16:20
BY MR. KAHN:
Q But you don't remember any complaints that actually supports what your saying in paragraph 103 sitting here right now, without reading the whole complaint, which I know would take hours, so can't do that. 11:16:29
But just sitting here today, you can't remember anyplace in the complaint where it alleges that Facebook or any of the other defendants 11:16:37

concealed from investors that an amount of the company's revenue was based on unsustainable practices allowing third party access to user data, correct? 11:16:40

MR. BROOKS: Same objections. 11:16:48

THE WITNESS: You know, I -- I'll sort of say what I did before. There are a large number of documents that I haven't read recently that I couldn't peg a particular thing to. So this is like that. 11:17:01

BY MR. KAHN:

Q So the answer is that you cannot identify, sitting here today, any allegation in the complaint that Defendants concealed from investors that an amount of the company's revenue was based on unsustainable practices allowing third party access to user data, correct? 11:17:15

MR. BROOKS: Objection. Asked and answered. Compound. And it's argumentative and unfair. 11:17:28

THE WITNESS: I'll just stand by my earlier answer.

BY MR. KAHN:

Q Your answer is "Sort of what I did before. There are a large number of documents that I haven't 11:17:37

read recently that I couldn't peg a particular thing to?" 11:17:40

That's your answer to my question?

A Yes. The complaint is one of those kinds of documents. It's a very long document. You're 11:17:46 asking me whether I can cite a particular pin site for a particular proposition. I couldn't do that for any number of nearly 300-page documents.

Q And you also cannot point to any allegation in the complaint that Defendants 11:18:05 concealed from investors, sitting here today with all your caveats, that the company would have to shoulder substantial auditing and programming costs once it was compelled to shut off unconsented third party access to user data, correct? 11:18:18

MR. BROOKS: Same objection.

THE WITNESS: I'm sorry. Can you ask the question again? There was a lot to it.

BY MR. KAHN:

Q With all of your caveats that you just 11:18:24 discussed about how the complaint is a long document, sitting here today, you cannot identify any allegation in the complaint that Defendants concealed from investors that the company would have to shoulder substantial auditing and programming 11:18:36

CONFIDENTIAL

costs once it was compelled to shut off unconsented third party access to user data, correct? 11:18:39

MR. BROOKS: Same objection. And misleading in that you misstated the caveat, which is that you have not let him read the complaint. 11:18:51

THE WITNESS: Well, I'm happy to look through the complaint.

BY MR. KAHN:

Q No. Without reading the complaint. I mean, just sitting here -- you wrote this report. 11:19:01

A You asked me if I could.

Q No, no. I mean, you wrote this report, and you said that, according to the allegations in the complaint, that Defendants concealed from investors that the company would have to shoulder substantial auditing and programming costs once it was compelled to shut off unconsented third party access to user data. 11:19:09

A Where did I say that?

Q You do not cite anything in support of that, as we've already discussed. So what is that based off of? 11:19:23

MR. BROOKS: Objection. Compound. Lacks foundation. Argumentative.

THE WITNESS: You just attributed a whole 11:19:32

lot of text to me, and I'd like you to tell me where 11:19:34
to find it in my report.

BY MR. KAHN:

Q Paragraph 103. We're still there.

A Okay. What was the question again? 11:19:56

Q You already testified that you do not cite
any allegation in the complaint in support of your
statements in paragraph 103. And so I'm asking you
to you identify what allegation in the complaint
says that Defendants concealed from investors that 11:20:13
the company would have to shoulder substantial
auditing and programming costs once it was compelled
to shut off unconsented third party access to user
data.

MR. BROOKS: Objection. Lacks foundation. 11:20:25
Again, it's argumentative and unfair without letting
him read the complaint.

You can answer.

THE WITNESS: I'll just say that -- you're
specifically asking about the auditing and 11:21:13
programming costs, right?

BY MR. KAHN:

Q Correct.

A Well, Facebook -- there was plenty of
information released to the market about auditing 11:21:41

and programming costs, I think in connection with 11:21:44
the July 2018 earnings release. And I know that
those topics are addressed in the complaint.

If you're going to play, like, gotcha,
find the pin cite with me, I can't tell you -- I 11:22:08
don't have an answer for the gotcha. But I believe
that the complaint does in fact speak to those
points.

Q But sitting here today, you can't identify
an allegation that Defendants concealed that 11:22:24
information from -- strike that.

Sitting here today, you cannot identify
any allegation in the complaint that Defendants
concealed that information from investors, correct?

MR. BROOKS: Objection. Lacks foundation. 11:22:38
Overbroad. Compound. Argumentative. And unfair
without letting him read the complaint.

THE WITNESS: I mean, the complaint
alleges that those costs were consequences of
Facebook's failures with respect to user control and 11:23:02
data misappropriation. And the complaint alleges
that Facebook failed in those ways.

And so I certainly could identify parts of
the complaint that did that. Even as I sit here
today, I could, if you would let me read the 11:23:41

complaint. 11:23:45
BY MR. KAHN:
Q And sitting here today, after preparing for this deposition, you cannot identify any allegation in the complaint that Defendants 11:23:54 concealed from investors that the company faced substantial legal and financial liability for violating the FTC consent decree that bound it, correct?
MR. BROOKS: Objection. Lacks foundation. 11:24:08 Overbroad. Compound. Argumentative. And unfair without allowing the witness a chance to read the complaint.
THE WITNESS: I'll just reiterate what I said in answer to your last gotcha question. 11:24:18
BY MR. KAHN:
Q And sitting here today, you cannot identify any allegation in the complaint that Defendants concealed from investors that Facebook faced the risk of diminished use due to reputational 11:24:35 harm, correct?
MR. BROOKS: Objection. Lacks foundation. Compound. Argumentative. And unfair without allowing the witness a chance to read the complaint.
THE WITNESS: I'm confident I could. 11:24:46

BY MR. KAHN: 11:24:48

Q You drafted this report, correct?

A I already testified that I did.

Q And you prepared for today's deposition today, correct? 11:24:57

A Yes.

Q And yet, sitting here today, you cannot identify the allegation in the complaint that supports your statement that Defendants concealed from investors that the company faced the risk of 11:25:10 diminished use due to reputational harm, correct?

MR. BROOKS: Objection. Lacks foundation. Compound. Argumentative. And unfair without allowing the witness a chance to read the complaint.

THE WITNESS: Yeah. At this point, I kind 11:25:22 of wonder what you mean by "cannot." Like, is it within my powers to do such a thing? Sure. You asked if I could identify it. I can identify it. I just need to read the complaint.

BY MR. KAHN: 11:25:36

Q Sitting here today, though, you cannot identify any allegation in the complaint that Defendants concealed from investors that the risk of expensive regulation in the U.S. was substantial, correct? 11:25:49

MR. BROOKS: Objection. Lacks foundation. Compound. Argumentative. And unfair without allowing the witness a chance to read the complaint. 11:25:49

THE WITNESS: I think what you're asking is whether I can, you know, like, game show quiz kind of way off the top of my head do those things. And I've testified with regard to your earlier questions of that sort that I'm confident I could if I were allowed to read the complaint. 11:25:58

BY MR. KAHN: 11:26:21

Q So your testimony, to be clear, under oath, is that there are allegations in the complaint that Defendants concealed from investors all of the information that we just discussed in paragraph 103, but you just identify them without reading the complaint again; is that correct? 11:26:33

A Well, what my report is about is, as I testified earlier, the Plaintiffs' theory of liability in the complaint as subject to the motion to dismiss. 11:26:53

And here I think it's also worth observing that the Ninth Circuit has spoken about what this case is about and what's -- you know, what consequences are connected to which false and misleading statements. And all of that is what I 11:27:15

have in mind. You know, I -- anyway, if you want to play gotcha games, I guess we'll keep doing it. 11:27:18

Q So my question was actually a yes-or-no question. So I'll repeat it for you so that you can address it. 11:27:36

Your testimony is that there are allegations in the complaint that Defendants concealed from investors all of the information that is in paragraph 103, but you just can't identify it without reading the complaint; is that right? 11:27:48

MR. BROOKS: Objection. Overbroad. Compound. Lacks foundation. Argumentative. And unfair without allowing him to read the complaint.

THE WITNESS: Well, I think what I testified to was that, if I were allowed to read the complaint, I could answer the questions. And one of the things about not being allowed to read a 279-page complaint that has 722 numbered paragraphs and being asked whether I can identify this or that thing is that -- without being allowed to read it is that I -- it's kind of a question that can't really be answered. There are -- there are many places in the complaint that I know are connected to the points I make in paragraph 103. I understand we're going to do, like, a parse thing and each little 11:27:59 11:28:40 11:29:03

detail, but -- and I know you wanted a 11:29:06
yes-or-answer, but you didn't ask a question that's really susceptible to a yes-or-no answer.

BY MR. KAHN:

Q You testified that you were confident that 11:29:12
the information that you describe in paragraph 103 is in the complaint, correct?

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: I think what I said was that -- I don't have the video screen that you have, 11:29:23
but I think what I said was that I'm confident that I could connect the Plaintiffs' theory of liability, much of which is clearly stated in the complaint. There's some element of the Ninth Circuit opinion that connects to all of this, but subject to the 11:29:46
motion to dismiss order to the points I make in 103.

BY MR. KAHN:

Q I want to direct your attention to paragraph 106 of your report. In 106(a), you say:

"Given that Plaintiffs' theory 11:30:12
of liability alleges that Defendants' misleading statements and omissions concealed and distorted the same relevant truth from the outset of the class period through and until each corrective 11:30:25

disclosure removed share price inflation, I can use a constant dollar approach to calculate the share price inflation." 11:30:28

Do you see that?

A I see those words, yeah. 11:30:42

Q Your damages model depends on the assumption that the alleged misleading statements and omissions concealed and distorted the same relevant truth from the outset of the class period, correct? 11:30:59

A What this paragraph 106(a) text is speaking to is -- let me back up.

The phrase "given that," which begins that sentence from which you read, should be understood here to mean that assuming it is the case that or if it were the case that. That's the role of "given that" in that situation. And so it's a counterfactual kind of discussion. 11:31:36

Do you want me to go on? Sorry. You asked specifically about the -- so my point is, what this is saying is that, if it is the case -- that's the role of "given that" in this context. If it is the case -- I'm sorry. Let me back up. 11:31:58

I'm sorry. I was thinking of a different thing. 11:32:25

Q Do you need me to rephrase the question? 11:32:26
A Would you just restate it, please.
Q Your damages model assumes that the alleged misstatements concealed and distorted the same relevant truth from the outset of the class 11:32:38 period, correct?
A I think that's correct, at least with respect to the points being discussed here.
Q And your damages model assumes that the relevant truth alleged by Plaintiffs existed from 11:33:01 the outset of the class period?
A The relevant truth being alleged by Plaintiffs. I think that's correct.
Q In paragraph 106(b), you say that you can use a constant percentage approach as well, correct? 11:33:34
A Well, I start that paragraph -- excuse me, subparagraph, with the word "alternatively."
So the point is that there are circumstances in which -- or it would be possible to use a constant percentage approach. 11:33:51
So I think that's correct.
Q And it would be possible to use that approach because of the assumption that the alleged misstatements concealed and distorted the same relevant truth from the outset of the class period? 11:34:08

A I think that's correct. 11:34:39
Q And like the constant dollar approach, the constant percentage approach proposed here assumes that the relevant truth alleged by Plaintiffs existed from the outset of the class period? 11:34:55
A I'm sorry. How is that different from your previous question?
Q My previous question -- so you talk about the constant dollar approach in 106(a)?
A Uh-huh. 11:35:11
Q And we walked through some of the assumptions?
A Right.
Q You then talk in 106(b) about the constant percentage approach. And I'm making sure that the 11:35:19 constant percentage approach depends on the same assumptions that we just discussed with respect -- with respect to the constant dollar approach.
A I just thought you had asked that very question. Maybe I misunderstood. 11:35:32
Q No. I did not ask that question. So I'll ask -- I'll ask the question again.
In the constant percentage approach, like the constant dollar approach, assumes that the relevant truth alleged by Plaintiffs existed from 11:35:48

the outset of the class period? 11:35:50
A I think I understand.
Yes.
Q I want to direct your attention to Table 5 on page 62 of your report. 11:36:03
A Okay.
Q And Table 5 shows the calculations of share price inflation that you opine was removed from Facebook's stock on each corrective disclosure date alleged by Plaintiffs, correct? 11:36:30
A Well, it doesn't include anything to do with -- like, the table doesn't include -- so two things.
One is the dates here are the trading dates associated with corrective disclosure dates. 11:36:58 So, for example, March 16th is when -- 2018 is when Facebook publishes its blog post admitting to some of the facts it had previously concealed.
Then over the weekend, there's the "New York Times" article, the "Guardian" article adding 11:37:21 more -- more facts.
And the trading date that's associated with these disclosures is March 19th. Because that's a Monday. It's the first trading date. The market is open. NasDaq hours are open. 11:37:41

And I just want to emphasize that you asked about corrective disclosure dates, and the table refers to event trading dates. So that distinction is important for me to note. 11:37:44

Having noted that distinction, then the second point is that I understand that on June 3rd of 2018, the "New York Times" published an article about Facebook's whitelisting practices, and that was also a corrective disclosure. 11:37:57

The Plaintiffs' theory of liability is that the -- as I understand it, is that the effects of that -- those corrective -- that the corrective information that was released on June 3rd in this "New York Times" article are not -- the importance of that is not clear to the market until the earnings call and earnings release on July 25th. And then we have the event trading date on July 26th. 11:38:25 11:38:46

So I just want to emphasize that the way you framed the question, it sounded like you were maybe asking me if every one of the corrective disclosure dates was reflected in this list. And I just wanted to emphasize that, if that's the question that you were asking, that, by design, June 3rd is not -- or June 4th, I guess it would be, 11:39:06 11:39:20

the trading date is not there. 11:39:23

Q Table 5 shows the calculations of share price inflation that you opined was removed from Facebook stock as a result of the alleged corrective disclosures, right? 11:39:38

A Sorry. Can you just tell me the precise phrasing again?

Q Table 5 shows the calculations of share price inflation that you opined was removed from Facebook's stock as a result of the alleged 11:39:56 corrective disclosures, correct?

A Incorporating what I said in my previous answer, yes.

Q Does adding up the numbers in the column "share price inflation removed" result in the total 11:40:10 amount of artificial inflation that you opine existed in Facebook's stock price prior to the first corrective disclosure alleged by Plaintiffs?

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: I think I want to emphasize 11:40:30 again that this is a provisional analysis. You know, this is not a final damages analysis. It illustrates the methodology.

The second part of my answer to your question is that your -- you know, if I were to 11:40:50

determine that constant dollar inflation were the appropriate -- the appropriate method to use for each of these share price impact dates, then adding up the column would be the right way to do things. But I have not made such a determination, as my report says. 11:40:58 11:41:18

BY MR. KAHN:

Q What was the relevant truth disclosed to the market that led to the price decline on March 19, 2018? 11:41:34

MR. BROOKS: Objection. Compound. Vague and ambiguous.

THE WITNESS: Well, part of the relevant truth was disclosed on March 16th. And then over the succeeding weekend, the 16th, with Facebook's blog post, and over the weekend with the "New York Times" and "Guardian" articles. 11:42:03

And you asked what was the relevant truth. I don't have those articles in front of me at the moment, but I can speak generally. But I also would be happy to look at them if you would want me to do that. 11:42:21

BY MR. KAHN:

Q I'd direct your attention to paragraph 99 of your complaint? 11:42:32

MR. BROOKS: Of his report. 11:42:34
MR. KAHN: Of his -- yes. Strike that.
BY MR. KAHN:
Q Paragraph 99 of your report. Thank you for helping me with that. 11:42:42
A If he didn't, I would have.
Q Yeah.
A Okay.
Q And we talked about this before, about categories of relevant truth. 11:42:54
And I'm going to use shorthand and you let me know if it makes sense. But there's one relevant truth is that Facebook had already suffered a major instance of misappropriation and misuse of users' data and there's -- that Facebook's profitability 11:43:13 was boosted by third parties' improper access and use of users' data.
Quick question about that one, is that the same as the consequences of the false statement that you were testifying about before? 11:43:28
A Sorry. You read a lot of stuff. You're asking me is the clause Facebook's profitability was boosted by third parties improper access to and use of users' data is that what.
Q Was that -- you described earlier and 11:43:49

testified earlier about consequences of the false statement and is this relevant truth that we were just talking about, that Facebook's profitability was boosted by third parties' improper access to and use of users' data subsumed within those consequences, or is this a separate relevant truth? 11:43:51 11:44:02

A Well, the fact that users didn't actually control their data is connected to the fact that Facebook's profitability was boosted by this improper access and use. And I think that the market becoming aware of the importance of that fact is the consequence. The fact itself I think is connected to user control facts. 11:44:51

Q So you identify three things here in paragraph 99 as the relevant truth. Facebook already suffered a major instance of misappropriation and misuse of users' data, that its profitability was boosted by a third party's improper access to and use of users' data, and that users do not have control over their data. 11:45:29 11:45:44

Is your testimony that those are three separate relevant truths?

MR. BROOKS: Objection. Vague and ambiguous.

THE WITNESS: My testimony is those are 11:45:59

aspects of the relevant truth. I don't know that 11:46:01
I've thought about answer to your question before.
I don't know that I think it's important.

BY MR. KAHN:

Q Which of those relevant truths was 11:46:12
disclosed prior to the price decline on March 19,
2018?

A So it's certainly the case that the
disclosures of March 16th, the blog post, and then
the "New York Times" and "Guardian" articles 11:46:46
disclosed that Facebook had suffered a major
instance of misappropriation and misuse and that
users did not have control of their data. Both of
those are clearly revealed in those news releases.

Q Were the consequences of the false 11:47:31
statement that -- strike that.

Were the consequences of the false
statements that you testified were the relevant
truth earlier today revealed prior to the price
decline on March 19, 2018? 11:47:50

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: I'm sorry. Can you say that
again?

BY MR. KAHN:

Q Were the consequences of the false 11:47:58

statements that you testified were the relevant 11:47:59
truth earlier today revealed prior to the price
decline on March 19, 2018?
MR. BROOKS: Same objections.
THE WITNESS: The consequences of the 11:48:10
relevant truth revealed by -- prior to March 19th
you said?
BY MR. KAHN:
Q Correct.
A I think that the full scope of the 11:48:36
consequences are -- is revealed not until July, as
the Ninth Circuit, for example, stated.
The -- you know, I would expect the market
to draw inferences about the scope of those
consequences. And that's why part of why I would 11:49:03
expect -- in the abstract, one would expect to see
what we did see on March 19th, which is a drop in
the share price.
Q Was it revealed prior to the price decline
on March 19, 2018 that Facebook's profitability was 11:49:24
boosted by third parties' improper access to and use
of users' data?
A Could you describe what you mean by
"revealed" here?
Q Did the market learn that Facebook's 11:49:47

profitability was boosted by third parties' improper access to and use of users' data prior to the price decline on March 19, 2018? 11:49:50

A The market learned facts that would reasonably give rise to that inference. 11:50:05

Q So we just walked through multiple of the -- strike that.

On paragraph 99, you talk about multiple relevant truths, three of them.

And I understand your testimony to be that all three of those were revealed to the market in connection with the price decline on March 19, 2018. 11:50:26

Is that correct?

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: I don't think that's an accurate characterization of what I said. 11:50:51

BY MR. KAHN:

Q The market learned all three of those things identified in paragraph 99 prior to the price decline on March 19, 2018? 11:51:03

MR. BROOKS: Same objection.

THE WITNESS: Well, I did say that the first and third of those were revealed to the market. The market learned them.

With respect to the profitability point -- 11:51:21

I'm not trying to be squirrely here -- I think revealed versus the market would -- the information that was revealed would be enough for the market to draw some inferences about. You know, I think that the full scope, as I said -- I'll just repeat what I said earlier, as the Ninth Circuit held, and, you know, I think the district court has also observed this, the full scope of the impact on profitability wasn't clear until the July 25th disclosure. 11:51:23 11:51:39

BY MR. KAHN: 11:52:02

Q In Table 5, you provisionally calculate that there was $8.50 of artificial inflation removed on March 19, 2018.

Do you have an opinion as to how much of that amount is attributable to one relevant truth versus the other? 11:52:14

A Not presently.

Q Turning to the price decline on March 20, 2018. What is the relevant truth that led to that -- strike that. 11:52:39

What is the relevant truth revealed to the market prior to March 20, 2018 that you opine led to the price decline on March 20, 2018?

A I think there are two ways of looking at the March 20th price decline in understanding 11:53:01

what -- how to answer your question with respect to 11:53:04
it.

So one way is that it's a continuation of the market digesting the really quite, you know, bombshell news of the previous days with respect to 11:53:22 Facebook and its fraudulent behavior and the news about Cambridge Analytica and the rest.

And so one -- you know, one reason why I would expect -- or certainly would not be surprised to see the price impact that we see on March 20 -- 11:53:48 strike what I just said.

The way I'll say it is, the news that broke over the 16th and then the weekend, together with the stories that continued to be published on Monday, the 19th, the morning, Tuesday the 20th, and 11:54:08 so on throughout the day, all of that would be enough to explain why the market would respond on both the 19th and the 20th as it's digesting the importance of this mammoth news.

In addition -- so that's the first. I 11:54:31 said two. That's the first.

In addition, I think that it's possible to look, for example, at the March 20th article, I think, by "The Guardian" that quotes a former Facebook employee with experience in the specific 11:54:51

area of user data, in platform data access, suggesting that maybe it looks like half or more than half of Facebook users might have had their data accessed in a way similar to what Kogan did, and suggesting that Facebook wasn't worried about stopping that sort of thing and so on. 11:54:58 11:55:21

I think that it's not out of the realm of reasonableness, from my point of view, to regard that as a new piece of information, in the sense that it broadens and deepens the scope of the existing information. 11:55:48

So distinguishing here between the market digesting an existing set of facts versus new information that broadens and deepens. And I think that could be a sufficient -- would be a sufficient explanation for the March 20th response as well. 11:56:05

Q And the price decline on March 20, 2018 accounts for $4.99 of share price inflation in your model.

Do you have an opinion as to how much of that amount is attributable to one relevant truth versus another? 11:56:26

A Again, emphasizing that this is a provisional analysis, sitting here today, I haven't tried to -- I haven't tried to sort that sort of 11:56:44

thing out. So I don't currently have an opinion about that. 11:56:53

Q Turning to the decline on July 26, 2018, prior to that decline, is that when the market first learned that Facebook had already suffered a major instance of misappropriation and misuse of users' data? 11:57:06

A Sorry. Can you say that again.

Q Turning to the stock price decline on July 26, 2018, is it your opinion that the relevant truth that led -- strike that. 11:57:18

Turning to the stock price decline on July 26, 2018, is it your opinion that the relevant truth revealed to the market in advance of that decline is that Facebook had already suffered a major instance of misappropriation and misuse of users' data? 11:57:40

A In advance of that decline?

Q Correct.

A So before the July 25th disclosures? 11:57:51

Or do you mean the July 25th disclosure -- are you talking about that disclosure when you say "in advance"?

Q Correct.

A I'm sorry. Just didn't understand. 11:58:05

So you're asking me whether -- I just want to make sure I understand. You're asking me whether the July 25th disclosure set of statements, et cetera constitute the disclosure writ large -- whether that -- are you looking back to paragraph 99? 11:58:07 11:58:21
Q In paragraph 99, is that when it was revealed that Facebook had already suffered a major instance of misappropriation and misuse of users' data? 11:58:34
A On July 25th?
Q Correct.
A No. I think I already testified that that happened in March.
Q And on July 25, is that when the market learned that users did not have control over their data? 11:58:41
A No. The market already knew that in March.
Q Is the relevant truth that you contend led to the stock price decline on July 26, 2018 that Facebook's profitability was boosted by third parties' improper access to and use of users' data? 11:59:03
A Your question is, again, about July 25th and the 26th, the 25th disclosures? 11:59:26

Q Correct. 11:59:30
A I think that would be included in the scope of things that are being clear on July 25th?
And before you ask another question, I just want to say, I could use a break soon. 11:59:44
Q How about one more question on this?
A Fine.
Q Is it your opinion that on July 25th, the relevant truth revealed to the market was the consequences of the allegedly false statements in 12:00:01 this case?
MR. BROOKS: Objection. Vague and ambiguous. Overbroad.
THE WITNESS: We talked about a lot of different consequences, so did you -- you looked 12:00:17 like you were going to rephrase.
BY MR. KAHN:
Q Any of the foreseeable consequences that we talked about earlier, are those what were disclosed on July 25th that you opine was the 12:00:34 relevant truth that caused the stock price decline on July 26, 2018?
A I'll say that the scope of the auditing and programming costs, for example, the impact on Facebook revenues of paring back access to user 12:00:56

data, possibly also reputational impacts, those things are -- those things are revealed on July 25th. 12:01:06

Q Is there any other --

A I thought we were going to take a break. 12:01:25

Q Almost done.

Is there any other relevant truth that you opine was disclosed to the market on July 25th that led to the stock price decline on July 26, 2018?

MR. BROOKS: Objection. Overbroad. Compound. Vague and ambiguous. 12:01:42

THE WITNESS: I think it's difficult to answer that question at that level of generality because a lot of information is disclosed in the earnings call. There's a lot of statements. I talk about some of them in the report. Many of them are quoted in the can't-be-read complaint. 12:02:01

And I'm -- I think that what I say in the report is -- I can look at -- I can find the statement if you want, but I think that those are the things that are disclosed on July 25th. 12:02:35

BY MR. KAHN:

Q Sure. What statement are you referring to?

A Give me a moment. 12:02:42

MR. BROOKS: The witness has asked for a break. You've asked about nine questions. 12:02:46
MR. KAHN: I know. But he offered to look. I know. He offered to look. So we're finished up with him. It's still the same line of questioning. 12:02:52
MR. BROOKS: Well, it's different than a question.
MR. KAHN: He offered. I'm just letting him do what he says he wants to do. 12:02:59
THE WITNESS: Well, I said I'd like to take a break now.
MR. KAHN: Well, soon. After you identify -- let's finish up the question.
Go ahead. 12:03:09
MR. BROOKS: Well, the witness wants to take a break. Let's take a break.
MR. KAHN: Let's just finish up the question. The question is pending. Let's go ahead, please. 12:03:14
It's going to be very fast. I hope so. I hope he can identify in his own report that he drafted where it is.
MR. BROOKS: Yeah, we can do this.
MR. KAHN: Yeah. 12:03:22

MR. BROOKS: If you're doing this with your witnesses, you know, I'm going to remember this. This is outrageous. He wants to take a break. He said that ten questions ago. 12:03:22

MR. KAHN: Well, let's finish up the line of questions. We're almost done. Let's go ahead. You're eating into his break, Luke. 12:03:31

All right. Let's go ahead.

THE WITNESS: So starting on page -- sorry, paragraph 130 and going at least through 138 and maybe also 139, 140, I talk about a bunch of things. And I've got to tell you, I really need a break, so I'm not going to try and summarize them now. 12:04:31

MR. KAHN: All right. Let's go ahead and take a break. 12:05:16

THE VIDEOGRAPHER: We are going off the record. The time is 12:05 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:03 p.m. 01:03:33

BY MR. KAHN:

Q It's your opinion that Facebook common stock traded in a semi-strong form efficient market throughout the class period, correct? 01:03:45

A Yes. 01:03:48
Q And in a semi-strong form efficient market, the price of the stock reflects all publicly available information, correct?
A The only reason I'm hesitating is that -- 01:03:57 well, yes.
Q You opine that in a semi-strong form efficient market, stock prices adjust relatively quickly to fully reflect newly public information.
What does "relatively quickly" mean? 01:04:13
A That's a good question.
You know, there's literature on this. And I think I cite some of it in the report.
In fact, let me -- you quoted from which paragraph? 01:04:32
Q Paragraph 31(b) of your report, Exhibit 1.
A Thank you.
Yeah. It's not where I was thinking of.
But I'll just say this: That "relatively quickly" is a relative term. There are some 01:04:46 situations in which it's very clear what the situation. There's no need for anybody to digest it. Highly liquid market. You'd expect in a situation like that in the middle of a trading day -- you'd expect in a situation like that the 01:05:06

price would adjust, you know, within an hour or two 01:05:09 or something like that.

Other situations where it's unclear what the import of the information is. So there's going to be a rapid adjustment to information, yes. But 01:05:18 what constitutes the information is kind of where the -- where the rub is.

And so, you know, as it becomes clear over time that -- that new information has a different implication from what was originally potentially 01:05:42 thought, then it would be perfectly reasonable for further adjustments to happen in one direction or another.

Q So but when a fact is reported to the market, how quickly is that fact incorporated into 01:06:00 the stock price?

MR. BROOKS: Objection. Incomplete hypothetical.

THE WITNESS: When a fact -- I guess I -- that's kind of -- I don't know how to answer a 01:06:15 question at that level of generality.

BY MR. KAHN:

Q When you just testified, at least as I understood you, you were talking about the market infers information -- excuse me, makes an inference 01:06:28

about a fact that is reported, and then it may later -- the market may later adjust as its inference about the import of that fact changes. 01:06:31

Is that an accurate characterization of what you just said? 01:06:43

A I don't think it's inconsistent with what I said. I'm not sure it would capture everything I said, but . . .

Q What I'm trying to ask about is, rather than inferences that the market is drawing being able to change stock prices, the repetition of a fact -- strike that. 01:06:52

How -- when a fact is reported to the market in a semi-strong form efficient market, would the stock price reflect that within a couple days at the outside? 01:07:18

MR. BROOKS: Same objection.

THE WITNESS: In a sense, same inability on my part to really answer at that level of generality because it depends on what the fact is, and it depends on what the market perceptions of the importance of that fact would be. 01:07:34

BY MR. KAHN:

Q In a semi-strong form efficient market, the stock price does not react to the repetition of 01:07:52

information that was already disclosed to the 01:07:55
market, correct?

MR. BROOKS: Same objection.

THE WITNESS: The way I would answer that question, I think the way -- the only reasonable way 01:08:08 to answer that question is to say that what matters is the effect of what you're calling a fact on the information sets of investors and, therefore, the market. The restating of the same words, for example, could have different implications in 01:08:40 different contexts and, therefore, can affect the information sets of investors differently.

And so what really matters is this chain from what is the -- what you're characterizing as a fact. What was that? How does that affect what 01:09:10 investors understand to be true? Therefore, how does their valuation of a stock change or not? And then the fact that you have a hypothesis here: Liquid market that's semi-strong efficient, it's going to be whatever impact, if any, there was on 01:09:37 investors' information sets is going to then be impounded into the stock price presumably rapidly.

(Exhibit 3 marked for identification.)

MR. KAHN: I'm going to mark this Exhibit 3. 01:10:45

BY MR. KAHN: 01:10:46

Q What's just been marked as Exhibit 3 is an article published in the "Guardian" on December 11, 2015 entitled "Ted Cruz using firm that harvested data on millions of unwitting Facebook users." 01:11:15

This is an article that you reviewed in connection with your report, correct?

A Yes.

Q And the information published in this article is public information, correct? 01:11:32

A By dint of its publication in the article, it became public. I mean, sorry. I'm not trying to be cute. I'm just saying, the fact that it was published makes the contents of the article public.

Q Correct. It's public information? 01:11:51

A Sure.

Q Let's turn to the first page.

It says --

MR. BROOKS: Do you want to read the article before you start answering questions on it? 01:12:04

THE WITNESS: Well, I'd like to hear the question is.

BY MR. KAHN:

Q It says at the top:

"Ted Cruz's presidential 01:12:09

campaign is using psychological data based on research spanning tens of millions of Facebook users, harvested largely without permission, to boost his surging White House run and gain an edge over Donald Trump and other Republican rivals." 01:12:11 01:12:26

In a semi-strong efficient market, would this information be incorporated into Facebook's stock price within a couple days of it becoming public? 01:12:43

A Here I would like to read the rest of the article, so give me a moment or a few.

Q Okay.

A So can you ask the question again?

Q So I read for you the first paragraph of this article, and I asked, in a semi-strong efficient market, would that information that I read to you, the first paragraph of the article, be incorporated into Facebook's stock price within a couple days of it becoming public? 01:14:43 01:15:01

A Great. So this is a really good example of where the construction that I gave you a little while ago about information sets is important to keep in mind.

So, as you noted, everything in this 01:15:14

article is public when the article is published. 01:15:19
And so the market becomes aware of the fact that all
of these things were published.

So what are some of the things in addition
to the Ted Cruz sentence you read? 01:15:33

There are -- there are places in this
article that suggest, for example, that the "without
their permission" part that you read is contested or
even false.

And so what I would expect in a 01:16:12
semi-strong efficient market is for investors to
read the whole thing and respond to the whole thing.
And I would expect, because it would change their --
could change their information set.

And I would expect the price to respond -- 01:16:25
the market price to respond in a way that reflects
the complete change, if any, in the information sets
of investors.

Q So, going back to my question, is this
information I read in the first paragraph part of 01:16:45
the information that is incorporated into the stock
price in a semi-strong form efficient market within
a couple days of the publication?

MR. BROOKS: Objection. Asked and
answered. 01:16:56

THE WITNESS: You know, I don't think I can improve on the answer I gave you. 01:16:57

BY MR. KAHN:

Q It's a yes-or-no question.

MR. BROOKS: Same objection. 01:17:04

THE WITNESS: I gave you my answer.

BY MR. KAHN:

Q Do you have a "yes" or "no" in response to my question that asks for a yes-or-no answer?

A I don't think the question was actually susceptible to a yes-or-no answer that would accurately convey my opinions. 01:17:12

Q So let me just ask it again because it is a yes-or-no question.

Is the information that Ted Cruz's presidential campaign is using psychological data based on research spanning tens of millions of Facebook users, harvested largely without their permission, to boost a certain White House run and gain an edge over Donald Trump information that would have been incorporated into Facebook's stock price within a couple of days in a semi-strong form efficient market? 01:17:24 01:17:41

MR. BROOKS: Objection. Asked and answered and lacks foundation. 01:17:52

THE WITNESS: Well, along with -- 01:17:54
BY MR. KAHN:
Q So no --
MR. BROOKS: Let him answer the question.
BY MR. KAHN: 01:17:58
Q Sorry. Go ahead.
A Along with the rest of the things that are stated in this article, the words that you read are made public.
What inferences investors draw from those 01:18:13 specific words that you read is going to depend on the full context, including the rest of what's stated.
Q So all the statements that are being made in this article is public information that becomes 01:18:26 incorporated into Facebook's stock price within a couple of days of this article being published; is that correct?
MR. BROOKS: Objection. Lacks foundation.
THE WITNESS: That's not what I said. 01:18:40 What I said was that the -- all the things that are stated in the article are made public, and investors draw whatever inferences from those published statements that they're going to. And if that -- if the investor inference -- investor information sets 01:19:00

change in a particular direction, then that would, 01:19:06 in a semi-strong efficient market, tend to show up in stock prices. But -- and do so rapidly.

But there's no -- it's unclear to me -- so zooming out, if I weren't involved in this case and 01:19:26 hadn't thought about any of these issues before, I would say "Well, jeez, there's, you know, a bunch of statements in this article from people or companies in a position to know that cast doubt on that sentence that you read." And so I would not have 01:19:45 any reason to be certain which way, if any, the stock price would change.

In this actual case which I am involved with, I know that there's been a lot of discussion of this exact question, related ones. And I know 01:20:02 that the Ninth Circuit has held and Plaintiffs have argued, leading to the Ninth Circuit holding that the market was not aware of the facts, for example related to "without their permission" in the way that it would have been if, for example, Facebook 01:20:33 had confirmed these facts in this story rather than suggesting they were false or unknown to Facebook either way.

