# Exhibit 4

# EXHIBIT 1

Rebuttal Expert Report of Professor Jonah B. Gelbach

August 14, 2023

## I. Issues Addressed by This Report

1. I prepared this report at the request of attorneys Jason A. Forge and Michael Albert for use in the matter of *In re Alphabet, Inc. Securities Litigation*.

2. I have been asked to review and respond to the opinions set forth in the "Rebuttal Report of Professor Allen Ferrell," dated June 30, 2023 (ECF 181-5) ("Ferrell Report"), regarding the impact of alleged omissions and disclosures on the prices of Alphabet's Class A common stock and Alphabet's Class C capital stock.[1] I have also been asked to review and respond to Professor Ferrell's opinions regarding whether it will be possible to measure damages in this case for all class members using a common class-wide methodology that is consistent with Lead Plaintiff's allegations of liability.

3. I have also been asked to review and respond to opinions set forth in the "Expert Report of Anindya Ghose," dated "JUNE 30, 2023 / DRAFT" (ECF 181-6) ("Ghose Draft Report"), regarding the connection between Alphabet's 2019-Q1 earnings and the alleged omissions and disclosures at issue in this litigation. The scope of my review and response covers the following: (i) inferences that may be drawn from Professor Ghose's description of internal documents that Alphabet provided him, accepting Professor Ghose's own characterization of these documents, which I have not read; (ii) an assessment of the degree, if any, to which the opinions Professor Ghose expresses regarding the present litigation meaningfully require his stated expertise in statistics and economics; (iii) an assessment of whether Professor Ghose's stated view, that randomized A/B testing is necessary to reliably evaluate the effects of product changes, would be consistent with his expressing an opinion about Lead Plaintiff's allegations in this case, given that Alphabet appears not to have conducted any such A/B testing of the product changes Alphabet instituted to remediate the privacy-related problems at issue in this litigation.

## II. Qualifications

4. I am an economist and the Herman F. Selvin Professor of Law at the University of California at Berkeley School of Law.

5. A copy of my curriculum vitae (CV) is attached to this report as Appendix A. This CV is dated August 14, 2023, and is up to date to the best of my recollection, including a list of what I believe to be all scholarly publications I have authored throughout my career,

---

[1] I understand that this litigation involves controversies over two classes of Alphabet stock: Class A stock and Class C stock. Where there is no need to distinguish the two, I refer to the two classes of stock collectively as "Alphabet's stock" (and similarly refer to their prices collectively as "the share price," and so on). I understand that Class A stock was traded under the symbol "GOOGL," and Class C stock was traded under the symbol "GOOG." *See* Alphabet Inc. Form 10-K for the year ended December 31, 2018 at 21.

including in the previous 10 years. I offer the following here for convenience and emphasis:

a. I have both a Ph.D. in economics (received in 1998 from MIT, where my fields of concentration were econometrics and public finance) and a J.D. (received in 2013).

b. I have been granted, or hired with, tenure at every university where I have held a non-visiting position. My first tenure-track position was in the Department of Economics at the University of Maryland at College Park, where I was hired in 1998 and awarded tenure in 2005. I accepted an offer to move to the University of Arizona in 2007, where I was a tenured Associate Professor for three academic years. I left Arizona at the end of the 2009-2010 academic year to attend law school at Yale, where I received my J.D. in 2013. Since then I have been a professor of law at the law schools of the University of Pennsylvania (2013-2019) and the University of California at Berkeley (2019-present). I was awarded tenure at the University of Pennsylvania in 2016 and have been tenured at all times since then.

c. At all times since I received my Ph.D. in economics from MIT in 1998, I have been fully or partially engaged in the professional use of statistical methods and economic reasoning. This was true including during the academic years between 2010 and 2013, when I was a law student and also engaged in scholarly and professional activities using statistical methods and economic reasoning.

d. From 2016-2020, I was a Co-Editor of the Journal of Law, Economics, & Organization, with a principal focus on submitted articles using quantitative empirical – *i.e.*, statistical – methods.

e. I was a Director of the American Law and Economics Association ("ALEA") between 2017 and 2020. Candidates for Director are nominated by the existing Board and elected by the membership at large. The ALEA is the primary association of scholars who work in the area of law and economics, which includes the area of law and finance.

f. I have published numerous articles using statistical methods, including several that extend statistical methods. My publications on statistical methods have been cited many thousands of times, according to Google Scholar.

g. Several of my published papers focus directly on statistical inference in the single-firm event study context that is the subject of many securities litigation cases, including this one.[2]

h. I have extensive expertise concerning causal inference (including the distinction between correlation and causation), which has been an important part of my teaching, my scholarship and my work as a journal editor and peer reviewer.

i. The opinions I offer in this report are founded on my expertise in statistics and/or econometrics, including my expertise in considering how statistical methodology and legal standards interact. The materials I have directly or indirectly (by virtue of those assisting me) considered in forming my opinions as of the date of this report is attached to this report as Appendix B.

6. I am being paid $900 per hour for my work in this case. I have been assisted in this matter by another economist who is also being compensated. Neither my compensation in this matter nor that person's compensation is in any way contingent or based on the content of my opinion or the outcome of this or any other matter. I have also received data production from attorneys for Lead Plaintiff, which I understand to have been done with assistance from BVA Group. I receive no compensation for work done by any person working on this matter other than for my own work.

## III. Summary of My Conclusions

7. Based on my expertise, knowledge and scholarship in the areas of statistical methods, event study econometrics and securities litigation, causal inference and the relationship between statistical testing and legal standards; a review of case documents and other relevant information; and conducting various studies whose results are described in this report, I have reached the following opinions.

8. Professor Ferrell fails to prove a lack of price impact on any of the following dates: (a) April 23, 2018; (b) July 24, 2018 (the "July Increase"); (c) October 8-10, 2018 (collectively, the "October Drops"); and (d) April 30, 2019 - May 1, 2019 (the "Spring Drop").

9. Although Professor Ferrell concedes that the July Increase is statistically significant when tested using his chosen null hypothesis and significance level, he nevertheless declares that the July increase was unrelated to the defendants' alleged concealment of information. He does this despite the fact that common sense and basic economic theory suggest that: (i) the increase in Alphabet stock prices that both Professor Ferrell and I found on July 24, 2018 would result from a market view that Alphabet's Form 10-Q disclosures indicated an improvement in the company's future revenue path; whereas, (ii)

[2] *See* Appendix A.

if Alphabet had disclosed the facts that the alleged scheme concealed, that would have reduced expectations for the company's future revenue path. In other words, had Alphabet disclosed the truth about its privacy situation on July 23, 2018, instead of hiding this information from the market, Alphabet's share price would have either fallen on July 24, 2018 or risen by less than it actually did. Thus, nothing Professor Ferrell says contradicts the reasonable belief that the alleged concealment scheme contributed to Alphabet's actual share price increase on July 24, 2018.

10. Professor Ferrell's opinions regarding the October Drops suffer from numerous flaws, among which the following four stand out:

a. First, Professor Ferrell's entire opinion rejecting the presence of price impact must be premised on a well-known statistical fallacy, namely the mistaken belief that failing to reject a null hypothesis justifies accepting that hypothesis (*see* §XIII.G., *infra*). For that reason, and for the additional reasons discussed in §XIII, *infra*, Professor Ferrell's flawed approach to null hypothesis significance testing is incapable – as a matter of introductory statistics – of yielding proof of the absence of price impact. That is to say, ***there is no set of empirical event-study results to which Professor Ferrell could apply his methodology and reliably reach the conclusion that there was a complete absence of price impact***. To adopt Professor Ferrell's approach and decide otherwise would effectively reverse the *Goldman Sachs* allocation to the defendants of the burden of proving lack of price impact at the class certification stage: Adopting Professor Ferrell's approach would treat statistical evidence that is too weak to ***support*** the conclusion that there was an absence of price impact as if it in fact ***proved*** such absence.

b. Second, Professor Ferrell's description of his hypothesis testing methodology does not match his actual method, and the discrepancy matters. The proper way to use null hypothesis significance testing to test Professor Ferrell's null hypothesis of zero price impact in this case is to use a test that will reject the null hypothesis only when Alphabet's price moves in a direction consistent with Lead Plaintiff's legal theory of liability (which serves as the alternative hypothesis). For the October drops, Lead Plaintiff's theory is not simply that Alphabet's stock price ***changed*** because Alphabet's bad privacy news was revealed, but specifically that Alphabet's stock price ***fell*** for this reason. Professor Ferrell describes a different methodological approach: he says he would reject his null hypothesis whenever the ***absolute value*** of his t-statistics exceeds the critical value he uses (1.96). That approach is appropriate only for a two-sided test and is inappropriate for every date at issue in this case for the simple reason that a price change in the direction opposite to Lead Plaintiff's legal theory of liability does not support Lead Plaintiff's position. This matters because, by claiming to use a two-sided testing framework, Professor Ferrell is able to say that his chosen critical value of 1.96 is consistent with his claimed significance level of 0.05. But the significance level associated with a given critical value is half as large – and thus twice as demanding – when an expert is actually using a one-sided test, as Professor Ferrell is.[3] Notwithstanding Professor

[3] As I discuss in ¶237, it is clear from the way that Professor Ferrell treats his event-study for April 24, 2018 that he is actually using a one-sided test. His t-statistic for that date has an absolute value

Ferrell's claim that his critical value of 1.96 is associated with a significance level of 0.05, his test actually imposes a significance level of 0.025 – equivalently, a confidence level of 97.5%. Professor Ferrell's statistical standard is thus considerably more demanding than he says, and he is able to claim otherwise only by obscuring his actual testing approach. Finally, even the actual standard he uses – a significance level of 0.05 – is unwarrantedly demanding for use in conjunction with the preponderance standard.

c. Third, contrary to Professor Ferrell's claim that "one would expect to observe a . . . statistically significant abnormal return on" revelation dates,[4] one would ***not*** expect to observe a statistically significant abnormal return on revelation dates when using Professor Ferrell's choice of critical value without an extremely large magnitude of fraud. The nature of null hypothesis significance testing is that there is always an effect size small enough for the chances of detecting it to be low. With the combination of Professor Ferrell's near-certainty standard for statistical significance and Alphabet's extremely large market capitalization, what counts as "small enough" is startlingly large: even actual price impacts having magnitude in the many billions of dollars would be unlikely to be detected using Professor Ferrell's standards. To have even a 50/50 shot at detecting price impact using an event study with Professor Ferrell's chosen significance level standard, a company like Alphabet would have to commit a fraud of at least ***$16.5 billion***. *See* §XIII.F.

d. Fourth, Professor Ferrell's report suffers from what can best be called ***contamination bias***. This bias arises from including in his event-study-regression model stock indexes that include companies whose share prices are sensitive, in the same ways that are true for Alphabet, to news about future industry-wide profitability and regulatory risks of internet-related firms. Including these internet-related firms causes Professor Ferrell's event study model to treat industry-wide ***effects*** of Alphabet's bad news as if they instead reflected causes of Alphabet's price changes unrelated to Alphabet's bad privacy news. By including those internet-related firms in his stock index regressors, Professor Ferrell thereby erroneously treats any industry-wide effects of Alphabet's bad news as a basis for reducing the magnitude of the calculated abnormal returns for Alphabet. The difference in our event-study results for October 2018 shows that Professor Ferrell's error here leads to seriously biased event study results.

11. Professor Ferrell concedes that the April 30, 2019 decline is statistically significant even under his fundamentally flawed event study. Yet, Professor Ferrell again abandons basic economic theory and common sense to reject price impact due to an unsound syllogism based on no facts other than Lead Plaintiff's definition of the Class Period. And Professor Ferrell fails to provide any statistical analysis at all for the May 1, 2019 decline, or for the combined Spring Drop.

---

above Professor Ferrell's chosen significance level of 1.96, yet he refuses to reject his null hypothesis of zero price impact – precisely on the ground that the abnormal return for April 24, 2018 has sign opposite to Lead Plaintiff's legal theory of liability. Ferrell Report, ¶49.

[4] Ferrell Report, ¶45.

12. Beyond the many flaws in Professor Ferrell's analyses, what stands out most about his report is the way its reasoning careens from relying on to disregarding statistical results, in ways that always support Alphabet's litigation position. When the October Drops fail to clear the near-certainty hurdle for statistical significance that Professor Ferrell sets up for his bias-inviting event study, he relies on a statistical fallacy to decide there was not price impact. But when his own event study results show that the July Increase and April 30, 2019 decline clear his overly demanding bar for statistical significance, Professor Ferrell waves them off anyway. Professor Ferrell's opinions require him to disregard contextually relevant facts and make arguments that bluntly contradict the common-sense theory of financial economics on which he says he relies.

13. Nothing in the Ghose Draft Report changes any of my opinions about price impact for the Spring Drop. There are numerous reasons why.

14. First, even if all conclusions in the Ghose Draft Report were accepted, that would still not sever the link between Alphabet's stock price movements following its April 29, 2019 earnings statement, and price impact related to Alphabet's earlier concealment of its bad news about privacy. The Ghose Draft Report is directed at only the revenue effects of four specific sets of Alphabet's remedial actions (what Professor Ghose calls the "Project Strobe Actions"), which means Professor Ghose fails to consider: (i) any cost effects of those four sets of remedial actions; or (ii) any revenue ***or*** cost effects of the other remedial actions Alphabet promised to take, and allegedly did take, after the truth about its privacy and data security problems was revealed. A person who ignores a large swath of alleged remedial actions – as Professor Ghose does with respect to Alphabet's promised additional controls and updated policies (including, for example, those that allegedly concerned data collection, use and content moderation policies) – cannot reliably draw inferences about company revenues that might be affected by those actions.

15. Second, Professor Ghose's conclusions do not involve the application of any of the statistical or economic expertise Professor Ghose describes as his qualifications. The Ghose Draft Report contains no evidence of any quantitative analysis Professor Ghose did to assess the disputed issues in this case. Nor does it appear from the Ghose Draft Report that Professor Ghose himself did any of the work he describes Alphabet having done to evaluate the "Burpee" advertising program. It appears that Professor Ghose's work with the specific facts of this case is limited to reporting the impressions he gleaned from reading and accepting at face value a gaggle of internal Alphabet documents. None of the opinions reached in the Ghose Draft Report seem to have required the deployment of any expertise more specialized than reading and writing.

16. Third, Professor Ghose is unable to provide any assessment of the actual – as opposed to "likely" or "unlikely" – effects on revenue of his four "Project Strobe Actions." Professor Ghose explains that he believes only "A/B" testing provides a reliable measure of the impact of company policy changes.[5] But because there appear not to have been any A/B tests of any of Professor Ghose's four "Project Strobe Actions," only one possible

---

[5] Ghose Draft Report, ¶107.

conclusion is left for Professor Ghose – that, in his words, "it is not possible to reliably isolate" the revenue effects of any of the "Project Strobe Actions."

17. Fourth, Professor Ghose's discussion of consumer preference heterogeneity has no discernible relevance to this litigation. That some consumers are willing to share their data does not mean that reasonable investors must believe ***all*** consumers (nor all regulators) are indifferent to Alphabet's privacy and data challenges. Indeed, the very nature of heterogeneity is variety – such that some consumers (and regulators) ***do*** care about these matters. That point, which Professor Ghose concedes, is enough for reasonable investors to reduce the value they place on the stock of companies when bad privacy news is revealed. The Ghose Draft Report discussion of consumer preference heterogeneity thus does nothing to sever the link between Alphabet's 2019-Q1 earnings statement and price impact related to its earlier concealment of privacy problems. Moreover, extensive facts documented in this report refute Professor Ghose's suggestion that consumer preference heterogeneity somehow immunizes tech firms from privacy-related fallout. Consider Facebook's Cambridge Analytica scandal (*see* ¶¶94-102) or the event-study evidence (¶¶160-179) and market commentary (¶¶33-34) related to the October 2018 revelations at issue in this case.

18. Fifth, Professor Ghose's description of Alphabet's documents related to the lapping quarter of "Burpee" does not address, much less exclude, the possibility that Alphabet's 2019-Q1 revenue was disappointing partly thanks to Alphabet's alleged diversion of engineering resources to deal with its previously concealed privacy issues.

19. In sum, neither the Ferrell Report nor the Ghose Draft Report plausibly establishes the absence of price impact for any of the dates I was asked to consider – not for April 24, 2018, not for July 24, 2018, not for October 8-10, 2019, and not for April 30 - May 1, 2019.

20. As set forth below, my analysis also demonstrates that there is affirmative evidence of price impact as to the July Increase, the October Drops, and the Spring Drop. My event study demonstrates affirmative evidence of price impact for the daily and cumulative declines in Alphabet's share prices on October 8, 2018, October 9, 2018 and October 10, 2018, following the initial revelation of defendants' privacy scheme and the response of market participants and commentators. Alphabet's shares exhibited declines on October 8 (statistically significant at the 94% confidence level for Class A stock and the 90% confidence level for Class C stock), on October 9 (at the 69% confidence level for Class A stock and the 67% confidence level for Class C stock), on October 10 (at the 88% confidence level for Class A stock and the 94% confidence level for Class C stock) and when the cumulative abnormal returns for the three October 2018 dates are considered (the 97% confidence level for both classes of stock).[6] Accordingly, Professor Ferrell's

[6] By "statistically significant at the confidence level X%," I mean that the p-value from a test of the null hypothesis of zero price impact equals [1-(X/100)]; for example, "statistically significant at the confidence level 94%" corresponds to a p-value of 0.06.

conclusion that "there is no reliable economic basis"[7] to conclude that there was any price impact on the October 2018 dates is incorrect.

21. As set forth below, my analysis demonstrates that there is affirmative evidence of price impact as to the daily declines in Alphabet's stock price following Alphabet's April 29, 2019 announcement that "product changes" had an adverse effect on its business. Alphabet's stock exhibited declines for both classes of stock on April 30, 2019 that were statistically significant at the 100% confidence level.[8] Professor Ferrell's own event study leads to the qualitatively identical statistical result, so our opinions as to April 30, 2019 differ only in the interpretation given to this result. Professor Ferrell is able to reject price impact as an explanation for our mutual statistical findings only because of an unsound syllogism based on no facts other than Lead Plaintiff's definition of the Class Period. For the May 1, 2019 decline, my analysis shows that price impact is not rejected when Lead Plaintiff's legal theory of liability is treated as the null hypothesis. Further, price impact better explains the observed abnormal returns than does zero price impact. Considering the Spring Drop together, Alphabet's stock exhibited declines for both classes of stock on April 30, 2019 that were statistically significant at the 100% confidence level, which is overwhelming statistical evidence in favor of price impact. Professor Ferrell fails to provide any statistical analysis of the May 1, 2019 decline or the combined Spring Drop.

22. Assuming Lead Plaintiff proves its theory of liability, it is my opinion that the damages per share could be calculated on a class-wide basis using an "out-of-pocket" damages analysis. As Professor Ferrell concedes, the event study methodology is "the ubiquitously used and generally accepted methodology to measure the impact of an event on the price of a security."[9] Such a method is also appropriate to measure the actual stock price losses suffered by Alphabet's investors as a result of the omissions involved here. Damages in this matter will be determined by the degree to which Alphabet's fraud caused its stock price to be inflated during the Class Period, which can be determined using only company-level and market information. Thus, damages are measurable on a class-wide basis.

## IV. Relevant Allegations and Factual Background

23. This summary is based on information made available to me by attorneys representing Lead Plaintiff in this matter, including the Consolidated Amended Complaint for Violation of the Federal Securities Laws (ECF 62) and the Supplement (ECF 154) (collectively, the "Complaint").

24. For years, Alphabet represented to the public that privacy and data security were of significant importance to the company's reputation and financial success. For example, in October 2013, then-Executive Chairman Eric Schmidt explained to a conference that

---

7 Ferrell Report, ¶¶24, 61, 65, 71.

8 Equivalently, the p-value was zero to three digits of rounding.

9 Ferrell Report, ¶89 (internal quotation marks deleted).

when it comes to data breaches, "'[w]e're always one mistake away. It's inconceivable you could materially change that.'"[10] Schmidt reassured the public that Google's focus on data privacy would remain constant because then-CEO Page "'is so precisely wired on these issues, it is inconceivable that there would ever be a change.'"[11]

25. In February 2018, Alphabet's 2017 Annual Report on Form 10-K warned:

> Privacy concerns relating to our technology could damage our reputation and deter current and potential users or customers from our products and services. (Original emphasis omitted.)
>
> If our security measures are breached resulting in the improper use and disclosure of user data, or if our services are subject to attacks that degrade or deny the ability of users to access our products and services, our products and services may be perceived as not being secure, users and customers may curtail or stop using our products and services, and we may incur significant legal and financial exposure. (Original emphasis omitted.)
>
> Concerns about our practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters, even if unfounded, could damage our reputation and adversely affect our operating results.[12]

26. In March 2018, Facebook announced it was pursuing a forensic audit of Cambridge Analytica and other parties involved in data misuse. Congress immediately responded by conducting hearings to investigate data privacy concerns, not only at Facebook but at Google and Twitter as well. The increased negative implications for Alphabet if it had a "Cambridge Analytica"-like scandal, particularly at a time when technology companies were under unprecedented scrutiny, was a momentous concern for the company and for the market:[13]

***a. The New York Times***:

> "Outside of Facebook, there is probably no company paying more attention" than Google, said Jason Kint, a frequent critic of Google and Facebook and chief executive of Digital Content Next, a trade group that represents entertainment and news organizations, including *The New York Times*. "They're absolutely ducking for cover while the heat is on Facebook. They don't want to try to trip any alarms."

---

10 Complaint, ¶20.
11 Complaint, ¶¶19-20.
12 Complaint, ¶27.
13 Complaint, ¶33; Tony Romm, *Congress wants to drag Google and Twitter into Facebook's privacy crisis*, Washington Post, March 26, 2018, https://www.washingtonpost.com/news/the-switch/wp/2018/03/26/facebooks-stock-falls-as-the-federal-trade-commission-confirms-its-investigating-the-company/.

> Over two days of hearings, Google was referenced 11 times by lawmakers. Twitter was mentioned 10 times and Amazon once. Apple was mentioned three times, mostly in passing.
>
> Google employees said they had not received explicit orders from management to keep a low profile because most already understood the risk. One employee, who spoke on the condition of anonymity because workers were not allowed to speak publicly on the issue, said there was an understanding inside Google that the company was the obvious next target.
>
> In a statement, Aaron Stein, a Google spokesman, said the company was "completely focused on protecting our users' data" and "will take action" if it found evidence of "deceptive behavior or misuse of personal data."[14]

***b. The Wall Street Journal*:**

> Recent controversy over Facebook's hunger for personal data has surfaced the notion that the online advertising industry could be hazardous to our privacy and well-being.
>
> As justifiable as the focus on Facebook has been, though, it isn't the full picture. If the concern is that companies might be collecting some personal data without our knowledge or explicit consent, Alphabet Inc.'s Google is a far bigger threat by many measures: the volume of information it gathers, the reach of its tracking and the time people spend on its sites and apps.
>
> Google uses, among other things, our browsing and search history, apps we've installed, demographics such as age and gender and, from its own analytics and other sources, where we've shopped in the real world. Google says it doesn't use information from "sensitive categories" such as race, religion, sexual orientation or health. Because it relies on cross-device tracking, it can spot logged-in users no matter which device they're on.
>
> Google fuels even more data harvesting through its dominant ad marketplaces. There are as many as 4,000 data brokers in the U.S., and collectively they know everything about us we might otherwise prefer they didn't – whether we're pregnant, divorced or trying to lose weight.

[14] Complaint, ¶33; Daisuke Wakabayashi and Jack Nicas, *Facebook Takes the Punches While Rest of Silicon Valley Ducks*, New York Times, April 13, 2018, www.nytimes.com/2018/04/13/technology/facebook-silicon-valley.html.

Google works with some of these brokers directly but the company says it vets them to prevent targeting based on sensitive information.[15]

*c. Bloomberg*:

No one at Google envied Mark Zuckerberg last week as he was being grilled by Congress. But for years, they certainly coveted the personal data that made Facebook Inc. a formidable digital ad player. And the strategies they set to compete have now placed Google squarely in the cross hairs of a privacy backlash against the world's largest social-media company.

Tech giants see a higher chance of legislation if Democrats win the House of Representatives or even the Senate later this year. At that point, the companies would have to begin haggling to fend off some proposals that would be intolerable, according to a top policy official at a major internet company. One concern is that proposals will require letting users opt out of data collection completely, the person said, describing that as an untouchable foundation of internet business models.

So far, Alphabet Inc.'s Google has suffered fewer of the problems plaguing Facebook, including fake news and Russian-linked political spending. And it's avoided public blunders like the Cambridge Analytica data leak.[16]

*d. The Daily Telegraph*:

It has been a common source of bafflement in recent weeks that the global reckoning over how internet companies collect and use our personal data has not, so far, managed to entrap the company that is the biggest hoarder of them all. . . . But what of Google, which seems to have emerged from the whole episode relatively unscathed? There has been no suggestion that any personal data held by the company has been exposed to outsiders, in the way Facebook's has. But the story has by now mutated into something bigger; an exposé of our collective naivety over the data-gathering tactics of the world's biggest companies.

There are a couple of obvious reasons: there is no evidence that Google data have been compromised, for one thing: Google's bosses

---

15 Christopher Mims, *Who Has More of Your Personal Data than Facebook? Try Google*, Wall Street Journal, April 22, 2018, www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401.

16 Mark Bergen and Ben Brody, *Google's Facebook Copycat Moves Leave It More Exposed to Privacy Backlash*, Bloomberg, April 16, 2018, www.bloomberg.com/news/articles/2018-04-16/google-s-facebook-copycat-moves-leave-it-more-exposed-to-privacy-backlash.

> have been aware for some time that it behooved the company to keep its data to itself, rather than Facebook's idealistic prospect of sharing it with other companies for their benefit. . . . Importantly when it comes to public perception, Google's products are almost all seen as a good thing: while there remains a big question mark over whether social networks are actually good for us, Google search, maps and email services are categorically useful.[17]

e. *New York Post*:

> Facebook is currently going through the worst user privacy crisis in its history. The Cambridge Analytica privacy breach that was revealed a few weeks ago made the world realize how much data the social giant is collecting about its users, and how easy that data could have ended up in the wrong hands.
>
> But Facebook is hardly the only company collecting treasure troves of user data. Google is able to track users even better than Facebook, and likely has a good amount of information on all Google services users. One report says that every two weeks, Google may be collecting the equivalent of 8 feet worth of A4 paper of user data.
>
> Google can't be happy about what happened to Facebook, and it's probably preparing its own privacy policy changes to comply with the EU's new regulations. And the company probably hopes the public keeps focusing on Facebook and forgets that Google is also gobbling up plenty of user data with each day that goes by.
>
> Unlike Facebook, however, Google doesn't have any pressing privacy breach to deal with. And its services are amazing, which is why so many people agree to have Google collect that much data. But should anyone want to regulate Facebook after the Cambridge Analytica mess, Google will also suffer the consequences.[18]

27. In the midst of these Congressional investigations, Alphabet discovered a defect in its Google+ social networking site that had given hundreds of third-party developers potential access to the private user profile data for Google+ users. Though the defect went undetected for three years, Google only had two weeks of data to review for misuse. Alphabet chose to conceal the defect from the investing public for fear of public scrutiny and regulatory interest.[19] However significant this event may have been in isolation,

[17] James Titcomb, *Google has dodged data scandal but is still in a mire*, Daily Telegraph, April 30, 2018.

[18] Chris Smith, *Google hoards way more of your personal data than Facebook*, New York Post, April 23, 2018, nypost.com/2018/04/23/google-hoards-way-more-of-your-personal-data-than-facebook/.

[19] Complaint, ¶37.

Lead Plaintiff alleges it was "just the tip of the iceberg" regarding Google's data privacy/security concerns, as well as corresponding regulatory and legislative concerns.[20]

28. In April 2018, Google's legal and policy staff prepared a memo concerning this security failure, including the many shortcomings in Google's security system and record keeping, which revealed previously unknown, or unappreciated, security vulnerabilities that made additional data exposures virtually inevitable. The Privacy Bug Memo warned that disclosure would likely trigger "'immediate regulatory interest'" and result in defendants "'coming into the spotlight alongside or even instead of Facebook despite having stayed under the radar throughout the Cambridge Analytica scandal.'" The memo also warned that disclosure "'almost guarantees Sundar [Pichai] will testify before Congress.'" Pichai received the memo and approved the plan to hide the privacy problems, in part, to avoid being called before Congress.[21]

29. In the period between discovering the privacy failure and its disclosure, Alphabet publicly stated that there had been no material changes to its risk factors.[22]

a. On April 23, 2018, Alphabet's SEC Quarterly Report on Form 10-Q for the period ending March 31, 2018, reported no material changes to the company's risk factors since its previous Annual Report on Form 10-K.[23]

b. On July 23, 2018, Alphabet's SEC Quarterly Report on Form 10-Q for the period ending June 30, 2018, again reported no material changes to the company's risk factors since the same Annual Report on Form 10-K. On this date, Alphabet also announced revenues that were nearly $500 million above expectations[24] and earnings per share $2.11 above expectations.[25] Alphabet's stock price rose significantly the next day (the Form 10-Q announcement had occurred after business hours), for a rise in the company's market capitalization of nearly $30 billion.

30. On April 27, 2018, Alphabet's proxy statement included a stockholder proposal for Alphabet to "issue a report to shareholders at reasonable cost, omitting proprietary or

---

20 Complaint, ¶73.
21 Complaint, ¶¶38-39.
22 Complaint, ¶¶43-49.
23 *Google Owner Alphabet Reports 84% Rise in Profits despite Privacy Concerns*, The Guardian, April 23, 2018, www.theguardian.com/technology/2018/apr/23/google-owner-alphabet-reports-earnings.
24 James Dean, *Alphabet shares leap despite EU's €4.3bn fine*, The Times, July 24, 2018.
25 Jeremy C. Owens and Max A. Cherney, *Alphabet stock soars to record highs as Google earnings smash expectations; After accounting for record EU antitrust fine, Alphabet earnings beat expectations by more than $2 a share*, MarketWatch, July 24, 2018, https://www.marketwatch.com/story/alphabet-stock-soars-to-potential-record-highs-as-google-earnings-smash-expectations-2018-07-23.

legally privileged information, reviewing the efficacy of its enforcement of Google's terms of service related to content policies and assessing the risks posed by content management controversies, including election interference, to the company's finances, operations, and reputation." Alphabet opposed the proposal but stated: "We believe that we have a responsibility to combat the misuse of our platforms and enforce our content policies. And we understand our continuing responsibility to update our users and stockholders on those efforts. We will continue to remain vigilant in this regard and plan to make regular public disclosures about our efforts, our results, and our future plans."[26]

31. In May 2018, the European Union enacted the General Data Protection Regulation ("GDPR"), a sweeping set of rules mandating strict safeguards to safeguard and prevent the misuse of users' data.[27]

32. On October 8, 2018, the following occurred:

a. Google published a blog post on "*Project Strobe*" that announced the shutdown of Google+, as well as:

> [A] sweeping set of data privacy measures as part of its response to the events described in the *WSJ* article, including: (1) launching more granular Google Account permissions to give consumers "more fine-grained control over what account data they choose to share with each app"; (2) limiting the applications that may seek permission to access users' Gmail data; and (3) limiting the ability of applications to ask for permission to access information in users' telephones. In addition, Google pledged that "[i]n the coming months, we'll roll out additional controls and update policies across more of our APIs."[28]

b. Minutes after the publication of the *Project Strobe* blog post, *The Wall Street Journal* published an exposé regarding Google's concealment of the Google+ privacy issues; a "larger rethinking of data privacy issues at Google"; the fact that "Google officials felt that disclosure could have serious ramifications [and r]evealing the incident would likely result 'in us coming into the spotlight alongside or even instead of Facebook despite having stayed under the radar throughout the Cambridge Analytica scandal'"; the implications under the GDPR; and Google's history of actual or suspected data misuse or mishandling.[29]

---

[26] Complaint, ¶47.

[27] Complaint, ¶34.

[28] Complaint, ¶76.

[29] Complaint, ¶68; Douglas MacMillan and Robert McMillan, *Google Exposed User Data, Feared Repercussions of Disclosing to Public*, Wall Street Journal, October 8, 2018, https://www.wsj.com/articles/google-exposed-user-data-feared-repercussions-of-disclosing-to-public-1539017194. With respect to the timing of the *Project Strobe* blog post and the publication of *The Wall Street Journal*'s piece, *see* Ferrell Report, ¶9 (stating that the article in *The Wall Street Journal*

33. On October 9, 2018, a *CNBC* article titled "Google learned the hard way it's better to be transparent about privacy bugs than cover them up" noted "[c]onsumers and regulators have shown they will judge companies far more harshly for covering up data security issues than for openly discussing them." That same article drew similarities between Google's cover-up of what the Complaint calls the Three-Year Bug and Uber's revelation of a data breach it had tried to cover up, noting the incident "was relatively minor except for the cover-up."[30] As of October 2018, Uber had paid nearly $150 million in settlements related to the revelation and is subject to increased monitoring by the FTC for 20 years.[31]

34. On October 9, 2018, *The Washington Post* published an article titled "The Cybersecurity 202: Google faces calls for privacy legislation, FTC probe after exposing user data," which noted the following:

> A top Senate Democrat is calling for tough legislation to protect consumer privacy – and for the Federal Trade Commission to investigate – after news that Google did not disclose that a security bug exposed the private data of up to 500,000 users.
>
> Google discovered and fixed the security vulnerability in its foundering Google+ social network in March, just as Facebook was coming under fire for its role in the Cambridge Analytica scandal. And reports that company officials decided not to disclose it in part because executives worried about drawing scrutiny from policymakers landed like a bombshell in Washington. It's clear that while Google has so far managed to avoid the kind of grilling Facebook and Twitter faced from lawmakers seeking to zero in on Silicon Valley's privacy and data use practices, those days are over.
>
> Shortly after the Wall Street Journal first reported the incident Monday afternoon, the company went into damage control mode. Google explained what happened in a blog post and announced a suite of new data privacy measures. The company also said it would shutter the consumer version of Google+ . . . . ***But it's Google's secrecy that may get the company in the most trouble***.
>
> Despite its concerns about lawmakers' reactions, Google might have been better off if it had gone public about the incident right away. The Google+ user base is minuscule, and public concerns about data leaks and breaches tends to fade fairly quickly unless the information is used for nefarious purposes. "But because Google tried to cover up the problem because it didn't meet some threshold of severity, the company looks much worse," TechCrunch's John Constine wrote; "That casts doubt on whether Google is being transparent on tons of other controversial questions about its practices."

---

was published at 12:46pm) and Ferrell Report, ¶10 (stating that the Google Project Strobe Blog post at issue here was published at 12:03pm).

30 Kate Fazzini, *Google learned the hard way it's better to be transparent about privacy bugs than cover them up*, CNBC, October 9, 2018, https://www.cnbc.com/2018/10/09/google-privacy-bug-highlights-difference-between-exposure-and-breach.html.

31 Kate Fazzini, *Google learned the hard way it's better to be transparent about privacy bugs than cover them up*, CNBC, October 9, 2018, https://www.cnbc.com/2018/10/09/google-privacy-bug-highlights-difference-between-exposure-and-breach.html.

> The disclosure could also boost calls for legislation that would replace the patchwork of state laws governing what companies must do to notify consumers and regulators of data breaches. Sens. John Kennedy (R-La.) and Amy Klobuchar (D-Minn.), are backing a bill that would require companies to notify customers of data breaches within 72 hours of discovering them and offer remedies to affected users. A similar standard exists under Europe's privacy law, which took effect earlier this year.[32]

35. On October 10, 2018, three Democratic Senators wrote to the FTC Chairman, demanding an investigation into Alphabet's privacy failure, including Google's concealment of it. The letter highlighted the deceptiveness of Google's response to *The Wall Street Journal* article.[33]

36. Alphabet's stock price declined for the three trading sessions beginning October 8, 2018. On October 8, 2018, Alphabet's Class A and Class C shares fell $0.59 and $0.42 per share, respectively. On October 9, 2018, Alphabet's Class A and Class C shares fell $0.54 and $0.51 per share, respectively. On October 10, 2018, Alphabet's Class A and Class C shares fell $2.65 and $2.88 per share, respectively.[34]

37. On February 5, 2019, Alphabet's Form 10-K warned for the first time that "changes to our data privacy practices . . . may affect the type of ads and/or manner of advertising that we are able to provide which could have an adverse effect on our business."[35]

38. With respect to the events of April 2019, Lead Plaintiff alleges the following:

    a. On April 29, 2019, Alphabet announced that "product changes" had had an adverse effect on its business.[36]

    b. The product changes and their resulting adverse effect on Alphabet's revenues were the direct result of Alphabet's remedial measures issued

---

[32] Cat Zakrzewski and Bastien Inzaurralde, *The Cybersecurity 202: Google faces calls for privacy legislation, FTC probe after exposing user data*, Washington Post, October 9, 2018, www.washingtonpost.com/news/powerpost/paloma/the-cybersecurity-202/2018/10/09/the-cybersecurity-202-google-faces-calls-for-privacy-legislation-ftc-probe-after-exposing-user-data/5bbb86201b326b7c8a8d189f/?outputType=amp.

[33] Complaint, ¶59.

[34] Calculated from Yahoo! Finance price data for GOOGL (https://finance.yahoo.com/quote/GOOGL) and GOOG (https://finance.yahoo. com/quote/GOOG) on October 7-10, 2018. These figures are based on Alphabet's post-split share prices, after its stock 20-for-1 in 2022. *See* "Alphabet Announces Second Quarter 2022 Results," July 26, 2002, https://abc.xyz/assets/0d/4a/646d28c945aba76a5eeeba68e686/2022q2-alphabet-earnings-release.pdf ("On July 15, 2022, the company executed a 20-for-one stock split with a record date of July 1, 2022, effected in the form of a one-time special stock dividend on each share of the company's Class A, Class B, and Class C stock."). Thus, each $1 change in Alphabet's post-split share price corresponds to a $20 change in its pre-2022 share price.

[35] Complaint, ¶82(a).

[36] Complaint, ¶82(b).

in response to "the events described in the *WSJ* article," *i.e.*, the Google+ privacy-related issues.[37]

c. These remedial measures, which defendants announced on October 8, 2018, allegedly were taken to stave off a legislative or regulatory response.[38]

d. The corresponding risks of these remedial measures did not materialize publicly until after October 2018.[39] By the end of 2019-Q1, these remedial measures, including stricter permissions,[40] and "additional controls" (*id.*) necessary "'to combat the misuse of our platforms and enforce our content policies,'"[41] enhanced users' data privacy and reduced Cambridge Analytica-like misuse of platforms such as YouTube, but diminished the effectiveness and volume of advertisers' ads.[42] This hurt advertising revenues, which account for over 85% of Alphabet's revenues.[43] These responsive product changes also hurt revenues by diverting engineering resources from revenue-enhancing product changes and increased costs.[44]

39. On April 30, 2019, Alphabet's Class A and Class C shares fell $4.86 and $4.96 per share, respectively, and on May 1, 2019, Alphabet's Class A and Class C shares fell an additional $1.28 and $1.02 per share, respectively.[45]

40. In this report, I use the terms "Alphabet's bad news about privacy" and "Alphabet's bad privacy news," and any similar construction, interchangeably to refer to all the information that the Complaint alleges was both revealed between October 8-10, 2018, inclusive, and previously concealed from the public by Alphabet.

## V. Price Impact Analysis Using an Event-Study

41. I begin this Part, Part V, by introducing a regression model that predicts Alphabet's stock price return for the event date (section A) and explaining how an event study's abnormal return is estimated using event date data and the results of estimating the regression model (section B). It is important that the regression model be structured so that the

---

37 Complaint, ¶82(b).
38 Complaint, ¶82(a).
39 Complaint, ¶82(b).
40 Complaint, ¶76.
41 Complaint, ¶47.
42 *See, e.g.*, Seth Fiegerman, *It's YouTube's time in the hot seat*, CNN Business, June 11, 2019, https://www.cnn.com/2019/06/11/tech/youtube-under-scrutiny.
43 Complaint, ¶82(b).
44 Complaint, ¶82(b).
45 Calculated from Yahoo! Finance price data for GOOGL (https://finance.yahoo.com/quote/GOOGL) and GOOG (https://finance.yahoo. com/quote/GOOG) on April 29-30, 2019.

estimated abnormal return is not contaminated by the fact that Alphabet's bad news about privacy could be expected to affect other internet industry firms besides Alphabet. I discuss this type of bias, and the fact that Professor Ferrell's event-study invites it, in Part VIII.

42. The discussion in this section takes as given that the statistical model can adequately account for the operative factors that drive Alphabet's stock price on event dates. Statistical inference conclusions require that an event study is otherwise reliably designed in this sense. To be reliably designed, an event study must account for identifiable factors that an expert believes can be expected to affect Alphabet's stock price on relevant event dates. The rest of the discussion in this Part of my report assumes that the event study has been reliably designed in this sense.

43. To ensure the robustness of my event-study results, I repeated the event study under a variety of alternative definitions of the market index used in the regression model, the regression model's estimation period and the approach used to compute Ferrell null p-values (defined below). The operative statistical results from this sensitivity analysis appear in Appendix F. This sensitivity analysis yields the same qualitative results that I discuss based on the estimates provided throughout the main body of this report. That is, the basic substance of the opinions I offer in the main body of this report would be the same were I to use any of the specifications described in Appendix F, rather than the specification I did use. Accordingly, Appendix F provides additional statistical evidence to reject Professor Ferrell's claim that there was no price impact on the dates relevant to this litigation.

### A. Regression Model

44. The regression model in an event study relates the daily stock return for the target firm – here, Alphabet – to the daily returns for other firms, which allows the expert to account for the component of the target firm's stock price movement that would be predicted to occur even in the absence of events that are the subject of the event study. A variable that measures the return on an index of other firms' stocks is known as a regressor. The regressor I use to account for returns on non-Alphabet stocks is an index of firms in non-internet industries (the "Non-Internet Index"),[46] which I discuss in Part VIII and in Appendix C.

45. I use the following notation:

---

[46] It is common practice to include both market-wide and industry-specific stock indexes as regressors in an event study. *See, e.g.,* Andrew Baker and Jonah B. Gelbach, *Machine Learning and Predicted Returns for Event Studies in Securities Litsigation*, 5 J. of L., Fin., & Acct. 231 (2020) (showing how to use machine learning techniques to choose event-study regressors, including an industry index, optimally). This is a reasonable – indeed, best – practice when there is no reason to worry about contamination bias. In the presence of such contamination bias, the better approach is to exclude the industry index, as well as to exclude industry firms from the market index.

a. Alphabet's daily return on date $t$ is $A_t$.

b. The daily return on day $t$ for the "Non-Internet Index" defined below is $Index_t$.

c. The regression coefficient, or "beta", for the Non-Internet Index is $\beta_{Index}$ ("beta-index").

d. The model for daily returns on non-event dates is

$$A_t = \beta_0 + Index_t \beta_{Index} + \epsilon_t,$$

where $\epsilon_t$ ("epsilon-tee") is the residual, or unexpected, component of Alphabet's return on date $t$ and $\beta_0$ ("beta-nought") is Alphabet's expected return on a hypothetical day with zero values of $\epsilon_t$ and $Index_t$.[47] The value of $\epsilon_t$ has mean value, also known as expected value, equal to 0.

46. The coefficients $\beta_0$ and $\beta_{Index}$ are estimated using the ordinary least squares method applied to the equation for Alphabet's returns on non-event dates, *i.e.*, the equation in ¶45.d above; the daily return for Alphabet is the dependent variable, and there are two regressors – a constant and the daily return on the Non-Internet Index.

## B. The Event Date Actual and Estimated Abnormal Returns

47. On event date $t$, Alphabet's stock price may change in an amount different from what would be expected due to market conditions or the usual random fluctuations. I denote this event date-specific price change as $\pi_t$. On a date when a fraudulent omission had inflated the stock price, Lead Plaintiff's legal theory of liability would hold that $\pi_t$ is positive (*see* Appendix E, ¶¶7-8 for details). Contrariwise, on a revelation date, Lead Plaintiff's legal theory of liability would hold that $\pi_t$ is ***negative***, given that stock price would fall with the revelation of a fraud that had previously inflated the stock price (*see* Appendix E, ¶¶7-8 for details). If an event had zero price impact, then $\pi_t$ would be 0. All of this can be captured by writing the equation for Alphabet's returns on event dates as follows:

$$A_t = \beta_0 + Index_t \beta_{Index} + \pi_t + \epsilon_t \qquad (1)$$

48. Alphabet's daily return, $A_t$, thus may be separated into three components:

a. The component that would be expected is the return that could be expected when $\pi_t$ and $\epsilon_t$ both are zero, *i.e.*:

$$Expected\ Return_t = \beta_0 + Index_t \beta_{Index}.$$

[47] The coefficient $\beta_0$ is what is sometimes referred to as the "alpha" for Alphabet. I do not use this term for $\beta_0$ so as to avoid creating confusion with the Greek letter $\alpha$ used in reference to the significance level of null hypothesis significance testing, below.

b. The component that involves a price change because of unusual events that occurred on date $t$ is:

$$Price\ Change_t = \pi_t.$$

c. The component that involves random fluctuations in Alphabet's return is:

$$Random\ Fluctuations_t = \epsilon_t.$$

49. The $Price\ Change_t$ component may include both (i) the legally relevant price impact at issue in the present litigation and (ii) other date-specific sources of price change, outside the realm of the random fluctuations captured by $\epsilon_t$, that happen to coincide with price impact on date $t$.

a. For example, earnings announcements occur on only a select set of dates, so their effects should not be understood as being captured by the random fluctuations term $\epsilon_t$. Thus, the price change caused by a company's announcement of unexpectedly strong earnings on date $t$ would be included in the overall price change term, $\pi_t$.

b. However, such an announcement might not be the kind of date-$t$ price impact at issue in litigation. For example, suppose that on the same date, a company announced both unexpectedly strong earnings for the previous reporting period and that its previously secret research had paid off with the discovery of a low-cost cure for all forms of cancer. Both announcements would be expected to cause the company's stock to rise, so both would be included in the overall price change term, $\pi_t$. But if a securities fraud lawsuit were later filed against the company alleging only that the cancer-cure claim was fraudulent, the legally relevant price impact term would be only that part of the overall price change term related to the cancer-cure announcement.

c. Thus, the price change component may be broken down into price impact and other-source sub-components operating on date $t$:

$$\pi_t = \pi_{t,Price\ Impact} + \pi_{t,OtherSources}.$$

d. A standard event study in which the price change is calculated based on daily returns data cannot directly distinguish between the price impact and other-source sub-components of price change. However, an expert using daily returns data may still offer other reasons derived from outside information to believe that there were, or were not, other sources of price change on date $t$.

e. If there is reason to believe that there were no important other-source sub-components of price change on event date $t$, then an expert may argue that $\pi_{t,Other\ Sources}$ is 0. In that case, the price impact sub-

component would equal the overall price change term, $\pi_t$. Statistical inferences about $\pi_t$ would then provide identical statistical inferences about price impact itself.

f. If there were reason to believe that there ***were*** other-source sub-components of price change on event date $t$, then statistical inferences about the overall price change term, $\pi_t$, could not directly serve as the expert's statistical inferences about price impact unless the expert somehow took account of other-source sub-components of price change on date $t$. For example, the expert might find a way to estimate the price effects of other-source sub-components of price change using data on other firms that had experienced events involving those sources.[48]

50. For the balance of this report, I will use the terms "price change" and "price impact" interchangeably except when it is conceptually or empirically important to distinguish the two. In such cases, I will refer explicitly to the terms in ways that make clear the relevant distinctions.

51. The ***abnormal return*** for date $t$ is found by subtracting the expected return for date $t$ from Alphabet's actual stock return on that date:

$$AR_t = A_t - Expected\ Return_t. \qquad (2)$$

52. The expected return and abnormal return must be estimated by the expert, because the true coefficient values $\beta_0$ and $\beta_1$ are unknown. These coefficient values can be estimated appropriately by applying ordinary least squares to the regression model discussed with respect to equation (1) above.[49] Denoting the estimators as $\hat{\beta}_0$ and $\hat{\beta}_{Index}$,[50] the model-based estimated abnormal return on date $t$ is found by subtracting the estimated expected return for date $t$ from Alphabet's stock price return for that date:

$$\widehat{AR}_t = A_t - Estimated\ Expected\ Return_t. \qquad (3)$$

### C. The Relationship Between Price Impact and the Probability Distribution of the Event Date Estimated Abnormal Return

53. Recall that the true abnormal return for date $t$ equals the sum of the price impact component, $\pi_t$, and the random fluctuations component, $\epsilon_t$:

48 *See, e.g.*, Allen Ferrell and Atanu Saha, *Forward-Casting 10b-5 Damages: A Comparison to Other Methods*, 37 J. Corp. L. 365, 381 (2012) (arguing that where a firm has limited history with a particular type of event, data for "comparable firms" that have experienced it could be used to "forward-cast[]" a price impact).

49 I report my estimated coefficients and associated statistics in Appendix D.

50 The notation $\hat{\beta}$ is pronounced "beta-hat"; a "hat" of this sort is widely used in statistics to denote an estimator for an unknown quantity.

$$AR_t = \pi_t + \epsilon_t. \qquad (4)$$

Because $\epsilon_t$ has mean 0, the date-$t$ abnormal return has a mean value equal to the date-$t$ price impact, $\pi_t$. Thus, to say there was no price impact on an event date is to say that the abnormal return had a mean of 0 on that date. To say price impact was positive on an event date is to say that the abnormal return had a positive mean; to say price impact was ***negative*** on that date is to say that the abnormal return had a ***negative*** mean.

54. Professor Ferrell assumes that the random fluctuation term $\epsilon_t$ has a normal probability distribution. Although this is often a problematic assumption for stock returns, my analysis indicates that it is a reasonable assumption for Alphabet over the time period involved in this case, so I adopt this assumption as well.[51] It follows that the date-$t$ abnormal return $AR_t$ has a normal probability distribution with mean equal to the date-$t$ price impact $\pi_t$ and standard deviation equal to the standard deviation of the random fluctuation term $\epsilon_t$.[52] I will refer to the standard deviation of $\epsilon_t$ using the Greek letter $\sigma$ ("sigma").

55. The estimated abnormal return $AR_t$ differs from the actual abnormal return $\widehat{AR}_t$ because of the need to estimate the expected return using the estimates of the beta coefficients.[53] However, under standard statistical conditions, the probability distribution of the estimated abnormal return will be sufficiently close to the actual abnormal return that it is appropriate to act as if the two probability distributions are the same.[54]

56. It follows that the date-$t$ estimated abnormal return $\widehat{AR}_t$ may be treated as being drawn from a normal probability distribution with mean equal to the date-$t$ price impact $\pi_t$ and standard deviation equal to $\hat{\sigma}$, the estimated standard deviation of the random fluctuation term $\epsilon_t$.

---

51 My calculations indicated that accounting for possible non-normality led to very similar qualitative results. *See* Appendix F.

52 The normal probability distribution is fully characterized by its mean and standard deviation; once these are known, or estimated satisfactorily, the distribution's properties are fully known to the expert.

53 To be precise, $\widehat{AR}_t = AR_t + [\hat{\epsilon}_t - \epsilon_t] = \pi + \hat{\epsilon}_t$, where $\hat{\epsilon}_t = \epsilon_t + \left(\hat{\beta}_0 - \beta_0 + Index_t(\hat{\beta}_1 - \beta_1)\right)$, with the term in parentheses capturing the degree to which the estimated value of the random fluctuations term deviates from the true value. (Notice that on non-event dates, for which $\pi_t = 0$, $AR_t = \epsilon_t$ and $\widehat{AR}_t = \hat{\epsilon}_t$.)

54 *See* Jonah B. Gelbach, Eric Helland and Jonathan Klick, *Valid Inference in Single-Firm, Single-Event Studies*, 15 Am. L. Econ. Rev. 495 (2013). The relevant conditions are satisfied under Professor Ferrell's implicit assumption that, conditional on the regressors, $\epsilon_t$ has a normal distribution and is independently and identically distributed. *See id.*

## VI. Null Hypothesis Significance Testing and Likelihood Ratio Analysis

57. This Part, Part VI, discusses key points related to null hypothesis significance testing and likelihood ratio analysis, which are two methods for drawing statistical inferences about price impact using event-study estimated abnormal returns. I provide a lengthier and more detailed discussion of these two issues in Appendix E.

### A. Null Hypothesis Significance Testing

58. This section provides a brief discussion of key points related to null hypothesis significance testing. Appendix E provides a more detailed discussion of the foundations of and steps involved in such testing.

59. Null hypothesis significance testing requires the specification of both a null hypothesis and an ***alternative hypothesis*** of interest. The approach involves computing a test statistic whose probability distribution is known under the assumption that the null hypothesis is true. The statistician then determines whether the observed value of the test statistic would be unusual enough under the null hypothesis that the null hypothesis should be considered to be rejected by the data. In this case, Professor Ferrell and I agree that the t-statistic corresponds to an event date abnormal return is an appropriate test statistic, and we agree on the distribution that test statistic will have when the null hypothesis is zero price impact.

60. The significance level of a null hypothesis significance test is the yardstick by which statisticians measure how much difference from a null hypothesis is "too much," as this phrase is used in the previous paragraph. Mathematically, the significance level, which is often abbreviated with the Greek letter "alpha", $\alpha$, is the probability that the expert mistakenly rejects a null hypothesis that is actually true. This result is often called a false positive (as when a person tests positive for a virus but is not actually infected) and is known among statisticians as a Type I error. Because the significance level is a probability, it varies between 0 and 1 and is often stated as a decimal value such as 0.05 or 0.10. It can equivalently be described as a percentage between 0% and 100%, and I will use decimal and percentage values interchangeably in that way.

61. Professor Ferrell specifies that for dates relevant to this case, the null hypothesis is that there was zero price impact on that date (the "Ferrell null hypothesis").[55]

62. Assuming there are no event date-specific sources of Alphabet's price change other than price impact, the Ferrell null hypothesis amounts to the assertion that the date-specific price change component for date $t$ is zero, *i.e.*, $\pi_t = 0$.[56]

[55] Ferrell Report, ¶36.

[56] As I noted in ¶50, I treat price impact and price change as the same thing except when discussing other date-specific factors that caused Alphabet's price to change. In ¶49, I introduced the notation $\pi_{t,OtherSources}$ to stand for these other factors. When there are no such factors at play, this term

63. Given the Ferrell null hypothesis, the alternative hypothesis that matches Lead Plaintiff's legal theory of liability for omission dates is that Alphabet's stock price ***was inflated*** because of its omission, so $\pi_t > 0$. This is an example of an upper-tailed alternative hypothesis; when the upper-tailed alternative hypothesis is true, $\pi_t$ is above its value under the null hypothesis. For revelation dates, the alternative hypothesis that matches Lead Plaintiff's legal theory of liability is that Alphabet's stock price ***fell*** because of its earlier omissions, so $\pi_t < 0$. This is an example of a lower-tailed alternative hypothesis; when the lower-tailed alternative hypothesis is true, $\pi_t$ is below its value under the null hypothesis.

64. When using a t-statistic to test the null hypothesis of zero price impact on an omission date, an expert should reject the null hypothesis at significance level $\alpha$ if and only if the t-statistic exceeds the $(1-\alpha)$-quantile of the standard normal distribution, which is known as $z_{1-\alpha}$ and is positive.[57] For example, if $\alpha = 0.10$, a statistician will reject the null hypothesis on an omission date if the t-statistic on that date exceeds 1.28. If instead $\alpha = 0.025$, $z_{1-\alpha} = 1.96$, so that the statistician will reject the null hypothesis of zero price impact on an omission date whenever the t-statistic exceeds 1.96. When using a t-statistic to test the null hypothesis of zero price impact on a revelation date, an expert should reject the null hypothesis at significance level $\alpha$ if and only if the t-statistic is more ***negative*** than the $\alpha$-quantile of the standard normal distribution, which is known as $z_\alpha$ and is negative.[58] For example, if $\alpha = 0.10$, a statistician will reject the null hypothesis on an omission date if the t-statistic on that date is less than -1.28. If instead $\alpha = 0.025$, $z_\alpha = -1.96$, so that the statistician will reject the null hypothesis of zero price impact on an omission date whenever the t-statistic is less than -1.96. The quantiles $z_{1-\alpha}$ and $z_\alpha$ are referred to as the ***critical values*** for level-$\alpha$ tests of the null hypothesis against upper- and lower-tailed alternative hypotheses.

65. As applied here, there are thus two criteria for an expert statistician using a t-statistic to reject the null hypothesis of zero price impact against a specified alternative hypothesis. First, the t-statistic must have the same sign that Lead Plaintiff's legal theory of liability predicts. Second, the t-statistic must have a large enough magnitude, that is "large enough" as determined by the significance level the expert chooses to use.

66. There are three functionally equivalent ways to carry out null hypothesis significance testing.

---

equals 0, which implies that price impact and price change are the same thing. *See* ¶¶49-50 for more details.

[57] By definition of a quantile, a random variable drawn from a standard normal distribution has probability $\alpha$ of taking on a value above $z_{1-\alpha}$. Thus, when the null hypothesis is true, there is probability $\alpha$ that the t-statistic will exceed $z_{1-\alpha}$. For values of $\alpha < 0.5$, which correspond to a chance of a false positive below 50%, $z_{1-\alpha}$ will have a positive sign.

[58] By definition of a quantile, a random variable drawn from a standard normal distribution has probability $\alpha$ of taking on a value below $z_\alpha$. Thus, when the null hypothesis is true, there is probability $\alpha$ that the t-statistic will be more negative than $z_\alpha$. For values of $\alpha < 0.5$, which correspond to a chance of a false positive below 50%, $z_\alpha$ will have a negative sign.

67. The first is to apply the criteria just discussed, *i.e.*, to assess whether the t-statistic's value is more extreme than the appropriate critical value for the type of alternative hypothesis at issue.

68. Second is to compute the p-value associated with the test and then determine whether that p-value is low enough to warrant rejection. The p-value is the probability that a randomly drawn t-statistic would have a value ***as extreme as or more extreme than*** the actually observed t-statistic's value, if the null hypothesis were known to be true.[59] It can be shown that the criteria for rejecting the null hypothesis in the previous paragraph are equivalent to finding that the p-value is below the significance level. Thus, the null hypothesis is rejected at significance level 0.10 when the p-value is less than 0.10, it is rejected at significance level 0.05 when the p-value is less than 0.05, and so on.

69. The third equivalent way to do null hypothesis significance testing involves whether the confidence level is high enough. For present purposes, the confidence level is simply one minus the p-value, with the result then expressed in percentage terms. For example, a p-value of 0.067 corresponds to a confidence level of 93.3% ($= 100\% \times (1 - 0.067)$). The expert rejects the null hypothesis when the confidence level exceeds the expert's chosen threshold level. For example, a significance level of 0.10 corresponds to a confidence level threshold of 90%, a significance level of 0.05 corresponds to a confidence level threshold of 95%, and so on.

70. A finding that the null hypothesis is rejected at the expert's chosen significance level against a particular alternative hypothesis means that the statistical evidence is strong enough to meet the expert's standard for adopting the alternative hypothesis.

71. But every introductory student learns that ***failing to reject*** the null hypothesis does not warrant ***accepting*** the null hypothesis.[60] Thus, the possible outcomes of null hypothesis significance testing under Professor Ferrell's specification that the null hypothesis is zero price impact are: (i) the expert ***rejects*** the null hypothesis of zero price impact, which means the statistical evidence supports the alternative hypothesis that there was price impact consistent with Lead Plaintiff's legal theory of liability; and (ii) the expert ***fails to reject*** the null hypothesis of zero price impact. In the latter case, the null hypothesis significance test rules out neither zero price impact nor the alternative hypothesis of price impact consistent with Lead Plaintiff's legal theory of liability.

72. By its nature, then, a test of the null hypothesis of zero price impact is incapable of proving the ***absence*** of price impact, which implies that Professor Ferrell's approach to testing necessarily fails to prove the absence of price impact.

73. However, it is possible to use null hypothesis significance testing in a way that ***could*** prove the absence of price impact. To do so requires effectively reversing the

---

59 *See, e.g.*, Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach*, 131 (2020). Thus Professor Ferrell is mistaken when he writes that a p-value is "[t]he probability of observing a given t-statistic by random market fluctuations." *See* Ferrell Report, ¶39.

60 *See* ¶10, *supra*.

designations of the null hypothesis and the alternative hypothesis relative to those implied by Professor Ferrell's specification. The null hypothesis becomes the price change predicted by Lead Plaintiff's legal theory of liability, and the alternative hypothesis becomes the opposite price change. For omission dates, this means the null hypothesis is that $\pi_t$ is positive, whereas for revelation dates, the null hypothesis is that $\pi_t$ is negative. In each case, the alternative hypothesis is the opposite of Lead Plaintiff's legal theory of liability. Price impact consistent with Lead Plaintiff's legal theory of liability would be rejected when the observed price change differs too much from what Lead Plaintiff's legal theory of liability predicts.

74. A statistician using this better approach to null hypothesis significance testing would reject Lead Plaintiff's legal theory of liability at the chosen level of statistical significance when two conditions are satisfied: (i) the t-statistic is larger in magnitude than the critical value corresponding to significance level $\alpha$; and (ii) the t-statistic has the ***opposite*** sign of the one predicted by Lead Plaintiff's legal theory of liability.[61]

75. I do not take the position that the Court in this case ***should*** use null hypothesis significance testing to decide whether or not Alphabet has proved a complete absence of price impact. Likelihood ratio analysis, discussed in Section B just below, offers a viable alternative approach. But if the Court does determine to use the null hypothesis significance testing framework, it is my expert opinion, as one who has studied the relationship between statistical proof and hypothesis testing in litigation, that the best way to do so is in a way that matches the legal standards that apply here. I understand that under the Supreme Court's decision in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, a defendant seeking to rebut the *Basic* presumption of class-wide reliance can do so by proving, by a preponderance of the evidence, a complete absence of price impact. To adopt Professor Ferrell's approach to null hypothesis significance would effectively reverse the *Goldman Sachs* allocation of this burden: It would treat statistical evidence that is too weak to support the conclusion that there was an absence of price impact as if it in fact proved such absence. The only way to use null hypothesis significance testing while avoiding such a perverse result is to adopt the approach described in ¶¶73-74 above.

### B. Likelihood Ratio Analysis

76. The likelihood ratio is a widely used statistical measure that allows an expert to compare how well the estimated abnormal return's value is explained by the hypothesis of zero price impact versus hypotheses consistent with Lead Plaintiff's legal theory of liability. I present relevant likelihood ratios throughout my discussion of the event study results below.

---

[61] This approach has support in the academic literature. *See, e.g.*, Merritt B. Fox, *Halliburton II: It All Depends on What Defendants Need to Show to Establish No Impact on Price*, 70 Bus. Law. 437, 447-454 (2015).

77. It is a basic principle – known as the "law of likelihood" – that observed data are better explained by a hypothesis with a higher likelihood than one with a lower likelihood.[62] The likelihood ratio is the ratio of the likelihood for one hypothesis to the likelihood for another; this is also known as the likelihood ratio in favor of the first hypothesis over the second. When the likelihood ratio in favor of one hypothesis over another exceeds 1, the first hypothesis provides the better – in the sense of "more likely" – explanation.

78. For example, Professor Ferrell's estimated abnormal returns for July 24, 2018, October 9, 2018 and April 30, 2019 all correspond to likelihood ratios exceeding 1, in favor of hypotheses with price impact consistent with Lead Plaintiff's legal theory of liability over Professor Ferrell's zero price impact hypothesis. Thus, Professor Ferrell's estimated abnormal returns for those dates would be better explained by price impact consistent with Lead Plaintiff's legal theory of liability than with zero price impact. My own event-study estimated abnormal returns are such that the likelihood ratio in favor of price impact consistent with Lead Plaintiff's legal theory of liability exceeds 1 for all event dates relevant to this litigation other than April 24, 2018. Thus, price impact consistent with Lead Plaintiff's legal theory of liability better explains the observed data than does the hypothesis of zero price impact.

79. Standards for statistical significance can be expressed in terms of likelihood ratio analysis. Conventional scholarly standards for statistical significance require that the estimated abnormal return be more than twice as likely with price impact as with zero price impact to meet the 10% significance level; nearly 4 times as likely with price impact as with zero price impact to meet the 5% significance level; and 6 times as likely with price impact as with zero price impact to meet the 2.5% significance level. Thus, as applied here, conventional scholarly standards are much more demanding than the simple requirement that the hypothesis of price impact be more likely than its opposite.

## VII. False Negatives and the Low Power of Professor Ferrell's Significance Tests

80. I return now to null hypothesis significance testing in order to assess the probability of a false negative result in the present litigation.

81. Recall that a Type I error occurs when the null hypothesis is true, but the expert mistakenly rejects that hypothesis. That result is analogous to the situation in which a person who is actually not infected with the coronavirus, and so would test negative with a perfectly accurate test, in fact tests positive for the virus because they used a less than perfectly accurate test. Thus, a Type I error is also known as a ***false positive*** result.

82. When an expert uses null hypothesis significance testing, the probability that a random variable would have a more extreme value under the null hypothesis, in the direction of the alternative hypothesis, than the test's critical value is the significance level, $\alpha$. By its

[62] This description of the law of likelihood was provided, *e.g.*, by philosopher of science Ian Hacking. Ian Hacking, *Logic of Statistical Inference* 49 (Cambridge Philosophy Classics Ed. 2016).

nature, this means that a significance test ensures that the probability of committing a Type I error – finding a false positive – is $\alpha$.

83. Null hypothesis significance testing is used in scholarly and scientific research in order to ensure that Type I errors – false positive conclusions – about scientific or other truths are very unlikely. For this reason, conventional choices of the significance level $\alpha$ are low in scholarly and scientific research, such as 0.10, 0.05, or 0.01. These choices ensure that a statistician will erroneously reject a true null hypothesis in no more than 1 in 10 (when $\alpha = 0.10$), 1 in 20 (when $\alpha = 0.05$) or 1 in 100 (when $\alpha = 0.01$) cases.

84. Such standards are quite different from the preponderance standard that I understand applies at this stage of this litigation. Indeed, scholars virtually never even attempt to apply a standard like preponderance to their scholarly endeavors. In more than 25 years as an economist engaged in empirical research, I cannot recall ever hearing a scholar presenting statistical results in a scholarly workshop announce that in assessing her statistical results, she had applied the preponderance standard, or a standard of "more likely than not," or any substantial equivalent.

85. Type I errors are not the only kind of mistaken determination an expert can make as a result of performing null hypothesis significance testing: If an expert fails to reject the null hypothesis when it is actually false, then the analyst makes a ***Type II error***, which can be thought of as a ***false negative***. It is akin to testing negative for the coronavirus when one is actually infected. As this example illustrates, Type II errors are undesirable, and a good statistical test will have a low probability of causing a Type II error. An equivalent way to say this is that a good test will have a high probability of leading to a ***correct positive***, as when an actually infected person tests positive for the coronavirus. With respect to the Ferrell null hypothesis, a correct positive is a determination that there was price impact, when that determination is the correct one.

86. The ***power*** of a test is the probability that a correct positive will occur when there really was price impact. For example, a test has power 0.5 if it would cause the expert to determine there was price impact in 1 out of every 2 cases with actual price impact. And if power were 0.10, that would mean that the analyst would determine there was price impact in only 1 out of 10 cases that actually had price impact.

87. Both Type I and Type II errors involve mistakes and can lead to erroneous judgments if null hypothesis significance testing is used.

88. For a given null hypothesis and alternative hypothesis, it is generally not possible to reduce the probability of committing either type of error without increasing the probability of the other type. In other words, there is a tradeoff between the two types of errors: the more demanding the significance level, the lower the test's power.

89. So, a test with significance level of 0.05 has a lower Type I error rate than a test with significance level of 0.10 – but this comes at the cost of lower power for the first test. Similarly, a test with significance level of 0.025 will have even lower power than the one with significance level of 0.05. This means that more demanding levels of statistical

significance correspond to a lower probability of finding price impact when it is there, increasing the rate of false negatives.

90. For example, if a particular test's significance level of 0.05 were accompanied by power of 0.10, then the test's false negative rate would be 0.90. This means that keeping the chance of wrongly rejecting the null hypothesis at 1 in 20 cases where there was no price impact comes at the cost of using a test that fails to reject a truly false null hypothesis in 18 out of 20 cases that really do have price impact.

91. Analysis in the law and finance literature has shown that requiring evidence as strong as Professor Ferrell does before rejecting his specified null hypothesis of zero price impact can lead tests to have very high probability of committing Type II errors – and thus very low power – when examining individual event dates for a single firm.[63] In other words, Professor Ferrell's standard tends to bring along a very high probability of a false negative – a high probability of failing to reject the Ferrell null hypothesis when price impact consistent with Lead Plaintiff's legal theory of liability really occurred.

## VIII. Addressing Contamination Bias in the Event Study

92. In this case, the likelihood of contamination bias is a serious concern. Bad news related to Alphabet's alleged privacy scheme indicated that more regulation and consumer backlash were headed toward firms besides Alphabet. It appears that Google officials expressed such sentiments internally, as *The Wall Street Journal's* October 8, 2018 article quoted an internal memo in which Google officials had expressed concerns about "coming into the spotlight alongside *or* ***even instead of Facebook***." And internet-related firms that depend on behemoths like Alphabet could expect that tighter controls on user data more broadly would make these behemoths less profitable to advertise with, and otherwise rely on for tech services. Accordingly, news related to Alphabet's alleged privacy scheme could be expected to affect not just Alphabet but also most, if not all, other internet-related firms.[64]

---

63 *See, e.g.*, Alon Brav and J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 Wash. U. L. Rev. 583 (2015); Jill E. Fisch and Jonah B. Gelbach, *Power and Statistical Significance in Securities Fraud Litigation*, 11 Harv. Bus. L. Rev. 55 (2021).

64 The term "contagion effect" is sometimes used to describe a situation in which one firm's bad news is expected to lead to downstream negative effects on other firms. *See, e.g.*, Cristi A. Gleason, Nicole Thorne Jenkins and W. Bruce Johnson, *The Contagion Effects of Accounting Restatements*, 83 The Accounting Review 83 (2008). That term could be used here, but the term "contamination bias" is better for two reasons.

First, although part of the impact of Alphabet's bad news on other firms could operate indirectly by reducing Alphabet's value to them as a service provider, analogous to colloquial understandings of contagion, it is also the case that regulations following Alphabet's bad news could apply directly to other firms as well, increasing their costs directly, rather than through Alphabet; in other words, even if Alphabet had never existed, such regulations could increase non-Alphabet firms' costs.

Second, whereas "contagion effects" relates to the source of the problem – an affliction of Alphabet – "contamination bias" focuses on the substantive statistical problem here – that if firms

93. To illustrate how contamination bias can operate following a large tech firm's bad news about privacy insecurity, I collected information about what happened following a different company's experience with devastating news about data privacy and security.

### A. The Spilling over of Privacy-Related Bad News Has Happened in Other Situations, Too

94. On Saturday, March 17, 2018, news broke that tens of millions of Facebook accounts had been accessed, without user authorization, by Cambridge Analytica.[65]

95. On Monday, March 19, 2018, Facebook's stock price fell nearly 7%; its abnormal return was -5.57%, with a t-statistic of -4.86, large enough in magnitude to reject the null hypothesis of no price impact against the alternative hypothesis of negative price impact, at any conventional significance level; the likelihood ratio in favor of the hypothesis of price impact of 5.57% over the hypothesis of zero price impact exceeds 135,000, making the former hypothesis overwhelmingly the better explanation.[66]

96. Alphabet's stock price also dropped on March 19, 2018 following the revelation of the Cambridge Analytica scandal; Alphabet's Class A stock price dropped 3%, and its Class C stock price dropped 3.2%. An event study using Alphabet's stock price returns as the dependent variables yielded abnormal returns of -1.65% and -1.77%.[67] A reasonable conclusion is that investors were worried that Facebook's troubles made it more likely that new regulations would follow, and that those regulations would apply to Alphabet as well, reducing its future profitability. Media reports are consistent with this conclusion:

---

affected by Alphabet's bad news are present in indexes included in the event study, their own stock price responses to the bad news will cause bias by contaminating the measurement of abnormal returns.

[65] *See* Matthew Rosenberg, Nicholas Confessore and Carole Cadwalladr, *How Trump Consultants Exploited the Facebook Data of Millions*, New York Times, March 17, 2018, https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html; Carole Cadwalladr and Emma Graham-Harrison, *Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach*, The Guardian, March 17, 2018, https://www.theguardian.com/news/2018/mar/17/cambridge-analytica-facebook-influence-us-election.

[66] To calculate Facebook's abnormal return on March 19, 2018, I conducted an event study like those described below for Alphabet on the event dates relevant to this litigation, using returns data for Facebook and the Non-Internet Index, described below, to estimate the same kind of regression model used for Alphabet's stock.

[67] The t-statistics for these abnormal returns were -1.68 and -1.80, implying p-values of 0.047 and 0.036 for testing the null hypothesis of zero price change against the alternative hypothesis that Alphabet's stock price fell on March 19, 2018. The associated likelihood ratios are 4.1 and 5.1, meaning that the observed drops in Alphabet's stock price would be roughly 4-5 times as likely to be observed if the effect of Facebook's bad news was a drop in Alphabet's Class A and Class C stock values of 1.68% and 1.8%, respectively, than if Facebook's bad news had zero effect on Alphabet's stock price.

> Google parent Alphabet's stock price dropped close to 4% in trading Monday, part of a broader tech selloff led by Facebook.
>
> A political research firm with ties to President Donald Trump reportedly accessed 50 million Facebook user accounts without authorization.
>
> Facebook is under huge pressure from lawmakers in the US and the UK over the way it handles user data and how that data can be manipulated for targeted political advertising.
>
> "The concern is that you're opening a can of worms," Macquarie analyst Ben Schachter told Business Insider. The long-term concern is that regulators might respond to news of the breach with onerous restrictions, said Schachter.
>
> Some of those restrictions could also apply to a company like Alphabet.[68]

97. July 2018 developments in Facebook's Cambridge Analytica scandal demonstrate that, when a tech firm later announces negative product news related to previously divulged bad news about privacy, that firm's ***own*** stock price may drop like a stone.

   a. On July 25, 2018, Facebook announced after trading hours had closed that its revenue and user growth for 2018-Q2 ($13.2 billion and 1.47 billion daily active users ("DAUs") had barely missed Wall Street forecasts ($13.3 billion and 1.49 billion DAU).[69]

   b. The company announced that its DAU in Europe had fallen 3 million – about 1% – during the quarter when Europe's GDPR privacy regulations took effect.[70] That same quarter, Facebook suspended hundreds of apps.[71]

   c. In the words of Facebook's CFO, the company's decision to give users "'more choices around data privacy'" after its Cambridge Analytica scandal "'may have an impact on our revenue growth.'" He projected that the company's revenue growth rate would first decelerate and then decline in 2018, and that "'we anticipate that total expense growth will

---

68 Matt Turner, *Google parent Alphabet drops as tech stocks get whacked*, Business Insider, March 19, 2018, https://markets.businessinsider.com/news/stocks/google-stock-price-drops-in-tech-selloff-2018-3-1018922118.

69 Olivia Solon, *Facebook stocks plummet more than 20% amid concerns over growth*, The Guardian, July 25, 2018, https://www.theguardian.com/technology/2018/jul/25/facebook-stocks-second-quarter-revenue-user-growth.

70 Olivia Solon, *Facebook stocks plummet more than 20% amid concerns over growth*, The Guardian, July 25, 2018, https://www.theguardian.com/technology/2018/jul/25/facebook-stocks-second-quarter-revenue-user-growth.

71 Olivia Solon, *Facebook stocks plummet more than 20% amid concerns over growth*, The Guardian, July 25, 2018, https://www.theguardian.com/technology/2018/jul/25/facebook-stocks-second-quarter-revenue-user-growth.

exceed revenue growth in 2019.'"[72] One news report explained that the CFO "told investors to expect a big jump in costs related to its efforts to improve data handling and an advertising drive to reassure users."[73] Indeed, "[c]osts in the latest quarter rose by 50% to $7.4bn as the company spent vast sums on improving data security and increased policing of the site."[74]

d. Facebook CEO Mark Zuckerberg summed up the company's position by explaining: "'We are investing so much in security that it will have a significant impact on our profitability . . . .'"[75]

e. Facebook's stock price dropped 19% on July 26, 2018.[76]

98. These same July 2018 developments also demonstrate how one large tech firm's bad news about privacy might cause ***other*** tech firms' stock prices to fall.

a. In trading on July 26, 2018, the Internet Index I describe below fell 0.64%.

b. Because other stocks actually increased in value on that date, the Internet Index abnormal return was -1.32%.[77] The associated t-statistic was -3.59, so that the Ferrell null hypothesis is rejected against the alternative hypothesis of negative price impact at any conventional significance level; the likelihood ratio in favor of the hypothesis of price impact of 5.57% over the hypothesis of zero price impact exceeds 600, making the former hypothesis overwhelmingly the better explanation. A reasonable inference is that investors assumed that other internet companies would be less profitable after seeing the substantial impact on Facebook's costs and revenues of the company's added costs related to privacy and data security. This could be partly due to the reduction

---

72 Rupert Neate, *Over $119bn wiped off Facebook's market cap after growth shock*, The Guardian, July 6, 2018, https://www.theguardian.com/technology/2018/jul/26/facebook-market-cap-falls-109bn-dollars-after-growth-shock.

73 Rupert Neate, *Over $119bn wiped off Facebook's market cap after growth shock*, The Guardian, July 6, 2018, https://www.theguardian.com/technology/2018/jul/26/facebook-market-cap-falls-109bn-dollars-after-growth-shock.

74 Rupert Neate, *Over $119bn wiped off Facebook's market cap after growth shock*, The Guardian, July 6, 2018, https://www.theguardian.com/technology/2018/jul/26/facebook-market-cap-falls-109bn-dollars-after-growth-shock.

75 Olivia Solon, *Facebook stocks plummet more than 20% amid concerns over growth*, The Guardian, July 25, 2018, https://www.theguardian.com/technology/2018/jul/25/facebook-stocks-second-quarter-revenue-user-growth.

76 Rupert Neate, *Over $119bn wiped off Facebook's market cap after growth shock*, The Guardian, July 6, 2018, https://www.theguardian.com/technology/2018/jul/26/facebook-market-cap-falls-109bn-dollars-after-growth-shock.

77 To calculate this abnormal return, I conducted the same kind of event study that I did for Facebook on March 19, 2018.

in profits seen by these companies in partnering with Facebook and partly due to market perceptions that other internet companies might face their own future costs associated with as-yet unannounced privacy problems of their own.

99. Unlike the broader Internet Index, Alphabet's stock price exhibited little movement following the July 25, 2018 news of Facebook's materialized risk from the Cambridge Analytica scandal.[78] Notably, the July 26 trading day was just two days after Alphabet had omitted to tell the investing public about its own bad privacy news. A possible inference is that Alphabet managed to insulate itself from the market consequences of Facebook's bad news by allowing the market to believe Alphabet did not know of any privacy problems of its own.

100. Beyond the Cambridge Analytica example, increased attention to and/or regulation of the privacy policies of large platforms such as Alphabet's has caused tech firms both large and small to incur added costs.

a. Facebook's investment burden has been affected by privacy changes at Alphabet and Apple. For example, in 2021, a Facebook Vice President for Product Marketing/Ads wrote that browser and operating system changes by Google and Apple, together with "the changing privacy regulatory landscape," made it "important to acknowledge that digital advertising must evolve to become less reliant on individual third-party data." For that reason, Facebook began "investing in a multi-year effort to build a portfolio of privacy-enhancing technologies and collaborate with the industry on these and other standards that will support this next era."[79]

b. Following development of new privacy features by Apple, "which allow mobile users to opt out of being tracked across their iOS apps," Facebook warned advertisers that these features "would cause issues for the way [Facebook's] ad targeting business typically operated. And it repeatedly argued that Apple's changes would impact small businesses that relied on Facebook ads to reach their customers. When the changes went into effect, Facebook's concerns were validated as studies found very few consumers are opting into tracking on iOS."[80]

---

78 Alphabet's Class A stock rose 0.75 percentage points on July 26, 2018, for a negative abnormal return of 0.07 percentage points; its Class C stock rose 0.37 percentage points, for an abnormal return of -0.46 percentage points. The combined effect of a small increase and a small decrease can reasonably be regarded as indicating little movement.

79 Graham Mudd, *Privacy-Enhancing Technologies and Building for the Future*, https://www.facebook.com/business/news/building-for-the-future.

80 Sarah Perez, *Facebook stock drops after company warns Apple's privacy changes to have bigger Q3 impact*, TechCrunch, September 22, 2021, https://techcrunch.com/2021/09/22/facebook-stock-drops-after-company-warns-apples-privacy-changes-to-have-bigger-q3-impact.

101. And publicly recognized increases in the threat of regulation of big tech firms has been associated with reductions in the stock prices of those firms, including Alphabet. For example, an article on Sunday, June 2, 2019 indicated that "the two federal agencies that handle antitrust matters have split up oversight of [Google and Amazon], with the Justice Department taking Google and the Federal Trade Commission taking Amazon, according to three people with knowledge of the matter," with the implication that "the agencies are signaling the potential for greater scrutiny."[81] The following day, stock prices for "Google, Amazon, Facebook and Apple were all lower, following reports that the tech giants are facing greater scrutiny from antitrust regulators in the Justice Department and Federal Trade Commission."[82] The drop in value was not limited to those four companies, as "[t]he technology-heavy Nasdaq index fell by 1.6 percent."[83]

102. All these examples illustrate a simple and important fact: When it comes to news about privacy, the prospect of future regulation and the risks associated with additional data security and privacy costs, market valuations of firms in the internet industry are interrelated. Bad news for one firm may spill over into bad news for these firms as a group, unless investors have a particular reason not to worry about such spillover effects, as they did due to Alphabet's omission on July 23, 2018.

### B. Addressing Contamination Bias

103. An event study meant to estimate the abnormal return for Alphabet will be unreliable if the market or industry indexes it includes to estimate Alphabet's expected return on event dates are subject to such spillover effects. These spillover effects will contaminate the estimated expected return for Alphabet on relevant event dates. Thus, to include such firms in the market or industry index is to invite contamination bias.

104. Professor Ferrell includes in his event study regression model the Dow Jones Internet Composite Index ("DJICI"), excluding Alphabet's own return. Assuming that the "beta" for this index is positive in Professor Ferrell's regression results,[84] he will erroneously treat price drops induced by Alphabet's bad news as if they were caused by drops in the DJICI, rather than the DJICI drop being caused by Alphabet's bad news. Professor Ferrell's market-wide index variable, which is the NASDAQ Composite Index excluding Alphabet's own return, includes many internet-industry stocks and so involves the same risk of contamination bias.

---

[81] Cecilia Kang, David Streitfeld, Katie Rogers and Stephanie Saul, *Google and Amazon Are at the Center of a Storm Brewing Over Big Tech*, New York Times, June 2, 2019, https://www.nytimes.com/2019/06/02/business/google-antitrust-investigation.html.

[82] *Big Tech Shares Slide as Prospect of Antitrust Scrutiny Mounts*, New York Times, June 3, 2019, https://www.nytimes.com/2019/06/03/business/stock-market-activity.html.

[83] *Big Tech Shares Slide as Prospect of Antitrust Scrutiny Mounts*, New York Times, June 3, 2019, https://www.nytimes.com/2019/06/03/business/stock-market-activity.html.

[84] Professor Ferrell's report does not report the coefficients from his model, but it is reasonable to believe the index will have a positive coefficient, and attempts to replicate his study suggest that it does.

a. It can be shown using econometric reasoning that Professor Ferrell's inclusion of these stocks in index variables will lead him to estimate price impacts that are biased toward zero.

b. So when bad news related to Alphabet's alleged privacy scheme actually causes negative price impact on Alphabet's stock price, Professor Ferrell's approach will understate the magnitude of the price impact.

c. This bias likely explains why Professor Ferrell's abnormal returns in October 2018 have sign opposite to mine or are closer to zero than mine, which contributes to his conclusion that there was no price impact.

105. The same problem could also happen in the opposite direction: Alphabet's concealment of its bad news related to its alleged privacy scheme might have been treated by the market as broadly good news for the broader set of internet-related firms.

106. When including a variable in a regression model causes bias, it is standard econometric practice to exclude it from the estimation.[85]

---

[85] A single-firm, single-date event study is equivalent to estimating the associated regression model with event dates included in the sample, and adding a dummy variable for each event date of interest. *See* Jonah B. Gelbach, Eric Helland and Jonathan Klick, *Valid Inference in Single-Firm, Single-Event Studies*, 15 Am. L. Econ. Rev. 495, 507-510 (2013). Econometrically speaking, the event date dummy variable acts exactly the same way a "treatment" dummy variable does in econometric models formulated in terms of estimating treatment effects, which is a common formulation.

The contamination bias problem arises because the daily return of the Internet Index on the event date includes a component that is directly caused by event date news related to Alphabet's alleged privacy scheme, rather than capturing the effects of some outside factor that could be expected to have the same impact on both Alphabet and other internet-related firms.

Variables that are affected by "treatment" – as the Internet Index variable here is affected by Alphabet's bad news on the event date – generally should be excluded from the regression model. *See, e.g.*, Jeffrey M. Wooldridge, *Violating Ignorability of Treatment by Controlling for Too Many Factors*, 21(5) Econometric Theory 1026 (2005) ("including certain controls – specifically, those that are themselves affected by treatment – generally violates the key ignorability assumption" for valid estimates); *id.* ("Overcontrolling is often a result of using goodness-of-fit measures" (such as a linear regression's $R^2$) "or statistical tests to decide whether to include certain covariates and forgetting about the ceteris paribus interpretation of regression coefficients."); Michael R. Roberts and Toni M. Whited, *Endogeneity in Empirical Corporate Finance*, Handbook of the Economics of Finance, Vol. 2 Part A (2013) ("it is crucial to remember that any covariates included as controls must be unaffected by the treatment," and the variable of interest here is the dummy variable for the event date in the present context); Laurent Frésard and Philip Valta, *How Does Corporate Investment Respond to Increased Entry Threat?*, 5(1) Rev. Corp. Fin. Stud. 1, 20 (2016) ("While controlling for changes in growth prospects is important in our setting, the validity of our baseline specification could be jeopardized by the presence of 'bad controls.' Indeed, the inclusion of bad controls . . . – control variables that are themselves affected by the treatment – can lead to biased inference . . . .").

107. I therefore created a "Non-Internet Index" based on those firms in the S&P 500 that can reasonably be thought to be non-internet firms. Here is how the Non-Internet Index was created:

   a. I made a list of the Global Industry Classification Standard industry group information ("industry code") for each firm in the DJICI during the period between April 23, 2017 and May 1, 2019. For purposes of this report, I consider any industry with an industry code on this list to be an "internet industry."

   b. All S&P 500 firms that ever had an industry code during the estimation window, which was April 23, 2017 through May 1, 2019, on the internet industry code list were then labeled "internet firms."

   c. All S&P 500 firms that never had an industry code on the internet industry code list were labeled "non-internet firms."

108. A value-weighted index of the daily returns for non-internet firms was created. This index, comprising over 300 firms, is the Non-Internet Index.

109. Appendix C contains further details regarding the construction of the Non-Internet Index.

110. All event study results for Alphabet's stock price described below are based on a set of regression model estimates in which the dependent variable is the daily return for Alphabet's stock and the regressors are: (i) a constant; and (ii) the daily return for the Non-Internet Index. I estimate the models separately for Alphabet's Class A and Class C stock returns. Estimates from these regression models appear in Appendix D, which also provides an econometric description of the regression models and lists the dates that are included in the regression model estimation.[86]

## IX. Professor Ferrell Fails to Show that Alphabet's Omissions on April 23 and July 23, 2018 Had No Impact on Alphabet's Stock Price

111. Professor Ferrell analyzes the omissions dates of April 23, 2018 and July 23, 2018, respectively, these are the dates when Alphabet filed its 2018-Q1 Form 10-Q for the period ended March 31, 2018 and its 2018-2Q Form 10-Q for the period ended June 30, 2018.

---

[86] For each event of interest, the estimation sample includes data for one year's worth of dates before that event date (with the provisos that (i) any other event dates relevant to this litigation that occurred within a year of the event date of interest are dropped, and (ii) for all three October 2018 event dates, the start date for the sample is October 7, 2017).

112. Professor Ferrell notes that the relevant risk factor disclosures used identical wording on those dates, and he asserts that in an efficient market, one would not expect Alphabet's stock price to react to risk disclosures using the same wording.

113. Nevertheless, Professor Ferrell performs an event study associated with April 24, 2018 and uses null hypothesis significance testing to evaluate its results, with his specified null hypothesis being that there was zero price impact on this date.

a. Professor Ferrell finds that the t-statistic for the abnormal return has a magnitude well in excess of his chosen critical value of 1.96.

b. Professor Ferrell recognizes that his specified null hypothesis of zero price impact should not be rejected because the abnormal return has the opposite sign of what Lead Plaintiff's legal theory of liability implies.

c. Consequently, Professor Ferrell determines that his event study for April 24, 2018 does not support a finding of a ***price increase*** on that date.[87]

d. Professor Ferrell's use of a critical value of 1.96 implies that the significance level he uses is $\alpha = 0.025$.[88]

114. Professor Ferrell performs another event study for July 24, 2018.

a. He finds that the estimated abnormal return is positive, with a positive t-statistic that exceeds his preferred critical value of 1.96, again implying a significance level of 0.025.

b. This means that Professor Ferrell should reject his null hypothesis of zero price impact in favor of the alternative hypothesis of price impact consistent with Lead Plaintiff's legal theory of liability.

c. However, Professor Ferrell does not reject his null hypothesis of zero price impact in favor of the alternative hypothesis of price impact consistent with Lead Plaintiff's legal theory of liability.

d. Instead, Professor Ferrell attributes the price increase to factors unrelated to Alphabet's relevant risk disclosures.

e. Professor Ferrell provides no statistical evidence to support this conclusion. Its sole basis is Professor Ferrell's contention that, because

---

87 However, Professor Ferrell fails to rule out that other factors might explain why price fell rather than rising on April 24, 2018.

88 For an upper-tailed test of the form Professor Ferrell uses for April 24, 2018, the significance level $\alpha$ equals the standard normal distribution's probability to the right of the critical value $z_{1-\alpha}$. Professor Ferrell's chosen critical value is $z_{0.975} = 1.96$. Therefore, $0.975 = 1 - \alpha$, which implies that $\alpha = 0.025$.

the July 23, 2018 disclosures used identical words to those Alphabet used on April 23, 2018, it would be impossible for rational investors to treat the July 23, 2018 statement as having positive news value.

f. Professor Ferrell's event study for July 24, 2018 thus plays no role in his conclusion that "there is no reliable economic basis to conclude that the price increase in Alphabet's stock can be ascribed to the alleged misleading statement/omission on July 23, 2018"[89] on that date.

g. Statistically speaking, Professor Ferrell's opinion as to July 24, 2018 is conclusory, in the sense that he would advance this opinion no matter the statistical evidence.

115. Professor Ferrell's analysis is incomplete, confuses words with the information they communicate and does not support his conclusions.

### A. Professor Ferrell Commits a Category Error by Equating Words with the Information They Communicate

116. Professor Ferrell observes that "[i]n an efficient market, for a disclosure to be 'news' it must be 'new.'"[90] Based on this truism, Professor Ferrell asserts that "in an efficient market, one would not expect Alphabet's stock prices to react to the risk disclosures [which were identical to previous risk disclosures]."[91]

117. But what makes news "new" in the relevant sense cannot be reduced simply to whether a statement uses the same words as those a previous statement used (or, as in this matter, whether an incomplete statement omitted the same information a prior incomplete statement omitted). What matters is not simply whether different words are used, but rather how the statement would affect reasonable investors' expectations of Alphabet's value given the prevailing market context.

118. The following example, deliberately situated outside the securities fraud context, illustrates how new information can be conveyed using the same words as an earlier statement used.

a. A woman saw her doctor for a routine physical in February 2018. As part of the checkup, her doctor tested her for Disease X, and then delivered good news: "analysis of this test's results shows there is no evidence of disease."

b. On March 17, 2018, the patient was exposed to a hazardous substance thought to cause Disease X. She went back to her doctor the next day.

89 Ferrell Report, ¶23.
90 Ferrell Report, ¶51.
91 Ferrell Report, ¶51.

c. The doctor explained that if the hazardous exposure did cause Disease X, evidence of Disease X might not materialize for a period of weeks or months.

d. So the doctor designed a plan of watchful waiting: the patient would return for a new test the following month, and if that test was negative, she would return for another test three months later.

e. Seeing that the patient was worried, the doctor further explained that the longer the patient goes without detectable disease, the better the chances that she would never contract the disease.

f. On April 23, 2018, the patient took her next test. The doctor told her the results: "analysis of this test's results shows there is no evidence of disease." Although the patient felt more optimistic about the future, her optimism was tempered by the fact that it had been just a few weeks since her exposure.

g. On July 23, 2018, the patient again took a test, and again the doctor told her the results: "analysis of this test's results shows there is no evidence of disease." Now the patient felt much more optimistic about the future, because she knew the disease likely would have materialized had it actually been present.

h. The April 2018 and July 2018 test results confirmed the February, pre-exposure result. The doctor used exactly the same words in relating the test results in April 2018 and July 2018 as he had used in March 2018. Nevertheless, each time he used those words, the doctor conveyed additional good news.

119. This example shows how the same words can convey new information, as the context in which the words are uttered changes. To connect it to the present action, consider the following analogous relationships:

a. The patient in the previous example is analogous to the market.

b. The doctor is analogous to Alphabet.

c. The February 2018 test result is analogous to Alphabet's 2017 Annual Report, which was filed in February 2018.

d. The hazardous substance is analogous to the Cambridge Analytica scandal, which broke on March 17, 2018.

e. The disease is analogous to the presence of similar privacy problems in Alphabet's systems.

f. The April and July test results are analogous to Alphabet's April 23, 2018, and July 23, 2018, omissions affirming the identical risk disclosures in the 2017 Annual Report.

g. The patient's experience of the doctor's statements regarding the April and July test results as good news is analogous to the market's capacity to treat Alphabet's April 23, 2018, and July 23, 2018, omissions as good news. Market participants might have thought Alphabet would not necessarily be able to detect Facebook-like problems within the very first month after that scandal surfaced, so that the April 23, 2018 omission might have caused only a muted response. But by July, Alphabet's assurance would be more meaningful.

120. In sum, as context changes, including the simple fact that time has passed without the materialization of risks, the informational content of identical words can shift.

121. Other examples abound. For example, before a hurricane ravages the shoreline, a beachfront homeowner might react little to the statement: "You have a beautiful beach house" – but the identical statement would be cause for great relief in the hurricane's aftermath.

122. These examples illustrate the common sense point that – contra Professor Ferrell's assertion that identical risk-factor statements on different dates cannot possibly be "news" – changes in context matter in assessing the informational content Alphabet's statements deliver. This idea is so commonplace that it has its own adage: "No news is good news."

## B. Alphabet's Concealment of Bad News Related to Its Privacy and Security Crisis Was Likely Important News to the Market

123. Following the revelations of the Cambridge Analytica scandal in March 2018, Alphabet investors can be thought of analogously to the patient described just above – they would reasonably have jitters that the next user-data shoe to drop might be Alphabet's. Indeed, as detailed above, market observers recognized that the Facebook Cambridge Analytica investigation affected Alphabet, whether or not its executives testified to Congress, because of similarities in the business models of Alphabet and Facebook. "Google is able to track users even better than Facebook, and likely has a good amount of information on all Google services users."[92] Congressional regulation meant "the companies would have to begin haggling to fend off some proposals that would be intolerable, according to a top policy official at a major internet company," who added that data collection is "an

---

[92] Chris Smith, *Google hoards way more of your personal data than Facebook*, New York Post, April 23, 2018, nypost.com/2018/04/23/google-hoards-way-more-of-your-personal-data-than-facebook/; *see also* Christopher Mims, *Who Has More of Your Personal Data than Facebook? Try Google*, Wall Street Journal, April 22, 2018, www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401.

untouchable foundation of internet business models."[93] As one analyst stated, "should anyone want to regulate Facebook after the Cambridge Analytica mess, Google will also suffer the consequences."[94] Data collection had turned Facebook's ads into a major revenue stream, one which Google and other internet companies leveraged.[95] Data misuse, however, placed Facebook in front of Congress and placed that revenue stream at risk.[96] The "obvious reason" that Alphabet was able to evade the level of fallout that Facebook was experiencing is because:

a. Alphabet "avoided public blunders like the Cambridge Analytica data leak";[97]

b. "[T]here [wa]s no evidence that Google data have been compromised";[98] and

c. "Unlike Facebook, however, Google d[id]n't have any pressing privacy breach to deal with."[99]

124. Instead of informing the market that the facts had borne out such concerns, Alphabet released its Forms 10-Q on April 23, 2018 and July 23, 2018, which restated the same risk factors from the company's 2017 Annual Report on Form 10-K.[100]

125. In ¶51 of his report, Professor Ferrell writes:

---

93 Mark Bergen and Ben Brody, *Google's Facebook Copycat Moves Leave It More Exposed to Privacy Backlash*, Bloomberg, April 16, 2018, www.bloomberg.com/news/articles/2018-04-16/google-s-facebook-copycat-moves-leave-it-more-exposed-to-privacy-backlash.

94 Chris Smith, *Google hoards way more of your personal data than Facebook*, New York Post, April 23, 2018, nypost.com/2018/04/23/google-hoards-way-more-of-your-personal-data-than-facebook/.

95 Mark Bergen and Ben Brody, *Google's Facebook Copycat Moves Leave It More Exposed to Privacy Backlash*, Bloomberg, April 16, 2018, www.bloomberg.com/news/articles/2018-04-16/google-s-facebook-copycat-moves-leave-it-more-exposed-to-privacy-backlash ("[F]or years, [Google] certainly coveted the personal data that made Facebook Inc. a formidable digital ad player.").

96 Mark Bergen and Ben Brody, *Google's Facebook Copycat Moves Leave It More Exposed to Privacy Backlash*, Bloomberg, April 16, 2018, www.bloomberg.com/news/articles/2018-04-16/google-s-facebook-copycat-moves-leave-it-more-exposed-to-privacy-backlash ("And the strategies they set to compete have now placed Google squarely in the cross hairs of a privacy backlash against the world's largest social-media company.").

97 Mark Bergen and Ben Brody, *Google's Facebook Copycat Moves Leave It More Exposed to Privacy Backlash*, Bloomberg, April 16, 2018, www.bloomberg.com/news/articles/2018-04-16/google-s-facebook-copycat-moves-leave-it-more-exposed-to-privacy-backlash.

98 James Titcomb, *Google has dodged data scandal but is still in a mire*, The Daily Telegraph, April 30, 2018.

99 Chris Smith, *Google hoards way more of your personal data than Facebook*, New York Post, April 23, 2018, nypost.com/2018/04/23/google-hoards-way-more-of-your-personal-data-than-facebook/.

100 That report was submitted on February 5, 2018.

> Alphabet "incorporated the ***identical risk disclosures*** from its 2017 10-K," as such, in an efficient market, one would not expect Alphabet's stock prices to react to the risk disclosures. In an efficient market, for a disclosure to be "news" it must be "new."[101]

126. Professor Ferrell's argument here is no more compelling than would be the claim that the hypothetical patient in the example above should have reacted indifferently to news of the negative test results on April 23 and July 23. Investors could rationally believe that as time passed with no report by Alphabet that the company knew of any data or privacy-related problem, it was less and less likely that Alphabet actually had such a problem; no news indeed would be good news. Thus rational investors could be expected to revise their estimates of Alphabet's value with each new statement by Alphabet that was limited to reaffirming the previously stated risk factors and omitted to inform the market of the truth that Alphabet had privacy-related bugs.

127. To assess the market response to this news-by-implication, I conducted an event study for each of the April 24, 2018 and July 24, 2018, dates.[102]

### C. Event Study Results for April 24, 2018

128. I estimate abnormal returns as follows: (i) I compute Alphabet's event date predicted return based on regression model estimates; and (ii) I subtract this event date predicted return from Alphabet's actual return on the event date.

129. If privacy problems of the sort involved in this litigation actually are unimportant to investors, then concealment of bad news related to Alphabet's alleged privacy scheme would have no price impact. In that case, abnormal returns on April 24, 2018 would have the same distribution as abnormal returns on any non-event date in the Class Period. Accordingly, under the Ferrell null hypothesis, each event date abnormal return has a mean of 0.

130. If, instead, Alphabet's concealment caused a positive price impact, that would show up as a positive abnormal return on the event date, all else equal. Accordingly, the alternative hypothesis of price impact on an event date is that the mean abnormal return was ***positive*** for that date.[103]

131. I compute t-statistics in the usual way: (i) estimate the standard error of the event date abnormal return using the square root of the estimated mean squared error from the

---

[101] Ferrell Report, ¶51 (emphasis in original).

[102] The April 23, 2018 and July 23, 2018 Forms 10-Q were filed after trading hours. Ferrell Report, ¶¶50-51. Thus it is appropriate to treat the next trading day – respectively, April 24, 2018 and July 24, 2018 – as the event date in each case.

[103] I note that a ***negative*** abnormal return on this date would be wrong-signed under Lead Plaintiff's legal theory of liability and so would not be evidence of price impact consistent with Lead Plaintiff's legal theory of liability. This means that it is incorrect to test the null hypothesis against the alternative hypothesis that the abnormal return had a ***non-zero*** mean on an event date. I return to this issue below.

regression model; and (ii) divide the estimated abnormal return by that estimated standard error.

132. Table 1 reports results from the event study for April 24, 2018.

| Table 1: Stock Price Reactions of Alphabet on 4/24/2018 | | | |
|---|---|---|---|
| | | Class A Stock | Class C Stock |
| Raw Return | [A] | -4.77% | -4.45% |
| Predicted Return | [B] | -1.31% | -1.33% |
| Abnormal Return | [C] | -3.45% | -3.11% |
| T-statistic | [D] | -3.38 | -3.03 |
| p-value (Ferrell null) | [E] | 0.000 | 0.001 |

133. The estimated abnormal return for Class A shares is -3.45%, and the corresponding t-statistic is -3.38.

a. These results are wrong-signed from the point of view of Lead Plaintiff's legal theory of liability as to April 24, 2018, which implies that the abnormal return on this date should come from a distribution with a positive mean.

b. Using a significance level of $\alpha = 0.10$,[104] the critical value for testing the Ferrell null hypothesis is $z_{0.9} = 1.28$. Because the t-statistic of -3.38 has sign opposite to that predicted by Lead Plaintiff's legal theory of liability, my results indicate that the Ferrell null hypothesis should not be rejected. I emphasize, though, that Professor Ferrell provided no consideration of confounding factors that might have caused Alphabet's stock price to fall even in the presence of the positive price impact specified by Lead Plaintiff's legal theory of liability. In terms of the notation in ¶49, that is, Professor Ferrell simply assumes that $\pi_{t,OtherSources}$ equals 0. Below, I discuss reasons to doubt that assumption's truth – *i.e.*, reasons to think that the measured change in price includes a nonzero $\pi_{t,OtherSources}$ component, so that measured price change is, by itself, an inadequate measure of price impact.

c. Next, I consider the results when Lead Plaintiff's legal theory of liability is the null hypothesis, rather than the alternative hypothesis. Again using a significance level of $\alpha = 0.10$, the critical value for testing the

[104] This is the significance level I have used throughout my career as a scholar publishing empirical research.

null hypothesis of price impact consistent with Lead Plaintiff's legal theory of liability is $z_{0.10} = -1.28$. Because the t-statistic for April 24, 2018 is to the left of this value, the null hypothesis of a price change on that date in the same direction as the price impact predicted by Lead Plaintiff's legal theory of liability is rejected at significance level 0.10.

134. Thus the statistical evidence for April 24, 2018 is inconsistent with a finding that price ***changed*** in the direction predicted by Lead Plaintiff's legal theory of liability on that date.

135. But this fact alone does not rebut Lead Plaintiff's legal theory of liability for the April 23, 2018 omission, because of the possibility that $\pi_{t,OtherSources}$ is not zero. Professor Ferrell acknowledges this point in the abstract when he writes that "when there are multiple pieces of information disclosed contemporaneously on a day when an event study finds a statistically significant price movement, an event study analysis alone cannot determine which piece of information was value-relevant."[105]

136. Given the proximity in time to the Cambridge Analytica scandal, for example, common sense suggests the market might have regarded Alphabet's restatement of its risk disclosure as not revealing much additional reason for optimism about Alphabet's exposure to such a scandal of its own;[106] investors might reasonably believe Alphabet wouldn't yet have found a similar bug. Further, Alphabet's misleadingly positive Form 10-Q report was only one piece of information that could have affected Alphabet's stock price on April 24, 2018. *The New York Times* reported that on that day that the sharp drop in Alphabet's stock price might have happened because "[i]nvestors appeared concerned with a surge of spending at the company that hurt its profit margins."[107] Investors' negative reaction to new information about Alphabet's spending would cause $\pi_{t,OtherSources}$ to have a negative value. Because measured price change is the sum of this negative value and the magnitude of price impact related to the omission, measured price change can be negative even when there is positive price impact due to Alphabet's omission. Professor Ferrell fails to consider this alternative explanation for Alphabet's April 24, 2018 stock price drop. In fact, other than his statistical analysis, he offers no discussion at all of the events immediately following Alphabet's April 23, 2018 release of its Form 10-Q report. This failure contradicts his acknowledgment that proper interpretation of event study results requires "another crucial step in the analysis," namely "'to closely examine the events and institutions involved'" via "'deductive reasoning.'"[108]

---

105 Ferrell Report, ¶43.

106 Recall the analogy to our patient from above: Her April test provided limited information because it came so soon after the March exposure.

107 Matt Phillips, *Grumpy Investors Can't Find Anything to Look Forward To*, New York Times, April 24, 2018, https://www.nytimes.com/2018/04/24/business/stock-markets-inflation-earnings.html.

108 Ferrell Report, ¶40 (partially quoting R. Gilson and B. Black, 1995, *The Law and Finance of Corporate Acquisitions*, Foundation Press, p. 221).

137. In order to better assess whether Alphabet's market value was inflated by its April 23, 2018 omission, one can perform an event study for the dates when the relevant truth is revealed to the market, and then infer that the event study-based stock price drop constitutes the measurable impact of the fraudulent failure to disclose. In addition to his use of an event study (however flawed) for the October 2018 dates in his report in the present matter, Professor Ferrell has endorsed this approach in his academic work.[109]

138. The event study results in Part X below suggest that disclosure in October 2018 of facts concealed by the alleged privacy scheme, together with subsequent developments pointing to the threat of adverse regulatory activity and the revelations in April 2019, caused just such drops in the market's expectations about Alphabet's future earnings path, thereby explaining the systematic price impact on the October 2018 dates discussed below.

### C. Event Study Results for July 24, 2018

139. As noted, Alphabet's concealment of its alleged privacy scheme kept the market from learning there was reason to think Alphabet's future earnings path was worse than could be ascertained from public data. By omitting to tell the market bad news on July 24, 2018 – essentially conveying that no privacy or data misuse problem had yet been found – Alphabet allowed the market to hold an unduly optimistic assessment of Alphabet's future earnings path. With roughly four months having elapsed since the Cambridge Analytica scandal, the market could be expected to treat this second omission as cause for optimism. That, in turn, would cause an inflated share price relative to the value the market would assess if the truth were known rather than hidden.

140. This is a simple application of the idea of using discounted cash flows ("DCF") to value a firm. To wit:

> "Value today always equals future cash flow discounted at the opportunity cost of capital."[110]

141. Professor Ferrell expresses agreement with this fundamental tenet of valuation, noting in ¶31 of his report that changes in Alphabet's stock price would flow from changes in

[109] Lucian A. Bebchuk and Allen Ferrell, *Rethinking Basic*, 69 Bus. Law. 671, 692 (2014) (Noting that one "potential use of an event study would be to measure whether there was a price reaction when the market learned the truth about the misstatement – that is, at the time of a corrective disclosure. This could be relevant to the question of whether the misstatement at the time it was made resulted in fraudulent distortion (even if it was a confirmatory lie).").

[110] Richard A. Brealey, Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* 95 (13th ed. 2020). *See also*, *e.g.*, Stephen H. Penman, *Combining Earnings and Book Value in Equity Valuation*, 15 Contemporary Accounting Research 291, 295 (2010) ("Price is viewed as being based on expected future earnings.").

Alphabet's "expected future cash flows and the risk thereof."[111] Expectations about future risks are particularly important to understanding the July 23, 2018, omission.

142. In its July 23, 2018 Form 10-Q, Alphabet once again reported after business hours that the company had had no material changes to its risk factors since its Annual Report on Form 10-K for the previous year. Alphabet also announced revenues nearly $500 million above expectations,[112] and its earnings beat analyst expectations by $1.5 billion.[113]

143. Alphabet's Class A stock rose 3.89% by the close of the trading day on July 24, 2018, and its Class C stock rose 3.45%, so that the company's market cap increased roughly $29 billion.

144. A firm's report of a one-time earnings beat is, in isolation, just an immediate increase in firm assets of $1.5 billion. By itself, then, an additional $1.5 billion in earnings increases the present value of cash flows only by that same $1.5 billion. Thus if news of a $1.5 billion earnings beat causes a public firm's market cap to spike more than $1.5 billion – and here, the jump was roughly $29 billion – the basic finance theory described above tells us the market must expect higher future earnings, lower risks or both, compared to expectations before the report.[114]

145. By inducing reduced expectations of future exposure to privacy and data problems, Alphabet's omissions on July 23, 2018, reasonably can be viewed as news that would have a positive price impact on July 24, 2018.

---

[111] Ferrell Report, ¶31.

[112] James Dean, *Alphabet shares leap despite EU's €4.3bn fine*, The Times, July 24, 2018.

[113] Reported earnings were $2.11 per share above analysts' average expectations. *See* Jeremy C. Owens and Max A. Cherney, *Alphabet stock soars to record highs as Google earnings smash expectations; After accounting for record EU antitrust fine, Alphabet earnings beat expectations by more than $2 a share*, MarketWatch, July 24, 2018, https://www.marketwatch.com/story/alphabet-stock-soars-to-potential-record-highs-as-google-earnings-smash-expectations-2018-07-23.
Alphabet had 703.247 million fully diluted shares for the three months ending June 30, 2018. *See* "Alphabet Announces Second Quarter 2018 Results," Alphabet press release, dated July 23, 2018. Multiplying $2.11 per share by 703.247 million shares yields a total of $1.5 billion.

[114] *See, e.g.*, Eli Bartov, Dan Givoly and Carla Hayn, *The rewards to meeting or beating earnings expectations*, 33 J. Accounting & Econ. 173, 175 (2002) ("The premium to earnings surprises appears to be justified on economic grounds: Earnings surprises apparently possess information content with respect to future earnings as evidenced by the positive association between earnings surprises and future firm performance."); Merton H. Miller and Kevin Rock, *Dividend Policy Under Asymmetric Information*, 40 J. Finance 1031, 1031-1032 (1985) ("The market's estimate of current earnings contributes in turn to the estimate of the expected future earnings on which the firm's market value largely hinges"); Roger Kormendi and Robert Lipe, *Earnings Innovations, Earnings Persistence, and Stock Returns*, 60 J. Business 323, 324 (1987) (citing Miller and Rock for the proposition that "the magnitude of the return reaction to an earnings innovation should be a function of the "persistence" of earnings, that is, the effect of an earnings innovation on expected future earnings").

146. I therefore conducted an event study for July 24, 2018.[115] Results appear in Table 2.

| Table 2: Stock Price Reactions of Alphabet on 7/24/2018 | | | |
|---|---|---|---|
| | | Class A Stock | Class C Stock |
| Raw Return | [A] | 3.89% | 3.53% |
| Predicted Return | [B] | 0.73% | 0.74% |
| Abnormal Return | [C] | 3.17% | 2.79% |
| t-statistic | [D] | 3.12 | 2.77 |
| p-value (Ferrell null) | [E] | 0.001 | 0.003 |
| Confidence level (Ferrell null) | [F] | 100% | 100% |
| Likelihood Ratio | [G] | 129.2 | 46.9 |

147. The table shows that the event study results are as follows:

a. On July 24, 2018, Alphabet's Class A stock daily return was 3.89%. Its predicted return was 0.73%, and the abnormal return was 3.17% (= 3.89% – 0.73%, after accounting for rounding). The sign of this abnormal return is as predicted by Lead Plaintiff's legal theory of liability, according to which Alphabet's July 23, 2018 after-hours omission would be expected to cause price inflation on the next day.

b. The t-statistic associated with this abnormal return was 3.12.

c. The p-value associated with testing the Ferrell null hypothesis against the alternative hypothesis of price impact consistent with Lead Plaintiff's legal theory of liability (the "Ferrell null p-value") is 0.001 (equivalently, the confidence level is 100% to zero decimal places).

d. The likelihood ratio in favor of price impact consistent with Lead Plaintiff's legal theory of liability was 129.

e. The results are broadly similar for Alphabet's Class C stock. Its daily return was 3.53%. Its predicted return was 0.74%, and the abnormal return was thus 2.79% (= 3.53% – 0.74%). The sign of this abnormal return is as predicted by Lead Plaintiff's legal theory of liability, according to which Alphabet's July 23, 2018, after-hours omission

[115] As noted in ¶46, the regression model for this event study includes a constant and the Non-Internet Index. As with the other event dates, and for the same reasons described in Part V of this report, I exclude the Internet Index.

would be expected to cause price inflation on the next day. The t-statistic associated with this abnormal return was 2.77. The Ferrell null p-value associated with this t-statistic is 0.003 (equivalently, the confidence level is 100% to zero decimal places).[116] The likelihood ratio in favor of price impact consistent with Lead Plaintiff's legal theory of liability is roughly 47.

f. These event study results are sufficient to reject the Ferrell null hypothesis at the 0.10 significance level, as well as at both the more demanding 0.05 level that Professor Ferrell verbally endorses in his report and the 0.025 level that he actually uses.

g. When we treat Lead Plaintiff's legal theory of liability as the null hypothesis, that hypothesis is not rejected against the alternative hypothesis that price moved in the direction opposite to Lead Plaintiff's legal theory of liability.

148. These event study results for July 24, 2018 are powerful evidence of positive price change on that date.

149. Professor Ferrell concedes that his event study also finds that the July 24, 2018 price increase was "statistically significant."[117] Nonetheless, he concludes "that Alphabet's stock price increase is attributable to factors unrelated to the relevant risk disclosures," citing two market commentators' statements about the earnings beat.[118] Professor Ferrell makes no attempt to assess whether the earnings beat, by itself, justifies Alphabet's stock price increase on July 24, 2018: he does not discuss the mismatch between the relatively modest magnitude – $1.5 billion – of Alphabet's earnings beat and the large increase – $29 billion – in the company's valuation. Nor does Professor Ferrell consider the possibility that market expectations would have been different if Alphabet had disclosed the truth about its privacy issues.

150. In fact, Professor Ferrell provides no statistical evidence to support his decision to simply ignore his event study results for July 24, 2018. Its sole basis is Professor Ferrell's contention that, because the July 23, 2018 disclosures used identical words to those Alphabet previously used, it would be impossible for rational investors to treat the July 23, 2018 statement as having positive news value.

151. Professor Ferrell's event study for July 24, 2018 thus plays no role in his conclusion that "there is no reliable economic basis to conclude that the price increase in Alphabet's stock can be ascribed to the alleged misleading statement/omission on July 23, 2018."[119]

---

116 The likelihood ratio is also large, at roughly 47.

117 Ferrell Report, ¶51.

118 Ferrell Report, ¶51.

119 Ferrell Report, ¶52.

152. In other words, Professor Ferrell would advance the opinion he has offered for July 24, 2018 ***no matter the statistical evidence***.

153. Moreover, Professor Ferrell ignores yet other market commentators who expressly noted that Alphabet had apparently dodged data-privacy-related risks:

a. *CNBC* published a story on July 24, 2018 about Alphabet's "blowout earnings" and "soar[ing]" shares. The second sentence of the story was the following: "The Google parent's positive numbers, which came despite fears about an immediate impact from Europe's new privacy rules, revealed that the company spent slightly less to drive traffic to its site."[120]

b. Pivotal Research Group published a research report with the following findings:

> BOTTOM LINE: Alphabet sustained >20% constant currency growth for the 12th consecutive quarter, generating $33bn in gross revenue during 2Q18 and beating expectations on both top and bottom lines.
>
> Alphabet reported constant currency growth of +23% for 2Q18, similar to growth observed in almost every quarter since 4Q15. Beyond ongoing market share gains in digital advertising, we think that relatively easy comparables because of last year's YouTube advertiser boycott and incremental revenue from GDPR probably helped as well.
>
> There do not appear to be any signs that should cause a meaningful slowdown any time soon, as fines from the EC are not likely to hamper Alphabet's growth rate. Conversely, regulatory changes such as GDPR in Europe (and similar laws implemented elsewhere) could have the effect of reinforcing Alphabet's growth going forward ***unless regulators choose to more aggressively attack Alphabet's market co-dominance, which they may very well do at some point in the future***.
>
> PRIVACY AND DATA-SHARING CONCERNS. A looming threat for all web publishers relates to rules established by governments which limit how publishers use consumer data with or without explicit authorization. ***Rules could be established in the future which hinder Google's ability to operate successfully given its heavy reliance on data to drive its core revenue generating activities***.[121]

c. Macquarie Research issued a report highlighting as a "Key Positive[] in the Quarter" that "GDPR a non-issue thus far – mgmt. states too early to

[120] *See* Michael Bloom, *Here's what every major Wall Street analyst had to say about Alphabet's blowout earnings*, CNBC, 24 July 24, 2018, https://www.cnbc.com/2018/07/24/heres-what-wall-street-analysts-had-to-say-about-alphabets-earnings.html.

[121] *GOOGL: Good 2Q18 Operating Results, Ongoing Increases in Capex*, Pivotal Research Group, July 24, 2018 (emphasis added).

tell, but no impact yet." As part of its target price risks, Macquarie Research noted "regulatory/legal risks (including, but not limited to, issues surrounding user privacy)."[122]

d. J.P. Morgan issued a report indicating as part of its first "Key Takeaway[] From Alphabet Earnings & Calls w/Management" that "mgmt did not call out GDPR as having any particular impact & noted that it remains early."[123]

e. Aegis Capital Corp. issued a report on July 24, 2018, raising its price target to $1,425, providing the following "Investment Thesis":

> Despite the business continuing to benefit from multiple secular tailwinds, including healthy growth in Search and video through YouTube, the shares . . . have been hindered due to margin concerns, regulatory concerns, and GDPR risks. We see the stock working through these concerns due to growth opportunities in Search as result of new and enhanced ad formats and AI, continued strength at YouTube, and growth of enterprise cloud computing.[124]

f. Oppenheimer issued a report giving GOOG a target price of $1,450, and noted "potential new privacy regulations" as its first "key risk."[125]

g. Suntrust Robinson Humphrey issued a report with an Earnings Recap stating that: "CEO Sundar Pichai believe[d] GDPR was something Google had been working on for 18 months before its effective date, but that it was too early to tell if there were any negative effects to the business. Search, which accounts for over 80% of total revenue (by our estimate) we believe is relatively insulated from the impending regulation. However, YouTube and Network (especially programmatic) could be impacted, considering their greater reliance on data, both first and third party."[126]

h. Wells Fargo issued a report increasing its price target from $1,275 to $1,400: "Our $1,400 target is based on a five-year DCF, and it implies 28x our 2019E GAAP EPS estimate. Risks to Alphabet include new General Data Protection Regulation (GDPR), which stands to change how large audience platforms like Google can collect and use customer

[122] *2Q'18: Strong Revs; Investments Continuing*, Macquarie Research, July 24, 2018.
[123] *Alphabet Inc. (GOOGL): Investments Again Drive Strong Top Line Growth, with Better 2Q Margins; Reiterate OW, PT to $1,440*, J.P. Morgan, July 24, 2018.
[124] *Alphabet Inc.; Rating: Buy; Strong Ad Growth Momentum; TAC Growth Pressures Eased; PT To $1,425; Still In The Race To $1T*, Aegis Capital Corp., July 24, 2018.
[125] *Alphabet Inc.: Top-line Growth Continues, Valuation Appears Compelling, Target to $1,450, Maintain Outperform*, Oppenheimer, July 23, 2018.
[126] *Alphabet Inc. (GOOGL): Maint. Buy/PT to $1,370 on Clean 2Q18 Beat; Regulatory Headwinds Remain*, Suntrust Robinson Humphrey, July 23, 2018.

> data, further EU regulatory hurdles, user activity shifting to verticalized, native mobile apps, growing TAC, and longer-term, the potential for saturation of digital ad dollars."[127]

154. In sum, Professor Ferrell does not sever the causal relationship between Alphabet's July 23, 2018 omissions and the powerful statistical evidence that Alphabet's stock price increased consistent with Lead Plaintiff's legal theory of liability immediately following those omissions.

## X. There Is Affirmative Evidence of Price Impact on October 8-10, 2018, Following the Initial Disclosure of Facts that the Alleged Privacy Scheme Concealed Undercuts Professor Ferrell's Conclusion that There Was No Price Impact

### A. Basics on Data and Event Study for October 8, 9, and 10, 2018

155. As with the April 23, 2018 and July 23, 2018 omission dates, I conducted an event study to assess whether the statistical evidence supports the conclusion that there was price impact on the dates of October 8, 9, and 10, 2018.

156. Crucially, as described above, I have designed this event study to eliminate contamination bias arising from Professor Ferrell's use of market and industry index variables that are heavily populated by firms in internet-exposed industries; see the discussion in Part VIII.

157. Unlike the results for April 23 and July 23, 2018 (discussed above), or for April 30 and May 1, 2019 (discussed below), the different conclusions that Professor Ferrell and I draw for the October 2018 dates when testing his specified null hypothesis of zero price impact turn partly on the choice of significance level when testing the Ferrell null hypothesis. Professor Ferrell's stated preference for a significance level of 5% (confidence level of 95%) is characteristic of many who apply the standards of statistical evidence conventionally required for publication in academic journals – including in financial economics journals. However, there is no requirement to impose this standard. For example, other scholars use a 10% significance level (confidence level of 90%).[128] And despite his stated preference for a significance level of 5%, the level that Professor Ferrell actually imposes in his report is 2.5% (confidence level of 97.5%).

158. Additionally, it is important to remember that Professor Ferrell's choice to treat the zero price impact hypothesis as the null hypothesis means that the only possible conclusions he can draw, consistent with proper statistical methodology, are (i) rejection of his null hypothesis that there was zero price impact or (ii) that neither price impact consistent with Lead Plaintiff's legal theory of liability nor zero price impact can be

---

127 *GOOGL: Organic Revs Accelerate; TAC Moderates*, Wells Fargo, July 23, 2018.

128 For example, I have used that standard throughout my career in academic journal publishing.

rejected. Thus even if Professor Ferrell's flawed event-study results were accepted, they would not support a finding that there was no price impact.

159. It is possible to implement a significance test that ***can*** reject the hypothesis of price impact, by assigning null hypothesis status to Lead Plaintiff's legal theory of liability, *i.e.*, treating price impact as the null hypothesis. As I discuss in Appendix E, ¶34, the p-value associated with this testing approach equals 1 minus the p-value for testing the Ferrell null hypothesis.

## B. Event Study Results for October 8, 2018

160. Table 3 reports key event study statistics relevant for October 8, 2018.

Table 3: Stock Price Reactions of Alphabet on 10/08/2018

| | | Class A Stock | Class C Stock |
|---|---|---|---|
| Including Only Non-internet SP500 firms | | | |
| Raw Return | [A] | -1.02% | -0.72% |
| Predicted Return | [B] | 0.58% | 0.59% |
| Abnormal Return | [C] | -1.60% | -1.32% |
| t-statistic | [D] | -1.53 | -1.28 |
| p-value (Ferrell null) | [E] | 0.063 | 0.101 |
| Confidence level (Ferrell null) | [F] | 94% | 90% |
| Likelihood Ratio | [G] | 3.2 | 2.3 |

a. The "Raw Return" row [A] shows that Alphabet's Class A stock ***fell*** 1.02% on October 8, 2018.

b. The "Predicted Return" row [B] shows that the regression model predicted that, given the performance of the index of non-internet firms on October 8, Alphabet's Class A stock could have been expected to ***rise*** 0.58%.

c. The "Abnormal Return" row [C] equals the row [A] number minus the row [B] number. Because Alphabet's stock was predicted to rise but actually fell, the abnormal return is even more negative than the actual return: Alphabet's Class A stock abnormal return for October 8, 2018, was -1.60%.

d. The "t-statistic" row [D] reports the ratio of row [C] to the model-based estimate of the standard error of the daily return on Alphabet's Class A stock.[129] The resulting t-statistic's value is -1.53.

e. The next row [E] reports the Ferrell null p-value for October 8, 2018, against the alternative hypothesis that the daily return came from a distribution with a negative mean, consistent with Lead Plaintiff's legal theory of liability. This p-value is 0.063.

f. Row [F] is the confidence level corresponding to the Ferrell null p-value. The confidence level is 1 minus the p-value, with the result expressed as a percentage. The confidence level is 94%.

g. The results for Alphabet's Class C stock indicate a somewhat smaller abnormal return (-1.32% rather than -1.60% for Class A) and a correspondingly smaller t-statistic (-1.28 rather than -1.53 for Class A). The Ferrell null p-value and confidence level for Class C are 0.101 and 90%.

161. These results support a finding of price impact for October 8, 2018, based on scholarly conventions for null hypothesis significance testing using the Ferrell null hypothesis. Therefore, these results also do not support the rejection of Lead Plaintiff's legal theory of liability when it is assigned null hypothesis status. Further, when Lead Plaintiff's legal theory of liability is treated as the null hypothesis, the p-value is 0.937 (Class A) and 0.899 (Class C), far above either the 0.025 significance level Professor Ferrell uses or the 0.05 significance level he mistakenly says he uses. Thus, there is no possible basis in these results to reject the hypothesis of price impact.

162. Further, using scholarly conventions for significance testing obscures the fact that the results in Table 3 provide strong support for a finding in favor of price impact, given that the governing standard is preponderance. As I have explained in my scholarly writing, scholarly conventions are, ***by design***, stronger than what is required to meet a standard of "more likely than not" or "more probable than not."[130]

163. Claims about statistical significance allow a statistician to evaluate the probability of observing the actual result or one that is more extreme, ***if the null hypothesis is true***. Such a probability bears at most an indirect connection to the preponderance standard that I understand applies to the question of whether there was price impact on alleged revelation dates. In particular, claims about statistical significance simply ignore the comparative question of whether the event study's observed result would be more or less likely if (i) there were really price impact consistent with Lead Plaintiff's legal theory of liability, than if (ii) there were not.

---

129 This estimated standard error was 0.0105. *See* Appendix D for further details.

130 Jonah B. Gelbach, *Estimation Evidence*, 168 U. Pa. L. Rev. 549, 602 (2020) ("By design, significance levels used in scholarship are . . . meant to be powerful.").

164. As discussed above, though, statistical methodology does offer a simple tool for answering that comparative question: the ***likelihood ratio***. The likelihood ratio allows direct consideration of the question of whether the statistical evidence on Alphabet's October 8, 2018, stock price drops reasonably meets the preponderance standard for price impact, because it answers the question of which hypothesis would be more likely to generate the observed data.[131]

165. Table 3 shows the likelihood ratio in favor of finding that the abnormal return came from a distribution with a negative mean. This likelihood ratio is 3.2 for Alphabet's Class A stock. That indicates that ***it would be more than 3 times as likely to observe the abnormal return of -1.60% if the actual price impact of the October 8, 2018 alleged revelation was a Class A price drop of 1.6%, than if there had been no price impact.***

166. For Class C stock, the likelihood ratio is 2.3, indicating that it would be more than twice as likely to observe the abnormal return of -1.32% if the actual price impact was a drop of 1.32%, than if there had been no price impact on October 8, 2018.

167. Thus the event study evidence indicates that the observed abnormal returns for Alphabet's Class A and Class C stock would be roughly 2 to 3 times more likely to occur with price impact equal to the abnormal returns observed on October 8, 2018 than if there was a zero mean. This is strong evidence, relative to the preponderance standard, that price impact, rather than random fluctuations, better explains the observed data.

### C. Event Study Results for October 9, 2018

168. Table 4 reports results for the event study involving October 9, 2018.

| Table 4: Stock Price Reactions of Alphabet on 10/09/2018 | | | |
|---|---|---|---|
| | | Class A Stock | Class C Stock |
| Raw Return | [A] | -0.93% | -0.88% |
| Predicted Return | [B] | -0.42% | -0.43% |
| Abnormal Return | [C] | -0.51% | -0.46% |
| t-statistic | [D] | -0.49 | -0.44 |
| p-value (Ferrell null) | [E] | 0.313 | 0.329 |
| Confidence level (Ferrell null) | [F] | 69% | 67% |

[131] For a similar view, *see* Dr. J.B. Heaton, *Price Impact in Securities Fraud Litigation* at 2, May 23, 2023, draft on file with this author (writing that "where an abnormal return is directionally consistent with a plaintiff's theory of liability, it will be the case that it is statistically more likely than not that the event had a price impact").

| | | | |
|---|---|---|---|
| Likelihood Ratio | [G] | 1.1 | 1.1 |

a. The "Raw Return" row [A] shows that Alphabet's Class A stock price dropped 0.93% on October 9, 2018.

b. The "Predicted Return" row [B] shows that the regression model predicted that, given the performance of the index of non-internet firms on October 9, Alphabet's Class A stock could have been expected to fall 0.42%.

c. The "Abnormal Return" row [C] equals the row [A] number minus the row [B] number. Because Alphabet's stock was predicted to fall, but by less than it actually fell, the abnormal return is negative but smaller in magnitude than the actual return: Alphabet's Class A stock abnormal return for October 9, 2018, was −0.51%.

d. The "t-statistic" row [D] reports the ratio of row [C] to the model-based estimate of the standard error of the daily return on Alphabet's Class A stock.[132] The resulting t-statistic's value is −0.49.

e. The next row [E] reports the Ferrell null p-value for October 9, 2018, which is 0.313.

f. Row [F] is the confidence level corresponding to the Ferrell null p-value. The confidence level is 1 minus the p-value, with the result expressed as a percentage. The confidence level is 69%.

g. The results for Alphabet's Class C stock on October 9, 2018, indicate a similar abnormal return (−0.46%), a correspondingly similar t-statistic (−0.44), Ferrell null p-value (0.329) and confidence level (67%).

h. The likelihood ratio for October 9, 2018, was 1.1 for both classes of Alphabet's stock.

169. The results for October 9, 2018 show that although the abnormal return and t-statistic have the sign predicted by Lead Plaintiff's legal theory of liability, which points in favor of price impact, the Ferrell null p-value and confidence level indicate considerably less strength than would be required by scholarly conventions for null hypothesis significance testing. Importantly, though, the t-statistic for October 9, 2018 lies between the critical values $z_\alpha$ and $z_{1-\alpha}$ for conventional scholarly choices of $\alpha$ such as 0.10 or lower, and as I discuss in Appendix E, this means that neither hypothesis can be rejected at such significance levels.

132 This estimated standard error was 0.0105. *See* Appendix D for further details.

170. The likelihood ratio results indicate that the observed data for October 9, 2018, would be only slightly – *i.e.*, about 10% – more likely to be observed under the alternative hypothesis of price impact equal to the abnormal return values, than under the Ferrell null hypothesis.

**D. Event Study Results for October 10, 2018**

171. Table 5 reports results from the event study for October 10, 2018.

| Table 5: Stock Price Reactions of Alphabet on 10/10/2018 | | | |
|---|---|---|---|
| | | Class A Stock | Class C Stock |
| Raw Return | [A] | -4.63% | -5.06% |
| Predicted Return | [B] | -3.38% | -3.44% |
| Abnormal Return | [C] | -1.25% | -1.62% |
| t-statistic | [D] | -1.2 | -1.57 |
| p-value (Ferrell null) | [E] | 0.116 | 0.058 |
| Confidence level (Ferrell null) | [F] | 88% | 94% |
| Likelihood Ratio | [G] | 2.0 | 3.4 |

a. The "Raw Return" row [A] shows that Alphabet's Class A stock fell 4.63% on October 10, 2018.

b. The "Predicted Return" row [B] shows that the regression model predicted that, given the performance of the index of non-internet firms on October 10, 2018, Alphabet's Class A stock could have been expected to fall 3.38%.

c. The "Abnormal Return" row [C] for Alphabet's Class A stock abnormal return for October 10, 2018, was thus −1.25% for October 10, 2018.

d. The "t-statistic" row [D] reports that the t-statistic's value for Alphabet's Class A stock is −1.2 for October 10, 2018.

e. The next row [E] reports the Ferrell null p-value for October 10, 2018,[133] which is 0.116 for Alphabet's Class A stock.

[133] *See* discussion of the p-value in ¶68 above.

f. Row [F] reports the confidence level corresponding to the Ferrell null p-value just discussed. The confidence level is 1 minus the p-value, with the result expressed as a percentage. The confidence level for October 10, 2018, is 88% for Alphabet's Class A stock.

g. The results for Alphabet's Class C stock on October 10, 2018, indicate a larger negative abnormal return (−1.62% rather than −1.25%), a correspondingly larger t-statistic (−1.57 rather than −1.2), and thus a lower Ferrell null p-value (0.058 rather than 0.116) and a higher confidence level (94%).

h. The likelihood ratio for October 10, 2018, was 2.0 for Alphabet's Class A stock and 3.4 for Class C stock.

172. These results imply that evidence in favor of price impact on October 10, 2018, for Alphabet's Class C stock meets scholarly conventions for statistical significance, *i.e.*, the Ferrell null hypothesis is rejected for this date at the 0.10 significance level.

173. Further, these results do not lead to the rejection of Lead Plaintiff's legal theory of liability when this theory is assigned the status of null hypothesis.

174. The corresponding results for Alphabet's Class A stock imply that evidence in favor of price impact on October 10, 2018, for Alphabet's Class A stock is slightly weaker than what scholarly conventions for statistical significance require, *i.e.*, the Ferrell null hypothesis would be rejected for this date only at significance levels above 0.10.

175. For both classes of stock, the likelihood ratio indicates that relative to the preponderance standard, there is substantial evidence in favor of price impact on October 10, 2018: the observed data would be twice (Class A stock) or more than 3 times (Class C stock) as likely to be observed with price impact equal to the abnormal return values as with zero price impact.

### E. Event Study Results for October 8, 9, and 10, 2018 Considered Together

176. Table 6 reports event study results concerning the sum of abnormal returns for October 8, 9, and 10, 2018.

| Table 6: Cumulative Stock Price Reactions of Alphabet for October 8, 9, and 10, 2018 | | | |
|---|---|---|---|
| | | Class A Stock | Class C Stock |
| Raw Return | [A] | -6.58% | -6.67% |
| Predicted Return | [B] | -3.21% | -3.27% |
| Abnormal Return | [C] | -3.36% | -3.40% |
| t-statistic | [D] | -1.85 | -1.9 |
| p-value (Ferrell null) | [E] | 0.032 | 0.029 |
| Confidence level (Ferrell null) | [F] | 97% | 97% |
| Likelihood Ratio | [G] | 5.6 | 6.1 |

a. The "Raw Return" row [A] shows that Alphabet's Class A stock fell a total of 6.58% over the three days of October 8-10, 2018.

b. The "Predicted Return" row [B] shows that the regression model predicted that, given the performance of the index of non-internet firms on October 8-10, 2018, Alphabet's Class A stock could have been expected to fall a total of 3.21%.

c. The "Abnormal Return" row [C] for Alphabet's Class A stock abnormal return for October 8-10, 2018, thus totaled −3.36%.

d. The "t-statistic" row [D] reports that the t-statistic's value for Alphabet's Class A stock is −1.85 for October 8-10, 2018.

e. The next row [E] reports the Ferrell null p-value for October 8-10, 2018, which is 0.032 for Alphabet's Class A stock.

f. Row [F] reports the confidence level corresponding to the Ferrell null p-value. The confidence level is 1 minus the p-value, with the result expressed as a percentage. The confidence level for October 8-10, 2018, is 97% for Alphabet's Class A stock.

g. The results for Alphabet's Class C stock on October 8-10, 2018, are very similar to those for Class A stock in all respects; the total abnormal return is −3.40%, the t-statistic is −1.9, the Ferrell null p-value is 0.029 and the confidence level is 97%.

h. The likelihood ratio for October 8-10, 2018, was 5.6 for Alphabet's Class A stock and 6.1 for Class C stock.

177. The results for the Ferrell null p-values/confidence levels imply that for both Alphabet's Class A stock and Class C stock, the evidence in favor of price impact over the three-day period of October 8-10, 2018 is strong enough to reject the Ferrell null hypothesis at conventional scholarly levels of statistical significance, including the 5% significance level that Professor Ferrell advocates.[134]

178. When null hypothesis status is assigned to Lead Plaintiff's legal theory of liability, the evidence fails to reject this hypothesis at any conventional level of statistical significance.

179. Further, for both classes of stock, the likelihood ratio indicates that relative to the preponderance standard, there is strong evidence in favor of price impact on the three days considered together. For each type of stock, ***the observed data would be roughly 6 times more likely to be observed with price impact equal to the abnormal return values, than with zero price impact.***

## XI. The Revelation on April 29, 2019 Was Associated with Negative Price Impact on April 30 and May 1, 2019

180. The Complaint alleges that:

> Google admitted in its October 8, 2018 blog post that it discovered and remediated the lone [Google+ bug] in March 2018, but that was just the tip of the iceberg.[135]
>
> Also on October 8, 2018, Google announced a sweeping set of data privacy measures as part of its response to the events described in the *WSJ* article, including: (1) launching more granular Google Account permissions to give consumers "more fine-grained control over what account data they choose to share with each app"; (2) limiting the applications that may seek permission to access users' Gmail data; and (3) limiting the ability of applications to ask for permission to access information in users' telephones. In addition, Google pledged that "[i]n the coming months, we'll roll out additional controls and update policies across more of our APIs." These are the types of decisions that the Companies consider and study for months, not minutes, before making them.[136]
>
> By the end of the first financial quarter of 2019, the risks from the remedial measures related to the events described in the *WSJ* article (*see* ¶76 above) (of which the Google+ crisis was the tipping point) materialized. On April 29, 2019, the big news of Alphabet's first quarter financial results was that "product changes" had had an adverse effect on its business. An adverse effect on Alphabet's revenues was a materialization of the risks posed by the remedial measures related to the events described in the *WSJ* article. As described above in ¶76 and the Project Strobe October 8, 2018 blog post referenced therein, responsive product changes included stricter Google Account permissions to curtail advertisers'/developers' overly broad access to Android device and Google Account data, and "additional controls and update[d] policies across more of our APIs," all of which spanned the full spectrum of

---

[134] These results do not meet the 2.5% significance level that Professor Ferrell actually applies.

[135] Complaint, ¶73.

[136] Complaint, ¶76.

Google's products, including, but not limited to, Android, Google Maps, Google Photos, Google Reviews, Google Search, as well as the entire G Suite and YouTube. By the end of the first financial quarter of 2019, these belated remedial measures, including stricter permissions, controls, and policies enhanced users' data privacy and offered more protection against Cambridge Analytica-like platform misuse, but diminished the volume and effectiveness of advertisers' ads (for example, belated changes in controls/algorithms to avoid using extremist content to increase user engagement). This hurt advertising revenues, which were Alphabet's lifeblood, accounting for over 85% of revenues. Such responsive product changes also increased costs and hurt revenues, including by diverting engineering resources from revenue-enhancing product changes.[137]

181. I therefore conducted event studies for April 30 and May 1, 2019, both individually and cumulatively.

### C. Event Study Results for April 30, 2019

182. Table 7 reports results from the event study for April 30, 2019.

**Table 7: Stock Price Reactions of Alphabet on 4/30/2019**

| | | Class A Stock | Class C Stock |
|---|---|---|---|
| Raw Return | [A] | -7.50% | -7.70% |
| Predicted Return | [B] | 0.80% | 0.80% |
| Abnormal Return | [C] | -8.31% | -8.50% |
| t-statistic | [D] | -7.01 | -7.20 |
| p-value (Ferrell null) | [E] | 0.0 | 0.0 |
| Confidence level (Ferrell null) | [F] | 100% | 100% |
| Likelihood Ratio | [G] | 4.59E+10 | 1.77E+11 |

a. The "Raw Return" row [A] shows that Alphabet's Class A stock fell 7.50% on April 30, 2019.

b. The "Predicted Return" row [B] shows that the regression model predicted that, given the performance of the index of non-internet firms on April 30, 2019, Alphabet's Class A stock could have been expected to ***rise*** 0.80%.

137 Complaint, ¶82(b).

c. The "Abnormal Return" row [C] equals the row [A] number minus the row [B] number. Because Alphabet's stock was predicted to rise but actually fell, the abnormal return is even more negative than the actual return: Alphabet's Class A stock abnormal return for April 30, 2019, was -8.31%.

d. The "t-statistic" row [D] reports the ratio of row [C] to the model-based estimate of the standard error of the daily return on Alphabet's Class A stock. The resulting t-statistic's value is -7.01.

e. The next row [E] reports that, to three digits of rounding, the Ferrell null p-value for April 30, 2019 is 0.

f. Row [F] is the confidence level corresponding to the Ferrell null p-value. The confidence level is 1 minus the p-value, with the result expressed as a percentage. To three digits of rounding, the confidence level is 100%.

g. The results for Alphabet's Class C stock indicate very similar results, with a slightly larger abnormal return (-8.50% rather than -8.31% for Class A) and a correspondingly larger t-statistic (-7.20 rather than -7.01 for Class A). As with Alphabet's Class A stock, the Ferrell null p-value and confidence level for Class C are 0 and 100% (each to three digits of rounding).

h. The likelihood ratio results for April 30, 2019, are in the tens of billions (Class A stock) and hundreds of billions (Class C stock), so the observed abnormal return values are overwhelmingly more likely under the hypothesis of price impact equal to the abnormal returns, than under the Ferrell null hypothesis.

183. These results support a finding of price impact for April 30, 2019, based on scholarly conventions for null hypothesis significance testing, including 0.05 (the one Professor Ferrell says he applies) as well as the more demanding 0.025 level (which he actually applies). The results support that same finding based on the likelihood ratio results. And when Lead Plaintiff's legal theory of liability is assigned null hypothesis status, the results do not support rejecting price impact in favor of zero price impact.

184. Professor Ferrell argues that he "would not expect that Alphabet's stock could have a price impact on April 30, 2019 attributable to" Alphabet's October 2018 bad news about privacy because he believes there was an "absence of information about" this bad news.[138] But the Complaint alleges that the extent of the remedial costs and financial damage to Alphabet was unknown to the market until Alphabet released its first quarter financial results on April 29, 2019.[139] These results were new information to the market.

[138] Ferrell Report, ¶82.

[139] Complaint, ¶82(b).

If Lead Plaintiff can prove that Alphabet's remediation of the previously concealed privacy problems caused the poor financial results announced on April 29, 2019, then those poor financial results are attributable to the privacy problems disclosed on October 8, 2018.

185. Professor Ferrell is also wrong to claim that Alphabet's poor 2019-Q1 financial results must be attributable only to known risks. For that to be true, Alphabet would have had to disclose the full scope of "additional controls and update[d] policies across . . . APIs" rather than using such generic language. But the Complaint alleges:

> [Alphabet's] belated remedial measures, including stricter permissions, controls, and policies enhanced users' data privacy . . . offered more protection against Cambridge Analytica-like platform misuse, but diminished the volume and effectiveness of advertisers' ads (for example, belated changes in controls/algorithms to avoid using extremist content to increase user engagement). This hurt advertising revenues, which were Alphabet's lifeblood, accounting for over 85% of revenues. Such responsive product changes also increased costs and hurt revenues, including by diverting engineering resources from revenue-enhancing product changes.[140]

My understanding is that Alphabet did not announce the full scope of these remedial measures before its April 29, 2019 statement. So that statement both (i) revealed previously non-public risks related to the April 23, 2018 and July 23, 2018 fraudulent omissions and (ii) evinced the materialization of those risks in the form of an unexpectedly poor earnings report.

186. Further, although I disagree with Professor Ferrell's contention that his results demonstrate the absence of price impact of the October 8-10, 2018 event study results, if he were right about that, it would only underscore the demonstration of price impact embodied in the April 30, 2019 market response to Alphabet's statement the day before.

a. Consider an investor who learns of Alphabet's privacy problem on October 8, 2018, and who agrees with Professor Ferrell's view that it's no big deal.[141] At no point during October 8-10, 2018 dates did Alphabet tell the public how much or even whether changes to its data privacy practices connected to its bad news about privacy would adversely affect its business. The investing public was thus left to speculate how important Alphabet's bad news about privacy would be. As noted above, Alphabet used only generic language.

b. So, an investor who shared Professor Ferrell's view in October 8-10, 2018 could reasonably be surprised when Alphabet released its poor 2019-Q1 financial results on April 29, 2019. If so, that investor might reduce their valuation of Alphabet stock. With enough investors like

[140] Complaint, ¶82(b).

[141] For quotations reflecting this sort of view, *see* Ferrell Report, ¶¶58-59.

that in the market, the end result would be a drop in Alphabet's stock price.

c. Thus the causal chain runs as follows: (i) Alphabet's omissions on April 23, 2018 and July 23, 2018 caused its price to be inflated for Alphabet stock buyers between the April 23-October 7, 2018 Class Period; (ii) the revelations of October 8-10, 2018 eliminated as much of this price inflation as corresponded to investors' changed expectations about Alphabet's future profitability following those disclosures; (iii) Alphabet's April 29, 2019 earnings statement revealed that the company's situation was worse than it had allowed investors to believe after the October 8-10, 2018 revelations. Accordingly, Alphabet's April 30, 2019 price drop reflects the impact of the company's April 23, 2018 and July 23, 2018 omissions.

187. Professor Ferrell offers a contrary interpretation of our very similar event study results for April 30, 2019. He argues that, even if Lead Plaintiff could prove that Alphabet's bad earnings report on April 29, 2019 reflected the materialization of risks from the remedial measures alleged by Lead Plaintiff, that "would be the materialization of a known risk, rather than an alleged truth correcting a prior misrepresentation/omission."[142] Thus, Professor Ferrell argues, the drop in Alphabet's stock price following the April 29, 2019 earnings statement would not be attributable to any misstatement or omission by Alphabet; it would be as if the market had been told that Alphabet had bet billions on a coin flip and the stock price fell only after the flip went against Alphabet.

188. For Professor Ferrell's *caveat emptor* story to be true, the October 8-10, 2018 revelations would have to have fully disclosed the actual risks associated with what the company's earlier statements omitted to tell the public. I have already shown why this is not the case, and Professor Ferrell offers no contradictory evidence. Instead, Professor Ferrell simply states that:

> [I]t is my understanding that any alleged misrepresentation and/or omission related to what the Plaintiff refers to as the Three-Year Bug, Privacy Bug, and Privacy Bug Memo as disclosed in the WSJ Article and the Google Project Strobe Blog was fully disclosed by the alleged corrective disclosures on October 8, 9, and 10, 2018.[143]

189. Professor Ferrell offers no economic basis for this understanding of his. The only basis he does offer is his statement that he "understand[s] that a class period ends only when any alleged misrepresentation and/or omission is fully disclosed to the market."[144]

190. Professor Ferrell's argument is in essence the following syllogism: (1) a class period ends when any alleged misrepresentation and/or omission is fully disclosed; (2) the Complaint in this case defines a Class Period that ends before April 29, 2019; (3)

142 Ferrell Report, ¶84 (footnote omitted).
143 Ferrell Report, ¶84.
144 Ferrell Report, ¶83.

therefore by April 29, 2019, the public must have known all the risks associated with anything disclosed on April 29, 2019.

191. The major premise of this syllogism is false. Element (1) described above in ¶190 assumes that, by defining a particular class period, Lead Plaintiff has necessarily conceded that no misrepresentation or omission occurred during any other time. This can be correct only if Lead Plaintiff lacks discretion to choose a Class Period restricted to a more limited period than might be accurately alleged. But:

a. I understand that Lead Plaintiff has discretion to plead a class period that is more limited than the most expansive possible one that might be imagined.

b. For example, the Complaint alleges that on February 5, 2019, Alphabet's Form 10-K warned that "'***[b]ugs or defects in our products and services have occurred and may occur in the future***'"[145] and "'changes to our data privacy practices . . . may affect the type of ads and/or manner of advertising that we are able to provide which could have an adverse effect on our business.'"[146]

c. The Complaint does not allege that these statements' content was publicly known before February 5, 2019. Instead, the Complaint alleges that February 5, 2019 was the ***first time*** Alphabet made such statements, so these February 5, 2019 statements may have provided additional, previously withheld information to the investing public.

d. Further, the Complaint alleges that the poor financial results Alphabet announced in the April 29, 2019 statement were the result of "belated remedial measures" that included "stricter permissions, controls, and policies [that] enhanced users' data privacy and offered more protection against Cambridge Analytica-like platform misuse, but diminished the volume and effectiveness of advertisers' ads."[147] It also alleges that the general statement of "'additional controls and update[d] policies across . . . our APIs'" that Alphabet had issued on October 8, 2018 corresponded to changes that "spanned the full spectrum of Google's products, including, but not limited to, Android, Google Maps, Google Photos, Google Reviews, Google Search, as well as the entire G Suite and YouTube."[148] And it alleged that the above "hurt advertising revenues, which were Alphabet's lifeblood, accounting for over 85% of revenues," and that the responsive product changes increased costs and hurt revenues, "including by diverting engineering

145 Complaint, ¶72 (emphasis in original).
146 Complaint, ¶82(a).
147 Complaint, ¶82(b).
148 Complaint, ¶82(b).

resources from revenue-enhancing product changes."[149] The general language Alphabet used on October 8, 2018 did not specify these details, and if Lead Plaintiff is able to prove that Alphabet knew about some or all of them on October 8, 2018, Lead Plaintiff will have proved that the April 29, 2019 statement filled in blanks that Alphabet left after the disclosures of October 8-10, 2018.

e. Thus, the first element of Professor Ferrell's syllogism is unfounded. That is reason enough to conclude that he is mistaken in claiming that consequences of Alphabet's omissions cannot be attributed to price impact.

192. But Professor Ferrell's syllogism is dubious for another reason: it proves too much. Contrary to Professor Ferrell's claim that "the Class Period ended on October 8, 2018,"[150] the Complaint's first numbered paragraph defines the Class Period to end on October *7*, 2018, not October 8.[151] That one-day gap in the actual Class Period and Professor Ferrell's mistaken Class Period matters, because Lead Plaintiff alleges ***no*** revelation that occurred on or before October 7, 2018. If "a class period ends only when any alleged misrepresentation and/or omission is fully disclosed to the market,"[152] then even October 8, 2018 could not be a revelation date in this litigation. Professor Ferrell has conspicuously failed to make ***that*** argument; throughout his report, he at least credits the possibility that disclosures about Alphabet on that date could have affected Alphabet's stock price.

193. In sum:

a. The statistical evidence for April 30, 2019 very strongly favors the rejection of the Ferrell null hypothesis.

b. Professor Ferrell's proffered basis for why this statistical evidence should be disregarded is unsound.

c. In the absence of a reason to think otherwise, the statistical evidence for April 30, 2019 strongly supports the conclusion that there was price impact on this date.

### D. Event Study Results for May 1, 2019

194. Table 8 reports results from the event study for May 1, 2019.

---

149 Complaint, ¶82(b).
150 Ferrell Report, ¶84.
151 Complaint, ¶1.
152 Ferrell Report, ¶83.

| Table 8: Stock Price Reactions of Alphabet on 5/1/2019 | | | |
|---|---|---|---|
| | | Class A Stock | Class C Stock |
| Raw Return | [A] | -2.14% | -1.72% |
| Predicted Return | [B] | -1.07% | -1.06% |
| Abnormal Return | [C] | -1.07% | -0.65% |
| t-statistic | [D] | -0.9 | -0.55 |
| p-value (Ferrell null) | [E] | 0.183 | 0.29 |
| Confidence level (Ferrell null) | [F] | 82% | 71% |
| Likelihood Ratio | [G] | 1.5 | 1.2 |

a. The "Raw Return" row [A] shows that Alphabet's Class A stock fell 2.14% on May 1, 2019.

b. The "Predicted Return" row [B] shows that the regression model predicted that, given the performance of the index of non-internet firms on May 1, 2019, Alphabet's Class A stock could have been expected to fall 1.07%.

c. The "Abnormal Return" row [C] equals the row [A] number minus the row [B] number. Because Alphabet's stock was predicted to rise but actually fell, the abnormal return is even more negative than the actual return: Alphabet's Class A stock abnormal return for May 1, 2019, was -1.07%.

d. The "t-statistic" row [D] reports the ratio of row [C] to the model-based estimate of the standard error of the daily return on Alphabet's Class A stock. The resulting t-statistic's value is -0.9.

e. The next row [E] reports that the Ferrell null p-value for May 1, 2019 is 0.183.

f. Row [F] is the confidence level corresponding to the Ferrell null p-value. The confidence level is 1 minus the p-value, with the result expressed as a percentage. This confidence level is 82%.

g. The results for Alphabet's Class C stock are an abnormal return of -0.65%, a t-statistic of -0.55, a Ferrell null p-value of 0.29 and a corresponding confidence level of 71%.

h. The likelihood ratio results for May 1, 2019, show that for Alphabet's Class A stock, the observed abnormal return would be 1.5 times as likely (or 50% more likely) to be observed with price impact of -1.07% as with price impact of 0. For Alphabet's Class C stock, the observed abnormal return would be 1.2 times as likely (or 20% more likely) to be observed with price impact of -0.65% as with price impact of 0.

195. Although these results do not support rejecting the null hypothesis of zero price impact for May 1, 2019 based on scholarly conventions for null hypothesis significance testing, they also do not support the rejection of price impact when Lead Plaintiff's legal theory of liability is treated as the null hypothesis. In that case, the p-value is 0.82 (Class A) or 0.71 (Class C), neither of which supports rejecting the null hypothesis at conventional scholarly choices of the significance level.

196. Further, the likelihood ratios of 1.5 (Class A) and 1.2 (Class C) show that for both classes of Alphabet's stock, price drops better explain the observed abnormal return than does Professor Ferrell's null hypothesis of zero price impact.

## E. April 30 and May 1, 2019, Event Study Results, Considered Together

197. Table 9 reports event study results concerning the sum of abnormal returns for April 30 and May 1, 2019.

**Table 9: Cumulative Stock Price Reactions of Alphabet for April 30 and May 1, 2019**

| | | Class A Stock | Class C Stock |
|---|---|---|---|
| Raw Return | [A] | -9.64% | -9.41% |
| Predicted Return | [B] | -0.26% | -0.26% |
| Abnormal Return | [C] | -9.38% | -9.15% |
| t-statistic | [D] | -5.59 | -5.48 |
| p-value (Ferrell null) | [E] | 0 | 0 |
| Confidence level (Ferrell null) | [F] | 100% | 100% |
| Likelihood Ratio | [G] | 6.3E+06 | 3.3E+06 |

a. The "Raw Return" row [A] shows that the daily percentage drops in Alphabet's Class A daily stock totaled 9.64% over April 30 and May 1, 2019.

b. The "Predicted Return" row [B] shows that the regression model predicted that, given the performance of the index of non-internet firms

on April 30 and May 1, 2019, the total daily percentage by which Alphabet's Class A stock would have been expected to drop was 0.26%.

c. The "Abnormal Return" row [C] for Alphabet's Class A stock abnormal return for April 30 and May 1, 2019, thus equals −9.38%.

d. The "t-statistic" row [D] reports that the t-statistic's value for Alphabet's Class A stock is −5.59 for April 30 and May 1, 2019.

e. The next row [E] reports the Ferrell null p-value for April 30 and May 1, 2019, which is zero to three digits of rounding for Alphabet's Class A stock.

f. Row [F] reports the confidence level corresponding to the Ferrell null p-value, which is 100% to three digits of rounding for Alphabet's Class A stock.

g. The results for Alphabet's Class C stock on April 30 and May 1, 2019, are very similar to those for Class A stock in all respects; the total abnormal return is −9.15%, the t-statistic is −5.48, the Ferrell null p-value is 0 to three digits and the confidence level is 100% to zero decimal places.

h. The likelihood ratio for April 30 and May 1, 2019, was 6.3 million for Alphabet's Class A stock and 3.3 million for Class C stock, indicating that price impact in the form of drops of 9.38% (Class A) or 9.15% (Class C) are overwhelmingly better explanations for the observed abnormal returns than is zero price impact.

198. These results for the Ferrell null p-values and confidence levels imply that for both Alphabet's Class A stock and Class C stock, the Ferrell null hypothesis is overwhelmingly rejected in favor of price impact over the two-day period of April 30 and May 1, 2019.[153]

199. When null hypothesis status is assigned to Lead Plaintiff's legal theory of liability, the evidence fails to reject this hypothesis, because the p-value is 1 to three digits, and the corresponding confidence level is 0.

200. Further, for both classes of stock, the likelihood ratio indicates that relative to the preponderance standard, price impact is an overwhelmingly better explanation for the observed abnormal returns than is zero price impact. For each type of stock, ***it would be millions of times more likely to observe the actual abnormal returns if there were price impact equal to the abnormal return values than if there were zero price impact.***

[153] These results do not meet the 2.5% significance level that Professor Ferrell actually applies.

## XII. Damages Are Measurable on a Class-Wide Basis

201. I have not yet been asked to determine the level of price inflation that Alphabet's nondisclosure of the facts concealed by its privacy scheme caused during the Class Period. I have, though, been asked for my opinion as to whether it is possible to perform such an analysis on a class-wide basis. The answer is a clear yes.

202. In this matter, each class member's damages are known as "out-of-pocket" damages. Lead Plaintiff alleges that class members overpaid for the stock they bought during the Class Period as a result of price inflation caused by Alphabet's fraudulent conduct. For buyers who rely on the market price, the amount of such price inflation is not individualized. Rather, it is the same for each buyer on any given Class Period date.

203. The analysis necessary to make that determination involves no individualized factors about class members. Rather, it is the same for each buyer on any given Class Period date, because analysis of price inflation involves only determinations about what the market price would have been in the absence of fraud.

204. For a purchaser who bought during the Class Period and held until afterward, price inflation may be measured, on a class-wide basis, as of the time of purchase, and changes in the amount of price inflation can be accounted for on a class-wide basis. In addition, for buy-and-hold class members who rely on market price to measure damages, the Private Securities Litigation Reform Act of 1995 caps damages for a given share to the difference between the purchase price for that share and: (i) the average closing price over the 90 days that follow a revelation (if the shares are held past the 90-day post-disclosure mark); or (ii) the average closing price through the date of sale (if shares are sold fewer than 90 days post-disclosure).

205. Professor Ferrell writes:

> [T]he event study methodology is the ubiquitously used and generally accepted methodology to "measure the impact of an event on the price of a security, such as a corrective disclosure of new value-relevant public information. Indeed, the event study methodology is the appropriate economic approach in this matter and directly measures the actual stock price losses, if any, suffered by Alphabet's investor [sic] as a result of the alleged misleading statements/omissions and revelation thereof.[154]

206. This passage implies, and I agree, that where event study estimates are feasible, they provide the right starting point to measure damages.[155]

---

[154] Ferrell Report, ¶27(a) (footnote omitted).

[155] David Tabak and Chudozie Okongwu, *Inflation Methodologies in Securities Fraud Cases: Theory and Practice*, NERA Working Paper at 2 (June 2002), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=315919; Allen Ferrell and Atanu Saha, *Forward-Casting 10b-5 Damages: A Comparison to Other Methods*, 37 J. Corp. L. 365, 368-370 (2012) (describing the constant-dollar inflation method as an instance of "back-casting" and suggesting it has its problems, but nevertheless recognizing that its use is common).

207. Indeed, Professor Ferrell's statement that an event study "directly measures the actual stock price losses, if any, suffered by Alphabet's investor[s]" is a direct acknowledgment that class-wide damage calculation is possible using event study results.

208. In quantifying damages, an expert should make any necessary adjustments related to confounding factors that occur at the same time as the omissions and revelations at issue in this matter.

a. Such adjustments can be based on a review of the mix of publicly available information on the relevant event dates, as well as documents received from defendants during discovery.

b. These analyses might be done using a variety of methods. For some confounding factors, *e.g.*, movements in financial variables such as interest rates, it may be possible to use event studies involving Alphabet's response to previous occurrence of similar events. And Professor Ferrell has previously suggested that, when a firm "has a limited history" with a type of event, the response of comparable firms' economic variables to that event could be used to estimate the response for the firm in question (here, Alphabet).[156]

c. Further, in some cases, fundamental valuation methods such as DCF estimation might be both necessary and useful.[157]

d. Professor Ferrell implicitly recognizes the potential use of valuation methods when he relies on analysts' estimates of Alphabet's target price over the period between October 8-10, 2018.[158]

e. According to the "Investopedia" website:

> A price target is an analyst's projection of a security's future price, one at which an analyst believes a stock is fairly valued.
>
> Analysts consider numerous fundamental and technical factors to arrive at a price target.[159]

---

156 Allen Ferrell and Atanu Saha, *Forward-Casting 10b-5 Damages: A Comparison to Other Methods*, 37 J. Corp. L. 365, 381 (2012).

157 *See, e.g.*, Expert Report of Professor Frank Partnoy (ECF 166-2), ¶22. *See also* Ferrell Report, ¶30 (acknowledging that "[i]n an efficient market, finance theory dictates that stock prices reflect the expected future cash flows of a company").

158 Ferrell Report, ¶¶56-60.

159 Carla Tardi, *Price Target, How to Understand and Calculate Plus Accuracy*, Investopedia, March 10, 2022, https://www.investopedia.com/terms/p/pricetarget.asp.

f. Thus, Professor Ferrell's own approach in his report relies in part on fundamental valuation methods to buttress his conclusions about event study results.

209. In sum, all aspects of the analysis necessary to calculate damages at the share level will be done on a class-wide basis because this analysis can be based on the answer to a single question: "By how much was the price of Alphabet stock inflated at the time of purchase?" Answering this question might involve the deployment of multiple analyses directed at initial estimates and the parceling out of confounding factors. But however these calculations are done, they will be done on a class-wide basis.

## XIII. Professor Ferrell's Report Uses Unreliable Statistical Methods, These Methods Could Not Disprove Price Impact Even If They Were Reliable, and He Fails Even to Stick to a Coherent Economic Framework

### A. Professor Ferrell's Event Study Suffers from Contamination Bias

210. Professor Ferrell explains that he used two variables in his regression model: first, he included the NASDAQ Composite Index to measure "the daily returns of a market index," and second, he included the DJICI as "an industry index," to match Alphabet's Form 10-K comparison of its common stock performance with the NASDAQ Composite Index and an internet Composite Index.[160]

211. The abnormal return Professor Ferrell calculates would be expected to be negative, as the market reduced its valuation of Alphabet, under Lead Plaintiff's hypothesis that the October 8-10, 2018 revelations related to defendants' alleged fraud damaged Alphabet's reputation with respect to privacy, thereby increasing the risk that Alphabet would face substantial regulatory hurdles as a result of increased Congressional scrutiny of the company's practices.

212. But all else was not equal. Contemporaneous media coverage, including quotes from multiple members of Congress, reflect that the revelation of Alphabet's privacy-related problems (and the company's alleged concealment of those problems) had ratcheted up the likelihood of Congressional attention and legislation. That would be bad not only for Alphabet but also for other companies with substantial consumer data and attendant privacy challenges. Professor Ferrell chose the DJICI precisely because of the overlap in internet-exposure of Alphabet and the firms in that index.[161]

---

[160] Ferrell Report, Appendix C, ¶3 (noting that data from the RDG Internet Composite Index are not available to him and explaining that he used the DJICI in its place). Professor Ferrell reports that he (appropriately) calculated both indexes' returns after excluding Alphabet.

[161] Further, the NASDAQ Composite Index, Professor Ferrell's choice for a broad market index, itself has substantial exposure to internet-related firms, with roughly half the market cap of the weighted value of this index being associated with firms in industries excluded from my Non-Internet Index.

213. Professor Ferrell writes in his report that "in an efficient market, new relevant information would be expected to impact ***any company*** to which such information is value relevant, regardless of who released the information."[162] Accordingly, for the reasons just explained, revelations relating to Alphabet's alleged privacy scheme would be expected to reduce the value of other internet-related firms.

214. Therefore, over the three days between October 8 and October 10, 2018 both the NASDAQ Composite Index daily return and the DJICI daily return could themselves be expected to fall in value because of the revelation of facts concealed by Alphabet's alleged privacy scheme and the drumbeat of bad news about future oversight.

215. Thus, on the October 8-10, 2018 event dates, the causality of bad news related to Alphabet's alleged privacy scheme runs from "Alphabet's bad news" to "peer firms' bad outcomes." But Professor Ferrell's approach instead treats stock-price drops for Alphabet's peers as a reason to expect Alphabet's shares to drop more, effectively reversing the causality of the October 2018 news.

216. Professor Ferrell's estimate of Alphabet's abnormal returns on event dates in October 2018, therefore equals the sum of components related to:

a. The random fluctuations term discussed above, $\epsilon_t$, which captures whatever daily stock-price variation typically occurs due to market vagaries.

b. The actual price impact of Alphabet's disclosure "concerning what [Lead] Plaintiff refers to as the Three-Year Bug, Privacy Bug, and Privacy Bug Memo"[163] and the drumbeat of bad news about future oversight.

c. A contamination bias term reflecting the fact that Professor Ferrell's approach mistakenly includes the ***effect*** of Alphabet's bad news as a ***cause*** of Alphabet's stock price drop.

217. The contamination bias term in Professor Ferrell's event study will be toward 0, so that it pushes Professor Ferrell's abnormal return estimates in the opposite direction from that predicted by Lead Plaintiff's legal theory of liability. The result is that part of the price impact that should end up in the abnormal return winds up being included as part of the predicted return that Professor Ferrell calculates. Professor Ferrell's approach thus makes it less likely that he will find the abnormal returns to be statistically significant than it would be if his approach did not introduce contamination bias.

218. In sum, Professor Ferrell's approach suffers from contamination bias that can be expected to bias his methodology against determining that there was price impact.

[162] Ferrell Report, ¶31 (emphasis added).

[163] Ferrell Report, ¶24.

### B. Professor Ferrell Alternately Rejects Fundamental Analysis – and Assumes that Fundamental Analysis Adds to the Informational Content of Event Studies

219. Professor Ferrell states that he believes that statistical evidence from an event study trumps information based on fundamental analysis techniques such as DCF analyses.

a. Professor Ferrell: "[T]he event study methodology is the appropriate economic approach in this matter and directly measures the actual stock price losses, if any, suffered by Alphabet's investor as a result of the alleged misleading statements/omissions and revelation thereof."[164]

b. Professor Ferrell: "[W]hen the event study methodology can directly measure the actual stock price impact as a result of the alleged fraud and revelation thereof, like in this matter, a DCF analysis adds nothing. The reason is that the event study analysis directly answers the relevant economic question: whether the alleged misleading statements/omissions identified in the Amended Complaint and their purported correction with the revelation of the alleged truth had a price impact on Alphabet's stock. On the other hand, a DCF analysis cannot measure the stock price impact of the alleged corrective disclosures directly. As a result, any purported losses in value from a DCF analysis cannot by itself demonstrate that an investor suffered any actual Alphabet stock losses due to the alleged fraud."[165]

c. Professor Ferrell: "Compared to an event study that can directly measure the actual stock price losses, a DCF analysis introduces unnecessary complexity. For example, it requires, among other things, estimated expected future cash flows and a discount rate to value these cash flows. Estimating these inputs can be difficult and complicated, and reasonable financial economists can differ."[166]

d. Professor Ferrell: "Market prices are superior to these other methods in terms of conceptual clarity, simplicity, and objectivity. They also avoid many of the pitfalls associated with other valuation methods . . . ."[167]

220. Professor Ferrell also takes the opposite position, that fundamental analysis techniques such as DCF analyses can trump statistical evidence from an event-study.

a. After presenting his event-study analysis for October 8, 2018, Professor Ferrell seeks to buttress that analysis by saying that additional

164 Ferrell Report, ¶27(a).
165 Ferrell Report, ¶27(b).
166 Ferrell Report, ¶91.
167 Ferrell Report, ¶92, footnote 134 (original emphasis omitted).

information is provided by (i) analysts' target prices, which are often the ***output*** of fundamental analysis such as DCF, and (ii) analysts' estimates of ***inputs*** often used in fundamental analysis, such as earnings before interest, taxes, depreciation, and amortization ("EBITDA").

b. Professor Ferrell: "[A]nalysts following Alphabet did not meaningfully adjust their estimates for Alphabet's revenue, EBITDA, and target price following the alleged October 8, 2018 Corrective Disclosure."[168]

c. Professor Ferrell: "Specifically, on October 8, 2018, the average analyst's estimates for Alphabet's 2018 and 2019 revenue went down slightly (-0.6%); the average analyst's estimates for Alphabet's 2018 and 2019 EBITDA did not change . . . ."[169]

d. Professor Ferrell: "[I]n fact, the average target price went up slightly (0.3%)."[170]

e. Professor Ferrell: "During the week following the alleged October 8, 2018 Corrective Disclosure, the average analyst's estimates for Alphabet's 2018 and 2019 revenue and EBITDA and target price only had de minimis changes."[171]

f. Many analysts' target prices are based on DCF analysis, about which Professor Ferrell writes:

> Compared to an event study that can directly measure the actual stock price losses, a DCF analysis introduces unnecessary complexity. For example, it requires, among other things, estimated expected future cash flows and a discount rate to value these cash flows. Estimating these inputs can be difficult and complicated, and reasonable financial economists can differ.[172]

g. Other analysts' target prices are based on simplistic earnings multiples such as multiplying EBITDA by a fixed number chosen by the analyst. Professor Ferrell does not explain how target prices based on that strategy would fare any better, or be any less susceptible to reasonable disagreement, than he thinks DCF analyses would.

221. Professor Ferrell provides no principled basis to explain his reversals – what explains why or when Professor Ferrell relies on event-study evidence rather than fundamental analysis evidence, nor what explains why or when he does the opposite.

---

168 Ferrell Report, ¶56 (footnote omitted).
169 Ferrell Report, ¶56.
170 Ferrell Report, ¶56.
171 Ferrell Report, ¶56.
172 Ferrell Report, ¶91.

### C. Professor Ferrell Alternately Argues that Information Will Be Immediately Impounded in Alphabet's Stock Price – and Relies on the Assumption that It Will Take Days or Even Longer for Information to Be Impounded in Alphabet's Stock Price

222. Professor Ferrell states that he believes that new information about Alphabet's value will be immediately impounded in Alphabet's stock price.

a. Professor Ferrell: "A central tenet of the efficient market hypothesis is that as new information becomes public, stock prices 'quickly and fully' reflect that information. . . . Only new public information will necessitate a revision of the company's expected future cash flows and the risk thereof and, hence, result in a changed stock price. In other words, only new information is 'news' in an efficient market, as previously known or expected information would have already been incorporated into the stock price of a security in an efficient market."[173]

b. Professor Ferrell: "It is not appropriate to use a two-day event window for an efficiently traded stock when a disclosure occurs at a known date and time. The mere restatement of previously disclosed information or analyst commentary on that information, which would have already been impounded into the company's stock price, does not add new information to the market and therefore does not warrant the use of longer event windows."[174]

c. Professor Ferrell: "In an efficient market, only new public information will necessitate a revision of Alphabet's expected future cash flows and the risk thereof and, hence, result in a changed stock price."[175]

223. Professor Ferrell also relies on the assumption that new information about Alphabet's value will ***not*** be immediately impounded in Alphabet's stock price and instead will take many days if not even longer for that to happen.

a. To advance the view that the October 10, 2018 abnormal return includes non-price impact elements, Professor Ferrell, writes: "Market commentary attributes the industry-wide decline to factors including trade disputes with China and chip shortages, rising bond yields and interest rates, and a mixed earnings outlook for internet companies."[176] He then quotes from news sources, as follows (the emphasis provided by Professor Ferrell).

---

173 Ferrell Report, ¶31 (footnote omitted).
174 Ferrell Report, ¶34 (footnote omitted).
175 Ferrell Report, ¶82.
176 Ferrell Report, ¶68.

b. Professor Ferrell, quoting news source: "'***Concerns that the trade dispute with China and resulting tariffs would have a massive impact on tech products was one of the major factors for the losses***.'"[177]

c. Professor Ferrell, quoting news source: "'[The] likely fallout of Intel's INTC ***chip shortage*** was another major concern.'"[178]

d. Professor Ferrell, quoting news source: "'[T]he US government announced plans for ***tougher oversight of foreign investment in US tech companies as the White House continued to spar with China over trade***.'"[179]

e. Professor Ferrell, quoting news source: "'[Facebook, Amazon, Alphabet and Netflix have] plunged about 8 percent in the past five sessions, ***sparked by a selloff in Treasuries that sent yields surging to multi-year highs. . . .*** That rotation out of tech and other growth stocks has been sparked in part by ***the recent jump in government bond yields and the Federal Reserve's interest rate increases. . . . Rising government bond yields*** have made them more attractive, leading investors to pull money out of equities. The move ***particularly affects high-growth tech companies***.'"[180]

f. Professor Ferrell provides no evidence that any of these factors – trade tensions with China, a chip shortage, increases in Treasury yields or Federal Reserve interest rate hikes – involved new information that was released on any of the dates of October 8, 9, or 10, 2018.

g. In fact, one October 10, 2018 quote he provides refers to the "'plunge[]'" in tech stocks over "'the past five [trading] sessions,'" which was supposedly "'sparked by'" an increase in Treasury yields. October 8, 9, and 10, 2018 themselves were just three trading sessions. Professor Ferrell here is suggesting that a single event "sparked" a five-day long drop in tech stocks' prices.

h. Further, the Treasury 10-year yield closed at 3.225% on October 10, 2018 – exactly its closing value on October 5, 2018. There was, thus, no net increase at all over the ***three*** trading days in question in this litigation. The yield did rise from 3.225% to a close of 3.233% on October 8, 2018. But then it ***fell*** to 3.208% on October 9, 2018, before finally returning to its October 5, 2018 value on October 10, 2018.[181]

---

177 Ferrell Report, ¶68.
178 Ferrell Report, ¶68.
179 Ferrell Report, ¶68.
180 Ferrell Report, ¶68.
181 Statements in this paragraph are based on my calculations using 10-year Treasury yield data I downloaded from Yahoo! Finance.

Professor Ferrell fails to explain how this pattern – especially the net change of zero over the dates that are relevant to this litigation – could bear any explanatory burden.

i. Next consider the Federal Reserve's interest rate policies. The Federal Reserve operates its monetary policy by setting both a lower target limit and an upper target limit on the federal funds rate, with a spread of 25 basis points between the limits. The Federal Reserve did increase this rate three times between January 1, 2018, and October 11, 2018. However, the last adjustment to this rate was on September 26, 2018 – a full two weeks before October 10, 2018. Thus, Professor Ferrell's endorsement of "the Federal Reserve's interest rate increases" to explain the October 10, 2018 drop in Alphabet's stock price is contradicted by Professor Ferrell's stated belief that value-relevant publicly known information rapidly would be impounded into Alphabet's stock price.

224. Professor Ferrell provides no clues to explain why he first says that new public information must be rapidly impounded into Alphabet's stock price, only to turn around and take the opposite position in other cases. He simply alternates between these positions, sometimes insisting on near-immediate impoundment and other times relying on news sources to advance his claims that information observable to every investor for days – even weeks – somehow explains subsequent movements in Alphabet's stock price.

225. Professor Ferrell's argument with himself about whether information must be impounded within a single day or whether cumulative abnormal returns over multiple days may be used is not limited to the empirical sections of his report. In the part titled "Scientific Foundations for Price Impact Analysis,"[182] Professor Ferrell writes both of the following:

> It is not appropriate to use a two-day event window for an efficiently traded stock when a disclosure occurs at a known date and time[183]

> Inferences about the ***cumulative abnormal returns*** can be drawn . . . to test the null hypothesis that the abnormal returns are zero[184]

226. Contrary to Professor Ferrell's assertions that take the immediate-impoundment position, financial economics scholars do recognize that even informationally efficient markets can take time to process information, especially when the information being released is subject to material processing costs.[185]

---

182 Ferrell Report, Part IV at 16.
183 Ferrell Report, ¶34.
184 Ferrell Report, ¶35 (quoting A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Lit. 13, 21, 24 (1997)) (emphasis added).
185 *See, e.g.*, Elizabeth Blankespoor, Ed deHaan and Ivan Marinovic, *Disclosure processing costs, investors' information choice, and equity market outcomes: A review*, 70 Journal of Accounting & Econ.,

a. For example, recent work has shown that post-earnings announcement drift, or the common pattern of under-reaction to earnings news, can be explained by canonical economic models with rational underpinnings.[186]

b. This is especially true when there is the potential for investor disagreement about the impact of a news event. One influential academic article shows that prices may gradually respond to news when specialists and generalists get information from different sources, and that this pattern "can be entirely consistent with a rational model with costs of information acquisition."[187] A market with these characteristics is consistent with the idea that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices."[188] Practical notions of market efficiency cannot reasonably require that all information always is impounded into the price of the stock in a single day.

c. A reasonable interpretation of market efficiency and price response that allows for the possibility of multi-day responses is also consistent with the scads of scholarly articles that use event studies to study corporate outcomes. Cumulative – meaning, multi-day – abnormal returns are commonly used in such scholarship.[189]

d. Thus, contrary to Professor Ferrell's claim that it "is not appropriate to use a two-day event window for an efficiently traded stock when a disclosure occurs at a known date and time,"[190] ***many*** event studies have been published in scholarly journals using multi-day periods.

e. In fact, one source on which Professor Ferrell relies in discussing event-study methodology provides extensive methodological and empirical discussion of multi-day cumulative abnormal returns ("CARs"),

Issues 2-3 (2020), https://www.sciencedirect.com/science/article/abs/pii/S016541012030046X ("One key insight we draw from the analytical literature review is that disclosure processing costs can provide rational explanations for many market phenomena that may otherwise appear anomalous.").

186 Sanford J. Grossman and Joseph E. Stiglitz, *On the Impossibility of Informationally Efficient Markets,* 70 Am. Econ. Rev. 393 (1980).

187 Harrison Hong and Jeremy C. Stein, *Disagreement and the Stock Market*, 21 J. Econ. Perspectives 109, 117 (2007).

188 *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 247, n. 24 (1988)).

189 A Google Scholar search for the phrase "cumulative abnormal returns" yielded "About 30,400 results." (This search was conducted on July 18, 2023 using the URL https://scholar.google.com/scholar?hl=en&as_sdt=0%2C39&q=%22cumulative+abnormal+returns%22&btnG=.)

190 Ferrell Report, ¶34.

including on the very pages Professor Ferrell cites as authority for other propositions.[191] The empirical example in that paper involves firms' earnings announcements,[192] which are "disclosure[s]" that "occur[] at a known date and time," to use Professor Ferrell's words.

f. In sum, as Professor Ferrell implicitly acknowledges when he endorses the use of CARs,[193] there is no Iron Law of Immediate Impoundment that requires an expert to restrict attention to a single trading date when considering the effects of a revelation.

## D. Professor Ferrell Ignores Evidence that Markets Saw the October 8-10, 2018 Revelations as Important, and He Does Nothing to Separately Measure the Effects of Other Sources He Claims Contributed to Alphabet's Stock Price Drop over This Period

227. Professor Ferrell inappropriately disregards contemporaneous market commentary directly linking the October 2018 revelations with declines in Alphabet's stock price:

> Alphabet Inc.'s Google will shut down the consumer version of its failed social network Google+ and tighten its data sharing policies after announcing on Monday that private profile data of at least 500,000 users may have been exposed to hundreds of external developers. . . . Shares of its parent company Alphabet closed down 1 percent at $1155.92 following the latest in a run of privacy issues to hit big U.S. tech companies.[194]

> Alphabet's Google (GOOGL) faced a new data privacy outcry on Monday as the internet giant said it will shut down its Google+ social network for consumers following the disclosure of a software glitch that exposed user's personal data to software developers. The disclosure sent Google stock down. . . . Google stock slid 1% to close at 1,155.92 on the stock market today. Shares in Google had traded down as much as 2.1% after the Wall Street Journal reported that a software glitch had disclosed the data of as many as half a million users. . . . In intraday trading, Google stock fell to its lowest point since July 5. The stock is trading well below its 50-day-moving-average.[195]

> Shares of the search giant were lower in Tuesday afternoon trading, building losses that have depressed the stock over $60 in the past week. . . . A report of a data privacy breach, reminiscent of Facebook (FB) problems stemming from the Cambridge Analytica scandal, has not helped shares recover. The attempt by company executives

[191] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Lit. 13, 21, 24 (1997). Professor Ferrell cites the same pages of this work. Ferrell Report, ¶35.

[192] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Lit. 13, 21, 24 (1997).

[193] Ferrell Report, ¶35 (quoting A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Lit. 13, 21, 24 (1997)).

[194] Arjun Panchadar, Munsif Vengattil and Paresh Dave, *Alphabet to shut Google+ social site after user data exposed*, Yahoo! Finance, October 8, 2018.

[195] Reinhardt Krause, *Google Stock Dips, To Shut Down Facebook Rival After Data Glitch*, Investor's Business Daily, October 8, 2018, https://www.investors.com/news/technology/google-stock-alphabet-consumer-data-privacy/.

to avoid the watchful eyes of regulators has been hurting the pockets of shareholders.[196]

- Software bug in the Google+ social network exposed information of users
- Google revealed data breach in a statement about shutting down Google+.
- Case is compared to Cambridge Analytica scandal for Facebook in March . . . .

News of the bug sent shares of Google's parent company, Alphabet, down as much as 2.2 percent to $1,142.43 (£872.93) in New York yesterday afternoon.[197]

The tech giant said it would shut down the consumer version of the platform after it revealed users' data may have been exposed by a bug that was present for more than two years. . . . Following the announcement, shares in Google's parent company Alphabet Inc were down 1.5% in response to the privacy issues.[198]

228. Further, Professor Ferrell's event study and price impact opinion do not account for contamination bias. The likelihood of contamination bias is supported by market commentary pointing to the industry-wide decline in the technology sector on October 10, 2018. Common sense suggests this decline was caused at least in part by security, privacy, and regulation concerns that can fairly be attributed to the events described in the October 8, 2018 *Wall Street Journal* article, even though it was two days old by October 10, 2018.[199] So do news reports in the days after October 8, 2018, which is consistent with the idea that investors were still digesting the information:

Reuters:

[S]everal of the [communications] sector's growth companies - Facebook, Alphabet and Twitter - face regulatory risks . . . . Recent disclosures of privacy breaches have increased concern among some investors that the U.S. government could soon target internet companies with new regulations. "The regulatory pendulum tends to swing from 'not enough' to 'too much,' and it will take time to balance," said Scott Wren, senior global equity strategist at Wells Fargo Investment Institute in St. Louis. "In the meantime, we have to think about overregulation."[200]

Zacks Investment Research:

---

196 Kevin Curran, *Alphabet Has Room to Fall Before It's a Buying Opportunity*, TheStreet, October 9, 2018, https://realmoney.thestreet.com/articles/10/09/2018/alphabet-still-has-room-fall-buying-opportunity-some-experts.

197 Annie Palmer, *Google shuts down social media platform Google+ after 'covering up' data breach of half a million users to avoid fallout that hit Facebook in wake of Cambridge Analytica scandal*, Daily Mail Online (U.K.), October 9, 2018, https://www.dailymail.co.uk/sciencetech/article-6253629/Google-exposed-user-data-chose-not-tell-public-WSJ.html.

198 Ajay Nair, *Plug pulled on social network Google+ after users' data left exposed*, Sky News (U.K.), October 8, 2018, https://news.sky.com/story/plug-pulled-on-social-network-google-after-users-data-left-exposed-11521546.

199 *See* ¶226, *supra*.

200 April Joyner, *New communication sector's shine could soon wear off*, Reuters, October 12, 2018, https://www.reuters.com/article/us-usa-stocks-weekahead-idINKCN1MM259.

The Dow suffered an 800-point drop and the S&P 500 suffered its severest loss since February, primarily due to the steep fall in tech shares. The wider market decline was a product of fears generated by rising yields. But tech majors were felled by other concerns, relating to trade, chip shortages and security and privacy concerns.[201]

Daily American:

After years of leading the market higher, fast-growing and innovative tech companies like Netflix, Google parent Alphabet, and Apple have come under intense pressure in the recent sell-off, signaling that investors are becoming more risk averse and taking a more defensive stance. . . . The tech stock drubbing, which also has been driven by increasing fears of regulatory scrutiny from government amid privacy breaches, shows 'investors are getting a bit more defensive,' Agati says.[202]

229. Further, there was additional news on October 10, 2018 regarding the regulatory risk that Alphabet faced after the October 8, 2018 disclosure of the truth regarding the company's data insecurity. For example, Professor Ferrell acknowledges that on October 10, 2018, a letter from "U.S. Senators Richard Blumenthal (D-CT), Edward J. Markey (D-MA) and Tom Udall (D-NM) called for an investigation into Google's security lapses and ongoing failure to prioritize consumer privacy."[203] This new information could naturally cause market players digesting the October 8, 2018 disclosures to revise upward their estimate of the regulatory risks facing Alphabet – and, therefore, revise downward their valuation of the company.

230. Professor Ferrell does offer a number of alternative explanations for the negative abnormal returns that Alphabet's stock price experienced over October 8-10, 2018: rising Treasury yields, chip shortages, trade tensions with China and the Federal Reserve's short-term interest rate. These can be thought of as proposed "other-source sub-component" explanations, in the terms set forth above,[204] for price change, and thus explanations for why price impact could be less in magnitude than the size of the overall price change term, $\pi_t$. But there are good reasons to doubt that Professor Ferrell's alternative explanations explain Alphabet's price drop on October 8-10, 2018:

a. Professor Ferrell cites a news article that mentions the rise in 10-year Treasury yields over the five trading sessions ending on October 10, 2018. But as discussed above, there was actually no net change in the 10-year Treasury yield between the October 5 closing price and the October 10 closing price.[205] Under Professor Ferrell's view that value-relevant news about Alphabet should be rapidly impounded in price,

---

201 Swarup Gupta, *Should You Bet on Tech After Wednesday's Rout? 4 Top Picks*, Yahoo!, October 11, 2018, https://www.yahoo.com/lifestyle/bet-tech-wednesday-apos-rout-125512161.html.

202 Adam Shell, *Stock market sell-off could signal turning point for a bull market, as Dow plunges again*, Daily American, October 12, 2018, dailyamerican.com/story/news/2018/10/12/stock-market-sell-off-could-signal-turning-point-for-bull-market-as-dow-plunges-agai/44005229/.

203 Ferrell Report, ¶69.

204 ¶49.c, *supra*.

205 *See* ¶223.h, *supra*.

bad news about yields that occurred before the close of trading on October 5, 2018 should have been incorporated into Alphabet's price before October 8, 2018, not after.

b. Likewise, trade tensions with China were hardly news in October 2018, more than 18 months after well-known anti-China protectionist Donald Trump assumed the presidency. Professor Ferrell provides no specific reason to believe these tensions changed notably between October 8-10, 2018, and I have been unable to find any evidence that they did. In fact, one careful study of "key policy developments" during 2017-2021 indicates that the last such development before October 10, 2018 occurred on September 24, 2018 (when both the U.S. imposed some new tariffs and China retaliated with its own tariffs), two weeks before the October 8, 2018 disclosures about Alphabet's privacy problems.[206]

c. Professor Ferrell's attempt to pin the October 8-10, 2018 price drop on the Federal Reserve's federal funds rate is even less plausible than his 10-year Treasury yield story. The Federal Reserve periodically announces decisions to change, or leave unchanged, the target range for the federal funds rate. The target federal funds rate was increased on September 26, 2018,[207] nearly two weeks before the October 8, 2018 disclosures relevant to this litigation. The target federal funds rate then remained constant well past October 10, 2018.[208] Bad news about the federal funds rate that occurred nearly two weeks before the close of trading on October 8, 2018 should have been incorporated into Alphabet's price before that date, not after.

d. Professor Ferrell provides no details about what chip shortages he believes had been widely discussed in the period leading up to October 8, 2018. And market commentary indicates that, at least as of the last trading date ***before*** October 8, 2018, it had become known that "chip

[206] *See* Chad P. Bown, *The US-China Trade War and Phase One Agreement*, Peterson Institute for International Economics, Working Papers 21-2 at 49 (February 2021), https://www.piie.com/sites/default/files/documents/wp21-2.pdf (Appendix Table 2, "Timeline of key policy developments in US-China trade war, 2017–21," listing no dates between September 24, 2018 and November 1, 2018).

[207] *See* Minutes of the Board's discount rate meetings from August 27 through September 26, 2018, at 3, https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20181023a1.pdf.

[208] The next increase in the target value of the federal funds rate did not occur until December 19, 2018. *See* Minutes of the Board's discount rate meetings from December 10 and December 19, 2018 at 2, https://www.federalreserve.gov/newsevents/pressreleases/files/monetary 20190115a1.pdf.

demand [had] proved to be weaker than expected,"[209] which would tend to mitigate a shortage.

e. Unlike disclosures specific to Alphabet's own previously non-public information, these disclosures do not plausibly involve a private-information component or obvious need for investors to digest their meaning over an extended period of time. Accordingly, it is unclear why Professor Ferrell believes this grab-bag of stale news items would still be changing Alphabet's stock price by the October 8-10, 2018 period.

231. Further, Professor Ferrell offers no attempt to determine how much of the observed drop in Alphabet's stock price over October 8-10, 2018 he believes is due to such other factors. For the chip-shortage and trade-tension explanations, Professor Ferrell could have done event studies for other firms and for Alphabet on previous dates with identifiable news related to chip shortages or trade tensions. For the federal funds rate, he could have done an event study to assess how much Alphabet's stock price moves 12-14 days following changes in the federal funds rate. Professor Ferrell offers no such event-study evidence.

232. Professor Ferrell's Treasury-yield explanation especially lacks credibility in light of how he designed his regression model. If Alphabet's daily stock returns are associated with 10-year Treasury yields, whose level also changes at a daily frequency, the natural thing for Professor Ferrell to do would have been to include the percentage change in the daily 10-year Treasury yield as a regressor in his regression model. His unexplained exclusion of this variable from his regression model indicates that he does not believe it is typically associated with Alphabet's stock price return. Nor does Professor Ferrell offer any reason to believe that that variable would matter specifically on October 8, 9, or 10, 2018 given his implied belief that it is not typically associated with Alphabet's stock price return.

233. In sum:

a. Professor Ferrell ignores evidence that market commentators were troubled by Alphabet's bad news about privacy and linked it to Alphabet's October 8, 2018 stock price slide.

b. Professor Ferrell fails even to attempt to measure how much of October 8, 9, or 10, 2018 price drops should be attributable to the alternative explanations for these price drops that he mentions.

c. Further, all of the alternative explanations Professor Ferrell cites involve types of information – chip shortages, trade tensions and medium-term movements in interest rate variables – that were publicly

[209] Wallace Witkowski, *Chip stocks hit worst as tech selloff drags broader market lower*, MarketWatch, October 5, 2018, https://www.marketwatch.com/story/chip-stocks-hit-worst-as-tech-selloff-drags-broader-market-lower-2018-10-05.

discussed and known before October 8, 2018. Professor Ferrell's contention that Alphabet's stock price drop over the October 8-10, 2018 period is attributable to those factors contradicts his other contention that value-relevant news should be immediately impounded in the price of a stock traded on an efficient market.

### E. Professor Ferrell Uses Overly Demanding Critical Values to Test for Event Effects, Even Accepting His Choice to Use a 95% Confidence Level

234. Consider one of the October 2018 revelation dates, and leave aside the other problems with Professor Ferrell's approach.

a. Because Lead Plaintiff's theory of liability implies Alphabet's stock price should ***fall*** on the event dates, a ***positive*** abnormal return would be contrary to Lead Plaintiff's legal theory of liability.

b. So an ***extremely large*** positive abnormal return would be ***extremely*** contrary to Lead Plaintiff's theory of liability.

c. Faced with a very large positive abnormal return, Professor Ferrell would not conclude that the evidence rejects the null hypothesis in favor of Lead Plaintiff's allegation that defendants' disclosures revealed fraud.

d. A significance test that will not reject the null hypothesis when the t-statistic is extreme in one direction cannot be a two-sided test. It is, by its nature, a one-sided test.

e. The appropriate way to test the Ferrell null hypothesis against a one-sided alternative hypothesis is to compare the actual, signed value of the t-statistic to the relevant critical value under the alternative hypothesis of price impact consistent with Lead Plaintiff's legal theory of liability. This makes no difference when the t-statistic has the sign expected under the alternative hypothesis. But when the t-statistic has the wrong sign under the alternative hypothesis, it will prevent the analyst from erroneously rejecting the null hypothesis.

235. Given that the appropriate tests are one-sided, Professor Ferrell's use of a critical value of 1.96 imposes a required significance level of 0.025 – equivalently, a confidence level of 97.5% – rather than his stated levels of 0.05 and 95%.[210]

236. Even if one were to agree with Professor Ferrell's stated 5% significance level, which corresponds to a 95% confidence level, his suggestion that only the absolute value of the t-statistic matters would be incorrect. Under Lead Plaintiff's theory of liability,

[210] This is true because 1.96 is the 0.975-quantile of the standard normal distribution; equivalently, the probability that a standard normal random variable will take on a value above 1.96 equals 0.025.

Alphabet's stock price could be expected to ***fall*** on the October 2018 dates – not rise ***or*** fall. This means that hypothesis testing in this case involves using a one-sided test, which means that the sign of the t-statistic matters.

237. Professor Ferrell's mistake here is that he improperly chooses the critical value for his stated significance level as if he were engaging in a two-sided test. As explained in Appendix E,[211] two-sided tests sometimes are appropriate, as when a large t-statistic in either direction would lead the expert to reject the null hypothesis. But that is not how Professor Ferrell treated the large, negative t-statistic for the April 23, 2018 omission.[212] Professor Ferrell writes: "on April 23, 2018, Alphabet filed its Q1 2018 10-Q after market close, and Alphabet's stock prices ***did not increase*** by statistically significant amounts. ***In fact***, the abnormal return is ***negative and statistically significant*** on this date."[213] If Professor Ferrell believed two-sided testing was appropriate, he simply would have rejected his null hypothesis on that date in light of the t-statistic's large magnitude; its sign would not have mattered in that case. Instead, Professor Ferrell emphasizes that the t-statistic has sign opposite to what Lead Plaintiff's legal theory of liability predicts, encouraging the reader to believe this evidence supports the null hypothesis of zero price impact. The simple explanation for Professor Ferrell's characterization of the April 24, 2018 event study results is that he is really using a one-sided test – just as he should. He errs, though, when he claims that a critical value of 1.96 (or -1.96 on revelation dates) corresponds to a significance level of 0.05; for a one-sided test, Professor Ferrell's critical value corresponds to a significance level of 0.025.[214]

238. The critical value for statistical significance tests at the 5% level is -1.65 for a revelation date and 1.65 for an omission date. Because the correct critical value has smaller magnitude than Professor Ferrell's critical value of -1.96 or 1.96, Professor Ferrell has biased his tests away from what a 0.05-level test would find: he will determine that results are statistically significant less frequently than an expert who actually used a 0.05-level test would.

239. Professor Ferrell should be aware of all this. For one thing, it is basic material in any college-level course on statistics. And Professor Ferrell cites as authority – in the "Scientific Foundations for Price Impact Analysis" part of his report[215] – a discussion that

[211] *See* Appendix E, ¶20 n.6.
[212] *Compare* Ferrell Report, ¶49 (reporting a t-statistic of -3.4, a value far more extreme than the critical value of -1.96 that would apply if Professor Ferrell actually were using a two-sided test) *to* Ferrell Report, ¶50 (stating that "Alphabet's stock prices ***did not increase*** by statistically significant amounts") (emphasis added).
[213] Ferrell Report, ¶50 (emphasis added).
[214] The number -1.96 is the 0.025-quantile of the standard normal distribution, so that a standard normal random variable will take on a negative value with a magnitude of more than 1.96 only 2.5% of the time.
[215] Ferrell Report, Part IV, at 16.

makes the basic point about the critical values used in one-sided testing, in the specific context of event studies.[216]

240. Finally, even if Professor Ferrell actually were to impose a significance level of 0.05 rather than 0.025 (a confidence level of 95% rather than 97.5%), as I discuss above, that would still be much more demanding than what statistical reasoning suggests the preponderance standard plausibly requires.[217]

### F. Professor Ferrell's Standard Yields a Test with Very Low Power, and Thus Very High Probability of Committing Type II Errors

241. Professor Ferrell writes that "[i]f the alleged misleading statements/omissions in fact caused the market to view the company more favorably than before (and presumably more favorably than if it had been told the alleged truth that was being concealed), then ***one would expect to observe a*** positive and ***statistically significant abnormal return on these dates***."[218]

242. Given the 0.025 significance level he requires, Professor Ferrell is mistaken that in this case "one would expect to observe a . . . statistically significant abnormal return" on relevant event dates with price impact. The word "expect" has both colloquial and technical statistical meanings. Colloquially, one expects something to occur if one regards it as likely to happen.[219] Statistically, the expected value of a random variable is its mean. To say one expects "to observe a . . . statistically significant abnormal return" could thus mean (colloquially) that one regards it as likely that one would observe a statistically significant abnormal return when testing the Ferrell null hypothesis if there really were price impact in this case, or (statistically) that the probability of observing a statistically significant abnormal return exceeds one-half when there was price impact, because then this probability exceeds the probability of observing a statistically ***insignificant*** abnormal return.

243. Although it goes unmentioned in Professor Ferrell's report, there is a well-known area of statistics that is concerned with the probability that an event-study will yield a statistically significant abnormal return. That area is known as power analysis and involves the analysis of "correct positives" and "false negatives," discussed above.[220] It is

[216] *See* Ferrell Report, ¶37, footnote 52 (citing Charles J. Corrado, *Event Studies: A methodology review*, 51(1) Accounting and Finance 207, 209-211 (2011)) (explaining on page 210 that a "test statistic ***larger than the upper-tail critical value*** $C_\alpha$ provides statistical evidence that [an event] had a ***significant positive impact*** on the stock price on the event date" and that "a test statistic ***less than the lower-tail critical value*** $-C_\alpha$ would provide evidence that the announcement had a ***significant negative impact***") (emphasis added).

[217] *See* ¶¶76-79, 84, *supra*, and Appendix E, ¶¶65-68.

[218] Ferrell Report, ¶45 (emphasis added).

[219] *See, e.g.*, Dictionary.com, https://www.dictionary.com/browse/expect (offering one definition of *to expect* as to "regard as likely to happen; anticipate the occurrence . . . of").

[220] *See* ¶¶80-91, *supra*.

connected as well to the concept of significance level, which involves "correct negatives" and "false positives."

244. As noted above, analysis in the law and finance literature has shown that requiring evidence as strong as Professor Ferrell does before rejecting the null hypothesis can lead tests to have very high probability of committing Type II errors – that is, tests with very low power – when examining individual event dates for a single firm.[221]

245. In other words, Professor Ferrell's significance standard tends to induce a very high probability of mistakenly failing to reject the null hypothesis of price impact. Here is an illustrative example.

a. Consider a firm whose daily abnormal return has a standard deviation of 0.84%, which appears to be the relevant daily standard deviation for Alphabet based on Professor Ferrell's event study.[222]

b. For this firm, to get a t-statistic that is negative with magnitude greater than 1.96 – so that Professor Ferrell should be willing to concede price impact exists given his significance level of 2.5% – would require an abnormal return of $-1.96\times0.84 = -1.65$ or lower.

c. Suppose the firm has market cap of $1 trillion, which is roughly in line with Alphabet in October 2018.

d. Suppose the firm commits a fraud that inflates its market value by $5 billion. That is 0.5% of the firm's market cap.

e. Even ignoring the contamination bias problem discussed above, there is only an 8.7% chance that, after a revelation, the abnormal return estimated by an analyst using Professor Ferrell's standard would be great enough to yield a finding of price impact.[223] This means that

---

[221] *See, e.g.*, Alon Brav and J. B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 Wash. U. L. Rev. 583 (2015); Jill E. Fisch and Jonah B. Gelbach, *Power and Statistical Significance in Securities Fraud Litigation*, 11 Harv. Bus. L. Rev. 55 (2021)

[222] This follows because the t-statistic is approximately the ratio of the abnormal return to the estimated standard deviation for the daily return, from which it follows that the estimated standard deviation equals the ratio of the abnormal return to the t-statistic. Professor Ferrell's Table 5, at page 34 of his report, reports that he estimated an abnormal return of -1.0% and a t-statistic of -1.19 for October 9, 2018. The ratio of -1.0 to -1.19 is 0.84, which is, thus, the standard deviation estimate implied by the figures Professor Ferrell reports.

[223] Here is how that figure is generated. Under Professor Ferrell's approach, the probability of rejecting the null hypothesis is the probability of observing a negative t-statistic with magnitude exceeding 1.96. When there has actually been a fraud of $5 billion, so that the revelation actually causes a price drop of 0.5%, this probability is $P(X/0.84<-1.96) = P(Z<-1.96+0.5/0.84) = P(Z<-1.36)$, where X is a random draw from the distribution of Alphabet's daily abnormal returns in the absence of price impact and Z is a standard normal random variable (*i.e.*, a normally distributed random

***Professor Ferrell's approach will correctly detect price impact in only 1 out of 12 actual frauds having magnitude $5 billion or less for a company like Alphabet.***

f. Even if the fraud inflated market value by twice as much – a $10 billion fraud – the probability of finding price impact by an analyst using Professor Ferrell's standard wouldn't even be 25%.[224] This means that ***Professor Ferrell's approach would detect only 1 in 4 actual frauds having magnitude $10 billion for a company like Alphabet.***

246. This discussion raises the question: Just how large would a fraud have to be for an analyst using Professor Ferrell's method to have at least an even chance of concluding there was price impact using an event study based on a single day's abnormal return? In other words, how large would a fraud have to be so that Professor Ferrell would be correct that "one would expect to observe a . . . statistically significant abnormal return on" a given event date?[225] The answer is large: for a trillion-dollar company, ***the fraud would have to involve price inflation that corresponds to an inflation of firm value equal to at least $16.5 billion.***[226]

247. Thus, Professor Ferrell's standard will fail to detect frauds more often than not unless the fraud's magnitude exceeds $16.5 billion for a company like Alphabet.

248. Professor Ferrell's claim that "one would expect to observe" statistical significance on event dates thus is false for any fraud having magnitude smaller than $16.5 billion.

### G. Professor Ferrell Mischaracterizes the Implications of Statistical Insignificance

249. Professor Ferrell commits a fundamental error by equating his finding that abnormal returns lack statistical significance at very high confidence levels to the proposition that there was no price impact. For example, Professor Ferrell writes that "[o]n the alleged October 8, 2018 Corrective Disclosure date, Alphabet's stock prices did not have statistically significant price changes. See Table 2."[227] He then immediately states that "***[t]his event study result***" – his conclusion that his estimated abnormal return was statistically insignificant – "***shows that*** . . . Alphabet's stock price movements ***are***

---

variable with mean 0 and standard deviation 1). The probability that such a variable will take on a value less than -1.36 is 0.087, corresponding to an 8.7% chance – roughly 1 in 12.

224 Repeating the calculations in footnote 223, *supra*, indicates that the probability of finding price impact is the probability that a standard normal random variable would take on a value more negative than -0.77; this probability is 0.22, corresponding to a chance of 22%.

225 Ferrell Report, ¶45.

226 To have a 50% chance of detection, the t-statistic must have a distribution that is centered at the critical value of 1.96 (for omission dates) or -1.96 (for revelation dates). That happens when $\frac{\pi_t}{\sigma} = 1.96$ or $-1.96$ (depending on the type of date). With a standard deviation of 0.84%, this means the abnormal return must be 1.65% (for omission dates) or $-1.65\%$ (for revelation dates). Multiplying 1.65% by $1 trillion yields a fraud size of $16.5 billion.

227 Ferrell Report, ¶54 (original emphasis omitted).

indistinguishable from random price fluctuations"; and "***cannot be*** attributed to the new Alphabet-specific information announced on that date."[228]

250. Professor Ferrell's claim here – that statistical insignificance of an abnormal return at a given significance level when testing his null hypothesis of zero price impact implies the absence of price impact – is embedded in his wider mis-characterization of how null hypothesis significance testing works. In the part of his report titled, "Scientific Foundations for Price Impact Analysis,"[229] Professor Ferrell writes:

> If the abnormal return falls within the confidence interval, then the stock price movement is indistinguishable from random price fluctuations and not considered to be significantly different from zero, and the null hypothesis cannot be rejected. In other words, the movement is fully explainable by movements in the market and industry and cannot be attributed to the new company-specific information announced on the event date.[230]

The quoted text concludes with Professor Ferrell's footnote 52, which cites to one authority, C. Corrado, 2011, "Event Studies: A methodology review," *Accounting and Finance*, 51:207-234, pp. 209-211. However, Professor Corrado's paper says nothing that supports Professor Ferrell's position. Pages 209-211 of Professor Corrado's paper make no reference to statistical insignificance or its implications.[231]

251. Thus, Professor Ferrell's report provides no support for his claim that statistical insignificance in testing his null hypothesis of zero price impact implies that there must not have been price impact in this case.

252. In reality, it is a basic fact of statistical significance testing methodology that statistical insignificance at a given significance level does not imply the falsity of the null hypothesis.[232]

---

228 Ferrell Report, ¶55 (emphasis added). Professor Ferrell makes similar claims with respect to his October 9, 2018 event study, Ferrell Report, ¶¶62-63, and also with respect to his October 10, 2018 event study, Ferrell Report, ¶¶66-67.

229 Ferrell Report, Part IV, at 16.

230 Ferrell Report, ¶37.

231 With respect to the broad topic of null hypothesis significance testing, the cited part of Professor Corrado's paper is limited to explaining the basis for concluding that an abnormal return ***is*** statistically significant at a stated significance level.

232 *See, e.g.*, Neil A. Weiss, *Elementary Statistics*, p. 392 (6th ed. 2005) ("[I]f we do not reject the null hypothesis in a hypothesis test, ***we simply reserve judgment about which hypothesis is true***. In other words, if we do not reject the null hypothesis, we conclude only that the data did not provide sufficient evidence to support the alternative hypothesis; we do not conclude that the data provided sufficient evidence to support the null hypothesis.") (emphasis added); Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach* 132 (7th ed. 2018) ("When [the null hypothesis] is not rejected, we prefer to use the language 'we fail to reject [the null hypothesis] at the x% level,' rather than '[the null hypothesis] is accepted at the x% level."); Douglas A. Lind, William G. Marchal and Samuel A. Wathen, *Statistical Techniques in Business & Economics*, 316 (18th ed. 2021) ("[I]f the

253. In my own published scholarship on event study econometrics in the litigation context, I have addressed this very point, writing:

> An event date's excess returns might be in the direction consistent with the plaintiff['s] allegations but be too small to be statistically significant at a significance level as demanding as 5%. Failure to demonstrate this level of statistical [significance] does not prove the null hypothesis, however; rather, such failure simply implies that one does not reject the null hypothesis at that significance level. That is, the standard event study does not show that the information did not affect stock price; it just shows that the information did not have a statistically significant effect at the 5% level [given the null hypothesis].[233]

254. The Reference Manual on Scientific Evidence ("RMSE") recognizes this fact, pointing out that failure to reject the null hypothesis can happen because the null hypothesis is true, but also because it "is false – but, by chance, the data happened to be of the kind expected" when the null hypothesis is true under the null.[234] And the RMSE goes on to explain that this second explanation is more likely when power is low[235] – equivalently, when the probability of a false negative is high – as in the present context.[236]

255. Professor Ferrell also fails to recognize that statistical proof ***ruling out*** price impact consistent with Lead Plaintiff's legal theory of liability requires a finding of an abnormal return in the ***opposite direction*** of Lead Plaintiff's theory.[237] This point is best illustrated using the October 8-10, 2018 revelation dates:

a. In order to prove an ***absence*** of price impact, Professor Ferrell needs to rule out, at his chosen level of statistical significance, the possibility that Alphabet's abnormal return came from a distribution with a negative mean.

---

null hypothesis is not rejected on the basis of the sample data, we cannot say that the null hypothesis is true. To put it another way, failing to reject the null hypothesis does not prove that [it] is true; it means we have ***failed to disprove [the null hypothesis]***.") (emphasis in original).

233 Jill E. Fisch, Jonah B. Gelbach and Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tex. L. Rev. 553, 611 (2018). Others writing about the econometrics of event studies for litigation have made the same point. *See, e.g.*, Alon Brav and J. B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 Wash. U. L. Rev. 587 (2015) ("Courts err [if they adopt the] mistaken premise that statistical insignificance indicates the probable absence of a price impact.").

234 RMSE 253-254.

235 RMSE 254; *see also* Michael O. Finkelstein and Bruce Levin, *Statistics for Lawyers* 188 (3rd ed. 2015) (explaining that "if power is low," as it is here for both Professor Ferrell's stated and actual choice of significance levels, *see* ¶¶241-248, *supra*, "then the non-significant result cannot be taken as support of either hypothesis, and no inferences should be drawn from the failure to reject the null.").

236 *See* ¶¶241-248*, supra*, with respect to low power/high false negative probability.

237 *See* ¶74, *supra*.

b. A minimal requirement for such proof at Professor Ferrell's 5% significance level standard is that his reported abnormal return on any revelation date be ***positive***. This is because a negative observed value of the abnormal return obviously is consistent with the hypothesis that the abnormal return came from a distribution with a negative mean. As discussed above, a value of $\epsilon_t = 0$ has maximum likelihood, so the likelihood of the observed data – *i.e.*, the value of the abnormal return – is greatest when $\pi_t = AR_t$. Thus, any alleged revelation date on which Professor Ferrell reports a negative abnormal return is a date on which he has presented statistical evidence that is consistent with price impact. And Professor Ferrell does not explain how evidence that is ***consistent*** with price impact possibly could ***rule out*** price impact. Such a position defies the common sense that I understand the *Goldman Sachs* decision says must apply to the question of whether a defendant has proved price impact.[238]

c. And the operative requirement here is actually much stronger than the minimal requirement that the abnormal return have a sign opposite to that predicted by Lead Plaintiff's legal theory of liability. To present ***statistically significant*** evidence ruling out that the abnormal return came from a distribution with a negative mean, Professor Ferrell would have to report a t-statistic that not only is positive, but also exceeds the critical value $z_{1-\alpha}$ on each alleged revelation date.

d. Even the contamination bias problem in his event-study design does not bias Professor Ferrell's t-statistics far enough upward to yield positive values above 1.96 for the October 8-10, 2018 dates. All his t-statistics for these dates (including the cumulative one) are less than 1.96, so none is adequate to reject Lead Plaintiff's legal theory of liability when it is assigned the status of null hypothesis when using Professor Ferrell's preferred significance level of 0.025. Further, all of Professor Ferrell's t-statistics for the October 8-10, 2018 dates are less than 1.28, so none rejects Lead Plaintiff's legal theory of liability when it is assigned the status of null hypothesis when using the 0.10 significance level.

e. Accordingly, Professor Ferrell's evidence for the October 2018 dates fails to meet the standard for rejecting the null hypothesis of price impact consistent with Lead Plaintiff's legal theory of liability.

[238] For a similar view, *see* Dr. J.B. Heaton, *Price Impact in Securities Fraud Litigation* at 2, May 23, 2023, draft on file with this author (writing that "where an abnormal return is directionally consistent with a plaintiff's theory of liability, it will be the case that it is statistically more likely than not that the event had a price impact").

### H. Professor Ferrell Contends that Alphabet's Stock Price Movements Are "Fully Explainable by Movements in the Market and Industry," but Alphabet's Stock Price Movements Are Much *Better* Explained by the Hypothesis of Price Impact

256. In discussing his event study results for the October 2018 dates, Professor Ferrell several times writes that Alphabet's abnormal returns are "fully explainable by movements in the market and industry":

a. "This event study result shows that on October 8, 2018, Alphabet's stock price movements are indistinguishable from random price fluctuations; ***the movements are fully explainable by movements in the market and industry*** and cannot be attributed to the new Alphabet-specific information announced on that date."[239]

b. "This event study result shows that on October 9, 2018, Alphabet's stock price movements are indistinguishable from random price fluctuations; ***the movements are fully explainable by movements in the market and industry*** and cannot be attributed to the new Alphabet-specific information announced on that date."[240]

c. "This event study result shows that on October 10, 2018, Alphabet's stock price movements are indistinguishable from random price fluctuations; ***the movements are fully explainable by movements in the market and industry*** and cannot be attributed to the new Alphabet-specific information announced on that date."[241]

257. This boilerplate language about "fully explainable" stock price movements reflects Professor Ferrell's already-discussed general mischaracterization of what a finding of statistical insignificance means with respect to price impact given his null hypothesis of zero price impact. In the part of his report titled "Scientific Foundations for Price Impact Analysis,"[242] Professor Ferrell offers similar boilerplate when he writes that if an estimated abnormal return is found to be statistically insignificant,

> then the stock price movement is indistinguishable from random price fluctuations . . . . In other words, the movement is fully explainable by movements in the market and industry and cannot be attributed to the new company-specific information announced on the event date.[243]

---

239 Ferrell Report, ¶55 (emphasis added).
240 Ferrell Report, ¶63 (emphasis added).
241 Ferrell Report, ¶67 (emphasis added).
242 Ferrell Report, Part IV, at 16.
243 Ferrell Report, ¶37. This claim about statistical significance and what is "fully explainable" is not one that I was able to find in Professor Ferrell's scholarly work until a 2022 article, when he wrote virtually the same text about "fully explainable" movements as he included in his report:

258. I explain elsewhere in this report that Professor Ferrell is mistaken to claim that statistical insignificance implies the absence of price impact given his specified null hypothesis.[244]

259. Beyond that, Professor Ferrell's "fully explainable" construction is not a term conventionally used in the theory and practice of statistical inference, and for good reason.

a. So long as it is ***logically*** possible that observed data are the result of Cause X, one can accurately say that the observed data are "fully explainable" by that cause. But if it is ***also*** logically possible that the observed data are the result of the opposite situation to Cause X, then the observed data are also "fully explainable" by the ***absence*** of Cause X.

b. To put this in practical terms, statistically significant findings happen sometimes even when the truth is that only random movements were at play – as discussed above, this is the definition of a Type I error, *i.e.*, a false positive result. Likewise, statistically ***insignificant*** findings occur even when the truth is that there ***was*** price impact – this is the definition of a Type *II* error, *i.e.*, a false negative result. If an observed result – here, the estimated abnormal return – is simultaneously "fully explainable" by both a hypothesis and its opposite, then references to what is "fully explainable" by such hypotheses are epistemically useless. Such claims simply have nothing to do with reasoned determinations about whether there was price impact.

260. Theories of statistical inference instead involve conclusions based on the probability of observing the data, or data more extreme than what is observed, under various counterfactual hypotheses about the state of the world.

261. As discussed above, the likelihood ratio provides a statistically meaningful approach to assess whether the observed data are better explained by the hypothesis that there was no price impact, or the hypothesis that there was price impact of a given level.[245] Unlike

---

[T]he event study determines whether the observed abnormal return on a particular date, such as the date of the corrective disclosure, is outside the range of typical random stock price fluctuations observed for that stock. If the stock price movement is indistinguishable from random price fluctuations (i.e., falls with the confidence interval), ***the movement is fully explainable by movements in the market and industry and cannot be attributed to the new firm-specific information announced on the event date***, such as a corrective disclosure date.

Allen Ferrell, *Hidden History of Securities Damages*, The University of Chicago Business Law Review: Vol. 1: No. 1, Article 4 at 105 (2022) (emphasis added).

[244] *See* ¶¶249-255, *supra*.

[245] *See* ¶¶76-79, *supra*, and Appendix E, §II.

Professor Ferrell's statistically meaningless "fully explainable" construct, the likelihood ratio approach directly reveals which hypothesis ***better explains*** the observed data.

a. Likelihood ratio analysis shows that Professor Ferrell's conclusion that there was no price impact on the October 8-10, 2018 dates does a comparatively poor job of explaining the observed values of the estimated abnormal returns.

b. For example, my event study results show that on October 8, 2018, ***any*** Class A stock price drop with magnitude less than 3.2% does a better job of explaining the data than does the Ferrell null hypothesis.

c. Ignoring the contamination bias problem in them, one could also use Professor Ferrell's ***own*** event study results to make a similar point, this time for Class A stock on October 9, 2018. On that date, Professor Ferrell reports an estimated abnormal return of -1.0%.[246] This observation would be less likely to be observed with zero price impact than with any price drop having magnitude less than 2%.[247] Thus, likelihood ratio analysis shows that price impact is a better explanation for Professor Ferrell's own October 9, 2018 event study results than is the absence of price impact.

262. Repeating the calculations above for my event study results for Class C stock on October 8, 2018 and for both classes on October 9-10, 2018 shows that:

a. My October 9, 2018 estimated abnormal return for Alphabet's Class C stock is a bit more than twice as likely with a price impact of -1.32% as with zero price impact. Further, the estimated abnormal return would be less likely to be observed with zero price impact than it would be to be observed for any price drop less than 2.64%.

b. My October 9, 2018 event study results for each of Alphabet's two classes of stock would be 10% – that is, only barely – more likely to observe with the most likely price drop as with no price impact. Still, the estimated abnormal return would be less likely to be observed with

---

246 *See* Ferrell Report, ¶62, Table 5.

247 The value of $\sigma$ implied by Professor Ferrell's regression model is $\frac{-1}{-1.19} = 0.84$ (this follows because the t-statistic is the ratio of the estimated abnormal return to $\hat{\sigma}$, so $\hat{\sigma}$ equals the ratio of the estimated abnormal return to the t-statistic, which is the ratio of -1 to -1.19). Under Professor Ferrell's specified null hypothesis of zero price impact, $\pi_t = 0$ on October 9, 2018, so $\epsilon_t$ must equal -1 on that date. The likelihood of observing a draw of $\epsilon_t = -1$ from a normal distribution with mean 0 and $\sigma = 0.84$ is 0.234. Given an estimated abnormal return of -1, when $\pi_t$ is between 0 and -2, it must be the case that $\epsilon_t$ is between 0 and 1. For each of these values of $\epsilon_t$, the likelihood of drawing it from a normal distribution with mean 0 and $\sigma = 0.84$ exceeds 0.234.

zero price impact than (for Class A stock) with any price impact less than 1.02%, or (for Class C stock) any price impact less than 0.92%.

c. For Alphabet's Class A stock, my October 10, 2018 event study result would be most likely to be observed if the true price impact were -1.25% and it would be twice as likely with that price drop as if there were no price impact. For Class C, the observed result would be most likely to be observed if there were a price impact of -1.62%, and it would be more than three times as likely with that price drop as with no price impact. The estimated abnormal return would be less likely to be observed with zero price impact than with (for Class A stock) any price impact less than 2.5%, or (for Class C stock) any price impact less than 3.24%.

d. For Alphabet's Class A stock, my event study result for the cumulative abnormal return over the October 8-10, 2018 period would be most likely to be observed if there were a cumulative price impact of -3.36% and it would be more than five times as likely with that price drop as if there were no price impact. For Class C, the observed result would be most likely to observe if there were a price impact of -3.40%, and more than six times as likely with that price drop as with no price impact. The estimated cumulative abnormal return would be less likely to be observed with zero price impact than (for Class A stock) with any price impact less than 6.72%, or (for Class C stock) any price impact less than 6.8%.

## XIV. The Ghose Draft Report's Claims Would Not Sever the Link Between Alphabet's Stock Price Movements and Price Impact on April 30 – May 1, 2019 Even if These Claims Were Accepted, and in Any Event These Claims Do Not Require the Application of Statistical or Economic Expertise

263. This Part of this report discusses five points about the Ghose Draft Report.

264. First, even if all its conclusions were accepted, the Ghose Draft Report would fail to sever the link between Alphabet's stock price movements on April 30 and May 1, 2019 and price impact related to Alphabet's earlier concealment of its bad news about privacy.

265. The Ghose Draft Report is directed at the question of whether certain specifically enumerated actions – the four "Project Strobe Actions," to use Professor Ghose's term – would "likely" affect Alphabet's ***revenue***.

a. But Professor Ghose does not consider whether his four "Project Strobe Actions" might have affected Alphabet's costs, despite Lead Plaintiff's allegation that "responsive product changes also increased costs."[248]

[248] Complaint, ¶82(b).

b. And nothing in the Ghose Draft Report indicates that he considered either the cost ***or*** the revenue effects of Alphabet's October 8, 2018 statement that "[i]n the coming months, we'll roll out additional controls and update policies across more of our APIs."[249]

266. Thus, even if all of Professor Ghose's conclusions were accepted as stated, and even if developments he characterizes as "unlikely" were known not to have occurred, the Ghose Draft Report still would fail to contradict (i) Lead Plaintiff's allegation that Alphabet's remedial actions increased costs or (ii) Lead Plaintiff's allegation that Alphabet's remedial actions reduced revenues.

267. Consequently, even if all of Professor Ghose's conclusions were accepted as stated, important channels remain for Alphabet's April 30 – May 1, 2019 stock price movements to reflect price impact of Alphabet's previous concealment of its bad news about privacy.

268. This conclusion is given further teeth by Alphabet's Annual Report for 2018 on Form 10-K, in which Alphabet stated that "'changes to our data privacy practices . . . may affect the type of ads and/or manner of advertising that we are able to provide which could have an adverse effect on our business.'"[250]

269. Second, Professor Ghose's conclusions do not require the application of expertise of the sort Professor Ghose's list of qualifications describes.

a. This is evident partly in the generality of the first two opinions Professor Ghose says he formed for purposes of this case. For example, the first opinion is that revenue "for companies like Alphabet that are driven largely by advertising sales varies for many reasons," which include "overall demand," "macro industry trends" and "the nature of competition".[251] Nothing about Alphabet would require an expert economist to conclude that revenue would be driven largely by overall demand, macro industry trends or the nature of competition. Indeed, an expert economist wouldn't even be needed to name these basic determinants of revenue; a competent undergraduate student of microeconomics would likely name at least two of them, and maybe all three.

b. Professor Ghose's third opinion is the product of his reading and consideration of "contemporaneous revenue tracking documents" provided

[249] This statement appears in the October 8, 2018 Project Strobe blog post, just below the four enumerated actions to which Professor Ghose refers as the "Project Strobe Actions." Ben Smith, *Project Strobe: Protecting your data, improving our third-party APIs, and sunsetting consumer Google+*, Google Blog, October 8, 2018, https://blog.google/technology/safety-security/project-strobe/.
[250] Complaint, ¶82(a).
[251] Ghose Draft Report, ¶26.

by Alphabet; it involves no statistical or economic analysis outside the reach of a competent reader of such documents.

c. Professor Ghose's fourth opinion also does not appear to require any professional expertise listed in his qualifications.

d. A final observation is that the Ghose Draft Report lacks the most obvious indicum of a statistical analysis, namely, the use of any of the terminology professional statisticians use to discuss their statistical work. At least some statistical terms would surely appear in any report that reflected the application of expertise in statistics, economics and the distinguishing of correlation and causation – yet Professor Ghose provides no analysis of his own using any such terms in communicating the basis for his opinions.

270. Third, Professor Ghose is unable to provide any assessment of the actual – as opposed to "likely" or "unlikely" – effects of his four "Project Strobe Actions" on revenue. Professor Ghose explains that he believes only "A/B" testing provides a reliable measure of the impacts of company policy changes.[252] But Professor Ghose describes no A/B test of any of his four "Project Strobe Actions." Without one, his belief in the necessity of such tests leaves only one possible conclusion for Professor Ghose – that "it is not possible to reliably isolate" the revenue effects of any of the "Project Strobe Actions."

271. Fourth, Professor Ghose's discussion of consumer preference heterogeneity has no discernible relevance to this litigation.

272. Fifth, Professor Ghose's description of Alphabet's documents related to the lapping quarter of "Burpee" does not address, much less exclude, the possibility that Alphabet's 2019-Q1 revenue was disappointing partly thanks to Alphabet's diversion of engineering resources to deal with its previously concealed privacy issues.

### A. Professor Ghose's Report Purports to Address Only a Partial Set of Channels Through Which Lead Plaintiff Alleges that Alphabet's Remedial Steps Affected Its Earnings as Announced on April 29, 2019

273. The Ghose Draft Report addresses only revenue effects.[253]

274. The Ghose Draft Report therefore does not address any effects of remediating Alphabet's previously concealed bad privacy news on Alphabet's ***costs***, despite the fact

252 Ghose Draft Report, ¶107.

253 Ghose Draft Report, ¶22 ("I was asked by counsel for Alphabet to consider Plaintiff's claims that implementation of the Project Strobe Actions affected Alphabet's ***revenue*** in the first quarter of 2019.") (emphasis added).

that Lead Plaintiff alleges that Alphabet's "responsive product changes also increased costs."[254]

275. Citing Alphabet's October 8, 2018 Project Strobe blog post, Professor Ghose writes:

> The Project Strobe Blog announced four "actions" it planned to take as a consequence of Project Strobe (the "Project Strobe Actions"):
>
> - Shutting down Google+ for consumers (the "Google+ Shutdown Action");
> - Providing consumers with "more fine-grained control over what [Google] [A]ccount data they choose to share with each app," and indicating that, "[i]nstead of seeing all requested permissions in a single screen, apps will have to show you each requested permission, one at a time, within its own dialog box" (the "Granular Controls Action");
> - Limiting the types of third-party apps that may seek permission to access consumers' data in Gmail, such that "[o]nly apps directly enhancing email functionality . . . will be authorized to access this data," and "[t]hese apps will need to agree to new rules on handling Gmail data and will be subject to security assessments" (the "Gmail Access Action"); and
> - Limiting which third-party apps available on Google Play can seek permission to access voice (call log) and SMS (text message) data on Android devices to only the apps a user has identified as "default" call and text messaging apps (the "Non-Default App Access" action).[255]

276. Professor Ghose's "Project Strobe Actions" were not the only actions the Project Strobe blog promised. After enumerating Professor Ghose's four "Project Strobe Actions," the same Google blog post stated: "In the coming months, we'll roll out additional controls and update policies across more of our APIs."[256]

277. Nothing in the Ghose Draft Report indicates that Professor Ghose considered the possibility of revenue effects related to the general remedial actions Alphabet referenced when it promised to roll out "additional controls" and "update[d] policies" across "more of [its] APIs" in "coming months."[257]

278. Even if all of Professor Ghose's conclusions were accepted as stated, then the Ghose Draft Report would fail to contradict (i) Lead Plaintiff's allegation that Alphabet's "responsive product changes . . . increased costs" or (ii) Lead Plaintiff's allegation that Alphabet's remedial actions "hurt revenues."[258]

---

[254] Complaint, ¶82(b).
[255] Ghose Draft Report, ¶16.
[256] Ben Smith, *Project Strobe: Protecting your data, improving our third-party APIs, and sunsetting consumer Google+*, Google Blog, October 8, 2018, https://blog.google/technology/safety-security/project-strobe/.
[257] I searched the publicly filed version of the Ghose Draft Report, which does contain redactions.
[258] Complaint, ¶82(b).

279. Consider an investor who on April 30 – May 1, 2019 drew the same conclusions that Professor Ghose draws in his report.

a. Nothing in the Ghose Draft Report would prevent such an investor from believing that the April 29, 2019 earnings statement was partly due to the ***cost***-related consequences of the category of specific remedial actions that constitute Professor Ghose's four "Project Strobe Actions."

b. Nothing in the Ghose Draft Report would prevent such an investor from believing that the April 29, 2019 earnings statement was partly due to revenue and cost-related consequences of the category of general remedial action involving "additional controls and update[d] policies across more of our APIs" that Alphabet promised to "roll out" in "coming months."

c. Accordingly, such an investor could have, on April 30 – May 1, 2019, agreed with everything Professor Ghose writes and still attributed Alphabet's poor earnings statement at least in part to consequences of Defendants' omissions and scheme, as the Complaint alleges.

280. In sum, the Ghose Draft Report does not sever the chain of inferences connecting Alphabet's poor earnings report of April 29, 2019 to the remedial actions Alphabet allegedly took in response to Alphabet's previously concealed bad privacy news.

281. Therefore, the Ghose Draft Report fails to demonstrate the absence of price impact from Alphabet's concealment of its bad privacy news, in the April 30 – May 1, 2019 market response to Alphabet's poor earnings report of April 29, 2019.

### B. The Analysis Professor Ghose Provides Does Not Require the Expertise of a Statistician, Economist or Expert in Causal Inference

282. It is my expert opinion that the kind of analysis evident in the Ghose Draft Report requires no special expertise in statistics, economics or the study of causal inference.[259]

283. Professor Ghose frames the issues addressed in his report as if they require disentangling complex statistical, economic or data science issues that distinguish correlation and causation. He writes:

a. "From an empirical perspective, Plaintiff has asserted ***an apparent correlation*** between two events, namely the announcement of the Project Strobe Actions in October 2018, and the lower-than-expected revenue announced by Alphabet in April 2019. However, I understand Plaintiff's claims to reflect ***an alleged causal link*** between these two events, namely that the announcement of the Project Strobe Actions not

[259] As noted in my qualifications, these are topics I have taught, used in my scholarly research and – as both a journal editor and referee – assessed throughout my career as an economist.

only preceded, but ***actually caused***, the lower-than-expected revenue."[260]

b. "Determining when ***a correlation*** between two events is ***actually causal*** is a key issue in data science, particularly in my fields of expertise, marketing and economics."[261]

c. "***Distinguishing correlation from causation*** has also been an aspect of much of my own research published in peer-reviewed journals and elsewhere."[262]

d. "I applied my academic and practitioner ***expertise***, including ***in distinguishing between correlation and causation*** in marketing and economics, to the issues of this case. First, I considered, based on my experience and the available documents and data, the factors that, from a business perspective, are understood to cause variation in revenue over time for a company like Alphabet. I also considered the role of companies' privacy policies and features in affecting revenue in such cases, and in particular considered consumer heterogeneity in privacy preferences. On the basis of that work, I formed two opinions:

- Revenue for companies like Alphabet that are driven largely by advertising sales varies for many reasons, including changes in the overall demand for advertising, macro industry trends, and the nature of competition between companies that facilitate digital advertising. These factors were at play during the period at issue during this case.

- There is significant heterogeneity in consumer privacy preferences and many consumers are willing to share their data with companies in return for various benefits, such as access to improved product features and higher-quality ads. As a consequence, ***privacy-related policy changes*** such as the Project Strobe Actions ***do not typically affect companies' advertising revenues in a financially material way***."[263]

e. "Plaintiff's ***correlational assertions*** do not demonstrate any causal relationship between the Project Strobe Actions and Alphabet's first quarter 2019 revenue."[264]

284. These various references to correlation and causation, and to Professor Ghose's expertise in distinguishing between the two, and to "data science [and Professor Ghose's] fields of expertise, marketing and economics,"[265] suggest that Professor Ghose is making

---

[260] Ghose Draft Report, ¶23 (emphasis added).
[261] Ghose Draft Report, ¶24 (emphasis added).
[262] Ghose Draft Report, ¶25 (emphasis added).
[263] Ghose Draft Report, ¶26 (emphasis added).
[264] Ghose Draft Report, ¶27 (emphasis added).
[265] Ghose Draft Report, ¶24 (emphasis added).

a claim that involves the application of the expertise he has acquired through the study or practice of statistics, marketing or economics. But nowhere in the Ghose Draft Report does he describe any use of statistical methods or application of his expertise in their interpretation.

285. Instead, even within the limited scope of the Ghose Draft Report, its substance is largely the quoting from and paraphrasing of documents Alphabet created while this litigation was ongoing. The Ghose Draft Report includes no statistical estimation or testing related to any of the information he attributes to Alphabet's documents. Professor Ghose does not describe any assessment of whatever underlying data exist. Nor does Professor Ghose describe any discussions with the author of any document. The report just shares Professor Ghose's reflections on what these documents might mean within the highly limited scope of his assignment.[266]

286. However valuable such document analysis and introspective consideration may be for some purposes, it does not entail the application of any expertise related to statistics or causal inference as such. This can most easily be seen by considering that the Ghose Draft Report does not use any of the terminology that statisticians typically use to describe empirical results they have conducted or are critiquing, including when considering whether estimation results bear a causal interpretation. I noticed in reading the Ghose Draft Report, and confirmed using a search with the Acrobat app, that none of the following terms appears in the Ghose Draft Report: ***regress***; ***coefficient***; ***parameter***; ***standard error***; ***standard deviation***; ***t-statistic***. In addition, none of the following terms appears in a context indicating that Professor Ghose conducted any statistical analysis for this report: ***estimate***; ***variance***; ***model***; ***endogenous***; ***independent***; ***independence***; ***inference***; ***hypothesis***.

287. Although it is easy to imagine expert statistical analyses that would not use ***all*** of the terms in the previous paragraph in a statistical context, it is hard to imagine that an expert statistical analysis would fail to use ***any*** of them in such a fashion.

288. Thus it is unclear what issues in the Ghose Draft Report required him to "appl[y his] academic and practitioner expertise . . . in distinguishing between correlation and causation."[267]

289. Those statements in the report that Professor Ghose could not have made before learning about this litigation are based on his review of internal documents provided by Alphabet and on reflections about what they might mean.[268] If it was necessary for

---

[266] Professor Ghose describes that assignment as considering whether "implementation of [his four specifically enumerated] Project Strobe Actions affected Alphabet's revenue in the first quarter of 2019." Ghose Draft Report, ¶22.

[267] Ghose Draft Report, ¶26.

[268] Some of Professor Ghose's opinions appear not even to have required any review of the documents Alphabet provided to him, and to be based only on his general knowledge, for example, about the determinants of revenues for companies for whom advertising revenues are important. For example, the first opinion Professor Ghose describes forming based on his work in this case

Professor Ghose to deploy the substantial statistical and topic-area expertise evident in his stated qualifications and curriculum vita, it is unclear why or how.

290. Thus, despite its references to correlation, causation and the challenges of distinguishing them, the substance of Professor Ghose's discussion of these matters is limited to the prosaic observation that there is such a fallacy as *post hoc ergo propter hoc*.

291. Any qualified statistician would agree with the claim that X need not have caused Y ***merely*** because X occurred before Y. But despite Professor Ghose's framing, that is not the nature of Lead Plaintiff's allegations related to April 2019.

292. Lead Plaintiff's basic argument is, rather, that Alphabet's stock price fell after the April 29, 2019 earnings statement because Alphabet's earnings report was disappointing, and Lead Plaintiff asserts that an important reason it was disappointing was that Alphabet had taken expensive remedial actions in response to the privacy and data security issues at issue in this litigation.

293. Lead Plaintiff's assertions of price impact thus will be empirically sensible if Lead Plaintiff offers evidence of the second link in the chain – that Alphabet's disappointing earnings were caused at least in part by Alphabet's remedial actions in response to the privacy and data security issues it previously concealed.

294. This argument does not indulge in a rooster-crowing-causes-the-sun-to-rise kind of fallacy, and no special expertise in statistics, economics or distinguishing correlation and causation is required to evaluate it.

295. Even Professor Ghose's discussion of Alphabet's A/B testing of the advertising formatting change known internally as "Burpee"[269] does not appear to have involved the use of any professional expertise.

a. The Ghose Draft Report does not indicate that he was involved in conducting, overseeing or analyzing the results of an A/B test related to any Alphabet app, product or policy change, including "Burpee."

b. Nor does the Ghose Draft Report indicate that Professor Ghose spoke with anyone at Google who conducted such an A/B test while this

includes this statement: "Revenue for companies like Alphabet that are driven largely by advertising sales varies for many reasons, including changes in the overall demand for advertising, macro industry trends, and the nature of competition between companies that facilitate digital advertising. These factors were at play during the period at issue during this case." Ghose Draft Report, ¶26. Professor Ghose must have thought the same thing even before considering any materials in this case, because all he says there is that (i) a firm's revenue is affected by factors that usually affect firms' revenues, and (ii) the roughly one-year period at issue in this case was not so unusual as to negate the usual explanatory value possessed by standard economic reasoning.

[269] Ghose Draft Report, ¶¶105-112.

litigation was underway, nor that he reviewed any test protocols or data resulting from such an A/B test.

c. Thus, the Ghose Draft Report provides no reason to believe he applied his expertise to determine the reliability of any A/B test conducted by Alphabet while this litigation was underway.

d. With respect to the specific A/B testing Professor Ghose describes, then, it appears from the Ghose Draft Report that he has simply read some documents that Alphabet's attorneys provided to him and then described the contents of those documents.[270] That does not require or even involve any expertise in statistics or economics.

### C. Professor Ghose's Stated Requirements for the Reliability of Privacy-Related Changes Prevent Him from Concluding that Alphabet's Revenues Were Unaffected by Those of Its Remedial Actions that Professor Ghose Did Consider (Unless Alphabet Did A/B Testing that Professor Ghose Does Not Discuss)

296. Professor Ghose opines that "privacy-related changes like those in Project Strobe are unlikely to affect ad revenues for companies like Alphabet in a financially material way."[271]

297. Professor Ghose also opines: "There is no reliable basis to conclude that any of the four Project Strobe Actions would have had a financially material effect on Alphabet's revenue during the first quarter of 2019."[272]

298. Notably, Professor Ghose does not opine that the four "Project Strobe Actions" he considered ***actually*** had no effect on Alphabet's revenue.

299. In fact, Professor Ghose ***could not*** come to such an opinion without contradicting his expressed opinion that only A/B tests can reliably determine the causal effect of a company's privacy policy change.

a. Professor Ghose: "The concept of an A/B test is that two groups . . . are expected to be the same in all relevant dimensions, except for their exposure to the change at issue."[273]

---

[270] Consider, for example, this statement: "***Alphabet's contemporaneous internal documents*** tracking revenue during the first quarter of 2019 in fact ***attribute*** a significant share of reduced growth in revenue during the first quarter of 2019 to the success of Burpee during the first quarter of 2018, thereby reducing the ability of Alphabet's revenue to grow as fast." Ghose Draft Report, ¶49 (emphasis added).

[271] Ghose Draft Report, Part IV, at 18 (all-caps removed for readability).

[272] Ghose Draft Report, ¶29.

[273] Ghose Draft Report, ¶107.

b. Professor Ghose: "As one textbook explains, this approach of applying the change to only one group, and using the other as a control, is a far more reliable way to measure the effects of that change than applying it to all users."[274]

c. Professor Ghose: "In other words, lots of variables may change over time. ***Without an A/B test, it is not possible to reliably isolate the factor of interest*** from all the other changes."[275]

300. Professor Ghose's general views of the necessity of doing A/B testing appear in the context of his recitation of the contents of Alphabet documents related to an A/B test of the "Burpee" formatting change, rather than to any of Professor Ghose's four "Project Strobe Actions."[276]

301. Professor Ghose does not discuss any A/B test conducted by Alphabet to study the revenue effects of any of the four "Project Strobe Actions" on which Professor Ghose focuses. I assume that Alphabet did not provide Professor Ghose with any information indicating that it had conducted any such testing.

302. Without any information from such A/B testing, Professor Ghose would be unable to draw any conclusions he viewed as reliable about the actual revenue effects of the four "Project Strobe Actions." This is because he believes A/B testing is necessary to "reliably isolate [any of the four 'Project Strobe Actions'] from all the other" factors that might have affected Alphabet's revenues, in either direction, during the period at issue in this case. Such other factors would include "the overall demand for advertising, macro industry trends, and the nature of competition between companies that facilitate digital advertising," all of which Professor Ghose says were "at play during the period at issue during this case."[277]

### D. Professor Ghose's Description of Consumer Preference Heterogeneity Has No Discernible Relevance to the Issues in This Case Related to April 30 – May 1, 2019

303. Professor Ghose writes: "There is significant heterogeneity in consumer privacy preferences and many consumers are willing to share their data with companies in return for various benefits, such as access to improved product features and higher-quality ads. As a consequence, privacy-related policy changes such as the Project Strobe Actions do not typically affect companies' advertising revenues in a financially material way."[278]

304. The support Professor Ghose offers for this opinion is:

---

274 Ghose Draft Report, ¶107.
275 Ghose Draft Report, ¶107 (emphasis added).
276 Ghose Draft Report, ¶¶105-112.
277 Ghose Draft Report, ¶26.
278 Ghose Draft Report, ¶26.

a. There is consumer preference heterogeneity in privacy attitudes, based on survey results.[279]

b. Only 20% of shopping mall visitors declined an offer from Professor Ghose and coauthors to receive something of presumably small value in return for sharing their location information.[280]

c. A subsequent study by other authors showed, in Professor Ghose's words, "that willingness to share data also varies based on several contextual factors."[281]

d. Professor Ghose's observation in a 2017 book that people "'care a lot about data privacy,'" but nevertheless, in the words of the Ghose Draft Report, they "are willing to share data in order to engage meaningfully with social media."[282]

305. Everyday experience and common sense suggest that people's attitudes about privacy differ, and that "contextual factors" are associated with variation in these attitudes. So it is believable that some consumers will trade away, say, their mall-location data for not much in return. And it is unsurprising that people both care a lot about data privacy and are willing to share their data to use internet services.

306. Further, that some consumers are willing to share their data does not mean that reasonable investors must believe ***all*** consumers (nor all regulators) are indifferent to Alphabet's privacy and data challenges. Indeed, the very nature of heterogeneity is variety – such that some consumers (and regulators) ***do*** care about these matters. In fact, Professor Ghose concedes that 21% of the population are what he calls "'privacy fundamentalists,'" who "'reject[] consumer-benefit or societal-protection claims for data uses.'"[283] Common sense suggests that, if 21% of the population cares deeply about their own data remaining private, then reasonable investors would reduce the value they place on the stock of companies when bad privacy news is revealed.

307. But even leaving those points aside, Professor Ghose's observations about consumer heterogeneity hardly would establish that "privacy-related policy changes ***such as the Project Strobe Actions*** do not typically affect companies' advertising revenues in a financially material way."[284] And his observations based on a handful of external sources especially should have failed to convince Professor Ghose, who insists that A/B testing is the only reliable way to learn the effects of company policy changes.

---

279 Ghose Draft Report, ¶40.
280 Ghose Draft Report, ¶41.
281 Ghose Draft Report, ¶41.
282 Ghose Draft Report, ¶42.
283 Ghose Draft Report, ¶¶40-41.
284 Ghose Draft Report, ¶26.

308. Moreover, extensive facts documented in this report refute Professor Ghose's suggestion that consumer preference heterogeneity somehow immunizes tech firms from privacy-related fallout. Consider Facebook's Cambridge Analytica scandal (*see* ¶¶94-102) or the event-study evidence (¶¶160-179) and market commentary (¶¶33-34) related to the October 2018 revelations at issue in this case.

309. Finally, Professor Ghose writes: "Of course, companies typically do make consumer privacy ***a significant priority*** and go to ***significant expense*** to maintain it."[285] This observation seems to be at odds with Professor Ghose's apparent view that privacy is unrelated to revenue for companies like Alphabet – why would profit-seeking companies incur significant expense making something a significant priority if it had no effect on revenue? On the other hand, Professor Ghose's concession as to the priority and expense of consumer privacy is quite consistent with Lead Plaintiff's argument.

### E. Professor Ghose's "Lapping Quarter" Explanation for Alphabet's 2019-Q1 Revenue Does Not Invalidate Lead Plaintiff's Position as to Alphabet's April 30 – May 1, 2019 Stock Price Movement

310. Professor Ghose attributes Alphabet's year-over-year ("YOY") quarterly drop in revenue in 2019-Q1 to the one-year-earlier introduction of Alphabet's "Burpee" formatting change.[286]

311. But YOY revenue growth was considerably closer to its 2018 values for 2019's second, third and fourth quarters, even though Professor Ghose's argument would apply as much to these quarters as to 2019-Q1. As with 2019-Q1, the second, third and fourth quarters were the first three Q2, Q3 and Q4 quarters following the introduction of "Burpee." Based on the numbers presented in Professor Ghose's Exhibit B, these three quarters averaged a 4.3-point drop in YOY revenue growth between 2018-2019,[287] compared to a 9-point drop in YOY revenue growth for 2019-Q1.

312. Further, even if, hypothetically, "Burpee" increased revenue by $2.5 billion in 2018, and even if that increase were uniformly distributed across 2018, then 2018-Q1 would account for only a bit more than half the $984 million revenue miss that Professor Ghose reports[288] based on his reading of Alphabet's documents.[289]

---

285 Ghose Draft Report, ¶43 (emphasis added).

286 Ghose Draft Report, ¶84 ("Because Burpee led to such a large increase in revenue after it was implemented in the first quarter of 2018, year-over-year growth in the first quarter of 2019 (the 'lapping' quarter) would likely be lower.").

287 Ghose Draft Report, ¶32 (whose Exhibit B shows a drop in YOY revenue growth of 7, 1 and 5 percentage points for 2019-Q2, -Q3 and -Q4).

288 Ghose Draft Report, ¶20.

289 One of the documents Professor Ghose read indicated that the launch of "Burpee" was complete as of January 17, 2018. Ghose Draft Report, ¶92. This implies there were 74 days in 2018-Q1 after Burpee's apparent launch on January 17, out of 349 total days in 2018 after that date. Multiplying

313. The Ghose Draft Report suggests that the "Burpee"-based increase in Alphabet's revenue was essentially a windfall – a one-time boost to revenue, never to be repeated. The further implication is that, if Wall Street analysts had realized that "Burpee" was a one-off revenue-increaser, then these analysts would have reduced their expectations for 2019-Q1 revenue.

314. But Professor Ghose does not investigate ***why*** the success of "Burpee" could not be replicated in 2019-Q1. Professor Ghose offers no explanation for why he believes that Alphabet could not innovate productively enough to keep its revenue growing in line with previous years, or even just in line with analysts' expectations.[290] This is a notable lacuna given Professor Ghose's repeated references to innovations by both Alphabet and its competitors, such as:

a. "***[C]ompanies like Alphabet*** and its competitors ***regularly improve their products in various ways and these lead to at least temporary competitive advantages***."[291]

b. "Facebook introduced a variety of new innovations in digital advertising during 2018 and the first quarter of 2019," and then enumerates innovations occurring in June 2018, July 2018, September 2018, and February 2019.[292]

c. "Many other Alphabet competitors also introduced innovations or other competitive moves in an attempt to attract more advertiser dollars during this period, including Snap, Inc., Microsoft Corporation; Twitter, Inc.; Roku, Inc.; Amazon.com, Inc.; AT&T Inc.; Verizon Communications, Inc.; Hulu, LLC; and BuzzFeed."[293]

315. The Complaint supplies one possible explanation, by alleging that Google's need to remediate its privacy issues caused it to divert engineering resources from revenue-enhancing product changes:

a. Whether via Professor Ghose's four "Project Strobe Actions" or via the general category of "additional controls and update[d] policies" in Alphabet's October 8, 2018 blog post, such diversion of resources after

---

the hypothetical sum of $2.5 billion by 74/349 yields a total of $530 million, which is a bit more than half of $984 million.

[290] To be sure, Alphabet would have avoided a revenue even had its YOY revenue growth dropped significantly. Professor Ghose reports that Alphabet's revenue missed analysts' expectations by only 2.6 percentage points. Ghose Draft Report, ¶20. Alphabet's revenue growth actually dropped 9 percentage points, from 26% in 2018-Q1 to 17% in 2019-Q1. Ghose Draft Report, ¶32 (Exhibit B). Thus Alphabet's YOY revenue growth fell roughly three times the amount necessary to avoid a revenue miss.

[291] Ghose Draft Report, ¶60 (emphasis added).

[292] Ghose Draft Report, ¶37.

[293] Ghose Draft Report, ¶38 (footnotes omitted).

Alphabet discovered its privacy problems in March 2018 could have reduced Alphabet's capacity to innovate sufficiently to continue on its earlier revenue growth path.

b. Further, the Complaint quotes from Alphabet's February 2019 statement, in its 2018 Annual Report on Form 10-K, that "'changes to our data privacy practices . . . may affect the type of ads and/or manner of advertising that we are able to provide which could have an adverse effect on our business.'"[294]

c. Thus, the Complaint is consistent with the idea that Alphabet would have been able to continue on with its -"'Burpee" revenue growth path had Alphabet not had to change its data privacy practices.

316. The Ghose Draft Report does not even address this explanation, much less disprove it.

## XV. Summary: Neither Professor Ferrell's Report nor the Ghose Draft Report Establishes the Absence of Price Impact Due to Alphabet's Allegedly Fraudulent Actions

### A. Professor Ferrell's Report Does Not Establish the Absence of Price Impact Due to Alphabet's Allegedly Fraudulent Actions

317. Professor Ferrell's report suffers from contamination bias for the October 2018 dates due to his use of indexes that include stocks that would be expected to drop ***as a result of the October 2018 revelations***.

318. Professor Ferrell sometimes insists that fundamental analyses such as DCF add nothing to event-study evidence yet other times treats fundamental analyses as providing additional information. Professor Ferrell provides no basis for his haphazard ranking of the evidentiary value of event studies and fundamental analyses.

319. Professor Ferrell sometimes insists that information will be immediately impounded in Alphabet's stock price yet other times relies on the assumption that it will take days or even longer for information to be impounded in Alphabet's stock price. Professor Ferrell provides no basis for determining when already-public information can be expected to affect stock prices, as would be necessary to accept his proposed price change sources, or when it should have been immediately incorporated into the price, as he must accept to contest the three-day event window of October 8-10, 2018.

320. Professor Ferrell ignores evidence that markets saw the October 8-10, 2018 revelations as important, and he does nothing to separately measure the effects of other sources of price change he claims contributed to Alphabet's stock price drop over this period.

---

294 Complaint, ¶82(a).

321. Despite Professor Ferrell's stated preference for a 5% significance level (95% confidence level), he uses a critical value that has the effect of reducing the significance level to 2.5% (raising the confidence level to 97.5%). And neither significance level is congruous with the preponderance standard that I understand governs the question of whether there was an absence of price impact.

322. Professor Ferrell's approach is plagued by very high probabilities of false negatives – failing to detect price impact when a revelation really is accompanied by price impact. This problem is especially severe for a company with market cap as large as Alphabet's. An analyst using Professor Ferrell's standard would detect price impact in ***only 1 in 12 cases*** having a ***$5 billion drop*** in market cap, for a trillion-dollar company with the same standard deviation of abnormal returns as Alphabet's. To trigger even ***a 50/50 chance*** of detecting price impact using Professor Ferrell's standard, the fraud would have to cause a ***$16.5 billion drop*** in market cap.

323. Professor Ferrell mischaracterizes the implications of statistical insignificance by treating a failure to reject a null hypothesis as being equivalent to a determination that it is true. That is a basic error in statistical reasoning, and one that is especially likely to be problematic when the probability of false negatives is substantial. It is hornbook statistics that such a finding does not mean the null hypothesis is accepted, but rather only that it is not rejected. Specifying the null hypothesis as the hypothesis of zero price impact, as Professor Ferrell does, is simply incapable of leading to a statistical determination that there was no price impact. Methodologically speaking, the only way to reject the possibility of price impact is to set up Lead Plaintiff's legal theory of liability – rather than zero price impact – as the null hypothesis. Tests that treat Lead Plaintiff's legal theory of liability as the null hypothesis do not come close to rejecting the possibility of price impact for July 24, 2018, for October 8, 9, or 10, 2018, or for April 30 or May 1, 2019, whether at the 5% significance level Professor Ferrell says he supports or at the 2.5% significance level he actually uses.

324. Professor Ferrell makes the statistically meaningless claim that Alphabet's stock price movements are "fully explainable by movements in the market and industry," ignoring the fact that these stock price movements are also "fully explainable" by price impact consistent with Lead Plaintiff's legal theory of liability. Professor Ferrell's construct of what is "fully explainable" has no foundation in statistical methodology and is useless in comparing the strength of different explanations for the observed statistical evidence. Likelihood ratio analysis, which avoids these problems, shows that: (i) for October 9, 2018, the hypothesis of price impact is slightly favored over the null hypothesis of zero price impact; and (ii) for October 8 and 10, 2018, Alphabet's stock price movements are ***much better*** explained by the hypothesis of price impact consistent with Lead Plaintiff's legal theory of liability than by the null hypothesis of zero price impact.

### B. The Ghose Draft Report Does Not Come Close to Establishing the Absence of Price Impact on April 30 – May 1, 2019

325. First, even if all conclusions in the Ghose Draft Report were accepted, that would still not sever the link between Alphabet's stock price movements following its April 29, 2019 earnings statement, and price impact related to Alphabet's earlier concealment of its bad news about privacy. This is because the Ghose Draft Report ignores any cost-effects of Professor Ghose's four "Project Strobe Actions" and ignores both cost ***and*** revenue effects of additional remedial actions that Alphabet promised and allegedly took. Professor Ghose's failure to consider such possible effects leaves him with no reliable foundation to conclude that Alphabet's April 29, 2019 earnings statement was unrelated to the company's previously concealed bad privacy news.

326. Second, Professor Ghose's conclusions do not require the application of any of the statistical or economic expertise Professor Ghose describes as his qualifications. The Ghose Draft Report lacks any quantitative analysis, and it describes no involvement by Professor Ghose in any of the work by Alphabet on the "Burpee" A/B test. Professor Ghose's work with the specific facts of this case seems limited to his reports of his impressions gleaned from reading a grab bag of internal Alphabet documents. Nothing about that would require Professor Ghose to deploy any specialized expertise.

327. Third, Professor Ghose could not provide any assessment of the actual – as opposed to "likely" or "unlikely" – effects of his four "Project Strobe Actions" on revenue, because he believes only "A/B" testing provides a reliable measure of the impacts of company policy changes.[295] As there appear not to have been any A/B tests of any of Professor Ghose's four "Project Strobe Actions," his own standard would compel him to conclude that it is impossible for him to "reliably isolate" the revenue effects of any of the "Project Strobe Actions."

328. Fourth, Professor Ghose's discussion of consumer preference heterogeneity has no discernible relevance to this litigation. Although some consumers no doubt share their data, the very nature of heterogeneity is that it implies others won't – and whatever the prevalence of Professor Ghose's consumers who don't care about privacy, there is little question that many regulators are concerned to protect consumer privacy. And evidence indicates that reasonable investors reduce the value they place on the stock of companies when bad privacy news is revealed. The Ghose Draft Report discussion of consumer preference heterogeneity thus does nothing to sever the link between Alphabet's 2019-Q1 earnings news and price impact related to its earlier concealment of privacy problems.

329. Fifth, Professor Ghose's description of Alphabet's documents related to the lapping quarter of "Burpee" does not address, much less exclude, the possibility that Alphabet's 2019-Q1 revenue was disappointing partly thanks to Alphabet's diversion of engineering resources to deal with its previously concealed privacy issues.

---

295 Ghose Draft Report, ¶107.

330. In sum, neither the Ferrell Report nor the Ghose Draft Report plausibly establishes the absence of price impact for any of the dates I was asked to consider – not for April 24, 2018, not for July 24, 2018, not for October 8-10, 2019, and not for April 30 - May 1, 2019.

331. I reserve the right to abridge, enlarge or modify my opinions described above in light of any new information, including any submissions by any experts for defendants that come to my attention.

Dated: August 14, 2023

Jonah B. Gelbach

## APPENDIX A

**JONAH B. GELBACH**
**CURRICULUM VITAE**
**AUGUST 14, 2023**
gelbach@berkeley.edu

### CURRENT APPOINTMENT

| | |
|---|---|
| UNIVERSITY OF CALIFORNIA AT BERKELEY LAW SCHOOL | |
| Herman F. Selvin Professor of Law | 2022-present |
| Professor of Law | 2019-2022 |

### PAST TENURE-LINE APPOINTMENTS

| | |
|---|---|
| UNIVERSITY OF PENNSYLVANIA LAW SCHOOL | |
| Professor of Law | 2016-2019 |
| Associate Professor of Law (untenured) | 2013-2016 |
| UNIVERSITY OF ARIZONA, ELLER COLLEGE OF MANAGEMENT | |
| Associate Professor of Economics (tenured) | 2007-2010 |
| UNIVERSITY OF MARYLAND AT COLLEGE PARK | |
| Associate Professor of Economics (tenured) | 2005-2007 |
| Assistant Professor of Economics (untenured) | 1998-2005 |

### VISITING APPOINTMENTS

| | |
|---|---|
| NYU SCHOOL OF LAW | |
| Visiting Professor of Law | 2021-2022 |
| FLORIDA STATE UNIVERSITY COLLEGE OF LAW | |
| Visiting Professor of Law and Economics | 2006-2007 |

### EDUCATION

| | |
|---|---|
| YALE LAW SCHOOL, J.D. | 2013 |
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Ph.D. (Economics) | 1998 |
| UNIVERSITY OF MASSACHUSETTS AT AMHERST, B.A. (Major: Economics) | 1993 |

### EDITORSHIPS & BOARD MEMBERSHIPS

| | |
|---|---|
| CO-EDITOR, JOURNAL OF LAW, ECONOMICS, AND ORGANIZATION | 2016-2021 |
| MEMBER, BOARD OF DIRECTORS, AMERICAN LAW AND ECONOMICS ASSOCIATION | 2017-2020 |
| SECTION CHAIR, AALS SECTION ON LAW AND ECONOMICS | 2017-2018 |

## PUBLISHED OR FORTHCOMING ACADEMIC ARTICLES AND BOOK CHAPTERS

1. *Free PACER*, in **Legal Tech and the Future of Civil Justice**, edited by David Engstrom, Cambridge University Press (2023)
2. *Power and Statistical Significance in Securities Fraud Litigation*, 11 **HARVARD BUSINESS LAW REVIEW** 55 (2021) (with Jill E. Fisch)
3. *Legal Tech, Civil Procedure, and the Future of American Adversarialism*, 169 **UNIVERSITY OF PENNSYLVANIA LAW REVIEW** 1001 (2021) (with David F. Engstrom)
4. *Machine Learning and Predicted Returns for Event Studies in Securities Litigation*, 5 **Journal of Law, Finance, and Accounting** 231 (2020) (with Andrew Baker)
5. *Estimation Evidence*, 168 **UNIVERSITY OF PENNSYLVANIA LAW REVIEW** 549 (2020)
6. *A Bayesian Approach to Event Studies for Securities Litigation*, 176 **JOURNAL OF INSTITUTIONAL & THEORETICAL ECONOMICS** 86 (2020) (with Jenny Rae Hawkins)
7. *The Reduced Form of Litigation Selection Models and the Plaintiff's Win Rate*, 61 **JOURNAL OF LAW AND ECONOMICS** 125 (2018)
8. *Rethinking Judicial Review of High Volume Agency Adjudication*, 96 **TEXAS LAW REVIEW** 1097 (2018) (with David Marcus)
9. *What We Don't Know About Class Actions but Hope to Know Soon*, 87 **Fordham L. Rev.** 65 (2018) (with Deborah R. Hensler).
10. *Error Costs, Legal Standards of Proof and Statistical Significance*, 25 **SUPREME COURT ECONOMIC REVIEW** 1 (2017) (with Michelle M. Burtis and Bruce H. Kobayashi)
11. *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 **TEXAS LAW REVIEW** 553 (2018) (with Jill E. Fisch and Jon Klick)
12. *American Pipe Tolling, Statutes of Repose, and Protective Filings: An Empirical Study*, 69 **STANFORD LAW REVIEW ONLINE** 92 (2017) (with David Freeman Engstrom)
13. *Crushed: Social Security Litigation in the Federal Courts*, 101 **JUDICATURE** 65 (2017) (with David Marcus)
14. *The Triangle of Law and The Role of Evidence in Class Action Litigation*, 165 **UNIVERSITY OF PENNSYLVANIA LAW REVIEW** 1807 (2017)
15. *Can Variation in Subgroups' Average Treatment Effects Explain Treatment Effect Heterogeneity? Evidence from a Social Experiment*, 99 **REVIEW OF ECONOMICS & STATISTICS** 683 (2017) (with Marianne Bitler and Hilary Hoynes)
16. *Empirical Law and Economics*, **OXFORD HANDBOOK** series, edited by Francesco Parisi (2017) (with Jonathan Klick)
17. *The Law and Economics of Proportionality in Discovery*, 50 **GEORGIA LAW REVIEW** 1093 (2016) (with Bruce Kobayashi)
18. *Can Simple Mechanism Design Results be Used to Implement the Proportionality Standard in Discovery?* 172 **JOURNAL OF INSTITUTIONAL & THEORETICAL ECONOMICS** 200 (2016)
19. *Material Facts in the Debate over* Twombly *and* Iqbal*,* 68 **STANFORD LAW REVIEW** 369 (2016)
20. *When Do Covariates Matter? And Which Ones, and How Much?* 34 **JOURNAL OF LABOR ECONOMICS** 509 (2016)

21. *Uncontrolled Experiments From the Laboratories of Democracy: Traditional Cash Welfare, Federalism, and Welfare Reform*, **The Law and Economics of Federalism**, edited by Jonathan Klick, Edward Elgar Publishing Ltd. (2017)
22. *Can We Learn Anything About Pleading Changes from Existing Data?,* 44 **INTERNATIONAL REVIEW OF LAW & ECONOMICS** 72 (2015)
23. *Can the Dark Arts of the Dismal Science Shed Light on the Empirical Reality of Civil Procedure?* 2 **STANFORD JOURNAL OF COMPLEX LITIGATION** 223 (2014)
24. *Rethinking Summary Judgment Empirics: The Life of the Parties*, 162 **UNIVERSITY OF PENNSYLVANIA LAW REVIEW** 1663 (2014)
25. *Expert Mining and Required Disclosure*, 81 **UNIVERSITY OF CHICAGO LAW REVIEW** 131 (2014)
26. *Valid Inference in Single-Firm, Single-Event Studies*, 15 **AMERICAN LAW & ECONOMICS REVIEW** 495 (2013) (with Eric Helland and Jonathan Klick)
27. Note, *Locking the Doors to Discovery? Assessing the Effects of* Twombly *and* Iqbal *on Access to Discovery*, 121 **YALE LAW JOURNAL** 2270 (2012)
28. *Robust Inference with Multiway Clustering*, 29 **JOURNAL OF BUSINESS & ECONOMIC STATISTICS** 238 (2011) (with A. Colin Cameron and Douglas L. Miller)
29. *Passive Discrimination: When Does It Make Sense to Pay Too Little?* 76 **UNIVERSITY OF CHICAGO LAW REVIEW** 797 (2009) (with Jonathan Klick and Lesley Wexler)
30. *Bootstrap-Based Improvements for Inference with Clustered Errors,* 90 **REVIEW OF ECONOMICS & STATISTICS** 414 (2008) (with A. Colin Cameron and Douglas L. Miller)
31. *Distributional Impacts of the Self-Sufficiency Project*, 92 **JOURNAL OF PUBLIC ECONOMICS** 748 (2008) (with Marianne Bitler and Hilary Hoynes)
32. *Welfare Reform and Children's Living Arrangements*, 41 **JOURNAL OF HUMAN RESOURCES** 1 (2006) (with Marianne Bitler and Hilary Hoynes)
33. *What mean impacts miss: Distributional effects of welfare reform experiments*, 96 **AMERICAN ECONOMIC REVIEW** 988 (2006) (with Marianne Bitler and Hilary Hoynes)
34. *Are Less-Educated Women Crowding Less-Educated Men Out of the Labor Market?* in **BLACK MALES LEFT BEHIND**, 87 (Ronald B. Mincy, ed., 2006) (with Rebecca Blank)
35. *Welfare Reform and Health*, 40 **JOURNAL OF HUMAN RESOURCES** 309 (2005) (with Marianne Bitler and Hilary Hoynes)
36. *Migration, the Life Cycle, and State Benefits: How Low Is the Bottom?, 112* ***JOURNAL OF POLITICAL ECONOMY*** *1091 (2004)*
37. The Impact of Welfare Reform on Marriage and Divorce, 41 **DEMOGRAPHY** 213 (2004) (with Marianne Bitler, Hilary Hoynes, and Madeline Zavodny)
38. *Some Evidence on Race, Welfare Reform, and Household Income, 93* ***AMERICAN ECONOMIC REVIEW, PAPERS AND PROCEEDINGS OF THE ONE HUNDRED FIFTEENTH ANNUAL MEETING OF THE AMERICAN ECONOMIC ASSOCIATION, WASHINGTON, DC*** *293 (2003) (with Marianne Bitler and Hilary Hoynes)*
39. *Public Schooling for Young Children and Maternal Labor Supply*, 92 **AMERICAN ECONOMIC REVIEW** 307 (2002)
40. *Is More for the Poor Less for the Poor? The Politics of Means-Tested Targeting,* 2 **TOPICS IN ECONOMIC ANALYSIS & POLICY** (2002) (with Lant Pritchett)
41. *Indicator Targeting in a Political Economy: Leakier Can Be Better, 4* ***JOURNAL OF POLICY REFORM*** *113 (with Lant Pritchett)*

## BOOK REVIEWS AND OTHER COMMENTS

1. *Comment* to Chapter 3, "Improving the Use of Demonstrations," by Robert R. Weathers II and Austin Nichols, in LESSONS FROM SSA DEMONSTRATIONS FOR DISABILITY POLICY AND FUTURE RESEARCH, Austin Nichols, Jeffrey Hemmeter, and Debra Goetz Engler, eds. (2021).

2. *Maybe there Is No Bias in the Selection of Disputes for Litigation: Comment*, 174 **JOURNAL OF INSTITUTIONAL & THEORETICAL ECONOMICS** 171 (2018)

3. *Debunking the Myth of the Copyright Troll Apocalypse,* 101 **IOWA LAW REVIEW BULLETIN** 43 (2016) (with Shyamkrishna Balganesh)

4. *The Sheriff of Nottingham Hypothesis: A Tribute to Theodore Eisenberg: Comment,* 171 **JOURNAL OF INSTITUTIONAL & THEORETICAL ECONOMICS** 141 (2015)

5. *Welfare Reform: Effects of a Decade of Change,* 44 **JOURNAL OF ECONOMIC LITERATURE** 1056 *(2006)*

## LITIGATION WRITINGS

LEAD AMICUS CURIAE/PRINCIPAL AUTHOR

Brief for *Amicus Curiae* Jonah B. Gelbach in Support of Plaintiffs-Appellants, *In Re: Lipitor (Atorvastatin calcium) Marketing, Sales Practices and Products Liability Litigation*, Nos. 17-1140(L), 17-1136, 17-1137, 17-1189 (CA4, April 28, 2017)

Brief of *Amici Curiae* Civil Procedure Professors in Support of Respondents, *Tyson Foods, Inc. v. Bouaphakeo*, No. 14-1446 (U.S. Sept. 29, 2015), 2015 WL 5719742

SIGNATORY TO AMICUS BRIEFS

Motion for Leave to File and Brief of Amici Curiae Professors of Civil Procedure in Support of Petitioners, *Morrissey v. Mayorkas*, No. 22-235 (U.S., October 13, 2022)

Brief Amicus Curiae of Professors of Civil Procedure in Support of Appellant Paul S. Morrissey and Reversal, *Morrissey v. Mayorkas*, No. 20-5024 (CADC, May 22, 2020)

Brief of 44 Election Law, Scientific Evidence, and Empirical Legal Scholars as *Amici Curiae* in *support* of Appellees, No. 16-1161 (U.S., September 1, 2017), 2017 WL 3948430

Brief for Civil Procedure and Securities Law Professors as *Amici Curiae* in Support of Petitioner, *California Public Employees' Retirement System v. ANZ Securities, Inc., et al.*, No. 16-373 (U.S., March 6, 2017), 2017 WL 929693

Brief for Civil Procedure and Securities Law Professors as *Amici Curiae* in Support of Petition for a Writ of Certiorari, *DeKalb County Pension Fund v. Transocean Ltd., Robert L. Long, Jon A. Marshall, and Transocean Inc.*, No. 16-206 (U.S., September 14, 2016)

Brief of Amici Curiae Civil Procedure Scholars in Support of Petitioner on Petition for a Writ of Certiorari, *Kosilek v. O'Brien*, No. 14-1120 (U.S., April 15, 2015), 2015 WL 1776459

Brief of Civil Procedure and Securities Law Professors as *Amici Curiae* in Support of Petitioner, *Public Employees' Ret. Sys. of Mississippi v. IndyMac MBS, Inc., et al.*, No. 13-640 (U.S., May 28, 2014), 2014 WL 2361893

## GOVERNMENT CONSULTING

SOCIAL SECURITY ADMINISTRATION

Member, Technical Expert Panel for the Claimant Representative Demonstration (April 2019)

ADMINISTRATIVE CONFERENCE OF THE UNITED STATES

*A Study of Social Security Litigation in the Federal Courts*, Final Report (July 28, 2016) (with David Marcus) (led to formal ACUS recommendation to the Judicial Conference of the United States to develop special procedural rules for review of final administrative decisions taken pursuant to 42 U.S.C. § 405(g)), available at https://www.acus.gov/report/report-study-social-security-litigation-federal-courts

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Provided pro bono consulting services to the District Court's Jury Committee for purposes of improving the racial representativeness of the qualified jury wheel (2016-2019)

## PRIVATE CONSULTING

[Racial Justice Act challenge to a California defendant's death penalty sentence]: Currently providing pro bono advice on statutory interpretation and statistical issues.

*In re Alphabet, Inc. Securities Litigation*, No. 4:18-cv-06245-JSW (N.D.C.A.): Currently serving as expert witness for Lead Plaintiff State of Rhode Island, Office of the Rhode Island Treasurer on behalf of the Employees' Retirement System of Rhode Island.

*Tavres v. Barnes & Noble, Inc.,* No. 3:19-cv-07655 (N.D.CA.): Served as expert witness for statistical analysis on behalf of plaintiff. Deposed in April 2021.

[Global Trade Secrets Misappropriation Litigation]: Provided advice on legal arguments and analysis.

*ATA Airlines, Inc., v. Federal Express Corporation*

Provided economic and statistical advice to Haynes and Boone LLP (petitioner's counsel) for preparation of petition for rehearing *en banc* by the United States Court of Appeals for the Seventh Circuit. The petition appealed a three-judge panel's reversal of the $66 million damage award petitioner won at a jury trial (2012).

Baker McKenzie: Provided event study analysis related to a U.S. pharmaceutical firm (2012).

International Center for Law & Economics:

Provided survey of statistical research on sugar-sweetened beverages (2010).

## COURSES TAUGHT

UNIVERSITY OF CALIFORNIA AT BERKELEY SCHOOL OF LAW (2019-present)

Doctrinal classes: Civil Procedure; Legislation & Statutory Interpretation; Evidence

Seminar/workshop: Law, Accounting & Business Workshop; Statutory Interpretation Theory; Civil Procedure Stories; Interpretation in Constitutional and Statutory Law

NYU LAW (2021-2022)

Doctrinal class: Procedure (Fall 2021)

Seminar: Statutory Interpretation (Spring 2022)

UNIVERSITY OF PENNSYLVANIA LAW SCHOOL (2013-2019)

Doctrinal classes: Civil Procedure; Legislation; Evidence

Seminars: Theories of Statutory Interpretation; Advanced Topics in Procedure and Litigation; Law, Economics & Psychology; Statutory Interpretation and Legislation; Public Law

UNIVERSITY OF PENNSYLVANIA FELS INSTITUTE OF GOVERNMENT (2018)

*Executive MPA*: Economic Principles of Public Policy

UNIVERSITY OF ARIZONA (2007-2010)

*Doctoral:* Linear Econometrics, Nonlinear Econometrics

*Undergraduate:* Law & Economics; Individuals & Society (basic microeconomics)

*Executive MBA:* Selected lectures in Strategy courses

FLORIDA STATE UNIVERSITY COLLEGE OF LAW (2006-2007)

Law and Statistics; Law and Economics; Social Insurance;
Writing Workshop in Empirical Law and Economics

UNIVERSITY OF MARYLAND (1998-2006)

*Doctoral:* Empirical Microeconomics; Public Economics (both tax and social insurance programs)

*Undergraduate:* Introductory Microeconomics; Economics of the Gambling Industry

## REFEREEING AND PEER REVIEW SERVICE (SELECTED JOURNALS)

American Economic Journal: Applied Economics
American Economic Journal: Economic Policy
American Economic Review
American Journal of Political Science
American Law and Economics Review
Demography
Harvard Law Review
Journal of the American Statistical Association
Journal of Econometrics
Journal of Law and Economics
Journal of Law, Economics and Organization
Journal of Legal Studies
Journal of Political Economy
Quarterly Journal of Economics
Review of Economic Studies
Review of Economics and Statistics
Science
Stanford Law Review
University of Pennsylvania Law Review
Yale Law Journal

**APPENDIX B**
**Materials Relied Upon**

**Court Documents**

- Consolidated Amended Complaint for Violation of the Federal Securities Laws, April 26, 2019
- Supplement to the Consolidated Amended Complaint for Violations of the Federal Securities Laws, February 28, 2023

**Expert Reports**

- Expert Report of Professor Frank Partnoy, May 2, 2023
- Rebuttal Report of Allen Ferrell, June 30, 2023
- Expert Report of Anindya Ghose, June 30, 2023 / Draft

**SEC Filings**

- Excerpts from Alphabet Inc. Form 10-K for period ending December 31, 2017
- Excerpts from Alphabet Inc. Form 10-K for period ending December 31, 2018
- Excerpts from Alphabet Inc. Form 10-Q for period ending March 31, 2018
- Excerpts from Alphabet Inc. Form 10-Q for period ending June 30, 2018
- Excerpts from Alphabet Inc. Form 10-Q for period ending March 31, 2019

**Analyst Reports**

- *GOOGL: Good 2Q18 Operating Results, Ongoing Increases in Capex*, Pivotal Research Group, July 24, 2018
- *2Q'18: Strong Revs; Investments Continuing*, Macquarie Research, July 24, 2018
- *Alphabet Inc. (GOOGL): Investments Again Drive Strong Top Line Growth, with Better 2Q Margins; Reiterate OW, PT to $1,440*, J.P. Morgan, July 24, 2018
- *Alphabet Inc.; Rating: Buy; Strong Ad Growth Momentum; TAC Growth Pressures Eased; PT To $1,425; Still In The Race To $1T*, Aegis Capital Corp., July 24, 2018
- *Alphabet Inc.: Top-line Growth Continues, Valuation Appears Compelling, Target to $1,450, Maintain Outperform*, Oppenheimer, July 23, 2018
- *Alphabet Inc. (GOOGL): Maint. Buy/PT to $1,370 on Clean 2Q18 Beat; Regulatory Headwinds Remain*, SunTrust Robinson Humphrey, July 23, 2018
- *GOOGL: Organic Revs Accelerate; TAC Moderates*, Wells Fargo, July 23, 2018

**News Articles**

- Tony Romm, *Congress wants to drag Google and Twitter into Facebook's privacy crisis*, Washington Post, March 26, 2018, https://www.washingtonpost.com/news/the-switch/wp/2018/03/26/facebooks-stock-falls-as-the-federal-trade-commission-confirms-its-investigating-the-company/
- Daisuke Wakabayashi and Jack Nicas, *Facebook Takes the Punches While Rest of Silicon Valley Ducks*, New York Times, April 13, 2018, www.nytimes.com/2018/04/13/technology/facebook-silicon-valley.html
- Christopher Mims, *Who Has More of Your Personal Data than Facebook? Try Google*, Wall Street Journal, April 22, 2018, www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

**APPENDIX B**
**Materials Relied Upon**


- Mark Bergen and Ben Brody, *Google's Facebook Copycat Moves Leave It More Exposed to Privacy Backlash*, Bloomberg, April 16, 2018, www.bloomberg.com/news/articles/2018-04-16/google-s-facebook-copycat-moves-leave-it-more-exposed-to-privacy-backlash
- Chris Smith, *Google hoards way more of your personal data than Facebook*, New York Post, April 23, 2018, nypost.com/2018/04/23/google-hoards-way-more-of-your-personal-data-than-facebook/
- *Google Owner Alphabet Reports 84% Rise in Profits despite Privacy Concerns*, The Guardian, April 23, 2018, www.theguardian.com/technology/2018/apr/23/google-owner-alphabet-reports-earnings
- Douglas MacMillan and Robert McMillan, *Google Exposed User Data, Feared Repercussions of Disclosing to Public*," Wall Street Journal, October 8, 2018, https://www.wsj.com/articles/google-exposed-user-data-feared-repercussions-of-disclosing-to-public-1539017194
- Kate Fazzini, *Google learned the hard way it's better to be transparent about privacy bugs than cover them up*, CNBC, October 9, 2018, https://www.cnbc.com/2018/10/09/google-privacy-bug-highlights-difference-between-exposure-and-breach.html
- Cat Zakrzewski and Bastien Inzaurralde, *The Cybersecurity 202: Google faces calls for privacy legislation, FTC probe after exposing user data*, Washington Post, October 9, 2018, www.washingtonpost.com/news/powerpost/paloma/the-cybersecurity-202/2018/10/09/the-cybersecurity-202-google-faces-calls-for-privacy-legislation-ftc-probe-after-exposing-user-data/5bbb86201b326b7c8a8d189f/?outputType=amp
- Seth Fiegerman, *It's YouTube's time in the hot seat*, CNN Business, June 11, 2019, https://www.cnn.com/2019/06/11/tech/youtube-under-scrutiny
- Arjun Panchadar, Munsif Vengattil, and Paresh Dave, *Alphabet to shut Google+ social site after user data exposed*, Yahoo! Finance, October 8, 2018
- James Titcomb, *Google has dodged data scandal but is still in a mire*, Daily Telegraph, April 30, 2018
- Reinhardt Krause, *Google Stock Dips, To Shut Down Facebook Rival After Data Glitch*, Investor's Business Daily, October 8, 2018, https://www.investors.com/news/technology/google-stock-alphabet-consumer-data-privacy/
- Kevin Curran, *Alphabet Has Room to Fall Before It's a Buying Opportunity*, TheStreet October 9, 2018, https://realmoney.thestreet.com/articles/10/09/2018/alphabet-still-has-room-fall-buying-opportunity-some-experts
- Annie Palmer, *Google shuts down social media platform Google+ after 'covering up' data breach of half a million users to avoid fallout that hit Facebook in wake of Cambridge Analytica scandal*, Daily Mail Online (U.K.), October 9, 2018, https://www.dailymail.co.uk/sciencetech/article-6253629/Google-exposed-user-data-chose-not-tell-public-WSJ.html
- Ajay Nair, *Plug pulled on social network Google+ after users' data left exposed*, Sky News (U.K.), October 8, 2018, https://news.sky.com/story/plug-pulled-on-social-network-google-after-users-data-left-exposed-11521546

**APPENDIX B**
**Materials Relied Upon**

- April Joyner, *New communication sector's shine could soon wear off*, Reuters, October 12, 2018, https://www.reuters.com/article/us-usa-stocks-weekahead-idINKCN1MM259
- Swarup Gupta, *Should You Bet on Tech After Wednesday's Rout? 4 Top Picks*, Yahoo!, October 11, 2018, https://www.yahoo.com/lifestyle/bet-tech-wednesday-apos-rout-125512161.html
- Adam Shell, *Stock market sell-off could signal turning point for a bull market, as Dow plunges again*, Daily American, October 12, 2018, dailyamerican.com/story/news/2018/10/12/stock-market-sell-off-could-signal-turning-point-for-bull-market-as-dow-plunges-agai/44005229/
- James Dean, *Alphabet shares leap despite EU's €4.3bn fine*, The Times, July 24, 2018
- Jeremy C. Owens and Max A. Cherney, *Alphabet stock soars to record highs as Google earnings smash expectations; After accounting for record EU antitrust fine, Alphabet earnings beat expectations by more than $2 a share*, MarketWatch, July 24, 2018, https://www.marketwatch.com/story/alphabet-stock-soars-to-potential-record-highs-as-google-earnings-smash-expectations-2018-07-23
- Matthew Rosenberg, Nicholas Confessore and Carole Cadwalladr, *How Trump Consultants Exploited the Facebook Data of Millions*, New York Times, March 17, 2018, https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html
- Carole Cadwalladr and Emma Graham-Harrison, *Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach*, The Guardian, March 17, 2018, https://www.theguardian.com/news/2018/mar/17/cambridge-analytica-facebook-influence-us-election
- Matt Turner, *Google parent Alphabet drops as tech stocks get whacked*, Business Insider, March 19, 2018, https://markets.businessinsider.com/news/stocks/google-stock-price-drops-in-tech-selloff-2018-3-1018922118
- Olivia Solon, *Facebook stocks plummet more than 20% amid concerns over growth*, The Guardian, July 25, 2018, https://www.theguardian.com/technology/2018/jul/25/facebook-stocks-second-quarter-revenue-user-growth
- Rupert Neate, *Over $119bn wiped off Facebook's market cap after growth shock*, The Guardian, https://www.theguardian.com/technology/2018/jul/26/facebook-market-cap-falls-109bn-dollars-after-growth-shock
- Graham Mudd, *Privacy-Enhancing Technologies and Building for the Future*, https://www.facebook.com/business/news/building-for-the-future
- Sarah Perez, *Facebook stock drops after company warns Apple's privacy changes to have bigger Q3 impact*, TechCrunch, September 22, 2021, https://techcrunch.com/2021/09/22/facebook-stock-drops-after-company-warns-apples-privacy-changes-to-have-bigger-q3-impact
- Cecilia Kang, David Streitfeld, Katie Rogers and Stephanie Saul, *Google and Amazon Are at the Center of a Storm Brewing Over Big Tech*, New York Times, June 2, 2019, https://www.nytimes.com/2019/06/02/business/google-antitrust-investigation.html

**APPENDIX B**
**Materials Relied Upon**

- *Big Tech Shares Slide as Prospect of Antitrust Scrutiny Mounts*, New York Times, June 3, 2019, https://www.nytimes.com/2019/06/03/business/stock-market-activity.html
- Matt Phillips, *Grumpy Investors Can't Find Anything to Look Forward To*, New York Times, April 24, 2019, https://www.nytimes.com/2018/04/24/business/stock-markets-inflation-earnings.html
- Michael Bloom, *Here's what every major Wall Street analyst had to say about Alphabet's blowout earnings*, CNBC, 24 July 2018, https://www.cnbc.com/2018/07/24/heres-what-wall-street-analysts-had-to-say-about-alphabets-earnings.html
- Wallace Witkowski, *Chip stocks hit worst as tech selloff drags broader market lower*, MarketWatch, October 5, 2018, https://www.marketwatch.com/story/chip-stocks-hit-worst-as-tech-selloff-drags-broader-market-lower-2018-10-05

**Academic Publications**

- Jonah B. Gelbach, Eric Helland, and Jonathan Klick, *Valid Inference in Single-Firm, Single-Event Studies*, 15 Am. L. Econ. Rev. 495, 509-510 (2013)
- Jeffrey M. Wooldridge, *Violating Ignorability of Treatment by Controlling for Too Many Factors*, 21(5) Econometric Theory 1026 (2005)
- Michael R. Roberts and Toni M. Whited, *Endogeneity in Empirical Corporate Finance*, Handbook of the Economics of Finance, Vol. 2 Part A (2013)
- Laurent Frésard and Philip Valta, *How Does Corporate Investment Respond to Increased Entry Threat?*, 5(1) Rev. Corp. Fin. Stud. 1, 20 (2016)
- Lucian A. Bebchuk and Allen Ferrell, *Rethinking Basic*, 69 Bus. Law. 671, 692 (2014)
- Stephen H. Penman, *Combining Earnings and Book Value in Equity Valuation*, 15 Contemporary Accounting Research 291, 295 (2010)
- Eli Bartov, Dan Givoly and Carla Hayn, *The rewards to meeting or beating earnings expectations*, 33 J. Accounting & Econ. 173, 175 (2002)
- Merton H. Miller and Kevin Rock, *Dividend Policy Under Asymmetric Information*, 40 J. Finance 1031, 1031-1032 (1985)
- Roger Kormendi and Robert Lipe, *Earnings Innovations, Earnings Persistence, and Stock Returns*, 60 J. Business 323, 324 (1987)
- Jonah B. Gelbach, *Estimation Evidence*, 168 U. Pa. L. Rev. 549, 602 (2020)
- David Tabak and Chudozie Okongwu, *Inflation Methodologies in Securities Fraud Cases: Theory and Practice*, NERA Working Paper at 2 (June 2002), https://ssrn.com/abstract=315919
- Allen Ferrell and Atanu Saha, *Forward-Casting 10b-5 Damages: A Comparison to Other Methods*, 37 J. Corp. L. 365, 368, 369-370 (2012)
- Jill E. Fisch, Jonah B. Gelbach and Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tex. L. Rev. 553, 611 (2018)
- Jill E. Fisch and Jonah B. Gelbach, *Power and Statistical Significance in Securities Fraud Litigation*, 11 Harv. Bus. L. Rev. 55 (2021)
- Alon Brav and J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 Wash. U. L. Rev. 587 (2015)

**APPENDIX B**
**Materials Relied Upon**

- Andrew Baker and Jonah B. Gelbach, *Machine Learning and Predicted Returns for Event Studies in Securities Litigation*, 5 J. of L., Fin., & Acct. 231 (2020)
- Merritt B. Fox, *Halliburton II: It All Depends on What Defendants Need to Show to Establish No Impact on Price*, 70 Bus. Law. 437, 447-454 (2015)
- Ian Hacking, *Logic of Statistical Inference* 49 (Cambridge Philosophy Classics Ed. 2016)
- Cristi A. Gleason, Nicole Thorne Jenkins and W. Bruce Johnson, *The Contagion Effects of Accounting Restatements*, 83 The Accounting Review 83 (2008)
- Dr. J.B. Heaton, *Price Impact in Securities Fraud Litigation*, May 23, 2023, draft on file with this author
- Sanford J. Grossman and Joseph E. Stiglitz, *On the Impossibility of Informationally Efficient Markets,* 70 Am. Econ. Rev. 393 (1980)
- Harrison Hong and Jeremy C. Stein, *Disagreement and the Stock Market*, 21 J. Econ. Perspectives 109, 117 (2007)
- A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Lit. 13, 21, 24 (1997)
- Chad P. Bown, *The US-China Trade War and Phase One Agreement*, Peterson Institute for International Economics, Working Papers 21-2 at 49 (February 2021), https://www.piie.com/sites/default/files/documents/wp21-2.pdf
- Allen Ferrell, *Hidden History of Securities Damages*, The University of Chicago Business Law Review: Vol. 1: No. 1, Article 4 at 105 (2022)
- Elizabeth Blankespoor, Ed deHaan and Ivan Marinovic, *Disclosure processing costs, investors' information choice, and equity market outcomes: A review*, 70 J. Accounting & Econ., Issues 2-3 (2020)
- Charles J. Corrado, *Event Studies: A methodology review*, 51(1) Accounting and Finance 207, 209-211 (2011)

**Textbooks**

- Neil A. Weiss, *Elementary Statistics* (6th ed. 2005)
- Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach* 131 (2020)
- Richard A. Brealey, Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* 95 (13th ed. 2020)
- Douglas A. Lind, William G. Marchal and Samuel A. Wathen, *Statistical Techniques In Business & Economics* 316 (18th ed. 2021)
- Michael O. Finkelstein and Bruce Levin, *Statistics for Lawyers* 188 (3rd ed. 2015)
- E.L. Lehmann and George Casella, *Theory of Point Estimation* 316 (2nd Ed. 1998)

**Other**

- National Research Council, Reference Manual on Scientific Evidence: Third Edition (2011).
- https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20181023a1.pdf
- https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20190115a1.pdf

**APPENDIX B**
**Materials Relied Upon**


- *Yahoo! Finance*, price data for GOOGL, October 7-10, 2018, https://finance.yahoo.com/quote/GOOGL
- *Yahoo! Finance*, price data for GOOG, October 7-10, 2018, https://finance.yahoo.com/quote/GOOG
- *Yahoo! Finance*, price data for GOOGL, April 29-30, 2019, https://finance.yahoo.com/quote/GOOGL
- *Yahoo! Finance*, price data for GOOG, April 29-30, 2019, https://finance.yahoo.com/quote/GOOG
- *Yahoo! Finance*, data for 10-year Treasury yield
- Bloomberg
- S&P 500
- Dow Jones Internet Composite Index
- NASDAQ Composite Index
- Carla Tardi, *Price Target, How to Understand and Calculate Plus Accuracy*, Investopedia, March 10, 2022, https://www.investopedia.com/terms/p/pricetarget.asp
- https://scholar.google.com/scholar?hl=en&as_sdt=0%2C39&q=%22cumulative+abnormal+returns%22&btnG=.)
- Dictionary.com, https://www.dictionary.com/browse/expect
- "Alphabet Announces Second Quarter 2022 Results," July 26, 2022, https://abc.xyz/assets/0d/4a/646d28c945aba76a5eeeba68e686/2022q2-alphabet-earnings-release.pdf
- Minutes of the Board's discount rate meetings from August 27 through September 26, 2018, at 3, https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20181023a1.pdf
- Ben Smith, *Project Strobe: Protecting your data, improving our third-party APIs, and sunsetting consumer Google+*, Google Blog, October 8, 2018, https://blog.google/technology/safetysecurity/project-strobe/
- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014)
- *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951 (2021)
- *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)

# APPENDIX C
## Sources and Construction

1. This appendix describes the sources of data and construction of indexes used in my regression analysis for this report.

2. Daily returns, market capitalization values and Global Industry Classification Standard (GICS) industry group information are downloaded from the Center for Research in Security Prices (CRSP) database.

3. A list of constituents for the S&P 500 Index, as well as linking files to identify GICS industry groups, were also retrieved from the CRSP.

4. The list of firms that enter the Dow Jones Internet Composite Index (DJICI) used in Professor Allen Ferrell's report, as well as the Index's daily trading price and returns, were obtained from Bloomberg.

5. The individual stocks that were ever included in the DJICI over the period April 23, 2017 – May 1, 2019 ("study period") were identified. This period was chosen because it encompasses all dates used in the regression model estimation for any of the event study dates considered in this report. After these firms were identified, a list (the "Internet Index GICS list") was made of all GICS industry group codes that matched any firm that was ever in the DJICI during the study period.

6. For any date during the study period, the Internet Index is composed of S&P 500 firms that ever had a GICS code value on the Internet Index GICS list during the study period.

7. The Non-Internet Index on a date during the study period is composed of the S&P 500 firms on that date that are not Internet Index firms. To calculate daily returns for this index, daily returns for each firm on a given date are weighted by that firm's market capitalization.

8. The Non-Internet Index just described is included as a regressor in the regression model estimates described in Appendix D and used to conduct the event studies whose results are described in the main report.

# APPENDIX D
## Regression Model Estimates

1. This appendix discusses the regression model estimates underlying the event study results reported in the main body of my report.

2. Table A1 reports the dates used to estimate the regression model for each event date.

Table A1: Set of Daily Return Observations Used to Estimate Regression Model by Event Date

| Event Date | Event Type | Set of Daily Return Observations Used to Estimate the Regression Model |
|---|---|---|
| **April 24, 2018** | Omission on April 23, 2018 | 4/24/2017 — 4/23/2018 |
| **July 24, 2018** | Omission on July 23, 2018 | 7/24/2017 — 7/23/2018 excluding 4/24/2018 |
| **October 8, 9, and 10, 2018** | Revelations on October 8-10, 2018 | 10/8/2017 — 10/7/2018 excluding 4/24/2018 & 7/24/2018 |
| **April 30 and May 1, 2019** | Revelation on April 29, 2019 | 4/30/2018 – 4/29/2019 excluding 7/24/2018 and 10/8/2018 – 10/10/2018 |

**APPENDIX D**
**Regression Model Estimates**

3. Table A2 reports the results from the regression model for the omission dates.

**Table A2: Event Study Regression Results for Fraudulent Omission Dates**

| Event Date | Event Type | | Regression Model Estimates | |
|---|---|---|---|---|
| | | | Class A | Class C |
| **April 24, 2018** | Omission on April 23, 2018 | Estimated intercept ($\hat{\beta}_0$) | 0.0 (0.001) | 0.0 (0.001) |
| | | Non-Internet Index coefficient ($\hat{\beta}_C$) | 1.26 (0.091) | 1.283 (0.092) |
| | | $R^2$ | 0.433 | 0.438 |
| | | RMSE ($s$) | 0.0102 | 0.0103 |
| | | Num. Obs. | 252 | 252 |
| **July 24, 2018** | Omission on July 23, 2018 | Estimated intercept ($\hat{\beta}_0$) | 0.001 (0.001) | 0.001 (0.0) |
| | | Non-Internet Index coefficient ($\hat{\beta}_C$) | 1.286 (0.088) | 1.301 (0.087) |
| | | $R^2$ | 0.464 | 0.474 |
| | | RMSE ($s$) | 0.0102 | 0.0101 |
| | | Num. Obs. | 251 | 251 |

**APPENDIX D**
**Regression Model Estimates**

4. Table A3 reports the regression results for the revelation dates.

**Table A3: Event Study Regression Results for Revelation Dates**

| Event Date | Event Type | | Regression Model Estimates | |
|---|---|---|---|---|
| | | | Class A | Class C |
| **October 8, 9, and 10, 2018** | Revelations on October 8-10, 2018 | Estimated intercept ($\hat{\beta}_0$) | 0.0<br>(0.001) | 0.0<br>(0.001) |
| | | Non-Internet Index coefficient ($\hat{\beta}_C$) | 1.283<br>(0.09) | 1.307<br>(0.089) |
| | | $R^2$ | 0.45 | 0.467 |
| | | RMSE ($s$) | 0.0105 | 0.0103 |
| | | Num. Obs. | 249 | 249 |
| **April 30 and May 1, 2019** | Revelations on April 29, 2019 | Estimated intercept ($\hat{\beta}_0$) | 0.001<br>(0.001) | 0.001<br>(0.001) |
| | | Non-Internet Index coefficient ($\hat{\beta}_C$) | 1.237<br>(0.092) | 1.235<br>(0.092) |
| | | $R^2$ | 0.425 | 0.426 |
| | | RMSE ($s$) | 0.0119 | 0.0118 |
| | | Num. Obs. | 247 | 247 |

**APPENDIX D**
**Regression Model Estimates**

5. Table A4 provides a comparison of the $R^2$ and RMSE estimates for each event date (or collection of event dates) to the $R^2$ and RMSE values obtained from estimating regression models for the corresponding dates but including the Internet Index variable as well as the Non-Internet Index variable in the model.

**Table A4: Comparison of $R^2$ and RMSE Values**
**Excluding and Including Internet Index Variable**

| | | Class A Stock | | Class C Stock | |
|---|---|---|---|---|---|
| | | Internet Index is: | | Internet Index is: | |
| **Event Date** | | Excluded | Included | Excluded | Included |
| **April 24, 2018** | $R^2$ | 0.433 | 0.669 | 0.438 | 0.693 |
| | RMSE | 0.0102 | 0.0078 | 0.0103 | 0.0076 |
| **July 24, 2018** | $R^2$ | 0.464 | 0.675 | 0.474 | 0.705 |
| | RMSE | 0.0102 | 0.0079 | 0.0101 | 0.0076 |
| **October 8, 9, and 10, 2018** | $R^2$ | 0.45 | 0.666 | 0.467 | 0.693 |
| | RMSE | 0.0105 | 0.0082 | 0.0103 | 0.0078 |
| **April 30 and May 1, 2019** | $R^2$ | 0.425 | 0.705 | 0.426 | 0.704 |
| | RMSE | 0.0119 | 0.0085 | 0.0118 | 0.0085 |

6. I now describe and evaluate Table A4's results.

   a. The table shows that the $R^2$ is between about 0.42 and about 0.47 for the models that exclude the Internet Index, and between about 0.67 and about 0.71 for the models that ***include*** the Internet Index.

   b. Thus when the Internet Index is added to the models used in my report, the $R^2$ rises in all cases, indicating that adding the Internet Index improves model fit. This is no surprise, as it can be proved mathematically that adding a variable to a regression model will increase the $R^2$. The question is whether the improvement in model fit comes at the cost of introducing other problems. As I explain in the body of my report, it does: including the Internet Index introduces contamination bias due to the fact that news related to Alphabet's software glitch can be expected to cause price impact for the Internet Index as well as Alphabet. This is a strong reason to exclude the Internet Index even though including it would increase $R^2$.

   c. As for the RMSE estimates, they are roughly 0.01 (*i.e.*, a 1% estimated standard deviation for the daily abnormal return) for the models that exclude the Internet Index, and roughly 0.008 (*i.e.*, a 0.8% estimated standard deviation for the daily abnormal return) for the models that ***include*** the Internet Index.

   d. Table A4 thus shows that the RMSE is about one-fourth higher when I exclude the Internet Index. Recall that the RMSE is the model estimate of the daily standard deviation of abnormal returns. For a given price impact value, having a more variable abnormal return makes it less likely that an event study will

**APPENDIX D**
**Regression Model Estimates**

yield a finding of price impact. In other words, the higher variability of the abnormal return that accompanies the exclusion of the Internet Index, all else equal, works against finding price impact.

e. In sum, including the Internet Index imposes the cost of a biased measure of price impact. By instead excluding the Internet Index, I avoid that problem. But avoiding it isn't free: my approach pays for the avoidance of bias by accepting greater variability, and thus a lower chance of finding price impact.

7. The event study results I discuss in the main body of this report use p-values based on the assumption that the t-statistic has an approximately standard normal distribution (this is the same assumption Professor Ferrell implicitly makes, as evidenced by his use of a critical value of 1.96). Academic research shows there is evidence of non-normality in daily abnormal returns for many firms.[1] Consequently, I have argued in favor of alternative approach based on a sample quantile (SQ) test.[2] The sensitivity analysis in Appendix F reports Ferrell null p-values for 15 different specifications. As the results in that appendix show, I do not find important qualitative differences based on which approach I use to calculate p-values.

8. Another issue I have previously written about in scholarly work is whether there is dynamic volatility in abnormal returns, *i.e.*, whether the standard deviation of abnormal returns varies over time.[3] If there is dynamic volatility, and it is especially large or especially small on an event date, then tests that ignore this issue can be misleading.[4] I therefore estimated a GARCH(1,1) model for estimated abnormal returns (after standardizing them by the RMSE). I then computed the forecast volatility for the event dates considered in the main body of my report. In all cases, the forecast volatility was less than 1, indicating that the t-statistics I report would actually rise if I accounted for dynamic volatility. However, none of the qualitative conclusions I draw in the main body of my report would be affected. For simplicity, I therefore follow Professor Ferrell's approach and disregard the issue of dynamic volatility.

[1] *See, e.g.*, Jonah B. Gelbach, Eric Helland and Jonathan Klick, *Valid Inference in Single-Firm, Single-Event Studies*, 15 Am. L. Econ. Rev. 495 (2013) and sources cited therein.

[2] *See* Jonah B. Gelbach, Eric Helland and Jonathan Klick, *Valid Inference in Single-Firm, Single-Event Studies*, 15 Am. L. Econ. Rev. 495 (2013); Jill E. Fisch, Jonah B. Gelbach and Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tex. L. Rev. 553 (2018).

[3] *See* Jill E. Fisch, Jonah B. Gelbach and Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tex. L. Rev. 553 (2018); *see also* Andrew C. Baker, *Single-Firm Event Studies, Securities Fraud, and Financial Crisis: Problems of Inference*, 68 Stan. L. Rev. 1207 (2016).

[4] Jill E. Fisch, Jonah B. Gelbach and Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tex. L. Rev. 553 (2018); *see also* Andrew C. Baker, *Single-Firm Event Studies, Securities Fraud, and Financial Crisis: Problems of Inference*, 68 Stan. L. Rev. 1207 (2016).

**APPENDIX E**
**Methodological Appendix**

## I. Null Hypothesis Significance Testing

1. In section A of this Part of this appendix, I discuss the approach to null hypothesis significance testing that Professor Ferrell takes. This approach is to specify that the hypothesis of zero price change on each event date is the null hypothesis of interest. This approach has two key drawbacks if used to assess whether Alphabet's bad privacy news had price impact.

    a. First, every student of introductory statistics learns that failing to reject the null hypothesis does not justify ***accepting*** that hypothesis.[1] Professor Ferrell's conclusion that there was no price impact is possible only because he ignores this fact. When properly applied, his approach to null hypothesis significance testing can yield only two possible conclusions: (i) that there ***was*** price impact, or (ii) that there may or may not have been price impact. Thus, his method, when properly applied, is simply incapable of yielding the conclusion that price impact was absent on relevant event dates.

    b. Second, Professor Ferrell's approach to null hypothesis significance testing fails to compare the relative strength of the null hypothesis and alternative hypotheses consistent with Lead Plaintiff's legal theory of liability.

    For the sake of comparison with Professor Ferrell's event-study results, though, I apply null hypothesis significance testing when I conduct my own event studies in the main body of this report.

2. In section B of this Part of this appendix, I discuss the role of the p-value in null hypothesis significance testing when using Professor Ferrell's specified null hypothesis of zero price impact, as well as the relationship of the p-value to the confidence level.

3. In section C of this Part of this appendix, I discuss how null hypothesis significance testing could be used in a way that allows an expert to reject price impact when the data so warrant. This approach involves reversing the assignment of null and alternative hypothesis status. Here, the null hypothesis is that there ***was*** price impact on relevant dates, so that statistical evidence strong enough to reject the null hypothesis on relevant dates would lead to the conclusion that there was a complete absence of price impact on those dates.

    a. On an alleged omission date, when Lead Plaintiff's legal theory of liability implies that Alphabet's stock price was ***inflated*** due to the omission, proof of the absence of price impact requires that the t-statistic for the estimated

[1] *See, e.g.*, Neil A. Weiss, *Elementary Statistics*, p. 392 (6th ed. 2005) ("[I]f we do not reject the null hypothesis in a hypothesis test, ***we simply reserve judgment about which hypothesis is true***. In other words, if we do not reject the null hypothesis, we conclude only that the data did not provide sufficient evidence to support the alternative hypothesis; we do not conclude that the data provided sufficient evidence to support the null hypothesis.") (emphasis added).

abnormal return be large and ***negative*** – *i.e.*, the opposite of what Lead Plaintiff's legal theory of liability predicts.

b. On a revelation date, when Lead Plaintiff's legal theory of liability implies that Alphabet's stock price ***fell*** because of the (perhaps partial) revelation of the truth, proof of the absence of price impact requires that the t-statistic for the estimated abnormal return be large and ***positive*** – *i.e.*, the opposite of what Lead Plaintiff's legal theory of liability predicts.

## A. Null Hypothesis Significance Testing with Professor Ferrell's Specification of the Null Hypothesis as Zero Price Impact

4. Null hypothesis significance testing requires specification of a null hypothesis of interest.

5. Professor Ferrell specifies that for dates relevant to this case, the null hypothesis is that there was zero price impact on that date.[2] Mathematically, this amounts to saying that the null hypothesis for date $t$ is $\pi_{t,Price\ Impact} = 0$.

6. For the moment, I follow this specification of Professor Ferrell's.

7. Null hypothesis significance testing also requires the specification of a relevant ***alternative*** hypothesis for date $t$. Given Professor Ferrell's specification of the null hypothesis as zero price impact, the relevant alternative hypothesis captures the circumstances under which Lead Plaintiff's legal theory of liability is correct.

a. Omission dates. In this case, there are two dates on which Alphabet issued risk factor disclosures that (i) used the same wording as previous statements to describe risk factors related to privacy and data security problems, while (ii) failing to alert the public that Alphabet was aware that these risks had, in fact, materialized in the form of the bad news at issue in this litigation. The omissions at issue were made on April 23, 2018 and July 23, 2018 – not long after the March 2018 Cambridge Analytica scandal rocked Facebook and highlighted Alphabet's own risks, causing Alphabet's own stock price to fall. *See* ¶¶123-159 of the main body of this report. Reasonable investors, knowing these risks had existed, but having been misled by Alphabet's omissions, would rationally believe that the unchanged nature of Alphabet's risk factor disclosures was reason to think the company was not exposed, or less exposed, than they had previously feared. *See* ¶¶116-122 of the main body of this report. Accordingly, Alphabet's omissions on April 23, 2018 and July 23, 2018 could be expected to have positive price impact under Lead Plaintiff's legal theory of liability: with the null hypothesis as Professor Ferrell specifies, the alternative hypothesis on omission dates implies that $\pi_{t,Price\ Impact} > 0$.

---

2 Ferrell Report, ¶36.

**APPENDIX E**
**Methodological Appendix**

b. On revelation dates, Lead Plaintiff's legal theory of liability holds that Alphabet's stock price should have fallen, because the market learned bad news the company previously concealed. So with the null hypothesis as Professor Ferrell specifies, the alternative hypothesis on revelation dates is that $\pi_{t,Price\ Impact} < 0$.

8. As discussed in ¶49 of the main body of this report, it is possible that on date $t$ Alphabet's stock price was affected by factors other than the price impact term $\pi_{t,Price\ Impact}$ or the random market fluctuations captured by $\epsilon_t$. Therefore, I use the term $\pi_{t,OtherSource}$ to represent these "other-source subcomponents" of Alphabet's stock price change on date $t$. By construction, the event date abnormal return, $\pi_t$, equals the sum of the price impact component $\pi_{t,Price\ Impact}$ and the other-source subcomponent $\pi_{t,OtherSource}$. The presence of other-source subcomponents would cause the event date abnormal return to have a different value from the price impact component. To identify price impact with the event date abnormal return, then, an expert must either believe that there were not important other-source subcomponents at work on the event date, or to be prepared to identify and measure such subcomponents. For the balance of this Appendix, unless explicitly stated otherwise, I will assume that $\pi_{t,OtherSource} = 0$, so that price impact and the event date abnormal return are equal. That aids exposition by allowing me to avoid repetitive distinctions between $\pi_{t,Price\ Impact}$ and the date-$t$ abnormal return $\pi_t$. The main body of the report discusses the role of other-source subcomponents where appropriate.

9. An expert makes what statisticians call a Type I error when he mistakenly rejects a true null hypothesis. Given Professor Ferrell's specification of the null hypothesis, a Type I error corresponds to determining that there was price impact consistent with Lead Plaintiff's legal theory of liability when the truth is that there wasn't. A type I error is also known as a ***false positive***.

10. The ***significance level*** of a test, often called α (the Greek letter "alpha"), is the probability that a false positive will occur. Because the significance level is a probability, it varies between 0 and 1 and is often stated as a decimal value such as 0.05 or 0.10. It can equivalently be described as a percentage between 0% and 100%, so that significance level 0.05 and 5% are the same, significance level 0.10 and 10% are the same, and so on. In this appendix I use decimal and percentage descriptions interchangeably in that way.

11. Null hypothesis significance testing is based on the idea that when the null hypothesis is true, the expert can use observed data to calculate a test statistic whose probability distribution is known. This distribution, known under the null hypothesis, is called the ***null distribution***. A statistician will reject the null hypothesis in favor of a particular alternative hypothesis if (i) the observed test statistic's value would be sufficiently surprising to observe for a random variable that has the null distribution, and (ii) the observed test statistic's value is consistent with the alternative hypothesis.

12. The test statistic that is often used in event studies is the t-statistic associated with the estimated abnormal return. This t-statistic is the ratio of the estimated abnormal return

**APPENDIX E**
**Methodological Appendix**

to the estimated standard error of the regression model used to predict the event date stock price. In terms of the notation used in the main body of this report, the date-$t$ t-statistic is defined as

$$T_t = \frac{\widehat{AR}_t}{\hat{\sigma}} = \frac{\pi_t + \hat{\epsilon}_t}{\hat{\sigma}}.$$

13. Under Professor Ferrell's null hypothesis that $\pi_t = 0$, the event date t-statistic has the same probability distribution as does the ratio $\frac{\hat{\epsilon}_t}{\hat{\sigma}}$. With a large number of dates included in the regression model's estimation, this ratio will have a probability distribution very close to the probability distribution followed by the ratio $\frac{\epsilon_t}{\sigma}$ – close enough that experts may reasonably rely on the distribution for the latter ratio.[3] Under the assumption that $\epsilon_t$ is normally distributed – an assumption adopted by Professor Ferrell – the probability distribution of $\frac{\epsilon_t}{\sigma}$ is the ***standard normal distribution,*** which is the normal probability distribution with mean 0 and standard deviation 1.

14. The $\alpha$-quantile of the standard normal probability distribution, denoted $z_\alpha$, is the value such that the probability of drawing a value less than $z_\alpha$ is exactly $\alpha$. Equivalently in mathematical notation, if the random variable $Z$ has a standard normal distribution, then $P(Z \leq z_\alpha) = \alpha$.[4] In the example where $\alpha = 0.10$, the value of $z_\alpha$ is $z_{0.10} = -1.28$. As Figure 1(a) shows, the area under the standard normal density function's graph up to $z_{0.10}$ is 0.10. This reflects the fact that when Professor Ferrell's specified null hypothesis of zero price impact is true, the probability of drawing a value of the t-statistic more extreme than -1.28 exactly equals 0.10.

**Figure1: Probability of Drawing Tail Values of a Standard Normal Random Variable**




---

[3] *See* Jonah B. Gelbach, Eric Helland and Jonathan Klick, *Valid Inference in Single-Firm, Single-Event Studies*, 15 Am. L. Econ. Rev. 495, 509-510 (2013). Although he does not give a precise explanation, Professor Ferrell takes this approach, and it is justifiable.

[4] The notation "$P(Z \leq z_\alpha)$" is read: "The probability that the random variable $Z$ is less than or equal to the value $z_\alpha$."

**APPENDIX E**
**Methodological Appendix**

| (a) Probability of drawing a standard normal random variable with value less than -1.28 equals 0.10 | (b) Probability of drawing a standard normal random variable with value greater than 1.28 equals 0.10 |
|---|---|

15. It is also true that $P(Z > z_{1-\alpha}) = \alpha$, *i.e.*, there is also probability $\alpha$ that a random variable with standard normal distribution will exceed the $(1-\alpha)$-quantile, $z_{1-\alpha}$.[5] In the example where $\alpha = 0.10$, the value of $z_{1-\alpha}$ is $z_{0.90} = 1.28$. As Figure 1(b) shows, the area under the standard normal density function above $z_{0.90}$ is 0.10. This reflects the fact that when Professor Ferrell's specified null hypothesis of zero price impact is true, the probability of drawing a value of the t-statistic more positive than 1.28 also exactly equals 0.10.

16. The idea of null hypothesis significance testing is that when the null hypothesis is correct – so that, using Professor Ferrell's specification, there is no price impact and the t-statistic has a standard normal distribution – the t-statistic should not have a value too far from the middle of its null distribution. But that is only one of two required ingredients to the null hypothesis significance testing recipe.

17. The other ingredient is the value of price impact under the ***alternative hypothesis***. To be useful, a significance test of the null hypothesis must take account of how the test statistic should behave if the alternative hypothesis, rather than the null hypothesis, is true. On omission date $t$, Lead Plaintiff's legal theory of liability implies that Alphabet's stock price was inflated, so:

    a. Given Professor Ferrell's specification of the null hypothesis, the alternative hypothesis on omission date $t$ is that price rose as a result of the omission: $\pi_t > 0$. This is equivalent to saying that the t-statistic (and the abnormal return) should have a ***positive*** mean on an omission date.

    b. There is probability $\alpha$ that the t-statistic exceeds $z_{1-\alpha}$ under Professor Ferrell's null hypothesis of zero price impact.

    c. Thus, for a date with an omission, a statistician using a null hypothesis significance test with significance level $\alpha$ will reject Professor Ferrell's null hypothesis whenever the t-statistic ***exceeds*** the value $z_{1-\alpha}$.

    d. Such a test is an ***upper-tailed test at significance level*** $\boldsymbol{\alpha}$, and the value $z_{1-\alpha}$ is known as the ***critical value*** for such a test.

    e. The basic mechanics of this test are illustrated in Figure 2 just below: the null hypothesis of zero price impact is rejected when the t-statistic is in the dark-shaded region to the ***right*** of $z_{1-\alpha}$, and otherwise the null hypothesis of zero price impact is not rejected.

---

5 This is true because the normal distribution is symmetric around its median, which implies that $P(Z \leq z_\alpha) = P(Z \geq z_{1-\alpha})$ for every value of $\alpha$ between 0 and 1.

**APPENDIX E**
**Methodological Appendix**

**Figure 2: Omission Dates –
Null Hypothesis Significance Testing
at Significance Level $\alpha$ When
the Null Hypothesis Is Zero Price Impact**




18. On a date with a revelation, Lead Plaintiff's legal theory of liability implies that Alphabet's stock price will have ***fallen*** due to the revelation of previously withheld true information, so:

   a. Given Professor Ferrell's specification of the null hypothesis, the alternative hypothesis on revelation date $t$ is that the price fell as a result of the omission: $\pi_t < 0$. Lead Plaintiff's legal theory of liability therefore implies that the t-statistic (and the abnormal return) should have a ***negative*** mean on a revelation date.

   b. There is probability $\alpha$ that the t-statistic is less than $z_\alpha$.

   c. For a revelation date, a statistician using a null hypothesis significance test with significance level $\alpha$ will reject the null hypothesis whenever the t-statistic is ***less*** than the value $z_\alpha$.

   d. Such a test is a ***lower-tailed test at significance level $\alpha$***, and the value $z_\alpha$ is known as the ***critical value*** for such a test.

   e. The basic mechanics of this test are illustrated in Figure 3 just below: the null hypothesis of zero price impact is rejected when the t-statistic is in the dark-shaded region to the ***left*** of $z_\alpha$, and otherwise the null hypothesis of zero price impact is not rejected.

# APPENDIX E
## Methodological Appendix

**Figure 3: Revelation Dates –
Null Hypothesis Significance Testing
at Significance Level $\alpha$ When
the Null Hypothesis Is Zero Price Impact**




19. To summarize the discussion above, an expert statistician using a t-statistic will reject the null hypothesis against a specified alternative hypothesis when the t-statistic's value satisfies each of two criteria:

   a. First, the t-statistic must be far from zero, *i.e.*, large enough in magnitude. How far it must be from zero, *i.e.*, how large its magnitude must be, is determined by the expert's choice of significance level, $\alpha$, which determines the critical value.

   b. Second, the t-statistic must have the sign that is consistent with the alternative hypothesis.

   c. On an ***omission*** date, a statistician testing Professor Ferrell's specified null hypothesis of zero price impact will reject the null hypothesis if the t-statistic is large and ***positive***, meaning that the t-statistic exceeds the critical value $z_{1-\alpha}$. *See* Figure 2. For example, if $\alpha = 0.10$, a statistician will reject that null hypothesis on an omission date if the t-statistic on that date exceeds 1.28.

   d. On a ***revelation*** date, a statistician testing Professor Ferrell's specified null hypothesis of zero price impact will reject the null hypothesis if the t-statistic is large and ***negative***, meaning that the t-statistic is less than the critical value $z_\alpha$. *See* Figure 3. For example, if $\alpha = 0.10$, a statistician will reject the null hypothesis on an omission date if the t-statistic on that date is less than -1.28.

**APPENDIX E**
**Methodological Appendix**

20. A statistician using null hypothesis significance testing in a case like this one will ***not*** reject Professor Ferrell's specified null hypothesis of zero price impact if the t-statistic is large and has the ***opposite*** sign to the one that Lead Plaintiff's legal theory of liability predicts.[6] When that happens, the t-statistic is in the light-shaded region in Figure 2 (for an omission date) or in Figure 3 (for a revelation date). Thus:

    a. On revelation date $t$, a finding that the t-statistic is large and ***negative*** will ***not*** cause the expert to reject the null hypothesis of zero price impact: *e.g.*, a t-statistic that is more negative than $-1.28$ will ***not*** cause rejection of the null hypothesis at significance level 0.10.

    b. On revelation date $t$, a finding that the t-statistic is large and ***positive*** will ***not*** cause the expert to reject the null hypothesis of zero price impact: *e.g.*, a t-statistic that exceeds 1.28 will ***not*** cause rejection of the null hypothesis at significance level 0.10.

21. Null hypothesis significance testing is used in scholarly and scientific research to ensure that Type I errors – false positive conclusions – about scientific or other truths are very unlikely. For this reason, conventional choices of the significance level $\alpha$ are low in scholarly and scientific research, having values such as 0.10 or 0.05. These choices ensure that a statistician will erroneously reject a true null hypothesis in no more than 1 in 10 (when $\alpha = 0.10$), 1 in 20 (when $\alpha = 0.05$) or 1 in 100 (when $\alpha = 0.01$) cases.

### B. The Role of the p-Value in Null Hypothesis Significance Testing

22. The p-value for testing Professor Ferrell's specified null hypothesis of zero price impact is the probability – given that Professor Ferrell's null hypothesis of zero price impact is

---

[6] To be sure, there are not circumstances under which a statistician would properly reject the null hypothesis when the t-statistic is large in magnitude, regardless of its sign. Sometimes it matters equally when a t-statistic departs from 0 in either direction; for example, consider testing the performance of a machine designed to make a circular tool that is supposed to have a quarter-inch circumference, with departures from a quarter-inch circumference in either direction – too small or too large – causing the tool to be dangerous. A test that rejects when the t-statistic has a large enough value in either direction is known as a ***two-tailed test*** or ***two-sided test***. It can be shown that a level-$\alpha$ two-tailed test uses the critical value $z_{1-\alpha/2}$ rather than the upper-tail critical value $z_{1-\alpha}$ or the lower-tail critical value $z_{\alpha}$. (A level-$\alpha$ test has probability $\alpha/2$ associated with each direction in which the t-statistic can depart from 0 – big positive values or big negative values – so that the total probability of rejection under the null hypothesis is $\frac{\alpha}{2} + \frac{\alpha}{2} = \alpha$.) This means the critical value for a two-sided 0.05-level has critical value is $z_{1-\alpha/2} = z_{0.975}$, which is 1.96. Thus, at a given significance level $\alpha$, the magnitude of the critical value for a two-tailed test is larger than the magnitude of the critical value for a one-sided test. Experts thus err when they use a critical value based on two-sided testing despite the fact that the relevant hypothesis test is either lower-tailed or upper-tailed.

true – of observing a value of the t-statistic ***as extreme as or more extreme than*** the observed t-statistic's value.[7]

23. The p-value may be used to do null hypothesis significance testing. An expert first calculates the t-statistic's value, $T_t$ for date $t$. With Professor Ferrell's null hypothesis of zero price impact, the expert determines the probability of drawing a value of a standard normal random variable that is more extreme than $T_t$ in the direction of the alternative hypothesis that Lead Plaintiff's legal theory of liability is correct.

    a. On an omission date, Lead Plaintiff's legal theory of liability specifies that price impact should be positive, so that the abnormal return, and thus the t-statistic, should have a positive mean. Thus, on an omission date, the p-value is the probability of observing a standard normal random variable with a value greater than $T_t$, *i.e.*, the p-value is $P(Z > T_t)$.

    b. On a revelation date, Lead Plaintiff's legal theory of liability specifies that price impact should be negative, so that the abnormal return, and thus the t-statistic, should have a negative mean. Thus, on a revelation date, the p-value is the probability of observing a standard normal random variable with a value less than $T_t$, *i.e.*, the p-value is $P(Z < T_t)$.

24. The p-value can be illustrated graphically.

    a. Figure 4(a) plots the probability density function for the standard normal distribution and shows the example of a positive t-statistic, in line with Lead Plaintiff's legal theory of liability on an omission date. The area of the shaded region to the right of $T_t$ is the probability of drawing a value greater than or equal to $T_t$, so this area is the p-value. In the Figure 4(a) example, the value of the t-statistic is 1.5, and the dark-shaded area represents the p-value, which is 0.067.

    b. Figure 4(b) shows the example of a negative t-statistic, in line with Lead Plaintiff's legal theory of liability on a revelation date. The area of the shaded region to the left of $T_t$ is the probability of drawing a value less than or equal to $T_t$, so this area is the p-value. In the example of Figure 4(b), the value of the t-statistic is -1.5, and the dark-shaded area represents the p-value, which is 0.067.

---

7 *See, e.g.*, Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach* 131 (2020). Professor Ferrell errs when he claims that a p-value is "[t]he probability of observing a given t-statistic by random market fluctuations." *See* Ferrell Report, ¶39.

# APPENDIX E
## Methodological Appendix

Figure 4: The p-Value and the t-Statistic on Omission and Revelation Dates




(a) Computing the p-value for an omission date on which the t-statistic has the sign consistent with Lead Plaintiff's legal theory of liability




(b) Computing the p-value for a revelation date on which the t-statistic has the sign consistent with Lead Plaintiff's legal theory of liability

25. When the p-value is less than the expert's chosen significance level, $\alpha$, and the null hypothesis is zero price impact, it is the case that (i) the t-statistic lies in the direction of Lead Plaintiff's legal theory of liability and (ii) has magnitude greater than the critical value. These are the two conditions required for statistical significance, as summarized in ¶20, *supra*. Accordingly, the t-statistic is statistically significantly different from zero at significance level $\alpha$ if and only if the p-value is less than or equal to $\alpha$. For example:

   a. In Figure 4(a), the combined dark- and light-shaded areas equal 0.10. Thus, the light-shaded area lies to the right of $z_{0.90} = 1.28$. This is the same as saying that the t-statistic of 1.5 in the figure's example exceeds 1.28. Professor Ferrell's null hypothesis of zero price impact would thus be rejected at significance level 0.10 whenever $p < 0.10$.

   b. In Figure 4(b), the combined dark- and light-shaded areas equal 0.10. Thus, the light-shaded area lies to the left of $z_{0.10} = -1.28$. This is the same as saying that the t-statistic of -1.5 in the figure's example is to the left of $-1.28$. Professor Ferrell's null hypothesis of zero price impact would again be rejected at significance level 0.10 whenever $p < 0.10$.

26. Therefore, a test of Professor Ferrell's specified null hypothesis of zero price impact against the alternative hypothesis that Lead Plaintiff's legal theory of liability is correct may be carried out by computing the p-value associated with the t-statistic on a given date, under Professor Ferrell's specified null hypothesis of zero price impact. The expert should reject this null hypothesis at significance level $\alpha$ if and only if the p-value is less than $\alpha$.

**APPENDIX E**
**Methodological Appendix**

27. Experts sometimes use confidence intervals to conduct null hypothesis significance testing, and they sometimes describe an estimate as being significant with a particular stated confidence level.[8] For present purposes, the confidence level is simply one minus the p-value, with the result then expressed in percentage terms.[9] For example, a p-value of 0.067 corresponds to a confidence level of 93.3% ($= 100\% \times (1 - 0.067)$).

### C. How Null Hypothesis Significance Testing Can Be Used in a Way that Allows Proof of the Absence of Price Impact

28. As discussed above, every introductory student learns that failing to reject the null hypothesis does not warrant ***accepting*** the null hypothesis.[10] Thus, the possible outcomes of null hypothesis significance testing under Professor Ferrell's specification of the null hypothesis as zero price impact are:

    a. The expert ***rejects*** the null hypothesis of zero price impact, meaning the expert concludes that the statistical evidence adequately supports the alternative hypothesis that there was a change in price consistent with Lead Plaintiff's legal theory of liability.

    b. The expert ***fails to reject*** the null hypothesis, in which case the result of the hypothesis test is inconclusive: it rules out neither the null hypothesis nor the alternative hypothesis that there was price impact consistent with Lead Plaintiff's legal theory of liability.

29. Thus, all that can be said when an expert fails to reject Professor Ferrell's null hypothesis of zero price impact against the alternative hypothesis of price impact consistent with Lead Plaintiff's legal theory of liability is that ***the expert has not rejected either hypothesis regarding price impact***. Such a test simply is not capable of proving the absence of price impact.

30. However, it ***is*** possible to use null hypothesis significance testing in a way that could prove the absence of price impact. To do so requires reversing the designations of the

---

8 A $100\% \times (1 - \alpha)$ confidence interval for the abnormal return on an omission date can be shown to contain all values greater than $\widehat{AR}_t - \hat{\sigma} z_{1-\alpha}$; a $100\% \times (1 - \alpha)$ confidence interval for the abnormal return on a revelation date is instead all values less than $\widehat{AR}_t + \hat{\sigma} z_{1-\alpha}$. The expert rejects the null hypothesis of zero price impact if and only if 0 lies outside the applicable confidence interval. For an omission date, this is equivalent to having a t-statistic greater than $z_{1-\alpha}$; for a revelation date, it is equivalent to having a t-statistic that is negative and larger in magnitude than $z_\alpha$. These are exactly the criteria for rejecting Professor Ferrell's specified null hypothesis of zero price impact, discussed above. So, this null hypothesis is rejected at significance level $\alpha$ if and only if a $100\% \times (1 - \alpha)$ confidence interval for the abnormal return does not include the value 0.

9 As thus defined, the confidence level is the greatest value of $100\% \times (1 - \alpha)$ for which the null hypothesis would be rejected. Because $p$ is the lowest value of $\alpha$ for which the null hypothesis would be rejected, it follows that the confidence level is $100\%(1 - p)$.

10 *See* ¶1.a, *supra*.

**APPENDIX E**
**Methodological Appendix**

null hypothesis and the alternative hypothesis relative to those that Professor Ferrell specifies.

31. With such an approach, the null hypothesis is that there was price impact consistent with Lead Plaintiff's legal theory of liability, *i.e.*, $\pi_t > 0$ on omission date $t$ or $\pi_t < 0$ on revelation date $t$. The alternative hypothesis is the opposite of the null hypothesis – that there was not price impact consistent with Lead Plaintiff's legal theory of liability, so that $\pi_t$ is either zero or has the sign opposite to what Lead Plaintiff's legal theory of liability predicts.[11]

32. In practice, this amounts to the following:

---

[11] The same t-statistic is used when we assign null hypothesis status to Lead Plaintiff's legal theory of liability as when we assign null hypothesis status to zero price impact, with the values of the t-statistic that warrant rejecting the null hypothesis of Lead Plaintiff's legal theory of liability being those in the opposite direction of when Lead Plaintiff's legal theory of liability is treated as the alternative hypothesis. Thus, Lead Plaintiff's legal theory of liability is rejected on an omission date when the t-statistic is large and negative, and rejected on a revelation date when the t-statistic is large and positive.

It is intuitively clear that reversing the designation of null and alternative hypothesis statuses should lead to a reversal of the criteria for rejection, as suggested by Merritt B. Fox, *Halliburton II: It All Depends on What Defendants Need to Show to Establish No Impact on Price*, 70 Bus. Law. 437 (2015). Nevertheless, some mathematically technical details lurk in the background. Lead Plaintiff's legal theory of liability is what is known as a composite hypothesis – a hypothesis under which the parameterization $\pi_t$ can take on more than one value. In such a situation, one way to proceed is to define the null hypothesis as $\pi_t = \pi^*$ for a particular value $\pi^*$ that is consistent with the composite null hypothesis and then construct a t-statistic based on $\pi^*$. Call this t-statistic $T_t^*$. The goal of this approach is (i) to find a $\pi^*$that yields a test statistic whose null distribution is known, (ii) so that a critical value may be found to carry out null hypothesis significance testing as usual when using $T_t^*$, (iii) with this test leading to false positive results no more frequently than the significance level $\alpha$, and (iv) so that using $T_t^*$ leads to power at least as great – correct positive results at least as frequently – as would any other choice of $\pi_t$ that is consistent with the null hypothesis. When a single such $\pi^*$ value exists, it induces what is known as the ***least-favorable distribution***. In the present situation, there is a slight technical difficulty in using the least-favorable approach: it can be shown that for any values $\pi_{farther}$ and $\pi_{closer}$ that are consistent with Lead Plaintiff's legal theory of liability, where $\pi_{closer}$ is closer to 0 than is $\pi_{farther}$, then using $\pi_{closer}$ to define the test statistic yields a test that has the same significance level as $\pi_{farther}$ but has greater power. This means there is no least-favorable value of $\pi$ that is consistent with Lead Plaintiff's legal theory of liability. The solution to this problem is to use the limiting value of $\pi_{closer}$ as if it were the least-favorable null hypothesis value. The limit as $\pi_{closer}$ grows ever closer to zero is $\pi = 0$ (formally, 0 is the limit of a least-favorable sequence)). *See* E.L. Lehmann and George Casella, *Theory of Point Estimation* 316 (2nd ed. 1998)). Practically, this means that the distribution of the t-statistic under the limiting least-favorable sequence is the same as under Professor Ferrell's specified null hypothesis of zero price impact. This makes null hypothesis significance testing simple when Lead Plaintiff's legal theory of liability receives null hypothesis status: (i) the t-statistic has the same null distribution, and (ii) the test is rejected if and only if that t-statistic has sign opposite to Lead Plaintiff's legal theory of liability and magnitude larger than the magnitude of the critical value.

## APPENDIX E
## Methodological Appendix

a. For omission dates, when Lead Plaintiff's legal theory of liability holds that the t-statistic has a positive mean, the expert rejects Lead Plaintiff's legal theory of liability when the t-statistic is large and ***negative***, as in the dark-shaded region in Figure 5 just below. For example, to reject Lead Plaintiff's legal theory of liability at significance level 0.10 on an omission date, an expert would have to find that the t-statistic was to the left of -1.28. Otherwise – in the light-shaded region of Figure 5 – the statistical evidence would be too weak to reject Lead Plaintiff's legal theory of liability using null hypothesis significance testing with significance level 0.10. Notice that Figure 5 is effectively the opposite of Figure 2 (whose rejection region was on the right rather than the left), which reflects the reversal of the assignment of null and alternative hypothesis status.

**Figure 5: Omission Dates –**
**Null Hypothesis Significance Testing**
**at Significance Level $\alpha$**
**When the Null Hypothesis Is**
**Lead Plaintiff's Legal Theory of Liability**




b. For revelation dates, when Lead Plaintiff's legal theory of liability holds that the t-statistic should be negative, the expert rejects Lead Plaintiff's legal theory of liability when the t-statistic is large and ***positive***, as in the dark-shaded region in Figure 6 below. For example, to reject Lead Plaintiff's legal theory of liability at significance level 0.10 on a revelation date, an expert would have to find that the t-statistic on a revelation date was to the right of 1.28. Otherwise – in the light-shaded region of Figure 6 – the statistical evidence is too weak to reject Lead Plaintiff's legal theory of liability using null hypothesis significance testing with significance level 0.10. Notice that Figure 6 is effectively

**APPENDIX E**
**Methodological Appendix**

the opposite of Figure 3 (whose rejection region was on the right rather than the left), which reflects the reversal of the assignment of null and alternative hypothesis status.

**Figure 6: Revelation Dates –**
**Null Hypothesis Significance Testing**
**at Significance Level $\alpha$**
**When the Null Hypothesis Is**
**Lead Plaintiff's Legal Theory of Liability**




33. The possible outcomes of null hypothesis significance testing when Lead Plaintiff's legal theory of liability has the role of the null hypothesis are:

   a. The expert rejects the hypothesis of price impact consistent with Lead Plaintiff's legal theory of liability, as in the dark-shaded regions of Figure 5 and Figure 6 above.

   b. The expert fails to reject that hypothesis, as in the light-shaded regions of Figure 5 and Figure 6 above. In that case, the result of the hypothesis test is inconclusive, ruling out neither the null hypothesis nor the alternative hypothesis that there was price impact consistent with Lead Plaintiff's legal theory of liability.

34. The test just described can also be expressed in terms of the p-value. The p-value associated with testing the null hypothesis of price impact consistent with Lead Plaintiff's legal theory of liability is 1 minus the p-value associated with testing Professor Ferrell's specified null hypothesis of zero price impact.[12]

---

[12] The p-value is the probability of drawing a standard normal random variable with a value that is more extreme than the observed t-statistic, in the direction of the alternative hypothesis. The t-

**APPENDIX E**
**Methodological Appendix**

35. Denote $p_{Ferrell}$ as the p-value for testing Professor Ferrell's specified null hypothesis of zero price impact and $p_{LP}$ as the p-value for testing Lead Plaintiff's legal theory of liability. Then because $p_{LP} = 1 - p_{Ferrell}$, the expert should reject Lead Plaintiff's legal theory of liability whenever $1 - p_{Ferrell} \leq \alpha$. That condition is equivalent to $p_{Ferrell} \geq 1 - \alpha$. The same argument implies that the expert should reject Professor Ferrell's specified null hypothesis of zero price impact if and only if $p_{LP} \geq 1 - \alpha$.

36. For any significance level less than 0.5, it is the case that $1 - \alpha > 0.5$, so:

   a. At most one of the tests of null hypotheses discussed here can lead to rejection of the null hypothesis.[13]

   b. It is possible that neither the hypothesis of zero price impact nor the hypothesis that there is price impact consistent with Lead Plaintiff's legal theory of liability will be rejected when it is treated as the null hypothesis. For example, suppose the t-statistic is -0.84 on a revelation date. Then $p_{Ferrell} = 0.2$ and $p_{LP} = 1 - p_{Ferrell} = 0.8$. For any significance level $\alpha < 0.2$, the expert would not reject either hypothesis, no matter which is treated as the null hypothesis.

37. For a given significance level $\alpha$, there are thus three possible results from null hypothesis significance testing:

   a. First, the t-statistic could have the sign consistent with Lead Plaintiff's legal theory of liability and be large enough in magnitude to reject Professor Ferrell's specification of the null hypothesis of zero price impact against Lead Plaintiff's legal theory of liability. For an omission date, this result corresponds to the dark-shaded region on the right side of Figure 7 just below, where the t-statistic is positive and exceeds the critical value $z_{1-\alpha}$.[14]

statistic itself is the same regardless of which hypothesis serves as the alternative. Thus, when the alternative hypothesis is switched from Lead Plaintiff's legal theory of liability to its opposite, "the direction of the alternative hypothesis" is reversed. A number $Z$ must be either no greater than another number T, no less than T or both (when they are equal), so $P(Z \geq T) + P(Z \leq T) = 1$. On an omission date, the p-value for testing Professor Ferrell's specified null hypothesis of zero price impact is $P(Z \geq T_t)$, and the p-value for testing Lead Plaintiff's legal theory of liability is $P(Z \leq T_t)$, so the two p-values sum to 1. On a revelation date, the assignment of these two probabilities is reversed, but each is the p-value for one of the hypotheses, so again they must sum to 1.

[13] This is true because when $p \leq \alpha < 0.5$, so that Professor Ferrell's specified null hypothesis of zero price impact is rejected, we have $1 - p \geq 1 - \alpha > 0.5 > p$, so that $p < 1 - \alpha$, which means that Lead Plaintiff's legal theory of liability cannot be rejected when it is the null hypothesis. Similarly, when $\alpha < 0.5$, we have $1 - \alpha > 0.5$, so $p \geq 1 - \alpha$ implies that $p > 0.5$, in which case we cannot have $p \leq \alpha$. This implies that if either hypothesis would be rejected when it is the null hypothesis, the other cannot be.

[14] On a revelation date, these statements hold with the sign of the t-statistic reversed, *i.e.*, the t-statistic consistent with Lead Plaintiff's legal theory of liability would be in the dark-shaded region to the left of the figure, rather than the one to the right.

**APPENDIX E**
**Methodological Appendix**

**Figure 7: Rejection and Non-Rejection of Hypotheses on Omission Date, According to the Value of the T-statistic**




b. Second, the t-statistic could have the sign opposite to Lead Plaintiff's legal theory of liability and be large enough in magnitude so that Lead Plaintiff's legal theory of liability is rejected when it is specified as the null hypothesis. In this case, the null hypothesis of zero price impact would not be rejected against the alternative hypothesis of price change consistent with Lead Plaintiff's legal theory of liability. For an omission date, this result corresponds to the dark-shaded region on the ***left*** side of Figure 7, where the t-statistic is ***negative*** and farther from zero than the critical value $z_{1-\alpha}$.

c. Third, the t-statistic could lie in the light region in the middle of Figure 7, between the critical values $z_\alpha$ and $z_{1-\alpha}$. Regardless of whether the event date involves an omission or a revelation, and regardless of which hypothesis is assigned null hypothesis status, when the t-statistic is in this region, the test will not result in rejecting either hypothesis. Effectively, although the event-study results point in favor of one of the hypotheses in such cases, it does not do so strongly enough to overcome the presumption that comes along with null hypothesis status.

38. I do not take the position that the Court in this case ***should*** use null hypothesis significance testing to decide whether Alphabet has proved a complete absence of price impact. Likelihood ratio analysis, discussed in Part II, *infra*, offers a viable alternative approach. But if the Court does determine to use the null hypothesis significance testing framework, it is my expert opinion, as one who has studied statistical proof and

**APPENDIX E**
**Methodological Appendix**

hypothesis testing in litigation,[15] that the best way to do so is in a way that matches the legal standards that apply here. I understand that under the Supreme Court's decision in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, a defendant seeking to rebut the *Basic Inc. v. Levinson* presumption of class-wide reliance can do so by proving, by a preponderance of the evidence, a complete absence of price impact. To adopt Professor Ferrell's approach to null hypothesis significance would effectively reverse the *Goldman Sachs* allocation of this burden: It would treat statistical evidence that is too weak to support the conclusion that there was an absence of price impact as if it in fact proved such absence. The only way to use null hypothesis significance testing while avoiding such a perverse result is to adopt the approach described here.

## II. The Relative Likelihood of Price Impact and No-Price Impact Explanations

39. I now discuss the likelihood ratio, which is a widely used statistical measure built to compare how well an expert's observation of the estimated abnormal return's value is explained by the null hypothesis of price versus alternative hypotheses consistent with Lead Plaintiff's legal theory of liability. I present relevant likelihood ratios throughout my discussion of the event-study results in the main body of this report.

40. Professor Ferrell's abnormal returns for July 24, 2018, October 9, 2018 and April 30, 2019 all have the sign predicted by Lead Plaintiff's legal theory of liability. As this Part explains, that means Professor Ferrell's own event-study results for those dates would be better explained by price impact consistent with Lead Plaintiff's legal theory of liability than with zero price impact.

41. Therefore, the discussion in this Part establishes that even if (i) the Court chose to disregard statisticians' own standards and practices with regard to null hypothesis significance testing, and even if (ii) the Court accepted Professor Ferrell's event-study evidence over the event-study evidence I provide in the main body of this report, then (iii) Professor Ferrell's statistical results still would not prove the complete absence of price impact. To conclude otherwise would require concluding that the complete absence of price impact somehow is both a ***worse explanation*** for the observed data and ***proved by*** those data.

### A. The Likelihood Function for Abnormal Returns

42. Consider an event date $t$ on which an alleged revelation occurred.

43. If there were actually no price impact on date $t$, then as discussed above, $\pi_t = 0$. This means that if there were no price impact, the abnormal return must have been drawn from a normal probability distribution with mean 0 and standard deviation $\sigma$.

---

[15] *See, e.g.,* Jonah B. Gelbach, *Estimation Evidence*, 168 U. Pa. L. Rev. 549, 602 (2020); Andrew Baker and Jonah B. Gelbach, *Machine Learning and Predicted Returns for Event Studies in Securities Litigation*, 5 J. of L., Fin., & Acct. 231 (2020).

**APPENDIX E**
**Methodological Appendix**

44. Suppose instead that there ***was*** price impact, with price falling 0.6% because of the revelation: $\pi_t = -0.60$. In this case, the estimated abnormal return must have been drawn from a normal probability distribution with mean -0.6 and standard deviation $\sigma$.

45. Given all this, there is a straightforward statistical method for assessing the relative likelihoods of the hypothesis of zero price impact and the hypothesis of price impact equal to -0.6: Compare the likelihood of observing the estimated abnormal return under each of the two hypotheses.

46. To be precise, statisticians calculate the ***likelihood ratio in favor of*** one hypothesis over the other by calculating the value of the ***likelihood function*** for the first hypothesis and dividing it by the value of the likelihood function for the second hypothesis.

### B. Computing the Likelihood Ratio in Favor of Price Impact Explanations

47. By rewriting equation (4) from the main body of this report,[16] it follows that the random fluctuation component equals Alphabet's event date abnormal return minus the event date price impact: $\epsilon_t = AR_t - \pi_t$. As discussed above, we must estimate the abnormal return using the regression model estimates. When we replace $AR_t$ with its estimated value, $\widehat{AR}_t$, the result is an estimated value of the random fluctuations term $\epsilon_t$, denoted $\hat{\epsilon}_t$.[17] With regression-model samples of the size typically used, *i.e.*, roughly 250, the probability distribution of the estimated value $\hat{\epsilon}_t$ will be close enough to the probability distribution of the unobserved value $\epsilon_t$ so that the difference between these distributions is immaterial.[18]

48. Accordingly, the probability density function $f_\sigma$, which is that of a random variable with a normal distribution having mean 0 and standard deviation $\sigma$, can be used as the probability density function for $\hat{\epsilon}_t$ in likelihood analysis. I use the notation $f_\sigma(\hat{\epsilon}_t)$ to indicate the value of this probability density function given the estimated value of the random fluctuations term.

49. The likelihood of the estimated abnormal return value given a hypothesized value of price impact, $\pi_t$, is the probability density of the estimated abnormal return when price impact has that value. It can be shown that this likelihood is $f_\sigma\left(\widehat{AR}_t - \pi_t\right)$.

50. If an alleged revelation had zero price impact on date $t$, then $\pi_t = 0$, so the likelihood equals $f_\sigma\left(\widehat{AR}_t\right)$. Intuitively, if there were zero price impact, only random fluctuations would explain why the abnormal return is not zero, so that the likelihood of observing the estimated abnormal return would be the likelihood of observing a random fluctuations component $\epsilon_t$ equal to the estimated abnormal return.

---

16 ¶53 of the main body of this report (showing that $AR_t = \pi_t + \epsilon_t$).

17 To be precise, $\hat{\epsilon}_t = \widehat{AR}_t - \pi_t$.

18 *See* Jonah B. Gelbach, Eric Helland and Jonathan Klick, *Valid Inference in Single-Firm, Single-Event Studies*, 15 Am. L. Econ. Rev. 495 (2013).

**APPENDIX E**
**Methodological Appendix**

51. If instead an alleged revelation had negative price impact on date $t$, then $\pi_t < 0$, so $\hat{\epsilon}_t$ must exceed the estimated abnormal return. Because of the shape of the normal distribution's probability density function, the likelihood with negative price impact will exceed the likelihood under the hypothesis of zero price impact whenever $\widehat{AR}_t - \pi_t$ is closer to 0 than is the estimated abnormal return.[19] To illustrate some implications:

a. Now suppose that the estimated abnormal return is $-1.0$. With zero price impact, the likelihood is $f_\sigma(-1.0)$. Suppose that the standard deviation $\sigma$ is 1.05, as is roughly the case for my event-study results below. Then $f$ is the probability density function for a normally distributed random variable with mean 0 and standard deviation 1.05. The likelihood is then $f_{1.05}(-1.0)$, which equals 0.241.

b. Now suppose instead that date $t$ actually had price impact of -0.6, so that $\pi_t = -0.6$. With an estimated abnormal return of $-1.0$, the likelihood is $f_\sigma\big(-1 - (-0.6)\big) = f_{1.05}(-0.4)$, which equals 0.353.

c. The likelihood ratio in favor of the hypothesis that price impact is -0.6 rather than 0 is then the ratio of the two likelihoods:

$$Likelihood\ Ratio\ favoring\ [\pi_t = -0.6]\ over\ [\pi_t = 0] = \frac{f_\sigma(-0.4)}{f_\sigma(-1)}$$

$$= \frac{0.353}{0.241}$$

$$= 1.47.$$

This result means that it would be 47% more likely to observe an estimated abnormal return of -1.0 with a true price drop of 0.6 than with no price impact.

52. The price drop of 0.6 percentage points used in the previous paragraph is just one particular value of $\pi_t$ for which there would be price impact consistent with Lead Plaintiff's legal theory of liability on a revelation date. The likelihood ratio for revelation dates also can be calculated for any other negative value of $\pi_t$. Given an estimated abnormal return of -1, the likelihood ratio's form is:

[19] The lone peak of the normal density function with mean 0 occurs at the value 0, and the density function slopes away from 0 as one moves further away from 0. Thus for two draws with the same sign, the density is greater for the draw that is closer to zero. Because the normal density with mean 0 is symmetric, this ranking also follows for draws with opposite signs.

**APPENDIX E**
**Methodological Appendix**

$$LR\ favoring\ [\pi_t = \pi]\ over\ [\pi_t = 0]\ given\ \left[\widehat{AR}_t = -1\right] = \frac{f_\sigma(-1-\pi)}{f_\sigma(-1)}$$

$$= \frac{f_\sigma(-1-\pi)}{0.241}.$$

a. Because the normal density with mean 0 is maximized at 0, the likelihood ratio is highest when price impact equals the estimated abnormal return. In the example with estimated abnormal return equal to -1, that means the likelihood ratio in favor of the alternative hypothesis is maximized at $\pi = -1$. The likelihood at that value is 0.380, so the highest possible likelihood ratio given the estimated abnormal return is $0.380 \div 0.241 = 1.58$. So an estimated abnormal return of -1 is 58% more likely to observe when true price impact is actually -1 than when true price impact is 0.

b. The likelihood ratio exceeds 1 in the example with estimated abnormal return equal to -1 whenever $\hat{\epsilon}_t = (-1-\pi)$ is closer to zero than is -1. That is the case with a price drop having any magnitude less than 2 percentage points.

53. These results generalize beyond the specific situation in which the estimated abnormal return is -1:

a. The likelihood ratio's highest possible value occurs when price impact happens to exactly equal the estimated abnormal return.[20]

b. When the estimated abnormal return is in the direction specified by Lead Plaintiff's legal theory of liability (*e.g.*, negative on revelation dates and positive on omission dates), then the likelihood ratio will exceed 1 for any value of price impact that is less than twice the magnitude of the estimated abnormal return. That is, whenever the estimated abnormal return is in the direction specified by Lead Plaintiff's legal theory of liability, the estimated abnormal return's value would be most likely to observe when there is price impact, rather than when there is not.

54. The examples considered so far involved the situation in which the estimated abnormal return has the sign that Lead Plaintiff's legal theory of liability predicts. The likelihood

---

[20] An implication of this fact is that the estimated abnormal return's value is the maximum likelihood estimator of price impact. Maximum likelihood estimators are frequently used in applied statistics, including in econometrics in general and financial economics in particular. More generally, philosopher of science Ian Hacking has described a ***law of likelihood***. As it applies here, the law of likelihood is that if one is given an observed datum – such as an abnormal return – and two different hypotheses of which probability distribution generated the datum – such as the density of abnormal returns given hypothesized price impact magnitude – then "the better supported [hypothesis] is that with the greater likelihood." Ian Hacking, *Logic of Statistical Inference* 49 (Cambridge Philosophy Classics Ed. 2016).

**APPENDIX E**
**Methodological Appendix**

ratio's usefulness is also useful when the estimated abnormal return has sign in the opposite direction.

55. Suppose there was an alleged revelation on date $t$, so that Lead Plaintiff's legal theory of liability is that $\pi_t < 0$. Suppose that the estimated abnormal return is 0.7, which is positive and thus has the sign opposite to the prediction of Lead Plaintiff's legal theory of liability.

a. For any hypothesized price impact level $\pi$, the likelihood is $f_{1.05}(0.7 - \pi)$.

b. Under the hypothesis of zero price impact, $\pi = 0$, so the likelihood for this hypothesis is $f_{1.05}(0.7) = 0.304$.

c. Only values of $\pi$ that are negative are consistent with Lead Plaintiff's legal theory of liability. This means that the point where the likelihood function is evaluated, $0.7 - \pi$, exceeds 0.7 for any value of $\pi$ that is consistent with Lead Plaintiff's legal theory of liability.[21] This means that every value of $\pi$ consistent with Lead Plaintiff's legal theory of liability has lower likelihood than does the hypothesis of zero price impact:

$$Likelihood\ Ratio\ favoring\ [\pi < 0]\ over\ [\pi = 0] \quad = \quad \frac{f_\sigma(0.7 - \pi)}{f_\sigma(0.7)} \quad < \quad 1.$$

d. The same conclusion would follow on an omission date if the estimated abnormal return were negative, rather than positive.

e. Accordingly, when the estimated abnormal return has the sign opposite to what Lead Plaintiff's legal theory of liability predicts, the estimated abnormal return is always more likely to be observed with zero price impact than with price impact consistent with Lead Plaintiff's legal theory of liability. In other words, "wrong-signed" estimated abnormal returns are less likely to be observed under Lead Plaintiff's legal theory of liability than under the hypothesis of zero price impact.

56. In sum, likelihood ratio analysis provides a simple and direct method for assessing how well the observed data, in the form of an estimated abnormal return, support a defendant's no-price-impact hypothesis against various price impact alternative hypotheses.

a. If the estimated abnormal return has the same sign as price impact under Lead Plaintiff's legal theory of liability, then the hypothesis of zero price impact is a ***worse*** explanation for the observed data than is every price impact value that is (i) consistent with Lead Plaintiff's legal theory of liability and (ii) less than twice as large as the estimated abnormal return. To conclude that there is no price impact in the face of such evidence would be

[21] Because the normal density function slopes down as its evaluation point moves away from its mean, and because the mean associated with $f_\sigma$ is 0.

**APPENDIX E**
**Methodological Appendix**

to accept a worse explanation for the observed data over all elements of a class of better explanations.

b. If the estimated abnormal return has the opposite sign to what Lead Plaintiff's legal theory of liability predicts, then the hypothesis of zero price impact is a ***better*** explanation for the observed data than any value of price impact consistent with Lead Plaintiff's legal theory of liability.

### C. The Relationship Between the Likelihood Ratio and Null Hypothesis Significance Testing

57. The likelihood ratio analysis and null hypothesis significance testing involve very different approaches to assessing the null hypothesis of zero price impact. However, like null hypothesis significance testing, likelihood ratio analysis can be described in terms of the t-statistic. This enables comparisons between the two methods.

58. As explained in the previous section, the likelihood of the hypothesis of zero price impact is $f_\sigma(\widehat{AR}_t)$. It is straightforward to show that this likelihood can also be written as $f_1(T_t)$, which is the standard normal probability density function evaluated at the usual t-statistic's value.

59. The likelihood of the hypothesis $\pi_t = \pi$ can be shown to be the standard normal distribution's probability density function evaluated at $f_1\left(T_t - \frac{\pi,}{\hat{\sigma}}\right)$.

60. The likelihood ratio in favor of the hypothesis that $\pi_t = \pi$ is therefore the ratio of the standard normal density at the two values in question, *i.e.*, the likelihood ratio is $f_1\left(T_t - \frac{\pi,}{\hat{\sigma}}\right)$ divided by $f_1(T_t)$. The maximum value of this ratio can be shown to equal

$$LR_{\{\pi_t = \widehat{AR}_t\}} = \exp\left(\frac{1}{2}(T_t)^2\right)$$

(where "exp" refers to a constant known as Euler's number).[22]

61. This means that when the estimated abnormal return has the sign predicted by Lead Plaintiff's legal theory of liability, it is possible to formulate in terms of the t-statistic both (i) the maximum likelihood ratio and (ii) the condition for rejecting Professor Ferrell's specification of the null hypothesis of zero price impact when using null hypothesis significance testing.

---

22 The hypothesis that maximizes the likelihood ratio when the estimated abnormal return has the sign predicted by Lead Plaintiff's legal theory of liability is the hypothesis according to which $\pi = \widehat{AR}_t$. Dividing both sides of this equality by $\hat{\sigma}$ then yields the result that the hypothesis that maximizes the likelihood ratio sets $\frac{\pi}{\hat{\sigma}}$ equal to the t-statistic.

## APPENDIX E
## Methodological Appendix

62. Recall that the rule for rejecting Professor Ferrell's specified null hypothesis of zero price impact at significance level $\alpha$ is:

a. For omission date $t$, reject the null hypothesis at significance level $\alpha$ whenever $T_t > z_{1-\alpha}$.

b. For revelation date $t$, reject the null hypothesis at significance level $\alpha$ whenever $T_t < z_{\alpha}$.

63. Whenever $T_t > z_{1-\alpha}$, the maximum likelihood ratio must exceed $\exp\left(\frac{1}{2}(z_{1-\alpha})^2\right)$.

64. Whenever $T_t < z_{\alpha}$, the maximum likelihood ratio must exceed $\exp\left(\frac{1}{2}(z_{\alpha})^2\right)$. Further, this threshold value is equal to $\exp\left(\frac{1}{2}(z_{1-\alpha})^2\right)$, due to the symmetry of the standard normal distribution.

65. Table E.1 shows several values of the significance level, $\alpha$, the associated critical values, their squares and the associated maximum likelihood ratio that must be achieved for Professor Ferrell's specification of the null hypothesis to be rejected at significance level $\alpha$.

**Table E.1: Significance Levels and Threshold Maximum Likelihood Ratio**

| Significance level $\alpha$ | Critical values | Squared Critical Value | Maximum Likelihood Ratio Required to Reject Professor Ferrell's Specification of the Null Hypothesis |
|---|---|---|---|
| 0.10 | $z_{\alpha} = -1.28, z_{1-\alpha} = 1.28$ | 1.64 | 2.3 |
| 0.05 | $z_{\alpha} = -1.65, z_{1-\alpha} = 1.65$ | 2.7 | 3.9 |
| 0.025 | $z_{\alpha} = -1.96, z_{1-\alpha} = 1.96$ | 3.8 | 6.8 |

66. The key column of this table is its final one, which shows the value of the maximum likelihood ratio that is necessary to reject the null hypothesis at each significance level. For example:

a. When the significance level is 0.10, an expert using null hypothesis significance testing would reject the null hypothesis on an omission date whenever the t-statistic exceeds 1.28, but otherwise fail to reject Professor Ferrell's specification of the null hypothesis. This is equivalent to saying that the expert would reject Professor Ferrell's specification of the null hypothesis whenever the most favorable likelihood ratio for Lead Plaintiff's legal theory of liability exceeds 2.3.

b. It also means that the expert would ***fail*** to reject Professor Ferrell's specification of the null hypothesis even when the observed t-statistic is

**APPENDIX E**
**Methodological Appendix**

***twice as likely*** to occur under explanations consistent with Lead Plaintiff's legal theory of liability as under Professor Ferrell's specification of the null hypothesis of zero price impact.

67. Similar analysis indicates the following:

a. For significance level 0.05, an expert would reject Professor Ferrell's specification of the null hypothesis only if the alternative hypothesis most favorable to Lead Plaintiff's legal theory of liability were more than 3.9 times as likely as the null hypothesis. This means that an expert using null hypothesis significance testing at the significance level 0.05 would fail to reject Professor Ferrell's specification of the null hypothesis even when the observed t-statistic is ***three times as likely*** to occur under explanations consistent with Lead Plaintiff's legal theory of liability as under Professor Ferrell's specification of the null hypothesis of zero price impact.

b. For significance level 0.025, an expert would reject Professor Ferrell's specification of the null hypothesis only if the alternative hypothesis most favorable to Lead Plaintiff's legal theory of liability were more than 6.8 times as likely as the null hypothesis. This means that an expert using null hypothesis significance testing at the significance level 0.025 would fail to reject Professor Ferrell's specification of the null hypothesis even when the observed t-statistic is ***six times as likely*** to occur under explanations consistent with Lead Plaintiff's legal theory of liability as under Professor Ferrell's specification of the null hypothesis of zero price impact.

68. These results demonstrate that when conventional scholarly levels are used in null hypothesis significance testing in litigation, they impose highly demanding standards for rejecting the null hypothesis of zero price impact. These standards are much more stringent than the legal preponderance standard of "more likely than not," if that standard is understood simply to require evidence that makes it more likely that price impact, rather than an absence of price impact, explains the observed data.

# APPENDIX F
## Sensitivity Analysis

1. This appendix reports results from re-doing my event-study analysis for October 8, 9, and 10, 2018, both individually and cumulatively, with 30 overall approaches.[1]
2. I considered 3 distinct definitions of the market index.
    a. The one used in the main body of the report: firms in the S&P 500, except for those identified as being in internet industries.
    b. Firms in the Russell 1000, except for those identified as being in internet industries.
    c. Firms in the Russell 3000, except for those identified as being in internet industries.
3. I considered 5 distinct definitions of the estimation window.
    a. The one used in the main body of the report: one year of trading dates immediately preceding October 8, 2018.
    b. Six months of trading dates immediately preceding October 8, 2018.
    c. Twelve months of trading dates immediately preceding the Class Period.
    d. Six months of trading dates immediately preceding the Class Period.
    e. The set of trading dates that occurred within the Class Period.
4. I considered 2 distinct approaches to computing p-values for testing Professor Ferrell's specification of the null hypothesis as zero price impact (the "Ferrell null p-value"):
    a. The one used in the main body of the report: the p-value based on the assumption that Alphabet's daily residuals, $\epsilon_t$, follow a normal probability distribution.
    b. The p-value based on the sample quantiles ("SQ") test developed in Gelbach, Helland, and Klick (2013), which does not assume normality of Alphabet's daily residuals.[2]
5. With 3 definitions of the market index, 5 definitions of the estimation window, and 2 approaches to computing p-values, there are $5 \times 3 \times 2 = 30$ total approaches.
6. Table F1 shows which definitions of the market index and estimation window, and which approach to computing p-values, are associated with each of the 30 specifications I consider in this appendix. The first specification listed is the one provided in the main body of my report and is labeled, "Main Body Approach."

---

[1] I did not re-do my event study analysis for the dates of April 24, 2018, July 24, 2018, or April 30, 2019, because Professor Ferrell's statistical results and mine are very similar for those dates.

[2] For the three dates considered individually, I calculated p-values using the empirical distribution function ("EDF") of estimation-date daily residuals, as proposed in Gelbach, Helland, and Klick (2013). For the three dates considered together, it is necessary to devise an analogous cumulative residual whose EDF can be used to calculate p-values. I do this by calculating the set of all possible values that could be taken on by the sum of three values that are drawn randomly from the estimation-date individual residuals' EDF. With 249 estimation dates, there are up to 15,438,249 distinct values of the three-day cumulative abnormal return (there could also be fewer distinct values, because different combinations of different sets of dates' residuals might have the same sum). I calculated all 15,438,249 potentially distinct three-day sums and then used the associated EDF as the basis for calculating p-values.

# APPENDIX F
## Sensitivity Analysis

Table F1: Sensitivity Analyses Considered in this Appendix

| | S&P 500 | Russell 1000 | Russell 3000 | 12 Months Before Event Date | 6 Months Before Event Date | 12 Months Before Class Period | 6 Months Before Class Period | Class Period | Normal | SQ |
|---|---|---|---|---|---|---|---|---|---|---|
| Main Body Approach | X | | | X | | | | | X | |
| Sensitivity 1 | X | | | X | | | | | | X |
| Sensitivity 2 | X | | | | X | | | | X | |
| Sensitivity 3 | X | | | | X | | | | | X |
| Sensitivity 4 | X | | | | | X | | | X | |
| Sensitivity 5 | X | | | | | X | | | | X |
| Sensitivity 6 | X | | | | | | X | | X | |
| Sensitivity 7 | X | | | | | | X | | | X |
| Sensitivity 8 | X | | | | | | | X | X | |
| Sensitivity 9 | X | | | | | | | X | | X |
| Sensitivity 10 | | X | | X | | | | | X | |
| Sensitivity 11 | | X | | X | | | | | | X |
| Sensitivity 12 | | X | | | X | | | | X | |
| Sensitivity 13 | | X | | | X | | | | | X |
| Sensitivity 14 | | X | | | | X | | | X | |
| Sensitivity 15 | | X | | | | X | | | | X |
| Sensitivity 16 | | X | | | | | X | | X | |
| Sensitivity 17 | | X | | | | | X | | | X |
| Sensitivity 18 | | X | | | | | | X | X | |
| Sensitivity 19 | | X | | | | | | X | | X |
| Sensitivity 20 | | | X | X | | | | | X | |
| Sensitivity 21 | | | X | X | | | | | | X |
| Sensitivity 22 | | | X | | X | | | | X | |
| Sensitivity 23 | | | X | | X | | | | | X |
| Sensitivity 24 | | | X | | | X | | | X | |

APPENDIX F

Sensitivity Analysis

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sensitivity 25 | X | | | X | | | | X |
| Sensitivity 26 | X | | | | X | | X | |
| Sensitivity 27 | X | | | | X | | | X |
| Sensitivity 28 | X | | | | | X | X | |
| Sensitivity 29 | X | | | | | X | | X |

APPENDIX F
Sensitivity Analysis

7. Table F2 reports event-study results for Alphabet's Class A stock. For the Main Body Approach and the even-numbered sensitivity analyses (*i.e.*, Sensitivity 2, Sensitivity 4, Sensitivity 6 and so on), each row reports the cumulative abnormal return and the t-statistic, as well as the Ferrell null p-value and the likelihood ratio based on the assumption that daily residuals are normally distributed. For the odd-numbered sensitivity analyses (*i.e.*, Sensitivity 1, Sensitivity 3, Sensitivity 5 and so on), each row reports only the Ferrell null p-value based on the SQ test, which does not rely on the normal-distribution assumption for daily residuals.[3]

[3] Because the SQ test is based on the same cumulative abnormal returns and t-statistic as tests based on assuming the normal distribution characterizes daily residuals, the odd-numbered sensitivity analyses have the same abnormal return and t-statistic as do the even-numbered ones, so I omit these statistics from the even-numbered rows. To provide a likelihood ratio for the SQ test, it would be necessary to estimate the probability density function of daily residuals nonparametrically, which I did not do. Given the similarity of the p-values reported in Tables F2 and F3, there is no reason for concern that the daily residuals' distribution is importantly non-normal, nor, thus, that the likelihood ratio would differ importantly when estimated nonparametrically.

APPENDIX F
Sensitivity Analysis

Table F2: Event-Study Results for Alphabet's Class A Stock

| | October 8, 2018 | | | | October 9, 2018 | | | | October 10, 2018 | | | | Cumulative | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Specification | AR | t | p* | LR | AR | t | p * | LR | AR | t | p* | LR | AR | t | p* | LR |
| Main Body Approach | -1.60% | -1.53 | 0.063 | 3.2 | -0.51% | -0.49 | 0.313 | 1.1 | -1.25% | -1.2 | 0.116 | 2 | -3.36% | -1.85 | 0.032 | 5.6 |
| Sensitivity 1 | | | 0.072 | | | | 0.261 | | | | 0.112 | | | | 0.032 | |
| Sensitivity 2 | -1.58% | -1.48 | 0.069 | 3 | -0.56% | -0.53 | 0.299 | 1.1 | -1.52% | -1.43 | 0.076 | 2.8 | -3.66% | -1.99 | 0.024 | 7.2 |
| Sensitivity 3 | | | 0.072 | | | | 0.272 | | | | 0.08 | | | | 0.02 | |
| Sensitivity 4 | -1.60% | -1.57 | 0.059 | 3.4 | -0.53% | -0.52 | 0.302 | 1.1 | -1.33% | -1.3 | 0.097 | 2.3 | -3.46% | -1.95 | 0.025 | 6.7 |
| Sensitivity 5 | | | 0.06 | | | | 0.231 | | | | 0.088 | | | | 0.033 | |
| Sensitivity 6 | -1.64% | -1.54 | 0.062 | 3.3 | -0.52% | -0.49 | 0.311 | 1.1 | -1.18% | -1.11 | 0.133 | 1.9 | -3.35% | -1.82 | 0.035 | 5.2 |
| Sensitivity 7 | | | 0.065 | | | | 0.234 | | | | 0.105 | | | | 0.037 | |
| Sensitivity 8 | -1.54% | -1.45 | 0.073 | 2.9 | -0.53% | -0.5 | 0.308 | 1.1 | -1.51% | -1.42 | 0.078 | 2.7 | -3.58% | -1.95 | 0.026 | 6.7 |
| Sensitivity 9 | | | 0.078 | | | | 0.287 | | | | 0.078 | | | | 0.023 | |
| Sensitivity 10 | -1.49% | -1.43 | 0.076 | 2.8 | -0.43% | -0.41 | 0.341 | 1.1 | -1.14% | -1.1 | 0.137 | 1.8 | -3.05% | -1.7 | 0.045 | 4.2 |
| Sensitivity 11 | | | 0.084 | | | | 0.289 | | | | 0.129 | | | | 0.044 | |
| Sensitivity 12 | -1.48% | -1.41 | 0.079 | 2.7 | -0.47% | -0.45 | 0.326 | 1.1 | -1.35% | -1.29 | 0.099 | 2.3 | -3.30% | -1.82 | 0.035 | 5.2 |
| Sensitivity 13 | | | 0.08 | | | | 0.32 | | | | 0.112 | | | | 0.029 | |
| Sensitivity 14 | -1.49% | -1.45 | 0.073 | 2.9 | -0.46% | -0.45 | 0.327 | 1.1 | -1.28% | -1.25 | 0.106 | 2.2 | -3.22% | -1.82 | 0.035 | 5.2 |
| Sensitivity 15 | | | 0.068 | | | | 0.251 | | | | 0.084 | | | | 0.041 | |
| Sensitivity 16 | -1.52% | -1.43 | 0.076 | 2.8 | -0.44% | -0.41 | 0.34 | 1.1 | -1.09% | -1.03 | 0.152 | 1.7 | -3.05% | -1.66 | 0.048 | 4 |
| Sensitivity 17 | | | 0.089 | | | | 0.274 | | | | 0.105 | | | | 0.05 | |
| Sensitivity 18 | -1.45% | -1.39 | 0.082 | 2.6 | -0.44% | -0.42 | 0.337 | 1.1 | -1.31% | -1.25 | 0.105 | 2.2 | -3.20% | -1.77 | 0.039 | 4.8 |
| Sensitivity 19 | | | 0.087 | | | | 0.33 | | | | 0.122 | | | | 0.035 | |
| Sensitivity 20 | -1.48% | -1.43 | 0.076 | 2.8 | -0.42% | -0.41 | 0.342 | 1.1 | -1.12% | -1.08 | 0.139 | 1.8 | -3.01% | -1.69 | 0.046 | 4.1 |
| Sensitivity 21 | | | 0.08 | | | | 0.289 | | | | 0.124 | | | | 0.045 | |
| Sensitivity 22 | -1.48% | -1.42 | 0.077 | 2.8 | -0.45% | -0.43 | 0.332 | 1.1 | -1.24% | -1.2 | 0.116 | 2 | -3.17% | -1.76 | 0.039 | 4.7 |
| Sensitivity 23 | | | 0.072 | | | | 0.304 | | | | 0.128 | | | | 0.033 | |
| Sensitivity 24 | -1.46% | -1.43 | 0.077 | 2.8 | -0.46% | -0.45 | 0.327 | 1.1 | -1.32% | -1.29 | 0.099 | 2.3 | -3.25% | -1.83 | 0.034 | 5.3 |
| Sensitivity 25 | | | 0.068 | | | | 0.251 | | | | 0.08 | | | | 0.04 | |

APPENDIX F
Sensitivity Analysis

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sensitivity 26 | -1.50% | -1.41 | 0.079 | 2.7 | -0.43% | -0.41 | 0.341 | 1.1 | -1.10% | -1.04 | 0.149 | 1.7 | -3.04% | -1.65 | 0.049 | 3.9 |
| Sensitivity 27 | | | 0.081 | | | | 0.274 | | | | 0.097 | | | | 0.051 | |
| Sensitivity 28 | -1.45% | -1.41 | 0.08 | 2.7 | -0.42% | -0.4 | 0.344 | 1.1 | -1.18% | -1.14 | 0.127 | 1.9 | -3.04% | -1.7 | 0.044 | 4.3 |
| Sensitivity 29 | | | 0.078 | | | | 0.313 | | | | 0.148 | | | | 0.04 | |

APPENDIX F
Sensitivity Analysis

8. The results in Table F2 are highly similar across specifications. For October 8, 2018, the Ferrell null p-value is always above 0.05 and below 0.10, with likelihood ratios in the neighborhood of 3. For October 9, 2018, the Ferrell null p-value is generally between 0.3 and 0.35, with likelihood ratios always equal to 1.1. For October 10, 2018, the Ferrell null p-value is always between 0.08 and 0.15 (to two decimal places), with likelihood ratios between 1.7 and 2.8. For the cumulative abnormal return over the three days of October 8-10, 2018, the Ferrell null p-value never is always below 0.050, and the likelihood ratio ranges from 4 to 7 (to zero decimal places).

9. Table F3 reports event-study results for Alphabet's Class A stock. Each row reports the results for each of the three event dates as well as the results for the three dates considered cumulatively. For each of these four date groups, the table reports the abnormal return, the t-statistic, the Ferrell null p-value, and the likelihood ratio that compares the likelihood of price impact equal to the estimated abnormal return to the likelihood of zero price impact.

# APPENDIX F
## Sensitivity Analysis

### Table F3: Event-Study Results for Alphabet's Class C Stock

| | October 8, 2018 | | | | October 9, 2018 | | | | October 10, 2018 | | | | Cumulative | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Specification | AR | t | p* | LR | AR | t | p * | LR | AR | t | p* | LR | AR | t | p* | LR |
| Main Body Approach | -1.32% | -1.28 | 0.101 | 2.3 | -0.46% | -0.44 | 0.329 | 1.1 | -1.62% | -1.57 | 0.058 | 3.4 | -3.40% | -1.9 | 0.029 | 6.1 |
| Sensitivity 1 | | | 0.108 | | | | 0.261 | | | | 0.06 | | | | 0.029 | |
| Sensitivity 2 | -1.28% | -1.24 | 0.107 | 2.2 | -0.50% | -0.49 | 0.313 | 1.1 | -1.90% | -1.84 | 0.033 | 5.5 | -3.69% | -2.06 | 0.02 | 8.4 |
| Sensitivity 3 | | | 0.128 | | | | 0.28 | | | | 0.04 | | | | 0.016 | |
| Sensitivity 4 | -1.32% | -1.28 | 0.1 | 2.3 | -0.48% | -0.47 | 0.32 | 1.1 | -1.70% | -1.65 | 0.049 | 3.9 | -3.51% | -1.97 | 0.025 | 6.9 |
| Sensitivity 5 | | | 0.076 | | | | 0.243 | | | | 0.048 | | | | 0.031 | |
| Sensitivity 6 | -1.37% | -1.27 | 0.102 | 2.2 | -0.48% | -0.45 | 0.328 | 1.1 | -1.56% | -1.45 | 0.074 | 2.9 | -3.40% | -1.83 | 0.034 | 5.3 |
| Sensitivity 7 | | | 0.089 | | | | 0.226 | | | | 0.081 | | | | 0.034 | |
| Sensitivity 8 | -1.25% | -1.23 | 0.11 | 2.1 | -0.47% | -0.47 | 0.32 | 1.1 | -1.90% | -1.86 | 0.031 | 5.7 | -3.62% | -2.05 | 0.02 | 8.2 |
| Sensitivity 9 | | | 0.139 | | | | 0.287 | | | | 0.043 | | | | 0.018 | |
| Sensitivity 10 | -1.20% | -1.18 | 0.119 | 2 | -0.37% | -0.36 | 0.358 | 1.1 | -1.51% | -1.48 | 0.07 | 3 | -3.08% | -1.74 | 0.041 | 4.6 |
| Sensitivity 11 | | | 0.12 | | | | 0.305 | | | | 0.068 | | | | 0.04 | |
| Sensitivity 12 | -1.18% | -1.16 | 0.122 | 2 | -0.41% | -0.41 | 0.342 | 1.1 | -1.74% | -1.71 | 0.044 | 4.3 | -3.33% | -1.89 | 0.029 | 6 |
| Sensitivity 13 | | | 0.144 | | | | 0.312 | | | | 0.04 | | | | 0.024 | |
| Sensitivity 14 | -1.20% | -1.17 | 0.122 | 2 | -0.41% | -0.39 | 0.346 | 1.1 | -1.65% | -1.6 | 0.055 | 3.6 | -3.26% | -1.83 | 0.034 | 5.3 |
| Sensitivity 15 | | | 0.096 | | | | 0.271 | | | | 0.056 | | | | 0.04 | |
| Sensitivity 16 | -1.24% | -1.16 | 0.123 | 2 | -0.39% | -0.37 | 0.357 | 1.1 | -1.46% | -1.36 | 0.086 | 2.5 | -3.09% | -1.67 | 0.047 | 4 |
| Sensitivity 17 | | | 0.097 | | | | 0.298 | | | | 0.089 | | | | 0.047 | |
| Sensitivity 18 | -1.15% | -1.15 | 0.124 | 1.9 | -0.38% | -0.38 | 0.351 | 1.1 | -1.70% | -1.7 | 0.044 | 4.3 | -3.24% | -1.87 | 0.031 | 5.7 |
| Sensitivity 19 | | | 0.157 | | | | 0.322 | | | | 0.043 | | | | 0.028 | |
| Sensitivity 20 | -1.19% | -1.17 | 0.121 | 2 | -0.37% | -0.36 | 0.359 | 1.1 | -1.49% | -1.47 | 0.071 | 2.9 | -3.05% | -1.73 | 0.042 | 4.5 |
| Sensitivity 21 | | | 0.116 | | | | 0.293 | | | | 0.068 | | | | 0.04 | |
| Sensitivity 22 | -1.18% | -1.17 | 0.121 | 2 | -0.39% | -0.39 | 0.348 | 1.1 | -1.64% | -1.62 | 0.052 | 3.7 | -3.21% | -1.84 | 0.033 | 5.4 |
| Sensitivity 23 | | | 0.144 | | | | 0.32 | | | | 0.048 | | | | 0.027 | |
| Sensitivity 24 | -1.18% | -1.14 | 0.127 | 1.9 | -0.41% | -0.4 | 0.345 | 1.1 | -1.70% | -1.65 | 0.05 | 3.9 | -3.29% | -1.84 | 0.033 | 5.4 |
| Sensitivity 25 | | | 0.096 | | | | 0.263 | | | | 0.052 | | | | 0.039 | |
| Sensitivity 26 | -1.22% | -1.14 | 0.127 | 1.9 | -0.39% | -0.36 | 0.359 | 1.1 | -1.47% | -1.38 | 0.084 | 2.6 | -3.08% | -1.66 | 0.048 | 4 |
| Sensitivity 27 | | | 0.097 | | | | 0.29 | | | | 0.081 | | | | 0.048 | |

APPENDIX F

Sensitivity Analysis

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sensitivity 28 | -1.15% | -1.17 | 0.122 | 2 | -0.36% | -0.37 | 0.357 | 1.1 | -1.58% | -1.6 | 0.054 | 3.6 | -3.10% | -1.81 | 0.035 | 5.2 |
| Sensitivity 29 | | | 0.157 | | | | 0.322 | | | | 0.052 | | | | 0.032 | |

APPENDIX F
Sensitivity Analysis

10. The results in Table F3 are highly similar across specifications. For October 8, 2018, the Ferrell null p-value is always between 0.08 and below 0.16 (to two decimals), with likelihood ratios in the neighborhood of 2. For October 9, 2018, the Ferrell null p-value is generally between 0.24 and 0.36, with likelihood ratios always equal to 1.1. For October 10, 2018, the Ferrell null p-value is always between 0.03 and 0.09 (to two decimal places), with likelihood ratios between 2.5 and 5.7. For the cumulative abnormal return over the three days of October 8-10, 2018, the Ferrell null p-value is always below 0.050, and the likelihood ratio ranges from 4 to 8 (to zero decimal places).