# Exhibit 5

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| In re FACEBOOK, INC. SECURITIES LITIGATION | No. 5:18-cv-01725-EJD |

# EXPERT REPORT OF DANIEL R. FISCHEL

October 9, 2026

## I. QUALIFICATIONS

1. I am Chairman of Compass Lexecon LLC, a consulting firm that specializes in the application of economics to a variety of legal and regulatory issues. I am also the Lee and Brena Freeman Professor of Law and Business Emeritus at The University of Chicago Law School. I have served previously as Dean of The University of Chicago Law School, Director of the Law and Economics Program at The University of Chicago, and as a Chaired Visiting Professor of Law at the Northwestern Law School. I have also served, by courtesy, as a Professor at The University of Chicago Graduate School of Business and the Kellogg School of Management at Northwestern University.

2. Both my research and my teaching have concerned the economics of corporate law and financial markets. I have published approximately 50 articles in leading legal and economics journals and am co-author, with Judge Frank Easterbrook of the Seventh Circuit Court of Appeals, of the book *The Economic Structure of Corporate Law* (Harvard University Press, 1991). Courts of all levels, including the Supreme Court of the United States, have cited my articles as authoritative. My curriculum vitae, which contains a list of my publications, is attached hereto as **Appendix A**.

3. I have served as a consultant or adviser on economic issues to, among others, the United States Department of Justice, the United States Securities and Exchange Commission, the National Association of Securities Dealers, the New York Stock Exchange, the Chicago Board of Trade, the Chicago Mercantile Exchange, the New York Mercantile Exchange, the United States Department of Labor, the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, and the Federal Trade Commission.

4. I am a member of the American Economic Association and the American Finance Association. I am also a former member of the Board of Directors of the Center for the Study of

the Economy and the State at The University of Chicago, and former Chairman of the American Association of Law Schools' Section on Law and Economics. I have testified as an expert witness in proceedings in arbitrations and multiple proceedings in U.S. federal and state courts and courts in other countries as detailed in **Appendix A**.

5. My billing rate is $2,250 per hour. My compensation does not depend on the outcome of this case. A list of the materials I have relied upon is included in **Appendix B**.

## II. BACKGROUND AND SUMMARY OF OPINIONS

### A. Relevant Background

6. I understand the relevant background to be as follows:

7. Facebook, Inc. ("Facebook" or the "Company")[1] operates the Facebook Platform enabling "people to connect, share, discover, and communicate with each other on mobile devices and personal computers."[2] Facebook generates "substantially all of [its] revenue from selling advertising placements to marketers" who "purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites."[3] Third-party applications ("apps") include any interfaces that users log into with

---

1. Facebook changed its name to Meta on October 28, 2021. "Introducing Meta: A Social Technology Company," Facebook Press Release, October 28, 2021, https://about.fb.com/news/2021/10/facebook-company-is-now-meta/.
2. Facebook Inc. Form 10-K for the fiscal year ended December 31, 2017, https://www.sec.gov/Archives/edgar/data/1326801/000132680118000009/fb-12312017x10k.htm, p. 5.
3. Facebook Inc. Form 10-K for the fiscal year ended December 31, 2017, https://www.sec.gov/Archives/edgar/data/1326801/000132680118000009/fb-12312017x10k.htm, p. 5.

Facebook or connect to a user's Facebook account.[4] For example, an app could be a game that a user accesses through Facebook.

8. In 2014, Dr. Aleksandr Kogan, a researcher at the University of Cambridge, launched a personality quiz Facebook app called "thisisyourdigitallife."[5] Users of the app consented to share their data with Dr. Kogan's company, Global Science Research ("GSR").[6] Facebook's data policy at the time permitted users to share not only their data but also their friends' data to the extent their friends' privacy settings allowed such sharing with third-party apps.[7]

---

4. Facebook, "Manage the privacy settings for third-party apps you connected to Facebook," https://www.facebook.com/help/218345114850283. In 2007, Facebook's CEO Mr. Mark Zuckerberg stated that allowing users access to third-party applications through Facebook "is good for us because if developers build great applications then they're providing a service to our users and strengthening the social graph… We provide the integration and distribution and developers provide the applications. We help users share more information and together we benefit." "Facebook Unveils Platform for Developers of Social Applications," Facebook Press Release, May 24, 2007, https://about.fb.com/news/2007/05/facebook-unveils-platform-for-developers-of-social-applications/.

5. *See* "Facebook responses to open questions from the 'Committee on Legal Affairs and Consumer Protection' and the 'Committee on the Digital Agenda,'" Facebook Press Release, April 27, 2018, https://about.fb.com/wp-content/uploads/sites/4/2018/06/final-responses-to-german-committees.pdf, at 1, 15.

6. *See* "Facebook responses to open questions from the 'Committee on Legal Affairs and Consumer Protection' and the 'Committee on the Digital Agenda,'" Facebook Press Release, April 27, 2018, https://about.fb.com/wp-content/uploads/sites/4/2018/06/final-responses-to-german-committees.pdf, at 1, 7, 15; "Ted Cruz using firm that harvested data on millions of unwitting Facebook users," *The Guardian*, December 11, 2015, https://www.theguardian.com/us-news/2015/dec/11/senator-ted-cruz-president-campaign-facebook-user-data.

7. *See* "Facebook responses to open questions from the 'Committee on Legal Affairs and Consumer Protection' and the 'Committee on the Digital Agenda,'" Facebook Press Release, April 27, 2018, https://about.fb.com/wp-content/uploads/sites/4/2018/06/final-responses-to-german-committees.pdf, at 1, 7, 9, 15-16. I understand that the operative version of Graph API at the time was called "V1.0." Facebook launched a new version of Graph API ("V2.0") on April 30, 2014, explaining that it had "heard from people that they're often surprised when a friend shares their information with an app," that it "updated Facebook Login so that each person decides what information they want to share about themselves, including their friend list," and that the changes "are available to all new apps starting today while existing apps have a full year to upgrade (April 30, 2015)." *Id.*, at 15-16 & "The New Facebook Login and Graph API 2.0," Facebook Inc., April 30, 2014, https://developers.facebook.com/blog/post/2014/04/30/the-new-facebook-login.

9. In June 2014, GSR started a collaboration with SCL Elections Ltd. ("SCL"), the parent company of political consulting firm Cambridge Analytica.[8] Through this collaboration, Cambridge Analytica obtained data on tens of millions of Facebook users from Mr. Kogan and GSR.[9]

10. In an article published on December 11, 2015, *The Guardian* reported that "Ted Cruz's presidential campaign is using psychological data based on research spanning tens of millions of Facebook users, harvested largely without their permission, to boost his surging White House run and gain an edge over Donald Trump and other Republican rivals."[10] The article explained how Dr. Kogan's company GSR collected Facebook users' data and used it to generate sophisticated models of the users' personalities, that Cambridge Analytica's parent SCL had contracted with GSR to profile American citizens, and that Cambridge Analytica was embedded within Senator Ted Cruz's campaign to use the profiles to help him win votes.[11] The article further reported that Facebook was "carefully investigating this situation," stating that "misleading people or misusing their information is a direct violation of our policies and we will

8. *See*, e.g., "Written evidence submitted by Aleksandr Kogan," UK Parliament, April 16, 2018, https://www.parliament.uk/globalassets/documents/commons-committees/culture-media-and-sport/Written-evidence-Aleksandr-Kogan.pdf.

9. *See*, e.g., "Ted Cruz using firm that harvested data on millions of unwitting Facebook users," *The Guardian*, December 11, 2015, https://www.theguardian.com/us-news/2015/dec/11/senator-ted-cruz-president-campaign-facebook-user-data, reporting that "Ted Cruz's presidential campaign is using psychological data based on research spanning tens of millions of Facebook users, harvested largely without their permission."

10. "Ted Cruz using firm that harvested data on millions of unwitting Facebook users," *The Guardian*, December 11, 2015, https://www.theguardian.com/us-news/2015/dec/11/senator-ted-cruz-president-campaign-facebook-user-data.

11. "Ted Cruz using firm that harvested data on millions of unwitting Facebook users," *The Guardian*, December 11, 2015, https://www.theguardian.com/us-news/2015/dec/11/senator-ted-cruz-president-campaign-facebook-user-data.

take swift action against companies that do, including banning those companies from Facebook and requiring them to destroy all improperly collected data."[12]

11. Subsequent articles by various news outlets reported on Cambridge Analytica's use of Facebook user data. In particular, an article published on March 30, 2017 by *The Intercept* reported:

> Shortly after The Guardian published its 2015 article, Facebook contacted Global Science Research and requested that it delete the data it had taken from Facebook users. Facebook's policies give Facebook the right to delete data gathered by any app deemed to be "negatively impacting the Platform." The company believes that Kogan and SCL complied with the request, which was made during the Republican primary, before Cambridge Analytica switched over from Ted Cruz's campaign to Donald Trump's. It remains unclear what was ultimately done with the Facebook data, or whether any models or algorithms derived from it wound up being used by the Trump campaign.[13]

12. After the market closed on Friday March 16, 2018, Facebook issued a press release (the "March 16, 2018 Press Release") announcing that it was suspending Cambridge Analytica and others from its platform.[14] The press release explained that the Company had demanded and received "certifications from Kogan and all parties he had given data to that the

---

12. "Ted Cruz using firm that harvested data on millions of unwitting Facebook users," *The Guardian*, December 11, 2015, https://www.theguardian.com/us-news/2015/dec/11/senator-ted-cruz-president-campaign-facebook-user-data.

13. "Facebook Failed to Protect 30 Million Users From Having Their Data Harvested By Trump Campaign Affiliate," *The Intercept,* March 30, 2017, https://theintercept.com/2017/03/30/facebook-failed-to-protect-30-million-users-from-having-their-data-harvested-by-trump-campaign-affiliate/ (capitalization omitted). The article also reported that "all five of the sources interviewed by The Intercept confirmed that Kogan's work on behalf of SCL involved collecting data from survey participants' networks of Facebook friends, individuals who had not themselves consented to give their data to Global Science Research and were not aware that they were the objects of Kogan's study." *Id.*

14. "Suspending Cambridge Analytica and SCL Group From Facebook," Facebook Press Release, March 16, 2018, https://about.fb.com/news/2018/03/suspending-cambridge-analytica/.

information had been destroyed" but that "[s]everal days ago, we received reports that, contrary to the certifications we were given, not all data was deleted."[15]

13. On Saturday March 17, 2018, *The Guardian* and *The New York Times* published articles reporting on the Facebook data used by Cambridge Analytica, stating that Facebook "failed to alert users and took only limited steps to recover and secure the private information of more than 50 million individuals"[16] and that Cambridge Analytica still possessed "most or all of the [data] trove," copies of which "still remain beyond Facebook's control."[17] The articles emphasized that this disclosure came "only weeks after indictments of 13 Russians by the special counsel Robert Mueller which stated they had used the platform to perpetrate 'information warfare' against the US"[18] and that "Facebook … is already grappling with intense criticism over the spread of Russian propaganda and fake news."[19] Facebook's stock price declined by 6.8% on Monday March 19, 2018, the first trading day following the disclosures that the user data had not been deleted.[20]

---

15. "Suspending Cambridge Analytica and SCL Group From Facebook," Facebook Press Release, March 16, 2018, https://about.fb.com/news/2018/03/suspending-cambridge-analytica/.

16. "Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach," *The Guardian*, March 17, 2018, https://www.theguardian.com/news/2018/mar/17/cambridge-analytica-facebook-influence-us-election.

17. "How Trump Consultants Exploited the Facebook Data of Millions," *The New York Times*, March 17, 2018, https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html.

18. "Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach," *The Guardian*, March 17, 2018, https://www.theguardian.com/news/2018/mar/17/cambridge-analytica-facebook-influence-us-election.

19. "How Trump Consultants Exploited the Facebook Data of Millions," *The New York Times*, March 17, 2018, https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html.

20. CRSP US Stock and Index Database from Morningstar.

14. Before the market opened on Tuesday, March 20, 2018, *The Guardian* published an article in which former Facebook employee Sandy Parakilas, "the platform operations manager at Facebook responsible for policing data breaches by third-party software developers between 2011 and 2012" who left the Company in 2012, asserted that "[h]undreds of millions of Facebook users are likely to have had their private information harvested by companies that exploited the same terms as the firm that collected data and passed it on to Cambridge Analytica."[21] On the same day, reports emerged that the FTC was investigating Facebook and a campaign to "#deleteFacebook" gained traction.[22] Facebook's stock price declined by 2.6% on March 20, 2018.[23]

15. In an article published on Sunday June 3, 2018, *The New York Times* reported that:

> Facebook has reached data-sharing partnerships with at least 60 device makers — including Apple, Amazon, BlackBerry, Microsoft and Samsung — over the last decade… Facebook allowed the device companies access to the data of users' friends without their explicit consent, even after declaring that it would no longer share such information with outsiders. Some device makers could retrieve personal information even from users' friends who believed they had barred any sharing, The New York Times found.[24]

The article also reported: "Facebook began moving to wind down the partnerships in April, after assessing its privacy and data practices in the wake of the Cambridge Analytica scandal. …

---

21. "'Utterly horrifying': ex-Facebook insider says covert data harvesting was routine," *The Guardian*, March 20, 2018, https://www.theguardian.com/news/2018/mar/20/facebook-data-cambridge-analytica-sandy-parakilas.

22. "Facebook stock takes another hit amid reported probe, #DeleteFacebook campaign," *San Francisco Chronicle*, March 21, 2018, https://www.sfchronicle.com/business/article/Facebook-stock-takes-another-hit-amid-probe-12768613.php.

23. CRSP US Stock and Index Database from Morningstar.

24. "Facebook Gave Device Makers Deep Access to Data on Users and Friends," *The New York Times*, June 3, 2018, https://www.nytimes.com/interactive/2018/06/03/technology/facebook-device-partners-users-friends-data.html.

About 22 of them have been shut down."[25] Later that day, Facebook responded that it entered into these partnerships so that companies can "recreate Facebook-like experiences for their individual devices or operating systems" and that "[t]hese partners signed agreements that prevented people's Facebook information from being used for any other purpose than to recreate Facebook-like experiences."[26] I understand that these partnership agreements relate to a practice that Plaintiffs refer to as "whitelisting," under which Facebook provided select entities with access to Facebook data while restricting access to others. I further understand that Cambridge Analytica and SCL were not among the whitelisted entities.[27] Facebook's stock price declined by 0.4% on Monday, June 4, 2018, the first trading day after the disclosure.[28]

16. On July 25, 2018, Facebook announced financial results for the second quarter of 2018 ("Q2 2018") and lowered its guidance.[29] Facebook's stock price declined by 19.0% on July 26, 2018, the first trading day after the Q2 2018 earnings announcement and conference call.[30]

---

25. "Facebook Gave Device Makers Deep Access to Data on Users and Friends," *The New York Times*, June 3, 2018, https://www.nytimes.com/interactive/2018/06/03/technology/facebook-device-partners-users-friends-data.html.

26. "Why We Disagree with The New York Times," Facebook Inc., June 3, 2018, https://about.fb.com/news/2018/06/why-we-disagree-with-the-nyt/.

27. "Why We Disagree with The New York Times," Facebook Inc., June 3, 2018, https://about.fb.com/news/2018/06/why-we-disagree-with-the-nyt/ (explaining that, "[t]his is very different from the public APIs used by third-party developers, like Aleksandr Kogan. These third-party developers were not allowed to offer versions of Facebook to people and, instead, used the Facebook information people shared with them to build completely new experiences.").

28. CRSP US Stock and Index Database from Morningstar.

29. Facebook Inc., FQ2 2018 Earnings Call Transcript, July 25, 2018, 5:00 PM ET. The accompanying press release was issued at 4:05 PM ET. "Facebook Reports Second Quarter 2018 Results," *PR Newswire*, July 25, 2018, 4:05 PM ET.

30. CRSP US Stock and Index Database from Morningstar.

### B. Plaintiffs' Claims

17. Plaintiffs bring this action on behalf of all persons who purchased Facebook common stock from February 3, 2017 through July 25, 2018 (the "Class Period") claiming that Facebook and its Chief Executive Officer ("CEO") Mark Zuckerberg, former Chief Operating Officer ("COO") Sheryl Sandberg, and former Chief Financial Officer ("CFO") David Wehner (collectively, "Defendants") made materially misleading or false statements that, when corrected, caused billions of dollars of losses in shareholder value.[31]

18. I understand from counsel that, after extensive briefing and appeals to the Ninth Circuit and Supreme Court that resulted in an appellate decision from the Ninth Circuit issued in 2023,[32] the most recent motion to dismiss order issued on February 27, 2026 ("2026 MTD Order") describes the three theories of liability contemplated in the operative Complaint as follows:

> **Initial Misuse:** "Defendants knew that … in 2015, Aleksandr Kogan, through his company GSR, sold user data to Cambridge Analytica, which in turn sold it to Ted Cruz's presidential campaign…"[33]
>
> **Continued Misuse:** "Defendants knew that … Cambridge Analytica did not delete users' data and indeed continued to use it to support Donald Trump's 2016 presidential campaign."[34]
>
> **Whitelisting:** "Defendants exempted a wide array of 'whitelisted' app developers and corporations from Facebook's general prohibition on third-

---

31. Fourth Amended Complaint In re Facebook, Inc. Securities Litigation, 5:18-cv-01725-EJD, July 1, 2025 ("Complaint"), ¶ 1.

32. In re Facebook, Inc. Securities Litigation, Order and Amended Opinion, December 4, 2023 ("2023 Ninth Circuit Order").

33. 2026 MTD Order, at 19. *See also* Complaint ¶ 36(a)-(c) describing factual allegations regarding Facebook's knowledge about the initial misuse of the data. I understand from counsel that the surviving claims concern the omission of the Initial Misuse itself, and that this Court has dismissed the claims based on Cambridge Analytica's Continued Misuse and the Investigation Statement.

34. 2026 MTD Order, at 19.

> party access to user friend data in exchange for advertising revenues and other business benefits."[35]

I further understand that the Court dismissed the Continued Misuse theory in its 2026 MTD Order,[36] and that the remaining claims are the Initial Misuse[37] and Whitelisting[38] theories.

19. The 2026 MTD Order describes the three categories of challenged statements contemplated in the operative Complaint as follows:

> **Risk Factor Statements:** "In 2016, Facebook represented in its 2016 Form 10-K filed with the Securities Exchange Commission ("SEC") that third-party misuse of Facebook users' personal data was a purely hypothetical risk. [Complaint] ¶ 442. (Facebook made the same statements in later disclosures.) *Id*., ¶¶ 443–44."[39]

> **Investigation Statement:** "On March 30, 2017, in response to an article titled 'Facebook Failed to Protect 30 Million Users From Having Their Data Harvested by a Trump Campaign Affiliate,' Facebook spokesperson Andy Stone made a statement to a reporter from *The Intercept* saying, 'Our

---

35. 2026 MTD Order, at 30. *See also* Complaint ¶ 24 ("Defendants exempted a wide array of 'whitelisted' app developers and corporate giants… from this prohibition on third-party access to user friend data. Defendants allowed these entities and hundreds more to override user privacy settings in order to get this data in secret… in exchange for advertising revenues and other valuable business benefits.").

36. 2026 MTD Order, at 27, 29 ("Plaintiffs failed to plead adequate facts showing that Defendants knew or should have known that Cambridge Analytica had not deleted the misappropriated data… Accordingly, the Court's earlier finding Plaintiffs failed to plead scienter as to continued misuse stands as the law of the case.").

37. 2026 MTD Order, at 24 ("But here, Facebook did not simultaneously disclose the initial misuse in other contexts—news outlets did. Indeed, in response to the 2015 *Guardian* article—the one that broke the story of the initial misuse—Facebook merely promised that it was 'carefully investigating' Cambridge Analytica. Thus, the Court echoes the Ninth Circuit in finding that reasonable investors would not have known that Cambridge Analytica had improperly accessed Facebook users' data such that users did not have control over their personal information on the platform." (internal citations omitted)) and 26 ("For the foregoing reasons, the Court finds that Plaintiffs' claim may proceed insofar as it is based on the initial misuse portion of the Cambridge Analytica theory of fraud. This finding applies to both the user control statements and the risk factor statements.").

38. 2026 MTD Order, at 30 ("Defendants do not challenge that the user control statements were allegedly false or misleading in light of Defendants' failure to disclose Facebook's practice of whitelisting … Insofar as Plaintiffs' Section 10(b) and Rule 10b-5 claim is based on those grounds, it may proceed.").

39. 2026 MTD Order, at 3.

> investigation to date has not uncovered anything that suggests wrongdoing.' [Complaint] ¶¶ 17, 635."[40]
>
> **User Control Statements:** "Throughout the class period, Facebook made several statements assuring Facebook users they had control over their information and content on Facebook. See, e.g., [Complaint] ¶¶ 420, 464, 465, 608-17, 622."[41]

I understand from counsel that the Court dismissed the Investigation Statement in its 2026 MTD Order,[42] and that the remaining alleged misstatements are the Risk Factor Statements and the User Control Statements.

20. Plaintiffs allege that the Risk Factor Statements, which were made in Facebook's quarterly and annual reports filed with the U.S. Securities and Exchange Commission prior to the March 16, 2018 Press Release, were false and misleading because they omitted that the stated risks had already materialized.[43] Plaintiffs allege that the User Control Statements, which are from (1) an ongoing "Statement of Rights and Responsibilities" posted on Facebook's website throughout most of the Class Period and (2) several one-off statements, all but one of which coincided with or followed the March 16, 2018 Press Release, were false and misleading because they omitted that users could not control their data.[44] The specific alleged misstatements that I understand from counsel to still be at issue in this matter are listed in § V below. I understand

40. 2026 MTD Order, at 3.

41. 2026 MTD Order, at 4-5.

42. 2026 MTD Order, at 16-17, 19 ("In 2021, this Court found that Plaintiffs failed to establish scienter for [the investigation] statement: they did not adequately plead that Defendants knew Cambridge Analytica was using the misappropriated data after Facebook obtained deletion certifications. The Ninth Circuit reached the same conclusion, and expressly 'affirm[ed] the dismissal of the statements' … Plaintiffs … repleaded the [investigation statement, but]… the Ninth Circuit did not instruct this Court to allow further proceedings on the investigation statement, as it did for the user control statements and the risk statements." (internal citations omitted)).

43. Complaint ¶¶ 628-630, 633.

44. Complaint ¶¶ 608-618, 622-623, 626.

from counsel that the Whitelisting theory of liability is not applicable to the Risk Factor Statements.[45]

21. Plaintiffs allege that "[t]he relevant truth emerged through a series of corrective disclosures that collectively wiped out hundreds of billions of dollars in shareholder value."[46] First, they claim that in the March 16, 2018 Press Release, "Defendants admitted for the first time that 'we' had known '[i]n 2015' that Cambridge Analytica had misappropriated user data, via Kogan, in 'violation' of Facebook's 'Platform Policies.'"[47] They claim further corrective information was disclosed "[t]he following day, March 17, 2018, [when] *The New York Times* and *The Guardian* published articles regarding Cambridge Analytica's misappropriation and misuse of Facebook user data." I refer to these collectively as the "March 2018 Disclosures."

22. Second, Plaintiffs claim that the March 20, 2018 article in *The Guardian* "detail[ed] that app developers routinely practiced data harvesting using tactics similar to Cambridge Analytica's" and reported that a former Facebook employee, Sandy Parakilas, "had stated that Facebook's lax data use policies had likely been exploited by numerous other app developers, such that the 'majority of Facebook users' could have had their data harvested by app developers without their knowledge.'"[48] I refer to this as the "March 20, 2018 *Guardian* Article." Plaintiffs also claim that "Defendants, however, continued to conceal the full scope of

---

45. 2026 MTD Order, at 32 ("[T]he Court holds that the risk factor statements may not proceed insofar as they are based on the whitelisting theory.").

46. Lead Plaintiffs' Notice of Motion and Motion to Certify Class, Appoint Class Representatives, and Appoint Class Counsel, and Memorandum of Points and Authorities in Support Thereof, August 21, 2026 ("Plaintiffs' Class Cert Brief"), at 8.

47. Plaintiffs' Class Cert Brief, at 8.

48. Lead Plaintiffs' Amended Responses and Objections to Defendants' First Set of Interrogatories to Plaintiffs, August 21, 2026 ("Plaintiffs' Responses"), at 11.

the fraud, reassuring the market [on April 25, 2018] that 'we don't expect [the investigation to] have an impact on revenue.'"[49]

23. Third, Plaintiffs claim that "[o]n June 3, 2018, *The New York Times* reported that Facebook had given 'whitelisted' third parties unauthorized access to users' data, exposing the broader pattern of data abuse beyond Cambridge Analytica."[50] I refer to this as the "Whitelisting Disclosure."

24. Finally, Plaintiffs claim that "[o]n July 25, 2018, in its earnings announcement, Defendants disclosed the substantial impact their misconduct had on the Company's results, allowing investors to appreciate the significance of the Cambridge Analytica and whitelisting scandals" which "included lower-than-expected revenue growth, declining profitability, and flat or declining active user metrics."[51] I refer to this as the "July 2018 Disclosure."

25. Plaintiffs allege loss causation based on the declines in Facebook's stock price that occurred on March 19, 2018, March 20, 2018, and July 26, 2018.[52] Plaintiffs do not allege loss causation based on the price decline on June 4, 2018.

### C. The Gelbach Report

26. Plaintiffs submitted an expert report by Jonah B. Gelbach in which he offers two principal opinions. First, he opines that "Facebook Stock traded on a semi-strong form efficient market" during the Class Period, which "means that stock prices adjust relatively quickly to fully

---

49. Plaintiffs' Class Cert Brief, at 8, describing statements made when Facebook reported its first quarter results on April 25, 2018. Complaint ¶¶ 501-502. However, I understand from counsel that this statement is not an alleged misstatement.

50. Plaintiffs' Class Cert Brief, at 8-9.

51. Plaintiffs' Class Cert Brief, at 9.

52. Plaintiffs' Class Cert Brief, at 8-9.

reflect newly public information."[53] As Professor Gelbach explains, "it is widely accepted among economists that share price responds when value-relevant information about the company is made public" such that "when the public receives new and material positive news about a company, its share price rises, and when the public receives new and material negative news about a company, its share price falls."[54] He further explains that "this stock price response will tend to begin relatively quickly for securities traded in markets that are liquid and characterized by a substantial volume of trading."[55]

27. A primary support of Professor Gelbach's market efficiency opinion is his "event study evidence."[56] He explains that an event study is "a statistical technique for evaluating the direction and magnitude of a stock's response to events that may include price-relevant news about the stock."[57] Professor Gelbach also quotes Nobel laureate Eugene F. Fama[58] as stating: "The typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements."[59]

---

53. Expert Report of Jonah B. Gelbach, In re Facebook, Inc. Securities Litigation, Master File No. 5:18-cv-01725-EJD, August 20, 2026 ("Gelbach Report"), ¶¶ 10, 31(b).

54. Gelbach Report, ¶ 30.

55. Gelbach Report, ¶ 30. Professor Gelbach found that during the putative Class Period, "Facebook Stock's average weekly trading volume was 4.4% of its shares outstanding, more than twice the figure *Cammer* [a widely-cited opinion regarding indicia of an efficient market] describes as triggering a strong presumption of market efficiency." *Id.*, ¶¶ 35 & 41. He cites academic literature which "find[s] that greater liquidity in a stock's trading leads to 'better incorporation of private information into prices'" and that "'the more liquid the market is, the more efficient it is in incorporating information into prices.'" *Id.,* ¶ 30 n.47.

56. Gelbach Report, ¶ 10.

57. Gelbach Report, ¶ 57.

58. Professor Fama was awarded the Nobel Prize in Economics for his work on market efficiency, including the definition of semi-strong market efficiency. *See* "Scientific Background on the Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 2013 Understanding Asset Prices," *Economic Sciences Prize Committee of the Royal Swedish Academy of Sciences*, October 14, 2013, https://www.kva.se/app/uploads/2013/10/globalassets-priser-ekonomi-2013-scibackek13.pdf.

59. Gelbach Report, ¶ 32 n.49.

28. Professor Gelbach's second principal opinion is that "damages in this matter can be calculated on a classwide basis in a manner consistent with Plaintiffs' theory of liability."[60] In particular, he claims that "traditional tools of financial economics can be used to measure artificial price inflation on the dates relevant to this litigation consistent with Plaintiffs' theory of liability, based on common proof, and applicable classwide."[61] In support of his opinion and based on his claims regarding Plaintiffs' theory of liability, he "offer[s] provisional damages calculations" based on the price declines that occurred on March 19, 2018, March 20, 2018, and July 26, 2018.[62]

**D. Assignment and Summary of Opinions**

29. I have been retained by counsel for Defendants to address two topics. First, I was asked to assess whether there is any reliable economic evidence that the alleged misstatements had an impact on Facebook's stock price (i.e., "price impact") by analyzing the price movements when the alleged misstatements were corrected (i.e., the "back end"), as well as the price movements when the alleged misstatements were made (i.e., the "front end"). Second, I was asked to determine whether Professor Gelbach has provided reliable methods to estimate alleged classwide damages in a manner consistent with Plaintiffs' theory of liability.

30. Based on my professional experience and my review and analysis of the facts and circumstances of this case, I have reached the following principal conclusions:

- There is no reliable economic evidence of "back end" price impact.
    - The disclosure of the Initial Misuse did not impact Facebook's stock price.
    - The disclosure of Whitelisting did not impact Facebook's stock price.

60. Gelbach Report, ¶ 11.

61. Gelbach Report, ¶ 162.

62. Gelbach Report, ¶¶ 88 & 148.

    - Plaintiffs and Professor Gelbach instead focus on price declines following other disclosures that are not relevant in analyzing whether the disclosures of the Initial Misuse and Whitelisting had any impact on Facebook's stock price.

- There is no reliable economic evidence of "front end" price impact.

- Professor Gelbach fails to provide a reliable method to estimate alleged classwide damages in a manner consistent with Plaintiffs' theory of liability.

I provide the bases for these conclusions in the remainder of this report.

## III. EVENT STUDY ANALYSIS

31. An event study is a primary tool in analyzing the relationship between information and security price movements. An efficient market supports the use of an event study because a central tenet of the efficient market hypothesis is that as new information becomes public, stock prices "quickly and fully" reflect that information.[63] But not all information is value-relevant. For example, information that is expected or was previously disclosed will not impact the prices of stocks that trade in an efficient market because it does not alter the total mix of publicly available information, i.e., the price already reflects that information.[64] Otherwise, the efficient market hypothesis that all public information is reflected in a stock's price is violated.

32. Professor Gelbach's opinion that the market for Facebook stock was efficient and exhibited substantial liquidity indicates that investors traded on all public information throughout the putative Class Period. Moreover, institutions with at least $100 million in discretionary assets under management that were required to report their holdings to the SEC accounted for

63. C. P. Jones, *Investments: Analysis and Management,* 12th Ed. (John Wiley & Sons, Inc., 2013) p. 320.

64. E. J. Elton, M. J. Gruber, S. J. Brown, and W. N. Goetzmann, *Modern Portfolio Theory and Investment Analysis* (John Wiley & Sons, Inc., 2003), pp. 402, 414.

74% of Facebook's tradeable shares outstanding as of December 31, 2017,[65] demonstrating that many sophisticated investors who had the economic incentive and resources to ferret out and trade on value-relevant information invested in Facebook stock during the Class Period.[66]

33. Before discussing my event study analysis, it is important to recognize that an event study by itself does not establish whether specific information impacted a stock's price without analyzing the full context of that information and the price movement. In particular, a statistical analysis often cannot determine by itself the cause of the change when there are multiple pieces of new information disclosed at the same time, or whether the new information corrects prior alleged misstatements.

34. To understand why, it is important to understand what a statistical event study does and does not do. A company's stock price can move due to many reasons, including factors that affect the entire market, the industries in which the company operates, or the company alone. An event study takes into account the effect of contemporaneous market and industry factors on a stock price change (or "return") by estimating the price change net of these factors ("residual

---

65. According to Capital IQ, actively traded funds that held Facebook during the Class Period include Fidelity Contrafund and T. Rowe Price Blue Chip Growth Fund. *See* Fidelity Contrafund Summary Page, https://fundresearch.fidelity.com/mutual-funds/summary/316071109 ("Investing in securities of companies whose value FMR believes is not fully recognized by the public. Investing in either 'growth' stocks or 'value' stocks or both. Normally investing primarily in common stocks."); T. Rowe Price Blue Chip Growth Fund Summary Page, https://www.troweprice.com/financial-intermediary/us/en/investments/mutual-funds/us-products/blue-chip-growth-fund.html ("The fund primarily invests in common stocks and focuses on blue chip growth companies.").

66. Information will be reflected in the prices of stocks traded in an efficient market even if only a few investors are aware of it. As explained by Stiglitz (a Nobel Prize laureate) and Walsh (2006): "Economists have shown that efficient markets do not require that all participants have information. If enough participants have information, prices will move as if the whole market had the information." J. E. Stiglitz and C. E. Walsh, *Economics*, 4th Ed. (W.W. Norton & Co. 2006), at 882. Because not all market participants must know all public information for that information to be priced into a stock in an efficient market, a market participant's affirmation that they were unaware of previously disclosed information is not evidence that the information was not fully reflected in a stock's price when that information was first disclosed.

return" or "abnormal return").[67] In this way, an event study attempts to disaggregate the effect of market and industry news on a stock's return from that of other factors.

35. Stock prices can move for reasons unrelated to news, in other words there are normal, random daily movements in the prices of many stocks. Therefore, it is important to test whether the residual return is of a sufficient magnitude to be considered "statistically significant," i.e., significantly different from zero at conventional levels of significance, such that it is unlikely to be due to chance. Statistical significance is typically assessed by calculating a standardized measure of the size of the residual return known as a "*t*-statistic."[68] A *t*-statistic with an absolute value of 1.96 or greater denotes statistical significance at the 5 percent level of significance (a conventional level at which assessments of statistical significance are made, also commonly referred to as the 95% confidence interval) in a "two-tailed" test (i.e., testing for significance regardless of whether the residual return is positive or negative).[69] A *t*-statistic with an absolute value of 1.65 or greater denotes statistical significance at the 5 percent level of significance in a "one-tailed" test (i.e., testing for significance where the residual return has a particular sign).[70]

---

67. This is typically done by 1) estimating the relationship between changes in a company's stock price and changes in the performance of relevant market and industry indices, 2) using the relationship and the actual performance of these indices on the day in question to calculate an expected return, and 3) subtracting the expected return from the actual return to derive the residual return.

68. *See*, e.g., J.Y. Campbell, A.W. Lo & A.C. MacKinlay, *The Econometrics of Financial Markets*, (Princeton University Press, 1997), at 160-66; A.C. MacKinlay, "Event Studies in Economics and Finance," 35 *J. Econ. Lit.* (March 1997), 13-39; G.W. Schwert, "Using Financial Data to Measure Effects of Regulation," 24 *J. Law and Economics* (1981) 121-58; D.R. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," 38 *The Business Lawyer* (1982), 1-20, at 19.

69. *See*, e.g., W. Mendenhall, J.E. Reinmuth & R.J. Beaver, *Statistics for Management and Economics* (Duxbury Press, 1993), at 330-331 & 345-346.

70. *See id*.

36. If the residual return is not statistically significant, the price change cannot be reliably attributed to the new information because it cannot be distinguished from price changes that are attributable to random chance alone. Accordingly, if an alleged misstatement or purported corrective disclosure is not associated with a statistically significant residual return in the appropriate direction (positive for allegedly misstated information and negative for purportedly corrective information), then there is no scientific and reliable economic basis to conclude that the new information had an impact on the stock price. However, if the firm-specific price movement is statistically significant, all that the statistical event study has established is that the residual movement likely is not attributable to random chance alone.

37. Company-specific factors can impact a security's price following a public disclosure for many reasons that do not support allegations that material information was misstated or improperly omitted and caused investor losses, including the timely disclosure of information, the materialization of known risks, and the disclosure of information that is unrelated to the allegations. Consequently, it is a mistake to conclude that a finding of statistical significance by itself proves anything other than that the totality of the newly-disclosed company-specific information had an impact on a security's price.

