# Exhibit 11

ROBBINS GELLER RUDMAN
& DOWD LLP
JASON C. DAVIS (253370)
KENNETH J. BLACK (291871)
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
SALVATORE J. GRAZIANO
JEREMY P. ROBINSON
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212/554-1400
212/554-1444 (fax)
salvatore@blbglaw.com
jeremy@blbglaw.com

Co-Lead Counsel for the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re FACEBOOK, INC. SECURITIES LITIGATION | Master File No. 5:18-cv-01725-EJD |
| | CLASS ACTION |
| This Document Relates To: | LEAD PLAINTIFFS' AMENDED RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES TO PLAINTIFFS |
| ALL ACTIONS. | |

Pursuant to Federal Rules of Civil Procedure 26 and 33, applicable Local Rules of the United States District Court for the Northern District of California ("Local Rules"), and the rules and orders of this Court, Lead Plaintiffs Amalgamated Bank, as Trustee for the LongView LargeCap 1000 Growth Index Fund, LongView Quantitative LargeCap Fund, and LongView Quant LargeCap Equity VEBA Fund ("Amalgamated Bank") and the Public Employees' Retirement System of Mississippi ("MissPERS," and together with Amalgamated Bank, "Lead Plaintiffs"), by their attorneys, hereby provide the following responses and objections to Defendants' First Set of Interrogatories to Plaintiffs (the "Interrogatories," and each individually, an "Interrogatory"), served on May 11, 2026 by defendants Facebook, Inc. (now Meta Platforms, Inc.) ("Facebook" or the "Company"), Mark E. Zuckerberg ("Zuckerberg"), David M. Wehner ("Wehner"), and Sheryl K. Sandberg ("Sandberg") (collectively, "Defendants"), as follows:

## I. INTRODUCTION AND RESERVATION OF RIGHTS

1. Lead Plaintiffs' responses to these Interrogatories (the "Responses," and each individually, a "Response") are made for the sole purpose of the above-referenced action (the "Action"). Each Response is subject to all objections as to competence, relevance, materiality, propriety, admissibility, privilege, privacy, and all objections are reserved and may be interposed at the time of trial. While preserving each of the objections within, each Response constitutes a reasonable, good-faith effort to respond to these contention interrogatories "applying the Definitions and Instructions and answering fully," as directed by the Court in its August 10, 2026 Order (ECF No. 275), with Lead Plaintiffs' current, preliminary contentions prior to the completion of fact and expert discovery. As stated in the Fourth Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 228) (the "Complaint"), to avoid any doubt, the Cruz and Trump campaigns are not alleged to have made any misstatements or omissions claimed herein.

2. Lead Plaintiffs' Responses are based upon, and therefore limited by, records and information in existence, presently recollected, and thus far discovered in the course of preparing these Responses. Consequently, Lead Plaintiffs reserve the right to revise or supplement these responses to the extent required by the Federal Rules of Civil Procedure, the Local Rules, or the

rules and orders of this Court if it appears that, at any time, inadvertent errors or omissions have been made, or additional or more accurate information becomes available. Lead Plaintiffs further reserve the right to supplement or modify the responses or any information herein, including evidentiary materials, as a result of, *inter alia*, expert opinion and/or ongoing discovery in this Action.

3. Lead Plaintiffs' Responses do not admit relevance, materiality, or the admissibility of the information sought or the subject matter of such information, or waive or abridge any applicable privilege or any applicable objection set forth herein. Lead Plaintiffs also reserve the right to object to the admissibility into evidence of any part of the information provided in or pursuant to the responses.

4. No objection or limitation, or lack thereof, in the Responses shall be deemed an admission by Lead Plaintiffs as to the existence or nonexistence of documents or information.

5. These Responses do not waive (and expressly reserve) Lead Plaintiffs' rights to: (a) object on any ground to the use of the information provided in the Responses in any stage or proceeding in this Action or any other action; (b) object on any ground to other information that involves or relates to the subject matter of the Interrogatories; or (c) revise, correct, supplement, or clarify any of the Responses at a later time.

**II. GENERAL OBJECTIONS**

1. Lead Plaintiffs object to the Interrogatories and their "Definitions" and "Instructions" on the following grounds, each of which is expressly incorporated by reference in the Responses to the individual Interrogatories below. All Responses are subject to and without waiver of any of these General Objections.

2. Lead Plaintiffs object to the Interrogatories, including the "Definitions" and "Instructions" sections, to the extent that they purport to impose requirements other than, or in addition to, the requirements of the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules, or other applicable provisions of law.

3. Lead Plaintiffs object to the Interrogatories to the extent that they are overbroad, vague, ambiguous, unreasonably cumulative, duplicative, or unduly burdensome, and employ

imprecise, incorrect, or legally irrelevant descriptions of the information sought. To the extent Lead Plaintiffs identify any documents or information in response to the Interrogatories, as set forth below in the Specific Responses and Objections, Lead Plaintiffs will provide only those documents or information that they can reasonably identify as responsive to the Interrogatories.

4. Lead Plaintiffs object to the Interrogatories to the extent that they seek information that is either irrelevant or disproportional to the claims asserted in the Complaint, Defendants' defenses, or class certification.

5. Lead Plaintiffs object to the Interrogatories to the extent that they purport to require unreasonably costly and/or time-consuming measures to locate and produce responsive information, such that the value of the information would be outweighed by the burden of obtaining it. Lead Plaintiffs will conduct a reasonable investigation from those sources in which they reasonably expect to find responsive documents or information.

6. Lead Plaintiffs object to the Interrogatories to the extent that they seek information that is exclusively or predominantly in the possession, custody, or control of Defendants and/or non-parties, or otherwise seek information that is not within Lead Plaintiffs' possession, custody, or control and thereby impose an undue burden upon Lead Plaintiffs.

7. Lead Plaintiffs object to the Interrogatories to the extent they seek information equally available to Defendants through public sources or records and subject Lead Plaintiffs to unreasonable and undue annoyance, oppression, burden, and expense.

8. Lead Plaintiffs object to the Interrogatories to the extent that they seek or require the disclosure of information or documents protected from discovery by the attorney-client privilege, the attorney work product doctrine, the joint prosecution or common-interest privilege, the right to privacy, or any other applicable privilege or immunity. Any information provided in response to the Interrogatories is not intended to be, and shall not operate as, a waiver of any applicable privilege, protection, or immunity, in whole or in part.

9. Lead Plaintiffs object to the Interrogatories to the extent they call for legal conclusions or legal arguments, or are premature at this stage of the litigation.

## III. OBJECTIONS TO DEFINITIONS

1. Lead Plaintiffs object to the Definitions to the extent they are overbroad, unduly burdensome, and impose obligations on Lead Plaintiffs exceeding or inconsistent with Rules 26 or 33, the Local Rules, any other applicable rule, order, or law, and/or any such other parameters as may be agreed among the parties.

2. Lead Plaintiffs further object to the specific Definitions listed below on the following grounds, each of which is expressly incorporated by reference in the Responses to the individual Interrogatories below. All Responses are subject to and without waiver of any of these Objections to Definitions.

3. Lead Plaintiffs specifically object to the definition of "Corrective Disclosure" as vague, ambiguous, overly-narrow, incorrect, incomplete, and inconsistent with Ninth Circuit law and the law of the case.

4. Lead Plaintiffs specifically object to the definitions of "Describe" and "Identify" as vague, ambiguous, overbroad, and unduly burdensome to the extent they are used beyond their usual and customary meanings and seek to impose burdens on Lead Plaintiffs that exceed the scope of their obligations under Rules 26 and 33, the Local Rules, any other applicable rule, order, or law, and/or any agreement by the parties. In responding to the Interrogatories, Lead Plaintiffs will interpret these terms within their usual and customary meanings.

5. Lead Plaintiffs specifically object to the definition of "Initial Misuse Alleged Fraud" as vague, ambiguous, overly-narrow, incorrect, incomplete, improper, inconsistent with Lead Plaintiffs' allegations in the Complaint, and inconsistent with and contrary to the Ninth Circuit's opinion dated December 4, 2023 in this Action. *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 950, 954 (9th Cir. 2023).

6. Lead Plaintiffs specifically object to the definition of "Lead Plaintiffs" as vague, ambiguous, overbroad, and unduly burdensome, seeking privileged information (including information protected by the attorney-client privilege and attorney work product doctrine), seeking information not relevant to the claims or defenses of any party, and disproportionate to the needs of the case insofar as it purports to include Lead Plaintiffs' "agents, representatives, or other Persons

acting or purporting to act on [their] behalf." In responding to the Interrogatories, Lead Plaintiffs respond only on their own behalf.

7. Lead Plaintiffs specifically object to the definition of "Plaintiff(s)" as vague, ambiguous, overbroad, and unduly burdensome, seeking privileged information (including information protected by the attorney-client privilege and attorney work product doctrine), seeking information not relevant to the claims or defenses of any party, and disproportionate to the needs of the case insofar as it includes absent class members who were named plaintiffs in earlier-filed complaints that have been consolidated into this Action, their "agents, representatives, or other Persons acting or purporting to act on [their] behalf," and Lead Plaintiffs' "agents, representatives, or other Persons acting or purporting to act on [their] behalf." In responding to the Interrogatories, Lead Plaintiffs will interpret this term to mean "Lead Plaintiffs" and respond only on their own behalf.

8. Lead Plaintiffs specifically object to the definition of "Pre-March 2018 Articles" as vague, ambiguous, lacking foundation, compound insofar as it is based on the objectionable and incorrect definition of "Initial Misuse Alleged Fraud," and argumentative, improper, wrong, incorrect, factually inaccurate, and inconsistent with and contrary to the Ninth Circuit's opinion dated December 4, 2023 in this Action (*Facebook*, 87 F.4th at 950, 954) insofar as it claims that the identified news articles purportedly "disclose[d] information regarding the Initial Misuse Alleged Fraud."

