ROBBINS GELLER RUDMAN
& DOWD LLP
JASON C. DAVIS (253370)
KENNETH J. BLACK (291871)
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
SALVATORE J. GRAZIANO
JEREMY P. ROBINSON
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212/554-1400
212/554-1444 (fax)
salvatore@blbglaw.com
jeremy@blbglaw.com

Co-Lead Counsel for the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re FACEBOOK, INC. SECURITIES LITIGATION | Master File No. 5:18-cv-01725-EJD |
| | CLASS ACTION |
| This Document Relates To: ALL ACTIONS. | LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE OPINIONS OF DANIEL FISCHEL AND MARTIN DIRKS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT |
| | DATE: January 21, 2027<br>TIME: 9:00 a.m.<br>DEPT.: Courtroom 4, 5th Floor<br>JUDGE: Honorable Edward. J. Davila |

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 2

II. LEGAL STANDARD ..... 4

III. ARGUMENT ..... 5

A. Professor Fischel's Price Impact Opinions Are Unreliable and Inadmissible ..... 5

1. Professor Fischel Contradicts, Without Explanation, the Principles and Methodology He Applied in *Household* ..... 5

2. Professor Fischel's Attribution Opinions Are Tautological: He Assumes the Ultimate Conclusion from Counsel and Then Reports It as an Economic Finding ..... 11

B. Mr. Dirks' Speculative, Unsupported *Ipse Dixit* Opinions Are Inadmissible ..... 15

1. Mr. Dirks' Materiality Opinions Are Inadmissible Under *Amgen* ..... 16

2. Mr. Dirks' Opinions as to How All Investors Interpreted the Alleged Misstatements and Corrective Disclosures Are Inadmissible Speculation ..... 17

3. Mr. Dirks' Opinions as to Whether Public Statements Fully Disclosed "Initial Misuse" or Related to "Initial Misuse" Versus "Continued Misuse" Are Inadmissible *Ipse Dixit* and Legal Conclusion ..... 19

4. Mr. Dirks' Opinions as to Analysts' Beliefs and Interpretation of Information Are Speculative and Rest on an Unsupported and Inconsistently Applied Methodology ..... 22

5. Mr. Dirks' Improper Bolstering of Professor Fischel's Conclusions Should Be Excluded ..... 24

IV. CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*AIG Ret. Servs., Inc. v. Altus Fin. S.A.*,
2011 WL 13213589 (C.D. Cal. Sep. 26, 2011)....17, 19

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)....3, 13, 16

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)....21

*Arrow Elecs., Inc. v. Quantum Corp.*,
2024 WL 5440992 (N.D. Cal. Dec. 27, 2024)....14

*Avendt v. Covidien, Inc.*,
262 F. Supp. 3d 493 (E.D. Mich. 2017)....6, 11

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
613 F. Supp. 3d 1308 (S.D. Cal. 2020)....23

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....16, 17

*Brown v. Google, LLC*,
2022 WL 17961497 (N.D. Cal. Dec. 12, 2022)....18, 20, 23

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995)....20, 23

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)....4, 17, 21

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025)....4, 11, 14, 20

*Fed. Trade Comm'n v. Tate's Auto Ctr. of Winslow Inc.*,
2021 WL 410857 (D. Ariz. Feb. 5, 2021)....14

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....4, 18

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015)....6

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021)....3, 16

**Page**

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ....... 16

*Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021) ....... 21

*Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934 (N.D. Cal. 2018) ....... 24

*In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934 (9th Cir. 2023) ....... *passim*

*In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007 (S.D. Cal. 2021), *aff'd*, 2022 WL 898595 (9th Cir. Mar. 28, 2022) ....... 6, 11

*In re Roundup Prods. Liab. Litig.*, 2025 WL 1575132 (N.D. Cal. Mar. 28, 2025) ....... 11, 24

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d 449 (E.D. Pa. 2014) ....... 6

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940 (9th Cir. 2005) ....... 16

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ....... 19

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051 (9th Cir. 2008) ....... 15, 22

*Olean Wholesale Grocery Coop. Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) ....... 5

*SEC v. Daifotis*, 2012 WL 2051193 (N.D. Cal. June 7, 2012) ....... 17, 20

*Shahinian v. Kimberly-Clark Corp.*, 2017 WL 11595343 (C.D. Cal. Mar. 7, 2017) ....... 19

*Slovak v. Golf Course Villas Homeowners Ass'n*, 2019 WL 12372104 (D. Nev. Jan. 15, 2019) ....... 24

*Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852 (9th Cir. 2019) ....... 4, 11, 13

**Page**

*United States of Am. v. J-M Mfg. Co., Inc.*,
2018 WL 11349904 (C.D. Cal. June 21, 2018) ........................................................12

*Waymo LLC v. Uber Techs., Inc.*,
2017 WL 5000352 (N.D. Cal. Nov. 2, 2017) ........................................................13

STATUTES, RULES AND REGULATIONS

Federal Rules of Civil Procedure
Rule 23 ........................................................5, 17
Rule 23(b)(3) ........................................................15, 16
Rule 26 ........................................................14
Rule 26(a)(2)(B)(i)-(ii) ........................................................14

Federal Rules of Evidence
Rule 401 ........................................................2, 4, 16
Rule 402 ........................................................2, 4, 16
Rule 702 ........................................................ *passim*
Rule 702(a) ........................................................17, 19

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE that on January 21, 2027, at 9:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Edward J. Davila, Lead Plaintiffs Amalgamated Bank, as Trustee for the LongView LargeCap 1000 Growth Index Fund, LongView Quantitative LargeCap Fund, and LongView Quant LargeCap Equity VEBA Fund ("Amalgamated"), and Public Employees' Retirement System of Mississippi ("MissPERS," and, together with Amalgamated, "Plaintiffs"), will and hereby do move under Federal Rules of Evidence ("FRE") 401-402 and 702 for an order excluding the opinions in the Expert Report of Martin Dirks dated October 9, 2026 (ECF 301-8) (the "Dirks Report" or "Dirks Rpt.") and certain opinions in the Expert Report of Daniel R. Fischel dated October 9, 2026 (ECF 301-6) (the "Fischel Report" or "Fischel Rpt."), submitted with Defendants' Opposition to Lead Plaintiffs' Motion to Certify Class, Appoint Class Representatives, and Appoint Class Counsel (ECF No. 301).[1] The Motion is based on this Notice, the Memorandum of Points and Authorities, the Declaration of Luke O. Brooks and exhibits, the pleadings and record, and any argument the Court may permit.[2]

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Defendants have established, by a preponderance of the evidence, that Professor Daniel Fischel's price-impact opinions reliably apply sound principles and methods where he: (i) contradicts his prior sworn testimony on the very economic principles underlying his opinions; (ii) adopts from counsel the very conclusion his analysis purports to test, contrary to

---

[1] Unless otherwise noted, capitalized terms have the same meaning as defined in Plaintiffs' Motion to Certify Class, Appoint Class Representatives, and Appoint Class Counsel (ECF No. 278). References to "Ex. _" are to the exhibits attached to the Declaration of Luke O. Brooks, filed concurrently.

[2] Plaintiffs do not waive, and instead reserve, their right to move to exclude the testimony of any of Defendants' experts, on these or other grounds after receipt of merits expert reports during expert discovery.

Plaintiffs' allegations and the law of the case; and (iii) applies his event-study methodology inconsistently.

