**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Salvatore J. Graziano
Jeremy P. Robinson
Preethi Krishnamurthy
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212/554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
jeremy@blbglaw.com
preethi@blbglaw.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
Jason C. Davis (253370)
Kenneth J. Black (291871)
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534
jdavis@rgrdlaw.com
kennyb@rgrdlaw.com

Co-Lead Counsel for the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re FACEBOOK, INC. SECURITIES LITIGATION | Master File No. 5:18-cv-01725-EJD |
| | <u>CLASS ACTION</u> |
| This Document Relates To: ALL ACTIONS. | **LEAD PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

| | |
|---|---|
| DATE: | January 21, 2027 |
| TIME: | 9:00 A.M. |
| LOCATION: | Courtroom 4, 5th Floor |
| JUDGE: | Hon. Edward J. Davila |

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....................................................................................... 1

II. ARGUMENT ............................................................................................ 2

A. Plaintiffs Seek Certification on Sustained Claims Pleaded in the Complaint ............................................................................................ 2

B. Plaintiffs' Damages Model Fits Their Liability Theory and Satisfies *Comcast* ............................................................................................ 3

C. Plaintiffs Have Established Class-Wide Reliance ................................. 6

1. The Truth Was Not Known to Investors Before March 2018 ..................... 6

2. Defendants Have Failed to Disprove Price Impact ................................ 9

D. The Class Period Properly Runs Through July 25, 2018 ........................ 12

E. MissPERS and Amalgamated Are Typical and Adequate ........................ 13

F. The Section 20(a) and 20A Claims Should Be Certified ......................... 15

III. CONCLUSION ......................................................................................... 15

# TABLE OF AUTHORITIES

**CASES** **Page(s)**


*AMI – Gov't Emps. Provident Fund Mgmt. Co. v. Alphabet Inc.*,
833 F. Supp. 3d 1034 (N.D. Cal. 2026) ....................13

*In re Apple Inc. Sec. Litig.*,
2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ....................9, 10

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ....................7, 11

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ....................5

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
337 F.R.D. 193 (D. Minn. 2020)....................9

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....................3

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*,
660 F.3d 1170 (9th Cir. 2011) ....................6, 9, 14

*Crews v. Rivian Auto., Inc.*,
2024 WL 3447988 (C.D. Cal. July 17, 2024)....................10, 11

*In re Diamond Foods, Inc., Sec. Litig.*,
295 F.R.D. 240 (N.D. Cal. 2013)....................14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)....................4

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) .................... *passim*

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021).................... *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)....................6, 9, 14

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ....................14

*Hayes v. MagnaChip Semiconductor Corp.*,
2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ....................13

*Hodges v. Akeena Solar, Inc.*,
274 F.R.D. 259 (N.D. Cal. 2011) ....................15

*Homyk v. ChemoCentryx, Inc.*,
2024 WL 1141699 (N.D. Cal. Mar. 6, 2024) ....................15

*In re Honest Co. Sec. Litig.*,
2023 WL 3190506 (C.D. Cal. May 1, 2023) ....................14

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ....................14

*Jaeger v. Zillow Grp., Inc.*,
2025 WL 2741642 (9th Cir. Sept. 26, 2025) ....................12

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ....................5

*In re Lucid Grp., Inc. Sec. Litig.*,
2026 WL 2884854 (N.D. Cal. Sept. 25, 2026) ....................14

*Ludlow v. BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015) ....................5

*In re Mattel, Inc. Sec. Litig.*,
2021 WL 4704578 (C.D. Cal. Oct. 6, 2021) ....................9, 12

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) .................... *passim*

*In re Oracle Corp. Securities Litigation*,
627 F.3d 376 (9th Cir. 2010) ....................5

*Pampena v. Musk*,
838 F. Supp. 3d 891 (N.D. Cal. 2026) ....................10

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017) ....................14

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ....................7

*Ret. Sys. v. S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019) ....................13

*San Diego Cnty. Emps. Ret. Ass'n v. Johnson & Johnson*,
2025 WL 2176586 (3d Cir. July 30, 2025) ....................7, 11

*Sayce v. Forescout Techs., Inc.*,
754 F. Supp. 3d 878 (N.D. Cal. 2024) ....................12, 13

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
335 F.R.D. 276 (N.D. Cal. 2020)....15

*Snapp v. United Transp. Union*,
889 F.3d 1088 (9th Cir. 2018)....15

*Turocy v. El Pollo Loco Holdings, Inc.*,
2018 WL 3343493 (C.D. Cal. July 3, 2018)....15

*In re Twitter Inc. Sec. Litig.*,
326 F.R.D. 619 (N.D. Cal. 2018)....14

*Weston v. DocuSign, Inc.*,
348 F.R.D. 354 (N.D. Cal. 2024)....3, 12, 15

*Zeleny v. Newsom*,
2020 WL 3057467 (N.D. Cal. June 9, 2020)....15

## I. INTRODUCTION

After eight years of litigation, Defendants still insist there were no material misstatements and no harm to investors. The Ninth Circuit, the Supreme Court, and this Court have all disagreed. A New Mexico court also disagreed, finding after a recent jury trial that Defendants Zuckerberg and Sandberg made "unlawful and willful" misrepresentations about Facebook "users' control of data" and "third party data misuse," including Cambridge Analytica, and imposed a civil penalty of ***$25 billion***—one of the largest in history. Ex. 23.[1] Defendants' privacy misconduct harmed many people, including the proposed Class of investors that Plaintiffs seek to certify.

