# EXHIBIT 23

FILED 1st JUDICIAL DISTRICT COURT
Santa Fe County
10/21/2026 10:51 AM
KATHLEEN VIGIL CLERK OF THE COURT
Gloria Landin

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

STATE OF NEW MEXICO, EX REL.
RAÚL TORREZ, ATTORNEY
GENERAL,

Plaintiff,

vs. No. D-101-CV-2021-00132

META PLATFORMS, INC.,
F/K/A FACEBOOK, INC.,

Defendant.

# FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

This Matter came before the Court on the trial on the merits of the State of New Mexico's Complaint; the State of New Mexico (the "State") appearing through its attorneys, Meta Platforms, Inc, ("Meta") appearing through its attorneys; and the Court having taken the evidence, heard arguments of Counsel and reviewed the pleadings and all matters of record and being otherwise fully advised in the premise, makes the following **Findings of Fact**:

1. Pursuant to the Stipulated Order for 12-Person Jury entered herein on August 21, 2025, the Jury has decided the factual issues in this case, including liability, unconscionability, willfulness and the number of violations.

2. Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., operates the Facebook social-media platform.

3. The Jury has found that Meta has committed 43,899,720 willful violations of the New Mexico Unfair Practices Act (the "Act") by unfair or deceptive trade practices and 5

willful violations by unconscionable trade practices for a total of 43,899,725 willful violations.

4. The Court finds that, based on the Jury's verdict and the evidence at the trial, Meta willfully and intentionally used a method, act or practice declared unlawful by the Act.

5. Meta refers to other penalty assessments for purposes of assessing proportionality, specifically the FTC's settlement with Meta and the $5 billion civil penalties which it agreed to pay, but the settlement cannot be viewed in a vacuum. Any consideration of the settlement must include the FTC's Docket, including the original Complaint and the subsequent consent agreement as well as the subsequent litigation concerning violations of the original and subsequent agreements. See *Meta Platforms, Inc. v. Federal Trade Commission*, 723 F.Supp.3d 64 (D.D.C. 2024) and *Facebook, Inc.*, No. 092 3184 (F.T.C. 2011).

6. Penalties, consent agreements and decrees have not deterred Meta from using deceptive trade practices in its representations to the citizens of New Mexico in violation of New Mexico's Act.

7. Facebook had 1,386,648 New Mexico monthly active users as of June 30, 2020. PX 591. There are approximately 2,100,000 people in New Mexico in total, which represents the expected or reasonably anticipated audience for Facebook's public representations.

8. The 26 representations the jury found violative and willful span more than eleven years, from May 24, 2010 through August 18, 2021.

9. The violations were not confined to one statement, one speaker, one medium, or one aspect of Facebook's business. The representations the jury found unlawful were disseminated through numerous public channels, including Facebook's own platform and

Newsroom, earnings calls, nationally-distributed television interviews, nationally-distributed print and online media interviews, and public conferences. *See*, *e.g.*, PX 9, PX 15, PX 87.

10. Among the representations that the jury found unlawful and willful were representations made personally by Facebook's most senior leadership, including its Chief Executive Officer, Mark Zuckerberg, and its then-Chief Operating Officer, Sheryl Sandberg.

11. These communications were part of a coherent strategy designed to mislead the public. As just one example, Facebook compiled and used internal messaging materials, including materials referred to as a "song sheet," to coordinate external messaging across company representatives and forums. *See* PX 467; Dr. Calum Matheson further testified that repetition of materially similar representations through different speakers and public forums reinforced the representations' credibility and expanded their reach, and that for at least one category of statements this repetition appeared to come directly in response to internal research on the persuasiveness of the repeated construction of a representation.

12. Facebook continued making public representations concerning users' control of data, third-party data misuse, misinformation, hate speech, and equal enforcement after employees, researchers, and senior personnel had internally identified that Facebook could not make good on its public promises. The internal disagreements with respect to Facebook's public messaging included, but were not limited to, internal communication to Facebook's CEO Mark Zuckerberg that the proposed public communications were misleading. *See* PX 16.

