# EXHIBIT 27

**EXPERT REPLY REPORT OF JONAH B. GELBACH**
In re FACEBOOK, INC. SECURITIES LITIGATION
Master File No. 5:18-cv-01725-EJD

**REDACTED**

## I. Introduction

1. I previously submitted a report in this matter on behalf of Plaintiffs, dated August 20, 2026 (the "Gelbach Report"), in which I set forth my opinions that: (a) shares of Facebook Stock traded in a semi-strong efficient market during the Class Period; and (b) damages may be computed on a class-wide basis for every member of the proposed Class using a common methodology that is grounded in Plaintiffs' theory of liability.[1]

2. Since issuing the Gelbach report, I have been asked by Counsel to evaluate and respond to the arguments and conclusions submitted by Defendants' experts in opposing Plaintiffs' motion for class certification, specifically the: (a) Expert Report of Daniel R. Fischel, dated October 9, 2026 ("Fischel Report"); (b) Expert Report of Martin Dirks, dated October 9, 2026 ("Dirks Report"); and (c) Expert Report of Dennis J. Zhang, dated October 9, 2026 ("Zhang Report"). This report presents my analysis and conclusions relating to the Fischel Report, Dirks Report, and Zhang Report, and the issues raised therein. As in the Gelbach Report, I take Plaintiffs' allegations as true and assume liability for purposes of my discussion in this report, subject to the District Court's Motion to Dismiss Opinion and Order[2] and the Ninth Circuit Opinion.[3]

---

1 Unless otherwise stated, all capitalized terms are the same as defined in the Gelbach Report and all emphasis is added. **Appendix A** to this report lists the documents and data I considered or relied on in preparing this report.

2 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Fourth Amended Complaint, ECF 258 (Feb. 27, 2026) ("MTD Opinion").

3 *In re Facebook, Inc. Securities Litigation*, 87 F.4th 934 (2023).

## II. Summary of Conclusions

3. Based on my review of the Fischel Report, Dirks Report, and Zhang Report and the evidence produced in this case, it is my expert opinion that:

(a) Facebook stock traded in a semi-strong efficient market. The defense experts do not contest this opinion set forth in the Gelbach Report. In fact, each of Professor Fischel and Mr. Dirks assumes the market is efficient as a basis for their opinions.

(b) Professor Fischel fails to establish a lack of price impact. First, his opinion regarding purported "truth-on-the market" disclosures reflects an unexplained change in methodology, directly contradicting the approach he applied, in both sworn testimony and expert reports, in a prior securities class action. Relatedly, he disregards that each purported "truth disclosure" prior to March 2018 included an implicit or explicit denial of that information by Facebook, which served to conceal the truth from investors. Second, Professor Fischel's conclusions regarding back-end price impact ignore overwhelming internal and market evidence directly linking the March and July 2018 price declines to the alleged misconduct at issue. Third, Professor Fischel's criticisms of my proposed damages methodology distort Plaintiffs' theory of liability and ignore the disaggregation techniques set forth in the Gelbach Report.

(c) Mr. Dirks's materiality opinions concerning the "value relevance" of the alleged misstatements and corrective disclosures are flawed, incomplete with respect to analyst reports, and ignore information other than what analyst reports contain. Mr. Dirks's equally misguided criticisms of my proposed damages methodology suffer from the same flaws as Professor Fischel's.

(d) Professor Zhang's criticisms of Model 2 are misleading, erroneous, and/or beside the point, and in any event they do not even purport to affect a single one of the Gelbach

Report's conclusions in this case; Professor Zhang's report is not even cited in Defendants' opposition to class certification.

For the reasons set forth in the Gelbach Report and herein, I stand by the opinions set forth in the Gelbach Report.

## III. Market Efficiency is Uncontested

4. Professor Fischel repeatedly acknowledges my conclusion in the Gelbach Report that the market for Facebook Stock was efficient.[4] He does not challenge this conclusion, offers no argument to the contrary, and in fact appears to affirmatively agree with it.[5]

5. Mr. Dirks also acknowledges my conclusion in the Gelbach Report that the market for Facebook Stock was efficient,[6] does not challenge this conclusion, and offers no argument to the contrary.

6. Professor Zhang does not challenge nor even mention my conclusion that Facebook Stock traded in an efficient market.[7]

7. In sum, none of Defendants' three experts contests my conclusion, stated in the Gelbach Report, ¶10, that the market for Facebook Stock was efficient during the Class Period.

---

[4] Fischel Report, ¶¶26, 32, 38, 39, 48, 53, 57.

[5] *Id.*, ¶51, n. 98 (claiming that "because the Company's stock traded in an efficient market," statements in a news article must have been reflected in the stock price following that article's publication).

[6] Dirks Report, ¶¶127, 143.

[7] The Zhang Report's only uses of the word "efficient" relate to contexts entirely distinct from the question of semi-strong market efficiency of Facebook Stock. *See* Zhang Report, ¶15b, n. 8 (discussing statistical efficiency of estimators) and *id.*, ¶45.

## IV. Analysis of the Fischel Report

8. The Fischel Report agrees with the Gelbach Report on several fundamental facts related to my assignment in the Gelbach Report:

(a) Professor Fischel agrees with the Gelbach Report that an event study is an appropriate method for determining whether a Stock responds to new information as expected in a semi-strong efficient market.[8]

(b) Professor Fischel voices no disagreement with the event study models I present.[9]

(c) Professor Fischel registers no disagreement with my methodology for determining statistical significance.

(d) Professor Fischel and I reach the same conclusion regarding the sign and statistical significance of the March 19, 2018 abnormal return—that it is negative and statistically significant.[10]

(e) Professor Fischel and I reach the same conclusion about the March 20, 2018 abnormal return—that it is negative and statistically significant.[11]

---

8 Fischel Report, ¶31.

9 He does refer to Model 2 as "non-traditional," Fischel Report, ¶41, n. 78, which is true enough, inasmuch as the model is based on a method designed to improve on traditional methods. I note, though, that I agree with Professor Fischel that Model 1 is a "traditional" one. *Id.*

10 Fischel Report, ¶43 (describing his own event study-based conclusion agreeing that the March 19, 2018 abnormal return was negative and statistically significant).

11 Fischel Report, ¶50 (describing his own event study-based conclusion agreeing that the March 20, 2018 abnormal return was negative and statistically significant).

(f) Professor Fischel and I reach the same conclusion about the July 26, 2018 abnormal return—that it is negative and statistically significant.[12]

9. The balance of my discussion about the Fischel Report will explain why he is wrong on the two points of substantive disagreement he *does* raise: price impact and damages computation.

### A. Professor Fischel Fails to Establish a Lack of Price Impact

10. I understand that Defendants must prove a complete lack of price impact to rebut the *Basic* presumption of reliance that flows from the Gelbach Report's demonstration that the market for Facebook stock is semi-strong efficient. The Fischel Report falls short of that hurdle for two reasons.

11. First, Professor Fischel's "Truth on the Market" opinion contradicts the Ninth Circuit and district court's holdings, the facts, and his own prior jury testimony.

12. Second, Professor Fischel ignores overwhelming evidence of back end price impact in March and July of 2018.

#### 1. Professor Fischel's "Truth on the Market" Opinion Contradicts the Ninth Circuit and District Court's Holdings and His Own Prior Testimony, and Ignores the Facts

13. Professor Fischel claims that there was no price impact to disclosure of "Initial Misuse" in March 2018. In his opinion, the existence of prior news reports meant that investors knew all the facts, despite Facebook's denials and public silence, so that any such price impact must have occurred before Facebook finally admitted some of the facts about the Cambridge

---

[12] Fischel Report, ¶56 (describing his own event study-based conclusion agreeing that the July 26, 2018 abnormal return was negative and statistically significant).

Analytica scandal in its March 16, 2018 blog post, which was followed by additional news reporting.

14. Several notable authorities contradict Professor Fischel. The first two are the Ninth Circuit and the District Court in this case. These courts have already explained why the December 2015 *Guardian* article and March 2017 *Intercept* article did not adequately reveal the full truth:

(a) "Before the March 2018 news broke, reasonable investors would not have known that Cambridge Analytica had improperly accessed Facebook users' data such that users did not have control over their personal information on the platform."[13]

(b) "[T]he Court echoes the Ninth Circuit in finding that reasonable investors would not have known that Cambridge Analytica had improperly accessed Facebook users' data such that users did not have control over their personal information on the platform."[14]

15. Another key source of disagreement with Professor Fischel's opinion in the present case is Professor Fischel himself. The Fischel Report contends that "reliable economic evidence that the disclosure of the Initial Misuse impacted Facebook's stock price" would have to come from evidence of price decline immediately following the December 2015 *Guardian* and March

---

[13] Ninth Circuit Opinion at 954; *see also id.* at 950 (discussing why the December 2015 *Guardian* and March 2017 *Intercept* articles "did not confirm before the 2016 10-K was filed that Cambridge Analytica had acted improperly or whether Facebook had taken the 'swift action' promised if it learned of violations," but rather "represented that no misconduct had been discovered"); *id.* at 955 ("The Cambridge Analytica revelation thus satisfies the pleading criteria for a corrective disclosure, which requires allegations that "the defendant's fraud was 'revealed to the market and caused the resulting loss[ ].'").

[14] MTD Opinion at 24; *see also id.* ("[H]ere, Facebook did not simultaneously disclose the initial misuse in other contexts—news outlets did. Indeed, in response to the 2015 *Guardian* article—the one that broke the story of the initial misuse—Facebook merely promised that it was 'carefully investigating' Cambridge Analytica.").

2017 *Intercept* articles.[15] But at trial in *Jaffe v. Household International* ("*Household*"), Professor Fischel told a jury exactly the opposite with respect to investor knowledge about defendant Household's alleged fraud:

> Q. … Now, reaching your opinion about inflation, did you consider whether investors during the relevant period were fully informed about Household's accounting and lending practices?
>
> A. I did.
>
> Q. And what did you find?
>
> A. I found that they were not fully informed for a number of different reasons.
>
> Q. And what were the reasons?
>
> A. Well, first, the ***disclosures coming out criticizing Household's practices didn't come from Household;*** and if a company is disclosing information about itself, it's one thing for third parties to comment, but ***it's another thing for the information to come directly from the company itself.***
>
> ***Since the company was not disclosing what the analysts and the critics were saying, market participants did not have full information***.[16]

16. And in an expert report he filed in the *Household* case, Professor Fischel also argued for the critical significance of a company's own ***first-time*** admission of previously denied facts. An expert witness for the *Household* defendants had written that a news article "Only Provided Stale Information" because "'complaints regarding Household's lending practices in Whatcom County, Washington had emerged almost four months earlier!'"[17] Professor Fischel responded by highlighting the first sentence of that news article, which was: "'***For the first time, Household International has acknowledged*** that its employees may have misrepresented

---

[15] Fischel Report, ¶¶39-40.

[16] *Household* Trial Transcript at 2684:7-23 (Apr. 16, 2009).

[17] *Household* Rebuttal Report of Daniel R. Fischel, ¶25 ("*Household* Fischel Rebuttal Report") (signed Feb. 1, 2008).

mortgage loan terms to some Whatcom County homeowners ….'"[18] Professor Fischel called that sentence "particularly significant," because "the article went on to report that" until then, "'company spokesmen have portrayed Household as an industry leader in consumer protection, with elaborate safeguards.'"[19] And Professor Fischel had more to say in *Household* that is inconsistent with what he says in this Litigation. For example:

- Here, Professor Fischel proclaims that "if an alleged misstatement or purported corrective disclosure is not associated with a statistically significant residual return in the appropriate direction…, then there is no scientific and reliable economic basis to conclude that the new information had an impact on the stock price."[20]

- But in an expert report he submitted in *Household,* Professor Fischel attested to the opposite view—that "***the fact that the market did not react significantly*** on every day that incomplete information related to Plaintiffs' allegations was disclosed ***is consistent with my conclusion that artificial inflation leaked out of Household's stock price*** in the latter part of the Class Period."[21]

17. Thus, Professor Fischel has given prior sworn testimony that he believes third-party statements do not necessarily fully inform investors of the truth of the stated facts, that such statements are particularly less informative in the face of company denials, that a company's own first confession is informationally important, that such a confession is "particularly significant" when it contradicts the position previously taken by company spokespeople, and that absence of statistical significance does not prove the absence of corrective disclosure. Each of these positions

[18] *Household* Fischel Rebuttal Report, ¶25.

[19] *Household* Fischel Rebuttal Report, ¶25.

[20] Fischel Report, ¶36.

[21] *Household* Fischel Rebuttal Report, ¶5, n. 3.

directly rebuts key positions Professor Fischel has staked out in his rebuttal report in this Litigation.

18. Unlike the position Professor Fischel takes in this case, Professor Fischel's previously articulated views in *Household* had it right on issues relating to the truth-on-the-market argument. His prior approach is consistent with the proper economic analysis set forth in the Gelbach Report (as well as the Ninth Circuit and District Court opinions approving this analytical approach in this Litigation). Professor Fischel fails to explain the stark reversal in his approach, and he is wrong about his truth-on-the-market argument.

19. Professor Fischel also argues that if the market impounded Facebook's March 2017 statement to The Intercept that its "investigation to date has not uncovered anything that suggests wrongdoing," it must also have impounded the rest of that article, including the unconfirmed report that Facebook stated it believed that the data had been deleted.[22] I agree that a semi-strong efficient market would have impounded both statements to the extent that investors credited them. But as Professor Fischel's testimony clearly articulated, investors may differentially credit statements made by the Company on the record and unsourced reporting about what it may have believed. And Professor Fischel's argument in this Litigation has a bigger problem: it misses or disregards the point that a market that impounded (a) Facebook's assurance that its investigation had found no wrongdoing, as well as (b) third-party reporting that Facebook believed the data had been deleted, was a market *that did not know the facts Facebook later confirmed in March 2018*. Even leaving aside Professor Fischel's contradiction of his prior (correct) position in *Household*, then, the logic and economic principles underlying Professor Fischel's argument in this Litigation

[22] Fischel Report, ¶48, n. 92.

*support*, rather than undermine, the conclusion that share-price inflation was maintained until the March 2018 disclosures.

### 2. Professor Fischel's Event Study Evidence Is Irrelevant to the Question of Price Impact in this Case

20. Professor Fischel devotes 13 pages of the Fischel Report to the question of front-end price impact, and he spends another 4 pages introducing and describing his event study results to analyze the publication dates of the December 2015 *Guardian* and March 2017 *Intercept* articles, all meant to support his argument that there is no price impact.[23]

21. However, Professor Fischel is no stranger to the idea of confirmatory price inflation, which is part of the Plaintiffs' theory of liability in this Litigation. In his *Household* Rebuttal Report, Professor Fischel wrote that "***the observed market price can become inflated even if it remains basically constant because, had adverse information been disclosed, the market price would have declined***."[24]

22. In a deposition in *Household*, Professor Fischel testified that "***a disclosure which contains an omission can create inflation even if there is no price reaction to it***."[25]

23. And at trial in *Household*, Professor Fischel explained to the jury the same phenomenon that is at work in this Litigation:

---

[23] I note that Professor Fischel commits a fundamental error of statistical methodology in his analysis of those subjects: He treats a *failure to reject* the null hypothesis as *proof that this hypothesis is true*. Every introductory statistics student is taught that is wrong. *See, e.g.*, Neil A. Weiss, *Elementary Statistics*, p. 392, (6th ed. 2005) ("[I]f we do not reject the null hypothesis in a hypothesis test, we simply reserve judgment about which hypothesis is true. In other words, ***if we do not reject the null hypothesis***, we conclude only that the data did not provide sufficient evidence to support the alternative hypothesis; ***we do not conclude that the data provided sufficient evidence to support the null hypothesis***.").

[24] *Household* Fischel Rebuttal Report, ¶38, n. 30.

[25] *Household* Deposition of Daniel Fischel at 125:21-126:21 (Mar. 21, 2008).

> [T]here are two classic situations where inflation can exist.
>
> One situation is where a company makes a false statement and the stock price rises to a level that's higher than it would have been in the absence of the false statement. That would be a classic misrepresentation situation.
>
> There is also an equally equivalent way that inflation can occur ***if a company discloses information but fails to disclose something negative about itself that it knows about but investors in the marketplace do not know about***. In that situation ***the stock is inflated because the stock is prevented from falling to a lower level***, which is the level that the stock would have fallen to had the company disclosed the additional negative information that it failed to disclose. That's a traditional omission type of situation causing inflation.[26]

### 3. Professor Fischel Ignores Overwhelming Evidence of Back-End Price Impact in March and July 2018

24. The Gelbach Report provides overwhelming statistical evidence of price impact on the back end via the revelations that caused the stock price declines on March 19 and 20 and July 26, 2018. Professor Fischel does not contest that the price declines on these three dates (measured as abnormal returns) were statistically significant. Indeed, Professor Fischel's own event study results strongly support the conclusion that this back-end price impact occurred via his finding of statistically significant negative abnormal returns on these dates.[27]

25. To avoid recognizing price impact on these dates, however, Professor Fischel claims that there was some *other* type of price impact that caused the stock price declines—while undertaking no effort to quantify any supposed non-fraud causes. For example, he erroneously claims that *only* Continued Misuse facts and other information were revealed on March 16 and 17, 2018, and that "the Initial Misuse information in the March 2018 Disclosures was not new

---

[26] *Household* Trial Transcript at 2605:4-19 (Apr. 16, 2009).

[27] Fischel Report, Appendix C.

information."[28] As discussed above, this claim contradicts determinations made in this Litigation by both the Ninth Circuit and the District Court, is contrary to the facts, and it relies on the same misguided "truth on the market" arguments that Professor Fischel himself repeatedly rejected in prior expert reports and trial testimony.

26. Moreover, the Fischel Report *itself* contradicts Professor Fischel's position as to back-end price impact by quoting and citing sources attributing the March 16-17, 2018 revelations to "Initial Misuse" facts.

**a. March 2018 Declines**

27. Professor Fischel says that "[m]arket participants attributed the residual declines in Facebook's stock price on March 19, 2018 and March 20, 2018 to a confluence of factors distinct from the Initial Misuse claim as described by the Court."[29] As an initial matter, Professor Fischel fails to describe his methodology for parsing between Initial Misuse and Continued Misuse facts. Professor Fischel does not identify any statistical test, regression, valuation analysis, or other tool of financial economics showing that Continued Misuse facts, but not Initial Misuse facts, caused the March 19 and 20 declines. He does not attempt to quantify the portion of either decline he attributes to Continued Misuse or to any other factor. His conclusion rests entirely on his characterization of a selection of analyst and press commentary, much of which, as I show below, actually attributes the declines to Initial Misuse facts. And Professor Fischel affirmatively asserts

[28] Fischel Report, ¶¶44-45. Defendants also do not contend that any Continued Misuse facts caused any portion of the March 19-20, 2018 price drops. Defendants' Amended Responses and Objections to Lead Plaintiffs' First Set of Interrogatories to All Defendants, dated October 19, 2026 ("Defendants' Amended Interrogatory Responses"), Response No. 2 and Response No. 8 (stating that Defendants "do not currently have contentions about the cause(s) of the March 2018 Price Declines").

[29] Fischel Report, ¶45.

that the categories he has drawn cannot be separately quantified, which concedes that he lacks any economic basis to conclude that Initial Misuse facts accounted for none of the declines. Further, as I explain below, the only reasons he offers for treating Continued Misuse facts as unrelated to Initial Misuse fail to withstand scrutiny—in fact, they confirm the causal link. But even putting all that aside and accepting arguendo Professor Fischel's dichotomy, his analysis still fails to establish the complete absence of price impact.

(a) Notably, Professor Fischel does not (because he cannot) say that *no* market participants attributed the March 2018 price drops to "the Initial Misuse claim as described by the Court." As the Fischel Report states: "Information will be reflected in the prices of stocks traded in an efficient market even if only a few investors are aware of it";[30] to back up this proposition, Professor Fischel cites an introductory economics textbook "by Stiglitz (a Nobel Prize laureate) and Walsh (2006)"[31] for the proposition that "'[i]f enough participants have information, prices will move as if the whole market had the information.'"[32] Thus, to prove that the March 2018 price declines were ***not*** caused by the revelation of fraud (which he attempts but fails to do), Professor Fischel's own standard requires him to show that there were not even a few investors who regarded the "Initial Misuse" facts in the March 2018 disclosures as new information. Professor Fischel does not even attempt to do that.

