# EXHIBIT 29

GIBSON, DUNN & CRUTCHER LLP
BRIAN M. LUTZ (SBN 255976)
blutz@gibsondunn.com
MICHAEL J. KAHN (SBN 303289)
mjkahn@gibsondunn.com
MARTIE KUTSCHER (SBN 302650)
mkutscherclark@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306

GIBSON, DUNN & CRUTCHER LLP
Joshua S. Lipshutz (SBN 242557)
jlipshutz@gibsondunn.com
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: 202.955.8217
Facsimile: 202.530.9614

*Attorneys for Defendants Facebook, Inc., Mark E. Zuckerberg, Sheryl K. Sandberg, and David M. Wehner*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re FACEBOOK, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Master File No. 5:18-cv-01725-EJD<br><br><u>CLASS ACTION</u><br><br>**DEFENDANTS' AMENDED RESPONSES AND OBJECTIONS TO LEAD PLAINTIFFS' FIRST SET OF INTERROGATORIES TO ALL DEFENDANTS** |

Defendants Facebook, Inc. ("Facebook" or the "Company," now Meta Platforms, Inc.), and Mark E. Zuckerberg, Sheryl K. Sandberg, and David M. Wehner (collectively, the "Individual Defendants" and, together with Facebook, "Defendants"), hereby submit amended responses and objections to the Lead Plaintiffs' First Set of Interrogatories as follows:

**PRELIMINARY STATEMENT**

1. Defendants' Amended Responses and Objections to the Interrogatories are made to the best of Defendants' current knowledge, information, and belief. Defendants' investigation of the facts and the identification, review, and analysis of documents relating to this action are ongoing. Defendants reserve the right to supplement or amend any responses should further investigation, discovery, or analysis indicate that such supplementation or amendment is necessary or appropriate.

2. Defendants' Amended Responses and Objections to the Interrogatories are made solely for the purpose of and in relation to this action. Each response is given subject to all appropriate objections (including, but not limited to, objections concerning privilege, competency, relevancy, materiality, propriety, and admissibility). All objections are reserved and may be interposed at any time.

3. Defendants' Amended Responses are premised on their understanding that Lead Plaintiffs seek only that information that is within each defendant's personal knowledge, possession, custody, and control, and Defendants are responding to these Interrogatories on that basis.

4. Defendants incorporate by reference each and every General Objection, Objection to Definitions, and Objection to Instructions set forth below into each and every specific response. The failure to include any General Objection in any specific response shall not be interpreted as a waiver of any General Objection to that response.

5. Nothing contained in these Amended Responses and Objections or provided in response to the Interrogatories consists of, or should be construed as, an admission relating to the accuracy, relevance, existence, or nonexistence of any alleged facts or information referenced in any Interrogatory, or an admission that any particular document or information is admissible.

6. Given the scope and complexity of these Interrogatories—which include more than 140 discrete requests and are targeted at current and former senior executives—Defendants sought a courtesy extension of two weeks in order to prepare thoughtful, substantive responses. Defendants relied in good faith on an agreement in principle that the deadline to serve these responses would be extended. Lead Plaintiffs revoked that agreement after business hours on the deadline to respond (October 5, 2026) and insisted any extension would require Defendants to waive all objections. Defendants instead submitted their Responses and Objections on October 5, 2026, stated they intended "to supplement these Responses by October 19, 2026" and—given Defendants were afforded mere hours to finalize the October 5, 2026 Responses after Lead Plaintiffs revoked the negotiated extension—Defendants reserved all rights to amend and supplement the Responses and Objections. Defendants now submit their Amended Responses and Objections.

7. Defendants are willing to meet and confer with Lead Plaintiffs regarding these Amended Responses and Objections to the Interrogatories.

## GENERAL OBJECTIONS

1. Defendants object to each Interrogatory, including the Definitions and Instructions, to the extent that it purports to impose obligations beyond those imposed or authorized by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Civil Local Rules of the United States District Court for the Northern District of California, the Court's standing orders, any other applicable federal or state law, and any agreements between the parties. Defendants will construe and respond to the Interrogatories in accordance with the requirements of the Federal Rules and other applicable rules or laws.

2. Defendants generally object to the Interrogatories, including the Definitions and Instructions, to the extent they purport to request the identification and disclosure of any information, communication(s), or document(s) that were prepared in anticipation of litigation, constitute attorney work product, reveal privileged attorney-client communications, are covered under the common-interest privilege and/or joint-defense privilege, or are otherwise protected or immune from disclosure under any applicable privilege(s), law(s), or rule(s). Defendants hereby assert all such

applicable privileges and protections, and exclude privileged and protected information from their responses to each Interrogatory. *See generally* Fed. R. Evid. 502. The production of any information or documents that are privileged or otherwise immune from discovery and any subsequent use and/or clawback of such information or documents is governed by the parties' stipulated protective order, entered by the Court on March 21, 2025 in this case. *See* Dkt. No. 211.

3. Defendants generally object to each Interrogatory, including the Definitions and Instructions, to the extent that it is vague, ambiguous, overbroad, and/or unduly burdensome, including to the extent that it calls for the identification of "any" or "all" facts, documents, or information concerning the subject matters referenced therein.

4. Defendants object to each Interrogatory to the extent it is overly broad, unduly burdensome, and not proportional to the needs of the case, taking into account the importance of the issues at stake in this action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, the stage of the case, and whether the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed. R. Civ. P. 26(b)(1).

5. Defendants object to each Interrogatory to the extent that it seeks information that is not relevant to the claims or defenses in this action and is not proportional to the needs of the case.

6. Defendants object to each Interrogatory to the extent it is compound or contains discrete subparts requiring Defendants to engage in separate and distinct inquiries to respond to each subpart, such that the subparts should be construed as independent interrogatories, and which, in total, would cause Lead Plaintiffs to exceed the maximum number of permissible interrogatories under the Federal Rules or any applicable Court order. In total, the Interrogatories contain more than 140 discrete requests, far in excess of the 25 interrogatories permitted under Federal Rule of Civil Procedure 33(a)(1).

7. Defendants generally object to each Interrogatory, including the Definitions and Instructions, to the extent that production of such information demanded therein would violate the privacy and confidentiality rights of third parties under the applicable laws of any relevant

jurisdiction, or that such production is otherwise prohibited by law, or is subject to legal requirements for notification of third parties.

8. Defendants object to each Interrogatory to the extent that it seeks information already in Lead Plaintiffs' possession, available in the public domain, or equally available to Lead Plaintiffs through other means.

9. Defendants object to each Interrogatory to the extent it calls for a legal conclusion or seeks the disclosure of legal theories, mental impressions, or litigation strategies of counsel.

10. Defendants object to each Interrogatory to the extent it improperly requires Defendants to disclose the results of expert analysis, investigation, and evaluation that cannot be completed at this stage of discovery, and attempts to impose an obligation to disclose expert testimony outside of the deadlines in the Court's scheduling order. Defendants will disclose their expert reports in accordance with the Court's scheduling order and reserve the right to supplement their responses at or after the close of discovery, consistent with Federal Rule of Civil Procedure 33(a)(2).

11. Defendants object to each Interrogatory to the extent it seeks information or contentions regarding claims that have been dismissed by the Court.

12. The Individual Defendants object that the Interrogatories are overbroad and unduly burdensome because they are all generally directed at matters more appropriately within the knowledge, possession, custody, and control of the Company, as the corporate entity, rather than any Individual Defendant. To the extent any Interrogatory seeks information within the Company's institutional or corporate knowledge, the Individual Defendants object that the Interrogatory is more appropriately directed to the Company, rely upon the Company's reasonable investigation, and any further response will be limited to the scope of their personal knowledge.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1. Defendants object to the definitions of the terms "All," "any," "each," "Including," the connectives "and" and "or," and singular/plural to the extent that they purport to expand the scope of any Interrogatory beyond its plain terms or to impose obligations beyond those imposed or authorized

by the Federal Rules, the Civil Local Rules, the Court's standing orders, and any agreements between the parties. Defendants will construe each Interrogatory in accordance with its ordinary meaning and the requirements of Rule 33.

2. Defendants object to Lead Plaintiffs' definition of "Initial Misuse" as vague, ambiguous, and compound. The definition conflates discrete events—the "sale, transfer, or provision of access" of data to Cambridge Analytica, SCL, Christopher Wylie, "and/or any party related thereto," and the "use of such data for political purposes, including in connection with Ted Cruz's presidential campaign." These are separate alleged events that may have occurred at different times, involving different actors, and in different circumstances. Defendants will construe this term to refer to Dr. Kogan's sale of Facebook user data to Cambridge Analytica in violation of Facebook's policies, and Cambridge Analytica's use of that data in connection with Senator Ted Cruz's 2016 presidential primary campaign, consistent with the Court's usage of the term "initial misuse" in its Order Granting In Part And Denying In Part Defendants' Motion To Dismiss Fourth Amended Complaint (Feb. 27, 2026), Dkt. No. 258 at 19.

3. Defendants object to Lead Plaintiffs' definitions of the terms "July 2018 Price Decline," "March 2018 Price Declines," and "Price Decline(s)" to the extent they suggest or assume as a factual matter that any decline in the price of Facebook common stock on March 19, March 20, or July 26, 2018 was caused, in whole or in part, by the revelation of any allegedly concealed fact or by any statement at issue, and to the extent they assume a single "decline" on each date rather than a change in price attributable to multiple factors. Defendants will interpret these terms to refer to the change in the closing price of Facebook Class A common stock on the identified dates relative to the prior trading day's close, without conceding causation.