BY MR. KAHN:

Q Putting aside the assumptions you heard 01:20:45

from Plaintiffs' counsel, is it your opinion as an economist that the stock market did not incorporate the statements that are contained in this article within a couple of days of the publication of this article? 01:20:46 01:20:58

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: So I just want to say that what I would need to put aside is what I've been told by counsel. As I have explained earlier today, I am -- what I am taking as true is Plaintiffs' theory of liability as limited by the district court's motion to dismiss order, and all this is in the context, as I've suggested, of the Ninth Circuit's opinion. 01:21:13

Now, there really isn't anything to put aside in the sense that, as an economist, understanding the context that I just laid out and looking at Facebook's suggestion that, you know, we are carefully investigating and -- what's the -- where did it go? They said that after the article was published. They also said, I think maybe before publication, that misleading people or misusing their information is a direct violation of our policies, and we will take swift action against companies that do, including banning those companies 01:21:35 01:22:09 01:22:27

from Facebook, requiring them to destroy all improperly collected data. 01:22:30

Meanwhile, you have Rick Tyler, who was Ted Cruz's spokesman, saying "My understanding is all the information is acquired legally and ethically with the permission," specifically suggesting the original statement is inaccurate, with the permission of the users when they sign up to Facebook. 01:22:41

My inclination is that there is no particular reason to think that the market would react to these -- this full article. 01:22:56

BY MR. KAHN:

Q So my question was not whether -- what inferences investors were taking from what was reported in here. 01:23:12

My question is just whether the stock market, in a semi-strong form efficient market, would have incorporated all of the statements that are being made in this public document within a couple of days of this public document being published. 01:23:25

A But that's an incoherent question. Because the reason that the stock market responds to news is that news changes investors' information 01:23:39

sets. 01:23:43
So, if you ask me to not think about investors' information sets, you're asking me not to think about the question of how the stock market could respond. 01:23:53
Q Again, I didn't ask about whether or not the stock market actually responded one way or the other in response to this news.
I'm just asking whether, in a semi-strong form efficient market, the statements made in this 01:24:04 article would have been known to the market and incorporated into its stock price.
A I've answered those questions.
Q Let's go down to the second paragraph:
"A little known data company now 01:24:22 embedded within Cruz's campaign and indirectly financed by his primary billionaire benefactor paid researchers at Cambridge University to gather detailed psychological profiles about the U.S. 01:24:37 electorate using a massive pool of mainly unwitting U.S. Facebook users built with an online survey."
In a semi-strong form efficient market, would that statement be known to the market and 01:24:50

incorporated into the stock price within a couple of days of that statement being made? 01:24:55

MR. BROOKS: Objection. Compound.

THE WITNESS: So, in a semi-strong efficient market, the stock price would respond to changes in investors' information sets, beliefs. 01:25:02

Whether this paragraph, sentence, whatever that you just read would be so incorporated just depends on what happens to investors' information sets when they read this article, which includes, as I said, a number of other statements that raise the question of whether those statements are true. 01:25:36

BY MR. KAHN:

Q You pointed to a statement by Facebook that it was looking into the issues identified in this article about data misuse. 01:25:55

Would that statement that you quoted regarding Facebook looking into this be information that would be incorporated into Facebook's stock price within a couple of days of this publication in a semi-strong form efficient market? 01:26:12

A I'll just say again, the full range of things that are -- that are provided in this article when they become public are available for investors peruse and draw whatever inferences they will draw 01:26:31

about what's true and how that might differ from 01:26:35
what they previously believed. And the end result of that process is what the efficient market theory is about.

Q Is it your opinion that information is 01:26:53
only known to the market if the company specifically provides -- is the source of that disclosure of that information?

A No.

Q Do you have an opinion about whether any 01:27:27
of the information in this article was incorporated into Facebook's stock price within a couple of days of its publication?

A Well, I haven't specifically studied that question. And so, no, I don't have an opinion about 01:27:45
that. I'll add to that, though -- well, no. I'll just leave it there.

Q No. Go ahead. What did you want to add?

No. Go ahead. Please.

A I don't have anything to add right now. 01:27:59

Q What were about to say?

A It's not important.

Q I'm asking you a question.

What were you about to say?

A What was I about to say? 01:28:08

I was about to say I know that in this case there has been a dispute about whether the contents of this article somehow fully informed the market of the truth regarding Facebook's user control and risk statements. And I know that the opinions from the courts that have addressed this -- I'm thinking of the Ninth Circuit, and I think also the most recent motion to dismiss order opinion -- that those courts have determined that Facebook had obfuscated and denied the facts and so on sufficiently, along with some of the other statements -- the Tyler statement, for example -- that the market did not actually know the facts about data making its way to Cambridge Analytica, et cetera, and such that when the March revelations -- March 2018 revelations happened, those were -- those revelations were, from the court's point of view, the -- were news to the market. 01:28:09 01:28:45 01:29:20 01:29:46

Q Is it your opinion that the facts disclosed in this article were not incorporated into Facebook's stock price within a couple days of the publication of this report? 01:30:12

MR. BROOKS: Objection. Vague and ambiguous. Asked and answered. 01:30:26

THE WITNESS: I think I already told you I didn't study that question. 01:30:28

BY MR. KAHN:

Q When a fact is being -- when a fact is reported about a company, does a stock price not incorporate that fact if a company denies that fact? 01:30:36

MR. BROOKS: Objection. Incomplete hypothetical.

THE WITNESS: I just redirect you to my earlier answer that the -- you haven't heard my -- you're shaking your head at me. But you know, the -- what matters is how the information offered or the statements made in a public statement, such as an article like this, how those affect investors' information sets. And that effect on information sets is what's going to determine what happens to the stock price. 01:30:54 01:31:20

BY MR. KAHN:

Q So, in a semi-strong form efficient market, not all publicly available information is incorporated into the stock price; is that your testimony? 01:31:32

A It's not at all my testimony.

Q How do you go about determining whether information disclosed to the market is actually 01:32:04

CONFIDENTIAL

incorporated into the stock price in a semi-strong form efficient market? 01:32:07

A One thing you would do is look at what happens to market price.

And so, for example, when the March 2018 revelations happened, the stock price falls substantially. There's a lot of analyst commentary, news articles. Those are other things you would look at, what else is going on at this time that indicates that market participants are moved essentially by the putative news. 01:32:19 01:32:41

Q So information is only incorporated into the stock price if there's analyst commentary or news articles about that information?

A I think you added the word "only." 01:33:04

Q Well, this was your answer. I asked you how information disclosed in the market is actually incorporated into the stock price. And you said analyst commentary and news articles, those are the things you would look at -- at what else is -- 01:33:20

A If you're going to characterize my testimony, could you read the whole thing?

Q "One thing you would do is look at what happens to market price.

"And so, for example, when the March 2018 01:33:33

revelations happened, the stock price falls 01:33:34
substantially. There's a lot of analyst commentary, news articles. Those are other things you would look at, what else is going on at this time that indicates that market participants are moved 01:33:46
essentially by the putative news."

A So those are examples.

Q When analysts comment on it, that shows that information was incorporated into the stock price; is that correct? 01:34:03

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: Analyst commentary can be a reason to think that -- that a particular cause is associated with a change in stock price.

BY MR. KAHN: 01:34:18

Q In a semi-strong form efficient market, does the stock price incorporate public information only when analysts or news articles comment on that information?

THE WITNESS: In a semi-strong form 01:34:35
efficient market, the stock price responds to new information through the channel of updates to investors' information sets.

Now, analysts and news articles and so on might be a conduit for investors to learn new 01:34:53

information. For example, you've been asking me about a news article and whether it would somehow cause stock price changes. They also could be a reflection of news that investors might have heard through a different channel. 01:34:57 01:35:13

BY MR. KAHN:

Q So one of the alleged corrective disclosures in this case that you point to in your report is an article from "The Guardian," correct?

A Which article are you talking about? 01:35:27

Q Well, you cite a couple from "The Guardian" that were corrective disclosures in March 2018, correct?

A You're referring to the -- the weekend article after the Facebook blog post and then also the March 20th article? 01:35:38

Q That's correct?

A And yes.

Q So did those articles reveal information to the market that was incorporated into the company's stock price within a couple of days of the publication of those "Guardian" articles? 01:35:50

A I think so, yes.

Q Why wouldn't you opine the same about this "Guardian" article from 2015? 01:36:04

A Because the March 2018 articles confirm facts -- factual statements that were unclear based on the full scope of this "Guardian" article, Exhibit 3, because the "Guardian" article coming the day after Facebook's blog post -- and also, I'd want to read it, so maybe, if you have it and I can look at it. 01:36:07 01:36:40

But the "Guardian" article over the weekend, following the Facebook blog post, I believe -- actually, since you're asking me about it, I'd like to see it. 01:36:55

Do you have a copy of it?

You mentioned two of them actually. I'd like to see them both.

Q My question wasn't about the "Guardian" articles from March 2018. I was asking you -- you already opined that those articles revealed information to the market that was incorporated into Facebook's stock price. That was your testimony. 01:37:15

My question is why you would not opine the same from this article from "The Guardian" from 2015. 01:37:30

A So you're asking me to make a comparative assessment. And I have one of the articles in front of me, and I don't have the other two. 01:37:41

Q So you're not able to address this 01:37:44
question without revealing the articles next to each
other. Is that the answer?

A I did not say that.

Q You know, you testified earlier that in a 01:38:16
semi-strong form efficient market, the stock price
responds to new information through the channel of
updates to investors' information sets.

What does that mean?

A What does which part of it mean? 01:38:38

Q What is a channel of updates to investors'
information sets? What does that mean?

A Are you asking what an update to an
information set means?

Q I'm asking what your testimony means. 01:38:52

You referred to a channel updates to
investors' information sets.

A It's clear to me, so that's what I'm
asking you what you're asking me to clarify.

Q What is a channel of updates to investors' 01:39:03
information sets to you? It's clear to you. So
please tell me what it is.

A I just want to try to be responsive to
your --

Q No. Please. 01:39:17

A -- your question. 01:39:17
Q Yeah.
A So an update -- well, I've already said what an information set is. It's essentially what investors -- in this case, investors believe, what 01:39:29 things they think are true, what things they think might be true, what likelihood they would assign to the possibility that different uncertain things are true and so on. That's what economists mean when we talk about information sets. 01:39:47
An update to an information set means -- it can mean a change. Typically, when we say "update," we mean change, there's news, there's new facts, how does the information set change.
It could be that the result of updating an 01:40:04 information set is not to change, so I just want to be clear about that. But often it's used to refer to changes in someone's beliefs.
So then I guess channel -- you know, a channel in this context is -- let's see. It's like 01:40:20 a way that there might be a link between one thing and another.
So one thing in this context would be investors' information sets. And the other thing would be trading in the market and the, you know, 01:40:41

sets of activities that lead to changes in market prices or for that matter an unchanged market price due to the choices that investors make. So I don't know if that's helpful to you. 01:40:44

Q Is it your testimony that public information must impact investors' information sets for that information to be incorporated into the stock price of a company in a semi-strong form efficient market? 01:41:00

A Stock prices should, in a semi-strong efficient -- form efficient market, stock prices should reflect the beliefs that investors have through the channel of market trading, investors trading on their information. 01:41:19

And so, if what you're asking me is -- I mean, I suppose a lot depends on what you mean by the word "incorporate" or "incorporated." 01:41:40

If one makes -- takes account of the possibility that a price doesn't change at all in response to some phenomenon that's publicly known, then, you know, like, if the temperature in some remote region changes by half a degree and somehow that becomes known to a particular moment, it rains, what have you, and somehow that becomes known to the market, I wouldn't expect that to affect the beliefs 01:42:04 01:42:33

of investors about the value of, say, Facebook stock. 01:42:38

And so I would say that there would be no change in investors' information sets with respect to the value of Facebook. And I would also not 01:42:50 expect, consequently, the price of Facebook stock to change merely because it rained in Timbuktu or whatever on that particular day. And so, if you want to say that that would somehow constitute incorporating the information that it rained in 01:43:13 Timbuktu, then I wouldn't have any objection to that.

The point I'm taking is that what causes price responses to new information is that that new information changes investors' ideas about what the 01:43:28 value of the stock is.

Q So, in your hypothetical, the stock market would incorporate the information that it rained in Timbuktu, even though it didn't cause Facebook's stock price to move? 01:43:45

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: I think I've already given you my answer.

BY MR. KAHN:

Q Is there a distinction between public 01:43:50

information and investors' information sets? 01:43:51
A I think it depends on what you mean by investors.
Q This is your term, "investors' information sets." 01:44:10
What's the distinction between that term and then public information?
A If you're asking what I mean by the word "investors" in that sentence, then I'm happy to answer. 01:44:19
Q Yeah. Correct.
A I'm talking about non-insider investors. So not the sort of people who would have, you know, access to material non-public information.
There's a -- kind of a convention of 01:44:35 speaking in that sort of way in this context, and that's what I'm adhering to.
Q Is there a distinction between that information and public information, in your opinion?
A Which information? 01:44:49
Q The information you just described about investors' information sets.
A Well, I think I just said that what I mean by investors in this context is somebody that does not have access to material non-public information. 01:45:01

So I would say that non-public information is distinct from public information. 01:45:04

Q Are you offering any opinion on when the truth concealed by the alleged misstatements was revealed to the market? 01:45:32

A I'm sorry. Could you be more -- more precise about which statements you're talking about?

Q The alleged misstatements that are still in this case.

Are you offering an opinion about when the truth concealed by those alleged misstatements was revealed to the market? 01:45:45

A I think I speak to this link in my report.

Let me look at my report.

Well, I think what I would say is that I'm offering opinions, as stated in my report, about market efficiency and about the susceptibility of damages calculation to classwide proof using -- or to calculation on a classwide basis using common proof, accepting while I do that Plaintiffs' theory of liability as qualified by the most recent district court motion to dismiss order. 01:46:20 01:46:51

And Plaintiffs allege as part of their theory of liability that the truth was revealed at particular moments. And so I'm accepting those 01:47:12

allegations as true. 01:47:13

Q Separate from those allegations and accepting them to be true for purposes of your opinion, are you -- did you do an independent analysis of when you believe the truth was revealed 01:47:28 to the market?

A I didn't -- I'm not done with my answer, to be clear.

Well, what I'll say is that my analysis of the facts that I'm aware of in this case, including 01:49:22 those I understand to constitute Plaintiffs' theory of liability as qualified in the ways that I've described, suggest to me very strongly that the -- that there were revelations that we've been discussing that -- what was your question? 01:50:07 Specifically focused on what?

Q Separate from Plaintiffs' allegations and accepting them to be true for purposes of your opinion, did you do an independent analysis of when you believe the truth was revealed to the market? 01:50:20

A The truth.

So I'll give you an example. And by all means, I know you will follow up if you don't feel I've answered your question.

So the revelations on March 16th and then 01:50:38

the -- that's the Facebook blog post, and then the "Guardian" and "New York Times" articles that followed it, that weekend, those revelations, those stories add considerable information to what was previously known. The stock price responds. 01:50:45 01:51:05

And I did in my report describe an analysis I did that involved accounting for changes in the prices of other peer firms -- Facebook's peer firms. And there's a lot. So I'm not going to get into every jot and tittle of it at the moment. I reserve the right to discuss that further. 01:51:37

But I'll say that, having analyzed the change in Facebook's price on March 19th and knowing that the information environment changed unambiguously over the proceeding several days, knowing that Facebook's price fell even after accounting for what happens with peer firms, it certainly is my opinion that that was the market responding to news about the statements at issue here. 01:51:58 01:52:27

Q So, putting aside your opinion that Facebook's stock price moved separately than the stock prices of peer firms and just focusing on this Facebook-specific information, is it your opinion that there was considerable information about the 01:52:50

initial misuse alleged fraud in this case that was 01:52:53 revealed to the market in the March 16th blog post and the March 17th news articles that was not previously known to the market?

A Yes. 01:53:11

Q What is that information?

A Okay. So I discuss this in my report. These are just examples. And if you'd like to know more, I renew my request to have a look at the articles themselves. But in paragraph 17 -- I'll 01:53:36 wait if you want to -- in paragraph 17, I observed that Facebook's blog post admitted that "In 2015, we learn that had a University of Cambridge professor" -- granting that that's my brackets there that say "a University of Cambridge professor" -- 01:54:03 "lied to us and violated our platform policies by passing data to SCL/Cambridge Analytica and Christopher Wylie of Eunoia Technologies Incorporated."

There's more in the paragraph, but I'll 01:54:20 stop there for a moment. But I'll just say that that constitutes a change in the available information because previously Facebook had not acknowledged any of those facts at all and indeed had made statements that would have led -- courts 01:54:42

have found did lead market participants to think that Facebook didn't know about these things. 01:54:46

So Facebook confirmed the fact that it knew these facts. It admitted that it had known that -- these facts all the way back in 2015. And I'll just stick to that sentence for the moment, but I'm happy to add more later. 01:55:09

I'll just also note that they name names in this blog post, and that also is news, I believe, relative to, for example, the Ted Cruz article you gave me. 01:55:34

Q Besides that information that you just described, is there any other new information about the initial misuse alleged fraud that you opine was revealed in March 2018? 01:55:53

So, continuing in that paragraph, I write: "The next day 'The Guardian' and 'The New York Times' reported the more extensive details of what had happened: By purchasing Facebook data from a company started by the professor in question, political consulting firm Cambridge Analytica had in the words of the Ninth Circuit 'improperly harvested personal data from millions of 01:56:13 01:56:31

unwitting Facebook users and retained 01:56:36
copies of the data beyond Facebook's
control.'"
    And I go on to say:
        "On March 20, 2018, 'The 01:56:49
Guardian' published and article revealing
that app developers routinely harvested
users' data, and quoting a former Facebook
employee that stated that, quote, 'the
majority of Facebook users could have'" -- 01:57:04
sorry, the "the" is before the quote.
"'The majority of Facebook users could
have had their data harvested by app
developers without their knowledge.'"
    Those are just some examples. 01:57:19
Q So you just quoted language saying that
there were reports in March 2018 that Cambridge
Analytica had improperly harvested personal data
from millions of unwitting Facebook users.
    My question is, how is that different than 01:57:38
the information that we were just reading from in
Exhibit 3, the 2015 "Guardian" article?
A Can you direct me to where in Exhibit 3
the word "millions" is used?
Q I'd look at the headline where it says 01:57:51

"millions of unwitting Facebook users." That's one example. 01:57:53

A Okay. Good.

Q As another example, I would look at the very first paragraph where it says "tens of millions of Facebook users, harvested largely without their permission." 01:58:03

What is the difference between that information and the information that we just discussed in paragraph 17 of your report that Cambridge Analytica improperly harvested personal data from millions of unwitting Facebook users? 01:58:17

A Well, again, in the "Guardian" article, Facebook said -- is quoted as saying "we're carefully investigating." As the courts have observed, that indicates -- it would suggest to any reasonable observer and listener that Facebook doesn't know it to be true. 01:58:39

Facebook says -- is quoted as saying in the "Guardian" article: 01:59:04

"Misleading people or misusing their information is a direct violation of our policies, and we will take swift action against companies that do, including banning those companies from 01:59:15

Facebook and requiring them to destroy all improperly collected data." 01:59:18

But then if we look back, think about the articles from March 2018, Facebook admits that it learned in 2015 that a University of Cambridge 01:59:36 professor lied to us and violated our platform policies by passing data to SCL/Cambridge Analytica and Christopher Wylie.

And so, if I compare these two statements, I see that in the "Guardian" story from -- Exhibit 3 01:59:59 anyway -- I see that Facebook says:

"We will take swift action against companies that misuse information, including banning them and requiring them to destroy all improperly collected data." 02:00:24

But then when I look at what I read from the first sentence of 17, that here it is March of 2018 and Facebook is only then announcing that it's suspending Cambridge Analytica, even though it knew, it says in 2015. So that doesn't sound like swift 02:00:45 action. And so that's a new fact for the market, that Facebook did know about this conduct and didn't take the promised swift action. So that's an example.

Q Have you reviewed any evidence that market 02:01:03

participants were expecting Facebook to comment on whether millions of unwitting Facebook users had their data taken by Cambridge Analytica? 02:01:22
A I'm sorry. Have I reviewed any evidence that? 02:01:38
Q That suggests that, after the 2015 "Guardian" article, in Exhibit 3, that market participants were expecting Facebook to comment on whether or not Cambridge Analytica had harvested data on millions of unwitting Facebook users? 02:01:52
A Well, I think it's a natural inference that, if a company says it would break our rules to do X and anybody who does that is going to be swiftly punished and, also, we are carefully investigating the situation regarding report of such 02:02:22 a thing, it would be a natural inference that when the company became aware, if it did, of such a thing, it would announce that.
And so it's also a natural inference that when the company doesn't announce such a thing, it 02:02:41 must not have found it.
Q Understanding that that is your natural inference, have you actually reviewed evidence suggesting that market participants thought that?
A Well, I know that the Ninth Circuit 02:03:04

thought they did. And I think the district court in 02:03:15
its most recent motion to dismiss order thought they did. And I don't have, you know, articles that were released and would be the natural place to find such evidence right in front of me right now. But I 02:03:36
certainly know that there was an enormous amount of public commentary, including from analysts and also media sources, that this was -- that the facts disclosed in March 2018 were inconsistent with expectations. 02:04:12

Q I want to direct your attention to paragraph 22(a) of your report and the last sentence where you say that:

"I understand that the initial misuse subtheory of the Cambridge 02:04:35
Analytica theory of fraud involves Cambridge Analytica's improper misappropriation and misuse of the purloined Facebook data, including for political purposes and related 02:04:49
allegations."

When you say that -- "including for political purposes," are you suggesting that the theory of fraud includes misuse of that data for other purposes in your understanding? 02:05:05

A Let me read the paragraph. 02:05:09
Sitting here today, I'm not thinking of something other than that. But I suppose it might depend on, you know, Cambridge Analytica was a business and they were selling, marketing, and 02:06:36 advertising and so on. And so I suppose one might think of that as business purposes as distinct from political purposes.
But if we understand their activities as being in the business of providing politically 02:06:54 related services, at least sitting here at the moment, that's what I understand this to mean.
Q And those political purposes that you're referring to, are you referring to anything else besides assisting Ted Cruz's presidential campaign 02:07:12 back in 2015?
A I'm sorry. The political purposes that?
Q That you're referring to here.
Is that referring to any political purpose besides assisting Ted Cruz's presidential campaign 02:07:26 back in 2015?
A Well, I think that the Plaintiffs' theory of liability as set forth in the complaint subject to the motion to dismiss order and -- and also, as I understand sitting here today, as elaborated in the 02:07:53

supplemental -- or I'll say the most recent 02:08:01
responses to interrogatories from your side, I
understand that the purposes that Cambridge
Analytica was using the data for included the --
throughout the scope of this case included not just 02:08:20
the Cruz campaign but also the 2026 Trump campaign
and I think also I the leave side of Brexit.

Q I want to direct your attention to
page 44, Footnote 118 of your report.

A Yeah. 02:08:58

Q You state here:

"The complaint also identifies
March 22nd, 23rd and 27, 2018 as
additional dates when Cambridge Analytica-
related disclosures impacted the price of 02:09:05
Facebook's common stock. I understand
that Plaintiffs do not currently intend to
pursue the stock price declines on these
dates as part of their damages claims."

My question is, did you analyze Facebook's 02:09:19
stock price declines on March 22nd, 23rd, and 27,
2018?

A I think that in an early stage of my work
I did the same kind of estimation for those dates as
for -- for other ones. 02:09:35

Q You conducted an event study to measure the abnormal returns of Facebook's stock price on those dates? 02:09:38

A I think that's correct, yeah.

Q And what did you conclude? 02:09:49

A I don't recall the specifics of what I concluded, but broadly -- but like, meaning I couldn't tell you specific numbers or anything like that. But my recollection is that there were not substantial or conventional level statistically 02:10:05 significant changes -- abnormal returns on those dates.

Q Did you analyze whether any corrective information was disclosed to the market prior to the declines alleged on March 22nd, 23rd, and 27, 2018? 02:10:22

MR. BROOKS: Objection. Vague and ambiguous.

BY MR. KAHN:

Q On the day prior to the March 22, 2018 decline alleged by Plaintiffs, did you analyze 02:10:40 whether any corrective information was revealed to the market?

MR. BROOKS: Objection. Vague and ambiguous.

THE WITNESS: Are you asking whether I 02:10:50

analyzed whether March 21st involved any new 02:10:52
information?
BY MR. KAHN:
Q Correct.
A I don't recall. 02:11:01
Q Do you recall doing that analysis?
A The analysis I said I recalled?
Q Do you recall doing an analysis of whether there was corrective information revealed on March 21, 2018? 02:11:14
A I recall reading -- looking at the complaint's description of news articles and news commentary over the range of dates we're talking about, broadly speaking, like the March -- the post -- March 19th forward through, I think, the 02:11:43 27th.
I don't recall specifics beyond that, but I do recall paying attention to that set of questions and looking at what the complaint alleged. And I probably read some news articles as well. 02:12:02
Q You opine that there was corrective information revealed the weekend prior to March 19th and that there was corrective information released on March 19th as well, the "Guardian" article regarding Mr. Parakilas' allegations. 02:12:22

Did you find any other corrective information revealed in the other articles that you just testified you reviewed from that period in March 2018 through March 27, 2018? 02:12:28

MR. BROOKS: Objection. Lacks foundation. 02:12:46

THE WITNESS: I don't know what article you're referring to on March 19th.

BY MR. KAHN:

Q The Parakilas article that you identify as a corrective disclosure. 02:12:59

MR. BROOKS: I think that's the 20th.

BY MR. KAHN:

Q March 20th, the Parakilas article.

A If you're talking about March 20th, then that's what I understand that article to seek. 02:13:09

Q Yes.

A And I think I said that it could -- could be viewed as a corrective disclosure.

Q Sure.

A And your question was did I -- 02:13:20

Q Besides those potential corrective disclosures that you actually identify in your report, did you identify any other corrective information that was revealed in the articles that you reviewed in the period of March ending March 27, 02:13:34

CONFIDENTIAL

2018 that you just testified? 02:13:39

A You're asking over and above whatever is in the complaint as to those dates?

Q No. Did you conclude -- and you reviewed articles that were in the complaint up through 02:13:49 March 27, 2018.

Besides the articles that you identify as potential corrective disclosures in your report, did you conclude that any other corrective information was revealed in those articles that you reviewed 02:14:04 from the complaint through March 27, 2018?

MR. BROOKS: Objection. Asked and answered.

THE WITNESS: I'll just reiterate that I don't recall the specifics of which of those 02:14:13 articles I analyzed and what level.

And what I do recall was there was a moment at which I became aware -- I don't recall what that moment was, to be clear, but I know that there was a point at which I became aware that 02:14:28 Plaintiffs did not -- as I write here in Footnote 118 -- intend to pursue, at that point, the stock price declines on those dates as part of their damages claims.

And you know, I don't remember any more 02:14:40

CONFIDENTIAL

details about what I did or didn't do surrounding 02:14:43
these dates that are no longer, as I understand it,
within the scope of what I as asked to assess.

BY MR. KAHN:

Q Is it your understanding that Plaintiffs 02:14:59
declined to pursue the stock price declines on
March 22nd, 23rd, and 27, 2018 as damages as a
result of your analysis?

MR. BROOKS: I'm going no object to that
question and instruct the witness not to answer. 02:15:11

BY MR. KAHN:

Q Are you going to accept that instruction?

A Yes.

MR. KAHN: Why don't we take a quick
break. Go off the record, please. 02:15:24

THE VIDEOGRAPHER: We're going off the
record. The time is 2:14 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the
record. The time is 2:34 p.m. 02:35:06

BY MR. KAHN:

Q Are you aware that Plaintiffs had alleged
in this case that Facebook made an alleged
misstatement in an article published by the
"Intercept" on March 30, 2017? 02:35:22

A I don't know about the specific date, but March 2017 rings a bell. 02:35:31

Q Sure. Let me direct your attention to Exhibit 2. That's the complaint.

A Uh-huh. 02:35:43

Q And if you go to paragraph 635.

Let me know if that refreshes your recollection about whether Plaintiffs had alleged a misstatement was made in that article.

A Okay. I'm sorry. What was the question again. I just read the paragraph, so. 02:36:17

Q The question was: Are you aware that Plaintiffs had alleged that a misstatement had been made by Facebook in the "Intercept" article dated March 30, 2017? 02:36:29

A Which is the subject of paragraph 635, yes.

Q And did you understand that Plaintiffs' theory was that this alleged material misstatement was incorporated into the stock price of Facebook after this alleged misstatement was made? 02:36:44

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: What do you mean by "after"?

BY MR. KAHN:

Q That the alleged misstatement impacted the 02:37:03

company's stock price after it was made in this 02:37:05
"Intercept" article.
A So you're not asking about March 31st or whatever the first trading date was or the day of March 30th? You're just saying after? 02:37:18
Q Within a couple days, it was incorporated into the stock price.
MR. BROOKS: Same objection. Lacks foundation.
THE WITNESS: Well, I understand this to 02:37:39 be -- I believe this is the investigation statement that the district court has found -- has dismissed.
And so I didn't -- you know, as I've said, I did my analysis under the -- you know, tracking Plaintiffs' theory of liability as it relates to, 02:38:21 you know, the scope of this -- of their claims, subject to the district court's motion to dismiss order.
And so I'm aware of this statement having been made and the fact that it's -- you know, it's 02:38:43 another statement where Facebook falsely or misleadingly conveys to the market that there is no reason to think the user control statements or the risk statements are false. So that sentence connected to my analysis. But I didn't do anything 02:39:21

or think particularly one way or another about 02:39:28
whether this statement itself caused -- caused a
price response.
BY MR. KAHN:
Q Understood about your analysis. 02:39:43
My question was whether you understood
that -- of course, the statement is now dismissed,
but before that, Plaintiffs were alleging that the
statement made in this article impacted the
company's stock price after it was made within a 02:39:56
couple of days?
MR. BROOKS: Objection. Vague and
ambiguous. Lacks foundation.
THE WITNESS: Yeah. Again, I don't recall
having thought about that or what I did think about 02:40:18
it, if I did.
(Exhibit 4 marked for identification.)
BY MR. KAHN:
Q Okay. We're going to mark as Exhibit 4
the "Intercept" article. And do you recognize this 02:40:30
as the article that contains the alleged
misstatement at paragraph 635 of Plaintiffs'
complaint?
A Well, it's got the same author and date
and title, so I think it's safe to say yes. 02:41:12

Q And the title of this article in all caps, 02:41:16
very big bold text:
"Facebook Failed to Protect
30 Million Users From Having Their Data
Harvested by Trump Campaign Affiliate: 02:41:30
Survey participants did not know that
likes and demographic data from their
Facebook profiles were being harvested by
political operatives."
Would that headline and information being 02:41:45
published here have been incorporated into
Facebook's stock price soon after the publication of
this article?
MR. BROOKS: Objection. Vague and
ambiguous. 02:41:58
THE WITNESS: Let me take a look at the
article. It's been a while since I read this,
so . . .
This is very high quality print.
MR. KAHN: Thank you. Only the best. 02:43:17
THE WITNESS: Okay. Could you repeat the
question, please?
BY MR. KAHN:
Q Would the information reflected in the
title of this article "Facebook Failed to Protect 02:46:01

30 Million Users From Having Their Data Harvested by Trump Campaign Affiliate: Survey participants did not know that likes and demographic data from their Facebook profiles were being harvested by political operatives" -- would that information have been incorporated into Facebook's stock price rapidly after the publication of this article given your opinion that Facebook's stock traded in a semi-strong form efficient market? 02:46:04 02:46:18

MR. BROOKS: Objection. Vague and ambiguous. 02:46:35

THE WITNESS: So I'll say again that the semi-strong efficient market -- the concept of a semi-strong efficient market is that, when investors are caused to update their information, that they trade in line with that and that that rapidly leads to changes in stock prices where the information was updated and would not be expected to do so where information was not updated. 02:46:57

So another way to put that, might be more familiar, is that, in a semi-strong efficient market, we expect prices to change when there's -- stock prices to change, and to do so rapidly, when there's new -- when there's information that's new -- released into the market place that's new, 02:47:16 02:47:33

value-relevant and company-specific. 02:47:37

Now, you've asked me about information in a headline. But I don't think that's a very helpful or a very -- think that's amenable to answering -- to understanding what the import of this article's 02:47:56 publication would be in a semi-strong efficient market. Because the article includes more than just the headline. And I would not expect investors to -- the marketplace to ignore the balance of a substantial article. This is, you know, several 02:48:17 pages long with beautiful pictures and so on.

And included in this article is a statement by a spokesperson for Cambridge Analytica for attribution -- this person is named -- saying "We do not do any work with Facebook likes." 02:48:49

And meanwhile, you know, Facebook, in this article, there's this statement from Facebook, which is the one that you asked about before we started talking about this article, where Facebook says "Our investigation to date has not uncovered anything 02:49:24 that suggests wrongdoing."

And you know, the headline says "Facebook Failed to Protect Millions of Users' Harvested Data," etc. So this is essentially Facebook saying we've done -- it is Facebook saying we've done an 02:49:44

investigation, and it hasn't uncovered exactly what the headline is speaking to. Also got Cambridge Analytica saying "We don't do that." 02:49:47

So is this new value-relevant information? I guess a way to assess that question would be to look at what happens to the stock price. But it wouldn't at all surprise me if the market did not respond to this. 02:50:03

BY MR. KAHN:

Q You'd agree that the information reported in this article became public information upon the publication of this article, correct? 02:50:20

A I would say that all of the contents of the article, when it was published, were then public, that they were -- those contents were present in that article. The truth value of any one of them, of course, is a different matter. 02:50:34

Q You would agree that public information is incorporated into a company's stock price even if that information doesn't cause the stock price to move, correct? 02:50:51

MR. BROOKS: Interpose an objection of vague and ambiguous.

THE WITNESS: I guess I just would like you to define "incorporate" for me, as you 02:51:06

understand it. 02:51:09

BY MR. KAHN:

Q In a semi-strong form efficient market, does the stock price reflect all public information known to the market? 02:51:23

A With the caveat that it might take some time for that to happen, of course. But "reflect," I think, is a better word to use then "incorporated," as much as "reflect" captures the level of the price rather than changes in it. And 02:51:47 so, you know, there's maybe a metaphysical doubt about whether no change in a price counts as an incorporation of new information where the incorporated amount is zero or something like that.

But I do think it's accurate to say that, 02:52:05 in a semi-strong market -- in a semi-strong efficient form market, the share price will rapidly come to reflect new value-relevant information. And that also means that, if there's not any new information that's value-relevant and 02:52:31 company-specific, then the fact that no such thing happened would also be reflected in the form of no change in the price related to those -- to such information.

Q I'd like to go back to Exhibit 3, which is 02:52:53

the 2015 "Guardian" article. 02:52:57
A Uh-huh.
Q You just testified that you prefer saying that public information is reflected in a stock price in a semi-strong form efficient market instead 02:53:15 of incorporated into the stock price in a semi-strong form efficient market. I want to go back to --
A I'm sorry. Was that a question?
Q That was my -- that's not a question. 02:53:34
A I don't agree that that's -- that's certainly not my view?
I was trying to make the point that, if we're going to have to worry about word games about whether "incorporate" -- you know, whether -- if I 02:53:47 say "everything would be incorporated," and you say "Aha, but there was no change; doesn't that mean there was no incorporation?" Like, that's the kind of thing I'm just trying to avoid. So it's really just a matter of trying to be precise for today's 02:54:01 purposes.
But I think, in general, as long as one is clear about what the scope of "incorporate" accounts for, it's a fine word to use.
Q The definition that I'm using that the 02:54:11

market knows that information and that the repetition of that information two months down the road would not cause a stock price change in a semi-strong form efficient market. 02:54:14

Does that make sense to you? 02:54:30

A Well, I don't think that's true, what you just said. It makes sense to me that that's your definition, but I think that just emphasizes the importance of precision.

Q What do you disagree with about what I just said? 02:54:41

A Well, the repetition of a statement, for example, can in fact be new value-relevant company information, depending on context.

Q Can you point to any literature that says that in a semi-strong form efficient market, the repetition of information that the market already knows can be value relevant, depending on context? 02:54:59

A I mean, I -- the point I'm trying to make is just that -- and this is true in -- this isn't even really about -- like, just about stock markets or something. Somebody says something and you don't know if the -- you know, if they really patent meant it or you don't know if it's true. And then you get confirmation of it, you know, that can have an 02:55:14 02:55:29

impact on your information set, meaning you become more sure that it's true or -- or you move from not being at all sure to thinking it's likely true and so on. So I don't think this is a point that requires any literature. This is just common sense. 02:55:43
Q But can you point to any literature that says that, in a semi-strong form efficient market, the repetition of information that the market already knows can be value relevant, depending on context? 02:55:57
A I think I said "repetition of a statement."
Q And I've asked you about information.
Can you point to any literature that says, in a semi-strong form efficient market, the repetition of information that the market already knows can be value relevant, depending on context?
A So, again, I think this is exactly the point about precision of language is, what I take "information" to mean is what people think is the case or might be the case with whatever likelihoods and so on based on the things that they observe in the world.
And so the question is, when you say "information" there, are you saying, well, if 02:56:38

there's a statement made or some event occurs in the universe that -- take rain in Timbuktu, for example. Go back to our earlier example. If that doesn't change people's understanding of the likelihood that Facebook is worth a lot or a little or that, you know, it was lying when it said it -- you know, hadn't discovered things that it had and so on -- if those kinds of statements don't change what people believe, then, for purposes of what I'm talking about, there's not been a change in the information. 02:56:42 02:56:57 02:57:13

And so I just want no be really precise that, if you're -- if, when you say "information" and you want me to answer a question related to information, if you agree with me that, or if -- put it this way: What I understand that to mean is the information set that investors have, which is the basis of their valuation of a firm and decisions about, you know, whether to buy and market prices that flow from decisions that people make about whether to buy and sell at different prices. 02:57:28 02:57:43

Then we're talking about -- when we say "information," we would be talking about new information. We would be talking about new company-specific value-relevant facts and information. 02:57:59

So, if that's what you mean, then -- then I do think that the price should change. 02:57:59

Q So it's great we're having a conversation about precision.