## IV. THERE IS NO RELIABLE ECONOMIC EVIDENCE OF "BACK END" PRICE IMPACT

38. As explained *supra* ¶¶ 21, 22, 24, 25, and 28, Plaintiffs claim and Professor Gelbach opines that the revelation of the allegedly omitted information caused Facebook's stock price to decline on March 19, 2018, March 20, 2018, and July 26, 2018. However, as explained below, they disregard that: 1) this information was disclosed long before these price declines and so, in the efficient market in which they claim the stock traded, was already reflected in the stock's price before the declines occurred; 2) the price did not decline significantly when the

information was disclosed; and 3) other information explains the price declines they focus on. Consequently, there is no reliable economic evidence of "back end" price impact, and Plaintiffs' and Professor Gelbach's attempts to conflate the allegedly corrective information with statistically significant price declines fails.

### A. There Was No Statistically Significant Price Reaction to the Revelation of Initial Misuse

39. As explained *supra* ¶¶ 10-11, the Initial Misuse was disclosed prior to the March 2018 Disclosures. In particular, the December 11, 2015 article published by *The Guardian* and March 30, 2017 article published by *The Intercept* disclosed the information that, to my understanding from counsel, Plaintiffs claim forms the basis for the Initial Misuse theory of liability:

- Dr. Aleksandr Kogan, through his company GSR, sold Facebook user data to Cambridge Analytica;[71]
- Cambridge Analytica acquired tens of millions of Facebook users' data from Kogan and GSR and used that data on behalf of Ted Cruz's presidential campaign;[72] and

---

71. "Ted Cruz using firm that harvested data on millions of unwitting Facebook users," *The Guardian*, December 11, 2015 ("A little-known data company [Cambridge Analytica], now embedded within Cruz's campaign and indirectly financed by his primary billionaire benefactor, paid researchers at Cambridge University to gather detailed psychological profiles about the US electorate using a massive pool of mainly unwitting US Facebook users built with an online survey…. Documents seen by the Guardian show Cambridge Analytica's parent, a London-based company called Strategic Communications Laboratories (SCL), was first introduced to the concept of using social media data to model human personality traits in early 2014 by Dr Aleksandr Kogan, a lecturer at Cambridge University's renowned psychology department. Kogan established his own company in spring that year and began working with SCL to deliver a 'large research project' in the US. His stated aim was to get as close to every US Facebook user into the dataset as possible…. By summer 2014, Kogan's company had created an expansive and powerful dataset. His business partner boasted on LinkedIn that their private outfit, Global Science Research (GSR), 'owns a massive data pool of 40+ million individuals across the United States – for each of whom we have generated detailed characteristic and trait profiles.'").

72. "Facebook Failed to Protect 30 Million Users From Having Their Data Harvested By Trump Campaign Affiliate," *The Intercept,* March 30, 2017 ("Facebook failed to protect 30 million users from having their data harvested by Trump campaign affiliate[.] Survey participants did not know that 'likes' and demographic data from their Facebook profiles were being harvested by

- Reporting on Facebook discussed that the Company acknowledged that user data were obtained by Cambridge Analytica, requested that the data be deleted shortly after *The Guardian* published its 2015 article, and believed that the data had been

political operatives…. The Intercept interviewed five individuals familiar with Kogan's work for SCL. All declined to be identified, citing concerns about an ongoing inquiry at Cambridge and fears of possible litigation. Two sources familiar with the SCL project told The Intercept that Kogan had arranged for more than 100,000 people to complete the Facebook survey and download an app. A third source with direct knowledge of the project said that Global Science Research obtained data from 185,000 survey participants as well as their Facebook friends. The source said that this group of 185,000 was recruited through a data company, not Mechanical Turk, and that it yielded 30 million usable profiles. No one in this larger group of 30 million knew that 'likes' and demographic data from their Facebook profiles were being harvested by political operatives hired to influence American voters. Kogan declined to comment. In late 2014, he gave a talk in Singapore in which he claimed to have 'a sample of 50+ million individuals about whom we have the capacity to predict virtually any trait.'…. [A]ll five of the sources interviewed by The Intercept confirmed that Kogan's work on behalf of SCL involved collecting data from survey participants' networks of Facebook friends, individuals who had not themselves consented to give their data to Global Science Research and were not aware that they were the objects of Kogan's study."); "Ted Cruz using firm that harvested data on millions of unwitting Facebook users," *The Guardian*, December 11, 2015, ("Ted Cruz's presidential campaign is using psychological data based on research spanning tens of millions of Facebook users, harvested largely without their permission, to boost his surging White House run and gain an edge over Donald Trump and other Republican rivals, the Guardian can reveal…. Documents seen by the Guardian have uncovered longstanding ethical and privacy issues about the way academics hoovered up personal data by accessing a vast set of US Facebook profiles, in order to build sophisticated models of users' personalities without their knowledge…. The academic used Amazon's crowdsourcing marketplace Mechanical Turk (MTurk) to access a large pool of Facebook profiles, hoovering up tens of thousands of individuals' demographic data – names, locations, birthdays, genders – as well as their Facebook 'likes', which offer a range of personal insights. This was achieved by recruiting MTurk users by paying them about one dollar to take a personality questionnaire that gave access to their Facebook profiles. This raised the alarm among some participants, who flagged Kogan for violating MTurk's terms of service. 'They want you to log into Facebook and then download a bunch of your information,' complained one user at the time. Crucially, Kogan also captured the same data for each person's unwitting friends. For every individual recruited on MTurk, he harvested information about their friends, meaning the dataset ballooned significantly in size. Research shows that in 2014, Facebook users had an average of around 340 friends. Kogan assured the MTurk users their Facebook data would 'only be used for research purposes' and remain 'anonymous and safe'. However, the Facebook data was then used to generate sophisticated models of each of their personalities using the so-called 'big five' personality traits and characteristics – openness, conscientiousness, extraversion, agreeableness, neuroticism (known as the OCEAN scale). By summer 2014, Kogan's company had created an expansive and powerful dataset. His business partner boasted on LinkedIn that their private outfit, Global Science Research (GSR), 'owns a massive data pool of 40+ million individuals across the United States – for each of whom we have generated detailed characteristic and trait profiles.'").

> destroyed before Cambridge Analytica switched from Ted Cruz's campaign to Donald Trump's campaign.[73]

The importance of these disclosures cannot be overstated because they undermine Plaintiffs' entire Initial Misuse theory of liability. Professor Gelbach concludes that Facebook's stock price traded in an efficient market, and so it necessarily follows that the price reacted quickly to reflect these revelations. Therefore, Facebook's stock price reflected the information that the Initial Misuse disclosure provided: that Facebook users did not have control over their information and content on Facebook and that third-party misuse of Facebook users' personal data was not a purely hypothetical risk. The price also reflected expectations about the possibility that the data were not deleted and the implications for third-party reactions by, e.g., users or regulators to any subsequent misuse that could occur if the data were not deleted.

40. However, neither the December 11, 2015 article in *The Guardian* nor the March 30, 2017 article in *The Intercept* coincides with a statistically significant decline in Facebook's stock price, with $t$-statistics of -0.49 and -0.23 on December 11, 2015 and on March 30, 2017,

73. "Ted Cruz using firm that harvested data on millions of unwitting Facebook users," *The Guardian*, December 11, 2015 (reporting that "Facebook said the company was 'carefully investigating this situation' regarding the Cruz campaign. '[M]isleading people or misusing their information is a direct violation of our policies and we will take swift action against companies that do, including banning those companies from Facebook and requiring them to destroy all improperly collected data,' a Facebook spokesman said in a statement to the Guardian."); "Facebook Failed to Protect 30 Million Users From Having Their Data Harvested By Trump Campaign Affiliate," *The Intercept,* March 30, 2017 (reporting that "[s]hortly after The Guardian published its 2015 article, Facebook contacted Global Science Research and requested that it delete the data it had taken from Facebook users. Facebook's policies give Facebook the right to delete data gathered by any app deemed to be 'negatively impacting the Platform.' The company believes that Kogan and SCL complied with the request, which was made during the Republican primary, before Cambridge Analytica switched over from Ted Cruz's campaign to Donald Trump's.").

respectively.[74, 75] Consequently, there is no reliable economic evidence that the disclosure of the Initial Misuse impacted Facebook's stock price.

### B. There Was No Statistically Significant Price Reaction to the Revelation of Whitelisting

41. Plaintiffs allege that details about Facebook's Whitelisting partnerships were disclosed on Sunday June 3, 2018.[76] Professor Gelbach states that "[t]hese [Whitelisting] practices were unknown to the investing public until *The New York Times* reported on them on June 3, 2018."[77] As shown in **Appendix C**, my event study finds that the residual return on Monday June 4, 2018, the first trading day after June 3, 2018, is not statistically significant with

---

74. To analyze the statistical significance of Facebook's stock price movements, we constructed an event study model using the market and industry indices to which Facebook compared its stock price performance from 2015 through 2019 in its Form 10-K for the fiscal year ended December 31, 2019 (https://www.sec.gov/Archives/edgar/data/1326801/000132680120000013/fb-12312019x10k.htm, at 41). Specifically, we regressed the returns of Facebook stock over the 120 trading days before each day against the S&P 500 Index, NASDAQ Composite Index, and the Dow Jones Internet Composite Index after removing Facebook from each index, and used indicator or "dummy" variables to remove the effects of the alleged misstatements and alleged corrective disclosures that occurred during each 120-day estimation period. *See* J.Y. Campbell, A.W. Lo & A.C. MacKinlay, *The Econometrics of Financial Markets*, (Princeton University Press, 1997), at 152 ("the market-model parameters could be estimated over the 120 days prior to the event," approximately six calendar months of trading days). I use 120 days to minimize the effect of volatility changes over the Class Period. My conclusions in this report remain the same if I use an estimation period of 250 trading days; however, I note that the residual return on July 28, 2017 is not statistically significant when I use this alternative estimation period (with a *t*-statistic of 1.60). **Appendix C** presents the results of my event study analysis for January 30, 2015, December 11, 2015 and each day of the Class Period plus July 26, 2018.

75. *The Guardian* published its article on December 11, 2015 at 7:30 AM EST https://www.theguardian.com/us-news/2015/dec/11/senator-ted-cruz-president-campaign-facebook-user-data. *The Intercept* published its article on March 30, 2017 at 2:01 PM EST https://theintercept.com/2017/03/30/facebook-failed-to-protect-30-million-users-from-having-their-data-harvested-by-trump-campaign-affiliate/. Because *The Intercept* article became available toward the end of the trading day on March 30, 2017, I checked the statistical significance of the residual return on the next trading day, March 31, 2017, and found that it also is not statistically significant, with a *t*-statistic of -0.39. *See* Appendix C.

76. Plaintiffs' Responses, at 31 ("The June 3, 2018 disclosure revealed the whitelisting practices.").

77. Gelbach Report, ¶ 97.

a *t*-statistic of -0.96.[78] Consequently, there is no reliable economic evidence that the disclosure of Whitelisting had an impact on Facebook's stock price.[79]

### C. Plaintiffs' Allegations and Professor Gelbach's Analysis Are Based on Price Declines Following Disclosures that Did Not Reveal Initial Misuse or Whitelisting

42. Presumably because the disclosures of the Initial Misuse and Whitelisting are not associated with statistically significant declines in Facebook's stock price, Plaintiffs and Professor Gelbach focus on statistically significant declines following *other* disclosures; these declines occurred on March 19, 2018, March 20, 2018, and July 26, 2018. None of these declines contradict my opinion that the alleged misstatements did not impact Facebook's stock price.

#### *i. The Alleged Corrective Disclosures on March 19, 2018 Revealed the Continued Misuse*

43. As explained *supra* ¶¶ 21, 22, and 25, Plaintiffs allege that disclosures made after the market closed on Friday March 16, 2018 revealed information about the Initial Misuse that caused declines in Facebook's stock price on Monday March 19, 2018 and Tuesday March 20, 2018. Professor Gelbach's event study analysis finds that Facebook's residual return is negative and statistically significant on these days, and he claims that these results "indicat[e] that class

---

78. Professor Gelbach presents two event study models, a traditional model that finds that the abnormal return it generates on June 4, 2018 is not statistically significant because its *t*-statistic is -1.04, and a non-traditional model that finds the abnormal return it generates is statistically significant because its *t*-statistic is -1.65, at the threshold of significance in a one-tailed test. Gelbach Report, ¶ 128 & *supra* ¶ 35. To my knowledge, his non-traditional model is not used in the academic literature to analyze price movements with an event study (other than by Professor Gelbach and his co-authors); indeed, Professor Gelbach does not cite to any such literature.

79. I note that Plaintiffs acknowledge the lack of a price impact caused by the Whitelisting Disclosure because they do not allege that there is loss causation associated with the price movement on June 4, 2018. *See supra* ¶¶ 23 and 25. Professor Gelbach explains that "[i]t is my understanding that the Complaint identifies June 3, 2018 as a date on which fraud-related news was released, but does not claim damages for the market's reaction on June 4, 2018." Gelbach Report, ¶ 128 n.144.

members who bought before March 19 and retained thereafter sustained losses due to Defendants' misleading statements."[80]

44. As an initial matter, market participants recognized that the Initial Misuse information in the March 2018 Disclosures was not new information. For example, an article published on March 21, 2018 by *The New Yorker* regarding the March 2018 Disclosures states:

> "… these were not really revelations at all. Reporters from the *Guardian*, *The New Yorker*, *The New York Review of Books*, *Das Magazin*, and the Intercept have been reporting these facts *for years*. We knew as early as December, 2015, for instance, that Facebook data obtained without users' knowledge was being exploited by Cambridge Analytica on behalf of Senator Ted Cruz…."[81]

Indeed, the March 30, 2017 article in *The Intercept* described the Initial Misuse as a fact (citing the 2015 article in *The Guardian*) and described the Continued Misuse as an unknown, stating: "It remains unclear what was ultimately done with the Facebook data, or whether any models or algorithms derived from it wound up being used by the Trump campaign."[82]

45. Market participants attributed the residual declines in Facebook's stock price on March 19, 2018 and March 20, 2018 to a confluence of factors distinct from the Initial Misuse claim as described by the Court. First, the March 16, 2018 Press Release and the articles by *The New York Times* and *The Guardian* revealed the Continued Misuse along with other

---

80. Gelbach Report, ¶ 117. As shown in **Appendix C**, my event study also finds that the residual return on March 19, 2018 is statistically significant, with a $t$-statistic of -3.87.

81. "Cambridge Analytica, Facebook, and the Revelations of Open Secrets," *The New Yorker*, March 21, 2018, https://www.newyorker.com/news/news-desk/cambridge-analytica-facebook-and-the-revelations-of-open-secrets. Emphasis in original. That some market participants expressed surprise at the March 16, 2018 Press Release is not itself surprising because individual investors are not expected to know all prior disclosures; nor is it evidence of price impact in an efficient market where the price reflects all previously disclosed information even when most investors did not review it.

82. "Facebook Failed to Protect 30 Million Users From Having Their Data Harvested by Trump Campaign Affiliate," *The Intercept*, March 30, 2017, https://theintercept.com/2017/03/30/facebook-failed-to-protect-30-million-users-from-having-their-data-harvested-by-trump-campaign-affiliate/.

information,[83] which prompted reactions from third parties such as users and regulators that Facebook could not have disclosed beforehand.[84]

46. Second, some market participants also focused on concerns about how Facebook and its management responded to Cambridge Analytica's misuse of the data. For example:

- WCCFTECH stated on March 17, 2018: "The biggest revelation isn't *how* this data was used to influence voters and polarize debates on hot topics, the problem is Facebook's silence on the matter until it was pushed by the whistleblower who made the details public…. In its press release, Facebook blamed everything on how it was lied to by a researcher and takes no charge of its policies that allowed such behavior or says anything about why the affected users weren't informed…"[85]

- Pivotal Research Group stated on March 21, 2018 that "Facebook is exhibiting signs of systemic mismanagement, which is a new concern we had not contemplated until recently."[86]

- *CNN* stated on March 19, 2018: "Meanwhile, Zuckerberg and the rest of the Facebook leadership seem conspicuously absent. Neither the Facebook CEO nor his top deputy, Sheryl Sandberg, have commented publicly on the matter."[87]

---

83. For example, *The New York Times* stated that its reporters had seen excerpts of the data online. *See* "How Trump Consultants Exploited the Facebook Data of Millions," *The New York Times*, March 17, 2018, https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html. As discussed above, the Initial Misuse was previously disclosed.

84. *See,* e.g., "Facebook stock takes another hit amid reported probe, #DeleteFacebook campaign," *San Francisco Chronicle*, March 21, 2018, https://www.sfchronicle.com/business/article/Facebook-stock-takes-another-hit-amid-probe-12768613.php.

85. "50 Million Facebook Profiles Harvested Without User Consent – Data Monster Chose NOT to Alert Victims & Is Trying to Threaten Reporters," *WCCFTECH*, March 17, 2018, https://wccftech.com/50-million-facebook-profiles-harvested/. Emphasis in original.

86. "FB: Systemic Mismanagement Introduces New Risks," *Pivotal Research Group*, March 21, 2018.

87. "Facebook is Facing an Existential Crisis," *CNN*, March 19, 2018.

47. Finally, market participants linked the price reactions to growing concerns of foreign election interference—concerns that were far less salient at the start of the Class Period.[88] For example:

- Deutsche Bank, March 19, 2018: "The first concern here is the leakage of personal data, though the more troubling issue seems to be how this data was then used to target political ads and then finally, how CA could potentially be tied to Russia."[89]

- Raymond James, March 19, 2018: "… we believe continued concerns over Russian targeting and data misuse are clearly weighing on the shares."[90]

- Pivotal Research Group, March 19, 2018: "Further, in context of concerns around Russian government influence on the US election, it is also problematic because the academic who originally gained access to Facebook data was also an associate professor at Russia's St. Petersburg State University and took 'Russian government grants to fund other research into social media.' Although such links may be benign, and Facebook wouldn't have necessarily known about those links, put in context of other concerns around undue electoral interference from Russian entities on Facebook, this will likely lead to more questions of how well Facebook knows its customers and other non-user constituents."[91]

48. Plaintiffs and Professor Gelbach fail to reliably explain why – contrary to their claim that Facebook stock traded in an efficient market during the Class Period – the Initial

88. *See* e.g., "Facebook says 126 million Americans may have seen Russia-linked political posts," *Reuters*, October 30, 2017, https://www.reuters.com/article/world/facebook-says-126-million-americans-may-have-seen-russia-linked-political-posts-idUSKBN1CZ2OF/; "Grand Jury Indicts Thirteen Russian Individuals and Three Russian Companies for Scheme to Interfere in the United States Political System," U.S. Department of Justice Press Release, February 16, 2018, https://www.justice.gov/archives/opa/pr/grand-jury-indicts-thirteen-russian-individuals-and-three-russian-companies-scheme-interfere.

89. "Opening Pandora's Box?" *Deutsche Bank*, March 19, 2018.

90. "Thoughts on Facebook Data Concerns," *Raymond James*, March 19, 2018.

91. "FB: Data Leak Details Described, Enhancing Risks," *Pivotal Research Group*, March 19, 2018.

Misuse was not fully reflected in the stock price prior to the March 2018 Disclosures.[92] Rather, Plaintiffs attempt to conflate the Initial Misuse and the Continued Misuse, claiming that:

> … once Facebook user data was transferred to Cambridge Analytica through the so-called initial misuse, the resulting loss of control over that data – including its retention, downstream use, and Facebook's inability to retrieve or contain it – was a foreseeable consequence of the initial misuse that had already occurred when Defendants made the risk disclosure statements and the lack of user control, which was concealed by the alleged false and misleading statements.[93]

Plaintiffs' attempt fails for two reasons. First, the "foreseeable consequence" would only be foreseeable if the Defendants had disclosed that the user data were *not* deleted, which I understand from counsel that Plaintiffs are not claiming. Second, their assertion is belied by the fact that the market was made aware of the Initial Misuse prior to the March 2018 Disclosures and thus would have priced in the expected value of any foreseeable consequences, such as the risk that the data were not deleted. As Professor Gelbach explains, "[i]t is financial economics 101 that a reduction in expected future cash flow reduces a company's value today."[94] Facebook's stock price declined on March 19, 2018 after the Company disclosed that the data were not destroyed and not under Facebook's control, thus reporting that the publicly disclosed risk (rather than a concealed risk) related to the Continued Misuse claim (rather than the Initial Misuse claim) had materialized.

---

92. Plaintiffs' claim is particularly disingenuous regarding the March 30, 2017 article published by *The Intercept* because the same article contained the Investigation Statement, which they alleged was reflected in Facebook's stock price because it traded in an efficient market. Plaintiffs cannot have it both ways – if the market for Facebook stock was efficient and its price reflected the alleged misstatement in *The Intercept* article as they claim, then the price also reflected the other disclosures in that article, including that Facebook requested that the data be deleted as well as its belief that it had been deleted before Cambridge Analytica began working for the Trump campaign.

93. Plaintiffs' Responses, at 8. Professor Gelbach echoes Plaintiffs' conflation of the Initial Misuse and the Continued Misuse. Deposition of Jonah B. Gelbach, Ph.D., September 18, 2026 ("Gelbach Dep."), at 190:18-196:13.

94. Gelbach Report, ¶ 24.

49. Regarding the March 2018 Disclosures, Professor Gelbach opines:

> … these disclosures are fraud-related. First, these disclosures revealed that users did not control their data and that Facebook had experienced a major data misappropriation and misuse incident, despite the fact that Defendants had claimed such incidents were merely hypothetical possibilities. And second, these disclosures permitted the market to appreciate, at least in part, the foreseeable consequences of the data misappropriation and lack of user control.[95]

However, he ignores the economic evidence presented above and provides no evidence to support his opinion, which amounts to nothing more than parroting Plaintiffs' allegations. Similarly, Professor Gelbach opines that:

> Although there was public reporting about the possibility of Kogan's access to and GSR's sale of Facebook user data to Cambridge Analytica as early as December 2015 and at various times between then and March 2018, Defendants obscured the truth. For example, the Company announced that it was investigating the facts—even though it already knew them. Facebook also promised swift action to address any improprieties—and signaled to investors through inaction that there was no such impropriety. Meanwhile, the Company represented in SEC filings that unauthorized data access was merely a hypothetical risk, rather than an already materialized fact and an ongoing one to boot, and Defendants represented that Facebook users controlled their data on the Facebook platform.[96]

Once again, he ignores the economic evidence and provides no support for his opinion, instead merely parroting Plaintiffs' allegations.

*ii. The Alleged Corrective Disclosures on March 20, 2018 Regard Conduct that Pre-Dates Both Initial Misuse and Whitelisting*

50. As explained *supra* ¶¶ 22 and 25, Plaintiffs allege that an article published in *The Guardian* on March 20, 2018 revealed information about the Initial Misuse that caused a decline in Facebook's stock price that day. Professor Gelbach's event study analysis finds that Facebook's residual return is negative and statistically significant on March 20, 2018, and he

95. Gelbach Report, ¶ 143.

96. Gelbach Report, ¶ 102.

claims that these results "indicat[e] that class members who bought before March 19 and retained thereafter sustained losses due to Facebook's fraudulent statements."[97]

51. However, the allegedly corrective information that Plaintiffs claim was "revealed" on March 20, 2018 is a former Facebook employee's assertion that the "'majority of Facebook users' *could* have had their data harvested by app developers without their knowledge."[98] Because the employee (Mr. Parakilas) left Facebook in 2012 (*see supra* ¶ 14), his claims pre-date Mr. Kogan's collection of user data in June 2014 (*see supra* ¶ 9) and thus Cambridge Analytica's use of those data in the Ted Cruz campaign, as well as Whitelisting, which I understand from counsel Plaintiffs allege began in 2015. I further understand that Mr. Parakilas' assertion is distinct from the definitions of Initial Misuse and Whitelisting claims as sustained by the Court, and thus fails to provide any new information regarding Plaintiffs' claims. Consequently, this

---

97. Gelbach Report, ¶ 121. As shown in **Appendix C**, my event study also finds that the residual return on March 20, 2018 is statistically significant, with a *t*-statistic of -2.68.

98. Plaintiffs' Responses, at 11 (emphasis added). The former employee's assertion appears to be based on academic research published in 2010. *See* "'Utterly horrifying': ex-Facebook insider says covert data harvesting was routine," *The Guardian*, March 20, 2018, https://www.theguardian.com/news/2018/mar/20/facebook-data-cambridge-analytica-sandy-parakilas ("Academic research from 2010, based on an analysis of 1,800 Facebooks apps, concluded that around 11% of third-party developers requested data belonging to friends of users. If those figures were extrapolated, tens of thousands of apps, if not more, were likely to have systematically culled 'private and personally identifiable' data belonging to hundreds of millions of users, Parakilas said.") and N. Wang, H. Xu, J. Grossklags, "Third-Party Apps on Facebook: Privacy and the Illusion of Control," *CHiMiT '11: Proceedings of the 5th ACM Symposium on Computer Human Interaction for Management of Information Technology*, Article No.: 4, December 4-5, 2011, https://doi.org/10.1145/2076444.2076448 ("Little research examines the privacy threats associated with the use of third-party apps on Facebook. To address this gap in the literature, we systematically study third-party apps' current practices for privacy notice and consent by: i) collecting data from the 1800 most popular Facebook apps to record their data collection practices concerning users and their friends, and ii) developing our own Facebook app to conduct a number of tests to identify problems that exist in the current design of authentication dialogs for third-party apps on Facebook.").

This academic research does not establish that half of Facebook's user data were acquired and exploited by third-party app developers. Moreover, because the Company's stock traded in an efficient market, the information in this published article was reflected in the stock price before March 20, 2018.

article does not reveal new information about the Initial Misuse and so does not provide evidence regarding the impact of the alleged misstatements on Facebook's stock price.

52. Professor Gelbach also claims that "even if new value-relevant information had *not* reached the public on [March 19, 2018 and March 20, 2018], it would be possible for the March 16-17 news about Facebook's user data scandal to have caused the additional price drop observed on March 20" because "it can take multiple days for the market to digest information."[99] Even if true, he fails to establish that the decline is linked to the Initial Misuse. First, Facebook's stock price decline on March 20, 2018 cannot be attributed to Initial Misuse for the same reason the price decline on March 19, 2018 cannot be attributed to it, i.e., because the "March 16-17 news" related to Initial Misuse was not disclosed for the first time in March 2018.[100] Moreover, market participants attributed Facebook's stock price decline on March 20, 2018 to third-party actions that Facebook could not have disclosed any earlier,[101] including that the FTC was investigating Facebook[102] and the #deleteFacebook campaign.[103]

---

99. Gelbach Report, ¶ 120 (emphasis in original); Gelbach Dep., at 93:18-95:16.

100. *See supra* ¶¶ 10, 11, and 39.

101. As discussed supra ¶ 39, Facebook's stock price already reflected expectations regarding third-party actions that were formed at the time of the disclosure of the Initial Misuse.

102. Because Initial Misuse disclosures prior to March 16, 2018 were unaccompanied by an FTC investigation, it is reasonable to believe that the FTC's decision to investigate was triggered by the new information disclosed in the March 16, 2018 Press Release. For example, *Politico* referenced Cambridge Analytica's connection to the Trump campaign when discussing the FTC investigation, stating "[t]he Federal Trade Commission is launching an inquiry into Facebook in the wake of reports that Trump-linked Cambridge Analytica misused data from 50 million Facebook accounts, according to a source familiar with the matter." "FTC launches inquiry into Facebook," *Politico*, March 20, 2018.

103. *See*, e.g., "Facebook stock takes another hit amid reported probe, #DeleteFacebook campaign," *San Francisco Chronicle*, March 21, 2018, https://www.sfchronicle.com/business/article/Facebook-stock-takes-another-hit-amid-probe-12768613.php; Complaint ¶ 676 ("[The March 20, 2018 *Guardian* Article and] additional disclosures regarding the widening scope of the data privacy risks, including calls for users to '#deleteFacebook' and unconfirmed reports of government investigations into the matter, caused the Company's stock price to fall further, closing at $168.15, a further 2.6% decline in the value of Facebook shares.").

53. Professor Gelbach's opinion that the market needed more than one trading day to process the allegedly corrective information that was purportedly first disclosed *almost four full days* earlier on March 16, 2018 also is inconsistent with his opinion that the market for Facebook stock was efficient, including with his own quote from Professor Fama regarding a one-day price reaction.[104] Professor Gelbach's use of a two-day price reaction is also inconsistent with "the practice typically used by expert witnesses and courts in securities litigation … in measuring the effects of an alleged corrective disclosure, [where] it is appropriate to use one-day returns following the date on which that alleged corrective disclosure was made" as described in Professor Gelbach's own academic research.[105]

54. Professor Gelbach further claims that "[o]ne widely cited article on event study methodology found clear evidence that the market response to earnings announcements can extend past the first post-news trading date" but fails to explain what in that article provides such "clear evidence."[106] In fact, the article, which combines earnings announcements made by many firms, states: "The source of these [second-day] effects is likely to be that some of the earnings announcements are made on [the first day] after the close of the stock market. In these cases, the

---

104. *See supra* ¶ 27. Professor Gelbach notes that a literature survey article documents "evidence that full adjustment of stock prices to new information *sometimes* takes more than one trading day" (Gelbach Report, ¶ 120 n.132 (emphasis added)) but ignores that the article attributes the delayed reaction to information processing costs, which is not an issue in this case as evidenced by the fact that many analysts issued reports prior to the end of trading on March 19, 2018. *See* E. Blankespoor, E. deHaan, & I. Marinovic, "Disclosure Processing Costs, Investors' Information Choice, and Equity Market Outcomes: A Review," 70 *J. Accounting & Econ*., Issues 1 (2020) at 8 and, *e.g.*, LSEG.

105. J. B. Gelbach and J. R. Hawkins, "A Bayesian Approach to Event Studies for Securities Litigation," 176 *Journal of Institutional and Theoretical Economics* 86 (2020) ("In this paper we will follow the practice typically used by expert witnesses and courts in securities litigation: we assume that in measuring the effects of an alleged corrective disclosure, it is appropriate to use one-day returns following the date on which that alleged corrective disclosure was made.").

106. Gelbach Report, ¶ 120.

effects will be captured on [the second day]."[107] In other words, because the study looks at many announcements by many firms and does not control for the time of day the market learned the information, there are instances when the second day in the analysis is actually the first day the market could trade on the information, thereby falsely making it appear as if the market continued to react to the disclosure on the second day.

*iii. Facebook Disclosed Q2 2018 Financial Results and Revised Guidance on July 25, 2018*

55. After the market closed on July 25, 2018, Facebook held a conference call to discuss its financial results for the second quarter of 2018 and guidance.[108] Among other things, Company management explained that it projected lower-than-expected revenue growth due to three factors: (i) currency headwinds; (ii) growth and promotion of experiences with lower levels of monetization (e.g., Stories); and (iii) more user choice regarding data privacy.[109]

56. As explained *supra* ¶ 24, Plaintiffs allege that Facebook's earnings announcement on July 25, 2018 revealed the impact of the alleged fraud on the Company's revenue growth, profitability, and active user metrics. Based on the opinion of Professor Gelbach, Plaintiffs

107. A.C. MacKinlay, "Event Studies in Economics and Finance," 35 *J. Econ. Lit.* (March 1997), 13-39, at 26. Note that the article refers to the day of the announcement as day zero and the second day as day one. *Id.,* at 25.

108. Facebook Inc., FQ2 2018 Earnings Call Transcript, July 25, 2018, 5:00 PM ET. The accompanying press release was issued at 4:05 PM ET. "Facebook Reports Second Quarter 2018 Results," *PR Newswire*, July 25, 2018, 4:05 PM ET.

109. Facebook Inc., FQ2 2018 Earnings Call Transcript, July 25, 2018, 5:00 PM ET ("Our total revenue growth rates decelerated approximately 7 percentage points in Q2 compared to Q1. Our total revenue growth rates will continue to decelerate in the second half of 2018, and we expect our revenue growth rates to decline by high single-digit percentages from prior quarters sequentially in both Q3 and Q4. There are several factors contributing to that deceleration. For example, we expect currency to be a slight headwind in the second half versus the tailwinds we have experienced over the last several quarters. We plan to grow and promote certain engaging experiences like Stories that currently have lower levels of monetization, and we are also giving people who use our services more choices around data privacy, which may have an impact on our revenue growth….").

claim that "[a]s a result of the July 25 disclosures, investors began to appreciate that closing down access to third-party use of user data and remedying Defendants' improper data practices would result in reduced revenues and increased operating costs."[110] His event study analysis finds that Facebook's residual return is negative and statistically significant on July 26, 2018[111] and he states that his "provisional opinion is that Facebook's July 25 disclosure caused class members to sustain losses on July 26."[112]

57. Professor Gelbach's provisional opinion is based on his assertion – devoid of any supporting citation – that "[t]he public could see the true importance to Facebook of whitelisting—and of third-party access to user data more broadly—only after Facebook's July 25, 2018 earnings call."[113] Indeed, nowhere in the entire seven-page discussion does he cite any market commentary to support his claims about what investors learned about the alleged misstatements from the July 2018 Disclosure. He states that "[i]n light of the facts and analysis

---

110. Plaintiffs' Class Cert Brief, at 9.

111. Gelbach Report, ¶ 123. As shown in **Appendix C**, my event study also finds that the residual return on July 26, 2018 is statistically significant, with a *t*-statistic of -17.14.

112. Gelbach Report, ¶ 123.

113. Gelbach Report, ¶ 97. Professor Gelbach states that the market learned the "relevant truth" that Facebook's "profitability was boosted by third parties' improper access to and use of users' data" on July 26, 2018. *Id.,* ¶ 99. I understand from counsel that the Ninth Circuit held that Plaintiffs adequately alleged loss causation for the July 26, 2018 price decline based on Plaintiffs' theory that the falsity of the User Control and Risk Factor Statements was revealed by the March 2018 and Whitelisting Disclosures, and that the July 2018 Disclosure revealed the consequences of the market's, users', and advertisers' reactions to those earlier disclosures. I further understand that the User Control and Risk Factor Statements are not alleged to have been misstated because they omitted the "relevant truth" regarding Facebook's profitability as Professor Gelbach asserts. Put differently, I understand from counsel that under Plaintiffs' claims as sustained by the Court, the July 2018 Disclosure purportedly revealed consequences of the March 2018 and Whitelisting Disclosures themselves rather than any purported falsity of the alleged misstatements. Accordingly, the price decline on July 26, 2018 does not demonstrate the price impact of the alleged misstatements because, to my understanding from counsel of the allegations sustained by the Court, the new information in the July 2018 Disclosure did not correct the alleged misstatements, hence the price decline on July 26, 2018 is not evidence of the purported truth that should have been disclosed at the time the alleged misstatements were made.

provided in earlier parts of this report, it is my opinion that the market had not yet internalized the full significance of the June 3, 2018 whitelisting revelation."[114] However, Professor Gelbach fails to explain precisely what "facts and analysis" provided in the preceding 129 paragraphs of his report support this vague opinion, especially given that almost half of the preceding paragraphs provide evidence that Facebook's stock price traded in an efficient market and thus – if his market efficiency opinion is correct – fully reflected the allegedly corrective information on Monday June 4, 2018 that he acknowledges was first disclosed on Sunday June 3, 2018.[115]

58. Professor Gelbach further claims that market participants did not understand the financial implications of Whitelisting because "[t]here was little reaction from analysts" and an analyst report he cites dated June 8, 2018 "did not discuss the revenue or cost implications of Facebook's whitelisting practices or their termination."[116] His insinuation is once again inconsistent with his market efficiency opinion because in an efficient market, "the revenue or cost implications of Facebook's whitelisting practices or their termination" based on the June 3, 2018 disclosure, which included that the Company was winding down the Whitelisting

114. Gelbach Report, ¶ 130.

115. Gelbach Report, ¶¶ 28-87 & 97.

116. Gelbach Report, ¶¶ 127, 130 & ¶ 127 n.143. Professor Gelbach ignores that on the same day the analyst report he references was published, an article in *The Wall Street Journal* reporting on the Whitelisting Disclosure discussed the value associated with Whitelisting deals to Facebook, stating: "The whitelist deals were struck with companies including Royal Bank of Canada and Nissan Motor Co., who advertised on Facebook or were valuable for other reasons, according to some of the people familiar with the matter. … 'Ninety-nine percent of developers were treated the same, but 1% got special treatment because they accounted for all the value of the platform,' one former Facebook employee said, referring to popular apps and services that attracted users." "Facebook Gave Some Companies Special Access to Additional Data About Users' Friends; Small number of companies had deals that gave them access to data after others were cut off," *The Wall Street Journal*, June 8, 2018, 7:28 pm ET, https://www.wsj.com/articles/facebook-gave-some-companies-access-to-additional-data-about-users-friends-1528490406.

partnerships,[117] would be fully reflected in Facebook's stock price along with the allegedly corrective information.