9. Lead Plaintiffs specifically object to the definition of "Whitelisting Alleged Fraud" as vague, ambiguous, overly-narrow, incomplete, improper, inconsistent with Lead Plaintiffs' allegations in the Complaint, and inconsistent with and contrary to the Ninth Circuit's opinion dated December 4, 2023 in this Action (*Facebook*, 87 F.4th at 950, 954).

10. Lead Plaintiffs specifically object to the Interrogatories' definition of "You" and "Your" as vague, ambiguous, overbroad, unduly burdensome, seeking privileged information (including information protected by the attorney-client privilege and attorney work product doctrine), seeking information not relevant to the claims or defenses of any party, and disproportionate to the needs of the case insofar as it includes absent class members who were

named plaintiffs in earlier-filed complaints that have been consolidated into this Action, their "representatives, employees, attorneys, investigators, accountants, managers, agents, parent companies, subsidiaries, or other persons or entities acting or purporting to act on their behalf," and Lead Plaintiffs' "representatives, employees, attorneys, investigators, accountants, managers, agents, parent companies, subsidiaries, or other persons or entities acting or purporting to act on their behalf." In responding to the Interrogatories, Lead Plaintiffs will interpret this term to mean "Lead Plaintiffs" and respond only on their own behalf.

11. Even though Lead Plaintiffs maintain that the Definitions are objectionable, including for the reasons outlined herein, each Response constitutes a reasonable, good faith effort to respond to these contention interrogatories "applying the Definitions and Instructions and answering fully," as directed by the Court in its August 10, 2026 Order (ECF No. 275), with Lead Plaintiffs' current, preliminary contentions prior to the completion of fact and expert discovery.

## IV. OBJECTIONS TO INSTRUCTIONS

1. Lead Plaintiffs object to the Instructions to the extent they are overbroad, unduly burdensome, and impose obligations on Lead Plaintiffs exceeding or inconsistent with Rules 26 or 33, the Local Rules, any other applicable rule, order, or law, and/or any such other parameters as may be agreed among the parties.

2. Lead Plaintiffs reserve all other objections and the right to amend or supplement these Responses as appropriate. Lead Plaintiffs' Response to any specific Interrogatory is not an admission of the existence of any evidence, document, fact, or thing set forth in, or assumed by, any Interrogatory, nor is any Response an admission that such Response, or any evidence, document, fact, or thing set forth in, or assumed by, any Interrogatory, constitutes admissible evidence.

3. Even though Lead Plaintiffs maintain that the Instructions are objectionable, including for the reasons outlined herein, each Response constitutes a reasonable, good faith effort to respond to these contention interrogatories "applying the Definitions and Instructions and answering fully," as directed by the Court in its August 10, 2026 Order (ECF No. 275), with Lead Plaintiffs' current, preliminary contentions prior to the completion of fact and expert discovery.

## V. SPECIFIC RESPONSES AND OBJECTIONS

INTERROGATORY NO. 1:

Identify each Corrective Disclosure that You contend revealed facts regarding the Initial Misuse Alleged Fraud that had not been previously disclosed publicly.

RESPONSE TO INTERROGATORY NO. 1:

Lead Plaintiffs preserve and incorporate herein the objections asserted in their original response, dated June 10, 2026. Pursuant to the Court's August 10, 2026 Order (ECF No. 275), and without waiving those objections, Lead Plaintiffs respond based on information presently known after reasonable inquiry. Fact discovery concerning the subject matter of this Interrogatory remains ongoing and incomplete. Expert discovery concerning the subject matter of this Interrogatory has not begun. Lead Plaintiffs reserve all rights to supplement this Response. For purposes of this Response, Lead Plaintiffs understand information had "not been previously disclosed publicly" where it was first disclosed to the market; where previously fragmentary, disputed, denied, unconfirmed, or nominally public information was newly confirmed with sufficient specificity and credibility; or where its significance or foreseeable consequences were first conveyed to the market. Even though Lead Plaintiffs maintain that the Definitions and Instructions are objectionable, including for the reasons outlined herein, the below Response constitutes a reasonable, good-faith effort to respond to this contention interrogatory "applying the Definitions and Instructions and answering fully," as directed by the Court in its August 10, 2026 Order (ECF No. 275), with Lead Plaintiffs' current, preliminary contentions prior to the completion of fact and expert discovery.

Subject to and without waiving the foregoing objections, Lead Plaintiffs' preliminary, good faith contention at the current time is as follows: Lead Plaintiffs contend that "Initial Misuse" and "continued misuse" are labels used to distinguish factual theories of falsity and scienter; they are not separate or mutually exclusive theories of loss causation. The alleged misstatements in this Action are the risk-factor and user-control statements, and Lead Plaintiffs contend that initial-misuse facts to establish why the risk-factor and user-control statements were false or misleading or omitted material information necessary to make them not misleading. Loss causation, however, presents a distinct proximate-cause inquiry under controlling Ninth Circuit law. Lead Plaintiffs contend that

loss causation may be established where a corrective disclosure is causally connected to the relevant truth concealed or distorted by Defendants' prior misrepresentations or omissions and causes the relevant truth, including the existence or consequences of the concealed or distorted relevant truth, to become reflected in Facebook's stock price. *See Facebook*, 87 F.4th at 956-57 (holding that Facebook's July 2018 earnings announcement "allowed the public to 'appreciate [the] significance' of the Cambridge Analytica and whitelisting scandals" – even though those scandals had already been made public) (citation omitted); *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 752-54 (9th Cir. 2018) (holding that proximate-cause principles govern loss causation, that a plaintiff may "trace[] the loss back to 'the very facts about which the defendant lied,'" that disclosure of the fraud or falsity is not necessary, and that causation may be shown in "'an "infinite variety" of ways'") (citations omitted); *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790, 794 (9th Cir. 2020) (holding that the relevant truth may emerge "over time through a series of partial disclosures," that "a disclosure 'need not precisely mirror the earlier misrepresentation,'" and that "some information, although nominally available to the public, can still be 'new' if the market has not previously understood its significance") (citation omitted).

Lead Plaintiffs contend that, once Facebook user data was transferred to Cambridge Analytica through the so-called initial misuse, the resulting loss of control over that data – including its retention, downstream use, and Facebook's inability to retrieve or contain it – was a foreseeable consequence of the initial misuse that had already occurred when Defendants made the risk disclosure statements and the lack of user control, which was concealed by the alleged false and misleading statements. Facts concerning these events therefore reveal or permit the market to appreciate the existence, scope, significance, and economic consequences of the concealed or distorted relevant truth, even though not each of these events is asserted as an independent basis of falsity. The fact that disclosed information also may arguably relate to continued misuse (a dismissed falsity theory on which Lead Plaintiffs reserve all rights) does not, by itself, render that information unrelated to the surviving claims. Lead Plaintiffs further contend that each of the disclosures identified below are proximately connected to one or more of the surviving user-control and risk-factor statements because they revealed, confirmed, or enabled the market to appreciate the

occurrence, scope, persistence, use, and/or consequences of the misleading nature of those statements, including through their connection to the initial misuse theory. The user-control statements represented and assured users and the market that Facebook users could control their data, including, among other things, by determining who received or accessed their information, how it was shared, and that they could rely on Facebook to respect their privacy settings. The corrective disclosures identified below showed that these representations were untrue or misleading, including because Defendants had known since 2015 that data belonging to tens of millions of users – including users who had not authorized the relevant transfer or use – had passed to a third party and was no longer within those users' control. The same corrective disclosures are proximately connected to the risk-factor statements, which represented that third-party access to, use of, or disclosure of Facebook user data was a hypothetical contingency that "could" or "may" occur. But Defendants knew that the risk had already materialized in connection with Cambridge Analytica before and at the time the statements were made.

Lead Plaintiffs contend preliminarily that the corrective disclosures identified below revealed that users did not control their data and that the purportedly hypothetical risks had in fact materialized on a massive scale, and informed investors of the scope and foreseeable consequences of Defendants' misstatements and omissions – including the need for remediation and increased security/privacy expenditures, greater regulatory and legal exposure, reputational harm, and adverse effects on revenue, growth, profitability, and operating costs. Those were the types of business consequences that Defendants' false and misleading statements made foreseeable.

Lead Plaintiffs do not contend that Defendants' statements caused Cambridge Analytica to misuse the data. Rather, Lead Plaintiffs contend that the statements concealed a risk that had already come to fruition and users' lack of control; when the market later learned the existence, nature, scope, persistence, use, and/or consequences of these conditions, the inflation attributable to those concealed facts dissipated. Accordingly, information concerning Cambridge Analytica's retention or downstream use of the data is causally connected to the initial-misuse and user-control statements; that "continued misuse" was dismissed as a separate falsity theory and has no bearing on the loss causation analysis. Such information illuminated the scope, seriousness, and/or foreseeable

consequences of the initial misuse and users' lack of control and the resulting price effect and losses are traceable to the alleged misstatements.

In accordance with the foregoing, Lead Plaintiffs preliminarily identify the following corrective disclosure events that they contend revealed new facts and/or allowed the market to appreciate the existence, significance, and/or consequences of Cambridge Analytica's initial misuse of Facebook user data and Facebook users' lack of control over their own data.