2. Whether Defendants have established, by a preponderance of the evidence, that Martin Dirks' opinions satisfy FRE 702 and are relevant under FRE 401-402 where: (i) his value-relevance opinions relate solely to the materiality of the alleged fraud to investors, *i.e.*, a merits issue that may not be decided at class certification and invades the province of the trier of fact; (ii) his opinions about investors' understanding of the alleged misstatements and corrective disclosures are speculative and unreliable; (iii) his opinions about analysts' assessments of value-relevance speculate about their states of mind, amount to pure *ipse dixit*, and are devoid of a valid, consistently applied methodology; (iv) his opinions about when "Initial Misuse" was fully disclosed and whether information relates to "Initial Misuse" or "Continued Misuse" lack a reliable foundation, are contrary to the facts, and offer improper legal conclusions that invade the province of the Court; and (v) portions of his report do nothing more than attempt to improperly bolster the credibility of Defendants' other expert.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Defendants' class certification experts, Professor Daniel Fischel and Martin Dirks, offer opinions that contradict prior testimony, assume away the alleged fraud, apply economic principles inconsistently, and substitute speculation about what investors and analysts thought for actual analysis of the facts regarding Facebook's stock price reaction to the corrective disclosures. FRE 702 requires a reliable basis for each opinion and a reliable application of the expert's methods to the facts. The challenged opinions satisfy neither requirement.

To start, Professor Fischel's price-impact conclusions are unreliable because they contradict his prior sworn testimony in *Lawrence E. Jaffe Pension Plan v. Household Int'l*, 1:02-cv-05893 (N.D. Ill.) ("*Household*"). On the three critical questions raised by Defendants in opposition to class certification – *i.e.*, whether denials and "investigating" statements can keep the truth from fully reaching the market, whether earlier public reporting renders a company's later acknowledgment of misconduct stale news, and whether the lack of stock price movement *per se* negates evidence of

price impact – Professor Fischel advanced the exact opposite economic principles and conclusions in *Household* than he does here. First, in *Household*, Professor Fischel correctly explained that markets discount third-party allegations when the company denies them. Here, he treats third-party allegations that Facebook denied as fully disclosing the truth. Second, in *Household*, he correctly explained that a company's first confirmation of an event's occurrence conveys new information even where third-party allegations were previously reported. Here, he treats Facebook's first acknowledgment that the third-party allegations were true as stale news. And, third, in *Household*, Professor Fischel correctly explained that a statistically insignificant reaction does not negate evidence of price impact. Here, he treats the absence of statistical significance as evidence of no impact. Professor Fischel does not explain any of his reversals. Courts routinely find such unexplained about-faces by experts to be unreliable.

Moreover, Professor Fischel's opinions attributing the stock price declines on the corrective disclosure dates to information unrelated to the fraud are circular: they assume what they purport to prove. Indeed, Professor Fischel assumes from defense counsel the very conclusion his analysis is supposed to test – that the alleged corrective disclosures revealed nothing related to the fraud – and then reports, unsurprisingly, that the resulting price declines are not fraud-related. This circular logic fails on its face. Professor Fischel's assumption also conflicts with both this Court's and the Ninth Circuit's treatment of the disclosures, is inconsistent with the facts and Plaintiffs' allegations, and is not the product of any specialized skill or methodology.

Mr. Dirks purports to "[d]iscuss what information a reasonable investor would consider 'value-relevant,'" Dirks Rpt., ¶29(ii) –but that is no more than speculative and unreliable opinion about what "reasonable investor[s]" find material. Further, Mr. Dirks' "value-relevance" opinions address what "reasonable investor[s]" would "typically" consider material, without connecting that assessment to the actual price movements of Facebook common stock. Mr. Dirks' opinions are barred by (i) the Supreme Court's opinion in *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013), which holds that materiality issues cannot be determined at class certification, and (ii) the Supreme Court's later opinion in *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113 (2021), which permits materiality evidence to be considered only insofar as it bears on ***actual***

price impact. Mr. Dirks' opinions therefore do not fit the issues now before the Court. His opinions are also unreliable for independent reasons. He speculates about market analysts' and investors' states of mind; sorts the corrective disclosures into "Initial Misuse"- and "Continued Misuse"-related without objective criteria; and applies an untested analyst-report test to reach a conclusion that his own data refutes – market analysts largely held their price targets in March 2018 even as Facebook lost roughly $60 billion in market value. These defects in foundation, methodology, and fit are fatal.

Plaintiffs respectfully request that the Court exclude Professor Fischel's and Mr. Dirks' opinions under FRE 401-402 and 702.

## II. LEGAL STANDARD

Under FRE 702, trial courts serve as gatekeepers, "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).[3] Expert testimony is admissible under FRE 702 if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FRE 702. The expert's opinion must "rest on 'facts or data in the case that the expert has been made aware of or personally observed,' not merely assumptions and speculation." *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019). Courts need not admit opinion evidence "connected to existing data only by the *ipse dixit* of the expert," and may exclude testimony where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The proponent of expert testimony bears the burden of establishing admissibility by a preponderance of the evidence, *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025),

---

[3] Unless otherwise indicated, all emphasis is added and all citations and internal quotation marks are omitted.

including on a contested Rule 23 issue at class certification. *Olean Wholesale Grocery Coop. Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665-67 (9th Cir. 2022).

## III. ARGUMENT

### A. Professor Fischel's Price Impact Opinions Are Unreliable and Inadmissible

Defendants retained Professor Fischel to assess both "back end" price impact when the alleged misstatements were corrected and "front end" price impact when they were made, and to evaluate the classwide damages opinions of Plaintiffs' expert, Professor Jonah Gelbach ("Dr. Gelbach"). Professor Fischel concludes that there is no reliable economic evidence of either form of price impact and that Dr. Gelbach supplies no reliable damages methodology consistent with Plaintiffs' liability theory. Fischel Rpt., ¶¶29-30. In analyzing back-end price impact, Professor Fischel, without any analysis, simply assumes as true defense counsel's argument that the December 11, 2015 *Guardian* and March 30, 2017 *Intercept* articles fully disclosed the Initial Misuse to the market – ***a theory this Court and the Ninth Circuit have rejected*** – and then rejects price impact because his event study finds no statistically significant declines on those dates. *See* Fischel Rpt., ¶¶39-40, 48; ECF No. 258 ("2026 Order") at 24; *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 954-55 (9th Cir. 2023). As to the corrective disclosures Plaintiffs actually allege, Professor Fischel rejects the statistically significant price declines on March 19-20 and July 26, 2018 as evidence of price impact based on the theory, assumed from defense counsel, that the truth was already on the market. Fischel Rpt., ¶¶38-60. As to front-end price impact, Professor Fischel finds no significant increase on most statement dates and attributes the remaining increases to non-fraud information or timing. *Id.*, ¶¶61-77. These price-impact and damages opinions suffer from myriad methodological and foundational defects, discussed below.