Defendants' lead argument in opposing class certification is that Plaintiffs purportedly seek to certify new, unpleaded claims. ECF No. 301 ("Opposition" or "Opp.") §IV.A. They do not. Plaintiffs seek certification on the misstatements and theories that this Court and the Ninth Circuit sustained: the user control and risk factor statements, based on initial misuse and whitelisting, which the operative Complaint repeatedly alleges were made "in order to ***promote growth and increase profits***." ¶62. Defendants cannot truthfully claim lack of notice or surprise.

The Opposition goes downhill from there. Defendants recycle their truth-on-the-market defense, which this Court and the Ninth Circuit rejected because Facebook's public response to pre-2018 reporting on Cambridge Analytica was that it was "investigating" and had "***not uncovered anything that suggest[s] wrongdoing***." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 952, 954-57 (9th Cir. 2023); ECF No. 258 ("2026 Order") at 23-24. Defendants enlist expert Daniel Fischel to support this twice-rejected defense. But in a prior case, Fischel swore the ***opposite*** was true, testifying that "disclosures by third parties [are] ***not*** the same as disclosures by the company itself," are "given less weight," are "discounted" when the company "is denying that

---

[1] "Ex." refers to exhibits attached to the accompanying Declaration of Jeremy P. Robinson. All standalone "¶__" references are to the operative Complaint (ECF No. 228, "Complaint"). "Daubert Mot." refers to Plaintiffs' Motion to Exclude the Opinions of Martin Dirks and Daniel Fischel, filed at ECF No. 312. Unless otherwise noted, all emphasis is added and all internal citations and quotations are omitted.

there's any problem," and that a company's acknowledgment of misconduct is new, price-moving information, even when allegations have circulated for months. Ex. 24 at 2684:12-2685:15; Ex. 25 ¶25. He gives no explanation for his reversal. ECF No. 301-6 ("Fischel Rpt.") ¶¶36, 39-40, 60-70.

Reversals aside, the Opposition offers nothing that defeats certification. It is undisputed that Facebook's stock traded in an efficient market and fell by statistically significant amounts in March and July 2018. While Defendants dispute that Facebook confirmed the previously denied initial misuse in March 2018 and that its financial results revealed the full significance of the fraud in July 2018, these are class-wide merits issues that support (not defeat) certification. Damages can be measured with a common methodology tied to Plaintiffs' theory, and Plaintiffs' expert ***has already*** provisionally measured per-share damages. Defendants' remaining arguments all fail.

## II. ARGUMENT

### A. Plaintiffs Seek Certification on Sustained Claims Pleaded in the Complaint

Defendants' lead argument, that Plaintiffs seek certification on an "unpleaded theory," is incorrect. Opp. at 8-10. Plaintiffs seek certification on the claims, statements and theories this Court and the Ninth Circuit sustained: (i) the risk-factor statements, which presented third-party misappropriation and misuse of user data as hypothetical when they had already occurred, and (ii) the user control statements, which represented that users controlled their data when they did not. *Facebook*, 87 F.4th at 949-50; 2026 Order at 26, 30. Dr. Gelbach's model is tethered to "(1) the initial misuse sub-theory of the Cambridge Analytica theory of fraud as to the risk disclosure and user control statements; and (2) the whitelisting theory of fraud related to user control statements." ECF No. 278-2 ("Gelbach Rpt.") ¶22; *see id.* ¶95. The language Defendants seize on describes the *damages* caused by the misrepresentations, not a separate "theory." *See id.* ¶¶23-24, 99-103.

None of these theories are "unpleaded." The Complaint's first sentence highlights the "impact of defendants' misconduct on Facebook's business and financial condition." ¶1. It also alleges that in "contrast to their public assurances," Defendants "disregarded user privacy and data control in order to ***promote growth and increase profits***." ¶62. The Complaint further explains that Defendants approved a "reciprocity" program under which "Facebook secretly gave third parties access to…user data in exchange for advertising revenues and other valuable business

benefits" (¶¶24, 76-84); and that "cutting off this practice…would significantly limit Facebook's ability to ***profit*** from its vast store of user data" (¶¶75, 82). And it alleges that the July 2018 disclosure revealed that the "privacy misconduct had in fact ***hit the Company's bottom line***," and that the financial results "were a direct and proximate result of the concealed problems with the Company's decision to grow at the expense of protecting user privacy." ¶¶33, 527-30, 687-91.

Further, the Ninth Circuit sustained loss causation for the July 2018 decline on precisely this basis, crediting allegations that it was caused by "dramatically lowered user engagement, substantially decreased advertising revenue and earnings, and reduced growth expectations going forward" on account of the scandals. *Facebook*, 87 F.4th at 956. And Plaintiffs' interrogatory responses laid out the theory in detail: the March 16, 2018 disclosures first confirmed the initial misuse, and the July 25, 2018 revenue deceleration, margin guidance, and privacy-spending disclosures revealed the financial consequences of the concealed practices. Ex. 26 ("Rog Resps.") at 10-13, 31-33. Defendants' authorities each turn on a lack of notice. Here, Defendants had ample notice from the pleadings, the Ninth Circuit, this Court, and verified discovery responses. Their statute of limitations argument (Opp. at 9-10) fails for the same reason.