13. Facebook knew information concerning the operation of its platform, its data-access architecture, and its internal enforcement systems that ordinary consumers could not

independently access or verify. Consumers could not independently determine whether Facebook's public representations accurately described its practices.

14. Pursuant to the Court's instructions, the jury determined for each representation the number of New Mexicans who were part of its reasonably expected or anticipated audience. The jury found either 1,386,648 or 2,100,000 violations for each of the 26 representations that it found to be unlawful and willful, reflecting the expected or reasonably anticipated audience for the statements.

15. The scale, duration, repetition, breadth, and willfulness of the violations, together with the evidence concerning Facebook's internal knowledge and practices, including the violations of the Federal Trade Commission consent agreements, settlements, orders and decrees prohibiting the same or similar types of activity as the Act, constitute substantial aggravating circumstances relevant to the Court's determination of the appropriate civil penalty.

16. The State alleged that six of the public representations made by Facebook and its executives concerning users' control of their data, including third party access and Facebook's monetization of their data, violated the Act. The jury found that all six constituted unfair or deceptive trade practices and that Facebook acted willfully with respect to each of them. The jury also found that, based on the expected or reasonably anticipated audience of the statements, these statements amounted to 10,459,944 separate violations of the Act.

17. Facebook's core business and primary source of revenue is generated from the sale of advertising to third parties that is targeted at Facebook's users based on their personal information. Dr. Calum Matheson testified that Facebook "sell[s] everything but your name." Facebook witness Isabella Leone likewise confirmed that the advertising platform requires user

data to function, and that users can neither stop Facebook's collection of their data nor turn off ads.

18. Facebook's privacy settings do not provide users with meaningful control over their data in many ways. Dr. Egelman testified that Facebook's privacy settings, including drop-down menus for users to select a limited audience for their posts, have "no bearing on what developers can pull from your profile or whether they could even read this post when they communicate with the API, because that's a totally separate set of Facebook privacy settings that studies have regularly shown most users have no idea those exist."

19. Facebook was aware that its users did not understand its privacy settings and took advantage of that to a grossly unfair degree. For example, Mr. Zuckerberg stated in a private email to another senior executive, Chris Cox, that "these folks"—referring to Facebook's users— "probably don't understand their current privacy settings or care about who sees their updates." PX 670. Rather than seek to educate Facebook's users about their privacy settings, Mr. Zuckerberg chose instead to capitalize on that lack of understanding in order to manipulate users into sharing more of their personal information publicly; all so that Facebook could better compete with one of its main rivals, Twitter. Mr. Zuckerberg outlined a plan for changing users' privacy settings without them noticing: "Give them a chance to change their privacy settings but obviously don't encourage it. Roll out search such that stream info is available but the names are perhaps somewhat obscured … Over time we'll add back in the last names once we set the proper user expectation." PX 670.

20. Facebook's misrepresentations about users' control of their data were not isolated incidents, but rather a systematic pattern of deception at the core of Facebook's business model.

21. The jury found that each of the ten statements it considered concerning Facebook's Friends Data access and App Developer Investigation ("ADI"), Questions 20 through 29, constituted unfair and deceptive trade practices, and that each violation was willful. The jury assigned a total of 18,146,592 violations for these ten statements, based on the expected or reasonably anticipated audience for the statements. The jury also separately found, in response to Question 34, that Facebook engaged in an unconscionable trade practice with respect to these representations and did so willfully.

22. Prior to 2014, Facebook allowed third party app developers to access personal information associated not only with users that chose to use the app, but also the friends of those users, even if those users were unaware that their personal information was being shared.