---

[30] Fischel Report, ¶32, n. 66.

[31] Fischel Report, ¶32, n. 66 (citing J.E. Stiglitz and C.E. Walsh, ECONOMICS (4th ed. 2006)).

[32] Fischel Report, ¶32, n. 66 (quoting J.E. Stiglitz and C.E. Walsh, ECONOMICS 882 (4th ed. 2006)).

(b) In fact, Professor Fischel does just the opposite: he offers plentiful evidence in his own report that market participants *did* attribute the March 2018 price drops to "the Initial Misuse claim as described by the Court." For example:

(i) Professor Fischel quotes a March 19, 2018 Deutsche Bank report's statement that: "'***The first concern here is the leakage of personal data***, though the more troubling issue seems to be how ***this data was then used to target political ads***, and then finally, how CA could potentially be tied to Russia.'"[33]

(ii) Professor Fischel's quotation from a March 17, 2018 article in *WCCF Tech* includes the statement that "the problem is ***Facebook's silence on the matter until it was pushed by the whistleblower who made the details public***…. In its press release, Facebook … takes no charge of its policies that allowed such behavior or says anything about why ***the affected users weren't informed***…."[34]

(iii) Professor Fischel twice cites the March 17, 2018 *Guardian* story by its title[35] but never grapples with the fact that the title is "***Revealed***: 50 million Facebook profiles ***harvested*** for Cambridge Analytica in major data breach," nor that the subtitle is "***Whistleblower describes how firm*** linked to former Trump adviser Steve Bannon ***compiled user data*** to target American voters."[36]

---

[33] Fischel Report, ¶47 (quoting Deutsche Bank, *Opening Pandora's Box?* (Mar. 19, 2018)). Note that the quoted text makes no distinction between advertising use for the Cruz campaign or later.

[34] Fischel Report, ¶46 (quoting Rafia Shaikh, *50 Million Facebook Profiles Harvested Without User Consent – Data Monster Chose NOT to Alert Victims & Is Trying to Threaten Reporters*, WCCF Tech (Mar. 17, 2018), https://wccftech.com/50-million-facebook-profiles-harvested/).

[35] Fischel Report, ¶13 n. 16; *id.* n. 18.

[36] Carole Cadwalladr & Emma Graham-Harrison, *Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach*," The Guardian (Mar. 17, 2018).

(c) Sources cited by Professor Fischel also attributed the March 2018 price drops to "the Initial Misuse claim as described by the Court" in passages Professor Fischel did not quote. For example:

(i) Professor Fischel repeatedly cites a *San Francisco Chronicle* article without acknowledging that it refers to the fact that Cambridge Analytica "***obtained data on 50 million people from Facebook without their consent***."[37]

(ii) Professor Fischel omits the lead sentence in the March 17, 2018 article in the *WCCF Tech* he cited,[38] which is: "***News broke late last night revealing*** how a startup data analytics firm, Cambridge Analytica, ***harvested profiles of millions of Facebook users*** in what is being termed the company's 'biggest ever data breach.'"[39] And the article also says (also omitted by Professor Fischel) that "***[t]he problem here is how Facebook, the biggest social network, chose to stay silent and not inform the affected users***."[40]

(iii) Professor Fischel twice quotes a March 19, 2018 financial report by Pivotal Research Group, but he omits this text: "Over the weekend, ***reporting in***

---

[37] Trisha Thadani, *Facebook stock takes another hit amid reported probe, #DeleteFacebook campaign,* San Francisco Chronicle, (Mar. 21, 2018), https://www.sfchronicle.com/business/article/Facebook-stock-takes-another-hit-amidprobe-12768613.php; Source cited, without quoting this text, in Fischel Report, ¶¶13, 45, and 52.

[38] Fischel Report, ¶46.

[39] Rafia Shaikh, *50 Million Facebook Profiles Harvested Without User Consent – Data Monster Chose NOT to Alert Victims & Is Trying to Threaten Reporters*, WCCF Tech (Mar. 17, 2018), https://wccftech.com/50-million-facebook-profiles-harvested/; source quoted, with this text omitted, in Fischel Report, ¶46.

[40] Rafia Shaikh, *50 Million Facebook Profiles Harvested Without User Consent – Data Monster Chose NOT to Alert Victims & Is Trying to Threaten Reporters*, WCCF Tech (Mar. 17, 2018), https://wccftech.com/50-million-facebook-profiles-harvested/.

**The New York Times** ***and*** **The Guardian's Observer** ***provided expanded details on a 50 million-person data leak***, building on initial reporting in *The Guardian* from December 2015 that apparently went unheeded. ***Made clear in the reporting is that Facebook*** did not make sufficient efforts to recover users' data, which then informed ad targeting in the 2016 US election. It also ***did not disclose the leak to users or investors***."[41]

28. Additional market commentary not cited by Professor Fischel at all also linked the March 19, 2018 decline to the Cambridge Analytica scandal, including specifically the "Initial Misuse" facts related to how Cambridge Analytica initially obtained Facebook user data:

(a) In a March 19, 2018 story titled "Facebook shares slump amid continued fallout from Cambridge Analytica scandal," *CNBC*'s lead was that "Facebook shares fell as much as 8 percent on Monday ***after reports that Cambridge Analytica mined the data of over 50 million users of the social network without their permission***," and the story went on to report that "Whistleblower Christopher Wylie ***revealed*** the alleged role played by Cambridge Analytica in ***obtaining data from Facebook users to The Observer newspaper in the U.K. and The New York Times***," with links provided to the March 17 articles at issue here.[42]

---

41 Pivotal Research Group, *FB: Data Leak Details Described, Enhancing Risks*, (Mar. 19, 2018)); cited, without including this text, in Fischel Report, ¶¶46, 47. In addition, CNBC published a March 19, 2018 article (not cited by Professor Fischel) around this analyst report, including the text: "What was "'made clear in the reporting is that ***Facebook*** did not make sufficient efforts to recover users' data, which then informed ad targeting in the 2016 US election. It also ***did not disclose the leak to users or investors***,'" analyst Brian Wieser wrote in a note to clients Monday." Tae Kim, *Data leak 'another indication of systemic problems at Facebook' so sell the stock, analyst says*, CNBC (Mar. 19, 2018), https://www.cnbc.com/2018/03/19/pivotal-research-data-leak-another-indication-of-systemic-problems-at-facebook.html.

42 Arjun Kharpal, *Facebook shares slump amid continued fallout from Cambridge Analytica scandal*, CNBC (Mar. 19, 2018), https://www.cnbc.com/2018/03/19/facebook-shares-fall-over-fallout-from-cambridge-analytica-scandal.html.

(b) In a March 19, 2018 story titled "Facebook shares slide after reports of data misuse," *Reuters*' lead was that "Facebook Inc's shares fell more than 4 percent in premarket trading after media reports that a political consultancy that worked on President Donald Trump's campaign ***gained inappropriate access to data on 50 million Facebook users***."[43]

(c) In a March 19, 2018 story titled "Facebook shares crushed after data controversy," *CBS News*' lead was that "Facebook (FB) shares fell nearly 7 percent Monday amid controversy over how Cambridge Analytica, which was hired by President Trump's 2016 campaign, ***was able to harvest personal data from more than 50 million Facebook users***," and went on to report how "***Facebook says it initially gave out the data to a researcher who claimed it would be used only for academic purposes***. ***Facebook claims the researcher then 'lied to us' and passed the content onto Cambridge Analytica***."[44]

29. Professor Fischel also quotes a March 21, 2018 *New Yorker* article asserting that the March 2018 disclosures "'were not really revelations at all'" because reporters had been covering the underlying facts for years.[45] One commentator's observation that some factual statements had been reported earlier does not show that the market had priced those statements as confirmed truth. It is also contradicted by the contemporaneous commentary discussed above, which repeatedly described the March 2018 news as "revealed," noted that the earlier reporting "apparently went unheeded," and emphasized that Facebook had not previously acknowledged the

[43] Munsif Vengattil, *Facebook shares slide after reports of data misuse*, Reuters (Mar. 19, 2018), https://www.reuters.com/article/world/facebook-shares-slide-after-reports-of-data-misuse-idUSKBN1GV1E2/.

[44] Aimee Picchi, *Facebook shares crushed after data controversy*, CBS News (Mar. 19, 2018), https://www.cbsnews.com/news/facebook-stock-price-slides-amid-questions-over-cambridge-analytica/.

[45] Fischel Report, ¶44 & n. 81.

data harvesting. And Professor Fischel's reliance on a single article is in tension with his own position that a single market participant's views are insufficient to establish what the market priced.[46]

30. Professor Fischel also fails to consider any of Facebook's internal communications and documents that further link the March 19-20 stock price declines directly to Initial Misuse facts concerning Cambridge Analytica's gathering of Facebook user data. For example:

[redacted]

---

[46] Fischel Report, ¶32 n. 66.

[redacted]

[redacted]

31. Instead of addressing this evidence, Professor Fischel contends that "market participants linked the price reactions to growing concerns of foreign election interference," quoting several analyst reports that mentioned Russia.[51] But Professor Fischel provides no evidence that Russian election interference caused the entire decline documented in the Gelbach Report. In fact, he provides no evidence that such interference caused *any* of Facebook's price decline. Professor Fischel does not even attempt to quantify the impact he thinks Russia-related concerns had, precluding him from using this explanation to meet the "complete lack of price impact standard" that I understand he and Defendants are attempting to satisfy.

32. Much of Professor Fischel's argument about the March 16-17, 2018 disclosures revolves around his attempt to cleave their price impact on March 19 and 20 into entirely independent "Initial" and "Continued" Misuse categories, and then to claim that all price impact fits within the latter category without any supporting analysis. I have already demonstrated that that attempt fails even when attention is restricted to Professor Fischel's own evidence, by showing that numerous quotations from news articles and analyst reports he cites belong to his Initial Misuse category. *See* ¶¶27-28, *supra*. Further, Professor Fischel himself says it would be impossible for him to separately quantify how much price impact is attributable to each of the

[redacted]

[51] Fischel Report, ¶47.

categories as he has drawn them.[52] Thus, Professor Fischel's own evidence and statements preclude him from proving Continued Misuse facts caused the entire declines on March 19 and 20, 2018.

33. And even leaving aside the copious evidence that market participants and Facebook executives saw the March 16-17, 2018 blog post and news articles regarding Cambridge Analytica as materially changing the mix of information about Facebook, Professor Fischel is also wrong to claim that facts related to Continued Misuse cannot have caused price impact attributable to his description of the Initial Misue in this case. By its nature, Continued Misuse was impossible without Initial Misuse—something cannot *continue* if it has not *started*—so any share-price inflation caused to be removed by revelations of Continued Misuse is causally linked and downstream of Initial Misuse.

34. Loss causation and damages that flow from Continued Misuse are the natural and foreseeable economic consequences of the Initial Misuse, which I understand is "the basis of a theory of fraud" by dint of the falsity and scienter with respect to user control and risk factor statements that Initial Misuse establishes, pursuant to the Ninth Circuit and District Court opinions.[53] Professor Fischel's contrary position fails for several reasons:

---

[52] Fischel Report, ¶81 (arguing that traditional tools of financial economics that "require financial metrics such as earnings and cash flow information" cannot be used to separate price declines due to "Initial Misuse and Continued Misuse" because their "nature … defies numerical categorization"). Although, as discussed below, such tools can accomplish this task if required, Professor Fischel's own assertion that it cannot be done, along with his failure to even try, renders unsupported and speculative his conclusion that each of the declines was caused entirely by non-fraud related factors.

[53] This is consistent with the District Court's acknowledgment that the Ninth Circuit credited Continued Misuse facts "most prominently in a section that analyzes loss causation." MTD Opinion at 28 (citing Ninth Circuit Opinion at 957). Coupled with the District Court's ruling that Plaintiffs failed to appeal the dismissal of the "continued misuse sub-theory of the Cambridge

(a) Plaintiffs' contention is economically sound. As I understand it, Plaintiffs contend that "once Facebook user data was transferred to Cambridge Analytica through the so-called initial misuse, the resulting loss of control over that data – including its retention, downstream use, and Facebook's inability to retrieve or contain it – was a foreseeable consequence of the initial misuse that had already occurred."[54] Plaintiffs also contend that information about Cambridge Analytica's "retention or downstream use of the data is causally connected to the initial-misuse and user-control statements," because it "illuminated the scope, seriousness, and/or foreseeable consequences of the initial misuse and users' lack of control."[55] That is consistent with basic economics. Once tens of millions of users' data had left Facebook's control without their consent, Facebook had no reliable way to ensure the data were destroyed or to prevent their further use. Retention and downstream use are the natural consequence of that loss of control—not some surprising and unrelated event.

(b) Professor Fischel's lone response to Plaintiffs' position appears in a single paragraph of his report.[56] Professor Fischel maintains that Plaintiffs (and I) somehow fail to explain why "the Initial Misuse was not fully reflected in the stock price prior to the March

---

Analytica theory of fraud" (*id.* at 29), I understand that the Ninth Circuit necessarily endorsed Continued Misuse facts as supporting Initial Misuse loss causation.

[54] Lead Plaintiffs' Amended Responses and Objections to Defendants' First Set of Interrogatories to Plaintiffs, dated August 21, 2026 ("Plaintiffs' Amended Interrogatory Responses"), Response No. 1; quoted in Fischel Report, ¶48.

[55] Plaintiffs' Amended Interrogatory Responses, Response No. 1; *see also id.*, Response No. 2, which identifies retention and downstream-use language "insofar as it illuminated the scope, persistence, seriousness, or foreseeable consequences of the initial misuse and Facebook users' lack of control – not as an independent basis for establishing falsity."

[56] Fischel Report, ¶48 & n.93.

2018 Disclosures."[57] But as I explain both above and below, overwhelming econometric and qualitative evidence demonstrates that Initial Misuse facts were material contributors to the March 19 and 20, 2018 price drops.[58]

(c) Professor Fischel then writes that foreseeable consequences of Initial Misuse "would only be foreseeable if the Defendants had disclosed that the user data were *not* deleted."[59] Professor Fischel's error here is to imagine that Plaintiffs' contention centers on foreseeability to the ***market***, rather than to ***Facebook***. Plaintiffs contend that Continued Misuse was "a foreseeable consequence of the initial misuse," and they contend that Facebook's "alleged false and misleading statements" had "concealed" the truth that users lacked control over their data and that Facebook had already suffered data misappropriation that rendered the risk factor statements misleading.[60] Nowhere do Plaintiffs (or I) contend that ***the market*** could foresee all the consequences of Facebook's false and misleading statements. In fact, Plaintiffs' allegation of concealment is just the ***opposite*** of that: Plaintiffs contend that the downstream consequences of the initial misuse were, all along, ***concealed by Facebook***. But these consequences were, naturally, ***foreseeable for Facebook***. Thus, once Facebook learned of Cambridge Analytica's acquisition of user data through the Initial Misuse, the Continued Misuse was foreseeable. The ***market***, of course, did not know the Continued Misuse that Facebook could foresee, due to Defendants' fraudulent concealment ***of the Initial Misuse***. In

---

57 Fischel Report, ¶48.

58 *See supra* ¶¶24, 27-28, 30.

59 Fischel Report, ¶48.

60 Plaintiffs' Amended Interrogatory Responses, Response No. 1 at 8 (quoted in Fischel Report, ¶48).

sum, the Fischel Report misrepresents Plaintiffs' position in this Litigation, confusing the true subject of Plaintiffs' foreseeability contention, so that the Fischel Report fails to recognize the full causal impact of the Initial Misuse on Facebook's Stock price in March 2018.

(d) Professor Fischel also asserts that, because the market supposedly knew of the Initial Misuse before March 2018, it "would have priced in the expected value of any foreseeable consequences, such as the risk that the data were not deleted."[61] By calling the "risk" that "the data were not deleted" a "foreseeable consequence" of the Initial Misuse, Professor Fischel acknowledges that Continued Misuse facts are economically downstream of, and causally connected to, the Initial Misuse. That concedes the point in dispute.

(e) Professor Fischel's description of what the market learned also concedes the Initial/Continued Misuse link. He states that Facebook's stock declined on March 19, 2018 "after the Company disclosed that the data were not destroyed and not under Facebook's control."[62] But news that Facebook user data were "not under Facebook's control" was news that users did not control their data and that the risk of improper third-party access had already come to pass. That is precisely the subject matter of the user control and risk factor statements. Labeling that information "Continued Misuse" does not change its economic content: it describes the same loss of control, revealed more fully.

35. With respect to the March 20 back-end price impact, the Gelbach Report explains that it is tied to Facebook's admissions in its March 16 blog post and the additional revelations in the March 17 stories in *The New York Times* and *The Guardian*, observing that "the mix of information available to the public continued to develop between market closing on the days of

61 Fischel Report, ¶48.

62 Fischel Report, ¶48.

March 19 and March 20," and further observing that it could take the market time to digest and make sense of the array of information that had been disclosed over the March 16-18 weekend.[63]

36. Of particular note was a March 20, 2018 article in *The Guardian* titled, "'Utterly horrifying': ex-Facebook insider says covert data harvesting was routine," in which former Facebook employee Sandy Parakilas, who was described as "responsible for policing data breaches by third-party software developers between 2011and 2012."[64] Key passages from this article that bear on this Litigation include (all bullet points contain direct quotes from the article):

- ***"Hundreds of millions of Facebook users are likely to have had their private information harvested by companies that exploited the same terms as the firm that collected data and passed it on to Cambridge Analytica, according to a new whistleblower*."**
- "'My concerns were that ***all of the data that left Facebook servers to developers* could not be monitored by *Facebook***, so we ***had no idea what developers were doing with the data***,' he said."
- "Parakilas said ***Facebook*** had terms of service and settings that "'people didn't read or understand'" and the company ***did not use its enforcement mechanisms, including audits of external developers, to ensure data was not being misused***."
- "***Parakilas***, whose ***job was to investigate data breaches by developers similar to the one later suspected of Global Science Research***, ***which harvested tens of millions of Facebook profiles and provided the data to Cambridge Analytica***, said the slew of recent disclosures had left him disappointed with his superiors for not heeding his warnings. "'It has been painful watching,'" he said, "'because I know that they could have prevented it.'"
- "Asked ***what kind of control Facebook had over the data given to outside developers, he replied: 'Zero. Absolutely none. Once the data left Facebook servers there was not any control***, and there was no insight into what was going on.'"

---

[63] Gelbach Report, ¶¶118-121.

[64] Paul Lewis, '*Utterly horrifying': ex-Facebook insider says covert data harvesting was routine*, The Guardian (Mar. 20, 2018).

- "***Parakilas said he 'always assumed there was something of a black market' for Facebook data that had been passed to external developers***."

- "Parakilas first went public with his concerns about privacy at Facebook four months ago, but ***his direct experience policing Facebook data given to third parties throws new light on revelations over how such data was obtained by Cambridge Analytica***."

- "Parakilas, 38, who now works as a product manager for Uber, is particularly critical of ***Facebook's previous policy of allowing developers to access*** the ***personal data of friends*** of people who used apps on the platform, ***without the knowledge or express consent of those friends***."

- "***Parakilas*** does not know how many companies sought friends permission data before such access was terminated around mid-2014. However, he ***said he believes tens or maybe even hundreds of thousands of developers may have done so***."

- "***Parakilas estimates that 'a majority of Facebook users' could have had their data harvested by app developers without their knowledge***."

- "Academic research from 2010, based on an analysis of 1,800 Facebooks apps, concluded that around 11% of third-party developers requested data belonging to friends of users. If those figures were extrapolated, ***tens of thousands of apps, if not more, were likely to have systematically culled 'private and personally identifiable' data belonging to hundreds of millions of users, Parakilas said***."

37. Professor Fischel acknowledges and does not object to the econometric conclusions in the Gelbach Report about the March 20 evidence.[65] In fact, the Fischel Report contains the same qualitative conclusion based on Professor Fischel's own event study—a statistically significant price decline on March 20.[66]

---

65 Fischel Report, ¶50.

66 Fischel Report, ¶50, n. 97. Professor Fischel's Appendix C shows that his estimate of the March 20 price decline is 3.04%, Fischel Report, Appendix C, at 8, a bit larger than the price decline estimate of 2.89% provided in the Gelbach Report, ¶148, tbl. 5.