4. Defendants object to the definitions of the terms "Risk Factor Statements" and "User Control Statements" on the ground that they incorporate the characterization that the statements were "false and misleading," which Defendants deny. Defendants will interpret "Risk Factor Statements" to refer to the statements identified as Statement Nos. 22, 23, and 24 in the Court's Order Granting In Part And Denying In Part Defendants' Motion To Dismiss Fourth Amended Complaint (Feb. 27,

2026), Dkt. No. 258 at 10, and "User Control Statements" to refer to the statements identified as Statement Nos. 1, 2, and 7 through 21 in the Court's Order, Dkt. No. 258 at 8–10. Nothing in Defendants' responses concedes that any such statement was false, misleading, or material.

5. Defendants object to the definition of the term "SCL" as overly broad and unduly burdensome to the extent it includes "any of its respective employees, agents, representatives, attorneys, and/or any other person acting under its direction or control." Defendants will interpret "SCL" to refer to Strategic Communication Laboratories.

6. Defendants object to Lead Plaintiffs' definition of "You" or "Your" as vague, ambiguous, overly broad, and unduly burdensome to the extent the terms are meant to include all "employees, agents, representatives, attorneys, accountants, and/or any other person acting under the respondent's direction or control." As to Facebook, Defendants will construe "You" to refer to Facebook, Inc., now Meta Platforms, Inc.; as to each Individual Defendant, Defendants will construe "You" as each Individual Defendant in his or her personal capacity. Defendants do not treat the knowledge of every employee, agent, or representative as the personal knowledge of the responding party for purposes of these Interrogatories.

7. Defendants object to Lead Plaintiffs' definition of "Whitelisting" to the extent it is defined differently than in this litigation. Defendants will interpret "Whitelisting" to refer to the alleged practice that Facebook "continued to give 'whitelisted' parties . . . access [to] users' data and users' friends' data, in contravention of user privacy settings," as described in the Court's Order Granting In Part And Denying In Part Defendants' Motion To Dismiss Fourth Amended Complaint (Feb. 27, 2026), Dkt. No. 258 at 4.

8. Defendants object to Instruction No. 1 to the extent it purports to require Defendants to furnish "all information available to you, including all information in the possession of your counsel," as this instruction would require disclosure of privileged attorney-client communications and attorney work product.

9. Defendants object to Instruction No. 4 to the extent it purports to impose requirements beyond those set forth in Federal Rule of Civil Procedure 33(d) by requiring Defendants to "map

each identified record to the particular statement, contention, event, or category to which it responds." Defendants will comply with the requirements of Rule 33(d).

**SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

For each Risk Factor Statement and User Control Statement as to which You maintain or rely upon Your Second Affirmative Defense,[1] identify each Person on whose "work, opinions, information, representations, [or] advice" You (or any Person you contend drafted, reviewed, approved, issued, repeated, or authorized the statement) reasonably relied upon. For each Person identified, state:

(a) the statement or statements to which the purported reliance relates;

(b) the Person's position and role;

(c) the date, manner, and substance of the work, opinion, information, representation, or advice; and

(d) the material facts, data, and specific Bates-numbered documents supporting the contention.

If You no longer maintain the Second Affirmative Defense as to any Risk Factor Statement or User Control Statement, state that fact unequivocally and identify each statement as to which the defense has been withdrawn.

**RESPONSE TO INTERROGATORY NO. 1:**

Defendants restate and incorporate their Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth herein.

Defendants object that this Interrogatory is compound in that it requires Defendants, for each Person identified, to separately state: (a) the statement or statements to which the purported reliance relates, (b) the Person's position and role, (c) the date, manner, and substance of the work, opinion, information, representation, or advice, and (d) the material facts, data, and specific Bates-numbered

[1] In Your Second Affirmative Defense, You claim: "The alleged misstatements or omissions made or caused to be made by Defendants were based in reasonable reliance upon the work, opinions, information, representations, and advice of others upon whom Defendants were entitled to rely."

documents supporting the contention. Each of these four subparts, multiplied across each Person for twenty separate statements, constitutes a separate and distinct inquiry such that this Interrogatory includes at least 80 distinct requests.

Defendants object that this Interrogatory is overly broad and unduly burdensome in that it seeks identification of every Person on whose work, opinions, information, representations, or advice any of the four Defendants (or any other Person who "drafted, reviewed, approved, issued, repeated, or authorized" any of the twenty Risk Factor Statements or User Control Statements) reasonably relied. Facebook is a large, global company with tens of thousands of employees. The scope of this Interrogatory requires Defendants to reconstruct the entire drafting, review, and approval process for every challenged statement across the multi-year class period, which would require an exhaustive analysis of internal communications and processes that is disproportionate to the needs of the case at this stage. It is not reasonable or proportionate to the needs of the case for Defendants to trace the entire chain of reliance through each intermediate step to the final statement, script, or talking points over eight years ago. Defendants have produced over 1.4 million documents in this litigation, which are equally available to Lead Plaintiffs and which Lead Plaintiffs have the ability to review and search independently for this information. Requiring Defendants to identify for Lead Plaintiffs specific persons and Bates-numbered documents within their voluminous productions, which Lead Plaintiffs are fully capable of reviewing themselves, imposes a burden that is not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

Defendants further object to this Interrogatory to the extent it seeks the substance or content of any legal advice rendered in connection with drafting, revising, reviewing, approving, or advising related to any challenged statement. Challenged statements may have been drafted, revised, reviewed, or approved with the involvement of Facebook in-house and outside counsel, and the communications and work product generated by those counsel may be protected by the attorney-client privilege, the attorney work-product doctrine, the common-interest and joint-defense privileges, and other applicable privileges. Defendants' assertion that the alleged misstatements or omissions made or caused to be made by Defendants were, or may have been, based on reasonable

reliance upon the work, opinions, information, representations, and advice of others upon whom Defendants were entitled to rely does not waive, and shall not be construed as waiving, the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or protection with respect to any communications between Defendants and their counsel, or any work product prepared by or at the direction of counsel, relating to the statements at issue. To the extent Defendants identify attorneys, or documents involving attorneys, in connection with the drafting, revising, reviewing, or advising on any challenged statement, such identification does not constitute an assertion of an advice-of-counsel defense and does not waive, and shall not be construed as waiving, any applicable privilege or protection or concede that any privileged communication or work product is discoverable. Defendants expressly reserve all applicable privileges and protections. *See* Fed. R. Evid. 502.

Defendants object to this Interrogatory's reference to "Risk Factor Statements" and "User Control Statements" as those terms are defined by Lead Plaintiffs. To the extent these definitions incorporate legal conclusions regarding the allegedly false or misleading nature of the statements, Defendants object and do not adopt those characterizations.

The Individual Defendants further object that this Interrogatory is overbroad and unduly burdensome because it seeks information that is primarily within the institutional or corporate knowledge, possession, custody, and control of the Company as the corporate entity, and is more appropriately directed to the Company than to the Individual Defendants in their personal capacities. Numerous persons across multiple teams at the Company are often involved in the preparation of materials before they reach the Individual Defendants. The Individual Defendants are often not aware of all those who participated in preparing materials for them.

**Response No. 1A**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, the Individual Defendants respond as follows:

To the extent Interrogatory No. 1 seeks information relating to statements made by the Individual Defendants, given the substantial passage of time, the Individual Defendants do not have a

specific recollection of each individual involved with the preparation of the statements at issue. Numerous persons across multiple teams at the Company—which may include Facebook's policy, legal, privacy, design, engineering, finance, investor relations, communications, and cross-functional teams, among others—were often involved, through multiple layers of review, in the preparation of materials before those materials reached the Individual Defendants. Further, the majority of the detailed and nuanced information sought through this Interrogatory, including the identity of every such person, the date, manner, and substance of each person's contribution, and the persons on whom those individuals in turn relied, may not have ever been within the Individual Defendants' personal knowledge.

To the extent Interrogatory No. 1 seeks information regarding statements not made by the Individual Defendants, the identity of the persons upon whom the authors or speakers of those statements relied in making them is not within the Individual Defendants' personal knowledge, and may never have been. Such information, to the extent it exists, is more appropriately sought from Facebook. The Individual Defendants' investigation is ongoing, and they reserve the right to supplement this response as discovery proceeds and additional information becomes available.

**Response No. 1B**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

To the extent Interrogatory No. 1 concerns statements made by the Individual Defendants, Facebook refers Lead Plaintiffs to the Individual Defendants' Response No. 1A above.

To the extent Interrogatory No. 1 concerns statements made by Facebook, decisions at Facebook are made by many different individuals and teams, including policy, legal, privacy, design, engineering, finance, investor relations, communications, and cross-functional teams, which participate at various stages and across multiple layers of review. A complete accounting of every person who contributed work, opinions, information, representations, or advice in connection with a given corporate statement could encompass a very large number of individuals, many of whom may have had only minor involvement but were nevertheless relied upon in connection with a statement at

issue.

Facebook is willing to meet and confer with Lead Plaintiffs to discuss a reasonable and proportionate approach to identifying the individuals upon whom Facebook relied in connection with the statements at issue. Facebook's investigation is ongoing, and it reserves the right to supplement this response as discovery proceeds and additional information becomes available.

**INTERROGATORY NO. 2:**

Identify all "other events or disclosures unrelated to Defendants' alleged violations" You contend caused or contributed to any portion of the March 2018 Price Declines and July 2018 Price Decline, as referenced in Your Fourth Affirmative Defense.[2] For each item identified, state:

(a) its date, time, source, and the exact language of the disclosure or nature of the event;

(b) the Price Decline or Price Declines to which it allegedly contributed;

(c) the causal mechanism by which Facebook contends it affected Facebook's stock price;

(d) the amount of share Price Decline(s) that You contend each "other event[] or disclosure[]" contributed to the March 2018 Price Declines and July 2018 Price Decline, respectively; and

(e) the material facts, data, and specific Bates-numbered documents supporting that contention.

**RESPONSE TO INTERROGATORY NO. 2:**

Defendants restate and incorporate their Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth herein.