Is it your opinion that, in a semi-strong form efficient market, the stock market doesn't know about information unless it's value-relevant to investors? 02:58:12

A I'll give you a counter-example. A lot of people are sports fans, and they know what happens in the World Series, for example, if they're baseball fans. And that would probably not be value relevant for lots of people, lots of companies. 02:58:36

Does the market know it? I guess.

Q Because it's public information. And in a semi-strong form efficient market, that information is known to the stock market, correct? 02:58:52

A I don't know what semi-strong efficient form has to do with the World Series. I think people just kind of tend to know who won the World Series. 02:59:08

Q Let's put the sports aside. Let's put the Timbuktu rain aside for the moment. Let's talk about company-specific information.

A Uh-huh. 02:59:20

Q Does the market know about company-specific information even if that company-specific information is not value relevant to investors? 02:59:21

MR. BROOKS: Objection. Incomplete hypothetical. 02:59:35

THE WITNESS: Can you give me an example of what you have in mind?

BY MR. KAHN:

Q Do you not understand my question? 02:59:45

A I think we've spent a lot of time talking about how I don't know if we mean the same thing by "information" in this context, so yeah.

Q Public information that is about a company that is not value relevant. Does the stock market 02:59:59 know about that information in a semi-strong form efficient market?

MR. BROOKS: Same objection.

THE WITNESS: It would be so much easier to answer your question if you would give me an 03:00:21 example.

BY MR. KAHN:

Q Well, here's an example. Let's say the company announces that it has hired a new vice president of marketing. Say that investors don't 03:00:58

think that that's value relevant. 03:01:07

Does the market still know that information?

A You said the company hires this person?

Q Yes. 03:01:18

A Does it publicize that fact?

Q Yes. It's public information.

A It releases a statement?

Q Let's say a news article reported about it. It's a news article reporting this information. 03:01:28

A And the company doesn't say something like "We're investigating whether this person has been" --

Q Yeah. How about a LinkedIn post that says, "Hey, I joined -- I joined Facebook." 03:01:41

Assume that investors don't think that's value-relevant information. In a semi-strong form efficient market, is the market still deemed to know that information?

A There's maybe a metaphysical question 03:02:01 about whether anybody would, like, try to know it, but let's leave that metaphysical point aside. And I'll just say, like, if it's -- you said it was on LinkedIn -- it goes through people's feeds. They see it. They don't think it matters, so they don't 03:02:15

adjust their valuation of the company, and no one trades on it. The price doesn't change. 03:02:18

Do people still know about it? Is it still known to the market? Sure.

Q So let's go back to Exhibit 3, which is the 2015 "Guardian" article. The headline "Ted Cruz using firm that harvested data on millions of unwitting Facebook users," yes or no, does the market know that information after this information becomes public? 03:02:26 03:02:48

A The market knows that the headline of the article says that. Yes to that point.

Q And all of the other information that is reported in this article, correct?

A I would expect the market to become aware of the fact that the things published in the article were published in the article. 03:03:02

Q And all of the information that is reported in Exhibit 4, the "Intercept" article, correct? 03:03:17

MR. BROOKS: Objection. Vague and ambiguous.

THE WITNESS: Yeah. You're just asking the same question about Exhibit 4. Is that --

/ / / /

BY MR. KAHN: 03:03:30
Q Yes.
In Exhibit 4, the public information reported in the article is known to the stock market soon after the publication of that article, correct? 03:03:42
A So, again, the fact that these statements were published, including the headline in this article, is known to the market.
Q And that's true of any news publication that publishes an article about a company. The 03:03:58 stock market soon knows the information that's reported in those articles after that news article is published, correct?
MR. BROOKS: Objection.
THE WITNESS: I feel like you keep 03:04:09 mischaracterizing my answers, or I'm worried that you might be mischaracterizing my answers by repeating something that I have not said is correct and saying "and so and so and so, correct?"
And so I just want to be really clear -- 03:04:24 I think I have been, but I'm going to be clear again -- by saying what I think is publicly known to the market when a news article is published, what is unambiguously publicly known to the market is the fact that the things that were published in the 03:04:44

CONFIDENTIAL

article are published in the article. 03:04:45

That is not necessarily the same thing as the market knows that the things in the article are true.

BY MR. KAHN: 03:05:19

Q Let's go back to Exhibit 1, which is your report. And I want to direct your attention to paragraph 133.

I'm sorry. 143. Excuse me.

A 143? 03:05:42

Q Yeah. It's page 58 to 59.

A Uh-huh. Okay.

Q And this paragraph of your report discusses the alleged corrective disclosures from March 2018, correct? 03:06:08

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: Could you repeat the question, please?

BY MR. KAHN:

Q This paragraph is referring to the alleged corrective disclosures from March 2018, correct? 03:07:02

MR. BROOKS: Same objection.

THE WITNESS: So referring to.

It discusses stock price reactions on two dates in March 2018. It's not limited to that 03:07:26

subject matter, I don't think. But it does discuss those things. 03:07:33

BY MR. KAHN:

Q If you go to page 59, three lines down, "It is my preliminary opinion that the March 16, 2018 Facebook blog post and the March 17, 2018 news articles," and then you go to the end of the sentence "are what impacted the stock price on March 19th through 20, 2018. 03:07:47

That is referring to the corrective disclosures alleged from March 16th, March 17th, and 20th, correct? 03:08:06

A Yes.

Q And you say at the end of that paragraph that these disclosures permitted the market to appreciate, at least in part, the foreseeable consequences of the data misappropriation and lack of user control, correct? 03:08:21

A Those words are there, yeah.

Q And you agree that market participants knew that the alleged corrective disclosures from March could reduce Facebook's future profitability, correct? 03:08:39

A March 2018 we're talking about.

That they could? Yes. 03:09:03

Q And you would agree that in March 2018, market participants knew that the March 2018 alleged corrective disclosures could lead to additional regulation for Facebook? 03:09:07
A Yes. 03:09:20
Q And you would agree that in March 2018, market participants knew that the alleged March 2018 corrective disclosures could lead to greater exposure for Facebook under the FTC consent decree?
A Yes. 03:09:39
Q And you would agree that in March 2018 market participants knew that the alleged corrective disclosures from March 2018 could lead to reduced revenues for Facebook, correct?
A Yes. 03:09:53
Q You would agree that in March 2018, market participants knew that the alleged corrective disclosures from March 2018 could lead Facebook to increase its privacy and security spending?
A Yes. 03:10:12
Q You would agree that in March 2018, market participants knew that the alleged corrective disclosures from March 2018 could result in user attrition on the Facebook platform, correct?
A Yes. 03:10:27

Q You would agree that in March 2018, market participants knew that the alleged corrective disclosures from March 2018 could result in advertisers spending less on advertising on the Facebook platform? 03:10:27 03:10:42
A Yes.
Q And it's your opinion that the stock price decline on March 19, 2018 was due in part to the market pricing in these risks to Facebook's business, correct? 03:10:58
A The only reason I'm hesitating is that I just want to be clear that, when I agree with that statement that when you say "pricing in these risks," I'm not making any -- I'm not meaning to draw any conclusion that those risks are somehow fully priced in or anything like that. But I, yes, would think that the price change there is -- is -- the whole point is it's driven by the market pricing as best it can on that day given what it knows these risks. 03:11:19 03:11:43
Q And that's the same answer for the stock price decline on March 20, 2018?
A With the caveat that I'd incorporate all the points I've said earlier about what exactly drove the March 20th price drop. 03:11:59

Q And then in the next paragraph on your report, 144, you discussed the stock price decline on July 26, 2018. And it's your opinion that the July 26, 2018 stock drop was due to the market learning that these consequences that we just discussed had actually occurred; is that correct? 03:12:05 03:12:29

A Can you repeat that question, please.

Q It's your opinion that the July 26, 2018 stock drop was due to the market learning that these consequences that we just were discussing had actually occurred, correct? 03:12:46

MR. BROOKS: Objection. Compound. Vague and ambiguous.

THE WITNESS: I want to start by just noting that it's the abnormal return to which I'm speaking, not the raw stock price drop. And I would apply that to all the dates we've been talking about in this part of our discussion. 03:12:58

With that point noted, I think it's helpful to, as we discuss July -- the July 26th abnormal return following the July 25th disclosures, it's helpful to think again about what I said was the relevant truth when we discussed that. That included both the falsity of the user control statements and the risk statements -- falsity, 03:13:20 03:13:44

misleading -- and also the -- not just the existence of but the scope of the effects on Facebook's costs, revenues, regulatory exposure, reputational -- regulatory exposure and reputational impact are, you know, ultimately going to matter for firm value because they plug into costs and revenues. And so, without meaning to get too in weeds about the details there, I'll say that those are the things that I said before constitute the relevant truth. 03:13:51 03:14:16

And so when we think about the importance of July 25th and 26th, with respect to my understanding of Plaintiffs' theory of liability and qualified in the ways we've described and the relevant truth, the importance is not just that it showed that the risks we talked about, that you talked about, asked me about existed but also the extent of them and the extent of their importance in revealing the impact of the concealed facts on Facebook's -- Facebook's value. 03:14:32 03:14:53

BY MR. KAHN: 03:15:27

Q So, when we talked about what the market was learning in March was that there are consequences to Facebook's business that could occur, is your opinion that what was revealed on July 25th is that these consequences, at least in 03:15:42

part, did occur? 03:15:46

A So let me just emphasize that -- can you read back the part about March in your question just now? Because there was something about the predicate of it I wanted to -- 03:15:55

Q When we talked about what the market was learning in March, that there were consequences to Facebook's business that could occur, it's your opinion that what was revealed on July 25, 2018 is that these consequences, at least in part, did 03:16:11 occur?

A I want to start with the March part because I don't think that captures what I did say.

What I said was that the March abnormal returns reflect market pricing of the foreseeable 03:16:29 consequences. In March, the market learns that Facebook's very statements were false and, you know, learns all these facts about that. And that should lead to the -- it did lead to the -- a fall in Facebook's market value. 03:17:07

But I didn't say that in March investors learned of the consequences. That's not at all what I said.

Q Okay.

A I can address the July part of your 03:17:33

question if you want, but . . . 03:17:35
Q I want to direct your attention to paragraph 106(a) of your report, Exhibit 1. And this is a paragraph we talked about earlier where I believe your testimony was that the relevant truth 03:18:39 alleged by Plaintiffs existed from the outset of the class period.
Do you remember that?
A I remember that we discussed that issue.
Q And you recall that testimony. I think 03:18:53 you agreed with that, but I'm trying to remember if --
A You know, I don't want to concede to any particular characterization of testimony I'm not looking at, but if you want to ask again, I'm happy 03:19:03 to --
Q Sure. Looking at 106(a), you'd agree that what you say there is that the same relevant truth -- that the alleged misleading statements and omissions concealed and distorted the same relevant 03:19:15 truth from the outset of the class period.
A So what I say is that Plaintiffs' theory of liability alleges that Defendants' misleading statements and omissions concealed and distorted the same relevant truth from the outset of the class 03:19:27

period through and until each corrective disclosure removed share price inflation. 03:19:30

And I'll just add the qualifier that that's the theory of liability subject to the district court's motion to dismiss order. And I'll just also add, as elaborated in the -- in the supplemental rogs answers. 03:19:43

Q And that theory of liability assumes that the relevant truth existed from the outside of the class period? 03:20:03

A That's what it says here, and that's my understanding.

Q And so your damages model assumes that the information that was revealed on July 25, 2018 could have been disclosed contemporaneously with the information disclosed in March 2018 regarding Cambridge Analytica? 03:20:19

MR. BROOKS: Objection. Vague and ambiguous. Lacks foundation.

Please. 03:20:40

THE WITNESS: Can you describe the information you're talking about in that question?

BY MR. KAHN:

Q I'm referring to the alleged relevant truth. 03:20:48

MR. BROOKS: Same objections. 03:20:50
THE WITNESS: Which aspect of the alleged relevant truth?
BY MR. KAHN:
Q So did only some of the alleged relevant 03:20:56 truth exist at the outset of the class period, or did all of the relevant truth exist at the outset of the class period, in your understanding?
A I'm sorry. I thought you were asking specifically about July 25th and 26th in that 03:21:12 question. And you referred to information on that date, and so that's what I wanted you to clarify.
Q So you understand that Plaintiffs allege that there was a relevant truth alleged -- excuse me, that -- strike that. 03:21:27
You understand that Plaintiffs allege there was a relevant truth disclosed on July 25, 2018, correct?
A I'll just -- with the -- I want to just say that I mean what I said before when I refer to 03:21:44 relevant truth, and I don't mean some other thing.
And what I understand to be the case is that Plaintiffs allege that on July 25th, there were disclosures that filled in the blanks about the relevant truth, showed the scope of the costs that 03:22:18

Facebook would -- you know, was -- was incurring as a result of addressing the problems at issue because of the revelations related to -- because of the initial misuse facts and all the things that are downstream of that, the revenue effects of them, regulatory, reputational points that I've already made. 03:22:25 03:22:47

So that's what I understand the July 25th disclosure to have done is to make it clear to the market what the scope of and the extent of those various things were. 03:23:07

As to the question of -- well, that's the -- that's my answer.

Q Do you understand that the relevant truth or any portion of the relevant truth alleged by Plaintiffs was revealed to the market on July 25, 2018? 03:23:29

A I think I just said the answer to that.

Q You said it filled in the blanks about the relevant truth. So that's what I'm trying to explore. 03:23:42

Is that something different than the relevant truth or is --

A Well, I said that --

Q Yeah. That's what I'm trying to 03:23:50

CONFIDENTIAL

understand. That's what tripped me up. I know 03:23:51
we've talked a lot about precision here.
And so, when you say that July 25th there
were disclosures that filled in the blanks about the
relevant truth, is it your understanding that 03:24:04
actually a relevant truth was revealed on July 25th?
A So I'll just remind you that by -- and I
apologize for the fill in the blanks thing to the
extent that that was confusing or somehow too
imprecise for you to understand what "fill in the 03:24:19
blanks" means in this context.
Three aspects of the relevant truth here:
Falsity of the user control statements, falsity of
the risk statements, and the scope and extent of the
impact of those things in their disclosure to the 03:24:40
market with respect to components or factors that --
that will explain Facebook's valuation and affect
Facebook's valuation.
On July 25th, the earnings call and
related discussions, materials, what have you, 03:25:00
include new facts about Facebook's costs, Facebook's
revenue path, its operating margin. As I discuss in
the report, the disclosure of those new facts is
what -- I'm going to not say "fill in the blanks."
I don't want to -- is what informs the market of 03:25:37

value-relevant Facebook-specific information that I 03:25:44
understand to be part of the relevant truth.
And I just want to add one point, which is
a number of your questions seem to be directed at
getting me to say that one thing or another is a 03:26:01
specific relevant truth or something like that.
And I just want to be clear that I think
about categories of the relevant truth kind of on
the whole, and I'm not -- I don't break it down into
parsable bits the way that I -- at least I -- it 03:26:17
sounds like you have in mind. So that's the point I
wanted to emphasize and provide in the context for
my answer.
Q Could the relevant truth that you opine
was revealed on July 25, 2018 have been disclosed 03:26:33
contemporaneously with the information disclosed in
March 2018 regarding Cambridge Analytica?
A Of course, the events that -- you know,
the disclosures of July 25th are disclosures about
Facebook's financial results in the second quarter 03:27:09
of 2018. And March is in the first quarter. So
just purely as a matter of, like, time moves in one
direction, as I understand physics, you know, we
wouldn't have known the financial results of the
second quarter in the first quarter. 03:27:30

Q Could those financial results disclosed on July 25, 2018 have been disclosed on the first day of the class period alleged in this case? 03:27:36

A So what Facebook could have disclosed on the first day of the class period is that they had been misleading the market about user control and risk. And they could have announced to the market on that date, February 2017, that "We haven't been telling you the whole truth or really a lot of the truth about these matters. The relevant truth is that we're going to have to spend a lot of money fixing these problems that we've been concealing from the public." 03:27:54 03:28:20

And it could have provided guidance about what the -- truthful, to be clear, guidance about what the costs of remediating these problems would be and what the impact on its revenues would be and the fact that it would be exposed to FTC punishment because of the consent decree, the fact that, you know, there would be the risk of new regulation that could be problematic for Facebook. 03:28:41 03:29:10

And it could have done all of those things on the first day of the class period, but it didn't.

Q In your damages model, a share purchased after March 20, 2018 and sold before July 25, 2018 03:29:48

would have zero loss associated with it, correct? 03:29:53
A That would be the case if constant dollar inflation were used.
MR. BROOKS: Sorry to be precise, but damages is what you're asking about -- right? -- not 03:30:08 loss? I'll interpose an objection it's vague and ambiguous, lacks foundation.
THE WITNESS: Could you repeat the question, please?
BY MR. KAHN: 03:30:22
Q So no artificial inflation exited the stock price during that period of time in your model?
MR. BROOKS: Same objection.
THE WITNESS: You're talking about my -- 03:30:40 the part of my report where I discuss share price inflation, to be clear?
BY MR. KAHN:
Q Yes. Table 5.
A So, again, if I adopt the constant dollar 03:30:50 measure for July 25th -- the effects of the July 25th disclosure in the July 26th abnormal return, then -- then that would be correct. With a constant percentage effect, it would depend on the movement of Facebook's share price in the period 03:31:19

you're describing. 03:31:23
Q In the provisional damages model that you actually discuss here in this report reflected with the artificial inflation amounts removed in Table 5, that model does not attribute any artificial 03:31:44 inflation to the facts about whitelisting that were revealed in the "New York Times" article published June 3, 2018, correct?
A No.
Q Was I correct in what I said? 03:32:07
A I'm sorry. Could you ask the question again?
Q So, in the provisional damages model that you discuss in this report, as reflected in Table 5 with the artificial inflation that's removed, that 03:32:22 model does not attribute any artificial inflation to the facts about whitelisting that were revealed in the "New York Times" article published June 3, 2018, correct?
MR. BROOKS: Objection. Vague and 03:32:37 ambiguous. Lacks foundation.
THE WITNESS: I meant to say no, it's not correct what you said.
BY MR. KAHN:
Q Why is that not correct? 03:32:49

A Under Plaintiffs' theory of liability, as qualified by the district court's motion to dismiss order and as described in the Ninth Circuit opinion -- and I think probably also the supplemental rogs, the whitelisting disclosure of June 3rd is one of the causes of the abnormal return and the share price drop that occurs on July 26th following the disclosures of July 25th because those disclosures demonstrate the scope and the importance not just of the Cambridge Analytica-related parts of Plaintiffs' theory of liability but also the whitelisting parts. 03:32:55 03:33:13 03:33:51

Q So, to make sure I understand, the facts that were revealed in the June 3, 2018 article about whitelisting themselves do not reduce artificial inflation in the stock price, but when the market learned on July 25th what the impact was of those facts, that's the -- when artificial inflation was removed under the alleged whitelisting theory of fraud? 03:34:13 03:34:38

MR. BROOKS: Objection. Lacks foundation.

THE WITNESS: I believe that your question -- the predicate of your question involved a -- or the beginning anyway -- I don't know if it's formally a predicate. It was a long question. 03:35:01

I believe that the beginning of your question said something about there not being any -- well, can you just ask the question again or read me back the question? 03:35:05

BY MR. KAHN: 03:35:16

Q So your understanding -- strike that.

My understanding of your opinion is that the facts that were revealed in the June 3, 2018 article about whitelisting themselves did not cause artificial inflation to be removed from Facebook's 03:35:31 stock price, but when the market learned on July 25th what the impact was of those facts, that's when artificial inflation attributable to the alleged whitelisting theory was removed from Facebook's stock price? 03:35:48

A So it's the case that the importance of the whitelisting disclosures in the June 3rd "New York Times" article was not -- was not fully clear to the market until the July 25th disclosures, and so the July 26th abnormal return contains a 03:36:20 reduction in share price inflation associated with those revelations, with the June 3rd story.

The reason that I'm saying it that way is I want to note that in paragraph 129 of my report -- and I can let you get there if you're not already 03:36:46

there. Sorry. 03:36:49

I say that Facebook's -- that there may have been a price drop associated with the "Times" whitelisting story but that the magnitude of any such price drop was comparatively small, less than 03:37:13 two points.

So I just want to emphasize that I'm not retracting my opinion or anything like that in answering your question.

Q I'm going to direct your attention to 03:37:24 paragraph 149, subsection (b) of your report.

In the provisional damages model that you opine on in this report, you say there would be zero loss associated with a share that was purchased after March 20, 2018 and sold before July 25, 2018, 03:37:54 correct?

A I think those are the words on the page.

Q So, in the provisional damages model that you put forth in this report, no artificial inflation exited the stock price for -- between 03:38:18 March 20, 2018 and July 25, 2018, correct?

A Just give me a moment, please.

So, in Footnote 144, which is attached to paragraph 128 at page 52, I say "It is my understanding that the complaint identifies the 03:39:00

June 3rd -- identifies June 3, 2018 as a date on 03:39:03 which fraud-related news was released but does not claim damages for the market's reaction on June 4, 2018."

And so the part of 149(b), whatever it was 03:39:18 that you asked about, that zero loss should be read by reference to and in context with that statement. There's no intended implication one way or another in the statement in 149(b) about share price inflation related to the June 4th disclosure. The 03:39:47 point is that I understand that Plaintiffs aren't pursuing any damages, and so there's no reason to talk about loss on that date.

Q If some of the alleged relevant truth was revealed to the stock market prior to the first 03:40:07 alleged corrective disclosure in March 2018, would some of the artificial inflation that your model assumes was in Facebook's stock price have been removed?

MR. BROOKS: Objection. Incomplete 03:40:24 hypothetical.

THE WITNESS: Can you repeat that, please?

BY MR. KAHN:

Q If some of the alleged relevant truth was revealed to the stock market prior to the first 03:40:28

alleged corrective disclosure in March 2018, would some of the artificial inflation that your model calculates existed in Facebook's stock price have been removed? 03:40:32

MR. BROOKS: Same objection. 03:40:46

THE WITNESS: What I'd say is, if that had happened, we're talking about before March 2018, right? That was your -- your premise?

So, if there had been information that the market treated as -- that the market viewed as indicating the relevant truth here, like the relevant truth in the sense that I've described, and -- and that was believed by the market, by investors, and they thought it was value-relevant in the sense that it -- you know, it pointed in the direction that we've been discussing as the relevant truth, had that happened, I would have expected or I would expect some response in the price. 03:41:18 03:42:01

BY MR. KAHN:

Q Did you analyze whether any of the relevant truth in whole or in part was revealed to the market prior to the first alleged corrective disclosure in March 2018? 03:42:17

MR. BROOKS: Objection. Vague and ambiguous. 03:42:38

THE WITNESS: Did I analyze it? In what sense? 03:42:40

BY MR. KAHN:

Q I'm just using the normal term "analyze."

Did you conduct an analysis of whether the relevant truth had been revealed to the market prior to the first alleged corrective disclosure in March 2018? 03:42:48

A Well, I read the articles that -- I read a large number of articles that predated March 2018, and including the exhibits that you've proffered. And of course, I read the -- I understand, you know, Plaintiffs' theory of liability from reading the complaint when I had time. And I've read the district court's motion to dismiss order and the Ninth Circuit's opinion and the, you know, collection of things I just described. I suppose you could call that an analysis of what you asked about. 03:43:12 03:43:47

What I will say is that I don't believe that the -- what I will say is that I believe that on March 19th, that was the first time when the market could trade on the information that Facebook had -- that its user control statements and essentially that the facts of the initial misuse 03:44:07 03:44:45

aspect of this case were true, that Facebook had known they were true for years, and also that, if we take together the "New York Times" and "Guardian" article and that Facebook blog post, that Facebook lacked the practical ability to control -- to ensure user control over user data even then. 03:44:48 03:45:14

March 19th was the first time on the strength of my analysis that the -- that those facts were in evidence for the market -- known to the market. 03:45:41

Q Did you analyze Facebook's stock price reaction on any of the dates that the alleged misstatements that are still in this case were made?

A Sorry. Did I analyze which? Facebook's?

Q Stock price reaction on any of the dates that the alleged misstatements that are still in this case were made. 03:46:00

A I don't recall doing that.

Q Do you have any opinion about whether Facebook's stock price rose in a statistically significant way after any of the alleged misstatements that are still in this case were made? 03:46:23

A Do I have an opinion about that?

Q Correct.

A My understanding is that your litigation 03:46:49

position is that they didn't. I think that's come up in the district court and in the -- maybe that's wrong. I'm not -- I'm not certain about that. But to the best of my knowledge, there wasn't any such response. 03:46:52 03:47:13

Q Is it your opinion that the alleged misstatements still in this case introduced artificial inflation into Facebook's stock price?

MR. BROOKS: Objection. Vague and ambiguous. Compound. 03:47:28

THE WITNESS: My understanding of Plaintiffs' theory of liability here is that Facebook's concealment of the true facts, the relevant truth I described earlier, prevented the market from knowing the truth. 03:47:53

And so, therefore, the effect of Facebook's statements, false and misleading statements, was to maintain Facebook's price, share price.

MR. KAHN: Let's take a quick break, please. 03:48:21

THE VIDEOGRAPHER: We are off the record. The time is 3:48 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the 04:15:43

record. The time is 4:15 p.m. 04:15:45

BY MR. KAHN:

Q The goal of an event study analysis is to determine the abnormal return in a company's stock price, correct? 04:15:57

A That's a -- that is an output of an event study analysis, yes.

Q And an abnormal return is the component of a stock price movement that can't be attributed to market- or industry-specific developments on a given 04:16:15 date, correct?

A Right. The things that are included in the event study model, in the regression model as -- you know, essentially to avoid attributing the change in stock price to factors that would 04:16:36 otherwise have caused it and are unrelated to matters at issue in the litigation.

Q The abnormal return measures the stock price movement that is specific to the company being studied? 04:16:53

A After -- specifically in the sense that we've already accounted for broad market and industry-specific factors as measured by whatever index one would use for that.

Q And in this case, your event study seeks 04:17:10

to isolate stock price movements that were specific to Facebook and that cannot be attributed to Facebook's industry or the larger market overall, correct? 04:17:15

MR. BROOKS: Objection. Vague and ambiguous. 04:17:25

THE WITNESS: Do you have a -- are you talking about the market efficiency part, the damages part, just any of the event study --

BY MR. KAHN: 04:17:37

Q Does it matter?

A I don't think it does.

Q Yeah.

A Maybe I'll reserve the right to come back to that, but I think that's -- I think that's right. 04:17:44

Q So the point is to isolate Facebook-specific stock price movements instead of by isolating and getting rid of the noise in the industry in the market overall?

A I don't think I would call that noise, just to be clear. But I agree with what I understand your point to be, which is to say we want to avoid predictable -- we want to avoid identifying as abnormal returns those things that are predictable because they happened to the market or 04:17:56 04:18:13

CONFIDENTIAL

industry index. 04:18:17

Q An event study cannot determine what specific information about Facebook caused an abnormal return, correct?

MR. BROOKS: Objection. Vague and ambiguous. Lacks foundation. 04:18:32

THE WITNESS: I just would say that, just to pick a deliberately extreme example, information that didn't happen on -- that wasn't released on a particular date would not be the -- you know, 04:18:49 attributed -- would not be in the abnormal return and attributed to that.

So there's a sense in which the event study can do some of what you described, but -- so it's, I think, important to be clear and precise 04:19:06 about which things one is asking about. But it is the case that -- that some sorts of things would not be amenable to measurement with an event study.

BY MR. KAHN:

Q So, on a given date, if the market learns 04:19:22 value-relevant information that is fraud related and value-relevant information that is not fraud related about Facebook, the event study couldn't answer whether the fraud information caused the abnormal return or the non-fraud information caused the 04:19:40

abnormal return? 04:19:43

MR. BROOKS: Same objection.

THE WITNESS: So I want to note that if the information -- the two types of information you're describing had been released at different 04:19:54 times, for example, on the same date that -- in principle, it might be possible. I just want to be very clear, it might be possible to use an intraday event study methodology. I didn't do that here. I didn't see any need to do that or any reason to do 04:20:14 that.

What is the case is if the -- if multiple types of information are released at exactly the same moment, then an event study is going -- like, an abnormal return from an event study is going to 04:20:28 capture the collection of those value-relevant things -- effects on the stock price, and that's what one would have from the abnormal return. That would be the proper understanding of it.

BY MR. KAHN: 04:20:52

Q Is it fine if I refer to non-fraud information as confounding information?

A I think you should refer to things how you want to, and I'll try to -- I'll let you know if I'm confused about what you mean. 04:21:06

Q Would you understand if I refer to -- if I say "confounding information" that I'm referring to non-fraud information about a company? 04:21:08

A If you tell me that's what you mean, I will take you to mean that. 04:21:16

Q That's what I'll mean.

A Okay. And sorry, just to clarify, not -- confounding, you mean information about the company that is not fraud-related but is still about that company? 04:21:28

Q That is correct.

A Okay. So not about some other company in the same industry or something like that?

Q Correct.

A Okay. 04:21:34

Q We've talked about the initial misuse theory of fraud in this case.

Do you have an understanding of what the continued misuse theory of fraud in this case was prior to its dismissal by the district court? 04:22:16

A My understanding is that the district court dismissed the continued misuse theory of fraud as it relates to falsity in scienter or perhaps just scienter, which I understand to be only one aspect of the theory of liability at issue here. 04:22:43

So I understand the -- what I understand continued misuse to be -- and I'll -- I want to augment my answer, say what I understand it to be and then go back to the point I was just making. 04:22:49

I understand the continued misuse theory of fraud, to the best of my understanding -- it's a little unclear to me from reading the papers in this case. But my understanding of it is that it refers to the retention by Cambridge Analytica of the user data that it acquired from -- I think it was GSR in the wrongful misappropriation, whatever the term is, sale. It refers to the retention of that data and the subsequent use after the retention of that data. That's what I understand the continued misuse theory to refer to. 04:23:06 04:23:35 04:24:08

And to go back to the point I was making, my understanding is that the -- you know, the retention of the data and the subsequent use of it by Cambridge Analytica, for example, with the Trump campaign and the leave campaign, as I mentioned before, those things could not have happened had there not been an initial misuse that involved the downloading of the, you know, first Kogan downloads the data and then sells it to Cambridge Analytica in violation of Facebook's terms or whatever the right 04:24:31 04:24:57

way to say that is. 04:25:05

So that's the initial misuse and the -- and the use of it with respect to the -- the use of it by Cambridge Analytica with respect to the Cruz campaign. 04:25:21

The retention after that and subsequent use of it, those things couldn't happen without the initial misuse. And they're also the foreseeable consequence of the initial misuse.

And so I understand the continued misuse, 04:25:38 as I've described it, to relate to loss causation and damages within the scope of Plaintiffs' theory of liability and --

So, when you say -- when you refer to dismissed from the case, that sounds overbroad to 04:25:59 me.

Q You understand that a theory of fraud premised on the continued misuse subtheory of the Cambridge Analytica theory of fraud has been dismissed from this case? 04:26:19

A I believe the dismissal relates specifically to scienter. And if that's what you mean, then we're on the same page about that.

Q I'd like to direct your attention to Exhibit 1. 04:26:38

CONFIDENTIAL

A Uh-huh. 04:26:39

Q Your report. And to paragraph 21.

And at the end, you say:

"The court dismissed Count 1 as the investigation statement and the 04:26:58 continued misuse subtheory of the Cambridge Analytica theory of fraud."

And then you drop a Footnote 37 saying:

"The continued misuse subtheory of fraud, which the district court 04:27:12 dismissed as to Count 1 relates to the fact that Cambridge Analytica did not delete users' data and indeed continued to use it to support Donald Trump's 2016 Presidential campaign." 04:27:27

Do you see that?

A I'm sorry. I thought you said paragraph 21.

Q Uh-huh. Correct.

A The footnote you mentioned is -- I think 04:27:53 is Footnote 39, which is part of paragraph 22.

Q Sorry. You're right. I did make that mistake.

A Could we start over so I know what you're asking? 04:28:05

Q I'll strike it. 04:28:07
So is it your understanding that if the stock price of Facebook declined in response to the market learning information about the continued misuse subtheory of fraud, that Plaintiffs cannot 04:28:25 recover damages for that portion of the stock price decline?
MR. BROOKS: Objection. Vague and ambiguous. Calls for a legal conclusion.
THE WITNESS: So let me tell you what my 04:28:41 understanding is.
My understanding is that the continued misuse of the data by Cambridge Analytica was a foreseeable consequence of the initial misuse facts. And my understanding is that, in assessing loss 04:29:08 causation and measuring damages when I'm called upon to do that finally, and to the extent that I've done so with a provisional analysis so far, my assignment is to take into account whatever facts relate to loss causation and damages under Plaintiffs' theory 04:29:48 of liability subject to the district court's dismissal order, understanding that, as I determine what all that means, the Ninth Circuit's opinion speaks to the role of continued misused facts with respect to loss causation, at least to loss 04:30:18

causation. The district court opinion refers to 04:30:23
that, acknowledges it. And then also paying
attention to, as I -- well, as I understand the
Plaintiffs' theory of liability, the context I've
just described is further articulated -- perhaps is 04:30:39
the right way to say it -- in the most recent rog
answers that Plaintiffs provided to you.
And with all of that as context and
background, my understanding is that when I
measure -- when I seek to measure damages, whether 04:31:02
provisionally or ultimately finally, I need to take
into account any source of loss causation or damages
that's connected to and relates to the initial
misused facts as in the rest of Plaintiffs' theory
of liability, as I've just described. 04:31:31
BY MR. KAHN:
Q And that would include the disclosure to
the market of facts about the continued misuse of
data by Cambridge Analytica as well?
A When you say "as well," I think I just -- 04:31:46
Q And that would include the disclosure to
the market of facts about the continued misuse of
data by Cambridge Analytica?
A I think I just said that any of the -- any
facts that relate in the way I've described to the 04:31:58

initial misused facts, foreseeable consequences that are associated with -- you know, that relate to loss causation damages downstream of the initial misused facts in the way I've described those things are things I'm -- my understanding is that I should be considering. 04:32:02 04:32:21

Q So the answer is yes, to the extent that continued misuse of facts being disclosed are foreseeable consequences of the initial misuse, then the disclosure of those facts would be part of your damages calculation in this case provisionally? 04:32:40

A To the extent that they relate to loss causation and damages.

Q Let's assume for the sake of argument that some of the information revealed in the alleged corrective disclosures in this case is confounding information, for the sake of argument. 04:32:58

At paragraph 143 of your report, you opine that the "traditional tools of financial economics discussed above will be available to assess the impact of such confounding information." 04:33:22

And my question is, are the traditional tools of financial economics discussed above referring to the discounted cash flow analysis and multiples-based approach described in paragraph 142 04:33:43

of your report? 04:33:47

MR. BROOKS: Objection. Lacks foundation. Vague and ambiguous.

THE WITNESS: The quote you read was from 143? 04:34:03

BY MR. KAHN:

Q 143, correct.

A Okay. Yeah. I think that the phrase in 143, "the traditional tools of financial economics discussed above," is, in this particular context, 04:34:43 directed at the -- the tools mentioned in 142.

I would just note that it's not meant to be an exclusive only those two or something like that. But those were what I had in mind, I believe, when I wrote that. 04:35:13

Q I want to direct your attention to paragraph 118 of your report.

And this paragraph discusses Plaintiffs' allegations about losses they suffered as a result of corrective disclosures, including the March 20th 04:35:46 piece in the "Guardian," correct?

A Can you ask the question again, please.