59. For all of the reasons explained above, there is no reliable economic evidence of "back end" price impact, and Plaintiffs' and Professor Gelbach's attempts to conflate the allegedly corrective information with statistically significant price declines fails.

## V. THERE IS NO RELIABLE ECONOMIC EVIDENCE OF "FRONT END" PRICE IMPACT

60. As explained *supra* ¶¶ 20 and 25, I understand from counsel that Plaintiffs claim that the alleged misstatements are false and misleading because they omitted information that purportedly was revealed by the alleged corrective disclosures and caused price declines on March 19, 2018, March 20, 2018, and July 26, 2018. Indeed, Plaintiffs do not claim that any of the alleged misstatements caused Facebook's stock price to increase when they were made.[118] And as explained in the previous section, I found no reliable economic evidence that the revelations of the alleged misstatements had a negative impact on Facebook's stock price. Consequently, it is not surprising that, as explained below, I find no reliable economic evidence demonstrating that the alleged misstatements had a positive impact on the Company's stock price at the time they were made.

61. To begin, Plaintiffs allege two categories of misstatements: (1) periodic risk-factor disclosures in Facebook's quarterly and annual SEC reports prior to the March 2018 Disclosures; and (2) statements about users' ability to control their data.[119] I discuss each

---

117. *See supra* ¶ 15.

118. Professor Gelbach and his co-authors state: "In circumstances in which fraudulent statements falsely confirm prior statements, the stock price would not be expected to move." J. E. Fisch, J. B. Gelbach, and J. Klick, "The Logic and Limits of Event Studies in Securities Fraud Litigation," 96 *Tex. L. Rev.* 553 (2018), at 556.

119. Complaint ¶¶ 608-610, 622, 628-629.

category in the text below. **Table 1** summarizes my event study results for each of the alleged misstatements, identifying whether under Plaintiffs' claims the trading date is associated with a Risk Factor Statement or a User Control Statement.

**Table 1**
**Event Study Results for Alleged Misstatement Price Reaction Dates**

| Statement Date(s)* | Statement Time (ET) | Reaction Date | Actual Return | Residual Return | *t*-Statistic | Statement Category |
|---|---|---|---|---|---|---|
| 02/02/17 | 9:13 PM | 02/03/17 | 0.11% | 0.04% | 0.04 | Risk Factor |
| 05/04/17 | 4:20 PM | 05/05/17 | -0.40% | -0.86% | -1.08 | Risk Factor |
| **07/27/17** | **4:25 PM** | **07/28/17** | **1.18%** | **1.18%** | **1.84** | **Risk Factor** |
| 10/12/17 | 9:00 AM | 10/12/17 | -0.11% | -0.24% | -0.34 | User Control |
| 11/02/17 | 4:37 PM | 11/03/17 | 0.00% | -0.90% | -1.17 | Risk Factor |
| 02/01/18 | 4:58 PM | 02/02/18 | -1.46% | -0.65% | -0.65 | Risk Factor |
| 03/16/18 - 03/17/18 | 9:30 PM | 03/19/18 | -6.77% | -4.50% | -3.87 | User Control |
| **04/04/18** | **4:18 PM** | **04/05/18** | **2.73%** | **2.25%** | **1.83** | **User Control** |
| **04/10/18** | **3:24 PM** | **04/10/18** | **4.50%** | **2.46%** | **1.99** | **User Control** |
| 04/10/18 - 04/11/18 | 4:47 PM | 04/11/18 | 0.78% | 1.09% | 0.88 | User Control |
| 04/24/18 | 6:08 AM | 04/24/18 | -3.71% | -1.47% | -1.16 | User Control |
| 06/08/18 | N/A** | 06/08/18 | 0.49% | 0.27% | 0.22 | User Control |
| 06/29/18 | N/A** | 06/29/18 | -0.97% | -0.91% | -0.72 | User Control |

**Notes:** Residual returns are from the regression of Facebook stock returns on the S&P 500 Index excluding Facebook, the NASDAQ Composite Index excluding Facebook, and the Dow Jones Internet Composite Index excluding Facebook with an estimation period of 120 days prior to each event date. We use indicator or "dummy" variables to remove the effects of the alleged misstatements and alleged corrective disclosures: February 3, 2017, May 5, 2017, July 28, 2017, October 12, 2017, November 3, 2017, February 2, 2018, March 19, 2018, March 20, 2018, April 5, 2018, April 10, 2018, April 11, 2018, April 24, 2018, April 26, 2018, June 4, 2018, June 8, 2018, and June 29, 2018. We also use a dummy variable on March 30, 2017 when information regarding Initial Misuse was disclosed. Residual returns that are positive and statistically significant at the 5% level in a one-tailed test are in bold.

*Table does not reflect the User Control Statement in Facebook's *Statement of Rights and Responsibilities* because it was posted on Facebook's website continually prior to and during the Class Period.

**There are no significant price increases on subsequent trading days. *See* Appendix C.

**Sources:** Facebook, Inc. SEC Filings; "Sheryl Sandberg in D.C. Thursday," *Axios* , October 10, 2017, https://www.axios.com/2017/12/15/sheryl-sandberg-in-dc-thursday-1513306065 ("Facebook COO Sheryl Sandberg will be interviewed by Axios' Mike Allen this Thursday at 9 a.m. in Washington."); "Facebook Says it Suspends Cambridge Analytica, SCL Group," *Bloomberg* , March 16, 2018; "Facebook CEO Speaks on a Call With Media Reporters," *Bloomberg* , April 4, 2018; "Live updates from Mark Zuckerberg's testimony to Congress Tuesday," *Vox* , April 10, 2018; Joint Full Committee Hearing "Facebook, Social Media Privacy, and the Use and Abuse of Data--Video," April 10, 2018, https://www.judiciary.senate.gov/committee-activity/hearings/facebook-social-media-privacy-and-the-use-and-abuse-of-data; Full Committee Hearing "Facebook: Transparency and Use of Consumer Data--Video" Committee on Energy and Commerce, April 11, 2018, https://democrats-energycommerce.house.gov/committee-activity/hearings/hearing-on-facebook-transparency-and-use-of-consumer-data-full-committee; "How to Take Control of Your Facebook," *PRNewswire* , April 24, 2018, https://www.prnewswire.com/news-releases/how-to-take-control-of-your-facebook-300635877.html.

62. As shown, there are thirteen trading dates that coincide with the Class Period disclosure of each alleged false and misleading statement. Of those, only three exhibit a statistically significant price increase.[120] Another date, March 19, 2018, is also the date of an alleged corrective disclosure and has a statistically significant price decrease. The other nine dates do not exhibit a statistically significant price increase, demonstrating that there is no scientific and reliable economic basis to conclude that the statements had an impact on the stock's price.

**A. Risk-Factor Statements**

63. The putative Class Period begins on February 3, 2017 with allegedly misleading risk-factor statements in Facebook's 2016 10-K.[121] The alleged risk-factor misstatements are:

- Security breaches and improper access to or disclosure of our data or user data, or other hacking and phishing attacks on our systems, could harm our reputation and adversely affect our business.
- Any failure to prevent or mitigate security breaches and improper access to or disclosure of our data or user data could result in the loss or misuse of such data, which could harm our business and reputation and diminish our competitive position.
- We provide limited information to…third parties based on the scope of services provided to us. However, if these third parties or developers fail to adopt or adhere to adequate data security practices…our data or our users' data may be improperly accessed, used, or disclosed.[122]

---

120. The three trading dates are July 28, 2017, April 5, 2018, and April 10, 2018. As explained below, July 28, 2017 is the trading date for a repeated risk factor statement with no new information, analysts attribute the increase on April 5, 2018 to a different statement from Mr. Zuckerberg that is not alleged to be false and misleading, and the stock price increase on April 10, 2018 occurred before the allegedly false and misleading statements were made.

121. Complaint ¶¶ 628-629.

122. Complaint ¶ 628.

These statements are repeated in Facebook SEC filings issued on May 4, 2017, July 27, 2017, November 2, 2017, and February 1, 2018.[123] As shown in **Table 1**, there are five trading dates that could be potentially impacted by the alleged risk factor misstatements.

64. Plaintiffs allege that these statements are false and/or misleading because Defendants knew and did not disclose the Initial Misuse.[124] However, the Risk Factor Statements did not change the total mix of information available to investors because they did not contain new information, hence they had no impact on Facebook's stock price. Moreover, the publication of the alleged risk-factor misstatements on February 3, 2017 itself is a repetition because the same language was published in Facebook's SEC Form 10-Q filed on November 3, 2016, prior to the beginning of the Class Period.[125] Plaintiffs do not challenge the identical statements Facebook made before the Class Period, including in its Form 10-Q filed on November 3, 2016. Because the statements published on February 3, 2017 added nothing to the information available to the market, there is no economic basis to expect that the repetition of

123. Complaint ¶¶ 628-629.

124. 2026 MTD Order, pp. 10-11, 19, 26, 32 ("Plaintiffs allege that both the user control statements and the risk factor statements were false because Defendants knew that … in 2015, Aleksandr Kogan, through his company GSR, sold user data to Cambridge Analytica, which in turn sold it to Ted Cruz's presidential campaign (the 'initial misuse' theory) … [T]he Court finds that Plaintiffs' claim may proceed insofar as it is based on the initial misuse portion of the Cambridge Analytica theory of fraud. This finding applies to both the user control statements and the risk factor statements…[T]he Court holds that the risk factor statements may not proceed insofar as they are based on the whitelisting theory."). As noted *supra* ¶ 20, I understand from counsel that the Whitelisting theory of liability is not applicable to the Risk Factor Statements.

125. Facebook, Inc., Form 10-Q for the quarterly period ended September 30, 2016, available at https://www.sec.gov/Archives/edgar/data/1326801/000132680116000087/fb-9302016x10q.htm, p. 44 ("Security breaches and improper access to or disclosure of our data or user data, or other hacking and phishing attacks on our systems, could harm our reputation and adversely affect our business…. Any failure to prevent or mitigate security breaches and improper access to or disclosure of our data or user data could result in the loss or misuse of such data, which could harm our business and reputation and diminish our competitive position…. We provide limited information to…third parties based on the scope of services provided to us. However, if these third parties or developers fail to adopt or adhere to adequate data security practice…our data or our users' data may be improperly accessed, used, or disclosed.").

those statements would cause the stock price to increase. Accordingly, there is no reason to believe the repetition of these statements by itself caused Facebook's stock price to increase.

65. As shown in **Table 1**, only one of the price reaction dates for the Risk Factor Statements exhibits a statistically significant increase in Facebook's stock price (July 28, 2017). There is no reason to believe that the July 28, 2017 Risk Factor Statement caused the stock price increase because it was a repetition of previously disclosed information, and none of the other four repetitions of the exact same information had an impact on the stock price, including the first two times that statement was made during the Class Period.

66. For the reasons stated above, there is no reliable economic evidence demonstrating that the Risk Factor Statements caused Facebook's stock price to increase at the time they were made.

### B. User Control Statements

67. Plaintiffs allege that Facebook's User Control Statements were false and misleading because Defendants knew and did not disclose the Initial Misuse and Whitelisting.[126] First, Plaintiffs claim that Facebook's *Statement of Rights and Responsibilities* listed on its website was false and misleading because it states, among many other things, that "[y]ou own all

126. 2026 MTD Order, pp. 8-10, 19, 26, 30 ("Plaintiffs allege that both the user control statements and the risk factor statements were false because Defendants knew that … in 2015, Aleksandr Kogan, through his company GSR, sold user data to Cambridge Analytica, which in turn sold it to Ted Cruz's presidential campaign (the 'initial misuse' theory) … [T]he Court finds that Plaintiffs' claim may proceed insofar as it is based on the initial misuse portion of the Cambridge Analytica theory of fraud. This finding applies to both the user control statements and the risk factor statements…Plaintiffs allege that the user control statements and the risk factor statements were false because Defendants exempted a wide array of 'whitelisted' app developers and corporations from Facebook's general prohibition on third-party access to user friend data in exchange for advertising revenues and other business benefits…. Defendants do not challenge that the user control statements were allegedly false or misleading in light of Defendants' failure to disclose Facebook's practice of whitelisting…. Insofar as Plaintiffs' Section 10(b) and Rule 10b-5 claim is based on those grounds, it may proceed.").

of the content and information you post on Facebook, and ***you can control how it is shared through your privacy and application settings***."[127] Because Facebook made this statement prior to the Class Period and continually thereafter,[128] these statements had no impact on the total mix of information available to investors during the Class Period. Accordingly, there is no reliable economic evidence demonstrating that these statements caused Facebook's stock price to increase during the Class Period.

68. Plaintiffs further allege that the following statements were false and misleading:

- On October 12, 2017, during an interview with Axios, Ms. Sandberg stated: "***[W]hen you share on Facebook you need to know*** that no one's going to steal your data. ***No one is going to get your data that shouldn't have it. That we're not going to make money in ways that you would feel uncomfortable with off your data. And that you're controlling who you share with***. So maybe it's not a great example because we're on live, but if we weren't on live, I could take a picture of the two of us and I could share it with just myself so I savor this moment, Mike. I could share it with just my mom because even when no one else cares what I do, my mom always cares and so does my dad and I'm grateful for that. Or I could share it with the whole world. And when I make that decision and I make that decision, that information needs to be shared with who I want to share. So privacy for us is not just adhering to the law. That's a basic. ***Privacy for us is making sure that you feel secure, sharing on Facebook***."[129]

- On March 16, 2018, in a post on its corporate website titled *Suspending Cambridge Analytica and SCL Group From Facebook*, Facebook stated: "In 2014, after hearing feedback from the Facebook community, we made an

127. Complaint ¶ 608. Emphasis in original.

128. Complaint, n. 632 ("Facebook's *Statement of Rights and Responsibilities* was published on Facebook's corporate website starting on January 30, 2015 and ending May 25, 2018 inclusive."). The changes to Facebook's *Statement of Rights and Responsibilities* were made during trading hours on January 30, 2015 and May 25, 2018. See Facebook Site Governance post, January 30, 2015, https://www.facebook.com/fbsitegovernance/posts/our-updated-terms-data-policy-and-cookies-policy-take-effect-today-january-30-20/10153018633659323/ and Facebook's Statement of Rights and Responsibilities, May 25, 2018, https://web.archive.org/web/20180525154320/https://www.facebook.com/terms/. Facebook did not have a statistically significant increase on January 30, 2015 and did not have a statistically significant decrease on May 25, 2018.

129. Complaint ¶ 609; "Exclusive interview with Facebook's Sheryl Sandberg," *Axios*, October 12, 2017, https://www.axios.com/2017/12/15/exclusive-interview-with-facebooks-sheryl-sandberg-1513306121. Emphasis added.

update to ensure that each person decides what information they want to share about themselves, including their friend list. This is just one of the many ways ***we give people the tools to control their experience***. Before you decide to use an app, you can review the permissions the developer is requesting and choose which information to share. You can manage or revoke those permissions at any time."[130]

- On March 17, 2018, Facebook made the following statement to a reporter for *The Washington Post*: "***We respected the privacy settings that people had in place***. Privacy and data protections are fundamental to every decision we make."[131]

- On April 4, 2018, during a telephonic press conference with journalists and members of the press, Mr. Zuckerberg stated: "[T]he main principles are, ***you have control over everything you put on the service***, and most of the content Facebook knows about you it [*sic*] because you chose to share that content with your friends and put it on your profile."[132]

- On April 10, 2018, during his live oral testimony before the Joint Commerce and Judiciary Committees of the U.S. Senate, Mr. Zuckerberg made the following statements:

  (a) "This is the most important principle for Facebook: Every piece of content that you share on Facebook, you own and you have ***complete control*** over who sees it and – and how you share it, and you can remove it at any time. That's why every day, about 100 billion times a day, people come to one of our services and either post a photo or send a message to someone, because ***they know that they have that control and that who they say it's going to go to is going to be who sees the content***. And I think that that control is something that's important that I think should apply to – to every service."

  (b) "That's what the [Facebook] service is, right? It's that you can connect with the people that you want, and you can share whatever content matters to you, whether that's photos or links or posts, and ***you get control over it***."

  (c) "The two broad categories that I think about are content that a person is [sic] chosen to share and that they have complete control over, they get to control when they put into the service, when they take it down, who sees it. And then the other category are data that are connected to making the ads relevant. ***You have complete control over both***."

130. Complaint ¶ 610. Emphasis in original.

131. Complaint ¶ 622. Emphasis in original.

132. Complaint ¶ 611. Emphasis in original.

(d) "Every person gets to ***control who gets to see their content***."

(e) "But, Senator, the – your point about surveillance, I think that there's a very important distinction to draw here, which is that when – when organizations do surveillance[,] people don't have control over that. ***But on Facebook, everything that you share there[,] you have control over***."[133]

- On April 11, 2018, during his live testimony before the U.S. House of Representatives' Energy and Commerce Committee, Mr. Zuckerberg stated:

(a) "[. . .] on Facebook, you have control over your information."

(b) "[. . .] every single time that you share something on Facebook or one of our services, right there is a control in line, where you control who – who you want to share with."

(c) "Congresswoman, giving people control of their information and how they want to set their privacy is foundational to the whole service [on Facebook]. It's not just a – kind of an add-on feature, something we have to . . . comply with . . . ***all the data that you put in, all the content that you share on Facebook is yours. You control how it's used.***"[134]

- On April 24, 2018, in a public post on Facebook.com, Facebook stated: "You've been hearing a lot about Facebook lately and how your data is being used. While this information can sometimes be confusing and technical, it's important to know that ***you are in control of your Facebook***, what you see, what you share, ***and what people see about you***."[135]

- On June 8, 2018, in its Responses to Additional Question from the Senate Commerce Committee, Facebook stated: "Privacy is at the core of everything we do, and our approach to privacy starts with our commitment to transparency and control. [. . .] Our approach to control is based on the belief that people should be able to choose who can see what they share and how their data shapes their experience on Facebook. People can control the audience for their posts and the apps that can receive their data."[136]

- On June 29, 2018, in its Responses to the U.S. House of Representatives Energy and Commerce Committee's Questions for the Record, Facebook stated:

---

133. Complaint ¶ 615. Emphasis in original.

134. Complaint ¶ 616. Emphasis in original.

135. Complaint ¶ 612. Emphasis in original.

136. Complaint ¶ 617.

- "We already show people what apps their accounts are connected to and ***allow them to control what data they've permitted those apps to use***."
- "Privacy is at the core of everything we do, and our approach to privacy starts with ***our commitment to transparency and control***. [. . .] Our approach to control is based on the belief that people should be able to choose who can see what they share and how their data shapes their experience on Facebook. ***People can control the audience for their posts and the apps that can receive their data***."[137]

69. As shown in **Table 1**, there are eight trading dates on which these User Control Statements could have had an impact on the stock price. As explained above, the only subsequent disclosure that revealed the purported truth about the alleged misstatements is the Whitelisting Disclosure on June 3, 2018, which was not accompanied by a statistically significant price decline. By itself, this fact provides powerful economic evidence that these alleged misstatements did not cause Facebook's stock price to increase because the purported correction of them did not cause the price to decrease.

70. In any event, if these statements changed the total mix of information available to investors, I would expect them to have caused statistically significant changes in Facebook's stock price. That did not happen. **Table 1** shows that six of the eight trading days did not have positive and statistically significant residual returns and, for the reasons explained below, the economic evidence demonstrates that two positive and statistically significant residual returns that coincide with User Control Statements were not caused by the allegedly misstated information. Consequently, I conclude that there is no reliable economic evidence demonstrating that these User Control Statements caused Facebook's stock price to increase during the Class Period.

137. Complaint ¶¶ 613-614. Emphasis in original.

*i. User Control Statement on April 4, 2018*

71. After the market closed on April 4, 2018, Mr. Zuckerberg held a press conference to address the March 2018 Disclosures[138] during which Plaintiffs allege he made a false and misleading statement as documented above. As shown in **Table 1**, my event study reports a statistically significant stock price increase on the following trading day, April 5, 2018. However, there is no reliable economic evidence to conclude that the April 4, 2018 statement had an impact on Facebook's stock price on April 5, 2018.

72. As an initial matter, Plaintiffs do not allege that the April 4, 2018 statement was meaningfully different from the earlier User Control Statements, including the statement in Facebook's Statement of Rights and Responsibilities and Ms. Sandberg's statement in October 2017, neither of which moved the stock price. We found that none of the analyst reports following the press conference discuss the User Control Statements at all, let alone as new information.[139]

73. In contrast, market commentary of the event focused on a statement from Mr. Zuckerberg regarding the impact of the #deleteFacebook campaign: "I don't think there has

138. "Hard Questions: Q&A with Mark Zuckerberg on Protecting People's Information," *Facebook*, April 4, 2018, https://about.fb.com/news/2018/04/hard-questions-protecting-peoples-information/; "Facebook CEO Speaks on a Call With Media Reporters," *Bloomberg*, April 4, 2018.

139. "Is Facebook's ad revenue growth threatened by the data privacy and fake news scandals engulfing he platform?," *Blueshift Research*, April 4, 2018; "Five Things to Consider," *Citi*, April 4, 2018; "Cautiously Optimistic The Bottom Is In," *Deutsche Bank*, April 4, 2018; "Addressing the Ad Concerns; Lower PT to $200 but Remain Bullish," *Morgan Stanley*, April 4, 2018; "FB: Taking Data Steps Up To Capitol Hill," *Wells Fargo*, April 4, 2018; "Getting arms around data issues and making a little progress," *Bank of America Merrill Lynch*, April 5, 2018; "U.S. Market Daily," *CrispIdea*, April 5, 2018; "GDPR Update and Partner Categories Implications," *Mizuho Securities*, April 5, 2018; "Addressing the Ad Concerns; Lower PT to $200 but Remain Bullish," *Morgan Stanley*, April 6, 2018 (an additional by Morgan Stanley that references its April 4, 2018 report); "Facebook - Fake relief.," *Radio Free Mobile*, April 6, 2018.

been any meaningful impact we've observed."[140] Specifically, we found that analyst reports discuss Mr. Zuckerberg's #deleteFacebook statement, and several expressly attribute the price increase on April 5, 2018 to this statement. For example:

- Bank of America Merrill Lynch stated on April 5, 2018 that "Facebook stock was up nearly 3% in the aftermarket (commentary that advertisers and users have not been materially impacted helped)."[141]

- CrispIdea stated on April 5, 2018 that "[t]he shares of Facebook rose 2.7% after Mark Zu[c]kerberg reported that, he had not seen a noticeable change in the behaviour after the scandal."[142]

- Deutsche Bank stated on April 4, 2018 that "FB CEO Mark Zuckerberg's comments to reporters Wednesday afternoon suggesting it has not seen any meaningful user or advertiser impact, and his tone with reporters, suggest to us that the worst is likely behind FB and the narrative (and multiple) can likely improve from here."[143]

Moreover, *Bloomberg* stated on April 5, 2018 that "[t]he shares rose as much as 4.2 percent today after Facebook Chief Executive Officer Mark Zuckerberg assured investors that he sees no meaningful impact from the scandal and its aftermath."[144] Consequently, the economic evidence demonstrates that the cause of the increase in Facebook's stock price on April 5, 2018 was Mr. Zuckerberg's #deleteFacebook statement, not the User Control Statement.

74. Finally, if the April 4, 2018 statement had an impact on Facebook's stock price, I would expect to observe that the impact was reversed when this alleged misstatement was purportedly corrected by the disclosure of the Whitelisting practices on June 3, 2018. The

---

140. The alleged misstatement occurs at about 40:22 of the audio recording of the event while Mr. Zuckerberg's statement that "I don't think there has been any meaningful impact we've observed" occurs at approximately 41:43 of the audio recording. https://about.fb.com/wp-content/uploads/2018/04/mark-press-call-4_4.mp3

141. "Getting arms around data issues and making a little progress," *Bank of America Merrill Lynch*, April 5, 2018.

142. "U.S. Market Daily," *CrispIdea*, April 5, 2018.

143. "Cautiously Optimistic The Bottom Is In," *Deutsche Bank*, April 4, 2018.

144. "Here's Why Some Are Saying Facebook's Stock Has Bottomed," *Bloomberg*, April 5, 2018.

absence of such a decline is further economic evidence that the April 4, 2018 statement did not have an impact on Facebook's stock price.

*ii. User Control Statements on April 10, 2018*

75. On April 10, 2018, Mr. Zuckerberg testified before the Joint Commerce and Judiciary Committees of the U.S. Senate.[145] Plaintiffs allege several misstatements from this testimony, but only the following statement occurs before the market closed on April 10, 2018:

> This is the most important principle for Facebook: Every piece of content that you share on Facebook, you own and you have ***complete control*** over who sees it and – and how you share it, and you can remove it at any time. That's why every day, about 100 billion times a day, people come to one of our services and either post a photo or send a message to someone, because ***they know that they have that control and that who they say it's going to go to is going to be who sees the content***. And I think that that control is something that's important that I think should apply to – to every service.[146]

76. As shown in **Table 1**, my event study reports a statistically significant stock price increase on April 10, 2018 and no statistically significant price reaction on April 11, 2018. Facebook's stock price was trading around $161.82 at the start of the hearing, then increased by about $3.93 during the first 45 minutes of the hearing reaching a high of $165.75 by 3:20pm.[147] This increase preceded the first alleged misstatement in the testimony, which occurred at

145. "Facebook, Social Media Privacy, and the Use and Abuse of Data," *U.S. Senate Committee on Commerce, Science, & Transportation*, https://www.commerce.senate.gov/2018/4/facebook-social-media-privacy-and-the-use-and-abuse-of-data.

146. Complaint ¶ 615. Emphasis in original.

147. TICK Intraday Data. The hearing, which was scheduled to begin at approximately 2:15pm E.T. was delayed by about 20 minutes with opening statements beginning at approximately 2:35pm E.T. *See* "Live updates from Mark Zuckerberg's testimony to Congress Tuesday," *Vox*, April 10, 2018, https://www.vox.com/2018/4/10/17216734/live-facebook-mark-zuckerberg-testimony-senate-hearing-data ("**2:07 pm ET:** Hello! I'm here inside the hearing room and we're all waiting for Zuckerberg. The hearing was supposed to start at 2:15 pm ET, but sounds like it has been pushed back a bit to accommodate a Senate vote taking place around the same time…**2:35 pm ET:** We are starting with opening statements from Sen. Chuck Grassley,"). Facebook's stock price at 2:15pm was $161.81 and its stock price at 2:35pm was $161.82.

approximately 3:24 pm.[148] As **Figure 1** demonstrates, the increase in Facebook's stock price on April 10 occurred *before* the first alleged misstatement that day. Consequently, the statistically significant stock price increase was not caused by the alleged misstatements.

**Figure 1**
**Intraday Stock Price on April 10, 2018**




Sources:
TICK Intraday Data; https://www.commerce.senate.gov/2018/4/facebook-social-media-privacy-and-the-use-and-abuse-of-data; Vox's live blog coverage of the hearing put an exchange with Senator Orrin Hatch at 3:23pm ET. See "Live updates from Mark Zuckerberg's testimony to Congress Tuesday," Vox, April 10, 2018, https://www.vox.com/2018/4/10/17216734/live-facebook-mark-zuckerberg-testimony-senate-hearing-data/.

77. For all of these reasons, there is no reliable economic evidence to conclude that the User Control Statements caused Facebook's stock price to increase.

148. Vox's live blog coverage of the hearing put an exchange with Senator Orrin Hatch at 3:23pm ET. See "Live updates from Mark Zuckerberg's testimony to Congress Tuesday," *Vox*, April 10, 2018, https://www.vox.com/2018/4/10/17216734/live-facebook-mark-zuckerberg-testimony-senate-hearing-data/. That exchange comes *before* the first alleged misstatement according to the official transcript of the proceedings. Joint Hearing before the Committee on Commerce, Science, and Transportation United States Senate and the Committee on the Judiciary United States Senate, Serial No. J-115-40, April 10, 2018, https://www.govinfo.gov/content/pkg/CHRG-115shrg37801/pdf/CHRG-115shrg37801.pdf. There are 226 words between the 3:23 PM ET exchange between Senator Orrin Hatch and Mr. Zuckerberg's first alleged misstatement.

## VI. PROFESSOR GELBACH FAILS TO PROVIDE A RELIABLE METHOD TO ESTIMATE ALLEGED CLASSWIDE DAMAGES IN A MANNER CONSISTENT WITH PLAINTIFFS' THEORY OF LIABILITY

78. Alleged classwide damages are based on estimates of daily artificial inflation applied to individual class members' trading data. There are two steps to estimate daily artificial inflation throughout a class period based on the method that Professor Gelbach proposes. First, he must reliably estimate the amount of inflation removed from Facebook's stock price when the allegedly omitted truth was disclosed. Second, he must use those results to reliably estimate the value of the allegedly misstated information on each day of the Class Period. Professor Gelbach fails to provide a reliable method to estimate alleged artificial inflation in this matter under either step.

### A. Estimating the Amount of Alleged Inflation Removed from Facebook's Stock Price

79. As explained *supra* § IV, the disclosure of the allegedly misstated information did not impact Facebook's stock price, hence there is no basis to estimate any amount of alleged inflation. Even if this were not the case, Professor Gelbach's proposed methodology fails.

80. Professor Gelbach recognizes that the price impact of information unrelated to Plaintiffs' allegations must be removed from his estimate of alleged artificial inflation.[149] Professor Gelbach asserts (again without providing any support) that there was no confounding news on March 19, 2018 or March 20, 2018.[150] He instead assumes that the price reaction to the disclosure of the dismissed Continued Misuse claim is related to Plaintiffs' remaining allegation of Initial Misuse because the former is a "foreseeable consequence" of the latter.[151] However,

149. Gelbach Report, ¶ 141 ("I understand that damages in this litigation cannot be awarded for losses caused by events that are not themselves traceable to securities fraud.").

150. Gelbach Report, ¶ 143 ("[I]t does not appear that any other value-relevant, non-fraud related information was released during this time period that might explain the March 19-20, 2018 Stock price declines.").

151. Gelbach Dep., at 190:18-196:13.

for the reasons explained *supra* ¶ 48, this assumption is groundless.

81. Accordingly, Professor Gelbach's provisional calculation of alleged artificial inflation fails to estimate the amounts of the price declines on March 19, 2018, March 20, 2018, and July 26, 2018 that are solely attributable to the disclosures of Initial Misuse and Whitelisting but not Continued Misuse. Moreover, his claim that he can use "traditional tools of financial economics" to account for such confounding information[152] fails in this instance for two reasons. First, these tools require financial metrics such as earnings and cash flow information, and the nature of the Initial Misuse and Continued Misuse claims defies numerical categorization. Second, Professor Gelbach assumes without any basis that these tools will be applicable to information found in discovery, but there is no reason to believe that Facebook categorized revenue declines and cost increases according to Plaintiffs' theories of liability, which did not exist during the Class Period.[153]

82. In addition, Professor Gelbach ignores that the price decline on July 26, 2018 reflects the materialization of disclosed rather than concealed risks.[154] His estimate of alleged

152. Gelbach Report, ¶¶ 142 & 145. Professor Gelbach claims that "the financial economics tools that I have employed for my preliminary damages analysis and plan to use at the merits stage on a full record reflect the same approaches that investors use, and that market prices therefore reflect, every day in U.S. public securities markets." *Id.,* ¶ 164. However, investors do not attempt to calculate hypothetical prices according to the difference between information related and unrelated to allegations of fraud.

153. Similarly, if the finder of fact were to reject either the Initial Misuse or the Whitelisting claim, Professor Gelbach provides no method to parse the effects of the rejected claim from the price declines he measures.

154. Professor Gelbach also asserts that there was no confounding news on July 25, 2018. *See* Gelbach Report, ¶ 144. He provides no support for his assertion, which is contradicted by market commentary. *See, e.g.,* "The Conference Call That Shook Investor Faith in Facebook; Concerns about revenue growth, monetizing Instagram Stories and the impact of new privacy laws hit the social-media giant's shares," *The Wall Street Journal*, July 26, 2018 ("advertising revenue growth slowed down more in Europe than anywhere else in the world partly because of new privacy laws there. That was a bit jarring, as most investors had come to believe the new law that went into effect in May would have minimal, if any, impact… This revelation about Stories startled many analysts and investors.").

artificial inflation assumes that Facebook's stock price was inflated on February 3, 2017, the first day of the Class Period, in part by the amount of the decline in the price he measures on July 26, 2018. This assumption only makes sense if the information disclosed on July 25, 2018 could have been disclosed on February 3, 2017. There is no support for that assumption. As explained *supra* ¶ 48, when the allegedly corrective information was disclosed in March 2018, Facebook's stock price fully reflected the risk that the disclosure of this information could have financial consequences, as Professor Gelbach acknowledged in his deposition.[155] But, according to Plaintiffs, Facebook's stock price did not reflect the specific financial consequences themselves until those consequences allegedly were disclosed on July 25, 2018. Accordingly, the price reactions to the allegedly corrective disclosures are distinct from the price reactions to their purported consequences. Put differently, because Plaintiffs claim Facebook's stock price did not reflect the negative financial consequences following the alleged disclosure of Initial Misuse and Whitelisting, there is no reason to believe that the price would have reflected those consequences on the first day of the Class Period had purportedly truthful information about Initial Misuse and Whitelisting been disclosed on that day.[156] Professor Gelbach provides no basis to support his assumption or any method to account for this issue.

---

155. Gelbach Dep., at 163:4-165:25.

156. I note that Professor Gelbach claims that had the "relevant truth" been disclosed earlier: "[investors] would have naturally *inferred* that Facebook's revenue *would* fall when it shut off third-party access and that the Company *would* incur greater costs to properly secure user data. That *would* reduce the ability of app developers to acquire and sell data useful for advertising. In turn, ad targeting deterioration *would* dampen demand for Facebook's ads, predictably reducing the number of ads sold, the price advertisers *would* be willing to pay for them, or both. Further, reputational harm *could* have led to reduced use, exacerbating the reduction in advertising revenues." Gelbach Report, ¶ 99 (emphasis added). Consequently, he claims that the risks but not the realizations of those risks would have been reflected in Facebook's price following the earlier disclosure of the allegedly corrective information. Moreover, while Professor Gelbach claims that the investors did not appreciate the Whitelisting disclosure in June 2018 until the July 2018 Disclosure (*id.,* ¶ 130), he does not make that claim regarding Initial Misuse.

83. Moreover, Professor Gelbach disregards that some of the materialized risks disclosed on July 25, 2018 relate to risks that were disclosed *before* the first alleged corrective disclosure, i.e., at least a portion of the stock price decline on July 26, 2018 is unrelated to the allegedly corrective information. Professor Gelbach describes and quotes from Facebook's July 25, 2018 conference call to discuss its financial results for the second quarter of 2018 as follows: "Zuckerberg led off the Company's Q2 2018 earnings call on July 25, 2018, stating: 'Looking ahead, we will continue to invest heavily in security and privacy,' and that 'we're investing so much in security that it will significantly impact our profitability. We're starting to see that this quarter.'"[157] However, the actual quote is: "Looking ahead, we will continue to invest heavily in security and privacy because we have a responsibility to keep people safe. **But as I've said on past calls,** <u>we're investing so much in security that it will significantly impact our profitability</u>. We're starting to see that this quarter."[158] Professor Gelbach skips over the bolded phrase, which explains that the risk that the Company's profitability would be significantly impacted was disclosed before July 25, 2018. In fact, Mr. Zuckerberg discussed this risk in November 2017, *before* the first alleged corrective disclosure:

> In many places, we're doubling or more our engineering efforts focused on security. And we're also building new AI to detect bad content and bad actors -- just like we've done with terrorist propaganda. I am dead serious about this. And the reason I'm talking about this on our earnings call is that <u>I've directed our teams to invest so much in security on top of the other investments we're making that it will significantly impact our profitability going forward</u>.[159]

Consequently, the profitability impact disclosure on July 25, 2018 reflects a disclosed rather than

157. Gelbach Report, ¶ 131.

158. Facebook Inc., FQ2 2018 Earnings Call Transcript, July 25, 2018, 5:00 PM ET, at 5.

159. "Facebook, Inc. NasdaqGS:FB FQ3 2017 Earnings Call Transcripts," November 1, 2017. I note that this statement is not alleged to be misstated or corrective.

concealed risk. Professor Gelbach provides no method to apportion the stock price decline he measures on July 26, 2018 between the materialization of risks related to Plaintiffs' allegations from the materialization of unrelated risks.