After the close of market on Friday, March 16, 2018, Defendants published a blog post on the Facebook's investor relations website titled "Suspending Cambridge Analytica and SCL Group From Facebook." The blog post stated that Defendants were suspending Cambridge Analytica, its parent company, and whistleblower Christopher Wylie for sharing Facebook's users' data without the users' consent. In the post, Defendants stated: "In 2015, we learned that [Kogan] lied to us and violated our Platform Policies by passing data . . . to SCL/Cambridge Analytica [and] Christopher Wylie of Eunoia Technologies Inc." Facebook explained that "[a]pproximately 270,000 people downloaded the app." The post further asserted that "[w]hen [Facebook] learned of the violation in 2015" it had "demanded certification from Kogan and all parties he had given data to that the information had been destroyed." Alluding to prior media contacts, the post asserted that "[s]everal days ago, we received reports that, contrary to the certifications we were given, not all data was deleted." The Company said it was "moving aggressively to determine the accuracy of the claims" and asserted it was "committed to vigorously enforcing our policies to protect people's information" and would "take whatever steps are required to see that this happens," including taking legal action "to hold [violators] responsible and accountable for" their actions. Facebook's March 16, 2018 website statements announcing the suspension of Cambridge Analytica and SCL Group also drew a direct link to issues of user control. For example, Facebook assured the public that a massive loss of data control like what happened with Cambridge Analytica could not happen again, stating, "[i]n 2014 . . . we made an update to ensure that each person decides what information they want to share about themselves, including their friend list," which "is just one of the many ways we give people the tools to ***control their experience***" (emphasis in Facebook's original).

On Saturday, March 17, 2018, *The Guardian* and *The New York Times* published articles expanding on the Cambridge Analytica scandal, further detailing how Cambridge Analytica had improperly harvested personal data from millions of unwitting Facebook users and retained copies of the data beyond Facebook's control, how Facebook had delayed taking action to address the Cambridge Analytica data breach, that Facebook had previously verified internally the Cambridge Analytica leak "without publicly acknowledging it," and that Facebook user data was potentially still in the hands of Cambridge Analytica and other third parties.

Because the foregoing disclosures occurred after the market closed on Friday and over the ensuing weekend, the market first had an opportunity to react to that information when trading resumed on Monday, March 19, 2018.

On March 20, 2018, *The Guardian* published another article further expanding on the Cambridge Analytica scandal, detailing that app developers routinely practiced data harvesting using tactics similar to Cambridge Analytica's. *The Guardian* reported that Sandy Parakilas – the platform operations manager responsible for policing access to Facebook data in 2011 and 2012 – had stated that Facebook's lax data use policies had likely been exploited by numerous other app developers, such that the "'majority of Facebook users' could have had their data harvested by app developers without their knowledge.'"

These March 2018 disclosures revealed information that had not previously been disclosed to the market, including that Cambridge Analytica had in fact improperly obtained Facebook user data, and that Facebook had known about the initial misuse since at least 2015. The "Pre-March 2018 Articles," as Defendants define that term, did not establish otherwise merely because certain articles previously reported unconfirmed and disputed allegations, suspicions, or speculation concerning whether Cambridge Analytica had obtained or used Facebook user data. Before March 2018, Facebook had not publicly acknowledged that Cambridge Analytica had obtained Facebook user data and instead had disputed or failed to confirm the relevant allegations and represented that it was investigating the matter. Indeed, as the Ninth Circuit has already held, "the extent of Cambridge Analytica's misconduct was not yet public when Facebook filed its 2016 10-K," and "[b]efore the

March 2018 news broke, reasonable investors would not have known that Cambridge Analytica had improperly accessed Facebook users' data." *Facebook*, 87 F.4th at 950, 954.

On July 25, 2018, Facebook announced its earnings for the second quarter of 2018 ("Q2 2018"). This was the first full quarter of Facebook results since the Cambridge Analytica data scandal news had surfaced in March 2018 and the first earnings announcement since the June 3, 2018 whitelisting revelation. This announcement revealed the foreseeable consequences of the Cambridge Analytica and whitelisting scandals. For example, Defendant Zuckerberg led off the Company's Q2 2018 earnings call by acknowledging that, "[l]ooking ahead, we will continue to invest heavily in security and privacy," and that "we're investing so much in security that it will significantly impact our profitability. We're starting to see that this quarter." Defendant Wehner stated that "we expect our revenue growth rates to decline by high single-digit percentages from prior quarters" due to, inter alia, Facebook "giving people who use our services more choices around data privacy, which may have an impact on our revenue growth." He also stated that due to further investments in privacy, "[o]ver the next several years, we would anticipate that our operating margins will trend towards the mid-30s on a percentage basis." Thus, Facebook's Q2 2018 earnings disclosures allowed the market to newly appreciate the magnitude of the Company's challenge in addressing its previous data control and risk shortcomings and fully "'appreciate [the] significance' of the Cambridge Analytica and whitelisting scandals" on Facebook's business. *See Facebook*, 87 F.4th at 956-57 (citation omitted).

Lead Plaintiffs reserve the right to amend and/or supplement this preliminary, good faith Response based on continuing fact and expert discovery.

<u>INTERROGATORY NO. 2</u>:

For each Corrective Disclosure identified in response to Interrogatory No. 1, quote the language that You contend is a fact regarding the Initial Misuse Alleged Fraud that was not previously disclosed publicly, Including, without limitation, by the Pre-March 2018 Articles.

<u>RESPONSE TO INTERROGATORY NO. 2</u>:

Lead Plaintiffs incorporate the prefatory statement and legal framework set forth in their Response to Interrogatory No. 1, including their preservation of objections, their understanding of

"not previously disclosed publicly," and the distinction between theories of falsity and scienter, on the one hand, and loss causation, on the other. Even though Lead Plaintiffs maintain that the Definitions and Instructions are objectionable, including for the reasons outlined herein, the below Response constitutes a reasonable, good-faith effort to respond to this contention interrogatory "applying the Definitions and Instructions and answering fully," as directed by the Court in its August 10, 2026 Order (ECF No. 275), with Lead Plaintiffs' current, preliminary contentions prior to the completion of fact and expert discovery.

Subject to and without waiving those objections, Lead Plaintiffs identify below the language that, viewed in context and individually or collectively with the other disclosures comprising the same disclosure event, conveyed facts not previously disclosed publicly or not previously appreciated by the investing public regarding Cambridge Analytica's initial misuse, Facebook users' lack of control, or the foreseeable scope, significance, and/or consequences of the conditions misrepresented, concealed, or distorted by the risk-factor and user-control statements.

Lead Plaintiffs do not contend that every sentence quoted below independently establishes falsity or disclosed an entirely unknown historical fact. Language is identified where it: (a) first disclosed information to the market; (b) newly confirmed with sufficient specificity and credibility information that had previously been fragmentary, disputed, denied, or only nominally public; (c) first conveyed the significance or foreseeable consequences of that information; or (d) otherwise, first allowed the investing public to appreciate the significance of the allegedly misrepresented or omitted information. To the extent quoted language also concerns Cambridge Analytica's retention or downstream use of the data, Lead Plaintiffs identify that language insofar as it illuminated the scope, persistence, seriousness, or foreseeable consequences of the initial misuse and Facebook users' lack of control – not as an independent basis for establishing falsity.

With respect to the July 25, 2018 earnings announcement and conference call, Lead Plaintiffs contend that the responsive information concerns the newly conveyed economic consequences of the fraud or allowed the investing public to appreciate the significance of the allegedly misrepresented or omitted information, rather than an additional historical detail concerning the original transfer of data to Cambridge Analytica.

In accordance with the foregoing, Lead Plaintiffs identify on a preliminary, good faith basis the following language from the corrective disclosures identified in the Response to Interrogatory No. 1 that Lead Plaintiffs contend revealed new facts and/or allowed the market to appreciate the existence, significance, and/or consequences of Cambridge Analytica's initial misuse of Facebook user data and Facebook users' lack of control over their own data:

- "Suspending Cambridge Analytica and SCL Group From Facebook," Facebook Newsroom (Mar. 16, 2018):

> We are suspending Strategic Communication Laboratories (SCL), including their political data analytics firm, Cambridge Analytica, from Facebook. Given the public prominence of this organization, we want to take a moment to explain how we came to this decision and why.
>
> * * *
>
> In 2015, we learned that a psychology professor at the University of Cambridge named Dr. Aleksandr Kogan lied to us and violated our Platform Policies by passing data from an app that was using Facebook Login to SCL/Cambridge Analytica, a firm that does political, government and military work around the globe. He also passed that data to Christopher Wylie of Eunoia Technologies, Inc.
>
> Like all app developers, Kogan requested and gained access to information from people after they chose to download his app. His app, "thisisyourdigitallife," offered a personality prediction, and billed itself on Facebook as "a research app used by psychologists." Approximately 270,000 people downloaded the app. In so doing, they gave their consent for Kogan to access information such as the city they set on their profile, or content they had liked, as well as more limited information about friends who had their privacy settings set to allow it.
>
> Although Kogan gained access to this information in a legitimate way and through the proper channels that governed all developers on Facebook at that time, he did not subsequently abide by our rules. By passing information on to a third party, including SCL/Cambridge Analytica and Christopher Wylie of Eunoia Technologies, he violated our platform policies. When we learned of this violation in 2015, we removed his app from Facebook and demanded certifications from Kogan and all parties he had given data to that the information had been destroyed. Cambridge Analytica, Kogan and Wylie all certified to us that they destroyed the data.
>
> * * *
>
> Several days ago, we received reports that, contrary to the certifications we were given, not all data was deleted. We are moving aggressively to determine the accuracy of these claims. If true, this is another unacceptable violation of trust and the commitments they made. We are suspending SCL/Cambridge Analytica, Wylie and Kogan from Facebook, pending further information.