#### 1. Professor Fischel Contradicts, Without Explanation, the Principles and Methodology He Applied in *Household*

In *Household*, Professor Fischel used an event study to assess the stock-price effects of alleged corrective events, just as he does here. Both cases involve initial third-party reports of misconduct, company denials and assurances of an investigation, and the respective companies'

eventual acknowledgment that the misconduct occurred. Yet Professor Fischel has now reversed positions on the economic significance of those events without citing, much less explaining, his prior analysis. Courts within the Ninth Circuit and across the country routinely exclude expert opinions as unreliable when the experts contradict their prior methodologies without explanation. *See In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1036-37 (S.D. Cal. 2021), *aff'd*, 2022 WL 898595 (9th Cir. Mar. 28, 2022) (excluding testimony as unreliable in part because expert's change in methodology he previously testified to, "without explanation or mention of" the prior method, suggested a lack of scientific rigor); *Avendt v. Covidien, Inc.*, 262 F. Supp. 3d 493, 524 (E.D. Mich. 2017) (expert's opinion that "blatantly contradict[ed]" his prior opinions not the product of a reliable methodology and therefore not admissible); *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d 449, 460 & n.36 (E.D. Pa. 2014) (excluding expert's opinion that was "not evidence based, and . . . directly contrary to . . . findings of her own," including her opinions expressed in a prior litigation).

***First***, in *Household*, Professor Fischel opined that third-party accusations met by company denials kept the truth from the market – the opposite of the principle he applies here. In *Household*, the company defrauded investors by misrepresenting the truth that predatory lending was driving the growth of its consumer lending business. *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 413 (7th Cir. 2015). The truth emerged only after the market had heard years of third-party accusations that Household was engaged in predatory lending, which the company repeatedly denied. Those accusations escalated steadily from 1998 through 2001. Regulators cited Household in California for illegal fees in 1998 and again in 2000. Ex. A, ¶12 & Ex. 5. Public criticism then intensified in 2001: in July, alleged victims "singled out" Household at Senate Banking Committee hearings, Ex. A, Ex. 20 at 11; in September, a major consumer advocacy group reportedly urged a public pension fund that had received complaints about Household to sell its Household stock; and on November 1, AARP joined a class action against Household's Beneficial unit, Ex. A, Ex. 28 at 33. Finally, in November 2001, the California Department of Corporations sued, alleging "thousands" of violations and announcing that Household had admitted about 36,000 such violations. Ex. A, Ex. 4. Household's response to all of these allegations followed the same pattern

of denial: for example, in response to the lawsuit, it claimed it was """currently reviewing the specifics of the lawsuit, but vehemently denies any assertion that it has willfully violated the lending laws that regulate its business."""  Ex. B at 2631:13-17.  Professor Fischel did not treat any of the earlier accusations as having put the truth on the market.  Instead, he testified that November 15, 2001 marked only "the beginning of the time when Household, that had been denying its involvement in predatory lending throughout, [saw] market participants begin to doubt Household's denials because of the accumulation of accusations and firsthand accounts."  *Id*. at 2631:18-25.

In *Household*, Professor Fischel told jurors that investors "were not fully informed" and the truth was not fully on the market where "the disclosures coming out criticizing Household's practices didn't come from Household," noting "it's one thing for third parties to comment, but it's another thing for the information to come directly from the company itself."  *See* Ex. B at 2684:7-23. He testified that a third-party's accusation "does not establish by itself" the truth of those accusations, Ex. C at 61, that "disclosures by third parties are given less weight" by investors, and that in *Household*, "that effect [was] compounded by the fact that Household, throughout the period, [was] denying that there [was] any problem, so that even with respect to the third-party disclosures . . . those disclosures [were] being discounted through much of the period until the very end because of management denials."  Ex. B at 2684:17-2685:15.  Professor Fischel explained that Household was "really the party in the best position to tell investors about its own practices," that third-party criticism of alleged conduct "provides some information to investors, but it's not the same thing as [the company] itself telling investors about its own practices," and that because "[t]he history [of market disclosures] . . . was accusations followed by denials," "for the first part of the period, investors really didn't know what to believe, and [Household's] denials were given some weight." Ex. D at 2838:1-17; *id*. at 2853:8-19.

That premise drove Professor Fischel's *Household* inflation analysis.  He testified that his damages opinion rested on the fact that analysts throughout the relevant period were "speculating about how big and bad this problem was going to be and increasingly so as Household's denials became less and less credible."  Ex. D at 2840:5-17.  Critically, Professor Fischel testified that statistically significant price reactions related to the fraud came "only when the truth began to come

out[,] when market participants ***began to disbelieve the denials***." Ex. D at 2963:21-2965:1. Defending his analysis, Professor Fischel dismissed the opposing expert's no-impact opinion as implausibly meaning that, had Household disclosed the truth from the outset, "that would have had no effect on investors at any point in time," "even though we know when that information came out . . . when Household's denials became less and less credible, the stock price fell dramatically." Ex. E at 4289:12-4290:16.

The same is true in this case, where Facebook responded to the early reports of Cambridge Analytica's misuse of user data just as Household did. In December 2015, Facebook told *The Guardian* it was """carefully investigating this situation,""" Fischel Rpt., ¶39 n.73, and in March 2017, it told *The Intercept* that """[o]ur investigation to date has not uncovered anything that suggests wrongdoing.""" *Id.*, ¶¶19, 48 n.92.

Despite the two cases' obvious factual equivalence – and the same economic principles at issue – Professor Fischel reaches a conclusion here opposite to the one he reached in *Household*. Indeed, even though Defendants denied the third-party allegations as to Cambridge Analytica's misuse of Facebook user data, Professor Fischel treats the December 2015 and March 2017 articles as fully disclosing the truth, rendering later corrective disclosures "stale" and non-corrective. *Id.*, ¶¶39, 44, 48, 52.[4] He asserts that the allegations Facebook was "investigating," and then denied, "necessarily" caused the truth to be incorporated into Facebook's stock price, *id.*, ¶39, and on that premise finds no evidence of price impact from the March 2018 and July 26, 2018 corrective disclosures. *Id.*, ¶¶52, 57 n.113. That analysis directly contradicts his *Household* testimony.

In short, Professor Fischel fails to analyze how Facebook's denials of Cambridge Analytica's misuse of user data affected the incorporation of the truth into its stock price. He inexplicably assumes the market fully credited the allegations that Facebook itself denied. Before declaring the

[4] Indeed, although he cites and quotes the *Intercept* article repeatedly, Professor Fischel conspicuously omits any mention of the fact that the article quotes a Facebook spokesperson as saying: "'Our investigation to date has not uncovered anything that suggests wrongdoing.'" *See* ECF No. 301-4 at 6.

truth fully disclosed, he never asks the question he treated as critical in *Household*: whether "investors really didn't know what to believe." Ex. D at 2838:1-17. That unexplained omission – a marked departure from his prior methodology – undermines his price-impact conclusions and renders them unreliable.

***Second***, here Professor Fischel opines that prior reporting of alleged corporate conduct renders that company's later acknowledgment of the conduct's actual occurrence "stale" news. He said the opposite in *Household*. There, Professor Fischel criticized the opposing expert for arguing that a July 2002 news report only provided the market "stale information" because complaints about Household's Washington lending practices had "emerged almost four months earlier." Ex. F, ¶25. Professor Fischel stated that the expert was wrong because he ignored "the first sentence of the article": "***For the first time***, Household International has acknowledged that its employees may have misrepresented mortgage loan terms." *Id.* He asserted that the company's acknowledgment was "particularly significant" to the market because, until that point, """company spokesmen ha[d] portrayed Household as an industry leader in consumer protection,""" whereas in reality, """an internal company probe of the complaints had uncovered some serious problems.""" *Id.* At trial, Professor Fischel reiterated the article's significance: "Household acknowledge[d] that some of its employees have misrepresented loan terms to customers . . . where they hadn't done that before. . . . And then there is a statement by the Household spokesperson that the internal company probe of customer complaints had uncovered some serious problems." Ex. B at 2642:20-2643:5.