### B. Plaintiffs' Damages Model Fits Their Liability Theory and Satisfies *Comcast*

*Comcast Corp. v. Behrend* asks whether a plaintiff's damages model fits its liability theory. 569 U.S. 27, 35 (2013). Plaintiffs' model does exactly that: it measures the artificial inflation removed from Facebook's stock price on the corrective disclosure dates using a standard event study and applies that inflation class-wide using the out-of-pocket method. Gelbach Rpt. ¶¶104-08, 147-51. This is "the standard method for calculating damages in virtually every Section 10(b) class action." *Weston v. DocuSign, Inc.*, 348 F.R.D. 354, 368 (N.D. Cal. 2024). Dr. Gelbach concludes that the statistically significant March and July 2018 declines "were caused or at least partially caused by market reaction to news that exposed Defendants' control and risk statements as false and misleading." Gelbach Rpt. ¶108. Fischel offers no alternative methodology and does not dispute market efficiency or the event-study measurements. Ex. 27 ("Gelbach Reply") ¶¶4, 8.

Defendants' *Comcast* attacks recycle failed arguments. **First**, Plaintiffs' damages model does not rest on a new, unpleaded theory. *See supra* § II.A. **Second**, Plaintiffs' model does not rely

on the dismissed "Continued Misuse Theory of Fraud." Rather, the March 2018 disclosures confirmed the initial misuse for the first time, including that Defendants "learned of [Cambridge Analytica's] violation in 2015." Ex. 28 ("Suspending Cambridge Analytica and SCL Group From Facebook") at 2; *see also* Ex. 26 at 10-12; Gelbach Reply ¶¶27-30. Any facts confirming data's continued misuse also necessarily confirm its initial misuse. News of Cambridge Analytica's retention and downstream use of the data is causally connected to the sustained statements: once the data was improperly transferred, the resulting loss of control was a "foreseeable consequence of the initial misuse that had already occurred" when Defendants spoke. Gelbach Reply ¶¶33-34. Loss causation, a proximate-cause inquiry, can be shown in "an infinite variety of ways." *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018). Thus, Defendants' first confirmation of initial misuse in March 2018 *and* the revelation of the downstream consequences of that misuse in March and July 2018 are corrective of and causally connected to the user control and risk misstatements. That "continued misuse" was dismissed as a separate *scienter* theory is irrelevant, which is why the Court observed that the Ninth Circuit credited continued misuse facts "most prominently in a section that analyzes loss causation." 2026 Order at 28-29. Tellingly, Defendants do not contend that the continued misuse news caused any part of the March declines; they admit they "do not currently have contentions about the cause(s) of the March 2018 Price Declines." Ex. 29 at 13-15, 36-38. Even if any portion of any decline here *does* reflect confounding information (it does not), Gelbach explains that apportionment—a class-wide merits question—can be performed with common tools. *See* Gelbach Reply ¶¶76-89; *see also* Gelbach Rpt. ¶¶138, n.152, 141-46; *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812-13 (2011).

**Third**, Defendants try to recast the July 2018 disclosure as a "materialization of the risk." Opp. at 2-3, 11-12. That label mischaracterizes the law and the facts. *See* Gelbach Reply ¶¶62-75. Indeed, Defendants' argument is foreclosed by the Ninth Circuit's ruling ***in this case*** that the July 2018 decline is a valid corrective disclosure, including because "Facebook's earnings report revealed new information to the market" that allowed the public to "appreciate [the] significance" of the Cambridge Analytica and whitelisting scandals. *Facebook*, 87 F.4th at 956. Defendants'

misstatements concealed both their improper data practices and their economic impact. The March 2018 disclosures did not reveal that impact, and Defendants hid it by assuring investors in April that "we don't expect [Cambridge Analytica] to have an impact on revenue." 2026 Order at 4. Then, in July 2018, Defendants attributed revenue deceleration to "giving people…more choices around data privacy" and said security and privacy spending "will significantly impact our profitability." Gelbach Rpt. ¶¶131-37; *see also* Ex. 29 at 38-43 (privacy and security factors "contributed to" the July results and guidance); Gelbach Reply ¶¶55-60 (discussing market commentary and internal evidence directly linking revenue deceleration and margin compression to Cambridge Analytica remedial efforts). The press called it the "profit versus privacy battle at the center of the Cambridge Analytica story." ¶¶692-700. Relatedly, a corrective disclosure "need not be a mirror-image" admission of falsity—loss causation asks whether a misrepresentation proximately caused the loss, so a disclosure may reveal the concealed truth through its financial consequences. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790-91 & n.3 (9th Cir. 2020); *see First Solar*, 881 F.3d at 753-54; *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). Unlike *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 392 (9th Cir. 2010), where an earnings miss was not connected to the fraud, the revenue deceleration and cost increases here flowed directly from it.