23. In 2014, Facebook publicly announced that it was ending this practice, known as "friend sharing". After a transition period ending May 2015, Facebook represented that an application would no longer be able to access a user's friends' detailed information; instead, each Facebook user would choose whether to share his or her own information with the application. PX 273;

24. However, more than a year before the announcement, Facebook was already planning to create exemptions for favored business partners who would continue to have access to friend sharing long after the announcement and transition period. *See*, *e.g.*, PX 473; PX 362; PX 358.

25. After the announcement, Facebook went ahead with its plan to exempt a substantial number of marquee business partners from the end of friend sharing. These exemptions were not disclosed to users, despite promises that "everyone" would be subject to restricted friends sharing permissions. PX 273.

26. Following the public revelations of the Cambridge Analytica scandal in March of 2018, Facebook made a number of user data on its platform, including that Facebook would (1) investigate all apps that had access to large amounts of user data before the 2014 platform change, (2) conduct full audits of applications with suspicious activity, (3) ban any developer found to be misusing data, (4) ensure deletions of improperly obtained user data, and (5) notify all users affected by data misuse. PX 272.

27. This investigation was known internally and externally as the "App Developer Investigation" or "ADI". The ADI was conducted by Facebook using a combination of Facebook employees, as well as outside counsel and consultants to investigate data misuse, and occurred from approximately March 2018 through March 2021. PX 297.

28. Facebook did not conduct the comprehensive investigation that it promised, and moreover, Facebook was aware at the time it made the promises that it did not have the ability to conduct such a thorough investigation or enforce deletion of the data due in large part to Facebook's poor record keeping and failure to vet third party developers at the time they were granted access to user data. PX 292. Pressure from senior executives to keep costs down, lack of adequate enforcement resources, inadequate investigative techniques, and a desire not to create a precedent for future investigations, led to an ADI that was willfully ineffective. *See, e.g.*, PX 292.

29. Facebook publicly committed to conduct a full audit when it identified suspicious activity. Over the entire three-year ADI, however, Facebook conducted only 14 forensic data "audits." PX 297. Even those "audits" were known by Facebook to be inadequate to actually uncovering data misuse, as the purported auditor expressly disclaimed any independent verification of the information provided by the target app developer. DX 512 ("We

have not sought to confirm the accuracy of the data or the information and explanations provided by the company. Our work has been limited in scope and time and we stress that more detailed procedures may reveal issues that this engagement has not"). This was despite thousands of applications that exhibited suspicious activity according to Facebook's own investigation. PX 297.

30. Facebook publicly committed to ban developers that misused Facebook user data. Facebook's internal ADI materials identified approximately 116 developers that Facebook ultimately banned, corresponding to approximately 125,000 separate apps. PX 297. Suspending an application or developer did not necessarily prevent them from simply creating or operating another application due to Facebook's lack of developer controls. PX 292.

31. Facebook publicly committed to ensure that improperly obtained user data was deleted. Facebook's own materials recognized, however, that it had limited ability to ensure that third-party developers actually deleted Facebook user data. *See, e.g.*, PX 356 (acknowledging that "[t]here is no reasonable enforcement/verification approach" to developer data deletion, and policy goal was in part "to optimize for external optics"). In practice, Facebook generally relied on developers to certify that data had been deleted rather than independently verifying deletion; even after publicly admitting that relying on the self-certification of Cambridge Analytica had been a mistake and promising to do better in the future.

32. Facebook publicly committed to notifying users when it found that an application had misused their data. In fact, however, Facebook only notified users of two apps, out of the thousands that were found to have been misusing data. The decision was deliberately made to narrow Facebook's internal definition of data misuse so that Facebook would not have to notify

as many people due to the operational burden of doing so. PX 344. That decision was never communicated to users, despite the very public promise to notify in all cases of misuse.