38. Unable to challenge the econometric conclusion that he also reached, Professor Fischel resorts to several unavailing arguments. First, he argues that the March 20 *Guardian* story did not matter, because Parakilas had left Facebook before Kogan harvested the data at the center of the "Initial Misuse" (and thus the "Continued Misuse").[67] But nothing in the March 20 story is predicated on Parakilas's personal involvement in Kogan's specific actions; the story turns on Parakilas's knowledge of Facebook's policies and actions that allowed companies to "exploit[] the same terms as the firm that collected data and passed it on to Cambridge Analytica,"[68] whose accuracy Professor Fischel does not question.

39. Professor Fischel also rehashes his truth-on-the-market argument to claim that the March 20 *Guardian* story could not have mattered because the academic research mentioned in the March 20 *Guardian* story was published in 2010 and, "because the Company's stock traded in an efficient market, the information in this published article was reflected in the stock price before March 20, 2018."[69] But of course, the March 16-17, 2018 revelations had not happened in 2010, so the import of the academic article would not have "been reflected in the stock price" in 2010, because the importance of the academic research to the events at issue here would not have been evident to investors until March 2018.[70]

---

[67] Fischel Report, ¶51.

[68] *See* ¶36 above.

[69] Fischel Report, ¶51, n. 98.

[70] Professor Fischel's contention that the academic article "does not establish that half of Facebook's user data were acquired and exploited by third-party app developers" (Fischel Report, ¶51, n. 98) is also beside the point, because the March 20 *Guardian* story does not say that half of Facebook's user data were acquired. Instead, it quotes Parakilas as saying that "a majority of ***Facebook users***" (Parakilas's words) might have "***had their data harvested*** by app developers without their knowledge" (*The Guardian* story's words); *see* ¶36 above for the full quotation. But even if the March 20 *Guardian* story lacked perfect precision in relating the findings of the 2010 academic article, arguing about the contents of that article, as Professor Fischel does in his

40. Next, Professor Fischel argues that the March 20 *Guardian* story does not count, once again leaning on his misguided Initial/Continued Misuse distinction. The quotations in ¶36 above show that facts relating to Initial Misuse were discussed in detail in the March 20 *Guardian* story, so that Professor Fischel is wrong to claim that "Mr. Parakilas' assertion is distinct from the definition[] of Initial Misuse."[71] The numerous passages quoted above repeatedly discuss how Facebook's policies and practices allowed app developers (including Kogan) to easily access user-friends data without their consent or knowledge, as well as Facebook's failure to do anything to stop the misuses of such data via transfer to third parties (including Cambridge Analytica). Further, as quoted above, the article explains that Parakilas's "direct experience policing Facebook data given to third parties ***throws new light on revelations over how such data was obtained*** by Cambridge Analytica." Professor Fischel may not be convinced by the March 20 *Guardian* story, but recall his own standard is that only "a few investors" had to be convinced for the story to cause price impact.[72]

41. Professor Fischel also hypothesizes that there may have been *additional* causes of Facebook's March 20 stock price decline, such as the disclosure of an FTC investigation and "the #deleteFacebook campaign."[73] As an initial matter, both of these disclosures are causally linked to the disclosures of Initial Misuse facts. Professor Fischel himself concedes that these "third-party actions" were "triggered by the new information disclosed in the March 16, 2018 Press

extended footnote 98 to ¶51, misses the point—which is how the March 20 *Guardian* story changed the mix of information available to investors.

71 Fischel Report, ¶51.

72 Fischel Report, ¶32, n. 66 ("Information will be reflected in the prices of stocks traded in an efficient market ***even if only a few investors are aware*** of it.").

73 Fischel Report, ¶52.

Release," and that the March disclosures "prompted reactions from third parties such as users and regulators."[74] Regulatory scrutiny under the 2012 FTC consent decree and reputational loss of users are foreseeable consequences of the concealed truth that I identified in my opening report.[75] A foreseeable consequence triggered by a corrective disclosure is not confounding information—it is the proximate *result* of the very data misappropriation and lack of user control at issue.

42. Moreover, it does not appear that [redacted]

43. Next, Professor Fischel suggests that the Gelbach Report somehow departs from my co-authored scholarly writing by stating that the March 20 price impact could be the result of a continual process of market assessment of the importance of the revelations on March 16 and 17. Professor Fischel says my "use of a two-day price reaction is also inconsistent with" a quotation

---

[74] Fischel Report, ¶¶45, 52 & n.102.

[75] Gelbach Report, ¶¶18, 23(c), (e), 100, 103.

[redacted]

from my scholarship that he presents as describing "'the practice typically used by expert witnesses and courts in securities litigation … in measuring the effects of an alleged corrective disclosure, [where] it is appropriate to use one-day returns following the date on which that alleged corrective disclosure was made.'"[78]

44. Leaving aside the changes in meaning caused by Professor Fischel's self-serving edits,[79] the larger issue is that he extracted this quote from a context that not only refutes his insinuation that I have changed my position, but in fact affirmatively rejects his argument as to March 20. Here is the full paragraph from which Professor Fischel plucked only the second sentence, with sentences numbered in brackets for reference:

> [1] It is thus clear that as a legal matter, the question of how quickly information is supposed to be impounded in stock prices, and whether an event counts as a corrective disclosure, depends on a case's specific context and facts. [2] In this paper we will follow the practice typically used by expert witnesses and courts in securities litigation: we assume that in measuring the effects of an alleged corrective disclosure, it is appropriate to use one-day returns following the date on which that alleged corrective disclosure was made. [3] This approach might be challenged on the ground that, given an alleged corrective disclosure date, it sometimes takes longer for the market to impound the information in question into stock prices. [4] In effect, this was the argument in the *Apollo* case with respect to whether the UBS Flynn reports could serve as a corrective disclosure. [5] Because these reports merely analyzed and summarized information that was itself previously publicly available, Apollo argued that they could have no effect on the

78 Fischel Report, ¶53, quoting from Jonah B. Gelbach & Jenny R. Hawkins, *A Bayesian Approach to Event Studies for Securities Litigation*, 176 J. Institutional & Theoretical Econs 86, (2020).

79 Professor Fischel's use of ellipsis and insertion of "[where]" subtly but unmistakably changes what I wrote, as can be seen by reading the unedited full sentence, which he at least provides in footnote 105 to Fischel Report, ¶53: "In this paper we will follow the practice typically used by expert witnesses and courts in securities litigation: ***we assume that*** in measuring the effects of an alleged corrective disclosure, ***it is appropriate*** to use one-day returns following the date on which that alleged corrective disclosure was made." Jonah B. Gelbach & Jenny R. Hawkins, *A Bayesian Approach to Event Studies for Securities Litigation*, 176 J. Institutional & Theoretical Econ. 86, 93 (2020). One doesn't need to assume something that is always true, and "typically" does not mean "always"; thus, contrary to Professor Fischel's presentation, our full sentence has the clear implication that multiple-day price reactions would sometimes be appropriate.

> market. [6] By rejecting this position, the Ninth Circuit allowed for the possibility that markets adjust only gradually, or perhaps in fits and starts, to information whose import is not immediately transparent. [7] Thus, at least in *Apollo* and related cases, courts have handled this challenge in a pragmatic and arguably reasonable way.[80]

45. Sentence 1 states that a case's "specific context and facts" determine "how quickly information" can be expected "to be impounded in stock prices, and whether an event counts as a corrective disclosure." Sentence 2, the only one Professor Fischel quoted, explains that, despite the sentences that surround it, my co-author and I planned to take the "typical[]" approach; in context, it is clear that "typical[]" contrasts to the wider scope of potential approaches, rather than somehow meaning exclusive, as the Fischel Report insinuates. Sentence 3 suggests that *the typical approach is subject to challenge*, for pragmatic reasons.

46. Sentences 4 through 7 refer to the *Apollo* case, and to the Ninth Circuit's resolution of it, which are completely at odds with Professor Fischel's entire line of argument with respect to all three back-end price impact dates in this case. To see why, some detail about *Apollo* is warranted.

47. Apollo Group, Inc., was the parent company of the University of Phoenix ("UOP").[81] In February 2004, the U.S. Department of Education ("DOE") alerted UOP of DOE's preliminary finding that the company had violated DOE regulations, and Apollo subsequently made statements that were misleading in light of that preliminary finding. In September 2004, several news articles disclosed the contents of the DOE's report on the matter. Five days later, analyst reports downgraded Apollo including for reasons plaintiffs alleged revealed the truth of

---

80 Jonah B. Gelbach & Jenny R. Hawkins, *A Bayesian Approach to Event Studies for Securities Litigation*, 176 J. Institutional & Theoretical Econ. 86, 93 (2020).

81 Facts in this paragraph come from *In re Apollo Grp., Inc. Sec. Litig.*, 2008 WL 3072731 at *1-*3 (D. Ariz. Aug. 4, 2008).

the company's misrepresentations. After a jury verdict in favor of the plaintiffs, the district court granted judgment as a matter of law to Apollo, finding that the evidence did not support that the analyst reports were corrective.

48. The Ninth Circuit reversed, stating: "The jury could have reasonably found that the UBS reports following various newspaper articles were 'corrective disclosures' providing ***additional or more authoritative fraud-related information that deflated the stock price***."[82] This sentence repudiates Professor Fischel's argument regarding the March 20 *Guardian* story, which also provided "additional or more authoritative fraud-related information" than earlier discussions because of whom it quoted (a former Facebook employee with responsibility in an area directly relevant to "Initial Misuse" facts) and what he said (that the scope of Facebook user data misuse could be and likely was massive and implicated companies beyond Cambridge Analytica). Contrary to Professor Fischel's view that the March 20 *Guardian* article could not be corrective because it came "*almost four full days*" after the limited admissions in Facebook's blog post,[83] the Ninth Circuit demonstrated in *Apollo* that *five* days was not too long, provided that the disclosure in question provides "fraud-related information," which the March 20 *Guardian* article does, as evinced by the quoted passages above.

49. But it is worse than that for Professor Fischel's argument. The Ninth Circuit panel in *Apollo* cited to 2008's *In re Gilead Scis. Sec. Litig.*[84] for the common-sense proposition that a

---

[82] *In re Apollo Grp., Inc. Sec. Litig.*, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010).

[83] Fischel Report, ¶53 (emphasis in original).

[84] 536 F.3d 1049, 1058 (9th Cir. 2008). As discussed below, the Ninth Circuit in this case cited *Gilead* in holding that the July 25, 2018 corrective disclosure "allowed the public to 'appreciate the significance' of the Cambridge Analytica and whitelisting scandals." Ninth Circuit Opinion at 956

"later disclosure [can be] corrective when [the] public initially 'failed to appreciate [the] significance' of negative information."[85] My article discussed this aspect of *Gilead*, two sentences before the sentence that Professor Fischel quoted.[86] In that case, the Ninth Circuit had held that loss causation is consistent with a *three-month* gap between the date when the public first learned facts whose significance the public could appreciate only after the company's disappointing financial results.[87] And the Ninth Circuit has connected its ruling in this Litigation directly to that reasoning.[88] Thus, Professor Fischel's attempt to use my scholarship to show inconsistency fails because what I wrote is consistent not only with the opinions in Gelbach Report, but also—unlike the Fischel Report—closely in line with what the Ninth Circuit has said in this and prior cases.

50. In sum, Professor Fischel fails to show that there was a complete absence of price impact on either March 19 or March 20, 2018.

**b. July 2018 Decline**

51. Professor Fischel agrees with my finding that there was a massive and statistically significant price decline on July 26, 2018.[89]

---

85 *Apollo*, 2010 WL 5927988, at *1 (citation omitted). *Apollo* also cited another Ninth Circuit case, *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 503 (9th Cir.1992), for the proposition that "what [the] what market understands depends on intensity and credibility of information," *Apollo*, 2010 WL 5927988, at *1 (citation omitted).

86 Jonah B. Gelbach & Jenny R. Hawkins, *A Bayesian Approach to Event Studies for Securities Litigation*, 176 J. Institutional & Theoretical Econ. 86, 93 (2020).

87 *Gilead*, 536 F.3d at 1058.

88 Ninth Circuit Opinion at 956 ("Here, ***as in* Gilead**, the shareholders adequately pleaded that the Cambridge Analytica and whitelisting revelations, not any other factor, caused the July 2018 stock price drop.").

89 Fischel Report, ¶56, n. 111 ("my event study also finds that the residual return on July 26, 2018 is statistically significant, with a t-statistic of -17.14"); Fischel Report, Appendix C at 11 (finding an abnormal return of -18.68%).

52. Professor Fischel's sole argument for why there was a complete absence of price impact—despite the overwhelming statistical evidence to the contrary—is to once again trot out his truth-on-the-market argument. He argues that in an efficient market, Facebook's stock necessarily "fully reflected" all Whitelisting-related "information on Monday June 4, 2018" because it was "first disclosed on Sunday June 3, 2018,"[90] despite the dearth of analyst discussion (so important to him elsewhere in the Fischel Report) of the June 3 *New York Times* story.[91] Evidently Professor Fischel believes it is impossible as a matter of logic for an earnings release to reveal to the market that an earlier disclosure was more economically significant than previously understood—but the Ninth Circuit disagreed with him on that exact issue in *Gilead*, as I explained above in relation to Professor Fischel's misleading and out-of-context quotation of my scholarship.[92] And leaving aside *Gilead* and my own published work, the Ninth Circuit has already specifically rejected the argument made by Professor Fischel *in this very Litigation* in finding that

[90] Fischel Report, ¶¶57-58.

[91] Professor Fischel criticizes me for not discussing a *Wall Street Journal* article published four days later than he would be willing to credit based on his truth-on-the-market arguments, Fischel Report, ¶58, n. 116, but he mangles the facts about this source. Professor Fischel says it "discussed the value associated with Whitelisting deals to Facebook." Fischel Report, ¶58, n. 116. On its face, his own quotation of the story says no such thing—rather, it says that a small share of developers "““got special treatment because they accounted for all *the value of the platform*,””" which is a statement about the importance of the clients who were permitted to Whitelist, not "the value associated with Whitelisting deals to Facebook." And one who reads the *Wall Street Journal* article will find that the ellipsis in Professor Fischel's quotation from it capaciously replaces more than a dozen paragraphs containing hundreds of words—including ones that make clear the *Wall Street Journal* story itself is about *additional* Whitelisting deals that "***were separate from Facebook's data-sharing partnerships*** with at least 60 device makers, which it ***disclosed this week***." Deepa Seetharaman & Kirsten Grind, *Facebook Gave Some Companies Special Access to Additional Data About Users' Friends*, Wall Street Journal (June 8, 2018) (linking to Deepa Seetharaman, *Facebook Confirms Data-Sharing Deals With Chinese Tech Firms*, Wall Street Journal (June 5, 2018)).

[92] ¶¶43-49, *supra*.

Facebook's July 25, 2018 earnings announcement supported loss causation because it "***allowed the public to 'appreciate [the] significance' of the Cambridge Analytica and whitelisting scandals***."[93] Tellingly, Professor Fischel does not even attempt to address the impact of the Cambridge Analytica allegations on the July 26, 2018 decline, thereby failing as a matter of course to prove a complete lack of price impact.

53. Professor Fischel's position here also contradicts his prior testimony in the *Household* case once again demonstrates. As with pre-March 2018 reporting about Cambridge Analytica, Facebook contested the Whitelisting story, publishing a blog post on June 3, 2018 arguing that the "device-integrated APIs" it says were at issue with respect to Whitelisting were "very different from the public APIs used by third-party developers, like Aleksandr Kogan."[94] Here is what Professor Fischel previously had to say about such a situation:

> ***[D]isclosures by third parties is*** [sic] ***not the same as disclosures by the company itself.***
>
> In a situation like this, ***disclosures by third parties are given less weight***; and, ***therefore, investors were not fully informed for that reason***.
>
> But ***that effect is compounded by the fact that Household, throughout the period, is denying that there's any problem, so that even with respect to the third-party disclosures, which are less important than disclosures by the company, those disclosures are being discounted through much of the period until the very end because of management denials***.[95]

---

93 Ninth Circuit Opinion at 956.

94 Ime Archibong, *Why We Disagree with The New York Times*, Facebook Newsroom (June 3, 2018), https://about.fb.com/news/2018/06/why-we-disagree-with-the-nyt/. In fact, the Complaint alleges that Kogan's "GSR app" was among those whitelisted, Complaint, ¶145, directly linking whitelisting to the "Initial Misuse" data transfer.

95 *Household* Trial Transcript at 2685:3-15 (Apr. 16, 2009).

54. Professor Fischel also relies on the absence of a statistically significant abnormal return on June 4, 2018.[96] But, as noted above, a failure to reject the null hypothesis is not evidence that the null hypothesis is true.[97]

55. Professor Fischel cites my statement that "[t]he public could see the true importance to Facebook of whitelisting—and of third-party access to user data more broadly—only after Facebook's July 25, 2018 earnings call,"[98] and says that this assertion is "devoid of any supporting citation."[99] But in the Gelbach Report, I cited to paragraphs 692-700 of the Complaint for the proposition that "[n]umerous analysts, media outlets, and market observers directly attributed the" July 26, 2018 "stock drop to, inter alia, the impact of the Cambridge Analytica and whitelisting scandals."[100] In the interests of brevity, here are just some quotes from these sources:

- A July 25, 2018 story in *The New York Times* titled "Facebook Starts Paying a Price for Scandals," observed that "***Facebook has grappled with months of scrutiny over*** Russian misuse of the platform in the 2016 American presidential campaign and ***the harvesting of its users' data through the political consulting firm Cambridge Analytica***. ***The results were among the first signs that the issues*** had pierced the company's image and ***would have a lasting effect on its moneymaking machine***."[101]

- A July 25, 2018 analyst report from William Blair contained the heading "New data privacy tools could limit targeting capabilities" for advertising, which it said helped explain the "meaningful[]" reduction in revenue forecast for 2H2018. The report noted that Facebook had developed "new tools … that give users more choice around the data that can be shared with

96 Fischel Report, ¶41.

97 *See supra* n. 23.

98 Gelbach Report, ¶97, quoted in Fischel Report, ¶57.

99 Fischel Report, ¶57.

100 Gelbach Report, ¶20 n. 32.

101 Sheera Frenkel, *Facebook Starts Paying a Price for Scandals*, New York Times (July 25, 2018), https://www.nytimes.com/2018/07/25/technology/facebook-revenue-scandals.html.

advertisers for ad targeting," such as a "Clear History" tool "that allows users to erase their browsing behavior, sites visited, and click data, among others, on Facebook."[102]

- A July 26, 2018 CFRA analyst report said: "[w]e lower our EPS estimates for 2018 to $7.29 from $7.42 and 2019 to $8.24 from $8.63, given what we see as FB's ***efforts to invest significantly to respond to the Cambridge Analytica revelations***"[103]

- In a July 26, 2018 story titled, "Facebook Takes Historic Plunge as Scandals Finally Take a Toll," Bloomberg's lead sentence was "Facebook Inc. plunged as much as 20 percent Thursday ***after months of scandal and criticism finally hit the company where it hurts: growth***," and the story noted that "the results followed a period in which ***data-privacy issues came under harsh scrutiny,*** with Chief Executive Officer Mark Zuckerberg testifying before U.S. Congress for hours on the company's missteps"; the story called Wehner's reference to greater user control over privacy "a direct response to criticism the company has fielded."[104]

- A July 26, 2018 analyst report from J.P. Morgan stated that "FB remains in the crosshairs of regulators & politicians, and ***data/privacy policies & products are just kicking in***. At the same time, we believe FB remains fully committed to improving ***safety & security on the platform, an expensive undertaking of ongoing spend w/little to no direct or tangible return of revenue***."[105]

- In a July 29, 2018 story titled "Profit Versus Privacy: Facebook's Stock Collapse And Its Empty 'Privacy First' Promise," Forbes said that "the abrupt implosion of Facebook's stock price" was caused by "***[t]he increasing impact of the profit versus privacy battle at the center of the Cambridge Analytica story and the growing inability of Facebook to control its platform and protect it from harmful misuse***," which the article located at "the center of [Facebook's] pessimistic outlook." The article characterized the broad response to Facebook's July 25, 2018 financial results: "As the technology press and pundits digested this week's

---

[102] William Blair, *Rare Miss on Ad Revenue and Margin Commentary Pressure Shares* (July 25, 2018).