Defendants incorporate and reassert their objection to Lead Plaintiffs' definitions of "July 2018 Price Decline," "March 2018 Price Declines," and "Price Decline(s)."

[2] In Your Fourth Affirmative Defense, You state: "Plaintiffs' claims, and the claims of the putative class that Plaintiffs purport to represent, are barred in whole or in part because other events or disclosures unrelated to Defendants' alleged violations are responsible for the damages alleged by Plaintiffs, including any decline in Facebook's share value."

Defendants object that this Interrogatory improperly requires Defendants to disclose the results of expert and/or legal analysis, investigation, and evaluation that cannot be completed at this stage of discovery, and attempts to impose an obligation to disclose expert testimony outside of the deadlines in the Court's scheduling order. Defendants will disclose their expert reports in accordance with the Court's scheduling order and reserve the right to supplement their response at or after the close of discovery, consistent with Federal Rule of Civil Procedure 33(a)(2).

Defendants object that this Interrogatory is compound in that it requires Defendants, for each identified event or disclosure, to separately state five distinct categories of information, which each constitutes a separate and distinct inquiry, for each of the March 2018 Price Declines and the July 2018 Price Decline. Each of these subparts constitutes a separate and distinct inquiry such that this Interrogatory contains at least ten distinct requests.

Defendants object that this Interrogatory is overly broad and unduly burdensome to the extent it requires Defendants to identify "all" other events or disclosures that caused or contributed to the Price Declines, specify the "exact language" of each disclosure, identify the "causal mechanism" by which each affected the stock price, and quantify the "amount of share Price Decline(s)" attributable to each. This level of specificity requires expert analysis and is not appropriate for resolution through an interrogatory.

The Individual Defendants further object that this Interrogatory seeks information that is not within their knowledge, possession, custody, and control. Such information is primarily within the institutional knowledge, possession, custody, and control of the Company, as the corporate entity, if at all, and this Interrogatory is more appropriately directed to the Company rather than to the Individual Defendants in their personal capacities.

**Response No. 2**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Defendants respond as follows:

Defendants contend they did not commit securities fraud. Defendants thus contend that "other events or disclosures unrelated to Defendants' alleged violations" must have caused the March

2018 Price Declines and the July 2018 Price Decline. Defendants do not currently have contentions about the nature of those "other events or disclosures," and Defendants do not need to have such contentions because they do not bear the burden of proof to establish what caused those stock price declines. It is Lead Plaintiffs' burden to establish that the alleged violations caused those stock price declines, but they have yet to offer any evidence in support of their claim (other than "preliminary" opinions from their expert, Jonah Gelbach, that are subject to change). If and when Lead Plaintiffs do offer such evidence, Defendants intend to rebut that evidence and show that Lead Plaintiffs do not meet their burden of proof.

Notwithstanding the foregoing, Defendants contend that the alleged fraud did not cause the March 2018 Price Declines or the July 2018 Price Decline because the market already knew the alleged "truth" well before those declines occurred. Lead Plaintiffs allege that the "truth" concealed by the alleged misrepresentations was revealed to the market in March 2018 through purported corrective disclosures concerning the Initial Misuse. Defendants contend that the market already knew this information. On December 11, 2015, The Guardian reported that Dr. Aleksandr Kogan had collected data from tens of millions of Facebook users, largely without their permission, transferred that data to Cambridge Analytica in violation of Facebook's policies, and that Cambridge Analytica then used that data on behalf of Senator Ted Cruz's presidential campaign. *See* Harry Davies, *Ted Cruz Using Firm that Harvested Data on Millions of Unwitting Facebook Users*, The Guardian (Dec. 11, 2015). These are the same facts that Lead Plaintiffs allege rendered Defendants' statements false or misleading. *See* Fourth Amended Consolidated Class Action Compl. ¶ 630(a) (July 1, 2025), Dkt. No. 228 ("Defendants did not disclose, but knew or recklessly disregarded, the fact that Kogan had violated the Company's policies by improperly transferring data relating to tens of millions of Facebook users to Cambridge Analytica"); Order Granting In Part And Denying In Part Defendants' Motion To Dismiss Fourth Amended Compl. (Feb. 27, 2026), Dkt. No. 258 at 19 ("Plaintiffs allege that both the user control statements and the risk factor statements were false because Defendants knew that (1) in 2015, Aleksandr Kogan, through his company GSR, sold user data to Cambridge Analytica, which in turn sold it to Ted Cruz's presidential campaign"); Lynam (Amalgamated

30(b)(6)) Dep. Tr. 124:6–133:20. Numerous other publications reported the same information or additional facts about the Initial Misuse prior to March 2018. Defendants refer Lead Plaintiffs to Facebook's Response No. 6A to Interrogatory No. 6, which identifies examples of those public disclosures. Because an efficient market is presumed to be aware of all publicly available information, the stock market already knew the facts about the Initial Misuse prior to March 2018. *See* Expert Report of Martin Dirks (Oct. 9, 2026) ("Dirks Rpt.") ¶¶ 43–44, 80–82, 127; Expert Report of Daniel R. Fischel (Oct. 9, 2026) ("Fischel Rpt.") ¶¶ 10–11, 39–40, 44. And because stock prices do not react to the repetition of information that the stock market already knows, the repetition of information about the Initial Misuse in March 2018 could not have caused the March 2018 Price Declines or the July 2018 Price Decline. *See* Dirks Rpt. ¶¶ 127, 143–47; Fischel Rpt. ¶¶ 43–49, 55–58. Defendants may disclose further contentions regarding the events and disclosures that caused or contributed to the March 2018 Price Declines and the July 2018 Price Decline through expert reports served in accordance with the Court's scheduling order. Defendants' investigation is ongoing, and Defendants reserve the right to supplement or amend this response at or after the close of discovery, including after the completion of expert discovery on loss causation and damages.

**INTERROGATORY NO. 3:**

Identify all facts and documents that formed the basis for the following statement Defendants Facebook and Zuckerberg made on Facebook's second quarter 2018 earnings call on July 25, 2018:

> Looking ahead, we will continue to invest heavily in security and privacy because we have a responsibility to keep people safe. But as I've said on past calls, we're investing so much in security that it will significantly impact our profitability. We're starting to see that this quarter.

Include, without limitation, in Your identification: (a) the date, occasion, speaker, audience, exact language, and transcript or recording by Bates number or public source of all "past calls" where You stated that investments in security and/or privacy "will significantly impact [Facebook's] profitability"; and (b) each document, data source, forecast, model, analysis, communication, or other information that You received, reviewed, relied upon, considered, and/or authored in advance of Facebook's second quarter 2018 earnings call concerning the impact of investments in security and/or

privacy on Facebook's profitability.

**RESPONSE TO INTERROGATORY NO. 3:**

Defendants restate and incorporate their Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth herein.

Defendants object that this Interrogatory is compound in that it contains two distinct subparts. First, identification of all "past calls" where Defendants stated that security and privacy investments would significantly impact profitability, including (i) the date, (ii) occasion, (iii) speaker, (iv) audience, (v) exact language, and (vi) transcript or recording by Bates number or public source. Second, a separate identification of each document or other information reviewed in advance of the earnings call. Each subpart constitutes a separate and distinct inquiry such that this Interrogatory contains at least seven distinct requests.

Defendants object that this Interrogatory seeks information that is equally available to Lead Plaintiffs. Facebook's public earnings call transcripts, including the Q2 2018 earnings call and prior earnings calls referenced in the quoted statement, are publicly available and have been cited by Lead Plaintiffs in the Complaint and other filings in this action.

Defendants object that this Interrogatory is overly broad and unduly burdensome in that it seeks "all facts and documents" that formed the basis for the quoted statement, as well as "each document, data source, forecast, model, analysis, communication, or other information" that Defendants "received, reviewed, relied upon, considered, and/or authored" in advance of the earnings call. This open-ended request effectively requires Defendants to identify every internal document, data source, and communication reviewed by any person involved in the preparation of the Q2 2018 earnings call—an enormously burdensome undertaking that is disproportionate to the needs of the case. Defendants have produced over 1.4 million documents in this litigation, which are equally available to Lead Plaintiffs and which Lead Plaintiffs have the ability to review and search independently for this information. Requiring Defendants to identify for Lead Plaintiffs specific documents, data sources, forecasts, models, analyses, and communications within their voluminous productions that Lead Plaintiffs are fully capable of reviewing themselves imposes a burden that is

not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Defendants will respond based on a reasonable investigation of documents produced to Lead Plaintiffs concerning the July 25, 2018 earnings call and publicly available transcripts of Facebook earnings calls prior to July 25, 2018.

Defendants further object to the extent this Interrogatory seeks information that is protected by the attorney-client privilege and the attorney work-product doctrine. Defendants expressly reserve all applicable privileges and protections. *See* Fed. R. Evid. 502.

The Individual Defendants further object that this Interrogatory seeks information that is primarily within the institutional knowledge, records, and control of the Company, as the corporate entity, and is more appropriately directed to the Company rather than to the Individual Defendants in their personal capacities.

**Response No. 3A**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows with respect to subpart (a):

On the April 25, 2018 earnings call, Mr. Wehner stated:

> On the expense side, we are tightening our initial expense guidance range. We now expect that full-year 2018 total expenses will grow 50–60% compared to our prior range of 45–60%. This narrowed range reflects the significant investments we're making in areas like safety & security, content acquisition, and our long-term innovation efforts.

*See* Apr. 25, 2018 Earnings Call Tr. at 8, https://s21.q4cdn.com/399680738/files/doc_financials/2018/Q1/Q1-18-Earnings-call-transcript.pdf. Mr. Wehner further stated:

> If you recall, it's very consistent with what we've been talking about it [sic] last couple of quarters, which is the acceleration of expense growth is really driven by 3 factors. It's the investments that we're making in safety and security; it's the content investments that we're making to support Watch and finally, it's innovation initiatives around our longer-term bets like AI, AR/VR and connectivity. It's those 3 factors.