Q This paragraph discusses Plaintiffs' allegations about losses they suffered as a result of corrective disclosures, including the March 20th 04:36:16

piece in the "Guardian," correct? 04:36:19

A It says the complaint also alleges that class members suffered losses due to the stock price drop of March 20th and then describes the fact that the complaint cites several articles, including the 04:36:34 March 20th piece in the "Guardian."

Q My question is whether the $4.99 of artificial inflation that you opine was removed on March 20, 2018 under your provisional damages model is attributable to the corrective disclosures 04:37:03 discussed in paragraph 118.

MR. BROOKS: Objection. Vague and ambiguous.

THE WITNESS: So a moment ago you asked me specifically about the "Guardian" article on 04:37:20 March 20th. And also included in paragraph 118 is a discussion of the fact that the complaint alleges that -- is a discussion of the March 16th to 18th -- the news from the March 16th to 18th articles, disclosures, the blog post, and then other articles. 04:37:51 And we talked about this earlier, and I told you that, with respect to March 20th -- I'm just going to go to the Table 5 page. I want to speak precisely.

With respect to March 20th, I said that I 04:38:12

thought that either the fact that the market could 04:38:15
be expected to continue to digest the, you know,
wide scope of news from the weekend and the Facebook
blog post or the -- potentially the March 20th news
specifically I had in mind -- although I don't mean 04:38:37
to say exclusively the "Guardian" article that you
referred to of March 20th -- that either of those
things could be sufficient -- pardon me -- to
explain the abnormal return -- to account for that
abnormal return in my damages model from the 04:38:54
provisional analysis.

BY MR. KAHN:

Q It's your opinion, based on your
preliminary analysis, that it does not appear there
is any confounding information that materially 04:39:11
impacted the July 26, 2018 stock price decline,
correct?

A I believe that's what I said specifically
in the report, but if --

Q I direct your attention to paragraph 144. 04:39:27

A 144. In fact, I think that is what I say
in paragraph 144.

Q At paragraph 138(a), you recount how
Mr. Wehner told the market on July 25th that
Facebook was giving people more choices around data 04:40:04

privacy, which may have an impact on our revenue growth and opine at the end of that paragraph that Wehner's comment demonstrates the link between a users' data privacy and advertising revenue. 04:40:09

Is it your opinion that Mr. Wehner saying this on the July 25th earnings call led in part to the stock price decline on July 26th? 04:40:28

MR. BROOKS: Objection. Vague and ambiguous. Lacks foundation.

THE WITNESS: Can you restate the last part of the question part? 04:40:52

BY MR. KAHN:

Q Is it your opinion that Mr. Wehner saying that Facebook was giving people more choices around data privacy, which may have an impact on our revenue growth, led at least in part to the stock price decline on July 26th? 04:41:01

A Well, it's my opinion that that statement by Wehner illustrates -- as I write here, demonstrates the link between users' data privacy and advertising revenue. And that subject is one of the reasons why -- one of the things that explains the abnormal return. 04:41:24

Q And is that because what Mr. Wehner said was, in your opinion, new value-relevant information 04:41:54

to the market? 04:41:58
A The statement that there was a revenue slowdown because Facebook was, as he said, giving people more choices around data privacy, that confirms the -- and I'll just say this particular 04:43:39 paragraph doesn't mention specific numbers, but recall it involved also a discussion of numbers.
While that confirms the fact that limiting -- that improving Facebook's privacy controls, for example, specifically in the direction 04:44:11 of making good on the user control statements it falsely made, doing that helps explain the extent of the operating margin and earnings -- well, here, I think this is specifically on revenue -- helps explain the -- the slowdown in revenue which is a 04:44:41 link between the -- remedying the problems with Facebook's privacy issues and revenues.
And your question is, is that new value-relevant information. The possibility that such a link exists, I would expect the market 04:45:16 already to understand, as we discussed earlier. The scope and the reality of it, though, I think, is new information here.
Q The quote for Mr. Wehner that you identify at paragraph 130(a), is that giving -- 04:45:36

A Did you say 130 or 138? 04:45:41
Q 138(a).
A Okay. I'm sorry.
Q The quote that you say there is that "Giving people who use our services more choices 04:45:47 around data privacy ... may have an impact on our revenue growth."
Is that statement about how the choices around data privacy may have an impact on our revenue growth new value-relevant information to the 04:46:06 market, in your opinion?
MR. BROOKS: Objection. Asked and answered.
THE WITNESS: Yeah. I just answered that.
BY MR. KAHN: 04:46:17
Q So the answer is "yes"?
MR. BROOKS: Same objection.
THE WITNESS: I'd refer you to my answer.
BY MR. KAHN:
Q That was a very long-winded answer. I'm 04:46:25 just trying to get a yes-or-no answer.
Are you opining that the statement for Mr. Wehner quoted at paragraph 138(a) is new value-relevant information to the market?
MR. BROOKS: Same objection. 04:46:39

BY MR. KAHN: 04:46:42
Q As contextualized by the long-winded answer that you gave me before?
MR. BROOKS: Argumentative.
THE WITNESS: I think that my answer 04:47:00 explains the reasons why I think there is new value-relevant information in the call related to these subjects, and that includes the specific quote here.
BY MR. KAHN: 04:47:15
Q Turning to the next subparagraph in 138(b), you say:
"It was disclosed on July 25th that the company's operating costs ballooned as it undertook the audits and 04:47:36 other steps that Zuckerberg publicly promised in March, with Zuckerberg acknowledging that these investments in security and privacy would 'significantly impact our profitability.'" 04:47:52
Is it your understanding that Facebook decided to increase costs to invest in security and privacy in reaction to the Cambridge Analytica news disclosures from March 2018?
MR. BROOKS: Objection. Lacks foundation. 04:48:23

CONFIDENTIAL

Objection to the long-winded prefatory statement. 04:48:27

THE WITNESS: I think you -- I think that you said something about Facebook choosing to increase costs? That's not the way, as an economist, I would think about costs. But can you 04:48:50 just rephrase that or, sorry, restate that?

BY MR. KAHN:

Q Is it your understanding that Facebook decided to spend more on security and privacy in reaction to the Cambridge Analytica news disclosures 04:49:12 from March 2018?

A As the report says here in 138(b), operating costs did balloon. And I connect that to the company's having undertaken audits and other steps that Zuckerberg had promised publicly. 04:49:46

And then I go on to say that he had acknowledged or that he did acknowledge that such investments would have a significant impact on profitability.

Q Is it your opinion that Mr. Zuckerberg's 04:50:09 statement on July 25th that investments in security and privacy would, quote, "significantly impact our profitability," end quote, was new value-relevant information to the market disclosed on that date?

A The July 25th disclosure, the statements 04:50:36

on the earnings call and the financial results 04:50:39
include information about costs and that they had
risen a lot. It's certainly the case that that was
new information to the market.
And I understand these statements by 04:51:03
Zuckerberg here as connecting the remediation of
privacy problems that we've been discussing to that
big increase in operating costs. So you have new
information about operating costs, and you have
Zuckerberg acknowledging that it's connected. 04:51:28
Q And is Mr. Zuckerberg's statement that
costs -- strike that.
Is Mr. Zuckerberg's statement that
investments in security and privacy would, quote,
"significantly impact our profitability," end quote, 04:51:48
new value-relevant information revealed to the
market on July 25th?
MR. BROOKS: Objection. Asked and
answered.
THE WITNESS: I think that's what you 04:52:05
asked before, and I gave you an answer.
BY MR. KAHN:
Q So the answer is "yes," as I understand
it?
MR. BROOKS: Same objection. 04:52:12

CONFIDENTIAL

THE WITNESS: Again, I don't think it's informative to pick out a particular phrase in an earnings call that involved a lot of information, a lot of facts discussed and then ask whether that specific phrase was new value-relevant information. 04:52:16 04:52:41

As I've discussed at length earlier today, the value relevance information, the significance to share price and the company valuation is contextual. And the answer I gave you a couple of times ago when you asked this question was I think the best that I can do to answer your question in a way that appropriately acknowledges the informational context in which the kind of stripped-down phrase that you want to focus on should be understood. 04:53:08

BY MR. KAHN: 04:53:33

Q The stripped-down phrase that you say I'm focusing on one -- excuse me.

The stripped-down phrase that you say I'm focusing on is the stripped-down phrase that you decided to include in your report, correct? 04:53:48

A I wouldn't at all agree that I have stripped down the phrase.

Q You quoted the language that I'm quoting back to you, that Mr. Zuckerberg said there was -- investments in security and privacy would 04:54:07

significantly impact our profitability. You chose to put that into your report. 04:54:10

I'm just asking you, is it because you contend that that statement by Mr. Zuckerberg is new value-relevant information? 04:54:23

A Counsel, I've already told you what I think about that. And the fact that I include a quote in my report does not mean -- in fact, the fact that I include it in appropriate context indicates that I don't think that pointing only to a handful of words is informative about this issue. 04:54:39

(Exhibit 5 marked for identification.)

BY MR. KAHN:

Q We are introducing as Exhibit 5 an article from the "New York Times," dated November 19, 2017. 04:55:41

A That's not what I'm looking at.

MR. BROOKS: We have the "Guardian" article from March 20th, 2018.

MR. KAHN: We'll mark a new one. I don't know if we've been -- 04:56:06

THE WITNESS: So this is not 5?

MR. KAHN: That's not 5.

This is the actual 5.

THE WITNESS: Thank you.

That was fake news. 04:56:27

BY MR. KAHN: 04:56:40
Q Do we now have the actual Exhibit 5 in front of you, the November 19, 2017 article in "The New York Times" entitled "We can't trust Facebook to regulate itself"? 04:56:52
A That's what I have, yeah.
Q Did you review this article in connection with preparing your report?
A I did read this article, yeah.
Q And this article, after it was published, 04:57:07 becomes public information, correct?
A Let me read the article.
Q Do you need to review the article to determine whether it was published?
A I'm sorry. Did you ask me if the article 04:57:38 was published?
Q Was this article published in the "New York Times?
A That seems to be what's indicated by the header. And I think it's been cited that way in 04:57:48 this case. So I assume so.
Q And information that is published in "The New York Times" is public information, correct?
A The fact that the words in the article were published in the "New York Times" is public 04:58:08

information. 04:58:11
Q And the market -- strike that.
And the stock market knows soon after the publication of this article the fact that the words that appear in this article, correct? 04:58:28
A The fact that the words appeared in the article did appear in it, yes, it knows that.
MR. KAHN: Let's go off the record.
THE VIDEOGRAPHER: We're going off the record. The time is 4:58 p.m. 04:58:43
(Recess taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 5:10 p.m.
BY MR. KAHN:
Q I'd like to direct your attention to the very last page of your expert report, which is Table 5 "Index Weights for Damages Related Dates." 05:10:54
Let me know when you're there.
A Yeah.
Q So this table reports weights on each compensation peer under your Model 2 for March 19, 2018 and then March 20, 2018, which are here on adjacent columns. 05:11:17
And my question is, why do the weights change so much when you only change one day in your 05:11:40

estimation window? 05:11:43
A So a couple thoughts.
One is that, as I think I explained -- yeah. So, if you look at Footnote 9 on page 6, it says -- 05:12:41
Q Wait. I'm sorry.
A I'm sorry. This is page 6 of the Appendix C, which is -- you said the last page of my report. It's the last page of Appendix C that you're asking about. 05:12:52
Q Thank you. I'm there now.
A Okay. So Footnote 9. It says:
"Only the coefficient estimates are used to construct abnormal returns for event dates and dates used in the 05:13:04 estimation. Accordingly, I do not report the estimated standard errors for the coefficients."
So the reason that that's relevant in thinking about your question is that I don't have 05:13:17 here -- so standard errors are the measure of the dispersion or the variability of the coefficient estimates. And the premise of your question is that -- that there was -- that these are really different, like substantially different numbers. 05:13:39

And I'm not actually sure how different they are in full context, which is to say in light of the variability of these coefficient estimates. 05:13:42

So I wouldn't necessarily even -- in fact, I don't accept your premise of the question. I haven't tried to assess how -- how different these are in a kind of formal statistical way. 05:13:56

And the reason that I haven't done that is that the purpose of the data-driven index weights, like the objective function in the elastic net methodology, which is what the index weights are generated by, that objective function is a penalized regression objective function. 05:14:23

And what it targets is the root mean squared error augmented by the penalization-related part of the objective function that has to do with the magnitude and sine of -- or the nature of these coefficient estimates that you were asking about, the ones that are in these two columns. 05:14:49

And the goal of prediction with an elastic net model or function or learner -- the goal of that prediction is not to estimate anything particularly causal about the regressors, which here means, like, the peer firms and the S&P -- the Standard & Poor's 500 index, but, rather, to do the best job we can 05:15:18 05:15:51

in -- efficiently in a statistical sense predicting 05:15:58
the root mean squared error on given days.
And it can easily be the case that the
coefficients in such a learner that result from it
are noisy and bounce around simply because there's, 05:16:21
you know, variability of each of these regressors on
every day. And so some are just the nature of --
so, as I said before, I don't accept the premise
that this is especially largely different because I
don't have the standard errors in front of me. But 05:16:43
the other reason is I wasn't especially worried
about that because that's not the nature of the --
of the enterprise here, for the reasons I just gave.
Q Do you have an opinion about what
Defendant should have disclosed at the beginning of 05:17:01
the class period that would have made investors
understand the foreseeable consequences of the
continued misuse of data by Cambridge Analytica?
MR. BROOKS: Objection. Vague and
ambiguous. Calls for speculation. 05:17:18
THE WITNESS: I haven't thought about how
to -- I haven't thought about that specific
question.
I think, if you wanted to know what
Facebook should have done to ensure the market knew 05:17:38

CONFIDENTIAL

the truth about the costs of remediating and 05:17:45
addressing its data privacy issues -- you asked what
I think Facebook should have said. I think it
should have told the market the truth.
If it had told the market the truth, as I 05:18:07
said in our earlier discussion, the -- then -- and
that would have included guidance related to the
costs of dealing with all this, then the market
would have known those things.
BY MR. KAHN: 05:18:27
Q And I understand that -- I think you
testified earlier that is your opinion of what they
could have disclosed at the beginning of the class
period with respect to the initial misuse.
And the question I just asked was 05:18:39
referring to the continued misuse. So I want to
make sure that investors would have also understood
the same consequences that you just discussed if
Facebook had disclosed the continued misuse as well.
MR. BROOKS: Objection. Lacks foundation. 05:19:02
Vague and ambiguous. Outside the scope. Incomplete
hypothetical.
MR. KAHN: Strike that.
BY MR. KAHN:
Q The response that you just gave to my 05:19:20

non-stricken question, the prior question that I did not strike, was in reference to disclosure of the continued misuse at the beginning of the class period; is that correct? 05:19:24

A Well, the point I was trying to make was that, if Facebook had given a complete description of the facts about user control, misappropriation, and about what it knew about Cambridge Analytica's acquisition of data and also its retention of it and continued use of it -- I think if Facebook had told the market all of those things and done so accurately and truthfully and given guidance about the costs of remediating its situation, just to pick the costs -- I mean, there's also revenue impacts and so on, as I discussed earlier. If Facebook had done all of that, then the continued misuse facts, like were the foreseeable consequence of the initial misuse, would have been on the table for the market to understand. And the loss causation associated with continued misuse facts that happened during the class period due to Facebook's failure to truthfully inform the market due to its false and misleading statements, that whole collection of things that stem from the initial misuse facts, including the implications of the continued misuse facts that 05:19:38 05:20:16 05:20:36 05:21:10 05:21:42

forseeably arise -- arose because of the initial 05:21:47
misuse, all that would have been on the table for
investors to understand. That's what I was saying.

MR. KAHN: Let's go off the record,
please. 05:22:08

THE VIDEOGRAPHER: We are going off the
record. The time is 5:21 p.m.

(Pause in the proceedings.)

THE VIDEOGRAPHER: We are back on the
record. The time is 5:22 p.m. 05:22:45

MR. KAHN: I have no further questions.

MR. BROOKS: And no questions from us.

THE VIDEOGRAPHER: And Counsel, would you
like a copy of the video?

MR. BROOKS: Yes. 05:22:59

THE VIDEOGRAPHER: Would you like it
synced with the transcript?

We can follow up with you off the record.

We are going off the record. The time is
5:23 p.m. 05:23:09

THE REPORTER: Does this need to be
designated confidential?

MR. BROOKS: We'll provisionally mark this
confidential.

(TIME NOTED: 5:23 P.M.)

DECLARATION UNDER PENALTY OF PERJURY

I, JONAH B. GELBACH, Ph.D., the witness herein, declare under penalty of perjury that I have read the foregoing in its entirety; and that the testimony contained therein, as corrected by me, is a true and accurate transcription of my testimony elicited at said time and place.

Executed this ______ day of _________ 2026, at
_____________________, __________________________.
(City) (State)

____________________________________
JONAH B. GELBACH, Ph.D.

REPORTER'S CERTIFICATION

I, Leslie Johnson, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: September 21, 2026

<%signature%>

LESLIE JOHNSON

CSR No. 11451, RPR, CCRR

MICHAEL J. KAHN, ESQ.
mjkahn@gibsondunn.com

September 21, 2026

RE: In Re Facebook, Inc. Securities Litigation v.
9/18/2026, Jonah B. Gelbach, Ph.D. , Volume I, (#8430381).

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure. Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

**&**

**&** 3:4,16 4:4 7:12 211:24 218:24 219:9

**0**

**01725** 1:5 2:5 6:18

**1**

**1** 1:17,24 2:18 5:4,11 6:12 10:11,15,16 13:1 69:12 102:16 162:6 169:3 192:25 193:4,11 219:1
**10** 5:11 67:11 67:19,20
**10020** 3:20
**103** 28:18 69:20,23 70:2 70:19 74:4,8 78:14 79:9,24 80:6,16
**104** 29:12,13 36:23 37:17,18
**105** 5:14
**106** 32:20 80:19,19 81:11 82:14 83:9,14 169:3,17
**107** 29:12,13
**10:00** 9:16
**10:16** 45:14
**10:42** 59:18
**10:55** 59:21
**11** 67:16,25 68:4,24 106:3
**11451** 1:22 2:22 7:23 217:25
**118** 139:9 143:22 197:17 198:11,16
**1200** 4:14
**1251** 3:19
**128** 180:24
**129** 179:24
**12:05** 101:18
**130** 101:10 201:25 202:1
**133** 162:8
**138** 101:10 199:23 202:1,2 202:23 203:12 204:12
**139** 101:11
**140** 101:11
**142** 196:25 197:11
**143** 162:9,10 196:18 197:5,7 197:9
**144** 166:2 180:23 199:20 199:21,22
**147** 5:16
**149** 180:11 181:5,9
**15** 20:5
**16** 163:5
**165** 26:23
**16th** 84:16 87:14,15 90:9 94:13 129:25 131:2 163:11 198:18,19
**17** 131:10,11 134:10 135:17 163:6
**17th** 131:3 163:11
**18** 1:16 2:20 6:1,5
**18th** 198:18,19
**19** 87:10 90:6 90:20 91:3,20 92:3,12,20 93:13 165:8 207:15 208:3 209:21
**1900** 2:19 3:8 6:20
**199** 69:13
**19th** 84:23 91:6 91:17 94:15,18 130:13 141:15 141:22,24 142:7 163:9 183:22 184:7
**1:03** 101:21

**2**

**2** 5:12 49:4,7 59:24 145:4 209:21
**20** 93:18,22,23 94:10 95:17 133:5 163:9 165:22 175:25 180:15,21 198:9 209:22
**201** 50:8
**2015** 106:4 121:25 122:22 131:12 132:5 133:22 135:5 135:20 136:6 138:16,21 153:1 160:6
**2016** 193:14
**2017** 67:12,20 144:25 145:2 145:15 175:8 207:15 208:3
**2018** 75:2 84:16 85:7 87:10 90:7,20 91:3,20 92:3 92:12,20 93:13 93:19,22,23 95:17 96:3,10 96:13 97:21 98:22 99:9

117:16 119:5 119:25 121:13 122:1,16 132:15 133:5 133:17 135:4 135:18 137:9 139:13,22 140:15,19 141:10 142:4,4 143:1,6,11 144:7 162:15 162:21,25 163:6,6,9,24 164:1,2,6,7,11 164:13,16,18 164:21,23 165:1,3,8,22 166:3,4,8 168:9 170:14 170:16 171:18 172:17 174:15 174:17,21 175:2,25,25 177:8,18 178:14 179:8 180:15,15,21 180:21 181:1,4 181:16 182:1,7 182:23 183:8 183:10 198:9 199:16 203:24 204:11 207:18 209:22,22

**202** 50:8
**2022** 10:4
**2025.520** 218:9 218:12
**2026** 1:16 2:20 6:1,6 139:6 216:10 217:22 218:3
**207** 5:18
**20th** 93:25 94:15,18,23 95:16 121:16 142:11,13,14 163:12 165:25 197:20,25 198:4,6,16,22 198:25 199:4,7 207:18
**21** 141:10 193:2,18 217:22 218:3
**212** 3:21
**219** 1:24
**21st** 141:1
**22** 137:12 140:19 193:21
**229** 51:5,8
**22nd** 139:13,21 140:15 144:7
**231-1058** 3:10
**234** 60:2,3
**23rd** 139:13,21 140:15 144:7
**25** 97:15 168:9 170:14 171:17 172:16 174:15 175:2,25 180:15,21
**25th** 29:3 85:16 93:9 96:20,21 97:3,11,24,25 98:3,8,20 99:3 99:8,21 166:21 167:11,25 171:10,23 172:8 173:3,6 173:19 174:19 176:21,22 178:8,17 179:12,19 199:24 200:6 203:13 204:21 204:25 205:17
**26** 96:3,10,13 97:21 98:22 99:9 166:3,4,8 199:16
**2600** 4:7
**26th** 29:3 85:18 97:25 166:20 167:11 171:10 176:22 178:7 179:20 200:7 200:17
**27** 139:13,21 140:15 142:4 142:25 143:6 143:11 144:7
**279** 79:18
**27th** 141:16
**2:00** 9:18
**2:14** 144:17
**2:34** 144:20

**3**

**3** 5:14 24:4 67:12,20 105:23,25 106:2 122:4 133:22,23 135:10 136:7 152:25 160:5 177:8,18 178:14 179:8 181:1
**30** 5:16 144:25 145:15 148:4 149:1 219:1
**300** 49:11 72:8
**307** 28:21
**308** 28:19
**30th** 146:5
**31** 102:16
**3161** 4:14
**31st** 146:3
**37** 193:8
**39** 193:21
**393-8200** 4:9
**3:00** 9:18
**3:48** 185:23

**3rd** 85:6,13,25 178:6 179:17 179:22 181:1

**4**

**4** 5:16 147:17 147:19 160:19 160:24 161:3 181:3
**4.99** 95:18 198:7
**415** 4:9
**44** 139:9
**451-4025** 4:16
**49** 5:12
**4:15** 186:1
**4:58** 209:10
**4q** 50:7
**4th** 85:25 181:10

**5**

**5** 5:18 26:22 84:4,7 86:2,8 93:11 176:19 177:4,14 198:23 207:12 207:14,21,22 207:23 208:2 209:17
**500** 211:25
**518** 6:18
**52** 180:24
**554-1400** 3:21
**58** 162:11
**59** 162:11 163:4
**5:10** 209:13
**5:18** 1:5 2:5
**5:21** 215:7
**5:22** 215:10
**5:23** 2:20 215:20,25

**6**

**6** 210:4,7
**608** 52:13 54:23 55:4,8 55:23 56:12,23 57:6
**617** 52:14 54:23 55:4,9 55:24 56:12,24 57:7
**618** 51:23 52:2 52:22 54:16
**619** 3:10
**62** 84:5
**621** 55:2,14 56:6,7,11 57:2 57:9
**622** 60:8 61:1 61:10,19,24 62:2,4,11,15,22 62:25 63:7,7,8 63:10,15,16,18 63:24,25 64:12 64:19 65:2,13 65:23
**623** 59:25 60:4 60:16 61:15,17 61:25 62:5,14 62:16,21 63:1 63:8,11,16,19 63:25 65:3
**626** 65:11,18,21
**628** 66:6,11,17 66:25 67:1,7,8 67:10,19,25,25 68:1,7,11 69:9
**629** 66:17,25 67:1,8 68:7,8,9 68:12,22 69:9
**630** 66:1,16,23 67:14,15,18 68:1,21
**633** 69:2,6
**635** 145:6,16 147:22
**655** 2:18 3:8 6:19
**67** 10:19

**7**

**7** 13:13 16:25 17:14
**722** 79:18

**8**

**8** 5:6
**8.50** 93:12
**84** 28:19
**8430381** 1:23 218:5
**8:30** 9:10

**9**

**9** 210:4,12
**9/18/2026** 218:5
**92101** 3:9 6:20
**92612-4412** 4:15
**94111-3715** 4:8
**949** 4:16
**95** 39:8
**99** 45:20 46:24 47:11 58:20 87:24 88:4 89:15 92:8,19 97:6,7
**9:03** 2:19 6:2,5
**9:59** 45:11

**a**

**a.m.** 2:19 6:2,5 9:10,16 45:11 45:14 59:18,21
**ability** 8:25 184:5
**able** 14:10 19:25 21:6 52:6 59:12 104:11 123:1
**abnormal** 140:2,11 166:15,21

168:14 176:22 178:6 179:20 186:4,8,18 187:24 188:4 188:11,24 189:1,15,18 199:9,10 200:23 210:14
**above** 143:2 196:20,23 197:10 218:6
**abstract** 91:16
**accept** 144:12 211:5 212:8
**accepted** 11:16
**accepting** 128:20,25 129:3,18
**access** 46:1 47:16 53:15,22 55:20 56:1 57:21 58:6,21 60:14,22 61:12 62:7,20 70:9 71:3,16 72:15 73:2,18 74:13 88:16,23 89:4 89:10,19 91:21 92:2 95:1 97:23 98:25 127:14,25
**accessed** 95:4
**account** 125:18 194:19 195:12 199:9
**accounted** 186:22
**accounting** 130:7,17
**accounts** 95:18 153:23
**accurate** 8:25 92:16 104:4 152:15 216:7
**accurately** 20:1 109:12 214:12
**acknowledge** 204:17
**acknowledged** 131:24 204:17
**acknowledges** 195:2 206:12
**acknowledging** 203:18 205:10
**acontextual** 36:17
**acquired** 113:5 191:10
**acquisition** 214:9
**action** 5:12 6:24 112:24 134:24 135:12 135:21,23 217:18,19
**actions** 1:8 2:8 18:9
**activities** 125:1 138:9
**actual** 47:24 111:13 207:23 208:2
**actually** 12:13 15:3 23:3,10 70:19 79:3 89:7 109:10 114:7 117:13 118:25 119:17 122:10,13 136:23 142:22 166:6,11 173:6 177:3 211:1
**add** 116:16,18 116:20 130:4 132:7 170:3,6 174:3
**added** 119:15
**adding** 84:20 86:14 87:3
**addition** 21:8 94:20,22 108:4
**additional** 27:2 27:10,13 37:23 139:14 164:3
**address** 54:1,3 79:5 123:1 168:25
**addressed** 75:3 117:6
**addressing** 172:2 213:2
**adhering** 127:17
**adjacent** 209:23
**adjust** 102:8 103:1 104:2 160:1
**adjustment** 103:5
**adjustments** 103:12
**administer** 6:23 7:20
**administered** 217:8
**admits** 135:4
**admitted** 131:12 132:4
**admitting** 84:17
**adopt** 176:20
**advance** 96:14 96:18,23
**advertisers** 165:4
**advertising** 138:6 165:4 200:4,21
**affect** 8:24 13:25 43:5 105:11,15 118:14 125:25 173:17

**affiliate** 5:17 148:5 149:2
**affiliations** 7:4
**ago** 13:22 52:18 101:4 107:23 198:14 206:9
**agree** 6:11 12:4 12:14,17,21 13:4,8,17 16:16,19 33:6 60:10,12,20 151:10,18 153:11 156:14 163:20 164:1,6 164:11,16,21 165:1,12 169:17 187:21 206:21
**agreed** 14:2 169:11
**aha** 153:17
**ahead** 10:13 25:6 36:1 49:6 52:8 68:9 100:15,19 101:6,8,15 110:6 116:18 116:19
**allegation** 57:18 58:7,25 60:7 71:13 72:10,23 74:7 74:9 75:10,13 76:5,18 77:8 77:22
**allegations** 41:4,6,7 43:20 44:3 50:9 52:12 73:13 78:12 79:7 129:1,2,17 137:21 141:25 197:19,24
**allege** 42:6,13 49:9 50:16 128:23 171:13 171:16,23
**alleged** 38:14 38:21 40:5,20 40:22 41:20,23 42:5,11 43:21 44:4,20 49:21 50:22 51:20 55:8,17,18,23 55:24 56:11 58:8 59:1 60:7 60:15,23 62:3 62:15,25 63:7 63:10,18 64:11 64:12,13,18,19 64:20 65:2,13 66:6,18 68:22 81:7 82:4,10 82:12,23 83:4 83:25 84:10 86:4,10,18 121:7 128:4,8 128:11 131:1 132:14 140:15 140:20 141:19 144:22,23 145:8,13,19,21 145:25 147:21 162:14,20 163:11,21 164:2,7,12,17 164:22 165:2 169:6,19 170:24 171:2,5 171:14 172:15 175:3 178:19 179:14 181:14 181:16,24 182:1,22 183:7 184:12,16,21 185:6 196:15
**allegedly** 50:1 64:4 98:10
**alleges** 55:2 69:22 70:6,24 75:19,21 80:21 169:23 198:2 198:17
**alleging** 147:8
**allowed** 78:9 79:15,17,20
**allowing** 62:7 70:9 71:3,16 76:12,24 77:14 78:3 79:13
**alphabet** 13:18 14:24 18:20,21 21:7
**alternatively** 82:17
**alvarado** 3:7
**amalgamated** 3:3
**ambiguous** 15:17 18:12 19:7 20:10 24:11 27:21 28:7 30:11 31:11 33:11 34:5 42:17 44:22 53:18 56:4 57:24 58:13 64:7 87:12 89:24 98:13 99:11 117:25 140:17 140:24 147:13 148:15 149:11 151:23 160:22 166:13 170:19 176:7 177:21 182:25 185:10 187:6 188:6 194:9 197:3 198:13 200:9 212:20 213:21
**amenable** 150:4 188:18

**amend** 26:25
**amended** 5:12
**americas** 3:19
**amount** 34:9,22 34:23 35:3,5,7 35:9,17 36:9 36:11,13,14 70:7 71:1,15 86:16 93:15 95:21 137:6 152:14
**amounts** 32:23 177:4
**analyses** 27:1,3
**analysis** 21:18 22:18 86:21,22 95:24 129:5,9 129:19 130:7 141:6,7,8 144:8 146:14 146:25 147:5 183:5,18 184:8 186:3,7 194:18 196:24 199:11 199:14
**analyst** 119:7 119:13,19 120:2,12
**analysts** 120:8 120:18,24 137:7
**analytica** 94:7 117:14 131:17 132:23 133:18 134:11 135:7 135:19 136:3,9 137:16 138:4 139:4,14 150:13 151:3 170:17 174:17 178:10 191:9 191:19,24 192:4,19 193:7 193:12 194:13 195:19,23 203:23 204:10 212:18
**analytica's** 137:17 214:8
**analyze** 139:20 140:13,20 182:20 183:1,4 184:11,14
**analyzed** 130:12 141:1 143:16
**ands** 12:25
**announce** 136:18,20
**announced** 45:21 175:7
**announces** 158:24
**announcing** 135:18
**answer** 8:15,21 8:22 21:19,24 25:2,13 26:12 26:13 32:3,13 36:16 39:2 48:1 50:25 67:4,7,9 68:7 71:12,22,24 72:3 74:18 75:6 76:15 79:16 80:2,3 86:13,24 90:2 94:1 99:13 103:20 104:19 105:4,6 109:2 109:6,9,11 110:4 118:10 119:16 123:3 126:23 127:10 129:7 144:10 156:13 158:20 165:21 172:13 172:18 174:13 188:23 191:3 196:7 202:16 202:18,20,21 203:3,5 205:21 205:23 206:9 206:11
**answered** 44:10 48:8 71:19 79:22 108:25 109:25 114:13 117:25 129:24 143:13 202:13,14 205:19
**answering** 106:20 150:4 180:9
**answers** 31:22 161:16,17 170:7 195:7
**anybody** 9:19 9:22 10:8 15:5 102:22 136:13 159:21
**anyplace** 70:24
**anyway** 67:19 79:1 135:11 178:24
**apologize** 61:21 173:8
**app** 133:7,13
**appeal** 10:3
**appear** 199:14 209:5,7
**appearance** 7:2
**appearances** 3:1 4:1 7:4
**appeared** 209:6
**appearing** 218:18 219:7
**appears** 56:5
**appellate** 10:2
**appendix** 9:25 10:5 13:1,13 16:23 18:21 24:5,8,18 210:8,9

**apply** 166:17
**appreciate** 163:16
**approach** 22:10 81:2 82:15,20,23 83:2,3,9,15,16 83:18,23,24 196:25
**appropriate** 27:16 87:2,2 207:9
**appropriately** 27:9 206:12
**area** 28:18 95:1
**areas** 18:2
**argued** 111:17
**argument** 196:14,17
**argumentative** 71:19 73:24 74:16 75:16 76:11,23 77:13 78:2 79:12 203:4
**arguments** 27:3
**arose** 215:1
**arrived** 9:10
**article** 5:14,16 84:20,20 85:7 85:14 94:23 106:3,6,10,11 106:14,20 107:12,16,18 108:1,1,7 110:8,15,17,22 111:8 112:3,5 112:20 113:12 114:11 115:10 115:16,23 116:11 117:3 117:21 118:14 121:2,9,10,15 121:16,25 122:3,4,8,21 132:10 133:6 133:22 134:13 134:20 136:7 141:24 142:6,9 142:13,15 144:24 145:9 145:14 146:2 147:9,20,21 148:1,13,17,25 149:7 150:7,10 150:12,17,19 151:11,12,14 151:16 153:1 159:9,10 160:6 160:12,14,16 160:17,19 161:4,5,8,10,12 161:23 162:1,1 162:3 177:7,18 178:14 179:9 179:18 184:4 198:15 199:6 207:14,18 208:3,7,9,10,12 208:13,15,17 208:24 209:4,5 209:7
**article's** 150:5
**articles** 87:17 87:19 90:10 119:8,14,19 120:3,18,24 121:19,22 122:1,16,17,24 123:2 130:2 131:3,10 135:4 137:3 141:12 141:20 142:2 142:24 143:5,7 143:10,16 161:12 163:7 183:9,10 198:5 198:19,20
**articulated** 195:5
**artificial** 30:4,7 31:7,15 33:2 33:16,23 34:1 34:9,13,23 35:10 44:17 86:16 93:12 176:11 177:4,5 177:15,16 178:15,18 179:10,13 180:19 181:17 182:2 185:8 198:8
**artificially** 29:17,23 33:20 38:11,13,20 40:4,17
**ascertain** 47:8
**aside** 111:25 112:8,16 130:21 157:22 157:23 159:22
**asked** 19:20 29:7 32:10 36:12 38:7 64:22 68:7 71:18 73:11 77:18 79:19 81:20 83:19 85:2 87:18 100:1,2 107:16 108:24 109:24 117:25 119:16 143:12 144:3 150:2,18 155:13 167:16 181:6 183:18 198:14 202:12 205:18,21 206:10 213:2 213:15
**asking** 15:19 16:6,8 19:9,9 19:12,13,14 21:20 22:1