### B. Estimating the Amount of Alleged Inflation on Each Day of the Class Period

84. Professor Gelbach provisionally opines that absent the alleged fraud, the March 2018 Disclosures would have caused the same price reaction on February 3, 2017 that occurred when they were actually made in March 2018.[160] However, as explained *supra* ¶ 47, the market's reaction to the March 2018 Disclosures was exacerbated by market concerns over Russia's use of Facebook to interfere with the 2016 U.S. presidential election, and those concerns developed over time. Consequently, the price reaction to the same disclosures most likely would have been smaller on February 3, 2017 because their context would not have been as influenced by the increasing Russian interference concerns that developed over the Class Period and accompanied those alleged corrective disclosures. Professor Gelbach fails to propose any method to estimate the price reaction to an earlier disclosure of the same information that would have occurred in a different context.[161]

85. For all of the reasons above, Professor Gelbach fails to provide reliable methods to estimate alleged classwide damages in a manner consistent with Plaintiffs' theory of liability in this matter.

---

160. Gelbach Report, ¶ 106.

161. Professor Gelbach's description and examples of how he could employ "traditional tools of financial economics" to reduce his estimates of the amount of purported price inflation removed from Facebook's stock are inapplicable to this situation because it does not involve directly measurable changes in financial metrics obtained through discovery. Gelbach Report, ¶¶ 142 & 145.

Daniel R. Fischel

October 9, 2026

**DANIEL R. FISCHEL** **October 2026**

Business Address:

Compass Lexecon
Two Prudential Plaza
180 N. Stetson Ave., STE 5300
Chicago, IL 60601
Tel: 312-322-0209
dfischel@compasslexecon.com

## PROFESSIONAL EXPERIENCE

Lee and Brena Freeman Professor of Law and Business, University of Chicago Law School (1/84 -12/2005, chair awarded in 7/89, emeritus as of 1/1/2006); Dean of Law School (1/99 - 2/01); Visiting Professor of Law, University of Chicago Law School (7/82 - 6/83).

Professor of Law and Business, Northwestern University School of Law (1/1/2006 - 5/2011). Professor, Kellogg School of Management (courtesy appointment, 1/1/2006 - 5/2011).

Jack N. Pritzker Distinguished Visiting Professor of Law, Northwestern University School of Law (6/02 - 6/03).

Professor of Law and Business, University of Chicago Graduate School of Business (courtesy appointment, 7/87 - 6/90).

Director, Law and Economics Program, University of Chicago (1/84 - 6/91).

Assistant Professor of Law, Northwestern University School of Law (6/80 - 6/81); Associate Professor of Law, Northwestern University School of Law (6/81 - 6/82); promoted to full professor in 6/82.

Attorney with Levy and Erens, Chicago, Illinois (7/79 - 6/80).

Law Clerk for Associate Justice Potter Stewart of the United States Supreme Court (1978 - 1979).

Law Clerk for Judge Thomas E. Fairchild, Chief Judge of the Seventh Circuit Court of Appeals (1977 - 1978).

## CONSULTING EXPERIENCE

Chairman, Compass Lexecon (2023-2025, 2026-Present)

President and Chairman (2008-2023, 2025)

## AREAS OF SPECIALIZATION

Securities and Financial Markets, Valuation and Financial Analysis, Bankruptcy and Financial Distress Litigation, ERISA Litigation, Class Certification, Damages, Corporate Governance.

## PUBLICATIONS

Payback: The Conspiracy to Destroy Michael Milken and His Financial Revolution, Harper Business (1995).

The Economic Structure of Corporate Law, Harvard University Press (1991) (with Frank H. Easterbrook).

## ARTICLES

The Use of Trading Models to Estimate Aggregate Damages in Securities Fraud Litigation: An Update, Briefly… Perspectives on Legislation, Regulation, and Litigation, Vol. 10, No. 3 (National Legal Center for the Public Interest, 2006) (with David J. Ross and Michael A. Keable).

The Hewlett-Packard Merger: A Case Study, in The New Investor Relations, Expert Perspectives on The State Of The Art (Bloomberg Press Princeton, 2004) (with Kenneth R. Cone, Gregory J. Pelnar and David J. Ross).

Market Evidence in Corporate Law, 69 U. Chi. L. Rev. 941 (2002).

Multidisciplinary Practice, The Business Lawyer, Vol. 55, (May 2000).

Government Liability for Breach of Contract, American L. & Econ. Rev. V1 N1/2 313 (1999) (with Alan Sykes).

Lawyers and Confidentiality, 65 U. Chi. L. Rev. 1 (1998).

The Law and Economics of Vanishing Premium Life Insurance, 22 Del. J. Corp. Law 1 (1997) (with Robert S. Stillman).

Clustering and Competition in Asset Markets, 20 J. Law & Econ. 23 (1997) (with Sanford J. Grossman, Merton H. Miller, Kenneth R. Cone and David J. Ross).

Corporate Crime, 25 J. Legal Studies 319 (1996) (with Alan O. Sykes).

The Use of Trading Models to Estimate Aggregate Damages in Securities Fraud Litigation: A Proposal for Change, in Securities Class Actions: Abuses and Remedies (The National Legal Center for the Public Interest, 1994) (with David J. Ross).

Civil Rico After Reves: An Economic Commentary, 1993 Sup. Ct. Rev. 157 (with Alan O. Sykes).

Contract and Fiduciary Duty, 36 J. Law & Econ. 425 (1993) (with Frank H. Easterbrook).

Should the Law Prohibit "Manipulation" in Financial Markets?, 105 Harv. L. Rev. 503 (1991) (with David J. Ross).

Efficient Capital Markets, the Crash, and the Fraud on the Market Theory, 74 Cornell L. Rev. 907 (1989).

The Corporate Contract, 89 Colum. L. Rev. 1416 (1989) (with Frank H. Easterbrook); also published in Corporate Law and Economic Analysis (Cambridge University Press 1990) (Lucian Bebchuk ed.).

The Economics of Lender Liability, 99 Yale L. J. 131 (1989).

Should One Agency Regulate Financial Markets, in Black Monday and the Future of Financial Markets (R. Kormendi, R. Kamphuis & J. W. H. Watson, ed.) (Dow Jones-Irwin Inc., 1988).

ERISA's Fundamental Contradiction: The Exclusive Benefit Rule, 55 U. Chi. L. Rev. 1105 (1988) (with John H. Langbein).

From MITE to CTS: Takeovers, the Williams Act and the Commerce Clause, 1987 Sup. Ct. Rev. 47.

The Regulation of Banks and Bank Holding Companies, 73 Va. L. Rev. 301 (1987) (with Andrew M. Rosenfield and Robert S. Stillman).

The Regulation of Accounting: Some Economic Issues, 52 Brooklyn L. Rev. 1051 (1987).

Organized Exchanges and the Regulation of Dual Class Common Stock, 54 U. Chi. L. Rev. 119 (1987).

Comparable Worth and Discrimination in Labor Markets, 53 U. Chi. L. Rev. 891 (1986) (with Edward P. Lazear).

Comparable Worth: A Rejoinder, 53 U. Chi. L. Rev. 950 (1986) (with Edward P. Lazear).

Close Corporations and Agency Costs, 38 Stan. L. Rev. 271 (1986) (with Frank H. Easterbrook).

The Role of Liability Rules and the Derivative Suit in Corporate Law: A Theoretical and Empirical Analysis, 71 Corn. L. Rev. 261 (1986) (with Michael Bradley).

Regulatory Conflict and Entry Regulation of New Futures Contracts, 59 J. Bus. S85 (1985).

Optimal Damages in Securities Cases, 52 U. Chi. L. Rev. 611 (1985) (with Frank H. Easterbrook).

The Business Judgment Rule and the Trans Union Case, 40 Bus. Law. 1437 (1985).

Insider Trading and Investment Analysts: An Economic Analysis of Dirks v. SEC, 13 Hofstra L. Rev. 127 (1984).

Limited Liability and the Corporation, 52 U. Chi. L. Rev. 89 (1985) (with Frank H. Easterbrook).

Labor Markets and Labor Law Compared with Capital Markets and Corporate Law, 51 U. Chi. L. Rev. 1061 (1984).

Customer Protection in Futures and Securities Markets, 4 J. Futures Markets 273 (1984) (with Sanford J. Grossman).

Mandatory Disclosure and the Protection of Investors, 70 Va. L. Rev. 669 (1984) (with Frank H. Easterbrook).

The Appraisal Remedy In Corporate Law, 1983 Am. Bar Found. Res. J. 875.

The Regulation of Insider Trading, 35 Stan. L. Rev. 857 (1983) (with Dennis W. Carlton).

Voting in Corporate Law, 26 J. Law & Econ. 395 (1983) (with Frank H. Easterbrook).

Auctions and Sunk Costs in Tender Offers, 35 Stan. L. Rev. 1 (1982) (with Frank H. Easterbrook).

The Corporate Governance Movement, 35 Vand. L. Rev. 1259 (1982).

Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities, 38 Bus. Law 1 (1982).

Antitrust Suits By Targets of Tender Offers, 80 Mich. L. Rev. 1155 (May 1982) (with Frank H. Easterbrook).

Corporate Control Transactions, 91 Yale L. J. 698 (1982) (with Frank H. Easterbrook).

The "Race to the Bottom" Revisited: Reflections on Recent Developments in Delaware Corporation Law, 76 Nw. Univ. L. Rev. 913 (1982).

Takeover Bids, Defensive Tactics and Shareholders' Welfare, 36 Bus. Law 1733 (1981) (with Frank H. Easterbrook).

The Law and Economics of Dividend Policy, 67 Va. L. Rev. 699 (1981).

The Proper Role of a Target's Management in Responding to a Tender Offer, 94 Harv. L. Rev. 1161 (1981) (with Frank H. Easterbrook) (awarded prize by Emory University for best paper written in law and economics for the year 1981).

Secondary Liability Under Section 10(b) of the Securities Act of 1934, 69 California L. Rev. 80 (1981).

Efficient Capital Market Theory, the Market for Corporation Control, and the Regulation of Cash Tender Offers, 57 Tex. L. Rev. 1 (1978); reprinted in K. Scott and R. Posner ed., Economic Perspectives on Corporation Law and Securities Regulation (Little Brown 1980).

Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine, 45 U. Chi. L. Rev. 80 (1977).

Comment, The Demand and Standing Requirements in Stockholder Derivation Actions, 44 U. Chi. L. Rev. 168 (1977).

Comment, The Use of Government Judgments in Private Antitrust Litigation: Clayton Act Section 5(a), Collateral Estoppel, and Jury Trial, 43 U. Chi. L. Rev. 338 (1976).

## EDUCATION

University of Chicago Law School, Chicago, Illinois; J.D. 1977, cum laude; Order of the Coif; Comment Editor, Vol. 44, University of Chicago Law Review; Approximately top 1% of the Class. Awarded Casper Platt Award for best paper written by a student of the University of Chicago Law School; awarded Jerome N. Frank Prize for excellence in legal writing while a member of the University of Chicago Law Review, 1975 - 1977. Studied law and economics with Richard Posner and other members of the faculty.

Brown University, Providence, Rhode Island; M.A. 1974 in American History.

Cornell University, Ithaca, New York; major-American History; minor-Economics; B.A. 1972.

## TESTIMONY

Deposition of Daniel R. Fischel In Re: Albertsons Companies, Inc. v. The Kroger Co., In the Court of Chancery of the State of Delaware, C.A. No. 2024-1276-LWW (September 2, 2026).

Testimony of Daniel R. Fischel In Re: Air Products and Chemicals Inc., and Prodair Corporation v. Corporación Infra, S.A. DE C.V., In the International Court of Arbitration of the International Chamber of Commerce, ICC Case No. 29446/ICA9 (July 1, 2026).

Deposition of Daniel R. Fischel In Re: Dr. Alan Sacerdote, et al., v. Cammack Larhette Advisors, LLC, In the United States District Court for the Southern District of New York, No. 1:17-cv-08834-KBF (June 18, 2026).

Testimony of Daniel R. Fischel In Re: Mudrick Capital Management L.P., et al. vs. Quarternorth Energy Inc., et al., In the Court of Chancery of the State of Delaware, C.A. No. 2024-0106-LWW (May 7 and 8, 2026).

Deposition of Daniel R. Fischel In Re: Pentacon BV and Baltisse NV v. Guy Vanderhaegen, Guy Vanderhaegen Revocable Trust, Pelican Invest, LLC, and Pelican International, LLC, In the United States District Court, Southern District of New York, Case No. 1:23-cv-02172-KPF (February 17, 2026).

Testimony of Daniel R. Fischel In Re: The Matter of Certain Glass Substrates for Liquid Crystal Displays, Products Containing the Same, and Methods for Manufacturing the Same, for the United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-1433 (February 13, 18, 2026).

Deposition of Daniel R. Fischel In Re: Mudrick Capital Management L.P., et al. Vs. Quarternorth Energy Inc., et al., In the Court of Chancery of the State of Delaware, C.A. No. 2024-0106-LWW (February 6, 2026).

Deposition of Daniel R. Fischel In Re: The Matter of Certain Glass Substrates for Liquid Crystal Displays, Products Containing the Same, and Methods for Manufacturing the Same, for the United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-1433 (September 29, 2025).

Deposition of Daniel R. Fischel In Re: David Dinkevich, on Behalf of Himself and All Other Similarly Situated Stockholders of T-Mobile US, Inc., and Derivatively on Behalf of T-Mobile US, Inc. vs. Deutsche Telekom AG, et al., In the Court of Chancery of the State of Delaware, C.A. No. 2021-0479-PAF (July 11, 2025).

Deposition of Daniel R. Fischel In Re: Charles Larry Crews Jr., Individually and on Behalf of All Others Similarly Situated vs. Rivian Automotive, Inc., et al., In the United States District Court, Central District of California, Western Division, Civil Action No. 2:22-cv-01524-JLS-E (May 30, 2025).

Deposition of Daniel R. Fischel In Re: Smartmatic USA Corp., Smartmatic International Holding B.V. and SGO Corporation Limited vs. Fox Corporation, Fox News Network LLC, Lou Dobbs, Maria Bartiromo, Jeanine Pirro, and Rudolph Giuliani, In the Supreme Court of the State of New York, County of New York, Index No. 151136/2021 (January 29, 2025).

Deposition of Daniel R. Fischel In Re: US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation vs. Newsmax Media, Inc., In the Superior Court of the State of Delaware, C.A. No. N21C-08-063 EMD (January 17, 2025).

Deposition of Daniel R. Fischel In Re: General Motors LLC, General Motors Company vs. Alphons Iacobelli, FCA US LLC, Fiat Chrysler Automobiles, N.V., Jerome Durden, In the State of Michigan, Circuit Court for the County of Wayne, No. 20-011998-CB, (October 9, 2024).

Testimony of Daniel R. Fischel In Re: Bed Bath & Beyond Corporation Securities Litigation, In the United States District Court for the District of Columbia, C.A. No. 22-02541, (August 2, 2024).

Deposition of Daniel R. Fischel In Re: Tops Holding II Corporation, et al., Debtors, Alan D. Halperin, as the Litigation Trustee for the Tops Holding Litigation Trust, vs. Morgan Stanley Investment Management, Inc. et al., In the United States District Court, Southern District of New York, Case No. 18-22279 (SHL) (July 19, 2024).

Testimony of Daniel R. Fischel In Re: Richard J. Tornetta et al., vs. Elon Musk, et al., In the Court of Chancery of the State of Delaware, C.A. No. 2018-0408-KSJM, (July 8, 2024).

Testimony of Daniel R. Fischel In Re: The Matter of The Companies Act (As Revised) and In The Matter of 58.COM Inc., In The Grand Court of The Cayman Islands, Financial Services Division, Cause No. FSD 275 of 2020 (CJMRH), (June 26, 27, 28 and July 1, 2, 2024).

Deposition of Daniel R. Fischel In Re: Bed Bath & Beyond Corporation Securities Litigation, In the United States District Court for the District of Columbia, Case No. 1:22-cv-02541-TNM, (June 17, 2024).

Deposition of Daniel R. Fischel In Re: TGC Partners Limited et al., v. SIG China Investments One et al., In the Court of Common Pleas of Montgomery County Pennsylvania, No. 2021-22424, (June 7, 2024).

Deposition of Daniel R. Fischel In Re: Richard J. Tornetta et al., vs. Elon Musk, et al., In the Court of Chancery of the State of Delaware, C.A. No. 2018-0408-JRS, (May 31, 2024).

Declaration of Daniel R. Fischel In Re: Richard J. Tornetta et al., vs. Elon Musk, et al., In the Court of Chancery of the State of Delaware, C.A. No. 2018-0408-KSJM, (May 8, 2024).

Deposition of Daniel R. Fischel In Re: Sjunde AP-Fonden et al., vs. General Electric, et al., In the United States District Court, Southern District of New York, Case No. 17-cv-08457 (JMF), (May 3, 2024).

Deposition of Daniel R. Fischel In Re: Maxmillian Klein, et al. on behalf of themselves and all others similarly situated v. Meta Platforms, Inc., In the United States District Court, Northern District of California, San Francisco Division, Case No. 20-cv-08570-JD, (March 20, 2024).

Deposition of Daniel R. Fischel In Re: Federal Trade Commission v. Meta Platforms, Inc., In the United States District Court for the District of Columbia, No. 1:20-cv-03590-JEB, (February 15, 2024).

Deposition of Daniel R. Fischel In Re: Stewart N. Goldstein, individually and on behalf of all others similarly situated v. Sarissa Capital Management, L.P., et al., In the Court of Chancery for the State of Delaware, Case No. 2020-1061-JTL, (January 25, 2024).

Deposition of Daniel R. Fischel In Re: Solar Eclipse Investment Fund III, LLC, Solar Eclipse Investment Fund IV, LLC, et al. v Cohnreznick LLP, Cohnreznick Capital Markets Securities LLC, et al., In the Superior Court of the State of California, County of Los Angeles, Case No. 19STCV45775, (October 31, 2023).

Deposition of Daniel R. Fischel In Re: Alta Partners, LLC v. Getty Images Holdings, Inc., No. 1:22-cv-08916-JSR and CRCM Institutional Master Fund (BVI) LTD., and CRCM SPAC Opportunity Fund LP, In the United States District Court, Southern District of New York, No. 1:23-cv-01074-JSR, (August 28, 2023).

Testimony of Daniel R. Fischel In Re: Petersen Energia Inversora, S.A.U. and Petersen Energia S.A.U. v. Argentine Republic and YPF S.A., In the United States District Court, Southern District of New York, 15 Civ. 2739 (LAP), (July 27, 2023).

Deposition of Daniel R. Fischel In Re: January 2021 Short Squeeze Trading Litigation, In The United States District Court, Southern District of Florida, Case No. 21-2989-MDL-ALTONAGA, (April 12, 2023).

Testimony of Daniel R. Fischel In Re: Sanchez Energy Corporation, et al., Debtors, In The United States Bankruptcy Court, Southern District of Texas, Houston Division, Chapter 11, Case No. 19-34508 (MI), (March 28, 2023).

Deposition of Daniel R. Fischel In Re: Sanchez Energy Corporation, et al., Debtors, In The United States Bankruptcy Court, Southern District of Texas, Houston Division, Chapter 11, Case No. 19-34508 (MI), (February 10, 2023).

Testimony of Daniel R. Fischel In Re: The Boeing Company and Boeing Brasil Servicos Tecnicos Aeronauticos LTDA. v. Embraer S.A. and Yabora Industria Aeronautica S.A., American Arbitration Association, Case No. 01-20-0005-0591, (February 6, 2023).

Testimony of Daniel R. Fischel In Re: Straight Path Communications Inc. Consolidated Stockholder Litigation, In the Court of Chancery of the State of Delaware, C.A. No. 2017-0486-SG, (December 9, 2022).

Testimony of Daniel R. Fischel In Re: Oracle Corporation Derivative Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 2017-0337-SG, (July 28, 2022).

Testimony of Daniel R. Fischel In Re: United States of America v. Gregg Smith, Michael Nowak, and Jeffrey Ruffo, In The United States District Court, Northern District of Illinois, Eastern Division, No. 19 CR 00669, (July 25 and 26, 2022).

Deposition of Daniel R. Fischel In Re: Sjunde Ap-Fonden, et al. vs. General Electric, et al. In The United States District Court, Southern District of New York, Index No. 17-cv-08457 (JMF), (July 14, 2022).

Deposition of Daniel R. Fischel In Re: Sanchez Energy Corporation, et al., and Delaware Trust Company v. Mesquite Energy Inc. f/k/a Sanchez Energy Corporation, Apollo Commodities Management, L.P., Fidelity Management and Research Company, et al. In the United States Bankruptcy Court, Southern District of Texas, Houston Division, Chapter 11, Case No. 19-34508 (MI), Adv. Pro. No. 21-3862 (MI), (May 17, 2022).

Deposition of Daniel R. Fischel In Re: Tesla, Inc., Securities Litigation, In the United States District Court for the Northern District of California, San Francisco Division, Civil Action No. 3:18-cv-04865-EMC, (March 28, 2022).

Deposition of Daniel R. Fischel In Re: Petersen Energia Inversora, S.A.U. and Petersen Energia S.A.U. v. Argentine Republic and YPF S.A., In the United States District Court, Southern District of New York, 15 Civ. 2739 (LAP), (March 17, 2022).

Testimony of Daniel R. Fischel In Re: Mindbody, Inc. Stockholder Litigation, In the Court of Chancery of the State of Delaware, C.A. No. 2019-0442-KSJM, (March 9, 2022).

Testimony of Daniel R. Fischel In Re: The Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. and its affiliated debtors et al. v. Yucaipa, et al., In the U.S. Bankruptcy Court for the District of Delaware, Bankr., D. Del., Proc. Nos. 13-50530-KBO, 14-50971-KBO (March 4, 2022).

Deposition of Daniel R. Fischel In Re: Securities and Exchange Commission v. Ripple Labs, Inc. et al., In the United States District Court, Southern District of New York, Case No. 20-Civ-10832 (AT) (SN) (February 28, 2022).

Deposition of Daniel R. Fischel In Re: Mindbody, Inc. Stockholder Litigation, In the Court of Chancery of the State of Delaware, C.A. No. 2019-0442-KSJM, (February 4, 2022).

Declaration of Daniel R. Fischel In Re: Mylan N.V. Securities Litigation, In the United States District Court, Southern District of New York, Case No. 1:16-cv-07926 (JPO), (December 22, 2021).

Deposition of Daniel R. Fischel In Re: JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation, In the United States District Court, Northern District of California, Case No.: 19-md-02913-WHO, (December 13, 2021).

Deposition of Daniel R. Fischel In Re: Oracle Corporation Derivative Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 2017-0337-SG, (December 8, 2021).

Deposition of Daniel R. Fischel In Re: Straight Path Communications Inc. Consolidated Stockholder Litigation, In the Court of Chancery of the State of Delaware, C.A. No. 2017-0486-SG, (October 21, 2021).

Deposition of Daniel R. Fischel In Re: Abu Dhabi Investment Authority vs. Mylan N.V. and Mylan Inc., In the United States District Court, Southern District of New York, Civil Action No. 1:20-cv-01342-JPO, (August 18, 2021).

Deposition of Daniel R. Fischel In Re: Mylan N.V. Securities Litigation, In the United States District Court, Southern District of New York, Case No. 1:16-CV-07926 (JPO), (August 17, 2021).

Deposition of Daniel R. Fischel In Re: Hawaii Structural Ironworkers Pension Trust Fund, Individually and on Behalf of All Others Similarly Situated vs. AMC Entertainment Holdings, Inc., et al., In the United States District Court, Southern District of New York, Case No.1:18-cv-00299-AJN-SLC, (August 12, 2021).

Deposition of Daniel R. Fischel In Re: Sjunde Ap-Fonden, et al, vs. General Electric, et al., In the United States District Court, Southern District of New York, Index No. 17-cv-08457 (JMF), (August 9, 2021).

Testimony of Daniel R. Fischel In Re: United States of America vs. Edward Bases and John Pacilio, In the United States District Court, Northern District of Illinois, Eastern Division, Docket No. 18 CR 48, (July 29, 2021).

Testimony of Daniel R. Fischel In Re: Ahmed D. Hussein vs. Sheldon Razin, Steven Plochocki, Quality Systems, Inc., And Does 1-10, Inclusive, In the Superior Court of California, County of Orange, NO. 30-2013-00679600, CU-NP-CJC (July 27, 2021).

Testimony of Daniel R. Fischel In Re: Tesla Motors, Inc. Stockholders Litigation, In the Court of Chancery of the State of Delaware, Consolidated Civil Action No. 12711-VCS (July 23, 2021).

Testimony of Daniel R. Fischel In Re: Huntsman International, LLC vs. Albemarle Corporation, Rockwood Specialties Group, Inc., and Rockwood Holdings, Inc., American Arbitration Association, AAA Case No. 01-17-001-4588 (May 10, 2021).

Testimony of Daniel R. Fischel In Re: Resolution Life L.P. and Resolution Life (Parallel) Partnership vs. GBIG Holdings, Inc. f/k/a Southland National Holdings, Inc.; SNH Acquisition, LLC and Greg Lindberg, In the Supreme Court of the State of New York, Civil Division, Index Nos. 650575/19, 653258/19, (April 19, 2021).

Deposition of Daniel R. Fischel In Re: Matthew Sciabacucchi and Hialeah Employees' Retirement System vs. John Malone, et al., and Charter Communications, Inc., In the Court of Chancery for the State of Delaware, C.A. No. 11418-VCG, (April 16, 2021).

Deposition of Daniel R. Fischel In Re: Jeld-Wen Holdings, Inc. Securities Litigation, In the United States District Court for The Eastern District of Virginia, Richmond Division, Civil Action No. 3:20-cv-00112-JAG, (February 26, 2021).

Testimony of Daniel R. Fischel In Re: The Pacific Gas and Electric Company Administration of Stress Test Methodology Developed Pursuant to Public Utilities Code Section 451.2(b) and (2) Determination That $7.5 Billion of 2017 Catastrophic Wildfire Costs and Expenses Are Stress Test Costs That May Be Financed Through Issuance of Recovery Bonds Pursuant to Section 451.2(c) and Section 850 et Seq.(U39E), Before the Public Utilities Commission of the State of California, Application No. 20-04-023, (December 15, 2020).

Deposition of Daniel R. Fischel In Re: Resolution Life L.P. and Resolution Life (Parallel) Partnership vs. GBIG Holdings, Inc. f/k/a Southland National Holdings, Inc.; SNH Acquisition, LLC and Greg Lindberg, In the Supreme Court of the State of New York, Index No. 650575/2019, (November 24, 2020).

Deposition of Daniel R. Fischel In Re: SH 130 Concession Company, LLC, Zachry Toll Road – 56 LP Cintra Texas 56 LLC et al. vs. Central Texas Highway Constructors, LLC, et al., In the United States Bankruptcy Court, Western District of Texas, Austin Division, Case No. 16-10262-TMD, Adversary No. 18-01030, (November 5, 2020).

Deposition of Daniel R. Fischel In Re: Ahmed D. Hussein versus Sheldon Razin, Steven Plochocki, Quality Systems, Inc., et al., In the Superior Court of the State of California, County of Orange, Case No. 302013-00679600 CUNPCJC, (October 22, 2020).

Deposition of Daniel R. Fischel In Re: Deutsche Bank National Trust Company, Solely in its Capacity as Trustee of the Harborview Mortgage Loan Trust Mortgage Loan Pass-Through Certificates, Series 2006-9, In the Supreme Court of the State of New York, County of New York, Index No. 654208/2018 (September 25, 2020).

Testimony of Daniel R. Fischel In Re: Fairstone Financial Holdings Inc., J.C. Flowers IV L.P. and VP Canada Acquisition, L.P. vs. Duo Bank of Canada, Court File No. CV-20-00641857-00CL and Duo Bank of Canada vs. Fairstone Financial Holdings Inc., J.C. Flowers IV L.P. and VP Canada Acquisition, L.P., Court File No. CV-20-00643629-00CL, In the Ontario Superior Court of Justice, (September 11, 2020).

Testimony of Daniel R. Fischel In Re: AB Stable VIII LLC vs. Maps Hotels and Resorts One LLC, et al., In the Court of Chancery of the State of Delaware, C. A. No. 2020-0310-JTL (August 28, 2020).

Deposition of Daniel R. Fischel In Re: AB Stable VIII LLC vs. Maps Hotels and Resorts One LLC, et al., In the Court of Chancery of the State of Delaware, Case No. 2020-0130-JTL (August 14, 2020).

Deposition of Daniel R. Fischel In Re: Willis Towers Watson PLC Proxy Litigation, In the United States District Court for the Eastern District of Virginia, Alexandria Division, Master File No. 1:17-cv-1338-AJT-JFA (August 12, 2020).

Deposition of Daniel R. Fischel In Re: Forescout Technologies, Inc. et al. vs. Ferrari Group Holdings, LP, and Ferrari Merger Sub, Inc., et al., In the Court of Chancery of the State of Delaware, Civil Action No. 2020-0385-SG (July 13, 2020).

Deposition of Daniel R. Fischel In Re: Brigade Leveraged Capital Structures Fund Ltd. et al. vs. Kindred Healthcare, Inc., et al., In the Circuit Court of Chancery of the State of Delaware, Case No. 2018 0165 (February 5, 2020).

Testimony of Daniel R. Fischel In Re: Gannaway Entertainment, Inc. et al vs. Frankly Inc. et al., American Arbitration Association, Case No. 01-18-0003-9480 (December 17, 2019).

Deposition of Daniel R. Fischel In Re: The Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. and its affiliated debtors et al. v. Yucaipa, et al., In the U.S. Bankruptcy Court for the District of Delaware, Bankr., D. Del., Proc. Nos. 13-50530-KBO, 14-50971-KBO (December 16, 2019).

Testimony of Daniel R. Fischel In Re: Nord Anglia Education, Inc., In the Grand Court of The Cayman Islands, Financial Services Division, Cause No. FSD 235 of 2017 (IKJ). (December 6, 9, 10 and 11, 2019).

Deposition of Daniel R. Fischel In Re: Lindie L. Banks and Erica LeBlanc, individually and on behalf of all others similarly situated vs. Northern Trust Corporation and Northern Trust Company, In the United States District Court, Central District of California, Case No. 2: 16-cv-09141-JFK (JCx) (November 22, 2019).

Deposition of Daniel R. Fischel In Re: Tesla Motors, Inc. Stockholder Litigation, In the Court of Chancery of the State of Delaware, C.A. No. 12711-VCS (November 19, 2019).

Deposition of Daniel R. Fischel In Re: Melina N. Jacobs, On Behalf of Herself and All Others Similarly Situated vs. Verizon Communications, Inc., et al., In the United States District Court for the Southern District of New York, Civil Action No. 1:16-cv-01082 (August 28, 2019).

Deposition of Daniel R. Fischel In Re: American Realty Capital Properties, Inc. Litigation, In the United States District Court, Southern District of New York, Civil Action No. 1:15-mc-00040-AKH Class Action (July 25, 2019).

Deposition of Daniel R. Fischel In Rajesh M. Shah, et al vs. Zimmer Biomet Holdings, Inc., et al, In the United States District Court, Northern District of Indiana, South Bend Division, Case No. 3:16-cv-815-PPS-MGG (May 17, 2019).

Testimony of Daniel R. Fischel In Colonial Chevrolet Co., Inc., et al., Alley's of Kingsport, Inc., et al., and Union Dodge, Inc., et al. vs. The United States (Nos. 10-647C, 11-100C, and 12-900L – Consolidated), In the United States Court of Federal Claims (May 8, 2019).

Testimony of Daniel R. Fischel In Anthem, Inc. vs. Cigna Corporation, In the Court of Chancery of the State of Delaware, C.A. No. 2017-0114-JTL (March 8, 2019).

Deposition of Daniel R. Fischel In Re: Nine West holdings, Inc., et al., Debtors, United States Bankruptcy Court, Southern District of New York, Chapter 11 Case No. 18-10947 (SCC) (January 16, 2019).

Deposition of Daniel R. Fischel In Re: Sandisk LLC Securities Litigation, United States District Court, Northern District of California, San Francisco Division, Case No. 3:15-cv-01455-VC (November 16, 2018).

Deposition of Daniel R. Fischel In Re: Colonial Chevrolet Co., Inc., Alley's of Kingsport, Inc. and Union Dodge, Inc., et al vs. The United States, In the United States Court of Federal Claims, Nos. 10-647C, 11-100C and 12-900L (Consolidated) (November 15, 2018).

Testimony of Daniel R. Fischel In Re: United States of America, et al., vs. J-M Manufacturing Co., Inc., United States District Court, Central District of California – Western Division, No. CV 6-55 GW (November 5, 2018).

Deposition of Daniel R. Fischel In Re: Appraisal of Air Methods Corp., In the Court of Chancery of the State of Delaware, C.A. No.: 2017-0317-JRS (September 27 and 28, 2018).

Testimony of Daniel R. Fischel In Re: Akorn, Inc., v. Fresenius Kabi, AG, et al., In the Court of Chancery of the State of Delaware, C.A. No. 2018-0300-JTL (July 13, 2018).

Deposition of Daniel R. Fischel In Re: Starz Stockholder Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 12584-VCG (July 12, 2018).

Deposition of Daniel R. Fischel In Re: Akorn, Inc. vs. Fresenius Kabi AG, Quercus Acquisition, Inc. and Fresenius SE & Co. KGaA, In the Court of Chancery of the State of Delaware, Index No. 2018-0300 (June 30, 2018).

Deposition of Daniel R. Fischel In Re: Physiotherapy Holdings, Inc., et al., Debtors; PAH Litigation Trust v. Water Street Healthcare Partners, L.P., et al., In the United States Bankruptcy Court for the District of Delaware, Case No. 13-12965 (KG) (Jointly Administered) (June 5, 2018).

Deposition of Daniel R. Fischel In Re: Facebook, Inc. Class C Reclassification Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 12286-VCL (May 18, 2018).

Testimony of Daniel R. Fischel In Re: Dr. Alan Sacerdote, et al. vs. New York University, In the United States District Court for the Southern District of New York, Civil Action No. 1:16-cv-6284-KBF (April 24, 25 and 26, 2018).

Deposition of Daniel R. Fischel In Re: Daniel Turocy, et al. vs. El Pollo Loco Holdings, Inc., et al., In the United States District Court, Central District of California, Southern Division, Case No. 8:15-cv-01343-DOC-KES (April 12, 2018).

Deposition of Daniel R. Fischel In Re: United States of America v. AT&T Inc., Directv Group Holdings, LLC, and Time Warner Inc., In the United States District Court for the District of Columbia, Case No. 1:17-cv-02511-RJL (March 9, 2018).

Deposition of Daniel R. Fischel In Re: Dr. Alan Sacerdote, et al. vs. New York University, In the United States District Court for the Southern District of New York, Civil Action No. 1:16-cv-6284-KBF (March 1, 2018).

Testimony of Daniel R. Fischel In Re: Lehman Brothers Holdings Inc., et al., In the United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No. 08-13555 (SCC) (December 4, 2017).

Deposition of Daniel R. Fischel In Re: Lehman Brothers Holdings Inc., et al., In the United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No. 08-13555 (SCC) (October 17, 2017).

Testimony of Daniel R. Fischel In Re: Genon Energy, Inc., et al, Debtors, In the United States Bankruptcy Court for the Southern District of Texas Houston Division, Chapter 11, Case No. 17-33695 (DRJ) (October 6, 2017).

Deposition of Daniel R. Fischel In Re: Genon Energy, Inc., et al, Debtors, In the United States Bankruptcy Court for the Southern District of Texas Houston Division, Chapter 11, Case No. 17-33695 (DRJ) (August 25, 2017).