- "Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach," *The Guardian* (Mar. 17, 2018):

> The data analytics firm that worked with Donald Trump's election team and the winning Brexit campaign harvested millions of Facebook profiles of US voters, in one of the tech giant's biggest ever data breaches, and used them to build a powerful software program to predict and influence choices at the ballot box.
>
> A whistleblower has revealed to the *Observer* how Cambridge Analytica – a company owned by the hedge fund billionaire Robert Mercer, and headed at the time by Trump's key adviser Steve Bannon – used personal information taken without authorisation in early 2014 to build a system that could profile individual US voters, in order to target them with personalised political advertisements.
>
> Christopher Wylie, who worked with a Cambridge University academic to obtain the data, told the *Observer*: "We exploited Facebook to harvest millions of people's profiles. And built models to exploit what we knew about them and target their inner demons. That was the basis the entire company was built on."
>
> Documents seen by the *Observer*, and confirmed by a Facebook statement, show that by late 2015 the company had found out that information had been harvested on an unprecedented scale. However, at the time it failed to alert users and took only limited steps to recover and secure the private information of more than 50 million individuals.
>
> The *New York Times* is reporting that copies of the data harvested for Cambridge Analytica could still be found online; its reporting team had viewed some of the raw data.
>
> The data was collected through an app called thisisyourdigitallife, built by academic Aleksandr Kogan, separately from his work at Cambridge University. Through his company Global Science Research (GSR), in collaboration with Cambridge Analytica, hundreds of thousands of users were paid to take a personality test and agreed to have their data collected for academic use.
>
> However, the app also collected the information of the test-takers' Facebook friends, leading to the accumulation of a data pool tens of millions-strong. Facebook's "platform policy" allowed only collection of friends' data to improve user experience in the app and barred it being sold on or used for advertising. The discovery of the unprecedented data harvesting, and the use to which it was put, raises urgent new questions about Facebook's role in targeting voters in the US presidential election. It comes only weeks after indictments of 13 Russians by the special counsel Robert Mueller which stated they had used the platform to perpetrate "information warfare" against the US.
>
> Cambridge Analytica and Facebook are one focus of an inquiry into data and politics by the British Information Commissioner's Office. Separately, the Electoral Commission is also investigating what role Cambridge Analytica played in the EU referendum.
>
> "We are investigating the circumstances in which Facebook data may have been illegally acquired and used," said the information commissioner Elizabeth Denham. "It's part of our ongoing investigation into the use of data analytics for political purposes which was launched to consider how political parties and

campaigns, data analytics companies and social media platforms in the UK are using and analysing people's personal information to micro-target voters."

On Friday, four days after the *Observer* sought comment for this story, but more than two years after the data breach was first reported, Facebook announced that it was suspending Cambridge Analytica and Kogan from the platform, pending further information over misuse of data. Separately, Facebook's external lawyers warned the *Observer* it was making "false and defamatory" allegations, and reserved Facebook's legal position.

The revelations provoked widespread outrage. The Massachusetts Attorney General Maura Healey announced that the state would be launching an investigation. "Residents deserve answers immediately from Facebook and Cambridge Analytica," she said on Twitter.

The Democratic senator Mark Warner said the harvesting of data on such a vast scale for political targeting underlined the need for Congress to improve controls. He has proposed an Honest Ads Act to regulate online political advertising the same way as television, radio and print. "This story is more evidence that the online political advertising market is essentially the Wild West. Whether it's allowing Russians to purchase political ads, or extensive micro-targeting based on ill-gotten user data, it's clear that, left unregulated, this market will continue to be prone to deception and lacking in transparency," he said.

Last month both Facebook and the CEO of Cambridge Analytica, Alexander Nix, told a parliamentary inquiry on fake news: that the company did not have or use private Facebook data.

Simon Milner, Facebook's UK policy director, when asked if Cambridge Analytica had Facebook data, told MPs: "They may have lots of data but it will not be Facebook user data. It may be data about people who are on Facebook that they have gathered themselves, but it is not data that we have provided."

Cambridge Analytica's chief executive, Alexander Nix, told the inquiry: "We do not work with Facebook data and we do not have Facebook data."

Wylie, a Canadian data analytics expert who worked with Cambridge Analytica and Kogan to devise and implement the scheme, showed a dossier of evidence about the data misuse to the *Observer* which appears to raise questions about their testimony. He has passed it to the National Crime Agency's cybercrime unit and the Information Commissioner's Office. It includes emails, invoices, contracts and bank transfers that reveal more than 50 million profiles – mostly belonging to registered US voters – were harvested from the site in one of the largest-ever breaches of Facebook data. Facebook on Friday said that it was also suspending Wylie from accessing the platform while it carried out its investigation, despite his role as a whistleblower.

At the time of the data breach, Wylie was a Cambridge Analytica employee, but Facebook described him as working for Eunoia Technologies, a firm he set up on his own after leaving his former employer in late 2014.

The evidence Wylie supplied to UK and US authorities includes a letter from Facebook's own lawyers sent to him in August 2016, asking him to destroy any data he held that had been collected by GSR, the company set up by Kogan to harvest the profiles.

That legal letter was sent several months after the *Guardian* first reported the breach and days before it was officially announced that Bannon was taking over as campaign manager for Trump and bringing Cambridge Analytica with him.

"Because this data was obtained and used without permission, and because GSR was not authorised to share or sell it to you, it cannot be used legitimately in the future and must be deleted immediately," the letter said.

Facebook did not pursue a response when the letter initially went unanswered for weeks because Wylie was travelling, nor did it follow up with forensic checks on his computers or storage, he said.

"That to me was the most astonishing thing. They waited two years and did absolutely nothing to check that the data was deleted. All they asked me to do was tick a box on a form and post it back."

Paul-Olivier Dehaye, a data protection specialist, who spearheaded the investigative efforts into the tech giant, said: "Facebook has denied and denied and denied this. It has misled MPs and congressional investigators and it's failed in its duties to respect the law.

"It has a legal obligation to inform regulators and individuals about this data breach, and it hasn't. It's failed time and time again to be open and transparent."

A majority of American states have laws requiring notification in some cases of data breach, including California, where Facebook is based.

Facebook denies that the harvesting of tens of millions of profiles by GSR and Cambridge Analytica was a data breach. It said in a statement that Kogan "gained access to this information in a legitimate way and through the proper channels" but "did not subsequently abide by our rules" because he passed the information on to third parties.

Facebook said it removed the app in 2015 and required certification from everyone with copies that the data had been destroyed, although the letter to Wylie did not arrive until the second half of 2016. "We are committed to vigorously enforcing our policies to protect people's information. We will take whatever steps are required to see that this happens," Paul Grewal, Facebook's vice-president, said in a statement. The company is now investigating reports that not all data had been deleted.

Kogan, who has previously unreported links to a Russian university and took Russian grants for research, had a licence from Facebook to collect profile data, but it was for research purposes only. So when he hoovered up information for the commercial venture, he was violating the company's terms. Kogan maintains everything he did was legal, and says he had a "close working relationship" with Facebook, which had granted him permission for his apps.

The *Observer* has seen a contract dated 4 June 2014, which confirms SCL, an affiliate of Cambridge Analytica, entered into a commercial arrangement with GSR, entirely premised on harvesting and processing Facebook data. Cambridge Analytica spent nearly $1m on data collection, which yielded more than 50 million individual profiles that could be matched to electoral rolls. It then used the test results and Facebook data to build an algorithm that could analyse individual Facebook profiles and determine personality traits linked to voting behaviour.

> The algorithm and database together made a powerful political tool. It allowed a campaign to identify possible swing voters and craft messages more likely to resonate.
>
> "The ultimate product of the training set is creating a 'gold standard' of understanding personality from Facebook profile information," the contract specifies. It promises to create a database of 2 million "matched" profiles, identifiable and tied to electoral registers, across 11 states, but with room to expand much further.
>
> At the time, more than 50 million profiles represented around a third of active North American Facebook users, and nearly a quarter of potential US voters.

- "How Trump Consultants Exploited the Facebook Data of Millions," *The New York Times* (Mar. 17, 2018):

> As the upstart voter-profiling company Cambridge Analytica prepared to wade into the 2014 American midterm elections, it had a problem.
>
> The firm had secured a $15 million investment from Robert Mercer, the wealthy Republican donor, and wooed his political adviser, Stephen K. Bannon, with the promise of tools that could identify the personalities of American voters and influence their behavior. But it did not have the data to make its new products work.
>
> So the firm harvested private information from the Facebook profiles of more than 50 million users without their permission, according to former Cambridge employees, associates and documents, making it one of the largest data leaks in the social network's history. The breach allowed the company to exploit the private social media activity of a huge swath of the American electorate, developing techniques that underpinned its work on President Trump's campaign in 2016.
>
> An examination by The New York Times and The Observer of London reveals how Cambridge Analytica's drive to bring to market a potentially powerful new weapon put the firm – and wealthy conservative investors seeking to reshape politics – under scrutiny from investigators and lawmakers on both sides of the Atlantic.
>
> Christopher Wylie, who helped found Cambridge and worked there until late 2014, said of its leaders: "Rules don't matter for them. For them, this is a war, and it's all fair."
>
> "They want to fight a culture war in America," he added. "Cambridge Analytica was supposed to be the arsenal of weapons to fight that culture war."
>
> Details of Cambridge's acquisition and use of Facebook data have surfaced in several accounts since the business began working on the 2016 campaign, setting off a furious debate about the merits of the firm's so-called psychographic modeling techniques.
>
> But the full scale of the data leak involving Americans has not been previously disclosed – and Facebook, until now, has not acknowledged it. Interviews with a half-dozen former employees and contractors, and a review of the firm's emails and documents, have revealed that Cambridge not only relied on the private Facebook data but still possesses most or all of the trove.

Cambridge paid to acquire the personal information through an outside researcher who, Facebook says, claimed to be collecting it for academic purposes.

During a week of inquiries from The Times, Facebook downplayed the scope of the leak and questioned whether any of the data still remained out of its control. But on Friday, the company posted a statement expressing alarm and promising to take action.