Here, without any explanation for the contradiction, Professor Fischel treats the March 16, 2018 disclosure as neither new nor corrective, even though Facebook publicly acknowledged Cambridge Analytica's misuse of Facebook user data for the first time in that disclosure. *See Facebook*, 87 F.4th at 954 (finding plaintiffs adequately pleaded that "the March 2018 revelation about Cambridge Analytica was the first time Facebook investors were alerted that Facebook users did not have complete control over their own data," and noting that "Facebook's public response to the *Guardian* article in 2015 was that it was 'carefully investigating' Cambridge Analytica"). This unexplained contradiction renders Professor Fischel's opinion unreliable.

***Third***, Professor Fischel contradicts his *Household* methodology by treating the absence of statistically significant residual returns on disclosure dates as proof of no price impact, which he rejected in *Household*. *See* Ex. F, ¶6 n.3. In *Household*, Professor Fischel opined that while "not all of the 41" events he identified "were associated with statistically significant market-adjusted price changes," "the fact that the market did not react significantly on every day that incomplete information related to Plaintiffs' allegations was disclosed [was] ***consistent*** with" artificial inflation leaking out of the company's stock price, particularly when accompanied by company denials. *Id.* He further concluded that the lack of a significant reaction did not mean that the disclosures lacked evidence of price impact. *Id.*; Ex. G at 2963:21-2965:1. Here, Professor Fischel adopts a contrary bright-line rule, asserting that the absence of a statistically significant reaction to *The New York Times*' June 3, 2018 reporting on whitelisting is proof the market did not care about whitelisting. But Facebook publicly denied *The New York Times*' allegations that same day,[5] muting the market reaction. As Professor Fischel previously acknowledged, the absence of a statistically significant reaction is not *per se* proof that there was no price impact.

Professor Fischel's reversals do not stop there. He attacks Dr. Gelbach's use of a two-day event window for the March 19-20, 2018 declines, Fischel Rpt., ¶¶52-54, yet he used a two-day residual window himself in *Household*. Ex. A, ¶35 n.21. Professor Fischel faults Dr. Gelbach for measuring inflation from the corrective disclosures, yet in *Household* he back-cast inflation from later disclosures to the first day of the class period. Ex. A, ¶¶36-37; Ex. B at 2670:2-2671:13. And although he now purports to explain away the statistically significant increase following the April 5, 2018 user-control statement, Fischel Rpt., ¶73, he testified in *Household* that event studies "measure stock price movements upon disclosure of new information, not the non-disclosure of information," and that "no regression analysis can be used to identify the day on which the stock price became inflated." Ex. F, ¶38 & n.30. Each position he criticizes Dr. Gelbach for is one he previously held.

---

[5] Ime Archibong, *Why We Disagree with The New York Times*, Facebook Newsroom (June 3, 2018), https://about.fb.com/news/2018/06/why-we-disagree-with-the-nyt/ (last accessed Nov. 8, 2026).

These contradictions illustrate an unreliable application of economic principles, not merely different outcomes in different cases. An economist who treats company denials as tempering market reactions in one case but ignores their effect in this one; who treats a company's first acknowledgment of misconduct as new, price-moving information there, but as stale news here; and who treats the lack of statistically significant price movement as evidence of inflation leakage there, but as definitive proof of no price impact here, is not applying a consistent methodology. Professor Fischel does not explain those departures on materially similar facts and identifies no economic principle that changed between *Household* and this case. The resulting opinions should be excluded. *Incretin*, 524 F. Supp. 3d at 1036-37; *Avendt*, 262 F. Supp. 3d at 524; *see also In re Roundup Prods. Liab. Litig.*, 2025 WL 1575132, at *1 (N.D. Cal. Mar. 28, 2025) (excluding "results-driven testimony" that contradicted expert's testimony in another case).

### 2. Professor Fischel's Attribution Opinions Are Tautological: He Assumes the Ultimate Conclusion from Counsel and Then Reports It as an Economic Finding

Although experts may rely on assumptions supplied by counsel about background facts, they may not assume the very conclusion their analysis is offered to establish. In assessing reliability, a "'key inquiry' is 'whether an expert had sufficient factual grounds on which to draw conclusions.'" *Engilis*, 151 F.4th at 1051. An assumption that answers the disputed question is not a ***factual*** ground; it is the conclusion itself. *See id.* (affirming exclusion of an opinion resting on a factual proposition the expert assumed was correct without independent investigation or analysis); *Stephens*, 935 F.3d at 856-57 ("a party cannot make [its speculation] sufficient simply by finding an expert who is willing to assume its correctness"). That is exactly what Professor Fischel does. The question his back-end analysis purports to answer is whether the alleged corrective disclosures revealed fraud-related information that moved Facebook's stock price. At each critical step, Professor Fischel answers that question by adopting counsel's "understanding" that the disclosures were not corrective, and then presents the predictable output – no fraud-related price impact – as the product of economic analysis. That reasoning is tautological, and is neither reliable nor helpful.

Professor Fischel applies this tautological reasoning with the 2015 and 2017 articles Defendants falsely claim revealed the truth. Professor Fischel opines that "the December 11, 2015 article published by *The Guardian* and March 30, 2017 article published by *The Intercept* disclosed the information that, ***to my understanding from counsel***, Plaintiffs claim forms the basis for the Initial Misuse theory of liability." Fischel Rpt., ¶39. Whether those articles disclosed what Plaintiffs allege was concealed is the disputed question, yet Professor Fischel takes the answer from defense counsel as an assumed fact. From that premise, he concludes that "[t]he importance of these disclosures cannot be overstated because they undermine Plaintiffs' entire Initial Misuse theory of liability" – itself an inadmissible legal conclusion[6] – and, since there were no statistically significant price reactions on those days, "there is no reliable economic evidence that the disclosure of the Initial Misuse impacted Facebook's stock price." Fischel Rpt., ¶¶39-40. He then uses the same assumed premise to reject Dr. Gelbach's damages analysis, reasoning that the Initial Misuse could not have caused the 2018 price declines because the truth was already on the market in 2015 and 2017. *Id.*, ¶¶80-83. This logic runs in a circle: assume the entire relevant truth came out in 2015 and conclude, because the truth was out earlier, that the 2018 stock price declines could not be caused by that truth. Professor Fischel uses no specialized skill at any step and never independently analyzes whether the articles fully disclosed the concealed facts, whether Facebook's contemporaneous denials prevented the market from crediting them, or whether incomplete disclosure explains the absence of statistical significance. His assumption also conflicts with the very order he relies on: this Court found those articles did ***not*** disclose all facts underlying Plaintiffs' claims and acknowledged the Ninth Circuit's holding that the March 2018 revelations were corrective of the user control and risk factor misstatements.[7] Fischel Rpt., ¶18 nn.33 (citing 2026 Order at 19) & 37

---

[6] *See United States of Am. v. J-M Mfg. Co., Inc.*, 2018 WL 11349904, at *11 (C.D. Cal. June 21, 2018) (finding Professor Fischel's opinion did not rely on economic analysis, but instead offered inadmissible legal opinion on sufficiency of the basis for damages).