*Ludlow v. BP, P.L.C.* does not help Defendants. 800 F.3d 674 (5th Cir. 2015). There, investors who bought ***before*** the Deepwater Horizon oil spill knowingly bore a generalized safety risk and had differing tolerances for a spill that had not yet happened. *See id.* at 690-91. Even so, a post-spill class was certified. Here, no oil well subsequently blew out: the initial misuse and whitelisting occurred ***before*** the Class Period, and the July 2018 disclosure first revealed the financial consequences of the "very facts" the misstatements concealed. *First Solar*, 881 F.3d at 753. The inflation removed in July is measured once for every class member using common evidence. Dr. Gelbach's passing reference to a "materialized risk" in a years-old report about a different company proves nothing about the damages theory ***in this case***. Defendants omit the fact that he testified here that he would need to consider "any new information…that might affect what I would think today." ECF No. 301-2 at 13:17-14:2. *Comcast* is satisfied.

### C. Plaintiffs Have Established Class-Wide Reliance

A plaintiff invokes the *Basic* presumption of reliance by showing "publicity, market efficiency, and market timing." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 119 (2021). Defendants do not dispute that the misstatements were public, that Facebook's stock traded in an efficient market, or that Class members traded during the Class Period. Fischel Rpt. ¶¶32, 39; Ex. 30 at 17, 18, 20-21, 31-35. Instead, Defendants try to repackage truth-on-the-market as a failure of the market timing element, arguing that Plaintiffs cannot show they traded "between when the misrepresentations were made and when the truth was revealed" because the "truth" was supposedly known before March 2018. Opp. at 12-14 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 277-78 (2014) ("*Halliburton II*")). That is the same defense under a different label. But "market timing" is just a temporal class-period requirement defining who falls within the class. *Halliburton II*, 573 U.S. at 279 (fourth element requires showing that plaintiff "purchased the stock at the market price ***during the relevant period***"). Defendants' incorrect and unsupported reading would turn that timing element into a requirement that Plaintiffs prove their case to invoke the presumption. *Halliburton II* includes no such requirement. In short, the *Basic* presumption applies here, and Defendants cannot meet their burden of "sever[ing]" the link between the misstatements and the price by a preponderance of the evidence. *Goldman*, 594 U.S. at 125-26.

#### 1. The Truth Was Not Known to Investors Before March 2018

Defendants recycle their twice-rejected truth-on-the-market defense. Opp. at 12-14. But that defense "is a method of refuting an alleged misrepresentation's materiality," a class-wide issue not considered at class certification. *Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011). Defendants' argument also fails on its merits. **<u>First</u>**, the Ninth Circuit held that pre-2018 reporting "did ***not*** reveal that Cambridge Analytica had misused Facebook users' data" and that "[b]efore the March 2018 news broke, reasonable investors would ***not*** have known that Cambridge Analytica had improperly accessed Facebook users' data." *Facebook*, 87 F.4th at 954. This Court "echo[ed]" that holding. 2026 Order at 24.

**<u>Second</u>**, Defendants' admissions confirm these rulings. In the recent New Mexico case,

Sandberg confirmed in sworn testimony that Facebook never publicly announced that user data had been breached before March 2018. *See* Ex. 31 at 1667:10-20. And Defendants' sworn interrogatory responses in this case claim that the Individual Defendants themselves "do not recall becoming aware of Dr. Kogan's violation of Facebook's policies before March 2018." Ex. 29 at 23-24, 44-45. If Facebook's own senior executives claim they did not know of the misuse before March 2018, then the market could not have known.

**Third**, each news article that Defendants cite included an implicit or explicit denial by Facebook. In December 2015 reporting, Facebook said it was "carefully investigating this situation" and would "take swift action" against violators—and both the Ninth Circuit and this Court have recognized that statement "did not confirm…that Cambridge Analytica had acted improperly or whether Facebook had taken the 'swift action' promised if it learned of violations." *Facebook*, 87 F.4th at 950; 2026 Order at 24. In March 2017, Facebook told the press that "[o]ur investigation to date has ***not uncovered anything that suggests wrongdoing***" (2026 Order at 3), which "represented that no misconduct had been discovered." *Facebook*, 87 F.4th at 950. A company's statement that its investigation found no wrongdoing is a denial, not a disclosure, and "[w]here a purported 'disclosure' is accompanied by a corporate denial, it is no 'disclosure' at all." *San Diego Cnty. Emps. Ret. Ass'n v. Johnson & Johnson*, 2025 WL 2176586, at *3 (3d Cir. July 30, 2025); *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 91-92 (2d Cir. 2023). Indeed, the SEC charged that Facebook's 2017 statement that its investigation "has not uncovered anything that suggests wrongdoing" was false and "reinforc[ed] the misleading statements in [Facebook's] periodic filings"—which Facebook paid $100 million to settle. ¶¶21, 557, 635, 637. At bottom, Facebook's denials kept the truth from being "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression." *Provenz*, 102 F.3d at 1492; *Facebook*, 87 F.4th at 954; 2026 Order at 24.