33. Facebook's investigation identified at least 2,000 unique apps associated with data misuse that should have triggered a user notification but for the narrowing of the misuse definition. That total included 234 apps engaged in bulk friends' data collection during the deprecation period, 671 apps that retained access to friends' data after the May 2015 cutoff, 358 apps collecting data without a valid privacy policy, and 1,549 additional apps that ADI investigators appeared to suspect of data misuse but did not act upon. These findings are not comprehensive of data misuse identified during the course of the ADI but demonstrate that the ADI uncovered rampant misuse on the platform.

34. Of the more than 2,000 applications identified by Dr. Egelman as misusing user data, Facebook was able to associate 1,585 applications with New Mexico Facebook user accounts. Those applications affected the data of at least 1,146,225 New Mexican Facebook users. That figure exceeded 80 percent of Facebook's 2020 New Mexico monthly active user population. Given the relatively small subset of apps for which data was available, this extrapolates to nearly all New Mexican Facebook users were affected by data misuse that Facebook was aware of and chose not to inform them about, which corresponds to 1,386,648 Facebook users in New Mexico as of 2020, while the ADI was ongoing.

35. The scale of misuse was predicted by Facebook's senior leaders even before the investigation was fully launched, as acknowledged by COO Sheryl Sandberg in a private email to company advisors immediately after the Cambridge Analytica scandal became public, stating that "there were a MILLION developers with access to the data [and w]e are going to have many many many more moments like this in the next months and year." PX 530. However, Facebook

did not have many more moments like the Cambridge Analytica scandal, because it chose to deceive its users about the misuse it found during the course of the ADI, rather than deliver on its promise of transparency.

36. In September 2019, Facebook's own internal legal assessment concluded that Facebook was not in a position to say that it had fulfilled its public commitment concerning the ADI. PX 519. Facebook nevertheless shut down the ADI in March 2021 without publicly announcing to consumers that the investigation had ended. PX 297; (Facebook corporate representative testifying that "as far as the public is concerned, nobody else remembers the ADI.").

37. The jury found two representations concerning misinformation and five representations concerning hate speech unlawful and willful. Facebook made repeated statements to the public respecting its ability to identify and remove hate speech and misinformation, despite knowing those statements to be deceptive.

38. Facebook's own internal research documented substantial limitations in its systems for detecting and addressing misinformation, and that its systems in fact could be seen promoting this content. According to one internally conducted test-user study, Facebook recommended groups and pages containing known misinformation. PX 542.

39. The same internal research found Facebook notifications and other recommendation systems could encourage users to view posts in polarized or conspiracy-focused groups and pages containing hateful content. PX 542.

40. Research performed on behalf of Facebook, circulated internally at the company and admitted as PX 241, identified substantial amounts of misleading, false, or possibly false political, health, and science content on Facebook and found a greater concentration of false

content in top performing advertising content than in top performing Facebook content generally. PX 241.

41. Internal Facebook communications in response to the research described in PX 241, which was sent to senior executives at the company including Chris Cox, shows Facebook chose to not release the negative underlying data to outside academics, as it had originally planned. PX 243.

42. Internal Facebook evidence admitted as PX 258 reflected that internal Facebook systems—such as the "CrossCheck" or "XCheck" system—often caused content that violated Facebook's Misinformation & Harm policy to stay up for extended periods, accruing millions of views. This happened despite being flagged by Facebook's other internal systems, and Facebook was aware of this fact. PX 258; In its many statements respecting hate speech and misinformation, Facebook never disclosed the extent or impact of the XCheck system.

43. Internal Facebook communications capture an instance in which Facebook executive Monika Bickert deliberately withheld information about Facebook's failure to enforce against hate speech that had been reported over 2,000 times in her outreach to online news outlet ProPublica, despite the fact that she herself acknowledged the violation was "not an edge case;" following Ms. Bickert's meeting with ProPublica, Sheryl Sandberg, in the same communication, expressed relief ("This is awesome.") that there was not significant press follow-up on the ProPublica coverage of Facebook's enforcement failures. PX 238; PX 239.