[103] CFRA, *CFRA Reiterates Hold Opinion on Shares of Facebook, Inc.* (July 26, 2018).

[104] Sarah Frier, *Facebook Takes Historic Plunge as Scandals Finally Take a Toll*, Bloomberg (July 25, 2018, 8:44pm, updated July 26, 2018).

[105] J.P. Morgan, *Major Reset Stories & Data/Privacy Drag on N-T Revs Heavy Investments Continue; Remain OW, PT to $205 Dropping from AFL* (July 26, 2018).

precipitous collapse of Facebook's stock price, headlines have largely linked the collapse to Facebook's privacy and safety woes coming home to roost. Yet, ***it is important to recognize that it is not those troubles themselves, but rather the impact of those woes on profit that were what so concerned investors and triggered the sell off***."[106]

56. Thus, there is plenty of support for the view that Facebook's price drop on July 26, 2018 was caused in whole or part by market recognition of the lost revenue and added costs that are attributable to Facebook's user data misconduct concealed by Defendants' misstatements.[107] Professor Fischel disregards this, even though he cites management's self-serving earnings-call characterization of factors that explained the Company's bleak revenue discussion: "(i) currency headwinds; (ii) growth and promotion of experiences with lower levels of monetization (e.g., Stories); and (iii) ***more user choice regarding data privacy***."[108]

(a) With respect to "currency headwinds," they are based on the fact that Facebook receives some of its revenue in non-dollar form, e.g., Euros; when the dollar strengthens, a fixed number of, e.g., Euros will be exchanged for a smaller number of dollars than before. The "currency headwinds" factor resulted from the fact that "'we expect currency to be a slight headwind in the second half versus the tailwinds we have experienced over the

---

[106] Kalev Leetaru, *Profit Versus Privacy: Facebook's Stock Collapse And Its Empty 'Privacy First' Promise*, Forbes (July 29, 2018), https://www.forbes.com/sites/kalevleetaru/2018/07/29/profit-versus-privacy-facebooks-stock-collapse-and-its-empty-privacy-first-promise.

[107] The articles' repeated references to "months" of scrutiny and scandal further confirm that the market first understood and credited the Cambridge Analytica facts in March 2018, not earlier. By July 25-26, 2018, about four months had passed since Facebook's March 16, 2018 press release and the March 17, 2018 reports in *The Guardian* and *The New York Times*. If the market had absorbed the Initial Misuse when *The Guardian* reported it on December 11, 2015, or when The *Intercept* reported it on March 30, 2017, as Professor Fischel contends (Fischel Report ¶¶39-40), commentators in July 2018 would have described two and a half years, or at least sixteen months, of scrutiny. They did not.

[108] Fischel Report, ¶55 (citing Facebook 2Q2018 earnings call transcript (July 25, 2018).

last several quarters.'"[109] But past tailwinds were known to the market already at the time of Facebook's earnings call, and the expected values of future exchange rates were also in the market's information set before the earnings call. Accordingly, Professor Fischel's view of market efficiency should attribute little, if any, of Facebook's share-price plunge to the "currency headwinds" category. And even if he disagrees as to any of those points, Professor Fischel makes no attempt to quantify the amount of the July 26, 2018 price impact he believes is accounted for by "currency headwinds," because he offers no quantification attempt.[110]

(b) Similarly, Professor Fischel does not present any quantification of the relative importance of revenue deceleration due to "growth and promotion of experiences with lower levels of monetization (e.g., Stories)" in explaining Facebook's share price decline.[111]

(c) That leaves the category of "more user choice regarding data privacy," which includes lost revenues that Plaintiffs allege were revealed in the July 25, 2018 earnings call.

109 Fischel Report, ¶55 n. 109 (quoting Facebook 2Q2018 earnings call transcript (July 25, 2018).

110 [redacted] On the earnings call, Wehner offered guidance that the margin compression would take place over a period of years, so the contribution of foreign exchange factors through the end of 2018 likely plays only a small role in explaining Facebook's decline in value in trading the previous day.

111 In fact, Wehner publicly characterized this promotion as an investment likely to pay off in the future. Facebook 2Q2018 earnings call (July 25, 2018) ("Instagram has more heavy usage of Stories, so ***that's an area of continued growth opportunity*** because the effective levels of monetization in Stories are lower.... [T]hat's, again, ***an important opportunity for growth***, is just continuing to build out more products on the demand side for Stories"). In a July 27, 2018 internal E-mail [redacted]

Although Professor Fischel does not mention it, this category does include revenue reductions from GDPR, but Wehner indicated that reductions in European MAU and DAU were only "slight[]," which was "consistent with the outlook we gave on the Q1 call." Wehner also said: "Europe, we saw the decline that we anticipated from GDPR." [112] This provides no reason to believe GDPR effects on revenue would have come as a surprise to the market, suggesting GDPR does not explain the price impact observed on July 26, 2018. By contrast, *other*—fraud-related—privacy issues that reduced revenue remain standing as an explanation, as demonstrated by this exchange on the July 25, 2018 earnings call, between Wehner and Citi analyst Mark May:

> Mark May: Thanks. Just following up on the comments. Sheryl mentioned that there's really no meaningful impact on GDPR to the ad business, at least as of now. But then, Dave, I think you mentioned that because you're giving people more control over their privacy and data, that this is one of the reasons why you're expecting the meaningful decel in the second half. Just trying to reconcile those two things. ***Maybe the questions are -- have been too specific around the impact of GDPR and should be more broad around data and privacy. And I guess ultimately the question is what impact, if any, is these greater controls that you're giving users having on ad revenue growth and monetization?*** Thanks.
>
> David Wehner: Sure, Mark. Let me take that. GDPR didn't have a significant impact in Q2, partially because of its implementation date so you're just seeing effectively one month of it in terms of -- in terms of revenue. We do think that there will be some ***modest*** impact -- and I don't want to overplay these factors -- but you've use [sic] got a couple things going on. You've got the impact of the opt-outs. And while we're very pleased with the vast majority of people opting in to the third party data use, some did not. That'll have a small impact on revenue growth. ***And then we're also seeing some impact from how advertisers are using their own data for targeting. Again, that will have a modest impact on growth. And then in addition, we're continuing to focus our product development around putting privacy first. And that's going to -- that's going to -- we believe -- have some impact on revenue growth.*** [113]

[112] Facebook 2Q2018 earnings call (July 25, 2018).

[113] Facebook 2Q2018 earnings call (July 25, 2018).

57. Thus, although Part IV.C.iii of the Fischel Report echoes the Company's listing of revenue factors unrelated to Plaintiffs' theory of liability, Professor Fischel fails even to consider *how much* of the July 26, 2018 share price decline, if any, could reasonably be attributed to any of these factors. This failure precludes Professor Fischel from establishing that the entire decline was caused by non-fraud factors. And Professor Fischel does not even attempt to address matters related to Facebook's costs or margin compression in this part of his report, despite Wehner's announcement of a significant downward revision in the Company's operating margin guidance due in important part to "significant long-term investments in the [sic] safety and security."[114]

58. In sum, Professor Fischel rejects the possibility of price impact consistent with Plaintiffs' theory of liability on July 26, 2018 despite his failure even to try to quantify alternative explanations of Facebook's surprising guidance related to revenues, expenses, or margin. I understand that Defendants carry a burden to show a *complete* lack of price impact, but Professor Fischel has failed to demonstrate that *any* amount of the July 26 price decline is due to alternative explanations. All he offers is his inapposite truth-on-the-market argument, contrary to the facts and the rulings by the Ninth Circuit and the District Court.

59. In addition to the market commentary discussed above, internal Facebook evidence directly links the July 26, 2018 share price decline to the earnings call's margin compression guidance, and it also links the margin compression guidance to Cambridge Analytica and Whitelisting remediation. For example:

[redacted]

[114] Facebook 2Q2018 earnings call (July 25, 2018).

[redacted]

(b) A July 26, 2018 email from Investor Relations to senior executives (including Zuckerberg, Sandberg, and Wehner) explaining that Defendant Wehner's comments regarding revenue deceleration and margin compression "received the most attention," as "analysts and investors expressed significant confusion and frustration about our revenue and long-term margin outlook (our 2018 expense guidance was unchanged and in-line with expectations). The weaker-than-expected outlook was a big surprise to Wall Street and is well summarized by the analyst at Baird: 'Facebook dropped two "bombshells": a significant slowdown in revenue growth for Q3/Q4, followed by operating margin declines over the next 3+ years.'"[116]

[redacted]

[redacted]

[116] E-mail from Natalia Kanevsky, 7/26/2018, 7:38am (FB-CA-SECURITIES-4358708).

[redacted]

[redacted]

60. Another important example—one that is discussed in the Gelbach Report but left entirely unaddressed by the Fischel Report—is the May 2018 statement by Mr. Zuckerberg to the Facebook Board that "'***even if the immediate impact from Cambridge Analytica did not impact our community or business metrics, it's likely that our responses to these events will***,'" because ***"'[a]ctions we take affecting ads will reduce revenue somewhat, and more significantly, the large investments we're making in security going forward will decrease our profitability***.'"[121]

[redacted]

[121] Gelbach Report, ¶138 n. 153 (quoting Mark Zuckerberg, Board Update, May 29, 2018 (FB-CA-SECURITIES-2061145)).

### B. Professor Fischel's Criticisms of the Proposed Damages Methodology are Unfounded

61. As noted above, the Fischel Report does not challenge the Gelbach Report's econometric conclusions, and the event study results in the Fischel Report are similar in magnitude to those in the Gelbach Report.[122] Thus, as with the issue of price impact, Professor Fischel's entire argument hinges on his attempt to explain away uncontroverted facts about the share price declines on damages-related dates.

#### 1. Professor Fischel Misconstrues Plaintiffs' Theory of Liability

62. Professor Fischel writes that "the price decline on July 26, 2018 reflects the materialization of disclosed rather than concealed risks."[123] Central to this position, of course, is the premise that Facebook, or someone else, *actually disclosed the risks at issue*. On that subject, Professor Fischel claims that the corrective disclosures of March 16-17, 2018 meant that "Facebook's stock price fully reflected the risk that the disclosure of this information could have financial consequences."[124] To support this view, he quotes an excerpt from ¶99 of the Gelbach Report, which, before Professor Fischel's editing, is:

> If Facebook had announced the relevant truth—that Facebook had already suffered a major instance of misappropriation and misuse of users' data, that its profitability was boosted by third parties' improper access to and use of users' data, and that users did not have control over their data—then investors reasonably would have realized that revenues would decrease and costs would increase when the relevant truth was revealed. They would have naturally inferred that Facebook's revenue would fall when it shut off third-party access and that the Company would incur greater costs to properly secure user data. That would reduce the ability of app

[122] Fischel Report, Appendix C at 8 (reporting drop in share price of 4.50% on March 19, 2018 and 3.04% on March 20, 2018) (similar to Gelbach Report, ¶148, tbl. 5 estimates of 4.59% for March 19 and 2.89% for March 20); Fischel Report, Appendix C at 11 (reporting drop in share price of 18.68%) (similar to Gelbach Report, ¶ 148, tbl. 5 estimate of 18.86%).

[123] Fischel Report, ¶82.

[124] Fischel Report, ¶82.

> developers to acquire and sell data useful for advertising. In turn, ad targeting deterioration would dampen demand for Facebook's ads, predictably reducing the number of ads sold, the price advertisers would be willing to pay for them, or both. Further, reputational harm could have led to reduced use, exacerbating the reduction in advertising revenues.[125]

63. But Professor Fischel edits out the text between the two em-dashes in ¶99 of the Gelbach Report, thereby omitting my assertion that the Company had concealed the truth that Facebook's "profitability was boosted by third parties' improper access to and use of users' data." Professor Fischel also ignores the Complaint's allegations that in "contrast to their public assurances," Defendants "disregarded user privacy and data control in order to promote growth and increase profits."[126] Facebook did not disclose all the facts it knew about this truth in its March 16, 2018 blog post, and neither *The New York Times* nor *The Guardian* did the next day. In paragraph 125 of the Gelbach Report, I wrote that the market's positive response to Facebook's positive April 25, 2018 earnings call "reflected the sentiment that, however bad the Cambridge Analytica scandal was in terms of public relations and the threat of future regulation, widely voiced concerns that it would harm Facebook's revenue and earnings paths had been off-base."[127] And immediately after that, I wrote: "The July 25, 2018 earnings release demonstrated that that optimism was misplaced."[128]

---

[125] Gelbach Report, ¶99.

[126] Complaint, ¶62; *see also id.*, ¶1 ("This securities class action arises from defendants' materially false and misleading statements and omissions concerning Facebook users' control over their private data, the risk of suffering a loss of control through third party misappropriation and misuse of Facebook user data, and ***the impact of defendants' misconduct on Facebook's business and financial condition*****.").**

[127] Gelbach Report, ¶125.

[128] Gelbach Report, ¶126.

64. Thus, in the Gelbach Report I explained that (a) Facebook had concealed the extent to which its profitability was boosted by third parties' improper access to and use of users' data (Gelbach Report, ¶99), (b) investors' response to the April 25, 2018 earnings call demonstrated that they did not know that extent (Gelbach Report, ¶125), and (c) on July 25, 2018 they learned the previously unknown truth about that extent. Professor Fischel excludes the Gelbach Report ¶99 text about profitability (item (a) just above), and he fails entirely to cite either of the paragraphs (125 and 126) of the Gelbach Report described in items (b) and (c).[129] Thus, his claim that "the price decline on July 26, 2018 reflects the materialization of disclosed rather than concealed risks" is based on his own view of events at issue in this Litigation—not on the economic evidence or Plaintiffs' theory of liability, which I understand is what Plaintiffs' damages model is meant to reflect.

65. Plaintiffs' theory of liability for the July 26, 2018 price decline is set forth in the Complaint's description of how the July 25, 2018 disclosures revealed to the market that Facebook's "privacy misconduct had in fact ***hit the Company's bottom line and seriously impacted its business***."[130] It is also present in Plaintiffs' interrogatory responses—which Professor Fischel fails to address:

> On July 25, 2018, Facebook announced its earnings for the second quarter of 2018 ("Q2 2018"). This was the first full quarter of Facebook results since the Cambridge Analytica data scandal news had surfaced in March 2018 and the first earnings announcement since the June 3, 2018 whitelisting revelation. This announcement ***revealed*** the foreseeable consequences of the Cambridge Analytica and whitelisting scandals. For example, Defendant Zuckerberg led off the Company's Q2 2018 earnings call by acknowledging that, "[l]ooking ahead, we will continue to invest heavily in security and privacy," and that "we're investing so much in security that it will significantly impact our profitability. We're starting to see that this quarter."

[129] The Fischel Report does elsewhere mention the Gelbach Report, ¶99 text he excluded from his ¶82 discussion of damages calculation; *see* Fischel Report, ¶57, n. 113.

[130] Complaint, ¶33; *see also id.*, ¶¶527-530, 687-691.

> Defendant Wehner stated that "we expect our revenue growth rates to decline by high single-digit percentages from prior quarters" due to, inter alia, Facebook "giving people who use our services more choices around data privacy, which may have an impact on our revenue growth." He also stated that due to further investments in privacy, "[o]ver the next several years, we would anticipate that our operating margins will trend towards the mid-30s on a percentage basis." Thus, Facebook's Q2 2018 earnings disclosures allowed the market to ***newly appreciate the magnitude of the Company's challenge in addressing its previous data control and risk shortcomings and fully "'appreciate [the] significance' of the Cambridge Analytica and whitelisting scandals" on Facebook's business***. *See Facebook*, 87 F.4th at 956-57 (citation omitted).[131]

66. Professor Fischel also neglects to respond to other aspects of the Gelbach Report's discussion of the July 25, 2018 earnings call's revelation of revenue deceleration (citing specific internal Facebook documents that pointed to potentially billions of dollars of lost revenue from responding to the Cambridge Analytica revelations[132]) and ramping-up costs (citing Zuckerberg's May 2018 missive to Facebook's Board[133]). The latter document shows that Zuckerberg himself tied the Company's response to the Cambridge Analytica scandal directly to reduced revenue and profitability. It is telling that Professor Fischel neglects to respond to this evidence in the Gelbach Report.

67. Professor Fischel also argues that a statement by Zuckerberg on the July 25, 2018 earnings call, from which I quoted as part of a lengthy narrative of the call,[134] was actually a repetition of a statement he had made on Facebook's November 1, 2017 earnings call.[135] Professor

---

131 Plaintiffs' Amended Interrogatory Responses, Response No. 1.

132 Gelbach Report, ¶138, n. 152.

133 Gelbach Report, ¶138, n. 153.

134 Gelbach Report, ¶¶131-139.

135 Fischel Report, ¶83.

Fischel is correct about that much. Here are the pertinent parts of Zuckerberg's November 1, 2017 and July 25, 2018 earnings call statements, as presented in the Fischel Report:[136]

> **November 1, 2017**: "In many places, we're doubling or more our engineering efforts focused on security. And we're also building new AI to detect bad content and bad actors – just like we've done with terrorist propaganda. I'm dead serious about this. And the reason I'm talking about this on our earnings call is that <u>I've directed our teams to invest so much in security -- on top of the other investments we're making – that it will significantly impact our profitability going forward.</u>"[137]
>
> **July 25, 2018**: "Looking ahead, we will continue to invest heavily in security and privacy because we have a responsibility to keep people safe. **But as I've said on past calls,** <u>we're investing so much in security that it will significantly impact our profitability</u>. We're starting to see that this quarter."[138]

Professor Fischel then goes back to his truth-on-the-market well, writing: "Consequently, the profitability impact disclosure on July 25, 2018 reflects a disclosed rather than concealed risk."[139]

68. As discussed below, these are two different statements from Zuckerberg. The first relates to investment in "security" to combat misinformation and harmful content. The second relates to investments in "security ***and privacy***" to prevent unauthorized third-party data access—adding privacy investments in an entirely new context. Yet even if these statements were identical, as with other aspects of Professor Fischel's position in this Litigation his truth-on-the-market argument here has been refuted by Professor Fischel's own prior deposition testimony (Professor Fischel's answers follow instances of "A"):

> Q Okay. In an efficient market like the one you described with respect to Household, can the repetition of the same information on a subsequent day

---

[136] Fischel Report, ¶83.

[137] Facebook 3Q2017 earnings call transcript (July 25, 2018) (emphasis on same words emphasized in Fischel Report, ¶83).

[138] Facebook 2Q2018 earnings call transcript (Nov. 1, 2017) (emphasis on same words emphasized in Fischel Report, ¶83).

[139] Fischel Report, ¶83.

> change the kind of publicly available information that's known about the stock or the company?
>
> A Again, completely hypothetically, under any circumstances, I would say ***yes, repetition can change market participants, expectations about whatever the information is that's being repeated***.
>
> Q How could that happen?
>
> A Again, without -- you are asking without any context, just circumstances that I can imagine?
>
> Q Exactly.
>
> A Okay. If the repetition of the information makes the information more credible because it's confirmed by a second source, confirmed by a more reliable source, ***whether intervening events have made the repetition of the information more likely to be accurate in light of developments from the first reference of the information to the second reference to the information*** -- those are the things that come to mind.
>
> But, again, it's such an open ended question, ***any particular situation would have to be analyzed depending on the facts and circumstances of that situation***.[140]

69. Thus, whereas Professor Fischel is certain with respect to this Litigation that a company's stock price must incorporate any phrasing of similar words that someone has previously stated, Professor Fischel previously recognized that, as a general matter, even *exact* "repetition can change market participants['] expectations about whatever the information is that's being repeated"—including for the reason that "intervening events have made the repetition of the information more likely to be accurate in light of developments from the first reference of the information to the second reference to the information." That is, "any particular situation would have to be analyzed depending on the facts and circumstances of that situation."