If I had to point to what's really leading us to tighten the range, it's really the first factor, which is the safety and security investments. Specifically, we're putting more behind that more quickly than we anticipated. And so that's where you're going to see it come up. If you look at the current results from this quarter, you'll see that our sales and marketing expense grew 51 percent in the quarter. One of the—year-over-year—one of the factors driving that is that's where we're categorizing our community operations investment and other operations teams that support the quality initiatives and the safety initiatives. You're already seeing some of that getting picked up in the quarter, and you'll see that carry through in the year.

*See* Apr. 25, 2018 Earnings Call Tr. at 10, https://s21.q4cdn.com/399680738/files/doc_financials/2018/Q1/Q1-18-Earnings-call-transcript.pdf.

On the November 1, 2017 earnings call, Mr. Zuckerberg said:

I'm dead serious about this, and the reason I'm talking about this on our earnings call is that I've directed our teams to invest so much in security—on top of the other investments we're making—that it will significantly impact our profitability going forward, and I wanted our investors to hear that directly from me. I believe this will make our society stronger and in doing so will be good for all of us over the long term. But I want to be clear about what our priority is: protecting our community is more important than maximizing our profits.

*See* Nov. 1, 2017 Earnings Call Tr. at 2, https://s21.q4cdn.com/399680738/files/doc_financials/2017/Q3/Earnings-call-prepared-remarks.pdf.

On the November 1, 2017 earnings call, Mr. Wehner said:

We expect full-year 2018 total expenses will grow approximately 45–60% compared to full-year 2017.

We continue to invest aggressively across the business, but there are three important factors driving an acceleration in our expense growth rates from 2017 levels. First, as Mark outlined in his earlier comments, we are making sizeable

security investments in people and technology to strengthen our systems and prevent abuse.

*See* Nov. 1, 2017 Earnings Call Tr. at 9, https://s21.q4cdn.com/399680738/files/doc_financials/2017/Q3/Earnings-call-prepared-remarks.pdf.

**Response No. 3B**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows with respect to subpart (b). Without purporting to identify every "document, data source, forecast, model, analysis, communication, or other information" related to the quoted passage, Facebook identifies the following document: FB-CA-SECURITIES-3232314. Facebook reserves the right to supplement this response as discovery proceeds and additional information becomes available.

**Response No. 3C**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, the Individual Defendants respond as follows:

The Individual Defendants rely upon the Company's investigation, document review, and institutional resources in formulating their response to this Interrogatory, have no unique information that differs from the Company's responses within their personal knowledge, and on that basis, adopt Facebook's responses to Interrogatory No. 3. The Individual Defendants reserve the right to supplement this response as discovery proceeds and additional information becomes available.

**INTERROGATORY NO. 4:**

Identify all facts and documents that formed the basis for the following statements Defendants Facebook and Wehner made on Facebook's second quarter 2018 earnings call on July 25, 2018:

Turning now to the revenue outlook.

Our total revenue growth rate decelerated approximately 7 percentage points in Q2 compared to Q1. Our total revenue growth rates will continue to decelerate in the second half of 2018, and we expect our revenue growth rates to decline by high single digit percentages from prior quarters sequentially in both Q3 and Q4.

There are several factors contributing to that deceleration. For example, we expect currency to be a slight headwind in the second half vs. the tailwinds we have experienced over the last several quarters. We plan to grow and promote certain engaging experiences

> like Stories that currently have lower levels of monetization. We are also giving people who use our services more choices around data privacy which may have an impact on our revenue growth.
>
> Turning now to expenses.
>
> We continue to expect that full-year 2018 total expenses will grow in the range of 50–60% compared to last year. In addition to increases in core product development and infrastructure, this growth is driven by increasing investments in areas like safety & security, AR/VR, marketing, and content acquisition.
>
> Looking beyond 2018, we anticipate that total expense growth will exceed revenue growth in 2019. Over the next several years, we would anticipate that our operating margins will trend towards the mid-30s on a percentage basis.

Include, without limitation, in Your identification each document, data source, forecast, model, analysis, communication, or other information that You received, reviewed, relied upon, considered, and/or authored in advance of Facebook's second quarter 2018 earnings call concerning: (a) actual and anticipated revenue growth deceleration; (b) the impact of data privacy changes on revenue growth; (c) actual and anticipated expense growth; (d) increased investments in safety, security, and/or privacy; and (e) actual and anticipated operating margins.

**RESPONSE TO INTERROGATORY NO. 4:**

Defendants restate and incorporate their Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth herein.

Defendants object that this Interrogatory is overly broad and unduly burdensome in that it seeks "all facts and documents" forming the basis for a lengthy block quotation from the Q2 2018 earnings call, as well as "each document, data source, forecast, model, analysis, communication, or other information" that Defendants reviewed or authored in advance of the call, across five separate subject-matter categories. This open-ended request would require Defendants to identify every internal document, data source, forecast, model, analysis, and communication bearing on revenue, expenses, margins, privacy, and security reviewed by any person involved in the preparation of the Q2 2018 earnings call—an unduly burdensome undertaking that is disproportionate to the needs of the case. Defendants have produced over 1.4 million documents in this litigation, which are equally available to Lead Plaintiffs and which Lead Plaintiffs have the ability to review and search independently for this information. Requiring Defendants to identify for Lead Plaintiffs specific

documents, data sources, forecasts, models, analyses, and communications within their voluminous productions that Lead Plaintiffs are fully capable of reviewing themselves imposes a burden that is not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Defendants will respond based on a reasonable investigation of documents produced to Lead Plaintiffs concerning the July 25, 2018 earnings call and "(a) actual and anticipated revenue growth deceleration; (b) the impact of data privacy changes on revenue growth; (c) actual and anticipated expense growth; (d) increased investments in safety, security, and/or privacy; and (e) actual and anticipated operating margins."

Defendants object that this Interrogatory is compound in that it contains five distinct requests for documents concerning: (a) actual and anticipated revenue growth deceleration; (b) the impact of data privacy changes on revenue growth; (c) actual and anticipated expense growth; (d) increased investments in safety, security, and/or privacy; and (e) actual and anticipated operating margins. Each subpart constitutes a separate and distinct inquiry, such that this Interrogatory contains at least five distinct requests.

Defendants further object to the extent this Interrogatory seeks information that is protected by the attorney-client privilege and the attorney work-product doctrine. Defendants expressly reserve all applicable privileges and protections. *See* Fed. R. Evid. 502.

The Individual Defendants further object that this Interrogatory seeks information that is primarily within the institutional knowledge, possession, custody, and control of the Company, as the corporate entity, and is more appropriately directed to the Company rather than to the Individual Defendants in their personal capacities.

**Response No. 4A**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

Without purporting to identify every "document, data source, forecast, model, analysis, communication, or other information" concerning the five topics within the block-quoted passage, Facebook identifies the following document: FB-CA-SECURITIES-4776115. Facebook reserves the right to supplement this response as discovery proceeds and additional information becomes

available.

**Response No. 4B**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, the Individual Defendants respond as follows:

The Individual Defendants rely upon the Company's investigation, document review, and institutional resources in formulating their response to this Interrogatory, have no unique information that differs from the Company's response within their personal knowledge, and on that basis, adopt Facebook's response to Interrogatory No. 4. The Individual Defendants reserve the right to supplement this response as discovery proceeds and additional information becomes available.

**INTERROGATORY NO. 5:**

Identify the earliest date that You contend that You became aware that Dr. Aleksandr Kogan violated Facebook's Platform Policies by transferring Facebook user data to SCL or Cambridge Analytica and describe in detail any and all facts or contemporaneous documents that You believe support Your contention.

**RESPONSE TO INTERROGATORY NO. 5:**

Defendants restate and incorporate their Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth herein.

Defendants object that this Interrogatory is compound in that it requires Defendants to (i) identify a specific date, (ii) describe in detail "any and all facts" supporting their contention, and (iii) identify "contemporaneous documents" supporting that contention. Each of these subparts constitutes a separate and distinct inquiry such that this Interrogatory contains at least three distinct requests.

Defendants further object that this Interrogatory is unduly burdensome and disproportionate to the needs of the case to the extent it requires Defendants to identify specific contemporaneous documents within Defendants' document productions. Defendants have produced over 1.4 million documents in this litigation, which are equally available to Lead Plaintiffs and which Lead Plaintiffs have the ability to review and search independently for this information. Requiring Defendants to

identify for Lead Plaintiffs specific contemporaneous documents within their voluminous productions that Lead Plaintiffs are fully capable of reviewing themselves imposes a burden that is not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

Defendants further object to the extent this Interrogatory seeks information that is protected by the attorney-client privilege and the attorney work-product doctrine. Defendants expressly reserve all applicable privileges and protections. *See* Fed. R. Evid. 502.

Defendants further object that this Interrogatory is overbroad to the extent it seeks identification of "any and all facts or contemporaneous documents," which would require Defendants to catalog every potentially relevant fact and document before discovery is complete.

Defendants further object to this Interrogatory to the extent it assumes that knowledge is equivalent to scienter.

Defendants further object to this Interrogatory to the extent it asks for Facebook to respond based on the knowledge of any and all of its tens of thousands of employees. Defendants understand this Interrogatory to be seeking information that Lead Plaintiffs contend (but Defendants dispute) is relevant to scienter, but the scienter of a corporation may only be established by "[t]he scienter of the senior controlling officers of a corporation." *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015). Accordingly, Facebook will respond to this Interrogatory based on the personal knowledge of the Individual Defendants.