27:23 32:9 41:2,5,6,10 44:23 47:1 48:3 57:11 58:24 61:2,7 72:6 74:8,20 78:4 85:21,24 88:22 97:1,2 114:3,9 116:23 121:1 122:10 122:16,23 123:13,15,19 123:19 125:15 127:8 140:25 143:2 146:3 160:23 171:9 176:5 188:16 193:25 207:3 210:10 211:18
**asks** 109:9
**aspect** 171:2 184:1 190:24
**aspects** 47:21 53:7 90:1 173:12
**assess** 144:3 151:5 196:20 211:6
**assessing** 194:15
**assessment** 122:24
**assign** 124:7
**assignment** 16:2 194:18
**assistant** 14:24
**assisting** 138:15,20
**associated** 40:13 84:15,22 120:14 176:1 179:21 180:3 180:14 196:2 214:19
**assume** 11:2 16:11 24:24 25:8 26:9 27:14 159:16 196:14 208:21
**assumes** 29:16 29:22,25 35:16 35:19 82:3,9 83:3,24 170:8 170:13 181:18
**assuming** 40:20 41:21 81:15
**assumption** 16:3 25:7,8 81:7 82:23
**assumptions** 15:14,22 16:7 16:8,10 24:20 26:6 83:12,17 111:25
**attached** 28:19 180:23
**attention** 17:13 24:3 39:8 45:19 51:4,22 55:1 59:15,23 59:25 65:7,11 66:1 69:2,13 69:20 80:18 84:4 87:24 137:11 139:8 141:18 145:3 162:7 169:2 180:10 192:24 195:3 197:16 199:20 209:15
**attorney** 7:5 217:18
**attributable** 93:15 95:21 179:13 198:10
**attribute** 177:5 177:16
**attributed** 73:25 186:9 187:2 188:11 188:12
**attributing** 186:14
**attribution** 150:14
**attrition** 164:24
**audio** 6:10
**auditing** 62:18 72:13,25 73:16 74:12,20,25 98:23
**audits** 203:15 204:14
**augment** 191:3
**augmented** 211:15
**author** 147:24
**authored** 23:2
**authorized** 6:23
**available** 102:4 115:24 118:20 131:22 196:20
**avenue** 3:19
**avoid** 153:19 186:14 187:23 187:23
**aware** 14:14 27:2 57:18 89:11 108:2 111:18 129:10 136:17 143:18 143:20 144:22 145:12 146:19 160:15

**b**

**b** 1:14 2:17 5:4 5:9,11 6:13 8:1 9:25 10:5 24:5 24:8,18 55:11 55:15 67:1 82:14 83:14

**[b - break]**


102:16 180:11 181:5,9 203:12 204:12 216:3 216:18 218:5 219:1
**back** 26:1,2 29:4 45:13 49:23 59:20 64:15,23 65:16 66:9,21 67:8 68:20 69:12 81:12,23 97:5 98:25 101:20 108:19 132:5 135:3 138:16 138:21 144:19 152:25 153:8 156:3 160:5 162:6 168:3 179:4 185:25 187:14 191:4 191:16 206:24 209:12 215:9
**backcasting** 35:21,24,25 36:2
**background** 195:9
**balance** 150:9
**balloon** 204:13
**ballooned** 203:15
**bank** 3:3
**banning** 112:25 134:25 135:14
**baseball** 157:12
**based** 34:10 43:20 44:3 62:6 70:8 71:2 71:15 73:22 107:1 109:17 122:2 155:22 196:25 199:13
**basically** 42:19
**basis** 24:17,19 27:18 29:8 128:19 156:17
**bear** 27:4
**beautiful** 150:11
**becoming** 89:11 107:9,20
**beginning** 2:19 7:5 35:17 178:24 179:1 212:15 213:13 214:3
**begins** 81:13
**behalf** 2:18 7:7 7:9 19:1
**behavior** 94:6
**beliefs** 14:13 115:6 124:18 125:12,25
**believe** 14:25 18:6 21:16 23:22 28:21
53:5 75:6 122:10 124:5 129:5,20 132:9 146:11 156:9 169:5 178:22 179:1 183:20 183:21 192:21 197:14 199:18
**believed** 116:2 182:13
**bell** 145:2
**benefactor** 114:18
**berger** 3:16
**bernstein** 3:16 7:15
**best** 10:5 148:20 165:19 185:4 191:6 206:10 211:25
**better** 51:7 152:8
**beyond** 11:22 133:2 141:17
**bible** 59:11
**big** 148:2 205:8
**billionaire** 114:18
**bit** 51:7
**bits** 174:10
**blanks** 171:24 172:19 173:4,8 173:11,24
**blbglaw.com** 3:22,23
**blog** 84:17 87:16 90:9 121:15 122:5,9 130:1 131:2,12 132:9 163:6 184:4 198:20 199:4
**blutz** 4:11
**bold** 148:2
**bombshell** 94:5
**boost** 107:4 109:19
**boosted** 45:25 47:15 53:15,22 55:20 56:1 57:21 58:5,21 60:13,21 61:11 88:16,23 89:4 89:9,18 91:21 92:1 97:22
**bought** 33:20
**bounce** 212:5
**bound** 63:4 76:8
**brackets** 131:14
**break** 29:1 45:9 45:16 46:7,22 48:9,17 64:23 65:17 66:10,21 68:20 98:5 99:5 100:2,12

100:17,17 101:4,7,13,16 136:12 144:15 174:9 185:20
**brexit** 139:7
**brian** 4:6,13 7:8,8
**briefs** 10:3
**broad** 64:16 186:22
**broadens** 95:10 95:14
**broadly** 30:25 44:13 61:15 140:7 141:14
**broadway** 2:19 3:8 6:20
**broke** 94:13
**brooks** 3:5 7:11 7:11 15:16 17:17,24 18:11 19:6 20:9 21:4 22:19 24:10 25:1,10,15,18 25:22 26:13,19 27:20 28:6 30:10 31:10,18 33:10 34:4,12 35:1 38:16,23 39:19 40:7,24 41:11,16 42:16 43:23 44:6,21 45:3 50:23 51:24 52:19 53:17 56:3 57:23 58:12 59:4 61:13 64:6 70:11 71:5,18 72:16 73:3,23 74:15 75:15 76:10,22 77:12 78:1 79:11 80:8 86:19 87:11 88:1 89:23 90:21 91:4 92:14,21 98:12 99:10 100:1,7 100:16,24 101:1 103:17 104:17 105:3 106:19 108:24 109:5,24 110:4 110:19 112:6 115:3 117:24 118:7 120:11 126:21 140:16 140:23 142:5 142:11 143:12 144:9 145:22 146:8 147:12 148:14 149:10 151:22 158:5 158:18 160:21 161:14 162:16 162:22 166:12 170:18 171:1 176:4,14 177:20 178:21 181:20 182:5 182:24 185:9 187:5 188:5 189:2 194:8 197:2 198:12 200:8 202:12 202:17,25 203:4,25 205:18,25 207:17 212:19 213:20 215:12 215:15,23
**built** 114:22
**bunch** 64:2 101:11 111:7
**business** 138:5 138:7,10 165:10 167:23 168:8
**buy** 156:18,20
**byang2** 4:17

**c**

**c** 55:12,15 67:1 210:8,9
**ca** 218:9,12,21
**calculate** 34:1 34:10 38:10 44:16 81:3 93:11
**calculated** 29:8 34:10
**calculates** 182:3
**calculation** 128:18,19 196:11
**calculations** 38:9 84:7 86:2 86:8
**calderon** 4:19 6:21
**california** 1:2 1:15 2:2,19 3:9 4:8,15 6:1,17 6:20 217:4
**call** 16:6 85:16 99:15 173:19 183:18 187:20 200:6 203:7 205:1 206:3
**called** 51:10 194:16
**calling** 105:7
**calls** 26:20 194:9 212:20
**cambridge** 94:7 114:19 117:14 131:13,15,17 132:23 133:17 134:11 135:5,7 135:19 136:3,9 137:15,17 138:4 139:3,14 150:13 151:2 170:17 174:17

178:10 191:9 191:19,24 192:4,19 193:7 193:12 194:13 195:19,23 203:23 204:10 212:18 214:8
**campaign** 5:17 107:1 109:16 114:16 138:15 138:20 139:6,6 148:5 149:2 191:20,20 192:5 193:15
**caps** 148:1
**capture** 104:7 189:16
**captures** 152:9 168:13
**carefully** 112:19 134:15 136:14
**case** 6:17 11:16 14:1,11,20,23 15:15,23 20:16 21:3,7 28:5 30:2,22 31:6 31:15 37:15 38:9 39:12 40:6,21 41:14 41:18,21 42:5 42:12 43:22 44:5 49:25 51:21 58:9 59:2 61:5 78:23 81:15,16 81:21,23 90:8 98:11 111:5,13 117:2 121:8 124:5 128:9 129:10 131:1 139:5 144:23 155:21,21 171:22 175:3 176:2 179:16 184:1,13,17,22 185:7 186:25 188:17 189:12 190:17,19 191:8 192:15 192:20 196:11 196:16 205:3 208:21 212:3 217:15
**cases** 14:21 18:17,23,25 19:3,5,18
**cash** 21:11 196:24
**cast** 111:9
**categories** 42:21 43:16 88:10 174:8
**category** 43:3
**causal** 211:23
**causation** 34:16 50:10,11 192:11 194:16 194:20,25 195:1,12 196:3 196:13 214:19
**cause** 120:13 121:3 126:19 151:20 154:3 179:9
**caused** 98:21 147:2,2 149:15 186:16 188:3 188:24,25
**causes** 31:2 126:13 178:6
**caveat** 73:4 152:6 165:23
**caveats** 72:12 72:20
**ccp** 218:9,12
**ccrr** 1:22 217:25
**center** 4:7
**certain** 109:19 111:11 185:3
**certainly** 14:1 20:4 22:1,14 23:4 27:15 40:15 49:13 75:23 90:8 94:9 130:18 137:6 153:12 205:3
**certification** 26:18 28:10 217:1
**certified** 2:21 217:3
**certify** 217:4,17
**cetera** 37:24 97:4 117:15
**chain** 105:13
**chance** 76:12 76:24 77:14 78:3
**change** 14:8 34:15 104:11 105:17 108:13 108:14,17 111:1,12 120:14 124:12 124:13,14,16 125:19 126:4,7 130:13 131:22 149:22,23 152:12,23 153:17 154:3 156:4,8,10 157:2 160:2 165:17 186:15 209:25,25
**changed** 130:14
**changes** 104:3 113:25 115:6 121:3 124:18 125:1,22 126:15 130:7 140:11 149:17 152:10

**channel** 120:22 121:5 123:7,11 123:16,20 124:19,20 125:13
**characterizati...** 92:16 104:4 169:14
**characterize** 44:14 119:21
**characterizing** 105:14
**charge** 11:8
**charging** 11:7 11:12,13,15
**check** 20:6
**choices** 125:3 199:25 200:14 201:4 202:5,8
**choosing** 204:3
**chose** 207:1
**christopher** 131:18 135:8
**circuit** 10:3 30:22 78:22 80:14 91:12 93:6 111:16,17 117:7 132:24 136:25 178:3
**circuit's** 112:14 183:16 194:23
**circumstances** 82:19
**citations** 51:2 69:19
**cite** 49:24 69:15 69:21 70:3 72:6 73:20 74:6 75:5 102:13 121:11
**cited** 208:20
**cites** 198:5
**city** 216:12
**civil** 218:19,21
**claim** 181:3
**claims** 41:8,17 139:19 143:24 146:16
**clarification** 40:25
**clarify** 123:19 171:12 190:7
**class** 3:3,15 5:12 18:9 26:18 28:10 29:9,18,24 30:5 33:19 35:18 51:12 80:24 81:9 82:5,11,25 83:5 84:1 101:25 169:7 169:21,25 170:10 171:6,8 175:3,5,23 198:3 212:16 213:13 214:3 214:21
**classwide** 29:8 128:18,19
**clause** 88:22
**clear** 22:20 25:10 47:11 78:11 85:15 93:9 98:3 102:21 103:8 123:18,21 124:17 129:8 143:19 153:23 161:20,21 165:12 172:9 174:7 175:15 176:17 179:18 187:21 188:15 189:8 189:16 214:23
**clearer** 12:9
**clearly** 40:13 80:13 90:14
**clip** 51:7
**code** 218:9,12 218:19,21
**coefficient** 210:13,22 211:3,18
**coefficients** 210:18 212:4
**colleague** 25:21
**collected** 113:2 135:2,15
**collection** 46:12 183:17
**colloquy** 25:14
**column** 86:14 87:4
**columns** 209:23 211:19
**come** 24:1,2 67:8 152:18 185:1 187:14
**comes** 48:19
**comfortable** 12:12
**coming** 122:4
**comment** 120:8 120:18 136:1,8 200:3
**commentary** 119:7,13,19 120:2,12 137:7 141:13
**committed** 49:12
**common** 29:9 101:23 128:19 139:16 155:5
**companies** 111:8 112:25 112:25 134:24 134:25 135:13 157:13
**company** 22:5 22:8,10,18 23:4 31:3 37:4 37:11 38:4

**[company - confidential]**


43:7 62:17 63:2,12 72:12 72:24 73:15 74:11 76:6 77:10 114:15 116:6 118:5,6 125:8 132:21 136:12,17,20 150:1 152:21 154:13 156:24 157:24 158:2,3 158:14,24 159:4,11 160:1 161:10 186:19 190:3,8,10,12 206:8

**company's** 29:17,23 70:8 71:2,15 121:21 146:1 147:10 151:19 186:4 203:14 204:14

**comparative** 122:23

**comparatively** 180:5

**compare** 135:9

**compass** 4:20 7:10

**compelled** 62:19 72:14 73:1,17 74:12

**compensation** 11:20 209:21

**complaint** 5:12 15:25 38:15,22 40:5,23 41:2,7 41:8,14,24 42:2,8,14,23 44:8 48:15 49:7,8,11,20 50:1,7,16 51:5 55:4,24 56:24 57:7,10,19 58:8,25 59:6 59:24 61:8,19 66:17 69:16,19 69:22 70:4,6 70:14,16,21,24 71:13 72:4,10 72:21,23 73:5 73:7,9,14 74:7 74:9,17 75:3,7 75:13,17,18,21 75:24 76:1,5 76:13,18,24 77:8,14,19,22 78:3,9,12,16,19 79:7,10,13,16 79:18,23 80:7 80:13 87:25 99:17 138:23 139:12 141:19 143:3,5,11 145:4 147:23 180:25 183:14 198:2,5,17

**complaint's** 141:12

**complaints** 70:18

**complete** 108:17 214:6

**completed** 218:7,17 219:6

**completion** 217:15 219:10

**complicated** 58:1

**component** 186:8

**components** 173:16

**compound** 15:17 33:11 34:5 35:1 57:24 59:9 61:14 70:12 71:19 73:23 75:16 76:11,23 77:13 78:2 79:12 87:11 99:11 115:3 166:12 185:10

**concealed** 37:24 40:21 41:22 45:6 53:14 69:23 70:7 71:1,14 72:11,24 73:14 74:10 75:10,14 76:6,19 77:9 77:23 78:13 79:8 80:23 81:8 82:4,24 84:18 128:4,11 167:18 169:20 169:24

**concealing** 175:12

**concealment** 40:17 185:13

**concede** 30:22 169:13

**concept** 149:13

**concerning** 51:16 52:13 55:3

**conclude** 140:5 143:4,9

**concluded** 19:22 140:7

**conclusion** 165:15 194:9

**conduct** 43:11 43:12 47:7 54:21 57:5 135:22 183:5

**conducted** 20:7 140:1

**conduit** 120:25

**confident** 76:25 78:8 80:5,11

**confidential** 1:11 2:15 22:9

215:22,24
**confirm** 122:1
**confirmation** 154:25
**confirmed** 111:21 132:3
**confirms** 201:5 201:8
**confounding** 189:22 190:2,8 196:16,21 199:15
**confused** 189:25
**confusing** 41:15 173:9
**confusion** 41:12
**conjunction** 34:15
**connect** 80:12 204:13
**connected** 78:24 79:23 89:8,13 146:25 195:13 205:10
**connecting** 39:25 205:6
**connection** 11:21 20:15 75:1 92:12 106:7 208:7
**connects** 80:15
**consent** 63:4 76:8 164:9 175:19
**consequence** 58:23 63:23 89:12 192:9 194:14 214:17
**consequences** 43:11 47:6,22 54:2,3,20 57:4 57:13,16 58:16 61:3,23 62:23 63:6,15 64:4 64:13,20,24,25 65:3,15,23 66:8,20 67:23 68:3,19 69:1,7 69:9 75:19 78:24 88:19 89:1,6 90:15 90:17,25 91:5 91:11,15 98:10 98:15,18 163:17 166:5 166:10 167:23 167:25 168:7 168:10,16,22 196:1,9 212:17 213:18
**consequently** 126:6
**consider** 15:11 22:7
**considerable** 130:4,25
**considered** 24:5,7,13
**considering** 196:6
**consistent** 30:21 40:15
**consolidated** 5:12
**constant** 81:2 82:15,20 83:2 83:3,9,14,16,18 83:23,24 87:1 176:2,20,24
**constitute** 35:10 97:4 126:9 129:11 167:9
**constitutes** 103:6 131:22
**construct** 210:14
**construction** 107:22
**consultant** 19:15,19
**consulting** 19:7 19:13,16 132:23
**cont** 4:1
**contact** 218:9 218:20
**contain** 26:16 27:18
**contained** 112:3 216:6
**contains** 28:9 52:11 147:21 179:20
**contemporan...** 170:15 174:16
**contend** 97:20 207:4
**contents** 12:4 12:12,15 19:13 106:14 117:3 151:13,15
**contested** 108:8
**context** 23:15 23:16 38:8 39:6,7 46:8 81:22 110:12 112:13,17 124:20,23 127:16,24 154:14,18 155:10,17 158:13 173:11 174:12 181:7 195:4,8 197:10 206:12 207:9 211:2
**contexts** 105:11
**contextual** 206:8

**contextualized** 203:2
**continuation** 94:3
**continue** 6:10 199:2
**continued** 33:21 94:14 190:19,22 191:2,5,14 192:10,18 193:6,9,13 194:4,12,24 195:18,22 196:8 212:18 213:16,19 214:3,10,16,20 214:25
**continuing** 132:16
**control** 42:22 46:3 47:17 48:11 51:16 52:13 53:5,9 53:11,24 54:22 55:3 75:20 89:8,13,20 90:13 97:16 117:5 133:3 146:23 163:18 166:24 173:13 175:6 183:24 184:5,6 201:11 214:7
**controls** 201:10
**convention** 127:15
**conventional** 140:10
**conversation** 6:9 157:3
**convey** 109:12
**conveys** 146:22
**copies** 133:2
**copy** 122:12 215:14
**correct** 11:6,25 12:19,22,24 13:15 14:18 16:14,17,21 17:12,16,23 19:1,2 20:16 23:11 29:9,10 29:18,24 30:5 30:9,17 33:9 33:12,23 34:3 35:18 38:15,22 40:23 41:24 42:8,15 51:21 52:25 53:2,16 54:6,9,15,17,21 54:24 55:21 56:2,8,13,16,25 57:3,14,22 58:11 60:5,17 61:20 62:2,8 62:20 63:4,13 63:21 64:14 65:6,10,17,20 66:10,22 68:23 69:4,17,24 70:1,10 71:4 71:17 72:15 73:2 74:23 75:14 76:9,21 77:2,5,11,25 78:16 80:7 81:10 82:6,7 82:13,15,21 83:1 84:10 86:11 91:9 92:13 96:19,24 97:12 98:1 101:25 102:4 105:2 106:7,10 106:15 110:18 120:10 121:9 121:13,17 127:11 140:4 141:4 151:12 151:21 157:17 160:14,20 161:5,13,18,19 162:15,21 163:12,18,23 164:14,24 165:10 166:6 166:11 171:18 176:1,23 177:8 177:10,19,23 177:25 180:16 180:21 184:24 186:5,11 187:4 188:4 190:11 190:14 193:19 197:7,21 198:1 199:17 206:20 208:11,23 209:5 214:4
**corrected** 216:6
**corrections** 218:14,15 219:3,4
**corrective** 20:19 30:8,13 30:16,19 31:1 31:8,17 32:7,9 32:23 33:3,14 33:22 34:3,11 34:19,25 35:9 35:12 36:4,8 36:15 40:12 44:20 45:4 80:25 84:9,15 85:2,9,12,12,21 86:4,11,18 121:7,12 140:13,21 141:9,21,23 142:1,10,18,21 142:23 143:8,9 162:14,21 163:10,21 164:3,8,12,17 164:22 165:2 170:1 181:16

182:1,22 183:7 196:16 197:20 197:25 198:10
**correctly** 67:23
**costs** 43:8,9 46:22 47:2,5 48:20 54:4 56:19,21,22 62:18 72:13 73:1,16 74:12 74:21 75:1,19 98:24 167:2,6 171:25 173:21 175:16 203:14 203:22 204:4,5 204:13 205:2,8 205:9,12 213:1 213:8 214:13 214:14
**counsel** 3:3,3 3:14,15 6:14 7:3,18,21 8:19 9:5,6,19,22 10:9 15:10,13 15:21,24 16:10 25:14 26:12 37:18 112:1,9 207:6 215:13 218:18,22 219:7
**count** 17:6 193:4,11
**counter** 157:9
**counterfactual** 81:18
**counts** 152:12
**couple** 104:15 107:9,20 108:23 109:22 110:17 112:4 113:21 115:1 115:20 116:12 117:22 121:11 121:21 146:6 147:11 206:9 210:2
**course** 14:9 16:13,19 36:5 147:7 151:17 152:7 174:18 183:12
**court** 1:1 2:1 6:16 7:19 8:13 26:1 93:7 128:22 137:1 146:12 185:2 190:20,22 193:4,10 195:1
**court's** 112:12 117:18 146:17 170:5 178:2 183:15 194:21
**courts** 117:6,9 131:25 134:15
**cover** 10:18
**covers** 38:6
**creating** 41:11
**crutcher** 4:4
**cruz** 5:14 106:4 108:5 132:10 139:6 160:6 192:4
**cruz's** 106:25 109:15 113:4 114:16 138:15 138:20
**csr** 1:22 217:25
**currently** 96:1 139:17
**cut** 46:19
**cute** 106:13
**cv** 1:5 2:5 6:18 13:14 16:24 17:2 18:21

**d**

**d** 5:1 55:12,15
**dalvarado** 3:13
**damaged** 33:20
**damages** 29:7 29:16,19,20,21 30:3 31:5,14 34:16 38:8 50:10,11 81:6 82:3,9 86:22 128:18 139:19 143:24 144:7 170:13 175:24 176:5 177:2,13 180:12,18 181:3,12 187:9 192:12 194:6 194:16,20 195:10,12 196:3,11,13 198:9 199:10 209:17
**darryl** 3:7
**data** 5:14,17 15:14 45:25 46:2,3 47:14 47:16,17 51:17 53:16,23 55:21 56:2 57:22 58:6,22 60:14 60:22 61:12 62:7,20 70:9 71:3,17 72:15 73:2,18 74:14 75:21 88:15,17 88:24 89:5,8 89:17,19,20 90:13 91:22 92:2 95:1,1,4 96:7,17 97:10 97:17,23 99:1 106:5 107:1 109:16 113:2 114:15 115:16 117:14 131:17 132:21,25 133:2,8,13,18 134:12 135:2,7 135:15 136:3

136:10 137:19 137:24 139:4 148:4,7 149:1 149:3 150:24 160:7 163:17 184:6 191:10 191:12,13,18 191:24 193:13 194:13 195:19 195:23 199:25 200:4,15,20 201:4 202:6,9 211:9 212:18 213:2 214:9
**date** 28:23 33:22 36:10,14 36:15 84:10,22 84:24 85:17 86:1 145:1 146:4 147:24 150:20 171:12 175:8 181:1,13 186:11 188:10 188:20 189:6 204:24 217:20 218:16 219:5
**dated** 145:14 207:15 217:22
**dates** 30:8 31:8 31:17 32:24 33:4 37:22 40:13 84:14,15 84:15 85:2,3 85:22 87:3 139:14,19,24 140:3,12 141:13 143:3 143:23 144:2 162:25 166:17 184:12,15 209:17 210:15 210:15
**david** 4:3
**day** 94:16 102:25 122:5 126:8 132:17 140:19 146:4 165:19 175:2,5 175:23 209:25 212:7 216:10
**days** 94:5 104:15 107:9 107:20 108:23 109:22 110:17 112:4 113:21 115:2,20 116:12 117:22 121:21 130:15 146:6 147:11 212:2
**dcf** 21:12,18 22:2,6,11,13,15 22:18 23:4,5,8 23:10
**dealing** 213:8
**december** 106:3
**decided** 203:22 204:9 206:20
**decisions** 156:17,19
**declaration** 216:1
**declare** 216:4
**decline** 34:2,11 87:9 90:6,20 91:3,19 92:3 92:12,20 93:18 93:23,25 95:17 96:3,4,9,12,15 96:18 97:21 98:21 99:9 140:20 165:8 165:22 166:2 194:7 199:16 200:7,17
**declined** 144:6 194:3
**declines** 139:18 139:21 140:15 143:23 144:6
**decree** 63:4 76:8 164:9 175:19
**deemed** 159:18
**deepens** 95:10 95:14
**defendant** 6:14 212:15
**defendants** 2:18 4:3 7:7,9 51:14 70:7,25 71:14 72:10,23 73:14 74:10 75:10,13 76:5 76:19 77:9,23 78:13 79:7 80:21 169:23
**defending** 25:19
**define** 18:14 20:11 30:12 151:25
**defined** 31:9
**definition** 32:9 153:25 154:8
**degree** 17:6,9 125:22
**degrees** 17:1,3 17:10
**delete** 193:13
**deliberately** 188:8
**demographic** 148:7 149:3
**demonstrate** 62:11 178:9
**demonstrates** 200:3,20
**denied** 117:10
**denies** 118:6
**depend** 110:11 138:4 176:24
**depending** 154:14,18

**[depending - disclosed]**


155:9,17
**depends** 15:1 81:6 83:16 104:20,21 115:9 125:16 127:2
**deposed** 8:7
**deposition** 1:13 2:17 6:13,19 9:3 10:1,7 25:16,20,20 76:4 77:4 217:14 218:19 218:23,25 219:8,10
**describe** 17:15 17:22 18:13 30:25 35:23 45:17 58:16 80:6 91:23 130:6 170:21
**described** 16:9 38:6 53:6,8 61:24 62:24 65:4 68:22 88:25 127:21 129:13 132:13 167:13 178:3 182:12 183:17 185:14 188:14 192:11 195:5 195:15,25 196:4,25
**describes** 30:23 46:11 50:9 198:4
**describing** 53:7 177:1 189:5
**description** 5:10 141:12 214:6
**design** 85:24
**designated** 215:22
**destroy** 113:1 135:1,15
**detail** 80:1
**detailed** 114:19
**details** 23:17 132:19 144:1 167:8
**determinants** 43:6
**determination** 43:5 87:5
**determine** 30:1 87:1 118:16 186:4 188:2 194:22 208:14
**determined** 117:9 218:18 218:23 219:7
**determining** 118:24
**developed** 13:24
**developers** 133:7,14
**development** 14:7
**developments** 186:10
**diego** 1:15 3:9 6:1,20
**differ** 14:20 116:1
**difference** 134:8
**different** 19:10 32:10 54:11,12 81:24 83:6 98:15 100:7 103:9 105:10 105:11 121:5 124:8 133:20 151:17 156:20 172:22 189:5 210:25,25 211:1,6 212:9
**differently** 105:12
**difficult** 36:16 99:12
**digest** 102:22 199:2
**digesting** 94:4 94:18 95:13
**diminished** 63:13 76:20 77:11
**dint** 106:11
**diploma** 17:6
**direct** 17:13 36:21 39:8 45:19 51:4,22 55:1 59:15,23 59:25 65:7,11 66:1 69:2,12 69:20 80:18 84:4 87:24 112:23 133:23 134:22 137:11 139:8 145:3 162:7 169:2 180:10 192:24 197:16 199:20 209:15
**directed** 26:12 33:13 34:18 62:1 174:4 197:11
**directing** 24:3
**direction** 103:12 111:1 174:23 182:16 201:10 217:10
**disagree** 14:15 154:10
**disclose** 58:10 59:3
**disclosed** 44:19 87:8,14 90:6 90:11 98:20 99:8,14,21

105:1 117:21 118:25 119:17 137:9 140:14 170:15,16 171:17 174:15 174:16 175:1,2 175:4 196:8 203:13 204:24 212:15 213:13 213:19
**disclosure** 30:9 30:13,16,19 31:1 32:8,10 32:24 33:4,22 34:3,11,25 35:4,9,12 36:4 36:9,15 40:13 81:1 84:9,15 85:2,9,22 86:18 93:9 96:21,22 97:3 97:4 116:7 142:10,18 170:1 172:9 173:15,23 176:22 178:5 181:10,16 182:1,23 183:7 195:17,21 196:10 204:25 214:2
**disclosures** 20:19 31:9,17 33:15 34:20 44:20 45:5 84:23 86:5,11 90:9 96:20 97:25 121:8,12 139:15 142:22 143:8 162:14 162:21 163:11 163:15,21 164:3,8,13,18 164:23 165:3 166:21 171:24 173:4 174:19 174:19 178:8,9 179:17,19 196:16 197:20 197:25 198:10 198:20 203:24 204:10
**discounted** 21:11 196:24
**discoverable** 25:3
**discovered** 156:7
**discovery** 25:9
**discuss** 10:7 35:22 48:5 130:11 131:7 163:1 166:20 173:22 176:16 177:3,14
**discussed** 14:22 23:9 35:17 42:23 55:17 64:4,11,18 65:4 69:23 72:21 73:21 78:14 82:8 83:17 134:10 166:2,6,23 169:9 196:20 196:23 197:10 198:11 201:21 206:4,6 213:18 214:15
**discusses** 162:14,24 197:18,23
**discussing** 23:8 32:1 45:16 46:7 68:20 129:15 166:10 182:16 205:7
**discussion** 81:18 111:14 166:18 198:17 198:18 201:7 213:6
**discussions** 173:20
**dismiss** 15:25 16:5 41:3,17 42:3,24 44:9 48:16 78:20 80:16 112:12 117:8 128:22 137:2 138:24 146:17 170:5 178:2 183:15
**dismissal** 190:20 192:21 194:22
**dismissed** 41:8 146:12 147:7 190:22 192:15 192:20 193:4 193:11
**dispersion** 210:22
**dispute** 11:4 117:2
**distinct** 47:9 128:2 138:7
**distinction** 85:4 85:5 126:25 127:6,18
**distinguishing** 95:12
**distorted** 37:24 80:23 81:8 82:4,24 169:20 169:24
**district** 1:1,2 2:1,2 6:16,16 93:7 112:11 128:22 137:1 146:12,17 170:5 178:2 183:15 185:2 190:20,21 193:10 194:21 195:1

**dividing** 48:2
**division** 1:3 2:3 6:17
**document** 1:7 2:7 72:5,22 113:20,21
**documents** 9:4 9:24 71:8,25 72:5,8
**doing** 12:7 33:9 79:2 101:1 141:6,8 184:18 201:12
**dollar** 81:2 83:2,9,18,24 87:1 176:2,20
**donald** 107:5 109:20 193:14
**doubt** 111:9 152:11
**dowd** 3:4 7:12
**downloading** 191:23
**downloads** 191:23
**downstream** 172:5 196:3
**draft** 15:5,7
**drafted** 15:9 77:2 100:23
**drafts** 15:11
**draw** 91:14 93:4 110:10,23 115:25,25 165:15
**drawing** 104:10
**drive** 4:14
**driven** 165:18 211:9
**drop** 91:17 165:25 166:4,9 166:16 178:7 180:3,5 193:8 198:4
**drops** 40:14
**drove** 165:25
**due** 63:13 76:20 77:11 125:3 165:8 166:4,9 198:3 214:21,22
**duly** 8:2
**dunn** 4:4 7:7,8

**e**

**e** 4:3 5:1 55:12 55:16 218:9,12 219:1
**earlier** 24:20 26:5 38:7 53:8 71:22 78:7,18 88:25 89:1 90:19 91:2 93:6 98:19 112:9 118:10 123:5 156:3 165:24 169:4 185:14 198:21 201:21 206:6 213:6,12 214:15
**early** 139:23
**earnings** 23:13 23:23 75:2 85:16,16 99:15 173:19 200:6 201:13 205:1 206:3
**easier** 158:19
**easily** 212:3
**eating** 101:7
**econometrics** 17:16,23 18:5
**economics** 17:16,23 18:5 21:21,23 196:19,23 197:9
**economist** 21:22 112:2,16 204:5
**economists** 124:9
**ed** 5:18
**edge** 107:5 109:20
**effect** 43:13,15 43:15 105:7 118:15 176:24 185:16
**effects** 43:12 47:7 48:20 85:11 167:2 172:5 176:21 189:17
**efficiency** 20:18 128:17 187:8
**efficient** 101:24 102:2,8 104:14 104:24 105:19 107:7,17 108:11,22 109:23 111:2 113:18 114:10 114:24 115:5 115:21 116:3 118:19 119:2 120:16,21 123:6 125:9,11 125:11 149:9 149:13,14,21 150:6 152:3,17 153:5,7 154:4 154:16 155:7 155:15 157:6 157:16,18 158:17 159:18
**efficiently** 212:1
**either** 111:23 199:1,7
**ejd** 1:5 2:5 6:18

**elaborated** 138:25 170:6
**elaboration** 46:17
**elastic** 211:10 211:20
**electorate** 114:21
**element** 80:14
**elicited** 216:7
**embarcadero** 4:7
**embedded** 114:16
**emphasize** 85:1 85:19,23 86:20 168:2 174:12 180:7
**emphasizes** 154:8
**emphasizing** 95:23
**employee** 94:25 133:9 217:18
**employees** 3:14
**ends** 66:24
**engage** 23:18 23:22
**engagement** 11:22
**engagements** 11:9,17 19:23 19:24
**engaging** 22:12
**enormous** 137:6
**ensure** 184:5 212:25
**enterprise** 212:13
**entirely** 15:11
**entirety** 216:5
**entitled** 5:14,16 5:18 25:9 106:4 208:4
**environment** 43:10 130:14
**equal** 34:23 36:11,14
**errata** 218:14 218:16 219:3,5
**error** 211:15 212:2
**errors** 28:15,16 210:17,21 212:10
**escaping** 30:24
**especially** 212:9,11
**esq** 3:5,6,7,17 3:18 4:5,6,13 218:1
**essentially** 119:11 120:6 124:4 150:24 183:25 186:14
**establish** 62:10
**estimate** 211:22
**estimated** 210:17
**estimates** 210:13,23 211:3,18
**estimation** 139:24 210:1 210:16
**et** 37:24 97:4 117:15
**ethically** 113:6
**eunoia** 131:18
**event** 20:7,12 20:15,21 21:1 21:3 27:2 34:15 37:22 85:3,17 140:1 156:1 186:3,6 186:13,25 187:9 188:2,13 188:18,23 189:9,14,15 210:15
**events** 174:18
**evidence** 27:3 30:1 135:25 136:4,23 137:5 184:9
**exact** 20:1 111:15
**exactly** 9:17 32:5 48:6 59:12 151:1 155:18 165:24 189:13
**examination** 5:3 8:5
**examined** 8:2
**example** 22:3 27:22 32:18 47:4 50:5 84:16 91:12 94:23 98:24 105:10 107:21 108:7 111:18 111:20 117:12 119:5,25 121:1 129:22 132:10 134:2,4 135:24 154:13 156:2,3 157:9,11 158:7 158:21,23 188:8 189:6 191:19 201:10
**examples** 120:7 131:8 133:15
**exclusive** 197:13
**exclusively** 199:6
**excuse** 82:16 103:25 162:9 171:14 206:17

**executed** 216:10
**exhibit** 5:11,12 5:14,16,18 10:11,15,16 13:1 49:4,6 59:24 69:12 102:16 105:23 105:25 106:2 122:4 133:22 133:23 135:10 136:7 145:4 147:17,19 152:25 160:5 160:19,24 161:3 162:6 169:3 192:25 207:12,14 208:2
**exhibits** 5:8 183:11
**exist** 171:6,7
**existed** 31:7,16 34:24 35:3,11 82:10 83:5,25 86:17 167:16 169:6 170:9 182:3
**existence** 167:1
**existing** 95:11 95:13
**exists** 30:4 201:20
**exited** 176:11 180:20
**expect** 27:15 50:12,25 91:13 91:16,16 94:9 102:23,25 108:10,13,15 125:25 126:6 149:22 150:8 160:15 182:18 201:20
**expectations** 137:10
**expected** 149:18 182:17 199:2
**expecting** 136:1,8
**expedite** 50:4
**expensive** 63:20,22 77:24
**experience** 94:25
**expert** 5:11 10:13,16,24 11:3,5,9,21,21 12:5,25 13:5,9 13:18 14:16,19 14:21 18:10,14 18:18 19:5,15 19:16,16,19 20:16 27:14 209:16
**expertise** 17:15 17:22 18:2,4
**experts** 14:4 25:11
**explain** 94:17 173:17 199:9 201:12,15
**explained** 112:9 210:3
**explaining** 62:1
**explains** 53:24 57:12 200:22 203:6
**explanation** 95:16
**explore** 172:21
**exposed** 175:18
**exposure** 164:9 167:3,4
**expressed** 27:19 28:1 31:3 42:2 48:15
**expressing** 16:20
**extensive** 132:19
**extensively** 23:22
**extent** 13:23 167:17,17 172:10 173:9 173:14 194:17 196:7,12 201:12
**extreme** 188:8