Deposition of Daniel R. Fischel In Re: United States ex re. Hendrix et al., vs. JM Manufacturing Company, Inc., et al., In the United States District Court, Central District of California, Case No. ED CV 06-00055-GW (July 20, 2017).

Testimony of Daniel R. Fischel In Re: Saguaro Power Co. v. Pioneer Americas LLC d/b/a Olin Chlor Alkali Products, In AAA Case No. 01-16-0005-1073 (June 30, 2017).

Testimony of Daniel R. Fischel In Re: Syngenta AG MIR 162 Corn Litigation, In the United States District Court for the District of Kansas, Master File No. 2:14-MD-02591-JWL-JPO (June 19, 2017).

Testimony of Daniel R. Fischel In Re: Motors Liquidation Company, f/k/a General Motors Corporation, et al., Debtors, United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No.:09-50026 (MG) and Motors Liquidation Company Avoidance Action Trust, et al vs. JPMorgan Chase Bank, N.A., et al., United States Bankruptcy Court, Southern District of New York, Case No.: 09-00504 (MG) (May 2 and 3, 2017).

Deposition of Daniel R. Fischel In Re: Alere-Abbott Merger Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 12963-VCG (April 4, 2017).

Testimony of Daniel R. Fischel In Re: Appraisal of AOL Inc., In the Court of Chancery of the State of Delaware, Consol C.A. No. 11204-VCG (March 20, 2017).

Deposition of Daniel R. Fischel In Re: City of Daytona Beach Policy and Fire Pension Fund, et al vs. Examworks Group, Inc., et al., In the Court of Chancery of the State of Delaware, C.A. No. 12481-VCL (February 22, 2017).

Deposition of Daniel R. Fischel In Re: Appraisal of AOL Inc., In the Court of Chancery of the State of Delaware, Consol C.A. No. 11204-VCG (February 14 and 15, 2017).

Deposition of Daniel R. Fischel In Re: Motors Liquidation Company, f/k/a General Motors Corporation, et al., Debtors, United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No.:09-50026 (MG) and Motors Liquidation Company Avoidance Action Trust, et al vs. JPMorgan Chase Bank, N.A., et al., United States Bankruptcy Court, Southern District of New York, Case No.: 09-00504 (MG) (January 31, 2017).

Deposition of Daniel R. Fischel In Re: Syngenta Litigation, In the State of Minnesota District Court, County of Hennepin Fourth Judicial District, Court File No. 27-CV-15-3785 and In Re: Syngenta AG MIR 162 Corn Litigation, In the United States District Court for the District of Kansas, Case No. 2:14-md-2591-JWL-JPO (January 20, 2017).

Testimony of Daniel R. Fischel In the Matter of Motiva Enterprises LLC vs. Bechtel Corporation, Jacobs Engineering Group, Inc. and Bechtel-Jacobs CEP Port Arthur Joint Venture, International Institute for Conflict Prevention and Resolution (October 20, 2016)

Deposition of Daniel R. Fischel in Beaver County Employees Retirement Fund, et al., vs. Cyan, Inc., et al., Superior Court of the State of California, County of San Francisco, Lead Case No. CGC-14-538355 (Consolidated with No. CGC-14-539008) (October 11, 2016).

Testimony of Daniel R. Fischel In Re: Paragon Offshore PLC, et al, Debtors, In the United States Bankruptcy Court, District of Delaware, Case No. 16-10386 (September 23, 2016).

Deposition of Daniel R. Fischel In the Matter of Motiva Enterprises LLC vs. Bechtel Corporation, Jacobs Engineering Group, Inc. and Bechtel-Jacobs CEP Port Arthur Joint Venture, International Institute for Conflict Prevention and Resolution (August 25, 2016)

Deposition of Daniel R. Fischel In Re: Syngenta AG MIR162 Corn Litigation, In the United States District Court for the District of Kansas; Case No. 2;14-MD-02591-JWL-JPO and In Re: Syngenta Litigation, In the State of Minnesota District Court, County of Hennepin, Fourth Judicial District, Case No. 27-CV-15-3785 (August 11, 2016).

Deposition of Daniel R. Fischel in The Western and Southern Life Insurance Company vs. The Bank of New York Mellon, Court of Common Pleas, Hamilton County, Ohio, Case No. A 1302490 (July 27, 2016).

Testimony of Daniel R. Fischel in Herbalife, Ltd., vs. KPMG LLP, Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution, CPR Case No. 1100076998 (May 19, 2016).

Testimony of Daniel R. Fischel in iHeart Communications, Inc., f/k/a Clear Channel Communications, Inc. vs. Benefit Street Partners, et al., In the District Court of Bexar County, Texas, Cause No. 2016 CI 04006 (May 17, 2016).

Deposition of Daniel R. Fischel in iHeart Communications, Inc., f/k/a Clear Channel Communications, Inc. vs. Benefit Street Partners, et al., In the District Court of Bexar County, Texas, Cause No. 2016 CI 04006 (May 12, 2016).

Testimony of Daniel R. Fischel in U.S. Commodity Futures Trading Commission v. Igor B. Oystacher and 3 Red Trading, LLC, In the United States District Court for the Northern District of Illinois, Eastern Division, Docket No. 15 C 9196 (May 6, 2016).

Testimony of Daniel R. Fischel in Merion Capital LP and Merion Capital II, LP vs. Lender Processing Services, Inc., In the Court of Chancery of the State of Delaware, C.A. No. 9320-VCL (May 4 and 5, 2016).

Testimony of Daniel R. Fischel in iHeart Communications, Inc., f/k/a Clear Channel Communications, Inc. v. Benefit Street Partners LLC, et al., In the District Court of Bexar County, Texas, 285th Judicial District, Cause No. 2016-CI 04006 (April 5, 2016).

Deposition of Daniel R. Fischel in iHeart Communications, Inc., f/k/a Clear Channel Communications, Inc. v. Benefit Street Partners LLC, et al., In the District Court of Bexar County, Texas, 285th Judicial District, Cause No. 2016-CI 04006 (April 2, 2016).

Deposition of Daniel R. Fischel in Herbalife Ltd. vs. KPMG LLP, Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution, CPR Case No.1100076998 (March 31, 2016).

Deposition of Daniel R. Fischel in U.S. Commodity Futures Trading Commission v. Igor B. Oystacher and 3 Red Trading, LLC, In the United States District Court, Northern District of Illinois, Eastern Division, No. 15-cv-09196 (March 25, 2016).

Deposition of Daniel R. Fischel in Merion Capital LP and Merion Capital II, LP vs. Lender Processing Services, Inc., In the Court of Chancery of the State of Delaware, C.A. No. 9320-VCL (March 15, 2016).

Deposition of Daniel R. Fischel in Lawrence E. Jaffe Pension Plan, On Behalf of Itself and All Others Similarly Situated v. Household International, Inc., et al., In the United States District Court, Northern District of Illinois Eastern Division, Lead Case No. 02-C-5893 (February 24, 2016).

Deposition of Daniel R. Fischel in Robert E. Morley, Jr. and REM Holdings 3, LLC vs. Square, Inc., Jack Dorsey, and James McKelvey, Jr., United States District Court for the Eastern District of Missouri, Eastern Division, Civil Action No. 14-CV-00172-SNLJ (February 19, 2016).

Testimony of Daniel R. Fischel In the Matter of the Application of U.S. Bank National Association, The Bank of New York Mellon, et al., Supreme Court of the State of New York, County of New York, Index No. 652382/2014 (January 20 and 21, 2016).

Testimony of Daniel R. Fischel in Sangeeth Peruri v. Ameriprise Financial, Inc., et al, American Arbitration Association, Case No. 01-15-0002-3991 (December 7, 2015).

Deposition of Daniel R. Fischel In the Matter of the Application of U.S. Bank National Association, The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., et al, In the Supreme Court of the State of New York, County of New York, Index No. 652382/2014 (December 3, 2015).

Testimony of Daniel R. Fischel in Securities and Exchange Commission v. Arkadiy Dubovoy, et al, In the United States District Court for the District of New Jersey, Civil Case No. 15-cv- 6076-MCA (October 8, 2015).

Deposition of Daniel R. Fischel in Steven A. Stender, Harold Silver and Infinity Clark Street Operating, L.L.C., on behalf of themselves and all others similarly situated v. Archstone- Smith Operating Trust, et al., in the United States District Court for the District of Colorado, Case No. 07-CV-02503-WJM-MJW (July 24, 2015).

Testimony of Daniel R. Fischel In Re: Determination of Royalty Rates and Terms for Ephemeral Recording and Digital Performance of Sound Recordings (Web IV), in the United States Copyright Royalty Judges, The Library of Congress, Docket No. 14-CRB-0001-WR (2016-2020) (May 21 and 22, 2015).

Deposition of Daniel R. Fischel In Re: Determination of Royalty Rates and Terms for Ephemeral Recording and Digital Performance of Sound Recordings (Web IV), in the United States Copyright Royalty Judges, The Library of Congress, Docket No. 14-CRB-0001-WR (2016-2020) (April 1, 2015).

Deposition of Daniel R. Fischel in MacDermid, Incorporated vs. Cookson Group, PLC, Cookson Electronics and Enthone, Inc., in the Superior Court, Judicial District of Waterbury, Docket No. UWY-CV-12-6016356-S (January 21, 2015).

Testimony of Daniel R. Fischel in the Securities and Exchange Commission vs. Samuel E. Wyly and Donald R. Miller, Jr., in his capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr., in the United States District Court, Southern District of New York, 10 Civ. 5760 (SAS) (November 17, 2014).

Deposition of Daniel R. Fischel In Re: Activision Blizzard, Inc. Stockholder Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 8885-VCL (October 17, 2014).

Testimony of Daniel R. Fischel in Hugh M. Caperton, Harman Development Corporation, Harman Mining Corporation, and Sovereign Coal Sales, Inc. v. A.T. Massey Coal Company, Inc., In the Circuit Court for Buchanan County, Case No. 027CL10000771-00 (May 20 and 21, 2014).

Deposition of Daniel R. Fischel in Center Partners, Ltd., et al v. Urban Shopping Centers, L.P., et al., In the Circuit Court of Cook County, Illinois, County Department, Law Division, Case No. 04 L 012194 (April 24, 2014).

Deposition of Daniel R. Fischel in Third Point LLC v. William F. Ruprecht, et al and Sotheby's, In the Court of Chancery of the State of Delaware, C.A. No. 9469-VCP (April 19, 2014).

Deposition of Daniel R. Fischel in Hugh M. Caperton, Harman Development Corporation, Harman Mining Corporation, and Sovereign Coal Sales, Inc. v. A.T. Massey Coal Company, Inc., In the Circuit Court for Buchanan County, Case No. 027CL10000771-00 (March 14, 2014).

Deposition of Daniel R. Fischel in Corre Opportunities Fund, LP, Zazove Associates LLC, DJD Group LLLP, First Derivative Traders LP, and Kevan A. Fight vs. Emmis Communications Corporation, United States District Court, Southern District of Indiana, Indianapolis Division, Case No. 1:12-cv-0491-SEB-TAB (October 4, 2013).

Testimony of Daniel R. Fischel In the Matter of the Application of The Bank of New York Mellon, (As Trustee Under Various Pooling and Servicing Agreements and Indenture Trustee under various indentures), Petitioner, for an order, pursuant to CPLR §7701, seeking judicial instructions and approval of a proposed settlement, Index No. 651786/11, Supreme Court of the State of New York, County of New York: Trial Term Part 39 (September 9 and 10, 2013).

Testimony of Daniel R. Fischel In Re: September 11 Litigation, Case No. 21 MC 97 (AKH), United States District Court for the Southern District of New York, (July 16, 2013).

Deposition of Daniel R. Fischel in Cantor Fitzgerald & Co., et al v. American Airlines, Inc., et al, Case No. 21 MC 101 (AKH), 04 CV 7318 (AKH), United States District Court, Southern District of New York (July 1,2013).

Deposition of Daniel R. Fischel In Re: Pfizer Inc. Securities Litigation, Case No. 04 Civ. 9866 (RO) in The United States District Court for the Southern District of New York (June 28, 2013).

Testimony of Daniel R. Fischel in William T. Esrey, Julie C. Esrey, Ronald T. LeMay and Casondra C. Lemay v. Ernst & Young LLP Arbitration, Case No. 13 107 Y 02332 11 (May 29, 2013).

Deposition of Daniel R. Fischel in Christine Bauer-Ramazani and Carolyn B. Duffy, on behalf of themselves and all other similarly situated v. Teachers Insurance and Annuity Association of America – College Retirement and Equities Fund (TIAA-CREF), et al, in the United States District Court, District of Vermont, Docket No. 1:09-cv-190 (May 21, 2013).

Deposition of Daniel R. Fischel In Re: Google Inc. Class C Shareholder Litigation, In the Court of Chancery of the State of Delaware, Case No. 7469CS (May 17, 2013).

Deposition of Daniel R. Fischel In the Matter of the application of The Bank of New York Mellon (as Trustee under various Pooling and Servicing Agreements and Indenture Trustee under various Indentures), et al., Supreme Court of the State of New York, County of New York, Index No. 651786/2011 (May 9, 2013).

Deposition of Daniel R. Fischel in William T. Esrey, Julie C. Esrey, Ronald T. Lemay, and Casondra C. Lemay v. Ernst & Young, L.L.P., Before the American Arbitration Association, Case No. 1234 (May 7, 2013).

Deposition of Daniel R. Fischel in Archer Well Company, Inc. v. GW Holdings LLC and Wexford Capital LP, in the United States District Court, Southern District of New York, ECF Case No. 1 1:12-cv-06762-JSR (April 5, 2013).

Testimony of Daniel R. Fischel in Meso Scale Diagnostics, LLC , Meso Scale Technologies, LLC v. Roche Diagnostics GmbH, et al., In the Court of Chancery of the State of Delaware, Civil Action No. 5589-VCP (February 27, 2013).

Deposition of Daniel R. Fischel in Center Partners, Ltd. et al v. Urban Shopping Centers, L.P., et al, Circuit Court of Cook County, Illinois, No. 04 L 012194 (February 6 and 7, 2013).

Deposition of Daniel R. Fischel In Re: September 11 Litigation, United States District Court, Southern District of New York, Civil Action No. 21 MC 101 (AKH) (January 11, 2013).

Deposition of Daniel R. Fischel in Meso Scale Diagnostics, LLC, Meso Scale Technologies, LLC v. Roche Diagnostics GmbH, et al., In the Court of Chancery of the State of Delaware, Case No: 5589-VCP (November 12, 2012).

Testimony of Daniel R. Fischel in Stuart Bederman, et al. v. Archstone, f/k/a Archstone-Smith Operating Trust, Arbitration before the Honorable Bruce W. Kauffman (October 17, 2012).

Deposition of Daniel R. Fischel in David E. Brown, et al. v. Authentec, Inc. et al., In the Circuit Court of the Eighteenth Judicial Circuit in and for Brevard County, Florida, Civil Division, Case No. 05-2012-CA-57589 (September 18, 2012).

Deposition of Daniel R. Fischel in Stuart Bederman, et al. v. Archstone, f/k/a Archstone-Smith Operating Trust, Arbitration before the Honorable Bruce W. Kauffman (September 14, 2012).

Testimony of Daniel R. Fischel in Tronox, Incorporated, et al., v. Kerr-McGee Corporation, et al., United States Bankruptcy Court, Southern District of New York, Adversary Proceeding No. 09-10098(ALG) (August 7, 8 and 9, 2012).

Deposition of Daniel R. Fischel In re McAfee, Inc. Shareholder Litigation, Superior Court of the State of California, County of Santa Clara, Lead Case No. 1:10-cv-180413 (August 2, 2012).

Testimony of Daniel R. Fischel in Kraft Foods Global, Inc., v. Starbucks Corporation, Arbitration Before JAMS, Arbitration No. 1340008345 (July 31, 2012).

Deposition of Daniel R. Fischel in Altana Pharma AG, and Wyeth v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries, Ltd., In the United States District Court, District of New Jersey, Consolidated Civil Action Nos. 04-2355 (JLL)(CCC), 05-1966 (JLL)(CCC), 05-3920 (JLL)(CCC) and 05-3672 (JLL)(CCC) (June 1, 2012).

Deposition of Daniel R. Fischel in Kraft Foods Global, Inc. v. Starbucks Corporation, Arbitration before JAMS, Arbitration No. 1340008345 (May 15, 2012).

Deposition of Daniel R. Fischel in Capital One Financial Corporation v. John A. Kanas and John Bohlsen, In the United States District Court for the Eastern District of Virginia, Alexandria Division, Civil Action No. 1:11-cv-750 (LO/TRJ) (May 10, 2012).

Deposition of Daniel R. Fischel In Re: Pfizer Inc. Securities Litigation, In the United States District Court, Southern District of New York, Case 1:04-cv-09866-LTS-HBP (May 3, 2012).

Deposition of Daniel R. Fischel in Willie R. Pittman, Susan B. Seales and Stephen T. Selzer vs. J. Coley Clark, Moneygram International, Inc., et al., In the Court of Chancery of the State of Delaware, C.A. No. 6387-VCL (April 26, 2012).

Deposition of Daniel R. Fischel in Chona Allison, et al v. CRC Insurance Services, Inc., In the United States District Court for the Northern District of Illinois, Eastern Division, Case No. 10-3313 (March 14 and 15, 2012).

Deposition of Daniel R. Fischel In Re: Tronox Incorporated, et al., Debtors, In the United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No. 09-10156 (ALG) (February 24, 2012).

Testimony of Daniel R. Fischel In Re: BankAtlantic Bancorp, Inc. Litigation, In the Court of Chancery of the State of Delaware, Consolidated Civil Action No. 7068-VCL (January 27 and 30, 2012).

Deposition of Daniel R. Fischel in Hildene Capital Management, LLC et al v. BankAtlantic Bancorp, Inc., et al, In the Court of Chancery of the State of Delaware, C.A. No. 7068- VCL (January 19, 2012).

Deposition of Daniel R. Fischel in Advanced Analogic Technologies, Incorporated v. Skyworks Solutions, Inc. and Powerco Acquisition Corp., In the Court of Chancery of the State of Delaware, Arbitration No. 005-A-CS (November 18, 2011).

Testimony of Daniel R. Fischel in Prudential Retirement Insurance and Annuity Company v. State Street Bank and Trust Company and State Street Global Advisors, Inc., United States District Court, Southern District of New York, Case No. 07-CV-8488 (October 13, 2011).

Deposition of Daniel R. Fischel In Re: Inkeepers USA Trust, et al v. Cerberus Series Four Holdings, LLC., et al, United States Bankruptcy Court, Southern District of New York, Case No. 10-13800 (SCC) (October 5, 2011).

Deposition of Daniel R. Fischel in Mary K. Jones, et al v. Pfizer, Inc., et al, United States District Court, Southern District of New York, Civil Action No. 10-cv-03864 (AKH) ECF (October 4, 2011

Testimony of Daniel R. Fischel in Marina Del Rey Country Club Apartments, et al. vs. Archstone and Archstone Multifamily Series I Trust, Ruby/Archstone Arbitration (August 30, 2011).

Deposition of Daniel R. Fischel in Maher Terminals, LLC v. The Port Authority of New York and New Jersey, Before the Federal Maritime Commission, FMC Docket No. 08-03 (August 25, 2011).

Testimony of Daniel R. Fischel in Securities and Exchange Commission v. Joseph P. Nacchio, Robert S. Woodruff, Afshin Mohebbi, James J. Kozlowski and Frank T. Noyes, United States District Court for the District of Colorado, Civil Action No. 05-cv-480-MSK-CBS (August 16, 2011).

Affidavit of Daniel R. Fischel in Glenhill Capital LP, et al v. Porsche Automobil Holding, SE, f/k/a Dr. Ing. h.c. F. Porsche AG, Supreme Court of the State of New York, County of New York, Index Number 650678/2011 (August 15, 2011).

Deposition of Daniel R. Fischel in Fairfax Financial Holdings Limited and Crum & Forster Holdings Corp. v. S.A.C. Capital Management, LLC, et al., Superior Court of New Jersey, Law Division: Morris County, Docket No. MRS-L-2032-06 (July 27, 2011).

Deposition of Daniel R. Fischel In Re: Lyondell Chemical Company, et al v. Leonard Blavatnik, et al., United States Bankruptcy Court, Southern District of New York, Chapter 11 Case No. 09-10023 – (REG) (Jointly Administered) (July 25, 2011).

Deposition of Daniel R. Fischel In Re: Constar Int'l Inc. Securities Litigation, United States District Court, Eastern District of Pennsylvania, Master File No. 03cv05020 (June 28, 2011).

Affidavit of Daniel R. Fischel In Re: Massey Energy Co. Derivative and Class Action Litigation, in The Court of Chancery of the State of Delaware, C.A. No. 5430-VCS (May 20, 2011).

Deposition of Daniel R. Fischel in Marina Del Rey Country Club, et al v. Archstone and Archstone Multifamily Series I Trust, Ruby/Archstone Arbitration (May 9, 2011).

Testimony of Daniel R. Fischel in The Dow Chemical Company v. Petrochemical Industries Company (K.S.C.), International Chamber of Commerce, International Court of Arbitration, ICC Case No. 16127/JEM/MLK (April 7, 2011).

Testimony of Daniel R. Fischel In Re: Tribune Company, et al., Debtors, In the United States Bankruptcy Court for the District of Delaware, Chapter 11, Case No. 08-13141 (KJC) (March 10, 2011).

Deposition of Daniel R. Fischel In Re: Tribune Company, et al., Debtors, In the United States Bankruptcy Court for the District of Delaware, Chapter 11, Case No. 08-13141 (KJC) (March 2, 2011).

Deposition of Daniel R. Fischel In Re: Genetically Modified Rice Litigation, In the United States District Court for the Eastern District of Missouri, Eastern Division, Case No. 4:06 MD 1811 CDP (February 15, 2011)

Deposition of Daniel R. Fischel in Riceland Food, Inc. v. Bayer Cropscience LP, et al, In the United States District Court, Eastern District of Missouri, Eastern Division, Case No. 4:09- cv-00433 CDP (January 18, 2011).

Deposition of Daniel R. Fischel In Re: Genetically-Modified Rice Litigation, In the United States District Court for the Eastern District of Missouri, Case No. 4:06-MD-1811 (November 11, 12, 2010).

Deposition of Daniel R. Fischel in Coleen Witmer, Individually, and on Behalf of All Others Similarly Situated v. Dynegy Inc., In the District Court of Harris County, Texas, 234th Judicial District (November 6, 2010).

Testimony of Daniel R. Fischel in Terra Firma (GP) 2 Investments Limited v. Citigroup Inc., United States District Court for the Southern District of New York, No. 1:09-CV-10459 (JSR) (November 2, 2010).

Testimony of Daniel R. Fischel in Terra Firma (GP) 2 Investments Limited v. Citigroup Inc., United States District Court for the Southern District of New York, No. 1:09-CV-10459 (JSR) (October 22, 2010).

Testimony of Daniel R. Fischel in Air Products and Chemicals, Inc. v. Airgas, Inc., Peter McCausland, et al, In the Court of Chancery of the State of Delaware, C.A. No. 5249-CC (October 5, 2010)

Deposition of Daniel R. Fischel in Air Products and Chemicals, Inc. v. Airgas, Inc., Peter McCausland, et al, In the Court of Chancery of the State of Delaware, C.A. No. 5249-CC (September 8, 2010).

Deposition of Daniel R. Fischel in Terra Firma (GP) 2 Investments Limited v. Citigroup Inc., United States District Court for the Southern District of New York, No. 1:09-CV-10459 (JSR) (July 28, 2010).

Deposition of Daniel R. Fischel in Citadel Investment Group, L.L.C. et al v. Mikhail Malyshev and Jace Kohlmeier, In the American Arbitration Association, Case No.AAA No. 51 166 00969 09 (July 13, 2010).

Testimony of Daniel R. Fischel In Re: United States of America v. Joseph P. Nacchio, in the United States District Court for the District of Colorado, Case No. 05-CR-00545-EWN (June 23, 2010).

Deposition of Daniel R. Fischel in Cantor Fitzgerald Securities, Cantor Fitzgerald & Co., Cantor Fitzgerald Partners v. The Port Authority of New York and New Jersey, in the Supreme Court of the State of New York, County of New York, Case No. 105447/94 (June 4, 2010).

Deposition of Daniel R. Fischel in Alaska Retirement Management Board on behalf of State of Alaska Public Employees' Retirement System and State of Alaska Teachers' Retirement System v. Mercer (US), Inc., Mercer Human Resources Consulting, Inc., and William M. Mercer, Inc., in The Superior Court for the State of Alaska, First Judicial District at Juneau, Case No. 1JU-07-974CI (April 29, 2010).

Deposition of Daniel R. Fischel In Re: ACS Shareholders Litigation, in The Court of Chancery of the State of Delaware, Consolidated Case No. 4940-VCP (April 26, 2010).

Testimony of Daniel R. Fischel in Securities and Exchange Commission v. Carl W. Jasper, in the United States District Court for the Northern District of California, San Jose Division, Case No. C-07-06122-JW (April 16, 2010).

Deposition of Daniel R. Fischel in Prudential Retirement Insurance and Annuity Company v. State Street Bank and Trust Company and State Street Global Advisors, Inc., in the United States District Court, Southern District of New York, Case No. 07 CIV 8488 (April 9, 2010).

Deposition of Daniel R. Fischel In re: Lyondell Chemical Company, et al., Debtors. Official Committee of Unsecured Creditors, on behalf of the Debtors' Estates v. Citibank, N.A., et al., in the United States Bankruptcy Court, Southern District of New York, Chapter 11 Case No. 09-10023 – (RED) (December 2, 2009).

Deposition of Daniel R. Fischel in Securities and Exchange Commission v. Carl W. Jasper, In the United States District Court, Northern District of California, San Jose Division, Case No. CV 07-6122 (HRL) (October 22, 2009).

Testimony of Daniel R. Fischel in Ventas, Inc. v. HCP, Inc., In the United States District Court of the Western District of Kentucky at Louisville, Civil Action No. 3:07-cv-00238-JGH (September 2, 2009).

Deposition of Daniel R. Fischel in Frank K. Cooper Real Estate #1, Inc., et al vs. Cendant Corporation f/k/a Hospitality Franchise Systems and Century 21 Real Estate Corporation, Superior Court of New Jersey, Law Division: Morris County, Docket No. MRS-L-377-02 (August 10, 2009).

Deposition of Daniel R. Fischel in Ventas, Inc. v. HCP, Inc., In the United States District Court of the Western District of Kentucky at Louisville, Civil Action No. 3:07-cv-00238-JGH (August 3, 2009).

Deposition of Daniel R. Fischel in U.S. Commodity Futures Trading Commission v. Amaranth Advisors, L.L.C., Amaranth Advisors (Calgary) and Brian Hunter, in the United States District Court, Southern District of New York, Case No. 07 CIV 6682 (July 8, 2009).

Declaration and Expert Surrebutal Report of Daniel R. Fischel in Ventas, Inc. v. HCP, Inc., In The United States District Court for the Western District of Kentucky at Louisville, Case No. 3:07-CV-00238-JGH (June 22, 2009).

Testimony of Daniel R. Fischel in NRG Energy, Inc. v. Exelon Corporation and Exelon Exchange Corporation, in the United States District Court, Southern District of New York, Case No. 09-CV-2448 (JGK) (DFE), (June 3, 2009).

Deposition of Daniel R. Fischel In Re: Delphi Corporation v. Appaloosa Management L.P., et al., In the United States Bankruptcy Court, Southern District of New York; Chapter 11, Case No. 05-44481(RDD) (Jointly administered), (June 2, 2009).

Deposition of Daniel R. Fischel in NRG Energy, Inc. v. Exelon Corporation and Exelon Exchange Corporation, in the United States District Court, Southern District of New York, Case No. 09-CV-2448 (JGK) (DFE), (May 31, 2009).

Deposition of Daniel R. Fischel in e-Bay Domestic Holdings, Inc. v. Craig Newmark and James Buckmaster and Craigslist, Inc., in the Court of Chancery of the State of Delaware, Case No. 3705-CC (May 29, 2009)

Testimony of Daniel R. Fischel In Re: Lawrence E. Jaffe Pension Plan, et al v. Household International, Inc., et al, in the United States District Court for the Northern District of Illinois, Eastern Division, No. 02-C-5893 (April 16, 20, 28 and 29, 2009).

Deposition of Daniel R. Fischel In Re: Rohm and Haas Company v. The Dow Chemical Company and Ramses Acquisition Corp., In the Court of Chancery of the State of Delaware, C.A. No. 4309-CC (March 4, 2009).

Deposition of Daniel R. Fischel In the Matter of Hoffman, et al. v. American Express Travel Related Services Company, Inc., et al., in the Superior Court of the State of California, in and for the County of Alameda, Case No. 2001-022881 (January 15, 2009).

Deposition of Daniel R. Fischel In Re: TyCom Ltd. Securities Litigation, in the United States District Court, District of New Hampshire, Docket No. 03-CV-1352 (September 22, 2008).

Deposition of Daniel R. Fischel In Re: Hexion Specialty Chemicals, Inc., et al v. Huntsman Corp., in the Court of Chancery of the State of Delaware, Civil Action No. 3841-VCL (September 4, 2008).

Deposition of Daniel R. Fischel In Re: Stone Energy Corp. Securities Litigation, in the United States District Court, Western District of Louisiana, Lafayette-Opelousas Division, Civil Action No. 6:05CV2088 (LEAD) (July 16, 2008).

Deposition of Daniel R. Fischel In Re: Initial Public Offering Securities Litigation, in the United States District Court, Southern District of New York, Master File No. 21 MC 92 (SAS) (April 3 and 4, 2008).

Deposition of Daniel R. Fischel In Re: Lawrence E. Jaffe Pension Plan, et al v. Household International, Inc., et al, in the United States District Court for the Northern District of Illinois, Eastern Division, No. 02-C-5893 (March 21, 2008).

Deposition of Daniel R. Fischel In Re: IAC/InteractiveCorp and Barry Diller v. Liberty Media Corporation, in the Court of Chancery of the State of Delaware in and for New Castle County, Consolidated Case Number 3486-VCL (February 29, 2008).

Testimony of Daniel R. Fischel In Re: Immunicon Corporation v. Veridex LLC, before the American Arbitration Association (Commercial Arbitration Rules), Case Number 50 180T 00192 07 (January 17, 2008).

Deposition of Daniel R. Fischel In Re: Unitedglobalcom Shareholders Litigation, in the Court of Chancery of the State of Delaware in and for New Castle County, Consolidated C.A. No. 1012-N (November 19, 2007).

Deposition of Daniel R. Fischel In Re: Cendant Corporation Litigation, in the United States District Court for the District of New Jersey, Master File No. 98-1664 (WHW) (November 15, 2007).

Deposition of Daniel R. Fischel In Re: Cendant Corporation Litigation, in the United States District Court for the District of New Jersey, Master File No. 98-1664 (WHW) (October 16, 2007).

Deposition of Daniel R. Fischel In Re: Schering-Plough Corporation Securities Litigation, in the United States District Court for the District of New Jersey, Master File No. 01-CV-0829 (KSH/RJH) (October 12, 2007).

Deposition of Daniel R. Fischel In Re: Carpenters Health & Welfare Fund, et al. vs. The Coca- Cola Company, in the United States District Court, Northern District of Georgia, Atlanta Division, File No. 1:00-CV-2838-WBH (Consolidated) (September 26, 2007).

Deposition of Daniel R. Fischel In Re: Parker Freeland, et al., vs. Iridium World Communications, Ltd., et al., in the United States District Court for the District of Columbia, Civil Action No. 99-1002 (August 7, 2007)

Deposition of Daniel R. Fischel In Re: Chuck Ginsburg v. Philadelphia Stock Exchange, Inc., et al., In the Court of Chancery of the State of Delaware in and for New Castle County, C.A. No. 2202-N (June 12, 2007).

Testimony of Daniel R. Fischel In Re: Holcombe T. Green and HTG Corp. v. McKesson, Inc., et al, In the Superior Court for the County of Fulton, State of Georgia, Civil Action File No. 2002-CV-48407 (June 5, 2007).

Affidavit of Daniel R. Fischel In Re: Lear Corporation Shareholders Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 2728-VCS (May 30, 2007).

Affidavit of Daniel R. Fischel In Re: Aeroflex, Inc. Shareholder Litigation, in the Supreme Court of the State of New York, County of Nassau: Commercial Division, Index No. 07-003943 (May 23, 2007).

Deposition of Daniel R. Fischel In Re: Holcombe T. Green and HTG Corp. v. McKesson, Inc., HBO & Company, Albert Bergonzi, and Jay Gilbertson, in the Superior Court for the County of Fulton, State of Georgia, Civil Action File No. 2002W48407 (May 21, 2007).

Deposition of Daniel R. Fischel In Re: Adelphia Communications Corp. v. Deloitte & Touche LLP, et al, in the Court of Common Pleas, Philadelphia County, Pennsylvania, Case No. 000598 (May 3 and 4, 2007).

Testimony of Daniel R. Fischel In Re: United States of America v. Joseph P. Nacchio, in the United States District Court for the District of Colorado, Case No. 05-CR-00545-EWN (April 9, 2007).

Deposition of Daniel R. Fischel In Re: MK Resources Company Shareholders Litigation, in the Court of Chancery for the State of Delaware in and for New Castle County, C.A. No. 1692- N (February 22, 2007).

Deposition of Daniel R. Fischel In Re: Starr International Company, Inc. v. American International Group, Inc., In the United States District Court, Southern District of New York, Case No. 05 CV 6283 (January 26, 2007).

Written testimony of Daniel R. Fischel In Re: Verizon Communications Inc. and Verizon Services Corp. v. Christopher G. Pizzirani, In the United States District Court for the Eastern District of Pennsylvania, Case No. 2:06-cv-04645-MK (November 6, 2006).

Testimony of Daniel R. Fischel In Re: Northeast Savings, F.A. v. United States of America, In the United States Claims Court, Case No. 92-550 C (November 2 and 9, 2006).

Testimony of Daniel R. Fischel In Re: United States of America v. Sanjay Kumar and Stephen Richards, United States District Court, Eastern District of New York, 04 Civ. 4104 (ILG) (October 25, 2006).

Affidavit of Daniel R. Fischel In Re: Lionel I. Brazen and Nancy Hammerslough, et al v. Tyco International Ltd., et al, In the Circuit Court of Cook County, Illinois County Department, Chancery Division, No. 02 CH 11837 (September 18, 2006).

Deposition of Daniel R. Fischel In Re: Tele-Communications, Inc. Shareholders Litigation, in the Court of Chancery of the State of Delaware in and for New Castle County, Consolidated C.A. No. 16470 (September 15, 2006).

Affidavit of Daniel R. Fischel In Re: United States of America v. Sanjay Kumar and Stephen Richards, United States District Court, Eastern District of New York, 04 Civ. 4104 (ILG) (September 8, 2006).

Deposition of Daniel R. Fischel In Re: James Gilbert v. McKesson Corporation, et al., in the State Court of Fulton County, State of Georgia, Civil Action File No. 02VS032502C (September 7, 2006).

Supplemental Declaration of Daniel R. Fischel In Re: United States of America v. Jeffrey K. Skilling, in the United States District Court, Southern District of Texas, Houston Division, Crim. No. H-04-25 (Lake, J.) (August 25, 2006).

Affidavit of Daniel R. Fischel In Re: United States of America v. Sanjay Kumar and Stephen Richards, United States District Court, Eastern District of New York, 04 Civ. 4104 (ILG) (August 22, 2006).

Declaration of Daniel R. Fischel In Re: United States of America v. Jeffrey K. Skilling, in the United States District Court, Southern District of Texas, Houston Division, Crim. No. H-04- 25 (Lake, J.) (August 3, 2006).

Deposition of Daniel R. Fischel In Re: Enron Corporation Securities Litigation, in the United States District Court, Southern District of Texas, Houston Division, Case Number: H-01- 3624 (May 24, 2006).

Testimony of Daniel R. Fischel In Re: Guidant Corporation Shareholders Derivative Litigation, in the United States District Court, Southern District of Indiana, Indianapolis Division, Master Derivative Docket No. 1:03-CV-955-SEB-WTL (January 20, 2006).