"This was a scam – and a fraud," Paul Grewal, a vice president and deputy general counsel at the social network, said in a statement to The Times earlier on Friday. He added that the company was suspending Cambridge Analytica, Mr. Wylie and the researcher, Aleksandr Kogan, a Russian-American academic, from Facebook. "We will take whatever steps are required to see that the data in question is deleted once and for all – and take action against all offending parties," Mr. Grewal said.

Alexander Nix, the chief executive of Cambridge Analytica, and other officials had repeatedly denied obtaining or using Facebook data, most recently during a parliamentary hearing last month. But in a statement to The Times, the company acknowledged that it had acquired the data, though it blamed Mr. Kogan for violating Facebook's rules and said it had deleted the information as soon as it learned of the problem two years ago.

In Britain, Cambridge Analytica is facing intertwined investigations by Parliament and government regulators into allegations that it performed illegal work on the "Brexit" campaign. The country has strict privacy laws, and its information commissioner announced on Saturday that she was looking into whether the Facebook data was "illegally acquired and used."

In the United States, Mr. Mercer's daughter, Rebekah, a board member, Mr. Bannon and Mr. Nix received warnings from their lawyer that it was illegal to employ foreigners in political campaigns, according to company documents and former employees.

Congressional investigators have questioned Mr. Nix about the company's role in the Trump campaign. And the Justice Department's special counsel, Robert S. Mueller III, has demanded the emails of Cambridge Analytica employees who worked for the Trump team as part of his investigation into Russian interference in the election.

While the substance of Mr. Mueller's interest is a closely guarded secret, documents viewed by The Times indicate that the firm's British affiliate claims to have worked in Russia and Ukraine. And the WikiLeaks founder, Julian Assange, disclosed in October that Mr. Nix had reached out to him during the campaign in hopes of obtaining private emails belonging to Mr. Trump's Democratic opponent, Hillary Clinton.

The documents also raise new questions about Facebook, which is already grappling with intense criticism over the spread of Russian propaganda and fake news. The data Cambridge collected from profiles, a portion of which was viewed by The Times, included details on users' identities, friend networks and "likes." Only a tiny fraction of the users had agreed to release their information to a third party.

"Protecting people's information is at the heart of everything we do," Mr. Grewal said. "No systems were infiltrated, and no passwords or sensitive pieces of information were stolen or hacked."

Still, he added, "it's a serious abuse of our rules."

Reading Voters' Minds

The Bordeaux flowed freely as Mr. Nix and several colleagues sat down for dinner at the Palace Hotel in Manhattan in late 2013, Mr. Wylie recalled in an interview. They had much to celebrate.

Mr. Nix, a brash salesman, led the small elections division at SCL Group, a political and defense contractor. He had spent much of the year trying to break into the lucrative new world of political data, recruiting Mr. Wylie, then a 24-year-old political operative with ties to veterans of President Obama's campaigns. Mr. Wylie was interested in using inherent psychological traits to affect voters' behavior and had assembled a team of psychologists and data scientists, some of them affiliated with Cambridge University.

The group experimented abroad, including in the Caribbean and Africa, where privacy rules were lax or nonexistent and politicians employing SCL were happy to provide government-held data, former employees said.

Then a chance meeting brought Mr. Nix into contact with Mr. Bannon, the Breitbart News firebrand who would later become a Trump campaign and White House adviser, and with Mr. Mercer, one of the richest men on earth.

Mr. Nix and his colleagues courted Mr. Mercer, who believed a sophisticated data company could make him a kingmaker in Republican politics, and his daughter Rebekah, who shared his conservative views. Mr. Bannon was intrigued by the possibility of using personality profiling to shift America's culture and rewire its politics, recalled Mr. Wylie and other former employees, who spoke on the condition of anonymity because they had signed nondisclosure agreements. Mr. Bannon and the Mercers declined to comment.

Mr. Mercer agreed to help finance a $1.5 million pilot project to poll voters and test psychographic messaging in Virginia's gubernatorial race in November 2013, where the Republican attorney general, Ken Cuccinelli, ran against Terry McAuliffe, the Democratic fund-raiser. Though Mr. Cuccinelli lost, Mr. Mercer committed to moving forward.

The Mercers wanted results quickly, and more business beckoned. In early 2014, the investor Toby Neugebauer and other wealthy conservatives were preparing to put tens of millions of dollars behind a presidential campaign for Senator Ted Cruz of Texas, work that Mr. Nix was eager to win.

When Mr. Wylie's colleagues failed to produce a memo explaining their work to Mr. Neugebauer, Mr. Nix castigated them over email.

"ITS 2 PAGES!! 4 hours work max (or an hour each). What have you all been doing??" he wrote.

Mr. Wylie's team had a bigger problem. Building psychographic profiles on a national scale required data the company could not gather without huge expense.

Traditional analytics firms used voting records and consumer purchase histories to try to predict political beliefs and voting behavior.

But those kinds of records were useless for figuring out whether a particular voter was, say, a neurotic introvert, a religious extrovert, a fair-minded liberal or a fan of the occult. Those were among the psychological traits the firm claimed would provide a uniquely powerful means of designing political messages.

Mr. Wylie found a solution at Cambridge University's Psychometrics Centre. Researchers there had developed a technique to map personality traits based on what people had liked on Facebook. The researchers paid users small sums to take a personality quiz and download an app, which would scrape some private information from their profiles and those of their friends, activity that Facebook permitted at the time. The approach, the scientists said, could reveal more about a person than their parents or romantic partners knew – a claim that has been disputed.

When the Psychometrics Centre declined to work with the firm, Mr. Wylie found someone who would: Dr. Kogan, who was then a psychology professor at the university and knew of the techniques. Dr. Kogan built his own app and in June 2014 began harvesting data for Cambridge Analytica. The business covered the costs – more than $800,000 – and allowed him to keep a copy for his own research, according to company emails and financial records.

All he divulged to Facebook, and to users in fine print, was that he was collecting information for academic purposes, the social network said. It did not verify his claim. Dr. Kogan declined to provide details of what happened, citing nondisclosure agreements with Facebook and Cambridge Analytica, though he maintained that his program was "a very standard vanilla Facebook app."

He ultimately provided over 50 million raw profiles to the firm, Mr. Wylie said, a number confirmed by a company email and a former colleague. Of those, roughly 30 million – a number previously reported by The Intercept – contained enough information, including places of residence, that the company could match users to other records and build psychographic profiles. Only about 270,000 users – those who participated in the survey – had consented to having their data harvested.

Mr. Wylie said the Facebook data was "the saving grace" that let his team deliver the models it had promised the Mercers.

"We wanted as much as we could get," he acknowledged. "Where it came from, who said we could have it – we weren't really asking."

Mr. Nix tells a different story. Appearing before a parliamentary committee last month, he described Dr. Kogan's contributions as "fruitless."

An International Effort

Just as Dr. Kogan's efforts were getting underway, Mr. Mercer agreed to invest $15 million in a joint venture with SCL's elections division. The partners devised a convoluted corporate structure, forming a new American company, owned almost entirely by Mr. Mercer, with a license to the psychographics platform developed by Mr. Wylie's team, according to company documents. Mr. Bannon, who became a board member and investor, chose the name: Cambridge Analytica.

The firm was effectively a shell. According to the documents and former employees, any contracts won by Cambridge, originally incorporated in Delaware, would be serviced by London-based SCL and overseen by Mr. Nix, a British citizen who held dual appointments at Cambridge Analytica and SCL. Most SCL employees and contractors were Canadian, like Mr. Wylie, or European.

But in July 2014, an American election lawyer advising the company, Laurence Levy, warned that the arrangement could violate laws limiting the involvement of foreign nationals in American elections.

In a memo to Mr. Bannon, Ms. Mercer and Mr. Nix, the lawyer, then at the firm Bracewell & Giuliani, warned that Mr. Nix would have to recuse himself "from substantive management" of any clients involved in United States elections. The data firm would also have to find American citizens or green card holders, Mr. Levy wrote, "to manage the work and decision making functions, relative to campaign messaging and expenditures."

In summer and fall 2014, Cambridge Analytica dived into the American midterm elections, mobilizing SCL contractors and employees around the country. Few Americans were involved in the work, which included polling, focus groups and message development for the John Bolton Super PAC, conservative groups in Colorado and the campaign of Senator Thom Tillis, the North Carolina Republican.

Cambridge Analytica, in its statement to The Times, said that all "personnel in strategic roles were U.S. nationals or green card holders." Mr. Nix "never had any strategic or operational role" in an American election campaign, the company said.

Whether the company's American ventures violated election laws would depend on foreign employees' roles in each campaign, and on whether their work counted as strategic advice under Federal Election Commission rules.

Cambridge Analytica appears to have exhibited a similar pattern in the 2016 election cycle, when the company worked for the campaigns of Mr. Cruz and then Mr. Trump. While Cambridge hired more Americans to work on the races that year, most of its data scientists were citizens of the United Kingdom or other European countries, according to two former employees.

Under the guidance of Brad Parscale, Mr. Trump's digital director in 2016 and now the campaign manager for his 2020 re-election effort, Cambridge performed a variety of services, former campaign officials said. That included designing target audiences for digital ads and fund-raising appeals, modeling voter turnout, buying $5 million in television ads and determining where Mr. Trump should travel to best drum up support.

Cambridge executives have offered conflicting accounts about the use of psychographic data on the campaign. Mr. Nix has said that the firm's profiles helped shape Mr. Trump's strategy – statements disputed by other campaign officials – but also that Cambridge did not have enough time to comprehensively model Trump voters.

In a BBC interview last December, Mr. Nix said that the Trump efforts drew on "legacy psychographics" built for the Cruz campaign.