[7] Professor Fischel, a lawyer, also cites the Ninth Circuit's order in describing his understanding of Plaintiffs' claims, yet ignores these holdings. Fischel Rpt., ¶18 n.32.

(citing 2026 Order at 24). Professor Fischel offers no economic rationale for disagreeing with either court. *Id.*, ¶¶39-40. An expert "who is willing to assume [the] correctness" of the desired conclusion or a party's position adds nothing. *Stephens*, 935 F.3d at 856-57; *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5000352, at *9 (N.D. Cal. Nov. 2, 2017) (expert's opinion that "parroted, with no additional analysis, Waymo's unsupported litigation position" was unreliable).

The evidence, including Defendants' ***own*** interrogatory responses, refutes the premise Professor Fischel adopts. In their Amended Responses and Objections to Lead Plaintiffs' First Set of Interrogatories to All Defendants, Defendants admit that the Individual Defendants "do not recall becoming aware of Dr. Kogan's violation of Facebook's policies before March 2018." Ex. H, Response Nos. 5A, 10. If Zuckerberg and Sandberg (Facebook's CEO and COO) claim they did not know the truth before March 2018, it defies logic and common sense for them to simultaneously claim that investors had that knowledge prior to March 2018. And the SEC charged that Facebook's March 2017 statement to *The Intercept* – one of the very articles Professor Fischel says disclosed the truth – was false and "reinforc[ed] the misleading statements in [Facebook's] periodic filings." ECF No. 228, ¶¶21, 557, 637. Nevertheless, Professor Fischel blindly adopts Defendants' counsel's legal conclusion that the truth was revealed in December 2015.

Professor Fischel's tautology also exposes the disconnect between class certification and Defendants' merits arguments. Professor Fischel's "the truth was already on the market" premise is a truth-on-the-market defense, which the Supreme Court has held goes to materiality – a class-wide issue – and is not a basis for denying class certification. *Amgen*, 568 U.S. at 481-82. Defendants cannot repackage that merits defense as a price-impact finding by having their expert assume it.

Professor Fischel likewise rejects the March 20, 2018 *Guardian* article, which reported statements from Sandy Parakilas – a former platform operations manager at Facebook responsible for policing data – that the ""'majority of Facebook users" could have had their data harvested by app developers without their knowledge,'" and that "'[h]undreds of millions of Facebook users are likely to have had their private information harvested by companies that exploited the same terms as the firm that collected data and passed it on to Cambridge Analytica.'" Fischel Rpt., ¶¶14, 51. Professor Fischel reasons that Parakilas left Facebook in 2012 and because he "further understand[s]

that Mr. Parakilas' assertion is distinct from the definitions of Initial Misuse and Whitelisting claims as sustained by the Court," concludes that "this article does not reveal new information about the Initial Misuse." *Id.*, ¶51; *see also id.*, ¶52. He provides no source for that "understanding" (presumably defense counsel), no supporting analysis, and no criteria for determining whether information relates to "Initial Misuse." That unexplained premise satisfies neither Rule 26 nor FRE 702. *See Engilis*, 151 F.4th at 1051; Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii) (experts must disclose the "basis and reasons" for their opinions and all "facts or data considered by the witness in forming them"); *Arrow Elecs., Inc. v. Quantum Corp.*, 2024 WL 5440992, at *3 (N.D. Cal. Dec. 27, 2024) (Cousins, M.J.) (excluding expert opinion where expert provided no information as to the principles and methods used in his assessment, and noting "expertise by itself is not enough" for reliability). And Professor Fischel's unexplained premise is circular: counsel (presumably) told him that the information disclosed on March 20 was unrelated to the fraud, so he concludes the significant decline that day reflects no fraud-related price impact. The conclusion is simply the assumption restated.[8] *See Fed. Trade Comm'n v. Tate's Auto Ctr. of Winslow Inc.*, 2021 WL 410857, at *8 (D. Ariz. Feb. 5, 2021) (refusing to admit "an implicit and circular legal conclusion").

The same tautology drives Professor Fischel's treatment of the July 26, 2018 decline, the largest in the Class Period. He concludes it cannot show price impact because, "to my ***understanding from counsel*** of the allegations sustained by the Court," the July disclosure "did not correct the alleged misstatements." Fischel Rpt., ¶57 n.113. Again, the assumption is the conclusion. Professor Fischel does not analyze what information the July 26 disclosure conveyed or whether that information was causally connected to the misstatements; he simply accepts and parrots counsel's say-so that it was not. He likewise attributes the March 19-20, 2018 declines to Russian

[8] In several places in his report, Professor Fischel also uses language suggesting that other, undisclosed individuals besides himself conducted the analyses in his report. *See* Fischel Rpt.,¶72 ("***We*** found that none of the analyst reports following the press conference discuss the User Control Statements at all."), ¶73 ("Specifically, ***we*** found that analyst reports discuss Mr. Zuckerberg's #deleteFacebook statement . . . .").

interference, the FTC inquiry, and #DeleteFacebook, *id.*, ¶¶43-45, 47, 52, without quantifying any portion of the decline attributable to that news – an attribution Defendants themselves declined to adopt under oath. Ex. H, Response No. 2 (Defendants "do not currently have contentions about the nature of those 'other events or disclosures'"). Whether a disclosure corrects a sustained theory is a legal question, and the Ninth Circuit has already held that the July 2018 decline was causally connected to the Cambridge Analytica and whitelisting revelations. *Facebook*, 87 F.4th at 956-57. An expert who takes the disputed legal conclusion from counsel and re-labels it an economic finding does not employ a reliable method. *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058-59 (9th Cir. 2008).

### B. Mr. Dirks' Speculative, Unsupported *Ipse Dixit* Opinions Are Inadmissible

Mr. Dirks, a former buy-side analyst and investment consultant, opines on whether the alleged misstatements and corrective disclosures were "value-relevant" to investors and sell-side analysts. He concludes that the risk factor misstatements are "boilerplate" statements that investors "would not consider to be value-relevant" (Dirks Rpt., ¶¶33(ii), 59-69); that the user control misstatements were "general comments" that investors "would not consider . . . value-relevant" (*id.*, ¶¶33(iii), 70-77); that the "Initial Misuse had been publicly disclosed in December 2015, and the lack of analyst commentary . . . demonstrates that it was not value-relevant to investors" (*id.*, ¶¶33(iv), 80-83); and that the lack of analyst commentary and rating or price-target changes following the March 2018 and June 2018 disclosures shows that the alleged misstatements were not value-relevant (*id.*, ¶¶33(v)-(vi), 84-121). He then criticizes Dr. Gelbach on the basis that the Cambridge Analytica data misuse was fully disclosed by December 2015, that whitelisting was fully disclosed by June 3, 2018, and that neither was value-relevant. *Id.*, ¶¶33(vii), 122-165. These opinions go to materiality, which is a class-wide issue that controlling Supreme Court precedent precludes from being decided under Rule 23(b)(3). These opinions also lack a consistent, replicable methodology and they are speculative *ipse dixit* about the states of mind and hypothetical actions of third parties. They should be excluded.