**Fourth**, Fischel's opinion that the March 2018 admission told the market nothing new (Fischel Rpt. ¶44) contradicts his own prior testimony. Gelbach Reply ¶¶15-19; Daubert Mot. at 6-10. In *Household*, Fischel testified that investors were "not fully informed" because information "didn't come from [the defendant]," "disclosures by third parties are given less weight," and they

"are being discounted through much of the period until the very end because of management denials." Ex. 24 at 2684:12-2685:15. He added that a company is "the party in the best position to tell investors about its own practices." *Id.* at 2838:1-17; Ex. 32 ¶25. That did not happen here until March 2018.

**Fifth**, the market evidence refutes Defendants. Neither the December 2015 nor the March 2017 articles moved Facebook's stock. Fischel Rpt. ¶40. In stark contrast, the March 2018 disclosures were followed by massive declines both experts found statistically significant. *Id.* ¶¶12, 43 n.80; Gelbach Rpt. ¶117. Fischel described a similar pattern in *Household*: no significant reaction to denied reports, then significant market reactions once "market participants began to disbelieve the denials." Ex. 24 at 2964:1-2965:1; Ex. 32 ¶6 n.3.

**Sixth**, the March 2018 New York Times article identified what was new: "**the full scale of the data leak … has not been previously disclosed – and Facebook, until now, has not acknowledged it**." ¶472. Defendants claim Facebook's confirmation appears "nowhere in their [Complaint]." Opp. at 13. This is false. The Complaint specifically quotes the language that Facebook first confirmed on March 16, 2018, including that it "learned of the violation in 2015." ¶468; *see also* ¶561 ("the SEC explained that it was not until March 16, 2018 that Facebook publicly acknowledged **for the first time**" the Cambridge Analytica misappropriation). The Ninth Circuit credited that allegation, *Facebook*, 87 F.4th at 954-55, and Plaintiffs' interrogatory responses confirm the same. Ex. 26 at 10-12.

**Seventh**, Defendants claim that two investment managers did not view the March and June 2018 disclosures as material. Opp. at 14-15, 18-19. This is inaccurate and irrelevant. Both managers have since confirmed that the disclosures were material. Wedgewood "did not ignore the 2018 news," it considered the news a "risk to Facebook's business," and it used the term "immaterial" only to mean that the news "did not change its long-term view of Facebook," not "in a legal sense or to any other investor." Ex. 33 ¶7. And all four of MissPERS' investment managers have confirmed that market price was an "important input," "important factor," a "consideration," or information they "relied on," respectively, in their decisions to purchase Facebook stock. Exs. 33, 34, 35, & 36. Emails from one investment manager, which Defendants themselves cite, confirm

that, [redacted] ECF No. 301-17. Regardless, materiality is an objective, class-wide merits question not resolved at class certification. *Amgen*, 568 U.S. at 466-67. "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Halliburton II*, 573 U.S. at 276. For the same reasons, the opinions of Defendants' materiality expert, Martin Dirks, should be disregarded. Daubert Mot. at 14-16.

**2. Defendants Have Failed to Disprove Price Impact**

To disprove price impact, Defendants must completely "sever" the link between the misstatements and the stock price by proving by a preponderance of the evidence that the misstatements had no impact at all on the stock price. *Goldman*, 594 U.S. at 125-26; *In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *7 (N.D. Cal. Feb. 4, 2022). Defendants cannot. Fischel admits that Facebook's stock declined by statistically significant amounts on March 19, March 20 and July 26, 2018. Fischel Rpt. ¶¶43 n.80, 50 n.97, 56 n.111. These admissions, along with the Ninth Circuit and this Court's findings that the March and July 2018 declines corrected the alleged misstatements, establish price impact and preclude Defendants from meeting their burden here. *See In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *5 (C.D. Cal. Oct. 6, 2021) ("A statistically significant price adjustment following a corrective disclosure is evidence that the original misrepresentation did, in fact, affect the stock price."). And Defendants do not even address the Ninth Circuit's holding that the July 2018 price decline corrected the risk statements because it "allowed the public to 'appreciate [the] significance' of the Cambridge Analytica and whitelisting scandals." *Facebook*, 87 F.4th at 956.

**Risk Statements**. **First**, Fischel opines that Facebook's stock price moved on March 19 and 20 for other reasons—namely, continued misuse, Russian interference, the FTC inquiry, and #DeleteFacebook. Fischel Rpt. ¶¶45, 47, 52. But he makes no attempt to quantify the price movement specific to those alternative disclosures and even asserts it cannot be done. *See In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 211 (D. Minn. 2020) (no *Basic* rebuttal where expert "did not attempt to quantify the amount of the price drop that was caused by other

factors”). Plus, Defendants refused to adopt Fischel’s theory under oath. When asked to identify the “other events or disclosures” that caused the declines, Defendants responded that they “do not currently have contentions about the nature of those ‘other events or disclosures.’” Ex. 29 at 12-15. To succeed, Defendants would need to prove that the stock price moved ***solely*** because of other revelations, and not the revelations that corrected the risk factor statements. *Apple*, 2022 WL 354785, at *10. They cannot do so here.