44. Internal Facebook evidence admitted as PX 180 reflected an assessment within the company that Facebook had substantially overpromised concerning its ability to moderate content. PX 180.

45. The jury found each of the three representations submitted concerning the unequal application of Facebook's Community Standards unlawful and willful.

46. Despite claims of equal application of its Community Standards to everyone on the platform, Facebook maintained systems, including "CrossCheck" (or "XCheck"), through which certain accounts received treatment different from that applied to ordinary accounts before enforcement occurred. PX 207; PX 208; PX 598.

47. For business partners, celebrities and influencers on these lists, the content from their accounts could remain publicly accessible while undergoing the additional review provided through CrossCheck, delaying application of Facebook's enforcement measures, in contrast to Facebook's approach for "normal" accounts where content would be taken down immediately on being found violating and only restored following a successful appeal. PX 210; PX 256.

48. Facebook's Oversight Board reported that Facebook represented to it that, for content posted by accounts in the United States undergoing CrossCheck review, the average time to a final decision was approximately twelve days. PX 210 at 15.

49. Internal Facebook communications demonstrated Facebook executives, such as the head of Facebook's "Integrity" division, Guy Rosen, were aware of the problems described by the Oversight Board despite public representations that CrossCheck was "just" a second level of review; in one May 31, 2020 document, admitted as PX 256, Mr. Rosen explicitly acknowledged that "today we effectively delay enforcement for policy-violating content for xcheck as it remains up and accrues VPVs while we take another look / do outreach / prepare comms." PX 256.

50. Samidh Chakrabarti, former head of Facebook's "Civic Integrity" division, testified that he viewed CrossCheck as inconsistent with the principle of equal treatment because

it made it more likely that certain entities would receive less enforcement than others and that he raised this concern internally.

51. Internal Facebook materials demonstrated that, in addition to the CrossCheck system, Facebook also had systems in place ensuring that high-profile accounts would receive outreach from Facebook so that those accounts could remove violating content before "strikes" were applied to their accounts, despite violating Facebook's rules, and that extra diligence would be applied to overturning strikes leveled against high-profile accounts, even when such decisions would not otherwise be made "at scale" for normal Facebook users. Prominent Facebook executives such as Guy Rosen, Nick Clegg, Joel Kaplan, and Monika Bickert were recipients of these internal documents. PX 257; PX 251.

52. Internal Facebook materials concerning political influence on content policy also documented exceptions for powerful actors and reflected senior-executive involvement in content-policy decisions, notwithstanding public representations that Facebook would treat all users equally. PX 647.

53. The violations the jury found were not the product of a single mistaken statement or isolated incident. They arose from repeated public representations over more than eleven years, concerning multiple core aspects of Facebook's platform and business, and made through numerous public channels and by multiple senior company representatives.

54. In all subject areas, Facebook possessed internal information concerning material limitations, exceptions, or contrary practices that was not disclosed in the categorical public representations later found unlawful by the jury.

55. Facebook continued making public representations concerning users' control of data, third-party data misuse, misinformation, hate speech, and equal enforcement after

employees, researchers, and senior personnel had identified substantial limitations in Facebook's practices and systems relevant to those representations.

56. Consumers did not have access to Facebook's internal data, systems, investigations, and decision-making and therefore could not independently determine whether Facebook's public representations accurately described its practices.

57. The jury's five additional findings of willful unconscionable trade practices demonstrate that the conduct established at trial was not confined to a single type of representation or isolated aspect of Facebook's relationship with New Mexico citizens.

58. The scale, duration, repetition, breadth, and willfulness of the violations, together with the evidence concerning Facebook's internal knowledge and practices, constitute substantial aggravating circumstances relevant to the Court's determination of the appropriate civil penalty.

59. According to Meta's Annual Form 10-K filed with the United States Securities and Exchange Commission for the Year 2025, Meta had Gross Revenues of $200,966,000,000 and Total Stockholders' Equity of $217,243,000,000.