70. I share Professor Fischel's previously-stated opinion that intervening events can change the context of the same words, so that repetition can sometimes affect firm share price. In

[140] *Household* Deposition of Daniel Fischel at 29:19-30:20 (Mar. 21, 2008).

the present Litigation, the context of the words Zuckerberg used on November 1, 2017 and July 25, 2018 changed importantly due to the March 16-17, 2018 disclosures about Cambridge Analytica's misappropriation and misuse of Facebook users' data and the June 3, 2018 Whitelisting story. When Zuckerberg made the first statement, he was referring to security investments in content moderation to combat misinformation, and investors did not know the facts about Cambridge Analytica and whitelisting that were revealed months afterward, so they could not fully appreciate the significance of his statement. But when Zuckerberg made the July 25, 2018 statement, there was a clear connection between these disclosures and Facebook's need to "invest[] so much in security that it will significantly impact our profitability … starting … this quarter"—as the market commentary described in ¶55 above reflects.[141]

71. The change in context runs deeper than just the timing of the disclosures. Between November 1, 2017 and July 25, 2018, Facebook told investors that users controlled their data on Facebook and presented third party misuse and misappropriation of user data as only a hypothetical possibility. In its March 16, 2018 post announcing the suspension of Cambridge Analytica, Facebook represented that "'***[i]n 2014*** … we made an update to ensure that each person decides what information they want to share about themselves, including their friend list,'" which it called "'just one of the many ways we give people the tools to control their experience.'"[142] And on April 25, 2018, Sandberg told investors that the Company did not expect its investigatory work

---

[141] In addition to his 2008 deposition testimony quoted above, Professor Fischel also testified at a 2016 deposition in *Household*, with respect to a weeks-later verbatim republication of a news article, that "***[s]ometimes a re-publication can itself have an effect, so that the fact that the article was published before, as I said, it's certainly relevant.***" Deposition of Daniel Fischel, *Household*, Tr. 268:13-271:5 (Feb. 24, 2016).

[142] Complaint, ¶610.

into application programming interfaces to "'have an impact on revenue.'"[143] Thus, as of spring 2018, the market could have understood that (i) the security spending Zuckerberg described in November 2017 was directed only at misinformation and content moderation, and (ii) no comparable new spending was needed to protect user data from third-party access, because Facebook said it had already closed that door in 2014. The June 3, 2018 Whitelisting story revealed that this was not so: Facebook had continued to give favored third parties unauthorized access to friends' data "'even after [Facebook] declar[ed] that it would no longer share such information with outsiders.'"[144] It is therefore significant that Zuckerberg's July 25, 2018 statement, unlike his November 1, 2017 statement, referred to investing "heavily in security ***and privacy***." For the first time, investors learned that the profitability hit would include the cost of actually delivering the user-data protections that Facebook had represented were already in place. As I explained in the Gelbach Report, this cost is a foreseeable consequence of the revelation that Facebook had not kept its earlier promises about users' control over their data. It was not a risk that had been disclosed in November 2017.

72. This point can also be seen by considering Zuckerberg's remarks to the Facebook Board in his May 29, 2018 message, which describe the specific types of investments that the Company was making in response to Cambridge Analytica:

> [I]t's worth re-summarizing some of the major actions we've taken: Related to privacy... - Related to Cambridge Analytica specifically, we notified everyone whose data may have been improperly shared with CA. We will conduct an audit of CA to understand what data they had, how they used it, and to confirm they've now deleted it. - To find any other cases like this, we announced we're investigating every single app that had access to a large amount of people's data in the past before we restricted access to our platform in 2014. So far we've investigated thousands of apps and have suspended more than 200. - To prevent this from happening again,

[143] Complaint, ¶502.

[144] Complaint, ¶426.

> we've further restricted developers' access to data, including, for example, preventing any app you haven't used in 30 days from accessing your information. (Again, the changes we already made to our platform in 2014 would have prevented the CA situation from happening today.) - To help people manage their apps, we showed everyone a tool listing the apps they've authorized and giving them an easy way to remove any they no longer want to use. - To further strengthen our privacy controls, we announced a new Clear History tool to let people easily clear their browsing data on Facebook. We also shipped our compliance with GDPR. - We have also re-examined our ads practices, which has led to changes like no longer working with data brokers, and building a subscription option so people can turn off ads. Related to politics and elections... - To make it more difficult to interfere in elections, we announced that we will verify the identities of people running political and issue ads, and people running large pages.[145]

When Zuckerberg spoke on November 1, 2017, none of the things just described as responses "to Cambridge Analytica specifically" had happened. So the context of his words changed significantly between then and July 25, 2018.

73. The May 29, 2018 Board message also confirms that the relevant truth about Cambridge Analytica was not on the market before March 2018. The actions Zuckerberg describes as a response "to Cambridge Analytica specifically" began after the March 2018 disclosures: notifying affected users, auditing Cambridge Analytica, and "investigating every single app that had access to a large amount of people's data in the past before we restricted access to our platform in 2014," which by late May 2018 had involved "thousands of apps" and more than 200 suspensions. If the December 2015 and March 2017 articles that Professor Fischel relies on had conveyed the relevant truth to investors, one would expect the market and the Board to have demanded these measures, and to have priced in their cost, in 2016 or 2017. There is no evidence of any of that. Indeed, the app investigation was announced "[t]o find any other cases like this." That wording shows that even Facebook's Board had not been apprised of the scope of third-party data misuse before March 2018; that full scope could hardly have been impounded in the stock

145 Mark Zuckerberg, Board Update, May 29, 2018 (FB-CA-SECURITIES-2061145).

price. Finally, Zuckerberg's parenthetical assurance to the Board that "the changes we already made to our platform in 2014 would have prevented the CA situation from happening today" repeats the same representation Facebook was making publicly. Days later, the June 3, 2018 Whitelisting story revealed that the 2014 changes had not been honored for favored third parties. This sequence is consistent with my opinion that the market came to understand the full significance of both the Cambridge Analytica and Whitelisting revelations, and their full cost full and impact on Facebook's business, only with the July 25, 2018 disclosures.

74. In sum, Professor Fischel's materialization-of-the-risk position is inconsistent with key parts of what I wrote in the Gelbach Report and rests on mischaracterizations of Plaintiffs' theory of liability; Professor Fischel ignores evidence of facts Defendants knew and did not publicize between the March and July disclosures; and the position Professor Fischel advances in this case regarding repetition of information contradicts positions he advanced in deposition testimony in *Household* in both 2008 and 2016. Professor Fischel's materialization-of-the-risk position is meritless.[146]

[146] Further, Defendants twist my deposition testimony in claiming that I "conceded … that the July drop 'reveal[ed] the impact of the concealed facts on Facebook's … value.'" Defs' Opp. At 11 (citing Deposition Transcript of Jonah B. Gelbach Ph. D., September 18, 2026, ("Gelbach Tr.") at 167:10-19). My unedited testimony on these 10 lines was: "And so when we think about the importance of July 25th and 26th, with respect to my understanding of Plaintiffs' theory of liability and qualified in the ways we've described and the relevant truth, ***the importance is not just that it showed that the risks we talked about, that you talked about, asked me about existed but also the extent of them and the extent of their importance in revealing the impact of the concealed facts on Facebook's*** -- Facebook's ***value***." Gelbach Tr. at 167:10-19. Defendants' opposition distorts my testimony by omitting the part that emphasizes that "***the extent***" and "***the importance***" of the risks involved were revealed to the market on July 25, 2018. That the market was aware risks existed as a general matter does not prove that it knew the scope or magnitude of the risks—just as I testified.

Facebook's counsel demonstrated his awareness of my full opinion when he asked me, just a few minutes earlier: "And it's your opinion that the stock price decline on March 19, 2018 was due ***in part*** to the market pricing in these risks to Facebook's business, ***correct***?" Gelbach Tr. at 165:7-10. Consistent with the later testimony Defendants mischaracterize, I testified in response:

75. Defendants also argue that, because risks purportedly were disclosed in March 2018, investors who traded thereafter responded "in their own unique and individual ways" based on their risk tolerance, so that damages for the July 26, 2018 decline cannot be measured on a class-wide basis.[147] As an economic matter, that argument does not apply to the out-of-pocket methodology described in the Gelbach Report. The inflation removed by the July 25, 2018 disclosures is measured once, using the event study, and is the same per share for every Class member who purchased before and held through that disclosure, regardless of that investor's risk tolerance. Investors' individual, heterogeneous views about risk are reflected in the market price itself; they do not change the amount of inflation each share carried. Nor did the July 25, 2018 disclosures concern an independent future event that might or might not occur; they revealed the

---

> "when I agree with that statement that when you say 'pricing in these risks,' I'm not making any – ***I'm not meaning to draw any conclusion that those risks are somehow fully priced in or anything like that***. But I, yes, would think that ***the price change*** there is -- is -- the whole point ***is*** it's ***driven by the market pricing as best it can on that day given what it knows these risks***." Gelbach Tr. at 165:12-20.

Defendants also cite a passing comment in an expert report I wrote for the *Alphabet* litigation. Defs' Opp. At 12 (citing Rebuttal Expert Report of Professor Jonah B. Gelbach, *In re Alphabet, Inc. Sec. Litig.*, No. 3:18-cv-06245-TLT (N.D. Cal. Aug. 14, 2023), ECF No. 199-1, Ex. 1 ("*Alphabet* Rebuttal Report"), ¶99). That comment concerned only the issue of whether Facebook's July 25, 2018 news affected Alphabet's stock price, and neither the specific cause nor the characterization of Facebook's July 25, 2018 news was an issue I needed to or did analyze in the *Alphabet* Rebuttal Report. Regardless, my passing comment in the *Alphabet* Rebuttal Report presents no inconsistency with my position about materialization of the risk in *this* Litigation, which is unchanged from the *Alphabet* litigation. As I discuss below in ¶113, that position is that Defendants' materialization-of-the-risks argument fails when earlier disclosures (here, those in March 2018 and on June 3, 2018) have not "***fully disclosed the actual risks associated with what the company's earlier statements omitted to tell the public***." *Alphabet* Rebuttal Report, ¶188. For the reasons discussed herein, the March and June 2018 disclosures did not do so here.

[147] Defendants' Memorandum of Law in Opposition to Lead Plaintiffs' Motion to Certify Class, Appoint Class Representatives, and Appoint Class Counsel (ECF 301), October 9, 2026 ("Defs' Opp.") at 12.

financial consequences of practices Facebook had already engaged in and was already in the process of remediating.

### 2. The Gelbach Report Explains How, If Necessary, Confounding Information Can Be Disaggregated When Calculating Damages

76. Professor Fischel acknowledges that the Gelbach Report addresses the need to isolate fraud-related sources of share-price inflation, by removing other causes of share price decline on March 19 and 20, 2018 and July 26, 2018.[148] He also acknowledges that the Gelbach Report observed that traditional tools of financial economics can be used to account for confounding information.[149]

77. Citing my deposition testimony (but not the Gelbach Report), Professor Fischel claims that I have wrongly treated "the price reaction to the disclosure of the dismissed Continued Misuse claim" as part of damages-relevant share-price inflation.[150] In fact, I understand that Plaintiffs claim Continued Misuse facts are causally linked and indicative of Initial Misuse (again: there cannot be a *continuation* of X without an *initiation* of X), so that consequences of Continued Misuse relate to Initial Misuse for damages purposes. For example, if Facebook's user engagement fell 10% due to user revulsion toward Cambridge Analytica's retention and use of platform data in the Trump campaign (it did not; *see* ¶79 below for more on this topic), and on revulsion more generally), that would reduce Facebook's revenue given that virtually all the Company's revenue comes from advertising. Such a revenue reduction would be attributable to Initial Misuse, because Cambridge Analytica was able to use retained data only because it acquired it from Kogan/GSR

[148] Fischel Report, ¶80 (citing Gelbach Report, ¶141).

[149] Fischel Report, ¶81.

[150] Fischel Report, ¶80.

in the first place, through the Initial Misuse. But if the trier of fact in this case disagrees, then I will be able to disaggregate share-price inflation removed due to Continued Misuse from the total share price that was removed.

78. Professor Fischel is wrong to say it is impossible to do so because "the nature of the Initial Misuse and Continued Misuse claims defies numerical categorization."[151] He defines "Continued Misuse" as the "theor[y] of liability contemplated in the operative Complaint," viz. "'Defendants knew that … Cambridge Analytica did not delete users' data and indeed continued to use it to support Donald Trump's 2016 presidential campaign.'"[152] I believe that Professor Fischel and I agree that a phenomenon that changes company value does so by changing the discounted value of the company's future cash flows.[153] To disaggregate share-price inflation attributable to Continued Misuse, then, simply requires determining its effects on the discounted value of Facebook's future cash flows.

79. The idea that substantial Stock price drops were caused by Continued Misuse requires that there be some reason to think that the market would alter its assessment of Facebook's

---

[151] Fischel Report, ¶81. Despite his view that "numerical categorization" is possible only with direct "financial metrics," Professor Fischel confidently declares that "the price reaction to the same disclosures most likely would have been smaller on February 3, 2017 because their context would not have been as influenced by the increasing Russian interference concerns that developed over the Class Period and accompanied those alleged corrective disclosures." Fischel Report, ¶84. He provides no support for this contention, despite the fact that "smaller" would seem to entail at least some sort of "numerical categorization"; nor does he explain why or how he thinks "Russian interference concerns" would affect cash flows. If Professor Fischel does provide such an explanation, I will take it into appropriate account in computing damages in this Litigation at the appropriate time.

[152] Fischel Report, ¶18.

[153] Professor Fischel agrees with my statement that "'[i]t is financial economics 101 that a reduction in expected future cash flow reduces a company's value today,'" Fischel Report, ¶48, and I assume that he would also agree with the converse of the proposition, i.e., that "a reduction in a company's value today is caused by a reduction in expected future cash flow."

future revenue or cost path due specifically to the fact that Cambridge Analytica retained the Facebook data it obtained years earlier from GSR. Professor Fischel does not describe the sources of reduced cash flows he believes would be causally connected to Continued Misuse, but potentially one such source is what I will call the "Revulsion Channel," meaning the decision of some Facebook users to stop using the platform, or significantly reduce their use, due to their revulsion at Facebook's conduct. For example, the value effects of the "#deleteFacebook campaign" Professor Fischel mentions could possibly be included in the Revulsion Channel.[154] But there are several reasons to believe that the Revulsion Channel played little to no role in Facebook's March and July 2018 stock price declines.

80. First, I have reviewed interrogatory responses in which Defendants admit that they "do not currently have contentions about the cause(s) of the March 2018 Price Declines" and do not currently have contentions about whether any "other events or disclosures" aside from the alleged misconduct might have caused the March and July 2018 stock price declines.[155]

81. Second, there is no public evidence of a significant change in U.S. use of Facebook following the Cambridge Analytica news of March 2018. For both daily active users ("DAU") and monthly active users ("MAU") in the U.S. and Canada, Facebook usage was unchanged between Q1 and Q2 of 2018.[156] Of course, it is possible that Facebook use actually would have increased

[154] Fischel Report, ¶52. Further, as noted in ¶83 below, the Revulsion Channel could involve Initial Misuse, Continued Misuse, or a combination of the two.

[155] Defendants' Amended Interrogatory Responses, Response No. 2 and Response No. 8.

[156] See 2Q2018 earnings presentation at 2-3. In this presentation, Facebook reports DAU and MAU figures with data from the U.S. and Canada combined. But if there were a significant dropoff in U.S. use, it would show up in these figures unless for some reason use by Canadians increased enough to offset a U.S. decline. I am unaware of any evidence that a spike in Canadian use occurred in 2018. Facebook may have internal records on this topic, which could be the subject of discovery. I would incorporate any useful information into my final analysis.

but for the Revulsion Channel's operation. But U.S./Canada DAUs had previously dropped by a million users in Q4 2017—a quarter that mostly occurred between 4 and 6 months before the Cambridge Analytica scandal broke. Daily usage did return to its Q3 2017 level in Q1 2018 (almost all of which occurred before the Cambridge Analytica news broke in mid-March),[157] but the argument that Facebook use would have been significantly higher in Q2 2018 but for the Revulsion Channel finds at most limited traction in the actual use data. Further, Zuckerberg told Facebook's Board on May 29, 2018 that there was "some risk that US [DAU] will decline from 185m [in Q1 2018] to 184m [in Q2 2018], *but that's not linked directly to CA.*"[158]

82. A third reason to doubt the importance of the Revulsion Channel relates specifically to the argument that opposition to President Trump reduced Facebook use. It is worth noting that the number of people who voted for Trump in 2016 barely differed from the number who voted for his Democratic opponent, Hillary Clinton.[159] If many Trump *opponents* were repelled by Facebook's reported role in Trump's victory, it stands to reason that many of his *supporters* would have celebrated it. Such a dynamic would have dampened or possibly even eliminated any Revulsion Channel effect.

83. Third, economic reasoning indicates that revenue effects of user disgust with Facebook that operated through channels other than quitting the platform should be attributed to

---

[157] See 3Q2018 earnings report at 2-3, which shows that use of Facebook by those outside the U.S., Canada, and Europe grew substantially over this period.

[158] Mark Zuckerberg, Board Update, May 29, 2018 (FB-CA-SECURITIES-2061145).

[159] *See, e.g.*, Mike Murphy, "Clinton Ends Up With 2.9 Million More Votes Than Trump," Fox Business News (Dec. 21, 2016), https://www.foxbusiness.com/markets/clinton-ends-up-with-2-9-million-more-votes-than-trump. Similarly, despite losing the 2020 election, Trump won only 4.4 percentage points less of the popular vote in 2020 than did his victorious opponent, Joe Biden. *Presidential Results*, CNN, https://www.cnn.com/election/2020/results/president (accessed on July 29, 2026) (reporting that Biden won 51.3% of votes to Trump's 46.9%).

the Initial Misuse basis for liability in this case.

(a) Facebook's revenues in the relevant period were virtually all due to advertising. The value to advertisers of placing an ad on Facebook depends on two basic variables: (i) the number of people who are presented with the ad, and (ii) the quality of targeting in determining whether the people who are presented with it will respond as the advertiser wishes. If Facebook use changed little in connection with the Revulsion Channel, that leaves only the targeting variable.

(b) Disgust with Facebook among those who did not leave the platform could have reduced the quality of ad targeting, if those users responded to the Cambridge Analytica news by taking advantage of newly created or newly communicated ways to reduce third-party access to the users' data. But what made it easy for app developers to obtain users' data without their consent was not that *users failed to opt out* of third-party access. Rather, despite Facebook's promises, developers were enabled because *users did not control* whether Facebook would allow access to user data without regard to users' permission. Whether revenue effects are attributed to subsequent user adoption of limitations on third-party data access therefore depends on how users responded after discovering that Facebook had broken its promises about user control, which the Ninth Circuit, the District Court, and copious contemporaneous commentary attributed to the March 2018 disclosures.

(c) Accordingly, revenue effects tied to user adoption of limitations on third party access to their data would more reasonably be attributed to the revelation of the Initial Misuse, so that no disaggregation is necessary.

84. Nevertheless, it would be possible to calculate a highly conservative upper bound

on the revenue reductions that could be attributable specifically to Continued Misuse by calculating the revenue reductions attributable to all lost users. This could be calculated by assuming that all lost users were lost specifically and solely because of Continued Misuse, and then multiplying the number of such lost users by the appropriate amount of average revenue per user.

85. In sum, it is still my preliminary damages opinion that the Revulsion Channel, including the #deleteFacebook "campaign," likely did not cause any (and caused at most a *de minimis* portion) of the share-price drops observed in March and July 2018. I will, however, re-evaluate this opinion as appropriate in response to any evidence Facebook provides in discovery, as well as any other additional information of which I become aware.

86. It is not evident how else, outside the Revulsion Channel, Continued Misuse would reduce Facebook's future cash flows, and neither Professor Fischel nor Defendants identify any rationale on that point. But if additional sources are identified, I believe that traditional tools of financial economics will allow me to construct a reasonable estimate of the share price impact of such future cash flows. For example, in the case of lost users (as discussed, for example, with respect to the upper bound described above in ¶84), it would be possible to value the reduction in cash flows associated with any reduction in the number of users in future years. A discounted cash flow ("DCF") analysis could then be used to complete the process of translating the reduction in the number of users into a corresponding reduction in Facebook's market capitalization; dividing by the appropriate number of shares would then yield a reasonable estimate of share price impact.