The Individual Defendants object that this Interrogatory asks them to identify the "earliest date" they became aware of specific facts concerning Dr. Kogan's alleged violation of Facebook's policies, which occurred more than a decade ago. Given the substantial passage of time, the Individual Defendants cannot reasonably be expected to recall the date on which they first learned particular facts from that period. This Interrogatory is objectionable to the extent it demands an unreasonable level of specificity regarding Individual Defendants' recollections after such a prolonged passage of time.

**Response No. 5A**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of

discovery in this action, the Individual Defendants respond as follows:

The Individual Defendants do not recall becoming aware of Dr. Kogan's violation of Facebook's policies before March 2018. The Individual Defendants' investigation is ongoing, and they reserve the right to supplement this response as discovery proceeds and additional information becomes available.

**Response No. 5B**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

To the extent Facebook's awareness of Dr. Kogan's violation may be established by the personal knowledge of the Individual Defendants, Facebook refers Lead Plaintiffs to Response No. 5A. Facebook otherwise refers Lead Plaintiffs to Response No. 6A. Facebook's investigation is ongoing, and it reserves the right to supplement this response as discovery proceeds and additional information becomes available.

**INTERROGATORY NO. 6:**

Identify all public disclosures dated prior to March 16, 2018 (including all such public disclosures that You made), that You contend made the public aware that SCL or Cambridge Analytica had obtained access to Facebook user data in violation of Facebook's Platform Policies. For each public disclosure, identify its date and time, author, publisher, title, Bates number, and the exact language You contend conveyed that information.

**RESPONSE TO INTERROGATORY NO. 6:**

Defendants restate and incorporate their Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth herein.

Defendants object that this Interrogatory is overly broad and unduly burdensome in that it requires Defendants to identify "all public disclosures" that "made the public aware" of certain information, without limitation as to source. This effectively requires Defendants to catalog every media report, regulatory filing, academic publication, blog post, social media post, or other communication worldwide that may have referenced Cambridge Analytica's access to Facebook user

data—an open-ended and enormously burdensome undertaking that extends far beyond information in Defendants' possession, custody, or control. Defendants further object to this Interrogatory to the extent it purports to require Defendants to identify specific language within each disclosure. The language of each disclosure is evident on its face; parsing, copying, and pasting the exact language from each disclosure is unduly burdensome and disproportionate to the needs of the case where Lead Plaintiffs may review the public disclosures themselves. Defendants will respond by providing a list of public disclosures that reported on SCL's or Cambridge Analytica's access to Facebook user data prior to March 16, 2018, and exemplar passages from those disclosures.

Defendants object that the phrase "made the public aware" is vague and ambiguous. Whether a particular disclosure "made the public aware" of certain facts is a legal conclusion that depends on the interpretation of the disclosure, the extent of its dissemination, and the audience that received it.

Defendants object that this Interrogatory is compound in that it requires Defendants to identify (i) each identified public disclosure, along with the accompanying (ii) date and time, (iii) author, (iv) publisher, (v) title, (vi) Bates number, and (vii) the "exact language" that conveyed the relevant information. Each subpart constitutes a separate and distinct inquiry such that this Interrogatory contains at least seven distinct requests.

Defendants object that this Interrogatory seeks information that is equally available to Lead Plaintiffs, including publicly available media reports that Lead Plaintiffs themselves have cited in the Complaint and other filings in this action.

Defendants object that this Interrogatory improperly requires Defendants to disclose the results of expert and legal analysis, investigation, and evaluation concerning Defendants' positions regarding disclosures that made the public aware of certain facts, which implicates Defendants' truth-on-the-market defense and other defenses. The necessary analysis, investigation, and evaluation cannot be completed at this stage of discovery. Defendants reserve the right to supplement their response to this Interrogatory at or after the close of discovery, consistent with Federal Rule of Civil Procedure 33(a)(2).

The Individual Defendants further object that this Interrogatory seeks information that is

primarily within the institutional knowledge, possession, custody, and control of the Company, as the corporate entity, and is more appropriately directed to the Company rather than to the Individual Defendants in their personal capacities.

**Response No. 6A**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

Without purporting to identify every public disclosure responsive to this Interrogatory, Facebook identifies the following publicly available disclosures that reported on SCL's or Cambridge Analytica's access to Facebook user data prior to March 16, 2018:

- Harry Davies, *Ted Cruz Using Firm that Harvested Data on Millions of Unwitting Facebook Users*, The Guardian (Dec. 11, 2015);
- Kif Leswing, *Ted Cruz's Secret Weapon: Your Facebook Likes*, Fortune (Dec. 11, 2015);
- Kate Knibbs, *Ted Cruz Might Have Your Facebook Data, Depending on How Broke Your Friends Are*, Gizmodo (Dec. 11, 2015);
- *Cruz Campaign Creeps on Facebook User Data in Search of Advantages*, RT (Dec. 12, 2015);
- Emma Roller, *Is It Ted Cruz's Party — Or Marco Rubio's?*, The New York Times (Dec. 15, 2015);
- Brendan Sasso, *Political Campaigns Are Spying on You, and There Are No Rules to Stop Them*, The Atlantic (Dec. 15, 2015);
- Harry Davies, *Ted Cruz Erased Trump's Iowa Lead by Spending Millions on Voter Targeting*, The Guardian (Feb. 1, 2016);
- McKenzie Funk, *Cambridge Analytica and the Secret Agenda of a Facebook Quiz*, The New York Times (Nov. 19, 2016);
- Yvonne Abraham, *Surveillance Is Everywhere Now*, Boston Globe (Nov. 30, 2016);
- Hannes Grassegger & Mikael Krogerus, *Trump Knows You Better Than You Know Yourself*, Antidote Zine (Jan. 22, 2017);

- Hannes Grassegger & Mikael Krogerus, *The Data That Turned the World Upside Down*, Vice (Jan. 28, 2017);
- Samson Simon Sharaf, *Democracy and the Power of Software*, The Nation (Feb. 3, 2017);
- Berit Anderson & Brett Horvath, *The Rise of the Weaponized AI Propaganda Machine*, Medium (Feb. 12, 2017);
- Jamie Doward, Carole Cadwalladr & Alice Gibbs, *Watchdog to Launch Inquiry into Misuse of Data in Politics*, The Observer (March 4, 2017);
- Hannes Grassegger & Mikael Krogerus, *Big Data and the Future of Democracy: The Matrix World Behind the Brexit and the US Elections*, Diplomat Magazine (March 5, 2017);
- Mattathias Schwartz, *Facebook Failed to Protect 30 Million Users from Having Their Data Harvested by Trump Campaign Affiliate*, The Intercept (March 30, 2017);
- Sue Halpern, *How He Used Facebook to Win*, The New York Review of Books (June 8, 2017);
- Nina Burleigh, *How Big Data Mines Personal Info to Craft Fake News and Manipulate Voters*, Newsweek (June 8, 2017);
- Stephanie Kirchgaessner, *Cambridge Analytica Used Data from Facebook and Politico to Help Trump*, The Guardian (Oct. 26, 2017).

By way of examples, the above disclosures included the following:

- "Ted Cruz's presidential campaign is using psychological data based on research spanning tens of millions of Facebook users, harvested largely without their permission, to boost his surging White House run and gain an edge over Donald Trump and other Republican rivals . . . ." Harry Davies, *Ted Cruz Using Firm that Harvested Data on Millions of Unwitting Facebook Users*, The Guardian (Dec. 11, 2015).
- "A little-known data company, now embedded within Cruz's campaign and indirectly financed by his primary billionaire benefactor, paid researchers at Cambridge University to gather detailed psychological profiles about the US electorate using a massive pool of mainly unwitting US Facebook users built with an online survey." Harry Davies, *Ted Cruz Using*

*Firm that Harvested Data on Millions of Unwitting Facebook Users*, The Guardian (Dec. 11, 2015).

- "Documents seen by the Guardian show Cambridge Analytica's parent, a London-based company called Strategic Communications Laboratories (SCL), was first introduced to the concept of using social media data to model human personality traits in early 2014 by Dr Aleksandr Kogan, a lecturer at Cambridge University's renowned psychology department. Kogan established his own company in spring that year and began working with SCL to deliver a 'large research project' in the US. His stated aim was to get as close to every US Facebook user into the dataset as possible." Harry Davies, *Ted Cruz Using Firm that Harvested Data on Millions of Unwitting Facebook Users*, The Guardian (Dec. 11, 2015).
- "The academic used Amazon's crowdsourcing marketplace Mechanical Turk (MTurk) to access a large pool of Facebook profiles, hoovering up tens of thousands of individuals' demographic data—names, locations, birthdays, genders—as well as their Facebook 'likes,' which offer a range of personal insights. This was achieved by recruiting MTurk users by paying them about one dollar to take a personality questionnaire that gave access to their Facebook profiles. This raised the alarm among some participants, who flagged Kogan for violating MTurk's terms of service. 'They want you to log into Facebook and then download a bunch of your information,' complained one user at the time." Harry Davies, *Ted Cruz Using Firm that Harvested Data on Millions of Unwitting Facebook Users*, The Guardian (Dec. 11, 2015).
- "Crucially, Kogan also captured the same data for each person's unwitting friends. For every individual recruited on MTurk, he harvested information about their friends, meaning the dataset ballooned significantly in size. Research shows that in 2014, Facebook users had an average of around 340 friends. Kogan assured the MTurk users their Facebook data would 'only be used for research purposes' and remain 'anonymous and safe.' However, the Facebook data was then used to generate sophisticated models of each of their personalities using the so-called 'big five' personality traits and characteristics—openness,

conscientiousness, extraversion, agreeableness, neuroticism (known as the OCEAN scale)." Harry Davies, *Ted Cruz Using Firm that Harvested Data on Millions of Unwitting Facebook Users*, The Guardian (Dec. 11, 2015).