**f**

**facebook** 1:4 2:4 4:3 5:15,16 5:19 6:15 45:21,22 47:12 51:16 54:5 70:25 74:24 75:22 76:19 84:17 86:4 88:13 89:15 90:11 94:6,25 95:3,5 96:5,15 97:8 98:25 101:23 106:5 107:3 109:18 111:20,22 113:1,9 114:22 115:14,18 117:9 121:15 122:9 126:1,5 126:6 130:1,24 131:23 132:2,3 132:20 133:1,8 133:10,12,19 134:1,6,12,14 134:17,19 135:1,4,11,18 135:22 136:1,2 136:8,10 137:19 144:23 145:14,20

146:21 148:3,8 148:25 149:4 150:15,16,17 150:19,22,24 150:25 156:5 159:15 160:8 163:6 164:4,9 164:14,18,24 165:5 172:1 174:1 175:4,21 183:24 184:1,4 184:4 187:2,17 188:3,23 194:3 199:3,25 200:14 201:3 203:21 204:3,8 208:4 212:25 213:3,19 214:6 214:10,15 218:4
**facebook's** 33:15 38:10,12 38:19 40:3,14 40:16 43:1,6,7 43:11,12,16 44:17 46:21 47:7,23 53:14 54:20 55:19,25 56:21 57:5,20 58:4,20 60:12 60:20 61:10 62:6 67:11 75:20 84:9 85:8 86:10,17 87:15 88:15,22 89:3,9 91:20 91:25 97:22 107:8,19 109:21 110:16 112:18 115:19 116:12 117:4 117:22 122:5 122:19 126:19 130:8,13,16,22 131:12 133:2 139:16,20 140:2 148:12 149:6,8 163:22 165:9 167:2,19 167:19,23 168:8,17,20 173:17,18,21 173:21 174:20 176:25 179:10 179:15 180:2 181:18 182:3 184:11,14,20 185:8,13,17,18 187:3 191:25 201:9,17 214:21
**faced** 63:2,12 76:6,20 77:10
**fact** 48:11,12 61:5 62:23 63:9 64:1 65:5 75:7 89:7,8,11 89:12 102:14 103:14,15,19 104:1,3,12,13 104:20,22 105:7,15,18 106:13 108:2 118:4,4,6,6 132:3 135:21 146:20 152:21 154:13 159:6 160:16 161:6 161:25 175:18 175:19 193:12 198:4,17 199:1 199:21 201:8 207:7,8,9 208:24 209:4,6 211:4
**factors** 43:5,8 173:16 186:15 186:23
**facts** 15:13 37:10 38:3,5 40:18 55:6 84:18,21 89:13 92:4 95:13 111:18,21 117:10,13,20 122:2 124:14 129:10 131:24 132:4,5 137:8 156:24 167:18 168:18 172:4 173:21,23 177:6,17 178:13,18 179:8,12 183:25 184:8 185:13 194:14 194:19,24 195:14,18,22 195:25 196:1,4 196:8,10 206:4 214:7,16,20,24 214:25
**factual** 122:2
**failed** 5:16 75:22 148:3,25 150:23
**failing** 59:3
**failure** 214:21
**failures** 75:20
**fair** 25:11
**fairly** 46:15 47:3
**fake** 207:25
**fall** 168:19
**falls** 119:6 120:1
**false** 38:13,20 40:4 41:22 42:7,14 43:2 43:22 44:5 47:23 48:12,12 50:1,3 51:10 51:15,20 52:14 53:6,11,25 54:5,7,14 55:5 55:9,18,25

56:12,18,24 57:7,12,12,15 57:16,17,19 58:9 59:2 60:8 60:16,24 61:3 61:5,8,19 62:2 62:5,16,22 63:1,6,9,11,17 63:19,23 64:1 64:5,13,20,24 64:25 65:1,5 65:14,15,24,25 66:7,8,18,20 67:21 68:2,23 68:25 69:10 78:24 88:19 89:1 90:15,17 90:25 98:10 108:9 111:22 146:24 168:17 185:17 214:22
**falsely** 38:6 146:21 201:12
**falsity** 57:13 58:16 61:23 62:10,11 65:22 67:24 68:3 69:1,1,7 166:24,25 173:13,13 190:23
**familiar** 149:21
**fans** 157:10,12
**far** 28:2 194:18
**fast** 100:21
**february** 67:12 67:20 175:8
**federal** 5:13 217:14 219:1,8 219:9
**feedback** 15:10
**feeds** 159:24
**feel** 44:9 68:17 129:23 161:15
**fell** 130:16
**fewer** 20:5
**fields** 17:15,22
**figure** 19:25 29:4
**file** 1:4 2:4 27:15
**filed** 6:15 67:11 67:20
**fill** 173:8,10,24
**filled** 171:24 172:19 173:4
**final** 86:22
**finally** 194:17 195:11
**financed** 114:17
**financial** 21:21 21:23 63:3 76:7 174:20,24 175:1 196:19 196:23 197:9 205:1
**financially** 6:25 217:17
**find** 38:12 40:3 50:12 74:2 75:5 99:19 137:4 142:1
**finding** 50:13
**findings** 39:12 39:16,17
**finds** 30:3,7
**fine** 39:15 59:8 59:15 98:7 153:24 189:21
**finish** 8:14,15 65:8 68:6 100:14,18 101:5
**finished** 9:17 100:5
**firm** 5:14 106:4 132:23 156:17 160:7 167:5
**firms** 130:8,9 130:17,23 211:24
**first** 8:2 17:2 31:19 36:25 39:10 52:9 58:19 67:4 84:24 86:17 92:23 94:20,21 96:4 106:17 107:15,18 108:20 134:5 135:17 146:4 174:21,25 175:2,5,23 181:15,25 182:22 183:7 183:22 184:7 191:23
**five** 20:4 21:9
**fixing** 175:12
**fleming** 3:18 7:14,16
**flow** 21:12 61:3 156:19 196:24
**focus** 206:14
**focused** 37:22 46:18 129:16
**focusing** 57:9 130:23 206:17 206:19
**follow** 129:23 215:18
**followed** 130:3
**following** 122:9 166:21 178:8
**follows** 8:3 26:4 39:23 218:8
**footnote** 28:18 28:21 139:9 143:22 180:23 193:8,20,21 210:4,12
**foregoing** 216:5 217:5,7

**[foregoing - generally]**

217:11,13
**foreseeable** 98:18 163:16 168:15 192:8 194:14 196:1,9 212:17 214:17
**form** 24:19,21 26:6 67:20 101:24 102:2,7 104:14,24 108:22 109:22 113:18 114:10 114:24 115:21 118:19 119:2 120:16,20 123:6 125:8,11 149:9 152:3,17 152:22 153:5,7 154:4,16 155:7 155:15 157:6 157:16,19 158:16 159:17
**formal** 211:7
**formally** 178:25
**formed** 24:15 24:16
**former** 94:24 133:8
**forming** 15:14 15:22 24:8
**forseeably** 215:1
**forth** 29:12 52:13 55:4 60:25 138:23 180:19 217:6
**forward** 141:15
**found** 16:4,4 31:7,16 38:19 132:1 136:21 146:12
**foundation** 17:17 25:1 26:19 31:11 38:16,23 40:7 40:24 43:23 44:6 50:23 52:19 56:4 58:13 73:24 74:15 75:15 76:10,22 77:12 78:1 79:12 80:8 86:19 90:21 92:14 109:25 110:19 112:6 120:11 126:21 142:5 145:22 146:9 147:13 162:16 170:19 176:7 177:21 178:21 188:6 197:2 200:9 203:25 213:20
**founded** 18:1
**fourth** 5:12
**framed** 85:20
**francisco** 4:8
**fraud** 131:1 132:14 137:16 137:24 178:20 181:2 188:21 188:22,24,25 189:21 190:3,9 190:17,19,22 191:6 192:17 192:19 193:7 193:10 194:5
**fraudulent** 94:6
**frcp** 219:1
**free** 68:17
**friday** 1:16 2:20 6:1
**front** 50:6 87:19 122:24 137:5 208:3 212:10
**ftc** 63:3 76:8 164:9 175:18
**full** 35:5 70:14 91:10 93:5,8 110:12 113:12 115:22 122:3 211:2
**fully** 102:9 117:3 165:16 179:18
**function** 211:10,12,13 211:16,21
**fundamental** 21:21
**further** 103:12 130:11 195:5 215:11 217:13 217:17
**future** 163:22

**g**

**g** 3:18
**gain** 107:5 109:20
**game** 25:11 78:5
**games** 79:2 153:14
**gather** 114:19
**gelbach** 1:14 2:17 5:4,9,11 6:13 8:1 216:3 216:18 218:5
**geller** 3:4 7:12 7:14
**general** 37:19 37:21 153:22
**generality** 21:25 99:13 103:21 104:20
**generally** 36:12 36:13 42:20 44:23 45:2

87:20
**generated** 211:12
**getting** 174:5 187:18
**gibson** 4:4 7:7 7:8
**gibsondunn.c...** 4:10,11,17 218:2
**give** 8:25 21:4,6 21:9 27:22 51:6 59:11 92:5 99:25 107:12 129:22 157:9 158:7,20 180:22
**given** 11:2 36:10,13 59:5 62:10 63:16,25 70:13 80:20 81:13,16,22 126:22 149:7 165:19 186:10 188:20 212:2 214:6,12 217:12
**gives** 68:25
**giving** 16:2,7 199:25 200:14 201:3,25 202:5
**glad** 48:9
**go** 6:11 10:13 13:11,12 23:3 25:6 28:11 36:1 45:9 47:25 49:6,16 49:23 52:8 59:16 68:9 81:19 100:15 100:19 101:6,8 101:15 110:6 112:20 114:14 116:18,19 118:24 133:4 144:15 145:6 152:25 153:7 156:3 160:5 162:6 163:4,7 191:4,16 198:23 204:16 209:8 215:4
**goal** 186:3 211:20,21
**goes** 55:7 159:24
**going** 6:5 10:13 13:11 19:8,25 21:5 25:13 28:17 39:5 45:8,10 48:19 49:6,23 50:24 52:6 55:1 59:17 68:11 69:5 75:4 79:25 88:11 98:16 99:5 100:21 101:2 101:10,13,17 103:4 105:20 105:21,24 108:19 110:11 110:24 118:16 119:9,21 120:4 130:9 136:13 144:9,12,16 147:19 153:14 161:21 167:5 173:24 175:11 180:10 189:14 189:15 198:22 209:9 215:6,19
**good** 6:4 7:11 7:16,16,22 29:6 46:20 102:11 107:21 134:3 201:11
**gotcha** 75:4,6 76:15 79:2
**graduate** 17:5
**granting** 131:14
**gray** 3:6
**great** 20:3 107:21 157:3
**greater** 164:8
**grossmann** 3:16
**ground** 8:10
**group** 13:6
**growth** 200:2 200:16 202:7 202:10
**gsr** 191:10
**guardian** 5:14 84:20 87:17 90:10 94:24 106:3 121:9,12 121:22,25 122:3,4,8,15,21 130:2 132:18 133:6,22 134:13,20 135:10 136:7 141:24 153:1 160:6 184:3 197:21 198:1,6 198:15 199:6 207:17
**guess** 9:8 14:6 15:1 20:20 27:11 44:7,13 79:2 85:25 103:19 124:19 151:5,24 157:14
**guidance** 175:14,15 213:7 214:12

**h**

**half** 95:2,3 125:22
**handful** 207:11
**handled** 218:8

**hang** 68:15
**happen** 103:12 152:7 188:9 192:7
**happened** 97:14 117:16 119:6 120:1 132:20 152:22 182:7,17 187:25 191:21 214:20
**happens** 115:9 118:16 119:4 119:24 130:17 151:6 157:10
**happy** 51:1 70:15 73:6 87:21 127:9 132:7 169:15
**hard** 21:24
**harm** 63:13 76:21 77:11
**harvested** 5:14 5:17 106:4 107:3 109:18 132:25 133:7 133:13,18 134:6,11 136:9 148:5,8 149:1 149:4 150:23 160:7
**head** 23:12 78:6 118:11
**header** 208:20
**headline** 133:25 148:10 150:3,8,22 151:2 160:6,11 161:7
**hear** 8:19 106:21
**heard** 111:25 118:10 121:4
**held** 93:6 111:16
**hello** 7:6
**help** 15:5,7 50:3
**helpful** 32:15 36:17 49:25 125:4 150:3 166:20,22
**helping** 88:5
**helps** 39:15 201:12,14
**hesitating** 102:5 165:11
**hey** 159:15
**high** 17:5,9 148:19
**higher** 11:13,16
**highly** 102:23
**hired** 158:24
**hires** 159:4
**hold** 28:4
**holding** 33:21 111:17
**honest** 39:21
**hope** 100:21,22
**hopefully** 36:17
**hour** 45:8 103:1
**hourly** 11:8,22
**hours** 70:21 84:25
**house** 107:5 109:19
**huh** 15:8 32:21 83:10 145:5 153:2 157:25 162:12 193:1 193:19
**hung** 35:19
**hypothesis** 105:18
**hypothetical** 103:18 118:8 126:17 158:6 181:21 213:22

**i**

**idea** 31:6,15 35:25 36:2
**ideas** 126:15
**identification** 10:11 49:4 105:23 147:17 207:12
**identified** 28:15 46:24 52:16 56:23 57:5 60:16 62:4,16 63:1 63:11,19 69:17 92:19 115:15
**identifies** 50:1 139:12 180:25 181:1
**identify** 47:11 53:13 54:4 55:7 58:7,19 58:24,25 70:5 71:12 72:22 74:9 75:9,12 75:23 76:4,18 77:8,18,18,22 78:15 79:9,19 89:14 100:14 100:22 142:9 142:22,23 143:7 201:24
**identifying** 187:23
**ignore** 150:9
**illustrates** 86:23 200:19
**impact** 33:14 33:16 37:25 48:17 87:3 93:8 94:10 98:24 105:20 125:6 155:1 167:4,18 173:15 175:17 178:17 179:12

196:21 200:1 200:15 202:6,9 203:20 204:18 204:22 205:15 207:1
**impacted** 139:15 145:25 147:9 163:8 199:16
**impacts** 99:1 214:14
**implication** 103:10 181:8
**implications** 48:21,22 105:10 214:25
**implied** 36:6
**import** 103:4 104:3 150:5
**importance** 85:14 89:11 94:19 104:22 154:9 167:10 167:14,17 178:9 179:16
**important** 8:12 85:4 90:3 107:23 116:22 188:15
**impounded** 105:22
**imprecise** 173:10
**improper** 46:1 47:15 53:15,22 55:20 56:1 57:21 58:5,21 60:14,22 61:11 88:16,23 89:4 89:10,19 91:21 92:1 97:23 137:17
**improperly** 113:2 132:24 133:18 134:11 135:2,15
**improve** 109:2
**improving** 201:9
**inability** 104:18
**inaccuracies** 8:16
**inaccurate** 113:7
**inclination** 113:10
**include** 19:23 19:24 42:21 43:8,9 47:22 65:14 66:7,19 69:18 84:11,12 173:21 195:17 195:21 205:2 206:20 207:7,9
**included** 47:4 98:2 139:4,5 150:12 166:24 186:12 198:16 213:7 218:14 219:3
**includes** 48:10 115:10 137:24 150:7 203:8
**including** 7:3 38:4 56:22 110:12 112:25 129:10 134:25 135:14 137:7 137:19,22 161:7 183:11 197:20,25 198:5 214:24
**incoherent** 113:23
**incomplete** 103:17 118:7 158:5 181:20 213:21
**inconsistent** 104:6 137:9
**incorporate** 112:2 118:6 120:17 125:17 126:18 151:25 153:15,23 165:23
**incorporated** 103:15 107:8 107:19 108:21 109:21 110:16 113:19 114:12 115:1,8,19 116:11 117:21 118:21 119:1 119:12,18 120:9 121:20 122:18 125:7 125:17 131:19 145:20 146:6 148:11 149:6 151:19 152:9 152:14 153:6 153:16
**incorporating** 86:12 126:10
**incorporation** 152:13 153:18
**incorrectly** 28:23
**increase** 164:19 203:22 204:4 205:8
**incurring** 172:1
**independent** 129:4,19
**index** 186:24 188:1 209:17 211:9,11,25
**indicated** 208:19
**indicates** 119:10 120:5 134:16 207:10

**indicating** 182:11
**indirectly** 114:17
**industry** 186:10,23 187:3,19 188:1 190:13
**inference** 92:5 103:25 104:3 110:25 136:11 136:16,19,23
**inferences** 91:14 93:4 104:10 110:10 110:23 113:15 115:25
**inferred** 46:13 46:15
**infers** 103:25
**inflated** 29:17 29:23 33:21 35:16 38:13,20 40:4,17
**inflation** 30:4,8 31:7,16 32:23 33:2,17,23 34:1,9,14,19,23 34:24 35:8,10 36:3,10 44:17 45:7 81:1,3 84:8 86:3,9,15 86:16 87:1 93:12 95:18 170:2 176:3,11 176:17 177:4,6 177:15,16 178:16,18 179:10,13,21 180:20 181:10 181:17 182:2 185:8 198:8
**inform** 214:22
**information** 13:24 14:11,15 27:3,9,10 31:1 36:19 37:1,3,3 37:23 40:12 42:6,13 43:15 59:3 64:3,10 64:17 69:22 74:25 75:11,14 78:14 79:8 80:6 85:13 93:2 95:9,11 95:14 99:14 102:4,9 103:4 103:5,6,9,25 105:1,8,12,21 106:9,10,15 107:8,17,23 108:14,17,20 108:21 109:15 109:20 110:15 110:25 112:23 113:5,25 114:3 115:6,9,18 116:5,8,11 118:12,15,15 118:20,25 119:12,14,17 120:9,17,19,22 120:23 121:1 121:19 122:18 123:7,8,12,14 123:17,21 124:4,10,11,14 124:16,24 125:6,6,7,14 126:4,10,14,15 126:18 127:1,1 127:4,7,14,19 127:19,20,21 127:22,25 128:1,2 130:4 130:14,24,25 131:6,23 132:12,13 133:21 134:9,9 134:22 135:13 140:14,21 141:2,9,22,23 142:2,24 143:9 148:10,24 149:5,15,17,19 149:24 150:2 151:4,10,11,18 151:20 152:4 152:13,18,20 152:24 153:4 154:1,2,14,17 155:1,8,13,16 155:20,25 156:10,12,14 156:16,22,23 156:25 157:7 157:15,16,24 158:2,3,13,14 158:16 159:3,7 159:10,17,19 160:9,9,13,18 161:3,11 170:14,16,22 171:11 174:1 174:16 182:9 183:23 188:3,8 188:21,22,24 188:25 189:4,4 189:13,22,22 190:2,3,8 194:4 196:15 196:17,21 199:15 200:25 201:19,23 202:10,24 203:7 204:24 205:2,4,9,16 206:3,5,7 207:5 208:11 208:22,23 209:1
**informational** 206:12
**informative** 206:2 207:11

**informed** 7:14 117:3
**informs** 173:25
**initial** 131:1 132:14 137:14 172:4 183:25 190:16 191:22 192:2,8,9 194:14 195:13 196:1,3,9 213:14 214:17 214:24 215:1
**insider** 127:12
**instance** 37:13 45:23 47:13 88:14 89:16 90:12 96:6,16 97:9
**instruct** 25:13 144:10
**instruction** 144:12
**intend** 26:17 139:17 143:22
**intended** 181:8
**intercept** 5:16 144:25 145:14 146:2 147:20 160:19
**interested** 6:25 217:17
**interior** 27:6
**internal** 27:6
**interpose** 151:22 176:6
**interrogatories** 139:2
**intraday** 189:8
**introduce** 7:19
**introduced** 185:7
**introducing** 207:14
**invest** 203:22
**investigating** 112:19 134:15 136:15 159:12
**investigation** 146:11 150:20 151:1 193:5
**investments** 203:18 204:18 204:21 205:14 206:25
**investor** 110:25 110:25
**investors** 46:13 69:24 70:7 71:1,14 72:11 72:24 73:15 74:10 75:14 76:6,19 77:10 77:23 78:13 79:8 105:8,12 105:16,21 108:11,18 110:10,22 113:15,25 114:3 115:6,9 115:24 118:14 120:23,25 121:4 123:8,11 123:17,20 124:5,5,24 125:3,6,12,13 126:1,4,15 127:1,3,4,9,12 127:22,24 149:14 150:8 156:16 157:8 158:4,25 159:16 168:21 182:14 212:16 213:17 215:3
**involve** 31:23 37:20 67:12
**involved** 22:12 64:24 111:5,13 130:7 141:1 178:23 191:22 201:7 206:3
**involves** 16:2 67:1,10 137:16
**irvine** 4:15
**isolate** 187:1,16
**isolating** 187:18
**issue** 54:11,12 130:19 169:9 172:2 186:17 190:25 207:11
**issues** 20:18 111:6 115:15 201:17 213:2

**j**

**j** 3:6,7 4:5 218:1
**janoski** 7:13
**janosky** 3:6
**jeez** 111:7
**jeremy** 3:17,22
**job** 1:23 211:25
**johnson** 1:21 2:21 7:23 217:3,24
**joined** 159:15 159:15
**jonah** 1:14 2:17 5:4,9,11 6:13 8:1 216:3,18 218:5
**jose** 1:3 2:3 6:17
**jot** 130:10
**july** 29:3 75:2 85:16,18 91:11 93:9 96:3,10 96:13,20,21 97:3,11,15,21 97:24 98:3,8 98:20,22 99:3 99:8,9,21 166:3,4,8,20,20 166:21 167:11

167:25 168:9 168:25 170:14 171:10,17,23 172:8,16 173:3 173:6,19 174:15,19 175:2,25 176:21,22,22 178:7,8,17 179:12,19,20 180:15,21 199:16,24 200:6,7,17 203:13 204:21 204:25 205:17

**june** 85:6,13,25 85:25 177:8,18 178:6,14 179:8 179:17,22 181:1,1,3,10

**k**

**k** 4:3 66:24 67:11,19,20

**kahn** 4:5 5:6 7:6,6 8:6 10:12 15:20 17:20 18:3,15 19:11 20:14 21:10 22:22 23:6 24:14 25:4,6 25:23 26:15 27:17,24 28:13 30:15 31:13 32:2 33:18 34:8,21 35:6 38:18 39:1 40:2,19 41:9 41:13,19 43:18 44:1,11 45:1,8 45:15 49:5 51:3 52:1,3,24 53:21 56:7,9 58:2,17 59:14 59:22 61:16 64:8 70:17 71:11,23 72:19 73:8 74:3,22 76:2,16 77:1 77:20 78:10 80:4,17 87:7 87:23 88:2,3 90:4,24 91:8 92:17 93:10 98:17 99:22 100:3,9,13,18 100:25 101:5 101:15,22 103:22 104:23 105:24 106:1 106:23 109:3,7 110:2,5 111:24 113:13 115:13 118:3,18 120:15 121:6 126:24 140:18 141:3 142:8,12 144:4,11,14,21 145:24 147:4 147:18 148:20 148:23 151:9 152:2 158:9,22 161:1 162:5,19 163:3 167:20 170:23 171:4 176:10,18 177:24 179:5 181:23 182:19 183:3 185:20 186:2 187:10 188:19 189:20 195:16 197:6 199:12 200:12 202:15,19 203:1,10 204:7 205:22 206:15 207:13,19,22 208:1 209:8,14 213:10,23,24 215:4,11 218:1

**keable** 4:20 7:9

**keep** 79:2 107:24 161:15

**kind** 27:23 77:15 78:6 79:21 81:18 103:6,20 127:15 139:24 153:18 157:20 174:8 206:13 211:7

**kinds** 72:4 156:8

**knew** 97:18 132:4 135:19 163:21 164:2,7 164:12,17,22 165:2 212:25 214:8

**know** 13:24 16:4,6 17:6 21:24 22:7 27:8 28:10 39:2 40:9 41:15 44:7 47:22 48:14 49:24 59:10 70:21 71:6 75:2 78:5,23 79:1,23 80:1 86:22,25 88:12 90:1,3 91:13 93:4,7 94:4,8 100:3,4 101:2 102:12 103:1,8 103:20 109:1 111:7,9,14,15 112:18 117:1,5 117:13 118:11 123:5 124:19 124:25 125:4 125:21 127:13 129:23 131:8 132:2 134:18 135:22 136:25

137:3,6 138:4 142:6 143:19 143:25 145:1,7 146:13,14,16 146:20 148:6 149:3 150:10 150:16,22 152:11 153:15 154:23,23,24 154:25 156:6,6 156:18 157:6 157:10,14,18 157:20 158:1 158:12,16 159:2,18,21 160:3,9 167:5 168:17 169:13 172:1 173:1 174:18,23 175:20 178:24 182:15 183:12 183:16 186:14 188:10 189:24 191:17,23 193:24 196:2 199:2 207:20 209:18 212:6 212:24
**knowing** 52:10 130:13,16 185:15
**knowledge** 48:18 50:21 133:14 185:4
**known** 114:11 114:15,25 116:6 125:20 125:23,24 130:5 131:4 132:4 152:5 157:17 160:4 161:4,8,22,24 174:24 184:2,9 213:9
**knows** 45:6 154:1,18 155:9 155:17 160:11 161:11 162:3 165:19 209:3,7
**kogan** 95:4 191:23
**krogman** 28:18

**l**

**la** 13:9
**lack** 163:17
**lacked** 184:5
**lacks** 17:17 25:1 26:19 31:11 38:16,23 40:7,24 43:23 44:6 50:23 52:19 56:4 58:13 73:23 74:15 75:15 76:10,22 77:12 78:1 79:12 80:8 86:19 90:21 92:14 109:25 110:19 112:6 120:11 126:21 142:5 145:22 146:8 147:13 162:16 170:19 176:7 177:21 178:21 188:6 197:2 200:9 203:25 213:20
**laid** 112:17
**language** 133:16 155:19 206:23
**large** 71:7,25 97:4 183:10
**largely** 107:3 109:18 134:6 212:9
**larger** 187:3
**law** 30:22 33:24
**laws** 5:13
**lead** 3:3,3,14,15 45:7 125:1 132:1 164:3,8 164:13,18 168:19,19
**leading** 111:17
**leads** 149:16
**learn** 91:25 120:25 131:13
**learned** 37:23 49:20 92:4,18 92:24 96:5 97:16 135:5 168:22 178:17 179:11
**learner** 211:21 212:4
**learning** 47:24 166:5,9 167:22 168:7 194:4
**learns** 168:16 168:18 188:20
**leave** 116:17 139:7 159:22 191:20
**led** 87:9 93:19 93:22 96:11 97:20 99:9 131:25 200:6 200:16
**legal** 6:22 63:3 76:7 194:9 218:7
**legally** 113:5
**length** 206:6
**lengthy** 47:3
**leslie** 1:21 2:21 7:22 217:3,24
**letters** 67:17
**letting** 74:16 75:17 100:9
**level** 21:25 99:13 103:21

104:19 140:10 143:16 152:10
**lexecon** 4:20 7:10
**liability** 16:3 42:1 44:14 48:15 63:3 76:7 78:19 80:12,21 85:10 112:11 128:21 128:24 129:12 138:23 146:15 167:12 169:23 170:4,8 178:1 178:11 183:13 185:12 190:25 192:13 194:21 195:4,15
**license** 7:23
**lied** 131:16 135:6
**light** 14:10 211:2
**likelihood** 124:7 156:4
**likelihoods** 155:21
**likely** 155:3
**likes** 148:7 149:3 150:15
**limited** 53:10 112:11 162:25
**limiting** 19:3 201:9
**line** 100:5 101:5 149:16 218:15 219:4
**lines** 163:4
**link** 124:21 128:13 200:3 200:20 201:16 201:20
**linkedin** 159:14 159:24
**liquid** 102:23 105:19
**list** 17:1 47:3 60:9 61:25 62:21 65:21,23 68:24 69:6 85:22
**listed** 9:25 10:4 13:1 17:3,10 17:11 18:20 24:18 50:18 56:11,14,16 61:4,7,18,24 63:5,7,14 65:12 66:3,5 66:15 68:4,21 69:9
**listener** 134:17
**lists** 24:5 51:19
**literature** 102:12 154:15 155:5,6,14
**litigation** 1:5 2:5 6:15 13:6 13:19 14:5 20:8 22:19,22 184:25 186:17 218:4
**litowitz** 3:16 7:15
**little** 9:10 21:24 79:25 107:22 114:15 156:5 191:7
**llp** 3:4,16 4:4
**location** 6:19
**locked** 218:12 219:1
**long** 9:15 39:22 42:10 49:12 50:6 72:5,21 150:11 153:22 178:25 202:20 203:2 204:1
**longer** 32:8 46:11 144:2
**look** 31:25 36:23 51:1 73:6 87:21 94:23 99:19 100:4,4 119:3 119:9,20,23 120:4 122:6 128:14 131:9 133:25 134:4 135:3,16 148:16 151:6 210:4
**looked** 20:17 98:15
**looking** 66:23 70:3 93:24 97:5 112:18 115:15,18 141:11,19 169:15,17 207:16
**looks** 50:7 95:2
**loss** 34:16 50:10,11 176:1 176:6 180:14 181:6,13 192:11 194:15 194:20,25,25 195:12 196:2 196:12 214:19
**losses** 197:19 197:24 198:3
**lot** 41:11 72:18 74:1 88:21 98:14 99:14,15 111:14 119:7 120:2 125:16 130:9 156:5 157:9 158:11 173:2 175:9,11 205:3 206:3,4
**lots** 157:13,13
**loud** 39:13
**luke** 3:5 7:11 101:7

**lukeb** 3:11
**lutz** 4:6 7:8 25:5,12,17,19
**lying** 156:6

**m**

**m** 4:3,6
**machine** 217:9
**made** 13:5,8,17 14:8,16 51:11 51:14 67:11,20 87:5 110:9,14 110:22 113:20 114:10 115:2 118:13 131:25 144:23 145:9 145:14,21 146:1,20 147:9 147:10 156:1 172:7 184:13 184:17,22 201:12 212:16 217:9
**magnitude** 180:4 211:17
**maintain** 185:18
**major** 45:23 47:12 88:13 89:16 90:11 96:5,16 97:8
**majority** 133:10,12
**make** 8:10,14 8:19 12:12,14 14:15 16:7,8 22:20 25:10 39:4,6 40:25 41:5 48:6 52:20 79:24 80:16 97:2 122:23 125:3 153:13 154:5 154:19 156:19 172:9 178:13 193:22 213:17 214:5 218:14 219:3
**makes** 88:12 103:25 106:14 125:18 154:7
**making** 83:15 117:14 165:14 191:4,16 201:11
**mammoth** 94:19
**mapped** 67:17
**march** 84:16,23 87:10,14 90:6 90:9,20 91:3,6 91:17,20 92:3 92:12,20 93:13 93:18,22,23,25 94:10,23 95:16 95:17 97:14,19 117:15,16 119:5,25 121:13,16 122:1,16 129:25 130:13 131:2,3 132:15 133:5,17 135:4 135:17 137:9 139:13,21 140:15,19 141:1,10,14,15 141:22,24 142:4,4,7,13,14 142:25,25 143:6,11 144:7 144:25 145:2 145:15 146:3,5 162:15,21,25 163:5,6,9,11,11 163:22,24 164:1,2,6,7,11 164:13,16,18 164:21,23 165:1,3,8,22,25 167:22 168:3,7 168:12,14,16 168:21 170:16 174:17,21 175:25 180:15 180:21 181:16 182:1,7,23 183:8,10,22 184:7 197:20 197:25 198:4,6 198:9,16,18,19 198:22,25 199:4,7 203:17 203:24 204:11 207:18 209:21 209:22
**marco** 3:6 7:13
**margin** 173:22 201:13
**mark** 4:3 10:13 49:6 105:24 147:19 207:19 215:23
**marked** 10:11 49:4 105:23 106:2 147:17 207:12
**market** 20:18 30:1 31:2,2 37:22 44:19 45:6 46:12 74:25 84:25 85:15 87:9 89:11 91:13,25 92:4,11,18,24 92:24 93:2,3 93:22 94:4,17 95:12 96:4,14 97:15,18 98:9 99:8 101:24 102:3,8,23 103:15,24 104:2,10,14,14 104:21,24 105:2,9,19

107:7,17 108:2 108:11,16,22 109:23 111:2 111:18 112:2 113:11,18,18 113:24 114:4,7 114:10,11,24 114:25 115:5 115:21 116:3,6 117:4,13,19 118:20,25 119:2,4,10,17 119:24 120:5 120:16,21 121:20 122:18 123:6 124:25 125:1,2,9,11,13 125:25 126:17 128:5,12,17 129:6,20 130:18 131:2,4 132:1 135:21 135:25 136:7 136:24 140:14 140:22 146:22 149:9,13,14,22 149:25 150:7 151:7 152:3,5 152:16,17 153:5,7 154:1 154:4,16,17 155:7,8,15,16 156:18 157:6,6 157:14,16,17 158:1,15,17 159:2,18,18 160:4,9,11,15 161:4,8,11,23 161:24 162:3 163:15,20 164:2,7,12,16 164:21 165:1,9 165:18 166:4,9 167:21 168:6 168:15,16,20 172:10,16 173:16,25 175:6,7 178:16 179:11,19 181:15,25 182:10,10,13 182:22 183:6 183:23 184:9 184:10 185:15 186:10,22 187:3,8,19,25 188:20 194:4 195:18,22 199:1,24 201:1 201:20 202:11 202:24 204:24 205:4,17 209:2 209:3 212:25 213:4,5,8 214:11,18,22

**market's** 48:18 181:3

**marketing** 138:5 158:25

**marketplace** 150:9

**markets** 47:24 154:21

**massive** 114:21

**master** 1:4 2:4

**material** 24:16 55:6 127:14,25 145:19

**materiality** 50:10

**materially** 51:10,15 52:14 53:6 55:5 199:15

**materials** 24:5 173:20

**matter** 6:14 10:14,17,24 11:3,8,22 14:5 20:24 22:8,11 22:16,17 23:8 26:25 27:4 37:21 125:2 151:17 153:20 163:1 167:5 174:22 187:11

**matters** 19:14 21:2,23 22:2 43:2 105:6,13 118:12 159:25 175:10 186:17

**mean** 12:9 15:2 18:14 19:22 20:11,13 21:19 23:20 24:13 25:4 30:13 31:21 34:6 35:2 36:20 37:2,8,14,15,16 37:17,21 46:19 48:5 54:10 55:15 59:11 61:21 73:10,12 75:18 77:16 81:15 91:23 96:21 102:10 106:12 123:9 123:10,12 124:9,12,13 125:16,16 127:2,8,23 138:12 145:23 153:17 154:19 155:20 156:15 157:1 158:12 171:20,21 189:25 190:4,5 190:6,8 192:23 199:5 207:8 211:14 212:2 214:14

**meaning** 30:21 140:7 155:1 165:14 167:7

**means** 37:9 123:14,15 124:11 129:23 152:19 173:11 194:23 211:23
**meant** 65:9 154:23 177:22 197:12
**measure** 33:16 140:1 176:21 195:10,10 210:21
**measured** 186:23
**measurement** 34:16 188:18
**measures** 186:18
**measuring** 33:14 34:18 37:25 194:16
**media** 6:12 137:8
**meet** 9:6
**meeting** 9:7,15 9:21
**member** 33:19
**members** 198:3
**memory** 49:12
**mention** 201:6
**mentioned** 122:13 191:20 193:20 197:11
**merely** 126:7
**met** 9:4,7
**metaphysical** 152:11 159:20 159:22
**method** 87:2
**methodology** 22:6 29:9,11 29:15,16,20,20 29:22 30:3,7 31:21,23 32:12 33:9,13 35:15 35:22,24 36:12 40:10,11 86:23 189:9 211:11
**michael** 4:5,20 7:6,9 218:1
**michelson** 4:14
**microphones** 6:7
**middle** 102:24
**million** 5:16 148:4 149:1
**millions** 5:15 106:5 107:2 109:17 132:25 133:19,24 134:1,5,12 136:2,10 150:23 160:7
**mind** 24:2 30:23 38:25 39:7,20 43:3 44:8 48:14,25 79:1 107:24 158:8 174:11 197:14 199:5
**minus** 41:8
**misappropria...** 45:24 47:13 75:21 88:14 89:17 90:12 96:6,16 97:9 137:18 163:17 191:11 214:7
**mischaracteri...** 161:16,17
**misleading** 38:13,20 40:5 41:22 42:7,14 43:2,22 44:5 47:23 50:2,3 51:10,15,20 52:14 53:7,11 53:18,25 54:6 54:8,14 55:5,9 55:19,25 56:13 56:25 57:8,20 58:9 59:2 60:9 60:16,24 61:3 61:6,9,20 62:5 62:17,23 63:2 63:6,9,12,17,20 63:24 64:1,13 64:20 65:6,14 65:22,24,25 66:7,19 67:21 67:24 68:2,3 68:23 69:8,11 70:12 73:4 78:25 80:22 81:7 112:22 134:21 167:1 169:19,23 175:6 185:17 214:22
**misleadingly** 146:22
**misrepresent...** 38:1
**misrepresented** 38:5,6 54:20
**misrepresenti...** 54:14 56:10,19 56:21 57:4
**mississippi** 3:15
**misstate** 55:6
**misstated** 73:4
**misstatement** 60:8 62:4,15 62:25 63:10,18 64:12,19 144:24 145:9 145:13,19,21 145:25 147:22
**misstatements** 40:21 41:20 42:5,12 43:21 44:4 55:8,17 55:23 56:12 58:8 59:1