Testimony of Daniel R. Fischel In Re. Hideji Jumbo Tanaka v. Cerberus Far East Management, L.L.C., et al., AAA Case No. 50 T 116 00284 03, (December 15, 2005).

Deposition of Daniel R. Fischel In Re: McKesson HBOC, Inc. Securities Litigation, in the United States District Court for the Northern District of California, No. C-99-20743-RMW (August 16, 2005).

Testimony of Daniel R. Fischel In the Matter of Visconsi Companies Ltd., et al. and Lehman Brothers, et al., National Association of Securities Dealers Department of Arbitration, Grievance No. 03-07606 (July 26, 2005).

Testimony of Daniel R. Fischel In Re: John P. Crowley, as Receiver of Ambassador Insurance Company v. Doris June Chait, et al., in the United States District Court for the District of New Jersey, Case No. 85-2441 (HAA) (July 21 and 22, 2005).

Deposition of Daniel R. Fischel In Re: Electronic Data Systems Corporation Securities Litigation, in the United States District Court for the Eastern District of Texas, Tyler Division, Case No. 6:03-MD-1512 (July 20, 2005).

Testimony of Daniel R. Fischel In Re: United States of America v. Philip Morris, Inc., et al, in the United States District Court for the District of Columbia, Case No. 1:99CV02496 (May 26 and 27, 2005).

Deposition of Daniel R. Fischel In Re: Cordis Corporation v. Boston Scientific Corporation, et ano, in the United States District Court for the District of Delaware, Case No. 03-027-SLR (May 25, 2005).

Deposition of Daniel R. Fischel In Re: United States of America v. Philip Morris, Inc., et al, in the United States District Court for the District of Columbia, Case No. 1:99CV02496 (May 16, 2005).

Testimony of Daniel R. Fischel In Re: Drury Industries, Inc. v. Drury Properties, Inc., in the First Judicial District Court of the State of Nevada in and for Carson City, Nevada (April 6 and 7, 2005).

Deposition of Daniel R. Fischel In Re: Jerry R. Summers and George T. Lenormand, et al v. UAL Corporation ESOP Committee, Marty Torres, Barry Wilson, Doug Walsh, Ira Levy, Don Clements, Craig Musa, and State Street Bank and Trust Company, in the United States District Court for the North District of Illinois, Eastern Division, No. 03 C 1537 (March 9, 2005).

Deposition of Daniel R. Fischel In Re: Drury Industries, Inc. v. Drury Properties, Inc., in the First Judicial District Court of the State of Nevada in and for Carson City, Nevada (March 7 and 10, 2005).

Testimony of Daniel R. Fischel In the Matter of Fyffes PLC v. DCC PLC, S&L Investments Limited, James Flavin and Lotus Green Limited, in The High Court, Dublin, Ireland (2002 No. 1183P) (February 1 and 2, 2005).

Deposition of Daniel R. Fischel In the Matter of the Arbitration between The Canada Life Assurance Company and The Guardian Life Insurance Company of America (January 12, 2005).

Deposition of Daniel R. Fischel In Re: IDT Corporation vs. Telefonica, S.A., et al, in the United States District Court, District of New Jersey, Civil Action No. 01-CV 471 (December 14, 2004).

Deposition of Daniel R. Fischel In Re: DQE, Inc. Securities Litigation, in the United States District Court, Western District of Pennsylvania, Master File No. 01-1851 (December 7, 2004)

Testimony of Daniel R. Fischel In Re: United States of America v. Daniel Bayly, James A Brown, Robert S. Furst, Daniel O. Boyle, William R. Fuhs and Sheila K. Kahanek, in the United States District Court of Southern Texas Houston Division, Case No. H-CR-03-363 (November 4, 2004).

Testimony of Daniel R. Fischel In the Matter of the Arbitration Between the Canada Life Assurance Company, Petitioner v. Caisse Centrale De Reassurance, Respondent, (November 2, 2004).

Testimony of Daniel R. Fischel In Re: Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company v. The United States, in the United States Court of Federal Claims, Case Nos. 98-126C, 98-154C and 98-474C (August 9, 2004).

Affidavit of Daniel R. Fischel In Re: Oracle Corp. Derivative Litigation, in the Court of the Chancery of the State of Delaware In and For New Castle County, Consolidated Civil Action No. 18751 (June 8, 2004).

Deposition of Daniel R. Fischel In Re: Reading International, Inc., et al v. Regal Entertainment Group, et al, (Delaware Chancery Court) (May 30, 2004).

Affidavit of Daniel R. Fischel In Re: Reading International, Inc., et al v. Regal Entertainment Group, et al, (Delaware Chancery Court) (May 28, 2004).

Deposition of Daniel R. Fischel In Re: Northeast Savings, F.A. v. United States of America, in the United States Claims Court, Case No. 92-550-C (May 4, 5 and 6, 2004).

Deposition of Daniel R. Fischel In Re: Tyson Foods, Inc. Securities Litigation, in the United States District Court for the District of Delaware, Civil Action No. 01-425-SLR (March 18, 2004).

Testimony of Daniel R. Fischel In the Matter of Coram Healthcare Corp. and Coram, Inc., Debtors, In the United States Bankruptcy Court for the District of Delaware, Case No. 00- 3299 Through 00-3300 (MFW) (March 4, 2004).

Testimony of Daniel R. Fischel In Re: Tracinda Corporation v. DaimlerChrysler AG, et al, in the United States District Court for the District of Delaware, Civil Action No. 00-984 (February 11, 2004)

Deposition of Daniel R. Fischel In Re: Gerald K. Smith, as Plan Trustee for and on behalf of the Estates of Boston Chicken, Inc., et al. v. Arthur Anderson LLP, et al., in the United States District Court for the Northern District of Illinois, Case Nos. CIV-01-218-PHX-PGR, CIV-01- 246-PHX-EHC, CIV-02-1162-PHX-PGR, CIV-02-1248-PHX-PGR (Consolidated) (October 29 and 30, 2003).

Deposition of Daniel R. Fischel In Re: Irene Abrams, on behalf of herself and all others similarly situated v. Van Kampen Funds, Inc., Van Kampen Investment Advisory Corp., Van Kampen Prime Rate Income Trust, Howard Tiffen, Richard F. Powers III, Stephen L. Boyd, Dennis J. McDonnell and Jeffrey W. Maillet, in the United States District Court for the Northern District of Illinois, Eastern Division, Case No. 01-C-7538 (October 21, 2003).

Deposition of Daniel R. Fischel In the Matter of Coram Healthcare Corp. and Coram, Inc., Debtors, In the United States Bankruptcy Court for the District of Delaware, Case No. 00- 3299 Through 00-3300 (MFW) (October 13, 2003).

Testimony of Daniel R. Fischel In Re: Transcore Holdings, Inc. v. Rocky Mountain Mezzanine Fund II, LP; Hanifen Imhoff Mezzanine Fund, LP; Moramerica Capital Corporation; and NDSBIC, LP and W. Trent Ates and Fred H. Rayner, In Re: Jams Arbitration, Case No. 1410003193 (September 24, 2003).

Deposition of Daniel R. Fischel In Re: Transcore Holdings, Inc. v. Rocky Mountain Mezzanine Fund II, LP; Hanifen Imhoff Mezzanine Fund, LP; Moramerica Capital Corporation; and NDSBIC, LP and W. Trent Ates and Fred H. Rayner, In Re: Jams Arbitration, Case No. 1410003193 (May 13, 2003).

Deposition of Daniel R. Fischel In Re: AT&T Broadband Management Corporation v. CSG Systems, Inc., American Arbitration Association No. 77 181 00159 02 VSS (April 9, 2003).

Deposition of Daniel R. Fischel In Re: DaimlerChrysler AG Securities Litigation, in the United States District Court for the District of Delaware, Civil Action No. 00-993-JJF (February 11 and 12, 2003).

Deposition of Daniel R. Fischel In Re: David T. Bard, Commissioner of Banking and Insurance for the State of Vermont, as Receiver for Ambassador Insurance Company v. Arnold Chait, et al, in the United States District Court for the District of New Jersey, Civil Action No. 85- 2441 (December 12, 2002).

Testimony of Daniel R. Fischel In Re: MHC Financing Limited Partnership, et al vs. City of San Rafael, et al, in the United States District Court, Northern District of California, Case No. C 00-3785 VRW (November 6, 2002).

Deposition of Daniel R. Fischel In Re: MHC Financing Limited Partnership, et al vs. City of San Rafael, et al, in the United States District Court, Northern District of California, Case No. C 00-3785 VRW (October 16, 2002).

Deposition of Daniel R. Fischel In Re: Maine Yankee Atomic Power Company v. United States of America, In the United States Court of Federal Claims, Case No. 98-474 C (October 8 and 9, 2002)

Testimony of Daniel R. Fischel In Re: California Federal Bank, FSB v. The United States of America, In the United States Court of Federal Claims, Case No. 92-138C (September 20 and 23, 2002).

Deposition of Daniel R. Fischel In Re: Maine Yankee Atomic Power Company v. United States of America, In the United States Court of Federal Claims, Case No. 98-474 C (September 4 and 6, 2002).

Deposition of Daniel R. Fischel In the Matter of RDM Sports Group, Inc., et al v. Smith, Gambrell, Russell, L.L.P.; et al, In the United States Bankruptcy Court for the Northern District of Georgia, Newnan Division, Case No. 00-1065 (May 14 and 15, 2002).

Deposition of Daniel R. Fischel In Re: Walter B. Hewlett, individually and as Trustee of the William R. Hewlett Revocable Trust, and Edwin E. van Bronkhorst as Co-Trustee of the William R. Hewlett Revocable Trust v. Hewlett-Packard Company, in the Court of the Chancery of the State of Delaware in and for New Castle County (April 24, 2002).

Deposition of Daniel R. Fischel In Re: California Federal Bank, FSB, v. The United States of America, in the United States District Court of Federal Claims, Case No. 92-138C (April 16 and 17, 2002).

Deposition of Daniel R. Fischel In Re: Computer Associates Class Action Securities Litigation, in the United States District Court, Eastern District of New York, File No. 98-CV-4839 (TPC) (MLO) (March 19 and 20, 2002).

Deposition of Daniel R. Fischel In Re: United States of America v. David Blech, In the United States District Court, Southern District of New York, Case No. S1 97 Cr. 402 (KTD) (February 13, 2002).

Testimony of Daniel R. Fischel In the Matter of Coram Healthcare Corp. and Coram, Inc., Debtors, In the United States Bankruptcy Court for the District of Delaware, Case No. 00- 3299 Through 00-3300 (MFW) (December 14, 2001).

Deposition of Daniel R. Fischel In Re: Sunbeam Securities Litigation, In the United States District Court, Southern District of Florida, Miami Division, Case No. 98-8258-CIV – Middlebrooks (December 4, 5 and 6, 2001).

Affidavit of Daniel R. Fischel In Re: Jack M. Webb, Special Deputy Receiver for American Eagle Insurance Company v. Elvis Mason, Mason Best Company, L.P., Don D. Hutson, American Eagle Group, Inc., Marion Phillip Guthrie, Frederick G. Anderson, George F. Cass, Richard M. Kurz, Patricia S. Pickard, Arthur Andersen & Co., L.L.P., and Towers, Perrin Forester & Crosby, Inc., D/B/A Tillinghast, In the District Court of Travis County, Texas, 201st Judicial District, Cause No. 99-08253 (September 7, 2001).

Declaration of Daniel R. Fischel In the Matter of Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities: Before the Federal Communications Commission, Washington DC, GN Docket No. 00-185, (Declaration with K. Arrow, G. Becker, D. Carlton, R. Gertner, J. Kalt, H. Sider, and Gustavo Bamberger) (July 24, 2001).

Declaration of Daniel R. Fischel In Re: Walter Green, on behalf of himself and all others similarly situated v. Merck-Medco Managed Care, L.L.C., United States District Court, Southern District of New York, Civil Action No. 99 CIV 0847 (CLB) (June 18, 2001).

Testimony of Daniel R. Fischel In Re:Tyson Foods, Inc. and Lasso Acquisition Corporation v. IBP, Inc., Delaware Chancery Court, (May 25, 2001).

Deposition of Daniel R. Fischel In Re:Tyson Foods, Inc. and Lasso Acquisition Corporation v. IBP, Inc., Delaware Chancery Court, (May 10, 2001).

Deposition of Daniel R. Fischel In Re: Myron Weiner, Nicholas Sitnycky, Ronald Anderson and Robert Furman on behalf of themselves and all others similarly situated v. The Quaker Oats Company and William D. Smithburg, United States District Court, Northern District of Illinois, Case No. 98 C 3123, (January 24, 2001).

Deposition of Daniel R. Fischel In Re: Retsky Family Limited Partnership v. Price Waterhouse, LLP, United States District Court, Northern District of Illinois, Eastern Division, No. 97 C 7694, (October 31, 2000).

Joint Affidavit of Daniel R. Fischel and David J. Ross In Re: Floyd D. Wilson, for himself and all others similarly situated v. Massachusetts Mutual Life Insurance Company, in the First Judicial District Court, County of Santa Fe, State of New Mexico, No. D0101 CV-98-02814 (August 4, 2000).

Affidavit of Daniel R. Fischel In Re: T. Rowe Price Recovery Fund, L.P., and Carl Marks Management Co., L.P., individually and derivatively on behalf of Seaman Furniture Co., Inc. v. James Rubin, M.D. Sass Associates, Inc., Resurgence Asset Management, L.L.C., M.D. Sass Corporation Resurgence Partners, L.P. , M.D. Sass Corporate Resurgence International, Ltd., Robert Symington, Byron Haney, Alan Rosenberg, Steven H. Halper, and Peter McGeough and Seaman Furniture Co., Inc., In the Court of Chancery of the State of Delaware in and for New Castle County, C.A. No. 18013, (June 7, 2000).

Testimony of Daniel R. Fischel In Re: Bank United of Texas, FSB, et al., v. United States of America, United States Court of Federal Claims, Case Number 95-437C, (October 12 and 14, 1999).

Deposition of Daniel R. Fischel In Re: Bank United of Texas, FSB, et al., v. United States of America, United States Court of Federal Claims, Case Number 95-437C, (September 26, 1999; July 10, 1999; and June 16, 17, 1999).

Testimony of Daniel R. Fischel In Re: C. Robert Suess, et al., v. The United States, United States Court of Federal Claims, No. 90- 981C (May 17, 1999).

Testimony of Daniel R. Fischel In Re: Lexecon, Inc. v. Milberg Weiss Bershad Specthrie & Lerach, et al., in the United States District Court, Northern District of Illinois Eastern Division, Case No. 92 C 7768 (March 8, 9, 10 and 15, 1999).

Testimony of Daniel R. Fischel In Re: California Federal Bank v. United States, in the United States Court of Federal Claims, Case Number 92-138C, (February 4 and 11, 1999).

Deposition of Daniel R. Fischel In Re: California Federal Bank v. United States, in the United States Court of Federal Claims, Case Number 92-138C, (February 6, 1999; January 27 and 30, 1999).

Deposition of Daniel R. Fischel In Re: C. Robert Suess, et al., v. The United States, United States Court of Federal Claims, No. 90- 981C (October 27 and 28, 1998).

Deposition of Daniel R. Fischel In Re: Connector Service Corporation v. Jeffrey Briggs, United States District Court, Northern District of Illinois, Eastern Division, No. 97-C-7088 (August 28, 1998).

Deposition of Daniel R. Fischel In Re: Statesman Savings Holding Corp., et al. v. United States of America, United States Court of Federal Claims, Case No. 90-773C, (May 4, 1998 and February 12, 1998).

Testimony of Daniel R. Fischel In Re: Glendale Federal Bank FSB v. United States of America, United States Court of Federal Claims, No. 90-772C, (March 24, 25 and 26, 1998; September 2, 3, 4, 5, 8, 9, 10, 11, 12, 24, 25, 26 and 27, 1997; October 7, 9, 16, 17, 30 and 31, 1997; December 8, 9 and 10, 1997).

Affidavit of Daniel R. Fischel and David J. Ross In Re: Publicis Communication v. True North Communications Inc., et al., United States District Court, Northern District of Illinois, Eastern Division, Case No. 97-C-8263, (December 7, 1997).

Deposition of Daniel R. Fischel In Re: Glendale Federal Bank FSB v. United States of America, United States Court of Federal Claims, No. 90-772C, (August 27 and 28, 1997).

Testimony of Daniel R. Fischel In Re: AUSA Life Insurance Company, et al. v. Ernst & Young, in the United States District Court, Southern District of New York, Master File No. 94 CIV. 3116 (CLB) (July 7 and 8, 1997).

Deposition of Daniel R. Fischel In Re: Santa's Best, f/k/a National Rennoc, an Illinois general partnership, and Tinsel/Ruff Group Limited Partnership, an Illinois limited partnership v. Rennoc Limited Partnership, a New Jersey limited partnership, v. Tinsel/Ruff Group Limited Partnership, an Illinois limited partnership, in the Circuit Court of Cook, Illinois County Department - Chancery Division, No. 95 CH 12160, (June 17, 1997).

Arbitration of Daniel R. Fischel In Re: Lerner v. Goldman Sachs, et. al., Before the American Arbitration Association, 75-136-00090-94 (April 10, 1997).

Affidavit of Daniel R. Fischel In Re: Hilton Hotels Corporation and HLT Corporation v. ITT Corporation, United States District Court, District of Nevada, CV-S-97-00095-PMP (RLH) (March 24, 1997).

Deposition of Daniel R. Fischel In Re: Glendale Federal Bank, FSB v. United States of America, Washington, D.C., Case No. 90-772C, (March 19, 1997; January 30 and 31, 1997).

Deposition of Daniel R. Fischel In Re: Statesman Savings Holding Corporation v. United States of America, Washington, D.C., Case No. 90-773-C, (February 19 and 20, 1997).

Testimony of Daniel R. Fischel In Re: Westcap Enterprises, Inc. and Westcap Corporation, Debtor; in the United States Bankruptcy Court, for the Southern District of Texas, Houston Division, Houston, Texas; Case No. 96-43191-H2-11, (November 1996).

Testimony of Daniel R. Fischel In Re: United States of America v. Robert R. Krilich, in the United States District Court, Northern District of Illinois, Eastern Division, No. 94 CR 419, (August 20, 1996 and July 15, 1996)

Deposition of Daniel R. Fischel In Re: McMahan & Company, Froley, Revy Investment Co., Inc. and Wechsler & Krumholz, Inc. v. Wherehouse Entertainment, Inc., Louis A. Kwiker, George A. Smith, Michael T. O'Kane, Lawrence K. Harris, et al., United States District Court, Southern District of New York, Index No. 88 Civ. 0321 (SS) (AJP), (July 16, 1996 and June 10, 1996).

Deposition of Daniel R. Fischel In Re: Joseph W. and Helen B. Teague, Steven Allen Barker, Rita Strahowski, Swannee Beck, and Lifetime Partners of PTL, as representatives of a nationwide class consisting of 150,129 Lifetime Partners and of 27,839 persons who have partially paid for Lifetime Partnerships v. James O. Bakker, in the United States District Court for the Western District of North Carolina, Civil Action No. 3:87CV514, (June 28, 1996).

Deposition of Daniel R. Fischel In Re: Snapple Beverage Corporation Securities Litigation, in the United States District Court, Eastern District of New York, Master File No. CV 94-3647 (May 30, 1996).

Testimony of Daniel R. Fischel In Re: Chuck Quackenbush, Insurance Commissioner of the State of California, in his capacity as Trustee of Mission Insurance Company Trust, et al. v.Borg-Warner Corporation, Borg Warner Equities Corporation, Borg-Warner Insurance Service, Inc., et al., for the Superior Court of the State of California, for the County of Los Angeles, No. C688487 (April 18, 1996).

Deposition of Daniel R. Fischel In Re: Chuck Quackenbush, Insurance commissioner of the State of California, in his capacity as Trustee of Mission Insurance Company Trust, et al. v.Borg-Warner Corporation, Borg Warner Equities Corporation, Borg-Warner Insurance Service, Inc., et al., for the Superior Court of the State of California, for the County of Los Angeles, No. C688487 (April 17, 1996).

Deposition of Daniel R. Fischel In Re: Household Commercial Financial Services, Inc. a citizen of the states of Delaware and Illinois v. Julius Trump, a citizen of the State of Florida, Edmond Trump, a citizen of the state of Florida, James M. Jacobson, a citizen of the State of New York, and Parker, Chapin, Flattau & Klimpl, a citizen of the states of New York and New Jersey, in the United States District Court, for the Northern District of Illinois Eastern Division, 92 C 5010 (February 1, 1996).

Deposition of Daniel R. Fischel In Re: JWP, Inc. Securities Litigation, in the United States District Court, Southern District of New York, Master File No. 92 Civ. 5815 (CLB); AUSA Life Insurance Company, et al. v. Ernst & Young, in the United States District Court, Southern District of New York, Master File No. 94 Civ. 3116 (CLB) (November 30, 1995; November 9, 1995; October 18 and 19, 1995; September 28, 1995).

Deposition of Daniel R. Fischel In Re: City of Houston Municipal Employees Pension System, a Texas association v. PaineWebber Group Inc., et al., in the United States District Court, Eastern District of Missouri, Eastern Division, No. 4:94CV0073CAS (November 15 and 16, 1995).

Testimony of Daniel R. Fischel In Re: American Continental Corporation/Lincoln Savings & Loan Securities Litigation - Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach and Kevin P. Roddy, in the United States District Court, District of Arizona, Civ-93-1087-PHX-JMR (July 25 and 26, 1995).

Deposition of Daniel R. Fischel In Re: Keith C. Bogard, et al., v. National Community Bank Inc., et al., in the United States District Court, District of New Jersey, No. 90-5-32 (HAA) (December 20, 1994).

Deposition of Daniel R. Fischel In Re: Harvey Rosen, Ben Rogers and Julie Rogers v. Deloitte & Touche, Elias Zinn, Julius Zinn, Dennis Lamm, and Ronald Begnaud, in the 268th Judicial District Court, of Fort Bend County, Texas, Cause No. 84-482 (November 9, 1994).

Testimony of Daniel R. Fischel In Re: PPM America, Inc., et al. v. Marriott Corporation et al., in the United States District Court, for the District of Maryland, Civil Docket No. H-92-3068 (October 12, 1994).

Deposition of Daniel R. Fischel In Re: Browning-Ferris Industries, Inc., Securities Litigation, United States District Court, for the Southern District of Texas, Houston Division, Civil Action H-903477 (September 1, 1994).

Testimony of Daniel R. Fischel In Re: Computer Associates International Inc. Securities Litigation, United States District Court, Eastern District of New York, CV-90-2398 (JBW) (May 26 and 27, 1994).

Deposition of Daniel R. Fischel In Re: PPM America, Inc., et al. v. Marriott Corporation et al., United States District, for the District of Maryland, H-92-3068 (May 10, 1994 and March 8, 1994).

Deposition of Daniel R. Fischel In Re: Securities and Exchange Commission v. Shared Medical Systems Corporation, R. James Macaleer, James C. Kelly and Clyde M. Hyde, United States District Court, for the Eastern District of Pennsylvania, Civil Action - Law: No. 91- CV-6549 (February 22, 1994).

Testimony of Daniel R. Fischel In Re: Peter M. Schultz and Pamela A. Schultz v. Rhode Island Hospital Trust National Bank, N.A., et al., United States District Court, District of Massachusetts, Civil Action No. 88-2870-T (February 16, 1994).

Deposition of Daniel R. Fischel In Re: Henry T. Endo, et al. v. John M. Albertine, et al., United States District Court, Northern District of Illinois, Eastern Division, No. 88 C 1815 (November 11 and 12, 1993; October 28, 1993).

Deposition of Daniel R. Fischel In Re: Computer Associates International Inc. Securities Litigation, United States District Court, Eastern District of New York, CV 90-2398 (JBW) (November 2, 1993 and February 4, 1993).

Affidavit of Daniel R. Fischel In Re: Peter M. Schultz and Pamela A. Schultz v. Rhode Island Hospital Trust National Bank, N.A. et al., United States District Court, District of Massachusetts, Civil Action No. SS-2870-T (October 28, 1993).

Deposition of Daniel R. Fischel In Re: Alpheus John Goddard, III, etc. v. Continental Bank N.A., etc., State of Illinois, County of Cook, Circuit Court of Cook County, County Department- Chancery Division, No. 89 CH 1081 (September 10, 1993).

Deposition of Daniel R. Fischel In Re: Taxable Municipal Bond Section "G" Securities Litigation, United States District Court, Eastern District of Louisiana, MDL No. 863 (September 2, 1993).

Reply Affidavit of Daniel R. Fischel In Re: Columbia Securities Litigation, United States District Court Southern District of New York, 89 Civ. 6821 (LBS) (August 30, 1993).

Affidavit of Daniel R. Fischel In Re: Consumers Gas & Oil, Inc. v. Farmland Industries, Inc., et al., United States District Court, for the District of Colorado, Civil Action No. 92-F-1394 (August 26, 1993).

Declaration of Daniel R. Fischel In Re: Equitec Rollup Litigation, United States District Court for the Northern District of California, Master file No. C90 2064 CAL (July 28, 1993).

Deposition of Daniel R. Fischel In Re: United Telecommunications, Inc. Securities Litigation, United States District Court for the District of Kansas, No. 90-2251-0 (July 22, 1993, April 21 and 22, 1993).

Deposition of Daniel R. Fischel In Re: Consumers Gas & Oil, Inc., a Colorado farm cooperative in liquidation, on behalf of itself and others similarly situated v. Farmland Industries, Inc., a Kansas farm cooperative, et al., United States District Court, District of Colorado, 92-F- 1394 (June 18, 1993).

Deposition of Daniel R. Fischel In Re. Rosalind Wells v. HBO & Company, United States District Court, Northern District of Georgia, Atlanta Division, 8-87-CV-657A (JTC) (June 10, 1993 and May 24, 1993).

Deposition of Daniel R. Fischel In Re: Equitec Rollup Litigation, United States District Court, Northern District of California, No. C-90-2064 CAL (June 2 and 3, 1993).

Supplemental Declaration of Daniel R. Fischel In Re: Oracle Securities Litigation, United States District Court, Northern District of California, Master File No. C 90 0931 VRW (May 20, 1993).

Affidavit of Daniel R. Fischel and Kenneth R. Cone In Re: Raymond P. Hayden, et al. v. Jeffrey L. Feldman, et al., United States District Court, Southern District of New York No. 88 Civ. 8048 (JES) (May 12, 1993).

Testimony of Daniel R. Fischel In Re: Melridge, Inc., Securities Litigation, United States District Court for the District of Oregon, CV No. 87-1426-FR (May 4 and 5, 1993).

Declaration of Daniel R. Fischel In Re: Oracle Securities Litigation, United States District Court, Northern District of California, Master File No. C 90 0931 VRW (April 20, 1993).

Deposition of Daniel R. Fischel In Re: Gillette Securities Litigation, United States District Court, District of Massachusetts, No. 88-1858-K (April 1, 1993).

Affidavit of Daniel R. Fischel In Re: Columbia Securities Litigation, United States District Court, Southern District of New York, 89 Civ. 6821 (LBS) (March 25, 1993).

Deposition of Daniel R. Fischel In Re: Westinghouse Securities Litigation, United States District Court, Western District of Pennsylvania, CV No. 91 354 (March 23, 1993).

Declaration of Daniel R. Fischel In Re: Oracle Securities Litigation, United States District Court, Northern District of California, Master File No. C 90-0931 VRW (March 22, 1993).

Deposition of Daniel R. Fischel In Re: Kroy, Inc., a Minnesota corporation et al. v. Bankers Trust New York Corporation, et al., Superior Court of the State of Arizona in and for the County of Maricopa, No. CV 89-35680 (March 18, 1993).

Deposition of Daniel R. Fischel In Re: Amos M. Ames, Helen M. Ames, Robert F. Bourke, Louise L. Bourke, Leo E. Corr, April C. Corr, Wence M. Horak, Ruth Horak, Robert T. Freas, Maurita Freas, Bruce Fink, Jr., William H. Jones, Candace A. Jones, Richard Paul, William L. Paul, Carole Paul, Steven J. Paul, Best Power Technology, Incorporated, and Best Power Technology Sales Corporation, in the State of Wisconsin, Circuit Court, Juneau County, Consolidated Case Nos. 92-CV-31, 92-CV-32 (January 26, 1993).

Deposition of Daniel R. Fischel In Re: Federal Express Corporation Shareholder Litigation, in the United States District Court, Western District of Tennessee, Master File No. 90-2359- 4B (December 3, 1992).

Deposition of Daniel R. Fischel In Re: Raymond Snyder, Individually and on behalf of all those similarly situated v. Oneok, Inc., et al., in the United States District Court, Northern District of Oklahoma, Civil Action No. 88 C 1500 E (October 15 and 16, 1992).

Deposition of Daniel R. Fischel In Re: Melridge, Inc. Securities Litigation, Consolidated Actions, United States District Court, District of Oregon, Master File No. CV87-1426-JU and Nos. 387-06589-P11, 88-05-JU, 88-221-JU, 88-0699-PA, 88-1266-JU (September 17, 1992; July 25 and 26, 1991).

Deposition of Daniel R. Fischel In Re: Maxus Corporate Company v. Kidder, Peabody & Co. Incorporated, Martin A. Siegel and Ivan F. Boesky, in the District Court Dallas County, Texas, 298th Judicial District, No. 87-15583-M (September 11, 1992; August 18 and 19, 1992).

Deposition of Daniel R. Fischel In Re: Jennifer A. Florin and Alan L. Mundt, on behalf of themselves and all others similarly situated v. Wesray Capital Corp., Citizens and Southern Trust Company, a subsidiary of Citizens and Southern Corporation, Robert K. Barton, Leonard S. Gaby, Allen G. Lacoe, Robert A. Magnusson, Anthony A. Saliture, Harlan B. Smith, Thomas F. Stutzman, Raymond G. Chambers, Frank E. Richardson, E. Burke Ross, Jr., William E. Simon and Frank W. Walsh, Jr., in the United States District Court, Western District of Wisconsin, Civil Action No. 91C-0948 (August 12, 1992).

Deposition of Daniel R. Fischel In Re: Pearl Newman, Shanna Lehmann & Athanasios Tsivelekidis, on their own behalf and on behalf of all other persons similarly situated v. On- Line Software International, Inc. Jack M. Berdy, John C. Crocker, Richard A. Granger, Richard R. Holtmeier, Michael S. Juceam, Edward J. Siegel, Howard P. Sorgen and Richard Ward, United States District Court, District of New Jersey, Consolidated Civil Action Nos. 88-3247, 88-3411 (July 28 and 29, 1992).

Deposition of Daniel R. Fischel In Re: Crazy Eddie Securities Litigation, Oppenheimer-Palmieri Fund, I.P., et al. v. Peat Marwick Main & Co., et al., United States District Court for the Eastern District of New York, 87 Civ. 0033 (EHN), 88 Civ. 3481 (EHN) (June 11, 1992; March 26 and 27, 1992).

Testimony of Daniel R. Fischel In Re: American Continental Corporation/Lincoln Savings and Loan Securities Litigation, in the United States District Court, for the District of Arizona MDL Docket No. 834 (June 4, 1992; May 26, 27 and 28, 1992).

Testimony of Daniel R. Fischel In Re: State of West Virginia v. Morgan Stanley & Co. Incorporated, in the Circuit Court of Kanawha County, State of West Virginia, Civil Action No. 89-C-3700 (April 27, 1992).

Affidavit of Daniel R. Fischel In Re: William Steiner, on behalf of himself and all others similarly situated v. Tektronix, Inc., et al., in the United States District Court, District Court of Oregon, Civil No. 90-587-JO (March 23, 1992).

Deposition of Daniel R. Fischel In Re: Martin Kaplan and Selma Kaplan, on Behalf of Themselves and All Others Similarly Situated v. VICORP Restaurants, Inc., Charles R. Frederickson, Robert S. Benson, Emerson B. Kendall, Robert T. Marto and Johyn C. Hoyt, United States District Court, District of Colorado, Civil Action No. 90-C-2182 (February 11, 1992).

Deposition of Daniel R. Fischel In Re: Interco Incorporated v. Wasserstein, Perella & Co., Inc., United States District Court, Eastern District of Missouri, Eastern Division, No. 91-0151-C- 6 (February 3, 1992 and December 12, 1991).

Statement of Daniel R. Fischel In Re: Far West Federal Bank, S.B., et al. v. Director, Office of Thrift Supervision, et al., United States District Court for the District of Oregon, Civil Action No. 90-103 PA (February 3, 1992).

Deposition of Daniel R. Fischel In Re: Capital Bank of California v. Morgan Stanley & Co., Incorporated, United States District Court, Central District of California, No. 91-1650-R (January 24, 1992).

Deposition of Daniel R. Fischel In Re: Trinity Ventures, et al. v. Federal Deposit Insurance Corporation, in its own capacity and as successor to the Federal Savings and Loan Insurance Corporation, United States District Court, for the District of Oregon, No. 90-103- PA (January 6, 1992).

Deposition of Daniel R. Fischel In Re: First Republic Bank Securities Litigation, United States District Court, Northern District of Texas, Dallas Division, Civil Action No. 3-88-0641-H (January 2, and 3, 1992; November 26, 1991).

Deposition of Daniel R. Fischel In Re: State of West Virginia v. Morgan Stanley & Co. Incorporated; Salomon Brothers Inc.; and Goldman Sachs & Co., in the Circuit Court of Kanawha County, State of West Virginia, Civil Action No. 89-C-3700 (December 19 and 20, 1991).

Deposition of Daniel R. Fischel In Re: The Regina Company, Inc. Securities Litigation, United States District Court, District of New Jersey, Civil Action No. 88-4149 (HAA) (October 31, 1991).

Affidavit of Daniel R. Fischel In Re: Gillette Securities Litigation, United States District Court, District of Massachusetts, Civil Action No. 88-1858-K (October 7, 1991)

Deposition of Daniel R. Fischel In Re: Capital Maritime Corporation v. Amfels, Inc., Far East Levingston Shipbuilding Ltd., John B. Allison and Patrick A. McDermid, United States District Court for the Southern District of Texas Houston Division, C.A. No. H-90-3417 (September 12, 1991).

Deposition of Daniel R. Fischel In Re: Thomas J. Caldarone, Jr. v. Isidore Brown, et al., and John E. Washburn, et al. v. Isidore Brown, et al., United States District Court, Northern District of Illinois, Eastern Division, Docket Nos. 80 C 6251 and 81 C 1475 (August 28, 29, and 30, 1991).

Testimony of Daniel R. Fischel In Re: Apple Securities Litigation, United States District Court, Northern District of California, Northern Division, Docket No. C-84-20148 (May 20 and 21, 1991).

Testimony of Daniel R. Fischel In Re: The Stuart-James Co., Inc., et al. Litigation, United States of America before the Securities & Exchange Commission, in Denver, Colorado, Administrative Proceeding File No. 3-7164 (May 6, 1991).

Deposition of Daniel R. Fischel In Re: Jennie Farber on behalf of herself and all others similarly situated v. Public Service Company of New Mexico; Jerry D. Geist; John P. Bundrant and Albert J. Robison, United States District Court for the District of New Mexico, CIV 89-456 JB WWD (April 17 and 18, 1991).

Affidavit of Daniel R. Fischel In Re: Moise Katz, Frederick Rand, Elias Weissman, Richard D. Morgan, Marion R. Morgan and Mortimer Schulman v. Raymond A. Hay, United States District Court, Southern District of New York, No. 86 Civ. 5640 (JES) (March 29, 1991).

Deposition of Daniel R. Fischel In Re: Standard Chartered PLC., a United Kingdom corporation, et al. v. Price Waterhouse, a general partnership, Superior Court of the State of Arizona, in and for the County of Maricopa, CV 88-34414 (March 13 and 14, 1991).

Affidavit of Daniel R. Fischel In Re: United States of America v. AVX Corporation, and Commonwealth of Massachusetts v. AVX Corporation, United States District Court, District of Massachusetts, Civil Action Nos. 83-3882-Y and 83-3899-Y (January 29, 1991).

Deposition of Daniel R. Fischel In Re: Apple Computer Securities, United States District Court Northern District of California, San Jose Division, No. C-84-20148 (a) JW (December 13 and 14, 1990).