After the Leak

By early 2015, Mr. Wylie and more than half his original team of about a dozen people had left the company. Most were liberal-leaning, and had grown disenchanted with working on behalf of the hard-right candidates the Mercer family favored.

Cambridge Analytica, in its statement, said that Mr. Wylie had left to start a rival firm, and that it later took legal action against him to enforce intellectual property claims. It characterized Mr. Wylie and other former "contractors" as engaging in "what is clearly a malicious attempt to hurt the company."

Near the end of that year, a report in The Guardian revealed that Cambridge Analytica was using private Facebook data on the Cruz campaign, sending Facebook scrambling. In a statement at the time, Facebook promised that it was "carefully investigating this situation" and would require any company misusing its data to destroy it.

Facebook verified the leak and – without publicly acknowledging it – sought to secure the information, efforts that continued as recently as August 2016. That month, lawyers for the social network reached out to Cambridge Analytica contractors. "This data was obtained and used without permission," said a letter that was obtained by the Times. "It cannot be used legitimately in the future and must be deleted immediately."

Mr. Grewal, the Facebook deputy general counsel, said in a statement that both Dr. Kogan and "SCL Group and Cambridge Analytica certified to us that they destroyed the data in question."

But copies of the data still remain beyond Facebook's control. The Times viewed a set of raw data from the profiles Cambridge Analytica obtained.

While Mr. Nix has told lawmakers that the company does not have Facebook data, a former employee said that he had recently seen hundreds of gigabytes on Cambridge servers, and that the files were not encrypted.

- "'Utterly horrifying': ex-Facebook insider says covert data harvesting was routine," *The Guardian* (Mar. 20, 2018):

Hundreds of millions of Facebook users are likely to have had their private information harvested by companies that exploited the same terms as the firm that collected data and passed it on to Cambridge Analytica, according to a new whistleblower.

Sandy Parakilas, the platform operations manager at Facebook responsible for policing data breaches by third-party software developers between 2011 and 2012, told the Guardian he warned senior executives at the company that its lax approach to data protection risked a major breach.

"My concerns were that all of the data that left Facebook servers to developers could not be monitored by Facebook, so we had no idea what developers were doing with the data," he said.

Parakilas said Facebook had terms of service and settings that "people didn't read or understand" and the company did not use its enforcement mechanisms, including audits of external developers, to ensure data was not being misused.

Parakilas, whose job was to investigate data breaches by developers similar to the one later suspected of Global Science Research, which harvested tens of millions of Facebook profiles and provided the data to Cambridge Analytica, said the slew of recent disclosures had left him disappointed with his superiors for not heeding his warnings.

"It has been painful watching," he said, "because I know that they could have prevented it."

Asked what kind of control Facebook had over the data given to outside developers, he replied: "Zero. Absolutely none. Once the data left Facebook servers there was not any control, and there was no insight into what was going on."

Parakilas said he "always assumed there was something of a black market" for Facebook data that had been passed to external developers. However, he said that when he told other executives the company should proactively "audit developers directly and see what's going on with the data" he was discouraged from the approach.

He said one Facebook executive advised him against looking too deeply at how the data was being used, warning him: "Do you really want to see what you'll find?" Parakilas said he interpreted the comment to mean that "Facebook was in a stronger legal position if it didn't know about the abuse that was happening".

He added: "They felt that it was better not to know. I found that utterly shocking and horrifying."

Parakilas first went public with his concerns about privacy at Facebook four months ago, but his direct experience policing Facebook data given to third parties throws new light on revelations over how such data was obtained by Cambridge Analytica.

* * *

'A majority of Facebook users'

Parakilas, 38, who now works as a product manager for Uber, is particularly critical of Facebook's previous policy of allowing developers to access the personal data of friends of people who used apps on the platform, without the knowledge or express consent of those friends.

That feature, called friends permission, was a boon to outside software developers who, from 2007 onwards, were given permission by Facebook to build quizzes and games – like the widely popular FarmVille – that were hosted on the platform.

The apps proliferated on Facebook in the years leading up to the company's 2012 initial public offering, an era when most users were still accessing the platform via laptops and computers rather than smartphones.

Facebook took a 30% cut of payments made through apps, but in return enabled their creators to have access to Facebook user data.

Parakilas does not know how many companies sought friends permission data before such access was terminated around mid-2014. However, he said he believes tens or maybe even hundreds of thousands of developers may have done so.

Parakilas estimates that "a majority of Facebook users" could have had their data harvested by app developers without their knowledge. The company now has stricter protocols around the degree of access third parties have to data.

Parakilas said that when he worked at Facebook it failed to take full advantage of its enforcement mechanisms, such as a clause that enables the social media giant to audit external developers who misuse its data.

Legal action against rogue developers or moves to ban them from Facebook were "extremely rare," he said, adding: "In the time I was there, I didn't see them conduct a single audit of a developer's systems."

* * *

During the time he was at Facebook, Parakilas said the company was keen to encourage more developers to build apps for its platform and "one of the main ways to get developers interested in building apps was through offering them access to this data." Shortly after arriving at the company's Silicon Valley headquarters he was told that any decision to ban an app required the personal approval of the chief executive, Mark Zuckerberg, although the policy was later relaxed to make it easier to deal with rogue developers.

While the previous policy of giving developers access to Facebook users' friends' data was sanctioned in the small print in Facebook's terms and conditions, and users could block such data sharing by changing their settings, Parakilas said he believed the policy was problematic.

"It was well understood in the company that that presented a risk," he said. "Facebook was giving data of people who had not authorised the app themselves, and was relying on terms of service and settings that people didn't read or understand."

It was this feature that was exploited by Global Science Research, and the data provided to Cambridge Analytica in 2014. GSR was run by the Cambridge University psychologist Aleksandr Kogan, who built an app that was a personality test for Facebook users.

The test automatically downloaded the data of friends of people who took the quiz, ostensibly for academic purposes. Cambridge Analytica has denied knowing the data was obtained improperly, and Kogan maintains he did nothing illegal and had a "close working relationship" with Facebook.

While Kogan's app only attracted around 270,000 users (most of whom were paid to take the quiz), the company was then able to exploit the friends permission feature to quickly amass data pertaining to more than 50 million Facebook users.

"Kogan's app was one of the very last to have access to friend permissions," Parakilas said, adding that many other similar apps had been harvesting similar quantities of data for years for commercial purposes. Academic research from 2010,

based on an analysis of 1,800 Facebooks apps, concluded that around 11% of third-party developers requested data belonging to friends of users.

If those figures were extrapolated, tens of thousands of apps, if not more, were likely to have systematically culled "private and personally identifiable" data belonging to hundreds of millions of users, Parakilas said.

The ease with which it was possible for anyone with relatively basic coding skills to create apps and start trawling for data was a particular concern, he added.

Parakilas said he was unsure why Facebook stopped allowing developers to access friends data around mid-2014, roughly two years after he left the company. However, he said he believed one reason may have been that Facebook executives were becoming aware that some of the largest apps were acquiring enormous troves of valuable data.

He recalled conversations with executives who were nervous about the commercial value of data being passed to other companies.

"They were worried that the large app developers were building their own social graphs, meaning they could see all the connections between these people," he said. "They were worried that they were going to build their own social networks."

'They treated it like a PR exercise'

Parakilas said he lobbied internally at Facebook for "a more rigorous approach" to enforcing data protection, but was offered little support. His warnings included a PowerPoint presentation he said he delivered to senior executives in mid-2012 "that included a map of the vulnerabilities for user data on Facebook's platform."

"I included the protective measures that we had tried to put in place, where we were exposed, and the kinds of bad actors who might do malicious things with the data," he said. "On the list of bad actors I included foreign state actors and data brokers."

Frustrated at the lack of action, Parakilas left Facebook in late 2012. "I didn't feel that the company treated my concerns seriously. I didn't speak out publicly for years out of self-interest, to be frank."

That changed, Parakilas said, when he heard the congressional testimony given by Facebook lawyers to Senate and House investigators in late 2017 about Russia's attempt to sway the presidential election. "They treated it like a PR exercise," he said. "They seemed to be entirely focused on limiting their liability and exposure rather than helping the country address a national security issue."

It was at that point that Parakilas decided to go public with his concerns, writing an opinion article in the New York Times that said Facebook could not be trusted to regulate itself. Since then, Parakilas has become an adviser to the Center for Humane Technology, which is run by Tristan Harris, a former Google employee turned whistleblower on the industry.

- Facebook Q2 2018 Earnings Press Release (July 25, 2018):

**Second Quarter 2018 Financial Highlights**

| *In millions, except percentages and per share amounts* | Three Months Ended June 30, 2018 | | Three Months Ended June 30, 2017 | | Year-over-Year % Change |
|---|---|---|---|---|---|
| Revenue: | | | | | |
| Advertising | $ | 13,038 | $ | 9,164 | 42% |
| Payments and other fees | | 193 | | 157 | 23% |
| Total revenue | | 13,231 | | 9,321 | 42% |
| Total costs and expenses | | 7,368 | | 4,920 | 50% |
| Income from operations | $ | 5,863 | $ | 4,401 | 33% |
| *Operating margin* | | *44%* | | *47%* | |
| Provision for income taxes | $ | 762 | | | |
| *Effective tax rate* | | *13%* | | | |
| Net income | $ | 5,106 | $ | 3,894 | 31% |
| Diluted Earnings per Share (EPS) | $ | 1.74 | $ | 1.32 | 32% |

**Second Quarter 2018 Operational and Other Financial Highlights**

- **Daily active users (DAUs)** – DAUs were 1.47 billion on average for June 2018, an increase of 11% year-over-year.
- **Monthly active users (MAUs)** – MAUs were 2.23 billion as of June 30, 2018, an increase of 11% year-over-year.
- **Mobile advertising revenue** – Mobile advertising revenue represented approximately 91% of advertising revenue for the second quarter of 2018, up from approximately 87% of advertising revenue in the second quarter of 2017.
- **Capital expenditures** – Capital expenditures for the second quarter of 2018 were $3.46 billion.
- **Cash and cash equivalents and marketable securities** – Cash and cash equivalents and marketable securities were $42.31 billion at the end of the second quarter of 2018.
- **Headcount** – Headcount was 30,275 as of June 30, 2018, an increase of 47% year-over-year.