### 1. Mr. Dirks' Materiality Opinions Are Inadmissible Under *Amgen*

Mr. Dirks' report answers the wrong question. The only reliance-related issue Defendants may contest at this stage is price impact; materiality is not part of the Rule 23(b)(3) predominance inquiry. *Amgen*, 568 U.S. at 459-60, 466-68. Mr. Dirks does not hide the ball – defense counsel retained him to "[d]iscuss what information a reasonable investor would consider 'value-relevant' in valuing a stock and making an investment decision." Dirks Rpt., ¶29(ii). That is on its face an inadmissible materiality opinion. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005) (explaining test for materiality is whether "there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed"). And Mr. Dirks' bottom-line opinions are hypothetical materiality counterfactuals: "if the Defendants had discussed the Initial Misuse [or whitelisting] earlier in the Proposed Class Period . . . such a disclosure would not have been value-relevant." Dirks Rpt., ¶¶33(v)-(vi), 109, 121. Because those opinions address materiality without any connection to actual price impacts, they are neither helpful under FRE 702 nor relevant under FRE 401-402.

Materiality and price impact are distinct inquiries. Materiality asks whether there is "a substantial likelihood that a reasonable shareholder would consider [the omitted fact] important," such that its disclosure "'would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). That inquiry asks, hypothetically, what significance a reasonable investor ***would*** attach to information. Plaintiffs need not prove materiality at class certification because the issue is common to the class: failure of proof on materiality ends the case for all class members. *Amgen*, 568 U.S. at 459-60, 466-68. Price impact asks something different: whether the alleged misrepresentation ***actually*** affected the market price of the stock. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279-82 (2014). That empirical question concerns actual price behavior, typically assessed through event studies. *Id.* at 280-81. In *Goldman* the Supreme Court reaffirmed that a court may not use class certification to decide materiality, even as it may consider price-impact evidence that ***also*** bears on materiality. 594 U.S. at 122-23. Evidence addressing only what ***would*** matter to a

reasonable investor, rather than actual price impact, remains outside the Rule 23 inquiry and does not "help the trier of fact . . . determine a fact in issue." FRE 702(a).

Mr. Dirks' opinions concern only materiality, not price impact. He repeatedly opines on what "reasonable investor[s]" ***would*** or ***would not*** do, how they ***would have*** interpreted the alleged misstatements and disclosures, and how they typically ***would have*** viewed particular information. *See, e.g.*, Dirks Rpt., ¶¶33, 58, 60, 62, 79-80, 86, 112, 127. His organizing concept – "value-relevance" – simply restates the materiality standard. He defines value-relevant news as "any new information that changes the mix of available information and substantially alters investors' assessment of the stock's value." *Id.*, ¶54; *see id.*, ¶33(i). That is *Basic*'s "total mix" test. 485 U.S. at 231-32. And Mr. Dirks never connects his account of hypothetical investor behavior to actual price movements. He does not tie his views on genericness or analyst silence to any measured price effect; for price impact, he defers to Professor Fischel, whose report he relays only through his "understand[ing] from counsel." Dirks Rpt., ¶¶58, 78, 111.

Because these opinions do not fit the price-impact issue before the Court, they should be excluded. *Daubert*, 509 U.S. at 591 (testimony must "'fit'" the question to be decided).

#### 2. Mr. Dirks' Opinions as to How All Investors Interpreted the Alleged Misstatements and Corrective Disclosures Are Inadmissible Speculation

When he does speculate on how Facebook's actual investors behaved, Mr. Dirks makes dozens of unsupported assertions about how they viewed or would have viewed particular statements, extrapolating his own interpretations to ***all*** investors. *See* Dirks Rpt., ¶¶33(ii-vi), 58, 60, 62, 70, 79-80, 86, 112, 127. Courts routinely reject such testimony as speculative and unhelpful. *AIG Ret. Servs., Inc. v. Altus Fin. S.A.*, 2011 WL 13213589, at *2-*3 (C.D. Cal. Sep. 26, 2011); *SEC v. Daifotis*, 2012 WL 2051193, at *5 (N.D. Cal. June 7, 2012) (excluding opinion "about what investors 'actually understood' or 'should have understood,'" especially where expert "did not speak to a single investor").

Like the expert in *Daifotis*, Mr. Dirks does not claim to have spoken to Facebook investors. He assumes that his present interpretation of Facebook's statements and third-party disclosures

matches the entire market's understanding nearly a decade earlier. He offers no basis for assuming investors shared his interpretation, and no explanation of how his experience as an investor would allow him to reach such a conclusion. That is speculative *ipse dixit*. *See Joiner*, 522 U.S. at 146; *Brown v. Google, LLC*, 2022 WL 17961497, at *11 (N.D. Cal. Dec. 12, 2022) (excluding expert's opinions "based on nothing more than his personal interpretation of the at-issue disclosures" because "a relevant personal view . . . [did not] qualify him to opine on how a reasonable consumer would understand them"); FRE 702 advisory committee's note to 2000 amendment (experience-based expert "must explain how that experience leads to the conclusion reached"; gatekeeping "requires more than simply 'taking the expert's word for it'").

Nor can Mr. Dirks bootstrap his views onto the market by pointing to a single investor. He cites the declaration of one MissPERS investment manager, Wedgewood's William Thomas, as "consistent with" his opinions. Dirks Rpt., ¶¶110, 120. One fund manager's subjective view – a manager who bought Facebook stock after the March 2018 price collapse because he thought the market had overreacted (itself an acknowledgment that the overall market reacted negatively to the news), *id.*, ¶110 & n.128 – says nothing about whether the market price was inflated or whether the corrective disclosures removed that inflation. Indeed, Mr. Thomas also stated in his initial declaration that "the news reported in March 2018 about Cambridge Analytica and in June 2018 about 'whitelisting' posed some risk to Facebook's business." ECF No. 301-15, ¶7. Further, in his supplemental declaration, Mr. Thomas clarifies his prior statements by explaining that (i) his prior comments were made "hypothetically," (ii) if the relevant news had been reported earlier, he "cannot speculate on what Wedgewood's investment decision would have been," and (iii) his prior comments about materiality "did not intend to state a legal conclusion" and he was not offering an "opinion on whether any information was 'material' in a legal sense or to any other investor." Ex. I, ¶¶6, 7. In short, Mr. Thomas's actual statements contradict and undermine Mr. Dirks' conclusions.

Mr. Dirks' opinions as to how investors would have reacted to particular news are similarly *ipse dixit*. Mr. Dirks opines, for example, that:

> if a professional investor considered Facebook's user control policies (including its "privacy and application settings") relevant to assess the value of the Company's stock, then that investor would review (among other things) the Company's stated

> publicly-available policies in full, rather than rely on a snippet from an interview of the Company's executives or a single sentence possibly taken out of context. That review would include Facebook's other disclosures warning of the ways in which information shared on its platform can in turn be shared by other third parties, including their friends and Platform Apps.

Dirks Rpt., ¶73; *see also id.*, ¶¶79, 112. According to Mr. Dirks, his hypothetical series of events means that investors would not have been misled by the alleged misrepresentations. *Id.* This again unreliably extrapolates Mr. Dirks' own subjective views to all investors, going so far as to speculate on the ***actions*** they would take as well as their states of mind. That rank speculation violates FRE 702's foundation requirement. *Shahinian v. Kimberly-Clark Corp.*, 2017 WL 11595343, at *12 (C.D. Cal. Mar. 7, 2017) (excluding proposed expert opinion because "[w]hat end-purchasers would have actually done under a hypothetical scenario is speculation"); *AIG*, 2011 WL 13213589, at *4 (excluding proffered opinion as to "the actions a 'prudent insurance commissioner' or a 'reasonable FRB' would have taken under a hypothetical state of facts" because such opinions are "inherently discretionary, mult[i]-layered, and speculative").