**Second**, Fischel’s attributions of the declines to other news are belied by the content of the March 2018 disclosures themselves, which revealed that the initial misuse of Facebook user data had in fact occurred, and that Facebook had known about it since 2015. *See* Gelbach Reply ¶¶27-30; Gelbach Rpt. ¶143. The commentary that Fischel cites proves this—it criticizes “Facebook’s ***silence on the matter***,” identifies “the leakage of personal data” as the “***first concern***,” and flags “systemic mismanagement” as “a ***new concern***.” Fischel Rpt. ¶¶46-47.

**Third**, Fischel takes issue with Dr. Gelbach’s use of a two-day event window regarding the stock price reaction on March 19-20. Fischel Rpt. ¶¶52-54. But courts routinely endorse two-day event windows. *Pampena v. Musk*, 838 F. Supp. 3d 891, 906 (N.D. Cal. 2026) (collecting cases). Fischel himself used a two-day residual window in *Household*. Ex. 25 ¶35 n.21. And March 20 contained additional disclosures tied to the initial misuse revelations on March 16-17, revealing that “hundreds of millions of Facebook users are likely to have had their private information harvested by companies that exploited the same terms as the firm that collected data and passed it on to Cambridge Analytica.” Gelbach Reply ¶¶35-36.

**Fourth**, Defendants’ “mismatch” argument for the risk statements fails because they match the disclosures. Opp. at 18-19. The risk statements told investors that improper access to user data “***could***” hypothetically occur, suggesting it had not. The March 2018 disclosures revealed that it ***had*** occurred on a massive scale and that ***Facebook had known since 2015***—exactly why the Ninth Circuit held that the risk statements were misleading. *Facebook*, 87 F.4th at 949-50. And the July 2018 disclosure revealed their significance, including their previously concealed impact on Facebook’s business. *Id.* at 956. *Crews v. Rivian Auto., Inc.* rejected a *Goldman* mismatch argument on nearly identical facts—a risk disclosed as hypothetical that had already

materialized—finding the corrective disclosure "sufficiently related to the alleged misrepresentations." 2024 WL 3447988, at *13-15 (C.D. Cal. July 17, 2024).

**Control Statements**. Defendants' attempt to disprove price impact for these statements fails for the same reasons, and their additional user control-specific arguments are equally flawed. **First**, Defendants' reliance on the absence of a significant decline on June 4, 2018 does not disprove price impact because Facebook denied that news the same day in a post titled "*Why We Disagree with The New York Times*." Its post falsely reassured the market that its whitelisting arrangements were harmless and claimed data was not shared without user consent. ¶686. Fischel himself has testified the market does not immediately credit news accompanied by a company's denial. Ex. 24 at 2684:12-2685:15. As Gelbach confirms (Gelbach Reply ¶¶52-54), the absence of a significant decline on a day Facebook denied the news does not disprove price impact. *Johnson & Johnson*, 2025 WL 2176586, at *3; *Goldman*, 77 F.4th at 91-92.

**Second**, Defendants are wrong that the July 26, 2018 decline cannot establish back-end price impact for the control statements. The Ninth Circuit already held that "the Cambridge Analytica and whitelisting revelations" bore "a causal relationship" to the July 2018 "dramatic drop in Facebook's stock price," and that the "reduced growth expectations" disclosed in July 2018 are causally connected to the fraud. *Facebook*, 87 F.4th at 956-57; *see also* Gelbach Rpt. ¶132 n.152 (remedial effort to increase controls on whitelisted "partner categories" and "measurement partners" would reduce annual revenues by $750 million to $4.3 billion). Defendants have not disproven that the July 2018 decline was, at least in part, attributable to the June 2018 whitelisting revelations that corrected the control statements. That is fatal to their price impact argument.

**Third**, Defendants claim that there is a "mismatch" between the control statements and the whitelisting disclosure. Opp. at 16. A court need not engage with the *Goldman* mismatch analysis unless the front-end statements are generic. *See Goldman*, 77 F.4th at 93 (genericness is the "threshold" inquiry). Here, the user control statements were "concrete" and far more specific than the generic statements in *Goldman*. *Id.* ("[I]ntegrity and honesty are at the heart of our business"). The Court's "mismatch" analysis can end there.

Regardless, the disclosures are directly corrective: the control statements promised that

users controlled their information, and the March disclosures showed that users could not control their data in the hands of third parties like Cambridge Analytica. The June 2018 disclosure revealed that users also lacked control because Defendants were giving secret, unauthorized access to user data to whitelisted third parties. And the July 2018 disclosure revealed the extent and impact of that lack of control on Facebook's business. *Jaeger v. Zillow Grp., Inc.*, 2025 WL 2741642, at *1-2 (9th Cir. Sept. 26, 2025) (back-end disclosures that "revealed new information" supported price impact despite mismatch argument); *Mattel*, 2021 WL 4704578, at *5-6 (*Goldman* does not contradict that a "corrective disclosure need not be a 'mirror image' disclosure").[2]

### D. The Class Period Properly Runs Through July 25, 2018

Defendants ask the Court to end the Class Period on March 20, 2018, ignoring the July 2018 disclosure and the Ninth Circuit's opinion. Opp. at 19-21. Whitelisting, an independent basis for the falsity of the user control statements (2026 Order at 30), was not disclosed until June 3, 2018, and Facebook immediately disputed it. As to Cambridge Analytica, even after the March 2018 disclosure, Defendants continued to assure investors that users had "complete control" over their data and that the investigatory work would not have "an impact on revenue." ¶¶502, 615; 2026 Order at 4. Indeed, the Ninth Circuit held that the truth about both Cambridge Analytica and whitelisting was not fully revealed before July 25, 2018, and sustained the user-control statements "that predated the June 3, 2018, whitelisting revelation." *Facebook*, 87 F.4th at 956-57. This Court recognized that "statements about user control made before June 3, 2018, could be pegged to the July price drop." 2026 Order at 7. A March 20 end date would wrongly extinguish these claims.