Based upon the foregoing, this Court makes the following **Conclusions of Law:**

1. The Court has subject matter jurisdiction over the parties and claims presented in this case.

2. Venue is proper in Santa Fe County, New Mexico.

3. The State is entitled to recover a civil penalty not exceeding five thousand dollars ($5,000.00) per violation found by the Jury pursuant to § 57-12-11, NMSA 1978, of the Act.

4. The Act constitutes remedial legislation to protect the citizens of New Mexico against unfair, deceptive and fraudulent practices in the course of commerce.

> In the UPA, the Legislature has provided for damages and other remedial relief for persons damaged by unfair, deceptive, and unconscionable trade practices. Sections 57–12–3, –10. Since the UPA constitutes remedial legislation, "we interpret the provisions of this Act liberally to facilitate and accomplish its purposes and intent." *State ex rel. Stratton v. Gurley Motor Co.*, 105 N.M. 803, 808, 737 P.2d 1180, 1185 (Ct.App.1987) (rejecting UPA exemption argument); *see Ashlock v. Sunwest Bank of Roswell, N.A.*, 107 N.M. 100, 102, 753 P.2d 346, 348 (1988) ("[W]e ensure that the Unfair Practices Act lends the protection of its broad application to innocent consumers."), *overruled on other grounds by Gonzales v. Surgidev Corp.*, 120 N.M. 133, 899 P.2d 576 (1995).

*Quynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 30, 147 N.M.583, 227 P.3d 73.

5. The Act's civil penalty assessment provision, § 57-12-11, supra, is a form of civil remedy even though it may have a deterrent purpose and effect.

> As a general matter, "monetary assessments are traditionally a form of civil remedy." *See Kirby*, 2003–NMCA–074, ¶ 31, 133 N.M. 782, 70 P.3d 772 (internal quotation marks and citation omitted). "[N]either money penalties nor debarment has historically been viewed as punishment." *Hudson*, 522 U.S. at 104, 118 S.Ct. 488. However, the imposition of monetary penalties has a deterrent purpose. *See State ex rel. Schwartz v. Kennedy*, 1995–NMSC–069, ¶ 38, 120 N.M. 619, 904 P.2d 1044 ("[M]onetary sanctions, such as fines or forfeitures, are qualitatively different from other types of administrative sanctions because of their distinctly punitive purposes."); *see also Hudson*, 522 U.S. at 105, 118 S.Ct. 488 ("Finally, we recognize that the imposition of both money penalties and debarment sanctions will deter others from emulating petitioners' conduct, a traditional goal of criminal punishment."). Nevertheless, "[a]lthough a civil penalty may cause a degree of punishment for the defendant, such a subjective effect cannot override the legislation's primarily remedial purpose." *White Chevy*, 2002–NMSC–014, ¶ 11, 132 N.M. 187, 46 P.3d 94. In addition, "[deterrence] may be a valid objective of a regulatory statute," *Id.* ¶ 14 (internal quotation marks and citation omitted), and "the mere presence of this purpose is insufficient to render a sanction criminal, as deterrence may serve civil as well as criminal goals." *Hudson*, 522 U.S. at 105, 118 S.Ct. 488 (internal quotation

> marks and citation omitted); *see also Schwartz*, 1995–NMSC–069, ¶ 37, 120 N.M. 619, 904 P.2d 1044 ("[T]he fact that the regulatory scheme has some incidental deterrent effect does not render the sanction punishment...."). Therefore, a monetary sanction has a "deterrent or retributive purpose if it is not designed to compensate the government for its losses." *Id.* ¶ 38.

*State ex rel. Foy v. Austin Capital Management, Ltd.*, 2015-NMSC-025, ¶ 46, 355 P.3d 1.