87. As for potential confounders other than Continued Misuse, such as the effects of the GDPR rollout, paragraph 145 of the Gelbach Report explained how they could be disaggregated from share-price inflation:

> [T]he July 25, 2018 conference call included some discussion of the impact of GDPR. Although Defendants downplayed its impact, if further discovery reveals that GDPR did have an appreciable impact on the announced financial metrics, I will use appropriate tools of economic analysis to estimate that impact and exclude it from my estimate of per-share artificial inflation.
>
> > (a) Suppose that discovery reveals that GDPR reduced Facebook's future annual earnings path by X dollars each year. Then DCF or multiples-based analysis could be used to calculate the impact on the Company's value of having X fewer dollars in earnings each year. Appropriate adjustment to share-price inflation would then be feasible using a constant-dollar approach to the adjustment.
> >
> > (b) If discovery revealed that the impact were measured in percent of earnings rather than dollars of earnings, a multiples-based approach would be appropriate. Appropriate adjustment to share-price inflation would then be feasible using a constant-percentage approach to the adjustment.
> >
> > (c) The key point is that these analyses would be based on proof that is common to all proposed Class members and applies classwide.[160]

88. Similarly, the effects on Facebook's share-price value of moving from "the tailwinds we have experienced over the last several quarters" before July 25, 2018 to "a slight headwind in the second half" of 2018 also can be measured, because Facebook announced the amount of this effect.[161]

89. In sum, nothing in Professor Fischel's report disproves the fact that traditional tools of financial economics can be used to measure, or perhaps compute an upper bound on, the contribution of confounders to event study-based share-price inflation. It is thus possible to use

---

160 Gelbach Report, ¶145.

161 Facebook announced that its Q2 total revenue was up 4 percentage points less on a constant-currency basis, which amounted to $370 million. Facebook 2Q2018 earnings call (July 25, 2018). As discussed in ¶56(a), though, the currency-headwinds component of Facebook's revenue report would have been surprising news to the market only if either (a) Facebook's foreign revenue made up a surprisingly high share of its overall revenue, or (b) Facebook had private information about exchange rates.

disaggregation to ensure that share-price inflation due to such confounders is not included in damages. I stand by my opinions in the Gelbach Report.

## V. Analysis of the Dirks Report

90. Mr. Dirks echoes many of Professor Fischel's claims, focusing on the question of whether the false and/or misleading statements and the corrective disclosures in this case were material ("value-relevant") to Facebook's stock price.[162] Mr. Dirks's claims are flawed, incomplete, and meritless.

### A. Mr. Dirks' Materiality Opinions on the Alleged Misstatements Are Flawed

91. Sections IV-VI of the Dirks Report discuss Mr. Dirks's views about how investors value stocks, i.e., what factors are material to a "reasonable investor" as a general matter (§IV), the materiality of the risk factor statements in this Litigation (§V), and the materiality of the user control statements in this Litigation (§VI).

92. As a threshold matter, I understand from Counsel that in a securities fraud case like this one, materiality is a merits question rather than one that affects the amenability of a case to class certification. Nevertheless, I have been asked to respond to Mr. Dirks's claims.

93. With respect to the substance of §§IV-VI of the Dirks Report, the quoted text of analyst reports cited therein demonstrates that the very analysts on whom Mr. Dirks relies *did* consider user data misappropriation and misuse by third parties to be material to Facebook investors. For example (emphasis is in the Dirks Report):

- Argus, February 6, 2017: "'**Even inadvertent leaks of personal member information could generate headline risk, legal liability, and regulatory**

[162] Dirks Report, ¶29.

**scrutiny. Facebook may also be subject to attacks from individuals or organizations attempting to steal member information**. '"[163]

- Mizuho, November 2, 2017 and March 19, 2018: "'Privacy issue: Facebook's advertising model is based on access to users' information. **Failure to properly protect/share users' data from/with developers and advertisers could damage Facebook's brand reputation** and lead to potential government regulatory investigations, which could negatively impact the business.'"[164]

- Hilliard Lyons, May 5, 2017 and April 26, 2018 said that risks to Facebook's valuation included "'[t]he unlawful distribution of user information, or the hacking of user information by an outside party and other privacy concerns that may drive users away from the site or create an unwillingness of users to share additional information.'"[165]

- Societe General, July 6, 2017: "'If privacy concerns were to be raised through any direct or indirect event, this could further raise risk for Facebook. Government search requests or **security breaches could be the catalyst for such concerns**.'"[166]

94. And the supposed analyst silence regarding the specific user control statements at issue in this Litigation[167] would not establish the immateriality of the substance of those statements—nor could it, because the analyst reports Mr. Dirks quotes, discussed just above, show that his own analysts thought this substance *was* material. Further, materiality is unmistakable in the response of analysts to the March 16-17 disclosures. For example:

- Bank of America Merrill Lynch ("BAML"), on March 20, 2018, fretted about "***privacy risk related to the data gathering was not communicated to users***, and Facebook is being considered an enabler."[168]

---

[163] Dirks Report, ¶63 (emphasis in original).

[164] Dirks Report, ¶66 (emphasis in original).

[165] Dirks Report, ¶67.

[166] Dirks Report, ¶68 (emphasis in original).

[167] Dirks Report, ¶72.

[168] BAML, *Facebook: New data management and privacy issues fueling the fire* (Mar. 19, 2018). Mr. Dirks features other text from this report in arguing that "several" analyst "reports noted that

- Evercore ISI, March 20, 2018: "Facebook traded down ~7% yesterday following ***a front page story in The New York Times over the weekend***, which drove a renewed concerns about how Facebook protects user data, and spawned renewed outcries for regulation of Facebook. The report ***detailed how Cambridge Analytica (CA), an election consultancy linked to the Trump campaign, was able to gain access to more than 50mn Facebook user profiles*** as part of a broader effort to influence the outcome of the 2016 US Presidential election."[169]

- Wells Fargo, March 20, 2018: "With Facebook shares off 9% since Friday's (3/16) close (vs. S&P -1%), … ***details of the 2014 Cambridge Analytica data abuse scandal continued to unfold***…."[170]

95. The Dirks Report's suggestion that share price had to move due to Facebook's misstatements for them to be material is just as disconnected from the reality of Plaintiffs' theory of liability as the Fischel Report is. As Professor Fischel explained in *Household*, front-end analyst silence is expected under an inflation maintenance theory such as the one Plaintiffs advance in this Litigation: "Plaintiffs claim that ***the alleged omissions*** were inflationary events because they ***prevented the price from falling to its true, uninflated value***. ***Under this theory, the Company's stock price did not have to increase upon Defendants allegedly false statements … in order to become inflated***."[171]

96. Mr. Dirks also characterizes the alleged misstatements as "generic" compared to Facebook's more detailed published policies,[172] and Defendants rely on that characterization to

---

the news about the Continued Misuse was different from the news about the Initial Misuse," Dirks Report, ¶87, but he neglects the text quoted above.

[169] Evercore ISI, *Darkest Hour: Thoughts on Yesterday's Selloff* (Mar. 20, 2018).

[170] Wells Fargo, *FB: Thank Goodness For Instagram* (Mar. 20, 2018).

[171] *Household* Fischel Rebuttal Report, ¶38.

[172] Dirks Report, ¶112.

argue that there is a "mismatch" between the front-end statements and the back-end disclosures.[173] From an economic perspective, there is no such mismatch. The risk factor statements presented third-party misappropriation and misuse of Facebook user data as a hypothetical risk; the March 2018 disclosures revealed that such misappropriation and misuse had already occurred and that Facebook had known of it since 2015.[174] The user control statements assured investors that users controlled their data; the March and June 2018 disclosures revealed that third parties had obtained user and friend data without those users' consent. The corrective information relates directly and precisely to the subject matter of the statements. Neither Mr. Dirks nor Professor Fischel performs any analysis showing that the market's reaction to the back-end disclosures reflected information unrelated to that subject matter.

### B. Mr. Dirks's Analysis of Analyst Reports After the March 2018 Disclosures Is Flawed, Self-Refuting, and Incomplete

97. Taking aim at the March 2018 disclosures, §VII of the Dirks Report misfires in repackaging the same flawed truth-on-the-market arguments presented by the Fischel Report, which the Ninth Circuit, the District Court (and Professor Fischel in *Household*) have rejected.[175]

98. Mr. Dirks finds it important that only 7 of the 49 analyst reports he read and catalogued lowered their target price after the March 2018 news, as well as that none of these reports attributed the target price cut to "Initial Misuse." But the stock price fell significantly

---

[173] Defs' Opp. at 16, 18.

[174] Consistent with my rejection of Mr. Dirks's claim about "generic" statements from the economic perspective just noted, the Ninth Circuit has already held that Plaintiffs' risk-factor statement allegations "more than support the claim that Facebook was aware of Cambridge Analytica's misconduct before February 2017, so Facebook's statements about risk management 'directly contradict[ed]' what the company knew when it filed its 2016 10-K with the SEC." Ninth Circuit Opinion at 948.

[175] *See* ¶¶14-18, *supra*.

anyway. This illustrates that analyst target-price changes are a poor proxy for how the market as a whole updated its valuation—especially in an efficient market.[176]

99. Additionally, Mr. Dirks's claim that he "confirmed that several of these reports noted that the news about the Continued Misuse was different from the news about the Initial Misuse"[177] is unsupported by the examples he gives. These examples are:

(a) A March 19, 2018 BAML report.[178]

(b) A March 19, 2018 Credit Suisse report.[179]

(c) A March 19, 2018 Pivotal Research Group report.[180]

(d) A March 20, 2018 Morgan Stanley report.[181]

(e) A March 21, 2018 RBC report.[182]

(f) A March 23, 2018 Wedbush report.[183]

100. None of those 6 reports actually "noted that the news about the Continued Misuse was different from the news about the Initial Misuse,"[184] except to the extent that merely describing

---

[176] Consider an analyst report with a price target that exceeds Facebook's market price by $50 per share. If that view were held throughout the market, then investors would rapidly bid up Facebook's price until it equaled the price target. No such thing occurred on July 26, 2018, of course.

[177] Dirks Report, ¶87.

[178] Dirks Report, ¶88.

[179] Dirks Report, ¶89.

[180] Dirks Report, ¶90.

[181] Dirks Report, ¶91.

[182] Dirks Report, ¶92.

[183] Dirks Report, ¶93.

[184] Dirks Report, ¶87.

two things in succession counts as noting differences in them. And Mr. Dirks's own examples include a description of the March 2018 news as *disclosing*—not just repeating—Initial Misuse facts. Consider his quotation from the Credit Suisse report (preserving emphasis Mr. Dirks added):

> "Media outlets are reporting **data was harvested from Facebook through the use of an app where users were paid to take a personality test and agreed to have their data collected for "'academic use.'"** This app collected data not only from users who opted in but also from their friends, which runs against Facebook's data collection policy.[185]

The statement that "***[m]edia outlets are reporting***" would make no sense if the authors saw it as stale and already known that "***data was harvested from Facebook … not only from users who opted in but also from their friends, which runs against Facebook's data collection policy***." This text alone, quoted by Mr. Dirks himself, vitiates his immateriality and truth-on-the-market claims.[186]

101. Finally, §VII of the Dirks Report is incomplete with regard to both the analyst report material Mr. Dirks discusses and with respect to sourcing.

(a) With respect to analyst report material, Mr. Dirks ignores that multiple analysts linked the Initial Misuse facts to Facebook's March 19 and 20, 2018 share price drops:

- Evercore ISI, March 20, 2018: "Facebook traded down ~7% yesterday following ***a front page story in The New York Times over the weekend***, which drove a renewed concerns about how Facebook protects user data, and spawned renewed outcries for regulation of Facebook. The report ***detailed how Cambridge Analytica (CA), an election consultancy linked to the Trump campaign, was able to gain access to more than 50mn***

[185] Dirks Report, ¶89 (quoting Credit Suisse, *Opportunity Arises, as News Flow Rubs Salt Into the Wound*, (Mar. 19, 2018) (emphasis in Dirks Report).

[186] Nor is that the only text *from the same page* of the Dirks Report to do so. Mr. Dirks quotes a March 20, 2018 Morgan Stanley report that describes the March 16, 2018 Facebook blog post as "'**alleging that CA had improperly obtained data on FB users**.'" Dirks Report, ¶91 (quoting Morgan Stanley, *Facebook Inc.: Top 4 Investor Questions and Our Answers*, (Mar. 20, 2018) (emphasis added in Dirks Report). This would be an odd way of saying that Facebook had repeated a fact that the analyst knew the investing public already knew to be true.

***Facebook user profiles*** as part of a broader effort to influence the outcome of the 2016 US Presidential election."[187]

- Wells Fargo, March 20, 2018: "With Facebook shares off 9% since Friday's (3/16) close (vs. S&P -1%), … ***details of the 2014 Cambridge Analytica data abuse scandal continued to unfold***…."[188]

(b) With respect to news media, in a section of his report that covers 15 pages, Mr. Dirks relates his conclusions from reading dozens of analyst reports; he discusses the March 16, 2018 Facebook blog post; and he even finds space for a long quotation from "an institutional investor,"[189] but in the nearly 6,000 words the Dirks Report spends on a section whose title begins with the phrase "**REACTIONS TO THE MARCH 2018 NEWS**,"[190] Mr. Dirks does not cite a single *news media* account of what was contained in the March 2018 disclosures or why this information was important. This doesn't appear to be the result of anti-

[187] Evercore ISI, *Darkest Hour: Thoughts on Yesterday's Selloff* (Mar. 20, 2018).

[188] Wells Fargo, *FB: Thank Goodness For Instagram* 1 (Mar. 20, 2018).

[189] Dirks Report, ¶110. Mr. Dirks quotes this investor as stating that he was aware of the March 2018 disclosures, and that his investment company "'**viewed the information reported in the March 2018 news about Cambridge Analytica as immaterial from an investment perspective**.'" Dirks Report, ¶110 (quoting Declaration of William M. Thomas, *In re Facebook Inc. Securities Litigation*, No. 5:18-cv-01725-EJD (N.D. Cal.), June 9, 2026, ¶¶ 1, 3) (emphasis added in Dirks Report). It is unclear what importance this one investor's view has. *Cf.* Fischel Report, ¶32 n. 66 ("Because not all market participants must know all public information for that information to be priced into a stock in an efficient market, a market participant's affirmation that they were unaware of previously disclosed information is not evidence that the information was not fully reflected in a stock's price when that information was first disclosed."). Even so, I understand that this investor has since clarified that his original declaration was drafted directly by Defendants' counsel, was not made on solely personal knowledge, used the term "immaterial" to merely mean that "**the news did not change its long-term view of Facebook as an investment for all of its clients**," and "**offer[s] no opinion on whether any information was 'material' in a legal sense or to any other investor.**" Supplemental Declaration of William M. Thomas, *In re Facebook Inc. Securities Litigation*, No. 5:18-cv-01725-EJD (N.D. Cal.), October 20, 2026, ¶¶3-7.

[190] Dirks Report, §VII title, at 27.

news media bias on Mr. Dirks's part, because much earlier in his report he observes that "in making investment decisions, investors … consider public information available through … print and online publications, television, [and] news aggregation services."[191] And §VII of the Dirks Report does cite a number of news media sources—just not any from the year 2018.[192] Even the Fischel Report quotes some news media articles that described reactions to the March 2018 revelations,[193] but these are conspicuous by their absence in §VII of the Dirks Report. Of course, there was copious discussion in the news media of the materiality of the March 2018 disclosures,[194] which Mr. Dirks simply ignores. For example:

- In a March 19, 2018 story titled "Facebook shares slump amid continued fallout from Cambridge Analytica scandal," CNBC's lead was that "Facebook shares fell as much as 8 percent on Monday ***after reports that Cambridge Analytica mined the data of over 50 million users of the social network without their permission***," and the story went on to report that "Whistleblower Christopher Wylie ***revealed*** the alleged role played by Cambridge Analytica in ***obtaining data from Facebook users to The Observer newspaper in the U.K. and The New York Times***," with links provided to the March 17 articles at issue here.[195]

- In a March 19, 2018 story titled "Facebook shares slide after reports of data misuse," Reuters' lead was that "Facebook Inc's shares fell more than 4 percent in premarket trading after media reports that a political consultancy

---

[191] Dirks Report, ¶54.

[192] *See, e.g.*, Dirks Report, ¶81 (citing numerous media articles or blog posts from 2015).

[193] *See* ¶27, *supra*.

[194] *See* ¶28, *supra*.

[195] Arjun Kharpal, *Facebook shares slump amid continued fallout from Cambridge Analytica scandal*, CNBC (Mar. 19, 2018), https://www.cnbc.com/2018/03/19/facebook-shares-fall-over-fallout-from-cambridge-analytica-scandal.html.

that worked on President Donald Trump's campaign ***gained inappropriate access to data on 50 million Facebook users***."[196]

- In a March 19, 2018 story titled "Facebook shares crushed after data controversy," CBS News' lead was that "Facebook (FB) shares fell nearly 7 percent Monday amid controversy over how Cambridge Analytica, which was hired by President Trump's 2016 campaign, ***was able to harvest personal data from more than 50 million Facebook users***," and went on to report how "***Facebook says it initially gave out the data to a researcher who claimed it would be used only for academic purposes***. ***Facebook claims the researcher then 'lied to us' and passed the content onto Cambridge Analytica***."[197]

102. In sum, the Dirks Report's discussion of reactions to the March 2018 disclosures is flawed, self-refuting, and incomplete.

### C. The Dirks Report Discussion of the June 2018 Disclosures Is Methodologically Flawed

103. The Dirks Report's §VIII claims that the June 3, 2018 *New York Times* article's disclosures were not material to investors. Mr. Dirks here argues that the absence of analyst commentary about the importance of the Whitelisting disclosures proves their unimportance. But Plaintiffs' argument is that the market did not appreciate the importance of these disclosures, so Mr. Dirks's observation that such commentary did not occur does nothing to undermine Plaintiffs' theory of liability.[198]

---

[196] Munsif Vengattil, *Facebook shares slide after reports of data misuse*, Reuters (Mar. 19, 2018), https://www.reuters.com/article/world/facebook-shares-slide-after-reports-of-data-misuse-idUSKBN1GV1E2/.

[197] Aimee Picchi, *Facebook shares crushed after data controversy*, CBS News (Mar. 19, 2018), https://www.cbsnews.com/news/facebook-stock-price-slides-amid-questions-over-cambridge-analytica/.

[198] That said, Mr. Dirks does offer one piece of evidence that the Whitelisting disclosures actually *were* material, when he quotes a CFRA analyst report from June 4, 2018 that called the June 3 *New York Times* article "concerning." Dirks Report, ¶116. That the report's authors were "satisfied with FB's reply" doesn't render the subject matter immaterial.

### D. The Dirks Report's Criticisms of the Proposed Damages Methodology are Unfounded

104. The Dirks Report repeats the same flawed criticisms and misconstrued theory of liability as the Fischel Report.

#### 1. March 2018 Declines

105. Mr. Dirks offers three categories of criticism of the Gelbach Report with respect to the March 2018 declines in §IX.A of the Dirks Report: (1) truth-on-the-market; (2) confounding factors; and (3) materiality, price impact, and market efficiency.

106. First, Mr. Dirks argues that the March 2018 disclosures were not material, based on the same flawed truth-on-the-market argument made in the Fischel Report. This argument is meritless.

(a) Mr. Dirks quotes the Gelbach Report, including its statement that "the March 16, 2018 Facebook blog post and the March 17 and 20, 2018 news articles … confirmed for the first time, *inter alia*, that Facebook had known since 2015 of the sale of users' data to Cambridge Analytica and the extent of that and similar data misuse."[199] Having bolded the phrase "first time," Mr. Dirks then writes: "Contrary to Dr. Gelbach's claims, the Initial Misuse was publicly known by December 2015 following the reporting in the December 11, 2015 *Guardian* Article."[200] But this is only "contrary" to what I write if one ignores the operative verb "***confirmed***." Mr. Dirks offers no evidence, because there is none, that Facebook confirmed any of these facts in *The Guardian* article, later in December 2015, or at any other

[199] Gelbach Report, ¶143; quoted at Dirks Report, ¶126.

[200] Dirks Report, ¶127.

time before March 16, 2018. On the contrary, Facebook implicitly or explicitly denied that any misappropriation or misuse of Facebook user data had occurred.