- "By summer 2014, Kogan's company had created an expansive and powerful dataset. His business partner boasted on LinkedIn that their private outfit, Global Science Research (GSR), 'owns a massive data pool of 40+ million individuals across the United States—for each of whom we have generated detailed characteristic and trait profiles.' Documents show SCL agreed to a contract with GSR, whereby it would pay its data collection costs in order to improve 'match rates' against SCL's existing datasets or to enhance GSR's algorithm's 'national capacity to profile capacity of American citizens.'" Harry Davies, *Ted Cruz Using Firm that Harvested Data on Millions of Unwitting Facebook Users*, The Guardian (Dec. 11, 2015).
- "Republican Sen. Ted Cruz is tapping an unusual source of information to help his presidential bid. A little-known data company 'embedded' within his campaign is providing it with access to millions of psychological profiles created by scouring information people post in their Facebook profiles . . . ." Kif Leswing, *Ted Cruz's Secret Weapon: Your Facebook Likes*, Fortune (Dec. 11, 2015).
- "The Cruz campaign has tapped Cambridge Analytica, the U.S. affiliate of the London-based behavioral research company SCL Group, to help it with a push to better target potential voters with ads. The company reportedly has a cache of Facebook 'likes' that it is combin[ing] with existing political data like whether people vote in primary elections or own guns." Kif Leswing, *Ted Cruz's Secret Weapon: Your Facebook Likes*, Fortune (Dec. 11, 2015).
- "[V]oters may blanch at Cambridge Analytica reportedly collecting information from Facebook, apparently without user permission." Kif Leswing, *Ted Cruz's Secret Weapon: Your Facebook Likes*, Fortune (Dec. 11, 2015).
- "Cambridge Analytica's data seems to come from a Cambridge University professor named

Aleksandr Kogan, who started conducting a large-scale personality survey in 2014. He relied on Amazon's Mechanical Turk service to find people who wanted to participate in the study in exchange for compensation. Kogan's company paid people $1 to take the study and give access to their Facebook (FB) profiles, which would be automatically scoured for data like name, location, and gender, and Facebook likes." Kif Leswing, *Ted Cruz's Secret Weapon: Your Facebook Likes*, Fortune (Dec. 11, 2015).

- "But people who have never taken a Mechanical Turk survey might find themselves in the dataset, because Kogan's company also captured the same data for each respondent's friends. The vast majority of those contacts never gave Kogan permission to use their Facebook profiles." Kif Leswing, *Ted Cruz's Secret Weapon: Your Facebook Likes*, Fortune (Dec. 11, 2015).
- "Cambridge Analytica reportedly used the data to create the 'psychographic profiles' based on their individual personality traits that Cruz' [sic] campaign is now using to better target its online ads." Kif Leswing, *Ted Cruz's Secret Weapon: Your Facebook Likes*, Fortune (Dec. 11, 2015).
- "Ted Cruz's presidential campaign must love dumb friends. In addition to releasing an app that rewards people for turning over their friends' personal information, the campaign is leaning on a data analytics company that has paid people $1 for access to their Facebook data and their friends' data. Cambridge Analytica builds 'psychographic profiles' for the campaign using Facebook data. This is where things get weird: Even if you didn't agree to give your data to the company, it still might have access to it." Kate Knibbs, *Ted Cruz Might Have Your Facebook Data, Depending on How Broke Your Friends Are*, Gizmodo (Dec. 11, 2015).
- "The Guardian reports that Cambridge Analytica's parent company, Strategic Communications Laboratories, has gathered Facebook data by paying people around $1 for it on Mechanical Turk, Amazon's marketplace for buying and selling 'human intelligence.' For a buck, Mechanical Turk users took personality questionnaires that allowed access to their

Facebook profiles." Kate Knibbs, *Ted Cruz Might Have Your Facebook Data, Depending on How Broke Your Friends Are*, Gizmodo (Dec. 11, 2015).

- "Aleksandr Kogan, a psychology professor at Cambridge University, told The Guardian how the Mechanical Turk gambit didn't limit the data collection to the people who sold out for a dollar. Anyone who happened to be Facebook friends with one of Mechanical Turk's cheapo mercenaries was fair game: 'Crucially, Kogan also captured the same data for each person's unwitting friends. For every individual recruited on MTurk, he harvested information about their friends, meaning the dataset ballooned significantly in size. Research shows that in 2014, Facebook users had an average of around 340 friends.'" Kate Knibbs, *Ted Cruz Might Have Your Facebook Data, Depending on How Broke Your Friends Are*, Gizmodo (Dec. 11, 2015).
- "Facebook failed to protect 30 million users from having their data harvested by Trump campaign affiliate. Survey participants did not know that 'likes' and demographic data from their Facebook profiles were being harvested by political operatives." Mattathias Schwartz, *Facebook Failed to Protect 30 Million Users from Having Their Data Harvested by Trump Campaign Affiliate*, The Intercept (March 30, 2017).
- "The Intercept interviewed five individuals familiar with Kogan's work for SCL. All declined to be identified, citing concerns about an ongoing inquiry at Cambridge and fears of possible litigation. Two sources familiar with the SCL project told The Intercept that Kogan had arranged for more than 100,000 people to complete the Facebook survey and download an app. A third source with direct knowledge of the project said that Global Science Research obtained data from 185,000 survey participants as well as their Facebook friends. The source said that this group of 185,000 was recruited through a data company, not Mechanical Turk, and that it yielded 30 million usable profiles. No one in this larger group of 30 million knew that 'likes' and demographic data from their Facebook profiles were being harvested by political operatives hired to influence American voters." Mattathias Schwartz, *Facebook Failed to Protect 30 Million Users from Having Their Data Harvested by Trump Campaign*

*Affiliate*, The Intercept (March 30, 2017).

- "[A]ll five of the sources interviewed by The Intercept confirmed that Kogan's work on behalf of SCL involved collecting data from survey participants' networks of Facebook friends, individuals who had not themselves consented to give their data to Global Science Research and were not aware that they were the objects of Kogan's study." Mattathias Schwartz, *Facebook Failed to Protect 30 Million Users from Having Their Data Harvested by Trump Campaign Affiliate*, The Intercept (March 30, 2017).
- "Shortly after The Guardian published its 2015 article, Facebook contacted Global Science Research and requested that it delete the data it had taken from Facebook users. Facebook's policies give Facebook the right to delete data gathered by any app deemed to be 'negatively impacting the Platform.' The company believes that Kogan and SCL complied with the request, which was made during the Republican primary, before Cambridge Analytica switched over from Ted Cruz's campaign to Donald Trump's. It remains unclear what was ultimately done with the Facebook data, or whether any models or algorithms derived from it wound up being used by the Trump campaign." Mattathias Schwartz, *Facebook Failed to Protect 30 Million Users from Having Their Data Harvested by Trump Campaign Affiliate*, The Intercept (March 30, 2017).

Facebook reserves the right to supplement this response as discovery proceeds and additional information becomes available.

**<u>Response No. 6B</u>**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, the Individual Defendants respond as follows:

The Individual Defendants rely upon the Company's investigation, document review, and institutional resources in formulating their response to this Interrogatory, have no unique information that differs from the Company's responses within their personal knowledge, and on that basis, adopt Facebook's response to Interrogatory No. 6. The Individual Defendants reserve the right to supplement this response as discovery proceeds and additional information becomes available.

**INTERROGATORY NO. 7:**

State whether You contend that, following the Initial Misuse, Facebook users whose data had been transferred to SCL or Cambridge Analytica retained the ability to Control whether those third parties retained, possessed, used, processed, transferred, disclosed, or deleted their data. If You so contend, describe in detail all facts supporting that contention.

**RESPONSE TO INTERROGATORY NO. 7:**

Defendants restate and incorporate their Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth herein.

Defendants incorporate and reassert their objection to Lead Plaintiffs' definitions of "Initial Misuse" and "SCL."

Defendants object that this Interrogatory is compound in that it has two distinct subparts: (i) whether Defendants "contend that, following the Initial Misuse, Facebook users whose data had been transferred to SCL or Cambridge Analytica retained the ability to Control whether those third parties retained, possessed, used, processed, transferred, disclosed, or deleted their data"; and (ii) a request that Defendants "describe in detail all facts supporting that contention." Each of these subparts constitutes a separate and distinct inquiry such that this Interrogatory contains at least two distinct requests.

The Individual Defendants further object that this Interrogatory seeks information that is primarily within the institutional knowledge, records, and control of the Company, as the corporate entity, and is more appropriately directed to the Company rather than to the Individual Defendants in their personal capacities.

**Response No. 7A**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Facebook responds as follows:

Facebook did not represent that Facebook users had "Control" as defined by Lead Plaintiffs—which includes the unilateral ability to "prevent or terminate a third party's possession, retention, processing, use, disclosure, or transfer" or "cause deletion of all copies and derivatives" of their

Facebook data within the possession of a third party without that party's "voluntary compliance." Indeed, throughout the class period and before it, Facebook's user-facing policies and public disclosures informed users that certain third parties could access and receive user data and that Facebook could not guarantee or control the actions of third parties who obtained user data through the developer platform.

As far back as 2007, Facebook's Privacy Policy informed users that while Facebook required Platform Developers to enter into agreements "which, among other things, requires them to respect your privacy settings and strictly limits their collection, use, and storage of your information," Facebook "of course cannot and do[es] not guarantee that all Platform Developers will abide by such agreements." FB-CA-SECURITIES-2367235 at 240 (Facebook May 24, 2007 Privacy Policy). Facebook's Privacy Policy further noted that Facebook "cannot control how such Platform Developers use any personal information that they may obtain in connection with Platform Applications," and directed users to "review [developers'] terms and policies carefully before using any Platform Application." *Id.*; *see also* FB-CA-SECURITIES-1495887 at 889 (Facebook Oct. 5, 2010 Privacy Policy) ("You should always review the policies of third party applications and websites to make sure you are comfortable with the ways in which they use information you share with them. We do not guarantee that they will follow our rules.").