68:22 82:4,24 128:4,8,11 184:13,16,22 185:7
**mistake** 193:23
**misunderstood** 83:20
**misuse** 45:24 47:13 88:14 89:17 90:12 96:6,16 97:9 115:16 131:1 132:14 135:13 137:15,18,24 172:4 183:25 190:16,19,22 191:2,5,14,22 192:2,8,9,10,18 193:6,9 194:5 194:13,14 195:18,22 196:8,9 212:18 213:14,16,19 214:3,16,18,20 214:24,25 215:2
**misused** 194:24 195:14 196:1,3
**misusing** 112:22 134:21
**mjanoski** 3:12
**mjkahn** 4:10 218:2
**model** 31:5,14 35:14 40:3 81:6 82:3,9 95:19 170:13 175:24 176:13 177:2,5,13,16 180:12,18 181:17 182:2 186:13,13 198:9 199:10 209:21 211:21
**modified** 41:3
**moment** 13:12 16:12 30:24 49:2 50:14 51:6 52:18 59:16 87:20 99:25 107:12 125:23 130:10 131:21 132:6 138:12 143:18 143:19 157:23 180:22 189:14 198:14
**moments** 128:25
**monday** 84:24 94:15
**money** 175:11
**months** 154:2
**morning** 6:4 7:11,16,17,22 94:15
**morning's** 9:21
**motion** 15:25 16:5 26:18 41:3,17 42:2 42:23 44:9 48:16 78:19 80:16 112:12 117:8 128:22 137:2 138:24 146:17 170:5 178:2 183:15
**move** 51:6 68:11 126:20 151:21 155:2
**moved** 32:23 119:10 120:5 130:22
**movement** 176:25 186:9 186:19
**movements** 187:1,17
**moves** 174:22
**multiple** 23:14 92:6,8 189:12
**multiples** 23:23 196:25
**mute** 6:9

**n**

**n** 5:1
**name** 6:21 132:8 217:21
**named** 150:14
**names** 132:8
**nasdaq** 84:25
**natural** 136:11 136:16,19,22 137:4
**naturally** 46:13
**nature** 65:22 67:24 68:4 69:8 211:17 212:7,12
**nearly** 49:11 72:8
**necessarily** 162:2 211:4
**necessary** 218:14 219:3
**need** 8:14 25:25 66:11 67:14 77:19 82:1 101:12 102:22 112:8 189:10 195:11 208:13 215:21
**needed** 24:1 33:5
**neither** 217:17
**net** 211:10,21
**new** 3:20,20 5:18 13:23 14:7,11 27:9 31:1 84:19 85:7,14 87:16 90:10 95:9,13

103:9 120:21 120:25 123:7 124:13 126:14 126:14 130:2 132:13,18 135:21 141:1 149:24,25,25 151:4 152:13 152:18,19 154:13 156:22 156:23 158:24 173:21,23 175:20 177:7 177:18 179:17 184:3 200:25 201:18,22 202:10,23 203:6 204:23 205:4,8,16 206:5 207:4,15 207:19 208:4 208:17,23,25
**newly** 102:9
**news** 90:14 94:5,6,12,19 113:25,25 114:8 117:18 119:8,11,14,19 120:3,6,18,24 121:2,4 124:13 130:19 131:3 132:9 141:12 141:12,20 159:9,10 161:9 161:12,23 163:6 181:2 198:19 199:3,4 203:23 204:10 207:25
**nine** 100:2
**ninth** 10:3 30:22 78:22 80:14 91:12 93:6 111:16,17 112:13 117:7 132:24 136:25 178:3 183:16 194:23
**noise** 187:18,20
**noisy** 212:5
**non** 127:12,14 127:25 128:1 188:25 189:21 190:3 214:1
**normal** 21:22 183:4
**northern** 1:2 2:2 6:16
**notating** 218:15 219:4
**note** 6:7 27:7 85:4 132:8 179:24 189:3 197:12
**noted** 85:5 107:25 166:19 215:25
**notice** 28:17
**noticing** 7:5
**noting** 166:15
**notwithstandi...** 8:22 41:16
**november** 207:15 208:3
**number** 5:10 9:4 19:12 20:1 21:4,6 26:23 28:19 47:14 67:15,16,18 71:7,25 72:8 115:11 174:4 183:10 218:15 219:4
**numbered** 79:18
**numbers** 67:17 86:14 140:8 201:6,7 210:25

**o**

**o** 3:5
**oath** 6:23 7:20 78:12 217:8
**obfuscated** 117:10
**object** 25:12 59:5,8 144:9
**objection** 8:23 15:16 17:17,24 18:11 19:6 20:9 24:10 25:1 26:19 27:20 28:6 30:10 31:10,18 33:10 34:4,12 35:1 38:16 40:7,24 42:16 43:23 44:6,21 45:3 50:23 52:19 53:17 56:3 57:23 58:12 59:4 61:13 64:6 70:11 71:18 72:16 73:3,23 74:15 75:15 76:10,22 77:12 78:1 79:11 80:8 86:19 87:11 89:23 90:21 92:14,21 98:12 99:10 103:17 104:17 105:3 108:24 109:5,24 110:19 112:6 115:3 117:24 118:7 120:11 126:11,21 140:16,23 142:5 143:12 145:22 146:8 147:12 148:14 149:10 151:22 158:5,18

160:21 161:14 162:16,22 166:12 170:18 176:6,14 177:20 178:21 181:20 182:5 182:24 185:9 187:5 188:5 189:2 194:8 197:2 198:12 200:8 202:12 202:17,25 203:25 204:1 205:18,25 212:19 213:20
**objections** 7:1 8:20 71:5 91:4 171:1
**objective** 211:10,12,13 211:16
**observe** 155:22
**observed** 93:7 131:11 134:16
**observer** 134:17
**observing** 78:21
**obviously** 41:2
**occur** 49:3 167:24 168:1,8 168:11
**occurred** 35:8 166:6,11
**occurs** 16:12 34:19 156:1 178:7
**offer** 18:1,6 26:17 27:12 28:10
**offered** 29:19 100:3,4,9 118:12
**offering** 27:8 40:9 128:3,10 128:16
**office** 218:11
**oh** 9:12
**okay** 9:24 18:4 20:25 25:24 32:11,25 33:8 36:24 37:18 39:9 42:4 44:12 53:3 60:6 62:12 66:14 67:7,15 68:17 74:5 84:6 88:8 107:13 131:7 134:3 145:10 147:19 148:21 162:12 168:24 190:7,12,15 197:8 202:3 210:12
**oliver** 4:19 6:21
**omission** 55:9
**omissions** 38:1 51:11 80:22 81:8 169:20,24
**omit** 55:6
**omitted** 38:5
**omitting** 58:10
**once** 62:19 72:14 73:1,16 74:12
**ones** 18:20 111:15 139:25 211:19
**ongoing** 19:23 19:24 22:9 26:25
**online** 114:23
**op** 5:18
**open** 84:25,25
**operating** 43:9 46:22 47:2,5 48:20 54:4 56:22 173:22 201:13 203:14 204:13 205:8,9
**operatives** 148:9 149:5
**opine** 29:7 84:8 86:16 93:22 98:20 99:8 102:7 121:24 122:20 132:14 141:21 174:14 180:13 196:18 198:8 200:2
**opined** 86:3,9 122:17
**opining** 35:11 202:22
**opinion** 14:8 20:23 26:16 28:4 33:1,19 33:25 41:3,17 80:14 93:14 95:20 96:1,10 96:13 98:8 101:23 112:1 112:14 116:5 116:10,15 117:8,20 127:19 128:3 128:10 129:4 129:19 130:18 130:21,24 149:8 157:5 163:5 165:7 166:3,8 167:24 168:9 178:4 179:7 180:8 183:16 184:19 184:23 185:6 194:23 195:1 199:13 200:5 200:13,18,25 202:11 204:20 212:14 213:12
**opinions** 12:18 15:15,23 16:2 16:20 18:1,6

24:8,15,17,21 26:7 27:1,7,13 27:16,19 28:1 28:9 109:12 117:6 128:16
**opportunity** 59:5
**order** 42:24 44:9 48:16 80:16 112:12 117:8 128:22 137:2 138:24 146:18 170:5 178:3 183:15 194:22
**original** 113:7 217:14 218:10 218:20,22
**originally** 103:10
**outcome** 6:25
**output** 186:6
**outrageous** 101:3
**outset** 80:24 81:9 82:5,11 82:25 83:5 84:1 169:6,21 169:25 171:6,7
**outside** 21:17 22:19,22 104:16 170:9 213:21
**overall** 187:3 187:19
**overbroad** 33:11 59:8 61:13 70:11 75:16 76:11 79:11 98:13 99:10 192:15
**own** 32:17 67:2 100:22

**p**

**p** 3:17
**p.m.** 2:20 9:18 101:18,21 144:17,20 185:23 186:1 209:10,13 215:7,10,20,25
**page** 5:10 8:11 10:18,19,20 11:1 13:12,13 16:25 17:2 50:8 51:5,8 60:1 66:24 72:8 79:18 84:5 101:9 106:17 139:9 162:11 163:4 180:17,24 192:23 198:23 209:16 210:4,7 210:8,9 218:15 219:4
**pages** 1:24 11:1 49:11 150:11 218:14,17,17 219:3,6,6
**paid** 114:18
**paper** 22:25 23:2,2,3,5,8,18 23:20,24
**papers** 191:7
**paragraph** 17:14 24:4 26:22 27:5 28:19,20 29:4 32:20 36:23 37:17,18 38:25 39:8 40:1 41:4 45:20 46:11,24 47:11,25 50:6 51:2,23 52:11 52:13,22 53:4 54:2 55:2,2,4,8 55:18,23 56:6 56:11,12,23 57:2,6,9,11 58:20 59:25 60:8,16 61:1 61:17 62:5,14 62:16,21 63:1 63:11,19 64:12 64:19 65:3,11 65:13 66:1,6 66:16,17 67:2 67:19,25 68:21 68:22 69:2,4,5 69:13,15,17,18 69:20,21,23 70:3,6,19 74:4 74:8 78:14 79:9,24 80:6 80:19 81:11 82:14,16 87:24 88:4 89:15 92:8,19 97:6,7 101:10 102:15 102:16 107:15 107:18 108:20 114:14 115:7 131:10,11,20 132:17 134:5 134:10 137:12 138:1 145:6,11 145:16 147:22 162:8,13,20 163:14 166:1 169:3,4 179:24 180:11,24 193:2,18,21 196:18,25 197:17,18,23 198:11,16 199:20,22,23 200:2 201:6,25 202:23
**paragraphs** 27:7 29:12 39:23 50:13 59:7 79:18

**parakilas** 141:25 142:9 142:13
**pardon** 199:8
**paring** 98:25
**parsable** 174:10
**parse** 79:25
**part** 10:2 22:15 32:16 33:14 34:17 35:10,13 46:11,15 50:9 51:25 62:9 67:3 86:24 87:13 91:15 104:19 108:8 108:20 123:10 128:23 139:19 143:23 163:16 165:8 166:18 168:1,3,10,12 168:25 174:2 176:16 181:5 182:21 187:8,9 193:21 196:10 200:6,11,11,16 211:16
**participants** 46:12 119:10 120:5 132:1 136:1,8,24 148:6 149:2 163:20 164:2,7 164:12,17,22 165:2
**particular** 20:23 36:8,15 38:24 40:1 44:24 50:11 52:22 54:2 71:9 72:1,6,7 111:1 113:11 120:13 125:23 126:8 128:25 169:14 188:10 197:10 201:5 206:2
**particularly** 147:1 211:22
**parties** 6:11 46:1 47:15 53:15,22 55:20 56:1 57:21 58:5,21 60:13 60:21 61:11 88:16,23 89:4 91:21 92:1 97:23
**parts** 31:22 75:23 178:10 178:12
**party** 6:24 62:7 62:20 70:9 71:3,16 72:15 73:2,17 74:13 217:19
**party's** 89:18
**passing** 131:17 135:7
**patent** 154:23
**path** 173:22
**pause** 215:8
**pausing** 39:24
**paying** 141:18 195:2
**pdf** 218:12 219:1
**peer** 130:8,8,17 130:23 209:21 211:24
**peg** 71:9 72:1
**penalization** 211:15
**penalized** 211:12
**penalty** 216:1,4 218:16 219:5
**pending** 100:19
**penultimate** 28:20
**people** 111:8 112:22 127:13 134:21 155:20 156:8,19 157:10,13,20 160:3 199:25 200:14 201:4 202:5
**people's** 156:4 159:24
**percentage** 82:15,20 83:3 83:15,16,23 176:24
**perceptions** 104:21
**perfectly** 103:11
**performed** 20:15 21:3,11 21:17 23:10,13
**period** 9:8 29:18,24 30:5 35:18 51:12 80:24 81:9 82:6,11,25 83:5 84:1 101:25 142:3 142:25 169:7 169:21 170:1 170:10 171:6,8 175:3,5,23 176:12,25 212:16 213:14 214:4,21 218:18 219:7
**perjury** 216:1,4 218:17 219:6
**permission** 107:4 108:8 109:19 111:19 113:6,8 134:7
**permitted** 163:15

**person** 150:14 159:4,12
**personal** 132:25 133:18 134:11
**pertains** 217:13
**peruse** 115:25
**ph.d.** 1:14 2:17 5:4,9 6:13 8:1 216:3,18 218:5
**phenomenon** 125:20
**phones** 6:9
**phrase** 33:6 43:4 81:13 197:8 206:2,5 206:13,16,18 206:19,22
**phrasing** 86:7
**physics** 174:23
**pick** 6:8 188:8 206:2 214:13
**pictures** 150:11
**piece** 95:9 197:21 198:1,6
**pin** 72:6 75:5
**piping** 25:18
**place** 6:11 137:4 149:25 216:8 217:6
**places** 26:22,24 27:6 79:22 108:6
**plaintiff** 3:3,14 49:9
**plaintiffs** 7:12 8:19 16:3 19:1 26:17 38:14,21 40:22 41:23 42:1,6,13 43:20 44:3,14 44:20 48:14 49:21 50:22 51:20 52:12 78:18 80:12,20 82:10,13 83:4 83:25 84:10 85:10 86:18 111:16 112:1 112:10 128:20 128:23 129:11 129:17 138:22 139:17 140:20 143:21 144:5 144:22 145:8 145:13,18 146:15 147:8 147:22 167:12 169:6,22 171:13,16,23 172:16 178:1 178:11 181:11 183:13 185:12 192:12 194:5 194:20 195:4,7 195:14 197:18 197:23
**plan** 27:12
**platform** 95:1 131:16 135:6 164:24 165:5
**play** 75:4 79:2
**please** 6:7,9 7:2 7:19 10:19 26:3 32:3 42:10 52:4 60:1,19 68:9 68:16 82:2 100:20 116:19 123:22,25 144:15 148:22 162:18 166:7 170:20 176:9 180:22 181:22 185:21 197:22 215:5
**plenty** 74:24
**plug** 167:6
**point** 26:21 31:20 49:8 72:9 77:15 81:20 82:18 85:6 92:25 95:8 117:18 121:8 126:13 143:20,22 153:13 154:15 154:19 155:4,6 155:14,19 159:22 160:12 165:18 166:19 174:3,11 181:11 187:16 187:22 191:4 191:16 214:5
**pointed** 115:14 182:15
**pointing** 207:10
**points** 75:8 79:24 80:16 82:8 165:24 172:6 180:6
**policies** 112:24 131:16 134:23 135:7
**political** 132:22 137:20,23 138:8,13,17,19 148:9 149:4
**politically** 138:10
**pool** 114:21
**poor's** 211:24
**portion** 172:15 194:6
**position** 111:9 185:1
**possibility** 124:8 125:19 201:19
**possible** 82:19 82:22 94:22 189:7,8

**possibly** 99:1
**post** 84:17 87:16 90:9 121:15 122:5,9 130:1 131:2,12 132:9 141:15 159:14 163:6 184:4 198:20 199:4
**potential** 64:25 65:15 66:8,19 68:19 142:21 143:8
**potentially** 103:10 199:4
**powers** 77:17
**practical** 184:5
**practices** 62:7 70:9 71:3,16 85:8
**precise** 21:6 50:15 86:6 128:7 153:20 156:11 176:4 188:15
**precisely** 198:24
**precision** 154:9 155:19 157:4 173:2
**predated** 183:10
**predicate** 168:5 178:23,25
**predictable** 187:23,25
**predicting** 212:1
**prediction** 211:20,22
**prefatory** 204:1
**prefer** 153:3
**preliminary** 163:5 199:14
**premise** 182:8 210:23 211:5 212:8
**premised** 192:18
**preparation** 10:1
**prepare** 9:2
**prepared** 77:4
**preparing** 14:19,21 24:24 26:10 76:3 208:8
**present** 4:18 7:3 9:19,22 33:7 36:4,10 36:13 52:23 151:16
**presented** 12:23
**presently** 27:12 93:17
**president** 158:25
**presidential** 106:25 109:16 138:15,20 193:15
**presumably** 105:22
**pretty** 23:25
**prevented** 185:14
**previous** 83:7,8 86:12 94:5
**previously** 37:23 84:18 116:2 130:5 131:4,23
**price** 29:17,23 30:5 31:4,8,16 32:22 33:3,15 33:17,21 34:2 34:10,14,14,18 34:23,24 35:8 35:11,16 36:5 36:9 37:5,11 37:25 38:4,10 38:12,19 40:4 40:14,16 43:6 43:8,17 44:17 45:7 81:1,3 84:8 86:3,9,15 86:17 87:3,9 90:6,19 91:2 91:18,19 92:2 92:12,19 93:18 93:23,25 94:10 95:17,18 96:9 96:12 97:21 98:21 99:9 102:3 103:1,16 104:15,25 105:22 107:9 107:19 108:15 108:16,22 109:22 110:16 111:12 114:12 115:1,5,20 116:12 117:22 118:5,17,21 119:1,4,6,13,18 119:24 120:1 120:10,14,17 120:21 121:3 121:21 122:19 123:6 125:2,8 125:19 126:6 126:14,20 130:5,13,16,22 139:15,18,21 140:2 143:23 144:6 145:20 146:1,7 147:3 147:10 148:12 149:6 151:6,19 151:20 152:4 152:10,12,17 152:23 153:5,6 154:3 157:2

160:2 162:24 163:8 165:7,17 165:22,25 166:2,16 170:2 176:12,16,25 178:7,16 179:11,15,21 180:3,5,20 181:9,18 182:3 182:18 184:11 184:15,20 185:8,18,19 186:5,9,15,19 187:1,17 189:17 194:3,6 198:3 199:16 200:7,17 206:8
**priced** 165:16
**prices** 102:8 104:11 111:3 125:2,10,11 130:8,23 149:17,22,23 156:18,20
**pricing** 165:9 165:13,18 168:15
**primary** 114:17
**principle** 189:7
**print** 148:19
**prior** 34:24 35:4,12 46:7 46:22 86:17 90:6,19 91:2,6 91:19 92:2,19 93:22 96:4 140:14,19 141:22 181:15 181:25 182:22 183:6 190:20 214:1 217:7
**privacy** 164:19 200:1,4,15,20 201:4,9,17 202:6,9 203:19 203:23 204:9 204:22 205:7 205:14 206:25 213:2
**private** 6:8
**privileged** 19:8
**probably** 9:18 21:8 141:20 157:12 178:4
**problem** 12:15
**problematic** 175:21
**problems** 172:2 175:12,16 201:16 205:7
**procedure** 218:19,21
**proceed** 7:21 8:21
**proceeding** 7:1 130:15
**proceedings** 215:8 217:5,7 217:9,15
**process** 12:7,10 14:19,20 15:2 52:6 116:3
**product** 15:12
**professor** 131:14,15 132:22 135:6
**proffered** 183:11
**profiles** 114:20 148:8 149:4
**profitability** 45:25 47:15 53:14,20 55:19 55:25 57:20 58:5,20 60:13 60:21 61:11 88:15,22 89:3 89:9,18 91:20 92:1,25 93:8 97:22 163:22 203:20 204:19 204:23 205:15 207:1
**programming** 62:18 72:13,25 73:16 74:12,21 75:1 98:24
**promised** 135:23 203:17 204:15
**proof** 128:18 128:20
**proper** 189:19
**propose** 29:11
**proposed** 83:3
**proposing** 29:22 31:6,14 35:15
**proposition** 72:7
**protect** 5:16 148:3,25 150:23
**provide** 15:13 15:21 174:12
**provided** 10:14 15:24 24:21 26:6 31:1 65:4 68:1 115:23 175:14 195:7 218:19 219:8
**provides** 53:4 60:9 67:15,18 116:7
**providing** 10:8 62:1 138:10
**provisional** 20:18 27:8 29:19,21 31:20 31:21,23 32:12 33:13 38:8 40:9,11 86:21 95:24 177:2,13 180:12,18

194:18 198:9 199:11
**provisionally** 40:15 44:16 93:11 195:11 196:11 215:23
**psychological** 107:1 109:16 114:20
**public** 3:14 102:9 106:10 106:12,14,15 107:10,20 108:1 110:9,15 110:22 113:20 113:21 115:24 118:13 120:17 125:5 126:25 127:7,14,19,25 128:1,2 137:7 151:11,15,18 152:4 153:4 157:15 158:14 159:7 160:10 161:3 175:13 208:11,23,25
**publication** 106:11 108:23 112:4,22 115:20 116:13 117:23 121:22 148:12 149:7 150:6 151:12 161:5,9 209:4
**publicize** 159:6
**publicly** 102:3 118:20 125:20 161:22,24 203:16 204:15
**published** 22:25 85:7 94:14 106:3,9 106:14 108:1,3 110:17,23 112:21 113:22 133:6 144:24 148:11 151:14 160:16,17 161:7,13,23,25 162:1 177:7,18 208:10,14,16 208:17,22,25
**publishes** 84:17 161:10
**punished** 136:14
**punishment** 175:18
**purchased** 175:24 180:14
**purchasing** 132:20
**purely** 174:22
**purloined** 137:19
**purpose** 20:12 138:19 211:9
**purposes** 16:11 20:12,25 24:12 24:24 26:9 30:13 129:3,18 137:20,23,25 138:7,8,13,17 139:3 153:21 156:9
**pursue** 139:18 143:22 144:6
**pursuing** 181:12
**put** 19:4 112:8 112:15 149:20 156:14 157:22 157:22 180:19 207:2
**putative** 119:11 120:6
**putting** 111:25 130:21

**q**

**qualification** 13:21
**qualifications** 27:14
**qualified** 128:21 129:12 167:13 178:2
**qualifier** 170:3
**qualifies** 18:6
**quality** 148:19
**quarter** 174:20 174:21,25,25
**question** 8:14 8:15,17,21,22 15:3 17:19 19:20 20:13,17 21:1,25 22:10 22:21 24:13 25:2,24 26:1,2 26:13 28:12 30:14 32:3,10 32:11,13 36:16 37:20 39:3,19 39:25 43:25 44:10 50:25 52:5,7,9,15 53:20 55:22 58:1 60:18 66:12 67:3,5 67:22 68:10,13 68:18 70:13 72:3,18 74:5 76:15 79:3,4 79:21 80:2 82:1 83:7,8,20 83:21,22 85:20 85:24 86:25 88:18 90:2 94:1 97:24 98:4,6 99:13 100:8,14,19,19 102:11 103:21 105:5,6 106:22 107:14 108:19

109:4,9,10,14 110:4 111:15 113:14,17,23 114:4 115:12 116:15,23 118:2 122:15 122:20 123:2 124:1 129:15 129:24 132:22 133:20 139:20 142:20 144:10 145:10,12 147:6 148:22 151:5 153:9,10 155:24 156:13 158:10,20 159:20 160:24 162:18 166:7 168:3 169:1 170:22 171:11 172:12 176:9 177:11 178:23 178:23,25 179:2,3,4 180:9 196:22 197:22 198:7 200:11 201:18 206:10,11 209:24 210:20 210:23 211:5 212:23 213:15 214:1,1
**questioning** 100:6
**questions** 25:5 64:22 78:8 79:16 100:2 101:4,6 106:20 114:13 141:19 174:4 215:11 215:12
**quick** 45:9 88:18 144:14 185:20
**quickly** 102:9 102:10,20 103:15
**quite** 22:14 39:24 48:1 94:4
**quiz** 78:5
**quote** 133:9,11 197:4 201:24 202:4 203:8 204:22,23 205:14,15 207:8
**quoted** 59:3 66:6,16 99:17 102:14 115:17 133:16 134:14 134:19 202:23 206:23
**quotes** 94:24
**quoting** 58:3 133:8 206:23

**r**

**r&s** 219:1,9
**rain** 156:2 157:23
**rained** 126:7,10 126:18
**rains** 125:23
**raise** 115:11
**range** 20:2,3 115:22 141:13
**rapid** 103:5
**rapidly** 105:22 111:3 149:6,16 149:23 152:17
**rate** 11:7,8,12 11:13,15,23
**rates** 11:16
**rather** 104:9 111:21 152:10 211:25
**raw** 166:16
**react** 104:25 113:12
**reaction** 181:3 184:12,15 203:23 204:10
**reactions** 162:24
**read** 9:4 12:14 26:1,2,4 39:10 39:13 46:8,10 46:10 47:20 51:1,7,24 52:2 52:5,7,10,21 55:16 64:15 65:18 66:11 67:7,8,14 69:5 70:13,15 71:8 72:1 73:5 74:17 75:17,25 76:12,24 77:14 77:19 78:3,9 79:13,15,17,20 81:14 88:21 99:17 106:19 107:11,15,17 108:5,8,12,20 110:8,11 111:10 115:8 115:10 119:22 122:6 135:16 138:1 141:20 145:11 148:17 168:3 179:3 181:6 183:9,9 183:12,14 197:4 208:9,12 216:4
**reading** 69:25 70:2,20 73:9 78:15 79:10 133:21 141:11 183:13 191:7 218:24 219:9
**reality** 201:22
**really** 79:21 80:3 94:4

101:12 104:19 105:13 107:21 112:15 153:19 154:21,23 156:11 161:20 175:9 210:24
**realm** 95:7
**reason** 11:4 54:5,7 56:11 56:17 57:25 61:18 62:22 63:8,16 65:24 68:21,25 69:10 94:8 102:5 111:11 113:11 113:24 120:13 146:23 165:11 179:23 181:12 189:10 210:19 211:8 212:11
**reasonable** 103:11 105:5 134:17
**reasonableness** 95:8
**reasonably** 14:7 92:5
**reasons** 27:25 50:2 52:15 53:4 55:7,11 56:22 57:6 60:9,10,15,23 61:4,25 62:1 62:10 63:25 65:5,12,21 66:3,5,15 67:16,18 68:1 68:25 200:22 203:6 212:13
**recall** 10:4 23:7 26:14 28:2 49:15,17,19 50:15 140:6 141:5,6,8,11,17 141:18 143:15 143:17,18 147:14 169:10 184:18 201:7
**recalled** 141:7
**receive** 15:10
**receiving** 11:20
**recent** 117:8 128:21 137:2 139:1 195:6
**recently** 22:25 71:8 72:1
**recess** 45:12 59:19 101:19 144:18 185:24 209:11
**recognize** 10:16,18,23,25 52:16 147:20
**recollection** 10:5 39:12,16 140:9 145:8
**record** 6:5,11 7:5 8:16 25:12 26:4 45:9,11 45:14 47:12 59:16,18,21 101:18,21 144:15,17,20 185:22 186:1 209:8,10,13 215:4,7,10,18 215:19 217:8 217:11
**recorded** 1:13 2:17 6:12
**recording** 6:10
**records** 20:6
**recount** 199:23
**recover** 194:6
**redirect** 118:9
**reduce** 163:22 178:15
**reduced** 164:13
**reduction** 33:16 34:18,22 35:7 179:21
**reevaluate** 31:2
**refer** 21:1 32:14,19 48:13 124:17 171:20 189:21,23 190:1 191:15 192:14 202:18
**reference** 34:2 34:7 35:3 181:7 214:2
**referenced** 12:1 218:6
**referred** 28:22 54:22 123:16 171:11 199:7
**referring** 32:6 36:22 56:5 57:1 58:15 60:25 61:9,15 61:17 99:23 121:14 138:14 138:14,18,19 142:7 162:20 162:23 163:10 170:24 190:2 196:24 213:16
**refers** 39:22 66:25 85:3 191:8,12 195:1
**refine** 27:1
**reflect** 102:9 104:15 125:12 152:4,7,9,18 168:15
**reflected** 14:12 85:22 148:24 152:22 153:4 177:3,14
**reflection** 121:4
**reflects** 102:3 108:16
**refresh** 33:1 39:16

**refreshes** 39:11 145:7
**refreshing** 33:6
**regard** 20:21 20:22 78:7 95:8
**regarding** 115:18 117:4 136:15 141:25 170:16 174:17
**regards** 53:10
**region** 125:22
**regression** 186:13 211:13
**regressors** 211:23 212:6
**regulate** 5:19 208:5
**regulation** 63:20,22 77:24 164:4 175:20
**regulatory** 43:10 47:6 48:21 167:3,4 172:6
**reiterate** 31:20 76:14 143:14
**relate** 192:11 194:19 195:25 196:2,12
**related** 6:24 20:19 53:9 67:13 111:15 111:19 137:20 138:11 139:15 152:23 156:13 172:3 173:20 178:10 181:2 181:10 188:21 188:22 190:9 203:7 209:17 211:15 213:7
**relates** 1:7 2:7 146:15 190:23 192:21 193:11 195:13
**relating** 28:4
**relative** 102:20 132:10 217:18
**relatively** 102:8 102:10,19
**release** 75:2 85:16
**released** 74:25 85:13 137:4 141:23 149:25 181:2 188:9 189:5,13 218:22
**releases** 90:14 159:8
**relevance** 206:7
**relevant** 36:18 37:1,3,4,7,9,10 37:12,24 38:2 38:3 40:21 41:23 42:4,9 42:11,18,20 43:1,4,14,19,24 44:2,18 45:5 45:17,22 46:6 46:16,23,25 47:4,9,10,21 48:5,10,24 49:9,10,21 50:16,21 52:17 53:7 58:4,10 58:14,19 69:16 80:23 81:9 82:5,10,12,25 83:4,25 87:8 87:13,18 88:10 88:12 89:2,6 89:15,22 90:1 90:5,18 91:1,6 92:9 93:15,19 93:21 95:21 96:10,13 97:20 98:9,21 99:7 150:1 151:4 152:18,20 154:13,18 155:9,17 156:24 157:7 157:13 158:3 158:15 159:1 159:17 166:23 167:9,14 169:5 169:18,20,25 170:9,24 171:3 171:5,7,14,17 171:21,25 172:14,15,20 172:23 173:5,6 173:12 174:1,2 174:6,8,14 175:10 181:14 181:24 182:11 182:12,14,16 182:21 183:6 185:14 188:21 188:22 189:16 200:25 201:19 202:10,24 203:7 204:23 205:16 206:5 207:5 210:19
**reliance** 50:9
**relied** 15:14,22 24:6 50:20
**rely** 14:23
**remaining** 44:15
**remediating** 175:16 213:1 214:13
**remediation** 205:6
**remedying** 201:16
**remember** 9:17 23:1,3 67:22 70:18,24 101:2 143:25 169:8,9 169:11

**remind** 173:7
**remote** 125:22
**remotely** 7:3
**removal** 36:5,6 45:7
**removed** 30:8 31:8,17 33:3 33:23 36:3,6 36:15 44:18 81:1 84:8 86:3 86:9,15 93:12 170:2 177:4,15 178:19 179:10 179:14 181:19 182:4 198:8
**render** 64:11 64:18
**rendered** 42:6 42:13 43:21 44:4 57:7,19 59:2
**renew** 131:9
**repeat** 17:18 31:12 43:25 60:18 68:17 79:4 93:5 148:21 162:17 166:7 176:8 181:22
**repeated** 25:25
**repeating** 161:18
**repetition** 104:11,25 154:2,12,17 155:8,11,16
**rephrase** 8:18 64:9 66:13 82:1 98:16 204:6
**report** 5:11 9:25 10:14,17 10:24 11:3,5 11:21 12:3,5 12:11,16,18,22 13:3,5,9,21 14:20 15:1,6,9 16:11,13,17,20 17:14 18:1,7 18:18 19:4 21:13,15,17 24:1,4,9,16,17 24:22,25 26:7 26:10,16 27:15 27:18,19 28:1 28:1,5,9,14,15 30:17,20 31:23 31:25 32:1,5,8 32:14,20 34:17 35:22 36:19,21 41:25 45:18,20 48:6 49:24 51:1 58:3 73:10,12 74:2 77:2 78:17 80:19 84:5 87:6 88:1,4 99:16,19 100:22 102:13 102:16 106:7 117:23 121:9 128:13,14,16 130:6 131:7 134:10 136:15 137:12 139:9 142:23 143:8 162:7,13 166:2 169:3 173:23 176:16 177:3 177:14 179:24 180:11,13,19 193:2 196:18 197:1,17 199:19 204:12 206:20 207:2,8 208:8 209:16 210:9,16
**reported** 1:21 103:14 104:1 104:13 113:16 118:5 132:19 151:10 159:9 160:14,19 161:4,12
**reporter** 2:21 7:19,22 8:13 26:1 215:21 217:4
**reporter's** 217:1
**reporting** 159:10
**reports** 12:17 12:21,25 13:18 13:22 14:2,4,9 14:12,16,21,24 14:25 133:17 209:20
**represented** 18:23
**representing** 6:21
**republican** 107:6
**reputational** 43:11 47:7 48:21 63:13 76:20 77:11 99:1 167:3,4 172:6
**request** 131:9
**requested** 217:16 219:1,9 219:10
**required** 218:20
**requirements** 47:6
**requires** 155:5
**requiring** 113:1 135:1,14
**research** 107:2 109:17
**researchers** 114:18

**reserve** 26:25 130:11 187:14
**respect** 14:3,4 23:24 31:22 42:25 44:15 65:1 69:3 75:20 82:8 83:17,18 92:25 94:1,5 126:4 167:11 173:16 192:3,4 194:25 198:22,25 213:14
**respond** 27:16 94:17 108:12 108:15,16 114:5 115:5 151:8
**responded** 114:7
**responding** 130:19
**responds** 113:24 120:21 123:7 130:5
**response** 27:9 28:12 95:16 109:8 114:8 125:20 147:3 182:18 185:5 194:3 213:25
**responses** 126:14 139:2
**responsive** 123:23
**rest** 94:7 107:11 110:7 110:12 195:14
**restate** 82:2 200:10 204:6
**restating** 105:9
**result** 34:19 35:8 36:3 86:4 86:10,15 116:2 124:15 144:8 164:23 165:3 172:2 197:19 197:24 212:4
**results** 174:20 174:24 175:1 205:1
**retained** 18:25 133:1
**retention** 191:9 191:12,13,18 192:6 214:9
**retirement** 3:15
**retracting** 180:8
**return** 166:15 166:21 176:23 178:6 179:20 186:4,8,18 188:4,11,25 189:1,15,18 199:9,10 200:23 218:17 219:6
**returns** 140:2 140:11 168:15 187:24 210:14
**reveal** 45:5 121:19
**revealed** 40:18 90:14,19 91:2 91:6,11,19,24 92:11,23 93:2 93:3,21 96:14 97:8 98:9 99:2 122:17 128:5 128:12,24 129:5,20 131:2 132:15 140:21 141:9,22 142:2 142:24 143:10 167:24 168:9 170:14 172:16 173:6 174:15 177:7,17 178:14 179:8 181:15,25 182:21 183:6 196:15 205:16
**revealing** 123:2 133:6 167:18
**revelation** 40:12 43:14
**revelations** 117:16,16,17 119:6 120:1 129:14,25 130:3 172:3 179:22
**revenue** 48:21 62:6 70:8 71:2 71:15 172:5 173:22 200:1,4 200:16,21 201:2,14,15 202:7,10 214:14
**revenues** 43:10 46:22 47:5 54:15 56:10 98:25 164:14 167:3,6 175:17 201:17
**review** 9:24 10:2 49:13 59:6 208:7,13 217:15 218:8 218:10,13 219:2
**reviewed** 11:1 16:13 106:6 135:25 136:4 136:23 142:3 142:25 143:4 143:10
**rgrdlaw.com** 3:11,12,13
**rick** 113:3
**rid** 187:18
**right** 25:7 26:25 32:13