Deposition of Daniel R. Fischel In Re: Polycast Technology Corporation, and Uniroyal Plastics Acquisition Corp. v. Uniroyal, Inc., et al., United States District Court Southern District of New York, No. 87 Civ. 3297 (December 6, 1990 and November 28, 1990).

Deposition of Daniel R. Fischel In Re: Ellen Rudd, on behalf of herself and all others similarly situated, and Mayer Corporation on behalf of themselves, and all others similarly situated, and Louis Brandt, and Israel Baker, Jay R. Kuhne, Pininfarina Corp., and American Transfer Co., on behalf of themselves and all others similarly situated v. Kirk Kerkorian, et al., Superior Court of the State of California, County of Los Angeles, Nos. CA 000980, CA 000981, CA 001017, CA 620279 (June 21, 1990).

Testimony of Daniel R. Fischel In Re: City of San Jose v. Paine, Webber, Jackson & Curtis, Incorporated, et al., and related counter- and Third-Party Claims, United States District Court, Northern District, No. C-84-20601 RPA (May 23 and 24, 1990).

Deposition of Daniel R. Fischel In Re: City of San Jose v. Paine, Webber, Jackson & Curtis, Incorporated, et al., and related counter- and Third-Party Claims, United States District Court, Northern District, No. C-84-20601 RPA (May 22, 1990), No. RPA 84-20601 (November 16, 1989 and September 8, 1989).

Testimony of Daniel R. Fischel In Re: Kulicke and Soffa Industries, Inc. Securities Litigation, United States District Court for the Eastern District of Pennsylvania, No. 86-1656 (March 20 and 21, 1990).

Deposition of Daniel R. Fischel In Re: Kulicke and Soffa Industries, Inc. Securities Litigation, United States District Court for the Eastern District of Pennsylvania, No. 86-1656 (March 9, 1990; December 19 and 21, 1989).

Affidavit of Daniel R. Fischel In Re: Viacom International Inc. v. Carl C. Icahn, et al., v. Ralph M. Baruch, et al., United States District Court, Southern District of New York, No. 86 Civ. 4215 (RPP) (March 8, 1990).

Deposition of Daniel R. Fischel In Re: Technical Equities Coordination Litigation, Superior Court of the State of California for the County of Santa Clara, Master File No. 1991, Santa Clara County Superior No. 600306 (March 1, 1990).

Deposition of Daniel R. Fischel In Re: Amalgamated Clothing and Textile Workers Union, AFL- CIO, et al. v. David A. Murdock, et al., United States District court for the Central District of California, No. CV-86-6410 IH (February 8, 1990).

Deposition of Daniel R. Fischel In Re: Connecticut National Life Insurance Company, et al. v. Peter A. Sprecher and Laventhol & Horwath, United States District Court, Central District of California, No. CV 87-1945 WJR (Tx) (January 30, 1990).

Deposition of Daniel R. Fischel In Re: Consolidated Capital Securities Litigation, United States District Court, Northern District of California, No. C-85-7332 AJZ (January 22, 1990).

Declaration of Daniel R. Fischel In Re Plaintiffs' Damages in Re: Liquidity Fund, et al. v. Southmark Corporation, et al. in the Superior Court of the State of California for the County of San Mateo, No. 332435 (January 18, 1990).

Deposition of Daniel R. Fischel In Re: Norman Kamerman, Shirley Brown, Edward Rosen, Lexim Investors Corp., and Dohsa Anstalt, on behalf of themselves and all others similarly situated, and Barnett Stepak v. Saul Steinberg, Reliance Group Holdings, Inc., Reliance Group, Inc., Reliance Financial Services corp., and Reliance Insurance Company, United States District Court, Southern District of New York, No. 84 Civ. 4440 (September 13, 1989).

Affidavit of Daniel R. Fischel In Re: Edward A. Taylor, et al. v. A. O. Smith Corporation et al., Circuit Court for Lincoln County, Tennessee, No. 098-84 (August 11, 1989).

Deposition of Daniel R. Fischel In Re: Container Products Inc. v. Pace Industries, United States District Court, Southern District of New York, No. 88-CIV. 3549 (KMW) (July 19, 1989).

Deposition of Daniel R. Fischel In Re: Joseph B. Moorman, et al. v. Southmark Corporation, et al., Liquidity Fund, et al. v. Southmark Corporation, et al., Superior Court of the State of California for the County of San Mateo, Nos. 322135 and 332435 (July 11, 1989).

Testimony of Daniel R. Fischel In Re: Tessie Wolfson, et al. v. Frederick S. Hammer, and Meritor Financial Group, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 87-8471 (June 20, 1989).

Deposition of Daniel R. Fischel In Re: Richard J. Heckmann, et al. v. C. L. Ahmanson, et al., and Consolidated Cases, Superior Court of the State of California for the County of Los Angeles, Nos. CA000851 and C642081 (June 8, 1989).

Deposition of Daniel R. Fischel In Re: Tessie Wolfson, et al. v. Frederick S. Hammer, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 87-8472 (May 11, 1989).

Testimony of Daniel R. Fischel In Re: Tessie Wolfson, et al. v. Frederick S. Hammer, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 87-8472 (April 13, 1989).

Deposition of Daniel R. Fischel In Re: National Union Fire Insurance Company of Pittsburgh, PA v. Wells Fargo Bank, N.A., District Court of Harris County, Texas, 125th Judicial District, No. 88-49246 (April 10 and 11, 1989).

Deposition of Daniel R. Fischel In Re: Susan Rothenberg, as Custodian for Stephen J. Rothenberg v. Charles E. Hurwitz, United Financial Corporation, United Savings Association of Texas, et al., United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-86-1435 (March 30, 1989).

Deposition of Daniel R. Fischel In Re: Jose Nodar, et al. v. William Weksel, Albert Bromberg, Henry B. Turner, IV, Frank L. Bryant, Leo Kuperschmid, Bennett S. Lebow, Ernst & Whinney and Oppenheimer & Co., Inc., United States District Court, Southern District of New York, No. 84 Civ. 3870 (VLB) and consolidation case No. 84 Civ. 5132 (VLB) (December 15 and 16, 1988).

Deposition of Daniel R. Fischel In Re: William Steiner, et al. v. Whittaker Corporation, et al., Superior Court of the State of California for the County of Los Angeles, No.CA000817 (December 7, 1988).

Deposition of Daniel R. Fischel In Re: Arnold I. Laven, et al. v. Western Union Corporation, et al., United States District Court for the District, Western District of Washington, MDL No. 551 (August 30 and 31, 1988).

Deposition of Daniel R. Fischel In Re: Washington Public Power Supply System Securities Litigation, United States District Court, Western District of Washington, MDL No. 551 (August 16 and 22, 1988).

Affidavit of Daniel R. Fischel In Re: District Business Conduct Committee for District No. 3 v. Blinder, Robinson & Company Inc., et al., National Association of Securities Dealers, Inc. National Business Conduct Committee, Complaint No. DEN-666 (July 21, 1988).

Deposition of Daniel R. Fischel In Re: Joseph Seidman, et al. v. Stauffer Chemical Company, et al, United States District Court for the District of Connecticut, No. B 84-543 (TFGD) (June 10, 1988 and May 5, 1987).

Deposition of Daniel R. Fischel In Re: Edlin Cattle Co., Inc., and James Edlin v. A. O. Smith Harvestore Products, Inc., et al., United States District Court for the Northern District of Texas, Amarillo Division, No. CA-2-86-0122 (May 12, 1988).

Deposition of Daniel R. Fischel In Re: MicroPro Securities Litigation, United States District Court for the Northern District of California, No. C-85-7428-EFL (A) (May 2, 1988).

Affidavit of Daniel R. Fischel In Re: Pizza Time Theatre Securities Litigation, United States District Court for the Northern District of California, Civil File No. 84-20048-(A)-RPA (March 25, 1988).

Affidavit of Daniel R. Fischel and Robert A. Sherwin In Re: First National Bank of Louisville v. Brooks Farms, and George C. Brooks, et al., Third-Party Plaintiffs v. A. O. Smith Corporation, et al., Circuit Court for Maury County, Tennessee, No. 2058 (March 3, 1988).

Testimony of Daniel R. Fischel In Re: Nucorp Energy Securities Litigation, United States District Court for the Southern District of California, M.D.L. 514 (March 15, 16, 17, and 18, 1988).

Deposition of Daniel R. Fischel In Re: Nucorp Energy Securities Litigation, United States District Court for the Southern District of California, M.D.L. 514 (January 27, 1988).

Deposition of Daniel R Fischel In Re: Anheuser-Busch Companies, Inc. v. W. Paul Thayer, et al., United States District Court for the Northern District of Texas, Dallas Division, No. CA- 3-85-0794-R (January 21, 1988; December 4, 1987; and November 5, 1987).

Testimony of Daniel R. Fischel In Re: Securities and Exchange Commission v. First City Finance Corporation Ltd., and Marc Belzberg, United States District Court for the District of Columbia, Civil Action No. 86-2240 (December 18, 1987).

Testimony of Daniel R. Fischel In Re: The Irvine Company v. Athalie Irvine Smith and Athalie R. Clarke, Trustee, State of Michigan Circuit Court for the county of Oakland, Civil Action No. 8327011-CZ (December 14, 15, and 16, 1987).

Deposition of Daniel R. Fischel In Re: Securities and Exchange Commission v. First City Finance Corporation, Ltd. and Marc Belzberg, United States District Court for the District of Columbia, Civil Action No. 86-2240 (December 11, 1987).

Affidavit of Daniel R. Fischel In Re: Gerald D. Broder and Constance D. Broder v. Alphonse H. Bellac and William B. Weinberger v. Combustion Equipment Associates, Inc., et al., and William B. Weinberger v. Coopers & Lybrand, United States District Court for the Southern District of New York, 80 CIV 6175 (CES), 80 CIV 6839 (CES), 84 CIV 8217 (CES) (July 22, 1987).

Deposition of Daniel R. Fischel In Re: The Irvine Company v. Athalie Irvine Smith and Athalie R. Clarke, Trustee, State of Michigan, Circuit Court for the County of Oakland, Civil Action No. 83270011-CZ (June 1, 1987).

Deposition of Daniel R. Fischel In Re: Fortune Systems Securities Litigation, United States District for the Northern District of California, Master File No. 83-3348A-WHO (May 7, 1987).

Deposition of Daniel R. Fischel In Re: Victor Technologies Securities Litigation, United States District Court for the Northern District of California, Master File No. C-83-3906(A)-RFP (FW) (January 8, 1987 and October 30, 1986).

Reply Declaration of Daniel R. Fischel in Support of the Motion by the Activision Defendants for Summary Judgment In Re: Activision Securities Litigation, United States District Court for the Northern District of California, Master File No. C-83-4639(A)-MHP (October 27, 1986).

Testimony of Daniel R. Fischel In Re: NVHomes, L.P. v. Ryan Homes, Inc.; and Ryan Homes, Inc. v. NVHomes, L.P., et al., United States District Court for the Western District of Pennsylvania, Civil Action No. 86-2139 (October 24, 1986).

Supplemental Affidavit of Daniel R. Fischel In Re: NVHomes, L.P. v. Ryan Homes, Inc.; and Ryan Homes, Inc. v. NVHomes, L.P. and NVAcquisition L.P., et al., United States District Court the Western District of Pennsylvania, Civil Action No. 86-2139 (October 24, 1986).

Affidavit of Daniel R. Fischel in Support of the Motion by the Activision Defendants for Summary Judgment In Re: Activision Securities Litigation, United States District Court for the Northern District of California, Master File No. C-86-2139 (October 20, 1986).

Declaration of Daniel R. Fischel in Support of the Motion by the Activision Defendants for Summary Judgment In Re: Activision Securities Litigation, United States District Court for the Northern District of California, Master File No. C-83-4639(A)-MHP (October 2, 1986).

Affidavit in Support of Defendants Motion for Summary Judgment In Re: MCorp Securities Litigation, United States Court for the Southern District of Texas, Civil Action No. H-85- 5894 (September 25, 1986).

Deposition of Daniel R. Fischel In Re: Activision Securities Litigation, United States District Court for the Northern District of California, No. C 83 4639 (August 18 and 19, 1986).

Deposition of Daniel R. Fischel In Re: John Mancino v. James A. McMaqhan, et al., United States District Court for the Northern District of California, Civil No. C-84-0407-TEH (August 14, 1986).

Testimony of Daniel R. Fischel In Re: Charles W. Leigh, et al. and George Johnson, et al. v. Clyde William Engle, et al., United States District Court for the Northern District of Illinois, Eastern Division, Case No. 78 C 3799 (August 1, 1986).

Reply Affidavit of Daniel R. Fischel In Re: The Amalgamated Sugar Company v. NL Industries, United States District Court for the Southern District of New York, 86 Civ. 5010 (VLB) (July 28, 1986).

Affidavit of Daniel R. Fischel In Re: The Amalgamated Sugar Company v. NL Industries, United States District Court for the Southern District of New York, 86 Civ. 5010 (VLB) (July 18, 1986).

Deposition of Daniel R. Fischel In Re: Charles W. Leigh, et al. and George Johnson, et al. v. Clyde William Engle, et al., United States District Court for the Northern District of Illinois, Eastern Division, Case No. 78 C 3799 (July 1, 1986).

Deposition of Daniel R. Fischel In Re: Seafirst Corporation v. William M. Jenkins, et al.; and Seafirst Corporation v. John R. Boyd, et al., United States District Court for the Western District of Washington at Seattle, Case No. C83-771R (February 27, 1986).

Deposition of Daniel R. Fischel In Re: Kreindler v. Sambo's Restaurants, Inc., United States District Court for the Southern District of New York, Case No. 79 Civ. 4538 (December 17, 1985).

Affidavit of Daniel R. Fischel In Re: United States of America v. S. Richmond Dole and Clark J. Matthews II (March 19, 1985).

Deposition of Daniel R. Fischel In Re: Craig T. McFarland, et al. v. Memorex Corporation, United States District Court for the Northern District of California, No. C 79-2926-WAI, C 79-2007-WAI, C 79-241-WAI (February 26, 1985; January 29 and 30, 1985).

Testimony of Daniel R. Fischel In Re: Robert J. Lawrence v. Grumman Corp. Pension Plan, et al., United States District Court for the Eastern District of New York, No. CV-81-3530 (December 19, 1983).

Testimony of Daniel R. Fischel In Re: Telvest, Inc. v. Junie L. Bradshaw, et al. and American Furniture Company, United States District Court, for the Eastern District of Virginia Richmond Division, No. CA-79-0722-R (December 4, 1981).

## OTHER ACTIVITIES

Member, American Economic Association, American Finance Association.

Former Member of the Board of Overseers of the Becker-Friedman Institute at the University of Chicago.

Former Advisor to the Harvard Program on Corporate Governance at Harvard University.

Former Member, Board of Directors, Center for the Study of the Economy and the State.

Former Member, Mid-America Institute Task Force on Stock Market Collapse.

Have acted as a consultant and/or advisor to the New York Stock Exchange, the National Association of Securities Dealers, the Chicago Board of Trade, the Chicago Board Options Exchange, the Chicago Mercantile Exchange, the New York Mercantile Exchange, the Federal Trade Commission, the Department of Labor, the Securities and Exchange Commission, the Canadian Securities and Exchange Commission, the United States Department of Justice, the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Federal Housing Finance Agency, and the Office of Thrift Supervision.

Referee, Journal of Financial Economics, Journal of Law and Economics, Journal of Legal Studies.

Participant and speaker at multiple conferences on the Economics of Corporate, Securities and Commodities Law and the Regulation of Financial Markets.

Former Chairman, American Association of Law Schools' Section on Law and Economics.

**APPENDIX B: MATERIALS RELIED UPON**

**Court Documents**

1. Order and Amended Opinion, December 4, 2023
2. Fourth Amended Complaint, July 1, 2025
3. Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Fourth Amended Complaint, February 27, 2026
4. Expert Report of Jonah B. Gelbach, August 20, 2026
5. Lead Plaintiffs' Amended Responses and Objections to Defendants' First Set of Interrogatories to Plaintiffs, August 21, 2026
6. Lead Plaintiffs' Notice of Motion and Motion to Certify Class, Appoint Class Representatives, and Appoint Class Counsel, and Memorandum of Points and Authorities in Support Thereof, August 21, 2026
7. Deposition of Jonah B. Gelbach, Ph.D., September 18, 2026

**Company Filings and Earnings Calls**

1. Facebook, Inc., Form 10-Q for the quarterly period ended September 30, 2016, https://www.sec.gov/Archives/edgar/data/1326801/000132680116000087/fb-9302016x10q.htm
2. Facebook, Inc., Form 10-K for the fiscal year ending December 31, 2016,
3. Facebook, Inc., Form 10-Q for the quarterly period ended March 31, 2017, https://www.sec.gov/Archives/edgar/data/1326801/000132680117000024/0001326801-17-000024-index.htm
4. Facebook, Inc., Form 10-Q for the quarterly period ended June 30, 2017, https://www.sec.gov/Archives/edgar/data/1326801/000132680117000038/0001326801-17-000038-index.htm
5. Facebook, Inc., Form 10-Q for the quarterly period ended September 30, 2017, https://www.sec.gov/Archives/edgar/data/1326801/000132680117000053/0001326801-17-000053-index.htm
6. Facebook, Inc. FQ3 2017 Earnings Call Transcripts, November 1, 2017
7. Facebook Inc. Form 10-K for the fiscal year ended December 31, 2017, https://www.sec.gov/Archives/edgar/data/1326801/000132680118000009/0001326801-18-000009-index.htm
8. Facebook Inc. FQ2 2018 Earnings Call Transcripts, July 25, 2018, 5:00 PM ET
9. Facebook Inc. Form 10-K for the fiscal year ended December 31, 2019, https://www.sec.gov/Archives/edgar/data/1326801/000132680120000013/fb-12312019x10k.htm

**Analyst Reports**

1. "FB: Data Leak Details Described, Enhancing Risks," *Pivotal Research Group*, March 19, 2018
2. "Opening Pandora's Box?" *Deutsche Bank*, March 19, 2018
3. "Thoughts on Facebook Data Concerns," *Raymond James*, March 19, 2018
4. "FB: Systemic Mismanagement Introduces New Risks," *Pivotal Research Group*, March 21, 2018
5. "Is Facebook's ad revenue growth threatened by the data privacy and fake news scandals engulfing he platform?," *Blueshift Research*, April 4, 2018
6. "Five Things to Consider," *Citi*, April 4, 2018
7. "Cautiously Optimistic The Bottom Is In," *Deutsche Bank*, April 4, 2018
8. "Addressing the Ad Concerns; Lower PT to $200 but Remain Bullish," *Morgan Stanley*, April 4, 2018
9. "FB: Taking Data Steps Up To Capitol Hill," *Wells Fargo*, April 4, 2018
10. "Getting arms around data issues and making a little progress," *Bank of America Merrill Lynch*, April 5, 2018
11. "U.S. Market Daily," *CrispIdea*, April 5, 2018
12. "GDPR Update and Partner Categories Implications," *Mizuho Securities*, April 5, 2018
13. "Addressing the Ad Concerns; Lower PT to $200 but Remain Bullish," *Morgan Stanley*, April 6, 2018
14. "Facebook - Fake relief.," *Radio Free Mobile*, April 6, 2018
15. "Data Shows Friends Don't Let Friends Leave Facebook," *Jefferies*, April 8, 2018
16. "FB: Checks Suggest News Flurry Has Had No Meaningful Impact on Current or Planned Spending," *KeyBanc*, April 8, 2018
17. "Another Facebook Post – Framing Scenarios on Data/Privacy & Platform Evolution," *UBS*, April 8, 2018

**News Articles, Press Releases, and Other Public Documents**

1. "Facebook Unveils Platform for Developers of Social Applications," Facebook Press Release, May 24, 2007, https://about.fb.com/news/2007/05/facebook-unveils-platform-for-developers-of-social-applications/
2. "Scientific Background on the Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 2013 Understanding Asset Prices," Economic Sciences Prize Committee of the Royal Swedish Academy of Sciences, October 14, 2013, https://www.kva.se/app/uploads/2013/10/globalassets-priser-ekonomi-2013-scibackek13.pdf
3. "The New Facebook Login and Graph API 2.0," Facebook Inc., April 30, 2014, https://developers.facebook.com/blog/post/2014/04/30/the-new-facebook-login

4. Facebook Site Governance post, January 30, 2015, https://www.facebook.com/fbsitegovernance/posts/our-updated-terms-data-policy-and-cookies-policy-take-effect-today-january-30-20/10153018633659323/
5. "Ted Cruz using firm that harvested data on millions of unwitting Facebook users," *The Guardian*, December 11, 2015, https://www.theguardian.com/us-news/2015/dec/11/senator-ted-cruz-president-campaign-facebook-user-data
6. "Facebook Failed to Protect 30 Million Users From Having Their Data Harvested By Trump Campaign Affiliate," *The Intercept,* March 30, 2017, https://theintercept.com/2017/03/30/facebook-failed-to-protect-30-million-users-from-having-their-data-harvested-by-trump-campaign-affiliate/
7. "Sheryl Sandberg in D.C. Thursday," *Axios*, October 10, 2017, https://www.axios.com/2017/12/15/sheryl-sandberg-in-dc-thursday-1513306065
8. "Exclusive interview with Facebook's Sheryl Sandberg," *Axios*, October 12, 2017, https://www.axios.com/2017/12/15/exclusive-interview-with-facebooks-sheryl-sandberg-1513306121
9. "Facebook says 126 million Americans may have seen Russian-linked political posts," *Reuters*, October 30, 2017 https://www.reuters.com/article/world/facebook-says-126-million-americans-may-have-seen-russia-linked-political-posts-idUSKBN1CZ2OF/
10. "Grand Jury Indicts Thirteen Russian Individuals and Three Russian Companies for Scheme to Interfere in the United States Political System," U.S. Department of Justice Press Release, February 16, 2018, https://www.justice.gov/archives/opa/pr/grand-jury-indicts-thirteen-russian-individuals-and-three-russian-companies-scheme-interfere
11. "Facebook Says it Suspends Cambridge Analytica, SCL Group," *Bloomberg*, March 16, 2018
12. "Suspending Cambridge Analytica and SCL Group From Facebook," Facebook Press Release, March 16, 2018, https://about.fb.com/news/2018/03/suspending-cambridge-analytica/
13. "50 Million Facebook Profiles Harvested Without User Consent – Data Monster Chose NOT to Alert Victims & Is Trying to Threaten Reporters," *WCCFTECH*, March 17, 2018, https://wccftech.com/50-million-facebook-profiles-harvested/
14. "How Trump Consultants Exploited the Facebook Data of Millions," *The New York Times*, March 17, 2018, https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html
15. "Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach," *The Guardian*, March 17, 2018, https://www.theguardian.com/news/2018/mar/17/cambridge-analytica-facebook-influence-us-election
16. "Facebook may have violated FTC privacy deal, say former federal officials, triggering risk of massive fines," *The Washington Post*, March 18, 2018,

https://www.washingtonpost.com/news/the-switch/wp/2018/03/18/facebook-may-have-violated-ftc-privacy-deal-say-former-federal-officials-triggering-risk-of-massive-fines/

17. "Facebook is Facing an Existential Crisis," *CNN*, March 19, 2018
18. "FTC launches inquiry into Facebook," *Politico*, March 20, 2018, https://www.politico.com/story/2018/03/20/ftc-launches-inquiry-into-facebook-473646
19. "'Utterly horrifying': ex-Facebook insider says covert data harvesting was routine," *The Guardian*, March 20, 2018, https://www.theguardian.com/news/2018/mar/20/facebook-data-cambridge-analytica-sandy-parakilas
20. "Cambridge Analytica, Facebook, and the Revelations of Open Secrets," *The New Yorker*, March 21, 2018, https://www.newyorker.com/news/news-desk/cambridge-analytica-facebook-and-the-revelations-of-open-secrets
21. "Facebook stock takes another hit amid reported probe, #DeleteFacebook campaign," *San Francisco Chronicle*, March 21, 2018, https://www.sfchronicle.com/business/article/Facebook-stock-takes-another-hit-amid-probe-12768613.php
22. "Facebook CEO Speaks on a Call With Media Reporters," *Bloomberg*, April 4, 2018
23. "Hard Questions: Q&A with Mark Zuckerberg on Protecting People's Information," Facebook Press Release, April 4, 2018, https://about.fb.com/news/2018/04/hard-questions-protecting-peoples-information/
24. Audio Recording of Q&A with Mark Zuckerberg, April 4, 2018, https://about.fb.com/wp-content/uploads/2018/04/mark-press-call-4_4.mp3
25. "Here's Why Some Are Saying Facebook's Stock Has Bottomed," *Bloomberg*, April 5, 2018
26. "Facebook, Social Media Privacy, and the Use and Abuse of Data," *U.S. Senate Committee on Commerce, Science, & Transportation*, April 10, 2018, https://www.commerce.senate.gov/2018/4/facebook-social-media-privacy-and-the-use-and-abuse-of-data
27. Joint Full Committee Hearing "Facebook, Social Media Privacy, and the Use and Abuse of Data -- Transcript," April 10, 2018, https://www.congress.gov/event/115th-congress/senate-event/LC64510/text
28. Joint Hearing before the Committee on Commerce, Science, and Transportation United States Senate and the Committee on the Judiciary United States Senate, Serial No. J-115-40, April 10, 2018, https://www.govinfo.gov/content/pkg/CHRG-115shrg37801/pdf/CHRG-115shrg37801.pdf
29. "Live updates from Mark Zuckerberg's testimony to Congress Tuesday," *Vox*, April 10, 2018, https://www.vox.com/2018/4/10/17216734/live-facebook-mark-zuckerberg-testimony-senate-hearing-data
30. Full Committee Hearing "Facebook: Transparency and Use of Consumer Data--Video" Committee on Energy and Commerce, April 11, 2018, https://democrats-

energycommerce.house.gov/committee-activity/hearings/hearing-on-facebook-transparency-and-use-of-consumer-data-full-committee

31. Full Committee Hearing "Facebook: Transparency and Use of Consumer Data – Transcript," Committee on Energy and Commerce, April 11, 2018, https://www.govinfo.gov/content/pkg/CHRG-115hhrg30956/pdf/CHRG-115hhrg30956.pdf
32. "Written evidence submitted by Aleksandr Kogan," UK Parliament, April 16, 2018, https://www.parliament.uk/globalassets/documents/commons-committees/culture-media-and-sport/Written-evidence-Aleksandr-Kogan.pdf
33. "How to Take Control of Your Facebook," *PRNewswire*, April 24, 2018, https://www.prnewswire.com/news-releases/how-to-take-control-of-your-facebook-300635877.html
34. "Facebook responses to open questions from the 'Committee on Legal Affairs and Consumer Protection' and the 'Committee on the Digital Agenda,'" Facebook Press Release, April 27, 2018, https://about.fb.com/wp-content/uploads/sites/4/2018/06/final-responses-to-german-committees.pdf
35. Facebook's Statement of Rights and Responsibilities, May 25, 2018, https://web.archive.org/web/20180525154320/https://www.facebook.com/terms/
36. "Facebook Gave Device Makers Deep Access to Data on Users and Friends," *The New York Times*, June 3, 2018, https://www.nytimes.com/interactive/2018/06/03/technology/facebook-device-partners-users-friends-data.html
37. "Why We Disagree with The New York Times," Facebook Press Release, June 3, 2018, https://about.fb.com/news/2018/06/why-we-disagree-with-the-nyt/
38. "Facebook Gave Some Companies Special Access to Additional Data About Users' Friends; Small number of companies had deals that gave them access to data after others were cut off," *The Wall Street Journal*, June 8, 2018, 7:28 PM ET, https://www.wsj.com/articles/facebook-gave-some-companies-access-to-additional-data-about-users-friends-1528490406
39. "Zuckerberg Responses to Commerce Committee Questions for the Record," June 8, 2018, https://www.judiciary.senate.gov/imo/media/doc/Zuckerberg%20Responses%20to%20Commerce%20Committee%20QFRs1.pdf
40. "Zuckerberg Responses to Hassan QFRs, June 29, 2018, https://www.judiciary.senate.gov/imo/media/doc/Zuckerberg%20Responses%20to%20Hassan.pdf
41. "Facebook Reports Second Quarter 2018 Results," *PR Newswire*, July 25, 2018, 4:05 PM ET, https://investor.atmeta.com/investor-news/press-release-details/2018/Facebook-Reports-Second-Quarter-2018-Results/default.aspx

42. "The Conference Call That Shook Investor Faith in Facebook; Concerns about revenue growth, monetizing Instagram Stories and the impact of new privacy laws hit the social-media giant's shares," *The Wall Street Journal*, July 26, 2018, https://www.wsj.com/articles/the-conference-call-that-shook-investor-faith-in-facebook-1532589109
43. "Introducing Meta: A Social Technology Company," Facebook Press Release, October 28, 2021, https://about.fb.com/news/2021/10/facebook-company-is-now-meta/
44. Facebook, "Manage the privacy settings for third-party apps you connected to Facebook," https://www.facebook.com/help/218345114850283
45. Fidelity Contrafund Summary Page, https://fundresearch.fidelity.com/mutual-funds/summary/316071109
46. T. Rowe Price Blue Chip Growth Fund Summary Page, https://www.troweprice.com/financial-intermediary/us/en/investments/mutual-funds/us-products/blue-chip-growth-fund.html


**Academic Literature**


1. E. Blankespoor, E. deHaan, & I. Marinovic, "Disclosure Processing Costs, Investors' Information Choice, and Equity Market Outcomes: A Review," 70 *Journal of Accounting and Economics* (2020)
2. J.Y. Campbell, A.W. Lo & A.C. MacKinlay, *The Econometrics of Financial Markets* (Princeton University Press, 1997)
3. E.J. Elton, M.J. Gruber, S.J. Brown, and W.N. Goetzmann, *Modern Portfolio Theory and Investment Analysis* (John Wiley & Sons, Inc., 2003)
4. J.E. Fisch, J.B. Gelbach, and J. Klick, "The Logic and Limits of Event Studies in Securities Fraud Litigation," 96 *Texas Law Review* 553 (2018)
5. D.R. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," 38 *The Business Lawyer* (1982), 1-20
6. J.B. Gelbach and J.R. Hawkins, "A Bayesian Approach to Event Studies for Securities Litigation," 176 *Journal of Institutional and Theoretical Economics* (2020), 86-111
7. C.P. Jones, *Investments: Analysis and Management*, 12th Ed. (John Wiley & Sons, Inc., 2013)
8. A.C. MacKinlay, "Event Studies in Economics and Finance," 35 *Journal of Economic Literature* (1997), 13-39
9. W. Mendenhall, J.E. Reinmuth & R.J. Beaver, *Statistics for Management and Economics* (Duxbury Press, 1993)
10. G.W. Schwert, "Using Financial Data to Measure Effects of Regulation," 24 *The Journal of Law and Economics* (1981), 121-158
11. J.E. Stiglitz and C.E. Walsh, *Economics*, 4th Ed. (W.W. Norton & Co. 2006)
12. N. Wang, H. Xu, and J. Grossklags, "Third-Party Apps on Facebook: Privacy and the Illusion of Control," *CHiMiT '11: Proceedings of the 5th ACM Symposium on*

*Computer Human Interaction for Management of Information Technology*, Article No. 4, December 4-5, 2011, https://doi.org/10.1145/2076444.2076448

**<u>Data</u>**

1. Capital IQ
2. CRSP US Stock and Index Database from Morningstar
3. LSEG
4. TICK Intraday Data

# APPENDIX C
## Event Study Analysis for Facebook Stock

| Date | Actual Return | Predicted Return | Residual Return | *t*-Statistic | One-Tailed *p*-Value | Statistically Significant? |
|---|---|---|---|---|---|---|
| **Pre-Class Period Dates Mentioned in the Report** | | | | | | |
| 01/30/15 | -2.68% | -0.04% | -2.64% | -2.26 | 1.28% | *** |
| 12/11/15 | -3.13% | -2.53% | -0.60% | -0.49 | 31.37% | |
| **Dates in the Putative Class Period and July 26, 2018** | | | | | | |
| 02/03/17 | 0.11% | 0.07% | 0.04% | 0.04 | 48.35% | |
| 02/06/17 | 0.82% | 0.03% | 0.80% | 0.84 | 20.24% | |
| 02/07/17 | -0.17% | 0.54% | -0.70% | -0.74 | 23.05% | |
| 02/08/17 | 1.79% | 0.00% | 1.79% | 1.88 | 3.13% | +++ |
| 02/09/17 | -0.04% | 0.35% | -0.39% | -0.41 | 34.20% | |
| 02/10/17 | 0.04% | 0.14% | -0.11% | -0.11 | 45.61% | |
| 02/13/17 | -0.10% | 0.25% | -0.36% | -0.37 | 35.57% | |
| 02/14/17 | -0.15% | 0.02% | -0.17% | -0.18 | 42.96% | |
| 02/15/17 | -0.31% | 0.81% | -1.12% | -1.17 | 12.25% | |
| 02/16/17 | 0.30% | -0.49% | 0.79% | 0.82 | 20.78% | |
| 02/17/17 | -0.23% | 0.77% | -1.00% | -1.03 | 15.17% | |
| 02/21/17 | 0.14% | 0.34% | -0.20% | -0.20 | 42.04% | |
| 02/22/17 | 1.79% | -0.29% | 2.08% | 2.17 | 1.61% | +++ |
| 02/23/17 | -0.56% | -0.88% | 0.32% | 0.33 | 37.15% | |
| 02/24/17 | 0.06% | 0.21% | -0.15% | -0.15 | 44.08% | |
| 02/27/17 | 0.72% | 0.18% | 0.53% | 0.55 | 29.28% | |
| 02/28/17 | -0.64% | -1.46% | 0.82% | 0.84 | 20.21% | |
| 03/01/17 | 1.39% | 1.33% | 0.06% | 0.06 | 47.62% | |
| 03/02/17 | -0.48% | -1.00% | 0.52% | 0.54 | 29.61% | |
| 03/03/17 | 0.30% | 0.10% | 0.20% | 0.21 | 41.77% | |
| 03/06/17 | 0.18% | -0.22% | 0.41% | 0.42 | 33.72% | |
| 03/07/17 | -0.09% | -0.18% | 0.10% | 0.10 | 46.01% | |
| 03/08/17 | 0.31% | 0.40% | -0.09% | -0.10 | 46.18% | |
| 03/09/17 | 0.38% | 0.03% | 0.34% | 0.36 | 36.13% | |
| 03/10/17 | 0.40% | 0.39% | 0.01% | 0.01 | 49.66% | |
| 03/13/17 | 0.58% | 0.65% | -0.06% | -0.07 | 47.31% | |
| 03/14/17 | -0.20% | -0.41% | 0.21% | 0.22 | 41.42% | |
| 03/15/17 | 0.29% | 0.44% | -0.15% | -0.16 | 43.68% | |
| 03/16/17 | 0.19% | 0.41% | -0.22% | -0.23 | 41.07% | |
| 03/17/17 | -0.11% | 0.19% | -0.30% | -0.31 | 37.84% | |
| 03/20/17 | 0.07% | 0.10% | -0.03% | -0.03 | 48.69% | |
| 03/21/17 | -1.02% | -2.19% | 1.16% | 1.23 | 11.10% | |