- Facebook Q2 2018 Earnings Call (July 25, 2018):

**[Zuckerberg:]** Thanks Deborah, and thanks everyone for joining us today. We had another solid quarter. Revenue grew 42% year-over-year to $13.2 billion, and Facebook now has more than 2.2 billion monthly actives with almost 1.5 billion using it every day.

* * *

Looking ahead, we will continue to invest heavily in security and privacy because we have a responsibility to keep people safe. But as I've said on past calls, we're investing so much in security that it will significantly impact our profitability. We're starting to see that this quarter. But in addition to this, we also have a responsibility to keep building services that bring people closer together in new ways as well. Now in light of increased investment in security, we could choose to decrease our investments in new product areas, but we're not going to because that wouldn't be the right way to serve our community and because we run this company for the long term, not for the next quarter. And Dave will talk about this in a few minutes.

* * *

**[Sandberg:]** It was a good second quarter with ad revenue growing 42% year-over-year. Mobile ad revenue was $11.9 billion, a 50% increase year-over-year, making up approximately 91% of total ad revenue.

* * *

**[Wehner:]** Daily active users on Facebook reached 1.47 billion, up 11% compared to last year led by growth in India, Indonesia, and the Philippines. This number represents approximately 66% of the 2.23 billion monthly active users in Q2. MAUs were up 228 million or 11% compared to last year. It is worth noting that MAU and DAU in Europe were both down slightly quarter-over-quarter due to the GDPR rollout, consistent with the outlook we gave on the Q1 call.

* * *

Turning now to the financials. All comparisons are on a year-over-year basis unless otherwise noted. Q2 total revenue was $13.2 billion, up 42% or 38% on a constant currency basis. Foreign exchange tailwinds contributed approximately $370 million of revenue in Q2.

Q2 ad revenue was $13 billion, up 42% or 38% on a constant currency basis. In terms of ad revenue by region, Europe and Asia Pacific both grew fastest at 47% each and benefitted from foreign exchange tailwinds. I'd note that European ad revenue growth decelerated more quickly than other regions and was impacted primarily by reduced currency tailwinds and, to a lesser extent, the rollout of GDPR. Mobile ad revenue was $11.9 billion, up 50% and represents approximately 91% of ad revenue. In Q2, the average price per ad increased 17% and the number of ad impressions served across our services increased 21%, driven primarily by ads in feed on Instagram and Facebook. Payments & other fees revenue was $193 million, up 23%.

Turning now to expenses. Total expenses were $7.4 billion, up 50%. We ended Q2 with over 30,000 full-time employees, up 47% compared to last year.

Operating income was $5.9 billion, representing a 44% operating margin. Our effective tax rate in the quarter was 13%. Net income was $5.1 billion or $1.74 per share. Capital expenditures were $3.5 billion, driven by investments in data centers, servers, network infrastructure, and office facilities.

In Q2, we generated $2.8 billion in free cash flow and ended the quarter with approximately $42 billion in cash and investments. And in the second quarter, we bought back approximately $3.2 billion of our Class A common stock.

Turning now to the revenue outlook. Our total revenue growth rates decelerated approximately 7 percentage points in Q2 compared to Q1. Our total revenue growth rates will continue to decelerate in the second half of 2018, and we expect our revenue growth rates to decline by high single-digit percentages from prior quarters sequentially in both Q3 and Q4. There are several factors contributing to that deceleration. For example, we expect currency to be a slight headwind in the second half versus the tailwinds we have experienced over the last several quarters. We plan to grow and promote certain engaging experiences like Stories that currently have lower levels of monetization, and we are also giving people who use our services more choices around data privacy, which may have an impact on our revenue growth.

Turning now to expenses. We continue to expect that full year 2018 total expenses will grow in the range of 50% to 60% compared to last year. In addition to increases in core product development and infrastructure, this growth is driven by increasing investments in areas like safety and security, AR/VR, marketing and content acquisition.

Looking beyond 2018, we anticipate that total expense growth will exceed revenue growth in 2019. Over the next several years, we would anticipate that our operating margins will trend towards the mid-30s on a percentage basis.

* * *

**[Eric Sheridan – UBS Analyst:]** Maybe going back to the OpEx and your comments, Dave, looking out sort of medium to longer term. Just want to understand if we can get a little bit more color on some of the drivers of that. How much of it can be video in support of where you want to take the business over the medium and long term versus things that maybe don't necessarily have a revenue component to them like the security and protection of the ecosystem that the whole team's been talking about since the end of last year?

**[Wehner:]** Yes. Eric, it's going to be a combination of those factors. I would say we're going to continue to invest in core product development and infrastructure, and so you've seen that already in terms of the ramp that we have in capital expenditures. We're continuing to build out features and functionality for the community across a wide range of different products, whether it be the ad products that Sheryl talked about or IGTV and the like. In addition to those core developments, we're also making the significant long-term investments in safety and security. Those investments are in the billions of dollars per year. Those will have a negative impact on margins. We think that's the right thing to do for the business in terms of ensuring the community's safety and security and the durability to franchise. So those are important investments from an ROI perspective, but they don't have obviously immediate translation into revenue dollars.

* * *

**[Ross Sandler – Barclays Analyst:]** Okay, sorry. Dave, I think you said that the quarter-on-quarter growth rates are going to be high single digits lower than the prior year quarter-on-quarter growth rates for 3Q and 4Q. That would imply around a 20% year-on-year growth rate exiting fourth quarter. So I just want to clarify, is that what you actually said? And, if so, what's driving this fairly dramatic deceleration of revenue growth?

**[Wehner:]** Ross, so yes, we grew it 42% in the current quarter, and we would expect a decel in high single digits for the next couple quarters. In terms of what is driving the deceleration, I – it's a combination of factors, and I think I outlined those in my commentary. First of all, there's the currency, which is going from being a tailwind to being a modest headwind, we expect. Secondly, we're going to be focusing on growing engaging new experiences like Stories and promoting those, and that's going to have a negative impact on revenue growth. And then finally, we're giving people who use service – the services more choice around privacy. And that's coming both in terms of impacts that could be ongoing from things like GDPR as well as other product options that we're providing that could have an impact on revenue growth. So it's a combination of all those factors that is leading to deceleration of revenue growth in the second half.

* * *

**[Justin Post – BAML Analyst:]** The guidance for the deceleration might raise some questions just on Facebook engagement. So just wondering how you're seeing activity within just core Facebook right now? Is it growing at a healthy rate? And then secondly, you have had a couple of months now with GDPR. Just wondering how you're thinking about how that will impact your ad targeting over the next year.

**[Wehner:]** Sure, Justin. I'll take that. So we're continuing to see good growth in the Facebook ecosystem with 11% DAU growth, and obviously, we've got broader family growth as well. In terms of – I guess going to the GDPR question – we've talked about – oh sorry, Sheryl, were you going to take the GDPR question?

**[Sandberg:]** Yes, I can talk about GDPR. GDPR has not had a significant revenue impact, but we also recognize it wasn't fully rolled out this quarter. It was very encouraging for us to see that the vast majority of people affirmed that they want us to use information, including from the websites they visit, to make their ads more relevant. But as we look further out, we recognize that there's still risk, and we're going to watch closely. Advertisers are still adapting to the changes, so it's early to know the longer-term impact. And things like GDPR and other privacy changes that may happen from us or may happen with regulation could make ads more relevant. One thing that we know that's not going to change is that advertisers are always looking for the highest ROI opportunity, and what's most important in winning budgets is our relative performance in the industry. And we believe we'll continue to do very well on that.

* * *

**[Mark May – Citi Analyst:]** Just following up on the comments. Sheryl mentioned that there's really no meaningful impact on GDPR to the ad business, at least as of now. But then, Dave, I think you mentioned that because you're giving people more control over their privacy and data that this is one of the reasons why you're expecting the meaningful decel in the second half. So just trying to reconcile those 2 things. Maybe the questions have been too specific around the impact of GDPR and should be more broad around data and privacy. And I guess, ultimately, the question is what impact, if any, is these greater controls that you're giving users having on ad revenue growth and monetization?

**[Wehner:]** Sure, Mark. Let me take that. So GDPR didn't have a significant impact in Q2 partially because of its implementation date. So you're just seeing effectively 1 month of it. In terms of revenue, we do think that there will be some modest impact. And I don't want to overplay these factors, but you've use got a couple things going on. You've got the impact of the opt-outs. And while we're very pleased with the vast majority of people opting into the third-party data use, some did not. So that'll have a small impact on revenue growth. And then we're also seeing some impact from how advertisers are using their own data for targeting, so again, that'll have a modest impact on growth. And then in addition, we're continuing to focus our product development around putting privacy first, and that's going to, we believe, have some impact on revenue growth. So it's really a combination of kind of how we're approaching privacy as well as GDPR and the like. So I think all of those factors together are one of the factors that we're talking about, the other being obviously the currency flip.

Lead Plaintiffs reserve the right to amend and/or supplement this preliminary, good faith Response based on continuing fact and expert discovery.

<u>INTERROGATORY NO. 3</u>:

Identify each Corrective Disclosure that You contend revealed facts regarding the Whitelisting Alleged Fraud that had not been previously disclosed publicly.