Mr. Dirks' conclusion that investors would not have been misled by the alleged misstatements also does not 'fit' this case because it ignores the role and impact of the securities laws in the market. Once a company or its executive speaks on an issue, they have a duty to disclose the full truth necessary to make their statements not misleading. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Mr. Dirks' assertion that investors would not rely on the specific words or "snippets" of the statements alleged to be false ignores what Plaintiffs allege made the misstatements materially misleading and incomplete: the facts that the Defendants should have, but ***did not***, disclose. *See* Dirks Rpt., ¶¶72-73.

#### 3. Mr. Dirks' Opinions as to Whether Public Statements Fully Disclosed "Initial Misuse" or Related to "Initial Misuse" Versus "Continued Misuse" Are Inadmissible *Ipse Dixit* and Legal Conclusion

Mr. Dirks' opinions depend on (i) his assertion that the Initial Misuse was publicly known before the Class Period from the December 11, 2015 *Guardian* article (Dirks Rpt., ¶¶80-82, 86, 98, 127); (ii) his assertions that particular reporting did or did not discuss "Initial Misuse" (*id.*, ¶¶83, 101, 107-108, 155-156); and (iii) his classification of information as related to "Initial Misuse" ***or***

"Continued Misuse" (*id.*, ¶¶50-51, 87-93, 101, 131-136, 144, 156, 158, 161, 165). Because these premises are unsupported and improper, the conclusions that flow from them are unreliable.

***First***, Mr. Dirks uses no specialized knowledge in concluding that the Initial Misuse was fully known to the market by December 2015. Nor does he explain why he disagrees with this Court's and the Ninth Circuit's opposite conclusions. *See supra* §III.A.2. Instead, Mr. Dirks' opinion rests on *ipse dixit* about what "a reasonable investor familiar with Facebook would have been able to conclude" from the *Guardian* article. Dirks Rpt., ¶80; *see supra* §III.B.2; *Brown*, 2022 WL 17961497, at *11; *Daifotis*, 2012 WL 2051193, at *5. Worse, his own evidence refutes the conclusion that the Initial Misuse was fully understood by the market. Mr. Dirks insists that news in widely-read outlets "is routinely followed by investors and analysts and quickly impounded in the stock price," Dirks Rpt., ¶81 – yet he found that ***not one*** of the 14 analyst reports issued in the week after the December 2015 *Guardian* article, and ***not one*** of the 23 issued after the March 2017 *Intercept* article, so much as mentioned Cambridge Analytica, Kogan, or the misuse. *Id.*, ¶83. The far more plausible inference is that the market did not credit, or did not absorb, the reported allegations that Facebook said it was "carefully investigating" and later said revealed no "wrongdoing" – an explanation that, importantly, Mr. Dirks does not even consider. And when analysts did react to reporting of the misuse in March 2018, they described it as containing "important new revelations," emphasizing that "Facebook was aware of the privacy breach two years ago" and that "[t]his lack of disclosure" raised "further questions." *Id.*, ¶¶90, 107 n.125. "[A]n 'expert must provide reasons for rejecting alternative "hypotheses using scientific methods and procedures"' and must rely on 'more than "subjective beliefs or unsupported speculation."'" *Engilis*, 151 F.4th at 1053. Mr. Dirks failed to do that.

***Second***, Mr. Dirks classifies news and analyst reports as concerning "Initial Misuse" or "Continued Misuse" without defining criteria for either category or explaining why information cannot concern both. Without objective criteria, his attribution of analyst commentary and valuation changes to one, both, or neither theory lacks a testable methodology or reliable foundation. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("*Daubert II*") ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability.

Under *Daubert*, that's not enough."). For example, Mr. Dirks suggests that he "confirmed" that analysts "noted that the news about the Continued Misuse was different from the news about the Initial Misuse." Dirks Rpt., ¶87. He then quotes several analyst reports regarding the March 2018 disclosures, bolding isolated sentences without explaining how they establish that distinction. *Id.*, ¶¶88-93. They do not. Analysts reacting to the March 2018 disclosures focused on what was new in them: Facebook's first acknowledgment that Cambridge Analytica had misused user data and that Facebook had known about that misuse since 2015 – the very facts that the Ninth Circuit held rendered the risk and user-control statements misleading. *Facebook*, 87 F.4th at 949-50, 954-55. Mr. Dirks never explains why commentary about data leakage, Facebook's prior silence on the matter, or regulatory and user-engagement fallout from that misuse concerns only "Continued Misuse." Likewise, Mr. Dirks claims that Dr. Gelbach wrongly ties the July 26, 2018 stock price decline to the Initial Misuse because analyst reports supposedly do not mention it and Facebook executives did not say "Cambridge Analytica" on the Q2 2018 conference call. Dirks Rpt., ¶¶158-161. Yet the analyst reports Mr. Dirks relies on expressly identify margin pressures that include "investments in," and "the effects of the continued efforts around," both "security and privacy" – margin pressures that arise from the Initial Misuse. Mr. Dirks offers no explanation as to why those would not relate to Initial Misuse. *Id.*, ¶¶158 & nn.203-205, 160.

Because Mr. Dirks does not explain his methodology for determining whether information relates to Initial Misuse or Continued Misuse or both, his unfounded classifications undermine the reliability of each resulting inference and require the resulting opinions' exclusion. *Hardeman v. Monsanto Co.*, 997 F.3d 941, 983 n.12 (9th Cir. 2021) ("The *Daubert* 'requirement that the expert testify to scientific knowledge – conclusions supported by good grounds for each step in the analysis – means that any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible.'") (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)).

***Third***, insofar as Mr. Dirks opines that the March and July 2018 disclosures and their financial consequences concern only "Continued Misuse" and cannot also concern "Initial Misuse," he offers an improper legal opinion. *See* Dirks Rpt., ¶¶101, 165; *id.*, Ex. 3B, ¶3 ("Instead, these

analyst reports cited other concerns arising from the Continued Misuse News, *e.g.*, the possibility that news of the Continued Misuse would heighten 'headline risk' . . . regulatory concerns or lower user engagement"). The same is true of his opinion that the July 2018 decline reflects only the "materialization of previously disclosed risks" rather than a correction. *Id.*, ¶147. Both opinions conflict with the Ninth Circuit's holding that those same consequences were adequately tied to the alleged fraud. *Facebook*, 87 F.4th at 956-57. "Resolving doubtful questions of law is the distinct and exclusive province of the trial judge[,]" not experts. *Nationwide*, 523 F.3d at 1058 (excluding expert opinion applying legal theory to facts of case). These opinions should be excluded.

**4. Mr. Dirks' Opinions as to Analysts' Beliefs and Interpretation of Information Are Speculative and Rest on an Unsupported and Inconsistently Applied Methodology**

Throughout his report, Mr. Dirks opines that analysts did not find information related to Plaintiffs' claims to be value-relevant. *E.g.*, Dirks Rpt., ¶33(ii) ("[A]nalysts did not find the Alleged Risk Factor Misstatements to be value-relevant."); *id.*, ¶33(iii) ("[A]nalysts did not find the Alleged User Control Misstatements to be value-relevant."); *id.*, ¶33(iv) ("The Initial Misuse had been publicly disclosed in December 2015, and the lack of analyst commentary regarding this news at the time demonstrates that it was not value-relevant to investors."); *id.*, ¶33(v) ("[N]o analyst, except possibly one, considered Facebook's recounting of the Initial Misuse as value-relevant."); *id.*, ¶33(vii)(d) ("My review of analyst commentary following the publication of this article confirms that most analysts did not comment on this article, which confirms that these analysts did not find this news value-relevant . . . none of them lowered their Value Assessment(s) for Facebook stock, i.e., even these four did not find the June 3, 2018 New York Times Article to be value-relevant."); *see also id.*, ¶¶61, 72, 86, 94, 109, 113, 119-120.