Defendants' request also fails as a matter of law. Courts reserve the question of "precisely when the truth was fully disclosed to the market…[to] the merits." *Weston*, 348 F.R.D. at 371. Courts shorten class periods only where defendants "unequivocally" disclosed the truth, *id.*, and corrected the misrepresentation by "explicitly disclos[ing] to investors that they should not rely on defendants' public statements," *Sayce v. Forescout Techs., Inc.*, 754 F. Supp. 3d 878, 897 (N.D.

---

[2] Defendants' front-end arguments as to both the control and risk statements are irrelevant because they cannot disprove back-end impact and cannot "sever the link." *Goldman*, 594 U.S. at 125-26.

Cal. 2024), as in the case Defendants cite, *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *7 (N.D. Cal. Dec. 22, 2016). Facebook, by contrast, assured investors that users had "complete control" over their data and that its remediation would not "impact…revenue," then disputed the June 2018 whitelisting revelations. Fischel Rpt. ¶¶15, 68, 73; 2026 Order at 4, 9.

Defendants' recycled truth-on-the-market argument fails for the same reason as discussed above: the March 2018 disclosures caused statistically significant declines. *Supra*, § II.C.2. That ends the inquiry, which "is whether Defendants have proven a complete lack of price impact during the Class Period, not whether the stock price decline following individual corrective disclosures was caused by the alleged misrepresentations, which is a loss causation analysis not appropriate at this stage." *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 395 (N.D. Ga. 2019); *accord AMI – Gov't Emps. Provident Fund Mgmt. Co. v. Alphabet Inc.*, 833 F. Supp. 3d 1034, 1045 (N.D. Cal. 2026); *Sayce*, 754 F. Supp. 3d at 897.

Nor have Plaintiffs conceded otherwise. The Complaint explains why the June 3 article did not cause a significant sell-off (¶683) and does not concede that the consequences revealed in July were already priced in—which would contradict the Ninth Circuit. *Facebook*, 87 F.4th at 956-57. Plaintiffs' statement on appeal that the truth "became known" in March addressed Cambridge Analytica misuse, not whitelisting or the combined financial impact. And Dr. Gelbach's testimony that the March disclosures "clearly revealed" the misappropriation of user data or that investors "could" have expected certain impacts after the March revelations (Opp. at 20-21 n.4; ECF No. 301-2 at 90:5-14) concedes nothing. As he explained, what remained concealed after March was the extent to which Facebook's profitability was boosted by third parties' improper use of users' data and that Facebook would "have to spend a lot of money fixing these problems"—exactly what July revealed. *Id.* at 174:14-25, 175:4-23; *see also* Ex. 26 at 12-13; Gelbach Reply ¶63.

### E. MissPERS and Amalgamated Are Typical and Adequate

**MissPERS**. Defendants claim MissPERS is atypical and inadequate because investment managers that "did not rely on the alleged misstatements" executed its Class Period trades. Opp. at 22-23. Not so. Each investment manager relied on the market price in buying Facebook stock, *see supra* § II.C.1, which in efficient markets satisfies the reliance inquiry under Rule 23. *E.g.,*

*Halliburton II*, 573 U.S. at 274; *In re Petrobras Sec.*, 862 F.3d 250, 275 (2d Cir. 2017); *Amgen*, 660 F.3d at 1173. A court in this District recently rejected Defendants' argument (Opp. at 22-23) that a lead plaintiff was atypical because it "would have bought…at the same price even had [it] been aware that the stock's price was tainted by fraud," explaining that, if the fraud were widely known, "that information would have been incorporated into the market price." *In re Lucid Grp., Inc. Sec. Litig.*, 2026 WL 2884854, at *7 (N.D. Cal. Sept. 25, 2026). And contrary to Defendants' claim that the investment managers "disregard[ed]…the alleged fraud," Wedgewood clarified that "any suggestion that [it]…would have disregarded…alleged fraud in relation to these investments" is "inaccurate." Ex. 33 ¶8. Courts "routinely reject" Defendants' arguments because the fact that "an investment advisor thinks it is smarter than the rest of the market…should not be a license for manipulators to pump false information into the public domain." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 251-53 (N.D. Cal. 2013); *see In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *6 (N.D. Cal. Dec. 22, 2016). In Defendants' sole case, *Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992), the plaintiff—unlike here—did not rely on market price. And speculation about what "other members of the putative class think" (Opp. at 23) cannot suffice.