6. The United States Supreme Court has not held that the Eighth Amendment applies to corporations. *See Browning–Ferris Inds. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276 n. 22, 109 S.Ct. 2909, 2920 n. 22, 106 L.Ed.2d 219 (1989).

7. The State is entitled to penalties pursuant under the Act pursuant to § 57-12-11, supra, in the amount of $219,498,600,000.00 ($5,000.00/ea. x 43,899,720 violations).

8. The jury's verdict establishes, for purposes of the civil penalty determination, that Facebook committed 43,899,720 unfair-or-deceptive-trade-practice violations and those violations were willful.

9. The jury's separate findings on Questions 30 through 34 establish that Facebook also engaged willfully in unconscionable trade practices in each of the five subject areas submitted to the jury. The jury was unequivocal: Facebook systematically misled the public regarding the core of its business operations, and in so doing took advantage of the public's lack of knowledge respecting Facebook's practices to a grossly unfair degree.

10. As the Supreme Court has explained, "Fair competition is not attained by balancing a gain in money against a misrepresentation of the thing supplied. The courts must set their faces against a conception of business standards so corrupting in its tendency." *FTC v. Algoma Lumber Co.*, 291 U.S. 67, 54 S.Ct. 315, 78 L.Ed. 655 (1934). Where a company engages in a systematic, years'-long campaign of lies and deception, a substantial verdict is

warranted, so long as the penalty bears a rational relationship to the scheme in which the defendant engaged.

11. Under the Due Process Clause of the U.S. Constitution, States possess a wide latitude of discretion in prescribing penalties for violations of their laws, and "their enactments transcend the limitation only where the penalty prescribed is so severe and oppressive as to be wholly disproportionated to the offense and obviously unreasonable." *St. Louis, Iron Mt. & S. Ry. Co. v. Williams,* 251 U.S. 63, 66 (1919). There is no bright line rule for determining what is reasonable, and courts around the country will undertake a "case-by-case determination based on the severity of the underlying conduct." *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharmaceuticals*, 414 S.C. 33, 89 (2015) (awarding per-violation penalties of between $100 and $2,000 in opposition to due process challenge). Any penalty must take into account that the UPA is remedial consumer-protection legislation. New Mexico Courts "construe the UPA liberally to ensure the protection of innocent consumers." *Salas v. Guadalupe Credit Union*, 2025-NMSC-006, ¶ 54; *see also Quynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 30, 147 N.M. 583, 227 P.3d 73; *State ex rel. King v. B & B Inv. Grp., Inc.*, 2014-NMSC-024, ¶ 48, 329 P.3d 658. The penalty "should take into consideration the purpose of the UPA plus the enormity and nature of the wrong and any aggravating circumstances." *Atherton v. Gopin*, 2015-NMCA-003, ¶ 56, 340 P.3d 630, 642, *citing Green Tree Acceptance, Inc. v. Layton,* 1989–NMSC–006, ¶ 9, 108 N.M. 171, 769 P.2d 84.

12. The harm in this matter is difficult to overstate, and goes to the heart of Facebook's basic business proposition. As Facebook admitted at trial, its primary asset is a network of users along with the personal data and content those users generate. Through that

network, and with that data, Facebook is able to engage in highly sophisticated ad targeting, and has created a business that in 2025 was worth approximately $1.7 trillion, with yearly revenues of $200 billion. To induce users to provide their personal information to Facebook, Facebook made many false promises respecting the security and control of that data over the course of more than a decade.

13. First, Facebook promised users that they (the users) controlled their data. This was false. Facebook did not disclose to the public that it had designed the open platform in a manner that allowed third party applications' illicit access to all user data. Facebook unconscionably allowed third parties to take user data without providing an explanation for what that data was for and did so without logging the data that was taken. PX 292. It did this despite recognizing that bad actors hoped to take advantage of the Facebook platform by using its permissions to take excessive amounts of user data, including data from users' friends. Trial Day Ten Tr. 3666:16 – 3667:24.