(b) Mr. Dirks insists that "the repetition of … information" in the December 11, 2015 *Guardian* article "could not be value-relevant several years later in March 2018" if "Facebook's stock traded in an efficient market."[201] This is the same truth-on-the-market argument I debunked in relation to the Fischel Report in § IV.A.1, above. One problem it faces in this Litigation is that the Ninth Circuit and the District Court have already rejected it.[202] Another problem is Professor Fischel's copious deposition and trial testimony in *Household* explaining why it is wrong.[203] A third problem it faces is that it assumes, with no foundation at all, that any time a statement is published about a company in a news article, investors assume that statement is true, even if the company denies it and otherwise acts as if the company disagrees. In sum, Mr. Dirks's truth-on-the-market argument fares no better than Professor Fischel's.

107. Second, Mr. Dirks claims that I do not disentangle the price impact of confounding factors with respect to the March disclosures. This line of his argument is also meritless.

(a) Mr. Dirks argues that Continued Misuse, not Initial Misuse, must have explained some or all of the March price drops. As with the Fischel Report and Defendants themselves, Mr. Dirks provides no analysis or quantification of such supposed contribution. But as I have already explained, Plaintiffs claim that Continued Misuse facts are causally linked to and indicative of Initial Misuse, so that damages flowing from Continued Misuse are

201 Dirks Report, ¶127.

202 Ninth Circuit Opinion at 954; MTD Opinion at 24.

203 *See* ¶¶15-18, *supra*.

available through the Initial Misuse theory of liability.[204] As I have stated here, and stated clearly in the Gelbach Report, if the Court disagrees, the effect of Continued Misuse facts can be disaggregated by quantifying their importance to Facebook's future cash flows, revenues, and/or earnings.[205]

(b) Mr. Dirks relies on his cataloging of analyst reports in §VII.C of the Dirks Report to support his claim that Initial Misuse had little or no part in explaining the March 19 and 20, 2018 price declines, based on the fact that "only seven analyst reports" that he "identified and reviewed between March 16, 2018 and March 27, 2018" reduced their target prices for Facebook. But analysts' price targets are speculative, and it is ironic that Mr. Dirks should accuse me of contradicting the logic of market efficiency even as he relies on the direction and level of target prices that differ substantially from Facebook stock's contemporaneous market price.[206] Further, Mr. Dirks's position that analyst report price targets prove the absence of price impact with respect to the Initial Misuse is at odds with the Fischel Report, which states: "Information will be reflected in the prices of stocks traded in an efficient

---

[204] *See* ¶¶33-34, *supra*.

[205] *See* ¶¶77-89, *supra*; Gelbach Report ¶¶142-145.

[206] If the market agreed with those target prices, Facebook's stock price would *equal* those target prices. Of course, inasmuch as analysts don't all agree on one single target price, it would be impossible for Facebook's stock price to equal all analysts' target prices. Thus Mr. Dirks's collective arguments result in a logical pretzel, or perhaps something of a Schrödinger's Efficiency: whether the market is efficient according to Mr. Dirks depends on why one is asking. *Cf.* Wikipedia, *Schrödinger's Cat*, https://en.wikipedia.org/wiki/Schr%C3%B6dinger%27s_cat (accessed on October 28, 2026) (discussing famous thought experiment of "a hypothetical cat inside a closed box [that] may be considered to be simultaneously both alive and dead while it is unobserved, as a result of its fate being linked to a random subatomic event that may or may not occur").

market *even if only a few investors are aware of it*."[207] Even to establish his claim about just the Initial Misuse facts, then, Mr. Dirks needs to show that *no market participants* viewed the March 2018 Initial Misuse revelations as material, but all he has done is read and describe some analyst reports. To put it mildly, Mr. Dirks has been selective in his reporting and characterization, as the following examples show:

- UBS, March 19, 2018: "Over the weekend, the press reported on a story of Cambridge Analytica, a voter-profiling company, ***illegally obtaining private data of FB users*** in order to target ads/messages to voters in both the Brexit campaign & the 2016 US Presidential election…. ***Facebook has*** rejected press characterization of the events as a "'breach'" & instead ***pointed to 3rd parties*** "'violating'" the company's policies/procedures. Lawmakers immediately called for government actions (potential new regulations) & investigations into data safeguards at Facebook and demanded company executives to testify."[208]

- BAML, March 20, 2018: "***privacy risk related to the data gathering was not communicated to users***, and Facebook is being considered an enabler," thereby underscoring that users' lack of control over their data was previously unknown, thus was revealed by the March 2018 disclosures, and that Facebook's concealment of these Initial Misuse facts had potential reputational consequences.[209]

- Evercore ISI, March 20, 2018: "Facebook traded down ~7% yesterday following ***a front page story in The New York Times over the weekend***, which drove a renewed concerns about how Facebook protects user data, and spawned renewed outcries for regulation of Facebook. The report ***detailed how Cambridge Analytica (CA), an***

---

[207] Fischel Report, ¶32, n. 66; *see also* discussion in ¶27(a) above.

[208] UBS, *Wading Through the Data of a Facebook Story* (Mar. 19, 2018). This quote not only mentions the "obtaining" of the data in question by Cambridge Analytica, which is a pure Initial Misuse fact, but also describes Facebook's position as emphasizing the violation of its policies by third "parties," in the plural, which therefore must refer to more than Cambridge Analytica's retention of the data (if it refers to that Continuing Misuse fact at all).

[209] BAML, *New data management and privacy issues fueling the fire* (Mar. 19, 2018). Mr. Dirks features other text from this report in arguing that "several" analyst "reports noted that the news about the Continued Misuse was different from the news about the Initial Misuse," Dirks Report, ¶¶87-88, but he avoids mention of the text quoted above.

***election consultancy linked to the Trump campaign, was able to gain access to more than 50mn Facebook user profiles*** as part of a broader effort to influence the outcome of the 2016 US Presidential election."[210]

- Morgan Stanley, March 20, 2018: "Last Friday FB stated … it was suspending Cambridge Analytica (CA) and its associates from Facebook...alleging that ***CA had improperly obtained data on FB users and that, contrary to what it told FB, it had not deleted all that data, when discovered in 2015***."[211]

- Wells Fargo, March 20, 2018: "With Facebook shares off 9% since Friday's (3/16) close (vs. S&P -1%), … ***details of the 2014 Cambridge Analytica data abuse scandal continued to unfold***…."[212]

(c) Meanwhile, Mr. Dirks provides no discussion of the March 2018 commentary in the business press, which, as I demonstrated above, included plentiful descriptions of the March 2018 revelations as material (*see* ¶¶27-28 and ¶101(b), *supra*).

108. Third, Mr. Dirks says that the Gelbach Report "contradicts the basic tenet of an efficient market"[213] because of my statement that "the market had not yet internalized the full significance of the June 3, 2018 whitelisting revelation" and did not do so until after the July 25, 2018 earnings call.[214] Our disagreement here is basic: Mr. Dirks believes that once words have

---

[210] Evercore ISI, *Darkest Hour: Thoughts on Yesterday's Selloff* (Mar. 20, 2018).

[211] Morgan Stanley, *Top 4 Investor Questions and Our Answers* (Mar. 20, 2018).

[212] Wells Fargo, *FB: Thank Goodness For Instagram* 1 (Mar. 20, 2018). Characterizing the revelations as involving the "2014 Cambridge Analytica data abuse scandal" necessarily roots the March 2018 disclosures in Initial Misuse territory, given that Facebook's March 16, 2018 blog post said that the Company had asked Cambridge Analytica to delete the Facebook user data it had obtained through the Initial Misuse only after "we learned of this violation in 2015." Paul Grewal, *Suspending Cambridge Analytica and SCL Group From Facebook*, Facebook Newsroom (Mar. 16, 2018), https://about.fb.com/news/2018/03/suspending-cambridge-analytica/.

[213] Dirks Report, ¶137.

[214] Gelbach Report, ¶130.

been uttered or published, market participants immediately know the full importance of those words for company value, even if information regarding that importance is unavailable. As I discussed above with respect to the Fischel Report, this extreme position has been rejected by the Ninth Circuit in *Gilead* (and in *Apollo*, as noted in my scholarship).[215] And it has been rejected by the Ninth Circuit and the District Court in this Litigation—as well as by Professor Fischel himself in *Household*. Thus, contrary to Mr. Dirks's claims, my position in the Gelbach Report is entirely consistent, and my deposition testimony reiterated that position: "***the importance*** of the whitelisting disclosures in the June 3rd 'New York Times' article was not -- ***was not fully clear to the market*** until the July 25th disclosures, and so the July 26th abnormal return contains a reduction in share price inflation associated with those revelations, with the June 3rd story."[216] Accepting Mr. Dirks's argument to the contrary would require failing to understand the distinction between learning a fact and knowing all the ways in which that fact is important. What Mr. Dirks (and Professor Fischel, in this Litigation) each see as inconsistency is just common sense regarding the contextual nature of materiality and price impact—that sometimes the importance of a fact learned isn't clear until later.

109. In sum, Mr. Dirks's criticisms of my analysis of the March and June 2018 revelations are meritless.

### 2. July 2018 Decline

110. Mr. Dirks offers two strands of criticism of my conclusions with respect to the July 26, 2018 price decline: (a) he says the market knew about all Initial Misuse risks in March 2018,

---

[215] *See* ¶¶44, 49, *supra*.

[216] Gelbach Tr. at 179:16-22; *see also id.* at 85:10-18 (explaining that "***the importance***" of "***the corrective information that was released on June 3rd***" in *The New York Times* article was "***not clear to the market until the earnings call and earnings release on July 25th***.").

and that the July 25, 2018 earnings call simply revealed the materialization of these risks, (b) he characterizes analyst reports he read, which he believes give competing explanations for why Facebook's share price fell so much on July 26, 2018, such as GDPR. Both these arguments are meritless.

111. First, Mr. Dirks writes that when the March 2018 disclosures occurred, "numerous analysts assessed the valuation impact of" their foreseeable consequences,[217] and he argues that the July 26, 2018 share price plunge therefore "would represent the materialization of previously disclosed risks—not the revelation of previously undisclosed risks related to the Initial Misuse and Alleged Whitelisting because these risks had been fully disclosed before July 25, 2018."[218] Mr. Dirks finds it significant that I said at my deposition that because "'time moves in one direction, as I understand physics,'"[219] therefore "Facebook could not have known its Q2 2018 financial results before the quarter ended."[220] If Mr. Dirks is simply saying that without "a crystal ball, Defendants could not have disclosed" the *specific numbers that were disclosed on the July 25, 2018 earnings call*, then he has that much right.[221] But the materialization of the risk defense makes no sense at that level of generality.

112. Rather, Mr. Dirks is essentially arguing here that once a fact is publicly disclosed, *all risks* associated with that fact are necessarily perfectly and accurately impounded in the share price due to the functioning of efficient markets. And if all risks associated with the newly

[217] Dirks Report, ¶144.

[218] Dirks Report, ¶147.

[219] Dirks Report, ¶148 n. 185.

[220] Dirks Report, ¶148.

[221] Dirks Report, ¶148.

disclosed fact were *publicly known*, the argument might be reasonable. But the market cannot be expected to accurately process or impound information that it does not have.

113. As I wrote in an expert report in the *Alphabet* litigation while responding to another expert's reliance on the same flawed argument Mr. Dirks makes, Mr. Dirks's argument is akin to saying that the situation here is "as if the market had been told that [Facebook] had bet billions on a coin flip and the stock price fell only after the flip went against [Facebook]."[222] I went on to say that for this "*caveat emptor* story to be true," the earlier disclosure (here, the March 2018 and June 3, 2018 disclosures) "would have to have fully disclosed the actual risks associated with what the company's earlier statements omitted to tell the public."[223] A market that has only partial information cannot price as if it had all the relevant information.

114. In failing to convey the significance of the costs and lost revenues from cleaning up its user data privacy act, Facebook left the market with insufficient information to accurately value the consequences that *were foreseeable to Facebook but not previously known to the market*. So the July 25, 2018 news was the revelation of information which the market previously did not have adequate knowledge to properly price.[224] Thus, Mr. Dirks's (and Professor Fischel's, and the

---

[222] *Alphabet* Rebuttal Report, ¶187.

[223] *Alphabet* Rebuttal Report, ¶188.

[224] Mr. Dirks seems to reject this proposition on the basis of nothing more than a legal argument. Dirks Report, ¶149 ("I understand that the only claims at issue in this case are the Alleged Risk Factor Misstatements and Alleged User Control Misstatements. No other statements by the Company including the guidance it provided during the Proposed Class Period regarding its future quarters are at issue. Dr. Gelbach's claim to the contrary, i.e., his assertion that in addition to correcting the Alleged Risk Factor Misstatements and User Control Misstatements, Defendants should also have purportedly provided different guidance regarding future costs and revenues over the Proposed Class Period, directly contradicts his own Summary of Plaintiffs' Claims, which does not assert that the Plaintiffs claim Facebook's guidance was false or misleading in any way.") (footnotes removed).

Defendants') argument about materialization of the risk is beside the point. Further, this discussion makes clear why both Mr. Dirks and Professor Fischel are wrong to say my opinion about the July 26, 2018 stock price drop contradicts the efficiency of the market in Facebook stock: semi-strong form market efficiency is entirely consistent with the proposition that all information that is known to someone in the universe is not necessarily impounded in the stock price;[225] what matters is *public* knowledge.

115. Mr. Dirks's second argument about my opinion as to the July 26, 2018 share-price decline is that reading a lot of analyst reports has convinced him that other factors besides the Cambridge Analytica scandal and Whitelisting caused Facebook's share-price drop. Like Professor Fischel, Mr. Dirks suggests that I did not provide examples that support Plaintiffs' theory of liability. As I did in ¶55 above in response to Professor Fischel, here I provide examples of support for Plaintiffs' position as to the July 26, 2018 price drop:

- A July 25, 2018 story in *The New York Times* titled "Facebook Starts Paying a Price for Scandals," observed that "***Facebook has grappled with months of scrutiny over*** Russian misuse of the platform in the 2016 American presidential campaign and ***the harvesting of its users' data through the political consulting firm Cambridge Analytica***. ***The results were among the first signs that the issues*** had pierced the company's image and ***would have a lasting effect on its moneymaking machine***."[226]

- A July 25, 2018 analyst report from William Blair contained the heading "New data privacy tools could limit targeting capabilities" for advertising, which it said helped explain the "meaningful[]" reduction in revenue forecast for 2H2018. In addition to any "potential impact from GDPR," the

[225] This proposition is basic enough that its negation is essentially the definition of *strong-form* market efficiency: a market is strong-form efficient if all information, including all private information, is impounded in the price as if it were publicly known. No court of which I am aware has held that strong-form efficiency is required for class certification—and if it were, no securities fraud class action would be possible, because share-price inflation is arbitraged away in a strong-form efficient market, leaving no possibility of persistent share-price inflation.

[226] Sheera Frenkel, *Facebook Starts Paying a Price for Scandals*, New York Times (July 25, 2018), https://www.nytimes.com/2018/07/25/technology/facebook-revenue-scandals.html.

report noted that Facebook had developed "new tools … that give users more choice around the data that can be shared with advertisers for ad targeting," such as a "Clear History" tool "that allows users to erase their browsing behavior, sites visited, and click data, among others, on Facebook."[227]

- CFRA, July 26, 2018: "We lower our EPS estimates for 2018 to $7.29 from $7.42 and 2019 to $8.24 from $8.63, given what we see as FB's ***efforts to invest significantly to respond to the Cambridge Analytica revelations***"[228]

- In a July 26, 2018 story titled, "Facebook Takes Historic Plunge as Scandals Finally Take a Toll," Bloomberg's lead sentence was "Facebook Inc. plunged as much as 20 percent Thursday ***after months of scandal and criticism finally hit the company where it hurts: growth***," and the story noted that "the results followed a period in which ***data-privacy issues came under harsh scrutiny, with Chief Executive Officer Mark Zuckerberg testifying before U.S. Congress for hours on the company's missteps***"; the story called Wehner's reference to greater user control over privacy "a direct response to criticism the company has fielded."[229]

- A July 26, 2018 analyst report from J.P. Morgan stated that "FB remains in the crosshairs of regulators & politicians, and ***data/privacy policies & products are just kicking in***. At the same time, we believe FB remains fully committed to improving ***safety & security on the platform, an expensive undertaking of ongoing spend w/little to no direct or tangible return of revenue***."[230]

- In a July 29, 2018 story titled "Profit Versus Privacy: Facebook's Stock Collapse And Its Empty 'Privacy First' Promise," Forbes said that "the abrupt implosion of Facebook's stock price" was caused by "***[t]he increasing impact of the profit versus privacy battle at the center of the Cambridge Analytica story and the growing inability of Facebook to control its platform and protect it from harmful misuse***," which the article located at "the center of [Facebook's] pessimistic outlook." The article characterized the broad response to Facebook's July 25, 2018 financial

---

[227] William Blair, *Rare Miss on Ad Revenue and Margin Commentary Pressure Shares* (July 25, 2018).

[228] CFRA, *CFRA Reiterates Hold Opinion on Shares of Facebook, Inc.* (July 26, 2018).

[229] Sarah Frier, *Facebook Takes Historic Plunge as Scandals Finally Take a Toll*, Bloomberg (July 25, 2018, 8:44pm, updated July 26, 2018).

[230] J.P. Morgan, *Major Reset Stories & Data/Privacy Drag on N-T Revs Heavy Investments Continue; Remain OW, PT to $205 Dropping from AFL* (July 26, 2018).

> results: "As the technology press and pundits digested this week's precipitous collapse of Facebook's stock price, headlines have largely linked the collapse to Facebook's privacy and safety woes coming home to roost. Yet, ***it is important to recognize that it is not those troubles themselves, but rather the impact of those woes on profit that were what so concerned investors and triggered the sell off***."[231]

116. Mr. Dirks evidently is more persuaded, as a factual matter, by other statements that say there were confounding factors. But mere mentions of confounding factors in analyst reports are not quantified price effects.

117. Additionally, and as discussed above in response to Professor Fischel, internal Facebook documents show that the guidance about substantial margin compression that spooked and moved the market on July 26, 2018 was connected to remediation efforts targeted at the Cambridge Analytica scandal.[232] Analyst commentary can be only as good as defendants' transparency allows it to be. Facebook's internal documents show that it knew more than it disclosed about the relationship between the facts of the Cambridge Analytica scandal and its own future profitability, so the facts disclosed on July 25, 2018 added to the market's information about the importance of those facts that had been disclosed earlier. In other words, the July 25, 2018 guidance statements were corrective because Facebook had concealed what it knew about the importance of previously disclosed facts for the Company's future cash flows.

118. Finally, I continue to hold the opinion that if it becomes necessary to quantify confounders, I will be able to do so using traditional tools of financial economics, information obtained in discovery, and/or a combination of the two. Nothing in the incomplete and

---

[231] Kalev Leetaru, *Profit Versus Privacy: Facebook's Stock Collapse And Its Empty 'Privacy First' Promise*, Forbes (July 29, 2018), https://www.forbes.com/sites/kalevleetaru/2018/07/29/profit-versus-privacy-facebooks-stock-collapse-and-its-empty-privacy-first-promise.

[232] *See* ¶¶59-60, 71, *supra*.

fundamentally flawed Dirks Report establishes otherwise. I stand by the opinions set forth in the Gelbach Report.

## VI. Analysis of the Zhang Report

119. The Zhang Report offers no criticism or disagreement with any of the overall econometric conclusions I draw in the Gelbach Report. Further, the Zhang Report is ignored—undiscussed, unquoted, and uncited—by the Fischel Report, the Dirks Report, and Defendants' opposition to class certification. Thus, even if I were to concede every claim in the Zhang Report, that would have no impact on the core conclusions I drew in the Gelbach Report. Nevertheless, because the Zhang Report is in the record, I will take this opportunity to provide some of the reasons why Professor Zhang's arguments about the reliability of Model 2 are erroneous and misleading, and why his arguments about statistical significance are irrelevant to assessing the conclusions in the Gelbach Report.[233]

### A. Professor Zhang's Assignment Does Not Include Model 1, and His Report Does Not Contest Any of the Provisional Conclusions I Drew About Damages

120. The Zhang Report's "Assignment and Summary of Opinions" section (§II) acknowledges Professor Zhang's understanding that Plaintiffs allege that Defendants "made a series of false or misleading statements that artificially inflated, or maintained artificial inflation in, Facebook's stock price" during the Class Period, as well as his "understand[ing] that a relevant question is whether particular statements or events had an impact on Facebook's stock price."[234] The Zhang Report also acknowledges that I considered both of two statistical models, Model 1

[233] My choice not to address every claim in the uncited and unrelied-on Zhang Report does not concede the correctness of any unaddressed claim. Should addressing any such claim become apposite to this Litigation in the future, I will do so appropriately.