Facebook's November 2013 Data Use Policy similarly disclosed that "games, applications and websites are created and maintained by other businesses and developers who are not part of, or controlled by, Facebook, so you should always make sure to read their terms of service and privacy policies to understand how they treat your data." FB-CA-SECURITIES-0019572 at 579 (Facebook Nov. 15, 2013 Data Use Policy). The policy further informed users that "if you've removed an application and want it to delete the information you've already shared with it, you should contact the application." *Id.* at 580.

Facebook's Data Policy contained similar disclosures throughout the class period. The policy informed users that "[w]hen you use third-party apps, websites or other services that use, or are integrated with, our Services, they may receive information about what you post or share." FB-CA-

SECURITIES-0019552 at 554 (Facebook Sept. 29, 2016 Data Policy). The policy also expressly informed users that "Information collected by these apps, websites or integrated services is subject to their own terms and policies"—not Facebook's policies. *Id.* Facebook's Statement of Rights and Responsibilities ("SRR") also expressly disclaimed that "FACEBOOK IS NOT RESPONSIBLE FOR THE ACTIONS . . . OF THIRD PARTIES." *See, e.g.*, FB-CA-SECURITIES-0019704 at 707–08 (Facebook Jan. 30, 2015 SRR).

Facebook also disclosed that information users shared on Facebook could be reshared with third parties. *See, e.g.*, FB-CA-SECURITIES-1496032 at 035 (Facebook Sept. 7, 2011 Data Use Policy) ("Just like when you share information by email or elsewhere on the web, information you share on Facebook can be re-shared. This means that if you share something on Facebook, anyone who can see it can share it with others, including the games, applications, and websites they use."); FB-CA-SECURITIES-0019557 at 565 (Facebook Dec. 11, 2012 Data Use Policy). Facebook warned, "Always think before you post. Just like anything else you post on the web or send in an email, information you share on Facebook can be copied or re-shared by anyone who can see it." FB-CA-SECURITIES-0019572 at 576–77 (Facebook Nov. 15, 2013 Data Use Policy). In its Data Policy, Facebook repeated, "people you share and communicate with may download or re-share this content with others on and off our Services." *E.g.*, FB-CA-SECURITIES-0019547 at 549 (Facebook Jan. 30, 2015 Data Policy); FB-CA-SECURITIES-0019552 at 554 (Facebook Sept. 29, 2016 Data Policy).

Facebook reserves the right to supplement this response as discovery proceeds and additional information becomes available.

**Response No. 7B**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, the Individual Defendants respond as follows:

The Individual Defendants rely upon the Company's investigation, document review, and institutional resources in formulating their response to this Interrogatory, have no unique information that differs from the Company's responses within their personal knowledge, and on that basis, adopt

Facebook's response to Interrogatory No. 7. The Individual Defendants reserve the right to supplement this response as discovery proceeds and additional information becomes available.

**INTERROGATORY NO. 8:**

State whether You contend that any portion of the March 2018 Price Declines resulted from information concerning Cambridge Analytica's continued use or retention of Facebook user data rather than Initial Misuse, and if so, whether You contend that such Price Decline(s) would have occurred from that information if the Initial Misuse had never occurred. If You so contend, describe in detail all facts supporting that contention, including the exact language or information that You contend caused or resulted in any part of any decline.

**RESPONSE TO INTERROGATORY NO. 8:**

Defendants restate and incorporate their Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth herein.

Defendants incorporate and reassert their objection to Lead Plaintiffs' definitions of "March 2018 Price Declines," "Price Decline(s)," and "Initial Misuse."

Defendants object that this Interrogatory is improper and unduly burdensome because it requires Defendants to disclose the results of expert and/or legal analysis, investigation, and evaluation that cannot be completed at this stage of discovery and attempts to impose an obligation to disclose expert testimony outside of the deadlines in the Court's scheduling order. Whether any portion of the March 2018 Price Declines is attributable to information concerning Cambridge Analytica's continued use or retention of Facebook user data, as distinct from the Initial Misuse, requires expert analysis. So too is whether any such decline would have occurred under a hypothetical scenario in which the Initial Misuse never took place. Contention interrogatories cannot be used to require a party, including the Individual Defendants in their personal capacities, to provide answers on economic, statistical, or other specialized matters that are outside their personal knowledge and properly the subject of expert testimony. Defendants will disclose their expert reports in accordance with the Court's scheduling order and reserve the right to supplement their response at or after the close of discovery, consistent with Federal Rule of Civil Procedure 33(a)(2).

Defendants object that this Interrogatory is compound in that it contains multiple discrete inquiries requiring separate and distinct analyses: (i) whether Defendants contend that any portion of the March 2018 Price Declines resulted from information concerning Cambridge Analytica's "continued use or retention" of data rather than the "Initial Misuse"; (ii) whether Defendants contend that such Price Declines would have occurred from that information if the "Initial Misuse" had never occurred; and (iii) a request to describe "in detail all facts supporting that contention, including [(iv)] the exact language or information" that Defendants contend caused or resulted in any part of any decline. Each of these subparts constitutes a separate and distinct inquiry such that this Interrogatory contains at least four distinct requests.

Defendants further object that this Interrogatory improperly seeks to reverse the burden of proof. Lead Plaintiffs bear the burden of proving loss causation, including disaggregating any portion of the March 2018 Price Declines attributable to information other than the alleged misrepresentations. Requiring Defendants to gather facts and devise a theory, including a counterfactual theory, on an element that Lead Plaintiffs must prove is inappropriate and unduly burdensome.

The Individual Defendants further object that this Interrogatory seeks information that is not within their knowledge, possession, custody, and control. Such information is primarily within the institutional knowledge, possession, custody, and control of the Company, as the corporate entity, if at all, and this Interrogatory is more appropriately directed to the Company rather than to the Individual Defendants in their personal capacities.

**Response No. 8**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Defendants respond as follows:

Defendants contend that they did not commit securities fraud, and therefore contend that their alleged violations did not cause the March 2018 Price Declines. Defendants otherwise do not currently have contentions about the cause(s) of the March 2018 Price Declines, and Defendants do not need to have such contentions because they do not bear the burden of proof to establish what

caused those stock price declines. It is Lead Plaintiffs' burden to establish that the alleged violations caused those stock price declines, but they have yet to offer any evidence in support of their claim (other than "preliminary" opinions from their expert, Jonah Gelbach, that are subject to change). If and when Lead Plaintiffs do offer such evidence, Defendants intend to rebut that evidence and show that Lead Plaintiffs do not meet their burden of proof.

Notwithstanding the foregoing, Defendants contend that the alleged misrepresentations regarding Initial Misuse did not cause the March 2018 Price Declines, and refer Lead Plaintiffs to Response No. 2 to Interrogatory No. 2 for an explanation regarding that contention.

Defendants' investigation is ongoing, and Defendants reserve the right to supplement or amend this response at or after the close of discovery, including after the completion of expert discovery on loss causation and damages.

**INTERROGATORY NO. 9:**

Identify each component of the revenue-growth deceleration, expense growth, security or privacy investment, and operating-margin reduction discussed during Facebook's July 25, 2018 earnings announcement or conference call that You contend was not caused, in whole or in part, by Facebook's response to or remediation of: (a) the Initial Misuse; (b) the termination, modification, or remediation of Whitelisting or other practices related to third parties' access to Facebook users' data; (c) expanded user privacy controls or changes in Facebook's rules regarding how user data could be used; or (d) increased auditing, monitoring, enforcement, security, legal, regulatory, or compliance activity arising from those matters.

**RESPONSE TO INTERROGATORY NO. 9:**

Defendants restate and incorporate their Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth herein.

Defendants object that this Interrogatory is unduly burdensome because it improperly requires Defendants to disclose the results of expert and/or legal analysis, investigation, and evaluation that cannot be completed at this stage of discovery and attempts to impose an obligation to disclose expert testimony outside of the deadlines in the Court's scheduling order. Defendants will disclose their

expert reports in accordance with the Court's scheduling order and reserve the right to supplement their response at or after the close of discovery, consistent with Federal Rule of Civil Procedure 33(a)(2).

Defendants object that this Interrogatory is compound in that it asks Defendants to separately analyze four distinct financial metrics (revenue-growth deceleration, expense growth, security or privacy investment, and operating-margin reduction) against four separate categories of potential causes: "(a) the Initial Misuse; (b) the termination, modification, or remediation of Whitelisting or other practices related to third parties' access to Facebook users' data; (c) expanded user privacy controls or changes in Facebook's rules regarding how user data could be used; or (d) increased auditing, monitoring, enforcement, security, legal, regulatory, or compliance activity arising from those matters." Each subpart constitutes a separate and distinct inquiry, such that this Interrogatory contains at least 16 distinct requests.

Defendants incorporate and reassert their objection to Lead Plaintiffs' definitions of "Initial Misuse" and "Whitelisting" as set forth in Defendants' Objections to Definitions above.

Defendants object that this Interrogatory is unduly burdensome because it improperly assumes that the financial metrics discussed on the July 25, 2018 earnings call were, or could have been, caused by the categories of conduct enumerated in subparts (a) through (d), then asks Defendants to identify which components were "not" so caused. This framing improperly reverses the burden of proof. Lead Plaintiffs bear the burden of proving loss causation. Lead Plaintiffs cannot shift their burden on a fact-intensive element of their claim to Defendants; requiring Defendants to disaggregate every component of Facebook's financial results and to disprove a causal connection that Lead Plaintiffs must establish is inappropriate and unduly burdensome.

The Individual Defendants further object that this Interrogatory seeks information that is not within their knowledge, possession, custody, and control. Such information is primarily within the institutional knowledge, possession, custody, and control of the Company, as the corporate entity, if at all, and this Interrogatory is more appropriately directed to the Company rather than to the Individual Defendants in their personal capacities.