56:15 64:5,21 67:10,17 70:20 74:21 79:10 83:13 86:5 87:4 101:8,15 116:20 130:11 137:5,5 176:5 182:8 186:12 187:14,15 191:25 193:22 195:6
**rings** 145:2
**rise** 92:5
**risen** 205:3
**risk** 42:24 48:12 63:12,20 63:22 67:19 76:20 77:10,23 117:5 146:24 166:25 173:14 175:7,20
**risks** 67:13 165:9,14,15,20 167:15
**rivals** 107:6
**road** 154:3
**robbins** 3:4 7:12,14
**robinson** 3:17
**rog** 195:6
**rogs** 170:7 178:5
**role** 81:16,22 194:24
**root** 211:14 212:2
**rose** 184:20
**routinely** 133:7
**rpr** 1:22 217:25
**rub** 103:7
**rudman** 3:4 7:12
**rules** 8:10 136:12 219:8
**run** 22:17 107:5 109:19

**s**

**s&p** 211:24
**safe** 147:25
**sake** 196:14,17
**sale** 191:12
**san** 1:3,15 2:3 3:9 4:8 6:1,17 6:20
**sandberg** 4:3
**satisfy** 12:3
**saying** 37:19 70:19 81:21 106:13 113:4 133:16 134:14 134:19 146:5 150:14,24,25 151:3 153:3 155:25 161:19 161:22 179:23 193:8 200:5,13 215:3
**says** 27:5 33:24 42:1 55:14 57:12 74:10 87:6 100:10 106:18,24 133:25 134:5 134:19 135:11 135:20 136:12 150:19,22 154:15,22 155:7,14 159:15 160:12 170:11 198:2 204:12 210:5 210:12
**schedule** 218:10
**school** 17:5,9
**scienter** 51:11 190:23,24 192:22
**scl** 131:17 135:7
**scope** 91:10,14 93:5,8 95:10 98:3,23 122:3 139:5 144:3 146:16 153:23 167:2 171:25 172:10 173:14 178:9 192:12 199:3 201:22 213:21
**screen** 80:10
**sealed** 218:20
**second** 42:24 68:15 85:6 86:24 114:14 174:20,25
**section** 29:13 49:19,25 50:7 50:11 51:10,14 51:25 53:13
**sections** 50:15
**securities** 1:5 2:5 5:13 6:15 13:6,19 14:5 18:9,17 19:4 19:18 20:8 21:3 218:4
**security** 164:19 203:19,22 204:9,21 205:14 206:25
**see** 26:23 39:11 46:4 51:9,13 51:14,18 55:10 55:14,15 65:2 68:2,24 69:6 81:4,5 91:16 91:17 94:10,10 122:11,14 124:20 135:10 135:11 159:25 189:10 193:16
**seek** 142:15 195:10

**seeks** 186:25
**seem** 174:4
**seemed** 64:16
**seems** 208:19
**sell** 156:20
**selling** 138:5
**sells** 191:24
**semi** 101:24 102:2,7 104:14 104:24 105:19 107:7,16 108:11,22 109:22 111:2 113:18 114:9 114:24 115:4 115:21 118:19 119:1 120:16 120:20 123:6 125:8,10 149:9 149:13,14,21 150:6 152:3,16 152:16 153:5,7 154:4,16 155:7 155:15 157:5 157:16,18 158:16 159:17
**sense** 88:12 95:9 104:18 112:16 154:5,7 155:5 182:12 182:15 183:2 186:21 188:13 212:1
**sensitive** 6:8
**sentence** 30:23 36:25 37:6,13 37:21 39:10,22 39:25 42:10 46:9,10 81:14 108:5 111:10 115:7 127:9 132:6 135:17 137:12 146:24 163:8
**separate** 46:24 89:6,22 129:2 129:17
**separately** 130:22
**september** 1:16 2:20 6:1,5 217:22 218:3
**series** 157:11 157:19,21
**served** 18:10,17 19:5,15,18,20
**services** 138:11 202:5
**set** 29:12 38:2 52:13 55:3 60:25 68:4 95:13 97:3 108:14 123:14 124:4,11,14,16 138:23 141:18 155:1 156:16 217:6
**sets** 105:8,12 105:21 107:23 108:17 110:25 114:1,3 115:6 115:10 118:15 118:16 120:23 123:8,12,17,21 124:10,24 125:1,6 126:4 127:1,5,22
**several** 13:21 13:23 130:15 150:10 198:5
**shaking** 118:11
**share** 31:3 32:22 33:15,16 34:2,10,14,18 34:22 35:8 36:5,9 37:5,11 38:4 40:14,16 43:6,7,16 45:7 81:1,3 84:8 86:2,8,15 87:3 91:18 95:18 152:17 170:2 175:24 176:16 176:25 178:7 179:21 180:14 181:9 185:18 206:8
**sheryl** 4:3
**shoals** 13:5 14:5,25 18:21 21:7 24:1
**short** 9:8
**shorthand** 2:21 88:11 217:3,9
**shoulder** 62:18 72:13,25 73:15 74:11
**show** 78:5 111:2
**showed** 167:15 171:25
**shows** 32:12 40:11,16 84:7 86:2,8 120:8
**shut** 62:19 72:14 73:1,17 74:13
**side** 139:2,7
**sign** 12:3,8,11 12:13,17,20,21 113:8 218:16 219:5
**signature** 10:20 11:1 217:23 218:22,24,24 219:9
**signed** 10:24 13:3 14:1,12 16:14
**significance** 206:7
**significant** 140:11 184:21 204:18

**significantly** 203:19 204:22 205:15 207:1
**signing** 28:14
**similar** 95:4
**simply** 212:5
**sine** 211:17
**sit** 43:4 49:13 75:24
**site** 72:6
**sitting** 14:14 49:2 70:5,20 70:23 71:13 72:11,22 73:10 75:9,12 76:3 76:17 77:7,21 95:24 138:2,11 138:25
**situation** 47:24 81:17 102:22 102:24,25 136:15 214:13
**situations** 102:21 103:3
**six** 68:17
**slowdown** 201:3,15
**small** 10:2 180:5
**sold** 175:25 180:15
**solutions** 6:22 218:7
**somebody** 127:24 154:22
**someone's** 124:18
**soon** 98:5 100:13 148:12 161:5,11 209:3
**sorry** 17:18,19 28:24 36:9 42:9 46:19 49:18 51:6 53:18 64:15 68:6,15 69:25 72:17 81:19,23 81:24 83:6 86:6 88:21 90:22 96:8,25 101:10 106:12 110:6 128:6 133:11 136:4 138:17 145:10 153:9 162:9 171:9 176:4 177:11 180:1 184:14 190:7 193:17,22 202:3 204:6 208:15 210:6,7
**sort** 71:6,24 78:8 95:6,25 95:25 127:13 127:16
**sorts** 188:17
**sound** 135:20
**sounded** 85:20
**sounds** 29:6 174:11 192:15
**source** 116:7 195:12
**sources** 137:8
**spanning** 107:2 109:17
**speak** 8:12 75:7 87:20 128:13 198:23
**speaking** 30:25 35:5 36:11 42:19 62:13 81:12 127:16 141:14 151:2 166:16
**speaks** 194:24
**specific** 15:19 47:20 50:13 51:2 94:25 110:11 130:24 140:8 145:1 150:1 152:21 156:24 157:24 158:2,3 174:1 174:6 186:10 186:19,23 187:1,17 188:3 201:6 203:8 206:5 212:22
**specifically** 8:20 47:1 51:22 53:5 56:14 58:15 61:25 62:13 65:1,19 74:20 81:20 113:6 116:6,14 129:16 171:10 186:21 192:22 198:15 199:5 199:18 201:10 201:14
**specifics** 140:6 141:17 143:15
**speculation** 26:20 212:20
**spend** 175:11 204:9
**spending** 164:19 165:4
**spent** 158:11
**spoken** 78:22
**spokesman** 113:4
**spokesperson** 150:13
**sports** 157:10 157:22
**squared** 211:15 212:2
**squirrely** 93:1
**stage** 139:23
**stand** 27:13 71:21

**standard** 210:17,21 211:24 212:10
**start** 8:15 19:17 21:14,14 37:19 68:11 82:16 106:20 166:14 168:12 193:24
**started** 9:16 11:18 132:21 150:18
**starting** 101:9
**starts** 66:23
**state** 7:2,4 139:11 216:12 217:4 218:9,12
**stated** 80:13 91:12 110:8,13 110:22 128:16 133:9
**statement** 14:8 57:19 60:15,23 60:24,25 61:4 61:5,8,9,10,19 61:24 62:2,3 62:11,22 63:6 63:8,15,16,24 63:25 64:5,14 64:21 65:1,5 65:13,22,24,25 77:9 88:19 89:2 90:16 99:20,23 113:7 114:25 115:2 115:14,17 117:12 118:13 146:11,19,21 147:2,7,9 150:13,17 154:12 155:12 156:1 159:8 165:13 181:7,9 193:5 200:18 201:2 202:8,22 204:1,21 205:11,13 207:4
**statements** 12:22,23 13:4 13:8,17 14:16 16:16 24:17 38:14,21 40:5 41:18 42:7,14 42:22,24 43:1 47:23 48:11,12 50:2 51:11,15 51:19 52:12 53:6,9,11,25 54:5,7,13,22 55:3 56:17,23 57:6,15 64:24 64:25 65:15 66:6,8,16,18,20 66:25 67:10,19 67:24 68:1,4 69:8,8,10 74:8 78:25 80:22 81:7 90:18 91:1 97:3 98:10 99:15 110:14,24 111:8 112:3 113:19 114:10 115:11,12 117:5,12 118:13 122:2 128:7 130:19 131:25 135:9 146:23,24 156:8 161:6 166:25,25 168:17 169:19 169:24 173:13 173:14 183:24 185:17,18 201:11 204:25 205:5 214:23
**states** 1:1 2:1 6:16
**statistical** 211:7 212:1
**statistically** 140:10 184:20
**statistics** 17:16 17:23 18:5
**stem** 214:24
**steps** 203:16 204:15
**stick** 132:6
**stipulation** 218:21
**stock** 29:17,23 30:4 31:8,16 33:3,21 34:24 35:11,16 38:10 38:12,19 40:3 44:17 84:9 86:4,10,17 96:9,12 97:21 98:21 99:9 101:24 102:3,8 103:16 104:11 104:15,25 105:17,22 107:9,19 108:21 109:21 110:16 111:3 111:12 112:2 113:17,24 114:4,7,12 115:1,5,19 116:12 117:22 118:5,17,21 119:1,6,13,18 120:1,9,14,17 120:21 121:3 121:21 122:19 123:6 125:8,10 125:11 126:2,6 126:16,17,20 130:5,22,23 139:16,18,21 140:2 143:23 144:6 145:20 146:1,7 147:10

148:12 149:6,8 149:17,23 151:6,19,20 152:4 153:4,6 154:3,21 157:6 157:17 158:15 161:4,11 162:24 163:8 165:7,21 166:2 166:4,9,16 176:12 178:16 179:11,15 180:20 181:15 181:18,25 182:3 184:11 184:15,20 185:8 186:4,9 186:15,18 187:1,17 189:17 194:3,6 198:3 199:16 200:7,16 209:3
**stop** 131:21
**stopping** 95:6
**stories** 94:14 130:4
**story** 111:21 135:10 179:22 180:4
**strength** 184:8
**stricken** 214:1
**strike** 12:20 18:16,24 22:4 29:14,15 35:14 38:11 56:19 60:11 66:3,12 75:11 88:2 90:16 92:7 93:20 94:11 96:11 104:12 171:15 179:6 194:1 205:12 209:2 213:23 214:2
**stripped** 206:13,16,18 206:19,22
**strong** 101:24 102:2,7 104:14 104:24 105:19 107:7,16 108:11,22 109:22 111:2 113:18 114:9 114:24 115:4 115:21 118:19 119:1 120:16 120:20 123:6 125:8,10 149:9 149:13,14,21 150:6 152:3,16 152:16 153:5,7 154:4,16 155:7 155:15 157:5 157:16,18 158:16 159:17
**strongly** 129:13
**studied** 116:14 186:20
**studies** 20:7,21 37:22
**study** 20:12,15 21:1,3 34:15 118:2 140:1 186:3,7,13,25 187:9 188:2,14 188:18,23 189:9,14,15
**stuff** 88:21
**subject** 16:4 42:2 44:8 48:15 78:19 80:15 138:23 145:16 146:17 163:1 170:4 194:21 200:21
**subjects** 203:8
**submitted** 10:17 13:5,9 13:18 18:18
**subparagraph** 82:17 203:11
**subscribed** 217:21
**subsection** 180:11
**subsequent** 191:13,18 192:6
**subsequently** 40:18
**substantial** 40:14 62:18 63:2,21,23 72:13,25 73:16 74:11 76:7 77:24 140:10 150:10
**substantially** 119:7 120:2 210:25
**subsumed** 46:23 47:10 89:5
**subtheory** 137:15 192:18 193:6,9 194:5
**succeeding** 39:23 66:24 87:15
**suffered** 45:23 47:12 88:13 89:16 90:11 96:5,15 97:8 197:19,24 198:3
**sufficient** 95:15 95:15 199:8
**sufficiently** 117:11
**suggest** 108:7 129:13 134:16
**suggested** 112:13

**suggesting** 95:2 95:5 111:22 113:7 136:24 137:23
**suggestion** 112:18
**suggests** 136:6 150:21
**suite** 2:19 3:8 4:7,14 6:20
**summarize** 101:13
**summary** 39:22
**supplement** 27:1
**supplemental** 139:1 170:7 178:5
**support** 26:17 69:16 73:20 74:7 193:14
**supports** 70:19 77:9
**suppose** 23:23 125:16 138:3,6 183:17
**sure** 8:10,14 12:12,14 13:2 17:21 19:8,21 20:20 22:14,20 23:19,25 29:21 32:5 35:2 36:23 39:4,6 39:24 41:1,5 46:16 48:1,6 52:8,11,20 77:17 83:15 97:2 99:23 104:7 106:16 142:19 145:3 155:2,3 160:4 169:17 178:13 211:1 213:17
**surging** 107:4
**surprise** 151:7
**surprised** 94:9
**surrounding** 144:1
**survey** 114:23 148:6 149:2
**susceptibility** 128:17
**susceptible** 80:3 109:11
**suspending** 135:19
**swift** 112:24 134:23 135:12 135:20,23
**swiftly** 136:14
**sworn** 8:2
**synced** 215:17
**system** 3:15

**t**

**table** 84:4,7,12 85:3 86:2,8 93:11 176:19
**take** 6:10 13:12 21:9 25:9 31:24 37:20 45:9 70:21 99:5 100:12,17 100:17 101:3 101:16 112:24 134:23 135:12 135:23 144:14 148:16 152:6 155:19 156:2 184:3 185:20 190:5 194:19 195:11
**taken** 2:18 6:13 45:12 59:19 101:19 136:3 144:18 185:24 209:11 217:5
**takes** 15:3 125:18
**talk** 23:5,25 39:5 43:13 47:18,25 48:24 61:21 83:8,14 92:8 99:15 101:11 124:10 157:23 181:13
**talked** 14:4,17 24:20 26:5 177:4,14 198:23 209:17 209:20 214:18 215:2
**talking** 13:12 13:13 31:25 43:14 46:21 47:19,21 48:23 55:11 58:18 59:7 65:19 89:3 96:22 103:24 121:10 127:12 128:7 141:13 142:14 150:19 156:9 156:21,22,23 158:11 163:24 166:17 170:22 176:15 182:7 187:8 88:9 98:14,19 167:15,16,21 168:6 169:4 173:2 190:16 198:21
**targets** 211:14
**task** 52:21
**techniques** 22:15 23:5,8
**technologies** 13:6 131:18
**ted** 5:14 106:4 106:25 108:5 109:15 113:4 132:10 138:15 138:20 160:6
**tell** 8:18,20 32:1,15 52:22

59:12 70:2 74:1 75:5 86:6 101:12 123:22 140:8 190:4 194:10
**telling** 175:9
**temperature** 125:21
**ten** 101:4
**tend** 111:2 157:20
**tens** 107:2 109:17 134:5
**term** 30:16,20 32:7 36:18,25 37:6,12,20 102:20 127:4,6 183:4 191:11
**terms** 19:14 56:14 191:25
**testified** 8:3 43:20 44:2,19 47:3 49:10,22 50:17 52:17,23 64:3,10,17 65:16 66:9,21 74:6 77:3 78:7 78:18 79:15 80:5 89:1 90:18 91:1 97:13 103:23 123:5 142:3 143:1 153:3 213:12
**testify** 39:17 65:2
**testifying** 18:10 18:14 19:16 88:20 217:8
**testimony** 8:25 10:8 53:8,10 68:5 78:11 79:6 89:21,25 92:10 118:22 118:23 119:22 122:19 123:15 125:5 169:5,10 169:14 216:5,7 217:12
**text** 46:10,18 47:20 48:2 74:1 81:11 148:2
**thank** 7:18 20:3 60:3 88:4 102:17 148:20 207:24 210:11
**theory** 16:3 42:1 44:14 45:2 48:14 78:18 80:12,20 85:10 112:11 116:3 128:20 128:24 129:11 137:16,24 138:22 145:19 146:15 167:12 169:22 170:4,8 178:1,11,19 179:14 183:13 185:12 190:17 190:19,22,25 191:5,14 192:12,17,19 193:7 194:20 195:4,14
**thing** 13:20 21:22 27:23 71:9 72:1 77:17 79:20,25 81:25 95:6 96:1 108:12,12 119:3,22,23 124:21,23,24 136:16,18,20 152:21 153:19 158:12 162:2 171:21 173:8 174:5
**things** 14:2 16:9 24:2 42:3 42:21,25 45:6 46:12,14,15 47:19,25 48:23 49:3 50:18 52:23 55:15 57:12 78:6 79:17 84:13 87:4 89:14 92:19 98:3 99:2,2,21 101:12 108:3,4 110:7,21 115:23 119:8 119:20 120:3 124:6,6,8 132:2 155:22 156:7 160:16 161:25 162:3 163:2 167:8 172:4,11 173:15 175:22 183:17 186:12 187:24 188:16 188:17 189:17 189:23 191:21 192:7 196:4,5 199:8 200:22 213:9 214:11 214:23
**think** 9:11,16 10:3 13:25 16:18,22 17:25 18:8,20 19:7 20:5 21:19 22:25 23:17 27:4,5 28:18 29:19,25,25 30:18 31:24 32:4 33:5,12 33:24 37:9 46:14 47:18,20 48:2,8,10 50:5 50:7,18 53:24 56:8 57:3 58:23 67:16,22

67:25 75:1 78:4,21 79:14 80:9,11 82:7 82:13,21 83:1 84:2 86:20 89:10,12 90:3 91:10 92:15 93:1,4,7,24 94:22,24 95:7 95:14 97:13 98:2 99:12,18 99:20 102:13 104:6 105:5 109:1,10 112:21 113:11 114:2,4 117:7 118:1 119:15 120:13 121:23 124:6,6 126:22 127:2,23 128:13,15 132:1 135:3 136:11 137:1 138:7,22 139:7 139:23 140:4 141:15 142:11 142:17 146:23 147:1,15,25 150:3,4 152:8 152:15 153:22 154:6,8 155:4 155:11,18,20 157:2,19 158:11 159:1 159:16,25 161:21,22 163:1 165:17 166:19,22 167:10 168:13 169:10 172:18 174:7 178:4 180:17 185:1 187:12,15,15 187:20 188:15 189:23 191:10 193:20 195:20 195:24 197:8 199:21 201:14 201:22 203:5,6 204:2,2,5 205:20 206:1 206:10 207:7 207:10 208:20 210:3 212:24 213:3,3,11 214:10

**thinking** 21:23 22:2 32:16 43:4 81:24 102:18 117:7 138:2 155:3 210:20

**third** 43:3 46:1 47:15 53:15,22 55:20 56:1 57:21 58:5,21 60:13,21 61:11 62:7,19 70:9 71:3,16 72:14 73:2,17 74:13 88:16,23 89:4 89:18 91:21 92:1,23 97:22

**thought** 28:11 32:11 83:19 90:2 99:5 103:11 111:6 136:24 137:1,2 147:15 171:9 182:14 193:17 199:1 212:21 212:22

**thoughts** 210:2

**three** 25:22 42:21 43:16 46:23 47:10,16 89:14,21 92:9 92:11,18 163:4 173:12

**timbuktu** 126:7 126:11,19 156:2 157:23

**time** 6:9 7:2 9:9 14:1,12 45:11 45:14 59:18,21 101:18,21 103:9 119:9 120:4 144:17 144:20 152:7 158:11 174:22 176:12 183:14 183:22 184:7 185:23 186:1 209:10,13 215:7,10,19,25 216:8 217:6 218:10,18,25 219:7

**times** 5:18 9:6 84:20 85:7,14 87:17 90:10 130:2 132:18 177:7,18 179:18 180:3 184:3 189:6 206:9 207:15 208:4,18,23,25

**timothy** 3:18 7:14

**timothy.flemi...** 3:23

**title** 51:9 147:25 148:1 148:25

**tittle** 130:10

**today** 8:20,25 9:3,12 10:7 13:25 14:14 43:4 55:16 70:23 71:13 72:11,22 75:9 75:12,25 76:3 76:17 77:5,7 77:21 90:19 91:2 95:24 112:9 138:2,25

206:6
**today's** 10:1 77:4 153:20
**together** 94:13 184:3
**told** 16:10 24:23 25:7 26:8 112:9 118:1 198:21 199:24 207:6 213:4,5 214:10
**took** 11:13 45:16
**tool** 21:23 22:1
**tools** 21:21 23:21 196:19 196:23 197:9 197:11
**top** 23:12 78:6 106:24
**topic** 22:12 23:18,25
**topics** 75:3
**total** 86:15
**tracking** 146:14
**trade** 149:16 183:23
**traded** 101:24 149:8
**trades** 160:2
**trading** 84:14 84:22,24 85:3 85:17 86:1 102:24 124:25 125:13,14 146:4
**traditional** 196:19,22 197:9
**transcribed** 217:10
**transcript** 215:17 217:11 217:14,16 218:6,8,10,13 218:13,22 219:2,2
**transcription** 216:7
**treated** 182:10
**tried** 95:25,25 211:6
**tripped** 173:1
**trouble** 50:13
**true** 12:25 13:2 14:3 16:4 37:10 41:25 62:21 69:3 105:16 112:10 115:12 116:1 124:6,7,9 129:1,3,18 134:18 154:6 154:20,24 155:2,3 161:9 162:4 184:1,2 185:13 216:6 217:11
**trump** 5:17 107:6 109:20 139:6 148:5 149:2 191:19
**trump's** 193:14
**trust** 5:19 208:4
**truth** 37:7,9,13 37:24 38:2 40:22 41:23 42:4,9,11,19,20 43:1,5,14,19,24 44:2,18 45:5 45:17,22 46:6 46:16 47:21 48:5,10,19,25 49:9,10,21 50:16,21 53:8 53:10,14 58:4 58:10,15,19 69:16 80:24 81:9 82:5,10 82:12,25 83:4 83:25 87:8,14 87:18 88:10,13 89:2,6,15 90:1 90:19 91:2,6 93:15,19,21 95:21 96:11,14 97:20 98:9,21 99:7 117:4 128:4,11,24 129:5,20,21 151:16 166:23 167:9,14 169:5 169:19,21,25 170:9,25 171:3 171:6,7,14,17 171:21,25 172:14,15,20 172:23 173:5,6 173:12 174:2,6 174:8,14 175:9 175:10,10 181:14,24 182:11,12,17 182:21 183:6 185:14,15 213:1,4,5
**truthful** 175:15
**truthfully** 214:12,21
**truths** 46:23,25 47:4,9,10 52:17 89:22 90:5 92:9
**try** 101:13 123:23 159:21 189:24
**trying** 23:17 35:21 41:1 47:8 48:4 93:1 104:9 106:12 153:13,19,20 154:19 169:11 172:20,25 202:21 214:5

**[tuesday - unsustainable]**

**tuesday** 94:15
**turn** 10:19 17:1 38:8 69:12 106:17
**turning** 38:7 93:18 96:3,9 96:12 203:11
**two** 13:22 20:21,22 26:22 27:7 28:16 42:25 47:14 84:12 93:24 94:21 103:1 122:13,25 135:9 154:2 162:24 180:6 189:4 197:13 211:19
**twon** 13:9
**tyler** 113:3 117:12
**types** 189:4,13
**typical** 22:10
**typically** 12:15 124:12
**typographical** 28:16

**u**

**u.s.** 63:21,23 77:24 114:20 114:22
**uh** 15:8 32:21 83:10 145:5
153:2 157:25 162:12 193:1 193:19
**ultimately** 167:5 195:11
**unambiguously** 130:15 161:24
**uncertain** 124:8
**unchanged** 125:2
**unclear** 103:3 111:4 122:2 191:7
**unconsented** 62:19 72:14 73:1,17 74:13
**uncovered** 150:20 151:1
**under** 16:2 55:14 78:11 146:14 164:9 178:1,19 194:20 198:9 209:21 216:1,4 217:10
**underlying** 27:25
**understand** 8:17 25:24 28:2 34:13 35:21 39:4 42:18,20 48:4 48:6 52:21 67:6 79:24 84:2 85:6,11 92:10 96:25 97:2 105:16 129:11 137:14 138:9,12,25 139:3,16 142:15 144:2 145:18 146:10 152:1 156:15 158:10 171:13 171:16,22 172:8,14 173:1 173:10 174:2 174:23 178:13 181:11 183:12 187:22 190:1 190:24 191:1,1 191:3,5,14 192:10,17 195:3 201:21 205:5,23 212:17 213:11 214:19 215:3
**understanding** 26:11 93:25 112:17 113:4 136:22 137:25 144:5 150:5 156:4 167:12 170:12 171:8 173:5 179:6,7 180:25 184:25 185:11 189:19 190:18,21 191:6,8,17 194:2,11,12,15 194:22 195:9 196:5 203:21 204:8
**understood** 16:1 39:6 53:12 64:23 81:14 103:24 147:5,6 206:14 213:17
**undertaken** 204:14
**undertook** 203:15
**unfair** 70:13 71:20 74:16 75:16 76:11,23 77:13 78:2 79:13
**unit** 6:12
**united** 1:1 2:1 6:16
**universe** 156:2
**university** 114:19 131:13 131:15 135:5
**unknown** 111:22
**unrelated** 186:16
**unsustainable** 62:6 70:8 71:2

71:16
**unwitting** 5:15 106:5 114:22 133:1,19 134:1 134:12 136:2 136:10 160:8
**update** 14:10 123:13 124:3 124:11,13 149:15
**updated** 27:9 149:18,19
**updates** 120:22 123:8,11,16,20
**updating** 124:15
**use** 21:22 22:11 23:20 24:1 30:16,19,21 36:18 37:6,12 46:2 47:16 53:15,23 55:20 56:2 57:21 58:6,21 60:14 60:22 61:12 63:13 76:20 77:11 81:2 82:15,20,22 87:2 88:11,17 88:23 89:5,10 89:19 91:21 92:2 97:23 98:5 152:8 153:24 186:24 189:8 191:13 191:18 192:3,3 192:7 193:14 202:5 214:10
**used** 22:1,13 32:7 34:15 124:17 133:24 176:3 210:14 210:15
**useful** 37:25
**user** 42:22 48:11 52:13 53:5,9,11,24 54:22 55:3 62:7,20 70:9 71:3,17 72:15 73:2,18 74:13 75:20 89:13 95:1 98:25 117:4 146:23 163:18 164:23 166:24 173:13 175:6 183:24 184:6,6 191:9 201:11 214:7
**user's** 45:24
**users** 5:15,17 46:2,2 47:13 47:16,17 51:16 53:16,23 55:21 56:2 57:22 58:6,22 60:14 60:22 61:12 88:14,17,24 89:5,7,17,19,20 90:13 91:22 92:2 95:3 96:6 96:17 97:9,16 97:23 106:5 107:3 109:18 113:8 114:22 133:1,8,10,12 133:19 134:1,6 134:12 136:2 136:10 148:4 149:1 150:23 160:8 193:13 200:4,20
**uses** 30:1 36:25
**using** 5:14 22:5 22:15 29:8 33:15 106:4 107:1 109:16 114:21 128:18 128:19 139:4 153:25 160:7 183:4 217:9

**v**

**v** 218:4
**vague** 15:16 18:11 19:6 20:9 24:10 27:20 28:6 30:10 31:10 33:10 34:4 42:16 44:21 53:17,18 56:3 57:23 58:12 64:6 70:12 87:11 89:23 98:12 99:11 117:24 140:16 140:23 147:12 148:14 149:10 151:23 160:21 166:12 170:18 176:6 177:20 182:24 185:9 187:5 188:5 194:8 197:3 198:12 200:8 212:19 213:21
**valuation** 21:12 22:2,15 23:1 23:14,21 38:3 105:17 156:17 160:1 173:17 173:18 206:8
**value** 22:18 31:3 36:18 37:1,3,4,7,9,10 43:6,7,17 126:1,5,16 150:1 151:4,16 152:18,20 154:13,18 155:9,17 156:24 157:7 157:12 158:3 158:15 159:1 159:17 167:5

167:19 168:20 174:1 182:14 188:21,22 189:16 200:25 201:19 202:10 202:24 203:7 204:23 205:16 206:5,7 207:5
**valued** 22:4,5
**valuing** 22:8,10 23:4
**variability** 210:22 211:3 212:6
**various** 23:21 172:11
**veritext** 6:22 218:7,9,11,20
**versa** 29:4
**versus** 93:2,16 95:13,22
**vice** 29:3 158:24
**video** 1:13 2:17 6:10,12 80:10 215:14
**videographer** 4:19 6:4,22 7:18 45:10,13 59:17,20 101:17,20 144:16,19 185:22,25 209:9,12 215:6 215:9,13,16
**view** 14:8,10 25:3 95:8 117:18 153:12
**viewed** 142:18 182:10
**viii** 50:9
**violated** 131:16 135:6
**violating** 63:3 76:8
**violation** 112:23 134:22 191:25
**violations** 5:12
**volume** 1:17 2:18 5:4 218:5

**w**

**wait** 131:11 210:6
**waived** 218:24 218:24
**waiving** 218:21
**walk** 8:9
**walked** 83:11 92:6
**want** 13:20 14:10 17:13 19:21 20:1,5 22:20 25:10 31:19 32:17 39:4,13 41:5 46:8 51:24 52:2,9,20,21 65:8 66:12 67:4 68:6 70:16 79:1 80:18 81:19 84:4 85:1,19 86:20 87:21 97:1 98:5 99:20 106:19 112:7 116:18 122:5 123:23 124:16 126:9 131:11 137:11 139:8 153:7 156:11,13 161:20 162:7 165:12 166:14 168:12 169:1,2 169:13,15 171:19 173:25 174:3,7 179:24 180:7 187:22 187:23 189:3,7 189:24 191:2 197:16 198:23 206:14 213:16
**wanted** 39:6 80:1 85:23 168:5 171:12 174:12 212:24
**wants** 100:10 100:16 101:3
**way** 13:20 36:17 47:4 48:2 54:1,3 78:6 85:19 87:4 94:3,12 95:4 105:4,5,5 108:16 111:11 111:19,23 114:7 117:14 124:21 127:16 132:5 147:1 149:20 151:5 156:15 174:10 179:23 181:8 184:21 192:1 195:6,25 196:4 204:4 206:11 208:20 211:7
**ways** 75:22 93:24 129:12 167:13
**we've** 45:8 68:19 73:21 129:14 150:25 150:25 158:11 166:17 167:13 173:2 175:12 182:16 186:22 190:16 205:7 207:20
**weaver** 13:10 15:1
**weeds** 167:7
**weekend** 84:19 87:15,16 94:13 121:14 122:9

130:3 141:22 199:3
**wehner** 4:3 199:24 200:5 200:13,19,24 201:24 202:23
**wehner's** 200:3
**weights** 209:17 209:20,24 211:9,11
**went** 64:2
**west** 2:18 3:8 6:19
**whereof** 217:20
**whispering** 6:8
**white** 107:4 109:19
**whitelisting** 85:8 177:6,17 178:5,12,15,19 179:9,14,17 180:4
**wide** 199:3
**winded** 202:20 203:2 204:1
**window** 210:1
**witness** 5:3 7:13,20 11:10 15:18 17:18,25 18:13 20:11 21:5 22:24 24:12 26:11,14 26:21 27:22 28:8 30:12 31:12,19 33:12 34:6,13 35:2 38:17,24 39:21 40:8 42:18 43:24 44:7,23 45:4 50:24 52:2,20 53:19 56:8 57:25 58:14 59:10 70:15 71:6,21 72:17 73:6,25 74:19 75:18 76:12,14,24,25 77:14,15 78:3 78:4 79:14 80:9 86:20 87:13 89:25 90:22 91:5 92:15,22 98:14 99:12 100:1,11 100:16 101:9 103:19 104:18 105:4 106:21 109:1,6 110:1 110:20 112:7 115:4 118:1,9 120:12,20 126:22 140:25 142:6 143:14 144:10 145:23 146:10 147:14 148:16,21 149:12 151:24 158:7,19 160:23 161:15 162:17,23 166:14 170:21 171:2 176:8,15 177:22 178:22 181:22 182:6 183:1 185:11 187:7 188:7 189:3 194:10 197:4 198:14 200:10 202:14 202:18 203:5 204:2 205:20 206:1 207:21 207:24 212:21 216:3 217:20 218:13,16 219:2,5
**witnesses** 101:2 217:7
**won** 157:20
**wonder** 77:16
**word** 28:20 35:19 82:17 119:15 125:17 127:8 133:24 152:8 153:14 153:24
**words** 51:13 81:5 105:9 110:8,11 132:24 163:19 180:17 207:11 208:24 209:4,6
**work** 15:11 19:7,14 20:16 22:11,16,19,23 26:24 27:4 139:23 150:15
**works** 35:24
**world** 155:23 157:11,19,20
**worried** 95:5 161:16 212:11
**worry** 153:14
**worth** 78:21 156:5
**writ** 97:4
**write** 132:17 143:21 200:19
**wrong** 185:3
**wrongdoing** 150:21
**wrongful** 191:11
**wrote** 11:3 12:16 13:21 73:10,12 197:15
**wylie** 131:18 135:8

**x**

**x** 5:1 136:13 219:9

| y | z |
| --- | --- |
| **yang** 4:13 7:8<br>**yeah** 9:13 14:6 15:18 16:22 23:20 25:6 28:18 29:6 36:1,2 48:8 51:13 55:15 66:2 77:15 81:5 88:7 100:24,25 102:18 124:2 127:11 139:10 140:4 147:14 158:13 159:14 160:23 162:11 163:19 172:25 187:13 197:8 202:14 208:6,9 209:19 210:4<br>**years** 13:22,23 184:2<br>**yesterday** 9:7 9:15<br>**york** 3:20,20 5:18 84:20 85:7,14 87:16 90:10 130:2 132:18 177:7 177:18 179:18 184:3 207:15 208:4,18,23,25 | **zero** 152:14 176:1 180:13 181:6<br>**zoom** 3:17,18 7:15<br>**zooming** 111:5<br>**zuckerberg** 4:3 203:16,17 204:15 205:6 205:10 206:24 207:4<br>**zuckerberg's** 204:20 205:11 205:13 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.