# APPENDIX C
## Event Study Analysis for Facebook Stock

| Date | Actual Return | Predicted Return | Residual Return | *t*-Statistic | One-Tailed *p*-Value | Statistically Significant? |
|---|---|---|---|---|---|---|
| 03/22/17 | 0.78% | 0.47% | 0.31% | 0.32 | 37.33% | |
| 03/23/17 | -0.04% | 0.04% | -0.08% | -0.09 | 46.56% | |
| 03/24/17 | 0.58% | 0.35% | 0.23% | 0.25 | 40.29% | |
| 03/27/17 | -0.01% | 0.41% | -0.42% | -0.44 | 33.02% | |
| 03/28/17 | 1.03% | 0.33% | 0.70% | 0.74 | 23.18% | |
| 03/29/17 | 0.63% | 0.72% | -0.09% | -0.10 | 46.21% | |
| 03/30/17 | -0.17% | 0.05% | -0.22% | -0.23 | 40.79% | |
| 03/31/17 | -0.25% | 0.12% | -0.37% | -0.39 | 34.86% | |
| 04/03/17 | 0.16% | -0.15% | 0.31% | 0.32 | 37.32% | |
| 04/04/17 | -0.39% | -0.03% | -0.36% | -0.38 | 35.33% | |
| 04/05/17 | 0.08% | -0.52% | 0.60% | 0.63 | 26.37% | |
| 04/06/17 | -0.48% | 0.18% | -0.66% | -0.70 | 24.32% | |
| 04/07/17 | -0.28% | -0.10% | -0.17% | -0.18 | 42.80% | |
| 04/10/17 | 0.18% | 0.13% | 0.06% | 0.06 | 47.70% | |
| 04/11/17 | -0.79% | -0.11% | -0.68% | -0.71 | 23.82% | |
| 04/12/17 | -0.24% | -0.41% | 0.17% | 0.18 | 42.97% | |
| 04/13/17 | -0.14% | -0.28% | 0.15% | 0.15 | 43.92% | |
| 04/17/17 | 1.46% | 1.01% | 0.45% | 0.47 | 31.91% | |
| 04/18/17 | -0.33% | -0.09% | -0.24% | -0.25 | 40.03% | |
| 04/19/17 | 0.93% | 0.51% | 0.42% | 0.44 | 32.90% | |
| 04/20/17 | 1.08% | 0.71% | 0.37% | 0.39 | 35.01% | |
| 04/21/17 | -0.08% | -0.01% | -0.07% | -0.08 | 46.97% | |
| 04/24/17 | 1.25% | 1.22% | 0.02% | 0.02 | 49.01% | |
| 04/25/17 | 0.70% | 0.86% | -0.16% | -0.17 | 43.35% | |
| 04/26/17 | 0.05% | 0.41% | -0.36% | -0.39 | 35.01% | |
| 04/27/17 | 0.78% | 0.89% | -0.11% | -0.12 | 45.20% | |
| 04/28/17 | 1.73% | 0.42% | 1.31% | 1.39 | 8.29% | |
| 05/01/17 | 1.47% | 1.19% | 0.28% | 0.34 | 36.62% | |
| 05/02/17 | 0.21% | 0.91% | -0.70% | -0.88 | 19.14% | |
| 05/03/17 | -0.64% | -0.36% | -0.28% | -0.35 | 36.22% | |
| 05/04/17 | -0.63% | 0.16% | -0.79% | -1.00 | 15.98% | |
| 05/05/17 | -0.40% | 0.45% | -0.86% | -1.08 | 14.04% | |
| 05/08/17 | 0.55% | -0.08% | 0.63% | 0.79 | 21.55% | |
| 05/09/17 | -0.38% | 0.55% | -0.93% | -1.22 | 11.22% | |
| 05/10/17 | -0.13% | 0.33% | -0.46% | -0.62 | 26.84% | |
| 05/11/17 | -0.17% | -0.21% | 0.04% | 0.05 | 47.84% | |
| 05/12/17 | 0.19% | 0.39% | -0.20% | -0.27 | 39.28% | |

# APPENDIX C
## Event Study Analysis for Facebook Stock

| Date | Actual Return | Predicted Return | Residual Return | *t*-Statistic | One-Tailed *p*-Value | Statistically Significant? |
|---|---|---|---|---|---|---|
| 05/15/17 | -0.09% | 0.57% | -0.66% | -0.92 | 17.98% | |
| 05/16/17 | -0.27% | 0.92% | -1.19% | -1.66 | 4.96% | *** |
| 05/17/17 | -3.29% | -2.87% | -0.42% | -0.64 | 26.18% | |
| 05/18/17 | 1.94% | 0.87% | 1.07% | 1.63 | 5.29% | |
| 05/19/17 | 0.27% | 0.18% | 0.10% | 0.14 | 44.29% | |
| 05/22/17 | 0.12% | 0.94% | -0.82% | -1.25 | 10.78% | |
| 05/23/17 | -0.11% | 0.00% | -0.12% | -0.18 | 42.91% | |
| 05/24/17 | 1.33% | 0.50% | 0.83% | 1.25 | 10.71% | |
| 05/25/17 | 1.28% | 0.96% | 0.32% | 0.49 | 31.41% | |
| 05/26/17 | 0.11% | 0.24% | -0.13% | -0.19 | 42.50% | |
| 05/30/17 | 0.16% | -0.11% | 0.28% | 0.42 | 33.67% | |
| 05/31/17 | -0.60% | -0.07% | -0.54% | -0.82 | 20.83% | |
| 06/01/17 | 0.05% | 1.07% | -1.02% | -1.55 | 6.17% | |
| 06/02/17 | 1.37% | 1.03% | 0.35% | 0.52 | 30.09% | |
| 06/05/17 | 0.01% | 0.17% | -0.16% | -0.24 | 40.62% | |
| 06/06/17 | -0.53% | -0.31% | -0.23% | -0.34 | 36.54% | |
| 06/07/17 | 0.20% | 0.31% | -0.11% | -0.16 | 43.60% | |
| 06/08/17 | 1.04% | 1.15% | -0.11% | -0.17 | 43.43% | |
| 06/09/17 | -3.30% | -3.05% | -0.25% | -0.38 | 35.08% | |
| 06/12/17 | -0.78% | -0.86% | 0.09% | 0.13 | 44.73% | |
| 06/13/17 | 1.51% | 0.77% | 0.74% | 1.14 | 12.94% | |
| 06/14/17 | -0.29% | -0.40% | 0.12% | 0.18 | 42.75% | |
| 06/15/17 | -0.30% | -0.43% | 0.13% | 0.21 | 41.84% | |
| 06/16/17 | 0.56% | -0.08% | 0.64% | 1.00 | 16.05% | |
| 06/19/17 | 1.48% | 1.51% | -0.03% | -0.04 | 48.41% | |
| 06/20/17 | -0.41% | -0.68% | 0.28% | 0.43 | 33.38% | |
| 06/21/17 | 1.09% | 1.41% | -0.32% | -0.50 | 31.02% | |
| 06/22/17 | -0.33% | 0.47% | -0.80% | -1.26 | 10.57% | |
| 06/23/17 | 1.09% | 1.02% | 0.07% | 0.11 | 45.57% | |
| 06/26/17 | -0.95% | -0.57% | -0.38% | -0.60 | 27.54% | |
| 06/27/17 | -1.96% | -1.59% | -0.37% | -0.58 | 28.32% | |
| 06/28/17 | 1.77% | 1.62% | 0.14% | 0.22 | 41.17% | |
| 06/29/17 | -1.44% | -1.43% | -0.01% | -0.01 | 49.56% | |
| 06/30/17 | -0.04% | -0.07% | 0.03% | 0.04 | 48.36% | |
| 07/03/17 | -1.69% | -0.95% | -0.74% | -1.20 | 11.58% | |
| 07/05/17 | 1.29% | 1.13% | 0.16% | 0.26 | 39.83% | |
| 07/06/17 | -1.01% | -0.74% | -0.27% | -0.45 | 32.86% | |

# APPENDIX C
## Event Study Analysis for Facebook Stock

| Date | Actual Return | Predicted Return | Residual Return | *t*-Statistic | One-Tailed *p*-Value | Statistically Significant? |
|---|---|---|---|---|---|---|
| 07/07/17 | 1.76% | 1.22% | 0.54% | 0.91 | 18.25% | |
| 07/10/17 | 1.36% | 0.77% | 0.59% | 0.99 | 16.16% | |
| 07/11/17 | 1.15% | 0.64% | 0.51% | 0.86 | 19.61% | |
| 07/12/17 | 2.34% | 1.36% | 0.98% | 1.64 | 5.22% | |
| 07/13/17 | 0.23% | 0.15% | 0.08% | 0.13 | 44.80% | |
| 07/14/17 | 0.45% | 0.62% | -0.18% | -0.29 | 38.53% | |
| 07/17/17 | -0.15% | 0.23% | -0.38% | -0.64 | 26.18% | |
| 07/18/17 | 1.96% | 1.16% | 0.80% | 1.36 | 8.89% | |
| 07/19/17 | 0.79% | 0.56% | 0.22% | 0.38 | 35.22% | |
| 07/20/17 | 0.24% | 0.00% | 0.24% | 0.42 | 33.89% | |
| 07/21/17 | -0.06% | 0.02% | -0.08% | -0.14 | 44.36% | |
| 07/24/17 | 0.95% | 0.80% | 0.15% | 0.26 | 39.62% | |
| 07/25/17 | -0.43% | -0.05% | -0.38% | -0.66 | 25.38% | |
| 07/26/17 | 0.20% | 0.01% | 0.19% | 0.35 | 36.53% | |
| 07/27/17 | 2.92% | -1.22% | 4.14% | 7.96 | 0.00% | +++ |
| 07/28/17 | 1.18% | 0.00% | 1.18% | 1.84 | 3.40% | +++ |
| 07/31/17 | -1.86% | -0.83% | -1.03% | -1.60 | 5.62% | |
| 08/01/17 | 0.36% | 0.17% | 0.19% | 0.29 | 38.67% | |
| 08/02/17 | -0.33% | -0.49% | 0.16% | 0.26 | 39.70% | |
| 08/03/17 | -0.42% | 0.14% | -0.56% | -0.89 | 18.66% | |
| 08/04/17 | 0.61% | 0.64% | -0.03% | -0.04 | 48.35% | |
| 08/07/17 | 1.39% | 0.66% | 0.73% | 1.17 | 12.29% | |
| 08/08/17 | -0.44% | -0.11% | -0.33% | -0.52 | 30.28% | |
| 08/09/17 | -0.03% | -0.33% | 0.30% | 0.49 | 31.24% | |
| 08/10/17 | -2.21% | -2.32% | 0.11% | 0.17 | 43.14% | |
| 08/11/17 | 0.41% | 1.11% | -0.70% | -1.15 | 12.65% | |
| 08/14/17 | 1.59% | 1.28% | 0.31% | 0.50 | 30.90% | |
| 08/15/17 | 0.15% | -0.18% | 0.33% | 0.56 | 28.83% | |
| 08/16/17 | -0.58% | 0.62% | -1.21% | -2.05 | 2.15% | *** |
| 08/17/17 | -1.82% | -1.53% | -0.29% | -0.48 | 31.52% | |
| 08/18/17 | 0.30% | 0.23% | 0.07% | 0.11 | 45.49% | |
| 08/21/17 | 0.22% | -0.01% | 0.23% | 0.39 | 34.83% | |
| 08/22/17 | 1.11% | 1.57% | -0.46% | -0.77 | 22.15% | |
| 08/23/17 | -0.55% | -0.06% | -0.49% | -0.82 | 20.62% | |
| 08/24/17 | -0.58% | 0.30% | -0.87% | -1.46 | 7.42% | |
| 08/25/17 | -0.85% | -0.69% | -0.16% | -0.27 | 39.52% | |
| 08/28/17 | 0.55% | 0.31% | 0.24% | 0.40 | 34.55% | |

# APPENDIX C
## Event Study Analysis for Facebook Stock

| Date | Actual Return | Predicted Return | Residual Return | *t*-Statistic | One-Tailed *p*-Value | Statistically Significant? |
|---|---|---|---|---|---|---|
| 08/29/17 | 0.48% | 0.57% | -0.08% | -0.14 | 44.61% | |
| 08/30/17 | 1.11% | 1.27% | -0.16% | -0.27 | 39.48% | |
| 08/31/17 | 1.21% | 1.16% | 0.05% | 0.08 | 46.96% | |
| 09/01/17 | 0.03% | 0.06% | -0.03% | -0.05 | 47.93% | |
| 09/05/17 | -0.76% | -0.67% | -0.08% | -0.14 | 44.53% | |
| 09/06/17 | 0.80% | 0.14% | 0.66% | 1.10 | 13.78% | |
| 09/07/17 | 0.65% | 0.47% | 0.19% | 0.31 | 38.05% | |
| 09/08/17 | -1.30% | -0.67% | -0.63% | -1.05 | 14.86% | |
| 09/11/17 | 1.50% | 1.05% | 0.45% | 0.74 | 23.01% | |
| 09/12/17 | -0.32% | 0.47% | -0.79% | -1.30 | 9.75% | |
| 09/13/17 | 0.05% | 0.03% | 0.02% | 0.03 | 48.70% | |
| 09/14/17 | -1.21% | -0.32% | -0.89% | -1.47 | 7.26% | |
| 09/15/17 | 0.40% | 0.31% | 0.09% | 0.15 | 44.08% | |
| 09/18/17 | -0.95% | 0.25% | -1.20% | -1.96 | 2.61% | *** |
| 09/19/17 | 1.48% | 0.15% | 1.33% | 2.15 | 1.69% | +++ |
| 09/20/17 | -0.20% | 0.05% | -0.25% | -0.40 | 34.67% | |
| 09/21/17 | -0.62% | -0.18% | -0.44% | -0.70 | 24.28% | |
| 09/22/17 | -0.33% | 0.20% | -0.53% | -0.85 | 19.97% | |
| 09/25/17 | -4.50% | -1.47% | -3.02% | -4.79 | 0.00% | *** |
| 09/26/17 | 0.82% | 0.07% | 0.76% | 1.10 | 13.63% | |
| 09/27/17 | 2.11% | 1.84% | 0.27% | 0.39 | 34.81% | |
| 09/28/17 | 0.63% | 0.01% | 0.61% | 0.90 | 18.60% | |
| 09/29/17 | 1.27% | 0.87% | 0.40% | 0.58 | 28.18% | |
| 10/02/17 | -0.82% | 0.40% | -1.22% | -1.77 | 4.00% | *** |
| 10/03/17 | 0.29% | 0.62% | -0.33% | -0.47 | 31.95% | |
| 10/04/17 | -0.91% | 0.26% | -1.16% | -1.67 | 4.85% | *** |
| 10/05/17 | 1.67% | 1.01% | 0.66% | 0.94 | 17.38% | |
| 10/06/17 | 0.58% | 0.24% | 0.34% | 0.48 | 31.44% | |
| 10/09/17 | 0.16% | -0.12% | 0.27% | 0.39 | 35.01% | |
| 10/10/17 | -0.53% | -0.40% | -0.13% | -0.19 | 42.58% | |
| 10/11/17 | 0.67% | 0.52% | 0.15% | 0.22 | 41.37% | |
| 10/12/17 | -0.11% | 0.13% | -0.24% | -0.34 | 36.68% | |
| 10/13/17 | 0.69% | 0.30% | 0.39% | 0.56 | 28.94% | |
| 10/16/17 | 0.45% | -0.11% | 0.56% | 0.79 | 21.43% | |
| 10/17/17 | 0.91% | -0.09% | 1.00% | 1.41 | 8.07% | |
| 10/18/17 | -0.05% | 0.05% | -0.10% | -0.13 | 44.72% | |
| 10/19/17 | -0.84% | -0.48% | -0.35% | -0.50 | 30.83% | |

# APPENDIX C
## Event Study Analysis for Facebook Stock

| Date | Actual Return | Predicted Return | Residual Return | *t*-Statistic | One-Tailed *p*-Value | Statistically Significant? |
|---|---|---|---|---|---|---|
| 10/20/17 | 0.24% | 0.50% | -0.26% | -0.37 | 35.60% | |
| 10/23/17 | -2.12% | -0.98% | -1.14% | -1.61 | 5.48% | |
| 10/24/17 | 0.31% | 0.52% | -0.21% | -0.29 | 38.49% | |
| 10/25/17 | -0.70% | -0.41% | -0.28% | -0.40 | 34.46% | |
| 10/26/17 | 0.02% | 0.48% | -0.46% | -0.66 | 25.60% | |
| 10/27/17 | 4.25% | 2.49% | 1.76% | 2.50 | 0.69% | +++ |
| 10/30/17 | 1.12% | 0.08% | 1.04% | 1.46 | 7.39% | |
| 10/31/17 | 0.11% | 0.78% | -0.68% | -0.94 | 17.46% | |
| 11/01/17 | 1.44% | -0.55% | 2.00% | 2.76 | 0.33% | +++ |
| 11/02/17 | -2.05% | -0.04% | -2.01% | -2.69 | 0.41% | *** |
| 11/03/17 | 0.00% | 0.90% | -0.90% | -1.17 | 12.23% | |
| 11/06/17 | 0.70% | 0.43% | 0.27% | 0.36 | 36.14% | |
| 11/07/17 | 0.04% | -0.78% | 0.83% | 1.08 | 14.08% | |
| 11/08/17 | -0.38% | 0.58% | -0.97% | -1.27 | 10.30% | |
| 11/09/17 | -0.14% | -0.94% | 0.80% | 1.04 | 14.96% | |
| 11/10/17 | -0.47% | 0.37% | -0.83% | -1.09 | 13.91% | |
| 11/13/17 | 0.17% | 0.17% | 0.00% | 0.00 | 49.94% | |
| 11/14/17 | -0.39% | 0.13% | -0.52% | -0.69 | 24.72% | |
| 11/15/17 | -0.07% | -0.32% | 0.25% | 0.32 | 37.35% | |
| 11/16/17 | 0.92% | 1.85% | -0.92% | -1.21 | 11.53% | |
| 11/17/17 | -0.33% | 0.13% | -0.46% | -0.60 | 27.57% | |
| 11/20/17 | -0.15% | 0.31% | -0.46% | -0.60 | 27.63% | |
| 11/21/17 | 1.75% | 1.36% | 0.38% | 0.50 | 30.91% | |
| 11/22/17 | -0.54% | 0.39% | -0.93% | -1.21 | 11.38% | |
| 11/24/17 | 1.06% | 0.67% | 0.39% | 0.51 | 30.69% | |
| 11/27/17 | 0.14% | -0.18% | 0.32% | 0.41 | 33.96% | |
| 11/28/17 | -0.33% | 0.04% | -0.37% | -0.49 | 31.43% | |
| 11/29/17 | -4.00% | -2.53% | -1.47% | -1.90 | 3.02% | *** |
| 11/30/17 | 1.17% | 0.12% | 1.05% | 1.34 | 9.18% | |
| 12/01/17 | -1.17% | -0.41% | -0.76% | -0.97 | 16.71% | |
| 12/04/17 | -2.07% | -2.29% | 0.22% | 0.28 | 38.98% | |
| 12/05/17 | 0.79% | 0.33% | 0.46% | 0.59 | 27.96% | |
| 12/06/17 | 1.87% | 0.49% | 1.38% | 1.74 | 4.20% | +++ |
| 12/07/17 | 2.32% | 0.99% | 1.33% | 1.67 | 4.88% | +++ |
| 12/08/17 | -0.63% | 0.11% | -0.74% | -0.92 | 17.98% | |
| 12/11/17 | 0.02% | 0.67% | -0.64% | -0.80 | 21.32% | |
| 12/12/17 | -1.16% | -0.57% | -0.60% | -0.74 | 23.12% | |

# APPENDIX C
## Event Study Analysis for Facebook Stock

| Date | Actual Return | Predicted Return | Residual Return | *t*-Statistic | One-Tailed *p*-Value | Statistically Significant? |
|---|---|---|---|---|---|---|
| 12/13/17 | 0.76% | 0.60% | 0.15% | 0.19 | 42.47% | |
| 12/14/17 | 0.05% | 0.32% | -0.27% | -0.33 | 37.08% | |
| 12/15/17 | 1.00% | 1.18% | -0.18% | -0.22 | 41.29% | |
| 12/18/17 | 0.36% | 1.40% | -1.05% | -1.30 | 9.80% | |
| 12/19/17 | -0.72% | -0.46% | -0.26% | -0.32 | 37.34% | |
| 12/20/17 | -0.90% | -0.22% | -0.69% | -0.85 | 19.99% | |
| 12/21/17 | -0.25% | -0.27% | 0.02% | 0.03 | 48.83% | |
| 12/22/17 | -0.14% | -0.33% | 0.19% | 0.23 | 40.81% | |
| 12/26/17 | -0.68% | -0.29% | -0.39% | -0.48 | 31.50% | |
| 12/27/17 | 0.93% | -0.04% | 0.97% | 1.18 | 11.93% | |
| 12/28/17 | 0.17% | 0.26% | -0.10% | -0.12 | 45.35% | |
| 12/29/17 | -0.82% | -0.66% | -0.16% | -0.20 | 42.19% | |
| 01/02/18 | 2.81% | 1.55% | 1.26% | 1.54 | 6.29% | |
| 01/03/18 | 1.79% | 1.15% | 0.64% | 0.78 | 21.95% | |
| 01/04/18 | -0.18% | -0.07% | -0.11% | -0.13 | 44.65% | |
| 01/05/18 | 1.37% | 0.89% | 0.48% | 0.58 | 28.10% | |
| 01/08/18 | 0.77% | 0.58% | 0.18% | 0.22 | 41.29% | |
| 01/09/18 | -0.22% | -0.18% | -0.04% | -0.05 | 47.94% | |
| 01/10/18 | -0.02% | -0.17% | 0.15% | 0.19 | 42.63% | |
| 01/11/18 | -0.04% | 1.01% | -1.05% | -1.27 | 10.29% | |
| 01/12/18 | -4.47% | 1.17% | -5.64% | -6.81 | 0.00% | *** |
| 01/16/18 | -0.55% | -0.70% | 0.15% | 0.15 | 43.86% | |
| 01/17/18 | -0.44% | 0.67% | -1.11% | -1.13 | 12.95% | |
| 01/18/18 | 1.24% | 0.09% | 1.15% | 1.17 | 12.25% | |
| 01/19/18 | 0.83% | 0.47% | 0.35% | 0.40 | 34.55% | |
| 01/22/18 | 2.25% | 0.81% | 1.44% | 1.62 | 5.39% | |
| 01/23/18 | 2.15% | 1.40% | 0.75% | 0.83 | 20.31% | |
| 01/24/18 | -1.48% | -1.10% | -0.38% | -0.42 | 33.62% | |
| 01/25/18 | 0.50% | -0.02% | 0.52% | 0.58 | 28.07% | |
| 01/26/18 | 1.34% | 0.94% | 0.41% | 0.45 | 32.58% | |
| 01/29/18 | -2.12% | 0.36% | -2.47% | -2.75 | 0.34% | *** |
| 01/30/18 | 0.61% | -0.13% | 0.75% | 0.81 | 21.01% | |
| 01/31/18 | -0.12% | 0.19% | -0.31% | -0.34 | 36.78% | |
| 02/01/18 | 3.32% | -0.99% | 4.31% | 4.67 | 0.00% | +++ |
| 02/02/18 | -1.46% | -0.80% | -0.65% | -0.65 | 25.93% | |
| 02/05/18 | -4.74% | -1.40% | -3.34% | -3.32 | 0.06% | *** |
| 02/06/18 | 2.23% | 2.40% | -0.16% | -0.16 | 43.69% | |

# APPENDIX C
## Event Study Analysis for Facebook Stock

| Date | Actual Return | Predicted Return | Residual Return | *t*-Statistic | One-Tailed *p*-Value | Statistically Significant? |
|---|---|---|---|---|---|---|
| 02/07/18 | -2.77% | -0.52% | -2.25% | -2.19 | 1.52% | *** |
| 02/08/18 | -4.77% | -3.61% | -1.17% | -1.12 | 13.31% | |
| 02/09/18 | 2.64% | 1.03% | 1.61% | 1.54 | 6.30% | |
| 02/12/18 | 0.17% | 1.91% | -1.74% | -1.65 | 5.08% | |
| 02/13/18 | -1.85% | 0.90% | -2.75% | -2.58 | 0.56% | *** |
| 02/14/18 | 3.68% | 2.42% | 1.26% | 1.15 | 12.57% | |
| 02/15/18 | 0.25% | 2.14% | -1.90% | -1.72 | 4.37% | *** |
| 02/16/18 | -1.44% | -0.69% | -0.75% | -0.68 | 25.00% | |
| 02/20/18 | -0.76% | 0.42% | -1.18% | -1.06 | 14.65% | |
| 02/21/18 | 1.08% | -0.17% | 1.25% | 1.11 | 13.42% | |
| 02/22/18 | 0.61% | -0.64% | 1.25% | 1.11 | 13.50% | |
| 02/23/18 | 2.40% | 1.87% | 0.53% | 0.47 | 31.89% | |
| 02/26/18 | 0.89% | 1.03% | -0.13% | -0.12 | 45.43% | |
| 02/27/18 | -1.88% | -1.23% | -0.65% | -0.57 | 28.44% | |
| 02/28/18 | -1.73% | -0.35% | -1.38% | -1.22 | 11.20% | |
| 03/01/18 | -1.33% | -1.41% | 0.08% | 0.07 | 47.24% | |
| 03/02/18 | 0.39% | 1.81% | -1.42% | -1.25 | 10.65% | |
| 03/05/18 | 2.14% | 0.95% | 1.19% | 1.04 | 15.03% | |
| 03/06/18 | -0.34% | 0.87% | -1.21% | -1.05 | 14.68% | |
| 03/07/18 | 2.19% | 0.63% | 1.56% | 1.35 | 8.92% | |
| 03/08/18 | -0.75% | 0.38% | -1.13% | -0.97 | 16.66% | |
| 03/09/18 | 1.59% | 1.86% | -0.27% | -0.23 | 40.79% | |
| 03/12/18 | -0.25% | 0.60% | -0.85% | -0.73 | 23.29% | |
| 03/13/18 | -1.56% | -1.73% | 0.17% | 0.14 | 44.29% | |
| 03/14/18 | 1.27% | 0.38% | 0.89% | 0.77 | 22.07% | |
| 03/15/18 | -0.18% | -0.54% | 0.36% | 0.31 | 37.72% | |
| 03/16/18 | 0.67% | -0.48% | 1.15% | 0.99 | 16.20% | |
| 03/19/18 | -6.77% | -2.27% | -4.50% | -3.87 | 0.01% | *** |
| 03/20/18 | -2.56% | 0.49% | -3.04% | -2.68 | 0.42% | *** |
| 03/21/18 | 0.74% | -0.38% | 1.12% | 0.98 | 16.42% | |
| 03/22/18 | -2.66% | -2.72% | 0.07% | 0.06 | 47.67% | |
| 03/23/18 | -3.34% | -2.91% | -0.43% | -0.37 | 35.46% | |
| 03/26/18 | 0.42% | 3.90% | -3.48% | -3.05 | 0.14% | *** |
| 03/27/18 | -4.90% | -3.88% | -1.02% | -0.87 | 19.44% | |
| 03/28/18 | 0.53% | -1.69% | 2.22% | 1.88 | 3.13% | +++ |
| 03/29/18 | 4.42% | 1.75% | 2.67% | 2.24 | 1.36% | +++ |
| 04/02/18 | -2.75% | -3.16% | 0.41% | 0.33 | 36.97% | |

# APPENDIX C
## Event Study Analysis for Facebook Stock

| Date | Actual Return | Predicted Return | Residual Return | *t*-Statistic | One-Tailed *p*-Value | Statistically Significant? |
|---|---|---|---|---|---|---|
| 04/03/18 | 0.46% | 0.72% | -0.26% | -0.21 | 41.63% | |
| 04/04/18 | -0.65% | 1.62% | -2.27% | -1.86 | 3.24% | *** |
| 04/05/18 | 2.73% | 0.48% | 2.25% | 1.83 | 3.52% | +++ |
| 04/06/18 | -1.34% | -2.47% | 1.13% | 0.91 | 18.15% | |
| 04/09/18 | 0.46% | 0.41% | 0.06% | 0.05 | 48.11% | |
| 04/10/18 | 4.50% | 2.04% | 2.46% | 1.99 | 2.47% | +++ |
| 04/11/18 | 0.78% | -0.32% | 1.09% | 0.88 | 19.06% | |
| 04/12/18 | -1.47% | 1.08% | -2.56% | -2.06 | 2.10% | *** |
| 04/13/18 | 0.40% | -0.87% | 1.27% | 1.00 | 15.88% | |
| 04/16/18 | 0.19% | 0.51% | -0.32% | -0.25 | 40.07% | |
| 04/17/18 | 2.32% | 2.51% | -0.19% | -0.15 | 44.03% | |
| 04/18/18 | -1.36% | 0.22% | -1.59% | -1.25 | 10.65% | |
| 04/19/18 | 1.05% | -0.67% | 1.72% | 1.35 | 9.02% | |
| 04/20/18 | -1.08% | -1.25% | 0.17% | 0.13 | 44.75% | |
| 04/23/18 | -0.26% | -0.51% | 0.25% | 0.19 | 42.41% | |
| 04/24/18 | -3.71% | -2.24% | -1.47% | -1.16 | 12.37% | |
| 04/25/18 | 0.00% | -0.70% | 0.70% | 0.56 | 28.96% | |
| 04/26/18 | 9.06% | 1.30% | 7.76% | 6.14 | 0.00% | +++ |
| 04/27/18 | -0.33% | -0.14% | -0.19% | -0.15 | 44.08% | |
| 04/30/18 | -0.92% | -0.48% | -0.44% | -0.35 | 36.22% | |
| 05/01/18 | 1.08% | 0.49% | 0.59% | 0.48 | 31.68% | |
| 05/02/18 | 1.27% | -0.57% | 1.85% | 1.49 | 6.99% | |
| 05/03/18 | -1.16% | 0.03% | -1.19% | -0.95 | 17.09% | |
| 05/04/18 | 1.49% | 1.25% | 0.24% | 0.19 | 42.44% | |
| 05/07/18 | 0.77% | 0.98% | -0.21% | -0.17 | 43.21% | |
| 05/08/18 | 0.53% | 0.19% | 0.35% | 0.28 | 39.15% | |
| 05/09/18 | 2.09% | 1.51% | 0.58% | 0.47 | 32.07% | |
| 05/10/18 | 1.57% | 0.80% | 0.77% | 0.62 | 26.88% | |
| 05/11/18 | 0.79% | -0.32% | 1.11% | 0.88 | 18.91% | |
| 05/14/18 | -0.19% | -0.51% | 0.32% | 0.26 | 39.89% | |
| 05/15/18 | -1.24% | -0.89% | -0.35% | -0.28 | 39.07% | |
| 05/16/18 | -0.61% | 0.52% | -1.13% | -0.90 | 18.47% | |
| 05/17/18 | 0.31% | -0.20% | 0.51% | 0.40 | 34.32% | |
| 05/18/18 | -0.59% | -0.17% | -0.42% | -0.33 | 37.11% | |
| 05/21/18 | 0.99% | 0.50% | 0.49% | 0.39 | 34.97% | |
| 05/22/18 | -0.37% | -0.73% | 0.35% | 0.28 | 39.04% | |
| 05/23/18 | 1.69% | 0.66% | 1.03% | 0.82 | 20.79% | |

# APPENDIX C
## Event Study Analysis for Facebook Stock

| Date | Actual Return | Predicted Return | Residual Return | *t*-Statistic | One-Tailed *p*-Value | Statistically Significant? |
|---|---|---|---|---|---|---|
| 05/24/18 | -0.52% | -0.10% | -0.42% | -0.34 | 36.71% | |
| 05/25/18 | -0.54% | -0.25% | -0.29% | -0.24 | 40.67% | |
| 05/29/18 | 0.44% | -0.78% | 1.22% | 0.98 | 16.35% | |
| 05/30/18 | 1.04% | 1.13% | -0.10% | -0.08 | 46.93% | |
| 05/31/18 | 2.19% | -0.31% | 2.50% | 2.02 | 2.31% | +++ |
| 06/01/18 | 1.15% | 1.50% | -0.35% | -0.28 | 38.96% | |
| 06/04/18 | -0.37% | 0.82% | -1.19% | -0.96 | 16.98% | |
| 06/05/18 | -0.18% | 0.54% | -0.71% | -0.57 | 28.38% | |
| 06/06/18 | -0.83% | 0.46% | -1.29% | -1.04 | 15.14% | |
| 06/07/18 | -1.65% | -1.00% | -0.65% | -0.52 | 30.13% | |
| 06/08/18 | 0.49% | 0.22% | 0.27% | 0.22 | 41.39% | |
| 06/11/18 | 1.29% | 0.11% | 1.18% | 0.94 | 17.47% | |
| 06/12/18 | 0.45% | 0.71% | -0.26% | -0.21 | 41.88% | |
| 06/13/18 | 0.01% | -0.06% | 0.06% | 0.05 | 47.99% | |
| 06/14/18 | 2.29% | 0.85% | 1.44% | 1.15 | 12.72% | |
| 06/15/18 | -0.49% | -0.11% | -0.38% | -0.30 | 38.23% | |
| 06/18/18 | 1.26% | 0.27% | 0.99% | 0.78 | 21.86% | |
| 06/19/18 | -0.41% | -0.37% | -0.04% | -0.03 | 48.74% | |
| 06/20/18 | 2.28% | 0.55% | 1.74% | 1.37 | 8.65% | |
| 06/21/18 | -0.25% | -1.13% | 0.88% | 0.69 | 24.52% | |
| 06/22/18 | 0.12% | -0.62% | 0.74% | 0.58 | 28.17% | |
| 06/25/18 | -2.67% | -2.59% | -0.08% | -0.06 | 47.42% | |
| 06/26/18 | 1.35% | 0.50% | 0.85% | 0.67 | 25.11% | |
| 06/27/18 | -1.59% | -1.71% | 0.12% | 0.10 | 46.10% | |
| 06/28/18 | 0.20% | 1.14% | -0.94% | -0.75 | 22.89% | |
| 06/29/18 | -0.97% | -0.06% | -0.91% | -0.72 | 23.68% | |
| 07/02/18 | 1.56% | 0.92% | 0.64% | 0.50 | 30.81% | |
| 07/03/18 | -2.35% | -0.86% | -1.49% | -1.17 | 12.32% | |
| 07/05/18 | 2.97% | 1.00% | 1.96% | 1.53 | 6.43% | |
| 07/06/18 | 2.41% | 1.15% | 1.25% | 0.97 | 16.70% | |
| 07/09/18 | 0.74% | 0.92% | -0.18% | -0.15 | 44.04% | |
| 07/10/18 | -0.59% | -0.23% | -0.35% | -0.30 | 38.23% | |
| 07/11/18 | -0.49% | 0.00% | -0.49% | -0.42 | 33.76% | |
| 07/12/18 | 2.16% | 1.66% | 0.50% | 0.43 | 33.36% | |
| 07/13/18 | 0.19% | -0.50% | 0.69% | 0.60 | 27.62% | |
| 07/16/18 | -0.04% | -0.05% | 0.01% | 0.01 | 49.66% | |
| 07/17/18 | 1.33% | 0.61% | 0.72% | 0.63 | 26.65% | |

# APPENDIX C
## Event Study Analysis for Facebook Stock

| Date | Actual Return | Predicted Return | Residual Return | *t*-Statistic | One-Tailed *p*-Value | Statistically Significant? |
|---|---|---|---|---|---|---|
| 07/18/18 | -0.30% | 0.00% | -0.30% | -0.26 | 39.64% | |
| 07/19/18 | -0.61% | -0.95% | 0.34% | 0.30 | 38.43% | |
| 07/20/18 | 0.89% | -0.31% | 1.20% | 1.05 | 14.89% | |
| 07/23/18 | 0.46% | 0.28% | 0.19% | 0.16 | 43.55% | |
| 07/24/18 | 1.78% | 0.06% | 1.73% | 1.52 | 6.52% | |
| 07/25/18 | 1.32% | 1.83% | -0.52% | -0.45 | 32.66% | |
| 07/26/18 | -18.96% | -0.28% | -18.68% | -17.14 | 0.00% | *** |

Notes: Residual returns are estimated from a regression of Facebook's stock returns on the returns of the S&P 500 Index, the NASDAQ Composite Index, and the Dow Jones Internet Composite Index, with Facebook excluded from each index. The estimation period is the 120 trading days preceding each date. We use indicator or "dummy" variables to remove the effects of the alleged misstatements and alleged corrective disclosures: February 3, 2017, May 5, 2017, July 28, 2017, October 12, 2017, November 3, 2017, February 2, 2018, March 19, 2018, March 20, 2018, April 5, 2018, April 10, 2018, April 11, 2018, April 24, 2018, April 26, 2018, June 4, 2018, June 8, 2018, and June 29, 2018. We also use a dummy variable on March 30, 2017 when information regarding Initial Misuse was disclosed.

*** = negative and statistically significant at the 5% level in a one-tailed test given the respective degrees of freedom

+++ = positive and statistically significant at the 5% level in a one-tailed test given the respective degrees of freedom