<u>RESPONSE TO INTERROGATORY NO. 3</u>:

Lead Plaintiffs incorporate the prefatory statement set forth in their Response to Interrogatory No. 1, including their preservation of objections, their understanding of "not . . . previously disclosed publicly," and the general principles governing loss causation. Even though Lead Plaintiffs maintain that the Definitions and Instructions are objectionable, including for the reasons outlined herein, the below Response constitutes a reasonable, good-faith effort to respond to this contention interrogatory "applying the Definitions and Instructions and answering fully," as directed by the Court in its August 10, 2026 Order (ECF No. 275), with Lead Plaintiffs' current, preliminary contentions prior to the completion of fact and expert discovery.

Subject to and without waiving those objections, Lead Plaintiffs' preliminary, good faith contention at the current time is as follows: Lead Plaintiffs contend that "Whitelisting" is a factual theory showing why the surviving user-control statements were false or misleading; it is not a separate or self-contained theory of loss causation. The user-control statements assured users and the market that Facebook users controlled who received their information, which applications could access their data, and whether Facebook would respect their privacy settings. The Court has identified those assurances as including statements that people could control the applications receiving their data and that Facebook respected users' privacy settings.

Lead Plaintiffs contend that the whitelisting disclosures identified below are proximately connected to those user-control statements because they revealed, confirmed, or enabled the market to appreciate the foreseeable consequences of the fact that Facebook granted selected third parties access to user and friend data notwithstanding Facebook's announced restrictions, users' privacy settings, and its assurances of user control. The June 3, 2018 disclosure revealed the whitelisting practices. The July 25, 2018 earnings announcement and conference call revealed or enabled the

market to appreciate the significance of the Cambridge Analytica and whitelisting scandals, including the economic consequences of changing, ending, or remedying Facebook's misstatements and omissions and data-access and privacy practices, including consequences for revenue growth, expenses, profitability, and/or operating margins.

The July 25, 2018 earnings announcement and conference call are corrective disclosure events even though they did not use the term "whitelisting." Loss causation does not require a disclosure to precisely mirror the alleged misstatement or the shorthand label assigned to a falsity theory. The Ninth Circuit held that the Cambridge Analytica and whitelisting revelations caused the July 2018 price decline and that user-control statements made before June 3, 2018 were linked to that decline.

In accordance with the foregoing, Lead Plaintiffs identify the following disclosures and disclosure events, individually and collectively, that they contend revealed new information and/or allowed the market to appreciate the existence, scope, significance, and/or consequences of Facebook's whitelisting practices and Facebook users' lack of control over their data.

On June 3, 3018, *The New York Times* reported that Facebook had accorded "whitelisted" status to dozens of third parties, allowing them unauthorized "access to vast amounts of its users' personal information." This access included information about users' friends' data without obtaining the friends' consent throughout 2017 and 2018, despite the fact that the Company had "declar[ed] that it would no longer share such information with outsiders."

On July 25, 2018, Facebook announced its earnings for Q2 2018. This announcement revealed the foreseeable consequences of the Cambridge Analytica and whitelisting scandals and allowed the investing public to appreciate the significance of those scandals. Zuckerberg led off the Company's Q2 2018 earnings call by acknowledging that "[l]ooking ahead, we will continue to invest heavily in security and privacy," and that "we're investing so much in security that it will significantly impact our profitability. We're starting to see that this quarter." Later, Wehner stated that "we expect our revenue growth rates to decline by high single-digit percentages from prior quarters" due to, inter alia, Facebook "giving people who use our services more choices around data privacy, which may have an impact on our revenue growth." He also stated that due to further

investments in privacy, "[o]ver the next several years, we would anticipate that our operating margins will trend towards the mid-30s on a percentage basis." Thus, Facebook's Q2 2018 earnings disclosures allowed the market to newly realize the magnitude of the Company's challenge in addressing its previous data privacy shortcomings and fully "'appreciate [the] significance' of the Cambridge Analytica and whitelisting scandals" on Facebook's business. *See Facebook*, 87 F.4th at 956-57 (citation omitted).

Lead Plaintiffs reserve the right to amend and/or supplement this preliminary, good faith Response based on continuing fact and expert discovery.

DATED: August 21, 2026

ROBBINS GELLER RUDMAN & DOWD LLP
LUKE O. BROOKS (212802)
DARRYL J. ALVARADO (253213)
HILLARY B. STAKEM (286152)
J. MARCO JANOSKI GRAY (306547)
JESSICA E. ROBERTSON (352207)

s/ J. MARCO JANOSKI GRAY
J. MARCO JANOSKI GRAY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
lukeb@rgrdlaw.com
dalvarado@rgrdlaw.com
hstakem@rgrdlaw.com
mjanoski@rgrdlaw.com
jrobertson@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
JASON C. DAVIS
KENNETH J. BLACK
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

Counsel for Amalgamated and Co-Lead Counsel for the Class

DATED: August 21, 2026

BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
SALVATORE J. GRAZIANO
JEREMY P. ROBINSON
PREETHI KRISHNAMURTHY
TIMOTHY G. FLEMING
THOMAS Z. SPERBER
MATTHEW S. GOLDSTEIN

s/ JEREMY P. ROBINSON
JEREMY P. ROBINSON

1251 Avenue of the Americas
New York, NY 10020
Telephone: 212/554-1400
212/554-1444 (fax)
salvatore@blbglaw.com
jeremy@blbglaw.com
preethi@blbglaw.com
timothy.fleming@blbglaw.com
thomas.sperber@blbglaw.com
matthew.goldstein@blbglaw.com

Counsel for Mississippi and Co-Lead Counsel for the Class

## DECLARATION OF SERVICE VIA EMAIL

I, KIRSTEN MCCORMACK, not a party to the within action, hereby declare that on August 21, 2026, I caused to be served the attached LEAD PLAINTIFFS' AMENDED RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES TO PLAINTIFFS by email on the parties to the within action addressed as follows:

**COUNSEL FOR DEFENDANTS:**

| GIBSON, DUNN & CRUTCHER LLP<br>One Embarcadero Center, Suite 2600, San Francisco, CA 94111 | |
|---|---|
| Brian M. Lutz | blutz@gibsondunn.com |
| Michael J. Kahn | mjkahn@gibsondunn.com |
| GIBSON, DUNN & CRUTCHER LLP<br>1700 M Street NW, Washington, D.C. 20036 | |
| Joshua S. Lipshutz | jlipshutz@gibsondunn.com |
| Amanda C. Machin | amachin@gibsondunn.com |
| GIBSON, DUNN & CRUTCHER LLP<br>310 University Avenue, Palo Alto, CA 94301 | |
| Martie P. Kutscher | mkutscher@gibsondunn.com |

**COUNSEL FOR PLAINTIFFS:**

| ROBBINS GELLER RUDMAN & DOWD LLP<br>Post Montgomery Center, One Montgomery Street, Suite 1800, San Francisco, CA 94104 | |
|---|---|
| Jason C. Davis | jdavis@rgrdlaw.com |
| Kenneth J. Black | kblack@rgrdlaw.com |
| ROBBINS GELLER RUDMAN & DOWD LLP<br>655 West Broadway, Suite 1900, San Diego, CA 92101 | |
| Luke O. Brooks | lukeb@rgrdlaw.com |
| Darryl J. Alvarado | dalvarado@rgrdlaw.com |
| Hillary B. Stakem | hstakem@rgrdlaw.com |
| J. Marco Janoski Gray | mjanoski@rgrdlaw.com |
| Jessica E. Robertson | jrobertson@rgrdlaw.com |
| BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP<br>1251 Avenue of the Americas, New York, NY 10020 | |
| Salvatore J. Graziano | salvatore@blbglaw.com |
| Jeremy P. Robinson | jeremy@blbglaw.com |
| Preethi Krishnamurthy | preethi@blbglaw.com |
| Timothy G. Fleming | timothy.fleming@blbglaw.com |

| | |
|---|---|
| Thomas Z. Sperber | thomas.sperber@blbglaw.com |
| Matthew S. Goldstein | matthew.goldstein@blbglaw.com |

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 21, 2026, at San Diego, California.

KIRSTEN MCCORMACK

**VERIFICATION**

I, Mandy Tenner, pursuant to 28 U.S.C. §1746, declare under penalty of perjury under the laws of the United States of America that the interrogatory responses contained in Lead Plaintiffs' Amended Responses and Objections to Defendants' First Set of Interrogatories to Plaintiffs, which have been assembled by Bernstein Litowitz Berger & Grossmann LLP and Robbins Geller Rudman & Dowd LLP, are true and correct to the best of my knowledge, information, and belief, based upon information provided to me in my official capacity as the Executive Vice President and Chief Legal Officer of Amalgamated Bank.

Dated: August 19, 2026

Signed by:
Mandy Tenner
0A5E263316E14A3...

Mandy Tenner
Executive Vice President and Chief Legal Officer
Amalgamated Bank
*on behalf of Amalgamated Bank, as Trustee for the LongView LargeCap 1000 Growth Index Fund, LongView Quantitative LargeCap Fund, and LongView Quant LargeCap Equity VEBA Fund*

**VERIFICATION**

I, Laken Ryals, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the interrogatory responses contained in Lead Plaintiffs' Amended Responses and Objections to Defendants' First Set of Interrogatories to Plaintiffs, which have been assembled by Bernstein Litowitz Berger & Grossmann LLP and Robbins Geller Rudman & Dowd LLP, are true and correct to the best of my knowledge, information and belief, based upon information provided to me in my official capacity as a Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi.

Dated: August 21, 2026

Laken Ryals
Special Assistant Attorney General
Office of the Attorney General of the State of Mississippi
*on behalf of Public Employees' Retirement System of Mississippi*