Mr. Dirks' applied test for value-relevance is whether analysts, within one week of a statement's release, mention that statement in an analyst report ***and*** change their valuation of the stock based on that statement. Dirks Rpt., ¶¶54-55, 113-120, 133. Although he acknowledges that analysts may discuss news while leaving their valuations unchanged, *id.*, ¶55, he repeatedly treats

the absence of a rating or target-price reduction as confirming that the news lacked value-relevance. *Id.*, ¶¶113-120, 133. That inference and its inconsistent application are unreliable.

***First***, in opining that analysts did not believe information was value-relevant, Mr. Dirks is offering speculative, inadmissible opinion about analysts' states of mind. *See Brown*, 2022 WL 17961497, at *11; *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1321 (S.D. Cal. 2020) (excluding expert's opinion as to how statements "'would be interpreted by industry participants'" as "impermissible testimony regarding the states of mind of third parties that has 'no basis in any relevant body of knowledge or expertise'").

***Second***, Mr. Dirks, who has never been a sell-side analyst, offers no valid basis for requiring analyst commentary and a rating or target-price change within one week to establish value-relevance. Dirks Rpt., ¶¶54-55, 113-120, 133; *Id.*, App. A. The only literature he cites addresses how ***quickly*** analysts revise recommendations after news, *id.*, ¶87 n.99 – not whether the absence of a revision means the news did not matter. An "expert's bald assurance of validity is not enough . . . some objective, independent validation of the expert's methodology" is required. *Daubert II,* 43 F.3d at 1316. His test also defies common sense. That news does not move an analyst from a "Buy" to a "Sell" rating does not mean the analyst deemed it ***irrelevant***. By Mr. Dirks' own logic, analysts' discussion of the information shows they found it value-relevant. *See* Dirks Rpt., ¶54 (investors read analyst reports for value-relevant news); *id.*, ¶55 (lack of discussion indicates lack of value-relevance). And the market proves the test wrong. Mr. Dirks reports that 41 of 49 analyst reports maintained or raised their valuations after the March 2018 disclosures. *Id.*, ¶94. Yet over that same week Facebook's stock fell roughly 12%, "reflecting roughly $60 billion in market capitalization lost." *Id.*, ¶97 n.110 (quoting Wedbush). A test that reads a $60 billion valuation decline as evidence that the news did not matter is not a reliable measure of anything. The test also excludes relevant evidence: Mr. Dirks entirely discounts market intelligence platform Red Pulse's discussion of the June 2018 whitelisting disclosure merely because Red Pulse did not generally issue ratings or price targets. *Id.*, ¶¶114, 119.

***Third***, even if his analysis were sound (it is not), Mr. Dirks applies it inconsistently. He opines that analysts did not find the March 2018 disclosures value-relevant "with one possible

exception." *Id.*, ¶¶86, 109. But that exception, William O'Neil + Company, removed Facebook from its U.S. Focus List on March 20, 2018, in a report noting that "Facebook was aware of the privacy breach two years ago" and that "[t]his lack of disclosure" raised "further questions about Facebook's approach to data protection and disclosure." *Id.*, ¶¶106-107 & n.125. Mr. Dirks waves away that clear evidence of value-relevance by claiming that the report was "highly unlikely" to reflect the Initial Misuse because William O'Neil + Company "employs a technical analysis" in its stock recommendations. *Id.*, ¶108. Yet CrispIdea, an equity research firm, ***raised*** its rating and target price after the June 2018 whitelisting disclosure "'purely based on technical analysis,'" and Mr. Dirks counts it as evidence that the news was not value-relevant. *Id.*, ¶¶118-119. Discounting technical analysis when it helps Plaintiffs and crediting it when it helps Defendants is results-driven expert testimony that fails FRE 702. *See, e.g.*, *Roundup*, 2025 WL 1575132, at *1 (excluding "results-driven testimony").

**5. Mr. Dirks' Improper Bolstering of Professor Fischel's Conclusions Should Be Excluded**

Expert testimony offered merely "to bolster the credibility" of another expert is "impermissible." *Slovak v. Golf Course Villas Homeowners Ass'n*, 2019 WL 12372104, at *12 (D. Nev. Jan. 15, 2019); *see also Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934, 993-94 (N.D. Cal. 2018) (finding that "[c]ourts have stricken the testimony of expert witnesses intended to bolster the testimony of another expert" and striking paragraphs from an expert report on those grounds). Mr. Dirks does exactly that in three sections of his report, where he declares Professor Fischel's conclusions "consistent with" his own based solely on his "understand[ing] from counsel" of what Professor Fischel concluded. Dirks Rpt., ¶¶58, 78, 111. Mr. Dirks does not claim to have read Professor Fischel's report, and Professor Fischel's analysis played no role in his. These passages do nothing but relay defense counsel's summary of Professor Fischel's conclusions with Mr. Dirks' additional expert imprimatur. That type of bolstering testimony is impermissible under FRE 702, and these sections of Mr. Dirks' report should be excluded.

## IV. CONCLUSION

Professor Fischel's challenged opinions contradict his own prior sworn methodology and assume the very conclusion they purport to prove. Mr. Dirks' opinions address irrelevant materiality rather than price impact, rest on speculation about the states of mind of investors and analysts, and apply an untested test that his own data refute. None of the challenged opinions satisfies FRE 702. Plaintiffs respectfully request that the Court grant the Motion.

DATED: November 10, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
LUKE O. BROOKS (212802)
DARRYL J. ALVARADO (253213)
HILLARY B. STAKEM (286152)
J. MARCO JANOSKI GRAY (306547)
JESSICA E. ROBERTSON (352207)

*s/ Luke O. Brooks*
LUKE O. BROOKS

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
lukeb@rgrdlaw.com
dalvarado@rgrdlaw.com
hstakem@rgrdlaw.com
mjanoski@rgrdlaw.com
jrobertson@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
JASON C. DAVIS
KENNETH J. BLACK
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

Counsel for Amalgamated and Co-Lead Counsel for the Class

DATED: November 10, 2026

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
SALVATORE J. GRAZIANO
JEREMY P. ROBINSON
PREETHI KRISHNAMURTHY
TIMOTHY G. FLEMING
MATTHEW S. GOLDSTEIN
THOMAS Z. SPERBER

*s/ Preethi Krishnamurthy***
PREETHI KRISHNAMURTHY

1251 Avenue of the Americas
New York, NY 10020
Telephone: 212/554-1400
212/554-1444 (fax)
salvatore@blbglaw.com
jeremy@blbglaw.com
preethi@blbglaw.com
timothy.fleming@blbglaw.com
matthew.goldstein@blbglaw.com
thomas.sperber@blbglaw.com

Counsel for MissPERS and Co-Lead Counsel for the Class

** Pursuant to Civ. L.R. 5-1(i)(3), the electronic filer has obtained approval from this signatory.