**Amalgamated**. Amalgamated has no conflict with other class members and has vigorously represented the class—conferring with counsel, reviewing filings, attending Supreme Court argument, producing over 1,600 documents, and providing verified discovery responses. ECF No. 278-5 ¶¶5-6. That is what adequacy requires. Defendants' claim that Amalgamated "ceded this case entirely to its lawyers" (Opp. at 24-25) is meritless; "it is not necessary for a lead plaintiff to demonstrate the legal acumen of a seasoned Wall Street attorney." *In re Honest Co. Sec. Litig.*, 2023 WL 3190506, at *7 (C.D. Cal. May 1, 2023). A representative is inadequate "only if [] startlingly unfamiliar" with the case. *In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 628 (N.D. Cal. 2018). Amalgamated's designee was not. Ex. 37 at 104:24-105:11; 106:15-107:2; 107:13-22; 109:11-110:4; 110:13-111:9; 113:5-114:7; 117:20-22; 119:2-9.

Nor is Amalgamated atypical because it supposedly "concedes that the truth was disclosed long before March 2018." Opp. at 23. Amalgamated's contentions are set forth in its verified interrogatory responses, as Magistrate Judge Cousins recognized in denying Defendants' motion

to compel different answers. ECF No. 294. Those responses—which Defendants ignore—state that revelation of the truth did not begin until March 16, 2018, when Facebook admitted it had known of Cambridge Analytica's misuse since 2015. Ex. 26 at 10-12. The deposition testimony Defendants cite concedes nothing. The designee, who had never seen the articles, was asked whether their contents "in part" informed Plaintiffs' allegations. Ex. 37 at 124:6-128:11, 133:23-138:21, 213:9-12. That they do is no surprise, as those articles are cited throughout the Complaint and contain Facebook's statements that it was "carefully investigating" and had "not uncovered anything that suggests wrongdoing," which this Court and the Ninth Circuit held kept investors in the dark. ¶¶5, 17, 162-85, 396-411; 2026 Order at 23-24. And the designee testified that "if [the truth] was known before, I feel like the stock price would have moved at that point in time." Ex. 37 at 111:5-9. In any event, "oral testimony in which the [30(b)(6)] witness has to answer questions on the spot about a party's legal contentions is an improper use of a deposition" and "a Rule 30(b)(6) deponent's…legal conclusions do not bind the entity." *Zeleny v. Newsom*, 2020 WL 3057467, at *2 (N.D. Cal. June 9, 2020); *see Snapp v. United Transp. Union*, 889 F.3d 1088, 1103 (9th Cir. 2018); *Turocy v. El Pollo Loco Holdings, Inc.*, 2018 WL 3343493, at *19 (C.D. Cal. July 3, 2018). Ultimately, Amalgamated's claims rest on the same legal theory as the rest of the class, and truth-on-the-market is irrelevant to typicality: if it succeeded, every class member's claim would fail. *Weston*, 348 F.R.D. at 363-65, 371. Typicality and adequacy are satisfied here.

### F. The Section 20(a) and 20A Claims Should Be Certified

Defendants concede that the Section 20(a) claim rises or falls with the Section 10(b) claim. Opp. at 21. As to Section 20A, courts repeatedly reject Defendants' contemporaneousness argument. *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 272 (N.D. Cal. 2011); *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 285-86 (N.D. Cal. 2020); *Homyk v. ChemoCentryx, Inc.*, 2024 WL 1141699, at *7 (N.D. Cal. Mar. 6, 2024). Section 20A damages, including the statutory cap, can be calculated class-wide from trading records, Gelbach Rpt. ¶¶152-58, and contemporaneity applied mechanically by comparing Zuckerberg's trades to class members'.

## III. CONCLUSION

The Court should grant Plaintiffs' Motion and certify the proposed Class in full.

DATED: November 10, 2026

Respectfully submitted,

*/s/ Jeremy P. Robinson*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
SALVATORE J. GRAZIANO
JEREMY P. ROBINSON
PREETHI KRISHNAMURTHY
TIMOTHY G. FLEMING
THOMAS SPERBER
MATTHEW S. GOLDSTEIN
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212/554-1400
212/554-1444 (fax)
salvatore@blbglaw.com
jeremy@blbglaw.com
preethi@blbglaw.com
timothy.fleming@blbglaw.com
thomas.sperber@blbglaw.com
matthew.goldstein@blbglaw.com

*Counsel for MissPERS and Co-Lead Counsel for the Class*

and

*/s/ Luke O. Brooks***
Luke O. Brooks

**ROBBINS GELLER RUDMAN & DOWD LLP**

LUKE O. BROOKS (212802)
DARRYL J. ALVARADO (253213)
HILLARY B. STAKEM (286152)
J. MARCO JANOSKI GRAY (306547)
JESSICA E. ROBERTSON (352207)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
lukeb@rgrdlaw.com
dalvarado@rgrdlaw.com
hstakem@rgrdlaw.com
mjanoski@rgrdlaw.com
jrobertson@rgrdlaw.com

JASON C. DAVIS
KENNETH J. BLACK
One Montgomery Street, Suite 1800
San Francisco, CA 94104

Telephone: 415/288-4545
415/288-4534 (fax)
jdavis@rgrdlaw.com
kblack@rgrdlaw.com

*Counsel for Amalgamated and Co-Lead Counsel for the Class*

** Pursuant to Civ. L.R. 5-1(i)(3), the electronic filer has obtained approval from this signatory.