14. Facebook claimed in 2014 that it would be shutting down "friend sharing," which had previously enabled applications to take data of users' friends without those friends' knowledge. In reality, Facebook had planned for more than a year prior to the public announcement to secretly continue access for its favored business partners without informing users in order to avoid losing revenue. *See* PX 473; PX 362; PX 358.

15. Following the revelations of data abuse involving Cambridge Analytica in March 2018, Facebook promised to undertake a thorough investigation of third-party applications, and to tell users if those users' data had been misused. That turned out to be a lie as well. Facebook never disclosed the limitations of its platform, secretly changed its own internal definition of "misuse" of data to confine "misuse" to mean a proven "sale" or

"sharing" of data in order to avoid notifying users, and ultimately told users of only two applications that misuse had occurred. Facebook had, in fact, identified thousands of applications who otherwise were engaging in abusive data practices, including "misuse" as defined by Facebook's own third-party application policies and by Facebook's own Chief Executive, Mr. Zuckerberg.

16. The lies extended beyond Facebook's data practices as well. A core aspect of Facebook's business is its encouragement of "engagement" on the Facebook platform. Facebook made promises regarding the prevalence and nature of misinformation and hate speech on the platform and assured the public that the users on the platform would, no matter who they were, be treated equally. The jury found those statements to be false as well.

17. Facebook's wrongdoing—over the course of years and systematically broadcast to the public—goes to the heart of Facebook's core business practices. It relates to the way in which Facebook induces people onto the platform and ultimately keeps them there. It also relates to the core *asset* that users bring to Facebook – users' data – which in turn is what has allowed Facebook to become as profitable as it is. As one court explained, "penalties that fall squarely within the boundaries set by [the legislature] deserve a strong presumption of constitutionality, because the statutory range reflects the considered legislative judgment as to what is excessive." *United States ex rel. Bassan v. Omnicare, Inc.*, No. 15 CIV. 4179 (CM), 2025 WL 1865202, at *3 (S.D.N.Y. July 7, 2025), *quoting Stop Ill. Health Care Fraud, LLC v. Sayeed*, 100 F.4th 899, 907 (7th Cir. 2024). *Cf. United States ex rel. Penelow v. Janssen Prods., LP*, No. CV 12-7758 (ZNQ) (JBD), 2025 WL 937504, at *16 (D.N.J. Mar. 28, 2025) (finding justified a per-offense award of $8,000 for each of 159,574 false claims, leading to $1,276,592,000 in civil penalties); *Yates v. Pinellas Hematology & Oncology,*

*P.A.*, 21 F.4th 1288, 1314 (11th Cir. 2021) (civil penalty of $1,179,000 against alleged harm of $755.54 not excessive where defendant engaged in 214 instances of fraud, and fine was lower than the potential statutory maximum).

18. The extraordinary number of willful violations found by the jury, the duration and repetition of the conduct, the breadth of subjects on which violations occurred, the involvement of senior Facebook leadership, the size of the New Mexico audiences reached, and the clearly intentional and systematic nature of Facebook's repeated misstatements established in the trial record support the highest level of penalty allowed by the New Mexico Unfair Practices Act - $5,000 per violation found by the jury.

19. Facebook received notice of the claims against it and a full opportunity to defend against liability, willfulness, and the number of violations during a thirteen-day jury trial. As the Court observed following the verdict, Facebook "had all the incentive that was required to defend this case vigorously" and "did defend vigorously."

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows:

1. The State is awarded and shall recover a civil penalty against Meta in the amount of $219,498,600,000.00, which penalty is reduced to the amount of $25,000,000,000.00.

2. Interest on the penalty shall accrue at the rate of fifteen percent (15%) per annum until paid in full.

3. The Court will reserve on injunctive relief pending further briefing in this matter.

Francis J. Mathew
District Court Judge

xc: Counsel, e-served