[234] Zhang Report, ¶12.

and Model 2, in reaching my conclusions. But although Professor Zhang takes issue with the reliability of Model 2, he neither criticizes Model 1[235] nor contests that the March 2018 revelations caused statistically significant negative price impacts on March 19, March 20, and July 26, 2018.[236] Further, the Zhang Report does not contest any of the provisional conclusions drawn about damages in the Gelbach Report.

### B. Professor Zhang Agrees With Me that Holdout Dates Should Be Used to Calculate Model 2's RMSE

121. The Zhang Report correctly observes that flexible models, including data-driven machine learning models such as the elastic net regression model underlying Model 2, can lead to overfitting.[237] In line with this fact, he observes that Model 2's RMSE on hold-out dates exceeds its RMSE on training dates.[238] The natural thing to do under such circumstances is to use the hold-out dates to calculate the RMSE for Model 2—as I did and explained that I did: all uses of RMSE for Model 2 in the Gelbach Report are based on holdout dates.[239] Therefore, any intimation to the contrary by Professor Zhang misleads, and his statement that "Model 2's RMSE on the hold-out

---

[235] Zhang Report, ¶13.

[236] Indeed, neither the word "March" nor the phrase "July 26" appears anywhere in the Zhang Report; the phrase "price impact" also is absent.

[237] Zhang Report, ¶21.

[238] Zhang Report, ¶22.

[239] Gelbach Report, Appendix C, ¶3 ("[I]n estimating Model 2, I randomly selected 50 trading days from the non-excluded dates as test-set dates (also sometimes referred to as 'hold-out' dates). ***I use these test-set dates for evaluating the root mean square error ('RMSE') for Model 2***, as discussed further below.") (footnote removed).

data exceeds its RMSE on the training data by an average of 5.8% during the Class Period,"[240] even if true, is 100% beside the point.

### C. Professor Zhang's Purported Demonstration of Instability of Model 2 Uses a Misleading Measure, and the Model 2 Abnormal Returns He Computes Using His Two Estimation Windows Are Actually Tightly Related to Each Other

122. Professor Zhang purports to "test how unstable Model 2 is," by "estimat[ing] Model 2 for each trading day during the Class Period, following Professor Gelbach's procedure."[241] To do so, he "compute[s] each day's abnormal return twice: once with the model estimated for that day (where the previous 250 trading days form the estimation sample), and once with the model estimated for the preceding trading day (where the estimation sample is based on the previous 251 trading days excluding the most recent previous trading day)."[242] According to Professor Zhang, this comparison can be described as: "the same model is run on nearly identical data (for example, dropping or adding a single trading day)."[243] That is a highly misleading characterization of what Professor Zhang actually does in challenging Model 2's stability, because his computer code reveals that for each date on which he calculates abnormal returns, he uses two different sets of training data to estimate the underlying model. Thus, in Professor Zhang's two-window comparison, it is not true that "the same model is run on nearly identical data" that differ by

[240] Zhang Report, ¶22.

[241] Zhang Report, ¶26.

[242] Zhang Report, ¶26.

[243] Zhang Report, ¶14.b (summarizing the procedure described in ¶26).

"dropping or adding a single day"; instead, his two windows can be expected to have training sets that differ by dozens of dates.[244]

123. Thus Professor Zhang's approach injects randomness into the very comparison he suggests demonstrates instability. Although correcting this design flaw would no doubt reduce whatever instability there is, my analysis of Professor Zhang's approach and its results shows that in fact there is no instability problem.

124. Professor Zhang estimates abnormal returns using Model 2, with the calculation of abnormal returns extended to 363 dates (by comparison to the handful of earnings-release and damages-related dates for which abnormal returns are computed as reported in the Gelbach Report) and using two different estimation windows for each of the 363 dates. The "(1, 250) Window" includes dates between 1 and 250 trading days before the target date whose abnormal return is to be estimated,[245] and the "(2, 251) Window" shifts to the dates between 2 and 251 days before the target date.[246] For each of the 363 dates, Professor Zhang computes the abnormal returns based on estimating Model 2 on these two windows, and then he computes their difference. Finally, Professor Zhang computes the RMSE of this difference. Professor Zhang finds that this RMSE is

---

[244] Professor Zhang's computer code uses different random "seed" values for the two windows on each date. As Professor Zhang writes: "On average two random draws of 50 days from a 250-day window share only about 10 days so changing the seed can move about 40 days into the training sample and about 40 days out of it, with roughly 200 training days—shifting about 20% of the training data." Zhang Report, ¶30.b, n. 21. Thus, Professor Zhang's approach to comparing a supposed one-day change in the estimation window entails having ***dozens of dates exit the training data set and dozens more enter it***.

[245] For example, if the abnormal return to be estimated is for Monday, March 19, 2018, the (1, 250) Window is the set of trading dates beginning on March 21, 2017 and ending on Friday, March 16, 2018.

[246] For example, if the abnormal return to be estimated is for Monday, March 19, 2018, the (2, 251) Window is the set of trading dates beginning on March 20, 2017 and ending on Thursday, March 15, 2018.

0.184%.[247] He offers no basis for determining whether 0.184% is small, large, or medium as an absolute matter. However, he does compare it to the RMSE he gets when he repeats the four-step procedure just described, using Model 1 in place of Model 2, for which he says the RMSE in that case is 0.015%.[248] Because 0.184% is 12.3 times as large as 0.015%,[249] Professor Zhang says his findings "show that Professor Gelbach's Model 2 generates unstable predictions."[250]

125. But Professor Zhang's RMSE-of-difference-of-different-models'-abnormal-returns ("RODODMARs") metric is an unsupported—and, I am about to demonstrate, worthless—approach for investigating whether the two sets of abnormal returns estimates are similar. A more natural way to answer that very simple question is to calculate the estimated coefficient from the regression of one of the two series of Model 2 abnormal returns estimates on the other. The value of the coefficient shows how similar the two series are, and the value of the associated R-squared shows how tight the relationship between the two series is.

126. Figure 1 below presents a scatter plot of these two estimates, with the estimate based on the (1, 250) Window measured on the horizontal axis and the estimate based on the (2, 251) Window measured on the vertical axis. Each blue dot corresponds to one pair of estimates of the abnormal return using the two Windows. If Professor Zhang were right that "Model 2 is unstable,"[251] the blue dots would be scattered willy-nilly across the plotted region, whereas if the

---

[247] Zhang Report, ¶27.

[248] Zhang Report, ¶27.

[249] Zhang Report, ¶27.

[250] In fact, the 0.015% figure Zhang Reports for Model 1 is what he obtains using the full set of 250 trading dates in estimating Model 1, i.e., he uses the Model 2 holdout dates in computing this. When the holdout dates are excluded, the Model 1 figure is several times greater.

[251] Zhang Report, ¶14.b.

two Windows always yielded identical estimates of abnormal returns, all the blue dots would be on top of the black dashed 45-degree line. In fact, the blue dots cluster closely around the 45-degree line, with a regression coefficient of 0.9831 and an R-squared of 0.9518. The blue dots' estimated regression line, drawn with a solid red line, is almost perfectly overlaid on top of the 45-degree line.

127. Thus, Professor Zhang's position reduces to the startling claim that two data series that have a regression line nearly indistinguishable from the 45-degree line, and that have an R-squared above 0.95, somehow have an unstable relationship. In sum, even ignoring the fact that Professor Zhang's supposed "single trading day" difference really is based on changing the estimation sample by dozens of observations, his conclusion that Model 2 is unstable is based on a measure whose merits he does not defend or discuss, and this measure obscures the reality that there is a strong and highly stable relationship between the Model 2 abnormal return estimates he computed using the (1, 250) Window and his chosen (2, 251) Window.[252]

[252] The Zhang Report offers a second metric, in addition to his RODODMARs, that Professor Zhang says shows Model 2 is unstable. This metric is the number of the 363 trading dates that "gain significance" or "lose significance" as a result of Professor Zhang's putative shift of "only one day." Professor Zhang writes that "shifting the estimation period by one day changes the significance for 25 days during the Class Period with 40% of the significant days losing significance (12 out of 30) and 4% of the insignificant days gaining significance (13 out of 333) according to a two-tailed *t*-test at the 5% level." Zhang Report, ¶28. But the Gelbach Report does not rely on *t*-tests, due to non-normality, and one has to go looking in a footnote to find Professor Zhang's admission that his own SQ-test results have many fewer "gain significance" and "lose significance" dates than the *t*-test results he highlighted above the line. Zhang Report, ¶28 n. 17. Finally, Professor Zhang's results here are just as subject to the criticism that he redraws the training sets across the two window-lengths, so that his gain/lose significance measures must be partly the result of injecting estimation-sample randomness across the windows.

**Figure 1: Regression of Estimated Abnormal Returns Using (2, 251) Window and (1, 250) Window**




### D. Despite Professor Zhang's Contentions that Model 2 is Not a Better Model, He Admits that His Own Estimates Show that "Model 2 Reduces Prediction Errors by About 14% Relative to Model 1"

128. Professor Zhang also argues that the Gelbach Report overstates the RMSE-based prediction gains from Model 2 as compared to Model 1.[253] In the interests of avoiding another deep dive into statistical details, here I will just point out that (a) after computing the RMSE for 363 dates, Professor Zhang admits that he "found that ***Model 2 reduces prediction errors by about 14% relative to Model 1***,"[254] and (b) nothing of any substance turns on whether one focuses on Professor Zhang's conceded 14% improvement or the 19% to 36% improvement I discussed.[255]

---

[253] Zhang Report, ¶33.

[254] Zhang Report, ¶34.

[255] Gelbach Report, Appendix C, ¶14.

### E. Although Professor Zhang Contends that the SQ Test As Applied to Model 2 is Biased in Favor of Finding Significance, He Identifies No Date On Which This Supposed Bias Makes a Difference to My Econometric Conclusions About the Three Damages Dates—and Professor Fischel Reaches My Same Conclusions Using an Approach that Professor Zhang Says Is Appropriate

129. Finally, Professor Zhang contends that the SQ test I used to evaluate statistical significance over-rejects. He does this by calculating a rejection dummy for each of 363 dates, which, again, is not something I did. His claim hinges on the assumption that the average rejection rate over the full Class Period is a valid measure of the date-specific rejection rate under the null hypothesis that there was no event-date price decline on each of the specific event dates I considered. Professor Zhang does not provide any proof of this proposition, even though it entails using a time-series average that is based on correlated data to measure the expected value of the rejection dummy on specific dates.[256]

130. Professor Zhang suggests that changing volatility might explain the high rejection rate he observed, and that to address that concern, "the researcher should consider shortening the estimation period to ensure comparability (for example, by using six months of data rather than

[256] As Professor Zhang notes, "statistical inference with machine learning models is complex and the theory is still evolving." Zhang Report, ¶45. In the article in which I co-developed the Model 2 approach, Andrew Baker and Jonah B. Gelbach, *Machine Learning and Predicted Returns for Event Studies in Securities Litigation*, 5 J. L. Fin. & Accounting 231 (2021), we discussed the possibility that the use of machine learning estimates could cause bias in the use of the SQ test, and we explained why the test nevertheless could plausibly perform well. We then presented evidence from a detailed simulation study that indicated the test did perform well in that context. I cited and discussed this article in the Gelbach Report, ¶70 n. 90 and Appendix C, ¶8 n. 6, but it is uncited in the Zhang Report or its Appendix B (Materials relied Upon).

one year)."[257] Professor Fischel uses approximately a six-month window in the Fischel Report,[258] and he draws the identical conclusions that I draw regarding the sign and statistical significance of abnormal returns on March 19 and 20, 2018 and July 26, 2018.[259]

131. Thus, Professor Zhang does not support his approach to assessing over-rejection on specific dates when using the Model 2/SQ-test combination; he does not say that he disagrees with my conclusion of statistical significance as to any of the three damages-related dates I consider; and Professor Fischel's event study results that satisfy Professor Zhang's suggested fix yield exactly the same conclusions about sign and statistical significance drawn in the Gelbach Report.

| | |
|---|---|
| November 10, 2026 | [signature] |
| Date | Jonah B. Gelbach |

[257] Zhang Report, ¶44.

[258] Fischel Report, ¶40 n. 74 (describing that "we" used a 120-day window, slightly less than a six-month window).

[259] Fischel Report, Appendix C at 8 (finding price drops on March 19 and 20, 2018 that are statistically significant at the 1% level); *id.* at 11 (finding same for July 26, 2018 price drop).

# Appendix A

**Expert Reports**

- Expert Report of Jonah B. Gelbach, dated August 20, 2026
- Expert Report of Martin Dirks, dated October 9, 2026
- Expert Report of Daniel R. Fischel, dated October 9, 2026
- Expert Report of Dennis J. Zhang, dated October 9, 2026
- Rebuttal Expert Report of Professor Jonah B. Gelbach in *In re Alphabet, Inc. Securities Litigation*, No. 3:18-cv-06245-TLT (N.D. Cal.), dated August 14, 2023
- Rebuttal Report of Daniel R. Fischel in *Lawrence E. Jaffe Pension Plan v. Household International, Inc., et al.*, No. 02-C-5893 (N.D. Ill.), dated February 1, 2008

**Court Documents**

- Fourth Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF 228)
- Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Fourth Amended Complaint (ECF 258)
- Defendants' Memorandum of Law in Opposition to Lead Plaintiffs' Motion to Certify Class, Appoint Class Representative, and Appoint Class Counsel (ECF 301)
- Declaration of William M. Thomas, dated June 8, 2026 (ECF 301-15)
- Supplemental Declaration of William M. Thomas, dated October 20, 2026
- March 21, 2008 Deposition Transcript of Daniel Fischel in *Lawrence E. Jaffe Pension Plan v. Household International, Inc., et al.*, No. 02-C-5893 (N.D. Ill.)
- April 16, 2009 Trial Transcript in *Lawrence E. Jaffe Pension Plan v. Household International, Inc., et al.*, No. 02-C-5893 (N.D. Ill.)

**Discovery**

- Defendants' Amended Responses and Objections to Lead Plaintiffs' First Set of Interrogatories to All Defendants, dated October 19, 2026
- Lead Plaintiffs' Amended Responses and Objections to Defendants' First Set of Interrogatories to Plaintiffs, dated August 21, 2026
- Deposition of Jonah B. Gelbach Ph.D., dated September 18, 2026

**Analyst Reports**

- Bank of America Merrill Lynch, *New data management and privacy issues fueling the fire* (Mar. 19, 2018)
- CFRA, *CFRA Reiterates Hold Opinion on Shares of Facebook, Inc.* (July 26, 2018)
- Credit Suisse, *Opportunity Arises, as News Flow Rubs Salt Into the Wound* (Mar. 19, 2018)
- Deutsche Bank, *Opening Pandora's Box?* (Mar. 19, 2018)
- Evercore ISI, *Darkest Hour: Thoughts on Yesterday's Selloff* (Mar. 20, 2018)
- J.P. Morgan, *Major Reset Stories & Data/Privacy Drag on N-T Revs Heavy Investments Continue; Remain OW, PT to $205 Dropping from AFL* (July 26, 2018)
- Morgan Stanley, *Top 4 Investor Questions and Our Answers* (Mar. 20, 2018)

- Pivotal Research Group, *FB: Data Leak Details Described, Enhancing Risks* (Mar. 19, 2018)
- UBS, *Walking Through the Data of a Facebook Story* (Mar. 19, 2018)
- Wells Fargo, *FB: Thank Goodness For Instagram* (Mar. 20, 2018)
- William Blair, *Rare Miss on Ad Revenue and Margin Commentary Pressure Shares* (July 25, 2018)

**News Articles**

- Ime Archibong, *Why We Disagree with The New York Times*, Facebook Newsroom (June 3, 2018)
- Carole Cadwalladr & Emma Graham-Harrison, *Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach*, The Guardian (Mar. 17, 2018)
- Sheera Frenkel, *Facebook Starts Paying a Price for Scandals*, New York Times (July 25, 2018)
- Sarah Frier, *Facebook Takes Historic Plunge as Scandals Finally Take a Toll*, Bloomberg (July 25, 2018, 8:44pm, updated July 26, 2018)
- Paul Grewal, *Suspending Cambridge Analytica and SCL Group From Facebook*, Facebook Newsroom (Mar. 16, 2018)
- Arjun Kharpal, *Facebook shares slump amid continued fallout from Cambridge Analytica scandal*, CNBC (Mar. 19, 2018)
- Tae Kim, *Data leak 'another indication of systemic problems at Facebook' so sell the stock, analyst says*, CNBC (Mar. 19, 2018)
- Kalev Leetaru, *Profit Versus Privacy: Facebook's Stock Collapse And Its Empty 'Privacy First' Promise*, Forbes (July 29, 2018)
- Paul Lewis, *'Utterly horrifying': ex-Facebook insider says covert data harvesting was routine*, The Guardian (Mar. 20, 2018)
- Mike Murphy, *Clinton Ends Up With 2.9 Million More Votes Than Trump*, Fox Business News (Dec. 21, 2016)
- Aimee Picchi, *Facebook shares crushed after data controversy*, CBS News (Mar. 19, 2018)
- Deepa Seetharaman, *Facebook Confirms Data-Sharing Deals With Chinese Tech Firms*, Wall Street Journal (June 6, 2018)
- Deepa Seetharaman & Kirsten Grind, *Facebook Gave Some Companies Special Access to Additional Data About Users' Friends*, Wall Street Journal (June 8, 2018)
- Rafia Shaikh, *50 Million Facebook Profiles Harvested Without User Consent – Data Monster Chose NOT to Alert Victims & Is Trying to Threaten Reporters*, WCCF Tech (Mar. 17, 2018)
- Trisha Thadani, *Facebook stock takes another hit amid reported probe, #DeleteFacebook campaign*, San Francisco Chronicle (Mar. 21, 2018)
- Munsif Vengattil, *Facebook shares slide after reports of data misuse*, Reuters (Mar. 19, 2018)

**Academic Publications**

- Andrew Baker & Jonah B. Gelbach, *Machine Learning and Predicted Returns for Event Studies in Securities Litigation*, 5 J. L. Fin. & Accounting 231 (2021)

- Jonah B. Gelbach & Jenny R. Hawkins, *A Bayesian Approach to Event Studies for Securities Litigation*, 176 J. Institutional & Theoretical Econ. 86 (2020)

**Books**

- Arthur Conan Doyle, *Silver Blaze, in The Memoirs of Sherlock Holmes* (Project Gutenberg 1997)
- Joseph E. Stiglitz & Carl E. Walsh, *Economics* (4th ed. 2006)
- Neil A. Weiss, *Elementary Statistics* (6th ed. 2004)

**Bates Documents**

- FB-CA-SECURITIES-0045433
- FB-CA-SECURITIES-0049290
- FB-CA-SECURITIES-1600769
- FB-CA-SECURITIES-2061145
- FB-CA-SECURITIES-4358708
- FB-CA-SECURITIES-4779397
- FB-CA-SECURITIES-7346851
- FB-CA-SECURITIES-7351168
- FB-CA-SECURITIES-7355091
- FB-CA-SECURITIES-7355135
- FB-CA-SECURITIES-NON-WAIVER-7271932

**Company Documents**

- 3Q2017 earnings call (Nov. 1, 2017)
- 2Q2018 earnings call (July 25, 2018)
- 2Q2018 earnings presentation
- 3Q2018 earnings report

**Cases**

- *Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992)
- *In re Apollo Grp., Inc. Sec. Litig.*, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008)
- *In re Apollo Grp., Inc. Sec. Litig.*, 2010 WL 5927988 (9th Cir. June 23, 2010)
- *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934 (9th Cir. 2023)
- *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008)

**Other Documents**

- *Presidential Results*, CNN, https://www.cnn.com/election/2020/results/president (accessed on July 29, 2026)
- *Schrödinger's Cat*, Wikipedia, https://en.wikipedia.org/wiki/Schr%C3%B6dinger%27s_cat (accessed on October 28, 2026)
- Computer code and files produced related to the Zhang Report