**<u>Response No. 9</u>**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Defendants respond as follows:

Defendants contend they did not commit securities fraud. Because Defendants did not commit fraud, no component of Facebook's reported results or guidance reflected the response to or remediation of any fraud.

Defendants contend that the factors that contributed to Facebook's second quarter 2018 results and its guidance for the remainder of 2018 and beyond were the factors Defendants identified on the July 25, 2018 earnings call, including those set forth below.

**Revenue-Growth Deceleration**. On the July 25, 2018 earnings call, Mr. Wehner stated:

> Our total revenue growth rate decelerated approximately 7 percentage points in Q2 compared to Q1. Our total revenue growth rates will continue to decelerate in the second half of 2018, and we expect our revenue growth rates to decline by high single digit percentages from prior quarters sequentially in both Q3 and Q4.
>
> There are several factors contributing to that deceleration. For example, we expect currency to be a slight headwind in the second half vs. the tailwinds we have experienced over the last several quarters. We plan to grow and promote certain engaging experiences like Stories that currently have lower levels of monetization. We are also giving people who use our services more choices around data privacy which may have an impact on our revenue growth.

*See* July 25, 2018 Earnings Call Tr. at 7, https://s21.q4cdn.com/399680738/files/doc_financials/2018/Q2/Q218-earnings-call-transcript.pdf. Mr. Wehner further stated, "I'd note that European ad revenue growth decelerated more quickly than other regions and was impacted primarily by reduced currency tailwinds and, to a lesser extent, the rollout of GDPR." *Id.* at 7. In response to a question about what was driving the deceleration, Mr. Wehner further stated:

> In terms of what is—what is driving the deceleration, I—it's a combination

of factors, and I think I outlined those in my commentary.

First of all, there's the currency, which is going from being a tailwind to being a modest headwind, we expect. Secondly, we're going to be focusing on growing engaging new experiences like Stories and promoting those, and that's going to have a negative impact on revenue growth.

And then finally, we're giving people who use service—the services more choice around privacy. And that's coming both in terms of impacts that could be ongoing from things like GDPR as well as other product options that we're providing that could have an impact on revenue growth.

It's a combination of all those factors that is leading to—leading to the deceleration of revenue growth in the second half.

*Id*. at 12. Mr. Wehner further stated:

GDPR didn't have a significant impact in Q2, partially because of its implementation date so you're just seeing effectively one month of it in terms of—in terms of revenue. We do think that there will be some modest impact—and I don't want to overplay these factors—but you've use [sic] got a couple things going on.

You've got the impact of the opt-outs. And while we're very pleased with the vast majority of people opting in to the third party data use, some did not. That'll have a small impact on revenue growth. And then we're also seeing some impact from how advertisers are using their own data for targeting. Again, that will have a modest impact on growth.

And then in addition, we're continuing to focus our product development around putting privacy first. And that's going to—that's going to—we believe—have some impact on revenue growth.

*Id*. at 18–19. In response to a question about the magnitude of the deceleration, Mr. Wehner stated, "The—this is a move we consistently have seen over the last eight quarters—constant currency

deceleration. There's a continuation of this trend. I don't think there's anything beyond that and the factors that I outlined." *Id*. at 22.

**Expense Growth and Security and Privacy Investment**. On the July 25, 2018 earnings call, Mr. Wehner stated, "We continue to expect that full-year 2018 total expenses will grow in the range of 50–60% compared to last year. In addition to increases in core product development and infrastructure, this growth is driven by increasing investments in areas like safety & security, AR/VR, marketing, and content acquisition." *See* July 25, 2018 Earnings Call Tr. at 8, https://s21.q4cdn.com/399680738/files/doc_financials/2018/Q2/Q218-earnings-call-transcript.pdf. On that earnings call, Mr. Zuckerberg stated, "Looking ahead, we will continue to invest heavily in security and privacy because we have a responsibility to keep people safe. But as I've said on past calls, we're investing so much in security that it will significantly impact our profitability. We're starting to see that this quarter." *Id*. at 2. In response to a question about Facebook's role with respect to elections, Mr. Zuckerberg stated:

> [W]e've built a playbook out that has included building AI tools to identify thousands of fake accounts and Groups and Pages that violate the policies. It's included growing the security and content review teams to 20,000 people to be able to handle the volume of work that we need to do.

*Id*. at 24.

Facebook's security investments, and their expected impact on profitability, were announced before the March 2018 reporting concerning Cambridge Analytica and the June 2018 reporting concerning the alleged Whitelisting. Mr. Zuckerberg said on the November 1, 2017 earnings call that he had "directed our teams to invest so much in security—on top of the other investments we're making—that it will significantly impact our profitability going forward." Defendants refer Lead Plaintiffs to Response No. 3A to Interrogatory No. 3.

**Operating-Margin Reduction**. On the July 25, 2018 earnings call, Mr. Wehner stated, "Looking beyond 2018, we anticipate that total expense growth will exceed revenue growth in 2019. Over the next several years, we would anticipate that our operating margins will trend

towards the mid-30s on a percentage basis." *See* July 25, 2018 Earnings Call Tr. at 8, https://s21.q4cdn.com/399680738/files/doc_financials/2018/Q2/Q218-earnings-call-transcript.pdf. Mr. Wehner further stated:

> In addition to those core developments, we're also making the significant long-term investments in the [sic] safety and security. Those investments are in the billions of dollars per year; those will have a negative impact on margins. . . .
>
> . . . .
>
> Secondly, we're continuing to make big investments in innovation, those we believe are attractive long-term investments. Things that I would point to are things like AI as well as investments in AR and VR. . . .
>
> . . . .
>
> Attractive investments, we believe, but ones that will take longer-term to pay off and thus, would have a dilutive effect in margins in the near-term. Those are the two factors that I would point to.

*Id*. at 11. Mr. Wehner further stated:

> As it relates to margin profile, you also just have the factor that you're increasing growth—the increasing mix of the business is shifting towards Asia and towards what are currently lower-ARPU markets.
>
> And so while those are very attractive, we believe to serve—both in the near- and in the long-run—they're going to have a different impact on margin, because the cost to support those users relative to the revenue they bring in does have a—does have an impact on margins in the medium-term.

*Id*. at 19–20.

Defendants' investigation is ongoing, and Defendants reserve the right to supplement this response as discovery proceeds and additional information becomes available, including after the completion of expert discovery on loss causation and damages.

**INTERROGATORY NO. 10:**

Identify each source that You contend revealed facts regarding the false or misleading nature of the Risk Factor Statements or User Control Statements prior to the March 2018 Price Declines, or between the March 2018 Price Declines and July 2018 Price Decline, along with the exact language that You rely on for forming the basis for Your contention.

**RESPONSE TO INTERROGATORY NO. 10:**

Defendants restate and incorporate their Preliminary Statement, General Objections, Objections to Definitions, and Objections to Instructions as though fully set forth herein.

Defendants incorporate and reassert their objection to Lead Plaintiffs' definitions of "July 2018 Price Decline," "March 2018 Price Declines," "Price Decline(s)," "Risk Factor Statements," and "User Control Statements."

Defendants object that this Interrogatory improperly requires disclosure of the results of expert and legal analysis, investigation, and evaluation concerning Defendants' positions regarding the truth-on-the-market defense and other defenses bearing on loss causation. Discovery is ongoing, and Defendants have not yet had a full opportunity to complete their investigation, review all relevant documents, take all relevant depositions, or consult with all necessary experts. Defendants reserve the right to supplement their response at or after the close of fact and expert discovery, consistent with Federal Rule of Civil Procedure 33(a)(2).

Defendants object that this Interrogatory is overly broad and unduly burdensome in that it seeks "each source" that revealed facts regarding the allegedly false or misleading nature of the challenged statements, along with the "exact language" relied upon, without any limitation as to source type. This effectively requires Defendants to catalog every media report, regulatory filing, academic publication, analyst report, and other public disclosure that may bear on the truth or accuracy of the challenged statements, a burden that is disproportionate to the needs of the case.

Defendants object that this Interrogatory seeks information that is equally available to Lead Plaintiffs, including publicly available media reports, analyst reports, and regulatory filings.

Defendants object that this Interrogatory is compound in that it requires Defendants to

separately identify "each source," along with "exact language," bearing on two distinct categories of statements (Risk Factor Statements and User Control Statements) across two distinct time periods (prior to the March 2018 Price Declines and between the March 2018 Price Declines and the July 2018 Price Decline). Each of these subparts constitutes a separate and distinct inquiry such that this Interrogatory contains at least eight distinct requests.

The Individual Defendants further object that this Interrogatory seeks information that is primarily within the institutional knowledge, records, and control of the Company, as the corporate entity, and is more appropriately directed to the Company rather than to the Individual Defendants in their personal capacities.

**Response No. 10**

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Defendants respond as follows:

Defendants do not contend that the Risk Factor Statements or User Control Statements were false or misleading. Therefore, Defendants do not contend that any sources reveal facts regarding the false or misleading nature of those statements. Defendants reserve the right to supplement this response as discovery and expert analysis proceed.

Dated: October 19, 2026

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Brian M. Lutz*

Brian M. Lutz
Michael J. Kahn
Martie Kutscher
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Tel: 415.393.8200
Fax: 415.393.8306
blutz@gibsondunn.com
mjkahn@gibsondunn.com
mkutscherclark@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Joshua S. Lipshutz
1700 M Street, N.W.
Washington, DC 20036-4504
Tel: 202.955.8217
Fax: 202.530.9614
jlipshutz@gibsondunn.com

*Attorneys for Defendants Facebook, Inc., Mark E. Zuckerberg, Sheryl K. Sandberg, and David M. Wehner*